# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ———————————————— x | | |
| CITY OF WARWICK RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | : : : : | Case No.<br><br>CLASS ACTION |
| Plaintiff, | : : | |
| vs. | : : | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| CONCHO RESOURCES INC., CONOCOPHILLIPS (SUCCESSOR-IN-INTEREST TO CONCHO RESOURCES INC.), TIMOTHY A. LEACH, JACK F. HARPER, C. WILLIAM GIRAUD, BRENDA R. SCHROER, and E. JOSEPH WRIGHT | : : : : : : : : : | DEMAND FOR JURY TRIAL |
| Defendants. | : : | |
| ———————————————— x | | |

**INTRODUCTION**

Plaintiff City of Warwick Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Concho Resources Inc. ("Concho" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**OVERVIEW OF THE ACTION**

1.      This is a securities class action brought on behalf of all persons or entities who purchased or otherwise acquired Concho common stock from February 21, 2018 through July 31, 2019, inclusive (the "Class Period"). The action is brought against Concho, ConocoPhillips as the Company's successor-in-interest having acquired Concho January 2021, and certain of Concho's officers and/or directors during the Class Period (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.      At all relevant times, Concho was engaged in the acquisition, development, exploration, and production of oil and natural gas properties, primarily in the Permian Basin. In 2018, Concho planned and constructed the Dominator Project ("Dominator") in the Delaware Basin, part of the larger Permian Basin. Dominator, consisting of 23 wells, was incredibly large in scope.

3.      During the Class Period, Concho repeatedly touted to investors that the Company's transition to large-scale development projects, including Dominator, generated cost

savings, optimized resource recovery, and was designed to mitigate well-spacing risks.  As an extension of this "evolution" to large-scale development, Defendants told investors that at Dominator in particular, the Company was engaging in "spacing tests" and "seeing the results [they] expect[ed]."

4.      However, despite Defendants' efforts to portray Dominator as a density test, the well spacing at Dominator was a highly reckless gamble of exorbitant cost premised on no reasonable basis to believe it would work as intended.  Moreover, Defendants' portrayal of Dominator as an outlier compared to other projects in terms of spacing density was false and misleading.  Indeed, unbeknownst to investors, current and upcoming 2018-2019 projects were also using aggressively dense well spacing, and therefore subject to the same risks.

5.      Importantly, aggressively tight well spacing can create underground interference between the wells and permanently decrease production rates.  Therefore, well spacing is material to investors.

6.      After the close of trading on July 31, 2019 and during the following trading day on August 1, 2019, Defendants shocked the market by revealing the wells at Dominator were spaced "too tight."  As a result, the Company disclosed that it had drastically reduced its total active rig count to avoid overshooting budgets and would be forced to scale down production targets for the rest of the year.  Defendants also disclosed that moving forward, Concho would begin spacing *all of its wells* farther apart—revealing at the same time that certain current and upcoming projects were "moderately more dense" in terms of spacing.

7.      In response to the disclosure, an analyst at Jeffries in a report dated August 5, 2019, expressed frustration that while the Company had previously stated Dominator "was not

representative of the company's development plans … it turns out operations were not consistent with that message."

8. Put simply, Concho's wager on Dominator and density testing in general was such an unmitigated failure that it would impact the entirety of the Company's 2019 operations and beyond.  On this news, Concho shares declined approximately 22 percent in a single day on August 1, 2019, as the artificial inflation was removed from Company stock.

9. As would be revealed following the end of the Class Period, it would take until 2020 to fully unwind the impacts of these "tests" at Dominator and elsewhere.

10. As a result of the foregoing, during the Class Period, Defendants made materially false and misleading statements regarding the Company's business and financial prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the well spacing at Dominator was aggressive and highly risky, and premised on no reasonable basis to believe it would work as intended; (2) Concho's practice of implementing tighter well spacing was not relegated to a handful of "tests" and therefore more widespread than the market was led to believe; (3) it was known or recklessly disregarded that any measures to mitigate well spacing risks were non-existent and or/impossible; (4) these risks had manifested during the Class Period, causing underground well interference and permanently decreasing production, forcing the Company to scale back production targets and adopt more conservative spacing measures in its other projects; (5) it would take multiple quarters to unwind the impacts of the widespread well spacing failure; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as ConocoPhillips, Concho's successor-in-interest, is headquartered in this District, does a significant portion of its business in this District, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Concho common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

16.     Defendant Concho was, at all relevant times, incorporated in Delaware and headquartered in Midland, Texas.  At all relevant times the Company's stock was listed on the NYSE under the ticker symbol "CXO."

17.     Defendant ConocoPhillips is incorporated in Delaware and headquarted in Houston, Texas.   In January 2021 ConocoPhillips acquired the Company in an all-stock

transaction valued at $9.7 billion.  ConocoPhillips is named herein as the successor-in-interest to Concho.

18.     Defendant Timothy A. Leach ("Leach") was, at all relevant times, Concho's Chief Executive Officer ("CEO"), and the Chairman of the Company's Board of Directors.

19.     Defendant Jack F. Harper ("Harper") was Concho's President at all relevant times and Chief Financial Officer ("CFO") until January 2019.

20.     Defendant C. William Giraud ("Giraud") was Concho's Executive Vice President at all relevant times and Chief Operating Officer ("COO") from January 2019.

21.     Defendant Brenda R. Schroer ("Schroer") was Concho's Treasurer and Senior Vice President at all relevant times, Chief Accounting Officer until January 2019, and CFO from January 2019.

22.     Defendant E. Joseph Wright ("Wright") was Concho's Director, Executive Vice President, and COO from the start of the Class Period until January 2019.

23.     Defendants Leach, Harper, Giraud, Schroer, and Wright are sometimes collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Concho's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that

the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24.     Concho, ConocoPhillips successor-in-interest to Concho, and the Individual Defendants, are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     During the Class Period, Concho was incorporated in Delaware and headquartered in Midland, Texas.  The Company described itself as an independent oil and natural gas company engaged in the acquisition, development, exploration, and production of oil and natural gas properties, primarily in the Permian Basin of West Texas and Southeast New Mexico.

26.     The Permian Basin is one of the most prolific oil and natural gas producing regions in the United States and is characterized by an extensive production history, long reserve life, multiple producing horizons, and significant recovery potential.  According to the Company, Concho's legacy in the Permian Basin provided it with a deep understanding of operating and geological trends as it further developed its resource base utilizing long-lateral wells and multi-well pad locations.

27.     In 2018, Concho assembled seven drilling rigs owned by six different contractors and five fracturing fleets on a mile-long tract of land to build Dominator.  The effort took the better part of a year and, in the end, it delivered 23 wells at an average horizontal distance of 230 feet targeting five individual target horizons in the Wolfcamp Shale formation.  The location, in the northern Delaware Basin, was selected because of its purported substantial yield potential.

## Materially False and Misleading Statements

28.     The Class Period begins on February 21, 2018.  On that date, Concho held a conference call with analysts and investors to discuss the Company's fourth quarter 2017 financial results.  On the call, Defendant Leach touted the Company's "validated well spacing, lateral placement and completion design" as key to Concho's growth for the foreseeable future:

> Our accomplishments last year paved the way for continued operational and financial performance for the next decade. Our development activities **validated well spacing, lateral placement and completion design**, and our strategic acquisitions and asset exchanges added complementary leasehold for long lateral development. **The result is more high quality reinvestment opportunities to fuel our growth**.

29.     Additionally on the call, in response to analyst questions, Defendant Harper stated that Concho had "successfully made [the] transition" to "large-scale development," which mitigated the risk of child wells:

> Sure, and **that is one of the reasons to move to the large-scale development as we have, and I think we've successfully made that transition and so you will see more of that in the future to attempt to avoid creating child wells. Where there are child wells, which is a smaller percentage of our opportunities, we will continue to test that and make sure that we try not to leave any behind.**

Defendant Harper also stated that the Company had "modeled [no degradation] based on the spacing that has either already happened or will happen in the future."

30.     That same day, Concho released its 2017 annual report on SEC Form 10-K after the close of trading (the "2017 10-K").  The 2017 10-K's mandatory risk disclosures made no mention of the risks associated with well spacing.  Instead, the relevant risk factors merely stated that "multi-well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production."  Further, in discussing the Wolfcamp shale formation, the 2017 10-K stated that Concho continued to "leverage leading-

edge horizontal drilling and completion technologies, utilizing multi-well pad sites and extended lateral lengths, to develop [this] producing formation[]."

31.     On March 28, 2018, following Concho's announcement that it had signed a definitive agreement to acquire RSP Permian, Inc. ("RSP"), the Company held an investor call with analysts and investors to discuss the benefits of the acquisition.  On the call, Defendant Leach stated that Concho's "size, scale and execution strength," among other things, allowed the Company to mitigate the risk of child wells:

> In addition **to our size, scale and execution strength provide us with the unique ability to capitalize on these new complementary assets. This ability includes moving these assets into manufacturing mode, which generates cost savings and minimizes parent-child locations.** It also includes developing these assets with long laterals and leveraging shared infrastructure systems.

32.     When questioned by analysts whether his statement regarding parent/child wells was intended to refer to Concho's entire Permian Basin operations, and whether the Company's "spacing perspective" was "relatively consistent," Defendant Leach responded in the affirmative:

> **Question:** And then my follow-up question is, regarding the comment on parent-child infill locations, could you confirm that you guys are thinking about the basin from a large spacing perspective relatively consistent? And let me just build -- let me, I assume that the parent-child comment was based on fulfilled section development versus three to four well pads, is that accurate?
>
> **Answer:** That's accurate. And yes, **we do have similar views on spacing in the different core asset areas.**

33.     In connection with the RSP acquisition, the terms of which required Concho's issuance of new shares to legacy RSP shareholders, Concho filed a registration statement on SEC Form S-4 on April 20, 2018, which after several amendments, was declared effective by the SEC on June 6, 2018 (the "Registration Statement").  Incorporated by reference in the Registration

Statement was the 2017 10-K.  The Registration Statement, which also included the prospectus filed on June 7, 2018, was signed by Defendants Leach, Harper, Schroer, and Wright.

34.     By issuing the Registration Statement, which incorporated the 2017 10-K by reference, Concho and the Individual Defendants were required to comply with Item 105 (formerly Item 503) of Regulation S-K, 17 C.F.R. § 229.105.  Specifically, Item 105 required that the Concho and the Individual Defendants furnish, among other things, a discussion of the most significant factors that made the offering speculative or risky.

35.     On August 2, 2018, Concho held its second quarter 2018 earnings call with analysts and investors.  On the call, Defendant Giraud was questioned whether larger projects such as Dominator were going to become more and more prevalent in the Company's operations. Defendant Giraud responded affirmatively that "bigger and bigger projects I think are just the further evolution of that trend." According to Defendant Giraud, this "evolution," included "test[ing] different spacing." He then stated that the Company was "continuing" to "test tighter spacing" on "smaller projects."

> **Question:** Perfect. And then, when I'm looking at the various kind of sizes of the projects, anywhere from kind of 5-well pads to 20-well pads. And you all do mention in the slides that, for example, on the Dominator pad like you all had to basically coordinate over a year in advance with the midstream partners with that project. I'm just kind of curious how much kind of the midstream component has an impact on the size of these kind of pads? And then, kind of longer term, if we should sort of think that these projects are likely going to kind of gravitate toward the larger end of that range over time?
>
> **Answer:** Sure. I mean, midstream is certainly one of the elements that goes into sizing it. But I would say the bigger driver is – well, let me step back for a minute. ***I think we've been one of the leaders in moving to these larger-scale development projects.*** And that's been a steady evolution over the last couple of years as we've tested different spacing between – within a zone and between zones. ***And so, these bigger and bigger projects I think are just the further evolution of that trend. Where you see some of the smaller***

> *projects, that's us continuing to test tighter spacing or different spacing within a zone or between zones again*. And so, I think you're right, longer term, you'll see an evolution to the bigger and bigger projects. However, we're still learning as we go and so I think you'll see a blend of different sizes.

36.    Concho held its third quarter 2018 earnings call with analysts and investors on October 31, 2018.  On the call, Defendants Leach and Giraud responded to questions on the differences in the development process regarding the mitigation of parent/child well interference in single well versus multi-well projects, stating that mitigating such interference was planned for in all projects:

> **Question:** And do you have a kind of estimate of – kind of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship?
>
> **Defendant Giraud:** *Yes. We definitely baked that into all of our plans and our forecast.*
>
> **Question:** Is that something you'd be willing to share.
>
> **Defendant Leach:** It's different by zone and different by area. And it's extremely complicated. *And we're developing a program to minimize it.* I'm not sure that any company in any location can completely eliminate that because you always have edges of your leases and things like that. But I think with our asset base and the big blocky nature of our assets and the way we're prosecuting our development program, *we're in the best position to kind of minimize that effect. And we think we have it estimated very well*.

37.    Later on the call, Defendant Giraud was questioned as to "ideal spacing" at a different project, responding that the project was using "660 foot spacing," and that to mitigate parent/child risk, the Company would need to "come in and offset these pads in time."  Defendant Giraud concluded that this approach was how the Company "thought about the rest of the world."

> It's typically as we – one of the big things we're learning is what's the optimal project size. And so, at the point in time when we're drilling things like the Windham, *you're seeing us typically target a 0.5 mile section at a time at that implied 8 across or 660 spacing*.

10

And so, to the extent you're testing additional zone, you can get some odd numbers. But, yes, you're right. And I think that was Tim's point that you're not eliminating the parent-child piece. You are going to have to come in and offset these pads in time. *And so, I think that Windham just reflects kind of how we think about the world*.

38.    On February 20, 2019, Concho released its 2018 annual report on SEC Form 10-K (the "2018 10-K").  The report's mandatory risk disclosures made no mention of the risks associated with well spacing.  Instead, the relevant risk factors merely stated that "multi-well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production."  Further, in discussing the Company's operations in the Delaware Basin, the 2018 10-K stated that Concho continued to "leverage leading-edge horizontal drilling and completion technologies, utilizing multi-well pad sites and extended lateral lengths, to develop [this] producing formation[]."

39.    On February 20, 2019, Concho held its fourth quarter 2018 earnings call with analysts and investors.  On the call, Defendant Giraud stated that they were "seeing the results [they] expect[ed]" from the transition to "large-scale project development" when questioned how much of Concho's "performance improvements" had come from "optimizing spacing and well design."

> **Question:** Good morning, everyone. Just wanted to follow up on the last question on well performance improvements, can you speak to how much you think the well performance improvements have come from optimizing spacing and well design aside from -- and things targeting on the reservoir, as opposed to just completion design modifications?
>
> **Answer:** That's a little hard to describe in a brief way. *But certainly what -- I think what we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect* and it's enabling us to do some pretty interesting thing from testing and continuing to understand the best way to do it.

11

40.     Finally during the call, Leach stated that "when you look at the Permian Basin map having big blocky acreage once again it becomes apparent to us that that's the way you can mitigate parent-child relationship and also frac heads from neighbors and things like that."

> I would also add that when you look at the Permian Basin map having big blocky acreage once again it becomes apparent to us that ***that's the way you can mitigate parent-child relationship and also frac heads from neighbors and things like that. So we're very pleased with the way our acreage is configured*** and the trades and the way we've continued to block up a big chunky blocks of -- the best parts of the Permian.

41.     Concho's February 20, 2019 earnings call had a positive effect on analyst commentary.  For example, that same day an analyst at SunTrust stated about Dominator: "We continue to believe that large pad developments represent the most prudent way to develop acreage and generate project returns given benefits of shared facilities, reduction of parent/child interference, and other benefits."

42.     Two months later, on April 4, 2019, an analyst at JP Morgan stated that with respect to "well productivity deterioration associated with 'parent-child' interference," that "CXO sees the risks as real, but has proactively taken steps to mitigate this risk through its manufacturing-style development scheme."

43.     Concho released its first quarter 2019 financial results on April 30, 2019.  In the earnings release, the Company stated that its "large-scale development … accelerates innovation and captures efficiencies to optimize resource recovery and overall project economics," and that it had "successfully started production on nine projects during first-quarter 2019, including the Dominator."

> Concho continues to advance large-scale development across its high-quality asset base. ***This approach to development accelerates innovation and captures efficiencies to optimize resource recovery and overall project economics. The Company successfully started production on nine projects during first-***

>*quarter 2019, including the Dominator*, Eider and Jack projects in the Delaware Basin as well as the Mabee project in the Midland Basin. Concho completed these projects on time or ahead of schedule.

44. Concho held its first quarter 2019 earnings call with analysts and investors on May 1, 2019. Defendant Harper, in reference to Dominator, which he referred to as Concho's "most extreme version of activity in a single square mile and also some of the more dense spacing we've tested," stated that "the teams did a fantastic job … bringing that project and a couple of other large ones this quarter and putting well production actually ahead of schedule."

>And so using the Dominator one, just because it's a good example, that is ***our most extreme version of activity in a single square mile and also some of the more dense spacing we've tested. And so, yeah, the teams did a fantastic job on that***, bringing that project and a couple of other large ones this quarter and ***putting well production actually ahead of schedule***.

>So we're continuing to figure out how to concentrate that much activity in one spot in the most efficient manner possible. ***We're continuing to play with spacing and also landing zones and we're still continuing to tinker with combinations of different landing zones and to our whole completion design in them.*** So there is a lot – there is still a lot to learn, but I think, ***at the same time, you've got a really competitive business that competes for investor capital. And so I think that's the exciting thing about what we've been able to do and are going to continue to do is deliver really compelling returns while continuing to learn.***

45. Additionally on the call, Defendant Leach responded to an analyst question regarding well spacing at Dominator stating that the "returns look pretty good."

>**Question:** Just specifically on that, I mean, have you found what you've seen on some of the initial results. I think, Dominator was in some of the closer space. What have you specifically seen in that compared to the wider space? What is the most optimal?

>**Answer:** On that one, we drilled at almost 50% more densely than kind of our -- where we typically look at resource booking in that zone. So we want to watch -- we haven't hit the kind of critical 60 days of production and we've included that will be the next

quarter's batch of wells to talk about, ***but certainly returns look pretty good for us***.

46.     The statements referenced in ¶¶ 24-36 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the well spacing at Dominator was aggressive and highly risky, and premised on no reasonable basis to believe it would work as intended; (2) Concho's practice of implementing tighter well spacing was not relegated to a handful of "tests" and therefore more widespread than the market was led to believe; (3) it was known or recklessly disregarded that any measures to mitigate well spacing risks were non-existent and or/impossible; (4) these risks had manifested during the Class Period, causing underground well interference and permanently decreasing production, forcing the Company to scale back production targets and adopt more conservative spacing measures in its other projects; (5) it would take multiple quarters to unwind the impacts of the widespread well spacing failure; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

47.     Moreover, the Individual Defendants' failure to disclose adverse material trends and uncertainties in Concho's annual and quarterly reporting with the SEC violated Item 303 of Regulation S-K [17 C.F.R. §229.303], which requires management to describe known trends or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on net sales, revenues or income from continuing operations.

## The Truth Is Revealed

48.     After the close of trading on July 31, 2019, Concho released its financial results for the second quarter 2019.  On this date, the Company revealed that Dominator's 23 wells were

spaced "too tight," and that Concho had *already* "incorporated learnings from [Dominator] into

its second half of 2019 program and future Delaware Basin projects."

> In the Delaware Basin, Concho completed the 23-well Dominator project, a well-spacing test targeting multiple landings within the Upper Wolfcamp. The average lateral length for the project was approximately 4,400 feet, and all 23 wells were drilled, completed and put on production safely and ahead of schedule. ***While the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates the well spacing was too tight. The Company has already incorporated learnings from this project into its second half of 2019 program and future Delaware Basin projects***.

49.     Concho also revealed that it would be forced to scale back production targets for

the rest of this year, including by reducing its active rig count to 18, down from 33 in the first

quarter 2019.

> Costs incurred for exploration and development activities for second-quarter 2019 totaled $785 million. During the quarter, Concho averaged 26 rigs, compared with 33 rigs in first-quarter 2019. ***The Company is currently running 18 rigs, including 11 rigs in the Delaware Basin and seven rigs in the Midland Basin***. Additionally, the Company is currently utilizing seven completion crews.

50.     Concho held is second quarter 2019 earnings call on August 1, 2019.  On the call

Defendant Leach stated that following Dominator's failure, Concho would be taking a more

conservative approach to well spacing.   Defendant Leach also attributed Concho's below-

expected active well count as a measure to avoid overshooting budgets.

> Thanks, Megan, and good morning. Yesterday's results and updated 2019 outlook reflect our continued move to a lower capital budget than originally planned this year and our desire to enter 2020 in the best position to deliver competitive production growth and increasing free cash flow.

> \* \* \*

In the Delaware Basin, the 23 well Dominator project was designed to test logistical capabilities and well spacing that was approximately 50% tighter than our current resource assessment. While initial rates were solid, current performance data indicates that we developed the Upper Wolfcamp too densely.

***We are incorporating the data into our development model to adjust spacing on future projects including those projects set to spud in the second half of '19.***

\* \* \*

Turning to our capital program; we averaged 26 rigs in the second quarter and capital totaled $785 million, which was down 15% compared to the first quarter. ***Year-to-date production volumes are ahead of schedule and today we're running 18 rigs, which is below our previous plan of 24. We made the decision to adjust our drilling and completion schedule in the second half of the year to slow down and not chase incremental production at the expense of capital discipline***.

51.     On the call Defendant Giraud stated that *at maximum* there should be 12 wells per project in the Permian:

Yes, I mean, in terms of the project spacing, I don't know that it has taught us anything in terms of the optimal project size, the teams executed extremely well from a logistical standpoint, getting that much work done on time actually ahead of schedule. ***So I do think, as we've talked about in previous calls, the optimal project size for us is probably in the 8 to 10 to 12 depending upon where you are in the Permian***. But I'm not sure that Dominator gave us confidence that we can continue to push that up over time and find incremental efficiencies and how we do it.

52.     Additionally on the call, Defendant Giraud attempted to downplay that existing and upcoming 2019 projects had "modestly more dense" spacing, by stating the well spacing was not "anywhere close to Dominator."

You know, I don't know the number off the top of my head. Typically, I would characterize '19 as the year that we were advancing our understanding of optimal lateral lengths, completion design and well-spacing being one of the critical variables there. Typically, where we've done that, we have added kind of one more well into a project. Dominator is the most extreme example where

16

we went 50% beyond kind of our traditional resource spacing. ***So I would say that in a number of the projects we have this year and including a couple more coming on in the back half of this year, you're going to see them developed at a modestly more dense than our resource spacing, but nothing anywhere close to Dominator***.

53.     Finally, Defendant Leach stated that "testing of density that 150% of [their] resource" was "just too tight."

> Yes, I mean, there's really nothing quite like that in the portfolio for '19 or beyond. As we mentioned [Dominator] was a test both of the intensity of activity with seven rigs and then five frac crews operating simultaneously in a square mile, but then it was also testing of density that 150% of our resource that's greater than we've ever done. And so we've certainly learned some things about the impact of the inner well communication and spacing. We've – I think as we have said from an operational standpoint, the team did a fantastic job executing the project with it all brought on safely as planned and ahead of schedule. But clearly, the – it's interesting that the 30 and 60-day production rates were consistent with our other projects in that area, ***but the performance has declined and that's been cleared. It's just too tight***.

54.     "How companies still, after all these years we have wailed and gnashed our teeth, manage to over-promise and under-deliver, remains an infuriating mystery," a Mizuho Securities analyst said in a note to clients; "[d]o we really need to repeat, that a company, much least in the most hated sector of the market, with a premium valuation, must never, ever, over-promise and under-deliver?"

55.     On this news, Concho sank 22% to close at $75.97 per share on August 1, 2019, down from the closing price of $97.68 per share on July 31, 2019.

## POST CLASS PERIOD EVENTS

56.     In response to the August 1, 2019 disclosure, an analyst at Jeffries stated in a report dated August 5, 2019, that while the Company had previously indicated Dominator "was not representative of the company's development plans … it turns out operations were not consistent with that message."

> Issues with the Dominator pad have been well understood, and while we were initially surprised the company would test well density as tight as 23-wells per (single) section in the Wolfcamp A, **CXO stated that it was not representative of the company's development plans**. While it's difficult to say how much of the guidance reduction is due to reduced activity vs. asset performance, **it turns out operations were not consistent with that message**.

57.     On August 29, 2019, the Journal of Petroleum Technology released a report titled:

*"Dominator Project" Raises Key Questions About Future of Cube Drilling*, describing

Dominator's drastic shortfall due to aggressive well-spacing.

> In Lea County, New Mexico, shale producers drill an average of 10 wells per 640-acre section.
>
> But last year, Concho Resources, the third-largest producer of oil and gas in the Permian Basin, decided to push the envelope. The company assembled seven drilling rigs owned by six different contractors and five fracturing fleets on a mile-long tract of land to build the "Dominator Project."
>
> The effort took the better part of a year and, in the end, it delivered 23 wells targeting five individual target horizons in the Wolfcamp Shale formation. The location, in the northern Delaware Basin, was carefully selected for sitting atop some of highest-quality geology within one of the highest-producing unconventional plays on the planet.
>
> **But when executives revealed the first oil production results in July, new doubts were raised about the success of the experiment. They said the well spacing, which averaged a horizontal distance of 230 ft. compared with the area average of 600 ft., was "too tight" and that future projects would execute wider intervals.**
>
> **Independently developed type curves show that the Dominator wells are now on pace to fall short of initial estimates, maybe by as much as 45%.** The news triggered one of the sharpest selloffs ever seen in the shale business, sending Concho's share price down 22% for a single-day market value loss of close to $4.4 billion.

58.     On October 30, 2019, Concho held its third quarter 2019 earnings call with

analysts and investors.  On the call, Defendant Leach stated that for "2020 and beyond, [Concho]

will develop fewer wells per project at wider spacing."  In response to analyst questions,

Defendant Leach also revealed that due to lingering "spacing tests," that the Company would not see increased capital efficiency until 2020.

> **Question:** How quickly do you think we see or we see in the quarterly results the kind of improved productivity from the shift to wider spacing and smaller projects away from the spacing test? That's something that very quickly becomes evident, you think, in the beginning of 2020, or is it going to take a little longer to work its way through the system?
>
> **Answer:** Sure. Well, we began moving into the wider spacing program this summer. ***So, while we still have a few spacing test rattling through the back half of this year, you see those less density space projects could be put on a production in the fourth quarter and then increasingly into 2020.***
>
> **Question:** And okay. And so like I guess early in 2020 that seems reasonable to start to maybe see an uplift in capital efficiency.
>
> **Answer:** ***From a productivity standpoint, That's right.***

59.     Concho released a slide presentation in connection with its October 30, 2019 earnings call.  One slide of note contained an X Y graph comparing well spacing versus the number of wells in 2018-2019 to 2020.  While the graph indicated that Dominator had the largest number of wells and the most closely spaced wells, the spacing for other 2018-2019 projects was tellingly closer to Dominator when compared to 2020 projects.

19



60.     On February 19, 2020, Concho released its 2019 annual report (the "2019 10-K").

In the report, a new risk factor was added regarding well spacing that had not been present in the

2017 and 2018 10-Ks:

> **We could experience adverse impacts associated with a high
> concentration of activity and tighter drilling spacing.**
>
> We are subject to drilling, completion and operating risks,
> including our ability to efficiently execute large-scale project
> development, as we could experience delays, curtailments and
> other adverse impacts associated with a high concentration of
> activity and tighter drilling spacing. ***A higher concentration of
> activity and tighter drilling spacing may increase the risk of
> unintentional communication with other adjacent wells and the
> potential to reduce total recoverable reserves from the reservoir***.
> If these risks materialize and negatively impact our results of
> operations relative to guidance or market expectations, and the
> research analysts who cover our Company may downgrade our
> common stock or change their recommendations or earnings or
> performance estimates, which may result in a decline in the market
> price of our common stock.

61.     Additionally on February 19, 2020, Concho held its fourth quarter 2019 earnings call with analysts and investors.  On the call, Defendant Harper stated that moving forward, "[t]he average project size will be six wells, and … average well spacing will be 700 to 800 feet *as compared to approximately 550 feet last year*."

## UNDISCLOSED ADVERSE FACTS

62.     The market for Concho stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Concho common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Concho shares relying upon the integrity of the market price of the Company's common stock and market information relating to Concho, and have been damaged thereby.

63.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Concho common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Concho's business, operations, and prospects as alleged herein.

64.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made a series of materially false and/or misleading statements about Concho's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects,

thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

66.     The Individual Defendants permitted Concho to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

67.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Concho, their control over, receipt, and/or modification of Concho's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Concho, participated in the fraudulent scheme alleged herein.

68.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Concho stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Concho's business, operations, and

management and the intrinsic value of Concho stock and caused Plaintiff and members of the Class to purchase Concho shares at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

69.     During the Class Period, as detailed herein, Concho and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Concho stock, and operated as a fraud or deceit on Class Period purchasers of Concho shares by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Concho stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Concho stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

70.     To the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

71.     Further, Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Concho stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

72.     At all relevant times, the market for Concho stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Concho filed periodic public reports with the SEC;

(b)     Concho regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Concho was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Concho common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "CXO."

73.     As a result of the foregoing, the market for Concho securities promptly digested current information regarding Concho from all publicly available sources and reflected such information in Concho's stock price.  Under these circumstances, all purchasers of Concho common stock during the Class Period suffered similar injury through their purchase of Concho common stock at artificially inflated prices and the presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Concho who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all person or entities who purchased or otherwise acquired Concho common stock between February 21, 2018 through July 31, 2019, inclusive (the "Class"). Excluded from the Class are: Defendants (as defined herein); any officers or directors of Defendants during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

76.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Concho stock was artificially inflated; and

(f)     The extent of the damage sustained by Class members and the appropriate measure of damages.

77.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

78.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

>     (a)     Employed devices, schemes, and artifices to defraud;

>     (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

>     (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Concho common stock during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Concho shares.  Plaintiff and the Class would not have purchased Concho stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

84.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Concho stock during the Class Period.

### COUNT  II

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of Concho within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Concho, the Individual Defendants had the power and ability to control the actions of Concho and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 30, 2021                        Respectfully submitted,

                                            */s/ Francis P. McConville*
                                            **LABATON SUCHAROW LLP**
                                            Francis P. McConville
                                            Alfred L. Fatale III
                                            140 Broadway
                                            New York, New York 10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            fmcconville@labaton.com
                                            afatale@labaton.com

                                            *Attorneys for Plaintiff*

<u>CERTIFICATION</u>

I, Alfred T. Marciano, hereby certify as follows:

1.      I am Chairman of the City of Warwick Retirement Board, and am fully authorized to enter into and execute this Certification on behalf of the City of Warwick Retirement System ("City of Warwick"). I have reviewed a complaint prepared against Concho Resources, Inc. ("Concho") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      City of Warwick did not purchase common stock of Concho at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      City of Warwick is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. City of Warwick fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      City of Warwick's transactions in Concho common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      City of Warwick sought to serve as a lead plaintiff in the following class action under the federal securities laws filed during the last three years:

Lewis v. YRC Worldwide Inc, No. 1:19-cv-0001 (N.D.N.Y.)

6.      Beyond its pro rata share of any recovery, City of Warwick will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Approved this _29th_ day of July, 2021.

Alfred T. Marciano
Chairman
City of Warwick Retirement Board

**EXHIBIT A**

**TRANSACTIONS IN CONCHO RESOURCES, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 04/22/19 | 5.00 | $119.53 | ($597.65) |
| Purchase | 04/22/19 | 32.00 | $119.65 | ($3,828.86) |
| Purchase | 04/22/19 | 10.00 | $119.78 | ($1,197.75) |
| Purchase | 04/22/19 | 22.00 | $119.97 | ($2,639.26) |
| Purchase | 04/22/19 | 45.00 | $120.02 | ($5,400.70) |
| Purchase | 04/22/19 | 6.00 | $120.09 | ($720.51) |
| Purchase | 04/22/19 | 27.00 | $120.09 | ($3,242.54) |
| Purchase | 04/23/19 | 1.00 | $120.08 | ($120.08) |
| Purchase | 04/23/19 | 6.00 | $121.57 | ($729.42) |
| Purchase | 04/23/19 | 68.00 | $121.85 | ($8,285.66) |
| Purchase | 04/23/19 | 13.00 | $122.52 | ($1,592.82) |
| Purchase | 04/24/19 | 22.00 | $121.06 | ($2,663.25) |
| Purchase | 04/24/19 | 28.00 | $121.12 | ($3,391.31) |
| Purchase | 04/24/19 | 33.00 | $121.18 | ($3,998.94) |
| Purchase | 04/24/19 | 63.00 | $121.50 | ($7,654.50) |
| Purchase | 04/24/19 | 104.00 | $121.60 | ($12,645.88) |
| Purchase | 04/24/19 | 12.00 | $122.28 | ($1,467.33) |
| Purchase | 04/24/19 | 141.00 | $122.49 | ($17,271.09) |
| Purchase | 04/25/19 | 49.00 | $121.30 | ($5,943.70) |
| Purchase | 04/25/19 | 132.00 | $122.28 | ($16,140.38) |
| Purchase | 04/26/19 | 107.00 | $118.00 | ($12,626.00) |
| Purchase | 04/26/19 | 169.00 | $118.02 | ($19,945.18) |
| Purchase | 04/26/19 | 18.00 | $118.55 | ($2,133.95) |
| Purchase | 04/26/19 | 167.00 | $119.74 | ($19,996.58) |
| Purchase | 04/26/19 | 96.00 | $119.78 | ($11,499.06) |