**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ x | | |
| | : | Case No. 4:21-cv-02473 |
| | : | |
| IN RE CONCHO RESOURCES INC., | : | <u>CLASS ACTION</u> |
| SECURITIES LITIGATION | : | |
| | : | <u>DEMAND FOR JURY TRIAL</u> |
| _____ | : | |
| x | : | |

**CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 2

II.    JURISDICTION AND VENUE ........................................................................ 5

III.   PARTIES .......................................................................................................... 6

     A.    Lead Plaintiffs .......................................................................................... 6

     B.    Defendants ................................................................................................ 7

IV.   BACKGROUND FACTS .................................................................................. 8

     A.    Overview of Concho's Business .............................................................. 8

     B.    Technical Background ............................................................................ 12

            1.    Classification of Oil and Natural Gas Resources ...................... 12

            2.    Relevant Drilling Techniques .................................................... 13

     C.    The Defendants' Materially False and Misleading Class Period
          Representations .................................................................................... 19

     D.    Former Concho Employees Demonstrate that the Defendants' Class Period
          Representations Were Materially False and Misleading ....................... 24

     E.    Defendants' Admissions and Analysis of the Dominator's Production
          Demonstrate that Their Class Period Representations Were Materially
          False and Misleading ............................................................................ 40

            1.    Data Shows that Dominator's Initial Production Was Significantly
                 Below its Peers .......................................................................... 40

            2.    Defendants' Post-Class Period Admissions Contradict Their
                 Previous Positive Statements About the Dominator and Similar
                 Projects ...................................................................................... 43

V.    DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ....................... 45

     A.    Defendants' Materially False and Misleading Statements and Omissions in
          Violation of Section 10(b) of the Exchange Act ................................... 45

            1.    Fourth Quarter and Full Year 2017 Financial and Operating
                 Results ........................................................................................ 45

            2.    Concho Presents at the Raymond James 39th Annual Institutional
                 Investors Conference .................................................................. 65

3.      Concho Announces Plans to Acquire RSP ............................................. 70

4.      First Quarter 2018 Financial and Operating Results................................ 73

5.      Concho Presents at the Citi 2018 Global Energy Utilities
        Conference ........................................................................................ 81

6.      Second Quarter 2018 Financial and Operating Results ............................ 85

7.      Concho Presents at the Barclays CEO Energy Power Conference........... 90

8.      Third Quarter 2018 Financial and Operating Results ............................ 100

9.      Fourth Quarter and Full Year 2018 Financial and Operating
        Results............................................................................................ 110

10.     Concho Presents at the Raymond James 40th Annual Institutional
        Investors Conference ....................................................................... 123

11.     First Quarter 2019 Financial and Operating Results............................. 125

12.     Concho Reveals Critical Well Spacing Issues ........................................ 130

B.      Post Class Period Events........................................................................... 139

1.      Spacing Issues Linger ......................................................................... 139

2.      ConocoPhillips Acquires Concho for Fire Sale Prices ......................... 143

C.      Defendants Acted with Scienter When They Made or Caused to be Made
        Material Misstatements and Omissions in Violation of Section 10(b) of the
        Exchange Act and Rule 10b-5 Promulgated Thereunder ................................. 144

1.      The Public Statements of the Individual Defendants Indicate Direct
        Knowledge of All Undisclosed Adverse Facts ....................................... 147

2.      The Individual Defendants Personally Reviewed and Approved the
        Company's Projects ............................................................................ 153

3.      The Individual Defendants Determined to Find the Limits of Well
        Spacing by Any Means Necessary.......................................................... 155

4.      The Individual Defendants Improperly Used Lower Risk Profiles
        Despite Repeated Warnings.................................................................. 157

5.      The Individual Defendants Attended Weekly Status Meetings and
        Had Access to Real Time Data .............................................................. 163

VI.     CONTROL PERSON ALLEGATIONS........................................................... 165

VII.    LOSS CAUSATION ................................................................................. 168

VIII.   PRESUMPTION OF RELIANCE ......................................................... 176

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE .................................................... 178

X.     CLASS ACTION ALLEGATIONS ...................................................... 179

       COUNT  I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants ......................................................................... 180

       COUNT  II For Violation of Section 20(a) of the Exchange Act Against the
Individual Defendants .......................................................................... 183

PRAYER FOR RELIEF ................................................................................... 184

JURY DEMAND ............................................................................................... 185

Court-appointed Lead Plaintiffs Utah Retirement Systems ("URS") and Construction Laborers Pension Trust for Southern California ("Southern California Laborers") (collectively, "Lead Plaintiffs"), by their undersigned counsel, allege the following against: (i) Concho Resources Inc. ("Concho" or the "Company"); (ii) ConocoPhillips, as successor-in-interest to Concho; and (iii) Timothy A. Leach ("Leach"), Jack F. Harper ("Harper"), C. William Giraud ("Giraud"), E. Joseph Wright ("Wright"), and Brenda R. Schroer ("Schroer") (the "Individual Defendants" and together with Concho and ConocoPhillips, the "Defendants").

Lead Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Lead Plaintiffs' counsel, Labaton Sucharow LLP ("Lead Counsel"), which includes, among other things a review of: (i) Concho's filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Concho's conference calls with analysts and investors; (iv) Concho's presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) interviews with former employees of Concho;[1] (vii) data reflecting the pricing of Concho stock; and (viii) other material and data concerning the Company, as identified herein.

Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for

---

[1]    Former employees of the Company ("FEs") will be identified herein by number (FE-1, FE-2).  All FEs will be described in the masculine to protect their identities.

the allegations set forth herein after a reasonable opportunity for further investigation or discovery. Lead Plaintiffs allege as follows:

# I.    INTRODUCTION

1.      This securities class action is brought against Concho and the Individual Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder and alleges fraud by these Defendants. This class action is brought on behalf of all persons or entities who or which purchased or otherwise acquired publicly traded Concho common stock during the period from February 21, 2018 through July 31, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.      Congress passed the Exchange Act during the Great Depression, to substitute a philosophy of full disclosure for the then-prevailing philosophy of *caveat emptor* and, thus, to achieve a high standard of business ethics in the securities industry that remains the default rule to this day. The Exchange Act gives rise to liability for false, misleading, and incomplete statements made in connection with the purchase or sale of securities to maintain confidence in our public securities markets.  It is designed with flexibility in mind, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W. J. Howey Co.*, 328 U. S. 293, 299 (1946).

3.      Throughout the Class Period, Concho and the Individual Defendants engaged in an undisclosed fraudulent bet-the-company endeavor in hopes of saving the Company from being acquired in a consolidating industry. Of course, companies and their management take gambles all of the time in the quest for profits and growth.  However, in this case Concho and the Individual Defendants fraudulently and affirmatively concealed from investors what they had put at stake and what the risks were for their venture. Had the bet paid off, the Individual Defendants would have been hailed as heroes by having achieved that proverbial "under promise and over deliver"

and no one would have been the wiser. Unfortunately for Concho's investors who were kept in the dark, that imprudent bet did not pay off.

4.      At the start of, and throughout, the Class Period, the Defendants touted to investors that Concho had transitioned to what was referred to as "large-scale development" or "manufacturing mode," which meant that Concho was employing simultaneous completion of tightly spaced wells in its projects.  In particular, Defendant Giraud told investors "we know what the spacing needs to be."

5.      The Defendants informed investors that they had, in real-time, "valuable data" that they used to "optimize" well design and completion.  Indeed, Defendant Leach assured investors at the start of the Class Period that "well spacing, lateral placement and completion design" for Concho's development activities had been "validated." Defendant Harper told investors that Concho had "successfully made [the] transition" to large-scale development and that Concho's "drilling synergies [were] well documented."  Moreover, the Defendants told investors that their models accounted for "spacing that has either already happened or will happen in the future" and that spacing issues were "definitely baked … into all of our plans and out forecasts."

6.      When the Defendants addressed the risk of their project development in a paragraph of boilerplate, they assured investors that they were using large-scale development "where practical."

7.      Moreover, the Defendants told investors that they were delivering "outstanding results from the Company's large-scale development projects" and that Concho's "transition to large-scale, multi-well projects ha[d] been an important development that w[ould] continue to drive growth, innovation and efficiencies."

8.      Importantly, Defendants promised investors that the Company's risk profile had not changed as a result of Concho's transition to manufacturing mode.  For example, Defendant Harper told investors that the Company's large-scale projects were "dispersed amongst [Concho's] asset base." Likewise, Defendant Giraud told investors that there was not "a dramatic change to development mode" and it was not like a "switch getting flipped" or a "big step change."

9.      As a result, throughout the Class Period, Defendants repeatedly raised their production outlook to call for an over 20% growth rate.  When talking about Concho's transition to manufacturing mode, Defendant Giraud pointed to the Company's production guidance to "give visibility into our business."

10.      When the Dominator project, a large-scale, 23 well manufacturing mode project that was much discussed during the Class Period, started producing, the Defendants told investors that Dominator had "paid off" and the "returns look pretty good for us."

11.      This, however, was not true, and shortly thereafter Defendants were forced to admit that Concho had spaced their wells "too tight" and that the Company had to significantly reduce its active rig count below prior estimates and issue weak production forecasts.  The market was shocked and Concho's stock price collapsed.

12.      Now, as detailed below, Lead Plaintiffs' investigation, as well as Defendants' own post-class period admissions, demonstrated the scope and nature of the fraud the Defendants engaged in through their undisclosed, highly risky activities.

13.      As explained below, Concho's manufacturing mode of development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing, and lacked a verifiable basis. The Individual Defendants

4

repeatedly ignored internal protests over the wells being spaced too closely. And, importantly, the Individual Defendants chose to incorrectly risk their manufacturing mode developments in order to falsely issue artificially high production forecasts. To this point, Defendants either failed to conduct or outright ignored modeling and other data which would have indicated their approach to production with aggressive well spacing would result in poorly performing and permanently impaired wells.

14.     Finally, while Defendants often focused on Dominator during the Class Period, their fraud was much larger in scope. While they had claimed that Concho had a balanced risk profile overall with lower risk projects to balance out the risk of manufacturing-style projects, the Defendants were in fact devoting all but a pittance of the Company's development budget to undisclosed, highly risky endeavors and failing to recognize those risks in the Company's forecasts and disclosures.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as ConocoPhillips, Concho's successor-in-interest, is headquartered in this District, does a significant portion of its business in this District, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiffs

19.     URS was appointed to serve as Lead Plaintiff on October 22, 2021. URS provides retirement and insurance benefits exclusively for Utah public employees. URS serves more than 240,000 members and over 470 public employers, including without limitation the State of Utah, its local governments, school districts, public safety, and fire. URS is an independent agency of the State of Utah, governed by Utah Code Title 49, and administers defined benefit pension systems and IRS-qualified defined contribution retirement savings plans. As set forth in the Certification accompanying URS's motion to be appointed a Lead Plaintiff (Dkt. No. 13-2), URS purchased Concho common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

20.     Southern California Laborers was appointed as Lead Plaintiff on October 22, 2021. Southern California Laborers is a multi-employer pension plan with more than 34,000 participants, and approximately $1.9 billion in assets, located in Covina, California. As set forth in the Certification accompanying Southern California Laborers' motion to be appointed Lead Plaintiff (Dkt. No. 13-2), Southern California Laborers purchased Concho common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

**B.** **Defendants**

21. Defendant Concho was, at all relevant times, incorporated in Delaware and headquartered in Midland, Texas. Since the Company's 2007 initial public offering and throughout the Class Period, Concho shares were listed on the New York Stock Exchange ("NYSE") under the ticker symbol "CXO."

22. Defendant ConocoPhillips is incorporated in Delaware and headquartered in Houston, Texas. In January 2021 ConocoPhillips acquired the Company in an all-stock transaction. ConocoPhillips is named herein as the successor-in-interest to Concho. ConocoPhillips stock is listed on the NYSE under the ticker symbol "COP."

23. Defendant Leach was, at all relevant times, Concho's Chief Executive Officer ("CEO") and the Chairman of the Company's Board of Directors. Defendant Leach served as Concho's Chairman and CEO since the Company's formation in 2006.

24. Defendant Harper was appointed as Concho's President in May 2017 and remained in this role at all relevant times. Defendant Harper was appointed as Concho's Chief Financial Officer ("CFO") in May 2016 and served in this role until January 2019. During the Class Period, Defendant Harper oversaw Concho's operations as well as the Company's legal, accounting, information technology and security functions.

25. Defendant Giraud was appointed as Concho's Executive Vice President in May 2017 and served in the role at all relevant times. In January 2019, Giraud was appointed as Concho's Chief Operating Officer ("COO"), having previously been named as a successor for the position in 2017.

26. Defendant Wright served as Concho's COO from November 2010 until January 2019. Defendant Wright served as Concho's Executive Vice President from November 2013 until January 2019.

27.     Defendant Schroer was Concho's Treasurer and Senior Vice President at all relevant times, Chief Accounting Officer until January 2019, and CFO from January 2019.

28.     Defendants Leach, Harper, Giraud, Wright, and Schroer are sometimes collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants, because of each of their positions with the Company, possessed the power and authority to control the contents of Concho's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. Each of the Individual Defendants were each provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

29.     Concho, ConocoPhillips, and the Individual Defendants, are referred to herein, collectively, as "Defendants."

## IV.     BACKGROUND FACTS

### A.     Overview of Concho's Business

30.     At all relevant times, Concho was an independent oil and natural gas company engaged in the acquisition, development, exploration and production of oil and natural gas properties in the Permian Basin. After its formation in 2006, the Company held its initial public offering in August 2007. The Company generates revenues through the sale of its oil and natural gas production in the Permian Basin principally to marketers and other purchasers that have access to pipeline facilities.

8

31.     The Permian Basin is a large sedimentary basin in located in western Texas and southeastern New Mexico covering more than 86,000 square miles and extending across an area approximately 250 miles wide and 300 miles long. The Permian Basin one of the most prolific oil and natural gas producing regions in the United States and is characterized by an extensive production history, long reserve life, multiple producing horizons, and enhanced recovery potential. The greater Permian Basin comprises several component basins, including the Delaware Basin and the Midland Basin, which are further subdivided by formation such as Wolfcamp, Bone Spring, Avalon Shale, and Spraberry.



32.     As of December 31, 2017, approximately: (i) 35 percent of Concho's proved reserves were attributable to the Northern Delaware Basin core area that primarily targets the Avalon shale and Bone Spring and Wolfcamp formations; (ii) 15 percent of Concho's proved reserves were attributable to the Southern Delaware Basin core area that primarily targets the Bone Spring and Wolfcamp formations; (iii) 32 percent of the Company's proved reserves were

attributable to the Midland Basin core area that primarily targets the Wolfcamp and Spraberry formations; and (iv) 18 percent of Concho's proved reserves were attributable to the New Mexico Shelf core area that primarily targets the Yeso formation.

33.     At all relevant times, one of the pillars of Concho's business model was its purported commitment to "capital discipline." Specifically, that Concho moderated its operations in order to generate and grow free cash flow, which was then used to fund future operations.

34.     To maintain this level of capital discipline, the Company needed balance the cost of its drilling and completion operations with current and projected oil and natural gas production and related revenues. In the event the Company's development projects failed to deliver expected production rates, thereby negatively impacting free cash flow, Concho would be forced to reduce drilling activity to avoid off-shooting budgets. In turn, a reduction in active drilling would impair future financial performance and growth. Thus, should one or more of the Company's major development projects fail, it could provoke a domino effect adversely impacting Concho's production and growth for the foreseeable future.

35.     Prior to the start of the Class Period, Concho primarily produced oil and natural gas through established methodologies that involved minimal risk. Leading up to and throughout the Class Period, however, Concho transitioned its production focus to large-scale development projects in the Permian Basin—frequently touting with much fanfare to the investing public that it was utilizing "manufacturing style development" and had entered "manufacturing mode." According to the Company, this transition was an "inflection point" that allowed the Company to increase production and recovery rates at a lower capital cost while mitigating risk.

36.     These manufacturing style projects entailed the active development of Concho's resource base by combining multiple advanced and often unverified completion methodologies

(either individually or as combined) such as cube drilling, zipper fracturing, tight well-spacing and other advanced completion methodologies (discussed in further detail *infra* Section IV.B.2) throughout its four core operating areas in the Permian Basin.

37.     As part of Concho's strategic shift to "manufacturing mode," the Company designed in 2017-2018 the flagship Dominator multi-well pad to be constructed in the Wolfcamp Shale formation of the Northern Delaware Basin, which began construction in 2018. As planned, the Dominator was a 23 multi-well pad with an average well spacing of 230 feet and average lateral length of 4,500 feet targeting five distinct landing zones within a single section utilizing seven completion crews, and therefore incredibly large in scope.

38.     As indicated in the chart below, the 23 Dominator wells received regulatory approval in April 2018, commenced the early stages of drilling, or "spudding" between approximately April 2018 through September 2018, and entered completion in February 2019:



B.      **Technical Background**

1.      **Classification of Oil and Natural Gas Resources**

39.      Oil and natural gas reserves are defined as those resources which are anticipated to be commercially recovered from known accumulations. Drilling and exploration companies such as Concho classify their oil and natural gas reserves based on the probability of commercially viable recovery, which is measured in barrels of oil equivalent ("Boe"), millions of Boe ("MMBoe"), and/or thousands of Boe per day ("MBoepd").

40.      These classifications, as discussed below, are essential in determining the fair market value ("FMV") of a company's assets, *i.e.*, the price that an item would sell for on the open market, as they determine the risk-adjusted rates of return for the reserves. Further, these risk-adjusted rates of return are vital for companies like Concho for planning and accounting purposes, such as setting capital budgets and issuing financial and production forecasts. On the other hand, should assets be miscategorized, a company could significantly overstate the FMV of its resources as well as their forecasted production.

41.      "Proved Reserves," which are broken up into three categories, are those reserves that are estimated commercially recoverable with a 90% level of certainty, and therefore carry the lowest level of risk. Proved Reserves are integral to the valuation of companies like Concho, as the ability of the Company to generate future revenue significantly depends upon how much of its discovered resources can be reliably extracted. Publicly traded oil and natural gas companies are required to include Proved Reserves in their financial reporting to help investors and analysts model future returns.

(a)      "Proved Developed Producing" (PDP) reserves are those for which the well is completed, and the reserves are currently being produced.

(b)      "Proved Developed Non-Producing" (PDNP) reserves are those for which the well-bore exists, and the reserves are identified but are not currently producing for some reason.

(c)      "Proved Undeveloped" (PUD) reserves are those determined to be economically recoverable utilizing existing technology and assets, but where the well has not yet been completed. PUD represents the lowest risk adjustment for uncompleted oil and natural gas projects.

42.      If a reserve's resources are technically recoverable using current technology yet lack the requisite level of certainty that such recovery would be commercially viable, it cannot be considered a Proved Reserve. In that case, the reserve may be categorized as "Probable" or "Possible." Probable reserves are those with a likelihood of commercial extraction of over 50% but under 90%, while Possible reserves are those with odds of commercial extraction under 50%, but higher than 10%.

43.      Aside from Proved Reserves, Probable, and Possible reserves, resources may also be categorized as "Contingent." Contingent resources are those estimated to be potentially recoverable, but which are not considered to be commercially recoverable with any reasonable degree of certainty due to any number of contingencies, including whether recovery is dependent on the development and/or testing of new technology. Oil and natural gas resources classified as Contingent are inherently high risk.

### 2.      Relevant Drilling Techniques

44.      Traditionally, oil and natural gas wells were drilled vertically in order to access an underground reserve of oil or natural gas. With the advent of hydraulic fracturing, or "fracking," however, lateral or horizontal oil and natural gas wells (as depicted in the diagram below) slowly overtook vertical wells as the predominant resource recovery methodology in the United States.

45.     Hydraulic fracturing is a well-stimulation technique used commonly in low-permeability rocks like tight sandstone/limestone, shale, and some coal beds to increase oil and/or gas flow to a well from petroleum-bearing rock formations. The process involves the high-pressure injection of "fracking fluid" (a slurry consisting primarily of water, containing sand or other proppants suspended with the aid of thickening agents and other chemicals) into a wellbore to create cracks (or flow pathways) in the deep-rock formations through which natural gas and petroleum will flow more freely. When the hydraulic pressure is removed from the well, small grains of hydraulic fracturing proppants hold the fractures open so that hydrocarbons can flow from the producing formation to the wellbore and ultimately produced and captured at the surface.



46.     While longer lateral well length can result in increased production and efficiencies by providing greater exposure to the formation of interest, they can carry considerable drawbacks, such as high levels of operational risks throughout the life cycle of the well. Such risks, which become more likely as lateral length increases, include costly and time-consuming remedial measures to salvage jammed equipment or to remedy sudden changes in the well's direction. Further, these and other risks, if critical, may permanently impair the well's productivity. These

risk factors are crucial to the considerations involved in determining the optimal lateral length in particular reservoirs and areas.

47.    Beginning at the turn of the century, a drilling technique known as "pad drilling" ballooned in popularity for onshore drilling and completions. Essentially, pad drilling is the practice of drilling multiple horizontal wells from a single surface (or "pad") location. Prior to the development of pad drilling, an operator would drill a single well, disassemble the drilling rig, move it to a new location, and then repeat the process. Pad drilling, however, allows multiple wells to be drilled from a single drilling pad location. When working correctly, multi-well pad drilling reduces drilling cycle time and overall operational cost, while leaving a smaller footprint on the surface (i.e., less surface disturbances).



48.    Well spacing considerations, both vertical and horizontal, are of paramount importance for multi-well drilling. In general, more tightly spaced wells—both vertical or horizontal—can lead to fracture interference which can in turn lead to the permanent degradation of a well's productivity over time. Hydraulic fracturing involves breaking rock to create a complex fracture network thousands of feet below land surface that cannot be fully controlled. Extremely high pressures are used to create the fracture network, but the exact direction and extent

of fractures depends largely on the rock itself. Geological heterogeneities and changes encountered by or brought on by existing hydraulic fractures can cause new fractures to inadvertently trend in the unintended directions or pathways, thereby permanently reducing recovery potential.  As wells are spaced more closely, the risk of wells interfering with one another is amplified.

49.     Spacing risk due to fracture interference is frequently discussed in the context of, but not limited to, parent-child interference. In that instance, a child or infill well is drilled in proximity to an existing or parent well (often which has been producing for some time) in order to capture remaining resources in the formation. Parent-child interference due to close spacing occurs when the existing well/fractures results in lower geological pressure, thereby diminishing the effectiveness of the child well. Further, in many cases the parent well may also be negatively impacted by tightly spaced infill drilling and well completions.

50.     Following the rise of onshore pad multi-well drilling, in the past decade, a simultaneous well completion method known as "zipper fracturing" has been increasingly utilized, in part, as a measure to avoid or minimize parent-child interference. Instead of drilling and hydraulically fracturing one well at a time, the zipper method involves drilling multiple wells from a multi-well pad site and then hydraulically fracturing a stage in one well, while at the same time preparing to fracture a parallel well immediately following the first, and so on. The multi-well completion method earns its name from the zipper-like configuration of the fracture stages between multiple wells.



51.     When working as intended, zipper fracturing can drastically decrease time to completion for multiple wells while increasing efficiency and yield. However, zipper fracturing carries its own operational risk on top of the risks associated with lateral wells and multi-well pad drilling. For example, while purportedly offering economies of scale, due to the simultaneous nature of zipper fracturing it is highly resource intensive during drilling operations and therefore highly sensitive to interruption. Further, absent correct fracture modeling and execution, including variables such as spacing considerations and the management of pressure between wells, zipper fracturing can still introduce adverse interference between multiple fractures due to tightly spaced wells, ultimately leading to permanently lower than anticipated resource recovery. Thus, while zipper fracturing can serve to reduce parent-child interference, it is by no means immune to fracture interference brought on by tightly spaced wells.

52.     In recent years, an unproven technique known as "cube drilling" has gained interest in multi-well pad drilling operations. As illustrated in the diagram below, cube drilling applies zipper fracturing using a three-dimensional, multi-layer approach.



53.     On paper, cube drilling can greatly increase the rate of resource recovery, although it is undecided whether cube drilling can also increase maximum recovery over time as well. The upfront costs of cube drilling are in the hundreds of millions of dollars and therefore astronomically prohibitive.

54.     Drilling and completing a large number of wells at once greatly reduces the ability to test spacing while also exponentially increasing the complexity and sophistication of the well site. One misstep in the planning, fracture modeling, construction, and execution of a cube drilling operation can result in a cascading failure which permanently impairs recovery for the entire pad—causing the upfront investment of hundreds of millions of dollars to evaporate. Accordingly, cube drilling likely introduces the largest amount of risk in drilling and completing wells in the entire upstream energy industry.

55.     Moreover, combining an unproven technology such as cube drilling, which carries a significant amount of inherent risk, with other risky techniques such as tightly spaced vertical wells and tightly spaced horizontal, or downspaced, wells, further intensifies the overall risk profile of the project. Further, these risks are not merely additive of one another but are instead

compounding. While some level of risk and the management thereof is a characteristic of the oil

and gas industry, combining multiple unproven, unreversible, extremely costly, and/or high-risk

activities—*i.e.*, cube drilling, zipper fracturing, tightly spaced vertical and horizonal wells, and

long lateral length—carries an enormous risk that far surpasses the typical level of risk for oil and

gas development projects.

### C.  The Defendants' Materially False and Misleading Class Period Representations

56.     Throughout the Class Period, Defendants repeatedly touted that Concho was set

apart from the oil and gas industry due to their innovations in project development. At various

times during the Class Period, the Defendants referred to Concho's approach as either large-scale

development, multi-well pad development, full-field optimization, or manufacturing mode, but

they all were synonymous with the simultaneous completion of tightly spaced wells. In

connection with this manufacturing mode development, Defendants repeatedly and affirmatively

stated that this new focus—which they had successfully transitioned to—would deliver

economies of scale which would maximize production, reduce costs, and mitigate risk.

57.     For example, at the start of the Class Period, Concho told investors on February

20, 2018, that Concho was delivering "outstanding results from the Company's large-scale

development projects in the North and South Delaware Basin" and Concho was "continuing to

advance manufacturing-style development with leading-edge drilling and completion

techniques."  Indeed, the Defendants repeatedly told investors that their current projects were

being informed by the past.  For example on February 20, 2018, Concho told investors that it was

using a project in the Wolfcamp to "collect[] valuable date that helps the company optimize lateral

placement, completion deign and facilitate planning" and was "utilizing leading-edge

technologies … to collect valuable proprietary data with real-time and long-term implications for full-field optimization."

58.     On February 21, 2018, Defendant Harper told investors that Concho's large-scale, multi-well projects would "continue to drive growth, innovation and efficiencies" at Concho. Importantly on February 21, 2018, Defendant Leach told investors that Concho's prior efforts had "validated well spacing, lateral placement, and completion design" and Defendant Harper stated that Concho had successfully made the transition to large-scale development.

59.     On March 5, 2018, Defendant Harper equated "cube development" as Concho's "manufacturing mode" through which they were trying to "maximize the rate of return and the resource at the same time and that "drilling synergies" were "well documented." Defendant Harper also discussed "zipper-style completions" as "efficient" and a potentially "more effective way to complete the wells."

60.     On March 28, 2018, Defendant Leach stated that Concho's manufacturing mode "generates cost savings" and was "very additive." Also on March 28, 2018, Defendant Harper stated with respect to the projects that "the efficiency that comes out of that and also the higher recoveries that come out of that will be the most immediate efficiency gains."

61.     On May 2, 2018, Defendant Harper stated that Concho's "large-scale project development will drive the quarterly production growth trajectory. And with a great start to the year, we've raised our full year 2018 production outlook." Defendant Harper also stated that "results have been very strong," with respect to Concho's shift to large-scale development.

62.     Defendant Giraud elaborated on May 15, 2018, when he explained to investors the shift to manufacturing style development was not a "switch get[ting] flipped" or a "big step change" at Concho because of their incremental and disciplined approach. For example,

Defendant Giraud explained that Concho had built up to larger-scale development mode and Concho was in the late stage. Specifically, according to Defendant Giraud, Concho had "come through discovery, … gone through delineation and now [Concho is] into development mode."

63.     On September 5, 2018, Defendant Leach assured investors that when drilling wells Concho was focused on "precision" driven by models and plans.  Defendant Leach further stated that "[o]ur wells are continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well," adding that "[a]s we're drilling these wells, we try to create a virtuous learning cycle, where we are continuing to learn as we drill," and that "type of efficiency and technology comes out of the wells that we're drilling and I'm telling you, I think, we are at a new inflection point."

64.     Likewise, Defendant Harper explained on October 31, 2018, that Concho's "large-scale projects … really emphasize planning and planning ahead" and Concho's team has done a good job of that." With respect to large-scale development, Defendant Giraud stated "[w]e like what we're seeing. We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them."

65.     On February 20, 2019, Defendant Leach stated that they were "seeing the results they expect" with the transition to large-scale projects: "But certainly what – I think what we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect and it's enabling us to do some pretty interesting thing from testing and continuing to understand the best way to do it."

66.     Defendants also repeatedly affirmed the Dominator project, including that its initial production was positive. On the August 2, 2018, Defendant Giraud responded to questions regarding Concho's projects sizes, including the Dominator, which the Company had to

"coordinate over a year in advance." In his response, Defendant Giraud stated that these larger
projects were "a steady evolution over the last couple of years as we've tested different spacing
between – within a zone and between zones." Defendant Giraud later stated that Concho was
"drilling really good wells."

67.     When the Dominator project started producing in early 2019, the Defendants
claimed it was a success. On May 1, 2019, Defendant Leach stated that he saw "strong early
production out of our latest projects, including the Dominator," later adding that "returns look
pretty good for us." Further with respect to Dominator, Defendant Giraud stated "the teams did a
fantastic job on that, bringing that project and a couple of other large ones this quarter and putting
well production actually ahead of schedule" With respect to 20 plus well projects like the
Dominator, Defendant Leach stated that drilling projects of this "kind" would "grow in wells in
the project over time" and that such projects "drives a lot of value creation."

68.     Throughout the Class Period, the Defendants also repeatedly increased Concho's
expected oil and production growth for the 2018-2020 time frame due in part to the Company's
"strong operating momentum." Defendants elaborated on the basis for their forecasts and
purportedly disclosed the facts that went into them.  For example, February 21, 2018, Defendant
Leach told investors that "when we give guidance, we try to forecast the things that we're aware
of at the time we give the guidance."

69.     Defendants repeatedly stated they were modeling for parent-child interference in
their manufacturing mode development and that Concho's well spacing was data driven with a
focus on mitigating risk. For example, when asked about whether Concho was seeing any
degradation due to parent-child wells in its manufacturing mode strategy, Defendant Harper told
investors on February 21, 2018, that "we've modeled the outcome as we see it based on spacing

that has either already happened or will happen in the future." On March 28, 2018, Defendant Leach stated that Concho's manufacturing mode "minimizes parent-child locations."  On May 15, 2018, Defendant Giraud specifically told investors that with respect to knowing what well "spacing needs to be," Concho was "farther down the line" and "in a later stage of innings."

70.    Defendant Giraud told investors on October 31, 2018, when discussing using large-scale projects to "maximiz[e] resources by minimizing the impact of the parent-child effect," that "we have built our type curves and our internal modeling based upon the results we have seen" and "everything we've seen has been consistent with what we were expected and has [been] baked into" the 2019 and 2020 production outlook.  Defendant Leach added that "we think we have estimated very well." With respect to parent-child interference in Concho's multi-well projects, Defendant Leach stated "[i]t's different by zone and different by area. And it's extremely complicated. And we're developing a program to minimize it." Defendant Leach added that drilling and well spacing was "one of the best parts of our business."

71.    On September 5, 2018, Defendant Leach explained to investors that one of the reasons Concho was engaged in manufacturing mode was "to minimize the pressure syncs that create parent/child relationships between wells." When asked about the risks of such development projects, the Defendants told investors that they utilized multi-well pad drilling and project development "where practical." Moreover, Defendant Leach told investors on September 5, 2018 that the management of risk was something he thought about but that scale help's Concho manage risk. On February 20, 2019, Defendant Harper stated that "[o]perationally, things are proceeding as planned" and that Concho's manufacturing mode development "continue[s] to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments."

72.     Nevertheless, the Defendants also told investors that they were not putting all their eggs in one basket and that its large-scale projects were dispersed among Concho's asset base. As Defendant Leach stated on September 5, 2018, Concho had a "philosophy of having a portfolio approach to mitigate risk." On March 4, 2019, Defendant Harper told investors that Concho has "historically been pretty conservative in the way we've accounted for inventory and well spacing" and "that's been [Concho's] view up till now." With respect to the Dominator project, on September 5, 2018 Defendant Leach described it as an "extreme example" of the manufacturing mode and Concho's "most aggressive multi-well pad."

73.     These statements and those discussed below, however, where materially false or misleading when made as illustrated by the statements from multiple former Concho employees and the Defendants' own post-class period admissions.

### D.     Former Concho Employees Demonstrate that the Defendants' Class Period Representations Were Materially False and Misleading

74.     FE-1 joined Concho before the Class Period and was on the technical staff that designed and executed the Dominator project. During the Class Period, FE-1 reported to managers who reported to Defendant Giraud, who reported to Defendant Harper, who reported to Defendant Leach.

75.     According to FE-1, Concho typically had a "theme" behind their annual capital budgeting process. The objective for 2018 was to shortcut getting the answer regarding the number of wells that could ultimately be drilled on Concho acreage and to determine how closely wells could be spaced together.  In turn, Concho intended to take their "lumps" in order to get there.

76.     According to FE-1, Concho would traditionally drill one well at a time, but the theme called for the shortcut of simultaneously drilling of wells closer together to prevent the permanent loss of Concho's resources.

77.     FE-1 recounted how Concho began planning Dominator in August 2017 and recalled attending regular budgeting meetings where the tight spacing was discussed along with the risks associated with this type of drilling. At these meetings it was determined that all risk considerations would be handled by the corporate teams, so that it would be consistent companywide.

78.     FE-1 explained that these budgeting meetings were attended by all of the technical teams at Concho, not just those on Dominator.  FE-1 stated that Defendant Giraud lead these meetings.

79.     FE-1 explained that with respect to preparing a production forecast, first the reservoir engineers are responsible for putting together the project's production forecast. After being initially prepared by reservoir engineers it was finalized in an iterative process and sent up to Defendant Giraud. According to FE-1, following this the data was passed to the corporate engineering group for a high-level review. Then the data would be sent to the corporate finance planning group for use in the Company's public financials. Finally, the data would go to Defendant Giraud for discussion with the technical teams for final approval. As discussed below, according to FE-1, risking should have gone on top of the final data to account for the experimentation risk, but it was not done so.

80.     When FE-1 was evaluating the final data set for Dominator it was clear that the necessary risking had not been applied.

81.     According to FE-1, there was a conscious decision made by Defendant Giraud to use Concho's historical risk profile numbers in forecasting rather than apply the significantly higher risk profile recommended by FE-1 and his team. FE-1 stated that his team's analysis was tracked in Concho's *Aries* database.[2]  FE-1 explained that he was given the directive to apply the historic or off the shelf risk profile to Dominator by Defendant Giraud.

82.     FE-1 explained that given the number of wells that were being done all at the same time on Dominator, the risk profile far exceeded any previous projects at Concho or within the industry.  Thus, according to FE-1, the traditional methodology could not be relied upon.

83.     FE-1 further elaborated that despite it being widely known that drilling wells closer together increases their risks, no such considerations were being made.  According to FE-1, he was frustrated because there was a refusal amongst management, and most significantly Defendant Giraud, to treat Dominator differently than previous Concho projects.

84.     According to FE-1, despite knowing at Dominator that the distance between wells carried significant risks, Concho chose to treat every well as if it was an individual, isolated well in their risk assessment.

85.     FE-1 explained that all the information about the production forecasting was housed in *Aries*.

86.     Again, FE-1 stated that he repeatedly brought up his concerns in meetings attended by Defendant Giraud but was not being heard. According to FE-1, although Defendant Wright was still at the Company until 2019, Defendant Giraud was functioning as the COO as early as 2018.

---

[2]     According to their site, the ARIES Petroleum Economics and Reserves Software provides comprehensive enterprise-wide property and data management, production and reserve forecasting (using decline curves or other methods), and proven economic evaluations for operations, engineering, and business teams.

87.     Despite Defendant Giraud not appreciating anyone questioning his decision, FE-1 expressed his concerns to him in multiple meetings. FE-1 recounted how his two biggest concerns were that Dominator was being improperly "risked" and that the use of these improper valuations would ultimately impact the roll-up of the Company's public forecasts. FE-1 told Defendant Giraud directly at meetings that they could not use the old risk factors for Dominator because the risks have changed but was instructed to do so. FE-1 described himself as animated in these meetings regarding his concerns and reiterated that he was continuously ignored.

88.     As a result, according to FE-1, Defendant Giraud's October 31, 2018 claim that the difference in the development process regarding the mitigation of parent/child well interference in single wells versus multi-well projects was "definitely baked … into all our plans and our forecasts" was false and misleading to investors.

89.     According to FE-1, Concho did not model for the known "degradation" that comes with that kind of drilling. FE-1 explained that "never in the history of the oil business" could you assume that wells spaced closer together were not subject to greater risk, specifically risk of degradation—which is precisely what Concho was doing at that time. FE-1 described it as "mind-blowing" to him. According to FE-1, the risk was just "disregarded" during the Class Period.

90.     FE-1 stated that drilling closer changed the Company's risk profile, but Concho did not change its underlying risk assumptions; there was no assumption made that risk would get worse the closer wells were spaced. FE-1 reiterated that "there is not an engineer in the world" who would not recommend increasing the risk in the budget models based on the tighter spacing. FE-1 was then asked if the modeling that he was referring to would make it into Concho's financial forecasts that were disclosed to the market and FE-1 responded that the modeling (production forecasts) "is the basis" for the financial forecasts. Moreover, FE-1 confirmed that

the financial forecasts were unreasonably high based on the failure to account for Concho's increased risk profile in its production forecasts.

91.     According to FE-1, the Dominator was the "poster child" for the closer drilling initiative but that the Company's theme was bigger than just the Dominator. Indeed, FE-1 stated that Dominator was a "reflection of everything" that was happening at Concho during the Class Period. FE-1 made clear that the projections for Dominator and for the majority of Concho's projects at the time lacked the proper risk calculations.

92.     FE-1 stated that Dominator was not even the worst performing project and that Concho's issues went beyond just Dominator.

93.     FE-1 explained that Dominator was just one of many projects under the same initiative to find the limits of well spacing that Concho had active during the Class Period.

94.     Moreover, according to FE-1, Concho did not appropriately change their risk profile/reserves to account for spacing risks on these projects, just like they did not do so on Dominator. Indeed, FE-1 spoke with members of Concho's Corporate Financial group who said that the Dominator was not even the worst of Concho's projects (referring to the lack actual performance relative to what was in the final plan) despite it being the largest in scale.

95.     Moreover, FE-1 stated that historically, Concho's activity had a smattering of risk profiles, but the concentration of large-scale, downspaced, simultaneous drilling in 2018 significantly increased Concho's risk profile without having the lower risk projects to balance it out.

96.     FE-1 made clear that the added risk related to the tighter spacing during the Class Period was quantified in Concho's *Aries* database but was not reflected in their production forecasts, which caused the production forecasts to be significantly overstated.

97.     According to FE-1, these riskier projects made up roughly 90% of the 2018 budget at Concho.  According to FE-1, Concho was not clear to the market about how much of their forecast was at risk and that Concho's entire production budget at the time was a "test" and Dominator was not a one-off situation.

98.     According to FE-1, the Dominator project was 3% of Concho's overall budget in 2018. He described that as a significant and large project for Concho.

99.     FE-1 referenced the chart in Paragraph 311 and advised that the chart made Dominator look differently than all other projects intentionally and was completely misleading. He explained number of wells per reservoir was misleading because it implied that Dominator was materially riskier than some of Concho's other projects which was false because Dominator was not Concho's only well spacing project at the time. FE-1 added that it was clear to him from the chart that Concho was attempting to cast Dominator as completely unique in terms of risk.

100.    FE-1 explained that originally Dominator had been projected to have massive production but that ultimately, Concho only achieved a fraction of that expected production.  FE-1 also stated that the majority of what Concho executed in 2018 and 2019 did not live up to what had been forecasted and it was clear that these projects (including Dominator but others as well) did not live up to what Concho had forecasted.

101.    When asked about Defendant Giraud's February 20, 2019, statement that Concho was "seeing the results we expected," FE-1 explained that Concho started learning very quickly what was happing with the wells because they had pressure gauges in the wells. In other words, FE-1 explained that Concho had "live" data from each well.  He recounted how early in the process it was clear that production was below what Concho had projected. In addition, Concho quickly started to see "pressure degradation" which was a concern. According to FE-1, the lack

of production and the amount of draw down was alarming. He explained that the pressure was monitored by pressure gauges that correlated to oil production and that everyone at Concho knew immediately, including Defendant Giraud, that Dominator was not producing what had been projected.

102.    FE-1 also stated that it was misleading for Defendant Leach to claim on May 1, 2019, that Dominator's "returns look pretty good."

103.    FE-1 went on to say that once the Dominator project came on-line and it was clear that production was suffering, there was a big effort to revise and get back in line with the budget. According to FE-1, many of Concho's well spacing projects, including Dominator, were not performing well. FE-1 recounted that Concho eventually went back and added the real risk assessments.

104.    When asked why Concho would not have initially baked into its forecasts the accurate risk assessments, FE-1 responded that at the time Defendant Giraud was blinded by the "big numbers" that did not include the proper risking.

105.    According to FE-1 there were weekly Tuesday meetings amongst the executives, including Defendants Giraud, Leach, and Schroer and that Dominator was likely discussed during these meetings.

106.    FE-2 worked as a Lead Reservoir Engineer for Concho from January 2012 until January 2017 until he transitioned to an Advisor role, which he maintained until his retirement in January 2020. FE-2 reported to Vice President of Delaware Basin Jeff Gasch, who reported to Senior Vice President of Assets Clay Bateman, who reported to Defendant Giraud.

107.    FE-2 was assigned to conduct a post-audit of the Dominator project towards the end of 2019, FE-2 recalled that he was very surprised to find Concho had drilled 24 wells. FE-2 said this was "unbelievable."

108.    FE-2 had performed studies in the Delaware Basin, citing the Wolfcamp zone as an example, prior to the Dominator project.  Based on the results of that prior well drilling study, FE-2 concluded that only eight to twelve wells should have been drilled in the area that was selected for the Dominator Project.

109.    FE-2 explained that areas to the east, west, and possibly north of the Dominator had already been heavily drilled by EOG Resources, INC. ("EOG"), and the area was therefore depleted to begin with. FE-2 further explained that, due to the proximity of the EOG wells, the Dominator wells qualified as child wells, also known as delayed offset development wells, which always ultimately produce less oil.

110.    According to FE-2, an economic drilling project produces 550,000 to 650,000 barrels of oil per well, and the Dominator wells produced only 300,000 to 350,000 barrels per well.

111.    FE-3 was a senior technical expert who worked in the applied technology team at Concho throughout the Class Period. FE-3 performed both advisory and technical functions for the Company for its ongoing projects.

112.    FE-3 advised the geoscience team working on the Dominator project during 2018. According to FE-3, he was fully aware of the project.  FE-3 stated that he and the geoscience team had concerns about the project. FE-3 explained that that there was plenty of evidence that this was an overly optimistic project, but management had the mindset that "we [Concho] can do no wrong."

113.    FE-3 stated that Dominator area was "over-completed," meaning the fractures of one horizontal completion interfering with another due to close well spacing, as a result of the project.  FE-3 also stated that management, who he identified as those occupying the C-Suite to Vice President roles, had expressed "irrational exuberance," meaning the existence of pre-project excitement despite the "very strong evidence" that drilling wells so close was problematic. FE-3 recalled several conversations with the geoscience team about the Dominator project and its issues, with the common sentiment being that "this [the Dominator project] is really stupid." When asked what was meant by "stupid," FE-3 explained that there seemed to be no technical basis for the Dominator project, that it had been too optimistic and aggressive, and failed to adequately weigh the risks with the thought of failure unreasonably remote. FE-3 recalled that the junior staff on the geoscience team expressed concerns about the project, but that they were ignored.

114.    FE-3 recalled a group meeting following the completion of Dominator that consisted of a "lot of back slapping" and "celebrations" before any oil had actually been produced. According to FE-3, he, along with other geoscientists and some engineers, looked on skeptically during this meeting.

115.    FE-3 explained that Defendant Giraud and Defendant Harper had drank "a little too much of their own Kool-Aid." FE-3 added that Giraud was an attorney who had as "close to zero field experience as anyone could have."

116.    FE-3 explained that based on how the project ended up he does not believe fracture modeling was conducted. FE-3 further explained that fracture modeling involves running several different scenarios with different variables to see if there would be interference with the wells. FE-3 explained that multiple models should have been run and the results would determine the

viability of the project. According to FE-3, a "halfway decent" model would have been able to predict the results seen in the Dominator project.

117.    FE-3 explained that certain modeling could have been done, whether in-house or contracted to test/model performance based on a number of parameters. According to FE-3 multiple models would have been used, but he does not believe that any were. FE-3 added that it was possible that models were run, but if they had been then they were ignored. FE-3 further recalled that following Dominator, he was aware of much more modeling being performed at Concho.

118.    FE-3 recalled expressing his concerns to the former Vice President of Geoscience and Technology and former Geoscience Manager at Concho.  Specifically, FE-3 recalled informal conversations with them where he spoke to some of the specifications for the Dominator Project looking "crazy," such as the 200-250 foot well spacing and the use of a fracture stimulation process similar to wells spaced much further part. FE-3 explained that wells spaced closer together using parameters of those spaced further apart will experience interference. In particular, FE-3 asked them about the 200-250 foot well spacing and whether "they consider the implications" because it did not seem like a "good idea." FE-3 also asked if they modified the completion parameters to account for the proximity of the wells and FE-3 was informed that they did not modify the completion parameters and they were using the completion parameters similar to wells that were 500 to 1,000 feet apart.

119.    According to FE-3, the completion phase was done in three sets. FE-3 explained that issues started to emerge with the second phase, which failed to reach maximum production, declined more quickly, and hinted at "interference." FE-3 explained that the third phase showed "immediate decline" as the wells were already partially completed.

120.     According to FE-3, internal fracture stimulation data would be subject to real time monitoring while production data would be available on a daily basis, at least.

121.     According to FE-3, "the Company lost its footing," citing 2018 as a pivotal year.

122.     According to FE-3, Concho was a "fine" company until it "went off the rails" with some of its management decisions.

123.     FE-3 recalled that Defendant Giraud played a key role in two prior poor deals for the company, including the acquisition of RSP Permian for an "idiotic, crazy price."   FE-3 recalled former Director of Operational Planning Beth Harrison referring to the project as "MacArthur" (referencing the "I shall return" quote from General Douglas MacArthur) and "Boomerang" because Concho had previously owned approximately a quarter or a third of the assets to be acquired from RSP Permian.  FE-3 explained that Concho had previously sold these RSP Permian assets for pennies on the dollar.  FE-3 described the reacquisition of RSP Permian to be irrational exuberance at the height of the market.  In the end, ConocoPhillips essentially paid the same amount for Concho that Concho had paid for RSP Permian.

124.     FE-3 explained that the total cost of the RSP Permian acquisition was approximately $9.5 billion, and ConocoPhillips acquired Concho for approximately $9.6 billion (excluding debt), noting that prior to the RSP Permian deal Concho was worth approximately $26 billion. FE-3 noted that it was "rare to see a company fall so fast."

125.     FE-4 was employed as a Senior Reservoir Engineer from March 2014 until February 2019. FE-4 explained that he was hired to help educate Concho employees about "multi-well" pads and was a part of a group that would examine the "economics" of potential projects.

126.     FE-4 explained that he worked in a group that was "adjacent" to Dominator that was trying to come up with a competing project for funding. FE-4 explained that his group had

pitched a different project which utilized proven methods, but with the introduction of a new technology that was going to include considerable cost savings. FE-4 expressed surprise at the Company's willingness to bypass proven methods to take on the Dominator instead.

127.     According to FE-4 there were budgeting meetings each year that are run by the reservoir engineers where they present ideas to management in an attempt to secure a portion of the budget for the following year.

128.     FE-4 recalled that at the budget meeting in October 2017 that the group pitching the Dominator focused their argument that year on timing and how completing the wells simultaneously would decrease the parent-child interference.  FE-4 stated that not only did this not make sense, but that everyone knew it would not work.  According to FE-4, he and his colleagues were shocked at the Company's decision to pursue the Dominator project.

129.     According to FE-4, at this stage in the process for Dominator, fracture modeling had not been completed and the modeling used to justify projects was "not quite back of the napkin," but relied on "broad assumptions."

130.     According to FE-4, the "tight curve" promised on the Dominator was unrealistic, because it did not make any adjustments based on the proposed well formation in terms of spacing and the inclusion of such a large quantity of wells. FE-4 explained that the calculations were based on a two-well model and how two wells interact in a vacuum, rather than looking at the project in its entirety.

131.     FE-5 worked at Concho as a Landman throughout the Class Period.

132.     FE-5 recalled that the Dominator project was "very controversial" within the Company and that "everybody thought it was too tight." FE-5 recalled speaking to approximately 10 geologists and engineers who worked on the Dominator Project and that they were "horrified

by what was happening." According to FE-5, the wells at the Dominator Project were "absolutely" too tight, and that he did not talk to a single geologist or engineer who felt otherwise. FE-5 stated that there was no scientific justification for the drilling formation at the Dominator Project.

133.    According to FE-5, the Dominator project was pushed from the top downwards by Concho's executive team despite staff protests.  FE-5 recalled that William Giraud was the driving force behind the Dominator project at all relevant times and that the direction of the Dominator project was the COO's responsibility.

134.    FE-5 relayed that he heard from a former geologist that Concho had previously drilled a couple of tight formations at the Grissom wells in Culberson County, TX with "God-awful" results. FE-5 suggested that Concho management thought "they could get away with" spacing wells tightly at the Dominator Project since it was located at one of the best spots in the Delaware Basin, although "not one geologist agreed." FE-5 went on to state that management "poured $100 million into the ground and burned it."

135.    FE-6 worked as a Superintendent Well Planner for Concho from June 2011 until January 2018 and was responsible for drilling new formations.

136.    FE-6 was not directly involved with planning the Dominator project but he heard about the project through colleagues.  FE-6 felt Concho was planning to drill "way too close" and was surprised because in his opinion it didn't appear that Concho had looked into the consequences of spacing wells so close together.

137.    FE-6 explained that the horizontal fracking process is a delicate operation that can easily disturb the ground in the immediate area where the drilling has occurred. FE-6 went on to relay that fracking drilling distances should thus be approached with an abundance of caution.

FE-6 continued to say that from his perspective, it did not appear that Concho gathered sufficient data prior to drilling wells so close together.

138.    FE-6 explained that from a driller's point of view, when you frack something, you permanently alter it. According to FE-6, it is like putting a "firecracker in an ant hill," the ground will be changed as a result of the activity and it is necessary to be able to adjust, whether it is unexpected frack water, unconsolidated ground formations that require additional mud, or another challenge entirely. FE-6 explained, that from his perspective it did not appear Concho had prepared to or was able to appropriately adjust to the changes in the ground resulting given the close-proximity of the wells.

139.    FE-7 worked for Concho as a Division Order Analyst from September 2018 until June 2020 and was a member of the team responsible for the Dominator oil pad.

140.    According to FE-7, he believed that the reservoir economics for Dominator "wouldn't work out." FE-7 likened a reservoir to a bathtub full of water and stated that the most sustainable way to drain the bathtub is to "poke one hole and drink through one straw." FE-7 went on to say that, at the Dominator pad, Concho drilled 24 holes and employed "24 straws." FE-7 explained that, as more holes are drilled into an oil reserve, productivity decreases as pressure decreases and that the 24 wells caused pressure at Dominator to decrease exponentially. FE-7 went on to say that "pressure is the name of the game" in the oil drilling industry.

141.    FE-7 stated that Dominator was the "poster child' for this type of aggressive drilling.

142.    FE-8 was employed by Concho as a Senior Geologist from February 2011 until June 2019. When asked about the Dominator project, FE-8 explained that he had heard about the

project from others at Concho and was present at least one geologists' meeting where it was discussed.

143.   According to FE-8, a FE-2 had warned the "powers to be" that the Dominator would not be successful based on his simulations. FE-8 referred to FE-2 as the "head guru" and the "frack guru" and explained that FE-2 oversaw production for all the simulations used for fracking and to ensure appropriate density of the wells. FE-8 added that FE-2 had informed management prior to the beginning of the project that it would not work and that they area was going to be over-drilled, but "no one would listen."

144.   According to FE-8, the problem with Concho's management was hubris.  The Company had been immensely successful and was growing fast and this level of success gave management the feeling that they had the "Midas touch."  FE-8 explained that it was this overconfidence that contributed to management ignoring FE-2 and FE-2's warnings that Concho was going to over-drill the area.  According to FE-8 another contributing factor to the project's failure was COO William Giraud.  According to FE-8, Defendant Giraud was the one to sign off on the Dominator project.

145.   FE-8 recalled Concho's strategy prior to the Dominator project being an "intensive and technical process" to determine the best well numbers and spacing. According to FE-8, the Company experimented with patterns and density during this period, which focused on a "gradual process" to identify the sweet spot regarding well numbers and their configuration. FE-8 explained that instead of continuing this gradual process, Concho went "all out" with the Dominator, despite FE-2's warnings about the density of the wells. FE-8 reiterated that Concho did not continue to take "baby steps" and really "packed in [the number of wells]."

146.    FE-8 recalled working with FE-1, who had a prominent role with the Dominator project. FE-8 described FE-1 as "really technically solid and sound."

147.    According to FE-8, if he were investigating this matter he would want to speak with FE-1 and FE-2.

148.    FE-9 was a Senior Data Specialist at Concho from February 2018 to July 2020 and his position fell under the umbrella of IT.

149.    FE-9 recalled attending an IT department team building event in January 2020, which was an off-site half-day attended by several executives on hand to answer employee questions.

150.    According to FE-9, Defendant was present and was asked very pointedly what had caused Concho's poor stock performance in the prior quarter.  FE-9 explained that Giraud attributed the poor results to performance of the Dominator project and the acquisition of RSP Permian.

151.    According to FE-9, Defendant Giraud explained that the spacing for the Dominator project was "bad" and that the issues "should've been caught a lot sooner."  Defendant Giraud continued to say that there were too many wells and drainage was a problem.  Defendant Giraud described the project as "inefficient.

152.    FE-9 also stated that Defendant Giraud said Concho paid "way too much" for the acquisition of RSP Permian.

153.    According to FE-9, similar reasons were discussed at the companywide Q1 2020 meeting.  FE-9 explained that they companywide meetings occurred each quarter and were held in the Company's cafeteria and were streamed for the satellite offices.

154.    FE-9 recalled Defendant Leach saying at the Q1 2020 meeting that Concho "could've tried hiding" the negative impact of the Denominator and that they could have "fudged" the numbers associated with RSP Permian's reserved.  FE-9 further recalled Defendant Leach saying that if they had "hidden" these developments that the Company's stock "could've not taken as bad a hit" and that "being open hurt us."

**E.    Defendants' Admissions and Analysis of the Dominator's Production Demonstrate that Their Class Period Representations Were Materially False and Misleading**

**1.    Data Shows that Dominator's Initial Production Was Significantly Below its Peers**

155.    To quantify and project the potential production and associated revenue of a natural gas or crude oil well (or wells), petroleum engineers commonly use and rely upon a comprehensive set of equations called decline curve analysis ("DCA"). This type of analysis was first developed by J.J. Arps in the 1940s and has been peer-reviewed, further-refined, and extended since its development. The primary use of DCA is for production forecasting and the estimation of reserves of natural gas or crude wells based upon their performance. Decline curve analysis is an industry standard analysis method that is commonly used and widely accepted as a method for the estimation of potential production.

156.    During the life of an oil or natural gas well, production rates decline over time from their initial rates, primarily due to the loss of reservoir pressure. The initial production (IP) rate is used as the starting point for that decline. IP is a sum of the daily production volumes over the first month and is usually the maximum month of natural gas or crude oil production from a well.  Any decline curve intended to estimate the rate of decline of natural gas or crude oil production from a well is impacted by the IP. Natural gas or crude oil wells beginning their lives with lower IPs produce lower cumulative volumes than wells that begin their lives producing at

higher rates.  Publicly, it has become important for producers to show that they are drilling and completing wells with very high IPs as a means of demonstrating a high quality well (or group of wells).





157.    As set forth in the above charts, data from the New Mexico Oil Conservation Division ("NMOCD") provided a production volume dataset of 206 natural gas and crude oil wells in New Mexico producing from the Wolfcamp formation. This dataset included the 23 wells drilled by Concho at the Dominator pad. In an effort to assess the wells from Concho's Dominator pad, an analysis was performed to compare initial production from the Dominator wells to other wells also producing from the Wolfcamp.

158.    To reach this result, the IP for each well was determined, then the standard deviation and mean were determined for the IP dataset. Standard deviation is a measure of the average amount of variability in a dataset. It shows, on an average, how far a value lies from the mean (or average) value. The larger the standard deviation, the more variable the data set is. The

mean IP for natural gas was determined to be 92,098 one thousand cubic feet of natural gas (mcf) per month with a standard deviation of 39,328 mcf/mo. The mean IP for crude oil was determined to be 49,839 barrels of crude oil (bbls) per month with a standard deviation of 23,217 bbls/mo.

159.    For each IP rate the probability of that value occurring was determined and then a cumulative probability plot was created. Using a cumulative probability plot, one can read off the probability of a value being above or below a particular value. In the charts IP rate is shown running along the X-axis and the Y-axis displays the percentage of likelihood (from 0 to 1) of a well achieving that IP rate compared to the rest of the dataset.

160.    As an example, in the Natural Gas IP plot, there is a 25% probability (P25) of being below ~66,000 mcf/mo. Consequently, that also means there is a 75% probability of being above ~66,000 mcf/mo.  The vast majority of the Dominator wells are below 25% and skewed toward the left side of the chart, meaning that the initial performance of the Dominator wells was significantly lower when compared to the majority of other wells completed into the same formation, demonstrating an overall poor performance of this group of wells from the very outset.

161.    Further, as noted above, IP rates typically represent the highest level of production an oil and natural gas well will ever reach. Therefore, based on the Dominator's initial performance, it's production rates would only further decline from poor to worse.

### 2.    Defendants' Post-Class Period Admissions Contradict Their Previous Positive Statements About the Dominator and Similar Projects

162.    After the close of trading on July 31, 2019, Defendants cryptically stated that the wells at Dominator were "too tight." At this same time, Defendants revealed that Concho had significantly reduced its active rig count below prior estimates and issued weak production forecasts.

163.    On August 1, 2019, Defendants clarified that the reduced activity was directly caused by aggressively spaced wells, including at the Dominator, which had forced the Company to scale back production in order to avoid off shooting budgets. Further Defendant Giraud would also reveal that "a number of the projects we have this year and including a couple more coming on in the back half of this year, you're going to see them developed at a modestly more dense than our resource spacing, but nothing anywhere close to Dominator."

164.    On September 4, 2019, Defendant Leach attributed Concho's poor 2019 performance and outlook to numerous projects with tightly spaced wells, citing to the Dominator as "the most high-profile example of our density work":

> Lower activity impacts our oil growth, and we trimmed our full year outlook from 29% to 24% at the midpoint, which corresponds to the factors at play in the capital budget. The lower oil outlook also incorporates the performance from spacing test. The Dominator project is the most high-profile example of our density work, but we have other projects at tested spacing, mainly in the Northern Delaware Basin.

165.    On October 30, 2019, Defendant Leach stated that for "2020 and beyond, [Concho] will develop fewer wells per project at wider spacing." Defendant Leach also revealed that due to lingering "spacing tests," that the Company would not see increased capital efficiency until 2020.

166.    On February 19, 2020, Concho released its 2019 annual report which included a new risk factor with respect to "higher concentration of activity and tighter drilling spacing." The report also disclosed a 16% reduction in the Company's Proved Reserves, primarily in the Delaware Basin and attributable to "[n]egative performance revisions [which] were primarily the result of the Company's recent capital programs that included projects testing tighter well spacing."

## V.     DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A.     Defendants' Materially False and Misleading Statements and Omissions in Violation of Section 10(b) of the Exchange Act

#### 1.     Fourth Quarter and Full Year 2017 Financial and Operating Results

167.     February 20, 2018, Concho issued its four quarter and full year financial results and provided 2018 guidance on SEC Form 8-K (the "4Q & FY17 Earnings Release"). The 4Q & FY17 Earnings Release reported that production for fourth-quarter 2017 was 19 MMBoe, or an average of 211 MBoepd, an increase of approximately 28% from fourth-quarter 2016 and 9% from third-quarter 2017. For full-year 2017, total production increased 28% to 70 MMBoe, or 193 MBoepd on a $1.7 billion capital program.

168.     In the 4Q & FY17 Earnings Release, Concho announced fourth quarter net income of $267 million, or $1.79 per share. Adjusted net income totaled $98 million, or $0.66 per share. For full-year 2017, the Company's net income totaled $956 million, or $6.41 per diluted share, and adjusted net income was $311 million, or $2.09 per diluted share. Finally, the Company reported that it generated $513 million of EBITDAX in the fourth quarter and $1.9 billion for 2017.

169.     In the 4Q & FY17 Earnings Release, Defendant Leach informed investors that:

> The fourth quarter was an excellent end to a great year for Concho. *Our operational and financial performance demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position*.

170.     The 4Q & FY17 Earnings Release informed investors that Concho was "*deliver[ing] outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin* and in the Midland Basin."

171.     Concho explained that its "*[h]igh- quality acreage and scale within the Permian Basin enables Concho to efficiently allocate capital while continuing to advance*

45

*manufacturing-style development with leading-edge drilling and completion techniques.*" As a result, Concho touted the following capital spending plan for 2018:

> Concho expects 2018 capital spending to be at the midpoint of its capital guidance range of $1.9 billion to $2.1 billion, which reflects the Company's current outlook for service cost inflation. ***The 2018 capital program is expected to be funded with cash flows from operations and generate 20% crude oil growth and 16% to 20% total production growth year-over-year.*** Approximately 93% of the capital program is allocated to drilling and completion activities, with approximately 65% of that capital directed towards large-scale manufacturing projects. The Company's 2018 capital program is allocated among the following areas: Northern Delaware Basin (40%), Southern Delaware Basin (25%), Midland Basin (30%) and the New Mexico Shelf (5%).

172.     Concho and Defendant statements in Paragraphs 169-171, which *inter alia* touted to investors that Concho (i) had the ability to "consistently execute, control costs and capitalize on opportunities that strengthen our competitive position," (ii) was "deliver[ing] outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin," and (iii) was "efficiently allocate[ing] capital while continuing to advance manufacturing-style development with leading-edge drilling and completion techniques," where materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

173.    In addition, the Company's statement that the 2018 capital program was expected to "generate 20% crude oil growth and 16% to 20% total production growth year-over-year" was materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)   Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)   the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)   as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

174.   Concho also provided a new three-year production growth outlook and touted to investors that the Company "expects to grow total production at a compound annual growth rate of 20% from 2017 to 2020."  Concho went on to attribute this growth over the three-year period to "the Company's high-quality production base," "strong operating momentum" and "the output of reinvesting high-margin cash flow into its drilling program."  Specifically, the 4Q & FY17 Earnings Release stated as follows:

> The Company provided a new three-year production growth outlook. ***Concho expects to grow total production at a compound annual growth rate of 20% from 2017 to 2020. The outlook reflects the Company's high-quality production base and strong operating momentum…. As with the Company's 2018 outlook, growth over the three-year period from 2017 to 2020 is the output of reinvesting high-margin cash flow into its drilling program.***

175.   Concho's statements in Paragraph 174 were materially false and misleading when made for the following reasons:

(a)   Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

176.    The 4Q & FY17 Earnings Release also informed investors that Concho was using its Vast project in the Wolfcamp to "***collect[] valuable data that helps the Company optimize lateral placement, completion design and facilitates planning.***"  Concho also told investors that it was "***utilizing leading-edge technologies, including fiber optic monitoring, to collect valuable proprietary data with real-time and long-term implications for full-field optimization.***"

177.    Concho's statements in Paragraph 176 were materially false and misleading when made for the following reasons:

(a)      Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

51

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

178.     With respect to Proved Reserves, the 4Q & FY17 Earnings Release, the Company stated that its Proved Reserves had increased 17% year-over-year, primarily attributing the increase to drilling and completion operations:

> At December 31, 2017, Concho's estimated proved reserves totaled 840 MMBoe, an increase of 17% from year-end 2016. The

Company's proved reserves are approximately 60% crude oil and 40% natural gas. Proved developed reserves totaled 588 MMBoe, an increase of 26% from year-end 2016. The Company's proved developed reserves represent approximately 70% of total proved reserves.

During 2017, Concho added 194 MMBoe of proved reserves primarily from drilling and completion operations, resulting in a reserve replacement ratio of 275%. The Company's proved developed finding and development cost was $8.68 per Boe for 2017.

179.   Concho's statements in Paragraph 178 were materially false and misleading when made for the following reasons:

(a)   Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)   the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)   Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)   Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)   Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

180.     On February 21, 2018, Concho released its annual report of SEC Form 10-K (the "2017 10-K"), which was signed by Defendants Leach, Wright, Harper, and Schroer. The annual report contained the following risk factor with respect to multi-well pad drilling:

> **Multi-well pad drilling and project development may result in volatility in our operating results.**
>
> ***We utilize multi-well pad drilling and project development where practical.*** Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area.  Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed.  Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi-well pad drilling and

project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations.

Additionally, infrastructure expansion, including more complex facilities and takeaway capacity, could become challenging in project development areas. Managing capital expenditures for infrastructure expansion could cause economic constraints when considering design capacity.

181. The statements in Paragraph 180, which incorrectly claim that Concho "utilzed multi-well pad drilling and project development where practical," were materially false and misleading when made by Concho and Defendants Leach, Wright, Harper, and Schroer for the following reasons:

(a) Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b) the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c) Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d) Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational

compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

182.    The 2017 10-K also reported that for the year ended December 31, 2017, that Concho's Proved Reserves, which it defined as "those quantities of oil and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations," were 840 MMBoe, with approximately half of said reserves in the Delaware Basin:

> At December 31, 2017, substantially all of our 840 MMBoe total
> estimated proved reserves were located in our core operating areas

and consisted of approximately 60 percent oil and 40 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our four core operating areas.

*\*\**

**Northern Delaware Basin.** At December 31, 2017, we had estimated proved reserves in this area of 295 MMBoe, representing 35 percent of our total proved reserves.

*\*\**

**Southern Delaware Basin.** At December 31, 2017, we had estimated proved reserves in this area of 128 MMBoe, representing 15 percent of our total proved reserves.

183.    Concho's statement in Paragraphs 182 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

184.    Also on February 21, 2018, Concho held a conference call with analysts and investors to discuss the Company's fourth quarter 2017 financial results (the "4Q 2017 Earnings Call").  Defendants Leach and Harper participated on the call.

185.    On the 4Q 2017 Earnings Call, Defendant Harper reiterated Concho's disclosure that the Company's investments in 2018 would "grow oil approximately 20%." Defendant Harper stated as follows:

> *As we look to 2018, our total capital investment is expected to be $2 billion, with 93% allocated for drilling and completion activity. This level of investment is expected to grow oil approximately 20%. Importantly, approximately two-thirds of our development capital will be directed to large-scale, multi-zone projects.*

186.    Defendant Leach also made clear that "*when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance*."

187.    Defendant Leach's and Defendant Harper's statements in Paragraphs 185-186 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)    Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)    Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)    the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)    as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

188.    Also on the 4Q 2017 Earnings Call, Defendant Leach told investors that Concho's "strategy allows us to adapt quickly and our history in the Permian, which is the best value-creating engine in our industry, enables us to be a leader in the development here," and that "[d]eveloping large-scale projects, manufacturing mode, whatever you call it is one way that we're doing that."  In particular Defendant Leach stated the following:

This industry is exciting. Commodity prices change, new plays emerge, technologies advance. ***Our strategy allows us to adapt quickly and our history in the Permian, which is the best value-creating engine in our industry, enables us to be a leader in the development here. Developing large-scale projects, manufacturing mode, whatever you call it, is one way that we're doing that.***

189.     Importantly, Defendant Leach assured investor that Concho's strategy had not changed: "***While our strategy is the same, the development of our inventory is more sophisticated and creates an opportunity to extend our competitive edge***."

190.     Defendant Harper added that "[o]ver the last few years, [Concho's] ***transition to large-scale, multi-well projects has been an important development that will continue to drive growth, innovation and efficiencies.***"

191.     Similarly, Defendant Leach assured investors that based on past experiences Concho's "development activities ***validated*** well spacing, lateral placement and completion design."  Specifically, Defendant Leach stated that:

> ***Our accomplishments last year paved the way for continued operational and financial performance for the next decade. Our development activities validated well spacing, lateral placement and completion design***, and our strategic acquisitions and asset exchanges added complementary leasehold for long lateral development. ***The result is more high-quality reinvestment opportunities to fuel our growth.***

192.     Defendant Leach's and Defendant Harper's statements in Paragraphs 188-191 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

193.    During the call analysts were particularly interested in the issues of well spacing, parent/child interference, and degradation. One analyst asked how investors should "think about moving to field development as it relates to child wells versus parent" and how Concho thought about it.  Defendant Harper explained that Concho had "successfully made [the] transition" to large-scale development and there would be "more of that in the future to attempt to avoid creating child wells" and that Concho would be testing when there were child wells.  The discussion occurred as follows:

> **Analyst**: Jack, most of your development to date, the tremendous growth over the last several years has, I guess, been single well pads as you've locked up your acreage and moved to an efficient mode of operation. How should we think about moving to field development as it relates to child wells versus parent, and how do you factor that into your thoughts in terms of guidance and so on?
>
> **Defendant Harper**: Sure. And *that is one of the reasons to move to the large-scale development as we have*. And I think *we've successfully made that transition. And so you will see more of that in the future to attempt to avoid creating child wells. Where there are child wells, which is a smaller percentage of our opportunities, we will continue to test that and make sure that we try not to leave any behind.*

194.    When asked by an analyst as to whether Concho was seeing any degradation in its strategy, Defendant Harper responded that "*we've modeled the outcome as we see it based on the spacing that has either already happened or will happen in the future.*"

195.    Defendant Harper's statements in Paragraphs 193-194 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)    Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 2.     Concho Presents at the Raymond James 39th Annual Institutional Investors Conference

196.    On March 5, 2018, Defendant Harper presented on behalf of Concho at the Raymond James 39th Annual Institutional Investors Conference.

197.    During the conference, Defendant Harper addressed the Company's 2018 capital budget and told investors that they "should expect more of the same in '18 as you saw in previous years from Concho."  In particular, Defendant Harper stated that:

> Here, let's talk about the 2018 budget for just a moment…. Well, first of all, before we go there**, let me say you should expect more of the same in '18 as you saw in previous years from Concho. It's going to be a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects that we've been describing to you.**

198.    Defendant Harper's statements in Paragraph 197 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)       the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)       as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

199.    Defendant Harper also explained Concho and the other Defendants meant "cube development" when they spoke about "manufacturing mode."  In particular, Defendant Harper stated:

> *So manufacturing mode is a term we use. Other people call it cube development and there's other names as well.* What we're trying to do is maximize the rate of return and the resource at the same time. And it's a work in progress, as you might guess. But some of the things that we're using as part of that is, clearly, technology. I said before, *taking this empirical data, combining it with modern technology helps us get to, we think, a better answer faster.* I think *the drilling synergies are well documented.* Walking rigs and drilling in nearby proximity. *Certainly on the completion site, not only are our zipper-style completions efficient and may be a more effective way to complete the wells, they're increasingly being priced in a preferential manner as well.* And then production optimization is speaking to this sizing out facilities not for maximum – not necessarily for maximum production, but for a maximum return over a long period of time.

200.    Defendant Harper's statements in Paragraph 199 were materially false and misleading when made for the following reasons:

(a)       Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(e)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(f)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

201.    Further, Defendant Harper told investors that the Company's upcoming large-scale projects were "dispersed amongst [Concho's] asset base" and referenced for the first time

the Dominator project by stating Concho had "a 20-plus well pad or project … that we'll begin this year."  Defendant Harper stated the following in full:

> We've highlighted here on the left side of the page a couple of the upcoming large-scale projects and really just to show you that where some of them are. ***They're very dispersed amongst our asset base***. And they are, in some cases, getting larger. We have a 20-plus well pad or project on here that we'll begin this year, but don't plan to see production until next year on that.

202.    Defendant Harper's statements in Paragraph 201 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(f)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 3.     Concho Announces Plans to Acquire RSP

203.    On March 28, 2018, Concho announced that it had a definitive agreement with RSP Permian, Inc. ("RSP") under which Concho would acquire RSP in an all-stock transaction valued at approximately $9.5 billion (the "RSP Acquisition"). Under the terms of the agreement, shareholders of RSP would receive 0.320 shares of Concho common stock in exchange for each share of RSP common stock, representing consideration to each RSP shareholder of $50.24 per share based on the closing price of Concho common stock on March 27, 2018. The RSP Acquisition valued RSP's Permian holdings at approximately $75,000/acre.

204.    Per the terms of the RSP Acquisition, the consideration given to RSP shareholders in connection with the RSP Acquisition represented an approximately 29% premium to RSP's closing price of $38.92 on March 27, 2018. Upon closing of the transaction, Concho shareholders would own approximately 74.5% of the combined company, and RSP shareholders would own approximately 25.5%.

205.    On March 28, 2018, Defendants Leach and Harper hosted a conference call with analysts and investors to announce Concho's definitive agreement to acquire RSP in an all-stock transaction (the "March 28, 2018 RSP Call").

206.    On the call Defendant Leach touted that the RSP Acquisition would increase Concho's Permian acreage position to over 640,000 net acres, and that the Company expected to realize over $60 million in annual corporate level savings and over $2 billion in operational synergies following the close of the transaction.

207.    On the March 28, 2018 RSP Call, Defendant Leach stated that Concho had the "ability" to move RSP's "assets into manufacturing mode":

> In addition **to our size, scale and execution strength provide us with the unique ability to capitalize on these new complementary assets. This ability includes moving these assets into manufacturing mode, which generates cost savings and minimizes parent-child locations**.

208.    When questioned by analysts on "the advantages of 'manufacturing mode,'" Defendant Leach explained that "multiwell pads is one of the big drivers" and that it "will be very additive."  The exchange was as follows:

> **Analyst**: Sure, understood. And then, I guess, second, the synergies you've talked about and the advantages of "manufacturing mode", can you just give a little bit of additional color or detail around what exactly it is that allows "manufacturing mode" on these assets to drive those synergies?

> **Defendant Leach**: Yes. As Steve mentioned, I mean, the balance sheet to be able to do **intense development**, instead of 1 or 2 little pads, to go to **8 well multiwell pads is one of the big drivers**. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. **All those things will be very additive**.

209.    When asked about the $2 billion plus worth of synergies the Concho claimed would result from RSP Acquisition, Defendant Harper told investors that one of the key drivers for those synergies was "preventing the parent-child relationship with larger-scale development" and that "there's good value in" that driver.  In particular, Defendant Harper stated:

Yes. We've said in total, Scott, that it's in excess of $2 billion, and Tim really hit on the keys. It's long lateral, ***it's large-scale development, it's preventing the parent-child relationship with larger-scale development***, it's that shared infrastructure. ***So those are the key drivers. And there's good value in each one of those***.

210. Defendant Leach's and Defendant Harper's statements in Paragraphs 206-209 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 4.      First Quarter 2018 Financial and Operating Results

211.      On May 1, 2018, Concho issued its first quarter 2018 financial and operating results and provided updated guidance (the "1Q 2018 Earnings Release"). 1Q 2018 Earnings Release reported that Concho's production for first-quarter 2018 was 21 MMBoe, or an average of 228 MBoepd, an increase of approximately 26% from first-quarter 2017 and 8% from fourth-quarter 2017. The 1Q 2018 Earnings Release also reported net income of $835 million, or $5.58 per share, adjusted net income of $149 million, or $1.00 per share, and EBITDAX of $570 million.

212.      The 1Q 2018 Earnings Release further reported that Concho was currently running 20 rigs and six completion crews, including nine rigs in the Northern Delaware Basin, six rigs in the Southern Delaware Basin and five rigs in the Midland Basin.

213.     Defendant Leach was quoted in the earnings release attributing Concho's financial results to the shift to large-scale development: "Our results reflect our focus on large-scale project development, which enables us to maximize ultimate recovery, efficiencies and returns." In particular, Defendant Leach stated:

> Our team achieved another outstanding quarter of operational and financial results, driving significant production growth while maintaining a disciplined capital program. ***Our results reflect our focus on large-scale project development, which enables us to maximize ultimate recovery, efficiencies and returns***. Looking ahead, we intend to build on our strong momentum and capitalize on our execution strength, cost control and strong balance sheet to extend our track record of delivering growth and returns.

214.     Defendant Leach's statements in Paragraph 213 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

215.    On May 2, 2018, Defendants Leach and Harper on behalf of Concho hosted an earnings call with analysts and investors to discuss the Company's first quarter 2018 financial and operating results (the "1Q 2018 Earnings Call").

216.    On the call, Defendant Leach again emphasized that Concho's focus on large-scale development presented numerous "value-creating opportunities," such as the ability to "maximize

recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term." In particular, Defendant Leach stated that:

> I want to focus on **the value-creating opportunities driven by large-scale development. We believe this type of development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term.**

217.   Defendant Leach's statements in Paragraph 216 were materially false and misleading when made for the following reasons:

(a)   Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)   the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)   Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)   the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(e)   Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(f)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

218.    Also, during the call an analyst specifically asked about the Dominator project and whether the 20 plus wells at Dominator "*ma[d]e sense*."  Defendant Leach responded by stating that drilling projects of this "*kind*" would "*grow in wells in the project over time*" and that such projects "*drives a lot of value creation*."

219.    Defendant Leach's statements in Paragraph 218 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c) Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d) Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e) the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f) Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g) Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h) while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(i) the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

220.    The accompanying presentation to the May 2, 2018 earnings call incorporated an infographic map depicting Concho's "Key Projects" for 2018 and 2019, all of which were multi-well and multi-zone projects, including the Dominator, a "20+ well multi-zone project" in the Northern Delaware Basin.



221.    Concho's infographic in Paragraph 220 was materially false and misleading when issued for the following reasons:

(a)      Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)      while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially

reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

       (j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

     **5.**     **Concho Presents at the Citi 2018 Global Energy Utilities Conference**

222.   On May 15, 2018, Defendant Giraud on behalf of Concho presented at the Citi 2018 Global Energy Utilities Conference (the "May 2018 Citi Conference").

223.   During the May 2018 Citi Conference, Defendant Giraud again touted the Company's development mode and noted how important well spacing and the purported learning process was to Concho's approach:

> The big thing that's going on in the business is this transition to development mode, and we've talked a lot about that. There's a lot of industry conversation around what that means, what that looks like. There's different terms, tanks, cubes, everybody has a little bit different definition. ***But for us, it means getting to what we think is the optimal development plan, recognizing that you're learning all the time, but trying to decide what the right spacing is, which is generally 8 across in the different zones, and really getting in, and both big multiwell pads and stringing together multiple multiwell pads into even larger projects, simultaneously developing a square mile.*** Simultaneously both from a – in the same horizontal zone, but also vertically. And so we've talked a lot about these big multiwell pad projects. We've highlighted how we're doing them, both in the Midland Basin and in the Southern Delaware and also in the Northern Delaware. The projects that we've talked the most about, that have the most kind of age on them are the Mabee project up in the Northern Delaware – sorry, the Northern Midland, where we drilled 13 wells on a single half-mile section to 5 different zones, and we've talked a lot about the challenges of that. I think industry generally agrees that's a better way to do it, but you have to have a very sizable balance sheet and technical team, a big enough productive base to work through those challenges. The challenges of – that's the best way to do it, but it can be challenging getting up the learning curve. ***And I think we're fortunate to have kind of learned along the way and evolve from first drilling a 2-well pad and then a 3-well pad and then 2 2-well pads together. So we've been building up to this kind of larger-***

> *scale development mode, and we're very excited about what we're seeing*. And I think that's the power of what are causing things like the first quarter and the results we had there.

224.     Defendant Giraud later explained that he did not view the Company's adoption of "development mode" as a "dramatic change" rather it was an evolution and not a "switch get[ting] flipped."  In particular, Defendant Giraud stated that:

> But *I don't really view it as a dramatic change to development mode. Like I said, it's kind of an evolution going from 2-well pads to 3-well pads to 6-well projects to 8-well. So I think there's been an evolutionary – I don't think you can kind of see a switch get flipped. It's been a long time coming. We give quarterly guidance because of the – trying to give visibility into our business. And so I think that, plus the annual guidance, is a good way. We try to be very thoughtful in kind of showing you how we get there on an annual basis. But I don't expect there to be some big step change and all that.*

225.     Defendant Giraud was asked how much further Concho had to go in "determining what is the optimum development scheme . . . to truly turn that into manufacturing mode and have a template going forward."  In response, Defendant Giraud focused specifically on well spacing and told investors that Concho was in the late stages of learning on the issue and that it had already completed its discovery, delineation, and was now in "development mode."  The exchange with the questioning analyst was as follows:

> **Analyst**: Will, as you look at the evolution of efficiencies in the Permian Basin, obviously, you're continuing to drill longer laterals, you're continuing to get more data and looking at 90-day and 180-day cumes. In some of these areas, you have up to 5 landing zones. You talked about 8 wells per unit. How much further do you have to go in optimizing the efficiencies in determining what is the optimum development scheme per unit here in being able to truly turn that into manufacturing mode and have a template going forward? And I know it's not one size fits all, all the acreage is different, but where do you think you are in that evolution? And maybe you could say we're, out of 9 innings, in the 5th or the 8th as far as all the learnings you're accumulating and just say, okay, this is the optimum way to go from this point forward?

82

**Defendant Giraud**: I think, we're -- from the areas that we're focused on, I'll turn to this slide where we've kind of highlighted the different major pad projects that we're doing in '18 and '19. And the takeaway, I hope, from that map is, we're doing that everywhere. We're doing it in the Midland Basin, the Southern Delaware and the ***Northern Delaware***. And what's nice about the RSP assets and what really attracted us to them is, they are already assembled and ready for this style of development. I think you can look at this map and see that while we have big blocks in Northern Delaware, there's work to be done still up there consolidating the overall position.  But ***we're in a relative light [sic] stage in terms of under – we've kind of come through discovery, we've gone through delineation and now we're into development mode. And so in those different 3 main assets [Midland Basin, Southern Delaware, and Northern Delaware], we're there.*** But what I don't want to leave you with the impression is that we're not still learning. We did that fiber-optics project up on the Mabee Ranch, 13 well pad. And from that, we've learned some things that have caused us to tweak our completion design, actually make a little bit lower costs. So we continue to learn and then can move those learnings around to the other basins quickly. And so there's still work being done, but I think what we're seeing is, ***we think we know***. And so we think we know in the Midland Basin how you need to match up the optimal spacing development of the Middle Spraberry, the Lower Spraberry, the Wolfcamp A and the Wolfcamp B. ***And we think we know what the spacing needs to be in all those and how you ought to develop it. But – so that specific example, I think, we're farther down the line. We're in a later stage of innings***. But I think it's worth noting that there's still discovery and delineation work happening on our assets and around the Permian. I mean, just this last quarter, you saw RSP talk about the Jo Mill on their assets, and that's not a zone we've historically targeted, that's not part of that stack that I just talked about. So there's still discovery and delineation work happening. I think there's still opportunity. We've tried to kind of highlight a little bit how we're thinking about that. This last quarter we talked about multiple landings in the Bone Spring over in Eddy County. We've talked about multiple landings in the Bone Spring and Lea County before. So there's still discovery and delineation of additional resource and still at figuring out what the optimal kind of development stack is. I've never been very good at predicting the innings. I think ***we've historically been more conservative***, and we're not very good at predicting additional operational efficiencies that we can gain out into the future. So..."

226. Defendant Giraud's statements in Paragraphs 223-225 were materially false and misleading when made for the following reasons:

(a)   Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)   the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)   Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)   the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(e)   Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(f)   Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)   the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially

reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 6.     Second Quarter 2018 Financial and Operating Results

227.     On August 1, 2018, Concho issued its second quarter 2018 financial and operating results and provided updated guidance on SEC Form 8-K (the "2Q 2018 Earnings Release"). The 2Q 2018 Earnings Release reported that Concho's production for second-quarter 2018 was 21 MMBoe, or an average of 229 MBoepd, an increase of approximately 24% from second-quarter 2017. During second-quarter 2018, Concho averaged 21 rigs, compared to 20 rigs in first-quarter 2018. The 2Q 2018 Earnings Release further reported net income of $137 million, or $0.92 per share, adjusted net income totaled $185 million, or $1.24 per share, and EBITDAX of $592 million.

228.     The Company announced that its current drilling activity was also focused on large-scale development of the Company's assets in the Northern Delaware Basin, with nine out of 16 rigs working on multi-well projects. The largest project underway was the Dominator, which consisted of 23 wells targeting five distinct landings within a single section. Concho disclosed that six of the 16 rigs in the Delaware Basin were being used on the Dominator.

229.     On August 2, 2018, Defendants Leach, Harper, and Giraud, on behalf of Concho, hosted an earnings call with analysts and investors to discuss its second quarter 2018 financial results (the "2Q 2018 Earnings Call").

230.     During the 2Q 2018 Earning Call, Defendant Leach reflected on the Company's "progression to large-scale development" and transition to "manufacturing mode."  In particular,

Defendant Leach stated that the transition to manufacturing mode had been one of the companies "most important operational and strategic priorities."

231.    Also during the 2Q 2018 Earnings Call, Defendant Giraud made clear to investors that Concho had been testing different spacings for a couple of years before Concho launched into manufacturing mode projects like Dominator. In particular, Defendant Giraud stated that:

> I think we've been one of the leaders in moving to these larger-scale development projects. ***And that's been a steady evolution over the last couple of years as we've tested different spacing between -- within a zone and between zones. And so these bigger and bigger projects, I think, are just the further evolution of that trend.*** Where you see some of the smaller projects, that's us continuing to test tighter spacing or different spacing within a zone or between zones, again.  And so I think you're right. ***Longer term, you'll see an evolution to the bigger and bigger projects.*** However, we're still learning as we go. And so I think you'll see a blend of different sizes.

232.    Defendant Leach's and Giraud's statements in Paragraphs 230-231 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational

compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

233.    Concho provided investor with a presentation to accompany the 2Q 2018 Earnings Call:



234.    In that presentation Concho claimed that "manufacturing mode" "**unlocks signficant value**" and "**optimizes well performance and increases resource reovery.**"

235.    Concho's infographic and statements in Paragraphs 233-234 were materially false and misleading when made and/or issued for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(e)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(f)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(g)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

236.    During the 2Q 2018 Earnings Call, an analyst also recognized that Concho "seem[s] to have a lot more visibility on the cadence of wells being brought to sales, not just for the next 2 quarters, but potenailly for the first 3-plus quarters of 2019" and asked if it was "fair to say that the second quarter and third quarter of '19 are when a lot of these new projects are going to come online?"

237.    Defendant Harper called this a "fair assessment" and state that it "does line up with the timing of a lot of these larger scale projects.

238.    Defendant Giraud later explained that for Dominator, "[t]he goal there is to bring – to complete those wells simultaneously with multiple frac spreads and then flow them back together. And that's probably a mid- to late next year timing."

### 7. Concho Presents at the Barclays CEO Energy Power Conference

239. On September 5, 2018, Defendant Leach on behalf of Concho presented at the Barclays CEO Energy Power Conference (the "September 2018 Barclays Conference").

240. During the September 2018 Barclays Conference, Defendant Leach told investors that "***[o]ur wells are continuing to get better***, and the costs continue to become more efficient, and we manage the cost side of the equation as well." In particular, Defendant Leach stated that:

> And those things I talked about that we are focused on that have created strategic advantages for us, I want to touch on those. The execution of my team, that's what allows us to run this large capital program and run these rigs. The asset base that we have built over the last decade provides balance both in the Midland Basin and in the Delaware Basin and it also gives us an inventory of premium locations that we have multiple decades of this type of drilling to do. Capital efficiency, we have focused on both sides of the efficiency equation. ***Our wells are continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well***. That's what allows us to generate growth and free cash flow. And growth and free cash flow are going to be the name of the game for the next decade. We'll spend some time talking about that.

241. Defendant Leach's statements in Paragraph 240 were materially false and misleading when made for the following reasons:

(a) Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b) the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

242.    Defendant Leach also spent much of the Conference assuring investors that Concho and its executives, including Defendants Leach, Harper, Giraud, Wright, and Schroer, manage risk.  Defendant Leach explained that his remarks were focused on Concho and his team's execution, strength and scale.  Of the three "buckets" that addressed these focal points, Defendant Leach identified operations, "allocation of capital" which purportedly allowed Concho to balance risk, and "management of risk" which Defendant Leach personally spent time considering. Defendant Leach stated in pertinent part:

> So what I really want to focus on today in my remarks are the execution, strength and scale that our company has and that our team has built. And I want to talk about it in the terms of what it means to us and why does it matter. And the -- it really falls into three different buckets. ***There's the operational bucket, there's also the building for the future and how do you manage risk***. And so the ***allocation of capital is probably the most important thing that our team does and the most important thing that we do that creates success for the company. That's what drives our production growth and free cash flow. Also, we run a very large and stable ship. This allows us to balance risk and kind of plow through the volatility of our business.*** As we're drilling these wells, we try to create a virtuous learning cycle, where we are continuing to learn as we drill. And, yes, I know that you probably heard it in this conference that maybe that we are at the end of gains and efficiency and improvements. And I would tell you, I think, we're at an inflection point. And the inflection point is probably just as important as when I stood up here and described an inflection point of going from vertical drilling to horizontal drilling in Permian several years ago, there's also an inflection point in our business, where we went from -- into the Delaware Basin and our team described why we thought the rock in the Delaware Basin were some of the best rock we've seen anywhere and why we were accumulating assets in the Delaware. Well, that type of efficiency and technology comes out of the wells that we're drilling and I'm telling you, I think, we are at a new inflection point. We also in execution and scale, focus on building for the future, and the assets that we've accumulated and the size and scale of those assets, and finally, the ***management of risk is, basically goes into the category, it's always something. We've had periods in the past, where whether it's weather or sand or frac spreads, this is a***

>    *volatile business. The size and scale helps us manage the risk of*
>    *those business. I'll spend some time talking about that.*

243.    Leach added that Concho had a "***philosophy of having a portfolio approach to***

***mitigate risk***" and further explained that the inflection point he was talking about "is driven by

manufacturing mode."

244.    Defendant Leach's statements in Paragraphs 242-243 were materially false and

misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and

extremely high-risk combination of development methodologies, which included aggressively

tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects

required an extremely high upfront investment with no verifiable basis that they would deliver

estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous

amount of risk that production rates and total production would be permanently impaired due to

improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the

risk of its manufacturing-style development projects, the concentration of which was aberrational

compared to the Company's historic development approach, and significantly heightened

Concho's overall risk profile;

(e)    Defendants' Class Period statements, including production forecasts,

failed to account for the concentration of Concho's materially riskier manufacturing-style

development projects;

93

(f)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)    Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)    Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)    while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(j)    the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(k)    as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

245.   Defendant Leach then expanded more upon the "inflection point … driven by manufacturing mode."   In particular, Defendant Leach explain that Concho was using cube drilling in a way to "minimize the pressure syncs that create parent/child relationships between wells."  Defendant Leach stated in full as follows:

> So this ***inflection point that I was talking about is driven by manufacturing mode***. And we increasingly are approaching developing our properties, not only from four different dimensions basically, there's a horizontal dimension, the vertical dimension,

94

the sequencing between zones and the timing of what some in the industry call mowing the grass. ***So you do this to minimize the pressure syncs that create parent/child relationships between wells. This is the future of our business.*** And this transition to this style of development is just as important, I believe, as the transition we went through for horizontal drilling. ***This is going to be a value creator and it optimizes recoveries, optimizes economics and reduces stranded wells.***

246.    Defendant Leach's statements in Paragraph 245 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

247.     Defendant Leach also assured investors that when drilling wells Concho is focused on "precision" and uses a lot of information, including "real-time information," to do that. Defendant Leach stated as follows:

> ***So as we drill these wells, we don't – we're not stamping out wells. Every one of these areas is – the rock is different and what we're going for is precision. And we are collecting a lot of information.*** This is just one example of – when you look over the past several years and you look at lateral length, what the average lateral length for the company has done, the stages per well for the company, what that's done, but then you look at the productivity. And you can see that we've been increasing the lateral length, we've been increasing the stages, but you can also notice that they kind of plateaued out in 2018. We have found the length that, we think, is optimal for these projects that we're drilling today. But look what's happening to the productivity of our wells. And this is an example of why that productivity continues to go up. This is the geo model for the Mabee area. That was driven a lot by fiber optics and by seismic. But I'm telling you, we've got a geo model like this for every area that we're drilling and it allows us, you probably can't see it on the screen, but the package is out there. ***You can see what the predrill well plan was. And then as we had this information, and we were using real-time information to steer the well, how it helped us guide the well into the best rock, it allowed us to drill a 13,000-foot well with 1 drill bit. And so this kind of geo model is what we're using in every one of our areas to continue to increase***

> *the productivity and efficiency of the wells.* So I really think, I mean, if you heard at this conference that the shale in the Permian is kind of reaching the end of the efficiency gain cycle, I completely disagree with that. I think that this transition to this type of development mode for the companies that can do it will continue to drive better and better productivity.

248. Defendant Leach's statements in Paragraph 247 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(e)    Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(f)    Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(g)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(h)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

249.     Finally, Defendant Leach discussed the Dominator project and called it "probably the extreme example" of multi-well pad drilling and that it would "be the most aggressive multi-well pad that we drill."  Defendant Leach stated as follows:

> And I can tell you more and more those projects are going to be multi-well pads. We started out a few years ago that it was 2, 3, 4 wells a pad. *We're right now – this is probably the extreme example, but the Dominator project in Lea County, New Mexico, is 23 wells being drilled by 7 rigs all at the same time on 1 section of land. That's probably going to be the most aggressive multi-well pad that we drill.* Probably going forward, a normal development will be 8 to 12 wells per pad. So that kind of capital efficiency would generate free cash flow for us.

250.     Defendant Leach's statements in Paragraph 249 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 8.    Third Quarter 2018 Financial and Operating Results

251.    On October 30, 2018, Concho issued its third quarter 2018 financial and operating results and provided updated guidance and SEC Form 8-K (the "3Q 2018 Earnings Release"). The 3Q 2018 Earnings Release reported that Concho's production for third-quarter 2018 was 26 MMBoe, or an average of 287 MBoepd. For the third quarter 2018, Concho recorded a net loss of $199 million, or $1.05 per share, adjusted net income of $269 million, or $1.42 per share, and EBITDAX of $829 million.

252.    The 3Q2018 Earnings Release reported that during third-quarter 2018, Concho averaged 31 rigs, and that the Company was currently running 34 horizontal rigs and 8 completion crews, including 22 rigs in the Delaware Basin and 12 rigs in the Midland Basin.

253.    The 3Q 2018 Earnings Release that oil production was projected to grow more than 25% from fourth-quarter 2018 to fourth-quarter 2019 and drive crude oil and total production compound annual growth rates of 30% and 25%, respectively, from 2018 to 2020:

> ***Oil production is expected to grow more than 25% from fourth-quarter 2018 to fourth-quarter 2019. Further, Concho's planned activity level is expected to drive two-year crude oil and total production compound annual growth rates of 30% and 25%, respectively, from 2018 to 2020.*** Importantly, disciplined capital allocation and high-margin oil growth is expected to drive strong free cash flow generation and improving ROCE in 2019 and 2020.

254.    Concho's statements in Paragraph 253 were materially false and misleading when made for the following reasons:

(a)      Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

255.    In the 3Q 2018 Earnings Release, Defendant Leach was quoted lauding Concho's disciplined approach and ability to monetize economies of scale:

> *We have been disciplined over the last several years – generating free cash flow, prudently growing oil production, reducing our cost structure and building for the future with accretive acquisitions and strategic portfolio management. These efforts position us well for the next stage of our company, which includes delivering high-margin oil growth and initiating a return-of-capital strategy to our shareholders. We are a growth company, and our platform for delivering growth, demonstrating the benefits of scale and enhancing shareholder value, has never been better.*"

256.    Defendant Leach's statements in Paragraph 255 were materially false and misleading when made for the following reasons:

(a)      Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

257.     On October 31, 2018, Defendants Leach, Harper, and Giraud hosted on behalf of Concho an earnings call to discuss the Company's third quarter 2018 financial and operating results (the "3Q 2018 Earnings Call").

258.     During the 3Q 2018 Earnings Call, Defendant Leach told investors that drilling and spacing were "one of the best parts of our business," that Concho could "get a whole lot more done" with the "spacing we're using," and that there was not a change in approach from the past. Moreover, Defendant Leach again touted Concho's historic "portfolio approach" and told investor that there would not be a change in that strategy.   Defendant Leach stated in pertinent part:

> No, I think **the drilling side of our business is one of the best parts of our business**. And I think **the way we have approached that in the past will continue.** I mean, you can see that it doesn't require that much of a growth in rigs to accomplish all the future, not just for 2019 and 2020, but beyond. So, b**y drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done.** And we do have rigs that now are on six-month contracts or one-year contracts, but **we do have kind of a portfolio approach on that, but I don't think you should expect us to – any change in strategy based on what we're seeing today.**

259.     An analyst asked Defendant Giraud about observations about Concho's large-scale development.   Giraud state that the Company "continue[d] to experiment with different completion designs, timings, and spacing," but with respect to benefits investors should look to the "2019 and 2020 program" and the Defendants' confidence in "making projects bigger over time."   Importantly, Defendant Giraud stated that **"[w]e like what we're seeing**."   The discussion was as follows:

> **Analyst**: Got it. And perhaps for Will, with the understanding that you guys are still in the relatively early stages of large-scale development, are there any generalizations you can make regarding efficiencies, gain or challenges experienced? I know that you guys recently talked about sequencing and timing in your Barclays presentation.

104

> **Defendant Giraud**: Sure. I mean, we continue to experiment with different completion designs, timings, spacing. There's still a lot of learning to be done there. But I mean, *early benefits, I think I think you see it in 2019 and 2020 program and you see it in the confidence of making these average projects sizes bigger over time. We like what we're seeing. We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them. So more to come.*

260.    Defendant Harper was asked about any challenges that Concho was facing with large-scale pads, either anticipated or not anticipated.  Defendant Harper address these concerns by assuring investors that Concho "really emphasize[s] planning and planning a head" and that "our team has done a good job of that."  The discussion was as follows:

> **Analyst**: Good morning, Tim, to you and your team there. I want to kind of take another run at that theme that Derrick had on his last question. So, as you guys are transitioning to these larger-scale pads, are there – the efficiencies, I think you guys have done a good job explaining, and I think the market's on top of that. But are there any challenges that are emerging, either ones that you anticipated or ones that you didn't anticipate that could lead to some non-obvious outcomes either in your CapEx profile quarter-to-quarter or your production ramp?

> **Defendant Harper**: Sure. *Yes, these large- scale projects, they really emphasize planning and planning ahead. And our team has done a good job of that.* I think we're out in front, out here in the industry on this. So, yeah, there are midstream considerations, there's water delivery, there's water disposal, there's a lot of considerations, but – which typically can require up to a year of planning. And again, *our team's doing a great job in managing that. And so, while there are challenges, we're up to it. And that is why we're increasing the percentage of capital towards this kind of projects.*

261.    Defendant Leach's, Defendant Harper's and Defendant Giraud's statements in Paragraphs 258-260 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

262.    During the 3Q 2018 Earnings Call, an analyst also asked about parent-child well relationships and how that was affecting larger-scale projects.  According to Defendant Giraud, Concho's large-scale projects were "maximizing the resource by ***minimizing the impact of the parent-child effect.***" Moreover, Defendant Giraud emphasized that an estimate of how Concho's programing in the relationship between single-well pad development versus multi-well pad development is affected by parent-child relationships was "***baked … into all of [Concho's] plans and [Concho's] forecast***."  Defendant Leach added that Concho was "***in the best position to kind of minimize that effect***" and that Concho "***ha[s] it estimated very well***."  The discussion was as follows:

> **Analyst:** Thanks. Appreciate the time. Yeah. There continues to be a lot of discussion about impacts of bounded versus unbounded well productivity on these pads in the Permian. What are you guys seeing on that front? And I guess how are you contemplating kind of parent-child relationships in the plan you've laid out? And how might that evolve as you think about moving more and more to these larger-scale projects?
>
> **Defendant Giraud:** Sure. ***Big driver on going to these large-scale projects are; one, we think maximizing the resource by minimizing the impact of the parent-child effect; and then also***

*getting the benefits on the capital side from efficiency.* So those are kind of the two big drivers behind going to project development. *As it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling based upon the results we have seen here. So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that we're talking about for 2019 and 2020.*

**Analyst:** Okay. And do you have a kind of estimate of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship?

**Defendant Giraud:** Yes. *We definitely baked that into all of our plans and our forecast.*

**Analyst:** Is that something you'd be willing to share.

**Defendant Leach:** It's different by zone and different by area. And it's extremely complicated. And we're developing a program to minimize it. I'm not sure that any company in any location can completely eliminate that because you always have edges of your leases and things like that. But I think *with our asset base and the big blocky nature of our assets and the way we're prosecuting our development program, we're in the best position to kind of minimize that effect. And we think we have it estimated very well.*

263.     Defendant Leach's and Defendant Giraud's statements in Paragraph 262 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 9.      Fourth Quarter and Full Year 2018 Financial and Operating Results

264.      On February 19, 2019, Concho issued its four quarter and full year financial results and provided 2018 guidance on SEC Form 8-K (the "4Q & FY 2018 Earnings Release"). The 4Q & FY 2018 Earnings Release reported that Concho's total production for 2018 increased 36% to 96 MMBoe, or 263 MBoepd, with for fourth-quarter 2018 was 28 MMBoe, or an average of 307 MBoepd, an increase of 45% from fourth-quarter 2017 and 7% from third-quarter 2018. Net income for 2018 was $2.3 billion, or $13.25 per share, compared with net income of $956 million, or $6.41 per share, in 2017. Full-year 2018 adjusted net income was $792 million, or $4.59 per share, compared with adjusted net income of $311 million, or $2.09 per share, for full-year 2017. Finally, Concho reported EBITDAX for 2018 of $2.8 billion, compared with $1.9 billion in 2017.

265.      The 4Q & FY 2018 Earnings Release reported that during fourth-quarter 2018, Concho averaged 34 rigs, compared to 31 rigs in third-quarter 2018, and that the Company was currently running 34 rigs and 7 completion crews, including 22 rigs in the Delaware Basin and 12 rigs in the Midland Basin.

266.      4Q & FY 2018 Earnings Release also provided Concho's projections for 2019. The Company projected capital spending for 2019 to be between $2.8 billion and $3.0 billion, representing a 17% reduction at the midpoint compared with the Company's prior capital guidance. ***Concho's planned activity for 2019 was forecast to deliver oil growth of 26% to 30%. The Company also announced it expected to drive a two-year oil compound annual growth rate of 23% (from 2018 to 2020)***. Finally, for first-quarter 2019, Concho projected production to average between 300 MBoepd and 306 MBoepd, and capital expenditures to total between $825 million and $875 million.

267.    Concho's statements in Paragraphs 266 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

268.    With respect to Proved Reserves, the 4Q & FY17 Earnings Release, the Company stated that its Proved Reserves had increased to approximately 1.2 billion Boe: "At December 31, 2018, Concho's estimated proved reserves totaled 1.2 billion Boe, compared to 840 million Boe at year-end 2017. The Company's proved reserves are approximately 63% oil and 37% natural gas. Proved developed reserves totaled 824 MMBoe, or 69% of total proved reserves."

269.    Concho's statements in Paragraphs 268 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

270.    On February 20, 2019, Concho released its annual report of SEC Form 10-K (the "2018 10-K"), which was signed by Defendants Leach, Wright, and Schroer. The annual report contained the following risk factor with respect to multi-well pad drilling:

> **Multi-well pad drilling and project development may result in volatility in our operating results.**
>
> ***We utilize multi-well pad drilling and project development where practical.*** Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area. Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed. Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi-well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations.

271.    The 2018 10-K also reported that for the fully year ended December 31, 2018, that Concho's Proved Reserves, which it defined as "those quantities of oil and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing

economic conditions, operating methods, and government regulations," were 1,187 MMBoe, up dramatically from 840 MMBoe in the prior year, with over half of said reserves in the Delaware Basin:

> At December 31, 2018, our 1,187 MMBoe total estimated proved reserves consisted of approximately 63 percent oil and 37 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our operating areas.
>
> \*\*\*
>
> **Delaware Basin.** At December 31, 2018, we had estimated proved reserves in this area of 674 MMBoe, representing 57 percent of our total proved reserves. During the year ended December 31, 2018, we commenced drilling or participated in the drilling of 281 (171 net) wells in this area, and we completed 239 (136 net) wells that are producing.

272.    Defendant Leach's, Defendant Wright's, and Defendant Schroer's statements in Paragraphs 270-271 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational

compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

273.    On February 20, 2019, Defendants Leach, Harper, and Giraud on behalf of Concho hosted an earnings call to discuss its fourth quarter and full year 2018 financial and operating results (the "4Q & FY2018 Earnings Call").

274.     During the 4Q & FY2018 Earnings Call, an analyst asked about the Dominator project and Defendant Giraud announced that Concho was "bringing that project on right now."

275.     During the 4Q & FY2018 Earnings Call, Defendant Harper reported to investors that "[o]perationally, things are proceeding as planned" and that Concho's manufacturing mode development "continue[s] to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments." Defendant Harper stated in pertinent part:

> **Defendant Harper:** *Operationally, things are proceeding as planned.* During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin. *We continued to advance our style of returns-centric development, which focuses on large-scale and multi-well projects across our asset base. Our project results continued to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments.*

276.     Defendant Harper's statements in Paragraph 275 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(i)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(j)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

277.    An analyst asked how optimizing spacing and well design was leading to well performance improvements and Defendant Leach responded that Concho was "seeing the results we expect."  The exchange occurred as follows:

> **Analyst:** Good morning, everyone. Just wanted to follow up on the last question on well performance improvements, can you speak to how much you think the well performance improvements have come from optimizing spacing and well design aside from -- and things targeting on the reservoir, as opposed to just completion design modifications?

> **Defendant Leach:** That's a little hard to describe in a brief way. But certainly what -- I think what *we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect* and it's enabling us to do some pretty interesting things from testing and continuing to understand the best way to do it.

278.    Defendant Leach was asked to provide additional color on takeaways that Concho was seeing from large-scale projects, including potential impact due to parent-child dynamics and well productivity.  Again, Defendant Leach told investors that Concho was "very pleased."

> **Analyst:** Great, thanks. Maybe just a question on the large scale projects, you've seen strong results to-date on the various projects that you've developed. Can you provide any additional color on takeaways that you're seeing from these projects whether regarding proper development of multiple horizons, efficiency gains, potential impact to parent-child dynamics and well productivity things like this?

> **Defendant Leach:** Sure, I mean, while it's still early it's been a *slow evolution for us into these larger and larger project sizes*. I'll just say we're obviously *very pleased with what we're seeing and in terms of what we're expecting to see, and I think we also double downed on the necessity of doing it this way and that this is the better way to do it*. I'm modestly optimistic with over measured in periods and years, we will continue to find more efficiencies out of doing it that way, *in addition to just the base reasons to do it around mitigating parent-child impacts, things like that.*

279.    Defendant Leach's statements in Paragraphs 277-278 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)    the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)    Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)    Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

280.     During the 4Q & FY2018 Earnings Call, Defendant Harper also told investors, in response to an analyst question, that Concho was now able well spacing was now a "knob[] that can now be turned to increased efficiency":

> **Analyst:** Okay. And – but I guess what I'm asking is what is it about 2020 that's going to make that performance even if the commodity assumption is lower? Is it just this continued push towards bigger and bigger projects and longer laterals, sort of what are some of the variables there?
>
> **Defendant Harper:** Sure, I mean, our focus will be on the most efficient deployment of our capital under any circumstance, and that is further highlighted the lower the commodity prices, and I think it's actually an opportunity for us to differentiate ourselves. ***But you're right, it's making our investment better through large project development, lateral placement within the zones, well spacing all of the small knobs that can now be turned to increased efficiency.***

281.     Defendant Harper's statements in Paragraph 280 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)      the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)      Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)      Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)      the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)      Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)      Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)      the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)      as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 10. Concho Presents at the Raymond James 40th Annual Institutional Investors Conference

282. On March 4, 2019, Concho presented at the Raymond James 40th Annual Institutional Investors Conference (the "March 2019 Raymond James Conference").

283. During the March 2019 Raymond James Conference, Defendant Harper was asked what Concho did not know about well spacing and Defendant Harper explained that Concho was at an "***advantage because we've drilled more wells than anybody else and have empirical data to look at***." Further, Defendant Harper claimed that Concho has an extremely complicated multivariable equation to figure out well spacing and that Concho has "***historically been pretty conservative in the way we've accounted for inventory and well spacing" and "that's been [Concho's] view up till now.***" Defendant Harper's full response was as follows:

> Defendant **Harper:** Sure. So the question was, what do we not know about well spacing and sand loading, and there's always a lot to learn. ***I think we're at an advantage because we've drilled more wells than anybody else and have empirical data to look at.*** And also, we study what our peers do. I'll tell you what we do know about sand loading is we have reached diminishing returns in some of our areas and even seen sand loading come down. So economically, when you can spend less and get a similar result, it increases the rate of return, so that's positive. ***Our well spacing, it's an extremely complicated multivariable equation that does take a lot of time to fully understand. I would remind people that we have historically been pretty conservative on the way we've accounted for inventory and well spacing, and I'm thankful that, that's been our view up till now***.

284. Defendant Harper's statements in Paragraph 283 were materially false and misleading when made for the following reasons:

(a)     Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)     the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(f)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(g)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(h)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(i)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

## 11.     First Quarter 2019 Financial and Operating Results

285.    On April 30, 2019, Concho issued its first quarter 2019 financial and operating results and provided updated guidance and SEC Form 8-K (the "1Q2019 Earnings Release"). Production for first-quarter 2019 was 29.6 MMBoe, or an average of 328 MBoepd, an increase of 44% from first-quarter 2018 and 7% from fourth-quarter 2018. Net loss for first-quarter 2019 was $695 million, or ($3.49) per share, compared with net income of $835 million, or $5.58 per share, for first-quarter 2018. First-quarter 2019 adjusted net income was $144 million, or $0.72 per share, compared with adjusted net income of $149 million, or $1.00 per share, for first-quarter 2018. Finally, the 1Q2019 Earnings Release reported $755 million of adjusted EBITDAX.

286.    The 1Q2019 Earnings Release also announced that Concho started production on nine projects during first-quarter 2019, including the Dominator in the Delaware Basin.

287.    During first-quarter 2019, Concho averaged 33 rigs, compared to 34 rigs in fourth-quarter 2018. At the time, the Company was currently running 29 rigs, including 20 rigs in the Delaware Basin and nine rigs in the Midland Basin. Additionally, the Company is currently utilizing eight completion crews.

288.    The 1Q2019 Earnings Release disclosed that Concho projected second-quarter 2019 production at 316 MBoepd to 322 MBoepd. The Company also increased full-year 2019 total production growth guidance to 23% to 27%, reflecting its purported first-quarter 2019

outperformance and strong execution of a disciplined capital program. Additionally, the Company increased full-year 2019 oil production growth guidance to 27% to 31%.

289.    In the 1Q2019 Earnings Release, Defendant Leach was quoted touting how Concho was raising its full-year 2019 growth outlook while maintaining capital expenditure guidance, stating in relevant part:

> We are delivering exceptional performance across our portfolio as we execute on our clear strategy to drive sustained, differentiated oil growth, free cash flow and corporate returns. Results for the first quarter of 2019 reflect our focus on large-scale development, controlling costs and generating solid returns on strategic investments, as demonstrated by the Oryx sale. During the quarter, we completed several important projects ahead of schedule, driving increased production that exceeded the high end of our guidance range. Given our strong start to the year, we are raising our full-year production growth outlook while maintaining our capital expenditure guidance. Our high-quality assets and returns-driven approach position us to extend our track record of enhancing value for shareholders.

290.    Finally, the 1Q2019 Earnings Release discussed the first production results for Dominator:

> In the Delaware Basin, excluding the New Mexico Shelf, Concho added 23 wells with at least 60 days of production as of the end of first-quarter 2019. The average 30-day and 60-day peak rates for these wells were 1,817 Boepd (73% oil) and 1,647 Boepd (72% oil), respectively. These wells were drilled to an average lateral length of 9,125 feet.

291.    On May 1, 2019, Defendants Leach, Harper, and Giraud on behalf of Concho held a conference call to discuss its first quarter 2019 financial and operating results (the "1Q 2019 Earnings Call").

292.    During the 1Q 2019 Earnings Call, Defendant Leach enthusiastically touted production, the Dominator project, and increased oil production estimates for 2019:

> Leach: *Our focus paid off for us last quarter*. We exceeded the high-end of our production guidance with strong oil volumes.

> ***Production for the quarter also benefited from strong early
> production out of our latest projects, including the Dominator,***
> Eider and Mabee, as well as outside operated volumes. With solid
> cost control and production ahead of expectations, we also
> delivered strong financial performance. As expected, our capital
> investments, which are front-end loaded this year, exceeded
> operating cash flow during the quarter. Importantly, ***we're on track
> to deliver on the $2.8 billion to $3 billion capital program we laid
> out last quarter, and we have increased our estimates for oil
> production in 2019.***

293.    Defendant Harper went on to identify **"full-field development," which "is all**

**about optimizing spacing, timing and drilling and completion techniques to maximize program**

**economics and recoveries" as "an important contributor to [Concho's] momentum."**

294.    An analyst asked if there was anything Concho had learned from large-scale

projects about "spacing or configuration."  Defendant Giraud answered by using Dominator as an

example and a "***fantastic job***":

> We continue to learn from all these projects. ***And so using the
> Dominator one, just because it's a good example, that is our most
> extreme version of activity in a single square mile and also some
> of the more dense spacing we've tested. And so, yeah, the teams
> did a fantastic job on that, bringing that project and a couple of
> these other large ones this quarter and putting them on
> production actually ahead of schedule.***
>
> So we're continuing to figure out how to concentrate that much
> activity in one spot in the most efficient manner possible. We're
> continuing to play with spacing and also landing zones, and we're
> still continuing to tinker with combinations of different landing
> zones and to our whole completion design in them. So there is a lot
> to learn, but I think, at the same time, you've got a really
> competitive business that competes for investor capital. ***And so I
> think that's the exciting thing about what we've been able to do
> and are going to continue to do as - deliver really compelling
> returns while continuing to learn.***

295.    Concho was also asked if there were any "problems with what you have seen on

some of the initial results" from Dominator and Defendant Leach assured investors "***returns look***

***pretty good for us***."  The full exchange was as follows:

127

**Analyst**: Okay. I appreciate it. And then just specifically on that. I mean, have you found what you've seen on some of the initial results. I think Dominator is in the closer space. I mean, what have you specifically seen in that compared to the wider space wells? Like, what is the most optimal?

**Defendant Leach**: It's going to range depending on where you are in the basin and also the zone you're drilling. On that one, we drilled at almost 50% more densely than kind of our - where we typically look at resource booking in that zone. So we will watch - we haven't hit for a, kind of, critical 60 days of production where we included that'll be next quarter's batch of wells to talk about, but *certainly returns look pretty good for us*.

296.    Finally, an analyst asked about Concho's beat on production and Defendant Harper attributed part of it to Dominator and explained:

Sure. *I'd say the beat in the first quarter, which was pretty significant, was a combination of a couple of things*, the non-op that we've highlighted, also *getting a couple of these very sizable projects on ahead of schedule*. And so, there was something a little unique to the quarter maybe in that. But, I mean, underlying all of that is, *we continue to see really strong results across our portfolio. And so, I think, that's what gave us the confidence to raise the overall annual guidance*.

297.    Defendant Leach's, Defendant Harper's, and Defendant Giraud's statements in Paragraphs 285-296 were materially false and misleading when made for the following reasons:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

128

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(j)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially

reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(k)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 12.     Concho Reveals Critical Well Spacing Issues

298.    After the close of trading on July 31, 2019, Concho released its financial results for the second quarter 2019 (the "2Q2019 Earnings Release"). Concho reported a disappointing a net loss of $97 million, or $0.48 per share. The Company reported adjusted net income of $139 million, or $0.69 per share, which was below consensus estimates of $0.72 per share, down from the previous quarter's results of $0.72 per share and down 45% year-over-year. Concho also reported $717 million of adjusted EBITDAX, below consensus estimates of $736 million and down from the previous quarter's results of $755 million.

299.    Concho also announced that it would be forced to scale back production targets for the rest of this year—without lowering its current budget—giving bearish production forecasts for the upcoming quarter of 316 MBoepd to 322 MBoepd, below consensus forecasts of 336 MBoepd. Concho also revealed that it had slashed its active rig count to 18, down from 33 in the first quarter 2019, and lower than that projected in the Company's first quarter 2019 earnings call commentary of low 20s by the summer and original guidance of 24 rigs by the second half of 2019.

> Costs incurred for exploration and development activities for second-quarter 2019 totaled $785 million. During the quarter, Concho averaged 26 rigs, compared with 33 rigs in first-quarter 2019. **The Company is currently running 18 rigs, including 11 rigs in the Delaware Basin and seven rigs in the Midland Basin**. Additionally, the Company is currently utilizing seven completion crews.

300.    Dovetailing on the reduced rig count, Concho also disclosed for the first time that Dominator's 23 wells were spaced "too tight," and that Concho had "incorporated learnings from [Dominator] into its second half of 2019 program and future Delaware Basin projects."

> In the Delaware Basin, Concho completed the 23-well Dominator project, a well-spacing test targeting multiple landings within the Upper Wolfcamp. The average lateral length for the project was approximately 4,400 feet, and all 23 wells were drilled, completed and put on production safely and ahead of schedule. ***While the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates the well spacing was too tight. The Company has already incorporated learnings from this project into its second half of 2019 program and future Delaware Basin projects***.

301.    Following publication of the 2Q2019 Earnings Release and prior to the Company's accompanying earnings call the following day, stock and research analysts that followed Concho were quick to voice their surprise and negative sentiment towards the Company's meaningful reduction in guidance and production without any reduction in budget on July 31, 2019. The analysts attributed the disappointing results to Concho's failed development strategy, including the Dominator, and credited the resulting after hours decline in the price of Company shares to this news. For example:

(a)    An analyst at Barclay's noted they "were caught off guard by having the old industry albatross of unsuccessful spacing pilots with lasting effects also being a culprit" with respect to the disappointing results and production forecasts.

(b)    Similarly, an Analyst at JP Morgan "expect[ed] a negative reaction to the print given the sharp reduction in the company's 2019 oil guide with no change to fullyear capex." The analyst noted the Company's underperformance "could reflect apparent underperformance from the 23 well Dominator project in the Delaware Basin that was spaced too tightly," and that the "magnitude of the miss" would raise concerns regarding "the legitimacy of the company's

manufactured development strategy." Finally, the JP Morgan analyst also called out the fact that Concho had "lowered the oil guide for the back half of 2019 well below consensus expectations," and that "the [C]ompany's rig count has declined from 33 rigs in 1Q19 to 18 today."

(c)     Raymond James issued an analyst report responding to the 2Q2019 Earnings Release noting that "[t]he market is hitting the stock hard in after hours trading," based on the "the surprise reduction in 2H19 activity and oil guidance."

(d)     An analyst report from RBC Capital Markets described the 2Q2019 Earnings Release as "negative" and predicted a decline in Concho shares considering the revelation that the Company had "meaningfully lowered activity for the remainder of 2019 and cut its oil production outlook but kept its capital spending budget unchanged."

(e)     An analyst at SunTrust Robinson Humphrey also expressed anticipated declines in Concho shares due to the 2Q2019 Earnings Release and noted concern and the need for more information regarding Concho's "updated results from some of its large pad developments with the most notably being the 23-well N. Delaware Dominator project, which CXO noted was spaced too tight … given the substantial capital commitment associated with the project."

(f)     An analyst report from Evercore noted the "disappointing well performance from its 23-well Dominator downspacing pilot and plans to revert to prior spacing designs (16 wells per section) on future pads." Adding that they "expect[ed] some skepticism on the read through for the broader Delaware asset base, noting the company added 62 Delaware wells during 2Q (not just Dominator TILs) with avg IP30s of ~1.4 mboepd down from ~1.8 mboepd during 1Q."

(g)     Macquarie analysts described the second quarter 2019 results and production guidance as "negative," noting that "[c]hallenges on well spacing, lower activity, and reduced guidance all result in a takeaway that should see a material negative reaction in the stock." The analysts further noted that "[d]isappointing performance from the Dominator project in the Upper Wolfcamp, driven by too tight of spacing, results in part of the downside to guidance in the near term and a recasting moving forward."

(h)     An analyst at Credit Suisse cut Concho's price target by $15 to a target of $105 per share, citing weak oil guidance, including "[s]teeper than expected rig count reduction in 2H19," which reflected a "significant deterioration of CXO's capital efficiency." The analyst noted that "despite FY19 capex being unchanged, CXO slashed its planned gross operated wells placed on production this year by ~10% implying higher well costs and/or lower capital efficiency from its prior outlook." According to the analyst, "we have historically viewed CXO as among the best-run companies in our E&P universe, its latest update with 2Q results has left us questioning its capital efficiency and what the material reduction to its 2H19 activity levels means for its 2020+ growth outlook."

(i)     MKM Partners decreased their price target for Concho shares by $19 to $131 on August 1, 2019, "due a near-term incremental ~25% reduction in drilling cadence (from 24 to 18 rigs), approximately 3% structurally lower oil composition and an almost 10% lower long-term capital spending expectation (~$3 billion per annum)."

302.    Concho held is second quarter 2019 earnings call on August 1, 2019. On the call Defendant Leach stated that following Dominator's failure, Concho would be forced to retreat back to a more conservative approach to well spacing. Defendant Leach also attributed Concho's below-expected active rig count as a measure to avoid overshooting budgets.

Thanks, Megan, and good morning. Yesterday's results and updated 2019 outlook reflect our continued move to a lower capital budget than originally planned this year and our desire to enter 2020 in the best position to deliver competitive production growth and increasing free cash flow.

\* \* \*

In the Delaware Basin, the 23 well Dominator project was designed to test logistical capabilities and well spacing that was approximately 50% tighter than our current resource assessment. While initial rates were solid, current performance data indicates that we developed the Upper Wolfcamp too densely.

***We are incorporating the data into our development model to adjust spacing on future projects including those projects set to spud in the second half of '19.***

\* \* \*

Turning to our capital program; we averaged 26 rigs in the second quarter and capital totaled $785 million, which was down 15% compared to the first quarter. ***Year-to-date production volumes are ahead of schedule and today we're running 18 rigs, which is below our previous plan of 24. We've made the decision to adjust our drilling and completion schedule in the second half of the year to slow down and not chase incremental production at the expense of capital discipline***.

303.     On the call Defendant Giraud stated that *at maximum* there should be 12 wells per

project in the Permian:

Yes, I mean, in terms of the project spacing, I don't know that it has taught us anything in terms of the optimal project size. The team has executed extremely well from a logistical standpoint, getting that much work done on time, actually ahead of schedule. ***So I do think, as we've talked about in previous calls, the optimal project size for us is probably in the 8 to 10 to 12 depending upon where you are in the Permian***. But I'm not sure that Dominator gave us confidence that we can continue to push that up over time and find incremental efficiencies and how we do it.

304.     Additionally on the call, Defendant Giraud attempted to downplay that existing and upcoming 2019 projects had "modestly more dense" spacing, by stating the well spacing was not "anywhere close to Dominator."

> You know, I don't know the number off the top of my head. Typically, I would characterize '19 as the year that we were advancing our understanding of optimal lateral length, plcaement design and well-spacing being one of the critical variables there. Typically, where we've done that, we have added kind of one more well into a project. Dominator is the most extreme example where we went 50% beyond kind of our traditional resource spacing. ***So I would say that in a number of the projects we have this year and including a couple more coming on in the back half of this year, you're going to see them developed at a modestly more dense than our resource spacing, but nothing anywhere close to Dominator***.

305.     Following the publication of the 2Q2019 Earnings Release and the Company's second quarter 2019 earnings call, Concho shares plummeted by 22% from the July 31, 2019 closing price of $97.68 per share on abnormally high volume of 17,881,152 shares traded—the highest trading volume for the entirety of the Class Period by over 5 million shares—closing at $75.97 per share on August 1, 2019.

306.     In response to the August 1, 2019 earnings call, stock and research analysts that followed Concho continued to respond negatively to the Company's second quarter 2019 results and financial forecasts.

(a)     "How companies still, after all these years we have wailed and gnashed our teeth, manage to over-promise and under-deliver, remains an infuriating mystery," a Mizuho Securities analyst said in a note to clients; "[d]o we really need to repeat, that a company, much least in the most hated sector of the market, with a premium valuation, must never, ever, over-promise and under-deliver?"

(b)     RBC Capital Markets cut Concho price targets by $5 to $140, calling the Company a "Show Me Story," and anticipated that "CXO shares could move into the penalty box

135

until it shows a successful transition to meaningful FCF generation." The analyst further noted that the Company's "outlook is a sharp contrast to what was contemplated in early 2019," attributing the disappointing shift to Concho's "decision to scale activity down to 18 rigs from 25-26 rigs in 2H19."

(c)     An analyst from TD Securities called the second quarter 2019 results and forecasts "NEGATIVE" and slashed price targets by $15 to $100, citing to slowing production growth, reduced active rig counts, and Dominator's failure.

(d)     In a follow up report dated August 1, 2019, analysts from SunTrust Robinson Humphrey slashed their price targets for Concho by $30 to $100. Citing to the Company's decreased production outlook and Dominator's failure, the analysts attributed the steep decline in Concho shares to "waning investor confidence not only in CXO but the overall group's capital efficiency/operations." The analysts surmised that this decline placed the Company at risk of being acquired: "CXO as a takeout candidate if large operators need to play catch up given its strong Permian position." Finally, the analysts expressed surprise at the sheer size and cost of Dominator in light of the project's failed spacing: "The main issue we see with the Dominator project is the sheer scale of the development, i.e. spacing a project too tightly when its 3-5 wells is easier to look passed than the massive capital and time commitment required for a 23-well project."

(e)     On August 1, 2019, Susquehanna Financial Group LLLP lowered their price target for Concho shares by $31 to $110 due to the Company's "reduced production outlook." According to the analysts, the reduced outlook was "indicative of lower productivity from recent spacing pilots that tested tighter densities and lower TIL count," which was expected to generate "headwinds for new completions over the next few quarters."

136

(f)      RBC Capital Markets analysts cut Concho price targets $20 per share to $130 on August 1, 2019, stating that Concho took a "Big Step Back with Revised Outlook."

(g)      After predicting material declines in Concho shares following publication of the 2Q2019 Earnings Release, on August 2, 2019, analysts at Macquarie slashed their price target for Company shares to $85 per share, down from $112.

(h)      An analyst at Jefferies stated in a report dated August 5, 2019, that Concho had "blindsided the market with a sharp reduction in 2H19 oil volume guidance," noting that "[a]sset productivity suffered as a result of well density." The analyst further noted that "it turns out much of [Concho's] 2H18 and 1H19 program was spaced too densely," and that while the Company had previously indicated Dominator "was not representative of the company's development plans … it turns out operations were not consistent with that message." The analyst concluded that "given the production guidance increase in 1Q19 and management's strong execution track record historically, this was difficult to see coming."

(i)      On August 5, 2019, JP Morgan analysts cut Concho price targets by $15 per share to $132, noting that "the stock could remain in the penalty box until execution improves," and that Company shares were trading "at less than $11K per Permian acre" (the Company paid ~$75,000 per acre in the RSP Acquisition). The analysts criticized Concho for a lack of transparency in its communications with the market leading up to the decline in Company shares, finding that "execution missteps … includ[ing] the combination of higher capex and unexpected gyrations in the company's 2019 oil guidance … has eroded confidence in the company's execution capabilities." In particular, the JP Morgan analysts believed the Company "should reconcile the updated oil guide from the previous oil guide and quantify how much of the lower oil output was driven by the spacing tests vs. lower activity and why capex remained the

same." The analysts also surmised that contrary to statements that Concho's 2018 business shift was focused on "peer leading production growth on a debt adjusted basis, FCF generation, and the return of cash to shareholders … the company's development approach appeared more NPV-focused given the magnitude of spacing tests underway." Finally, the analysts expected that the Company would face spacing headwinds as "there will be a number of projects in 2H19 that are in progress, which will include spacing that is too tight."

307.    On August 29, 2019, the Journal of Petroleum Technology released a report titled: *"Dominator Project" Raises Key Questions About Future of Cube Drilling*, describing Dominator's drastic shortfall due to aggressive well-spacing.

> In Lea County, New Mexico, shale producers drill an average of 10 wells per 640-acre section.
>
> But last year, Concho Resources, the third-largest producer of oil and gas in the Permian Basin, decided to push the envelope. The company assembled seven drilling rigs owned by six different contractors and five fracturing fleets on a mile-long tract of land to build the "Dominator Project."
>
> The effort took the better part of a year and, in the end, it delivered 23 wells targeting five individual target horizons in the Wolfcamp Shale formation. The location, in the northern Delaware Basin, was carefully selected for sitting atop some of highest-quality geology within one of the highest-producing unconventional plays on the planet.
>
> ***But when executives revealed the first oil production results in July, new doubts were raised about the success of the experiment. They said the well spacing, which averaged a horizontal distance of 230 ft. compared with the area average of 600 ft., was "too tight" and that future projects would execute wider intervals.***
>
> ***Independently developed type curves show that the Dominator wells are now on pace to fall short of initial estimates, maybe by as much as 45%.*** The news triggered one of the sharpest selloffs ever seen in the shale business, sending Concho's share price down 22% for a single-day market value loss of close to $4.4 billion.

B.      **Post Class Period Events**

308.    Following the Company's revelation of spacing issues at the close of the Class Period and the significant decline in Concho shares, Defendants would later disclose in greater detail that Concho's aggressive spacing initiative was companywide. Despite Defendants' attempt to downplay these multimillion dollar projects years in the making as "tests," the Company's production outlook would remain flat throughout 2019—resulting in a 16% reduction in Concho's Proved Reserves. Ultimately Concho shares would flounder and never recover, as ConocoPhillips would later pounce to acquire Concho at a fraction of its Class Period value—a price comparable to that paid by Defendants for RSP.

1.      **Spacing Issues Linger**

309.    On September 4, 2019, Defendant Leach presented at the Barclay's CEO Energy-Power Conference 2019. At the conference, Defendant Leach attributed Concho's poor 2019 performance and outlook to numerous projects with tightly spaced wells, not just the Dominator:

> Lower activity impacts our oil growth, and we trimmed our full year outlook from 29% to 24% at the midpoint, which corresponds to the factors at play in the capital budget. The lower oil outlook also incorporates the performance from spacing test. ***The Dominator project is the most high-profile example of our density work, but we have other projects at tested spacing, mainly in the Northern Delaware Basin***.

310.    On October 30, 2019, Concho held its third quarter 2019 earnings call with analysts and investors.  On the call, Defendant Leach stated that for "2020 and beyond, [Concho] will develop fewer wells per project at wider spacing." In response to analyst questions, Defendant Leach also revealed that due to lingering "spacing tests," that the Company would not see increased capital efficiency until 2020.

> **Question:** How quickly do you think we see or we see in the quarterly results the kind of improved productivity from the shift to wider spacing and smaller projects away from the spacing test?

That's something that very quickly becomes evident, you think, in the beginning of 2020, or is it going to take a little longer to work its way through the system?

**Answer:** Sure. Well, we began moving into the wider spacing program this summer. ***So, while we still have a few spacing test rattling through the back half of this year, you see those less density space projects could be put on a production in the fourth quarter and then increasingly into 2020.***

**Question:** And okay. And so like I guess early in 2020 that seems reasonable to start to maybe see an uplift in capital efficiency.

**Answer:** ***From a productivity standpoint, That's right.***

311.    Concho released a slide presentation in connection with its October 30, 2019 earnings call.  One slide of note contained an X Y graph comparing well spacing versus the number of wells per reservoir in 2018-2019 to 2020.  While the graph indicated that Dominator had the largest number of wells and the most closely spaced wells, the spacing for other 2018-2019 projects was tellingly closer to Dominator when compared to 2020 projects:



312.    FE-1 referenced the chart in Paragraph 311 and advised that the chart made Dominator look differently than all other projects intentionally and was completely misleading. He explained number of wells per reservoir was misleading because it implied that Dominator was materially riskier than some of Concho's other projects which was false because Dominator was not Concho's only well spacing project at the time. FE-1 added that it was clear to him from the chart that Concho was attempting to cast Dominator as completely unique in terms of risk.

313.    On February 19, 2020, Concho released its 2019 annual report (the "2019 10-K"). In the 2019 10-K, a new risk factor with respect to "higher concentration of activity and tighter drilling spacing." Tellingly, it was only after the then-present and known risk that Concho's widespread initiative to combine risky drilling techniques with tightly packed wells had foreseeably manifested, did Defendants feel compelled to include a dedicated risk factor in their reporting with the SEC.

**We could experience adverse impacts associated with a high concentration of activity and tighter drilling spacing.**

We are subject to drilling, completion and operating risks, including our ability to efficiently execute large-scale project development, as we could experience delays, curtailments and other adverse impacts associated with a high concentration of activity and tighter drilling spacing. *A higher concentration of activity and tighter drilling spacing may increase the risk of unintentional communication with other adjacent wells and the potential to reduce total recoverable reserves from the reservoir*. If these risks materialize and negatively impact our results of operations relative to guidance or market expectations, and the research analysts who cover our Company may downgrade our common stock or change their recommendations or earnings or performance estimates, which may result in a decline in the market price of our common stock.

314.    The 2019 10-K also reported a significant downward revision in Concho's Proved Reserves: 1,002 MMBoe as of December 31, 2019, down from 1,187 in the prior year.

315.    As set forth in the 2019 10-K, these "*[n]egative performance revisions were primarily the result of the Company's recent capital programs that included projects testing tighter well spacing*." Put differently, Concho's well spacing "tests" had led to *a 16% total reduction in the Company's Proved Reserves*. Directly following this telling admission, Concho again emphasized that it "ha[d] modified its development approach to prioritize wider spacing between wells in order to maximize well performance and program economics."

316.    Finally, on February 19, 2020, Concho held its fourth quarter 2019 earnings call with analysts and investors.  On the call, Defendant Harper stated that moving forward, "[t]he average project size will be six wells, and … average well spacing will be 700 to 800 feet *as compared to approximately 550 feet last year*." Thus, despite repeated attempts to downplay the Company's spacing initiative as "tests," Concho would in fact widen its average well spacing across all of its projects to upwards of *250 feet*.

### 2.     ConocoPhillips Acquires Concho for Fire Sale Prices

317.    On October 19, 2020, ConocoPhillips and Concho announced that they had entered into a definitive agreement, dated October 18, 2020, to combine the two companies in an all-stock transaction (the "Concho Acquisition"). At the time of announcement, the Concho Acquisition was valued at $9.7 billion. Under the terms of the Concho Acquisition, 1.46 shares of ConocoPhillips common stock would be exchanged for each outstanding share of Concho common stock, with legacy Concho shareholders owning approximately 21% of the combined company following the transaction. The Concho Acquisition closed on January 15, 2021. Shortly thereafter, Concho shares were delisted and ceased trading on the NYSE.

318.    Comparing the startlingly similar values of $9.7 billion and $9.5 billion for the Concho Acquisition and RSP Acquisition, respectively, illustrates the steep and permanent decline in the value of the Company following the Class Period. In 2018, the $9.5 billion RSP Acquisition price tag left legacy RSP shareholders with an approximately 25% stake in the combined company. However, two years later, a comparable price for Concho—again, which *included the former RSP assets*—would leave legacy Concho shareholders with only 20% of the combined company. In essence, Concho's failed gambit to tightly space its wells together while utilizing myriad unverified completion techniques sent the Company into a permanent tailspin from which it would never recover, ultimately erasing the lion's share of its value.

319.    Tellingly, the discussions regarding the Concho Acquisition were already set in motion as early as October 2019—less than three months after the close of the Class Period. Specifically, in Connection with the Concho Acquisition, Concho and ConocoPhillips issued a joint proxy statement/prospectus on SEC Form 424B3 on December 11, 2020 (the "Concho Acquisition Prospectus"). The Concho Acquisition Prospectus disclosed that on October 15, 2019, ConocoPhillips' CEO approached Defendant Leach about "the possibility of a combination

between Concho and ConocoPhillips," to which Defendant Leach replied "he would be open to discussing the possibility later in the year."

320.    The Concho Acquisition Prospectus also disclosed that Defendants Leach, Harper, and Giraud were expected to continue working for ConocoPhillips, and would enjoy millions in profits as their restricted share awards from their employ at Concho would be triggered by the ConocoPhillips merger. Therefore, only legacy Concho shareholders would be the only ones left holding the bag.

### C.    Defendants Acted with Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

321.    As alleged herein, Defendants acted with scienter in that they: (i) knew, or were deliberately reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew, or were deliberately reckless in not knowing, that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly (or with deliberate recklessness) and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

322.    As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Concho, their control over, receipt, and modification of Concho's allegedly materially misleading statements and their associations with the Company that made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

323.    The Individual Defendants permitted Concho to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock. As set forth herein, the Individual Defendants, by virtue

of their receipt of information reflecting the true facts regarding Concho, their control over, receipt, and modification of the Company's allegedly materially misleading statements and omissions, and their positions with the Company that made them privy to confidential information concerning Concho, participated in the fraudulent scheme in violation of the Exchange Act as alleged herein.

324.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased Concho common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Concho's business, operations, and management and the intrinsic value of the Company's common stock and caused Lead Plaintiffs and members of the Class to purchase Concho common stock at artificially inflated prices.

325.    Numerous additional facts give rise to the strong inference of scienter that, throughout the Class Period, Defendants Leach, Harper, Giraud, Wright, and Schroer knew or were severely reckless in disregarding that:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)     Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)     Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(j)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially

reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(k)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

### 1.     The Public Statements of the Individual Defendants Indicate Direct Knowledge of All Undisclosed Adverse Facts

326.     The public statements by the Individual Defendants indicate their knowledge of undisclosed facts. These Defendants spoke to investors and analysts prior to and throughout the Class Period regarding its large-scale, multi-well development projects, including Dominator. Defendants' communications with the public regarding the development and operation of these projects were detail-laden, reflecting that the Individual Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding Concho's large-scale, multi-well development projects, including Dominator, whether disclosed to the investing public or not.

327.     For instance, on February 21, 2018, Defendants Leach and Harper participated in a conference call with analysts and investors to discuss Concho's fourth quarter 2017 financial results where they both provided first hand knowledge of Concho's shift to large-scale development and the benefits thereof. When questioned regarding production and efficiency gains with respect to Concho's shift to manufacturing mode, Defendant Leach stated that "when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance." Also on the call, Defendant Leach stated the Concho's business strategy remained the "same," and that the transition to "large-scale projects, manufacturing mode, whatever you call it," was merely an extension of this strategy.

328.     Additionally on the February 21, 2018, conference call, Defendant Harper stated that Concho's "transition to large-scale, multi-well projects has been an important development

that will continue to drive growth, innovation and efficiencies," and later touted that he believed they had "successfully made that transition." With respect evaluating parent-child interference in Concho's large-scale development, Defendant Harper stated "we've modeled the outcome as we see it based on the spacing that has either already happened or will happen in the future."

329.   On March 5, 2018, Defendant Harper presented at the Raymond James 39th Annual Institutional Investors Conference where they expressed first-hand knowledge of the Company's new manufacturing mode strategy as well as its large upcoming projects. On the call, Defendant Harper equated "cube development" as Concho's "manufacturing mode" through which they were trying to "maximize the rate of return and the resource at the same time and that "drilling synergies" were "well documented." Defendant Harper also discussed "zipper-style completions" as "efficient" and a potentially "more effective way to complete the wells." Finally, Defendant Harper referenced Concho's "upcoming large-scale projects" which were "dispersed amongst our asset base," including "a 20-plus well pad or project on here that we'll begin this year, but don't plan to see production until next year on that."

330.   On March 28, 2018, Defendant Leach and Defendant Harper participated in a conference with analysts and investors to discuss the RSP Acquisition. On the call, Defendant Leach again discussed Concho's manufacturing mode, noting it "generates cost savings and minimizes parent-child locations." Later in regards to manufacturing mode's benefits, Defendant Leach stated that "instead of 1 or 2 little pads, to go to 8 well multiwell pads is one of the big drivers. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. All those things will be very additive."

331.    Also during the March 28, 2018 conference, Defendant Harper stated that: "You're going to see much larger development projects. So I think, that's going to – the efficiency that comes out of that and also the higher recoveries that come out of that will be the most immediate efficiency gains." Further, Defendant Harper stated that "we do have similar views on spacing in the different core asset areas."

332.    On May 2, 2018, Defendants Leach and Harper participated in Concho's earnings call with analysts and investors to discuss the Company's first quarter 2018 financial and operating results, discussing their first-hand knowledge of the benefits and success thus far of Concho's large-scale development. On the call, Defendant Harper stated that Concho's "large-scale project development will drive the quarterly production growth trajectory. And with a great start to the year, we've raised our full year 2018 production outlook." Defendant Harper also stated that "results have been very strong," with respect to Concho's shift to large-scale development. Also on the March 28, 2018 conference call, Defendant Leach stated that "these kind of drilling projects are going to grow in wells in the project over time and grow dramatically. And that's -- it drives a lot of value creation."

333.    On May 15, 2018, Defendant Giraud presented at the Citi 2018 Global Energy Utilities Conference. At the conference Defendant Giraud stated "we're very excited about what we're seeing," regarding Concho's "larger-scale development mode" and that they had "learned along the way." With respect to optimal spacing for these large-scale projects Defendant Giraud stated "we think we know what the spacing needs to be in all those and how you ought to develop it. But – so that specific example, I think, we're farther down the line. We're in a later stage of innings."

334.    On August 2, 2018, Defendants Leach, Harper, and Giraud participated in an earnings call with analysts and investors to discuss the Company's second quarter 2018 financial results, where they again discussed their first-hand knowledge regarding the Company's shift to large-scale development, including the Dominator project. On the call, Defendant Leach stated the transition to manufacturing mode "has been one of our most important operational and strategic priorities."

335.    Additionally on the August 2, 2018, call, Defendant Giraud responded to questions regarding Concho's projects sizes, including the Dominator, which the Company had to "coordinate over a year in advance." In his response, Defendant Giraud stated that these larger projects were "a steady evolution over the last couple of years as we've tested different spacing between -- within a zone and between zones." Defendant Giraud later stated that Concho was "drilling really good wells." Directly in reference in the Dominator, Defendant Giraud stated "The goal there is to bring -- to complete those wells simultaneously with multiple frac spreads and then flow them back together. And that's probably a mid- to late next year timing."

336.    Finally on the August 2, 2018, call, an analyst commented that Defendants "would seem to have a lot more visibility on the cadence of wells being brought to sales, not just for the next 2 quarters, but potentially for the first 3-plus quarters of 2019," and questioned whether it was "fair to say that the second quarter and the third quarter of '19 are when a lot of these new projects are going to come online?" Defendant Harper responded that it was "a fair assessment," and "line[d] up with the timing of a lot of these larger-scale projects."

337.    On September 5, 2018, Defendant Leach presented at the Barclays CEO Energy Power Conference, going into great detail regarding the Company's large-scale development projects, including Dominator. For example, Defendant Leach stated that "[o]ur wells are

continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well." Defendant Leach also stated that "[a]s we're drilling these wells, we try to create a virtuous learning cycle, where we are continuing to learn as we drill," and that "type of efficiency and technology comes out of the wells that we're drilling and I'm telling you, I think, we are at a new inflection point." Defendant Leach discussed the "Dominator project in Lea County, New Mexico, is 23 wells being drilled by 7 rigs all at the same time on 1 section of land." Defendant Leach also went into detail regarding what he referred to as the "inflection point" of "manufacturing mode":

> So this inflection point that I was talking about is driven by manufacturing mode. And we increasingly are approaching developing our properties, not only from four different dimensions basically, there's a horizontal dimension, the vertical dimension, the sequencing between zones and the timing of what some in the industry call mowing the grass. So you do this to minimize the pressure syncs that create parent/child relationships between wells. This is the future of our business. And this transition to this style of development is just as important, I believe, as the transition we went through for horizontal drilling. This is going to be a value creator and it optimizes recoveries, optimizes economics and reduces stranded wells.

338.    On October 31, 2018, Defendants Leach, Harper, and Giraud participated in an earnings call to discuss the Company's third quarter 2018 financial and operating results where they again expressed first-hand knowledge regarding the Company's upcoming large-scale development projects.  Defendant Harper stated that "these large-scale projects, they really emphasize planning and planning ahead. And our team has done a good job of that," and added that "while there are challenges, we're up to it. And that is why we're increasing the percentage of capital towards this kind of projects." Defendant Giraud stated that "we continue to experiment with different completion designs, timing, spacing." With respect to large-scale development, Defendant Giraud stated "[w]e like what we're seeing. We like the benefits we get of efficiency

with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them." Finally with respect to parent-child interference in Concho's multi-well projects, Defendant Leach stated "[i]t's different by zone and different by area. And it's extremely complicated. And we're developing a program to minimize it."

339.    On February 20, 2019, Defendants Leach, Harper, and Giraud participated in an earnings call to discuss Concho's fourth quarter and full year 2018 financial and operating results, expressing first-hand knowledge regarding the Dominator and the results of Concho's shift to large-scale development. Defendant Harper stated that "Operationally, things are proceeding as planned. During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin." Defendant Leach stated that "But certainly what -- I think what we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect and it's enabling us to do some pretty interesting thing from testing and continuing to understand the best way to do it." Finally with respect to Dominator, Defendant Giraud stated "We're obviously bringing that project on right now, I think that's something we will be speaking to in more detail next quarter. But I would say we would measure it the same way we would measure any other drilling project in terms of the returns we received versus the investment."

340.    On March 4, 2019, Defendant Harper participated in the Raymond James 40th Annual Institutional Investors Conference. On the call, Defendant Harper went into detail regarding Concho's well spacing philosophy, stating that: "Our well spacing, it's an extremely complicated multivariable equation that does take a lot of time to fully understand. I would remind people that we have historically been pretty conservative on the way we've accounted for inventory and well spacing, and I'm thankful that, that's been our view up till now."

341.    On May 1, 2019, Defendants Leach, Harper, and Giraud participated in a conference call to discuss Concho's first quarter 2019 financial and operating results. On the call, Defendant Leach stated that he saw "strong early production out of our latest projects, including the Dominator," later adding that "returns look pretty good for us." Further with respect to Dominator, Defendant Giraud stated "the teams did a fantastic job on that, bringing that project and a couple of other large ones this quarter and putting well production actually ahead of schedule" Finally, Defendant Harper stated that "during the first quarter, we commenced production on nine projects, many of which, including the 23-well Dominator project, were ahead of schedule."

### 2.    The Individual Defendants Personally Reviewed and Approved the Company's Projects

342.    Former Concho employees have confirmed that the Individual Defendants personally reviewed and approved the Company's large-scale projects, including Dominator.

343.    FE-1 recounted how Concho began planning Dominator in August 2017 and recalled attending regular budgeting meetings where the tight spacing was discussed along with the risks associated with this type of drilling. At these meetings it was determined that all risk considerations would be handled by the corporate teams, so that it would be consistent companywide.

344.    FE-1 explained that these budgeting meetings were attended by all of the technical teams at Concho, not just those on Dominator.  FE-1 stated that Defendant Giraud lead these meetings.

345.    FE-1 explained that with respect to preparing a production forecast, first the reservoir engineers are responsible for putting together the project's production forecast. After being initially prepared by reservoir engineers it was finalized in an iterative process and sent up

to Defendant Giraud. According to FE-1, following this the data was passed to the corporate engineering group for a high-level review. Then the data would be sent to the corporate finance planning group for use in the Company's public financials. Finally, the data would go to Defendant Giraud for discussion with the technical teams for final approval. As discussed below, according to FE-1, risking should have gone on top of the final data to account for the experimentation risk, but it was not done so.

346.    FE-3 also stated that management, who he identified as those occupying the C-Suite to Vice President roles, had expressed "irrational exuberance," meaning the existence of pre-project excitement despite the "very strong evidence" that drilling wells so close was problematic. FE-3 explained that Defendant Giraud and Defendant Harper had drank "a little too much of their own Kool-Aid."

347.    According to FE-4 there were budgeting meetings each year that are run by the reservoir engineers where they present ideas to management in an attempt to secure a portion of the budget for the following year. FE-4 recalled that at the budget meeting in October 2017 that the group pitching the Dominator focused their argument that year on timing and how completing the wells simultaneously would decrease the parent-child interference. FE-4 stated that not only did this not make sense, but that everyone knew it would not work. According to FE-4, he and his colleagues were shocked at the Company's decision to pursue the Dominator project.

348.    According to FE-5, the Dominator project was pushed from the top downwards by Concho's executive team despite staff protests. FE-5 recalled that William Giraud was the driving force behind the Dominator project at all relevant times and that the direction of the Dominator project was the COO's responsibility.

349.     According to FE-8, the problem with Concho's management was hubris.   The Company had been immensely successful and was growing fast and this level of success gave management the feeling that they had the "Midas touch."   FE-8 explained that it was this overconfidence that contributed to management ignoring FE-2 and FE-2's warnings that Concho was going to over-drill the area.   According to FE-8 another contributing factor to the project's failure was COO William Giraud.   According to FE-8, Defendant Giraud was the one to sign off on the Dominator project.

### 3.     The Individual Defendants Determined to Find the Limits of Well Spacing by Any Means Necessary

350.     Former Concho employees have confirmed that during the Class Period, the Individual Defendants determined to find the limits of well spacing for many of the Company's projects by any means necessary and were prepared to "take their lumps" in order to do so.

351.     According to FE-1, Concho typically had a "theme" behind their annual capital budgeting process. The objective for 2018 was to shortcut getting the answer regarding the number of wells that could ultimately be drilled on Concho acreage and to determine how closely wells could be spaced together.   In turn, Concho intended to take their "lumps" in order to get there.

352.     According to FE-1, Concho would traditionally drill one well at a time, but the theme called for the shortcut of simultaneously drilling of wells closer together to prevent the permanent loss of Concho's resources.

353.     According to FE-1, the Dominator was the "poster child" for the closer drilling initiative but that the Company's theme was bigger than just the Dominator. Indeed, FE-1 stated that Dominator was a "reflection of everything" that was happening at Concho during the Class

Period. FE-1 made clear that the projections for Dominator and for the majority of Concho's projects at the time lacked the proper risk calculations.

354.     FE-1 stated that Dominator was not even the worst performing project and that Concho's issues went beyond just Dominator.

355.     FE-1 explained that Dominator was just one of many projects under the same initiative to find the limits of well spacing that Concho had active during the Class Period.

356.     Moreover, FE-1 stated that historically, Concho's activity had a smattering of risk profiles, but the concentration of large-scale, downspaced, simultaneous drilling in 2018 significantly increased Concho's risk profile without having the lower risk projects to balance it out.

357.     According to FE-1, these riskier projects made up roughly 90% of the 2018 budget at Concho.  According to FE-1, Concho was not clear to the market about how much of their forecast was at risk and that Concho's entire production budget at the time was a "test" and Dominator was not a one-off situation.

358.     FE-5 relayed that he heard from a former geologist that Concho had previously drilled a couple of tight formations at the Grissom wells in Culberson County, TX with "God-awful" results. FE-5 suggested that Concho management thought "they could get away with" spacing wells tightly at the Dominator Project since it was located at one of the best spots in the Delaware Basin, although "not one geologist agreed." FE-5 went on to state that management "poured $100 million into the ground and burned it."

359.     FE-8 recalled Concho's strategy prior to the Dominator project being an "intensive and technical process" to determine the best well numbers and spacing. According to FE-8, the Company experimented with patterns and density during this period, which focused on a "gradual

process" to identify the sweet spot regarding well numbers and their configuration. FE-8 explained that instead of continuing this gradual process, Concho went "all out" with the Dominator, despite FE-2's warnings about the density of the wells. FE-8 reiterated that Concho did not continue to take "baby steps" and really "packed in [the number of wells]."

### 4. The Individual Defendants Improperly Used Lower Risk Profiles Despite Repeated Warnings

360. Former Concho employees have confirmed that the Individual Defendants determined to use "off the shelf" risk profiles for Company projects utilizing tightly spaced wells—despite repeatedly warnings that these projects carried significantly more risk—which were then incorporated into Concho's production and financial forecasts.

361. According to FE-1, there was a conscious decision made by Defendant Giraud to use Concho's historical risk profile numbers in forecasting rather than apply the significantly higher risk profile recommended by FE-1 and his team. FE-1 stated that his team's analysis was tracked in Concho's *Aries* database.  FE-1 explained that he was given the directive to apply the historic or off the shelf risk profile to Dominator by Defendant Giraud.

362. FE-1 explained that given the number of wells that were being done all at the same time on Dominator, the risk profile far exceeded any previous projects at Concho or within the industry.  Thus, according to FE-1, the traditional methodology could not be relied upon.

363. FE-1 further elaborated that despite it being widely known that drilling wells closer together increases their risks, no such considerations were being made.  According to FE-1, he was frustrated because there was a refusal amongst management, and most significantly Defendant Giraud, to treat Dominator differently than previous Concho projects.

364.     According to FE-1, despite knowing at Dominator that the distance between wells carried significant risks, Concho chose to treat every well as if it was an individual, isolated well in their risk assessment.

365.     Again, FE-1 stated that he repeatedly brought up his concerns in meetings attended by Defendant Giraud but was not being heard. According to FE-1, although Defendant Wright was still at the Company until 2019, Defendant Giraud was functioning as the COO as early as 2018.

366.     Despite Defendant Giraud not appreciating anyone questioning his decision, FE-1 expressed his concerns to him in multiple meetings. FE-1 recounted how his two biggest concerns were that Dominator was being improperly "risked" and that the use of these improper valuations would ultimately impact the roll-up of the Company's public forecasts. FE-1 told Defendant Giraud directly at meetings that they could not use the old risk factors for Dominator because the risks have changed but was instructed to do so. FE-1 described himself as animated in these meetings regarding his concerns and reiterated that he was continuously ignored.

367.     According to FE-1, Concho did not model for the known "degradation" that comes with that kind of drilling. FE-1 explained that "never in the history of the oil business" could you assume that wells spaced closer together were not subject to greater risk, specifically risk of degradation—which is precisely what Concho was doing at that time. FE-1 described it as "mind-blowing" to him. According to FE-1, the risk was just "disregarded" during the Class Period.

368.     FE-1 stated that drilling closer changed the Company's risk profile, but Concho did not change its underlying risk assumptions; there was no assumption made that risk would get worse the closer wells were spaced. FE-1 reiterated that "there is not an engineer in the world" who would not recommend increasing the risk in the budget models based on the tighter spacing.

FE-1 was then asked if the modeling that he was referring to would make it into Concho's financial forecasts that were disclosed to the market and FE-1 responded that the modeling (production forecasts) "is the basis" for the financial forecasts. Moreover, FE-1 confirmed that the financial forecasts were unreasonably high based on the failure to account for Concho's increased risk profile in its production forecasts.

369.    According to FE-1, the Dominator was the "poster child" for the closer drilling initiative but that the Company's theme was bigger than just the Dominator. Indeed, FE-1 stated that Dominator was a "reflection of everything" that was happening at Concho during the Class Period. FE-1 made clear that the projections for Dominator and for the majority of Concho's projects at the time lacked the proper risk calculations.

370.    FE-1 stated that Dominator was not even the worst performing project and that Concho's issues went beyond just Dominator.

371.    FE-1 explained that Dominator was just one of many projects under the same initiative to find the limits of well spacing that Concho had active during the Class Period.

372.    Moreover, according to FE-1, Concho did not appropriately change their risk profile/reserves to account for spacing risks on these projects, just like they did not do so on Dominator. Indeed, FE-1 spoke with members of Concho's Corporate Financial group who said that the Dominator was not even the worst of Concho's projects (referring to the lack actual performance relative to what was in the final plan) despite it being the largest in scale.

373.    Moreover, FE-1 stated that historically, Concho's activity had a smattering of risk profiles, but the concentration of large-scale, downspaced, simultaneous drilling in 2018 significantly increased Concho's risk profile without having the lower risk projects to balance it out.

374.    FE-1 went on to say that once the Dominator project came on-line and it was clear that production was suffering, there was a big effort to revise and get back in line with the budget. According to FE-1, many of Concho's well spacing projects, including Dominator, were not performing well. FE-1 recounted that Concho eventually went back and added the real risk assessments.

375.    When asked why Concho would not have initially baked into its forecasts the accurate risk assessments, FE-1 responded that at the time Defendant Giraud was blinded by the "big numbers" that did not include the proper risking.

376.    FE-2 was assigned to conduct a post-audit of the Dominator project towards the end of 2019, FE-2 recalled that he was very surprised to find Concho had drilled over 20 wells. FE-2 said this was "unbelievable."

377.    FE-2 had performed studies in the Delaware Basin, citing the Wolfcamp zone as an example, prior to the Dominator project.  Based on the results of that prior well drilling study, FE-2 concluded that only eight to twelve wells should have been drilled in the area that was selected for the Dominator Project.

378.    FE-3 stated that Dominator area was "over-completed," meaning the fractures of one horizontal completion interfering with another due to close well spacing, as a result of the project.  FE-3 also stated that management, who he identified as those occupying the C-Suite to Vice President roles, had expressed "irrational exuberance," meaning the existence of pre-project excitement despite the "very strong evidence" that drilling wells so close was problematic. FE-3 recalled several conversations with the geoscience team about the Dominator project and its issues, with the common sentiment being that "this [the Dominator project] is really stupid." When asked what was meant by "stupid," FE-3 explained that there seemed to be no technical

basis for the Dominator project, that it had been too optimistic and aggressive, and failed to adequately weigh the risks with the thought of failure unreasonably remote. FE-3 recalled that the junior staff on the geoscience team expressed concerns about the project, but that they were ignored.

379.    FE-3 explained that based on how the project ended up he does not believe fracture modeling was conducted. FE-3 further explained that fracture modeling involves running several different scenarios with different variables to see if there would be interference with the wells. FE-3 explained that multiple models should have been run and the results would determine the viability of the project. According to FE-3, a "halfway decent" model would have been able to predict the results seen in the Dominator project.

380.    FE-3 explained that certain modeling could have been done, whether in-house or contracted to test/model performance based on a number of parameters. According to FE-3 multiple models would have been used, but he does not believe that any were. FE-3 added that it was possible that models were run, but if they had been then they were ignored. FE-3 further recalled that following Dominator, he was aware of much more modeling being performed at Concho.

381.    FE-3 recalled expressing his concerns to the former Vice President of Geoscience and Technology and former Geoscience Manager at Concho.  Specifically, FE-3 recalled informal conversations with them where he spoke to some of the specifications for the Dominator Project looking "crazy," such as the 200-250 foot well spacing and the use of a fracture stimulation process similar to wells spaced much further part. FE-3 explained that wells spaced closer together using parameters of those spaced further apart will experience interference. In particular, FE-3 asked them about the 200-250 foot well spacing and whether "they consider the

implications" because it did not seem like a "good idea." FE-3 also asked if they modified the completion parameters to account for the proximity of the wells and FE-3 was informed that they did not modify the completion parameters and they were using the completion parameters similar to wells that were 500 to 1,000 feet apart.

382. According to FE-4, at this stage in the process for Dominator, fracture modeling had not been completed and the modeling used to justify projects was "not quite back of the napkin," but relied on "broad assumptions."

383. According to FE-4, the "tight curve" promised on the Dominator was unrealistic, because it did not make any adjustments based on the proposed well formation in terms of spacing and the inclusion of such a large quantity of wells. FE-4 explained that the calculations were based on a two-well model and how two wells interact in a vacuum, rather than looking at the project in its entirety.

384. FE-5 recalled that the Dominator project was "very controversial" within the Company and that "everybody thought it was too tight." FE-5 recalled speaking to approximately 10 geologists and engineers who worked on the Dominator Project and that they were "horrified by what was happening." According to FE-5, the wells at the Dominator Project were "absolutely" too tight, and that he did not talk to a single geologist or engineer who felt otherwise. FE-5 stated that there was no scientific justification for the drilling formation at the Dominator Project.

385. According to FE-8, a FE-2 had warned the "powers to be" that the Dominator would not be successful based on his simulations. FE-8 referred to FE-2 as the "head guru" and the "frack guru" and explained that FE-2 oversaw production for all the simulations used for fracking and to ensure appropriate density of the wells. FE-8 added that FE-2 had informed

management prior to the beginning of the project that it would not work and that they area was going to be over-drilled, but "no one would listen."

     **5.**     **The Individual Defendants Attended Weekly Status Meetings and Had Access to Real Time Data**

386.    Former Concho employees have confirmed that the Individual Defendants attended weekly status meetings where the Company's large-scale development projects were discussed. Former employees have also confirmed that the Individual Defendants had access to Company databases and real time data related to these projects.

387.    FE-1 recounted how Concho began planning Dominator in August 2017 and recalled attending regular budgeting meetings where the tight spacing was discussed along with the risks associated with this type of drilling. At these meetings it was determined that all risk considerations would be handled by the corporate teams, so that it would be consistent companywide.

388.    FE-1 explained that these budgeting meetings were attended by all of the technical teams at Concho, not just those on Dominator.  FE-1 stated that Defendant Giraud lead these meetings.

389.    According to FE-1, there was a conscious decision made by Defendant Giraud to use Concho's historical risk profile numbers in forecasting rather than apply the significantly higher risk profile recommended by FE-1 and his team. FE-1 stated that his team's analysis was tracked in Concho's *Aries* database.  FE-1 explained that he was given the directive to apply the historic or off the shelf risk profile to Dominator by Defendant Giraud.

390.    FE-1 explained that all the information about the production forecasting was housed in *Aries*.

391.     FE-1 made clear that the added risk related to the tighter spacing during the Class Period was quantified in Concho's *Aries* database but was not reflected in their production forecasts, which caused the production forecasts to be significantly overstated.

392.     When asked about Defendant Giraud's February 20, 2019, statement that Concho was "seeing the results we expected," FE-1 explained that Concho started learning very quickly what was happing with the wells because they had pressure gauges in the wells. In other words, FE-1 explained that Concho had "live" data from each well.  He recounted how early in the process it was clear that production was below what Concho had projected. In addition, Concho quickly started to see "pressure degradation" which was a concern. According to FE-1, the lack of production and the amount of draw down was alarming. He explained that the pressure was monitored by pressure gauges that correlated to oil production and that everyone at Concho knew immediately, including Defendant Giraud, that Dominator was not producing what had been projected.

393.     FE-1 went on to say that once the Dominator project came on-line and it was clear that production was suffering, there was a big effort to revise and get back in line with the budget. According to FE-1, many of Concho's well spacing projects, including Dominator, were not performing well. FE-1 recounted that Concho eventually went back and added the real risk assessments.

394.     According to FE-1 there were weekly Tuesday meetings amongst the executives, including Defendants Giraud, Leach, and Schroer and that Dominator was likely discussed during these meetings.

395.     According to FE-3, the completion phase was done in three sets. FE-3 explained that issues started to emerge with the second phase, which failed to reach maximum production,

declined more quickly, and hinted at "interference." FE-3 explained that the third phase showed "immediate decline" as the wells were already partially completed. According to FE-3, internal fracture stimulation data would be subject to real time monitoring while production data would be available on a daily basis, at least.

## VI.    CONTROL PERSON ALLEGATIONS

396.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

397.    Defendant Leach was, at all relevant times, Concho's Chief Executive Officer ("CEO") and the Chairman of the Company's Board of Directors. Defendant Leach served as Concho's Chairman and CEO since the Company's formation in 2006.

398.    Defendant Harper was appointed as Concho's President in May 2017 and remained in this role at all relevant times. Defendant Harper was appointed as CFO in May 2016 and served in this role until January 2019. During the Class Period, Defendant Harper oversaw Concho's operations as well as the Company's legal, accounting, information technology and security functions.

399.    Defendant Giraud was appointed as Concho's Executive Vice President in May 2017 and served in the role at all relevant times. In January 2019, Giraud was appointed as COO, having previously been named as a successor for the position in 2017. According to FE-1,

although Defendant Wright was still at the Company until 2019, Defendant Giraud was functioning as the COO as early as 2018.

400.    Defendant Wright served as Concho's COO from November 2010 until January 2019. Defendant Wright served as Concho's Executive Vice President from November 2013 until January 2019.

401.    Defendant Schroer was Concho's Treasurer and Senior Vice President at all relevant times, Chief Accounting Officer until January 2019, and CFO from January 2019.

402.    During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a)    Concho's manufacturing-style development was an unverified and extremely high-risk combination of development methodologies, which included aggressively tight well spacing;

(b)    the construction of Concho's manufacturing-style development projects required an extremely high upfront investment with no verifiable basis that they would deliver estimated production and capital efficiency;

(c)    Concho's manufacturing-style development projects carried an enormous amount of risk that production rates and total production would be permanently impaired due to improperly spaced wells;

(d)    Concho lacked a sufficient amount of lower risk projects to balance out the risk of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e)     Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's materially riskier manufacturing-style development projects;

(f)     the Individual Defendants, including Defendant Giraud, were repeatedly warned internally of the risks related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g)     Defendants incorrectly risked Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h)     Defendants failed to conduct, or at the very least ignored, the necessary facture modeling and other data collection which would have indicated their manufacturing-style development and aggressive well spacing would result in poorly performing wells;

(i)     while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such risky projects;

(j)     the above-mentioned risks would and did manifest during the Class Period, eventually forcing the Company to scale back production for the foreseeable future and materially reduce its Proved Reserves to such a significant extent that the value of the Company would never recover; and

(k)     as a result, Defendants' statements during the Class Period were knowingly and/or recklessly false and misleading when made.

403.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were

provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

404.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Concho's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

405.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time period, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

## VII.    LOSS CAUSATION

406.    During the Class Period, as detailed herein, the Individual Defendants engaged in a course of conduct that artificially inflated the price of Concho. Their conduct operated as a fraud or deceit on Class Period purchasers of Concho's common stock and warrants by failing to disclose and misrepresenting the adverse facts relating to the Company's business and growth

prospects that are detailed herein. By presenting a misleading picture of Concho's business and prospects, the Individual Defendants' false and misleading statements had the intended effect of causing Concho common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $163.11 per share on May 2, 2018.

407.   The price of Concho common stock fell precipitously when the prior artificial inflation in Concho shares evaporated when: (i) the Individual Defendants' prior material misstatements and omissions were revealed; (ii) omitted material adverse facts were disclosed and/or became apparent to the market; and/or (iii) the risks concealed by the Individual Defendants' misconduct materialized.

408.   As alleged herein, the artificial inflation in the price of Concho common stock dissipated on August 1, 2019 as Defendants' false and misleading statements and omissions became apparent to the market, and the price of Concho common stock sank 22% on abnormally high volume of 17,881,152 shares traded—the highest trading volume for the entirety of the Class Period by over 5 million shares—closing at $75.97 per share on August 1, 2019, down from the closing price of $97.68 per share on July 31, 2019.



409.   The declines in the price of Concho stock pled herein were a direct and proximate result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions being revealed to investors. The timing and magnitude of the price decline of Concho common stock negates any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

410.   It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate and/or maintain the price of Concho common stock. It was also foreseeable to Defendants that the revelation of the truth alleged herein would cause the price of Concho common stock to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

411.    Following publication of the 2Q2019 Earnings Release and prior to the Company's accompanying earnings call the following day, stock and research analysts that followed Concho were quick to voice their surprise and negative sentiment towards the Company's meaningful reduction in guidance and production without any reduction in budget on July 31, 2019. The analysts attributed the disappointing results to Concho's failed development strategy, including the Dominator, and credited the resulting after hours decline in the price of Company shares to this news. For example:

(a)    An analyst at Barclay's noted they "were caught off guard by having the old industry albatross of unsuccessful spacing pilots with lasting effects also being a culprit" with respect to the disappointing results and production forecasts.

(b)    Similarly, an Analyst at JP Morgan "expect[ed] a negative reaction to the print given the sharp reduction in the company's 2019 oil guide with no change to full-year capex." The analyst noted the Company's underperformance "could reflect apparent underperformance from the 23 well Dominator project in the Delaware Basin that was spaced too tightly," and that the "magnitude of the miss" would raise concerns regarding "the legitimacy of the company's manufactured development strategy." Finally, the JP Morgan analyst also called out the fact that Concho had "lowered the oil guide for the back half of 2019 well below consensus expectations," and that "the [C]ompany's rig count has declined from 33 rigs in 1Q19 to 18 today."

(c)    Raymond James issued an analyst report responding to the 2Q2019 Earnings Release noting that "[t]he market is hitting the stock hard in after hours trading," based on the "the surprise reduction in 2H19 activity and oil guidance."

(d)     An analyst report from RBC Capital Markets described the 2Q2019 Earnings Release as "negative" and predicted a decline in Concho shares considering the revelation that the Company had "meaningfully lowered activity for the remainder of 2019 and cut its oil production outlook but kept its capital spending budget unchanged."

(e)     An analyst at SunTrust Robinson Humphrey also expressed anticipated declines in Concho shares due to the 2Q2019 Earnings Release and noted concern and the need for more information regarding Concho's "updated results from some of its large pad developments with the most notably being the 23-well N. Delaware Dominator project, which CXO noted was spaced too tight … given the substantial capital commitment associated with the project."

(f)     An analyst report from Evercore noted the "disappointing well performance from its 23-well Dominator downspacing pilot and plans to revert to prior spacing designs (16 wells per section) on future pads." Adding that they "expect[ed] some skepticism on the read through for the broader Delaware asset base, noting the company added 62 Delaware wells during 2Q (not just Dominator TILs) with avg IP30s of ~1.4 mboepd down from ~1.8 mboepd during 1Q."

(g)     Macquarie analysts described the second quarter 2019 results and production guidance as "negative," noting that "[c]hallenges on well spacing, lower activity, and reduced guidance all result in a takeaway that should see a material negative reaction in the stock." The analysts further noted that "[d]isappointing performance from the Dominator project in the Upper Wolfcamp, driven by too tight of spacing, results in part of the downside to guidance in the near term and a recasting moving forward."

(h)     An analyst at Credit Suisse cut Concho's price target by $15 to a target of $105 per share, citing weak oil guidance, including "[s]teeper than expected rig count reduction in 2H19," which reflected a "significant deterioration of CXO's capital efficiency." The analyst noted that "despite FY19 capex being unchanged, CXO slashed its planned gross operated wells placed on production this year by ~10% implying higher well costs and/or lower capital efficiency from its prior outlook." According to the analyst, "we have historically viewed CXO as among the best-run companies in our E&P universe, its latest update with 2Q results has left us questioning its capital efficiency and what the material reduction to its 2H19 activity levels means for its 2020+ growth outlook."

(i)     MKM Partners decreased their price target for Concho shares by $19 to $131 on August 1, 2019, "due a near-term incremental ~25% reduction in drilling cadence (from 24 to 18 rigs), approximately 3% structurally lower oil composition and an almost 10% lower long-term capital spending expectation (~$3 billion per annum)."

412.    In response to the August 1, 2019 earnings call, stock and research analysts who followed Concho continued to respond negatively to the Company's second quarter 2019 results and financial forecasts, attributing the sharp declines in Concho shares to a surprising and material lowered production outlook due to reduced rig count and failed spacing projects, including Dominator:

(a)     "How companies still, after all these years we have wailed and gnashed our teeth, manage to over-promise and under-deliver, remains an infuriating mystery," a Mizuho Securities analyst said in a note to clients; "[d]o we really need to repeat, that a company, much least in the most hated sector of the market, with a premium valuation, must never, ever, over-promise and under-deliver?"

(b)      RBC Capital Markets cut Concho price targets by $5 to $140 on August 1, 2019, calling the Company a "Show Me Story," and anticipated that "CXO shares could move into the penalty box until it shows a successful transition to meaningful FCF generation." The analyst further noted that the Company's "outlook is a sharp contrast to what was contemplated in early 2019," attributing the disappointing shift to Concho's "decision to scale activity down to 18 rigs from 25-26 rigs in 2H19."

(c)      On August 1, 2019, an analyst from TD Securities called the second quarter 2019 results and forecasts "NEGATIVE" and slashed price targets by $15 to $100, citing to slowing production growth, reduced active rig counts, and Dominator's failure.

(d)      In a follow up report dated August 1, 2019, analysts from SunTrust Robinson Humphrey slashed their price targets for Concho by $30 to $100. Citing to the Company's decreased production outlook and Dominator's failure, the analysts attributed the steep decline in Concho shares to "waning investor confidence not only in CXO but the overall group's capital efficiency/operations." The analysts surmised that this decline placed the Company at risk of being acquired: "CXO as a takeout candidate if large operators need to play catch up given its strong Permian position." Finally, the analysts expressed surprise at the sheer size and cost of Dominator in light of the project's failed spacing: "The main issue we see with the Dominator project is the sheer scale of the development, i.e. spacing a project too tightly when its 3-5 wells is easier to look passed than the massive capital and time commitment required for a 23-well project."

(e)      On August 1, 2019, Susquehanna Financial Group LLLP lowered their price target for Concho shares by $30 to $110 due to the Company's "reduced production outlook." According to the analysts, the reduced outlook was "indicative of lower productivity

from recent spacing pilots that tested tighter densities and lower TIL count," which was expected to generate "headwinds for new completions over the next few quarters."

(f)     RBC Capital Markets analysts cut Concho price targets $20 per share to $130 on August 1, 2019, stating that Concho took a "Big Step Back with Revised Outlook."

(g)     After predicting material declines in Concho shares following publication of the 2Q2019 Earnings Release, on August 2, 2019, analysts at Macquarie slashed their price target for Company shares to $85 per share, down from $112.

(h)     An analyst at Jefferies stated in a report dated August 5, 2019, concluded that Concho had "blindsided the market with a sharp reduction in 2H19 oil volume guidance," noting that "[a]sset productivity suffered as a result of well density." The analyst further noted that "it turns out much of [Concho's] 2H18 and 1H19 program was spaced too densely," and that while the Company had previously indicated Dominator "was not representative of the company's development plans … it turns out operations were not consistent with that message." The analyst concluded that "given the production guidance increase in 1Q19 and management's strong execution track record historically, this was difficult to see coming."

(i)     On August 5, 2019, JP Morgan analysts cut Concho price targets by $15 per share to $132, noting that "the stock could remain in the penalty box until execution improves," and that Company shares were trading "at less than $11K per Permian acre" (the Company paid ~$80,000 per acre in the RSP Acquisition). The analysts criticized Concho for a lack of transparency in its communications with the market leading up to the decline in Company shares," finding that "execution missteps … includ[ing] the combination of higher capex and unexpected gyrations in the company's 2019 oil guidance … has eroded confidence in the company's execution capabilities." In particular, the JP Morgan analysts believed the Company

"should reconcile the updated oil guide from the previous oil guide and quantify how much of the lower oil output was driven by the spacing tests vs. lower activity and why capex remained the same." The analysts also surmised that contrary to statements that Concho's 2018 business shift was focused on "peer leading production growth on a debt adjusted basis, FCF generation, and the return of cash to shareholders … the company's development approach appeared more NPV-focused given the magnitude of spacing tests underway." Finally, the analysts expected that the Company would face spacing headwinds as "there will be a number of projects in 2H19 that are in progress, which will include spacing that is too tight."

## VIII.   PRESUMPTION OF RELIANCE

413.   Lead Plaintiffs allege that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing. Such statements artificially inflated or artificially maintained the price of Concho publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that common stock during the Class Period. Because Defendants chose to speak on the issues described in Section V, it was important that Defendants not mislead investors or withhold material information.

414.   Lead Plaintiffs are entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Lead Plaintiffs and other members of the Class purchased Concho stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

415.    At all relevant times, the market for Concho stock was efficient for the following reasons, among others:

(a)     Concho stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's annual reports on SEC Form 10-K for the years 2017, 2018, and 2019, Concho had: (i) 149,067,852 shares of common stock outstanding as of February 16, 2018; (ii) 200,594,232 shares of common stock outstanding as of February 15, 2019; and (iii) 196,705,121 shares of common stock outstanding as of February 14, 2020, demonstrating a very active and broad market for Concho common stock at all relevant times;

(c)     as a regulated issuer, Concho filed periodic public reports with the SEC;

(d)     Concho regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     Concho was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(f)     Unexpected material news about Concho was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

416.     As a result of the foregoing, the market for Concho securities promptly digested current information regarding Concho from all publicly available sources and reflected such information in Concho's stock price.   Under these circumstances, all purchasers of Concho common stock during the Class Period suffered similar injury through their purchase of Concho common stock at artificially inflated prices and the presumption of reliance applies.

417.     In the alternative, to the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Concho's business and financial prospects, including its large-scale development projects during the Class Period, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

418.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of Concho who knew that the statement was false when made.

## X.      CLASS ACTION ALLEGATIONS

419.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all person or entities who purchased or otherwise acquired Concho common stock between February 21, 2018 through July 31, 2019, inclusive (the "Class").  Excluded from the Class are: (i) Defendants (as defined herein); (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of any Defendant.  For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Concho employees.

420.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      Whether the Exchange Act was violated by Defendants;

(b)      Whether Defendants omitted and/or misrepresented material facts;

(c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Concho stock was artificially inflated; and

(f)     The extent of the damage sustained by Class members and the appropriate measure of damages.

421.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

422.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

423.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

424.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

425.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and the Class, against Concho and the Individual Defendants.

426.    During the Class Period, Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

427.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Concho common stock during the Class Period. The Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

428.    During the Class Period, Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase or sale of Concho common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other Class members; (b) artificially inflate and maintain the market price of Concho common stock; and (c) caused Lead Plaintiffs and other members of the Class to purchase Concho common stock at artificially inflated prices and to suffer losses when the true facts became known.

429.    Defendant Concho and Defendant ConocoPhillips, as successor in interest to Concho, are liable for all materially false or misleading statements made during the Class Period, as alleged above.

430.    The Individual Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

431.    As alleged above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth.  The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Concho common stock, were either known to the Defendant or were so obvious that the Defendants should have been aware of them.

432.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Concho, establish a strong inference that Defendants acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

433.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Concho common stock and were harmed when the truth about Concho negatively impacted the price of those securities. Lead Plaintiffs and the Class would not have purchased Concho common stock at the prices they paid, or at all, had they been aware of the truth about Concho.

434.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the class period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

435.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

436.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against each of the Individual Defendants.

437.    As set forth above, each of the Individual Defendants were each controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants acted as controlling persons of Concho within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

438.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about Concho and the actions of Concho and its employees.  Moreover, the Individual Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Concho during the Class Period.  As a

result of the foregoing, the Individual Defendants each were controlling persons of Concho within the meaning of Section 20(a) of the Exchange Act.

439.    As alleged above, Concho violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Concho and as a result of their own aforementioned conduct, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Concho common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers and/or directors of Concho, each of the Individual Defendants culpably participated in the material misstatements and omissions made by Concho, as set forth above.

440.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 7, 2022

Respectfully submitted,

*/s/ Francis P. McConville*

**LABATON SUCHAROW LLP**
Francis P. McConville
Alfred L. Fatale III
Charles Wood
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
afatale@labaton.com
cwood@labaton.com

*Counsel for Lead Plaintiffs and Lead
Counsel for the proposed Class*

185

## <u>CERTIFICATE OF SERVICE</u>

I certify that this 7th day of January 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

*/s/ Francis P. McConville*
Francis P. McConville
