# Case No. 1

2022 WL 112029, Fed. Sec. L. Rep. P 101,302

2022 WL 112029
United States District Court,
S.D. Texas, Houston Division.

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM on behalf of itself individually, and All
Others Similarly Situated, and Iron Workers
District Council (Philadelphia and Vicinity)
Retirement and Pension Plan, Plaintiffs,
v.
CABOT OIL & GAS
CORPORATION, et.al, Defendants.

Civil Action No. H-21-2045
|
Signed 01/12/2022

**Attorneys and Law Firms**

Darryl James Alvarado, Pro Hac Vice, Francisco J. Mejia, Pro Hac Vice, Kevin Lavelle, Robbins Geller Rudman & Dowd, San Diego, CA, Lawrence F. Stengel, Saxton & Stump LLC, Lancaster, PA, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Plaintiff Delaware County Employees Retirement System.

Andrew L. Zivitz, Pro Hac Vice, Joshua Edward D'Ancona, Henry W. Longley, Pro Hac Vice, Kessler Topaz Meltzer Check, LLP, Radnor, PA, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, Lawrence F. Stengel, Saxton & Stump LLC, Lancaster, PA, for Plaintiff Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan.

Gerard G. Pecht, Pro Hac Vice, Kelly A. Potter, Norton Rose Fullbright US LLP, Houston, TX, Peter Andrew Stokes, Pro Hac Vice, Norton Rose Fulbright US LLP, Austin, TX, Amy L. Barrette, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for Defendant Cabot Oil & Gas Corporation, Dan O. Dinges, Scott C. Schroeder.

Amy L. Barrette, Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, Peter Andrew Stokes, Pro Hac Vice, Norton Rose Fulbright US LLP, Austin, TX, for Defendant Phil L. Stalnaker.

## MEMORANDUM AND OPINION

Lee H. Rosenthal, Chief United States District Judge

**\*1** This motion asks the court to decide when a company's public descriptions of its environmental issues minimize the costs and risks and violate the securities laws. The Delaware County Employees Retirement System and the Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan, (the "Retirement Plans"), purchased common stock in Cabot Oil & Gas Corporation. The Retirement Plans allege that from October 2015 to June 2020, Cabot and its executive officers told investors that it was remediating environmental problems and complying with ongoing legal and regulatory requirements, increasing the stock price. The Retirement Plans allege that since at least 2009, Cabot was instead leaving problems unremediated and continuing to violate environmental laws. (Docket Entry No. 47 at ¶¶ 1–4). In June 2020, the Pennsylvania Office of the Attorney General announced criminal charges against Cabot, including felony counts for failing to fix known faulty gas wells that leaked pollutants into residential water supplies. The stock price dropped. Litigation followed, alleging that the investors like the Retirement Plans lost millions. (*Id.* at ¶¶ 9–11).

In October 2020, the Retirement Plans sued Cabot and three executive officers on behalf of those who purchased Cabot common stock between October 23, 2015, and June 12, 2020. (Docket Entry No. 1). The first amended complaint asserts claims against Cabot; its chief executive officer, Dan O. Dinges; its chief financial officer, Scott O. Schroeder; and its senior vice president and regional manager, Phil L. Stalnaker, under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Docket Entry No. 47). Cabot and the three officers have moved to dismiss. (Docket Entry Nos. 63, 64). The Retirement Plans have responded, and Cabot and the officers have replied. (Docket Entry Nos. 90, 93). The court heard argument on the motion.

Based on the motion, the response, oral argument, and the applicable law, the court grants the motion to dismiss as to all claims. To the extent the claims are based on the following categories of statements, they are dismissed with prejudice because leave to amend would be futile:

• Code of Business Conduct Statements;

• Notice of Violation Statements in Form 10-Qs and 10-Ks;

• Potential Risk Statements in Form 10-Ks;

Case 4:21-cv-02473 Document 29-28 Filed 03/08/22 in TXSD Page 3 of 14

Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2022)
2022 WL 112029, Fed. Sec. L. Rep. P 101,302

• The Dinges Letter in the 2016 Annual Report;

• The 2018 Schroeder Presentation;

• The Dinges Letter in the 2019 Annual Report; and

• The 2019 Annual Report Statements.

To the extent the claims are based on the following categories of statements, they are dismissed, without prejudice and with leave to amend, because the present record does not show that amendment would be futile:

• Substantial Compliance Statements in Form 10-Ks;

• Remediation Statements Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

• The 2016 Consent Order Notification in the 2016 Form 10-K; and

**\*2** • The Report of 2017 Notices of Violation in the 2019 Form 10-Q.

An amended complaint may be filed no later than **February 11, 2022**, adding allegations that support a claim for relief only as to the four categories of misstatements the court has dismissed without prejudice.

The reasons for these rulings are set out below.

## I. Background
Cabot Oil & Gas Corporation is a publicly traded oil and gas company on the New York Stock Exchange. (Docket Entry No. 47 at ¶ 19). From 2015 to 2019, its revenue grew from $1.3 to over $2 billion. (*Id.* at ¶ 28). The Delaware County Employees Retirement System is a benefit pension fund with more than 4,600 beneficiaries. It provides retirement benefits to current and former Delaware County employees. (*Id.* at ¶ 17). From October 2015 to June 2020, it owned Cabot stock. The Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan also invested in Cabot's common stock. (*Id.* at ¶ 18).

Like many in its business, Cabot fracks. Fracking requires drilling into underground geological formations to release and capture natural gas. (*Id.* at ¶¶ 2, 19). Cabot's fracking is concentrated in the Marcellus Shale Deposit in parts of Pennsylvania, West Virginia, Ohio, and New York. (*Id.* at ¶ 2). By December 31, 2016, 93% of Cabot's year-end proved

reserves—the amount of hydrocarbon that can be recovered from a deposit with a reasonable level of certainty—were allegedly located in the Marcellus Shale. (*Id.* at ¶ 30). By 2019, all Cabot's proved undeveloped reserves were located in the part of the Marcellus Shale located under Susquehanna County, Pennsylvania. (*Id.*).

In early 2009, the Pennsylvania Department of Environmental Protection opened an investigation into Cabot's Susquehanna County fracking operations after an explosion at a residential water well in the Dimock Township. (*Id.* at ¶¶ 4, 65). The investigation concluded that Cabot's drilling had caused methane gas to migrate into residential water wells. (*Id.*). The Pennsylvania Department of Environmental Protection and Cabot entered into a Consent Order Agreement, but after "Cabot's failure to abide by the terms," Cabot and the Department signed a new Consent Order in April 2010. (*Id.* at ¶ 5). In a final Consent Order signed in December 2010, Cabot agreed to "take all actions necessary ... to comply with all applicable environmental laws and regulations." (*Id.* at ¶ 6).

The Retirement Plans allege that Cabot repeatedly and knowingly flouted the December 2010 Consent Order over the next decade. Kat Kennedy, an Oil and Gas Inspector Supervisor at the Pennsylvania Department of Environmental Protection, testified that in 2015, he discovered 11 gas wells needing evaluation, but that Cabot did not begin remediating any of these wells until 2018. (*Id.* at ¶ 86). A geologist who worked for Cabot from 2011 to 2018 testified that Cabot's drill sites often lacked sufficient cement bonds, which in his view was "the number one issue for gas migration at the Company's drill sites." (*Id.* at ¶ 109–12). Cabot would test the cement casings by creating a "cement bond log." The geologist stated that, "when you saw a good log you were surprised." (*Id.*). Several Dimock Township residents testified that as late as 2019, they were experiencing the same water issues that had resulted in the 2009 water well explosion. (*Id.* at ¶¶ 74, 76).

**\*3** In February 2020, a Pennsylvania grand jury recommended charges against Cabot, finding that:

> [o]ver a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of these gas

wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. In light of Cabot's long-term indifference to the damage it caused to the environment and the citizens of Susquehanna County, these were not merely technical violations.

(*Id.* at ¶ 58). In June 2020, criminal charges were filed. (*Id.* at ¶ 59).

The charges were based on two categories of Cabot wells: (1) those covered by the December 2010 Consent Order that were not remediated as of 2015; and (2) more recently drilled wells in Susquehanna County outside the Dimock Township area. The charges listed regulatory violations from industrial waste discharges in specific Dimock Township wells and time periods:

• from August 14, 2009 through June 11, 2018, from the gas wells G Shields IV, G Shields 2H, G Shields 4H, and G Shields 5H located in Dimock Township, Susquehanna County, Pennsylvania;

• from July 16, 2008 through June 11, 2018, from the gas wells Costello 1V, Costello 2V, Gesford 4H, and Gesford 8H located in Dimock Township, Susquehanna County, Pennsylvania;

• from October 31, 2008 through June 11, 2018, from the gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V located in Dimock Township, Susquehanna County, Pennsylvania; and

• from March 27, 2008 through June 11, 2018, from the gas wells Ely 4H and Ely 6H located in Dimock Township, Susquehanna County, Pennsylvania.

(*Id.* at ¶¶ 90, 91). The Pennsylvania Department of Environmental Protection had served Cabot with Notices of Violation for each of these gas wells from 2010 to 2020. (*Id.* at ¶ 93). For the G Shields well, the Notice of Violation issued in October 2011; for the Costello and Gesford wells, in June 2014; for the Ratzel wells, in December 2014; and for the Ely wells, in March 2018. (*Id.* at ¶ 94). According to a June 2018 Notice of Violation, all the violations were outstanding. (*Id.*).

Cabot also had fracking operations outside the Dimock Township but still within Susquehanna County. The Pennsylvania Department of Environmental Protection also served Cabot with Notices of Violation for some of these wells. The Notices issued in March 2017, and June 2017, for Howell gas wells 2H, 4H, 6H, and 8H; in November 2017, for Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H; and in October 2019, for a POWERS M gas well 002. (*Id.* at ¶ 96). As of June 2018, at least the Jeffers Farm and Howell wells remained unresolved. (*Id.* at ¶ 97).

During this time, Cabot had a Safety and Environmental Affairs Committee, made up of at least three of Cabot's Board members.[1] The Committee advised the Board on matters relating to Cabot's compliance with environmental laws and received reports of notices of violations, civil actions, and remediation work. (*Id.* at ¶¶ 43–44). Cabot's Audit Committee reported to the Board on matters affecting Cabot's financial reporting and its compliance with legal and regulatory requirements. (*Id.* at ¶ 46). Company management provided periodic reports to the Audit Committee on areas of potential exposure, including litigation and regulatory risks. (*Id.*). All Cabot directors, officers, and employees had to sign a statement that they understood and would comply with Cabot's Code of Business Conduct, which was posted on Cabot's website. (*Id.* at ¶ 47).

[1] The Committee's name was changed to the "Environment, Health & Safety Committee" during the class period. (Docket Entry No. 47 at 25 n.1). For consistency, the court will refer to it by its original name, the Safety and Environmental Affairs Committee.

**\*4** As CEO, Dan Dinges signed press releases, spoke on conference calls, and certified and signed Securities and Exchange Commission filings on Cabot's behalf. (*Id.* at ¶ 20). Cabot's CFO, Scott C. Schroeder, similarly spoke on Cabot's behalf and certified and signed filings with the SEC. (*Id.* at ¶ 21). As the senior vice president and regional manager overseeing Cabot's Susquehanna operations, Phil L. Stalnaker also made public statements for Cabot. (*Id.* at ¶ 22).

The Retirement Plans allege that due to numerous false and material misrepresentations and omissions made by Cabot, Dinges, Shroeder, and Stalnaker from October 2015 to June 2020, investors were in the dark as to the nature and extent of Cabot's violations of environmental law, failures to remediate, and lack of compliance with the December 2010 Consent

Order. (*Id.* at ¶¶ 8, 26). The alleged misrepresentations are categorized below.

1. ***Code of Business Conduct Statements***. Cabot's Code of Business Conduct provided:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities.

(*Id.* at ¶ 135). The Retirement Plans allege that Cabot issued proxy statements directing investors to the full text of the Code of Business Conduct and incorporated the Code by reference in its Form 10-Ks filed with the Securities and Exchange Commission. (*Id.* at ¶ 52). The proxy statements included the following:

> All employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior. The Code of Business Conduct covers all areas of professional conduct ..., as well as requiring strict adherence to all laws and regulations applicable to the Company's business. Employees, officers and directors are required annually to reply to a Code of Conduct Questionnaire, which is designed to elicit information related to any known or possible violation of the Code.

(*Id.* at ¶¶ 132–33).

2. ***Notice of Violation Statements in Form 10-Qs and 10-Ks***. On October 23, 2015, Cabot filed its quarterly report with the Securities and Exchange Commission. The Form 10-Q stated in part that:

> [f]rom time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(*Id.* at ¶ 119). Cabot repeated this statement in its 2015, 2016, 2017, 2018, and 2019 Form 10-Ks filed with the Securities and Exchange Commission. (*Id.* at ¶ 120). CEO Dinges and CFO Schroeder signed statements certifying that the Form 10-Ks did not contain untrue statements or omit material facts and that the company had controls to ensure that all material information was made known to them. (*Id.* at ¶ 121).

3. ***Potential Risk Statements in Form 10-Ks***. In its 2015 Form 10-K, Cabot provided the following information about environmental and safety regulations:

> **\*5** Operations are subject to extensive federal, state and local laws and regulations, including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment. These laws and regulations can adversely affect the cost, manner or feasibility of doing business.... Governmental authorities have the power to enforce compliance with their regulations, and violations could subject us to fines, injunctions or both.... Failure to comply with these laws also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties as well as the imposition of corrective action orders.

(*Id.* at ¶ 130). Similar warnings were contained in the 2016, 2017, 2018, and 2019 10-K Forms. (*Id.*).

4. ***Substantial Compliance Statements in Form 10-Ks***. Cabot's 2015, 2016, 2017, 2018, and 2019 Form 10-Ks included the statement that Cabot "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations." (*Id.* at ¶ 122).

5. ***Remediation Statements Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***. Cabot's 2015 Form 10-K stated that the company had received a Notice of Violation from the Pennsylvania Department of Environmental Protection in September 2011 for failing to prevent the migration of methane gas into fresh groundwater sources in Susquehanna County. Cabot stated that: it was "engaged with the PaDEP in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; it believed "the source of methane has been remediated and [that it was] working with the PaDEP to

reach agreement on the disposition of this matter"; that it had received a proposed Consent Order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and that it would continue to work to bring the matter to a close. (*Id.* at ¶ 123). Similar statements were made in Cabot's Form 10-Qs filed in May 2016, July 2016, and October 2016. (*Id.* at ¶ 124).

6. ***The 2016 Consent Order Notification in the 2016 Form 10-K***. In its 2016 Form 10-K, Cabot notified investors that it had finalized a new Consent Order and Agreement with the Pennsylvania Department of Environmental Protection:

We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

(*Id.* at ¶ 124).

7. ***The Dinges Letter in the 2016 Annual Report***. In March 2017, Cabot published its 2016 Annual Report. CEO Dinges signed a letter to shareholders stating that Cabot had an "unwavering commitment to comply with or exceed all regulations to enhance the environment and communities where we operate." (*Id.* at ¶ 125).

8. ***The 2018 Schroeder Presentation***. In August 2018, Schroeder told investors at an EnerCome Oil & Gas conference that:

[w]e have more wells that we're completing right now in the Upper Marcellus. And look to the February year-end reserve report for data on that. [A] [q]uestion you might ask is, "Okay, why – if you're doing them now, why don't you tell us sooner?" Because of the way we complete our wells in the field to be environmentally friendly, green, however you want to say it, a long time ago, several years ago, we changed our completion technique.

**\*6** (*Id.* at ¶ 126).

9. ***The Report of 2017 Notices of Violation in the 2019 Form 10-Q***. In July 2019, Cabot filed its 2019 Form 10-Q with the Securities and Exchange Commission, reporting that it had received two proposed Consent Orders and Agreements related to two Notices of Violation from the Pennsylvania Department of Environmental Protection. Cabot stated:

We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close. With regard to the November 2017 Notice of Violation, the proposed Consent Order and Agreement, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement, and to complete the ongoing investigation and remediation.

(*Id.* at ¶¶ 137, 138). Cabot also addressed a June 2017 Notice of Violation, stating that it believed the water-quality complaints had been resolved through remediation and that it was working with the Pennsylvania Department of Environmental Protection. (*Id.* at ¶ 139).

10. ***The Dinges Letter in the 2019 Annual Report***. In March 2020, Cabot published its 2019 Annual Report. CEO Dinges signed a letter to shareholders stating that Cabot "make[s] every effort to reduce and limit our impact on air, water[,] and the environment with the best technologies currently available" and that its "commitment to free cash flow, return on capital back to shareholders with the least possible impact to the environment remains paramount in importance to [Cabot]." (*Id.* at ¶ 127).

11. ***The 2019 Annual Report Statements***. The 2019 Annual Report also stated that "Cabot embraces environmental innovation and is a leader in utilizing new technology to reduce our overall impact on the environment," and that "it is from this platform that we will continue our efforts to improve the environment, being a beacon of light by doing the right thing." (*Id.* at ¶ 128).

The Retirement Plans allege that these statements misrepresented Cabot's compliance with the environmental laws and regulations, its compliance with the December

2010 Consent Order, and its remediation efforts, and that the misrepresentations inflated Cabot's stock price.

On November 2, 2017, CEO Dinges sold 66,610 shares of Cabot stock for over $1.8 million. (*Id.* at ¶¶ 20, 168). When Cabot first partially disclosed the 2017 Notices of Violation in its 2019 Form 10-Q on July 26, 2019, the price of Cabot stock declined 12%, while the Dow Jones U.S. Exploration & Production Index fell by less than 0.5%. (*Id.* at ¶ 174).

When the Pennsylvania Attorney General's Office announced charges against Cabot on June 15, 2020, Cabot's stock price dropped by more than 3%, while the Dow Jones U.S. Exploration & Production Index increased slightly. (*Id.* at ¶¶ 176–77). The Retirement Plans allege that they and their investors lost millions. (*Id.* at ¶ 11).

**\*7** This lawsuit followed.

## II. The Rule 12(b)(6) Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.' " *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by

the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## III. Section 10(b) of the Securities Exchange Act of 1934

Cabot argues that the Retirement Plans' first amended complaint fails to state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, because the complaint did not: (1) plead fraud with particularity under Rule 9 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act; (2) identify material actionable misstatements or omissions; (3) plead specific facts supporting a strong inference of scienter; or (4) adequately allege causation. The Retirement Plans argue that their first amended complaint pleads repeated patterns of environmental law violations from 2010 to 2020, many statements minimizing those violations, corporate structures and governance suggesting that Cabot's executive officers knew that Cabot continued to violate environmental laws and regulations, and stock-price drops when those violations were revealed.

**\*8** Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Section 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b–5(b). While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations

Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2022)

2022 WL 112029, Fed. Sec. L. Rep. P 101,302

actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); *see also Dura Pharm.*, 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)).

### A. Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b–5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322–23. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citations omitted). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, No. 20-40571, 2021 WL 4269565, at *5 (5th Cir. Sept. 20, 2021); *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017).

The Private Securities Litigation Reform Act requires the party to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading." *Neiman*, 854 F.3d at 746 (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "[F]or each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.' " *Id.* (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

Even if misrepresentations and omissions are pleaded with sufficient specificity, they must be material. There is no bright-line rule; determining materiality is a fact-intensive

inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts are material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Emp. Retirement Sys. v. Whole Foods Market, Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (citing *Basic*, 485 U.S. at 231).

**\*9** "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. Opinion statements, such as those prefaced by "we believe" or "we think," may, or may not, be actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). Whether representations in an opinion statement are actionable depends on whether (1) "the speaker did not hold the belief she professed," and (2) "the supporting fact she supplied [was] untrue." *Id.* at 185–86. Whether omissions in an opinion statement are actionable depends on whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and ... investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig. (BP I)*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012) (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)). The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not actionable.

The Retirement Plans allege eleven categories of false or misleading statements made by Cabot and the individual executive officers. Four categories qualify as corporate

cheerleading and are not actionable: (1) the Code of Business Conduct Statements; (2) the Dinges Letter in the 2016 Annual Report; (3) the Dinges Letter in the 2019 Annual Report; and (4) the 2019 Annual Report Statements.

General statements in Cabot's Code of Business Conduct about the company's policy to comply with environmental protection laws are goal-driven and cannot be reasonably read as promises or guarantees to investors of complete compliance with all such laws and regulations. (Docket Entry No. 47 at ¶¶ 48, 52, 135). The proxy statement language directing investors to the Code of Business Conduct generally described the purpose of the Code as "ensur[ing] that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior." (*Id.* at ¶¶ 132–33). Courts have found that similar statements are general statements of commitment to improving legal—including environmental and safety—compliance, not specific or factual representations, and are not actionable. *See In re Plains All Am. Pipeline, L.P., Sec. Litig.*, 307 F. Supp. 3d 583, 624–26 (S.D. Tex. 2018), *aff'd*, *Police and Fire Retirement Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 Fed. Appx. 726, 731 (5th Cir. 2019) (a company's code of conduct statement that its "commitment to safe and environmentally responsible operations also includes compliance with applicable environmental, health and safety rules, laws, and regulations" was a nonactionable general commitment to improving safety and legal compliance—not "a specific or factual representation").

CEO Dinges's letter to shareholders in the 2016 Annual Report contains a similar statement of Cabot's general "unwavering commitment to comply with or exceed all regulations to enhance the environment and communities where we operate." (Docket Entry No. 47 at ¶ 125). Statements in Cabot's 2019 Annual Report, including in CEO Dinges's letter to shareholders, that the company is making efforts to reduce its environmental impact, that it is committed to having the least possible impact to the environment, and that it hopes to improve the environment by "being a beacon of light," (*id.* at ¶¶ 127–28), are also generalized, optimistic, statements that a reasonable investor would consider corporate puffery. *See Whole Foods*, 905 F.3d at 901 ("We have explained that a company's generalized, positive statements are immaterial because they do not alter a reasonable investor's assessment of the company's prospects." (internal citations and quotation marks omitted)).

**\*10** Four other categories of statements pleaded in the first amended complaint as actionably false or misleading are not: (1) the Notice of Violation statements in Form 10-Qs and 10-Ks; (2) the potential risk statements in Form-10Ks; (3) the 2018 Schroeder presentation statements; and (4) the substantial compliance statements in the Form 10-Ks. The Retirement Plans argue that the Notice of Violations statements in Cabot's October 2015 Form 10-Q and its 2015, 2016, 2017, 2018, and 2019 Forms 10-K downplayed the significance of the environmental law violations. The allegedly misleading language stated that, "[f]rom time to time, we receive notices of violation" and are required to pay fines and penalties that "may result in monetary sanctions individually or in the aggregate in excess of $100,000." (Docket Entry No. 47 at ¶¶ 119–21). The Retirement Plans do not explain how this language is misleading, false, or materially so. To the contrary, the first amended complaint alleges that Cabot received two Notices of Violation in 2014, three in 2017, one in 2018. The complaint does not allege that Cabot paid associated fines for the notices significantly exceeding $100,000. (*Id.* at ¶¶ 94–96, 98; *see also* Docket Entry No. 90 at 13).

Nor do the Retirement Plans explain how general statements in Cabot's 2015, 2016, 2017, 2018, and 2019 Form 10-Ks, addressing the potential risks of failing to comply with environmental laws and regulations, were materially misleading or false. The statements are that: environmental "laws and regulations can adversely affect the cost, manner or feasibility of doing business"; "[g]overnmental authorities have the power to enforce compliance," which "could subject [Cabot] to fines, injunctions, or both"; and "failure to comply with these laws may result in the suspension or termination of [Cabot] operations ...." (Docket Entry No. 47 at ¶ 130). The Retirement Plans do not argue that these statements were false. The Retirement Plans instead argue that these statements were misleading because they generally described what can happen in the case of an environmental law or regulatory violation but did not disclose that Cabot was already facing such risks.

Cabot' general explaining of some of the risks associated with violating legal or regulatory requirements would not mislead reasonable investors to believe that Cabot was fully compliant with all requirements or free of violations. Cabot disclosed in those same Form 10-Ks that it had received Notices of Violation. Cabot's statements of potential risks did not hide the fact that Cabot had received Notices of Violation. *Omnicare*, 575 U.S. at 190 ("[A]n investor

reads each statement within [a Securities and Exchange Commission document], whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."). As Cabot points out, the Form 10-Ks included statements reminding investors that "drilling natural gas and oil wells is a high-risk activity" and that "risks of substantial costs and liabilities related to environmental compliance issues are part of oil and natural gas production operations. No assurance can be given that significant costs and liabilities will not be incurred."[2] In sum, a reasonable investor reading Cabot's Form 10-Ks as a whole would not conclude that because Cabot provided an explanation of potential environmental regulatory risks, it was not presently facing such risks.

[2]     (Docket Entry No. 65-2 at 29–31, 37; Docket Entry No. 65-7 at 32, 41; Docket Entry No. 65-11 at 31, 38; Docket Entry No. 65-15 at 31, 38; Docket Entry No. 65-20 at 28, 37; Docket Entry No. 65-24 at 28, 41). Although the court may not accept as true the statements within forms filed with the Securities and Exchange Commission at the motion to dismiss stage, it may take judicial notice of the fact that the statements were made. *Petrobas Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021) ("The SEC filings ... may be properly judicially noticed to the extent that they are "considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." (citation omitted)).

 **\*11**  Statements made by CFO Schroeder at an EnerCome Oil & Gas Conference in August 2018 are similarly not actionable. At the conference, Schroeder disclosed that Cabot had been working on completing more wells in the Upper Marcellus Shale using a more environmentally friendly completion method. (Docket Entry No. 47 at ¶ 126). The Retirement Plans make no allegations of facts contrary to Schroeder's statement that Cabot had switched to a more environmentally friendly completion method in the Upper Marcellus Shale region. Nor do the Plans explain how Schroeder's statement would mislead investors into believing that Cabot was in compliance with environmental requirements—including those imposed by the Consent Orders—for the well sites identified throughout the Retirement Plans' first amended complaint.

Last, Cabot's statements in its Form 10-Ks that it "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations" are not false or misleading. (*Id.* at ¶ 122). The first amended complaint identifies 25 wells that allegedly had compliance issues throughout the class period. (*See id.* at ¶¶ 90, 96). As Cabot pointed out during oral argument, the Retirement Plans have not alleged whether these well sites were a substantial piece of Cabot's production or a substantial number of wells out of Cabot's total wells, which is part of the Plans' pleading burden. The Plans attempt to rely on statements made by a former Cabot geologist that there were frequent cement bond log issues, but the geologist allegedly worked for Cabot from 2011 to 2018. (*Id.* at ¶¶ 109–12). The Plans do not identify when the geologist witnessed cement bond log issues or how many well sites he visited out of all of Cabot's Marcellus Shale operations. Without more, the court cannot conclude that it is materially and actionably false for Cabot to have asserted it was in substantial compliance with laws and regulations, even if the court accepts as true that all identified well sites in the complaint were defective. *See Plains*, 777 Fed. Appx. at 731 ("substantial compliance" statements were not misleading when the plaintiffs alleged failures in only a small portion of company's overall pipeline network); *see also In re Univ. Health Servs., Inc. Deriv. Litig.*, C.A. No. 17-2187, 2019 WL 3886838, at \*42 (E.D. Pa. Aug. 19, 2019) (a statement of substantial compliance was not an actionable misstatement because "although a small number of [the defendant's] facilities experienced compliance issues, it [did] not appear that these issues pervaded the entire company").

The court does consider allegations of some of the three remaining categories of statements to state a claim for actionably false or misleading statements. These categories are set out below:

1. ***Remediation Statements Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***. Cabot's 2015 Form 10-K stated that the company had received a Notice of Violation from the Pennsylvania Department of Environmental Protection in September 2011 for failing to prevent the migration of methane gas into fresh groundwater sources in Susquehanna County. Cabot stated that: it was "engaged with the PaDEP in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; it believed "the source of methane has been remediated and [that it was] working with the PaDEP to

reach agreement on the disposition of this matter"; that it had received a proposed Consent Order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and that it would continue to work to bring the matter to a close. (Docket Entry No. 47 at ¶ 123). Similar statements were made in Cabot's Form 10-Qs filed in May 2016, July 2016, and October 2016. (*Id.* at ¶ 124).

**\*12** 2. ***The 2016 Consent Order Notification in the 2016 Form 10-K***. In its 2016 Form 10-K, Cabot notified investors that it had finalized a new Consent Order and Agreement with the Pennsylvania Department of Environmental Protection:

We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

(*Id.* at ¶ 124).

3. ***The Report of 2017 Notices of Violation in the 2019 Form 10-Q***. In July 2019, Cabot filed its 2019 Form 10-Q with the Securities and Exchange Commission, reporting that it had received two proposed Consent Orders and Agreements related to two Notices of Violation from the Pennsylvania Department of Environmental Protection. Cabot stated:

We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close. With regard to the November 2017 Notice of Violation, the proposed Consent Order and Agreement, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement, and to complete the ongoing investigation and remediation.

(*Id.* at ¶¶ 137, 138). Cabot also addressed a June 2017 Notice of Violation, stating that it believed the water-quality complaints had been resolved through remediation and that it was working with the Pennsylvania Department of Environmental Protection. (*Id.* at ¶ 139).

To the extent each of these statements asserts that Cabot has, or believes it has, remediated and resolved the identified environmental violations, the Retirement Plans have alleged statements that could be actionable. (*E.g., id.* at ¶ 123 (Cabot has "engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents."); *id.* at ¶ 124 ("We believe the source of methane has been remediated .... We ... continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged."); *id.* at ¶ 139 (Cabot stated that it had resolved the water quality complaints that caused the June 2017 Notice of Violation by performing appropriate remediation work and engaging with the Pennsylvania Department of Environmental Protection)).

The Retirement Plans alleged sufficient facts that, if proven, could make these statements false and materially misleading. Most of Cabot's fracking operations from 2015 to 2020 were located in Susquehanna County. Cabot had not remediated or resolved the environmental law and various Consent Order obligations for wells in Susquehanna County when the Pennsylvania Attorney General's Office announced the June 2020 criminal charges. (*See id.* at ¶¶ 94, 96). The June 2020 criminal charges were based on compliance issues with wells that were the subjects of October 2011, June 2014, December 2014, March 2014, March 2017, June 2017, November 2017, June 2018, and October 2019 Notices of Violation. Statements that Cabot had resolved or remediated issues with the well sites are contrary to these and other facts alleged in the first amended complaint. *Plains,* 777 Fed. Appx. at 731 (a statement that the company "performs scheduled maintenance on all of their pipeline systems and makes repairs and replacements" was actionable because the plaintiffs alleged specific contradictory facts); *see also Meyer v. Jinkosolar Holdings Co., Ltd.,* 761 F.3d 245, 251 (2d Cir. 2014) (a prospectus that described a company's reasonably effective efforts to comply with applicable environmental regulations was misleading and contradictory to allegations that the company had ongoing and serious pollution violations).

2022 WL 112029, Fed. Sec. L. Rep. P 101,302

**\*13** Cabot's motion to dismiss is granted as to the four categories of "corporate cheerleading" statements and the four categories of statements that do not present an actionable untrue or misleading statement. Most of the categories are dismissed with prejudice because the court held that the statements are not actionable as a matter of law and leave to amend would be futile; however, the court will permit leave to amend the category of misstatements regarding Cabot's "substantial compliance" statements. The allegations as to the remaining three categories of statements, which the court held were actionably false or misleading, are addressed further below.

### B. Scienter

In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b–5 are not insurance against bad corporate management. Rather, they protect only against knowing or severely reckless misstatements. *Shaw Grp.*, 537 F.3d at 535. "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.' " *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2*, 401 F.3d at 643). "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Shaw Grp.*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)).

The court may consider documents incorporated by reference into the complaint and matters proper for judicial notice. *BP I*, 843 F.Supp.2d at 748 (citing *Tellabs*, 551 U.S. at 323). The court looks to the allegations about an individual's state of mind when that individual made the statement to determine whether the allegations support a strong inference of scienter. *Tellabs*, 551 U.S. at 33; *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364–65 (5th Cir. 2004). The inference must be "cogent and compelling," not simply "reasonable" or "permissive," and "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count

against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.' " *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)). "[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but ... allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the [Private Securities Litigation Reform Act]." *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003)). The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement.

The plaintiffs cannot simply allege that some other person at the corporation knew of facts that make a challenged statement misleading and impute that knowledge to the speaker. *Southland*, 365 F.3d at 366. The plaintiffs must make specific factual allegations about each responsible individual's state of mind when each challenged statement was made. Allegations about another person's knowledge, or about the defendants' collective knowledge, are insufficient. Simply pleading that a defendant had access to internal information that contradicted that individual's public statements is not enough. *In re BP P.L.C. Sec. Litig. (BP II)*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002)). To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents, and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

**\*14** The Retirement Plans have sufficiently alleged three categories of actionable misstatements. The Retirement Plans allege that the following facts support their claim that CEO Dinges, CFO Schroeder, and SVP Stalnaker acted with scienter when making those statements:

- the "Defendants' knowledge of and access to information and reports reflecting that Cabot was not in compliance with relevant environmental laws";

- the "Defendants' obligations associated with Cabot's disclosure controls and environmental compliance"; and

Case 4:21-cv-02473   Document 29-28   Filed 03/08/22 in TXSD   Page 13 of 14

Delaware County Employees Retirement System v. Cabot Oil &..., Slip Copy (2022)
2022 WL 112029, Fed. Sec. L. Rep. P 101,302

- that "the misstatements and omissions of material facts concerned the Company's core operations."

(Docket Entry No. 47 at ¶ 145). Although CEO Dinges and CFO Schroeder were aware of the Notices of Violation because they signed the company's financial forms taking note of the violations, the plaintiffs have pleaded no facts alleging a sufficient basis to infer that the individual officers were aware of continuing violations and failures to remediate beyond what the Notices of Violation provided.

General allegations that the defendants received reports with material information are not sufficient to create a strong inference of scienter. In *Plains*, this court rejected the argument that the plaintiffs had met their burden to plead scienter based on allegations that the executive officers signed SEC forms stating that the company's disclosure controls required material information to be processed and communicated to them, and stating that the executive officers were required to report to the company's Audit Committee. 307 F. Supp. 3d at 639–40. As in *Plains*, the plaintiffs' allegations that the officer defendants reviewed and received reports and notices are group allegations based on their positions as senior executive officers. These allegations fall short of the burden required by Rule 9(b) and the Private Securities Litigation Reform Act. The Retirement Plans have not alleged instances in which specific individual officers were apprised of facts contradicting their subsequent public statements. *See Iron Workers Benefit & Pension Fund – Iron Workers Dist. Council Philadelphia & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269–70 (5th Cir. 2019) (per curiam) (the plaintiff's allegations that a company's executive officers had information presented to them that could have led them to conclude that the company's operations were not in compliance with applicable laws and regulations were not enough to plead scienter); *Local 731*, 810 F.3d at 957 ("[T]his court has rejected the 'group pleading approach to scienter,' and focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the 'collective knowledge of all the corporation's officers and employees.'" (quoting *Shaw Grp.*, 537 F.3d at 533)).

The Retirement Plans allege that CEO Dinges's sale of Cabot stock in November 2017 at one of the highest prices during the class period creates an inference of scienter as to Dinges, combined with the allegations that he received reports, was involved in core company operations, and was responsible for the company's disclosures. Dinges sold Cabot stock only once in the class period. Dinges sold 66,610 shares of Cabot stock for $1.8 million in proceeds on November 2, 2017, which was two weeks before Cabot received another Notice of Violation, 20 months before the first stock price decline at issue in this case in July 2019, and a little under three years before the June 2020 criminal charges against Cabot were announced. (Docket Entry No. 47 at ¶¶ 167– 68). The Retirement Plans make no allegations as to how many shares Dinges had remaining, or as to how Dinges timed the sale to maximize personal profit. The Retirement Plans also do not allege that any other defendant sold stock during the same period. *See Local 731*, 810 F.3d at 960 ("[E]ven unusual sales by one insider do not give rise to scienter when other defendants do not sell some or all of their shares during the Class Period." (quoting *Abrams*, 292 F.3d at 435)). The allegations as to the fact, extent, or timing of the sale do not create the strong inference of scienter required under Rule 9(b) and the Private Securities Litigation Reform Act pleading standards. *See Alaska Elec. Pension Fund v. Asar*, 768 Fed. Appx. 175, 181 (5th Cir. 2019) ("[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter ... [but] this is true of insider trading 'only' when 'in suspicious amounts or at suspicious times." (internal citations and quotation marks omitted)).

 **\*15**  The closest the Retirement Plans come to alleging that an individual executive officer had knowledge of Cabot's ongoing violations is its allegation that senior vice president Stalnaker attended daily meetings to "discuss well operations, including any problems with those wells." (Docket Entry No. 47 at ¶ 151). But the Retirement Plans have failed to allege that Stalnaker himself made any misstatements or misrepresentations in the three remaining categories of actionable misrepresentations.[3] Unlike the allegations as to CEO Dinges and CFO Schroeder, the amended complaint does not allege that Stalnaker signed off on, or certified to be true, the challenged statements in Cabot's 10-K and 10-Q Forms.

[3]     The Retirement Plans allege that Cabot's 2016 and 2019 Annual Reports were prepared and distributed under Stalnaker's name, among others; however, the court has held that the statements in Cabot's Annual Reports were not actionable. (Docket Entry No. 47 at ¶¶ 125, 127).

Because the Retirement Plans have not alleged facts that meet the heightened pleading standards required by Rule 9(b)

2022 WL 112029, Fed. Sec. L. Rep. P 101,302

and the Private Securities Litigation Reform Act supporting a strong inference that Dinges, Stalnaker, or Schroeder had the required state of mind when making the three categories of misrepresentations, Cabot's motion to dismiss is granted as to the claims against these defendants. Because a well-pleaded complaint with additional allegations as to scienter might cure the deficiencies identified, the motion to dismiss as to these categories of misstatements is without prejudice and with leave to amend.

## IV. Section 20 of the Securities Exchange Act of 1934

Under § 20(a) of the Exchange Act, every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ...." 15 U.S.C. § 78t(a). "Control person" liability under § 20(a) is derivative, "and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. A party who fails to state an underlying primary claim for an Exchange Act violation fails to state a claim for control-person liability under § 20(a).

Because the Retirement Plans have failed to state a primary claim for an Exchange Act violation, their § 20 claim fails. Cabot's motion to dismiss is granted as to the § 20 claim.

## V. Conclusion

Cabot's motion to dismiss, (Docket Entry No. 63), is granted, in part with prejudice and in part without prejudice. The Retirement Plans filed an amended complaint designed to consolidate previous complaints. It would be futile to permit the Retirement Plans to amend again to attempt to fix the deficiencies in the complaint as to the categories of alleged misstatements that are not material or actionable as a matter of law. Dismissal of these claims is with prejudice and without leave to amend. These categories include:

• Code of Business Conduct Statements;

• Notice of Violation Statements in Form 10-Qs and 10-Ks;

• Potential Risk Statements in Form 10-Ks;

• The Dinges Letter in the 2016 Annual Report;

• The 2018 Schroeder Presentation;

• The Dinges Letter in the 2019 Annual Report; and

• The 2019 Annual Report Statements.

The court does permit the Retirement Plans to file amended complaint allegations as to the category of alleged misstatements that fail because the amended complaint has not alleged adequate facts to state a claim, which include Cabot's "substantial compliance" statements and statements for which the Plans did not adequately plead scienter. These categories include:

• Substantial Compliance Statements in Form 10-Ks;

**\*16** • Remediation Statements Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

• The 2016 Consent Order Notification in the 2016 Form 10-K; and

• The Report of 2017 Notices of Violation in the 2019 Form 10-Q.

An amended complaint may be filed no later than **February 11, 2022**, adding allegations that support a claim for relief only as to the four categories of misstatements the court has identified above. Because Cabot's motion to dismiss is granted, the Retirement Plans' motion to lift a discovery stay during the pendency of a motion to dismiss, (Docket Entry No. 106), is moot.

**All Citations**

Slip Copy, 2022 WL 112029, Fed. Sec. L. Rep. P 101,302

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.