# Case No. 5

2020 WL 2306434
United States District Court, S.D. New York.

IN RE GENERAL ELECTRIC
SECURITIES LITIGATION
This document relates to the following actions:

19cv1013 (DLC)
|
19cv1244
|
Signed 05/07/2020

**Attorneys and Law Firms**

For the plaintiffs: Cohen Milstein Sellers & Toll PLLC, Laura H. Posner, Joel P. Laitman, 88 Pine Street, Fourteenth Floor, New York, NY 10005, Steven J. Toll, Julie Goldsmith Reiser, Molly J. Bowen, Eric S. Berelovich, 1100 New York Ave. NW, Fifth Floor, Washington, DC 20005.

For the defendants: Latham & Watkins LLP, Miles N. Ruthberg, Blake T. Denton, 885 Third Avenue, New York, NY 10022, Sean M. Berkowitz, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, William J. Trach, 200 Clarendon Street, Boston, MA 02116, Sarah A. Tomkowiak, 555 Eleventh Street NW, Washington, DC 20004.

OPINION AND ORDER

DENISE COTE, District Judge:

**\*1** Investors in the General Electric Company ("GE") have brought a federal securities class action against the company and seven of its officers (the "Individual Defendants"). Plaintiffs allege that the defendants made misleading statements concerning two subjects: (1) the performance of GE's HA model gas turbine and (2) the goodwill attributable to GE's Power Segment, which provides goods and services related to energy production. According to the plaintiffs, defendants' statements artificially inflated the price of GE's stock for a year, between December 4, 2017 and December 6, 2018 (the "Class Period"). The defendants have moved to dismiss for failure to state a claim. Defendants' motion is granted.

**Background**

The following facts are drawn from the Second Amended Complaint ("SAC") and documents relied upon by the SAC. For the purposes of deciding this motion, plaintiffs' factual allegations are accepted as true and all reasonable inferences are drawn in plaintiffs' favor.

### I. The HA Turbine

In 1989, GE launched the 9F family of gas turbines. In 2014, GE began to sell its next-generation HA turbine, which it had spent over $2 billion to develop. Plaintiffs allege that GE misleadingly touted the reliability of the HA turbine, while concealing from investors a significant defect that affected the turbine's performance.

#### A. Gas Turbines and Oxidation

In a gas turbine, a mixture of air and fuel is combusted, producing a high-pressure stream of heated gas that expands through a series of blades. This causes the blades to rotate, and the turbine's rotation is used to generate electricity. [1] Running a turbine at a higher temperature allows for more efficient power generation. GE's HA turbine ran at temperatures as high as 2900 degrees Fahrenheit. [2] The HA turbine used materials and technology in its high-temperature section similar to those found in the earlier generation models known as 9FB.

[1] See generally Dep't of Energy, Office of Fossil Energy, How Gas Turbine Power Plants Work (last visited May 4, 2020), https://www.energy.gov/fe/how-gas-turbine-power-plants-work.

[2] See Gen. Elec., Tomas Kellner, Here's Why the Latest Guinness World Record Will Keep France Lit Up Long After Soccer Fans Leave (June 17, 2016), https://www.ge.com/reports/bouchain (stating that running the HA turbine "close to the melting point of steel ... allows us to generate a lot of energy efficiently").

The 9F and HA turbines both produce temperatures that exceed the melting point of the turbine blades. To prevent the blades from melting, cool air is circulated through the blades' interiors, and the blades' exteriors are covered in a ceramic coating. But if the coating fails or the cooling is insufficient, the turbine's internal temperatures can cause



oxidation. Oxidation can cause turbine blades to corrode and ultimately break, damaging other components along the turbine's exhaust path.

In 2015, GE learned of premature oxidation of two 9FB turbines. GE was still studying the problem when it began to ship HA turbines to customers. By 2017, GE knew that the oxidation issue affected its HA turbines as well. It informed its customers of the issue and its solution, which was to inspect the blades, add a new protective coating to repair the blades, or to replace the blades altogether.

### B. GE Touts HA Turbines

**\*2**  On December 4, 2017, the first day of the Class Period, GE issued a press release stating that "its largest and most efficient gas turbine, the HA, is now available at more than 64 percent efficiency in combined cycle power plants, higher than any other competing technology today."[3]  The press release also described the HA turbine as "the most efficient gas technology available in the world today."

[3]    In a "combined-cycle" plant, excess heat from the turbine exhaust is captured and used to create steam, which in turn drives a separate steam turbine. See Gen. Elec., Combined Cycle Power Plant: How It Works (last visited May 4, 2020), https://www.ge.com/power/resources/knowledge-base/combined-cycle-power-plant-how-it-works.

On January 24, 2018, GE held an earnings call, during which defendant Russell Stokes -- then the President and CEO of GE Power -- said,

> We are proud of the HA gas turbine technology. It is operating in line with performance guarantees. While we've had some issues related to commissioning at certain sites, we've readily addressed them.... We have 23 units installed and over 70,000 hours of experience, with all of the units performing to specifications and guarantees.

As described below, GE made many more statements over the course of 2018 praising the HA turbine.

### C. Disclosure of the Oxidation Defect: Exelon

In September 2018, a GE customer -- Exelon -- suffered a blade break in one of its HA turbines and shut down three other turbines as a precaution. On September 19, Stokes posted an article on LinkedIn that publicly disclosed the oxidation issue for the first time. He wrote,

> [W]e identified an issue that we expect to impact our HA units. It involves an oxidation issue that affects the lifespan of a single blade component. Obviously, this was a frustrating development, for us, as well as for our customers. But we have identified a fix and have been working proactively with HA operators to address impacted turbines. The minor adjustments that we need to make do not make the HA any less of a record setting turbine -- they are meeting -- and in many cases exceeding -- their performance goals at every customer site today.

On September 20, analysts and a number of mainstream publications further reported on the disclosures from the LinkedIn post.

On September 21, GE issued a press release disclosing that the "oxidation issue" affected "stage-one blades in GE's highest-efficiency turbines -- HA and 9FB, one of the HA's predecessors." Over the four trading days between September 20 and 25, GE's stock price fell 12.36%, from $12.86 per share to $11.27 per share.

On October 30, 2018, GE disclosed in its Form 10-Q that it had recorded a $200 million charge. It explained that the charge "related to an oxidation issue within the HA and 9FB Stage 1 turbine blades, resulting in increased warranty and maintenance reserves." For comparison, the Power Segment reported $5.7 billion in revenues during the same quarter.

On December 7, the last day of the Class Period, Reuters reported that utilities were shutting down at least eighteen of GE's HA turbines for blade repairs, representing 33% of the HA turbine fleet. The article also reported that GE was "setting aside $480 million to repair its 9HA, 7HA, and 9FB model turbines."

## II. Goodwill in GE's Power Segment

GE removed nearly $22 billion in Power Segment goodwill from its books in October 2018. The plaintiffs allege that GE should have adjusted its goodwill balance sooner but instead provided misleading valuations of its goodwill based on accounting that did not comply with GAAP.

### A. The Alstom Acquisition

**\*3** The bulk of the October 2018 goodwill impairment was attributed to goodwill that had been added to GE's balance sheet from its November 2015 acquisition of the French manufacturing company Alstom S.A. ("Alstom"). GE acquired Alstom for $10 billion and booked $17 billion of goodwill in connection with the transaction.

The large amount of goodwill reflected GE's prediction that it would recognize significant synergies from the Alstom acquisition. Alstom manufactured steam turbines and heat recovery steam generators ("HRSGs"). The key components of a combined-cycle power plant are a gas turbine, an HRSG, and a steam turbine. GE believed that Alstom's products would complement GE's existing product lines and allow it to win a larger share of each new combined-cycle plant.

The plaintiffs do not challenge GE's initial accounting for the goodwill from the Alstom acquisition; rather, they allege that GE should have more quickly disclosed that its Power Segment goodwill was impaired. Had GE used GAAP-compliant accounting, the SAC alleges, material impairments would have occurred in the fourth quarter of 2017 and first quarter of 2018, and the full $22 billion impairment would have been taken by the second quarter of 2018.

### B. GE's Experience with Alstom before October 2018

By the fourth quarter of 2017, there were indications that the Alstom deal had not produced the expected synergies. In every quarter of 2016, Alstom was less profitable than the Power Segment as a whole, with profit margins that were lower by 6-12%. In the fourth quarter of 2017, GE cut its forecasts for sales of gas turbines and related products, anticipating that it would ship between 31% and 50% fewer units during 2018 than it had in 2017. In a November 2017 interview, John Flannery -- then GE's Chairman and CEO -- said the Alstom acquisition "in total has been a disappointment" and that if GE could "go back in a time machine today, we would pay a substantially lower price than we paid." [4]

[4] CNBC, GE Chairman & CEO John Flannery Speaks With CNBC's David Faber Today (Nov. 14, 2017), https://www.cnbc.com/2017/11/14/cnbc-exclusive-cnbc-transcript-ge-chairman-ceo-john-flannery-speaks-with-cnbcs-david-faber-today.html.

The global gas power market was also experiencing a substantial downturn. During the fourth quarter of 2017, GE reduced its total sales forecast for new plant orders to 40 gigawatts, the lowest level in two decades, and a substantial reduction from GE's March 2017 forecast of 78 gigawatts. Flannery observed in the same interview that the Power Segment faced "a challenging macro environment" and that the "market clearly has been substantially worse than we forecast" at the time of the Alstom acquisition.

These challenges manifested in broader indicators of GE's financial health as well. While the Power Segment had in March 2017 forecasted its year-end operating profits to be $5.7 billion, by November 2017 it had revised that forecast downwards to $4.0 billion. The Power Segment's fourth-quarter 2016 profit margin had been 24.4%; in the fourth quarter of 2017 it was just 2.8%. On November 13, 2017, GE announced that it was cutting its dividend in half. On December 7, GE announced that it was cutting 12,000 Power Segment jobs. GE explained in a press release that layoffs were "driven by challenges in the power market worldwide."

**\*4** Finally, the SAC alleges that GE's cash flows were affected by a decrease in the value of its long-term service agreements. Under such agreements, GE's power-generation customers pay for maintenance and repair of their GE equipment. The SAC alleges that long-term service agreements were an important source of Power Segment revenue, but that the profit from such agreements decreased during 2017 and 2018 due to (1) reduced sales of original equipment, (2) a reduction in the operating hours of gas-turbine plants, driven by growth in renewable energy, and (3) warranty service to remedy the HA oxidation defect. [5]

[5]   The SAC also identifies a number of "operational issues" that GE experienced during 2017, including (1) its failure to close sales in emerging markets, (2) the HA turbine's oxidation defect, (3) problems with certain HA turbines in Pakistan, and (4) closure of a power plant that used GE's H turbine, a predecessor to the HA.

## C. Defendants' Statements Concerning Power Segment Goodwill

GE carried significant Power Segment goodwill on its books throughout the Class Period. In its 2017 Form 10-K, filed February 23, 2018, GE indicated that its Power Segment had $25.3 billion in goodwill. GE included the following description of its impairment-testing [6] methodology:

We test goodwill for impairment annually in the third quarter of each year using data as of July 1 of that year.... We determined fair values for each of the reporting units using the market approach, when available and appropriate, or the income approach, or a combination of both.

* * *

Under the income approach, fair value is determined based on the present value of estimated future cash flows, discounted at an appropriate risk-adjusted rate. We use our internal forecasts to estimate future cash flows and include an estimate of long-term future growth rates based on our most recent views of the long-term outlook for each business. Actual results may differ from those assumed in our forecasts. We derive our discount rates using a capital asset pricing model and analyzing published rates for industries relevant to our reporting units to estimate the cost of equity financing. We use discount rates that are commensurate with the risks and uncertainty inherent in the respective businesses and in our internally developed forecasts. Discount rates used in our reporting unit valuations ranged from 9.0% to 18.0%.

Based on the results of GE's step-one testing, [7] it reported that "the fair values of each of the GE reporting units exceeded their carrying values except for our Power Conversion reporting unit, within our Power operating segment." GE wrote down $947 million of Power Conversion goodwill in the third quarter and $217 million in the fourth quarter, reducing that unit's goodwill to zero.

[6]   GAAP requires goodwill to be annually tested for impairment. The annual test may be performed at any time during the year, provided that it is performed at the same time every year. ASC 350-20-35-28. Goodwill of a reporting unit must also be tested in between annual tests "if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30. Such events or circumstances may include "[i]ndustry and market considerations such as a deterioration in the environment in which an entity operates" or "a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods." ASC 350-20-35-3C.

The Accounting Standards Codification ("ASC") is the "source of authoritative generally accepted accounting principles" published by the Financial Accounting Standards Board ("FASB"). FASB, Accounting Standards Codification: About the Codification 4 (Dec. 2014), https://asc.fasb.org/imageRoot/71/58741171.pdf; see also Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) (relying on FASB standards as a source of GAAP).

[7]   During the Class Period, impairment testing required a two-step process. The first step involves "compar[ing] the fair value of a reporting unit with its carrying amount, including goodwill." ASC 350-20-35-4. "Fair value" means "the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date." ASC 320-20-35-22. If the step-one analysis finds that the reporting unit's fair value exceeds its carrying amount, then "goodwill of the reporting unit is considered not impaired" and "the second step of the impairment test is unnecessary." ASC 350-20-35-6. But "[i]f the carrying amount of a reporting unit exceeds its fair value," then "the second step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any." ASC 350-20-35-8.

In January 2017, the FASB simplified the procedure for measuring impairment by eliminating the second step. See FASB, Accounting Standards Update No. 2017-04:

Intangibles -- Goodwill and Other (Topic 350) (Jan. 2017), https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176168778106. But that change did not go into effect until December 15, 2019, after the end of the Class Period. See FASB, Accounting Standards Updates -- Effective Dates (Mar. 2020), https://www.fasb.org/jsp/FASB/Page/SectionPage & cid=1218220137102.

**\*5** The Form 10-K also disclosed that GE had conducted interim impairment testing of its Grid Solutions reporting unit and found that its fair value exceeded carrying value by approximately 8%. Therefore, GE found that the goodwill of Grid Solutions was not impaired. But GE disclosed concern about an impairment related to the Alstom acquisition. It explained that while the goodwill of Grid Solutions was not currently impaired,

> there could be an impairment in the future as a result of changes in certain assumptions. For example, the fair value could be adversely affected and result in an impairment of goodwill if expected synergies of the acquisition with Alstom are not realized or if the reporting unit was not able to execute on customer opportunities ....

(Emphasis supplied.) GE also noted that "[d]ue to the overall decline in the Power market," it had conducted "an interim-step one analysis" of the Power Generation reporting unit. That analysis "indicated that its fair value has declined since our last impairment test; however, was still significantly in excess of its carrying value." GE said that it would "continue to monitor the Power markets and the impact it may have on this reporting unit."

In its first-quarter 2018 Form 10-Q, filed May 1, 2018, GE reported a slightly increased Power Segment goodwill balance of $25.9 billion. GE indicated that during the first quarter it had not identified any reporting units requiring interim impairment testing and opined that, "As of March 31, 2018, we believe goodwill is recoverable for all of our reporting units." GE noted, however, that "the Power and Oil & Gas markets continue to be challenging and there can be no assurances that goodwill will not be impaired in future periods

as a result of sustained declines in macroeconomic or business conditions."

In its second-quarter 2018 Form 10-Q, filed July 27, 2018, GE reported a somewhat decreased Power Segment goodwill balance of $23.2 billion. GE indicated that it had decided to perform interim impairment testing of its Power Generation and Grid Solutions reporting units. According to the 10-Q, "The results of the analysis indicated that fair value was in excess of carrying value by approximately 10% for our Power Generation reporting unit and 9% at our Grid Solutions reporting unit." GE again included the disclaimer that "there can be no assurances that goodwill will not be impaired in future periods."

### D. GE's Impairment of $22 Billion in Goodwill

On October 1, 2018, GE made two simultaneous announcements. First, it announced that H. Lawrence Culp, Jr. was succeeding Flannery as Chairman and CEO. [8] Second, it alerted investors that a significant impairment charge was imminent:

> [D]ue to weaker performance in the GE Power business, the Company will fall short of previously indicated guidance for free cash flow and EPS [earnings per share] for 2018. In addition, GE expects to take a non-cash goodwill impairment charge related to the GE Power business. GE Power's current goodwill balance is approximately $23 billion and the goodwill impairment charge is likely to constitute substantially all of this balance. The impairment charge is not yet finalized and remains subject to review. [9]

(Emphasis supplied.) On October 1, GE's stock price rose 7.09%. [10]

[8] Gen. Elec., H. Lawrence Culp, Jr. Named Chairman And CEO Of GE (Oct. 1, 2018), https://www.genewsroom.com/press-

releases/h-lawrence-culp-jr-named-chairman-and-ceo-ge.

9    Id.

10   The Court takes judicial notice of these "well publicized stock prices," as is permissible on a motion to dismiss. Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 37 n.1 (2d Cir. 2012).

**\*6** In its third-quarter 2018 Form 10-Q, filed October 30, 2018, GE wrote down $22.0 billion in goodwill. GE included much the same description of its impairment-testing methodology from its February 2018 10-K. GE then provided the following explanation for the impairment, which included a discussion of the Alstom acquisition:

> Based on the results of our step one testing, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment. The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units. As previously disclosed, the Power market as well as its operating environment continues to be challenging. Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets. In addition, our near-term earnings outlook has been negatively impacted by project execution and our own underlying operational challenges. Finally, market factors such as increasing energy efficiency and renewable energy penetration continue to impact our

view of long-term demand. These conditions have resulted in downward revisions of our forecasts on current and future projected earnings and cash flows at these businesses.

(Emphasis supplied.) Thus GE proceeded to step two of the impairment testing:

> In performing the second step, we identified significant unrecognized intangible assets primarily related to customer relationships, backlog, technology, and trade name. The value of these unrecognized intangible assets is driven by high customer retention rates in our Power business, our contractual backlog, the value of internally created technology, and the GE trade name. The combination of these unrecognized intangibles, adjustments to the carrying value of other assets and liabilities, and reduced reporting unit fair values calculated in step one, resulted in an implied fair value of goodwill substantially below the carrying value of goodwill for the Power Generation and Grid Solutions reporting units. Therefore, in the third quarter, we recorded our best estimate of a non-cash impairment loss of $21,973 million.

GE's stock price dropped by 8.78% following the October 30 announcements, from $11.16 per share to $10.18.

III. Procedural History

This action was filed on February 1, 2019. On April 25, the Teachers' Retirement System of Oklahoma was appointed lead plaintiff, in accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3). The lead plaintiff filed an amended complaint on June 21. On August 2, the defendants moved to dismiss.

The SAC was filed on August 30. The plaintiffs had been warned that any further opportunities to amend would be unlikely. The SAC alleges (1) that the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

On September 27, the defendants moved to dismiss the SAC. The motion became fully submitted on November 8.

**Discussion**

**\*7** When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014). A claim is sufficiently plausible to withstand a motion to dismiss when the "factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). In the context of a securities class action, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Id. (citation omitted).

A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by "stating with particularity the circumstances constituting fraud." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015). SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5; see also 15 U.S.C. § 78j(b). "To avoid dismissal under ... Rule 10b-5, a complaint must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019) (citation omitted).

With respect to the Rule 10b-5 claim, the defendants have not challenged the adequacy of plaintiffs' allegations as to the statements' connection with the purchase or sale of a security, reliance, or economic loss. The disputed issues for the alleged violation of Rule 10b-5 are therefore whether the plaintiffs have adequately pleaded that defendants (1) made a material misrepresentation or omission (2) with scienter, (3) that caused the plaintiffs' losses. As explained below, it will only be necessary to assess whether the plaintiffs have adequately pleaded the first two of these three elements.

I. Applicable Law

A. Material Misrepresentations or Omissions
"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Id. at 63 (citation omitted). "The statement must also be misleading, evaluated not only by literal truth, but by context and manner of presentation." Id. (citation omitted). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." Kleinman v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). Each misleading statement must be pleaded with particularity, including "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); see also Blanford, 794 F.3d at 305.

Statements that are mere "puffery" cannot give rise to Rule 10b-5 liability. ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009). "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor. They are statements that lack the sort of definite positive projections that might require later correction." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (citation omitted). [11]

[11]    For example, the Second Circuit has held the following statements to constitute inactionable puffery: (1) the claim that Diet Coke will "not go to your waist," Geffner v. Coca-Cola Co., 928 F.3d 198, 200 (2d Cir. 2019) (per curiam); (2) the assertion that a defendant company had "established policies and procedures to comply with applicable requirements," Singh, 918 F.3d

at 60, 63; (3) the assertion that a defendant had a "culture of high ethical standards, integrity, operational excellence, and customer satisfaction," SAIC, 818 F.3d at 97-98; (4) the assertion that a defendant's merger was "off to a promising start," IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015); and (5) assertions that a defendant was "optimistic" about its earnings and "expected" its product to perform well, San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2d Cir. 1996).

**\*8** "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). "[T]o support a finding of liability, Rule 10b–5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." In re Vivendi, 838 F.3d at 239. "[A] complete failure to make a statement -- in other words, a 'pure omission,' -- is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Id. (citation omitted). "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." Kleinman, 706 F.3d at 152–53 (citation omitted). But a duty to disclose "may arise when there is ... a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted).

### B. Item 303 of SEC Regulation S-K

The SAC alleges that under SEC regulations the defendants had a duty to disclose the risks that (1) the oxidation defect would cause reduced revenues and (2) reduced cash flow would lead to a major goodwill impairment. Item 303 of SEC Regulation S-K ("Item 303") requires Forms 10-K and 10-Q to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). [12] "Disclosure is required where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 39 (2d Cir. 2017) (citation omitted). A violation of Item 303 can constitute a material omission under Rule 10b-5,

but plaintiffs must also sufficiently plead the other elements of such a claim, including scienter. Stratte-McClure, 776 F.3d at 103.

[12]    See also 17 C.F.R. § 229.10(a) (specifying the applicability of Regulation S-K); SEC, Form 10-K at 9 (Apr. 2020), https://www.sec.gov/files/form10-k.pdf ("Furnish the information required by Item 303 of Regulation S-K....").

### C. Scienter

To adequately plead scienter, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Blanford, 794 F.3d at 305 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). In evaluating the sufficiency of scienter allegations, courts must "tak[e] into account plausible opposing inferences and consider[ ] plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. (citation omitted).

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198. The "motive and opportunity" prong requires plaintiffs to "allege that [the defendant company] or its officers benefitted in some concrete and personal way from the purported fraud." Id. (citation omitted). "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." Id. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id.

Alternatively, plaintiffs may allege "facts to show strong circumstantial evidence of conscious misbehavior or recklessness" by the defendants. Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016) (citation omitted).

**\*9**    Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately

illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Blanford, 794 F.3d at 306 (citation omitted). "In the securities fraud context, recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (citation omitted). An inference of scienter is "strong" if it is "at least as likely as any plausible opposing inference." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 185 (2d Cir. 2014) (citation omitted) (emphasis omitted).

"Corporate officials need not be clairvoyant" to avoid a finding of recklessness; "they are only responsible for revealing those material facts reasonably available to them." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." Id. When plaintiffs have not pleaded motive on the part of corporate officers, "the strength of the circumstantial allegations must be correspondingly greater." ECA, 553 F.3d at 198-99. Where plaintiffs "rely solely on the [d]efendants' alleged conscious misbehavior or recklessness," they must adequately plead "conscious recklessness -- i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." Stratte-McClure, 776 F.3d at 106 (citation omitted).

## II. Defendants' Statements and Omissions Concerning the HA Turbine

The SAC contends that thirteen statements by GE or one of the Individual Defendants on behalf of GE, made in the roughly ten months between December 2, 2017 and September 28, 2018, about the HA turbine were false and misleading. The SAC does not adequately plead a material misrepresentation as to any of the statements. While it is assumed that GE had a duty to disclose, pursuant to Item 303, that the oxidation issue was reasonably expected to have a material impact on GE's revenues, the SAC fails to adequately plead scienter with respect to that omission.

### A. Material Misrepresentations and Omissions

The SAC does not adequately plead that GE's statements concerning the HA turbine were materially misleading or false. Many of the statements were too general to constitute representations that an investor could reasonably rely upon. Others were statements of opinion for which the SAC has not provided sufficient grounds to suggest that they were actionable.[13] And still others would have been understood as glossy statements of praise for the company or its products and not as representations of fact. The thirteen statements on which the SAC relies to plead a claim that the defendants made a false or misleading statement about the HA Turbine are the following.

13  A description of the law that applies to statements of opinion is given in section III.A, infra.

On the first day of the Class Period, December 4, 2017, GE issued a press release advertising that the HA was "available at more than 64 percent efficiency," and had "been successfully tested at full-load and full-speed." The SAC does not take issue with the accuracy of either of these factual statements. The SAC asserts instead that these statements misleadingly suggested that the HA technology was "successful and without substantial problems." A reasonable investor would not understand these factual statements to be broader than they were or to constitute a guarantee of success. The press release also described the HA as "a proven technology" with over seventy orders from customers located across the world. The SAC asserts that this statement is misleading since it omitted any reference to the blade oxidation problem or the fact that GE was working on the oxidation issue with customers. Advising the public on the status of orders, or referring generally to the HA technology as proven, was not misleading for its failure to describe as well the company's plans for addressing the oxidation issue.

**\*10** On December 27, 2017, GE made a statement to Reuters that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency."[14] On January 3, 2018, a GE employee was quoted as saying that "the company also is innovating with advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures, including ceramic material composites." On March 28, Stokes was quoted as saying that "HA technology enables the power plant of the future, delivering unprecedented levels of efficiency and reliability." On June

26, GE held a "company update" call with analysts. During the call Flannery, then GE's Chairman and CEO, said that GE's Power business was "a fundamentally strong franchise with leading technology." Flannery added that GE had "approximately 7,000 gas turbines" and "a 20-year plus track record that demonstrates we can improve output, reliability and performance of those assets when we service them." On September 12, GE issued a press release touting the selection of its "industry leading HA gas turbine technology" for a plant in Ohio. The press release also stated that the HA fleet had achieved "more than 175,000 operating hours" and that the HA had received an engineering award in 2017. None of these statements is actionable, based on the principles recited above.

[14]    This is a statement of opinion, and the SAC does not plead particular facts that rendered it misleading.

Following disclosure that an oxidation problem had affected the HA blades in a turbine at the Exelon facility in September 2018, GE made a number of statements regarding the problem. On September 20, defendant Chuck Nugent -- then GE's Gas Power Systems CEO -- gave an interview in which he addressed the oxidation issue, saying that "the concerns were overblown" and "the turbine's performance has been highly reliable." He further opined, "I am confident this is not a significant issue from a customer perspective." The SAC does not provide a basis to find that these statements of opinion were misleading. On September 21, a GE spokesperson disclosed that oxidation was expected to affect the HA fleet. He added, "We have identified the solution and have a plan in place, and we have been proactively working with customers on a case-by-case basis to address any impacted unit. We expect the Exelon unit to return to service soon." The same day, Stokes made a statement that GE was "working proactively with ... customers on a case-by-case basis to quickly return impacted units to service and mitigate any future issues." He added that "developing and launching products at this scale and complexity involves fine-tuning and adjusting the technology." Again, the SAC has not adequately alleged that these statements were false or misleading.

Only four of the statements on which the SAC relies require any detailed discussion. The first three are various statements that defendants made concerning the HA turbine's performance goals or guarantees. On January 24, 2018, GE held an earnings call. During the call, Stokes asserted that the "HA gas turbine technology" was "operating in line with performance guarantees." He noted that there were 23

HA turbines in operation and said that "all of the units" were "performing to specifications and guarantees." The plaintiff argues that this was false because GE knew that the oxidation problem shortened the lifespan of the blades and required inspection and replacement, which could force power plants to shut down prematurely. While the SAC adequately pleads that GE knew of the oxidation issue with blades for turbines since 2017,[15] it does not describe the HA turbine specifications or performance guarantees, identify how they were impacted by the oxidation issue, or adequately plead that at any time GE understood that the oxidation problem would prevent the HA turbines from performing to those contractual specifications or would cause a breach in the guarantees GE issued with those turbines.

[15]    In 2015, a 9FB turbine blade broke after 22,000 hours of use, even though it was not due to be serviced until after 25,000 hours of use. As already recited, during 2017, GE was inspecting HA turbine blades for oxidation problems and replacing them as necessary.

On September 19, Stokes wrote in the wake of the Exelon blade failure, "The minor adjustments that we need to make do not make the HA any less of a record setting turbine -- they are meeting -- and in many cases exceeding -- their performance goals at every customer site today." On September 28, defendants Chuck Nugent and Scott Strazik published a LinkedIn post repeating the assertion that the HA turbine was "meeting -- and in many cases exceeding -- performance goals at every customer site today." As with the January 24 statement, the SAC fails to plead with particularity any performance goals for the HA turbine that GE failed to meet as of September 2018 due to blade oxidation.

**\*11**    Nugent and Strazik's post gave the following description of the problem that had caused the Exelon plant shutdowns: "The issue involves oxidation that could cause distress on 9FB and HA gas turbine Stage 1 Blades (S1B)." The plaintiffs contend that it was misleading to suggest that oxidation "could cause distress" when such distress was more than a mere possibility and had already occurred. Again, in context, no reader could have been misled by this admission by GE. The article was prompted by the failure of a blade at the Exelon facility and GE was not suggesting, when its statements are read in context, that this was a failure which might or might not ever occur.

The SAC alleges one final statement that plaintiffs argue was materially misleading and on which they place particular emphasis in opposing this motion to dismiss. On September 20, Reuters published an article that read, in relevant part:

> General Electric Co. <GE.N> said on Thursday that four of its new flagship power turbines in the United States have been shut down due to an "oxidation issue" and warned it expects the problem to affect more of the 51 units it has shipped, sending shares lower.
>
> The giant machines form the beating heart of billion-dollar electricity plants around the world. Analysts consider GE's success with the new turbines, known as the HA class, critical to rescuing its power division from a steep decline in sales and profits.
>
> "The issue, if not quickly resolved, could hurt GE's turbine brand image and market share," Jim Corridore, an analyst at CFRA, said in a note, cutting his price target to $14 from $15.
>
> GE stock was down 3 percent at $12.49 on the New York Stock Exchange.
>
> The problem was first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp <EXC.N> in Texas a few weeks ago, GE told Reuters.
>
> The problem forced Exelon to shut down one turbine. Exelon said it shut down its three other units as a precaution.
>
> GE and Exelon said they expect the turbines to return to service soon. Neither company provided details about the oxidation or how it led to the shutdowns.
>
> GE is working with other customers "to address any impacted unit," GE spokesman Chris Shigas said, adding that 10 other HA turbines in the United States were still operating.
>
> But, he added, "We expect the same issue will impact other HA units."
>
>                     ***
>
> GE Power Chief Executive Officer Russell Stokes first mentioned the problem at the bottom of a post on its LinkedIn internet page on Wednesday, without identifying the plant or providing details.

> "The minor adjustments that we need to make do not make the HA any less of a record setting turbine -- they are meeting -- and in many cases exceeding -- their performance goals at every customer site today," Stokes wrote.

(Emphasis supplied.)

Plaintiffs argue that the underlined statements were false for essentially two reasons. They first argue that GE falsely stated that it "first discovered" the oxidation problem with blades a "few weeks ago" when GE had known of the oxidation problem since 2017. Since this is not a statement issued by GE, but a press report about an interview, it is particularly important to read the statement at issue with care and in context. Read in that way, the reference to a "few weeks ago" refers to the discovery of the breakdown at Exelon. For instance, the lede of the article indicates that it is about the shutdown of turbines at the Exelon facility. In the key passage, GE explains that it first learned about the problem with the Exelon blades "a few weeks ago." In the sentences that follow, the focus continues to be on what had happened at Exelon and when the Exelon facility would return to operation. The reporter adds that neither GE nor Exelon provided details about the oxidation issue, further undermining the plaintiffs' effort to read the highlighted passage as a broader statement about the history of the oxidation issue generally.

**\*12** The plaintiffs next argue that it was misleading for GE to characterize the problem as requiring only "minor" adjustments since GE was forced "at significant expense to extend its warranty coverage."[16] They describe that expense as amounting to a $200 million charge that GE recorded in the third quarter of 2018. Characterizing a problem as minor reflects the use of judgment and is not, read in context, a factual assertion. Indeed, the expense for the extension of warranty coverage, as reported by the SAC, was relatively minor when compared to GE Power's $5.7 billion in revenues that quarter.

16     As the Reuters article indicates, this reference to minor adjustments was first made in a September 19 statement by Stokes. It therefore additionally appears in this Opinion in the discussion of that September 19 statement.

In addition to these thirteen allegedly false and misleading statements, the SAC also asserts that there was a material omission from GE's SEC filings, beginning with its February

23, 2018 Form 10-K. The SAC asserts that GE had an obligation under Item 303 to report the risk that the oxidation defect might have a material impact on its revenue. It will be assumed for purposes of this Opinion that the SAC has adequately pleaded a material omission in this regard.

### B. Scienter

The SAC does not plead the requisite strong inference of scienter as to any Item 303 omission. To state a claim under Item 303, plaintiffs must plead a strong inference that the defendants "were at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures ... would mislead investors about material facts." Stratte-McClure, 776 F.3d at 106. "The requisite 'strong inference' of scienter is one which is at least as likely as any plausible opposing inference." City of Pontiac Policemen's & Firemen's Ret. Sys., 752 F.3d at 185 (citation omitted). Here, the non-culpable inference offered by the defendants is decidedly more plausible. It is described in the very press reports on which the SAC relies. Well before the Exelon blade failure, GE had identified the oxidation problem and what it believed to be a solution for that problem. It was rolling out replacement blades, a solution it believed would be sufficient to avert a material impact on the company's financial condition. Indeed, the SAC makes no particularized scienter allegations supporting the duty to disclose under Item 303. Cf. Stratte-McClure, 776 F.3d at 106-07 (finding allegations that a defendant company was internally evaluating a risk insufficient to plead scienter for failure to disclose that risk under Item 303). And the brief in opposition to this motion has no developed discussion of the adequacy of the pleading of scienter regarding the alleged Item 303 omission.

### III. Defendants' Statements Concerning GE's Power Segment Goodwill

GE took a goodwill impairment of $22 billion on October 30, 2018 in its Form 10-Q. This was a mammoth write-off. Its unprecedented scale caused the GE stock price to fall by 8.78% and the federal government to open criminal and civil investigations of GE. The plaintiffs argue that GE was "severely reckless" in not taking that impairment earlier. In particular, they argue that GE should have recognized by at least the first quarter of 2018 that its recording of $17 billion in goodwill from the acquisition of Alstom, which it had purchased for only $10 billion, was excessive and that the anticipated synergies from the acquisition would not be realized. They argue in opposition to this motion to dismiss,

that the full impairment should have been taken no later than the second quarter of 2018. The plaintiffs also contend that GE's earnings projections and estimates of future cash flows did not match the realities of the gas power market in 2018.

**\*13** The defendants have moved to dismiss this claimed violation of the securities laws for its failure to plead either a misrepresentation or their scienter. They are correct. The SAC does not adequately allege that GE's statements concerning goodwill were materially misleading or published with scienter.

### A. Applicable Law Concerning Goodwill Accounting

Under SEC rules, "financial statements which are not prepared in accordance with GAAP are presumptively misleading or inaccurate." SAIC, 818 F.3d at 93 (alterations omitted) (quoting 17 C.F.R. § 210.4-01(a)(1)). But "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Id. (citation omitted). When relying on a theory that a defendant was reckless, plaintiffs must plead facts that support a strong inference that the defendant made "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198 (citation omitted); see also SAIC, 818 F.3d at 96 (requiring "strong circumstantial evidence of conscious misbehavior or recklessness" (citation omitted)).

The Second Circuit has observed that "[e]stimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011). Accordingly, goodwill balances are opinion statements. Id. at 111.

To adequately plead that a statement of opinion is false or misleading, the plaintiff

> must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the

2020 WL 2306434, Fed. Sec. L. Rep. P 100,821

opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Tongue, 816 F.3d at 209 (citation omitted). [17] Liability for making a false statement of opinion may also lie if either the "speaker did not hold the belief she professed or the supporting facts she supplied were untrue." Id. at 210 (citation omitted). But an opinion, "though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." Id. Put another way, "a reasonable investor may ... understand an opinion statement to convey facts about ... the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 188 (2015). But "reasonable investors understand that opinions sometimes rest on a weighing of competing facts," and a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Tongue, 816 F.3d at 210 (citation omitted).

[17]    Insofar as the defendants suggest that the SAC must plead that the goodwill balances were "disbelieved by the defendant" at the time the statements were made, Fait, 655 F.3d at 110, that is no longer the only method for pleading a misleading statement of opinion.

B. Material Misrepresentations

*14 Plaintiffs have failed to plead that the defendants made misleading statements in their calculations of GE's goodwill. Goodwill balances are accounting estimates produced through an exercise of judgment. Because a wide range of goodwill values could be compliant with GAAP, the plaintiffs must identify particular facts supporting an inference that GE's accounting fell outside of that permissible range.

The plaintiffs' assertion of falsity rests on an accusation that GE's judgment or opinion about goodwill, which rested on other judgments -- its projections of future cash flows and anticipated synergies -- was misleading. The SAC alleges that GE knew before it took the massive impairment about the very trends that it used to justify the impairment -- chiefly,

the absence of synergies from the Alstom acquisition and the decreasing global demand for gas-fired power generation. But a company's knowledge of unfavorable trends does not show that its goodwill balances were misleading as of the time they were stated; previously known trends may later reveal themselves to be of a different magnitude or importance than initially expected. The SAC's theory ultimately rests entirely on a disagreement about the exercise of judgment.

Strikingly, the trends that plaintiffs rely on in alleging that GE should have more quickly written down its goodwill were all publicly disclosed to investors during the Class Period. For example, Flannery publicly stated before the Class Period began that the Alstom deal had been a "disappointment," and that GE would have in hindsight paid a lower price for the acquisition.

Likewise, the general downturn in power generation markets was widely known and disclosed in GE's SEC filings. [18] From its Form 10-K filed in February 2018 and in every subsequent SEC filing, GE described the marketplace pressures and uncertainties underpinning its projections for future growth and revenue. Those disclosures included discussion of the very issues on which the SAC relies in an attempt to suggest that the impairment should have been recorded earlier. GE also reported that the uncertainties were so significant that it tested its assessment of goodwill through interim impairment analyses. In July 2018, GE warned that its assessment of goodwill might change in the future. While GE, under new management, made a different set of judgments and assessments about these risks and the likelihood of future success, the SAC has failed to plead facts that would support a claim that the goodwill reported in the Class Period, which the plaintiffs acknowledge is a matter of opinion, was a false or misleading statement of opinion.

[18]    The SAC likewise does not plead a violation of Item 303 as to GE's goodwill balances. Plaintiffs argue that Item 303 required GE to disclose the risk that its reduced cash flow was likely to lead to a major goodwill impairment. GE's SEC filings adequately disclosed that risk, and the plaintiffs have not pleaded facts asserting otherwise.

C. Scienter

The SAC also fails to plead the defendants' scienter. In opposition to this motion to dismiss, the plaintiffs renounce any assertion that the defendants acted in bad faith or that the defendants did not actually believe in GE's statements

2020 WL 2306434, Fed. Sec. L. Rep. P 100,821

of goodwill at the time that those statements were recorded in its financial statements and published in its SEC filings. Instead, the plaintiffs rely exclusively on an assertion that the defendants were reckless. Because the same factors that led to the impairment had existed before the impairment, they contend it necessarily follows that the impairment should have been taken earlier as well.

**\*15** The SAC has not adequately pleaded that the defendants were reckless in reporting their estimates of goodwill in the SEC filings at issue. They have not pleaded that any defendant benefitted in a concrete and personal way from the purported fraud; that any defendant engaged in deliberately illegal behavior; or that they failed to check information they had a duty to monitor. Nor have they adequately pleaded that the defendants knew facts or had access to information suggesting that their public statements were not accurate. The assessment of goodwill was a judgment based on other judgments and projections. The failures, as described in the SAC, were at worst failures in judgment. They do not constitute conscious recklessness.

To plead scienter, the plaintiffs rely almost entirely on the size of the $22 billion write-down. The plaintiffs allege that it was the largest such impairment since the 2008 financial crisis. But the magnitude of an alleged fraud alone is not enough to support an inference of scienter. In re UBS AG Sec. Litig., No. 07cv11225 (RJS), 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012); see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010).

The SAC makes a laundry list of other allegations that the plaintiffs argue support an inference of scienter: that Flannery was replaced as CEO; that certain Individual Defendants had been longtime supporters of the Alstom acquisition; that GE's Board was monitoring negative analyst reports; that GE had given certain customers discounts on long-term service agreements; that GE was motivated to maintain its credit rating, dividend, and place on the Dow Jones Industrial Average; and that GE allegedly engaged in a pattern of unrelated accounting misconduct. None of these allegations support an inference that GE's goodwill accounting was reckless. See ECA, 553 F.3d at 198 (motives common to most corporate officers insufficient to support scienter); Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379, 400 (S.D.N.Y. 2019) (finding a similar batch of allegations insufficient to support scienter).

### Conclusion

Defendants' September 27, 2019 motion to dismiss is granted. The Clerk of Court shall close the case.

**All Citations**

Slip Copy, 2020 WL 2306434, Fed. Sec. L. Rep. P 100,821

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.