Case No. 6

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 2 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

KeyCite Yellow Flag - Negative Treatment

Distinguished by [Fresno County Employees' Retirement Association v. comScore, Inc.,](#) S.D.N.Y., July 28, 2017

2017 WL 1536223
Only the Westlaw citation is currently available.
**<u>NOT FOR PUBLICATION</u>**
United States District Court, D. New Jersey.

IN RE: HERTZ GLOBAL HOLDINGS,
INC. SECURITIES LITIGATION

Civil Action No. 13–7050
|
Signed 04/27/2017

**OPINION**

[ARLEO](#), United States District Judge

**Table of Contents**

**\*1** I. Facts
A. Background and Procedural History...——

B. Allegedly False or Misleading Statements...——

   1. 2013 Statements...——

   2. 2014 Statements...——

   3. 2015 Statements...——

C. The 2014 Form 10–K and Restatement...——

II. Legal Standard...——
A. Standard for Rule 12(b)(6) Motion to Dismiss...——

B. Standard for Securities Fraud...——

III. Analysis...——
A. False and Misleading Statements...——

   1. Timing of Advantage Fleet Impairment...——

   2. Puffery...——

   3. GAAP Compliance...——

   4. Forward–Looking Statements...——

B. Scienter...——

   1. Size and Scope of Restatement...——

   2. Internal Controls...——

   3. SOX Certifications...——

   4. Upper Management Resignations...——

   5. Insider Trading...——

   6. Corporate Scienter...——

   7. Failure to Plead a Strong Inference of Scienter...——

IV. Control Person Claim Against the Individual Defendants under § 20(a) of the Securities Exchange Act...——

V. Dismissal With Prejudice...——

VI. Conclusion...——

**THIS MATTER** is before the Court by way of Defendants Hertz Global Holdings, Inc. ("Hertz"), Mark Frissora, Elyse Douglas, Jatindar Kapur, Thomas Kennedy, and David Rosenberg's ("Individual Defendants") (collectively, "Defendants") motions to dismiss the Fourth Consolidated Amended Complaint ("FAC"). Dkt. Nos. 104, 108, 109, 110, 112, 115. Lead Plaintiff Sheet Metal Workers' Local No. 80 Pension Trust Fund ("Lead Plaintiff") and Westchester Teamsters Pension Fund's (collectively, "Plaintiffs") opposed the motion. Dkt. No. 123.

This is Plaintiffs' third bite at the apple. The Hon. Stanley R. Chesler, U.S.D.J., dismissed the Amended Complaint with leave to replead, and this Court dismissed the Second Amended Complaint without prejudice. In the latest iteration, the FAC, Plaintiffs alleged a number of false statements, but they failed to allege scienter. The FAC continues to suffer from some of the same infirmities with respect to particularity and scienter as the prior complaints, and Plaintiffs have not demonstrated that they could plead any additional facts that would cure these defects. The motions to dismiss are **GRANTED** and the case is **DISMISSED WITH PREJUDICE.**

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 3 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

## I. FACTS

### A. Background and Procedural History

Plaintiffs bring this putative securities class action on behalf of purchasers of Hertz common stock between February 14, 2013 and July 16, 2015 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. FAC ¶ 1, Dkt. No. 102. Plaintiffs are pension funds that purchased Hertz common stock during the Class Period. Id. ¶¶ 12, 13.

Plaintiffs claim that Hertz, a publicly traded company that operates a car and equipment rental business, and certain members of its management team engaged in fraud during the Class Period. Their claim stems from Hertz's disclosures in 2014 and 2015 that several of its financial reports from 2011 to 2013 were misstated and required restatement. FAC ¶¶ 2–3. In July 2015, after two internal investigations, Hertz concluded that those errors were attributed to material accounting issues and deficiencies in internal controls over financial reporting. Id. ¶¶ 3–4.

**\*2** Although this is Plaintiffs' fourth attempt at pleading securities fraud, it is the first time they are asserting claims based on the restatements and investigations. They initially sued Hertz in 2013 based on entirely separate allegations of fraud. Dkt. No. 1. Judge Chesler granted Defendants' first motions to dismiss with leave to replead. Order dated October 8, 2014, Dkt. No. 44. Plaintiffs filed another complaint, in which they altered and expanded their theory of liability. The case was transferred to this Court, and it was again dismissed with leave to replead. Opinion ("Op.") and Order dated July 22, 2015, Dkt. Nos. 63, 64. Now that Hertz has announced the restatement and investigations, Plaintiffs filed the instant FAC (at a lengthy 133 pages), and assert yet another theory of fraud based on those disclosures. Meanwhile they have jettisoned almost all of their previous claims. The FAC challenges as false a substantial number of historical and forward-looking statements by Hertz and the Individual Defendants made over the ten quarters preceding the July 2015 disclosure of the full extent of the accounting and control issues.

### B. Allegedly False or Misleading Statements [1]

[1] These allegations are derived from Plaintiffs' FAC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," such as SEC filings, press releases, and transcripts. *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). Because the FAC contains roughly 50 pages of alleged false statements, the following section describes the particularly material statements and a representative set of all other ones.

#### 1. *2013 Statements*

On February 25, 2013, just after the beginning of the Class Period, Hertz published a press release announcing its financial results for the fourth quarter of 2012 and the full year of 2012. Id. ¶ 201. The press release [2] emphasized the company's "record" results and reported net income of $243.1 million for the full year based on generally accepted accounting principles ("GAAP"). FAC ¶ 201. The press release also provided Hertz's Full Year 2013 Guidance ("2013 Guidance"). Id. ¶ 204. The 2013 Guidance anticipated a net income of $830 to $875 million for the year. Id. The press release quoted Mark Frissora, Hertz's CEO and Chairman of the Board, who attributed the performance "to sustained operational excellence." Id.

[2] Hertz filed this press release and all subsequent ones discussed below in the Form 8–K for the respective quarters. See, e.g., FAC ¶¶ 201, 230.

Frissora and Elyse Douglas, Hertz's Senior Executive Vice President and CFO, discussed these announcements in a conference call with analysts and investors. They reiterated the financial results from the press release and the 2013 Guidance. Id. ¶¶ 206, 210. During the call, Frissora stated, "we have a very consistent track record post-recession of improving both margins, as well as all financial metrics." Id. ¶ 210.

On March 4, 2013, Hertz filed its annual report on Form 10–K with the SEC for the full year 2012 (the "2012 Form 10–K"), which was signed by Frissora, Douglas, and Jatindar Kapur, Hertz's Senior Vice President of Finance and Corporate Controller. Id. ¶ 212. Frissora and Douglas also signed certifications mandated by the Sarbanes–Oxley Act of 2002 ("SOX") attesting to the fair presentation of Hertz's financial statements and the Company's internal control over financial reporting. Id. ¶ 49.

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 4 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

The 2012 Form 10–K reiterated the financial results reported in the press release issued on February 25 and represented that the "financial statements ... have been prepared in accordance with [GAAP]." Id. Hertz also explained its method of determining the value and depreciation rates of particular assets, explained when GAAP requires Hertz to review asserts for impairment in value, and stated that it reviewed depreciation rates on a quarterly basis. Id. ¶¶ 91, 98.

Later that month, Douglas attended two conferences and answered questions about the company's performance and future prospects. Id. ¶¶ 214, 216. She again reiterated the 2012 numbers and the 2013 Guidance, and explained that "given our strategies and all the work that we've done to put these strategies in place, we believe that we're going to see significant growth in profits and margins continue into 2015."Id. ¶ 214.

 **\*3**  On July 29, 2013, Hertz announced its financial operations and operational results for the second quarter of 2013. Id. ¶ 230. Hertz again reaffirmed the 2013 Guidance. Id.

In August 2013, Hertz filed its Form 10–Q for the second quarter of 2013 ("2Q13 Form 10–Q"). Id. ¶ 238. Hertz discussed the status of a transaction known as the "Advantage Divestiture." Id. ¶¶ 76, 238. The Court discussed this transaction in depth in its prior opinion. See Op. at 4–6. In summary, it involved Hertz's plan to divest a large fleet of cars—known as the "Advantage Fleet"—by leasing the cars to a company called Simply Wheelz LLC ("Simply Wheelz") and directing Simply Wheelz to sell the fleet in auctions by December 2014. FAC ¶ 80. As part of the Advantage Divestiture, Hertz loaned Simply Wheelz up to $45 million and helped it obtain alternative fleet financing. Id. ¶ 78. Under this arrangement, Simply Wheelz would pay the money it earned at auction to Hertz, and if it auctioned a car for a loss (i.e., the amount achieved was less than the value reflected in Hertz's books and records), Simply Wheelz was responsible for paying the difference to Hertz. Id. ¶ 84. In the 2Q13 Form 10–Q, Hertz provided an update on the transaction. It explained that it "will have significant continuing involvement in the operations of the disposed Advantage business," and "the operating results associated with the Advantage business will continue to be classified as part of our continuing operations...." Id. ¶ 238.

Meanwhile, Frissora and Douglas participated in several more conference calls and conferences. Id. ¶¶ 220, 222, 226, 228, 232, 240. At each one, they reiterated and discussed the most recent press release and Form 10–Qs. Frissora stated at one conference that the figures "show[ ] and demonstrat[e] the strategies have been working...." Id. ¶ 226. At another point, on September 18, Frissora stated that the "trajectory ... since 2009 has been done primarily through a combination of revenue growth and cost reduction programs ... So we believe that the last 12 months total profit up 66% over 2007 (peak leave) level demonstrate this Company is a much better Company than it was in 2007." Id. ¶ 240.

On September 23, 2013, Hertz announced in a press release that Douglas was resigning from her position effective October 1, to be replaced by Defendant David Rosenberg on an interim basis. Id. ¶ 242. Hertz stated that Douglas was resigning because personal reasons kept her from relocating from the metropolitan area to the Company's new headquarters in Florida. See Press Release dated Sept. 23, 2013, "Hertz CFO Steps Down," *available at* http://ir.hertz.com/2013-09-23-Hertz-CFO-Steps-Down.

Four days later, on September 26, Hertz announced in a press release that its 2013 Guidance from February required revision. Id. ¶ 243. The press release provided the new 2013 Revised Guidance, which reduced the 2013 Guidance's revenue, income, EBITA, and earnings per share projections. Id. ¶ 243. Frissora explained in the press releases that the revision occurred "primarily because of the weaker than anticipated volume generated by the Hertz brand in the U.S. airport car rental market, our largest business." Id. ¶ 246. "Despite these challenges," he added, "we anticipate Hertz will nevertheless generate record earnings for the full year, with adjusted pre-tax income up more than 30% year-over-year." Id. At a conference later that day, Frissora reaffirmed his outlook: "[I]t's not like we are revising our guidance into a bunch of pathetic numbers. There are really, really strong numbers. It doesn't change the story. We feel very confident the story is intact." Id. ¶ 249.

 **\*4**  In a press release issued on November 4, 2013, Hertz discussed recent problems with the Advantage Divestiture. Id. ¶ 255. Hertz explained that, as of September 2013, Simply Wheelz had not made payments due to Hertz under the terms of the divestiture, and Simply Wheelz's parent company reported liquidity issues. Id. Hertz announced an impairment charge of $40 million. Id.

The next day, November 5, 2013, Simply Wheelz announced that it was filing for bankruptcy. Id. ¶ 258. In the bankruptcy action, Simply Wheelz stated its belief "that Hertz had

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 5 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

materially overstated the [carrying] value of the vehicles included in the [Advantage] Fleet, based on an analysis of certain specimen cars representative of the vehicles included in the [Advantage] Fleet." Id. ¶ 81. Simply Wheelz began to experience the losses in June 2013 when it first started auctioning the vehicles. Id. ¶¶ 82–84. Simply Wheels also explained that its representatives met with Hertz in July 2013 to determine how Hertz calculated the book value of the Advantage Fleet but Hertz did not provide any information. Id. ¶ 87.

Confidential Witness 1 ("CW1"), a former contract employee in Advantage's accounting department, also "believed that the Advantage Fleet vehicles were overvalued because of the losses incurred upon the sales of the vehicle." Id. ¶ 81. According to CW1, Simply Wheelz was "taking losses every time we disposed" of an Advantage Fleet vehicle, and these losses were "substantial." Id. ¶ 83. CW1 also claims that Hertz immediately knew about these losses because it received the proceeds of the sales directly from the auction company. Id. ¶ 84. Confidential Witness 2 ("CW2"), a Hertz Remarketing Manager at John Wayne Airport, in Santa Ana, California corroborated CW1's assessment of the overvaluation. Id. ¶¶ 33, 108.

The same day, Frissora, Rosenberg, and Douglas (a month after his resignation) participated in conference calls and conferences where they reiterated the news of the impairment charge. Id. ¶¶ 259, 261, 264–65.

On December 2, 2013, Hertz announced in a Form 8–K filing that the Company appointed Defendant Thomas Kennedy as Senior Vice President and CFO effective December 9, 2013. Id. ¶ 270. Hertz also announced that Rosenberg's term as interim CFO would end on December 9. Id.

### 2. *2014 Statements*

Over the course of 2014, Hertz incrementally disclosed the accounting issues. On March 3, 2014, Hertz announced that it could not file its annual report for fiscal year 2013 (the "2013 Form 10–K") on time. Id. ¶ 273. "During the course of the preparation of the Company's 2013 financial statements," Hertz stated, "it identified certain adjustments relating to prior periods which will require the Company to revise certain of its previously issued financial statements." Id. However, Hertz did "not expect" the revisions would "have a material impact

on the Company's previously reported results of operations, financial condition, or liquidity." Id.

On March 18, 2014, Hertz announced its Full Year 2014 Guidance ("2014 Guidance"). Id. ¶ 278. During a conference call that day, Kennedy commented on the delayed 2013 Form 10–K. He attributed the delay to difficulties in implementing a new resource system, and reasserted that the adjustments to the prior periods would not be material. Id. ¶ 282. That was the last time any of the Individual Defendants spoke at a conference or event.

 **\*5** Hertz filed its 2013 Form 10–K on March 19, 2014. The 2013 Form 10–K reported a net income of $346.2 million for 2013. Id. ¶¶ 284, 286. Hertz also elaborated on the accounting adjustments disclosed on March 3. Id. ¶ 286. It stated, "[d]uring the fourth quarter of 2013, we identified certain out of period errors totaling $46.3 million, of which $34.7 million ($21.0 million, net of tax) related to our previously issued consolidated financial statements for the years ended December 31, 2012, 2011 and prior." Id. But Hertz stated that those errors were not material, so it would merely adjust (not restate) those financial statements. Id.

In late April, Kapur resigned as Senior Vice President of Finance and Corporate Controller. Id. ¶ 287.

In May 2014, Hertz changed the outlook predicted in the 2013 Form 10–K. It admitted that it may have to restate its financial statements for 2011. Id. ¶ 288. Hertz stated, however, that it would probably not have to restate the financial statements for 2012 and 2013. Id.

On June 6, Hertz changed its outlook again. It disclosed for the first time that a restatement of the full year 2011 financials was necessary. Id. ¶ 291. It also stated that the restatement could result in material adjustments for 2012 and 2013. Id. Hertz also disclosed that at least one material weakness existed in Hertz's internal control over financial reporting and that disclosure controls and procedures were ineffective at December 31, 2013. Id.

Given these issues, Hertz commenced a targeted investigation ("Internal Investigation") into the Company's financial results between 2011 and 2013. Id. ¶ 45. The Internal Investigation divided into two parallel reviews. Id. In the first investigation, the Audit Committee directed management to review the 2011, 2012, and 2013 financial records to determine whether and to what extent adjustments to those years' financial

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 6 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

statements were necessary. Id. The second investigation was performed by outside counsel, independent counsel for Hertz's Audit Committee, outside consultants, and recently hired senior Hertz accounting and compliance personnel. Id. That investigation looked into the internal controls that were guiding the accounting process in prior periods. Id.

The negative news continued into August 2014. Hertz announced that it would be "well below" the 2014 Guidance. Id. ¶ 295. Hertz attributed the missed target "to operational challenges in the rental car and equipment segments as well as the associated costs related to the accounting review previously disclosed." Id. Hertz then withdrew the 2014 Guidance entirely, citing the same challenges, "as well as potential revisions related to the ongoing accounting review." Id.

On September 8, 2014, Frissora resigned as CEO and Chairman of the Board. Id. ¶ 298.

In November, Hertz provided an update on the Internal Investigation. It disclosed that errors in the 2012 and 2013 financial statements turned out to be material, so those statements (in addition to the 2011 financial statements) had to be restated and should no longer be relied upon. Id. ¶ 301. As such, Hertz did not expect to complete the restatements before mid–2015. Id. Hertz also disclosed for the first time that the Securities and Exchange Commission ("SEC") notified Hertz in June 2014 about its investigation into "the events disclosed in certain of the Company's filing SEC," and that the investigation was ongoing. Id.

By the end of 2014, Hertz announced Frissora's replacement and the resignation of other members of the management team. Id. ¶¶ 204–05.

### 3. *2015 Statements*

On February 25, 2015, Hertz provided another update on the investigation. Id. ¶ 306. It identified cumulative errors of approximately "$28 million, $74 million and $51 million for 2013, 2012 and 2011, respectively...." Id. A week later, on March 3, Hertz announced that it would file its 2014 Form 10–K late because of the ongoing review and its potential impact. Id. ¶ 308. At the end of the month, Hertz disclosed that the New York Stock Exchange (the "NYSE") threatened to delist the company if it did not file its 2014 Form 10–K by September. Id. ¶ 310.

**\*6** In May 2015, Hertz provided yet another update, indicating that the errors were worse than those disclosed in February. Id. ¶ 314. Hertz increased its cumulative errors to approximately "$42 million, $85 million and $56 million for 2013, 2012 and 2011." Id. Hertz reaffirmed that it would not file its 2014 Form 10–K or its first quarter 2015 Form 10–Q before mid–2015. Id.

### C. The 2014 Form 10–K and Restatement

On July 16, 2015, Hertz filed the 2014 Form 10–K, which contained the final restatements ("Restatement"). It included restated full year financial statements for 2012 and 2013, as well as selected financial data from 2011, 2012, and 2013, though it did not indicate that it restated the timing of the Advantage Fleet impairment. Marino Cert. Ex. 2, 2014 Form 10–K at iv, Dkt. No. 111–2.

Specifically, the Restatement found that between 2011 and 2013 Hertz overstated pre-tax income by approximately $215 million and overstated net income by approximately $132 million. FAC ¶ 43. Based on the Internal Investigation, the Audit Committee stated that these overstatements stemmed from errors in fifteen accounting categories, including accruals for un-invoiced non-fleet vendor obligations, capitalization and timing of depreciation for non-fleet capital, accruals for customer rewards programs, and reserve estimates associated with allowances for doubtful accounts, among others. Id.; 2014 Form 10–K at iv.

The Audit Committee also revealed the findings of its investigation in the company's internal controls. It concluded that as of December 31, 2014, "there were four categories of material weaknesses in our internal control over financial reporting that contributed to the material misstatements in the 2011, 2012, and 2013 consolidated financial statements." 2014 Form 10–K at iv. There were weaknesses in control environment, risk assessment, information and communication, and monitoring. Id. v-vi.

It stated that there was "an inconsistent and sometimes inappropriate tone at the top ... under the then existing senior management that did not in certain circumstances result in adherences to [GAAP] and Company accounting policies and procedures." Id. at v. "In particular," it stated, Frissora's "management style and temperament created a pressurized operating environment at the Company, where challenging

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 7 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

targets were set and achieving those targets was a key performance expectation." Id. It continued:

> There was in certain instances an inappropriate emphasis on meeting internal budgets, business plans, and current estimates. [Frissora] further encouraged employees to focus on potential business risks and opportunities, and on potential financial or operating performance gaps, as well as ways of ameliorating potential risks or gaps, including through accounting reviews. This resulted in an environment which in some instances may have led to inappropriate accounting decisions and the failure to disclose information critical to an effective review of transactions and accounting entries, such as certain changes in accounting methodologies, to the appropriate finance and accounting personnel or our Board, Audit Committee, or independent registered public accounting firm.

Id. These weaknesses "may have" led to inappropriate accounting decisions and changes in accounting methodologies. Id. at v-vi.

These issues occurred, according to the Restatement, because Hertz "did not design and maintain effective monitoring controls" because of unqualified personelle and inadequate auditing systems. Id. at vi.

 **\*7** The failure in risk assessment and communications caused additional weaknesses. As to risk assessment, Hertz "did not design effective controls over certain business processes including our period-end financial reporting process. This includes the identification and execution of controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments required to assess the appropriateness of certain account balances at period end." Id. As to communication and information, Hertz "did not have an adequate process for internally communicating information between the accounting department and other operating departments necessary to support the proper functioning of internal controls. This material weakness led to misstatements in the capitalization and timing of depreciation of non-fleet capital." Id.

The Audit Committee found that the accounting errors were caused by these control issues, "along with a complex mix of structural and environmental factors." Id. Beyond Frissora's management style, the Audit Committee also pointed to "the distraction caused by the multiple, conflicting business initiatives; challenges related to managing complex, inefficient legacy systems; the lack of a sufficient complement of personnel with an appropriate level of knowledge, experience, and training with GAAP; unclear reporting structures, reporting lines, and decisional authority in the organization; and other matters." Id.

Finally, the Audit Committee explained its remedial steps. In addition to changes in procedures, it explained the changes in upper management. "For example," it stated, "in the last two years, the Company searched for and hired a new Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, General Counsel, and over twenty highly qualified vice president-or director-level accounting employees from outside the Company, and changed and enhanced leadership in the business units associated with the restatement matters." Id. at vii.

Based on these disclosures, Plaintiffs allege that the Class Period statements were false. They claim that historical statements were false or misleading because (1) "Hertz's financial results were presented in violation of GAAP and the Company's publicly disclosed accounting policies"; (2) "Hertz's financial results were materially overstated and should not have been relied upon"; (3) "Hertz's disclosure controls and internal controls were materially deficient and not operating effectively"; and (4) "there was an inconsistent and sometimes inappropriate tone at the top at Hertz that resulted in Hertz violating GAAP and Company accounting policies." FAC ¶ 199. Plaintiffs claim that the 2013 and 2014 Guidance and forecasts were false for similar reasons. Seeid. ¶ 205. Finally, Plaintiffs claim that timing of the Advantage Fleet impairment was false and misleading because Hertz should have recorded the impairment earlier than it did. Seeid. ¶ 231.

## II. LEGAL STANDARDS

Case 4:21-cv-02473     Document 29-33     Filed 03/08/22 in TXSD     Page 8 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

### A. Standards For Rule 12(b)(6) Motion to Dismiss

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief" and provides the defendant with "fair notice of what the ... the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted). In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id.

However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Standard for Securities Fraud

 **\*8**  Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). "A corporation is liable for statements by employees who have apparent authority to make them." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009) (internal citation omitted).

In addition to the customary pleading requirements under Rule 8, plaintiffs must meet the heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). See *City of Edinburgh*, 754 F.3d at 168. To allege fraud under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). At a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

To allege fraud under the PSLRA, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 321 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 194 n.12 (1976), and citing 15 U.S.C. § 78u–4(b)(1), (2)). In order to satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added). A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. With these principles in mind, the Court turns to the substance of Plaintiffs' § 10(b) claim.

### III. ANALYSIS

Defendants challenge three elements of Plaintiffs' § 10(b) claim: material misrepresentations and omissions, scienter, and reliance.

## A. False and Misleading Statements

Defendants move to dismiss only some of the statements in the FAC on material falsity grounds. First, they challenge Plaintiffs' claim that Hertz recorded the Advantage Fleet impairment too late. They claim that Plaintiffs have not alleged any actual falsity as to that claim. Second, Defendants challenge comments surrounding the Class Period financial statements, such as Defendants' statements in press releases and guidances, at conferences, and during investor calls. They argue that these statements are not actionable because they are puffery, opinion statements, or forward-looking statements that meet the requirements for the PSLRA's safe harbor. The Court will address each in turn.

### 1. *Timing of Advantage Fleet Impairment*

 **\*9**  Hertz announced a $40 million impairment in the Advantage Fleet in November 2013. Plaintiffs allege, however, that Hertz should have recorded the impairment or at least disclose the risk of impairment, by the second quarter of 2013 when Simply Wheelz first started taking losses on the auction sales. Plaintiffs claim that GAAP and Hertz's own accounting policies required Hertz to do so. As such, Plaintiffs claim that Hertz's financial information and guidance after July 2013 were inflated. See FAC ¶ 231.

The Court dismissed this claim in its prior Opinion, stating:

> GAAP "provides that long-lived assets ... must be reviewed for an impairment in value when facts and/or circumstances indicate that the ... book value of the asset ... may be greater than the sum of undiscounted cash flows expected from the asset's (or group of assets) use and disposal." Furthermore, Hertz represented in its 2012 Form 10–K that it reviewed depreciation rates on a quarterly basis and made adjustments based on market conditions. Based on documents filed in connection with Simply Wheelz's bankruptcy petition and information provided by CWs, Plaintiff alleges "that the carrying value of the Advantage Fleet was greater than the sum of the undiscounted cash flows Simply Wheelz expected from the Advantage Fleet's use and disposal."
>
> Plaintiff's claim here fails because it relies on Simply Wheelz's expectations regarding future cash flows, not Hertz's. As Hertz retained ownership of the Advantage

Fleet expectations regarding cash flow from the fleet should be analyzed from Hertz's perspective.

Op. at 30–31 (internal citations omitted).

Looking at the value of the Advantage Fleet from Hertz's perspective, the Court held that Hertz "had no obligation to record an impairment" before it did. Id. at 31. That was because "the terms of the Advantage Divestiture ensured that Hertz would always receive book value upon the sale of any vehicle in the Advantage Fleet."Id. That is,

> [t]he terms of the Advantage Divestiture provided that Hertz retained ownership of the Advantage Fleet and required Simply Wheelz to sell off the entire Advantage Fleet solely through Manheim [the auction company] by July 31, 2014. The terms of the Advantage Divestiture further provided that whenever Simply Wheelz sold an Advantage Fleet vehicle for less than the book value (as determined by Hertz) of the vehicle, Simply Wheelz would be responsible for payment of the difference to Hertz. Hertz thus would always be made whole on the sale of any Advantage Fleet vehicle so long as Simply Wheelz remained solvent and capable of making the payments.... There is therefore no basis to conclude that Hertz should have written down the value of the Advantage Fleet when it was receiving full book value for every Advantage Fleet vehicle. Hertz would have potentially left $40 million on the table had it done so.

Id. at 29 (internal citations omitted). Importantly, the Court explained that Plaintiffs had to plead that Hertz would have been prevented from receiving book value. Id. at 31. This would happen only if Simply Wheelz (1) became insolvent, or (2) was otherwise unable to pay under the terms of the Advantage Divestiture. Seeid. at 31. Since neither fact was alleged, the Court dismissed the claim.

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

Plaintiffs claim that they have corrected these deficiencies for two reasons. Neither are persuasive. First, they rely on the admissions in the Restatement. They claim that the Restatement admitted that Hertz had accounting issues in 2013, and the Advantage Fleet impairment was calculated in 2013, so the accounting decisions that went into announcing the impairment in November 2013 must have been wrong. The Court disagrees. The Restatement discussed a number of corrections to the 2013 financials, but it did not admit that the timing of the impairment was incorrect. As such, Hertz's admission of accounting errors in 2013 does not support the claim that the timing of the impairment was incorrect.

 **\*10** Second, Plaintiffs claim that, independent of the Restatement, the FAC alleges that Hertz should have disclosed the impairment earlier "because the overvaluation of the Advantage Fleet negatively impacted Simply Wheelz's cash flow and creditworthiness—that is, its ability to pay Hertz for the shortfalls on the sales of Advantage Fleet vehicles." Opp'n Br. at 34 (citing FAC ¶¶ 83, 107, 110), Dkt. No. 123. This is a reformulation of the same theory the Court rejected in its prior Opinion. It fails for the same reasons. The FAC does not allege that Simply Wheelz failed to pay Hertz the difference between the book value and auction value at the end of the second quarter of the 2013. So, up to that point, Hertz received the benefits of the transaction, even though the transaction negatively impacted Simply Wheelz.

The FAC does plead that Hertz was aware that Simply Wheelz was covering the difference in the losses. The question then is whether the FAC sufficiently pleads that Hertz had reason to believe the losses were so severe that they risked Simply Wheelz's insolvency. It does not.

Plaintiffs maintain they added two allegations to explain why there was a risk of impairment by the end of the second quarter of 2013. They point to allegations that Simply Wheelz and Hertz met in July 2013 to discuss the losses, and that Hertz had "significant continuing involvement" in the Advantage business. See FAC ¶ 349. Neither allegation is sufficient. As explained in the previous Opinion, Plaintiffs cannot plead merely that Simply Wheelz told Hertz it was taking on losses. Plaintiffs also had to plead that Simply Wheelz informed Hertz that the losses were so severe that Simply Wheelz's insolvency was a real possibility. Plaintiffs' allegation that Hertz and Simply Wheelz met to discuss losses does not bridge that gap. Likewise, the generalized allegation that Hertz had "continuing involvement" also fails. Plaintiffs ask the Court to infer that Hertz was on notice

that the impairment was necessary because Hertz was still involved in Simply Wheelz's business after the divestiture. But that inference is not supported by the FAC. The FAC does not explain Hertz's involvement in Simply Wheelz with particularity, aside from the sole allegation that Hertz classified the advantage business' operating results as part of Hertz's continuing operations. See FAC ¶ 238. Accordingly, the FAC does not sufficiently alleged that the Advantage Fleet was actually impaired by end of the second quarter of 2013. That claim is dismissed again.

#### 2. *Puffery*

Defendants next contend that several statements are non-actionable puffery. They point particularly to statements about (1) "strong" financial results (FAC ¶¶ 190, 193, 197, 220, 226, 249); (2) "record" results (FAC ¶¶ 187–88, 194, 196, 201, 203, 208, 218, 230, 232, 234, 246–47, 253, 261–62, 276); and (3) other various optimistic statements about financial growth (FAC ¶¶ 193 ("results are a testament to fostering a culture of continuous improvement"), 201 ("sustained operational excellence"), 210 ("we've got a great track record"), 214 ("we're going to see significant growth"), 226 ("the strategies have been working"), 240 ("this Company is a much better Company than it was in 2007"), 249 ("[w]e feel very confident the story is intact"), 259 ("it's where we see the lay of the land"), 271 ("Our profitability trend has been fairly significant.")).

"[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (internal quotes and citations omitted); see also *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (noting that puffery includes "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."). In other words, a statement is considered puffery only when it is immaterial. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990) (internal citation omitted). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Aetna*, 617 F.3d at 283 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 11 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

**\*11** The Court agrees that statements about "strong" and "record" financial results, as well as the generally optimistic statements, constitute puffery. They are not determinate, verifiable statements. They are the types of vague statements upon which reasonable investors do not rely. Such statements of optimism are commonly heard from corporate managers and are too imprecise to alter the total mix of available information. See *Advanta*, 180 F.3d at 537–38 (statement that company "achieved excellent growth and returns throughout our core business" found inactionable); *Underland v. Alter*, No. 10–3621, 2011 WL 4017908, \*8 n.94 (E.D. Pa. Sept. 9, 2011) ("A vague statement that capital levels are 'very strong' simply is not the sort of 'hard information' upon which a reasonable investor typically relies"); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) (finding "record sales and earnings for the first quarter ended March 31, 1999" to be puffery), aff'd, 269 F.3d 806 (7th Cir. 2001).

### 3. *GAAP Compliance*

Defendants next contend that several statements are non-actionable opinion statements. FAC ¶¶ 189, 212, 284. Specifically, they argue the statements about GAAP compliance in the 2011, 2012, and 2013 Form 10–Ks and other SEC filings are opinions, and Plaintiffs have not adequately alleged facts to satisfy the Omnicare standard for pleading opinion statements. See *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).

First, the parties dispute whether statements about GAAP compliance are statements of opinion or fact. They are opinions. "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare*, 135 S. Ct. at 1325 (2015). Where statements about GAAP compliance are concerned, courts have deemed them to be opinions. See, e.g., *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 250 n.44 (S.D.N.Y. 2015). This is so because GAAP standards are often subjective. They involve a range of possible treatments instead of a single objective set of calculations. See *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 675 n.22 (3rd Cir. 2002) ("GAAP is a term of art that encompasses a wide range of acceptable procedures.") (citing *Thor Power Tool Co. v. C. I. R.*, 439 U.S. 522, 544 (1979) (GAAP is not "a canonical set of rules that will ensure

identical accounting treatment of identical transaction.")). Hertz's Form 10–Ks explain this inherent subjectivity. They state that preparation of the GAAP-compliant financial statements "requir[ed] management to make *estimates and judgments* that affect" the valuation of things like loan loss reserves or assets and liabilities, and that "[a]ctual results could differ materially from those estimates." Marino Cert. Ex. 22, Form 10–K dated Mar. 4, 2013 ("2012 Form 10–K") at 44, 79 (emphasis added); see also Marino Cert. Ex. 9, Form 10–K dated Feb. 27, 201 ("2011 Form 10–K") at 52, 91–92; Marino Cert. Ex. 45, Form 10–K dated Mar. 19, 2014 ("2013 Form 10–K") at 44, 83. These are not matters of objective fact. See *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d. Cir. 1992) ("There appears to be no single method of evaluating and setting loan loss reserves, perhaps because no method has proven foolproof.").

While certain GAAP rules have objective application such that compliance would be a statement of fact, Plaintiffs do not identify any objective rules here. To the contrary, the Restatement describes methodologies that are inherently subjective. Consider, for example, Hertz's admission that it misidentified "estimate[d] recoveries from third parties" and receivables with "significantly different credit risk profiles." FAC ¶ 73; see 2014 Form 10–K at 95–98. An estimation of an amount, or a determination that two profiles are not just different, but significantly different, are inherently subjective tasks that vary depending on circumstances. See *In re Am. Int'l Grp., Inc.*, 2008 Sec. Litig., No. 08–4772, 2013 WL 1787567, at \*4 (S.D.N.Y. Apr. 26, 2013) (requirement to report "significant" credit risk was "a determination that hinges on management's judgment."). The standards cited in the FAC are also subjective. The FAC cites to two GAAP standards—ASC Topic 360, which discusses impairment reviews for long-lived assets, and ASC Topic 450–20, which discusses loss contingency calculations. See FAC ¶¶ 96, 103. Neither standard is objective. ASC Topic 360 requires a company to review an asset for impairment when the asset's carrying value may be greater than the amount of cash flow the company "expect[s]" to receive from its use and disposal. FAC ¶ 96. ASC Topic 450–20 requires disclosure of a loss either where an asset impairment is "probable" and the loss can be "reasonably estimated," or where the asset impairment is "at least reasonably possible." Opp'n Br. 18 n.11. These are not the kind of fixed rules that would qualify as objective standards. See *NECA–IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10–440, 2012 WL 3191860, at \*14 n.22 (S.D.N.Y. Feb. 9, 2012) ("[T]he valuation of assets not traded on the New York Stock Exchange or some other efficient

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 12 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

market where the fair market value typically is the price at which a share or other asset is trading at any given moment' is generally a matter of such subjective opinion.").

**\*12** Plaintiffs' reliance on *Underland v. Alter* is unpersuasive. 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011). There, the defendants stated that they would consider historical experience as part of its methodology for calculating loan loss reserves. Id. at \*9. But when they ran the calculations, they did not factor in historical experience. Id. The court held that was a misstatement of fact, not an opinion, because it was a measurable fact—they promised they would use a metric but never did. Id. Here, Plaintiffs do not allege that Hertz bypassed a methodology or metric, but that Hertz applied its methodologies incorrectly.

Having concluded that the "compliance with GAAP" statements are opinions, the Court must decide whether the opinions are actionable. The Supreme Court recently determined that an opinion may be actionable (1) as an untrue statement of material fact if the opinion is both incorrect (i.e., objectively false) and not genuinely believed (i.e., subjectively false), or (2) as misleading if the speaker omits material facts underlying the basis for the opinion "if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1326, 1329; see also*City of Edinburgh*, 754 F.3d at 170 ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis.") (citing *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008)). [3]

[3] Defendants do not dispute Omnicare's application to this § 10(b) case, even though Omnicare involved claims under § 11 of the Securities Act of 1933. See*OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 n.11 (3d Cir. 2016) (explaining that Third Circuit has yet to decide whether Omnicare applies to § 10(b) claims). Given Defendants' concession, the Court will apply Omnicare here. See*In re Amarin Corp. PLC Sec. Litig.*, No. 13–6663, 2016 WL 1644623, at \*8 (D.N.J. Apr. 26, 2016) (explaining Omnicare's applicability to § 10(b) claim).

Hertz argues that Plaintiffs fail to allege facts showing subjective falsity or that its statements were misleading. Plaintiffs respond that they pleaded both. They contend that Hertz did not genuinely believe their financials were GAAP compliant because they had internal control deficiencies that led to the accounting problems. They contend, alternatively, that Hertz omitted material information. That is, Hertz did not disclose that they "fostered an environment riddled with internal control deficiencies and encouraged employees to manufacture accounting adjustments to enable Hertz to achieve the desired financial results." Opp'n Br. at 28 (citing FAC ¶ 140). As discussed in the Court's scienter analysis in Section III.B below, however, neither argument prevails. Plaintiffs have failed to plead facts which would create a strong inference that Defendants knew their financials were not GAAP compliant when the statements were issued, and they have likewise failed to plead that Defendants knowingly or recklessly omitted that fact from their statements.

### 4. *Forward–Looking Statements*

Defendants next challenge the forward-looking statements. Specifically, Defendants point to the 2013, revised 2013, and 2014 earnings guidance and guidance-related statements, arguing that they are not actionable because they fall under the PSLRA's safe harbor for forward-looking statements. See15 U.S.C. § 78u–5(c).

#### i. *PSLRA Safe Harbor for Forward–Looking Statements*

The PSLRA imposes additional pleading burdens for allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. A " 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.' " Id. at 255 (quoting *Tellabs II*, 513 F.3d at 705).

#### ii. *Challenged Statements*

**\*13** Defendants appear to break down the challenged statements into two categories: (1) "guidance statements," and (2) "guidance-related statements." "Guidance statements" are the forecasts in the guidances themselves, as well as those times Hertz and the Individual Defendants

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 13 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

reiterated those forecasts. See FAC ¶¶ 142–54, 204, 206, 210, 214, 216, 218, 220, 226, 228, 230, 232, 243–44, 246, 249, 251, 256, 259, 265, 278, 280. "Guidance-related statements" appear to be statements by the Individual Defendants that evaluated or commented on the projections. See FAC ¶¶ 214, 240, 246–47, 249, 259, 265, 271, 282.

Defendants argue that these statements discussed future economic performance or financial projections and were accompanied by meaningful cautionary language.

Plaintiffs respond with three arguments. They argue that (1) several of the guidance-related statements are not forward-looking; (2) the cautionary language was not meaningful; and (3) Defendants knew their statements lacked any reasonable basis in light of the company's systemic issues.

### iii. *Forward–Looking Statements*

Plaintiffs contend that several of the guidance-related statements discuss present or historical facts, not future ones. The Court disagrees.

The guidance-related statements are forward-looking. They are all "statements of 'future economic performance, including such statement contained in a discussion and analysis of financial condition by management....' " *Avaya,* 564 F.3d at 255 (quoting 15 U.S.C. § 5(i)(1)(C)). For example, the FAC quotes Douglas as saying, "given our strategies ... we're *going to see* significant grown in profits and margins *continue into 2015*," and "we *expect* to see this type of continuous profit improvement *continue into the foreseeable future*," and Frissora as saying, "we *anticipate* Hertz will nevertheless generate record earnings for the full year, with adjusted pre-tax income up more than 30% year-over-year." FAC ¶¶ 214, 246–47, 265 (emphasis added). These statements plainly discuss future performance and contain language that identify them as such.

The closest call is Frissora's statement in paragraph 249 of FAC, but that is forward-looking too. There, the day Hertz issued its 2013 Revised Guidance, Frissora stated that the new numbers do not "change the story. We feel very confident the story is intact." Id. This statement falls under the safe-harbor. The "story" is Hertz's view that the 2013 Revised Guidance, though lower than expected, still projected improvements in pretax income and adjusted net income. Seeid. And the fact that Frissora is "confident" in the story indicates his adoption

and endorsement of the future projection. See*Avaya,* 564 F.3d at 255–56 (expressing comfort with projections "does not transform the statements ... into non-forward-looking assertions outside of the Safe Harbor"); id. at 274 n.48. This statement, like all of the other guidance and guidance-related statements, is forward-looking.

### iv. *Cautionary Language*

In addition to being forward-looking, the guidance and guidance-related statements must be accompanied by meaningful cautionary language. Plaintiffs contend the cautionary language was not meaningful because it did not warn investors about Hertz's (1) deficient disclosure and internal controls, and (2) improper accounting decisions.[4] The Court finds that the warnings about accounting errors were not meaningful.

[4] Plaintiffs also claim that the 2013 Guidance was false because it failed to timely record and disclose the Advantage impairment. See FAC ¶ 230. However, as the Court noted in its prior opinion, Hertz provided meaningful cautionary language about the impairment. See Op. 25–26 (noting warnings that future financial results could be affected by "the operational and profitability impact of the Advantage [D]ivestiture," and that financial results could be impacted by "the effect of tangible and intangible asset impairment charges"). Plaintiffs provide no argument for revisiting that decision.

**\*14** Cautionary language must be extensive yet specific and touch upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply. See*Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) ("[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.") (quoting *In re Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir. 1993)); accord*Avaya, Inc.*, 564 F.3d at 256 (reiterating same). Cautionary language in SEC filings "may be incorporated by reference" into the document containing the forward-looking statement, and need not be contained within the same document as the forward-looking statement itself. *Aetna,* 617

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 14 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

F.3d at 282 (quoting *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

The Court turns first to the sufficiency of the warnings about Hertz's control environment. The control warnings were extensive and specific. Hertz's Form 10–Ks from 2011 to 2013 stated, "we face risks associated with our initiatives, including ... the effectiveness of our internal controls. Any of these risks could have a material adverse impact on our results of operations, financial condition, liquidity and cash flows." See, e.g., 2012 Form 10–K at 23. Elsewhere, the filings explain how the internal controls are structured, management's responsibilities vis-à-vis the controls, and how the controls can become inadequate. See, e.g., 2012 Form 10–K at 141. Specifically, Hertz explains that "controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate." Id.

Moreover, these warnings became more hedged and guarded as time went on and information suggested the company's internal controls were malfunctioning. That is, the May 2014 Form NT–10Q—where Hertz announced for the first time that it may need to restate the 2011 financials—provided the following update: "Management is continuing to review these matters to determine if it needs to make any changes to its internal control over financial reporting and disclosure controls and procedures. The Company will consider the effect of these errors on its prior conclusions regarding the Company's internal control over financial reporting and disclosure controls and procedures." See Marino Cert. Ex. 3, Form NT–10Q dated May 13, 2014 at 2. In June 2014, when Hertz disclosed that it would need to restate the 2011 financials, and about two months before Hertz withdrew the 2014 Guidance, Hertz stated,

> management, in consultation with the Audit Committee, has determined that at least one material weakness existed in Hertz's internal control over financial reporting and that disclosure controls and procedures were ineffective at December 31, 2013. Hertz intends to amend its Management's Report on Internal Control Over Financial Reporting and Disclosure Controls and Procedures and expects to receive an adverse opinion on the internal control over financial reporting as of December 31, 2013 from PricewaterhouseCoopers LLP.
>
> Hertz is in the process of implementing new procedures and controls, and strengthening the accounting and finance departments through the addition of new personnel.

See Marino Cert. Ex. 4, Form 8–K dated June 6, 2014 at 2. As such, the warnings about control issues were "substantive and tailored to the specific future projections," *Avaya*, 564 F.3d at 256, and Hertz updated the public about those warnings when new information became available.

The Court reaches a different conclusion about the warnings over accounting issues. Several of Hertz's SEC filings warned of "changes in accounting principles, or their application or interpretation, and our ability to make accurate estimates and the assumptions underlying the estimates...." See, e.g., Marino Cert. Ex. 19, Form 8–K dated Feb. 25, 2013 at 7. Defendants argue that, by including this language, they warned investors about the type of accounting failures that befell the company. But they did not. The cautionary language borders on boilerplate, essentially stating that accounting principles and practices could change in general. And although the warnings cross-reference risk factors listed in other SEC filings like the Form 10–Ks, those filings discuss numerous other potential hazards in detail but make no further mention of accounting risks. See, e.g., 2012 Form 10–K at 1–2. More importantly, the warning was not tailored to the harm pled in the FAC. The FAC alleges that the senior management's improper tone caused their subordinates to "manufacture improper accounting adjustments...." See FAC ¶¶ 65, 69, 73 (listing improper adjustments). Allegations of accounting manipulations are a far cry from a mere "change[ ] in accounting principles."

**\*15** Moreover, the cautionary language remained the same despite evidence of accounting errors. The same sentence that appeared in the February 25, 2013 Form 8–K continued to appear after Hertz announced that it had to downward revise its 2013 Guidance on September 26, 2013 and adjust its previously issued financial statements in the 2014 Form NT–10Q on May 13, 2014. See, e.g., Marino Cert. Ex. 34, Press Release, "Hertz Revises Full Year 2013 Guidance" at 2; 2014 Form NT–10Q (warning that actual results could differ but not updating accounting warning despite noting that Hertz "identified certain adjustments relating to prior periods which will require the Company to revise certain of its previously issued financial statements for 2011"). Given this information, the fact that the vague cautionary language never changed strongly suggests that it was not "tailored to the specific future projection." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received in early May 2001 belies any contention that the cautionary

language was 'tailored to the specific future projection.' ") (quoting *Avaya*, 564 F.3d at 256).

Since some of Hertz's warnings were inadequate, Defendants can only avoid liability for those forward-looking statements if they did not know their statements were false.[5] See15 U.S.C. § 78u–5(c)(1)(B). That brings us to the central issue in this case: scienter.

[5]    Because the Court finds that the forward-looking statements were false based on inadequate warning, the Court need not decide whether the statements also lacked any reasonable basis. See*Burlington Coat Factory*, 114 F.3d at 1427 ("[I]f a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis.") Assuming they did, Plaintiffs have still failed to allege that Defendants were aware the statements were unreasonable at the time they were made.

**B. Scienter**

As to the requirement of scienter—the intent to deceive, manipulate, or defraud investors—"each act or omission alleged to violate [Section 10(b) ] [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2).

In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.... The inference ... need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.' " Id. at 314, 324. A court must consider the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." *Tellabs*, 551 U.S. at 322; see also*Avaya*, 564 F.3d at 273. The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. *S.E.C. v. Infinity Grp.*

*Co.*, 212 F.3d 180, 192 (3d Cir. 2000); see also*In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 607 (E.D. Pa. 2009) (noting that Tellabs specifically reserved the question of whether recklessness could give rise to civil liability under 10b–5, but "every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly."). In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Infinity Grp.*, 212 F.3d at 192.

**\*16**  Here, the FAC alleges that Defendants knew or recklessly disregarded that the public documents, projections, and statements by the Individual Defendants were false and misleading. FAC ¶ 335. Plaintiffs claim a strong inference of knowledge or recklessness based on the following facts: (1) the size and scope of the Restatement; (2) Hertz's admission that there were material weaknesses in internal control; (3) the SOX certifications; (4) the replacement of Hertz's upper management; and (5) alleged insider trading by Douglas and Kapur. Plaintiffs also claim they have pleaded corporate scienter. The Court will addresses these arguments in turn.

**1.** *Size and Scope of Restatement*

Plaintiffs point first to the size and scope of the Restatement. "Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter." See*In re Bio–Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005). Plaintiffs concede this, but they argue that the Restatement is still highly probative given its magnitude. They are correct up to a point. Indeed, Defendants do not dispute the Restatement's scope (it spanned three fiscal years) or its size (it resulted in a pre-tax income reduction of $90 million for 2012 and $72 million for 2013).See 2014 Form 10–K at 93. There is little doubt a Restatement of this character creates an inference of scienter on all Defendants. On the other hand, the Court also considers the $90 and $72 million figures in the context of their component parts. The overstatements did not occur in a few, key product lines or transactions. Nor was there a precipitous margin change, the magnitude of which would tip off a vigilant executive that the books could be wrong. Instead, the Restatement reveals something more pernicious. It shows that the overstatements in income were caused by a combination

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 16 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

of discrete accounting errors that occurred over fifteen areas. See 2014 Form 10–K at 93–94. And it describes a minimum of twenty adjustments that were necessary across those areas. Id. at 95–98. Accordingly, the Restatement permits an inference that Defendants were aware the accounting was off when they issued prior financials, but the strength of that inference is circumscribed by the diffuse nature of the accounting errors.

### 2. *Internal Controls*

Plaintiffs claim that Hertz's admissions about material failures in internal controls create a strong inference of scienter. They point first to their allegations that Frissora and "then existing senior management" set an "inappropriate tone at the top" and placed "inappropriate emphasis" on goals, which resulted in GAAP violations and accounting errors.

There are two problems with their argument. First, the admissions in the Restatement are more measured than Plaintiffs suggest. The Restatement admitted that there was a "sometimes" inappropriate tone at the top, which did not "in certain instances result in" GAAP compliance; and there was inappropriate emphasis on target goals "in certain instances." 2014 Form 10–K at v. The Restatement also stated that the tone at the top—which was one piece of "a complex mix of structural and environmental factors"—"may *have been* a factor influencing one or more employees to record an accounting entry now determined to be improper." Id. at vi (emphasis added). Thus, although the Restatement admits to mismanagement and admits that the mismanagement impacted company accounting decisions, that by itself is not actionable. *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) ( [A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b–5; nor will an allegation that a defendant failed to disclose the existence of mismanagement.). The Restatement did not admit that there was a "culture of fraud," that its senior management "encouraged Hertz employees to manipulate Hertz's financial results," or that Defendants knew or were reckless about the impact their management style had on the Company's control environment or accounting decisions. See FAC ¶¶ 43, 50. See also*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529 (S.D.N.Y. 2010) ("If ... allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.") (internal citation and quotes omitted).

**\*17** That leads to the second and more important problem. Since the Restatement merely describes mismanagement, Plaintiffs were required to supplement it with additional allegations of wrongdoing. They were required to allege that Defendants were "aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement."*Hayes*, 982 F.2d at 106 (citing *Shapiro*, 964 F.2d at 281–83). They did not do so. Their "tone at the top" scienter allegations are both conclusory and circular. They allege, for example,

> [w]ith respect to defendant Frissora, the 2014 Form 10–K admits that "*[t]he tone set and pressures imposed by the former Chief Executive Officer were inappropriate in certain instances* and may have been a factor influencing one or more employees to record an accounting entry now determined to be improper." This establishes that defendant Frissora was personally involved in, and knowledgeable about, Hertz's deficient accounting practices during the Class Period....

FAC ¶ 337 (emphasis in original). This allegation does not establish knowledge or recklessness. It is an attempt to plead fraud by hindsight—i.e., since Hertz admitted in July 2014 that Frissora made bad decisions during the Class Period, Frissora knew his decisions were bad at the time. The "strong inference" formulation guards against such allegations. *Tellabs*, 551 U.S. at 320; see also*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

It is also an attempt to infer state of mind from his conduct —i.e., since Frissora set the tone and pressure, he must have known his tone and pressure were inappropriate and causing accounting issues at the time. But the FAC misses critical allegations that would support such an inference. They do not plead, for example, that red flags were present, which would've put them on notice of their mismanagement;[6] that they were intimately involved in oversight of the lower level employees who committed the accounting errors; that they were aware there were inexperienced or unqualified personnel in the various departments; that any of the investigations or audits were shams; or that there are any confidential witnesses or documents that could corroborate the claims. Moreover, aside from the allegation that senior management created a pressurized environment to meet sales goals, Plaintiffs

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 17 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

do not provide particularized allegations explaining how management's tone and target goals were inappropriate, or how the environment actually caused Company employees to misstate the financials. These missing allegations, to name a few, are necessary to nudge Plaintiffs' claim from nonculpable mismanagement to actionable fraud.

6    For example, one alleged red flag is the Company's announcement in September 2014 that adjustments to previous financial statements were necessary, and the subsequent updates that the errors were worse than they thought. After each downward correction, the FAC alleges that Defendants "minimized the severity of the revisions needed for prior periods." FAC ¶¶ 274, 282. But the only support for that allegation is the fact that the statement turned out to be untrue. There are no allegations that Defendants were aware that their public statements about the extent of the errors were wrong when they said them. To the contrary, the more likely inference based on the FAC is that the Company downgraded its prognosis as new information came in and kept the public abreast of the changes.

Another red flag is the existence of the SEC investigation that began in June 2014. Plaintiffs do not allege the state of the investigation or its conclusions. An SEC investigation that has not resulted in charges or any finding of wrongdoing does not support an inference of scienter. See *Cozzarelli v. Inspire Pharmaceuticals, 549 F.3d 618, 628 n.2 (4th Cir. 2008)* (pending SEC investigation is "too speculative to add much, if anything, to an inference of scienter"); *Brophy v. Jiangbo Pharm., Inc., 781 F.3d 1296, 1304 (11th Cir. 2015)* ("The 'mere existence of an SEC investigation' likewise does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing.") (quoting *In re Hutchinson Tech., Inc. Sec. Litig., 536 F.3d 952, 962 (8th Cir. 2008)*).

**\*18** This is particularly so in light of Hertz's explanation that the control environment was one piece of a "complex mix" of structural problems. In other words, the tone at the top did not cause the errors on its own. The errors were also the result of "the distraction caused by the multiple, conflicting business initiatives; challenges related to managing complex, inefficient legacy systems; the lack of a sufficient complement of personnel with an appropriate level of knowledge, experience, and training with GAAP; unclear reporting structures, reporting lines, and decisional authority in the organization; and other matters." 2014 Form 10–K at vi. The confluence of these factors cut away at any inference that the Individual Defendants were aware that their tone at the top caused the accounting errors.

Plaintiffs respond that Defendants were at least reckless because fraud was a foregone conclusion in the environment they created. They do not base their argument on factual allegations, but on industry standards. Specifically, they cite to the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and the Public Company Accounting Oversight Board's ("PCAOB") contentions that a company's tone at the top is the most important factor for the integrity of a company's financial reporting process, and that fraud is likely where there is both an emphasis on earnings targets and deficient internal controls. Because these conditions existed at Hertz, Plaintiffs maintain that Defendants were recklessly indifferent to the potential for fraud. But this misses the point. It presupposes that Defendants were on notice that the company's tone at the top and earnings targets were inappropriate before those issues became public—a fact the FAC never establishes.

Plaintiffs also argue that the inappropriate tone at the top should be analyzed in conjunction with the other admitted internal control weaknesses. They point specifically to Hertz's admissions of control failures in risk assessment, information and communication, and monitoring; noncompliance with GAAP and internal accounting policies; and the unreliability of its Class Period financial statements. Citing *In re Ikon Office Solutions, Inc. Securities Litigation, 66 F. Supp. 2d 622 (E.D. Pa. 1999)*, Plaintiffs contend that these "gross[ ] deficien[cies]" strengthen the inference of scienter. Opp'n Br. at 49. But Ikon does not stand for the proposition that the magnitude of the control deficiencies is dispositive. That point is made clear in Ikon. There, the plaintiffs' fraud claim was sufficient because they pled two things: (1) the company, Ikon, had "grossly deficient" internal controls, and (2) the defendant, Ikon's accounting firm Ernst & Young, issued an unqualified audit despite knowing about the deficiencies. *Ikon, 66 F. Supp. 2d at 630* ("Plaintiffs focus particularly on the failure of Ikon's internal controls and E & Y's knowledge thereof. Plaintiffs allege that E & Y knew of these problems since at least January 1996 but nonetheless issued the unqualified audit in 1997...."). Here, Plaintiffs have pled the first part, but not the second. And, unlike Plaintiffs here, the Ikon plaintiffs provided particularized facts explaining

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 18 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

why the defendant was aware of the control deficiencies. They pled that Ikon discovered the control deficiencies in 1996, told Ernst & Young to do an audit, and Ikon's CFO wrote an internal memorandum in mid–1997 summarizing the "alarm[ing]" extent of noncompliance revealed in the audit. Id. at 631. Then, Ernst & Young issued the 1997 audit knowing those errors persisted. The plaintiffs established that fact by "describ[ing] a variety of internal memoranda expressing concern that the problems had not been corrected by the time of the September 30, 1997 audit, including a memorandum from [the CFO] to the district and marketplace presidents on November 26, 1997, stating that there had been no improvements." Id. In our case, however, Plaintiffs have not provided allegations that approaches the cogency and particularity of the Ikon allegations.

### 3. *SOX Certifications*

**\*19** The same analysis applies to Plaintiffs' claim that Frissora, Douglas, Rosenberg, and Kennedy intentionally made misstatements in the SOX certifications. See FAC ¶ 319; see alsoid. ¶¶ 132–33, 189, 192, 195, 198, 212, 224, 236, 268, 284. Under the Sarbanes–Oxley Act, principal executive and financial officers of public companies must make a number of certifications about their numbers and books. See15 U.S.C. § 78m, 78*o*(d), 7241(a)(4). They must certify to the general truthfulness of the company's quarterly and annual reports and to the establishment and adequacy of the company's internal controls. *In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 287 (D.N.J. 2007); City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 417 (D. Del. 2009).*

From 2013 to 2015, the Individual Defendants (except Kapur) signed SOX certifications for their respective Form 10–Ks and 10–Qs. See FAC ¶ 219. The FAC identifies the following certifications by Frissora, Douglas, Rosenberg, and Kennedy: (1) one stating that, to knowledge of the certifying officer, the reports did not contain any materially false statements or omissions; (2) one stating that, to the knowledge of the certifying officer, the financial information was "fairly presented"; (3) those declaring that the certifying officer designed the internal and disclosure controls, evaluated their effectiveness, and disclosed any recent changes; and (4) those declaring that the certifying officer disclosed all significant deficiencies and material weaknesses in the internal controls. See FAC ¶ 132.

Plaintiffs claim they have established that those defendants knew their certifications were false "because the admitted, inappropriate tone at the top—which these Defendants created—was itself a violation...." Opp'n Br. at 47. Yet there are no allegations explaining how Frissora, Douglas, Rosenberg, or Kennedy knew when they signed the SOX certifications that their management style was inappropriate and was so inappropriate that it amounted to a deficient internal control. Cf.*In re Intelligroup Sec. Litig.*, 527 F. Supp. at 289–90 ("[A]llegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous."). [7]

[7] Plaintiffs' failure to plead knowledge also impairs their claims concerning Item 303 of SEC Regulation S–K. Item 303 creates a duty to disclose any trend, event, or uncertainty that is "both (1) presently known to management; and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." *In re Ply Gem Holdings, Inc. Sec. Litig., 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015)* (citing 17 C.F.R. § 229.303); but see*Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000)* ("[A] violation of SK–303's reporting requirements does not automatically give rise to a material omission under Rule 10b–5."). Plaintiffs claim that Item 303 required Defendants to disclose the GAAP violations, control issues, and accounting errors in the 2012 Form 10–K, 1Q13 Form 10–Q, 2Q13 Form 10–Q, 3Q13 Form 10–Q, and 2013 Form 10–K—the same filings that contained the SOX certifications. See FAC ¶¶ 319, 330. Because Plaintiffs have not pled that Defendants knew about these issues when they signed the SOX certifications, they also have not pled that Defendants knew they needed to make Item 303 disclosures in those same filings.

### 4. *Upper Management Resignations*

**\*20** Plaintiffs next claim that Frissora, Douglas, and Kapur's resignations support a finding of scienter. The Court disagrees.

Douglas resigned as CFO and Senior Executive Vice President on September 23, 2013, the day before Hertz announced the 2013 Revised Guidance—though she continued to appear on the Company's behalf after her resignation date. FAC ¶¶ 158, 265. Kapur resigned as Senior Vice President of Finance and Corporate Controller on April 22, 2014, about seven weeks after Hertz announced that it was filing the 2013 Form 10–K late due to adjustments to previous financial statements. Id. ¶ 160. Frissora resigned as CEO and Chairman of the Board on September 8, 2014, about three weeks after Hertz withdrew the 2014 Guidance and two months after the Internal Investigation began. Id. ¶¶ 166, 169, 344. Douglas, Kapur, and Frissora all cited "personal reasons" for their resignations. Id. ¶¶ 158, 160, 169. Meanwhile, the 2014 Form 10–K explained that Hertz hired nine new members of senior management to remediate the control problems and twenty new people in Hertz's financial reporting and accounting departments. Id. ¶ 345

Plaintiffs claim that the timing of the resignations and the need to replaced Frissora, Douglas, and Kapur to remediate control problems "implicitly acknowledge[ ] that the Individual Defendants were either the cause of the deficiencies or, at a minimum, were reckless in connection with the causes and circumstances underlying the Restatement."Id.

Their argument is unpersuasive. "The Third Circuit, and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud." *In re Interpool, Inc. Sec. Litig.*, No. 04–321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (citing *In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 Fed.Appx. 465 (3d Cir. 2004) (declining to find that the allegation that nine employees were fired as a result of accounting irregularities supported a strong inference of scienter); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (finding that resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications")). Plaintiffs have not provided any additional evidence to infer that the resignations are suggestive of fraud.

Plaintiffs incorrectly argue that the timing of the resignations suggest fraud. There is little doubt that the resignations of Frissora and Kapur were causally related to the bad news that came before.[8] That fact, however, cuts against Plaintiffs. "Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the

resignation occurred as a result of the restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (citing *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that [defendant's employee] was fired simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department.")).

[8]    That Frissora and Kapur left for purely "personal reasons" is belied by the fact that their resignations came on the heels of material public disclosures that caused Hertz's stock price to drop. It is far more likely that their resignations occurred for business reasons.

 *21  Here, the timing does not suggests the resignations were connected to fraud. Kapur resigned seven weeks after Hertz first disclosed its prior financials could be wrong, and three weeks before Hertz confirmed that its 2011 financials needed restatement, not mere adjustments as Hertz stated previously. Frissora resigned on the tail end of a tumultuous fiscal year, soon after the withdrawal of the 2014 Guidance, and in the midst of an ongoing investigation into financial statements issued during his tenure. In that context, it was clear in 2014 that the Company had serious problems, so the resignations of those at the helm are not particularly surprising or suspicious. See, e.g., *Stambaugh v. Corrpro Cos., Inc.*, 116 Fed.Appx. 592, 598 (6th Cir. 2004) (resignations of a number of chief financial officers most likely were caused by a long period of corporate mismanagement, not by fraud); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (successive resignation of key officials did not create an inference of scienter because it was "more likely probative only of the fact that the company was failing"); *Kurtzman v. Compaq Computer Corp.*, No. 99–779, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) ("[T]here are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by anything besides a sense of inadequacy for the job in the face of [the company's] troubles."). It is equally unsurprising that, after Hertz discovered control deficiencies, it hired new people to remedy those issues. None of these facts support a reasonable inference that Frissora and Kapur resigned because they were caught perpetrating a fraud.

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 20 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

Douglas's resignation is also unavailing. Her resignation occurred well before the Restatement and months before Hertz discovered its accounting was off. And Plaintiffs have not provided any facts linking her resignation to fraud. Plaintiffs respond that Hertz admitted in the 2014 Form 10–K that Douglas resigned as part of the fraud. Even though the 2014 Form 10–K states that Hertz first identified potential accounting issues in June 2014, and Hertz did not discover the depth of problems until later, Plaintiffs read the 2014 Form 10–K as an admission that Hertz actually knew about the issues in 2013 and replaced Douglas as CFO accordingly. They direct the Court to the following: "We have taken, and continue to take, action to remediate the identified material weaknesses. For example, in the last two years, the Company searched for and hired a new Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, General Counsel, and over twenty highly qualified ... employees from outside the Company...." 2014 Form 10–K at vii. This statement does not suggest that Hertz knew about fraud since 2013 or that it fired Douglas because of fraud; rather, it suggests that Douglas and many other members of senior management who were on board during the relevant time are no longer there, which, according to Hertz, should allay fears that the material weaknesses could persist.

### 5. Insider Trading

Plaintiffs next argue that Kapur and Douglas's Class Period Hertz stock sales support an inference of scienter. Plaintiffs allege that Kapur made five Class Period sales, all in 2013. FAC ¶ 356. He sold 65,000 shares on March 11; 50,000 shares on May 8; 12,600 shares on May 20; 5,200 shares on May 22; and 32,200 shares on May 28. Id. Plaintiffs allege that Douglas made four Class Period sales, also all in 2013. Id. She sold 36,758 shares on April 15; 52,300 shares on May 8; 57,700 shares on May 15; and 40,000 shares on December 31. Id.

The Court "will not infer fraudulent intent from the mere fact that some officers sold stock." *Burlington Coat Factory*, 114 F.3d at 1424. But if the stock sales are unusual in stope or timing, they may support an inference of scienter. See *id.* Whether a sale is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (citing *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)). Other factors relevant to

scope and timing are whether the sales were "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation. Id. (citing *Burlington Coat Factory*, 114 F.3d at 1423).

**\*22** Here, of the five Individual Defendants, Plaintiffs only target Douglas and Kapur's trading; they make no mention of Frissora, Kennedy, or Rosenberg's trading during the class period. [9] See FAC ¶ 356. This casts doubt on their theory at the outset. See*Advanta*, 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported.") (citing *Acito*, 47 F.3d at 54 (holding that lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit")) (internal quotation marks omitted).

[9]  Plaintiffs do allege Class Period stock sales by other senior Hertz executives, but they were not named in this action.

Nonetheless, Plaintiffs' allegations against Douglas and Kapur are insufficient. As to timing, Plaintiffs allege that Douglas and Kapur sold their shares "near Class Period highs." FAC ¶ 357. That is not accurate. As Defendants note, the Class Period high was $31.56 per share on August 19, 2104, see Marino Cert. Ex. 5, but the majority of Douglas and Kapur's sales occurred in May 2013 at share prices ranging from $21.23 to $26.14, FAC ¶ 356. See*Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (noting that timing was not suspicious in part because "none of these three key players sold at the high points of the stock price."). The trades are not temporally suspicious, either. Plaintiffs allege that Douglas did not sell any stock in the three years prior to her 2013 sales, and that Kapur made one sale in December 2012 during the same time period. FAC ¶ 357. But Kapur and Douglas note that all of their Class Period sales except one was made pursuant to Rule 10b5–1 trading plans. [10] See Marino Cert. Ex. 5 (SEC Form 4s). "Sales made through such pre-approved plans counter any inference that the trades were made on the basis of insider knowledge." *In re NutriSystem, Inc. Derivative Litig.*, 666 F. Supp. 2d 501, 518 (E.D. Pa. 2009).

[10]  A Rule 10b5–1 plan is a written plan that allows corporate insiders to make prearranged stock transactions. See17 C.F.R. § 240.10b5–1(c). Kapur

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 21 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 1536223

and Douglas have submitted SEC Form 4s which state that all of their challenged trades except Kapur's March 11 sale were made pursuant to these prearranged transactions. Plaintiffs maintain that the Court cannot take judicial notice of these public documents to establish "that Douglas and Kapur entered into legitimate 10b5–1 trading plans." Opp'n Br. at 75. "The Court finds," however, "that it can take judicial notice of the public filings showing that the challenged sales by [the defendants] were made pursuant to 10b5–1 plans." *NutriSystem*, 666 F. Supp. 2d at 518 n.11 (citing SEC *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)); see also*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 n.14 (S.D.N.Y. 2011); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003). Moreover, Plaintiffs have not alleged that Kapur or Douglas prearranged these sales based on material nonpublic information.

Even without the trading plans, the result is the same. The majority of the sales followed soon after positive news and far before any negative disclosures. Kapur and Douglas made their first Class Period sales soon after Hertz filed its 2012 Form 10–K with positive results on March 4, 2013: Kapur's first sale occurred a week later; Douglas's about five weeks later. And these sales, as well as their May 2013 sales, occurred several months before the first negative news in the Class Period—the September 2013 announcement that the 2013 Guidance would be revised—and even farther away from the first disclosure in March 2014 that the Company's prior financials could be inaccurate. Such "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." See*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (finding no scienter based on sales in part because "sales took place ... twelve, four and three months, respectively, before [the company] announced its inability to complete the year-end audit"); *In re Astea Int'l Inc. Sec. Litig.*, No. 06–1467, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 9, 2007) ("[A] lapse of five months [between the sale and negative disclosure] weakens the inference that the individual defendants were motivated to cash out before the company disclosed its restatement.").

 **\*23** Plaintiffs' allegations based on the scope of the sales have more force, but not enough to overcome the overall insufficiencies. Plaintiffs allege that Douglas earned proceeds totaling $4,721,573, for a profit of $3.999 million compared to her annual compensation of $3.052 million. FAC ¶¶

358–59. Kapur earned proceeds totaling $3,934,458, for a profit of $3.934 million. Id. Plaintiffs do not allege Kapur's compensation but infer that it was lower than Douglas's. Seeid. At the same time, however, Douglas and Kapur both retained stock, selling about 34.5 percent of their aggregate holdings. See FAC ¶ 359 (alleging that Douglas and Kapur sold 25 and 62 percent of their holdings, respectively); *Advanta*, 180 F.3d at 541 ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest [that] they had every incentive to keep Advanta profitable."); *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (finding that individual defendants' sales of 38 percent of their aggregate holdings reduce the inference of scienter). And that aggregate number must be considered alongside the fact that there are no allegations that the other key insiders—Frissora, Kennedy, or Reuben—sold any stock, a fact which suggests the aggregate number of stock sold by all of the Individual Defendants' would be much lower.

On balance, Plaintiffs have not sufficient alleged that Douglas and Kapur's sales were "motivated by an intent to profit from inflated stock prices before the upcoming losses were reported." *Advanta*, 180 F.3d at 540.

### 6. *Corporate Scienter*

Finally, Plaintiffs argue that they have alleged corporate scienter. Under this doctrine, "a plaintiff can ... plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." Rahman v. Kid Brands, Inc., 736 F.3d 237, 246 (3d Cir. 2013) (internal citation omitted). The Third Circuit has neither accepted nor rejected corporate scienter. Id. Assuming the doctrine's applicability in this circuit, Plaintiffs' arguments still fail.

To allege corporate scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, 531 F.3d 190, 195 (2d Cir. 2008). Here, Plaintiffs allege that they meet this standard based on two facts: (1) Hertz's purported admission in the 2014 Form 10–K that it knew about material weaknesses in mid-to late–2013, and (2) the existence of an inappropriate tone at the top. Neither of these is sufficient. As the Court explained above, the first fact is a misreading of the 2014 Form 10–K; the second is an admission of

Case 4:21-cv-02473   Document 29-33   Filed 03/08/22 in TXSD   Page 22 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

mismanagement, not fraud. Were the Court to attribute these two allegations to unknown agents of the Company, it would not create a strong inference of scienter. Accordingly, the Court will not apply corporate scienter.

### 7. *Failure to Plead a Strong Inference of Scienter*

In sum, Plaintiffs have failed to plead a strong inference that Defendants knew or consciously disregarded that their statements were false. This is so whether the statements were historical or forward-looking.

The strongest inference of scienter comes from the Restatement. However, the Restatement is not enough by itself, so Plaintiffs had to tip the inferential scale with the four other categories of allegations. But, as explained, those categories do not strengthen the inference of knowledge or recklessness. The allegations fall far short of demonstrating any knowing misstatements. There are virtually no allegations supporting that portion of Plaintiffs' claim. The allegations do approach reckless ignorance, but Plaintiffs have not pled a strong inference of it. At bottom, the FAC does not allege a cognizable fraud. Even giving Plaintiffs every reasonable inference, their allegations amount to the following: Hertz discovered serious accounting problems, traced those problems back to a corporate mismanagement (and possibly even negligent conduct), publicly disclosed those problems, and updated the public every time it realized the problem was worse than previously disclosed. The FAC carefully explains how the accounting problems were caused by the Individual Defendants, but it never provides a cogent and compelling explanation how those defendants were aware that they caused those problems before Hertz discovered them. For those reasons, their claims fail. [11]

[11] Because Plaintiffs have failed to plead scienter, the Court does not reach Defendants' reliance arguments.

### IV. CONTROL PERSON CLAIM AGAINST THE INDIVIDUAL DEFENDANTS UNDER § 20(a) OF THE SECURITIES EXCHANGE ACT

**\*24** Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284. Accordingly, liability

under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *Avaya*, 564 F.3d at 252; *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted). Because Plaintiff has failed to state a claim for violation of § 10(b) against Defendants, Plaintiff's § 20(a) claim against the Individual Defendants necessarily fails. Count Two is accordingly dismissed.

### V. DISMISSAL WITH PREJUDICE

Finally, Plaintiffs request leave to amend the FAC to cure any defects outlined in this Opinion. In particular, they claim to have new facts, "gleaned over the course of their investigation," about the tone at the top, improper accounting adjustments, and internal control deficiencies. Opp'n Br. at 105.

Fed. R. Civ. P. Rule 15(a) provides that leave to amend "shall be freely given" by the court "when justice so requires." Leave may be denied, however, due to undue delay, bad faith, prejudice, and futility. *Burlington Coat Factory*, 114 F.3d at 1434 (internal citations omitted); see also*GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir. 2004) (explaining standard in PSLRA context). "The concept of 'undue delay' includes consideration of whether new information came to light or was available earlier to the moving party." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004). " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Burlington Coat Factory*, 114 F.3d at 1434 (internal citations omitted).

Here, Plaintiffs claim to have new information from a "former vice president of finance who reported directly to Douglas during the Class Period" and a "former employee who worked in Hertz's Internal Audit Group during the Class Period...." Opp'n Br. at 105, 106. Some of their allegations, however, are not new. For example, the former vice president would state that senior management called him and put pressure on him to "meet pre-set numbers" and "pre-existing financial targets," id. at 105–06; the former audit group employee would state that "internal control problems existed when Douglas was CFO," id. at 106. These allegations were in the FAC, see, e.g., FAC ¶ 3 ("Hertz senior management[ ] created a pressurized operating environment whereby manipulations of Hertz's financials were made by employees in order to achieve pre-set financial targets."); id. ¶¶ 16, 46 (explaining

Case 4:21-cv-02473 Document 29-33 Filed 03/08/22 in TXSD Page 23 of 24

In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 1536223

Hertz's admission of control deficiencies in 2011 to 2013, which overlaps with Douglas's tenure as CFO), and were addressed in this Opinion, see, e.g., supra Sections III.B.2 and III.B.4.

Other allegations are new. Plaintiffs claim that the employees could explain how senior management was aware of fraud, but they provide a vague description of allegations. The vice president would allege that, "[i]f the actual results did not meet the pre-set goals, employees would be told that their numbers could not be correct, and that they were not looking at the numbers properly," adding that "various types of accounting treatments were implemented to fit what was needed at the time to make the numbers." Opp'n Br. at 106. The former audit group employee would allege, "Hertz's Internal Audit Group was pressured to 'water down' its findings to avoid unsatisfactory ratings," adding that "Hertz's senior management knew about internal control problems...." Id. These claims lack detail and are unclear. Unlike the active voice used in the previous allegations, Plaintiffs explain these new allegations with a passive voice—i.e., the employees "would be told," accounting treatments "were implemented," the audit group "was pressured." The Court therefore cannot discern who told what to whom. Nor is there any detail in these allegations that satisfy the who, what, where, and when required under Rule 9(b). These new facts do little to cure the FAC's scienter issues.

 **\*25** Normally, the Court would readily allow plaintiffs to replead claims like these that fail for lack of particularity. Given the context of this case, however, the Court is not inclined to do so. As explained at the outset of this Opinion, this case has a long history. It was first filed in 2013, and the parties have vied over four different complaints. Yet Plaintiffs' failure to particularly allege its claims has been a constant theme. In October 2014, for example, Judge Chesler dismissed Plaintiffs' first amended complaint, stating "[t]his complaint as its drafted is simply unsatisfactory. I am dismissing it without prejudice for failure to adequately plead the statements which are fraudulent and to comply with the PSLRA requirement that you plead with specificity the manner in which those statements were fraudulent." Tr. of Oral Arg. dated Oct. 1, 2014 ("Tr.") 28:14–19, Dkt. No. 43. He warned, however, "[y]ou can do this and get it right but, understand, this time, if I wade through this, whatever gets dismissed gets dismissed with prejudice. There will be no further opportunities to amend." Tr. 28:25–294. The case was then transferred to the undersigned, and in July 2015 the Court dismissed the second amended complaint. The Court found

that Plaintiffs failed to plead any actionable statements or scienter, again noting the paucity of fact. See, e.g., Op. at 39 ("Plaintiff instead relies solely on the power of suggestion, and not on any concrete facts, in urging this Court to presume a connection between Mr. Frissora's resignation, the internal investigation, and the facts alleged in the SAC."). The Court has put Plaintiff on notice of its factual deficiencies, so there is no excusable reason for Plaintiffs to provide such an opaque description of the new allegations they wish to add now.

Plaintiffs respond that those prior warnings should be overlooked because the FAC asserts new claims that were not in the prior complaints. But Plaintiffs have benefitted from that argument before. For example, despite Judge Chesler's earlier warnings, the Court let them amend the second amended complaint for precisely the same reason. See Order dated Aug. 22, 2015 ("Defendants' motion to dismiss is GRANTED WITHOUT PREJUDICE in light of the fact that the accompanying Opinion addresses issues not previously addressed in connection with Defendants' earlier motion to dismiss"), Dkt. No. 64. Given the mutable nature of Plaintiffs case, the Court finds the argument unpersuasive.

But that is not all. In addition to these prior warnings, the Court also considers the apparent staleness of these purportedly new allegations. Plaintiffs claim they obtained this information "over the course of their investigation," but they do not say when. Yet Plaintiffs have had considerable time to investigate these new allegations and incorporate them into the pleadings: Hertz published the Restatement in July 2015, Plaintiffs filed the FAC eight months later in March 2016, and they disclosed the new allegations in their opposition brief in May 2016 without formally moving to amend. At this late stage, if Plaintiffs had the information, they had to plead it or at least describe it with particularity in their opposition brief. They did neither. Pleadings in a case this old cannot be based on such a wait-and-see approach. The case is dismissed with prejudice.

### VI. CONCLUSION

For the reasons set forth herein, the motions to dismiss are **GRANTED** and the FAC is **DISMISSED WITH PREJUDICE.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1536223

**In re Hertz Global Holdings, Inc. Securities Litigation, Not Reported in Fed. Supp. (2017)**

2017 WL 1536223

---

**End of Document**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---