# Case No. 8

2000 WL 33208116

KeyCite Yellow Flag - Negative Treatment
Distinguished by Securities and Exchange Commission v. Bardman, N.D.Cal., October 27, 2016

2000 WL 33208116
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Herbert KANE et al., On Behalf Of Themselves And All Others Similarly Situated, Plaintiffs,
v.
MADGE NETWORKS N.V. et al., Defendants.

No. C–96–20652–RMW.
|
May 26, 2000.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND DENYING
PLAINTIFFS' COUNTER–MOTION TO STRIKE

WHYTE, District J.

**\*1** Defendants' motion to dismiss the complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and plaintiffs' counter-motion to strike were submitted to the court on May 19, 2000 without oral argument.[1] The court has read the moving and responding papers. For the reasons set forth below, the court grants the motion to dismiss. The court denies plaintiffs' counter-motion to strike as moot.

[1] The motions were originally set for hearing on May 19, 2000, but the parties stipulated that the matter should be decided on the papers after the court issued its tentative ruling granting defendants' motion to dismiss.

I. BACKGROUND

This securities class action was filed after the trading price of publicly traded securities in Madge Networks N.V. ("Madge") declined precipitously.

Madge makes adaptor cards and switches used to network computers. (Compl.¶ 8.) Throughout the class period

(October 1995 through June 1996), Madge's flagship product was the Smart Ringswitch ("the Ringswitch"), a network switch. (Id. ¶ 2.).

At the beginning of the class period, Madge had a marketing agreement with networking giant Cisco to sell the Ringswitch. During the class period, Madge acquired Lannet, a company that directly competed with Cisco. (Id. ¶ 2.) This acquisition allegedly soured the Cisco–Madge relationship. (Id. ¶ 2.)

The class period saw other woes befall Madge. The Ringswitch allegedly lacked key features that would have enabled it to remain commercially successful. (Id. ¶ 2.) Sales of other Madge products also fell. Madge's acquisition of Lannet did not go smoothly; the companies were structured differently, and Madge made an unsuccessful effort to bypass Lannet's network of resellers (VAR's) and to market its product directly to customers. (Id. ¶ 3.)

The complaint alleges that Madge and the individual defendants (including Madge principal Robert Madge, referred to as "R. Madge") made false positive statements about Madge despite their insider knowledge of these problems. The complaint also alleges that two high-ranking insiders each sold 20% of their holdings during the class period.[2] The complaint also alleges that Madge failed to disclose material facts when it issued shares to holders of Lannet and another company that Madge acquired during the class period.

[2] These insiders were initially named as defendants, but have since been dismissed as defendants in this case. (Compl. ¶ 37 n. 1.)

Plaintiffs seek relief under Section 10(b) of the Securities Exchange Act of 1934 and Section 11 of the Securities Act of 1933, as well as relief under the "control person" provisions of those statutes.

II. LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." As a result, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to defendants of the charges against them.

Case 4:21-cv-02473 Document 29-35 Filed 03/08/22 in TXSD Page 3 of 12

While the Rule 8 notice pleading standard is the general rule, the more specific provisions of Rule 9(b) apply to "all averments of fraud or mistake." In such cases, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This requires pleading of two types of information: (1) the "time, place, and content of alleged misrepresentation" (the "neutral facts necessary to identify the transaction"); and (2) "an explanation as to why the statement or omission complained of was false or misleading." *In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547–48 (9th Cir.1994) (en banc).

**\*2** The Private Securities Litigation Reform Act of 1995 ("the Reform Act") tightens these requirements even further for securities fraud allegations. Most notably, the Reform Act requires pleading of scienter with particularity: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Nor can such particularity be avoided by pleading on information and belief: such pleading must still "state with particularity all facts on which that belief is formed." *Id.* § 78u–4(b)(1). The Ninth Circuit recently interpreted these statutory provision in *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999). The *Silicon Graphics* court held that "a private securities plaintiff proceeding under the [Reform Act] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct .... [Averment of p]articular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the [Reform Act]." 183 F.3d at 974.

### III. ANALYSIS

After five amendments, the complaint is a 50–page, 105–paragraph document that features color-coded charts and liberal use of boldfaced fonts. Defendants argue that the complaint, despite its verbosity, has the following deficiencies: 1) failure to allege any material misstatements or omissions; 2) failure to plead falsity and/or materiality of undisclosed facts with particularity; 3) failure to plead a duty to disclose; 4) failure to plead scienter to the degree of specificity required by the Reform Act; and 5) failure to state a claim under Section 11 of the Securities Act of 1933.[3] The court addresses theses issues in turn.

3  Defendants also argue that the "bespeaks caution" doctrine insulates them from liability for their alleged misstatements and omissions, and that plaintiffs fail to plead their information-and-belief allegations in conformity with the Reform Act. Because the court finds that defendants' motion is well-taken for the reasons listed above, the court does not reach these other, narrower issues.

### A. MATERIALITY OF ALLEGED MISSTATEMENTS OR OMISSIONS

The court has previously held that many of the statements made by the defendants during the class period were simply too vague to qualify as material misstatements of fact. Nonetheless, the complaint is filled with statements that, on their face, are immaterial puffery.

Examples include:

- "the quarter was also characterized by the significant progress we made in combining the two companies" (Compl.¶ 52);

- Madge and Lannet were "working together;" (*Id.*)

- R. Madge personally believed that the Lannet acquisition was "fabulous" (*Id.* ¶ 55);

- bypassing resellers and marketing directly to end-users would "enhance" sales (*Id.* ¶ 56);

- "merger-related risks are not as significant as one might assume" (*Id.* ¶ 58);

- Madge "made great strides toward our long-term goal of becoming the number one leader in end-to-end switched networking" (*Id.* ¶ 59);

- Madge anticipated increased revenues due to "strong demand for its new products" (*Id.* ¶ 62); and

**\*3** • Madge had "marketing strengths" (*Id.* ¶ 63).

Such statements cannot be said to "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc .,* 426 U.S. 438, 449 (1976) (citation omitted). In a fraud-on-the market case such as this, the sophisticated players who help set market prices are expected to be appropriately skeptical of a company's efforts at self-

promotion. *See Raab v. General Physics Corp.,* 4 F.3d 286, 289–90 (4th Cir.1993). As a consequence,

> courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996). Many, indeed most, of the statements in plaintiffs' complaints belong to the "rosy affirmation" category.

A prime example is the complaint's repeated insistence that positive statements about Madge's acquisition of Lannet were false. When one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light. Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve "synergies" from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers. Thus, in *Grossman v. Novell, Inc.,* 120 F.3d 1112 (10th Cir.1997), the Court of Appeals held as a matter of law that the following "statements of corporate optimism" about a merger were immaterial:

> 1) Frankenberg's statements that Novell had experienced "substantial success" in integrating the sales forces of the two companies, that the merger was moving "faster than we thought," and that the merger presented a "compelling set of opportunities" for the company; and 2) Novell's statements that "[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge of the expanding scope of network solutions," and that it "expects that network applications will quickly reshape customer expectations."

120 F.3d at 1121. The various alleged falsehoods in the complaint relating to the Lannet–Madge merger are no

different from the statements in *Grossman.* The court concludes that the statements here are equally immaterial.

Similarly, companies almost always anticipate strong demand for their products. Not surprisingly, courts have rejected forecasts of "strong demand" as immaterial. *See, e.g., Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785, 792 (S.D.N.Y.1997) ("continued strong demand"); *Cione v. Gorr,* 843 F.Supp. 1199, 1205 (N.D.Ohio 1994) (company predicted "continued strong demand for tire products"), *cited with approval in Searls v. Glasser,* 64 F.3d 1061, 1067 (7th Cir.1995); *see also In re Syntex Corp. Sec. Litig .,* 855 F.Supp. 1086, 1096 (N.D.Cal.1994) (company expected "increased sales" and "very strong fiscal 1993"), *aff'd,* 95 F.3d 922 (9th Cir.1996).

 **\*4** A few of the alleged misstatements come closer to being material. For instance, Madge continued to promote its marketing relationship with Cisco at a time when that relationship was allegedly falling apart. While a company can be expected to "puff" its own product and management abilities, there is less tolerance for mischaracterizations of a company's relationship with third parties. At the very least, investors may be less wary of statements about a relationship with a key customer than they would be about a company's predictably glowing self-characterizations. *Cf. Marksman Partners, L.P. v. Chantal Pharmaceutical,* 927 F.Supp. 1297, 1306 (C.D.Cal.1996) (holding that defendant's improper accounting of sales to a key customer was not immaterial as a matter of law).

However, close inspection shows that even the class-period statements about the Cisco relationship are extremely vague:

- *November 29, 1995:* Analysts at Oppenheimer reported that "Madge management has stated that it does not expect the acquisition to alter the company's alliances with Cisco Systems." [4] (Compl.¶ 56.)

[4] There appears to be a particularity problem with this allegation as well, inasmuch as the precise time and content of the communications between Madge executives and the Oppenheimer analysts is not described in the complaint. A company is not responsible for the incorrect statements of stock analysts, unless the company has "intertwined" itself with the false reports, either by planting them or adopting them. *See Wenger v. Lumisys,* 2 F.Supp.2d 1231, 1249–50 (N.D.Cal.1998). The

Kane v. Madge Networks N.V., Not Reported in F.Supp.2d (2000)

2000 WL 33208116

facts of such intertwining must be pleaded with particularity. *See id.*

• *January 24, 1996:* Madge executives announced during a conference call that "Madge continued to see strong demand for both token ring and Ethernet switch products both through its direct sales efforts and through Cisco for a portion of its token ringswitches. [¶] Madge was very pleased with its relationship with Cisco, which was working very well." (*Id.* ¶ 60.)

• *January 29, 1996:* "Madge's relationship with Cisco had strengthened, was successful and continuing to flourish." (*Id.* ¶ 62.)

• *March 26, 1996:* Madge reviewed and approved an Oppenheimer report that stated:

"Importantly, we point out that the Cisco and Madge relationship remains intact." (*Id.* ¶ 67.) Most of these statements are general characterizations, not verifiably false assertions of fact. The one arguably factual assertions is not even particularly optimistic: Madge claimed that Cisco was a sales channel for a "portion" of its ringswitches. (Plaintiffs do not contend that this particular statement was false.) However, these allegations may be sufficient for pleading purposes. [5] As demonstrated below, these claims fail nonetheless because their falsity is not pleaded with particularity.

[5]    The court doubts this, however. Among other things, Madge had warned the market in contemporaneous SEC filings that by acquiring Lannet, Madge was becoming a competitor of Cisco. (Vasquez Decl. Ex. B at 18–19 (disclosing numerous risks associated with "intense industry competition").)

B. PLEADING OF FRAUD WITH PARTICULARITY
Even assuming the materiality of the alleged misstatements, plaintiffs continue to plead fraud with inadequate particularity. Specifically, plaintiffs (1) fail to plead the "neutral circumstances" of the alleged accounting fraud, and (2) fail to plead the falsity of the various other false and misleading statements with the required specificity.

1. *Failure to Plead Accounting Fraud with Particularity*
The complaint alleges two types of accounting fraud: (1) insufficient bad debt reserves in the first quarter of 1996, and

(2) failure to write off inventory when its value sank because of decreasing demand.

**\*5**  Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Among other things, this requires pleading of the "time, place, and content of alleged misrepresentation" (the "neutral facts necessary to identify the transaction"). *GlenFed,* 42 F.3d at 1547–48.

With regard to many of the alleged misrepresentations, the complaint adequately presents the "neutral facts," for example, identifying a specific press release and its specific contents. However, plaintiffs fall short when it comes to pleading the alleged accounting fraud. [6]

[6]    Defendants also argue that the allegations of accounting fraud are barred by the statute of limitations and the doctrine of waiver. The court need not reach these arguments because the allegations are insufficient.

a. *Insufficient Bad Debt Reserves*
Companies are obliged to make reasonable predictions about the collectability of their accounts receivable. Underestimates of bad debt reserves lead to overstatement of income, and ultimately inflation of stock price. Accordingly, the Ninth Circuit has recognized that understatement of bad debt reserves can be a form of securities fraud. *See In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 925 (9th Cir.1993); *Blackie v. Barrack,* 524 F.2d 891, 904 (9th Cir.1975). However, the Ninth Circuit has also recognized that predictions about the collectability of debt are foreword-looking, and that they are based on "flexible accounting principles." *GlenFed,* 42 F.3d at 1549; *accord Mathews v. Centex Telemgmt., Inc.,* No. C–92–1837 CAL, 1994 U.S. Dist. LEXIS 7895, at \*15–16 (N.D. Cal. June 9, 1994) (recognizing that bad debt reserves are "essentially predictions about the future"). In other words, accounts receivable reserves are relatively "soft" information, despite the fact that they are expressed in dollars and cents. Thus, it is not enough to allege that the bad debt reserves were inadequate, because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show that the initial prediction was "a falsehood." *GlenFed,* 42 F.3d at 1549.

Plaintiffs have alleged no particular facts showing that Madge's accounts receivable reserves in the first quarter of 1996 were understated. Instead, plaintiffs recycle their

charge that Madge's effort to bypass Lannet's resellers and sell directly to end-users was disastrous:

> Beginning in 12/95 and in 1/96, Madge's insiders knew that Lannet's VARs were so furious with Madge's decision to compete with them that they were refusing to pay for product previously shipped to them. Moreover, because Madge had extended stock rotation and price protection terms to Lannet's VARs, it bore an increased risk with regard to the Lannet receivables than Lannet had borne pre-merger.[7] Despite these facts, the Individual Defendants deliberately did not record a charge against income to reflect the impaired value of Madge's receivables from the Lannet VARs, as such a charge would have been contrary to their positive statements about the integration of the companies and Madge's future prospects. Thus, as opposed to increasing its allowance for doubtful accounts, the defendants intentionally caused Madge to reduce its allowance by $900,000 in 1stQ 96—a deliberate manipulation of its financial records to falsify Madge's reported results for 1stQ 96. In 95, Madge's ratio of bad debt to net sales was approximately 3.2%, which given Madge's problems with Lannet's VARs, should have increased in 96. Instead Madge reduced its allowance to materially overstate its 1stQ 96 results.

[7] This statement is misleading because, as defendants note, Madge had in fact allocated additional reserves to account for these developments. (Vasquez Decl. Ex. B at 51 (noting "an accounts receivable reserve for $1,500,000 for estimated exposures related to conforming policies regarding price protection and stock rotation

because madge expects to extend these allowances to the Lannet product line").)

**\*6** (Compl.¶ 90.) Absent from this paragraph is any allegation that any particular account was rendered uncollectible by Madge's business decision to adopt a new marketing strategy. This is insufficient to support a claim of securities fraud. *See Stack v. Lobo,* 903 F.Supp. 1361, 1368–69 (N.D.Cal.1995) (dismissing claims for inadequate "doubtful account" reserves except as to two named customers who had impaired credit).[8]

[8] Nowhere does the complaint allege that a specific Lannet reseller refused to pay for previous orders. Instead, throughout the complaint, it is alleged that Lannet resellers were "furious" and were refusing to "cooperate" with Madge or to place new orders. This, however, is quite different from alleging that the resellers would renege on their legal obligation to pay their bills to Madge.

b. *Failure to Write Off Inventory*

As plaintiffs correctly note, companies are also obliged to value their inventory in accordance with GAAP, which requires that inventory be assessed at the lower of cost or market value. Plaintiffs allege that defendants knew that their inventory value had deteriorated based on three facts:

[1] Madge's new Ringswitch product was selling very poorly because it lacked transparent-bridging capability such that the inventory Madge had accumulated of this product was not worth anywhere near the amount Madge had originally estimated.

[2] Demand for token ring adaptor card and Ringswitch products from Cisco—the largest customer for Madge's products—had fallen dramatically beginning in the 4thQ 95 and even more so in the 1stQ 96, meaning Madge's future sales of its Ringswitch inventory would be much lower than originally projected since Cisco, its largest single customer, was now refusing to purchase Ringswitch in any volume.

[3] Madge's inventory turnover had deteriorated significantly over the past year and its inventory was, at 3/31/96, turning over less than one time per quarter, a very negative switch. Madge lied to analysts about increasing inventories being due to intentionally accelerated buildout to meet increasing demand.

(Compl.¶ 87.) Again, plaintiffs have failed to plead accounting fraud with particularity. Plaintiffs largely avoid pleading specific figures, speaking instead of demand that had "fallen dramatically," products that were "selling very poorly," and inventory turnover that had "deteriorated significantly." While plaintiffs do plead that inventory turnover was less than once per quarter (and that it had been more than twice a quarter just a year previously), they fail to place that drop in context, nor do they take account of the many other factors that influence financial ratios such as inventory turnover. *See Stack v. Lobo,* No. C–95–20049 SW, 1995 U.S. Dist. LEXIS 19966, at *14 (N.D.Cal. Apr. 20, 1995).) Thus, the alleged inventory valuation fraud is pled with insufficient particularity.

### 2. *Failure to Plead Falsity with Particularity*

Rule 9(b) mandates that the "circumstances indicating falseness" must be pleaded with particularity. *GlenFed,* 42 F.3d at 1548. Pleading falsity with particularity requires pleading of "inconsistent contemporaneous statements or information" indicating that the speaker knew that he was not telling the truth. *Id.* at 1549.

Pleading of inconsistent contemporaneous facts must be itself particular. It is not enough to allege that there was "confidential non-public information" that contradicted the false statement. *Yourish v. California Amplifier,* 191 F.3d 983, 994 (9th Cir.1999). Plaintiffs must also provide "some detail about the alleged information, other than that its substance contradicted the substance of the identified statement." *Id.* at 995. Otherwise, plaintiffs could always use artful pleading to evade the requirement of pleading falsity with particularity.

 **\*7** Because the misstatements alleged in the complaint are mostly immaterial, the pleading of falsity is equally deficient. At times, plaintiffs resort to little more than name-calling:

On 11/28/95, Madge issued a release announcing the "completion" of the Lannet acquisition, which stated:

"*I personally believe that this is a fabulous acquisition,*" added [Robert] Madge. "*We are beginning to see immediate benefits from the combination of the two companies. There has been no loss of momentum within the two organizations, and we are already operating as a fully integrated combined company.*"

These statements were deliberate *lies* as, in fact, the Lannet acquisition was not a "*fabulous acquisition,*" the

combination of the two companies was not leading to "*immediate benefits* " with "*no loss of momentum* " and the companies were not "*already operating as a fully integrated combined company,*" as Madge's decision to eliminate the VAR customers had been extremely disruptive to Lannet's sales process, the effort to integrate the two companies had failed and the Lannet acquisition was actually hurting Madge's business....

(Compl. ¶ 55 (emphases in original).) Labeling immaterial statements of optimism "lies" does not render them any more actionable.

Even a lengthy recitation of seemingly specific "true facts" cannot substitute for pleading falsity with particularity. For instance, the same paragraph of the Complaint offers the following "true facts" purportedly showing falsity:

The true facts, which the Individual Defendants knew, were:

• Madge had made, and was implementing, a decision to discontinue Lannet's VAR sales channel in favor of an expanded direct sales force. This had *already* caused disruption of the sales channel and a real loss of business momentum for Lannet's Ethernet products as the VARs were furious with Madge, refusing to cooperate with Madge and had begun to curtail orders from Madge/Lannet. Thus, Madge was being *hurt* by the acquisition and not seeing immediate benefits.

• The integration of the sales and marketing departments of the two companies was *not* going well, but instead was resulting in friction and ill-will, in part because of R. Madge's decision to drop the VARs, whom the Lannet sales and marketing organizations had cultivated and relied upon to make Lannet a success prior to the acquisition, and who now were complaining bitterly and curtailing orders.

• The head of Lannet U.S.A., Atkinson, a key figure necessary for Lannet's continued success, was not being "integrated," but instead was leaving the Company.

• The two companies were not "*already operating as a fully integrated combined company.*" Efforts at integrating Lannet into Madge were encountering serious and sustained difficulties and they were not operating as a fully integrated combined company. The sales and marketing departments of Madge and Lannet were not being "integrated" at all, but rather were in conflict and upheaval. The Lannet sales and marketing employees had been relegated to trying to calm the VARs, but denied the

2000 WL 33208116

tools to help the VARs sell and service Lannet products. The Madge salespeople were ineffective at selling Ethernet products because they lacked the technical training and know-how to successfully market them. Also, Lannet's Financial and Operations Department were not being successfully integrated, because the MIS and financial and accounting systems of the two companies were incompatible and could not be harmonized.

**\*8** (*Id.* ¶ 55.) This is not entirely inadequate. However, many of these "true facts" are difficult to align with the allegedly false statements of optimism made by R. Madge. Moreover, they are not particular. For instance, Atkinson is alleged to have been in the process of "leaving the Company." Had he already made his decision to leave? Had he told anyone at Madge that he was leaving? Similarly, the VARs (all of them?) were allegedly "furious" with Madge, and were set to "curtail" orders. The degree to which the VARs were "furious" and the extent to which they were prepared to "curtail" orders goes unexplained. [9] Moreover, given that many of the alleged "lies" are statements of opinion (for example, R. Madge's personal beliefs), the pleadings are largely inadequate in addressing the degree to which the speaker did not in fact believe those opinions.

[9]    Of course, much of this problem stems from the vagueness of the alleged misstatements themselves. One reason that statements like "things are going well" are not actionable is that hindsight can always reveal problems that can make such optimism seem unfounded.

Similar problems mar plaintiffs' efforts to plead that the upbeat assessments of the Cisco relationship were false. As noted earlier, it would be troubling if Madge was lying about its relationship with a key customer. However, the complaint provides little in the way of specifics regarding the state of the Madge–Cisco relationship. Instead, the complaint offers generalities (the relationship was "adversely impacted," and Cisco was "telling Madge it would sharply curtail orders"), which are simply repeated throughout the complaint with little variation. (Compl.¶¶ 48, 53, 57, 61.) The complaint does not even hazard a guess at the numbers involved, nor is anything of the form or substance of the communication between Cisco and Madge conveyed. Plaintiffs therefore fail to plead with particularity the falsity of Madge's upbeat assessments of the Madge–Cisco relationship.

Finally, the court notes that the complaint consistently fails to allege with the requisite particularity the falsity of defendants'

earnings and revenue forecasts. While such forecasts may be actionable, plaintiffs must plead specific facts that show that such projections "lacked a reasonable basis at the time that they were made or were not issued in good faith." *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1249 (N.D.Cal.1998). Plaintiffs' complaint fails in this regard. For instance, nowhere do plaintiffs allege what good-faith earnings projections *would* have been, nor do they present the facts that would go into making such projections. Instead, they assert, mantra-like, that the forecasts "were actually known by each Individual Defendant to be false and unattainable." This is not adequate pleading of falsity (let alone adequate pleading of scienter).

C. DUTY TO DISCLOSE ADVERSE INFORMATION
Throughout the complaint, plaintiffs allege that defendants failed to disclose adverse material information. However, it is well established that the federal securities laws rarely require companies to disparage their own product lines or the skills of their managers. *See In re Craftmatic Sec. Litig.,* 890 F.2d 628, 640 (3d Cir.1990) (holding that Rule 10b–5 did not require company to disclose that its research was "meaningless" or that its management was "unfocused" and "unable to manage"). Nor are companies required to predict that their future operations will fail. *See id.* at 641 (holding that company was not required to disclose that its new products "were not amenable to being marketed successfully"). Many of the alleged omissions seem to be of this variety, for instance the alleged failures to disclose problems in adding new features to the Ringswitch, which are alleged throughout the complaint. (Compl. ¶¶ 48, 53, 57, 61, 63, 69.) Other "omissions" appear to relate to information that was readily available to the public, such as declining demand for Madge products. *See In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1410 (9th Cir.1996) (affirming dismissal of complaint that alleged that defendants had failed to disclose weakened product demand, because such information is publicly known, despite complaint's characterization of such information as non-public and will "defeat claims of fraud on the market.").

**\*9** At a more fundamental level, plaintiffs fail to plead any facts that would give rise to a duty to disclose material non-public information. Plaintiffs appear to allege three sources of a duty to disclose: (1) a duty to update previous projections of success in developing a FDDI capability for the Ringswitch; (2) a duty to disclose triggered by affirmative representations; and (3) a duty to disclose information when Madge issued shares to Lannet and Teleos shareholders.

Plaintiffs' first argument is unavailing. Before the class period, the most definitive statement that Madge had made about the release of FDDI capability for the Ringswitch was that it was "targeted" for the first quarter of 1996 as part of a broader "roadmap" for developing new products. (Vasquez Decl. Ex. A at 194–95.) These statements, themselves too vague to be actionable, could not give rise to a subsequent duty to provide updated information announcing development difficulties. [10]

[10]     In addition, Madge "bespoke caution" to the market in SEC filings about its product development schedule: "Although Madge has announced its expected shipment dates for some of these [new] products, schedules for high technology products are difficult to predict, and there can be no assurance that Madge will achieve its expected shipment dates of these or any other new or enhanced products developed by Madge." (Vasquez Decl. Ex. D at 17.) In any case, investors already know that product development schedules are uncertain at best. *Cf. Stac,* 89 F.3d at 1410 (noting that it is "public domain" information that high-technology products are uniquely susceptible to risk of obsolescence).

Plaintiff's second contention—that Madge's affirmative representations created a duty to disclose adverse information—is also unsuccessful, and has been previously rejected by the court. Few of the alleged omissions are even linked to specific true statements that were rendered misleading because adverse information was omitted. [11] Instead, plaintiffs take general positive statements (largely immaterial because of their vagueness) and point to individual problems that undermined those statements. For instance, plaintiffs argue that defendants could not make positive statements about the Lannet takeover without also disclosing that one particular Lannet executive disagreed with Madge's decision to bypass resellers and engage in direct marketing. However, general positive statements do not give rise to a duty to disclose the details of internal corporate disputes. *See Cooperman v. Individual, Inc.,* 171 F.3d 43, 50–51 (1st Cir.1999) (holding that positive statements about company's business model in prospectus did not trigger duty to disclose a dispute among the company's directors about the company's direction, even though such information might have been material).

[11]     The one possible exception (as with issue of materiality) is the characterization of the Cisco relationship. Arguably, by representing that the Cisco–Madge relationship was "intact," defendants were then obliged to reveal that there were problems with that relationship. In any event, as discussed above, the allegations of falsity and scienter relating to the Cisco relationship are deficient.

Finally, plaintiffs cite no apposite authority for the proposition that a company issuing shares of itself as part of a merger or acquisition has a duty to disclose material non-public information to its own shareholders. At least one case from the Court of Appeals suggests otherwise. *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 814 (2d Cir.1996) (holding that company's issuance of $700 million in debt securities did not trigger duty to disclose adverse facts). Like other "insiders," a corporation has no affirmative duty to disclose unless it is "trading with" its shareholders. *McCormick v. Fund Am. Cos.,* 26 F.3d 869, 876 (9th Cir.1994). Issuing stock pursuant to a merger or acquisition is not such a transaction.

D. PLEADING OF SCIENTER UNDER THE REFORM ACT

Given that many of the alleged misstatements and omissions are immaterial, and that the pleading of falsity is deficient, it follows almost as a matter of course that the pleading of scienter is deficient as well.

**\*10**  Plaintiffs' theories of scienter appear to be: 1) defendants knew their statements were false because they received negative internal reports contradicting their public statements; 2) defendants' later statements were admissions of falsity; 3) defendants were to inflate the trading price Madge stock to avoid a dilutive effect from the Lannet and Teleos acquisitions; 4) two insiders sold 20% of their holdings each; 5) some positive statements were made suspiciously close to the alleged corrective disclosures; 6) defendants' accounting fraud raises a strong inference of scienter; and 7) scienter was "manifest." The court will briefly address these theories of scienter in turn.

1. *Negative Internal Reports*

Plaintiffs fail to match up even one negative internal report with any specific statement of the defendants. [12] All the complaint does is allege that the individual defendants were

Kane v. Madge Networks N.V., Not Reported in F.Supp.2d (2000)

2000 WL 33208116

"hands-on managers" who received information through "e-mail, teleconferences, and meetings." (Compl.¶¶ 12, 15.) The complaint even attempts to turn the presence of a fax machine in a conference room into evidence of scienter. (*Id.* ¶ 15.) All these allegations do is show that defendants *could* have learned of information contradicting their public statements, not that they actually *did* learn such information (or that they were deliberately reckless to the falsity of their statements).[13] Such allegations are plainly insufficient under *Silicon Graphics,* which rejected allegations that the defendants there had received monthly "Flash Reports" and "Monthly Financial Statements/Packages" and that they therefore knew the true facts contradicting their false statements. *See* 183 F.3d at 984–85. The closest the complaint comes to alleging a specific "negative internal report" is that William Atkinson, Lannet USA's former CEO told R. Madge in the summer of 1995 that his direct marketing idea was "crazy." (*Id.* ¶ 19.) (Atkinson apparently also believed that this decision was "nauseating", although he did not share that sentiment with R. Madge. (*Id.*).) This is not even a "negative internal report"—it is an internal corporate disagreement that can be expected any time a company decides to change course. At best, the Atkinson–Madge conversation reveals that Madge was aware that the decision to bypass Lannet's resellers was not risk-free. However, there is no indication that Madge ever represented that the new marketing strategy was without risks.[14]

[12] Indeed, scienter is pled as a separate section of the complaint, covering the entire class period. This makes it difficult to piece together allegations of scienter with allegations of falsity. Such pleading appears to violate the Reform Act's requirement that plaintiffs plead scienter "with respect to each act or omission alleged to violate" the Securities Exchange Act. 15 U.S.C. § 78u–4(b)(2).

[13] Plaintiffs' allegations of "angry" phone calls and "furious" VAR's are so unspecific that they do not adequately plead falsity, let alone scienter.

[14] To the contrary, when Madge acquired Lannet, it disclosed the risks of a possible switch to direct marketing. (Vasquez Decl. Ex. B at 20.)

## 2. Later "Admissions"

Madge's later admissions that it had experienced "difficulties in integrating" Madge and Lannet do not create a strong inference of scienter, despite the earlier rosy statements about the Madge–Lannet merger. Although the earlier optimistic statements may have been misguided, the later admissions only reveal that it might have been unreasonable to be so optimistic, not that there had been any fraud. None of the admissions suggest that defendants knew all along that the merger would never be successful.

## 3. *Motive to Avoid Stock Dilution*

**\*11** Plaintiffs allege that Madge and R. Madge wished to avoid the dilutive effects of using stock to acquire Lannet and Teleos by artificially boosting the price of Madge stock. At best, this is a *motive* for fraud; it is not an allegation of particular facts that would create a "strong inference" of scienter. Moreover, it is a weak motive at best, because every corporation and large-scale shareholder would have this motive. *See In re PETsMART, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 999 (D.Ariz.1999) (rejecting allegation, even under pre-Reform Act standard, that motive to facilitate acquisition of another company was sufficient pleading of scienter); *see also Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) (rejecting as "nihilistic" allegations of scienter based merely on individual defendants' purported desire to receive greater compensation or to enhance personal stock holdings); *but see In re Time Warner Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.1993) (holding that desire to avoid dilutive effect of rights offering could state a claim for scienter), *criticized as "inconsistent" and post-Reform Act validity questioned, Bryan v. Avado Brands, Inc.,* 187 F.3d 1271, 1286 (11th Cir.1999).

## 4. *Insider Trading*

In *Silicon Graphics,* the Ninth Circuit held that insider trading by six defendants did not raise a strong inference of scienter because four of the defendants "sold a relatively small portion of their total holdings and traded in a manner consistent with prior practice." *Id.* at 987. The Ninth Circuit also noted innocent explanations for the substantially larger sales by two insiders, one of whom sold 75.3 percent of his holdings in the company. *See id.* The insider trading in this case pales in comparison. Only two insiders are alleged to have engaged in *any* trading during the class period. Not one misleading statement is attributed to either of these insiders. No insiders (not even the insider traders) are alleged to have left the class period with more money in hand than before the class period. The insiders who did trade sold only 20% of their holdings, and it is not alleged that these sales were out of line with their previous sales. Plaintiffs have accordingly failed to raise a strong inference of fraud through their insider trading allegations.

Kane v. Madge Networks N.V., Not Reported in F.Supp.2d (2000)
2000 WL 33208116

### 5. *Timing*

Plaintiffs argue that the timing of some alleged misstatements demonstrates that they were made with scienter. For instance, plaintiffs point out "glowing" statements made by Madge only four weeks before Madge revealed the disappointing figures that caused Madge shares to drop. However, the final alleged statements made in an analyst's report of May 15, 1996 came at a time when Madge stock had already begun to slip significantly, and even from the selective snippets provided by plaintiffs, it is clear that defendants were largely seeking simply to allay investor concerns ("*recent concerns* have been overdone ... Madge Networks *remains* excellently positioned to continue to enjoy rapid revenue and earnings growth"). (Compl. ¶ 76 (emphasis added).) In any case, an upbeat analyst's report a month before the alleged corrective disclosures is hardly enough to create a strong inference of scienter.

### 6. *Alleged Accounting Fraud*

**\*12** Plaintiffs argue that the alleged accounting improprieties are themselves proof of scienter, because "books ... do not cook themselves." Opp'n at 14:11. There is some truth to this argument, but the alleged accounting fraud here raises no such inference. First, it is not clear how the alleged accounting fraud benefitted anyone, because the allegedly false numbers were not released until the latter part of the class period, after Madge had already acquired Lannet and Teleos. Second, the alleged accounting fraud related to relatively "soft" categories of information—bad debt reserves and inventory valuation—that are difficult to calculate. Given the complaint's failure to specify the exact nature of the alleged accounting fraud, the mere incorrectness of Madge's figures cannot by itself show scienter.

### 7. *"Manifest" Scienter*

Finally, plaintiffs contend that the allegedly large, systemic problems in the Madge organization must have alerted the defendants to the falsity of their statements. Opp'n at 13:8–9 ("Defendants' knowledge of problems affecting Madge's core business is manifest.") The court is not persuaded. This broad-brush approach to pleading scienter evades the Reform Act's requirement that plaintiffs point to specific facts rendering *each* alleged misstatement by defendants false. While it might be reasonable to assume that high-ranking corporate officials know about their companies problems, the Reform Act requires a *strong* inference of scienter, not

merely a reasonable inference. *See In re Read-rite Corp. Sec. Litig.,* No. C–98–20434 JF (N.D. Cal. filed Mar. 1, 2000) (unpublished op. at 5).

## E. FAILURE TO STATE A SECTION 11 CLAIM

Plaintiffs seek to state a Section 11 claim based on Madge's alleged representation that the Lannet and Teleos mergers were fair, when, in fact, Madge stock was artificially inflated. A close analysis reveals that this does not state a Section 11 claim. First, the actual documents filed with the SEC report the recommendations of the Madge, Lannet, and Teleos Boards that the mergers were fair to the shareholders of their own companies. (Vasquez Decl. Ex. B at 10; Ex. D at 8.) [15] Even if Madge stock was artificially inflated, this fact would not have been material to *Madge* 's shareholders, who could only have benefitted by allowing the company to purchase its new subsidiaries with inflated shares. In other words, if the stock were not artificially inflated, the merger would have cost *more* to Madge and its shareholders. This would hardly have made the transaction more fair as to them. *See Elfenbein v. American Fin. Corp.,* 487 F.Supp. 619 (S.D.N.Y.1980) (rejecting Section 11 claim by shareholders as to whom disclosure of allegedly material information would have been harmful), *aff'd mem.,* 652 F .2d 53 (2d Cir.1981). Of course, the mergers may not have been fair to Lannet and Teleos shareholders, but Madge did not make any representations of fairness to them. Thus, plaintiffs fail to state a Section 11 claim against Madge. [16]

[15]    With regard to the Teleos acquisition, only the Teleos Board made any recommendations to its shareholders.

[16]    Moreover, defendants are correct that plaintiffs fail to plead facts showing that the board of Madge did not believe in the truth of its fairness opinion. *See A.M. Gollomp v. MNC Fin., Inc.,* 756 F.Supp. 228, 233 (D.Md.1991).

## IV. ORDER

**\*13** For the foregoing reason, the court dismisses the complaint in its entirety. Although leave to amend is liberally granted, this is the fifth amended complaint, and it shows little improvement over the original complaint, which was filed four years ago. Plaintiffs have pointed to no new facts they could allege, and their latest amendment demonstrates that

their factual investigation has long since ceased to yield new facts. Instead, plaintiffs are repeating vague allegations that the court has previously dismissed as inadequate. The court is left with the distinct impression that this case, even more than many complaints alleging securities fraud, is essentially a case of "fraud by hindsight."

Moreover, the Ninth Circuit's recent opinion in *Silicon Graphics* underscores the high standard that plaintiffs must now meet to plead scienter in a securities case. The allegations in this case are much less compelling than that in *Silicon Graphics;* for instance, there is much less insider trading alleged here than was alleged in *Silicon Graphics.* Because leave to amend would therefore be futile, the court will dismiss the complaint with prejudice.

Plaintiffs' counter-motion to strike is denied as moot, because the court did not consider the materials that were the subject of that motion in deciding the motion to dismiss.

Finally, pursuant to 15 U.S.C. § 78u–4(c)(1), the court has conducted an independent review of the record, and is satisfied that there is no cause for sanctions pursuant to Rule 11(b) of the Federal Rules of Civil Procedure. (In this regard, the court notes that no party has moved for sanctions.)

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 33208116

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.