# Case No. 13

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Unumprovident Corp. Securities Litigation, E.D.Tenn.,   September 12, 2005

2002 WL 318441
United States District Court,
N.D. Texas, Dallas Division.

Jeffrey SCHILLER, et al., On Behalf of Themselves
and All Others Similarly Situated, Plaintiffs,
v.
PHYSICIANS RESOURCE
GROUP, INC., et al., Defendants.

No. Civ.A. 3:97–CV–3158–L.
|
Feb. 26, 2002.

MEMORANDUM OPINION AND ORDER

LINDSAY, J.

*1  Before the court are the following five motions:

1.  Physician Resource Group's Motion to Dismiss Third Amended Complaint, filed February 5, 2001;

2.  Individual Defendants Emmett E. Moore, Richard M. Owen, and Richard J. D'Amico's Motion to Dismiss Plaintiff's Third Amended Complaint for Violations of the Securities Exchange Act of 1934, filed February 5, 2001;

3.  Defendant John N. Bingham's Motion to Dismiss Plaintiff's Third Amended Complaint, filed February 6, 2001;

4.  Defendant Arthur Andersen L.L.P.'s Motion to Dismiss Plaintiff's Third Amended Complaint, filed February 5, 2001; and,

5.  Plaintiffs' Motion to Strike Tabs I, J, K, filed March 22, 2001. [1]

[1]  Plaintiffs move to strike three exhibits contained in Appendix A to Defendant PRG's Motion to Dismiss Third Amended Complaint, filed February 5, 2001. Tab I contains a chart that

delineates certain of the alleged misrepresentations and omissions with corresponding cautionary language taken from PRG's prospectuses. Tab J contains another chart that lists the alleged misrepresentations and omissions placed adjacent to the reasons why they are insufficient as a matter of law. Finally, Tab K contains a chart that categorizes the alleged misrepresentations and omissions into a number of subcategories. Plaintiffs contend that PRG uses Tabs I, J, and K to extend the number of pages of briefing beyond the page limits imposed by the court's October 2000 briefing order. The court has not relied on any information or briefing contained in the aforementioned appendices. The court, therefore, denies as moot plaintiffs' motion to strike.

After careful consideration of the motions, responses, replies, and the applicable law, the court, for the reasons stated below, grants defendants' motions to dismiss.

I. Factual and Procedural Background

Plaintiffs are a class of persons who purchased or otherwise acquired Defendant Physician Resource Group Inc.'s (“PRG”) common stock during the period between September 15, 1995 and November 19, 1997 (the “class period”). They sue PRG, Emmett E. Moore (“Moore”), Richard M. Owen (“Owen”), Richard J. D'Amico (“D'Amico”), and John N. Bingham (“Bingham”) (collectively, the “Individual Defendants”). [2] Plaintiffs also sue Arthur Andersen L.L.P. (“Andersen”), PRG's independent auditor. Plaintiffs allege that PRG, the Individual Defendants, and Andersen violated § 10(b) of the Securities and Exchange Act of 1934 (the “Exchange Act”), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The Plaintiffs further contend the Individual Defendants are liable as controlling persons pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

[2]  During Class Period, Moore was Chief Executive Officer, President and Chairman of the Board of Directors; Owen was Chief Financial Officer and a director; D'Amico was Executive Vice President and Chief Administrative Officer; and Bingham was the Controller, Vice President, and Chief Accounting Officer. Plaintiffs' Third Amended Complaint [hereinafter “Third Am. Compl.”] ¶ 21.

Schiller v. Physicians Resource Group, Inc., Not Reported in F.Supp.2d (2002)

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

Defendant PRG is a publically traded corporation that acquired the assets of and provided management services to ophthalmic and optometric practices. PRG went public in June 1995, and over the following eighteen months, acquired more than 150 eye-care practices nationwide. In March 1996, PRG added nearly 70 individual eye-care practices with its acquisition of EyeCorp, Inc., and by October 1996, PRG had acquired its two primary competitors, American Ophthalmic and EquiMed. PRG hoped to integrate these individual practices, and under common ownership, use its management expertise, increased capital, and improved information and accounting systems to achieve economies of scale, synergies of operation, and increased earnings per share. During this period of growth by acquisition, PRG stock reached a class period high of just under $35 a share.

Plaintiffs allege that between approximately September 1995 and February 1997, PRG and the Individual Defendants issued false and misleading statements concerning their management expertise, their ability to integrate the acquired practices, and the success of their management information and accounting systems. These statements, among others, were purportedly made to artificially inflate the stock price, thereby enabling PRG to acquire practices using a combination of cash and stock as currency. Plaintiffs allege this "scheme" enabled PRG to acquire practices with fewer shares, maintain an appearance of profitability, and later market itself as an attractive acquisition candidate. During the class period, PRG and the Individual Defendants described the Company in press releases and other publically filed documents as a "preeminent leader," which had "successfully integrated" a number of practices, and was "ready to move forward with the future integration" of others. PRG and the Individual Defendants also asserted they had a "strong," "deep management team" that was able to integrate their acquisitions with "sophisticated management information systems" and "strong internal monitoring and controls."

 **\*2** Plaintiffs claim that contrary to these statements, PRG lacked the management information and accounting systems necessary to manage its existing businesses and integrate the acquired practices. Plaintiffs also allege that PRG failed to conduct adequate due diligence before acquiring several of the eye-care practices, which resulted in the acquisition of practices with diminishing bottom lines, poor financial structures, and other legal liabilities. Plaintiffs maintain that Andersen participated in this "scheme" by issuing unqualified audit reports on PRG's financial statements for the years ending December 31, 1995 and December 31, 1996, and by

reviewing year 1997 quarterly reports. In short, Plaintiffs charge that PRG, the Individual Defendants, and Andersen concealed the true financial condition of the corporation, failed to disclose material, adverse facts about its operations and finances, and used misrepresentations to make misleading forecasts about its earnings and growth potential.

Plaintiffs further base claims on representations contained in those financial statements filed with the SEC for the fourth quarter of 1995, all of 1996, and the first and second quarters of 1997. These representations were false and misleading, Plaintiffs allege, because the financial information contained therein was not prepared in conformity with GAAP and relevant SEC regulations. Specifically, Plaintiffs claim that Defendants overstated revenues, belatedly booked certain charges, and failed to establish adequate reserves for uncollectible receivables. Plaintiffs further allege that Defendants overstated the assets acquired in the EquiMed acquisition, forcing them to incur a one time $31.75 million "asset valuation loss" in the third quarter of 1997. These revelations, among others, led to the eventual termination of Moore and Owen, and according to Plaintiffs, caused the price of the stock to fall more than ninety-three percent from its class period high.

Plaintiffs filed suit against PRG and the Individual Defendants in December 1997. Plaintiffs amended their complaint against PRG and several of the Individual Defendants in July 1998. In November 1998, Plaintiffs filed a separate action against Andersen, which was transferred to this court in December 1998, and consolidated with Plaintiffs' initial action on October 4, 2001. In June 1999, Plaintiffs again amended their complaint, adding Andersen as a defendant, and amending their previous claims against PRG and the several of the Individual Defendants. Plaintiffs' Third Amended Complaint was filed on December 21, 2000. Defendants, collectively, now move to dismiss Plaintiffs' Third Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b), and for failure to plead scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

II. Applicable Pleading Standards

  A. Pleading Requirements of Rules 12(b)(6), 9(b) and the PSLRA

 **\*3** A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and is rarely

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

granted." *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). A district court must not dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 913–14 (N.D.Tex.1998) (*"Coates I"* ). The court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). The plaintiff, however, must plead specific facts; the court will not accept conclusory allegations in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982); *Robertson v. Strassner,* 32 F.Supp.2d 443, 445 (S.D.Tex.1998); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 621 (N.D.Tex.1998).

Plaintiffs assert a claim pursuant to the Section 10(b) of the Securities and Exchange Act, 15 U.S.C. 78j, as amended by the PSLRA. Section 10(b) makes it unlawful for a person to:

> use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In relevant part, Rule 10b–5 makes it unlawful for any person, directly or indirectly, to:

> make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in

> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under these provisions, a plaintiff must allege (1) a misrepresentation or omission; (2) of a material fact; (3) made with the intent to defraud; (4) on which the plaintiff relies; (5) which proximately caused the plaintiff's injury. *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir.1997); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994); *Cyrak v. Lemon,* 919 F.2d 320, 325 (5th Cir.1990). Where a plaintiff alleges "a fraud on the market" theory, it is not necessary for the plaintiff to prove individual reliance on the false or misleading statement. *Nathenson v. Zonagen, Inc.,* 267 F .3d 400, 414 (5th Cir.2001); *Coates I,* 26 F.Supp.2d at 914 n. 1; *Zuckerman,* 4 F.Supp.2d at 621. Instead, a plaintiff may show that he indirectly relied on the statements by relying on the integrity of the market price of the stock. *Nathenson,* 267 F.3d at 414.

**\*4** Because section 10(b) claims sound in fraud, the plaintiff must also satisfy the pleading requirements imposed by Fed.R.Civ.P. 9(b). *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994); *Tuchman,* 14 F.3d at 1067. Rule 9(b) requires certain minimum allegations in a securities fraud case, namely, the specific time, place, and contents of the false representations, along with the identity of the person making the false representations and what the person obtained thereby. *Melder,* 27 F.3d at 1100; *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993). This application of the heightened pleading standard provides defendants with fair notice of the plaintiff's claims, protects them from harm to their reputations and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Melder,* 27 F.3d at 1100; *Tuchman,* 14 F.3d at 1067.

The PSLRA further reinforces the particularity requirement. *Coates I,* 26 F.Supp.2d at 914. The PSLRA requires that

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). To satisfy Rule 9(b) and the PSLRA, a plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman,* 14 F.3d at 1067; *Coates I,* 26 F.Supp.2d at 915. The PSLRA further requires that any allegations made on information and belief must state with particularity all facts on which that belief is formed. *Robertson,* 32 F.Supp.2d at 446; *Coates I,* 26 F.Supp.2d at 915.

### B. Scienter Requirement

In addition to the aforementioned pleading requirements, plaintiffs asserting securities fraud claims must allege facts demonstrating scienter. *Lovelace,* 78 F.3d at 1018; *Tuchman,* 14 F.3d at 1068; *Zuckerman,* 4 F.Supp.2d at 622. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud ." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976); *Lovelace,* 78 F.3d at 1018. Allegations of recklessness may satisfy the scienter requirement, however, such occasions are limited to "severe recklessness," which "resembles a slightly lesser species of intentional misconduct." *Nathenson,* 267 F.3d at 408. The Fifth Circuit defines "severe recklessness" as

limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Id.*

The PSLRA also requires that the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u–4(b)(2). When such facts are based on information and belief, the PSLRA requires that the complaint state with particularity all facts on which that belief is informed. 15 U.S.C. § 78u–4(b)(1).

### III. Analysis

**\*5** Defendants move to dismiss plaintiffs' complaint, contending it fails to satisfy the particularity requirements of Rule 9(b) and the PSLRA, and because Plaintiffs have not adequately pleaded facts raising a strong inference of scienter. These arguments are examined below.

### A. Particularity

Plaintiffs' Third Amended Complaint, which spans sixty-seven pages, represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint.[3] The purported misrepresentations and omissions are broadly organized into four sections arranged in chronological order: The first section encompasses statements made by PRG and the Individual Defendants between September 18, 1995 and November 12, 1996, Third Am. Compl. ¶¶ 29–62; the second section encompasses those statements made between November 14, 1996 and February 11, 1997, *id.* ¶¶ 64–79; the third section includes statements made between February 12, 1997 and September 4, 1997, *id.* ¶¶ 81–88; and, the fourth section identifies a series of purportedly false financial statements made in publically filed documents, *id.* ¶¶ 98, 100, 110–112. In each of these aforementioned paragraphs, the complaint identifies the alleged statement or omission, pleads the time, place, and content of the false representation, and in some cases, attempts to identify the speaker. The complaint contains no fewer than 56 purported misrepresentations.

[3]     For example, rather than identify a false statement or omission and match it with specific facts explaining how the statement is misleading, Plaintiff's Complaint catalogs scores of purportedly false statements culled from press releases and other public information. The complaint reserves explanation regarding how or why the statements are misleading for several paragraphs interspersed throughout its sixty-seven pages. *See, e.g.,* Third Am. Compl. ¶¶ 63, 80, 82, 89. Moreover, nowhere does the complaint distinguish those facts relevant to Defendants' state of mind from those facts relevant to whether a misrepresentation

is misleading. The court finds the complaint redundant and confusing. The organization of the complaint, or the lack thereof, makes it substantially more difficult for the court to assess the sufficiency of the complaint under Rule 9(b) and the PSLRA.

The court holds that Plaintiffs have failed to satisfy Rule 9(b) with respect to all purported misrepresentations or omissions that rely on "group pleading." Rule 9(b) requires Plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams, 112 F.3d at 177–78.* Before the adoption of the PSLRA, the "group pleading" doctrine created the presumption that the senior executives of a corporation may be held personally liable for misrepresentations or omissions contained in public statements attributed to or issued by the corporation. *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 759 (N.D.Cal.1997). Although there exists some debate in the district courts whether or not the group pleading doctrine survived the enactment of the PSLRA, this district has come to the resounding conclusion that it does not. *See Coates I,* 26 F.Supp.2d at 916 ("The PSLRA codifies a ban on group pleading.") (Fitzwater, J.); *Zishka v. American Pad & Paper Co.,* No. 3:98–CV–0660–M, 2000 WL 1310529, at *1 (N.D.Tex. Sept. 13, 2000) ("[T]his Court rejects the notion of 'group pleading,' and 'group publication' and concludes that such concepts ... did not survive the adoption of the PSLRA.") (Lynn, J.); *Lemmer v. Nu–Kote Holding, Inc.,* No. 3:98–CV–0161–L, 2001 WL 1112577, at *7 (N.D.Tex. Sept. 6, 2001) ("The group pleading doctrine is inconsistent with the particularity requirements of the PSLRA....") (Lindsay, J.); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* No. 4:00–CV–355–Y, slip op. at 6 (N.D.Tex. March 12, 2001) ("The Court initially finds that Plaintiffs' complaint fails because of its reliance on group pleading.") (Means, J.); *Calliot v. HFS, Inc.,* No. 3:97–CV–09241–I, 2000 WL 351753, at *5 (N.D.Tex. March 31, 2000) (dismissing complaint based, in part, on plaintiffs' use of group pleading) (Lindsay, J.); *Branca v. Paymentech, Inc.,* No. 3:97–CV–2507–L, 2000 WL 145083, at *8 (N.D.Tex. Feb. 8, 2000) (same) (Lindsay, J.). Thus, the PSLRA requires plaintiffs to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *In re Silicon Graphics, Inc.,* 970 F.Supp.2d at 752 (emphasis added).

**\*6** With few exceptions, the complaint is replete with instances of such group pleading. For example,

the complaint repeatedly asserts that Moore, D'Amico, Owen, and Bingham: "reviewed and approved" misleading reports issued by securities analysts,[4] disseminated false information during healthcare-conference presentations and road-shows,[5] issued false statements during conference calls to shareholders, analysts, money managers, and others,[6] and that Owen and Bingham signed the Form 10–Q's filed with the SEC.[7] Plaintiffs fail to identify any statements or omissions attributable specifically to either D'Amico or Owen, and in thirty-one references to Bingham, none contains any statements attributable to him apart from a group of individuals. The PSLRA and Rule 9(b) require Plaintiffs to identify the particular individual who made the misstatement or omission. Plaintiffs cannot avoid the bar on group pleading by simply identifying the constituents of a group of defendants in rote and conclusory fashion. Plaintiffs cannot satisfy Rule 9(b) by attributing statements or omissions to the corporation without any identification of the officer or director responsible for making the statement.[8] *See Coates v. Heartland Wireless Communications, Inc,* 55 F.Supp.2d 628, 633 n. 3 (N.D.Tex.1999) ( *"Coates II"* ) (finding statements attributed solely to corporation insufficiently particular under Rule 9(b) and the PSLRA).

[4]     *See, e.g.,* Third Am. Compl. ¶¶ 35, 35, 39, 46, 48, 50, 54, 55, 56, 59, 61, 62, 68, 69, 70, 72, 73, 76, 77, 79.

[5]     *Id.* ¶¶ 30, 31, 43, 57, 78.

[6]     *Id.* ¶¶ 37, 52, 66.

[7]     *Id.* ¶ 100.

[8]     *See, e.g., id.* ¶¶ 28, 41, 42, 44, 60, 81, 83, 85, 88.

The court thus concludes that Plaintiffs have failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA with respect to statements or omissions contained in the Third Am. Compl. ¶¶ 28, 30, 31, 34, 35, 37, 38, 39, 41, 42, 43, 44, 46, 48, 50, 52, 54, 55, 56, 57, 59, 60, 61, 62, 66, 68, 69, 70, 72, 73, 76, 77, 78, 79, 81, 83, 85, 88, 100.

### B. Scienter

The PSLRA states that a securities fraud complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Plaintiffs must "set forth

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

specific facts to support an inference of fraud." *Lovelace,* 78 F.3d at 1018. "A plaintiff may not rely on boilerplate or conclusory allegations to satisfy its pleading obligations." *Coates II,* 55 F.Supp.2d at 633. These facts, when "assumed to be true" must "constitute persuasive, effective, and cogent evidence from which it can logically be deduced that defendants acted with intent to deceive, manipulate, or defraud." *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 422 (N.D.Tex.2000) (*"Coates III"*). "A mere reasonable inference is insufficient to survive a motion to dismiss." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir.1999). The Fifth Circuit, in *Nathenson,* recently clarified what "patterns of facts ... may be pleaded in order to create the 'strong inference' of either intentional misconduct or severe recklessness." 267 F.3d at 409. Before *Nathenson,* there existed some uncertainty in this circuit whether the motive and opportunity test for establishing scienter survived the passage of the PSLRA. *See id.* at 410. After an exhaustive analysis of the pleading requirements in various other circuits, and a review of the PSLRA's legislative history, the Fifth Circuit determined that

> **\*7** [w]hat must be alleged is not motive and opportunity as such but particularized facts giving rise to a strong inference of scienter. Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but it would seem to be a rare set of circumstances indeed where those allegations alone are both sufficiently persuasive to give rise to a scienter inference of the necessary strength....

*Id.* at 412. Thus, the district court may consider evidence demonstrating a defendant's motive and opportunity to commit fraud so long as the totality of the allegations raises a strong inference of fraudulent intent. *Nathenson,* 267 F.3d at 411–412. When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required. 15 U.S.C. 78u–4(b)(3)(A); *Coates II,* 55 F.Supp.2d at 634.

#### 1. Motive and Opportunity

*a. Allegations Related to the Use of Stock as Currency*

Plaintiffs' scienter theory rests primarily on the PRG and the Individual Defendants' purported motivation to maximize PRG's stock price to complete a large number of acquisitions. Only by completing acquisitions, Plaintiffs contend, could PRG meet earnings and growth expectations. Plaintiffs articulate this theory in ¶ 26 under the heading "PRG's and Individual Defendants' Motive for Participation in the Wrongful Course of Conduct":

> The Company and its top officers had strong motives to inflate the stock price. They wanted to pursue an accelerated acquisition program, because growth by acquisition provided the only way that they could foster the perception in the business community that PRG was a "growth" company, thereby ensuring a substantially inflated stock price. Because the Company did not have the cash necessary to pay for the acquisitions that the Individual Defendants wanted to make, PRG had to pay for them by issuing or selling stock or securities related to its stock to raise cash to pay for part of the acquisition prices. A high stock price was also important to the Individual Defendants because a material part of their net worth consisted of PRG's stock and the Company needed to maintain the appearance that it was profitable.

Third Am. Compl. ¶ 26. Judge Fitzwater twice rejected this scienter theory in a case involving PRG and several of the same individual defendants. *See RGB Eye Assocs., P.A. v. Physicians Resource Group, Inc.,* No. 3:98–CV–1715–D, slip op. (N.D. Tex May 13, 1999) (*"RGB I"* ); *RGB Eye Assocs., P.A. v. Physicians Resource Group, Inc.,* No. 3:98–CV–1715–D, 1999 WL 980801 (N.D.Tex. Oct. 27, 1999) (*"RGB II"* ). In *RGB I,* the court held that a "company's animus to inflate its stock price because it is expanding through acquisitions and is primarily paying for them with common stock is indistinguishable from a motive to inflate

Schiller v. Physicians Resource Group, Inc., Not Reported in F.Supp.2d (2002)
2002 WL 318441, Fed. Sec. L. Rep. P 91,722

its stock price to ensure a successful public offering." *RGB II,* 1999 WL 980801 at [*]3. This does not create a strong inference of fraud because, if held to be adequate, it "would almost universally permit an inference of fraud." *Id.* at [*]9; *See also Mortensen v. AmeriCredit Corp.,* 123 F.Supp.2d 1018, 1023 (N.D.Tex.2000) ("[A]ssertions that would almost universally be true, such as the desire to raise capital, or successfully bring a public offering to fruition, economic self-interest, and the desire to maintain good relationships with suppliers, encourage retailers, forestall lenders, and protect one's executive position, are inadequate of themselves to plead motive.") (citations omitted).

**\*8** Plaintiffs contend the amended complaint in this case differs from the *RBG* complaints in two relevant respects. First, Plaintiffs claim the present complaint, unlike the complaint in *RGB I* or *RGB II,* details each of the specific acquisitions made during the class period that used stock as currency. *See* ¶ 15, 29, 58. These allegations, according to Plaintiffs, plead with particularity the dates, number of shares, and the reasons behind each of the transactions. While the court agrees that the present complaint may satisfy Rule 9(b) in this regard, the court nevertheless finds Plaintiffs' motive theory unpersuasive. The court in *RGB I* and *RGB II* held that such generalized or universal allegations of motive are insufficient to establish scienter as a matter of law. This court agrees. In other words, Plaintiffs' motive theory does not fail for lack of particularity, but because in any transaction involving a combination of stock and cash, "[o]ne could always infer that the purchaser had acted with intent to 'preserve its capital.' " *RGB II,* 1999 WL 980801, at [*]9.

Second, Plaintiffs claim that the present complaint, unlike the complaint in *RGB II,* alleges a stronger form motive. Plaintiffs argue that PRG's very existence was premised on a "growth by acquisition" business model. This fact, they suggest, adds weight to their motive theory because the entire business would fail should PRG and the Individual Defendants be unable to complete a large, and presumably never-ending set of acquisitions. These allegations do not bolster or give any added weight to Plaintiffs' motive theory. Instead, the court finds Plaintiffs' theory circular and confusing. Under Plaintiffs' theory, the defendants artificially inflated the stock price to complete acquisitions, but found they must complete acquisitions, many of them without engaging in due diligence, solely to inflate the stock price and increase earning and growth. However characterized, Plaintiffs' motive theory boils down to one already rejected in both *RGB I* and *II,*

namely, that the defendants sought to cheapen the cost of expansion by using a mix of cash and stock as currency.

Accordingly, the court holds that Plaintiffs' first motive theory does not meaningfully enhance any strong inference of scienter.

*b. Allegations Related to Defendants' Wealth*

Plaintiffs also allege as motive that Defendants inflated the stock price "because a material part of their net worth consisted of PRG stock." Third Am. Compl. ¶ 26. "To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission." *Coates II,* 55 F.Supp.2d at 642 (citations omitted). Allegations regarding compensation, without more, do not sufficiently plead a motive to commit securities fraud. *See Melder,* 27 F.3d at 1103; *Tuchman,* 14 F.3d at 1068 (finding no inference of scienter based on personal compensation where Plaintiffs did not aver that Defendants sold or purchased stock during the class period); *Nathenson,* 267 F.3d at 420 ("[A]llegations that corporate officers and directors would benefit from enhancing the value of their stock ... are likewise insufficient to support a strong inference of scienter."). Here, Plaintiffs do not allege that Defendants purchased, sold, or engaged in any other improper stock transaction during the class period. Absent any allegation that Defendants acted in their own self-interest to obtain concrete benefits, the court finds no inference of scienter. *See Melder,* 27 F.3d at 1102 (finding no "readily apparent" motive to commit securities fraud where complaint contains no allegation corporate defendants profited from inflated stock values).

**\*9** Accordingly, the court concludes that Plaintiffs have failed to plead a strong inference of fraud based on personal gain.

*c. Allegations Related to Andersen's Motive*

Plaintiffs allege that Andersen was primarily motivated to engage in securities fraud because it feared the public would learn that the consulting services it allegedly performed with respect to PRG's management information and accounting systems had failed. Ps. Br. at 23. This motive is by no means clear from the face of the complaint. Under the heading "Arthur Andersen's Motive for Participation in the Wrongful Course of Conduct," paragraph 27 states

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

> Arthur Andersen was motivated ... by its desire to retain PRG as a client, to continue to generate the substantial fees from its audit and review engagements, and to secure additional business from the Company including the more profitable consulting business. The partners responsible for the PRG engagement were particularly motivated to participate in the wrongdoing alleged because their incomes were directly tied to the fees generated from the engagement.... It also wanted to maintain and increase its market share for auditing, accounting, and consulting services in Texas and also in the managed care industry.

Third Am. Compl. ¶ 27. It is not until paragraphs 118 and 121(c) do Plaintiffs allege that Andersen "set up PRG's initial MIS and consulted extensively on its information systems." Third Am. Compl. ¶ 118; *see also* ¶ 121(c) ("Because [Andersen] had designed PRG's MIS and continued to consult with the Company about the system, the auditors were very familiar with its weaknesses."). As pled, Plaintiffs fail to provide particularized facts that support this theory. Absent the conclusory allegation that Andersen set up PRG's initial management information systems, Plaintiffs plead no other facts that indicate what services and systems Andersen provided to the company, the level of Andersen's involvement after it had "initially" set them up, when these initial systems were activated, or how Andersen became aware of the systems' failure. Further, Plaintiffs ask the court to assume that these management and accounting systems did in fact fail, a proposition that, as the court explains below, is not itself pleaded with sufficient particularity to support a strong inference of fraud.

Plaintiffs' remaining allegations concerning Andersen's purported motive do not meaningfully enhance any inference of fraud. In *Melder,* the Fifth Circuit rejected similar motive allegations even before the adoption of the PSLRA. 27 F.3d at 1103 (finding insufficient as motive for securities fraud allegations that accounting firm sought to "protect and enhance fees," "maintain and increase its market share," "increase the income received" by firm partners, and "maintain its competitive position" among other accounting firms). Plaintiffs' remaining motive theories are the same type of boilerplate, generic allegations that the *Melder* Court found insufficient, and that could be alleged against any accounting firm engaged in the audit and consulting business. Accordingly, the court does not find that Plaintiffs' motive theory with respect to Andersen meaningfully enhances an inference of fraud.

### 2. Conscious or Severely Reckless Behavior

**\*10** Absent an apparent motive to commit fraud, "a plaintiff can plead scienter 'by identifying circumstances that indicate conscious behavior on part of the defendant, though the strength of the circumstantial evidence must be correspondingly greater' " *Coates II,* 55 F.Supp.2d at 635 (quoting *Tuchman,* 14 F.3d at 1068). The conscious behavior standard is more stringent, and requires a strong inference that defendant knew the statement or omission was false or misleading when made. *See Coates III,* 100 F.Supp.2d at 424.

A Plaintiff may also plead scienter based on severe recklessness. "A Defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Lovelace,* 78 F.3d at 1018 n. 2. When basing scienter on severe recklessness, the facts must present "strong circumstantial evidence of that recklessness and must, in fact, approximate an actual intent to aid in the fraud being perpetrated." *Coates III,* 100 F.Supp.2d at 424 (internal citations omitted); *see also Greebel,* 194 F.3d at 199 (noting that recklessness is closer to a lesser form of intent). Plaintiffs may not rely on rote conclusory allegations that Defendant "knowingly" or "recklessly" did something, but must instead plead with particularity facts that indicate Defendants either knew, or recklessly disregarded, information that should have been disclosed to the investing public. *Melder,* 27 F.3d at 1104.

Plaintiffs may not rely on fraud by hindsight to establish a claim for securities fraud. *See, e.g., Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim for securities fraud." *Coates III,* 100 F.Supp.2d at 429 (quoting *Stevelman v. Alias Research Inc.,*

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

174 F.3d 79, 84 (2d Cir.1999). A plaintiff must plead facts demonstrating that the statements or omissions alleged were fraudulent when made. *Thornton v. Micrografx, Inc.,* 878 F.Supp.2d 931, 934 (N.D.Tex.1995). Plaintiffs may not "scize upon disclosures in later reports and allege they should have been made in earlier ones." *Calliot,* 2000 WL 351753, at * 8.

Plaintiffs allege that the Individual Defendants had access to internal corporate data and other non-public information that contradicted their public statements about the success of PRG's business and acquisition strategy. [9] A review of the complaint shows that Plaintiffs attempt to plead scienter based on the following alleged facts, statements, and omissions: (1) that PRG and the Individual Defendants failed to conduct adequate due diligence before making acquisitions; (2) that contrary to PRG's purported "sophisticated" MIS and "strong operational and financial controls," the Individual Defendants and PRG failed to monitor existing operations; and, (3) that in order to overstate revenues, net income, and EPS, the Individual Defendants caused PRG to violate GAAP and SEC regulations. [10]

[9] *See* Third Am. Compl. ¶ 21. As explained elsewhere, "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In *Coates I,* the court noted that an "unsupported general claim of the existence of confidential company reports is insufficient to survive a motion to dismiss." 26 F.Supp.2d at 920. The court further noted that to support an inference of fraud, Plaintiffs must "provide more details about the alleged negative internal reports, such as the report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information." *Id.* at 92.

In this case, Plaintiffs fail to provide any facts that support its information and belief allegation that the Individual Defendants had access to any such internal information. The complaint fails to identify what type of information they had access to, if any, the contents of such unnamed documents, or even which of the several individual defendants were in possession of this information. Accordingly, to the extent that Plaintiffs attempt to plead

scienter on information and belief based on "internal corporate documents" or other "non-public information," the court holds that such allegations, without more, are insufficient under the heightened pleading standard of Rule 9(b) and the PSLRA, and thus cannot support a strong inference of fraud.

[10] Plaintiffs' allegations regarding scienter further demonstrate the tension between the group pleading doctrine and the PSLRA. The complaint fails to plead scienter with respect to any of the defendants individually. The complaint also fails to identify any corporate agent when attempting to attach scienter to PRG alone. Instead, Plaintiffs make allegations regarding the Defendants' collective state of mind. In paragraphs 63, 80 and 82, for example, Plaintiffs generally aver scienter with respect to PRG or the Individual Defendants as a group. *See, e.g.,* Third Am. Compl. ¶ 63 ("The positive statements made by defendants ... were each known to be or were recklessly disregarded by them as false and misleading when made."); ¶ 63(a) ("PRG and the Individual Defendants ... knew or recklessly disregarded ..." EquiMed's overstated assets); ¶ 63(p) ( "the Individual Defendants knew that the process of integrating ... would take much longer ..."); ¶ 80(a) ("PRG did virtually no due diligence."); ¶ 82 ("Individual Defendants knew of, but did not disclose, the negative effect of the EquiMed acquisition on revenue and operations.").

These allegations do not support a strong inference of fraud because they do not plead scienter with regard to any Individual Defendant or corporate officer. The court might find plaintiffs' scienter allegations deficient on this basis alone. *See Coates I,* 26 F.Supp.2d at 916–17 ("Plaintiffs must properly plead wrongdoing and scienter as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within [the company]."). In an abundance of caution, and because several of the alleged misrepresentations or omissions are attributed to Moore alone, the court will examine each of the theories that Plaintiffs claim support an inference of scienter.

Case 4:21-cv-02473 Document 29-40 Filed 03/08/22 in TXSD Page 11 of 15
Schiller v. Physicians Resource Group, Inc., Not Reported in F.Supp.2d (2002)
2002 WL 318441, Fed. Sec. L. Rep. P 91,722

*a. Allegations Related to Due Diligence*

**\*11** Plaintiffs first allege that PRG and the Individual Defendants failed to engage in adequate due diligence before making the EquiMed acquisition. Paragraph 63(a) alleges

> Contrary to their representations ... PRG did virtually no due diligence before making acquisitions. For EquiMed, it never obtained separate, accurate, and complete financial statements of Equivision ... before completing the acquisition. Moreover, no inquiries were done by the Company in connection with any of the EquiMed New York state practice groups that were acquired. PRG and defendants knew or recklessly disregarded that revenues from the acquired EquiMed practice groups would decline because New York state does not allow fees to be split with non-doctors nor can corporations practice medicine.... PRG did not even obtain EquiMed's financials before making the $54–million cash acquisition.

Third Am. Compl. ¶ 63(a). These allegations do not create a strong inference of fraud. First, Plaintiffs do not state with sufficient particularity what due diligence PRG and the Individual Defendants engaged in prior to the EquiMed acquisition, or for that matter, any other acquisition made during the class period. Nowhere do plaintiffs provide any specific facts that allege the level of due diligence accomplished on other acquisitions, which other acquisitions were completed without adequate due diligence, or which of the Individual Defendants participated or otherwise involved themselves in the due diligence process. Instead, Plaintiffs make the conclusory allegations that PRG did "virtually no due diligence" before completing this, and perhaps other, acquisitions. The court cannot find, based on these allegations, that defendants' conduct in connection with the due diligence process constitutes an extreme departure from the standards of ordinary care. The court refuses to make the inferential leap required to transform the allegation that PRG did *"virtually* no due diligence" (emphasis added) into a

factual allegation that PRG *did no due diligence at all.* Finally, even assuming that such facts were pled with specificity, the failure to engage in due diligence before closing an acquisition does not automatically support an inference of fraud. *See, e.g., Brogen v. Pohlad,* 933 F.Supp. 793, 799 (D.Minn.1995) (failing "to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud.").

Plaintiffs' second allegation contends that the Individual Defendants knew, but did not disclose, that revenues would decline because new York state does not allow fee-splitting with non-doctors or corporations. Had Defendants conducted adequate due diligence, Plaintiffs claim, the Individual Defendants would have discovered and disclosed the existence of these purported illegal agreements. Plaintiffs ignore that Defendants did, in fact, warn investors that such "anti-kickback" or "fee-splitting" laws could adversely affect PRG's business operations. In a May 14, 1996 prospectus, for example, Defendants disclosed under the heading "Government Regulation" that "[s]everal states ... have adopted laws similar to the "anti-kickback" and "anti-referral" laws that cover patients in private programs as well as government programs." Def. PRG's App. "Tab D" at 11–12. This paragraph warns investors that "[a] determination of liability under any such laws could have a material adverse affect on PRG." *Id.* at 12. Defendants included similar or identical disclosures in prospectuses dated June 23, 1995, *id.* "Tab A" at 8; February 14, 1996, *id.* "Tab B" at 11–12; July 25, 1996, *id.* "Tab E" at 7; August 26, 1996, *id.* "Tab F" at 5; and January 2, 1997, *id.* "Tab G" at 7. The existence of these disclosures in no fewer than six prospectuses filed with the SEC substantially undermines any inference of scienter based on the these purportedly illegal practice management agreements. *See Lovelace,* 78 F.3d at 1019–20 (finding no inference of scienter after noting that defendants disclosed certain risk factors in prospectuses filed with the SEC).

*b. Allegations Related to PRG's Management Information and Accounting Systems*

**\*12** Plaintiffs next allege that PRG's "sophisticated" management information systems and "strong operational and financial controls" were inadequate to monitor existing operations and to integrate the acquired practices. Paragraph 63(c) asserts

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

> The Company could not generate accurate monthly financial statements for the practices it supposedly managed, which resulted in persistent disputes with them, including their refusal to pay disputed receivables to PRG.

Third Am. Compl. ¶ 63(c). Paragraph 63(e) further alleges that

> PRG's accounting department was overwhelmed—it lacked adequate personnel, systems, or controls to monitor existing operations, let alone cope with the increasing number of acquisitions. As a result, the Company could not generate accurate financial statements for its individual practices or the parent public company.

*Id.* ¶ 63(e). These allegations are framed in conclusory terms and are based on hindsight, and therefore do not raise a strong inference of fraud. The complaint fails to identify with particularity which monthly financial statements were inaccurate, how they were inaccurate, the number or nature of the inaccuracies, or when, if ever, these financial statements were disputed. Nor does the complaint specify which individual practices disputed their financial statements or what particular statements were in dispute. The complaint does not even specify, except in conclusory terms, that any of the Individual Defendants knew of these inaccuracies or when they became aware of them. Plaintiffs argue that PRG's internal accounting problems were so pervasive and severe the Individual Defendants were reckless in not knowing about them, yet Plaintiffs identify only one practice that experienced problems with its payroll. Without a stronger factual predicate, the court cannot, based on so few well-pleaded factual allegations, find strong circumstantial evidence of reckless conduct that would give rise to an actionable inference of fraud. Finally, even assuming that PRG experienced accounting and information failures, "the securities laws simply do not guarantee sound business practices" *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d

357, 361 (1st Cir.1994) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

*c. Allegations Relating to PRG's Failure to Follow GAAP*
Finally, Plaintiffs assert that PRG and the Individual Defendants violated generally accepted accounting principles and relevant securities and exchange regulations. Specifically, paragraph 98 alleges:

> In order to overstate PRG's revenues, net income, and EPS during the Class Period, the Individual Defendants caused the Company to violate GAAP and SEC rules by improperly recognizing revenue on management services for which it could not reasonably expect ever be paid due to its woefully inadequate internal controls, which made collection improbable. PRG failed to adequately accrue reserves for its uncollectible accounts receivable and receivables from affiliates, and failed to account for financial impairment caused by the over-valuation of EquiMed when it became aware of the need to write off EquiMed's assets.

**\*13** Third Am. Compl. ¶ 98.

As a general rule, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Lovelace,* 78 F.3d at 1020 (quoting *Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990); *see also Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."). In *Lemmer,* this court recognized that GAAP requirements "often require the substantial application of judgment to the totality of circumstances." *Lemmer,* 2001 WL 1112577, at *10. "The term 'generally acceptable accounting procedures' ... encompass[es] a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

of acceptable procedures when that accountant prepares a financial statement." *Lovelace,* 78 F.3d at 1021 (citations omitted).

Plaintiffs allege that Defendants improperly recognized revenue from management services for which it could not reasonably expect to recover. Third Am. Compl. ¶ 98. In similar fashion, Plaintiffs contend that PRG failed to accrue adequate reserves for its uncollectible accounts receivable and receivables from affiliates. *Id.* Plaintiffs fail to state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-(b)(2). To establish a strong inference of scienter, plaintiffs must provide additional facts that describe what accounts receivable were uncollectible, when they became due, why they are presently uncollectible, and perhaps most importantly, why the Individual Defendants knew that they could not expect to recover on the accounts at the time such statements or omissions were made.

Plaintiffs also fail to state with any particularity what percentage of the accounts were uncollectible, what proportion of accounts were uncollectible in relation to all of its accounts, what reserves were allocated, or what reserves Plaintiffs believe should have been taken. They also have not alleged the "significance of the overstated receivables in relation to [the company's] total financial picture." *Coates II,* 55 F.Supp.2d at 639 (holding inadequate under Rule 9(b) pleading that alleged defendants overstated receivables but did not provide facts that support overstatement was material); *see also Shushany v. Allwaste, Inc.,* 992 F.2d 517, 522 (5th Cir.1993) (holding inadequate under Rule 9(b) complaint that did not specify whether accounting adjustments were material); *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992) (finding inadequate allegations concerning reserve allocations where plaintiff failed to allege what reserves were or what they should have been). Absent greater particularity, the court cannot determine whether these alleged GAAP violations constitute "an extreme departure from the standards of ordinary care." *Nathenson,* 267 F.3d at 408. As pleaded, Plaintiffs' allegations in this regard do not support a strong inference of fraudulent intent.

 **\*14** In its current form, Plaintiffs' complaint pleads fraud by hindsight, suggesting that Defendants "must have" known that certain accounts were uncollectible and that reserves should have been accrued. As evidence of scienter, Plaintiffs point to comments made during a meeting in late November

1997 by Defendant D'Amico. In this meeting, Plaintiffs allege that D'Amico admitted, *inter alia,* that PRG lacked the necessary accounting systems to generate reliable Form 10–Q's, that PRG could not add more practices because of internal control problems, and that a number of the acquired practices experienced diminishing bottom lines. Third Am. Compl. ¶ 93. Plaintiffs bolster D'Amico's "admissions" with a December 1997 news article and with comments made in mid-January by PRG's new President and Chief Operating Officer, Peter G. Dorflinger. Third Am. Compl. ¶¶ 94, 95. All of these "admissions" post date the class period. To be sure, the statements and "admissions" made by D'Amico, Dorflinger, and other Board members indicate that PRG and some of the Individual Defendants were aware of a number of accounting inaccuracies by late November 1997 and early 1998; however, contrary to what Plaintiffs allege, none of these comments suggests that the Individual Defendants knew or recklessly disregarded PRG's accounting errors at the time these "errors" were made.

Plaintiffs also allege that PRG failed to account for the financial impairment caused by its overvaluation of EquiMed. The overvaluation resulted in a one-time $31.75 million charge for uncollectible accounts receivable and practice closings and created a $18 million loss in the third quarter of 1997. Plaintiffs maintain that PRG and the Individual Defendants knew by at least June 30 of the second quarter of 1997 that EquiMed's assets were overstated. As evidence of Defendants' scienter, Plaintiffs point to a $45 million counterclaim filed in June 1997 by PRG against EquiMed in an arbitration proceeding. PRG announced these counterclaims in a June 17, 1997 press release stating, in relevant part, that PRG's counterclaims "include, among others, breach of representation and warranties, fraud and conversion." Def. PRG's App. "Tab P"; *see also* Third Am. Compl. ¶ 85. Plaintiffs contend that PRG should have taken the impairment as the time it became aware of the need, or the latest, sometime in the second quarter of 1997.

The timing of a write-off alone, however, cannot support an inference of fraud. *See Coates III,* 100 F.Supp.2d at 429. Instead, Plaintiffs must allege that "the need to write-down ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Id.* (internal citations omitted). Although PRG did not take a write-down in the second quarter of 1997, the company did disclose this information to the market when it became of aware that an accounting adjustment might be necessary. This disclosure substantially undermines any

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

strong inference of fraud based on the impairment PRG later deemed necessary. The court rejects the opportunity to find a strong inference of fraud based on these allegations, particularly in light of Defendants' disclosure.

**\*15** Finally, Plaintiffs allege that the magnitude of the accounting errors creates an inference of fraud. Paragraph 110, for example, estimate

> the extent of PRG's misstated financial results, related to the Company's improper revenue recognition and failure to adequately reserve for uncollectible accounts receivables, was to misstate its 1996 operating income (excluding merger charges) by a minimum of $1 million for Q1, $1.3 million for Q2, $1.9 million for Q3, and $3.0 million for Q4, and by a minimum of $4.0 million, and $6.0 million of Q1 and Q2 1997 respectively. PRG's 1995 results were similarly misstated due its [sic] improper revenue recognition on uncollectible reserves.

Third Am. Compl. ¶ 110. To the extent these estimations are based on information and belief, Plaintiffs nowhere in the complaint "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Thus, the court cannot determine from the face of the complaint how these estimations were made, whether they are reasonable, or whether they support an inference of fraud.

### d. Allegations Related to Andersen's Intentional Misconduct and Severe Recklessness

Plaintiffs maintain that Andersen possessed actual knowledge or recklessly disregarded that PRG's 1995 and 1996 year-end, and 1997 quarterly financial statements were false and misleading. As evidence of Andersen's scienter, Plaintiffs point to the same facts they claim support an inference of fraud against PRG and the Individual Defendants; namely, that (1) Andersen knew, but disregarded, that PRG did not conduct adequate due diligence on a number of its acquisitions, (2) Andersen knew, and disregarded, PRG's lack of adequate internal controls, and finally, that (3) Andersen

violated GAAS and GAAP by (i) recognizing improperly revenue that would not be realized, (ii) failing to accrue adequate reserves for the uncollectible receivables, and (iii) failing to account for the financial impairment of EquiMed. Plaintiffs further allege that the magnitude of fraud supports a strong inference of scienter.

In support of these general allegations, Plaintiffs do not distinguish those facts they allege support an inference of fraud against PRG with those facts that support such an inference against Andersen. Instead, the paragraphs that contain allegations regarding PRG and the Individual Defendants' scienter also contain boilerplate averments that Andersen "intentionally or recklessly concealed" certain "true facts ... which were 'red flags.' " *See, e.g.,* Third Am. Compl. ¶ 63. These "red flags" include the same general and conclusory allegations that the court, as explained above, determined were insufficient to support an inference of fraud on the part of PRG and the Individual Defendants. [11] These allegations do not support any greater inference of fraud when alleged against Andersen alone.

[11]   Specifically, these "red flags" include allegations that PRG never obtained EquiMed's complete financial statements, Third Am. Compl. ¶ 63(a), that EquiMed could not generate monthly or quarterly financial reports, *id.,* that PRG did not generate accurate monthly financial statements for its affiliated practices, *id.* ¶ 63(c), that the acquired practices refused to pay disputed receivables, *id.,* that PRG lacked the personnel and infrastructure required to integrate its acquisitions, *id.* ¶ 63(j), and that PRG's core revenue growth was slowing, which put pressure on its ability to achieve EPS growth, *id.* ¶ 63(o), among others.

Moreover, nowhere does the complaint plead with sufficient particularity facts that support how Andersen knew or became aware of these "red flags." Plaintiffs generally base Andersen's knowledge on its participation in "audits and reviews," "consulting services," and "its review of [PRG's] prospectuses and other SEC filings." Third Am. Compl. ¶ 63. Plaintiffs also claim that Andersen was aware of PRG's internal control deficiencies because Andersen "set up" PRG's information and accounting systems, *id.* ¶ 118, and because Andersen advised PRG of weaknesses in PRG's internal control structures in connection with its year 1997 audit, *id.* ¶ 97. The complaint does not, however, match any of these general averments with any particularized facts

2002 WL 318441, Fed. Sec. L. Rep. P 91,722

that support the claim that Andersen knew or recklessly disregarded this information at the time it conducted its audits and quarterly reviews. As pleaded, the complaint generally avers knowledge or severe recklessness with respect to all of the Defendants, and asks this court to assume, based on conclusory averments of fact, that Andersen participated in a scheme to defraud investors. Plaintiffs cannot rely on Andersen's eventual resignation as the PRG's auditor to support an inference of fraud. That Andersen later became aware of, and ultimately disclosed, PRG's internal accounting control problems does not support the inference that Andersen had knowledge or recklessly disregarded that information earlier.

**\*16** Taken together, Plaintiff's allegations do not raise a strong inference of fraudulent intent and therefore do not adequately plead scienter with respect to any Defendants. 15 U.S.C. §§ 78u–4(b)(2); *Robertson,* 32 F.Supp.2d at 477. Plaintiffs criticize the piecemeal examination of its claims, however, the PSLRA "does not permit the Court to look at the broad picture to determine if Plaintiff has properly plead its claim." *Lain v. Evans,* 123 F.Supp.2d 344, 348 (N.D.Tex.2000). Accordingly, all Defendants are entitled to dismissal of the § 10(b) and Rule 10b–5 claims against them in light of Plaintiffs' failure to plead sufficient facts that establish a strong inference of the required state of mind. 15 U.S.C. § 78u–4(b)(3)(A).

IV. Plaintiffs' Remaining Claims

Plaintiffs' also allege violations of section 20(a) of the Exchange Act. This section defines controlling person liability, providing that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person....

15 U.S.C. 78t(a). Where a primary violation by the "controlled person" has not been adequately pleaded, the court should also dismiss a section 20(a) claim. *See Coates I,* 26 F.Supp.2d at 923. Because Plaintiffs have failed to plead a violations of section 10(b) and Rule 10b–5, Plaintiffs' section 20(a) claim must also be dismissed. *See Coates II,* 55 F.Supp.2d at 645.

V. Conclusion

For the reasons stated above, the court concludes that Plaintiffs have failed to plead fraud with sufficient particularly to state a claim under the federal securities laws. The court also concludes that Plaintiffs have not adequately alleged scienter with respect to any Defendants.

Plaintiffs have requested the court to allow further amendment of their Complaint if it believes that they have not stated a claim upon which relief can be granted. The decision to allow amendment of the pleadings is within the sound discretion of the district court. *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994). In determining whether to allow an amendment of the pleadings, the court considers the following: undue delay in the proceedings, undue prejudice to the opposing parties, timeliness of the amendment, and futility of the amendment. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.,* 690 F.2d 1157, 1163 (5th Cir.1982).

The court concludes that Plaintiffs have stated their best case after four bites at the apple. As the Fifth Circuit has stated, "[a]t some point, a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Jacquez v. Procunier,* 801 F.2d 789, 792–93 (5th Cir.1986). The court believes that permitting a fifth pleading attempt would be an inefficient use of the parties' and the court's resources, would cause unnecessary and undue delay, and would be futile. For the reasons stated herein, Plaintiffs' claims are dismissed with prejudice. Judgment will be entered by separate document as required by Fed.R.Civ.P. 58.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 318441, Fed. Sec. L. Rep. P 91,722

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.