United States District Court
Southern District of Texas

**ENTERED**

**February 23, 2023**

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE CONCHO RESOURCES INC.,  §
SECURITIES LITIGATION.  §
§
§  **CIVIL ACTION NO. 4:21-CV-2473**
§
§
§
§
§
§
§

**MEMORANDUM AND RECOMMENDATION**

This is a securities fraud class action brought on behalf of a class of investors who purchased Concho common stock during the period of February 21, 2018, through July 31, 2019, (the "Class Period"), and allege they were damaged thereby. (Dkt. No. 25.) Pending before the Court is Defendants' Motion to Dismiss under Rule 12(b)(6).[1] (Dkt. No. 29.) Based on a thorough review of the motion, arguments, and relevant law, the Court **RECOMMENDS** the Motion be **DENIED.**

I.      **BACKGROUND**

The Plaintiffs commenced this class action on July 30, 2021. (Dkt. No. 1.) The Consolidated Complaint ("Complaint") was filed on January 7, 2022. (Dkt. No. 25.) Defendants' Motion to Dismiss was filed on March 8, 2022. (Dkt. No. 29.) Plaintiffs allege Concho Resources Inc., ConocoPhillips, as successor-in-interest to Concho, Timothy A. Leach, Jack F. Harper, C. William Giraud, E. Joseph Wright, and Brenda R. Schroer (the "Individual Defendants" and

---

[1] On April 7, 2022, this case was referred to the Undersigned for all purposes pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure 72. (Dkt. No. 30.)

together with Concho and ConocoPhillips, the "Defendants") made misstatements and omissions which amount to securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 implementing § 10(b) of the Act. (Dkt. Nos. 1, 25.) Plaintiffs categorize the allegations into four areas, including: declaring the transition to large-scale development as a success and touting its benefits despite having no basis to know it would work as intended;[2] falsely stating that "manufacturing mode" was the product of gradual learning and verified techniques despite being experimental;[3] issuing non-risk adjusted production forecasts despite internal understanding that such forecasts were inaccurate and overstated;[4] and stating that large-scale development projects with higher risk exposure were balanced by projects with lower risk exposure, when in reality exposure was company-wide.[5] (Dkt. No. 25 at 5.) The Court must decide whether the complaint states a claim against Defendants for violations of § 10(b) of the Act and Rule 10b-5 and if it states a secondary § 20 control person claim against the Individual Defendants. Defendants challenge two elements of the § 10(b) claim: falsity and scienter, and also challenge the § 20 claim for lack of properly pleading a primary claim. (Dkt. No. 29.)

Plaintiffs' claims are based on personal knowledge; Concho's filings with the U.S. Securities and Exchange Commission ("SEC"); research reports by securities and financial analysts; transcripts of Concho's conference calls with analysts and investors; Concho's presentations, press releases, and reports; news and media reports concerning Concho, interviews with several former Concho employees; Concho stock price data; and other significant data. (Dkt. No 25 at ¶ 1.)

---

[2] (*See* Dkt. No. 25 at ¶¶ 172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297.)

[3] (*See* Dkt. No. 25 at ¶¶ 172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297.)

[4] (*See* Dkt. No. 25 at ¶¶ 173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272.)

[5] (*See* Dkt. No. 25 at ¶¶ 172, 181, 192, 198, 202, 226, 244, 261, 284.)

### A.  Concho Before the Class Period

Concho was a publicly traded oil and natural gas company engaged in the acquisition, development, exploration, and production of oil and natural gas properties in the Permian Basin. (*Id.* at ¶ 30.) Defendant Leach was Concho's Chief Executive Officer ("CEO") and the Chairman of the Company's Board of Directors beginning in 2006. (*Id.* at ¶ 23.) Defendant Harper was appointed as Concho's President in May 2017, and as Concho's Chief Financial Officer ("CFO") in May 2016; he served as CFO until January 2019. (*Id.* at ¶ 24.) Harper oversaw Concho's operations as well as the Company's legal, accounting, information technology, and security functions. (*Id.*) Defendant Giraud was appointed as Concho's Executive Vice President ("EVP") in May 2017 and was named as the successor for Concho's Chief Operating Officer ("COO"). (*Id.* at ¶ 25.) In January 2019, he was appointed as COO. (*Id.*) Defendant Wright preceded Giraud as Concho's COO from November 2010 until January 2019. (*Id.* at ¶ 26.) Wright served as Concho's Executive Vice President from November 2013 until January 2019. (*Id.*) Defendant Schroer was Concho's Treasurer and Senior Vice President during the class period, Chief Accounting Officer until January 2019, and CFO beginning in January 2019. (*Id.* at ¶ 27.)

Prior to the class period, Concho used established methods of vertical and horizontal drilling in the Permian Basin. (*Id.* at ¶ 35.) Even though industry predicted producers in the Permian Basin like Concho were at the "end of gains[,] efficiency[,] and improvement," Concho believed it had found the next significant technological advancement to "maximize ultimate recovery, efficiencies and returns." (Dkt. No. 29 at 1, 12; Dkt. No. 25 at ¶ 242.) Concho's production was at an "inflection point" which the company claimed would allow for a technological transition to maintain its established efficiencies, returns, and risk management in its historically well-managed portfolio. (Dkt. No. 25 at ¶ 35, 242.) If the technological transition

was successful, it would create a renaissance in the Permian Basin resembling the advent of hydraulic fracturing. (Dkt. No. 29 at 1.)

The end of 2017 marked Concho's transition to "large-scale development," "manufacturing style development," "manufacturing mode," or "cube development." (Dkt. No. 29 at 12.) Concho wanted to retain its position as "a leader in [] development . . . in the Permian" Basin and this was "one way that [Concho planned on] doing that." (Dkt. No. 25 at ¶ 188.) Concho allocated "93% of [its] capital program [] to drilling and completion activities, with approximately 65% of that capital directed towards large-scale manufacturing projects." (*Id.* at ¶ 171.) Defendants advised it "expect[ed] to grow total production at a compound annual growth rate of 20% from 2017 to 2020." (*Id.* at ¶¶ 171, 185.) On December 31, 2017, Defendants estimated proved reserves increased 17% from year-end 2016, proved developed reserves increased 26% from year-end 2016, and that proved developed reserves represented about 70% of total proved reserves.[6] (*Id.*)

---

[6] Proved Reserves are reserves that are estimated commercially recoverable with a 90% level of certainty and carry the lowest level of risk. (*Id.* at ¶ 41.) The market relies on a company's Proved Reserves to establish the valuation of a Company because the ability to generate future revenue depends upon how much of its discovered resources can be reliably extracted. (*Id.*) Publicly traded oil and natural gas companies are required to include Proved Reserves information in a company's financial reporting to assist investors and analysts in modeling future returns. (*Id.*) Proven Reserves are broken up into three categories:

(a) "Proved Developed Producing" (PDP) reserves are those for which the well is completed, and the reserves are currently being produced;
(b) "Proved Developed Non-Producing" (PDNP) reserves are those for which the well-bore exists, and the reserves are identified but are not currently producing;
(c) "Proved Undeveloped" (PUD) reserves are those determined to be economically recoverable utilizing existing technology and assets, but where the well has not yet been completed. PUD represents the lowest risk adjustment for uncompleted oil and natural gas projects.

(*Id.*) A reserve may also be categorized as Probable, Possible, or Contingent. (*Id.* at ¶¶ 42–43.) Probable reserves are those with a likelihood of commercial extraction of over 50% but under 90%, while Possible Reserves are those with odds of commercial extraction under 50%, but higher than 10%. (*Id.* at ¶ 42.) Contingent resources are those estimated to be potentially recoverable, but

Defendants 2017 annual report of SEC Form 10-K included a risk factor that warned, "[m]ulti-well pad drilling and project development may result in volatility in our operating results" and it is used "where practical." (*Id*. at ¶ 180.) The 10-K also indicated the proved reserves in the Northern Delaware Basin were estimated at 35% of total proved reserves, and the Southern Delaware Basin was at 15% of total proved reserves. (*Id*. at ¶ 182.)

### B.  Concho's Representations During the Class Period

In February 2018, Concho announced 7-well, 8-well, 10-well, and 13-well large-scale developments that showed "strong performance" and "outstanding results'" which would serve as an empirical point for moving forward with larger projects in the North and South Delaware Basin. (Dkt. No. 29 at 13; Dkt. No. 25 at ¶¶ 57, 170.) Defendant Leach assured investors that Concho's prior efforts had "validated well spacing, lateral placement, and completion design" which allowed them to "give guidance [and] forecast the things that [they were] aware of at the time [they] give the guidance." (Dkt. No. 25 at ¶ 58, 186.) Defendant Harper explained the Company "had successfully made the transition" because they "modeled the outcome as [they] see it based on the spacing that has either already happened or will happen in the future." (*Id.* at ¶ 328.)

In March 2018, Concho announced plans to speed up development of large-scale projects, despite simultaneously acknowledging the company "did not 'have all the answers'" and the program was a "work in progress." (Dkt. No. 29 at 13.) Harper equated the large-scale development with what industry commonly refers to as cube development and alluded to this being the method it would use to begin a 20 plus well project.[7] (Dkt. No. 25 at ¶¶ 59, 329.) Concho

---

which are not considered to be commercially recoverable with any reasonable degree of certainty due to any number of contingencies. (*Id.* at ¶ 43.)

[7]       https://energyhq.com/2018/08/is-cube-development-the-future-of-shale-production/ (describing cube development as a technique that uses a three-dimensional, multi-layer approach that is costly, risky, complex, and multi-variable dependent).

indicated the "well documented" benefit of the technique was the "drilling synergies" that "generates cost savings . . . [and] higher recoveries" and would be a "more effective way to complete [] wells." (*Id.* at ¶¶ 59–60, 199, 329.) Despite an "increased percentage of capital going towards . . . larger-scale projects" Harper assured investors they should "expect more of the same" in the 2018 budget as was seen "in previous years." (*Id.* at ¶ 197.) This was seemingly because, as he indicated, the large-scale projects were "dispersed amongst [Concho's] asset base." (*Id.* at ¶¶ 8, 201, 329.)

Concho then announced it would acquire RSP Permian, Inc. for $9.5 billion in an all-stock transaction. (*Id.* at ¶¶ 203–05.) Leach indicated the purchase was expected to realize more than $60 million in annual corporate savings and over $2 billion in operational synergies. (*Id.* at ¶ 206.) The company also planned to move the newly acquisitioned assets into manufacturing mode to "generate cost savings and minimize[] parent-child locations."[8] (*Id.* at ¶ 207.) The $2 billion in operational synergies Harper described was going to be achieved by "preventing parent-child relationship[s through] larger-scale development [and] shared infrastructure." (*Id.* at ¶ 209.)

In May 2018, Concho announced six multi-zone "Key Projects" planned for 2018 and 2019, including a 6+ well project, an 8+ well project, three 10+ well projects, and a 23 well project. (*Id.* at ¶¶ 38, 220.) The 23 well project was called the "Dominator" and received regulatory approval the previous month, in April. (*Id.*) The project began early stages of development in April and completion in February 2019. (*Id.* at ¶ 38.)

---

[8] https://jpt.spe.org/what-is-really-happening-when-parent-and-child-wells-interact (describing a study on the interactions on parent and child wells in oil and gas production and explaining the parent-child relationship describes a subsurface challenge where wells negatively interact with one another, effecting each well's production performance; the issue is traditionally addressed through proper well spacing to mitigate the negative effects of too tightly spaced wells).

Harper was already projecting that "large-scale project development [would] drive the quarterly production growth trajectory. Noting a great start to the year, [they] raised [the] full year 2018 production outlook" because "results [had] been very strong." (*Id.* at ¶¶ 61, 332.) Giraud explained they could make this projection because it was not a "switch get[ting] flipped" or a big step change" from the company's historical approach. (*Id.* at ¶ 62.) He explained the evolution the company went through, from first 2-well projects, to 3-well projects, to then 6 and 8-well projects, all leading to what the optimal development plan would be in simultaneously developing a square mile. (*Id.* at ¶ 224.) He acknowledged that in order to achieve this scale a company needs a very sizable balance sheet and technical team to withstand the challenges of the transition to the development mode technique. (*Id.* at ¶ 223.)

Giraud assured investors the company went through a discovery, delineation, and development process to allow for an empirically based transition to the new technique. (*Id.*) This included knowing what the well "spacing need[ed] to be" because the company was further down the line and in a "later stage of innings" for data collection. (*Id.* at ¶ 69.) Leach explained that the positive first quarter operational and financial results were due to the company-wide focus on large-scale product development that enabled it to "maximize recoveries, efficiencies, and returns." (*Id.* at ¶ 213.)

In August 2018, Giraud explained the company coordinated over a year in advance to develop the plan for the Dominator project, and it was supported with data from a steady years long evolution of testing different spacing within a drilling zone and between drilling zones. (*Id.* at ¶¶ 66, 231, 335.) He touted the technique as unlocking significant value because it optimized well performance and increased resource recovery. (*Id.* at ¶ 234.)

In September 2018, Leach acknowledged the Dominator was an "extreme example of manufacturing mode" and Concho's "most aggressive multi-well pad." (*Id.* at ¶ 72.) He explained the transition's purpose was to minimize parent-child interference and that the wells continued to get better and more cost-efficient. (*Id.* at ¶ 71, 239.) Leach assured investors that the company took a portfolio approach to mitigating risk and the scale of the program helped to manage the risk of the technique. (*Id.* at ¶¶ 71–72.) He further explained Concho's ability to "balance risk" was "the most important thing that [Concho] do[es] that creates success for the company." (*Id.* at ¶¶ 72, 242, 258.)

In October 2018, Concho projected that production growth would increase by more than 25% from fourth quarter 2018 to fourth quarter 2019, and the planned activity would drive two-year crude oil and total production compound annual growth rates of 30% and 25% respectively from 2018 to 2020. (*Id.* at ¶ 253.) Giraud again assured investors that the new technique would minimize the impact of parent-child effects because the company built "type curves" and other "internal modeling on the results they [had] already seen." (*Id.* at ¶ 70.) He explained that the results were consistent with the company's expectations, and as such, it was baked into the 2019 and 2020 production outlook. (*Id.*) Leach acknowledged that minimizing the effects would be different by zone and area, but despite its complexity, the company was developing a program to minimize interference. (*Id.*)

In February 2019, Defendant Harper stated that Concho's manufacturing mode development "continue[s] to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments." (*Id.* at ¶¶ 71, 275.)

In March 2019, Harper told investors Concho has "historically been pretty conservative in the way [it] accounted for inventory and well spacing" and "that's been [Concho's] view up till now." (*Id.* at ¶¶ 72, 283, 340.)

In May 2019, Defendant Leach stated that he saw "strong early production out of our latest projects, including the Dominator," later adding that "returns look pretty good for us" and that such projects "drive[] a lot of value creation." (*Id.* at ¶¶ 67, 281, 292, 341.)

## C.  Concho's Representations After the Class Period

On July 31, 2019, Concho released its financial results for the second quarter 2019 after the close of trading. (*Id.* at ¶¶ 298, 299.) Concho advised it reduced its active rig count, production targets were being reduced for the remainder of the year, but there would not be a parallel reduction in its capital budget. (*Id.*) Concho blamed the Dominator and it's too-tight well spacing for the disparity between its financial projections and in its financial results. (*Id.*) But Concho would reveal the next day that the Dominator was not the only densely spaced project impacting its financial results. (*Id.* at ¶ 304.) Concho announced it would immediately change its trajectory to wider spaced wells in an attempt to reign in the expenditure of transitioning to manufacturing mode in order to stay on budget. (*Id.* at ¶ 303.) Concho stock price decreased by 22% from the July 31, 2019 closing price of $97.68 per share. (*Id.* at ¶ 305.) The stock traded at the highest volume, 17,881,152 shares, for the entirety of the Class Period by over 5 million shares. (*Id.*) The stock closed at $75.97 per share on August 1, 2019. (*Id.*) Analysts were at a consensus. Concho "blindsided the market with a sharp reduction in 2H19 oil volume guidance," because of the "sharp contrast to what was contemplated in early 2019" and the resulting about face to wider well spacing. (*Id.* at ¶ 306.) In the following days, analysts decreased Concho's stock price target repeatedly, indicated the decline placed the company at risk of being acquired, and challenged the

company to "reconcile the updated oil guide from the previous oil guide and quantify how much of the lower oil output was driven by the spacing tests vs. lower activity and why capex remained the same." (*Id.* at ¶ 306.)

The outlook did not change in the following months. Leach indicated in 2020 and beyond fewer wells would be developed, all using wider spacing, but that even so, there would not be an increase in capital efficiency until 2020. (*Id.* at ¶¶ 309–10.) The company reduced its proved reserves by 16% primarily due to the "Company's recent capital programs that included projects testing tighter well spacing." (*Id.* at ¶¶ 31–43, 314–15.) Concho also released a more exacting risk warning related to tight well spacing. (*Id.* at ¶ 313.) On October 19, 2020, ConocoPhillips and Concho announced that they entered into an agreement to combine the two companies in a transaction valued at $9.7 billion, nearly the same price Concho had acquired RSP. (*Id.* at ¶ 317.)

## II.    LEGAL STANDARDS

A complaint in a federal securities fraud claim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" but must also meet additional heightened pleading requirements under Rule 9(b). Fed. R. Civ. P. 8(a)(2).

### A.  Rule 9(b)

Rule 9(b) is interpreted strictly and requires the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted); Fed. R. Civ. P. 9(b). The Private Securities Litigation Reform Act ("PSLRA") further requires plaintiffs to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and for "each act or omission alleged" to be false or misleading, "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing 15 U.S.C. § 78u-4(b)(1)-(2) & (b)(2)(A)).

### B.  §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, and Securities and Exchange Commission (SEC) Rule 10b-5 provide an implied private right of action based on material misstatements or omissions in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Section 10(b) is the general antifraud provision of the Act and states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>         . . . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j. Rule 10b–5, as adopted by the SEC, implements § 10(b) and makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 20(a) of the Exchange Act asserts liability for control-person liability. 15 U.S.C. § 78t(a). It creates liability for anyone "who, directly or indirectly, controls any person liable [for Exchange Act violations] shall also be liable . . . to the same extent as such controlled person." A

plaintiff must establish a primary violation before the defendant can be found liable under § 20(a), and courts may only hold control persons liable jointly and severally with the primary violators for damages the primary violation caused. *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Defendants, likewise, cannot be grouped together in a control person claim. *Id.* A control person is not liable if they acted in good faith and did not directly or indirectly induce the act or acts constituting the violation. 15 U.S.C. § 78t(a).

To state a claim under § 10(b) and Rule 10b-5 a plaintiff must allege: "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (quoting *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520–21 (5th Cir.1993)). A complaint must specify: (i) the statement, identity of the speaker, when and where the statement was made; and (ii) explain why the statement was false and misleading. *See Nathenson v. Zonagena, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

Scienter is defined as the mental state embracing "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty*, 565 F.3d at 207 (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005)). Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Nathenson*, 267 F.3d at 408 (applying the PSLRA standard which requires that factual allegations are pleaded with particularity which support a strong inference of scienter); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).

A three-step approach is required to analyze a strong inference of scienter at the motion to dismiss stage. *Indiana Elec.*, 537 F.3d at 533. First, all factual allegations must be taken as true. *Tellabs*, 551 U.S. at 322. "Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice." *Indiana Elec.*, 537 F.3d at 533. Courts must consider all plausible explanations for the claimed conduct and consider whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether individual allegations viewed in isolation meets the standard. *Tellabs*, 551 U.S at 323; *Abrams*, 292 F.3d at 431. Third, the strong inference of scienter must be "cogent" and at least as compelling as an opposing inference drawn from the facts alleged, not just reasonable or permissible. *Flaherty*, 565 F. 3d at 208. "Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter." *Abrams*, 292 F.3d at 430 (quoting *Nathenson*, 267 F.3d at 410–12).

"[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, 551 U.S. at 325. Disclosure is required "only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotations omitted). For that reason, "[a] claim of incomplete disclosure is actionable only if what they said is misleading. In other words[,] it must affirmatively create an impression of a state of affairs that differs in a

material way from the one that actually exists." *Indiana Elec.*, 537 F.3d at 541–42 (internal quotations omitted). Yet, "a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248–49 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover on meritorious claims). An omission is material if there is a "substantial likelihood that the disclosure of omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 818 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019).

The Fifth Circuit does not permit group pleading for scienter because it fails to meet the required heightened pleading standard. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015). Courts are required to look at the corporate official(s) state of mind "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Elec.*, 537 F.3d at 533 (quoting *Southland*, 365 F.3d at 366). Thus, for a court to determine if the complaint sufficiently pleads scienter, it must only address the allegations that adequately show scienter on the part of the officers. *Southland*, 365 F.3d at 367.

### C. Rule 12(b)(6)

Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 500 (5th Cir. 2020) (quotations omitted).

In reviewing a 12(b)(6) motion, a court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). In a securities fraud claim, "[i]f the plaintiff fails to satisfy the pleading requirements for scienter, the district court shall, on defendant's motion to dismiss, dismiss the complaint." *In re Enron Corp.*, 238 F. Supp. 3d at 826 (citations and internal quotations omitted).

## III.   DISCUSSION

The Court will address Plaintiffs' allegations that Defendants knowingly and/or recklessly spoke in misleading half-truths while omitting the true risks associated with manufacturing style development. Plaintiffs break the allegations into four categories of conduct, and the Court will

proceed category by category, to comprehensively determine if the statements were material misstatements or omissions; if scienter was properly alleged; and if any statement is protected by the PSLRA's safe harbor provision. *See Owens*, 789 F.3d at 537 (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552–55 (5th Cir. 2007) (employing two-step method)). Before addressing each category, the Court will address any discounting that should be attributed to the former employee ("FE") accounts, which are key to Plaintiffs' Complaint sufficiently alleging misstatements, omissions, and scienter.

Plaintiffs allege Defendants' adoption of manufacturing mode was an experimental combination of highly risky development techniques that used too tightly spaced wells. (Dkt. No. 33 at 4–5.) Investors were unaware of the true risk exposure of transitioning to manufacturing mode. (*Id.* at 5.) Plaintiffs' Complaint includes statements from nine FEs. Plaintiffs contend the allegations are supported by FE accounts and Defendants post-Class admissions. (*Id.*)

A. **Former Employee Accounts**[9]

According to Concho's FEs the company's projects were unsupported by data, the risks associated with the densely spaced wells were common knowledge, Defendants purposefully under-risked the models when issuing financial forecasts, and Defendants knew real time that the projects were performing under company expectations and projections. (Dkt. No 33 at 2–3.)

Courts must apply a discount to confidential witness' allegations because the anonymity obstructs a courts ability to weigh the inference from their accounts against other possible inferences. *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 207 (5th Cir. 2023) (citing *Indiana Elec.*, 537 F.3d at 535). "Courts may rely on assertions from

---

[9] The Complaint, and accordingly the Court, references all FEs in the masculine to protect their identities. (Dkt. No. 25 at 1 n.1.)

confidential sources if the person is 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Six Flags Ent. Corp.*, 58 F.4th at 208 (citing *Owens*, 789 F.3d at 542 n.11) (instructing that "the important assertions must be factual and not mere conclusory statements") (citation omitted).

FE-1 joined the company before the Class period. (Dkt. No. 25 at ¶¶ 74, 101.) He was a member of the technical staff that designed and executed the Dominator project and worked with the "Aries"[10] database which was used to track his team's analysis of the project, the risk profile of the project, and also contained the historical risk profiles of previous lower risk projects. (*Id.*) He reported to managers who reported to Giraud, who reported to Harper, who reported to Leach. He was referred to by other FEs as having a prominent role with the project, and was technically solid and sound. (*Id.*)

FE-2 is a former Concho Lead Reservoir Engineer from 2012–2017 and Advisor from 2017–2020; he reported to the VP of Delaware Basin, who reported to the SVP of Assets, who reported to Giraud. (*Id.* at ¶¶ 107, 109–10.) He conducted a post-audit of the Dominator project near the end of 2019 among other studies in the same or adjoining area; other FEs refer to him as the frack guru or head guru. (*Id.*)

FE-3 is a senior technical expert who worked in the applied technology team. (*Id.* at ¶¶ 112–13.) He advised the geoscience team working on the Dominator project in 2018, expressed that there was very strong evidence that drilling the wells so closely in the project was problematic,

---

[10] https://www.landmark.solutions/ARIES-Petroleum-Economics (explaining the software enables companies to deliver accurate economic data to justify projects, plan budgets, report reserves and assess prices).

and concluded that fracture modeling on the planned tightly spaced wells was not conducted because of how the project failed. (*Id.*)

FE-4 is a former Senior Reservoir Engineer from 2014 to 2019 who was hired to educate employees about multi-well pads as part of a group that examined the economics of potential projects. (*Id.* at ¶¶ 125–27.) He was in an adjacent group to the Dominator project team; and he participated in the annual budget meetings where teams presented to management in an attempt to secure funding for their competing project. (*Id.*)

FE-5 is a former Landman who recalled the Dominator project as being controversial within the company, as unsupported by several team geologists, as unsupported by past tightly drilled projects which failed, and concluded from his interactions that there was not scientific justification for the project. (*Id.* at ¶¶ 131–32.)

FE-6 is a former Superintendent Well Planner from 2011–2018. (*Id.* at ¶¶ 136–38.) He was not directly involved with the Dominator project but noted it did not appear the project was supported by sufficient data, and he concluded that Concho seemingly was unable to adjust to geological changes that occurred because of the tightly spaced wells. (*Id.*)

FE-7 is a former Division Order Analyst from 2018–2020. (*Id.* at ¶¶ 139–40.) He was a member of the team responsible for the Dominator project's oil pad. (*Id.*) He determined that the economics would not work according to the company's projections because the increase in wells would cause pressure to decrease exponentially, thereby significantly affecting production rates. (*Id.*)

FE-8 is a former Senior Geologist from 2011–2019 and he attended meetings where the Dominator project was discussed. (*Id.* at ¶¶ 143–45.) He described the company's historical development strategy as being an intensive, technical, and gradual process to determine the best

well numbers and spacing prior to the project. (*Id.*) He attributed the company's historical success as the driver for the executive team to abandon its previously measured strategy and push the project forward, such that any warnings were ignored to maintain its success. (*Id.*)

FE-9 is a former Senior Data Specialist who worked in the IT department from 2018 to 2020 and attended several meetings where company executives were asked to explain Concho's poor stock performance. (*Id.* at ¶¶ 148–49, 153.) Giraud and Leach attributed the decline to the Dominator project's poor performance and the land acquisition of RSP Permian. (*Id.* at ¶¶ 150–53.)

The Complaint alleges "job descriptions, individual responsibilities, and specific employment dates" for all FEs. *Cent. Laborers'*, 497 F.3d at 552. The detail in which the FEs are described tends to show that they were in a position to know first-hand facts regarding the transition to manufacturing mode, the risks associated with taking on a project like the Dominator, the system used to house project risk profiles, and the risk profile that was applied to the Dominator when making production and financial projections. *See Six Flags Ent. Corp.*, 58 F.4th at 208 (quoting *Tellabs*, 513 F.3d at 712) (indicating when "confidential sources consist of persons who from the description of their jobs were in a position to know at first hand the facts, and there is convincing detail to the information they provide, there is reason to credit the informants' reliability") (internal quotations omitted). The FEs assertions are largely factual and not conclusory statements.

All FEs are described with sufficient particularity. But those statements which are conclusory statements and largely secondhand accounts should be discounted because their reliability and personal knowledge are in question. The Complaint's details about the responsibilities of FE-1, 2, 3, 4, 7, 8, and 9's positions are directly relevant to the events at issue

in this case and their roles substantiate that those FEs would have the necessary knowledge for minimally discounting their anonymity. The Complaint's accounts of FE-5 and FE-6 are largely conclusory and speak to the conclusions of others whose opinions would be directly relevant to the issues in this case. FE-5's accounts are relevant to the overall issue of the transition to manufacturing mode not being properly risked, but his lack of direct experience on the Dominator project or other large-scale project warrants discounting his accounts of other employee's opinions. (Dkt. No. 25 at ¶¶ 131–34.) FE-6's accounts about fracking in general are relevant to understanding the geologic anomalies of fracking that are likely necessary to develop a properly risked project. Yet, he does not offer any direct factual information as opposed to conclusions based off other employee's opinions. Accordingly, FE-5 and FE-6's conclusory statements should be generally discounted.

The Complaint's FEs establish that the risks and lack of technological basis for the transition to manufacturing mode were viewed negatively by the company's technical teams for a lack of a technical, data-driven, foundation. Their accounts show that large-scale development projects were not tests, as the majority of the company's budget and resources were allocated to the projects. Their accounts also show the Individual Defendants had access to databases which properly quantified the actual risks associated with large-scale, tightly spaced, development but the data was not used in financial projections. The FEs corroborate that the Individual Defendants were regularly and repeatedly warned of the risks by senior technical staff in project and financial meetings, but the warnings were ignored and omitted from the company's statements to the market. (Dkt. No. 33 at 6–9, 27–31.)

**Plaintiffs allege Defendants Extrapolated Early Success in Large-Scale Development.**

Plaintiffs allege Defendants declared the transition to large-scale development as a success and touted its benefits despite having no basis to assert it would work as intended. (Dkt. No. 25 at ¶¶ 172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297.) Plaintiffs contend that Defendants stated they had "successfully made th[e] transition" to large-scale development and touted the "outstanding results from the Company's large-scale development projects." (*Id.* at ¶¶ 170, 193.) Leach stated that the transition was "very additive" and "generate[d] cost savings." (*Id.* at ¶ 207–08.) Concho stated that any positive financial results "reflect[ed] [Defendants'] focus on large-scale project development, which enable[d] [Concho] to maximize ultimate recovery, efficiencies and returns." (*Id.* at ¶ 213.)

Plaintiffs note Concho discussed that it "benefited from strong early production out of [its] latest projects, including the Dominator." (*Id.* at ¶ 292.) The Dominator served as the company's flagship project for tight well spacing and was based on "strong results." (*Id.* at ¶ 296.) Defendants explained to investors that Concho was "on track to deliver on the $2.8 billion to $3 billion capital program" and that they "increased estimates for oil production in 2019." (*Id.* at ¶ 292.) Defendants explained Concho's "full-field development [was] all about optimizing spacing, timing and drilling and completion techniques to maximize program economics and recoveries." (*Id.* at ¶ 293.) It was celebrated as "an important contributor to [Concho's] momentum." (*Id.*) Defendants stated returns looked "pretty good" and the Dominator, along with "other larger [projects]," would allow Concho to "deliver really compelling returns while continuing to learn" (*Id.* at ¶¶ 294–95.)

According to FE-1, it was apparent early on that production was below projections, and the Company quickly started to see concerning "pressure degradation." (*Id.* at ¶¶ 74, 101.) FE-1 indicated that Defendants were immediately aware that the Dominator and other large-scale projects were underperforming and not hitting projections. (*Id.* at ¶¶ 101–03.)

According to FE-2, the Dominator wells were technically qualified as child wells which produce less oil and were uneconomical compared to production medians. (*Id.* at ¶¶ 107, 109–10.)

According to FE-3, the area's close well spacing led to interference which meant it was "over-completed." (*Id.* at ¶¶112–13.) The technical teams doubted the Dominator's success, but Defendants purported its early and on-going accomplishment despite being advised otherwise. (*Id.* at ¶¶ 114–15.) FE-3 indicated the completion phase at Dominator was done in three sets. (*Id.* at ¶119.) Issues started to emerge with the second phase, which failed to reach maximum production, and the third phase showed "immediate decline." (*Id.*)

According to FE- 5, the Dominator wells were "absolutely" too tight, and he did not talk to a single geologist or engineer who felt otherwise. (*Id.* at ¶¶ 131–32.) According to FE-9, Defendant Giraud explained that the spacing for the Dominator project was "bad," the issues "should've been caught a lot sooner," and there were too many wells. (*Id.* at ¶ 151.)

**Plaintiffs allege Defendants lacked a Technological Basis for the Experimental Production Technique.**

Plaintiffs allege Defendants falsely stated to investors that manufacturing mode was the product of gradual learning and verified techniques despite being experimental. (Dkt. No. 25 at ¶¶ 172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297.) Plaintiffs allege that during the Class Period, Giraud stated that the production transition was not a "dramatic change" or a "switch get[ting] flipped," but that Concho was "in a later stage of innings" in determining ideal well spacing because they had already "come through discovery." (*Id.* at ¶¶ 8, 62, 69, 224, 225, 229, 333.) Further, Plaintiffs note that Giraud assured that the well spacing was the product of a "steady evolution" over the past "years." (*Id.* at ¶¶ 66, 231, 335.) Harper indicated that "drilling synergies," were "well documented." (*Id.* at ¶¶ 5, 59, 199, 329). Harper also stated that they had "modeled the

outcome as [they saw] it based on spacing that [had] already happened or will happen in the future." (*Id.* at ¶¶ 69, 194, 328.)

According to FE-3, there was no technical basis for Dominator. (*Id.* at ¶¶ 112–13.) Concho did not conduct fracture modeling, or ignored modeling, which was highly unusual based on past practices and thus failed to adequately weigh the risks. (*Id.*) He indicated "halfway decent" modeling would have shown the project would fail. (*Id.* at ¶¶ 116–17.) The Vice President of Geoscience and Technology and former Geoscience Manager at Concho told FE-3 that completion parameters were not modified to account for the proximity of wells at the Dominator. (*Id.* at ¶ 118.)

According to FE-8, Concho historically employed a gradual process to collect data, which was abandoned for the Dominator. (*Id.* at ¶ 145.) FE-2, referred to as a "frack guru," conducted a well drilling study for Concho that indicated only eight to twelve wells should have been drilled in the area selected for the Dominator project. (*Id.* at ¶ 108.) FE-8 agreed with FE-2's well-spacing risk conclusions. (*Id.* at ¶ 143.)

According to FE-4, Defendants avoided proven production methods when electing to pursue the Dominator, and the project relied on "broad assumptions," which were improperly based on a two-well model. (*Id.* at ¶ 130.)

According to FE-5 there was no scientific justification for the drilling formation at the Dominator wells because similar projects failed in the past. (*Id.* at ¶¶ 132–34.)

According to FE-6, Concho failed to gather sufficient data prior to drilling tightly spaced wells. (*Id.* at ¶¶ 136–38.)

**Plaintiffs allege Defendants used the Incorrect Risk Profile to Develop Financial Forecasts.**

Plaintiffs allege Defendants issued non-risk adjusted production forecasts despite internal understanding that the forecasts were inaccurate and overstated. (*Id.* at ¶¶ 173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272.) Plaintiffs allege that during the Class Period, Leach stated that Concho's guidance reflected what they were "aware of at the time." (*Id.* at ¶¶ 68, 186, 327.) Harper affirmed that "large-scale project development will drive the quarterly growth trajectory" when "rais[ing] . . . full year 2018 production outlook." (*Id.* at ¶¶ 61, 332.) Plaintiffs note that Giraud stated that well-spacing risk mitigation of parent-child wells had been "baked" into Concho's forecasts. (*Id.* at ¶¶ 70, 262.)

According to FE-1, Defendants issued inflated production forecasts for the Dominator and other large-scale projects. (*Id.* at ¶¶ 92–96.) He stated the Dominator only achieved a fraction of its forecasted production and most of the Class Period projects did not match what was forecasted. (*Id.* at ¶¶ 100, 102.) Even though Leach represented that returns looked pretty good, pressure degradation quickly became a concern. (*Id.*) He stated that when determining production forecasts for the Dominator, which informed public financial forecasts, Concho applied legacy risk profiles, which were inappropriate given the magnitude and spacing of wells. (*Id.* at ¶¶ 74, 80–84, 90.) He stated it was a conscious decision by Giraud to apply an incorrect risk profile to the Dominator despite the heightened risks and he ignored repeated protests from FE-1 in meetings. (*Id.* at ¶¶ 83–84, 86–88.) FE-1 indicated improper risk calculations were consistent in a majority of the projects at the time. (*Id.* at ¶¶ 91, 94.) Further, he indicated Concho failed to model for degradation due to tight-well spacing, which was against industry standards and concerning because no one would assume that tighter spaced wells did not carry increased risk. (*Id.* at ¶ 89.) He concluded Concho's financial forecasts were unreasonably high and misleading based on the failure to account for the

increased risk profile in its production forecasts because the tight well-spacing changed its entire risk profile. (*Id.* at ¶¶ 90, 97.)

**Plaintiffs allege that Defendants' Mislead Investors about the True Nature of the Portfolio Exposure.**

Plaintiffs allege Defendants stated that large-scale development projects were dispersed when exposure was company wide. (Dkt. No. 25 at ¶¶ 172, 181, 192, 198, 202, 226, 244, 261, 284.) Plaintiffs allege that during the Class Period, Harper stated Concho's large-scale projects were "dispersed amongst [Concho's] asset base." (*Id.* at ¶¶ 8, 201, 329.) The SEC Form-10K assured that multi-well pad drilling was used "where practical." (*Id.* at ¶¶ 180, 270.) According to Plaintiffs, Concho's "philosophy of having a portfolio approach to mitigate risk" was not followed from 2017 on when the company transitioned to manufacturing mode. (*Id.* at ¶¶ 72, 243, 258.) Leach assured investors that its risk mitigation "strategy [was] the same." (*Id.* at ¶ 189.) Harper indicated Concho's "view up till now" was "pretty conservative in the way [they've] accounted for inventory and well spacing" as investors had come to expect. (*Id.* at ¶¶ 72, 283, 340.) Plaintiffs note Defendants' statements informed investors to "expect more of the same" regarding its dedication to capital discipline. (*Id.* at ¶¶ 33–34, 197.)

Defendants announced that future projects would have "fewer wells per project at wider spacing," that average well spacing across all projects would increase by about 250 feet, and Concho's capital efficiency would not increase until at least 2020. (*Id.* at ¶¶ 165, 310, 316.) Plaintiffs allege in one fell swoop Defendants acknowledged the failure of their transition to manufacturing mode and began back peddling to historical approaches. Concho was later forced to reduce proved reserves by 16%, primarily due to "the Company's recent capital programs that included projects testing tighter well spacing." (*Id.* at ¶¶ 314–15.) Plaintiffs note how analysts were blindsided by the company's announcement, many commenting while the Company had

previously indicated the Dominator "was not representative of the company's development plans . . . it turns out operations were not consistent with that message." (*Id.* at ¶¶ 306, 412.)

According to FE-1, Concho's highly risky manufacturing style projects were concentrated, and not isolated "tests" as Defendants told the market. (*Id.* at ¶¶ 91–94, 97, 99.) FE-1 indicated projects with risky tight well-spacing were widespread, and that Dominator was a "reflection of everything" that was happening during the Class Period. (*Id.* at ¶ 91.) Further, he stated that 90% of Concho's 2018 budget was devoted to risky projects, and the Company lacked low risk projects to balance the risk, which was opposite to its historical practice. (*Id.* at ¶¶ 95, 97.) He concluded that the Company's tight well-spacing changed its entire risk profile. (*Id.* at ¶ 90.)

Defendants move for dismissal of all of Plaintiffs' claims. (Dkt. No 29.) Defendants contend that Concho timely, robustly, and accurately disclosed information related to the well-spacing tests. (*Id.* at 2–3.) Specifically, Defendants contend that Plaintiffs have failed to plead facts showing Defendants' statements were materially false or severely reckless; Plaintiffs have failed to plead a strong inference of scienter; and any statement is inactionable puffery, opinions, or forward-looking warranting protection under the PSLRA's safe harbor provision. (*Id.* at 3.)

Plaintiffs respond by arguing that the Complaint adequately pleads materially false and misleading statements as it shows that Defendants' statements discussing large-scale development regarding the success and benefits, technological justification, relevant production guidance, and overall concentration in the company's asset base were false and misleading because those statements created an "impression of a state of affairs" materially different than the "one that actually existed." *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016).

**B. PSLRA Safe Harbor, Opinion Statements, and Puffery**

Defendants argue that many of the statements Plaintiffs allege are inactionable because they are forward-looking statements accompanied by meaningful cautionary language. (Dkt. No. 29 at 18–19 & n.10.) A statement is inactionable if it is "identified as a forward-looking statement[] and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). A mixed present/future statement is not entitled to safe harbor when the forward-looking statement's falsity is about a present fact. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014). When future outcomes are accompanied by reassurances about present progress towards those deadlines, it is not a forward-looking statement, especially when the crux of the allegation about why it is misleading is rooted in the present. *See Six Flags Ent. Corp.*, 58 F.4th at 216 (explaining when viewing statements in isolation they can be considered forward-looking, but when they are considered in context and concern present information, they are not forward-looking). "Courts cannot apply a blanket safe harbor for all forward-looking statements." *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 850 (N.D. Tex. 2018). "Each statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245. "The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372.

Defendants indicate those statements that contain financial projections and future performance cannot form the basis of Plaintiffs' claims. (Dkt. No. 29 at 18.) Defendants contend the company disclosed detailed risk factors in its Form 10-Ks addressing the risks associated with the forward-looking statements. (*Id.* at 7, 19 & n.11.) As Plaintiffs correctly note, Defendants use a supplementary appendix that labels most statements as protected under the safe harbor provision,

but the appendix does not instruct the Court what portion of the statement is protected, what cautionary language should be applied to which parts of those statements, and often labels several paragraphs of text with several potential exceptions with no indication of what exception applies to which part of the statement. (Dkt. No. 29-2 at 1–31.)[11] Plaintiffs assert that any forward-looking statement regarding financial projections and future performance was made in reference to the present strength of large-scale development and the present transition to manufacturing mode. (*Id.* at 21–22.) Plaintiffs further argue that safe harbor does not apply to material omissions of fact. (*Id.* at 22.) The Court agrees with both assertions.

Here, Defendants' statements identified that contain forward-looking statements rely on present and historical facts. *In re Apache Corp.*, No. 4:21-CV-00575, 2022 WL 4277350, at *4 (S.D. Tex. Sept. 15, 2022), *report and recommendation adopted sub nom. Plymouth Cnty. Ret. Ass'n v. Apache Corp.*, No. 4:21-CV-00575, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) ("Even a cursory review of the alleged misstatements [contained in appendices] . . . indicates that many are statements of current or historical fact, which are not protected by the PSLRA's safe harbor.") (citing *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 799–800 (S.D. Tex. 2012) ("[T]he challenged statements are presented as a representation of [the defendant's] past achievements . . . and are not forward-looking."); *In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009

---

[11] Defendants' motion is largely "representative of those challenged" statements in the Complaint. (Dkt. No. 34 at 3 n.4; Dkt. No. 29 at 12 n.5.) Defendants have submitted an appendix in support of their motion to dismiss. The Court understands that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (citation omitted). In attaching, Defendants assist Plaintiffs in establishing the basis of the suit, however, the sixty-eight challenged statements that are contained in the appendix list between one and four reasons why it is not actionable. Defendants do not specify what portion of the statement is inactionable for each of the listed reasons. The reasons are not arguments, but a spreadsheet of conclusions. These conclusions are not properly before the Court because the Court is unable to conclude what reason applies to what portion of the statement.

WL 6325540, at *32 (S.D. Tex. July 9, 2009) ("[A] statement of historical fact cannot be protected by the safe harbor.")). The identified statements imply that the present transition to manufacturing mode was data-driven, finite, and predictable enough that it drove production and financial predictions quarter over quarter and year over year. Defendants' statements projected time and again an increase in production due to the current technique being employed. Defendants tied increased production to increased financial forecasts based on the purported data they gradually collected over a significant amount of time. Giraud indicated to investors they had data at the time of making the forecasts because it was baked into future projections. Defendants assured investors any current and future endeavor was consistent with its historically conservative approach. Defendants omitted material information regarding the baked in risk assumptions that inflated financial forecasts, the lack of data supporting the too tightly spaced wells, the ability to offset the risk incurred by the transition and thus the ability to weather the failure of transitioning to manufacturing mode.

Even so, Plaintiffs point the Court to the blanket warnings Defendants submitted in Concho's SEC filings as being inadequate to provide safe harbor if any of the statements are considered forward-looking. "Congress clearly intended that boilerplate cautionary language not constitute "meaningful cautionary" language for the purpose of the safe harbor analysis." *Lormand*, 565 F.3d at 244. Defendants claim three excerpts of cautionary language warn of the risks concerning the ability to efficiently execute large-scale development and the aggressive spacing of the Dominator project. (Dkt. 29 at 18–19.) It would seem though that the highlighted statements are a "litany of generally applicable risk factors" which would be applicable to any oil and gas exploration and production company. *Lormand*, 565 F.3d at 245. The highlighted statements do not give specific warnings of the risk exposure Concho faced when transitioning to

large-scale development; that inapplicable risk modeling was consciously being applied to the large-scale projects to under risk the projects; that these figures went to the base of the company's financial forecasts; that the large-scale projects overexposed Concho's asset portfolio to risk which put the company in jeopardy. Ultimately, they do not provide sufficiently meaningful caution about the clearly present danger that was materializing from the transition to manufacturing mode. After surveying Defendants' highlighted warnings, and drawing inferences in Plaintiffs' favor, the referenced precautionary language is insufficient to give meaningful warnings to the thirty plus statements Defendants claim they would apply. Defendants' safe harbor argument fails.

Next Defendants argue that several statements are inactionable opinions. (Dkt. No. 29 at 9.) Opinion statements are actionable if the speaker did not hold the belief expressed in the opinion, if the underlying factual assertion is untrue, or if a factual "omission makes the opinion statement . . . misleading to a reasonable person reading the statement fairly and in context." *Id.* at 185–86, 194. An "investor must identify particular (and material) facts" left out of the opinion statement, like a warning that a technique "'carrie[d] a heightened risk' of. . . exposure[,]" and allege the omission of that fact, or any other like it, from a company's statements. *Id.* at 195–96. Then "the court must determine whether the omitted fact would have been material to a reasonable investor." *Id.* at 196. "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor" and "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 186–87, 190. "The inquiry (like the one into materiality) is objective." *Id.* at 186–87 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) (noting that the relevant inquiry is the "significance of an omitted or misrepresented fact to a reasonable investor")). "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about

the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188. Thus, a statement of opinion holds the implied assertion that the opinion is justified by the underlying facts.

Here, Plaintiffs have identified particular facts going to the basis of the Defendants' opinion statements that were left out of the statement, whose omission makes the opinion statement misleading to a reasonable person reading the statement fairly and in context. The Complaint pleads that both large-scale development and appropriate well-spacing were not methodically data-driven, but instead were actually a switch getting flipped in terms of asset and resource allocation because the objective for 2018 was to figure out just how closely wells could be spaced together and how many wells could be placed on a pad by any means possible. (*Id.* at ¶¶ 75, 223–225.) *See e.g.*, *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (explaining defendants claim that "statements are inactionable puffery or merely opinion statements fails because the statements contain the allegedly false embedded fact" underlying the misrepresentation); *Edgar v. Anadarko Petroleum Corp.*, No. CV 17-1372, 2018 WL 3032573, at *12 (S.D. Tex. June 19, 2018) (instructing a plaintiff must "allege that the individual defendants were aware of the facts the plaintiffs rely on to show that they made statements that they did not believe or knew to be false [or] misleading"); *In re Plains*, *All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 919 (S.D. Tex. 2017), *aff'd on other grounds sub nom*. *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) ("To show that an estimate was false or misleading when made, the plaintiffs must allege either that the speaker disbelieved it or knew facts that a reasonable person would assume did not exist based on hearing the estimate.").

Defendants were willing to "take their lumps" in order to meet that goal despite the risk the aggressive technique held. (Dkt. No. 25 at ¶ 75.) A reasonable person reading or hearing that, "outstanding results" from the area supported moving forward with manufacturing mode; that "[t]he 2018 program is expected . . . [to] generate 20% crude oil growth and 16% to 20% total production growth"; "Concho is collecting valuable data that helps the Company optimize lateral placement, completion design and facilitates planning"; utilizing leading-edge technologies, including fiber optic monitoring, to collet . . . data with real-time and long-term implications" and many other similarly labeled opinion statements would understand the opinions to convey the company was not proceeding with a production method unsupported by the data the company actually did have, nor that the project was proceeding despite technical teams' advice, and that any projections did not have the underlying risk profile for the type of project it was. (Dkt. 29-2 at 1–2.) Here, "literal accuracy is not enough" because a company cannot "mislead[] investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). The omissions rendered Concho's attestations that manufacturing mode was gradually built, supported by a technological basis, projections were built on data reflective of the technique's risk, and the transition was an early success misleading because the excluded facts as pled by Plaintiffs show that Concho lacked the basis for making those assurances. Plaintiffs have pled facts which show that Defendants knew their gamble "was far riskier and subject to far greater undisclosed costs, write-downs, and/or risks than publicly disclosed" which is exactly what a reasonable investor would expect to know for such a wide-scale transition from the company's historical way of operating. (Dkt. No. 33 at 25.) Defendants opinion argument is without merit.

Similarly, Defendants argue that the initial Dominator results are "textbook non-actionable puffery." (Dkt. No. 29 at 13–14.) "Non-actionable puffery are statements of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Rougier*, 2019 WL 6111516, at *10 (quoting *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (internal quotation omitted). Plaintiffs have alleged specific facts to show that Defendants raised production guidance before the project came on line and during the initial stages such that investors and analysts alike had concrete expectations. Concho was asked if there were any "problems with what you have seen on some of the initial results" from the Dominator and Leach assured investors "returns look pretty good for us" and "we continue to see really strong results across our portfolio. And so, I think, that's what gave us the confidence to raise the overall annual guidance." (Dkt. No. 25 at ¶¶ 283–96.) These statements were made in the context of announcing projected increases in production which influenced the financial forecasts. These statements are too specific to categorize as general corporate optimism. Defendants' puffery argument is without merit.

## C. False and Misleading Statements and/or Omissions

"This Circuit's precedent interprets Rule 9(b) strictly, requiring the plaintiff to 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Flaherty*, 565 F.3d at 207. "In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)). A plaintiff must establish that there was a

substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Basic*, 485 U.S. at 231–32. The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004). "There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not, material because determining materiality is a 'fact-specific inquiry that requires consideration of the source, content, and context' of the allegedly omitted information." *Rougier*, 2019 WL 6111516, at *8 (citing *Matrixx Initiatives*, 563 U.S. at 43.) "Confidential witness accounts are a permissible basis on which to allege falsity." *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *23.

Defendants contend that the Complaint's identified statements regarding Concho's largescale development projects, including the success and benefits, technological justification, relevant production guidance, and overall concentration in Concho's asset base, were not false and misleading. (Dkt. No. 29 at 12–19.) The Complaint largely focuses on Defendants' failure to disclose the true nature of the risk of Concho's large-scale development projects, which make Defendants' statements concerning its benefits and progress materially misleading. (Dkt. No. 33 at 17–21.)

First, the Complaint alleges that when describing the early success of the transition to manufacturing mode, as verified by FEs, Defendants omitted the initial and ongoing cost and risk which threatened overall "production, capital efficiency, growth, asset longevity, and overall financial health." (Dkt. No. 33 at 16.) The FE accounts indicate that the initial results of the Dominator Project and other manufacturing mode projects were under company expectations from

the start. (*Id.* at 18.) Plaintiffs provided their own analysis showing that the Dominator was significantly underperforming as compared to other wells in the same region. (Dkt. No. 25 at ¶¶ 155–161.)

Second, the Complaint alleges that Defendants abandoned proven methodologies in favor of the "manufacturing" technique despite the technique lacking any technical basis, as confirmed by FEs. The Complaint further alleges that Concho's shift to manufacturing mode was not as gradual as investors were told. Instead, Plaintiffs allege that Defendants actions did not correspond with the Company's previous historical approach to learning and mobilizing accrued data. (*Id.* at ¶¶ 75, 145, 350–51.)

Third, the Complaint alleges that Defendants disregarded the risks associated with large-scale development and aggressively spaced wells. Specifically, the Complaint alleges a conscious decision by Giraud to apply an inapplicable 2-well risk profile to the Dominator despite the heightened risks of a 23-well project. (*Id.* at ¶¶ 83–84, 86–88.) Plaintiffs support their allegations with numerous FE accounts and post-Class Period events. Further, Plaintiffs allege Concho failed to model for degradation due to tight well spacing, an unheard of practice in the oil and gas industry, which directly impacted the company's financial disclosures. (*Id.* at ¶ 89.) Plaintiffs allege this practice applied to the majority of the Class Period projects. (*Id.* at ¶¶ 91, 94.) Thus, the Complaint alleges that Concho's financial forecasts were unreasonably high and misleading. (*Id.* at ¶¶ 90, 97.)

Last, the Complaint alleges that despite Defendants' regular representations that risk was spread throughout the company's portfolio of assets, projects with risky well-spacing were widespread. (*Id.* at ¶¶ 90–91.) Plaintiffs further allege Concho lacked low risk projects to balance the increase in risk from the transition to manufacturing mode, which was the opposite of its

historical practice, resulting in Concho's risk profile changing. (*Id.* at ¶¶ 95, 97.) Plaintiffs allege, and FEs confirm, Concho threw the vast majority of its budget at projects with aggressively spaced wells. The Complaint alleges that it was false and misleading that Defendants described the aggressive well-spacing technique as "tests" without equating that large-scale development and aggressive well-spacing were one and the same. (*Id.* at ¶¶ 97, 164, 231, 300, 302, 309, 310, 357.) Plaintiffs argue even if the term "test" was literally true when spoken, it misled investors about the full truth of the company's exposure to risk. Plaintiffs were unaware of the "anticipated magnitude" of the risks Concho was exposed to should the transition to manufacturing mode fail.

The Complaint identifies each alleged misleading statement, the individual speaker, the date when the statement was made, the context the statement was made, and why the statements are misleading. Given the historical approach of the company, the early affirmation of a successful transition, representations regarding a gradual transition supported by long accrued data, and inflated financial forecasts. Although Plaintiffs list largely the same boilerplate reasons for why Defendants' statements are misleading in the Complaint, Plaintiffs explanations for the falsity of Defendants' statements logically correspond with each alleged misstatement.

Next, Defendants argue any omission alleged is inactionable because it would "impose a duty of self-flagellation that is foreign to federal securities laws." (Dkt. No. 29 at 16.) While "corporate officials need not present an overly gloomy or cautious picture of the company's current performance[,]" its "public statements [must be] reasonably consistent with reasonably available data." *Abrams*, 292 F.3d at 433. "[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Six Flags Ent. Corp.*, 58 F.4th at 217. Seemingly, Defendants are arguing that disclosing that the transition to manufacturing mode employed an unverified and risky technique would go beyond the company's duty under securities laws. But this muddies what

is required here to survive a motion to dismiss. *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012) (noting that the court must draw all reasonable inferences in favor of the plaintiff in its Rule 12(b)(6) analysis, except those for scienter).

Plaintiffs have pled the type of facts omitted, the place where the omissions should have appeared, and the way in which the omitted facts made Concho's representations misleading. *See Carroll*, 470 F.3d at 1174. Plaintiffs have alleged sufficient facts to show that Defendants' omission that the transition to manufacturing mode was more of a shot in the dark technologically which ratcheted up the risk the company historically took on is material. *See Lormand*, 565 F.3d at 248 (explaining that an "omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action"). A reasonable investor would have viewed the widespread risk increase, lack of a measured technological basis for the risk increase, and inflated financial forecasts without proper reflection of that risk, as significant facts to alter the total mix of information available. *See Six Flags Ent. Corp.*, 58 F. 4th at 217 ("Once the defendants engaged in public discussions . . . they had a duty to disclose a 'mix of information' that is not misleading.").

**Plaintiffs argue Defendants Wright and Schroer are makers of statements.**

Defendants argue that Defendants Schroer and Wright should be dismissed because Plaintiffs have not alleged either Defendant made specific misstatements or omissions nor have Plaintiffs plead individual scienter. (Dkt. No. 29 at 23.) Plaintiffs argue Defendants Schroer and Wright are makers of statements for their contributions to Concho's annual SEC filings, namely their signatures. (Dkt. No. 25 at ¶¶ 180–83, 270–71.) Defendants Leach, Wright, Harper, and Schroer signed the 2017 annual report and Defendants Leach, Wright, and Schroer signed the 2018 annual report. (*Id.*) Plaintiffs contend because Schroer and Wright signed the filings they are

considered makers of the allegedly fraudulent statements and/or omissions regarding large-scale development and proved reserves. Plaintiffs allege both reports were knowingly and or recklessly false and misleading when made.

"[A] corporate statement may be charged to an officer if the plaintiff alleges the officer signed the document containing the statements." *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 7760201, at *11 (W.D. Tex. Dec. 1, 2015). "A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10–K, regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under § 10(b) for making a false statement." *In re Enron Corp. Sec.*, 258 F.Supp.2d at 587. "An allegation that the individual signed a document containing a statement ties the statement to the individual, but it does not show the individual's mental state when the statement was signed." *In re Plains*, 245 F. Supp. 3d at 908. "[B]y signing documents filed with the [SEC], [signatories] implicitly indicate that they believe that the filing is accurate and complete." *In re Enron Corp. Sec.*, 258 F. Supp. 2d at 588. Thus, Plaintiffs have adequately alleged Wright and Schroer made statements by signing the SEC 10-K Forms, which are allegedly false and misleading.

### D.  Strong Inference of Scienter

"[I]n the Fifth Circuit, a court need look only to the allegations claimed to adequately show [scienter] on the part of the [named officers] to determine whether the complaint sufficiently pleads scienter." *KB Partners*, 2015 WL 7760201, at *11 (citing *Indiana Elec.*, 537 F.3d at 533–34) (quoting *Southland*, 365 F.3d at 367) (internal quotations omitted). "[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved in issuing [statements] or was so

severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005). Scienter "encompasses reckless indifference such that the omission or misrepresentation was 'so obvious that the defendant must have been aware of it.'" *Id.* (citing *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 546 n. 3 (5th Cir. 2001)). "The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences." *Tellabs*, 551 U.S. at 324. "As a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of scienter," courts do "not need to consider additional allegations of scienter." *Hoffman v. RCI Hosp. Holdings, Inc.*, No. 4:19-CV-1841, 2021 WL 1232782, at *3 (S.D. Tex. Mar. 31, 2021) (citing *Owens*, 789 F.3d at 537).

Defendants argue that Plaintiffs have failed to allege scienter because the Complaint does not allege motive and opportunity to commit fraud; FE statements do not support a strong inference of scienter because they must be "heavily" discounted; Defendants access to information is an insufficient basis to allege scienter; and Defendants' post-Class Period statements cannot lead to an inference of scienter because they would constitute fraud-by-hindsight. (Dkt. No. 29 at 24–26, 31–32.)

Plaintiffs allege Concho and the Individual Defendants' motive for the transition to manufacturing mode was to stay relevant as "pioneers in the industry" in the "American oil and gas exploration and production . . . renaissance." (Dkt. No 25 at ¶ 3; Dkt. No. 29 at 1; Dkt. No. 33 at 3.) Plaintiffs explain because FE statements do not have to be heavily or even generally discounted, FE statements indicating Defendants had access to production databases, attended weekly meetings discussing large-scale development, and that FE-1 directly told Defendants they were incorrectly risking wells, creates a strong inference of scienter. (Dkt. No. 33 at 27–31, 32–

33.) Plaintiffs further allege that Defendants' statements, including that they had achieved the "inflection point" of large-scale development that "emphasize[d] planning and planning ahead" based on a years-long learning process of which they were in a "later stage of innings," creates a strong inference of scienter. (Dkt. No. 25 at ¶¶ 326–41.) Next, Plaintiffs allege that post-Class Period statements can support a strong inference of scienter because the statements are reflective of what was known at the time of the announcements. (Dkt. No. 33 at 32.)

Allegations of "motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers'*, 537 F.3d at 533. While "motive allegations might 'meaningfully enhance the strength of the inference of scienter,' a strong inference of severe recklessness does not depend on such an enhancement." *Spitzberg*, 758 F.3d at 685 (citing *Flaherty*, 565 F.3d at 208). "[C]onfidential source statements are a permissible basis on which to make an inference of scienter." *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *28. An officer's position with a company can support the inference of scienter only when viewed with other special circumstances which may help tip the scale in favor of an inference of scienter. *Id.*, at *27. They include "(1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions 'critical to the company's continued vitality,' (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements." *Id.* While plaintiffs cannot claim defendants intentionally mislead investors about facts defendants may have become aware of after making statements to the public, there are situations where matters occurring after the statements are "so temporally connected that they can shed light on the . . . condition of the companies at the time of the announcement." *Plotkin*, 407 F.3d at 698.

Plaintiffs have sufficiently pled circumstances constituting at least severe recklessness with respect to Defendants' overstatement of its success in large-scale development serving as the basis for the transition to manufacturing mode; Defendants' assurances to investors regarding the nature of portfolio exposure; Defendants' confirmation of a data-driven technological basis for the production technique; and Defendants' using the incorrect risk profile to develop financial forecasts. Taking these factual allegations together they would undoubtedly present an "'obvious' danger of 'misleading buyers or sellers' of Defendants['] . . . securities as to the value of the company's assets." *Spitzberg*, 758 F.3d at 684 (citing *Indiana Elec.*, 537 F.3d at 532–33). Defendants' claims that the "overtly experimental nature of Concho's progressive effort to push the boundaries" all but writes the narrative Plaintiffs allege, as opposed to the "non-culpable gloss" they aim. (Dkt. No. 29 at 34.)

Plaintiffs rely on nine FE accounts to allege a strong inference of scienter. As the Court explained above, it only generally discounts two of those accounts, and minimally discounts the remainder. FE-1 provides contemporaneous facts regarding the Defendants' motivation to push manufacturing mode as successful too early. Contrary to their public statements, the transition was largely an experiment, and Defendants were willing to conceal the true nature of risk in hopes it would pay off. (*Id.* at ¶ 75.) While Concho traditionally drilled one well at a time, Defendants were willing to shortcut the historical process to prevent the permanent loss of its resources by any means possible. (*Id.* at ¶ 351.) Defendants wanted to maintain their reputation as the "best value-creating engine in [the] industry" and "manufacturing mode" was one way they assured investors they would be able to do that. (*Id.* at ¶ 188.) These allegations enhance the strength of the inference of scienter.

Plaintiffs have pointed to specific meetings where the risk of transitioning to manufacturing mode was discussed among technical teams, reservoir engineers, management, and Giraud. FE-4 explained budget meetings would occur every year where technical teams would present to management and compete for portions of the budget. (*Id.* at ¶ 347.) When the Denominator project was chosen by management at the October 2017 meeting, other technical teams were shocked because they knew it would not work. (*Id.* at ¶ 347.) FE-1 explained Giraud led these budget meetings and there it was determined the corporate teams would handle any risk considerations. (*Id.* at ¶ 343.) Leach confirmed managing risk was the important thing his team did, indicating to investors that balancing risk allowed them to plow through the volitility of the business. (*Id.* at ¶ 242.) According to FE-5 the project was pushed top down by the executive team. (*Id.* at ¶ 348.) Giraud was the driving force. *Id.*

FE-8 explained that FE-2, who oversaw simulations to ensure appropriate well density, warned Concho that based on simulations Dominator would not work and would be "over-drilled," yet Concho and Giraud ignored FE-2. (*Id.* at ¶ 143–44.) FE-2 confirmed that, based on a prior study, only eight to twelve wells should have been drilled in the Dominator area. (*Id.* at ¶¶ 107–08.) FE-2 stated that the Dominator area had already been heavily drilled and the Dominator wells qualified as child wells which produce less oil. (*Id.* at ¶ 109.) These allegations give rise to a strong inference of scienter because this is an extreme departure from the standards of ordinary care such that the danger of misrepresentation must have been obvious. Giraud, who reported to Harper, who reported to Leach, all extolled the benefits of transitioning to manufacturing mode, and at the very least, as the solution for minimizing parent-child well interference. But, as Concho's testing had proved, the Dominator project only consisted of child wells. Taken as true, this shows Giraud,

Harper, and Leach ignored their own data and recklessly disregarded known risks as they touted the program as a success to the investing public.

FE-1 explained, traditionally, reservoir engineers are responsible for putting together the project's production forecast and then they would send it to Giraud. (*Id.* at ¶ 345.) It would then go to the corporate engineering group for high-level review. (*Id.*) The data would then go to the corporate finance group to use in the company's financials. (*Id.*) It would then go to Giraud for discussion with the technical teams for final approval. (*Id.*) It is in this last stage where risk modeling would go on top of the final data to account for experimentation risk. (*Id.*) FE-1 indicated it was clear this last step did not happen for the Dominator when he evaluated the final data set. (*Id.* at ¶ 80.) FE-1 confirmed Giraud made a conscious decision to use Concho's historical risk profile numbers in forecasting rather than apply the significantly higher risk profile recommended by he and his team. (*Id.* at ¶ 81.) FE-1 explained that he was given the directive to apply the historic profile to Dominator by Giraud. (*Id.*) Management likewise failed to heed FE-1's warnings even though they were brought to their attention and Giraud's attention several times. (*Id.* at 83, 87.) The true risk profile was available, as FE-1 indicated, because his team's analysis was tracked in Concho's "Aries" database. (*Id.*) Thus, at any time the financial forecasts were increased by the executive team and disseminated to the public, Defendants had the true data but were not applying it. This supports a strong inference of scienter that Giraud at the least recklessly, but more likely knowingly, used the incorrect risk profile to develop financial forecasts to mislead the public.

Plaintiffs do not rely on core operations as an independent basis to adequately allege scienter but argue the core operations exception contributes to a strong inference of scienter. While Plaintiffs do not contest that Concho was a large company, and thus the company's size cuts against an inference of scienter, Plaintiffs rely on the importance of manufacturing mode, and the

Individual Defendants involvement in daily operations for supporting scienter. Generally, "an officer's position with a company does not suffice" to infer scienter, but "special circumstances, taken together with an officer's position, may support a strong inference of scienter." *Six Flags Ent. Corp.*, 58 F.4th at 219 (explaining four factors which support a strong inference are the company's size; if the issue was "critical to the company's continued vitality"; if the misrepresented information "would have been readily apparent to the speaker"; and if "the defendant's statements were internally inconsistent with one another") (citations omitted).

At the beginning of the Class Period Concho allegedly primed the market to view the transition to manufacturing mode as an important achievement by the Individual Defendants' public statements emphasizing the profitability of the transition to Concho's operations. Harper indicated in the fourth quarter 2017 earnings call that large-scale development was expected to grow oil approximately 20%. (*Id.* at ¶ 185.) Leach assured this guidance was based on what they were aware of at that time and that Concho's strategy was the same as it historically had been. (*Id.* at ¶¶ 186–87.) These assurances were given despite the choice to apply inappropriate risk modeling. Leach, Harper, and Giraud repeatedly told investors that the transition to manufacturing mode was a key driver of Concho's successful financial performance by maximizing efficiencies, recoveries, and returns. (*Id.* at ¶ 214.) The program was not only important to the growth prospects of Concho but really the only thing Defendants attributed to its projected exponential production growth.

FE-1 confirmed that the transition to riskier multi-well pad projects like Dominator "made up roughly 90% of the 2018 budget at Concho," and Dominator alone "was 3% of Concho's overall budget in 2018." (Dkt. No. 25 at ¶¶ 97–98.) Defendants continued to pump money into the program, dedicating 80% of its capital to larger scale developments in 2019. (Dkt. No. 29 at 15.)

After the Dominator failed, well spacing "tests" led to a 16% total reduction in Concho's proved reserves, which directly impacts the company's financial reporting used by investors and analysts to model future returns. (Dkt. No. 25 at ¶¶ 41, 315, 318.) FE-1 confirmed Concho's financial forecasts that were disclosed to the market were based on modeling production forecasts, yet the financial forecasts were unreasonably high based on the failure to account for increased risk profile in its production forecasts. (*Id.* at ¶ 90.) Concho was soon thereafter acquired in 2020 by ConocoPhillips for $9.7 billion, $0.2 billion more than the value of the RSP acquisition two years earlier when Concho had an implied value of $38 billion. (*Id.* at ¶¶ 41, 203–04, 315, 318.)

The facts alleged show the importance of manufacturing mode to Concho's overall vitality. With one project's failure on the heels of Individual Defendants' touting the strong performance of said project, capital efficiency ended, proved reserves declined, stock prices declined, analysts and the market were stunned, and the company was acquired. The Dominator's gamble created a domino effect. "The fact that a gamble— concealing bad news in the hope that it will be overtaken by good news— fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs*, 513 F.3d at 710. The Dominator failing to work as Defendants claimed it would dragged down the company's financial performance because of the company's inability to respond quickly, mitigate risk, or spread the risk over the asset base. This was despite Defendants' assurances to the contrary since the Dominator was not the only risky project. *In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (finding scienter for individual defendants who were four of the top officers/directors, three of which were directly responsible for discussing the company's business with the public, where the undisclosed problems regarding "the lifeblood of the company" should have been obvious to company executives). The

importance of the transition and the project to the company's overall vitality supports a strong inference of scienter for Leach, Harper, Giraud, Wright, and Schroer.

Plaintiffs' circumstantial allegations regarding the Defendants' participation in day-to-day activities give rise to a strong inference that Leach, Harper, Wright, and Schroer knew or were severely reckless in not knowing at the time of the 2017 and 2018 annual reports releases that the reports misrepresented the status of the company's financial forecasts, and they contained omissions that would impact investors and analysts' ability to accurately model returns. *Abrams*, 292 F.3d 430 ("Circumstantial evidence can support a strong inference of scienter."). According to FE-1, there were weekly Tuesday meetings amongst the executives, including Giraud, Leach, and Schroer, where the Dominator was likely discussed. (Dkt. No. 25 at 105, 394; Dkt. No. 33 at 29, 30, 33.) The Dominator project was the COO's responsibility, and although Giraud functioned as COO as early as 2018, Wright was at still named COO at the company until 2019 when FE-1 repeatedly brought up his concerns in meetings regarding the transition to large-scale development. (Dkt. No. 25 at ¶¶ 86, 133.)

There are no direct allegations about what Schroer or Wright knew when they signed the SEC filings where the statements appear. Instead, Plaintiffs rely on factual allegations of surrounding circumstances to conclude Schroer and Wright knew or were severely reckless in not knowing of fraudulent statements about large-scale development and proved reserves in the Form 10-K. Given the importance of this technique's success across Concho's asset base, it is reasonable to assume that Wright and Schroer would have familiarized themselves with the financial condition of taking on the shift to manufacturing mode and the parallel risk associated. Considering the day-to-day activities that would reasonably take place when 90% of a company's budget is engaged in risky endeavors like the weekly executive meetings, the yearly budget meetings, the ratcheting up

of resource allocation, and how publicly traded oil and gas companies build their financials that are released in the Form 10-K, the Complaint contains strong circumstantial evidence of conscious misbehavior or recklessness on the part of those who signed the report, namely Schroer and Wright.

According to the Complaint and Defendants' own statements, Concho was willing to do whatever it took to stay a leader in the Permian. The Complaint alleges that Defendants "engaged in an undisclosed fraudulent bet-the-company endeavor in hopes of saving the Company." (Dkt. No 25 at ¶ 3.) As an analyst reviewing Defendants' aftermath commented, "[t]he main issue we see with the Dominator project is the sheer scale of the development, *i.e.* spacing a project too tightly when its 3-5 wells is easier to look passed than the massive capital and time commitment required for a 23-well project." (*Id.* at ¶ 306.) Something so capital and time intensive goes to the heart of Plaintiffs' assertion that special circumstances strengthen the inference of scienter. Plaintiffs' allegations of two of the four categories of special circumstances taken together with the Individual Defendants' positions supports a strong inference of scienter.

The Court's final inquiry is to analyze Defendants' competing inferences in light of those Plaintiffs advance to determine if they are more compelling. *Tellabs*, 551 U.S. at 311. Plaintiffs' inferences of scienter only need be at least as likely as those plausible inferences offered by Defendants, where a tie favors Plaintiffs. *See Spitzberg*, 758 F.3d at 686 ("Where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss.") (quotation marks and citation omitted). Individual Defendants' argue their conduct demonstrates "hubris or overconfidence," but not scienter. (Dkt. No. 29 at 33.) But this tends to support the inference that Defendants' actions went beyond mere negligence. Defendants' willingness to bet the transition to manufacturing mode would work, despite technicians,

engineers, and management being aware and voicing that modeling said otherwise, is an extreme departure from the standards of ordinary care that the danger of misleading investors was so obvious that the Defendants must have been aware of it. *See Nathenson*, 267 F.3d at 408.

Defendants contend that they disclosed they were learning as they went, which showed the risky nature of their experiment, but the risk of learning as you go is only mitigated when that process is gradual. Plaintiffs contend the transition was never a data-driven gradual process as it had been before. Plaintiffs' factual allegations that Defendants shirked the unfavorable data they were collecting for a riskier and hopefully higher payout, support inferences more cogent and compelling than Defendants' purported inferences. Defendants "unconventional way of thinking in the E&P industry" was an extreme departure from the standards of ordinary care, and taking Plaintiffs' allegations as true, presented a danger of misleading buyers or sellers which should have been so obvious that the Defendants must have been aware of it. (Dkt. No. 29 at 34.) Defendants' admissions show that the transition to manufacturing mode was a risk that did not align with their expectations or their attestations to investors and analysts. According to the FEs, Concho's projects were unsupported by data, the risks associated with the densely spaced wells was well known, Defendants purposefully under-risked the models when issuing financial forecasts, and Defendants knew in real time that the projects were performing under expectations. (Dkt. No 33 at 2–3.) The Court recognizes that although additional evidence at later stages of the proceedings may confirm or undermine Plaintiffs' factual proposition set forth by FEs, Plaintiffs' contention at the motion to dismiss stage is "at least as compelling as any opposing inference one could draw." *Spitzberg*, 758 F.3d at 684. In viewing Plaintiffs factual allegations holistically, Plaintiffs have sufficiently pled a strong inference of scienter as to each Defendant.

**E.  Section 20 Claim**

Section 20(a) claims for control person liability are derivative of primary claims under § 10(b), and when there is no viable § 10(b) claim, there can be no § 20(a) claim. *See Indiana Elec.*, 537 F.3d at 545 (reversing trial court's denial of defendants' motion to dismiss plaintiffs's § 20(a) claims where plaintiffs failed to adequately plead § 10(b) violations). Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Because those arguments fail, Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit.

## IV.   CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** Defendants' Motion to Dismiss (Dkt. No. 29) be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on February 23, 2023.

Sam S. Sheldon
United States Magistrate Judge