# APPENDIX

## DEFENDANTS' UNPUBLISHED AUTHORITIES FOR
## OBJECTIONS TO MEMORANDUM AND RECOMMENDATION REGARDING
## MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT

| | **CASE NAME** |
|---|---|
| 1. | *Barry v. Colony NorthStar, Inc.*, 2019 WL 13237710 (C.D. Cal. Jan. 24, 2019) |
| 2. | *Edwards v. McDermott Int'l, Inc.*, 2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) |
| 3. | *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) |
| 4. | *In re Apache Corp. Sec. Litig.*, 2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) |
| 5. | *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) |
| 6. | *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) |
| 7. | *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658 (S.D.N.Y. Feb 14, 2014) |
| 8. | *In re Repros Therapeutics, Inc. Sec. Litig.*, 2010 WL 11583428 (S.D. Tex. Nov. 17, 2010) |
| 9. | *In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540 (S.D. Tex. July 9, 2009) |
| 10. | *Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) |
| 11. | *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153 (S.D. Tex. July 24, 2019) |
| 12. | *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) |
| 13. | *Plaisance v. Schiller*, 2019 WL 1205628 (S.D. Tex. Mar. 14, 2019) |
| 14. | *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) |
| 15. | *Yang v. Nobilis Health Corp.*, 2020 WL 6815402 (S.D. Tex. June 25, 2020) |
| 16. | *Yang v. Nobilis Health Corp.*, 2020 WL 5512456 (S.D. Tex. Sept. 14, 2020) |
| 17. | *Yang v. Nobilis Health Corp.*, 2021 WL 3619863 (5th Cir. Aug. 13, 2021) |

# Case No. 1

Barry v. Colony NorthStar, Inc., Slip Copy (2019)

2019 WL 13237710

2019 WL 13237710
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Brian BARRY
v.
COLONY NORTHSTAR, INC., et al.

Case No. CV 18-2888-GW(MRWx)
|
Filed January 24, 2019

**Attorneys and Law Firms**

Lionel Zevi Glancy, Robert Vincent Prongay, Glancy Prongay and Murray LLP, Los Angeles, CA, Laurence M. Rosen, Rosen Law Firm PA, Los Angeles, CA, for Brian Barry.

Daniel M. Petrocelli, Brittany Rogers, Matthew W. Close, O'Melveny & Myers LLP, Los Angeles, CA, for Colony NorthStar, Inc., Richard B. Saltzman, Darren J. Tangen, David T. Hamamoto.

**PROCEEDINGS: DEFENDANTS'
MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINT [51]**

GEORGE H. WU, UNITED STATES DISTRICT JUDGE

**\*1** Court and counsel confer. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would GRANT the motion, but would permit leave to amend.

**I. Background**
Court-appointed Lead Plaintiff Teamsters Local 710 Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, sues Colony NorthStar, Inc. ("CLNS"); Richard B. Saltzman, CLNS's CEO, President, and Director; Darren J. Tangen, CLNS's CFO; and David T. Hamamoto, CLNS's former Director and Executive Vice Chairman (collectively, "Defendants") [1] for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 ("SEC Rule 10b-5"), 17 C.F.R. § 240.10b-5; and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See generally* First Amended Complaint ("FAC"), Docket No. 49.

[1]  The Court will refer to Saltzman, Tangen, and Hamamoto collectively as the "Individual Defendants."

CLNS is a hybrid real estate investment trust ("REIT") that was formed in January of 2017 after a merger (the "Merger") between Colony Capital, Inc. ("Colony") and two publicly traded real estate investment companies: NorthStar Asset Management Group Inc. ("NSAM") and NorthStar Realty Finance Corp. (collectively, "NorthStar"). FAC ¶ 4. Generally, REITs are entities that own or finance income-producing real estate and hybrid REITs own real estate and debt instruments secured by mortgages on real estate. [2] *Id.*

[2]  As generally described by the Securities and Exchange Commission ("SEC"):
A real estate investment trust ("REIT"), generally, is a company that owns – and typically operates – income-producing real estate or real estate-related assets. \* \* \* \*
REITs generally fall into three categories: equity REITs, mortgage REITs, and hybrid REITs. Most REITs are equity REITs. Equity REITs typically own and operate income-producing real estate. Mortgage REITs, on the other hand, provide money to real estate owners and operators either directly in the form of mortgages or other types of real estate loans, or indirectly through the acquisition of mortgage-backed securities. Mortgage REITs tend to be more leveraged (that is, they use a lot of borrowed capital) than equity REITs. In addition, many mortgage REITs manage their interest rate and credit risks through the use of derivatives and other hedging techniques. \* \* \* \* Hybrid REITs generally are companies that use the investment strategies of both equity REITs and mortgage REITs.
*See* https://www.sec.gov/fast-answers/answersreitshtm.html (last visited Jan. 23, 2019).

Defendants completed the Merger on January 10, 2017. *Id.* ¶ 31. The expressed purpose of the Merger was to "unlock" the value in the undervalued stand-alone companies. *Id.* ¶ 21. Defendants stated that because of the Merger "[CLNS] is expected to be in the top quartile [of REIT investments] ranked by equity market capitalization." *Id.* ¶

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

22. Plaintiff alleges that the investment management business, and specifically the retail fundraising business from NSAM, was "critical" to the success of the Merger. *Id.* ¶¶ 24-25. The investment management business would enable the Defendants to earn fees from investing and managing other investors' capital. *Id.* ¶ 24. The investment management business had two components – capital from institutional investors and capital from retail investors. [3] *Id.* While the capital raised from institutional investors would be larger than that raised from retail investors, the retail investment management business charged higher management fees. *Id.* However, in April 2016, new regulations went into effect requiring REIT account statements to either list the security purchase price less any fees or commissions or, in the alternative, list a current value for the security. *Id.* ¶ 27. Prior to the rule changes, account statements could identify a security's gross purchase price even though commissions and fees could erode its value over time. *Id.* Plaintiff alleges that these new regulations hurt the retail investment market. *Id.*

[3]     "Retail investors" are generally "Small individual investors who commit capital for their personal account rather than on behalf of another company." *See* https://www.nasdaq.com/investing/glossary/r/retail-investors (last visited Jan. 23, 2019).

 **\*2**  At the close of the Merger, CLNS had a market capitalization of approximately $9 billion and assets under management of approximately $56 billion. *Id.* ¶ 31. Pursuant to the Merger, the executives of CLNS were the former Colony executives, with the exception of Hamamoto, who was a former NorthStar executive. *Id.* ¶ 29. Hamamoto and the rest of the NorthStar executive leadership team made $120 million from the Merger based on change-of-control and other agreements. *Id.* ¶ 29.

A. Averments as to False and/or Misleading Statements

After the Merger, CLNS reported on a quarterly basis the financial metrics Funds From Operations ("FFO") and Core FFO. *Id.* ¶ 18. On the first earnings call after the Merger, on February 28, 2017, CLNS issued Core FFO guidance of $1.40 to $1.58 per share and a $1.08 per share dividend for the year. *Id.* ¶ 31. On a March 1, 2017 call, Defendant Tangen stated that the Core FFO guidance "more than covers" the "new annual dividend of $1.08 per share." *Id.* ¶ 62. The Core FFO guidance assumed $2 billion of new fundraising for 2017. *Id.* ¶ 31. An analyst on the call asked Saltzman for a breakdown of retail versus institutional fundraising within the $2 billion. *Id.* ¶ 60. Saltzman responded, "[w]ell, we

haven't been transparent about that, so yes, there is a mix of institutional and retail. I'm probably not going to comment on it per se at this point." *Id.* During the same call, Defendants acknowledged "headwinds" in regards to fundraising but said that the "ability to raise third-party outside capital ... [was] intended to turbocharge growth and returns" and noted that the capital fundraising "tide appear[ed] to have turned [from the new regulations] for both institutional and retail placements based upon the momentum we are now experiencing in both markets." *Id.* ¶¶ 32, 61. Defendants added that "if momentum continues to build, [institutional and retail capital fundraising] is an area where we could be very pleasantly surprised." *Id.*

Plaintiff alleges that Defendants' statements about Core FFO guidance and a $1.08 dividend were made without a reasonable basis because they depended on a substantial contribution from retail investment management fees that were not forthcoming. *See id.* ¶ 64. More precisely, Plaintiffs contend that retail investment management fees were critical to CLNS meeting its projections, but that CLNS knew that its retail investment business was down from the previous year. *See id.* For the same reasons, Defendants' statements about the momentum it was experiencing in the investment management business was false and/or misleading because CLNS had only raised $40 million in retail capital during the first quarter of 2017. *Id.* ¶ 65

The Class Period begins with CLNS filing its 2016 Annual Report on February 28, 2017. *Id.* ¶ 53. The 2016 Annual Report listed two of CLNS's retail companies as having active offering periods open. *Id.* ¶ 55. For one of those companies, CLNS stated that the capital raise was expected to "accelerate in 2017." *Id.* The 2016 Annual Report also stated that a new retail company, NorthStar/Townsend Investment ("Townsend"), was going to become active and "begin raising capital from third parties in the first half of 2017. *Id.*

Plaintiff alleges that the statements about accelerating funding were false and/or misleading because the newly implemented disclosure regulations hampered Defendants' fundraising capabilities by exposing Defendants' high fees. *Id.* ¶ 56. In essence, Plaintiff argues that there was no reasonable basis for Defendants to make these statements because, at the time of the 2016 Annual Report, the capital raising was off to a "miserable start," having raised less than 1% of the offering amount. *Id.* Likewise, Plaintiff contends that the statement about Townsend starting to raise funds in the first half of 2017

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Barry v. Colony NorthStar, Inc., Slip Copy (2019)**

2019 WL 13237710

was false because Defendants ended up selling Townsend. *Id.* ¶ 57.

 **\*3**  On May 9, 2017, Defendants reported that CLNS's Core FFO for the first quarter of 2017 was $0.31 per share – or 17% below the midpoint guidance. *Id.* ¶ 66. Nonetheless, Saltzman stated that CLNS "remain[ed] on track to achieve [its] 2017 full year goals for core FFO." *Id.* ¶ 67. As part of this projection, Defendants pointed to "additional Core FFO upside" from, among other things, retail investment management. *Id.* ¶ 69. Again, Defendants stated that CLNS was seeing momentum in the retail fundraising marketplace:

> Turning to our retail platform. After an extended period of extraordinary market disruption mainly driven by significant regulatory changes, **we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising.** We've positioned our retail platform and product lineup to take full advantage of the evolving market environment and to support our goals of broadening the pool and channels of capital we access, which now includes registered investment advisers and traditional Wall Street firms, in addition to the historical network of independent broker-dealers, all with an objective of bringing Colony NorthStar's institutional asset management acumen and best practices to the retail investor client. And post merger, this includes using our balance sheet to foster better alignment of interest with investors. Our offerings include nontraded REITs and 40 Act funds allowing us to serve both long-term existing relationships and targeted new pools of capital. Product structures are innovative and **best-in-class, well suited to the new market environment and reflect our drive to be a visionary value-producing leader in the marketplace.**
>
> **In connection therewith, we've seen strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising**. More than $6 billion of targeted capital is anticipated to be raised in products that are generally early in their life cycles and just starting the capital raising process, **including our 2 effective programs the $2 billion NorthStar/RXR New York Metro real estate nontraded REIT and a $3.2 billion NorthStar Real Estate Capital Income 40 Act closed-end fund, as well as our soon-to-be effective $1 billion NorthStar/Townsend Institutional Real Estate 40 Act interval fund**. Privately placed retail products, or institutional funds that have a retail sleeve, are also in various stages of development. **All of these are structured**

**to be highly attractive to a very broad group of financial advisers and their clients**.

*Id.* ¶ 71. Plaintiff alleges that the statements about momentum and acceleration were false and/or misleading because, at that point, retail fundraising was $68 million dollars – a small percentage of the total fundraising of $2 billion that CLNS required to meet its Core FFO guidance. *Id.* ¶ 74. Plaintiff further states that Defendants could not make up the difference with institutional fundraising because institutional capital management was garnering lower fees than the previous year. *Id.*

Next, Defendants stated on June 22, 2017 that the company was "very comfortable with the $1.08 per annum yield level" and that the Core FFO guidance provided "substantial and adequate coverage" for the dividend. *Id.* ¶ 75. These projections relied on "replac[ing] what's burning off in terms of gains [from opportunistic investments made during the financial crisis] and replac[ing] it with more investment management economics, primarily base investment management fees through incremental capital raises that we're going to be able to do in all of these various constructs that we're describing." *Id.* Plaintiff claims that statements about being comfortable with the dividend are false and/or misleading for the same reasons stated above – that CLNS did not have the retail investment management fees to meet its guidelines. *Id.* ¶ 76.

 **\*4**  As to the second quarter results, CLNS issued a press release on August 8, 2017, which included a Core FFO of $0.35 per share. *Id.* ¶ 77. The following day, Saltzman reiterated that CLNS's dividend "will be well covered by our 2017 core FFO." *Id.* Saltzman also recognized "industry challenges," but stated "we remain optimistic that the retail investment management business will continue to institutionalize and rebound." *Id.* Saltzman also stated:

> The majority of our fundraising year-to-date has been sourced from institutional clients, and we expect this trend to continue through the balance of the year as the retail market stabilizes from the regulatory headwinds previously described and starts to grow again during the second half of 2017 and into 2018 and beyond.

*Id.* ¶ 78. But, Plaintiff asserts that the market was not stabilizing and that the retail investment management business would not "turbocharge" CLNS. *See id.* ¶¶ 79-80.

On November 9, 2017, CLNS announced its third quarter results, which included a Core FFO of $0.33 per share. *Id.* ¶ 82. CLNS's reported Core FFO implied a run rate of approximately $1.25 for full-year 2017, below the midpoint of its guidance with one quarter remaining in the fiscal year. *Id.* On the earnings call, Saltzman stated:

> In terms of operating performance for the quarter, we generated core FFO of $193 million or $0.33 per share, which covered our dividend of $0.27 per share after adjusting for $0.06 per share of net gain contribution in the quarter. A solid quarterly result, but admittedly, cumulative year-to-date core FFO has been below our beginning of the year target. As we invest on more than $1 billion of dry powder and grow our investment management business through complementary coinvesting and related fund placements, we expect to fill that gap over time.

*Id.* When an analyst questioned Saltzman about "bigger-picture thoughts" on CLNS's investment management business, Saltzman responded:

> So it's kind of good news/bad news, if you will, although I think we fall into the category of a preferred manager. And simultaneously, I think we've done a great job of really selecting what are the appropriate strategies, consistent with all of things I reviewed earlier in the call, some of – all the things that we've been doing in the last 10 years, whether in single-family for rent or other spaces. And so as a result, notwithstanding that the market is picky and selective, we're quite

> confident and optimistic about getting at least our fair share, if not more than our fair share, of the market.

*Id.* ¶ 83. An investor presentation of CLNS's website also touted that a benefit of being an investment manager was that "[g]rowing, stable fees generate [a] diversified income stream." *Id.* ¶ 86. Plaintiff claims that statements about filling the gap between targeted Core FFO and actual results were false and/or misleading because CLNS's retail fundraising had slowed as compared to the previous quarter. *Id.* ¶¶ 84-85.

**\*5** Finally, on March 1, 2018, the last day of the Class Period, CLNS released its fourth quarter and full-year results for 2017. *Id.* ¶ 88. CLNS's full year Core FFO was $1.16 per share – below its guidance of $1.40 to $1.58. *Id.* The Company also announced impairment charges of $375 million related to the Company's investment management segment. *Id.* Ultimately, Defendants recognized that its broker-dealer distribution business was disappointing and that the Merger had not provided the hoped-for benefits:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction. It was a merger that was supposed to be earnings neutral at worst. And so far, it has proven to be earnings dilutive. Furthermore, the merger integration has taken longer than expected. We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from the inherited NorthStar businesses that have been the primary source of our underperformance in 2017.

*Id.* ¶¶ 89-90.

CLNS also disclosed that it was reducing its dividend from $1.08 per share in 2017 to $0.44 per share in 2018:

**Barry v. Colony NorthStar, Inc., Slip Copy (2019)**
2019 WL 13237710

Let me next focus on our go-forward business, including the resetting of our dividends. Based on the confidence we have around our new baseline of recurring earnings, excluding gains, combined with a generally conservative bias we have toward preserving cash at this juncture of the real estate and economic cycles. Earlier today, via our earnings release, we announced expected dividend level of $0.44 per share for the calendar year 2018. This is a meaningful reduction from $1.08 per share we paid in 2017.

*Id.* ¶ 91.

On March 1, 2018, CLNS's stock price fell nearly 23%. *Id.* ¶ 92. Certain analysts blamed the drop on "an unexpectedly sizable dividend cut," "weak results in 3rd party fundraising," and that the Merger proved to be "a dud." *Id.* ¶ 93.

### B. Scienter allegations

In addition to the foregoing, Plaintiff alleges that Defendants had scienter because fundraising in the investment management business was one of CLNS's "top strategic priorities" after the Merger. *Id.* ¶ 95. Moreover, each defendant was aware of the potential "deleterious implications" of the rule changes requiring clearer disclosures of management fees. *Id.* ¶ 96. Plaintiff asserts that these regulatory changes caused the "precipitous decline" in CLNS's investment management business and that Defendants' reduction in fees demonstrates that they knew the higher fees were part of the problem. *See id.* ¶¶ 97-98. Plaintiff also argues that CLNS's sale of the NorthStar/Townsend business confirms that the Defendants knew the investment management business was faltering. *Id.* ¶ 99.

Plaintiff also alleges that certain financial incentives demonstrate Defendants' scienter. For example, Saltzman and Tangen's annual cash bonus was tied to "the amount of third-party capital raised, a key strategic objective for the Company." *Id.* ¶ 101. Likewise, in December 2017, Hamamoto sold over two million shares for approximately $26.9 million. *Id.* ¶ 102. Tangen sold approximately 275,000

shares between May and September 2017 for a total of nearly $3.5 million. *Id.* ¶ 104.

Lastly, Plaintiffs argue that the departures of Hamamoto and Daniel Gilbert – who was the chief investment and operating officer of NSAM before the Merger and head of the retail platform at CLNS after – suggest scienter. *Id.* ¶¶ 29, 106. Letter agreements incentivized Hamamoto and Gilbert to remain with CLNS for at least two years after the Merger, but both effected their departures at one year after the Merger. *Id.* ¶¶ 107-108.

Defendants now move to dismiss the FAC in its entirety. *See generally* Motion to Dismiss FAC ("Motion"), Docket No. 51. Plaintiff opposes. *See generally* Opposition to Motion ("Opp'n"), Docket No. 53. Defendants filed a reply. *See generally* Reply ISO Motion ("Reply"), Docket No. 56.

## II. Legal Standard

### A. Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

**\*6** In deciding a Rule 12(b)(6) motion, a court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Further, in deciding a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a Rule 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of L.A.*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] ... the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

### B. Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9 requires a heightened pleading standard when alleging fraud in federal court. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The allegations must contain "an account of the time, place, and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). "The plaintiff must plead facts explaining why the statement was false when it was made." *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001). "This requirement has long been applied to securities fraud complaints." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under the Private Securities Litigation Reform Act ("PSLRA"), a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." *Id.* at 990-91.

### C. Exchange Act Section 10(b) and SEC Rule 10b-5

"Under Section 10(b) of the [Exchange Act], it is unlawful '[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.' " *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017) (quoting 15 U.S.C. § 78j(b)). SEC Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To plead a violation of Section 10(b) of the Exchange Act and SEC

Rule 10b-5, a plaintiff must sufficiently allege: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

**\*7** "At the pleading stage, a complaint stating claims under [S]ection 10(b) and [SEC] Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners, LLC*, 552 F.3d at 990. The PSLRA requires that Plaintiffs plead with particularity both falsity and scienter. *In re Atossa Genetics Inc. Secs. Litig.*, 868 F.3d at 794 (citing *Reese v. Malone*, 747 F.3d 556, 568 (9th Cir. 2014)).

To sufficiently plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u– 4(b)(2). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

> [T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive [a Rule 12(b)(6) motion] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 324.

"In [the Ninth Circuit], the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *In re Quality Sys., Inc. Secs. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (internal quotation marks omitted). "Deliberate Recklessness" is tough to define, but courts in this circuit "continue to view it as a form of intentional or knowing misconduct." *Zucco Partners*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc. Secs.*

*Litig.*, 183 F.3d 970 (9th Cir. 1999) *abrogation on other grounds recognized by* *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

> More specifically, although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. Rather, the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Zucco Partners*, 552 F.3d at 991 (citations and internal quotation marks omitted).

## III. Discussion

### A. False or Misleading Statements

As a general matter, Plaintiff's theory is that Defendants downplayed the importance of the retail investment management business in CLNS's meeting its stated financial guidance and mischaracterized the underperformance of the retail investment management business. *See* Opp'n at 4. More specifically, Plaintiffs claim that retail investment management fundraising was "critical" to CLNS's success because it typically generated higher fees than institutional investing. See FAC ¶¶ 6, 24. These alleged misleading statements came to a head when CLNS announced that it had not met its Core FFO guidance for 2017 and that it was reducing its expected 2018 dividend as compared to the 2017 dividend. *See* Opp'n at 4. Defendants respond that Plaintiff did not particularly allege that the retail investment business was critical to CLNS meeting its guidance; that none of CLNS's statements are false; that CLNS paid its full 2017 dividend despite missing its guidance; and that any

misleading statements are either protected by a the PSLRA safe harbors or are non-actionable puffery. *See* Reply at 1-3.

### 1. General Statements about the Merger

**\*8** Defendants first argue that statements made about the potential of the merger were not false or misleading at the time they were made. *See* Motion at 8-9. It is a bit unclear exactly which statements Defendants attack in this section but they cite FAC paragraphs 33, 38, 46, and 50, which include statements such as: "[a]dditional core FFO upside exists from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, including retail investment management," FAC ¶ 33; and the allegations that CLNS's stated guidance was not "attainable" because of "the dismal state of its retail business," *id.* ¶ 38.

In support of the general point that none of Defendants' statements were false or misleading when made, Defendants cite *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001). In *Ronconi*, an acquiring company, Nellcor, made "a very large acquisition" that ultimately did not meet expectations. *Id.* at 427. Nellcor made "optimistic predictions about the merger" including that the new company would "be the leading provider," would "significantly enhance[ ]" growth opportunities, and lead to higher earnings and cost savings, etc. *Id.* at 430. Combining the material misrepresentation and scienter analysis, the Ninth Circuit held that "no facts are alleged in the complaint that would support an inference that the company's more optimistic predictions were known to be false or misleading at that time by the people who made them. The complaint does not plead facts that show that company insiders knew what the complaint says 'would' occur in what was then the future." *Id.*

The Court recognizes that *Ronconi* may be relevant here, but does not agree that it provides a comprehensive answer about the alleged misstatements in this case. *See* Motion at 9. In the Court's reading, *Ronconi* stands for the principle that plaintiffs must plead both falsity and scienter with particularity and that a failure to do so warrants dismissal. *See Ronconi*, 253 F. 3d at 430-31. Likewise, the Court agrees that "[t]he fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993). However, the reason the Court does not think *Ronconi* is controlling is that it is unclear whether Plaintiff is actually challenging any statements about the expected success of the Merger. Rather,

the bulk of Plaintiff's FAC alleges that Defendants mischaracterized the state of the retail investment management segment of the business and what that meant for CLNS's financial projections. As such, rather than total reliance on *Ronconi*, the Court must individually analyze each alleged misstatement.

Nonetheless, to the extent Plaintiff is challenging general statements about the expected success of the Merger, the Court would find that Plaintiff has not particularly alleged falsity. To conclude otherwise would be an endorsement of securities fraud by hindsight because Plaintiff has not alleged that Defendants knew from the outset that the Merger would fail to meet expectations.

*2. Statements Regarding Core FFO Guidance and Dividend*

Defendants next argue that their quarterly performance statements about CLNS's investment management business – regarding both retail and institutional – were accurate. *See* Motion at 10-12.

At the start of the Class Period, Defendants issued guidance of $1.40-$1.58 per share for Core FFO and set a dividend of $1.08 per share. FAC ¶ 43. This guidance assumed $2 billion in investment management fundraising. *Id.* ¶ 31. There are no allegations that CLNS stated that it must raise a certain proportion of the $2 billion from retail investment management as opposed to institutional. *See id.* ¶ 60. In fact, when asked about the breakdown of retail versus institutional, Saltzman declined to provide an answer: "we haven't been transparent about that, so yes, there is a mix of institutional and retail. I'm probably not going to comment on it per se at this point." *Id.* Nonetheless, throughout the year, Defendants provided updates about fundraising and the Core FFO guidance, which included the amount of retail fundraising as a proportion of total fundraising. *See id.* ¶¶ 35, 38, 41 (alleging that retail capital constituted between 2 and 7 percent of the total investment management capital raised). Saltzman also told investors in the second quarter of 2017 that "[t]he majority of our fundraising year-to-date has been sourced from institutional clients, and we expect this trend to continue through the balance of the year," and that regulations "negatively impacted the retail [investment management] business year-to-date." *Id.* ¶¶ 77-78.

**\*9** At the end of the Class Period, CLNS had achieved its $2 billion fundraising goal, but not its Core FFO guidance. *See* Opp'n at 6; FAC ¶ 88. Instead, Defendants hit $1.16 per share

for Core FFO. FAC ¶ 88. Nonetheless, CLNS still paid the expected $1.08 dividend. *Id.* While CLNS did not ultimately meet its Core FFO guidance, there are no allegations that it reported false numbers throughout the year or withheld information that it was obligated to disclose. Therefore, to the extent Plaintiff alleges that the quarterly financial reports and figures released were false or misleading, the Court would conclude that Plaintiff has not sufficiently alleged facts demonstrating their falsity.

However, just because the quarterly figures released were not misleading does not mean that Defendants' *commentary* about the reports was correct. In this vein, Plaintiff challenges statements that the $1.08 dividend enjoyed a "meaningful cushion," and that CLNS was "on track" to meet the Core FFO guidance. *See id.* ¶¶ 33, 35, 66-69, 74-75. Plaintiff also challenges statements about the strength of the retail investment management market such as comments that the "tide appears to have turned" for retail fundraising, that fundraising was experiencing "momentum" and "acceleration," and that Core FFO "upside" existed because of the retail investment management business. *See, e.g., id.* ¶¶ 61, 63. Plaintiff argues that such statements in support of the Core FFO guidance or dividend level had no basis because of the lack of retail investment management fees. *See* Opp'n at 9-11.

First of all, as to statements about a cushion for the dividend, the Court would conclude that the allegations demonstrate that there was in fact a cushion. Even with CLNS missing its Core FFO guidance, it still paid the $1.08 dividend for 2017. As such, the Court would find that Plaintiff has not sufficiently alleged that statements about the cushion were false. To the extent Plaintiff challenges these statements because of the reduction in the *expected 2018 dividend*, the Court would conclude that Plaintiff has not plausibly alleged that any defendants made statements about the 2018 dividend.

Next, as to statements about being "on track" to meet the Core FFO guidance, Defendants only argue that these statements were forward looking. The Court will address that contention below, but notes that Defendants do not argue that such statements were true. In the absence of a challenge, the Court would conclude that Plaintiffs sufficiently alleged that statements about being "on track" to reach the guidance were arguably false because the pace of fundraising was slower than expected. However, the Court has its doubts about whether Plaintiff can successfully allege the falsity of this statement going forward because the Court is not sure about

2019 WL 13237710

the other financial inputs that may dictate whether CLNS was "on track" despite certain shortcomings. Therefore, in future pleadings, if Plaintiff chooses to maintain its theory that Defendants' statements about the retail investment segment were false or misleading regarding CLNS's ability to meet its financial projections, Plaintiff will need to allege a more comprehensive picture of CLNS's business. Specifically, Plaintiff will need to allege facts demonstrating that the retail investment management business was in reality "critical" to CLNS's overall success and ability to reach Core FFO guidance. As Plaintiff recognizes, Core FFO is contingent upon different financial metrics that may or may not have anything to do with retail investment management. *See* FAC ¶ 18 n.4. Without a more comprehensive picture of the business, the Court cannot evaluate the significance of the retail investment management business, and therefore, whether statements about being "on track" or "accelerating fundraising" or "momentum" or "upside" are false.

 **\*10**   Finally, as to comments about the state of the retail investment management business, Defendants contend that Defendants' characterizations about "acceleration," "momentum," and "upside" in the retail investment business are accurate. *See* Reply at 9. As alleged, in the first quarter of 2017, the retail business accounted for 2 percent of the expected $2 billion raise, or $40 million. *See* FAC ¶ 35. In the second quarter, retail fundraising accounted for $99 million meaning that CLNS raised $59 million in the second quarter or $19 million more than in the first. *See* FAC ¶ 80. At the end of the third quarter retail funding was up to $147 million, but the $48 million raised in this quarter was $11 million less than in the second quarter. *See id.* ¶ 85. Therefore, results are mixed as to whether retail funding actually accelerated quarter to quarter. While the Court thinks the question is close, the Court would conclude that Plaintiff has not sufficiently explained why statements about acceleration were false at the time spoken. The same is true as to whether there was "momentum" in the market or whether the "tide had turned." [4]

[4]     Defendants   argue   that   statements   about "acceleration" and "momentum" are both forward looking and non-actionable puffery. *See* Motion at 13-14, 16. Defendants also argue that statements about "upside" were forward looking.

As to statements about the "upside" in the retail investment market, Defendant argues that "precisely because retail [investment management] was underperforming

expectations ... there was potential for improvement." *See* Motion at 12. Plaintiffs argue that "stating that retail [investment management] represented 'upside' to Core FFO, [D]efendants created the impression that the institutional [investment management] business would support the Core FFO target and sustain the dividend without incremental retail funds." Plaintiff's argument strikes the Court as conclusory. Plaintiff cannot point to any statement where a Defendant said that the institutional investment management alone would support the Core FFO target. Moreover, as Plaintiff alleges, Core FFO is determined by a number of factors, suggesting that CLNS's target was not based solely on its fundraising activities. *See* FAC ¶18 n.4. As such, the Court would conclude that Plaintiff has not particularly alleged that statements about retail investment management's upside were false or misleading.

To sum up, the Court would conclude that, at this point, Plaintiff has only alleged the falsity of statements about being "on track" to reach CLNS's stated guidance. The Court thinks that Plaintiff is close to alleging the falsity of statements about the "acceleration" of fundraising. Otherwise, the Court would grant Defendants' Motion in regards to the rest of the alleged misstatements for Plaintiff's failure to plead falsity. [5]

[5]     For the benefit of the parties in future potential pleadings and motions, the Court notes that one of the problems with the FAC is that it presents a somewhat disorganized litany of statements – only some of which it seems Plaintiff is challenging. The Court encourages Plaintiff to limit any future complaint in line with the guidance in this tentative ruling. To remind Plaintiff, it has the obligation to "provide a one-to-one connection between misleading statements and the reasons why the statements are misleading." *See Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1140 (C.D. Cal. 2018) (citation omitted). As to Defendants, the Court advises them on any future motion to dismiss to better specify exactly which statements they are attacking and under which theories. The Court notes that in the past it has found a chart that lists the challenged statements and why they are not actionable to be helpful. For example, something like this:

| Statements | Falsity | Puffery | Forward-Looking |
|---|---|---|---|
| "accelerating" ¶ _ | X | | X |

**Barry v. Colony NorthStar, Inc., Slip Copy (2019)**

2019 WL 13237710

| "momentum" | X | X |
| --- | --- | --- |
| ¶ _ | | |

### 3. Forward-Looking Statements

Although the Court need only reach the issue on statements about being "on track," it will briefly analyze the parties' arguments about forward looking statements to provide guidance on any future motions.

**\*11** The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (internal quotation marks omitted). The safe harbor provision applies:

> [I]f the forward-looking statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (ii) if it is not identified as a forward-looking statement and not accompanied by cautionary language, unless the statement was "made with actual knowledge ... that the statement was false or misleading."

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting 15 U.S.C. § 78u-5(c)(1)). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1142.

Defendant argues that the majority of the statements that Plaintiff challenges are forward looking and therefore non-actionable under the PSLRA safe harbor. *See* Motion at 12-16. Specifically, Defendants attack the statements made in paragraphs 55, 58-63, 66-73, 77-79, 82—83, 86, which include statements such as: "capital raise was expected to accelerate in 2017" (¶55), "the tide appears to have turned for both institutional and retail placements based upon the momentum we're now experiencing in both markets" (¶ 61), "we remain on track to achieve our 2017 full year goals for core FFO" (¶ 67), "[a]dditional core FFO upside exists" (¶ 69), "[retail fundraising is more likely to be robust on our

behalf during the second half of the year and then going into 2018" (¶ 73), and "we expect to fill that gap over time" (¶ 82).

Plaintiff correctly concedes that certain statements are forward looking, including statements about CLNS's Core FFO guidance (¶5), the "per annum" and "annual" dividend statements (¶¶62, 75), and the statement that "we expect to fill that [Core FFO] gap over time" (¶82). *See* Opp'n at 18. Plaintiff, however, contests that statements about "momentum," "remaining on track," having "coverage" for the dividend are forward looking. *Id.* at 16-17.

First, the Court must determine which of the contested statements are forward looking. As to comments like the "momentum we're now experiencing," "we are finally seeing positive momentum in the overall retail marketplace" and "we remain on track to achieve our 2017 full year goals for core FFO," Defendants argue that the statements are forward looking because they "relate to future expectations and performance." *See* Motion at 13 (citing *Waterford Twp. Police*, 321 F. Supp. 3d at 1150. Plaintiff responds that such statements are not forward looking because "their veracity was readily 'ascertainable when the challenged statements were made.' " Opp'n at 17 (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142-44 (2d Cir. 2010)). Plaintiff also cites *Ronconi*, which held that the statement "sales growth was accelerating" was not forward looking because "the statement is material and descriptive of [a] historical fact ...." *See Ronconi*, 253 F.3d at 430-31.

**\*12** The Court is somewhat convinced that statements about remaining "on track" to achieve some future goal are forward looking because they "cannot meaningfully be distinguished from the future projection of which they are a part." *Inst. Inv'rs Grp. v. Avaya*, Inc., 564 F.3d 242, 255 (3d Cir. 2009); *Waterford Twp. Police*, 321 F. Supp. 3d at 1150. Being "on track" to reach a future projection assumes the correctness of that projection – it reinforces the company's view that it will *eventually* reach the stated goal. As such, with adequate cautionary language, the Court would conclude that such statements are not actionable. To be frank, however, the Court thinks this is a close call and could possibly be swayed by future briefing that statements about being "on track" describe a then present-state condition (somewhat similar to "sales growth was accelerating"). However, there will have to be a more complete set of allegations s to the facts as to what was happening at the time the statement was made and how those facts would preclude Defendants at that point from ever possibly meeting the future projection.

**Barry v. Colony NorthStar, Inc., Slip Copy (2019)**

2019 WL 13237710

Conversely, the Court thinks that statements about currently experiencing momentum or acceleration are descriptions of the present. As an illustration, it could be true that a company was *currently experiencing* momentum but *expecting* a slow-down in the longer-term. For that reason, the Court would find that statements like "we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising" are not forward looking. Of course, statements about *expecting* acceleration would be forward looking. As such, the statement in paragraph 55 would be forward looking: "capital raise expected to accelerate in 2017."

The rest of the statements that the parties raise in this are forward looking. For example, statements such as "[a]dditional core FFO upside exists from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, including retail investment management" (¶ 69), and statements about there being coverage for the *expected* dividend describe "a projection of revenues" or "future economic performance." *See* 15 U.S.C. § 78u-5(i).

Plaintiff separately argues that Defendants' cautionary language was insufficient to trigger the PSLRA safe harbor. *See* Opp'n at 17-19. Specifically, Plaintiff contends that Defendants' cautionary statements were generic boilerplate, did not directly relate to the forward looking statements at issue, and were vague warnings about adverse facts that had already materialized. *See id.* at 18-19.

Defendants in turn direct the Court to various cautionary language recited in CLNS's SEC filings and at the beginning of earning calls. *See* Reply at 15-16. On the earnings calls, the company would state:

> [P]lease note that on this call certain information presented contains forward-looking statements. These statements are based on management's current expectations; and are subject to risks, uncertainties and assumptions. Potential risks and uncertainties that could cause the company's business and financial results to differ materially from these forward-looking statements are described in

the company's periodic reports filed with the SEC from time to time. All information discussed on this call is as of today, [date], and Colony NorthStar does not intend and undertakes no duty to update future events or circumstances.

*See, e.g.*, Request for Judicial Notice re Motion ("RJN"), Docket No. 52, Ex. B at 28. [6] In its SEC filings, CLNS also warned that the filing contained forward looking statements. *See, e.g.*, RJN Ex. G at 803-04; RJN Ex. H at 935. Moreover, CLNS warned that the Merger may not achieve the desired results, *see* RJN Ex. H at 935, and that CLNS may not "be able to achieve a streamlined organization as a leading diversified equity REIT with a concentration in select areas demonstrating the most favorable supply/demand dynamics globally that further benefits from an embedded best-in-class investment management operation in the anticipated timeframe or ever," *see* RJN Ex. Q at 1641.

[6] Defendants request that the Court judicially notice a group of exhibits. Most of the exhibits are documents that CLNS publicly filed with the SEC. Plaintiff responded that it does not oppose the RJN but notes that "judicial notice should not be taken of the *truth* of their contents." *See* Response to RNJ, Docket No. 54, at 1. The Court would grant the RJN and agrees with Plaintiff's position that courts do not take judicial notice of the truth of the contents of the documents. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

**\*13** The Court thinks that even the more general cautionary statements are sufficient in regards to forward looking statements about CLNS's revenue and dividend projections. *See Police Ret. Sys.*, 759 F.3d at 1059 (upholding cautionary language similar to that used on CLNS's earnings calls); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (same). Additionally, the more specific cautionary language in the SEC filings about the Merger not achieving its desired results are also sufficient. Even the cases that Plaintiff cites recognize that "the PSLRA does not require a listing of *all* factors that might make the results different from those forecasted. Instead, the warning must only mention *important* factors of similar significance to those actually realized." *In re Copper Mt. Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004). Here, the crux of Plaintiff's theory

is that Defendants mischaracterized the retail investment management, leading to results below those expected when Defendants announced the Merger. The Court thinks that CLNS sufficiently cautioned investors about the risk that the company may not ultimately realize the expected benefits of the Merger.[7]

[7]   In future briefing Defendants should better direct the Court to which challenged statements appear in which document so that the Court can more easily examine the specific cautionary language at issue.

Plaintiff's argument that the cautionary language says "nothing about the importance of the retail [investment management] business to [D]efendants' stated targets," is unavailing because, as described above, Plaintiff did not particularly allege that retail investment management was important to reaching the stated guidance.

As such, the Court would find that many of Defendants' allegedly false statements would fall within the PSLRA safe harbor.

### 4. Non-Actionable Puffery

"Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys.*, 759 F.3d at 1060 (internal quotation marks omitted). " 'Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision." *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (internal quotation marks and citation omitted). Further, the puffery rule "has its limitations; a projection of optimism becomes actionable when (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Id.* (internal quotation marks and citation omitted). In other words, "even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d at 1143 (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Defendants argue that the following statements are non-actionable puffery: "our new company is off to a very promising start in 2017" (FAC ¶ 33), "this is an area where we could be very pleasantly surprised" (*id.* ¶ 61), "the environment is as positive as it is" (*id.* ¶ 61), "we are finally seeing positive momentum in the overall retail marketplace" (*id.* ¶ 71), "accelerate fundraising" (*id.* ¶¶ 55, 59, 86), having "another excellent quarter" (*id.* ¶ 82), and intending to "turbocharge growth and returns" (*id.* ¶ 63; *see also id.* ¶ 79). The Court would agree that most of these are non-verifiable statements of corporate optimism and are therefore not actionable. *See In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) (concluding that the following statements were non-actionable puffery: "highly optimistic about [growth in] the US," and "extremely bullish for the US markets"). The only statements that do not seem like puffery are statements about accelerating fundraising, but as described above those may be forward looking.

**\*14**   Defendants also challenge statements about the Company and its offerings, including that it has "[p]roduct structures that are innovative and best-in-class" that would be "highly attractive to a very broad group of financial advisors and their clients" (*id.* ¶ 71), and may be considered a "preferred manager" (*id.* ¶ 83). Again, these are the type of vague, buzzword-filled statements that investors know how to value and are therefore non-actionable in a securities fraud suit. *See In re Solarcity Corp.*, 274 F. Supp. 3d at 995 ("[O]ur growth profile is going to be pretty darn big compared to most companies that are out there"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("[A] first step ... towards being a trusted advisor.").

Finally, Defendants argue that the following statements about the direction of the market are non-actionable: "the retail environment ... is improving ... now that we've got these regulatory headwinds behind us" (FAC ¶ 72), experiencing "positive momentum" (*id.* ¶ 71), and "[retail is] more likely to be robust on our behalf during the second half of the year" (*id.* ¶ 73). Again, the Court would conclude that these statements cannot support a securities fraud suit. There is simply no way to measure "positive momentum," "improving environment," or "headwinds" being "behind" the company. Plaintiff states that some of these statements are "verifiable statement[s] of present fact and measurable given its connection to specific metrics and/or aspects of CLNS's business," but Plaintiff has

not suggested how one might measure a regulatory headwind. *See* Opp'n at 14. [8]

[8]     Conversely, statements about "remaining on track" or having a "cushion" on guidance are verifiable facts and therefore not puffery.

Plaintiff lastly argues that the statements fall outside of the puffery rule because they addressed specific aspects of CLNS's operations that Defendants *knew* were performing poorly. The Court does not have a problem with the legal principle that vague optimistic statements can be rendered actionable if spoken with knowledge that they were false. However, as explained below, the Plaintiff has not sufficiently alleged that Defendants had such knowledge.

### B. Scienter

Because the Court would conclude that Plaintiff has only alleged falsity regarding statements about being "on track" to reach financial projections, and because the Court concluded that such statements fell under the PSLRA forward looking safe harbor, it need not reach scienter. Again, the Court provides the following to inform potential future motion practice.

Defendants argue that Plaintiff has not sufficiently pleaded "any specific, contemporaneous factual information known to the Company or the Individual Defendants demonstrating that the challenged statements were false." *See* Motion at 19. The Court would agree. Plaintiff's allegations about scienter are mostly conclusions that Defendants "knew" the challenged statements were false. *See* FAC ¶¶ 35, 36, 42, 64, 94-96.

Plaintiff gets a bit closer by contending that Defendants were monitoring the retail investment market because it was a "critical core operation" and/or a "top strategic priority." *See* Opp'n at 20-21. But, as stated throughout this tentative ruling, there are no particularized *factual* allegations that retail investment management was critical to CLNS reaching its financial goals. Moreover, these types of allegations boil down to nothing more than arguing that Defendants *must have known* that their statements were false. However, as currently pleaded, Plaintiffs have not alleged that the falsity of Defendants' statements were "patently obvious" when made. *See Zucco Partners*, 552 F.3d at 1001. This is especially true regarding comments about being "on track" – the only statements Plaintiff sufficiently alleged as false. It is clear from the face of the complaint that a host of factors contribute to CLNS's business and therefore its projections

about its business. Put another way, the Court is not sure that even if Individual Defendants knew CLNS was way below expectations on retail investment management, that they would know that CLNS was not "on track" to reach the Core FFO guidance. Plaintiff certainly has not alleged any facts, such as a confidential informant or a document, that demonstrate the Individual Defendants' scienter.

**\*15** Plaintiff does provide a few specific scienter arguments. First, Plaintiff argues that CLNS's sale of Townsend demonstrates Defendants' scienter. *See* Opp'n 20-21. Defendants respond that the more plausible explanation of the sale was the explanation CLNS gave: "it became clear that the market perceived a conflict with Colony's institutional investment management business." *See* RJN Ex. R at 1765.

The Court is confused by Plaintiff's reasoning regarding Townsend. The Court thinks there is a link missing between selling a portion of the investment management business and *knowing* or being deliberately reckless in the belief that CLNS could achieve its goals. In other words, it is entirely plausible that Defendants reasonably believed they could make up for the sale of Townsend via other avenues of the business. Further, where so much of Plaintiff's FAC is focused on retail investment management, the Court is a bit confused about how the sale of an institutional investment management business fits into the theory of the case. If Plaintiff maintains that the sale of Townsend is crucial to its allegations of scienter (or falsity of CLNS's financial projections) it must spell out the connection in more specific terms.

Next, Plaintiff argues that Hamamoto and Tangen's sales of some of their shares create a strong inference of scienter. "For sales of stocks to be suspicious, they must be dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (internal quotation marks and citation omitted). Plaintiff does not allege that any other Individual Defendants sold shares. As such, the Court would conclude that Hamamoto and Tangen's sales are irrelevant to the other Defendants' mindsets. Further, even if the Court did find Hamamoto and Tangen's sales suspicious pursuant to *Curry*, the Court does not think that those sales *alone* support a strong inference of scienter. *See Ronconi*, 253 F.3d at 436 ("[One insider's] trading supports only a weak inference, not a strong one, in light of what the other, equally knowledgeable, insiders were doing."). For similar reasons, the Court would conclude that Hamamoto's departure – when allowed to leave

after the one year vesting period – and non-defendant Gilbert's departure do not establish scienter.

### C. Section 20(a) Claims

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must first allege an underlying violation of Section 10(b). *See Zucco Partners, 552 F.3d at 990, 1008* (affirming dismissal of Section 20(a) claims where plaintiffs failed to allege violation of Section 10(b)). Defendants argue that Plaintiff's Section 20(a) claim fails "[b]ecause Plaintiff has failed to state a claim under Section 10(b)." Motion at 25. Because the Court has found

that Plaintiff has failed to state a claim under Section 10(b) and SEC Rule 10b-5, the Court would dismiss Plaintiff's second cause of action as well.

### IV. Conclusion

Based on the foregoing discussion, the Court would **GRANT** the motion, but would permit leave to amend.

### All Citations

Slip Copy, 2019 WL 13237710

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 2

2022 WL 3927828
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Miriam EDWARDS, et al., Plaintiffs.

v.

MCDERMOTT INTERNATIONAL,
INC., et al., Defendants.

Civil Action No. 4:18-cv-04330
|
Signed August 30, 2022

**Attorneys and Law Firms**

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Plaintiff Miriam Edwards.

Chet B. Waldman, Sean M. Zaroogian, Matthew Insley-Pruitt, Robert C. Finkel, Pro Hac Vice, Wolf Popper LLP, John J. Rizio-Hamilton, Lauren Ormsbee, Pro Hac Vice, Bernstein Litowitz Berger & Grossman LLP, New York, NY, James M. Fee, Labaton Sucharow LLP, New York City, NY, Michael Kenan Oldham, Reynolds Frizzell LLP, Jeffrey W. Chambers, Chambers Law Firm, Houston, TX, for Plaintiff Public Employees' Retirement System of Mississippi.

R. Dean Gresham, Gresham Law Group, Dallas, TX, Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, for Plaintiff Wah Kee Ho.

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, for Plaintiffs John Arden Ahnefeldt, Robert Brower, Jr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, Alexandre Tazi.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Elizabeth Pennington Furlow, Baker Botts LLP, Houston, TX, for Defendants McDermott International, Inc., David Dickson, Stuart Spence.

David D. Sterling, Baker Botts LLP, Houston, TX, for Defendant Chicago Bridge & Iron Co.

**MEMORANDUM AND RECOMMENDATION**

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before me is Defendants' Motion to Dismiss Plaintiff's § 10(b) Supplemental Class Action Complaint ("Motion to Dismiss"). Dkt. 222. After carefully reviewing the Supplemental Class Action Complaint, the excellent briefing submitted by both sides, and the applicable law, I recommend that the Motion to Dismiss be **GRANTED**.

**BACKGROUND**

This is a securities class action lawsuit brought on behalf of purchasers of the common stock of McDermott International, Inc. ("McDermott") against McDermott and two of its former top executives, President and Chief Executive Officer David Dickson ("Dickson") and Executive Vice President and Chief Financial Officer Stuart Spence ("Spence").

In the Corrected Class Action Complaint, Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") brings claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.[1] The crux of the Corrected Class Action Complaint is that Defendants made misrepresentations and omissions regarding the true risks and costs of McDermott's May 2018 merger with Chicago Bridge & Iron Company, N.V. The Corrected Class Action Complaint's proposed class consists of those persons and entities who purchased or otherwise acquired McDermott common stock between December 18, 2017 and September 17, 2019.

[1]     There is a separate group of plaintiffs asserting claims under § 14(a). Those claims are not at issue in the pending Motion to Dismiss.

Defendants moved to dismiss the Corrected Class Action Complaint. In the spring of 2021, United States District Judge George C. Hanks, Jr. denied the motion to dismiss and ordered that discovery proceed. *See Edwards v. McDermott Int'l, Inc.,* No. 4:18-CV-4330, 2021 WL 1421609, at \*10 (S.D. Tex. Apr. 13, 2021).

Last fall, Novia Scotia sought leave to file a Supplement to its Corrected Class Action Complaint ("Supplement"). Over vigorous opposition, I granted Novia Scotia leave to file the Supplement. I also set a briefing schedule for Defendants' anticipated motion to dismiss the Supplement.

In short, the 30-page Supplement carries forward the allegations of securities fraud from September 17, 2019, through McDermott's bankruptcy filing on January 23, 2020. In doing so, the Supplement adds roughly 20 allegedly false and misleading statements made by Defendants, ranging in time from late September 2019 through January 23, 2020. The Supplement also offers a new theory of liability, arguing that Defendants had a duty to disclose that it was planning for a potential bankruptcy filing. Section V of the Supplement, titled "Additional Partial Corrective Disclosures," pleads November 4–5 of 2019 and January 21–23 of 2020 events and stock drops as partially corrective of alleged misstatements previously pleaded in the Corrected Class Action Complaint.[2] Finally, the Supplement seeks to expand the class definition to cover the time period from September 18, 2019 through January 23, 2020.

[2]    As Defendants readily acknowledged at oral argument, they have not moved to dismiss these corrective disclosures from the case.

**\*2** As expected, Defendants have moved to dismiss the Supplement, raising a number of distinct arguments. First, Defendants contend that the Supplement fails to allege any actionable false or misleading statement. Second, Defendants argue that there is no legal duty to disclose bankruptcy planning, and creating such a duty would lead to disastrous policy consequences. Third, Defendants insist that the alleged misrepresentations are nothing more than non-actionable puffery, statements of opinion, or protected forward-looking statements. Fourth, Defendants aver that the Supplement fails to establish the requisite inference of scienter required under the Private Securities Litigation Reform Act ("PSLRA").

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct.

1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R § 240.10b–5(b). "A § 10b–5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled 'with particularity' and ... the requirements of the [PSLRA]." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

Rule 9(b) requires parties claiming fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The allegations must include "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quotation omitted).

Enacted by Congress in 1995, the PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). To accomplish this goal, the PSLRA contains "[e]xacting pleading requirements." *Id.* at 313, 127 S.Ct. 2499. Under the PSLRA's heightened pleading requirements, a plaintiff seeking to properly state a Section 10(b) and Rule 10b–5 claim must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John*

*Fund, Inc.*, 573 U.S. 258, 267, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014) (quotation omitted).

The scienter, or state-of-mind element of a § 10(b) and Rule 10b–5 claim, is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To allege scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

 **\*3**  Section 20(a) of the Exchange Act provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act. 15 U.S.C. § 78t(a). "To impute liability to [Dickson] and [Spence]—the alleged 'control persons' of [McDermott] under § 20(a) of the Securities Exchange Act—the investors ha[ve] to show a 'primary violation' under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

### OBJECTIONS TO EXHIBITS 4–6 AND 8–9 ATTACHED TO THE MOTION TO DISMISS

As a preliminary matter, I need to address Nova Scotia's objection to various news articles attached to the Motion to Dismiss as Exhibits 4–6 and 8–9. Nova Scotia objects to these exhibits on the grounds that they are not attached to or incorporated in the Supplement. Nova Scotia is correct. This is not a close call.

In considering a Rule 12(b)(6) motion, a district court may consider: (1) the pleadings and any attachment to the pleadings; (2) documents incorporated into the complaint by reference; and (3) documents that a defendant attaches to its motion to dismiss if those documents are referenced in the plaintiff's complaint and are central to the plaintiff's claim. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Because the news articles at issue clearly do not fall with any of these well-defined exceptions, I will strike Exhibits 4–6 and 8–9 from consideration.

### ANALYSIS

As noted, to state a claim for a violation of Section 10(b) and Rule 10b–5, a plaintiff must first plead a material misrepresentation or omission. For the reasons set forth below, Nova Scotia has failed to allege any actionable misrepresentation or omission by Defendants.

### A. LEGAL FRAMEWORK FOR PLEADING A MATERIAL MISREPRESENTATION OR OMISSION

Under the PSLRA, securities fraud plaintiffs must "identify the particular statement they contend is false and misleading and the reason why that statement is false or misleading. Attempting to overwhelm the court with conclusory, garrulous and esoteric allegations simply does not get the job done." *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 560–61 (N.D. Tex. 2003). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quotation omitted).

District courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under federal securities law. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). This is because "no reasonable investor would consider such statements material and ... investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012). "Statements that are predictive in nature are actionable only if they were false when made." *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir.1993).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must also be material. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). "A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R & W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000).

### B. THE SUPPLEMENT FAILS TO ALLEGE A FALSE OR MISLEADING STATEMENT

**\*4** By my count, the Supplement identifies approximately 20 statements that it contends are materially false or misleading. A close look at those statements, however, fails to reveal any statement made by Defendants that was factually untrue or misleading at the time it was made.

As described in great detail in the Corrected Class Action Complaint, McDermott faced significant financial challenges in the fall of 2019. On September 18, 2019, the company's stock price plummeted 49 percent in morning trading after *The Wall Street Journal* reported that McDermott had "engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." Dkt. 105 at 216. Later that same day, McDermott confirmed the hiring of the turnaround firm, stating that the company was "taking positive and proactive measures ... intended to improve its capital structure and the long-term health of its balance sheet." *Id.*

According to the Supplement, Defendants falsely convinced analysts and investors that McDermott could overcome its liquidity problems by obtaining short-term financing and then, later on, selling its Lummus Technology business. "Unbeknownst to investors," the Supplement alleges, "the operational issues, project delays, cost overruns, and cash drains of [various projects] were insurmountable absent a bankruptcy reorganization." Dkt. 220 at 5. "Defendants' statements were merely a scheme to maintain artificial inflation in McDermott's stock price while providing time to develop and execute a prepackaged Chapter 11 restructuring plan that wiped out common stockholders." *Id.* at 6. The Supplement also notes that McDermott issued a press release announcing that the company had filed a prepackaged bankruptcy on January 21, 2020. *See id.* at 21.

Although the Supplement is well-written and certainly conveys its thematic message that Defendants reportedly knew that bankruptcy was a foregone conclusion, Nova Scotia cannot point to a single statement in which Defendants affirmatively denied the possibility that it would file for bankruptcy protection. At this preliminary pleading stage, it is my job to look at each challenged statement, one by one, to determine if it contains a false statement of fact. I have done that. The statements Nova Scotia challenge merely identify strategic alternatives McDermott pursued in an effort to address its serious liquidity concerns. The statements do not promise that McDermott would never file a bankruptcy proceeding. *See, e.g*, Dkt. 220 at 8 (alleging McDermott "expects to utilize the amounts under

the Agreement [with secured lenders] to finance working capital and support the issuance of required performance guarantees on new projects" (emphasis omitted)); *id.* ("McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology and the sale process for the remaining portion of the pipe fabrication business." (emphasis omitted); *id.* at 11 ("Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers." (emphasis omitted)); *id.* ("We continue to pursue the previously announced strategic alternative process for our Lummus Technology business and the sale process for the remaining portion of our pipe fabrication business." (emphasis omitted)); *id.* at 12 ("Tranche B funding is expected to allow McDermott to continue collaborative discussion regarding a long-term balance sheet solution" (emphasis omitted)).

**\*5** The above-referenced statements are a mere sampling of the statements challenged by Nova Scotia in the Supplement. Attached as Exhibit A to Defendants' Motion to Dismiss is an extremely helpful Appendix, listing, in one convenient place, each allegedly fraudulent statement made by Defendants.[3] *See* Dkt. 222-1. Although Defendants repeatedly described their efforts to ameliorate McDermott's liquidity problems, they never once promised investors that a bankruptcy filing was off the table. The reality for any company is that a bankruptcy filing always remains a possibility in the event its efforts to cure a severe liquidity crisis do not bear fruit. Indeed, McDermott expressly stated in its Form 10-Q for its third quarter (ending September 30, 2019) that the company "may be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11 of the Bankruptcy Code if we are unable to successfully negotiate a timely out-of-court restructuring agreement with our creditors." Dkt. 222-5 at 64.

[3]     As an aside, Nova Scotia objects to Appendix A on the ground that it seeks "to rewrite the Supplement's statements and raise argument beyond the brief page limits." Dkt. 230 at 22 n.3. I overrule Nova Scotia's objections. Because Appendix A merely identifies the challenged statements **verbatim** in one easily accessible chart, I view Appendix A as a helpful guide to the Court, not a devious attempt to avoid page limitations.

*See Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 212 (D. Mass. 2018) (rejecting attempt to exclude a chart identifying misstatements and omissions alleged in a securities fraud complaint because such information is "helpful to the Court" and not "argumentative in nature").

In short, the Supplement fails to identify a materially false or misleading statement. [4] Because I have concluded that the Supplement does not allege an actionable misrepresentation, I must now determine whether the Supplement alleges an actionable omission.

[4]     Because the alleged misstatements set forth in the Supplement are not, in fact, misstatements at all, I need not address whether the challenged statement+s: (i) are forward-looking statements protected by the PSLRA's safe-harbor provision; or (ii) constitute nonactionable puffery.

**C. THE SUPPLEMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION**

"[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). *See also Basic*, 485 U.S. at 239 n.17, 108 S.Ct. 978 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). "[M]erely because a reasonable investor might really like to know [a] fact" does not mean that a corporation has a legal duty to disclose that fact. *Berger v. Beletic*, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003). "Disclosure is required under [§ 10(b) and Rule 10b-5(b)] only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx*, 563 U.S. at 44–45, 131 S.Ct. 1309 (quoting Rule 10b-5). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Id.* at 45, 131 S.Ct. 1309.

Nova Scotia contends that once Defendants chose to speak about their efforts to combat McDermott's liquidity issues, they had an obligation to disclose the fact that they were considering the possibility of filing for bankruptcy. *See* Dkt. 220 at 12 (McDermott "failed to disclose ... that a prepackaged bankruptcy was forthcoming and that McDermott's lenders would not permit access to third tranche funding outside of a bankruptcy proceeding"); *id.* at 13

(McDermott "failed to disclose that [it] was nearing an imminent prepackaged bankruptcy that would wipe out its common stockholders"). This type of failure-to-disclose-bankruptcy-planning claim has been considered and rejected by district courts on both sides of the Mississippi River. *See Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1154 (E.D. Mo. 2014) (rejecting claim that a company had an obligation to disclose a material risk of bankruptcy given its poor financial condition), *aff'd sub nom. Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015); *McNulty v. Kanode*, No. A-13-CV-026-LY, 2013 WL 12077503, at *12 (W.D. Tex. Nov. 6, 2013) (explaining "even if [the company] had in fact hired bankruptcy counsel and was seriously considering filing for bankruptcy, Defendants would not have been required to disclose this plan to investors" absent a duty to disclose); *Hutchinson v. Perez*, No. 12 Civ. 1073(HB), 2012 WL 5451258, at *5 (S.D.N.Y. Nov. 8, 2012) (statement that company had "no intention" of filing for bankruptcy was not misleading even while option was under consideration); *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. Feb. 24, 2009) (companies need not disclose contingency planning merely because contingency ultimately materializes), *aff'd*, 419 F. App'x 38 (2d Cir. 2011); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (company's "failure to disclose its bankruptcy planning did not make its other disclosures"—such as a statement that it was pursuing "options for easing [its] liquidity problems"—misleading).

 **\*6**  The reason district courts almost universally reject the notion that a public company must disclose when it is contemplating bankruptcy proceedings is grounded in "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." *Beleson*, 599 F. Supp. 2d at 527. The *Beleson* court further explained:

> Any standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers. Such a standard might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence

in the company and close the capital markets. In some cases, a rule requiring disclosure of bankruptcy plans might prematurely foreclose other options the company may be contemplating that could restore its financial viability and thus avert bankruptcy. Such a standard would also raise substantial practical challenges in defining the proper moment during the continuum of contingency planning at which the obligation to disclose would take effect.

*Id.*

In a footnote, Nova Scotia cites several cases for the proposition that a failure to disclose an imminent bankruptcy is a material omission. *See EnSource Invs. LLC v. Tatham, No. 3:17-CV-00079, 2017 WL 10648061 (S.D. Cal. Mar. 9, 2017); Anderson v. McGrath, No. CV-11-01175-PHX-DGC, 2012 WL 5381406 (D. Ariz. Nov. 1, 2012); In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947 (D. Minn. 2009); *In re McLeodUSA Sec. Litig.*, No. C02-0001, 2003 U.S. Dist. LEXIS 27915 (N.D. Iowa Aug. 7, 2003); *Arnlund v. Smith*, 210 F. Supp. 2d 755 (E.D. Va. 2002); *Salkind v. Wang*, No. CIV.A. 93-10912-WGY, 1995 WL 170122 (D. Mass. Mar. 30, 1995). But, as pointed out by Defendants, those cases are inapposite. Each of those cases involved "defendants affirmatively paint[ing] a rosy, misleading picture of a company's financial status and then [failing to] disclose underlying liquidity problems." Dkt. 222 at 22. By contrast, McDermott expressly acknowledged its fragile liquidity position and outlined various steps— from bridge loan financing in the short-term to a possible sale of Lummus Technology at a future date—the company considered in an effort to escape from under crippling debt. Viewed in light of all the information available at the time, it is hard to argue with a straight face that a reasonable investor would be surprised to learn that McDermott faced the real possibility of seeking bankruptcy protection. This is particularly true given the specific disclosure in McDermott's quarterly federal securities filings, discussed above, that the company "may be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11 of the Bankruptcy Code." Dkt. 222-5 at 64. Even Nova Scotia, in this very case, recognized

in a filing with the Court on September 18, 2019, that "McDermott fil[ing] for bankruptcy protection" was a "strong possibility." Dkt. 95 at 4.

With its back against the wall, Nova Scotia contends that even though McDermott allegedly knew as early as September 2019 that bankruptcy was its "only option" and a "foregone conclusion," McDermott failed to publicly disclose such information. Dkt. 230 at 25–27. In making this argument, Nova Scotia relies heavily on statements made by McDermott's Chief Transformation Officer, John Castellano, during bankruptcy proceedings on March 12, 2020, to the effect that once the company obtained bridge financing in the fall of 2019, "there really weren't any other options at all, other than restructuring." Dkt. 240-2 at 128. In Nova Scotia's mind, this statement is an express admission that McDermott knew early on that it had no alternative other than to seek Chapter 11 protection. But this view is too simplistic, as it assumes that the term "restructuring" is synonymous with filing for bankruptcy. This certainly is not the case, as restructuring often occurs out of court by, for example, stretching out the maturity date of obligations, partial forgiveness of principal and accrued interest, changing covenants in debt instruments, or a combination of these and other changes. *See In re Solutia, Inc.*, No. 03-17949 PCB, 2007 WL 1302609, at *4 (Bankr. S.D.N.Y. May 1, 2007) (recognizing the difference between out-of-court restructuring efforts and filing for bankruptcy). Defendants maintain that McDermott's public filings, as well as the entirety of Castellano's bankruptcy testimony, expressly recognize that McDermott actively sought out-of-court restructuring before it finally concluded, as a last resort, that it had no alternative but to file for bankruptcy protection. *See* Dkt. 240-2 at 134 (Castellano specifically denying that bankruptcy was a "fait accompli" as of October 21, 2019, and testifying that "we knew a reorganization of some form or fashion was necessary"). After carefully reviewing the documents referenced in the Supplement, which clearly indicate that McDermott analyzed both in-court and out-of-court options to address its capital structure, I am unwilling to jump to the conclusion that Defendants knew all along that bankruptcy was the only real alternative to its business problems.

**\*7** All told, I refuse to fault Defendants for failing to disclose that McDermott was considering bankruptcy. In reaching this conclusion, I follow the reasoning of the overwhelming majority of federal courts which have held that a company's "failure to disclose its bankruptcy planning [does] not make

2022 WL 3927828

its other disclosures misleading." *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348. Accordingly, Nova Scotia has failed to allege an actionable omission.

\*\*\*

In short, the Supplement has failed to identify a misleading statement or material omission actionable under § 10(b) and Rule 10b-5(b). I thus recommend that the Supplement's new § 10(b) and Rule 10b-5(b) claims be dismissed. Nova Scotia's § 20(a) claim against Dickson and Spence likewise fails, as it is predicated on a successful § 10(b) claim. *See Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 905 (5th Cir. 2018). Because I have concluded that Nova Scotia has failed to identify a misleading statement or omission, I need not address whether the Supplement's federal securities claims should also be dismissed for the failure to allege scienter. *See Labs.' Loc. #231 Pension Fund v. PharMerica Corp.*, No. 3:18-CV-109-RGJ, 2019 WL 4645583, at \*13 (W.D. Ky. Sept. 24, 2019).

**CONCLUSION**

For the reasons explained above, I recommend that Defendants' Motion to Dismiss Plaintiff's § 10(b) Supplemental Class Action Complaint (Dkt. 222) be **GRANTED**. The claims arising out of the alleged additional materially false and misleading statements and omissions set forth in ¶¶ 6–15 of the Supplement should be dismissed. At the same time, this recommendation is not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to January 23, 2020 as described in ¶ 4 of the Supplement.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**All Citations**

Slip Copy, 2022 WL 3927828

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 3

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 26 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.,
N.D.Tex.,   June 25, 2018

2017 WL 6398742
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Alan HALL and James Depalma, individually and
on behalf of all others similarly situated, Plaintiffs

v.

RENT-A-CENTER, INC., Robert D.
Davis, and Guy J. Constant, Defendants

CIVIL ACTION NO. 4:16cv978
|
Signed 10/19/2017

**Attorneys and Law Firms**

Lionel Z. Glancy, Glancy Prongay & Murray LLP, Los
Angeles, CA, Elton Joe Kendall, Jamie Jean McKey, Kendall
Law Group, LLP, Willie Charles Briscoe, The Briscoe Law
Firm, R. Dean Gresham, Steckler Gresham Cochran LLP,
Dallas, TX, Jonathan Gardner, Marisa N. Demato, Labaton
Sucharow LLP, New York, NY, Guillaume Orson Buell,
Hicks Davis Wynn P.C., Houston, TX, for Plaintiffs.

David Dykeman Sterling, Baker Botts LLP, Houston, TX,
Jessica B. Pulliam, Baker Botts LLP, Dallas, TX, Peter
Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX,
for Defendants.

**AMENDED REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE** [1]

[1]   The   Court   issues   this   Amended   Report
and   Recommendation   to   add   on   page   68
the   inadvertently   omitted   phrase   "Defendants'
assertions   regarding"   in   the   last   sentence   of   the
Court's discussion of Plaintiffs' § 20(a) claims.

CAROLINE   M.   CRAVEN,   UNITED   STATES
MAGISTRATE JUDGE

**\*1**  The above-referenced cause of action was referred to
the undersigned United States Magistrate Judge for pretrial

purposes in accordance with 28 U.S.C. § 636. The following
motion is before the Court:

> **Defendants'   Motion   to   Dismiss
> Plaintiffs'   Consolidated   Class
> Action Complaint (Docket Entry
> #44).**

The   Court,   having   reviewed   the   relevant   briefing,
recommends the motion be **DENIED**.

**I. BACKGROUND**

This is a federal securities class action brought pursuant
to Sections 10(b) and 20(a) of the Securities Exchange
Act of 1934 (the "Exchange Act") and SEC Rule 10b-5
promulgated thereunder (17 C.F.R. § 240.10b-5) against
Rent-A-Center, Inc. ("RAC" or the "Company"); its former
Chief Executive Officer ("CEO") Robert D. Davis ("Davis");
and its former Executive Vice President of Finance, Chief
Financial Officer ("CFO"), and Treasurer Guy J. Constant
("Constant") (collectively "Defendants") [2] on behalf of all
persons and entities that purchased or otherwise acquired
RAC publicly traded common stock during the period
from February 2, 2015 through October 11, 2016, inclusive
(the "Class Period") and who were damaged thereby. The
action involves Defendants' alleged collective failure to
inform the market that the "pivotal initiative the Company
undertook during the Class Period and had been promising
Wall Street—the rollout of its proprietary point-of-sale
("POS") management information system, which had been in
development for more than five years and cost the Company
at least $175 million—was an abject failure fraught with
stability and functionality problems that directly affected the
Company's ability to complete sales and collect rental income
during the Class Period." Docket Entry # 45 at 1.

[2]   Davis and Constant are referred to herein as the
"Individual Defendants."

The facts are drawn from the Consolidated Amended Class
Action Complaint for Violations of Federal Securities Laws
and the documents it incorporates by reference such as filings
with the Securities and Exchange Commission ("SEC")
and other documents that provide the basis for Plaintiffs'
claims. *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, No. CV

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 27 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

H-15-2213, 2017 WL 590383, at *5 (S.D. Tex. Feb. 14, 2017) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

RAC is one of the largest rent-to-own operators in North America. Compl., ¶ 2. At RAC's stores, customers can rent-to-own electronics, appliances, furniture, and other durable items. During the Class Period, RAC generated revenue from four operating segments: (1) Core U.S., (2) Acceptance Now, (3) Mexico, and (4) Franchising. *Id.* at ¶ 3. Core U.S. was RAC's largest segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada, and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of the Core U.S. segment" and that any "significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies." *Id.*

 **\*2** Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms. *Id.* at ¶ 4. Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. Because RAC's key customer demographic was "unbanked" and without credit, most of its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, the customer would be able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. *Id.*

The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts. RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. *Id.*

Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its proprietary point-of-sale management information system ("POS" or "SIMS"), which had been in development since at least 2009. *Id.* at ¶ 5. This new POS system was purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each store's sales and collection data. [3] Prior to the rollout of SIMS, each store was required to download and transmit to RAC headquarters all store data at least twice daily. *Id.*

[3]     According to Defendants, SIMS was a "proprietary in-house developed system" designed to manage "key business processes in the store such as sales, customer account management, cash management and inventory management" and to "extend and improve capabilities for store sales and operations." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 13; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68; Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 4.

At the beginning of the Class Period, on February 2, 2015, RAC announced the new POS system was "fully operational" at its first store "following the system-wide implementation of the back office solution." *Id.* at ¶ 6. Otherwise, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives. Specifically, Defendants knew, but failed to inform investors, the POS system had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of the system. *Id.*

Throughout 2015, the Company rolled out the POS system to an increasing number of stores, and by December 31, 2015, the system was deployed in 385 stores. *Id.* at ¶ 7. However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and other information that should have caused Defendants to either halt the Company-wide rollout of the system or at least undertake a system-wide revamp before proceeding

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 28 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

with a full rollout, Defendants steadfastly refused to do either. *Id.* at ¶ 8. Defendants also failed to inform investors of the ongoing problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was "fully operational and ready to go." *Id.*

**\*3** "Defendants rushed out a full rollout of the POS system Company–wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016." *Id.* at ¶ 9. According to Plaintiffs, the truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016, when the Company announced its results for the year ended December 31, 2015 after the market closed that day. *Id.* at ¶ 10. The next day, during the Company's earnings call, Defendants acknowledged problems with implementation of the POS system and disclosed that for the first quarter of 2016 (ended March 31, 2016) RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact ... associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. *Id.*

According to Plaintiffs, Defendants falsely assured investors the "little bit of impact to revenue" would "go away then in the back half of the year." *Id.* Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores." Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. *Id.*

Additional information about problems with the POS system's implementation was revealed on April 27, 2016. *Id.* at ¶ 11. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so the Company could address a "greater-than-expected impact on sales." *Id.* However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [ ] operating this new POS system." *Id.* Defendants also assured investors the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations,

RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. However, Plaintiffs allege the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues. *Id.*

The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016. *Id.* at ¶ 12. Despite revealing decreased sales because of the impacts and acceleration of the POS system rollout, Defendants represented "the distraction of a major system roll-out is now behind us." *Id.* As a result of these disclosures, on July 28, 2016, RAC's common stock price fell approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume. *Id.*

The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. *Id.* at ¶ 13. According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." *Id.* "In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, *or over 28%* on abnormally high trading volume." *Id.* (emphasis in original).

On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter. *Id.* at ¶ 14. On December 2, 2016, the Company announced the termination of Defendant Constant effective immediately. *Id.* at ¶ 15. On January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately. *Id.*

**\*4** According to Plaintiffs, the statements of former RAC employees ("confidential witnesses" or "CWs") "with personal knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues existed at the time RAC initially

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 29 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

implemented the POS system in late 2014, and that these problems were not sufficiently remediated during the Company-wide rollout of the POS system when additional scalability and functionality problems surfaced." Docket Entry # 45 at 1. According to the Complaint, the statements of former RAC employees with knowledge of SIMS' development and implementation confirm that "internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system when it was initially rolled out in early 2015." Compl., ¶ 16. For example, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe) ("CW-1"), "stated Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout." *Id.* According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. "Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years." *Id.*

The Complaint also relies on "CW-2," who was employed by RAC for nineteen years from 1997 until June 2016. *Id.* at ¶ 17. "From March 2007 to June 2016, CW-2 held the title of Senior Director of Information Security and IT Service Management and reported directly to Chief Information Officer ... who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired." *Id.* "CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level." *Id.* CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout. CW-2 attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores, and CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

## II. PROCEDURAL BACKGROUND

On December 23, 2016, the original Class Action Complaint for Violations of the Federal Securities Laws was filed by Alan Hall, individually and on behalf of all others similarly situated. The case was assigned to District Judge Mazzant and referred to Magistrate Judge Johnson for pretrial purposes. On February 2, 2017, Magistrate Judge Johnson granted Defendants' Unopposed Motion for Consolidation of Related Cases, consolidating *James Depalma v. Rent-A-Center, Inc., et al.* (Cause No. 4:16cv981-ALM-KPJ) into the above first-filed case. Docket Entry # 9. All subsequent filings have been made in the above case.

On February 21, 2017, Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") filed a motion for the entry of an Order (1) appointing Oklahoma Firefighters as Lead Plaintiff for a Class of all persons who purchased the securities of Rent-A-Center, Inc., between July 27, 2015, and October 10, 2016, inclusive; and (2) approving Oklahoma Firefighters' selection of Labaton Sucharow LLP ("Labaton Sucharow") as Lead Counsel for the Class and Hicks Davis Wynn, PC as Liaison Counsel for the Class. Docket Entry # 10. The same day, Alan Hall and Larry Adams filed a motion for appointment as Lead Plaintiff and approval of Glancy Prongay & Murray LLP and Bragar Eagel & Squire, P.C. as Co-Lead Counsel for the class and Kendall Law Group, PLLC as Liaison Counsel. Docket Entry # 14. Three other movants filed motions to be appointed lead counsel, but they later requested their motions be withdrawn. Docket Entry #s 13, 15, 16. Magistrate Judge Johnson granted the movants' requests.

Although Alan Hall and Larry Adams did not request the Court withdraw their motion, they notified the Court that it appeared they did not possess the "largest financial interest in the relief sought by the class" as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u(a)(3)(B). *See* Docket Entry # 25. Thus, Magistrate Judge Johnson only considered Oklahoma Firefighter's motion as to whether it met the requirements for designation as lead plaintiff. On March 16, 2017, Magistrate Judge Johnson granted Oklahoma Firefighters' motion and denied Alan Hall and Larry Adams' motion. Docket Entry # 34. Judge Johnson also approved Oklahoma Firefighters' selection of lead counsel.

**\*5** Court-appointed Lead Plaintiff Oklahoma Firefighters is a defined-benefit pension plan headquartered in Oklahoma City, Oklahoma. Oklahoma Firefighters, together with additional named plaintiff City of Hollywood Employees'

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 30 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

Retirement Fund, filed the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws on May 5, 2017.

### III. DEFENDANTS' MOTION TO DISMISS

On June 5, 2017, Defendants filed their current Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Docket Entry # 44. The elements of a private securities fraud claim based on violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).

Defendants assert the Complaint fails to plead either (1) falsity or (2) the requisite strong inference of scienter with particularity as to any of the alleged misrepresentations. Specifically, Defendants assert the Complaint is devoid of any facts demonstrating how or why the Individual Defendants knew, or were consciously blind to, information showing that their regular (and increasingly negative) reports on the SIMS rollout throughout the Class Period were false at the time they were made.

In response, Plaintiffs point out Defendants contest only two elements of Plaintiffs' 10(b) claim—falsity and scienter —and assert Defendants thus concede "all other elements have been adequately pled: materiality, reliance, economic loss, and loss causation." Docket Entry # 45 at 3. Regarding falsity and scienter, Plaintiffs assert Defendants' arguments fail. According to Plaintiffs, allegations from senior-level CWs confirm that Defendants' statements and omissions were false and misleading when made. Plaintiffs assert Defendants, despite having test results and other information that clearly demonstrated the massive problems RAC was encountering with the SIMS rollout, failed to inform investors both of the existence of the ongoing problems and that the problems would likely materially affect the Company's revenues. "Instead, Defendants repeatedly assured the market that SIMS was fully operational and that any issues RAC faced were minor and had already been resolved," and when problems started to seriously impact RAC collection efforts,

"Defendants falsely reassured investors that these were only temporary hiccups that had been fully addressed." *Id.* at 2.

In addition, Plaintiffs contend allegations from the CWs, the Core U.S. segment's importance to the Company and the POS to the future of RAC's business, "as well as Constant and Davis's terminations, taken together with allegations that Defendants were motivated to roll out the POS System rather than write down this $175 million asset, demonstrate a strong inference of scienter." *Id.* at 3.

### IV. LEGAL STANDARDS

#### A. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a case for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**\*6** To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gonzalez*, 577 F.3d at 603 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.*

As explained below, a district court evaluating a motion under Rule 12(b)(6) must also consider the strict pleading requirements of Rule 9(b) and the PSLRA in a securities fraud case. *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. 03-md-1530, 2004 WL 5278716, at \*5 (E.D. Tex. June 16, 2004); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

## B. Section 10(b) of the Securities Exchange Act and Rule 10b-5 pleading requirements

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b); *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *9 (W.D. Tex. Jan. 26, 2017). Section 10(b) provides it is unlawful to "use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, nor misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).

Both FED. R. CIV. P. 9(b) and the PSLRA impose a heightened pleading requirement on § 10(b) claims. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b). To satisfy Rule 9(b)'s pleading requirements, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997); *see also Southland*, 365 F.3d at 362 ("The PSLRA reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading.")

**\*7** The PSLRA further enhances the "particularity" requirement for pleading securities fraud under Rule 9(b). Enacted in 1995 in response to frustration with Rule 9(b)'s inability "to prevent abusive, frivolous strike suits," the goal of the PSLRA is to "prevent the abuse of federal securities laws by private plaintiffs." *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001) (citing H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740). The PSLRA provides in relevant part as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> *  *  *
>
> Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2)(A); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642, 645 (5th Cir. 2005) (observing that only strong inferences of scienter, not based on conclusory allegations or unwarranted deductions, survive a motion to dismiss).

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 32 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

## V. WHETHER THE COMPLAINT PLEADS WITH PARTICULARITY ANY FALSE OR MISLEADING REPRESENTATION

### A. Plaintiffs' allegations

Plaintiffs allege RAC attempted to develop its own POS system, but the results were deeply flawed. According to Plaintiffs, the Individual Defendants knew the POS system implementation was experiencing "serious problems and that the roll-out threatened to affect both store operations and collections." Compl., ¶ 30. Plaintiffs allege the problems were not properly remediated before the system rolled out Company-wide, and the Individual Defendants disseminated materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the troubled implementation of the Company's new POS system, SIMS. *Id.* at ¶¶ 30, 34. This scheme allegedly: (i) deceived the investing public regarding RAC's operations and the true value of RAC's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase RAC common stock at artificially inflated prices, which fell as the truth concerning the material and sustained effect that the implementation of the POS system had on Core revenues ultimately became known. *Id.* at ¶ 34.

Regarding the allegedly false and misleading statements and/or omissions, the Complaint alleges the following background. In 2008, RAC began developing a proprietary POS system with the goal of centralizing certain functions. *Id.* at ¶ 42. The system was designed to centralize and manage sales, inventory, payments, collections, and customer relationships, all in real-time, from one POS system. *Id.* at ¶¶ 5, 42. Centralizing these functions was critical to RAC's future success because its other strategic initiatives—including integrated inventory management, e-commerce, and variable pricing—required such centralized infrastructure.[4] *Id.* at ¶¶ 42, 72.

[4]    According to CW-2, prior to the Class Period RAC used an "off the shelf POS system designed for the rent-to-own market" and "sales and collection information" was stored and transmitted to RAC headquarters multiple times daily. Compl., ¶ 43. CW-2 stated the old program could not meet the technological goals of RAC, including a centralized reporting system and e-commerce functionality. *Id.*

**\*8** CW-2 stated that between 2009—2010, RAC employed in-house and temporary engineers, as well as subcontractors, to develop the POS system that it ultimately named "SIMS." *Id.* at ¶¶ 5, 44. According to CW-1, the version of SIMS that was implemented during the Class Period was developed on an "outdated Oracle Linux-based operating system that was already considered to be at 'end of life' before SIMS was rolled out to the first store in Plano, Texas." *Id.* at ¶ 45. "Because of a series of executive changes in the CIO position at RAC between 2010 and 2013 (four CIOs in four years), CW-2 said that ownership of the POS/SIMS project was bounced around from executive to executive until December 2013 when RAC hired a new CIO (Herman Nell) and a new CTO (Christi Liebe)." *Id.* at ¶ 46.

According to CW-2, Nell reported directly to Davis while Liebe reported to Nell until Nell retired from RAC in April of 2016. *Id.* According to CW-2, when Nell retired Liebe reported directly to his successor Angela Yochem. "CW-2 said that Nell was tasked with getting the POS system ready to be commercially deployed (despite all its flaws) with Liebe and Gary Peek (former Vice President of IT Solutions) assisting with the development of the network servers, asset management, software licensing, database and network infrastructure, and "Dev/Ops" (cloud services)." *Id.*

Despite its efforts and capital investments of approximately $175 million during this period, SIMS, which the CWs have described as a patchwork of multiple older and outdated programs, suffered countless setbacks and was riddled with problems when RAC began pilot testing in one RAC store in December 2014. *Id.* at ¶¶ 47-52, 56. As explained by the CWs, the reason for its failure was that the POS was built on an outdated Oracle operating system that clashed with modern applications and was extremely difficult and costly to upgrade. *Id.* at ¶¶ 45, 64-65.

According to CW-1, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers that was responsible for implementing SIMS and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations, Nell and Liebe were given less than one year to work on the POS project before RAC decided to begin pilot testing in a store near headquarters in December 2014. *Id.* at ¶¶ 47, 50. CW-1 stated "the timing of the rollout decision was predominantly based on concerns that if the Company did not commercialize the POS system soon, significant amounts of

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 33 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

the capitalized software development costs associated with the project would need to be written off." *Id.* at ¶ 47.

According to CW-1, at the end of 2014, SIMS was "still nowhere near ready for pilot testing" as "serious capacity and performance issues were being experienced." *Id.* at ¶¶ 48-49. According to CW-1, Liebe and Nell were aware of the serious problems surrounding the development and deployment of the system and "would have communicated any significant problems and delays to Davis and Constant through, for example, color-coded SIMS incident reports ... and at SIMS Executive Steering Committee meetings which were attended quarterly by Liebe, Nell, Department Heads, SVPs, and the Individual Defendants, and more frequently as the rollout of the POS system progressed." *Id.* at ¶¶ 50-51.

CW-2 confirmed that Davis and Constant were aware of issues relating to the POS system implementation. *Id.* at ¶ 52. CW-2 said Individual Defendants were on the SIMS Executive Steering Committee, and Davis held weekly meetings with his CIOs, including Nell during the Class Period, where SIMS issues were always discussed. *Id.*

The Complaint details the meetings attended by senior RAC executives, including the Individual Defendants, where the ongoing problems with the development and implementation of SIMS were discussed:

**\*9**  • quarterly meetings of the SIMS Executive Steering Committee which included Davis and Constant during which SIMS' progress and issues were continually discussed (¶¶ 50-52);

• weekly SIMS project team meetings attended periodically by Davis and Constant (¶ 51); and

• weekly meetings Davis held with CIO Nell (then CIO Angela Yochem starting in May 2016) during the Class Period where SIMS was discussed.

*Id.* at ¶¶ 50-52, 74. CW-2 also indicated Davis and Constant were kept aware of issues the technology team was encountering with SIMS, and that as the SIMS rollout accelerated and more issues arose, Davis' involvement increased. *Id.* at ¶ 74. CW-2 further confirmed that Davis was directly involved in SIMS' development from the onset. *Id.*

The Complaint also details the reports provided to senior RAC executives in which the problems with the development and implementation of SIMS also were discussed, including:

• SIMS Incident Reports which employed a green/yellow/red color-coding system to rank the severity of SIMS' problems and were provided to Davis and Constant (¶¶ 51, 71); and

• "Root Cause Analysis Reports" which detailed the pervasive scope and specific issues the Company was having with SIMS and "show that RAC was experiencing outages in the weeks prior and subsequent to the start of the Class Period —the same time Defendants were reporting the successful implementation of SIMS in the first pilot store."

*Id.* at ¶ 68.

The Complaint alleges RAC rushed the pilot testing and rollout of the POS system despite known risks and flaws in order to avoid a massive write-down of the system. Specifically, the Complaint alleges as follows. RAC invested at least $175 million in the development of SIMS prior to the Class Period. *Id.* at ¶ 53. Pursuant to Generally Accepted Accounting Principles ("GAAP"), RAC was required to capitalize certain costs associated with SIMS' development. *Id.* at ¶¶ 53-56. The Company was not required to begin amortizing such costs until the software was placed into use. However, GAAP mandated that RAC write down its capitalized costs for software under development to the lower of (1) its carrying amount or (2) its fair value (if any) once its completion or use no longer appeared probable. *Id.* at ¶¶ 55-57, 169.

If it was no longer probable that the POS system would be completed or placed into service, the capitalized asset would need to be reported at the lower of the carrying amount or fair value, if any, less costs to sell. A rebuttable presumption existed in GAAP that uncompleted software has a fair value of zero. *Id.* at ¶ 57. The Complaint alleges the impact of such an accounting adjustment in late 2014 would have been highly material to the Company's annual financial statements. *Id.* at ¶¶ 58-60, 170-71. Indeed, the result of abandoning the still-not-functioning POS system and writing-off the approximately $175 million invested by the Company (and not pilot testing SIMS for later implementation even on a scaled back basis) would have converted RAC's net earnings for the year and the quarter ending December 31, 2014 of $96.4 million and $25.6 million, respectively, into net losses of approximately $0.6 million and $71.5 million. *Id.* at ¶ 171.

**\*10** "According to CW-1, it was very well known within the Company that the POS system was rolled out in December 2014 despite its flaws because that project was close to

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 34 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

reaching its 5-year anniversary after having been started in 2009." *Id.* at ¶ 63. CW-1 explained that, by December 2014, RAC had to roll SIMS out into production in order to continue holding it as an asset on its balance sheet. *Id.* CW-1 further explained that if the Company failed to do so, it would be forced to take a substantial write off on SIMS, as its technology was already outdated by late 2014. CW-1 added that instead of taking the write off, the Company decided to rollout what they had and hoped to make it work as they went along. *Id.*

Turning to the alleged false and misleading statements and/or omissions, Plaintiffs contend RAC falsely touted SIMS as "fully operational" in 2015 while failing to acknowledge the serious issues plaguing the system. The Class Period begins on February 2, 2015. *Id.* at ¶ 80. According to the Complaint, in early 2015, Defendants announced that the "[n]ew POS system is fully operational in its first site...." *Id.* at ¶¶ 80, 81. Thereafter, the Company discussed its growth strategies, many of which relied on the successful implementation of SIMS. *Id.* at ¶ 82. However, the Company failed to mention "the pervasive issues the Company was having with the development and rollout of SIMS." *Id.*

Throughout 2015, Defendants touted the successful testing and implementation of the POS System in a growing number of stores, while failing to disclose the major issues the POS system was encountering:

- "hundreds of issues" were reported in Root Cause Analysis Reports from the first store in Plano, Texas; did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015; and generally failed in the stores it was rolled out to afterwards; (¶ 66)

- "major bugs were still being worked on through the end of [CW-1's] tenure in June 2016;" (¶ 67)

- the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (¶ 85(a))

- the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation; (¶ 85(b))

- the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development

efforts and modifications to make it compatible for Company-wide use; (¶ 85(c))

- the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores; (¶ 85(d))

- Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on were already considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with.

*Id.* at ¶ 86. Yet in an April 27, 2015 press release, the Company disclosed that the POS system was "fully operational" in 34 stores, and Davis stated, in part: "Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts." *Id.* at ¶ 87.

On April 28, 2015, before the market opened, the Company hosted a conference call to discuss its results for the first quarter ended March 31, 2015. During the call, with respect to the Company's implementation of SIMS, Davis stated, in part:

> **\*11** Following the successful pilot tests of our new POS system last quarter, today I'm proud to say that 34 stores are running the new system exclusively as an expanded pilot. General deployment of our new POS system through the remainder of our Core US RTO stores will start midyear and continue throughout this year, giving us the tools to understand and serve customers like never before.

*Id.* at ¶ 88. Similar statements were made for second quarter fiscal 2015 results and third quarter fiscal 2015 results. *See id.* at ¶¶ 94-99, 101-04. For example, on November 9, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015 and stated, in part, as follows:

> We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. *This system is operational in 8.5% of our Core U.S. stores at September 30, 2015, with general deployment starting in early 2016 to minimize impact on our fourth quarter holiday season.*

*Id.* at ¶ 104 (emphasis in original).

Both CWs confirmed that at all times from RAC's pilot program through June 2016, when they both left the Company, RAC continued to experience, document, and unsuccessfully mitigate hundreds of problems with SIMS, many relating to integral utilities such as general functionality and "scalability." *Id.* at ¶¶ 64, 67-68, 71, 73.

According to the Complaint, the details of the severity of the POS system implementation problems slowly began to emerge beginning with results for year ended December 31, 2015 (partial corrective disclosure). Compl. at pg. 42. However, Plaintiffs allege Defendants continued to mislead the market on the severity and impact of the POS system issues. *Id.* According to Plaintiffs, the truth about RAC's business was disclosed through a series of corrective disclosures of what Defendants "mischaracterized" as minor or "short-term" issues with the system beginning on February 2, 2016 with the release of the Company's fourth quarter 2014 results. Docket Entry # 45 at 8.

That day, the Company disclosed that its 2016 EPS would be down due to the "short-term impact" associated with putting the new POS system in stores. Compl., ¶¶ 109-11. Constant informed the market of the lower expected results during a February 2, 2016 RAC earnings call, stating: "What we've seen as we have tested the rollout ... is we see a pretty short-term impact, just given the activity associated with putting in new [POS] system in the stores. Very quickly the stores get up to speed and we end up with a better [POS] system that allows them to be more efficient to process transactions quicker and to deal with customers better." *Id.* at ¶ 110.

During the same call, Davis responded to a question concerning the rationale for the expected losses on the POS implementation. *Id.* at ¶ 111. Davis failed to acknowledge the persistent systemic issues with the POS system, blaming losses only on installation and training time. Davis also assured investors that all issues encountered during POS testing had been fixed, stating in part as follows:

> We've tested in 385 stores now, so ... we have a very good knowledge of what we see in terms of the impact on the stores. *We've done numerous upgrades and additions to the system ... that's improved any of the areas where we were seeing challenges.*
>
> No, the commentary is more around just the change that occurs when you're asking people that are operating the point-of-sale system every day to change what they're doing..... And so that distraction that we see for a fairly short period of time is what we factored into the commentary around first-quarter revenue.

**\*12** *Id.* (emphasis in original).

The next partial corrective disclosure occurred on April 27, 2016 when, in connection with the announcement of the Company's first quarter 2016 results, Defendants revealed that SIMS had been rolled out to "fewer locations than expected in the quarter," stating this "allowed for implementation of identified system enhancements." *Id.* at ¶¶ 118. During the earnings call, Davis listed the POS implementation as one factor that caused a 7% decline in revenue. *Id.* at ¶¶ 119-20. Davis (1) reiterated that all necessary changes had been made, (2) said the POS system was "operating" in 33% of Core U.S. stores, and (3) projected Company-wide implementation by September 2016. *Id.*

Constant then suggested the POS issues stemmed from "potential transition period impact." *Id.* at ¶ 121. Constant further stated: "we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." *Id.*

Defendants made a third partial corrective disclosure on July 27, 2016 in connection with the announcement of second quarter 2016 results during which Defendants disclosed that Core U.S. revenue decreased by 10.6%, driven in part by "the impact and acceleration of the [POS] rollout" to all stores. *Id.* at ¶¶ 127-34, 137. During its earnings call the next day, Davis stated he was "extremely disappointed in

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 36 of 281

**Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)**
2017 WL 6398742

our top-line performance and the short-term revised outlook" and explained that the rollout of the POS system to all 2,400 Core stores was accelerated because RAC's "other critical initiatives" depended on the full implementation of POS in all stores. *Id.* at ¶ 129. According to Plaintiffs, RAC continued to mislead investors about how the rollout to all stores would further exacerbate problems the Company was already struggling to mitigate. Specifically, Davis further stated as follows:

> Despite our team's efforts to mitigate the negative impact of accelerating the implementation of the new system, the decline in core top-line results was more significant than we expected, making up over half of the second-quarter decline in core same-store sales. ***Although the system performance and usability issues identified in the first quarter were fixed, the distraction of the new system*** impacted our core portfolio and took time away from collections efforts which resulted in a hit to revenues. Given the impact to the portfolio, we expect it to be a few quarters before we fully recover.

> That said, the distraction of a major system roll-out is now behind us, and we believe that longer-term benefits of our new system will outweigh the short-term costs. The new POS enables us to move forward with several growth opportunities to address the broader challenges in the core business.

> * * *

> The new POS system also enables us to be more prescriptive on pricing, so that we can customize pricing elements by region and by product category to ensure our value proposition continues to be relevant to our customers. Although we are not happy with the negative impact from ***the distraction related to the roll-out of new POS system, we are excited about the opportunities it will continue to bring well into the future***.

**\*13** *Id.* at ¶ 129 (emphasis in original).

Constant also made a number of other false and misleading statements, including calling the "primary driver" of the portfolio deterioration a "transition" problem and assuaging "now [ ] we're through that distraction." *Id.* at ¶ 132. Even when asked by an analyst regarding how the POS implementation could case such financial harm and why the Company elected to expedite the POS rollout if it had been projecting issues, including significant deterioration of earnings since at least the beginning of 2016, "neither

Davis nor Constant explained the true loss "driver"-crippling POS system outages, coupled with an inexplicable failure to install redundancies, made it onerous if not impossible to collect payments from its high risk customers." Docket Entry # 45 at 10. Instead, Davis stated "there's a number of capabilities that we are unlocking by getting the POS system fully implemented and in place" and one part to the answer is "just getting it behind us and eliminating the distraction" and "get going sooner on these new capabilities." Compl., ¶ 133. Davis then "falsely reassured" the analyst the issues were corrected. *Id.* at ¶ 134.

According to Plaintiffs, the full truth about the troubled POS implementation and its negative effects on the Company's revenues was not revealed until October 11, 2016 when the Company issued a press release announcing results for the third quarter ended September 30, 2016. *Id.* at ¶ 141. Defendants disclosed that Core U.S. sales for the third quarter would be down by approximately 12% due to "***system performance issues and outages*** that resulted in larger than expected negative impact on Core sales." *Id.* Less than one month before this disclosure, Davis and Constant presented at the Raymond James North American Equities Conference, wherein Davis stated RAC had recently rolled out a new store information management system that was "having a short-term negative impact on sales" but that set RAC up very well in the future to continue to grow the business. *Id.* at ¶ 139.

On October 11, 2016, RAC's stock price per share fell from a close of $12.88 on October 10, 2016 to a close of $9.18 on October 11, 2016—a decline of approximately 28.7%—on unusually high trading volume. *Id.* at ¶ 142. Two weeks later on October 26, 2016, RAC confirmed that, for the quarter ended September 30, 2016, Core U.S. same store sales had decreased by 12% "driven by the impact of the store information management system implementation and system outages...." *Id.* at ¶ 146.

During a conference call the next day, the Company explained that it had to implement additional software releases and changes to "improve stability" and that "additional hardware capacity has been added to help mitigate the overutilization issues." *Id.* at ¶ 148. Davis also explained how the peak time outages affected the Company's ability to collect revenues from RAC's customers. *Id.* Constant further revealed details concerning the Company's losses and how those losses impacted the Core U.S. segment going forward. *Id.* at ¶ 149. He stated about two-thirds of the "core same-sales decline" was related to the rollout of the new POS system; some was

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

the "absorption factor ... as a result of co-workers getting used to the new system," but the remainder was related to the outages. *Id.* at ¶ 150.

**\*14** Constant was terminated by Davis on December 2, 2016, less than sixty days after the Company announced the truth regarding the failed POS system implementation and its negative impact on the Company's long-term financial status. *Id.* at ¶ 154.

On January 9, 2017, the Board of Directors of RAC announced Davis' "resignation" as CEO and board member effective immediately. Board Chairman Mark E. Speese, the Company's founder and former CEO, was appointed interim CEO of RAC. *Id.* at ¶ 153.

## B. Defendants' assertions

Defendants assert the Complaint fails to plead with particularity any false or misleading representation. According to Defendants, far from suggesting that the SIMS implementation was problem-free, RAC disclosed that SIMS was rolled out at a slow pace, starting with one store. Defendants further assert at the outset of the rollout, when SIMS was operational only in a small number of stores, the Company warned as follows:

• RAC's operations were dependent on effective management information systems and failure of the systems to perform as designed, loss of data, or any interruption of the management information systems for a significant period of time could disrupt RAC's business;

• If the management information systems were to sustain repeated failures, the Company might not be able to manage store operations, which could have a material adverse effect on its business, financial condition, and results of operations;

• Enhancements or replacement of store information management systems could have a significant impact on the ability to conduct core business operations and increase risk of loss resulting from disruptions of normal operating processes and procedure that may occur during the implementation of new technology; and

• RAC could make no assurances that SIMS would be implemented without material disruption, that it would be beneficial, or that it would not harm results of operations.

*See, e.g.*, Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 14.

According to Defendants, analysts following the Company repeated and explained these warnings in reports to investors. Compl., ¶ 84 (quoting April 20, 2015 analyst report stating "[a]ny disruption in the rollout of the company's new POS system could negatively impact sales and inventory"). On a quarterly basis throughout the Class Period, RAC informed investors about the number of stores operating SIMS and warned investors concerning the risks inherent in implementing the new system. *See, e.g.*, Compl., ¶¶ 80–83, 87–89, 91, 94–95, 98, 101, 104, 110–11, 114–15, 118–22, 125; *see also* Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 1 (warning that the Company's actual operating results might materially differ from projected results depending the Company's "ability to successfully implement [its] new store information management system"). According to Defendants, RAC never suggested the pilot tests of SIMS were without setback, and the slow pace of the rollout demonstrated the Company was taking time to address issues along the way.

According to Defendants, over a year after SIMS rolled out to the first store, when RAC reported on its results for the year ended December 31, 2015, the Company reported it had tested SIMS in only 385 of 2,627 stores. Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68. Defendant Davis explained the Company had completed "numerous upgrades and additions to the system throughout the testing process" and had made "improvements" in areas where the Company was "seeing challenges." Compl., ¶ 111. By that time, RAC had been able to review the data related to the implementation of SIMS in the pilot stores.

**\*15** Even with only 385 stores in the pilot at that time, the Company projected that "activity associated with putting a new point-of-sales system in the stores" caused distraction that would negatively impact revenue. Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 13. As Davis explained, the Company planned to roll out SIMS to all stores by the end of the first quarter or beginning of the second quarter 2016 and was projecting that Core revenues in the first quarter would be down from $629.2 million the prior year to $575—$590 million. [5] Def. Ex. 6, Form 10-Q (filed May 1, 2015) at 11; Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 7.

[5]    The Complaint alleges RAC's stock price dropped "[i]n reaction to these disclosures" about the SIMS pilot in only 385 of 2,627 stores. Compl., ¶ 112; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 38 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

68. According to Defendants, Plaintiffs ignore that the Company reported at the same time that it had written down goodwill as a result of impairment in its Core segment by $1.17 billion and reported a diluted loss of $17.20 per share, instead of what would have been earnings of $0.54 per share, as a result. Def. Ex. 13, Form 8-K (filed Feb. 1, 2016).

Following the first quarter of 2016, the Company explained it paused the implementation of SIMS over the quarter because it had identified system enhancements that it needed to address and because there was a "greater-than-expected impact" on sales. Def. Ex. 17, First-Quarter 2016 Earnings Call (Apr. 28, 2016) at 3. At the time RAC reported on its results from the first quarter, SIMS was operating in one third of stores in the Core segment, and the Company expected to have the system fully implemented by the end of the third quarter. *Id.*

In the second quarter, the Company completed the implementation of SIMS earlier than expected, and SIMS rolled out to all stores in the Core segment by the end of the quarter. In reporting on the second-quarter results, RAC identified "system performance and usability issues" that had been fixed. Def. Ex. 20, Second-Quarter 2016 Earnings Call (Jul. 28, 2016) at 3. Davis explained that the implementation involved distraction that "negatively impacted Core revenue" and resulted in a decline in that segment's top-line results that was "more significant than ... expected." Def. Ex. 19, Form 8-K (filed July 27, 2016); Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3. Davis stated "we expect it to be a few quarters before we fully recover." Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3.

During the third quarter, after SIMS was operating in all stores, the system experienced "unexpected capacity-related system slowness and outages following the full implementation of our new store information management system within our Core U.S. stores." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3. When reporting on the third-quarter results, Davis explained that these issues and outages "resulted in a larger than expected negative impact on Core sales." Def. Ex. 23, Form 8-K (filed Oct. 11, 2016) at 2. Because the system was down during peak business hours, key business activities were severely limited and customers fell behind on their rental agreements. Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3. The Company reported it had implemented software releases to improve stability and that other steps were taken to mitigate overutilization issues. *Id.* at 4. As a result, the Company's

collection metrics improved significantly during the weeks following the system outages. *Id.* at 3-4. The Company did not experience any capacity-related issues during the fourth quarter of 2016. Def. Ex. 25, Form 10-K (filed Mar. 1, 2017) at 13.

**\*16** According to Defendants, the majority of the challenged statements in the Complaint consist of RAC's reports concerning the number of stores that had transitioned to operating SIMS, but the Complaint does not plead any facts demonstrating RAC's reports about the number of stores operating SIMS during the rollout were inaccurate. Defendants contend the allegations appear to confuse the difference between the Company's reporting of historical information and reporting of information as of the date the Company was making statements to investors.

Defendants further assert the Complaint's only other basis for claiming falsity with respect to RAC's regular updates on the number of stores operating SIMS is a "litany of opinions from two unidentified low-level employees." Docket Entry # 44 at 20. According to Defendants, the Complaint ignores that RAC never represented SIMS was problem-free and "instead coupled its reports of the slow rollout with warnings concerning the potential for unexpected results with the new system." *Id.* Defendants argue RAC's reporting of factual information about the number of stores in which SIMS was operating did not create any duty to disclose details or opinions about the issues it was addressing with SIMS during the course of its rollout. Even so, Defendants state RAC began reporting with more detail about SIMS—beyond merely stating the number of stores in which SIMS was operating—once the pilot had expanded around 385 of more than 2,400 stores.

According to Defendants, "[a]t that time, the Company did not pretend the rollout was without a hitch but instead explained, based on what it had learned so far in the pilot, that it expected a company-wide negative impact due to the distraction involved in implementing SIMS." *Id.* Defendants point out that in each quarter of the Class Period the Company "updated its outlook concerning the expected impact of implementing SIMS" and assert these "reports of negative information and opinions concerning a negative outlook did not create any duty to disclose the opinions of lower-level employees concerning SIMS." *Id.* at 20-21.

## C. Applicable law

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 39 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

**1. Section 10(b) and Rule 10b-5**

Section 10(b) and Rule 10b–5 require that the defendant make a material misstatement or omission. A plaintiff pleading a false or misleading statement or omission as the basis for a § 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A):

> (1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

> (2) identify the speaker;

> (3) state when and where the statement was made;

> (4) plead with particularity the contents of the false representations;

> (5) plead with particularity what the person making the misrepresentation obtained thereby; and

> (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). This is the "who, what, when, where, and how" required under Rule 9(b) in Fifth Circuit securities fraud jurisprudence and under the PSLRA. *Id.* Additionally, under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, the plaintiff must "state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief." *Id.*

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity *sufficient* facts to support that belief. *Id.* at 353. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named. *Id.* at 352.

**\*17** In determining whether the plaintiff has plead with particularity sufficient facts to support the allegations of false or misleading statements made on information and belief, sources need not be named in the complaint so long as the other facts provide an adequate basis for believing the defendants' statements were false or misleading; if the other facts do not provide such an adequate basis, the complaint does not need to name the confidential sources

so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *Id.* at 353. Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id.*

**2. PSLRA safe harbor**

With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." A statement is forward-looking if it is

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i) and (ii). Where the forward-looking statement is not accompanied by cautionary

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 40 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

Vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Fleming*, 2004 WL 5278716, at *9. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 888 (S.D. Tex. 2001) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

### D. Discussion

#### 1. Safe harbor/ "puffery"
Defendants contend the alleged misrepresentations are not actionable because they are protected by PSLRA's safe harbor or are inactionable "puffery." ***First***, Defendants argue ¶¶ 103, 109, 110, 111, 121, 127, 129-134 contain protected forward-looking statements. According to Defendants, each of these statements in RAC's quarterly filings, press releases, and conference calls were accompanied by meaningful cautionary language. Defendants assert statements projecting financial results and predicting the impact from the implementation of SIMS are not actionable, both because they were accompanied by meaningful cautionary language and because the Complaint fails to plead any facts that either of the Individual Defendants had actual knowledge that the forward-looking statements were false at the time.

 **\*18** As noted above, a forward-looking statement is a statement containing financial projections, a statement "of the plans and objectives of management for future operations," or a statement "of future economic performance." *In re BP p.l.c. Sec., Litig.*, 843 F. Supp. 2d 713, 747 (S.D. Tex. 2012); 15 U.S.C. § 78u-5(i)(1). The Fifth Circuit has described the test for applying the safe harbor provision of the PSLRA as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state

of mind." *Southland*, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward-looking and accompanied by "meaningful cautionary statements" or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove the statement was made with "actual knowledge" that it was false or misleading. *Id.*; *see also* 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii), (B).

The Court first notes Plaintiffs have alleged Defendants had actual knowledge of the falsity of the statements when the statements were made. *See* Compl., ¶¶ 43-52, 62-74. Specifically, Plaintiffs have alleged facts based directly on the personal knowledge of two CWs, both of whom were senior managers, employed in the IT department at RAC where they worked on the technology at the center of the alleged fraud before and during the Class Period. The CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs assert the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since pilot testing began in December 2014. *Id.* at ¶¶ 17, 68, 71, 73. Moreover, the CWs stated they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his Chief Information Officer, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

Because Plaintiffs adequately allege Defendants "actually knew that their statements were misleading at the time they were made, [the second prong of] the safe harbor provision is inapplicable to all alleged misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) (citing 15 U.S.C. § 78u–5(c)(1)(A)–(B)). Even when the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward-looking and is accompanied by meaningful cautionary language. *Southland*, 365 F.3d at 371. Therefore, the Court considers the first prong of the safe harbor.

Regarding the first prong, Defendants do not assert, nor does the Court find, the statements are immaterial. Additionally, Plaintiffs assert the statements at issue are not forward-

looking but false statements of existing fact. Plaintiffs rely on *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016), [6] wherein the court stated "[s]tatements describing past or present conditions are not forward-looking statements that trigger the PSLRA's safe harbor." The court in *Carlton* analyzed statements about how a plant operated and determined that statements regarding how "technology was operating and whether the problems *were* merely start-up glitches or more fundamental, structural issues implicating ... core proprietary technology" were not forward-looking, but "referred to then-present factual conditions." *Id.* (emphasis in original).

[6]    The court amended its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against the defendant company's CFO. Although the analysis changed, the outcome did not. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *1 (S.D. Tex. July 22, 2016).

 **\*19**  Here, Defendants focus on ¶¶ 103, 109, 110, 111, 121, 127, 129-134 of the Complaint, representative samples of which are listed as follows: (1) "[The portfolio's] not in bad shape. But it's not quite as good as it was at the start of the quarter." (¶ 103); (2) "We expect the year-over-year declines in core revenues to the weakest in the first quarter, coming in at approximately $575 million to $590 million, *as we absorb the short-term impact* as seen in tests of the rollout of our new point-of-sale system to our core store network. This will result in a projected first quarter year-over-year earnings-per-share decrease of over 20% (¶ 109) (emphasis in original); (3) "Yes, that's correct, we expect the EPS to be down more than 20%. It's basically related to revenues in the core business that we think will come in between $575 million and $590 million. *What we've seen as we have tested the rollout of our new point-of-sale system is we see a pretty short-term impact, just given the activity associated with putting in new point-of-sale system in the stores*...." (¶ 110) (emphasis in original); (4) "We've tested in 385 locations now, so pretty substantial test and so we have a very good knowledge of what we see in terms of the impact on the stores. *We've done numerous upgrades and additions to the system through the testing process that's improved many of the areas where we were seeing challenges*...." (¶ 111) (emphasis in original); (5) "[A]s we look at rolling out the POS system, we obviously want to a manage the impact we have on the stores and reduce the potential transition period impact over all to results.... Now that being said, we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." (¶ 121); (6) "The point of sale implementation negatively impacted Core revenue in the second quarter and reduced our portfolio making it necessary to revise our outlook for the year. *However, the benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities.*" (¶ 127) (emphasis in original). *See also* ¶¶ 129-134.

While there are parts of these paragraphs that may contain future statements ("We expect...."), other parts of these paragraphs, and most significantly the parts emphasized in the Complaint, are past or present statements ("What we've seen ...;" "We've tested ...;" "We've done ..."). Even if certain of the statements at issue are "mixed present/future statement[s]," such statements are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014); 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).

Finally, Plaintiffs correctly assert none of the statements identified by Defendants as forward-looking were accompanied by meaningful cautionary language. A "meaningful" cautionary statement "calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. A "generic and formulaic" cautionary statement that is repeated "only with slight variations" and "used in conjunction with each alleged misrepresentation" is not meaningful. *Lormand*, 565 F.3d at 245. Thus, RAC's generic risk disclosures do not shield Defendants' false statements.

According to Plaintiffs, Defendants negated any cautionary statements "through their concomitant false and misleading reassurances that any SIMs distractions had been resolved and was limited to personnel concerns." Docket Entry # 47 at 4. For example, when the Company filed its annual Form 10-K on February 29, 2016, the Company qualified the potential in a risk disclosure concerning the POS implementation, stating the new POS system "may cause distraction of key personnel." Compl., ¶ 114. According to Plaintiffs, Davis and Constant both used the term "distraction" when discussing

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 42 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

the Company's Q2 2016 results on July 28, 2016. *Id.* at ¶¶ 129-134. Davis used the term "distraction" no fewer than seven times during the Q2 2016 earnings call, twice claiming "the distraction ... is [ ] behind us." *Id.* at ¶¶ 129, 133-34. Constant used the term once during that call, but he did so by referring to "Robert [Davis'] point" about "now that we're through that distraction ... the resulting profitability of it will be much better." *Id.* at ¶ 132.

Drawing all inferences in favor of Plaintiffs, the Court finds any "cautionary language" relied upon by Defendants "do not provide sufficiently meaningful caution about clearly present danger that was materializing." *Lormand,* 565 F.3d at 247 (citing *Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir. 1994)) (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive). Viewing all of the statements in context, the Court concludes Defendants' safe harbor argument is without merit.

**\*20 *Second*,** Defendants argue many statements alleged to be false or misleading in the Complaint constitute non-actionable "puffery." *See* Compl., ¶¶ 80, 81, 87, 88, 89, 94, 96, 108, 127, 129.[7] The Fifth Circuit has repeatedly held that statements that constitute "optimistic generalizations" or "expressions of confidence in its management or business" are not actionable. *See, e.g.*, *Nathenson,* 267 F. 3d at 419 (statements that a drug was "fast acting" and an "improved formulation" were "optimistic generalizations" and thus non-actionable puffery). "Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Carlton,* 184 F. Supp. 3d at 455 (quoting *In re BP,* 843 F.Supp.2d at 748).

[7]     *See, e.g.*, Compl., ¶ 80 ("[O]ur resolve is strengthened in the pursuit of that balance and the urgency remains high in delivering on the initiatives and results that we have promised."); ¶ 81 ("Our key initiatives have moved from the planning stage to the implementation stage and are set to provide meaningful results in 2015."); ¶ 87 ("Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts."); ¶ 88

(stating that fully deploying SIMS would "giv[e] us the tools to understand and serve customers like never before"); ¶ 89 ("[W]e are on the cusp of—the next couple of quarters—some of our strategic initiatives coming online and having a meaningful impact to the Business."); ¶ 94 ("We continue to see progress toward transforming our Core business."); ¶ 96 ("Again, we are very pleased with our second-quarter results and optimistic about our future, again, particularly given that two of our largest strategic initiatives are just now getting started in earnest."); ¶ 108 ("We're now two years into our multi-year transformation strategy, with the plan to deliver improved profitability in our core rent-to-own business."); ¶ 127 ("[T]he benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities."); ¶ 129 ("Although we are not happy with the negative impact from the distraction related to the rollout of new POS system, we are excited about the opportunities it will continue to bring well into the future.").

The statements identified by Defendants are not inactionable statements of puffery—"of the vague and optimistic type" that are not specific enough to perpetrate a fraud on the market. According to Plaintiffs, they detailed specific milestones RAC had purportedly reached in the development and implementation of SIMS while withholding "facts that would undermine the veracity of its statements at the time those statements were made." *Marcus v. J.C. Penney Co.*, No. 13-cv-736-MHS-KNM, 2015 WL 5766870, at \*5 (E.D. Tex. Sept. 29, 2015). "Even if these statements were looked upon as mere 'puffery' ... that does not negate the duty to disclose other information necessary to make those statements not misleading." *Id.* (citing *Rubinstein,* 20 F.3d at 170). For these reasons, the Court finds Defendants' "puffery" arguments without merit.

**2. Falsity**

The Court now considers whether the Complaint alleges Defendants made materially false and misleading statements and/or omissions. A misleading statement or omission has been adequately pleaded when a plaintiff alleges the defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order the make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. § 78u-4(b)(1).

Plaintiffs assert the Complaint clearly identifies each of the false and misleading statements and omissions, including the speaker and the date when and location where the statement was made; explains why each statement was false and misleading when made; identifies Defendants' purported risk disclosures; explains why each disclosure was insufficient; and contains substantial information from high-level CWs who were employed by RAC before and during the Class Period, based on their own personal knowledge of the facts alleged. Thus, according to Plaintiffs, they have adequately pleaded falsity under the PSLRA.

**\*21** According to Defendants, the Complaint suggests without support or particularization that Defendants were aware of ongoing material problems. Defendants assert "[a]t bottom, the Complaint contends that the Defendants committed securities fraud because they did not disclose opinions about SIMS espoused by low-level, unidentified employees who left the Company." Docket Entry # 46 at 3. Defendants assert they are not required to present an overly gloomy picture. but even so they reported negative information, did not tout the successful testing or implementation of SIMS, or convey SIMS was fully operational when it was not.

A corporation has "no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). "[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002). Instead, the plaintiffs must plead with particularity the reasons why the defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp.*, Inc., 537 F.3d 527, 541 (5th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Plaintiffs assert they have done just that and again rely on the *Carlton* case.

In its falsity discussion, the *Carlton* court found the plaintiffs had "plausibly alleged, with particularity, that the statements about the Columbus plant's operations materially misled investors to believe that KiOR was a viable business when it was not." 184 F. Supp. 3d at 472. According to the court, confidential witnesses, all former KiOR employees, "detailed issues at the Columbus plant throughout this period that were more severe than [CEO] Cannon and [CFO] Karnes

represented." *Id.* And even though Cannon disclosed some of these issues in January 2014, the court noted "he also assured investors on the earnings call that the company would make improvements to the plant that would have it back up and running," but the plant was shut down two months later. *Id.* Although Cannon and Karnes argued they had no obligation to characterize the operational issues at the Columbus plant as "severe design flaws" rather than as "start up issues," the court stated as follows:

> But by downplaying the extent and duration of the technological problems as normal start-up issues, while simultaneously assuring investors that the core technology was sound for commercial-scale production, these defendants represented that the ... plant was a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul.

*Id.* The court found the third amended complaint plausibly alleged "the misleading nature of these representations with facts that are sufficiently particularized to explain why and on what basis they were misleading." *Id.* at 472-73.

Notwithstanding the limited negative information Defendants may have disclosed, Plaintiffs assert Defendants, having chosen to speak about the POS system, had a duty to disclose the full truth about the problems plaguing the POS system and the Company-wide rollout of the system. In the Complaint, Plaintiffs allege Defendants' statements in each of the four partial disclosures (fourth quarter and full year 2014 results, first quarter fiscal 2015 results, second quarter fiscal 2015 results, and third quarter fiscal 2015 results) were false and misleading when made because Defendants knew but failed to disclose that:

**\*22** (a) the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b) the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;

(c) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and

(d) the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

Compl., ¶¶ 85, 92, 99, 105.

Further, for each of these partial disclosures, Plaintiffs allege the Company's disclosures about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS not performing as designed or sustaining "repeated failures." *Id.* at ¶¶ 86, 93, 100, 106. According to Plaintiffs, this was already happening during in-house testing and in the pilot stores where the system was implemented. Plaintiffs further allege Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with. *Id.* According to Plaintiffs, Defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See Shaw*, 537 F.3d at 541.

Defendants rely on *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14 CV 3876-LTS, 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016), wherein the defendants made public disclosures about RM's live check program that were generally positive but that downplayed increasing delinquency rates with the new program. "The thrust of all of Plaintiffs' allegations [was] that RM's positive statements regarding the live check program expansion, its loan loss reserve provisions, and its underwriting practices were materially misleading, or omitted information necessary to make the statements not misleading, because RM and the Individual Defendants knew, at the time of each such statement, that: (1) staffing problems had created, or were likely to lead to, increased delinquencies; (2) that RM's

underwriting practices were unsound and would lead to increased delinquencies as the live check program grew; and (3) that there were material undisclosed financial reporting and control problems." *Id.* at \*5.

According to the court, the alleged misstatements as to RM's underwriting were statements in the nature of belief or opinion, and the plaintiffs did not allege facts demonstrating RM or the Officer Defendants did not believe the statements were true at the time they were made. *Id.* at \*10. The court explained that "[a]lthough Plaintiffs have alleged that lower-level branch staff were skeptical of RM's live check underwriting and were experiencing difficulties in servicing live check loans, Plaintiffs have alleged no facts demonstrating that RM's management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type...." *Id.* The court concluded the plaintiffs' allegations did not identify misstatements or omissions of material facts, but rested solely on "non-actionable opinion statements by the Officer Defendants and RM...." *Id.* at \*11.

**\*23** In *Waterford*, unlike in this case, the plaintiffs did not allege the defendants were aware of ongoing material problems that were already causing problems at the time the statements or omissions were made. There, the plaintiffs alleged no facts demonstrating RM's management believed the Company's underwriting practices were unsound or inappropriate for a program of that type. Instead, they alleged the defendants made poor business choices, including understaffing branches which "were likely to lead to" such problems. *Id.* at \*5.

Here, Plaintiffs have alleged facts indicating Defendants knew of the problems with the POS development and implementation. What is more, the Court is not convinced the CWs relied upon in the Complaint were "low-level" employees whose corroborating allegations should be discounted like in the *Waterford* case, as maintained by Defendants in their reply brief. Confidential witness accounts are a permissible basis on which to allege falsity. As noted above, the witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements."[8] *ABC Arbitrage*, 291 F.3d at 351-53. In lieu of names, plaintiffs must provide details such as "job descriptions, individual responsibilities, and specific

2017 WL 6398742

employment dates for the witnesses." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 839 (S.D. Tex. 2016) (citation omitted).

8    In *ABC Arbitrage*, the Fifth Circuit found that "allegations concerning a conversation between 'a high ranking [Company] official' who was 'a top executive of [the Company]' " and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standard for pleadings based on information and belief" in that "[t]his executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *In re Fleming*, 2004 WL 5278716, at *9 (quoting *ABC Arbitrage*, 291 F.3d at 357). The Fifth Circuit concluded that the plaintiffs' allegations relying on the Group Services Report, the *Stuttgarter Zeitung* article, the MMRs, and the "Kom–Aktuell" newsletter, "as well as the allegations based on a July 1998 conversation between a top Alcatel executive and Dunoge, survive dismissal under section 78u–4(b)(1) of the PSLRA." *ABC Arbitrage*, 291 F.3d at 358-59. However, as to those allegations that survived dismissal under the PSLRA's pleading requirements, the court found the plaintiffs failed to allege *materially* false or misleading statements or omissions sufficient to state a securities fraud claims under § 10(b) and Rule 10b-5 upon which relief could be granted. *Id.* at 362 (emphasis added).

In their Complaint, Plaintiffs provide each CW's job title and description, her reporting structure, dates of employment, office location, and basis of knowledge. Compl., ¶¶ 16-17. Defendants assert the CWs were no longer RAC employees during the third quarter of 2016, when SIMS experienced capacity-related outages, and therefore they have no personal knowledge of what led to the outages and are in no position to opine that the prior statements about SIMS were proven false by the subsequent outages. Even taken as true, Defendants assert none of the CW allegations are inconsistent with the Company's factual reports or the negative updates concerning SIMS in the latter half of the Class Period. According to Defendants, the opinions of two unidentified former

employees who were no longer at RAC at the time of the third-quarter outages do nothing to demonstrate that, at the time of the prior statements, anyone predicted significant outages or problems with SIMS beyond those the Individual Defendants had already disclosed.

**\*24** In *Carlton*, Cannon and Karnes challenged the confidential witnesses' qualifications to offer opinions. 184 F.Supp.3d at 473. For example, they argued the confidential witnesses were "several levels removed from any operational authority" and could not distinguish between a design flaw and a start-up issue at the Columbus plant. *Id.* However, the court noted both confidential witnesses had worked at the Columbus plant from June 2012 to February 2013, and the complaint relied on their "firsthand observations from that work." *Id.* The court further noted both confidential witnesses had engineering and oil-refinery experience, and this experience was not insufficient or unreliable. *Id.* at 473-74.

The defendants also argued the allegations of the confidential witnesses' statements and reports were not sufficiently particular. *Id.* at 474. The defendants also criticized "the failure to directly quote the confidential witnesses and instead vaguely and conclusorily summarizing the information allegedly obtained from them." *Id.* The *Carlton* court pointed out that a complaint relying in part on confidential witnesses must identify the witnesses' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. *Id.* According to the court, the third amended complaint provided this information. *Id.*

Similarly here, the Complaint identifies the CWs' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. The Court finds the two CWs have been described with sufficient particularity to establish their reliability and personal knowledge. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, both before and during the Class Period, where they gained personal knowledge of the central issue in this case—the Company's failed attempt at developing and implementing the POS technology platform. According to Plaintiffs, both before and during the Class Period, "the Company and the Individual Defendants relied on the CWs' experience and knowledge to help address the burgeoning problems with SIMs," and by reason of such first-hand knowledge and experience, "the testimony of these CWs

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 46 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

reliably details the nature and extent of the issues with SIMs." Docket Entry # 47 at 1. The Court further notes the CWs independently corroborate one another's statements. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (CWs' statements sufficiently reliable to establish falsity where corroborated by other CWs). Considering Plaintiffs' allegations as a whole, including those provided by the Cws, the Court finds the Waterford case relied upon by Defendants is distinguishable.

Finally, the Court considers several other assertions made by Defendants, including that the Company reported it took one year to rollout the POS system to just 385 stores of the Company's 2,627 stores; the Company used the phrase "fully operational" in only three instances (when SIMs rolled out to 1, 10 and 34 stores); and the Company reported negative information in its disclosures, including that numerous upgrades had been required, the Company had been "seeing challenges," and implementation was going to negatively impact revenue. According to Defendants, the Complaint is entirely devoid of facts indicating that (1) the Individual Defendants' factual reports concerning the number of stores in which SIMS was operating were false or (2) the Individual Defendants did not believe the projections they gave concerning expected negative impacts from the SIMS implementation at the time of these reports or statements.

 **\*25**  Regarding the ***first issue***, Defendants argue the number of stores they reported to the market as "operating SIMS" each quarter was correct and thus cannot serve as the basis for liability. However, Plaintiffs are not challenging the number of stores where SIMS was installed, but that Defendants' repeated characterization of SIMS as "operational" in those stores was meant to and did convey to the market that SIMS was fully functional in those stores (which it was not). Plaintiffs have identified numerous instances over the Class Period where Defendants indicated SIMS was "functional in a growing number of locations." Docket Entry # 47 at 3. *See, e.g.*, Compl., ¶ 80 ("New POS system is fully operational in its first site"); ¶ 81 ("I am excited to say the new POS system is now fully operational in its first site"); ¶ 87 ("New POS system ... is fully operational in 34 stores"); ¶ 95 ("150 core US [are] running the new system exclusively); ¶ 104 ("[POS] is operational in 8.5% of our Core U.S. stores"); ¶ 115 ("We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015 and we expect to complete the roll out to the remaining stores in 2016."); ¶ 119 ("Today approximately one-third of our core stores are operating

this new POS system."); ¶ 129 ("After out initial delay, in Q2 we completed the roll-out of our new POS system...."). According to Plaintiffs, the sparse "negative information" Defendants claims to have disclosed was inconsequential and "was offset by accompanying positive statements and baseless reassurances." Docket Entry # 47 at 3.

The Court agrees with Plaintiffs that whether the term "operational"/ "fully operational" was intended to and did convey to the market that SIMS was fully functional is best answered based on the evidence produced during a later stage of this litigation. *See Spitzberg*, 758 F.3d at 689 (stating whether Defendants–Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" can "only be answered based on the evidence produced during a later stage of this litigation"); *see also Lormand*, 565 F.3d at 249 ("defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized").

Regarding the ***second issue***, the CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs confirm the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since pilot testing began in December 2014. Compl., ¶¶ 17, 68, 71, 73. Moreover, the CWs confirmed that they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his CIO, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

In sum, the Court finds a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions as described above.

### 3. Failure to disclose information required under Item 303 of SEC Regulations S-K

Plaintiffs further allege Defendants violated Item 303 of Regulation S–K, 17 C.F.R. § 229.303, by failing to disclose trends or uncertainties that would have a material impact on RAC's sales, revenues, and income. "Item 303 of Regulation

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 47 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

S–K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations." *In re Blockbuster Inc. Sec. Litig.*, No. 03-cv-0398-M, 2004 WL 884308, at *11 (N.D. Tex. Apr. 26, 2004).

According to Plaintiffs, Item 303 of Regulation S–K obligated Defendants to disclose, among other things, that: (i) the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (ii) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; (iii) the POS system lacked sufficient redundancies which would magnify any problems encountered during the implementation; (iv) by the first quarter of 2016, the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results; (v) RAC's projected growth strategy was unsustainable if the Company was unable to adequately collect overdue amounts in its rent-to-own portfolio; and (vi) the importance of the POS system to many of RAC's other strategic initiatives. Compl., ¶¶ 75-79. The Complaint also alleges the SOX certifications Davis and Constant signed during the Class Period were false. *Id.* at ¶ 79.

**\*26** The Fifth Circuit has not held that Item 303 creates a duty to disclose under the Exchange Act, and other circuits are divided on the question. *Compare Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 creates an actionable duty to disclose), *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (Item 303 does not create a duty to disclose under the Securities Act). Considering Defendants have not moved to dismiss on this issue, and further considering the Court's findings as to the issues on which Defendants moved to dismiss, the Court need no reach the question at this time of whether Item 303 creates a duty to disclose under the Securities Act.

The Court now considers whether the Complaint fails to establish a strong inference of scienter.

## VI. WHETHER THE COMPLAINT ESTABLISHES A STRONG INFERENCE OF SCIENTER

### A. Defendants' assertions
Defendants assert the Complaint does not demonstrate any inference of scienter with respect to any statement by either of the Individual Defendants. Defendants assert the Complaint's CW allegations do not create any inference of scienter. According to Defendants, the Complaint contains none of the typical motive allegations, such as allegations that a corporate executive was motivated to issue false statements to capitalize on insider trades of the company's stock. Defendants argue the only supposed "motive" is that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter. Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Finally, Defendants contend Davis and Constant's resignations do not support an inference of scienter.

### B. Applicable law
The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Stated differently, in the Fifth Circuit, "plaintiffs must plead facts giving rise to a 'strong inference' that defendants acted intentionally or severely recklessly to survive a motion to dismiss." *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d 544, 555 (E.D. Tex. 2004).

Severe recklessness is defined as follows:

> Severe recklessness, which, properly defined and adequately distinguished from mere negligence, resembles a slightly lesser species of intentional misconduct ... limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 48 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 555-56 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). A plaintiff can raise a strong inference of scienter by alleging either conscious disregard of the truth or "that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005).

The United States Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints for failing to establish a strong inference of scienter. "First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true." *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *10 (W.D. Tex. Jan. 26, 2017)(citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)). Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.*

**\*27** "The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences." *City of Pontiac*, 2017 WL 384072 (citing *Tellabs*, 551 U.S. at 324). To create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.' " *Local 731*, 810 F.3d at 957 (quoting *Tellabs*, 551 U.S. at 323). Plaintiffs may establish a strong inference of scienter by circumstantial evidence. *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d at 556.

The Fifth Circuit Court of Appeals has also rejected the group pleading approach to scienter, which would allow a plaintiff

to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine if a complaint sufficiently pleads scienter. *Id.*; *see also Trendsetter Inv'rs, LLC v. Hyperdynamics Corp.*, Civ. A. No. H-06-0746, 2007 WL 172627, at *13 (S.D. Tex. Jan. 18, 2007) ("The plaintiff must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant; so-called group pleadings are insufficient.").

Allegations of "motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). Without more, "an officer's position with a company does not suffice to create an inference of scienter." *Izadjoo*, 237 F.Supp.3d at 509. An officer's position with a company can support the scienter inference only when viewed with other "special circumstances." *Id.* (quoting *Local 371 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016)). These special circumstances include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements. *Id.*

Corporate statements that allegedly misrepresent facts or omit facts necessary to avoid misrepresentation can be connected to a particular officer if the plaintiff alleges the officer signed the document in which the statement appears or adequately alleges the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). Signed SOX certifications support scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)(internal quotation marks omitted). A defendant's signature on a SOX certification, without more, does not support a strong scienter inference. *Izadjoo*, 237 F. Supp. 3d at 509 (citations omitted).

**C. Discussion**
Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically,"

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 49 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6398742

*Tellabs, Inc.*, 551 U.S. at 326, the Court has categorized the scienter allegations for convenience. The Court then assesses the allegations holistically. *See City of Pontiac*, 2017 WL 384072, at \*10.

### 1. CW allegations

**\*28** Defendants first assert the Court should discount the confidential witness allegations. According to Defendants, "[a]llegations regarding scienter that are derived from confidential sources *detract* from their weight in the scienter analysis, and courts *must discount* allegations from confidential sources." (Docket Entry # 44 at 26)(emphasis in original) (quoting *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 Fed.Appx. 334 (5th Cir. 2012)). However, the Fifth Circuit Court of Appeals in *Spitzberg* recently reversed and remanded the dismissal of a securities fraud complaint and held that scienter was adequately alleged based, in large part, on statements from confidential witnesses.

In *Spitzberg*, the plaintiffs, investors in a Houston-based energy company, alleged the company's statement that it had "estimated recoverable reserves of 1 to 4 billion barrels" of oil was misleading. 758 F.3d at 680. The plaintiffs argued the statement "communicated to investors that certain geological testing had been completed based on the definition of 'reserves' used by the oil industry and by SEC regulations." *Id.* The defendants argued they had not "explicitly represent[ed] that any drilling had yet occurred," that their other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [oil industry]." *Id.* at 681.

The plaintiffs alleged other fraudulent statements were made after test drilling began. *Id.* Specifically, in a number of regulatory filings and press releases, the defendants repeatedly stated that a test well had produced "strong inflow[s]" and "significant shows" of both "gas and oil." *Id.* But according to the statements (cited extensively in the complaint) of confidential witnesses that were allegedly involved in the drilling operations, the test well produced no "inflow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. *Id.* at 682.

The Fifth Circuit assumed the truth of the confidential witness statements. *Id.* at 684. The court recognized that although additional evidence at later stages of the proceedings may

confirm or undermine the factual proposition set forth by a particular confidential witness, the court noted that the plaintiffs' contention, at the motion to dismiss stage, was "at least as compelling as any opposing inference one could draw." *Id.* at 684-85. Therefore, according to the Fifth Circuit, the plaintiffs' complaint could not be dismissed based on the failure to plead severe recklessness. *Id.* at 685.

Even cases relied upon by Defendants (most older than *Spitzberg*) state confidential source statements are a permissible basis on which to make an inference of scienter. Confidential witness allegations may be credited if, as they are here, such sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Shaw*, 537 F.3d at 535 (ellipses omitted).

Here, the confidential witnesses are described with sufficient particularity to support the probability that a person in their position would possess the information pleaded. The CWs detail how Davis and Constant were made aware of information that demonstrated, contrary to their statements to the public, SIMS was initially not ready for pilot testing and then still not ready for general rollout due to persistent and pervasive problems which threatened to affect the Company's ability to record and track sales and payments. Compl., ¶¶ 16-17, 43, 47, 50-52, 65-68, 71-74.

**\*29** Defendants next assert the Complaint contains no facts to "support the probability that a person in the position occupied by [either of the confidential witnesses] would possess the information" ascribed to him. *Shaw Grp.*, 537 F.3d at 535, 539 (alteration in original). The Court disagrees. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, where they gained personal knowledge of the Company's attempt at developing and implementing SIMS. Defendants next contend Plaintiffs fail to allege particularized facts concerning the state of mind of either Davis or Constant regarding any alleged misrepresentation.[9] Defendants contend the Complaint vaguely references "Individual Defendants" or "the Company," as follows: (1) that company officials "would have communicated any significant problems and delays to Davis and Constant" via "color-coded SIMS incident reports ... and at SIMS Executive Steering Committee meetings," Compl. ¶ 51; (2) that "Davis held weekly meetings with his CIOs" during the Class Period in which "SIMS issues were always discussed," (*id.* ¶ 52); and (3) that "Davis

and Constant were kept aware of any issues the technology team was encountering with implementing SIMS." *Id.* at ¶ 74. According to Defendants, these vague and conclusory allegations add nothing to the scienter analysis, as they are drawn from two lower-level former employees, who —according to the Complaint—did not participate in any meeting with either Davis or Constant.

9     On the one hand, Defendants assert the Complaint does not demonstrate how either CW had any first-hand information concerning either of the Individual Defendants' state of mind or knowledge of any specific event, conversation, or document. On the other hand, Plaintiffs assert such knowledge in not necessary, noting what Defendants "actually believed ... is irrelevant to whether Defendants ... were severely reckless." *Spitzberg*, 758 F.3d at 686. As pointed out by Plaintiffs, in *Spitzberg* the Fifth Circuit relied in large part on allegations attributed to a single confidential witness that did not involve first-hand knowledge of the individual defendants' state of mind as sufficient to plead "circumstances constituting at least severe recklessness." *Id.* at 684-85. The court did not rely in its opinion on any allegations that the confidential witness interacted with the individual defendants; he only allegedly worked for another company that was the defendants' business partner. *Id.* at 681-85.

It is true an officer's mere presence at meetings, without specific allegations regarding discussions at the meetings, will not support an inference of scienter. *See, e.g., In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 632 & n.31 (S.D. Tex. 2013). However, this is not a case where Plaintiffs try to impute knowledge of problems with the POS system to Davis and Constant simply because of their mere presence at meetings. "Plaintiffs have pointed to specific meetings, reports, and practices whereby [Defendants] were made actually aware of the [POS'] status." *See In re EDS and "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004). Both CWs confirm *how* information about the POS' problems was communicated to Davis and Constant; *when* meetings occurred (¶¶ 32, 50-52, 74, 158), *who* was involved in communicating information (¶¶ 46, 50-52, 65, 71, 74), *what* reports were titled and *by whom* (¶¶ 16-17, 46-47, 68, 71, 74), facts regarding Davis and Constant's *motive* in acting severely recklessly (¶¶ 16, 53-63, 73-74, 159-73), and the contemporaneous problems the POS experienced during the Class Period, rendering Defendants' statements or omissions false and misleading. (¶¶ 45, 48-50, 64-73).

According to the CWs, Davis was involved in the POS project from the onset, and he held weekly meetings with RAC CIO Nell until April 2016 where SIMS was always discussed. Compl., ¶¶ 52, 74. Davis and Constant also were members of and participated in the "SIMS Executive Steering Committee," which was a "C-Level meeting" wherein the SIMS' progress and issues were discussed. *Id.* at ¶ 74. The Executive Steering Committee met quarterly at first, and then more frequently as the rollout progressed. *Id.* at ¶ 51. These Executive Steering Committee meetings were attended by Davis, Constant, CTO Liebe, CIO Nell, Department Heads, and SVPs. *Id.* Davis and Constant also periodically attended weekly SIMS project team meetings during which changes, challenges, and problems related to SIMS were discussed. *Id.* at ¶¶ 50-52, 74. As the SIMS rollout accelerated (and therefore into the Class Period), and more issues arose, Davis' involvement with the POS increased. *Id.* at ¶ 74. Both Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS. *Id.*

**\*30** What is more, both Davis and Constant admitted during the Class Period that management was deeply involved with the SIMS rollout: "the approach that we took to learn in the early stages had a lot more care and feeding [sic], if you will, and hand-holding and oversight from multi-levels of management" (¶ 134—Davis) and "as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores" (¶ 121—Constant).

With respect to the various reports the CWs describe, those are pled in sufficient detail, even under the case law relied on by Defendants. "[F]or allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients, and (2) the corporate reports be connected to the speaking executive in a persuasive way." *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (citations omitted). Both criteria are met here. Corroborating details, authors, recipients, and their connections to Davis and Constant are all adequately pled.

In addition to providing specific facts regarding how, when, and where information regarding the POS system was communicated to Defendants Davis and Constant, the former employees also provide the what—the scope of issues the POS system experienced prior to and during the Class Period:

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 51 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

- By the end of 2014, just prior to the start of the Class Period, the POS system experienced serious capacity and performance issues including but not limited to (1) network bandwidth issues; (2) scalability problems; (3) capacity problems including network capacity, database capacity, and old-technology capacity problems; (4) functionality problems with payment methods; and (5) hundreds of other varying issues. (¶ 48). Certain issues continued through at least June 2016. (¶ 73)

- RAC's systems ran on an older Oracle-based operating system that newer software was increasingly unable to interact with. (¶ 65)

- The POS System did not meet the Company's needs when it was first rolled out in Plano, Texas, resulting in hundreds of issue detailed in Root Cause Analysis Reports. Moreover, the overall functionality of the POS system never improved much, and did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015 (during the Class Period). POS system continued to generally fail as it was rolled out to additional stores. (¶ 66)

- The Company did not fix problems with the POS system before implementation in additional stores and major bugs were still being worked on as of June 2016. Necessary redundancies in the POS system were not in place by June 2016, which also magnified the risk of outages the Company was experiencing. (¶ 73).

Taken together, these facts—which the Court must accept as true—plead a strong inference that Davis and Constant were at least severely reckless during the Class period, "especially when they are juxtaposed with what they told the public:"

- On February 3, 2015, Davis stated "the new POS system is now fully operational in its first site." (¶ 81). Defendants did not disclose the system was unable to interact with the older system, or that it was experiencing "serious capacity and performance issues"—instead, the Company's 10-K merely stated future issues hypothetically might impact the Company's performance (when present issues were already hampering performance at the pilot store). (¶ 83).

- **\*31** • On April 27, 2015, the Company stated POS was "fully operational" in 34 stores. No warnings were provided to the market about what was internally known. (¶ 87).

- On February 2, 2016, Constant revealed that RAC saw a "short-term impact" due to a "distraction" in stores

where the POS system was being rolled-out, and Davis stated that "numerous upgrades and additions to the [POS] system ... improved any of the areas where we were seeing challenges." (¶¶ 110-11). There was no disclosure of the host of ongoing capacity and functionality issues. (¶ 116).

- On July 28, 2016, Davis stated "we decided to accelerate the roll-out, which was completed in its entirety in Q2" and that "the system performance and usability issues identified in the first quarter were fixed," and "that distraction is behind us." (¶ 129). Again, there was no disclosure of the ongoing issues and outages being experienced.

Docket Entry # 45 at 24-25. [10]

[10]    As urged by Plaintiffs, the allegations belie Defendants' argument that the Complaint engaged in "group pleading" only. These statements, and other alleged facts, are specifically attributed to each Individual Defendant.

### 2. Motive

Defendants spend a large part of their argument on motive, or the lack thereof. According to Defendants, Plaintiffs' only attempt to allege a "motive" is to assert that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter for the following reasons. *First*, according to Defendants, this suggestion of a "write-down" motive is drawn entirely from the purported statements of a single confidential witness—who is not alleged to have been in a position to know anything about RAC's accounting policies or financial statements—and whose allegations "must [be] discounted." *See Shaw Grp.*, 537 F.3d at 535, 539. *Second*, Defendants assert a motivation to take action that will maximize a company's financial results *i.e.*, placing SIMS into service to avoid writing off development costs, is not motive to commit securities fraud. According to Defendants, Plaintiffs' contention is nothing more than an allegation that the Individual Defendants were motivated to increase profits, which is insufficient to support a claim of scienter as a matter of law. *Third*, Defendants assert the supposed "write-down" motivation is illogical and inconsistent with the other alleged facts—the scienter inference Plaintiffs propose is not compelling, much less *at least as compelling* as far more logical inferences that can be drawn from the alleged facts. [11] *See Tellabs*, 551 U.S. at 324 ("A complaint will survive ... only if a reasonable person would deem the inference of

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 52 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

11      The Complaint states "the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its [five]-year anniversary after having been started in 2009." Compl., ¶ 63. But according to Defendants, the Complaint does not explain the significance of the five-year anniversary for write-down purposes, nor does it explain why five years would have been any more significant than three, four, or six years. Defendants assert the notion that the Individual Defendants were motivated to misrepresent information about the SIMS rollout even while knowing SIMS was supposedly bound to fail due to "material flaws"—simply because the software-development project had reached its fifth anniversary—is illogical.

Defendants further argue Plaintiffs' proposed "motive" inference becomes more illogical when one considers the bigger picture, as the Complaint notes, for year-end 2015, the Company recorded and disclosed that it was taking a $1.17 billion dollar write-down to the goodwill asset on its balance sheet. Compl., ¶ 107. Defendants challenge Plaintiffs' over-inflated estimates, but even taking them as true, Defendants assert the value of a potential SIMS write-down was dwarfed by the company's $1.17 billion 2015 goodwill write-down. According to Defendants, Plaintiffs' allegations require the illogical assumption that, while the Individual Defendants disclosed over a billion dollars' worth of write-downs to investors, they also were willing to commit securities fraud to prevent a much smaller write-down of the cost of the SIMS program.

**\*32** In *Spitzberg*, the Fifth Circuit noted the parties had mistakenly focused on the presence or absence of a pecuniary motive for the defendants to commit securities fraud, as the "absence of a motive allegation, though relevant, is not dispositive" under the PSLRA. 758 F.3d at 685 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1324 (2011)). Although motive allegations might "meaningfully enhance the strength of the inference of scienter," the Fifth Circuit found a strong inference of severe recklessness did not depend on such an enhancement in the *Spitzberg* case. *Spitzberg*, 758 F.3d at 685.

According to Plaintiffs, the CWs provide facts that raise compelling evidence of the Individual Defendants' motive. The Complaint alleges Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout, with severely limited functionality, but the Individual Defendants still directed the rollout late in 2014 in order to avoid having to write-down that asset. Compl., ¶¶ 16, 47, 63. According to the Complaint, that was the predominant reason the POS system was first rolled out in late 2014, despite all of its known flaws. *Id.* at ¶¶ 43, 63. Such a write-off—approximately $175 million—would have been substantial and material to the Company's 2014 financial results, and it would have turned its earnings upside down, from positive to negative earnings for the fourth quarter of 2014. *Id.* at ¶¶ 53-61, 169-73.

Although Defendants challenge CW-1's lack of knowledge of RAC's accounting policies and financial statements, Plaintiffs assert they are not relying upon CW-1 for facts regarding accounting irregularities or accounting policies. Rather, CW-1 provides contemporaneous facts regarding the Defendants' motivation to push out the POS system too early, when (contrary to their public statements) the POS system was not working and dragging down the Company's financial performance. These allegations enhance the strength of the inference of scienter.

### 3. Core operations

Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Plaintiffs do not rely on core operations as an independent basis to adequately alleged scienter but argue the "core operations" exception *contributes* to a strong inference of scienter.

The Fifth Circuit recognizes core operations as indicative of scienter in cases which exhibit some combination of the following four considerations that might tip the scales in favor of an inference of scienter: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality;" (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Nathenson*, 267 F.3d at 425.

According to Plaintiffs, both the Core U.S. segment and SIMS were critically important to RAC. Plaintiffs allege Defendants repeatedly acknowledged how important both the POS system and the Core U.S. segment were to the Company.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 53 of 281

Hall v. Rent-A-Center, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 6398742

Compl., ¶¶ 39, 81, 89, 94, 127, 161. The Core U.S. segment, which was negatively impacted by the POS system rollout during the Class Period, represented more than two-thirds of RAC's revenue throughout the Class Period. *Id.* at ¶¶ 159-63. Plaintiffs allege that "[g]iven the size of the Core Segment and its critical importance to [the Company's] overall business, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval." *Id.* at ¶ 163.

**\*33** The "core operations" doctrine is an extremely narrow exception to the rule that "scienter may not rest on the inference that defendants must have been aware of" the alleged misconduct "based on their positions within the company." *Abrams*, 292 F.3d at 432 (affirming trial court's dismissal of plaintiffs' securities fraud class action for failure to adequately plead scienter). Under the narrow exception, if a business unit or product is effectively the only product of a small-scale company, and certain other "special circumstances" apply, knowledge of that business unit or product might be sufficient to support an inference that executives must have known certain facts. *See Nathenson*, 267 F.3d at 422, 424–25 (plaintiffs "barely" pleaded scienter where a single-product company with less than 40 employees devoted "substantially all" of its resources to its patented product and had "ample opportunity to become familiar with" a patent it falsely represented as covering the product).

The Court is not convinced these "special circumstances" are present here. First, as noted by Defendants, the Company has approximately 21,600 employees and is much larger than the companies to which the exception has been applied. *See Carlton*, 184 F.Supp.3d at 479 ("These circumstances are not present here. KiOR has 183 employees, many more than the companies falling under the *Nathenson* exception."). Second, Defendants assert for the "core operations" exception to apply, Plaintiffs would have to plead particularized facts showing circumstances akin to those in *Nathenson*, in which the defendant company sold only a single patented product and planned to devote "[s]ubstantially all of [its] efforts and expenditures over the next few years" to that product. *Nathenson*, 267 F.3d at 422; *see also Carlton*, 184 F.Supp.3d at 479, 484 ("The plaintiffs have not pleaded a basis to infer that Karnes' culpable knowledge of the plant's day-to-day operations and the production issues can be presumed under the limited circumstances outlined in *Nathenson*." However, the court allowed the "core-business exception" to apply to the CEO Cannon "by virtue of his position and in light of the surrounding circumstances.")

Here, the Company's size is substantially larger than the less than 40 employees in *Nathenson* and the 183 employees in *Carlton*. And despite Plaintiffs' allegations as to the importance of the POS system and the U.S. Core segment, the Court is not convinced RAC is a "one-trick pony" without an "extensive operating [history]" whose success was "dependent" on the facts underlying the basis of the statements alleged to be false or misleading. *See Carlton*, 184 F.Supp.3d at 484 (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342-43 (5th Cir. 2008)). Plaintiffs recognize that "[d]uring [the] Class Period, [the Company] generated revenue from four operating segments: Core U.S., Acceptance Now, Mexico, and Franchising." Compl., ¶ 3. While "[t]he Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period," *id.*, nearly one third of the Company's consolidated net revenues came from other sources. For these reasons, this is not the "rare" case with such "special circumstances" where a strong inference of scienter may be drawn from Davis and Constant's positions in the Company. *See Diodes*, 810 F.3d at 959.

**4. Terminations/resignations of Davis and Constant**
Finally, Plaintiffs contend the Court should infer "compelling evidence of scienter" from the sudden terminations of Davis and Constant shortly after the truth was fully revealed. Compl., ¶¶ 153-55, 164-68. As urged by Defendants, "[t]he resignation of officials is, in and of itself, unavailing as proof of the commission of fraud" absent "specific evidence" indicating that the resigning officials knew of the alleged misconduct. *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. September 29, 2016) (noting "executive resignations did not have "any scienter implications" (citing *Southland*, 365 F.3d at 383 & *Abrams*, 292 F.3d at 434)). "Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724–25 (W.D. Tex. 2010).

**\*34** Even accepting as true Plaintiffs' allegation that Davis and Constant's departures were not voluntary but were terminations, Defendants assert the "more logical assumption is that" the allegedly forced resignations were due to "corporate mismanagement" rather than "the result of fraudulent acts." *In re Pilgrim's Pride Corp. Securities Litig.*, No. 2:08cv419-TJW, 2010 WL 3257369, at \*13 (E.D. Tex. Aug. 17, 2010). However, Plaintiffs assert the sudden "terminations" of Davis and Constant, coupled with an acknowledgment by the Company after the Class Period that

2017 WL 6398742

RAC's "operational challenges" were "exacerbated under the previous management regime" and that the departure of Davis and Constant was "a change aimed at improving shareholder value," contribute to the allegations of scienter. *Id.* at ¶ 168. The Court agrees.

Viewed in the context of all the factual allegations pleaded in the Complaint, the alleged terminations are circumstantial evidence that both Constant and Davis were let go because of the failed implementation of the POS system. *Id.* at ¶ 166. *See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 653 (W.D. Tex. 2006) (termination of CEO "for cause" because the company needed to "transition to a management led by an executive who was not involved in the subjects of the possible restatement of previous financial statements and the Audit Committee investigation" supported strong inference of scienter). Here, the Court finds this is another factor supporting a strong inference of scienter.

**5. Scienter allegations, viewed holistically**

Viewed holistically, Plaintiffs' allegations give rise to a strong inference of scienter and satisfy Plaintiffs' burden under the PSLRA. Even if Defendants' interpretation of the events does support a strong inference as to a lack of scienter, "15 U.S.C. § 78u–4(b)(2) is nonetheless satisfied in the present case because the competing inference of severe recklessness is at least as cogent and compelling." *Spitzberg*, 758 F.3d at 686. As recognized by the Fifth Circuit in *Lormand*, where there are competing inferences that establish or negate the scienter requirement, "a tie favors the plaintiff" on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2). 565 F.3d at 254. Taking them as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs' allegations present a strong inference of scienter against Defendants "at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 314.

## VII. SECTION 20(a) CLAIMS

Section 20(a) claims for control person liability are derivative of primary claims under § 10(b), and when there is no viable § 10(b) claim, there can be no § 20(a) claim. *See, e.g., Shaw Grp.*, 537 F.3d at 545 (reversing trial court's denial of defendants' motion to dismiss plaintiffs' § 20(a) claims where plaintiffs failed to adequately plead § 10(b) violations). Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Because those arguments fail, Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit.

## VIII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Docket Entry #44) be **DENIED**.

## OBJECTIONS

Within fourteen (14) days after receipt of this Amended Report and Recommendation, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

**\*35** Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6398742

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 4

2022 WL 4277350
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE APACHE CORP. Securities Litigation

Civil Action No. 4:21-cv-00575
|
Signed September 15, 2022

**Attorneys and Law Firms**

David R Kaplan, Saxena White P.A., San Diego, CA, Naumon A Amjed, Daniel Rotko, Gregory M Castaldo, Pro Hac Vice, Johnston de Forest Whitman, Jr, Joshua Edward D'Ancona, Michelle M. Newcomer, Pro Hac Vice, Kessler Topaz Meltzer and Check LLP, Radnor, PA, John Saul Edwards, Jr, Thomas Robert Ajamie, Ajamie LLP, Houston, TX, Jeremy A Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY for Plaintiff.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Charles Frank Mace, Baker Botts LLP, Houston, TX, for Defendants.

**MEMORANDUM AND RECOMMENDATION**

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

 **\*1** Pending before me is Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("Motion to Dismiss"). *See* Dkt. 71. Having reviewed the motion, the response, the reply, the pleadings, and the applicable law, I recommend that the Motion to Dismiss be **DENIED**.

**BACKGROUND**

This is a securities class action lawsuit brought by Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (collectively, "Lead Plaintiffs"), individually and on behalf of those purchasers of the common stock of Apache Corporation ("Apache") during the period from September 7, 2016 through March 13, 2020 (the "Class Period"). The defendants are Apache, an exploration and production company headquartered in the Houston area, and three of its

top executives: (1) John J. Christmann IV ("Christmann"), Apache's President and Chief Executive Officer; (2) Timothy J. Sullivan ("Sullivan"), Apache's former Executive Vice President – Operations Support; and (3) Stephen J. Riney ("Riney"), Apache's Executive Vice President and Chief Financial Officer. I will refer to Christmann, Sullivan, and Riney, collectively, as the "Individual Defendants." Lead Plaintiffs bring claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission.

Lead Plaintiffs' live pleading is the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Class Action Complaint"). *See* Dkt. 65. In this 148-page pleading, Plaintiffs allege a massive fraud centering on an oil and gas field in the Texas panhandle. The origins of this fraud, according to Lead Plaintiffs, began in the early 2010s when Apache endured a prolonged financial slump. As its competitors in the exploration and production industry capitalized on advances in hydraulic fracturing, Apache allegedly did not make a single notable discovery during the fracking boom. As a direct result, the company's stock price languished. Plaintiffs cite a Houston Chronicle article, which observed that Apache "found itself on the outside looking in," and management "knew Apache had to get back its swagger if it was to reverse its fortunes. It had to return to the business of risk, and it had to make a headline-grabbing find." *Id.* at 18.

In an effort to make such a headline-grabbing find, Apache focused on a remote area of West Texas in Reeves County, dubbed "Alpine High." On September 7, 2016, the first day of the Class Period, Apache announced Alpine High as a major oil discovery in Texas. As alleged by Plaintiffs,

> For three years, Defendants touted Alpine High as a "transformational discovery" and "world class resource play" with immense production capabilities, including "conservative" estimates of over three billion barrels of oil and significant amounts of "really rich gas." Defendants supported their claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations," which would "deliver incredible value to Apache and its shareholders for many, many years to come." Analysts and industry media lauded this "massive shale discovery," emphasizing that Alpine High's "compelling economics" represented Apache's "largest catalyst opportunity" for the coming

years and put Apache "back in the game" after a "rough time keeping up with competitors." Fueled by Defendants' assurances, Apache's stock price soared, reaching a Class Period high of $69.00 on December 12, 2016. The Individual Defendants took full advantage, reaping more than $75 million in Alpine High-linked compensation during the Class Period.

**\*2** ... Unbeknownst to investors, Defendants' statements were false. In reality, Apache's own production data and analyses of the Alpine High play never supported Defendants' public representations. As Apache was ultimately forced to admit, Alpine High was virtually barren.

Indeed, after three years of relentlessly touting Alpine High to investors, the "world class resource play" that was supposedly going to "transform" Apache produced less than 1% of the oil and gas that Defendants had represented to investors was recoverable. Alpine High was so devoid of oil and gas that Apache was forced to cease all drilling at the field in 2020, take a $3 billion write down, and slash its dividend by a staggering 90%. When the truth regarding Defendants' fraud emerged, analysts and the nation's leading financial publications excoriated Defendants, noting that the revelations "were in stark contrast to [Defendants'] past defense of Alpine High," and Apache's stock price was decimated, closing at a mere $4.46 on March 17, 2020—an astonishing decline of 93% from its high during the Class Period.

*Id.* at 8-9 (cleaned up).

This is not, Lead Plaintiffs insist, a situation in which a prospect turned out to be poor performing much to the surprise of those involved in the project. Instead, Lead Plaintiffs paint a sinister picture, claiming that Defendants touted the economic viability of Alpine High knowing full well that such statements were false. Based, in part, on statements from 24 confidential witnesses, the Consolidated Class Action Complaint asserts that Defendants lacked crucial data they needed to support impressive claims about Alpine High's production capabilities. Even worse, Lead Plaintiffs contend that the data behind the play actually indicated that Alpine High was not commercially viable. Lead Plaintiffs maintain that Defendants nonetheless went ahead and widely broadcast overwhelmingly positive statements about this high-profile project.

Defendants have moved to dismiss the Consolidated Class Action Complaint for failure to plead (i) an actionable false or misleading statement; or (ii) scienter with particularity as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Reform Litigation Act ("PSLRA").

## LEGAL FRAMEWORK

Rule 12(b)(6) authorizes dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At this initial pleading stage, I am required to accept as true all well-pleaded factual allegations in the Consolidated Class Action Complaint. *See Twombly*, 550 U.S. at 555–56.

Rule 9(b) requires parties claiming fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The allegations must include "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quotation omitted).

**\*3** Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R § 240.10b–5(b). "A § 10b–5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled 'with particularity' and ... the requirements of the [PSLRA]." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Enacted by Congress in

1995, the PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To accomplish this goal, the PSLRA contains "[e]xacting pleading requirements." *Id.* at 313. Under the PSLRA's heightened pleading requirements, a plaintiff seeking to state a § 10(b) and Rule 10b–5 claim must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quotation omitted).

The scienter, or state of mind element of a § 10(b) and Rule 10b–5 claim, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Scienter is satisfied by a showing of severe recklessness, *i.e.*, an extreme departure from the standards of ordinary care." *Sec. & Exch. Comm'n v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (quotation omitted). To allege scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Section 20(a) of the Exchange Act provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act. 15 U.S.C. § 78t(a). "To impute liability to [the Individual Defendants]—the alleged 'control persons' of [Apache] under § 20(a) of the Securities Exchange Act—the investors ha[ve] to show a 'primary violation' under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

## ANALYSIS

### A. Lead Plaintiffs Adequately Plead Actionable Misrepresentations

Defendants first argue that the Consolidated Class Action Complaint contains no well-pleaded allegations of an affirmative misrepresentation or omission. I disagree.

At the outset, I note that there is no dispute that Apache and the Individual Defendants made many optimistic statements during the Class Period about the commercial viability of Alpine Heights.[1] For illustrative purposes, I note that Defendants promoted Alpine High as "an immense resource and a transformational discovery for Apache" that would "drive incremental growth and returns for years to come." Dkt. 65 at 93; *see also id.* at 86 ("I've said it's world class. This would compare it versus three – what other people would view as world-class resources, the Woodford SCOOP, the Marcellus, and the Eagle Ford ... It stacks up as well as anything."); *id.* at 109 ("[W]e are building out a world-class resource play that will change the course of Apache."); *id.* at 115 ("There is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil."); *id.* at 118 ("Investors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High.").

[1]  The Consolidated Class Action Complaint describes the alleged misstatements in great detail. For convenience, Defendants put together an Appendix identifying in one, easy-to-use chart, each alleged misrepresentation made by Defendants. *See* Dkt. 71-1. For completeness, Lead Plaintiffs have copied Defendants' Appendix A and added a column titled "Plaintiffs' Response" that contains Lead Plaintiffs' brief response to Defendants' arguments for why the alleged misstatements are not actionable. *See* Dkt. 74-2.

**\*4** As Defendants correctly note, " 'the standard for misrepresentation in this [omission] context is whether the information disclosed, *understood as a whole*, would mislead a reasonable potential investor.' " Dkt. 71 at 27 (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 824 (S.D. Tex. 2017)). At this early pleading stage, it is my responsibility to determine whether the totality of allegations indicate that representations made by Defendants concerning the commercial viability of Alpine High were materially false or misleading when made. To help me make this determination, Lead Plaintiffs emphasize that the Consolidated Class Action Complaint does not make naked assertions of falsity. Instead, Lead Plaintiffs allege, in great detail, that Defendants were fully aware that there was no reliable data to support the wildly enthusiastic claims for Alpine High. By way of example, Lead Plaintiffs allege that Steven Keenan, the lead geologist Apache had tapped to discover the next big find, repeatedly told senior management in 2016 that the company did not

have the data to announce the play, and would need at least nine more months of consistent production from numerous wells within the play to properly assess the commercial viability of Alpine High. Despite these warnings, Lead Plaintiffs contend, Apache made a grand announcement on September 7, 2016, hyping Alpine High's attributes, performance, and commercial viability. If the Consolidated Class Action Complaint is to be believed, Apache senior management had no reason to make such rosy statements to the market concerning this new shale play. Possibly even more alarming is the lawsuit's accusation that, in mid-2019, Apache commenced an independent internal technical review of Alpine High. That review, named "Project Neptune," reportedly concluded "that the vast majority of Apache's Alpine High wells had ***never*** performed or produced anything like the Company had represented to the market." Dkt. 65 at 46. "Instead, the current, recent, and historical production and performance were far worse than what Apache and Defendants had told investors." *Id.* Lead Plaintiffs also allege that Apache's top executive, Christmann, deliberately shielded critical Alpine High data from the rest of the company for years, thus precluding standard peer review practices from occurring.

Over my career, both as a lawyer and as a judge, I have had the opportunity to review a vast number of securities class action lawsuits. Despite their usual length, many of those filings are cut-and-paste jobs that unquestionably fail to properly allege a false or misleading statement. This is not one of those complaints. The Consolidated Class Action Complaint provides a detailed discussion of the alleged misrepresentations at issue and explains the reasons why Defendants allegedly knew at the time they spoke publicly that those statements were materially false. *See id.* at 85-130. For that reason, I conclude that Lead Plaintiffs have sufficiently alleged that Defendants made materially false or misleading statements, a necessary prerequisite to stating a § 10(b) and Rule 10b–5 claim. *See Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at \*12 (S.D. Tex. Apr. 14, 2021) (sustaining fraud claims at the motion to dismiss stage where plaintiffs relied "on the accounts of two production engineers, [to] allege that [defendants] clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates").

**B. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' Alleged Misstatements**

Defendants contend that many of the alleged misstatements contained in the Consolidated Class Action Complaint constitute forward-looking statements protected by the PSLRA's safe harbor provision. The PSLRA's safe harbor provides, in relevant part, that a forward-looking statement is not actionable if (1) the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (2) if "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A–B).

Defendants assert that the "vast majority" of the Consolidated Class Action Complaint's alleged misstatements are forward-looking statements that fall within the PSLRA's safe harbor. Dkt. 71 at 29. In my view, Defendants are overreaching. Even a cursory review of the alleged misstatements (conveniently listed on the dueling Appendixes provided by the parties) indicates that many are statements of current or historical fact, which are not protected by the PSLRA's safe harbor. *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 799–800 (S.D. Tex. 2012) ("[T]he challenged statements are presented as a representation of [the defendant's] past achievements ... and are not forward-looking."); *In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009 WL 6325540, at \*32 (S.D. Tex. July 9, 2009) ("[A] statement of historical fact cannot be protected by the safe harbor."). To the extent some of the alleged misstatements contain forward-looking elements, many of them incorporate factual assertions, rendering the safe harbor inapplicable. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (quotation omitted)); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516, at \*10 (S.D. Tex. Mar. 27, 2019) ("A forward-looking statement ... whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision.").

**\*5** Even if all the alleged misstatements can, nonetheless, be construed as forward-looking, I still do not believe the safe harbor provides a panacea for Defendants. Because the Consolidated Class Action Complaint alleges that the Defendants knew that their statements were misleading at the time they were made, the key question becomes whether those statements were accompanied by meaningful cautionary language. *See Carlton v. Cannon,* 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016) ("Even if the

plaintiffs show actual knowledge, the safe harbor may still apply if the statement ... is identified as forward looking and is accompanied by meaningful cautionary language."). And what is meant by the phrase "meaningful cautionary language"? The Fifth Circuit has explained that "formulaic" and "generic" disclaimers cannot protect forward-looking statements because "Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–45 (5th Cir. 2009); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (The safe harbor would not protect "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Here, the language Defendants primarily rely on for the safe harbor to apply provides that any company statements were subject to "a number of risks and uncertainties which could cause our actual results, performance, and financial condition to differ materially from our expectations." Dkt. 71 at 30. Defendants' generic use of terms such as "risks" and "uncertainties" fails to provide substantive, company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, as the Fifth Circuit requires. Indeed, the Fifth Circuit in *Lormand* expressly rejected similar cautionary-disclaimer language, refusing to apply the safe harbor when the company's disclaimer stated: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Lormand*, 565 F.3d at 245. As for the more specific warnings that Defendants point to, like warning of "the risk that Apache will not encounter commercially productive oil and gas reservoirs" (Dkt. 71 at 30), these warnings are insufficient because "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015). Accepting Lead Plaintiffs' allegations as true, at the start of the Class Period, Defendants had *years* of data indicating that Apache would not encounter commercially productive oil and gas reservoirs. Accordingly, far more specific warnings were

required to bring Apache's statements within the safe harbor. I thus conclude that Defendants' cautionary statements are not meaningful. The result is that the PSLRA's safe harbor provision does not apply.

**C. Lead Plaintiffs Adequately Plead Actionable Misleading Statements of Opinion**

Defendants next argue that the "vast majority" of alleged misstatements identified in the Consolidated Class Action Complaint qualify as non-actionable opinions. Dkt. 71 at 31. Because § 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A–B), Defendants note that statements of opinion are not actionable under federal securities laws simply because they allegedly "turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). That is true, but "certain opinion statements can be actionable as well, since 'the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.' " *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) (quoting *Lormand*, 565 F.3d at 248); *see also Omnicare*, 575 U.S. at 193 ("[T]he phrases 'we believe' or 'we think' ... can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors"). The Supreme Court's *Omnicare* opinion "clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion." *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. CV H-21-2045, —— F. Supp. 3d ——, 2022 WL 3227584, at *9 (S.D. Tex. Aug. 10, 2022). Under *Omnicare*, opinion statements are actionable if the speaker did not sincerely hold that opinion, or if the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.' " *In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting *Omnicare*, 575 U.S. at 189).

**\*6** As an initial matter, I am not convinced, as Defendants claim, that the "vast majority of the [alleged misstatements] qualify as opinions." Dkt. 71 at 31. But even if I assume that virtually all the alleged misstatements are opinions, those opinions are actionable under Supreme Court precedent. As Lead Plaintiffs point out, "Defendants repeatedly made highly specific and authoritative Alpine High estimates, including

about its volumes of recoverable oil and gas, drilling locations, and commercial viability." Dkt. 74 at 54. Under *Omnicare*, each of these alleged misstatements is actionable because Defendants purportedly concealed material facts, including that (i) the Apache geologists responsible for exploring and developing Alpine High did not believe the data supported the company's grandiose predictions; (ii) top Apache management blocked Alpine High data from being vetted under the standard peer review processes that were otherwise utilized at Apache; and (iii) the underlying data never supported the sky-high estimates offered by Apache senior management. In short, Lead Plaintiffs have sufficiently alleged that Defendants omitted material factual information that would render their statements misleading to a reasonable investor under the *Omnicare* rubric. At this juncture, I conclude that Lead Plaintiffs' alleged misrepresentations, even those based on opinions, survive to see another day.

### D. Lead Plaintiffs Adequately Plead Scienter

As a final matter, Defendants maintain that the Consolidated Class Action Complaint fails to establish a strong inference of scienter, as required by the PSLRA. To allege scienter under the PSLRA, the plaintiff must plead, with particularity, facts giving rise to a strong inference of either an "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12. Because "there will rarely be direct evidence of intent to defraud," *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. 503-MD-1530, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004), a plaintiff may allege scienter "by pleading facts giving rise to a strong inference of recklessness or conscious misconduct." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001). "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015) (quoting *Tellabs*, 551 U.S. at 326); *see also Lormand*, 565 F.3d at 251 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). A district court must also consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. "Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," but allegations of motive and opportunity, without more, will *not*

fulfill the pleading requirements of the PSLRA. *Owens*, 789 F.3d at 540 (quotation omitted).

Turning to the inference of scienter in this case, I concede that this is a close call. A very close call. As I examined the scienter issue, I went back and forth as to whether Lead Plaintiffs' scienter allegations pass muster. In the end, I rely heavily on the Fifth Circuit's instruction that "where there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss." *Spitzberg*, 758 F.3d at 686 (quoting *Lormand*, 565 F.3d at 254).

Lead Plaintiffs claim that they have adequately alleged a strong inference of scienter through a detailed recitation of the purported fraud in the Consolidated Class Action Complaint. In a nutshell, Lead Plaintiffs contend that Defendants, desperate to reverse Apache's slumping performance and announce a major U.S. shale play, initially touted Alpine High as a huge prospect although such statements lacked any reasonable basis. According to Lead Plaintiffs, extensive geologic testing Apache conducted between 2012 and 2014 indicated that Alpine High was not a viable oil play. Then, near the start of the Class Period, a team of technical experts who had reevaluated the asset purportedly advised Apache senior management that the company lacked the technical data and analyses to make reasonable statements or projections about future production from Alpine High. Apache management disregarded these explicit warnings and moved forward with a major public announcement and glowing reports on how Alpine High would drive shareholder value for years to come. As alleged, the summer of 2019 witnessed growing friction among high-level Apache management as the company had still not escaped from the doldrums. The company launched an internal investigation of Alpine High, which concluded that: "(1) the vast majority of Alpine High wells never performed or produced anywhere close to the manner in which they were presented to investors; (ii) from the outset, Alpine High produced only limited quantities of poor quality of oil and gas; and (iii) any price pressure destroyed the economic viability of Alpine High." Dkt. 65 at 123. Nonetheless, Lead Plaintiffs assert, Defendants failed to come clean and acknowledge the project's severe limitations. Instead, Defendants stuck to their guns, defended the economic viability of Alpine High, and moved forward with the project on a wing and a prayer.

**\*7** For purposes of determining "whether a statement made by the corporation was made by it with the requisite Rule

10(b) scienter," the Fifth Circuit holds that it is "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement ... rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. In this case, Lead Plaintiffs' scienter allegations are based, in part, on statements from a bevy of confidential witnesses, many of whom confirm that the Individual Defendants received regular reports and updates on Alpine High, making the Individual Defendants fully aware of the play's limitations. In particular, the live pleading alleges that "Keenan was 'intimately aware' of production, drilling and completions at Alpine High through Daily Operations Meetings and Weekly Production Meetings," and he "routinely updated Defendants Christmann and Sullivan regarding Alpine High throughout the Class Period during both Quarterly Review Meetings in San Antonio as well as during Kennan's monthly trips to Apache's corporate headquarters in Houston." Dkt. 65 at 125. Riney also allegedly "closely tracked the status of each Alpine High well," *id.* at 125-16, and attended meetings at which Alpine High's production woes were openly discussed. *See id.* at 62. Despite this alleged knowledge, the Individual Defendants—through numerous investor presentations, press releases, earnings calls, and press interviews—made repeated statements promoting Alpine High's performance and profitability. These statements were, according to Lead Plaintiffs, materially misleading.

Defendants argue that Lead Plaintiffs' scienter theory—"that Defendants 'knew' Alpine High would never be an economic play and they 'lacked any scientific or factual basis' for their statements, concealed the truth from investors, and yet continued to 'pour[ ] money into the ground' to the tune of *more than $3 billion*"—is nonsensical. Dkt. 71 at 39 (quoting Dkt. 65 at 60, 120). It is, Defendants contend, wholly illogical and irrational for Apache and its senior management to promote a play they knew, all along, would fail miserably. This argument goes a bit too far. While it certainly would not have been in the company's best interest to stick by a strategy doomed from the start, the Consolidated Class Action Complaint's allegations are not wholly illogical. With Apache stock languishing and senior management convinced that only a major announcement could put the company back on track, Defendants supposedly went "all in" on Alpine High, "gambling that they would figure something out, even though the Company's extensive explorations repeatedly failed to produce scientific support for their bold claims." Dkt. 74 at 73. To this end, after Apache announced the Alpine High play,

the company "desperately drilled its way across Alpine High during the Class period," hoping to stumble across highly economic wells. Dkt. 65 at 54. The Consolidated Class Action Complaint quotes one confidential witness as stating that Apache geologists " 'willfully ignored' [data demonstrating that Alpine High lacked economically recoverable resources] because they were under 'a lot of pressure' to make an oil find and Alpine High was a 'Hail Mary pass to the end zone.' " *Id.* at 121. As Judge Richard Posner once explained:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). While the course of conduct allegedly pursued by Defendants might not have been a wise one, it was rational (though reckless). [2] Considering the totality of Lead Plaintiffs' allegations, the inference that Defendants acted recklessly is at least as compelling as any alternative inference.

[2] I must admit that I am puzzled by Lead Plaintiffs' assertion in their response that the Consolidated Class Action Complaint does **not** allege that "Defendants knew Alpine High was destined to fail." Dkt. 74 at 72. That is exactly what the lawsuit alleges. *See, e.g.*, Dkt. 65 at 111 ("As Defendants knew from the outset, ... Alpine High was never justified by the long-term scale and return potential even at lower gas prices." (cleaned up)).

To bolster their scienter allegations, Lead Plaintiffs advance a number of additional arguments. First, Lead Plaintiffs claim that the resignation in October 2018 of Keenan, Apache's lead technical advisor on the Alpine High play, favors an inference of scienter. Second, Lead Plaintiffs argue that a strong inference of scienter is supported by Apache's announcement in February 2020 that it took a massive $3 billion write-down and ceased all further exploration in

Alpine High. Third, Lead Plaintiffs maintain that scienter is enhanced by the Individual Defendants' compensation structures, which strongly incentivized the executives to inflate Apache's stock price by hyping Alpine High. Even if I completely discount these additional scienter allegations, I still think Lead Plaintiffs have done enough at the pleading stage to establish a strong inference of scienter.

**\*8** Viewing Lead Plaintiffs' allegations as true and evaluating the facts as a whole, I conclude that Consolidated Class Action Complaint's allegations are sufficient to support a strong inference of scienter by Defendants. *See, e.g., In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) ("[I]f a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter."); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) (holding that defendants' access to contradictory information provided "more than mere conclusory allegations that Defendants ... must have had knowledge" of the information); *Singh v. 21Vianet Grp., Inc*, No. 2:14-cv-00894, 2017 WL 4322483, at \*3 (E.D. Tex. Sept. 13, 2017) (a strong inference of scienter may arise when defendants knew facts or had access to information suggesting that their public statements were not accurate (quotation omitted); *Brody v. Zix Corp.*,

No. 3:04-CV-1931, 2006 WL 2739352, at \*7 (N.D. Tex. Sept. 26, 2006) (finding it reasonable to assume defendants had actual knowledge of material misstatements because they regularly received reports showing the statements were false). I thus recommend that the Motion to Dismiss be denied on the grounds that Lead Plaintiffs failed to adequately plead scienter.

**CONCLUSION**

For the reasons explained above, I recommend that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. 71) be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**All Citations**

Slip Copy, 2022 WL 4277350

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 5

KeyCite Yellow Flag - Negative Treatment
Distinguished by Strougo v. Barclays PLC, S.D.N.Y., April 24, 2015

2015 WL 1514597
United States District Court,
S.D. New York.

In re Barrick Gold Securities Litigation.

No. 13 Civ. 3851(SAS).
|
Signed April 1, 2015.

### Attorneys and Law Firms

Christopher F. Moriarty, Esq., David P. Abel, Esq., James M. Hughes, Esq., Motley Rice LLC, Mt. Pleasant, SC, William H. Narwold, Esq., Motley Rice LLC, One Corporate Center, Hartford, CT, Jonathan M. Plasse, Esq., Serena Pia Hallowell, Esq., Christopher J. Keller, Esq., Joel H. Bernstein, Esq., Jonathan Gardner, Esq., Labaton Sucharow, New York, NY, Brian P. Murray, Esq., Glancy Binkow & Goldberg LLP, New York, NY, Gregory B. Linkh, Esq., Glancy Binkow & Goldberg LLP, New York, NY, Lionel Z. Glancy, Esq., Michael Goldber, Esq., Robert V. Prongay, Esq., Glancy Binkow & Goldberg LLP, Los Angeles, CA, Ira M. Press, Esq., Kirby McInerney LLP, New York, NY, Jeffrey A. Barrack, Esq., Barrack, Rodos & Bacine, Two Commerce Square, Philadelphia, PA, for Plaintiffs.

Ada Fernandez Johnson, Esq., Jonathan Rosser Tuttle, Esq., Debevoise & Plimpon LLP, Washington, DC, Bruce E. Yannett, Esq., Elliot Greenfield, Esq., Debevoise & Plimpton LLP, New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

### INTRODUCTION

**\*1** Lead plaintiffs Union Asset Management Holding AB and LRI Invest S.A. bring this action on behalf of themselves and others similarly situated against Barrick Gold Corporation ("Barrick" or the "Company"); Aaron Regent, Jamie Sokalsky, Ammar Al–Joundi, Peter Kinver, Igor Gonzales, and George Potter (the "Individual Defendants"); and Sybil Veenman. The putative class consists of all persons and entities who purchased or acquired Barrick common stock during the period May 7, 2009 through and including November 1, 2013 (the "Class Period") and who were allegedly damaged thereby. Plaintiffs assert three causes of action for: violations of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder against Barrick; violations of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder against the Individual Defendants; and violations of Section 20(a) of the Exchange Act against the Individual Defendants and Veenman. Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants now move to dismiss all claims. For the following reasons, defendants' motion is granted in part and denied in part.

### II. BACKGROUND [1]

[1] The facts below are taken from the Consolidated Amended Class Action Complaint ("Compl."), as well as documents incorporated by reference into the Complaint.

Barrick is one of the world's largest gold mining companies, with a business focus on growing its base of low-cost gold production and gold reserves. [2] In 1994, Barrick acquired Pascua–Lama (the "Project"), an untapped gold mine spanning the border between Chile and Argentina. [3] Pascua–Lama is "one of the biggest and most difficult industrial ventures in the world" presenting many "logistical, operational, and environmental challenges." [4] To access the ore, Barrick planned to carve a massive open-pit gold mine into the peaks of the Andes mountains, fifteen thousand feet above sea level, while taking care not to disrupt the surrounding glaciers. [5]

[2]    See Compl. ¶ 33.

[3]    See id. ¶¶ 34–35.

[4]    Id. ¶ 36.

[5]    See id.

Because of the possible negative impact of construction on the glaciers, Barrick could not begin the project without first obtaining the necessary environmental approvals from the governments of Chile and Argentina. [6] Barrick went through several rounds of proposals with both Chile and Argentina from 2000 through 2006, before gaining the requisite approvals from both countries. [7] To gain the approvals, Barrick agreed to abide by four hundred environmental

conditions in the Chilean environmental impact assessment ("EIA").[8] These focused on addressing environmental concerns related to the Andean glaciers and Barrick's proposed management of water.[9] Barrick was required to implement dust control measures to prevent toxic dust from the mine site and access roads from drifting onto the glaciers to avoid poisoning the water supply.[10] One of these measures included wetting the paths of the mining trucks by permanent irrigation, which would limit the spread of particulates and toxic dust.[11] The approved design also required Barrick to implement a water management system that would divert any waters not impacted by the operations around the facility, and to capture, treat and reuse any water used to minimize environmental impact.[12] To this end, Barrick agreed to construct canals to control the Project's run-off and channel it to a treatment system.[13]

[6] See id. ¶ 42.

[7] See id. ¶¶ 43–44.

[8] See id. ¶ 45.

[9] See id. ¶ 46.

[10] See id.

[11] See id.

[12] See id. ¶ 47.

[13] See id.

**\*2** On May 7, 2009, Barrick announced that it would begin construction of the Project.[14] The press release highlighted a "[p]re-production construction estimate of $2.8–$3.0 billion"; that "[c]ommissioning [was] expected in late 2012 and production in early 2013"; and that "[f]ully compliant environmental management and monitoring plans [were] developed and being implemented."[15] The release described Pascua–Lama as "one of the lowest cost gold mines in the world."[16] It explained that "[t]he anticipated total cash costs are $20–$50 per ounce—which would make Pascua–Lama one of the lowest cost gold producing mines in the world ."[17] The press release also contained extensive cautionary language that the Company's forward-looking statements, including the cost and schedule estimates, represented expectations and were subject to inherent risks and uncertainties.[18]

[14] See id. ¶ 57.

[15] Id. ¶ 58; May 7, 2009 Press Release, Ex. 6 to Declaration of Elliot Greenfield in Support of Defendants' Motion to Dismiss the Amended Complaint ("Greenfield Decl."), at 1.

[16] May 7, 2009 Press Release, at 1.

[17] Id. at 2.

[18] See May 7, 2009 Press Release, at 5.

**A. Cost and Schedule Estimates**

In 2006 or 2007, Barrick received an Engineering, Procurement, and Construction Management ("EPCM") proposal to construct Pascua–Lama from the Bechtel Corporation (the "Bechtel Report").[19] The Bechtel Report detailed that project development would cost more than $5 billion and that it would take 4–5 years to complete.[20] Potter, the Senior Vice President of Technical Services and Capital Projects, did not accept this proposal and looked for other EPCM firms who would submit a lower proposal of costs.[21]

[19] See Compl. ¶ 52.

[20] See id. ¶¶ 53–54.

[21] See id. ¶ 56.

Barrick first reported in its May 7, 2009 Press Release and on a shareholder call the same day that the Project had a "pre-production construction estimate of $2.8–$3.0 billion" and that production was expected in early 2013.[22] Barrick confirmed these cost and schedule estimates on earnings calls on July 30, 2009, April 28, 2010, and October 28, 2010, and in its Form 6–K filed with the SEC on April 29, 2010.[23] On February 18, 2011, Barrick reported in its Form 6–K that "capital costs at Pascua Lama were expected to increase 10–20% to $3.3–$3.6 billion due to inflationary pressures, high labor costs, exchange rates, and increased commodity (steel) prices."[24] On July 28, 2011, Barrick announced an increase in the Project budget to $4.7–$5.0 billion.[25] Barrick included this figure in its July 29, 2011 Form 6–K, and indicated that production was on schedule for mid–2013 .[26] On February 17, 2012, Barrick repeated the previously announced figure of $4.7–$5.0 billion. However, on July 26, 2012, Barrick announced that capital costs for the

Project would increase fifty to sixty percent over the previous budget of $4.7–$5.0 billion, making the new estimate $7.5–$8.0 billion, and disclosed that initial gold production was not expected until mid–2014.[27] Barrick then announced in a November 1, 2012 earnings call that the estimate would be $8–$8.5 billion with first production in the second half of 2014.[28] Barrick confirmed this estimate and schedule in an earnings call on February 14, 2013, Form 6–Ks filed February 15, 2013 and March 26, 2013, and a Form 40–F filed on March 28, 2013.[29] However, on April 10, 2013, Barrick announced that construction work would be suspended on the Chilean side of Pascua–Lama while the company worked to address regulatory requirements, but stated that it was "too early to assess the impact, if any, on the overall capital budget and schedule of the project."[30] On June 28, 2013, Barrick announced that it would delay production until mid–2016 and that it expected to take an after-tax impairment charge[31] of $4.5–$5.5 billion.[32] Finally, on October 31, 2013, Barrick announced that it was indefinitely suspending construction at Pascua–Lama, except for activities required for environmental protection and regulatory compliance.[33]

[22]   May 7, 2009 Press Release, at 1; Compl. ¶¶ 57–58.

[23]   *See* Compl. ¶¶ 62–63, 67.

[24]   *Id.* ¶ 70.

[25]   *See id.* ¶ 73.

[26]   *See id.* ¶ 74.

[27]   *See id.* ¶ 84; July 2012 Form 6–K, Ex. 12 to Greenfield Decl., at 5.

[28]   *See* Compl. ¶ 85.

[29]   *See id.* ¶¶ 402, 406, 408.

[30]   *See id.* ¶ 131, April 10, 2013 Press Release, Ex. 17 to Greenfield Decl., at 1.

[31]   An asset is impaired when its carrying amount exceeds its recoverable amount. *See* Compl. ¶ 176.

[32]   *See id.* ¶ 141.

[33]   *See id.* ¶ 148.

**\*3**  During this period, there were a number of internal reports that suggested the cost estimate and production

schedule were inaccurate. In mid-October 2010, a Project Plan Report "concluded that the current estimate of $2.8 billion capital budget was infeasible within the Company's allotted 36–month time frame" and that "the time line was at least 18 months too short."[34] In July 2011, Barrick engaged a third-party consulting firm to conduct a "high-level audit of the original (2009 Estimate) and forecasted estimate (June 2011)."[35] The T & T Report concluded that the original estimate complied with typical Class III Barrick standards, but that the forecast estimate required some adjustments.[36] Also in July 2011, Barrick undertook a high level review of risk exposure, and concluded in the Risk Exposure Report that internal controls at Pascua–Lama suffered from "[i]naccurate reporting of deliverables/failure to adequately monitor progress" and had "[n]o formal system in place for scope/change management."[37] Monthly progress reports in July and September 2011 and January 2012 identified Project concerns and internal control deficiencies, including "[s]ignificant inaccuracies, omissions and inconsistencies in monthly reports"; "[c]ost [m]anagement [p]rocess weaknesses and inaccurate reporting"; and "[r]isk [m]anagement [p]rocess weaknesses contributing to inaccurate reporting."[38]

[34]   *Id.* ¶¶ 67, 69.

[35]   *Id.* ¶¶ 75–76; Turner & Townsend Report ("T & T Report"), Ex. 32 to Greenfield Decl., at 1.

[36]   T & T Report, at 1.

[37]   Compl. ¶ 78.

[38]   *Id.* ¶ 80; July 2011 Monthly Report, Ex. 27 to Greenfield Decl., at 2–3; September 2011 Monthly Report, Ex. 28 to Greenfield Decl., at 3–4; January 2012 Monthly Report, Ex. 29 to Greenfield Decl., at 3–4.

**B. Environmental Compliance**
In April 2010, the Pascua–Lama Project Manager (the "Project Manager") began oversight of construction and infrastructure within the Pascua–Lama Project.[39] He met with Chief Operating Officer Kinver and told him that he needed additional funds to maintain compliance with environmental requirements and the schedule, but was told to make do with the existing budget.[40] However, at the time the Project Manager began managing the Project, it was

In re Barrick Gold Securities Litigation, Not Reported in F.Supp.3d (2015)

2015 WL 1514597, Fed. Sec. L. Rep. P 98,433

not environmentally compliant. [41] The Project did not have enough water to comply with the requirement to keep the roads near the mine wet to prevent toxic dust from being blown onto nearby glaciers. [42] The Project Manager found a compound that could be used instead of water, but Barrick determined that it was too expensive and refused to purchase it. [43]

[39]    *See* Compl. ¶ 32.

[40]    *See id.* ¶ 66.

[41]    *See id.* ¶ 90.

[42]    *See id.*

[43]    *See id.*

In January 2010, Barrick was sanctioned for its failure to implement measures intended to reduce particulate matter emissions. [44] A report in May 2011 from regulators stated that "dust [was] falling on top of the glaciers." [45] Although Barrick had agreed to build canals near the mine to remove runoff water, Barrick changed the plans to build these canals to cut costs by thirty-five percent without prior governmental approval. [46] The Operations Manager at Pascua–Lama drafted three reports explaining his concerns and how the changes to the canals would hurt Barrick in the long run, and presented these reports to Barrick's South American Operations Manager. [47] However, Barrick made the changes, which resulted in environmental problems that were severe enough to cause Barrick to inform the Chilean government. [48] This eventually led to an injunction suspending work on the Project . [49] Internal reports throughout the period identified other issues with environmental compliance. [50]

[44]    *See id.* ¶ 108.

[45]    *Id.*

[46]    *See id.* ¶ 98.

[47]    *See id.* ¶ 99.

[48]    *See id.*

[49]    *See id.* ¶¶ 99, 131.

[50]    *See id.* ¶¶ 92, 93, 96, 101, 104.

**\*4** Despite this, Barrick made numerous statements regarding its environmental compliance. In Barrick's October 28, 2010 earnings conference call, Regent, Barrick's Chief Executive Officer, stated that "the Pascua–Lama project ... [is] not impacting the glaciers surrounding our operations" and that "we're in compliance with our permits and we're in compliance with the provincial legislation." [51] Barrick also repeatedly stated in its Forms 6–K and other filings that Pascau–Lama had been "undertaken pursuant to existing environmental approvals" and that "[w]e have a comprehensive range of measures in place to protect [sensitive environmental] areas and resources." [52]

[51]    *Id.* ¶¶ 303(b), 304.

[52]    *See id.* ¶¶ 70, 110, 123, 307(c), 313, 318, 324, 326(b), 335, 353, 360(b), 373, 393, 397(b).

**C. Disclosures**

On June 6, 2012, Barrick announced the termination of CEO Regent, and his replacement by then-CFO Sokalsky. [53] Media reports proposed that one explanation for replacing Regent was "problems with the giant Pascua–Lama Project." [54] Barrick's stock declined approximately 3.8% on heavy trading volume. [55] On July 26, 2012, Barrick disclosed that capital costs would increase by fifty to sixty percent, and production would be delayed until mid–2014. [56] Sokalsky stated that "overall project management structure had let us down." [57] Barrick's stock dropped 3.2% and media and analyst reports described the news as "outrageous" and indicative of a "lack of controls." [58] Other analysts linked the disclosed problems with Pascua–Lama to Regent's termination. [59] On November 1, 2012, Barrick again disclosed substantial increases in capital costs. [60] In response, Barrick's stock declined 9.4%. [61] On April 1, 2013, the media reported that an Appeals Court in Chile had issued an order halting construction work on Pascua–Lama and that Barrick could be fined millions as a result of failing to comply with environmental rules. [62] Barrick issued a press release stating that it was suspending construction work on the Chilean side while working to address environmental requirements. [63] Barrick's stock declined approximately 8.4%. [64] On May 24, 2013, the media reported that Chile's Environmental Superintendent had issued a resolution suspending Pascua–Lama for non-compliance with environmental permits, that it had imposed the maximum penalty possible under Chilean

2015 WL 1514597, Fed. Sec. L. Rep. P 98,433

law, and that Barrick had admitted to twenty-two of twenty-three environmental violations.[65] Barrick's stock fell two percent, even though the Company halted trading for approximately three hours during the day.[66] On June 28, 2013, Barrick disclosed that it would take an impairment charge of $4.5 to $5.5 billion, almost its entire investment in the project, and that production would be delayed up to a year and a half.[67] Barrick's stock dropped approximately 3.1%.[68] On October 31, 2013, Barrick announced that it had suspended the Project indefinitely and its stock dropped approximately 5.4%. The next day, Barrick announced a three billion dollar equity offering in order to pay down debt and for other corporate purposes, including "capital expenditures relating to Barrick's existing portfolio of mines."[69] An analyst report attributed this need to raise capital to cost overruns and stated that "delays with Pascua Lama have left Barrick with less cashflow to service its debt."[70] Barrick's stock dropped approximately 7.1%.[71]

[53]    See id. ¶ 210.

[54]    Id. ¶ 211.

[55]    Id. ¶ 212.

[56]    See id. ¶ 213.

[57]    Id. ¶ 119.

[58]    Id. ¶¶ 216–217.

[59]    See id. ¶ 121.

[60]    See id. ¶ 124.

[61]    See id. ¶ 126.

[62]    See id. ¶ 130.

[63]    See id. ¶ 131.

[64]    See id. ¶ 226.

[65]    See id. ¶ 227.

[66]    See id. ¶ 229.

[67]    See id. ¶ 141.

[68]    See id. ¶ 232.

[69]    Id. ¶ 237.

[70]    Id. ¶ 238.

[71]    Id. ¶ 239.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(6) Motion to Dismiss

**\*5** In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[ ] all factual allegations in the complaint as true and draw [ ] all reasonable inferences in the plaintiff's favor."[72] The court may consider "the complaint, [ ] any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily,"[73] as well as "legally required public disclosure documents filed with the SEC [ ]...."[74]

[72]    *Grant v. County of Erie,* 542 Fed. App'x 21, 23 (2d Cir.2013).

[73]    *Building Indus. Elec. Contractors Ass'n v. City of New York,* 678 F.3d 184, 187 (2d Cir.2012) (quotation marks omitted).

[74]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[75] Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[76] For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[77] Under the second prong of *Iqbal,* "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[78] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[79] "The plausibility standard is not akin to a probability requirement" because it requires "more than a sheer possibility that a defendant has acted unlawfully."[80]

[75]    *See* 556 U.S. 662, 678–79 (2009).

76      *Id.* at 679.

77      *Id.* at 678.

78      *Id.* at 679.

79      *Id.* at 678.

80      *Id.* (quotation marks omitted).

### B. Heightened Pleading Standard Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Private securities fraud claims are subject to a heightened pleading standard. *First,* Rule 9(b) requires plaintiffs to allege the circumstances constituting fraud with particularity. However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." [81]

81      Fed.R.Civ.P. 9(b).

*Second,* the PSLRA provides that, in actions alleging securities fraud, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." [82]

82      15 U.S.C. § 74u–4(b)(2).

### C. Leave to Amend

Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion." [83] Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." [84] "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." [85] In particular, it is the usual practice to grant at least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b). [86] Leave to amend should be denied, however, where the proposed amendment would be futile. [87]

83      *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007).

84      Fed.R.Civ.P. 15(a).

85      *Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999).

86      See *ATSI,* 493 F.3d at 108.

87      See *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 87–88 (2d Cir.2002).

## IV. APPLICABLE LAW

### A. Section 10(b) of the Exchange Act and Rule 10b–5

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." [88] Rule 10b–5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact ... in connection with the purchase or sale of any security ." [89] To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." [90]

88      15 U.S.C. § 78j(b).

89      17 C.F.R. § 240.10b–5.

90      *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157(2008).

### 1. Material Misstatements or Omissions

*\*6* In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made." [91] "[A] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell [securities]...." [92] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." [93]

91      *Rombach v. Chang,* 355 F.3d 164, 172 (2d Cir.2004) (internal quotation marks omitted).

92      *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 92–93 (2d Cir.2010) (internal quotation marks omitted).

93     *Id. Accord Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000).

Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the safe harbor provision, a forward-looking statement is non-actionable when it is "accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." [94] "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information" [95] identifying "important factors that could cause actual results to differ materially from those in the forward-looking statements." [96] Moreover, statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality." [97] The applicability of the immateriality prong of the safe harbor "necessarily depends on all relevant circumstances." [98] Under the judicially created bespeaks caution doctrine, "alleged misrepresentations ... are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language...." [99] Statements may also be deemed immaterial as merely vague expressions of optimism or puffery. [100] Liability under the actual knowledge prong of the safe harbor "attaches only upon proof of knowing falsity"—a showing of recklessness is insufficient. [101] Lastly, pleadings based on fraud by hindsight are not actionable as a matter of law. [102]

94     *Slayton v. American Express Co.,* 604 F.3d 758, 766 (2d Cir.2010) (emphasis in original).

95     *Id.* at 772.

96     15 U.S.C. § 78u–5(c)(1)(A).

97     *In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 629 (S.D.N.Y.2003). *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

98     *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir.2009).

99     *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).

100     *See ECA,* 553 F.3d at 206; *In re Gildan Activewear, Inc.,* 636 F.Supp.2d 261, 274 (S.D.N.Y.2009); *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 34 (S.D.N.Y.2004).

101     *Slayton,* 604 F.3d at 773.

102     *See Caiafa v. Sea Containers, Ltd.,* 525 F.Supp.2d 398, 410–11 (S.D.N.Y.2007).

### 2. Scienter

The required level of scienter under Section 10(b) is either "intent to deceive, manipulate, or defraud" [103] or "reckless disregard for the truth." [104] Plaintiffs may meet this standard by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." [105] Under the latter theory, plaintiffs must allege that the defendants have engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." [106] "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." [107] An inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." [108]

103     *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976).

104     *South Cherry St., LLC v. Hen nessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir.2009) ("By reckless disregard for the truth, we mean 'conscious recklessness —*i.e.,* a state of mind *approximating actual intent,*

and *not merely a heightened form of negligence.' "* (quoting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000)).

105 *ATSI,* 493 F.3d at 99 (citing *Ganino v. Citizens United Co.,* 228 F.3d 154, 168–69 (2d Cir.2000)).

106 *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001) (quotation marks and citations omitted).

107 *Novak,* 216 F.3d at 308.

108 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). *Accord Sawabeh Info. Servs. Co. v. Brody,* 832 F.Supp.2d 280, 295 (S.D.N.Y.2011) (noting that "the tie ... goes to the plaintiff" (quotation marks and citations omitted)).

### 3. Loss Causation

**\*7** A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation." [109] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm." [110] "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations....' " [111] Therefore, "to plead loss causation, the complaint[ ] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." [112]

109 *ATSI,* 493 F.3d at 106. Defendants do not dispute transaction causation.

110 *Id.* at 106–07 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346 (2005); *Lentell v. Merrill lynch & Co., Inc.,* 396 F.3d 161, 172 (2d Cir.2005)). *Accord Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 157 (2d Cir.2007).

111 *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 513 (2d Cir.2010) (quoting *lentell,* 396 F.3d at 173) (emphasis in original).

112 *Lentell,* 396 F.3d at 175.

### B. Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator. [113] "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." [114] Where there is no primary violation, there can be no "control person" liability under Section 20(a). [115]

113 *See* 15 U.S.C. § 78t(a).

114 *ATSI,* 493 F.3d at 108.

115 *See id. See also In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 297–98 (S.D.N.Y.2006).

## V. DISCUSSION

### A. Section 10(b) Claims

Plaintiffs allege four main categories of actionable misstatements: statements regarding cost and schedule (including statements that Pascua–Lama was a "low-cost project"), statements regarding compliance with environmental regulations, statements regarding internal controls and accounting for capital costs, and statements concerning accounting for the project.

### 1. "Low–Cost Project"

Plaintiffs allege that defendants' repeated statements that Pascua–Lama was a "low-cost project" were material misrepresentations. However, plaintiffs incorrectly characterize this statement as meaning that the Project would be "low cost" to build—a meaning that is unsupported by the context of the statement.

Barrick repeatedly stated that Pascua–Lama would be a "low-cost" mine, but this refers to anticipated costs of mining each ounce of gold once the Project was fully developed, *not* the cost of developing Pascua–Lama into an operating mine. [116] Plaintiffs have not alleged that the anticipated cost of production was misstated, only that the estimates regarding the pre-production cost were misrepresented. Therefore, none of the statements expressing that Pascua–Lama was a "low-cost project" are actionable.

116 *See, e.g.,* Compl. ¶¶ 40 ("Pascua Lama was a 'world-class project that will contribute low-cost

ounces at double digit returns to Barrick' ''), 203 (Pascua–Lama "was expected to contribute to new low cost production that replace[s] declining higher cost mines"), 288 (Pascua–Lama is "anticipated to contribute to significant low cost production for many years to come").

### 2. Cost and Schedule Estimates

Defendants made extensive disclosures regarding the expected capital costs of the Project and the anticipated production schedule. The company initially reported estimated costs of $2.8 to $3 billion, with production expected in early 2013. The reported estimated cost of the project increased steadily—first to $3.3–$3.6 billion, then to $4.7–$5.0 billion, then to $7.5–$8.0 billion, and finally to $8.0–$8.5 billion. Likewise, the expected production schedule was first pushed to mid–2014, then to the second half of 2014, then to mid–2016, and finally suspended indefinitely.

### a. PSLRA Safe Harbor

**\*8** Defendants argue that the cost and schedule estimates are protected as forward-looking statements protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine. Defendants contend that each of these statements used the words "estimate" and "expected," which made clear that the announcements reflected forecasts and anticipated outcomes, not statements of existing fact. Further, Barrick accompanied these statements with cautionary language stating that

> [t]he words 'believe', 'expect', ... 'estimate' and similar expressions identify forward-looking statements. Forward-looking statements are necessarily based upon a number of estimates and assumptions that, while considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies.... These risks, uncertainties and other factors include ... changes in the worldwide price of gold, silver, copper or certain other commodities ...; operating or technical difficulties in connection with mining or

development activities; ... availability and costs associated with mining inputs and labor; [and] the speculative nature of exploration and development, including the risks of obtaining necessary licenses and permits.... [117]

[117] May 7, 2009 Press Release, at 5. All other press releases contained similar, if not identical language. Moreover, statements made on earnings calls were preceded by a statement that "we will be making forward-looking statements during the course of this presentation. For a complete discussion of the risks, uncertainties and factors, which may lead to our actual financial results and performance being different from the estimates contained in our forward-looking statements, please refer to our year-end report or our most recent AIF filing." February 17, 2011 Earnings Call, Ex. 8 to Greenfield Decl., at 1.

The cost and schedule estimates are forward-looking statements as defined by the PSLRA—"a statement containing a projection of ... capital expenditures, ... [or] a statement of the plans and objectives of management for future operations...." [118] The construction estimate was clearly identified as just that—an estimate—and the schedule was set out as "expected." These statements plainly qualify as forward-looking statements. Moreover, they were identified as forward-looking statements, as required by the PSLRA, and accompanied by meaningful cautionary language that identified with specificity the types of risks that might lead the estimates to be inaccurate. To be eligible for the safe harbor, the cautionary language must be "substantive and tailored to the specific future projections, estimates, or opinions" that the plaintiffs challenge. [119] Here, the language was not boilerplate, but rather conveyed substantive warnings referring to some of the very risks that materialized here —"availability and costs associated with mining inputs and labor," "operating or technical difficulties in connection with mining or development activities," and "the risks of obtaining necessary licenses and permits." [120] Thus, the safe harbor applies, and the cost and schedule estimates are not actionable unless plaintiffs allege facts that show defendants had actual knowledge that the statements were false or misleading when made.

118      15 U.S.C. § 78u–5(i).

119      *Slayton,* 604 F.3d at 772 (quoting *Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 256 (3d Cir.2009)).

120      May 7, 2009 Press Release, at 5.

**b. Scienter**

Plaintiffs allege that every cost and schedule estimate that defendants reported was false and misleading, because defendants "concealed that the Project was not economically or technically feasible under the parameters they disclosed to shareholders."[121] Plaintiffs base this allegation on several internal reports, which they contend show both that the statements were false when made and that defendants knew the falsity of the statements at the time they were made. The first such report is the so-called Bechtel Report. Plaintiffs allege that "[i]n 2006 or 2007, the Bechtel Corporation, one of the world's largest construction and engineering companies, submitted its EPCM proposal to construct Pascua–Lama."[122] This proposal detailed that the project would cost more than $5 billion and would take four to five years to complete.[123] Plaintiffs allege that this proposal was the subject of discussion among Barrick executives, and that the executives, including Potter, "would not accept Bechtel's assessment and went looking for other EPCM firms who would submit a lower proposal of costs."[124] Plaintiffs use this proposal—and only this proposal—to contend that, prior to the start of the class period, defendants knew that the costs of the project would far exceed their public statements.

121      Compl. ¶ 246. The Complaint repeats this statement for every alleged misstatement relating to cost and schedule. *See id.* ¶¶ 246–418.

122      *Id.* ¶ 52.

123      *See id.* ¶¶ 53–54.

124      *Id.* ¶¶ 55–56.

**\*9** Plaintiffs may establish scienter by

alleging facts to show either (1) that defendants had the motive and opportunity to commit

fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. In order to raise a strong inference of scienter through "motive and opportunity" to defraud, Plaintiffs must allege that [Barrick] or its officers benefitted in some concrete and personal way from the purported fraud. Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry.... Alternatively, if Plaintiffs cannot make the "motive" showing, then they could raise a strong inference of scienter under the "strong circumstantial evidence" prong, though the strength of the circumstantial allegations must be correspondingly greater if there is no motive.[125]

125      *ECA,* 553 F.3d at 198–99 (internal quotations and citations omitted).

Circumstances that may give rise to a strong inference of scienter include where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate...."[126] Because the cost and schedule estimates are protected under the PSLRA safe harbor, plaintiffs must allege actual knowledge—recklessness will not suffice.

126      *Id.* at 199.

Here, plaintiffs allege no plausible motive to make fraudulent misstatements. Plaintiffs argue that the defendants' motive was to obtain financing and shareholder approval to undertake the Project to "gamble that increasing gold prices would lift this infeasible Project into reality, along with their careers."[127] *First,* gambling on a risky project in the hope that external events will conspire to make it profitable does not constitute motive for the purposes of securities fraud —it is instead a desire for profits that is "common to most corporate officers."[128] *Second,* even assuming that a

motive of career enhancement was sufficient, there are no facts alleged in the Complaint that would support plaintiffs' argument that the individual defendants sought to advance their careers in this way.

127    Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Opp.Mem."), at 39–40.

128    *ECA,* 553 F.3d at 198. A risky gamble may, in some circumstances, rise to the level of recklessness that would satisfy the scienter requirement for statements not protected by the PSLRA safe harbor. *See In re Agnico–Eagle Mines Ltd. Sec. Litig.,* No. 11 Civ. 7960, 2013 WL 144041, at *19 (S.D.N.Y. Jan. 14, 2013) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 710 (7th Cir.2008)). However, this would establish—if properly supported by facts pleaded in the Complaint—circumstantial evidence of scienter, *not* motive for the purposes of securities fraud.

In the absence of motive, plaintiffs must assert strong circumstantial evidence that defendants knew facts or had access to information that would suggest that their public statements were not accurate. Here, the Bechtel Report fails to provide the requisite evidence. This Report is merely an unsuccessful bid from a third-party contractor. It is certainly *possible* that defendants knew that this bid was more accurate than the bid they ultimately accepted. However, plaintiffs themselves provide the more plausible interpretation—the defendants wanted a firm with a lower proposal, and sought to find one. [129] That they looked for an estimate that fit their preferred budget does not indicate their knowledge that a lower proposal was inaccurate. Moreover, speculation from the Project Manager—who was not employed by Barrick until three to four years *after* the Bechtel Report was submitted—that Barrick "knew going into the Project what the real costs would be, but was worried that it would not be able to get financing," is just that—speculation. [130] Weighing the competing inferences, the opposing inference of nonfraudulent intent is more compelling. [131]

129    *See* Compl. ¶ 56.

130    *See id.* ¶¶ 32, 56.

131    *See Tellabs,* 551 U.S. at 314.

**\*10**  Without the Bechtel Report, plaintiffs have *no* circumstantial evidence that would show that defendants knew or had access to information suggesting that their statements regarding the cost and production schedule of the Project were inaccurate at the start of the class period. Without this Report, no facts suggest that the project was a "gamble" at the outset, or that defendants knew that the project was infeasible for the cost and schedule they reported to the public.

Beyond the Bechtel Report, plaintiffs rely on statements from internal confidential sources, such as the Project Manager and the Operations Manager, as well as other internal reports that suggest that the Project would not be able to be developed within the cost and time frame presented in public statements. Plaintiffs allege that in May and June 2010, the Project Manager discussed with Potter that the timeframe and budget was "unrealistic," but was told "the budget was what is [sic] was, and the Project Manager had to deal with it." [132] Then, in mid-October 2010, a Project Plan Report "concluded that the current estimate of $2.8 billion capital budget was infeasible within the Company's allotted 36–month time frame" and that "the timeline was at least 18 months too short." [133] In July 2011, Barrick engaged a third-party consulting firm to conduct a "high-level audit of the original (2009 Estimate) and forecasted estimate (June 2011)." [134] The T & T Report concluded that the original estimate complied with typical Class III Barrick standards, but that the forecast estimate required some adjustments. [135] Also in July 2011, an internal report concluded that project reporting at Pascua–Lama suffered from " '[s]ignificant inaccuracies, omissions and inconsistencies in monthly reports'; '[c]ost [m]anagement [p]rocess weaknesses and inaccurate reporting'; and '[r]isk [m]anagment [p]rocess weaknesses contributing to inaccurate reporting.' " [136] These were repeated in the September 2011 Monthly Report and the January 2012 Monthly Report. [137]

132    Compl. ¶ 63.

133    *Id.* ¶¶ 67, 69.

134    T & T Report, at 2.

135    *See id.*

136    Compl. ¶ 80; July 2011 Monthly Report, Ex. 27 to Greenfield Decl., at 2–3.

137    *See* Compl. ¶¶ 80–81; September 2011 Monthly Report, Ex. 28 to Greenfield Decl., at 3–A; January

2012 Monthly Report, Ex. 29 to Greenfield Decl., at 3–4.

While these documents plausibly allege recklessness with regard to the estimates and schedules Barrick reported to the public, they do not support a strong inference that the estimates were announced with actual knowledge of their falsity, as required for forward-looking statements. Moreover, Barrick continually updated the cost and schedule estimates with the public, raising the estimate in February 2011 to $3.3–$3.6 billion, and raising it again in July 2011 to $4.7–5.0 billion. This raises a strong inference that Barrick was continually investigating and relaying updated information to the public. Indeed, the T & T report, while concluding that the methodology of the updated estimate had some flaws, ultimately stated that adjustments would be implemented and documented over the next four to six weeks.[138] This supports the inference that Barrick was working to confirm that its estimates were accurate and to make corrections where needed. Conducting reviews of estimates before releasing information to the public is ' "a prudent course of action that weakens rather than strengthens an inference of scienter.' "[139]

[138]    See T & T Report, at 1.

[139]    Slayton, 604 F.3d at 777 (quoting Horizon Asset Mgmt. Inc. v. H & R Block, Inc., 580 F.3d 755, 763 (8th Cir.2009)). Accord Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 761 (7th Cir.2007) ( "Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

 *11   Therefore, plaintiffs fail to allege facts that support a strong inference of actual knowledge that any of the cost and schedule estimates were false or misleading. Because plaintiffs have not sufficiently alleged scienter, their claims based on cost and schedule estimates must be dismissed.

### 3. Statements Regarding Environmental Approvals

#### a. Material Misstatements

Defendants first contend that plaintiffs have failed to allege facts that indicate that statements regarding environmental approvals were false when made. I disagree. *First,* there is no dispute that the statements are material.[140] *Second,* plaintiffs have alleged sufficient facts indicating that defendants'

statements were false or misleading when made. Defendants stated that "the Pascua–Lama project ... [is] not impacting the glaciers surrounding our operations" and that "we're in compliance with our permits and we're in compliance with the provincial legislation."[141] However, plaintiffs have alleged that defendants knew that Barrick was violating its environmental commitments as early as April 2010.[142] For example, one compliance commitment involved the need to keep the roads near the mine wet to prevent dust from being blown onto the nearby glaciers.[143] As the Project did not have enough water to fulfill this obligation, the Project Manager identified compounds that could be used instead of water and did in fact use these compounds for a period of time.[144] However, defendants concluded that the compounds were too expensive and refused to purchase them, which caused the Project to violate the environmental obligations that Barrick had agreed to.[145] Because of this, Barrick was continuously fined.[146] These facts, as well as many others in the Complaint,[147] sufficiently allege material misstatements regarding compliance with environmental commitments.

[140]    See Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 252 (2d Cir.2014) ("[A] reasonable investor could conclude that a substantial non compliance would constitute a substantial threat to earnings.").

[141]    Compl. ¶¶ 303(b), 304 (quoting Barrick's October 28, 2010 earnings conference call). There are other examples of statements regarding environmental compliance. *See, e.g., id.* ¶ 111 ("[T]he company has put in place a range of measures to mitigate the potential impact of dust emissions on glaciers."). Plaintiffs also cite Barrick's statement, repeated in numerous Forms 6–K, that Pascua–Lama had been "undertaken pursuant to existing environmental approvals" and that Barrick "ha[d] a comprehensive range of measures in place to protect [sensitive environmental] areas and resources." *See id.* ¶ 110. Defendants contend that this statement referred only to compliance with a new Argentinian federal law, and not to compliance with Chilean requirements. To support this argument, defendants have attached one Form 6–K, which does indeed support their contention. *See* October 2010 Form 6–K, Ex. 26 to Greenfield Decl., at 14. However, plaintiffs have alleged that

2015 WL 1514597, Fed. Sec. L. Rep. P 98,433

this statement was continually repeated throughout the class period, and defendants have not provided context for any of the other instances when this statement was made. Without context, I cannot conclude that *every* repetition of this statement referred only to compliance with Argentinian law.

142    *See* Compl. ¶ 90.

143    *See id.*

144    *See id.*

145    *See id.*

146    *See id.*

147    *See, e.g., id.* ¶¶ 93 (monthly reports showed dust-mitigation procedures were being violated), 94 (monthly reports stated that Barrick was failing to meet its water management system construction commitments), 97 (Field Engineering Manager stated Barrick disregarded obligation to treat contaminated water), 98 (breaching commitment to capture runoff water and changing engineering plans to cut costs without the government's consent), 101 (violating obligation to divert sedimentation on Argentinian side of the mine).

### b. Scienter

Plaintiffs may satisfy the scienter requirement by showing either actual knowledge or recklessness. [148] As discussed above, plaintiffs have failed to allege a plausible motive, but may demonstrate scienter by alleging strong circumstantial evidence. [149] With regard to statements of environmental compliance, plaintiffs have met this burden. Plaintiffs provide detailed allegations supporting a strong inference that defendants had access to information that directly contradicted their public statements that Barrick was complying with all environmental commitments. [150] Based on the facts alleged, defendants had access to information in the form of monthly progress reports and statements from the Project Manager that the Project was not complying with applicable environmental regulations and commitments. Nevertheless, defendants continued to state, in a variety of different ways, that the Project was compliant. This raises a strong inference that is at least as compelling as any opposing inference of nonfraudulent intent that Barrick either knew that its statements were false, or was recklessly indifferent to that possibility. [151]

148    *See South Cherry St., LLC,* 573 F.3d at 109.

149    *See ECA,* 553 F.3d at 199.

150    *S ee supra* n. 147.

151    *See Tellabs,* 551 U.S. at 314.

**\*12**    Plaintiffs have sufficiently alleged scienter with regard to the Individual Defendants and with regard to Barrick. *First,* plaintiffs allege that all Individual Defendants had access to specific reports and statements that contradicted their public statements regarding environmental compliance. [152] Though plaintiffs have not alleged a motive, they have sufficiently alleged strong circumstantial evidence of conscious misbehavior or recklessness by pleading facts showing that defendants had access to information suggesting that their public statements were not accurate. [153] *Second,* plaintiffs have sufficiently alleged scienter against Barrick. Defendants argue that plaintiffs failed to allege scienter against Barrick because they fail to allege scienter against anyone whose intent could be imputed to the Company. However, "the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant...." [154] Because I conclude that plaintiffs have sufficiently alleged scienter on behalf of the Individual Defendants, it follows that the Complaint also alleges scienter on behalf of Barrick with regard to statements about environmental compliance.

152    *See Teamsters Local 445 Freight Div. Pension Fund. v. Dynex Capital Inc.,* 531 F.3d 190, 196 (2d Cir.2008) (noting that plaintiffs must specifically identify the reports or statements containing contrary facts); Compl. ¶¶ 66 (Project Manager told Kinver and Potter that additional funds were needed to maintain compliance with environmental regulations), 79 (monthly progress reports circulated to Kinver and Gonzales, Barrick's Pascua–Lama team in Chile, and the Toronto office).

153    *See ECA,* 553 F.3d at 199.

154    *Teamsters,* 531 F.3d at 195.

### c. Loss Causation

Defendants contend that plaintiffs have failed to adequately plead loss causation with respect to the statements regarding

environmental compliance, because the risks that ultimately materialized had not been concealed. Plaintiffs point to two specific dates on which previously concealed risks related to environmental compliance materialized: April 10, 2013 and May 24, 2013. On April 10, the media reported that an appeals court in Chile had issued an order halting construction work on Pascua–Lama and Barrick faced as much as $10.2 million in fines for failing to comply with environmental rules.[155] The stock price dropped approximately 8.4%.[156] Similarly, on May 24, the media reported that Chile's Environmental Superintendent had issued a resolution suspending the Project pending compliance with an environmental permit, and imposed a fine of sixteen million dollars.[157] One article reported that Chile's environmental regulator had identified twenty-three violations and that Barrick had admitted to all but one .[158] Barrick's stock fell two percent, despite the fact that Barrick had suspended trading for approximately three hours.[159]

[155]   *See* Compl. ¶ 130.

[156]   *See id.* ¶ 226.

[157]   *See id.* ¶ 227.

[158]   *See id.*

[159]   *See id.* ¶ 229.

Defendants argue that neither of these disclosures satisfy loss causation because the risks that materialized were not concealed. Barrick warned in publicly filed documents that plaintiffs in the Chilean actions alleged non-compliance with the environmental approvals which resulted in negative impacts on water sources and the risk of contamination.[160] Barrick further stated that the Chilean plaintiffs sought suspension of construction until all environmental obligations were fulfilled.[161] Because these were the very risks that materialized in the April 10 and May 24 disclosures, defendants argue that they were not concealed, and therefore these disclosures do not satisfy loss causation.

[160]   *See* November 2012 Form 6–K, Ex. 15 to Greenfield Decl., at 71.

[161]   *See id.*

**\*13** The Second Circuit has described the materialization of the risk concept as following:

If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.[162]

[162]   *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 188 (2d Cir.2001).

Plaintiffs have met their burden here. Although Barrick did warn of the risk of the specific litigation that resulted in the April 2013 injunction and the possible consequences of that litigation, defendants' alleged misstatements regarding environmental compliance meant that investors could not accurately weigh that risk. The risk that caused the loss—the successful Chilean litigation—was within the ' "zone of risk *concealed* by the misrepresentations.' " [163] In other words, because Barrick assured investors that it was complying with all environmental commitments, plaintiffs may have been aware of the Chilean litigation but "perceived [it] as remote or highly unlikely." [164] Had Barrick not made the alleged misstatements regarding environmental compliance, a reasonable investor may have taken the Chilean litigation and the risk of suspension of the Project construction much more seriously.[165] Therefore, plaintiffs have sufficiently alleged loss causation with regard to statements relating to environmental compliance.

[163]   *See In re Omnicom,* 597 F.3d at 513 (quoting *Lentell,* 396 F.3d at 173) (emphasis in original).

[164]   *Castellano,* 257 F.3d at 188.

[165]   Defendants also allege that these disclosures do not relate to dust mitigation, and therefore plaintiffs have failed to plead loss causation for the related misstatements. Whether the Chilean litigation addressed the dust mitigation issue is a question

of fact that can only be answered with a full record. At this stage, plaintiffs have alleged that the April and May 2013 disclosures related to wide-ranging breaches of environmental requirements and nothing in the Complaint (or the documents attached by defendants that were incorporated into the Complaint) shows that these allegations are incorrect.

> Finally, defendants argue that plaintiffs have failed to disaggregate losses due to misstatements as opposed to other industry-wide factors or company-specific news. For the two disclosure dates at issue here, this argument fails. Defendants point to only the steep decline in the price of gold that occurred during the second quarter of 2013 as a factor that could have contributed to Barrick's falling stock price. However, plaintiffs need not, at this stage, provide detailed evidence attributing an exact portion of the fall in the stock price to the misstatements. Rather, plaintiffs need only "allege[ ] facts that would allow a factfinder to ascribe some rough proportion of the whole loss" to Barrick's misstatements. *Lattanzio,* 476 F.3d at 158. Plaintiffs have met that burden here.

### 4. Statements Regarding Internal Controls and Accounting for Capital Costs

Internal controls are the processes Barrick was required to design and maintain to provide reasonable assurance regarding the achievement of objectives, including "(i) effectiveness and efficiency of operations; (ii) reliability of financial reporting and disclosures; and (iii) compliance with applicable laws and regulations."[166] Under the Sarbanes–Oxley Act of 2002 Sections 302 and 404, Regent, Sokalsky, and Al–Joundi certified with the SEC that Barrick had effective internal controls, and were obligated to report any significant changes to Barrick's internal controls and any other factors that could impact Barrick's internal controls.[167]

[166] Compl. ¶ 154(citing Committee of Sponsoring Organizations of the Treadway Commission, "Internal Control Integrated Framework," Ch. 1 "Definitions").

[167] *See id.* ¶ 155.

Plaintiffs have alleged numerous deficiencies in the reporting structure for Pascua–Lama. For example, Barrick's July 2011

Risk Exposure Report concluded that controls at Pascua–Lama suffered from "[i]naccurate reporting of deliverables/ failure to adequately monitor progress" and "[n]o formal system in place for scope/change management."[168] Also beginning in July 2011, monthly reports for Pascua–Lama were circulated internally.[169] The July 2011 Monthly Progress Report concluded that project reporting at Pascua–Lama suffered from " '[s]ignificant inaccuracies, omissions and inconsistencies in monthly reports'; '[c]ost [m]anagement [p]rocess weaknesses and inaccurate reporting'; and '[r]isk [m]anagment [p]rocess weaknesses contributing to inaccurate reporting.' "[170] These were repeated in the September 2011 Monthly Report and the January 2012 Monthly Report.[171] However, during this period, Barrick stated that "[b]ased on Barrick management's assessment, Barrick's internal control over financial reporting is effective."[172] Regent, Sokalsky, and Al–Joundi certified through this period that, based on each defendant's knowledge, the filed report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made ... not misleading...."[173] The defendants also certified that they "[d]isclosed ... [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information...."[174]

[168] *Id.* ¶ 78.

[169] *See id.* ¶ 79.

[170] *Id.* ¶ 80; July 2011 Monthly Progress Report, at 2–3.

[171] *See* Compl. ¶¶ 80–81; September 2011 Monthly Progress Report, at 3–4; January 2012 Monthly Progress Report, at 3–4.

[172] Compl. ¶ 166.

[173] *Id.* ¶ 420.

[174] *Id.*

**\*14** Defendants argue that plaintiffs' claims regarding internal controls fail because (1) plaintiffs have alleged only project-level issues that do not constitute a material weakness at the company level, and (2) plaintiffs allege no facts

indicating that the officers who signed the certifications knew of any material weakness in the Company's internal controls.

*First,* the project-level issues identified by plaintiffs are significant enough to support a claim of a material weakness in internal controls at the company level. Plaintiffs rely upon several internal Barrick documents that discuss serious weaknesses in internal controls at Pascua–Lama. Plaintiffs also allege numerous statements by defendants that Pascua–Lama was a "key priority," a "flagship project," and one that is "expected to have a significant impact on [Barrick's] future production, cash, costs, and earnings." [175] In 2011, Barrick spent $1.1 billion on the Project, more than twice its expenditures on any other project and nearly sixty-five percent of its total project capital expenditures. [176] Thus, plaintiffs have alleged that expenditures on the Project formed a significant portion of Barrick's total company-wide capital expenditures during the class period. In light of this, a weakness in internal controls at the project level could lead to a material weakness in internal controls at the company level.

[175]    *Id.* ¶ 200.

[176]    *See id.* ¶ 201.

*Second,* while defendants correctly note that a certification of internal controls and financial statements can give rise to a securities fraud claim only where the underlying financial forms contained material misstatements and defendants had knowledge of those misstatements, plaintiffs have met that burden here. [177] As discussed above, plaintiffs have alleged that the filings contained misstatements in failing to disclose material weaknesses in internal controls. Defendants' certifications, therefore, are materially false if they knew of those misstatements. Plaintiffs have alleged numerous internal reports beginning in July 2011 that discussed the weakness of internal controls at Pascua–Lama, and have alleged that all defendants, including Regent, Sokalsky, and Al–Joundi, knew or had access to the information included in those reports. [178] As Pascua–Lama was a significant project for Barrick, it is reasonable to conclude that all defendants knew the information that these reports contained—or at the very least were reckless if they failed to read these reports before certifying a lack of material weakness in internal controls.

[177]    *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended

Complaint ("Def.Mem."), at 22 (quoting *In re Scottish Re Grp. Sec. Litig,* 524 F.Supp.2d 370, 391 (S.D.N.Y.2007)).

[178]    *See supra* nn. 168–171.

Regarding loss causation, plaintiffs have alleged eight specific dates on which, in response to disclosures, Barrick's share price dropped as the truth concealed by defendants' misstatements began to emerge. [179] In particular, on July 26, 2012, Barrick disclosed a fifty to sixty percent increase in capital costs and production estimates, and CEO Sokolsky stated that "overall project management structure let us down." [180] The same day, *Bloomberg* reported that an analyst described the cost increase as "outrageous" and indicative of "a lack of controls." [181] Another analyst report linked the cost increase with Regent's termination as CEO six weeks earlier, stating, "[i]n hindsight, market suspicions that Aaron Regent's dismissal was about more than was revealed by the company have proved valid." [182] That day, Barrick's stock dropped approximately 3.2% with heavy trading volume . [183] Contrary to defendants' argument that "none of the statements or events alleged to have caused a decline in stock price revealed any concealed information" related to internal controls, [184] plaintiffs have specifically identified the July 26, 2012 disclosure as relating to a weakness in internal controls. Furthermore, the other disclosures similarly reveal cost escalation and production delays that plausibly expose the previously concealed risk of material weaknesses in Barrick's internal controls. [185]

[179]    *See* Compl. ¶¶ 209–239.

[180]    *Id.* ¶¶ 117, 119.

[181]    *Id.* ¶ 216.

[182]    *Id.* ¶ 121.

[183]    *See id.* ¶ 217.

[184]    Def. Mem. at 41.

[185]    *See id.* ¶¶ 210–239.

**\*15** Finally, defendants argue that plaintiffs' claims of improper accounting for Pascua–Lama's capital costs and failure to evaluate Pascua–Lama's impairment must be dismissed because (1) plaintiffs failed to plead facts demonstrating that defendants knew or believed that Pascua–

Lama would not generate future economic benefits in excess of the costs of the Project; and (2) plaintiffs fail to allege facts suggesting that the asset impairment analyses were performed inadequately. With regard to accounting, plaintiffs allege that "[t]hroughout the Class Period, Defendants were aware that Pascua–Lama was not economically feasible given the size of the Project, the inherent logistical challenges of the Project, and the applicable and necessary environmental commitments."[186] As such, Barrick "should not have calculated the Project as an asset on its balance sheet. Instead, the Project expenses should have been expensed as costs when incurred."[187] To the extent that plaintiffs rely on the Bechtel Report for their conclusion that Barrick knew at the outset that their capital investment in the Project would not be recoverable, their claim fails. The Bechtel Report does not support an inference that defendants knew of, or recklessly disregarded, an obvious risk that the Project would never be profitable. As discussed above, the Bechtel Report is merely a third-party bid and defendants did not act recklessly in searching for a lower bid. However, plaintiffs have sufficiently alleged that there came a time during the Class Period on or after July 2011 that defendants either knew or recklessly disregarded the risk that their capital investment in Pascua–Lama might not be recoverable because of a material weakness in the Project's internal controls.[188]

[186]    *Id.* ¶ 191.

[187]    *Id.* ¶ 192.

[188]    *See id.* ¶ 169.

Similarly, plaintiffs allege that Barrick's internal controls were so inadequate that defendants did not have a reasonable basis to evaluate whether an impairment of the Project had occurred. Specifically, the Complaint alleges that "the Company had failed to disclose [potential indicators of impairment] and failed to conduct a proper impairment analysis when those indicators arose; and [ ] additional impairment indicators could have existed at Pascua–Lama prior to 2013, but a material weakness in the Company's internal controls compromised Defendants' ability to assess Pascua–Lama's impairment indicators."[189] As defendants were obligated to analyze the impairment of an asset in the presence of potential indicators of impairment,[190] the failure to assess an impairment before 2013 was an omission of a material fact. The same analysis regarding scienter and loss causation discussed above is applicable here, and therefore plaintiffs have sufficiently stated a claim related to statements and omissions regarding accounting.

[189]    *Id.* ¶ 181.

[190]    *See id.* ¶ 178.

**B. Control Person Liability Under Section 20(a)**
Defendants first contend that the Section 20(a) claim should be dismissed because plaintiffs have failed to allege a primary violation of Section 10(b). As discussed above, plaintiffs have adequately pleaded a Section 10(b) violation with regard to statements relating to environmental compliance. Defendants also argue that the Section 20(a) claim should be dismissed with regard to Kinver, Potter, and Gonzales because plaintiffs failed to plead that these defendants had actual control over the wrongdoer. Defendants further contend that plaintiffs have failed to plead facts showing culpable participation as to any of the Individual Defendants. Finally, defendants argue that the Section 20(a) claim should be dismissed with regard to Veenman because plaintiffs have not alleged that she participated in the alleged fraud in any way.

 **\*16** The Complaint alleges the high-level positions of the individual defendants and Veenman during the class period.[191] It details the involvement of the Individual Defendants in the alleged fraud and alleges that the Individual Defendants and Veenman acted as controlling persons of Barrick.[192] Plaintiffs have therefore adequately pleaded that the Individual Defendants had actual control. With regard to Veenman, plaintiffs have alleged facts regarding her position at Barrick and that she signed and filed false and misleading SEC filings and Company statements.[193] While "a mere recitation of [her] title ... is not sufficient, ... [i]t comports with common sense to presume that a person who signs [her] name to a report has some measure of control over those who write the report."[194]

[191]    *See* Compl. ¶¶ 22–27, 29.

[192]    *See id.* ¶ 89–115, 546.

[193]    *See id.* ¶ 29.

[194]    *In re Alstom SA,* 406 F.Supp.2d 433, 494 (S.D.N.Y.2005) (internal quotations omitted).

Thus, the remaining question is whether this claim should be dismissed as to the Individual Defendants and Veenman

2015 WL 1514597, Fed. Sec. L. Rep. P 98,433

on the ground that the Complaint does not plead culpable participation. It remains unsettled in this District whether control person liability is premised on fraud, and thus whether culpable participation requires proof of scienter. [195] These issues in turn impact whether Rule 8, Rule 9(b), and/or the heightened pleading requirements of the PSLRA apply. I have previously held that scienter is not an essential element of a Section 20(a) claim and that neither Rule 9(b) nor the PSLRA apply, [196] and I continue to adhere to this view.

[195]    *See generally Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.,* 33 F.Supp.3d 401, 438 (S.D.N . Y.2014) ( "While district courts tend to frame the debate as whether 'culpable participation' is a required element of a Section 20(a) claim, the debate is more properly understood as a disagreement over the *meaning* of culpable participation.") (quotation marks and citations omitted) (emphasis in original); *see also id.* at 437 ("[D]istrict courts within the Second Circuit disagree on the question of whether Section 20(a) plaintiffs must also allege 'culpable participation' as a third element of their claim, or, alternatively, whether Section 20(a) created a burden-shifting framework where plaintiffs must only plead a primary Section 10(b) violation and control, with defendants allowed to raise a good faith defense in their answer that can later be rebutted by plaintiffs.") (quotation marks omitted); *In re Parmalat Sec. Litig.,* 414 F.Supp.2d 428, 440–41 (S.D.N.Y.2006).

[196]    *See Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC,* No. 12 Civ. 5329, 2014 WL 5334053, at *7 n. 75 (S.D.N.Y. Oct. 20, 2014).

The Complaint adequately pleads participation on the part of the Individual Defendants. Plaintiffs allege numerous misstatements regarding environmental compliance and generally allege that the Individual Defendants knew and participated in the fraud. [197] With regard to Veenman, the allegations are sparse, but nevertheless suffice to allege that, as the person who signed the statements and SEC filings, she participated in the fraud. These allegations are sufficient to state a claim against the Individual Defendants and Veenman under Section 20(a).

[197]    *See* Compl. ¶¶ 89–115.

### C. Non–Domestic Transactions

Plaintiffs argue that their Section 10(b) claim applies to all transactions in Barrick's stock that is registered and listed on the NYSE, irrespective of whether the transaction occurred in the United States or abroad. However, the Second Circuit has squarely held that *"Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange." [198] Thus, plaintiffs' claims related to transactions conducted on the Toronto Stock Exchange must be dismissed.

[198]    *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 181 (2d Cir.2014) (citing *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247 (2010)).

### D. Leave to Amend

Plaintiffs have not requested leave to amend, and it is difficult to believe that plaintiffs will be able to plead additional facts that are not already included in their almost 200–page, 548–paragraph Complaint. Nevertheless, leave to amend should be freely given "when justice so requires." [199] Therefore, I grant plaintiffs leave to amend if they can correct the deficiencies noted in this Opinion in compliance with their obligations under Rule 11. Any repleading must be made within thirty days of the date of this Order.

[199]    Fed.R.Civ.P. 15(a)(2).

### VI. CONCLUSION

 **\*17** For the foregoing reasons, defendants' motion is GRANTED in part and DENIED in part. The Clerk of the Court is directed to close this motion (Docket No. 55). A conference is scheduled for May 4, 2015 at 4:30 p.m.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1514597, Fed. Sec. L. Rep. P 98,433

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 6

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 84 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 732952, Fed. Sec. L. Rep. P 99,635

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re QuantumScape Securities Class Action Litigation, N.D.Cal., January 14, 2022

2017 WL 732952
United States District Court, N.D. California.

IN RE INTREXON CORPORATION
SECURITIES LITIGATION

Case No. 16-cv-02398-RS
|
Signed 02/24/2017

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

RICHARD SEEBORG, United States District Judge

### I. INTRODUCTION

**\*1** Lead plaintiff Joe Seppen brings this putative class action for securities fraud against defendants Intrexon Corp., Randal J. Kirk, Rick L. Sterling, and Krish S. Krishan (collectively "Defendants"). Intrexon is a biotechnology company that focuses on developing tools for designing, building, and regulating genes. In April 2016, an anonymous short-seller named Spotlight Research published a report concluding that Intrexon's core technology suite was overhyped and its revenue was heavily driven by "round-tripping." Almost exclusively on this basis, Plaintiff alleges violations of the Securities Exchange Act of 1934. Defendants move to dismiss the amended complaint on the grounds that Plaintiff fails to state a claim. For the reasons stated below, Defendants' motion to dismiss is granted with leave to amend.

### II. BACKGROUND [1]

[1] This factual background is based on the averments in the amended complaint, which must be accepted as true at this stage, as well as public records properly subject to judicial notice.

Intrexon builds and acquires technologies that design, modify and regulate DNA sequences. Intrexon's technologies include UltraVector (a DNA design and fabrication platform),

RheoSwitch (a gene switch for regulation of level and timing of gene expression), AttSite Recombinases (a tool for enabling targeted gene delivery), Cell Systems Informatics (a guide for selection of pathways for genomic modification), Laser-Enabled Analysis and Processing ("LEAP") (a platform for imaging and laser-based purification of high-value cells), and others.

Intrexon's business model is designed around collaborations with other companies. These collaborations include exclusive channel collaborations, research collaborations, and joint ventures. Intrexon licenses its tools to collaborators who provide product development expertise in their specific industry sectors. Intrexon earns revenue from its partners through license fees, reimbursement for research and development costs, milestone payments and future royalties.

In April 2016, an anonymous short-seller known as "Spotlight Research" released an eight-part report about Intrexon. The report concluded that Intrexon's core technology suite consists of an "overhyped, undifferentiated collection of commodity and failed products." ACAC, Ex. B at 39. For example, it said UltraVector is a "common DNA synthesizer" and that "Rheoswitch gained no traction over the years." *Id.* at 76, 80. It also opined that Intrexon's revenues were overstated. It claimed that Intrexon "created an intricate web of microcap, zero revenue, free cash flow negative companies that seem to exist solely for the purpose of inflating Intrexon's revenue and profitability." *Id.* at 1.

This lawsuit was filed shortly after the Spotlight report's publication. Plaintiff brings suit against Intrexon, Kirk, Sterling, and Krishnan. Kirk has been Intrexon's Chief Executive Officer since 2009 and his investment management firm, Third Security LLC, has often invested alongside Intrexon and other partners involved in various collaborations. Sterling has been Intrexon's Chief Financial Officer since 2007. Krishan was Intrexon's Chief Operation Officer from 2011 until his resignation in March 2016. The Amended Class Action Complaint ("ACAC") primarily recites the findings of the Spotlight report. It also includes brief statements from three confidential witnesses. In his first claim, Plaintiff avers that Defendants violated section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. In his second claim, he asserts a violation of section 20(a) of the Exchange Act. Plaintiff is suing on behalf of all persons who purchased Intrexon securities between May 11, 2015 and April 27, 2016.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 85 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 732952, Fed. Sec. L. Rep. P 99,635

## III. LEGAL STANDARD

**\*2** A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under *Rule 12(b)(6)* may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. (*Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true)). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

## IV. DISCUSSION

A. Count I—Section 10(b) of the Exchange Act
Section 10(b) makes it unlawful for "any person ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b)*. Rule 10b-5 further provides: "It shall be unlawful for any person ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5(c)*. A claim for violation of Rule 10b-5 includes five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Id.* (quoting *In re Daou Sys., Inc. Secs. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005)) (internal quotation marks omitted). Defendants move to dismiss the section 10(b) claim for failure to plead the elements of a material misrepresentation or omission, scienter, and loss causation.

1. Material Misrepresentation or Omission (Falsity)
Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed." *15 U.S.C. 78u-4(b)(1)*. Plaintiff alleges three categories of purportedly "false" statements: (1) statements concerning Intrexon's suite of technologies; (2) statements concerning Intrexon's CAR-T collaborations; and (3) revenue disclosures. Specifically, Plaintiff alleges that statements related to Intrexon's technology suite are misleading because the suite consisted of undifferentiated, commodity, and/or failed technologies. He alleges that statements related to Intrexon's CAR-T collaborations using the RheoSwitch technology are misleading because RheoSwitch failed to function properly. Finally, he claims Intrexon's revenue disclosures are misleading because a material portion of revenues ascribable to collaborations are the result of "round-trip" transactions. Plaintiff's efforts to allege a material misrepresentation or omission fail for several reasons.

**\*3** First, with respect to the statements regarding Intrexon's suite of products, Plaintiff's allegations lack specificity. He argues repeatedly that Intrexon's "core technology suite" is worthless but nowhere defines the scope of that "suite." The challenged statements make no mention of a "core technology suite," so the term appears to be one of Plaintiff's (or Spotlight's) own making. The ACAC includes one slide

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 86 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 732952, Fed. Sec. L. Rep. P 99,635

from an investor presentation that is entitled "Integrated Technology Suite," which lists several technologies, but it does not allege facts related to each technology listed therein and does include factual allegations related to unidentified technologies, rendering that list both over and under inclusive and unenlightening on the scope of the term "core technology suite." *See* ACAC ¶¶ 108, 65-74. Moreover, the challenged statements do not appear limited to any specific subset of Intrexon's technologies. To the contrary, they refer broadly to Intrexon's "proprietary and complementary technologies" and those Intrexon has "built, acquired and integrated."

Second, most of the challenged statements concerning CAR-T collaborations relate to future expectations. *See, e.g.*, ACAC ¶¶ 100 ("aims to develop"); 116 ("goal is to develop"); 161 ("intend to employ"); 165 ("plans to develop"); 168 ("plan to pursue"). The PSLRA Safe Harbor protects projections of future performance and "the assumptions underlying or relating to" such projections if they are identified and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(i)(1)(D); 15 U.S.C. § 78u-5(c)(1). Here, Intrexon identified such statements as forward-looking and accompanied them with cautionary statements and/or a discussion of "risk factors." *See, e.g.*, RJN Exs. 1 at 4-5, 19-39; 18 at 4-5; 19 at 1; 20 at 4; 21 at 1-3; 22 at 3; 23 at 4. [2] Plaintiff contends that these statements are of a mixed present/future quality that are not entitled to the safe harbor. Yet, "examined as a whole ... [they] relate[ ] to future expectations and performance." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014). As such, they are protected by the PSLRA's Safe Harbor.

[2]    Intrexon requests judicial notice of several SEC filings. Judicial notice of such public records is proper, so the request is granted. *See Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

Third, a substantial portion of the statements quoted in the ACAC are best characterized as "puffery" or other non-specific assertions that cannot give rise to a fraud claim. For example, Plaintiff takes issue with statements like: "We believe we are a leader in the field of synthetic biology," ACAC ¶¶ 106, 122, 125, 135, 138, 143, 153, "Intrexon has built, acquired and integrated a suite of technologies creating a one-stop-shop for start-to-finish conceptualization, engineering and production of bio-based solutions," *id.* ¶ 109, and "We have accumulated extensive

knowledge and experience ... [and] believe all of these factors, coupled with our suite of proprietary and complementary technologies, provides us with a first-mover advantage in synthetic biology." *Id.* ¶ 159. These vague, general statements of optimism are non-actionable puffery. *See In re Cutera Securities Litigation*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation."). Even viewed in context, these challenged statements fail to rise to more than general characterizations and opinions.

Finally, even if otherwise actionable, Plaintiff has not sufficiently alleged the falsity of the statements in any of the three categories:

### a. Suite of Technologies

Plaintiff challenges statements related to Intrexon's technology suite, such as: "Using our suite of proprietary and complementary technologies, we design, build, and regulate gene programs." ACAC ¶¶ 106, 122, 125, 135, 138, 143. The challenged statements refer to Intrexon's "suite of proprietary and complementary technologies" or the suite of technologies Intrexon has "built, acquired, and integrated." On their face, these statements relate to Intrexon's entire suite of technologies and make no specific representations about the provenance or value of any specific technology. Accordingly, even if Plaintiff's allegations sufficed to establish that one or two of Intrexon's technologies were undifferentiated, or amounted to commodities with in some instances track records of failure, that alone would not establish the falsity of the statements regarding Intrexon's suite of technologies. Plaintiff argues that this is an "overly literal" approach. He claims that the challenged statements give a misleading impression about the value of each of the technologies in the suite. Intrexon, however, specifically told investors: "There are companies that have competing technologies for individual pieces of our suite of complementary technologies. For example, there are companies that can synthesize DNA." RJN, Ex. 1 at 14. At minimum, Plaintiff's argument that Intrexon misled consumers into believing that UltraVector, its DNA synthesis product, had unique value is unavailing given Intrexon's express disclaimer that other companies synthesize DNA. Even for the remaining technologies, Plaintiff's interpretation is unpersuasive.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 87 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 732952, Fed. Sec. L. Rep. P 99,635

**\*4** In any event, Plaintiff fails to allege facts sufficient to establish that the remaining technologies identified in the complaint were worthless or nothing more than commodities. As explained below, Plaintiff fails to advance sufficient facts to show that RheoSwitch failed. As for the other technologies, Plaintiff relies almost exclusively on the Spotlight report, which primarily attacks the companies that previously owned or researched those technologies. For example, for Cell Systems Informatics, acquired by Intrexon in 2011, Spotlight reports that the former owner licensed the core technology from a company with low licensing revenues. Likewise, for the LEAP platform, acquired by Intrexon in 2011, Spotlight reports that a 2006 study paid for by the former owner projected low total revenue and net selling prices in 2006. Plaintiff's allegations regarding the other technologies, such as Endometrial Regenerative Cells and mABLogix, nowhere found in any of the challenged statements, are similar.[3] Plaintiff alleges no facts related to the function or value of these technologies, particularly in current times.

[3]      Plaintiff alleges that confidential witness number 1 (CW1) stated that "mAbLogic never worked," but advances no facts to suggest CW1's personal knowledge of the technology or the reliability of her opinion. ACAC ¶ 68.

Instead, Plaintiff argues that "the proof is in the market outcomes." He claims the market reaction to the Spotlight report proves Intrexon's technologies were "overhyped." As Defendants note, this is essentially a fraud-by-hindsight argument. A plaintiff cannot show that a prior statement was false or misleading merely by pointing to the market reaction upon a subsequent disclosure of information. *See, e.g., In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) *abrogated on other grounds, S. Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008). "[E]vidence of stock price movements provides no rational basis for determining whether [a product's] risks were adequately conveyed to the public." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett Packard Co.*, No. 14-16433, 2017 U.S. App. LEXIS 955, at \*20-21 (9th Cir. Jan. 19, 2017) (rejecting argument that stock price drop indicates material misrepresentation). Plaintiff also claims that the "marginal value" of Intrexon's technology suite is evidenced by the company's failure to attract collaborations with blue-chip companies. He acknowledges, however, that Intrexon collaborates with companies like Merck and Sanofi and research centers like the M.D. Anderson Cancer Center at the University of Texas and the National Cancer Institute. His only response is that those collaborations make up a small percentage of Intrexon's overall revenue. The allegation that those collaborations drive only a small portion of Intrexon's revenue does not support the falsity of generic statements related to the value and provenance of Intrexon's amorphous "suite" of technologies.

### b. CAR-T Collaborations & RheoSwitch

Plaintiff alleges that RheoSwitch failed to function properly and thus challenges statements related to the RheoSwitch platform, like "RheoSwitch gene regulation delivers precise control in multiple biological systems" or "utilizing Intrexon's ... RheoSwitch platform, the collaboration aims to develop leading-edge products." ACAC ¶¶ 100, 110. In support of the claim that RheoSwitch failed to function properly, Plaintiff relies primarily on the statement of CW1. That individual stated that RheoSwitch was supposed to work like a light switch subject to being turned on and off, but in reality worked more like a dimmer switch; "it turned the gene on, but it was difficult to turn the gene completely off." ACAC ¶ 53. This vague statement falls short. CW1 does not state, as Plaintiff contends, that RheoSwitch failed to work properly in multiple biological systems. Rather, she says that, in her experience, it did not work "as it should." CW1 was an Associate Director in the Health Sector group from 2011-2016; she worked on one CAR-T project in one division. That the technology might have been unsuccessful in one single application does not suggest its uselessness for other applications. CW1 does not opine on RheoSwitch's functionality in any other context, including any other CAR-T collaborations. She made no statements about RheoSwitch's use by collaborators, nor did she deny that collaborators developed cancer therapies using RheoSwitch. In fact, Plaintiff acknowledges that RheoSwitch was used in several collaborations, including ones involving cancer therapies that are in Phase I and II clinical trials. *See* ACAC ¶ 53; *id.,* Ex. B at 37-38.

**\*5** Aside from the opinion of CW1, Plaintiff relies on Spotlight's attack on the company that formerly owned the RheoSwitch technology, RheoGene. Plaintiff alleges that RheoGene donated the RheoSwitch technology to the University of Pittsburgh Medical Center ("UPMC") for a tax write-off in 2003. Defendants contend the primary sources relied upon by Spotlight reveal that RheoGene's transaction

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 88 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 732952, Fed. Sec. L. Rep. P 99,635

with UPMC was actually a strategic partnership in which UPMC agreed to own and fund RheoGene and continue to develop its technology. Plaintiffs' allegation relates to a decade-old event and is insufficient to show that RheoSwitch, in its current form, constitutes a failed technology. At most, the facts alleged might raise a question about the value of the technology in 2003, but not its functionality. For these reasons, Plaintiff fails to allege facts sufficient to suggest the falsity of Intrexon's statements regarding its CAR-T collaborations involving RheoSwitch.

#### c. Round-Tripping

While conceding that Intrexon complied with applicable accounting and SEC disclosure rules, Plaintiff alleges Intrexon nonetheless reported misleading revenue figures. In particular, he alleges the revenue reports were deceptive because Defendants knew or recklessly ignored that a material portion of collaboration revenues were the result of "round-trip" transactions. Plaintiff, however, does not allege the usual "round-tripping" exchange of like services. A typical "round-tripping" scheme "involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services." *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 178 (4th Cir. 2007)(citing *In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1024–25 (C.D. Cal. 2003)). "Such transactions can be improper because the parties book revenues even though the transactions 'wash out' without any economic substance. But the basis for alleging 'round-tripping' does not exist when either of the transactions have economic substance because those transactions would not wash out." *Id.* Here, Plaintiff does not allege that Intrexon's collaboration agreements involved reciprocal contracts to exchange similar amounts of money or that the agreement lacked economic substance.

Principally, Plaintiff alleges that Intrexon's revenue figures were materially misleading because the company failed to disclose that a substantial portion of its revenue was ultimately sourced by Intrexon or Kirk, its CEO. Yet, as noted above, Intrexon disclosed its revenue recognition policy and relationships with collaborators in detail as required by GAAP and SEC regulations. Intrexon specifically disclosed that it has engaged in a variety of transactions with companies in which Kirk and his affiliates have an interest. *See* RJN, Ex. 29. That Intrexon did not disclose the specific source of each revenue dollar in order to dispel Plaintiff's theory of liability does not render its lawful and accurate revenue disclosures

deceptive. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 (9th Cir. 2012) (no requirement to disclose every relevant fact, "even if investors would consider the omitted information significant," as long as "the omissions do not make the actual statements misleading").

#### 2. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In particular, the complaint must allege the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Systems, Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999)). "Reckless conduct may be defined as a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care ... that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 702 (9th Cir. 2012) (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir. 1990)).

**\*6** Here, the absence of an adequate pleading of material misstatements or omissions necessarily means Plaintiff has failed to plead scienter as well. In essence, Plaintiff is alleging that Defendants overhyped their core technologies, collaborations, and revenue, so that they could acquire other valuable technologies. While Plaintiff is trying to argue that Intrexon management was aware of the worthlessness of Intrexon's technologies and collaborations at the time they were making the generally positive public statements, an equally plausible inference is that Intrexon management believed the collaborations and technology suite had value. Moreover, the ACAC does not include any allegations related to the individual defendants' trading histories. Plaintiff alleges no facts to suggest that the individual defendants' trading practices during the class period were "dramatically out of line" with prior trading practices. *Zucco Partners*, 552 F.3d at 1005. [4]

[4]     Plaintiff argues that the individual defendants' trading histories are irrelevant here because he has not pleaded motive. Yet, in the complaint and the opposition brief, he argues that Defendants had a

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 89 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 732952, Fed. Sec. L. Rep. P 99,635

financial motive for overhyping the technologies. In any event, even if motive is not required to plead scienter, the fact of stock sales (or lack thereof) during the class period is a consideration in the scienter analysis. *See, e.g., In re Rigel Pharms., 697 F.3d at 884* ("because none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure ... the value of the stock and stock options does not support an inference of scienter"); *In re Apple Computer Sec. Litig.*, 886 F.2d at 1117 ("Apple's massive investment [ ] demonstrates this good faith.").

Plaintiff seeks to invoke the "core operations" doctrine by arguing that Defendants must have known the minimal value of Intrexon's technology suite given their roles at the company. Allegations regarding management's role in a company may conceivably satisfy the PSLRA standard, "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Plaintiff has failed to advance facts suggesting that this is such a case. "Where defendants make cheerful predictions that do not come to pass, plaintiffs may not argue, based only on defendants' prominent positions in the company, that they ought to have known better. Instead, the PSLRA requires 'particular allegations which strongly imply Defendant[s'] contemporaneous knowledge that the statement was false when made.' " *Berson v. Applied Signal Technology Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). As explained above, Plaintiff fails sufficiently to allege the falsity of any challenged statement.

Plaintiff notes other facts that he claims add to the inference of scienter, such as Intrexon's stock offerings, which he acknowledges is insufficient to show scienter. *See Anderson v. Peregrine Pharms., Inc.*, 2016 WL 3212258 (9th Cir. June 8, 2016) (declining to find defendants' attempts at securing capital to support an inference of scienter). He also notes Mr. Krishnan's resignation, but alleges no facts that show the resignation was accompanied by suspicious circumstances. "[A]bsent allegations that the resignation at issue was uncharacteristic ... or was accompanied by suspicious circumstances," the inference of a suspicious change in personnel will never be as cogent or as compelling as the inference of a benign one. *Zucco*, 552 F.3d at 1002. Finally, he relies on three witness accounts, which are

lacking in detail and fail to establish personal knowledge and reliability. *See Zucco*, 552 F.3d at 996-98. None of the three witnesses had any contact with the individual defendants or claim to speak to their states of mind. Two of the witnesses were not employed during the class period and allege no information about the company during those years. CW3 does not criticize Intrexon's products at all. CW2 was a junior scientist who worked in one division who opined that UltraVector was a commodity product and CW1 was a scientist in a different division who offered a similar opinion and also stated that RheoSwitch did not work as intended in her case. As explained above, these opinions are insufficient to make the inference of a material misrepresentation and likewise fail to suggest scienter. Even considered holistically, the allegations in the complaint fail to support a strong inference of scienter.

**\*7** In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007), the Supreme Court explained that a "strong inference" of the required intent means that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." As explained in *Zucco*, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." 552 F.3d at 991. At least at this juncture, even to the extent anything in the ACAC could be seen as an adequate allegation of a material misrepresentation or omission, Plaintiff has not pleaded facts to support a compelling inference that any such misrepresentations or omissions were the result of an intent to deceive. Just as plausible, such statements or omissions represent a contrary valuation of the technologies and collaborations or a failure to analyze business conditions correctly.

### 3. Loss Causation

"Loss causation" refers to a plaintiff's obligation in a securities fraud action to establish "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The loss causation requirement was codified in the PSLRA: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u–4(b)(4) (emphasis added). To establish loss causation,

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 90 of 281

In re Intrexon Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 732952, Fed. Sec. L. Rep. P 99,635

Plaintiff must allege that Intrexon's stock declined because of a "corrective disclosure" that revealed to the market the "truth" of the alleged misstatements. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (citing *Meyer v. Greene*, 710 F.3d 1189, 1192–93 (11th Cir. 2013)).

Here, the absence of an adequate pleading of material misstatements or omissions necessarily means Plaintiff has not alleged sufficient facts to show loss causation. In any event, Plaintiff fails to show how the Spotlight report constitutes a corrective disclosure. "The mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." *In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850, 2015 WL 1245191, at *5 (C.D. Cal. Mar. 16, 2015); *see also Meyer*, 710 F.3d at 1199 ("[I]f the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released is the opinion itself, and such an opinion, standing alone, cannot 'reveal[ ] to the market the falsity' of a company's prior factual representations.") Plaintiff argues that the Spotlight report discloses more than an opinion. Yet, the report states that it "expresses our research opinions, which we have based upon interpretation of certain facts and observations, all of which are based on publicly available information." ACAC, Ex. A at 29. The report does not "reveal to the market something previously hidden or actively concealed." *In re Herbalife*, at *5 n. 9. Throughout the report, Spotlight clearly attributes its findings to public filings, websites and other publicly available documents. Because the Spotlight report "only collected and opined on already public information, it does not constitute disclosure of 'the truth' as required for a corrective disclosure." *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 U.S. Dist. LEXIS 119194, 2016 WL 4585753 (N.D. Cal. Sept. 2, 2016). Thus, Plaintiff fails adequately to plead loss causation.

B. Count II—Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act makes certain "controlling" individuals liable for violations of Section 10(b) and its underlying regulations. There is no dispute that any liability under Section 20(a) in this action is dependent on the existence of an underlying violation of Section 10(b). In view of the dismissal of the 10(b) claim, this count must also be dismissed.

## V. CONCLUSION

**\*8** The motion to dismiss is granted with leave to amend. Any amended complaint shall be filed within 30 days of the date of this order.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 732952, Fed. Sec. L. Rep. P 99,635

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 7

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 92 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

2014 WL 585658
United States District Court,
S.D. New York.

In re KERYX BIOPHARMACEUTICALS,
INC., SECURITIES LITIGATION.

Nos. 13 Civ. 755(KBF), 13 Civ. 1307(KBF).
|
Feb. 14, 2014.

*OPINION & ORDER*

KATHERINE B. FORREST, District Judge.

 **\*1** There is a significant public interest in the development of life-saving drugs. For every drug that succeeds, others do not. Clinical trials are phased into stages: some drugs never make it past the first stage, others never make it past the second stage, and so on. The costs of failure are high, but the rewards for success are also high. The relationship and ratio between the two determines whether, as a matter of economics, the costs of experimentation are worth it. Publicly traded pharmaceutical companies have the same obligations as other publicly traded companies to comply with the securities laws, but they take on no special obligations by virtue of their commercial sector. It would indeed be unjust—and could lead to unfortunate consequences beyond a single lawsuit—if the securities laws become a tool to second guess how clinical trials are designed and managed. The law prevents such a result; the Court applies that law here, and thus dismisses these actions.

Plaintiffs brought this purported class action on February 1, 2013 on behalf of all persons who purchased Keryx Biopharmaceuticals, Inc. ("Keryx" or the "Company") common stock between June 1, 2009 and April 1, 2012 (the "Class Period"). Plaintiffs' claims are brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b–5 promulgated there under (17 C.F.R. § 240.10b–5.)

A related case containing substantially similar allegations, 13 Civ. 1307, was subsequently filed on February 26, 2013. By order dated June 10, 2013, the Court granted a motion to consolidate the two actions, and appointed lead plaintiff and lead counsel. (ECF No. 29.) [1] Plaintiffs then filed their consolidated amended complaint on July 10, 2013, and defendants moved to dismiss on August 26, 2013. Defendants' motion became fully briefed on November 12, 2013.

[1]  Unless otherwise noted, all "ECF No." references in this opinion correspond to the docket in 13 Civ. 755.

For the reasons set forth below, the motion to dismiss is GRANTED.

I. ALLEGATIONS IN THE CONSOLIDATED AMENDED COMPLAINT

For purposes of this motion, the Court assumes the truth of all well-pleaded factual allegations and construes them in plaintiffs' favor.

Corporate defendant Keryx is a biopharmaceutical company focused on the acquisition, development, and commercialization of medically important pharmaceutical products. (Consolidated Amended Complaint (hereinafter, "CAC") ¶¶ 2, 16, ECF No. 36.) Individual defendant Ronald Bentsur was the Company's chief executive officer ("CEO") at all relevant times and was appointed as a director on June 16, 2009. (*Id.* ¶ 17.) According to plaintiffs, as a senior executive and director, Bentsur was privy to confidential and proprietary information regarding Keryx's business, finances, products, markets, and present and future business prospects. (*Id* . ¶ 19.) Given his access to this information, plaintiffs allege Bentsur knew or recklessly disregarded that certain adverse facts were not disclosed to, or were being concealed from, the investing public. (*Id.*) As CEO, plaintiffs allege that Bentsur controlled or possessed the authority to control release of the Company's reports, press releases, and presentations to securities analysts. (*Id.* ¶ 20.) Plaintiffs also allege that Bentsur received stock options and shares linked to certain milestones, including achieving certain share prices, filing a "new drug application" with the U.S. Food and Drug Administration ("FDA"), and commercial sales of the drug perifosine. (*Id.* ¶ 138.) Perifosine was a drug being tested for its potential to treat metastatic colorectal cancer ("mCRC"). (*Id.* ¶ 3.) During the Class Period, plaintiffs allege that Bentsur sold common stock for total gross proceeds of $1,526,588. (*Id.* ¶ 141.)

 **\*2** Plaintiffs assert that, just prior to the commencement of the Class Period, the Company's assets and revenues were severely limited, its losses were substantial, an important

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 93 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

drug trial had failed, and its stock faced de-listing by the NASDAQ. (*Id.* ¶ 28.) As a result, plaintiffs assert that the success of perifosine—which might be Keryx's next drug available to go to market—was critical to the Company's continued viability. (*Id.*)

Plaintiffs allege that perifosine had a checkered past—it had been the subject of clinical trials going back to 1998, which had shown "decidedly mixed results." (*Id.* ¶ 29.) Through a licensing agreement, Keryx obtained rights to sell the drug in North America, but was also responsible for conducting all research and development necessary to obtain regulatory approvals. (*Id.* ¶¶ 30–31.)

During the Class Period, Keryx ran a "Phase 3" clinical trial of perifosine. (*Id.* ¶ 3.)[2] The CAC alleges defendants misled investors regarding the results of the Phase 2 trial for perifosine, repeatedly asserting that perifosine had demonstrated statistically significant positive results. (*Id.* ¶¶ 3–4.)

[2]     Plaintiffs allege that, prior to the start of the Phase 3 trial and Class Period, Keryx announced the failure of a Phase 3 trial with respect to another drug, Sulonex. (*Id.* ¶ 22.) Plaintiffs allege that Keryx's revenues were at risk because "it had only its drugs, including perifosine, deep in the developmental pipeline." (*Id.*) Bentsur stated "[o]ur goal is to have Perifosine in a pivotal program this year .... " (*Id.*) In April 2008, the Company went through a restructuring which included laying off workers and terminating 12 of 20 early-stage clinical studies of perifosine. (*Id.* ¶ 23.)

Plaintiffs assert that defendants' representations regarding the Phase 2 test results were misleading half-truths or falsehoods. (*Id.* ¶¶ 5.) According to plaintiffs, defendants knew or recklessly disregarded that their statements were false based on the design and analysis of the trial itself. (*Id.*) The crux of plaintiffs' claims in this regard relies on various omissions which are alleged to have rendered defendants' statements false or half-truths. For instance, plaintiffs assert that defendants' statements omitted the following material facts: that the Phase 2 trial involved multiple testing of different cancer treatments on a group of patients diagnosed with various types of cancer ("multiplicity"), included unplanned interim analyses of hypothesis-generating data from the testing, and other ad hoc, interposed steps that, under both regulatory guidance and the accepted statistical principles

that underpin such guidance, required certain adjustments in the data that defendants failed to make when evaluating the statistical significance of the results. (*Id.*)

A. *Allegations Regarding the Flaws in the Phase 2 Trial*
Plaintiffs allege that virtually all clinical trials involve multiplicity—multiple tests to assess intervention effects across multiple outcomes or endpoints. (*Id.* ¶ 34.) However, according to plaintiffs, literature shows that the probability of making a certain type of error (a "Type I error") increases as the number of tests that are performed. (*Id.* ¶¶ 35–36.) Literature states that "[g]iven the potential of multiplicity to inflate the Type I error rate of an experiment, it is critical to adjust the level of statistical significance when multiplicity is present in order to keep the overall probability of accepting any one of the alternative hypotheses, when all of the findings are due to chance, at the specified level." (*Id.* ¶ 37.) Failing to adjust for multiplicity may result in "believing" a research hypothesis "just because a P value is statistically significant." (*Id.* ¶ 39.) This can lead to errors in hypothesis generation. (*Id.* ¶¶ 38–44.)

 **\*3** Plaintiffs also allege that the Phase 2 trial was flawed due to "interim analysis" which occurred. (*Id.* ¶ 45.) The FDA defines "interim analysis" as "any analysis intended to compare treatment arms with respect to efficacy or safety at any time prior to the formal completion of a trial." (*Id.*) According to plaintiffs, interim analysis "may also introduce bias and impact any purported statistical significance of a study's results when it is not planned and in advance and described in the study's protocol." (*Id.*) Plaintiffs spend a number of paragraphs describing issues and potential issues with unplanned interim analysis. (*Id.* ¶¶ 46–48.)

According to plaintiffs, the Phase 2 trial for perifosine was affected by multiplicity, hypothesis generation, and interim analysis data comparisons—"yet, Keryx did not adjust the P-values it used to evaluate the statistical significance of the results." (*Id.* ¶ 49.) According to plaintiffs, the Company "then went on to tout the Phase 2 results as 'statistically significant' when, due to Keryx's failure to adjust the statistical evaluation of the Phase 2 results, such claims lacked any reasonable basis." (*Id.*)

B. *Defendants' Public Statements*
Plaintiffs' story regarding perifosine's Phase 2 clinical trial begins with a press release Keryx issued on June 1, 2009 when it announced positive FDA Phase 2 trial data. (*Id.*

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 94 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

¶ 77.) On August 12, 2009, Keryx filed a Form 10–Q with the SEC announcing its financial results for the fiscal quarter ending on June 30, 2009, which included statements regarding the statistical significance of the Phase 2 test results (statements identical to those in the June 1, 2009 press release.) (*Id.* ¶ 78.) Bentsur submitted certifications to the SEC in which he attested that the Form 10–Q "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading with respect to the period covered by this report." (*Id.* ¶ 79.) Keryx then repeated or incorporated by reference its statements regarding the Phase 2 clinical trial results on multiple occasions in 2009. (*Id.* ¶¶ 80–83.)

On January 25, 2010, the Company issued a press release reporting the updated results of the Phase 2 trial. (*Id.* ¶ 85.) The press release was entitled: "Keryx Reports Statistically Significant Benefit in Survival from Updated Results of a Randomized, Double–Blind, Placebo–Controlled Phase 2 Study of KRX–0401 (Perifosine) in the Treatment of Advanced Metastatic Colon Cancer." (*Id.*)

During a conference call on January 28, 2010, Bentsur stated, "[w]e're excited about the dramatic advantages we saw across all key efficacy parameters .... " (*Id.* ¶ 86.) He also made public statements touting the "statistically significant" or "highly successful" Phase 2 results on at least eighteen different occasions over the next year and a half. (*Id.* ¶¶ 87–89, 92, 94, 97–98, 101–106, 109, 112–15.) Additionally, press releases and quarterly statements issued by Keryx on April 8, June 10, August 9, November 5, 2010, and March 9, 2011, stated essentially the same points. (*Id.* ¶¶ 93, 96, 99, 110.)

### C. *Keryx Announces a Phase 3 Trial*

**\*4** In February and April 2010, respectively, Keryx announced that it had a "Special Protocol Assessment" ("SPA") [3] agreement with the FDA for the conduct of a Phase 3 trial of perifosine—and an FDA "Fast Track" designation for the Phase 3 trial. (*Id.* ¶ 61.) The "Fast Track" program is designed to "facilitate the development and expedite the review of new drugs that are intended to treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs." (*Id.*) Neither an SPA nor a Fast Track designation is tantamount to an FDA determination that a drug has demonstrated clinical efficacy. (*Id .* ¶ 62.)

[3]  The SPA process is a "procedure by which the FDA provides official evaluation and written guidance on the design and size of proposed protocols that are intended to form the basis for a new drug application." (*Id.* ¶ 61.)

In a press release dated April 8, 2010, Keryx announced that it had initiated the Phase 3 trial. (*Id.* ¶ 64.) Plaintiffs allege that, in this and other public statements regarding the Phase 3 trial, Keryx "emphasized how the purportedly positive results from the Phase 2 mCRC perifosine trial provided a 'strong' basis for expecting the Phase 3 results to be successful, with a marketable perifosine product for Keryx following immediately thereafter." (*Id.*)

### D. *The October 2011 Disclosure*

On October 5, 2011, Keryx issued a press release announcing the publication of a clinical manuscript in the Journal of Clinical Oncology ("JCO"). (*Id.* ¶ 6, 117.) In that press release, Keryx set forth data which "highlight[ed] the efficacy and safety data" of the Phase 2 trial on mCRC patients, and when used in combination with another drug, "demonstrated statistical significance with respect to median overall survival and median time to tumor progression." (*Id.* ¶¶ 6, 117.) Plaintiffs allege that "buried within the clinical manuscript was critical new information," and amounted to an "admission by Keryx" that "fatally undermined Keryx's claim of statistical significance in the results." (*Id.* ¶ 6.) The JCO manuscript stated, "[t]he P values were not adjusted for the unplanned interim analyses or for the multiple comparisons ... because of the exploratory nature of the study design with small sample size." (*Id.* ¶ 118.)

On October 19, 2011, a critique of the Phase 2 perifosine trial was published on the website *TheStreet.com.* (*Id.* ¶¶ 7, 119.) The critique stated that the design of the clinical trial was flawed, noting "certain unplanned, interim analyses and changes that Keryx had interposed into the original trial plan." (*Id.* ¶¶ 7, 119.) The critique concluded that the "p values are not real p values in the phase II study." (*Id.* ¶¶ 7, 119.) The critique also stated that the Phase 2 results were "uninterpretable" and provided "no basis to believe that the Phase 3 mCRC perifosine study results would be positive." (*Id.* ¶ 7.) The Keryx stock price dropped 6% on October 19, 2011 after a day of heavy trading. (*Id.* ¶ 120.)

Plaintiffs assert that, notwithstanding the critiques of the Phase 2 trial, the Company continued to insist that the Phase 2 results showed a statistically significant positive

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 95 of 281
In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

result and still provided a strong basis on which to expect a positive outcome for a Phase 3 trial. (*Id.* ¶ 70.) And, "despite having acknowledged that it had interposed numerous unplanned interim analyses and comparisons during Phase 2, Keryx never disclosed how many of these unplanned actions occurred, or what they involved, as would allow for independent assessment of their impact on the calculation of statistically significance of the Phase 2 data." (*Id.*)

**\*5** During a November 3, 2011 earnings call, Bentsur tried to reassure the market and referred to the FDA's grant of the SPA for ongoing Phase 3 study. (*Id.* ¶ 71.) Plaintiffs claim that this was a misleading "sleight-of-hand" because an "SPA does not equate with an FDA endorsement of claims of drug efficacy at trial." (*Id.* ¶ 73.) Bentsur also stated on the call that "it's hard to refute overall survival data from a double-blind randomized study, even if the study was relatively small." (*Id.* ¶¶ 8, 122.) According to plaintiffs, defendants responses to these critiques "raised irrelevancies and obfuscated the flaws in the Phase 2 trial—and the resultant risk as to the Phase 3 trial—that [the critiques] had identified." (*Id.* ¶ 9.)

In January and February 2012 presentations, Bentsur referred to the Phase 2 results as showing a "pretty dramatic difference" in "median overall survival." (*Id.* ¶¶ 125–26.) On March 2, 2012, Keryx's Form 10–K contained further statements regarding the statistical significance of the Phase 2 results. (*Id.* ¶ 128.)

### E. *The Phase 3 Trial Fails*
Plaintiffs allege that the risk concealed by the misleading statements regarding Phase 2 materialized when Keryx announced the failure of Phase 3. (*Id.* ¶ 75.) On April 2, 2012, the Company announced that the Phase 3 trial "did not meet the primary endpoint of improving overall survival versus capecitabine placebo." (*Id.* ¶¶ 10, 130.) In a press release issued by Keryx that day, Bentsur is quoted as saying, "[w]e are all extremely disappointed with the results of the study." (*Id.* ¶ 130.)

Plaintiffs allege that detailed test data released in June 2012 indicated how "disastrously" perifosine had performed in the Phase 3 trial." (*Id.* ¶ 10.) According to plaintiffs, properly interpreted, perifosine was shown to actually increase the risk of hastening patient death. (*Id.*) Plaintiffs assert that the Phase 3 failure was "within the zone of risk created by the flawed Phase 2 study." (*Id.*) Between March 30, 2012 and April 2, 2012, the Company's share price declined by 65%. (*Id.*)

## II. LEGAL STANDARDS

### A. *Motion to Dismiss Under Rule 12(b)(6)*
On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, *Ashcroft v. Iqbal,* 556 U.S. 662, 678–80 (2009), and draws all reasonable inferences in plaintiffs' favor. *See Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). To withstand dismissal, however, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal punctuation omitted); *see also* Fed.R.Civ.P. 8(a)(2).

### B. *Liability Under Section 10(b) and Rule 10b–5*
**\*6** In Count I of the Consolidated Amended Complaint, plaintiffs allege that defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. (CAC ¶¶ 168–177.)

To state a claim under Section 10(b) and Rule 10b–5(b), plaintiffs must adequately allege the following: (1) the defendant made[4] a misstatement or omission of material fact; (2) the defendant did so with the requisite scienter; (3) the misstatement or omission was in connection with the purchase or sale of securities; (4) that one or more plaintiffs relied upon such misstatement or omission; and (5) that such reliance was the proximate cause of a plaintiff's loss. *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005); *In re IBM Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998);

[4]     In *Janus Capital Group. Inc. v. First Derivative Traders,* 131 S.Ct. 2296, 2302 (2011), the Supreme Court stated that, for Rule 10b–5 liability, the "maker" of a statement is the person or entity with

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

ultimate control over the statement, including its content and whether and how to communicate it.

Plaintiffs may also allege a claim for so-called "scheme" liability under Section 10(b) and Rule 10b–5(a) and (c). To state such a claim, plaintiffs must allege that the defendants: "(1) committed a deceptive or manipulative act,[5] (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 491–92 n. 90 (S.D.N.Y.2005) (citing cases); *see* 17 C.F.R. §§ 240.10b–5(a), (c).

[5]     Rule 10b–5(a) prohibits individuals from "employ[ing] any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a). Rule 10b–5(c) prohibits individuals from "engage[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5(c).

1. *Falsity*

Claims of actionable misstatements or omissions sound in fraud.[6] As a result, allegations supporting such claims must meet the requirements of both Rule 9(b) of the Federal Rules for Civil Procedure and the PSLRA. *See Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This pleading standard further requires that a plaintiff state with particularity not only the particular statements that the plaintiff asserts were fraudulent, but also the when and where the statements were made and why the statements were fraudulent. *See* 15 U.S.C. § 78u–4(b)(1); *Novak,* 216 F.3d at 306; *In re Parmalat,* 376 F.Supp. at 491.

[6]     An omission is only actionable when the speaker has a duty to disclose the omitted facts. *SEC v. DiBella,* 587 F.3d 553, 563 (2d Cir.2009). If a development renders a past statement misleading, a failure to correct the statement may be actionable. *In re Time Warner Sec. Litig.,* 9 F.3d 259, 267–68 (2d Cir.1993).

The Second Circuit has repeatedly stated that plaintiffs must do more than say that statements were false and misleading —"they must demonstrate *with specificity* why that is so." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004) (emphasis added): *accord Kleinman v. Elan Corp., plc,* 706

F.3d 145, 152–53 (2d Cir.2013). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007).

In *Kleinman,* the Second Circuit reviewed dismissal of a complaint under Rule 12(b)(6) for failure adequately to allege falsity as required by Section 10(b) of the Exchange Act and Rule 10b–5 there under. In that case, the plaintiffs also alleged that positive statements regarding the results of a flawed Phase 2 drug trial were actionable. *Id.* at 148–49. Elan's CEO remarked that the results of Phase 2 clinically supported their decision to move to Phase 3. *Id.* at 149. In sum, the amended complaint in *Kleinman* alleged that the defendants "knowingly failed to disclose the full magnitude of overall negative Phase 2 trial results and duped [plaintiff] and other investors with the overly optimistic ... press release." *Id.* at 152.

**\*7** The Second Circuit found that these allegations failed as a matter of law. *Id.* Section "10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information." *Id.* (citing *Matrixx Initiatives. Inc. v. Siracusano,* 131 S.Ct. 1309, 1321 (2011)). Moreover, disclosure is not required simply because an investor might find the information relevant or of interest. *Kleinman,* 706 F.3d at 153 (citing *Resnik v. Swartz,* 303 F.3d 147, 154 (2d Cir.2002)). That the plaintiffs in *Kleinman* would have preferred the defendants to have used a different drug trial methodology, or found the defendants' methodology to be lacking, was not sufficient to adequately allege falsity. *Kleinman,* 706 F.3d at 153–54. The court reasoned: "Kleinman (and others) may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement." (*Id.*)

The *Kleinman* court further explained:

> Kleinman's real complaint is that defendants were able to tout positive results only because they deviated from the established protocol (which called for a linear analysis) and changed the metrics by which data

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 97 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...

2014 WL 585658, Fed. Sec. L. Rep. P 97,820

was analyzed. At bottom, Kleinman simply has a problem with using post-hoc analysis as a methodology in pharmaceutical studies.... Our job is not to evaluate the use of post-hoc analysis generally in the scientific community.... Instead, we look to see whether the statements made were misleading or rendered misleading due to an omission.

*Id.* at 154–55. Ultimately, the *Kleinman* court found that this was not a case in which positive predictions were made without qualification, as the statements were accompanied by a "note of caution." *Id.* at 155.

An actionable misstatement is not simply one that is false or incomplete; there must also be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction. *See Basic Inc. v. Levinson,* 485 U.S. 224, 238 (1988); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994); *In re Espeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 279 (S.D.N.Y.2006). As a result, "rosy predictions," or statements that are loosely optimistic regarding a company's well-being have been found to be too vague and general to be actionable. *See, e.g. Novak,* 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *see also Rombach,* 355 F.3d at 174 (unfocused expressions of puffery and corporate optimism not actionable). In *Kleinman,* the Second Circuit found that words such as "encouraging" that are used in connection with the results of drug trials do not generally give rise to a securities law violation. *Kleinman,* 706 F.3d at 153 (citing *Rombach,* 355 F.3d at 174).

### 2. *Scienter*

**\*8** Scienter is the mental state embracing an intent to deceive, manipulate, or defraud. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 323 (2007). When deciding a motion pursuant to Rule 12(b)(6), a court must decide whether all facts taken together—that is, collectively—give rise to a strong inference of scienter. *Id.* at 323. The question is not, therefore, whether any individualized statement in "scrutinized in isolation" meets this standard. *Id.* A plaintiff has adequately alleged scienter "only if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Facts giving rise to a strong inference of scienter can be alleged by (1) pleading motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); *accord Novak,* 216 F.3d at 311. Motive and opportunity require plausible allegations of concrete benefits that could be realized by the misstatement, and the likely prospect of achieving such benefits. *See Shields,* 25 F.3d at 1130. Allegations limited to the type of "corporate profit" motive possessed by most corporate directors and officers do not suffice. *See Kalnit,* 264 F.3d at 139. "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *EGA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009).

Assertions of conscious misbehavior or recklessness can also satisfy the scienter requirement of Section 10(b). Conscious misbehavior generally consists of deliberate, illegal behavior. *Novak,* 216 F.3d at 308. Recklessness requires allegations that a defendant's conduct was highly unreasonable and constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *See Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000); *Novak,* 216 F.3d at 308; *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (recklessness can be found in instances of "[e]regious refusal to see the obvious, or to investigate the doubtful"). Plausible allegations that a defendant had facts at his disposal contradicting material public statements, but then ignoring such facts or proceeding despite them, can be sufficient to plead recklessness. *See Novak,* 216 F.3d at 308–309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."),

"The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period." *Lapin v. Goldman Sachs Grp., Inc.,* 506 F.Supp.2d 221, 237 (S.D.N.Y.2006) (internal quotation marks and citations omitted); *Freudenberg v. E\*Trade Fin. Corp.,* 712 F.Supp.2d 171, 183–84 (S.D.N.Y.2010); *In re Vivendi Universal, S.A. Sec. Litig.,* 381 F.Supp.2d 158, 181 (S.D.N.Y.2003) (post-class period articles can be used to establish awareness of

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 98 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

falsity of statements during the class period; the opposite result would reward defendant for successful concealment efforts). Allegations in a complaint, including allegations about the knowledge defendants had or should have had, must be viewed together. *See Freudenberg,* 712 F.Supp.2d at 197–98 (citing *Tellabs,* 551 U.S. at 323).

### 3. *Loss causation*

**\*9** Pleading loss causation is an essential element of a Section 10(b) and Rule 10b–5 claim for private plaintiffs, but this requirement is not meant to impose a great burden. *See Dura Pharm ., Inc. v. Broudo,* 544 U.S. 336, 346–47 (2005). There is no heightened standard for pleading loss causation. *See In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F.Supp.2d 148, 163 (S.D.N.Y.2008). A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient. *Dura,* 544 U.S. at 346–47.

To establish loss causation, a complaint must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," *Lentell,* 396 F.3d at 173, but must do more than merely allege that a company's shares declined substantially in value after purchase. *See Dura,* 544 U.S. at 343. A plaintiff can make this showing "by alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.,* 503 F.Supp.2d 666, 677 (S.D.N.Y.2007).

### C. *Control Person Liability Under Section 20(a)*

In Count II of the Consolidated Amended Complaint, plaintiffs allege so-called control person liability by defendant Bentsur under Section 20(a) of the Exchange Act. (CAC ¶¶ 178–184.)

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person

to whom such controlled person is liable, ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To sustain a claim of control person liability under Section 20(a), plaintiffs must allege plausible facts that (1) there was a primary violation by a controlled person, (2) the defendant controlled the primary violator, and (3) the defendant who is alleged to be the controlling person was, in some sense, a culpable participant in the controlled person's fraud. *See ATSI,* 493 F.3d at 108.

Although a defendant may not be held liable both for a primary violation of the Exchange Act under Section 10(b) as well as a control person violation under Section 20(a), alternative theories are allowed at the pleading stage. *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998).

## III. ANALYSIS

The crux of plaintiffs' claim is that the design of the Phase 2 trial was flawed, and therefore the statistically significant results it generated were inherently unreliable; that defendants knew or recklessly disregarded that fact in their public statements in order to keep Keryx's stock price inflated; and only when the results of the Phase 3 trial were announced did the public learn the truth. Put another way, by relying on a flawed study, defendants risked that the results from Phase 2 were misleading and knew when "they" made the statements at issue the results were in fact flawed. Finally, plaintiffs allege that the Phase 2 risks "materialized" when Phase 3 failed.

**\*10** A case based on similar allegations—relating to the same drug, perifosine, against Keryx's co-developer, Aeterna Zentaris—was previously dismissed with prejudice by Judge P. Kevin Castel in this District last year. *See Abely v. Aeterna Zentaris,* No. 12 Civ. 4711, 2013 WL 2399869, at \*1 (S.D.N.Y. May 29, 2013). In *Abely,* the plaintiffs alleged that Keryx's design for the Phase 2 trial was inherently flawed due to undisclosed multiplicity, that it failed to account for different hypotheses, and that flawed results emanating from this flawed study were reported publicly as "statistically significant." *Id.* at \*2–3. The *Abely* plaintiffs also asserted that the defendants—Aeterna and three individual senior

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 99 of 281
In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

executives—were misleading about the prospects for the Phase 3 trial success, since they knew or should have known of the inherent flaws in Phase 2. *Id.* at *4. Judge Castel disagreed, finding that *Abely* plaintiffs had failed to adequately plead falsity or scienter. *Id.* at *14–17.

The allegations in the instant complaint are similarly deficient.

A. *Falsity*

At their core, plaintiffs' allegations as to falsity amount to a desire to have known aspects of the methodology used in the Phase 2 trial earlier than such details were fully disclosed (in October 2011). In substance, plaintiffs assert that, given the extent of the methodological flaws, defendants' statements regarding the Phase 2 results were actionable misstatement or half-truths. Plaintiffs are incorrect; these allegations fail as a matter of law. [7]

[7] The Court does not, however, agree with defendants that this is a case in which they are left searching to decipher or divine which statement are at issue. (*See* Mem. at 9–10, ECF No. 38.) The issue, rather, is whether the statements that plaintiffs point to are false or misleading. The Court finds that they are not.

A false statement must be just that: false; in error; wrong. An actionable omission must be information that, in light of other statements made, defendants had a duty to disclose so as not to mislead. Here, if this Court were to determine that the statements defendants made were actionable, it would essentially be the "thin end of the wedge": it would be equivalent to a determination that if a researcher leaves any of its methodology out of its public statements—how it did what it did or was planning to do—it could amount to an actionable false statement or omission. This is not what the law anticipates or requires. "The Second Circuit has emphasized that in scrutinizing a section 10(b) claim, a court does not judge the methodology of a drug trial, but whether a defendant's statements about that study were false and misleading." *Abely,* 2013 WL 2399869, at *7 (citing *Kleinman,* 706 F.3d at 154–55); *see also In re MELA Sciences, Inc. Sec. Litig.,* No. 10 Civ. 8774, 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012) (positive statements about outcome of clinical trial, when viewed against defendants' criticisms of methodology, "are essentially no different than opinions"; in order to properly plead, "plaintiffs must allege

with particularity provable facts demonstrating the statement of opinion is both objectively and subjectively false").

*Kleinman* and *Abely* are both useful and instructive here. In both, plaintiffs' claims were based on assertions that the methodology of a drug trial had not been sufficiently disclosed. In both, such claims were rejected as insufficient to support allegations of, *inter alia,* falsity. In *Kleinman,* the Second Circuit rejected an argument that the statements at issue were false because the defendants had not followed established statistical protocol and changed the metrics by which data was analyzed. 706 F.3d at 154. The *Kleinman* court declined to mold such criticisms into actionable securities fraud on the basis of false statements or omissions. *See id.* at 154–55. This Court declines to do so here as well.

**\*11** Plaintiffs have surrounded their recitation of the statements regarding the "statistically significant" Phase 2 results with assertions as to why the underlying methodology was unsound. (*See, e.g.,* CAC ¶¶ 50–59.) Specifically, plaintiffs assert that the methodology suffered from a failure to adjust "p-values" for "multiplicity" and led to errors in hypothesis generation, and also that interim analysis introduced bias. (*Id.* ¶¶ 32–49.)

Plaintiffs concede, however, that defendants disclosed the fact that p-values had not been adjusted in the JCO manuscript published on October 3, 2011 and referenced in the October 5, 2011 press release. (*Id.* ¶¶ 65–66, 117–18.) A critique of the Phase 2 trial published in *TheStreet.com* a week later mentioned all of the issues that plaintiffs assert were hidden. (*Id.* ¶¶ 67, 119.) This October 2011 disclosure by Keryx, followed by the critique published in *TheStreet.com,* contain the very facts plaintiffs claim defendants should have disclosed earlier. *See Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333, 337–38 (2d Cir.2011) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.") (citations omitted).

Plaintiffs also concede knowledge of the other types of risks of which they complain. Plaintiffs allege that "virtually all" clinical trials involve multiplicity and, because multiplicity can inflate the Type I error rate and result in flawed hypothesis generation, researchers must properly adjust for it. (CAC ¶¶ 34–41, 43, 49.) In essence, plaintiffs assert that the Phase 2 trial involved what "virtually all" clinical trials involve—multiplicity—but that defendants did not make proper adjustments on the back end and should have informed the

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 100 of 281
In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

world of this flawed methodology. This is not falsity; it is less disclosure than plaintiffs would have liked. Given the known "decidedly mixed results" of perifosine's prior clinical trials dating back to 1998 (*id.* ¶ 29), and the known use of multiplicity in "virtually all clinical trials" (*id.* ¶ 34), plaintiffs allegations reflect their awareness of the potential for known —not unknown or hidden—risks.

In terms of "interim analysis," plaintiffs assert that defendants never disclosed how many analyses or comparisons it performed, and thus never disclosed information that one could use to determine potential bias that may have been introduced into the results. (*Id.* ¶¶ 55–58.) There is, however, no rule requiring this type of "deep dive" disclosure plaintiffs assert should have been made here. That plaintiffs would have preferred to have had more information regarding how the Phase 2 trial was performed and how the results were analyzed is irrelevant to a determination of actionable falsity. *See In re Time Warner Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.")

 **\*12** Though plaintiffs do not attach the full documents containing the statements they allege to be either materially false or half-truths to the CAC, a review of even the statements they chose to excerpt shows that many of them contain "notes of caution" concerning both the sample size of the Phase 2 trial and the need to confirm the Phase 2 results in a Phase 3 trial. For instance, in the June 1, 2009 press release that plaintiffs allege was quoted or otherwise incorporated by reference multiple times, Dr. Howard Burris states: "Although not a large sample size, the data here is very interesting and next steps should be considered." (CAC ¶ 77.) In the January 25, 2010 press release, Bentsur notes the " 'need to confirm these results in a Phase 3 setting." (*Id.* ¶ 85.) In a June 9, 2010 presentation at the Needham Healthcare Conference, Bentsur states: "One thing that's very important to mention. We would be the first ones to admit that this study was not a large Phase 2 study, [it] was 38 patients." (*Id.* ¶ 97.) In a October 22, 2010 presentation at BioCentury's NewsMakers in the Biotech Industry Conference, Bentsur again notes that "it wasn't a big Phase 2 study ...." (*Id.* ¶ 106.) These are precisely the kinds of "notes of caution" that the *Kleinman* court viewed as balancing the defendants' positive statements about the clinical trials at issue in that case. *See Kleinman,* 706 F.3d at 156,

In sum, the Court holds that the allegations in the CAC fail to allege actionable falsity as a matter of law,

### B. *Scienter*

Even if this Court accepts that defendants made a series of public statements that contained actionable misstatements or half-truths regarding the Phase 2 trial, the Court would also need to determine whether plaintiffs' allegations are sufficient to support a strong inference of scienter. The Supreme Court's decision in *Tellabs* requires the Court to weigh competing inferences as to a defendant's state of mind when making the alleged material misstatement or omission. *Tellabs,* 551 U.S. at 323 ("The strength of an inference [of scienter] cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"). Such an analysis here reveals the inadequacy of plaintiffs' scienter allegations.

Plaintiffs argue that defendants acted at least recklessly by stating half-truths and omitting material facts of which they were aware regarding the results of the Phase 2 trial. (Opp. at 18, ECF No. 40.) In particular, plaintiffs take issue with repeated statements by Bentsur that the Phase 2 results were "statistically significant." (*Id.*) Plaintiffs allege that the misleading nature of these results was hidden by defendants' failure to follow proper scientific methodology. Failure to follow industry standards—without more—is not itself sufficient to support scienter. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999). Even accepting that such a failure occurred (which the Court must on this motion), it might as easily be due to mismanagement than conscious or reckless disregard of the truth. *Id.* at 85 ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud.").

 **\*13** Here, plaintiffs' allegations against the Company amount to no more than management problems: someone failed to adjust p-values, which led to increased chances of Type I errors and errors in hypothesis generation, and interim analyses may have introduced bias. The CAC does not, however, adequately plead that the statements the Company made regarding the Phase 2 trial *were known to be false* at the time they were made. Put another way, it is one thing to suggest that the scientists and analysts did their job poorly; it is another to suggest that the Company knew that they had done their job poorly, and nonetheless (either consciously or recklessly) made statements to hide those errors.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 101 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...

2014 WL 585658, Fed. Sec. L. Rep. P 97,820

Plaintiffs attempt to plead around this issue in two ways. First, they include boilerplate allegations in the CAC that Bentsur, as CEO, "was privy to confidential and proprietary information concerning Keryx," and "[b]ecause of his possession of such information, Bentsur knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public." (CAC ¶ 19.) This is an insufficient allegation upon which to hang a claim of securities fraud. Plaintiffs ask this Court to make a number of unsupported assumptions as to their allegations: (1) that Bentsur knew that the Phase 2 trial results had not been adjusted for multiplicity (something which even plaintiffs agree should routinely occur); (2) that Bentsur knew that failure to adjust for multiplicity had in fact resulted in hypothesis generation issues; and (3) that Bentsur knew of unplanned interim analyses (one or more) and that such analyses did in fact introduce bias into the results. There are no allegations with any specificity to support knowledge by Bentsur of any of these facts prior to the October 2011 disclosures.

Second, plaintiffs seem to suggest (though they do not argue it affirmatively) that Bentsur's stock-based compensation package and stock sales during the Class Period give rise to a strong inference of scienter. (*See id.* ¶¶ 138–141.) That Bentsur received Keryx stock as compensation (*id.* ¶¶ 138–140) is insufficient to give rise to such an inference; "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Grp. Inc.,* 47 F.3d 47, 54 (2d Cir.1995).

Similarly, that Bentsur sold small portions of his holdings during the Class Period also does not salavage plaintiffs' scienter allegations. Such insider sales of stock may be indicative of scienter, but only if the trades are unusual or suspicious in timing or amount. *See, e.g., Glaser v. The9. Ltd.,* 772 F.Supp.2d 573, 587 (S.D.N.Y.2011). No such factors are present here. Plaintiffs allege that Bentsur sold shares of Keryx common stock on March 24, 2010, March 24, 2011, and January 3, 2012. (*Id.* ¶ 141.) [8] In addition to being small sales when compared to Bentsur's overall holdings, the sales did not take place shortly before either the alleged corrective disclosure in October 2011 or the end of the Class Period in April 2012 (when the failure of the Phase 3 trial was announced). In fact, the relevant Form 4s that were filed by Keryx with the SEC for these sales by Bentsur indicate that the sales were executed to cover the tax withholding obligations due upon the vesting of shares of restricted stock.

(*See* Jordak Decl. Exs. C, D, E, ECF No. 19.) [9] Such sales for tax reasons are not indicative of fraud. *See, e.g., In re Bristol–Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 561 (S.D.N.Y.2004) ("While 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent.") (citations omitted).

[8]     The Court notes that the total number of shares and the total gross proceeds from these three stock sales by Bentsur listed in Paragraph 141 of the CAC do not add up to the total number of shares and the total gross proceeds listed in the final sentence of that paragraph. This discrepancy, however it may be resolved, is immaterial to the Court's holding that plaintiffs have failed to adequately plead scienter.

[9]     The Court may take judicial notice of disclosures made in publicly available SEC documents such as these. *See, e.g., Finn v.. Smith Barney,* 471 F. App'x 30, 32 (2d Cir.2012).

**\*14**  Accordingly, the allegations contained in the CAC as to defendants' scienter with respect to making public statements regarding the Phase 2 trial results fail as a matter of law.

### C. *Loss Causation*

Plaintiffs' failure to adequately plead loss causation for their Section 10(b) and Rule 10b–5 claim serves as an additional basis to grant defendants' motion to dismiss. Plaintiffs first allege that, following publication of the critique of the JCO manuscript on *TheStreet.com* on October 19, 2011, "Keryx's common stock dropped approximately 6% to close at $2.75 per share that day." (CAC ¶ 148.) The disclosure by *Keryx,* however, occurred more than two weeks earlier; the JCO manuscript clearly stated, with respect to the Phase 2 trial, that "[t]he P values were not adjusted for the unplanned interim analyses or for the multiple comparisons ... because of the exploratory nature of the study design with small sample size." (*Id.* ¶ 118.) As a result, this allegation of loss causation is insufficient as a matter of law. *See In re Omnicom Group, Inc. Sec. Litig.,* 597 F.3d 501, 512 (2d Cir.2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").

Plaintiffs next allege that the "risk concealed by Defendants' repeated misleading statements materialized on April 2, 2012

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 102 of 281

In re Keryx Biopharmaceuticals, Inc., Securities Litigation, Not Reported in F.Supp.3d...
2014 WL 585658, Fed. Sec. L. Rep. P 97,820

upon the Company's announcement of perifosine's failed Phase 3 results," and that Keryx's stock price dropped 73% from the Class Period high following this announcement. (*Id.* ¶ 152.) This allegation of loss causation fails for the same reason as the first—defendants disclosed their decision not to adjust the p-values for the Phase 2 trial nearly six months prior to the April 2, 2012 announcement regarding Phase 3 results. Plaintiffs fail to allege that a *concealed* risk materialized and resulted in the loss, *see Lentell,* 396 F.3d at 173, and thus fail to allege loss causation in the CAC as a matter of law.

### D. *Control Person Liability for Bentsur*

As set forth above, control person liability requires an underlying violation of Section 10(b) of the Exchange Act. *See ATSI,* 493 F.3d at 108. Having failed adequately to plead a claim under Section 10(b) and Rule 10b–5, plaintiffs' claim for control person liability by Bentsur also fails.

### IV. LEAVE TO AMEND

At the end of their opposition, plaintiffs request leave to amend pursuant to Federal Rule of Civil Procedure Rule 15(a)(2) in order to cure any deficiencies the Court may find in the CAC. (Opp. at 23 .) Though Rule 15(a)(2) provides that leave to amend "should be freely given when justice so requires," Fed.R.Civ.P. 15(a)(2), "[o]ne appropriate basis for denying leave to amend is that the proposed amendment is futile." *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir.2002). The Court notes that, in addition to the three rounds of pleading in *Abely* concerning substantially similar

allegations, plaintiffs have had the benefit of two rounds of pleading in the instant action. (ECF Nos. 1, 36.)

**\*15** If, in light of the deficiencies identified by the Court herein, plaintiffs believe that amending the complaint would not be futile, they shall submit a memorandum setting forth what new allegations they would include in a consolidated second amended complaint to cure these deficiencies within 14 days of the date of this order. Plaintiffs shall also attach a copy of a proposed consolidated second amended complaint to their memorandum that is blacklined against the current CAC.

If plaintiffs submit such a memorandum and proposed consolidated second amended complaint, defendants may submit any opposition within 7 days of plaintiffs' submission.

### V. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Consolidated Amended Complaint is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF No. 37 in 13 Civ. 755 and ECF No. 17 in 13 Civ. 1307, and to terminate both actions.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 585658, Fed. Sec. L. Rep. P 97,820

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 8

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 104 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

2010 WL 11583428
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE REPROS THERAPEUTICS,
INC. SECURITIES LITIGATION

Civil Action No. 09-2530
|
Signed 11/17/2010

## MEMORANDUM AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS

MARY MILLOY, UNITED STATES MAGISTRATE JUDGE

**\*1** This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #59). In this putative class action alleging securities fraud, lead Plaintiff Raymond Wong ("Plaintiff," "Wong") complains that Defendant Repros Therapeutics, Inc. ("Repros") "made untrue statements of material facts," in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. (Consolidated Class Action Complaint ["Complaint"], Docket Entry #56). Defendants Joseph Podolski ("Podolski"), Paul Lammers ("Lammers"), and Lewis Ploth, Jr. ("Ploth"), are said to have made similarly fraudulent representations in their capacities as officers and directors of Repros. (*Id.*). Defendants have moved to dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Defendants' Motion to Dismiss Consolidated Class Action Complaint ["Defendants' Motion"], Docket Entry #57). Plaintiff has responded to that motion, and Defendants have replied. (Plaintiff's Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint ["Plaintiff's Response"], Docket Entry #60; Defendants' Reply in Support of their Motion to Dismiss Consolidated Class Action Complaint ["Defendants' Reply"], Docket Entry #61). After a review of the pleadings, and the applicable law, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

## BACKGROUND

Raymond Wong is a Repros investor "who purchased common stock of [the company] ... between July 1, 2009 and August 2, 2009" (the "Class Period"). (Complaint ¶ 1). Wong allegedly purchased the stock based, at least in part, on the potential profitability of Proellex, a drug that Defendant developed to treat symptoms of uterine fibroids and endometriosis. (*Id.* ¶ 2). In this lawsuit, Wong contends that, as early as July 2009, Defendants knew that significant safety concerns compromised the drug's marketability. (*Id.*). Plaintiff complains, however, that in three press releases dated July 1, July 7, and July 23, 2009, Repros failed to disclose those safety issues to investors. (*Id.*). Defendants allegedly hid this negative information so that Repros could secure increased funding and meet the requisite deadlines set by the National Institute of Health ("NIH"). (*Id.*). Plaintiff alleges that, in August 2009, the Food and Drug Administration ("FDA") placed a "clinical hold" on Proellex, which forced Defendants to reveal the safety issues and cancel further clinical trials. (*Id.*). Those revelations allegedly resulted in a 73% drop in the value of Repros stock during the class period. (*Id.* ¶ 53). Wong complains that Defendants' failure to timely disclose those known safety concerns, in the July 2009 press releases, induced him to purchase shares in the company, and he seeks damages for the resulting devaluation of Repros stock after the drug trials were cancelled. (*Id.* ¶ 2).

**\*2** It is axiomatic that when reviewing a motion to dismiss, the court must accept all of the plaintiff's allegations as true.[1] Given that posture, the following allegations are critical Defendants' motion to dismiss: Repros, a Texas-based biopharmaceutical company, develops "oral small molecule drugs for major unmet medical needs that treat male and female reproductive disorders." (*Id.* ¶ 22). In 1999, Repros received a license from the NIH to develop a drug called Proellex. (*Id.* ¶ 25). The NIH agreement required Repros to pay a license fee, and to meet certain developmental milestones, including FDA approval. (*Id.* ¶ 25). The NIH had the authority to revoke the license if Repros failed to pay the fee, or to meet the designated milestones. (*Id.*).

---

[1]  In considering a motion to dismiss under Rule 12(b)(6), a court must accept the plaintiff's allegations as true and draw all reasonable inferences in their favor. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

In 2009, during the Class Period, Repros was researching two different drugs, Proellex and Androxal. (*Id.* ¶ 23).

Plaintiff alleges that Proellex was crucial to the company's success because it had the greater potential to return a profit. (*Id.*). Repros stated that it had no "clear clinical path to develop Androxal" in the United States, and that the company could only market the drug in the "limited European market." (*Id.*). For that reason, Repros reported that it intended "to concentrate our resources on the clinical development of Proellex ... in order to achieve commercialization as soon as practicable." (*Id.* ¶ 24). Repros stated further that it was testing Proellex use at three different dosages, and "accumulating safety results for all three ... in order to expedite the development" of the drug. (*Id.*). Proellex was intended "to treat three medical problems: (1) anemia associated with uterine fibroids; (2) treatment of chronic symptoms associated with uterine fibroids; and (3) treatment of chronic symptoms associated with endometriosis." (*Id.* ¶ 23).

In a press release, issued on January 12, 2009, Repros reported "statistically significant reductions" in the endometriosis symptoms of participants in the Proellex trial. (*Id.* ¶ 36). Two months later, on March 16, 2009, Repros filed its Form 10-K financial report, as required, with the Securities and Exchange Commission. (*Id.* ¶ 26). In that 10-K filing, Repros discussed the progress of three Proellex clinical trials. (*Id.*). At that time, all three trials had completed the "Phase 2" stage, and had proceeded to "Phase 3." [2] (*Id.*). In the March 2009 10-K filing, Repros confirmed that the Phase 2 trial for treatment of endometriosis had "tested two doses of Proellex, 25mg and 50mg, as a once-a day oral therapy versus placebo in a double-blind design and was four-months in duration." (*Id.* ¶ 30). Repros reported that "[t]here was a clear dose response in the Proellex treatment groups, and Proellex was well tolerated over the course of the trial." (*Id.*). Repros described future clinical steps as follows:

> We are preparing to request an end of Phase 2 meeting with the FDA that we anticipate could occur mid-year 2009. Pending positive FDA outcome from that meeting and acceptance of clinical protocols, we plan to initiate registration Phase 3 pivotal trials as soon as practicable. We estimate the filing of a NDA [New Drug

Application] for endometriosis in late 2010-2011.

(*Id.* ¶ 36).

[2]   Phase 2 trials are "[c]ontrolled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks." (Complaint ¶ 27). Phase 3 trials are "[e]xpanded controlled and uncontrolled trials after preliminary evidence suggesting effectiveness has been obtained, and are intended to gather additional information to evaluate the overall benefit-risk relationship of the drug and provide an adequate basis for physician labeling." (*Id.*).

 **\*3**  In the 10-K filing, on March 16, 2009, Repros also produced its annual financial report for the 2008 fiscal year. (*Id.* ¶ 32). Defendants reported that, "depending on the timing and success of our clinical trials," the company could fund operations through the second quarter of 2009. (*Id.*). After that point, the company stated, "we will need to seek additional funding through public or private financings." (*Id.*). Critically, Repros reported that "[i]f we delay or abandon our development efforts related to Proellex or Androxal, we may not be able to generate sufficient revenues to continue operations or become profitable." (*Id.* ¶ 35).

On July 1, 2009, the beginning of the Class Period, Repros issued a press release in which it stated that the "Phase 2 study that Repros completed earlier this year demonstrated clinically and statistically significant reductions of the three key pain symptoms commonly experienced by women with endometriosis." [3] (*Id.* ¶ 38). Those reductions were reportedly "accompanied by a statistically significant reduction in the number of patients requiring pain medication in both doses in this Phase 2 study compared with placebo." (*Id.*). Repros stated that it found "no efficacy differences between the 25 mg and 50 mg doses." (*Id.*). Repros did reveal, however, that it had decided "to discontinue the use of the higher, 50 mg dose ... due to an observed dose-dependent increase in liver enzymes in a low percentage of women." (*Id.*). Repros also reported the following:

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 106 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

To date, Repros has dosed over 600 patients, and over 200 patients have completed at least one dosing period followed by an off-drug interval. From completed studies as well as from the ongoing large open label trial, it has been determined that the drug is well tolerated with few women discontinuing treatment due to adverse events.

Repros believes that the decision to discontinue the higher dose will most likely improve the benefit/risk profile of the drug. To date, there has been no evidence for an increase in efficacy at the 50 mg dose. In addition, earlier studies have demonstrated highly effective control of excessive menstrual bleeding and clinically significant improvement in quality of life parameters at the lower doses of 12.5 and 25 mg.

(*Id.*). The company advised that it did not expect any subsequent trials to delay development of the drug. (*Id.*). Plaintiff alleges that, following that press release, the value of Repros stock decreased, from $7.19 a share, to $4.96 a share. (*Id.* ¶ 41).

3      Defendants submitted the July 1, 2009, press release to the SEC in a Form 8-K, dated July 2, 2009. (*Id.* ¶ 39).

On July 7, 2009, Defendants issued a second press release, again stating that "Repros' recent decision to discontinue the use of the Proellex 50 mg dose in its ongoing clinical studies was based on observations of a dose-related increase in liver enzymes in a low percentage of women." [4] (*Id.* ¶ 42). Repros stressed that the "company believes that the 25 mg and 12.5 mg doses will offer comparable efficacy benefits while providing an improved safety profile." (*Id.*). That conclusion was based, in part, on "[c]ompleted studies at 25 and 12.5 mg doses [which] demonstrated statistically and clinically significant control of excessive menstrual bleeding and improvement in quality of life parameters." (*Id.*). Repros stated that it "believe[d] that the decision to move forward with the 25 and 12.5 mg doses will improve the benefit/risk profile of Proellex," and that "any new studies required for the approval of the 12.5 mg dose will not adversely impact anticipated timing of NDAs for Proellex." (*Id.*). Wong alleges that, after Repros issued that press release, shares of the company's stock rose, from $4.24 to $4.56 a share. (*Id.* ¶ 43).

4      Defendants submitted the same information to the SEC in a Form 8-K, dated July 8, 2009. (*Id.* ¶ 44).

**\*4** Plaintiff alleges that, following the press releases dated on July 1, and July 7, 2009, the NIH "pressured Repros to obtain additional funding." (*Id.* ¶ 33). On July 7, 2009, Repros and the NIH negotiated an amended licensing agreement. (*Id.*). The amended agreement provided that, by September 30, 2009, Repros must "[o]btain financing, upfront licensing consideration, or any combination thereof ... of no less than a combined total of Six Million Dollars ($6,000,000)." (*Id.*).

On July 23, 2009, Repros issued a third press release. [5] (*Id.* ¶ 46). In that statement, the company repeated that it "believes that the decision to move forward with the 25 mg and 12.5 mg doses will improve the benefit/risk profile of Proellex." (Id.). The company reported that it had "informed the Food and Drug Administration, or FDA, of the decision to discontinue the 50 mg dose," and that Repros "intends to obtain guidance from the FDA in the coming months on the clinical and regulatory pathways forward for the Proellex clinical programs." (*Id.*). Following the press release, the value of Repros stock dropped from $4.92 a share, to $2.99 a share. (*Id.* ¶ 49).

5      That same day, Defendants submitted the press release to the SEC in a Form 8-K. (*Id.* ¶ 47).

On August 3, 2009, Repros issued another press release, this time announcing the suspension of all Proellex clinical trials, due to a "clinically significant" increase in liver enzymes among participants. [6] (*Id.* ¶ 51). The company stated that it had made the decision "in the interest of patient safety ... based on available information ... [and] recent input from a consulting panel of liver experts." (*Id.*).

6      Repros submitted the press release to the SEC in a Form 8-K, dated August 3, 2009. (*Id.* ¶ 52).

In the August 3, 2009 press release, Repros also described the company's current "Financial Situation." (*Id.*). Repros reported that it was "considering various financing alternatives," but that "[n]o assurance can be given that the Company will be successful in obtaining financing." (*Id.*). Further, Repros cautioned that "such financing will result in significant dilution of the ownership interests of its current stockholders." (*Id.*). Finally, Defendants warned investors that a failure to secure adequate financing would trigger several options, "including but not limited to, reductions of expenses, sale of the Company, sale or license of a portion or all of its assets, a bankruptcy filing or the liquidation of the Company." (*Id.*). After Defendants issued the press release,

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 107 of 281
In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

shares of company stock dropped from $2.53 a share, to $1.31 a share. (*Id.* ¶ 53).

Three days later, on August 6, 2009, Repros revealed in a press release that the FDA was placing Proellex on a "clinical hold for safety reasons." (*Id.* ¶ 54). Repros reported that it was scheduled to meet with the FDA in September 2009, at which time the company reportedly,

> ... intend[ed] to present a detailed analysis of all of the patients with elevated liver enzymes, discuss the events that led to the suspension of the clinical trials, and determine whether and under which conditions, if any, the clinical hold may be lifted and the clinical trials of Proellex be safely resumed.

(*Id.*). Plaintiff has provided no further information about the September 2009 meeting with the FDA, or the future of Proellex. (Complaint). Wong has alleged, however, that, on September 16, 2009, Repros removed Defendant Ploth as Chief Financial Officer of the company. (*Id.* ¶ 55). Reportedly, Defendant Lammers then resigned as President, on October 29, 2009. (*Id.*).

 **\*5** On January 27, 2010, Plaintiff filed his Consolidated Complaint. (Complaint). In that pleading, Wong challenges the statements made in the July 2009 press releases. (*Id.*). Plaintiff contends that "Defendants issued misstatements during a five-week period about Proellex that had no basis in fact and deliberately or recklessly concealed the severity of the safety issues." (*Id.* ¶ 3). In response to these allegations, Defendants filed their motion to dismiss, insisting that Plaintiff has not alleged, with sufficient particularity, that any statement made by Repros "was false when made [or] that the speakers knew it to be false." (Defendants' Motion p.2). Defendants argue that Plaintiff has "pleaded no facts showing that any Defendant knew anything about the liver enzyme issues contrary to what was disclosed in the press releases" at issue. (*Id.* p.1). After a review of the pleadings, and the applicable law, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

**STANDARD OF REVIEW**

### *Rule 12(b)(6)*

Under Rule 12(b)(6), a party may move to dismiss an action for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In considering such a motion, a court must accept the plaintiff's allegations as true and draw all reasonable inferences in their favor. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Further, a court may not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279 (5th Cir. 1991). While, typically, a complaint need not contain detailed factual allegations, the Supreme Court has held that a plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face" and to "raise a right to relief above the speculative level." *Id.* at 1974; *Nationwide Bi-Weekly Admin. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007). More recently, the Supreme Court has addressed the standard applicable to motions to dismiss, under Rule 12(b)(6), in the following terms:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

2010 WL 11583428

*Ashcroft v. Iqbal*, ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal citations and quotation marks omitted). Two "working principles" underlie this standard. *Id.* at 1949-50. The first principle is "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* The second principle holds that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed.R.Civ.P. 8(a)(2)).

### The PSLRA and Rule 9(b)

Because Wong has complained of fraud and securities law violations, his allegations are also subject to unique, and stringent, pleading requirements. The Federal Rules of Civil Procedure dictate that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ. P. 9(b). More importantly, Congress has increased the quantum of factual detail required in complaints seeking recovery under the federal securities laws. The Private Securities Litigation Reform Act ("PSLRA"), requires that,

> *6 In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading:
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Under this statute, a plaintiff must "lay out the who, what, when, and where in the pleadings *before* access to the discovery process is granted, to prevent abusive, frivolous strike suits." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003). These requirements, taken together, guide the courts in "winnowing out meritless claims by imposing more stringent pleading requirements on

plaintiffs." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001).

## DISCUSSION

Wong has brought his claims against these Defendants under § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated under it. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Those claims stem from the overarching contention that, in the press releases, issued on July 1, 7, and 23, 2009, Repros, and the individual Defendants, violated federal securities law by making material misrepresentations or omissions. (Complaint ¶¶ 57-65). Plaintiff alleges, in particular, that Defendants "knowingly or with reckless disregard for the truth" failed to disclose that Proellex posed "severe" safety issues, and that the clinical trials of the drug must be cancelled for that reason. (*Id.* ¶ 2). Defendants insist, however, that Plaintiff has failed to adequately plead that any alleged statements were false, or that any Repros employee knew that a statement was false when made.

Under § 10(b) of the Exchange Act, it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). In relevant part, SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. A valid claim under § 10(b) and Rule 10b-5, then, requires a plaintiff to allege that, in connection with the purchase or sale of securities, the defendant (1) made a misrepresentation or omission (2) of a material fact (3) with scienter (4) on which plaintiff relied (5) that resulted in his injury. *R2 Investments*, 401 F.3d at 640-42; *Nathenson*, 267 F.3d at 406-07 (both quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

### False Statements

Plaintiff contends, first, that, in the July 1, 2009 press release, Defendants "falsely stated that Proellex [was] 'well tolerated' " by the drug trial participants. (Complaint ¶ 38). Plaintiff alleges that statement was false at the time that it was made because, "33 days after this statement was issued, it was revealed that patients enrolled in the Proellex clinical trials suffered liver enzyme increases so severe" that the trials

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

were later cancelled. (Plaintiff's Response p. 8). Wong insists that the "magnitude of this safety risk hardly indicates that Proellex was 'well tolerated.' " (*Id.*). In response, Defendants are adamant that Plaintiff's complaint contains no "facts indicating that any Defendant knew about the elevated liver enzymes at any time before the press releases disclosed the issue." (Defendants' Motion p.1).

**\*7** To satisfy the particularity requirements of the PSLRA, and Rule 9(b), a plaintiff must "(1) specify each statement alleged to have been misleading, *i.e.,* contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003).

In the cited press release, Repros reported that "it has been determined that the drug is well tolerated with few women discontinuing treatment due to adverse events." (Complaint ¶ 38). That determination was reported to have been based on the "completed studies" performed "to date." (*Id.*). Further, investors were cautioned that the stated conclusions were based on "interim data" which might not be "consistent" with the "final data" obtained from the ongoing trials. (*Id.*). In his Complaint, Wong makes no attempt to explain how, based on the trials completed at the time, Repros falsely concluded that Proellex was "well tolerated." *See Rosenzweig*, 332 F.3d at 866; *Goldstein*, 340 F.3d at 245.

For example, Plaintiff does not allege that the data from the completed studies, available on July 1, 2009, showed that Proellex was not "well tolerated." Nor does Wong allege that, as of July 1, 2009, more than a "few" women had discontinued treatment. Instead, in making his complaint, Plaintiff relies solely on the fact that *later* data led to cancellation of the trials. But Wong does not explain how data from subsequent trials shows that conclusions about earlier trials were false. (Plaintiff's Response p. 8). Indeed, the July 1, 2009 press release explicitly warns investors that it is based on "interim data" that is subject to change. In fact, Plaintiff admits that "[i]t is possible that Defendants could receive unexpected data about elevated liver enzymes associated with Proellex, and it would take Defendant 33 days to analyze the data and confer with experts to determine the extent of the liver issues,

and ascertain whether those problems were also present in the lower doses." (Plaintiff's Response pp. 13-14). Plaintiff concedes, then, that it is possible that no information existed before August 3, 2009, that conflicted with *any* challenged statement by Repros in the July 2009 press releases. This point bears emphasis. Plaintiff's action rests solely on the assertion that Repros' statements were false, and were known to be false, because later data led to the cancellation of the clinical trials. In light of the warning in the July 1, 2009, press release, and because Plaintiff has not alleged that information actually existed at the time to show that Proellex was not "well tolerated," he has failed to "explain the reason or reasons why the statement is misleading" based on the subsequent trial cancellation. *See Rosenzweig*, 332 F.3d at 866; *Goldstein*, 340 F.3d at 245. Because Plaintiff has failed to allege, with sufficient particularity, that the challenged statement was false, his claim should be dismissed. *Goldstein*, 340 F.3d at 257 (a plaintiff must "lay out the who, what, when, and where in the pleadings before access to the discovery process is granted, to prevent abusive, frivolous strike suits.").

Next, Plaintiff contends that, in the July 7, 2009 press release, Defendants falsely stated that the lower dosages of Proellex had an "improved safety profile" over the higher doses. Plaintiff claims that the fact that the later trials were cancelled is proof that the statement was false. (Plaintiff's Response pp.9-10). Again, the stringent pleading standards in securities fraud actions require Plaintiff to isolate the allegedly false statement he challenges, and to explain how it was false. 15 U.S.C. § 78U-4(b)(1).

**\*8** In the July 7, 2009 press release, Defendants reported that the "company believes that the 25 mg and 12.5 mg doses will offer comparable efficacy benefits while providing an improved safety profile." (*Id.* ¶ 42). It is well settled that a "statement of belief is only open to objection where the evidence shows that the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter." *Greenberg, v. Crossroads Systems, Inc.*, 364 F.3d 657, 670 (5th Cir. 2004). Here, Plaintiff has not alleged that the company did not believe, in fact, that the lower doses demonstrated "an improved safety profile" at the time of the July 7, 2009 press release. Wong, for example, acknowledges that, based on the allegations in his Complaint, "it is possible ... [that] Defendants did not have complete knowledge about the extent of the elevated liver enzymes," and that " 'the company was analyzing data as it became available and disclosing the results as that analysis was completed.' " (Plaintiff's

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 110 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)

2010 WL 11583428

Response p.12). Again, Plaintiff relies solely on the fact that the trials were subsequently cancelled, but that fact says nothing about whether Repros' statements were false at the time that they were made. (Plaintiff's Response p. 8). For that reason, Plaintiff's action should be dismissed for failure to state his fraud claim with the requisite particularity. *Nathenson*, 267 F.3d at 407.

Plaintiff also complains that *all* statements related to Proellex in the July 2009 press releases were false, because they had no "reasonable basis in fact." (*Id.* ¶¶ 38, 42, 46). As a threshold matter, Plaintiff has not identified any specific statements that he believes to be false. *See Rosenzweig*, 332 F.3d at 866 (plaintiff must "specify each statement alleged to have been misleading") Further, Plaintiff has not explained how any particular statement lacked a "reasonable basis in fact." (*Id.* ¶¶ 38, 42, 46). In each press release at issue, Defendants cautioned that the results reported were based on the state of the clinical trials at that time. (*Id.*). There is no showing from Plaintiff that the available information was inadequate to support those reported results. (*Id.*). In the absence of such a showing, Plaintiff's lacks the requisite particularity to be actionable. *See Rosenzweig*, 332 F.3d at 866.

Finally, Plaintiff claims that the July 2009 press releases were false or misleading because Defendants failed to warn investors that safety concerns with Proellex might lead to the drug trial cancellations. (*Id.* ¶¶ 38, 42, 46). Plaintiff's claim should be dismissed because he has failed to "specify each statement alleged to have been misleading." *Goldstein*, 340 F.3d at 257. And, because Plaintiff has failed to identify specific statements, he cannot explain how those statements were rendered false or misleading due to the omitted information. *Id.*; 15 U.S.C. § 78U-4(b)(1). For that reason, Plaintiff's claim should be dismissed. *Id.*

### Scienter

In actions for securities fraud, scienter is defined as "an intent to deceive, manipulate, or defraud," or "severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 643; *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *R2 Invs.*, 401 F.3d at 643 (quotation omitted). It is critical that a complaint allege facts to show that a defendant had the requisite scienter *at the time* a particular representation was made. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). Courts will not infer "that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," or so-called "fraud by hindsight." *Id.* Courts employ a three step approach to review allegations of scienter when weighing a motion to dismiss based on the PSLRA. *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). First, the allegations must be taken as true. *Id.* Second, the facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. *Id.* Further, the court may consider any documents that have been incorporated in the complaint by reference, as well as matters subject to judicial notice. *Id.* Third, a court must take into account any "plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* Most importantly, the inference of scienter must be "cogent and compelling," not merely "reasonable" or "permissible." *Id.*

**\*9** To show that Repros officers were aware of safety problems with Proellex, Plaintiff relies on the fact that the clinical trials were ultimately cancelled. (Plaintiff's Response pp.11-12). Citing "the short five-week time period between the first misstatement [in the July 1, 2009, press release] and the revelation of the truth" in the August 3, 2009 press release, Plaintiff urges the court to "presume[ ] that Defendants ... knew at the start of the Class Period that Proellex" was unsafe, or that Defendants were reckless in not knowing that it was unsafe. (Complaint ¶ 20). It is fundamental, however, that the court cannot infer scienter merely from a bad result. *Lormand*, 565 F.3d at 254. Here, Wong argues simply that, because the trials were cancelled due to safety concerns, Defendants surely knew about those concerns before the cancellation. Plaintiff's contention, then, amounts to no more than impermissible "fraud by hindsight," and it should be dismissed. *Id.*; *Iqbal*, 129 S.Ct. at 1949 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' ").

Next, Plaintiff points to the fact that Defendants had an "electronic data capture system" that must have alerted Repros' officers to the safety issues. (Complaint ¶ 56). On several occasions, however, the Fifth Circuit has considered whether the mere existence of internal reporting systems is sufficient to raise a strong inference of scienter. In

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 111 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

*Shaw*, the plaintiffs argued that the "defendants knew or should have known that Shaw was prematurely recognizing revenue," because management received "monthly reports on the progress of contracts, which were discussed at meetings." *Shaw*, 537 F.3d at 540. The court held that such allegations did not raise an inference of scienter because the complaint did not "allege that the reports or the meetings included information at odds with Shaw's public statements." *Id.* Likewise, in *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, the plaintiffs complained that the defendants "failed to disclose adverse" financial information "known only to the defendants due to their access to internal" data." 365 F.3d 353, 370 (5th Cir. 2004). The Fifth Circuit held that such "access" did not raise an inference of scienter because the plaintiffs had not alleged any details regarding the contents of those reports. *Id.* ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss"). Finally, in *Abrams v. Baker Hughes Inc.*, the plaintiffs sought to establish scienter based on the fact that the defendants "allegedly received unidentified daily, weekly, and monthly financial reports that apprized them of the company's true financial status." 292 F.3d 424, 430 (5th Cir. 2002). The Fifth Circuit found that this allegation did not raise a strong inference of scienter, holding that,

> The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Such allegations must have corroborating details regarding the contents of allegedly contrary reports*, their authors and recipients.

*Id.* (emphasis added).

Here, Plaintiff alleges that Repros employed a "data system" to monitor the drug trials. But Wong does not allege that this system was ever utilized to notify any Repros corporate officer that lower doses of the drug produced dangerous enzyme levels, or that the enzyme levels were severe enough to require cancellation of the clinical trials. Nor does Plaintiff

detail which individual Repros officers, if any, utilized the data system, or when. (Complaint ¶¶ 28, 56(c)). Finally, Plaintiff has not alleged any specific information which shows that the data system contained statements that conflicted with Defendants' representations during the class period. (*Id.*). As with the reporting systems in *Shaw*, *Southland*, and *Abrams*, Plaintiff has failed to allege "details regarding the contents" of the reporting systems that were "at odds with [Defendants'] public statements at the time those statements were made." *Shaw*, 537 F.3d at 540; *Abrams*, 292 F.3d at 430. For that reason, Defendants' "data system" alone does not lead to an inference of scienter.

**\*10** Plaintiff also argues that scienter can be inferred because Proellex was a "key" product for Repros. Plaintiff alleges that "Proellex was Repros' key product, and the safety of Proellex was crucial to the survival of the company." (Complaint ¶ 56). The Fifth Circuit has considered a similar argument in *Plotkin v. IP Axess, Inc.,* 407 F.3d 690 (5th Cir. 2005). In that case, the plaintiffs alleged that the defendant, a "struggling company," announced that it had reached "multimillion dollar" agreements with two buyers. *Id.* The prospective revenue from those agreements amounted to a thirty-fold increase over the funds generated the year before. *Id.* at 700. The buyers were unable to complete the sale, however, which led to alleged financial losses for the plaintiff investors. *Id.* The Fifth Circuit observed that, given the importance of the prospective revenue to the struggling defendant, it was reasonable to assume that it would have been familiar with the financial condition of the entities making the agreements, and so, would have discovered their precarious financial condition. *Id.* The court held that, on the facts presented,

> plaintiffs had thus alleged specific facts that gave rise to a strong inference that the company knew or was severely reckless in not knowing that the purchasers were not able or were not likely to be able to make the contracted payments.

*Id.*

*Plotkin*, however, is of no avail to Plaintiff here. In *Plotkin*, there was no question that information about the financially weak buyer was available to the defendant. *Id.* It was

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 112 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)

2010 WL 11583428

undisputed, then, that important information existed which the company officers must have known about. *Id.* In contrast, here, Wong only speculates that information about the safety issues might have been available to Repros prior to the August 3, 2009 press release. Again, Plaintiff admits that it is possible that Defendants were unable to receive or to analyze the Proellex trial data prior to disclosing those results to investors. (Plaintiff's Response p.12) ("it is possible ... [that] 'the company was analyzing data as it became available and disclosing the results as that analysis was completed.' "). But as the Supreme Court recently held, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 129 S.Ct. at 1949. Given that Plaintiff has not alleged any particular information that existed before the August 3, 2009 press release, and, in fact, he concedes that no such information may have existed, there is no strong inference of scienter. *See Shaw*, 537 F.3d at 533 (courts must take into account any "plausible inferences opposing as well as supporting a strong inference of scienter.").

### Individual Defendants

Plaintiff argues that a strong inference of scienter should be imputed to the individual Defendants by virtue of their positions in the company. (Plaintiffs' Response p.12). The Fifth Circuit has considered and rejected similar contentions on several occasions. In *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, the plaintiffs insisted "that the individual defendants must have known of the [accounting] irregularities because of their executive positions in the company." 537 F.3d at 535. The court held that allegation insufficient to support an inference of scienter, and stated that "this court's caselaw makes clear that 'pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company.' " *Id.* (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)); *see also Flaherty*, 565 F.3d at 211-212 (rejecting attempt to infer scienter based on the defendant's executive "position with TXU"). In light of the precedent in this circuit, the court cannot find that the individual Defendants acted with the requisite scienter merely because of their positions as Repros corporate officers. *Id.*

Finally, Plaintiff alleges that a strong inference of scienter exists because Defendants had a motive to mislead investors. Specifically, Plaintiff argues that,

**\*11** Defendants had a specific motive to issue the misrepresentations during a specific time frame, because revelation of the truth would have jeopardized efforts to obtain immediate funding, which Defendants needed in order to meet both Repros's capital requirements and the September 30, 2009 NIH financing deadline.

(Complaint ¶ 56). It is well-settled, however, that "motive" allegations can be used only to bolster an inference of scienter that arises from other sources. *See Southland*, 365 F.3d at 368; *Shaw*, 537 F.3d at 543; *Flaherty*, 565 F.3d at 208. In *Flaherty*, the Fifth Circuit found that, "[a]lthough we have stated that allegations of motive and opportunity standing alone will not suffice to meet the scienter requirement, motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." 565 F.3d at 208.

Here, then, for Plaintiff's allegations to have any relevance, the Complaint must have raised an inference of scienter that could be "meaningfully enhanced." *See Flaherty*, 565 F.3d at 208. However, no such inference has been raised. Plaintiff has not demonstrated, for example, that the company's "data system" or the importance of Proellex, raise an inference of scienter. *See Shaw*, 537 F.3d at 533; *Abrams*, 292 F.3d at 430. Because motive "standing alone will not suffice to meet the scienter requirement," and the Complaint does not otherwise raise an inference of scienter that Repros' alleged motive could "meaningfully enhance," Plaintiff's action against the individual Defendants should be dismissed. *See Flaherty*, 565 F.3d at 208.

### Section 20(a) of the Exchange Act

In addition to his § 10(b) and Rule 10b-5 claims, Plaintiff contends that the individual Defendants are liable for violations of Section 20(a) of the Exchange Act. (Complaint ¶¶ 157-160). Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable." 15 U.S.C. § 78t. This so-called "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 113 of 281

In re Repros Therapeutics, Inc. Securities Litigation, Not Reported in Fed. Supp. (2010)
2010 WL 11583428

F.3d at 383. Here, Plaintiff has not shown a violation of § 10(b), Rule 10b-5, or any other Exchange Act provisions or rules. Because the Complaint does not adequately state primary securities law violations, Plaintiff's secondary claims under § 20(a) should be dismissed as well.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendants' motion to dismiss be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11583428

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 9

2009 WL 6325540

KeyCite Yellow Flag - Negative Treatment

Order Clarified by   In re TETRA Technologies, Inc. Securities Litigation, S.D.Tex.,   August 10, 2009

2009 WL 6325540
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. Texas,
Houston Division.

In re TETRA TECHNOLOGIES,
INC. SECURITIES LITIGATION.

Civil Action No. 4:08–cv–0965.
|
July 9, 2009.

**Attorneys and Law Firms**

David Avi Rosenfeld, Samuel H. Rudman, Coughlin Stocia Geller Rudman & Rubbins Llp, Melville, NY, Roger B. Greenberg, Schwartz Junell et al, Houston, TX, Beth A. Kaswan, Scottscott LLP, New York, NY, John Henry Crouch, IV, Kilgore Kilgore PLLC, Dallas, TX, for Plaintiff.

Paul R. Bessette, Royale M. Pence, Greenberg Traurig LLP, Austin, TX, for Defendant.

### *MEMORANDUM & ORDER*

KEITH P. ELLISON, District Judge.

 **\*1** Pending before the Court are Defendants' Motion to Dismiss (Doc. No. 44) and Defendants' Motion for Sanctions. (Doc. No. 61.) Having considered the Motions, all responses and replies thereto, and the arguments of counsel at a recent motion hearing, the Court has determined that Defendants' Motion to Dismiss must be granted in part and denied in part, and Defendants' Motion for Sanctions must be denied.

## I. INTRODUCTION

This is a Securities Exchange Act class action on behalf of purchasers of TETRA Technologies, Inc. ("TETRA") common stock between November 3, 2006 and October 16, 2007 (the "Class Period"). TETRA is an oil and gas services company with three divisions: fluids; wells abandonment and decommissioning ("WA & D"); and production enhancement. The Fluids Division manufactures and markets clear brine fluids ("CBF") that are used in well drilling, completion and workover operations [1]. The WA & D Division has two operating segments: WA & D Services, which performs well abandonment and decommissioning work, and Maritech Resources, Inc. ("Maritech"), which purchases mature oil and gas wells. The properties purchased by Maritech provide business for WA & D Services. The Production Enhancement Division is not part of this litigation.

[1]   Operations that clean, repair, and maintain a production well to increase or restore production.

Plaintiffs are investment funds that suffered when the price of TETRA stock fell at the end of 2007. [2] Individual Defendants [3] allegedly dumped millions of dollars of stock at inflated prices during the Class Period: Geoffrey M. Hertel received $12 million from stock proceeds in May 2007; George McCarroll received over $400,000 in stock proceeds during the Class Period; and Raymond Symens received over $11 million in stock proceeds during the Class Period.

[2]   Fulton County was appointed lead Plaintiff in late June 2008 because it has the largest financial interest in the relief sought. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (Private Securities Litigation Reform Act, "PSLRA").

[3]   The individual Defendants are: Geoffrey M. Hertel who was the President and CEO during the class period and had formerly been its Executive Vice–President Finance and Administration and COO; George M. McCarroll who was the President of Maritech, a subsidiary of TETRA, and Raymond D. Symens who was a senior VP of TETRA who oversaw the Fluids Division.

In May 2007, TETRA announced the "highest first quarter earnings in company history" and forecast even greater earnings in later quarters. In August 2007, Tetra announced lower than expected earnings for the Fluids Division, WA & D Services, and Maritech. TETRA's CEO Hertel held a conference call in which he explained that Maritech took a write-off related to receivables from disputed insurance proceeds, the Fluids Division recorded lower than expected earnings from onshore operations and high inventory costs,

and Maritech experienced a production shortfall because two offshore platforms did not produce as early as was anticipated. TETRA's stock price dropped 25 percent. On October 16, 2007, TETRA withdrew its previously issued 2007 earnings guidance, and announced more possible insurance-related write-downs, and that Maritech would record impairments for non-productive oil and gas properties purchased in 2005. Its stock dropped 8 percent.

Plaintiffs' claim that Defendants committed fraud because they:

(1) misrepresented the expected cash flow from a package of properties purchased in 2005 ("2005 properties") by understating Maritech's decommissioning liabilities, improperly allocating acquisition costs for these properties to fields without proved reserves, and failing to either "write off" the properties under the "successful efforts" method of accounting or increase their "depreciation and depletion" expenses at the proper time;

**\*2**  (2) misrepresented the profitability of Maritech's oil and gas properties by wrongly stating that oil and gas reserves of the 2005 properties had increased when TETRA was about to write the properties off;

(3) improperly reduced the cost of goods sold and inflated revenues from the Fluids' Division "buyback" program by failing to report customer credits for returned CBFs as sales returns and allowances;

(4) misrepresented the financial performance TETRA's Fluids Division by overstating forecasted sales for onshore operations when demand was flat; and

(5) misrepresented the likelihood of collection of millions of dollars of insurance reimbursements for hurricane-related repairs performed by WA & D when some of the claims had already been disallowed and Defendants had already incurred costs for weather downtime that exceed those allowed under the applicable insurance policies. Defendants also failed to recognize expense for weather downtime and other reimbursable costs spent working on Maritech properties.

Because of these challenged patterns of alleged conduct, Plaintiffs contend that TETRA and individual Defendants made misleading and false statements about TETRA's expected performance and artificially inflated stock prices during the class period, thereby violating § 10(b) of the Exchange Act of 1934 and Rule 10b–5. They aver that the individual Defendants violated § 20(a) of the Exchange Act as controlling persons. Plaintiffs detail several TETRA filings that contain allegedly false and misleading statements related to the above challenged patterns of alleged conduct. Plaintiffs pray for damages, costs, and fees. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." Johnson v. Johnson, 385 F.3d 503, 529 (5th Cir.2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir.2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009) (quoting Twombly, 550 U.S. at 570). Although the Court generally considers a motion to dismiss for failure to state a claim based on the face of the complaint, the Court may also take notice of matters of public record when considering a 12(b)(6) motion. See Davis v. Bayless, 70 F.3d 367, 372 n. 3 (5th Cir.1995); Cinel v. Connick, 15 F.3d 1338, 1343 n. 6 (5th Cir.1994). Defendants have provided many SEC filings, and the Court may rely on them for what they say, although not for their truth, in deciding the Motion to Dismiss in addition to the complaint and documents incorporated therein. Tellabs Inc. v. Makor Issues & Rights, Ltd. (Tellabs I), 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007).

**\*3**  Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED.R.CIV.P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 207 (5th Cir.2009) (quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir.1997)).

## III. SECURITIES VIOLATIONS

### A. Pleading Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u–4(b)(1), a plaintiff must allege, in connection with the purchase or sale of securities (1) a material misstatement or omission (2) made with scienter (3) on which plaintiff relied, (4) economic loss and, (5) "loss causation" (a causal connection between the material misrepresentation and the loss). *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 238–39 (5th Cir.2009); *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir.2006) (quoting *ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 348 (5th Cir.2002) (internal quotations omitted)).

The PSLRA requires plaintiffs to specify each allegedly misleading statement and the reason why it is misleading; it incorporates, at a minimum, the FED.R.CIV.P. 9(b) fraud-pleading standard. *ABC Arbitrage v. Tchuruk,* 291 F.3d at 348. "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

The Fifth Circuit has defined the PSLRA standard as requiring the plaintiffs to:

(1) specify each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

(7) [for statements made on information and belief] state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief.

*Tchuruk,* 291 F.3d at 350, 363 n. 4 (citing 15 U.S.C. § 78u–4(b) (2)); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362–63 (5th Cir.2004); *In re Alamosa Holdings, Inc.,* 382 F.Supp.2d 832, 842 (N.D.Tex.2005).

The Fifth Circuit has rejected the group pleading doctrine, or the presumption that statements in group-published documents are attributable to those individuals with direct involvement with the everyday business of the company. [4] *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 531 n. 1 (5th Cir.2008) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d at 363–65 (5th Cir.2004)). *See also, In re Alamosa Holdings, Inc.,* 382 F.Supp.2d at 857 (dismissing allegations made against "defendants" because the allegations do not meet the pleading requirements for allegations of fraud). This rejection requires plaintiffs, in pleading both material misstatements and scienter, to distinguish among defendants and allege the role of each with respect to "each act or omission" in the alleged fraud. *Southland Sec. Corp.,* 365 F.3d at 365. Therefore, corporate statements can be tied to corporate officers if plaintiffs allege that these officers signed the documents in which the statements were made or plaintiffs adequately allege the officers' involvement in creating the documents. *Blackwell,* 440 F.3d at 287 (citing *Southland Sec. Corp.,* 365 F.3d at 364–65). A silent defendant who knows that another's statement is false may be liable as long as the complaint identifies which defendant made the statement and which remained inappropriately silent. *Blackwell,* 440 F.3d at 288. The Circuit, however, attributes to the defendant corporation all the statements in SEC filings, reports, and releases issued in its name by individual defendants pursuant to their positions of authority within the company. *Southland Securities Corp.,* 365 F.3d at 365–66.

[4]     The Court notes that the group pleading doctrine is still accepted outside the Fifth Circuit. For example, in the Southern District of New York, one corporate document may be considered the product of a group effort and considered the responsibility of top management for 10b–5 purposes. *See, e.g., In re Pfizer Inc. Securities Litigation,* 584 F.Supp.2d 621, 638 (S.D.N.Y.2008).

**\*4** As to documentary evidence, the plaintiffs must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Tchuruk* 291 F.3d at 356 (5th Cir.2002) (citing *In re Scholastic Corp. Litig.,* 252 F.3d 63, 72 (2d Cir.),

*cert denied sub nom, Scholastic Corp. v. Truncellito,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001)). The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir.2002); *Tchuruk* 291 F.3d at 355–56. That is, named reports delivered on particular dates are specific enough to support securities act claims, but unidentified "regular reports" delivered to the defendants without any detail about how frequently they were prepared or by whom, are not. *Tchuruk* 291 F.3d at 359.

### B. Materiality

Materiality is the "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Tchuruk,* 291 F.3d at 359. The disclosure is not measured by the "literal truth" but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Lormand,* 565 F.3d at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* (collecting cases). Materiality is traditionally a question of fact, but if the alleged omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *See Eizenga v. Stewart Enterprises, Inc.,* 124 F.Supp.2d 967, 975 (E.D.La.2000) (quoting *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 342 (3d Cir.1999)).

The Court addresses most of the parties specific arguments in its analysis of Plaintiffs' allegations below. It pauses however on the parties' differing contentions as to the recently issued opinion in the *Skilling* case since their arguments concern the law to be applied. Likewise, when the parties' arguments relate globally to the ACC, the Court will note them in its recitation of the law to frame the analysis below.

Defendants contend that Plaintiffs have failed to plead materiality because they cite numbers and percentages without examining the total mix of information including TETRA's cautionary disclosures. Defendants contend that, in the context of TETRA's full disclosures, the allegedly omitted information would not have significantly altered the mix of information available. Plaintiffs cite the recent decision on materiality in the *Skilling* case as analogous to the

facts at hand. There, Skilling held conference calls in which he claimed, *inter alia,* that all of Enron's businesses were "uniquely strong franchises with sustainable high earnings power" when there was evidence of contrary, verifiable historical facts that some of the businesses were facing a potentially enormous loss, one business had an unsupportable cost structure and was losing money, and one company was based on unstable, speculative trading. *U.S. v. Skilling,* 554 F.3d 529, 553–54 (5th Cir.2009). The Fifth Circuit upheld the jury's determination that those statements were material and not, as the defendant alleged, immaterial puffery. The Court explained that conclusory statements of belief may be so contrary to verifiable historical facts that they falsely misstate the speaker's true reasons and mislead the investors about the stated subject matter. *Skilling,* 554 F.3d at 553. Defendants contend that, unlike the government in *Skilling,* Plaintiffs made no allegations that any individual Defendant knew facts contrary to TETRA's public disclosures at the time they were made. Applying this standard below, the Court will conclude that, for one of the challenged patterns of alleged conduct, Plaintiffs allege that Defendants made several specific material misrepresentations or omissions in press releases, conference calls, interviews, and filings with the SEC that were purportedly contrary to verifiable historical facts.

### C. Scienter

**\*5** Defendants contend that none of the confidential witnesses ("CW") provide facts that give rise to a strong inference of scienter. In addition, because Plaintiffs cite no false statement made by McCarroll or Symens, Defendants argue that, because the Fifth Circuit has rejected group pleading, Plaintiffs have failed to plead a securities violation as to Symens or McCarroll as a matter of law. Plaintiffs respond that they have demonstrated conscious misbehavior in at least four ways: (1) information provided by the confidential witnesses, (2) suspiciously timed insider stock sales, (3) statements of Defendants, and (4) the nature and extent of the GAAP violations. The Court will examine the pleading standard and the inferences that may be permissibly drawn from each of these possible sources of scienter, but will reserve the specific arguments as to particular confidential witnesses, post-class statements, presumed knowledge, stock sales and alleged GAAP or SOX violations to the analysis section of the Order.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

In *Tellabs I,* the Supreme Court outlined the proper approach to evaluate scienter. First, the plaintiff's allegations must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. Third, a plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent" and is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs I,* 127 S.Ct. 2510;[5] *Lormand,* 565 F.3d at 239. In its analysis, the court must take into account "plausible opposing inferences." *Tellabs I,* 127 S.Ct. at 2502. This strong inference, however, need not be "of the smoking-gun genre or even the most plausible of competing inferences ." *Tellabs I,* 127 S.Ct. at 2510. That is, for the scienter element only, the court must alter the 12(b)(6) rule that all reasonable inferences should be drawn in the plaintiff's favor and take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 533 (5th Cir.2008) (citing *Tellabs I,* 127 S.Ct. at 2510).

[5]   The Fifth Circuit has taken a holistic view of the 9(b) standard. The complaint in *Shushany v. Allwaste, Inc.* was dismissed for failure to satisfy FED.R.CIV.P. 9(b)—pre-PSLRA but the reasoning was quoted with approval by the Fifth Circuit last year. The *Shushany* court held that the plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.* 537 F.3d 527, 540 (5th Cir.2008) (quoting *Shushany v. Allwaste,* 992 F.2d 517, 522 (5th Cir.1993)).

The facts must be evaluated collectively to determine whether a strong inference of scienter has been pled. *Indiana Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 533 (citing *Tellabs I,* at 2509–10). Each allegation of a misrepresentation or fraud must individually meet the particularity requirements of the PSLRA. *Barrie v. Intervoice–Brite, Inc.,* 397 F.3d 249, 260 (5th Cir.2005) (citing generally *Greenberg v. Crossroads Sys.,* 364 F.3d 657 (5th Cir.2004)). However, when considering scienter, the complaint must be considered *in toto* to discern whether its allegations create a strong inference. *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.,* 497 F.3d 552, 555 (citing *Barrie,* 397 F.3d at 260). For purposes of corporate defendants, if the plaintiff alleges only that the named individual defendants acted with scienter in issuing any of the complained of statement and no other director, officer, or employee did so, the court can simply address the allegations of the individual defendants because liability of the defendant corporation arises derivatively from the individual defendants' state of mind. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d at 367.

 **\*6**  In the Fifth Circuit, scienter can be established with intent or severe recklessness and may be based on circumstantial evidence. *Fin. Acquisition Partners LP,* 440 F.3d at 287; *Goldstein v. MCI WorldCom,* 340 F.3d 238, 246 (5th Cir.2003); *Nathenson v. Zonangen, Inc.,* 267 F.3d 400, 412 (5th Cir.2001). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, or that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware." *Nathenson,* 267 F.3d at 408. *See also Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir.2005) (describing reckless indifference as an omission or misrepresentation that is "so obvious that the defendant must have been aware of it").

Motive and opportunity may support a finding of severe recklessness, but the plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible. *Nathenson,* 267 F.3d at 412 ("[M]otive and opportunity does not of itself automatically and categorically mean that the necessary strong inference of scienter is present.") The allegations that directors and officers possess motive and opportunity to keep a high stock price for their benefit or that a corporation benefits from the high price are universal goals for public companies,

and cannot be used to create a strong inference of scienter. *Nathenson,* 267 F.3d at 420 (citing *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994)). Likewise, the desire to keep one's job does not satisfy the scienter requirement. *Blackwell,* 440 F.3d at 290 (citing *Melder,* at 1102).

### 1. Use of Confidential Witnesses

Defendants argue that Plaintiffs' reliance on confidential witness ("CW") statements in their Complaint is improper because Plaintiffs have not described the witnesses with sufficient particularity to support the probability that a witness in that person's position at the Company would possess the information alleged. Without their statements, Defendants aver that Plaintiffs fail to allege any other facts to support their claims or to call into question TETRA's disclosures. Defendants contend that, in general, courts must discount allegations from confidential sources. In their Reply, Defendants specifically claim that CWs 1–3 and 6–8 do not possess personal knowledge of the facts they assert. They do not specifically address CWs 4 and 5—those related to the reporting of expected insurance payments—but contend that those statements do not establish materiality. Plaintiffs respond that the CWs are in positions to have personal knowledge of the allegations attributed to them and highlight the details provided for each CW.

Confidential sources may be used, but they must be described with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." *Tchuruk,* 291 F.3d at 353.[6] *See also Barrie v. Intervoice–Brite, Inc.,* 397 F.3d 249, 259 (5th Cir.2005) (citing *Tchuruk* ). Post-*Tellabs I,* the Fifth Circuit has explained that allegations of confidential sources must be discounted, and, at the very least, must comply with the requirement stated above—that they are identified with sufficient particularity to support the probability that the person would possess the information pleaded. *Indiana Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 535 (5th Cir.2008) (discussing *Higginbotham v. Baxter Intern., Inc.,* 495 F.3d 753 (7th Cir.2007) (holding that, pursuant to the PSLRA, allegations from confidential sources must be discounted, but not necessarily ignored, post-*Tellabs I* )). Recently, the Seventh Circuit distinguished *Higginbotham* and credited the testimony of confidential witnesses when:

6    Confidential sources may be used, but, prior to *Tellabs I,* the Fifth Circuit adopted a Second Circuit test to determine whether they are appropriately described:

> (1) if plaintiffs rely on confidential personal sources *and* other facts, their sources need not be named in the complaint so long as the other facts, *i.e.,* documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
>
> (2) if the other facts, *i.e.,* documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;
>
> (3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

*Tchuruk,* 291 F.3d at 353.

**\*7** The confidential sources listed ... consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify ... The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources ... the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.* (Tellabs II), 513 F.3d 702, 712 (7th Cir.2008) (noting that named sources would be preferable).

### 2. Presumed Knowledge

In addition, pleadings of scienter may not rely on allegations that the defendants must have known of the misstatements based on their position within the company, even if they have a "hands on" management style. *Indiana Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 535, 539–40. Likewise, allegations that the perpetrator of the fraud reported to one of the defendants are insufficient to establish scienter.[7] *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 828 (8th Cir.2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring"); *Indiana Elec. Workers',* 537 F.3d at 542 (citing *Kushner* ); *cf. Nathenson,* 267 F.3d at 424–25 (holding that an officer's position may create an inference of scienter when the company is a small, one product company and patent protection of the product is the source of the misstatements).

[7]     The Fifth Circuit dismissed a complaint against Bernard Ebbers of WorldCom because "the complaint here present[ed] what could best be described as allegations of mismanagement of WorldCom's accounts receivable situation, perhaps even gross mismanagement, by several individuals in charge of handling the accounts rather than severe recklessness by Ebbers and Sullivan individually...." *Goldstein v. MCI WorldCom,* 340 F.3d 238, 254 (5th Cir.2003).

### 3. Timing of Stock Sales

Plaintiffs contend that the individual Defendants sold millions of dollars of stock within several days for the May 7, 2007 announcement of TETRA's 2007Q1 performance. (Am. Consolidated Compl. "ACC" ¶ 154.) Defendants argue that Plaintiffs ignore all of the stock sales other than those in May 2007 to create an artificial inference of scienter. Stock sales may suggest scienter, depending on their timing and amount. When a defendant makes regular stock sales or does not sell stock immediately following an alleged material misstatement, the court will not infer scienter. *Indiana Elec. Workers',* 537 F.3d at 543–44. Only trading at suspicious times or in suspicious amounts is probative of scienter. *Abrams v. Baker Hughes, Inc.,* 292 F.3d at 434 (citing *In re Silicon Graphics Inc. Securities Litigation,* 193 F.3d 970, 987 (9th Cir.1999)). In this context, "suspicious" means "sales that are out of line with prior trading practices or at

times calculated to maximize personal profit." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.,* 497 F.3d 546, 552 (5th Cir.2007) (quoting *Abrams v. Baker Hughes, Inc.,* 292 F.3d at 435). If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter. *Cent. Laborers Pension Fund,* 497 F.3d at 553 (selling 4 percent of one's stock insufficient combined with continued ownership of a large amount of stock).

### 4. Post-class Statements

**\*8** Defendants contend that Plaintiffs' post-class statements may only give rise to an inference of scienter if they are directly and cogently related, quoting *Lormand,* 565 F.3d at 254. Plaintiffs insist that several post-class statements imply that management knew of the problems with the production from reserves in the 2005 packages "from the start." *Rosenzweig v. Azurix Corp.,* 332 F.3d at 867, 868 n. 8. *Azurix* distinguished hindsight assessments from allegations that the management knew, at the time of the relevant occurrence, that the problems were already manifest. *Azurix,* 332 F.3d at 867–68 (holding that the post-class statements were insufficiently particular to satisfy the 9(b) and PSLRA pleading requirements).

### 5. GAAP and Sarbanes–Oxley violations

Defendants contend that Hertel was not on notice of any glaring irregularities or red flags such that his SOX verifications would support a strong inference of scienter. Allegations that the defendants failed to follow GAAP or published inaccurate accounting figures, without more, are not adequate to satisfy the scienter prong—such allegations must be coupled with allegations that lead to a strong inference of fraudulent intent to mislead investors. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc. .,* 537 F.3d at 534, 534 n. 3 (collecting cases); *Fin. Acquisition Partners LP,* 440 F.3d at 290 (citing *Fine v. Am. Solar King Corp. .,* 919 F.2d 290, 297 (5th Cir.1990)). On the other hand, securities fraud may be proved, even where improper accounting is alleged as the basis for misrepresentation, without showing violations of GAAP. *S.E.C. v. Seghers,* 298 Fed.Appx. 319, 331 (5th Cir.2008) (not designated for publication). Similarly, Sarbanes–Oxley ("SOX") certifications do not, without allegations that the officer knew of glaring accounting violations or other red flags, establish scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW,* 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir.2006) with approval).

The Fifth Circuit accepted as a "plausible" interpretation of the PSLRA that a defendants' SOX certification may raise an inference of scienter "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers Pension Fund,* 497 F.3d at 555.

### D. Loss causation

Defendants contend that, because there were no corrective disclosures that contradict the Company's disclosures or describe the challenged patterns of alleged conduct that Plaintiffs allege, Plaintiffs have not adequately pled loss causation. Plaintiffs respond that the Fifth Circuit does not require a confession of fraudulent misconduct to satisfy the requirement of relatedness between the false statements and the disclosures causing the stock decline. Because the purported disclosures that establish loss causation relate to all the challenged patterns of alleged conduct at once, the Court will address Plaintiffs' allegations of loss causation here rather than in the context of the challenged patterns of alleged conduct below.

**\*9** The Exchange Act requires plaintiffs to plead loss causation, or a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Brodo,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Catogas v. Cyberonics, Inc.,* 292 Fed. Appx. 311, 314 (5th Cir. Sept.8, 2008) (not designated for publication). The plaintiffs must allege that the market responded negatively to a corrective disclosure; confirmatory information, information already known to the market, may not constitute a corrective disclosure. *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 663 (5th Cir.2004). That is, the plaintiffs must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal a "facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand,* 565 F.3d at 258 (citing *Dura* and *Twombly* ) (holding that statements related to churn and involuntary disconnection problems with its sub-prime credit classes were plausibly related to the alleged misstatements regarding the benefits of programs promoting sales to sub-prime credit classes). The Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth, or disclosures by persons other than the defendants. *Lormand,* 565 F.3d at 261–63 (relying on disclosures by corporations involved in the same business, disclosures by the parent corporation, reports of expert stock analysts, and the defendant's discussion of the failures of the business program about which the defendant made material misrepresentations). Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong. *Alaska Electrical Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 2009 WL 1740648, at *7– *8 (5th Cir. June 19, 2009) (distinguishing the requirements for alleging loss causation from the requirements for alleging scienter).

Specifically, as to the Fluids Division's buyback program, Defendants contend that the corrective disclosure that purportedly "corrected and removed the inflation from TETRA's stock price" actually revealed that the high Fluids Division inventory was due to the Company's decision to accelerate the purchase obligations under a high-price contract with a bromine supplier. Likewise, as to the 2007 forecasts for the Fluids'Division, Defendants contend that none of the disclosures purportedly reveals any foreseeable losses known at the time the forecasts were issued. As to Maritech's accounting for oil and gas properties, the alleged disclosures simply state that the Company recorded impairments in accordance with the successful accounting method. As to the hurricane-related claims, Defendants argue that Plaintiffs identify no statement related to Plaintiffs' allegation that TETRA delayed writing off the insurance receivables.

**\*10** Plaintiffs respond that the August and October 2007 press releases were related to the challenged pattern of alleged conduct to inflate TETRA's stock price by falsely portraying the Company's prospects in these business areas even though the reasons given for the problems in fall 2007 were not necessarily truthful or complete. On August 3, 2007, TETRA announced a decrease in per share earnings for 2007Q2 and reduced the 2007 earnings guidance to $1.30–1.50/share (from $1.80–2.15 per share), but Hertel attributed the decrease to "transitory" reasons. TETRA stock fell 25 percent. (ACC ¶ 129.) Plaintiffs contend that this release revealed a portion of the truth by disclosing flat onshore customer demand, insurance write-offs, and reduced production from the 2005 properties.

Specifically, in these releases, Hertel explained that the Fluids Division was impacted by higher inventory costs because of an existing purchase contract that the company

was terminating and that earnings from the onshore fluids service business had not made up the difference because of exceptional rainfall in the Texas and southern Oklahoma markets. (ACC ¶ 127.) Also in the August 3, 2007 press release, Hertel explained that delays in production from two offshore platforms meant that Maritech's production did not reach previously budgeted volumes. (ACC ¶ 127.) In an earnings conference call later that day, Hertel repeated some of these statements and explained that Maritech had taken a write-off for insurance proceeds related to the 2005 hurricanes because the amount was in dispute with the insurance carrier. (ACC ¶ 128.) On August 9, 2007, Defendants filed TETRA's 2007Q2 Form 10–Q that included the purported "admission" regarding the insurance claims that "the underwriters repeated their position that certain wells did not qualify as covered costs." (ACC ¶ 131.)

Later, on October 16, 2007, when TETRA withdrew its 2007 earnings guidance, Hertel purportedly admitted accounting manipulations related to the insurance reimbursements when he explained "we also have a number of issues related to prior events. An example of this is where historical costs are currently represented as insurance receivables. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not affect cash flow, in the then current period." (ACC ¶ 133.) Hertel also explained that, as of October 2007, TETRA had $27.8 million in unreimbursed insurance receivables. (ACC ¶¶ 134–35.) TETRA also revealed that it would record impairments "in accordance with the successful efforts accounting method," a statement that Plaintiffs contend reveals what should have happened many quarters previously: all capitalized costs for non-producing properties would have to be expensed. (ACC ¶ 136.)

Unlike scienter, the standard for loss causation is notice pleading guided by FED.R.CIV.P. 8. *Lormand,* 565 F.3d at 266–67 (rejecting the defendants' arguments that they had a more plausible alternative inference as to the proximate cause of the plaintiffs' economic loss). Consequently, Plaintiffs allege a facially plausible causal relationship between the purported misrepresentations as to the insurance reimbursements and their losses. Prior statements indicated that Defendants believed that most of the insurance receivables would be collected, including Misrepresentations 16–21, discussed below. Plaintiffs connect their losses to TETRA's announcement of the large write off associated with allegedly previously known but undisclosed difficulties with the insurance companies. By consistently omitting the

information that the insurance receivables had already been disallowed and then revealing that the company had to write-off millions of dollars of receivables related to those insurance payments, Plaintiffs have plausibly suggested that a significant portion of the stock decline in the fall of 2007 may have been caused by a revelation of part of the truth about the collectibility of the insurance receivables. The Court need not reach the question of loss causation as to the other challenged patterns of alleged conduct because it finds that Plaintiffs have not adequately alleged facts giving rise to a strong inference of scienter.

### E. Forward Looking Statements

**\*11** Defendants note that forward-looking statements accompanied by cautionary language are not actionable because they are protected by the PSLRA "safe harbor" and the "bespeaks caution" doctrine. Defendants contend that the cases upon which Plaintiffs rely to render forward-looking statements actionable are distinguishable because those cases involve particular, detailed facts available to management that demonstrate that forecasts disclosed to investors were based on false information. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920 (9th Cir.2003); *Griffin v. GK Intelligent Sys., Inc.,* 87 F.Supp .2d 684 (S.D.Tex.1999); *Rubenstein v. Collins,* 20 F.3d 160 (5th Cir.1994). *Rubinstein* involved predictions about data about a new gas well when the defendants knew that test results should have given management reason to know that the test results were inaccurate. 20 F.3d 160 (5th Cir.1994). *America West* and *Griffin* purportedly involve statements of current fact rather than forward-looking statements. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 937 (9th Cir.2003) (holding that statements about the present effect of a past violation are not forward looking); *Griffin v. GK Intelligent Sys., Inc.,* 87 F.Supp.2d 684, 686 (S.D.Tex.1999) (holding that statements about an announced agreement that, in fact, did not exist, were not forward looking). In addition, Defendants contend that the cautionary language accompanying TETRA's disclosures was meaningful and substantive. Plaintiff contends that none of the assertions was wholly forward looking. In the alternative, Plaintiffs contend that Defendants knew that the predictions were false, lacked a reasonable basis and were belied by other facts, and the cautionary language was either boilerplate or failed to provide warning of applicable risks.

No person shall be liable under the securities laws for forward looking statements. 15 U.S.C. § 78u–5(c)(1)-(2). In general, under the safe harbor clause, a "forward-looking" oral or

written statement is not actionable if (1) the statement is "identified as ... forward-looking ... and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially ....."; (2) it is "immaterial"; or (3) "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(A)-(B). *Lormand,* 565 F.3d at 243. Well-pleaded factual allegations that defendants knew their statements were false are sufficient to bar application of the safe harbor clause. *Lormand,* 565 F.3d at 244; *Tellabs II,* 513 F.3d at 705 (noting that "indifference to the danger that a statement is false" is insufficient, citing, inter alia, 15 U.S.C. § 78u–5(c) (1)(B)(ii)).

**\*12** A "forward looking statement" is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission....

15 U.S.C. § 78u–5(i)(1); *Congregation of Ezra Sholom v. Blockbuster, Inc.,* 504 F.Supp.2d 151, 162 (N.D.Tex.2007).

" 'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp.,* 365 F.3d at 372. *See, e.g. Lormand,* 565 F.3d at 244 (holding that the following is boilerplate: statements in its documents are "not guarantees of future performance ... and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."). [8] Meaningful cautionary language identifies "important factors that could cause actual results to differ materially from the forward-looking statements." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir.1999) (quoting 15 U.S.C. § 78u–5(c)(1)). If "reasonable minds

could disagree as to whether the mix of information in the allegedly actionable document is misleading, the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand,* 565 F.3d at 248 (internal citations omitted).

[8]   The Court notes that the language identified by Defendants as "Standard 2006 Cautionary Language" is similar to this rejected language in *Lormand.* TETRA's language is: "This press release includes certain statements that are deemed to be forward-looking statements. These statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. Such statements are subject to a number of risks and uncertainties, many of which are beyond the control of the Company. Investors are cautioned that any such statements are not guarantees of future performances and that actual results or developments may differ materially from those projected in the forward-looking statements. Some of the factors that could affect actual results are described in the section titled 'Certain Business Risks' contained in the Company's ... Form 10–K for ... 2005, as well as other risks identified from time to time in its reports on Form 10–Q and Form 8–K ..." (Doc. No. 45, Ex. 8, at Ex. 99.1, p. 4.) As this language explicitly incorporates risk factors identified in other SEC filings, the Court considers below whether these factors may provide meaningful cautionary language.

Oral statements are not actionable if they are accompanied by an "oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available [identified] written document or portion thereof." 15 U.S.C. § 78u–5(c)(2). Reasoning by analogy, federal district courts in Texas have held that incorporated language from SEC filings may protect forward-looking statements in other written statements. *See, e.g., Home Solutions of Am. Investor Group v. Fradella,* No. 3:06–cv–1096–N, 2008 WL 1744588, at *6 (N.D.Tex. Mar.24, 2008); *In re Blockbuster Securities Litigation,* No. 3:03–cv–0398–M, 2004 WL 884308, at *4 (N.D.Tex. Apr.26, 2004). The "bespeaks caution" doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and

2009 WL 6325540

protects optimistic projections accompanied by cautionary language. *In re Securities Litigation BMC Software, Inc.,* 183 F.Supp.2d 860 (S.D.Tex.2001) (holding that the doctrine can protect alleged misstatements even when the cautionary language is not contained in the same document as the alleged misstatement when the cautionary language is sufficiently related in time and substance to the purported misstatements). *See also Kurtzman v. Compaq Computer Corp.,* No. Civ. A H–99–779 et al., 2002 WL 32442832, at *23 (S.D. Tex. Mar 30, 2002) (citing *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1122 (10th Cir.1997) for the proposition that cautionary language that does not appear in the same document as the forward-looking statement is less effective).

## IV. Application to TETRA's Challenged Patterns of Alleged Conduct

**\*13** In the following alleged misstatements[9] Plaintiffs specifically identify the speaker, when and where the statement was made, and why the statements are allegedly misstatements. The facts that purportedly render these statements are false, provided by the confidential witnesses and by post-class statements made by the individual Defendants, are discussed below. Each set of statements is provided followed by Plaintiffs' explanation as to why they are material misstatements.

[9]   Because this is a Motion to Dismiss, the following are referred to throughout the Order as "misstatements" followed by the numbers assigned below.

1. On November 3, 2006, Defendants issued a press release that included statements about WA & D's 2006Q4 revenues and profits and discussed the timing of insurance reimbursements as a possible source of profit, though they noted that $2.2 million in pre-tax earnings were eliminated until they were reviewed by the underwriter. (ACC ¶ 90.)

2. The same press release discussed Maritech's pretax earnings and explained that earnings increases of 803 percent over 2005Q3 levels reflected production increases from acquired properties. TETRA predicted that the same factors that raised earnings over 2006 would bode well for production in 2007. (*Id.*)

3. The same press release describes the 152 percent increase over 2005Q3 pretax earnings from the Fluids Division as a result of the absence of hurricane downtime, price increases,

and the rapid increase in domestic and international onshore markets. In this release, Defendants predict that inventory profits should decline throughout 2006 and 2007, but overall, they predict earnings growth in 2007 and note that the domestic onshore business continues to grow rapidly. (*Id.*) Plaintiffs allege these statements were materially misleading because the reports about record earnings are not the result of legitimate business operations, but instead were the direct result of Defendants' challenged pattern of alleged conduct to manage earnings in the Fluids and WA & D Divisions (including Maritech) by manipulating TETRA's successful efforts accounting method, failing to recognize expense for weather delays, and inflating Fluids Division revenues and writing up inventory pursuant to TETRA's buyback program. Furthermore, the statement about the onshore business was purportedly misleading because demand for onshore customers was flat. In addition, Plaintiffs contend that Defendants' statements about the timing on insurance reimbursements was false because Defendants already knew that the claims had been returned as "not allowed." (ACC ¶¶ 91–94.)

4. On January 3, 2007, Defendants issued a press release announcing earnings guidelines for 2007 in which Hertel explained that some WA & D profits were deferred until an insurance payment expected in 2007 and that TETRA incurred substantial costs " 'waiting on weather' on turn-key platform decommissioning contracts (this work was essentially completed in December)." (ACC ¶ 95.)

5. Also in that press release, Hertel explained that the existing and potential market for WA & D Services in the Gulf of Mexico is larger than previously experienced and WA & D has acquired new equipment and secured a number of contracts. Defendants aver that the dramatically improved profitability guidance for WA & D reflects these among other factors. (ACC ¶ 95.)

**\*14** 6. The January 3, 2007 press release also discusses Maritech's anticipated growth from bringing storm damaged production back onstream and an expected $52 million of well abandonment and decommissioning work in 2007. The company predicted that significant exploitation capital expenditures for 2007 would materially impact 2008 and beyond but not substantially affect 2007 production. (ACC ¶ 95.)

7. The same press release repeated expectations that the Fluids Division and associated markets would improve in 2007

from investments in expanding domestic and international markets and that this growth bodes well for longer-term Fluids Division profits. (ACC ¶ 95.)

Plaintiffs contend that these statements were false and misleading for many of the same reasons discussed above: TETRA knew that its insurer had disallowed the claims so that deferred "profits" for WA & D would not be collectible. In addition, the statements about WA & D were misleading because the majority of the 2005 properties had already been exploited and would soon be abandoned. These statements were also misleading because the hurricane repair work would lead to losses rather than profits because of the lack of reimbursement from the insurance companies. As to Maritech, the statements were allegedly misleading because Maritech's properties had already been exploited and Defendants manipulated the successful efforts accounting method. Finally, the Fluids' Divisions earnings were misleading because 80 percent of Fluids Division profits were attributable to the wrongful accounting of the buy-back program including the inflation of revenues and the write-up of inventory and because the onshore market was flat. (ACC ¶¶ 96–99.)

8. On January 3, 2007, Hertel and another TETRA officer held a conference call and again stated that they could not record insurance proceeds until they have been paid and that anticipated 2007 Maritech volumetric production gains were expected from expenditures made in 2006 and 2005. (ACC ¶ 100.)

These statements are allegedly misleading for the reasons described above.

9. On February 28, 2007, Defendants announced record 2006 earnings of $1.37 per share and announced a 31–57 percent increase over its 2006 earnings guidance for 2007. (ACC ¶¶ 101.)

10. Discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007...." (ACC ¶ 102.)

Plaintiffs aver that these statements were false and misleading because Defendants knew that Maritech had already exploited the most attractive 2005 properties and Defendants were facing a complete write-off of these properties. In addition, Plaintiffs contend that these statements are misleading because of the manipulation of the successful efforts

accounting method through which Defendants avoided recognizing costs associated with decommissioning the wells and avoided recognizing current expense. (ACC ¶ 103.)

 *15  11. Also on February 28, 2007, Hertel and McCarroll held an earnings conference with analysts in which Hertel explained that TETRA had completed some Maritech work for which it could not reflect profits because the insurer had not yet paid. In addition, Hertel explained that Maritech had an excellent 2006, increased its proven reserves after producing 16 Bcf equivalents, and the new reserves should allow an increase in total profits in 2007. (ACC ¶ 104.)

Plaintiffs argue that these statements are misleading because Defendants later admitted that Maritech had exploited the most attractive properties first and the "proven" reserves had been depleted already. Plaintiff reiterates that Maritech's 2007 profitability was misleading because of manipulation of the "successful efforts" accounting methods. (ACC ¶ 105.)

13. On February 29, 2007 [10] , TETRA filed its 2006 Form 10–K that included TETRA's balance sheet and explained the accounting rules that applied to the 10–K, including that TETRA periodically evaluates its estimates including the collectibility of accounts receivable and the current cost of future abandonment and decommission obligations and basis its estimates on reasonable historical experience and future expectation. (ACC ¶¶ 106–107.)

[10]     The Complaint uses the date February 29, 2008, but the Court assumes this date is actually 2007 as it reports on 2006 year-end numbers. The 2006 Form 10–K listed its filing date as March 1, 2007. (Doc. No. 52, Ex. 1.)

14. The 2006 Form 10–K also describes the method by which Maritech accounts for its oil and gas properties: Maritech accounts for its interests using the successful efforts methods where costs, including those for unsuccessful development wells "are capitalized and costs related to unsuccessful exploratory wells are expensed as incurred." In addition, capitalized costs are recorded by field and depleted on a unit-of-production basis, based on the estimated remaining proved oil and gas reserves of each field. The properties "are assessed for impairments in value whenever indicators become evident and any impairment is charged to expense." The Form described decommissioning liabilities as estimates based on third-party market values to plug and abandon

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 127 of 281

the wells and to generally decommission the pipelines and platforms and clear the sites. (ACC ¶ 108.)

15. The 2006 Form 10–K specifies that TETRA reviews its decommissioning liabilities "whenever indicators suggest that either the amount or the timing of the estimated cash flows underlying the liability have changed materially." The 10–K also describes procedures for revenue recognition for turnkey contracts, valuing reserves for bad debts from oil and gas exploration and production companies, and accounting for acquisitions of the TETRA businesses. (ACC ¶ 108.) Plaintiffs contend that figures associated with the 10–K were misstated in violation of GAAP and the description of the accounting rules included false and misleading statements and omissions with respect to TETRA's actual accounting practices. (ACC ¶ 108.) These challenged patterns of alleged conduct are fleshed out below in ACC ¶ 119, summarized below.

**\*16** 16. The 2006 Form 10–K described accounting for insurance reimbursements and reported both $5.2 million of repair costs that the Company did not believe will be reimbursed, as well as a $9.2 million gain associated with insurance proceeds in excess of the net carrying value of the destroyed assets. TETRA notes "The Company believes that substantially all of the repair and well intervention and debris removal costs associated with the hurricane damage, other than the applicable deductibles and the amount charged to earnings discussed above, will be covered under the company's various insurance policies." (ACC ¶ 109.)

17. The 2006 Form 10–K also explains that, in the last half of 2006, the insurance claims adjuster did not have enough information to conclude that the well intervention costs for qualifying wells would qualify as covered costs, but "the Company believes that well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection." In addition, the Company indicated its belief that debris removal costs, in excess of the policy limit for removal of debris with the three destroyed platforms, is available under an August 2005 endorsement although TETRA acknowledged that the underwriters questioned whether this endorsement provides additional coverage. (ACC ¶ 110.)

18. In the footnotes to the 2006 Form 10–K, the Company states its belief that "the significant majority of hurricane repair costs, including the well intervention and debris

removal costs associated with the three destroyed Maritech platforms, is covered pursuant to the Company's various insurance policies." The Company reported that $57.9 million of hurricane related costs had already been reimbursed during 2006 and $12.5 million in the early parts of 2007. (ACC ¶ 111.)

19. These footnotes explain that the net book value of destroyed assets covered by the Company's insurance policies are included in accounts receivable and that these amounts were $12.8 million as of December 31, 2005 and $64.5 million as of the end of 2006, including non-storm related insurance claims. The company stated its belief that it will be reimbursed related to repair costs for the destroyed assets. (ACC ¶ 111.)

20. The Company also anticipated $27.9 million included in accounts receivable related to well intervention costs related to three destroyed Maritech offshore platforms. The Company stated its belief that all of the well intervention costs were probable of collection. (ACC ¶ 111.)

21. Likewise, the Company reiterated its belief that debris removal and other costs qualify for reimbursement under an endorsement obtained in August 2005 even though it noted that the underwriters questioned whether there is additional coverage provided under this endorsement for the cost of removal of the platforms. (ACC ¶ 111.) Plaintiffs contend that these statements are misleading with respect to hurricane repair expenses and insurance reimbursements. (ACC ¶ 111.)

**\*17** 22. The 2006 Form 10–K explained that the cash outflow to extinguish Maritech's total decommissioning liability would occur shortly after the end of each property's productive life. It also explained that the timing of the cash outflows is estimated based on future oil and gas production and the resulting depletion of the company's oil and gas reserves. (ACC ¶ 112.) Plaintiffs aver that this statement is misleading because it suggests that there will be cash outflow from the 2005 properties for several years. (ACC ¶ 112.)

23. The 2006 Form 10–K explained that determination of impairments on long-lived assets is based on the future estimated cash flows from the Company's proved, probable and possible reserves. (ACC ¶ 113.)

Plaintiffs allege that this statement was misleading with respect to the facts underlying Maritech's oil and gas impairments.

24. The 2006 Form 10–K explained that Fluids' revenues are recognized "only when collectibility is reasonably assured." (ACC ¶ 114.)
Plaintiffs argue that this statement is misleading with respect to revenue recognition for the Fluids' Division.

25. The 2006 Form 10–K contained statements about costs of product sales and costs of services that includes operating expenses. The Form 10–K also explains that depreciation, depletion, amortization and accretion include depreciation expense for all of the Company's facilities. (ACC ¶ 115.)
Plaintiffs contend that these statements are false and misleading as they apply to Fluids, WA & D expenses incurred on Maritech's properties and Maritech's expense recognition.

26. The 2006 Form 10–K describes TETRA's process for accounting for asset retirement obligations and explains that these asset retirement obligations are the estimated fair value for retiring these assets and are capitalized as part of the asset accounting. The costs are then depreciated on a unit of production basis for oil and gas properties. It then reports that TETRA acquired $6.9 million in liabilities and incurred $2.8 million in retirement of obligations during 2006. (ACC ¶ 116.)
Plaintiffs contend that this is a misleading account of asset retirement obligations as applied to Maritech properties.

27. The 2006 Form 10–K describes costs incurred in oil and gas property acquisition including $115 million in capitalized costs for proved properties acquired in 2005, and $187 million of proved developed properties being amortized in 2005. TETRA explains that the capitalized costs of properties include the properties' proportionate share of liabilities relating to these properties. It also describes the depreciation, depreciation, and amortization for 2006 as $38 million and the impairments of properties as zero for 2006. The 10–K provides the definition for "proved" oil and gas reserves. The 10–K also describes the standardized measure of discounted future net cash flows including $752 million for discounted future net cash flows relating to proved oil and gas reserves for 2006, including $244 million for production

and $196 million for development and abandonment. (ACC ¶ 117.)

*18 28. The Form 10–K includes the standard Sarbanes–Oxley certification, signed by Hertel.
Plaintiffs aver that the 2006 Form 10–K balance sheet is false and/or misleading because of the challenged patterns of alleged conduct described previously. For example, some of the WA & D expenses are improperly treated as insurance receivables, Fluids Division inventories are misstated because sales returns are recorded as inventory rather than sales credits to customers. They contend that, as the flip side of the improperly recorded Fluids inventories, the Fluids Division's income statement included inflated product sales because Fluids failed to report customer credits as sales returns and allowances and COGS were understated for Fluids inventory write-ups. Fluids revenues were recognized even though the Company agreed to provide credit for the buy-back program so revenues were recognized even though collection was not "reasonably assured."

In addition, as to WA & D, the cost of services was understated because WA & D failed to report expenses for weather downtime. In addition, Plaintiffs contend that the amounts for Maritech DD & A were understated because of abuses of the successful efforts method and the false assumption that the cash flows from the 2005 properties would continue for several years. They also contend that the insurance reimbursement statements were misleading because facts relating to the 2006 disallowances were not discussed.

Plaintiffs reiterate that TETRA had not adjusted the reported balances for Maritech's 2005 property "impairments" even though they knew the properties were unproductive or largely depleted, decommissioning liabilities were not adjusted up, and Defendants had not expensed the costs of unsuccessful wells as represented in the Critical Accounting Policies and Estimates. Plaintiffs also contend that acquisition cost allocations for the 2005 purchases were made to fields without proven reserves. Impairments were not assessed on the basis of true reserves because the 2005 properties did not have a productive life of more than 3 years. The Maritech properties did not consider the assets' "useful life" because the assets were already exhausted; they were not depreciated in a straight-line basis.

28. On May 7, 2007, TETRA issued a press release and represented that WA & D Services profits were up 712 percent

over profits in 2006Q1. It also explained that production volumes for Maritech were lower than forecasted in the 2007 guidance but that Maritech is attempting to accelerate exploitation activities planned for later in the year to offset a near-term production shortfall. (ACC ¶ 120.)

29. In an earnings conference that day, Hertel explained that TETRA was experiencing unprecedented growth because it was: constructing a new fluids plant to reduce COGS for completion fluids, terminating a supply agreement for some products, experiencing heartening WA & D performance. TETRA noted that a production shortfall for Maritech could be remedied by moving forward several projects. (ACC ¶ 121.)

**\*19** 31. Hertel explained that WA & D revenues should increase and Maritech production was only 3 or 4 months out of sync with the levels that were indicated previously. (ACC ¶ 122.)
Plaintiffs contend that these statements are misleading because Maritech's oil and gas properties were exhausted so there was a permanent volumetric shortfall, WA & D expenses were increasing because TETRA's insurer was not going to reimburse costs on Maritech properties and Fluids' high inventories were falsely stated and the buy-back program concealed. (ACC ¶ 123.)

32. On May 10, 2007, Defendants filed TETRA's 2007Q1 Form 10–Q and reiterated several statements of previous forms including communications from the insurance adjusters, reiterated false and misleading accounting figures, and repeated the false and misleading statement that TETRA continued to expect cash flow from the 2005 properties over several years. (ACC ¶¶ 124–25.)
Plaintiffs contend that these statements are false for the reasons described above.

### A. Successful Efforts Accounting for Oil and Gas Properties

In 2005, just prior to Hurricanes Katrina and Rita's landfall, Maritech purchased three "packages" of economically unproductive oil and gas wells in the Gulf of Mexico, for $23.1 million cash up-front with decommissioning liabilities (the cost to dismantle the oil or gas wells when they were depleted or abandoned, known as asset retirement obligations or "AROs") of $94.6 million ("2005 properties").[11] (ACC ¶¶ 2, 33–34.) Defendants purportedly recorded the packages on their books using the "successful efforts" accounting

method, which requires the immediate expensing of the cost of non-productive or uneconomic wells.[12] (ACC ¶ 36 .) Plaintiffs allege that acquisition costs and the associated abandonment and decommissioning liabilities were allocated to unproductive wells. (*Id.*) In this manner, instead of properly accounting for the wells using the "successful efforts" accounting method, Defendants allegedly delayed the recognition of depreciation, depletion, and amortization ("DDA") expenses as they worked the wells in 2006. Instead, Defendants allegedly wrote these expenses off as impairments near the end of 2007. Plaintiffs claim that Defendants misrepresented the profitability of the WA & D Division that include Maritech. TETRA reported an "impairment" charge of $70 million for the abandonment of properties purchased in 2005 and Maritech reported a $71 million total loss in 2007. (ACC ¶ 3.)

[11]    As this is a Motion to Dismiss, Plaintiffs' alleged facts are taken as true. To the extent that the following are consistent with Plaintiffs' explanation of TETRA's accounting conduct, the Court provides Defendants' explanation of the some of the accounting terms used throughout the Order: Defendants explain that when a well is purchased, the abandonment and decommissioning obligations are recorded as asset retirement obligations ("AROs"). Over time, these AROs are reduced as cash is spent on abandonment work and have no effect on profit or income. In addition, the portion of acquisition costs assigned to the producing fields is amortized over time and is expensed as "depreciation, depletion or amortization" ("DDA"). Low producing fields are allocated little or none of the purchase price of the field. Impairment costs are recorded against income when the Company determines that production at a particular field is no longer possible or profitable. (Def. Reply, at 5–6.)

[12]    Defendants contend that TETRA's accounting policy was actually to account for its properties by field rather than by well so that the decision to write off a given field is based on the whole field rather than individual wells. (Def. Reply at 4.) (citing Doc. No. 445, Ex. 29, at 26–27.)

Defendants contend that Plaintiffs misstate GAAP and TETRA's accounting methods to allege their supposed misstatements. Defendants note that TETRA accounts for its properties by field, so that the decision to write off a field

is made based on the field as a whole. Consequently, even if many of the wells in the field are unproductive, the field need not yet be written off. In addition, Defendants contend that Plaintiffs misconstrue purchase price allocation under GAAP. They aver that the acquisition cost of a package of fields is allocated based on the fields' realizable reserves or production so that fields with minimal cash flow are allocated little or none of the purchase price. In this manner, Plaintiffs' contention that Defendants failed to immediately expense costs associated with low performing fields is allegedly wrong. Likewise, Defendants explain that AROs are recorded when fields are acquired and when they are reduced, they do not result in a charge against income or impact profit (unless the actual ARO costs exceed the recorded liability). Moreover, they contend that SFAS No. 143 requires AROs to be recorded at present value so that the AROs carried on the books will often understate the expected future cost.

**\*20** Defendants also contend that certain of the purported misstatements related to the successful efforts accounting challenged pattern of alleged conduct are protected by the PSLRA safe harbor. For example, as related to Misstatement 2, in its 2005 10–K, TETRA explains that estimating reserves is complex, and the estimates of oil and gas reserves may be significantly incorrect. Moreover, Maritech may continue to experience significant revisions to its reserve estimates because reserve estimates are:

> to some degree subjective, each of the following items may prove to differ materially from that assumed in estimating reserves: the quantities of oil and gas that are ultimately recovered; the production and operating costs incurred; the amount and timing of future development and abandonment expenditures; and future oil and gas sales prices. Furthermore, different reserve engineers may make different estimates of reserves and cash flow based on the same available data.

(Doc. No. 45, Ex. 3, at 16.) Plaintiffs contend that the statement that Maritech's earnings increased 803 percent, a statement of past fact, is false and therefore cannot be protected by the safe harbor. As to the part of Misstatement 2 in which TETRA avers that 2007 production would do

similarly well in the future, Defendants' purported meaningful cautionary language does not warn that revenues and earnings may be significantly revised because the company was improperly allocating acquisition costs to non-producing fields or intentionally understating AROs in order to manage the reporting of expenses (see also Misstatement 5). While the language notes that reserve engineers' estimates may reasonably differ as to reserves, taking all inferences in favor of Plaintiffs, if, as Plaintiffs allege, Defendants knew that the fields would have to be written off well before they were, the PSLRA safe harbor provides no protection. Misstatements 14, 15, and 26 are related to how TETRA performs its accounting rather than predictions of future results. Likewise, Misstatements 5 and 13 are not protected to the extent that Plaintiffs have adequately alleged that Defendants knew that recorded AROs were too low and depreciation expenses were written off too slowly. The Fifth Circuit has clarified that, in cases where defendants knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable. *Lormand,* 565 F.3d at 244 (citing 15 U.S.C. § 78u–5(c)(1) (A)-(B)); *Tchuruk,* 291 F.3d at 359.

Even though the analysis of scienter requires courts to find a strong inference of scienter, this weighing is not appropriate when addressing whether Plaintiffs have alleged misstatements. Assuming that the successful efforts accounting method does require the cost of non-productive wells to be immediately expensed and that, as Plaintiffs allege, costs were allocated to unproductive wells and fields without reserves and then expensed en masse in 2007 in an action called an ''impairment,'' Defendants may have materially misstated the revenues, profits and assets of WA & D in several of its disclosures by failing to expense these non-productive wells and by under-booking the AROs for these fields not in accordance with SFAS 143. (ACC ¶ 119.) The $70 million impairment, purportedly related to the misstatements regarding the accounting of non-productive wells and underbooking AROs, is plausibly material because an investor would have considered that this omission altered the basic mix of information—the impairment equaled Maritech's revenues for the previous year. Plaintiffs allege the connection between the $70 million restatement and the allegedly improper accounting practices.

**\*21** Assuming that Plaintiffs have pled a material misstatement, and leaving aside some problems with Plaintiffs' failure to plead the fraudulent scheme with particularity that are addressed below, the Court now turns to the scienter prong. As to whether Plaintiffs have adequately

alleged scienter as opposed to only negligent or innocent misrepresentations, Plaintiffs provide the statements of the CWs, post-class statements, the individual Defendants' stock sales, and purported GAAP and SOX violations.

CW 5 is described as an accounting manager from April 2006 until June 2007 who reported to Maritech's CFO. (ACC ¶ 71.) CW 5's allegations relate to the challenged patterns of alleged conduct at WA & D including the write-offs of the 2005 properties, the purported successful accounting method flaws, and the insurance reimbursements. Based on the job description provided, it is probable that CW 5 had personal knowledge of the concern expressed by staff at the CFO's weekly meetings regarding the asset retirement obligations for abandoned and decommissioned wells. CW 5 contends that he knew that ARO costs exceeded the liability on the books, but the alleged fact that Maritech's CFO knew that the ARO costs were "large" does not suggest that he knew that they were recklessly or intentionally underbooked or how they were underbooked. Although one could infer that the CFO heard these concerns about AROs, CW 5 does not contend that the CFO shared these concerns. The CFO allegedly participated in meetings with two other high level TETRA officials, but it is not clear that, if he shared the concerns with the AROs, he repeated them to these TETRA officials. CW 5 also does not allege that any individual Defendants who made alleged misstatements knew of the alleged problems with the non-productive wells that were allocated part of the purchase price, but not expensed.

CW 4 is described as a senior joint interest billing accountant from December 2005 until September 2007 who handled billing of costs, accounts receivable, and other accounting. (ACC ¶ 62.) She reported to Maritech's controller. (*Id.*) CW 4 alleges that Maritech did not have many properties being drilled and that the successful efforts accounting method meant that non-performing properties were written off immediately. Based on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know this information firsthand. CW 4 does not, however, allege that anyone at the company knew that other properties should have been written off. [13] In addition, she asserts her own belief that Maritech was not keeping up with FAS 143 or that its plug and abandon costs, but she does not explain how that accounting was improper and does not aver that she shared these concerns with others such that her allegations may allow a strong inference of scienter about these supposed problems.

[13]    The end of ACC ¶ 69 appears to have been cut off.

CW 1 is described as the vice president of operations at Maritech who reported to the president of Maritech, then McCarroll. (ACC ¶ 45.) Defendants contend that Plaintiffs do not plead that CW 1 held a position that allowed him personal knowledge of the accounting decisions and particularities involved in writing off a well. CW 1 describes a property, Sabine 12, that was allegedly not performing well, and claims that "new engineers" had determined that the reserves of other properties were overestimated, specifically East Cameron 305 and others at the Vermillion locations. Plaintiffs concede that CW 1 was only involved with accounting for Maritech and TETRA from the "fringes." (ACC ¶ 53.)

**\*22**    Defendants contend that CW 1's statements about reserves are speculative because CW 1 is not a reserve engineer. *See, e.g., Wieland v. Stone Energy Corp.,* No. 05–2088, 2007 WL 2903178, at \*5 (W.D.La. Aug.17, 2007) (holding that statements from a production manager and reservoir engineers who had knowledge regarding the way proved reserves were calculated, and how and why the reports deviated from SEC requirements, were sufficient to conclude that they would possess the information they allege). CW 1 does not assert that he is familiar with the reserve process, but instead relies on reports by the new engineers. On one hand, he is described as a vice president who speaks to McCarroll. On the other hand, even if he did have personal knowledge of the information, the purported fraud is not described with particularity—CW 1 does not specifically allege that the reserves were intentionally overestimated or by how much they were overestimated. Plaintiffs also do not plead that McCarroll or other officers knew of the overestimation. Even if CW 1 had responsibilities or job descriptions suggesting that he would understand the accounting problems at a particular well or field, CW 1 explains that reserves were overstated but does not provide the alleged discrepancy between actual and underreported reserves.

Defendants aver that Hertel's post-class statements are not an admission that he previously knew that the properties written off had already been largely exhausted. They also contend that the statement that TETRA exploits the most attractive properties first, suggests only that TETRA accesses the most attractive properties first, not that these same properties were largely exhausted. Plaintiffs suggest that the post-class statements imply that Hertel knew, at least by February 28, 2007, that his statements that Maritech had actually increased its proven reserves for the 2005 packages and that the new

reserves should allow Maritech to increase total profits in 2007, were false and misleading.

In the November 5, 2007 earnings call, Hertel explained:

> Maritech produces profits by actively exploiting properties that it acquires. The last packages ... of properties purchased by Maritech were pre-Rita and Katrina. The inventory of exploitable operations in these older purchases has dwindled during the last 29 months.

(ACC ¶ 138.) Defendants explain that "develop" and "exploit" are synonyms. That is, developing a field is not the same as "exhausting" its reserves.

In an earnings call in January 14, 2008, Hertel stated that the company attempts to exploit the most attractive properties first and that "the remaining exploitable opportunities after three years are generally quite lean in the economic area." (ACC ¶ 140.) Likewise, in that press release, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD & A grew more rapidly than did its operational pretax profits in 2007." (ACC ¶ 139.) Then, in 2007Q4, TETRA allegedly reported an "impairment" charge for the abandonment of the 2005 package of more than $70 million. (ACC ¶ 141.)

**\*23** Acknowledging a diminishing return potential is not the same as acknowledging that the field is largely exhausted. Acknowledging a diminishing return potential is also not inconsistent with a belief that new reserves would allow Maritech to increase total profits. Likewise, acknowledging that there are fewer operations to develop is not an admission that the fields are largely exhausted. Likewise, in *Barrie v. Intervoice–Brite, Inc.,* even though the plaintiffs pled that the defendant contended that the company was focusing on its sales momentum while, in fact, sales were slowing, this was insufficient to plead a misrepresentation (much less a post-class admission of scienter) because a diminishing sales force is not inconsistent with a focus on sales momentum. 397 F.3d at 260. Consequently, these statements do not appear to allow an inference of scienter as to Hertel or TETRA. In addition, Hertel's other post-class statements do not add much

to the analysis of scienter. Hertel stated that he would like to address the ARO issues to the extent that "we can get things cleaned up" even though he recognized "it's not like the old days.... You can't just set up reserves against something you have an issue with." (ACC ¶ 156.) The phrases describing cleaning up the AROs or addressing issues do not suggest that Hertel knew that officers within his company were committing intentional or severely reckless fraud sufficient to create a strong inference of scienter. Drawing that inference is not equally plausible as Defendants' theory that Hertel was accurately describing the business or even that he was providing hindsight analysis of problems that had occurred.

Lastly, Defendants contend that Hertel's stock sales do not permit a strong inference of scienter. They argue that his sales in May occurred well before the alleged partial disclosure of the "fraud" in August and October 2007 and, therefore, the sales were not suspiciously timed. In addition, Hertel allegedly sold his options before they were set to expire in September and October 2007 and while they were well in the money. Defendants aver that the May 7, 2007 Form 8–K disclosed several pieces of bad news, including a $30 million reduction in Fluids Division's profits and delayed production at two Maritech properties. Moreover, Defendants contend that Hertel owned more stock after the Class Period than he did when the period began. Hertel's stock sales as provided to the SEC suggest that each year, he chose a specific month to exercise his stock sales, although not always the same month. That he conducted a large amount of activity in one month, therefore, appears nonsuspicious. The month he choose, however, does allow some suggestion of scienter. The options Hertel exercised were set to expire in the fall of 2007 not in the summer. The magnitude of his sales in 2007, over $12 million, was about $3 million more than the year before which was, in turn, more than $2 million more than the prior year. This increase does not seem particularly suspicious. Lastly, his stock ownership increased over the Class Period.

**\*24** Plaintiffs aver that both Hertel and Symens dumped tens of millions of dollars of stock within days of the May 7, 2007 announcement of the 2007Q1 performance, which was the last group of laudatory comments about TETRA's earnings growth and prospects in general. In addition, Plaintiffs contend that one may infer scienter because Hertel identified June 2007 as the month in which TETRA's fortunes turned —therefore the insiders sold before the market learned of TETRA's reversal. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the

purported disclosures in August and October and the turn around in June 2007, provides facts that may be used as motive and opportunity allegations to create a slight inference of scienter. Even combined with Hertel's stock sales in May 2007, however, the allegations of scienter as to the accounting methods are insufficient to raise a strong inference of scienter as to the challenged patterns of alleged conduct surrounding the successful efforts accounting and recording of reserves and costs at the WA & D Division. Even if there were problems with the accounting, and it is not clear that the CWs allege that there were, neither the post-class statements nor the CWs allege that any particular Defendant knew of these problems and then fraudulently concealed them. The CWs' allegations, even combined with the post-class statements and the stock sales do not render Plaintiffs' challenged pattern of alleged conduct as plausible as an innocent inference that Defendants did not knowingly mislead their investors. Defendants' misrepresentations as to this challenged pattern of alleged conduct will not support a § 10b–5 claim.

### B. Write off of the 2005 Maritech Properties

Although closely related to the allegations relating to the successful efforts accounting, Defendants also contend that Plaintiffs have not properly alleged securities violations claims for relief related to the reserves of the 2005 properties and their eventual write off.

Beginning with the 2006Q3 performance and guidance, TETRA issued a press release that explained that "Maritech's performance ... reflects production increases derived from the acquired properties, reworking older wells and new drillings. These same factors should bode well for production into 2007." [14] (ACC ¶ 90.) The January 3, 2007 conference call included statements that Maritech's production would increase because of expenditures made in 2005 and 2006 to exploit properties. (ACC ¶ 100.) On February 28, 2007, Hertel explained that Maritech had an excellent 2006 because it increased its proven reserves to 93 Bcf after producing 16 Bcf equivalents and the new reserves should allow an increase in total profits in 2007. In addition, discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007...."

[14]     As the Court discussed above, with respect to the purportedly meaningful cautionary language related to Misstatement 2, the language cautions

against uncertainties in reserve estimates, but does not warn against the behavior alleged by Plaintiffs: the purported decision to falsely tout the production capacity of properties that the Company allegedly knows it will have to soon write off.

**\*25** Defendants contend that they did not make false statements as to Maritech's oil and gas properties: they claim that Plaintiffs essentially allege that reserves could not have "actually increased" when certain fields were about to be written off. Relying on SEC filings, Defendants respond that TETRA reasonably expected 2007 production to exceed 2006 production because storm-damaged parts of the 2005 package of properties were scheduled to come back onstream. (Doc. No. 45, Ex. 7, at Ex. 99.1, p. 3.) Maritech, however, experienced unexpected delays for two properties that were drilled in late 2006. (Doc. No. 45, Ex. 9, at Ex. 99.1, p. 3.) Defendants allege that TETRA channeled its development expenditures into existing properties and then, after the Class Period, into new properties Maritech purchased once it determined that it no longer had sufficient capital to develop the remaining undeveloped properties among the 2005 package of properties. Plaintiffs' ACC does not explain why the statement that Maritech continued to produce more reserves from the 2005 properties is inconsistent with the fact that it was about to write them off. [15]

[15]     In their ACC, Plaintiffs provide TETRA's statements about its accounting practices. For example, TETRA explains that "the oil and gas industry is cyclical, and our estimates of the period over which futures cash flows will be generated, as well as the predictability of these cash flows, can have significant impact on the carrying value of these assets and, in periods of prolonged down cycles, may result in impairment charges." (ACC ¶ 108.) Consequently, impairments appear to address cash flow considerations rather than necessarily reflecting adjustments in reserve estimates.

Plaintiffs contend that these were material misstatements because the properties had already been largely depleted, and Maritech exploited the most attractive properties first. Plaintiffs plead that, by the end of 2006, "Defendants ... fully knew that" TETRA's production and profitability would drop sharply in 2007. (ACC ¶ 38.) Consequently, Defendants, including Hertel, knew that cash flows for the operation of the 2005 properties would not continue for several years, so these statements and the balance statements in the 2006 10–K were false. (ACC ¶ 1 19(d)). Likewise, Plaintiffs

contend that statements made in a May 7, 2007 press release were false: Maritech noted a potential shortfall to production, but Defendants also explained that "Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008." (ACC ¶ 120, *see also* ACC ¶ 122.) Plaintiffs contend that Defendants knew, at the time, that there was a permanent volumetric shortfall. (ACC ¶ 123.) Plaintiffs argue that these facts became known to the public, when, on October 16, 2007, as noted above, TETRA reported an "impairment" charge for the abandonment of the 2005 properties of more than $70 million. After the Class Period, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD & A grew more rapidly than did its operational pretax profits in 2007." (ACC ¶ 139.)

Some of the alleged misstatements are similar to those in cases in which the plaintiffs have adequately pled material misrepresentations. As to the profitability and production capacity of the 2005 properties, the Court finds that Plaintiffs have successfully pled a material misrepresentation. It finds this case similar to the facts in *Plotkin v. IP Axess, Inc.* In *Plotkin,* the defendant company's statements regarding the likely success of agreement with another company that later failed satisfied the material misrepresentation requirement. In that case, the partner company later filed for bankruptcy such that statements about the likely success of the sales contracts supported inferences that the relationship was doomed when the defendant company made the statements. 407 F.3d 690, 697–98 (5th Cir.2005). Like the bankruptcy of the partner company in *Plotkin,* TETRA purportedly eventually acknowledged the problems with the fields and wrote off the 2005 acquisitions.

**\*26** Per *Tellabs I,* the Court must take Plaintiffs' pleadings as true. Plaintiffs plead that Defendants knew by early 2007 that TETRA had largely exhausted the economically exploitable oil and gas properties purchased in 2005, but instead of revealing this information then, continued to tout the productive capacity of these properties, going so far as to explain that their reserves had increased by a particular number. The Court finds that these pleadings satisfy the PSLRA requirement for pleading fraud with particularity. Plaintiffs have alleged several misstatements as to this challenged pattern of alleged conduct.

Defendants contend that Plaintiffs have not sufficiently pled materiality because TETRA had already disclosed that it is difficult to predict costs or profits because of the inherently imprecise nature of oil and gas reserve estimating. Again, however, the $70 million impairment, that Plaintiffs allege was related to the misstatements regarding the written off fields, was material because it was the size of Maritech's revenues for the previous year. Drawing all inferences in favor of Plaintiffs, they do allege a plausible material misstatement related to the 2005 properties.

Defendants also argue that several of the alleged misstatements were forward-looking and protected by the PSLRA's safe harbor. For example, as to Misstatement 6, Defendants contend that cautionary language about future production estimates adequately warned of the potential shortfalls that might affect the process of bringing the new "storm damaged production" online. Plaintiffs' contention is that, like the *U.S. v. Skilling* case, 554 F.3d 529, at the time TETRA made the announcement about bringing storm-damaged properties back online, it already knew that the inventory of exploitable operations from the 2005 properties had dwindled such that these properties would not be able to be profitably drilled and prepared for production.

The incorporated 2005 10–K cautionary statements regarding the inaccuracy of future production estimates warns: "actual future production, cash flows, development expenditures, operating and abandonment expenses and quantities of recoverable natural gas and oil reserves may vary substantially from those initially estimated by us." (Doc. No. 45, Ex. 3, at 15.) Again, however, while this cautionary language explains possible risks with production estimates, it does not warn about certain dangers that Plaintiffs claim had already begun to materialize. Likewise, the other statements about the anticipated production gains from the 2005 properties and Maritech's cash flow, while forward-looking, are not protected if Defendants knew that the properties were exhausted of possible exploitable or producible reserves at the time those statements were made (Misstatement 8, 9).

The Court must then address whether the CWs' testimony and other allegations of scienter supports a strong inference of scienter on the part of the individual Defendants or TETRA. CW 3's allegations relate to the challenged patterns of alleged conduct at WA & D including the write-offs of the 2005 properties and the purported successful accounting method flaws. CW 3 is described as lead operator for Maritech from 2005 through January 2008 and in charge of five Maritech

platforms. (ACC ¶ 58.) Defendants also argue that the job responsibilities of this CW, including inspections, monitoring well production, reviewing costs, and overseeing repair work, (ACC ¶ 59) do not suggest that he had involvement with accounting or whether or not fields should be written off. The Court agrees with this argument. While it appears that CW 3 had personal knowledge about the production at these wells, and he concluded that the properties "probably should have been written off sooner than they were," (ACC ¶ 60) the description of this CW is insufficient to allow the court to conclude that he spoke with personal knowledge of when a field should be written off or whether it was profitable for Maritech. His testimony does not appear to be based on personal knowledge such that his statements may be used to establish scienter as to whether the fields were not written off when they should have been. Even if the Court had chosen to credit CW 1 (discussed above in the context of the purported manipulation of successful efforts accounting) and CW 3's testimony, they do not allege that they told Hertel or McCarroll that the fields necessarily should have been written off sooner than they were or provide allegations that would support a strong inference that Hertel or McCarroll knew of these problems and fraudulently failed to reveal them to investors.

**\*27** Plaintiffs allege that Hertel's post-class statements support a strong inference of scienter. In November 2007, Hertel stated that "[t]he inventory of exploitable operations in these older properties has dwindled during the last 29 months" and "by 2007, most exploitation projects, generated out of the 2005 acquisitions, had diminishing return potential." Consequently, Plaintiffs allege that these statements make it difficult to credit Hertel's earlier assertions that Maritech production from older properties would drive its growth. Defendants respond that these post-class disclosures only state that, in late 2007, TETRA "canceled plans for the development of some of the previously held, less attractive exploitation properties" in order "to create growth opportunities for 2008 through 2010." (ACC ¶ 139.) As noted above, Defendants argue that these statements do not suggest that the accounting for these properties had ever been inaccurate or that it should have previously taken any impairment charges. Defendants' competing theory to defeat scienter is that Defendants had no idea that the properties would need to be written off at the time of the alleged misstatements because Maritech suffered unexpected production shortfalls from weather and rig delays, and subsequent events rendered other more-recently purchased

fields more profitable, even though the 2005 properties produced profits throughout 2007.

The Court discussed the inference that may be drawn from Hertel's stock sales above. Defendants contend that McCarroll's stock sales, which occurred near the end of the Class Period, occurred five days before the options expired, and that he sold half of the shares resulting from the exercise of the stock options. In addition, McCarroll's stock ownership increased during the Class Period and, shortly thereafter, he left TETRA to start another company. *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 258 F.Supp.2d at 594 (explaining that readily available, plausible explanations for a sale, such as that the insider is leaving the company, might make a sale nonsuspicious). McCarroll's sales do not seem concentrated after any particular announcement, and he made significant sales after the August 2007 announcements when the stock fell precipitously. Even construing all facts in favor of Plaintiffs, McCarroll's stock sales do not seem to be suspicious in timing or amount such that they would substantiate strong motive and opportunity allegations to create an inference of scienter.

The Court finds that, considering the discounted value of the CWs, the only plausible inference of scienter from Hertel's stock sales, and the limited value of the post-class statements, given the plausible non-culpable inferences that can be drawn from the word "exploitable" as discussed above, renders Plaintiffs' theory that Hertel or McCarroll knowingly or recklessly touted the production capacity of the 2005 properties while knowing that they were unproductive or largely exhausted less plausible than competing theories. The CWs have not provided testimony that there was necessarily anything wrong with the treatment of the 2005 properties. Even if they had, they do not support an inference that any of the defendants knew about these problems at the time and fraudulently concealed them. When considered together, Plaintiffs' allegations as to the write offs of the 2005 properties do not create a strong inference of scienter.

### C. Fluids Buyback Program
**\*28** As for the other challenged patterns of alleged conduct, Defendants *inter alia* contend that the CWs did not possess personal knowledge as to the facts they profess to know, some of the alleged misstatements are protected by the safe harbor provisions of the PSLRA, and the post-class statements, stock sales, and other purported indicia of scienter do not support a claim.

Plaintiffs allege that Defendants altered monthly Fluids division sales estimates to reach arbitrary sales goals by manipulating sales and inventory though a "buyback program." (ACC ¶¶ 26–27.) Plaintiffs allege that TETRA's fluids customers typically purchase more CBFs than necessary as a precaution with the understanding that TETRA will repurchase the extra at 40–60 percent of the original sales price. (*Id.* at ¶ 81.) When the CBFs were returned, however, TETRA "revalued" the Fluids division's inventory rather than reduce sales or income to account for the returns. (ACC ¶¶ 27, 85.) According to a confidential witness, 80 percent of the Fluids Division's total profits were due to the inventory adjustment. (*Id.* at ¶ 84.) In addition, TETRA allegedly stored the used CBFs it also received from customers rather than reworking and recycling them for reuse. TETRA purportedly falsely attributed the high fluids inventories to a historically high cost supplier and concealed its inventory write-ups/ inflated sales. (*Id.* at ¶¶ 28, 88.)

Defendants argue that TETRA properly accounted for the Fluids buyback program as a separate transaction. They further aver that TETRA's treatment of the program was approved by TETRA's independent auditors and that CW 7's statements support Defendants' version of the facts. They complain that his statement that inventory has been "written up" lacks sufficient context. Defendants also argue that the November 2006 spreadsheet produced by CW 6 that purportedly shows a variance or revaluation that reflect improper accounting at the Fluids Division is not necessarily connected to the buyback program, and it is unclear to what the word "revaluation" refers. Finally, Defendants contend that CW 8 was not in a position to know whether re-use of CBFs occurred in the Fluids Division. Defendants explain that TETRA's inventories rose because TETRA switched suppliers in 2006 and accelerated purchases from the old supplier to fulfill its obligations more quickly. (Doc. No. 45, Ex. 8 at Ex. 99 .1 p. 3; Ex. 19 at Ex. 99.1 p. 3; Ex. 7 at Ex. 99.1 p. 3.) Defendants contend that these inventory cost increases were properly disclosed.

Plaintiffs respond that the Fluids Division failed to report customer credits as sales returns and allowances as required by SFAS 48 and that cost of goods sold was understated because of Fluids inventory write-ups. In addition, they contend that Fluids' revenues had been recognized even though their collection was not "reasonably assured," despite the Company's agreement to provide credits pursuant to its buyback program. Specifically, the November 3, 2006 press release announced "third quarter pretax earnings that

exceeded third quarter 2005 levels by 152 percent." If the costs of goods were understated because of inventory write-ups, these earnings statements were misrepresentations of the true picture of Fluids Division sales. This statement is not forward-looking, and therefore cannot be protected by the safe harbor.

**\*29** Defendants also aver that several other of the purported misstatements associated with the Fluids Division are protected by the PSLRA safe harbor. Misstatement 3, as it relates to Fluids Division earnings growth, is a statement of historical fact and not protected. Likewise, Misstatements 24, 25, and 28 are not forward looking and reflect purported distortions in past numbers because of the allegedly improper reporting of inventory returns. Misstatement 30 relates to the cost of goods for primary completion fluids: Defendants contend that the cost of goods will go down because of a new plant and a new agreement with Chemtura. In addition, TETRA explained that it purchased large inventories in 2005 and 2006 and that it will terminate its previous supply agreements. These statements are purportedly false because they misstate or omit the reasons that Fluids inventories were high—they are not forward-looking statements. In addition, Plaintiffs contend these statements are false because Defendants do not disclose the impact of the buyback program on inventories.

Defendants contend that Plaintiffs do not adequately plead materiality because they only use rough numbers such as "hundreds of storage tanks" of used brine fluids and do not explain how many customers participated in the buyback program to understand its potential impact on TETRA. Notably, Defendants do not address CW 7's allegations that much of Fluids' total profit was attributable to the inventory adjustment. (ACC ¶ 84.) The Court, however, finds that, even drawing inferences in favor of Plaintiffs, it is not plausible that CW 7 spoke with personal knowledge of the buyback program as to the facts he alleges.

Even assuming Plaintiffs have pled material misstatements, however, Plaintiffs have not alleged a strong inference of scienter. As to allegations of scienter from the confidential witnesses, CW 6 is described as the regional Fluids sales manager. (ACC ¶ 75.) CW 6 provided a report that showed a reduction in the Fluids Division cost of goods sold for "variance/revaluation." (ACC ¶ 76.) This term is not explained, although CW 6 alleges that a person named Hank Reeves disclosed to him that sometime in mid–2006 the fluids inventory was "revalued." (*Id.*) Defendants contend that CW

6's information from Hank Reeves is a "rumor." Moreover, they argue that there is no suggestion that CW 6's job duties included accounting work or that he would have knowledge of the accounting for the Fluids Division buyback programs. CW 6 explains his understanding of the buyback program, but he admits that the actual computation of the credits was a "big secret" that was held by other people, including Hank Reeves, and he had heard that some component of the buyback program was "borderline illegal." (ACC ¶¶ 81–82.) These admissions suggest that CW 6 was not in a position to know whether or not Defendants were improperly accounting for or misrepresenting the buyback credits or intentionally misstating inventories at the Division.

**\*30** CW 7 is described as a general manager at the Fluids Division from August 2006 until August 2007 who met with senior executives, including the vice-president for the Fluids Division. (ACC ¶ 86.) CW 7's allegations relate to the challenged patterns of alleged conduct at the Fluids divisions including the buyback program and the purportedly artificially inflated forecast numbers discussed below. CW 7 describes the buyback program as overstating revenues and inventories and contends that 80 percent of the Fluids Division's profits were attributable to this program. (ACC ¶¶ 84–85.) Beyond the generic term "general manager," Plaintiffs do not provide CW 7's job description, however, or his interaction with accounting or upper management such that he would know how the buyback program was run or who knew about it. Plaintiffs also fail to describe CW 7's education or employment history that would provide a basis for any statement about a buyback program, or how it should be treated for purposes of financial reporting. CW 7 averred that, rather than account for these returns against actual sales, TETRA would record this credit in inventory. As explained more below in the section describing the Fluids' forecasts challenged pattern of alleged conduct, CW 7 allegedly reported demand projection figures to Symens, but CW 7 does not allege that he had interactions with Symens regarding the buyback program. Even if the Court had chosen to credit CW 7's statements as based on personal knowledge, CW 7 alleges that much of the Fluids Division's profit was attributable to inventory adjustment, CW 7 does not contend who knew about this program and does not specifically contend that any of the individual Defendants or any officer or manager who prepared the corporate disclosures knew about the allegedly improper massaging of sales at the Fluids' Division. The testimony of CW 7 is therefore insufficient to make a strong inference of scienter as to any of the individual Defendants or as to TETRA, possible.

CW 8 is described as a TETRA contractor who worked as an engineer in the new brine production facility. He explained that he knew of the "brine buyback program" whereby TETRA would buy "dirty" brine to resell. (ACC ¶¶ 87–88.) Defendants contend that a contract engineer would not have knowledge of accounting practices at the firm. The Court finds that the description provided for CW 8 is insufficiently detailed to allow his allegations to raise an inference of scienter as to any of the individual Defendants or TETRA. Plaintiffs do not provide argument on this point. The Court does not find that the details pled concerning CW 8's job duties and position at TETRA suggest that he would have personal knowledge of the way accounting was conducted for the buyback program and he does not provide support for a strong inference of scienter as to misrepresentations concerning this program. Consequently, regardless of whether Plaintiffs have pled material misrepresentations with sufficient particularity, the allegations of the CWs do not support a strong inference of scienter.

**\*31** As to this challenged pattern of alleged conduct, Plaintiffs do allege that Defendants specifically violated GAAP by failing to reduce customer sales by the return credits. However, as noted above, GAAP violations do not alone support a strong inference of scienter.

Defendants contend that Symens' Class Period sales were not unusual because he could have made much more money by selling them earlier or later. In addition, Symens made his final Class–Period sale in May 2007, several months before the alleged disclosures. His stock options were also set to expire in March and September. Unlike Hertel, Symens does not appear to typically concentrate sales, but to make sales periodically, and not very frequently. Symens sold more than half his shares and exercised options that were not about to expire in May 2007. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October provides facts that may be used as motive and opportunity allegations to create an inference of scienter. Symens, however, was a non-speaking Defendant and Plaintiffs have not connected him to any particular misstatement or to any particular statements in TETRA's SEC filings. Given the Fifth Circuit's rejection of group pleading, that Symens was a non-speaker is determinative of the issue.

When taken together, the lack of sufficient detail to allow an inference of personal knowledge on the part of the CWs, the non-suspicious timing of the stock sales, even with the purported GAAP violations and SOX certifications, do not support a strong inference of scienter. The Court holds that Plaintiffs have not pled facts that allow for a strong inference of scienter as to any Defendant as to the challenged pattern of alleged conduct related to the buyback program.

### D. Fluids Forecasts

Defendants contend that Plaintiffs' allegations that the Fluids Division's demand was flat are false because revenues increased from 2005 through 2007. In addition, they contend that CW 6 was not in a position to know about the overall Fluids business to the extent that his statements about forecasting can be credited. Moreover, they aver that the spreadsheet he provides, in which his superiors revise upwards sales projections for his region, only demonstrates that CW 6's superiors expected more of him that he did himself. Moreover, Defendants contend that the forecast data CW 7 allegedly provided to Symens was based on upcoming orders from current customers and did not account for projections from future growth or new customers. Defendants aver that the Fluids Division's onshore operations suffered unexpected losses in 2007 because of flooding in Texas and Oklahoma during May–July 2007.

Plaintiffs claim that Defendants misrepresented TETRA's Fluids Division financial performance as growing rapidly when the company knew that onshore demand was flat. Assuming that Plaintiffs' allegations that TETRA's upper management revised onshore demand upwards are true, statements that the onshore business was growing rapidly, including those in the November 3, 2006, press release could be misstatements that misled investors as to the prospects of the onshore Fluids Division business. In the January 3, 2007 TETRA further explained that there were "greater opportunities" for "domestic onshore and international growth."

**\*32** As with the other challenged patterns of alleged conduct, Defendants claim that the safe harbor protects several of the alleged misstatements. For example, they respond that Misstatement 3, related to the growth in the onshore Fluids Division business, was a forward-looking statement protected by cautionary language. The specific statement that the onshore business continues to grow rapidly includes a comment on historical fact—that onshore business had grown rapidly in the past-and a statement of historical

fact cannot be protected by the safe harbor. As to the continuing growth, the Court agrees that the cautionary language provided does not warn investors about the reasons that Plaintiffs contend demand turned out to be flat-that Defendants had knowingly, unreasonably inflated forecasted demand. This same analysis applies to Misstatement 7 related to the Fluids Division forecasts.

As to whether TETRA might have acted with scienter as to these statements, in *Southland Securities Corp.,* the Fifth Circuit explained that in determining whether a statement was made by a corporation with scienter "we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." 365 F.3d at 366. Likewise, scienter may not rest on the inference that the defendants must have been aware of the alleged fraud because of their position in the company. *Abrams v. Baker Hughes, Inc.,* 292 F.3d at 432. Although courts have found scenarios in which it is possible to infer corporate scienter because of the position of the defendant, that is not the case here. Demand for CBFs onshore is, as Plaintiffs admit, only a part of the Fluids Division revenues and not significant enough to infer that the speaking Defendants would have known about the alleged manipulations of the revenue forecasts such that their statements were made recklessly or with intent to deceive. *See, e.g, Tellabs II,* 153 F.3d at 710 (describing a hypothetical wherein General Motors claimed that it had sold millions of SUVs when it actually sold none); *Nathenson v. Zonagen, Inc.,* 267 F.3d at 424–25.

Turning to the allegations of scienter from the CWs: CW 6 conceded that he did not know where the 2007 forecast numbers came from but that he believed they were inaccurate from the beginning. (ACC ¶ 79.) Based on the pled facts, CW 6 had personal knowledge of the proper forecasts for his region (which comprised the bulk of "onshore" sales) and the amount by which his supervisors revised them upwards, but Plaintiffs' provided job description does not indicate that he had personal knowledge of the forecasts for the overall Fluids Division, because sales primarily occurred offshore. (ACC ¶ 75.) CW 6 alleges that he informed several managers that demand was to be flat and they told him to make the numbers "work" within the set budget. The "S & OP 2007 Rev" spreadsheet produced in November 2006

supposedly reflects that his supervisors wanted him to change his forecast upward by $4 million for 2007. He does not allege that any of the individual Defendants had knowledge of these purported forecast manipulations. Claims regarding an allegedly fraudulent scheme must fail if the complaint does not adequately identify a particular corporate officer who improperly recorded revenue or performed the challenged acts. *See, e.g., Barrie v. Intervoice–Brite, Inc.,* 397 F.3d 249, 259 (5th Cir.2005).

**\*33** Plaintiffs also allege that CW 7 provides statements that support a strong inference of scienter: CW 7 avers that he met with Symens every month and provided him and another manager with the projected Fluids demand-that Symens would then "change." (ACC ¶ 86.) Although it is probable that CW 7 had personal knowledge of parts of the forecasting process, these allegations do not support a strong inference of scienter. It is unclear why Symens changed these numbers. CW 7 contends that demand for fluids was "not there," but he does not provide facts sufficient for the Court to infer that Symens was manipulating the numbers to make fraudulent demand projections such that the Court can draw a strong inference of fraud. Here, even if managers at TETRA and the Fluids Division knew that the Fluids forecasts were massaged, it is unclear that this information was conveyed to the speakers who made the alleged misstatements; or that Short, Pernik or Reeves (unspecified employees in the Fluids Division) were involved in drafting or signing the TETRA releases that contain the alleged misstatements such that TETRA may have had scienter of the alleged misstatements.[16]

[16]   In their Response, Plaintiffs aver that CW 6 relayed the information to Fluids' management who reported to Symens. Even if this was the proper chain of command, in the ACC, CW 6 does not specifically allege that the information flowed to Symens.

Evaluating together all sources of scienter as to the misstatements related to the Fluids Division forecasts, including the timing and size of the individual Defendants' stock sales, the purported GAAP violations and SOX certifications, these allegations do not support a strong inference of scienter as to the Fluids forecasts. Misstatements with respect to this challenged pattern of alleged conduct therefore are insufficient to state a securities violation claim. The Court will not, therefore, address Defendants' arguments about Plaintiffs' failure to allege loss causation as to this challenged pattern of alleged conduct.

**E. Insurance Receivables**

Defendants contend that TETRA continually disclosed ongoing negotiations with the insurance companies and that none of the CWs claimed knowledge of a final denial of insurance receivables or even knowledge of the insurance negotiation process. Defendants argue that TETRA never promised its investors that hurricane-related claims would be covered and properly disclosed the negotiation process, including that the insurers questioned whether certain well intervention costs would be covered under the policy. Citing several disclosures, Defendants contend that they continually kept investors informed of developments with the insurance company and eventually sued it in November 2007 over disputed claims. (Doc. No. 45, Ex. 4, at Ex. 99.1, p. 1 (a TETRA press release).) Moreover, Defendants aver that Plaintiffs wrongly emphasize the word "repeated" in the 2007Q2 disclosure about the negotiations to suggest that TETRA had already been denied certain insurance claims. Finally, Defendants take the position that its decision to wait until 2007Q2 to write off the insurance receivables, when it decided to sue its insurer, was a conservative decision, rather than a GAAP violation.

**\*34** Moreover, they aver that the statements about insurance receivables are protected by the safe harbor provisions. For example, as to statements about WA & D Services' profits related to the collection of insurance reimbursements for Maritech, TETRA warned that "a significant factor in the fourth quarter will be the inclusion or elimination of WA & D Services profits related to work performed for Maritech which is contingent on the timing of insurance reimbursements." (Nov. 3.2006 press release, Doc. No. 45, Ex. 8, Ex. 99.1, p. 4.) In addition, TETRA warned its investors that the press-release includes forward-looking statements that are subject to risks and uncertainties. It contends that other cautionary language from the 2005 10–K was allegedly incorporated by reference by the November 3, 2006 press release. The press release specifically incorporates the 2005 10–K language. This 2005 10–K (filed March 16, 2006) explains:

> [W]e could suffer additional losses in the future related to storm repair efforts.... We maintain insurance protection covering substantially all

In re TETRA Technologies, Inc. Securities Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 6325540

of the property damaged incurred; and repair costs incurred up to the amount of deductibles were charged to earnings as they were incurred during 2005. However, the amount of covered costs is subject to certain maximum amounts, depending on the policy. If actual repair costs are significantly greater than our estimates, we may exceed these maximum coverage amounts. In that event, it is possible that a portion of future repair expenditures will have to be funded with our capital resources and result in charges to our earnings. In addition, for repair expenditures that are covered by insurance, the collection of insurance claims may be delayed, resulting in the temporary use of our working capital to fund such repairs.

(Doc. No. 45, Ex. 3, at 13.) Notably, this warning explains that the protection covers "substantially all" of the property damage incurred. The warning, therefore, that "the amount of covered costs is subject to certain maximum amounts," when read in tandem with the statement that substantially all property damage is covered suggests that the company believes actual repair costs will approximate covered costs. Later, however, in a filing made March 1, 2007, TETRA explained:

If a significant amount of well intervention costs incurred are not covered pursuant to our insurance policy, or if we incur total well intervention costs in excess of our estimates, our working capital and results of operations could be adversely affected.... In June 2006, the underwriters questioned whether there is additional coverage provided for the cost of the removal of ... platforms in excess of the policy limit under an endorsement we obtained in August 2005.... While we have yet to incur costs for the removal of the destroyed

platforms, these costs, as well as other costs covered under the endorsement, could equal or possibly exceed the policy maximum limit under the endorsement. If all or a portion of these costs are not reimbursed, or if the total debris removal and other costs exceed the policy maximum, our working capital and results of operations could be adversely affected.

**\*35** (Doc. No. 52, Ex. 1, at 13.) In that filing, TETRA also explained that "[w]hile the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection, it is possible that all or a portion of these costs may not be reimbursed." (*Id.* at 15.) TETRA specifically warned that all or a portion of the costs may not be reimbursed because insurers questioned whether a policy obtained in August 2005 provided additional coverage for the cost of removal. TETRA reiterated its position that it believes that the costs qualify for reimbursement under the endorsement. (*Id.* at 16.)

Nowhere in this cautionary language does the company explain that significant portions of the insurance receivables have already been denied. Taking all inferences in favor of Plaintiffs, this warning does not render the alleged Misstatement 1, as it relates to the insurance receivables' effect on WA & D profits, immaterial. Likewise, the other misstatements related to the payment of insurance receivables are not protected under the PSLRA because Plaintiffs have adequately alleged that Defendants knew that certain insurance payments had already been denied at or before the time that Defendants contended that "substantially all" of the insurance claims would be covered. The Misstatements that relate to the insurance receivables, notably 8, 13, 16–21, 25, 27, 29–31 are not protected by the PSLRA safe harbor.

Plaintiffs provide allegations from several confidential witnesses that, in August or September 2006, Maritech reviewed its insurance contracts and discovered that Lloyd's would only pay for the first $1 million in weather-delay expenses for the damaged wells even though WA & D had already accrued millions of costs attributable to weather delays for the East Cameron 195 project. (*Id.* at ¶¶ 50, 57.) By late 2006 Maritech received unspecified "printouts" that various claims submissions were not allowed. (*Id.* at ¶¶ 49–

52; 57–58.) In addition, Defendants allegedly admitted their failure to appropriate write off their receivables in the 2007Q2 Form 10–Q in which they stated that "during [2007Q2] ... the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (*Id.* at ¶ 40.)

Plaintiffs aver that the statements in the press releases and earnings report are misstatements because Defendants expressed a belief that they would be paid on several insurance claims even though the claims had already been denied. Plaintiffs aver that the insurer had already disallowed insurance claims and, therefore, statements of January 3, 2007, in which Hertel explained that WA & D "profits" from insurance receivables were deferred until they were collected was a material omission because this statement implies that claims submitted for reimbursement were covered. Likewise, TETRA's 2006 Form 10–K explained that substantially all of the hurricane damage would be covered, apart from deductibles and a $5.2 million charge to earnings already made. Similarly, because of these misstatements as to the insurance receivables, Plaintiffs contend that Defendants misstated WA & D profits and earnings in the May 7, 2007 press release.

 **\*36** Defendants contend that Plaintiffs have not alleged that the purported misstatements related to insurance receivables were material. They note that TETRA disclosed its negotiations with the insurer on its hurricane repair claim, that the insurer had been slow to pay, and that it was possible that the insurer would not reimburse all TETRA's costs. If the individual Defendants or another corporate officer knew that the insurance receivables had been denied prior to the release of these statements, that fact would provide a strong inference of scienter.

As to the confidential witnesses, CW 4 reported that, beginning in December 2005, she was told to set up all claims as "receivables" whether or not they had been paid. (ACC ¶ 66.) CW 4 prepared a monthly report of insurance receivables that she delivered to McCarroll and Hertel. (*Id.* at ¶ 68.) She avers that invoices for repair work done by outside companies were personally approved by McCarroll. (*Id.* at ¶ 67.) Defendants contend that CW 4 was not in attendance at the meetings when the participants discussed her spreadsheet, and CW 4 does not contend that the information in the spreadsheets was different than that disclosed to investors. Defendants also aver that Plaintiffs do not provide specific

dates when Defendants purportedly acquired knowledge of the denials. (*Id.* at ¶ 50.)

Based, however, on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know who was attending the meetings and that her report of insurance receivables must have at least been viewed by the participants. Defendants do not specifically argue that CW 4 lacked personal knowledge of the facts she provides but, rather, contend that nothing to which she testifies suggests that she had any knowledge the receivables she booked were not probable of collection from the insurer. As explained above, knowledge of general wrongdoing rather than specific knowledge of particular accounting errors may support an inference of scienter. Her statements as to the insurance payments and Maritech's compliance with accounting regulations may be credited and evaluated as a basis for scienter. Although CW 4 does not specifically allege that McCarroll and Hertel knew that the insurance claims were disallowed, she does provide information that allows the inference that McCarroll and Hertel were intimately involved with the insurance process and provides support for other allegations of scienter provided by other CWs.

CW 1 averred that there were a number of days lost to weather downtime in the spring of 2006 and Maritech "quickly" learned that the insurance company would only cover the first $1 million of weather time even though the witness credibly estimated that the weather downtime at the East Cameron 195 project was $10–12 million. Defendants contend that Plaintiffs do not plead that CW 1 had personal knowledge of the negotiations with the insurers or with the accounting for the insurance claims. Plaintiffs provide details about damages to certain properties, insurance company statements about what work would be paid for, and specific issues at particular fields such as the cost of weather downtime at East Cameron 195, including the dates that they arose sufficient to support a strong inference of scienter. In contrast to the CWs provided in *Cent. Laborers' Pension Fund,* Plaintiffs do provide employment dates for this witness, aver that CW 1 directly reported to Maritech President McCarroll and provide sufficient detail, including property names; dates that suggest that it is probable he has personal knowledge of his testimony and that he is in a position to know first hand the facts he conveys as far as the disallowed "weather downtime." *See* 497 F.3d at 552. CW 1 testifies that he was involved only with accounting at the fringes, but suggestions that challenged patterns of alleged conduct are fraudulent, such as allowing

millions of dollars of weather downtime to accrue when "Maritech quickly learned the insurance company would only cover the first $1 million of weather time incurred" (ACC ¶ 50) may support an inference of scienter, although this inference would need to be strengthened with other evidence because it is unclear who at TETRA knew this and when. CW 1's further allegations that "there were going to be problems" with the coverage of the East Cameron 195 work are more specific. He contends that, in December 2006 or January 2007, the adjusters "balked" at paying any additional claims. [17]

[17]    On the other hand, his allegation that Maritech started to receive computer printouts that claims submissions were "not allowed" is too vague to be credited. 17 The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *See, e.g., Abrams v. Baker Hughes, Inc.,* 292 F.3d at 432; *Tchuruk,* 291 F.3d at 355–56.

 **\*37**  CW 2 is described as an operations manager at Maritech from November 2002 to November 2006, the beginning of the Class Period. (ACC ¶ 54.) McCarroll purportedly told CW 2 that the TETRA invoices to be submitted to the insurance company, should not include references to weather downtime. Defendants contend that Plaintiffs have provided no information to explain why CW 2 would be involved with the Company's negotiations with its insurers. CW 2, however, was involved with platform repair, and he avers that he was told by McCarroll that, with respect to Ship Shoal 269 where he was working, TETRA invoices should not include references to weather downtime. (ACC ¶ 58.) These allegations suggests that CW 2 had knowledge of the reporting for weather downtime because he was working in the field at issue and had heard the instruction directly from McCarroll. Defendants respond that neither CW 2 nor Plaintiffs provide any idea of the percentage of accrued well-intervention costs that constituted by weather downtime. In addition, they note that CW 2 does not allege that McCarroll knew that weather downtime was disallowed or that he knew that the costs already incurred at East Cameron 195 exceeded the weather time allowance. Plaintiffs respond that, based on CW 2's allegations "McCarroll and others at TETRA realized that the insurance policies had been misread and that the costs attributable to 'weather time' were not covered by the insurance claims for millions in costs attributable to weather delays." (ACC ¶ 58.) Plaintiffs Complaint does not

appear to go this far in alleging McCarroll's knowledge of the disallowed weather down time. Instead, CW 2 describes the realization of "the Company" that "weather time" was capped at $1 million and that after August or September 2006, McCarroll told unspecified people to limit weather costs on all projects. (ACC ¶ 58.) Taking all inferences in favor of the Plaintiff, however, it is a plausible inference that McCarroll, by making the instruction that he did, knew that the weather time insurance claims were disallowed sufficient to support a strong inference of scienter. [18]

[18]    Defendants contend that allegations that a defendant "attended meetings" is tantamount to the suggestion that the defendant knew something because he was an executive. *See Ind. Elec.,* 537 F.3d at 535. The Court finds the two suggestions distinguishable. The Court realizes that it is relying, in part on a *Nathenson*-type inference that the head of a Division would have knowledge of disallowed insurance claims that affect millions of dollars of work in his Division. It also acknowledges that the ACC does not explicitly state that McCarroll knew that the insurance claims were disallowed but uses phrases such as "the Company realized" or "the company figured this out." The *Nathenson*-inference, however, combined with McCarroll's instruction to limit weather costs around the same time that the company made the realization that weather time was not allowed enable the Court find that Plaintiffs have pled a strong inference of scienter as to McCarroll for the purportedly disallowed insurance claims.

In addition, Hertel, in the 2007Q3 earnings call, explained that, as to insurance receivables, he was going to "force that issue." He also told analysis that

> a lot of the issues that you've seen this year and that could hurt us on a go-forward basis would be involved with the insurance situation and there we do have some control over that from the perspective of when we address or bright line some of these issues and we are going to bright line them this quarter and bring them to a head.

(ACC ¶ 156.) Plaintiffs contend that Hertel's choice to reveal his decision to bright line the insurance issue was particularly suspicious in the insurance context because he had already sold his stock. Moreover, Plaintiffs aver that, in the 2007 Form 10–Q, signed by Hertel, Hertel explained that "the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (ACC ¶ 40.) Plaintiffs contend that this is Hertel's admission that the underwriters had already disallowed claims. Defendants respond that "repeated" refers to a prior disclosure that the investors had questioned whether certain well costs would be covered under the policy. Although the Court admits some skepticism, it does seem at least as plausible as any innocent inferences that may be drawn that Hertel managed the insurance situation and knew that claims were already denied prior to the time at which TETRA expensed its unreimbursable costs. The scienter analysis does not require the Court to determine the most plausible of competing inferences. *See, e.g., Tellabs I,* 127 S.Ct. at 2510.

**\*38** Although it is a close call, Plaintiffs have pled facts that give rise to a strong inference of scienter with respect to McCarroll and Hertel's treatment of the purportedly disallowed insurance receivables. CW 2 places McCarroll at meetings with Lloyd's, the insurance adjusters; CW 4 describes weekly meetings involving McCarroll and Hertel to discuss insurance receivables and explains that she prepared reports for these meetings. Based on these allegations, and the inferences the Court may draw from the post-class statements, the Court finds that Plaintiffs have pled sufficient facts so as to make it plausible that McCarroll and Hertel would have been aware that weather downtime already exceeded that allowed for East Cameron 195 and that weather downtime was managed at Ship Shoal 269. Plaintiffs' explanation of disallowance of the insurance receivables is just as compelling as Defendants' argument that TETRA and Maritech were taking a conservative approach pursuant to GAAP. Plaintiffs have pled facts sufficient to satisfy the standard enunciated in *Tellabs I.*

As explained above, the Court finds Plaintiffs' allegations sufficient to plead loss causation, or a connection between the pled fraud and Plaintiffs' injury as the truth leaks out. Defendants do not contest that Plaintiffs have suffered economic harm.

### F. Exchange Act 20(a)

Controlling person liability is derivative; it is predicated on the existence of an independent securities violation. *Rubinstein v. Collins,* 20 F.3d 160, 166 n. 15 (5th Cir.1994). Consequently, Plaintiffs 20(a) claims remain only as to the claims based on misstatements related to the insurance receivables.

### G. Leave to Amend

"We will generally not construe unelaborated, nested requests for amendment as motions to amend." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.,* 497 F.3d at 556. If the party requests leave in response to a motion to dismiss, without indication of the grounds on which the amendment is sought, is not a motion pursuant to FED.R.CIV.P. 15(a). 497 F.3d at 556 (affirming an implicit denial of leave to amend because amending would have been futile). In *Cent. Laborers Pension Fund,* the Court construed a request for leave as a proper motion because the plaintiffs explained that they would fix infirmities with the pleadings using two deposition transcripts such that the plaintiffs request was not "devoid of any indication of the grounds for amendment." *Id.*

Here, in a footnote to their Response to Defendants' Motion to Dismiss, Plaintiffs ask for leave to amend to remedy any perceived deficiencies as well as incorporate subsequently uncovered facts. [19] In light of the Fifth Circuit's statements, and without further elaboration of the reasons for amendment, this Court is hesitant to consider this footnote a proper Motion pursuant to FED.R.CIV.P. 15(a). The Court has not dismissed the action in its entirety, and therefore, should Plaintiffs so desire, upon proper Motion, the Court will consider whether leave to amend is warranted in this case.

[19] During the Motion hearing on Defendants' Motion to Dismiss, Plaintiffs submitted several attachments from recent state court pleadings involving TETRA and its insurer. At the time of the hearing, Defendants did not object to the Court taking judicial notice of the documents but later objected, generally, to Plaintiffs purported attempt to rely on new facts outside those alleged in the Complaint to oppose Defendants' Motion. As the Court did not base any of its holdings on these submitted documents, these objections are **DENIED AS MOOT.**

### V. MOTION FOR SANCTIONS

2009 WL 6325540

**\*39** Defendants filed a Rule 11 Motion, contending that several of the allegations in the ACC have no evidentiary support or factual basis because Plaintiffs misquoted or misconstrued statements made by confidential witnesses. Defendants provide sworn affidavits from some of the confidential witnesses in which the witnesses aver that some of the information attributed to them in the ACC is not based on their personal knowledge. Plaintiffs respond that they investigated the allegations behind the ACC and based the CW allegations on the reports of their investigator.

Under Rule 11, the court must identify some federal filing in which the attorney violated the rule that claims must be well-grounded in fact and in law, and that filings not be submitted for an improper purpose. FED.R.CIV.P. 11; _Edwards v. General Motors Corp.,_ 153 F.3d 242, 245 (5th Cir.1998). The court must examine "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." _Cooter & Gell v. Hartmarx Corp.,_ 496 U.S. 384, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). The court considers three issues: (1) factual questions regarding the attorney's pre-filing inquiry and factual basis of the filing (2) legal issues of whether the filing is warranted by existing law or a good faith argument, and (3) discretionary issues regarding an appropriate sanction. _See id._ at 399; _St. Amant v. Bernard,_ 859 F.2d 379, 381–82 (5th Cir.1988). Reasonableness is measured on an objective basis. _See Jenkins v. Methodist Hosps. of Dallas, Inc.,_ 478 F.3d 255, 263 (5th Cir.2007) (holding that, in certain cases, an isolated factual misrepresentation may serve as the basis for sanctions, including when the misquoted statement could have had a serious impact on a court's summary judgment decision).

Defendants contend that CW 2 based his allegation that "work done by TETRA was costing much more than the insurance company would ever pay Maritech on the claims" on an erroneous assumption that TETRA's insurance policy had a $50 million cap. (ACC ¶ 56.) Defendants also claim that CW 2's statements related to the cost of weather downtime at East Cameron 195 were based on rumor. Plaintiffs aver that, based on the state court litigation documents, the proper insurance limit for the insurance policy of which CW 2 speaks, allegedly based on rumor, does have a $50 million limit. Defendants note that TETRA holds many policies, and it is unclear of which policy CW 2 was speaking. Defendants claim that Plaintiffs learned of the $50 million policy after they filed the ACC, but they knew that information was not based on the CW's personal knowledge when they filed the ACC. Defendants reiterate their contention that CW 2's statements

about the insurance limits, and whether the incurred expenses exceeded those limits, were based on rumor.

Moreover, Plaintiffs purportedly supplied CW 1 the $10–12 million estimate of weather downtime at East Cameron that CW 1 confirmed, although he claims he does not know where the number came from. Plaintiffs argue that CW 1's affidavit shows that statement about the $10–12 million downtime in for East Cameron 195 was a response to a leading question about an approximation-a proper investigative technique that does not render the statement inadmissible. In his affidavit, Wes Spinic (CW 1) avers: "I did not estimate that the weather downtime on the East Cameron 195 project alone was approximately $10–12 million. Rather the investigators asked me if the weather downtime was approximately $10–12 million and I indicated that the approximation was plausible even though I do not know who supplied them that estimate." (Doc. No. 61, Ex. 1 ¶ 6.) The Court does not find the inclusion of this allegation in the ACC improper or sanctionable because Plaintiffs adequately created a foundation for personal knowledge as to that allegation, and Defendants' affidavit does not specifically defeat that foundation.

**\*40** In addition, Defendants claim that CW 1 never made allegations that Maritech received computer printouts from adjusters that certain claims were disallowed. CW 1 now avers that he did not tell investigators that Maritech received printouts in 2007 indicating that claims submissions were not allowed, whereas, in the ACC, CW 1 alleged that Maritech received the printouts in December 2006. (ACC ¶ 52.) Defendants respond that CW 1 clarified that the printouts occurred in 2007 rather than 2006, an allegation that Plaintiffs aver is contrary to the statements CW 1 provided Plaintiffs' investigators and the timeline as revealed in state court pleadings. Defendants respond that, because TETRA did not sue Lloyd's until November 2007, it is plausible that the printouts he described were received in late 2007. CW 1's explanation that he had no personal knowledge of the ACC paragraph containing the allegations about printouts is troubling. Based, however, on these discrepancies and conflicting statements, the Court does not find sanctionable behavior or that Plaintiffs failed to reasonably investigate the statements included in the Complaint. The Court notes that it did not rely on statements about the printouts in its Motion to Dismiss.

Lastly, Defendants aver that CW 6's statements that the Fluids Division's buyback program was "borderline illegal" was

**In re TETRA Technologies, Inc. Securities Litigation, Not Reported in F.Supp.2d (2009)**
Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 145 of 281
2009 WL 6325540

made in the context of how it was marketed to customers, not in the manner for which it was accounted. In the ACC, the allegations attributed to CW 6 include:

> His understanding of the program, and how it was marketed to customers, was that TETRA would contract with customers to buy-back the fluids after they were used. The customers were told that they would receive a 50% "credit" for the returned fluids.

> According to the witness, the actual computation of the buyback credits was a "big secret" and it was closely held by Hank Reeves and Paul Coombs. Reeves once told the witness (in "early" 2007), that the way TETRA did the buyback credit was "borderline illegal."

(ACC ¶¶ 81–82.)

The phrase "the way TETRA did the buyback credit" does not seem to particularly refer to either accounting or marketing, and, as Plaintiffs note, falsely described measurements of a business's accounts, in marketing or in financial reporting, may support a securities violation. Defendants respond that there are no allegations in the ACC that the buyback credit was improperly explained to customers or that these statements impacted the financial statements. The Court finds that the provided affidavit, claiming that the previous statements about the borderline illegality of the buyback credit related to the marketing rather than the accounting of the buyback credit, while perhaps inartfully drafted, does not require the Court to strike these statements from the ACC or other take other measures. Moreover, the Court did not rely on this statement in the Motion to Dismiss.

## VI. CONCLUSION

**\*41** Defendants' Motion to Dismiss (Doc. No. 44) is hereby **GRANTED AS TO ALL PLAINTIFFS' CLAIMS EXCEPT THOSE RELATED TO INSURANCE RECEIVABLES.** Defendants' Motion for Sanctions (Doc. No. 61) is hereby **DENIED.**

## IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 6325540

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 10

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 147 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

2015 WL 1143081
United States District Court,
S.D. Texas,
Houston Division.

LOCAL 210 UNITY PENSION AND WELFARE
FUNDS, Individually and on Behalf of all
Others Similarly Situated, et al, Plaintiffs,
v.
McDERMOTT INTERNATIONAL
INC., et al, Defendant.

Civil Action No. 4:13–CV–2393.
|
Signed March 13, 2015.

**Attorneys and Law Firms**

Damon Joseph Chargois, Mashayekh & Chargois, P.C., Andrew M. Edison, Edison, McDowell & Hetherington, LLP, Thomas Robert Ajamie, Ajamie LLP, Houston, TX, Michael W. Stocker, Labaton Sucharow LLP, New York, NY, Danielle S. Myers, Jonah H. Goldstein, Ashley M. Robinson, Robbins Geller Rudman & Dowd, LLP, Blair A. Nicholas, David R. Kaplan, Timothy A. Delange, Bernstein Litowitz Berger & Grossman LLP, San Diego, CA, for Plaintiffs.

David D. Sterling, Baker Botts LLP, Mark Alan Junell, The Junell Law Firm PC, Houston, TX, Nicholas I. Porritt, Levi Korsinsky LLP, Washington, DC, for Defendants.

*MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

**I. INTRODUCTION**

 **\*1**  In this consolidated securities fraud class action, PAMCAH–UA Local 675 Pension Fund (the "plaintiff") brings suit against McDermott International, Inc. ("McDermott" or the "Company"), Stephen M. Johnson ("Johnson"), former President and CEO of the Company, and Perry L. Elders ("Elders"), its Senior Vice President and CFO (collectively, the "defendants") for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Pursuant to FED. R. CIV. P. 12(b)(6), the defendants move

to dismiss the Consolidated Class Action Complaint (the "Complaint," ECF No. 54) for failure to plead fraud with the heightened specificity required by Rule 9(b) of the federal procedure rules, and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4 *et seq.* (ECF No. 55).[1] The plaintiff filed an opposing response (ECF No. 57), in which it alternatively requests leave to amend the Complaint if dismissal is granted, and the defendants timely replied (ECF No. 58). Having reviewed the pleadings, motion and responsive documents, the Court determines that the defendants' motion should be GRANTED and the plaintiff's request for leave to amend be DENIED.

[1] The Court treats the plaintiff's Complaint as an amended one. Original class action complaints were filed in this district by Jerad Flood, under Cause No. 4:13–CV–02442, on August 20, 2013, and by Local 210 Unity Pension and Welfare Funds, under the captioned case number, on August 15, 2013. *See* Order Granting Stipulation on Amended Complaint and Motion to Dismiss Briefing Schedule, Dec. 17, 2013, ECF No. 44; Order Consolidating Action, Approving PAMCAH–UA Local 675 Pension Fund As Lead Plaintiff and Approving Selection of Counsel, Dec. 5, 2013, ECF No. 36.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

  **A. McDermott's Business**
The following facts are taken from the Complaint and public disclosure documents on file with the SEC.[2] McDermott, headquartered in Houston, Texas, is a global engineering, procurement, construction and installation ("EPCI") company focused on designing and executing complex offshore oil and gas projects. As an EPCI services provider, the Company delivers fixed and floating production facilities, pipeline installations and subsea systems from concept to commissioning. McDermott conducts much of its business through fixed-price contracts—i.e., contracts executed for a pre-determined amount based on project cost and profit assessments—that are awarded through a competitive bid process. All bids over $40 million are reviewed by executive management, including Johnson and Elders (the "individual defendants"). Executive officers additionally review developments on these projects on a monthly basis.

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 148 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

[2] The Court takes judicial notice of the Company's 2012 annual report (Form 10–K) attached to the pending motion, cited in the Complaint, and on file with the SEC. *See Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." (citing cases) (internal quotation marks omitted)); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 & n. 1 (5th Cir.1996) (adopting rule of *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991), that in securities fraud action, judicial notice may be taken of contents of public disclosure documents required to be filed with SEC).

Because fixed-price contracts typically take years to complete, the Company often requires customers to make progress payments. McDermott employs a percentage-of-completion accounting method for determining contract revenue, which requires it to periodically review contract price and cost estimates and make profit adjustments to reflect work progress. Ultimately, successful and profitable completion of a project depends on several factors, including project bidding discipline, execution and oversight.

According to public disclosure documents, projects executed under McDermott's fixed-price contracts entail inherent risks that expose it to profitability losses. In fact, "[f]ixed-price contracts entail more risk to [the Company] because they require [it] to predetermine both the quantities of work to be performed and the costs associated with executing the work." Actual costs related to a project could exceed original projections notwithstanding measures taken in the first instance to account for "anticipated changes in labor, material and service costs." Specifically, "cost and gross profit ... could vary materially from the estimated amounts because of supplier, contractor and subcontractor performance, [the Company's] own performance, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and increases in the cost of raw materials ... over the term of the contract." Accordingly,

> *2 current estimates of [McDermott's] contract costs and the profitability of [its] long-term

projects, although reasonably reliable when made, could change as a result of the uncertainties associated with these types of contracts, and if adjustments to overall contract costs are significant, the reductions or reversals of previously recorded revenues and profits could be material in future periods.

Moreover, if developed into actual events, project risks could affect the business, financial condition, results of operations or cash flows of the Company in a manner that causes the trading price of company common stock to decline. These risks are matters of public record.

**B. Alleged Misrepresentations**

The Complaint alleges that between November 6, 2012 and August 6, 2013, inclusive (the "Class Period"), the plaintiff purchased shares of McDermott common stock and that the stock value plummeted because the defendants concealed "pervasive" and "ongoing" failures related to the Company's project bidding, execution and oversight. These failures, the Complaint asserts, caused McDermott to experience significant losses. Stock prices dropped 13% in May of 2013 and another 21% in August of 2013 allegedly in response to the disclosure of these negative events. [3] It is claimed that investors suffered losses in the hundreds of millions of dollars as a result.

[3] In early November, 2012, McDermott's common stock was priced just below $10 per share. The price peaked at more than $13 per share on February 8, 2013. Between February 28, 2013, when the Company announced its 4Q2012 earnings, and March 1, 2013, the stock price dropped from $12.72 to $10.70 per share, an alleged 16% decline. Between May 8, 2013, when the Company released its 1Q2013 earnings, and May 9, 2013, the price dropped from $11.03 to $9.59, an alleged 13% decline. Finally, following the announcement of 2Q2013 results on August 5, 2013, the stock price dropped from $8.73 to $6.93 overnight, representing an alleged 21% decline.

The Complaint blames the defendants for causing these losses by engaging in a course of fraudulent conduct that

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

deceived the plaintiff and other class-member investors in the process. Allegedly, the defendants artificially inflated McDermott's stock price by making overly optimistic, false and/or misleading statements and concealing truths about McDermott's business, financial status and outlook. The information concerned material losses on several problematic projects and challenges related to project bidding and execution.

The individual defendants are quoted at length as proof that the two actively participated in the fraud. Their statements are contained in paragraphs 32–96 of the Complaint and summarized in the defendants' motion to dismiss. Representative statements are reprinted here for convenience and reference:

- *"The positive results of our 2012 third quarter keep us on track for solid 2012 financial performance"* (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K)). [4]

[4]     Unless otherwise noted, emphasized allegations were emphasized in the Complaint.

- The Company is on pace for "solid" performance (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K), and Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - It is "my [Johnson's] belief that it is highly likely that we will return the Atlantic region to profitability into 2013" and that the region *"is likely to be one of the highest growth markets for the Company"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - The Atlantic Region's *"competitive situation remains stable in our view"* and *"nothing is changing in a material way up or down"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

  - *3  • "We feel very good about our strength in the Middle East. We hold what we consider the strongest competitive position because of not only our Jebel Ali facility, but also because of the type of marine fleet we have"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- *"[W]e have done a number of other things in the Atlantic region to turn it around"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- *"I'm [Johnson] quite bullish on the Atlantic region these days." "I'm sticking with my view about 2013 for the Atlantic region until I have a reason to adjust. And I don't have good reason to do that"* (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- There is *"no particular project or discrete item that needs to be highlighted"* and *"no major project issues to discuss"* (quoting Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- Johnson "remain[ed] positive" that the Atlantic segment would be profitable in 2013 (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings) (brackets in Complaint).

- *"I [Elders] think we're going to have a good year in 2013 in the Middle East"* (quoting Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- *"We're feeling pretty good that we fully estimated the cost to complete"* the Malaysia project (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- *"McDermott is well positioned to meet the growing customer demand in each of our market segments"* (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The problems faced in the Atlantic and Asia Pacific segments are *"isolated situations, and are not representative of our business as a whole"* (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The 1Q2013 results reflect *"isolated challenges"*; *"we are absolutely focused on the resolution of those issues"* (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 150 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

• The loss in the Middle East is a *"one-time situation"* and **"there's nothing that we can see, or the project team can see, that would indicate any further problems with that program"** (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

• The Company is dedicated to *"implementing a compre hens ive project execution operating model that emphasizes our key project management disciplines"* "Key elements of the model include project planning, including risk identification and mitigation planning, interface management, as well as the incorporation of clearly defined accountability across the organization." The model will enable the Company "to improve our execution on even the most challenging projects" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

**\*4** Johnson is responsible for "bringing in project execution personnel from outside McDermott to assure best practices from industry are brought to bear on our projects" (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings).

• **"I [Johnson] would say we are equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control. And that has been rolled out through the past 12 months throughout the entire organization"** (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings). [5]

[5] Without identifying specific speaker(s), paragraphs 65 and 88 of the Complaint quote the defendants as making a number of additional statements about general bidding discipline and revenue recognition.

The Complaint further alleges that the individual defendants are liable for suffered damages "[b]y virtue of their high level positions" and direct involvement in the day-to-day operations of the Company. These positions, the Complaint asserts, made Johnson and Elders "privy ... to confidential propriety information concerning the Company and its business" and, therefore, responsible for the dissemination of any false and/or misleading statement or omission.

**C. Alleged "Partial Disclosures" by McDermott**

The Complaint also alleges that the defendants made the following quarterly disclosures, characterized by the plaintiff as "partial disclosures," during the Class Period:

• "The fourth quarter 2012 results were negatively affected by an aggregate of approximately **$32 million of project losses and increased costs on certain projects, including approximately $23 million in the Asia Pacific segment** as a result of incremental costs associated with anticipated productivity and project delays on one subsea project, which is expected to complete in late 2013. **The Atlantic segment also was impacted by increased cost estimates relating to two fabrication projects totaling approximately $9 million,** due to lower than expected productivity, which are expected to complete in mid–2013" (quoting Feb. 28, 2013 (4Q2012) Press Release (Form 8–K)).

• "The Company's operating income in the first quarter 2013 was $53.0 million, a decrease of $27.2 million compared to $80.2 million in the first quarter 2012. The first quarter 2013 results were affected by operating losses in the Middle East and Atlantic segments, partially offset by stronger operating income in our Asia Pacific segment. In the first quarter 2013, operating losses in the Middle East segment totaled approximately $18.5 million compared to operating income of $34.7 million for the corresponding prior year period, a decline primarily attributable to execution plan changes on a project at an advanced stage of completion, which resulted in cost increases associated with hook-up activities and the use of third-party vessels. In addition, the decline in operating income was due to lower asset utilization and project activity compared to the prior year. The operating loss for the Atlantic segment changed by approximately $4.4 million to a loss of approximately $16.4 million due to increased support costs associated with lower marine asset utilization" (quoting May 8, 2013 (1Q2013) Press Release (Form 8–K)).

**\*5** • On August 5, 2013, McDermott filed a Form 8–K with the SEC, in which McDermott announced its financial results for the second quarter ended June 30, 2013. McDermott announced a substantial decrease in the Company's year-over-year financial results driven primarily by $100 million in increased loss estimates on problematic projects. In its Asia Pacific segment, the Company incurred a $62 million charge "due to delays on a deepwater pipelay project in Malaysia" caused

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

by late deliveries and McDermott's inability to timely reconfigure the vessel required to execute the project. This $62 million charge was in addition to the $23 million the Company previously recognized in 4Q2012– costs, which, on March 1, 2013, defendant Johnson assured investors the Company was confident had been "fully estimated." Defendant Johnson conceded on August 6, 2013 that the Malaysia failure was a "significant bid miss" (citing Aug. 6, 2013 (2Q2013) Press Release (Form 8–K)).

The defendants have not yet answered the Complaint. Instead, they move to dismiss it for failing to plead fraud with specificity.

## III. PARTIES' CONTENTIONS

According to the defendants, several reasons justify dismissal: the misrepresentations alleged in the Complaint are non-actionable expressions of corporate optimism about McDermott's financial performance, projects, bidding discipline and future prospects; the Complaint alleges "fraud by hindsight" and fails to explain how any of the challenged statements were false when made; the Complaint neither pleads scienter nor contains particularized allegations giving rise to a strong inference of scienter, as required by Rule 9(b) and the PSLRA; and the Complaint's derivative claims under § 20(a) of the Exchange Act fail because primary claims under § 10(b) do not meet the established pleading requirements for fraud.

Dismissal is improper, the plaintiff contends, because the Complaint pleads specific facts demonstrating that the defendants engaged in a pattern of fraud during the Class Period. In its view, the Complaint sufficiently alleges that the defendants' quarterly statements on November 5–6, 2012, February 28–March 1, 2013, and May 8–9, 2013 were false when made; the temporal proximity between the defendants' misleading statements and the disclosures of the truth demonstrate falsity; and the defendants made actionable misrepresentations related to the Company's core EPCI projects. The plaintiff also contends that the Complaint alleges facts that command a strong inference that the defendants knew or were reckless in not knowing about the ongoing problems facing McDermott's operations. In support of this argument, the plaintiff cites to the defendants' quarterly disclosure statements and points to its assertion that the individual defendants took part in monthly review meetings where these problems were likely discussed.

## IV. STANDARD OF REVIEW

A motion to dismiss for failure to plead with the heightened specificity required by Rule 9(b), as "reinforce[d]" by the PSLRA, is properly raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 186 n. 8 (5th Cir.2009); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir.2004); *Lovelace,* 78 F.3d at 1017. The Court accepts as true all well-pleaded facts and construes them in the light most favorable to the plaintiff. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002). The Court does not, however, "strain to find inferences favorable to the plaintiff," nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions ." *See Southland,* 365 F.3d at 361 (internal quotation marks omitted); *Westfall v. Miller,* 77 F.3d 868, 870 (5th Cir.1996). Dismissal is proper when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Collins,* 224 F.3d at 498 (internal quotation marks omitted).

**\*6** Rule 9(b) and the PSLRA require that the circumstances supporting a claim for securities fraud be pleaded "with particularity." FED. R. CIV. P. 9(b); 15 U.S.C. § 78u–4(b); *see Southland,* 365 F.3d at 361–62. Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). The PSLRA correspondingly provides, in relevant part, that a securities fraud complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 152 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

15 U.S.C. § 78u–4(b)(1). In addition, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Read together, Rule 9(b) and the PSLRA direct the pleader to:

(1) specify ... each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002). By Fifth Circuit nomenclature, these elements establish the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* A district court must dismiss a § 10(b)/SEC Rule 10b–5 complaint that does not meet these requirements. 15 U.S.C. § 78u–4(b)(3)(A).

**IV. ANALYSIS AND DISCUSSION**

"Private federal securities fraud actions are based on federal securities statutes and their implementing regulations." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 238–39 (5th Cir.2009) (citing *Dura Pharmas., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). The Complaint purports to state a claim under § 10(b)/SEC Rule 10b–5 as to all defendants, and a derivative claim under § 20(a) as to the individual defendants. Under § 10(b), it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Correspondingly, SEC Rule 10b–5 prohibits any person from using any means or instrumentality of interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

**\*7** (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Based on these provisions, "[s]ection 20(a) ... imposes joint and several liability upon persons who 'control' defendants that violate the Exchange Act. 15 U.S.C. § 78t(a)." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 862 (5th Cir.2003).

**A. Section 10(b)/SEC Rule 10b–5 Claim**

To state a claim under § 10(b)/SEC Rule 10b–5, a plaintiff must plead: a(1) misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, i.e. "a mental state embracing intent to deceive, manipulate, or defraud," and upon which (5) the plaintiff justifiably relied, (6) proximately causing injury to it. *E.g., id.* at 865–66 (internal quotation marks omitted). The pending motion argues that the Complaint fails to adequately plead materiality and scienter.[6] The Court agrees.

[6]  The Court addresses the parties' dispute over falsity in its analysis of scienter.

*1. Insufficient Allegations of Materiality*

The defendants argue that the statements attributed to them are immaterial because they constitute puffery. "[A] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *E.g., ABC Arbitrage,* 291 F.3d at 359 (internal quotation marks omitted); *accord Rosenzweig,* 332 F.3d at 865 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). As the defendants point out, all of the statements casted as "misrepresentations" fall into one of four categories: (1) optimistic and vague statements regarding McDermott's future financial performance and profitability; (2) generalized statements about McDermott's positioning in various segments (regions) of operation; (3) indefinite descriptions of the challenges facing the Company and the

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 153 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

Company's response to those challenges; and (4) generalized descriptions of McDermott's bidding discipline and project planning. None of these statements are "concrete factual or material misrepresentations" of the type that can be the basis for a § 10(b)/SEC Rule 10b–5 claim. *See Southland,* 365 F.3d at 372 (internal quotation marks omitted).

In this Circuit, expressions of corporate confidence, including "generalized, positive statements about [a] company's competitive strengths, experienced management, and future prospects," are immaterial and, thus, not actionable under the federal securities laws. *Rosenzweig,* 332 F.3d at 869.[7] The vast majority of alleged statements express nothing more than corporate optimism. These statements include announcements that the Company's positive 3Q2012 results would "keep [it] on track for solid 2012 financial performance" for the remainder of the year; the defendants "remain[ed] positive" and "belie [ved] that it [was] highly likely" that they could make profitable (in 2013) their operations in the Atlantic region, where they maintained a "stable," "competitive situation"; they "fe[lt] good about [their] strength in the Middle East"; Johnson remained "quite bullish" concerning McDermott's Atlantic presence; the Company was "well positioned to meet the growing customer demand in each of [its] market segments"; and the Company was "equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control." The Complaint itself defeats its own pleading objective by characterizing the defendants' statements as statements of "positivity," albeit false from the plaintiff's perspective.

[7]    The Court notes, without deciding, that under the PSLRA's "safe harbor" provision, a defendant is not liable for any "forward-looking" statement, as that term is defined by statute. 15 U.S.C. § 78u–5(c). Generally, a forward-looking statement is one that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A). It also includes a statement "made with actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(l)(B). The parties have neither raised nor briefed this issue, however.

**\*8** The Court is hard pressed to conclude that any of the above statements expresses or creates assurances about

McDermott's future profitability that would lead a rational investor to rely on them. *See ABC Arbitrage,* 291 F.3d at 359 (" '[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities law' as a matter of law."). They constitute non-actionable puffery by all reasonable inferences. The defendants did not, as the plaintiff argues, "speak in concrete terms with respect to actions they were currently taking, and had already taken," nor did they "assure" investors that the Company had remedied challenges in each of its segments. If realized, any number of risks detailed in McDermott's 2012 annual report could have compromised goals that appeared attainable when announced, or derailed Company plans altogether. The potential profitability losses associated with these risks are spelled out in this report. As extensively as the defendants are quoted in the Complaint, no allegation meaningfully reconciles the defendants' oral representations with these risk disclosures. To the extent that the plaintiff acknowledges the risks involved in McDermott's contracts, it glosses over their potential impact by clinging to the Company's touted "three-tiered approach to reviewing projects (local, global and executive level review) in order to mitigate risk."

Similarly, the allegations make no attempt to square the defendants' statements with the multi-million dollar losses acknowledged in the Complaint and announced on February 28, 2013 (4Q2012 results) and May 8–9, 2013 (1Q2013 results). Yet, this is precisely the kind of analysis a rational investor would likely have conducted before making projections about McDermott stock. Remarks made by analysts in August, 2013 make the point all too clearly. The Complaint states that at the same time analysts expressed surprise that McDermott was failing, they complained that the disappointing results from the previous quarter dealt "yet *another* blow to management credibility" and that McDermott had had issues in the past (emphasis added). They also inquired "why ... the *rest* of the business" was falling apart at that particular juncture (emphasis added). These statements suggest that analysts had been alerted to and were in fact monitoring McDermott's progress *and* setbacks, and not simply relying on the Company's optimistic representations without considering known red flags. "It is difficult to form a 'strong inference' of scienter" from such telling factual concessions. *Rosenzweig,* 332 F.3d at 868.

In any event, to the extent that McDermott faced challenges, the defendants were "under no duty to cast [the Company's] business in a pejorative, rather than a positive, light." *Id.* at

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 154 of 281
Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

869; *Abrams,* 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.")). Accordingly, the defendants could have, for example, asserted that there were "no major project issues to discuss" and that problems faced in certain segments were "isolated situations" that were "not representative of our business as a whole," without running afoul of § 10(b)/SEC Rule 10b–5.

### 2. Insufficient Allegations to Raise Inference of Scienter

**\*9** The parties dispute whether the Complaint pleads scienter, or an inference of scienter, with the requisite specificity. Scienter has been adequately pleaded if, taken together, the allegations directly or circumstantially show that a defendant has intentionally deceived, manipulated or defrauded the public, or acted with severe recklessness in doing so. *E.g., Rosenzweig,* 332 F.3d at 866. In defining severe recklessness, the Fifth Circuit has stated:

> Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter.

*Abrams,* 292 F.3d at 430 (citing *Nat hens on v. Zonagen, Inc.,* 267 F.3d 400, 408, 410–12 (5th Cir.2001)). Guided by Supreme Court and Fifth Circuit precedent, the Court takes the following three-step approach to determine whether a " 'cogent and compelling,' [and] not merely 'reasonable' or 'permissible,' " inference of scienter exists: it assumes that the allegations to be true; to the extent applicable, it "consider[s] documents incorporated in the complaint by reference and matters subject to judicial notice"; and it "take[s] into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.,* 537 F.3d 527, 533 (5th Cir.2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

The false and/or misleading statements alleged in the Complaint relate to the defendants' November, 2012,

February/March, 2013, and May, 2013 statements. The plaintiff bears the burden of pleading the reason or reasons why these statements are false or misleading. FED. R. CIV. P. 9(b); *Southland,* 365 F.3d at 361–62. To meet this burden, the plaintiff essentially argues that the scienter pleaded in the Complaint is one of recklessness. It relies on a string of "plausabilities" and "implausabilities" about what the individual defendants knew or should have known based on their executive positions and day-to-day involvement in McDermott's business. These positions, it is alleged, afforded them at least monthly opportunities to participate in bid and project review meetings where problematic EPCI projects were likely discussed.

These contentions do not comport with the Fifth Circuit jurisprudence, however, and the plaintiff cites no binding case to support its faulty reasoning. The Fifth Circuit has held that "[a] pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions with the company." *E.g., Abrams,* 292 F.3d at 432. Moreover, falsity or scienter is not pleaded with particularity, as the plaintiff suggests, by simply alleging that a corporate officer attended a meeting. *See In re BP p.l.c. Sec. Ltg.,* 922 F.Supp.2d 600, 632 & n. 31 (S.D.Tex.2013); *cf. Ind. Elec.,* 537 F.3d at 540 (reversing denial of motion to dismiss due to lack of scienter and rejecting allegation that defendants knew or should have known that their statements were false by virtue of monthly reports discussed at meetings). Here, the allegation has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts. A corporate officer's defendant's "hands-on" management style or intimate involvement with a matter is likewise not sufficient to infer scienter. *See Ind. Elec.,* 537 F.3d at 535 ("Bernhard's [CEO] management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter."); *Goldstein v. MCI WorldCom,* 340 F.3d 238, 251 (5th Cir.2003) ("[P]laintiffs' general allegation that Ebbers was a 'hands-on' CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity."); *Abrams,* 292 F.3d at 431–32.

**\*10** Equally unavailing is the attempt to manufacture falsity by linking generalized, optimistic statements with disappointing earnings results announced weeks or months later. Absent substantiation, these later results do not establish that the earlier statements were false when made. For example

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 155 of 281
Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...
2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

on August 6, 2013, when the defendants announced that the Company's Malaysia project was a "significant bid miss" requiring additional funding, this disclosure did not contradict their prior assertion on February 28/March 1, 2013 that they were "feeling pretty good that [they] fully estimated the cost to complete the project." On August 5, 2013, when the defendants made known that 2Q2013 losses in the Middle East segment were the result of "poor project management, especially around changed conditions," lack of oversight in project execution and "weaknesses" in operating performance, these so-called admissions did not convert into a falsity their previous belief that the Company was "going to have a good year in 2013 in the Middle East." Neither did the announcement discredit the earlier representation that there was nothing that would "indicate any further problems with that program." Similarly, Johnson's August, 2013 announcement regarding operating losses and the restructuring of the Atlantic segment on account of "increased support costs" and lower-than-expected utilization did not negate his November, 2012 statements regarding his "bullish" outlook on the Atlantic segment and the Company's ability to maintain its position as a formidable bidding contender in the region.

Even when construed in the light most favorable to the plaintiff, the Complaint does nothing more than allege that in McDermott's quarterly earnings calls, the defendants should have accurately predicted what the results of the next quarter would be. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." *Abrams,* 292 F.3d at 433 (approving Second Circuit's observation in *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000)). No allegation supports an inference, much less a *strong inference,* that the defendants knew or should have known that there was no basis for concluding that project objectives were achievable. This is a classic case of pleading "fraud by hindsight," and the law makes no allowance for it. *See Rosenzweig,* 332 F.3d at 867–68 (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); *Lormand,* 565 F.3d at 248–49 (defining "fraud by hindsight" as the case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly" or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later"). Business misjudgments are simply not fraud. *Melder v. Morris,* 27 F.3d 1097, 1101 n. 8 (5th Cir.1994).

**\*11** To the extent that any of the defendants' Class Period statements is an admission at all, it is at most an admission of mismanagement. "[N]egligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action." *Abrams,* 292 F.3d at 433; *see Ind. Elec.,* 537 F.3d at 539 ("[T]he allegation of Shaw–Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence."); *In re Anadarko Petrol. Corp. Class Action Litig.,* 957 F.Supp.2d 806, 818 (S.D.Tex.2013) ("Section 10(b) and [SEC] Rule 10b–5 do not protect investors against negligence or corporate mismanagement.").

Finally, virtually all of the challenged statements are cast in terms of personal opinions and beliefs about the future, rather than facts. A claim of securities fraud that rests on such opinion or belief is doomed to fail, however, unless the evidence shows that "the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter ." *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 670 (5th Cir.2004); *see Rosenzweig,* 332 F.3d at 869 (holding that statement by management that "[w]e anticipate funding capital expenditures ... through operating cash flows and long-term debt" was immaterial because it was "qualified" as management's "anticipat[ion]," rather than fact); *see also Nolte v. Capital One Fin. Corp.,* 390 F.3d 311, 315 (4th Cir.2004) ("[T]he Supreme Court held that in a securities fraud case, a statement of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." (citing *Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)). The Complaint makes no particularized showing that the defendants did not believe what they were saying when they said it.

Because the plaintiff fails to sufficiently plead materiality and scienter, its § 10(b)/SEC Rule 10b–5 claim must be dismissed.

**B. Section 20(a) Claim**

The plaintiff's § 20(a) claim is a derivative claim of § 10(b). Based on the failure of the primary claim, it too must be dismissed.

**C. Leave to Amend**

The plaintiff makes a one-sentence request seeking leave to amend the Complaint for the second time. A district court has

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 156 of 281

Local 210 Unity Pension and Welfare Funds v. McDermott..., Not Reported in...

2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

discretion to grant or deny motions to amend pleadings. Fed. R. C iv. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Although Rule 15(a) "evinces a bias in favor of granting" such a motion, *Rosenzweig,* 332 F.3d at 863 (internal quotation marks omitted), deference towards this bias is not warranted here since the Court afforded the plaintiff an opportunity once already to cure pleading deficiencies in the original complaints. *See supra* note 1. The plaintiff has not presented any new information to cure the existing deficiencies. Accordingly, the request for leave to amend is denied and the Complaint is dismissed with prejudice. *See id.* at 864–65 ("The Supreme Court lists five considerations in determining whether to deny leave to amend a complaint: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment....' *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).").

## VI. CONCLUSION

**\*12** Based on the foregoing analysis and discussion, the defendants' motion to dismiss is GRANTED and the Complaint dismissed with prejudice.

It is so **ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1143081, Fed. Sec. L. Rep. P 98,400

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 11

2019 WL 3451153

2019 WL 3451153
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

MICROCAPITAL FUND LP, MicroCapital
Fund Ltd., and MicroCapital LLC, Plaintiffs,
v.
CONN'S INC., Theodore M. Wright, Brian
Taylor, and Michael J. Poppe, Defendants.

No. 4:18-CV-1020
|
Signed 07/24/2019
|
entered 07/26/2019

**Attorneys and Law Firms**

Hillary B. Stakem, Steven W. Pepich, Mark Solomon, Robbins Geller et al, San Diego, CA, Willow E. Radcliffe, Pro Hac Vice, Robbins Geller et al, San Francisco, CA, Jason Anthony Richardson, McDowell Hetherington LLP, Houston, TX, for Plaintiffs.

Jennifer Barrett Poppe, Vinson & Elkins, Austin, TX, Stephen Sullivan Gilstrap, Vinson & Elkins LLP, Dallas, TX, for Defendants.

**REPORT AND RECOMMENDATION**

Dena Hanovice Palermo, United States Magistrate Judge

**\*1** Plaintiffs MicroCapital Fund LP, MicroCapital Fund Ltd., and MicroCapital LLC (collectively "Plaintiffs" or "MicroCapital") filed this action for violations of federal securities laws, common law fraud, and negligent misrepresentation against Defendants Conn's, Inc. ("Conn's" or "Corporation"), Theodore Wright, Brian Taylor, and Michael Poppe (collectively "Defendants"). Pls.' Compl., ECF No. 3. Before the Court is Defendants' motion to dismiss.[1] ECF No. 39. Having considered the record and authorities, the Court recommends that Defendants' motion to dismiss, ECF No. 39, should be granted in part and denied in part.[2]

[1]    Plaintiffs filed an opposition. ECF No. 47. Defendants filed a reply. ECF No. 49. Both parties

also filed supplemental briefs, ECF Nos. 55, 57, pursuant to the Court's order, ECF No. 52. Plaintiffs also filed a motion for leave to file a chart of false and misleading statements in support of their opposition to Defendants' motion to dismiss. ECF No. 42. Although Plaintiff represented that the motion was opposed, Defendants did not file a response and the time to do so expired. The Court granted Plaintiff's motion. Order, ECF No. 63.

[2]    The District Judge referred this case for all pretrial purposes pursuant to 28 U.S.C. § 636. ECF Nos. 50, 61. Pursuant to 28 U.S.C. 636(b)(1)(B), a motion to dismiss is a dispositive motion appropriate for a Report and Recommendation. Plaintiffs' motion is not a dispositive motion and is appropriate for an Order.

**I.**

**BACKGROUND**

**A. The Parties.**

This case shares a common factual background with a settled securities fraud class action (the "Class Action")[3] and a shareholder derivative suit against Conn's,[4] which sells household appliances in retail stores across the country and also has a credit arm of its business, providing in-house credit options, third-party financing programs, and third-party rent-to-own payment plans to its customers. ECF No. 3 at ¶¶ 3, 30, 43. The MicroCapital Plaintiffs were previously class members in the Class Action but opted out of the Class Action settlement and filed the instant lawsuit. *See* Letter, *In re Conn's*, No. 14-CV-548 (S.D. Tex. Sept. 20, 2018), ECF No. 189.

[3]    *Compare* ECF No. 3 *with* Fourth Am. Compl., *In re Conn's, Inc. Sec. Litig.*, No. 14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

[4]    *See* Compl., *Hack v. Wright et al.*, No. 4:14-CV-3442 (S.D. Tex. Dec. 1, 2014), ECF No. 1.

Beginning in February 2014, Conn's made public announcements that its Fourth Quarter Fiscal Year ("FY") 2014 bad debts in its credit segment exceeded its previously issued FY 2014 guidance and it expected earnings per share dilution in the Fourth Quarter in 2014 and in 2015. ECF No. 3 at ¶¶ 181-82. Plaintiffs allege that Defendants engaged in

2019 WL 3451153

wrongdoing between April 3, 2013 and February 20, 2014 (the "Relevant Period"). *Id*. at ¶ 2. Plaintiffs purchased Conn's stock during the Relevant Period. *Id*. at ¶¶ 27-29. Plaintiffs bring this case against Conn's and three Individual Defendants who are former Conn's executives: Wright, Conn's Chief Executive Officer ("CEO"); Taylor, Conn's Chief Financial Officer ("CFO"); and Poppe, Conn's Chief Operating Officer ("COO"). *Id*. at ¶¶ 31, 33, 35. The complaint alleges they each held these positions during the Relevant Period and have since left Conn's. *Id.*

### B. Plaintiffs' Complaint.

 **\*2**  In their 103-page complaint, Plaintiffs allege that Conn's lowered its underwriting standards and offered credit to riskier customers—including those with zero credit scores and very little verification—as a strategy to generate revenue. *Id*. at ¶¶ 4, 42, 46, 49, 53-56, 58, 62, 161. Plaintiffs allege this led to financial problems including increases in delinquencies, of which the Defendants were aware. *Id*. at ¶¶ 66, 84, 132, 134. Plaintiffs allege that Defendants made false and misleading public statements (including press releases, annual and quarterly financial reports, statements during conference calls and conferences, and statements to analysts) that misrepresented the extent of the underwriting policy changes, overstated Conn's financial condition, and falsely attributed the financial problems to reasons other than the lower underwriting standards, thereby violating their fiduciary duties and federal securities laws. *Id*. at ¶¶ 88-130.

Plaintiffs also allege that the false and misleading information presented to the public artificially inflated Conn's stock prices during the Relevant Period. *Id*. at ¶¶ 117, 141, 214, 215. Plaintiffs allege that they paid artificially inflated prices for Conn's securities and suffered damages as a result. *Id*. at ¶¶ 27-29, 89, 243. Plaintiffs bring claims for (1) securities fraud in violation of section 10(b) of the Securities Exchange Act ("SEA") and Securities and Exchange Commission ("SEC") Rule 10b-5, (2) control person liability under section 20(a) of the SEA, (3) insider trading in violation of section 20A of the SEA, (4) Texas common law fraud, (5) Texas common law negligent misrepresentation, (6) Connecticut common law fraud, and (7) Connecticut common law negligent misrepresentation. *Id*. at ¶¶ 230-78.

### C. Defendants' Motion to Dismiss.

Defendants seek to dismiss each of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for the following reasons:

1. Plaintiffs' securities fraud claim because Plaintiffs failed to plead material misstatements or scienter with the particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b);

2. Plaintiffs' 20(a) control person liability claim because Plaintiffs failed to plead a viable underlying securities fraud claim;

3. Plaintiffs' 20A insider trading claim because Plaintiffs failed to plead an underlying securities fraud claim and their purchases were not "contemporaneous" with the Individual Defendants' stock sales; and

4. Plaintiffs' state law claims because they are duplicative.

ECF No. 39 at 7.

## II.

### LEGAL STANDARD UNDER RULE 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The complaint must include more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citations omitted). A complaint must "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the pleaded factual contents allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 160 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

be true 'raise a right to relief above the speculative level.' " *Culliver v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

**\*3** The ultimate question "is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 590 (S.D. Tex. 2012). "[I]n considering a motion to dismiss under Rule 12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true." *Duke Energy Int'l*, 748 F. Supp. at 665. "[C]ourts are required to dismiss, pursuant to [Rule 12(b)(6)], claims based on invalid legal theories, even though they may be otherwise well-pleaded." *Farshchi v. Wells Fargo Bank, N.A.*, No. H-15-1692, 2016 WL 2858903, at \*2 (S.D. Tex. May 13, 2016) (citing *Flynn v. State Farm Fire and Cas. Ins. Co.*, 605 F. Supp. 2d 811, 820 (W.D. Tex. 2009)).

## III.

### SECURITIES FRAUD UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND SECURITIES AND EXCHANGE COMMISSION RULE 10b-5

**A. Legal Standard For Securities Fraud.**

Under section 10(b) of the SEA,

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate....

15 U.S.C. § 78j(b). "SEC Rule 10b-5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *In re BP P.L.C. Sec. Litig.*, No. 4:12-CV-1256, 2013 WL 6383968, at \*17, 2013 U.S. Dist. LEXIS 171459, at \*47 (S.D. Tex. Dec. 5, 2013) (quoting 17 C.F.R. § 240.10b-5(b)) (Ellison, J.).

To state a claim under section 10(b), the plaintiff must allege:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. [5]

*Id*. at \*48 (citing *Lormand*, 565 F.3d at 238-39).

[5]   Defendants only allege that the first two elements are not adequately pleaded. ECF No. 39 at 7.

#### 1. Material misrepresentations and omissions.

"Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b)." *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) (citations omitted) (Ellison, J.). Not only does Rule 9(b) require fraud to be pleaded with particularity, but the PSLRA enhances the requirements of Rule 9(b). To meet the pleading requirements of the PSLRA, a plaintiff must

> (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 161 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Id*. (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

**\*4** "To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material." *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *49. A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Id*. (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "Fraud based on an omission must sufficiently allege a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 457 (S.D. Tex. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)) (internal quotation marks omitted).

### 2. Scienter.

"In the context of federal securities fraud, scienter is defined as an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *In re BP*, 843 F. Supp. 2d at 748 (citation and quotation marks omitted).

Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Id*. at 748-49 (citation omitted). "Section 10(b) and Rule 10b-5 do not protect investors against negligence or corporate mismanagement." *Id*. at 748 (citation omitted).

"[T]he court may not construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *52 (citation and quotation marks omitted). The court must look to the "state of mind of the individual corporate official or officials who make or issue the statement...." *Id*. at *52 (citation and quotation marks omitted).

The Supreme Court "outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA." *In re BP*, 843 F. Supp. 2d at 748 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

First, the allegations must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated into the complaint by reference and matters subject to judicial notice.[6] The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded. ... Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."

*Id*. (citations omitted). "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Carlton*, 184 F. Supp. 3d at 459 (quoting *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499). While the court may look to each individual allegation, the court must still "follow this initial step with a holistic look at all the scienter allegations." *Id*. (citation omitted).

[6]    Both parties attached to their briefing SEC filings, press releases, transcripts of earnings calls and

exhibits from those calls, stock prices, and other documents referred to in the complaint. On a motion to dismiss, courts may consider documents that are referred to in the complaint and central to the plaintiff's claims without converting the motion to a motion for summary judgment. *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)) (Ellison, J.), *aff'd*, 464 F. App'x 334 (5th Cir. 2012); *accord Carlton*, 184 F. Supp. 3d at 451-52 (considering SEC filings, 10-Q and 10-K forms, and earnings call transcripts attached to the motions to dismiss). In securities fraud cases, courts may also take judicial notice of documents that are filed with the SEC. *In re Franklin*, 782 F. Supp. 2d at 385; *see also In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979-80 (N.D. Cal. 2010) (taking judicial notice of transcripts of analyst conference calls and PowerPoint presentations to analysts); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (courts may take judicial notice of stock prices and documents of public record).

**\*5** "[T]he strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) (citation omitted). "It does, however, permit the court to 'engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak.' " *Id.* (citation omitted).

### B. Alleged Misrepresentations And Omissions.
Because the volume of allegedly actionable statements is so large, the Court will not examine each statement individually but will group them as follows for ease of analysis: (1) statements that were upheld in the Class Action, (2) statements that were struck in the Class Action, (3) statements regarding Conn's loosening of underwriting standards, (4) statements regarding the cause of the deterioration of Conn's credit portfolio, (5) statements allegedly protected by the PSLRA's safe harbor, and (6) Conn's financial statements.[7]

[7] The complaint also identifies several statements by analysts. ECF No. 3 at ¶¶ 98, 118, 120, 128, 130. However, Plaintiffs do not appear to allege that these statements are actionable. *See* ECF No. 47-1. Therefore, the Court assumes they were only

included in the complaint for context. The District Judge dismissed the analyst statements from the Class Action. *See* Mot. Hr'g Tr. at 49:6-50:2, 74:2-25, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

### 1. Statements upheld in the Class Action.

Plaintiffs challenge several statements that were upheld as actionable in the Class Action. *See* ECF No. 3 at ¶¶ 91, 92, 94, 104, 106, 107, 108, 112, 113,[8] 115, and 122;[9] Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125 (Ellison, J.); Mot. Hr'g Tr. at 73:1-89:10, 111:14-123:6, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (upholding statements in paragraphs 66, 67, and 96 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 3:25-29:20, 31:12-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (upholding statements in paragraphs 96, 97, 99, 100, and 111 in the Class Action Fourth Amended Complaint). For the same reasons the District Judge found these statements actionable (and supported by scienter) in the Class Action, the Court recommends the same statements be found actionable (and supported by scienter) here. Defendants' motion as to these statements should be denied.[10]

[8] Only part of the statement in paragraph 113 was addressed and upheld in the Class Action ("[T]hey're still the same type of customers we've always gotten. We're still using the same underwriting tools and practices that we used before."). Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 34:17-40:3, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 100, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Part of the statement in paragraph 113 ("The short answer is no. We don't believe that the increase in the percentage of sales that we're financing had anything to do with the issues that we faced in collections ... And so we expect we'll get a similar result. So, no, we don't believe that that's a factor.") was not challenged in the Class Action and should be upheld for reasons addressed *infra* at Section III.B.4. *See* ECF No. 3 at ¶ 113; ECF No. 57-1 at 21.

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

9 Part of the statement in paragraph 122 ("...the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system.") was found actionable in the Class Action and the other part ("We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter.") was struck. Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 111, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

10 Part of the statement challenged in paragraph 90 ("In February we made refinements to our decision process that resulted in declining higher-risk accounts with credit scores above 525 and began underwriting applications with credit scores between 500 and 525.") is nearly identical to part of the statement challenged in paragraph 94, and should be upheld for the same reasons. *Compare* ECF No. 3 at ¶ 90 *with id*. at ¶ 94. Although Defendants argue they did not lower Conn's standard minimum FICO score and scores below 500 were accepted only in new stores temporarily, Plaintiffs alleged that Defendants did not disclose the full extent of how low FICO scores Conn's accepted in new stores. ECF No. 39 at 16; ECF No. 47 at 14; ECF No. 3 at ¶¶ 49, 53, 56, 58. To the extent Defendants argue that documents cited in the complaint disprove Plaintiffs' allegations, the Court cannot decide the ultimate falsity or truth of the statements on a motion to dismiss, only whether Plaintiffs pleaded specific facts that, if proved, could form the basis of a securities fraud claim. *Rubinstein v. Collins*, 20 F.3d 160, 173 (5th Cir. 1994).

**2. Statements struck in the Class Action.**

**\*6** Plaintiffs challenge several statements that were struck in the Class Action. *See* ECF No. 3 at ¶¶ 95, 96, 97, 102, 103, 122,[11] and 124-25; Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statements in paragraphs 68, 69, 82, and 83 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (striking statements in paragraphs 111 and 113 in the Class Action Fourth Amended Complaint).

11 *See supra*, n.9.

In the Class Action, the plaintiffs relied almost exclusively on confidential witness ("CW") allegations and the District Judge found those allegations insufficient to support these statements as actionable and therefore dismissed them. Here, Plaintiffs corroborated the same CW allegations with references to Conn's internal documents. Nevertheless, Plaintiffs' substantive arguments as to why the statements are false are similar as in the Class Action and warrant the same disposition. *Compare* ECF No. 57-1 at 7, 8, 13, 14, 28, 30 *with* Mot. Hr'g Tr. at 89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 *and Mot*. Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118. Just because here there are more sources stating similar facts, that does not automatically transform those same statements that were held to be non-actionable into actionable ones. *See, e.g.*, *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*76, 78-79, 82 (holding that alleged misstatements which were struck in related Class Action remained non-actionable in subsequent suit where nothing in the complaint "compel[led] a different conclusion"). Defendants' motion as to these statements should be granted. [12]

12 In paragraphs 102 and 125, Plaintiffs appear to challenge longer sections of the statements here than in the Class Action. *Compare* ECF No. 3 at ¶¶ 102, 125 *with* Fourth Am. Compl. at ¶¶ 83, 113, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Nevertheless, the rest of the statements seem to go along with the ones the District Judge already struck in the Class Action so should be struck as well.

**3. Plaintiffs challenge statements concerning Conn's credit underwriting standards.**

Plaintiffs challenge the following statements concerning Conn's loosening of credit underwriting standards and its

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 164 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

impact on delinquencies. The Court will discuss them seriatim.

- "And I would just emphasize again that that wasn't in place after February 1; and the information that we provided from February onward, it's not a factor at all." ECF No. 3 at ¶ 93 (Wright, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

The Plaintiffs challenge the statement in paragraph 93 because the lower underwriting standards continued beyond February 1, 2013. ECF No. 57-1 at 4-5. Plaintiffs point to CW-4's allegations that "every customer was approved for credit during the initial four to five months that a new Conn's store was opened...." ECF No. 3 at ¶ 42(m). Plaintiffs allege that the lower underwriting standards began in the Christmas sales season, around November or December 2012, so four to five months later would be between February and May 2013. *Id.* at ¶¶ 42(j), 56, 134(a); ECF No. 47 at 11, 13. The District Judge found another similar statement actionable in the Class Action that Wright made during the same call that lower underwriting standards applied only "for a brief period of time," when in fact plaintiffs alleged these lasted for four to five months after new stores opened, crediting the CW allegations. *See* Mot. Hr'g Tr. at 73:1-80:19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117. This statement should be upheld as actionable for the same reasons.

**\*7** - "For certain credit applicants that may have past credit problems or lack ... credit history, we use ... stricter underwriting criteria. The additional requirements include verification of employment and recent work history, reference checks and minimum down payment levels." *Id.* at ¶ 99 (Conn's, 2013 Form 10-K filed on Apr. 5, 2013).

Plaintiffs allege the statement in paragraph 99 is false and misleading because Conn's did not use stricter underwriting criteria, and instead lowered underwriting standards and verification requirements, including for riskier customers. ECF No. 57-1 at 10. Plaintiffs failed to adequately plead that this statement is false. While underwriting standards may have been lowered across the board for all applicants and more so for new customers in new stores, that does not necessarily mean there were no verification requirements. While Plaintiffs allege there were "virtually" no checks on riskier new customers in new stores and that verification requirements were significantly *reduced*, ECF No. 3 at ¶¶ 42(l), 49, 53-55, 62, 64, 132(e)-(f), (i), the allegations do not quite go so far as to allege there were *no* additional

requirements for such customers in new stores. For example, Plaintiffs' own allegations indicate that Conn's apparently still required at least one reference and a down payment and did not require verification of phone numbers *if* the address was verified by Accurint or the customer's bureau in new stores. *Id.* at ¶¶ 62, 132(e); Pls.' Ex. 4 at 21, ECF No. 47-3. These new customers were not automatically approved through the auto approval algorithm. ECF No. 3 at ¶ 53. Furthermore, the District Judge already struck similar statements in the Class Action referring to "raising" or "tightening" or using "stricter" underwriting standards in part because they were too vague and non-specific to be actionable. [13]

- "[W]e implemented changes in our underwriting process during the quarter. These changes were based on analysis performed over the past year to identify credit attributes that would allow us to enhance our decision model to better identify quality credit customers." *Id.* at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

[13]  *See* Mot. Hr'g Tr. at 94:9-14, 102:20-111:13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117.

Plaintiffs argue the statement in paragraph 100 is false because rather than "enhance" Conn's credit portfolio, Defendants weakened it by lowering underwriting standards and knew that lower underwriting criteria increased risk and delinquencies. ECF No. 57-1 at 12. However, the District Judge already struck a similar statement in the Class Action because the mere fact that Defendants lowered underwriting standards does not necessarily mean that they were not trying to enhance their credit operations. [14] Likewise here, the lowering of underwriting standards is not necessarily inconsistent with having performed an analysis over the past year to identify attributes of quality credit customers.

- When asked about credit metrics and 30-day delinquencies in new stores, Wright responded it "[i]s still very early." *Id.* at ¶ 101 (Wright, First Quarter FY 2014 Earnings Call on June 6, 2013).

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 165 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

14      *See* Mot. Hr'g Tr. at 92:13-23, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statement in paragraph 74 in the Class Action Fourth Amended Complaint that "[w]e are also focusing on improving the profit contribution of our credit operation by raising our underwriting standards.").

**\*8** Plaintiffs contend the statement in paragraph 101 is false because it was not too early to determine the negative impact of the loosened underwriting standards, and Defendants already knew from trend data that looser underwriting standards were causing increased delinquencies. ECF No. 57-1 at 12-13. Defendants contend Plaintiffs fail to plead with particularity how this statement is false or misleading, particularly because Conn's acknowledged in the same call that it continued to open new stores on a rolling basis. ECF No. 55-1 at 20. The Court agrees with Defendants and also holds that the statement is too vague without more context to be actionable. [15] Defendants' motion should be denied as to the statement in paragraph 93 and granted as to the statements in paragraphs 99-101 in the complaint.

15      Neither party attached the June 6, 2013 earnings call transcript. *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010) (on a motion to dismiss securities fraud action, the parties' failure to attach analyst call transcripts "precludes our full consideration of the context in which the statements were made").

### 4. Plaintiffs challenge statements concerning the causes of financial problems in Conn's credit segment.

Plaintiffs challenge statements Wright and Poppe made during Conn's Second Quarter FY 2014 Earnings Call on September 5, 2013, and Wright made during Conn's Third Quarter FY 2014 Earnings Call on December 5, 2013, for falsely attributing the deterioration of Conn's credit portfolio to problems other than its underwriting policies (such as to collections issues and flawed implementation of the new electronic Latitude system) and for falsely claiming Conn's corrected those short-term issues (i.e. the systems issues). ECF No. 3 at ¶¶ 111, 113, 114, 116, 126-27. Plaintiffs contend these statements falsely concealed the true cause of the rising delinquencies—the lower underwriting standards. ECF No. 57-1 at 20-22 (citing ECF No. 3 at ¶¶ 42(d), 61-79, 134, 136-37, 193). Plaintiffs allege Defendants did not

correct the problems that were actually causing the increase in delinquencies—credit underwriting—which would have a longer-term impact on delinquencies than a one-time systems issue. *Id*. at 23 (citing ECF No. 3 at ¶¶ 4, 10, 12, 42, 61, 66-70, 74, 76-77, 87, 134, 159-61).

Defendants contend that Plaintiffs failed to plead with particularity facts that show these statements are false. ECF No. 55-1 at 34, 37, 39-40, 42, 52. Defendants contend that Plaintiffs failed to show that software issues had *no* impact on delinquency, and that some of the documents Plaintiffs rely on in the complaint show that Defendants were trying to investigate the cause of rising delinquencies and there was in fact a systems issue that at least to some extent contributed to collections issues because many customers' phone numbers were lost. *Id*.

These statements should be upheld as actionable. Even if these statements are true in part to the extent that the software issues had *some* impact on rising delinquencies, Plaintiffs alleged facts that the lower underwriting standards were the primary or at least a significant cause of rising delinquencies. [16] ECF No. 3 at ¶¶ 8, 10, 42(d), (k), 66, 68, 69(d). Plaintiffs also pleaded facts that this was evident before the misstatements were made. *Id*. at ¶¶ 10, 42(i), (r), 68, 69(d), 70, 72. In addition, the cause of the rise in delinquencies is plausibly material because an investor would have considered that this altered the basic mix of information, including whether the problem was reasonably resolved and would have a shorter or longer-term impact on Conn's financial performance. Thus, the statements could have misled investors to the extent that Conn's failed to disclose the full picture and the primary cause of rising delinquencies that was not in fact remedied. *See, e.g.*, *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178, at \*11 (W.D. La. Aug. 17, 2007) (denying motion to dismiss because even though "the market knew of the general problems regarding the company's proved reserve estimates, there are factual issues concerning whether the full extent and effect of those problems was known at that time."). Furthermore, the District Judge upheld similar statements as actionable in the Class Action, so these should be upheld for the same reasons. [17] Defendants' motion should be denied as to statements in paragraphs 111, 113, 114, 116, 126-27 in the complaint.

16      Defendants also contend the statement in paragraph 113 is not actionable because it is forward-looking.

ECF No. 55-1 at 37-38. While part of the statement ("And so we expect we'll get a similar result.") is forward-looking, it should be actionable because the statements immediately before and after it are actionable. *See supra*, section III.B.1. To the extent Plaintiffs pleaded that those statements are misleading, the future expectations based thereon are likewise misleading. This statement also lacks meaningful cautionary language. The only cautionary language was given at the beginning of the call, but this constitutes boilerplate language that is not meaningful. *See infra* n.20, Defs.' Ex. 21 at 2, 13, ECF No. 39-16; *Carlton*, 184 F. Supp. 3d at 454.

17    *See* Order, *In re Conn's, Inc., Sec. Litig.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 111:14-123:6, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (upholding statements in paragraph 96 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 3:25-29:20, 31:12-34:16, 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (upholding statements in paragraphs 97, 99, and 111 in the Class Action Fourth Amended Complaint).

### 5. Defendants contend certain statements challenged by Plaintiffs are protected by the PSLR's safe harbor.

#### a. Applicable legal standard for PSLRA's safe harbor.

**\*9**  "With regard to misstatements, the PSLRA establishes a 'safe harbor' protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading." *In re BP*, 843 F. Supp. 2d at 747 (citing 15 U.S.C. § 78u-5(c)(1)(A)). A statement is forward-looking if it is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

*Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(A)). A defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if":

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading[.]

*Carlton*, 184 F. Supp. 3d at 452-53 (quoting 15 U.S.C. § 78u-5(c)(1)). Under Fifth Circuit precedent, the safe harbor provision has independent prongs. *Id.* at 453 (citation omitted).

> Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

sophisticated to rely on vague expressions of optimism rather than specific facts.

*In re BP*, 843 F. Supp. 2d at 748 (citation omitted).

### b. Analysis.

Defendants contend the following statements are forward-looking:

- "[T]he amount of the loss for an individual loan, yes, would increase with larger balances. But that doesn't necessarily mean that the rate would increase. ... And we don't think the loss rate for portfolio should be materially different with a slightly larger average balance size. ... But we don't believe that the modest increase in average loan size is going to significantly affect the portfolio loss rates." ECF No. 3 at ¶ 109 (Wright, Second Quarter FY 2014 Earnings Call on Sept. 5, 2013).

**\*10**  - "Results so far indicate that performance of current-year originations is within expectations." *Id.* at ¶ 110 (Poppe, Second Quarter FY 2014 Earnings Call on Sept. 5, 2013).

Plaintiffs contend the safe harbor does not apply because even forward-looking statements are actionable if made with knowledge of their falsity. ECF No. 3 at ¶¶ 227, 229. Regarding the statement in paragraph 109, Plaintiffs contend it is false because Wright "created the false impression that increase in the average customer balance was not materially impacting Conn's credit portfolio losses...." ECF No. 57-1 at 18. However, Wright compared different types of metrics and Plaintiffs do not appear to challenge the accuracy of the underlying numbers. Plaintiffs have not sufficiently pleaded that this statement was false when made or that Wright knew this to be false.

Regarding the statement in paragraph 110, Plaintiffs contend it is misleading because "Defendants did not disclose that Conn's had increased originations by lowering acceptable FICO scores and reducing other underwriting criteria...." and "Defendants knew (but did not disclose) that performance of current loan originations had been and was expected to be poor...." *Id*. at 19-20. However, what might fall "within expectations" is too vague to be actionable. *See, e.g., In re*

*BP*, 843 F. Supp. 2d at 774-75 (dismissing statements as too vague to be actionable). Plaintiffs point to no contrary information or report about what Conn's specific expectations were. Plaintiffs also argue that, to the extent Defendants' statements concern then-present and historical conditions, they are not protected by the safe harbor. ECF No. 47 at 20-21. The Court agrees that this statement is not forward-looking; however, Plaintiffs must still plead why the statement is false and failed to do so.

Defendants contend the following statements are opinions or mere puffery:

- "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure to purchase home necessities." ECF No. 3 at ¶ 90 (Poppe, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

- "It is important to note that standard credit scores are not reliable predictors of customer performance at lower scores." *Id.* at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

- Wright told Plaintiffs that Conn's problems related to "semi-retarded investors." *Id.* at ¶ 119 (Wright, Sept. 20, 2013 e-mail to Plaintiffs' Representative).

- Wright denied an investor's comments that Conn's was growing at a reckless speed. *Id.* at ¶ 121 (Wright, Dec. 3, 2013 e-mail to Plaintiffs' Representative).

- "Many years of experience underwriting a single type of credit for our core customer limited variation in underwriting practices over time, and experience collecting this specific type of credit, allows us to deliver consistent performance." *Id.* at ¶ 123 (Poppe, Third Quarter FY 2014 Earnings Call on Dec. 5, 2013).

The Court agrees that these statements are opinions and therefore not actionable. The statement in paragraph 123, additionally, is optimistic puffery. "[I]t is well established that generalized positive statements about a company's progress are not a basis for liability." *Carlton*, 184 F. Supp. 3d at 493 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001)) (statements that "we are seeing significant operational progress ... and we believe that we are turning the corner toward steady-state operations" are vague assertions of corporate optimism); *see also In re BP*, 843 F. Supp. 2d at 775 (" '[G]eneralized positive statements about the company's competitive strengths, experienced management, and future

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

prospects' are immaterial.") (citation omitted). Regarding the statements in paragraphs 90 and 100, the District Judge struck a similar statement in the Class Action. [18] Defendants' motion should be granted as to the statements in paragraphs 90, 100, 109, 110, 119, 121, and 123 in the complaint.

[18]    *See* Mot. Hr'g Tr. at 56:11-57:6, 91:9-92:12, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking paragraph 69 in the Class Action Fourth Amended Complaint).

#### 6. Plaintiffs challenge Conn's financial statements.

**\*11**  Plaintiffs allege that Conn's Fourth Quarter FY 2013, FY 2013, First Quarter FY 2014, Second Quarter FY 2014, and Third Quarter FY 2014 financial reports in Conn's press releases, annual 10-K form, and quarterly 10-Q forms dated April 3, 2013, April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013 are false. ECF No. 3 at ¶¶ 143-52. Plaintiffs further allege that Wright's and Taylor's Sarbanes-Oxley ("SOX") certifications were false when made on the above-referenced annual 10-K and quarterly 10-Q forms filed with the SEC. [19] *Id*. at ¶ 174.

[19]    "Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724 (W.D. Tex. 2010) (citing 15 U.S.C. § 7241(a)).

Plaintiffs allege that Conn's understated and failed to properly account for doubtful accounts and provision for bad debt, which caused Conn's assets (or accounts receivable ("A/R")) and earnings per share ("EPS") to be overstated. *Id*. at ¶ 141. Plaintiffs allege the failure to properly establish a reserve for uncollectible accounts violated Generally Accepted Accounting Principles ("GAAP") and SEC accounting rules, which require Defendants to provide "reserves" for all receivables where uncollectability is "probable" and can be estimated. *Id*. at ¶¶ 141, 153, 157, 168. Plaintiffs allege that Defendants failed to follow GAAP accounting practices because even though delinquencies and the 60+ days past due balances were rising, Conn's allowance for doubtful accounts as a percentage of its receivables 60+ days past due was decreasing. *Id*. at ¶¶ 157(d), 159-67. Plaintiffs make numerous circumstantial allegations that Defendants extended credit to riskier customers, delinquencies were rising, lower underwriting standards caused the rise in delinquencies, and therefore the financial reports must have been inaccurate. *Id*. at ¶¶ 8, 10, 42, 50, 53, 54, 58, 62-69, 77, 85, 86, 157-63.

Defendants contend the financial statements and SOX certifications are not actionable because: (1) Plaintiffs failed to plead with particularity any facts showing the statements are false, (2) Plaintiffs failed to plead particularized facts showing how Conn's miscalculated debt reserves or otherwise violated GAAP, (3) Conn's to date has not been required to restate its financials, (4) none of the CW allegations or internal documents cited in the complaint discuss Conn's financial statements or suggest bad debt reserves were understated, and (5) Plaintiffs failed to plead scienter. [20] ECF No. 55-1 at 13, 16-18, 24-26, 43-46, 53-55.

[20]    Defendants also contend that some of these are forward-looking and protected under the PSLRA's safe harbor. ECF No. 39 at 21 n.9. However, Plaintiffs cite several cases indicating that financial statements such as 10-K and 10-Q forms filed with the SEC are not subject to the safe harbor. ECF No. 47 at 20 n.18 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 767-68 (2d Cir. 2010); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008); *Baker v. MBNA Corp.*, No. 05-272, 2007 WL 2009673, at \*5 (D. Del. July 6, 2007); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1171 (N.D. Ill. 2004)).

While Plaintiffs are permitted to rely on circumstantial allegations as they do here, these allegations fall short of pleading that the financial statements are actionable. Plaintiffs primarily draw their allegations from a letter the SEC sent to Defendants, requesting more information about why the percentage of bad debt allowance to account balances 60+ days past due decreased when the account balance of 60+ days past due was increasing. ECF No. 3 at ¶¶ 163-65. However, from the face of the complaint, the Court cannot infer that this metric is necessarily false or materially so, nor whether this is even the most pertinent metric. While Plaintiffs need not go so far as to allege a specific amount for how much the allowance for doubtful accounts or bad debt provision should have been increased, Plaintiffs have not alleged even an estimate of how far off these numbers were to indicate whether the understatement was material. [21] Furthermore, the fact that the SEC requested more information or initiated an investigation

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 169 of 281

does not necessarily mean that the financial reports were fraudulently false or even false at all.[22] Although the SEC filed a complaint against Conn's and Poppe and they entered consent judgments, the Defendants expressed they were not admitting any of the allegations in the complaint. ECF Nos. 62-1, 62-3 at 2, 62-4 at 2.[23]

[21]   *See, e.g.*, *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 536 (5th Cir. 2008) (reversing denial of motion to dismiss where plaintiffs "make no attempt to estimate by how much the earnings were inflated").

[22]   In their opposition brief, Plaintiffs allege that in Conn's FY 2013 10-K form, Conn's conceded that, pending the outcome of the SEC investigation, there may be "a potential restatement of our financial statements." ECF No. 47 at 24 n.25; Pls.' Ex. 19 at 24, ECF No. 44-2. However, this was not in the complaint and this potential may never materialize. Even so, the fact of a restatement does not mean the original form was fraudulent.

[23]   Plaintiffs filed a request for the Court to take judicial notice of the SEC's complaint against Conn's and Poppe and the consent judgments entered in that case. ECF No. 62. The Court reviewed those documents and takes judicial notice of the information contained in them. The Court granted Plaintiff's motion. Order, ECF No. 64. However, the SEC's complaint specifies that it is pleading a claim based on negligence and that the SEC need not prove scienter. ECF No. 62-1 at 6, 11. Thus, there is nothing that shows the Defendants were actually aware of the falsity of the financial reports at the time.

**\*12** In addition to the SEC investigation, Plaintiffs rely on the following post-Relevant Period allegations to show the financial reports were false when made:

- In Conn's financial reports for FY 2015, Conn's significantly increased its allowance for doubtful accounts and bad debt provision. ECF No. 3 at ¶¶ 169, 187.

- In FY 2015 conference calls, Wright stated that over the prior year, (1) Conn's tightened underwriting standards and discontinued certain marketing messages to new customers, (2) growth in the portfolio and originations

to new customers caused the Relevant Period's increase in delinquencies, and (3) provision for loan losses were adjusted to account for increases in delinquencies. *Id.* at ¶¶ 170, 189-91.

- After the Relevant Period, Conn's established a Credit Risk and Compliance Committee and initiated a search for a Chief Risk Officer to deal with credit issues. *Id.* at ¶¶ 172, 179.

- In March 2014, Conn's staff sent an e-mail to Poppe stating that Conn's credit manual was outdated and had not been updated in over a year. ECF No. 3 at ¶ 177; Pls.' Ex. 18 at 37-38, ECF No. 47-4. Plaintiffs claim this shows Conn's lacked internal controls. ECF No. 3 at ¶ 177.

However, none of these later statements suggest that the financial statements made during the Relevant Period were false or misleading. This amounts to pleading "fraud by hindsight" which is not an actionable claim.[24] *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005); *see also* *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-33 (5th Cir. 2002) (where "plaintiffs have not pointed to any particular reports or information ... that are contrary to the restatements[,]" allegations that senior executive defendants received "unidentified daily, weekly, and monthly financial reports that apprised them of the company's true financial status" were insufficient to show scienter and that financial statements were false); *Stockman v. Flotek Indus., Inc.*, No. H-09-2526, 2010 WL 3785586, at \*15 (S.D. Tex. Sept. 29, 2010) (earnings guidance was not actionable where plaintiffs failed to point to any specific internal projections that contradict it).

[24]   "The Fifth Circuit defines 'fraud by hindsight' as a 'case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly' or 'a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later.' " *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 741 (N.D. Tex. 2018) (quoting *Lormand*, 565 F.3d at 248-49); *see also* *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1249 (10th Cir. 2016) (announcement of forward loss made more than two months after alleged misstatement did not contribute to inference of

Case 4:21-cv-02473　Document 41-1　Filed 03/30/23 in TXSD　Page 170 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

scienter because it did not allege that defendant was aware the alleged misstatement was false when made two months earlier, and at most "suggest[s] an honest mistake in predicting [defendant's] future production and costs"); *Southland Sec. v. INSpire Ins. Sols.*, 365 F.3d 353, 383 (5th Cir. 2004) (because fraud cannot be proved by hindsight, subsequent decline, lawsuits, or resignations are not persuasive of scienter because they "do not show what any particular individual knew, or was severely reckless in not knowing, at the time" of the alleged misstatements).

**\*13** Plaintiffs cite *In re Triton* for the proposition that "[t]o withstand a motion to dismiss, it is enough that plaintiffs alleged a violation of accounting standards and stated such violation resulted in material misstatement." ECF No. 47 at 22 n.22 (quoting *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at \*23 (E.D. Tex. Mar. 30, 2011)). However, Plaintiffs must still satisfy the heightened pleading standards under the PSLRA and cannot withstand a motion to dismiss with conclusory allegations. [25]

[25]　In addition, some of the challenged statements are press releases with no individual speaker identified, other than the corporation. ECF No. 3 at ¶¶ 143, 146, 148, 149, 151; *see, e.g., Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (affirming grant of motion to dismiss section 10(b) claim as to press releases for which plaintiffs failed to identify a speaker), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) (same). The Court construes the 10-K and 10-Q forms as being attributed to Wright and Taylor because they signed the forms. *See, e.g., In re BP*, 843 F. Supp. 2d at 749 ("[C]orporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears....") (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006)).

Plaintiffs cite other cases in which courts denied motions to dismiss involving allegations of accounting fraud—including allegations that loan loss reserves were understated—but these are distinguishable because those plaintiffs alleged facts with greater particularity. [26] Thus, Defendants' motion should be granted as to the statements in paragraphs 143-52 in the complaint. *See Southland*, 365 F.3d at 383 (granting motion to dismiss allegations of inflated revenues and failure

to record losses for uncollectible receivables); *In re Alamosa*, 382 F. Supp. 2d at 852-55 (granting motion to dismiss allegations that defendants did not make sufficient allowances for uncollectible accounts). [27]

[26]　Plaintiff cited the following cases, which are distinguishable. *See Barrie*, 397 F.3d at 257, 264 (denying motion to dismiss in part where allegations of accounting fraud and GAAP violations were supported by sworn expert analysis and CW allegations by witness who was directed by defendant to investigate accounting practices and submitted an accounting to defendants which defendants ignored); *Parmelee v. Santander Consumer USA Holdings, Inc.*, No. 3:16-CV-782, 2018 WL 276338, at \*4-6 (N.D. Tex. Jan. 3, 2018) (denying motion to dismiss where company's financial restatements gave rise to strong inference of scienter); *In re ArthroCare*, 726 F. Supp. 2d at 721-22 (same); *In re Netbank, Inc., Sec. Litig.*, No. 1:07-CV-2298, 2009 WL 2432359, at \*7 (N.D. Ga. Jan. 29, 2009) (denying motion to dismiss where defendants' own internal analysis showed it needed to increase loan loss reserves). Plaintiff also cited a case that was decided before the PSLRA was passed to heighten pleading standards for securities fraud and is outdated. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) (denying motion to dismiss where plaintiffs alleged defendants understated loan loss reserves by at least $350 million), *superseded by statute as stated in Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000).

[27]　*See also, e.g., Shaw Grp.*, 537 F.3d at 535-36 (reversing denial of motion to dismiss where complaint lacked facts common in "most securities fraud cases, which are precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes.... [and] there was no mea culpa from the company in the form of acknowledge wrongdoing or restated financial reports, ... nor any publicly expressed reservations by the auditors....").

## C. Scienter.

### 1. Wright.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 171 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

**\*14**  The Court recommended that 12 statements Wright made remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter for those statements and holds that they have. The Court relies on the District Judge's ruling on defendants' motion to dismiss in the Class Action. *See* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125. Although the District Judge did not explicitly explain his holding regarding scienter allegations, by partially denying the defendants' motion to dismiss, the District Judge implicitly found the Fourth Amended Complaint adequately pleaded scienter as to Wright, at least for the statements that were found actionable, many of which are challenged here or are similar. *Id.* In the Class Action, the plaintiffs' scienter allegations for the Individual Defendants consisted of CW allegations, post-Relevant Period statements, allegations of insider trading, and allegations regarding Defendants' positions and motive. *See* Fourth Am. Compl., *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Here, Plaintiffs rely on the same allegations in addition to Conn's internal documents, the SEC investigation, Wright's departure from Conn's, and his SOX certifications. ECF No. 3. While the Court must ultimately consider the scienter allegations collectively, the Court addresses each separately first for ease of discussion.

### a. Confidential witness allegations.

Plaintiffs rely on the following CW allegations to plead scienter as to Wright (and Poppe): [28]

- CW-1, a former Conn's Senior Manager of Collections Strategy, allegedly sent daily reports to both Wright and Poppe containing detailed analytics and metrics, including first payment defaults ("FPDs") and delinquencies. *Id*. at ¶¶ 42(b), 70.

- CW-2, a former Conn's Credit Manager, alleged that Wright and Poppe were aware that relaxed underwriting standards adversely impacted the business because they were hands-on in the credit department, came into the credit department three to four times per week, and had face-to-face meetings with credit managers. *Id.* at ¶¶ 42(i), 71. CW-2 allegedly reported these credit issues directly to executives including Wright and Poppe. *Id.* at ¶ 42(i).

- CW-3, a former Conn's credit underwriter, alleged Conn's lowered underwriting standards including by modifying its auto approval algorithm to automatically approve customers it previously would not have approved. *Id.* at ¶ 56. Plaintiffs also allege that, according to internal documents, algorithm modifications needed to be approved by the CEO (Wright) and COO (Poppe). *Id.;* Pls.' Ex. 2 at 11, ECF No. 47-3.

- CW-4, a former Conn's District Manager, allegedly attended quarterly meetings with Wright at which the amount of credit approved and utilized during store openings was discussed. ECF No. 3 at ¶ 71.

- CW-5, the former Conn's Vice President of Credit, alleged Conn's was a relatively "flat" organization, so management was frequently involved in day-to-day issues like collections. *Id.* CW-5 allegedly met with Conn's executives daily to discuss the status of collections and delinquencies. *Id.* [29]

28   Defendants contend that all of Plaintiffs' CW allegations should be struck because Plaintiffs copied those allegations from the Class Action Fourth Amended Complaint and did not independently verify them. ECF No. 39 at 14-15. Defendants allege this violated Plaintiffs' counsel's Rule 11 duties. *Id.* Plaintiffs respond that the CW allegations should be upheld because the District Judge already upheld them in the Class Action, and they cite authorities indicating that copying allegations from other complaints is not impermissible, particularly when, as here, they are supported by other materials personally investigated by the plaintiff. ECF No. 47 at 29-31. Other than one Supreme Court case discussing Rule 11 generally, the parties do not cite any applicable authority from the Fifth Circuit or its district courts. Nevertheless, Defendants' concerns are mitigated because (1) the District Judge already upheld the same CW allegations in the Class Action, (2) the MicroCapital Plaintiffs were previously plaintiffs in the Class Action and the CW allegations were already alleged on their behalf there before they opted out and filed their own lawsuit, and (3) Plaintiffs certified that their complaint is based on various sources including internal Conn's documents and depositions of Conn's current and/or former employees. ECF No. 3 at ¶ 1. Indeed, the complaint references in great detail other sources which corroborate

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 172 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

the CW allegations. "Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014); *cf. Main State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (granting motion to strike allegations lifted from other complaints where plaintiffs' counsel did not claim to have taken any measures to independently investigate the bases for those allegations); *In re Connetics*, 542 F. Supp. 2d at 1005-06 (granting motion to strike paragraphs copied from SEC complaint where plaintiffs "make no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims against defendants."). The CW allegations should not be struck.

[29] Plaintiffs also point to statements that Conn's Vice President of Credit Strategy made about Conn's bad lending practices and deteriorating credit portfolio. ECF No. 3 at ¶¶ 10, 51, 61, 69(b), 77, 82, 134(b); Pls.' Ex. 14 at 20, ECF No. 47-4. However, his statements do not necessarily show scienter or the Individual Defendants' knowledge.

**\*15** "Confidential source statements are a permissible basis on which to make an inference of scienter."[30] *Carlton, 184 F. Supp. 3d at 460* (quoting *Cent. Laborers' Pension Fund, 497 F.3d at 552*). However, even when confidential source statements are adequately pleaded, the Fifth Circuit requires district courts to give less weight to and " 'discount allegations from confidential sources' because they 'afford no basis for drawing plausible competing inferences.' " *Id.* (quoting *Shaw Grp., 537 F.3d at 535*).

[30] Though a plaintiff does not have to state the names of the CWs, there must be sufficient particularized details "to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements" such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the

information supporting an inference of scienter, such as when a relevant comment was made to the confidential source." *Carlton, 184 F. Supp. 3d at 460* (citations omitted).

Standing alone, the CW allegations fall short of raising a strong inference of scienter because some courts have found similar CW allegations that defendants received unspecified reports or attended frequent meetings through which they learned information contrary to their alleged misstatements insufficient.[31] However, while Plaintiffs do not describe in detail the content of each daily report given to Wright or the matters discussed in each meeting he attended, when considered holistically with other allegations in the complaint —and because the District Judge implicitly credited the CW allegations in the Class Action— there is enough context to infer that the reports and other information shared with Wright showed delinquencies were rising because of lower underwriting standards. Therefore, when considered holistically, the CW allegations contribute to a strong inference of scienter against Wright.[32]

[31] *See, e.g., Neiman v. Bulmahn, 854 F.3d 741, 748 (5th Cir. 2017)* (for allegations concerning internal reports to support a strong inference of scienter, there must be "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients" and that defendant actually read them) (citations omitted); *Southland, 365 F.3d at 370* ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss."); *In re ArthroCare, 726 F. Supp. 2d at 719* (CW allegations, alone, did not raise a strong inference of scienter where "[t]here is hardly a single instance in which one of the CWs alleges they had a conversation with or overhead a comment by either [defendant] and also states when and where the conversation occurred. Many of the CWs simply state their own conclusions about what occurred ... For instance, CW 10 states that [defendant] attended 'weekly staff meetings every Tuesday or Wednesday that were attended by all the top executives and lasted for about 90 minutes,' and solely on this basis concludes that all the executives in the meetings 'knew what was going on'....").

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 173 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

32      *See, e.g.*, *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736, 2015 WL 5766870, at *6 (E.D. Tex. Sept. 29, 2015) (allegations that defendants were aware of facts undermining their statements because inventory purchases were the subject of monthly meetings and regular review by defendants, in combination with other allegations, contributed to a strong inference of scienter); *Brody v. Zix Corp.*, No. 3:04-CV-1931, 2006 WL 2739352, at *7, 2006 U.S. Dist. LEXIS 69302, at *20 (N.D. Tex. Sept. 26, 2006) (CW allegations that defendants regularly received tracking reports which would have alerted them to the fact that their statements were materially misleading contributed to a strong inference of scienter); *In re Fleming Co. Inc. Sec. & Deriv. Litig.*, No. CIVA503MD1530, 2004 WL 5278716, at *28-34 (E.D. Tex. June 16, 2004) (CW allegations that defendants received weekly reports and attended weekly meetings concerning data on financial performance contributed to a strong inference of scienter).

#### b. Post-Relevant Period statements.

**\*16**  Plaintiffs allege post-Relevant Period statements Wright made demonstrate his knowledge during the Relevant Period. ECF No. 3 at ¶¶ 17, 52, 72, 54-55, 189, 194-95. For example, Plaintiffs allege that Wright admitted in a September 22, 2014 investor and analyst meeting that "when we opened the first four stores we opened back in 2013, we did [reduce credit quality] ... a little bit and it took us about three months to figure out that was a really bad idea." *Id*. at ¶ 72. Wright also testified he recalled that in late 2012, Conn's reduced verification and down payment requirements for customers in new stores. *Id*. at ¶ 54-55. These contribute to an inference of scienter that by about March or April 2013, Wright knew that Conn's lowered underwriting standards and delinquencies were rising because of lower underwriting. *See, e.g.*, *Lormand*, 565 F.3d at 254 (post-Relevant Period admissions regarding defendants' own state of mind at the time of their misrepresentations raise a strong inference of scienter).

#### c. Insider trading.

Plaintiffs also allege Wright sold stock based on his inside information about the deterioration of the credit portfolio, which allowed him to benefit from artificially inflated stock prices. ECF No. 3 at ¶¶ 11, 212-13. Plaintiffs allege Wright sold 15,000 shares each on June 20, 2013 and December 17, 2013 for the first time since 2007, gaining proceeds of $1,932,450. *Id*. at ¶ 213. Plaintiffs allege the timing is suspicious because in June, "Defendants were setting expectations regarding the quality of Conn's credit[.]" *Id*. at ¶ 213. As for the December trade, it was purportedly suspicious because it was made (1) less than two weeks after Wright denied Conn's was reckless in its growth, (2) immediately after he assured investors that Conn's credit problems were due to systems issues, (3) on the heels of his false statements, and (3) eight weeks before the stock would fall due to news of greater delinquency rates. *Id*. at ¶ 213.

"Insider trading alone cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, No. H-06-3022, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007). "Because corporate executives are often paid in stock and stock options, they will naturally trade those securities in the normal course of events, and courts will not infer fraudulent intent from the mere fact that some officers sold stock." *Carlton*, 184 F. Supp. 3d at 480 (quoting *Shaw Grp.*, 537 F.3d at 543) (internal quotation marks omitted). Insider trading allegations may enhance the inference of scienter when the trades occur in suspicious amounts, at suspicious times calculated to maximize personal profit, or are out of line with prior trading practices. *Id*. (citations omitted). On the other hand, when a defendant regularly sells stock, does not sell stock immediately following an alleged material misstatement, or sells stock but the price continues to climb, these circumstances do not strengthen the inference of scienter. *Id*. at 481; *In re TETRA Tech., Inc. Sec. Litig.*, No. 4:08-CV-965, 2009 WL 6325540, at *7 (S.D. Tex. July 9, 2009), *clarified*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) (Ellison, J.).

As to timing, while Plaintiffs allege Wright sold stock during the Relevant Period and generally after making false and misleading statements, Wright does not appear to have sold stock immediately after the alleged misstatements to take advantage of a spike in stock prices, nor have Plaintiffs alleged that Wright sold stock at a time when the stock price peaked. To the contrary, Defendants assert that Wright's sales were made when Conn's stock was not at its highest price and well before the February 2014 alleged corrective disclosures. ECF No. 39 at 28; *see, e.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (stock sales did not raise an inference

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 174 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

of scienter because they were made when stock prices were below the alleged Class Period high); *Stockman*, 2010 WL 3785586, at \*28 (same).

 **\*17** Furthermore, while the cash value of the stock proceeds seems high and Plaintiffs contend Wright had not sold stock since 2007, Defendants contend that Wright's stock sales represented a small percentage of his total shares. ECF No. 39 at 27. Each sale constituted 9.55% and 7.49% of his total shares. *Id.* Courts have held that such small percentages do not raise a strong inference of scienter. *See In re TETRA*, 2009 WL 6325540, at \*7 ("If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter."); *Oppenheim*, 2007 WL 2720074, at \*5 (where defendants sold 17.59% and 13.79% of their total shares, sales did not contribute to a strong inference of scienter). These allegations contribute only slightly to an inference of scienter against Wright due to his trading history.

#### d. Position and motive.

Plaintiffs allege that Wright and each of the Individual Defendants had knowledge given their positions in the company, their experience and background including in accounting, their focus on credit operations as part of their job duties, and their day-to-day involvement in the operations of the company. ECF No. 3 at ¶¶ 38-41, 200. Plaintiffs allege the Individual Defendants routinely represented to analysts and investors that they monitored and were knowledgeable about Conn's finances including credit operations. *Id.* at ¶ 201. Plaintiffs allege the Individual Defendants had motive and incentive to engage in the alleged fraud because they could receive performance-based bonuses and equity.[33] *Id.* at ¶¶ 206-08, 211.

[33]  Defendants allege that Plaintiffs rely on group pleading, which is impermissible in the Fifth Circuit. ECF No. 39 at 24; *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*51-52 (citing *Shaw Grp.*, 537 F.3d at 533-34). But, "[t]he fact that [some] allegations pertain to more than one person does not make them group pleading[,]" particularly where, as here, it is sufficiently clear from the face of the complaint which scienter allegations apply to each Individual Defendant. *Alaska Elec. Pension Fund*

*v. Asar*, No. 17-50162, 768 Fed.Appx. 175, 2019 WL 1567766, at \*7 (5th Cir. 2019).

While allegations of motive and opportunity alone will not support a strong inference of scienter, they may "meaningfully enhance the strength of the inference of scienter." *In re BP*, 843 F. Supp. 2d at 749 (citation omitted). However, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. ... [W]ere the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Carlton*, 184 F. Supp. 3d at 481 (quoting *Abrams*, 292 F.3d at 434) (allegations that defendant was motivated to continue receiving lucrative salary and compensation did not raise a strong inference of scienter). In addition, "[c]orporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded." *In re BP*, 843 F. Supp. 2d at 749 (citation omitted); *see also Carlton*, 184 F. Supp. 3d at 478-79 (allegations that defendants must have known the misstatements were false based on their high-level positions within the company did not raise a strong inference of scienter). Plaintiffs' allegations based on motive and Defendants' positions at Conn's contribute little, if at all, to an inference of scienter.

#### e. Conn's internal documents.

Plaintiffs point to Conn's internal documents to plead that Wright knew the underwriting standards were being loosened and that the rise in FPDs was due primarily to new store underwriting:

- In a **January 31, 2013** e-mail that Poppe sent to other Conn's staff, Poppe stated that he discussed underwriting requirements for new stores with Wright and decided against "keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶ 65; Pls.' Ex. 7 at 32, ECF No. 47-3.

 **\*18** • On **March 30, 2013,** Poppe sent an e-mail to Wright attributing the rising FPDs to underwriting standards in new stores and explaining that credit verifications were tightened to avoid fraud. ECF No. 3 at ¶ 10; Defs.' Ex. 17, ECF No. 40-4.

- On **April 12, 2013**, Poppe sent an e-mail to Wright referring to their prior conversation about keeping lower underwriting standards (lower minimum FICO score cut-offs) in place for new stores permanently going

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 175 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

forward. ECF No. 3 at ¶ 73; Defs.' Ex. 19 at 2, ECF No. 40-6.

- In July 2013, Wright sent a memorandum to the Conn's Board, noting that the " 'grand opening' practices at the new stores opened in November and December" had an impact on credit performance and was at least one causal factor. ECF No. 3 at ¶ 134(a); Defs.' Ex. 24 at 4, ECF No. 40-10. [34]

[34]     Plaintiffs also make general statements that based on internal e-mails, "it was known internally at Conn's that the lowering of Conn's underwriting standards to 'significantly riskier' customers ... 'represent[ed] a straight loss for the lender.' " ECF No. 3 at ¶ 50; Defs.' Ex. 25 at 3, ECF No. 40-11. However, at least some of these internal e-mails and documents were not sent to or from any of the Individual Defendants so they cannot show scienter as to Defendants. *See* Defs.' Ex. 25 at 2-3, ECF No. 40-11; Pls.' Ex. 14 at 20, ECF No. 47-4.

While the Plaintiffs do not necessarily plead facts that Wright read the e-mails sent to him, the e-mails referring to conversations involving him and his memorandum to the Board raise the inference that by early 2013, Wright knew Conn's lowered underwriting standards and this contributed to a rise in delinquencies. In addition, the omission of facts that Wright read the e-mails is offset somewhat by the CW allegations and Wright's later statement that, after Conn's opened new stores in early 2013, it took "about three months to figure out that was a really bad idea." ECF No. 3 at ¶ 72. Standing alone, these documents raise only a slight inference of scienter against Wright, but when considered together with other allegations, contribute to a strong inference of scienter.

### f. SEC investigation.

Plaintiffs allege that Conn's disclosed on December 10, 2014 that the SEC began investigating Conn's. *Id.* at ¶¶ 19, 157(d), 163-66, 172. However, "[g]overnment investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants[,]" nor have they alleged any facts regarding the outcome of the investigation. *Carlton*, 184 F. Supp. 3d at 480 (allegations of SEC investigation did not raise a strong inference of scienter) (quoting *Konkol v. Diebold, Inc.*, 590

F.3d 390, 402 (6th Cir. 2009)). Now, Plaintiffs ask the Court to take judicial notice of the outcome and filed the SEC complaint and the consent judgments against Conn's and Poppe. ECF No. 62. Because the SEC's claims are based on negligence and specifically acknowledge that the SEC does not need to prove scienter, those documents provide no support for the proposition of Defendants' actual knowledge at the time. ECF No. 62-1 at 6, 11. Moreover, the complaint was not asserted against Wright, but only Poppe. Therefore, this contributes little, if at all, to an inference of scienter.

### g. Termination.

*\*19* Plaintiffs allege that Conn's announced on September 9, 2015—more than a year after the Relevant Period—that Wright would be replaced as CEO, but Plaintiffs do not allege any reason for his departure. ECF No. 3 at ¶ 20. Courts have held that "[e]xecutive resignations are generally 'unavailing as proof of the commission of fraud.' " *Carlton*, 184 F. Supp. 3d at 478 (finding allegation of resignation alone insufficient to plead scienter) (citation omitted); *accord In re ArthroCare*, 726 F. Supp. 2d at 724-25 (same); *see also Neiman*, 854 F.3d at 752 (resignation did not raise an inference of scienter where there were no allegations as to the reason); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) ("the successive resignations of key officials ... is more likely probative only of the fact that the company was failing."). Thus, Wright's departure contributes little, if at all, to an inference of scienter.

### h. Sarbanes-Oxley certifications.

Plaintiffs allege that Wright (and Taylor) signed SOX certifications on Conn's annual 10-K and quarterly 10-Q forms on April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013, falsely certifying the financial reports were accurate. ECF No. 3 at ¶ 174. But Plaintiffs failed to show the financial statements were actionable, so they cannot show the SOX certifications raise an inference of scienter. *See supra*, section III.B.6. Even assuming Plaintiffs sufficiently pleaded that Defendants' financial statements were actionable, Plaintiffs failed to allege scienter as to those statements. [35]

[35]     Plaintiffs'    circumstantial    allegations    that Defendants knowingly increased Conn's credit risk

by lowering underwriting standards, knowingly increased sales and extended greater amounts of credit to new "riskier" customers, and knew delinquencies were rising as a result do not go far enough to show Defendants knew Conn's financial statements were materially misstated at the time. ECF No. 3 at ¶¶ 4, 10, 42(i), (r), 50, 52, 64, 68, 69(c), (d), 70, 72, 84, 157(a)-(b), 161, 162; ECF No. 57-1 at 9-12, 14-15, 23-26, 30-32. "[I]t is well-settled that Sarbanes-Oxley certifications, standing alone, are not indicative of scienter—otherwise, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company." *In re ArthroCare*, 726 F. Supp. 2d at 724 (citations omitted). "The certifications are probative of scienter only if the person signing ... was severely reckless in certifying the accuracy of the financial statements." *In re Franklin*, 782 F. Supp. 2d at 396 (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550). "That is, there must be facts establishing that the person ... had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.' " *Id.* (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550) (SOX certifications failed to support a strong inference of scienter); *accord In re TETRA*, 2009 WL 6325540, at *31. Post-Relevant Period financial statements that included increased bad debt provisions likewise do not show that Defendants knew any financial statements issued during the Relevant Period were understated. *See* ECF No. 3 at ¶¶ 169-73; 180-99; *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016) (rejecting allegations that defendants' *later* increase in reserve estimates gave rise to a strong inference of scienter at the time of the alleged misstatements). This may be "sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." *Pirnik*, 2016 WL 5818590, at *8 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

#### i. Collective allegations.

**\*20** While several of the aforementioned allegations fail to raise a strong inference of scienter with particularity if considered in isolation, the Court concludes they do when considered collectively, albeit barely so.[36] For example, the internal documents are the only sources that provide a specific date on which Wright would have known the information contained therein. But, taking Plaintiffs' allegations as true, these documents combined with the CW allegations, post-Relevant Period statements, and other allegations raise a sufficiently strong inference of scienter that as early as April 2013, Wright knew that underwriting standards were lowered, and this was a cause of the rising delinquencies.

[36]   Plaintiffs' complaint approaches "puzzle pleading." *In re Alamosa*, 382 F. Supp. 2d at 857 (collecting cases that dismissed complaints for "puzzle pleading"); *accord In re Franklin*, 782 F. Supp. 2d at 384-85 (where "Plaintiffs group together all of the defendants' false statements made during the ... conference call, press release, and Form 8-K, and allege collective reasons why the statements were materially false and misleading ... this does not satisfy the requirement that, for *each* false or misleading statement, they are to explain the reason or reasons why the statement was misleading....") (emphasis in original). While Plaintiffs' complaint passes this threshold because in their section explaining why the statements are false, they cross reference the paragraph numbers of alleged misstatements in the prior section and relevant facts in yet another section, the complaint could more clearly and systematically identify each *actionable* statement and why *each* is actionable. *See, e.g.*, *Singh v. 21Vianet Grp., Inc.*, No. 2:14-CV-894, 2017 WL 4322483, at *2 (E.D. Tex. Sept. 13, 2017) (denying motion to dismiss where for each alleged misstatement, the complaint explains in the paragraph immediately after the alleged misstatement why it is misleading, and follows the same pattern for each statement), *report and recommendation adopted*, 2017 WL 4310154 (S.D. Tex. Sept. 28, 2017). This would conserve judicial resources and mitigate the need for supplemental briefing that the Court requested here. "However easy the puzzle, assembling puzzles is not the duty of the Court." *In re Alamosa*, 382 F. Supp. 2d at 857.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 177 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

The Court must weigh competing inferences of scienter as to those statements the Court found actionable. Where there is an inference of scienter at least as cogent and compelling as opposing inferences—that Wright was at most negligent or committed no wrongdoing—such as here, "[a] tie favors the plaintiff." *Carlton*, 184 F. Supp. 3d at 484 (quoting *Lormand*, 565 F.3d at 254) (when considered holistically, allegations including CW allegations raised an inference that defendant acted with scienter which is at least as compelling as the inference that he acted without it).[37] Defendants' motion to dismiss Plaintiffs' securities fraud claim against Wright should be denied, to the extent some of his statements are actionable.

[37]   *See also, e.g.*, *Stone v. Life P'ners Holdings, Inc.*, 26 F. Supp. 3d 575, 611 (W.D. Tex. 2014) (collectively, allegations of internal reports imputing knowledge, combined with other allegations, raised a strong inference of scienter); *In re ArthroCare*, 726 F. Supp. 2d at 725 (even though some allegations of scienter, standing alone, did not raise a strong inference of scienter, collectively, the role of defendants in the company, insider trading, SOX certifications, and other allegations gave rise to a strong inference of at least severe recklessness for a certain time period); *In re TETRA*, 2009 WL 6325540, at *38 (collectively, CW allegations that defendants attended relevant meetings to discuss insurance receivables and post-class statements raised a strong inference that defendants had knowledge).

**2. Poppe.**

**\*21**  The Court recommended that five statements by Poppe remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter as to those statements and holds that they have. The Court again relies on the fact that the District Judge implicitly found the Class Action Fourth Amended Complaint adequately pleaded scienter as to Poppe, at least for the statements that were found actionable in the Class Action, many of which are challenged here or are similar.[38] *See* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125.

[38]   While the parties did not brief Conn's 10(b) liability for the corporate Defendant,

"all misrepresentations attributable to Individual Defendants are also treated as having been made by [Conn's], as 'all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company.' " *In re BP*, 843 F. Supp. 2d at 788 (citation omitted). "Thus, the actionable misrepresentations discussed above that are attributable to [Wright and Poppe] are sufficient to give rise to an inference of scienter with respect to [Conn's]." *Id.*

In addition to the CW allegations discussed above which pertain to both Wright and Poppe, Plaintiffs rely on additional CW allegations specific to Poppe to plead scienter.[39] Plaintiffs also make other similar scienter allegations against Poppe as they did against Wright involving (1) insider trading,[40] (2) motive to earn performance-based compensation, (3) Poppe's departure and alleged firing on May 23, 2017, and (4) the SEC investigation.[41] ECF No. 3 at ¶¶ 11, 19-20, 157(d), 163-66, 172, 206, 209, 211-13. As with Wright, the CW allegations—when considered holistically with other allegations in the complaint—contribute to a strong inference of scienter while the latter allegations contribute little to an inference of scienter against Poppe.

[39]   CW-1 reported that if the daily analytics reports were not circulated by 10:00 a.m. each day, Poppe would call or e-mail asking for the report. ECF No. 3 at ¶¶ 42(b), 70. CW-5 stated that data on FPDs and delinquencies were discussed each day across everyone involved in collections, including Poppe. *Id*. at ¶¶ 42(r), 70.

[40]   Plaintiffs allege Poppe sold 30,000 shares on April 25, 2013 and 19,900 shares on October 21, 2013 for the first time since 2007, gaining proceeds of $2,581,911. ECF No. 3 at ¶ 213. Plaintiffs allege the timing is suspicious because in April, "Defendants were setting false expectations regarding the Company's credit risks." *Id.* As for the October trade, it was purportedly suspicious because it was made "on the heels of Defendants' false representations that Conn's credit issues related to a one-time computer system issue and omission[.]" *Id.* The timing allegations are somewhat more conclusory than the similar allegations against Wright. Defendants allege that Poppe's stock sales cannot support a strong inference of scienter because (1) the sales constituted relatively small

Case 4:21-cv-02473  Document 41-1  Filed 03/30/23 in TXSD  Page 178 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

percentages of Poppe's overall holdings (18.71% and 14.53%), (2) his April sales were made at $34 per share less than the peak price during the Relevant Period months before the February 2014 corrective disclosures, and (3) they were made pursuant to a Rule 10b5-1 plan. ECF No. 39 at 27-28 (citing *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008)). However, the 10b5-1 plan is an affirmative defense, which is irrelevant at the motion to dismiss stage. *In re ArthroCare*, 726 F. Supp. 2d 696, 722-23 (W.D. Tex. 2010). While Poppe's trading history makes these trades somewhat suspicious, the timing and percentage of his total holdings do not. These allegations contribute only slightly to an inference of scienter against Poppe.

As discussed above, the SEC complaint and consent judgment against Poppe is based on a negligence standard and does not prove actual knowledge at the time. ECF No. 62-1 at 6, 11. The consent judgment also states that Poppe does not admit any of the allegations in the complaint. ECF No. 62-4 at 2.

### a. Conn's internal documents.

**\*22** Plaintiffs also rely on numerous e-mails to and from Poppe, some of which had analytics reports attached:

- E-mails in **November and December 2012** suggest that Poppe knew about lower underwriting standards being implemented in new stores, that Conn's credit portfolio was shifting toward lower FICO scores, and that lower FICO scores were at least correlated with higher delinquency rates. *Id.* at ¶¶ 53, 61; Defs.' Ex. 14 at 2, ECF No. 40-1; Defs.' Ex. 15 at 2, ECF No. 40-2; Defs.' Ex. 26 at 2, ECF No. 40-12.

- E-mails from **January 2013** suggest that Poppe knew credit performance was declining; there were concerns about fraud in at least one new store, after which verification requirements were increased slightly for new applicants with FICO scores under 520; changes were made at the end of January to the underwriting process, which included offering credit to customers with zero FICO scores in new stores, but "not keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶¶ 53, 62, 64, 65; Pls.' Ex. 3-7, ECF No. 47-3; Defs.' Ex. 16 at 2-3, ECF No. 40-3.

- E-mails throughout **March 2013** suggest that Poppe knew that FPD rates were rising, particularly in new stores; he and colleagues were trying to determine the cause; and rising FPDs were attributed to new store underwriting. ECF No. 3 at ¶¶ 10, 68, 69(a); Pls.' Ex. 8 at 36-37, ECF No. 47-3; Defs.' Ex. 17, ECF No. 40-4; Defs.' Ex. 18 at 2, ECF No. 40-2.

- E-mails from late **April through May** suggest that Poppe was aware that credit performance was declining; delinquency rates in new stores were poor and described as "very shocking," "disturbing," and "off the rails;" and that implementation of the new Latitude system did not have a large impact on phone numbers and therefore likely did not affect delinquencies. ECF No. 3 at ¶¶ 53, 74, 76, 134(c); Pls.' Ex. 9-12, ECF No. 47-4; Defs.' Ex. 22 at 3, ECF No. 40-8.

- E-mails on **June 11-12 and in July** suggest that Poppe knew delinquencies and FPDs continued to worsen and the credit segment was still underperforming. ECF No. 3 at ¶¶ 77, 134(a); Pls.' Ex. 13 at 17, ECF No. 47-4; Pls.' Ex. 17 at 27-35, ECF No. 47-4; Defs.' Ex. 23 at 2-6, ECF No. 40-9.

- In an **October 2013** e-mail, Poppe acknowledged that September data on delinquencies was poor. ECF No. 3 at ¶ 78; Pls.' Ex. 15 at 22, ECF No. 47-4.

These allegations raise a strong inference of scienter that Poppe knew before and throughout the Relevant Period that underwriting standards were being lowered, credit performance was deteriorating because of lower underwriting standards, and that the systems change was not responsible for performance deterioration (or at least not the primary cause).

### b. Collective allegations.

When considered collectively, Plaintiffs' allegations as to Poppe raise a strong inference of scienter for actionable statements he made. *See, e.g., Carlton*, 184 F. Supp. 3d at 476, 482-84; *Stone*, 26 F. Supp. 3d at 611; *In re ArthroCare*, 726 F. Supp. 2d at 725; *In re TETRA*, 2009 WL 6325540, at *38. Plaintiffs' scienter allegations for Poppe are significantly stronger than for Wright due to the volume, time frame, and specificity of e-mails which raise a strong inference that Poppe was informed about and actively engaged in discussions and efforts to lower underwriting standards,

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 179 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

monitor credit performance, and determine the cause of rising delinquencies. This inference is more compelling than any competing theories. Defendants' motion to dismiss Plaintiffs' securities fraud claim against Poppe should be denied, to the extent some of his statements are actionable.

### 3. Taylor.

**\*23** The only statements Plaintiffs contend are actionable against Taylor are the SOX certifications and corresponding financial statements he signed, which the Court found are not actionable. *See supra*, section III.B.6. Therefore, Plaintiffs cannot establish scienter as to Taylor. [42] *See In re BP*, 843 F. Supp. 2d at 778 (dismissing defendant because where the alleged misrepresentations attributable to defendant were not actionable, plaintiffs cannot demonstrate scienter as to that defendant). Defendants' motion to dismiss Plaintiffs' securities fraud claim against Taylor should be granted.

[42] Even if any statements attributable to Taylor are actionable, Plaintiffs still failed to plead scienter. Plaintiffs' only allegations of scienter as to Taylor—(1) his sudden departure from Conn's in December 2014, (2) motive to earn performance-based compensation, and (3) him signing the SOX certifications—do not raise a strong inference of scienter, even when considered collectively. ECF No. 3 at ¶¶ 18, 44, 174, 206, 210-11. Taylor was also dismissed from the Class Action. *See* Mot. Hr'g Tr. at 74:2-13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

### IV.

### CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

Section 20(a) of the SEA establishes control person liability:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent

as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*54 (quoting 15 U.S.C. § 78t(a)). "[T]o prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP*, 843 F. Supp. 2d at 791 (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)). "Section 20(a) is a secondary liability provision[.]" *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*54 (citing *ABC Arbitrage*, 291 F.3d at 348 n.57).

Defendants' only argument for why Plaintiffs' section 20(a) claim should be dismissed is that Plaintiffs failed to plead a predicate violation under section 10(b). ECF No. 39 at 28. Because Plaintiffs failed to plead with particularity a primary violation under 10(b) against Taylor, Plaintiffs' section 20(a) claim against him fails and should be dismissed. *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (finding no secondary control liability where plaintiffs failed to state a claim for securities fraud under Section 10(b) and Rule 10b-5); *accord Carlton*, 184 F. Supp. 3d at 495. However, because Plaintiffs successfully pleaded a primary violation under 10(b) against Wright and Poppe at least in part, Plaintiffs' 20(a) claims should remain to the extent the 10(b) claims based on actionable misstatements remain. *See In re TETRA*, 2009 WL 6325540, at \*38 ("Plaintiffs 20(a) claims remain only as to the claims based on misstatements" upheld as actionable); *accord Carlton*, 184 F. Supp. 3d at 495 (there is no basis for dismissing the control person claims against [defendant] because the § 10(b) claims against him have not been dismissed.").

### V.

### INSIDER TRADING UNDER SECTION 20A OF THE SECURITIES EXCHANGE ACT

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 180 of 281

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

**\*24** "Section 20A provides for a private right of action to buyers and sellers of securities who trade 'contemporaneously' with an insider in possession of material nonpublic information." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000). To state a section 20A claim, a plaintiff must plead that a defendant: "(1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the [plaintiff]." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (citations omitted). Both parties characterize the elements as requiring Plaintiff to state (1) a primary securities fraud violation under section 10(b) of the SEA and (2) that Plaintiffs traded "contemporaneously" with Wright and Poppe. ECF No. 39 at 29; ECF No. 47 at 31; *accord In re MicroStrategy*, 115 F. Supp. 2d at 662. Because the Court determined that Plaintiffs stated a claim under section 10(b) for at least some of Wright's and Poppe's alleged misstatements, Plaintiffs have stated a predicate securities fraud violation and the main issue is whether Plaintiffs' stock purchases were "contemporaneous."

The parties dispute the meaning of "contemporaneous." Defendants contend that "contemporaneous" means that the stock must have been traded on the same day. ECF No. 39 at 30. Plaintiffs contend that their purchases of Conn's stock one day after Poppe's April 25, 2013 sale, one day after Wright's December 17, 2013 sale, three days after Poppe's October 21, 2013 sale, and four days after Wright's June 20, 2013 sale are sufficiently "contemporaneous." ECF No. 47 at 31.

Reflective of the cases the parties cited, the Southern District of Texas has recognized that "[d]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remained undisclosed.' " *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2599327, at \*5 (S.D. Tex. June 15, 2017) (citing *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003)). Since section 20A does not define "contemporaneous," some courts have taken the same-day approach to "guard against 'mak[ing] the insider liable to all the world' " and in consideration for "the increasingly dynamic nature of the securities markets." *In re MicroStrategy*, 115 F. Supp. 2d at 663-64 (collecting cases) (requiring trades to be made on the same day to be contemporaneous); *accord In re Fed. Nat'l Mortg. Ass'n Sec. Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 47-48 (D.D.C.

2007) (same); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) (same). But, a strict same-day rule means that

> insiders could trade near the close [of the trading day] and greatly reduce the universe of potential successful plaintiffs. On the other hand, interpreting "same day" to mean the 24-hour period after the insider's transaction presents a problem on motions to dismiss: most plaintiffs will only be able to determine the date—not the time—of the insider's transactions.

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (finding stock purchases the day after defendants' sales sufficiently contemporaneous); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (finding eight-day gap sufficiently contemporaneous).

Because of this wide range, the *In re Cobalt* court "[could] not conclude that an allegation of a six-day gap between [defendant's] sale and [plaintiff's] purchase is too long as a matter of law to constitute 'contemporaneous' trades...." 2017 WL 2599327, at \*5. [43] This Court agrees. Defendants rely only on cases from other courts and have not cited any authority from the Fifth Circuit or its district courts that require application of a same-day-trading rule. Defendants failed to establish as a matter of law that Plaintiffs' section 20A claim must be dismissed at this stage. Defendants' motion to dismiss Plaintiffs' section 20A claim should be denied.

[43]  *See also, e.g., In re Enron*, 258 F. Supp. 2d at 600, 618 (Despite dismissing section 20A claims where plaintiffs did not trade on the same day, "find[ing] that two or three days, certainly less than a week, constitute[s] a reasonable period to measure the contemporaneity...."); *accord In re Enron Corp. Sec., Deriv. & ERISA Litig.*, No. H-01-3624, 2016 WL 4095973, at \*38 (S.D. Tex. Aug. 2, 2016), *aff'd*, 725 F. App'x 278 (5th Cir. 2018), *cert. denied*, ——U.S. ——, 139 S. Ct. 199, 202 L.Ed.2d 123 (2018).

MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3451153

## VI.

### STATE LAW CLAIMS

**\*25** Defendants argue that Plaintiffs' Texas and Connecticut common law claims for fraud and negligent misrepresentation should be dismissed because they are duplicative of Plaintiffs' section 10(b) securities fraud claim and must satisfy the particularity requirements of Rule 9(b). ECF No. 39 at 28-29. Plaintiffs contend that their fraud and negligent misrepresentation claims do not need to satisfy the heightened PSLRA pleading requirements, and even if they do, they satisfy that standard. ECF No. 47 at 28-29. Plaintiffs also contend that their negligent misrepresentation claims need only satisfy Rule 8 because these claims are based only on a subset of allegations in their complaint. *Id.* at 29.

To the extent Plaintiffs stated a claim under section 10(b) satisfying the PSLRA's heightened pleading standards, Defendants' motion to dismiss Plaintiffs' fraud and negligent representation claims should be denied as to the same alleged misstatements in paragraphs 90-94, 104-08, 111-16, 122, and 126-27 in the complaint. *See RYH Prop., LLC v. West*, No. 508-CV-172, 2009 WL 10676645, at \*13 (E.D. Tex. Aug. 3, 2009) (denying defendants' motions to dismiss common law fraud claim where plaintiffs adequately pleaded federal securities fraud claims); *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 364-65 (D. Conn. 2013) (denying defendants' motion to dismiss common law fraud and negligent misrepresentation claims where plaintiffs adequately pleaded federal securities fraud claims).

### A. Plaintiffs' Fraud Claims.

Regarding the remainder of Plaintiffs' common law fraud claims, Plaintiffs do not dispute that these must satisfy the particularity requirement of Rule 9(b), although they contend there need not be a "strong inference" of scienter because state of mind can "be alleged generally." [44] ECF No. 47 at 28-29. While the standard for scienter may be slightly more relaxed under Rule 9(b) than under the PSLRA, Plaintiffs must still plead with particularity why the alleged misstatements are false under Rule 9(b). [45] To the extent Plaintiffs failed to plead why the alleged misstatements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 in the complaint were false under the PSLRA, they likewise fail to plead why the same statements were false under Rule 9(b).

[44] *See Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) (although "common law fraud claims are not subject to the heightened 'strong inference' of scienter standard imposed by the PSLRA, ... [they] are still subject to the pleading standard of Rule 9(b)."), *cert. denied*, 558 U.S. 873, 130 S.Ct. 199, 175 L.Ed.2d 125 (2009); *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

[45] *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 561 (D. Conn. 2016) ("In order to satisfy Rule 9(b)'s particularity requirement with regard to fraud claims, the complaint must: '... (4) explain why the statements were fraudulent.' "); *see also Omni USA, Inc. v. Parker-Hannifin Corp.*, No. H-10-4728, 2012 WL 1038642, at \*3 (S.D. Tex. Mar. 27, 2012) ("To plead fraud under Texas law, a plaintiff must allege (1) the defendant made a misrepresentation to the plaintiff; (2) the representation was material; (3) the representation was false....") (quoting *Shandong Yinguang Chem. Indust. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010)); *Simms v. Seaman*, 308 Conn. 523, 548, 69 A.3d 880 (2013) (Under Connecticut law, "[t]he essential elements of an action in common law fraud ... are that: (1) a false representation was made as a statement of fact....") (quoting *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010)).

### B. Plaintiffs' Negligent Misrepresentation Claims.

**\*26** Ordinarily, negligent misrepresentation claims are not subject to Rule 9(b). *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 (5th Cir. 2004). But Defendants argue that Rule 9(b) applies to "claims for negligent misrepresentations where the factual allegations underlying it and a fraud claim are the same." ECF No. 39 at 29; *Omni*, 2012 WL 1038642, at \*2 (citing *Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003)) (collecting cases). [46] Plaintiffs argue that their negligent misrepresentation claims are based on different facts from their fraud claims, pointing to language in their complaint that for their negligent misrepresentation claims,

they "incorporate each and every allegation contained above as if fully set forth herein, except all allegations concerning intentional reckless conduct, or that sound in fraud." ECF No. 3 at ¶¶ 251, 269.

46    *Accord Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 737 (N.D. Tex. 2008) (granting motion to dismiss negligent misrepresentation claim based on the same operative facts as fraud claim).

While the Court doubts that such boilerplate language is sufficient to show that different facts form the basis of Plaintiffs' negligent misrepresentation claims, *Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.* interpreted relevant Fifth Circuit law to mean instead that negligent misrepresentation claims

> do not become subject to heightened pleading simply because they are based on the same set of operative facts as corresponding fraud claims. Rather, Rule 9(b) operates to require dismissal of a negligent misrepresentation claim only when (1) a plaintiff waives arguments to the contrary or (2) the inadequate fraud claim is so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the fraud claim while leaving behind a viable negligent misrepresentation claim.

362 F. Supp. 2d 744, 749 (N.D. Tex. 2005). The court held that,

> in determining whether a negligent misrepresentation claim is subject to dismissal along with an impermissibly general fraud claim, the question is whether ... the Court [can] describe a simple redaction that removes allegations of fraud from the complaint, but leaves the plaintiff's valid and intelligible negligent misrepresentation claim intact.... Conversely, when it would be necessary to engage in line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of negligent misrepresentation, several factors counsel in

favor of dismissal. ... [I]f it is unclear which allegations pertain to the fraud claim as opposed to the negligent misrepresentation claim, the court risks interpreting the complaint in a manner inconsistent with the intent of the plaintiff. Finally, a court that endeavors to separate intertwined fraud and negligence claims takes upon itself a burden that is better placed upon the party responsible for the defective pleading. Rather than "sift through allegations of fraud in search of some lesser included claim," or "rewrite ... a deficient complaint," the court should dismiss without prejudice.

*Id.* at 752. This Court's review of Defendants' cited cases and the Fifth Circuit cases they rely on suggest that Fifth Circuit precedent on this matter does not go quite as far as Defendants urge—that Rule 9(b) categorically applies to negligent misrepresentation claims whenever they are based on the same facts underlying fraud claims. *See Hamilton Lane*, 115 F. App'x at 668 (reversing dismissal of negligent misrepresentation claim under Rule 9(b)).

Nevertheless, the Court is unable to effectively distinguish between Plaintiffs' fraud and negligent misrepresentation claims without "engag[ing] in a line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of misrepresentation...." because the negligent misrepresentation claims appear to be based on the same alleged misstatements and Plaintiffs' allegations for why those statements are false. *Am. Realty Trust, Inc.*, 362 F. Supp. 2d at 752.

**\*27** In addition, even if Plaintiffs need only satisfy Rule 8, to state a claim for negligent misrepresentation under either Texas or Connecticut law, Plaintiffs must still allege that a false statement was made. [47] For the same reasons Plaintiffs failed to allege why the statements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 were actionable for their section 10(b) claim, Plaintiffs likewise failed to allege those same statements were false even under the lower Rule 8 pleading standard. Thus, Defendants' motion to dismiss Plaintiffs' state law claims should be granted in part and denied in part to the same extent as Plaintiffs' section 10(b) claim.

47    *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 560 (D. Conn. 2016) ("To plead a claim for negligent misrepresentation under Connecticut law, a plaintiff must allege (1) that the defendant made a misrepresentation of

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 183 of 281
MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)
2019 WL 3451153

fact....") (citations omitted); *City of Houston Tex. v. Towers Watson & Co.*, No. 4:14-CV-2213, 2015 WL 5604059, at *2 (S.D. Tex. Sept. 23, 2015) (Under Texas law, "[t]o state a claim for negligent misrepresentation, a plaintiff must allege: ... (2) the defendant supplies 'false information' ....") (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

## VII.

## LEAVE TO AMEND

Plaintiffs request that if the Court grants Defendants' motion, they be granted leave to amend. ECF No. 47 at 32. "When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice" unless it is clear the defects are incurable. *Freuler v. Parker*, 803 F. Supp. 2d 630, 635 (S.D. Tex. 2011) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)), *aff'd*, 517 F. App'x 227 (5th Cir. 2013). Courts have discretion to grant leave to amend and may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.* (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

While Defendants did not address Plaintiffs' request for leave to amend, they point out that Plaintiffs had access to hundreds of thousands of documents and deposition testimony from the Class Action before filing this action. ECF No. 39 at 8. Therefore, amendment might be futile. Plaintiffs also have not explained what additional facts they could plead to cure any deficiencies. ECF No. 47 at 32. But, based on the parties' minimal briefing on this issue, the Court cannot conclude that amendment would in fact be futile. The operative complaint is still the original complaint and Plaintiffs should be granted at least one opportunity to amend.

## VIII.

## CONCLUSION

The Court recommends that Defendants' motion to dismiss, ECF No. 39, should be **DENIED in part** and **GRANTED in part without prejudice** as follows:

1. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims should be **denied** as to the alleged misstatements in paragraphs 90-94,[48] 104-08, 111-16, 122,[49] and 126-27 in the complaint.

2. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims should be **granted** as to the alleged misstatements in paragraphs 90,[50] 95-97, 99-103, 109, 110, 119, 121-25,[51] 143-52, and 174 in the complaint.

3. Defendants' motion to dismiss Plaintiffs' claim for control liability under section 20(a) should be **denied** as to Wright and Poppe and **granted** as to Taylor.

**\*28**  4. Defendants' motion to dismiss Plaintiffs' claim for insider trading under section 20A should be **denied**.

5. Defendant Taylor should be **dismissed**.

[48]  This part of paragraph 90 should remain: "In February we ... began underwriting applications with credit scores between 500 and 525."

[49]  This part of paragraph 122 should remain: "....the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system."

[50]  Only this part of paragraph 90 should be struck: "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure...."

[51]  Only this part of paragraph 122 should be struck: "We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter."

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(B). Failure to file timely**

**MicroCapital Fund LP v. Conn's Inc., Not Reported in Fed. Supp. (2019)**
2019 WL 3451153

**objections will preclude review of factual findings or legal conclusions, except for plain error.** *Quinn v. Guerrero*, 863 F.3d 353, 358 (5th Cir. 2017).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3451153

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 12

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 186 of 281

Oppenheim Pramerica Asset Management S.A.R.L. v...., Not Reported in...

2007 WL 2720074

2007 WL 2720074
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

OPPENHEIM PRAMERICA ASSET

MANAGEMENT S.A.R.L., on behalf of

itself and others similarly situated, Plaintiffs,

v.

ENCYSIVE PHARMACEUTICALS,

INC., et al., Defendants.

No. Civ.A.H–06–3022.
|
Sept. 18, 2007.

**Attorneys and Law Firms**

Richard Eugene Norman, Timothy Joseph Crowley, Crowley
& Douglas, Thomas E. Bilek, The Bilek Law Firm LLP,
Patrick Andrew Zummo, Zummo & Midkiff LLP, Houston,
TX, Ann K. Ritter, James M. Hughes, Joseph F. Rice, Motley
Rice LLC, Mount Pleasant, SC, James M. Evangelista,
Lauren S. Antonino, Motley Rice LLC, Atlanta, GA, Austin
P Tighe, Jr., Feazell & Tighe LLP Bridgepoint 2, Austin, TX,
Howard G. Smith, Smith & Smith LLP, Bensalem, PA, Lionel
Z. Glancy, Glancy Binkow Goldberg, Los Angeles, CA, for
Plaintiffs.

Gerard G. Pecht, Peter Andrew Stokes, Fulbright & Jaworski,
Austin, TX, for Defendants.

*MEMORANDUM AND ORDER*

ATLAS, J.

**\*1** This securities fraud case is before the Court on
Defendants' Motion to Dismiss [Doc. # 82], to which
Plaintiffs filed their Opposition [Doc. # 83], and Defendants
filed a Reply [Doc. # 84]. Based on the Court's
review of Plaintiffs' Consolidated Class Action Complaint
("Complaint") [Doc. # 76] and all other matters of record, and
the application of governing legal authorities, the Court grants
the Motion to Dismiss.

I. *BACKGROUND*

Defendant Encysive Pharmaceuticals, Inc. ("Encysive") is
a biopharmaceutical company. Defendant Bruce Given is
Encysive's President and Chief Executive Officer, and
Defendant Richard Dixon is its Chief Scientific Officer.
Defendant Stephen Mueller and Defendant Terrence Coyne
were each Encysive's Vice President of Finance, Secretary,
and Treasurer during various portions of the relevant time
frame. Defendant Gordon Busenbark was Encysive's Chief
Financial Officer. Given and Dixon are also members of
Encysive's Board of Directors.

Lead Plaintiff Oppenheim Pramerica Asset Management
S.a.r.l ("OPAM") is a European fund management company
that purchased shares of Encysive stock during the Class
Period between February 19, 2004 and July 24, 2006.

Encysive developed a drug called sitaxentan, to be marketed
under the trade name "Thelin," for the treatment of
Pulmonary Arterial Hypertension ("PAH"). Encysive applied
for approval from the Food and Drug Administration
("FDA") and from regulatory authorities in Europe, Canada,
and Australia. Approval was granted in Canada, in Australia,
and in Europe for all twenty-seven countries in the European
Union. During the Class Period, the FDA issued two letters
stating that Thelin is "approvable," but the agency has not
yet given final approval for Encysive to market Thelin in the
United States. [1] The FDA has not, however, denied approval
of Thelin.

[1] These letters were issued on March 24, 2006, and
July 24, 2006. On July 15, 2007, the FDA issued a
third "approvable" letter.

OPAM, for itself and on behalf of other similarly situated
investors in Encysive stock during the Class Period, filed
this Complaint alleging that Encysive engaged in securities
fraud in violation of § 10(b) of the Securities Exchange Act,
15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder.
Plaintiffs assert that Encysive made false and misleading
statements during the Class Period that caused the price
of Encysive stock to be artificially inflated. Plaintiffs also
assert a claim against the individual Defendants as controlling
persons under § 20(a) of the Securities Exchange Act, 15
U.S.C. § 78t(a).

Defendants filed their Motion to Dismiss. The Motion has
been fully briefed and is now ripe for decision.

II. *STANDARD FOR MOTION TO DISMISS*

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to seek dismissal of a claim if it fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A securities fraud cause of action can fail to state a "claim upon which relief can be granted" if the plaintiff fails to plead each element with particularity. *See Central Laborers' Pension Fund v. Integrated Elec.,* 497 F.3d 546, 2007 WL 2367776, *2 (5th Cir. Aug.21, 2007). The United States Supreme Court has made clear that a plaintiff is obligated to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). [2] "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests." *Id.* at 1965 n. 3 (internal quotation marks omitted). When the Complaint contains inadequate factual allegations, "this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 1966. "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

[2]     *Twombly* was decided under the less stringent pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure. Because the Private Securities Litigation Reform Act ("PSLRA") requires that each element of the securities fraud claim be pled with particularity similar to the more onerous pleading requirements of Rule 9, the Supreme Court's decision in *Twombly* applies with at least equal force to the PSLRA pleading requirements.

III. *ANALYSIS*

**\*2** In order to state a claim for securities fraud under § 10(a) of the Securities Exchange Act, "a plaintiff must allege, in connection with the purchase or sale of securities[:] (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately

[injured him]." *Central Laborers' Pension Fund v. Integrated Elec.,* 497 F.3d 546, 2007 WL 2367776, *2 (5th Cir. Aug.21, 2007) (quoting *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir.2006)). The Private Securities Litigation Reform Act ("PSLRA") requires that each element be pled with particularity. *See id.*

A. *Material Misstatement or Omission*
Defendants argue that Plaintiffs have not alleged with adequate particularity a material misstatement or omission. "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* "Failure to do so results in dismissal of the complaint." *Id.*

Plaintiffs identify statements made during the Class Period by Defendants in press releases, corporate reports, and conference calls with analysts. Many of the statements relate to the clinical studies of Thelin and a comparison of Thelin to a competing drug bosentan, marketed as Tracleer. For example, in press releases during the summer of 2004, Encysive described the continuing clinical program for Thelin. In press releases during the fall of 2004, Encysive compared Thelin with Tracleer and expressed the belief that Thelin "has the potential" to be an important alternative for patients who developed liver problems when using Tracleer. Encysive continued to report the status and ultimate results of clinical testing throughout the remainder of 2004 and all of 2005.

There is no allegation that Encysive falsified or misstated the status and results of the various clinical tests involving Thelin. Indeed, Encysive fully disclosed problems that were encountered with Thelin's efficacy and safety at different dosage levels. Instead, Plaintiffs allege that these statements were false because the supporting trials were "inadequate." *See, e.g.,* Complaint, ¶¶ 39, 78. Absent any particularized allegation that Encysive knew its trials were fraudulent, the allegation that the trials themselves were inadequate fails to allege a false statement. "[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study. Medical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 420 (5th Cir.2001).

Other allegedly false or misleading statements Plaintiffs identify in the Complaint relate to Encysive's plan to apply

for priority review of Thelin by the FDA and the company's hopes for a successful result. As to many of these statements, however, Plaintiffs fail to allege a factual basis for the conclusory allegation that the statement was false. For example, Encysive issued a press release in February 2005 stating that the company was "focused on filing a New Drug Application (NDA) with the [FDA] in April 2005 to seek marketing authorization." *See* Complaint, ¶ 56. During a conference call that same day, Defendant Given stated that Encysive would "absolutely request priority review." *See id .,* ¶ 57. During an April 2005 conference call, Given noted that cancer and HIV drugs frequently get priority review from the FDA and expressed the view that PAH should get priority review as well because it has a higher mortality rate than HIV and many cancers. *See id.,* ¶ 62. Plaintiffs allege no facts to indicate that these statements were false or that they omitted material information.

 **\*3** The remaining statements identified by Plaintiffs in connection with the FDA application are clearly forward looking projections as to which Defendants enjoy a "safe harbor." "Under Section 21E of the PSLRA, a defendant will not be liable for forward-looking statements, where the forward-looking statement is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.' " *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 866 (5th Cir.2003) (quoting 15 U.S.C. § 78u–5(A)(ii) ("safe harbor provision"). Meaningful cautionary statements are "company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir.2004). To avoid this safe harbor provision, the plaintiff must plead with particularity facts showing that the forward-looking statement was made with actual knowledge that it was false. *See id.* at 371. For example, in the February 2005 conference call referenced above, Defendant Given stated that Encysive believed it had a "good shot" at receiving priority review from the FDA, but noted clearly that it was "an FDA decision of course." *See* Complaint, ¶ 57. During a later conference call in February 2005, Given stated that Encysive did not expect the FDA to require additional clinical trials, but also stated clearly that "you never know what's going to happen when you get into a regulatory process." *See id.,* ¶ 59. Encysive's statements of its expectations regarding the FDA approval process were

clearly no more than that—statements of Encysive's hopes and expectations.

Plaintiffs have alleged in bald, conclusory fashion that Defendants knew that Thelin would not obtain FDA approval, would not be commercialized, and would not gain market share from Tracleer. *See id.,* ¶ 78. Plaintiffs have not, however, alleged with any particularity facts supporting Defendants' alleged knowledge. These conclusory assertions of knowledge and falsehoods are insufficient to withstand Defendants' Motion to Dismiss.

Plaintiffs note that Encysive received an "approvable letter" on March 24, 2006, and another one in July 2006. Although Plaintiffs concede that Encysive disclosed the receipt of each letter immediately, Plaintiffs allege that Defendants made misstatements or omissions because they declined to discuss the details of the letters with market analysts. When declining to answer such questions from analysts, Encysive explained clearly that, in order to avoid assisting competitors with their FDA applications, Encysive would keep the details confidential. Encysive's decision not to discuss publicly the details of the "approvable" letters did not constitute a material misstatement or omission. [3]

[3]     Plaintiffs have not alleged and cannot allege that this decision was unreasonable, given the competitive market conditions. During the Class Period, several other companies were testing competing drugs to treat PAH.

 **\*4** Plaintiffs have failed as a matter of law to identify any statements by Defendants that constituted misstatements or omissions in support of their securities fraud claims. As a result, Defendants are entitled to dismissal of the Complaint.

 B. *Scienter*

Defendants argue that this case should be dismissed because Plaintiffs have failed to allege scienter with adequate particularity. In any private securities fraud action under the PSLRA, the complaint shall, with respect to each alleged misstatement or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). The plaintiff must allege and prove that the defendant acted with scienter, which means intent or severe recklessness. *Id.* "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence,

but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*

When determining whether a plaintiff has alleged facts that give rise to the requisite inference of scienter, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences ... Yet the inference of scienter must be more than merely reasonable or permissible —it must be cogent and compelling, thus strong in light of other explanations." *Id.* (internal citations and quotations omitted). A complaint, therefore, will survive dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Plaintiffs in this case have not alleged facts that raise an inference that Defendants acted with the necessary scienter. Plaintiffs argue scienter is established by Encysive's failure to disclose "any information about the FDA's refusal to approve Thelin or why it wanted additional clinical trial data." *See* Opposition, p. 17. This argument is rejected. First, the FDA has not refused to approve Thelin and Encysive promptly disclosed the FDA's approvable letters seeking additional information. Second, as is discussed above, Encysive explained its reasons for not discussing publicly the specifics of the FDA letters and that explanation is cogent and compelling. Indeed, it is as reasonable as Plaintiffs' belief that the decision to withhold those specifics constituted knowledge of some misstatement or omission.

**\*5** Plaintiffs also argue that they have adequately alleged scienter by showing that Encysive was motivated to engage in securities fraud because it needed money from public stock offerings. It is rare that a company conducts a public stock offering for any reason other than to raise money and, therefore, this does not raise an inference of scienter. Additionally, Encysive used a large part of the money it acquired from the stock sales to finance the development of Thelin, indicating Defendants' belief that Thelin's potential as a successful and lucrative product for the company justified the expenditures.

Moreover, the allegations in the Complaint do not raise an inference of intent or severe recklessness that is at least as compelling as the opposing inference one could draw from the facts alleged. For example, Encysive's applications for approval to market Thelin in Europe, Canada and Australia were approved, supporting Encysive's belief that the FDA application would similarly be approved. Encysive, as early as its 2003 Form 10–K filed in March 2004, clearly and unequivocally cautioned that "[i]f we are unable to clearly demonstrate that Thelin0 provides an acceptable risk-benefit profile as compared to currently approved therapies, we are not likely to receive regulatory approval to market" the drug. *See* Complaint, ¶ 46. Similar cautionary language was included in the other public statements regarding the clinical testing and the FDA approval process. As is noted above, Encysive invested significant resources in the development of Thelin, indicating its genuine belief that the drug would receive FDA approval and be successfully marketed. The allegations in the Complaint do not support a cogent inference of scienter.

Plaintiffs also note that two of the individual Defendants sold stock during the Class Period. "Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts." *See Central Laborers' Pension Fund,* 2007 WL 2367776 at \*5 (citing *Rubinstein v. Collins,* 20 F.3d 160, 169 (5th Cir.1994)). "Suspicious in this context generally means that the sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Id.* (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 435 (5th Cir.2002)). "Insider trading alone cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Id.* (internal quotations and citation omitted). An insider's sales of only a small percentage of his total stock holdings does not contribute to an inference of scienter. *See id.* In this case, Given, Encysive's CEO and the person who actually made the challenged statements during the press conferences, did not sell any shares during the Class Period. Defendant Mueller sold 17.59% of his holdings and Defendant Dixon sold 13.79% of his holdings. Each had sold shares prior to the Class Period, and each retained the vast majority of their shares throughout the Class Period. Because the sales were of small percentages and only by two insiders, and because there is no other inference of scienter, the stock sales by Mueller and Dixon do not create a cogent inference of scienter.

**\*6** Absent allegations that raise an inference of scienter that is both cogent and at least as compelling as any opposing

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 190 of 281

Oppenheim Pramerica Asset Management S.A.R.L. v...., Not Reported in...

2007 WL 2720074

inference one could draw from the facts alleged, Plaintiffs' Complaint must be dismissed.

C. *Section 20 Control Person Liability*

As is discussed above, Plaintiffs have failed to plead with adequate particularity facts to support either the misstatements or the scienter element of a securities fraud cause of action. Because they have failed to allege a primary securities fraud violation, they necessarily fail to state a claim for control person liability under § 20. *See Financial Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 288 (5th Cir.2006).

IV. *CONCLUSION AND ORDER*

Plaintiffs have failed to allege with adequate particularity that Defendants made false statements with the necessary scienter. The pleading requirements of the PSLRA and the standard described by the United States Supreme Court in *Twombly* have not been met. The Consolidated Class Action Complaint [Doc. # 76] is itself an amended pleading filed after three civil cases, each with its own complaint, were consolidated. As a result, it appears that additional attempts to amend to plead securities fraud violations in this case would be futile. The Court will not further delay the final resolution of this dispute by allowing yet another amendment. Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss [Doc. # 82] is GRANTED. The Court will issue a separate Final Dismissal Order.

*FINAL ORDER*

For the reasons stated in the accompanying Memorandum and Order, it is hereby

ORDERED that Defendants' Motion to Dismiss [Doc. # 82] is GRANTED. This is a final, appealable order.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2720074

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 13

2019 WL 1205628
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Kristen PLAISANCE, Robbie Plaisance, Rickie Corley, Charles F. Leekley, Brett Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino, Richard Sparacino, Christian Schick, Jack Gostl, Santiago Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, Robert Roig, Joseph C. Rosso, and Arthur D. Secor, Plaintiffs,

v.

John D. SCHILLER, Jr., D. West Griffin, Hill A Feinberg, Norman M.K. Louie, William Colvin, David M. Dunwoody, Cornelius Dupré II, Kevin Flannery, Scott A. Griffiths, James LaChance, and UHY LLP, Defendants.

Civil Action No. H-17-3741
|
Signed 03/14/2019

**Attorneys and Law Firms**

Randall Scott Newman, Mark C. Rifkin, Wolf Haldenstein et al, New York, NY, Deirdre Carey Brown, Hoover Slovacek LLP, Houston, TX, for Plaintiffs.

Barrett H. Reasoner, Ashley McKeand Kleber, David Michael Sheeren, Gibbs Bruns LLP, Houston, TX, Kenneth E. Warner, Warner Partners, P.C, Clifford Thau, Vinson Elkins, New York, NY, Jill Rickershauser Carvalho, Paul R. Bessette, Tyler Wayne Highful, King and Spalding, Austin, TX, Jeffrey S. Johnston, Vinson Elkins LLP, Houston, TX Richard Kent Piacenti, Vinson and Elkins LLP, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SIM LAKE, UNITED STATES DISTRICT JUDGE

**\*1** This action is brought by plaintiffs, Kristen Plaisance, Robbie Plaisance, Rickie Corley, Charles F. Leekley, Brett Morris, Henry Negrette, Jim Nesbitt, Cindy Sparacino, Richard Sparacino, Christian Schick, Jack Gostl, Santiago Cordovez, Floyd Bone, Tom Howland, Michael Mernah, Ben A. Seale, Joe Shupak, Marshall Whitmer, Bill Walters, Robert Roig, Joseph C. Rosso, and Arthur D. Secor (collectively,

"Plaintiffs"), against defendants, UHY LLP ("UHY"), and ten individual defendants (collectively, "Individual Defendants"): John D. Schiller ("Schiller"), D. West Griffin ("Griffin"), Hill A Feinberg ("Feinberg"), Norman M.K. Louie ("Louie"), William Colvin ("Colvin"), David M. Dunwoody ("Dunwoody"), Cornelius Dupré II ("Dupré"), Kevin Flannery ("Flannery"), Scott A. Griffiths ("Griffiths"), and James LaChance ("LaChance"), for common law fraud and alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, during the period beginning on September 28, 2007, and ending on December 30, 2016, arising from statements and representations regarding Energy XXI Ltd. ("EXXI" or the "Company"). Plaintiffs also assert claims for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for breach of fiduciary duty against the Individual Defendants all of whom served as members of EXXI's Board of Directors. Pending before the court are UHY LLP's Motion to Dismiss ("UHY's MD") (Docket Entry No. 101), Defendant D. West Griffin's Motion to Dismiss the Amended Complaint ("Griffin's MD") (Docket Entry No. 102), Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint ("Louie's MD") (Docket Entry No. 103), Defendant John D. Schiller, Jr.'s Motion to Dismiss the Amended Complaint ("Schiller's MD") (Docket Entry No. 104), and The Director Defendants' Motion to Dismiss the Amended Complaint ("Director Defendants' MD") (Docket Entry No. 105). For the reasons stated below, the defendants' motions to dismiss will be granted.

**I. Procedural History and Alleged Facts**

Plaintiffs initiated this action on September 6, 2017, by filing in the Southern District of New York a Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty (Docket Entry No. 1), asserting claims for fraud and violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants, and claims for violation of § 20(a) of the Exchange Act and breach of fiduciary duty against the Individual Defendants. On December 1, 2017, the Southern District of New York entered an Order pursuant to 28 U.S.C. § 1404(a) transferring the action to this court (Docket Entry No. 52). On February 12, 2018, defendants moved for dismissal (Docket Entry Nos. 85, 86, 89, 93, and 94). On March 29, 2018, Plaintiffs filed an Amended Complaint for Violation of the Federal Securities Law, Common Law Fraud, and

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

Breach of Fiduciary Duty ("Plaintiffs' Amended Complaint") (Docket Entry No. 97), in which they reassert the same claims asserted in their initial complaint. On May 18, 2018, defendants filed the pending motions to dismiss Plaintiffs' Amended Complaint (Docket Entry Nos. 101-105). On July 16, 2018, plaintiffs filed responses to each of the pending motions to dismiss (Docket Entry Nos. 111-115), and on August 29, 2018, defendants filed replies in support of their motions to dismiss (Docket Entry Nos. 118-122).

**\*2** Plaintiffs' Amended Complaint alleges that EXXI was founded by Schiller and Griffin in 2005 to acquire, explore, develop, and operate oil and natural gas properties onshore in Louisiana and Texas and offshore in the Gulf of Mexico Shelf, funded by a $300 million initial public offering of common stock traded on the London Stock Exchange Alternative Investment Market ("AIM").[1] Plaintiffs allege that Schiller served as EXXI's President, Chief Executive Officer ("CEO"), and member of the Board of Directors ("Board") from the company's inception through and including February 2, 2017, when EXXI announced the termination of Schiller's employment as President, CEO, and member of the Board in a Current Report filed with the SEC on Form 8-K.[2] From EXXI's founding in 2005 through and including October 15, 2015, Schiller also served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds from personal acquaintances or their affiliates, some of whom provided services to EXXI or its subsidiaries, and that in 2014 he personally borrowed $3 million from defendant Louie before Louie was appointed to the Board effective December 15, 2014.[3] Plaintiffs allege that as EXXI's Board Chairman and CEO, Schiller signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A.[4]

[1]    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 15 ¶¶ 64-65. All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2]    Id. at 6 ¶ 20.

[3]    Id. ¶ 22.

[4]    Id. ¶¶ 20-21.

Plaintiffs allege that defendant Griffin served as EXXI's Chief Financial Officer ("CFO") and Board member from the Company's inception through and including October 20, 2014, when EXXI announced Griffin's resignation in a press release and a Current Report filed with the SEC on Form 8-K/A on December 1, 2014, following BDO USA, LLP's ("BDO") acquisition of the Texas practice of UHY, which provided independent public accounting services to EXXI.[5] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed.[6]

[5]    Id. at 9 ¶ 39.

[6]    Id. ¶¶ 37-38.

Plaintiffs allege that UHY was engaged to audit EXXI's financial statements and to express an opinion on whether those financial statements fairly presented the financial condition of the Company.[7] Specifically, UHY was engaged to audit EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, and 2014.[8] Plaintiffs allege that each audit opinion contained UHY's opinion that it audited EXXI's financial statements "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" (the "PCAOB"),[9] that it "plan[ned] and perform[ed] the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects,"[10] and that each audit stated: " 'In our opinion Energy XXI (Bermuda) Limited and subsidiaries maintained, in all material respects, effective internal control over financial reporting' for the year in question."[11]

[7]    Id. at 19 ¶ 85.

[8]    Id.

[9]    Id. at 20 ¶ 92.

[10]    Id. ¶ 93.

[11]    Id. at 20-21 ¶ 94.

Plaintiffs allege that in addition to serving on EXXI's Board, defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee;[12] defendant Flannery was a member of the

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 194 of 281
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Audit Committee and the Nomination and Governance Committee;[13] defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee;[14] defendant Griffiths served on the Audit Committee and the Compensation Committee;[15] defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an ex officio member of the Audit Committee;[16] and defendant Dupré was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee.[17]

[12]    Id. at 11 ¶ 48.

[13]    Id. ¶ 49.

[14]    Id. at 11-12 ¶ 50.

[15]    Id. at 12 ¶ 51.

[16]    Id. ¶ 52.

[17]    Id. at 12 ¶ 53.

Plaintiffs allege that between 2006 and 2010, EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion of borrowed funds: (1) Marlin Energy, L.L.C. ("Marlin") in February 2006 for approximately $448.4 million; (2) certain Louisiana Gulf Coast producing properties from affiliates of Castex Energy, Inc. ("Castex Properties") in June 2006 for approximately $312.5 million; (3) certain Gulf of Mexico shelf properties from Pogo Producing Company ("Pogo Properties") in June 2007 for approximately $415.1 million; (4) certain Gulf of Mexico shelf oil and natural gas interests from MitEnergy Upstream LLC, a subsidiary of Mitsui & Co., Ltd. ("MitEnergy Interests") in November 2009 for $276.2 million; and (5) certain shallow water Gulf of Mexico shelf oil and natural gas interests from affiliates of Exxon Mobil Corporation ("ExxonMobil Acquisition") in December 2010 for $1.01 billion.[18]

[18]    Id. at 16 ¶¶ 69-71.

 *3  Plaintiffs allege that on July 31, 2007, following EXXI's acquisition of the Pogo Properties in June of 2007, EXXI announced that in addition to trading on the AIM in London, its common stock was approved for trading in the United States on the NASDAQ national exchange.[19] Plaintiffs allege that on August 12, 2011, EXXI's common stock was listed for trading on the NASDAQ Global Select Market under the symbol "EXXI."[20] Plaintiffs allege that because many institutional investors are prohibited from investing in companies that do not meet certain minimum requirements such as the requirements needed to be listed on the NASDAQ Global Select Market exchange, listing thereon gave EXXI greater access to capital and increased market liquidity.[21] Plaintiffs assert their belief that after a reasonable opportunity for discovery, evidence will show that but for EXXI's use of cash flow hedge accounting, EXXI would not have met the minimum requirements for listing on the NASDAQ Global Select Market.[22]

[19]    Id. at 16-17 ¶ 72.

[20]    Id. at 17 ¶ 73.

[21]    Id. ¶ 74.

[22]    Id. ¶ 76.

Plaintiffs allege that from 2010 to 2013 EXXI made optimistic and positive statements about its ultimately unsuccessful ultra-deep exploration program, particularly the Davy Jones No. 1 and No. 2 wells, that were false and misleading when made.[23]

[23]    Id. at 25-32 ¶¶ 108-43.

Plaintiffs allege that in early 2014 defendants caused EXXI to acquire EPL, an independent oil and natural gas exploration and production company, and assert their belief that after a reasonable opportunity for discovery evidence will show that Schiller pursued the acquisition without customary and reasonable due diligence, and consequently that EXXI overpaid for EPL,[24] that following the acquisition one of EPL's Board of Directors, defendant Griffiths, joined EXXI's Board and changed EPL's method of accounting from successful efforts to full cost accounting to match EXXI's accounting method,[25] EXXI's reported goodwill rose from zero reported in EXXI's financial statements from the period ended March 31, 2014, shortly before the acquisition, to $329 million reported by EXXI in its June 30, 2014, financial statements filed immediately after the acquisition.[26]

[24]    Id. at 33-34 ¶¶ 147-155.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 195 of 281
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

25  Id. at 35-36 ¶¶ 159-68.

26  Id. at 37 ¶ 173.

Plaintiffs allege that following EXXI's acquisition of EPL, EXXI issued financial statements that were false and misleading because EXXI failed to perform a quantitative goodwill impairment test and therefore failed to recognize goodwill impairments for EPL or for its other oil and gas properties [27] and failed to disclose the existence of a personal loan from defendant Louie to defendant Schiller. [28]

27  Id. at 38-49 ¶¶ 176-230.

28  Id. at 56 ¶¶ 269-70.

Plaintiffs allege that on or about December 14, 2014, EXXI common stock was cancelled for trading on the AIM in London by action of the Board taken pursuant to a shareholder vote at the annual meeting held on November 4, 2014. [29]

29  Id. at 18 ¶ 78.

Plaintiffs allege that in September of 2015, following a change in independent auditors, EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting. [30] Plaintiffs allege that EXXI's financial statements for the years ended June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes. [31] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations." [32] Plaintiffs also allege that

> **\*4** EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and misleading because it made it appear that the reason for the

restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings. [33]

30  Id. at 17-18 ¶ 77.

31  Id. at 52 ¶ 249.

32  Id. at 54 ¶ 257.

33  Id. at 54-55 ¶ 259.

Plaintiffs allege that on April 16, 2016, EXXI sought protection from its creditors by filing a voluntary Chapter 11 bankruptcy petition in the Southern District of Texas. [34]

34  Id. at 68-69 ¶ 328.

Plaintiffs allege that on April 20, 2016, EXXI was informed by the Listing Qualifications Department of NASDAQ that its stock would be delisted from the NASDAQ for failure to meet the minimum listing qualifications. [35]

35  Id. at 18 ¶ 79.

Plaintiffs allege that on December 13, 2016, the Bankruptcy Court for the Southern District of Texas approved EXXI's amended plan of reorganization. [36]

36  Id. ¶ 81.

## II. Standards of Review

Defendants argue that Plaintiffs' Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable

to the Plaintiffs, and draw all reasonable inferences in the Plaintiffs' favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6) a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 127 S. Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 127 S. Ct. at 1966).

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). Courts may also rely on " 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " Id. See also Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010) (When considering a motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.") (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000) ). In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed and are filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (citing and adopting rule of Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991), and explaining that rule does not apply to other forms of disclosure such as press releases and announcements at shareholder meetings).

## III. Analysis

**\*5** Defendants argue that all of the claims asserted against them should be dismissed because Plaintiffs have failed to state a claim for which relief may be granted.

### A. Federal Securities Law Claims

Defendants argue that the securities claims asserted against them should be dismissed because Plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a), and because the factual allegations do not satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act ("PSLRA") set forth at 15 U.S.C. § 78u-4(b).

#### 1. Applicable Law

##### (a) Federal Securities Law

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014). See also Owens v. Jastrow, 789 F.3d 529, 535 (5th Cir. 2015) (same). To satisfy the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 96 S. Ct. 2126, [449] (1976) (citing Basic Inc. v. Levinson, 108 S. Ct. 978, [231] (1988) ). The Fifth Circuit has stated that "[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1448 (5th Cir. 1993). Inclusion of cautionary language along with disclosure of any firm-specific adverse facts or assumptions is relevant to the materiality inquiry, but "cautionary language as such is not per se dispositive of this inquiry." Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (2007) (quoting Ernst & Ernst v. Hochfelder, 96 S. Ct. 1375, 1381, n.12 (1976) ). Scienter does not require a specific intent to deceive; instead,

**\*6** the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994) (quoting Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993) ). Plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant." R2 Investments LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005) (citing Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among

those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud") ). Group allegations that "the defendants" or "the company" knew something do not meet that standard. Southland, 365 F.3d at 366. The factual allegations contained in the entire complaint must be considered in determining whether plaintiffs' allegations raise a strong inference of scienter. Id. To withstand a motion to dismiss, the facts alleged must permit an inference of intentional deception that is at least equally as compelling as any alternative inference. Lormand v. US Unwired, Inc., 565 F.3d 228, 254 (5th Cir. 2009) (quoting Tellabs, 127 S. Ct. at 2499, 2510).

Plaintiffs must show a causal connection between the company's revealing of the truth regarding an earlier misrepresentation and a subsequent decline in the company's stock price. See Alaska Electrical Pension Fund v. Flowserve Corp., 572 F.3d 221, 229 (5th Cir. 2009). This corrective disclosure must be "related to" or "relevant to" the alleged fraud, meaning the disclosed information must make the existence of the alleged fraud "more probable than it would be without that alleged fact." Public Employees' Retirement System of Mississippi, Puerto Rico Teachers' Retirement System v. Amedisys, Inc., 769 F.3d 313, 321 (5th Cir. 2014), cert. denied, 135 S. Ct. 2892 (2015). The corrective disclosure "can be gradually perceived in the marketplace through a series of partial disclosures." Id. at 322. Partial disclosures are viewed collectively and considered as a whole to determine when cumulative facts support a corrective disclosure that meets the loss causation pleading standard. Id. at 325.

The parties agree that the applicable statute of limitations and repose is 28 U.S.C. § 1658(b). [37] Under 28 U.S.C. § 1658(b) an action for securities fraud must be brought no later than two years after the discovery of the facts constituting the violation or five years after the occurrence of the violation, whichever is earlier. The period of repose begins to run from the date of the misrepresentation or omission that forms the basis of the securities law violation. Hall v. Variable Annuity Life Insurance Co., Civil Action No. H-11-3639, 2012 WL 12877431, at *4 (S.D. Tex. May 31, 2012), aff'd, 727 F.3d 372 (5th Cir. 2013) (citing In re Exxon Mobil Corp. Securities Litigation, 500 F.3d 189, 199-200 (3d Cir. 2007) ("[W]e hold that the repose period applicable to § 10(b) claims as set out in §§ 9(e) and 1658(b)(2) begins to run on the date of the alleged misrepresentation."). Because Plaintiffs filed this action on September 6, 2017, [38] the date of repose is September 6, 2012. Plaintiffs state that they "do not assert any claims for any false, misleading, or incomplete

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 198 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

statements made prior to that date." [39] Nevertheless, citing Rubinstein, 20 F.3d at 170 n.41, Plaintiffs argue that "to the extent that untrue statements were made prior to September 6, 2012, about which Defendants had a duty to correct – such as EXXI's 2011 annual report, which improperly utilized hedge accounting – the omission of a corrective disclosure in subsequent statements made *after* that date are actionable." [40]

[37]   See, e.g., Director Defendants' MD, Docket Entry No. 105, pp. 29-30, and Plaintiffs' Memorandum of Law in Opposition to the Director Defendants' Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Director Defendants' MD"), Docket Entry No. 115, p. 26.

[38]   See Complaint for Violation of the Federal Securities Law, Common Law Fraud, and Breach of Fiduciary Duty, Docket Entry No. 1.

[39]   Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 26.

[40]   Id.

**\*7**  In Rubinstein, 20 F.3d at 170 n.41, the Fifth Circuit acknowledged that defendants have a duty under Rule 10b-5 to correct statements if those statements have become materially misleading in light of subsequent events, but the Rubinstein court neither held nor stated that material omissions made before the date of repose remain actionable because defendants have an ongoing duty to correct such omissions. Plaintiffs' argument that material omissions made before the date of repose are nevertheless actionable because defendants had an ongoing duty to correct those omissions would negate the five-year statute of repose by allowing plaintiffs to revive time-barred claims simply by asserting that defendants had an ongoing duty to correct their material omissions. Any claims based on misrepresentations or omissions allegedly made before September 6, 2012, are therefore barred by the statute of repose. See Hall, 2012 WL 12877431, at \*4 (citing Malhotra v. The Equitable Life Assurance Society of the United States, 364 F. Supp. 2d 299, 305-06 (E.D.N.Y. 2005) (granting defendants' 12(b)(6) motion on the ground that the statute of repose began to run on the day of the initial omission).

(b) Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiffs must plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003) (citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 118 S. Ct. 412 (1997) ). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman, 14 F.3d at 1067.

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.' " Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992) ). See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.") ). "A dismissal for failure to plead fraud with particularity as required by rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland, 365 F.3d at 361 (citing Shushany, 992 F.2d at 520-520).

(c) Private Securities Litigation Reform Act

In 1995 Congress amended the Exchange Act through the passage of the PSLRA, 15 U.S.C. § 78u-4(b)(1). In relevant part the PSLRA provides:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; or

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 199 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

**(A) In general**

 **\*8**  Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

...

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the court coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4 (b) (1) & 78U-4(b) (3) (A):

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

(7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief.

In Indiana Electric Workers' Pension Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008), the Court reiterated that the PSLRA heightened the pleading standards for private claims of securities fraud by requiring plaintiffs to allege with particularity why each one of defendants' representations or omissions was misleading under 15 U.S.C. § 78u-4(b)(1), and by requiring plaintiffs to plead with particularity those facts giving rise to a strong inference that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2). In Tellabs, 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." However, in Lormand, 565 F.3d at 267, the Fifth Circuit held that the PSLRA did not heighten pleading standards for all six elements of securities fraud. The Fifth Circuit explained that the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." Id. at 255 n.18. Nothing in this language expressly or impliedly heightens the standard of pleading to loss causation. Thus, when considering a motion to dismiss, courts are "not authorized or required to determine whether the plaintiff's plausible inference of loss causation [under 15 U.S.C. § 78u-4(b) (4)] is equally or more plausible than other competing inferences, as [they] must in

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 200 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

assessing allegations of scienter under the PSLRA." Id. at 267.

**\*9** The PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C. § 78u-5(c)(1)(A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity." Southland, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B); Nathenson v. Zonagen Inc., 267 F.3d 400, 409 (5th Cir. 2001) ).

2. Application of the Law to the Alleged Facts

(a) Defendant UHY

UHY argues that the federal securities law claims asserted against it should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing an actionable misstatement or omission of fact arising from its audit opinions or a strong inference of scienter.[41] UHY also joins in the arguments presented in the Director Defendants' MD with respect to the securities fraud claims regarding group pleading, loss causation, and the statute of repose.[42]

[41]    UHY's MD, Docket Entry No. 101, p. 12. See also UHY LLP's Reply in Support of the Motion to Dismiss the Amended Complaint (UHY's Reply"), Docket Entry No. 119, pp. 6-15.

[42]    UHY's MD, Docket Entry No. 101, p. 7 n.2.

**(1) Alleged Misstatements and Omissions**

Citing Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 135 S. Ct. 1318 (2015), UHY asserts that its audit reports are statements of opinion, not fact, and argues that the securities law claims asserted against it should be dismissed because plaintiffs fail to allege an actionable misstatement or omission of fact arising from its audit reports.[43] At least one court in this district has held that audit reports are statements of opinion, not fact, and

plaintiffs do not argue otherwise. See Johnson v. CBD Energy Ltd., Civil Action H-15-1668, 2016 WL 3654657, at \*10 (S.D. Tex. July 6, 2016) ("an auditor's 'statement regarding ... compliance inherently [is] one of opinion' "). Nevertheless, without addressing the applicability of the Supreme Court's Omnicare opinion, plaintiffs respond that UHY's

> argument ignores the fact that Plaintiffs have alleged materially false and misleading statement[s] *in UHY's own audit reports*. As alleged in the Amended Complaint, each of the Company's annual financial statements included an affirmative statement prepared by UHY that it audited the financial statements "in accordance with the standards of the [PCAOB] (United States)." ¶ 92. Plaintiffs also allege UHY represented that it planned and performed the audits to obtain reasonable assurance about whether the Company maintained effective internal control over its financial reporting. ¶ 93. And UHY also affirmatively represented in each audit report that EXXI maintained effective internal control over its financial reporting. ¶ 94.

> As alleged in the Amended Complaint, and as explained above, those statement[s] were materially false and misleading, and UHY had no basis for making them.[44]

Asserting that UHY audited EXXI's annual financial statements included in EXXI's 2011, 2012, 2013, and 2014 annual reports filed with the SEC on Form 10-K, plaintiffs allege that "[t]hose financial statements were erroneous,"[45] because

> [a]s EXXI announced in a press release and a Current Report on Form 8-K filed with the SEC on September 8, 2015, the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013 and 2014, along with its consolidated financial statements for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be reinstated. ¶ 83.[46]

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 201 of 281

43    Id. at 20.

44    Plaintiffs' Memorandum of Law in Opposition to Defendant UHY LLP's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to UHY's MD"), Docket Entry No. 111, p. 17.

45    Id. at 5.

46    Id. at 5-6.

*10 In Omnicare the Court clarified how trial courts should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion. Omnicare provides "two potential avenues for plaintiffs to establish the falsity of an opinion." In re BP p.l.e. Securities Litigation, 2016 WL 3090779, at *9. First, "every ... statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief." Omnicare, 135 S. Ct. at 1327. A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion. Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding that view. Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

Id. at 1322. Thus, even if a speaker's opinion is sincerely held,

> the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

In re BP p.l.e. Securities Litigation, MDL No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting Omnicare, 135 S. Ct. at 1329). The Omnicare Court emphasized that the latter avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a fraud claim by alleging in

general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way." 135 S. Ct. at 1329 (explaining that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why [a speaker] may frame a statement as an opinion, thus conveying uncertainty"). Id. But the Supreme Court also recognized that reasonable investors expect a speaker's statement of opinion to fairly align with the information in his or her possession at the time. Id.

In their Amended Complaint Plaintiffs allege that

> UHY's unqualified audit reports were materially false and misleading because, among other things: (a) the audits were not conducted in accordance with PCAOB standards; and (b) EXXI's financial statements did not fairly present the Company's true financial position and results of operations and did not comply with GAAP [Generally Accepted Accounting Principles]. [47]

In support of their allegations that UHY's audit reports were materially false and misleading, Plaintiffs allege

102. The Company's financial statements did not comport with GAAP as they failed to disclose the millions of dollars in loans to Defendant Schiller from EXXI's vendors and from a confederate on the Board who was also an affiliate of one of the Company's largest shareholders.

103. Contrary to the Audit Report, the audit was not conducted in accordance with PCAOB standards. In particular, PCAOB Standard AU § 316 sets forth certain fraud risks or red flags, including: (a) unsupported balances or transactions; (b) inconsistent, vague or implausible responses from management arising from inquiries or analytical procedures; (c) lack of timely and appropriate documents; (d) missing documents; and (e) evasive or unreasonable responses of management to audit reports.

*11 104. In conducting its audits of the financial statements in EXXI's annual reports, Defendant UHY ignored the most obvious of red flags, the missing

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

documentation necessary to permit the Company to use cash flow hedge accounting. [48]

[47] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 22 ¶ 100.

[48] Id. at 24 §§ 102-04.

Missing from the Plaintiffs' Amended Complaint are allegations of fact capable of proving that UHY did not subjectively believe its audit opinions when they were issued. Therefore, to state a claim against UHY for its audit reports, Plaintiffs must allege, with particularity, facts capable of establishing that UHY knew, but omitted to include in its audit reports, material facts that contradict its opinion statements. See In re Plains All American Pipeline, L.P. Securities Litigation, 245 F. Supp. 3d 870, 905 (S.D. Tex. 2017). [49] The facts that Plaintiffs allege contradict UHY's audit opinions concern loans that defendant Schiller received from defendant Louie and EXXI vendors and lack of documentation needed to support EXXI's use of hedge accounting. [50] But missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that when UHY issued its audit reports, UHY knew or should have known about Schiller's loans. Moreover, since Plaintiffs' Amended Complaint expressly alleges that Schiller's loans were undisclosed until October of 2015, long after UHY issued the audit opinions about which Plaintiffs complain, [51] the facts alleged in Plaintiffs' Amended Complaint contradict their contention that UHY's audit reports were false and misleading because they omitted information about Schiller's loans. [52]

[49] In Plains All American Judge Rosenthal explained that

[s]howing that a statement was false or misleading using this Omnicare prong blurs the lines between the falsity and scienter elements of an Exchange Act claim. Determining whether a statement is false or misleading turns on what the speaker knew, making it similar to the scienter inquiry. But even though this Omnicare inquiry overlaps with the scienter inquiry, the two are not identical. Here, the issue is whether the plaintiffs have adequately pleaded that the defendants were aware of material facts that: (1) contradicted or undermined their compliance opinion statements; and (2) that an investor

would reasonably believe were not true based on that statement. The scienter issue is the individual's state of mind in stating the opinion. 245 F. Supp. 3d at 905.

[50] Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 17.

[51] Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 3 ¶ 22, p. 4 ¶ 24, p. 10 ¶ 44.

[52] See Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 16 n.7 (apparently contradicting the allegations in ¶ 102 of Plaintiffs' Amended Complaint by stating: "Plaintiffs do not allege that UHY's audits were deficient because they failed to uncover the loans.").

Also missing from Plaintiffs' Amended Complaint are any allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known that EXXI lacked documentation needed to support its use of cash flow hedge accounting. Asserting that "EXXI lacked the specific required documentation to utilize cash flow hedge accounting," [53] Plaintiffs argue that

*12 [i]n any adequate audit, UHY would have requested or looked for the required documentation as part of its audit procedures. Had UHY done so, it immediately would have learned that EXXI lacked the required documentation for hedge accounting. Had UHY performed any adequate audit, the lack of specific required documentation would have been obvious to it. [54]

A careful review of Plaintiffs' Amended Complaint, however, only reveals allegations that UHY's audit reports were false when made because EXXI later restated some of its financial statements. [55]

[53] Id. at 15.

[54] Id.

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

[55] See Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 50-51 ¶¶ 239-243.

Plaintiffs allege that in December of 2014, following UHY's acquisition by BDO, EXXI engaged BDO as its successor auditor, and that in September of 2015 EXXI filed a Current Report on Form 8-K with the SEC announcing that the Company's previously issued consolidated financial statements for the years ended June 30, 2011, 2012, 2013, and 2014, and for the quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014, should no longer be relied upon and would be restated. [56] Plaintiffs allege that

> 252. During the preparation of its annual report on Form 10-K for the year ended June 30, 2015, EXXI and its new auditor, BDO, determined that certain of the Company's oil and gas hedges did not qualify for cash flow hedge accounting treatment. EXXI and BDO determined that the Company's hedge documentation did not specify the hedged items and, therefore, the designations failed to meet the documentation requirements for cash flow hedge accounting treatment.

> 253. As a result of that determination, EXXI was required to restate its previously issued consolidated financial statements to reflect the unrealized recognition of gains and losses on derivative financial instruments ... [57]

But missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that when UHY issued its audit reports, UHY knew or should have known that EXXI lacked documentation required to use cash flow hedge accounting. Instead, asserting that "[t]he lack of documentation regarding the hedged items could not be a result of a difference of opinion between the Company's auditors BDO and UHY as the Company disclosed that it had *no documentation* regarding what was being hedged," [58] Plaintiffs allege that UHY's audit reports were false and misleading because absent the missing documentation the audit reports could not have been conducted in accordance with PCAOB Auditing Standards or Generally Accepted Auditing Standards ("GAAS"). [59]

[56] Id. at 51 ¶¶ 244-245.

[57] Id. at 53 ¶¶ 252-53.

[58] Id. at 50 ¶ 235 (emphasis in original).

[59] Id. at 50-51 ¶¶ 237-43.

Despite Plaintiffs' assertion to the contrary, the Current Report on Form 8-K filed with the SEC in September of 2015 announcing the restatement did not state that EXXI had no documentation regarding what was being hedged. Instead, EXXI's September 2015 Form 8-K states:

> [I]n connection with preparing its annual report on Form 10-K for the year ended June 30, 2015 (the "2015 Form 10-K") management of Energy XXI Ltd. (the "Company") and the Audit Committee of its Board of Directors (the "Audit Committee") determined that the contemporaneous formal documentation it had historically prepared to support its initial designations of derivative financial instruments as cash flow hedges in connection with the Company's crude oil and natural gas hedging program did not meet the technical requirements to qualify for cash flow hedge accounting treatment in accordance with ASC Topic 815, Derivatives and Hedging. The primary reason for this determination was that the formal hedge documentation lacked specificity of the hedged items and, therefore, the designations failed to meet hedge documentation requirements for cash flow hedge accounting treatment. [60]

**\*13** EXXI's disclosures in the September 2015 Form 8-K show that EXXI's management reached a judgment different from that previously reached regarding the level of specificity required for the documentation of hedged transactions; the disclosures do not show that EXXI had no documentation regarding what was being hedged. Nor do EXXI's disclosures mention UHY or its auditing services as a reason for the restatements.

2019 WL 1205628

60    September 2, 2015, Form 8-K, Exhibit A to UHY's MD, Docket Entry No. 101-1, p. 2.

Because Plaintiffs fail to allege facts capable of establishing either that UHY did not sincerely believe the opinions stated in its audit reports, or that when UHY issued its audit reports UHY knew or should have known – but failed to disclose – material facts about its inquiry into or knowledge concerning the opinions stated in its audit reports, and that those facts conflict with what a reasonable investor would take from the reports themselves, i.e., information about Schiller's loans and about deficiencies in documentation required to support EXXI's use of cash flow hedge accounting, Plaintiffs have failed to allege facts capable of establishing an actionable misstatement or omission of fact arising from the opinions expressed in UHY's audit reports. See Omnicare, 135 S. Ct. at 1329. Moreover, for the reasons stated below, the court concludes that even if the facts alleged in Plaintiffs' Amended Complaint were capable of establishing an actionable misstatement or omission of fact in UHY's audit reports, Plaintiffs have failed to allege facts capable of raising a strong inference that the misstatements or omissions were made with scienter.

### (2) Scienter

UHY argues that the Exchange Act claims asserted against it should be dismissed because Plaintiffs fail to allege facts capable of establishing a strong inference of scienter. Asserting that EXXI restated its financial statements for fiscal years 2011 through 2014, Plaintiffs argue that the restatements are compelling evidence of UHY's scienter because "UHY knew, or was severely reckless in not knowing, that EXXI's consolidated annual financial statements were not prepared in accordance with GAAP and did not fairly and accurately present the Company's financial results."[61] Plaintiffs argue that "UHY has provided no alternative or opposing explanation for certifying financial statements in which EXXI utilized cash flow hedge accounting without the requisite documentation of specific hedged risks."[62]

61    Plaintiffs' Opposition to UHY's MD, Docket Entry No. 111, p. 8.

62    Id.

To adequately plead scienter Plaintiffs must allege circumstances supporting a strong inference that UHY had actual knowledge, or recklessly disregarded, that its audit reports were false or misleading when made or were made without a reasonable basis. See Lovelace, 78 F.3d at 1018-19. Circuit courts of appeal have found that the requirement of "recklessness" in securities fraud cases is especially stringent when a claim is made against an outside auditor like UHY. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693 (6th Cir. 2004) (collecting cases). "Recklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.' " Id. (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir. 1982) ). Thus, Plaintiffs must allege facts capable of establishing not merely that there was a deviation from accounting principles, but

*14    that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

Id. at 693-94 (quoting In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1426 (9th Cir. 1994) ). See also In re Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 402 (S.D. Tex. 2011); In re Dell Inc., Securities Litigation, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008).

A careful review of the Plaintiffs' allegations of scienter reveal little more than assertions that UHY's audit reports were false because EXXI later restated certain financial information. Courts in this circuit inferring scienter based in part on improper accounting do so only when other factors strongly support the inference. See In re ArthroCare Corp. Securities Litigation, 726 F. Supp. 2d 696 (W.D. Tex. 2010) (improper accounting practices and denials of media reports); In re Seitel, Inc. Securities Litigation, 447 F. Supp. 2d 693 (S.D. Tex. 2006) (improper accounting practices and overstated revenues, memoranda and meeting minutes revealing that the defendants explicitly discussed the

2019 WL 1205628

improper accounting methods, affirmatively chose to ignore potential problems, and dismissed an auditor who confronted them about the improper practices).

Plaintiffs' Amended Complaint does not allege media reports or internal company documents that would permit an inference that UHY knew of or recklessly disregarded evidence that EXXI's accounting misrepresented EXXI's financial condition. Instead, as reasons to infer UHY's scienter, Plaintiffs point to the magnitude of the restatements, and to the reason for the restatements – i.e., lack of specificity in the documentation used to support EXXI's use of cash flow hedge accounting. [63] But the magnitude of misstated financials cannot support a strong inference of scienter absent allegations of facts capable of establishing either that UHY knew or was severely reckless in not knowing of the improper accounting, or that UHY ignored warning signs or red flags indicating that such an inference is merited. See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693.

[63]     Id. at 11-14.

Asserting that "the lack of supporting documentation of EXXI's hedging activities [needed] to permit the Company to utilize hedge accounting was a glaring red flag, giving UHY every reason to know that the financial statements contained material misstatements or omissions," [64] Plaintiffs argue that "[h]ad UHY performed any adequate audit, the lack of specific required documentation would have been obvious to it." [65] But Plaintiffs do not plead any specific facts capable of showing what UHY's audits entailed, how or why they were deficient, or why there is any reason to believe that the alleged deficiencies were purposeful or reckless as opposed to negligent mistakes. Arthrocare, 726 F. Supp. 2d at 735 (citing Dell, 591 F. Supp. 2d at 903). Instead, Plaintiffs rely on the circular reasoning that UHY must have acted with scienter simply because it did not catch the lack of specific documentation for cash flow hedge accounting later identified as the reason for EXXI's restatements. These allegations may support an inference of negligent mismanagement, but they are not sufficient to make intentional or reckless fraud at least as compelling as plausible nonculpable explanations. See Lormand, 565 F.3d at 254 (quoting Tellabs, 127 S. Ct. at 2510).

[64]     Id. at 14-15.

[65]     Id. at 15.

**\*15**  Plaintiffs' pleading on this issue consists of long explanations of the GAAP and GAAS accounting principles allegedly violated, followed by the conclusory statement that UHY clearly violated that principle based solely on the fact that the restatement was issued. [66] But the GAAS standards acknowledge that "even a properly planned ... audit may not detect a material misstatement," AU § 230.12; thus, the mere fact that the audits did not catch a later-revised accounting error in the financial statements is not conclusive. Arthrocare, 726 F. Supp. 2d at 735 (citing In re Dell, 591 F. Supp. 2d at 903). Absent facts specifying fraudulent intent or UHY's state of mind, accounting errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." In re Baker Hughes Securities Litigation, 136 F. Supp. 2d 630, 649 (S.D. Tex. 2001). The parties dispute the simplicity and obviousness of the misapplied accounting rules. [67] But reading the Plaintiffs' Amended Complaint and the record in the Plaintiffs' favor, the Amended Complaint does not sufficiently allege that EXXI violated rules that were so clear and obvious as to make its outside auditor either knowingly deceptive or severely reckless in certifying EXXI's figures on the SEC filings. Plaintiffs' factual allegations make it more plausible, or at least as plausible, to infer that UHY acted negligently than to infer that UHY knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements.

[66]     Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 20-24 ¶¶ 92-104, pp. 49-51 ¶¶ 231-43.

[67]     See Plaintiff's Opposition to UHY's MD, Docket Entry No. 111, pp. 9-11.

Because Plaintiffs have failed to allege facts capable of establishing that when UHY issued its audit reports, UHY knew – or was severely reckless in not knowing – that its audit opinions contained statements that were false or misleading or that the audit opinions were so deficient that they amounted to "no audit at all," Plaintiffs' allegations against UHY are not capable of raising a strong inference of scienter. See In re Dell Inc., Securities Litigation, 591 F. Supp. 2d at 900. That UHY failed to discover in 2011 and 2014 accounting deficiencies that were not found until 2015 might arguably and at most support an allegation of negligence, but not of fraud. [68] Accordingly, UHY's motion to dismiss the federal securities law claims asserted against it will be granted and those claims will be dismissed with prejudice.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 206 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

68    For the reasons stated in § III.A.2(e)(3), below, the court concludes that Plaintiffs have failed to plead facts capable of establishing loss causation.

### (b) Defendant Griffin

Griffin argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because he left EXXI on October 20, 2014 – more than two years before the last alleged misstatement, and because Plaintiffs fail to plead facts capable of raising a strong inference of scienter with respect to statements that he did make.[69] Griffin also joins in all of the arguments presented in the Director Defendants' MD and in the arguments presented in Louie's MD with respect to alleged "related party transactions."[70] Plaintiffs respond that Griffin's MD should be denied because he is liable for EXXI's false, misleading, and incomplete financial statements, and because they have adequately alleged scienter with respect to him.[71]

69    Griffin's MD, Docket Entry No. 102, p. 5.

70    Id. at 5 & n.1.

71    Plaintiffs' Memorandum of Law in Opposition to Defendant D. West Griffin's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Griffin's MD"), Docket Entry No. 112, pp. 7-16.

### (1) Alleged Misstatements and Omissions

Plaintiffs allege that Griffin served as EXXI's CFO and Board member from the Company's inception in 2005 through and including October 20, 2014, when EIXXI announced Griffin's resignation in a Press Release and a Current Report filed with the SEC on Form 8-K/A on December 1, 2014, following BDO's acquisition of UHY's Texas practice, which had provided independent public accounting services to EXXI.[72] Plaintiffs allege that as CFO, Griffin signed EXXI's quarterly and annual reports filed with the SEC on Forms 10-Q, 10-K, and 10-K/A, and that Griffin is responsible for the content of the reports that he signed and the financial information contained in the Company's press releases.[73] Plaintiffs allege that Griffin was responsible for preparing nearly all of the financial statements that were restated after

BDO became EXXI's auditor and determined that EXXI's financial statements for 2011 through 2014 should no longer be relied upon.[74] Asserting that

**\*16** [t]he financial statements issued during Griffin's tenure as CEO that had to be restated after his resignation were the annual financial statements for the four years ended June 30, 2011, 2012, 2013, and 2014, and the quarterly financial statements for the quarters ended September 30, and December 31, 2013, March 31, 2014, and June 30, 2014,[75]

Plaintiffs argue that these financial statements were false and misleading because they

were not prepared according to generally accepted accounting principles ("GAAP"), including ASC Topic 815, which requires the reporting entity to document exactly what was being hedged, specifying the exact items (i.e., the particular monthly well production) to utilize hedge accounting.... While Griffin was responsible for EXXI's financial reporting, the Company lacked the necessary documentation for its hedging program to utilize cash flow hedge [accounting] but did so anyhow.[76]

Griffin does not plausibly argue that the financial statements he signed that were ultimately restated did not contain statements that were false and misleading.[77] The court concludes, therefore, that Plaintiffs have pled specific facts sufficient to hold Griffin liable for the financial statements that he signed. See Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person

or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

72    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 9 ¶ 39.

73    Id. at 9 ¶¶ 37-38.

74    Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 8 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 51 ¶ 245).

75    Id. at 8.

76    Id. (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 17-18 ¶ 77).

77    Griffin's MD, Docket Entry No. 102, p. 10 (arguing that "[f]or the reasons explained in the Director Defendants' Motion to Dismiss and Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint, Plaintiffs have not alleged that any statement in those financial statements was false or misleading when made.").

The court concludes, however, that as to statements made in press releases, Plaintiffs are relying on the group pleading doctrine – a doctrine abolished by the Fifth Circuit in Southland, 365 F.3d at 365. In Southland the Fifth Circuit held that the PSLRA requires plaintiffs to "enlighten *each defendant* as to his or her particular part in the alleged fraud," so that "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." Id. Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of the entire document or specific portion of the document containing the statement. Id. Plaintiffs have not pled with particularity facts capable of showing that statements made in any of the press releases about which they complain are attributable to Griffin. Instead, Plaintiffs attempt to hold Griffin responsible for unattributed corporate statements in the press releases based solely on his title as CFO. [78]  Accordingly, the court concludes that Plaintiffs have not sufficiently pled specific factual allegations linking Griffin to allegedly false and misleading statements in EXXI's press releases.

78    Id. at 9 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 29 ¶ 128, p. 34 ¶ 157, and

p. 36 ¶ 166). See also id. at 10 n.2 (asserting that "[s]ince Griffin was the Company's CFO, it is far more likely that he provided the 'numbers' to [the employee who prepared the press releases] so that they could be incorporated in the Company's press releases").

### (2) Scienter

**\*17**  Griffin argues that "[a]s explained in the Director Defendants' Motion to Dismiss, Plaintiffs' impermissible attempt to plead scienter based solely on Defendants' positions within EXXI and alleged GAAP violations mandates dismissal of their Complaint." [79]  Griffin argues that the only allegations as to his scienter are that

(1) his "net worth was dependent upon his investment in EXXI stock and options," Am. Compl. ¶ 42; *se also id.* ¶¶ 40-41; (2) he had an incentive to "protect his job," *id.* ¶ 42; and (3) he had access to unspecified "material non-public information," *e.g., id.* ¶¶ 57, 59. [80]

Griffin argues that Plaintiffs fail to allege that he sold any stock during the Class Period, and that Plaintiffs' factual allegations are internally inconsistent about his alleged motivations because they allege not only that his incentive was to protect his job, but also that he " 'resigned over a disagreement regarding the Company's financial disclosures, including those related to its ultra-deep [water] investments and accounting for its acquisition of EPL.' " [81]  Asserting that Plaintiffs' theory of his scienter "rests on nothing more than baseless speculation, and is not 'at least as compelling as any opposing inference one could draw from the facts alleged,' " [82]  Griffin argues that "[t]he far more compelling inference is that, to the extent there was any wrongdoing occurring within EXXI, [his] resignation is evidence that he was not a participant." [83]

79    Id. at 10.

80    Id. at 11.

81    Id. at 12 (quoting Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶ 43).

82    Id.

83    Id.

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**
2019 WL 1205628

Asserting that EXXI restated its financial statements for four years, Plaintiffs argue that the restatements are compelling evidence of Griffin's scienter because

> as EXXI's [CFO] – the senior officer directly responsible for assuring the accuracy of EXXI's financial reporting – Griffin undoubtedly knew the Company lacked the necessary documentation – *i.e.*, it had no specific documents regarding the hedged items – to utilize hedge accounting under ASC Topic 815. At the very least, Griffin was severely reckless in not knowing so. [84]

Plaintiffs also argue that the following allegations support a strong inference of Griffin's scienter: (1) the amount of EXXI's restatements was significant; (2) EXXI's hedging activities were unusually high; (3) Griffin knew or recklessly disregarded the fact that EXXI delayed recognizing impairment of assets that it acquired from EPL despite steadily declining oil and gas prices that caused EPL to write down those same assets ahead of EXXI; and (4) EXXI lost its entire investment in EPL in a year. [85]

[84]   Plaintiffs' Opposition to Griffin's MD, Docket Entry No. 112, p. 11 (emphasis in original).

[85]   Id. at 14-15 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 17 ¶¶ 75-76, pp. 42-43 ¶¶ 197-201, p. 46 ¶ 220.

A complaint for violation of federal securities laws "will survive [a motion to dismiss] ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510. A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter. See Central Laborers' Pension Fund v. Integrated Electrical Services Inc., 497 F.3d 546, 555 (5th Cir. 2007) ("If we were to accept [this] proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the

pleading requirements for scienter set forth in the PSLRA.") (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) ). In Central Laborers' the Fifth Circuit adopted the Eleventh Circuit's test for when Sarbanes-Oxley certifications, i.e., signatures on SEC filings, could support an inference of scienter. [86] The "person signing the certification [must have] had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." Id.

[86]   In Central Laborers', 497 F.3d at 554, the Fifth Circuit explained that,
       [t]he Sarbanes-Oxley Act states that signing officers must certify that they are "responsible for establishing and maintaining internal controls [and] have designed such internal controls to insure that material information relating to the [company] and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the period reports are being prepared." 15 U.S.C. § 7241 (a) 4).

**\*18**   In ArthroCare, 726 F. Supp. 2d at 716, an individual defendant confronted with media reports providing "blatant evidence" of the specific accounting fraud at issue nonetheless "continued to defend [the accounting] stridently and deny the allegations." Although the plaintiffs in ArthroCare alleged accounting errors in eight quarterly SEC filings, and the defendant signed each filing, the court held that only the two quarterly filings immediately following the detailed media reports could support an inference of scienter. Id. at 724. In Seitel, 447 F. Supp. 2d at 693, the court held that the defendant's signature on SEC filings supported a strong inference of scienter because the plaintiffs alleged not only improper accounting practices but also: (1) overstated revenues of 15 percent for the year 2000 and 30 percent for the first 9 months of 2001; (2) memoranda and meeting minutes revealing that the defendants explicitly discussed the improper accounting methods and affirmatively chose to ignore potential problems; and (3) the dismissal of an auditor who confronted the defendants over the improper practices. Id.

Plaintiffs allege that Griffin signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 209 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See, e.g., ArthroCare, 726 F. Supp. 2d at 721 (" '[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").

Plaintiffs argue that the facts they have alleged raise a strong inference of scienter as to Griffin because EXXI misapplied two accounting standards, i.e., the standards for documenting the use of hedge accounting and for reporting asset impairment, the resulting restatements covered four years, and the magnitude of the restatements was significant. Plaintiffs also allege that Griffin was motivated to inflate EXXI's profitability to help EXXI qualify for listing on the NASDAQ Global Markets. While the parties dispute the simplicity and obviousness of the misapplied accounting standards, Plaintiffs' Amended Complaint does not allege facts capable of establishing either that the standards being violated were so clear and obvious as to make Griffin either knowingly deceptive or severely reckless in certifying EXXI's SEC filings, or severely reckless by not knowing that EXXI's accounting was improper. Plaintiffs' allegations regarding the magnitude of EXXI's misstated financials do not support a strong inference of scienter because "the magnitude of the error does not show that the existence of the error was clear when it was made," Schott v. Nobilis Health Corp., 211 F. Supp. 3d 936, 955 (S.D. Tex. 2016), and because EXXI's improper accounting did not uniformly benefit EXXI or consistently line up with a motive to skew the accounting results to favor EXXI's financial position.[87] See ArthroCare, 726 F. Supp. 2d at 724; Seitel, 447 F. Supp. 2d at 693. Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Griffin to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Griffin engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Griffin signed the financial statements at issue with scienter other than the fact that,

like the senior financial managers of every company, he had control over EXXI's accounting policies and procedures. See Izadjoo v. Helix Energy Solutions Group, Inc., 237 F. Supp. 3d 492, 516 (S.D. Tex. 2017) (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omissions in Sarbanes-Oxley certifications or earnings calls).

87    See UHY's MD, Docket Entry No. 101, p. 16 (asserting without objection from Plaintiffs: "For fiscal years 2012 and 2013 the restated net income was higher than the originally reported net income."). See also UHY's Reply, Docket Entry No. 119, pp. 9-12.

*19 Plaintiffs cannot demonstrate scienter by relying either on Griffin's position on the Board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers', 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Griffin negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court therefore concludes that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Griffin. Accordingly, Griffin's motion to dismiss the Exchange Act claims asserted against him will be granted and those claims will be dismissed with prejudice.

### (c) Defendant Louie

Asserting that he joined EXXI's Board on December 15, 2014, and that his term expired on December 1, 2015,[88] Louie argues that the Exchange Act claims asserted against him should be dismissed because he did not make many of the alleged misstatements, because Plaintiffs allege no facts requiring disclosure of his personal loan to Schiller, and because Plaintiffs rely on group pleading and fail to plead facts capable of raising a strong inference of scienter or loss

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 210 of 281
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

causation. [89] Plaintiffs respond that Louie's MD should be denied because he knew – but failed to disclose – that he had loaned $3 million to Schiller, because he signed EXXI's 2014 amended Annual Report which had to be restated, and because scienter and loss causation are adequately pled. [90]

[88]     Louie's MD, Docket Entry No. 103, p. 6. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 10 ¶¶ 44-45.

[89]     Louie's MD, Docket Entry No. 103, p. 9.

[90]     Plaintiffs' Memorandum of Law in Opposition to Defendant Norman M.K. Louie's Motion to Dismiss ("Plaintiffs' Opposition to Louie's MD"), Docket Entry No. 113, pp. 7-12.

### (1) Alleged Misstatements and Omissions

Regarding Louie plaintiffs allege:

22. From EXXI's founding in 2005 through and including October 15, 2015, Defendant Schiller ... served as Chairman of the Board. He was stripped of that title by the Board on October 9, 2015, following an internal investigation that found he borrowed funds in 2007, 2009, and 2014 from personal acquaintances or their affiliates, certain of whom provided the Company and certain of its subsidiaries with services, and in 2014 he personally borrowed $3 million from Defendant Norman Louie ("Louie"), before Louie was appointed to the Board effective December 15, 2014. At the time of the loan from Louie, Louie was a managing director at Mount Kellet Capital Management, LP, one of the Company's largest shareholders. The internal investigation was prompted by an SEC inquiry.

...

44. Defendant Louie was appointed to the Board, effective December 15, 2014, by Defendant Schiller and the rest of the Board without election by shareholders, to stand for election by shareholders at the 2015 annual meeting. When Defendant Schiller's secret loan from Defendant Louie was discovered, the Board determined not to nominate Defendant Louie for election as a director at the 2015 annual meeting.

45. During his short tenure on the Board, Defendant Louie signed the Company's Amended 2014 annual report filed on Form 10-K/A with the SEC on December 23, 2014. As a signatory of the annual report issued in the name of the Company and not attributed to an individual author, Louie is responsible for the content of the annual report he signed.

...

269. In the Current Report on Form 8-K, filed with the SEC on December 15, 2014, announcing Defendant Louie's appointment to the Board, Defendants caused EXXI to state that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K, 17 C.F.R. ¶ 229.404(a).

 *20 270. That statement in the Current Report on Form 8-K was materially incomplete and misleading because it failed to disclose that (a) Louie had loaned Defendant Schiller $3 million and the loan was outstanding at the time the Form 8-K was filed, (b) Louie was at least indirectly interested in the hedge fund MK's ownership of EXXI common stock, (c) Louie was at least indirectly interested in the M21K partnership between the Company and MK, and (d) Louie was at least indirectly interested in M21K's $123 million asset purchase from EXXI in 2014. All of those transactions were related party transactions requiring disclosure pursuant to Item 404(a) of Regulation S-K. [91]

[91]     Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 22, p. 10 ¶¶ 44-45, and p. 56 ¶¶ 269-70.

Louie does not argue the Form 10-K/A he signed that was ultimately restated did not contain statements that were false and misleading. [92] The court concludes, therefore, that the plaintiffs have plead specific facts sufficient to hold Louie liable for the financial statement that he signed. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

[92]     Id. at 10 ¶ 45.

Louie argues, however, that Plaintiffs' allegations fail to state an Exchange Act claim against him for statements made in the December 15, 2014, Form 8-K because he did not sign that form and cannot be held liable for the statements

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 211 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

contained therein, and because the statements in the Form 8-K are all true as the transactions at issue were not related-party transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed. [93] Plaintiffs do not dispute that Louie did not sign the Form 8-K filed on December 15, 2014, and therefore cannot be held liable as a maker of the statements contained therein. See Kerr v. Exobox Technologies Corp., Civil Action No. H-10-4221, 2012 WL 201872, at *11 (S.D. Tex. 2012) (defendant not liable under Rule 10b-5 for allegedly false statements in company's SEC filings, even if he supplied the statements at issue, because he did not sign the filings). See also Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Nor do Plaintiffs dispute that the transactions at issue are not "related party" transactions that Regulation S-K, 17 C.F.R. ¶ 229.404(a) require to be disclosed. [94]

[93]    Louie's MD, Docket Entry No. 103, pp. 7-8.

[94]    Id. at 7-9 (arguing that the transactions at issue were either not "related party" transactions, or that Louie did not have a material interest in them).

Citing In re Bristol Myers Squibb Co. Securities Litigation, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008), and City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 670 (6th Cir. 2005), plaintiffs argue, however, that their Exchange Act claims against Louie should not be dismissed because the Form 8-K "statements regarding no related party transactions, which may have been literally true under the narrow definition of 'related party,' were, if not literally false, highly misleading," [95] and because the Form 10-K/A that Louie signed was one of EXXI's annual reports that had to be restated. [96] Plaintiffs argue that Louie's loan to Schiller and involvement with entities that owned EXXI stock

> should have been disclosed to investors because they adversely impacted Schiller's and Louie's ability to manage the Company prudently and to ensure that the Company's public disclosures were truthful. Schiller's dire financial circumstances were a strong motive for him to mislead investors – precisely as he did.

Likewise, Louie was highly motivated to inflate the value of EXXI stock, which secured his secret loan to Schiller, if only to reduce his risk of loss if Schiller defaulted on the loan. [97]

[95]    Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 7.

[96]    Id. at 9-10.

[97]    Id. at 8.

**\*21** It is undisputed that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. United States, 100 S. Ct. 1108, 1118 (1980) (discussing disclosure requirements in the context of insider trading and finding that silence is only fraudulent if there exists a duty to disclose). The Bristol Myers and Bridgestone cases on which Plaintiffs rely stand for the well established principle that once a party makes a disclosure, even if it is literally true, the party is under a duty to speak the full truth. See Bristol Myers, 586 F. Supp. 2d at 160 ("even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it – or other statements made – materially misleading"); Bridgestone, 399 F.3d at 670 ("If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts ... to the extent that the volunteered disclosure was misleading' "). See also Rubinstein, 20 F.3d at 170 (" 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything' "). But the statements Plaintiffs allege were misleading due to Louie's failure to disclose his loan to Schiller and his relationship to entities that owned EXXI stock are statements made by EXXI on the Form 8-K signed by Griffin; not statements made by Louie.

Plaintiffs fail either to cite any authority or to allege any facts capable of establishing that Louie had a duty to disclose information needed to correct the allegedly misleading statements made by EXXI and Griffin. See In re Franklin Bank Corp. Securities Litigation, 782 F. Supp. 2d 364, 398 (S.D. Tex. 2011), aff'd, 464 F. App'x 334 (5th Cir. 2012) (plaintiffs failed to allege facts capable of establishing that defendant was under a duty to correct a misleading

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 212 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

statement made by a third-party analyst). Plaintiffs also fail to allege facts capable of establishing that Louie was the source of the information for the related-party statements in the Form 8-K about which Plaintiffs complain, that Louie knew those statements had been made in the Form 8-K, that those statements were material to the Plaintiffs' decision to purchase or to hold (i.e., not to sell) EXXI stock, or that those statements imposed upon Louie a duty to disclose the existence of his loan to Schiller or his relationship to entities that owned EXXI stock. See In re Securities Litigation BMC Software, Inc., 183 F. Supp. 2d 860, 871 & n.21 (S.D. Tex. 2001) (recognizing that a party generally has no liability for misleading claims made about it by a third party and no obligation to correct such statements, but that a party may be liable for allegedly misleading statements made by a third-party if sufficiently involved in preparation of those statements). Absent such allegations Plaintiffs may not maintain an Exchange Act claim against Louie arising from either the related-party statements contained in EXXI's December 15, 2014, Form 8-K, or from Louie's failure to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock. See Basic Inc. v. Levinson, 108 S. Ct. 978, 987 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

### (2) Scienter

Plaintiffs' failure to allege facts capable of establishing that Louie had a duty to disclose his loan to Schiller or his position with respect to entities that owned EXXI stock precludes Plaintiffs from raising a strong inference of scienter with respect to allegedly misleading statements and/or omissions arising from the Form 8-K that EXXI filed on December 15, 2014. See In re Centerline Holdings Co. Securities Litigation, 678 F. Supp. 2d 150, 161-62 (S.D.N.Y. 2009) (defendants did not act with scienter regarding omissions "when there was no duty to disclose in the first place"). Nor have Plaintiffs alleged facts capable of raising a strong inference of scienter with respect to the Form 10-K/A that Louie signed in December of 2014 shortly after being named to the Board because missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Louie to the accounting violations that led to the restatement of EXXI's financials. Plaintiffs offer no facts in support of their contention that Louie signed the Form 10-K/A at issue with scienter other than the fact that he was allegedly motivated to inflate the market value of EXXI because his personal loan to Schiller was purportedly secured by Schiller's EXXI shares. However,

the law in this circuit has long been well established that scienter in a particular case may not be based solely on motives universal to all corporate executives such as the desire to maintain a high stock price. See Indiana Electrical, 537 F.3d at 544. Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the Form 10-K/A at issue Louie negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers', 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Louie.

### (3) Loss Causation

**\*22** Louie argues that even if Plaintiffs had alleged facts capable of establishing all the elements of their Exchange Act claims, they "have not alleged, nor can they, that there was any loss associated with this loan or its disclosure." [98] Louie argues that under Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1633-34 (2005),

> Plaintiffs must allege "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the Company's] previous representations...." ... The personal loan from Mr. Louie to Mr. Schiller was disclosed on September 29, 2015. See Ex. C Energy XXI Ltd, Annual Report (Form 10-K) (Sept. 29, 2015) at 43. Immediately thereafter, EXXI's price increased. See Ex. D Energy XXI Stock Prices (showing seven consecutive trading days of increases, reaching a high of $2.28 on October 8, 2015). Even assuming there was a prior misstatement regarding the personal loan – which there was not – without any alleged loss caused by the disclosure of Mr. Louie's personal loan, all of Plaintiffs' claims relating to the personal loan must fail. [99]

Plaintiffs respond only that they "have sufficiently alleged loss causation to withstand his motion to dismiss." [100]

98    Louie's MD, Docket Entry No. 103, p. 9.

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**

2019 WL 1205628

99    Id.

100    Plaintiffs' Opposition to Louie's MD, Docket Entry No. 113, p. 12.

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In Dura Pharmaceuticals, 125 S. Ct. at 1633-34, the Supreme Court held that loss causation incorporates traditional elements of proximate causation and economic loss. See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013) (confirming that loss causation continues to be an element of a claim under § 10(b) ). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price. See Catogas v. Cyberonics, Inc., 292 F. App'x 311, 314 (5th Cir. 2008) ("Plaintiffs must allege ... that the market reacted negatively to a corrective disclosure, which revealed the falsity of [defendant's] previous representations regarding the accounting for its stock options."). Because Plaintiffs fail to allege in their Amended Complaint or to argue in their brief in opposition to Louie's motion to dismiss that a corrective disclosure about Louie's loan to Schiller caused EXXI's stock price to fall, Plaintiffs have failed to plead loss causation.

Because Plaintiffs have failed to allege facts capable of establishing that Louie made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs complain, Louie's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

### (d) Defendant Schiller

Schiller argues that the Exchange Act claims asserted against him should be dismissed because Plaintiffs' Amended Complaint fails to allege facts capable of establishing that the statements attributed to him were false or misleading, or that he acted with scienter. Schiller also joins the arguments made by Louie and by the Director Defendants that Plaintiffs' Amended Complaint fails to allege facts capable of establishing loss causation, or that his loans from Louie were "related party transactions." [101]

101    Schiller's MD, Docket Entry No. 104, p. 6.

### (1) Alleged Misstatements and Omissions

**\*23**    Plaintiffs argue that

[a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

And *third*, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined the integrity of the Company's financial statements. ¶ 142. [102]

Plaintiffs argue that Schiller made false and misleading statements on three matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the EPL acquisition, and EXXI's financial condition resulting from its use of cash flow hedge accounting. [103] Schiller argues that the statements Plaintiffs attribute to him are not actionable because Plaintiffs have failed to allege facts capable of proving that the statements were, in fact, false or misleading. [104] Schiller also argues that the statements for which Plaintiffs seek to hold him liable are not actionable because they were generally forward looking statements of opinion or belief, and because Plaintiffs have failed to plead facts capable of establishing that he did not genuinely hold the stated opinion or belief, that the opinion or belief contained embedded misstatements of fact, or that he omitted material facts about his inquiry into or knowledge of information that would conflict with what a reasonable investor would have understood from his comments. [105] See Omnicare, 135 S. Ct. at 1327-29.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 214 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

102    Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-29 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

103    Plaintiffs' Memorandum of Law in Opposition to Defendant John D. Schiller's Motion to Dismiss Amended Complaint ("Plaintiffs' Opposition to Schiller's MD"), Docket Entry No. 114, pp. 9-16.

104    Director Defendants' MD, Docket Entry No. 105, p. 11.

105    Id. at 12-13.

### (i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly alleged that Schiller either made or caused EXXI to make false and misleading statements regarding EXXI's ultra-deep drilling activities on five separate occasions: (1) a November 7, 2012, Press Release regarding the Davy Jones well production; (2) EXXI's 2013 Annual Report filed with the SEC on August 21, 2013; (3) comments made at an Oil & Gas conference on October 17, 2013; (4) EXXI's quarterly report for the second quarter of fiscal year 2014 filed with the SEC on Form 10-Q on February 7, 2014; and (5) EXXI's quarterly report for the third quarter of fiscal year 2014 filed with the SEC on Form 10-Q on May 1, 2014. [106] Plaintiffs argue that

**\*24** as Schiller knew, the Company's ultra-deep drilling activities were largely unsuccessful – only one of 15 target wells identified by the joint venture ever produced any oil (¶ 139) – and he lacked any basis for the upbeat statements he repeatedly made. Plaintiffs substantiate their allegations that Defendants knowingly grossly overstated the status of the ultra-deep drilling activities with information provided by a former EXXI employee who was directly responsible for managing EXXI's reserves and the Company's reserve accounting at the

time of the Davy Jones discovery. ¶ 140. In that capacity, the former employee was well positioned to know whether the Company possessed information to substantiate the stated reserves. That former employee said that when the Davy Jones 2 well was tested, it only produced *water*, not natural gas... [107]

106    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11, 18-19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 28-31 ¶¶ 127-29, 132-34, 136-37).

107    Id. at 19 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 138-40).

### (A) November 7, 2012, Press Release

Regarding the November 7, 2012, Press Release Plaintiffs allege:

On November 7, 2012, EXXI issued a press release in which Defendants caused the Company to state as follows:

Within the shallow-water ultra-deep exploration program with McMoRan, the Davy Jones discovery well is proceeding toward first production and the company is participating in the Blackbeard West #2, Lomand North and Lineham Creek wells.

The Davy Jones discovery well, the first shallow-water, ultra-deep sub-salt completion on the Gulf of Mexico shelf, is being completed. The wellbore was cleaned out to enable testing of all 165 feet of perforated sands in the Wilcox and the final steps of installing the wellhead are underway. Once these steps are complete, flow testing is expected to commence...

Completion and testing of the Davy Jones offset appraisal well (Davy Jones #2) is expected to commence following review of results from the Davy Jones discovery well. [108]

108    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29, ¶ 127.

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 215 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that any of the statements in the November 7, 2012, Press Release were false or misleading when made, or that they were attributed to, formulated, signed, or adopted by Schiller. Instead, Plaintiffs merely allege that "[o]nly one of 15 target wells identified by the joint venture ever produced oil." [109] But the fact that EXXI's ultra-deep drilling activities were ultimately not successful is not probative of falsity. See Carlton v. Cannon, 184 F. Supp. 3d 428, 469 (S.D. Tex. 2016) ("[T]he plaintiffs have at most alleged fraud by hindsight. Courts treat this as insufficient because it is based on 'the fact that something turned out badly must mean [the] defendant[s] knew earlier that it would turn out badly.' "). Plaintiffs fail to allege contemporaneous facts capable of showing that Schiller knew earlier material information that he chose not to disclose until later. Id. (citing Abrams, 292 F.3d at 433 ("company officials should not be held responsible for failure to foresee future events"). Because Plaintiffs fail to allege facts capable of establishing either that statements contained in the November 7, 2012, Press Release were false or that any false statements are attributable to Schiller, and because Plaintiffs neither allege nor argue that statements contained in the November 7, 2012, Press Release misled the market, the statements made in that press release are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d 862, 882 (S.D. Tex. 2002) (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"), aff'd sub nom. Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003); Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004) (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document" containing the false or misleading statement).

[109]   Id. at 31 ¶ 139.

### (B) EXXI's 2013 Annual Report

**\*25**  Regarding EXXI's 2013 Annual Report, Plaintiffs allege:

In its 2013 Annual Report filed with the SEC on August 21, 2013, Defendants caused the company to state that "work is ongoing to establish commercial production"

from Davy Jones No. 1. However, when the statement was made, Defendants knew that Davy Jones No. 1 was not commercially viable. [110]

Plaintiffs also allege that

[a]s Chairman of the Board and Chief Executive Officer of EXXI, Defendant Schiller signed the Company's annual reports filed with the SEC on Form 10-K and 10-K/A. As a signatory of the annual reports issued in the name of the Company and not attributed to an individual author, Schiller is responsible for the content of the annual reports he signed. [111]

[110]   Id. at 29-30 ¶ 132.

[111]   Id. at 6 ¶ 21.

Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that on August 21, 2013, when EXXI's 2013 Annual Report was filed, work was not ongoing to establish commercial production from Davy Jones No. 1, that Schiller knew or did not genuinely believe that work was ongoing to establish commercial production from Davy Jones No. 1, or that Schiller had contradictory information, i.e., information that Davy Jones No. 1 was not commercially viable. Absent allegations of such facts, the statements about ultra-deep drilling activities in EXXI's 2013 Annual Report are not actionable against Schiller. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

### (C) Statements at Oil & Gas Conference

Regarding Schiller's October 17, 2013, statements at an Oil & Gas Conference, Plaintiffs allege that

[a]t an Oil & Gas conference on October 17, 2013, Schiller said that Davy Jones No. 1 was "too deep and too narrow to flow gas" but Schiller falsely stated that Davy Jones No. 2 had a "high probability" of producing and that completion of Davy Jones 2 was expected to start in December, 2013. [112]

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 216 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Plaintiffs allege that

> Defendant Schiller's "high probability" statement was false and misleading when it was made. As Schiller knew on October 17, 2013, there was no objective or empirical evidence, such as test results or preliminary production data, to support Schiller's "high probability" statement at that time (or ever). Thus, on that date, Schiller lacked any reasonable basis for his "high probability" statement. [113]

Plaintiffs also allege that

> [a]ccording to a former EXXI employee directly responsible for managing EXXI's reserves and the Company's reserve accounting at the time of the Davy Jones discovery, when the Davy Jones No. 2 well was tested, it only produced water, not natural gas. This material adverse fact, though known by EXXI and the Individual Defendants, was not timely disclosed to investors, including Plaintiffs in particular. [114]

[112]   Id. at 30 ¶ 133.

[113]   Id. ¶ 134.

[114]   Id. at 31 ¶ 140.

Missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that Schiller's statements that Davy Jones No. 2 had a "high probability" of producing or that completion of Davy Jones No. 2 was expected to start in December of 2013, were false, or that when Schiller made these statements he either knew that they were false

or did not genuinely believe them. Plaintiffs' assertion that Schiller lacked any reasonable basis for his "high probability" statement because he had no objective or empirical evidence to support that statement is unavailing because Plaintiffs fail to allege particularized facts capable of establishing that objective or empirical evidence existed that contradicted that statement. In Rosenzweig, 332 F.3d at 870, the Fifth Circuit reaffirmed its prior recognition in Rubinstein, 20 F.3d at 169, that "[s]imply alleging that the predictive statements ... did not have a reasonable basis – that is, that they were negligently made – would hardly suffice to state a claim under Rule 10b-5."

**\*26** Plaintiffs' reference to an unidentified former EXXI employee in support of their allegations that when Davy Jones No. 2 was tested, it produced water, not gas, is unavailing because Plaintiffs have not alleged either when the test occurred or that it occurred before Schiller made the statements alleged to be false and misleading at the Oil & Gas Conference on October 17, 2013. Nor have plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of producing gas, or knew that the test necessarily meant that completion of Davy Jones No. 2 was not expected to start in December of 2013. Because Plaintiffs do not allege facts capable of establishing that Schiller's statements at the Oil & Gas Conference on October 17, 2013, were false, or that Schiller either knew those statements were false or did not genuinely believe them, and because Plaintiffs neither allege nor argue that any of those statements misled the market, Schiller's statements at the Oil & Gas Conference on October 17, 2013, are not actionable under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

(D) Form 10-Qs Filed in Early 2014

Regarding statements on EXXI's Form 10-Q filings for the second and third quarters of fiscal year 2014, Plaintiffs allege:

> 136. In EXXI's quarterly report for the period ended December 31, 2013, filed on Form 10-Q with the SEC on February 7, 2014, Defendants caused the Company to state that "work is ongoing to establish commercial production" from Davy Jones 1 and that "[o] perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014."

> 137. In EXXI's quarterly report for the period ended March 31, 2014, filed on Form 10-Q with the SEC on May 1,

2014, Defendants failed to mention Davy Jones No. 1, but maintained that Davy Jones No. 2 was "in the process of being completed." [115]

115     Id. at 30-31 ¶¶ 136-37.

Plaintiffs argue that the statement in the Form 10-Q filed on February 7, 2014, that "work is ongoing to establish commercial production" from Davy Jones No. 1 was false because Schiller had stated at an October 17, 2013, Oil & Gas Conference that Davy Jones No. 1 was "too deep and too narrow to flow gas." [116] Schiller replies that Plaintiffs have not alleged any facts capable of establishing that statements in the Form 10-Q filed on February 7, 2014, were false or misleading. [117] Asserting that Plaintiffs have selectively cited only a portion of the Form 10-Q filed on February 7, 2014, Schiller argues that when read in context together with the surrounding statements, the statement that work was "ongoing to establish commercial production from Davy Jones 1," which plaintiffs allege is false and misleading because it conflicts with the statement he made on October 17, 2013, that Davy Jones No. 1 is too deep and too narrow to flow gas is, in fact, consistent with his October 17, 2013, statement. Schiller explains that Plaintiffs

omit an important sentence in the February 7, 2014 Form 10Q filing in which the company truthfully disclosed that "work is ongoing to establish commercial production" from Davy Jones 1. Immediately following that sentence, the company stated in the 10Q: "The operator [Freeport McMoRan] is developing a fit for purpose fracture stimulation process" for Davy Jones 1." [118]

116     Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, pp. 10-11.

117     Defendant John D. Schiller, Jr.'s Reply in Support of His Motion to Dismiss the Amended Complaint ("Schiller's Reply"), Docket Entry No. 122, pp. 12-13.

118     Id. at 13 (citing Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3).

In pertinent part the Form 10-Q filed on February 7, 2014, states:

*Davy Jones*. As previously reported, our operating partner, Freeport McMoRan, has drilled two wells in the Davy Jones field. The Davy Jones No. 1 well is located on South Marsh Island Block 230 in 19 feet of water and work is ongoing to establish commercial production from the well. The operator currently is developing a fit for purpose fracture stimulation process. The Davy Jones No. 2 offset appraisal well, located two and a half miles southwest of Davy Jones No. 1, confirmed 120 net feet of potential pay in multiple Wilcox sands, indicating continuity across the major structural features of the Davy Jones prospect, and also encountered 192 net feet of potential hydrocarbons in the Tuscaloosa and Lower Cretaceous carbonate sections. Operations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014. [119]

119     Energy XXI (Bermuda) Limited, Form 10-Q for the quarterly period ended December 31, 2013, p. 35, Exhibit 2 to Declaration of David M. Sheeren, Docket Entry No. 122-3, p. 42. The court may properly consider the full section of this Form 10-Q at this stage of the case because in securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain. See Lovelace, 78 F.3d at 1018 & n.1. See also Lone Star Fund V (U.S.), 594 F.3d at 387 (holding that when considering a motion to dismiss courts may consider documents that are "central to the claim and referenced by the complaint").

**\*27** Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing that when the Form 10-Q was filed on February 7, 2014, the work to complete Davy Jones No. 1 was not still ongoing, that the operator was not attempting to develop a "fit for purpose fracture stimulation process" to that well, or that objective or empirical evidence existed that contradicted the statement that Plaintiffs allege was false. Because Plaintiffs do not allege facts capable of establishing that the statement that "work is ongoing to establish commercial production" from Davy Jones No. 1 made in the Form 10-Q filed on February 7, 2014, was false, because Plaintiffs neither allege nor argue that Schiller did not genuinely believe that statement or had information that contradicted it, and because Plaintiffs neither allege nor argue that the statement about the Davy Jones No. 1 well misled the market, that statement will not support a claim against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

Plaintiffs argue that the statements that "[o]perations to commence completion of the Davy Jones No. 2 well are expected during calendar year 2014" made in the Form 10-Q filed on February 7, 2014, and that Davy Jones No. 2 was "in the process of being completed" made in the Form 10-Q filed on May 1, 2014, were false because by 2014 specialized production equipment used for ultra-deep well production had been removed from Davy Jones No. 2 and relocated to a different site, and because an unidentified former EXXI employee has allegedly provided information that when Davy Jones No. 2 was tested, it produced water, not gas. [120] These allegations are not sufficient to state a claim for violation of the Exchange Act against Schiller because Plaintiffs have failed to allege facts capable of establishing when the specialized equipment was removed from the Davy Jones No. 2 site or even that it was removed from the site before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged facts capable of establishing the type of specialized equipment that was removed, that removal of the equipment necessarily meant the Davy Jones No. 2 well could not be completed, or that when the statements were made Schiller did not genuinely believe them or had information that contradicted them. Plaintiffs have similarly failed to allege facts capable of establishing when the test that allegedly produced water instead of gas occurred or even that it occurred before EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014. Nor have Plaintiffs alleged any facts capable of establishing that Schiller knew about the test, knew the test demonstrated that Davy Jones No. 2 was incapable of producing gas, or knew that the test would necessarily lead to the cessation of ongoing efforts to complete Davy Jones No. 2. Absent factual allegations capable of establishing that when EXXI filed the Form 10-Qs at issue on February 7, 2014, and May 1, 2014, operations to commence completion of the Davy Jones No. 2 well were not expected during calendar year 2014, and that when EXXI filed the Form 10-Q filed on May 1, 2014, Davy Jones No. 2 was not "in the process of being completed," or that Schiller knew either that work was not ongoing on that well or that the well was not capable of producing gas, Schiller cannot be held liable under the Exchange Act for the allegedly false statements regarding Davy Jones No. 2 contained in EXXI's Form 10-Qs filed on February 7, 2014, or May 1, 2014. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

[120]  Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 11 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 31 ¶¶ 139-40).

### (ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that Schiller caused EXXI to buy EPL in 2014 to turn around the Company's stagnant growth and sagging stock price, [121] Plaintiffs argue that

**\*28** [a] year earlier, the Company decided that EPL was overpriced. ¶¶ 14.9 & 160. However, Schiller was so desperate to deliver any purportedly good news to the market that he rushed the Company to complete the $2 billion purchase – its largest by far – without conducting any due diligence. ¶ 153. The haste in which Schiller forced EXXI to buy EPL was matched by the haste in which the purchase soured: less than a year after buying EPL, the assets EXXI acquired had become worthless. ¶¶ 220-21.

After EXXI acquired EPL, the Company and its subsidiary reported financial results side-by-side. Quarter after quarter, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter. Each time, EXXI wrote down the exact same impairment charge one quarter after EPL did so. EXXI has never explained the reason for its delayed recognition of the impairment charge. [122]

[121]  Id. at 19-20 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 33 ¶ 147). See also id. at 11-15.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 219 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

122    Id. See also Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 32-49 ¶¶ 144-230.

Plaintiffs' allegations that Schiller rushed the EPL acquisition, caused EXXI to overpay for EPL, and was so desperate to bring good news to the market that he failed to do any due diligence, are not supported by allegations of particularized facts capable of establishing that any statements about the EPL acquisition attributable to Schiller were false or misleading, or that Schiller failed to disclose information needed to make his EPL statements not misleading. Even assuming that such facts were pled with specificity, the "failure to engage in due diligence before closing an acquisition does not automatically support an inference of fraud." Schiller v. Physicians Resource Group, Inc., 2002 WL 318441, *11 (N.D. Tex. February 26, 2002) (citing Brogen v. Pohlad, 933 F. Supp. 793, 799 (D. Minn. 1995) (failing "to adequately investigate the merits of a potential acquisition and subsequent steps to remedy that omission may give rise to a claim for negligence; but it cannot support a claim for securities fraud") ).

Plaintiffs' allegations that Schiller can be held liable under the Exchange Act for false or misleading statements because EXXI recognized impairment charges for EPL one quarter after EPL did so without explaining the reason for its delayed recognition, are not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that Schiller knew or ignored glaring red flags that statements about EPL attributable to him were false or misleading when made. Also missing from Plaintiffs' Opposition to Schiller's MD is any argument or authority for Plaintiffs' contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for the same assets. See North Collier Fire Control and Rescue District Firefighter Pension Plan and Plymouth County Retirement Association v. MPC Partners, Inc., No. 15 Civ. 6034 (RJS), 2016 WL 5794774, *3, 9-11, 24 (S.D.N.Y. 2016) (dismissing § 10(b) claim that rested on allegations of how management of parent company should have tested and impaired goodwill related to subsidiary). See also Harris v. Amtrust Financial Services, Inc., 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do not allege facts capable of establishing that any of EXXI's statements about EPL were false, or that EXXI had a duty to explain the differences between its accounting for EPL's goodwill impairment and EPL's own accounting for impairment of its assets; because Plaintiffs fail to allege facts capable of establishing that Schiller either knew that any statements about EPL attributable to him were false, or did not genuinely believe any such statements; and because Plaintiffs' neither allege nor argue that any statements about EPL misled the market, the EPL statements about which Plaintiffs complain are not actionable against Schiller under the Exchange Act. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

### (iii) EXXI's Financial Statements Are Actionable

**\*29**    Asserting that "EXXI lacked the necessary documentation for its hedging activities to utilize hedge accounting," [123] Plaintiffs argue that

> [a]s a result, in September 2015, shortly after EXXI's auditor was acquired, the new auditor required the Company to restate more than four years of financial statements and to make an adjustment to its accumulated deficit to eliminate the effects of cash flow hedge accounting. ¶¶ 244-45. On September 8, 2015, EXXI announced that its previously issued consolidated financial statements for the four years ended June 30, 2011, 2012, 2013, and 2014, and for the seven quarters ended September 30, 2013 and 2014, December 31, 2013 and 2014, March 31, 2014 and 2015, and June 30, 2014 – **eleven** financial statements in all – should no longer be relied upon, and would be restated. ¶ 245. The announcement stunned Plaintiffs and other EXXI investors. ¶ 247. [124]

Plaintiffs argue that

[a]s Chairman and CEO, Schiller signed all of EXXI's Annual Reports including its 2011, 2012, 2013, and 2014 Annual Reports. ¶ 21. On September 8, 2015, the Company announced that all four annual reports should not be relied upon and had to be restated to eliminate hedge accounting from them. ¶¶ 83 & 89. The Company's Annual Reports for 2012, 2013, and 2014 also included materially false or misleading information about the Company's ultra-deep drilling activities (¶¶ 124-26, 132, & 242), and the 2014 Annual Report included materially false or misleading information about EXXI's acquisition of EPL (¶¶ 172 & 174).

And *third*, Schiller is tied directly to the Company's misstatements regarding its oil and gas reserves in EXXI's annual and quarterly financial statements. As Plaintiffs allege, Schiller repeatedly pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the reserves reported in the quarterly and annual financial statements. ¶ 141. That pressure undermined the integrity of the Company's financial statements. ¶ 142. [125]

[123]　Id. at 15-16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 49-50 ¶¶ 234-35).

[124]　Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 244-45, and 247).

[125]　Id. at 24-25 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 6 ¶ 21, pp. 18-20 ¶¶ 83 & 89, pp. 27-30 ¶¶ 124-26 & 132, pp. 31-32 ¶¶ 141-42, p. 37 ¶¶ 172 & 174, and p. 51 ¶ 242).

Regarding Schiller's alleged misstatements on EXXI's oil and gas reserves Plaintiffs allege:

141. According to the former EXXI employee, Defendant Schiller pressured Company employees to include unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program in the amount of reserves reported in the Company's quarterly and annual financial statements. This led to internal confrontations over accounting policies and practices.

142. Although the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of

the Company's financial statements, the pressure from Defendant Schiller and the confrontations it led to created mistrust between the Company's internal accountants and senior management. [126]

**\*30** Because Plaintiffs expressly allege that "the unsubstantiated estimates of natural gas reserves purportedly discovered as a result of EXXI's ultra-deep drilling program were not included in any of the Company's financial statements," [127] they are not statements for which Schiller can be held liable under the Exchange Act. Schiller does not plausibly argue, however, that the financial statements he signed that were ultimately restated due to EXXI's lack of specific documentation needed to support its use of cash flow hedge accounting did not contain statements that were false and misleading. The court therefore concludes that the Plaintiffs have pled specific facts sufficient to hold Schiller liable for the financial statements that he signed and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

[126]　Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 31-32 ¶¶ 141-42.

[127]　Id. ¶ 142.

#### (iv) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege Schiller made about EXXI's ultra-deep oil drilling activities, and EXXI's accounting for the unsuccessful EPL acquisition will not support Exchange Act claims against Schiller either because Plaintiffs have failed to allege facts capable of establishing that the statements were false when made, or that to the extent they were statements of opinion or belief, Schiller did not genuinely hold the opinions expressed, the opinions contained embedded untrue statements of fact, or Schiller omitted material facts about his inquiry or knowledge that would conflict with what a reasonable investor would have understood from his statements. See Omnicare, 135 S. Ct. at 1327-29. The court concludes, however, that the Plaintiffs have pled particularized facts capable of establishing Schiller's liability for false and misleading statements contained in EXXI's financial statements that Schiller signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 221 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

**(2) Scienter**

Schiller argues that "the Amended Complaint should be dismissed for failure to allege any inference of scienter, much less a strong one." [128] He argues that Plaintiffs' references to his desire to maintain a lavish lifestyle, his executive position within EXXI, his signature on SEC filings that were restated, and his loans from Louie and EXXI vendors are all inadequate – individually or collectively – to raise a strong inference of scienter. [129]

[128]   Schiller's MD, Docket Entry No. 104, p. 13.

[129]   Id. at 13-22. See also Schiller's Reply, Docket Entry No. 122, pp. 16-21.

Citing Nathenson v. Zonagen Inc., 267 F.3d 400 (5th Cir. 2001), Plaintiffs respond that they have alleged

> several "special circumstances" that strongly support an inference of Schiller's scienter. Those circumstances include: (i) Schiller's prominence as EXXI's founder, Chairman, and CEO; (ii) the importance of the Company's ultra-deep drilling activities, its oil and gas reserves, and the EPL acquisition to EXXI's net worth and future prospects; (iii) the fact that Schiller himself made several statements regarding the Company's ultra-deep drilling, its reserves, and the EPL acquisition; (iv) Schiller's attempt to influence the Company's reserve estimates; and (v) Schiller's dependence on the market price for EXXI stock to meet his need for cash to fund his lavish lifestyle. Those circumstances – particularly Schillers' need to control the Company's disclosures to satisfy his urgent need for cash – make his scienter "at the very least, equally as compelling as any alternative inference, and **a tie favors the plaintiff.**"
>
> *Lormand*, 565 F.3d at 254 (emphasis added). [130]

Plaintiffs also point to the loans that Schiller took from Louie and from EXXI's vendors but failed to disclose to the Board or to the market as strong inferences of scienter. [131]

[130]   Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27 (emphasis in original).

[131]   Id. at 27-31.

 **\*31**  In Nathenson the Fifth Circuit held that the individual defendants' positions within the defendant pharmaceutical company enhanced the scienter allegations. Recognizing "that normally an officer's position with a company does not suffice to create an inference of scienter," id. at 424, the court found a number of special circumstances that taken together, sufficed to support a different result in that case: (1) the company was small and had only three-dozen full-time employees; (2) it was essentially a one-product company; and (3) the alleged misrepresentations were about the patent protection for that single product, the company's most crucial issue. Id. at 425.

The Fifth Circuit and other courts have been reluctant, however, to apply the limited exception recognized in Nathenson. See Rosenzweig, 332 F.3d at 867-68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business – water-privatization projects – supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must identify exactly who supplied the information or when they knew the information"); Abrams, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). Instead, the Fifth Circuit has stated that only in the "rare case" will a strong inference of scienter be drawn from an officer's position in a company, and only when this factor combines with other, "special circumstances." Local 731 I.B of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016). The Fifth Circuit reiterated that such circumstances may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. Id.

Plaintiffs neither allege nor argue that facts capable of establishing any of the special circumstances recognized in Nathenson or Diodes are present in this case. Plaintiffs' allegations that between 2006 and 2010 EXXI completed five major acquisitions for aggregate cash consideration of approximately $2.5 billion demonstrates that EXXI differed substantially from the small, single product companies at issue in Nathenson and Diodes. [132] Instead, as special circumstances capable of allowing a strong inference of scienter to be drawn from Schiller's position with the Company, Plaintiffs point to Schiller's prominence as EXXI's founder, Chairman, and CEO known for his lavish lifestyle, the importance of EXXI's ultra-deep drilling activities, the

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 222 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

EPL acquisition, and oil and gas reserves to EXXI's net worth and future prospects, and the allegedly false and misleading statements that Schiller made about these subjects, i.e., EXXI's ultra-deep drilling activities, EPL acquisition, and gas reserves. [133] Since, however, for the reasons stated in § III.A.2(d)(1)(i)-(iii), above, the court has already concluded that Plaintiffs have failed to plead facts capable of establishing that Schiller's statements about EXXI's ultra-deep drilling activities, EPL acquisition, or reserves were false or misleading, Plaintiffs' attempt to infer a strong inference of scienter for and/or from making those statements misses the mark. The only allegedly false and misleading statements that the court has found are actionable against Schiller are the financial statements included in the EXXI SEC filings that he signed and were later restated.

[132]    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 16 ¶¶ 69-71. Moreover, Schiller argues without objection that EXXI had approximately 257 employees at the time of its bankruptcy, more than the companies falling under the Nathenson exception. See Schiller's Reply, Docket Entry No. 122, p. 19 & n.9 ("In connection with its bankruptcy petition, the company sought emergency relief to pay these employees during the course of the bankruptcy. See Ex. 3 to the Declaration of David M. Sheeren at p. 5 (disclosing 257 employees). The Court can properly take judicial notice of that adjudicative fact. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)." See also Carlton, 184 F. Supp. 3d at 479 (183 employees voids the Nathenson exception).

[133]    Plaintiffs' Opposition to Schiller's MD, Docket Entry No. 114, p. 27.

 **\*32**  A defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter. See Central Laborers', 497 F.3d at 555. "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also ArthroCare, 726 F. Supp. 2d at 716; Seitel, 447 F. Supp. 2d at 693. To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at

721 ("[W]hen the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."). Although Plaintiffs have argued that the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, Plaintiffs have made no such argument as to Schiller. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow board member Louie and from EXXI vendors but did not disclose. But for the reasons stated in § III.A.2(c)(1), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie – or now Schiller – had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting Schiller to the accounting violations that led to the restatement of EXXI's financial statements. Nor are there any allegations that Schiller engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that Schiller signed the financial statements at issue with scienter other than the fact that, like the senior managers of every company, he had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omissions in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on Schiller's position on the board, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 223 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to Schiller.

### (3) Loss Causation

Schiller joins in and incorporates by reference arguments made by the Director Defendants and by Louie

> that Plaintiffs failed to show that any of the alleged misstatements were followed by corrective disclosures that caused the price of the stock to drop. Plaintiffs fail to plead loss causation because they do not allege any causal connection between the supposed fraudulent conduct and their purported losses. [134]

Although they have not responded directly to Schiller's loss causation argument, Plaintiffs argue that they "have sufficiently alleged loss causation to withstand [Schiller's] motion to dismiss." [135] Citing Lormand, 565 F.3d at 256-58, and asserting that "[l]oss causation 'is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b)," [136] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege 'a facially "plausible' " connection between the misstatements or omissions and their loss." [137] Citing North Port Firefighters' Pension – Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation," [138] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation." [139]

[134]    Schiller's Reply, Docket Entry No. 122, p. 21. See also Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss

and incorporates those arguments herein by reference.").

[135]    Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

[136]    Id.

[137]    Id.

[138]    Id.

[139]    Id. at 25.

 **\*33**  For the reasons stated in § III.A.2(c)(3), above, with respect to Louie, and in § III.A.2(e)(3), below, with respect to the Director Defendants, Plaintiffs have failed to plead loss causation with respect to Schiller.

### (4) Conclusions as to Schiller

Because Plaintiffs have failed to allege facts capable of establishing that Schiller made an actionable misstatement or omission, with scienter, that caused the loss of which the Plaintiffs' complain, Schiller's motion to dismiss the Plaintiffs' Exchange Act claims will be granted, and those claims will be dismissed with prejudice.

### (e) Director Defendants

The Director Defendants argue that the federal securities law and fraud claims asserted against them should be dismissed because Plaintiffs' Amended Complaint fails to plead an actionable misstatement or omission, scienter, or loss causation. The Director Defendants also argue that Plaintiffs' Amended Complaint

> fails to the extent it asserts (1) claims against the Director Defendants based on statements attributed to unspecified "Defendants" or the Company when those Director Defendants were not on the EXXI board and (2) claims barred by the five-year statute of repose or the prohibition on holder claims. [140]

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

[140] Director Defendants' MD, Docket Entry No. 105, p. 11. See also Reply Brief in Support of the Director Defendants' Motion to Dismiss the Amended Complaint ("Director Defendants' Reply"), Docket Entry No. 121, pp. 6-12.

### (1) Alleged Misstatements and Omissions

Asserting that the Director Defendants are Feinberg, Colvin, Dunwoody, Dupré, Flannery, Griffiths, and LaChance, Plaintiffs argue that

[a]t relevant times, each of the Director Defendants served as a director of EXXI. In addition to serving on the Board, Defendant Colvin was Chairman of the Audit Committee and a member of the Nomination and Governance Committee. ¶ 48. Defendant Flannery was a member of the Audit Committee and the Nomination and Governance Committee of the Board. ¶ 49. Defendant Dunwoody was Chairman of the Remuneration Committee and a member of the Audit Committee. ¶ 50. Defendant Griffiths served on the Audit Committee and the Compensation Committee. ¶ 51. Defendant Feinberg was Lead Independent Director, Chairman of the Nomination and Governance Committee, a member of the Compensation Committee, and an *ex officio* member of the Audit Committee. ¶ 52. Defendant Dupré was Chairman of the Compensation Committee and a member of the Nomination and Governance Committee. ¶ 53.

By virtue of their Board positions and responsibilities, the Director Defendants were privy to and participated in the creation, development, and reporting of the Company's financial condition; they had significant personal contact and familiarity with the Company and its senior officers and their fellow directors; and they were advised of and had access to internal reports and other non-public data and information about the Company's finances, operations, and sales. ¶ 290. The Director Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false, misleading, and incomplete. *Id.*

... [T]he Amended Complaint more than sufficiently pleads claims under the [PSLRA], for common law fraud, and for breach of fiduciary duty against the Director Defendants. Their motion to dismiss the Amended Complaint should be denied in its entirety. [141]

[141] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, pp. 8-10 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶¶ 48-53 and p. 62 ¶ 290).

**\*34** Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make a series of materially misleading statements about three different matters: EXXI's ultra-deep oil drilling activities, EXXI's accounting for the unsuccessful EPL acquisition, EXXI's improper use of cash hedge accounting, and Schiller's secret loan from defendant Louie. [142] Unlike the specific statements on these issues made by or attributed to Schiller, Plaintiffs argue that the statements regarding EXXI's ultra-deep drilling activities for which they seek to hold the Director Defendants liable were not attributed to any person. [143] Citing Southland, 365 F.3d at 365, Plaintiffs argue that "directors may be held liable for false, misleading, or incomplete statements in corporate documents that have no stated author or are not attributed to any individual if they are sufficiently linked to the document or statement in question." [144]

[142] Id. at 12-22.

[143] Id. at 12-13, & n.5.

[144] Id. at 12.

### (i) Statements About EXXI's Ultra-Deep Drilling Activities Are Not Actionable

Plaintiffs argue that they have plausibly alleged that the Director Defendants caused EXXI to make false and misleading statements regarding EXXI's ultra-deep oil drilling activities in a November 7, 2012, Press Release regarding the McMoRan and Davy Jones well production, and in EXXI's Form 10-Q filed on February 7, 2014, for the period ended December 31, 2013. [145] Plaintiffs' allegations regarding the November 7, 2012, Press Release are quoted in § III.A.2(d)(1)(i)(A), above, and their allegations regarding the Form 10-Q filed on February 7, 2014, are quoted in § III.A.2(d)(1)(i)(D), above. For the reasons stated in those previous sections of this Memorandum Opinion and Order, the court has already concluded that Plaintiffs' Amended Complaint fails to allege facts capable of establishing that any of the statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q about

which Plaintiffs complain were false or misleading when made. Plaintiffs' Amended Complaint similarly fails to allege facts capable of establishing that any of the statements about EXXI's ultra-deep drilling activities contained in either of these documents was attributed to, formulated, signed, adopted, or used by any of the Director Defendants as conduits to the market. Absent such allegations, the Director Defendants cannot be held liable for statements in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q. See Azurix, 198 F. Supp. 2d at 882 (holding that statements were "not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue"); Southland, 365 F.3d at 365 (holding that facts tying an officer or director to a statement "would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document"). Also missing from Plaintiffs' Amended Complaint are allegations of fact capable of establishing that any of the statements contained in either the November 7, 2012, Press Release, or the February 7, 2014, Form 10-Q mislead the market. Accordingly, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EXXI's ultra-deep drilling activities made in either the November 7, 2012, Press Release or the February 7, 2014, Form 10-Q.

[145] Id. 12-13 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 28-29 ¶ 127, and 30 ¶ 136.

### (ii) Statements About EXXI's Accounting For The EPL Acquisition Are Not Actionable

Asserting that after EXXI acquired EPL, EPL wrote down assets as impaired, only to have EXXI delay doing so by one quarter,[146] that in Plaintiffs' Amended Complaint they "allege in detail the sequence of accounting for the impairment charges,"[147] and that "EXXI restated financial statements that were prepared after the Company acquired EPL in June [of 2014,"[148] Plaintiffs argue that

> **\*35** [t]he side-by-side comparison of EXXI's recognition of impairments in the Company's consolidated annual and quarterly financial statements with EPL's more timely recognition

of them in its stand-along financial statements amply explains how and why EXXI's accounting for the assets acquired from EPL in the Company's consolidated financial statements was false, misleading, and incomplete. The adequately inform the Director Defendants of the particular misrepresentations.[149]

Citing Southland, 365 F.3d at 365, Plaintiffs argue that

> the Director Defendants are liable for the false, misleading, or incomplete statements in EXXI's financial statements because they are linked to them by virtue of their ability to control EXXI's financial disclosures.... In particular, the Director Defendants who were members of the Audit Committee – Colvin (Chair), Flannery, Dunwoody, Griffiths, and Feinberg (*ex officio*) – are closely linked to the Company's financial statements. As members of the Audit Committee, those five Director Defendants recommended the annual appointment of the Company's auditor, reviewed the scope of the audits, reviewed the Company's accounting principles, and reviewed the Company's financial statements included in the annual and quarterly reports filed with the SEC. ¶ 54. They are undoubtedly liable for the false and misleading financial statements.[150]

[146] Id. at 13.

[147] Id.

[148] Id. at 14.

[149] Id.

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 226 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

Id. at 14-15.

Plaintiffs' argument that the Director Defendants can be held liable under the Exchange Act for false or misleading statements in EXXI's financial statements because EXXI recognized impairment charges for EPL one quarter after EPL did without explaining the reason for its delayed recognition is not supported by allegations of particularized fact. Missing from Plaintiffs' Amended Complaint are allegations of facts capable of establishing the relevant accounting standards, how those standards were violated, or that any of the Director Defendants knew – or ignored glaring red flags – that EXXI's financial statements were false and misleading due to improper accounting for impairment of EPL's assets. Also missing from Plaintiffs' Amended Complaint is an allegation that any of EXXI's financial statements were restated to correct misstatements arising from a failure to properly account for the impairment of EPL's assets. Missing from Plaintiffs' Opposition to Director Defendants' MD is any argument or authority supporting their contention that a corporate parent has a duty to explain why its accounting for impairment of a subsidiary's assets differs from the subsidiary's own accounting for impairment of the same assets. See MDC Partners, 2016 WL 5794774, at *3, 9-11, 24 (dismissing § 10(b) claim that rested on allegations of how management of parent company should have tested and impaired goodwill related to subsidiary). See also Harris, 135 F. Supp. 3d at 171 ("The fact that Lead Plaintiff cannot tick and tie the loss and loss adjustment expense reported in AmTrust's consolidated financial statement to the losses its individual subsidiaries reported to insurance regulators, without more, does not plausibly allege a misstatement."). Because Plaintiffs do not allege facts capable of establishing that the Director Defendants made or caused EXXI to make any false or misleading statements about EPL and/or the impairment of its assets, or that EXXI had a duty to explain the differences between its accounting for impairment of EPL's assets and EPL's own accounting for impairment of its assets, and because Plaintiffs neither allege nor argue that any statements about EPL misled the market, the court concludes that the Director Defendants cannot be held liable under the Exchange Act for allegedly false and misleading statements about EPL and/or EXXI's accounting for impairment of EPL's assets. See In re Azurix Corp. Securities Litigation, 198 F. Supp. 2d at 882.

### (iii) EXXI's Financial Statements Are Actionable

**\*36** Plaintiffs allege that because EXXI used hedge accounting without required documentation, "EXXI was required to restate its financial statements for the fiscal years ended June 30, 2011, 2012, 2013, and 2014, and for the intermediate quarters from September 30, 2013 through March 31, 2015." [151] Plaintiffs argue that "[t]he Director Defendants cannot dispute that those erroneous financial statements were materially false and misleading when issued." [152] Because Plaintiffs' Amended Complaint alleges that each of the Director Defendants signed the Company's annual reports filed with the SEC on Forms 10-K and 10-K/A, [153] each of them can be held liable for false and misleading statements made in those annual reports. The Director Defendants do not dispute that they signed EXXI's annual reports filed with the SEC on Forms 10-K and 10-K/A and that the annual reports for fiscal years ending June 30, 2011, 2012, 2013, and 2014 that they signed and that were ultimately restated did not contain statements that were false and misleading. [154] The court concludes, therefore, that the Plaintiffs have pled specific facts sufficient to hold the Director Defendants liable for the financial statements that they signed containing false and misleading statements resulting from EXXI's use of hedge accounting. See Janus, 131 S. Ct. at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

---

[151] Id. at 16 (citing Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 19-20 ¶ 89).

[152] Id.

[153] Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 11-13 ¶ 46 (LaChance), ¶ 48 (Colvin), ¶ 49 (Flannery), ¶ 50 (Dunwoody), ¶ 51 (Griffiths), ¶ 52 (Feinberg), and ¶ 53 (Dupré).

[154] Id. at 11 ¶ 46.

### (iv) Statements About Schiller's Loans Are Not Actionable

Plaintiffs allege that EXXI's Form 8-K filed with the SEC on December 15, 2014, was false and misleading because it "state[d] that there were no related party transactions between Louie and the Company or any of its subsidiaries that would require disclosure pursuant to Item 404(a) of Regulation S-K," but failed to disclose that Schiller had taken a personal

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 227 of 281

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

loan from Louie. [155] But for the reasons stated in § III.A.2(c)(1), above, the court has already concluded that the statement in the Form 8-K about which the Plaintiffs complain was neither false nor misleading and therefore not actionable under the Exchange Act.

[155]     Id. at 56 ¶¶ 269-70.

#### (v) Conclusions

For the reasons stated above, the court concludes that the purportedly false and misleading statements that Plaintiffs allege the Director Defendants caused EXXI to make about ultra-deep drilling activities, accounting for the impairment of EPL's assets, and Schiller's secret loan from defendant Louie will not support Exchange Act claims, but that Plaintiffs have alleged an actionable claim against the Direct Defendants for false and misleading statements contained in EXXI's financial statements that they signed, that were filed with the SEC, and that were restated because EXXI improperly utilized cash flow hedge accounting. See Janus, 131 S. Ct. at 2302.

#### (2) Scienter

Asserting that "[t]he facts of the restatements give rise to a strong inference of scienter[, ... as] do the facts of the related party transaction between Louie and Schiller," [156] Plaintiffs argue that

> the Director Defendants, particularly the four directors on the Nomination and Governance Committee, were severely reckless in not discovering Louie's loan to Schiller before he joined the Board. And so, too, do the facts relating to the accounting for the EPL acquisition and EXXI's ultra-deep drilling activities. The differences in accounting for impairment in EXXI's consolidated financial statements [for] EXXI when compared to the stand-alone financial statements of its subsidiary, EPL, cannot be attributed to any "overhaul" in accounting systems. Taken together, the sum of

> all these misstatements and omissions of material fact easily gives rise to the requisite strong inference of scienter. [157]

[156]     Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 23.

[157]     Id.

Plaintiffs allege that the Director Defendants signed SEC filings that contained false and misleading statements of EXXI's financial condition because EXXI misapplied the accounting standard for documenting use of cash flow hedge accounting. But "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." Lovelace, 78 F.3d at 1020. See also Central Laborers, 497 F.3d at 555 (recognizing that a defendant's signature on an SEC filing with false or misleading statements or omissions cannot by itself support a strong inference of scienter). To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. See ArthroCare, 726 F. Supp. 2d at 721. Although Plaintiffs have argued that the number, size, timing, nature, frequency, and context of the misapplication of accounting principles and the restatement raise a strong inference of scienter as to Griffin, EXXI's CFO, plaintiffs have made no such argument as to the Director Defendants. Instead, Plaintiffs merely point to the loans that Schiller borrowed from fellow Board member Louie that the Director Defendants neither discovered nor disclosed. But for the reasons stated in §§ III.A.2(c)(1) and III.A.2(d)(1)(iv), above, the court has already concluded that Plaintiffs have failed to allege any facts capable of establishing that Louie or Schiller had a duty to disclose those loans. Absent a duty to disclose, failure to disclose is not capable of raising a strong inference of scienter. See Chiarella v. United States, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

**\*37** Moreover, missing from Plaintiffs' Amended Complaint are any allegations of specific facts connecting the Director Defendants to the accounting violations that led to

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)

2019 WL 1205628

the restatement of EXXI's financial statements. Nor are there allegations that any of the Director Defendants engaged in insider trading or stood to benefit personally from any of the alleged accounting errors. Plaintiffs offer no facts in support of their contention that the Director Defendants signed the financial statements at issue with scienter other than the fact that, like the directors of every company, they had control over the Company. See Izadjoo, 237 F. Supp. 3d at 516 (find no scienter for officers where there were no "glaring irregularities or red flags" to put them on notice of material misstatements and omission in Sarbanes-Oxley certifications or earnings calls). Plaintiffs cannot demonstrate scienter by relying either on the Director Defendants' position on the Board or on certain board committees, Abrams, 292 F.3d at 432, or on the fact that certain financial statements were restated. See Central Laborers, 497 F.3d at 546 (restatement of financial data, by itself, does not create a strong inference of scienter). Plaintiffs' factual allegations make it more plausible or at least as plausible to infer that when signing the SEC filings at issue Schiller negligently relied on EXXI's accountants and auditors than to infer that he knowingly or recklessly disregarded the presence of glaring accounting irregularities or other red flags in EXXI's financial statements. See Tellabs, 127 S. Ct. at 2510; Central Laborers, 497 F.3d at 555. See also Abrams, 292 F.3d at 433 (recognizing that accounting problems that lead to a restatement of a company's financials can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). The court concludes therefore that Plaintiffs' factual allegations are not sufficient to raise a strong inference of scienter as to the Director Defendants.

### (3) Loss Causation

The Director Defendants argue that even if Plaintiffs could satisfy the falsity and scienter elements of their Exchange Act claims that "[a] third, independent basis compelling dismissal is Plaintiffs' failure to plead facts demonstrating loss causation – that is, 'a causal connection between the [alleged] material misrepresentation and the loss.' "[158] The Director Defendants argue that the Plaintiffs have not alleged that there was any loss associated with any of the statements or categories of statements that Plaintiffs allege were false and misleading, i.e., statements about EXXI's ultra-deep drilling activities, EPL, Schiller's loans, or EXXI's improper use of hedge accounting.[159]

[158] Director Defendants' MD, Docket Entry No. 105, p. 27. Defendants UHY and Schiller join the Director Defendants' argument on loss causation. See UHY's MD, Docket Entry No. 101, p. 7 & n.2 ("The arguments in the motion to dismiss of the Director Defendants are adopted for purposes of this motion to dismiss;" and n.2, "[w]ith respect to the securities fraud claim, UHY incorporates the arguments regarding group pleading, loss causation, and the statute of repose."); Schiller's MD, Docket Entry No. 104, p. 6 ("Mr. Schiller joins in all of the arguments in The Director Defendants' Motion to Dismiss and incorporates those arguments herein by reference.").

[159] Id. at 27-29.

Plaintiffs respond that they "have sufficiently alleged loss causation to withstand [the defendants'] motion[s] to dismiss."[160] Citing inter alia Lormand, 565 F.3d at 256-58, and asserting that "[l]oss causation is subject to the pleading standard of Federal Rule of [Civil] Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b),"[161] Plaintiffs argue that "[u]nder that relaxed pleading standard, [they] need only allege a facially plausible connection between the misstatements or omissions and their loss."[162] Citing North Port Firefighters' Pension – Local Option Plan v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 761 (N.D. Tex. 2013), Plaintiffs argue that they "need not plead a fact-for-fact disclosure to establish loss causation,"[163] and if the court disagrees, Plaintiffs "respectfully request the opportunity to amend their complaint to add such factual allegations in further support of loss causation."[164]

[160] Plaintiffs' Opposition to Director Defendants' MD, Docket Entry No. 115, p. 24.

[161] Id.

[162] Id.

[163] Id.

[164] Id. at 25.

Under the PSLRA Plaintiffs must prove that a defendant's act or omission alleged to have violated federal securities laws "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation refers to a direct link between the misstatement and a plaintiff's loss,

Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in stock price after the truth is revealed. See Spitzberg v. Houston American Energy Corp., 758 F.3d 676, & n.18 (5th Cir. 2014) (citing In re Williams Securities Litigation, 558 F.3d 1130, 1137 (10th Cir. 2009) ). In Dura Pharmaceuticals, 125 S. Ct. at 1633-34, the Court held that loss causation incorporates traditional elements of proximate causation and economic loss. See Amgen, 133 S. Ct. at 1192 (confirming that loss causation continues to be an element of a claim under § 10 (b) ). The Fifth Circuit has held that the Rule 8(a) and 12(b)(6) plausibility pleading standard, not heightened pleading, is sufficient to plead loss causation. Lormand, 565 F.3d at 258 ("[W]e conclude that Rule 8(a) (2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss ... or, as Twombly indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." (internal citations omitted) ). A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the PSLRA." Id. at 267.

 *38 In pertinent part Plaintiffs allege:

LOSS CAUSATION/ECONOMIC LOSS

278. As alleged herein, Defendants engaged in a scheme to deceive the investing market generally, and Plaintiffs in particular, and a course of conduct that artificially inflated EXXI's stock price and operated as a fraud or deceit on purchasers of EXXI stock by misrepresenting the Company's financial and operating condition and prospects as well as known trends in its industry.

279. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, EXXI's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of EXXI stock alleged herein, and their decision to refrain from selling EXXI stock alleged herein, Plaintiffs suffered significant economic losses.

280. Defendants' false and misleading statements had the intended effect and caused EXXI stock to trade at artificially inflated levels at all relevant times and caused Plaintiffs to refrain from selling EXXI stock.

281. As investors and the market became aware of EXXI's prior misstatements and omissions and that EXXI's actual financial condition and business prospects were, in fact, not as represented, EXXI's stock price reacted negatively, substantially damaging Plaintiffs. [165]

165    Plaintiffs' Amended Complaint, Docket Entry No. 97, p. 59 ¶¶ 278-81.

Missing from Plaintiffs' Amended Complaint are allegations that identify any corrective disclosure followed by a drop in the price of EXXI stock. Argument as to the existence of any such disclosures is also missing from the briefs that Plaintiffs have filed in opposition to the defendants' motions to dismiss.

Plaintiffs allege that in September of 2015 EXXI was required to restate more than four years of financial statements to eliminate the use of hedge accounting. [166] Plaintiffs allege that EXXI's financial statements for the years ending June 30, 2011, 2012, 2013, 2014, and 2015, filed with the SEC on August 26, 2011, August 9, 2012, August 21, 2013, August 28 and December 23, 2014, and September 29, 2015, were materially false and misleading because they stated that EXXI did not use hedging for speculative or trading purposes. [167] Plaintiffs allege that "[u]ntil EXXI's financial statements were corrected on September 29, 2015, the Company's publicly filed financial statements for at least the years ended[ ] June 30, 2011, 2012, 2013, and 2014, and for all the intervening quarters materially misstated and did not fairly and accurately present the Company's financial condition and its results of operations." [168] Plaintiffs do not allege that EXXI stock price declined as a result of the disclosure that four years of financial statements would be restated. The Director Defendants argue that Plaintiffs are unable to satisfy the requirement for pleading loss causation because EXXI's stock price actually increased following disclosure in September of 2015 that certain of EXXI's financial statements would be restated and that Schiller had taken personal loans from Louie and from EXXI vendors. [169]

166    Id. at 17-18 ¶ 77.

**Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)**

2019 WL 1205628

167    Id. at 52 ¶ 249.

168    Id. at 54 ¶ 257.

169    Director Defendants' MD, Docket Entry No. 105, pp. 28-29 (citing Exhibit 10, EXXI stock price table, Docket Entry No. 106-10).

**\*39** While the Fifth Circuit has recognized that courts can take judicial notice of historical stock prices, see Catogas, 292 F. App'x at 316, the court need not do so here because it is sufficient in considering the motions to dismiss that Plaintiffs have alleged no losses following the relevant disclosures in September of 2015. See Schott, 211 F. Supp. 3d at 946. Since Plaintiffs have not alleged that the restatements caused their losses, the court does not factor the restatements into its analysis of loss causation. Instead, Plaintiffs allege that

> EXXI's disclosure that it was required to restate its financial statements to eliminate cash flow hedge accounting was materially false and misleading because it made it appear that the reason for the restatement was a mere technical deficiency in documentation, when the true reason for the restatement was that the Company was hedging for improper purposes, including speculating on future oil and natural gas prices or manipulating reported revenue and earnings. [170]

But also missing from Plaintiffs' Amended Complaint are facts capable of establishing that EXXI's stated reason for the restatements was false, or that the stated reason for the restatements was ever the subject of a corrective disclosure that was followed by a decline in stock price. Accordingly, Plaintiffs have failed to plead loss causation.

170    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 54-55 ¶ 259.

At the end of their responsive briefing on the issue of loss causation, Plaintiffs request leave to amend "[t]o the extent the Court requires ... specificity notwithstanding the general pleading requirements of Rule 8(a)(2), Plaintiffs respectfully request the opportunity to amend their complaint to add such

factual allegations in further support of loss causation." [171] Federal Rule of Civil Procedure 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." "Although Rule 15[a] 'evinces a bias in favor of granting leave to amend,' it is not automatic." Matter of Southmark Corp., 88 F.3d 311, 314 (5th Cir. 1996), cert denied, 117 S. Ct. 686 (1997) (quoting Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 597 (5th Cir. 1981) ). "A decision to grant leave is within the discretion of the trial court. Its discretion, however, is not broad enough to permit denial if the court lacks a substantial reason to do so." Id. (citing State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1302-1303 (5th Cir. 1995) (per curiam) ). Generally, a district court errs in dismissing a complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend. Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir.) (per curiam), cert. denied, 119 S. Ct. 156 (1998). If, however, a complaint alleges the plaintiff's best case, there is no need for further amendment. Id. See also Jones v. Greninger, 188 F.3d 322, 327 (5th Cir. 1999) (per curiam) (dismissing plaintiff's pro se action because court could perceive of no viable claim plaintiff could include in an amended complaint based on the underlying facts). The Fifth Circuit has also held that in exercising its discretion, a court may consider various criteria including, inter alia, the failure to cure deficiencies by amendments previously allowed and futility of the proposed amendment. See Whitaker v. City of Houston, Texas, 963 F.2d 831, 836 (5th Cir. 1992) (citing Foman v. Davis, 83 S. Ct. 227, 230 (1962) ). Because Plaintiffs have already had an opportunity to file an amended complaint and because the court is persuaded that Plaintiffs have pleaded their best case, the Plaintiffs' request for leave to amend will be denied.

171    Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 25.

**B. Control Person Liability Claims**

**\*40** Plaintiffs allege that the Individual Defendants are all liable as "controlling persons" of EXXI under § 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383. Because the court has concluded that the Plaintiffs' primary claims under § 10(b) should be dismissed, the § 20(a) claims will also be dismissed under

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 231 of 281
Plaisance v. Schiller, Not Reported in Fed. Supp. (2019)
2019 WL 1205628

Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See Izadjoo, 237 F. Supp. 3d at 520.

## C. Common Law Fraud Claims

Plaintiffs assert claims for common law fraud against all of the defendants. [172] Under Texas law a claimant alleging fraud must prove the following:

> (1) that a material representation was made; (1) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (quoting In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001) ). See also Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 212-13 (5th Cir. 2009) (same). Although Plaintiffs' common law fraud claim is not subject to the heightened "strong inference" standard for pleading scienter under the PSLRA, Plaintiffs are nevertheless required to satisfy Rule 9(b), which requires them to state with particularity facts supporting each element of fraud. See Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003). " 'At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.' " Id. (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992) ). In other words, the claimant must plead the who, what, when, where, and how of the fraud. Id.

172    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 66-67 ¶¶ 313-320. Although Plaintiffs' Amended Complaint does not specify that this claim is being asserted under Texas law, both defendants and Plaintiffs have cited and relied upon Texas law. See Director Defendants' MD, Docket

Entry No. 105, pp. 31-33 and Plaintiffs' Opposition to the Director Defendants' MD, Docket Entry No. 115, p. 27.

Plaintiffs' common law fraud claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e., Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements with scienter that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' common law fraud claims will be granted, and these claims will be dismissed.

## D. Breach of Fiduciary Duty Claims

Plaintiffs assert claims for breach of fiduciary duty against the Individual Defendants. [173] In pertinent part Plaintiffs allege that the Individual Defendants breached their fiduciary duties of care and loyalty to the Company and its shareholders, including the Plaintiffs, inter alia "by making or causing the Company to make the materially false and misleading statements about the Company's financial and operating condition and prospects alleged herein." [174] Plaintiffs also allege that "[t]he Individual Defendants' breaches of fiduciary duty were intertwined with the materially false and misleading statements they made or caused the Company to make about the Company's financial and operating condition and prospects alleged herein." [175] Plaintiffs' breach of fiduciary duty claims rest on the same alleged misstatements underlying their Exchange Act claims and fail for the same reasons, i.e., Plaintiffs have not alleged facts with particularity showing that any of the defendants made false statements that caused injury. Accordingly, defendants' motions to dismiss Plaintiffs' breach of fiduciary duty claims will be granted, and these claims will be dismissed.

173    Plaintiffs' Amended Complaint, Docket Entry No. 97, pp. 67-69 ¶¶ 321-32.

174    Id. at 68 ¶ 324.

175    Id. at 69 ¶ 329.

## IV. Conclusions and Order

*41   For the reasons explained above, the court concludes that Plaintiffs have failed to state claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for

common law fraud, or for breach of fiduciary duty.[176] Accordingly, UHY LLP's Motion to Dismiss (Docket Entry No. 101) is **GRANTED**. Defendant D. West Griffin's Motion to Dismiss the Amended Complaint (Docket Entry No. 102) is **GRANTED**. Defendant Norman M.K. Louie's Motion to Dismiss the Amended Complaint (Docket Entry No. 103) is **GRANTED**. Defendant John D. Schiller, Jr.'s Motion to Dismiss the Amended Complaint (Docket Entry No. 104) is **GRANTED**. The Director Defendants' Motion to Dismiss the Amended Complaint (Docket Entry No. 105) is **GRANTED**. Plaintiffs' request for leave to amend is **DENIED**.

[176]    The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1205628

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 14

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)

2010 WL 3785586

2010 WL 3785586
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

David Earl STOCKMAN and Carol Burke, on behalf
of themselves and others similarly situated, Plaintiffs,

v.

FLOTEK INDUSTRIES, INC., Jerry D.
Dumas, Sr., and Lisa G. Meier, Defendants.

Civil Action No. H–09–2526.
|
Sept. 29, 2010.

West KeySummary

1    **Securities Regulation** 🔑 Forecasts,
Estimates, Predictions or Projections

Shareholders failed to state a securities fraud
claim against a corporation arising out of
erroneous earnings guidance. The shareholders
failed to establish that the corporation or its
officers made any materially false or misleading
statements regarding the corporation's projected
earnings. The shareholders failed to specify
with sufficient particularity which financial
projections were overstated, when the
overstatements or misstatements occurred, or by
what amounts the projections were overstated.
Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.;
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**Attorneys and Law Firms**

Jennifer L. Gmitro, Jonah H. Goldstein, Anne L. Box,
Robbins Geller Rudman & Dowd LLP, San Diego, CA,
Michael I Fistel, William Woodhull Stone, Holzer, Holzer
& Fistel, LLC, Atlanta, GA, Roger B. Greenberg, Schwartz
Junell et al, Houston, TX, Jeffrey A. Berens, Robert J. Dyer,
III, Dyer & Berens LLP, Denver, CO, for Plaintiff.

Gerard G. Pecht, Fulbright and Jaworski, Houston, TX,
Peter Andrew Stokes, Fulbright & Jaworski, Austin, TX, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

SIM LAKE, District Judge.

**\*1** Plaintiffs, David Earl Stockman and Carol Burke, bring
this federal securities class action on behalf of all persons
and entities who purchased or otherwise acquired the publicly
traded securities of Flotek Industries, Inc. ("Flotek" or "the
Company") between May 8, 2007, and January 23, 2008,
inclusive ("the Class Period"). The defendants named in
this action are Flotek, Jerry D. Dumas, Sr., who served as
Chief Executive Officer of Flotek from September 1998
until his retirement in 2009 and as Chairman from 1998
until Flotek's 2010 annual stockholder's meeting, and Lisa
G. Meier, who served as Chief Financial Officer of Flotek
from April 2004 until August 2008 and Vice–President from
January 2005 until August 2008. Plaintiffs' First Amended
Class Action Complaint for Violations of Federal Securities
Laws (Docket Entry No. 32) asserts claims for violation of
§§ 10(b) and 20(a) of the Securities Exchange Act of 1934
(1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5, 17
C.F.R. § 240.10b–5, promulgated thereunder by the Securities
Exchange Commission (SEC). Pending before the court are
Defendants' Motion to Dismiss and Brief in Support (Docket
Entry No. 36) and plaintiffs' request for leave to amend if the
court grants the defendants' motion to dismiss (Docket Entry
No. 40). For the reasons explained below, the defendant's
motion to dismiss will be granted, and the plaintiffs' request
for leave to amend will be denied.

**I.** *Standard of Review*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for
failure to state a claim for which relief may be granted tests
the formal sufficiency of the pleadings and is "appropriate
when a defendant attacks the complaint because it fails to state
a legally cognizable claim." *Ramming v. United States,* 281
F.3d 158, 161 (5th Cir.2001), *cert. denied sub nom Cloud v.
United States,* 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839
(2002). The court must accept the factual allegations of the
complaint as true, view them in a light most favorable to the
plaintiff, and draw all reasonable inferences in the plaintiff's
favor. *Id.*

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). To avoid dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). This "plausibility standard" requires "more than an unadorned, the-defendantunlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 127 S.Ct. at 1966).[1]

[1] Before *Twombly* a dismissal under Rule 12(b)(6) would not be appropriate unless it appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In *Twombly,* 127 S.Ct. at 1966, the Supreme Court disavowed the "no set of facts" language from *Conley.* The Supreme Court explained that "[t]his phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969. Courts have applied this change generally, and not limited its application to cases like *Twombly* that involve antitrust law. Although this court's decision to grant the Defendants' Motion to Dismiss rests on the standard expressed in *Twombly* and *Iqbal,* the court would have reached the same decision had it applied the *Conley* standard.

**\*2** The claims for fraud asserted in plaintiff's complaint are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Pleading fraud with particularity in this circuit requires "[a]t a minimum ... the particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Benchmark Electronics, Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.), *modified on denial of rehearing on other grounds,* 355 F.3d 356 (5th Cir.2003) (quoting *Tel–Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992)). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 361 (5th Cir.2004) (citing *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993)).

In considering a Rule 12(b)(6) motion to dismiss a court must limit itself to the contents of the pleadings, with two exceptions. In *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000), the Fifth Circuit approved the district court's consideration of certain documents the defendant attached to a motion to dismiss. The Fifth Circuit has "restricted such consideration to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.,* 343 F.3d 533, 536 (5th Cir.2003) (citing *Collins,* 224 F.3d at 498–99).

In securities cases courts may also take judicial notice of the contents of public disclosure documents that are required by law to be filed with the SEC and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 & n. 1 (5th Cir.1996) (citing and adopting rule of *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991), and explaining that this rule does not apply to other forms of disclosure such as press releases or announcements at shareholder meetings). *See also In re Azurix Corp. Sec. Litig.,* 198 F.Supp.2d 862, 877 (S.D.Tex.2002), *aff'd sub nom. Rosenzweig v. Azurix Corp.,* 332 F.3d 854 (5th Cir.2003), and *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 209 (5th Cir.2009).

Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted. *See Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir.2003), *cert. denied,* 540 U.S. 1161, 124 S.Ct. 1173, 157 L.Ed.2d 1206 (Jan. 26, 2004) (citing *Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas,* 20 F.3d 1362, 1366–70 (5th Cir.1994) (dismissing claim as time barred under Rule 12(b)(6)).

## II. *Factual Allegations*

**\*3**  Flotek is an oil field industry service provider that has three primary divisions: Chemicals and Logistics, Drilling Products, and Artificial Lift.

> Chemicals and Logistics consists of ... specialty chemical and automated bulk material handling divisions; Drilling Products consists of downhole drilling tool sales, rentals and inspection services; and Artificial Lift consists of ... Petrovalve and ... downhole submersible pump divisions. [2]

[2]    News Release, May 8, 2007, Exhibit C attached to Defendants' Motion to Dismiss and Brief in Support ("Motion to Dismiss"), Docket Entry No. 36, p. 1.

In 2006, "[i]n the face of increased industry competition from other niche players in the oil field service industry, Dumas and Meier sought to convert Flotek from a niche oil field industry service provider to a specialized solutions outfit." (FACAC ¶ 4) [3] That year Flotek achieved a revenue milestone, reporting more than $100 million in sales, nearly double its Fiscal Year 2005 sales.

[3]    First Amended Class Action Complaint for Violations of Federal Securities Laws (FACAC), Docket Entry No. 32.

On March 13, 2007, Flotek issued a press release announcing its financial results for the fourth quarter of 2006, which ended on December 31, 2006. Flotek reported revenues of $33.3 million and net income of $3.9 million, or $0.21 per diluted share-a 14% increase over the prior quarter. (FACAC ¶ 41) [4] The press release explained that "[t]he revenue growth was driven primarily by organic growth in our Chemicals and Logistics and Drilling Tools segments, coupled with three acquisitions made in the Drilling Tools and Artificial Lift segments." [5] The press release quoted Dumas as stating "[d]espite a hefty increase in professional fees and effective tax rate, we met the expectations of our shareholders. We have brought together a first-rate collection of companies and will continue to focus on integrating them in 2007 to maximize profit." (FACAC ¶ 41) [6] Following the press release the defendants conducted a conference call with investors and analysts, at which Dumas explained,

[4]    *See* March 13, 2007, News Release, Exhibit A attached to Motion to Dismiss, Docket Entry No. 36. This press release actually reported net income of $0.42 per share, but since on June 19, 2007, Flotek announced approval of a 2–for–1 split of its common stock, plaintiffs have adjusted the per share amounts alleged in the FACAC to reflect the stock split.

[5]    *Id.*

[6]    *Id.*

> [f]or the full year the Company exceeded $100 million in revenue, nearly doubling sales levels from 2005. The growth was driven and the sales were driven by 72 acquisitions, two artificial lift acquisitions as well as strong organic growth within both our chemicals division and our established downhole drilling and mining tool group.

(FACAC ¶ 42) [7] Dumas stated "based on our performance projections, we're providing earnings guidance of [$1] of diluted earnings per share for ′07 without the addition of any acquisitions." [8] Meier similarly projected "company revenues of $160 million with diluted earnings per share of $[1.00]." [9] Plaintiffs do not allege that these statements were false when made but, instead, that these statements "remained alive and uncorrected throughout the Class Period." (FACAC ¶ 43)

[7]    03/13/07 Flotek Earnings Call, Exhibit B attached to Motion to Dismiss, Docket Entry No. 36, p. 1. *But see* Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 1

n. 2 (acknowledging that Flotek did not complete 72 acquisitions between 2005 and early 2007 but, instead, completed only nine acquisitions and citing in support of this acknowledgment Flotek's Form 10–K for the fiscal year ended December 31, 2007, Exhibit K attached to Motion to Dismiss, Docket Entry No. 36, p. 5.

8     *Id.* at 3. The earnings guidance provided in this conference call was actually $2 per diluted share, but on June 19, 2007, Flotek approved a 2–for–1 stock split. The earlier statements of projected earnings per share alleged in the FACAC have been adjusted to reflect this stock split.

9     *Id.* at 4.

On May 8, 2007, Flotek issued a press release announcing its financial results for the First quarter of 2007, which ended on March 31, 2007. Flotek reported revenues of $35.1 million and net income of $3.7 million, or $0.19 per diluted share. (FACAC ¶ 45) [10] The press release quoted Dumas as stating, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools." [11] (FACAC ¶ 45) Following the press release the defendants conducted a conference call with investors and analysts, at which Meier stated that in January 2007 Flotek completed the acquisition of Triumph Drilling Tools, a regional provider of downhole rental equipment in the oil and gas industry, and that later in January Flotek acquired a 50% partnership interest in CAVO Drilling Motors, an entity specializing in the rental servicing and sales of high performance mud motors for drilling applications. [12] Meier also stated that "we project the company will generate revenues of $160 million and diluted earnings per share of $[1.00]. These projections include the purchase of Triumph and CAVO." [13] Dumas similarly stated that "[b]ased on our performance, we hold to our earnings guidance of $[1] diluted earnings per share for 2007 without the addition of any more acquisitions which obviously would have a positive [e]ffect." [14] (FACAC ¶ 46)

10     *See* May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36.

11     *Id.*

12     05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

13     *Id.* at 4.

14     *Id.* at 3.

**\*4** Plaintiffs allege that in response to statements made in the press release and conference call held on May 8, 2007, the price of Flotek stock rose $1.88 per share, or 9%, to close to $21.90 per share on May 9, 2007, and that from May 11, 2007, through May 18, 2007, Dumas and Meier sold over 55,000 shares of their Flotek stock for gross proceeds of over $1.27 million at prices exceeding $22.00 per share. (FACAC ¶ 47–48)

On June 19, 2007, Flotek announced approval of a 2–for–1 split of its common stock. The additional shares were distributed on July 11, 2007, and Flotek began trading at the split-adjusted price the following day. Accordingly, Flotek's previous guidance of $2.00 in diluted earnings per share was adjusted to $1.00 per share to reflect the stock split. (FACAC ¶ 50)

On August 2, 2007, Flotek issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007. Flotek reported revenues of $37.8 million and net income of $4.9 million, or $0.25 per fully diluted share despite inclement weather. (FACAC ¶ 51) [15] The press release quoted Dumas as stating that "[n]et income more than doubled in the second quarter of 2007 compared to 2006, and increased 31% above first quarter 2007, despite severe weather in many of our operating areas. We estimate inclement weather deferred approximately $2 million in sales." [16] Following the press release the defendants conducted a conference call with investors and analysts at which Dumas stated that "[b]ased on our performance projections we hold our earnings guidance of $1 a diluted share, diluted earnings per share for '07 without the addition of any more acquisitions." [17] (FACAC ¶ 52) Plaintiffs allege that Meier similarly stated, "[w]e hold to our original guidance" (FACAC ¶ 52), [18] and that she allegedly touted Flotek's integration efforts, stating:

15     August 2, 2007, News Release, Exhibit E attached to Motion to Dismiss, Docket Entry No. 36.

16     *Id.*

17      08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

18      *Id.* at 12 (Meier is quoted as stating: "We hold to our original guidance.").

[i]n January, we completed the acquisition of Triumph Drilling Tools. Triumph is a leading regional provider of downhole rental equipment to the oil and gas industry. The integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS shore-drilling location this year which we feel will further increase the utilization of our expansive tool inventory.

(FACAC ¶ 52) [19] Plaintiffs allege that in response to these statements, "the price of Flotek stock rose $1.45 per share, or 5%, to close at $31.94 per share on August 2, 2007." (FACAC ¶ 53)

19      *Id.* at 3.

Plaintiffs allege that between August 6 and August 10, 2007, defendant Dumas sold over 155,000 shares of his Flotek stock (more than 17% of his holdings) at prices between $31.00–$33.00 per share for gross proceeds of over $4.9 million, and that on August 13, 2007, Meier sold 5,000 shares of her Flotek stock at a price of $32.30 per share for gross proceeds of $61,500. (FACAC ¶ 54)

On October 31, 2007, Flotek issued a press release announcing its financial results for the third quarter of 2007, which ended on September 30, 2007. Flotek reported revenues of $41.7 million and net income of $5.0 million, or $0.26 per fully diluted share. (FACAC ¶ 56) [20] The press release quoted Dumas as stating:

20      October 31, 2007, News Release, Exhibit G attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

 **\*5** [t]he drop in Rocky Mountain wellhead gas prices and associated drop in gas drilling and production delayed sales in our chemical, drilling and artificial lift divisions. Despite this, we are on track and performing at or above plan and making progress on several strategic initiatives. Based on our performance we reiterate our guidance of $1.00 per share on a fully diluted basis for 2007. [21]

21      *Id.*

(FACAC ¶ 56) Following the press release the defendants conducted a conference call with investors and analysts at which Dumas explained that

[s]equentially, third quarter revenues were 4% higher than the second quarter revenues with low gas prices in the Rocky Mountains affecting drilling activity. The focus in that area is continued integration, product line expansion and moving from sub-rental of products to owning tools that will increase the profitability on those rentals ... Operating profit margins were 12.4% in the third quarter ′07 verses 11.7% in the second quarter of ′07. And they were 20.1% in the third quarter of ′06.

Year-over-year operating profit margins are lower due to a shift in our revenue mix from sales to rentals and services, which are more people intensive, plus $700,000 more in depreciation and amortization expense. Artificial Lift sales decreased from 5.8 million in the third quarter of ′06 to 4.3 million in the third quarter of ′07. Low gas prices and pipeline capacity constraints significantly reduced coal bed methane production and drilling activity in the Powder River Basin in the third quarter of ′07 versus 2006. There were about 25% less drilling rigs operating in the third quarter compared to the quarter in ′06.

As a percentage of revenue, operating margins for the third quarter were 10.9% verses 14.6% for the same period in ′06. Sequentially, Artificial Lift sales increased 1.3 million in the third quarter compared to second quarter of this year. Operating margins also increased from 5.4% in the second quarter of ′07 to 10.9% in the third quarter. In our corporate cost, we were $2.6 million in the third quarter of ′07 versus 1.6 million in the third quarter of ′06.

The primary increase in this cost relates to the expansion of our accounting and support personnel plus equity compensation expenses associated with the retention plan by the Board to put into place for me and Lisa.

...

Our business operations and prospects for future revenue remain strong. We have not seen a reduction in demand for our products and services due to the quality of the service of our products but as I mentioned we have had some reduction because of the gas price that affected the drilling operation and because we had pipeline problems and we also have other issues that reduced the activity in

2010 WL 3785586

the Powder River in our coal bed methane operations that reduced the rig count by 25%.

Based on all of this activity, based on the performance of projections and the third quarter performance, we are right on our plan as we have anticipated this year and we have consistently indicated to our share holders that we would have a guidance of $1 per share diluted earnings and without any addition of any acquisitions.

 **\*6** At this point, I want to point out that we continue to stand firm on that guidance.[22]

[22]     Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 1–3.

(FACAC ¶ 57) During a question and answer period Dumas explained that Flotek had anticipated a sales decline "[b]ecause we were beginning to hear from our customers that ... some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August."[23] (FACAC ¶ 58) When asked "[w]here ... [does Flotek] stand in terms of the final integration with Triumph, the RTMS and stuff like that to kind of get the last the consolidation benefits out?"[24] Dumas stated "we are going to continue to work on it. I hope that we will see and I think that we will see an improvement in the fourth quarter over the third quarter."[25] (FACAC ¶ 59) Nevertheless, Dumas insisted

[23]     *Id.* at 7.

[24]     *Id.* at 4.

[25]     *Id.*

there is nothing in our planning that doesn't indicate that we are going to continue to grow at the same approximate level that we have been growing for the last 3–4 years, and that is a 75–80% growth in profits and a, we grew 65% organic in revenues in the third quarter. So we are doing it internally with it's kind of like WalMart same-store sales were up 65%.[26]

[26]     *Id.* at 11.

(FACAC ¶ 60) In response to these statements, the price of Flotek common stock fell $14.35 per share, or 28%, to close at $36.45 per share on November 29, 2007. (FACAC ¶ 61)

On January 23, 2008, Flotek issued a press release announcing that it was lowering its previously announced guidance for the year ending December 31, 2007. The press release stated:

The Company expects revenues for the 2007 year to be approximately $158 million, generating earnings in the range of approximately $0.88 to $0.92 per diluted share, as compared to prior guidance of $1.00 per diluted share, and actual earnings of $0.61 per diluted share in 2006. The revised guidance is preliminary and subject to audit. Flotek expects to release final results for the fourth quarter and year ending December 31, 2007 on March 12, 2008.

During the fourth quarter, which historically has been one of Flotek's strongest quarters, revenues were lower than anticipated due to a general slowdown in North American fracturing activity and drilling activity, accompanied by weather disruptions in the mid-continent region.

(FACAC ¶ 63)[27] The press release quoted Dumas as stating:

[27]     Press Release, Exhibit I attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

"The growth fundamentals of our core businesses remain sound, and the pace of North American oilfield service activity seems to be strengthening in January. We believe the business line additions of the last several years will continue contributing to growth in 2008 and beyond as these businesses are integrated and ramp-up matures. We have made a significant investment in 2007 to strengthen our internal controls and expand our information technology processing capability. We anticipate the costs associated with these initiatives to level off in 2008."[28]

[28]     *Id.*

 **\*7** Plaintiffs allege that in response to these announcements, the price of Flotek stock fell 30%, or $7.60 per share to close at $17.86 per share on January 24, 2008. (FACAC ¶ 64)

On March 17, 2008, Flotek held a conference call with investors and analysts to discuss the Company's fourth-quarter and full-year results for the period ending December 31, 2007, stating:

Flotek delivered a strong performance in ′07 and we earned net income of $16.7 million, or $0.88 per fully diluted share during 2007, compared to $11,400,000 or $0.61 per fully

diluted share in ′06. Our net income increased 46% and fully diluted earnings per share increased 45% in ′07 versus ′06. All amounts reflect the two-for-one split we completed in July of ′07. Our focus has been clearly on expanding sales and rentals of our proprietary technology-driven products. Because of this company-wide, we increased our gross profit margins from 41% in 2006 to 43% in 2007.

Operating income margin remained constant at 19% in 2007 and 2006. We generated total revenues of $158 million, compared to 101 million in 2006, despite adverse weather and lower gas prices due to lack of pipeline outlets in the Rocky Mountains. Our organic sales growth made approximately 64% of our year-over-year growth. The acquisition of Triumph Drilling Tools, Sooner Energy Services and CAVO Drilling Motors made up the balance. The chemicals and logistics segment increased revenue 71% year-over-year as a result of 117% growth in our biodegradable environmentally benign "green" chemicals sales.[29]

[29]    Q4 2007 Earnings Call, Exhibit J attached to Motion to Dismiss, Docket Entry No. 36.

(FACAC ¶ 65)

On March 16, 2009, Flotek issued a press release announcing that the Company had recorded a goodwill impairment of $67.7 million. (FACAC ¶ 66)[30] The impairment caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks. As a result, the Company was forced to enter into a series of amendments to its credit arrangements that limited Flotek's revolving credit line and imposed capital expenditure limitations.[31]

[30]    March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[31]    Id. at 5.

Each of Flotek's press releases ended with a section titled "Forward–Looking Statements" that stated:

This Press Release contains forward-looking statements (within the meaning of Section 27A of the Securities Act of 1933 (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934) regarding Flotek Industries, Inc. business, financial condition, results of operations and prospects. Words such as expects, anticipates, intends, plans, believes, seeks, estimates and

similar expressions or variations of such words are intended to identify forward-looking statements, but are not the exclusive means of identifying forward-looking statements in this Press Release.

Although forward-looking statements in this Press Release reflect the good faith judgment of management, such statements can only be based on facts and factors currently known to management. Consequently, forward-looking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from the results and outcomes discussed in the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include, but are not limited to, demand for oil and natural gas drilling services in the areas and markets in which the Company operates, competition, obsolescence of products and services, the Company's ability to obtain financing to support its operations, environmental and other casualty risks, and the impact of government regulation. Further information about the risks and uncertainties that may impact the Company are set forth in the Company's most recent filings on Form 10K (including without limitation in the "Risk Factors" Section) and Form 10–Q, and in the Company's other SEC filings and publicly available documents. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Press Release. The Company undertakes no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Press Release.[32]

[32]    May 8, 2007, Press Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36, p. 4. Identical and/or virtually identical statements are included at the end of every press release at issue in this action. See the following press releases attached to Docket Entry No. 36: March 13, 2007, Exhibit A, p. 4; August 2, 2007, Exhibit E, p. 4; October 31, 2007, Exhibit G, p. 5; January 23, 2008, Exhibit I, p. 2; and March 16, 2009, Exhibit Q, p. 10.

*8 Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, and conducted a non-public offering to repay its debt and fund its working capital needs, and announced the departure of defendant Dumas. (FACAC ¶ 68) Plaintiffs allege that Flotek Director, John Chisholm, interim president, later remarked,

"[A]s I indicated on the second quarter call, one of the most important goals I have as interim President is to provide no nonsense transparency to all of our stakeholders. We have worked diligently to renew lines of communication with all of our stakeholders, and while we still have work to do, we are generally pleased with our efforts today."

(FACAC ¶ 68)

### III. *Analysis*

Plaintiffs bring this securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly-traded securities of Flotek during the Class Period. Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b–5 promulgated thereunder by the Securities Exchange Commission (SEC) against Flotek and its senior officers, Jerry D. Dumas, Sr., and Lisa G. Meier. Plaintiffs allege that the defendants made false statements and omissions in four sets of press releases and analysts calls between March 13 and October 31, 2007. The alleged misstatements and omissions fall into four broad categories: (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand. Defendants contend that the plaintiff's claims are subject to dismissal under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b)(1), because plaintiffs have failed to allege facts sufficient to state a claim for securities fraud in violation of § 10(b), Rule 10(b)–5, and/or § 20. For the reasons explained below, the court agrees.

### A. Applicable Law

1. *Section 10(b) and Rule 10b–5*
Section 10(b) of the Exchange Act makes it unlawful for any person:

To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for any person, directly or indirectly,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**\*9** 17 C.F.R. § 240.10b–5(b).

2. *Rule 9(b) and Private Securities Litigation Reform Act*
Actions for securities fraud filed pursuant to § 10(b) and Rule 10b–5 are subject to the pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, *et seq.*

(a) Rule 9(b)
"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). Plaintiffs must also plead the elements of their Rule 10b–5 claims with particularity. *See Goldstein v. MCI WorldCom,* 340 F.3d 238, 245 (5th Cir.2003) (citing *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir.), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997)). *See also Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520–521 (5th Cir.1993). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then

2010 WL 3785586

attempting to discover unknown wrongs. *See Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.' " *Id .* at 1068 (quoting *Tel–Phonic Services,* 975 F.2d at 1139). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." *Southland Securities,* 365 F.3d at 361.

(b) PSLRA

In 1995 Congress amended the 1934 Act through the passage of the PSLRA. In relevant part, the PSLRA, 15 U.S.C. § 78u–4(b)(1), provides that

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

In *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002), the Fifth Circuit coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4 (b)(3) (A):

 **\*10**  (1) specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.

Where misrepresentations appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the group that likely put the challenged documents together. *In re Solv–Ex Corp. Sec. Litig.,* 210 F.Supp.2d 276, 283 (S.D.N.Y.2000); *In re Worlds of Wonder Sec. Litig.,* 721 F.Supp. 1140, 1143 (N.D.Cal.1989). Under this group-pleading-doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are insiders or affiliates of the company. *Solv–Ex,* 210 F.Supp.2d at 283. The group-pleading-doctrine allows plaintiffs to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.

In *Southland* the Fifth Circuit held that group pleading

cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."

365 F.3d at 364. Given the PSLRA's directive that each defendant must be enlightened as to his or her part in the alleged fraud, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author, or statements within documents not attributed to any individual, may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3785586

Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement. *Id.* at 365. "[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation." *Id.*

### 3. *Pleading Standards*

**\*11** Section 10 (b) and Rule 10b–5 may be violated by using devices, schemes, or artifices, making misstatements or omissions of material fact, or engaging in any act, practice, or course of business that would operate as a fraud in connection with the purchase or sale of any security. To state a claim under section 10(b) of the 1934 Act and Rule 10b–5 the plaintiffs must allege (1) that the defendant made a material misstatement or an omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* 597 F.3d 330, 335 (5th Cir.2010), *pet. for cert. filed* May 13, 2010 (No. 09–1403).

#### (a) Misrepresentations and Manipulations

A misrepresentation is not actionable unless it is material. *Tuchman,* 14 F.3d at 1067. To meet the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). "[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." *Rubenstein v. Collins,* 20 F.3d 160, 168 (5th Cir.1994) (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1448 (5th Cir.1993)). The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." *Id.* (quoting *Krim,* 989 F.2d at 1445).

#### (b) Scienter

The term "scienter" as applied to conduct giving rise to an action under the Exchange Act and Rule 10b–5 is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Lovelace,* 78 F.3d at 1018 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). In order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b–5 claim must plead facts rendering a plausible inference of scienter that is cogent and at least as strong as any opposing inference one could draw from the facts alleged. *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 250–51 (5th Cir.2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510–11, 168 L.Ed.2d 179 (2007)).

[S]evere recklessness can supply the scienter required to prove securities fraud. Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002) (quoting *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 408–409 (5th Cir.2001)). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand,* 565 F.3d at 251 (citing *Tellabs,* 127 S.Ct. at 2509).

#### (1) Circumstantial Evidence

**\*12** The Fifth Circuit has "never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims." *Goldstein,* 340 F.3d at 246. "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." *Nathenson,* 267 F.3d at 410. Nevertheless, conclusory allegations will not suffice to plead scienter, and the court may not conduct a piecemeal analysis of the alleged facts and circumstances but must, instead, view the totality of the alleged facts and circumstances as a whole to determine whether they raise the requisite strong inference of scienter. *See Abrams,* 292 F.3d at 430–431 (citing *Nathenson,* 267 F.3d at 424–425).

#### (2) Motive and Opportunity

Before enactment of the PSLRA the Fifth Circuit followed the Second Circuit's approach that allowed plaintiffs to raise an inference of scienter either by pleading facts that identify circumstances indicating defendants' conscious or severely

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)

2010 WL 3785586

reckless behavior, or by pleading facts that demonstrate defendants' motive and opportunity to commit securities fraud. *Lovelace,* 78 F.3d at 1018–1019. *See also Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994), and *Tuchman,* 14 F.3d at 1068. Following the PSLRA, however, the Fifth Circuit has "concluded that '[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter,' but that allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA." *Goldstein,* 340 F.3d at 246 (quoting *Nathenson,* 267 F.3d at 412).

Insider trading can be alleged as a form of motive and opportunity. *See Southland,* 365 F.3d at 368 (citing *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999) (allegations "that the individual [d]efendants did profit by selling many of their shares at artificially inflated prices during the class period ... largely tend to illustrate that [d]efendants had the motive and opportunity to commit securities fraud")). However, insider trading will raise a strong inference of scienter only when "in suspicious amounts or at suspicious times." *Id.* (quoting *Abrams,* 292 F.3d at 435). *See also Central Laborers' Pension Fund, v. Integrated Electric Services, Inc. .,* 497 F.3d 546, 552–53 (5th Cir.2007) ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts."); *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 987 (9th Cir.1999) ("insider trading is suspicious only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"). Courts consider the amount and percentage of shares sold, trading history, and timing, including whether other defendants sold shares at the same time, when assessing whether a stock sale qualifies as extraordinary or unusual. *See id.* (citing *In re Silicon Graphics,* 183 F.3d at 986).

**(3) Totality of the Circumstances**

*13 All the facts and circumstances alleged must be considered to determine whether they, in toto, raise a requisite strong inference of scienter. *Abrams,* 292 F.3d at 430; *Nathenson,* 267 F.3d at 410. Conclusory assertions that the defendant should have known about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter. *Abrams,* 292 F.3d at 432. The mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles ("GAAP"), without more, does not establish scienter. *Melder,* 27 F.3d at 1103. Allegations that the

defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." *Abrams,* 292 at 434.

(c) Reliance

Plaintiffs must also allege reliance on defendants' material misrepresentations or omissions. In class actions plaintiffs usually premise the reliance element of their claims on the fraud-on-the-market doctrine, which allows plaintiffs who may not have read the alleged misrepresentations to rely upon market conditions reflecting the fraud. The theory is that an established market assimilates all of the available information regarding a particular stock, sets the stock price accordingly, and that investors make their decisions in reliance on the integrity of an informed market. *See Basic,* 108 S.Ct. at 983. Where material misrepresentations have been placed into the mix of information or where omissions render the market information misleading, the stock price is skewed and investors may be defrauded. *Id.* Under this theory plaintiffs are entitled to a rebuttable presumption of reliance when they show that materially misleading statements were, in fact, disseminated into "an impersonal, well-developed market for securities." *Id.* at 991. Defendants can rebut the presumption by showing that the market price was not affected by their misrepresentations, that the plaintiffs did not trade in reliance on the integrity of the market, or that plaintiffs would have traded despite knowing the statement was false. *Id.* at 992.

(d) Loss Causation

Under the PSLRA plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). But the PSLRA does not specifically describe what a plaintiff must allege in a complaint in order to plead the "loss causation" element of such a claim. In *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005), the Supreme Court held that the federal securities statutes and regulations "permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 1633.

*14 In other words, the federal laws require "that a plaintiff prove that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's

Case 4:21-cv-02473   Document 41-1   Filed 03/30/23 in TXSD   Page 245 of 281
Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3785586

economic loss." In order to establish this proximate causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss.

*Lormand,* 565 F.3d at 255 (quoting Dura, 125 S.Ct. at 1631, 1633).

4. *Section 20(a)*

Section 20(a) of the Exchange Act defines "controlling person liability." It provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To establish controlling person liability plaintiffs must show that a primary violation was committed and that the defendants directly or indirectly controlled the violator. *See ABC Arbitrage,* 291 F.3d at 348 n. 57, 362 n. 123. *See G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981) (rejecting need to allege that the controlling person actually participated in the underlying primary violation). Nevertheless, the plaintiff needs to allege some facts beyond a defendant's position or title to show that the defendant had actual power or control over the controlled person. *See Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509–510 (5th Cir.1990).

**B. Application of the Law to the Facts**

1. *Failure to State a Claim for Primary Liability Under Section 10(b)/Rule 10b–5 Claims*

The defendants argue that the Exchange Act claims asserted against them should be dismissed because plaintiffs have failed to allege particularized facts showing a material false statement or actionable omission; plaintiffs' claims are barred by the safe harbor for forward-looking statements; plaintiffs' allegations do not support a plausible inference of scienter; and plaintiffs fail to allege loss causation.

(a) Material False Statements or Actionable Omissions

The statements and omissions about which the plaintiffs complain fall into four categories: (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand.

**(1) Earnings Guidance**

Plaintiffs allege that throughout the Class Period "[d]efendants repeatedly highlighted the company's 100% year-overyear growth and promised the market Flotek was poised to achieve $1.00 in diluted earnings per share in 2007." (FACAC ¶ 9) Plaintiffs allege that during a pre-Class Period conference call with analysts held on March 13, 2007, Dumas projected that the Company would "be able to deliver $[1] per share diluted earnings," (FACAC ¶ 42), and that Meier similarly projected that "the Company will generate revenues of $160 million with diluted earnings per share of $[1]." (FACAC ¶ 42) Plaintiffs do not allege that these projections were false when made but, instead, that they "remained alive and uncorrected throughout the Class Period." (FACAC ¶ 43) Plaintiffs allege that during conference calls with analysts held on May 9, 2007,[33] August 3, 2007,[34] and November 1, 2007,[35] Dumas and Meier both reiterated that based on the Company's performance projections they held to their original earnings guidance for 2007 of $1.00 earnings per diluted share. (FACAC ¶ 46 (Dumas and Meier on May 9th), ¶ 52 (Dumas and Meier on August 3rd), ¶ 57 (Dumas on November 1st))[36]

[33]   05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[34]   08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36.

[35]   Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

[36]   [Missing Text].

**\*15**   Plaintiffs allege that, unbeknownst to investors, defendants' statements about earnings guidance were false because undisclosed "internal projections indicated that the Company could not achieve $1.00 per share." (FACAC ¶ 9) However, plaintiffs do not support their allegations with cites to any promises as opposed to estimates of Flotek's 2007 earnings, or to any specific internal projections that contradict and/or conflict with Dumas's and Meier's earnings guidance. Instead, plaintiffs support their allegations that the defendants' statements about earnings guidance were materially false and misleading with statements attributed to CW1 identified as a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i)) Plaintiffs

allege that CW1 heard from Company executives, including Steve Reeves, President of the Downhole Tool Division, Bruce McGovern, who headed up the Drilling Products segment, and Jesse "Jumpy" Neyman, Chief Accounting Officer, that Dumas " 'had a habit' of overstating financial projections to the market" (FACAC ¶ 49(a)(i)), and "had no factual information or projections from anyone to support his positive statements" (FACAC ¶ 49(a)(iv)); but plaintiffs have not identified any specific financial projections that Dumas overstated. Plaintiffs allege that CW1 witnessed a disconnect between Dumas and Meier evidenced by Dumas's habit of regularly jumping in to add a positive spin on numbers that demonstrated a shortfall against expectations or in comparison to prior periods (FACAC ¶ 49(a)(iii), ¶ 55(a)(i), ¶ 62(a)). But plaintiffs fail to identify any specific numbers showing a shortfall or expected shortfall on which Dumas placed an unreasonably positive spin, and fail to identify any specific time, place, or context at which Dumas added a positive spin to such numbers. Plaintiffs allege that during a meeting with Reeves, Neyman, McGovern, Meier, and possibly others that took place during the third or fourth quarter of 2007, "in the middle of descriptions about specific issues causing the problems, Dumas got up to leave and in typical fashion said, 'just go out and find it,' referring to revenues that would meet performance expectations" (FACAC ¶ 62(a)(v)), but plaintiffs fail to identify which issues were raised, and/or why whatever was said about those issues would prove that Dumas's and/or Meier's statements about earnings guidance were materially false and/or misleading.

The statements attributed to CW1 are not sufficient to raise an inference that Dumas's and Meier's statements about earnings guidance were materially false and/or misleading because they are hearsay lacking factual particularity and specificity required by Rule 9(b) and the PSLRA. The statements attributed to CW1 fail to specify any financial projections that Dumas and/or Meier overstated, fail to specify any dates on which Dumas and/or Meier received financial projections that they overstated, and fail to specify the amounts by which Dumas and/or Meier overstated any financial projections. "The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud." *In re Azurix,* 198 F.Supp.2d at 882. The statements attributed to CW1 also lack indicia of reliability required by case law to raise an inference that the defendants' statements were materially false and misleading. *See ABC Arbitrage,* 291 F.3d at 353 (alleged sources of information must be described "with sufficient particularity to support the probability that a person in the

position occupied by the source as described would possess the information pleaded"). Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek could not reasonably estimate annual earnings of $1 per share, the court concludes that plaintiffs have failed to plead facts that if true would show that statements attributed to the defendants about Flotek's earnings guidance contained material misstatements or actionable omissions.

### (2) Integration of Acquired Companies

**\*16** Plaintiffs allege that commenting on a pre-Class Period press release issued on March 13, 2007, Dumas stated "[w]e have brought together a first-rate collection of [9] companies and will continue to focus on integrating them in 2007 to maximize profit" (FACAC ¶ 41), and that during a conference call with investors and analysts following the press release, Dumas stated that "[t]he drilling tool groups will focus on integration this year." (FACAC ¶ 42) Plaintiffs allege that throughout the Class Period defendants touted the integration efforts that would reduce costs and improve Flotek's margins. (FACAC ¶ 44) Plaintiffs allege that during a conference call with analysts held on May 9, 2007,[37] Dumas stated, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment" (FACAC ¶ 45), and that during a conference call with analysts held on August 3, 2007,[38] Meier stated that "[t]he integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS to our drilling locations this year which we will further [use to] increase the utilization of our expansive tool inventory." (FACAC ¶ 52) Plaintiffs allege that during a conference call with analysts held on November 1, 2007, Bo McKenzie of Pritchard Capital Partners asked where the Company stood "in terms of the final integration with Triumph ... and stuff like that to ... get the last of the consolidation benefits out" (FACAC ¶ 59), to which Dumas responded, "Bo, we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter." (FACAC ¶ 59)

| | |
|---|---|
| 37 | 05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36. |
| 38 | 08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36. |

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3785586

Plaintiffs allege that unbeknownst to investors, defendants' statements about integration of acquired companies were materially false and misleading because

> defendants failed to integrate any of the acquired companies into Flotek, exacerbating the inevitable complexity that ensues from so many acquisitions in such a short period of time. Instead, according to former employees, the acquired companies continued to operate as independent entities within various, separate frameworks for sales, process, technology, finance, accounting and controls (to the extent any controls existed). Flotek simply had no uniform accounting or forecast system in place to integrate and assimilate the acquisitions and was incapable of providing accurate financial results as a result of this lack of due diligence and integration.

(FACAC ¶ 8) However, plaintiffs do not support their allegations with cites to any evidence that Flotek ever reported inaccurate financial results or that any inaccurate financial reports were attributable to Flotek's failure to integrate new acquisitions. Instead, plaintiffs support their allegations that the defendants' statements about integration of acquired companies were materially false and misleading with statements attributed to CW1, a "Flotek Human Resources Director from August of 2007 through May of 2009," (FACAC ¶¶ 9 and 49(a)(i)), CW2, "a Fixed Asset Accountant who worked for the company from July 2008 through February 2009, performing inventory counts at most of Flotek's tool yards," (FACAC ¶ 49(b)(iv)), CW3, "Flotek's IT Director and Senior Architect from April 2008 to June 2009 ... [whose] position was akin to the position of a Chief Information Officer[, and who] visited each facility for each division in performing ... responsibilities to spearhead Flotek's IT initiatives" (FACAC ¶ 49(b)(vi)) and CW4, a person who "worked for Triumph from April 1, 2004 as a Regional Manager responsible for North Texas and Oklahoma until Flotek acquired Triumph in January 2007 ... [and who i]n March 2008 ... was transferred to manage the integration of the CAVO and Spidle Turbeco sales forces." (FACAC ¶ 49(b)(xx))

*17 Plaintiffs allege that CW1 heard from Company executives, including Reeves, McGovern, and Neyman, that Dumas "did not integrate anything" (FACAC ¶ 49(b)(i)), "kept everyone in place doing business the same way with the same system they had" (FACAC ¶ 49(b)(i)), and "had no uniform accounting or forecasting system for the newly acquired companies." (FACAC ¶ 49(b)(ii)) Plaintiffs allege that CW1's statements are corroborated by CW2 who "saw no indication of an integrated, uniform accounting or other management/computer system utilized by Flotek's facilities during CW2's employment[, i.e., July 2008 through February 2009]" (FACAC ¶ 49(b)(v)), and "heard from the people CW2 worked with that when generating sales projections, 'they used whatever they sold the last year and maybe adjusted that as things changed.' " (FACAC ¶ 49(b)(v)) Plaintiffs have failed to allege any particularized facts showing that statements attributed to CW1 and CW2 contradict or otherwise prove that Dumas's statements that in 2007 Flotek was focused on actively integrating its recent acquisitions to maximize profit or Meier's statement that the integration of Triumph Tools had been very successful were materially false and/or misleading. Because plaintiffs have not alleged that the defendants ever stated that Flotek had a uniform accounting or forecast system for new acquisitions, or that absent such uniform systems Flotek could not reasonably generate sales projections, the statements attributed to CW1 and CW2 are insufficient to raise an inference that defendants' statements about Flotek's efforts to integrate new acquisitions contain material misstatements or actionable omissions. Moreover, plaintiffs' allegations lack any explanation for why CW1, a human resource manager who worked for Flotek during only part of the Class Period, and/or CW2, an accountant who did not work for Flotek during any of the class period, are reliable sources of information about Flotek's efforts to integrate new acquisitions during the Class Period.

Plaintiffs allege that the statements regarding Flotek's integration of new acquisitions attributed to CW1 and CW2 are corroborated by CW3 who worked as Flotek's IT Director and Senior Architect from April of 2008 to June of 2009. Plaintiffs allege that "CW3 learned right away that although Flotek had acquired numerous companies over the past few years, there had been **virtually** no integration." (FACAC ¶ 49(b)(vii) (emphasis added)) According to CW3, Meier explained

2010 WL 3785586

that Flotek had been experiencing "serious inventory problems," and accounting problems resulting from the various facilities all operating independently. CW3 was to visit each of the facilities for each division, to prepare a detailed integration plan and execute it so that Flotek could begin operating as one.

(FACAC ¶ 49(b)(vii) Plaintiffs allege that

[a]ccording to CW3, Flotek had not been able to even devise a plan to perform this system integration, that the Company had paid hundreds of thousands of dollars to consultants and "seemed to have gotten nowhere" when CW3 joined in April 2008. CW3 said they were bogged down figuring out what was needed and how to get all the reporting modules, the statistics and "underlying baseline" they needed.

 **\*18**  (FACAC ¶ 49(b) (viii))

Far from showing that the statements attributed to Dumas and Meier about Flotek's efforts to integrate new acquisitions during the Class Period were materially false and misleading, the statements attributed to CW3 show that before CW3 was hired in April of 2008 Flotek had "paid hundreds of thousands of dollars to consultants" in an effort to integrate its newly acquired companies. The only inference to be drawn from the statements attributed to CW3 is that Flotek made efforts to integrate its new acquisitions in 2007, but had not completed that effort by April of 2008 when CW3 was hired to continue that effort. Thus, even if true, CW3's allegations would only prove that Flotek's efforts to integrate its new acquisitions had not succeeded by April of 2008; they would not prove that Flotek was not focused on actively attempting to integrate its new acquisitions. Nor would CW3's statements prove that the statements about Flotek's integration efforts attributed to

Dumas and Meier contained material misstatements and/or actionable omissions.

Plaintiffs allege that the statements attributed to CW2 and CW3 are corroborated by CW4 who worked for Triumph from April 1, 2004, as a Regional Manager responsible for North Texas and Oklahoma, and in March of 2008 was transferred to manage the integration of the CAVO and Spidle Turbeco sales forces. (FACAC ¶ 49(b)((xx)) Plaintiffs allege that

[a]ccording to CW4, there was no integration in 2007 ... Flotek was clearly moving too fast buying companies and expecting "too many cooks in the kitchen" to work together in a cooperative organized manner. CW4 saw there would be no possibility of a "seamless" integration of the acquired companies in 2007 or 2008 as "nobody knew who was supposed to do what" and each was operating the way it always had.

(FACAC ¶ 49(b)(xx)) CW4's statements about Flotek's efforts to integrate its new acquisitions in 2007 are neither sufficiently particularized nor sufficiently reliable to raise an inference that Dumas's statements that Flotek was actively integrating its recent acquisitions to maximize profit in 2007 were materially false and/or misleading because CW4's statements address only the outcome of Flotek's integration effort. CW4 does not cite any particularized facts that, if true, would show that throughout the Class Period Flotek was not focused on actively integrating its new acquisitions, that the efforts Flotek was making to integrate its new acquisitions were unreasonable, or that those efforts could not be expected to accomplish the task of integrating the new acquisitions within a reasonable period of time. Nor are CW4's statements sufficiently particularized to prove that Meier's statement that Triumph had been successfully integrated was materially false or misleading. Meier qualified the statement about which plaintiffs complain, *i.e.*, "[t]he integration of Triumph into Flotek has been very successful" (FACAC ¶ 52), with the explanation that Flotek had "leveraged off [Triumph's] expertise to help roll out [Flotek's] RTMS to [its] drilling locations this year which [Flotek] will further [use to] increase the utilization of [its] expansive tool inventory." (FACAC ¶ 52) Meier did not state that every aspect of Triumph's business had been successfully integrated but only that Triumph had successfully been integrated into Flotek's RTMS.[39] None of the statements attributed to CW4 would contradict this statement, or prove that Triumph had not been successfully integrated into Flotek's RTMS.

2010 WL 3785586

39      *See* May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36. ("We are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools.")

**\*19** The statements attributed to CW1, CW2, CW3, and CW4 are insufficient to raise an inference that the defendants' statements about Flotek's 2007 efforts to integrate its newly acquired companies were materially false and/or misleading because they are hearsay lacking specificity required by Rule 9(b) and the PSLRA and lacking indicia of reliability required by case law. *See ABC Arbitrage, 291 F.3d at 353.* Missing from plaintiffs' allegations about defendants' statements concerning Flotek's 2007 efforts to integrate its new acquisitions is any factual description by plaintiffs of Flotek's integration efforts, any explanation of why those efforts were unreasonable, and/or why those efforts could not be expected to accomplish the task of integrating Flotek's acquisitions within a reasonable period of time. Moreover, plaintiffs' allegations that defendants' statements about Flotek's efforts to integrate its acquisitions in 2007 contained material misstatements and/or actionable omissions are contradicted by the statements attributed to CW3 that before Flotek hired CW3 in April of 2008, Flotek paid consultants hundreds of thousands of dollars in an effort to integrate its acquisitions. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that statements attributed to Dumas and Meier about Flotek's efforts to integrate newly acquired companies contained material misstatements and/or actionable omissions.

#### (3) Inventory Accounting

Plaintiffs allege that "[i]n order to inflate the price of Flotek's stock, defendants caused the Company to falsely report its results for the first three quarters of 2007 by improperly accounting for its inventory, including its valuation for excess and obsolete inventory, which misstated the Company's reported inventory, gross margin and net income." (FACAC ¶ 73) Plaintiffs allege that the "results for interim 2007 were included in Form 10–Q's filed with the SEC ... [and] included in press releases disseminated to the public" (FACAC ¶ 74), and that "[d]ue to Flotek's failure to properly account for excess and obsolete inventory, the Company's financial statements were not a fair presentation of Flotek's results

and were presented in violation of ... [GAAP] and SEC rules." (FACAC ¶ 75)

However, plaintiffs do not support their allegation with cites to any specific misstatements of reported inventory, gross margin, or net income. Instead, plaintiffs support their allegations that Flotek's failure to accurately account for its inventory caused Flotek to misstate its interim financial results for 2007 by alleging that Flotek had "huge volumes of old, unusable inventory throughout several of the acquired companies, including Triumph" (FACAC ¶ 49(c)), and that "Flotek did not adequately reserve for this obsolete inventory during the Class Period." (FACAC ¶ 55(c)) Plaintiffs' allegations about Flotek's failure to properly account for its inventory are based primarily on observations attributed to CW2, "a Fixed Asset Accountant who worked for the Company from July 2008 through February 2009, performing inventory counts at most of Flotek's tool yards" (FACAC ¶ 49(b)(iv)) and CW3, an accountant who began working for Flotek in April of 2008 and did on-site inspections. (FACAC ¶ 49(b)(vii))

**\*20** Plaintiffs allege that "[d]uring inventory at the Spidle Turbeco tool yards, CW2 found large volumes of old, rusting and otherwise unusable tools which were scheduled to sit on Flotek's books for as many as seven years as usable assets being depreciated." (FACAC ¶ 49(c)(i)) Plaintiffs allege that while CW2 was employed by Flotek, *i.e.,* July 2008 through February 2009, Flotek's former Controller, Julie Schwendimann, told CW2 that Reeves and McGovern could not understand why the plants in their division were keeping obsolete tools on their books for up to seven years, that according to McGovern, Flotek executives wanted to maintain the obsolete inventory as assets on Flotek's books under the rationale that the tools could be cut up or changed in a way that would make them usable, but that CW2 never observed that practice. (FACAC ¶ 49(c) (ii) and (viii))

Plaintiffs allege that CW3 learned from Meier "that tool inventory accounting and tracking was intended to be performed on Flotek's RTMS that had begun implementation in 2006 or 2007 ... [but that] there had been an inventory accounting performed in early 2007 that demonstrated the RTMS was seriously inadequate ... because too many plant level personnel had direct access to input or change information ... [and t]his created an array of problems, including failures to show that a tool had been transferred to another facility or a customer site." (FACAC ¶ 49(b)(ix)) Plaintiffs allege that Meier told CW3 "that the 2007

inventory accounting project was the result of concerns that assets may have been overstated and thus they wanted to 'get it cleaned up,' and get integrated" (FACAC ¶ 49(b)(xiv)), and that "when the inventory team went out in early 2007, the RTMS was so inaccurate they had to perform physical counts by hand[, and that t]he same was true again during the 2008 count." (FACAC ¶ 49(b)(xix)) According to CW3, these inventory accounting concerns "resulted in material variations and inconsistencies that necessitated yet another, and more comprehensive physical inventory count in 2008[, and that t]his count was performed sometime in May or June 2008." (FACAC ¶ 49(b)(ix)) Plaintiffs allege that Schwendimann told CW3 that

> the dollar value of old and unusable tools, determined through the inventory counts and efforts to reconcile the RTMS with actual inventories at the various locations, equated to millions of dollars that would eventually come off of Flotek's books. Schwendimann explained that this was one component of an "impairment charge" that Flotek was going to take in 2008. Schwendimann told CW3 that these were assets that should not be on the books, and that there were things on the books that were "very inaccurate" and this was to be "part of the goodwill write-off."

(FACAC ¶ 49(b) (xvii))

According to CW3, Flotek's inventory problems were particularly acute at CAVO. Plaintiffs allege that "CW3 personally saw large volumes of junk inventory strewn around CAVO yards, clearly unusable and rusting" (FACAC ¶ 49(b)(xi)), and that in the fall to latter part of 2008, RTMS expert contractor, Michelle Hill, discovered what amounted to "two sets of books" at CAVO, and learned that Flotek's Controller, Schwendimann, "was well aware of the two sets of books." (FACAC ¶ 49(b)(xii)) According to CW3, Schwendimann confirmed that accounting entries from prior periods dating back to the time of the CAVO acquisition had been changed to remove certain inventory as assets, but that "reclassifications" were performed to inflate CAVO's value to

a level that supported its acquisition price. (FACAC ¶ 49(b)(xiii))

**\*21** Plaintiffs allege that "[u]ltimately, at year-end 2007, during a quarter in which Flotek's financial statements were audited, the company increased its allowance of excess and obsolete inventory to above 10% of gross inventory, up from less than 8% in each of the prior quarters." (FACAC ¶ 81)

On March 16, 2009, Flotek issued a press release announcing that the Company had recorded a goodwill impairment of $67.7 million, [40] which caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks, and forced Flotek to amend its credit arrangements in ways that limited its revolving credit line and imposed capital expenditure limitations. [41] (FACAC ¶ 66) In the press release Flotek explained that

[40]    March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[41]    *Id.*

> [t]he impairment charge resulted from management's comparison of the current asset carrying values to their fair-value. The economic outlook in 2009 caused management to reach the conclusion that the fair market value of those identified assets had been lowered, or "impaired". [42]

[42]    *Id.* at p. 2.

Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, conducted a non-public offering to repay its debt and fund its working capital needs, and announced the departure of defendant Dumas. (FACAC ¶ 66)

The statements attributed to CW2 and CW3 are insufficient to raise an inference that problems associated with Flotek's inventory accounting caused Flotek's financial reports for the first three quarters of 2007 to be materially false and/or misleading because they lack factual particularity and specificity required by Rule 9(b) and the PSLRA. None of the statements attributed to either CW2 or CW3 explain (1) why either of these CWs, one a fixed asset accountant and the other an IT director, was competent and/or capable of identifying tools that were old, obsolete, or unusable, (2) why seven years was an unreasonable amount of time for Flotek to keep tools on its books, or (3) why Flotek

2010 WL 3785586

should not hold old and obsolete tools on its books until they could be sold as scrap. Moreover, although CW3 says that the RTMS inventories were inaccurate because too many plant-level personnel had direct access to input and change information, and that the RTMS inaccuracies prompted hand counts of inventory in 2007 and again in 2008, neither CW2 nor CW3 provides particularized facts showing that the hand counts were inaccurate, or that Flotek did not adjust its allowance for excess and obsolete inventory to above 10% of gross inventory, up from 8%, as soon as the data on which that adjustment was based became available. Nor does either of these two CWs provide any facts demonstrating the amounts by which Flotek's allegedly improper accounting for its inventory caused the Company to misstate its reported inventory, gross margin, or net income. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that any problems Flotek had with its inventory accounting during the Class Period caused Flotek's 2007 interim financial statements to contain material misstatements and/or actionable omissions.

### (4) Product Demand

**\*22** Plaintiffs allege that the defendants made materially false statements regarding continuing demand for Flotek's products by stating that sales had been "deferred" and/or "delayed" when, in fact, the defendants knew that the sales in question had been lost. Plaintiffs allege that during a conference call with analysts held on May 9, 2007, [43] Dumas stated "we have not seen a slow down in any of our three operating segments exclusive of the weather that just delayed some of our activities." (FACAC ¶ 46) Plaintiffs allege that during a conference call with analysts held on November 1, 2007, Dumas explained during a question and answer session that Flotek had actually anticipated a sales decline during the third quarter but, nevertheless, assured investors that the decline was only temporary. In response to a question posed by Joe Hill of Wachovia Capital about the weekly run rate of sales for an emulsion chemical, Dumas stated:

[43]   05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

... I visited with our people, and I said[,] I see that July numbers were moving up. We had the second largest month that we had in and it looked like August is going to be better. And do you see this as a trend? *And their comment is no, I don't think so. Because we were beginning to*

*hear from our customers that we sell ... the microemulsion to[,] that some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August.* Then we had a pickup in October. I am certainly hopeful and right now it appears that we are still moving forward, so we could have about a $2 million increase in sales in the chemical division or more in the fourth quarter. Because it appears that they are beginning to do a little more fracing.

...

We saw a pause in the fracing work. But that seems to some how or another, based on what we're seeing right now, that pause seems to have been eliminated ... But we clearly had a reduction in their proprietary chemicals, which is our—primarily our microemulsion. And that was the reason we have a small decrease in the gross profit margin in the chemical group. But we do not consider that a trend. It was only a short-term adjustment.

(FACAC ¶ 58 (emphasis in original))

Plaintiffs allege that unbeknownst to investors, Dumas's statements about product demand were materially false and misleading because "defendants knew by early 3Q07 that sales had not been 'delayed,' but that decreasing drilling and fracing activity would further erode sales throughout 2007 and impact the Company's margins by 30%." [44] Plaintiffs support these allegations with statements attributed to CW1, a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i)) Plaintiffs allege that

[44]   Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 9 (citing FACAC ¶¶ 49(d), 55(d), 58–59).

[w]ith respect to the Drilling Products segment, defendants knew that the pricing pressure would continue to negatively impact both sales and margins. According to CW1, McGovern confided in CW1 that he felt Dumas had unfairly committed the Drilling Products segment to positive results for 4Q07 and to meet 2007 expectations. According to CW1, the very problems Dumas admitted to having in 3Q were not going to be clearing up, yet the CEO assured the market problems were already "eliminated" by the end of 3Q07. McGovern told CW1 that Dumas could

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)

2010 WL 3785586

not be reasoned with, that the CEO would not listen to what he and the other operating division thought "was realistic."

**\*23** (FACAC ¶ 62(d))

CW1's statements about Flotek's product demand are insufficient to raise an inference that the statements about which plaintiffs complain were materially false and/or misleading because those statements are neither sufficiently particularized nor sufficiently reliable to prove that Dumas's statements were materially false and/or misleading. CW1 states that McGovern confided that he felt Dumas had unfairly committed the Drilling Products segment to positive results for 4Q07 and to meet 2007 expectations, but fails to allege facts that show the basis for McGovern's opinion or that he had communicated it to defendants. CW1 states that "the very problems Dumas admitted to having in 3Q were not going to be clearing up," but fails to allege any facts showing why those problems were not going to clear up, or why CW1's belief that they were not going to clear up was reasonable. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that Dumas's statements about Flotek's product demand made during the Class Period contained material misstatements and/or actionable omissions.

**(5) Conclusions as to False Statements**

Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek (1) could not reasonably estimate 2007 annual earning of $1 per share; (2) did not actively attempt to integrate newly acquired companies; (3) did not accurately report Flotek's financial results, including inventory, gross margin, and net income; and (4) did not reasonably expect that demand for its products would remain stable, the court concludes that plaintiffs have failed to plead facts that if true would prove that the statements attributed to the defendants about Flotek's earnings guidance, integration of new acquisitions, inventory accounting, and product demand contained any material misstatements and/or actionable omissions.

(b) Safe Harbor for Forward–Looking Statements

The PSLRA creates a safe harbor for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A). Citing *ABC Arbitrage,* 291 F.3d at 336, defendants contend that plaintiffs' Exchange Act claims are barred under both the PSLRA and

common law prohibitions on liability for forward-looking statements because "Flotek did not 'guarantee' anything and consistently warned that actual results could differ from guidance."[45] *Id.* at 359 (quoting *Krim,* 989 F.2d at 1446) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.")). Plaintiffs respond that the statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in the FACAC because "the alleged misrepresentations and omissions concerned present facts and the 'cautionary language' was insufficient to afford protection to defendants' statements."[46] For the reasons explained below, the court concludes that all but one of the statements regarding earnings guidance, integration of acquired companies, and product demand about which plaintiffs complain are protected by the safe harbor provision because they are forward-looking statements that were accompanied by specific cautionary disclosures. The single exception is Meier's August 3, 2007, statement that "[t]he integration of Triumph into Flotek has been very successful. We have leveraged off their expertise to help roll out our RTMS to our drilling locations this year which we will further [use to] increase the utilization of our expansive tool inventory." (FACAC ¶ 52) However, for the reasons explained in § III.B.1(a)(2) above and in § III.B.1(c) below, the court concludes that the statement Meier made on August 3, 2007, is not actionable.

45      Defendants' Motion to Dismiss, Docket Entry No. 36, p. 19.

46      Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 11.

**(1) Earnings Guidance**

**\*24** Plaintiffs allege that during conference calls with investors and analysts on March 13, 2007,[47] May 9, 2007,[48] August 3, 2007,[49] and November 1, 2007,[50] defendants stated that based on the Company's performance projections their earnings guidance for 2007 was $1.00 earnings per diluted share. (FACAC ¶¶ 42, 46, 52, 57) These earnings guidance statements were forward-looking and were accompanied by both general statements of caution and by specific cautionary disclosures. The March statements were accompanied by specific cautionary disclosures that Flotek had recently undergone an "exorbitant" audit process in 2006 due to the first year of Sarbanes–Oxley compliance, would not raise per share earnings guidance above $1 per share for fiscal

year 2007, and could not give guidance regarding its margins because Flotek had a lot of acquisitions to integrate.[51] The May statements were accompanied by specific cautionary disclosures that weather adversely affected activity levels, that Flotek had experienced a significant increase in administrative costs, and that information provided about Triumph and CAVO were based on only two months of experience.[52] The August statements were accompanied by specific cautionary disclosures that Flotek's major customers had experienced a slowdown, that the weekly run rate in July was "not good," and that revenue was "hopefully delayed rather than lost."[53] The November statements were accompanied by specific cautionary statements from Dumas that he was "hopeful" that Flotek was still moving forward and could have a $2 million sales increase in October, but that Flotek's costs were increasing due, in part, to expansion of accounting and support personnel, and that Flotek could only "guesstimate" the Sarbanes–Oxley expenses, which Meier predicted to be approximately $1 million in 2007.[54] Moreover, Dumas candidly opined that there had been "some irrational exurberance" in the marketplace about Flotek's stock price, and that the $50–$55 peak price during the third quarter was "pretty rich."[55]

[47]   03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[48]   05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[49]   08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[50]   Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[51]   03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (audit), 6 (EPS estimate), and 7–8 (inability to give guidance on margins).

[52]   05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (weather), 4 (costs), 3 and 6 (Triumph and CAVO).

[53]   08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 4 (slowdown and weekly run rate), and 13 (revenue "hopefully" delayed).

[54]   Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 2 and 6 (costs), 7 ("hopeful" about sales), and 11 (Sarbanes–Oxely "guesstimate").

[55]   *Id.* at 11.

### (2) Integration of Acquired Companies

Plaintiffs allege that defendants made statements in press releases and/or conference calls with investors and analysts on March 13, 2007,[56] May 8, 2007,[57] August 2, 2007,[58] and October 31, 2007,[59] touting Flotek's efforts to integrate its recently acquired companies. (FACAC ¶ ¶ 41–42, 45, 52, and 59) The integration statements made on each of these dates were forward-looking and accompanied by both general statements of caution and by specific cautionary disclosures. The March statements were accompanied by specific cautionary disclosures that Flotek would need to spend significant efforts integrating recently acquired companies.[60] The May statements were accompanied by specific cautionary disclosures that statements about Triumph and CAVO were based on only two months of experience.[61] Moreover, when asked about the integration of Flotek's previously acquired companies during the November 1, 2007, conference call, Dumas stated that "we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter."[62]

[56]   03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[57]   05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[58]   08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[59]   Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[60]     03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

[61]     05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 6.

[62]     Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 4.

### (3) Product Demand

**\*25** Plaintiffs allege that defendants made materially false statements during conference calls with investors and analysts on May 9, 2007,[63] and November 1, 2007,[64] about continuing demand for Flotek's products by stating that sales had been "deferred" and/or "delayed" when, in fact, they knew that the sales in question had been lost. (FACAC ¶¶ 46 and 58) The product demand statements made on each of these dates were forward-looking statements that were accompanied by both general statements of caution and by specific qualifying and/or cautionary disclosures. Specific disclosures in May cautioned that statements about Triumph were based on only two months' experience,[65] and specific cautionary statements made in November disclosed that low gas prices and pipeline capacity constraints significantly reduced activity, that 25% fewer drilling rigs were operating during the third quarter of 2007 than during the same quarter of 2006, that competitors were cutting prices, and that the market was showing some "irrational exuberance" about Flotek's expectations and stock price.[66]

[63]     05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[64]     Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

[65]     05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 6.

[66]     Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 2, 4, 10, and 11.

### (c) Scienter

The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." *Goldstein,* 340 F.3d at 249. In determining whether a plaintiff's allegations support a strong inference of scienter, the court must consider all facts, circumstances, and allegations in toto. *Goldstein,* 340 F.3d at 246; *Abrams,* 292 F.3d at 431 ("the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter"). *See also Nathenson,* 267 F.3d at 425. Under the Supreme Court's decision in *Tellabs,* 127 S.Ct. at 2510, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Id.* The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.' " *Indiana Electrical Workers Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 533 (5th Cir.2008) (quoting *Tellabs,* 127 S.Ct. at 2510).

### (1) Dumas

Dumas argues that the Exchange Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances; or that he made any misrepresentations with scienter. Plaintiffs respond that the Exchange Act claims asserted against Dumas should not be dismissed because his public admissions, knowledge of Flotek's false financial projections and GAAP violations, and his stock sales all show that he acted with scienter when he knowingly or recklessly certified the following false and misleading financial statements during the Class Period: First Quarter Form 10–Q filed on May 10, 2007, Second Quarter Form 10–Q filed on August 9, 2007, and Third Quarter Form 10–Q filed on September 30, 2007.

#### (i) *Public Admissions*

**\*26** Plaintiffs contend that

Dumas' admissions reveal that in August 2007 he was aware of facts that directly contradicted statements he made to the public at that time. During the August 2007 earnings call, Dumas reassured investors that Flotek "had not seen a reduction in demand for [its] products"

2010 WL 3785586

and that despite "$4 million in total revenue" that was not booked due to inclement weather, "[w]e are very confident that a vivid portion of that was delayed, and [that we] will pick it up" ... Although Dumas did not admit it until October 2007, he knew at the time he made those statements that customers were advising Flotek that "some of the operators are taking a pause, a time out, on some of [the] fracing" and that Flotek was expecting a further sales decline—not a "pick up"—of deferred sales ... Indeed, as customers were advising defendants of a slowdown in drilling, defendants were bracing for the imminent price cutting, as evidenced by Dumas' admission that "we made a decision; we were not going to cut prices. No question about it, we knew what we did. And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision to ignore that and it has cost us some revenue." [67]

[67]     Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 15–16.

Plaintiffs contend that Dumas's admissions demonstrate his knowledge that Flotek expected diminished sales in 3Q07 and that he intended to deceive investors to capitalize on Flotek's inflated stock price.

Defendants contend, and the court agrees, that there is no inconsistency between Dumas's statements in August and November. During the August 3, 2007, conference call Dumas stated that inclement weather shut down drilling activity and delayed dramatically the amount of frac activity that was going on in Texas and Oklahoma, that the July run rate was not good, that customers were taking pauses in fracing, that Flotek had experienced a slowdown, and that Flotek had "determined by talking to ... customers [in the mid-continent region that there was] ... a ten week backlog of frac jobs." [68] Dumas also disclosed on August 3, 2007, that these delays reduced Flotek's second-quarter earnings by $3–4 million, and that the revenue from these jobs was "hopefully delayed rather than lost." [69]

[68]     8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 4.

[69]     Id. at 13.

Although plaintiffs attempt to create an inference that Dumas already knew at the beginning of August that there would be an additional slowdown and price cutting in September, the evidence does not support such an inference. Dumas's August 3, 2007, statement that revenues were "hopefully delayed rather than lost" appears to have had a reasonable basis because Flotek's total revenues and chemical sales undisputedly increased during the third quarter:

> Flotek generated total revenues in the third quarter of $42 million compared to ... 38 million in the second quarter of '07 ... During the third quarter sales of our green chemical grew 5% over the prior quarter. While total sales for the Chemical and Logistics segment grew 10%. [70]

[70]     Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

**\*27** The fact that Flotek's total revenues and chemical sales actually increased during the third quarter substantiate Dumas's August 3, 2007, statement that "we have not seen a reduction in demand for our products." [71] The court concludes that the discrepancies that plaintiffs contend exist between Dumas's August and November statements neither exist nor create a strong inference of scienter.

[71]     8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

(ii) *Knowledge of Flotek's Financial Projections and GAAP Violations*

Plaintiffs contend that the following allegations contained in the FACAC establish a strong inference that Dumas acted with scienter because they show that Dumas knew or recklessly disregarded that Flotek's financial projections were false and in violation of GAAP:

Defendant Dumas spoke directly with executives in the Divisions to discuss ... reports and financial projections (¶ 49(b) (ii)), but intentionally ignored the projections that were stated to him, and touted false projections to the market in May, August and October of 2007, because Dumas "never wanted to hear any bad news" and would

2010 WL 3785586

tell the divisions to "just go out and find it" if they were not projecting the numbers Dumas wanted. ¶¶ 49(a)(i), 49(a)(iv), 55(d)(ii)-(iii), 62(a)(i)-(v), 62(d) ...

At a minimum, Dumas' "egregious refusal to see the obvious, or to investigate the doubtful" demonstrates his severe recklessness with respect to giving guidance to investors ... Indeed, Defendant Dumas' severe recklessness is demonstrated by the Division presidents' consensus that he should be "[kept] away from the analysts" because he "had a habit" of overstating financial projections to Wall Street (¶ 49(a)(i)) and touting guidance that the Division presidents told him was "impossible" to achieve and "not fair" to investors (¶ 62(a)(i)-(ii)). *See also* ¶ 49(a)(iii)-(iv) (management "cringed" at projections Dumas stated to the market that were contrary to actual performance because he would just "make it up as he went"). [72]

[72]    Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17–19.

These allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Dumas's conduct was not fraudulent because they fail to identify any specific communications or reports that directly contradicted Dumas's public statements, fail to identify any individual who provided such communications or reports to Dumas, and fail to establish that such communications or reports had been provided to Dumas before he made any of the public statements about which the plaintiffs complain. Nor do plaintiffs allege any facts showing that any of Flotek's financial projections were false or in violation of GAAP, or that Dumas knew that Flotek's financial projections were false or in violation of GAAP. *See Abrams,* 292 F.3d at 432 (dismissing complaint where plaintiffs could "point to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); *Shaw Group,* 537 F.3d at 539 (allegation that executive was "informed, in great detail, by a former ... project controls manager, of all the problems associated with the use of Shaw–Tac" insufficient); *Southland,* 365 F.3d at 376 (allegation that individual defendants were told by programmers of alleged problems insufficient). The court concludes that the allegations against Dumas on which plaintiffs rely to establish that Dumas acted with scienter do not create a strong inference of scienter.

(iii) *Stock Sales*

**\*28**  Plaintiffs allege that in May and August of 2007 while in possession of adverse, material, undisclosed information about the Company, Dumas sold 186,816 shares of his Flotek stock for over $5 million in illegal insider-trading proceeds. (FACAC ¶ 90) Plaintiffs argue that the size and timing of Dumas's sale is probative of scienter. (FACAC ¶ 91)

Plaintiffs allege that Dumas made sales on two days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.25 to $22.57, and sales on four days in August of 2007 at prices that ranged from $31.00 to $33.00–prices that were far below the alleged Class Period high of $53.49. (FACAC ¶ 101) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Dumas's sales is not consistent with fraudulent intent. *See Nathenson,* 267 F.3d at 420–421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1093–1096 (9th Cir.2002) (sales made at $20 to $25 were not suspicious—even if in substantial quantities-where stock price peak was several months later at $39). Moreover, although plaintiffs allege that Dumas's sales were made while Dumas possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead particularized facts showing what undisclosed information about the Company Dumas possessed.

The court concludes that Dumas's stock sales are not sufficient to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise suspicious. Although plaintiffs allege that Dumas's 2007 stock sales "well exceeded [his] pre-Class Period sales," plaintiffs fail to allege any facts about Dumas's trading history. Plaintiffs' failure to plead facts showing Dumas's trading history negates any inference of scienter. *See Silicon Graphics,* 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); *Abrams,* 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); *Nathenson,* 267 F.3d at 420–421 (same).

(iv) *Conclusions*

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on

Stockman v. Flotek Industries, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3785586

their part is appropriate." *Goldstein,* 340 F.3d at 249. When considered in toto, the allegations asserted against Dumas fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect him to any alleged fraud.

### (2) Meier

**\*29** Meir argues that the Exchange Act claims asserted against her should be dismissed because plaintiffs have failed to allege with particularity facts showing that she made any misrepresentations about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances or that she made any misrepresentations with scienter. Plaintiffs respond that the Exchange Act claims asserted against Meier should not be dismissed because her knowledge of Flotek's false financial projections and GAAP violations, and her stock sales all show that she acted with scienter when she knowingly or recklessly certified the following false and misleading financial statements during the Class Period: First Quarter Form 10–Q filed on May 10, 2007, Second Quarter Form 10–Q filed on August 9, 2007, and Third Quarter Form 10–Q filed on September 30, 2007.

#### (i) *Knowledge of Flotek's Financial Projections and GAAP Violations*

Plaintiffs contend that the following allegations in the FACAC establish a strong inference of Meier's scienter because they show that she knew that Flotek's financial projections were false and that Flotek's financial statements for the first three quarters of 2007 were false:

... Meier received financial results and projections from the Division presidents through conversations and through monthly profit and loss reports, and participated in meetings to discuss financial results and prospects prior to quarterly closing ...

... Defendant Meier—the CFO—was acutely aware of Dumas' inaccurate forecasting to the market and his recitation of lofty numbers that did not correspond to those prepared by the operating divisions. ¶ 62(a)(i)(v). Despite her duty to shareholders and her opportunity to correct Dumas during quarterly earnings calls, Meier not only failed to correct the CEO, but she also knowingly reiterated the same false guidance projections touted by Dumas. ¶¶ 55(a)(i), 62(a)(i)-(ii). Accordingly, plaintiffs have adequately alleged that [Meier] knew [her] public

statements concerning guidance were false and issued with utter disregard for internal reports and management consensus demonstrating $1.00 EPS was unachievable. [73]

[73]    Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17–18.

Plaintiffs' allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Meier' s conduct was not fraudulent because they fail to identify any specific communications or reports that directly contradicted Dumas's and/or Meier's public statements, fail to identify any individual who provided such communications or reports to Meier, and fail to establish that such communications or reports had been provided to Meier before she made any of the public statements about which plaintiffs complain. *See Abrams,* 292 F.3d at 432; *Shaw Group,* 537 F.3d at 539; *Southland,* 365 F.3d at 375–76. Accordingly, the court concludes that the allegations against Meier on which plaintiffs rely to establish that she acted with scienter, do not create a strong inference of scienter.

#### (ii) *Stock Sales*

**\*30** Plaintiffs allege that in May, August, and December of 2007 while in possession of undisclosed information about the Company, Meier sold 40,000 shares of Flotek stock for over $1 million in illegal insider-trading proceeds. (FACAC ¶ 90) Plaintiffs argue that the amount and timing of Meier's stock sales are probative of scienter. (FACAC ¶ 91)

Plaintiffs allege that Meier made sales on three days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.31 to $23.80, a sale on one day in August of 2007 at the price of $32.30, and sales on two days in December of 2007 at prices of $35.20 and $36.10; prices that were all far below the alleged Class Period high of $53.49. (FACAC ¶ 101) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Meier's stock sales is not consistent with fraudulent intent. *See Nathenson,* 267 F.3d at 420–421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); *In re Vantive Corp.,* 283 F.3d at 1093–1096 (sales made at $20 to $25 were not suspicious—even if in substantial quantities—where stock price peak was several months later at $40). Moreover, although plaintiffs allege that Meier's sales were made while Meier possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead

2010 WL 3785586

particularized facts showing what undisclosed information about the Company Meier possessed.

The court concludes that Meier's stock sales are not sufficient either to state a claim or to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise suspicious. Although plaintiffs allege that Meier's 2007 stock sales "well exceeded [her] pre-Class Period sales," plaintiffs fail to allege any facts about Meier's trading history. Plaintiffs' failure to plead facts showing Meier's trading history negates any inference of scienter. *See Silicon Graphics,* 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); *Abrams,* 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); *Nathenson,* 267 F.3d at 420–421 (same).

#### (iii) *Conclusions*

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." *Goldstein,* 340 F.3d at 249. When considered in toto, the allegations asserted against Meier fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect her to any alleged fraud.

#### (d) Loss Causation

**\*31** Plaintiffs allege that during the Class Period the defendants engaged in a scheme to deceive the market into believing that Flotek could meet guidance for fiscal year 2007, that Flotek was successfully integrating its new acquisitions, and that sales would not decrease. Plaintiffs allege that defendants' scheme artificially inflated the price of Flotek common stock and operated as a fraud or deceit on Class Period purchases of that stock by failing to disclose materially adverse facts. (FACAC ¶¶ 99–105) Asserting that plaintiffs have identified only two sets of "corrective disclosures," neither of which revealed the falsity of any prior alleged misstatements, defendants contend that they are entitled to dismissal because plaintiffs have failed to allege facts that if true would establish that the defendants' acts or omissions caused the losses for which the plaintiffs seek to recover. [74] For the reasons explained

above in section III.B.1(a) pursuant to which the court has already concluded that plaintiffs have failed to allege particularized facts showing that the statements about which they complain contained any material misstatements or actionable omissions, the court agrees that the plaintiffs have failed to properly allege loss causation.

[74]    Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 29–30.

#### 2. *Section 20(a) Control Person Claims*
Plaintiffs allege that Dumas and Meier

> acted as controlling persons of Flotek within the meaning of § 20(a) of the Exchange Act ... By reason of their positions as officers and/or directors of Flotek, and their ownership of Flotek stock, the Individual Defendants had the power and authority to cause Flotek to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

(FACAC ¶ 113)

Section 20(a) of the 1934 Act imposes liability on anyone "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Because the plaintiffs have failed to plead a violation of section 10(b) and Rule 10b–5 against the controlled person, *i.e.,* Flotek, there can be no liability against Dumas or Meier under § 20(a). *In re Capstead Mortgage Corp. Securities Litigation,* 258 F.Supp.2d 533, 566 (N.D.Tex.2003). Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.

#### 3. *Conclusions*
Plaintiffs allege violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5(b), against Dumas, Meier, and Flotek. For the reasons explained above, the court concludes that the plaintiffs have failed to allege particularized facts showing that any of the statements about which plaintiffs complain

2010 WL 3785586

contained a material misstatement or actionable omission, and that instead, plaintiffs' allegations show that all but one of those statements is subject to protections afforded by the safe harbor provision. The court also concludes that plaintiffs have failed to allege particularized facts establishing a strong inference of scienter against Dumas or Meier, or that any of the defendants' acts and/or omissions about which the plaintiffs complain caused the losses for which the plaintiffs seek to recover. Accordingly, the § 10(b) and Rule 10b5 claims asserted against Dumas, Meier, and Flotek will be dismissed.

**\*32** Plaintiffs allege violations of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Dumas and Meier. Because the court has concluded that plaintiffs have failed to state a claim against any of the defendants under § 10(b) or Rule 10b–5, there can be no liability against Dumas or Meier under § 20(a). Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.

### IV. *Plaintiffs' Request to Amend*

Plaintiffs end their response to the defendants' motion to dismiss by requesting leave to amend "[i]n the event that the Court grants defendants' motion in whole or in part."[75]

[75] Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 30.

The Fifth Circuit recognizes that leave to amend shall be freely granted when justice so requires, Goldstein, 340 F.3d at 254, and that Rule 15 evinces a bias in favor of granting leave to amend. *Id.* (citing Southern Constructors Group, Inc. v. Dynalectric Co., 2 F.3d 606, 611 (5th Cir.1993)). However, the Fifth Circuit has also stated that leave to amend under Rule 15 is by no means automatic, Southern Constructors, 2 F.3d at 612, and has upheld the denial of leave to amend when the moving party attempted to present theories of recovery serially to the district court. Southern Constructors, 2 F.3d at 612. The Supreme Court has sanctioned bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the

amendment as plausible reasons for a district court to deny a party's request for leave to amend. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Plaintiffs have filed two complaints in this action: a Class Action Complaint for Violation of the Federal Securities Laws filed on August 7, 2009 (Docket Entry No. 1), and the First Amended Class Action Complaint (FACAC) filed on February 4, 2010 (Docket Entry No. 32). The FACAC is 65–pages long. In addition to being repetitive, the FACAC is legally deficient in many respects. Yet, almost as an afterthought, plaintiffs have tacked a general curative amendment request to the end of each of their responses in opposition to the defendants' motion to dismiss. Plaintiffs are certainly aware of the defendants' objections to the FACAC as written because they appeared in the defendants' motion to dismiss. Despite this awareness, plaintiffs have not demonstrated how they would replead their claims with greater specificity if given the opportunity, have not proffered a proposed second amended class action complaint, and have not suggested in their opposition to defendants' motion to dismiss any additional facts not initially pleaded that could cure the pleading defects raised by the defendants. *See Goldstein,* 340 F.3d at 254–255. Under these circumstances the court is not persuaded that plaintiffs should receive yet another opportunity to amend their complaint. *See McKinney v. Irving Independent School Dist.,* 309 F.3d 308, 315 (5th Cir.2002), *cert. denied,* 537 U.S. 1194, 123 S.Ct. 1332, 154 L.Ed.2d 1030 (2003) (no abuse of discretion in denying leave to amend where the plaintiffs failed to alert the court to the substance of any proposed amendment). Accordingly, plaintiffs' request for leave to amend will be denied.

### V. *Conclusions and Order*

**\*33** For the reasons stated above, Defendants' Motion to Dismiss (Docket Entry No. 36) is **GRANTED,** and plaintiffs' request for leave to amend is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3785586

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 15

2020 WL 6815402

KeyCite Red Flag - Severe Negative Treatment

Report and Recommendation Adopted in Part, Rejected in Part by Zhang Yang v. Nobilis Health Corp., S.D.Tex., September 14, 2020

2020 WL 6815402
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

ZHANG YANG, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
NOBILIS HEALTH CORP., Harry Fleming,
David Young, and Kenneth J. Klein, Defendants.

Civil Action No. 4:19-CV-00145
|
Signed 06/25/2020

**Attorneys and Law Firms**

Jeremy A. Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY, Omar Jafri, Patrick V. Dahlstrom, Pomerantz Grossman, Chicago, IL, Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX, for Plaintiff.

Tyler G. Doyle, Smyser Kaplan et al., Houston, TX, for Defendants.

**MEMORANDUM AND RECOMMENDATION**

FRANCES H. STACY, UNITED STATES MAGISTRATE JUDGE

**\*1** This class action securities fraud case is brought against the former senior executives of Nobilis Health Corporation ("Nobilis"): Harry Fleming ("Fleming," CEO), David Young ("Young," CFO), and Kenneth Klein ("Klein," CFO). [1] Each defendant served Nobilis during part of the class period. Lead Plaintiff Zhang Yang alleges that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 by omitting and misrepresenting material financial information to investors during a class period of May 8, 2018 to April 11, 2019.

[1] Nobilis itself was originally included in the suit. However, Nobilis has since declared bankruptcy.

The case thus proceeds with just the individual defendants.

The Court now considers Defendants' Motions to Dismiss (Document Nos. 26 & 28) and the filings made in opposition or support: Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint (Document No. 33), Defendants' Replies (Document Nos. 34 & 35), Plaintiff's Sur-Reply (Document No. 39), and the parties' Supplemental Briefs (Document Nos. 59 & 60). For the reasons stated and explained below, the Magistrate Judge RECOMMENDS that the motions to dismiss from each defendant be GRANTED.

**I. Procedural History**

Lead Plaintiff filed the initial Complaint on January 14, 2019 asserting claims for violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. (Document No. 1 ¶ 1). On April 2, 2019, the Court signed an Order Granting Zhang Yang's Motion for Appointment for Lead Plaintiff and Approval of Counsel. (Document No. 12). Plaintiff filed the First Amended Complaint on May 17, 2019, (Document No. 25); and Defendants timely filed their 12(b)(6) Motions to Dismiss on June 7, 2019. (Document Nos. 26-28). In Defendants' Motions to Dismiss, they argue Plaintiff has not stated a claim under federal securities law because Plaintiff has not adequately pled three elements of a § 10(b) claim: misrepresentation, scienter, and reliance. Defendants also argue that in the absence of a plausible securities fraud claim under § 10(b), there cannot be a plausible claim under § 20(a).

**II. Standards of Review**

A. Federal Rules of Procedure: 12(b)(6) Motions to Dismiss

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868. 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is said to be plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility will not

be found where the claim alleged in the complaint is based solely on legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Nor will plausibility be found where the complaint "pleads facts that are merely consistent with a defendant's liability" or where the complaint is made up of " 'naked assertions devoid of further factual enhancement.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955)). Plausibility, not sheer possibility or even conceivability, is required to survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955; *Iqbal*, 556 U.S. at 678-79, 129 S.Ct. 1937.

**\*2** In considering a Rule 12(b)(6) motion to dismiss, all well pleaded facts are to be taken as true, and viewed in the light most favorable to the plaintiff. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). But, as it is only facts that must be taken as true, the court may "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. It is only then that the court can view the well pleaded facts, "assume their veracity and [ ] determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. A plaintiff must support every element in each cause of action with specific factual allegations in order to meet the pleading requirements and survive a 12(b)(6) motion to dismiss. *Kan v. OneWest Bank, FSB*, 823 F. Supp. 2d 464. 468 (W.D. Tex. 2011).

### B. Federal Securities Law: Elements of a 10(b) and 10b-5 Claim

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a § 10(b) and Rule 10b-5 claim, a plaintiff must sufficiently allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398. 38 (2011).

### C. Federal Securities Law: Heightened Pleading Standards

In securities fraud cases, Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") heighten a plaintiff's pleading requirements beyond what is required under Rule 12(b)(6). The Fifth Circuit combined Rule 9(b) and PSLRA into one cohesive rule:

[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b). 15 U.S.C.A. §§ 78u-4(b) (1) and 78u-4 (b) (3) (A):

(1) specify [that] each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

*ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

In addition, the PSLRA further heightened the pleading standards for the scienter element.[2] *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008). Under the PSLRA, a plaintiff must plead with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C.A. § 78u-4 (b) (2). *Id.* At the pleading stage, a complaint must establish an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged" to a reasonable person. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179. 324 (2007).

[2]   PSLRA only heightens the pleading standard for scienter, not any of the other five elements of security fraud. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009).

**\*3**  Finally, the PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove to be false. To qualify for this protection, the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C.A. § 78u-5 (c)(1) (A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity." *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) (citing § 78u-5(c)(1)(B)); *see also Nathenson v. Zonagen, Inc.*, 267 F.3d 400. 409 (5th Cir. 2001).

If the plaintiff fails to meet the pleading standards established by 12(b)(6), 9(b), or the PSLRA, the claim should be dismissed. *Lormand v. US Unwired, Inc.*, 565 F.3d 228. 239 (5th Cir. 2009).

### III. Plaintiff's Allegations

#### A. Element One: Material Misrepresentation or Omission

Plaintiff's claims are based in three alleged misrepresentations: (1) falsely blaming the transition to a new accounting rule for a decline in revenue; (2) misrepresenting the initiatives and improvements in the company's financial reporting and collections process; and

(3) misrepresenting the company's ability to collect on its account receivables. In support of those misrepresentation claims, Plaintiff first alleges Defendants falsely blamed a change in accounting rules for the decline in Nobilis' revenues, specifically concerning revenues from unpaid account receivables. That accounting change, in Accounting Standards Codification ("ASC") 606, established how firms must recognize revenue and replaced ASC 605 ("Legacy GAAP").[3] Nobilis transitioned from Legacy GAAP to ASC 606 on January 1, 2018. According to Plaintiff, the transition had no effect on the treatment of account receivables and did not apply to transactions that occurred before the transition date, January 1, 2018. According to Plaintiff, Nobilis should have continued to account for uncollectible account receivables by increasing its allowance for doubtful accounts or bad debt expenses. Instead, Plaintiff alleges Defendants improperly accounted for account receivables by subtracting uncollectible amounts from current revenues.

[3]   Plaintiff claims ASC 606 replaced ASC 985, (Amended Complaint 9-10; Plaintiff's Reply 2-3), but ASC 985 concerns revenue recognition for transactions in the *software* industry. For a general comparison of the ASC 605 and 606 standards for when public companies recognize revenue, see Josef Rashty, *Collectibility. A Revenue Recognition Condition*, Today's CPA, Jan./Feb. 2016. at 21-22.

Plaintiff points to multiple statements made by Defendants that allegedly misled investors about the effect of ASC 606. (Emphasis added throughout).

- 5/8/18: Nobilis' 10-Q states, "The Company did not identify any changes to the recognition of *revenue* under ASC 606 as compared to legacy U.S. GAAP. However adoption of the new standard also resulted in changes with regard to the *presentation of revenues* and the provision for uncollectible accounts. Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating *revenues*, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 4 at 8).

- 8/2/18: Nobilis issues a press release, saying, "The decrease in total *revenue* was largely driven by the impact of the implementation of ASC 606 and the loss of the company's Lab Testing ancillary business." (Ex. 2 at 4).

**\*4** • On 8/2/18, Nobilis held a conference call. In the call, Defendant Young stated, "the impact of the new accounting pronouncement led to a lower overall *revenue* per case figure." (Ex. 3 at 4).

• 8/3/18: Nobilis' 10-Q states, "However adoption of the new standard also resulted in changes with regard to the presentation of *revenues* and the provision for uncollectible accounts. Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating *revenues*, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 5).

• 11/9/18: Nobilis issues a press release, announcing they have notified the SEC that they will file their third quarter 10-Q late because "[Nobilis] is re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable, primarily on out of network claims greater than 365 days old." (Ex. 6).

• 11/9/18 Press Release, cont'd.: "Over the last several months we have completely overhauled the process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables." (Ex. 6).

• 1/2/19: Fleming and Springfield [the new CEO] hold a conference call in which Springfield states, "our audit firm is working to determine the ultimate amount of this reserve and the applicable periods to which they would be applied."

Plaintiff also alleges Defendants made misleading statements concerning the efficacy of Nobilis' collection and financial reporting procedures, as well as Nobilis' expectations about the collectability of its account receivables. Plaintiff points to

• 5/8/18: Nobilis holds a conference call. Young states that he expects to collect 100% of the account receivables listed on the balance sheet.

• 8/2/18: Nobilis holds a conference call. Young states that he expects a $20 million reduction in the $144 million outstanding amount in Nobilis' account receivables.

• 8/3/18: Nobilis' 10-Q states Nobilis' "disclosure control and procedures were effective ... except for the material weaknesses previously identified in [the 2017 10-K]."

• 11/9/18: Nobilis issues a press release that states, "We are deeply disappointed by the slow pace of our collection efforts that have resulted in this impact to our receivables, which will have a significant negative impact on our financial results for 2018. Over the last several months we have completely overhauled the [collection] process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables."

Plaintiff points to statements from confidential witnesses ("CWs") to establish the falsity of Defendants' statements about Nobilis' collection procedures and expectations of collectability. Confidential Witness 1 ("CW1") was a former Collections Supervisor. CW1 claimed "senior managers at Nobilis pressured CW1's collections team to recover on claims that were several years old at an impossible rate." (Document No. 25 ¶ 46). CW1 stated that many claims that Nobilis sought to collect had been denied by the insurance companies, and they were not appealable." *Id.* CW1 claimed Nobilis' "split billing" practices resulted in uncollectible claims because insurers would only pay for the approved procedure. *Id.* ¶ 48.

**\*5** Confidential Witness 2 ("CW2") was a collections specialist. *Id.* ¶ 51. CW2 affirmed CW1's assertion that split billing resulted in uncollectible claims. *Id.* CW2 also alleged a senior director billed "fictitious prices." *Id.* ¶ 52.

Confidential Witness 3 ("CW3") was a financial clearance specialist who coordinated between patients, the hospital, and insurance companies regarding services and payments. *Id.* ¶ 53. CW3 claimed "nearly half of these outstanding claims were attributable to claims that were denied due to the Company's split billing policy." *Id.* ¶ 54.

### B. Element Two: Scienter

Plaintiff alleges Defendants knowingly or recklessly failed to write down uncollectible account receivables on Nobilis' balance sheet and concealed their past failures by improperly deducting uncollectible accounts from current revenue and

falsely blaming the consequently falling revenue on ASC 606. (Document No. 25 ¶ 6; Document No. 33, at 1).

Plaintiff claims Defendants knew that ASC 606 would have no effect on account receivables because Defendants previously made representations to that effect. Namely, Plaintiff alleges the 2017 10-K filed on March 12, 2018 stated the accounting changes "will not have a material impact on *financial results.*" (Ex. 5 at 59) (emphasis added). Plaintiff says this contradicts later statements (quoted above) that blame falling *revenue* on accounting changes and ASC 606.

Plaintiff also cites to CWs' statements to establish scienter: "CWl's team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books. (Document No. 25 ¶ 46). CW2 said, "Nobilis had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect." *Id.* ¶ 52. CW3 claimed, "Young came to the business office several times a week between February 2018 and July 2018 to oversee [Nobilis'] collection effort. *Id.* ¶ 55.

Finally, Plaintiff alleges the officers' high position in the company supports an inference of scienter because it meets the "special circumstances" described in *Carlton v. Cannon.* 184 F. Supp. 3d 428, 459-60 (S.D. Tex. 2016) (establishing small company, critical transaction, readily apparent information, and inconsistent statements as four special circumstances that support an inference of scienter in rare cases). (Document No. 33, at 13).

### C. Elements 3-6: Reliance/Loss/Causation

Plaintiff alleges that share prices dropped following Nobilis' announcement that they would submit their mandatory financial disclosures late due to their reconsidering the collectible values in their account receivables. Plaintiff also alleges the security price was therefore inflated and, had Plaintiff and the class known about the improper handling of account receivables, they would not have acquired the securities at the inflated price.

### IV. Analysis

Defendants argue that the securities fraud claims in this case should be dismissed because Plaintiff has failed to satisfy the 12(b)(6), 9(b), and the PSLRA pleading requirements

for a § 10(b) and Rule 10b-5 claim. Because § 20(a) claims are derivative of § 10(b), if the primary claim violation is dismissed the § 20(a) claims must be as well.

**\*6** As set forth above, Plaintiff alleges three different misrepresentations: falsely blaming the transition to ASC 606 for the decline in revenues, misrepresenting the initiatives and improvements in the company's financial reporting and collections process, and misrepresenting the company's ability to collect on its account receivables. In their Motions to Dismiss, Defendants argue 1) Defendants' statements, far from being misleading, were true and accurate, 2) Plaintiff fails to establish scienter for any Defendant, and 3) neither Plaintiff nor members of the class relied on the misleading statements because share prices did not increase after Defendants made the allegedly misleading statements.

Because much of the controversy concerns the effect ASC 606 had, or should have had, on Nobilis' accounting, a review of the relevant accounting principles is needed. ASC 606 replaced the ASC 605's standards for when to recognize revenue. Under ASC 606, which Nobilis adopted January 1, 2018, an entity must complete five steps before recognizing revenue:

Step 1: Identify the contract(s) with a customer.

Step 2: Identify each parties' performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: If there are multiple performance obligations, allocate the total transaction price among each performance obligation.

Step 5: Recognize revenue when the entity satisfies its performance obligation.

ASC 606-10-05-4.

By application, Steps 1 and 3 also change *how* an entity presents revenue: A company has to deduct what it does not expect to collect directly from revenue, instead of listing it as an allowance or bad debt expense. ASC 606-10-25-1(e) permits an entity to identify the contract (therefore reporting revenue) only if collection is *probable*. Of course, the chances of collection increase if the amount to be collected decreases. Therefore, an entity can satisfy the 606-10-25-1 criteria by either recognizing an explicit price concession, or factoring in implicit price concessions. Such price concessions are

determined through Step 3: "Determine the transaction price." An entity arrives at the transaction price by subtracting any price concessions from the contractual price. *See* ASC 606-10-32-2. [4] The entity then reports this transaction price directly as revenue. ASC 606-10-32-1.

[4]    *See also* Dixon Hughes Goodman, LLC, *Navigating the New Healthcare Revenue Recognition Model* 3-4 (2018) ("The 'transaction price' under the new standard does not refer to gross charges based on established rates per the charge description master; rather, it is the amount the provider expects to be entitled to under the contract."). For examples of companies adjusting the transaction price to reflect what they *expect* to collect, see ASC 606-10-55-99 through 55-101; 606-10-55-102 through 55-105; and 606-10-55-208 through 55-215.

Under Legacy GAAP (Generally Accepted Accounting Principles), entities could list the entire contractual price as revenue and account for what they did not expect to collect by listing it as an "allowance" or "bad debt expense." With the goal to simplify and standardize financial statements, under ASC 606, "bad debt expense will no longer be a separate line item on the face of a health care company's income statement. Instead, total revenues will already include the amount the company doesn't expect to collect from patients." *How the Revenue Recognition Standard will Affect Bad Debts in Health Care*, WEAVER (Dec. 14, 2017), https://weaver.com/blog/how-revenue-recognition-standard-will-affect-bad-debts-health-care/. In sum, the change in accounting rules under ASC 606 affected how companies report their revenue, but it did not affect their net profits because the rule only dictates *where* companies report the same uncollectible bills. A company must consider all relevant factors in determining a reasonable amount to collect, including historic data on collectability, current information, and forward-looking forecasts. ASC 606-10-32-9.

**\*7** The reporting requirements for subsequent changes in collectability-estimates depend on the reason for the change. New information about a patient's credit (e.g., if the patient files for bankruptcy) is reported as an allowance and recorded as an expense—not as a reduction in revenue. ASC 310-10-35-41. However, for all other adjustments, [5] changes in estimates are "recognized as revenue, or as a reduction of revenue, in the period in which the transaction price changes."

ASC 606-10-32-43; *see also* BKD, *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018)* ("AICPA believes changes in the entity's expectation of the amount of customer payments will be recorded in revenue—unless there is a patient-specific event, e.g., a bankruptcy filing, that suggests the patient no longer has the ability and intent to pay the amount due and, therefore, the changes in estimate better represent an impairment (bad debt).").

[5]    "Contractual adjustments and discounts are variable consideration and shall be measured in accordance with paragraphs 606-10-32-5 through 32-14 (e.g. as revenue)." ASC 954-310-30-1 (alteration added). Contractual adjustments and discounts include consideration conditioned on inspection, ASC 606-10-55-194 though 55-197, timing, 55-198 through 55-200, and volume, 55-216 though 55-220. In general, "variable consideration is anything that causes the consideration to vary. For health care entities, this includes contractual allowances, discounts, concessions and contingent payments. Pricing also varies depending on the party financially responsible for payment—patient, private insurer, Medicare, etc." *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018).*

A. <u>Plaintiff has not Plausibly Alleged an Actionable Misrepresentation</u>

### 1. Statements Related to Transition to ASC 606

Defendants' statements about ASC 606 do not constitute actionable misrepresentations. First, Plaintiff misstates the effect and governing rules of ASC 606. Plaintiff cites to statements made by Defendants on August 2, 2018 and August 3, 2018 where Nobilis attributes the decrease in *revenue*, in part, to the change in accounting rules. Plaintiff says this is misleading because "the change in accounting rules and the adoption of ASC 606 has no effect on the calculation of accounts receivables." (Document No. 25 ¶¶ 64, 68). Plaintiff appears to confuse an effect on *revenue* with an effect on *net profits*. ASC 606 changes where uncollectible account receivables are reported. This has no effect on net profit but naturally decreases revenue by reshuffling where the bad debts are reported. Defendants accurately described the accounting change in their 10-Q form filed May 8, 2018: "Upon adoption, any estimation

of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating revenues, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 4 at 8).[6] Defendants' statements that recognize *revenues* decreased in part due to the accounting change were, under ASC 606, true and accurate.

[6]     *See* Dixon Hughes Goodman, LLC, *Navigating the New Healthcare Revenue Recognition Model* 3-4 (2018) ("Under the new standard, such implicit price concessions are not presented separately as 'provision for uncollectible accounts' or 'bad debts,' but are direct reductions of revenue, similar to contractual adjustments. Such amounts are not part of the transaction price and thus are not recognized as revenue in the first place."). BKD, LLP also released a white paper, entitled, *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018)*. The example 10-K filings in BKD's white paper for "Community Health Systems, Inc." and "Tenet Healthcare Corporation" uses language substantially similar to Nobilis' 10-K filing in question. *Id.* 33-34, 131 S.Ct. 1309.

**\*8** Second, Defendants' accurately described ASC 606's reporting requirements for subsequent changes in estimates: "With the implementation of ASC 606, we now record all AR adjustments as reductions in revenue, unless they are specifically credit-related." (Ex. 3 at 3; *see also* Ex. 4 at 14 ("[S]ubsequent changes in estimate of collectability due to a change in the financial status of a payor, for example a bankruptcy, will be recognized as bad debt expense in operating expenses.")). Defendants' statements that indicated AR adjustments are reported as reductions in revenue, unless caused by patient-specific changes in credit status, were true and accurate descriptions of current GAAP standards under ASC 606 and ASC 310.

Plaintiff has not stated a plausible § 10(b) and 10b-5 claim based on Defendants' statements about ASC 606.

### 2. Statements Related to Nobilis' Financial Reporting and Collection Processes

Defendants' statements about their financial reporting and collection processes also do not constitute actionable

misrepresentations. Nobilis' November 9, 2018 press release states, "Over the last several months we have completely overhauled the process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables." Plaintiff contests the sufficiency of these improvements but does not contest that changes to improve the collections process occurred. Therefore, Plaintiff fails to allege facts that plausibly state that these claims were misleading.

Nobilis' 10-Q filed on August 3, 2018 states, "Based on this evaluation, the Company's disclosure controls and procedures were effective during the six months ended June 30, 2018, *except for the material weaknesses previously identified in [the Company's 2017] 10-K* for the year ended December 31, 2017 as filed with the SEC on March 12, 2018." (Ex. 4 at 40) (emphasis added). One such weakness identified in the 2017 10-K is the failure to "maintain a sufficient level of review or documentation of approval regarding the Company's management of third-party billing and collections of aged receivables and allowance for doubtful accounts." One of the remedial measures laid out in the same August 3rd 10-Q was "the process of assessing the allowance for doubtful account process and methodology including documenting additional procedures; which includes those designed to add depth to our review procedures." (Ex. 4 at 40).

Nobilis' later announcement on November 9, 2018 that it is "re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable" does not contradict its August 3rd statement. The August statement told investors it was reevaluating the process; the November announcement told investors it was reevaluating the amount.[7]

[7]     In *Central Laborers' Pension Fund v. Integrated Electric Services Inc.*, the court found "public statements and subsequent restatement due to GAAP violations provide some basis to infer scienter." 497 F.3d 546, 572 (5th Cir. 2007). In *Central Laborers*', though, the "mea culpa" was ultimately insufficient to determine scienter. *Id.* at 555. Moreover, before even getting to the question of weight, *Central Laborers'* is inapplicable here due to timing. The class period in *Central Laborers'* ends with the public acknowledgment of material weaknesses in internal controls that may require restatement of past periods, and begins with the

periods actually restated. 497 F.3d at 549. In Nobilis' case, the acknowledgment occurred in March 2018 and the acknowledged weaknesses occurred in 2017. The class period begins in May 2018. In *Central Laborers*', the identified weaknesses constituted the class period; in the case at hand, the identified weaknesses predate the class period.

**\*9** Finally, Plaintiff alleges there were other known and unaddressed weaknesses in the reporting process—namely, the CFO's refusal to "write off millions of dollars... for claims that were widely known to be uncollectible throughout the Class Period." Were this true, Nobilis' assurance that "the Company's disclosure controls and procedures were effective" would be misleading. In other words, the reporting process could not be effective if senior management was "cooking the books." But, the fact that Nobilis overstated the collectability of its account receivables cannot by itself establish fraud. Courts have long rejected pleading "fraud by hindsight." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Denny v. Barber*, 576 F.2d 465. 470 (2d Cir. 1978)). Meaning, Plaintiff cannot solely rely on the fact that some of Nobilis' account receivables proved uncollectible; instead, Plaintiff has to allege facts (not conclusions) that would support a conclusion that Defendants made statements about the effectiveness of its disclosure systems and processes that Defendants knew were not true at the time they were made. To bridge that gap, Plaintiff relies on statements and information from three confidential witnesses, which are detailed above. For the reasons that follow, the confidential witnesses' allegations are insufficient to support a § 10(b) and Rule 10b-5 claim based on Defendants' statements related to Nobilis' financial reporting and collection processes.

Courts discount information from confidential sources because their anonymity frustrates the Court's scienter analysis that weighs plausible competing inferences. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *Carlton v. Cannon*, 184 F.Supp.3d 428. 460 (S.D. Tex. 2016). To be given any weight at all, a plaintiff must describe the CWs' positions "with sufficient particularity to support the probability that a person in the position occupied by the source ... would possess the information pleaded." *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

Here, many of the CWs' allegations establish nothing more than a difference in judgment. For example, "CW1's

team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books." Inferring fraud from this allegation is far from the only possible inference. A strong competing inference is that senior managers disagreed with their employees, thought the claims were still collectable, and wanted to expend every effort to do so. Similarly, CW1 and CW2's belief that Nobilis sought to collect claims at an "impossible rate" is a matter of judgment, not fact. CW allegations that split billing caused the claims' uncollectability is also conclusory. In practice, split billing separates bills by each medical procedure. Insurance subjects each claim to the same approval process. There is nothing nefarious nor determinatively uncollectible about split billing.

Moreover, even assuming split billing results in more uncollectible claims, and even assuming Nobilis materially underreported the amount of uncollectible claims, Plaintiff still does not sufficiently allege that Nobilis' statements to the efficacy of its reporting process were misleading when made. In order to prove Nobilis' reporting process was not adequate because Defendants were "cooking the books," Plaintiff must allege facts to show that Defendants were "cooking the books." As described above, the CWs do not speak to this, and "the fact that something turned out badly [does not establish by itself that] defendant knew earlier that it would turn out badly." *Lormand v. US Unwired. Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (describing the fraud-by-hindsight doctrine) (citing *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008))

CW3 offers a more factual version of the claim: "nearly half of these outstanding claims were attributable to claims that were denied due to the Company's split billing policy." The claim still suffers from a disconnect between statement and allegation similar to CW1 and CW2. The origin of outstanding claims (from split billing) does not speak to the collectability of the claims. And, once again, an allegation that certain claims had lower collectability provides only the set-up for a claim that Nobilis improperly estimated the collectability of its account receivables—it does not state a claim in and of itself.

**\*10** Other allegations are outside what the CW would reasonably know given their position. CW2 alleges "Nobilis had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect." However, even assuming "Company" means the senior executives

including the individual defendants in this case, it is unclear how a collections specialist in an eight-person team would be privy to the Individual Defendants' knowledge. Similarly, Plaintiff has not provided sufficient detail to explain how CW2, as a *collections* specialist, would have knowledge about the senior director's alleged *billing* of fictious prices. This claim also fails because the accusation is not leveled at any Individual Defendant.

Moreover, the inference that senior executives fraudulently kept uncollectible accounts on their balance sheet is outweighed by the inference that the mis-estimation was made in good faith. Courts give companies' flexibility in the inherently opaque realm of business judgments and asset valuation: "There is no standard of comparison to what the correct numbers would have been. Valuations of assets, especially contracts and assets acquired from bankrupt companies, as well as the application of sophisticated accounting standards like 'fair value,' leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably." *Shaw*, 537 F.3d at 536 (5th Cir. 2008) (citing *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (" 'Generally accepted accounting principles' ... tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.")).

Finally, only one allegation provides a link between the information presented by the CWs and any Individual Defendant: that "Young came to the business office several times a week between February 2018 and July 2018 to oversee the Company's collection effort." [8] From Young's presence, Plaintiff infers that he must have known the accounts were uncollectible. However, a more plausible competing inference from Young's presence is that he worked with the collections office because he believed the accounts were collectible. After all, dedicating multiple days per week is a large time investment for a CFO just to oversee collection efforts he knows are doomed. His presence supports an inference that he held a sincere belief on the information available to him that the account receivables were collectible. His evaluation may have been wrong, but mistake or even negligence is not sufficient to establish fraud. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981).

[8]    Put another way, no evidence offered by CWs relates to potential scienter for Klein or Fleming.

Based on the lack of inconsistent statements and the discounted weight of the confidential witnesses' allegations, Plaintiff has not stated a plausible claim that Defendants' statements about Nobilis' financial reporting and collection processes violated § 10(b) and Rule 10b-5.

### 3. Statements Related to Collection Expectations

Defendant Young's statement about Nobilis' collection expectation also does not constitute an actionable misrepresentation given the Safe-Harbor Provisions in the PSLRA.

In a May 8, 2018 conference call, Young told a shareholder he expected "to collect everything that's on the balance sheet expect to collect." [9] The shareholder confirmed this meant 100%. Close to three months later, in an August 2, 2018 conference call, Young told a shareholder he expected a $20 million reduction in the $144 million of outstanding receivables. Plaintiff alleges these representations were inaccurate because "a significant number of accounts from several years ago were based on denied insurance claims or were otherwise uncollectible." (Document No. 25 ¶ 59). However, Defendant Young's statements were predictions: forecasting what he *expected* to happen, and forecasts are protected by PSLRA's Safe-Harbor, forward-looking rule.

[9]    Perhaps an awkward phrasing, but the idea is simple and self-proving: A company expects to collect 100% of what they expect to collect.

**\*11** The PSLRA gives companies' leeway when making inherently imprecise "projection[s] of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items." 17 C.F.R. § 230.175(c)(1). The Safe Harbor provision applies if a projection is accompanied by a sufficient cautionary statement, if the projection is immaterial, or if the Plaintiff fails to establish actual knowledge that the projection was false when it was made. *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353. 371 (5th Cir. 2004); 15 U.S.C.A. §§ 77z-2(c); 78u-5c. [10] In general, a forward-looking statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." §§ 77z-2(c)(1)(A)(i); 78u-5c(1)(A)(i); *see also Southland*, 365 F.3d at 372 (requiring cautionary language be " 'substantive' company-specific warnings based on a

realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors. more specific than just generic, boilerplate disclaimers.").

10    Plaintiff cites *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2016 WL 215476, at *5, 2016 U.S. Dist. LEXIS 5702. at *18 (S.D. Tex. Jan. 19, 2016), to support the proposition that "[t]he safe harbor is inapplicable if a defendant has reason to know that his or her statements are misleading." (Document No. 60, at 7). *Cobalt* in turn relies on *Lormand v. US Unwired. Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations.").

However, *Southland*, a 5th Circuit case that preceded *Lormand*, treated actual knowledge and cautionary statements as two "independent prongs." *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353. 371 (5th Cir. 2004). If there is a contradiction between the two rulings, the prior-panel-precedent rule mandates a court follow the first ruling on the issue. *Carlton v. Cannon*, 184 F.Supp.3d 428, 453 n.1 (S.D. Tex. 2016) (quoting *Smith v. GTE*. 236 F.3d 1292. 1300 n.8 (5th Cir. 2001) ("[T]he holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."). For a thorough list of courts that applied *Southland*'s view of a disjunctive safe harbor standard over *Lormand*'s joint standard, see *Hopson v. MetroPCS Commc'ns, Inc.*, Civ. A. No. 3:09-cv-2392-G, 2011 WL 1119727, at *18 n.19 (N.D. Tex. Mar. 25, 2011).

Because Young made both statements orally on conference calls, the statements are held to a slightly modified standard. For oral forward-looking statements, the company must (i) identify "that the particular oral statement is a forward-looking statement; and (ii) that the actual results might differ materially from those projected in the forward-looking statement." §§ 77z-2(c)(2)(A); 78u-5c(2)(A). Notably, oral forward-looking statements do not require the specificity of

forward-looking statements in general, but they do need to identify a readily accessible written document that satisfies those general requirements. §§ 77z-2(c)(2)(B); 78u-5c(2) (B). Nobilis began each conference call with cautionary statements that warned investors of the variability of forward-looking statements and pointed to a specific 10-K form with disclaimers that specifically identified company-specific risks.

Whether the cautionary statements made at the beginning of each conference call were sufficient to bring Young's projections into the PSLRA's Safe Harbor provision is not entirely clear. In *Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 973 F.Supp.2d 541, 555 (D. Vt. 2013), warnings at the beginning of a conference presentation were determined to be sufficient to place the defendants in the safe harbor; but *In re Sec. Litig, BMC Software. Inc.*, 183 F.Supp.2d 860, 909-10 (S.D. Tex. 2001), the Court found,

> **\*12** Defendants may refer to written documents containing meaningful factors, but each particular oral statement must be identified as forward-looking and the cautionary language must warn that actual results might differ materially from those projected in the forward-looking statement. § 78u–5(c)(2). Plaintiff emphasize that the statement at the beginning of the conference calls says nothing more than that forward-looking statements may be included at some point in an extended discussion. Therefore the statutory requirement of identifying each particular oral statement is not satisfied. § 78u–5(c)(2)(B)(I)–(ii).

Although Young's stated expectation about the collectability of the pending accounts receivable was not accompanied by any contemporaneous disclaimer, it is difficult to imagine that such a contemporaneous disclosure would be required when statements are made in a conference call setting. In particular, it seems unreasonable to expect a company and its executives to interrupt a conference call to add a disclaimer to every individual and particular forward-looking statement they may make. Given that the law is not entirely

clear on this issue, the undersigned concludes that Nobilis' cautionary statement at the beginning of the conference call was sufficient because it described the kinds of statements with reasonable particularity that are forward-looking and variable. [11] The cautionary statement therefore meets the burden described in *Golesorkhi*, and is generally consistent with the concerns expressed in *In re Securities Litig.*, insofar as it describes its forward-looking statements with more particularity than just saying, "forward-looking statements may be included at some point in an extended discussion."

[11] Exhibit 1: "Some of the statements that we make today may be considered forward-looking, including statements regarding future acquisitions, the expected performance of our business and our long-term growth and innovation. These statements involve a number of risks and uncertainties that could cause actual results to differ materially. For more information, please refer to the risk factors discussed in our Form 10-K for the fiscal year 2017 filed on March 12, 2018 with the SEC."

Moreover, even if Defendants' cautionary statements were inadequate, the Safe Harbor provision would still apply to Young's statements because—as discussed below—there are no facts alleged from which it could be determined that Young had actual knowledge at the time of the conference call that his statements about the amount of accounts receivable Noblilis expected to collect were false. For that additional reason, Plaintiff has not stated a plausible § 10(b) and 10b-5 claim based on Defendant Young's statements about the expected collectability of Nobilis' accounts receivables.

### B. Plaintiff has not Sufficiently or Plausibly Alleged Scienter

In addition to a failure to state a plausible, actionable misrepresentation, Plaintiff's allegations also fail to sufficiently and plausibly allege scienter and are subject to dismissal on that basis as well. Scienter to support a securities fraud claim is an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Southland*, 365 F.3d at 366 (internal citations, quotations and ellipsis omitted). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care."

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929. 961–62 (5th Cir. 1981).

**\*13** When pleading scienter under PSLRA, Plaintiff's factual allegations must establish a "strong inference" of knowledge or recklessness: higher than the "reasonable inference" burden under 12(b)(6). Moreover, a court must compare inferences that favor the plaintiff with "plausible competing inferences" that favor the defendant. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). Finally, courts give less weight to confidential witnesses in the scienter analysis. *In re. Dell Inc., Sec. Litig.*, 591 F.Sup.2d 877, 895 (W.D. Tex. 2008). In order to sufficiently plead scienter for the corporation Nobilis, Plaintiff must sufficiently plead scienter for an individual defendant acting on behalf of the corporation. *In re BP p.l.c. Sec. Litig.*, 852 F.Supp.2d 767, 818 (5th Cir. 2012).

Plaintiff's First Amended Complaint attempts to establish a strong inference of scienter through Young and Fleming's signed certifications under the Sarbanes Oxley Act of 2002 (SOX), Young's presence in the business office, and the Defendants' corporate positions. First, signatures alone are not sufficient to establish scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546. 555 (5th Cir. 2007). In *Ramirez v. Exxon Mobil Corp.*, scienter was inferred from the defendant's signature where the defendant also received in-depth briefings and was directly involved in the drafting of the report. 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018). Here, there are no allegations about any additional involvement of Defendant Fleming of the kind described by *Ramirez.* As for Defendant Young, perhaps his presence in the office could be an analogous circumstance to direct involvement and in-depth briefings in *Ramirez.* However, as described above, Young's presence in the office supports a strong competing inference that he believed the accounts receivable were collectable. Young's signature on certifications and his presence in the office are insufficient to support a *strong* inference of scienter as it relates to any of the alleged misstatements or misleading statements at issue in this case.

As for Defendants' respective positions with the company, the 5th Circuit has generally found that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). A plaintiff may sometimes establish a sufficient inference of scienter through special

circumstances, but the Fifth Circuit and other courts have been reluctant to apply this limited exception. In such rare cases, nonetheless, "[a]n officer's position within a company can support the scienter inference only when viewed with other, "special circumstances." These include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements by the officer." *Carlton v. Cannon*, 184 F.Supp.3d 428, 459-60 (S.D. Tex. 2016) (citing *Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016) (internal citations omitted)). However, successfully pleading such a special circumstances exception is exceedingly rare, and has heretofore only been applied when a small company is involved. *Alaska Elec. Pension Fund v. Flotek Ind., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019) ("However, we have never found special circumstances permitting an inference of scienter based solely on a defendant's position when the company was large.").

**\*14** Here, the special circumstances exception for alleging scienter simply does not apply. Plaintiff does not allege any facts to show that Nobilis is a small company. Indeed, at nine hundred employees (seven hundred full time), Nobilis easily clears the threshold on this issue. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (finding 60+ employees failed to establish a small company in the special circumstances analysis). [12]

[12]    A plaintiff has successfully classified a defendant as a small company for the scienter analysis when that company consisted of eight employees, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342–43 (5th Cir. 2008), and roughly thirty-five employees, *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).

As for the remaining special circumstances factors, they do not support a strong inference of scienter either. First, as discussed above in connection with the determination that the alleged misrepresentations are not actionable, the alleged accounting inconsistencies of which Plaintiff complains are resolved by noting the difference between revenue and net income. Second, the only facts alleged to establish readily-apparent information is Young's presence at the business office. However, as described above, matters that may appear clear in hindsight do not constitute fraud when looking back. Furthermore, Young's presence suggests he sincerely believed

the assets were collectible, which strikes against a theory that their uncollectability was readily apparent.

Third, while the collectability of Nobilis' accounts receivables was arguably a critical issue, this by itself would be insufficient to warrant inferring scienter. Plaintiff claims a senior director—not a defendant in this case—allegedly told CW2 "that Nobilis needed to collect, at least, $5 million in aged receivables to be able to sustain the Company's financial stability." (Document No. 25 ¶ 83). If taken as true, this supports an inference that collecting on account receivables was sufficiently urgent that Defendants would be informed about, and possibly involved with, the process. Thus, the transactions may be critical, but only barely so under existing precedent. There is a high bar for what counts as "critical," with even sources generating 22%, 29%, and 30% of a company's total revenue having been found insufficient as a special circumstance to create a strong inference of scienter based on an individual defendant's corporate position and presence alone. *Neiman*, 854 F.3d at 750, *Alaska Elec. Pension Fund v. Asar*, 768 Fed.Appx. 175, 188 (5th Cir. 2019), *Edgar v. Anadarko Petroleum Corp.*, Civ. A. No. H-17-1372, 2019 WL 1167786 at \*17 (S.D. Tex. Mar. 13, 2019). A plaintiff must adequately plead that the company's continued existence *depends* on the transaction. *See Edgar*, 2019 WL 1167786 at \*17 ("[W]hile the second amended complaint alleges that Anadarko's Colorado wells accounted for 30.1% of its worldwide oil production, it does not allege that the company's existence hinged on its operations there."). Nonetheless, even if Nobilis' continued existence depended on collecting this $5 million in aged receivables, Plaintiff still fails to establish, for the special circumstances exception to apply to the pleading of scienter, inconsistency, readily apparent, and most importantly, that Nobilis was a small company.

In all, because the special circumstances exception for pleading scienter does not apply and because the individual Defendants' positions with Nobilis and their presence at Nobilis' offices is insufficient to established a strong inference of scienter, Plaintiff has not plausibly alleged scienter and dismissal of Plaintiff's § 10(b) and Rule 10b-5 claims is warranted. Additionally, because a § 20(a) claim cannot survive when claims under § 10(b) and 10b-5 have been dismissed, the § 20(a) claims are subject to dismissal as well. [13]

[13]    *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("Control person

liability is secondary only and cannot exist in the absence of a primary violation."); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) ("Thus, the failure of a plaintiff to state adequately a 10(b) claim for primary securities fraud violations constitutes a failure to state a claim for control person liability under Section 20(a).")

**V. Conclusion and Recommendation**

**\*15** Based on the foregoing, and the conclusion that Plaintiff has not stated a plausible claim under § 10(b), Rule 10b-5 or 20(a), the Magistrate Judge

RECOMMENDS that Defendants' Motions to Dismiss (Document Nos. 26 & 28) both be GRANTED.

**All Citations**

Slip Copy, 2020 WL 6815402

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  13

# Case No. 16

2020 WL 5512456

2020 WL 5512456
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

ZHANG YANG, Plaintiff,
v.
NOBILIS HEALTH CORP., et al, Defendants.

Civil Action No. 4:19-CV-145
|
Signed 09/14/2020

**Attorneys and Law Firms**

Jeremy A. Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY, Omar Jafri, Pomerantz LLP, Patrick V. Dahlstrom, Pomerantz Grossman, Chicago, IL, Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX, for Plaintiff.

Tyler G. Doyle, Smyser Kaplan et al, Houston, TX, for Defendants.

## **ORDER**

Andrew S. Hanen, United States District Judge

 **\*1** Pending before the Court is the Memorandum and Recommendation of the United States Magistrate Judge (Doc. No. 62), Lead Plaintiff Zhang Yang's ("Plaintiff") objections to that ruling (Doc. No. 64), the response to those objections filed by Defendants Harry Fleming, David Young, and Kenneth Klein (collectively, "Defendants") (Doc. No. 66), and Plaintiff's reply (Doc. No. 70). Having considered the objections and issues *de novo*, the Court hereby sustains Plaintiffs objections as to the Memorandum and Recommendation's conclusion regarding the pleadings as to misrepresentation and overrules his objections as to the pleadings concerning scienter.

The Memorandum and Recommendation concluded that Plaintiff did not plausibly allege an actionable misrepresentation. (Doc. No. 62 at 14–24). Plaintiff objects that the Memorandum and Recommendation relies on materials outside of the complaint and inappropriately weighs factual disputes. While the distinctions in play are quite fine and the line drawn by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd,* 551 U.S. 308 (2007)

is somewhat nebulous and difficult to apply, the Court is concerned that the Plaintiff's complaint in this regard may have merit. "When reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs,* 551 U.S. at 322). Additionally, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007).

A portion of the Memorandum and Recommendation's analysis on the claims of misrepresentation compares Plaintiffs allegations and inferences pleaded in the amended complaint with alternative compelling inferences. (*See, e.g.*, Doc. No. 52 at 17-20). The Memorandum and Recommendation concludes that the alternative inferences are so strong that they undercut the inferences in the Plaintiff's pleading that he needs to support a pleading of misrepresentation under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4(b)(1), 78u-4(b)(3)(A).

In particular, the Memorandum and Recommendation determined that the allegations based upon confidential witnesses' ("CW") allegations fail to support a claim of misrepresentation based on Defendants' statements relating to Nobilis' financial reporting and collection processes. (*See id.* at 17). The Recommendation found that the CWs' allegations that senior managers decided to keep uncollectible claims on the books despite being urged to write them off as uncollectible, did not necessarily support an inference of misrepresentation. Instead, it suggested that the senior managers' decisions to keep uncollectible claims on the books more probably gave rise to an inference of genuine disagreement between employees and managers about the collectability of the claims. (*See id.* at 18.). The Recommendation also suggested an alternative inference— that of good-faith misestimation by the senior managers. It noted that determinations on sophisticated matters like asset valuation can differ "reasonably and sizably." (*See id.* at 19–20 (quoting *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3 527, 536 (5th Cir. 2008))). Similarly, the Memorandum and Recommendation did not find the allegations based upon the CW's information to the effect that Defendants' split billing practices led to uncollectible bills

to be probative of misrepresentation. Instead, it found many other practical, and more likely, reasons to engage in split billing. (*See id.* at 18).

**\*2** Additionally, the Magistrate Judge rejected the Plaintiff's allegation of misrepresentation based on Defendant Young's visits to the business office. Plaintiff pleads that Defendant Young's repeated visits to the business office between February and July 2018 to oversee company collection efforts suggest that he had knowledge that the accounts were uncollectable, and thus his statements to the contrary were in fact misrepresentations. The Recommendation puts forth a contrary inference from Young's continued presence at the business office, namely that his consistent visits implied just the opposite: that he thought the accounts were, in fact, collectible. (*See id.* at 20).

Regardless of the persuasiveness of the Memorandum and Recommendation that Plaintiff failed to plausibly allege actionable misrepresentation, this Court is concerned that the conclusion was reached using sources outside the scope of those sources allowable when weighing a motion to dismiss and that it failed to treat factual allegations as true and in the light most favorable to Plaintiff.[1] While clearly and correctly stating the law, the Court is concerned that some of the Memorandum could be read as improperly conducting a "competing inferences" analysis when evaluating the element of misrepresentation. (*See* Doc. No. 64 at 16). Accordingly, the Court does not adopt the Memorandum and Recommendation insofar as its finding that misrepresentation was not plausibly pleaded.

[1]     The Court recognizes that the PSLRA, as discussed later in the text, alters the traditional motion to dismiss analysis as to the scienter element of a securities fraud claim. That heightened pleading (and evaluated) standard, however, does not apply to any other element of a claim for securities fraud. *See, e.g., Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) ("[W]e are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA."). The Memorandum and Recommendation recognized that this heightened standard applies only to the element of scienter, and consequently this Court finds that it was the intent of the Memorandum and Recommendation

to correctly apply the PSLRA. Nevertheless, it concerns this Court that the Memorandum and Recommendation could be read to have mistakenly applied the heightened standard to both the misrepresentation and scienter elements and might therefore give rise to a claim that the Act was misapplied to the misrepresentation element. (*See* Doc. No. 62 at 17–20). That is the primary reason this Court is not adopting that section.

Turning to the scienter element, the Court overrules the Plaintiff's objections and adopts the Memorandum and Recommendation's analysis. Under the PSLRA, the pleading standard for the element of scienter in securities fraud claims is heightened. *See* 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 313–14. In particular, "[t]o withstand a motion to dismiss, 'an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Ala. Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981–82 (5th Cir. 2019) (quoting *Tellabs*, 551 U.S. at 314). Moreover, the Supreme Court has stated that, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court *must* take into account plausible opposing inferences." *Tellabs*, 551 at 323 (emphasis added).

Specifically, the Memorandum and Recommendation determined that the combination of Defendants' actions, including signing certifications under the Sarbanes Oxley Act of 2002; Defendant Young's presence in the business office; and each Defendants' corporate positions, do not comprise a strong inference of scienter that withstands competing inferences. (Doc. No. 62 at 25). First noting that signatures alone never suffice to establish scienter, the court determined that Defendant Young's continued presence in the business office, even alongside his signed certification, does not outweigh the benign (and much stronger) inference that Young mistook the accounts as collectible, as stated above. (*Id.* at 25–26).[2]

[2]     Indeed, a third inference may even be stronger and that is that Defendant Young knew the importance of collecting the receivables and his presence in the business office was to stimulate collection efforts.

**\*3** The Memorandum and Recommendation further noted that corporate positions in themselves seldom support a strong inference of scienter, and that the Fifth Circuit has found those to be a permissible inference of scienter only when

accompanied by "special circumstances." (*Id.* at 26). The circumstances that comprise the exception permitting an inference of scienter based on corporate position include: "(1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions 'critical to the company's continued vitality,' (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements by the officer." (*Id.* (citing *Carlton v. Cannon*, 184 F.Supp.3d 428, 459–60 (S.D. Tex. 2016))). The Magistrate Judge emphasized that the Fifth Circuit has never applied this exception in the absence of a small company, and easily concluded that with nine hundred employees, Nobilis is not small. (*Id.*) The Magistrate Judge also easily dispensed with the other three special circumstances that could possibly support an inference of scienter, concluding they do not apply. (*Id.* at 27–28).

The Court agrees with the conclusion that the inferences of scienter alleged in the amended complaint are outweighed by stronger competing inferences. The Court also adopts the Memorandum and Recommendation's rejection of establishing scienter through special circumstances. (*See*

Doc. No. 62 at 26–28). Accordingly, the Court adopts in full the conclusion that Plaintiff failed to plausibly allege scienter in the amended complaint in compliance with the requirements of the PSLRA. (*See id.* at 28).

Therefore, the Memorandum and Recommendation of the Magistrate Judge (Doc. No. 62) is adopted as to its conclusions concerning the pleadings of the scienter element, but not as to its recommendations relating to the pleadings of misrepresentation. Since scienter is required for Plaintiff to state a securities fraud claim under Section 10(b) and Rule 10b-5, the Court's adoption of the Report's scienter recommendation alone warrants dismissal. *See* 15 U.S.C. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5; *see also Flotek Indus.*, 915 F.3d 975, 981 (5th Cir. 2019) (*Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017)). Defendants' Motions to Dismiss (Doc. Nos. 26 and 28) are GRANTED.

**All Citations**

Slip Copy, 2020 WL 5512456

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 17

2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

2021 WL 3619863
United States Court of Appeals, Fifth Circuit.

Zhang YANG, Plaintiff—Appellant,

v.

NOBILIS HEALTH CORPORATION; Harry Fleming;
David Young; Kenneth J. Klein, Defendants—Appellees.

No. 20-20538
|
FILED August 13, 2021

Appeal from the United States District Court for the Southern
District of Texas, USDC No. 4:19-cv-145

**Attorneys and Law Firms**

Omar Jafri, Patrick V. Dahlstrom, Pomerantz, L.L.P.,
Chicago, IL, Sammy Ford, IV, Ahmad, Zavitsanos,
Anaipakos, Alavi & Mensing, P.C., Houston, TX, for
Plaintiff-Appellant.

Tyler Geoffrey Doyle, Rex Manning, Jacquelyn Rex, Crystal
Robles, Smyser Kaplan & Veselka, L.L.P., Houston, TX, for
Defendants-Appellees.

Before Jolly, Duncan, and Oldham, Circuit Judges.

**Opinion**

Per Curiam:[*]

[*] Pursuant to 5th Circuit Rule 47.5, the court
has determined that this opinion should not be
published and is not precedent except under the
limited circumstances set forth in 5th Circuit Rule
47.5.4.

**\*1** A putative class of stockholders of Nobilis Health
Corporation sued the company and three of its corporate
officers, claiming the company engaged in unlawful and
fraudulent misrepresentation of the company's financial
condition to inflate its stock price. The district court found
that the amended complaint failed to adequately plead scienter
under the Private Securities Litigation Reform Act of 1995
("PSLRA") and dismissed the case for failure to state a claim.
We affirm.

I.

Nobilis was a publicly traded healthcare development and
management company with 30 locations across Texas and
Arizona. Defendant Harry Fleming served as CEO from
January 2017 until December 2018, and later served as
chairman of the board. Defendant David Young served as
the company's CFO from February 2017 until October 2018.
And Defendant Kenneth Klein served as interim CFO from
October 2018 until January 2019.

The plaintiffs claim Nobilis struggled financially but
deceptively concealed its declining position with half-true
press releases and flawed financial reports. In its March 2016
10-K, Nobilis admitted that it had failed to employ personnel
with the requisite knowledge or training in the application
of Generally Accepted Accounting Principles ("GAAP"),
and that it failed to appropriately oversee the company's
accounting and financial reporting departments. In particular,
Nobilis confessed problems with "management of third-party
billing and collections of aged receivables," and noted its
efforts to remediate operational defects by hiring staff with
GAAP experience.

But according to the plaintiffs, the company's announced
remedial efforts were all smoke and mirrors. The plaintiffs
claim that the company continued to flout GAAP rules and
failed to write down accounts receivable the company knew to
be uncollectable. Worse yet, the plaintiffs allege the company
fraudulently blamed a change in GAAP rules for financial
failures and missed targets, rather than alerting investors
and analysts that the financial difficulties were caused by
uncollectable accounts receivable.

The district court determined that the plaintiffs' allegations
fell short of the heightened scienter pleading requirements of
the PSLRA and thus dismissed the case for failure to state a
claim. The plaintiffs appealed. Our review is *de novo*. *Heinze
v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020).

II.

The elements of a private securities fraud claim based on
violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–
5 are: (1) a material misrepresentation or omission by
the defendant; (2) scienter; (3) a connection between the
misrepresentation or omission and the purchase or sale of a

Case 4:21-cv-02473 Document 41-1 Filed 03/30/23 in TXSD Page 280 of 281

Yang v. Nobilis Health Corporation, Not Reported in Fed. Rptr. (2021)
2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; (6) loss causation. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011) (quotation omitted). Only scienter is relevant to this appeal.

Analyzing scienter is a holistic enterprise that asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A court first considers "the contribution of each individual allegation to a strong inference of scienter." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015). If "any single allegation, standing alone, create[s] a strong inference of scienter, the case should proceed"; but if not, the court must then follow the individualized analysis with a holistic review of all scienter allegations together. *Ibid.* A complaint will survive only if the plaintiffs "plead facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference" of intent or severe recklessness. *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. We begin with an individualized analysis of plaintiffs' allegations. Then we turn to a holistic review.

### A.

**\*2** The plaintiffs offer three pieces of information in support of their scienter allegations. First, they allege that Fleming and Young signed the company's 2018 Sarbanes-Oxley ("SOX") certifications in their official capacities as corporate executives. But our court has been clear that SOX certifications standing alone are insufficient to make out a compelling inference of scienter. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007).

Next, the plaintiffs allege that the GAAP violations coupled with Young's position as CFO are sufficient to show he knew or was severely reckless in ignoring the company's faltering financial state. But GAAP violations standing alone do not make out a cogent and compelling case for scienter. *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 534 & n.3 (5th Cir. 2008) ("[A] failure to follow GAAP, without more, does not establish scienter." (quotation omitted)).

Last, the plaintiffs offer confidential-witness testimony from three Nobilis employees who claimed that the company retained a backlog of unpaid claims executives knew to be uncollectable. For a confidential witness testimony to be credited towards a finding of scienter, the complaint must indicate how or when the officers became aware of what the confidential source allegedly knew. *See Shaw Group*, 537 F.3d at 542. The confidential testimony here doesn't do that. Stripped down, the testimony of the confidential witnesses makes some conclusory allegations about corporate knowledge, but none of the testimony indicates how or when corporate officers became aware of the relevant information. *See Owens*, 789 F.3d at 545 (finding no scienter where the complaint "contain[ed] no particularized allegations of ... warnings to [defendants]" of alleged fraud); *Shaw Group*, 537 F.3d at 545 (finding no scienter where the plaintiff failed to plead facts showing that the defendants were "on notice" as to their alleged misstatements).

The most particularized allegation from any of the confidential witnesses comes from confidential witness 3, who claims that Young's state of mind can be inferred because he was present in the company's billing office over the course of several months. But simply alleging that Young was in a particular office at a particular time does not permit this court to infer that Young was aware or severely reckless in failing to appreciate the uncollectablilty of particular accounts. Mere proximity to information does not automatically translate to knowledge of it. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424 (5th Cir. 2001) ("An officer's position with a company does not suffice to create an inference of scienter.").

### B.

Because plaintiffs' allegations individually do not support a "powerful or cogent" inference of scienter, we turn next to a holistic review of the complaint to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. Our review is particular to each defendant. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (requiring plaintiffs suing under the PSLRA to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud" (quotation omitted)).

There are no particular scienter allegations against Klein other than that he, by virtue of his corporate position, must've been aware of the company's GAAP violations and the misrepresentations made in corporate releases. Plaintiffs urge us, in our holistic review, to infer Klein's scienter based on

Case 4:21-cv-02473    Document 41-1    Filed 03/30/23 in TXSD    Page 281 of 281

Yang v. Nobilis Health Corporation, Not Reported in Fed. Rptr. (2021)
2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

his corporate position—but that isn't allowed. *See Nathenson, 267 F.3d at 424*.

 **\*3** The allegations against Fleming are similarly thin. The plaintiffs offer two allegations they claims to be sufficient to allege scienter as to Fleming: first, Fleming's position as CEO, and second, Fleming's signatures on SOX certifications. Taken together, Fleming's corporate position and SOX signature provide neither cogent nor powerful inference of scienter and are plainly insufficient. *See ibid.*; *Cent. Laborers' Pension Fund*, 497 F.3d at 552. These allegations simply reveal a truism—that Fleming was a corporate director who performed official duties including signing SOX certificates. We know nothing about Fleming's frame of mind, nor can we infer it based on the plaintiffs' conclusory assumptions that he acted with reckless disregard to alleged fraud.

That leaves Young. Taken together, the amended complaint alleges that Young's scienter can be inferred on the basis of three allegations. First, Young's position as CFO; second, Young's signature on the SOX certifications; and third, the allegation that Young visited the business office on several occasions to stimulate debt collection. There is not a single allegation that any confidential witness or any other person informed Young about their subjective views of the company's financial situation. So rather than presenting a "powerful or cogent" allegation of scienter, *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499, the plaintiffs ask us to imagine that Young acted with scienter based on his day-to-day involvement with the company, and the fact he was in proximity to people who allegedly had the relevant information. That's plainly insufficient to plead scienter. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). [†]

[†] The plaintiffs also ask us to forgive the insufficient scienter allegations in accordance with the special circumstances exception. In "rare case[s] ... motive and opportunity allegations alone can support a strong inference of scienter." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund*, 810 F.3d 951, 958 (5th Cir. 2016) (quotation omitted). Under that narrow exception, one must meet some combination of four considerations. First, the company must be small. *See Alaska Elec. Pension Fund v. Flotek Indust., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019) ("[This court] has never found special circumstances permitting an inference of scienter based solely on a defendant's position when the company was large."). Second, the transaction at issue is critical to the company's continued vitality. *See Local 731 I.B.*, 810 F.3d at 968. Third, the misrepresentation is readily apparent to the speaker. *See ibid.* And last, the defendants' statements are internally inconsistent. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005). The exception does not apply in this case because Nobilis was a large company with hundreds of employees, in 30 locations, and the exception does not apply in such circumstances. *See Alaska Elec. Pension Fund*, 915 F.3d at 985.

AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 3619863, Fed. Sec. L. Rep. P 101,210

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.