# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

IN RE BANCO BRADESCO S.A.      ) Case No. 1:16-cv-04155-GHW
SECURITIES LITIGATION          )
                                      )
                                      )
                                      )
                                      )
_____ )

**EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA**

**December 14, 2018**

**Table of Contents**

|  | **Page** |
|---|---|

I.      INTRODUCTION ...................................................................................................... 3

II.     SUMMARY OF OPINIONS ..................................................................................... 4

III.     DR. HUTTON DOES NOT DISPUTE THAT ALL TEN FACTORS ANALYZED IN THE COFFMAN REPORT SUPPORT A FINDING OF MARKET EFFICIENCY......................................................................................................... 9

IV.     DR. HUTTON FAILS TO ESTABLISH A LACK OF PRICE IMPACT AND THERE IS STRONG EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER ................................................................................................................ 11

    A.     DR. HUTTON'S DISCUSSION OF PRICE REACTIONS ON THE ALLEGED MISTATEMENT DATES DOES NOT SUPPORT THE ABSENCE OF PRICE IMPACT ............................................................................................................ 11

    B.     DR. HUTTON FAILS TO PROVE A LACK OF PRICE IMPACT ON THE POTENTIAL CORRECTIVE DISCLOSURE DATES .................................................. 17

        i.     MAY 31, 2016 ............................................................................................... 19

        ii.     MARCH 26, 2015 .......................................................................................... 23

        iii.     JULY 28, 2016 ................................................................................................ 28

        iv.     MAY 20, 2015 ............................................................................................... 31

        v.     MARCH 28, 2015 AND APRIL 3, 2015 ....................................................... 33

V.     DR. HUTTON DOES NOT DISPUTE THE CLASS-WIDE DAMAGES METHODOLOGY ..................................................................................................... 34

## I.    INTRODUCTION

1.    On October 11, 2018, I submitted an expert report in this matter[1] in which I opined that the market for Banco Bradesco Preferred ADSs[2] was efficient throughout the Class Period[3] and that damages could be calculated subject to a class-wide formula and methodology consistent with Lead Plaintiff's liability theory.[4]  Following the submission of my Report, counsel for Lead Plaintiff provided me with a copy of the November 28, 2018 Expert Report of Amy Hutton, Ph.D. (the "Hutton Report") submitted in further support of Defendants' Memorandum of Law In Opposition to Lead Plaintiff's Motion for Class Certification filed November 9, 2018.[5]  Counsel for Lead Plaintiff asked me to review and respond to contentions in the Hutton Report that (1) there is no evidence of price impact on the alleged misstatement/omission dates;[6] (2) there is no evidence of price impact on the alleged corrective disclosure dates;[7] and (3) there is no evidence of price impact on additional dates on which Dr. Hutton contends news regarding the alleged scheme became public.[8]  My responses to the

---

[1] On August 17, 2018, I submitted an expert report in this matter (my "Initial Report").  On October 11, 2018, I provided a declaration to which I attached a corrected report (my "Corrected Report" or the "Coffman Report" or my "Report") (ECF No. 157-1), which made several non-substantive corrections, and which replaces my Initial Report.

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Coffman Report.  Dr. Hutton refers to the Banco Bradesco Preferred ADSs as the "Bradesco PADS."  Both terms shall have the same meaning in this Rebuttal Report.

[3] The Class Period is from August 8, 2014 through July 27, 2016, inclusive.

[4] Coffman Report ¶¶ 6-7.

[5] I understand that Dr. Hutton submitted an expert report in this matter on November 9, 2018 (filed November 10, 2018) in conjunction with Defendants' Memorandum of Law In Opposition to Lead Plaintiff's Motion for Class Certification filed on November 9, 2018.  I further understand that on November 28, 2018, Dr. Hutton provided a declaration to which she attached a corrected report (the "Hutton Report") (ECF No. 162-1), which replaces the expert report she previously submitted.

[6] Hutton Report ¶ 16.

[7] Hutton Report ¶ 17.

[8] Hutton Report ¶ 18.  Dr. Hutton does not offer an affirmative opinion as to the movement in the price of Bradesco Preferred ADSs due to the information released on April 3, 2015.

Hutton Report are set forth in this document (the "Coffman Rebuttal Report" or my "Rebuttal Report").

2.      In formulating my opinions set forth in this Rebuttal Report, I have relied upon the Coffman Report and my knowledge, experience, and formal training in economics, finance, and statistics in addition to the allegations and facts set forth in this lawsuit.  In performing the analyses set forth in this Rebuttal Report, I also considered: (1) the Hutton Report; (2) data, analyses, and back-up materials provided by Dr. Hutton to counsel for Lead Plaintiff that Dr. Hutton claims to have considered in connection with her analyses; (3) sworn testimony from Dr. Hutton in a deposition taken on December 5, 2018 (the "Hutton Deposition"); and (4) other relevant materials and information.  I also performed additional analyses to test certain assertions made in the Hutton Report/Hutton Deposition.  All of the materials that I relied upon and considered in reaching my opinions in this Rebuttal Report are identified in the attached **Appendix A** (as well as a similar Appendix A attached to the Coffman Report).

## II.      SUMMARY OF OPINIONS

3.      In summary, nothing in the Hutton Report or the Hutton Deposition disturbs my opinions that the market for Banco Bradesco Preferred ADSs was efficient during the Class Period and that damages in this matter can be calculated subject to a well-settled common methodology on a class-wide basis consistent with Lead Plaintiff's liability theory.  In addition, Dr. Hutton's analysis does not provide economic evidence establishing a lack of price impact from the alleged misstatements/omissions.  To the contrary, there is strong economic evidence of price impact in this matter.

4.      More specifically, my Report empirically analyzes a total of ten factors to evaluate the market efficiency of Banco Bradesco Preferred ADSs, each of which supports a finding of

4

market efficiency.[9] Dr. Hutton does not address any of my analyses or conclusions regarding market efficiency for Bradesco Preferred ADSs. Thus, there is no dispute that all of the factors I analyzed in my Report support a finding that the market for Bradesco Preferred ADSs was efficient during the Class Period.

5.     Dr. Hutton asserts she has established a lack of price impact because there are no statistically significant price increases at the time of the alleged misstatements/omissions.[10] However, there is no reason to expect that the alleged misstatements/omissions in this case would necessarily surprise the market and cause a statistically significant price increase. As in many cases, the alleged misstatements/omissions had a price impact by preventing the price of the Bradesco Preferred ADSs from falling to the level at which it would have traded had the relevant truth been disclosed (i.e., "price maintenance"). For this very reason, and as acknowledged by Dr. Hutton, establishing a lack of price impact would require a showing that there was no market response to any of the corrective disclosures.[11] This is especially true in this matter where, as acknowledged by Dr. Hutton, seven of the eight alleged misstatements and/or omissions convey information that had been previously disclosed to the market.[12] Therefore, the fact that the market price of Bradesco Preferred ADSs did not increase at the time of the alleged misstatements/omissions is not determinative of price impact.

---

[9] Coffman Report § VII.

[10] Hutton Report ¶ 16.

[11] Hutton Report ¶ 17 ("Nevertheless, if, contrary to this finding, the alleged misstatements maintained inflation in the price of the Bradesco PADS during the Class Period, that inflation should have been removed from the price at the time of the alleged corrective disclosures . . . Accordingly, I also analyze whether the alleged corrective disclosures in this matter had a negative impact on the price of the Bradesco PADS."). *See also* Hutton Report ¶94.

[12] Dr. Hutton acknowledges that the alleged misstatements on August 8, 2014; April 10, 2015; April 30, 2015; April 18, 2016; May 31, 2016; June 1, 2016; and June 9, 2016 were repetitions of information previously disclosed to the market. *See* Hutton Report fns 40, 52, 102, and 105 and Hutton Deposition 158:18-159:4; 168:8-20; 198:19-199:5; and 200:2-25.

6.     Dr. Hutton also asserts there is no evidence of price impact from the alleged corrective disclosure dates.[13] However, Dr. Hutton's opinion is (1) inconsistent with her own statistical analysis of May 31, 2016, (2) based upon a fundamentally flawed analysis of March 26 and 27, 2015, (3) based upon an analysis of the wrong event window on July 28, 2016, and (4) based on an incomplete evaluation of May 20, 2015.[14] Furthermore, her opinion relies upon a series of loss causation arguments that are both unreliable and, to my understanding, premature.

7.     Indeed, there is strong economic evidence of price impact in this matter. Dr. Hutton and I both find that there is a statistically significant price reaction to the indictment of Bradesco executives on May 31, 2016 and she cannot definitively rule out that it reflected the impact of the alleged fraud.[15] Dr. Hutton's speculative linking of this event with a price increase a year after the Class Period is an unreliable and premature loss causation argument. Furthermore, even if her loss causation argument were ultimately accepted during the merits phase, the statistically significant price decline on May 31, 2016 still establishes price impact and economic loss for investors that sold their shares prior to the purported offsetting positive event.

8.     Dr. Hutton's analysis of March 26 and 27, 2015 is fundamentally flawed because she fails to even consider the possibility that the disclosure of Operation Zealots (which spanned dozens of Brazilian companies and many industries) impacted more than just Banco Bradesco and thus tainted her "control" variables. Dr. Hutton also ignores the evidence that suggests it

---

[13] Hutton Report ¶ 17.

[14] Dr. Hutton also generally bases her opinions on statistical tests that measure price movements over time periods of less than a full day. While such approaches are sometimes necessary and appropriate because of the introduction of specific confounding information at a particular time of day, her general approach of focusing on very narrow time windows departs from the standard and well-accepted daily event study methodology that is typically applied in the class action securities litigation context and in much of the academic literature (*see* footnote 114, *infra*). Nevertheless, I show that even under her far too narrow approach, there is clear evidence of price impact.

[15] Hutton Report ¶ 97 ("While I cannot exclude the possibility that the observed firm-specific price decline of the Bradesco PADS on May 31, 2016 could be related to the market's heightened perception of risks of negative outcomes for Bradesco from the investigation…").

6

took the market multiple days to fully digest the disclosure.  As I will show, if one considers the Brazilian indices "tainted" as a result of the disclosure of Operation Zealots, there is evidence of price impact.  Indeed, the Bradesco Preferred ADSs declined by over 6% on March 26 and 27, 2015, and Dr. Hutton's opinion relies entirely on attributing the decline to the "market" without even considering how other companies in the Brazilian market may have been influenced by the same disclosure.  Dr. Hutton's opinion with respect to March 26 and 27, 2015 is unreliable.

9.      Dr. Hutton's analysis of July 28, 2016 is incorrect because she analyzes the wrong time window(s).  In particular, Dr. Hutton fails to consider that the Court accepted the charges against Bradesco's executives in a filing that was made available on July 27, 2016 at 6:34 PM Eastern Time.[16]  Yet, Dr. Hutton, without any support, assumes that the market could only react to this news beginning at 11:10 AM the next day, when the first newspaper article discussing the decision was published.  Indeed, Dr. Hutton's event study, as well as my own, confirms there was a statistically significant price decline in the Bradesco Preferred ADSs on July 28, 2016 if one considers the return from market close on July 27, 2016, thus capturing any reaction to the decision that was publicly available on the evening of July 27, 2016.  In addition, Dr. Hutton fails to acknowledge that the press conference with federal prosecutors held at 2:00 PM on July 28, 2016, which discussed information related to the alleged fraud, likely also contributed to the decline in the Bradesco Preferred ADSs.  While I understand that any impact from the acceptance of the criminal charges and the press conference could be confounded by the earnings announcement that also took place on this day, Dr. Hutton has not scientifically established that the alleged corrective information did not have any impact on the price of Bradesco Preferred

---

[16] The Federal Court in Brazil has an online system that is publicly available.  A chronological report of the case indicates that the decision was released at 7:34:33 PM Brazil Time, which is 6:34:33 PM Eastern Time.  *See* the "Inteiro Teor [Full Content]" tab at https://processual.trf1.jus.br/consultaProcessual/processo.php?proc=0037645-54.2015.4.01.3400&secao=DF&pg=1&enviar=Pesquisar.

ADSs on July 28, 2016. In fact, Dr. Hutton has not attempted to disaggregate these various pieces of information. Therefore, Dr. Hutton has not provided sufficient evidence to support her opinion of a lack of price impact on July 28, 2016.

10. Dr. Hutton's analysis of May 20, 2015 is incomplete and unreliable. Her conclusion of a lack of price impact from the information released on this day is entirely dependent on ignoring a statistically significant price movement in the Bradesco Preferred ADSs on May 21, 2015. Dr. Hutton has not proven to any scientific degree that the statistically significant price movement on May 21, 2015 was not due to the alleged corrective information and thus she fails to prove a lack of price impact from this alleged corrective disclosure.

11. Dr. Hutton's analysis of two dates in addition to the corrective disclosures alleged in the Complaint is insufficient to establish a lack of price impact. As discussed below, there is strong evidence of price impact in this matter, irrespective of the price movements on these two dates, and Dr. Hutton explicitly disclaims to offer an affirmative opinion about price impact on one of the two dates.

12. With respect to the availability of a damages methodology, I described in my Report how the standard and well-accepted out-of-pocket damages methodology can be applied uniformly, formulaically, and class-wide in this matter.[17] Dr. Hutton does not address this conclusion or proposed methodology. Thus, there is no dispute that damages in this action are subject to a well-settled, common methodology that can be applied to all Class Members.[18]

13. The remainder of this Report details the bases for my opinions.

---

[17] Coffman Report § VIII.

[18] Indeed, none of her arguments addressing price impact references the identity of any specific class member.

8

III.    DR. HUTTON DOES NOT DISPUTE THAT ALL TEN FACTORS ANALYZED
IN THE COFFMAN REPORT SUPPORT A FINDING OF MARKET
EFFICIENCY

14.    Dr. Hutton does not dispute that my empirical analysis of ten well-established
factors supports a finding of market efficiency throughout the entire Class Period.  In particular,
my Report demonstrates that: (1) the average weekly trading volume of Bradesco Preferred
ADSs was 86.8 million shares,[19] which represents 8.57% turnover per week, which easily
exceeds the *Cammer* threshold and compares favorably against other exchange-traded securities
(*Cammer* Factor 1);[20] (2) a large number of securities analysts followed Bradesco (at least 240
reports from 27 different firms during the Class Period), and there was also substantial press
coverage and other sources of publicly available information regarding the Company (*Cammer*
Factor 2);[21] (3) Bradesco Preferred ADSs traded on the NYSE at all times during the Class
Period, thus satisfying the "market maker" factor (*Cammer* Factor 3);[22] and (4) Bradesco was
apparently eligible to file Form F-3s during the Class Period (*Cammer* Factor 4).[23]  The analysis
in my Report also demonstrates that (5) Bradesco Preferred ADSs had market capitalization that
was higher than the majority of NYSE and NASDAQ stocks during the Class Period, a factor
associated with larger institutional ownership, greater analyst coverage, and is therefore
correlated with a finding of market efficiency;[24] and (6) Bradesco Preferred ADSs also had one
of the lowest bid-ask spreads when compared to a random sample of 100 common stocks on the

---

[19] Adjusted to reflect all stock splits that have occurred through August 2018 according to S&P Capital IQ.

[20] Coffman Report ¶¶ 26-30.

[21] Coffman Report ¶¶ 31-36.

[22] Coffman Report ¶¶ 37-41.

[23] Coffman Report ¶¶ 42-44.

[24] Coffman Report ¶¶ 66-69.

NYSE and NASDAQ.  This metric indicates that Bradesco Preferred ADSs traded in a well-developed market and that costs to transact in Bradesco Preferred ADSs were relatively low, also indicating an efficient market.[25]  My Report further shows that (7) Bradesco Preferred ADSs were traded by sophisticated traders, with over 88% of its public float held by institutions during the Class Period on average;[26] (8) there was no evidence of persistent autocorrelation for Bradesco Preferred ADSs;[27] and (9) there was considerable options trading during the Class Period, which is associated with the underlying security trading in an efficient market.[28]  Finally, (10) there was a strong cause-and-effect relationship between new Company-specific information and the market price of Bradesco Preferred ADSs during the Class Period.[29]

15.   Taken together, these metrics provide overwhelming and undisputed evidence that support a conclusion that Bradesco Preferred ADSs traded in an efficient market throughout the entire Class Period.  Dr. Hutton does not offer a single criticism of any part of my analysis or conclusions regarding the market efficiency of Banco Bradesco Preferred ADSs.  In fact, the price impact arguments set forth in the Hutton Report presume that the market for the Bradesco Preferred ADSs was efficient during the Class Period.[30]

---

[25] Coffman Report ¶¶ 70-71.

[26] Coffman Report ¶¶ 72-73.

[27] Coffman Report ¶¶ 74-81.

[28] Coffman Report ¶ 82.

[29] Coffman Report ¶¶ 45-65.

[30] *See*, for example, Hutton Report Appendix D ¶ 2 ("In an efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information.") and ¶ 7 ("...I expect to observe a quick price response to the allegation-related information released on a given Event Date."). *See also,* Hutton Deposition 79:24-81:19.

**IV.    DR. HUTTON FAILS TO ESTABLISH A LACK OF PRICE IMPACT AND THERE IS STRONG EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER**

16.    Dr. Hutton analyzes two categories of events to assess price impact: (1) alleged misstatements/omissions, and (2) potential corrective disclosures (those alleged by Plaintiff as well as two additional dates that Dr. Hutton identifies).[31]  From her analysis, Dr. Hutton suggests that information related to the alleged fraud on these dates (other than April 3, 2015) did not impact the price of Banco Bradesco Preferred ADSs in a statistically significant manner.[32]  As I will discuss in further detail below, Dr. Hutton's analysis is flawed and there is, in fact, strong evidence of price impact in this matter.

**A.   DR. HUTTON'S DISCUSSION OF PRICE REACTIONS ON THE ALLEGED MISTATEMENT DATES DOES NOT SUPPORT THE ABSENCE OF PRICE IMPACT**

17.    Dr. Hutton presents an analysis of the market price reaction to two categories of alleged misstatements/omissions: (1) statements about Bradesco's Code of Ethical Conduct and anti-corruption policies;[33] and (2) denials relating to the Operation Zealots investigation.[34]  She then concludes that she has found no empirical evidence of statistically significant price increases associated with the eight alleged misstatements/omissions at issue in this case.[35]  However, Dr. Hutton's analysis of whether there were statistically significant price increases at the time of the alleged misstatements/omissions, even if computationally correct, is not sufficient

---

[31] Hutton Report ¶ 22.

[32] Dr. Hutton does not offer an affirmative opinion as to the movement in the price of Bradesco Preferred ADSs due to the information released on April 3, 2015.  *See* Hutton Report ¶¶ 16-18.

[33] August 8, 2014; April 30, 2015; and April 18, 2016.  *See* Hutton Report § VI.A.

[34] March 31, 2015; April 10, 2015; May 31, 2016 – June 1, 2016; and June 9, 2016.  *See* Hutton Report § VI.B.

[35] Hutton Report ¶ 94.

to conclude that Banco Bradesco's Preferred ADS prices were unaffected by the alleged misrepresentations and omissions.[36]

18.    In her analysis of the first category of alleged misstatements/omissions concerning Bradesco's Code of Ethical Conduct and anti-corruption policies, Dr. Hutton claims the following:

> Given the market's heightened concern about bribery at Brazilian companies after Operation Car Wash, Plaintiff's theory of liability as discussed in the MTD Order suggests that Bradesco's alleged misstatements about the Company's Code of Ethical Conduct and anti-corruption policies, to the extent they had an impact on the price of the Bradesco PADS, should be associated with an increase in Bradesco's PADS price. In other words, given my understanding, the alleged misstatements about Bradesco's Code of Ethical Conduct and anti-corruption policies (on August 8, 2014, April 30, 2015, and April 18, 2016), if important to investors, should be associated with a statistically significant increase in the price of the Bradesco PADS.[37]

19.    Dr. Hutton has no reliable basis for her unscientific assertion that "heightened concern" about bribery at Brazilian companies "suggests" that the market should have reacted positively to any misstatements/omissions about Banco Bradesco's Code of Ethical Conduct and anti-corruption policies.  First, Dr. Hutton acknowledges that the August 8, 2014 misstatement was a reiteration of a July 31, 2014 disclosure filed in Portuguese,[38] and she concedes that one may not expect a price reaction from the misstatements on April 30, 2015 and April 18, 2016, which repeated the substance of the August 8, 2014 statement.[39]  Second, Dr. Hutton cites *nothing* (academic authority or economic analysis of any kind) to support her opinion, and there

---

[36] *See* footnote 14, *supra.*

[37] Hutton Report ¶ 33.

[38] Hutton Report fn 52 and Hutton Deposition 127:16-22.

[39] Hutton Report fn 40 ("To the extent that the alleged misstatements about Bradesco's Code of Ethical Conduct and anti-corruption policies on April 30, 2015 and April 18, 2016 reflect a repetition of the alleged misstatement on August 8, 2014, it is possible that no price reaction would be expected (since typically there should be no price reaction to previously-disclosed information).").

is nothing in the Court's Order on Defendants' motion to dismiss supporting any notion that the

alleged misstatements/omissions at issue here would result in statistically significant increases in

the price of Bradesco Preferred ADSs.  Third, as a matter of economic logic, even if the market

does have heightened concern about an issue, this does *not* imply that investors would be

surprised to hear a company reassure the market about that issue.  Indeed, Dr. Hutton cites no

evidence to suggest that the market was surprised that Banco Bradesco claimed to have and to

follow a Code of Ethics and anti-corruption policies.  I understand the Company had a Code of

Ethics since at least 2003,[40] and that Dr. Hutton testified that it is standard for a company to have

a "Code of Ethics".[41]  Dr. Hutton recognizes in her Report, and admitted during her deposition,

that disclosures that repeat or confirm information that has already been disclosed are not

expected to cause a measurable movement in the price of a security trading in an efficient

market.[42]  I agree that statements that repeat information already disclosed to investors are not

expected to impact the price of a security trading in an efficient market.[43]  Dr. Hutton testified

numerous times that it is possible that information previously disclosed would not be expected to

affect the price of Bradesco Preferred ADSs upon reiteration.[44]  Furthermore, my review reveals

that there were no news stories or analyst reports suggesting that Defendants' statements were

---

[40] Banco Bradesco SEC Form 20-F for the fiscal year ended December 31, 2003.

[41] Hutton Deposition 139:24-140:2 ("But this is sort of a boilerplate -- doesn't everybody have a Code of Ethics?")

[42] Hutton Report fns 40 and 102 ("…typically there should be no price reaction to previously-disclosed information…") and Hutton Report Appendix D ¶ 2 ("In an efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information.  The repetition of "old" information would therefore not be expected to have a statistically significant effect on security prices.").  *See also* Hutton Deposition 158:18-159:4 and 168:8-20.

[43] Dr. Hutton recognizes and does not dispute that Plaintiff alleges these misstatements also omitted facts.  *See* Hutton Report ¶ 35.  The price impact of omitted information cannot be determined until such information is actually disclosed.  Hutton Deposition 116:19-117:12.

[44] *See,* for example, Hutton Deposition 45:4-22; 106:15-107:8; and 129:21-130:3.

surprising to the market, and Dr. Hutton certainly does not cite any. However, the market would have been surprised to learn the underlying truth that the Company was affirmatively engaged in the alleged wrongful conduct in contravention of such policies.

20. My understanding of Plaintiff's theory is that the *falsity* of such statements would be particularly value relevant in the context of what had occurred at Petrobras,[45] not that the market would be surprised that companies were issuing reassurances about their own policies.[46] In addition, regarding alleged omissions, Dr. Hutton testified that information not disclosed to the market would not be expected to impact the price of a security at the time of the omission.[47] Therefore, the lack of statistically significant price increases at the time of the alleged misstatements/omissions related to Banco Bradesco's Code of Ethical Conduct and anti-corruption policies does not, by itself, prove a lack of price impact. The price impact of the alleged misstatements/omissions is more reliably evaluated based on the market price response to the revelation of the truth on the alleged corrective disclosures. Critically, Dr. Hutton acknowledges that to the extent the alleged misstatements/omissions maintained artificial

---

[45] Complaint ¶ 45 ("In 2014, the public learned of an investigation being conducted by the Federal Police and Federal Prosecutor ("MPF") called Operação Lava Jato ("Operation Car Wash"). In connection with Operation Car Wash, the Federal Police and MPF are investigating allegations of bid-rigging and bribery at Brazil's state-owned oil company, Petróleo Brasileiro S.A.—Petrobras ("Petrobras"). The evidence unearthed by this investigation to date establishes a decades-long corruption scheme, in which third-party contractors were awarded Petrobras contracts based on inflated bids and then kicked-back a certain percentage of the contract value as a bribe payment that was funneled to Petrobras executives and politicians. Operation Car Wash has resulted in numerous arrests and convictions").

[46] The Hutton Report also makes the assertion that the expectation of statistically significant price increases on the alleged misstatement dates is "consistent with . . . the MTD Order" (*See* Hutton Report ¶¶ 17 and 94). Dr. Hutton does not cite the MTD Order to support this claim, and I am not aware of any such statistical prognostication in the MTD Order.

[47] Hutton Deposition 54:24-55:6 and 116:19-117:12.

inflation by failing to disclose the relevant underlying truth, it is relevant for assessing price impact to consider the market price reaction to the alleged corrective disclosures.[48]

21.  In her analysis of the second category of alleged misstatements/omissions, denials relating to the Operation Zealots investigation, Dr. Hutton claims the following:

> … each of the remaining alleged misstatements is an "affirmative denial" by Bradesco relating to the Operation Zealots investigation. Accordingly, each of these alleged misstatements should be associated with a statistically significant increase in the price of the Bradesco PADS.[49]

22.  Yet again, Dr. Hutton has no reliable basis for her unscientific assertions that an "affirmative denial" of alleged misconduct should be associated with a statistically significant increase in the market price of Banco Bradesco Preferred ADSs.  First, Dr. Hutton concedes that one may not expect a price reaction from the misstatement on April 10, 2015, which repeated the substance of the March 31, 2015 misstatement.[50]  Further, she acknowledges that it is possible that no price reaction would be expected to the alleged misstatement on June 9, 2016 since it appears to be a reiteration of the alleged misstatements on May 31, 2016 and June 1, 2016.[51]  In addition, the affirmative denials offered by Banco Bradesco would be largely expected and are misleading based on what they fail to disclose.  Also, as mentioned above regarding the alleged omissions, Dr. Hutton testified that information not disclosed to the market would not be

---

[48] Hutton Report ¶ 17 ("Nevertheless, if, contrary to this finding, the alleged misstatements maintained inflation in the price of the Bradesco PADS during the Class Period, that inflation should have been removed from the price at the time of the alleged corrective disclosures . . . Accordingly, I also analyze whether the alleged corrective disclosures in this matter had a negative impact on the price of the Bradesco PADS.").  *See also* Hutton Report ¶ 94.

[49] Hutton Report ¶ 60.

[50] Hutton Report fn 102 ("The alleged misstatement on April 10, 2015 is the filing of the March 31, 2015 press release as a Form 6-K with the SEC, and may therefore represent a repetition of the alleged misstatement from March 31, 2015.  In this case, it is possible that no price reaction would be expected (since typically there should be no price reaction to previously-disclosed information).  To the extent that the alleged misstatement on April 10, 2015 represented new material information to the market, however, the "affirmative denial" should again be associated with a statistically significant increase in the price of the Bradesco PADS.").

[51] Hutton Report fn 105.

expected to impact the price of a security.[52]  Therefore, the lack of statistically significant price

increases in the Bradesco Preferred ADSs at the time of the alleged misstatements/omissions

related to the Company's denials of wrongdoing do not imply a lack of price impact.  The price

impact of the alleged misstatements/omissions is more reliably evaluated based on the market

price responses to corrective disclosures.  Dr. Hutton acknowledges that to the extent these

statements maintained artificial inflation by failing to disclose the relevant underlying truth, it is

relevant for assessing price impact to consider the market price reaction to the alleged corrective

disclosures.[53]

23.     Dr. Hutton's analysis of the alleged misstatements fails to prove a lack of price

impact.  Misstatements and/or omissions often conceal the relevant truth, but do not provide new

and unexpected information to the market.  For example, if a company continues to state that the

quality of its loan portfolio has remained consistent (even though this had become untrue), one

would not expect to observe a price increase associated with this misstatement because it

represents what the market was expecting to hear.  In other words, the misstatement served to

maintain the price at a higher level than the level at which it would have otherwise traded, had

the truth been revealed.[54]  In those circumstances, one could not evaluate price impact by

evaluating whether there was a change in price at the time of the misstatement.  Thus, the fact

that the alleged misstatements/omissions did not result in statistically significant price increases

---

[52] Hutton Deposition 54:24-55:6 and 116:19-117:12.

[53] Hutton Report ¶ 17 ("Nevertheless, if, contrary to this finding, the alleged misstatements maintained inflation in the price of the Bradesco PADS during the Class Period, that inflation should have been removed from the price at the time of the alleged corrective disclosures . . . Accordingly, I also analyze whether the alleged corrective disclosures in this matter had a negative impact on the price of the Bradesco PADS.").  *See also* Hutton Report ¶ 94.

[54] As contemplated by Dr. Hutton, the lack of price change could also theoretically be due to confounding factors that mask the effect of the alleged misstatements and/or omissions.  *See* Hutton ¶ 27 ("Specifically, for the alleged misstatement dates (when, as noted earlier, there should be an *increase* in the price of the Bradesco PADS), I evaluate whether there was new, *negative* information released about Bradesco (and unrelated to the allegations in this matter) that would be expected to obscure a price increase associated with the alleged misstatements.").

is absolutely consistent with the idea of price maintenance (as well as market efficiency and price impact). Measuring the price change only at the time of the misrepresentation/omission is not the reliable way to evaluate price impact. In addition, there is nothing in Plaintiff's claims that, from an economic point of view, requires the price to have reacted positively to any specific alleged misstatement or omission (nor have I asserted such a reaction occurred). Indeed, the alleged misstatements/omissions in this matter amount to statements that Banco Bradesco was not criminally bribing officials. There is no evidence of which I am aware, and certainly none offered by Dr. Hutton, that would suggest these statements would contradict existing market beliefs or surprise the market. Often, as here, the only reliable way to evaluate price impact is to examine the change in price when the relevant truth is revealed (i.e., on the corrective disclosure events). Thus, as a matter of economics, to demonstrate lack of price impact, one would have to show no price responses to both the alleged misrepresentations as well as the alleged corrective disclosure events. However, as discussed below in **Section IV.B**, there is strong evidence of price impact in the wake of alleged corrective disclosures.

### B. DR. HUTTON FAILS TO PROVE A LACK OF PRICE IMPACT ON THE POTENTIAL CORRECTIVE DISCLOSURE DATES

24. Dr. Hutton presents an analysis of each of six potential corrective disclosure dates in this matter (four of which were alleged by Plaintiff and two additional events that she identifies).[55] She asserts that she has found no empirical evidence to support the conclusion that the alleged corrective information released on three of the alleged corrective disclosures (i.e., March 26, 2015, May 20, 2015 and July 28, 2016) had a statistically significant impact on the

---

[55] Plaintiff alleges the following dates as corrective disclosures: March 26, 2015; May 20, 2015; May 31, 2016; and July 28, 2016. Dr. Hutton identifies March 28, 2015 and April 3, 2015 as dates upon which she believes similar information emerged. *See* Hutton Report § VII and § VIII.

17

price of the Bradesco Preferred ADSs.[56]  In addition, despite conceding that there was a statistically significant impact on the price of the Bradesco Preferred ADSs on the remaining alleged corrective disclosure (i.e., May 31, 2016), Dr. Hutton concludes it is "more likely" that the price movement on this date was due to reasons unrelated to the alleged fraud.[57]  Finally, Dr. Hutton asserts that she has found no empirical evidence to support the conclusion that the March 28, 2015 disclosure (which is not an alleged corrective disclosure) had a statistically significant impact on the price of the Bradesco Preferred ADS, and elects not to offer an opinion on price impact of the information released on April 3, 2015 (which is also not an alleged corrective disclosure).[58]

25.     However, as I describe below, Dr. Hutton's opinions regarding the potential corrective disclosures are: (i) inconsistent with her own statistical analysis of May 31, 2016; (ii) based upon a fundamentally flawed analysis of March 26, 2015; (iii) based upon analyzing the wrong time period for July 28, 2016; and (iv) based on an incomplete analysis of May 20, 2015. Dr. Hutton also fails to definitively prove a lack of price impact on the two additional potentially corrective events that she identifies, March 28, 2015 and April 3, 2015.  Moreover, Dr. Hutton's conclusion regarding the potential corrective disclosure dates relies upon making a series of loss causation arguments that are both unreliable and, to my understanding, premature at this stage of litigation.

---

[56] Hutton Report ¶¶ 96 and 98.

[57] Hutton Report ¶¶ 17(b), 97, and 128.

[58] Hutton Report ¶ 18.

i.   **MAY 31, 2016**

26.   There is strong evidence of price impact on May 31, 2016.  First and foremost, Dr. Hutton observes a statistically significant price decline at the 95% confidence level or greater on May 31, 2016 according to her Baseline Model, regardless of which event window she analyzes.[59]  I also observe a statistically significant price decline at the 95% confidence level on this day, according to the event study I described in my Report.[60]  Second, while Dr. Hutton argues that "it is more likely" that the price movement on this day is unrelated to the alleged fraud,[61] her assertion is purely speculative and does not prove a lack of price impact.  Finally, Dr. Hutton's speculative linking of this event with a price increase a year after the Class Period is an unreliable and premature loss causation argument.

27.   During trading hours on May 31, 2016, Bradesco's then CEO Trabuco, as well as Defendant Angelotti and another Bradesco executive, was formally indicted by Brazilian authorities on multiple counts of criminal corruption stemming from the Operation Zealots investigation.[62]  Dr. Hutton acknowledges that this news came out during market hours:

> Based on my review of the information released on May 31, 2016, I find that, at 2:02PM ET (during market hours), the Brazilian publication *O Estado* reported that Bradesco's CEO, Mr. Trabuco, and two other Bradesco executives were indicted as part of the Operation Zealots investigation. The *O Estado* article stated that the Brazilian Federal Police had "indicted Bradesco president [and CEO] Luiz Carlos Trabuco and two bank executives in the Zealotes Investigation that investigates the purchase of decisions at [CARF]."[63]

---

[59] Hutton Report Exhibit 13-B-1.

[60] Coffman Report § VII.F.

[61] Hutton Report ¶¶ 17(b), 97, and 128.

[62] Complaint ¶¶ 1-2.

[63] Hutton Report ¶ 114.

28.    Dr. Hutton and I both find a statistically significant price decline in the Bradesco Preferred ADSs on May 31, 2016, which provides strong evidence of price impact.  Based on the event study outlined in my Report,[64] the Banco Bradesco Preferred ADSs declined by 3.97%, after controlling for market and industry effects, which is statistically significant at the 95% confidence level with a t-statistic of -2.45.  Dr. Hutton also observes a statistically significant price decline at the 95% confidence level or greater on this day according to her Baseline Model, as well as most of the other models she tests for robustness.[65]  Because Dr. Hutton agrees that there was a statistically significance price decline on this day, she concedes that she has not rebutted price impact for May 31, 2016 on the basis of a lack of statistically significant price movement.

29.    Unable to refute the statistical evidence demonstrating that the May 31, 2016 alleged corrective disclosure affected the price of the Bradesco Preferred ADSs, Dr. Hutton asserts that the "only new purportedly corrective confirmation" that was disclosed during market hours on May 31, 2016 is that the criminal charges were brought against Bradesco's CEO and two other executives.[66]  Dr. Hutton acknowledges that this news may have provided the market with information that partially corrected the underlying fraud.[67]  While Dr. Hutton asserts that the underlying reason for the decline in price of the Bradesco Preferred ADSs *might* not be related to the fraud, she does not state this with any degree of scientific certainty, and does not opine that no portion of the price decline is attributable to the revelation of information

---

[64] Coffman Report § VII.F.

[65] Hutton Report ¶ 115 and Exhibit 13-B-1.

[66] Hutton Report ¶¶ 17(b) and 117.

[67] Hutton Report ¶¶ 17(b), 97, and 128 ("While I cannot exclude the possibility that the observed firm-specific price decline of the Bradesco PADS on May 31, 2016 could be related to the market's heightened perception of risks of negative outcomes for Bradesco from the investigation…").

pertaining to the facts that Defendants misrepresented and concealed in the alleged misstatements/omissions.[68]

30. Dr. Hutton suggests that Mr. Trabuco's potential departure as a result of the criminal charges is "confounding" information instead of "corrective" information even though she herself draws a clear causal link between the underlying wrongdoing, the potential departure, and the acknowledged price impact that results.[69] In my opinion, this is clearly corrective information. I am aware of no loss causation principle (and Dr. Hutton cites no authority for her position) that would allow one to conclude with any certainty that this information was confounding, particularly because Mr. Trabuco's indictment is *precisely* what would have led investors to question his tenure with the Company at the time and the impact it might have on the Company's future cash flows. Moreover, Dr. Hutton's questions as to whether investors were concerned with Trabuco's tenure with Bradesco overlook the simultaneous indictment of other high-level Bradesco executives, namely Angelotti and Abreu. Regardless, at a minimum, this is a detailed loss causation question, which I understand is premature to resolve at this stage of litigation.[70]

31. Dr. Hutton notes that after market hours on June 13, 2017, the criminal complaint filed against Mr. Trabuco was dismissed.[71] This is nearly one year after the Class Period ended.

---

[68] Hutton Report ¶¶ 17(b), 97, and 128 ("it is *more likely* that the price movement is substantially related to uncertainty around Mr. Trabuco's continued tenure as Bradesco's CEO *because of the criminal charges against him*…" (emphasis added).

[69] Hutton Report ¶¶ 17(b), 97, and 128. Hutton Deposition 257:8-17.

[70] Dr. Hutton conceded during the Hutton Deposition that she is analyzing whether there is a causal connection between the corrective disclosure and the alleged fraud, which is a loss causation analysis. *See* Hutton Deposition 239:14-18 ("Q. And you then go on to analyze whether there's a causal connection between the disclosure of that new information and the alleged fraud. Isn't that accurate? A. That's accurate.").

[71] Hutton Report ¶ 118.

Nevertheless, Dr. Hutton asserts that the finder of fact should consider this partially (but not fully) offsetting event.[72] This is yet another unreliable and premature loss causation argument.

32. Specifically, Dr. Hutton states:

> The fact that the abnormal price increase of the Bradesco PADS following the dismissal of criminal charges against Mr. Trabuco on June 14, 2017 approximately offsets the abnormal price decline on May 31, 2016 when the criminal charges against him were announced suggests that the price movement observed on May 31, 2016 is likely substantially associated with uncertainty about Mr. Trabuco's tenure as Bradesco CEO because of the criminal charges against him.[73]

33. Even if Dr. Hutton were correct that the market price movement on June 14, 2017 is relevant at all, it would only apply to Class Members who continued to hold their shares for over a year beyond the May 31, 2016 corrective disclosure. Moreover, she has no basis to draw any conclusion about how much of the price increase on this day relates to Mr. Trabuco's tenure versus a reassessment of the underlying wrongdoing. Her linking of these events is pure speculation as to loss causation issues, and in no way proves a lack of price impact as of May 31, 2016.

34. Dr. Hutton's analysis of whether May 31, 2016 and June 14, 2017 were collectively statistically significant assumes the outcome of a loss causation analysis and ignores the fact that many Class Members would have sold their shares before this potentially offsetting event, and therefore were still impacted. Thus, such an analysis is not relevant to a determination of price impact and Dr. Hutton fails to prove a lack of price impact on this basis.

35. There is undeniably a statistically significant price decline in the Banco Bradesco Preferred ADSs on May 31, 2016 in response to clearly corrective information, and Dr. Hutton

---

[72] Hutton Report ¶ 120.

[73] Hutton Report ¶ 120.

has not demonstrated that the price decline on this day is unrelated to the fraud. Taken together, this is strong evidence of price impact on May 31, 2016.

### ii. MARCH 26, 2015

36. Dr. Hutton's analysis of March 26, 2015 is fundamentally flawed. The Complaint states that the alleged corrective information on March 26, 2015 is that:

> …MPF [the Federal Police and Federal Prosecutor] announced the ongoing Operation Zealots investigation. This announcement disclosed for the first time that the MPF was conducting an investigation into allegations of bribery related to certain CARF proceedings, and that the MPF's investigation had uncovered facts demonstrating that numerous companies, including Brazilian banks, had sought to bribe and/or bribed public officials, including CARF members, in exchange for favorable tax rulings.[74]

37. As Dr. Hutton describes, there was a news article written in Portuguese in Brazil before the market open on March 26, 2015 that disclosed the existence of Operation Zealots.[75] The investigation was widespread and involved at least 70 Brazilian firms in a number of industries, which Dr. Hutton acknowledges was alleged in the Complaint and does not dispute.[76] As such, unlike a typical alleged corrective disclosure where the corrective information concerns the defendant company only such that it makes sense to control for market-wide and industry-specific price movements, in this unique circumstance where many Brazilian firms are implicated, such a procedure controls for the fraud itself and does not provide a reliable

---

[74] Complaint ¶ 186.

[75] "PF faz operação contra desvios na Receita Federal," *O Estado,* March 26, 2015, 6:26 AM; Hutton Report ¶ 100. ("Based on my review of the information released on March 26, 2015, I find that, at 6:26 AM ET (before market open), the Brazilian publication *O Estado* reported on the revelation of Operation Zealots.").

[76] Hutton Report ¶ 99 ("According to Plaintiff, on March 26, 2015, "the Federal Police publicly disclosed certain information concerning the ongoing Operation Zealots investigation to the public," including that "seventy industrial, agricultural, civil engineering and financial companies, including banks, were under investigation for bribing CARF members to obtain favorable rulings that reduced or waived the tax amounts these companies owed.").

benchmark for evaluating price impact on this specific day.[77,78]  Indeed, within 90 minutes of the

market opening on March 26, 2015, the market price of the Banco Bradesco Preferred ADSs had

fallen by 3.28% compared to the price at the close on the previous trading day.[79]  The close-to-

close return on this day was -2.90%.[80]  If this were an abnormal return, this price movement

would be statistically significant under either Dr. Hutton's Baseline Model or the event study

described in my Report.[81]  Therefore, because the corrective information confounds the

"independent" variables in the wake of this event, one cannot establish a lack of price impact by

controlling for those indices.

38.    Indeed, one way to evaluate whether this fundamental problem in her analysis is

capable of masking price impact is to compute the expected return and abnormal return from her

model, excluding the tainted indices on this day.[82]  **Table A** below demonstrates the results of

---

[77] One of the most basic assumptions in a regression model is that there is no correlation between the error term and the independent variable (*See*, for example, Gujarati, Damodar N., *Basic Econometrics*, Third Edition, 1995, p. 65.). In the context of her event study, Dr. Hutton is using the error term (i.e., the abnormal return) to evaluate price impact of corrective information.  But if the corrective information is also directly impacting her "independent" variables, then they are correlated and no longer "independent", thus violating this basic assumption of regression.

[78] In performing my analyses to determine whether the market for Bradesco Preferred ADSs was efficient during the Class Period, I was not evaluating the price impact of this specific information.  Therefore, the lack of statistical significance on March 26, 2015 according to the event study I described in the Coffman Report (§ VII.F) cannot be interpreted as evidence that the disclosure of Operation Zealots did not have an impact on the price of Banco Bradesco Preferred ADSs.  The proper method for analyzing price impact (which was not the purpose of the Coffman Report) would consider the extent to which the controls used could be masking any price impact. Likewise, Dr. Hutton's reference to my deposition testimony (Hutton Report fn 173) is misleading because I was not asked specifically about whether there was evidence of price impact on March 26, 2015.  Instead, I was only asked whether the event study model outlined in the Coffman Report showed a statistically significant result on this day (after controlling for the indices included in my model).

[79] Based on the closing price of Banco Bradesco Preferred ADSs according to S&P Capital IQ and intraday trades according to TICK data.

[80] Based on the closing price of Banco Bradesco Preferred ADSs according to S&P Capital IQ.

[81] Coffman Report § VII.F.

[82] To be clear, I am not suggesting that the control variables in her Baseline Model are generally inappropriate for evaluating statistical significance where the news is specific to Banco Bradesco.  I am suggesting that the inclusion of the Brazilian indices in the computation of the expected return and abnormal return in the wake of the announcement of Operation Zealots is inappropriate because the nature of the news is no longer firm-specific.

Dr. Hutton's Baseline Model for the close-to-close return on March 26, 2015 and March 27, 2015.[83] Note that on March 26, 2015 she finds a positive 0.70% abnormal return and concludes this event is not statistically significant. But this is entirely based upon concluding that there was an "expected return" of -3.60%. As one can see, under the "Observed Returns", there was a -1.99% return for the "Industry Index",[84] which includes other Brazilian banks that were suspected of being caught up in Operation Zealots.

| | **Table A** Dr. Hutton Close-to-Close Baseline Model | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Observed Returns | | | | Coefficients | | | | Statistics | | | | |
| Date | Bradesco | Market | Industry [(1)] | Country [(1)] | Market | Industry | Country | Constant | Expected Return | Abnormal Return | t-Statistic | P-Value | Significance Level [(2)] |
| 3/26/2015 | -2.90% | -0.24% | -1.99% | -0.13% | 1.16 | 1.46 | 0.81 | (0.003) | -3.60% | 0.70% | 0.58 | 0.56 | |
| 3/27/2015 | -3.78% | 0.23% | -0.50% | -0.98% | 1.16 | 1.46 | 0.81 | (0.003) | -1.57% | -2.22% | (1.82) | 0.07 | * |
| Cumulative | | | | | | | | | | -1.53% | (0.89) | 0.38 | |

Notes:
(1) Orthogonalized returns. *See* Hutton Appendix D fn 41.
(2) * denotes statistical significance at the 90% confidence level or greater and *** denotes statistical signifiance at the 99% confidence level or greater.

39. **Table B** recomputes the expected return, abnormal return, and level of statistical significance if one assumes the observed returns for the Brazilian indices that were tainted by Operation Zealots were zero (note that I am not setting the "Market Index" of the S&P 500 to zero since that would not be tainted in a material way by Operation Zealots). This is equivalent to assuming that the announcement of Operation Zealots was responsible for the movement in those indices.

---

[83] Table A and Table B are based on and back-up materials provided by Dr. Hutton to counsel for Lead Plaintiff that Dr. Hutton claims to have considered in connection with her analyses.

[84] Dr. Hutton orthogonalizes the returns of the Industry Index and Country Index used in her model. -1.99% return for the Industry Index is the abnormal return of the Industry Index compared to the S&P 500. *See* Hutton Appendix D fn 41.

**Table B**
Modified Dr. Hutton Close-to-Close Baseline Model

| | Observed Returns | | | | Coefficients | | | | Statistics | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Bradesco | Market | Industry [1] | Country [1] | Market | Industry | Country | Constant | Expected Return | Abnormal Return | t-Statistic | P-Value | Significance Level [2] |
| 3/26/2015 | -2.90% | -0.24% | 0.00% | 0.00% | 1.16 | 1.46 | 0.81 | (0.003) | -0.59% | -2.31% | (1.90) | 0.06 | * |
| 3/27/2015 | -3.78% | 0.23% | 0.00% | 0.00% | 1.16 | 1.46 | 0.81 | (0.003) | -0.04% | -3.74% | (3.08) | 0.00 | *** |
| Cumulative | | | | | | | | | | -5.97% | (3.47) | 0.00 | *** |

Notes:
(1) Orthogonalized returns. *See* Hutton Appendix D fn 41.
(2) * denotes statistical significance at the 90% confidence level or greater and *** denotes statistical signifiance at the 99% confidence level or greater.

40.    The results above show that removing the impact of the tainted indices implies that Banco Bradesco had a negative return on March 26, 2015 that was statistically significant at the 90% confidence level. There was also a negative statistically significant return at the 99% confidence level on March 27, 2015, the first day the market could react to English-language reporting in the United States of Operation Zealots.[85] Taken together, there was an abnormal decline of -5.97% over the two-day window, which is statistically significant at the 99% confidence level. This clearly demonstrates that Dr. Hutton's use of tainted indices on these days is driving her purported finding of a lack of price impact.

41.    While Dr. Hutton (correctly) testified that the removal of the indices from the calculation of the expected return might introduce additional confounding factors into the analysis, the extent to which those factors matter is a detailed loss causation question.[86] What is clearly wrong, however, is to conclude there is a lack of price impact based on the use of tainted indices. Dr. Hutton cannot deny that the market price of Banco Bradesco Preferred ADSs fell in

---

[85] Hutton Report fn 193.

[86] Hutton Deposition 67:10-18.

26

excess of 6% over the two days following the disclosure of Operation Zealots,[87] and has already concluded that she performed no analyses to determine whether her "independent" variables were impacted by the very news she is trying to evaluate.[88]

42. Dr. Hutton's conclusions with respect to the disclosure of Operation Zealots is also entirely dependent on her non-standard use of very narrow time windows. As Dr. Hutton notes, I find a statistically significant price decline on March 27, 2015 *even with* the tainted industry controls when using the standard daily event window[89] following the first English-language reporting of Operation Zealots in the United States.[90] Under Dr. Hutton's Baseline Model, she finds that there is a negative return that is statistically significant (even with her tainted indices) at the 92.9% level when looking over the same time period.[91]

43. In other words, Dr. Hutton's conclusions with respect to the disclosure of Operation Zealots depend entirely upon the following: (1) using tainted indices, (2) using non-standard event windows, (3) selecting her regression specification over mine, and (4) assuming that the return on March 27, 2015 is irrelevant. On this last point, even in an efficient market, it is entirely reasonable for the market to take two days to fully impound unexpected information that on the first day was only reported in foreign language news sources at a time when the market

---

[87] The raw return from market close on March 25, 2015 to market close on March 27, 2015 was -6.57% according to S&P Capital IQ and the data and back-up materials provided by Dr. Hutton to counsel for Lead Plaintiff that Dr. Hutton claims to have considered in connection with her analyses.

[88] Hutton Deposition 69:6-17 and 71:8-16.

[89] Evaluating the price response in at least a full day window is the standard event study approach in securities litigation and in the academic literature. *See* footnote 114, *supra.*

[90] Hutton Report Exhibit 11-B-2 (showing a p-value of less than .05 under my close-to-close model).

[91] Hutton Report Exhibit 11-B-2 (showing a p-value of 0.071, which translates to a confidence level of 1 minus the p-value, or roughly 93%). *See also* Hutton Deposition 222:19-223:8.

was not expecting company-specific news.[92]  Indeed, Dr. Hutton herself testified that republished

news in a new country might require looking at multiple days.[93]  Taken together, in the two days

immediately following the disclosure of Operation Zealots, the market price of Banco Bradesco

Preferred ADSs fell by 6.57%.  While Dr. Hutton's Baseline Model implies this return is not

statistically significant, this result is driven entirely by the use of tainted indices, using non-

standard event windows, and ignoring the different context in which the information was

revealed.

### iii.    JULY 28, 2016

44.    Dr. Hutton fails to establish a lack of price impact on July 28, 2016 because she

incorrectly identifies when the corrective information was first publicly-available and ignores

that there may have been additional corrective information provided during a press conference

later in the day.  Dr. Hutton claims that the alleged corrective information was released during

market hours on July 28, 2016:

> The alleged corrective disclosure (which I understand was the Brazilian
> court's acceptance of the criminal complaint against the Bradesco
> executives) was released one hour and forty minutes into the trading day at
> 11:10 AM ET on July 28, 2016.[94]

---

[92] *See*, for example, Tabak, David, et. al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003.

[93] Hutton Deposition 181:17–183:3 ("So again, what could cause the information to be important to investors is the extent to which the context in which they're receiving the information is changing. . . When there's another statement released – or the same statement is filed in another form, in another country, is it contextually different? Is it possible that something shifted so that the [market's perception of the probability of wrongdoing] is affected again?  I don't expect that if they are completely repetitive that – if they're completely repetitive and there's not been much context changed, but if – if there is a context change or there's a sense in which they're somehow providing different information, then I need to examine both of these dates.").

[94] Hutton Report ¶¶ 17(c) and 98.

45.    Dr. Hutton then states that she would expect the alleged corrective disclosure to be reflected in the price of the Bradesco Preferred ADSs over the "event-to-close" period, i.e., from 11:10 AM ET to 4:00 PM ET on July 28, 2016."[95]  Dr. Hutton observes a statistically significant price decline at the 91% confidence level according to her Baseline Model over this event-to-close window on July 28, 2016.[96]  Academic literature in financial economics routinely draws inferences from studies that demonstrate significance at the 90% confidence level or greater.[97]

46.    Even still, Dr. Hutton's analysis is wrong.  First, she fails to consider that the decision accepting the criminal charges was signed by a Brazilian Federal judge and released to the public the day prior at 6:34 PM ET on July 27, 2016.[98]  In other words, the alleged corrective information was made publicly available more than 16 hours before 11:10 AM ET on July 28, 2016, when Dr. Hutton begins her analysis.  Yet, Dr. Hutton assumes that the market could only react to this news after the first newspaper article discussing the decision was published, and she ignores the potential impact the public release of the decision could have had on the price of Banco Bradesco Preferred ADSs prior to 11:10 AM ET on July 28, 2016.  Dr. Hutton testified that she did not incorporate the filing of the decision on July 27, 2016 into her analysis.[99]  As shown in **Exhibit 1**, the price of the Bradesco Preferred ADSs declined from 6:34 PM ET on

---

[95] Hutton Report ¶ 131.

[96] Hutton Report Exhibit 14-B.

[97] DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Methods for Investment Analysis,* 292 (2001).

[98] The decision was signed by Federal Judge Vallisney de Souza Oliveira on July 27, 2016.  *See* https://www.conjur.com.br/dl/justica-federal-recebe-denuncia.pdf. The Federal Court in Brazil has an online system that is publicly available.  A chronological report of the case indicates that the decision was released at 7:34:33 PM Brasilia Time, which is 6:34:33 PM Eastern Time. *See* the "Inteiro Teor [Full Content]" tab at https://processual.trf1.jus.br/consultaProcessual/processo.php?proc=0037645-54.2015.4.01.3400&secao=DF&pg=1&enviar=Pesquisar.

[99] Hutton Deposition 277:19-24.

29

July 27, 2016 to 11:10 AM ET on July 28, 2016, yet Dr. Hutton does not include this in her analysis of price impact on this day, which is unreliable.

47.     Second, Dr. Hutton fails to consider that a press conference held later in the day may have contributed to the decline in the price of the Bradesco Preferred ADSs.  At 2:00 PM ET on July 28, 2016, the Brazilian federal police held a press conference to discuss the judge's acceptance of the complaint and Operation Zealots.[100]  Dr. Hutton acknowledges the timing of this press conference with Federal Police.[101]  Yet, she does not consider that the information released during the press conference, which was related to the alleged fraud, could have contributed to the decrease in the Bradesco Preferred ADSs on July 28, 2016.[102]  Indeed, as shown in **Exhibit 1**, the price of the Bradesco Preferred ADSs declined shortly after 2:00 PM ET, when the press conference began.

48.     I understand that before market hours on July 28, 2016, Banco Bradesco announced financial results for the second quarter of its fiscal year 2016.[103]  Dr. Hutton claims that there is a possibility that additional detail regarding this earnings announcement could obscure the price movement resulting from the alleged corrective information released on July 28, 2016.[104]  Indeed, an analyst report that she cites in the Hutton Report[105] explicitly states that the alleged

---

[100] "A Whisper in a Crowded Room," *Brasil Plural*, July 28, 2016, (emphasis added).

[101] Hutton Report ¶ 131.

[102] Hutton Deposition 280:2-283:17.

[103] "Brazil's Banco Bradesco 2Q Net BRL4.13B Vs. BRL4.47 Bln," *Dow Jones,* July 28, 2016, 5:57 AM and "Press Release: Banco Bradesco 1Q16 Results," *Dow Jones,* July 28, 2016, 8:24 AM.  The title of this press release states 1Q16 Results; however, this was an earnings announcement for 2Q16 as evidenced by the results reported in the press release, the subsequent conference call, and the Company presentation that accompanied the conference call. *See* "FQ2 2016 Earnings Call Transcripts," S&P Capital IQ, July 29, 2016 and accompanying Bradesco presentation obtained from S&P Capital IQ titled "Bradesco 2Q16 Earnings Results".

[104] Hutton Report ¶ 137.

[105] Hutton Report ¶ 135 and Exhibit 14-E.

corrective information overshadowed the earnings announcement, which the analyst viewed as positive:

> Overall, we view Bradesco's 2Q results more on the positive side…**But the results are being overshadowed by news today that an investigation by the Zelotes, the Brazilian federal police, has indicted three top Bradesco executives.** Between the results and the news flow, the stock has fallen 3-4% in trading. According to reports, the police will hold a press conference to discuss the case today at 15:00, Brazil time.[106]

49. While I understand that any impact from the alleged corrective information could be confounded by this contemporaneous earnings announcement, Dr. Hutton has not scientifically established that the Brazilian judge's acceptance of criminal charges against Mr. Trabuco and other Bradesco executives as well as the press conference held in the afternoon did not impact the price of Bradesco Preferred ADSs on July 28, 2016. In fact, the results of Dr. Hutton's Baseline Model beginning at market close on July 27, 2016, before the decision was signed, and ending at market close on July 28, 2016, after the press conference, indicate a statistically significant price decline at the 95% confidence level.[107] Coupled with the fact that this news potentially overshadowed the earnings announcement as discussed above, this statistically significant price decline is evidence of price impact, and there is certainly no basis for Dr. Hutton's opinion that she has proven a lack of price impact.

### iv. MAY 20, 2015

50. On May 20, 2015, Plaintiff alleges that additional corrective information was released when the Brazilian Federal Police announced they would divide up and prioritize certain

---

[106] "A Whisper in a Crowded Room," *Brasil Plural,* July 28, 2016.

[107] Hutton Report Exhibit 14-B.

investigations within Operation Zealots.[108]  Dr. Hutton concludes that there was no price impact

from this event based on not finding a statistically significant price response from the specific

time of this event until the close of the market on May 20, 2015.[109]  She also states that she does

not find a statistically significant price response at the 95% confidence level from the close on

May 20, 2015 to the open on May 21, 2015;[110] though she does observe a statistically significant

price movement at the 94.8% confidence level.[111]  In addition, Dr. Hutton demonstrates that

according to my event study model, the price movement from close on May 20, 2015 to open on

May 21, 2015 is statistically significant at greater than the 95% confidence level.[112]

Furthermore, Dr. Hutton ignores that both her Baseline Model as well as my model show a

statistically significant price reaction from the close of the market on May 20, 2015 to the close

on May 21, 2015 at the 95% confidence level or greater.[113]  Therefore, her opinion is entirely

dependent on ignoring a statistically significant price movement on the day following the release

of the alleged corrective disclosure.  As discussed above, it is not unusual for the market to take

more than a day to fully impound corrective information and looking at the price response of at

least a full day is the standard event study approach in securities litigation and in the academic

---

[108] Complaint ¶ 14.

[109] Hutton Report ¶ 112.

[110] Hutton Report fn 206.

[111] Hutton Report Exhibit 12-B-2 and Hutton Deposition 228:22-230:1.  Academic literature in financial economics routinely draws inferences from studies that demonstrate significance at the 90% confidence level or greater. *See,* for example, DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Methods for Investment Analysis,* 292 (2001).

[112] Hutton Report Exhibit 12-B-2.

[113] Hutton Report Exhibit 12-B-2.

literature.[114]  Thus, Dr. Hutton's analysis of the alleged corrective information released on May 20, 2015 is incomplete and unreliable, and she fails to prove a lack of price impact.

### v.    MARCH 28, 2015 AND APRIL 3, 2015

51.    In addition to the alleged misstatements and the alleged corrective disclosures, Dr. Hutton analyzes the price movements of the Bradesco Preferred ADSs on two additional dates, March 28, 2015 and April 3, 2015, when "Plaintiff contends that Brazilian news sources released information about the alleged scheme that was the subject of Operation Zealots."[115]  Dr. Hutton's only opinion as to these dates is that she finds no empirical evidence to support the conclusion that the information released on March 28, 2015 had a statistically significant impact on the price of the Bradesco Preferred ADSs.[116]  She elects not to offer any opinion on price impact of the information released on April 3, 2015.[117]

52.    Neither of these two dates was alleged in the Complaint as a partial disclosure of the relevant truth concealed by the alleged misrepresentations and/or omissions.  Dr. Hutton also acknowledges that these dates were not pled in the Complaint for purposes of loss causation.[118] Dr. Hutton has not ruled out the possibility of price impact on the Banco Bradesco Preferred ADSs from information released on these two days that she herself identified as being potentially

---

[114] *See,* for example, Tabak, David, et. al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003; Fama, Eugene F. "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, No. 5 (1991) p. 1607 ("The cleanest evidence on market-efficiency comes from event studies, especially event studies on *daily returns*" (emphasis added)); and Francis, Jennifer, et. al., "The Stock Market Response to Earnings Announcements Released During Trading versus Nontrading Periods," *Journal of Accounting Research,* Volume 30, No. 2 (Autumn 1992) pp. 165-184 at p. 166 ("We find no evidence that investors' opening trades reflect overnight announcement information. Price and volume reactions begin soon after the open and continue through the following day's open.").

[115] Hutton Report ¶ 137.

[116] Hutton Report ¶ 146.

[117] Hutton Report ¶ 149.

[118] Hutton Report ¶¶ 18(a), 18(b), 138, and 139.

corrective.  Notably, Dr. Hutton does not even assert how she expects that the price of the

Bradesco Preferred ADSs should have moved on these two dates.  Dr. Hutton explains she would

expect the alleged misstatements and alleged corrective disclosures to be associated with price

increases and price decreases, respectively.[119]  However, she sets no such clear expectation for

either March 28, 2015 or April 3, 2015.  Thus, her opinion that the information released on

March 28, 2015 did not cause a statistically significant price decline is meaningless because she

does not opine on how the price should have moved on this day.

54.    Regardless, even if Dr. Hutton were able to successfully prove a lack of price

impact on these two dates that she views as consistent with the alleged corrective disclosures,

which she has not, any such conclusion would not be sufficient to conclude that Banco

Bradesco's Preferred ADS prices were unaffected by the alleged fraud.  As discussed above,

there is strong evidence of price impact in this matter, irrespective of the price movements

associated with the information released on March 28, 2015 and April 3, 2015.

## V.    DR. HUTTON DOES NOT DISPUTE THE CLASS-WIDE DAMAGES METHODOLOGY

54.    In the Coffman Report, I claimed that damages in this matter could be calculated

subject to a class-wide formula and described the common and well-accepted method for

computing damages in a Rule 10(b)-5 matter such as this.  In particular, I stated:

> the standard and well-settled formula for assessing damages for each class
> member under Section 10(b) is the "out-of-pocket" method which measures
> damages as the artificial inflation per share at the time of purchase less the
> artificial inflation at the time of sale (or, if the share is not sold before full
> revelation of the fraud, the artificial inflation at the time of purchase, subject
> to the PSLRA's "90-day lookback" provision, a formulaic limit on damages
> that also can be applied class-wide).[120]

---

[119] Hutton Report ¶¶ 16 and 17.

[120] Coffman Report ¶ 83.

Case 1:16-cv-04155-GHW Document 165-2 Filed 12/14/18 Page 36 of 51

55.     In addition, I stated that the methodology and evidence for measuring the artificial inflation per share in the market price on each day during the Class Period is also common to all Class Members and the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to the alleged corrective disclosures.[121]

56.     Dr. Hutton does not dispute the damages methodology I described in my Report let alone address damages in the Hutton Report.  Thus, there is no dispute that damages in this action are subject to a well-settled, common methodology that can be applied to all Class Members consistent with Lead Plaintiff's liability theory and there is no dispute the event study methodology is a reliable approach to isolate the price impact of new company-specific information for a given security, and thus, help identify the artificial inflation per share.

57.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Chad Coffman

Executed on December 14, 2018

---

[121] Coffman Report ¶ 84.



**Exhibit 1**
**Banco Bradesco Preferred ADS Intraday Price and Volume[1]**
**7/27/2016 - 7/28/2016**

Notes:
(1) Intraday data obtained from TICK. Price and volume are adjusted to reflect all stock splits that have occurred through August 2018 according to S&P Capital IQ.
(2) "Inteiro Teor [Full Content]" tab at https://processual.trf1.jus.br/consultaProcessual/processo.php?proc=0037645-54.2015.4.01.3400&secao=DF&pg=1&enviar=Pesquisar.
(3) Dr. Hutton claims the alleged corrective information was released at 11:10 AM. *See* Hutton Report ¶ 130.
(4) Hutton Report ¶ 131 and "A Whisper in a Crowded Room," *Brasil Plural*, July 28, 2016.

# Appendix A
# Documents Considered

## Prior Reports in this Matter

- Expert Report of Chad Coffman, CFA, dated October 11, 2018, including all data and documents included in Appendix A of that report.
- Expert Report of Amy Hutton, PhD, dated November 9, 2018, including all data, analyses, and back-up materials provided by Dr. Hutton to counsel for Lead Plaintiff that Dr. Hutton claims to have considered in connection with this report.
- Corrected Report of Amy Hutton, PhD, dated November 28, 2018.

## Court Documents

- Class Action Complaint for Violations of Federal Securities Laws, filed June 3, 2016, in *William Bryan, et al., vs. Banco Bradesco S.A., et al.,* Case No. 1:16-cv-04155 (S.D. New York).
- Amended Class Action Complaint, filed October 21, 2016, *In Re Banco Bradesco S.A. Securities Litigation,* Case No. 1:16-cv-04155-GHW (S.D. New York).
- Opinion and Order filed September 29, 2017, *In re Banco Bradesco S.A. Securities Litigation,* Case No. 1:16-cv-4155-GHW (S.D. New York).
- Defendants' Memorandum of Law in Opposition to Lead Plantiff's Motion For Class Certification, filed November, 9, 2018, *In Re Banco Bradesco S.A. Securities Litigation,* Case No. 1:16-cv-4155-GHW (S.D. New York).
- Supplemental Declaration of Alana M. Longmoore, filed November 28, 2018, *In Re Banco Bradesco S.A. Securities Litigation,* Case No. 1:16-cv-04155-GHW (S.D. New York), including the Declaration of Amy Hutton, PhD, dated November 28, 2018.

## Depositions

- Deposition of Chad Coffman, CFA, October 12, 2018.
- Deposition of Amy Hutton, PhD, December 5, 2018.

## SEC Filings

- Banco Bradesco SEC filings submitted during the Analysis Period.
- Banco Bradesco SEC Form 20-F for the fiscal year ended December 31, 2003.

## Security Data

- All data referenced in Appendix A of my Report, dated October 11, 2018, for the Analysis Period.
- Data provided by Dr. Amy Hutton to counsel for Lead Plaintiff that Dr. Hutton claims to have considered in connection with Expert Report of Amy Hutton, PhD, dated November 9, 2018.

**Banco Bradesco News and Public Statements**

- Banco Bradesco earnings conference call and investor call transcripts and accompanying presentations during the Analysis Period.
- Banco Bradesco earnings, pre-announcement, and guidance update press releases during the Analysis Period.
- "PF faz operação contra desvios na Receita Federal," *O Estado,* March 26, 2015.
- "Brazil's Banco Bradesco 2Q Net BRL4.13B Vs. BRL4.47 Bln," *Dow Jones*, July 28, 2016.
- "Exclusivo: Juiz aceita denúncia contra presidente do Bradesco, Luiz Carlos Trabuco, por esquema no Carf," *O Estado,* July 28, 2016.

**Banco Bradesco Analyst Reports**

- Banco Bradesco analyst reports supplied by Investext via Thomson Reuters for the Analysis Period.
- "A Whisper in a Crowded Room," *Brasil Plural,* July 28, 2016.

**Academic Articles**

- DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Methods for Investment Analysis,* 292 (2001).
- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance,* Vol. 46, No. 5 (1991).
- Francis, Jennifer, et. al., "The Stock Market Response to Earnings Announcements Released During Trading versus Nontrading Periods," *Journal of Accounting Research,* Volume 30, No. 2 (Autumn 1992).
- Gujarati, Damodar N., *Basic Econometrics,* Third Edition, 1995.
- Tabak, David, et. al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003.

**Other**

- https://www.conjur.com.br/dl/justica-federal-recebe-denuncia.pdf
- https://processual.trf1.jus.br/consultaProcessual/processo.php?proc=0037645-54.2015.4.01.3400&secao=DF&pg=1&enviar=Pesquisar

## APPENDIX B

### CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:           (312) 470-6500
Mobile:          (815) 382-0092
Email:           ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats. MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 41 of 51
Case 1:16-cv-04155-GHW Document 105-2 Filed 12/14/18 Page 41 of 91

Chad Coffman
Page 2 of 12

    **B.A.**    Knox College, 1995
        Economics, Magna Cum Laude
        Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
        Supply Pricing: Using Galesburg, Illinois as a Case Study"
        Dean's List Every Term
        Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  - In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  - Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 42 of 51
Case 1:16-cv-04155-GHW Document 165-2 Filed 12/14/18 Page 42 of 91
Chad Coffman
Page 3 of 12

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed expert rebuttal report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2011.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 43 of 51
Case 1:16-cv-04155-GHW Document 165-2 Filed 12/14/18 Page 43 of 51

Chad Coffman
Page 4 of 12

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010. Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD)</u>, <u>United States District Court for the Southern District of New York</u>. Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>. Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 44 of 51
Case 1:16-cv-04155-GHW Document 165-2 Filed 12/14/18 Page 44 of 51

Chad Coffman
**Page 5 of 12**

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 45 of 51
Case 1:16-cv-04155-GHW Document 185-2 Filed 12/14/18 Page 45 of 51

Chad Coffman
Page 6 of 12

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015. Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 46 of 51
Case 1:16-cv-04155-GHW Document 185-2 Filed 12/14/18 Page 46 of 51
Chad Coffman
Page 7 of 12

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC,</u>

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 47 of 51
Case 1:16-cv-04155-GHW Document 185-2 Filed 12/14/18 Page 47 of 91

Chad Coffman
Page 8 of 12

United States District Court for the Southern District of New York. Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts.</u> Filed expert report March 6, 2017.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 48 of 51
Case 1:16-cv-04155-GHW Document 169-2 Filed 12/14/18 Page 48 of 51

Chad Coffman
Page 9 of 12

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert rebuttal report May 19, 2017. Deposition July 20, 2017. Filed expert report September 14, 2017.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 49 of 51
Case 1:16-cv-04155-GHW Document 165-2 Filed 12/14/18 Page 49 of 51
Chad Coffman
Page 10 of 12

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018.

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 50 of 51
Case 1:16-cv-04155-GHW Document 185-2 Filed 12/14/18 Page 50 of 51

Chad Coffman
Page 11 of 12

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>. Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation. Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

      KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
      KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)


**PUBLICATIONS:**

      Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

      Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities,"

Case 4:21-cv-02473 Document 68-7 Filed 03/15/24 in TXSD Page 51 of 51
Case 1:16-cv-04155-GHW Document 105-2 Filed 12/14/18 Page 51 of 51

Chad Coffman
Page 12 of 12

*Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

    Associate Member CFA Society of Chicago
    Associate Member CFA Institute
    Phi Beta Kappa

**AWARDS:**

    1994  Ford Fellowship Recipient for Summer Research.
    1993  Arnold Prize for Best Research Proposal.
    1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.