# Case No. 5

In re Chicago Bridge & Iron Company N.V. Securities Litigation, Not Reported in Fed....

---

**H** KeyCite history available

2019 WL 5287980
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE CHICAGO BRIDGE & IRON
COMPANY N.V. SECURITIES
LITIGATION

17 Civ. 01580 (LGS)
|
Related Cases: 17 Civ. 02414 (LGS), 17 Civ. 04251
(LGS), 18 Civ. 09927 (LGS), 18 Civ. 09928 (LGS)
|
Signed 10/16/2019
|
Filed 10/18/2019

SPECIAL MASTER REPORT AND
RECOMMENDATION REGARDING CLASS
CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVES AND CLASS COUNSEL

Shira A. Scheindlin, Special Master

**TABLE OF CONTENTS**

**\*1** I. FACTUAL BACKGROUND...——

II. DISPUTED ISSUES...——

III. LEGAL PRINCIPLES...——
A. Adequacy...——

B. Typicality...——

C. Predominance...——

IV. DISCUSSION...——
A. Adequacy...——

B. Typicality...——

C. Predominance...——

1. Plaintiffs' Argument...——

2. Defendants' Argument...——

3. Methodology...——

a. Statistical Significance Threshold...——

b. Holm-Bonferroni Adjustment...——

i. Regression Models...——

ii. Multiple Comparison Adjustments...——

iii. Application of the Holm-Bonferroni Adjustment in Securities Fraud Cases...——

4. Front-End and Back-End Price Impact Principles...——

a. Front-End Impact...——

b. Back-End Impact...——

i. Corrective Disclosures and Price Maintenance...——

ii. Corrective Disclosures and Newness...——

iii. Corrective Disclosures and "Correctiveness"...——

5. Misrepresentations...——

6. Corrective Disclosures...——

a. Corrective Disclosure #1...——

b. Corrective Disclosure #2...——

c. Corrective Disclosure #3...——

d. Corrective Disclosure #4...——

e. Corrective Disclosure #5...——

f. Corrective Disclosure #6...——

g. Corrective Disclosure #7...——

7. Class Period...——

V. CONCLUSION...——

Pursuant to the June 27, 2019 Order of the Court, the Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel ("Motion") was referred to the Special Master for a Report and Recommendation. Accordingly, the Special Master reviewed all of the submissions in support of and in opposition to the Motion, including voluminous exhibits consisting primarily of competing expert reports. The Special Master then held an evidentiary hearing on September 5, 2019 ("Hearing") at which each side's expert provided testimony and counsel presented oral argument. The following constitutes the Special Master's Report and Recommendation.

## I. FACTUAL BACKGROUND

The instant case is factually complex. I am providing only a thumbnail sketch of the facts as alleged by Plaintiffs in their 97 page Consolidated Amended Complaint dated August 14, 2017 ("Complaint"). The facts summarized here are drawn from the Complaint and Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel ("Pl. Mem.").

Plaintiffs allege that Defendants — Chicago Bridge & Iron Company ("CBI"), Phillip Asherman (CBI CEO), and Ronald A. Ballschmiede (CBI CFO) — made material misrepresentations and omissions[1] regarding losses in CBI nuclear business that led to investor losses during the proposed class period (October 30, 2013 through June 23, 2015). CBI was a global provider of engineering, procurement, and construction ("EPC") services to the energy sector. In February 2013, CBI purchased The Shaw Group, Inc. ("Shaw") in order to enter the nuclear fabrication business. Shaw, together with its partner Westinghouse Electric Corporation (individually "WEC" and together with Shaw, the "Consortium"), had contracts to fabricate two nuclear reactors: Vogtle in Waynesboro, Georgia and V.C. Summer in Jenkinsville, South Carolina.[2]

[1]     Plaintiffs allege various omissions throughout the Complaint. However, during the Hearing, Plaintiffs conceded that they had not provided a list of omissions because "the misrepresentations omit information about the delays and cost overruns," and Plaintiffs "allege a misrepresentations case." Transcript of Evidentiary Hearing ("Hearing Tr.") at 618. Plaintiffs then confirmed that this is "not an omissions case." *Id.* Thus, because Plaintiffs are no longer pressing the omissions point and Defendants have conceded market efficiency, Plaintiffs no longer need to rely on the *Affiliated Ute* presumption to establish reliance. *See id.* at 619. Therefore, to the extent this Report and Recommendation addresses omissions, they will be analyzed as confirmatory misrepresentations, or half-truths.

[2]     The EPC contracts for the Vogtle plant were with Southern Company/Georgia Power and the contracts for the Summer plant were with South Carolina Electric & Gas, a subsidiary of SCANA Corporation. *See* Complaint ¶ 80.

**\*2** Plaintiffs allege that in their public filings and statements Defendants did not accurately describe their performance during the course of these projects to their investors. Plaintiffs claim that Defendants "manipulated the purchase price accounting and financial reporting for the nuclear business to inflate financial results, refused to write down goodwill even though [they] knew the business was failing, and falsely touted progress in the Nuclear Projects."[3] Plaintiffs argue that Defendants' statements were both quantitatively and qualitatively false. In the first category, Plaintiffs allege that Defendants consistently inflated their financial results by misstating both revenue and profits. They further allege that Defendants hid problems by delaying reporting any impairment of goodwill, even though "internal reports and communications acknowledged serious deterioration in the business."[4] On the qualitative side, Plaintiffs allege that Defendants "assured investors that 'things are progressing well' with the Nuclear Projects and that CBI was 'very positive' about the business, [when i]nternal communications showed the exact opposite."[5]

[3]     Pl. Mem. at 2 (citing Complaint ¶¶ 99-175).

[4]     *Id.* at 4.

[5]     *Id.* (citing Complaint ¶ 17).

Plaintiffs finally allege that Defendants' fraudulent statements and omissions were eventually revealed to investors through a series of corrective disclosures that occurred between June 11, 2014 and June 23, 2015.[6] Once

these corrective disclosures were made and absorbed by the market, Plaintiffs allege that the artificial inflation in CBI's stock price resulting from the alleged misrepresentations dissipated and Plaintiffs were injured.

6    Plaintiffs originally alleged fifteen corrective disclosures (on fourteen dates) which they subsequently reduced to seven. The last remaining alleged corrective disclosure was made on February 4, 2015.

Perhaps the most explicit summary of the alleged misrepresentations is found at paragraph 5 of the Complaint, which bears quoting in pertinent part:

Defendants: (1) falsely claimed that CBI was protected from liability arising from cost overruns on the Nuclear Projects when the Company was actually subject to substantial liability; (2) made materially false and misleading statements regarding the progress of the Nuclear Projects; (3) falsely asserted that delays in construction would have no effect on CBI's profitability; (4) hid fabrication defects and unsafe practices by CBI, including improper welding of critical nuclear modules; (5) failed to disclose a stop work order resulting from CBI's lack of safety compliance; (6) hid the fact that the Nuclear Projects had become so uneconomical for CBI that it was secretly considering giving away its share of the Nuclear Projects to cut off liability; and (7) boosted reported revenues, earnings, and assets by repeatedly violating Generally Accepted Accounting Principles ("GAAP") in multiple respects.

The Complaint sets forth two major categories of misrepresentations one of which has several subsets. The first category can be summarized as failures to comply with GAAP.[7] The second category is described in the Complaint as misrepresentations regarding change orders, delays, and cost overruns.[8]

7    See generally Complaint ¶¶ 46-54 (providing an overview of all of the GAAP violations).

8    See generally id. ¶¶ 79-98.

The first category — GAAP violations — includes several different alleged violations, and is broken down into four sub-categories. An overview of each subcategory will assist in analyzing the alleged misrepresentations and the corresponding alleged corrective disclosures.

The first sub-category is titled Contracts in Progress, Net ("CIP").[9] Following its purchase of Shaw, CBI allegedly recorded $1.2 billion (pretax) in costs and losses from underperforming construction projects acquired from Shaw as a purchase price adjustment ("PPA") to the fair value of the contracts in progress, as a net figure.[10] Plaintiffs allege that Defendants made similar PPAs to goodwill. In essence, Plaintiffs allege that by adjusting these two figures, CBI improperly inflated goodwill and shielded earnings and revenue numbers from the dramatically increased costs on construction contracts due to delays and cost overruns.[11]

9    See id. p. 19.

10    Plaintiffs note that it was not until two years after the Shaw acquisition that CBI disclosed that the reporting of "contracts in progress, net" actually included five separate balances totaling billions of dollars that should have been separately reported. See id. ¶ 52.

11    See generally id. ¶¶ 55-65.

*3 The second sub-category of alleged GAAP violations is titled Margin Fair Value Liability for Acquired Contracts (Deferred Revenue) ("MFVL").[12] Plaintiffs' allegation in this regard is that CBI recorded a margin fair value adjustment in its purchase price allocation for the acquired contracts that was less than its fair value and this violated GAAP because only fair value can be reported (not margin or profits). CBI then allegedly amortized this value into revenue over time, leading CBI to report hundreds of millions of dollars in future revenue that was "illusory" and "phantom."[13]

12    See id. p. 23.

13    Id. ¶¶ 66-68.

The third sub-category of alleged GAAP violations is titled Impaired Goodwill ("Goodwill").[14] In this section, Plaintiffs allege that CBI artificially inflated goodwill to $3.3 billion, which was $1.1 billion higher than the $2.2 billion it paid for Shaw. This means that the value of Shaw's assets was actually negative $1.1 billion. Moreover, CBI allegedly ignored various other indicators that the value of its goodwill might be overstated.[15]

14    *See id.* p. 24.

15    *See id.* ¶¶ 69-73.

The final sub-category of alleged GAAP violations is titled Unapproved Change Orders ("UCO").[16] In this section, Plaintiffs allege that CBI reported UCOs as assets and revenue which is not permitted by GAAP. Because the recovery of the costs of the UCOs was allegedly contingent rather than probable, Plaintiffs claim a GAAP violation of massive proportions — amounting to hundreds of millions of dollars of overstated revenue.[17]

16    *See id.* p. 26.

17    *See id.* ¶¶ 74-78.

The second general category of misrepresentations is the liability for change orders, delays, and cost overruns. These topics are interrelated and encompass the stop work order ("SWO"), fabrication defects, cost overruns, and safety concerns which all account for delays. Change orders fall into both the first category and the second. The accounting for change orders is a GAAP reporting problem because of the contingent aspect of whether the cost incurred by the change order would be recovered by CBI.

The use of the term change order in this second category is different. Here, the term relates to who will eventually pay for changes (the owners or the contractors) and what is defined as a change order pursuant to the EPC contracts. Plaintiffs note that even if CBI could recover for certain types of change orders outlined in the agreements, it could not be expected to recover for defective goods, the costs for uncovering CBI's defective work (fabrication defects), or work suspension as a result of SWOs resulting from CBI's acts or omissions.[18] Cost overruns, in turn, occur as a result of delays — including from SWOs, change orders, correcting defective materials, and/or addressing safety issues.

18    *See id.* ¶¶ 87-88.

There is no dispute that Plaintiffs alleged sixteen misrepresentations (on ten dates) and fifteen corrective disclosures.[19] But Plaintiffs now assert that they are only relying on seven disclosure dates that occurred between June 11, 2014[20] and February 4, 2015.[21]

19    *See* Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Def. Mem.") at 6-7 (citing Complaint ¶ 5).

20    Several of the relevant alleged disclosures occurred either at a time when the market was closed or too late in the day to have a full price impact, and thus the relevant date that the experts analyzed for a price impact was the following market day. In this case, the disclosure took place on June 11, 2014, but the alleged price impact occurred on June 12, 2014. This Report and Recommendation treats such consecutive dates, where applicable, as interchangeable for the purposes of identifying alleged disclosure dates — as do the parties. *See* Expert Report of John D. Finnerty, Ph.D. in Support of Lead Plaintiffs' Motion for Class Certification, dated February 4, 2019 ("Finnerty Rpt."), Ex. O to Declaration of Kim E. Miller in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel, ¶ 47 ("The new information is the 'event', and generally, the one-day change in the issuing company's common stock price the day the information is released into the market (or the next trading day if the information is disclosed publicly while the market is closed) indicates the stock market's assessment of the information's significance.").

21    *See* Pl. Mem. at 17-18 and Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel ("Reply Mem.") at 6. The seven corrective disclosure dates asserted by Plaintiffs are found at pages 17-18 of Plaintiffs' Memorandum of Law. These dates are: June 12, 2014; June 17, 2014; July 25, 2014; October 2, 2014; November 24, 2014; January 30, 2015 and February 4, 2015.

## II. DISPUTED ISSUES

**\*4** The prerequisites to class certification are well known and beyond dispute. The proposed class must satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure ("Rule") as well as the requirements of one or more sections of Rule 23(b). In shorthand terms the requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. Plaintiffs are proceeding only under Rule 23(b)(3), which requires

plaintiffs to prove that common questions of law or fact predominate and that a class action is superior to other methods of adjudicating the controversy.

As is often the case, Defendants do not challenge all of the class certification requirements. They do not challenge either the numerosity or commonality requirements of Rule 23(a), nor do they challenge the superiority requirement of Rule 23(b). They do, however, challenge the typicality and adequacy requirements of Rule 23(a) and the predominance requirement of Rule 23(b).

Defendants attempt to refute the predominance element by rebutting the *Basic* presumption, thus preventing Plaintiffs from establishing reliance on a class-wide basis. Courts have long recognized that if plaintiffs are required to individually prove that they relied on a given misrepresentation in purchasing or selling a defendant's stock, then individual issues of fact will predominate and class certification will almost always be defeated. Therefore, in *Basic, Inc. v. Levinson*, the Supreme Court held that where plaintiffs can establish that the market in which the defendant's stock traded was efficient, plaintiffs are entitled to the rebuttable presumption that they each relied on the integrity of the market price in reflecting public information about the defendant when they traded the stock during the class period, and thus that plaintiffs relied on defendant's misrepresentation(s) in trading the stock.[22] Here, Plaintiffs have put forth significant evidence that the market for CBI stock was efficient, and Defendants have conceded this point for the purposes of class certification.[23] Thus, Defendants' only contention with respect to reliance is that the alleged misrepresentations did not impact the price of the stock.

[22]     485 U.S. 224 (1988).

[23]     *See* Hearing Tr. at 65.

A lack of price impact would rebut the presumption that all purchasers or sellers of the stock relied on the proposition that the market price incorporated all relevant information then known about a company. If this presumption is rebutted, then every plaintiff would have to prove that he or she relied on a particular misrepresentation, and common issues would no longer predominate over individual ones.

In addition to disputing the existence of price impact, the parties dispute: (i) whether to apply a Holm-Bonferroni adjustment in their event studies in determining the significance of an abnormal return; (ii) the statistical significance percentage cutoff; (iii) the proper use of analyst reports; (iv) whether "newness" of both misrepresentations and corrective disclosures must be considered at this stage; and (v) whether "correctiveness" of disclosures must also be considered at this stage. Each of these disputes concern the ultimate issue of price impact, and are addressed more fully below.

## III. LEGAL PRINCIPLES

The Supreme Court has repeatedly endorsed the use of class actions in adjudicating claims under the federal securities laws.[24] Moreover, "the Second Circuit 'has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases.' "[25]

[24]     *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 476-77 (2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313-14, 320 n.4 (2007); *Basic,* 485 U.S. at 231.

[25]     *In re EVCI Career Colls. Holding Corp. Sec. Litig.,* 2007 U.S. Dist. LEXIS 57918, 2007 WL 2230177, at *35 (S.D.N.Y. July 27, 2007) (quoting *In re Nortel Networks Corp. Sec. Litig.,* 2003 U.S. Dist. LEXIS 15702, 2003 WL 22077464, at *2 (S.D.N.Y. Sept. 8, 2003)). *Accord Gucciardo v. Titanium Constr. Servs.,* 2017 U.S. Dist. LEXIS 109727, at *7 (S.D.N.Y. July 14, 2017) (Schofield, J.) ("[T]he Second Circuit gives Rule 23 a 'liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.' ").

**\*5** It is also true, however, that a class may not be certified unless a named plaintiff, " 'affirmatively demonstrate[s her] compliance' with Rule 23."[26] A plaintiff seeking to certify a class must "prove ... *in fact* [the] numerosity, commonality, typicality, and adequate representation" requirements of Rule 23(a).[27] A court must engage in a "rigorous" class certification analysis that may "entail some overlap with the merits of the plaintiff's underlying claim."[28]

[26]     *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 340 (2011)).

[27]     *Wal-Mart,* 564 U.S. at 349-50 (emphasis in original).

[28]     *Id.* at 351.

**A. Adequacy**

The adequacy inquiry addresses more than simply whether the interests of a purported class representative are "antagonistic" to those of the class. Courts also consider "the honesty and trustworthiness of the named plaintiff";[29] whether the named plaintiff possesses "a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation";[30] and whether a proposed class representative "could become the focus of cross-examination and unique defenses at trial, to the detriment of the class."[31] Thus class representation status may be denied where there are serious concerns about a plaintiff's credibility, diligence, and/or integrity.[32]

[29]     *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification).

[30]     *In re Lloyd's Am. Trust Fund Litig.,* 1998 WL 50211, at *11 (S.D.N.Y. Feb. 6, 1998).

[31]     *In re NYSE Specialists Sec. Litig.,* 240 F.R.D. 128, 144 (S.D.N.Y. 2007).

[32]     *See Kline v. Wolf,* 702 F.2d 400, 402-03 (2d Cir. 1983) (denying certification due to such concerns).

**B. Typicality**

To satisfy the typicality requirement, a plaintiff must show "that [her] claims are typical of the claims of the class, and that [she] is 'not subject to any unique defenses which threaten to become the focus of the litigation.' "[33] "Regardless of whether the issue is framed in terms of the typicality of the representative's claims ... or the adequacy of its representation ... there is a danger that absent class members will suffer if their representative is preoccupied

with defenses unique to it."[34]

[33]     *In re IMAX Sec. Litig.,* 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 40 (2d Cir. 2009)). *Accord Baffa v. Donaldon, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59-60 (2d Cir. 2000).

[34]     *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker,* 137 S. Ct. 1702 (2017).

**C. Predominance**

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Not all questions of fact or law must be common, but some questions must be common and must predominate over individual questions. When considering whether questions of law or fact common to class members predominate, a court must begin "with the elements of the underlying cause of action."[35] The core elements of a 10b-5 claim are well established and include: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[36]

[35]     *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*").

[36]     *Id.* at 810.

**\*6** "Predominance is a test readily met in certain cases alleging ... securities fraud...."[37] " 'Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.' "[38]

[37]     *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

[38]    *UFCW Local 1776 v. Eli Lilly and Co.,* 620 F.3d 121, 131 (2d Cir. 2010) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)).

As described in a recent Supreme Court case, *Basic* "held that investors could satisfy th[e] reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information — including material misstatements."[39] To invoke this "fraud-on-the-market" presumption, plaintiffs must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."[40]

[39]    *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 263 (2014) *("Halliburton II").*

[40]    *Id.* at 268.

The Supreme Court has also held that a defendant can rebut the presumption of reliance — assuming a plaintiff shows it applies — by proving "that the misrepresentation did not in fact affect the stock price."[41] In a recent decision, the Second Circuit held that the party opposing class certification bears the burden of persuasion on this issue and must demonstrate a complete lack of price impact.[42] Defendants must "do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the stock's price by a preponderance of the evidence."[43] "[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security."[44]

[41]    *Halliburton II,* 573 U.S. at 279.

[42]    *See Waggoner v. Barclays PLC,* 875 F.3d 79, 99-103 (2d Cir. 2017), *cert. denied Barclays PLC v. Waggoner*, 138 S. Ct. 1702 (Apr. 30, 2018).

[43]    *Id.* at 101 (emphasis in original).

[44]    *Id.* at 105 (emphasis in original).

The Second Circuit has explained in some detail how defendants can rebut the presumption of reliance.

> The "fundamental premise" underlying the fraud-on-the-market theory is "that an investor presumptively relies on a misrepresentation" that "was reflected in the market price at the time of his transaction." *Halliburton I,* 563 U.S. at 813, 131 S. Ct. 2179. If defendants "sever the link" between the misrepresentation and the market price — by showing, for example, that the misrepresentation was not public, the shares did not trade in an efficient market, or "the misrepresentation in fact did not lead to a distortion of price" — both the theory and the presumption collapse. *Basic,* 485 U.S. at 248, 108 S. Ct. 978.[45]

Accordingly, " '[a]ny showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff ... will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.' "[46]

[45]    *Arkansas Teachers Retirement Sys. v. Goldman Sachs Grp., Inc.,* 879 F.3d 474, 483 (2d Cir. 2018).

[46]    *Halliburton II,* 573 U.S. at 281 (quoting *Basic*, 485 U.S. at 248).

**\*7** A defendant can rebut the presumption "by showing that the alleged misrepresentation did not actually affect the stock's price — that is, that the misrepresentation had no 'price impact.' "[47] There are two ways that a defendant can show lack of price impact. *First*, a defendant can provide direct "evidence of no 'front-end' price impact" — meaning that when an alleged misrepresentation was made, it " 'had no discernable impact on [the] stock price.' "[48] *Second,* a defendant can rebut the presumption with evidence of no back-end price impact — meaning that there was no decrease in price following a claimed corrective disclosure. Defendants suggest there are at least two other ways in which the Basic presumption can be rebutted: (i) the information disclosed is not new; (ii) the information is not "corrective."[49]

[47]    *Id.* at 263-64.

[48]    *IBEW Local 98 Pension Fund v. Best Buy Co.,* 818 F.3d 775, 779, 782 (8th Cir. 2016). *Accord Halliburton II,* 573 U.S. at 279-80 (finding presumption rebuttable with "evidence that the asserted misrepresentation (or

its correction) did not affect the market price of the defendant's stock"); *In re Virtus Inv. Partners, Inc. Sec. Litig.,* 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017) (noting that a "defendant may rebut the presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns ('front-end price impact')").

[49]     *See infra* at pp. 54-59.

The "correctiveness" proposition has not yet been addressed in any court in the Second Circuit. Only a few district courts have addressed this issue. In *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton III*"), the court held that whether the alleged corrective disclosure was truly corrective was not an appropriate inquiry at the class certification stage.[50] Other courts have found, without discussion of whether such an inquiry is appropriate under *Halliburton II,* that certain corrective disclosures alleged by plaintiffs were not corrective at all, and therefore that any drop in price as a result of those statements could not be used to show that the alleged misrepresentations impacted the price of the stock.[51]

[50]     *See Erica P. John Fund, Inc. v. Halliburton Co.,* 309 F.R.D. 251, 161-62 (N.D. Tex. 2015); *see also infra* note 137 and accompanying text discussing the grant of appellate review of class certification order.

[51]     *See, e.g., In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) (*appeal pending*) (finding that one of the alleged corrective disclosures was not corrective because "[t]he raising of questions and speculations by analysts and commentators does not reveal any truth about an alleged fraud"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Calif. Dec. 22, 2016) (finding the *Basic* presumption rebutted as to a particular misrepresentation stating that "[t]he Court is not convinced the quarterly financial results were a corrective disclosure at all.").

## IV. DISCUSSION

### A. Adequacy

Defendants challenge the adequacy of the proposed class representatives and counsel on the following grounds: (1) the alleged impropriety of Plaintiffs' failure to disclose their fee sharing agreement to the Court; (2) an alleged conflict of plaintiff ALSAR Ltd. Partnership ("ALSAR") based on its sole shareholder, Dr. Robert Fishel's ("Dr. Fishel") involvement in unrelated shareholders' derivative suits, one of which was filed by the firm of Pomerantz LLP ("Pomerantz"); (3) the alleged lack of sufficient knowledge of plaintiff Ironworkers Local 40, 361, and 417 Union Security Funds and Iron Workers Local 580 Joint Funds ("Ironworkers") to prosecute the case; and (4) alleged unique defenses applicable to the Ironworkers' claims based on their use of a financial advisor who employed a "value investment" approach to investing. As set forth below, none of these arguments are sufficient to disqualify Plaintiffs as representatives.

**\*8** Rule 23(a)(4) provides that a proponent for class certification must show that "the representative parties will fairly and adequately protect the interests of the class." The Rule requires courts to ask whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[52]

[52]     *Baffa*, 222 F.3d at 60.

Turning first to the fee sharing agreement between Kahn Swick & Foti, LLC ("KSF"), and Pomerantz, as well as their respective clients, ALSAR and the Ironworkers, Defendants argue that Plaintiffs' failure to disclose the agreement, reached a week before the Court's ruling on the appointment of lead counsel and lead plaintiff, raises serious questions about an appearance of impropriety and the ability of Plaintiffs to represent the class. Both sets of plaintiffs advocated in briefing to the Court that they be selected as sole lead plaintiff and sole lead counsel. After these briefs were submitted they entered into the agreement to act as co-lead counsel and share the workload of lead counsel.

Defendants acknowledge that "by virtue of the two sets of plaintiffs and law firms appearing on the Consolidated Amended Complaint and filings thereafter," the Court may have been aware that counsel were working together.[53] Because Pomerantz appeared on multiple filings in the case both before and after the agreement and appeared regularly before the Court, the Court was surely aware that Pomerantz represented at least one of the plaintiffs.

[53]     Def. Mem. at 20 n.11.

There is nothing untoward, unethical, or even unusual about a fee-sharing arrangement between counsel. The agreement here complies with Local Rule 23.1, the Court's Individual Rule III.C.4 and Rule 1.5(g) of the New York Rules of Ethical Conduct. The appropriate time to disclose any fee arrangement among counsel is at the class settlement stage. Other than suggesting that it raises serious concerns, Defendants have cited no authority in which class representatives were disqualified on the basis of such a fee agreement. To the contrary, case law suggests that such agreements do not render a lead plaintiff inadequate.[54] Accordingly, I find that the fee sharing agreement does not render the lead plaintiffs inadequate.

[54]   *See Lu v. Jumei Int'l Holding Ltd.*, 2015 U.S. Dist. LEXIS 86776, 2015 WL 4104570, at *10 (S.D.N.Y. June 22, 2015) (finding that cases in this Circuit do "not support the proposition that a fee-sharing arrangement among presumptive lead plaintiffs' counsel renders a lead plaintiff inadequate").

Next, Defendants' assertion that the Ironworker plaintiffs lack sufficient knowledge to serve as class representatives can be quickly resolved. In complex securities litigation, "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel."[55] Class representative status may only be properly denied where "the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."[56]

[55]   *Baffa*, 222 F.3d at 60.

[56]   *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (internal citation omitted).

The Ironworker plaintiffs have shown sufficient knowledge of and involvement in the case to serve as class representatives. At their depositions, representatives of the Ironworker plaintiffs demonstrated that they have a basic understanding of the claims in this case,[57] including the class period,[58] the types of alleged misrepresentations made by Defendants,[59] what it means to be a class representative,[60] when and where the case was commenced,[61] and even how many documents Defendants

have produced in discovery.[62] They have also chosen able counsel with extensive experience in securities class actions. On these facts, I find that lead plaintiffs possess sufficient knowledge to act as adequate class representatives.

[57]   *See generally* Deposition of Brian Sabbaugh ("Sabbaugh Tr."), Ex. B to the Declaration of Kim E. Miller in Support of Reply Memorandum in Support of Plaintiffs' Motion for Class Certification ("Miller Reply Decl."), at 30-31.

[58]   *See id.* at 38.

[59]   *See* Deposition of Patrick Doherty ("Doherty Tr."), Ex. C to the Miller Reply Decl. at 43-44.

[60]   *See id.* at 66.

[61]   *See id.* at 45; Sabbaugh Tr. at 34.

[62]   *See* Sabbaugh Tr. at 36.

**\*9** Last, Defendants challenge the adequacy of lead plaintiff ALSAR on the ground that Dr. Fishel served as an independent director of Opko Health, a public company, which has been the subject of an SEC civil enforcement action, 10b-5 actions, and derivative suits arising out of the 10b-5 actions, including one action brought by Pomerantz.

As an initial matter, Pomerantz is no longer involved in any Opko litigation, thus diffusing any potential conflict between Plaintiffs' counsel and Dr. Fishel.[63] Second, as Plaintiffs point out, Dr. Fishel is only tenuously connected to the derivative lawsuits (and not to the SEC or 10b-5 actions), having been added as a defendant only because the five-year period in the securities derivative complaints ended shortly after he joined Opko as an independent director. Plaintiffs and Dr. Fishel insist that any possible wrongdoing occurred before he was involved in the company.[64] Indeed, Dr. Fishel himself lost $11 million in the Opko price decline, a fact he believes will make him better suited as a fiduciary for the CBI shareholders.[65]

[63]   *See* Reply Mem. at 3 n.4.

[64]    *See id.* at 3.

[65]    *See id.* at 2 n.3.

Even if Dr. Fishel were more directly involved in the lawsuits against Opko, I see no reason why the filing of unrelated and unresolved lawsuits, which have found no wrongdoing on his part, disqualifies ALSAR from serving as lead plaintiff. Dr. Fishel lost $3 million in CBI stock, he is extensively knowledgeable about and engaged in the litigation, he understands the claims, reviews documents filed with the Court and stays apprised of the case and the relevant litigation dates.[66] Based on the record before me, because Dr. Fishel's interests are not antagonistic to the interests of other class members, ALSAR is an adequate class representative. Accordingly, the adequacy requirement is satisfied.

[66]    *See id.* at 2 n.2.

**B. Typicality**

With respect to typicality, Defendants contend that the Ironworkers are atypical plaintiffs because they are subject to unique defenses. Specifically, they argue that the Ironworkers' investment manager, M.D. Sass, utilized a value investment approach to make decisions on what stocks to buy and sell, including CBI stock, which rebuts any fraud-on-the market theory of reliance to which the other class members may be entitled.

I disagree. In *Halliburton II*, the Supreme Court addressed the value investor in the context of the efficient market hypothesis and the *Basic* presumption. The Court's discussion is apt here:

> In any event, there is no reason to suppose that even [defendant's] main counterexample — the value investor — is as indifferent to the integrity of market prices as [defendant] suggests. Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information — how else could the market correction on which his profit depends occur. *To be sure, the value investor does not believe that the market price accurately reflects public*

> *information at the time he transacts. But to indirectly rely on a misstatement in the sense relevant for the* Basic *presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can be skewed by a market tainted by fraud.*[67]

**\*10** Thus, it cannot be assumed that an investor who subscribes to a value investment approach does not rely on market prices. Particularly at this stage of the proceedings, the mere fact, standing alone, that a class member may be a value investor is not sufficient to defeat *Basic's* presumption of reliance.[68]

[67]    573 U.S. at 273-74 (emphasis added) (internal citation omitted).

[68]    *See In re Vivendi Universal*, 123 F. Supp. 3d 424 (S.D.N.Y. 2015) ("[V]alue investors may invoke the *Basic* presumption at the class certification stage."); *see also GAMCO Investors, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 260 (S.D.N.Y. 2013) (holding that an investor's "lack of reliance on the market price ... may not defeat the typicality requirement for class certification").

There is insufficient evidence in the record here to demonstrate that the plaintiff Ironworkers did not rely on market price in investing in CBI stock. There is no evidence to support the notion that because a value theory of investment was used by their investment advisor, the Ironworker plaintiffs were not misled by fraud or that they would have purchased or sold CBI stock if they had known of the fraud.

Instead, the sole evidence proffered by Defendants in support of their atypicality argument is: (i) an article about the Ironworkers' investment manager which describes his investing strategy as focused on the "intrinsic" value of companies, but also focused on cash flow and other financial considerations of a company and (ii) an article written by Mr. Sass with a point heading entitled "A Counterpoint to the Efficient Market Hypothesis."[69] Yet even within the counterpoint, Mr. Sass indicates in his article that market "irrational[ity]" provides "meaningful opportunities" for investment. This suggests that Mr. Sass is precisely the type of investor looking for "overvalued" and "undervalued" market prices that the Supreme Court in *Halliburton* held can be impacted by fraud. Accordingly, the typicality requirement is satisfied.

[69] The text of the article is found at Ex. 7 to June 4, 2019 Declaration of Brian C. Kerr in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Kerr Decl.").

### C. Predominance

With respect to the predominance requirement, Defendants do not contest Plaintiffs' right to *invoke* the presumption of reliance, but rather assert that Defendants have successfully carried their burden to *rebut* that presumption. Because Defendants focus solely on rebutting the presumption by proving a lack of price impact, they do not challenge that CBI's stock traded in an efficient market. There is therefore no need to undertake the usual analysis of whether a market is efficient under the criteria developed in the two leading cases — *Cammer v. Bloom*,[70] and *Krogrman v. Sterritt*.[71]

[70] 711 F. Supp. 1264 (D.N.J. 1989).

[71] 202 F.R.D. 467 (N.D. Tex. 2001).

However, the fifth *Cammer* factor is in play in the sense that in his initial report Plaintiffs' expert focused on proving market efficiency. To do that, he conducted an event study and charted the movement of CBI's stock price on each day of the class period. He then opined as to the statistical significance of the price movement on the dates of the alleged misrepresentations and corrective disclosures. For the purpose of proving an efficient market, the last *Cammer* factor considers whether there is a demonstrable cause-and-effect relationship between the news events and the price of a stock. In the context of proving the *absence* of price impact the question is posed differently. As the Second Circuit explained in *Arkansas Teachers*, there are several ways to sever the causal link between the misrepresentation and the market price. Among the examples provided by the Second Circuit were the following two: (i) that the misrepresentation was not public or (ii) that the misrepresentation did not lead to a distortion of price.[72] The second of these is at the heart of the dispute now before the Court.

[72] *Arkansas Teachers*, 879 F.3d at 483-84.

### 1. Plaintiffs' Argument

**\*11** Not knowing that Defendants would concede market efficiency, Plaintiffs offered the report of their expert, Dr. John D. Finnerty, to establish market efficiency. I now briefly describe his expert qualifications. Dr. Finnerty obtained his undergraduate degree (magna cum laude) majoring in mathematics from Williams College. He went on to obtain a second bachelor's degree and a master's degree in Economics from Cambridge University as a Marshall Scholar. Finally, he obtained his Ph.D. in Operations Research at the Naval Postgraduate School. After completing his education he spent the next 24 years working in the financial sector for various investment banks and entities. Since 2001, he has worked as a consultant at various companies. For the last six years he has been with AlixPartners, LLP, first as a Managing Director of the Financial Advisory Services Group and then as an Academic Affiliate of the same group. In addition, for the last 32 years he has taught at the Fordham University Gabelli School of Business as a professor of finance, and is now the Director of the Master of Science in Quantitative Finance Program. Dr. Finnerty has also authored sixteen books, three monographs, and more than 120 articles. He has been retained as an expert in close to 50 cases in the last four years.[73]

[73] While Dr. Finnerty's CV submitted as part of his initial report lists 49 cases under the heading "Expert Testimony in Last Four Years," during the Hearing Dr. Finnerty testified that he has been retained as an expert in approximately 175 cases. *See* Finnerty Rpt. App. A; Hearing Tr. at 298-299.

In his report provided in support of *Cammer* factor five, Dr. Finnerty describes the results of his event study as follows:

> I reviewed the information released on the misrepresentation and disclosure dates and found that CBI's stock price reacted in a manner that is consistent with an efficient market on every one of these dates. For all earnings release dates I reviewed, the information released was economically significant to investors and security analysts, and CBI's stock price reactions are also statistically significant at the 5% level or better and are in the direction one would expect in an efficient market.[74]

He concluded that CBI's stock traded in an efficient market during the class period.

[74] Finnerty Rpt. ¶ 25.

**2. Defendants' Argument**

In their effort to rebut the presumption by proving the absence of price impact, Defendants make two general arguments. *First*, they argue that the alleged misrepresentations did not cause any front-end price impact. *Second*, Defendants argue that there was no back-end price impact. They support these arguments with the report and testimony of their expert, Lucy Allen.[75] I now briefly describe her expert qualifications.

75    *See generally* Expert Report of Lucy P. Allen, dated April 9, 2019 ("Allen Rpt."), Ex. 1 to Kerr Decl.

Ms. Allen is a graduate of Stanford University, holds a Master of Business Administration degree with a concentration in Finance and Accounting from Yale University, a Master of Arts in Economics, and a Master of Philosophy in Economics, also both from Yale University. Beginning during her years doing graduate work in Economics, she spent ten years as a teaching fellow at Yale. She also served as an economist on the Council of Economic Advisers for both Presidents George H.W. Bush and Bill Clinton. For the past 27 years she has been a member of the National Economic Research Associates, Inc. (NERA)'s Securities and Finance Practice, first as a Senior Consultant and Vice President, and then as Managing Director and Senior Vice President of NERA Economic Consulting. She has authored more than 30 articles and has served as an expert witness in more than 30 cases.[76]

76    *See* Allen Rpt. App. A.

To support her conclusion of no front-end price impact, Ms. Allen calculated the statistical significance of the stock price changes following the alleged misrepresentations using four separate event study models: (A) Dr. Finnerty's adapted Fama-French Three-Factor model; (B) an alternative Capital Asset Pricing Model of her own; (C) Dr. Finnerty's model with an added Holm-Bonferroni adjustment;[77] and (D) her alternative model with an added Holm-Bonferroni adjustment. Ms. Allen found that there was no statistically significant price impact on the following number of dates out of the nine alleged misrepresentation dates analyzed for price impact,[78] for each of the four models described above: (A) 6; (B) 5; (C) 7; (D) 6. Thus, depending upon

the model used, Ms. Allen found that between five and seven of the nine alleged misrepresentation dates did not have statistically significant stock price increases. She also found a lack of price impact through her review of a number of analyst reports released on or shortly after the dates of the seven alleged misrepresentations for which any of the models identified a statistically significant price increase.[79]

77    For a detailed discussion of the Holm-Bonferroni adjustment, *see infra* Part IV.C.3.b.

78    While Plaintiffs allege sixteen misrepresentations occurring on ten different dates, only nine discrete dates were analyzed for price impact. *See infra* pp. 58-59.

79    *See* Allen Rpt. at 28-37.

**\*12** Ms. Allen also studied fifteen alleged corrective disclosures that occurred between June 11, 2014, and June 23, 2015. She conducted her own event study on or shortly after each of the alleged corrective disclosures and found that there was no statistically significant price reaction following nine of the fifteen alleged corrective disclosures.[80]

80    *See id.* ¶¶ 110-194.

In addition to arguing that they rebutted the *Basic* presumption by showing a lack of statistically significant stock price movements following most of the alleged corrective disclosures, Defendants also argue that they rebutted the presumption by showing that the purported corrective disclosures failed to disclose new information. Finally, Defendants argue that they rebutted the presumption by showing that the alleged corrective disclosures did not, in fact, correct the alleged misrepresentations. All of these arguments are supported by the report and testimony of Ms. Allen.

Dr. Finnerty later submitted a rebuttal report which addressed Ms. Allen's contentions.[81] In that report, he disagreed with Ms. Allen's conclusions and affirmed his original finding that the market's reaction on many of the misrepresentation and corrective disclosure dates, was statistically significant, thus establishing price impact.[82]

81    *See* Reply Expert Report of John D. Finnerty, Ph.D., dated May 31, 2019 ("Finnerty Reply Rpt."), Ex. J to Miller Reply Decl.

[82]    *See id.* ¶ 4.

### 3. Methodology

As noted earlier, each of the experts submitted extensive reports. In addition, each testified at the Hearing. The reports and testimony revealed two major disputes with respect to methodology. Before describing the disputes, I note that there were also areas of agreement. Both experts conducted classic event studies, albeit using slightly different models. Each acknowledged that the differing choice of models did not significantly alter their respective conclusions. In addition, both studied contemporaneous analyst reports and testified that it is common practice to do so in performing event studies.[83]

[83]    However, in his Reply Report, as well as during the Hearing, Dr. Finnerty contested Ms. Allen's use of analyst reports to rebut price impact, as opposed to identifying potential disclosure dates. He argued that Ms. Allen's use of the reports to rebut price impact is not a commonly accepted practice, and that her methodology is "unscientific, unreliable, and results-oriented," "unrecognized in the field of financial economics," and "potentially very misleading." Finnerty Reply Rpt. ¶¶ 4(d), 16-20; Hearing Tr. at 353-361.

The two major disagreements were with respect to: (i) the required statistical level of significance of a movement in the price of the stock; and (ii) whether the data should be analyzed using what statisticians refer to as a "multiple comparison adjustment." These disputes are discussed further below.

### a. Statistical Significance Threshold

The parties and their experts dispute whether returns with a statistical significance level below 5% ($p$-value > .05) should be considered as evidence of price impact. Defendants argue that a 5% significance level is the standard threshold used by experts and courts for identifying evidence of market efficiency or price impact.[84] Plaintiffs argue that 5% is not always used as the cutoff in 10b-5 cases, and that courts should be able to

consider statistical significance even at the 10% level.[85]

[84]    *See* Def. Mem. at 14-15 n.9; Allen Rpt. ¶ 155; Surreply at 1-3.

[85]    *See* Reply Mem. at 6 n.10; Finnerty Reply Rpt. ¶¶ 34-44.

**\*13** Ms. Allen cites the *Reference Guide on Statistics* for the proposition that the 5% level " 'is the most common in social science' and that is typically used by courts."[86] In his Reply Report, Dr. Finnerty argues that this claim regarding the 5% level in social science is not specific to finance and economics.[87] He also describes the results of a survey he performed of the top three finance journals, and finds that 70.8% of the empirical articles published from 2005 to 2010 reported statistical significance at the 10% level or better.[88] However, while the author of a finance article may *report* findings at the 10% level, in addition to those at the 5% level, that is different than creating a *decision rule* for identifying evidence of market efficiency or price impact in 10b-5 cases. The case law establishes that 5% is the standard — though not exclusive — decision rule employed by courts in this context.[89]

[86]    Allen Rpt. ¶ 155.

[87]    *See* Finnerty Reply Rpt. ¶ 37.

[88]    *See id.* ¶ 40.

[89]    *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011); *see also In re Intuitive Surgical*, 2016 WL 7425926, at *15-16; *Halliburton III*, 309 F.R.D. at 270; *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *5 (N.D. Ill. Mar. 5, 2015); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 409 n.2 (D. Conn. 2010).

The 5% level was first used by Ronald A. Fisher in 1926, where he acknowledged that it was chosen as a matter of personal preference and convenience.[90] Moreover, while Defendants are correct that the 5% threshold is most common in this context, Plaintiffs offer a compelling argument that statistical significance should not be

Case 4:21-cv-02473 Document 68-16 Filed 03/15/24 in TXSD Page 15 of 52

In re Chicago Bridge & Iron Company N.V. Securities Litigation, Not Reported in Fed....

evaluated as a binary question, with statistical significance lying at the 4.99% level but not at the 5.01% level.[91] They argue that courts should be free to consider significance levels between 5% and 10% as evidence of price impact/market efficiency.[92]

[90]    *See* Stanton A. Glantz, Primer of Biostatistics 121-122 (6th ed. 2005) (quoting Ronald A. Fisher, *The Arrangement of Field Experiments*, 33 J. Ministry Agric. Gr. Brit. 503, 503-504 (1926)); *see also* Campbell R. Harvey, *Presidential Address: The Scientific Outlook in Financial Economics*, 122 J. FIN. 1399, 1421 (2017) ("[W]hat is so special about the significance level of 0.05? This is an arbitrary cutoff.").

[91]    *See* Finnerty Reply Rpt. ¶ 42 ("A conclusion does not immediately become 'true' on one side of the divide and 'false' on the other.... Pragmatic considerations often require binary, 'yes-no' decisions, but this does not mean that p-values alone can ensure that a decision is correct or incorrect. The widespread use of 'statistical significance' (generally interpreted as 'p ≤ 0.05') as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.") (quoting Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-values: Context Process, and Purpose*, 70 Am. Statistician 129 (2016)).

[92]    *See* Finnerty Reply Rpt. ¶¶ 41-42.

Of course there must be some level of statistical significance at which the return no longer constitutes probative evidence. However, it makes little sense to treat a finding just above the 5% level as nearly irrebuttable evidence that the disclosure impacted the stock price, while not considering a finding below the 5% level at all.[93] Event studies merely allow experts and courts to draw inferences based on probability — they do not provide causal proof as to whether the disclosure impacted the stock price or whether a market is efficient. Thus, while a return at the 5.01% level allows for a weaker inference of price impact than a return at the 4.99% level, it still allows for *some* inference.

[93]    *See* Harvey, *supra* note 90 at 1412 ("Scientific conclusions and business or policy decisions should not be based only on whether a *p*-value passes a specific threshold. It is rare that there is a clean dividing line between 'true' and 'false,' and a *p*-value should not be used as such a dividing line.").

*14 As the court in *Pirnik v. Fiat Chrysler Automobiles, N.V.* recently stated, a return with a statistical significance level of 7.88% "is obviously less comfort than a result that is statistically significant at the [5% level], but it does not prove the *absence* of price impact."[94] Thus, experts and courts should consider returns that fall somewhat below the 5% level, and decide what weight to give such returns as evidence of price impact. For this purpose it is helpful for experts to report the precise *p*-value, rather than merely stating that the return is significant at the 5% level or the 10% level.[95]

[94]    327 F.R.D. 38, 46 (S.D.N.Y. 2018) (emphasis in original).

[95]    *Cf.* Glantz, *supra* note 90 at 122 ("Although $P < .05$ is widely accepted, and you will certainly not generate controversy if you use it, a more sensible approach is to consider the $P$ value in making decisions about how to interpret your results without slavishly considering 5 percent a rigid criterion for 'truth.' ").

I therefore conclude that Dr. Finnerty's report of *p*-values for all of the dates analyzed and his opinion as to whether those between .05 and .10 (5-10% statistical significance) support a finding of market efficiency or price impact may be considered in deciding the issues presented by this motion. However, it is apparent that the weaker the statistical significance the less support the report provides toward the ultimate finding.

### b. Holm-Bonferroni Adjustment

The parties and their experts dispute whether it is appropriate to apply the Holm-Bonferroni multiple comparison adjustment to their respective event study regression models. Defendants argue that it is necessary,[96] while Plaintiffs claim that it is inappropriate to ever apply such adjustments in 10b-5 actions.[97] Before deciding whether to apply the Holm-Bonferroni adjustment, I will briefly provide some background on regression models and multiple comparison adjustments, to place this dispute in its proper context.

[96]    *See* Allen Rpt. ¶ 41; Surreply at 4-5.

[97]    *See* Finnerty Reply Rpt. ¶¶ 24-33.

### i. Regression Models

A regression model compares two unique sets of data in order to determine whether they bear any significant relationship to one another. The model tests the data against what is known as the "null hypothesis," which is the theory that the two groups of data being studied *do not* share a significant relationship. Any statistically significant data point is used as some evidence to disprove the null hypothesis. A statistically significant data point is one which is so far removed from the normal expected range that there is a very small chance, often designated as 5% or less, that the data point would have occurred merely by chance (assuming the null hypothesis is true).[98] Thus, a statistically significant result demonstrates that there likely *is* a significant relationship between the two data sets analyzed.[99]

[98]    *But see infra* Part IV.C.3.a (discussing the consideration of statistical significance below 5%).

[99]    *See, e.g.*, Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 564 (1994).

Event studies are regression models that are most often used in 10b-5 cases at the class certification stage for two distinct but closely related purposes: (i) testing whether the market in which the relevant security traded was efficient; and (ii) testing whether an alleged affirmative misrepresentation or corrective disclosure affected the price of the relevant security.[100] In either case, the event study will compare (i) daily stock price percentage changes (returns) directly following firm-specific news events (disclosures), with (ii) the company-specific average returns over a given representative period of time (the abnormal returns).

[100]    Both are ultimately used as evidence of price impact. However, in *Halliburton II* the Supreme Court clarified that the use of an event study to prove market efficiency constitutes an "indirect proxy for price impact," while the second use constitutes direct evidence of price impact. 573 U.S. at 277-84.

**\*15** In a 10b-5 case, the null hypothesis is that the market did not act efficiently or that a particular news event did not impact the company's stock price. If a well-crafted event study identifies a return following a disclosure that

is so far removed from the average daily return that it would only happen by "chance" about 5% or less of the time, assuming the null hypothesis is true, then most experts consider that to be a statistically significant return. This return is then offered as evidence of an efficient market or price impact. Even a finding at this high rate of significance, however, does not prove market efficiency or price impact — it merely allows a strong inference to that effect. This is because regression models are subject to what are known as Type I errors (false positives)[101] and Type II errors (false negatives).[102]

[101]    A Type I error occurs in a 10b-5 case when an expert relies on an event study to conclude that the disclosure impacted the return (establishing efficiency or price impact), when in fact the model cannot disprove that the return occurred merely by chance or for an unrelated reason.

[102]    A Type II error is the converse of a Type I error. In a 10b-5 case, a Type II error occurs when the event study does not identify a significant relationship between the disclosure and the return, even though in fact the market acted efficiently or the disclosure did have an impact on the company's stock price.

### ii. Multiple Comparison Adjustments

Multiple comparison adjustments are applied to regression models in order to correct for false positive errors when multiple data points are analyzed for significance, which increases the likelihood of obtaining at least one finding that supports a significant relationship. Dr. Finnerty argues that the adjustments are only necessary where the expert is attempting to disprove the universal/joint null hypothesis, that is, the single null hypothesis that there is no significant relationship between *any* of the alleged misrepresentations/disclosures and the abnormal returns on those dates. Thus, the universal hypothesis treats the data set as a whole, instead of looking at each individual date analyzed. Ms. Allen disputes Dr. Finnerty's contention, because the Holm-Bonferroni adjustment allows the expert to determine which out of the several dates analyzed have statistically significant returns, and thus determine *which* of the individual null hypotheses, that is, those relating to a single data point, are false.[103] However, regardless of whether the issue is framed as disproving a single universal hypothesis verses an individual one, articles cited by both experts agree that the multiple comparison problem arises "when multiple tests are performed and the

expert would claim that the result of any one test would support a certain finding," that is, would support the rebuttal of the null hypothesis.[104]

103   *See* Mikel Aickin & Helen Gensler, *Adjusting for Multiple Testing When Reporting Research Results: The Bonferroni vs Holm Methods*, 86 Am. J. Pub. Health 726 (1996); Ralf Bender & Stefan Lange, *Multiple Test Procedures Other Than Bonferroni's Deserve Wider Use*, 318 Brit. Biomedical J. 600, 600-601 (1999); *see also* Plaintiffs' Hearing Slides 7, 8.

104   David Tabak, *Multiple Comparisons and the Known or Potential Error Rate*, 19 J. Forensic Econ. 231, 232 (2006). The rationale behind multiple comparison adjustments is most easily visualized with an example borrowed from David Tabak. *See id.* Assume that an expert is testing whether it is likely that a company engaged in discriminatory practices in firing women. The expert sets the decision rule of the regression model as to whether a finding disproves the null hypothesis (the company did not discriminate) at the 5% significance level. If the expert then finds that the rate of women fired across the *entire* company is so high that it would only occur at random in the absence of discrimination 5% or less of the time (or in 1 out of 20 companies), then the expert can assert with 95% confidence that the company likely engaged in discriminatory practices. Now assume that the expert evaluated the rate of women fired across 20 separate divisions of the company, and found that in one of those divisions the rate was statistically significant at the 5% level. The expert cannot assert with 95% confidence that the company engaged in discrimination. That is because one would expect to find such a high rate in at least one of twenty companies or independent divisions to occur merely by chance even in the absence of discrimination.

**\*16** This problem can occur either where the same sets of data are tested for correlation across multiple variables, or where independent subgroups of the same data sets are tested with respect to the same variable. Because it is much more likely that the expert would find a false positive in either of these scenarios — a finding that the data sets are related when in reality they are not — the Type I error rate is much higher than where only one data point is tested.

Multiple comparison adjustments attempt to solve this problem by adjusting the requisite statistical significance level for individual data points in order to reduce the overall Type I error rate.[105] But by reducing the Type I error rate, multiple comparisons tend to *increase* the probability of Type II errors.[106]

105   The Holm-Bonferroni adjustment achieves this by manually increasing the *p*-values for each consecutive date tested.

106   *See* Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015); Thomas V. Perneger, *What's Wrong with Bonferroni Adjustments*, 316 Brit. Biomedical J. 1236, 1236 (1998); Hearing Tr. at 504-505.

### iii. Application of the Holm-Bonferroni Adjustment in Securities Fraud Cases

The parties have identified only one decision that has squarely addressed the issue of whether to apply multiple comparison adjustments in the 10b-5 context. In virtually all other securities fraud cases, as both parties acknowledge, no multiple comparison adjustment is applied.[107]

107   *See* Hearing Tr. at 206-208; Finnerty Reply Rpt. ¶ 33 ("To my knowledge, the Holm-Bonferroni adjustment has not been adopted by the court in any securities fraud litigation in which I have served as an expert, and it is not generally used in event studies that economic experts perform for securities fraud litigations.").

In *Halliburton III*, defendants' expert — again Ms. Allen — argued for the application of a Bonferroni adjustment (another type of multiple comparison adjustment) to the 35 alleged misrepresentations and corrective disclosure dates that she analyzed for price impact.[108] Plaintiffs' expert, Chad Coffman, argued that multiple comparison adjustments are inappropriate in 10b-5 cases, and, as the court acknowledged, are "rarely utilized in event studies for securities litigation."[109] But if the court ultimately found that the adjustment was needed, Coffman argued that a Holm-Bonferroni adjustment would be more appropriate, because it reduces the Type II error rate as compared to the Bonferroni adjustment.[110]

108   *See* 309 F.R.D. at 263, 265-66.

109   *Id.* at 267.

110    *See id.* at 266.

The court concluded that "the use of a multiple comparison adjustment [was proper] because of the substantial number of comparisons, thirty-five comparisons, being tested for statistical significance in Allen's analysis."[111] Mindful of Coffman's concern regarding Type II errors, the court found the Holm-Bonferroni adjustment more appropriate than the Bonferroni adjustment.[112]

111    *Id.* At the Hearing, Ms. Allen conceded that while the problem that the adjustment seeks to remedy becomes more severe as the number of dates analyzed increases, so too does the magnitude of the adjustment. Moreover, she stated that there is no set number of comparisons at which the Holm-Bonferroni adjustment is warranted (above one), and she generally only applies multiple comparison adjustments when they alter the number of statistically significant dates. *See* Hearing Tr. at 102-109, 209-217.

112    *See Halliburton III*, 309 F.R.D. at 267.

**\*17** I am aware of only one other court that has addressed the issue of whether to apply a multiple comparison adjustment in a securities fraud case. In *In re NII Holdings, Inc. Sec. Litig.*, defendants challenged plaintiffs' expert's event study, offered to establish market efficiency, on the grounds that it did not apply the Holm-Bonferroni adjustment to the eighteen earnings announcement days analyzed.[113] There, the court rejected defendants' argument given the "relatively small sample size" of earnings announcement dates analyzed.[114]

113    *See In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 411-12 (E.D. Va. 2015).

114    *Id.* at 412.

Here, there are sixteen total remaining alleged misrepresentation and corrective disclosure dates that were analyzed for price impact — even fewer than the eighteen dates at issue in *In re NII Holdings, Inc. Sec. Litig.*, and significantly fewer than the 35 dates analyzed in *Halliburton III*. Moreover, because Defendants conceded market efficiency, Ms. Allen performed her event study exclusively to test whether the alleged misrepresentations and corrective disclosures had an impact on CBI's stock price.[115] At this stage, Defendants must prove by a preponderance of the evidence the absence of price impact as to each misrepresentation or disclosure date.[116] A price impact analysis then must necessarily be limited to the single disclosure at issue.

115    *See* Allen Rpt. ¶¶ 24-26.

116    *See Waggoner*, 875 F.3d at 99-103.

While it may be economical for an expert to include all of her findings regarding price impact on each separate disclosure date in a single report, they are all individual tests that relate exclusively to a single disclosure. The null hypothesis for a price impact analysis is not that the alleged fraudulent misrepresentations and corrective disclosures *never* had an impact on the company's stock price, but instead that the individual misrepresentation or corrective disclosure being analyzed did not affect that individual return. Thus, a price impact analysis does not present the type of problem that the Holm-Bonferroni adjustment corrects.[117] Particularly in light of the few dates at issue here and the precedential rarity of applying multiple comparison adjustments in 10b-5 cases, I decline to require the use of the Holm-Bonferroni adjustment in weighing competing expert analyses.

117    There is potentially a stronger case for the application of multiple comparison adjustments when evaluating market efficiency rather than price impact, given the vastly larger number of dates analyzed in the former. If an expert chose to rely on only one or a few statistically significant abnormal returns to show that the market acted efficiently over the entire class period, a multiple comparison might well be appropriate. But experts usually rely on a large number of abnormal returns to establish a general trend of market efficiency. Moreover, courts require a correlation of more than a few dates between news disclosures and statistically significant returns to satisfy the fifth *Cammer* factor, *see, e.g.*, David I. Tabak, What Should We Expect When Testing for Price Response to News in Securities Litigation? (2016), likely eliminating the need for a multiple comparison adjustment even when analyzing market efficiency. Dr. Finnerty's calculations regarding the alleged misrepresentations and corrective disclosures were offered to establish market efficiency, not price impact. However, in attempting to rebut price impact, Ms. Allen applied the multiple comparison adjustment to his findings only on those misrepresentation and corrective disclosure dates. Accordingly, she makes no claim regarding the need for a multiple comparison adjustment in the context of market efficiency.

**\*18** Assuming, arguendo, that I were to find the proposed adjustment necessary, two additional points must be noted. *First*, Dr. Finnerty took issue with Ms. Allen's decision to use fourteen dates to calculate the multiple comparison adjustment for the corrective disclosures, when Plaintiffs now rely on only seven.[118] The more dates that the expert uses to perform the multiple comparison calculation, the more powerful the effect of the adjustment. Thus, using the incorrect number of dates distorts the adjustment. Because Plaintiffs have abandoned seven earlier identified disclosure dates, considering them for the purposes of a multiple comparison analysis is unnecessary, and Ms. Allen's calculations are potentially overly conservative.

[118]   *See* Hearing Tr. at 326-330; Plaintiffs' Hearing Slides 7, 8.

*Second,* applying the proposed adjustment would only make a difference at the 5% significance level for one alleged misrepresentation date (10/30/13) and two of the seven remaining corrective disclosure dates (6/11/14 and 11/21/14), even using Ms. Allen's calculations.[119] Thus, the issue of whether to apply the Holm-Bonferroni adjustment — while hotly disputed by the parties — is not dispositive with respect to Plaintiffs' motion for class certification.[120]

[119]   *See* Plaintiffs' Hearing Slides 1, 7; Allen Rpt. ¶¶ 42, 114. Using only seven corrective disclosure dates to compute the adjustment as Dr. Finnerty suggests would not result in any change in the number of statistically significant price reactions at the 5% level. *See* Plaintiffs' Hearing Slide 8.

[120]   Defendants also suggest that Plaintiffs have reverse-engineered their event study. *See* Def. Mem. at 1. An expert reverse-engineers an event study where he first identifies which dates have statistically significant price changes, and then tries to find news releases on those dates that could be linked to alleged fraud. Such a practice obviously constitutes improper data mining, and undermines the very purpose of the event study. In *Halliburton III*, the court raised a concern about possible reverse-engineering by the plaintiffs as additional support for the application of the Holm-Bonferroni adjustment. 309 F.R.D. at 266. However, adjusting the *p*-values for these returns is not the most appropriate method for dealing with such concerns. A better approach is to analyze the substance of the disclosures to determine whether they: (i) relate to the fraud, (ii) present new information, and (iii) are corrective. Such an analysis helps ensure that plaintiffs cannot simply work backwards and allege statistically

significant market reactions that bear no relation to the fraud alleged.

**4. Front-End and Back-End Price Impact Principles**
Defendants also argue that the Court must evaluate whether misrepresentations and corrective disclosures present new information to the market, because an efficient market should only react to new information. If the information is not new, Defendants assert that they have severed the link between the stock price and the misrepresentation. Defendants further claim that the Court must also evaluate whether the alleged corrective disclosures in fact corrects the prior misrepresentations. Otherwise, plaintiffs will be able to rely on statistically significant stock price movements that bear no relation to the alleged fraud. I will now discuss the economic and legal principles bearing on these issues, beginning with the misrepresentations (front-end impact).

**a. Front-End Impact**
Not every 10b-5 case requires an evaluation of whether the alleged fraud had front-end impact, *i.e.*, whether the alleged misrepresentations artificially inflated the defendant's stock price when made. In a case alleging only a price-maintenance theory, for example, plaintiffs allege that the misrepresentations either failed to inform the market about negative information (omissions), or confirmed market expectations without revealing negative information (confirmatory misrepresentations), thus maintaining the defendant's stock price at an artificially inflated level.[121] While the distinction between omissions and confirmatory misrepresentations is somewhat hazy, both can be evaluated under a price-maintenance theory.[122]

[121]   Plaintiffs intend to proceed on a price maintenance theory with respect to every misrepresentation that does not have front-end price impact. *See* Plaintiffs' 9/19/19 Supplemental Letter Brief in Further Support of Plaintiffs' Motion for Class Certification at 6. However, only misrepresentations that confirm market expectations can properly proceed under a price maintenance theory. *See Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 87 ("Price maintenance fits the theory of plaintiffs' case.... Where, as here, 'a misrepresentation or omission merely confirms market expectations, there will be no reactionary price impact.' ") (emphasis added) (internal citation omitted). When a

misrepresentation presents entirely new information to the market that it could not possibly have expected, this information cannot fairly be said to maintain inflation that is already present in the stock price. If there is no increase in the stock price following that type of misrepresentation, it is not material to the market, and thus not an actionable misrepresentation under 10b-5. However, none of Plaintiffs' alleged misrepresentations fall into this latter category.

[122]    *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 n.5 (11th Cir. 2014) (recognizing that while confirmatory misrepresentations are not exactly the same as omissions, they are similar in that the former are "affirmative representation[s] that omit[ ] negative information," and thus it is appropriate to evaluate both under a price - maintenance theory); *see also Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 87 (acknowledging that a price-maintenance theory is appropriate where " 'a misrepresentation or omission merely confirms market expectations,' " as " 'there will be no reactionary price impact' "). Moreover, it is a distinction that is not directly in dispute here. *See* Hearing Tr. at 620-621 (Judge Scheindlin: "[Plaintiffs] aren't pressing omissions, but they are saying it is a price maintenance to some degree, some of the statements, but what difference does it make?"; Mr. Sterling: "It really doesn't...."). Thus, this distinction is not at issue for the purposes of this Report and Recommendation.

**\*19** Here, however, Plaintiffs are alleging not only price-maintenance, but also price-inflation (affirmative misrepresentations). Where plaintiffs allege affirmative misrepresentations, it is necessary to evaluate whether those misrepresentations caused a statistically significant stock price increase. Thus, both experts evaluated the front-end price impact of the sixteen alleged misrepresentations in their event study models.

Despite Ms. Allen's finding of a statistically significant price reaction to a number of the alleged misrepresentations, she concludes an absence of price impact for all alleged misrepresentations based on two arguments.[123] *Frist*, she compares an alleged misrepresentation to a previous release of what she asserts is the same information. In doing so, Ms. Allen is asking the Court to determine whether the alleged misrepresentation contained any new information.

[123]    While she makes these arguments with respect to all of the misrepresentations, they are geared most specifically to those dates for which she found a statistically significant price increase.

I decline to engage in this exercise. Even if the information in the alleged misrepresentation had been previously disclosed (and therefore impounded into the price of the stock in an efficient market), the repetition of misleading information can maintain the price of the stock; prevent an otherwise expected decrease in the price; or, can continue to cause artificial inflation in the price by the repeated assurance that the false statement is true. In his Reply Report, Dr. Finnerty explains that a misrepresentation would be expected to "trigger a price increase or mitigate an otherwise expected price decrease that would have occurred but for the fraud." He also notes that the "repetition of a misrepresentation can also avoid a price decrease that would have occurred but for the fraud...."[124] Thus, a "newness" analysis is not required when evaluating front-end impact of alleged misrepresentations.[125]

[124]    Finnerty Reply Rpt. ¶ 9.

[125]    I note that Defendants cite no case in which a court has required a "newness" analysis with respect to each alleged misrepresentation. The *Arkansas Teachers* case dealt with the "newness" of corrective disclosures — not misrepresentations. When a misrepresentation repeats identical (false) information it can be viewed as a confirmatory misrepresentation of an earlier disclosed (false) fact or it can be viewed as a new misrepresentation because it again asserts that even with the passage of time, the (false) information is still being touted by the defendants. So, for example, if a defendant says we are "making good progress" in May and says it again in October, that is a new misrepresentation if it is false on both dates. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016) (" 'We decline to erect a per se rule that, once a market is already misinformed about a particular truth, corporations are free to knowingly and intentionally reinforce material misconceptions by repeating falsehoods with impunity.' ") (quoting *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011)).

Ms. Allen's second argument is that when she reviewed contemporaneous analyst reports she found that they did not react to the alleged misrepresentation but rather focused on other aspects of news released at or about the same time. From this review she questioned whether there was "any evidence that any of these alleged misrepresentations *caused* a statistically significant price increase."[126]

[126]     Allen Rpt. ¶ 43 (emphasis added).

**\*20** I am compelled to reject her invitation to review analyst reports to determine their reactions at or about the time of the alleged misrepresentations. To do as Ms. Allen suggests would cross the line into a merits-based foray into the materiality of the alleged misrepresentations and the question of loss causation. Both of these inquiries are off limits at the class certification stage.[127]

[127]     *See Amgen,* 568 U.S. 455 (holding that plaintiffs need not prove materiality at class certification stage); *Halliburton I,* 563 U.S. 804 (holding that plaintiffs need not prove loss causation at class certification stage).

### b. Back-End Impact

Turning now to corrective disclosures (back-end impact), there are at least three issues that must be addressed. *First,* should the Court look for a corresponding corrective disclosure for a misrepresentation date on which there was a statistically significant price impact? *Second,* should the Court engage in a "newness" analysis? And, finally, should the Court engage in a "correctiveness" analysis?

### i. Corrective Disclosures and Price Maintenance

There are two ways to demonstrate price impact, or the absence of it, at this stage of the proceedings — directly and indirectly. The indirect method was recently reaffirmed in *Halliburton II*. There, the Court rejected defendants' suggestion that plaintiffs be required "to prove that a defendant's misrepresentation actually affected the stock price — so-called 'price impact' — in order to invoke the *Basic* presumption."[128] In doing so, the Court stated:

> Far from a modest refinement of the *Basic* presumption, this proposal would radically alter the required showing for the reliance element of the Rule 10b-5 cause of action.... [I]f a plaintiff shows that the defendant's misrepresentation was public and material and the stock traded in a generally efficient market, he is entitled to a presumption that the *misrepresentation*

*affected the stock price.*[129]

[128]     *Halliburton II,* 573 U.S. at 277.

[129]     *Id.* at 279 (emphasis added).

The other method is to offer direct proof of price impact, usually through the vehicle of an event study which shows the market's reaction following the misrepresentation or corrective disclosure. Plaintiffs need not use this method to establish price impact because they are entitled to use the proxy for price impact provided by the indirect method described in *Halliburton II*. But they often offer this proof, nonetheless, to establish an efficient market, by satisfying *Cammer* 5. Defendants, on the other hand, need to establish the absence of price impact, and the only way to do that when there is no dispute as to market efficiency is through direct proof.

When the direct method is employed, there are again two ways to demonstrate the market's reaction. The first is by demonstrating that a stock price has increased in a statistically significant manner after an alleged misrepresentation is released to the public. In this circumstance a plaintiff has the benefit of the *Basic* presumption and has also demonstrated price impact through the event study, as the price of the stock has been presumptively artificially inflated due to the alleged misrepresentation. It remains to be proved at trial (or perhaps disproved at summary judgment or trial) whether that increase in price was *caused* by the release of the alleged misrepresentation or was caused as a result of other events. But at the class certification stage, once the price impact has been shown at the front end by virtue of a positive rise in the stock price following the alleged misrepresentation, there is no need to analyze an alleged corrective disclosure.

**\*21** However, courts must analyze corrective disclosures when there is no statistically significant positive price impact at the date of the misrepresentation because the misrepresentation avoided an otherwise expected decline if the truth had been known.[130] In this circumstance, price impact is shown if, when the truth is revealed, the artificial inflation in the stock price (maintained as a result of a repeated misrepresentation) dissipated and the price of the stock fell.[131]

[130]     *See In re Intuitive Surgical*, 2016 WL 7425926, at \*13 ("While Defendants also challenge the seven dates Plaintiffs allege affirmative misrepresentations took place on the grounds that there was 'no positive price impact,' this argument is unpersuasive.... The lack of a

statistically significant price increase following an alleged misrepresentation does not indicate lack of price impact.") (citing *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016) ("Price impact in securities fraud cases is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed.") (citing *Halliburton II*, 573 U.S. at 279-80)).

[131]    *See Waggoner*, 875 F.3d at 104 (finding that a lack of front-end price impact does not alone rebut a price-maintenance theory).

Thus, absent proof from defendants rebutting the *Basic* presumption — whether established directly or indirectly — plaintiffs will be entitled to rely on the *Basic* presumption to satisfy the reliance element of a 10b-5 action, and the predominance inquiry will be satisfied.[132] On those dates where both experts found a statistically significant price impact at the time of the misrepresentation, Defendants attempt to rebut that presumption by arguing that because analysts did not attribute the price rise to the misrepresentation, it must have been caused by other events in the industry or in the news. This is an impermissible question of loss causation.

[132]    In *Halliburton II,* the Court stated: "What is called the *Basic* presumption actually incorporates *two constituent presumptions*: First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock *in reliance on* the defendant's misrepresentation." 573 U.S. at 279 (emphasis added).

### ii. Corrective Disclosures and Newness

The question of whether a court should review the "newness" of a corrective disclosure at the class certification stage appears to be settled now in the Second Circuit as a result of the recent decision in *Arkansas Teachers*. There, the district court initially declined to review defendants' evidence, proffered to rebut the *Basic* presumption, that on a large number of occasions prior to the alleged corrective disclosure dates, the truth had been publicly revealed but the market did not react. The district court declined to review this evidence, finding that it went to the impermissible question of materiality or the "truth on the market" defense, rather than to the question of whether defendants had rebutted the presumption of price impact.[133] The Second Circuit disagreed and reversed, holding that while price impact "touches on materiality, [it] refers to the effect of a misrepresentation on a stock price." The Second Circuit broadly held that at class certification if a defendant can show, "for whatever reason" that "a misrepresentation did not actually affect the market price of defendants' stock," that evidence is relevant to the question of whether the defendant has succeeded in rebutting the *Basic* presumption by severing the link between the misrepresentation and the market price.[134]

[133]    *In re Goldman Sachs Group, Inc. Sec. Litig.*, 2015 WL 5613150, at *6 (S.D.N.Y. Sep. 24, 2015), *vacated*, 879 F.3d 474 (2d Cir. 2018).

[134]    *Arkansas Teachers*, 879 F.3d at 486.

**\*22** On remand, the district court held an evidentiary hearing and considered each of the 34 statements made prior to the alleged corrective disclosures to see if they contained the same information as the corrective disclosure, thus rendering the information in the corrective disclosure old news. Given this holding and at least one other subsequent district court proceeding, a "newness" analysis of the proffered corrective disclosures is required in this Circuit.[135]

[135]    *See In re Signet*, 2019 WL 3001084, at *17. *Cf. In re Intuitive Surgical*, 2016 WL 7425926, at *16; *Grae v. Corr. Corp. of Am.*, 2019 WL 266674, at *8-9 (M.D. Tenn. Jan. 18, 2019).

### iii. Corrective Disclosures and "Correctiveness"

The issue of whether to consider the "correctiveness" of a disclosure is a related, but unresolved question. The parties strongly disagree as to whether it is appropriate at this stage for a court to determine whether an alleged corrective disclosure actually provided information that corrects information found in an earlier alleged misrepresentation. Plaintiffs suggest that a determination of "correctiveness" bleeds impermissibly into the merits of loss causation, while Defendants contend that lack of

correctiveness is evidence of a lack of price impact that they may utilize to demonstrate that the stock price was not impacted by any alleged misrepresentation.

The caselaw supporting these positions is unsettled. Plaintiffs rely principally on the decision in *Halliburton III*, where the district court held that defendants may not rebut the *Basic* presumption with evidence that a disclosure preceding a stock price decline did not actually correct any alleged misrepresentation. That court found that defendants' arguments were, "in effect, a veiled attempt to assert the truth on the market defense."[136] In a concurrence of the grant of leave to appeal, one judge agreed that the Fifth Circuit should answer the question of whether "correctiveness" should be analyzed at class certification, but shared his view that the Supreme Court's *Amgen* decision — which held that any question as to the materiality of an alleged misrepresentation should be left to the merits stage — precludes such a review.[137]

[136]    *Halliburton III,* 309 F.R.D. at 261 (internal citation omitted).

[137]    *Erica P. John Fund, Inc. v. Haliburton Co.*, 2015 WL 10714013 (5th Cir. Nov. 4, 2015) ("[A]s I read *Halliburton II,* it did not render the corrective nature of a disclosure a class certification issue because, even though it bears on the issue of price impact, it does not affect the issue of predominance at the class certification stage.").

Defendants rely predominantly on *Halliburton II* and the Second Circuit's broad language in the *Arkansas Teachers* decision, emphasizing that "any showing" that rebuts the *Basic* presumption "for whatever reason" may be considered at class certification. The Court in *Arkansas Teachers* observed that while a "newness" analysis at this stage may "touch on materiality," it differs in the crucial respect that price impact looks to whether a misrepresentation was reflected in the market price at the time of the transaction, which is the "fundamental premise" of *Basic* and lies at the heart of the class-wide reliance and predominance inquiry.[138]

[138]    *Arkansas Teachers,* 879 F.3d at 486.

The reasoning of *Arkansas Teachers* is persuasive here. Like "newness," whether a corrective disclosure is "corrective" may "touch on materiality," but it is an inquiry into whether an alleged misrepresentation affected the market price. Indeed, on remand in that case, the district court conducted a subject matter,

correctiveness-type inquiry, analyzing whether earlier reports were of the same "nature and extent" as the alleged corrective disclosure.[139] As with "newness," simply identifying whether a disclosure is related to an earlier misrepresentation can be done without getting unnecessarily tangled in an analysis of loss causation or materiality. If a defendant can only rebut the *Basic* presumption by "severing the link" between the alleged misrepresentation and the stock price, there must first be an existing link to sever.

[139]    *In re Goldman Sachs Grp.*, 2018 U.S. Dist. LEXIS 137414, at *14 (S.D.N.Y. Aug. 14, 2018).

**\*23** While there is no Second Circuit precedent directly reaching this issue, several district courts post-*Arkansas Teachers* have conducted the "correctiveness" analysis at the class certification stage. However, a review of those cases demonstrates that the analysis has been carefully limited to a few inquiries, including: (i) whether the information in the alleged corrective disclosure is new — if it is not new then it cannot be corrective;[140] (ii) whether the information in the alleged corrective disclosure relates to the same subject matter or is wholly unrelated;[141] and (iii) whether the information in the alleged corrective disclosure is merely analyst speculation or opinion which cannot be deemed corrective.[142] Any further examination of the alleged corrective disclosure risks crossing the line into an analysis of loss causation.[143] If a court finds that the alleged corrective disclosure is: (i) not new, (ii) not related to the subject or the misrepresentation, or (iii) merely speculative or negative commentary, and if the misrepresentation did not cause a price increase when made, then the defendant will have "severed the link" between the misrepresentation and the stock price. In short, I conclude that a limited analysis of an alleged disclosure as to whether it is "corrective" is appropriate at this stage of the proceedings.

[140]    *See supra* pp. 54-55.

[141]    *See In re Signet Jewelers,* 2019 WL 30001084, at *17 (analyzing corrective disclosures and finding that a corrective disclosure need not "take the form of a 'flashing neon light' with an explicit message stating that it is a intended to cure an earlier fraudulent statement, in order for it to qualify as corrective"); *In re Intuitive Surgical,* 2016 WL 7425926, at *16 (finding that defendants had rebutted the *Basic* presumption with respect to the company's financial disclosures because they were "not corrective of [the alleged prior] misrepresentations" and thus "were not corrective disclosures at all").

In re Chicago Bridge & Iron Company N.V. Securities Litigation, Not Reported in Fed....

142    *See In re Signet Jewelers,* 2019 WL 30001084, at *17.

143    *See supra* p. 56, discussing *Halliburton III.*

### 5. Misrepresentations

With these guiding principles in mind, the below chart sets forth a description of each alleged misrepresentation, and reports the positive price impact found by each expert on each date without a multiple comparison adjustment.[144] Each of the misrepresentations relate to one or more of the following categories, as outlined in the Complaint: (i) liability for delays/cost overruns; (ii) fabrication defects; (iii) SWO/safety issues; and the following four sub-categories of the alleged GAAP violations: (iv) CIP; (v) MFVL; (vi) Goodwill; and (vii) UCO/Cost Overruns.

| Alleged Misrepresentations | | | Misrepresentation Categories | Statistically Significant Increase | |
|---|---|---|---|---|---|
| | | | | Dr. Finnerty[145] | Ms. Allen[146] |
| 1 | 10/30/2013 | 3Q:13 10-Q | Delays/Cost Overruns; CIP; Goodwill; UCO/Cost Overruns; | — | 5% |
| 2 | 2/25/2014* | FY:13 Earnings Announcement | SWO; UCO/Cost Overruns | 1.2% | 5% |
| 3 | 2/25/2014* | FY:13 Earnings Call | Delays/Cost Overruns; Fabrication Defects | 1.2% | 5% |
| 4 | 2/27/2014 | FY:13 10-K | CIP; Goodwill; UCO/Cost Overruns | — | — |
| 5[147] | 4/23/2014* | 1Q:14 Earnings Announcement | Delays/Cost Overruns; SWO; CIP; MFVL; UCO/Cost Overruns | — | — |
| 6 | 4/23/2014* | 1Q:14 Earnings Call | Delays/Cost Overruns; Fabrication Defects; SWO | — | — |
| 7 | 4/24/2014 | 1Q:14 10-Q | Delays/Cost Overruns; SWO; CIP; MFVL; Goodwill; UCO/Cost Overruns | — | — |
| 8 | 7/24/2014* | 2Q:14 Earnings Announcement | UCO/Cost Overruns | — | — |
| 9 | 7/24/2014* | 2Q:14 Earnings Call | Delays/Cost Overruns; Fabrication Defects; CIP | — | — |
| 10 | 7/25/2014 | 2Q:14 10-Q | CIP; Goodwill; UCO/Cost Overruns | — | — |
| 11 | 10/23/2014* | 3Q:14 Earnings Call | Delays/Cost Overruns; Fabrication Defects | 1.1% | 5% |
| 12 | 10/24/2014 | 3Q:14 10-Q | CIP; Goodwill; UCO/Cost Overruns | 1.1% | 5% |
| 13 | 11/11/2014 | Investor Day Conference | Delays/Cost Overruns; Fabrication Defects | — | — |
| 14 | 2/24/2015* | FY:14 Earnings Call | Delays/Cost Overruns | 0.0% | 5% |
| 15 | 2/25/2015 | FY:14 10-K | CIP; Goodwill; UCO/Cost Overruns | 0.0% | 5% |
| 16 | 4/24/2015 | 1Q:15 10-Q | CIP; Goodwill; UCO/Cost Overruns | — | — |
| * Event occurred after market close. | | | | | |

[**Editor's Note:** The preceding image contains the reference for footnotes[145,146,147]].

144    *See supra* Part IV.C.3.b. *See also* Complaint ¶¶ 99-175; Finnerty Rpt. Ex. 8; Def. Hearing Ex. 21.

145    The *p*-values were drawn from Ex. 8 of the Finnerty Rpt.

146    Ms. Allen did not report the actual *p*-values of her calculations to the Court. Thus, the precise level of significance of her findings are unknown.

147    For this disclosure date, as well as for 7/25/14 and 4/24/15, Dr. Finnerty found a statistically significant *decrease* in CBI's stock price. *See* Finnerty Rpt. Ex. 9. However, because this section's analysis focuses on alleged misrepresentations, as opposed to corrective disclosures, statistically significant decreases do not disprove Plaintiffs' theory of price-maintenance. *See Waggoner,* 875 F.3d at 104. As an initial matter, the stock price drop could be attributed to a number of other causes, such as confounding information or other market forces not already accounted for in the model. Moreover, a price-maintenance argument necessarily assumes that no new information is being disclosed with respect to the misrepresentation. Thus, if Defendants attempted to rebut this argument by pointing to a price decrease, they would have to abandon one of two necessary assumptions, either: (i) that new information was not released, or (ii) that the market was efficient. If Defendants abandon the first assumption, and instead presume that new information *was* released, that argument would respond to an affirmative misrepresentation theory. If Defendants abandon the assumption that the market was efficient, they can no longer rely on any statistically significant change in CBI's stock price to prove what information was already impounded in the price, as they will have severed the causal evidentiary link between stock price changes and new information being revealed to the market. *Cf. infra* pp. 83-84 (finding that the same set of disclosures cannot act as misrepresentations where Plaintiffs rely on the statistically significant price drop on the *same date* to establish a corrective disclosure).

### 6. Corrective Disclosures

**\*24** Plaintiffs now assert seven corrective disclosure dates, all of which are discussed in detail below. Defendants, on the other hand, refer to fifteen alleged corrective disclosures, including all the corrective disclosures that Plaintiffs originally pled. I decline to analyze those corrective disclosures that Plaintiffs have abandoned.[148] I further conclude that it is inappropriate for Defendants to analyze those disclosures in their attempt to disprove price impact as there is no longer a claim by Plaintiffs that those disclosures prove there *was a price impact* in the first place. The only way in which the abandoned corrective disclosures would be relevant is if

Defendants now claim they are corrective disclosures, but did not affect the market price of CBI stock — a position Defendants emphatically reject.[149]

148    I recognize that Plaintiffs are not bound by the allegations in their Complaint. *See In re Vivendi, S.A. Sec. Litig.,* 838 F.3d at 242 n.11 ("We identify no such requirement in the PSLRA, which sets out certain pleading standards so as to prevent securities-fraud plaintiffs from filing costly securities class-action suits on the basis of a barely formed hunch, but nowhere binds such plaintiffs to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation."). However, I strongly believe that they are now bound by their decision in this class certification motion to disclaim reliance on any corrective disclosures other than the seven identified in their memoranda of law and in their expert's reports. To permit Plaintiffs to reinstate those dates at summary judgment or trial would make a sham of the class certification proceedings — the expert analyses, the Hearing, and this Opinion.

149    *See, e.g.,* Allen Rpt. ¶¶ 173-177 (finding that the previously alleged corrective disclosure of a November 23, 2014 downgrade of CBI stock by Goldman Sachs "bears no apparent relation to Plaintiffs' allegations...."; and "Goldman Sachs explicitly stated that their downgrade of CBI's stock was *unrelated* to the Nuclear Projects"); ¶ 185 (finding that the previously alleged corrective disclosure of February 4, 2015 was not corrective as the same information had been previously disclosed); ¶ 189 (finding that the previously alleged corrective disclosure of April 23, 2015 was not corrective as the same information had been previously disclosed); ¶ 194 (finding that the previously alleged corrective disclosure of June 23, 2015 was not corrective as the same information had been previously disclosed).

There is one further important point regarding the relationship between corrective disclosures and alleged misrepresentations. Seven of the sixteen alleged misrepresentations were found to have a statistically significant front-end impact by one or both of the experts. As discussed, there are only two ways that a defendant might rebut front-end price impact: (i) by rejecting the plaintiffs' expert's event study findings; or (ii) by showing that the alleged misrepresentation contained no new information. Neither of those options are available to Defendants for those seven alleged misrepresentations because: (i) Ms. Allen found a statistically significant price impact on each date;[150] and (ii) I have already rejected the need to conduct a newness analysis with respect to alleged misrepresentations.[151] Thus, I will not consider Defendants' evidence of the absence of price

impact as to the potential corrective disclosures relating to those seven misrepresentations, as an absence of back-end price impact does not rebut a statistically significant front-end response to the alleged misrepresentation.

150    *See* Def. Hearing Ex. 21.

151    *See supra* pp. 54-55.

In addition to considering whether each of the alleged corrective disclosure dates have statistically significant price reactions, I will evaluate both newness and correctiveness as set forth above.[152] In evaluating "correctiveness" I will first identify the categories of alleged misrepresentations as outlined above to which that a particular disclosure relates.[153]

152    *See supra* pp. 54-59.

153    *See supra* p. 59.

### a. Corrective Disclosure #1

**\*25** Although it was not originally pled in the Complaint, Plaintiffs now submit that an analyst report, published by Vertical Research Partners on the afternoon of June 11, 2014 ("Vertical Report"), is a corrective disclosure with respect to certain of CBI's allegedly improper accounting practices.[154] The Report stated, in pertinent part, that "the allocation of the Shaw acquisition purchase price to net contracts in process account ... deteriorated by a meaningful amount between Q113 and year end. Conversely, deferred tax income and goodwill increased significantly."[155] The Vertical Report further noted that "the goodwill balance became almost equal to the entire purchase price of the Shaw acquisition."[156] The Report also commented on the process of marking liabilities to market which create[d] a non-cash 'credit' for the company, and troubling differences between the balance sheet and the cash flow statement concerning " 'change[s] in contracts in process and advanced payments' amount[ing] to $1.2 billion."[157] Ultimately, the Vertical Report downgraded its rating of CBI from buy to sell, and reduced its target price from $95 to $71.[158]

154    *See* Finnerty Rpt. App. C, ¶¶ 23-24 (citing Vertical Research Partners, CBI: Is Goodwill a Bad Omen?

Downgrade to Sell (2014)). The full Vertical Report is annexed as Ex. F to the Miller Reply Decl.

Finnerty Rpt. App. C ¶ 23 (quoting the Vertical Report).

*Id.*

*Id.* (quoting the Vertical Report at 1-2).

*See id.*

In addition to these statements, the Vertical Report provided several warnings to investors about CBI:

> We find the size and timing of the Shaw [purchase price] reallocations very unusual, and CB&I's limited explanations hard to understand.

> [T]he risk of a future impairment [of goodwill] is high. [I]t appears that a meaningful amount of cash left the company and is unlikely to be recovered.[159]

*See* Vertical Report at 1.

The Vertical Report thus relates to the following alleged GAAP violation subcategories: (i) Goodwill; (ii) CIP; and (iii) MFVL.[160] As a result, the Vertical Report could be corrective of the following alleged misrepresentations: #1 (10/30/13) (Goodwill and CIP only); #4 (2/27/14) (Goodwill and CIP only); #5 (4/23/14) (MFVL only); and #7 (4/23/14) (Goodwill, CIP, and MFVL only).[161] The experts found a statistically significant front-end price reaction with respect only to #1 (only by Ms. Allen — not Dr. Finnerty).[162] However, because neither expert found a statistically significant price reaction with respect to ##4, 5, and 7, Defendants can rebut price impact for those three alleged misrepresentations by establishing an absence of price impact following this (and all other relevant) corrective disclosure date(s).

*See* Finnerty Rpt. App. C ¶¶ 23-24.

While several other alleged misrepresentations relate to

these GAAP issues (*i.e.* #9 (7/24/14), #10 (7/25/14); #12 (10/24/14); #15 (2/25/15) and #16 (4/24/15)), the Vertical Report cannot have corrected any misrepresentations on those dates because it was issued in June of 2014, *prior* to those alleged misrepresentations, and an earlier corrective disclosure logically cannot correct a later misrepresentation.

*See supra* p. 59.

I will briefly summarize the relevant portions of the three alleged misrepresentations that did not have a front-end price impact. On February 27, 2014, CBI released its Fiscal Year 2013 10-K. Plaintiffs allege that the 10-K contained the following misrepresentations relating to goodwill impairment and GAAP compliance:

> ***Based upon [CBI's] quantitative assessment, no [goodwill] impairment charge was necessary during 2013, as the fair value of each of the reporting units acquired in 2013 exceeded their respective net book value and the fair value of all other reporting units significantly exceeded their respective net book values.***[163]
> These Consolidated Financial Statements ... are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") ...[164]

Complaint ¶ 110 (emphasis in original).

*Id.* ¶ 114.

On April 23, 2014, CBI issued a press release announcing first quarter revenue of $2.9 billion, net income of $89 million, and adjusted earnings per share ("EPS") of $.87.[165] In the press release, CBI and Mr. Asherman boasted that CBI's " 'revenues and earnings remained solid.' "[166] According to Plaintiffs, these figures were inflated and misleading, in part, because "they omitted that the liability for contracts in progress, net, obtained in the Shaw purchase, was understated by more than $1 billion" and they "omitted that a stop work order had been issued covering large parts of Q1 2014 due to 'multiple adverse conditions impacting hardware,' including 'welder qualification, the qualification and compliance of welding procedures, and documentation of fabrication activities....' "[167]

*See* Finnerty Rpt. App. C, ¶ 15.

166   Complaint (quoting the 4/23/14 CBI press release).

167   *Id.* ¶ 117.

**\*26** The third alleged misrepresentation took place on the following day, April 24, when CBI released its 1Q:14 10-Q. Plaintiffs allege that not only did the 10-Q repeat the misleading information first disclosed in the press release from the previous day, it also made the following misrepresentations regarding goodwill impairment and compliance with GAAP:

> ***During the three months ended March 31, 2014, no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded.***[168]
> The accompanying unaudited interim Condensed Consolidated Financial Statements ... for CB&I have been prepared ... in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") ...[169]

168   *Id.* ¶ 122 (emphasis in original).

169   *Id.* ¶ 124.

The Vertical Report was published several months later, on June 11, 2014. According to Dr. Finnerty, the abnormal return for CBI's common stock on the next trading day was -3.35%.[170] Dr. Finnerty found this return to be statistically significant at the 1.89% level, and Ms. Allen found the return to be statistically significant at the 0.69% level.[171] Thus, both experts agree that that there was a statistically significant negative price reaction following the release of the Vertical Report. This conclusion, however, does not end the inquiry. As noted above, I also have determined that the disclosure must be analyzed for both "newness" and "correctiveness" as defined earlier in this Opinion.[172]

170   Finnerty Rpt. Ex. 10 at 3.

171   Dr. Finnerty reported a *p*-value for this date of .0189, which corresponds to a statistical significance level of 1.89%. Ms. Allen reported a *p*-value of .0069,

corresponding to a statistical significance level of 0.69%. *See* Plaintiffs' Hearing Slide 3, which Dr. Finnerty prepared using his findings as well as the raw data that Ms. Allen provided to Plaintiffs as backup. Ms. Allen did not provide this data directly to the Court.

172   *See supra* pp. 54-59.

With respect to this particular disclosure, Defendants do not dispute that it relates to the same subject matter as several earlier misrepresentations. But they do emphatically argue that the Vertical Report did not reveal any new information to the market. Defendants argue that if the Vertical Report merely explains or expands on previously disclosed figures, that is not new information.

Ms. Allen opines that the "allegedly corrective information in the Vertical Research report was based entirely on previously-disclosed, publicly available information that was released months prior" to the report.[173] According to Ms. Allen, any price impact would contradict the efficient market hypothesis because that would mean the market had not impounded the earlier disclosed information into the price of the stock.[174]

173   Allen Rpt. ¶ 126.

174   *See id.*

Turning to the specific information disclosed, Ms. Allen asserts that the Vertical Report's comments regarding the changes to CBI's goodwill and CIP liability, and the disparity between CBI's net income and cash flows were previously disclosed in the company's SEC filings, and were commented on by analysts at the time of the filings. She provided two examples of such commentary from February of 2014, which discussed the "**increased levels of contract capital and goodwill on the balance sheet**," and the "notable $422 million outflow on account of contracts in progress (which we assume are largely linked to work done on the nuclear projects)."[175]

175   *Id.* ¶¶ 129, 130 (emphasis in original).

**\*27** Ms. Allen is correct that the Vertical Report's calculation of the changes in the goodwill and CIP figures over the course of the fiscal year is not new information.

Not only had prior analysts performed and reported similar calculations, but simply comparing one line in a 10-Q to the same line item in a prior 10-Q is not the type of analysis that could provide new information to the market. When markets react to SEC filings, they react not only to the absolute numbers provided in that filing, but also to relative changes in the figures over time (*i.e.* trends). Thus, when the Vertical Report states that CBI's "net contracts in progress account specifically deteriorated by $1.2B between Q113 (quarter deal closed) and Q413," or "[m]anagement's adjustments to Shaw's purchase price allocation drove goodwill up $847MM to $3.30B," this would not be new information to the market — even the first time an analyst reports the calculation.[176]

176   While I tend to agree with Defendants that once data is disclosed it cannot be considered new information merely because an analyst explains the data in a more fulsome manner, several courts have addressed this question and have reached different conclusion on this fact intensive issue. *Compare Meyer v. Greene*, 710 F.3d 1189, 1197-1200 (11th Cir. 2013) (finding that an analyst report suggesting that the company's goodwill should be impaired pursuant to GAAP was not a corrective disclosure because it was merely a repackaged opinion of already public information), *with In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (finding that a reasonable jury could conclude that an analyst report that downgraded the company's stock five days after the public disclosure of a DOE report suggesting that the company had violated DOE regulations constituted a corrective disclosure that "provid[ed] additional or more authoritative fraud-related information that deflated the stock price"). However, because of my findings below regarding the remainder of the related "new" information identified by Plaintiffs in the Vertical Report, I need not make a definitive decision as to whether analysis of previously disclosed data *could ever* act as a corrective disclosure.

However, the Vertical Report provides more than simple arithmetic with respect to various figures in CBI's 10-Qs. In his rebuttal report, Dr. Finnerty acknowledged that the Vertical Report analyzed certain prior financial disclosures but he found that it also revealed for the first time questionable accounting treatment regarding CBI's PPAs for the Shaw acquisition.[177] He also cited internal CBI communications on June 12, 2014, which revealed concerns both from CBI executives and from investors, including a request from large investors to speak with CBI management, regarding "CBI's explanation of its evolving accounting for the Shaw acquisition."[178] Dr. Finnerty opines that these communications disprove Ms. Allen's assertion that the contents of the Vertical Report were previously known to the market.[179] He also points

out that if the information in the Vertical Report was, in fact, known to the market, "large investors would not have [had] questions about the report and would not have felt the need to speak with CBI's Chief Financial Officer, [ ] about the accounting issue."[180]

177   *See* Finnerty Reply Rpt. ¶ 145.

178   *Id.* ¶ 147. *See also* Plaintiffs' Hearing Slide 36 quoting various documents obtained during discovery: "Overnight it was by several of our larger holders who are all asking to speak with [CFO] Ron [Ballschmiede] asap.... [T]he report generated downward anxiety among shareholders, as reflected in the downward pressure in the stock, which closed at $76.72, down 5% .... [T]he street views [Vertical analyst Brian Konigsberg, the author of the Vertical Report] as having credibility and providing fairly thorough research.").

179   *See* Finnerty Reply Rpt. ¶ 148.

180   *Id.*

**\*28** I agree. There is information in the Vertical Report that was new to the market. In addition to information regarding the accounting treatment surrounding CBI's PPAs for the Shaw acquisition, the Vertical Report disclosed conversations that the Report's author had with CBI management in which they revealed how CBI's accounting for liabilities by marking them to market "created a non-cash credit for the company" and discussed their belief that that the CIP liability "was the major driver of the change" to the net CIP account in its financial statements. The recounting of these conversations with firm management alone is "new" information to the market.

Moreover, during the Hearing, Ms. Allen essentially conceded that the statements in the Vertical Report regarding: (i) the unlikely chances of CBI recovering the large amount of cash that had left the company; (ii) the unusual nature of the "size and timing of the purchase price reallocations"; and (iii) the high risk of a future goodwill impairment, were all new to the market.[181] However, Ms. Allen argues that all of those statements are merely the analyst's opinions and speculations.[182] Such information, even if new to the market, cannot be corrective.[183]

[181]    *See* Hearing Tr. at 234-244.

[182]    *See id.*

[183]    *See supra* note 142; *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

While it may be true that analyst reports that "merely rais[e] questions and speculation by analysts"[184] do not constitute corrective disclosures, the Vertical Report contains more than analyst questions and speculation. It identifies accounting and financial statement irregularities and conveyed CBI's limited explanations for its treatment to the market. Accordingly, the Vertical Research Report constitutes a corrective disclosure.

[184]    *See In re Signet Jewelers,* 2019 WL 3001084, at *4, *17.

### b. Corrective Disclosure #2

On June 17, 2014, several days after the publication of the Vertical Report, Prescience Point Research Group ("Prescience Point"), a short-seller, published an in-depth 38 page report strongly criticizing CBI's accounting practices and directly calling into question its compliance with GAAP and the integrity of its reported profitability (the "Prescience Report"). Plaintiffs claim that this Report is a partial corrective disclosure.[185] While it may relate to some of the same misrepresentations as the Vertical Report, it is immediately apparent that the Prescience Report is substantially different both in tone and in depth of content and analysis.

[185]    *See* Complaint ¶ 129; Finnerty Rpt. App. C ¶¶ 25-28 (citing Prescience Point, Acquisition Accounting Gone Nuclear (2014)). The full Prescience Report is annexed as Ex. 2 to the Kerr Decl.

The Prescience Report goes beyond merely reporting changes in financial figures over time and raising questions about whether those changes are unusual or could eventually signal difficulties for CBI. It attacks the veracity of the information that CBI is issuing and that the market is ultimately relying upon in valuing CBI's stock, even going so far as to refer to CBI's accounting as "highly misleading," "useless toward evaluating its business," a "mirage," and a "blatant lie."[186] The Prescience Report also discusses management's incentive to inflate earnings in order to meet EPS bonus targets, and characterizes their actions in doing so as "akin to a theft."[187]

[186]    Prescience Report at 6, 7, 9.

[187]    *Id.* at 7; *see also id.* at 23-26.

The Prescience Report provided several new pieces of information to the market. While the Prescience Report is too long to describe in detail here, it bears quoting from the Executive Summary in substantial part:

> **\*29** Shares of [CBI] are grossly overvalued. CBI has used creative acquisition accounting to conceal losses, resulting in GAAP financial statements divorced from its economic realities. After acquiring Shaw Group in 2013, CBI made unusual and repeated retroactive adjustments to its purchase price allocation. Doing so enabled it to amass a ~1.56B reserve that can be converted directly into gross profit to offset future costs, thereby inflating profitability.... CBI is struggling with certain Shaw contracts that may prove to be severely loss making, and the reserve is being used to mask their impacts and CBI's increasingly fragile financial condition. Q1'2014 results confirm our expectations that CBI continues to face headwinds, including continued losses, divergence of earnings and cash flow, and a rising dependency on debt. CBI likely has no excess cash, and is already overleveraged.... We believe CBI will be forced into a goodwill write-down or financials restatement, either of which would trigger debt default, heightening the risk of a liquidity crisis or dilutive equity raise.
>
> Meanwhile, Wall Street analysts are missing the forest for the trees, anchoring their projections to CBI guidance without knowledge that CBI is using cookie jar accounting to "close the gap" on achieving it. We believe CBI has presented itself to the investing public in a highly questionable manner and that, as a result, it has been successful in its efforts to inflate its stock price beyond reasonable measure. Based on our analysis, CBI stock is worth ~$37 per share, 49% below current trading levels.[188]

[188]    *Id.* at 5.

According to Plaintiffs, the Prescience Report also

asserted that CBI: (i) improperly accounted for goodwill to cover up construction delays and cost overruns; (ii) masked its credit risk through the PPAs; (iii) was likely violating GAAP through its "cookie jar accounting"; (iv) was "knowingly or recklessly failing to disclose that its underlying financial performance [was] dramatically different from [its] reports to the investing public"; (v) was misleading investors regarding progress with the Nuclear Projects by not disclosing fabrication defects;[189] and (vi) was likely on the hook for cost overruns.[190]

[189]   *See, e.g., id.* at 16 ("A recent report to the South Carolina office of regulatory staff indicates, the delay was in part due to CBI's failure to deliver modules on time and to quality from [its] Lake Charles, LA, facility, which would indicate CBI should be on the hook for some of these costs. Of course, if CBI is on the hook, as we suspect, but it made PPA adjustments in response to post-acquisition events such as the one above, then indeed, it would be [sic] enable it to demonstrate no impact on guidance or go-forward financials, given that the reserve would allow it to avert the reporting of contract losses.").

[190]   Complaint ¶ 129; Finnerty Rpt. ¶¶ 25-28 (quoting Prescience Report at 5).

The Prescience Report thus relates to following misrepresentation categories: (i) liability for delays/cost overruns; and (ii) fabrication defects, as well as the following alleged GAAP violation subcategories: (i) Goodwill; (ii) CIP; and (iii) MFVL. This implicates the following alleged misrepresentations: #1 (10/30/13) (liability for delays/cost overruns, Goodwill, and CIP only); #3 (2/25/14); #4 (2/27/14) (Goodwill and CIP only); #5 (4/23/14) (liability for delays/cost overruns, CIP, and MFVL only); and #7 (4/24/14) (liability for delays/cost overruns, CIP, MFVL, and Goodwill only).[191] The experts found a statistically significant front-end price reaction with respect to #1 and #3. But because neither expert found a statistically significant price reaction with respect to ##4, 5, and 7, Defendants can rebut price impact for those alleged misrepresentations by establishing an absence of price impact following this (and all other relevant) corrective disclosure date(s). I have already summarized the relevant portions of those three alleged misrepresentations with respect to the remaining categories at issue here.[192]

[191]   Several other later alleged misrepresentations also relate to these categories: ## 9-16, all of which occurred *after* the alleged corrective disclosure. *See supra* note 161.

[192]   *See supra* pp. 65-67. As discussed above, the Prescience Report also relates to (i) liability for delays/cost overruns; and (ii) fabrication defects. However, the only alleged misrepresentations that occurred prior to the Prescience Report that also relate to these categories are #1 and #3. Because both of these alleged misrepresentations had front-end impact, they need not be analyzed further, and thus the portion of the Prescience Report that relates to these two categories are not addressed. However, I note that the Prescience Report does appear to provide some information in relation to these two categories that I would consider to be corrective. *See, e.g.*, Prescience Report at 34-38.

**\*30** Following the publication of the Prescience Report, CBI's stock dropped by more than 8% on high trading volume.[193] Both Dr. Finnerty and Ms. Allen found the abnormal return of approximately -8% to be statistically significant at the 0.00% level.[194] Notwithstanding this extreme level of statistical significance, Ms. Allen argues that there was no price impact caused by this alleged corrective disclosure, based on the newness and correctiveness of its content.[195]

[193]   *See* Complaint ¶ 129.

[194]   *See* Plaintiffs' Hearing Slide 3.

[195]   As with the Vertical Report, Defendants do not dispute that the Prescience Report relates to the same subject matter as the alleged misrepresentations. However, Ms. Allen also claims that "analyst commentary attributed the price decline not to the allegedly corrective information about CBI's goodwill or the divergence between CBI's net income and cash flow, but to the market's concern over the suggestion that CBI might be required to write down its goodwill immediately or restate its financials, which would affect the Company's liquidity position and require the Company to raise more capital." Allen Rpt. ¶ 137. Not only is this alternative explanation "directly related to Plaintiffs' allegations," Finnerty Reply Rpt. ¶ 161, it crosses the threshold into an improper analysis of loss causation.

However, I will first address Defendants' additional contention regarding the ulterior motives behind the Report.[196] As clearly acknowledged in the Report, Prescience Point is, at least in part, a short-seller, and held a short position in CBI stock when it published the Report.[197] Thus it stood to gain financially if and when the

stock price of CBI declined.[198]

196    *See* Hearing Tr. at 162.

197    *See id.*; Prescience Report at 3.

198    On December 15, 2014, Prescience Point tweeted the following: "$CBI hit our $37.50 price target today; it's declined ~50% since we published our Sell rec on 6/17/14. Easy money's been made. We are out." *See* Kerr Decl. Ex. F to Ex. 2.

Defendants argue that because the Prescience Report was published with the intention of lowering CBI's stock price, it has little or no credibility. While Defendants are correct that the statements in the Report must be viewed through the prism of this intent, this is not an absolute bar to the Report serving as a corrective disclosure. Although the market was aware that the Report was published by a short-seller, CBI's stock price nonetheless dropped by more than 8% in its wake. Thus, as Dr. Finnerty stated during the Hearing, "sometimes [short-sellers] do pretty good research.... I wouldn't condemn somebody just because they're a short seller. I think you have to read the report and you've got to judge the credibility of what's in that report based on what's there."[199]

199    Hearing Tr. at 465.

I now turn to newness and correctiveness. Ms. Allen again claims that "the allegedly corrective information in the Prescience Point report were based entirely on previously-disclosed, publicly available information that was released months prior to the alleged corrective disclosures."[200] As in the Vertical Report, the Prescience Report calculates some changes in various CBI financial statement line items over the course of 2013.[201] As I found to be the case with respect to the Vertical Report, these simple calculations do not provide new information to the market.[202] However, many of the Prescience Report's allegations — reminiscent of those in the Complaint — present new information to the market that goes beyond merely speculating or raising questions. A few examples follow:

**\*31** [I]n light of the completeness of CBI's pre-acquisition due diligence and its reassurances in its due diligence process months after the acquisition, the pattern of CBI's fair value adjustments — with the lion share of the total adjustment being made in Q3 and Q4 — appears to indicate they were made in response to

post-acquisition events. If so, the PPA adjustments are not legitimate and CBI has violated GAAP by not taking charges against its earnings. [This conclusion] is supported by the existence of a litany of post-acquisition events which, we think, should have negatively impacted CBI's guidance and financial statements, but never did.[203]

Given the gravity of our findings, we arranged calls with CBI Investor Relations (IR) for more clarity. We spoke with a CBI IR contact on 2 occasions (3/26/14 and 5/14/14). He was helpful in answering questions and had a working knowledge of the PPA adjustments, although we asked several questions he either did not know the answer to or just did not want to answer ... We requested two different times to have a follow-up call with the CFO but these requests were not met.... Regardless our contact with management confirms the core of our thesis — that CBI is offsetting costs, and thereby inflating its profitability, made possible by its post-acquisition adjustments to the Shaw PPA.[204]

[In response to questioning regarding the purpose of the reserve, CBI IR responded] That I think we have not clearly laid out in our financials as to why we say there was a change in the fair value of the assets that we acquired. We have not pinpointed a specific cause for these adjustments beyond the change in value. As you know when you go through an acquisition you don't have 100% visibility as to the quality of the assets. We have not specifically discussed the cost and drivers for that adjustment.[205]

[M]anagement can be observed, we believe, to actively mislead investors to prevent the discovery of its accounting shenanigans ... CBI is taking cash losses, and we believe those losses are being concealed from shareholders.[206]

200    Allen Rpt. ¶ 134. In further support, Defendants point out that the Prescience Report states in the Legal Disclaimer section that all of the "research opinions ... are based upon publicly available information." Prescience Report at 3; *see also* Hearing Tr. at 459-464. Yet, the Report also states that its conclusions were in part informed and confirmed by two calls made to CBI's investor relations personnel, transcripts of which the report quotes from at some length. *See* Prescience Report at 26-27.

201    *See, e.g.*, Prescience Report at 6 ("CBI made $1.2B of the total ~$1.56B (>75%) fair value adjustment in Q3 and Q4 alone, eight to eleven months after the deal was completed....") (emphasis omitted).

202    *See supra* pp. 69-70.

203    Prescience Report at 6.

204    *Id.* at 7.

205    *Id.* at 27 (quoting CBI IR call transcript).

206    *Id.* at 17.

Notwithstanding the litany of allegations outlined in the Prescience Report, Ms. Allen points to analyst reports following the disclosure which allegedly confirm that CBI's accounting practices were not in violation of GAAP and were standard in the EPC industry.[207] It is not necessary, however, to determine whether or not CBI's accounting practices in fact violated GAAP. So long as the Prescience Report disclosed new and sufficiently corrective information to the market and caused a price impact, that ends the inquiry. I find that the Prescience Report is a corrective disclosure with respect to the same categories of information as the alleged misrepresentations identified above, and thus find that the Report is a partial corrective disclosure.

207    *See* Allen Rpt. ¶¶ 139-140; Hearing Tr. at 120-131. Earlier in her report, Ms. Allen also cites to the fact that: (i) CBI never restated its financials; and (ii) no regulatory agency ever publicly found that CBI violated GAAP, as evidence that CBI *did not* violate GAAP. *See* Allen Rpt. ¶ 131.

### c. Corrective Disclosure #3

**\*32** The allegation that CBI's 2Q:14 10-Q, filed on July 25, 2014, constituted a partial corrective disclosure can be found at paragraphs 134, 139, and 204 of the Complaint:

The Form 10-Q ... again falsely stated that there were no indicators of impairment of goodwill. ***Significantly, however, the Q2:14 Form 10-Q showed a growing disparity between cash flows and non-cash earnings*** .... (¶ 134 (quoting CBI's 2Q:14) (emphasis added))

CBI's financial statements did not comply with GAAP because, *inter alia*, CBI's financial statements impermissibly ... ***carried goodwill that far exceeded its fair value***, all of which overstated earnings. (¶ 139 (quoting 2Q:14) (emphasis added))

[CBI's] 2Q:14 Form 10-Q revealed data showing a growing disparity between cash flows and non-cash earnings. (¶ 204)

This corrective disclosure allegedly revealed to the market that CBI violated GAAP by falsely stating that there were no indicators of impairment of goodwill at the time it filed its financial disclosures with the SEC. Accordingly, the following alleged misrepresentations are at issue here, limited to those occurring before or simultaneous with the alleged corrective disclosure: #1 (10/30/13) (Goodwill only); #4 (2/27/14) (Goodwill only); #7 (4/23/14) (Goodwill only); and #10 (7/25/14) (Goodwill only).[208] Of these, only ##4, 7, and 10 did not have a statistically significant front-end impact. I have already summarized ##4 and 7 above.[209] I will now summarize the remaining alleged misrepresentation (#10) to the extent it relates to the subject matter of this alleged corrective disclosure.

208    The alleged misrepresentations #8 and #9 also occurred on the same market date as this alleged corrective disclosure.

209    *See supra* pp. 65-67.

On July 25, 2014 CBI filed its 2Q:14 10-Q. The gist of the alleged misrepresentation is that CBI falsely stated that its financial statements and SEC reporting complied with GAAP. The 10-Q explicitly stated that "no indicators of goodwill impairment were identified and therefore no goodwill impairment charge was recorded."[210]

210    Complaint ¶ 136 (emphasis omitted).

The Complaint alleges that goodwill was in fact impaired because "it's carrying (reported) value was higher than its fair value ... and declining cash flows provided an indicator of impairments."[211] According to Plaintiffs, GAAP required CBI to "write down goodwill to its fair value, with a corresponding charge to expense on its income statement, but failed to do so."[212] In a concluding paragraph Plaintiffs allege that the financial statement failed to comply with GAAP because it "... carried goodwill that far exceeded its fair value, all of which overstated earnings."[213]

211    *Id.* ¶ 137.

212    *Id.*

213    *Id.* ¶ 139.

Before analyzing whether the July 25, 2014 filing of the 2Q:14 10-Q was, in fact, corrective, a different issue must be addressed. Plaintiffs allege that the July 25 10-Q constitutes both a misrepresentation *and* a corrective disclosure.[214] On the trading date following the release of the 10-Q, the market price of CBI stock *dropped* by ~8%, and both experts found the abnormal return to be statistically significant at the 0% level.[215] Obviously no artificial inflation in the price was created as a result of the release of the 10-Q and Plaintiffs cannot rely on a price maintenance theory because on the corrective disclosure side, Plaintiffs *rely* on the steep statistically significant *decline* in the price to show that the market learned for the first time that previous statements with respect to GAAP compliance regarding goodwill impairment were false.

214    The alleged misrepresentation in the 10-Q clearly dealt with the same subject matter as the corrective disclosure. *See* Complaint ¶ 136 (quoting 2Q:14 10-Q).

215    *See* Plaintiffs' Hearing Slide 3.

**\*33** Plaintiffs cannot have it both ways. The same set of disclosures analyzed on this date (misrepresentations ##8-10) cannot be both misrepresentations and a partial corrective disclosure with respect to CBI's compliance with GAAP. Nor have Plaintiffs explained how the disclosures could serve both functions, given the interrelated nature of the alleged misrepresentations. Because there was no price increase at the time of the misrepresentation, and because Plaintiffs are relying on the price drop on the date following the release of the 10-Q, the link between the misrepresentation and the price of the stock has been severed. These alleged misrepresentations are not actionable as there is no proof of price impact resulting from the alleged misrepresentations.[216]

216    I realize that some parts of the 10-Q are alleged to be corrective disclosures and other parts are alleged to be

misrepresentations. But there still has to be some indication that the misrepresentation either raised or maintained the price of the stock. The *Basic* presumption has been rebutted by Defendants' showing of an absence of price impact for this misrepresentation.

I turn now to the allegation that the 2Q:14 10-Q is a partial corrective disclosure. With respect to the other misrepresentations identified above, Plaintiffs allege at paragraph 137 of the Complaint that "[a]ccording to GAAP, CBI was required to write down goodwill to its fair value, with a corresponding charge to expense on its income statement, but failed to do so." This allegation is based on the disclosure in the 10-Q that the declining cash flows (referenced at paragraph 134 of the Complaint), were, in fact, an indicator of impairment. Analyst commentary cited by Dr. Finnerty at Appendix C of his original report also focused on concerns relating to various aspects of CBI's financial reporting based on disclosures in the 10-Q.[217] The only remaining question, then, is whether this information had been previously disclosed to the market.[218]

217    *See* Finnerty Rpt. App. C ¶¶ 32-39 providing the following examples (UBS pointed to the Company's "negative cash flow"; Barclays noted CBI's "weak cash flows").

218    "Newness" is the only element of "correctiveness" to be addressed. There is no argument here that the alleged correction did not relate to the same subject matter as previous misrepresentations, and there is no argument that the alleged correction is mere speculation or negative criticism.

Ms. Allen challenges the "newness" of the information regarding the disparity between net income and cash flow based on analyst reports just prior to and shortly after the release of the 2Q:14 10-Q. But the snippets from the pre-release analyst reports quoted by Ms. Allen reveal only that some analysts had the *expectation* that cash flow would be "negative again in 2Q14" and expressed the *belief* that "CBI will again post disappointing 2Q14 cash flow."[219] This is quite distinct from the release of actual figures by CBI in its 2Q:14 10-Q filing two days later, which provided the precise dollar amounts supporting the conclusion that the disparity between net income and cash flow had grown since previous financial disclosures.[220] This is sufficient to make the information contained in the 10-Q new to the market, and therefore a corrective disclosure as to CBI's misrepresentations relating to

goodwill.[221]

219   Allen Rpt. ¶ 144 (quoting 7/21/14 analyst report).

220   *See* Finnerty Reply Rpt. ¶ 173 ("The corrective disclosure on July 25, 2014 is not merely concerned with the 'disconnect between CBI's earnings and cash flow' and/or 'negative cash flows, but rather, with the *magnitude of the divergence*, which was revealed for the first time in CBI's 2Q14 Form 10-Q.") (emphasis added). *See also* Hearing Tr. at 479-481.

221   Ms. Allen also argues that commentary in analyst reports published *after* the release of the 10-Q attributed the drop in the stock price to causes other than the potential GAAP violations. But this alternative explanation of the *cause* of the decline crosses the line into assessments of loss causation and materiality.

### d. Corrective Disclosure #4

**\*34** The next alleged corrective disclosure, although not pled in the Complaint, is a SCANA press release dated October 2, 2014.[222] In the press release SCANA disclosed that the Consortium had issued a revised construction schedule to "incorporate project delays associated with engineering completion, construction lessons learned and component procurement and fabrication." The new schedule would "address the primary causes of delays to date, including late delivery of structural sub-modules." SCANA then stated that it had not accepted this new proposed schedule. The press release also noted that the Consortium had provided preliminary cost estimates related to these delays showing that SCANA's 55% share would be $660 million (suggesting a cost overrun of $1.2 billion). But, once again, SCANA rejected this figure. Finally, the press release stated that SCANA was investigating both the proposed schedule and the cost estimate and expected both to be a subject of further negotiation. Most importantly, the press release stated that SCANA had not "accepted financial responsibility for any project cost impact associated with these delays."[223]

222   However, the Complaint does describe a newspaper article of the same date as the press release, which included substantially the same information. The article warned that the V.C. Summer project might be further delayed and cost an additional $1.2 billion to complete. The article also discussed the scope of the project delay and suggested that CBI could be responsible for

hundreds of millions of dollars due to delays and cost overruns. *See* Complaint ¶¶ 140-145.

223   The text of the press release is found at Ex. 3 to the September 27, 2019 Supplemental Declaration of Brian C. Kerr in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Supp. Kerr Decl.").

This alleged corrective disclosure relates to the categories of liability for delays/cost overruns as well as fabrications defects. Therefore, the following misrepresentations are alleged to be corrected by this disclosure, at least in part: #1 (10/30/13) (liability for delays/cost overruns only); #3 (2/25/14); #5 (4/23/14) (liability for delays/cost overruns only); #6 (4/23/14) (liability for delays/cost overruns and fabrication defects only); #7 (4/24/14) (liability for delays/cost overruns only); and #9 (7/24/14) (liability for delays/cost overruns and fabrication defects only).[224] Only alleged misrepresentations ##5-7 and 9 did not have front-end impact, and I have already summarized #5 and #7 above.[225] I will now summarize the relevant portion of the remaining misrepresentations.

224   Three other alleged misrepresentations relate to delays and cost overruns but they occurred *after* this alleged corrective disclosures. Those are #11 (10/23/14); #13 (11/11/14); and #14 (2/24/15).

225   *See supra* pp. 65-67.

In the first quarter 2014 earnings conference call of April 23, 2014, Mr. Asherman stated that:

> Lake Charles has gone through some extensive NRC audits recently and I think passed those pretty well.... So we are thinking that [SCANA] is going to reach the similar milestone here very shortly, and we're going to continue to make progress and substantial progress on these jobs.[226]

226   Complaint ¶¶ 118-119 (citing CBI 1Q:14 earnings conference call of April 23, 2014).

On July 24, 2014, CBI held its 2Q:14 earnings conference call. At paragraph 132 of the Complaint, Plaintiffs alleged that CBI made the following misrepresentation as to cost overruns during that call.

[Question] Can you just maybe clarify what that

contract or the project extension timeframe means for CB&I's profitability?

MR. ASHERMAN: Well, ***the profitability doesn't change. ...*** But we feel pretty confident that we're going — it really doesn't affect it***.... So it doesn't really affect your profitability, I guess. And we're well protected in the contract ... and if there are changes ... the contract is very definitive in terms of whose [sic] entitled to what*** (emphasis in original).

Defendants challenge the SCANA press release, made several months after this alleged misrepresentations, as a corrective disclosure on two grounds. *First,* Ms. Allen points out that Dr. Finnerty only found a statistically significant negative return on the date of the press release at the 8.44% level of significance.[227] Ms. Allen found a statistically significant negative return on that date at the 6.56% level.[228] As set forth above, these findings are entitled to some weight, albeit less than if they had been at a higher level of significance.[229] Thus, there is some evidence of price impact on this date.

[227]     *See* Finnerty Rpt. Ex. 9.

[228]     *See* Plaintiffs' Hearing Slide 3.

[229]     *See supra* Part IV.C.3.a.

**\*35** *Second,* Ms. Allen relies on a single analyst report as evidence that nothing in the press release was new, because on July 22, 2014 — more than two months before the press release — the analyst noted uncertainty regarding the "likelihood and timing of the recovery of the cost increases on the nuclear projects," that there was "currently a dispute as to who is responsible for the cost overruns," and that CBI "expects to be reimbursed by either the customer ... or its consortium partner ... [although] it acknowledges that the timing or reimbursement remains uncertain."[230]

[230]     Allen Rpt. ¶ 159 (quoting a Wells Fargo analyst report of 7/22/14).

The July 22, 2014 analyst report does comment on the uncertainty as to who will bear the responsibility for cost overruns. And, as Defendants claim, it is true that SCANA made that same statement on several prior occasions — specifically on November 8, 2013, May 8, 2014, and August 11, 2014.[231] Thus, this information was

not new and could not have had any price impact in an efficient market. But what *is* new in the SCANA press release is the exact dollar amount of the dispute — $1.2 to $1.4 billion — which is not contained in the July 2014 analyst report or in the earlier 10-Qs.[232]

[231]     *See* Defendants' Hearing Ex. 31.

[232]     *See* Finnerty Reply Rpt. ¶¶ 187-188 (opining that the disclosure of the dollar figure, which was referenced in the analyst's October report, was "new information to the market when SCANA announced the news, and it is clear that Wells Fargo viewed this announcement as negative information"). *See also* Hearing Tr. at 483.

Finally, Ms. Allen notes that only one analyst — the same analyst as in the July report — covered the October SCANA press release.[233] In the October report the analyst summarized the press release and noted that it was still unclear what the impact of this dispute would be to CBI. This sole analyst report does not diminish the validity of the press release's status as a corrective disclosure.

[233]     *See* Allen Rpt. ¶¶ 157-158.

For the reasons set forth above, I conclude that the SCANA press release provides *some* new information to the market and is sufficiently corrective with respect to the alleged cost overruns misrepresentations.

### e. Corrective Disclosure #5

The next alleged corrective disclosure is testimony given on November 21, 2014 by two witnesses, Steven D. Roetger and William R. Jacobs, before the Georgia Public Service Commission. Mr. Roetger was an analyst for the Georgia Public Service Commission and Dr. Jacobs was the project manager at the Vogtle site and an executive consultant with a consulting and engineering firm. According to paragraph 153 of the Complaint, their testimony warned of various important developments in the construction of the Vogtle nuclear plants.

There continued to be "various stop work orders" at the Lake Charles, Louisiana facility [a CBI fabricating facility that was manufacturing components for the nuclear plants].

Georgia Power intended to "***hold the consortium***

*accountable for [the project] schedules* and methods and processes." (emphasis in original).

The Complaint alleges that in the five days following this testimony CBI stock dropped more than 17%.[234] Dr. Finnerty found that the 4.09% drop in price on the first trading day after the testimony (November 24) was statistically significant at the 0.43 level,[235] and Ms. Allen found the return to be statistically significant on that same day at the 1.33% level.[236] This alleged corrective disclosure covers: (i) liability for delays/cost overruns; (ii) fabrication defects at the Lake Charles facility; and (iii) the SWO/safety issues. As a result, the following misrepresentations relate to this disclosure: #1 (10/30/13) (cost overruns only) #2 (2/25/14) (SWO only); #3 (2/25/14); #5 (4/23/14) (cost overruns and SWO only); #6 (4/23/14); #7 (4/24/14) (cost overruns and SWO only); #9 (7/24/14) (cost overruns and fabrication defects); #11 (10/23/14); and #13 (11/11/14) (delays and fabrication defects).[237] The experts found statistically significant front-end impacts with respect to ##1-3 and 11, and I have already summarized ##5-7 and 9 above.[238] Thus, I turn now to a review of the remaining alleged misrepresentation (#13).

[234]    *See* Complaint ¶ 154.

[235]    *See* Plaintiffs' Hearing Slide 3.

[236]    *See id.*

[237]    According to the Complaint, only misrepresentations ##2, 5, 6, and 7 relate to the stop work orders.

[238]    *See supra* pp. 65-67, 88.

**\*36** In a colloquy during an Investor Day conference on November 11, 2014, Mr. Asherman responded as follows to a question regarding whether CBI would be "*left holding the bag if these projects continue to sort of push out a little bit*": "*So we're very optimistic about it.*" Later during the conference in response to another question as to whether investors could be confident that the future risk of further delays and cost overruns would be significantly reduced, Plaintiffs allege that Mr. Asherman implied that they would stating, "*We see that as we go further, and more economies of scale as we go forward*

*in the job. So, that's — it's a big difference*."[239]

[239]    Complaint ¶¶ 151-152 (citing CBI Investor Day, November 11, 2014) (emphasis as in Complaint).

A comparison of the summary of the testimony before the Georgia Public Service Commission, and the earlier misrepresentations, clearly shows that they address the same subject matter and that the testimony takes issue with those earlier statements. In Appendix C to his original report, Dr. Finnerty analyzes the effect of the Friday testimony before the Georgia Public Service Commission. As noted, both experts found some level of statistical significance with respect to the price drop on the Monday following the Friday testimony.[240]

[240]    The parties dispute when the testimony became available to the public. Plaintiffs say that the testimony transcript was not available to the public until Monday, November 24. Defendants argue that the testimony was available on Friday, and thus the 21st is the correct date to look for price impact. *See* Hearing Tr. at 570-571 ("Mr. Sterling: There's a question about what the proper reaction date is, but we think they're wrong, we think there's argument for the 21st, there's an argument for the 24th, there's no real argument for the 23rd...."). On the Sunday before, November 23, there was a negative analyst report that was originally identified by Plaintiffs as a corrective disclosure. Once they had the opportunity to review that report, Plaintiffs concluded that it did not relate to the subject matter of the misrepresentations. Defendants conclude that the stock drop on Monday November 24 was related to the negative analyst report issued on November 23, rather than the testimony before the Georgia Power Commission. *See id.* at 138-142, 570-572. But this argument bleeds into loss causation.

Ms. Allen, however, claims that the correct date to analyze the abnormal return was November 21 — the day of the testimony. Allen did not find a statistically significant reaction at the 5% level on that date. Ms. Allen further argues that the testimony did not provide any corrective information because no analysts commented on the testimony. She concludes that the lack of analyst commentary demonstrates the lack of any statistically significant price impact.

As discussed earlier, the presence or absence of analyst commentary, while of interest, is not a scientifically accepted method of demonstrating price impact or its absence. Furthermore, a trier of fact, eventually, can consider that evidence, or lack thereof, as proof of the absence of price impact. But at this stage analyst commentary is only some evidence that rebuts the results

of the competing event studies. In rebuttal, Dr. Finnerty makes two arguments. *First,* he states that Ms. Allen studied the wrong date (*i.e.* November 21) when she asserts that there was no statistical significance at the 5% level. *Second,* Dr. Finnerty found one analyst report of November 25, 2014 which did, in fact, comment on the testimony.[241]

241   *See* Finnerty Reply Rpt. ¶¶ 196-198 (describing the analyst report that highlighted the risk of delays and cost overruns, as well as new cost expectations, and criticizing the lack of an updated timeline, and new cost expectations).

**\*37** I agree with Dr. Finnerty that November 24 is the appropriate date to test for price impact. Moreover, given the limited nature of the acceptable correctiveness review, I conclude that the testimony before the Georgia Public Service Commission is a corrective disclosure.

### f. Corrective Disclosure #6

The next corrective disclosure alleged in the Complaint is the publication of the Southern Company 8-K on the evening of January 29, 2015, disclosing, *inter alia,* further construction delays.[242] On the next trading day, CBI's stock price dropped by more than 10%.[243] Both experts found the single day drop following the disclosure of ~8.5% to be statistically significant at the 0.00% level.[244]

242   *See* Complaint ¶¶ 155-156. Georgia Power is a subsidiary of the Southern Company. *See* Finnerty Rpt. ¶ 59.

243   *See* Complaint ¶ 156.

244   *See* Plaintiffs' Hearing Slide 3.

The relevant portions of the alleged corrective disclosure are set forth at paragraph 155 of the Complaint:

Georgia Power has been notified by [CBI] ... of the Contractor's revised forecast for completion of Plant Vogtle Units 3 and 4, *which would incrementally delay the previously disclosed estimated in-service dates by 18 months. ...* Georgia Power believes that ... *the Contractor is responsible for the Contractor's costs related to the Contractor's delay* (including any

related construction and mitigation costs, which could be material) and that Georgia Power and the other co-owners are entitled to recover liquidated damages for the Contractor's delay.... (emphasis in original).

According to paragraph 208 of the Complaint, the 8-K disclosed that the delay would cause $720 million in additional costs ($40 million per month for each additional month).

This alleged corrective disclosure relates to liability for delays/cost overruns. As a result, the corresponding portions of the following misrepresentations are allegedly corrected by the release of the Southern Company 8-K: #1 (10/30/13); #3 (2/25/14); #5 (4/23/14); #6 (4/23/14); #7 (4/24/14); #9 (7/24/14); #11 (10/23/14); and #13 (11/11/14).[245] Of these alleged misrepresentations, only ##5-7, 9 and 13 did not have a statistically significant front-end impact. The relevant portions of these alleged misrepresentations are quoted above, and will not be repeated here.[246]

245   While alleged misrepresentation #14 also relates to this issue, it was made *after* this corrective disclosure.

246   *See supra* pp. 65-67, 87-88, 92. To the extent any of these alleged misrepresentations focused on the Vogtle plant as opposed to V.C. Summer, those portions of the misrepresentations would be relevant here in addition to the general topic of protection from cost overruns.

Despite the large price drop following the release of the 8-K which was statistically significant at the 1% level, Ms. Allen nonetheless argues that this alleged corrective disclosure "provides no evidence of price impact of the alleged misrepresentations."[247] Ms. Allen bases her conclusion on her close review of analyst reports following the release of the 8-K. At paragraph 180 of her Report she writes:

[A] detailed analysis comparing the difference in analysts' statements before and after the January 29 alleged corrective disclosure shows that analysts expressed the *same* opinions about whether CBI would be liable for cost overruns after the alleged corrective disclosure as they did before. In other words, the January 29 8-K did not change analysts' perceptions about whether CBI would be liable for cost overruns (emphasis in original).

**\*38** Ms. Allen concluded this paragraph by stating that this "undermines any link between the alleged misrepresentations and CBI's stock price, and shows that the alleged misrepresentations did not have price impact."

[247]    Allen Rpt. ¶ 179.

There are two flaws in this argument. *First*, attributing the cause of a stock drop to information other than that released in the 8-K crosses the line into an impermissible analysis of loss causation. This is particularly apparent from the following statement at paragraph 182 of the Allen report: "Analysts covering CBI *attributed the price decline to the announcement of another delay at the Nuclear Projects.*" (emphasis added). *Second,* a close look at the analyst statements released before and after the 8-K, found in Ms. Allen's chart at pages 91-92 of her Report, demonstrate that the 8-K, in fact, revealed new information to the market. Here is but one example:

> Delays to the project are not a surprise in our view, given the VC Summer units in SC (basically identical to the Vogtle units except for site conditions), announced 12 month delays several months ago; *however, a longer delay of 18 months is likely to be viewed negatively.* (Cowen Analyst Report 1/30/15 (emphasis added)).[248]

[248]    Allen Rpt. ¶ 182 (emphasis added). In the chart at page 91, a Cowen report of 9/11/14 spoke of "potential schedule delays," whereas the 1/30/15 report covers the release of the 8-K announcing an 18 month delay. Similarly a Deutsche Bank report from 9/3/14 discussed the possible risk of cost overruns without providing any figures, whereas its report of 1/30/15 projected a 50/50 split with Westinghouse such that "CB&I would be responsible for only $370M," which is half of the $720 million figure disclosed in the 8-K.

Indeed, Ms. Allen conceded as much during her testimony at the Hearing. On cross-examination, Ms. Allen stated "I do think [the disclosure of the $720 million cost overrun figure] was new information." When asked whether she thought the additional 18-month delay was new information, Ms. Allen acknowledged "Yes." Finally, she said "certainly an additional delay is bad news and increases somebody's liability regardless of who might pay. So the size of the problem is now bigger."[249]

[249]    Hearing Tr. at 274-275.

For these reasons, the evidence proffered by Defendants does not establish that this 8-K is not a corrective disclosure and certainly does not establish an absence of price impact with respect to the relevant misrepresentations. At most, Defendants offer alternative reasons for a price drop when the truth regarding delays and cost overruns was disclosed. As the caselaw makes clear, "merely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security."[250]

[250]    *Waggoner*, 875 F.3d at 105.

### g. Corrective Disclosure #7

The final alleged corrective disclosure was Southern Company's Fiscal Year 2014 earnings call on February 4, 2015. During the call, the CEO of Southern Company elaborated on the delay at the Vogtle facility and the associated costs. Here is the most relevant statement from the CEO:

> **We have not agreed to any change to the guaranteed substantial completion dates, nor do we believe that all efforts to mitigate the contractor delays have been made. Based on our review thus far and considering the fixed and firm nature of our EPC contract, we believe the contractors are responsible for their costs associated with the delay and any costs to mitigate.... Our contract also provides for liquidated damages for each day the two units are late, and this stipulation should help mitigate the cost of any delay.**[251]

[251]    Complaint ¶ 157 (quoting Earnings Call) (emphasis in original).

**\*39** This statement also deals with CBI's liability for delays/cost overruns and corrects the same misrepresentations set forth above with respect to the January 30 release of the Southern 8-K.[252] Following this statement the price of CBI stock fell by more than 6%. Dr. Finnerty found the abnormal return on this date to be statistically significant at the 1.72% level, and Ms. Allen found it to be statistically significant at the 6.37% level.[253]

[252]    *See supra* pp. 65-67, 88, 92.

[253]    *See* Plaintiffs' Hearing Slide 3.

Ms. Allen further challenges this alleged corrective disclosure on the ground that the information found here was disclosed four days earlier in the Southern Company 8-K (corrective disclosure #6). A chart she prepared at

pages 95-96 of her report compares the two alleged disclosures. She further notes that *no analyst* published a report following the February 4 call.

Dr. Finnerty's rebuttal on this point is very limited. Echoing the language of the Complaint, Dr. Finnerty states that the February 4 call "elaborated on the delay and costs by attributing the construction delay and consequent increase in project cost to a financial dispute between the two builders, CBI and Westinghouse, and ***affirming with certainty to the market*** that Southern Company would hold the contractors responsible."[254]

[254]    Finnerty Reply Rpt. ¶ 213 (emphasis added).

In a final effort to salvage this alleged corrective disclosure, Plaintiffs argued at the Hearing that there were two new bits of information in the February 4 call that were not mentioned in the Southern 8-K. The first was that in the call, Southern Company's CEO mentioned that in his view CBI would be responsible for the cost to mitigate the impact of the delay.[255] A close look at the 8-K reveals that the exact statement regarding mitigation costs was also made there.[256] This is clearly not new information.

[255]    *See* Hearing Tr. at 278-282.

[256]    *See* Southern Company 8-K, filed January 29, 2015 at 4. The text of the 8-K is found at Ex. 4 to the Supp. Kerr Decl.

The second piece of information that Plaintiffs argue was new was that Southern Company's CEO believed that one cause of the delay was the dispute between Westinghouse and CBI regarding who should bear the costs associated with the delays.[257] The exact words are found at page 33 of the transcript of the call where the Southern Company CEO stated in response to an analyst's question: "And I think there are some financial disputes between the two of them. And we believe anyway, that those disputes have some bearing on this unmitigated schedule we got."[258] This statement does not provide new information to the market. At best it is the CEO's belief as to the cause of the delay, not the fact of the delay.

[257]    *See id.* at 496-500.

[258]    Edited Transcript of February 4, 2015 call, Ex. 5 to the Supp. Kerr Decl. at CB&ICo_000402449.

Reviewing this alleged corrective disclosure for "newness," I find that there was no new information provided by this alleged corrective disclosure. As noted by Ms. Allen, "in an efficient market, confirmatory or repeated news (*i.e.* news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction."[259] Accordingly, because there was no new information released to the market in the February 4 call, this cannot serve as a corrective disclosure.

[259]    Allen Rpt. ¶ 185.

**7. Class Period**

The last remaining dispute concerns the span of the class period. Plaintiffs propose a class period beginning on October 30, 2013 and ending on June 23, 2015. The rationale behind Plaintiffs' argument for extending the class period beyond the last corrective disclosure is not altogether clear, but appears to be that the class period should continue until June 23, 2015 because of additional misrepresentations and corrective disclosures that are alleged in the Complaint.[260] Defendants argue that even if the Court were to otherwise accept Plaintiffs' position that there were misrepresentations during the class period and corrective disclosures that revealed the fraud, the truth was revealed to the market with the last corrective disclosure with a statistically significant price drop that occurred on February 5, 2015.

[260]    Plaintiffs' position was briefly articulated during their summation at the Hearing in response to Defendants' argument that the class period should be shortened. Plaintiffs' counsel acknowledged that the "price drop" occurring later than the February 5, 2015 corrective disclosure date was "not statistically significant at the 10% [level]," but that the "price drop" explains why the Plaintiffs continued to run the class period until June 23, 2015. Hearing Tr. at 630-631.

**\*40** The Court is not bound by the class definition proposed in the Complaint and has the authority to modify a class definition.[261] At the class certification stage "courts are required to cut off the class period on the date of a statement or event that cures the market."[262] That is, the class period should end "when the full truth has been disclosed to the market."[263] If there is "no substantial

doubt as to the curative effect" of a corrective disclosure, the class period may be shortened.[264] Only on "clear, unambiguous disclosures" is it appropriate to modify the class.[265] Where, however, there is an issue of fact as to whether a particular disclosure cured the market or a disagreement as to the precise day on which the truth was known, a broader time period should be certified.[266] In that event, the decision is appropriately left to trial or a motion for summary judgment.[267]

[261]   *See Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521-22 (S.D.N.Y. 2018).

[262]   *Pirnik*, 327 F.R.D. at 48 (internal citations omitted). Typically this is the date of the last corrective disclosure. *See, e.g., In re SunEdison, Inc., Sec. Litig.*, 329 F.R.D. 124, 135 (S.D.N.Y. 2019); *Yi Xiang*, 327 F.R.D. at 521-22.

[263]   *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 583 (S.D.N.Y. 2008) (internal citation omitted).

[264]   *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *7 (internal citation omitted).

[265]   *In re SunEdison*, 329 F.R.D. at 135.

[266]   *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2017 2062985, at *7; *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 114 (E.D.N.Y. 2012).

[267]   *In re SunEdison,* 329 F.R.D. at 138. I further note that this issue was not raised by Defendants in their opposition to the motion, in their Surreply, or in their post-hearing letters. It was only raised very briefly at the Hearing during the cross-examination of Dr. Finnerty and the closing arguments. *See* Hearing Tr. at 403-405; 630-631. There is no doubt that this issue would benefit from full briefing by the parties. Indeed, cases in this Circuit in which courts have ruled on a potential shortening of the class period have done so after the issue was fully briefed by the parties. *See, e.g., Pirnik,* 327 F.R.D. at 48; *In re SCOR Holding (Switz.) AG Litig.*, 547 F. Supp. 2d at 580.

On the record before me, I cannot conclude that the class period should be shortened. Even though Plaintiffs have abandoned their originally pled corrective disclosure dates of April 23 and June 23, 2015 as to price impact, Plaintiffs still allege front-end misrepresentations on February 24, February 25 (both of which were statistically significant) and April 24, 2015 (which showed a statistically significant price drop), and allege market movements on the abandoned disclosure dates, albeit not statistically significant ones. On April 23, 2015, for example, Plaintiffs allege that CBI's 10-Q failed to disclose that the carrying value of good will exceeded its fair value and misrepresented that CBI's financial statements complied with GAAP. Thus, Plaintiffs allege that as of April 24, 2015, CBI continued to mislead the market. On these facts, I cannot find that there is "no substantial doubt" as to the curative effect of the last corrective disclosure.

As noted, on April 24, 2015, the price of CBI stock dropped. Plaintiffs have not explained why this misrepresentation can be said to have maintained the stock price when the drop in the stock price was statistically significant. Nevertheless, the *cause* of the price drop cannot be determined at this stage and the downward movement in the stock price may be unrelated to the misrepresentation. In that case, but for this unknown reason, the stock may have maintained its already inflated price.

Yet, having failed to even identify a later-in-time corrective disclosure that reveals the falsity of the April 23, 2015 misrepresentation, loss causation and damages for this date will be difficult to establish on the merits. After merits discovery, the class period may therefore revert back to the February 24 and 25 statistically significant misrepresentations or the January 29, 2015 last corrective disclosure date. At this stage, however, the existence of subsequent statistically significant misrepresentations creates sufficient doubt that the truth about CBI was fully known to the market after the last corrective disclosure. I therefore decline, at this time, to shorten the class period.

**V. CONCLUSION**

**\*41** I respectfully recommend that the Court grant Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel. As set forth above, Defendants challenge only three of the requirements for class certification: (i) the adequacy of the class representatives (Rule 23(a)(4)); (ii) the typicality of the class representatives (Rule 23(a)(3));

and (iii) the predominance requirement of Rule 23(b)(3). The first two challenges were straightforward. As discussed in this Opinion, I conclude that the class representatives are both typical of the class members and are fully capable of adequately representing the class.

The predominance inquiry occupied most of the briefing on this motion and substantially all of the testimony at the Hearing and the post-hearing submissions. The question turned on whether Defendants carried their burden to rebut the *Basic* presumption which allowed Plaintiffs to prove reliance on a class-wide basis because CBI stock concededly traded in an efficient market. Having exhaustively reviewed each of the alleged misrepresentations and corrective disclosures, I conclude that Defendants have failed, in most instances, to sever the link between the alleged misrepresentations and the stock price.

Nonetheless, a few more words are necessary to explain my conclusions. With respect to misrepresentations, where Defendants' expert found a statistically significant price impact at the time of the alleged misrepresentation, Defendants did not rebut the presumption by showing an absence of price impact. Where there was no statistically significant price impact at the time of the alleged misrepresentation, and Plaintiffs did not allege a later related corrective disclosure, but the misrepresentation was confirmatory or omitted to disclose pertinent information, the price maintenance theory applies and Defendants failed to demonstrate an absence of price impact. The following chart sets forth my conclusions as to each misrepresentation:

| | | Alleged Misrepresentations | Front-End Impact | Corrective Disclosures | *Basic* Presumption |
|---|---|---|---|---|---|
| 1 | 10/30/2013 | 3Q:13 10-Q | ✓ | | |
| 2 | 2/25/2014* | FY:13 Earnings Announcement | ✓ | | |
| 3 | 2/25/2014* | FY:13 Earnings Call | ✓ | | |
| 4 | 2/27/2014 | FY:13 10-K | | ✓ | |
| 5 | 4/23/2014* | 1Q:14 Earnings Announcement | | ✓ | |
| 6 | 4/23/2014* | 1Q:14 Earnings Call | | ✓ | |
| 7 | 4/24/2014 | 1Q:14 10-Q | | ✓ | |
| 8** | 7/24/2014* | 2Q:14 Earnings Announcement | | | |
| 9** | 7/24/2014* | 2Q:14 Earnings Call | | | |
| 10** | 7/25/2014 | 2Q:14 10-Q | | | |
| 11 | 10/23/2014* | 3Q:14 Earnings Call | ✓ | | |
| 12 | 10/24/2014 | 3Q:14 10-Q | ✓ | | |
| 13 | 11/11/2014 | Investor Day Conference | | ✓ | |
| 14 | 2/24/2015* | FY:14 Earnings Call | ✓ | | |
| 15 | 2/25/2015 | FY:14 10-K | ✓ | | |
| 16*** | 4/24/2015 | 1Q:15 10-Q | | | ✓ [268] |

\* Event occurred after market close.
\*\* I have already determined that Plaintiffs cannot rely on this date to serve as both alleged misrepresentations and a corrective disclosure. *See supra* pp. 83–84.
\*\*\* Plaintiffs have not identified a corrective disclosure relating to this alleged misrepresentation. But, the price-maintenance theory allows Plaintiffs to rely on the *Basic* presumption.

[**Editor's Note:** The preceding image contains the reference for footnote[268]].

[268]    *But see supra* pp. 103-104.

With respect to corrective disclosures, where the disclosure provided no new information or was otherwise not "corrective," Defendants have successfully severed the link between the related misrepresentations without front-end impact and the stock price.[269]

[269]    This applies only to corrective disclosure #7.

In accordance with that rationale, Defendants have only been able to prove, by a preponderance of the evidence, the absence of price impact as to misrepresentations ##8-10, and have also proved that corrective disclosure #7 failed to provide any new information to the market.[270] As to all of the others, the Defendants have failed to carry their burden. As a result, Plaintiffs have satisfied the predominance requirement.

[270]    But eliminating corrective disclosure #7 does not sever the link for any misrepresentations because other corrective disclosures establish price impact for the related misrepresentations.

For all of these reasons I again respectfully recommend that the Motion be granted. A class should be certified for the period October 30, 2013 through and including June 23, 2015;[271] ALSAR Ltd. Partnership and Ironworkers Local 40, 361, and 417 Union Security Funds and Iron Workers Local 580 Joint Funds should be appointed as class representatives; and Kahn Swick & Foti should be appointed as class counsel.

[271]    As indicated earlier, the class period decision is conditional in that it might yet be altered based on full briefing either now or at summary judgment.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5287980

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-02473    Document 68-16    Filed 03/15/24 in TXSD    Page 42 of 52

In re Chicago Bridge & Iron Company N.V. Securities Litigation, Not Reported in Fed....

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    41

**H** KeyCite history available

2020 WL 1329354
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE CHICAGO BRIDGE & IRON
COMPANY N.V. SECURITIES
LITIGATION

17 Civ. 1580 (LGS)
|
Signed 03/23/2020

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

**\*1** Plaintiffs ALSAR Ltd. Partnership ("ALSAR"), Ironworkers Local 40, 361 and 417 Union Security Funds and Iron Workers Local 580 Joint Funds ("Ironworkers"), individually and on behalf of all other persons similarly situated, bring this putative class action against Defendants Chicago Bridge & Iron Company Ns.V. ("CBI"), Philip K. Asherman, Ronald A. Ballschmiede and Westley S. Stockton, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. On February 4, 2019, Plaintiffs moved for class certification and appointment of Class Representatives and Class Counsel pursuant to Federal Rule of Civil Procedure 23. This Order addresses Special Master Scheindlin's Report and Recommendation (the "Report"), dated October 16, 2019, recommending that the Court grant Plaintiffs' motion.[1] For the reasons stated below, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated below, and Plaintiffs' motion is granted.

1    On December 7, 2018, the Court appointed retired United States District Judge Shira A. Scheindlin to serve as a Special Master pursuant to Federal Rule of Civil Procedure 53(a)(1)(A) and (a)(1)(C).

## I. LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 53(f)(1), in acting on a master's order, the Court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1). If a party raises objections to the master's report, "[t]he court must decide de novo all objections to conclusions of law made or recommended." Fed. R. Civ. P. 53(f)(4). Courts in this Circuit use a "clear error" standard to review a master's findings of fact and conclusions of law where no objection is raised, which is the same standard applied to a Magistrate Judge's report and recommendation in this context. *See, e.g., Seggos v. Datre*, No. 17 Civ. 2684, 2019 WL 3557688, at \*2 (E.D.N.Y. Aug. 5, 2019) (applying clear error review to portions of a Special Master's Report to which no objections were made); *CA, Inc. v. New Relic, Inc.*, No. 12 Civ. 5468, 2015 WL 13753674, at \*6 (E.D.N.Y. Sept. 28, 2015) (same).

Before granting a class certification motion, a court must ensure that the requirements of Federal Rule of Civil Procedure 23(a) and (b) have been met. Rule 23(a) has four prerequisites: numerosity, commonality, typicality and adequacy of representation. An additional implied requirement of Rule 23 is ascertainability, which requires that members of the proposed class be identifiable. *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). "If Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b)." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir. 2013). Plaintiffs here are proceeding under Rule 23(b)(3), which requires that Plaintiffs prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**\*2** As Rule 23 is more than a "mere pleading standard," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), the party seeking certification must prove these requirements by a preponderance of the evidence. *In re Petrobras Sec.*, 862 F.3d at 260. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *accord Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at \*2 (S.D.N.Y. Sept. 17, 2019). "Frequently that 'rigorous analysis' will entail

some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc.*, 564 U.S. at 351; *accord Marotto v. Kellogg Co.*, No. 18 Civ. 3545, 2019 WL 6798290, at *3 (S.D.N.Y. Dec. 5, 2019).

The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968) ("[Rule 23] should be given a liberal rather than restrictive interpretation."); *accord Gruber*, 2019 WL 4439415, at *2. "[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968); *accord Gruber*, 2019 WL 4439415, at *2. "Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707, 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)); *accord Gruber*, 2019 WL 4439415, at *2.

## II. BACKGROUND

Familiarity with the factual and procedural background of the case is assumed. The facts as stated in Special Master Scheindlin's Report and Recommendation are incorporated herein.

Plaintiffs moved to certify a class under Rule 23(b)(3). In their opposition to class certification, Defendants did not challenge whether Plaintiffs had established Rule 23(a)'s numerosity, commonality and ascertainability requirements, or the superiority requirement of Rule 23(b). Defendants did challenge the typicality and adequacy requirements of Rule 23(a), the predominance requirement of Rule 23(b) and the span of the Class Period. The Special Master reviewed the parties' submissions and held an evidentiary hearing at which each party's respective expert testified and counsel presented oral argument. In a comprehensive, 108-page Report, the Special Master recommended that the Court grant Plaintiffs' motion for class certification; appoint ALSAR and Ironworkers as Class Representatives; appoint the law firm of Kahn Swick & Foti as Class Counsel; and certify the Class for the period October 30, 2013, through and including June 23, 2015 (the "Class Period").

Defendants timely filed objections to the Report. The Court reviews these objections de novo and evaluates the remainder of the Report's findings, to which Defendants did not object, for clear error. *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at *2. For the reasons stated below, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated below, and Plaintiffs' motion is granted.

## III. DISCUSSION

### A. Defendants' Objections

#### 1. Rule 23(b)(3) Predominance of Common Issues

**\*3** Four of Defendants' five objections are related and challenge the Rule 23(b)(3) requirement of predominance. Defendants dispute whether Plaintiffs can prove reliance -- a critical element of their securities fraud claim -- on a class-wide basis. If not, individual inquiries about class members' reliance would defeat a finding of predominance.

Plaintiffs argue that they can show class-wide reliance without individual proof because reliance is presumed if the stock at issue was traded in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-50 (1988) (holding that, if plaintiffs can show that the market for defendant's stock was efficient, plaintiffs are entitled to the rebuttable presumption that the market price reflects all public information, and that they therefore relied on defendant's misrepresentation(s) in trading the stock).[2] However, a defendant can rebut the *Basic* presumption by proving "that the misrepresentation did not in fact affect the stock price." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 279 (2014). That is Defendants' argument here.[3]

---

[2] As the Second Circuit noted in *Arkansas Teachers*, the *Basic* presumption "derives from the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on [a] well-developed market[ ] reflects all publicly available information, and, hence, any material misrepresentations.' " *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)) (alterations in original). Accordingly, "[i]f defendants 'sever the link' between the misrepresentation and the market price ... both the theory and the [*Basic*] presumption collapse."

*Ark. Teachers Ret. Sys.*, 879 F.3d at 483 (quoting *Basic Inc.*, 485 U.S. at 248) (other internal quotation marks and alteration omitted).

3    Defendants have conceded, for purposes of class certification, that the market trading CBI stock was efficient.

A defendant can show a lack of price impact in two principal ways. First, "[a] defendant may rebut the [*Basic*] presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns," *i.e.*, the alleged misrepresentation had no statistically positive, "front-end" impact on stock. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017); *see Halliburton II*, 573 U.S. at 279-83. Second, a defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentation was not associated with "negative price stock-returns," *i.e.*, there was no statistically negative, "back-end" impact on stock following a corrective disclosure. *Virtus Inv. Partners*, 2017 WL 2062985, at *4. A corrective disclosure occurs when the truth about an earlier allegedly fraudulent statement or omission is revealed to the market. *See id.* at *5.

Defendants suggest that the *Basic* presumption can be rebutted on the back-end in at least two other ways: (i) if they can show that the information in a back-end disclosure is not new, *see Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018), or (ii) if they can show that the information in a back-end disclosure was not actually corrective. *See In re Signet Jewelers Ltd. Secs. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019). However, for class certification purposes, when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on these additional back-end arguments to rebut the *Basic* presumption. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) ("[B]ecause [d]efendants did not carry their burden of demonstrating the absence of price impact, [p]laintiffs are entitled to the [*Basic*] presumption.").

**a. Burden of Persuasion**

**\*4** As a threshold matter, Defendants argue that because

Federal Rule of Evidence 301 governs presumptions in civil cases (unless a federal statute or Federal Rule of Evidence provides otherwise), and because the *Basic* presumption has never been incorporated into any federal statute or Rule, the Report erred in concluding that Defendants bear the burden of persuasion, rather than the burden of production, in rebutting the *Basic* presumption.

This objection is overruled as it is contrary (and Defendants admit as much) to binding Second Circuit precedent in *Waggoner v. Barclays PLC*, 875 F. 3d 79, 99-103 (2d Cir. 2017). The Report properly applied the *Waggoner* rule that a party opposing class certification bears the burden of persuasion when rebutting the *Basic* presumption and must demonstrate a complete lack of price impact by a preponderance of the evidence. *Id.* at 103; *see Ark. Teachers Ret. Sys.*, 879 F.3d at 485 ("Because the *Basic* presumption is a substantive doctrine of federal law that derives from the securities fraud statutes, [*Waggoner*] determined it altered the default rule and imposed a burden of persuasion on defendants seeking to rebut it.").

**b. 5% Statistical Significance Threshold**

One of Defendants' arguments to rebut the *Basic* presumption was that one of seven alleged corrective disclosures ("CD #4") -- the October 2014 SCANA press release -- had no price impact because the parties' experts agreed that the disclosure did not have a statistically significant price reaction at the 5% level, which means there is no more than a 5% chance that the observed relationship is purely random. Defendants object that the Report erred in rejecting this argument and finding that Defendants had failed to prove lack of price impact as to the October 2014 SCANA press release (CD #4).[4] Defendants' expert had found a reaction at the 6.56% level for this event, and Plaintiffs' expert had found a reaction at the 8.44% level (*i.e.*, a 93.44% and 91.56% confidence level respectively). Defendants argue that a 5% significance level is the standard threshold used by experts and courts for identifying evidence of price impact and should have been applied here to find that CD #4 had no price impact.

4    The Report's finding was more nuanced. The Report concluded that Plaintiffs' expert "report of *p*-values for all of the dates analyzed and his opinion as to whether those between .05 and .10 (5-10% statistical significance) support a finding of market efficiency or price impact may be considered in deciding the issues presented by this motion. However, it is apparent that the weaker the statistical significance the less support

the [expert] report provides toward the ultimate finding." (Dkt. No. 217 at 39-40/111). The Report later finds "some evidence of price impact on [the date of the October 14 SCANA press release]." (Dkt. No. 217 at 91/111).

This objection is overruled. Defendants are correct that a 5% significance level is the typical measure of statistical significance used in this context, but it is not the exclusive measure. *Compare Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) ("In most scientific work, the level needed to obtain a statistically significant result is set at a five percent level of significance."), *and In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (same), *with Pirnik*, 327 F.R.D. at 46-47 (holding that plaintiffs' expert's analysis with respect to certain disclosures -- finding price impact at a statistically significant level below 95% -- did not demonstrate the absence of price impact), *and Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018) (same), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019). No hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one. The Report correctly recommends that statistical significance not be evaluated as a binary question, "with statistical significance lying at the 4.99% level but not at 5.01% level." (Dkt. No. 217 at 38/111). Academic economics literature supports this proposition, *i.e.*, that scientific conclusions, business or policy decisions should not be based only on whether a *p*-value passes a specific threshold, as researchers must consider multiple contextual factors when performing data analysis:

> **\*5** A conclusion does not immediately become "true" on one side of the divide and "false" on the other.... Pragmatic considerations often require binary, "yes-no" decisions, but this does not mean that p-values alone can ensure that a decision is correct or incorrect. The widespread use of "statistical significance" (generally interpreted as "p ≤ 0.05") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.

Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on p-Values: Context, Process, and Purpose*, 70 Am. Statistician 129 (2016); *see* Dkt. No. 194-10 ¶ 42.

Defendants also argue that the Report erred in relying on *Pirnik* to justify its departure from the 5% standard, suggesting that *Pirnik* is an "outlier," "inapposite" and "does not support abandoning the 5% standard." (Dkt. No. 220 at 6-7/16); *see* 327 F.R.D. 38. However, *Pirnik*

does not abandon the 5% standard, but rather points out that while a *p*-level of 7.88% is below "the conventional statistical measure of a 95% confidence level" and "is obviously [of] less comfort than a result that is statistically significant at a confidence rate of 95%," it does not, in itself, "prove the *absence* of price impact," which is what a defendant must show to defeat the *Basic* presumption. 327 F.R.D. at 46-47. Similarly, the Report concludes that values between 5% and 10% may be considered in deciding issues presented by the class certification motion, and qualifies this conclusion by noting that "it is apparent that the weaker the statistical significance the less support the [R]eport provides toward the ultimate finding." (Dkt. No. 217 at 39-40/111).

### c. The Report's "Correctiveness" Test

Defendants attempt to rebut the *Basic* presumption by showing that certain allegedly corrective disclosures did not in fact correct an alleged misrepresentation. Defendants object to the Report on the ground that it adopted a legally erroneous test of "correctiveness," which resulted in improperly upholding four of the alleged corrective disclosures, "CDs" #3, #4, #5 and #6. This objection is overruled.

The Report found -- over Plaintiffs' objection and without the benefit of Second Circuit precedent -- that an inquiry into whether a disclosure is actually corrective is proper on a motion for class certification. Defendant does not object to this conclusion. But the Report also concluded that only "a limited analysis of an alleged disclosure as to whether it is 'corrective' is appropriate at this stage of the proceedings," (Dkt. No. 217 at 61-62/111), and that among the permissible inquiries is "whether the information in the alleged corrective disclosure relates to the same subject matter [as the misrepresentation] or is wholly unrelated." (Dkt. No. 217 at 61/111). Defendants object to the limited nature of the analysis and what they characterize as the "wholly unrelated" standard as the test of correctiveness. (Dkt. No. 220 at 7/16). Based in part on this analysis, the Report found that Defendants had not shown the lack of price impact based on CDs #1, #2 (partial), #3, #4, #5 and #6, but had shown the lack of price impact as to CD #7.

First, the Report correctly relied on reasoning from *Arkansas Teachers* to recommend that a court may appropriately consider, at the class certification stage, whether an alleged corrective disclosure actually corrected an earlier misrepresentation. In *Arkansas Teachers*, the Second Circuit held that the district court

had erred in not considering defendants' price impact information at the class certification stage. 879 F.3d at 486; *see also Halliburton II*, 573 U.S. at 279-83 (holding that defendants may seek to rebut the *Basic* presumption at the class certification stage through evidence that the misrepresentation had no price impact). In *Arkansas Teachers*, the price impact information sought to establish that the information in the alleged corrective disclosure had no price impact because it was not new. The court in *Arkansas Teachers* further concluded that:

> **\*6** Although price impact touches on materiality, which is not an appropriate consideration at the class certification stage, it differs from materiality in a crucial respect. Price impact refers to the effect of a misrepresentation on a stock price. Whether a misrepresentation was reflected in the market price at the time of the transaction [--] whether it had price impact [--] is *Basic*'s fundamental premise. It has everything to do with the issue of predominance at the class certification stage.

879 F.3d at 486 (internal quotation marks, citations and ellipses omitted). In this case, Defendants sought to establish that alleged corrective disclosures had no price impact because they were not actually corrective. The analysis from *Arkansas Teachers* is the same, concluding that price impact is a proper inquiry at the class certification stage. Accordingly, the Report correctly reasoned that an inquiry into correctiveness, like newness, is appropriate at the class certification stage.

Second, the Report's conclusion that CDs #3, #4, #5 and #6 were corrective was not in error. The Court finds that the challenged disclosures were corrective but without the need to adopt the precise articulation of a "correctiveness" test as formulated in the Report. The case law is clear that a corrective disclosure needs to be corrective and "linked" to a specific alleged misrepresentation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 504, 510 (2d Cir. 2010). The analysis must focus on whether the disclosure was, in fact, corrective. *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at \*15 (S.D.N.Y. Mar. 30, 2012); *see also Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 812 (2011) (holding that loss causation need not be shown at the class certification stage).

CD #3 -- CBI's July 25, 2014, 2Q:14 10-Q -- is a partial corrective disclosure because it revealed to the market that CBI had violated Generally Accepted Accounting Principles ("GAAP") in its prior Securities and Exchange Commission filings by falsely stating that there were no indicators of impaired goodwill and by not taking an impairment charge to reduce goodwill, in particular by revealing a growing disparity between cash flow and

growing non-cash earnings since CBI's prior financial disclosures. The Report correctly concluded that CD #3 relates to CBI's alleged misrepresentations of the amount of goodwill on CBI's balance sheet. Defendants' arguments that the information in CD #3 was not corrective of any alleged misrepresentation and had been repeatedly disclosed are incorrect.

CD #4 -- the October 2014 SCANA press release -- is a corrective disclosure. SCANA was the parent company of CBI's counterparty on its contract for the V.C. Summer nuclear reactor project. The press release was corrective because it revealed new information to the market regarding the revised construction schedule for the V.C. Summer nuclear reactor project to reflect project delays, including a preliminary cost estimate of $1.2 billion related to the delays, SCANA's rejection of its alleged share of 55% of those costs and SCANA's statement that it had not accepted financial responsibility for any of the costs associated with the delays (thereby suggesting that CBI and its partners in the project could be responsible for those costs). Defendants' assertion that the estimate cost overrun total from CD #4 was not corrective of any alleged misrepresentation is meritless. The Report correctly concluded that CD #4 relates to alleged misrepresentations about CDI's liability for delays/cost overruns and/or fabrication defects.

**\*7** CD #5 -- testimony from two witnesses before the Georgia Public Service Commission on November 21, 2014 -- is a corrective disclosure because it revealed important information regarding developments in the construction of the Vogtle nuclear plant, specifically that there continued to be "various stop work orders" at a CBI facility manufacturing components for the nuclear plants and that Georgia Power, a subsidiary of the Southern Company, intended to hold CBI and its Consortium partners (The Shaw Group, Inc. and Westinghouse Electric Corporation) accountable for the delays. Defendants' argument that the content of CD #5 was not new or corrective is meritless. The Report correctly concluded that CD #5 relates to alleged misrepresentations about CBI's liability for delays/cost overruns, fabrication defects at the referenced CBI manufacturing facility and stop work order ("SWO")/safety issues.

Finally, CD #6 -- the publication of the Southern Company 8-K on January 29, 2015 -- is a corrective disclosure because it disclosed new information regarding further construction delays at the Vogtle nuclear plant, specifically an estimated eighteen-month delay, an estimated $720 million associated cost and Georgia Power's belief that CBI was responsible for the delay.

Defendants' argument that CD #6 was "just bad news" is meritless. The Report correctly concluded that CD #6 relates to alleged misrepresentations about CBI's liability for delays and cost overruns.

### d. The Vertical and Prescience Reports

Defendants object that the Report erred in concluding that the "Vertical Report," a stock-analyst report published by Vertical Research Partners on June 11, 2014, was a corrective disclosure (CD #1). They argue that the information the Report identifies as "new" was stock-analyst speculation and analysis of already public financial information, which cannot, as a matter of law, constitute a corrective disclosure in an efficient market.[5]

[5] This objection relates to Defendants' argument that the *Basic* presumption can be rebutted on the back-end by showing that the information contained in a disclosure is not new. As the Report correctly finds, a court should review the "newness" of a corrective disclosure at the class certification stage. *See Ark. Teachers Ret. Sys.*, 879 F.3d at 486.

Defendants' objection is overruled. The Report correctly finds that some of the information in the Vertical Report was new to the market, specifically the information regarding (1) questionable accounting treatment of CBI's purchase price allocation ("PPAs") for the Shaw acquisition, which could result in an overstatement of goodwill and of future revenues, and (2) related statements by CBI management to the author of the Vertical Report that "the process of marking liabilities to market creates a non-cash 'credit' for the company.... suggesting about $140MM of revenue could be recognized each year [in the future, and] ... these are non-cash earnings." (Dkt. No. 194-6 at 2/7). This information is corrective because it relates directly to the first three sub-categories of alleged misstatements arising from GAAP violations outlined in the Report: Contracts in Process ("CIP"), Margin Fair Value Liability for Acquired Contracts ("MFVL") and Impaired Goodwill ("Goodwill") as those terms are defined in the Report. It is also new in that the questionable accounting treatment and statements by CBI management had not been previously disclosed.

Defendants argue that the disclosure was not new, and therefore not corrective, because it was merely speculative and an interpretation of CBI's financial reporting. They argue in effect that any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace. This is incorrect. "While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (finding that a WSJ article analyzing publicly available Medicare records could plausibly constitute a corrective, and not merely confirmatory, disclosure); *see Meyer v. Greene, 710 F.3d 1189, 1199 n.10 (11th Cir. 2013)* (noting that analyst reports or short-seller opinions may constitute sufficient corrective disclosures if they "reveal to the market something previously hidden or actively concealed"); *In re Signet Jewelers Ltd. Secs. Litig., 2019 WL 3001084, at *17* ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective]."); *In re Xerox Corp. Sec. Litig., 746 F. Supp. 2d 402, 412 (D. Conn. 2010)* (rejecting defendants' argument that plaintiffs' expert could not show that the alleged corrective disclosure contained new information where, in part, the expert conducted analysis "of ... public information" contained in news releases); *In re Vivendi Universal, S.A., Sec. Litig., 634 F. Supp. 2d 352, 371-72 (S.D.N.Y. 2009)* (denying summary judgment where the court did "not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information").

**\*8** Plaintiffs' expert cites communications the day after the Vertical Report was published that confirm that the article raised new concerns about irregularities in CBI's accounting. Defendants therefore have failed to meet their burden of showing that the Vertical Report contained no new information and thus had no price impact.

Defendants rely on several cases (only one by the Second Circuit), but they are distinguishable from the instant case because of the nature of the information disclosed. In *In re Omnicom Grp., Inc. Sec. Litig.*, for example, the allegations of fraud were "focused on the loss in value of [Omnicom's] internet companies and the failure to reflect that loss on Omnicom's books," which the company accomplished primarily by means of a spin-off transaction in which the ailing subsidiaries were transferred to another company called Seneca. 597 F.3d at 504, 507-08. The Second Circuit held that two reports contained in a certain WSJ article were not corrective. The first was that a Board member and chair of the Audit Committee had

resigned due to "general concerns over an aggressive accounting strategy" apart from the known Seneca transaction, plus "Omnicom's year-old failure to write-down the value of the internet companies," which had long been known to the market. *Id.* at 511-12. Second, the article reported statements of two accounting professors, "one who thought that Seneca 'raises a red flag,' and one who said '[y]ou really have to wonder where this fair value is coming from in this environment, in this area.' " *Id.* at 506-07 (alteration in original). The Second Circuit found that neither report was corrective, implying that the first provided no new information when it was widely known that Omnicom had not written down the value of the internet companies on its own books due to the Seneca transaction. The Second Circuit stated that the accounting professors held "conclusory suspicions ... [which] added nothing to the public's knowledge that the Seneca transaction was designed to remove losses from Omnicom's books." *Id.* at 512. Here, in contrast, the accounting issues raised in the Vertical Report were specific, new and related directly to the specific accounting deficiencies alleged in the Complaint.

Defendants make similar objections with respect to the "Prescience Report," a short-seller report published by Prescience Point Research Group on June 17, 2014 (CD #2). They argue that the Prescience Report "consists entirely of speculation by a short-seller based on public information which had only two pieces of 'new' information." (Dkt. No. 220 at 12/16).

Defendants' objection is overruled here as well. The Report correctly finds that the Prescience Report "provide[d] several new pieces of information to the market," specifically that "[s]hares of [CBI] are grossly overvalued.... We believe CBI will be forced into a goodwill write-down or financials restatement, either of which would trigger debt default, heightening the risk of a liquidity crisis or dilutive equity raise.... Based on our analysis, CBI stock is worth [ ]$37 per share, 49% below current trading levels." (Dkt. No. 217 at 77/111). Further, the Report correctly identifies as new portions of the Prescience Report that highlight, for example, "the pattern of CBI's fair value adjustments ... [which] appears to indicate they were made in response to post-acquisition events," a conclusion "supported by the existence of a litany of post-acquisition events which, we think, should have negatively impacted CBI's guidance and financial statements, but never did." (Dkt. No. 217 at 82/111). The Report also identifies -- as new information -- portions of the Prescience Report stating that "[the authors] arranged calls with CBI Investor Relations ... for more clarity.... [and that this] contact with management confirms the core of our thesis ... that CBI is offsetting costs, and thereby

inflating its profitability, made possible by its post-acquisition adjustments to the Shaw PPA." (Dkt. No. 217 at 82/111). This and much of the other information in the lengthy report is specific, not previously disclosed and reveals more than speculation to the market. Accordingly, Defendants' objections regarding the corrective nature of the Vertical and Prescience Reports are overruled.

### e. CBI's April 23, 2015, First Quarter 10-Q

**\*9** Defendants argue that the Report erred by provisionally granting certification as to a misrepresentation that allegedly had no front-end impact, and where Plaintiffs never identified any corrective disclosure related to it. Even though the Report found that the "price-maintenance theory" applied to the misrepresentation in question, Defendants contend that "an alleged misrepresentation cannot have price impact if it lacks both front-end and back-end impact, and it is an impossible burden on defendants to have to prove the absence of back-end impact without any allegation (as here) of a corrective disclosure." (Dkt. No. 220 at 13/16).

Defendants' objection is overruled because Plaintiffs properly rely on a price-maintenance theory as to the misrepresentation in question.[6] The alleged misrepresentation occurred on April 23, 2015, when CBI filed its first quarter Form 10-Q ("1:Q:15 10-Q") with the SEC, which allegedly misstated information related to goodwill and whether CBI's financial statements complied with GAAP. The 1:Q:15 10-Q did not present entirely new information to the market, as similar statements about goodwill and compliance with GAAP dated back to 2013. Therefore the 1:Q:15 10-Q had no statistically significant front-end impact.[7] *See Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 87 (concluding that "[p]rice maintenance fit[ ] the theory of plaintiffs' case," where defendants' material omissions maintained inflation in stock price and there was no reactionary price impact). While a chart in the Report indicates that the 1:Q:15 10-Q had no back-end impact because Plaintiffs have not identified a corrective disclosure relating to it, the Report also correctly notes that on April 24, 2015, the day after the filing, the price of CBI stock dropped and the cause of the price drop cannot be determined at the class certification stage. *See Halliburton I*, 563 U.S. at 812. Put another way, because there is an issue of fact whether this particular disclosure had a price maintenance effect, which potentially was cured the next day (or perhaps not, if the price fell for an unrelated reason), the Report correctly finds that Defendants failed to rebut the *Basic* presumption by a

preponderance of the evidence as to the 1:Q:15 10-Q.

6     As the Report correctly points out, Plaintiffs can allege securities fraud through a price-inflation theory (*i.e.*, whether alleged misrepresentations artificially inflated Defendants' stock price when made), but also under a price-maintenance theory, where "[P]laintiffs allege that the misrepresentations either [1] failed to inform the market about negative information (omissions), or [2] confirmed market expectations without revealing negative information (confirmatory misrepresentations), thus maintaining ... [D]efendant[s'] stock price at an artificially inflated level." (Dkt. No. 217 at 50/111); *see Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018).

7     The Report correctly notes that "only misrepresentations that confirm market expectations can properly proceed under a price maintenance theory," as "[w]hen a misrepresentation presents entirely new information to the market that it could not possibly have expected, this information cannot fairly be said to maintain inflation that is already present in the stock price." (Dkt. No. 217 at 50/111 n.121).

**2. Rule 23(a) Adequacy**

Finally, Defendants argue that the Report erred in concluding that the proposed Class Representatives and their counsel will fairly and adequately protect the interests of the Class under Rule 23(a). Specifically, Defendants object to the Report's finding that the fee-sharing agreement between counsel for Lead Plaintiffs ALSAR and Ironworkers was proper, despite the "behind the scenes" agreement after ALSAR and Ironworkers each advocated for appointment as sole lead plaintiff along with their counsel as sole lead counsel.

**\*10** Defendants' objection is overruled. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Regarding the appointment of class counsel, the inquiry is whether they "are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *accord George v. Shamrock Saloon II LLC*, No. 17 Civ. 6663, 2020 WL 133621, at \*8 (S.D.N.Y. Jan. 13, 2020). Essentially, Defendants argue that counsel's alleged dishonesty in dealing with the Special Master disqualifies them. However, the Special Master did not indicate that she was misled, pointed out that both sets of Plaintiffs and

law firms appeared on the Consolidated Amended Complaint and that Pomerantz LLP appeared on filings both before and after the agreement and appeared regularly before her.

The fee sharing agreement itself appears to be unproblematic. Defendants cite no authority where prospective class representatives were disqualified on the basis of a fee arrangement where attorneys for each class representative agreed to work on the case 50/50 and split the fees 50/50. Further, as the Report correctly notes, this agreement complies with Local Rule 23.1, the Court's Individual Rule III.C.4 and Rule 1.5(g) of the New York Rules of Ethical Conduct. Defendants' objection is overruled and Plaintiffs' motion to appoint Plaintiffs ALSAR and Ironworkers as Class Representatives and Kahn Swick & Foti as Class Counsel is granted.

**B. Remaining Class Certification Prerequisites**

Defendants did not object to class certification based on Rule 23's numerosity, ascertainability, commonality, typicality or superiority requirements. Of these, the Report made findings only with respect to typicality. Accordingly, the conclusion that these remaining class certification prerequisites are satisfied is reviewed below for clear error. *See* Fed. R. Civ. P. 53(f)(4); *Seggos*, 2019 WL 3557688, at \*2.

**1. Rule 23(a) Numerosity**

To establish numerosity, "the class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *accord Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In the Second Circuit, numerosity is presumed for a class of forty or more plaintiffs. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 700 (S.D.N.Y. 2019). Plaintiffs represent that there are several thousand geographically dispersed putative class members who allegedly traded CBI stock during the relevant time period. Accordingly, Rule 23(a) numerosity is satisfied. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700 (concluding that numerosity was likely met where "plaintiffs represent[ed] that there [were] thousands of geographically dispersed class members who transacted in [defendant's] [b]onds").

### 2. Rule 23(a) Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *accord Sykes*, 780 F.3d at 80. A question is common to a class if it is "capable of classwide resolution [--] which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50, and "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

**\*11** Rule 23(a) commonality is satisfied because Plaintiffs allege the same injury and claims resulting common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted CBI stock. *See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs satisfied commonality because proceeding as a class would "generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, whether there was scienter, and whether insider trading occurred").

### 3. Rule 23(a) Typicality

Rule 23(a)(3) is satisfied by showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *accord Sykes*, 780 F.3d at 80. This standard is "not demanding," as "the claims only need to share the same essential characteristics, and need not be identical." *Gruber*, 2019 WL 4439415, at *3. A plaintiff can establish typicality when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar*, 659 F.3d at 252; *accord In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 700.

Plaintiffs have established Rule 23(a) typicality because

all potential class members were allegedly injured by the same alleged misrepresentations and omissions regarding Defendants' nuclear business, and all claim securities law violations based on the same federal statutes and nucleus of facts. *See Gruber*, 2019 WL 4439415, at *3 (concluding that plaintiffs established typicality because the class representative's claims arose from the same fraudulent scheme as the class and would make similar arguments to prove defendants' liability, regardless of "minor variations" in the fact patterns underlying individual claims).

### 4. Rule 23 Ascertainability

The Second Circuit has recognized that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable," often characterized as an "ascertainability" requirement. *See In re Petrobras Sec.*, 862 F.3d at 264. The "touchstone" of ascertainability is whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.*

The Report recommends certifying a class defined as all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. This definition is sufficiently definite to determine whether any given individual or entity is a class member. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 n.6 (S.D.N.Y. 2013) (concluding that the ascertainability requirement was "easily met in the context of securities litigation where the list of shareholders is readily obtainable").

### 5. Rule 23(b) Superiority

Under Rule 23(b)(3), a plaintiff must both establish predominance and that "a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy." Fed. R. Civ. P. 23(b)(3); *accord Sykes,* 780 F.3d at 81. This analysis is "explicitly comparative in nature," *In re Petrobras Sec.,* 862 F.3d at 268, requiring courts to ask whether "a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). Securities cases "easily satisfy" this requirement, *Kaplan v. S.A.C. Capital Advisors, L.P,* 311 F.R.D. 373, 383 (S.D.N.Y. 2015), as "the alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green,* 406 F.2d at 301; *accord Kaplan,* 311 F.R.D. at 383.

**\*12** Here, given the size of the Class, certification will promote judicial efficiency by permitting claims common to all Plaintiffs to be resolved just once, rather than having individual lawsuits regarding the same alleged wrongdoing, particularly in a securities context involving thousands of stockholders. *See In re SunEdison, Inc. Sec. Litig.,* 329 F.R.D. 124, 144 (S.D.N.Y. 2019) (concluding that a securities class action was superior because "of the efficiencies of class wide adjudication").

## IV. CONCLUSION

For the foregoing reasons, the Report is adopted except to the extent any of its reasoning is inconsistent with what is stated above, and Plaintiffs' motion is GRANTED. It is hereby ordered that:

(1) Plaintiffs ALSAR and Ironworkers are appointed as Class Representatives to sue on behalf of a class of all those who purchased or otherwise acquired the common stock of Chicago Bridge & Iron Company N.V. on the NYSE during a Class Period from October 30, 2013, through and including June 23, 2015, excluding Defendants, officers, and directors of CBI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

(2) Kahn Swick & Foti is appointed as Class Counsel;

(3) The parties shall confer and prepare a mutually agreeable form and manner of notice, to be filed on ECF for the Court's review by April 13, 2020. *See* Fed. R. Civ. P. 23(c)(2)(B). To the extent that the parties cannot agree on the form and manner of notice, the parties shall include a brief statement of their disagreement in the filing.

The Clerk of Court is respectfully directed to close the motion at Docket No. 179.

## All Citations

Not Reported in Fed. Supp., 2020 WL 1329354

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.