# Case No. 6

**H** KeyCite history available

2024 WL 873054
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston
Division.

MIRIAM EDWARDS, Plaintiff.
v.
MCDERMOTT INTERNATIONAL, INC.,
et al., Defendants.

CIVIL ACTION NO. 4:18-cv-04330
|
Filed 02/29/2024

### MEMORANDUM AND RECOMMENDATION

ANDREW M. EDISON UNITED STATES
MAGISTRATE JUDGE

*1 Pending before me in this putative securities class action is the § 10(b) Plaintiffs' Motion for Class Certification and Appointment of § 10(b) Class Representatives and § 10(b) Class Counsel ("Motion for Class Certification"). Dkt. 305. On September 27, 2023, I held a hearing on the Motion for Class Certification during which both sides presented expert testimony and voluminous exhibits. *See* Dkt. 412. Following the hearing, I requested supplemental briefing, which the parties provided via letters to the Court. *See* Dkts. 425–429, 450, 460–61, 471. Having considered the parties' briefing, oral arguments, the record, and the applicable law, I recommend the Motion for Class Certification be **DENIED** without prejudice to refiling.

### BACKGROUND

The Court has already summarized the "pertinent factual allegations" in this litigation. *See Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-4330, 2021 WL 1421609, at *1–6 (S.D. Tex. Apr. 13, 2021). For efficiency's sake, I will be

brief. This litigation concerns the 2018 merger (the "Merger") of McDermott International, Inc. ("McDermott") with Chicago Bridge & Iron Company, N.V. ("CB&I"). McDermott and CB&I announced their potential merger on December 18, 2017, "whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." Dkt. 105 at 30. McDermott shareholders approved the Merger on May 2, 2018, and the Merger closed on May 10, 2018.

Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Plaintiff") alleges Defendants[1] made pre- and post-Merger material misrepresentations and omissions regarding (1) "four large, challenging CB&I projects" known as the "Focus Projects"; (2) "the importance of McDermott's acquisition of CB&I's technology business, Lummus ... and McDermott's ability to integrate and operate that business as a post-Merger company despite the challenges posed by the Four Focus Projects"; and (3) "the strength and viability of McDermott's post-merger capital structure, balance sheet, liquidity, and financial health in light of its acquisition of CB&I, and specifically the Four Focus Projects." *Id.* at 5. The truth, according to Plaintiff, was that the Focus Projects "carried undisclosed forecasted costs of well over $1 billion when the merger was announced and when it closed." *Id.* at 34. Moreover, Defendants continuously touted the importance of Lummus to the post-Merger company's long-term success, all the while "fail[ing] to disclose ... that ... the sale of Lummus Technology ... was a necessary component of maintaining adequate cash flows and liquidity." *Id.* at 198.

[1] The Defendants are McDermott, David Dickson (McDermott's former President and Chief Executive Officer), Stuart Spence (McDermott's former Executive Vice President and Chief Financial Officer), CB&I, and Patrick Mullen (CB&I's former President and Chief Executive Officer).

Plaintiff Miriam Edwards filed the initial class action complaint on November 15, 2018, styled *Edwards v. McDermott, International, Inc.*, No. 4:18-cv-04330 (S.D. Tex.), alleging claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). On January 14, 2019, a related class action complaint—styled *Public Employees' Retirement System of Mississippi v. McDermott International, Inc.*, No. 4:19-cv-00135 (S.D. Tex.)—was filed alleging § 14(a) and § 20(a) Exchange Act claims. On June 4, 2019, both actions were

consolidated. *See* Dkt. 84.

**\*2** Six competing lead plaintiff motions were filed in the § 10(b) Action, including Plaintiff's motion and the motion of City of Pontiac General Employees' Retirement System ("Pontiac"). Plaintiff asserted that it expended $517,825 to purchase 25,052 shares of McDermott stock, and "incurred losses of $318,682 in connection with its transactions in McDermott stock during the Class Period." Dkt. 23 at 11. Pontiac asserted that it "purchased 22,442 shares of McDermott stock at artificially inflated prices and suffered over $373,000 in losses as a result of the alleged wrongdoing." Dkt. 21 at 5. On June 4, 2019, the Court appointed Plaintiff to serve as the § 10(b) Lead Plaintiff. *See* Dkt. 84.

On October 4, 2019, Plaintiff filed the operative Consolidated Class Action Complaint (the "Complaint")

> on behalf of the 10(b) Class, consisting of all persons and entities, other than Defendants, their family members, and their subsidiaries, affiliates, and any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and September 17, 2019, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

Dkt. 105 at 257. The Court denied Defendants' motion to dismiss in April 2021. *See* Dkts. 163, 168. Class discovery began in May 2021 and is ongoing.

On September 29, 2021, Plaintiff moved to supplement the Complaint to (1) expand the Class Period by four months, through January 23, 2020; (2) add Pontiac as an additional, non-lead, named plaintiff; and (3) add Pontiac's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as additional, non-lead plaintiffs' counsel in the § 10(b) action. *See* Dkt. 189. On November 2, 2021, I granted Plaintiff's motion to supplement the Complaint but denied Plaintiff's request to add Pontiac and its counsel. *See* Dkt. 216. On November 23, 2021, Defendants moved to dismiss the Supplemental Complaint (Dkt. 190-1). *See* Dkt. 222. On August 30, 2022, I recommended that Defendants' motion to dismiss the Supplemental Complaint be granted, but I made clear that my recommendation was "not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to January 23, 2020 as described in ¶ 4 of the Supplement." Dkt. 265 at 13. The Court adopted my recommendation. *See* Dkt. 268.

On October 28, 2022, Plaintiff timely filed its Motion for Class Certification, seeking certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons and entities (the "§ 10(b) Class members") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5. Excluded from the § 10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

Dkt. 305-2 at 12. Plaintiff seeks the appointment of itself as Class Representative, the appointment of Pomerantz LLP ("Pomerantz") as Lead Counsel, and the appointment of the Briscoe Law Firm ("Briscoe") as Liaison Counsel. *See id.* at 10. Defendants oppose class certification, though several issues—numerosity, commonality, superiority, and the adequacy of Lead and Liaison Counsel—are uncontested.

## LEGAL STANDARD

### A. CLASS CERTIFICATION STANDARD

**\*3** Rule 23 governs the inquiry of whether a proposed class should be certified. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). Rule 23(a) requires that any purported class meet four "prerequisites":

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the

class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class).

*Madison v. Chalmette Refin. L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (cleaned up). These prerequisites—numerosity, commonality, typicality, and adequacy—are necessary but not sufficient conditions for class certification.

Rule 23(b) specifies three class types and sets out requirements—beyond those articulated in Rule 23(a)—for each. The putative class here seeks certification under Rule 23(b)(3), which permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

In considering a motion for class certification, I "must rigorously consider both Rule 23(a)'s prerequisites and the Rule 23(b) class type." *Chavez v. Plan Benefit Servs. Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This rigorous analysis requires me "to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quotation omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). My "obligation ... to conduct a rigorous analysis of Rule 23's requirements ... is not dispensed with by the parties' stipulation to certification or failure to contest one or more of Rule 23's requirements." *Ward v. Hellerstedt*, 753 F. App'x 236, 244 (5th Cir. 2018). "[T]he court [is] bound to conduct its *own* thorough [R]ule 23(a) inquiry." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002).

As part of this "rigorous analysis," I must ask whether the proposed class's damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35. "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged effect of the violation." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (cleaned up) (applying *Comcast*'s rationale to a putative securities class action);

see also *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410–11 (5th Cir. 2017) ("*Comcast* held that when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto plaintiffs' liability theory. Our cases interpreting *Comcast* confirm that what *Comcast* demands is fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory."). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33–34 (quotations omitted).

**\*4** Finally, I must also "consider how a trial on the merits would be conducted if the class were certified." *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021) (quotation omitted).

## B. THE EXCHANGE ACT
Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of "any untrue statement of a material fact" or the omission of any "material fact necessary in order to make the statements ... not misleading." 17 C.F.R. § 240.10b–5(b). Plaintiffs may recover damages under § 10(b) by showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 810 (2011) (quotations omitted).

### 1. The "Forced Seller" Doctrine
"Standing under [§ 10(b) and Rule 10b-5] requires that a

plaintiff be an actual 'purchaser' or 'seller' of securities who has been injured by deception or fraud 'in connection with' the purchase or sale." *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 226 (5th Cir. 1994). "The federal courts have created an exception to this rule[, known as the 'forced seller' doctrine,] when a[n] investor's interest in a company is fundamentally altered through a merger, acquisition, or liquidation." *Id.* The Fifth Circuit has long followed the "forced seller" doctrine. In more recent decades, "the concept has evolved—at least in the context of merger and acquisition transactions involving involuntary exchanges of securities ..., and a subsequent line of cases in this circuit has applied the more flexible 'fundamental change in investment' test." *Id.* at 226–27 (collecting cases). "Instead of analyzing whether the transaction left the plaintiff with essentially a mere claim to cash, these cases focus on the 'economic reality of the transaction' and evaluate the magnitude of the change in the nature of the investment and accompanying risks." *Id.* at 227 (quoting *Rathborne v. Rathborne*, 683 F.2d 914, 920 (5th Cir. 1982).

### 2. Establishing Reliance

At issue in every securities class action is the intersection between Rule 23(b)(3)'s predominance requirement and § 10(b)'s reliance requirement. Ordinarily, a plaintiff establishes reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021). But this individualized inquiry is impractical in a class action. So, the Supreme Court has permitted presumptions of reliance in certain circumstances. "The two major doctrines that have evolved to provide such a presumption of classwide reliance are the *Affiliated Ute* presumption and the 'fraud on the market' theory" first articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (the "*Basic* presumption"). *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 679 (S.D. Tex. 2006).

### a. The *Affiliated Ute* Presumption

**\*5** "[T]o invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure." *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA),*

*Inc.*, 482 F.3d 372, 384 (5th Cir. 2007). The *Affiliated Ute* presumption "operates only in omissions cases, not where plaintiffs assert positive misrepresentations of material information." *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 529 (5th Cir. 1992). "The logic of *Affiliated Ute* is that, where a plaintiff is entitled to rely on the disclosures of someone who owes him a duty, requiring him to prove 'how he would have acted if omitted material information had been disclosed' is unfair." *Regents*, 482 F.3d at 385 (quoting *Basic*, 485 U.S. at 245).

### b. The *Basic* Presumption

Under *Basic*, district courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *See Halliburton I*, 563 U.S. at 813. To establish the *Basic* presumption, Plaintiffs must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268 (2014).

### i. Establishing an efficient market

District courts "may not simply presume the facts in favor of an efficient market" at class certification. *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005). "Because this inquiry can prove decisive for class certification, and because, given the realities of litigation costs, certification can compel settlements without trial, courts have frequently applied rigorous, though preliminary, standards of proof to the market efficiency determination." *Id.* at 322 (collecting cases). Courts consider eight factors—derived from decisions in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 477–78 (N.D. Tex. 2001) (the "*Cammer/Krogman* factors")—when analyzing whether the security at issue traded in an efficient market.

These factors include (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following

and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S–3 (as opposed to Form S–1 or S–2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005) (quoting *Unger*, 401 F.3d at 323).

"Although this does not represent an exhaustive list, and in some cases one of the above factors may be unnecessary, once a court endeavors to apply these factors, they must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." *Unger*, 401 F.3d at 323. "In many cases, where heavily-traded or well known stocks are the target of suits, market efficiency will not even be an issue." *Id.* at 322. Yet, courts have declined "to draw bright line tests—such as whether a company is listed on a national exchange or is entitled to register securities on SEC Form S–3—to assist fact finders in determining whether a stock trades in an 'open and efficient market.' " *Cammer*, 711 F. Supp. at 1287.

### ii. The *Basic* presumption is rebuttable

**\*6** Once established, Defendants can rebut the *Basic* presumption by proving "that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 573 U.S. at 284. Defendants "must carry that burden by a preponderance of the evidence." *Goldman*, 594 U.S. at 126. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. Courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (quotation omitted). "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 126–27.

The question of whether Defendants have rebutted the *Basic* presumption with a preponderance of evidence of

no price impact overlaps with merits questions like materiality and loss causation. *See id.* at 122. In considering such evidence, I must "resist[ ] the temptation" to draw merits conclusions. *Id.* n.2 (quotation omitted). Even so, "to maintain the consistency of the presumption with the class certification requirements of [Rule] 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 573 U.S. at 284.

When plaintiffs' theory is that defendants' misrepresentations or omissions kept their stock artificially inflated, price impact may be shown on the back end. *See Goldman*, 594 U.S. at 123. Front-end price impact may be inferred from a back-end price drop when the stock price falls after a corrective disclosure, demonstrating that Defendants' previous statements were untrue or that Defendants failed to disclose the truth. *See id.* A back-end price drop supports this inference when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.*

A corrective "disclosure need not precisely mirror an earlier misrepresentation." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (cleaned up). The two need only be "related" or "relevant" to one another. *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). However, if there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *Goldman*, 594 U.S. at 123. The Supreme Court has given the example of "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Id.* "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

\* \* \*

With these principles in mind, I turn to Plaintiff's Motion for Class Certification.

## ANALYSIS

The disputes here concern (1) Plaintiff's adequacy and typicality as class representative; (2) the sufficiency of Plaintiff's damages methodology under *Comcast*; (3) whether the large number of short sellers during the Class Period defeats predominance; (4) whether the market was efficient after September 17, 2019; (5) whether the *Affiliated Ute* presumption applies if the market was *not* efficient after September 17, 2019; and (6) whether the last five alleged corrective disclosures demonstrate price impact. I will address each in turn. But first, I must fulfill my obligation "to conduct [my] *own* thorough [R]ule 23(a) inquiry." *Stirman*, 280 F.3d at 563 n.7 (cleaned up).

### A. THE UNCONTESTED ISSUES

**\*7** Defendants concede that Plaintiff has satisfied Rule 23(a)'s numerosity and commonality requirements, as well as Rule 23(b)'s superiority requirement. Defendants also concede that Pomerantz and Briscoe are adequate Class and Liaison Counsel. I also have no trouble finding that Plaintiffs satisfy the requirements of numerosity, commonality, adequacy (as to Class and Liaison Counsel), and superiority.

#### 1. Numerosity

The putative class is numerous. "During the § 10(b) Class Period, McDermott had an average of approximately 165.5 million shares outstanding and traded heavily, with an average weekly trading volume of 34.4 million shares." Dkt. 305-2 at 32. Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. Unit A July 1981); *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (certifying a class where defendant corporation "had more than 50 million shares of Class A common stock outstanding during the class period, and the average weekly trading volume on the NASDAQ Stock Market during the class period was roughly 2.7 million shares").

#### 2. Commonality

There are common questions of law and fact between Plaintiff and the proposed class, including whether Defendants misrepresented or omitted material facts, scienter, materiality, economic loss, and loss causation. *See* Dkt. 305-2 at 33. These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, the requirement of commonality is satisfied.

#### 3. Adequacy

When assessing adequacy, I must consider "the zeal and competence of the representatives' counsel." *Slade*, 856 at 412. Pomerantz has served as lead counsel in multiple securities class actions, has devoted substantial time and resources to this case, and has demonstrated a willingness to take this case to trial. *See* Dkts. 305-3, 305-4. Briscoe has served as counsel in numerous securities fraud cases. *See* Dkts. 305-3, 305-5. Accordingly, Lead Counsel and Liaison Counsel are adequate.

#### 4. Superiority

Defendants do not contest "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

> [C]ourts readily agree that class actions are a superior method for resolving security fraud claims for publicly traded stocks. There is little interest in individual investors controlling their own claims, and a class action is more efficient than entertaining a multitude of suits. Finally, Defendants have presented no arguments suggesting the superiority requirement is not satisfied.

*Lumen v. Anderson*, 280 F.R.D. 451, 462 (W.D. Mo. 2012); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 676 (N.D. Ga. 2009) ("As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." (quotation omitted)).

### B. PLAINTIFF HAS STANDING

When Plaintiff moved to be appointed lead plaintiff, it

represented to the Court that it "expended $517,825" when it "purchased 25,052 shares of McDermott stock." Dkt. 23 at 11. When Plaintiff filed the Complaint, it again alleged that it "*purchased* McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud." Dkt. 105 at 15 (emphasis added). Only after class discovery commenced did the parties realize that Plaintiff *acquired* all of its McDermott stock by converting its CB&I shares at the time of the Merger.[2]

[2]    In considering the long procedural history of this case, it bears remembering that the lead plaintiff appointment process and the first motion to dismiss were briefed and decided without the benefit of this information.

**\*8** Now that Defendants know how Plaintiff came to be a McDermott shareholder, they argue that Plaintiff "is an inadequate and atypical class representative because it suffered no economic injury" and thus "cannot satisfy the damages element of its claims." Dkt. 318 at 12. Defendants contend that, under the unique facts of this case, Plaintiff "actually *benefited*" when it exchanged its CB&I shares, which "were allegedly significantly inflated because of the undisclosed losses in CB&I's Focus Projects, and received shares of McDermott, which were untainted by any such issues before the Merger." *Id.* at 13. Defendants highlight that "Plaintiff's own Complaint admits that CB&I entered the Merger 'to stave off bankruptcy,' " meaning the "Merger and conversion thereby provided CB&I shareholders a lifeline that, at the very least, was better than bankruptcy and the concomitant elimination of their equity interests." *Id.* at 14 (quoting Dkt. 105 at 6).

Defendants argue that "[a]t minimum, [Plaintiff] is subject to unique defenses" that render it an inadequate and atypical representative. Dkt. 318 at 15. Specifically, Defendants contend Plaintiff "is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares." *Id.* at 16. Beyond the minimum, Defendants also contend the "lack of damages defeats [Plaintiff]'s securities fraud claim and is a standing deficiency as well." *Id.* at 14.

Before I address Defendants' arguments, I want to establish what Defendants are *not* arguing. Defendants *concede* that shareholders who acquire shares through conversion during a merger *may* be injured, *may* participate in a § 10(b) class, and *may* be adequate and typical class representatives. Defendants' counsel has admitted that "if the shoe were on the other foot [and] the undisclosed problems were on the McDermott side, not the CB&I side[,] and after the merger closed, the

McDermott problems became manifest [and] the stock price went down[, we] would agree that the CB&I shareholders are part of the class." Dkt. 412 at 24. Thus, Defendants' arguments turn on the unique manner in which the alleged misrepresentations reflected on CB&I.

I will cut to the chase: Defendants overreach with their attack on Plaintiff's standing. Defendants' standing argument assumes that CB&I's stock was inflated and McDermott's stock was not inflated at all. If true, Plaintiff (and all other CB&I shareholders) would have only benefitted from the exchange of their shares and would not have suffered any economic injury. But—and this is a big "but"—this argument is based on nothing more than the conclusory assertion of Defendants' expert, Lucy Allen ("Allen"). *See* Dkt. 318 at 13 (citing Dkt. 318-2 at 15–17). The only support Allen offers for that conclusory assertion is a single cite to a general description of Plaintiff's case in the Complaint. *See* Dkt. 318-2 at 15 n.49 (citing Dkt. 105 at 58). This is far from sufficient.

Defendants' authorities on this point are of no help, at least as far as the standing argument is concerned. Defendants compare Plaintiff to the plaintiffs in *Earl v. Boeing Co.*, who were found to lack standing because they "offered no plausible theory of economic harm." 53 F.4th 897, 903 (5th Cir. 2022). But that is not the case here. Plaintiff has alleged that McDermott stock was inflated as a result of Defendants' misrepresentations when Plaintiff acquired it. If CB&I's stock was inflated *less* than McDermott's stock, Plaintiff may indeed have been injured, despite benefitting from McDermott's alleged misrepresentations about the inherent value of the Focus Projects inflating CB&I's stock. Nor is *In re McKesson HBOC, Inc. Securities Litigation* the powerful medicine that Defendants made it out to be at the hearing. Despite the *McKesson* court's "unease with the notion that holders of [the target company] stock are entitled to damages"—given that "[t]heir shares were inflated due to fraud after they had purchased them, and they acquired [the merged company's shares] at a discount because of that fraud"—the court nevertheless acknowledged "one possible way in which [target company] shares acquired before the class period may have sustained a loss as a result of the alleged fraud." 97 F. Supp. 2d 993, 998 & n.6 (N.D. Cal. 1999). Moreover, the court's passing observation, in a footnote, that such shareholders "are thus ineligible to recover under Section 10(b)" because their "shares were sold into an inflated market," is *ipse dixit. Id.* at 999 n.7.[3]

[3]    In the other two cases that Defendants provided at the hearing—*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Security Act (ERISA) Litigation*, 281 F.R.D. 134 (S.D.N.Y.

2012), and *In re Heckmann Corp. Securities Litigation*, No. 1:10-cv-378 (D. Del. Oct. 19, 2012), ECF No. 185—the class definitions sought by plaintiffs did not include target company shareholders. Without either court confronting this issue, these cases have no bearing on my standing analysis here.

**\*9** I am not going to knock out an entire group of plaintiffs based on Allen's conclusory assertion that Defendants' alleged misrepresentations inflated *only* CB&I's stock and not McDermott's stock. Plaintiff's expert, Dr. Zachary Nye ("Dr. Nye"), reasons the "contention that McDermott's stock price was free of inflation prior to the Merger, while CB&I's stock was full of inflation, is easily demonstrated to be false by examining the contemporaneous stock prices of CB&I and McDermott during that period," which "traded in lockstep" between the announcement and closing of the Merger. Dkt. 342-2 at 11. But herein lies the rub: in offering this opinion, Dr. Nye *admits* that "Defendants' alleged misstatements and omissions were clearly incorporated *in CB&I's* and McDermott's stock price prior to the Merger." *Id.* at 12 (emphasis added). Accordingly, even Plaintiff's expert concedes that CB&I's stock was *also* inflated *as a result of the alleged fraud.* This inflation may not present a standing problem, but it calls into question Plaintiff's adequacy as a class representative.

## C. PLAINTIFF IS AN INADEQUATE CLASS REPRESENTATIVE

Plaintiff has repeatedly stressed—through its expert, its counsel, and its briefing—that, just like open-market purchasers, CB&I shareholders "took money out of their pocket to acquire new McDermott shares." Dkt. 342-2 at 16–17; *see also id.* at 16 ("Thus, rather than use currency, CB&I investors paid for their new McDermott shares using the value of their CB&I shares."). In its reply brief, Plaintiff takes issue with the fact that

> Defendants fail to explain why CB&I investor A who converted its stock directly into McDermott shares via the Merger lacks damages and standing, whereas CB&I investor B who sold its shares just before the Merger and used the proceeds to buy McDermott shares are differently situated for purposes of damages and standing.

Dkt. 342 at 21 n.27. But there is no explanation because there is no difference.

No one is disputing that "CB&I investors could have easily sold their shares for $16.39 apiece, and then promptly purchased approximately the same number of new McDermott shares the next day." Dkt. 342-2 at 16. Rather, Defendants' point is that common sense and the near-lockstep movement of CB&I's and McDermott's stock leading up to the Merger suggest that CB&I's shares were worth $16.39 apiece *only because of the fraud that Plaintiffs are alleging.* Unlike the inflation in McDermott's stock, which unquestionably harmed all class members, the inflation in CB&I's stock prior to the Merger was a *benefit* to CB&I shareholders. When CB&I shareholders "took money out of their pocket to acquire new McDermott shares" (Dkt. 342-2 at 16–17), they had more money in their pockets because the alleged fraud had inflated CB&I's stock. The very potential of this unaccounted-for benefit from the alleged fraud renders Plaintiff an unsuitable class representative.

Following the hearing, I gave Plaintiff an opportunity to direct me to "any cases in which the shareholders of a target company were allowed to participate in a 10(b) class *when the alleged fraud stemmed in part from misrepresentations regarding the health of the target company.*" Dkt. 405 at 1–2. Plaintiff directed me to three cases, each of which merit discussion. But first, I must address Plaintiff's "objections from the § 10(b) class certification hearing to Defendants' Binder Tabs 13-20 and 22[ ], which were case authority entirely absent from their *two* class certification opposition briefs." Dkt. 429 at 3.[4] Plaintiff argues that "[u]nder black letter law, Defendants **waived** any argument based on this authority." *Id.*

[4] Plaintiff is correct that Defendants submitted two class certification briefs—a response and a surreply. That surreply, however, was expressly limited to the price impact issue, "[p]ursuant to the Court's instructions," and thus could not have touched upon the question of Plaintiff's standing. Dkt. 355 at 2.

It is true that a party "waive[s] [an] *argument* by failing to raise it clearly and develop it adequately in [its] opening brief." *Irvin v. S. Snow Mfg., Inc.*, 517 F. App'x 229, 231 (5th Cir. 2013) (emphasis added). But Defendants opened their briefing with the *argument* that Plaintiff is an inadequate and atypical class representative because it necessarily benefitted from the inflation to CB&I's stock caused by the very fraud that Plaintiff alleges. That argument is not waived simply because Defendants submitted "decades old" case law the night before the hearing. Dkt. 412 at 243. I do question why Defendants did not cite these cases—including one in which Defendants' counsel "submitted some of the competing

lead plaintiff briefs" (*id.* at 17)—in their response brief, or direct Plaintiff's and the Court's attention to them at any point in the six months between the class certification briefing and the hearing. But any prejudice Plaintiff suffered by confronting unfavorable, persuasive authorities during the hearing was remedied when Plaintiff was afforded the opportunity to submit contrary authorities, which it did.[5] I turn to those cases now.

[5]    Plaintiff would be no better off if I sustained its objection and turned a blind eye to Defendants' last-minute authorities. Recall that *Plaintiff* bears the burden of demonstrating its adequacy and typicality as a class representative. Yet, despite Defendants' challenges to Plaintiff's adequacy as a class representative, *see* Dkt. 318 at 12–16, Plaintiff pointed me to no analogous cases in its reply brief. All the cases Plaintiff cited for the proposition that classes of purchasers and acquirers are routinely certified are of no moment. *See* Dkt. 342 at 9 n.4. No one disputes the *general* proposition that "otherwise acquiring" shares is functionally indistinguishable from purchasing them. Defendants are not challenging Plaintiff's adequacy simply because it acquired McDermott shares through conversion of its CB&I shares during the Merger. Defendants are challenging Plaintiff's adequacy because, under the unique facts of this case, the CB&I shares Plaintiff converted were, at the time of conversion, necessarily inflated *because of the alleged fraud* (as a matter of common sense given the alleged misrepresentations, and as evidenced by the near lockstep trading of McDermott and CB&I stock leading up to the Merger), and thus a *benefit* to Plaintiff.

**\*10** The first case Plaintiff cites is *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008). Plaintiff argues "[t]he *Atlas* case makes clear that ... not only can shareholders of a target company participate in a § 10(b) class when the fraud stemmed in part from misrepresentations regarding the health of the target company, they can clearly **_represent_** the class." Dkt. 429 at 1 (quotation omitted). But the *Atlas* case never even made it to class certification, settling before class certification briefing was complete. *See* Joint Motion to Vacate Class Certification Hearing, Vacate Scheduling Orders, and Adopt Proposed Schedule of Settlement Procedures, *Atlas*, No. 3:07-cv-00488 (S.D. Cal. Apr. 21, 2019), ECF No. 196. Moreover, the target company shareholder in *Atlas* advanced claims under §§ 11, 12, and 15 of the Securities Act of 1933, but **_not_** § 10(b). *See* 556 F. Supp. 2d at 1147, 1159–61. Most importantly, unlike this case, in *Atlas*, the pre-merger misrepresentations concerned the inherent value of the acquiring company, not the assets of the target company. *See, e.g.*, Corrected Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Atlas*, No. 3:07-cv-00488

(S.D. Cal. Aug. 24, 2007), ECF No. 54 at 27 ("For example, the Joint Proxy Statement and Prospectus issued by Accredited [the acquiring company] and Aames [the target company] in connection with the acquisition stated that 'Aames's [historic] higher delinquency rate is due to the lower credit quality of its typical borrower as compared to Accredited's.' Investors were further led to believe that Accredited's acquisition of Aames would succeed, in part, because Aames's mortgage underwriters would be taught Accredited's disciplined and conservative underwriting procedures."). Thus, *Atlas* does not persuade me that Plaintiff can adequately represent the entire class as proposed.

The next case Plaintiff cites is *Freedman v. Value Health, Inc.*, 190 F.R.D. 33 (D. Conn. 1999). *Freedman*, a § 11 case, has some strong language about there being "no adversity of interests" between open market purchasers of the security at issue and shareholders of the target company who acquired their shares via merger "because 'the damages measure takes into account the true 'value' of the securities purchased by a plaintiff but not the 'value' of the currency used to purchase those securities.' " Dkt. 429 at 2 (quoting *Freedman*, 190 F.R.D. at 35). But *Freedman*'s holding is specific to "the way that damages are calculated under § 11 of the Securities Act of 1933." *Freedman*, 190 F.R.D. at 35 (citing 15 U.S.C. § 77k(e)). "[T]he question of whether or not the value of the stock used to acquire stock of another company in a merger is artificially inflated is irrelevant to the damages calculus *under § 11*." *Freedman*, 190 F.R.D. at 35 (emphasis added). *Freedman* says nothing about whether the same is true in § 10(b) cases.

Plaintiff saved its best case for last: *In re Vivendi Universal, S.A., Securities Litigation*, 242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016). *Vivendi*, a sweeping securities class action that included 10(b) claims, is seemingly on all fours with this case. In *Vivendi*, Defendants challenged the adequacy of a class representative, Gerard, who "exchanged Vivendi, S.A. shares for Vivendi Universal shares pursuant to the three-way merger with Seagram and Canal Plus." *Id.* at 85. As here, the *Vivendi* defendants argued "that persons such as Gerard who obtained Vivendi Universal shares and/or ADSs only in the one-to-one exchange of Vivendi, S.A. securities may not be properly included in the putative class, because such persons did not suffer economic damage and cannot prove materiality." *Id.* The defendants also argued that "preexisting Vivendi shareholders[ ] cannot show that the alleged misstatement inflating the value of shares or ADSs that they already owned was material to them or caused them any

economic damage." *Id.* (quotation omitted).

The *Vivendi* court rejected this argument:

> [I]t is not inappropriate to consider either damages or materiality in assessing the typicality of the individual plaintiffs' claims, even though some assessment of the merits of their claims is required. However, the Court is not persuaded that either issue precludes a finding that the typicality requirement is satisfied here. ***Materiality for all class members will turn on the nature and accuracy of all defendants public statements*** including, obviously, those made in connection with the three-way merger of Vivendi, Seagram and Canal Plus in December, 2000. ***That Vivendi S.A. shareholders received Vivendi Universal shares as a result of the merger does not alter the materiality of defendants alleged misstatements to plaintiff-shareholders' decision to approve the merger and accept shares in a new entity.*** And to the extent that, as alleged, defendants were constructing an ever-expanding house of cards, old Vivendi S.A. shareholders who accepted shares in Vivendi Universal were likely damaged thereby. Therefore, the Court declines to exclude members of the class who acquired their shares in the one-to-one exchange, including Gerard as class representative, on the basis of defendants' arguments regarding damages or materiality.

**\*11** *Id.* at 86 (emphasis added). The *Vivendi* court certified the class, and Gerard as class representative.

I obviously agree with *Vivendi*'s reasoning insofar as Plaintiff's standing is concerned. Now is not the time to determine whether Plaintiff suffered economic damage. But that is really all the *Vivendi* court addressed. The *Vivendi* court did not discuss whether Gerard was subject to unique defenses or had a fundamental conflict with open market purchasers. In fact, neither side here has raised the issue of a fundamental conflict either. But, as discussed above, I must conduct my own thorough inquiry. *See Stirman*, 280 F.3d at 563 n.7.

### 1. Plaintiff Is Not Subject to Unique Defenses

Defendants argue:

> A class representative fails the typicality requirement if it "is subject to unique defenses that threaten to become the focus of the litigation." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004). While "the presence of an arguable unique defense [does not]

> necessarily destroy[ ] typicality," "the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137-38 (5th Cir. 2005) (quoting *Lehocky*, 220 F.R.D. at 501-02); *see also Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (identifying relevant typicality concern as whether "representation of the class will suffer if the named plaintiff is preoccupied with a defense"). Because NSHEPP is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares, it is an inadequate and atypical class representative.

Dkt. 318 at 16. The first two sentences are true statements of law. And Plaintiff may yet spend "considerable time" rebutting the argument that it benefitted from the alleged fraud. But as Plaintiff notes, "whatever time is spent will be necessary[ ] for the benefit of the Class Members facing the defense." Dkt. 342 at 22. Given that CB&I shareholders owned 47 percent of post-Merger McDermott, that is likely a considerable portion of the class. *See* Dkt. 105 at 30 ("McDermott shareholders would own approximately 53% of the combined entity."); *see also* Dkt. 412 at 176 ("CB&I exchangers actually held a large number of shares. So they make up 62 percent.").

"Unique defense" means unique *to Plaintiff*—not to half (or more) of the class. *See, e.g., Plymouth Cnty. Ret. Sys. v. Apache Corp.*, 566 F. Supp. 3d 712, 719 (S.D. Tex. 2021) (potential plaintiff subject to unique defense that he is a net seller and net gainer); *Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 567 (E.D. Tex. 2021) (investor subject to unique defense where his "material gain in common stocks [made his] trading practices during the Class Period functionally the same as an investor who traded only in options and materially different from the putative class consisting largely of common stockholders"); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002) (plaintiff subject to unique defense that it did not buy in reliance either on the market or on statements by defendants, or on Registration Statements and Prospectuses). Accordingly, Plaintiff is not subject to a unique defense that renders it an atypical representative. But that does not end the inquiry. Plaintiff may yet devote considerable time to a defense that is of no benefit whatsoever to McDermott shareholders who never owned CB&I stock during the Class Period. That suggests a fundamental conflict.

### 2. Plaintiff, and All Former CB&I Shareholders,

***Have a Fundamental Conflict with the Rest of the Class***

**\*12** "For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." *In re Deepwater Horizon*, 739 F.3d 790, 813 n.99 (5th Cir. 2014) (quoting *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010), and citing *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 186 (3d Cir. 2012); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189. "A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate." *Dewey*, 681 F.3d at 184. "[N]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Valley Drug*, 350 F.3d at 1190.

It is too early to say whether former CB&I shareholders derived a net economic benefit from the alleged fraud.[6] "Nobody has quantified the inflationary effect ... on CB&I stock." Dkt. 412 at 53. If CB&I's stock was less inflated than McDermott's stock, then former CB&I shareholders may prove an economic injury. This possibility is why Plaintiff has standing. But it is also *possible* that CB&I's stock was more inflated than McDermott's stock, and that former CB&I shareholders derived a net economic benefit from exchanging their shares.[7] *This* possibility represents a fundamental conflict. This is not a "merely speculative or hypothetical" conflict. 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Plaintiff's own expert has already conceded that "Defendants' alleged misstatements and omissions were clearly incorporated in CB&I's ... stock price prior to the Merger." Dkt. 342-2 at 12.[8]

[6]    It is too early to say whether the alleged fraud was, in fact, fraudulent.

[7]    It is also *possible* that the Merger was a zero-sum game for CB&I shareholders—that their shares were either going to be eviscerated in a CB&I bankruptcy, or McDermott's bankruptcy.

[8]    I am **_not_** determining as a matter of law that CB&I's stock was inflated prior to the Merger as a result of Defendants' alleged misrepresentations. All I am saying is that such a conflict is not speculative or

hypothetical where Plaintiff's own expert has already conceded as much on the record.

Now is not the time to litigate these issues, but I must "consider how a trial on the merits would be conducted if the class was certified." *Prantil*, 986 F.3d at 574 (quotation omitted). The inflationary effect of the alleged fraud on CB&I's stock simply does not concern purchasers of McDermott stock who never owned CB&I shares during the Class Period. To the extent it does concern them, purchasers of McDermott stock who never held CB&I shares only benefit if former CB&I shareholders are excluded, or if former CB&I shareholders must accept an offset to their damages. *See, e.g.*, Dkt. 412 at 177 ("[W]ith a company that's in—has gone through bankruptcy, the pie cannot always get bigger, sort of by definition."). It is fundamentally unfair for absent class members who never held CB&I shares to be represented by Plaintiff and its counsel, who may yet expend considerable time—as they did during the class certification hearing—on this issue. *See, e.g.*, Dkt. 412 at 74–78, 102–119, 138–151, 217–242.[9]

[9]    Notwithstanding this fundamental conflict, Plaintiff and its counsel, Pomerantz and Briscoe, have skillfully represented the putative class thus far.

Having determined that Plaintiff has a fundamental conflict with purchasers of McDermott stock who never held CB&I shares during the Class Period, I must decide how to manage this conflict. Recognizing that subclassing is not always preferred, I have considered whether this fundamental conflict can be resolved without designating subclasses, such as "bifurcating liability and damage trials with the same or different juries" or "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages." 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Because the lack of damages speaks to question of Defendants' liability—an affirmative defense that need not be addressed by purchasers of McDermott stock who never held CB&I shares during the Class Period—the creation of two conflict subclasses is the best approach. Accordingly, I recommend two subclasses: one subclass of purchasers and acquirers of McDermott stock who held CB&I shares during the Class Period, and one subclass of purchasers and acquirers of McDermott stock who never held CB&I shares during the Class Period.

**\*13** The things that make Plaintiff an inadequate representative of those class members who never held CB&I shares during the Class Period are inapplicable to a

subclass of former CB&I shareholders. Accordingly, Plaintiff is an adequate and typical representative for a subclass of purchasers and acquirers of McDermott stock who held CB&I shares during the Class Period. Likewise, Pomerantz and Briscoe are adequate lead and local counsel for a subclass of former CB&I shareholders.

Defendants' counsel has acknowledged that "[t]here are tons of potential class members who ... would be adequate and typical." Dkt. 412 at 20. Plaintiff's Motion for Class Certification—originally filed before I denied Plaintiff's request to add Pontiac and its counsel, Robbins Geller—discusses why Pontiac would be an adequate class representative and Robbins Geller would be adequate class counsel. *See* Dkt. 305-2 at 36–39. I do not know, however, whether Pontiac held CB&I shares during the Class Period.[10] In any event, the parties must be afforded an opportunity to brief the question of which plaintiff should lead a subclass of purchasers of McDermott stock who never held CB&I shares during the Class Period.

[10]    I suspect Pontiac did not own CB&I shares because the schedule of its securities transactions does not reflect acquisition of any shares in May 2018, when the Merger was complete. *See* Dkt. 21-3 at 4.

"A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." FED. R. CIV. P. 23 advisory committee's note to 2003 amendment. Thus, I recommend that the Court (1) determine the remaining issues presented by the parties' briefing as discussed below; and (2) solicit additional briefing limited solely to which plaintiff and its counsel should lead a subclass of McDermott shareholders who did not own CB&I shares during the Class Period.

## D. PLAINTIFF'S DAMAGES METHODOLOGY IS SUFFICIENT

Defendants attack Plaintiff's damages methodology on four fronts, arguing that (1) Dr. Nye's methodology leads to economically nonsensical results whether he estimates inflation using the dollar method or the percent method; (2) Dr. Nye's model "does not account whatsoever for the offsetting economic gains that accrued to class members who also owned CB&I shares"; (3) "Dr. Nye glosses over ... [how he will] calculate the alleged inflation during the [ ] almost six-month period between the beginning of the alleged Class Period and when the Merger was

completed"; and (4) Dr. Nye does not identify "how the damages methodology will match purchases and sales together." Dkt. 318 at 18–20. None of these arguments is persuasive.

First, courts in this district routinely find that "[t]he *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-02399, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019). Furthermore, Dr. Nye has explained that the economically nonsensical results Defendants warn of are simply not possible under the "capped-dollar method" in which "the price inflation at that moment is 'capped' at the sale price (*i.e.*, the remaining fraud-related inflation in the stock cannot exceed its price)." Dkt. 342 at 25; *see also* Dkt. 342-2 at 48–50.

Second, I am not convinced that *Plaintiff* is required to account for any offsetting economic gains that may have accrued to CB&I shareholders. That is an affirmative defense—not part of Plaintiff's theory of liability. In any event, Dr. Nye testified that "upon analysis of the actual level of price inflation of damages if there was a reason to have an offset, it could be modeled and applied on a class-wide basis." Dkt. 412 at 78. Plaintiff's counsel asked Allen: "Let's say the jury accepts your view [that CB&I exchangers had to have received a benefit]. Let's say the jury believes that a $2 offset, a $3 offset, a $4 offset should be applied. Is there any reason that couldn't be applied for each share that was exchanged?" *Id.* at 237. Rather than answer this question and rebut Dr. Nye's testimony, Allen merely reiterated Defendants' position that "the proposed lead plaintiffs and substantial members of the class are benefiting rather than having a damage, [and] they shouldn't be in the class." *Id.* Thus, I have no reason to think that Dr. Nye's methodology cannot account for any offsetting economic gains that may have accrued to CB&I shareholders.

**\*14** Third, "[Dr.] Nye's methodology of determining damages is consistent with the plaintiffs' theory that the class's losses come from the inflated stock price caused by the defendants' misstatements and later price drop when the truth was revealed." *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479, 2023 WL 2337364, at *12 (D. Nev. Mar. 1, 2023). "[D]efendants' argument that [Dr.] Nye's method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage." *Id.* The Second Circuit has addressed this exact argument head-on:

[W]e are not persuaded by the Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time. *Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that "[c]alculations need not be exact." 569 U.S. at 35, 133 S.Ct. 1426. Thus, even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants' argument fails.

Dr. Nye explained that damages for individual class members could be calculated by applying a method across the entire class that focused on the decline in stock price following the disclosure of the New York Attorney General's lawsuit and then isolating company–specific events from market and industry events. His model also accounted for calculating the damages for individual class members based on their investment history.

Therefore, we conclude that the district court did not abuse its discretion when it certified the Plaintiffs' class over the Defendants' damages–related objections. *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). I see no reason to depart from this analysis.

Fourth, Defendants' own expert disavowed the need to match shares to one another in a 10(b) case, stating that "if you think the shares are inflated, you can see how much you benefited from the inflation and you can see how much you were harmed by the inflation. And you don't need to match one share to another. ***It doesn't matter***." Dkt. 342-3 at 37 (emphasis added).

\* \* \*

For all of these reasons, Plaintiff's damages methodology satisfies *Comcast*.

### E. COMMON ISSUES PREDOMINATE

#### *1. Short Sellers Do Not Create a Predominance Problem*

Defendants argue that the "unusually high amount of short selling creates a reliance problem because short sellers' atypical motivations prevent them from invoking the fraud-on-the-market presumption." Dkt. 318 at 22. Defendants contend "that reliance problem devolves into a predominance issue due to the need for individualized reliance inquiries." *Id.* The Fifth Circuit has explained the basics of short selling:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.

**\*15** *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008) (quoting *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988)).

Defendants' argument that short sellers cannot invoke the *Basic* presumption is the minority rule. I greatly appreciate and commend the candor of Defendants' counsel in acknowledging the "competing line of authority that would permit short sellers to invoke the fraud-on-the-market presumption despite their atypical beliefs and motivations." Dkt. 318 at 24. But I agree with the Seventh Circuit and the reasoning of the erudite then-Chief Judge Easterbrook:

> That the class includes short sellers (many investors were long at some times and short at others) also is irrelevant. A person buys stock (goes long) because he thinks the current price too low and expects it to rise; a person sells short (sells today and promises to cover in the market and deliver the shares in the future) because he thinks the price too high and expects it to fall. These positions are mirror images. If a long can participate in a class, so can a short. Both the long and the short are affected by news that influences the price they pay or receive. It may turn out that the shorts do not suffer compensable losses—that, indeed, the shorts' gains should be subtracted from the longs' losses, and only the net treated as damages—but this does not imply that the class definition is defective. *See Kohen v. Pac.*

*Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009); *Fry v. UAL Corp.*, 84 F.3d 936, 938–39 (7th Cir. 1996).

Defendants' insistence that short sellers don't rely on the market price suggests that they misunderstand the efficient capital market hypothesis, which underlies the fraud-on-the-market doctrine....

Short sellers play a role in aligning prices with information under any version of the efficient capital market hypothesis. That the resulting price may be inaccurate does not detract from the fact that false statements affect it, and cause loss, whether or not any given investor reads and relies on the false statement. That's all that *Basic* requires.

*Schleicher v. Wendt*, 618 F.3d 679, 684–85 (7th Cir. 2010). Thus, I disagree that the large short position defeats predominance.

### 2. The Market Was Efficient Throughout the Class Period

Defendants argue that "[a]ny class cannot include purchases made during the post-September 17, 2019 period covered by the Supplemental Class Action Complaint ("Supplement") because ... [t]he market for McDermott ceased to be efficient after that point, which means that the fraud-on-the-market presumption could no longer apply." Dkt. 318 at 25.[11] Specifically, Defendants argue that under Dr. Nye's own analysis, (1) the number of securities analysts following and reporting on McDermott's stock, (2) the cause-and-effect relationship between news and McDermott's stock price, (3) McDermott's market capitalization, and (4) the bid-ask spread "radically shifted following the September 18–19, 2019 news." Dkt. 318 at 26.

[11]     Defendants also argue that such purchases cannot be included "because this Court granted Defendants' motion to dismiss the Supplement." Dkt. 318 at 25 (citing Dkt. 265). But I expressly stated that my recommendation "is not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to January 23, 2020 as described in ¶ 4 of the Supplement." Dkt. 265 at 13.

**\*16** Plaintiff first retorts that Allen "has ***never*** done a market efficiency analysis ... and ***does not opine*** that the market was *inefficient* after September 19, 2019," rather, "[s]he merely pokes at Dr. Nye's work, claiming certain factors are not consistent with market efficiency." Dkt.

342 at 31. But it is *Plaintiff* who "must prove, inter alia, that the security at issue is traded in an 'efficient market.' " *Unger*, 401 F.3d at 322. Moreover, Allen is not poking holes in Dr. Nye's work so much as demonstrating how, *using Dr. Nye's own analyses and logic*, these four factors do not support market efficiency during the Supplemental Period.

For the reasons stated in Defendants' response brief, Allen's expert report, and Allen's testimony during the class certification hearing, I agree with Defendants and Allen that, after the September 18–19, 2019 news, the cause-and-effect relationship between news and McDermott's stock price, McDermott's market capitalization, and the bid-ask spread do not *support* market efficiency. I also agree that the number of securities analysts following and reporting on McDermott's stock does not *support* market efficiency, though only *after* early November 2019.[12] Yet, none of these four factors, individually or in combination, seem persuasive enough to find that the market for McDermott stock—which had been efficient—had become *in*efficient. Despite four factors weakening after the September 2019 news, other factors remained strong.

[12]     To the extent that Allen purports to call market efficiency into question by using Dr. Nye's own report against him, she observes that "*seven* of Dr. Nye's nine 'well-known' firms stopped issuing reports by September 21, 2019, and *all* stopped issuing reports by early November 2019." Dkt. 318-2 at 37. That two of these firms, whose coverage helps "facilitate the dissemination of new information to investors," were still reporting on McDermott until early November 2019 cuts against Allen's argument that the analyst factor stopped supporting market efficiency in September 2019. *Id.* (quotation omitted)

Take, for example, the average weekly trading volume. "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286. The *lowest* weekly trading volume during the Supplemental Period was 20.11 percent, which tracks the average of 20.7 percent for the entire Class Period. *See* Dkt. 305-9 at 64. If turnover of only two percent gives rise to a strong presumption of efficiency, then it would surely take some remarkable evidence to overcome a trading volume 10 times that amount. Moreover, the extent to which market makers and arbitrageurs traded in McDermott stock did "not materially vary between the unexpanded and expanded Class Periods." Dkt. 305-9 at 21 n.56. "[T]here were over 120 active market makers that traded

McDermott stock (data reported monthly from December 2017 to January 2020, inclusive)," and "the level of short interest, the degree of institutional ownership and the tightness of bid/ask spreads suggest that arbitrage activity for McDermott stock was prevalent during the § 10(b) Class Period." *Id.* at 22–23. Additionally, "McDermott filed Form S-3s before and during the § 10(b) Class Period," which demonstrates that "the SEC viewed [McDermott] to be in an efficient market where documents 'on file' could be deemed to be known by the investment community." *Id.* at 27–28 (quotation omitted). Finally, McDermott's "large public float percentage further supports [Dr. Nye's] conclusion that [McDermott]'s stock traded in an efficient market throughout the § 10(b) Class Period." *Id.* at 34.

**\*17** These factors "must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." *Unger,* 401 F.3d at 323. I recognize that the market for McDermott stock changed during the Supplemental Period, and that certain factors no longer *supported* market efficiency. But other factors—particularly the large weekly trading volume—remained strong. Because no case law or expert testimony tells me that the market for McDermott stock was *affirmatively inefficient* during the Supplemental Period, I decline to find that the previously efficient market for McDermott stock ceased to be efficient.[13]

[13]    Because the market for McDermott stock remained efficient during the Supplemental Period, I do not reach Plaintiff's contention that the *Affiliated Ute* presumption applies.

## F. LAST FIVE ALLEGED CORRECTIVE DISCLOSURES

Plaintiff alleges Defendants made eight corrective disclosures during the Class Period:

(1) October 30, 2018 disclosure of changed Focus Project estimates, increased Merger goodwill, and McDermott's intent to sell its tank storage and U.S. pipe fabrication businesses;

(2) February 13, 2019 disclosure of changed Focus Project estimate;

(3) July 29, 2019 disclosure of $205 million in cash used by operating activities in Q2 2019, net loss of $146 million, and lowered guidance;

(4) September 18–19,[14] 2019 reports of hiring AlixPartners LLP, a leading turnaround and restructuring firm, and McDermott's potential sale of Lummus to "counteract [McDermott's] negative working capital issues," which prompted multiple trading halts;

(5) September 24, 2019 reports of seeking a $1.7 billion bridge loan "to cover McDermott's working capital deficit 'until it can sell an asset such as [Lummus]' ";

(6) September 27, 2019 reports of a challenging credit situation related to obtaining a bridge loan, including that McDermott "would find it 'virtually impossible' to obtain super-senior debt that had seniority status over existing creditors";

(7) November 4, 2019 disclosure of an SEC investigation into "into 'disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project' " that began three and a half months earlier on July 26, 2019; and

(8) January 21, 2020 press release announcing Chapter 11 bankruptcy, sale of Lummus, and delisting of common stockholders' shares.

Dkt. 105 at 216–17; Dkt. 190-1 at 20. Defendants contend there is a mismatch between the last five corrective disclosures and the alleged misrepresentations that "defeats price impact and precludes application of the fraud-on-the-market presumption." Dkt. 318 at 30.

[14]    The Citi analyst report that Lummus "was among the assets [for which McDermott] could get [fast] cash" was published after-hours, meaning that September 19, 2019 was the first day the market could have reacted to the report. Dkt. 105 at 216.

Before I address the challenged disclosures, however, I must first address Plaintiff's gross mischaracterization of Defendants' argument as being "that correctives must be a *mirror image* of misstatements, *e.g.*, that McDermott's bankruptcy could **only** correct a statement saying it would not declare bankruptcy." Dkt. 342 at 36. Plaintiff is correct in stating "[t]hat is **not** the standard." *Id.* But it also is **not** what Defendants are arguing. Plaintiff notably does not offer a citation to anything Defendants have submitted to this Court to support Plaintiff's (mis)characterization of Defendants' argument. What Defendants have actually argued is that "[w]hile these five disclosures doubtlessly represented bad news, 'none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.' " Dkt. 318 at

31 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Defendants also contend that "whereas the alleged misrepresentations are broad and generic ..., the alleged corrective disclosures concern very specific items[,] ... [which] further establish[ ] the lack of correctiveness." Dkt. 318 at 31.

**\*18** Rather than address Defendants' challenges to the correctiveness of the last five alleged disclosures, Plaintiff takes the stance that "[t]hese arguments are inappropriately presented now," and that Defendants cannot sever the link without evidence or expert opinion testimony. Dkt. 342 at 34. Yet, Plaintiff fails to supply any post-*Goldman* authorities to support the notion that Defendants must present expert testimony or evidence beyond analysis of the statements themselves. To the contrary, *Goldman* instructed courts to use their "common sense" when determining whether there is evidence of price impact. 594 U.S. at 122. Thus, courts do not necessarily require an economist or evidence to "determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 127. Moreover, "[t]he defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Id.* "[T]he allocation of the burden is unlikely to make much difference on the ground." *Id.* at 126.

Plaintiff did not even attempt to articulate the link between the alleged misstatements and corrective disclosures in its reply. Nor did Plaintiff meaningfully address correctiveness at the hearing. Plaintiff is content, post-*Goldman*, to rest its laurels on the belief that "a non-exhaustive comparison-by-sampling of [alleged] misstatements against the correctives reveals that they are sufficiently specific and aligned with one another as to pass muster at this stage." Dkt. 342 at 36. Thus, armed with *Goldman*'s instructions, Defendants' arguments, Plaintiff's chart, and common sense, I turn to the question of whether the last five alleged corrective disclosures were, in fact, corrective of anything.

### 1. September 18–19, 2019 Disclosures
Plaintiff alleges these corrective disclosures on September 18–19, 2019:

On September 18, 2019, McDermott's stock price plummeted 49% in morning trading ... amid leaks and rumors that it had hired ... AlixPartners LLP[,] ... one of the global leaders in turnaround and restructuring services....

....

... According to a Citi analyst report from after-hours on September 18, 2019, McDermott needed cash fast to counteract its negative working capital issues.

Dkt. 105 at 215–16. Plaintiff contends the following are some of the alleged misrepresentations those disclosures corrected:

We believe our anticipated future operating cash flow, capacity under our credit facilities and uncommitted bilateral lines of credit, along with access to surety bonds, will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our normal, anticipated working capital needs for the foreseeable future. (April 24, 2018)

We believe our cash on hand, cash generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and other external sources of liquidity, such as the issuance of debt and equity instruments, will be sufficient to finance our capital expenditures ... settle our commitments and contingencies ... and address our normal, anticipated working capital needs for the foreseeable future. (July 31, 2018)

Dkt. 342-12 at 2 (quoting Dkt. 105 at 181, 184).

"It may frequently be the case that what is *corrective* about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 98 (2d Cir. 2023). In the situation "where the corrective disclosures do not expressly identify the alleged misrepresentation as false ..., the 'truthful substitute' should align in genericness with the alleged misrepresentation." *Id.* at 98–99. So, what is the "truthful substitute" for these alleged misrepresentations? It is:

We do not believe our cash on hand, cash generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and *other external sources of liquidity* will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our normal, anticipated working capital needs for the foreseeable future.

**\*19** Now, how big is the gap between these truthful substitutes and the September 18–19, 2019 corrective disclosures? "[L]imited" or "minimal." *Goldman*, 77 F.4th at 99 & n.12. Hiring a restructuring firm and looking internally, to Lummus, for fast cash are basically saying the truthful substitute without saying it.

Unlike the September 18–19, 2019 disclosures, the first three alleged corrective disclosures did nothing to reveal that McDermott was *so* cash-strapped that it would need to look at internal sources of liquidity (Lummus) to address urgent, working capital needs. "After each negative partial disclosure, Defendants attempted to mitigate the impact of those disclosures by making contemporaneous misstatements to the market [thus preventing] the full truth from being revealed at once." *Amedisys*, 769 F.3d at 324. For example, on July 29, 2019, McDermott "disclosed a ***$205 million cash burn*** for operating activities in the second quarter of 2019, reflecting both a $146 million net loss and the cash used on Cameron." Dkt. 105 at 11. "McDermott also lowered 2019 guidance due ... to changed assumptions about the performance of the Four Focus Projects and a shift from 2019 to 2020 in the timing of remaining incentives on the Cameron project." *Id.* Yet, that very same day, Dickson reassured investors of an "exceptionally positive" long-term outlook, stating McDermott was "***steadily advancing toward completion of the Cameron and Freeport LNG projects***" and was "***confident now that the challenges we have confronted since the combination with CB&I[ ] will be largely behind us by the end of the year***." *Id.* at 126. And the next day, McDermott issued a press release stating, "***we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020***." *Id.* Thus, not until the September 18–19, 2019 disclosures were investors able to see the alleged falsity in McDermott's statements that it could cover its capital needs with cash, revenue, credit, and external sources of liquidity.

#### 2. September 24 & 27, 2019 Disclosures

Plaintiff alleges additional corrective disclosures on September 24, 2019, and September 27, 2019:

[O]n September 24, 2019, reports came out indicating McDermott was seeking a bridge loan to the tune of around $1.7 billion. This news revealed to the market that the sale process would not finish soon enough to resolve McDermott's short term woes. *Bloomberg* reported that the bridge loan was to cover McDermott's working capital deficit "until it can sell an asset such as [Lummus]," This ... indicated that asset sales could not be consummated quickly enough to resolve the balance sheet issues, and the bridge loan was necessary as an emergency measure....

A few days later, on September 27, 2019, analysis came out detailing McDermott's credit situation as it pertained to obtaining a bridge loan. McDermott, according to an Xtract Research report, would find it "virtually impossible" to obtain super-senior debt that had seniority status over existing creditors under their May 2018 credit agreement. According to the report, existing creditors were unlikely to accept amendments to existing debt rules that moved them back in the priority line. Given McDermott's dire cash flow situation, and inability to unload major assets quickly, the bridge loan was a necessity to keep operations afloat, and these emerging difficulties made a tough situation worse.

**\*20** Dkt. 105 at 217–18. Yet, according to Plaintiff's charts, these disclosures corrected the very same misrepresentations as the September 18–19, 2019 disclosures. *See* Dkt. 342-12 at 2; *compare* Dkt. 427-1, *with* Dkts. 427-2, 427-3. Plaintiff's expanded, supplemental "Charts 1, 2, and 3 purport to show correctiveness for three different alleged corrective disclosures, but the charts list *the same 50 alleged misrepresentations* for each alleged corrective disclosure." Dkt. 471 at 3.

Plaintiff makes no attempt whatsoever to explain what misrepresentations the September 24 or 27, 2019 disclosures corrected that were not already corrected on September 18–19, 2019. I certainly cannot discern any. McDermott never assured investors that it could unload assets quickly enough to resolve a dire cash flow situation. To the contrary, McDermott's misrepresentations were tantamount to assuring investors that it would never be in such a situation in the first place. But *those* statements were already revealed to be false on September 18–19, 2019. Thus, the September 24 and 27, 2019 disclosures did not correct any alleged misrepresentations.

#### 3. November 4, 2019 Disclosure

The disclosure garnering the most meaningful debate from the parties is McDermott's November 4, 2019 disclosure that three and a half months earlier, "the ***SEC had launched an investigation*** into 'disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project' by letter dated ***July 26, 2019***." Dkt. 190-1 at 20. Defendants correctly note that "commencement of [a] government investigation[ ] on suspected fraud do[es] not, standing alone, amount to a corrective disclosure." Dkt. 318 at 32 (quoting *Amedisys*, 769 F.3d at 323). Defendants further

contend that "disclosure of the SEC investigation is, if anything, the tail-end of the iceberg rather than its tip, coming as it did as one of the last alleged corrective disclosures. Nor, to be clear, did the announcement contain any 'revelation of prior misrepresentations.' " Dkt. 318 at 32 (quoting *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008)). I disagree.

News of the SEC investigation suggested McDermott may have fraudulently reported projected losses associated with the Cameron project. Defendants do not even attempt "to disentangle and separately quantify the price decline attributable to, on the one hand, the conduct underlying the [SEC investigation], and, on the other hand, the news of the [SEC investigation] itself." *Goldman*, 77 F.4th at 92 (holding that "[i]t was not clear error to credit [the expert's] opinion" that "the enforcement action 'signals the greater severity than if an enforcement action hadn't been filed, but an enforcement action is never going to get filed unless the misbehavior or alleged misbehavior occurred in the first place ... [t]hat's why you can't separate them' " (quotation omitted)). "There [is] no question ... that [news of the SEC's investigation into McDermott's reporting of projected losses associated with the Cameron project] directly implicated not just the [losses], but the alleged misstatements themselves." *Id.* at 97. "The back-end disclosures' corrective effect upon the affirmative misrepresentations was obvious." *Id.* at 98.

Icebergs and fraud have this much in common: "the whole is greater than the sum of its parts." *Amedisys*, 769 F.3d at 324. News of the SEC investigation may indeed have been the tail-end of the iceberg, but only when the tail-end is visible can you appreciate the depth and breadth of the fraud. Accordingly, Defendants have not carried their burden of rebutting price impact with respect to the November 4, 2019 news of the SEC investigation.

### 4. January 21, 2020 Disclosures

**\*21** On January 21, 2020, McDermott issued a press release that, "[b]oiled down," announced:

> [McDermott's] entry into a Restructuring Support Agreement in connection with a Joint Prepackaged Chapter 11 Plan of Reorganization.... Lummus was being sold for $2.725 billion, but the proceeds would protect only McDermott's debt creditors, nearly all of whom would be equitized, while ***McDermott's common stockholders*** – the Class members at issue in this lawsuit – ***would be wiped out***, as its shares would

> be delisted from the NYSE and cancelled as part of the restructuring.

Dkt. 190-1 at 21. According to Plaintiff's supplemental Chart 5, the January 21, 2020 disclosures were apparently corrective of most of the alleged misrepresentations throughout the Class Period. *See* Dkt. 427-5 at 2–8.

Defendants parrot my earlier observation that they "never once promised investors that a bankruptcy filing was off the table." Dkt. 318 at 30–31 (quoting Dkt. 265 at 8). To be clear, this is more than a simple "mismatch" argument. As Defendants note, " 'plaintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information.' " Dkt. 318 at 31 (quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004)).

Plaintiff has never meaningfully engaged with this argument. Plaintiff failed to address this argument at all in its reply brief, and it failed to address it at the hearing. According *to Plaintiff*, the market had already learned that the Focus Project estimates were wrong; that McDermott had hired a turnaround and restructuring firm; that McDermott was planning to sell Lummus; that McDermott couldn't sell Lummus quickly enough and was so cash-strapped that it needed a bridge loan; that McDermott was in such dire financial straits it was having problems obtaining the bridge loan; *and* that the SEC was investigating McDermott for how it reported projected losses associated with one of the Focus Projects. The news of McDermott's bankruptcy was merely confirmation that McDermott's downward spiral had finally reached rock bottom. But it did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Omnicom*, 597 F.3d at 511. Thus, the January 21, 2020 disclosures were not corrective of any alleged misrepresentation.

### CONCLUSION

For the reasons explained above, I recommend Plaintiff's Motion for Class Certification (Dkt. 305) be **DENIED** without prejudice to refiling a motion to certify the following two subclasses:

> 1. All persons and entities (the "§ 10(b) CBI Subclass") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and November 5, 2019, both dates inclusive ("10(b) Class Period"), and who held stock in Chicago Bridge & Iron Company, N.V. (NYSE: CBI) during

the 10(b) Class Period, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

**\*22** 2. All persons and entities (the "§ 10(b) MDR Subclass") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and November 5, 2019, both dates inclusive ("10(b) Class Period"), and who never held stock in Chicago Bridge & Iron Company, N.V. (NYSE: CBI) during the 10(b) Class Period, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

Excluded from both subclasses are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest. Should this recommendation be adopted, I will immediately schedule a status conference with the parties to determine the scope and expedited schedule of further class certification briefing. I expect such briefing to be limited, as the class certification issues determined by this recommendation will not be relitigated.[15] Specifically, I recommend the Court hold that:

1. Plaintiff—a former CB&I shareholder who held CB&I shares during the Class Period—has standing to pursue its claims. But Plaintiff has a fundamental conflict with purchasers and acquirers of McDermott stock who never held CB&I shares during the Class Period, which necessitates subclasses.

2. The § 10(b) CBI Subclass described above satisfies the Rule 23 requirements for class certification, including that Plaintiff is an adequate and typical representative of a subclass of purchasers and acquirers of McDermott stock who held CB&I

shares during the Class Period, and Plaintiff's Lead Counsel (Pomerantz) and Local Counsel (Briscoe) are adequate to represent such a subclass.

3. Plaintiff's damages methodology satisfies *Comcast* and can account for inflation in CB&I's stock as a result of the alleged fraud, and the corresponding economic benefit to purchasers and acquirers of McDermott stock who held CB&I shares during the Class Period, should any such inflation and economic benefit ultimately be proven.

4. The large number of short sellers during the Class Period does not defeat predominance.

5. The market for McDermott stock was efficient after September 17, 2019, and throughout the Class Period.

6. The September 24 and 27, 2019 disclosures and the January 21, 2020 disclosures did not reveal any new information regarding the alleged misrepresentations. The Class Period should end on November 5, 2019, the date of the last corrective disclosure.

15  The parties are, of course, free to preserve their continuing objections to these determinations in the (hopefully) final round of class certification briefing.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 29th of February 2024.

**All Citations**

Slip Copy, 2024 WL 873054

**End of Document**　　© 2024 Thomson Reuters. No claim to original U.S. Government Works.