# Case No. 7

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

**H** KeyCite history available

2019 WL 6168254
United States District Court, M.D. Tennessee,
Nashville Division.

IN RE ENVISION HEALTHCARE
CORPORATION SECURITIES
LITIGATION
This Document Relates To:
ALL ACTIONS

No. 3:17-cv-01112
|
(Consolidated with Case No. 3:17-cv-01323,
(Consolidated with Case No. 3:17-cv-01397
|
Filed 11/19/2019

__MEMORANDUM__

WILLIAM L. CAMPBELL, JR., UNITED STATES
DISTRICT JUDGE

**\*1** Pending before the Court is Defendant Envision
Healthcare Corporation and the Individual Defendants'
Motion to Dismiss the Consolidated Amended Complaint
(Doc. No. 125). Also pending before the Court is a
motion to dismiss filed by Clayton, Dublier & Rice, LLC,
CD&R Associates VIII Ltd., Clayton Dubilier & Rice
Fund VIII, L.P., CD&R EMS Co-Investor, L.P., CD&R
Advisor Fund VIII Co-Investor, L.P., and CD&R Friends
and Family Fund VIII, L.P. (the "CD&R Defendants")
(Doc. No. 122). Plaintiffs filed a consolidated response in
opposition to both motions (Doc. No. 131). Defendant
Envision Healthcare Corporation and the Individual
Defendants filed a Reply (Doc. No. 133) and the CD&R
Defendants filed a Reply (Doc. No. 132). For the
following reasons, the motion to dismiss by the CD&R
Defendants is **GRANTED**, and the motion to dismiss by
Envision and the Individual Defendants is **GRANTED** in
part, **DENIED** in part.

## I. BACKGROUND

### A. Procedural Background
On August 4, 2017, Plaintiff Terry W. Bettis filed an
initial complaint against Envision Healthcare Corporation
and four individual defendants: William A. Sanger,
Randel G. Owen, Christopher A. Holden, and Claire M.
Gulmi (Doc. No. 1). That initial complaint alleged
violations of the Securities Act of 1933 (the "1933 Act")
and the Securities Exchange Act of 1934 (the "1934
Act"). (*Id.* ¶¶ 63-78). The case brought by Beattis was
consolidated with two related cases: *Carpenters Pension
Fund of Illinois v. Envision Healthcare Corporation*, Case
No. 3:17-cv-01323 (M.D. Tenn., Sept. 29, 2017); and
*Central Laborers' Pension Fund v. Envision Healthcare
Corporation*, Case No. 3:17-cv-01397 (M.D. Tenn.,
October 23, 2017). (*See* Doc. Nos. 58 and 60). The
Plaintiffs filed a Consolidated Class Action Complaint on
January 26, 2018 (Doc. No. 88), alleging violations of the
1933 Act and the 1934 Act against Envision Healthcare
Corporation, the private equity firm, Clayton, Dubilier &
Rice, LLP ("CD&R"), four CD&R-associated companies
(together with CD&R, the "CD&R Defendants"), and
twenty-three (23) individual defendants.

### B. The Parties
Plaintiffs bring this action on behalf of all entities or
individuals who purchased or acquired Envision's
common stock between February 3, 2014, and October
31, 2017 (the "Class Period"). The Complaint identifies
four institutional investors as lead/named Plaintiffs:
Laborers' Pension Trust Fund for Northern California
(lead Plaintiff); Laborers' International Union of North
America National Industrial Fund (lead Plaintiff); Central
Laborers' Pension Fund (named Plaintiff); and United
Food and Commercial Workers Union Local 655 Food
Employers Joint Pension Fund (named Plaintiff). (*Id.* ¶¶
25-28).

Defendant Envision Healthcare Corporation ("Envision")[1]
is headquartered in Nashville, Tennessee. EmCare is a
subsidiary of Envision and its largest business unit –
generating approximately 60% of Envision's net revenue
(*Id.* ¶¶ 1-2). EmCare provides "facility-based physician
services," which is essentially physician staffing for

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

hospital emergency rooms. (*Id.*) On December 1, 2016, Envision merged with AMSURG Corp. ("AmSurg"). (*Id.* ¶ 257). The combined company continued to operate EmCare and other legacy Envision and AmSurg services. (*Id.* ¶¶ 1-2).

[1] Prior to a merger with AMSURG Corp. on December 1, 2016, Envision was Envision Healthcare Holdings. Following the merger, the combined company is Envision Healthcare Corporation. For simplicity, the Court refers to both companies as Envision throughout. For purposes of this motion, the only relevant distinction between the two companies is that the Officers and Directors changed following the merger.

**\*2** The Complaint identifies 23 Individual Defendants, which have been grouped by Plaintiffs as follows:

1. The Envision Officer Defendants served as officers of Envision prior to and at the time of the merger: William A. Sanger, Randel G. Owen, Craig A. Wilson, and Todd G. Zimmerman. William A. Sanger was President and CEO of Envision from May 2011 until the AmSurg Merger in December 2016. He served as Chairman of the Envision Board from November 2014 through the Merger, and as Executive Chairman of the Board from December 2016 through December 2017. (*Id.* ¶ 30). Randel G. Owen was CFO and Executive Vice President (May 2011-November 2016) and Chief Operating Officer (September 2012-November 2016) of Envision. (*Id.* ¶ 31). Following the merger with AmSurg on December 1, 2016, Owen was Executive Vice President and President of Envision's Ambulatory Service Group. (*Id.*) Plaintiffs allege Owen signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision before the merger with AmSurg. (*Id.*) Craig A. Wilson is Senior Vice President, General Counsel, and Secretary of Envision. (*Id.* ¶ 32). Todd G. Zimmerman was Executive Vice President of Envision from May 2011 until the AmSurg merger. (*Id.* ¶ 32). He also served EmCare as President (April 2010 – April 2015) and CEO (February 2013 – June 2017). (*Id.*)

2. The Envision Director Defendants, each of whom served as a member of Envision's Board of Directors prior to and at the time of the Merger: Carol J. Burt, Mark V. Mactas, Leonard M. Riggs, Jr., Richard J. Schnall, James D. Shelton, Michael L. Smith, Ronald A. Williams, and William A. Sanger (also an Envision Officer Defendant). (*Id.* ¶ 35). The following directors joined the new Envision Board after the AmSurg merger: Burt, Riggs, Schnall, Shelton, Smith, and Williams.

3. The AmSurg Officer Defendants, each of whom served as an officer of AmSurg at the time of the Merger and an officer of Envision post-Merger: Christopher A. Holden, Claire M. Gulmi, and Kevin D. Eastridge. (*Id.* ¶¶ 37-40). Christopher Holden has been President and CEO of Envision since the December 1, 2016, merger with AmSurg. (*Id.* ¶ 37). Following the merger, Holden signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision. Claire M. Gulmi was Executive Vice President and CFO of Envision from December 1, 2016, to October 2, 2017. (*Id.* ¶ 38). During that time, she signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision. (*Id.*) Kevin D. Eastridge was Senior Vice President, Finance and Chief Accounting Officer of Envision from December 1, 2016, to October 2, 2017, and Envision's CFO thereafter. (*Id.* ¶ 39).

4. The AmSurg Director Defendants, each of whom served as a member of AmSurg's Board of Directors at the time of the Merger: Christopher A. Holden, Claire M. Gulmi, Kevin D. Eastridge, Thomas G. Cigarran, James A. Deal, John T. Gawaluck, Steven I. Geringer, Henry D. Herr, Joey A. Jacobs, Kevin P. Lavender, Cynthia S. Miller, and John W. Popp, Jr. (*Id.* ¶ 41).

**\*3** The Complaint also names as defendants four CD&R funds, the general partner of those funds, and an independent investment advisor, Clayton, Dubilier & Rice LLC and refers to them all as CD&R.[2] (*Id.* ¶ 43). CD&R includes CD&R LLC, CD&R Associated VIII Ltd., CD&R Fund VIII, L.P., CD&R EMS Co-Investor, L.P., CD&R Advisor Fund VIII Co-Investor L.P., and CD&R Friends and Family Fund VIII L.P. According to Plaintiffs, CD&R "formed Envision in May 2011 ... and owned over 97% of Envision at the time of [Envision's] IPO" in 2013. (*Id.*) CD&R had the right to designate the chairperson of Envision as long as they held 30% of the Envision stock, which was until March 2015, when CD&R sold all of its remaining Envision stock. (*Id.*) CD&R designated Envision Director Defendants Schnall, Giurico, and Williams. (*Id.*) Williams served as Chairman of the Board from May 2011 to November 2014, and Schnall and Williams remained on the Board until March and October 2017, respectively. (*Id.*)

[2] Other than listing each of the CD&R defendants in paragraph 43 of the Complaint, Plaintiffs refer to these six defendants throughout the Complaint as "CD&R."

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
Fed. Sec. L. Rep. P 100,705

## C. Factual Background

### 1. The Alleged Fraudulent Scheme

The overarching allegations of the Complaint are that Envision artificially inflated its earnings through out-of-network billing, illegal upcoding, and inflated facility spending, and failed to disclose to investors that these business practices were substantially responsible for EmCare's revenue growth. Between 2013 and 2016, EmCare almost doubled its annual revenue from $2.3 billion to $4.2 billion. (Compl., Doc. No. 88, ¶ 3). Plaintiffs allege EmCare intentionally staffed its emergency rooms with out-of-network physicians, which allowed it to bill health insurers and patients at "vastly higher rates" and reap the associated profits. (*Id.* ¶ 5). Plaintiffs also allege EmCare engaged in illegal upcoding – billing for services using a billing code that is more expensive than the code associated with services the patient actually received or required. (*Id.* ¶ 6). In a similar vein, Plaintiffs allege EmCare increased facility spending for its hospital partners by increasing hospital admission and imaging rates without regard to medical necessity. (*Id.* ¶ 7). Increased facility spending had the dual benefit of increasing EmCare's revenue and increasing revenues for the hospitals with which it contracted. As a result, Plaintiffs allege, EmCare was able to parlay this increase in hospital revenue into more contracts and thereby increase its own revenue. (*Id.* ¶¶ 4, 7, 64-65).

According to Plaintiffs, EmCare's out-of-network billing, upcoding, and increased facility spending were uncovered by a study published by the National Bureau of Economic Research (the "NBER study") and brought to public attention by a *New York Times* article (the "Article") published on July 24 (online) and 25 (print), 2017.[3] (*Id.* ¶¶ 15, 16).

[3]    The Article is *The Company Behind Many Surprise Emergency Room Bills* by Julie Cresswell, Reed Abelson, Margot Sanger-Katz, NEW YORK TIMES, July 24, 2017 (Doc. No. 127-39). Defendants' exhibit (Doc. No. 127-39) is a printout of the online version of the article. The Article was also published on page A1 of the *New York Times* on July 25, 2017, with the headline: *Costs Shoot Up As a Company Runs the E.R.* The NBER study is *Surprise Out-of-Network Billing for Emergency Care in the United States* by Zack Cooper, Fiona Scott Morton, Nathan Shekita, NBER Working Paper Series, Working Paper 23623, National Bureau of Economic Research, July 2017, *available at* www.nber.org/papers/w23623, (Doc. No. 127-38).

The Article reported that the NBER study examined data

provided by one insurance company for the time period 2011 to 2015 and found that many of the emergency rooms with the highest rate of out-of-network billing were run by EmCare. (Doc. No. 127-39). The NBER study focused on 16 hospitals that EmCare entered between 2011 and 2015 and found that in eight of those hospitals, out-of-network billing rose "quickly and precipitously." (*Id.* at 5). The NBER study also looked at a larger sample of EmCare operated emergency departments and found an out-of-network billing rate of 62 percent, which it said was higher than the national average. (*Id.*) The Article reported that "[t]he before-and-after analysis [in the NBER study] was limited to the small number of hospitals where researchers could find public records of EmCare's entrance and was based on claims from only one large insurance company. (*Id.*). While the nationwide patterns are consistent with studies that have looked at other insurance companies, the single insurer in the study may not be typical in all cases: EmCare does not participate in some insurer's networks, such as Blue Cross of Texas." (*Id.*). The article reported that EmCare had reached agreements with additional insurers since 2015. (*Id.*).

**\*4** Regarding Plaintiffs' allegation of unlawful upcharging and increased facility spending, the article gives an example of one small hospital north of Spokane, Washington, where the number of patients billed for the most complex level of case increased from 6 percent to 28 percent when EmCare took over. (*Id.* at 1). The Article also quotes a doctor at a California hospital who claimed to have discovered a pattern of "inflated bills and out-of-network bills." (*Id.* at 7). The Article also informed readers that EmCare was named in a 2011 whistle-blower lawsuit (brought by a former EmCare executive) alleging that EmCare and hospitals pressured emergency doctors to increase admission and tests without regard to medical necessity. (*Id.* at 6).

Both the Article and the NBER study acknowledge there are various factors contributing to out-of-network billing, including that some doctors are not willing to accept the rates offered by insurance companies. (*Id.* at 5). Neither the Article nor the NBER study suggests out-of-network billing is illegal, only that patients were upset by "surprise out-of-network billing" and that they complained about it to hospitals. Although the NBER study itself broadly analyzed out-of-network billing trends, the reasons contributing to high levels of out-of-network billing, and existing and potential policy responses to "surprise out-of-network billing," the *New York Times* article, which incorporated data from the NBER study, focused specifically on EmCare. (*See* NBER Study, Doc. No. 127-38; *New York Times* Article, Doc. No. 127-39).

Fed. Sec. L. Rep. P 100,705

### 2. Stock Sales

CD&R sold its $ 4.4 billion equity stake in Envision in four stock offerings in February 2014, July 2014, September 2014, and March 2015. (Compl., Doc. No. 88, ¶ 46). Plaintiffs allege certain Envision officers and directors sold Envision stock in 2014 and 2015: William Sanger ($80 million), Randel Owen ($36 million), Todd Zimmerman ($18 million), Ronald Williams ($4.3 million). (*Id.* ¶¶ 30, 31, 33, 35, 147).

### 3. Underperforming Contracts

In 2014 and 2015 Envision entered into approximately 30 contracts that underperformed expectations. In October 2015, Envision issued drastically reduced earnings and projections and attributed the earning miss to these underperforming contracts. (*Id.* ¶¶ 133-134). The contracts, which had been expected to produce revenue of $3.5 million instead resulted in a loss of $6.5 million – a negative $10 million variance. (*Id.*). William Sanger, speaking at a healthcare conference, revealed the contracts at issue had been performing below expectations for over a year and explained, "we kind of misread what the cash per visit was ... We ran into a set of frankly, poor execution, poor decision about taking those contracts." (*Id.* ¶ 135). Sanger later added that they relied heavily on incomplete data provided by the hospital and made assumptions that were incorrect. (*Id.* ¶ 137). At the same conference, Randel Owen explained that the problems with the contracts were largely due to unexpected challenges recruiting physicians and that they had a "much higher cost of staffing." (*Id.* ¶ 139). Following the October 22, 2015 announcement of reduced earnings and guidance, Envision's stock price fell 30%. (*Id.* ¶ 11).

### 4. AmSurg Merger

On June 15, 2016, Envision and AmSurg announced a merger agreement between the two companies. (*Id.* ¶ 13). On August 5, 2016, Defendants sent shareholders the Joint Proxy Registration Statement ("Registration Statement"), which estimated revenue growth of 14 percent (to $1.5 billion) in 2017 and revenue growth of 13 percent (to $1.7 billion) in 2018. (*Id.* ¶ 254). Following

shareholder approval, the merger was completed on December 1, 2016. (*Id.* ¶ 257). The merged company issued stock to Envision shareholders – 0.334 shares of new stock for each share of pre-merger Envision stock (approximately $4.26 billion). (*Id.*)

### 5. Transition from Out-of-Network to In-Network

**\*5** On February 28, 2017, Envision announced it planned to transition its out-of-network business in-network over the next 18-24 months. (*Id.* ¶ 99). At the time, out-of-network business was valued at approximately $1 billion and constituted somewhere between 17 and 35 percent of post-merger physician services revenue. (*Id.* ¶¶ 14, 94, 102). Envision said it believed the transition would be "revenue neutral" and that the "stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12-18 months" (*Id.* ¶ 99-104). Envision representatives continued to discuss the transition to in-network billing at healthcare conferences and on investor conference calls in the spring and summer of 2017.[4] (*Id.* ¶¶ 101-108). The *New York Times* article acknowledged Envision's plan to move most of its business in-network: "EmCare said in early February that it planned to reach agreements with insurers for most of its doctors." (Doc. No. 127-39 at 7).

[4]     Plaintiffs specifically cite discussion of the transition to in-network status at healthcare conferences and on investor phone calls on March 14, March 17 and May 2, 2017. (Compl. Doc. No. 88 at ¶¶ 101, 102, 103.)

### 6. Final Stock Price Declines

Following the publication of the *New York Times* article, Envision's stock value declined 6 percent by close of market on July 25, 2017. (Compl., Doc. No. 88, ¶ 199).

On September 18, 2017, Envision announced the resignation of the Physician Services Division President. (*Id.* ¶¶ 172, 200). That day, Envision's stock declined an additional 10% on substantial volume of 11.2 million shares. (*Id.* ¶ 201).

On October 31, 2017, Envision released its 2017 third-quarter results and decreased earnings and revenue projections for 2017 and 2018. (*Id.* ¶ 19). The revised projections anticipated 2017 reduction in revenue of 50 percent from predictions made at the time of the merger

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

and a 25%-30% reduction in 2018 revenue predictions. (*Id.*) Envision said the miss and guidance reduction were "essentially all attributable to Physicians Services" specifically to losses caused by Hurricanes Harvey and Irma (approximately $22 million) and reduction in volumes for emergency medicine and anesthesia. (*See* Transcript: Q3 2017 Envision Healthcare Corp. Earnings Call, Nov. 1, 2017, Doc. No. 127-37 at 6; Compl. Doc. No. 88, ¶¶ 195, 203). Envision's stock price fell over 41%. (Compl. Doc. No. 88, ¶¶ 19, 202).

**D. The Claims**

The Consolidated Complaint alleges eight counts under the 1933 Act and the 1934 Act:

Count I – claims alleging securities fraud in violation of Section 10(b) of the 1934 Act and Securities and Exchange Commission ("SEC") Rule 10b-5 brought by all Plaintiffs against Envision, the Envision Officer Defendants (Sanger, Owen, Wilson, and Zimmerman), and the AmSurg Officer defendants (Holden, Gulmi, and Eastridge);

Count II – claims for control person liability under Section 20(a) of the 1934 Act brought by all plaintiffs against the Envision Individual Defendants and the AmSurg Defendants (except Ciggaran, Herr, and Popp) alleging these defendants controlled the dissemination of the alleged false and misleading statements at issue in Claim I;

Count III – insider trading in violation of Section 20A of the 1934 Act brought by the UFCW Pension Fund against Williams, Sanger, Owen, and Zimmerman, and the CD&R Defendants;

Counts IV and V – strict liability and negligence claims under Sections 11 and 12(a)(2) of the 1933 Act brought by all Plaintiffs against Envision and the Envision Individual Defendants, alleging these defendants were responsible for false and misleading statements in the Joint Proxy Registration Statement;

Count VII – negligence based claims under § 14(a) of the 1934 Act and SEC Rule 14a-9 brought by all Plaintiffs against Envision, the Envision Individual Defendants, and the AmSurg Defendants for false and misleading statements in the Joint Proxy Registration Statement;

Counts VI and VIII – claims for control person liability under Section 15 of the 1933 Act and Section 20(a) of the

1934 Act. Claims for violation of Section 15 of the 1933 Act are brought against the Envision Individual Defendants. Claims under Section 20(a) of the 1934 Act are brought against CD&R and four associated CD&R companies, the Envision Individual Defendants, and the AmSurg Defendants.

**II. Standard of Review**

**\*6** In deciding a motion to dismiss under Rule 12(b)(6), a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss provided they are referred to in the Complaint and are central to the claims. *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008). In support of their motion to dismiss, Envision and the Individual Defendants have included numerous documents referenced in the Complaint. (*See* exhibits to Doc. No. 127). These include copies of numerous SEC filings, conference and teleconference transcripts, and the *New York Times* article and NBER study. The CD&R Defendants included a number of public filings in support of their motion to dismiss. (*See* exhibits to Doc. No. 124). For purposes of the pending motions to dismiss, the Court will consider these documents.

**III. Analysis**

**A. Securities and Exchange Act Claims: Section 10(b) and Rule 10b-5**

Plaintiffs bring claims for securities fraud under Section

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

10(b) of the Securities and Exchange Act and Rule 10b-5 against Envision and seven individual defendants who were officers of Envision and AmSurg: William A. Sanger, Randel G. Owen, Craig A. Wilson, Todd G. Zimmerman, Christopher A. Holden, Claire M. Gulmi, and Kevin D. Eastridge.

Section 10(b) and Rule 10b-5 prohibit fraudulent, material misstatements in connection with the sale or purchase of securities. *Indiana St. Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund*, 583 F.3d 935, 942 (6th Cir. 2009) (citing *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008)). Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC to implement Section 10(b), makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for violation of § 10(b) and Rule 10b-5 a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Because the Section 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply. *Frank v. Dana*, 547 F.3d 564, 569-70 (6th Cir. 2008). At a minimum, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* at 570. The PSLRA imposes additional requirements. *Id.* The complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In addition, plaintiffs must "with respect to *each act or omission* alleged to violate this chapter, state with *particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see Frank*, 547 F.3d at 570.

**\*7** "For purposes of Rule 10b-5, the 'maker' of a statement is a person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011). The Supreme Court reasoned that "[o]ne 'makes' a statement by stating it," comparing a corporate statement to a speech drafted by a speechwriter – even when drafted by someone else, the content of the speech is entirely within the control of the person who delivers it. *Id.* After *Janus*, courts have consistently held that corporate officers who sign documents on behalf of the corporation "make" the statements in those documents. *See Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at * 3 (M.D. Tenn. Apr. 19, 2018).

Plaintiffs allege Defendants are liable for false or misleading statements that fall generally into three categories: (1) statements regarding "critical drivers" of revenue growth (including quality of care)[5] that failed to disclose EmCare's high rate of out-of-network billing; (2) statements about the transition from out-of-network to in-network status; and (3) statements about the due diligence conducted in connection with certain 2014-15 contracts and the performance of those contracts.

[5]   The statements regarding quality of care are alleged to be misleading because "it was not the quality of care that was driving Envision's reported revenue growth," but rather out-of-network billing and upcoding. (*See* Compl., Doc. No. 88, ¶ 122). Although the Complaint places statements regarding drivers of growth and statements regarding quality of care in separate categories, the Court finds that Plaintiffs put forth a singular theory as to the misleading nature of all of these statements and will, therefore, consider them together.

### 1.  Omitting Out-of-Network Billing and Upcoding as Basis of Revenue Growth

#### A.  Factual Support for the Allegations

During the class period, Envision made numerous statements about what it considered to be the basis for the company's revenue growth and general success. To summarize, Envision stated that it believed its revenue growth was due to factors such as integrated service offerings, meeting consumer service expectations, and providing quality care. Plaintiffs argue these statements, even those couched as statements of opinion, were misleading because Defendants knew that Envision's

Fed. Sec. L. Rep. P 100,705

revenue was due in large part to EmCare's reliance on out-of-network billing and upcoding, as well as a strategy of increasing facility spending by increasing admission rates and procedures without regard to medical necessity. Defendants argue that the facts alleged by Plaintiffs do not show out-of-network billing was a "prime driver" of revenue or that Envision "inflated" revenue through illegal upcoding and improperly increased facility spending.

The Court must first assess whether Plaintiffs allege facts sufficient to create a plausible inference that Envision actually engaged in these practices or that revenue growth was reliant on them. Defendants cannot be held responsible for failing to disclose that which is not plausibly alleged. See *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " (alterations in original) (citing Fed. R. Civ. P. 8(a)(2))).

With regard to out-of-network billing, Defendants claim the practice is neither illegal nor illicit and argue that the NBER study uses too limited a data set to substantiate allegations of a company-wide business practice of out-of-network billing.[6] Plaintiffs respond with evidence of high levels of out-of-network billing, and corresponding revenue, from the NBER study and from Envision's own disclosures. Plaintiffs contend that because EmCare generates approximately 60 percent of Envision's revenue, its business practices and sources of revenue necessarily have an effect on overall revenue. (Compl., Doc. No. 88, ¶ 2). Plaintiffs cite evidence that out-of-network billing at hospitals managed by EmCare was significantly higher than other hospitals (62% on average) and that out-of-network billing at hospitals managed by EmCare increased when EmCare took over. During the transition to in-network billing, Envision disclosed that out-of-network billing represented upwards of 35 percent and $1 billion of EmCare's revenue. (Compl., Doc. No. 88, ¶¶ 102, 110; Doc. No. 127-33 at 4). The Court finds Plaintiffs have sufficiently alleged facts that raise a plausible inference that out-of-network billing was a significant source of revenue.

[6]    The NBER study does not claim that out-of-network billing is "illicit." To the contrary, the study notes a wide range of factors, including state laws, considered by the insurer, employers, hospitals, and physicians when deciding whether physicians will enroll in insurance networks.

**\*8** On the other hand, the allegations of upcoding improper hospital admissions and procedures are based entirely on one statistic from the NBER study, which showed the likelihood of a patient being coded as "most severe" increased by 42%, and the likelihood of a patient being admitted to the hospital increased by 23% when EmCare took over management of the emergency department. The NBER study relied on data from one insurer[7] and covered 16 of EmCare's 900 hospitals.[8] (Compl., ¶¶ 63, 67; Article, Doc. No. 127-39). Neither the NBER study nor the Article made accusations of upcoding. In fact, the Article said Envision explained that admissions increased because EmCare "allows hospitals to treat sicker patients." (Article, Doc. No. 127-39).

[7]    NBER Study at 9.

[8]    NBER Study at 12.

The question then is whether evidence cited by Plaintiffs indicating that admissions rates and coded severity (as reported by one insurer) increased at eight emergency departments when EmCare took over, supports a reasonable belief that the company was engaging in systemic, illegal upcoding in an effort to improperly boost revenue. The Court finds the evidence insufficient to plausibly raise this inference. The sample size given is too small to suggest a company-wide policy or practice of unlawful upcoding. Without more, Plaintiffs have not raised a plausible inference of upcoding or improperly increased admissions rates. The statements cannot be considered misleading for failure to discuss that which is not plausibly alleged. See *In re Career Educ. Corp. Sec. Litig.*, No. 03C8884, 2006 WL 999988, at * 8 (N.D. Ill., Mar. 28, 2006) (granting motion to dismiss when plaintiffs' allegations of conduct in six of defendants' 78 campuses did not "raise an inference of fraud on a nation-wide level such that [ ] statements and omissions" regarding company-wide statistics were false or misleading); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 897 (S.D. Tex. 2017) (allegations of specific problems with pipes comprising a small fraction of the overall network do not give rise to an inference that statements about pipeline integrity management are false and misleading); *Metzler Inv. GmBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (disclosure of an investigation at one of the schools 88 colleges raised only the "potential" of widespread fraudulent conduct which was insufficient to state a claim under Section 10(b)).

For these reasons, the Court will consider whether the alleged representations are misleading for failure to

Fed. Sec. L. Rep. P 100,705

disclose Envision's alleged out-of-network billing practices.[9]

> [9]    From this point forward, the Court will refer only to allegations regarding out-of-network billing. As discussed, plaintiffs have not provided facts sufficient to plausibly allege Envision engaged in illegal upcoding or improperly increased facility spending. See *supra*, Section III, A.,1, A.

### B. Material Misrepresentation

Materiality can be established by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Zaluski*, 527 F.3d at 571 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant has a duty to disclose, and generally this duty does not apply to forecasts, or soft information. *Zaluski*, 527 F.3d at 571. However, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.' " *Id.* at 572.

**\*9** Statements identified as statements of opinion are actionable if it was subjectively false (i.e. not honestly held) or omits material facts about the basis or reliability of the opinion. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). To state a claim for an omission resulting in a misleading opinion statement, "the investor must identify particular (and material) facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

In addition, liability does not attach to mere corporate puffery or statements of corporate optimism. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004). Courts have consistently found immaterial "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace –

loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* at 570-71. Vague predictions of positive future results cannot engender reasonable reliance by investors. *Indiana State Dist. Council*, 583 F.3d at 944 ("continuation of outstanding earnings growth" is a vague forward-looking statement entitled to safe-harbor).

The Court finds that a reasonable investor could view a significant level of out-of-network billing as material information. *See Zaluski*, 527 F.3d at 571 (material information is that which significantly alters the "total mix" of information made available). Materiality alone, however, does not impose an affirmative duty to disclose. Rather, a company must disclose material information when necessary "to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 44.

The Complaint includes a long list of alleged misleading statements. These are gathered from what appears to be every quarterly and annual filing during the class period and numerous statements made by Envision officers during teleconferences with shareholders and at various healthcare conventions. (*See* Compl., Doc. No. 88, ¶¶ 71-91; 112-121). Defendants allege these statements are not actionable because they are accurate financial statements, statements of opinion, forward-looking statements, or puffery.

The Court now turns to the statements themselves.

### i. Accurate Financial Statements

Plaintiffs have included each and every statement of revenue and EBITDA[10] filed with the SEC during the class period and have not alleged these statements of revenue were inaccurate. Instead they claim, "[I]t is the combination of the reported financial results and metrics together with defendants' explanations of the bases for those purportedly extraordinary results that gives rise to plaintiffs' claims." (Pl. Br., Doc. No. 131 at 31). Plaintiffs it seems do not contest the general rule that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Almost Family, Inc. Securities Litig.*, No. 3:10-cv-00520, 2012 WL 443461, at *3 (W.D. Ky. Feb. 10, 2012) (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)). Instead, they argue that the accurate financial statements provide context for the other alleged

Fed. Sec. L. Rep. P 100,705

misstatements. Envision's reports of historical income and EBITDA growth are not themselves actionable statements. However, the Court will consider Envision's historic revenue growth as context for the other allegedly misleading statements.

10      EBITDA stands for "earnings before interest, taxes, depreciation, and amortization."

### ii. Statements Regarding "Drivers of Revenue and Growth"

**\*10** Plaintiffs argue Envision's statements regarding the drivers of revenue and growth were materially misleading because they attributed EmCare's growth to new contracts obtained as a result of "differentiated service offerings and ability to deliver efficient, high-quality care," and failed to disclose that out-of-network billing was a significant factor contributing to the company's revenue and growth. Plaintiffs cite statements published in quarterly and annual filings to the SEC and in the preliminary prospectus filed in conjunction with the 2014 secondary stock offering and statements made at healthcare conferences and during investor phone calls by individuals on behalf of Envision. The Court will address them in turn.

### a. Statements in Envision Filings

Pursuant to the Supreme Court's decision in *Janus*, only the "maker" of the statements can be liable under 10(b) and Rule 10b-5. *Janus Capital*, 564 U.S. at 143. In addition to the corporation itself, corporate officers who sign documents on behalf of the corporation "make" the statements in those documents. *See Zwick Partners*, 2018 WL 2933406, at \*3. Plaintiffs allege the SEC quarterly and annual filings made through December 1, 2016, the date of the AmSurg merger, were signed by William Sanger and Randel Owen; and that the 2016 Annual Report, filed in March 2017, was signed by Christopher Holden and Claire Gulmi. Accordingly, there can be no liability for alleged misstatements in these filings against the other individual defendants.

The statements are reviewed in context to determine whether a reasonable investor would have found them misleading in light of the circumstances in which they were made. *See* 17 C.F.R. § 240.10b-5(b) (providing liability for failure to "state a material fact necessary in order to make the statement made, in light of the circumstances in which they were made, not misleading"); *Omnicare*, 135 S. Ct. at 1327 ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."). In *Omnicare*, the Supreme Court emphasized the importance of context specifically noting that a reasonable investor expects statements in a registration statement to have been "carefully wordsmithed to comply with the law." *Omnicare*, 135 S. Ct. at 1328.

The following are a representative sample of the allegedly misleading statements regarding drivers of growth that were published in Envision's quarterly and annual filings in 2013, 2014, and 2015:

• Growth is "primarily driven by revenue increases from net new contract wins and same store revenue growth."

• "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."

• "[N]ew contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross-selling services to their respective customers."

• "We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs."

• "We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers."

• "We have developed strong brand recognition and competitive advantages in clinician recruitment as a result of our market position, clinical best practices and clinician leadership development programs."

• "[W]e believe that our track record of consistently meeting or exceeding our customers' service expectations allows us to continue to compete effectively in the bidding process for new contracts."

**\*11** • "We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions."

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

• "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."

(Compl., Doc. No. 88, ¶¶ 72-75, 91, 113-4).

On February 3, 2014, Envision filed a preliminary prospectus which contained the following statements:

**Strong and Consistent Revenue Growth from Diversified Sources**. We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions. We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care. Further, new contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross-selling services to their respective customers. Our new contract pipeline remains robust across each of our businesses.

* * *

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities**. Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives since 2011, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs.

(*Id.* ¶ 71) (emphasis omitted).

The 2016 Annual Report, issued on March 1, 2017, included the following statements of Envision's "Competitive Strengths":

• We have a track record of delivering strong growth through a combination of organic growth, new contract additions and selective acquisitions. Organic growth has historically been supported by consistent

underlying market volume trends, stable pricing and a diversified payor mix. Market volumes have been driven primarily by the non-discretionary nature of our services, aging demographics and primary care physician shortages that drive patients to emergency rooms.

• We have successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care, which has helped us expand our relationships with our existing customers and compete effectively in the bidding process for new contracts.

(*Id.* ¶ 91).

Defendants argue that these statements from annual and quarterly reports are non-actionable opinions and point to the numerous statements preceded by indicia of an opinion statement – "we believe." As an initial matter, the Court notes that not all of the statements are couched as statements of opinion. Several of the statements raised by Plaintiffs state unequivocally the reasons for Envision's growth. For example, the Annual Reports made statements such as, "[w]e have successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care," and "[o]rganic growth has historically been supported by consistent underlying market volume trends, stable pricing and a diversified payor mix." Moreover, merely appending "we believe" or "we think" does not automatically render statements non-actionable. *See Omnicare*, 135 S. Ct. 1318, 1331 (such a rule would "nullify that statutory requirement for all sentences starting with the phrases 'we believe' or 'we think' "). A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion. *Id.*

**\*12** Defendants further argue Plaintiffs have not offered facts to show that Envision's stated factors contributing to its success were false or that Envision did not expect its success to continue unless it continued "the illicit practices." (Def. Br., Doc. No. 126 at 17). The case Defendants cite in support of this argument, *In re Almost Family*, 2012 WL 443461, is distinguishable from the facts presented here. In *AlmostFamily*, the court held that statements about a company's "strategy, success, and management" were not misleading even though they failed to disclose the company's growth was "substantially due to its scheme to manipulate Medicare's reimbursement system" because "[the Company's] success could be attributed to several factors, and Plaintiffs have offered no evidence suggesting that the factors discussed ... were farcical." *Id.* at \* 7. The statements in *Almost Family* were made, not in a "carefully wordsmithed" formal SEC filing, but by the

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

company owner during a conference presentation. The *Almost Family* opinion does not give enough information about the statements themselves for the Court to know if the owner purported to represent all of the factors contributing to the company's success or just some of them. Moreover, *Almost Family*, applied a standard requiring the statements to be objectively false and did not consider whether a reasonable investor would have considered them misleading. *Id.* ("Absent specifically alleging that statements made by [the CEO] were false, Plaintiffs cannot successfully assert them to be a material misrepresentation.")

Considering the allegations in this case, the Court reaches a different conclusion. Whether stated as an opinion or fact, a reasonable person could view the statements regarding the drivers of success as misleading for omitting information regarding out-of-network-billing as a factor driving revenue.[11] Other courts have found similar statements could be viewed as misleading by a reasonable investor. *See e.g.,Norfolk Cty Retirement Sys. v. Cmty Health Sys., Inc.*, No. 3:11-00433, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016), *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017), ("once [defendants] 'put the topic of the cause of [their] financial success at issue,' they were 'obligated to disclose information concerning the source of the success' ") (quoting *Sapssov v. Health Mgmt. Assoc., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014)); *see also*, *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at * 6 (S.D.N.Y. Mar. 28, 2018) ("[W]here a company puts at issue the causes of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices.") (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)); *Garden City Emp. Ret. Sys. v. Psychiatric Sols.*, No. 3:09-00882, 2011 WL 1335803, at * 30-31 (M.D. Tenn. Mar. 31, 2011) (failure to disclose that company's revenue growth was predicated upon an undisclosed practice of cutting expenses below the level necessary to prevent physical and sexual assault was a material omission).

[11]  The Court agrees however, that not all of the statements included in this section of the complaint have anything to do with "drivers of growth." These statements cannot be said to be misleading for failure to disclose an out-of-network billing strategy to increase revenue.

### b. Statements by Individuals on Behalf of Envision

The Court now reviews alleged misrepresentations made

by Envision officers at various healthcare conferences in which they discuss "drivers of growth." Once again, the statements are reviewed in context to determine whether a reasonable investor would have found them misleading in light of the circumstances in which they were made.

At a healthcare conference in December 2014, Envision Officers Randel Owen and Todd Zimmerman attributed EmCare's business growth to new contracts and its "integrated service offering." (Compl., Doc. No. 88, ¶ 77.) Plaintiffs allege Zimmerman made the following statement:

> So what differentiates EmCare, and why have we been able to grow? One of the strongest areas that I think differentiates us is our integrated service offering. So if you look at in the industry, you got a lot of hospitals that are contracting with maybe being multiple vendors, maybe somebody for emergency medicine, somebody different for hospitals. And they need to coordinate care across all these specialties. So how do you do that when you've got different companies, different leaders, different budgets? From EmCare's standpoint what we did is we broadened our offering to include the key services.
>
> **\*13** And then we took those key services and we rolled them under a single operational leadership structure, single budget, single strategic plan, single hospital contact. And it really aligns us better with our hospital partners to coordinate care across the specialties. That has been big for us and led to a lot of growth for us.
>
> * * *
>
> So take a look at the revenue growth here. You can see certainly from the same-store contracting standpoint it's pretty consistent year in, year out. So there may be some fluctuation there, but generally we look at it at a 3% to 5% same-store revenue growth. But really, you see that middle ground with the net new contracts – big growth on the EmCare side. And that's really the result of what I was talking about with the integrated service offering and the acceptance of the market on that side.

(*Id.*)

The Court finds that this statement is not misleading, even in light of the allegations that EmCare had a high portion of revenue from out-of-network billing. The context of the statement shows that Zimmerman is explaining his opinion of *one of the reasons* EmCare has been able to grow. He does not purport to provide a complete list of reasons EmCare has been successful. In fact, he only discusses the integrated service offering which he says "has been big for us." His later statement about revenue

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

growth merely states statistics on "same store revenue growth." Plaintiffs do not allege this statement is false and the Court does not find that is could be viewed as misleading.

Speaking at the same conference, Randel Owen affirmed that EmCare's growth is based on new contracts. Owen said:

> Net new contracts is really where the growth has been and continues to be ... So, we still see a great demand for services. A couple things driving that, I think, are, one, hospitals are still – always have been but are more focused on metrics and metric improvement as reimbursement is moving toward differentiation based on outcomes and based on metrics. So we think the backdrop is continuing to drive hospitals to look for more sophisticated players who can have a broader impact on metrics. A lot of hospitals today still contract a lot with small groups, local or regional groups. That's still predominantly what is served in the market. And while they may have good doctors and run a good department, hospitals are needing more than just good clinicians in one department. They are looking for a broader base. And so, we think that's still a backdrop that continues in terms of that organic growth opportunity.

(*Id.* ¶ 78).

This statement is also not misleading. Like Zimmerman, Owen gave his opinion regarding one of the factors driving contract growth. He did not discuss a comprehensive list of reasons hospitals choose to contract with EmCare. He refers to "a couple of things" driving growth and specifically mentions "one." For this reason, the court finds that his failure to discuss out-of-network billing does not render the statements misleading to the reasonable investor.

**\*14** On May 13, 2015, Randal Owen gave another presentation at a healthcare conference. In response to a question about the drivers behind and sustainability of EmCare's growth in new contracts, Owen essentially repeated his previous statement about reimbursement and "differentiation based on outcomes and metrics":

> I think if you look at the macro backdrop in terms of what's been driving the growth and what we believe will continue to drive that growth is really from a hospital standpoint, reimbursement continues to move to differentiation based on outcomes and metrics... So hospitals are looking for more sophistication, more ability to impact broader metrics, and so that's driven our growth.

(*Id.* ¶ 82.) The Court finds this statement would not be

misleading to a reasonable investor. First, it is couched as an opinion. Second, Owen does not purport to give a comprehensive list of the reasons hospitals would choose to contract with EmCare. Instead, Owen says the most important thing to hospitals is EmCare's ability to "impact broader metrics." The statement is vague such that an investor would have no idea what, specifically, EmCare is doing to "impact metrics." In this context, omission of EmCare's out-of-network billing is not misleading, even if that is one of many factors that "impact metrics."

At a healthcare conference in January 2015, Envision Officer William Sanger made the following statements regarding the 2015 17%-20% EBITDA growth projections: "On the EmCare side we believe we've got very strong visibility into the ability to continue that organic growth over the next several years with a very active pipeline on both the organic and the acquisition side."

This statement is not actionable because it is opinion, forward-looking, and puffery. No reasonable investor would take this statement as a guarantee of growth. In fact, the statement vaguely says the company has "strong visibility" into its "ability to continue that organic growth." This is precisely the sort of corporate self-aggrandizement that cannot engender reasonable reliance by reasonable investors.

In summary, the Court finds that the statements regarding the factors driving the company's growth made by individual defendants at healthcare conferences would not be misleading to a reasonable investor. The individual statements were not misleading, nor would a reasonable investor expect to receive a comprehensive picture of a company's business from select statements, many of which were in response to specific questions, in that venue.

### iii. Revenue Projections and Forward Looking Statements

Plaintiffs have included in their long list of alleged misstatements virtually every financial projection made by Envision during the class period. (*See* Compl., Doc. No. 88, ¶¶ 74-76, 81, 85-87). With few exceptions, these revenue projections appear to have been borne out. It is difficult to imagine how revenue projections that were ultimately proved to be correct, can be viewed as misleading. That logical obstacle aside, revenue and earnings projections are generally considered "forward-looking" within the meaning of the PSLRA.

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

*See* 15 U.S.C. § 78u–5(i)(1) ("The term 'forward-looking statement' means ... a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc) ("projections, statements of plans and objectives, and estimates of future economic performance" do not state a claim absent factual allegations showing actual knowledge of the false or misleading nature of the statement).

**\*15** The PLSRA established a limited safe-harbor for forward-looking statements which "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance." *Helwig*, 251 F.3d at 547-48 (citing 15 U.S.C. § 78u-5(i)(1)). "[A] defendant will not be liable for material forward-looking statement if either (1) the statements is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) 'the plaintiff fails to prove the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." *Dougherty v. Esperion Therapeutics*, 905 F.3d 971, 983 (6th Cir. 2018). Accordingly, the state of mind is irrelevant if the forward-looking statement is accompanied by meaningful cautionary language. *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 910 (M.D. Tenn. 2019) (citing *Miller v. Champion Ents., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003)). In the absence of meaningful cautionary language, the safe harbor still protects against liability if the maker lacked actual knowledge that the statement was false or misleading.

A meaningful cautionary statement conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements. *Helwig*, 251 F.3d at 558-59. A "boilerplate litany of generally applicable risk factors" does not qualify as "meaningful." *Slayton v. Am Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010).

Without identifying specific statements, the parties generally dispute whether Plaintiffs alleged the statements were made with knowledge of the false or misleading nature of the statement and whether the cautionary language was "meaningful." The 2014 preliminary prospectus included the following cautionary language: "SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS AND INFORMATION" warning, among other things, that "[w]e are subject to

decreases in our revenue and profit margin under our fee-for-service contracts, where we bear the risk of changes in volume, payor mix and third-party reimbursement rates." (*See* 2014 Prospectus, Doc. No. 127-2). Similarly, the 2016 Joint Proxy Registration statement contains 13 pages discussing risk factors associated with the transaction. (*See* Joint Proxy Statement, Doc. No. 127-4).

At this juncture in the case, the Court finds that Plaintiffs have pleaded sufficient facts to plausibly allege Defendants were aware of the potentially misleading nature of some of their statements. The only statement Defendants specifically identify as forward-looking in this portion of the Complaint is the revenue projection contained in the Joint Proxy Registration Statement. (Compl., Doc. No. 88, ¶ 89). This statement is only identifiable as forward-looking because Defendants claim "all of the statements" in the registration statement are subject to the safe harbor and this is the only statement in this portion of the complaint from the registration statement. Otherwise, Defendants claim PLSRA safe harbor protection generally as to "most of the statements."[12]

[12]  Defendants argue some of the statements in the 2014 preliminary prospectus and all of the statements in 2016 joint proxy registration statement are protected by the safe-harbor as forward-looking statements. (Def. Br., Doc. No. 126 at 27-28). Later, in their reply, Defendants argue that "most of the challenged statements are forward-looking and accompanied by appropriate cautionary language" and that Plaintiffs have not "pled that any statement by any defendant was knowingly false." (Def. Reply, Doc. No. 133 at 19, 19 n.17). Plaintiffs respond, "Most, if not all, of the statements alleged to be misleading under the 1934 Act are not forward-looking." (Pl. Br., Doc. No. 131 at 34).

The alleged misrepresentation in the Joint Proxy Registration Statement is the projection that "Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion) and that the Merger was 'expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings and access to a broader client base.' " (Compl., Doc. No. 88, ¶ 89). Plaintiffs allege that this statement was misleading because: (1) Envision was aware of declining revenues from out-of-network billing that could or would impact its ability to achieve the predicted growth; and (2) it failed to disclose that the predicted growth was based on unsustainable levels of

out-of-network billing.

**\*16** The cautionary statement warning of "the risk of changes in volume, payor mix and third-party reimbursement rates" is only meaningful to the extent that such changes have not already occurred. In *Weiner v. Tivity Health*, 365 F. Supp. 3d at 911, this Court discussed what makes a cautionary statement meaningful: "If a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then ... its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person 'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " *Id.* (quoting *In re Harmon Int'l Indus. Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015)).

In this case, it is evident that the meaningfulness of the cautionary statement cannot be determined without a determination of the facts – i.e. whether Envision was already experiencing changes in payor mix or third-party reimbursement rates at the time it made the statement. The Court cannot make such a factual determination on a motion to dismiss. With regard to other potentially forward-looking statements, the parties have not identified specific statements to which the safe-harbor might apply, and so the Court cannot realistically assess whether the cautionary language was meaningful as to any particular alleged misstatement. Accordingly, the question of whether any statements are protected by the safe-harbor is reserved summary judgment or trial.

2. Statements Regarding Transition to In-Network Billing

On February 28, 2017, Envision announced its intent to transition "the majority of [its] relationships to in-network status." (Compl., Doc. No. 88, ¶ 98). During the course of the following six months, Envision officers participated in a number of healthcare conferences and investor teleconferences in which they discussed the transition to in-network. The central tenant of the statements is that EmCare intended to transition "the majority of [its] out-of-network revenue to in-network status within the next 12-18 months with a revenue neutral impact." (*Id.* ¶ 104). The officers repeatedly stated that they believed the transition could be achieved in a revenue neutral way. The statements include:

• "[W]e believe this can be achieved in a budget neutral or positive way." (*Id.* ¶ 99).

• "We think it can be – it won't be dilutive to make the change." (*Id.* ¶ 100).

• "[W]e think that a contracted rate and moving in network is revenue neutral to the organizations."

• "The strategy is to move that in [net]work in a way that would be neutral to both revenue and EBITDA ... We think we can achieve this to be revenue neutral." (*Id.* ¶ 102).

• "[O]ur recent success reinforces our confidence in our plan to migrate the majority of our out-of-network to in-network status over the next 18 to 24 months with complete revenue neutrality." (*Id.* ¶ 103).

• "As you may recall, our stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12 to 18 months with a revenue neutral impact." (*Id.* ¶ 104).

Plaintiffs claim the statements about the transition to in-network were misleading because: (1) "defendants had no reasonable basis to believe and did not believe that the transition from out-of-network to in-network was 'revenue neutral' "; (2) the in-network rates were not comparable to the out-of-network rates the company had previously been receiving; (3) Envision was moving business in-network because it was no longer viable to have a large volume of out-of-network payors; (4) that the transition would be revenue neutral only because the reimbursement rate for out-of-network billing had dropped significantly during the preceding years; and (5) that the negative trend for out-of-network reimbursement was expected to continue and to negatively impact Envision's FY17 and FY18 results. (*Id.* ¶ 110).

**\*17** Defendants respond that these statements are not materially misleading and are non-actionable forward-looking statements of opinion. Moreover, Defendants argue that Envision fully disclosed the reasons for the decision to transition the majority of its business to in-network and the basis of the opinion that the transition could be revenue neutral. (Def. Br., Doc. No. 126 at 32-33).

Once again, the statements are reviewed in context to determine whether a reasonable investor could have found them misleading in light of the circumstances in which they were made. Therefore, the Court begins with a review of the statements regarding the transition to

in-network status.

Envision began discussing out-of-network billing in March 2016 after the Florida legislature passed balance billing legislation. On May 5, 2016, during a conference call with investors, Owen specifically addressed Envision's out-of-network billing practices:

> I also want to [add] some information on the discussion around out-of-network and balance billing that Bill just noted. While there are recent questions raised on the matter, it's been a part of our business for a long time and it's primarily related to our ED services. It's important to reemphasize that when we are out-of-network with a payer, this approach is negotiated with our hospital partners upfront and throughout the [life] of the contract. In these discussions, hospitals identify which payers they want us to be in network with. Oftentimes, we're also out-of-network with payers during a renegotiation process.

(*Id.* ¶ 95-96.)

On February 28, 2017, almost a year after the Florida legislature passed balance billing legislation, Envision announced its intent to transition a majority of its out of network business to in-network. (*Id.* ¶ 98). Defendants Holden, Gulmi, and Owen represented Envision on a conference call with investors. Holden said, "we believe this can be achieved in a budget neutral or positive way." (*Id.* ¶ 99).

On March 14, 2017, at a healthcare conference, Holden again addressed the transition to in-network billing: "[W]e think that a contracted rate and moving in network is revenue neutral to the organizations." Holden explained that state-level legislation governs how out-of-network payment disputes are remediated and that given the "battle to collect out of network from both the payer and the patient, it's really a wash." (Edited Transcript of Barclays Global Healthcare Conference, March 14, 2017, Doc. No. 127-30 at 8). Holden stated that the move to in-network would take some of the administrative burden out of the collection process and save money. (*Id.* at 9). He concluded, "I feel very confident that over the next 18 to 24 months, we can make a significant debt in the out of network." (*Id.*)

On March 21, 2017, Bob Kneeley presented on behalf of Envision at another healthcare conference. Kneeley stated, "The strategy is to move that in [net]work in a way that would be neutral to both revenue and EBITDA ... We think we can achieve this to be revenue and EBITDA neutral. We have negotiated several contracts that give us good visibility into that statement and to the results

implied in that statement and we feel good about the progress we are making." (*Id.* ¶ 102).

On a May 2, 2017, conference call with investors and analysts, Holden reported on the transition to in-network status:

> We've also migrated our ED services to in-network status with 3 statewide payers in the state of Florida. We are essentially in-network for all services for those payers. And our recent success reinforces our confidence in our plan to migrate the majority of our out-of-network to in-network status over the next 18 to 24 months with complete revenue neutrality.

**\*18** (*Id.* ¶ 103).

On May 16, 2017, Holden repeated this information again when explaining the rationale behind the transition, "[W]e've been migrating to and recording our rates per what we've been getting paid over the last several years, and those rates are very consistent with what you would have in a contracted rate." (Corrected Transcript, Bank of America Merrill Lynch Health Care Conference, May 16, 2017, Doc. No. 127-32). On June 7, 2017, Holden again noted that the "effective yield has been declining for several years." (Transcript, Envision Healthcare Corp at Jefferies Healthcare Conference, FD (Fair Disclosure) Wire, June 7, 2017, Doc. No. 127-33).

On August 8, 2017, on a conference call with investors and analysts, Holden gave an update on the transition: "We believe that progress is moving on our time line and with the expected results. As you may recall, our stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12 to 18 months with a revenue-neutral impact." (Compl., Doc. No. 88, ¶ 104.)

On September 6, 2017, at a healthcare conference, Holden again commented on the plan for a revenue neutral transition from out-of-network to in-network. He said, "I wouldn't have raised this as a strategy if I didn't have very high confidence in our ability to execute ... this is not a high-risk strategy to execute." (*Id.* ¶ 106). The next day, at another healthcare conference, Holden said:

> But it is truly one of the positives of the merger, and it's a decision I have great confidence in. And I know it's more than directionally correct. It's competitively advantageous, and it is the right decision. And ultimately, we have a whole litany of strategies that are around what we call physician engagement. Again, they go back to that desire to become the employer partner of choice for physicians going forward so we can better serve those increasingly complex customers.

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

And so when we did the math and looked at the waterfall of moving these out of network to in network, it's really a revenue-neutral decision ...

(*Id.* ¶¶ 107-8).

The Court finds that the statements of objective / belief / strategy that the transition to in-network status would be revenue neutral are not misleading because they are forward looking and statements of opinion. Moreover, Plaintiffs have failed to plead any facts showing that the belief that the transition would be revenue neutral was not honestly held or call into question the basis for the opinion that the transition would be revenue neutral. *See Omnicare*, 135 S.Ct. at 1332. To the contrary, the alleged omissions, including the motivation for the transition, were in fact disclosed in numerous public statements.

### 3. Statements Regarding Performance of Contracts

Plaintiffs' allegations of misrepresentations relating to certain 2014-15 contracts are twofold. First, Plaintiffs claim that Envision failed to perform adequate due diligence regarding the contracts despite assurances to the contrary. Second, Plaintiffs allege Envision failed to disclose or correct problems with these contracts for 12 months, and misleadingly assured investors that the contracts were performing "pretty similar to [its] overall EmCare margins." In October 2015, Envision disclosed that the contracts, which had been expected to produce revenue of $3.5 million instead resulted in a loss of $6.5 million. (Compl., Doc. No. 88, ¶ 134).

**\*19** Defendants argue that the allegations of misrepresentations regarding the due diligence on the contracts is barred by the two-year statute of limitations for 10(b) claims because Plaintiffs became aware of their potential claim no later than October 22, 2015, when Envision released its third quarter results for 2015. *See* 28 U.S.C. § 1658(b) (providing statute of limitations on § 10(b) claims is two years from discovery).

Plaintiffs assert the claim is not time barred because Central Labors' Pension Fund filed a complaint on October 23, 2017 "containing allegations regarding this exact claim." (Pl. Br., Doc. No. 131 at 31). A review of the Central Labors' Complaint, however, shows they did not raise the issues of misstatements regarding due diligence on the contracts, only that "defendants knew of the issues causing the failure to meet Legacy Envision's guidance and necessitating the change in guidance months before the October 22, 2015 announcement." Compl. ¶

10, *Central Laborers' Pension Fund v. Envision*, Case No. 3:17-cv-01397 (M.D. Tenn. Oct. 23, 2017) (Doc. No. 1).

Insofar as the claim asserts the statements about due diligence were misleading, the Court finds that these claims were raised for the first time in the Consolidated Complaint (Doc. No. 88) on January 26, 2018, more than two years after the claims accrued. Accordingly, claims related to the due diligence on the contracts is barred by the two-year statute of limitations.[13]

[13]    Even if the claims related to the due diligence on the contract were not time barred, the Court finds that the statements about due diligence are not actionable. The statements that Envision has "a very good understanding of the payer mix [and] a great understanding of reimbursement" and is "99% right" in predicting contract performance are nothing more that corporate puffery. No reasonable investor would consider those statements a guarantee that all new contracts would be profitable and statements that the company has a "great understanding" of various aspects of the contract is not a guarantee of faultless due diligence. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013).

However, the second aspect of Plaintiffs claim related to these contracts was timely raised. Plaintiffs allege that Envision knew that some 2014-15 contracts were underperforming for over twelve months and during this time reassured investors that the contracts were performing "on an aggregate basis, pretty similar to our overall EmCare margins." (*Id.* ¶ 127). It was not until October 2015 that Envision adjusted projected revenue and EBITDA to reflect the contracts actual performance and admitted these contracts had never performed well. As to this part of the claim, Plaintiffs have alleged facts sufficient to state a claim that the projections of income and reassurances that the contracts were performing adequately were false and misleading.

### 4. Scienter

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter must be pleaded separately as to each defendant. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039-43 (6th Cir. 2016) (assessing scienter allegations as to each defendant); *see*

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

*also*, *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 772 (M.D. Tenn. 2013) ("where fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately).

**\*20** In a securities fraud case, an inference of recklessness is sufficient to satisfy a plaintiff's burden on the scienter element. *Dougherty*, 905 F.3d at 979-80 ("In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." (quoting *Doshi*, 823 F.3d at 1039)). Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care ... akin to conscious disregard." *Id.* at 980 (citing *PR Diamonds, Inc. v. Chandler*, 91 Fed. App'x. 418, 426 (6th Cir. 2004)).

"A strong inference of scienter 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Doshi*, 823 F.3d at 1039 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The proper inquiry for the Court in evaluating allegations of scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

The Sixth Circuit has held that the following factors are usually probative of scienter in securities fraud actions:

(1) Insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending stock sale; (9) the self-interested motivation of defendants in the form

of saving their salaries or jobs. *Doshi*, 823 F.3d at 1039 (quoting *Helwig*, 251 F.3d at 552).

Plaintiffs put forward the following theory as to scienter, which the Court will consider holistically, taking all of Plaintiffs' factual allegations into account.[14] The foundation of Plaintiffs' theory is that high level executives must have been aware of the high levels of out-of-network billing because of its overall significance to corporate revenue – upwards of 35% and $1 billion of revenue of Envision's largest division, EmCare. Plaintiffs allege that out-of-network billing was not merely a small technical aspect of EmCare's business, but an overarching strategy designed to maximize revenue. Plaintiffs allege that Envision intentionally concealed the high levels of out-of-network billing from investors in order to maintain high stock value and that while the stock was at artificially high prices in 2014 and 2015, Envision's senior executives and CD&R sold over $4 billion in stock. Plaintiffs suggest Envision merged with AmSurg in December 2016 to conceal the declining out-of-network revenue. Sanger received $3 million in equity compensation as a result of the merger, which Plaintiffs argue suggests that he concealed out-of-network billing to consummate the merger on favorable terms.

[14] Plaintiffs assertion that Envision's December 2017 settlement of a qui tam action related to allegations of conduct in 2008-2012 supports an inference of scienter is unavailing. The conduct underlying the settlement took place two to six year prior to the start of the class period and was not related to the alleged misrepresentations at issue here.

**\*21** Plaintiffs assert that when Envision did begin to discuss out-of-network billing, it did so in a way that was "impossible to understand" and intentionally obscured the level of out of network billing by either being highly specific or overly vague so that investors would not know the true facts. For example, in May 2016, March 2017, and August 2017, Defendant cited different rates of out-of-network billing ranging from "roughly 20%" to "perhaps 30% to 35%" and "$700 to $800 million" or "about $1 billion." Further, Plaintiffs suggest that the decision to transition the majority of accounts to in-network status was further effort to conceal the extent of Envision's reliance on out-of-network billing and the fact that out-of-network recovery rates had declined to below the in-network rate. Finally, they argue that the resignation of "a string of defendants" soon after disclosure of EmCare's out-of-network billing shows the Individual Defendants were motivated to fraudulently conceal the levels of out-of-network billing to save their

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

jobs.

Defendants take issue with Plaintiffs' characterization of the facts and argue that none of the *Helwig* factors supports an inference of scienter and that a more compelling competing inference is "the absence of fraud" – that the statements at issue were nothing more than statements of "misguided optimism."

The Court considers whether the Plaintiffs adequately pleaded scienter with respect to each statement and each defendant. In so doing, the Court considers only those statements it has found could be viewed as materially misleading by a reasonable investor.

i. Statements and Omissions Regarding Out-of-Network Billing

As discussed above, Plaintiffs have sufficiently pleaded that statements in Envision's quarterly and annual filings could be viewed as misleading for failure to include out-of-network billing as a basis for revenue growth. Statements in corporate filings are "made" by the corporation and by the corporate officers who sign documents on behalf of the corporation. *SeeZwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at * 3 (M.D. Tenn. April 19, 2018) (citing *Janus*, 564 U.S. at 143). The quarterly and annual filings made through December 1, 2016, the date of the AmSurg merger, were signed by William Sanger and Randel Owen. The 2016 Annual Report, filed in March 2017, was signed by Christopher Holden and Claire Gulmi. There can be no liability for alleged misstatements in these filings against the other individual defendants, therefore the Court will consider whether scienter has been sufficiently pleaded as to the four individual defendants who signed the filings with the allegedly misleading statements.

As to corporate scienter, the Sixth Circuit has held that a corporation's state of mind in making false or deceptive statements is assessed by reference to the state of mind of: (1) the individual agent who uttered or issued the misrepresentation; (2) any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; or (3) any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or

issuance. *Bondali v. Yum!Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) (citing *Omnicare*, 769 F.3d at 476). Accordingly, if Plaintiffs have adequately pleaded scienter as to the individual officers, they have also pleaded scienter as to Envision.

The Court identifies three allegations supporting a strong inference that Owen and Sanger knew their statements were false and misleading: (1) they were aware of the high volume of out-of-network revenue by virtue of their positions in the company; (2) they engaged in insider trading during the class period; and (3) Sanger received significant stock compensation – $3 million – following the AmSurg merger.

**\*22** Plaintiffs allege that Owen and Sanger, by virtue of their positions in the company would have been aware that EmCare intentionally staffed emergency rooms with out-of-network physicians and relied on out-of-network billing for a large portion of its revenue. "Courts may presume that high-level executives are aware of matter related to their business's operations where the misrepresentations and omissions pertain to 'central, day-to-day operational matters,' " particularly for facts "critical to a business's core management." *Garden City Ret. Sys. v. Psychiatric Sols*, 3:09-00882, 2011 WL 1335803, at * 57 (M.D. Tenn. Mar. 31, 2011) (quoting *Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) and *In re Ancor Commc'ns, Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)); *see also*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) (*abrogated in part on other grounds*, *Frank v. Dana Corp.*, 646 F.3d at 680) (affirming the notion that "high-level executives can be presumed to be aware of matters central to their business's operations).

Defendants argue the allegation that the individual defendant had information solely by virtue of their status as directors and officers cannot support an inference of scienter. The cases cited by Defendants, however, consider whether high-level corporate officials were aware of specific details of the business, not their awareness of "core operations." *SeeIn re Rockwell Med., Inc. Sec. Lit.*, No. 16-cv-1691, 2018 WL 1725553, at *14 (S.D.N.Y. March 30, 2018) (finding insufficient evidence that defendants had knowledge of specific problems related to the commercial viability of the liquid form of a drug and finding the core operations doctrine inapplicable because plaintiffs did not plead what portion of Rockwell's business depended on the drug); *PR Diamonds*, 364 F.3d at 688 (holding company executives, solely by virtue of their positions, could not be presumed to be aware of "relatively arcane" accounting issues that resulted in inaccurate financial statements); *see also,*

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

*Bondali v. Yum!Brands, Inc.*, 620 F. App'x 483, 492 (6th Cir. 2015) (finding no strong inference that corporate executives were aware of specific food safety test results simply because food safety was important to company operations and the test results at issue were from China, which was the "core" of the business).

Both Sanger and Owen held high-level positions in the company. Prior to the AmSurg merger, Sanger was Chairman of the Board and President of Envision. Owen served as Executive Vice President and Chief Financial Officer before to the AmSurg Merger. After the merger, he was an Executive Vice President and President of the Ambulatory Services Group. EmCare accounted for the vast majority of Envision's revenue – between 63% and 67%. The Defendants admitted that at least 20% of EmCare's commercial collections were from out-of-network revenue. It was later disclosed that revenue from out-of-network billing could be upwards of 35% and $1 billion in annual revenue. In these circumstances it is reasonable to presume that Sanger and Owen were aware of the out-of-network billing practices at EmCare and that the statements regarding the "drivers of growth" were misleading for omitting discussion of out-of-network billing. In *Helwig* terms, this could be considered factor 6: "disregard of the most current factual information before making statements."

The Court views the allegations of insider trading to be less indicative of scienter in this case. First, the timing of the trades is significantly removed from the disclosure of the purportedly false statements. *See In reAxis Capital Holdings, Inc. Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) ("timing is more an indicia of fraud where sales occur shortly after insiders learn undisclosed adverse information or made affirmative misrepresentations, or shortly before correctively disclosures on the market"). However, the volume of the trades, even though many were pursuant to 10b(5)-1 trading plans, may nevertheless indicate a motive to inflate Envision's stock price. *See Psychiatric Sols., Inc.*, 2001 WL 1335803, at * 31 (considering stock sales under 10b5-1 trading plans as evidence of motive). The fact that other Envision Director Defendants increased their stock holdings during this period does not affect the individual allegations of scienter as to Sanger and Owen. This is enough to raise a strong inference of scienter.

**\*23** Taken collectively, the allegations give rise to a strong inference that Sanger and Owen knew the extent to which out-of-network billing contributed to Envision's revenue and that omission of this information, when otherwise disclosing the basis for Envision's revenue and growth, was misleading to investors.

Holden and Gulmi became officers at Envision following the AmSurg merger on December 1, 2016, and, therefore, could only be responsible for the statements in the 2016 Annual Report filed on March 1, 2017.[15] Although these officers were at the company for a short amount of time, even post-merger out-of-network billing accounted for $1 billion and as much as 35% of revenue and, like Sanger and Owen, Holden and Gulmi were likely aware of the general high volume of out-of-network billing. Although it is less plausible that out-of-network billing would have been considered a current "competitive strength" at this time, particularly considering that Envision was announcing the intent to transition most of its out-of-network business to in-network and that out-of-network revenue had allegedly decreased dramatically, the annual statement refers in part to historic factors supporting "organic growth" and represents that growth will continue because of these factors. Plaintiffs have stated a plausible theory of scienter that Envision continued to obscure the extent to which it relied on out-of-network billing before the transition and did so to minimize the impact of the transition announcement. Having considered the totality of the allegations, the Court finds Plaintiffs pleaded sufficient facts to raise a strong inference of scienter as to Holden and Gulmi with regard to the statements of "competitive strengths" in the 2016 Annual Report.

[15] Holden and Gulmi would also be liable for any misleading statements they personally made, but the Court did not find any of these statements could be considered materially misleading.

ii. Statements and Omissions Regarding the Contracts

Plaintiffs have raised a strong inference of scienter as to Owen, Sanger, and Envision concerning statements made about the performance of the 2014-15 contracts. The facts pleaded indicate these defendants disregarded current factual information indicating that the contracts were not performing as expected and that they nevertheless made statements affirming projected revenue and assuring investors that the contracts were performing "pretty similar to our overall EmCare margins." This is sufficient to state a strong inference of scienter.

5. Loss Causation

In a securities action, the plaintiff bears the burden of pleading and proving loss causation. 15 U.S.C. § 78u-4(b)(4); *Indiana State Dist. Council*, 583 F.3d at 944 (*citingDura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005)). For loss causation claims, the Federal Rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *SeeDura*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.") At the motion to dismiss stage, it is sufficient for the plaintiff's allegations to be plausible. *Ohio Public Emp. Ret. Sys. v. Fed. Home Loan Mort. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (the burden to plead causation is "not meant to impose a great burden"). Loss causation does not require proof that the fraudulent misrepresentation was the sole cause of the security's loss in value, but the plaintiff must still demonstrate that the fraudulent statement was a "substantial" or "significant" cause of the decline in price. *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013); *see also*, *In re Am. Service Grp.*, No. 3:06-0323, 2009 WL 1348163, at * 63 (M.D. Tenn. Mar. 31, 2009).

**\*24** The Sixth Circuit has recognized two methods by which a plaintiff can show loss causation: (1) through a corrective disclosure; and (2) through materialization of a concealed risk. *Ohio Pub. Emp.*, F.3d at 384-85. A corrective disclosure reveals the fraud and the market reacts negatively to the disclosure of fraud. *Id.* at 384 (citing *In re Omnicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Indiana State Dist. Council*, 583 F.3d at 944 (citing *Dura*, 544 U.S. at 346-47). This is the easiest loss causation to show because the stock price drop immediately follows the revelation of the fraud to the public. *In re KBC Asset Mgmt.*, 572 F. App'x. 356, 360 (6th Cir. 2014). Sometimes defendants reveal their own fraud via a corrective disclosure, i.e. a statement that reveals what the defendants themselves previously concealed, but revelations can come from other sources, including whistleblowers, analysts, and news reports. *Norfolk Cty. Ret. Sys.*, 877 F.3d at 695. A plaintiff need not rely on a single, complete disclosure; the truth may gradually be revealed through a series of partial disclosures. *Id.* "Of course, for the revelation to cause the plaintiffs' losses, the information must be in a practical sense be new; otherwise the market will have processed and reacted to the information already." *In re Almost Family, Inc. Securities Litigation*, No. 3:10-520, 2012 WL

443461, at \*10 (W.D. Ky. Feb. 10, 2012) (citation omitted).

Under the materialization of the risk theory, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."*Ohio Pub. Emp.*, 830 F.3d at 384 (citations omitted); *see also*, *Norfolk Cty. Ret. Sys.*, 877 F.3d at 695.

Plaintiffs identify two corrective disclosures: (1) the July 25, 2017 *New York Times* article and NBER Study; and (2) the October 31, 2017 announcement of an earnings miss and guidance reduction.[16] Defendants argue the *New York Times* article cannot be viewed as a corrective disclosure because it did not reveal any previously undisclosed misrepresentations. Defendants claim it was a matter of public record that a significant portion of EmCare's revenue was from out-of-network billing and that out-of-network billing was unpopular among patients, and that the *New York Times* article and NBER study did not add any previously undisclosed facts. (Def. Br., Doc. No. 126 at 43). Defendants rely on cases in which the purported disclosure was based entirely on facts already known to the market. *SeeMeyer*, 710 F.3d at 1199 (analysts opinion that a company's assets were significantly overvalued was based entirely on publicly available information and did not disclose any new information); *Almost Family*, 2012 WL 443461, at \*13 (article based entirely on a statistical analysis of financial statements and records already available to the public did not present new information to the public); *KBC Asset Mgmt.*, 572 F. App'x at 359-60 (affidavits admitting the company had not previously complied with discovery obligations and had improperly attempted to influence a judge did not disclose any new information when two years before the admissions in the affidavits, the company was sanctioned $1.5 million for the discovery violations and "the market already knew [the company] had failed to meet its discovery obligations and had had hired [an agent] to improperly influence [the judge]").

16    Plaintiffs also point to a decline in share price accompanying Envision's September 18, 2017 announcement of organizational changes, following which Envision's share price dropped 10.05%, but there are no allegations that this organizational change was in any way a corrective disclosure.

Plaintiffs argue that, unlike the cases cited by Defendants, the *New York Times* article and NBER study, reveal previously undisclosed information regarding the nature and extent of EmCare's out of network billing. The Court

agrees. While it had been disclosed that out-of-network billing made up a significant portion of EmCare's revenue, the Article and NBER study revealed previously undisclosed details, such as the fact that emergency departments managed by EmCare had a comparatively high rate of out-of-network billing, which the study said showed a "distinct out of network strategy." (NBER Study, Doc. No. 127-38 at 5). The study also quantified the increase in out-of-network billing rates when EmCare took over management of some emergency departments. (*Id.* at 6). These statistics, which the NBER study supports with detailed analysis, were not previously revealed to the public and inform investors of facts indicating that EmCare had more than just "substantial revenue" from out-of-network billing, it had a "distinct out-of-network strategy." (*Id.*) Moreover, the NBER study highlighted the relevance of EmCare's out-of-network billing strategy as it assessed the potential of various regulatory measures to "address out of network surprise billing." (*Id.* at 33).

**\*25** After the October 31, 2017 announcement that Envision missed its third quarter guidance and was significantly reducing its fourth quarter guidance and expectations for 2018, Envision's stock price fell 42%. Though plaintiffs label the announcement of a decline in revenue as a "corrective disclosure," their argument more aptly characterized as materialization of the risk. Plaintiffs' argument is that high levels of out-of-network revenue were unsustainable and that Envision saw decreased revenue when this risk was realized and EmCare began to transition accounts to in-network. Envision has other explanations for the decreased revenue, including hurricanes and a decline in emergency medicine volumes. At this stage in the litigation, Plaintiffs need only allege sufficient facts to plausibly allege causation. *Ohio Public Employees*, 830 F.3d at 388. The Court will not and cannot determine whether the drop in stock value was actually due to other factors.

"Having considered the relationship between the risks allegedly concealed and the risks that subsequently materialized," and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged causation.

### B. Violations of Section 20A of the 1934 Act (Insider Trading)

Only one plaintiff, UFCW Pension Fund ("UFCW"), alleges the CD&R Defendants, Williams, Sanger, Owen, and Zimmerman violated Section 20A of the 1934 Act by engaging in insider trading.

The 1934 Act provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a).

To plead a Section 20A cause of action, a plaintiff must allege a requisite independent, predicate violation of the securities law and show that he purchased or sold securities contemporaneously with the purchase or sale of securities that is the subject of the violation. *SeeBeach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at *5-6 (M.D. Tenn. Mar. 9, 2009) (citing *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D.Tex. 2003)). When an insider trades in his company's stock, he has a duty to disclose any nonpublic, material information he knows about the company before trading. *J & R Marketing v. Gen. Motors Corp.*, 549 F.3d 384, 398 (6th Cir.2008). Failure to do so constitutes a violation of Section 10(b) of the 1934 Act that can serve as a predicate for a Section 20A claim. *SeeBeach*, 2009 WL 650408, at *5-6. Section 20A claims "sound in fraud" and must be pleaded with particularity under Fed. R. Civ. P. 9(b). *SeePicard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1130 (W.D. Mich. 1996).

As discussed above, Plaintiffs have sufficiently alleged the Envision Director Defendants knew of EmCare's out-of-network billing strategy. As to CD&R,[17] however, Plaintiffs have not alleged facts creating a strong inference that CD&R had the same information. Plaintiffs conclusively allege that it is "implausible that CD&R, with this level of control and access, would not have been aware of Envision's fundamental business strategies, including upcoding and out-of-network billing." (Pl. Br., Doc. No. 131 at 76). The allegations are based on the following facts: (1) CD&R owned the majority of Envision stock at the time of the February 5, 2014 and July 10, 2014 offerings (Compl., Doc. No. 88, ¶¶ 44, 45); (2) CD&R designated three board members to serve on Envision's board of directors (*Id.* ¶ 43); and (3) the "billing scheme" constituted central business operations of which the directors must have been aware (*Id.* ¶ 154). The Complaint alleges no facts suggesting the CD&R

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

nominated directors communicated information about the "illicit billing scheme," or anything else, to CD&R. Without more, this is not enough to allege CD&R was in possession of insider information at the time of the sales.

> 17    For purposes of this analysis, the Court will treat CD&R as Plaintiffs have – as a singular entity. The Court notes, however, that CD&R is, in fact, six entities. The evidence in the record shows that only the CD&R Funds held Envision stock.

**\*26** Moreover, Plaintiffs' assertion that the size and timing of CD&R stock sales are suspicious and an indication that CD&R sold stock while in possession of material, nonpublic information is unpersuasive. First, CD&R is a private equity fund whose sole purpose is to invest in companies and ultimately sell them. (*See* Compl., Doc. No. 88, ¶ 143 n.8). It is, therefore, not suspicious that it would divest itself of stock in large sales. Second, the stock sales took place 7 to 20 months before the first stock price decline,[18] tempering any implication that CD&R had material nonpublic information that would cause a decline in stock price. The stock sales in and of themselves do not raise a strong inference that CD&R was in possession of material nonpublic information.

> 18    The first stock price decline, which occurred in October 2015, is allegedly associated with underperforming contracts, not anything to do with the alleged "billing scheme." Plaintiffs have not alleged any facts to show that CD&R knew of the details of a series of underperforming contracts.

Defendants Williams, Sanger, Owen, and Zimmerman argue the period of time between their trades and a subsequent UFCW stock purchase is not close enough in time to be considered contemporaneous. Plaintiffs must plead the "contemporaneous transaction" component with specificity. *SeeIn re Fed. Nat'l Mortg. Ass'n Sec., Derivatives, and ERISA Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007). The statute does not define "contemporaneous," and the courts have varied on how they define the term. *SeeBeach*, 2009 WL 650408, at * 6. Courts have found that contemporaneous means the insider and the plaintiff must have traded anywhere from on the same day, to less than a week, to within a month, to the entire period while relevant and nonpublic information remained undisclosed. *Id.* (citing *In re Enron*, 258 F. Supp. 2d at 599–600 (listing cases)).

UFCW alleges it purchased stock pursuant to Evision public offerings on February 5, 2014, July 10, 2014, September 23, 2014, and March 5, 2015.[19] CD&R, Owen,

Sanger, Zimmerman, and Williams each sold stock pursuant to these offerings. The actual transaction dates are sufficiently close in time that, for purposes of the motion to dismiss, the Court finds they are "contemporaneous."

> 19    The dates are the effective dates of the sales prospectuses.

The Court finds that Plaintiffs have not pleaded facts sufficient to allege that the CD&R defendants traded securities while in possession of material, nonpublic information. Accordingly, the claim against CD&R for violation of Section 20A will be dismissed. However, Plaintiffs have alleged facts as to Defendants Williams, Owen, Sanger, and Zimmerman to sufficiently allege they traded on material nonpublic information contemporaneously with UFCW.

### C. Claims Related to the Joint Proxy Registration Statement

1. Securities Act Claims: Section 11 and Section 12(a)(2)

All Plaintiffs bring claims for violation of Sections 11 and 12(a)(2) of the Securities Act against Envision and the Envision Individual Defendants based on alleged misrepresentations in the Joint Proxy Registration Statement. As with the Section 10(b) and Rule 10b-5 claims discussed above, Plaintiffs assert the Joint Proxy Registration Statement omitted to include EmCare's reliance on out-of-network billing when it attributed "significant organic growth" to "integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs." In addition, Plaintiffs allege Envision and the Envision Individual Defendants claimed Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion) and that the Merger was "expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings to a broader client base."

**\*27** Section 11 places a relatively minimal burden on a plaintiff, imposing liability for securities registration

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

statements containing materially false or misleading statements or omissions of material fact. *J&R Marketing v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008). Liability against the issuer of the security "is virtually absolute, even for innocent misstatements" and, therefore, a plaintiff is not required to plead scienter." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation. *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

### A. Applicability of Rule 9(b) to the Section 11 and Section 12(a)(2) Claims

Defendants argue Plaintiffs 1933 Act claims are based in fraud and, therefore, Plaintiffs must comply with Rule 9(b) and plead these clams with particularity. Defendants argue that Plaintiffs have failed to meet the Rule 9(b) pleading standard because they "fail to mention even one individual, much less include allegations as to who knew what or how or when they knew it" and the Complaint "address[es] the Joint Proxy Registration Statement in conclusory fashion and make[s] no real effort to plead actionable statement or omission." (Def. Reply, Doc. No. 133 at 28).

Plaintiffs claim to have "carefully segregated" these claims from the fraud claims elsewhere in the Complaint and argue they are "not based in fraud," but in Defendants' "failure to make a reasonable investigation or have a reasonable basis to support their projections of continued EBITDA growth in light of the declining rate of out-of-network reimbursement and the risks to Envision's ability to continue relying on out-of-network billing ... to drive growth." (Pl. Br., Doc. No. 131 at 47).

Courts vary in their application of the Rule 9(b) pleading standard to 1933 Act claims. *See e.g., In re Sirrom Cap.Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (holding that 9(b) does not apply, but that Plaintiffs will not be allowed to allege or attempt to prove fraud in connection with their Section 11 and Section 12 claims); *EveryWare*, 175 F. Supp. 3d at 869-70 (applying the Rule 9(b) heightened pleading standard to Section 11 and 12 claims against some, but not all, defendants).

Rule 9(b) requires that, for claims alleging fraud, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008). "The particularity requirements of Rule 9(b) serve three purposes: (1) to ensure that fraud allegations are concrete enough to give defendants fair notice of the grounds of the complaint; (2) to protect defendants' reputations or goodwill from the harm that comes from being accused of serious wrongdoing; and (3) to inhibit the filing of complaints that are a pretext for the discovery of unknown wrongs or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves."*In re Sirrom Cap.Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (citing *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 591 (E.D. Mich. 1985)).

The Court notes that Plaintiffs are not required to prove fraud to establish a claim under Sections 11 and 12(a)(2) and they have alleged these claims based only on strict liability and negligence. Regardless of whether they were required to do so, the Court finds that the allegations in the Complaint meet the heightened pleading standard. Plaintiffs have provided sufficient detail of the alleged scheme and which statements are alleged to be false to allow defendants to defend the charges, thereby satisfying the purpose of Rule 9(b).

### B. Forward Looking Statements

**\*28** Defendants assert that "all of the statements" in the 2016 Joint Proxy Registration Statement are non-actionable forward-looking statements accompanied by meaningful cautionary language. The 2016 Joint Proxy Registration Statement indicates on the title page that it "contains forward looking statements" and devotes thirteen pages to discussing risk factors associated with the transaction, warning, among other things, that Envision is "subject to decreases in [its] revenue and profit margin under [ ] fee-for-service contracts, where [it] bear[s] the risk of changes in volume, payor mix and third-party reimbursement rates." (Def. Br., Doc. No. 126 at 18 (citing Doc. No. 127-4 at 36-49)). This cautionary language, Defendants argue, places the Joint Proxy Registration Statement within the PLSRA safe harbor.

Plaintiffs argue the PLSRA safe harbor does not apply to statements in the Joint Proxy Registration Statement because it is an initial public offering ("IPO"), and IPOs are specifically excluded from the PLSRA safe harbor. (Pl. Br., Doc. No. 131 at 64). Further, Plaintiffs argue

that, even absent the express statutory carveout, some of the statements are not forward looking and the cautionary language is not meaningful. (*Id.* at 65).

The Court concludes that, for purposes of the motion to dismiss, Plaintiffs have sufficiently alleged the Joint Proxy Registration Statement is misleading based on non-forward-looking statements, specifically those pertaining to the basis of Envision's success and historic contract growth. At this time, the Court does not reach the question of whether the PLSRA safe harbor applies to the Joint Proxy Registration Statement and if it applies, whether it included meaningful cautionary statements. *See supra*, Section III, A., 1., iii.

C. Statutory Sellers Under Section 12(a)(2) of the 1933 Act

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), imposes liability for selling a security by means of a prospectus or oral communication containing materially false or misleading statements or omissions of material fact. Section 12(a)(2) differs from Section 11 because a plaintiff has standing to bring a claim only against a "statutory seller" from which plaintiff purchased the security at issue. *SeeIn re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 867 (S.D. Ohio 2016). A statutory seller is one who "either transferred title to the purchaser or successfully solicited the transfer for financial gain." *Id.* (citations omitted). In order to state a claim for relief under Section 12(a)(2), the plaintiff must allege that: (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. *In re Morgan Stanley*, 592 F.3d at 360.

Defendants argue that the Envision Individual Defendants are not "statutory sellers" because merely signing the registration statement does not suffice as solicitation for purposes of Section 12(a)(2). (Def. Br., Doc. No. 126 at 56, 57 n. 52). Indeed, most Courts of Appeals have held that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." *SeeCitiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506, 512 (2d Cir. 2010). Notably, in *Citiline*, the court rejected the plaintiffs' contention that signing the registration statement was alone enough to constitute solicitation.

Here, Plaintiffs allege Defendants have done more than sign the registration statement. They allege defendants have "participated in the solicitation of proxies in support of the Merger." (Compl., Doc. No. 88, ¶ 36). In fact, the Joint Proxy Registration Statement states that "each of the boards of directors of AmSurg and Envision are soliciting proxies from their respective common shareholders and stockholders." (Doc. No. 127-4 at 1). While signing the registration may not be sufficient, in this case the registration statement specifically states that the board is "soliciting proxies." At this stage in the litigation, this is sufficient to allege they were in fact engaged in the activity as they claimed. *SeeIn re Prison Realty Securities Litig.*, 117 F. Supp. 2d 681, 691 (M.D. Tenn. 2000).[20]

[20] Defendants also argue in a footnote that Plaintiffs lack standing because there were not "purchasers" of securities; they "received shares ... pursuant to the Joint Proxy Registration Statement" and, therefore lack standing to bring a Section 12(a)(2) claim. The case cited in support of this argument, *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y.), dismissed a Section 12(b)(2) claim where the plaintiffs did not allege they purchased shares in the IPO, but instead purchased shares "pursuant to or traceable to" the Prospectus leaving open the possibility of a secondary market transaction. (*Id.* at 588-89). Accordingly, *In re Cosi* is not dispositive of the question of whether "receiving shares" is enough to confer standing for purposes of Section 12(a)(2). Other than the single footnote, the parties have not briefed this question.

**\*29** The Court finds that Plaintiffs have pleaded facts sufficient to state claims under Section 11 and Section 12(a)(2) of the 1933 Act.

2. Section 14(a) of the 1934 Act

Plaintiffs assert claims under Section 14(a) of the Exchange Act against Envision, the Envision Individual Defendants and the AmSurg Defendants alleging that as a result of false and misleading statements in the Joint Proxy Registration Statement, shareholders were induced to vote in favor of the Merger. (Compl., Doc. No. 88, ¶ 287). Section 14(a) makes it "unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe ... *to solicit or to permit the use of his name to solicit* any proxy ...." 15 U.S.C. § 78n(a)(1) (emphasis added). Rule 14a–9 makes it unlawful to issue a proxy statement "which omits to state any material fact necessary in order to make the statement therein not false or misleading." 17 C.F.R. § 240.14a–

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....

Fed. Sec. L. Rep. P 100,705

9(a). Plaintiffs have adequately alleged Defendants solicited proxies for the same reasons stated above. The voting form and cover letter state that the Board of Directors "recommends" the Merger and that the proxy is "solicited on behalf of the Board of Directors." (Doc. No. 127-4).

The Court finds that Plaintiffs have sufficiently alleged that Envision, the Envision Individual Defendants, and the AmSurg Individual Defendants solicited proxies in support of the merger. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 293 (S.D.N.Y. 2010) (finding the board of directors solicited proxies "within the plain language of Section 14(a)" when the joint proxy registration statement stated, "This Proxy is Solicited on Behalf of the Board of Directors"). Accordingly, Plaintiffs have sufficiently stated a claim for violation of Section 14(a) of the 1934 Act.[21]

[21] As stated above, the Court found that Plaintiffs plausibly allege a material misrepresentation regarding the failure to disclose high levels of out-of-network billing. *See Goldberg v. Meridor*, 567 F.2d 209, 222 n. 3 (2d Cir. 1977) (the test of materiality under Section 14a-9 and Rule 10b-5 is the same).

**D. Control Person Liability – Section 20(a) of the 1934 Act and Section 15 of the 1933 Act**

When a primary violation of securities law is shown, that provision imposes joint and several liability on "controlling persons." Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

To state a control-person claim, plaintiffs must plead a predicate Section 10(b) violation by a "controlled person," and a "controlling person" must have directly or indirectly controlled the person liable for the Section 10(b) violation. *PR Diamonds*, 364 F.3d at 696. Similarly, liability under Section 15 of the 1933 Act attaches to every person who "controls any person liable under Section 11 or 12." 15 U.S.C. § 77*o*(a).

**\*30** Whether a person is a controlling person is normally

a question of fact that cannot be determined at the pleading stage. *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at * 6 (M.D. Tenn. Mar. 9, 2009). Moreover, Defendants have not argued they do not meet the standard for controlling person, only that there has been no predicate violation of the Exchange Act or the Securities Act.

As stated above, except as to the CD&R Defendants, the Court finds that Plaintiffs have sufficiently alleged violations of both the 1933 Act and the 1934 Act.

As to CD&R, Plaintiffs allege that CD&R is liable as a control person for the statements in the Joint Proxy Registration Statement claiming that CD&R "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Joint Proxy Registration Statement." (Compl., Doc. No. 88, ¶ 295). In 2016, CD&R owned no Envision stock and did not have the right to nominate members of Envision's Board of Directors, although two of its previous nominees remained on the Board in 2016. (Compl., Doc. No. 88, ¶¶ 9, 43).

The parties disagree on the standard the Court should apply to determine whether Plaintiffs have stated a plausible claim for control person liability. Plaintiffs argue that they are not required to plead "actual control" over Envision. Defendants argue the Court should apply the standard applied by the Sixth Circuit in *Sanders Confectionary Products, Inc. v. Heller Fin. Inc.*, 973 F.2d 474, 486 (6th Cir. 1992). In *Sanders*, the Sixth Circuit did not adopt a test for control, but held that the plaintiff had failed to meet even the least rigorous test. *Id.* The "least rigorous test" applied in *Sanders* required a showing "(1) that the defendant exercised control over the operations of the violator in general and (2) that the defendant possessed the power to control the transaction or activity upon which the primary violation is predicated." *Id.*

The Sixth Circuit again addressed control person liability in *PR Diamonds*, 364 F.3d at 396-97:

> Section 20(a) thus establishes two requirements for a finding of control person liability. First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting

Fed. Sec. L. Rep. P 100,705

securities, by contract, or otherwise." *Id.* (citing 17 C.F.R. § 230.405). The court in *PR Diamonds* did not ultimately decide whether the plaintiffs had adequately pleaded control because plaintiffs did not establish an underlying violation. *Id.*

The fact that two of CD&Rs nominees continued as directors on an eight-person board more than 18 months after CD&R had *any* ownership interest in Envision is insufficient to plausibly allege that CD&R controlled or had the ability to control the content of the Joint Proxy Registration Statement. Nor is there any allegation that the two board members continued to act on behalf of CD&R rather than fulfill their fiduciary duties as board members of Envision. *See Picard Chemical*, 940 F. Supp. at 1136 (holding "formal means of control which have terminated in the past do not constitute a basis for alleging current control").

**\*31** Plaintiffs have failed to state a plausible claim that any of the CD&R defendants were controlling persons of Envision at the time of the issuance of the Joint Proxy Registration Statement. Accordingly, the claim for control person liability against the CD&R defendants is dismissed.

### E. Request to Amend

In the last section of their response brief, Plaintiffs "request leave to amend the Complaint to cure any defect identified by the Court." (Doc. No. 131 at 74). The Sixth Circuit has held that a request to amend in a response to a motion to dismiss does not constitute a motion within the meaning of Federal Rule of Civil Procedure 15(a). *See Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young*, 622 F.3d, 471, 486 (6th Cir. 2004). Accordingly, the request to amend is denied. Plaintiffs may file a properly supported motion if they desire to amend the Complaint.

### IV. CONCLUSION

For the reasons stated, the Motion of the CD&R Defendants to Dismiss the Consolidated Amended Complaint (Doc. No. 122) is **GRANTED**. Defendant Envision Healthcare and the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint (Doc. No. 125) is **GRANTED** in part, and **DENIED** in part.

Count I alleging violations of Section 10(b) Rule 10b-5 will proceed as to Envision, Sanger, and Owen only with regard to the allegations involving out-of-network billing as a basis of revenue and growth and the performance of certain 2014-15 contracts. Count I claims against Holden and Gulmi will proceed only with regard to the allegations involving out-of-network billing as a basis of revenue and growth in the 2016 Annual Report. Claims alleged in Count I are dismissed as to Williams, Zimmerman, and Eastridge and with regard to allegations of upcoding and improperly increasing hospital admissions and tests and the transition to in-network status.

Count II alleging control person liability by the Envision Individual Defendants and the AmSurg Defendants (except Cigarran, Herr, and Popp) will proceed.

Count III alleging insider trading in violation of Section 20A of the 1934 Act is dismissed against the CD&R Defendants, and will proceed against Williams, Sanger, Owen, and Zimmerman.

Counts IV and V alleging violations of Sections 11 and 12 of the 1933 Act against Envision and the Envision Individual Defendants will proceed.

Counts VI alleging control person liability under Section 15 of the 1933 Act for the Joint Proxy Registration Statement against the Envision Individual Defendants will proceed.

Count VII alleging violation of Section 14(a) of the 1934 Act against Envision, the Envision Individual Defendants, and the AmSurg Individual Defendants will proceed.

Count VIII alleging control person liability under Section 20(a) of the 1934 Act for the Joint Proxy Registration Statement against the CD&R Defendants, the Envision Individual Defendants, and the AmSurg Defendants will proceed as to the Envision Individual Defendants and the AmSurg Individual Defendants. Count VIII against the CD&R Defendants is dismissed.

It is so **ORDERED**.

### All Citations

Not Reported in Fed. Supp., 2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....**

Fed. Sec. L. Rep. P 100,705

**WESTLAW**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    27