# Case No. 8

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

KeyCite Yellow Flag - Negative Treatment

Distinguished by Cooper v. Thoratec Corporation, N.D.Cal., May 8, 2018

2017 WL 6026244
United States District Court, N.D. California,
San Jose Division.

IN RE FINISAR CORPORATION
SECURITIES LITIGATION

Case No. 5:11-cv-01252-EJD
|
Signed 12/05/2017

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 131

EDWARD J. DAVILA, United States District Judge

**\*1** Lead Plaintiff, the Oklahoma Firefighters Pension & Retirement System ("Plaintiff"), brings this putative securities fraud class action against Defendants Finisar Corporation ("Finisar"), Eitan Gertel, and Jerry S. Rawls (collectively, "Defendants"), alleging that Defendants issued a single false or misleading statement on December 2, 2010, denying an inventory build-up of Finisar's key telecom products by the Company's customers. Presently before the Court is Plaintiff's motion for class certification. The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). Having considered the parties' papers and for the reasons explained below, Plaintiff's motion for class certification is denied.

**I. BACKGROUND**

Plaintiff brings this action on behalf of itself and a class

of all persons and entities who purchased or otherwise acquired the common stock of Finisar between December 2, 2010 and March 8, 2011 (the "Class Period"). SAC ¶ 1. Finisar is a technology company that "develops and sells fiber optic subsystems and components that enable high-speed voice, video and data communications for telecommunications, networking, storage, wireless and cable television applications." Id. ¶ 2. Gertel served as Chief Executive Officer ("CEO") and a director of Finisar from August 2008 to September 2015. Id. ¶ 23. Plaintiff alleges that during the Class Period, Gertel made over $5.17 million by selling 201,913 shares of his Finisar stock at artificially inflated prices. Id. ¶¶ 23, 74-75. Rawls has served as Chairman of the Board of Finisar since 2006 and was appointed CEO in September 2015. Id. ¶ 24.

Prior to the Class Period, Finisar experienced six consecutive fiscal quarters of revenue growth, which Plaintiff alleges was driven primarily by sales of its wavelength selective switches ("WSS") and reconfigurable optical add/drop multiplexers ("ROADM") linecard telecom products. Id. ¶¶ 30-33. Plaintiff alleges that during this phase of growth but prior to the Class Period, analysts in the industry "suspected that this growth was driven by customers building-up inventory rather than purchasing Finisar products for immediate use in production." Id. ¶ 3. Plaintiff contends that Finisar did not affirm nor deny the inventory build-up suspicions during this time, and as a result, "Finisar's stock price remained relatively consistent over the course of the six-quarters of record-growth." Id. ¶ 36.

Plaintiff alleges that on December 2, 2010, Finisar's then-CEO, Gertel, "participated in the Credit Suisse Technology Conference call with analysts, media representatives, and investors." Id. ¶ 62. During this call, an analyst from Credit Suisse named William Stein allegedly highlighted that Finisar had "significantly outgrown [its] end markets for the last six quarters" and raised the fear that the company's growth "is going to revert." Id. Mr. Stein then asked, "Can you help us understand how it's possible for the company to not only sustain that [growth] but continue to grow faster than the end markets?" Id. In response, Gertel allegedly provided the following explanation:

**\*2** So if you look at the market, you see the fundamentals for growth are there. People need more higher bit rate products, more sophisticated products to address the cost reduction that the network needs and the demand continues.

As far as we know we haven't seen any inventory issues with our product with our customers. Our

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

product—our business is 60/40, basically 40% is LAN/SAN business, 60% is telecom. On the LAN/SAN side, by far the majority of our sales is a vendor-managed inventory. So we have visibility to what people have. There is no reason for them to have inventory because we own the inventory. So we're pretty safe with that.

And on the telecom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting products and doesn't look to us, not visible to us at all, all these quarters if they are building any inventory.

Id.

The same day Gertel made this statement, Finisar's common stock increased $3.29 per share (or 16.64%), going from $19.77 per share on December 1, 2010, to close at $23.06 per share on December 2, 2010. Id. ¶¶ 13, 63. The following day, on December 3, 2010, the price per share increased another $0.95 (or 4.12%). Id. ¶ 63. Plaintiff alleges that Finisar's stock price continued to rise in this manner throughout the Class Period, reaching a Class Period high of $43.23 per share on February 14, 2011. Id. ¶¶ 63, ¶ 77.

But on March 8, 2011, Finisar issued a press release indicating that its fourth quarter revenues would be lower than projected due in part to "the previously undisclosed inventory build-up at some of the Company's telecom customers and a slowdown in business in China." Id. ¶ 78. The press release read, in relevant part:

> During the fourth quarter ending April 30, 2011, the Company will be impacted by the full three months of the annual price negotiations with telecom customers that typically take effect on January 1, the 10-day long shutdown at certain customers for Chinese New Year in February, the adjustment of inventory levels at some telecom customers, particularly for products which had previously been on allocation and long lead times, including WSS and ROADM line cards, and a slowdown in business in China overall. Primarily as a result of these factors, the Company indicated that it currently expects revenues for the fourth quarter to be in the range of $235 to $250 million.

Id. ¶ 53, 79. The press release was issued after the market closed on March 8, 2011. Id. Rawls also held a conference call the same day to discuss the expected results, and explained the inventory adjustment in this way:

> [M]any, many of the people that follow our company have speculated for several quarters about double ordering inventory builds on the part of our customers

and we continually responded that we asked our customers and they say, "No. We're buying for production and we're not buying for inventory." Well we have clearly learned here in the last month or so from several of them that all of a sudden surprise, surprise they have some pretty good size inventories of wavelength selective switches. And the question is we don't really have great visibility into their inventory levels other than what they tell us and I, you know, they're not—we're not getting complete information I don't think.

*3 Id. ¶ 54

In reaction to the March 8 press release, Finisar's stock price dropped by $15.43 per share, falling from $40.04 per share on March 8, 2011 to close at $24.61 on March 9, 2011, "marking a one-day decline of nearly 39%." Id. ¶¶ 6, 68, 81. Plaintiff asserts that Finisar's stock price has never fully recovered from this decline. Id.

Plaintiff contends that Gertel's December 2nd statement misled investors as to the nature of Finisar's growth by denying that its revenue increase was the result of a short-term, unsustainable inventory build-up by customers rather than the result of increased demand for Finisar products. Plaintiff claims that the statement misrepresented Finisar's growth as being "in line with" and "not outpacing" the end-market growth, and incorrectly suggested that its "growth would not revert due to an inventory correction after an inventory build-up by customers." Id. ¶ 64.

Plaintiff alleges that both before and during the Class Period, Finisar would have "necessarily learned about customer inventory and demand during its annual demand and pricing negotiations with customers." Opp. at 5 (citing SAC ¶¶ 5, 45-50). According to Plaintiff, these negotiations occurred over the course of a three-month period that "concluded before the end of 2010," the results of which were implemented by January 1, 2011. SAC ¶¶ 7, 45, 53, 79. Plaintiff further alleges that an investigation conducted by Lead Counsel, with the assistance of a private investigative firm located in China, "affirm[ed] that inventory levels and the economic slow-down in China were discussed during negotiations with Finisar in 2010." Id. ¶ 46. Indeed, the SAC identifies confidential witnesses who, according to Plaintiff, were "personally involved in making purchases from Finisar" and confirmed that current volumes and the next year's projected demand volumes were discussed during annual negotiations at that time. Id. ¶¶ 49-51. From this Plaintiff concludes that Defendants either knew, or were reckless in not knowing, that an inventory build-up existed, and that Finisar's growth would decline in the upcoming

quarters as customers became less concerned about supply constraints and needed to "burn-off existing excess inventory." Id.

Finally, Plaintiff contends that Defendants' knowledge of the inventory build-up is further supported by their behavior during the Class Period. Specifically, Plaintiff asserts that Defendants capitalized on the rapidly rising stock price by conducting a substantial stock offering that garnered over $118 million in gross proceeds. Id. ¶ 72. Additionally, Gertel himself "sold 201,913 shares of his personally held or controlled Finisar stock for gross proceeds of over $5.17 million," which Plaintiff claims was "substantially more than in any previous year." Id. ¶¶ 73-75

## II. STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class certification. Parties seeking class certification bears the burden of affirmatively demonstrating that they have satisfied each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). Rule 23(a) provides that a class may only be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In other words, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy to maintain a class action. Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012).

**\*4** In addition, a party seeking class certification must also "satisfy through evidentiary proof" at least one of the three requirements of Rule 23(b). Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Dukes, 564 U.S. at 350. Where a plaintiff seeks certification under Rule 23(b)(3)'s predominance approach, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A trial court has broad discretion in making the decision to grant or deny a motion for class certification. Bateman v. American Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). In making this determination, the court's analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 466 (2013) (quoting Dukes, 564 U.S. at 349); see also Mazza, 666 F.3d at 588. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen, 568 U.S. at 466; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 568 U.S. at 466. The court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." Id. (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.' " Hataman v. Advanced Micro Devices, Inc., No. 14-226 YGR, 2016 WL 1042502, at \*3 (N.D. Cal. Mar. 16, 2016) (quoting Ellis, 657 F.3d at 982). Where a court concludes as a result of its analysis that the moving party has met its burden of proof, then the court may certify the class. Zinser, 253 F.3d at 1186.

## III. DISCUSSION

A. Rule 23(a) Requirements
Plaintiff seeks certification of a class of all persons and entities who purchased or acquired the public traded common stock of Finisar during the period from December 2, 2010 through March 8, 2011, inclusive, and were damaged thereby.[1] With respect to the requirements for class certification set forth in Rule 23(a), Fed.R.Civ.P., Plaintiff first asserts that the numerosity requirement is satisfied because the Class consists of thousands of similarly situated investors who purchased Finisar common stock at artificially inflated prices during the Class Period. Second, Plaintiff contends that numerous legal and factual questions are common to all Class members. Third, Plaintiff asserts that its claims are typical of the proposed Class. Fourth, Plaintiff represents that it is a sophisticated institutional investor with a significant financial interest in the case and has been committed to overseeing and managing the litigation fairly and adequately to protect the interests of the Class. Defendants do not dispute Plaintiff's showing with

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

respect to the four requirements set forth in Rule 23(a).

1    Excluded from the Class are (i) Defendants Finisar, Gertel and Rawls, (ii) the officers and directors of Finisar at all relevant times, (iii) members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and (iv) any entity in which Defendants have or had a controlling interest.

**\*5** After careful examination of the record, the Court finds that Plaintiff's proposed Class satisfies the numerosity, commonality, typicality, and adequacy requirements to maintain a class action under Rule 23(a).

B. Rule 23(b) Requirements

Plaintiff also asserts that the action satisfies Rule 23(b)(3), Fed.R.Civ.P. According to Plaintiff, Defendants' alleged misstatements perpetuated a "fraud on the market," and therefore questions regarding whether misleading conduct occurred, whether that conduct occurred with the requisite scienter, and whether that conduct caused investors to suffer losses predominate over individual questions. Further, Plaintiff asserts that it is entitled to the presumption of class-wide reliance under the fraud-on-the-market doctrine. Finally, Plaintiff asserts that a class action is superior to a multitude of individual actions.

Defendants raise two arguments in opposition. First, Defendants contend that the proposed Class is overbroad to the extent it includes persons who traded millions of shares on the morning of December 2nd before Gertel spoke during the Credit Suisse Technology Conference call at approximately 18:08:38 GMT (1:08:38 p.m. Eastern Time). Second, Defendants seek to rebut the presumption of reliance by showing that Gertel's alleged misrepresentations had no impact on Finisar stock price. Because the Court finds Defendants' second argument persuasive for the reasons set forth below, the Court finds it unnecessary to consider the first argument regarding the breadth of the proposed Class.

Predominance Requirement

Rule 23(b)(3) requires in pertinent part that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Here, the parties dispute whether the element of reliance raises questions of law or fact common to the class. Plaintiff contends that class-wide issues predominate over individualized issues on the

element of reliance because class members are entitled to a presumption of reliance based upon the fraud-on-the-market theory.

The fraud-on-the-market theory "facilitates class certification by recognizing a rebuttable presumption of class wide reliance on public, material misrepresentations when shares are traded in an efficient market." Amgen, 568 U.S. at 463. "Absent the fraud-on-the market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." Id. at 462-463. To invoke the presumption of reliance based upon the fraud-on-the-market theory, a plaintiff seeking class certification must show: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded stock between the time the misrepresentations were made and when the truth was revealed. Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398 (2014) ("Halliburton II") (citing Basic v. Levinson, 485 U.S. 224, 248, n.27 (1988)). The first three requirements "are directed at price impact—'whether the alleged misrepresentations affected the market price in the first place.'" Halliburton II, 134 S.Ct. at 2414. "In the absence of price impact, Basic's fraud-on-the-market theory and presumption of reliance collapse." Id.

**\*6** Here, Plaintiff has made a sufficient showing to invoke the fraud-on-the-market presumption of reliance. Plaintiff's expert, Michael L. Hartzmark, Ph.D. ("Hartzmark"), opines that the Finisar stock traded on an open, well-developed, and efficient market. Defendants do not dispute the sufficiency of Plaintiff's showing. Rather, Defendants seek to rebut the presumption of reliance based on evidence that Gertel's alleged misstatement had no impact on Finisar's stock price.

"Because the presumption's efficient market analysis is only an 'indirect proxy for price impact,' it must give way to direct 'evidence showing that the alleged misrepresentation did not actually affect the stock's market price....'" Hatamian, 2016 WL 1042502, at \*6 (N.D. Cal. March 16, 2016) (quoting Halliburton II, 134 S.Ct. at 2415-16). "If [d]efendants show that the alleged misrepresentation did not affect the stock's price, then the Basic presumption will not apply." Id. (citing Halliburton II, 134 S.Ct. at 2416); see also Basic Inc. v. Levinson, 485 U.S. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."). Defendants bear the burden of production

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

and the burden of persuasion on the issue of price impact. See Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 260 (N.D. Tex. 2015) ("Halliburton Tex."); see also Waggoner v. Barclays PLC, No. 16-1912, 2017 WL 5077355, at *37 (2nd Cir. Nov. 6, 2017).

Defendants contend that Gertel's December 2nd statement did not cause the $3.29 increase in stock price from $19.77 at the close of trading on December 1st to $23.06 at the close of trading on December 2nd. Defendants' argument is supported by the event study conducted by their expert, Dr. Alexander Aganin ("Aganin"). Aganin's report shows that after the market closed on December 1st, Finisar issued a press release announcing its final unaudited results for its Second Quarter of Fiscal Year 2011 and its forecast for its Third Quarter of Fiscal Year 2011. Finisar management also held a conference call. According to Aganin, Finisar's stock price increased after the aftermarket dissemination of the unchallenged[2] December 1st statement to open on December 2nd at $21.12 per share, which was $1.35 above the $19.77 closing price on December 1st. Thereafter, Finisar's stock price continued increasing during the morning trading hours to reach $22.81 per share before Gertel made any public statements on December 2nd.

[2]     Neither the December 1st press release nor the conference call are alleged to contain false or misleading statements. Plaintiff's initial complaint, however, alleged that Finisar made false and misleading statements in the December 1st press release and conference call. Consolidated Complaint (filed Jan. 20, 2012).

In conducting his study, Aganin assumes that if Gertel's statements had an impact on Finisar's stock price as alleged by Plaintiff, "one would expect this impact to be discernible in Finisar's stock price by the time of 4:00 PM EST, market close on December 2, 2010 (approximately 3 trading hours after the statements were made)." Expert Report of Alexander Aganin, Ph.D., attached as Exhibit 1 to Decl. of David Priebe (Dkt. 136-2), p. 11. According to Aganin's calculation, Finisar's stock price increased 1.14% between the time Gertel made his public statements and the close of trading on December 2nd. During that same time frame, the SPDR S&P 500 ("SPY") increased 0.13% and the industry index[3] increased 1.07%. Aganin opines that Finisar's residual return was 0.65% and was not statistically significant.

[3]     Aganin's industry index was an equal-weighted index of stock returns of four of Finisar's competitors: JDS Uniphase Corp., Oplink Communications, Inc., Oclaro, Inc. and Opnext, Inc.

*7 Aganin also evaluates whether there was any evidence of price impact by the end of the next trading day, December 3, 2010, when Finisar stock price closed at $24.01. Id. According to Aganin's calculation, Finisar's stock price increased 5.39% between the time Gertel made his public statements and the close of trading on December 3, 2010. During that same time frame, the SPY increased 0.38% and the industry index increased 5.84%. Aganin opines that Finisar's residual return was -0.25% and was not statistically significant. In summary, based upon the event study, Aganin opines that any increase in stock price after Gertel made his public statements, whether compared to the closing price on December 2nd or December 3rd, 2010, was not statistically significant when the price is adjusted for general market and industry trading.

Plaintiff's expert, Hartzmark, does not provide any evidence about the stock price at the time Gertel made the challenged statements, and his event study does not segregate the effect of the December 1st information that was in the market on December 2nd before Gertel's statements from the effect, if any, of Gertel's statements.[4] Instead, Plaintiff argues that Aganin's study is flawed for various reasons. First, Plaintiff contends that Aganin failed to conduct a complete, affirmative price impact analysis, and therefore Aganin's conclusions are incorrect. As explained in Hartzmark's rebuttal report, to conduct an affirmative economic price impact analysis, an expert assumes that a misstatement represents new information entering the market, and then uses a statistical analysis "in combination with the analysis of news reports, analyst evaluations and firm specific financial information" to isolate the impact of the misstatements relative to other disclosures that are contemporaneously revealed." Rebuttal Report of Michael L. Hartzmark, Ph.D., attached as Exhibit B to the Supp. Decl. of Ian D. Berg (Dkt. 141). Hartzmark's rebuttal report tracks the continuing rise of Finisar's stock from December 2nd to March 8, 2011, the date Finisar allegedly issued a corrective statement, in combination with analyst reports issued on December 13 and 15, 2010, January 6, 2011, and February 4, 2011. Hartzmark reasons that after Gertel's statements on December 2nd, analysts and investors evaluated the prospects of Finisar through a more optimistic lens. According to Hartzmark, the increase in Finisar's stock price from December 2nd until the corrective disclosure on March 8, 2011 is consistent with his conclusion that there is a price impact.

[4]     In his rebuttal report, Hartzmark offers a new analysis in an attempt to show a statistically significant stock price change after Gertel's December 2nd statement. The Court rejects Hartzmark's analysis because he does

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

not test for statistically significant stock price changes during the December 2nd trading day.

The Court rejects the notion that the analyst reports show a delayed price impact of the December 2nd statement. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." Halliburton Tex., 309 F.R.D. at 269. The analyst reports relied upon by Hartzmark were issued weeks and months after Gertel's December 2nd statements and do not refer to Gertel's December 2nd statements. Furthermore, Defendants cannot be held liable for any affect the analyst reports may have had on the price of Finisar stock in the absence of evidence that Defendants exercised control over the content of those analyst reports. See Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 144 (2011).

Second, Plaintiff contends that Aganin's report is flawed insofar as it fails to consider Finisar's stock price change following the allegedly corrective disclosure of March 8, 2011. According to Plaintiff, Finisar's stock price fell from $40.04 per share on March 8, 2011 to close at $24.61 on March 9, 2011. Plaintiff is correct that for purposes of price impact analysis, courts have focused on the corrective disclosure date in certain cases. See e.g. Halliburton Tex., 309 F.R.D. at 262 ("Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth."); Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *7 ("Price impact in a securities fraud case is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed."); In re Intuitive Surgical Sec. Litig., 2016 WL 7425926, *13 (N.D. Cal. Dec. 22, 2016) ("In conducting this analysis, the court will focus on changes in the stock price with respect to the corrective disclosure dates, as opposed to the misrepresentations alleged, because this method more accurately captures the impact, if any, of a material misrepresentation or omission."). Neither the Supreme Court nor the Ninth Circuit, however, has addressed the relative importance of the date of the alleged misstatement as compared to the date of the corrective statement in analyzing price impact and the issue is open to debate. The absence of controlling caselaw on this specific issue allows Defendants to make "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, [which] will be sufficient to rebut the presumption of reliance." Basic Inc. v. Levinson, 485 U.S. at 248. The Court accordingly finds

no flaw in Aganin's analysis simply because it focuses on the date of the alleged misstatement rather than the date of the alleged corrective disclosure. Furthermore, Aganin's analysis focusing on the date of alleged misstatement is supported by a relatively recent decision by the Eighth Circuit. See IBEW Local 98 Pension Fund v. Best Buy Co., 818 F.3d 775 (8th Cir. 2016) (overwhelming evidence of no "front-end" price impact at the time of the alleged misstatement rebutted the Basic presumption).

**\*8** Whether Aganin's showing is sufficient to sever the link between the alleged misrepresentation and the price received or paid by Plaintiff is a separate issue. Plaintiff contends that courts have inferred price impact from an alleged corrective disclosure even where, as in the present case, an alleged misstatement arguably has no price impact. See e.g. Hatamian, 2016 WL 1042502, *7. One stated rationale for focusing on the date of the corrective disclosure rather than the date of the alleged misstatement or omission is that "misstatements are not made in a vacuum and other information can offset or confound the effects of a particular misrepresentation." Id. There is, however, no evidence in the present case of any information in the market that may have offset or confounded the effects of Gertel's alleged misrepresentations. To the contrary, there is evidence that other information in the market before Gertel spoke, namely the December 1 press release and conference call, contributed to a price increase. Another stated rationale for focusing on the corrective disclosure date is that "a misstatement could serve to maintain the stock price at an artificially inflated level." Id. Plaintiff in this case is not proceeding on a price maintenance theory, however.

Notably, the Hatamian case is also factually distinguishable from the present case. In Hatamian, defendants' own expert acknowledged that defendant's stock price experienced statistically significant price increases on four days on which defendants had allegedly made 43 (of the 125) misstatements and/or omissions, and defendants' stock price experienced a statistically significant price decrease on every one of the five days defendants allegedly made corrective disclosures. In contrast, Aganin's analysis shows no statistically significant price increase following Gertel's December 2nd statements. Because the December 2nd statements had no price impact, it cannot be presumed that the March 8 disclosures revealed a latent price impact of Gertel's statements. Furthermore, after Gertel's statements and before the alleged corrective March 8th disclosure, several analyst reports were issued. These reports constitute new information that "severs the link" between Gertel's December 2nd statements and any increase in Finisar's stock.

In re Finisar Corporation Securities Litigation, Not Reported in Fed. Supp. (2017)

Fed. Sec. L. Rep. P 99,929

Third, Plaintiff argues that Aganin's methodology contained three critical errors resulting in a flawed empirical analysis: (1) a flawed regression specification; (2) improper selection of two discrete points in time ("time frame") to evaluate price movement and statistical significance; and (3) an econometric error resulting from a biased "industry" index that lacks independence from Finisar's return and is influenced by Finisar-specific news. See Hartzmark Rebuttal Report, ¶¶ 10, 15-43. When these purported errors are corrected, Plaintiff contends that the evidence shows a price increase following Gertel's statements that was statistically significant.

With respect to the regression specification, Plaintiff contends that the Aganin Report is unreliable because Aganin erred in failing to use dummy variables to exclude seven dates when Finisar announced preliminary and actual earnings, an acquisition, and Finisar's secondary offering. Aganin clarifies in his Rebuttal Report that he ran his regression with and without dummy variables and the results did not change. Aganin Rebuttal Report, ¶ 50. Furthermore, Aganin reran his event study excluding the seven dates. The results confirm Aganin's opinion that Gertel's statements on December 2nd did not result in statistically significant increase of Finisar's stock price on December 2 or 3, 2010. Aganin Rebuttal Report, ¶¶ 56-57. The Court is persuaded by Aganin's rebuttal on these points.

Plaintiff's criticism of the time frame used in Aganin's analysis is also unpersuasive. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." Halliburton Tex., 309 F.R.D. at 269. Further, the time frame selected by Aganin is supported by an academic study by James Patell and Mark Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," Journal of Financial Economics 13, no. 2 (June 1984).

*9 Finally, with respect to the industry indices, Aganin used two indices: the SPY and an index of four competitors of Finisar. Hartzmark does not object to the use of the SPY nor to the use of industry indices in general. According to Hartzmark, however, Aganin's index of four competitors was too narrow to fully account for industry-wide effects. Hartzmark contends that

Aganin should have included a larger group of companies in the telecom industry, including customers and suppliers. Hartzmark opines that an appropriate index would be iShares U.S. Telecommunication ETF. Hartzmark Rebuttal Report, ¶ 48, n.62.

In his rebuttal report, Aganin explains that Hartzmark's use of a broader index is methodologically unsound because good news for a major Finisar customer may be good news or bad news for Finisar and its peers. Aganin Rebuttal Report, ¶ 36. Aganin also states that an overbroad industry index fails to isolate the effect of issuer-specific information from information about the industry or market. Id., ¶¶ 36-37, 41-46. In any event, Aganin reran his event study using returns of both his index and the iShares U.S. Telecommunication ETF. The results show that none of the returns for the event windows ending on December 2, 2010 are statistically significant. Id., ¶ 38. Aganin concludes that the sensitivity analysis confirms that Gertel's challenged statements did not result in a statistically significant increase of Finisar's stock price on December 2 or 3, 2010. Id., ¶¶ 38-39. The Court finds Aganin's conclusion persuasive.

## IV. ORDER

Defendants have rebutted the Basic presumption of fraud-on-the-market reliance by demonstrating through a preponderance of evidence that Gertel's December 2nd statement had no price impact when made or thereafter. It follows that the predominance requirement for class certification has not been met. Accordingly, Plaintiff's motion for class certification is DENIED.

The hearing scheduled for December 7, 2017, is VACATED.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2017 WL 6026244, Fed. Sec. L. Rep. P 99,929

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.