# Case No. 10

KeyCite Yellow Flag - Negative Treatment

Distinguished by Monroe County Employees' Retirement System v. Southern Company, N.D.Ga., August 22, 2019

2016 WL 7425926
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

IN RE INTUITIVE SURGICAL
SECURITIES LITIGATION.

Case No. 5:13-cv-01920-EJD
|
Signed 12/22/2016

ORDER CERTIFYING PLAINTIFF CLASS

EDWARD J. DAVILA, United States District Judge

**\*1** Lead Plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS"), together with named Plaintiff Greater Pennsylvania Carpenters' Pension Fund ("Greater Penn") (collectively, "Plaintiffs"), bring this putative securities class action against Intuitive Surgical, Inc. ("Intuitive"), Lonnie M. Smith ("Smith"), Gary S. Guthart ("Guthart"), and Marshall L. Mohr ("Mohr") (collectively, "Defendants"), alleging violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Pls' Second. Am. Class Action Compl. ("SACC"), Dkt. No. 184-9.[1] Plaintiffs bring this action individually and on behalf of all other persons and entities that purchased or acquired Intuitive's common stock during the proposed class period of February 6, 2012 and July 18, 2013, inclusive.

[1]    The court has determined that it is appropriate to Grant Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. No. 185). A written Order to this effect is forthcoming. As a result, Plaintiff's Second Amended Class Action Complaint (Dkt. No. 184-9) is now the operative pleading in this action and the court will therefore rely on it accordingly for the purposes of this Order.

Presently before the court is Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 (Dkt. No. 123, "Mot."). After careful consideration of the parties' papers, the evidence submitted in this case, the argument of counsel presented at the hearing, and for the reasons explained below, the court hereby GRANTS Plaintiffs' Motion for Class Certification in accordance with the findings and analysis set forth in this Order.

## I. BACKGROUND

The factual and procedural background of this case is by now well-known and was discussed at length in this court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Order on MTD"). See Dkt. No. 83. Accordingly, the court will briefly summarize the general background in this case, highlighting the facts and allegations most relevant to the issue of class certification.

Intuitive is a biomedical corporation that designs, manufactures, and sells da Vinci Surgical Systems ("da Vinci"), a robotic surgical system that uses computer technology to allow surgeons to remotely operate through a small tube inside the patient. SACC ¶¶ 30, 40-41. The da Vinci is Intuitive's sole product and source of revenue. Id. ¶¶ 30, 41. Because da Vinci is the only robotic surgical system in the United States approved by the Food and Drug Administration ("FDA") for soft tissue procedures, Intuitive enjoyed rapid growth, and by December 31, 2012, there were 2,585 da Vinci systems installed in 2,025 hospitals worldwide. Id. ¶¶ 39-40. Intuitive common stock is publicly traded on the NASDAQ under the ticker symbol "ISRG." Id. ¶ 30.

Hawaii ERS is a public pension plan governed by an eight-member board of trustees and made up of retirees, beneficiaries, inactive vested members, and active public employees working for the state and counties of Hawaii. Id. ¶ 26. Hawaii ERS purchased a total of 26,048 shares of Intuitive common stock during the class period, and sold a total of 12,268 shares. Id. Greater Penn is a "trustee-administered, multi-employer, defined benefit pension plan for carpenters in Pennsylvania." Id. ¶ 28. Greater Penn purchased a total of 2,893 shares, and sold 21 shares of Intuitive common stock during the class period. Id.

**\*2** One of da Vinci's most commonly used tools is the "Hot Shears Monopolar Curved Scissors ("monopolar scissors"), which can cauterize tissue through the application of electricity via an electrode. Id. ¶ 43-44, 47. To ensure that the electricity is only channeled through that electrode, the metal parts of the scissors are covered with insulating rubber sleeves ("tip covers"). Id. ¶ 45. Plaintiffs allege that the tip covers were prone to tiny cracks or slits that prevented them from properly insulating the metal instruments, thus allowing electricity to escape into the patient's body, damaging tissue and internal organs. Id. ¶¶ 45-48.

According to Plaintiffs, Intuitive became aware of this defect through medical device reports ("MDRs").[2] Plaintiffs allege that Intuitive received thousands of MDRs regarding da Vinci's safety issues, and systematically concealed and underreported the complaints to the FDA. See id. ¶¶ 85-111. Plaintiff alleges that, instead of reporting the MDRs to the FDA, Intuitive issued a "secret recall" where, beginning in October 2011, Intuitive sent letters modifying or correcting the instructions for proper use of the monopolar scissors in order to avoid damaging the tip covers. Id. at ¶¶ 60-64. Intuitive did not report or otherwise inform the FDA that it had sent these letters, which the FDA later determined to be a violation of 21 C.F.R. § 806.10. Id. ¶ 63. On July 16, 2013, Intuitive received a Warning Letter issued by the FDA, citing Intuitive's failure to adequately report the recalls and adverse events, which Intuitive publicly released on July 19, 2013. Id. ¶¶ 137-150.

2    Pursuant to FDA regulations, if an adverse event (death or serious injury) occurs at a hospital, and the hospital has information that reasonably suggests a medical device may have caused or contributed to that event, the hospital must report that information to the manufacturer through an MDR. See id. ¶¶ 81-85; see also 21 U.S.C. § 360i(b)(1)(B); 21 C.F.R. §§ 803.30, 803.50. And if the MDR suggests that the device may have contributed to a serious injury or death, then the manufacturer must report the MDR to the FDA. Id.; see also 21 C.F.R. § 803.50(a).

Plaintiffs filed this action alleging that Defendants made numerous materially false and misleading statements and omissions regarding the safety of the da Vinci system and Intuitive's compliance with FDA regulations. See Pls.' First Am. Compl., Dkt. No. 48. The alleged misrepresentations fell into roughly four categories: (1) statements regarding the general safety and efficacy of da Vinci surgery; (2) statements regarding Intuitive finances; (3) warning statements regarding the risks Intuitive may face from product-liability lawsuits, product defects, and product recalls; and (4) statements regarding the FDA regulations the company faces. See Order on MTD at 5-7, 11. The court dismissed Plaintiffs allegations as to the second, third, and fourth categories of statements. Id.

Plaintiffs contend that the "truth" about Defendants fraudulent misrepresentations and omissions was revealed in a series of five corrective disclosures: (1) a *Bloomberg* article published on February 28, 2013; (2) another *Bloomberg* article published on March 5, 2013; (3) Intuitive's first quarter financial results released on April 18, 2013; (4) a pre-announcement of Intuitive's second quarter financial results released on July 8, 2013, and (5) Intuitive's actual second quarter financial results plus the FDA's Warning Letter, released on July 18, 2013. Mot. at 4-5; SACC ¶¶ 216-220. Plaintiffs allege that each of these "corrective disclosures" cumulatively resulted in a dramatic decline the price of Intuitive common stock. Mot. at 5; SACC ¶ 180. Plaintiffs now seek to certify a class of investors who purchased Intuitive common stock between February 6, 2012 and July 18, 2013 and suffered damages as a result. Mot. at 2.

## II. LEGAL STANDARD

**\*3** Rule 23 of the Federal Rules of Civil Procedure governs class certification. A party seeking class certification bears the burden of affirmatively demonstrating that they have satisfied each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). Rule 23(a) provides that a class may only be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In other words, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy to maintain a class action. Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012).

In addition, a party seeking class certification must also "satisfy through evidentiary proof" at least one of the three requirements of Rule 23(b). Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013); Dukes, 564 U.S. at 350. Where a plaintiff seeks certification under Rule

23(b)(3)'s predominance approach, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A trial court has broad discretion in making the decision to grant or deny a motion for class certification. Bateman v. American Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). In making this determination, the court's analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 133 S. Ct. 1184, 1194 (2013) (quoting Dukes, 564 U.S. at 349); see also Mazza, 666 F.3d at 588. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen, 133 S. Ct. at 1194–95; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 133 S. Ct. at 1195. The court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole.*" Id. (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.' " Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *3 (N.D. Cal. Mar. 16, 2016) (quoting Ellis, 657 F.3d at 982). Where a court concludes as a result of its analysis that the moving party has met its burden of proof, then the court may certify the class. Zinser, 253 F.3d at 1186.

**III. DISCUSSION**

Plaintiffs move to certify a class consisting of "all persons or entities who purchased or acquired the publicly traded common stock of Intuitive Surgical, Inc. during the period from February 6, 2012 through July 18, 2013 inclusive, and who were damaged thereby."[3] SACC at 1 and ¶ 248. Plaintiffs contend that the proposed class complies with Rule 23(a) and 23(b)(3). Defendants oppose class certification on the grounds that Plaintiffs have failed to satisfy the requirements of Rule 23(a)(3), (a)(4) and (b)(3). See Defs.' Opp. to Mot. for Class Cert. ("Opp.") at 1-2, Dkt. No. 135.

[3]    Excluded from the Class are (i) all Defendants; (ii)

members of the immediate families of individual defendants Guthart, Mohr, and Smith; (iii) any subsidiaries and affiliates of Defendants; (iv) any person who is or was an officer or director of Intuitive or any of Intuitive's subsidiaries of affiliates; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) Intuitive's employee retirement and benefit plan(s); and (vii) the legal representatives, heirs, successors and assigns of any such excluded person or entity. ACC ¶ 256.

**A. Rule 23(a) Requirements**

**i. Numerosity**

**\*4** Under Rule 23(a)(1), the first requirement for class certification is that the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While satisfaction of the numerosity requirement generally does not turn on an exact number, "where the number of class members exceeds forty, and particularly where class members number in excess of one hundred, the numerosity requirement will generally be found to be met." Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 102 F.R.D. 457, 461 (N.D. Cal. 1983); Noll v. eBay, Inc., 309 F.R.D. 593, 602 (N.D. Cal. 2015). "Additionally, it is not necessary to state the exact number of class members when the plaintiff's allegations 'plainly suffice' to meet the numerosity requirement." In re Cooper Cos. Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal. 2009). District courts have consistently found a proposed class to be sufficiently numerous in securities fraud cases where "several million shares of stock were purchased during the class period." Id. (quoting In re Unioil Sec. Litig., 107 F.R.D. 615, 618 (C.D. Cal. 1985)).

Here, Plaintiffs meet the requirements for numerosity. While the exact number of proposed class members is presently unknown, Plaintiffs submit evidence indicating that more than 1,000 persons and/or entities purchased or acquired Intuitive common stock between February 6, 2012 and July 18, 2013. See Mot. for Cert. at 7; Declaration of Jonathan Gardner ("Gardner Decl."), Ex. 1 (RFA Responses) at 5. The record further indicates that "Intuitive had between 39 million and 40 million shares outstanding throughout the Class Period. Gardner Decl. Ex. 1 at 22. Defendants do not challenge Plaintiffs' compliance with Rule 23(a)(1). See Opp. at 5 n. 2.

Accordingly, the court finds that Plaintiffs have successfully met the requirements for numerosity. See Cooper, 254 F.R.D. at 634 (highlighting that the defendant had more than 36 million shares of stock outstanding during the class period and explaining that the court "certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year.").

### ii. Commonality

The second requirement under Rule 23(a), known as "commonality," requires that class members' claims contain "questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2); Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003). As the Ninth Circuit explained in Hanlon v. Chrysler Corp.,

> Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

150 F.3d 1011, 1019 (9th Cir. 1998). In other words, a few factual variations among the class will generally not defeat commonality, so long as the class claims still arise from foundation of shared pertinent legal or factual issues. See Staton, 327 F.3d at 953. Such issues must be of sufficient importance "to convince a court that a class action is the most efficient way of determining the rights of the parties." Cooper, 254 F.R.D. at 634 (citing Martin v. Dahlberg, Inc., 156 F.R.D. 207, 214 (N.D. Cal. 1994) ("the core purposes of a class suit will only be advanced if the common issues of law or fact are issues central to the case.")). In securities fraud cases, commonality is often satisfied as a result of the inherent nature of such cases. That is, courts have "easily" found commonality "where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties." In re VeriSign, Inc. Sec. Litig., 2005 WL 7877645, at *5 (N.D. Cal. Jan. 13, 2005); see also Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions ...").

*5 Similarly to other securities fraud class actions, here, Plaintiffs contend that all class members were "harmed as a result of a common course of conduct arising from material misrepresentations and omissions Defendants made to the investing public." Mot. for Cert. at 9. Plaintiffs identify the common questions of law and fact as: (1) whether Defendants violated the Securities Exchange Act; (2) whether Defendants omitted and/or misrepresented material facts; (3) whether Defendants knowingly or recklessly disregarded that their statements and omissions were false and misleading; (4) whether the price of Intuitive's stock was artificially inflated as a result of Defendants' misrepresentations and/or omissions; and (5) whether and to what extent disclosure of the truth regarding Defendants' omissions and/or misrepresentations of material facts caused class members to suffer economic loss and damages. Id.

Such inquiries raise questions common to all purported class members. Moreover, Defendants do not dispute that Plaintiffs satisfy Rule 23(a)(2) here. See Opp. at 5 n. 2. Accordingly, the court finds that Plaintiffs have satisfied the commonality requirement.

### iii. Typicality

The third requirement under Rule 23(a), "typicality," provides that the claims or defenses of the class representatives must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality must be assessed in light of the circumstances presented by each case. Blackie, 524 F.2d at 910. The purpose of the typicality requirement is to "assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

The Ninth Circuit instructs that the test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct." Ellis, 657 F.3d at 984 (quoting Hanon, 976 F.2d at 508) see also Hanlon, 150 F.3d at 1020 (explaining that a representative's claims or defenses may be considered "typical" of the class where "they are reasonably co-extensive with those of absent class members; they need not be substantially identical."); accord Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir. 2004) ("a class representative can establish the requisite typicality under Rule 23 if the defendants committed the same wrongful acts in the same manner against all members of the class."

(internal quotations omitted)). However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." In re Montage Technlogy Grp. Ltd. Sec. Litig., 2016 WL 1598666, at *4 (N.D. Cal. 2016) (citing Hanon, 976 F.2d at 508); In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 598 (C.D. Cal. 2009) (explaining that "typicality is defeated where 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.' ").

Here, Defendants contend that Plaintiffs—through their investment managers—were privy to different statements and information than other stockholders, and are therefore not typical of the proposed class. Opp. at 5-6. Specifically, Defendants assert that certain investment managers working on behalf of Plaintiffs regularly met with Intuitive executives, including "in person once a year at the investment managers' offices, and by phone once a quarter at Intuitive's headquarters following earnings calls." Id. Based on these interactions, Defendants challenge typicality on two related grounds. First, Defendants argue that the merits of Plaintiffs' claims are distinct from the claims of the proposed class because their investment advisors "heard and relied upon statements different than those alleged to have defrauded the market." Id. at 5. And second, because of these investment advisors' special relationship with Intuitive, Defendants contend Plaintiffs are subject to defenses that are unique from other class members. Id. at 5-6. Defendants particularly highlight instances where these advisors acknowledged, downplayed, or dismissed concerns regarding da Vinci's purported safety issues, and maintain that in light of this, "the litigation going forward will focus not on whether the class relied on the alleged misstatements and omissions, but rather on whether these particular Plaintiffs in fact relied on them." Id.

**\*6** Defendants' argument is insufficient to defeat typicality. The fact that certain of Plaintiffs' investment managers met with Intuitive on occasion does not, without more, render Hawaii ERS or Greater Penn atypical of the proposed class. Importantly, there is no evidence that non-public information was shared during the in-person meetings or phone conversations referenced by Defendants. As the district court explained in Beach v. Healthways, Inc.,

> Mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information. Courts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a

corporate officer. In general, the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative.

2010 WL 1408791, at *4 (M.D. Tenn. Apr. 2, 2010) (citing In re DVI, Inc. Sec. Litig., 249 F.R.D. 196, 202-03 (E.D. Pa. 2008)) (internal citations omitted).

Moreover, where, as here, the plaintiffs advance a "fraud on the market" theory of liability, the question of whether investment managers specifically relied on Defendants' alleged misrepresentations is unlikely to significantly shift the focus of the case given that "an investor's reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action." Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988); see In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. 240, 252 (N.D. Cal. 2013) (explaining that while "[m]ost investors think they are a little smarter than average and see opportunities others have missed ... they all rely on publicly available data (with the exception, of course, of investors trading on insider information)."); see also Darquea v. Jarden Corp., 2008 WL 622811 (S.D.N.Y. 2008) (explaining that even where the lead plaintiffs' investment advisors testified that the alleged misstatements at issue were not crucial to their decision to recommend the stock purchase, "there is no reason to believe that the defense will draw any extraordinary attention or divert the trial from the main issues"). Indeed, courts have "routinely rejected" the argument that different investment strategies among plaintiffs necessarily subject them to unique defenses such that they become atypical of the class. See Diamond Foods, 295 F.R.D. at 252 (quoting In re WorldCom Inc. Sec. Litig., 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003)).

Thus, while special circumstances may be relevant to assessing typicality, the record here does not suggest Plaintiffs possessed material non-public information or otherwise operated under materially distinct factual circumstances from other class members. See Hanon, 976 F.2d at 508-09. To the contrary, Plaintiffs' claims are generally "founded on the same alleged facts and legal theories as the claims of other Class members—i.e., the alleged artificial inflation and consequent market correction of the price of Intuitive's stock caused by Defendants' fraudulent public statements and omissions—and the injury Plaintiffs suffered is alleged to be the same as the injury suffered by the proposed Class as a whole." Mot. at 10. Accordingly, the court finds that Plaintiffs are sufficiently typical of the proposed class.

#### iv. Adequacy

**\*7** Finally, the fourth requirement under Rule 23(a), "adequacy," provides that class representatives must be capable of fairly and adequately protecting the interests of absent class members. Fed. R. Civ. P. 23(a)(4). The adequacy condition requires the court to evaluate issues on which the named plaintiffs and members of the proposed class might disagree. The two primary issues for the court to consider when evaluating the adequacy of representation are (1) whether the class representative(s) and counsel have any conflicts of interest with other class members; and (2) whether the named representative(s) and counsel will prosecute the action vigorously on behalf of the class. Staton, 327 F.3d at 954; Hanlon, 150 F.3d at 1020; see also In re Montage Technlogy, 2016 WL 1598666, at \*5. Plaintiffs contend that they are adequate class representatives because their "interests are not antagonistic to those of other Class members" and because they are represented by qualified, experienced counsel that is "fully capable of prosecuting this action vigorously on behalf of the Class." Mot. at 11-12.

Defendants challenge Plaintiffs' adequacy as representatives of the putative class on two grounds. First, Defendants argue that there is a "real danger" that Plaintiffs will become preoccupied and distracted from representing the interests of other class members as a result of the unique defenses they may face, as discussed with respect to typicality. Opp. at 7-8. And second, Defendants contend that Plaintiffs lack sufficient knowledge of the case to serve as representatives, stating that Plaintiffs are "completely uninformed and unconcerned with both the prosecution of this litigation and its underlying allegations." Id. at 8-9.

With respect to the unique defenses issue, the court finds that there is no evidence to suggest that Plaintiffs or their counsel have conflicts of interest that would prevent them from adequately representing other class members. Defendants' identify two statements from certain of Plaintiffs' investment advisors in which the advisors expressed some skepticism or disagreement with respect to the allegations of fraud against Intuitive.[4] See Opp. at 8. However, based on the court's review of the record, these limited statements indicating possible differences of opinion between Plaintiffs and two of their investment advisors does not suggest that Plaintiffs have a conflict of interest with, or otherwise could not adequately represent the interests of, the unnamed class members.

disagreed with Greater Penn's view of the fraud claims. Depo. of James Klein ("Klein Depo.") at 249:24-250:3, Dkt. No 139-10 Second, Defendants reference statements from Sands Capital—an investment manager for Hawaii ERS—downplaying the safety criticisms of the da Vinci. See Decl. of Philip Tassin ("Tassin Decl."), Ex. 39, Dkt. No. 134-20.

As to the argument that Plaintiffs' lacked adequate knowledge, the court finds Defendants' allegations to be overstated and without merit. "The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim [ ] and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case." Moeller v. Taco Bell Corp., 220 F.R.D. 604, 611 (N.D. Cal. 2004), amended on other grounds, 2012 WL 3070863 (N.D. Cal. 2012); see also Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 267 (N.D. Cal. 2011). To establish adequacy, class representatives generally need only to be "familiar with the basis for the suit and their responsibilities as lead plaintiffs" such that they can uphold their obligations to other class members. In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig., 270 F.R.D. 521, 531 (N.D. Cal. 2010). However, while this is a "modest" requirement, class certification many nevertheless be denied "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008).

**\*8** Defendants here argue that Greater Penn and Hawaii ERS demonstrated inadequate knowledge of the case to serve as class representatives and are "nothing more than the willing pawn[s] of counsel." Opp. at 8-11. In support of this position, Defendants highlight select answers from the deposition of Greater Penn's representative Jim Klein in an effort to show Mr. Klein's lack of knowledge or involvement as to certain aspects of the case. Id. at 10-11; see Depo. of James R. Klein ("Klein Depo.") at 126:2-127:3, 157:21-159:1, 259:2-4; 263:18-267:22, 269:12-20, Dkt. No. 139-10. Similarly with respect to Hawaii ERS, Defendants reference portions of the deposition testimony from Hawaii ERS witnesses Wesley Machida,[5] Vijoy Chattergy,[6] and Brian Aburano,[7] in which the witnesses were unable to answer certain questions about Hawaii ERS and/or the case. See id.

---

[4]  First, Defendants point to the deposition testimony of Greater Penn's corporate representative, James Klein, wherein he agreed that Brown Advisory—an investment manager for Greater Penn—may have

[5]  Mr. Machida was formerly employed as the Executive Director of Hawaii ERS and presently serves on its board of trustees. Depo. of Wesley Machida ("Machida Depo.") at 61:23-612:6; 70:13-16, Dkt. No 139-12. Mr.

Machida now works as the State Director of Finance. Id. at 61:23-24.

6    Mr. Chattergy is the chief investment officer for Hawaii ERS. Depo. of Vijoy Chattergy ("Chattergy Depo.") at 9:22-10:1, Dkt. No 139-14.

7    Mr. Aburano is a deputy attorney general assigned to Hawaii ERS to advise and represent it, and serves as its corporate designee for purposes of this litigation. Depo. of Brian Aburano ("Aburano Depo.") at 50:3-16; 148:17-19, Dkt. No. 139-8.

Defendants compare this testimony to Monster Worldwide, wherein the district court found the class representative to be inadequate where the corporate designee for the plaintiff-entity did not know (1) the name of the stocks at issue; (2) the name of the defendants in the case; (3) whether plaintiff ever owned any of the stock at issue; (4) whether an amended complaint had been filed; (5) whether he had ever seen a complaint in the action; and (6) whether defendant had moved to dismiss. 251 F.R.D. at 135. Defendants then focus in on Mr. Machida and Mr. Chattergy's lack of knowledge as to such factors. See Opp. at 8-10; Machida Depo. at 116:15-19; 118:20-22, 120:22-124:24, 136:5-24, 145:19-146:13; Chattergy Depo. at 98:10-15, 111:18-112:5, 194:3-195:24, 198:25-199:24. However, these cherry-picked excerpts highlighted by Defendants are largely irrelevant, if not misleading, to the present inquiry. While it is true that Mr. Machida and Mr. Chattergy demonstrate arguably insufficient knowledge to serve as the class representative, neither individual was selected as Hawaii ERS' "corporate designee"—or 30(b)(6) witness—for the purposes of this action.8 Rather, it is Mr. Aburano who Hawaii ERS identified as its corporate designee for the purposes of this litigation. See Aburano Depo. at 8:3-4, 10:19-21.

8    As Plaintiffs point out, during the class period, "Mr. Machida did not sit on the HIERS board or have a vote in board decisions and was not responsible for keeping up with the day to day of litigation. Mr. Machida was not designated as a 30(b)(6) witness and so there was no obligation that he be prepared to testify on behalf of [Hawaii ERS] as to all information reasonably available to the organization." Reply at 5. Similarly, "[w]hile Mr. Chattergy testified extensively as to the structure of the [Hawaii ERS] and its investment philosophy and policies, he was not knowledgeable about this litigation because he is not involved in its prosecution or supervision." Id.

In contrast to individual witnesses, corporate designees are responsible for the information related to the plaintiff-entity on a broader scale. "It is not expected that the designee have personal knowledge as to all relevant facts; however, the designee must become educated and gain the requested knowledge to the extent reasonably available." Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 486 (N.D. Cal. 2012) (recognizing that a Rule 30(b)(6) deposition represents the entity's knowledge and not that of the individual deponent). The witness should be capable of providing "complete, knowledgeable and binding answers on behalf of the corporation" about the topics noticed for deposition. Marker v. Union Fidelity Life Ins., 125 F.R.D. 121, 126 (M.D.N.C. 1989). Thus, the entity has a duty to educate its designees about matters beyond his or her personal knowledge.

*9 In support of Mr. Aburano and Mr. Klein's adequacy as class representatives, Plaintiffs identify specific deposition testimony wherein both Mr. Aburano and Mr. Klein correctly provide information that the court in Monster Worldwide identified relevant to its determination of adequacy. See 251 F.R.D. at 135. The Monster factors and Plaintiffs' corresponding deposition excerpts are summarized as follows:

| | Factor | Hawaii ERS | Greater Penn |
|---|---|---|---|
| 1 | Whether designee knew the name of the stock at issue | "Intuitive stock." Ex. 1, Aburano Depo. 35:24. | Discussing Fund's purchases of "Intuitive stock." Ex. 2, Klein Depo. 147:22-24. |
| 2 | Whether designee knew the name of defendant(s) | "Gary Guthart . . . Marshall Mohr, Lonnie Smith." Aburano Depo. 183:3-5. | Marshall Mohr…I think he was CFO…Gary Guthart…I believe he was CEO…And Lonnie Smith. I think former CEO and board of directors." Klein Depo. 260:10-19. |
| 3 | Whether designee knew if plaintiff(s) ever owned the stock at issue | Correctly identified "ERS's transactions in Intuitive Surgical securities during the class period." Aburano Depo. 158:24-25. | Q: "Do you know which of the 15 equity managers held Intuitive Surgical shares in 2012 and 2013 for Greater Penn?" A: "Yes…Brown Advisory." Klein Depo. 124:4-11 |
| 4 | Whether designee knew if an amended complaint was filed | "I reviewed drafts of the amended complaint." Aburano Depo. 60:12-15. | Q: "Is there now some doubt in your mind that you [reviewed the amended complaint]?" A: "No." Klein Depo. 272:9-11. |
| 5 | Whether designee had ever seen a complaint in the action | | |
| 6 | Whether designee knew if defendant(s) had ever moved to dismiss | Q: "Did you read the motion to dismiss papers?" A: "I did at one point." Q: "Did you read the motion to dismiss order?" A:"I… read the order partially granting and partially denying the motion to dismiss." Q: "Did you read the motion for reconsideration of that order?" A: "I did read it." Aburano Depo. 201:7-16. | "I've looked at a lot of documents, court filings." Klein Depo. 264:21-22. "[The Order on Defendants' motion to dismiss] might be one of the documents I've read through." Klein Depo. 264:14-17. "I believe I've seen [defendants' motion for reconsideration]." Klein Depo. 274:17-21. |

Based on the foregoing, Mr. Aburano and Mr. Klein demonstrated a sufficient level of knowledge about this case to satisfy the court that they are capable of protecting

the interests of the class in this litigation. Accordingly, the court concludes that Plaintiffs have met their burden to show that are adequate class representatives under Rule 23(a)(4).

### B. Rule 23(b)(3)—The Predominance Requirement

Having satisfied the Rule 23(a) requirements, the court now turns to Rule 23(b). Where, as here, a plaintiff seeks certification under Rule 23(b)(3), the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs contend the predominance requirement of Rule 23(b)(3) is satisfied here because Intuitive's alleged misconduct "affected all class members in the same manner," and therefore common question of law and fact prevail over questions affecting only individual class members. Mot. at 12; see Fed. R. Civ. P. 23(b)(3). Plaintiffs further contend the use of class action is superior in securities cases because it ensures "the just, speedy, and efficient determination of the class member's claims."[9]Mot. at 24.

[9]    Defendants do not challenge Plaintiffs' claim that superiority is satisfied in this case. See Opp. at 12-13.

**\*10** "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Halliburton I"). Here, Plaintiffs bring claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.[10] To establish liability and recover damages under Section 10(b) and 10b–5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen, 133 S. Ct. at 1191-92; Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1061 (9th Cir. 2008). However, the Supreme Court has ruled that loss causation and materiality need not be proven at the certification stage. See Halliburton I, 563 U.S. at 813 (it is not required to "show loss causation as a condition of obtaining class certification"); see also Amgen, 133 S. Ct. at 1197 (securities fraud plaintiffs need not prove materiality at

the class certification stage, because "the question of materiality is common to the class, and [ ] a failure of proof on that issue would not result in questions affecting only individual members."). Defendants challenge Plaintiffs' ability to satisfy predominance as to reliance and damages. See Opp. at 12-13.

[10]    Plaintiffs also assert claims against the individually named defendants in this case for violations of sections 20(a) and 20A Securities Exchange Act of 1934 (15 U.S.C. § 78t, t-1). However, Defendants do not appear to advance any additional argument as to predominance that is specific to these claims, nor does the court find that there is any reason to address them independently at this time.

### i. Presumption of Reliance

Courts have long recognized that without a classwide presumption of reliance in securities fraud cases, Rule 23(b) (3)'s predominance requirement "would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation." Dukes, 131 S.Ct. at 2552 n. 6; see also Halliburton, 563 U.S. at 810 (explaining that "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would prevent such plaintiffs from proceeding with a class action, since individual issues would overwhelm the common ones.") (citing Basic, 485 U.S. at 242). Accordingly, the Supreme Court has identified two avenues through which plaintiffs may invoke a rebuttable presumption of reliance: the "fraud-on-the-market" presumption, as outlined in Basic Inc. v. Levinson, and the Affiliated Ute presumption, as set forth in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-154 (1972). Plaintiffs contend they are entitled to a presumption of reliance under both theories.[11]

[11]    Because the court finds that Plaintiffs are entitled to a presumption of reliance under Basic such that the class may be certified, it is unnecessary for the court to reach the question of whether Plaintiffs are similarly entitled to such a presumption under Affiliated Ute.

Basic's "fraud on the market" theory provides a rebuttable presumption that because "the market price of shares traded on well-developed markets reflects all publicly available information," including any misrepresentations, "all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements." Basic, 485 U.S. at 246-7; Dukes, 131

S.Ct. at 2552 n. 6; see also Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2404 (2014) ("Halliburton II") (reaffirming Basic's presumption of reliance). To invoke this presumption at the class certification stage, plaintiff must show: (1) the alleged misrepresentations were publicly known, (2) Intuitive's stock traded in an efficient market, and (3) "the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." Halliburton I, 131 S. Ct. at 2185 (quoting Basic, 485 U.S. at 248, n. 27). However, the presumption may be rebutted where a defendant offers evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248; see Halliburton II, 134 S. Ct. at 2415-16.

**\*11** Plaintiffs have made a preliminary showing that they are entitled to the fraud-on-the-market presumption here.[12] Defendants do not challenge Plaintiffs' initial satisfaction of the elements required to invoke the presumption, but rather contend that the presumption is rebutted because individual questions of knowledge predominate and because "the alleged misrepresentations and omissions had no impact on the stock price." Opp. at 17.

[12]    Specifically, Plaintiffs allege that Intuitive "artificially inflated or maintained its stock price through *public* misrepresentations and omissions, that the stock is commonly traded on the NASDAQ, and that class members bought Intuitive common stock during the class period and suffered losses when the truth was disclosed." Mot. at 17. Plaintiffs also offer further analysis of market efficiency pursuant to the five factors set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), as well as four of the additional factors used by some courts in the Ninth Circuit. See Mot. at 18-22; Binder v. Gillespie, 184 F.3d 1059, 1065 (9th Cir. 1999) (quoting Cammer, 711 F. Supp. at 1286-87).

#### a. Individualized Questions of Knowledge

First, Defendants assert that individualized questions of knowledge will predominate over common questions because the allegedly "omitted" information at issue here was publicly available during the class period. Opp. at 13. That is, Defendants contend that "a substantial number of class members had actual knowledge of the allegedly omitted information, making reliance impossible to prove classwide." Opp. at 13. Specifically, Defendants identify four means through which they argue class members could have accessed the information Plaintiffs allege was

fraudulently concealed: (1) the October 2011 Letters; (2) the Medical Device Reports; (3) the Product Liability Lawsuits; and (4) a January 2012 Patent Application. Defendants maintain that this theory is distinct from a "truth-on-the-market" defense, which they acknowledge is improper to consider at the class certification stage. See Amgen, 133 S. Ct. at 1194-95. Defendants explain that a truth-on-the-market defense precludes any investor from recovering on the grounds that all investors necessarily knew of the allegedly omitted information, while Defendants here argue "only that some class members—not necessarily all class members—likely knew the truth and that consequently the court cannot presume that the whole class was ignorant of, and relied upon, the alleged omission." Opp. at 14, n. 6.

#### 1. The October 2011 "Customer Letters" or "Secret Recall Letters"

In October 2011, Defendants sent over 2,000 letters to various purchasers of da Vinci—namely, hospitals—providing clarifications and additional instruction on how to use the da Vinci tip covers safely. See Opp. at 14; SACC ¶¶ 60-64. Plaintiffs characterize the Letters as "secret recalls," accusing Defendants of trying to indirectly correct for the safety issues without having to suffer the fallout of taking responsibility directly. See SACC ¶¶ 60-64. In any event, these letters arguably alluded to or implicated some of the safety concerns at issue in this lawsuit. As a result, Defendants argue that some members of the class were made aware of da Vinci's safety problems via the Letters, thus resulting in individualized questions of knowledge. Opp. at 14. However, the court agrees with Plaintiffs that there is a significant difference between sending an instructional letter to certain entities regarding a product, and publicly disclosing critical safety issues posed by the product. See Reply at 11.

#### 2. The Medical Device Reports (MDRs)

**\*12** Next, Defendants claim that MDRs are publicly available in the FDA's database, and thus the allegedly unreported or misclassified reports were actually uploaded and accessible to the public long before the March 2013 press release announcing the changes to Defendants' MDR reporting procedures. Accordingly, Defendants argue that "anyone in the proposed class could have known about the increase in MDRs." Opp. at

15.

Defendants' argument overlooks the substance of Plaintiffs' allegations on this particular issue. Plaintiffs assert that "thousands of MDRs were improperly kept secret by Defendants failing to report them at all, and even those that were filed [in the FDA's] database were misclassified as 'other' instead of 'serious injury,' thereby misleading the market as to da Vinci's safety. Reply at 11-12; SACC ¶¶ 7, 86, 96. Accordingly, the fact that some MDRs were publicly available is not inconsistent with Plaintiffs allegations that other MDRs were not, nor is it evidence that class members had knowledge of the information Plaintiffs actually allege was concealed.

### 3. The Products Liability Lawsuits

Defendants argue that the nature and number of product liability lawsuits against Intuitive was no secret, and therefore class members would have been aware of the safety issues Defendants purportedly concealed. However, this argument again excludes critical pieces of Plaintiffs' allegations regarding the extent of Defendants' omissions. Specifically, Plaintiffs accuse Defendants of having entered into "secret tolling agreements" with individuals who suffered injuries as a result of the da Vinci. SACC ¶¶ 6, 79-80; Reply at 12-13. Plaintiffs allege that Intuitive is currently engaged in litigation regarding insurance coverage for over a thousand claims made before and during the class period, where the insurers claim they had not been informed of the agreements, and had they been so informed, they would not have issued the policy. Id. Accordingly, the court agrees with Plaintiffs that these lawsuits, while public, are not an accurate or complete source of the relevant information pertaining to da Vinci's safety that Plaintiffs claim was omitted.

### 4. The Patent Application

Finally, Defendants claim that information regarding the defective tip cover was publically available and known to some class members because Defendants filed a patent application for a redesigned tip cover on January 12, 2012—before the proposed class period. This argument lacks merit. First, as Plaintiffs point out, patent updates are routine, and the mere fact that Defendants filed an application for a redesigned tip cover does not actually communicate relevant safety information regarding the

product to the public. See Reply at 12. And second, it is highly unlikely that a patent's technical language would be construed publicly as a "revelation" of the safety concerns at issue or a disclosure regarding the product's defective design. See id.

* * *

In sum, while Defendants may be correct that certain individuals or entities had access to pieces of information Plaintiffs allege was fraudulently concealed, the court is not convinced that individual questions as to these highly specific and limited sources of information will predominate over the larger questions of reliance that remain common to the class. For this reason, and for the reasons explained above, Defendants fail to rebut the presumption of reliance.

### b. Price Impact

**\*13** Defendants' second argument seeks to rebut Plaintiffs' presumption of reliance on the grounds that the misrepresentations and corrective disclosures had no impact on Intuitive's stock price. Opp. at 17-18. In Halliburton II, the Court explained that price impact is at the core of Basic's fundamental premise that a misrepresentation or omission will be reflected by the market price at the time the statement is made. Halliburton II, 134 S. Ct. at 2416. For that reason, if a defendant can demonstrate that a misrepresentation or a corrective disclosure did not actually impact the price of the stock in an efficient market, the "basis for finding that the fraud had been transmitted through market price would be gone" and the suit should not proceed as a class action. Id.; Basic, 485 U.S. at 248. Accordingly, Halliburton II confirmed that a defendant may attempt to rebut the Basic presumption at the class certification stage with evidence showing a lack of price impact.

Based on the ruling from Halliburton II, on remand, the district court for the Northern District of Texas conducted an extensive assessment of the evidence of price impact submitted by both parties. See Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 263 (N.D. Tex. 2015) ("Halliburton Tex."). The evidence submitted by the respective parties primarily consisted of reports from competing experts, both of whom had "developed a market model and performed an event study to determine whether there was statistically significant price movement

on the dates of the alleged misrepresentations and corrective disclosures." Id. After a detailed evaluation of the merits of each expert's methodology and conclusions, the district court concluded that Halliburton's expert had demonstrated lack of price impact on all but one of the corrective disclosure dates. Id. at 270, 271 272, 274, 276, 280. The court therefore granted class certification, but only as to the single corrective disclosure date where Halliburton had failed to rebut price impact. See id. at 280.

As was presented to the district court in Halliburton Tex, the parties to the instant action have offered competing evidence from their respective experts on the issue of price impact. Thus, this court is now similarly tasked with evaluating whether Defendants have rebutted the presumption of reliance under a price impact theory as to each of the corrective disclosures alleged here. In considering this evidence, the court evaluates not only the admissibility but also the persuasiveness of the expert reports. See Ellis, 657 F.3d at 982; In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244, 255 (D.C. Cir. 2013).

As a preliminary matter, the court finds that Defendants bear both the burden of production and the burden of persuasion on the issue of price impact. See Halliburton Tex., 209 F.R.D. at 260. That is, where Plaintiffs have satisfied the requirements entitling them to the initial presumption of reliance, in order to rebut this presumption Defendants must convince the court that their evidence is more probative of price impact than the evidence offered by Plaintiffs. See id. In conducting this analysis, the court will focus on changes in the stock price with respect to the corrective disclosure dates, as opposed to the misrepresentations alleged, because this method more accurately captures the impact, if any, of a material misrepresentation or omission.[13] While Defendants also challenge the seven dates Plaintiffs allege affirmative misrepresentations took place on the grounds that there was "no positive price impact," this argument is unpersuasive. See Opp. at 17. The lack of a statistically significant price increase following an alleged misrepresentation does not indicate lack of price impact. See Hatamian, 2016 WL 1042502, at *7 ("Price impact in securities fraud cases is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed."); Halliburton II, 134, S. Ct. at 2414.

[13]    As explained by the district court on remand from Halliburton II,
    Fraud on the market securities litigation typically focuses on a price change at the time of a corrective disclosure. If a particular disclosure causes the stock

price to decline at the time of disclosure, then the misrepresentation must have made the price higher than it would have otherwise been without the misrepresentation. Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth. Thus, the misrepresentation will not have changed the share price at the time it was made. Halliburton Tex., 309 F.R.D. at 262.

**\*14** With that, the court now turns to the five corrective disclosure dates alleged by Plaintiffs here: February 28, 2013; March 5, 2013; April 18-19, 2013; July 8, 2013; and July 18, 2013. "To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means 'one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price.' "[14] Halliburton Tex., 309 F.R.D. at 262 (citing Merrit B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Price Impact*, 70 Bus. Law 437, 442 n. 17 (2014–15)). Both parties have submitted expert reports as evidence in support of their arguments for and against price impact. Plaintiffs' expert, Professor Chad Coffman, concludes that statistically significant negative price changes occurred on each of the five corrective disclosure dates. Reply at 13-14, Dkt. No. 139-3; Expert Rebuttal Report of Chad Coffman, CFA ("Coffman Rebuttal") ¶ 6, Dkt. No 141-13. Conversely, Defendants' expert Dr. Kenneth M. Lehn concludes that there were no statistically significant price decreases on the first three dates (February 28, March 5, and April 19), and the statistically significant decreases on the last two dates (July 8 and July 18) are irrelevant and should not be considered by the court. Opp. at 18-19; Expert Report of Kenneth M. Lehn ("Lehn Report") ¶¶ 43-65, Dkt. No. 135-39. Each disclosure will be addressed briefly below.

[14]    An event study is a regression analysis that seeks to show how the market price of a company's stock tends to respond to pertinent publicly reported events. Halliburton II, 134 S. Ct. at 2415.

### 1. February 28, 2013—Bloomberg's "Safety Probe" Article

On February 28, 2013, *Bloomberg News* reported that a U.S. regulator (later identified as the FDA in subsequent

articles) had initiated a "safety probe" of the da Vinci surgical system. SACC ¶ 10, 113, 216; Lehn Report at ¶ 9; Coffman Rebuttal ¶¶ 31-32. The article was published approximately five minutes before the stock market closed. SACC ¶ 10, 113, 216. Within those five minutes, Intuitive's stock price dropped by approximately 11 percent, with the stock value declining from about $573 to about $510 per share. Id. at 10.

Because the article was released only five minutes before the market closed on February 28, 2013, Defendants' expert used a two-day window to conduct his event study, "consisting of both February 28, 2013 and March 1, 2013." Lehn Report ¶ 44. Lehn's event study did not find a statistically significant change in stock price. Id.

The court finds that it was inappropriate to use a two-day window to calculate price impact here. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." Halliburton Tex., 309 F.R.D. at 269. Absent unusual circumstances, it is likely that the market would have therefore quickly incorporated the information contained in the *Bloomberg* article into Inuitive's stock price. See id.; Coffman Rebuttal ¶¶ 35-38. There is also no dispute that in the minutes following the release of the article, stock prices dropped by roughly 11 percent. Lehn reaches a different conclusion only when the event window is expanded to two full days. See Lehn Report ¶ 44. Moreover, as Coffman points out, "[e]ven if one accepts Dr. Lehn's position that the partial rebound on March 1, 2013 should be considered, a proper 'event window' to analyze this event should run from just before the release of the news at 3:55pm on February 28, 2013, through market close on the next trading day, March 1, 2013," rather than incorporating "almost a full day before the event occurs." Coffman Rebuttal ¶¶ 36-37. The court agrees with Coffman.

Based on the foregoing, the court finds that the substantial decline in Intuitive's stock price and Coffman's event study establish price impact as to the February 28, 2013 disclosure, and Defendants have not met their burden to show otherwise. To the extent that Defendants advance an additional argument in a footnote that the information revealed by the disclosure was unrelated to any alleged misrepresentation, this argument is neither convincing nor adequately supported. See Opp. at 19 n.10. Accordingly, Plaintiffs are entitled to a presumption of reliance with respect to the February 28 corrective disclosure.

### 2. March 5, 2013—Bloomberg's "Robosurgery Death Reports" Article

**\*15** On March 5, 2013, another *Bloomberg* article entitled "Robosurgery Suits Detail Injuries as Death Reports Rise" was published, writing that "incident reports sent to U.S. regulators linked the da Vinci to at least 70 deaths since 2009." SACC ¶ 217. The parties disagree about exactly when the article was released, with Plaintiffs asserting that it was published in the early morning of March 5, 2013, while Defendants contend the news broke after the market closed that day. Compare Coffman Rebuttal ¶ 55, Dkt. No. 141-13, with Lehn Report ¶ 10, Dkt. No. 135-39. Based on Lehn's conclusion that the article was published after market close, he contends it is "appropriate to conduct an event study of Intuitive's stock price on March 6, 2013" as opposed to March 5. Lehn Report ¶¶ 52 n.90, 53.

While the record supports the contention that a version of the article was indeed released after the market closed, Plaintiffs offer compelling evidence to suggest that an earlier version of the article was released the morning of March 5, 2013. Plaintiffs cite an analyst's report released prior to the market open on March 5, 2013 that can be construed as referencing or alluding to the *Bloomberg* article and the information it reported. Coffman Rebuttal ¶ 58 n. 73 (citing "ISRG Volatility is Potential Boon to Buyers. The Chance of da Vinci Having Safety Issues is Remote," Janney Capital Markets, Mar. 5, 2013, Ex. 23, Dkt. No. 135-27). The analyst report stated: "ISRG shares could be under pressure this morning for the second straight day as business journal articles continue to harp on potential safety concerns on da Vinci." Id. Plaintiffs also submit a purported copy of the earlier version of the article as Appendix B to the Coffman Rebuttal (Dkt. No. 141-13 at 62-67). Defendants do not offer any such evidence on this issue.

Based on this record, the court finds that March 5, 2013 is the more appropriate date on which to perform the regression analysis. Because Lehn does not discuss his event study for the date of March 5 in his Report, Defendants fail to rebut price impact for this corrective disclosure.

### 3. April 18-April 19, 2013—First Quarter 2013 Financial Results

On April 18, 2013, Intuitive reported its first quarter financial results for 2013 after the market closed. SACC ¶ 218. Plaintiffs allege that "Intuitive reported procedure growth of 18%, below consensus expectations of 21%, and guided total 2013 procedure growth to the lower end of its range." Id. "Intuitive's common stock fell by $8.62,

approximately 3%, from a closing price of $493.37 on April 18, 2013 to a closing price of $484.75 on April 19." Id. ¶ 218(c).

The court finds a lack of price impact in connection with the release of Intuitive's financial results between April 18th and April 19th 2013. First, neither Lehn nor Coffman found a statistically significant price impact at the 95% confidence level for this date. Coffman Rebuttal ¶ 6(iii)(a). Rather, Coffman's analysis resulted in a price impact at a 90% confidence level. Id.; Reply at 14. Although Plaintiffs argue that price impact at a 90% confidence level is a statistically significant, the district court in Halliburton Tex adopted 95% confidence level as the threshold requirement and this court finds no reason to deviate here. See 309 F.R.D. at 270.

Second, there is a lack of clarity regarding the source of information and the regression analysis conducted as to this disclosure. In addition to disclosing quarterly financial information, Plaintiffs also allege that Intuitive's Senior Vice President Marshall L. Mohr made a false or misleading statement on April 18, 2013. SACC ¶ 32. As Lehn points out, Coffman "does not provide a reliable methodology for distinguishing the effect of the alleged corrective disclosure from the effect of the alleged misrepresentation on April 18, 2013." Lehn Report ¶ 27(d). It is also not entirely clear from the parties' papers whether Coffman and Lehn used April 18th, April 19th, or a two-day window including both days for their respective event studies regarding this disclosure. Compare Opp. at 19, Dkt. No. 135, with Reply at 14, Dkt. No. 139-3.

**\*16** Finally, even if the court accepted the 90% confidence level, the court is not convinced the quarterly financial results were a corrective disclosure at all. As discussed below in connection with the release of Intuitive's second quarter financial results, financial statements are not corrective of misrepresentations related to safety, and the court dismissed all other categories of affirmative misstatements Plaintiffs previously plead. See Order on MTD, 15-16, Dkt. No. 83. While Defendants only raise this argument in connection with July's financial disclosures, the court finds it equally applicable here. Accordingly, Plaintiffs' presumption of reliance for April 18-April 19, 2013 is rebutted.

### 4. July 8 Press Release & July 18 Second Quarter Financial Results

On July 8, 2013, Intuitive issued a press release "pre-announcing" its second quarter financial results,

which Plaintiffs characterize as "dismal" and falling "well below expectations." SACC ¶¶ 130, 219. On July 18, 2013, after market-close, Intuitive then officially released its "2Q 2013" financial results, which were "consistent with its July 8, 2013 pre-announcement" prognosis. Id. ¶ 220. Both experts found statistically significant declines in Intuitive's stock price on July 8, 2013 and July 18, 2013. See Coffman Rebuttal ¶¶ 74-78, 84-95; Lehn Report ¶¶ 66-74.

While Defendants concede that there was a decline in stock price, they argue that the July financial statements should not be considered "corrective disclosures" because this kind of financial information is unrelated to allegations of da Vinci's safety problems. Plaintiffs argue that the July 8 press release and the July 18 financial report disclosed "new" information related to Intuitive's financial situation, which makes the statements corrective. SACC ¶¶ 130, 219. Plaintiffs are mistaken. As Defendants point out, the court dismissed allegations that were based on Intuitive's financial statements because such statements were "literally true," and therefore unlikely to "mislead a reasonable investor as to the future state of Intuitive's market success." Order on MTD at 15-16; Opp. at 19. Consequently, this action contains no alleged misrepresentations related to Intuitive's financial condition that a remedial disclosure could correct. Based on the foregoing, Defendants have successfully rebutted the presumption as to the release of financial information on July 8, 2013 and July 18, 2013.

### 5. July 18, 2013—FDA Warning Letter

However, also on July 18, 2013, Intuitive publically released a Warning Letter it had received two days earlier from the FDA. Id. ¶ 220. As discussed above, both experts found a statistically significant decline in Intuitive's stock price in connection with this disclosure. See Coffman Rebuttal ¶¶ 84-95; Lehn Report ¶¶ 66-74.

Intuitive was given the Warning Letter following an "onsite audit" conducted by the FDA to monitor issues it had previously identified in a Form 483. See SACC ¶ 220; Coffman Rebuttal ¶¶ 84-89. The Form 483 had been provided to Intuitive on June 25, 2013. Id. Defendants' argument that "the Warning Letter revealed nothing new to the market that was not disclosed previously in the Form 483" is unpersuasive. As Coffman explains, "Form 483 is used to document a problem that is still being investigated and not necessarily part of a company's permanent record, whereas a warning letter is an indication that the company reply to the Form 483 has

been insufficient to explain or solve the issues in question." Coffman Rebuttal ¶ 87. According to Coffman, the FDA only issues a warning "after Form 483 is issued *and* the inspector completes the Establishment Inspection Report *and* an FDA official ... reviews the Form 483 and believes that a serious violation may exist." Id. As a result, issuance of a Warning Letter strongly suggests that it is the FDA's position that the corrective actions undertaken by the receiver have not been adequate. See Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 948 (N.D. Cal. 2014).

**\*17** The existence and implications of the Warning Letter absolutely constitutes "new" information. Moreover, the information is also directly relevant to alleged misrepresentations regarding safety. Accordingly, the court concludes that there is compelling evidence of price impact in connection with the July 18, 2013 disclosure of the FDA Warning Letter. Based on this finding, the court also rejects Defendants' argument that if any class is certified, the class period must end no later than June 25, 2013. Opp. at 23. The class period shall extend through July 18, 2013, as proposed.

### ii. Damages Methodology

In a final attempt to undermine Plaintiffs' satisfaction of the predominance requirement, Defendants, relying on Comcast, argue that Plaintiffs fail to present a classwide method for computing damages, and thus inquiries as to class members' individual damages assessments will predominate in contravention Rule 23(b)(3). Opp. at 21.

While the court agrees that Comcast supports the general notion that damages questions should be considered when weighing issues of predominance, Defendants' reading of Comcast is too broad. The Ninth Circuit has construed Comcast as requiring only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." Levya v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013) (citing Comcast, 133 S.Ct. at 1435); accord Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015) ("the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance"); In re Deepwater Horizon, 739 F.3d 790, 817 (5th Cir. 2014) (calling the defendants' suggestion that class certification should be denied based on a failure to show classwide damages "a significant distortion of Comcast" that had already been rejected by several circuits). Courts in this district have similarly declined to adopt such an overly broad interpretation of

Comcast. See, e.g., Hatamian, 2016 WL 1042502, at \*8; Diamond Foods, 295 F.R.D. at 251.

Plaintiffs state that they will use the "out-of-pocket" methodology, which is the standard approach used for calculating damages in Section 10(b) securities cases. Coffman Rebuttal ¶¶ 96-109. Coffman explains that the "out-of-pocket" method

> measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class wide

Id. ¶ 96. This method is widely considered "an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." Diamond Foods, 295 F.R.D. at 251; see id.

Based on ample legal precedent, as well as Coffman's report explaining the methodology Plaintiffs represent that they will use to calculate classwide damages, the court finds that Plaintiffs have identified a satisfactory methodology for calculating damages here. Plaintiffs demonstrate that damages are capable of being "feasibly and efficiently calculated" on a classwide basis "once the common liability questions are adjudicated." See Levya, 716 F.3d at 514; Hatamian, 2016 WL 1042502, at \*9.

### IV. CONCLUSION

Based on the foregoing, the court finds, concludes, and orders as follows:

1. Plaintiffs' Motion for Class Certification is GRANTED.

2. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), this action is found to be appropriate for class certification. The class is defined as follows:

> **\*18** All persons or entities who purchased or acquired the publicly traded common stock of Intuitive Surgical, Inc. during the period from February 6, 2012 through July 18, 2013, inclusive, and who were damaged thereby. Excluded from the Class are (i) all Defendants; (ii) members of the immediate families of individual defendants Guthart, Mohr, and Smith; (iii) any subsidiaries and affiliates of Defendants; (iv) any person who is or was an officer or director of Intuitive

or any of Intuitive's subsidiaries of affiliates; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) Intuitive's employee retirement and benefit plan(s); and (vii) the legal representatives, heirs, successors and assigns of any such excluded person or entity. SACC ¶ 248.

3. Lead plaintiffs Employees' Retirement System of the State of Hawaii and Greater Pennsylvania Carpenters' Pension Fund are hereby appointed as Class Representatives.

4. The law firm of Labaton Sucharow LLP shall be appointed Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7425926

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.