# Case No. 13

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

KeyCite citing references available

2023 WL 5415315
United States District Court, N.D. Texas, Dallas
Division.

Pedro RAMIREZ, Jr., Individually and on
Behalf of All Others Similarly Situated,
Plaintiff,
v.
EXXON MOBIL CORPORATION, Rex W.
Tillerson, Andrew P. Swiger, Jeffrey J.
Woodbury, and David S. Rosenthal,
Defendants.

Civil Action No. 3:16-CV-03111-K
|
Signed August 21, 2023

**Attorneys and Law Firms**

Joe Kendall, Kendall Law Group PLLC, Dallas, TX, Balon B. Bradley, Balon B. Bradley Law Firm, Dallas, TX, Darren J. Robbins, Pro Hac Vice, Erika Oliver, Pro Hac Vice, Nathan R. Lindell, Pro Hac Vice, Patrick Coughlin, Sara Bierl Polychron, Pro Hac Vice, Scott H. Saham, Pro Hac Vice, X. Jay Alvarez, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Jamie Jean Gilmore, Scott Gilmore Thompson PLLC, Dallas, TX, Jeffrey S. Abraham, Abraham Fruchter & Twersky LLP, New York, NY, John C. Herman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Atlanta, GA, Mary K. Blasy, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiff.

Nina Cortell, Haynes & Boone LLP, Dallas, TX, Daniel Kramer, Pro Hac Vice, Daniel Toal, Pro Hac Vice, Gregory F. Laufer, Pro Hac Vice, Jonathan Hurwitz, Pro Hac Vice, Theodore V. Wells, Pro Hac Vice, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, Justin Anderson, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Matthew Stachel, Pro Hac Vice, Paul Weiss Rifkin Wharton & Garrison LLP, Wilmington, DE, Ralph H. Duggins, Cantey Hanger LLP, Fort Worth, TX, for Defendants Exxon Mobil Corporation, Andrew P. Swiger, Jeffrey J. Woodbury.

D Patrick Long, Squire Patton Boggs, Dallas, TX, for Defendant Rex W. Tillerson.

Daniel Kramer, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY, Justin Anderson, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Matthew Stachel, Pro Hac Vice, Paul Weiss Rifkin Wharton & Garrison LLP, Wilmington, DE, for Defendant David S. Rosenthal.

**MEMORANDUM OPINION AND ORDER**

ED KINKEADE, UNITED STATES DISTRICT JUDGE

**TABLE OF CONTENTS**

1. INTRODUCTION...——

2. BACKGROUND...——
2.1. Exxon Mobil's Canadian Bitumen Operations, Including Kearl...——

2.2. Exxon Mobil's RMDG Operations...——

2.3. Proxy Costs of Carbon...——

2.4. The Alleged Corrective Disclosures...——

    2.4.1. The First Corrective Disclosure: The Guardian Article (November 9, 2015)...——

    2.4.2. The Second Corrective Disclosure: *The Los Angeles Times* Article (January 20, 2016)...——

    2.4.3. The Third Corrective Disclosure: Second Quarter Earnings Announcement for 2016 (July 29, 2016)...——

    2.4.4. The Fourth Corrective Disclosure: *The Washington Post* Op-Ed (August 10, 2016)...——

    2.4.5. The Fifth Corrective Disclosure: Third Quarter Earnings (October 28, 2016)...——

    2.4.6. The Sixth Corrective Disclosure: UBS Downgrade (January 18, 2017)...——

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

2.4.7. The Seventh Corrective Disclosure: Fourth Quarter Earnings Announcement for 2016 (January 31, 2017)...——

3. LEGAL STANDARDS...——

4. ANALYSIS...——
4.1. Rule 23(a)...——

4.1.1. Numerosity...——

4.1.2. Commonality...——

4.1.3. Typicality...——

4.1.4. Adequacy...——

4.2. Rule 23(b)(3)...——

4.2.1. Predominance...——

4.2.1.1. Fraud-on-the-Market Theory and the Presumption of Reliance...——

4.2.1.1.1. Rebutting Basic's Presumption of Reliance: Price Impact...——

4.2.1.1.2. The Parties' Event Studies...——

4.2.1.1.3. Event Study Windows...——

4.2.1.1.4. The Corrective Disclosures Analyzed...——

4.2.1.1.4.1. November 9, 2015: *The Guardian* Article...——

4.2.1.1.4.2. January 20, 2016: *The Los Angeles Times* Article...——

4.2.1.1.4.3. July 29, 2016: Second Quarter Earnings Announcement for 2016...——

4.2.1.1.4.4. August 10, 2016: *The Washington Post* Op-Ed...——

4.2.1.1.4.5. October 28, 2016: Third Quarter Earnings Announcement for 2016...——

4.2.1.1.4.6. January 18, 2017: UBS Downgrade...——

4.2.1.1.4.7. January 31, 2017: Fourth Quarter Earnings Announcement for 2016...——

4.2.1.2. Omissions-Based Presumption of

Reliance...——

4.2.2. Superiority...——

5. CLASS DEFINITION AND CONCLUSION...——

Before the Court are Lead Plaintiff's Motion for Class Certification, Doc. No. 86, Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification (collectively, the "Motion" or the "Motion for Class Certification"), Doc. No. 87, Defendants' Corrected Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification (the "Response"), Doc. No. 115, and Lead Plaintiff's Reply in Further Support of Its Motion for Class Certification (the "Reply"), Doc. No. 104. Having carefully considered the Motion, the Response, the Reply, the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), Doc. No. 36, and the applicable law, the Court **GRANTS in part** and **DENIES in part** the Motion.

**1. INTRODUCTION**

Lead Plaintiff Greater Pennsylvania Carpenters Fund (the "Fund" or "Plaintiff") brings this putative class action against Defendants Exxon Mobil Corporation ("Exxon Mobil" or the "Company"), Rex. W. Tillerson ("Tillerson"), Andrew P. Swiger ("Swiger"), Jeffrey J. Woodbury ("Woodbury"), and David S. Rosenthal ("Rosenthal") (collectively, "Defendants"), alleging violations of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(j)(b), and Securities and Exchange Commission ("SEC") Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Doc. No. 36. In its Complaint, Plaintiff alleges that Defendants violated § 10(b) of Exchange Act and SEC Rule 10(b)-5 by, among other things: (1) misleading investors about Exxon Mobil's investment and asset valuation processes for proxy costs of carbon; (2) failing to properly account for and disclose losses and requisite reserve revisions related to Exxon Mobil's Kearl Lake Operations ("Kearl" or the "Kearl Operation(s)"); and (3) failing to properly account for and disclose losses and take impairments related to Exxon Mobil's Rocky Mountain Dry Gas Operations ("RMDG" or the "RMDG Operation(s)"). *E.g.*, Doc. No. 36 at 174-78. Plaintiff also claims via § 20(a) of the Exchange Act, 15 U.S.C. § 78(t)(a), that Tillerson, Swiger, Woodbury, and Rosenthal (the "Individual Defendants") are liable as control persons of Exxon Mobil. *E.g.*, Doc. No. 36 at 178-79.

**\*2** Plaintiff moves the Court to certify the following class:

> All persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between March 31, 2014 and January 30, 2017, inclusive, and were damaged thereby.

*E.g.*, Doc. No. 87 at 8. Plaintiff seeks appointment as class representative, and asks the Court to appoint lead counsel in this case, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as class counsel. Doc. No. 86; Doc. No. 86-1; Doc. No. 87.

## 2. BACKGROUND

Exxon Mobil is a multinational oil and gas company whose stock trades on the New York Stock Exchange ("NYSE") under the ticker "XOM." Doc. No. 36 ¶ 34. Plaintiff is a pension fund based in Pittsburgh, Pennsylvania. *Id.* ¶ 33. Plaintiff alleges that Defendants have violated the securities laws by misrepresenting Exxon Mobil's operations and financial health. Defendants' alleged misrepresentations fall into roughly three categories: (1) misrepresentations about Exxon Mobil's Canadian Bitumen Operations, including Kearl; (2) misrepresentations about Exxon Mobil's RMDG Operations; and (3) misrepresentations about Exxon Mobil's proxy costs of carbon. *See* Doc. No. 87 at 10-11; Doc. No. 104 at 11. The Court briefly discusses each category and the corresponding misstatements as alleged in the Complaint below.

### 2.1. Exxon Mobil's Canadian Bitumen Operations, Including Kearl

Exxon Mobil controls two separate upstream bitumen operations in Alberta, Canada: the Kearl Operation and the Cold Lake Operation (collectively, the "Canadian Bitumen Operations"). Doc. No. 36 ¶ 96. Kearl is a joint venture between Exxon Mobil's majority-owned and fully consolidated subsidiary, Imperial Oil Limited ("Imperial"), and Exxon Mobil's wholly-owned subsidiary, ExxonMobil Canada. *Id.* Imperial owns a 70.96% stake in Kearl, with the remaining 29.04% being held by ExxonMobil Canada. *Id.* ¶ 100. The Cold Lake Operation is entirely owned by Imperial. *Id.* ¶ 96.

In its bitumen operations, Exxon Mobil extracts raw oil from bitumen, a thick, tar-like substance found in loose sand and clay deposits. *E.g., id.* ¶¶ 92, 96, 100. The process is complex and costly. *E.g., id.* ¶¶ 40, 44. Exxon Mobil's multibillion-dollar Kearl Operation is a prime example, comprising four massive open-pit mines where Exxon Mobil and Imperial strip-mine bitumen from the earth's surface. *E.g., id.* ¶¶ 92, 96, 100. Unlike conventional light crude oil that can be easily pumped from the ground and refined, bitumen requires extensive processing before it can be transformed into useable fuel. *E.g., id.* ¶¶ 92, 95. As a result of these higher production costs, among other factors, extracting oil from bitumen offers lower profit margins than pumping light crude oil. *E.g., id.* ¶ 95.

The success of bitumen projects like the Kearl Operation depends on the market price for oil. *See id.* ¶¶ 2, 56, 156. If oil prices drop too low, the costs associated with developing and running a project may exceed revenues. *See id.* ¶¶ 56, 63.

Investors and regulators care about whether oil and gas companies record their costs accurately. *See id.* ¶ 73. Regulators require oil and gas operators, including Exxon Mobil, to capitalize a considerable portion of the costs related to acquiring, exploring, and developing oil and gas projects. *Id.* ¶¶ 45, 55. A capitalized cost is an expense that a company treats as a long-term asset investment rather than an immediate expense; it is recognized on the balance sheet as an asset and is gradually expensed over its useful life through depreciation or amortization. *Id.* ¶¶ 45, 325. An asset's "carrying value" refers to the cost of the asset less depreciation or amortization. *Id.* ¶ 325. A capitalized asset is expected to generate future cash flows in excess of its carrying value. *See id.* ¶ 55. If circumstances change and future cash flows are no longer projected to cover the carrying value of the asset, the asset is "impaired." *Id.* ¶¶ 55, 328-29. The owner of an impaired asset must adjust its recorded value to equal its fair value by recording an impairment charge on the owner's earnings statement. *Id.* ¶ 55.

**\*3** Regulators also require oil and gas companies to disclose detailed information about their "reserves." *Id.* ¶ 50. Reserves represent the quantity of raw oil and gas that a company either owns or holds the rights to extract. *Id.* ¶¶ 46, 72. They are the core assets of an oil and gas company. *Id.* One special class of reserves are "proved reserves," which encompass raw oil and gas that a company can profitably extract under the economic conditions existing at the time the business records the reserves in a financial statement. *Id.* ¶¶ 52, 332, 362. Companies assess profitability using historical prices—generally, the average of the first-day-of-the-month prices for the twelve months prior to the assessment—and current costs. *Id.* ¶¶ 52, 333.

When later assessments reveal that reserves previously classified as proved are no longer profitable to extract, these reserves must be "de-booked," or reclassified as unproved reserves. *Id.* ¶¶ 54, 334. Companies disclose the reserves they have classified as proved in their financial statements. *Id.* ¶ 47.

By the time Exxon Mobil had finished construction, started production, and initiated a second phase of expansion at Kearl in 2013, the Western Canadian Select benchmark ("WCS") for heavy crude produced from the Canadian oil sands had maintained an average price of around $72 per barrel over three consecutive years. *Id.* ¶¶ 58, 107. In 2014, however, oil and gas prices began a marked and prolonged global collapse. *Id.* ¶¶ 148-54. From its peak in June 2014, the WCS benchmark experienced an 83% decline, reaching $14.50 per barrel in January 2016. *Id.* ¶ 148. Through 2014 and 2015, Exxon Mobil's competitors recognized billions of dollars in asset impairments, including for Canadian oil sands projects like Kearl. *Id.* ¶¶ 156-62, 167. Exxon Mobil did not. *Id.* ¶¶ 166-68. Plaintiff alleges that Tillerson—then Exxon Mobil's Chief Executive Officer and Chairman—and Woodbury—then Exxon Mobil's Secretary and Vice President of Investor Relations—instead made misleading statements to the market in an effort to portray Exxon Mobil as immune from the market forces impacting its peers. *Id.* ¶¶ 35, 37, 71, 81-84, 90, 257, 265-68, 272-75, 277-87, 289-92, 298-301, 302, 309-17.

According to Plaintiff, Defendants also misrepresented Exxon Mobil's proved reserves in the Company's SEC filings. On February 24, 2016, Exxon Mobil filed its 2015 Form 10-K (the "2015 10-K") with the SEC. *Id.* ¶¶ 16, 277, 343, 348. At the time of the filing, proved reserves from the Canadian Bitumen Operations, most of which were attributable to Kearl, constituted a significant portion of Exxon Mobil's total worldwide proved reserves, representing 31% of the company's liquids proved reserves and 18% of the company's combined liquids and natural gas proved reserves. *Id.* ¶¶ 97, 101, 346. Plaintiff alleges that the 2015 10-K implied that the average profit per barrel of bitumen produced from its Canadian Bitumen Operations in 2015 was $5.87. *Id.* ¶ 343. Plaintiff contends that Exxon Mobil's Canadian Bitumen Operations were losing money by mid-November 2015, if not sooner, and there was no indication of a favorable change in the foreseeable future. *Id.* ¶¶ 170, 301, 342, 344. While Plaintiff does not allege that the average profit implied by 2015 10-K was inaccurate (it apparently accounted for the recent losses), Plaintiff maintains that Defendants' failure to disclose the Canadian Bitumen Operations' losses violated Generally Accepted Accounting Principles ("GAAP") and made the

implied average profit materially misleading. *See id.* ¶¶ 17, 255-56, 287, 318.

The continued drop in oil prices also threatened the profitability of the Kearl bitumen reserves. *See id.* ¶¶ 20, 22, 107, 169, 177, 180-81, 231. Plaintiff alleges that, by the end of 2015, the Kearl reserves were—at best—on the verge of no longer meeting the SEC's definition of proved reserves. *Id.* ¶¶ 175-76, 301. When Exxon Mobil filed the 2015 10-K in late February and oil prices still had not improved, Plaintiff claims that it was "all but certain" that the reserves would no longer meet the SEC's definition of proved reserves by the end of 2016 and would need to be de-booked. *Id.* ¶¶ 14, 20, 169, 176-77, 286, 310, 318, 347, 351. Recognizing the potential impact of low oil prices on Exxon Mobil's classification of proved reserves, the 2015 10-K stated the following:

> **\*4** When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur.

> Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

*Id.* ¶ 285. Despite the cautionary language in the 2015 10-K, Plaintiff asserts that the document was misleading, violated SEC disclosure standards, and was inconsistent with GAAP because the warning was too tepid considering prevailing oil prices and the high likelihood of a future de-booking. *Id.* ¶¶ 17, 180, 231, 348. Plaintiff further alleges that, as 2016 progressed and oil prices continued to sag, the probability of an end-of-year de-booking became more certain, but Exxon Mobil's 2016 Form 10-Q reports—filed on May 4, 2016, and August 3, 2016—still failed to adequately inform investors of this reality. *Id.* ¶¶ 22, 169, 178-80, 184, 231, 348. Plaintiff alleges that these reports were misleading and violated SEC disclosure requirements. *Id.* ¶¶ 256, 348-52.

### 2.2. Exxon Mobil's RMDG Operations

Plaintiff alleges that Defendants similarly misled the market about reserves tied to Exxon Mobil's RMDG Operations. Faced with declining domestic natural gas reserves, Exxon Mobil acquired XTO Energy, Inc., in December 2009. *Id.* ¶¶ 114, 116. The all-stock deal, valued between $36 billion and $41 billion, made Exxon Mobil the largest domestic natural gas producer in the United States. *Id.* ¶¶ 117, 120.

The deal proved inopportune for Exxon Mobil, as oil and gas prices began their extended decline in 2014. *Id.* ¶¶ 148-54. Between February 2014 and December 2015, the Henry Hub benchmark price—the most commonly used benchmark for natural gas produced in the United States—dropped 80%, from $8.15 per million British thermal units ("BTU") to $1.63 per million BTU. *Id.* ¶¶ 59, 121, 155. Due in large part to that decline, Exxon Mobil's competitors in the natural gas sector, including those with dry gas operations in the Rocky Mountains, recorded impairment charges in 2014 and 2015. *E.g., id.* ¶¶ 156-57, 159, 161-64. Exxon Mobil did not follow suit. *Id.* ¶¶ 166-68. Plaintiff contends that Exxon Mobil's executives instead made misstatements to the market in an attempt to present itself as unaffected by falling prices. *E.g., id.* ¶¶ 128-31, 134-37, 139, 192, 247, 270-71, 275-76.

Plaintiff asserts that by the end of 2015, the combination of low gas prices and prevailing market trends required Defendants to assess whether the RMDG reserves were impaired. *Id.* ¶¶ 169, 185-86. According to Plaintiff, had Defendants conducted a proper test, they would have recognized that the carrying value of the RMDG assets was no longer recoverable, necessitating an impairment charge. *Id.* ¶¶ 185, 191-93, 368-72. Because Exxon Mobil failed to properly recognize an impairment charge, Plaintiff contends, Exxon Mobil's 2015 10-K and certain subsequent 2016 Form 10-Q reports contained misleading financial information and violated SEC disclosure requirements. *Id.* ¶¶ 366-70, 373-76.

### 2.3. Proxy Costs of Carbon

**\*5** Plaintiff alleges that Defendants misled investors by not adhering to their public statements about using a proxy cost of carbon—a figure representing the projected effects of various climate-related policies on the future global energy demand—in their investment and valuation procedures. *E.g., id.* ¶¶ 7-8, 137-47. To reassure investors that Exxon Mobil would address climate change-related risks to its business, like increasing demand for renewable energy, in March 2014, Defendants issued a public report stating that Exxon Mobil would use a proxy cost of carbon. *Id.* ¶¶ 3, 295.

Plaintiff contends that Exxon Mobil used a lower proxy cost of carbon or no proxy cost of carbon in its internal proved reserves and impairment calculations for the Canadian Bitumen Operations, including Kearl, and in asset impairment evaluations for the RMDG Operations. *E.g., id.* ¶¶ 137-47, 191-92, 243-45, 361, 371. According to Plaintiff, had Exxon Mobil properly employed its publicly declared proxy costs of carbon to assess the profitability of the Kearl and RMDG Operations, its eventual de-booking and impairment announcements would have been made far sooner. *See id.* ¶¶ 137-47, 175-77, 191-94. Plaintiff largely bases these allegations on the Affirmation of John Oleske (the "Oleske Affirmation"), which was filed on June 2, 2017, as part of an investigation by the New York Attorney General ("NYAG") into whether Exxon Mobil misled the public and investors regarding the business risks associated with climate change. *E.g., id.* ¶¶ 137-47, 191-92, 243-45, 361, 371; *see* Doc. No. 36-1.

### 2.4. The Alleged Corrective Disclosures

Plaintiff alleges that Defendants' statements about Exxon Mobil's Canadian Bitumen Operations, RMDG Operations, and Exxon Mobil's use of a proxy cost of carbon were revealed to be misleading in a series of seven corrective disclosure (the "Corrective Disclosures") dated November 9, 2015; January 20, 2016; July 29, 2016; August 10, 2016; October 28, 2016; January 18, 2017; and January 31, 2017. Doc. No. 36 at 167-72; Doc. No. 98-8 at 6.

### 2.4.1. The First Corrective Disclosure: The Guardian Article (November 9, 2015)

On November 9, 2015, *The Guardian* reported that the NYAG was investigating Exxon Mobil for providing false information to the public regarding climate change and the potential business risks associated with it, including whether Exxon Mobil funded "climate denial front groups" and "spread[ ] disinformation about climate science." Doc. No. 36 ¶ 426; Doc. No. 98-5.

Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)

Fed. Sec. L. Rep. P 101,658

**2.4.2. The Second Corrective Disclosure:** *The Los Angeles Times* **Article (January 20, 2016)**

On January 20, 2016, *The Los Angeles Times* reported that the California Attorney General ("CAAG") was "investigating whether Exxon repeatedly lied to the public and investors about the risks to its business from climate change, specifically whether Exxon's actions 'could amount to securities fraud and violations of environmental laws.' " Doc. No. 36 ¶ 429; Doc. No. 98-6.

**2.4.3. The Third Corrective Disclosure: Second Quarter Earnings Announcement for 2016 (July 29, 2016)**

On July 29, 2016, at 8:00 a.m. ET, Exxon Mobil released its second quarter earnings for 2016. Doc. No. 98-7. According to Plaintiff, Exxon Mobil revealed "a significant miss of expectations in Upstream"—the segment of Exxon Mobil's business involving the exploration, acquisition, development, and extraction of unprocessed oil and gas commodities—"including a reported loss of $514 million in U.S. Upstream ... driven heavily by poor performance by XTO and Kearl." Doc. No. 98-8 at 6; *see* Doc. No. 36 ¶ 40.

**2.4.4. The Fourth Corrective Disclosure:** *The Washington Post* **Op-Ed (August 10, 2016)**

**\*6** On August 9, 2016, *The Washington Post* published an op-ed by Senators Elizabeth Warren and Sheldon Whitehouse entitled *Big Oil's Master Class in Rigging the System.* Doc. No. 36 ¶ 432; Doc. No. 98-10 at 2-4. Plaintiff alleges the op-ed revealed that "Exxon and its allies with financial ties to the oil and gas industry were harassing and bullying investigators in an attempt to 'sidetrack state investigations and silence groups petitioning the government to address [Exxon's] potential wrongdoing' and avoid 'court-supervised discovery ... into whether it has spent decades deliberately deceiving the public about the harms associated with [climate change].' " Doc. No. 36 ¶ 432.

Plaintiff also references a report from Environment and Energy Publishing LLC (the "EEP Report"), published on August 10, 2016. Doc. No. 36 ¶¶ 433-34. According to Plaintiff, the report detailed the calls of certain politicians for "Exxon executives to testify about climate change in light of state Attorney General investigations into whether

Exxon knowingly misled the public and investors regarding the risks of carbon emissions." *Id.*

**2.4.5. The Fifth Corrective Disclosure: Third Quarter Earnings (October 28, 2016)**

On October 28, 2016, at 8:00 a.m. ET, Exxon Mobil released its third quarter earnings for 2016. *Id.* ¶ 437; Doc. No. 88-3. Plaintiff characterizes the earnings release as disclosing that Exxon Mobil "might be forced to de-book nearly 20% of its oil and gas reserves, specifically acknowledging that it might have to de-book 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves" if energy prices did not improve. Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6.

**2.4.6. The Sixth Corrective Disclosure: UBS Downgrade (January 18, 2017)**

On January 18, 2017, after the close of trading, UBS downgraded Exxon Mobil to "sell" and reduced its price target from $86 to $77. Doc. No. 36 ¶ 443. Plaintiff notes that UBS cited Exxon Mobil's "risk of de-booking up to 4.6 of its 24.8 BBoe of proved reserves" in its report downgrading the Company. *Id.*; Doc. No. 88-7.

**2.4.7. The Seventh Corrective Disclosure: Fourth Quarter Earnings Announcement for 2016 (January 31, 2017)**

On January 31, 2017, Exxon Mobil released its fourth quarter earnings for 2016. Doc. No. 36 ¶¶ 446-47. The Company confirmed that it would be taking an asset impairment charge of about $2 billion largely related to the RMDG Operation and that it would de-book the Kearl Operation reserves within the coming weeks. *Id.*; Doc. No. 88-4.

**3. LEGAL STANDARDS**

Before a court can certify a class, the party seeking class certification bears the burden of proving by a preponderance of the evidence that the class meets all four requirements of Fed. R. Civ. P. 23(a): (1)

numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Mary Kay Inc. v. Reibel*, 327 F.R.D. 127, 129 (N.D. Tex. 2018) (Fitzwater, J.) (citing *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009)). The court must conduct a "rigorous analysis" of each Rule 23(a) factor. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). The party seeking class certification must establish by a preponderance of the evidence that the class meets the requirements of at least one subsection of Rule 23(b). *Mary Kay Inc.*, 327 F.R.D. at 129 (citing *Flowserve*, 572 F.3d at 228). For proposed classes seeking monetary damages, like this one, the relevant requirements are "predominance" and "superiority" under Rule 23(b)(3). *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

Although a court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful decision on class certification. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

## 4. ANALYSIS

### 4.1. Rule 23(a)

#### 4.1.1. Numerosity

**\*7** To establish numerosity under Rule 23(a)(1), Plaintiff must show that its proposed "class is so numerous that joinder of all members is impracticable." In examining numerosity, the Court considers factors such as "the geographical dispersion of the class, the ease with which class members may be identified, [and] the nature of the action." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (quoting *Philips v. Joint Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). Defendants do not dispute that Plaintiff has satisfied Rule 23(a)(1).

The Court finds that Plaintiff has sufficiently established numerosity. Exxon Mobil's stock is a nationally traded security, with over four billion shares outstanding and an average weekly trading volume of tens of millions of shares. Doc. No. 88-1 ¶¶ 23-24, 29-30; *id.* at 108. The massive number of outstanding shares and the average weekly rate at which these shares are traded suggests that the purchasers of shares comprising Plaintiff's proposed

class are too numerous to practicably join. *See Zeidman*, 651 F.2d at 1039 (collecting cases). The fact that Exxon Mobil trades nationally on the NYSE serves as additional evidence of numerosity, as it is highly likely that the individuals or entities involved in trading Exxon Mobil securities are spread throughout the country. *Id.*

#### 4.1.2. Commonality

To establish commonality under Rule 23(a)(2), Plaintiff must demonstrate that "there are questions of law or fact common to the class." Even "a single common question will do." *Dukes*, 564 U.S. at 359. "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.' " *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)). Defendants do not dispute that Plaintiff has demonstrated commonality.

The Court concludes that the commonalty requirement is satisfied. Common questions in this case include whether Defendants made material misrepresentations or omissions, whether the Individual Defendants controlled the content and dissemination of the allegedly misleading misrepresentations, and whether the putative class members incurred damages. *See* Doc. No. 87 at 15. These issues, central to the securities fraud claims of the proposed class, arise from the same basic set of facts and can be addressed through evidence common to the proposed class.

#### 4.1.3. Typicality

To establish typicality under Rule 23(a)(3), Plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This undemanding test "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426. "Typicality does not require complete identity of claims, but requires that the representatives' claims share the same essential characteristics with the class members' claims. Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories." *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 565 (E.D. Tex. 2005) (citing *James v. City of*

*Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)).

Defendants argue that Plaintiff's claims are atypical of the proposed class claims because Plaintiff purchased all of its Exxon Mobil stock after the first two alleged Corrective Disclosures, subjecting it to the unique defense that it could not have relied on any supposed misrepresentations that were corrected before its purchase. Doc. No. 115 at 35.

**\*8** Class certification will not be denied, however, on the basis of the presence of a unique defense unless there is a significant risk that Plaintiff will unduly devote resources to litigating the defense that should be devoted to litigating other matters material to the proposed class. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502 (S.D. Tex. 2004)* (Hittner, J.). Defendants have not sufficiently established that the timing of Plaintiff's purchases of Exxon Mobil stock—even if unique to Plaintiff—poses such a risk. Plaintiff's claims are founded on the same factual allegations and legal theories as the claims of all class members: that Defendants' misstatements and omissions artificially inflated the price of Exxon Mobil's stock, and that investors suffered damages when the truth was revealed. Regardless, Defendants' unique defense argument is moot based on the Court's narrowed class definition, discussed in Section 5 below. The Court finds that the typicality requirement has been met.

### 4.1.4. Adequacy

Rule 23(a)(4) requires Plaintiff to demonstrate that it "will fairly and adequately protect the interests of the class." In determining adequacy, courts consider three primary questions: (1) whether there are any conflicts of interest between the representative parties and the class they seek to represent; (2) whether the representative parties have the willingness and ability to play an active role in the litigation; and (3) whether class counsel has the competence and zeal to represent the class and protect the interests of the absentee class members. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005); *Berger v. Compaq Comput. Corp. (Berger I)*, 257 F.3d 475, 479 (5th Cir. 2001).

Plaintiff's interests align with the interests of the proposed class because both have suffered losses as a result of the same allegedly unlawful conduct. Plaintiff is highly motivated to pursue this case and maximize the recovery not only for itself, but also for the absentee class members. The Court also finds that Robbins Geller is adequate to serve as class counsel given its extensive

experience in litigating securities class actions in federal court, *see* Doc. No. 88-13 at 5-9, 26-46, 100, and its diligent representation of Plaintiff thus far. Defendants have not presented any evidence of a conflict of interest between Plaintiff and the proposed class, and they have not raised any concerns regarding the adequacy of Robbins Geller as class counsel.

Defendants question the adequacy of Plaintiff based on the deposition testimony of its designated representative, Mr. Michael Swiderski, however. Doc. No. 115 at 36-39. Defendants contend that certain portions of Mr. Swiderski's testimony indicate that he does not completely understand the allegations against Defendants, that he does not know the current status of this litigation, and that what he does know about the litigation comes solely from Robbins Geller. *Id.*; *see* Doc. No. 104 at 33-34, Doc. No. 105-8. Defendants conclude that Plaintiff impermissibly delegated this case to Robbins Geller and is, "at most, a disinterested spectator, lacking even basic knowledge about this case." Doc. No. 115 at 37.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, "raises the standard adequacy threshold" for securities class actions by requiring that they "be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Berger I*, 257 F.3d at 483. The PSLRA does not create any additional Rule 23(a)(4) adequacy requirements. *Berger v. Compaq Comput. Corp. (Berger II)*, 279 F.3d 313 (5th Cir. 2002). Class representatives are not required to have a complete knowledge of the case. *Lehocky* 220 F.R.D. at 503 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 62 (2d Cir. 2000)). They "need not be legal scholars and are entitled to rely on counsel." *Berger I*, 257 F.3d at 483. Class representatives do "need to know more than that they were 'involved in a bad business deal.' " *Id.* at 483 (quoting *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D. Okla. 1990)).

**\*9** Although Defendant's adequacy concerns are not entirely unfounded, the Court concludes that Plaintiff is willing and able to adequately participate in and direct this litigation. In his deposition testimony, Mr. Swiderski could not comment on whether this lawsuit has anything to do with climate change, he was seemingly unfamiliar with some of the alleged Corrective Disclosures, and he could not name any Defendant except Exxon Mobil. Doc. No. 105-8 at 7, 9, 11. Mr. Swiderski's testimony also revealed that he understands the basic theory of liability in this case and that the Fund allegedly suffered damages because of misstatements and omissions by Defendants. *Id.* at 3, 9. Mr. Swiderski also demonstrated that he knows

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

more than that the Fund was purportedly involved in a bad business deal. For example, he testified (1) that he had devoted at least sixty hours to fulfilling his responsibilities as a proposed class representative, a majority of which happened before he received a deposition notice; (2) that he regularly communicates with counsel about this case; (3) that at least Plaintiff's liaison counsel reviewed the Complaint before it was filed; and (4) that his responsibilities are to "vigorously fight the case for the common good of the class members." *Id.* at 4, 6, 12, 13; *see* Doc. No. 25-2 at 8-9.

### 4.2. Rule 23(b)(3)

Having determined that Plaintiff has satisfied the prerequisites of Rule 23(a), the Court now proceeds to evaluate whether it meets the predominance and superiority requirements of Rule 23(b)(3).

### 4.2.1. Predominance

The predominance element of Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." As previously discussed in Section 4.1.2 above, the proposed class claims present a number of common questions. The predominance requirement is "far more demanding" than commonality, as it tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger*, 401 F.3d at 320 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). In evaluating predominance, courts consider whether "members of a proposed class will need to present evidence that varies from member to member," or whether "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012)).

The Court must consider predominance on a claim-by-claim basis. *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021) (citing *Castano*, 84 F.3d at 744). The predominance analysis therefore begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 809 (2011). Plaintiff alleges violations under §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10(b)-5. Doc. No. 36 at 176-79. The elements of a § 10(b)

and SEC Rule 10(b)-5 claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss ["damages"]; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460-61 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)). Control person liability under § 20(a) requires the existence of an independent "primary" violation of the securities laws—in this case, § 10(b) and SEC Rule 10(b)-5. *See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 690 (N.D. Tex. 2022) (Pittman, J.) (citing *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 905 (5th Cir. 2018)); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 286 n.69 (S.D. Tex. 2005). The individual defendant must have had actual power over the controlled person and induced them, directly or indirectly, to commit the acts constituting the primary violation. *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (Ellison, J.) (citing *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)).

In applying the Rule 23(b)(3) predominance test to Plaintiff's claims, the Court asks whether "*questions* common to the class *predominate*," not whether those "questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis added).

**\*10** As to most of the elements of Plaintiff's claims, there are no meaningful individualized questions that predominate over the common questions. First, whether Defendants' alleged misrepresentations and omissions would have influenced the decision-making process of a reasonable investor—*i.e.*, whether they are material—is a common question. *Id.* Even if Plaintiff is unable "to prove materiality [that] would not result in individual questions predominating," it would simply end the case for the entire class. *Id.* at 459-60. The same is true for the scienter, falsity, and—for purposes of § 20(a)—the control, influence, and culpability elements of Plaintiff's claims. All of these elements depend on the conduct of Defendants and do not vary with the identity of the putative class member asserting the claims. Finally, Plaintiff's proposed out-of-pocket damages methodology computes damages on a class-wide basis because the methodology provides a mechanical way of calculating each putative class member's damages based on the times at which they bought and sold Exxon Mobil shares. *E.g.*, Doc. No. 87 at 21, 27-28; *see Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (Higginbotham, J.) ("In short, in order to certify a class, the damages methodology must be 'sound' and must 'produce

commonality of damages.' " (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)))).

Reliance is different. An individual plaintiff can, of course, prove reliance by "showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810. In the context of a securities class action, like this one, with numerous potential class members, how can a plaintiff demonstrate each class member's reliance? The Supreme Court addressed this issue in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

#### 4.2.1.1.  Fraud-on-the-Market Theory and the Presumption of Reliance

Recognizing the unrealistic evidentiary burden that would result from requiring proof of direct reliance from each member of a proposed § 10(b) and SEC Rule 10(b)-5 class, the Supreme Court in *Basic* blessed the use of the "fraud-on-the-market" theory to create a rebuttable presumption of class-wide reliance. *Id.* at 241-47. The fraud-on-the-market theory posits that the price of a security traded in an efficient market reflects all publicly available information, including any material misrepresentations about the security. *Amgen*, 568 U.S. at 462. "Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.' " *Id.* (quoting *Basic*, 485 U.S. at 245).

To invoke *Basic*'s rebuttable presumption that class members relied on an alleged misrepresentation, a plaintiff must ultimately prove: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 268 (2014). At the class certification stage, however, a plaintiff need only establish the first, third, and fourth elements, known as publicity, market efficiency, and market timing, respectively. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021). The Court leaves materiality "to the merits stage because it does not bear on Rule 23's predominance requirement." *Id.* (citing *Amgen*, 568 U.S. at 466-68).

There is no dispute that Defendants' alleged misrepresentations were publicly known. Defendants made them during earnings calls or in public filings and reports. *See* Doc. No. 98-12 at 18-19. As addressed in Section 5 below, the class definition here includes only persons who traded Exxon Mobil stock between the time of the alleged misrepresentations and the revelation that they were false, satisfying the marketing timing requirement.

That leaves the market efficiency requirement. In evaluating whether a stock traded in an efficient market, the Fifth Circuit considers a number of factors, including:

> **\*11** (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S–3 (as opposed to Form S–1 or S–2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger*, 401 F.3d at 323 (internal quotation marks omitted) (first citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); and then citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) (Lynn, J.)). Significantly, "market efficiency is a matter of degree"; the "markets for some securities are more efficient than the markets for others." *Halliburton II*, 573 U.S. at 271-72.

The Court finds, and Defendants agree, that the market for Exxon Mobil stock is efficient. Doc. No. 176 at 48. Plaintiff has demonstrated, *inter alia*, that Exxon Mobil stock trades on the NYSE at a very high weekly trading volume and is widely covered by securities analysts. Doc. No. 87 at 22-23. Exxon Mobil's market capitalization is massive, at well over $100 billion. *Id.* at 25. And the market efficiently absorbs Exxon Mobil-specific news and rapidly translates it into changes in stock price. *See id.* at 24; Doc. No. 88-1 at ¶¶ 47-50. As plaintiff's expert's market efficiency analysis demonstrates, the market for Exxon Mobil stock is among the most efficient for stocks listed on the NYSE and Nasdaq. *See, e.g.*, Doc. No. 88-1 ¶¶ 29-31, 35-37, 98-99, 101-03.

Plaintiff has therefore discharged its burden to show market efficiency, as well as publicity and market timing. *Basic*'s rebuttable presumption of class-wide reliance applies.

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

#### 4.2.1.1.1. Rebutting Basic's Presumption of Reliance: Price Impact

Defendants seek to rebut *Basic*'s presumption of class-wide reliance. They contend that their alleged misrepresentations had no impact on the price of Exxon Mobil stock. Because the "fundamental premise" behind *Basic*'s presumption of reliance is that, in an efficient market, "an investor presumptively relies on a misrepresentation *so long as it was reflected in the market price* at the time of his transaction," Defendants' contention would cause "*Basic*'s fraud-on-the-market theory and presumption of reliance [to] collapse." *Halliburton II*, 573 U.S. at 278 (emphasis added) (quoting *Halliburton I*, 563 U.S. at 812).

It is not always clear how a "price impact" argument like Defendants' will differ from a materiality argument—an inquiry reserved for the merits stage. *Goldman Sachs*, 141 S. Ct. at 1959 (citing *Amgen*, 568 U.S. at 466-68). If a misstatement is immaterial, one would not expect the exposure of its falsehood to have a negative impact on the price of the stock to which it relates. In practice, this may not matter much, as courts assessing price impact at the class certification stage " 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.' That is so regardless whether the evidence is also relevant to a merits question like materiality." *Id.* at 1961 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020)).

The defendant bears the burden of persuasion to demonstrate a lack of price impact by a preponderance of the evidence. *Id.* at 1963. If a defendant presents evidence to rebut *Basic*'s presumption of class-wide reliance, "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* This is a familiar concept. In a typical civil action, for example, the plaintiff has the burden to prove its case by a preponderance of the evidence. The plaintiff will offer whatever it can to meet this burden, and the defendant, often through cross-examination and its own evidence, will attempt to chip away at the plaintiff's case. Where the factfinder determines that the evidence is in "equipoise," the plaintiff loses; it did not prove its case by a preponderance of the evidence. *See id.* Of course, the plaintiff's job is easier where the defendant fails to defend. But the burden is still the plaintiff's. Weak evidence—even coupled with the defendant's

silence—may not be enough to overcome it.

**\*12** The Court therefore turns to the evidence of price impact, keeping in mind that Defendants bear the burden of persuading the Court, by a preponderance of the evidence, that there was no impact. *Id.* at 1963.

#### 4.2.1.1.2. The Parties' Event Studies

Plaintiff and Defendants both submit expert reports on the issue of price impact. In his report, Plaintiff's expert, Professor Frank C. Torchio ("Professor Torchio"), employs an "inflation-maintenance" theory of price impact. Under this theory, "a misrepresentation causes a stock price 'to *remain* inflated by preventing preexisting inflation from dissipating from the stock price.' " *Id.* at 1959 (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1315 (11th Cir. 2011)). The resulting measure of damages is "the amount that the stock's price would have fallen 'without the false statement.' " *Id.* at 1961 (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)). To estimate this amount, plaintiffs typically "point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* (first citing *Glickenhaus*, 787 F.3d at 413-417; and then citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 233-37, 253-59 (2d Cir. 2016)). Professor Torchio takes this approach.

Defendants' expert, Dr. Allen Ferrell ("Dr. Ferrell"), likewise tests whether Defendants' alleged misrepresentations caused Exxon Mobil's stock to maintain an inflated price. Both Dr. Ferrell and Professor Torchio (collectively, the "Experts") conduct event studies to determine the extent to which the changes in Exxon Mobil's stock price may have resulted from the information revealed in the alleged Corrective Disclosures as opposed to broader market and industry trends or random price fluctuations. *See* Doc. No. 88-1, Doc. No. 98-12, Doc. No. 103. The Experts agree that price fluctuations should be statistically significant before the Court rejects the possibility that the fluctuations are merely the result of random price movements. *See, e.g.*, Doc. No. 88-1 at 115-17, Doc. No. 98-12 ¶ 21. Neither the Experts nor the parties dispute the fitness of the regression models used by the Experts for their event studies. *See, e.g.*, Doc. No. 98-12 ¶ 22; Doc. No. 104 at 12.

Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)

Fed. Sec. L. Rep. P 101,658

Professor Torchio applied his model to analyze the reaction of Exxon Mobil's stock price to three of the alleged Corrective Disclosures: the earnings announcements dated July 29, 2016, October 28, 2016, and January 31, 2017. *See* Doc. No. 88-1 at ¶¶ 73-91; Doc. No. 103 ¶¶ 60-86, Doc. No. 104 at 12-13. Examining the cumulative stock price movement over a "two-day window" spanning two consecutive trading days following each alleged Corrective Disclosure, Professor Torchio found statistically significant negative price reactions associated with all three disclosures. *E.g.*, Doc. No. 88-1 ¶¶ 73-91, Doc. No. 103 ¶¶ 60-86.

Plaintiff does not present expert analysis of fluctuations in Exxon Mobil's stock price associated with the alleged Corrective Disclosures on November 9, 2015, January 20, 2016, August 10, 2016, or January 18, 2017, because, in Plaintiff's view, analyzing fluctuations in response to Exxon Mobil's earnings announcements is sufficient. Doc. No. 104 at 36. As support for this view, Plaintiff asserts that it is Defendants' "burden to prove no price impact." Doc. No. 176 at 197.

**\*13** While Defendants bear the burden of persuasion to demonstrate a lack of price impact by a preponderance of the evidence, Plaintiff's conclusion does not follow from its premise. Defendants have analyzed fluctuations in Exxon Mobil's stock price associated with all of the Corrective Disclosures alleged by Plaintiff, and the Court must consider Defendants' analysis to comply with *Goldman Sachs'* directive that the Court be "open to *all* probative evidence" when assessing price impact. 141 S. Ct. at 1961. In *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton III*)—a case on which Plaintiff relies, *see* Doc. No. 104 at 11, 14, 16, 26, 30—Judge Lynn evaluated the parties' experts' price impact opinions with respect to many corrective disclosures that were not earnings announcements. 309 F.R.D. 251, 270-71, 273-74, 276-80 (N.D. Tex. 2015) (Lynn, J.).

Dr. Ferrell's analysis of Exxon Mobil's stock price revealed statistically significant negative price reactions to at least some of the seven alleged Corrective Disclosures. Examining a "close-to-open" event study window that encompasses stock price movements from the market close before an alleged Corrective Disclosure to the first market open after the alleged Corrective Disclosure, Dr. Ferrell found statistically significant negative price reactions only on July 29, 2016, and October 28, 2016. Doc. No. 98-12 ¶¶ 32-66. Examining a "close-to-close" event study window that encompasses stock price movements from the market close before an alleged Corrective Disclosure to the market close after the alleged Corrective Disclosure, Dr. Ferrell found

statistically significant negative price reactions on the same dates, as well as January 20, 2016, and January 18, 2017. *Id.*

Dr. Ferrell also analyzed the reaction of Exxon Mobil's stock price to Defendants' alleged misrepresentations. *Id.* ¶¶ 30-31. Using a close-to-close window, Dr. Ferrell found that no statistically significant positive reaction occurred on the date of any alleged misrepresentation. *Id.* Citing, *inter alia*, *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016), Defendants argue that the lack of a statistically significant stock price increase associated with the alleged misstatements demonstrates a lack of price impact sufficient to rebut *Basic*'s presumption of class-wide reliance. Doc. No. 115 at 17.

The inflation-maintenance theory, however, recognizes "that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *In re Vivendi*, 838 F.3d at 256. Defendants do not meaningfully dispute that the information contained in the alleged misrepresentations analyzed by Dr. Ferrell coincided with the expectations of the market, making a statistically significant stock price increase unlikely. *See* Doc. No. 115 at 17, 19; Doc. No. 104 at 30. Further, the inflation-maintenance theory is widely accepted by the federal judiciary. Merritt B. Fox & Joshua Mitts, *Event-Driven Suits and the Rethinking of Securities Litigation* 77 (Eur. Corp. Governance Inst., Working Paper No. 656, 2022) (collecting cases); *see also Ludlow*, 800 F.3d at 674 (affirming certification of class based in part on "stock price inflation" theory). The Court sees no persuasive reason to buck that trend here.

### 4.2.1.1.3. Event Study Windows

Having determined that the Court must analyze whether Exxon Mobil's stock price reacted to any of the alleged Corrective Disclosures with fluctuations indicating that Defendants' alleged misstatements maintained the stock price at an inflated level, the Court turns to the subject of the Experts' primary disagreement: the appropriate event window for assessing price impact.

**\*14** Professor Torchio advocates for the use of a two-day window to measure price impact. *See, e.g.*, Doc. No. 103 ¶ 72. He notes that the proper event window duration depends on case-specific factors like the intricacy of the disclosure at issue, how widely the disclosure is shared among the investing public, how the company being

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

studied responds to the market's interpretations of the event being studied, and the information from analysts and commentators that surfaces after the event. Doc. No. 88-1 ¶ 152; Doc. No. 103 at 22-31 (collecting authorities). Professor Torchio argues that, in this case, studying the two-day period following each of the three alleged Corrective Disclosures he analyzed best captures the full effect of the news and commentary related to the alleged Corrective Disclosures. Doc. No. 88-1 ¶ 56; Doc. No. 103 ¶¶ 29-43, 78-86.

Dr. Ferrell submits that the proper event window depends on the timing of each alleged Corrective Disclosure. Doc. No. 98-12 ¶¶ 19-20; *see also id.* at 8-13 nn.9-26 (collecting authorities). According to Dr. Ferrell, using a close-to-open event window is best for analyzing the market reaction to alleged Corrective Disclosures made while the market was closed. *Id.* Dr. Ferrell opines that this targeted window best reflects the market's reaction to the disclosure without influence from possible confounding news or events that could occur during regular trading hours, particularly for a stock with a market as efficient as Exxon Mobil's. *Id.*; *see* Doc. No. 176 at 120-25. By contrast, Dr. Ferrell opines that using a close-to-close window is most appropriate for disclosures issued during trading hours. *E.g.*, Doc. No. 98-12 ¶ 19. Both Experts seemingly agree that the close-to-close window is the "standard" or "default" window. Doc. No. 176 at 74, 167-68; *see* Doc. No. 98-12 at 10 n.16.

Dr. Ferrell agrees that the use of a two-day window may be appropriate in cases involving, for example, an inefficient market, a corrective disclosure on an unknown date, or corrective disclosures made in close succession, but he disagrees that a two-day window is appropriate here. *E.g.*, Doc. No. 176 at 133-37. He opines that the market for Exxon Mobil stock is efficient, the dates of the Corrective Disclosures are known, and the Corrective Disclosures were not issued in close succession. *Id.* Dr. Ferrell reasons that any disclosure or analyst commentary repeating information previously shared in a corrective disclosure will have no additional price impact in the highly efficient market for Exxon Mobil stock because investors will have already traded on the information in the corrective disclosure. Doc. No. 98-12 ¶¶ 20, 58. Dr. Ferrell concludes that a two-day event window is too long to appropriately measure price impact. *Id.* ¶ 20.

At least for class certification purposes, the Experts' disagreement about whether a two-day window is appropriate in this case is only relevant with respect to the January 31, 2017, Corrective Disclosure. Using their preferred event windows, each Expert agrees that Exxon Mobil stock experienced a statistically significant price

decline on July 29, 2016, and October 28, 2016—the only other dates Professor Torchio analyzed. *See* Doc. No. 98-12 ¶¶ 43, 55; Doc. No. 103 ¶¶ 62, 69-70.

The Supreme Court has yet to adopt "any particular theory of how quickly and completely publicly available information is reflected in the market price." *Basic*, 485 U.S. at 248 n.28. Here, based on the information presented, the Court agrees with Dr. Ferrell's analysis of the narrow issue disputed by the Experts: In this case, a two-day window is unsuitable for measuring price impact in an efficient market. *See Halliburton III*, 309 F.R.D. at 268-69. A two-day window could include extraneous market noise, making it more difficult to understand the effect of the alleged Corrective Disclosures on Exxon Mobil's stock price. The Court sees no reason to doubt the general observation made by Dr. Ferrell that the efficient market here rapidly incorporates the disclosure of material information into the price of the stock prior to the publication of analyst commentary. Any commentary that does not itself present new information will not further impact the price of the stock. And, at least as to the alleged Corrective Disclosure on January 31, 2017, Plaintiff does not appear to contend that any new information became available in analyst commentary published afterwards. *See* Doc. No. 103 ¶¶ 75-86; Doc. No. 104 at 23-25; Doc. No. 176 at 135-37.

#### 4.2.1.1.4. The Corrective Disclosures Analyzed

**\*15** Defendants attempt to rebut the *Basic* presumption of class-wide reliance by demonstrating a lack of price impact associated with each of the seven alleged Corrective Disclosures. *See* Doc. No. 115. Defendants contend that the price impact inquiry does not necessarily end with the finding of a statistically significant negative price reaction. *Id.* at 21-27. According to Dr. Ferrell, "[a]n event study can tell us that something happened, but it can't tell us *why*." Doc. No. 98-12 ¶ 23 (quoting Bernard S. Black & Ronald J. Gilson, The Law and Finance of Corporate Acquisitions 221 (Westbury NY: The Foundation Press, Inc., 1995)). To properly attribute a stock price movement to an alleged Corrective Disclosure, Defendants reason, the Court should consider, *inter alia*, the total mix of information the market possessed prior to the disclosure, the market reaction to similar, prior disclosures, and any additional confounding factors that might have impacted the stock price within the event window. *See, e.g.*, Doc. No. 115 at 17-28. Consistent with *Goldman Sachs*, the Court considers all evidence of price impact for each of the seven alleged Corrective Disclosures, "regardless whether that evidence

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

overlaps with materiality or any other merits issue." 141 S. Ct. at 1961.

#### 4.2.1.1.4.1. November 9, 2015: *The Guardian* Article

The first alleged Corrective Disclosure came on November 9, 2015, at 10:30 a.m. ET, when *The Guardian* reported on the investigation by the NYAG into whether Exxon Mobil disseminated inaccurate information regarding climate change and its potential business ramifications. Doc. No. 36 ¶ 426; Doc. No. 98-5. Plaintiff did not specifically address this Corrective Disclosure in either its Motion or Reply, and Professor Torchio did not analyze or provide an opinion about it. *See* Doc. No. 87; Doc. No. 88-1; Doc. No. 103; Doc. No. 104; Doc. No. 176 at 94-95. Plaintiff ostensibly considers it partially corrective of some of Exxon Mobil's alleged misstatements about its use of a proxy cost of carbon.

The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the alleged November 9, 2015, Corrective Disclosure did not impact Exxon Mobil's stock price. Dr. Ferrell analyzed the reaction of Exxon Mobil's stock price to the November 9, 2015, article and found no statistically significant negative price reaction. Doc. No. 98-12 ¶¶ 35-38.

The Court finds further support for its conclusion in Dr. Ferrell's analysis of the reaction of Exxon Mobil's stock price to two additional articles. Dr. Ferrell analyzed the stock price reaction to a November 5, 2015, 6:38 p.m. ET, article published by *The Guardian* that is identical to the November 9, 2015 article. *Compare* Doc. No. 98-4, *with* Doc. No. 98-5. Dr. Ferrell also analyzed the stock price reaction to a November 5, 2015, 12:05 p.m. ET article published by the *New York Times* that conveyed the same essential information as the articles published by *The Guardian.* Doc. No. 98-12 at 23-24 (citing Justin Gillis & Clifford Krauss, *Exxon Mobil Under Investigation in New York Over Climate Statements*, N.Y. Times (Nov. 5, 2015)).

Dr. Ferrell's analysis of Exxon Mobil's stock price reaction to the November 5, 2015, articles found no statistically significant price reaction on either a close-to-open or close-to-close basis. *Id.* ¶¶ 37-38. Dr. Ferrell's assessment of a sample of 480 contemporaneous research analyst reports revealed only six containing analyst commentary regarding the NYAG's investigation. *Id.* None of the six analyst reports regarded the NYAG's investigation as significant enough to necessitate

adjustments to their price targets. *Id.*

#### 4.2.1.1.4.2. January 20, 2016: *The Los Angeles Times* Article

The second alleged Corrective Disclosure is a report, published by *The Los Angeles Times* on January 20, 2016, at 3:00 a.m. ET, addressing an investigation by the CAAG into whether Exxon Mobil lied to the public and investors about the risks to its business from climate change. Doc. No. 36 ¶ 429; Doc. No. 98-6. Except to note that, on a close-to-close basis, Dr. Ferrell found that the alleged Corrective Disclosure had a statistically significant negative impact on Exxon Mobil's price, Plaintiff does not substantively address this alleged Corrective Disclosure in its Motion or Reply. *See* Doc. No. 87; Doc. No. 104 at 13, 28, 36. Professor Torchio also did not analyze or provide an opinion about the alleged Corrective Disclosure. *See* Doc. No. 88-1, Doc. No. 103; Doc. No. 104; Doc. No. 176 at 94-95. Nonetheless, Plaintiff deems the January 20, 2016, article to be partially corrective of some of Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon. Doc. No. 104 at 28 n.19.

**\*16** Given that the alleged January 20, 2016, alleged Corrective Disclosure occurred after the market was closed, Dr. Ferrell argues that any stock price reaction is best measured using a close-to-open window. *See* Doc. No. 98-12 ¶¶ 19-20, 40. Dr. Ferrell's close-to-open analysis revealed no statistically significant negative stock price reaction, though his close-to-close analysis did. *See id.* at 21.

If the use of a close-to-open window is ever appropriate, it would probably be for something like the alleged January 20, 2016, Corrective Disclosure—a short, easily digestible article issued hours before the market opened, discussing another investigation very similar to the one discussed in *The Guardian* and *The New York Times* articles mentioned above.

Considering the close-to-open analysis alongside other evidence, the Court is satisfied that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence with respect to the January 20, 2016, Corrective Disclosure notwithstanding the statistically significant negative price reaction on a close-to-close basis. Dr. Ferrell's review of 480 concurrent research analyst reports found no analyst commentary regarding the CAAG's investigation. *Id.* ¶ 41. As with the NYAG investigation discussed in Section 4.2.1.1.4.1 above, the

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

dearth of analyst commentary on the CAAG's investigation suggests that the market likely did not consider it to be significant. There is no indication that the market took the CAAG investigation more seriously than the NYAG investigation, or that it saw political attention and multiple investigations as more troubling than one, as evidenced by the lack of a statistically significant negative price reaction associated with *The Washington Post* op-ed addressed below, which discussed another, similar investigation by the Attorney General of Massachusetts.

### 4.2.1.1.4.3. July 29, 2016: Second Quarter Earnings Announcement for 2016

On July 29, 2016, at 8:00 a.m. ET, Exxon Mobil issued the third alleged Corrective Disclosure, releasing second quarter earnings for 2016 wherein the company revealed an earnings miss in its upstream business. *See* Doc. No. 98-7. Even though the earnings release did not specifically attribute the miss to the Canadian Bitumen Operations (including Kearl proved reserves), the RMDG Operations, or carbon proxy costs, *see id.*, Plaintiff nevertheless alleges that it was partially corrective of misstatements related to all three. *See* Doc. No. 104 at 12-13, 15, 25-28.

The parties agree that Exxon Mobil stock experienced a statistically significant negative price movement on July 29, 2016, including on a close-to-open basis. *See* Doc. No. 98-12 ¶ 43; Doc. No. 104 at 12-13. Defendants argue that the movement is attributable to factors other than their alleged misrepresentations. *See* Doc. No. 98-12 ¶ 50. Alternatively, Defendants argue that, even if the earnings release was partially corrective of Defendants' alleged misrepresentations, the market did not realize that the release was corrective, negating any price impact stemming from the correction. *See* Doc. No. 115 at 23-26.

The Court agrees with Defendants and finds that they have rebutted the *Basic* presumption by a preponderance of the evidence by showing that the alleged July 29, 2016, Corrective Disclosure did not impact Exxon Mobil's stock price.

First, the Court accepts that the statistically significant negative price movement on July 29, 2016, was likely not attributable to the alleged corrective information in the earnings release about the Kearl Operation or the Canadian Bitumen Operations at large. This is because Imperial also released its quarterly earnings the morning of July 29, 2016 (at 7:55 a.m. ET), and, on a close-to-open basis, Imperial's stock price did not

experience a statistically significant negative price reaction that day. *E.g.*, Doc. No. 98-12 ¶ 45. Recall that Imperial owns approximately 70% of Kearl and that, when Exxon Mobil issued it second quarter earnings release for 2016, the proved reserves at Kearl constituted a substantial part of the overall proved reserves from the Canadian Bitumen Operations, which in turn made up a significant portion of Exxon Mobil's total worldwide proved reserves. *E.g.*, Doc. No. 36 ¶¶ 96-101. If a downturn in performance at the Kearl Operation was responsible for Exxon Mobil's stock's statistically significant adverse close-to-open price movement on the day of the earnings release, one would therefore anticipate a comparably negative statistically significant close-to-open price movement in Imperial's stock. Because there was no such movement, the Court doubts that the observed reaction in Exxon Mobil's stock can reasonably be linked to Kearl and the broader Canadian Bitumen Operations.

**\*17** As Dr. Ferrell explains, confounding factors likely explain the movement in Exxon Mobil's stock price on July 29, 2016. Reviewing twenty-four contemporaneous analyst reports, Dr. Ferrell found that analysts mainly ascribed the earnings shortfall to Canadian wildfires and civil disturbances in Nigeria, which collectively resulted in an estimated decrease in production of 100,000 barrels per day. Doc. No. 98-12 ¶ 50. Dr. Ferrell's review did not reveal any analyst commentary concerning asset impairments or possible de-bookings of Exxon Mobil's proved reserves. *Id.*

On cross-examination, Professor Torchio agreed with Dr. Ferrell "that there was no information that the market took from the earnings disclosure that connected to Kearl or Rocky Mountain." Doc. No. 176 at 104; *see also* Doc. No. 103 ¶ 112. Absent information in the earnings release about the Canadian Bitumen Operations (including Kearl) or the RMDG Operations, there should be no price impact from the release related to either Operation.

Finally, the Court notes that the evidence demonstrating that the July 29, 2016, earnings release did not, as relevant here, have an impact on Exxon Mobil's stock price is consistent with Plaintiff's theory of the case—that Defendants made misleading statements to present Exxon Mobil as unaffected by the market forces harming its competitors, and that they successfully kept the market in the dark until they finally revealed the truth to the market on October 28, 2016. *See* Doc. No. 104 at 18-19, 22.

### 4.2.1.1.4.4. August 10, 2016: *The Washington Post*

**Op-Ed**

On the evening of August 9, 2016, *The Washington Post* published an op-ed by Senators Elizabeth Warren and Sheldon Whitehouse, entitled *Big Oil's Master Class in Rigging the System.* Doc. No. 36 ¶ 432; Doc. No. 98-10 at 2-3. This is the fourth alleged Corrective Disclosure. In the op-ed, Senators Warren and Whitehouse recapped the allegations that Exxon Mobil made misleading statements about climate change and the risks climate change posed to its long-term business model. Doc. No. 98-10 at 2. The Senators noted the existence of the NYAG investigation and a similar probe of Exxon Mobil being conducted by the Attorney General of Massachusetts. *Id.*

The Complaint also references the EEP Report, which was published on August 10, 2016, 1:11 p.m. ET. Doc. No. 36 ¶¶ 433-34. This report purportedly discussed certain politicians' desire for Exxon Mobil executives to testify in light of the multiple state attorneys general's investigations. *Id.*

Plaintiff does not specifically address *The Washington Post* op-ed or the EEP Report in its Motion or Reply, and Professor Torchio did not analyze the impact of either publication on Exxon Mobil's stock price. *See* Doc. No. 87; Doc. No. 88-1; Doc. No. 103; Doc. No. 104; Doc. No. 176 at 95. As with *The Guardian* and *The Los Angeles Times* articles, Plaintiff seemingly considers the publications to be partially corrective of some of Exxon Mobil's alleged misstatements about its use of a proxy cost of carbon.

The Court finds that Dr. Ferrell's analysis of the effect of the op-ed and the EEP Report on Exxon Mobil's stock price rebuts the *Basic* presumption of reliance. Because the op-ed was published after trading hours on August 9, 2016, and the EEP Report was published during trading hours on August 10, 2016, Dr. Ferrell's analysis of the window from market close on August 9, 2016, to market close on August 10, 2016, accounted for both publications. Dr. Ferrell's analysis revealed no negative stock price reaction attributable the publications. *See* Doc. No. 98-12 at 21.

**\*18** Not only does Dr. Ferrell's analysis sufficiently rebut the *Basic* presumption by showing a lack of price impact, but also it further supports Defendants' assertion that the market did not care about the state attorneys general's investigations into whether Exxon Mobil misled investors about its internal use of carbon proxy costs.

**4.2.1.1.4.5. October 28, 2016: Third Quarter Earnings Announcement for 2016**

On October 28, 2016, at 8:00 a.m. ET, Exxon Mobil issued the fifth alleged Corrective Disclosure, releasing its third quarter earnings for 2016. Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6. Until this point, Plaintiff alleges, Defendants successfully misled investors into believing that Exxon Mobil was immune from the broader market forces impacting its peers. For example, Plaintiff cites an analyst report, issued five weeks prior to the alleged Corrective Disclosure, stating that Exxon Mobil's ability to steer clear of write-down issues was due to the company's unique conservative approach to the timing and extent of its capitalization of reserves. Doc. No. 104 at 18. According to Plaintiff, on October 28, 2016, Exxon Mobil "finally came clean about likelihood of reserve write-downs and impairments" when it revealed in its earnings announcement that it might have to de-book approximately 3.6 billion barrels of oil sand reserves and 1 billion barrels of other North American reserves. *Id.* at 19; *e.g.*, Doc. No. 36 ¶ 437; Doc. No. 88-3 at 6.

This is the Corrective Disclosure from which Defendants cannot escape. The parties agree that Exxon Mobil's stock experienced a statistically significant negative price reaction on October 28, 2016, including on a close-to-open basis. *See* Doc. No. 98-12 ¶ 55; Doc. No. 104 at 13.

Defendants primarily contend that the third quarter earnings release could not have had any relevant impact on Exxon Mobil's stock price because all meaningful information regarding Exxon Mobil's de-bookings, impairments, or losses at the Canadian Bitumen Operations was accessible to the market before the release. *E.g.*, Doc. No. 115 at 26-28. Defendants reason that the efficient market for Exxon Mobil's stock incorporated this information prior to the issuance of the release. *Id.*

There is reason to doubt Defendants' assertion that the market had access to the information about the Canadian Bitumen Operations disclosed in the earnings release before Exxon Mobil issued the release. Both parties' Experts cite analyst reports that express surprise and dismay about the potential de-bookings and impairments announced in the release. *See* Doc. No. 98-12 at 36-37.

If Defendants' theory were correct, one would expect to observe two results that did not, in fact, materialize. First, if the market could infer that Exxon Mobil's reserves were impaired or should be de-booked from competitors' impairments and de-bookings, one would expect to see a statistically significant negative price reaction for Exxon

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

Mobil's stock on the days when its peers announced their impairments and de-bookings. Professor Torchio's analysis demonstrates that the expected result did not occur. *See* Doc. No. 103 ¶¶ 140-43. Second, one would expect to observe no statistically significant negative movement in Exxon Mobil's stock price on October 28, 2016, unless the reaction was attributable to other factors. Since Exxon Mobil's stock price dropped on October 28, 2016, Defendants should be able to identify such factors. Dr. Ferrell suggests that the earnings release primarily emphasized the negative impact of lower refining margins and commodity prices on Exxon Mobil's results, while also spotlighting notable year-over-year drops in earnings and capital and exploration expenditures. Doc. No. 98-12 ¶ 57. As the contemporary analyst reports show, the market was concerned with de-booking and impairment; the Court finds that the factors identified by Dr. Ferrell do not fully explain the drop in Exxon Mobil stock price on October 28, 2016. *See id.* at 36-37.

**\*19** Even if Defendants are correct that all of the de-booking and impairment information disclosed in the third quarter earnings release was discoverable in advance of the issuance, Defendants have not necessarily shown that the information was so widely known that it had become an integral part of the total mix of information available to investors. *E.g.*, *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011). Defendants' theory that the market could have used publicly available information to deduce the information subsequently disclosed in the earnings report largely relies on expert analysis. Doc. No. 115 at 26-28. As the Fifth Circuit has explained:

> While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace.

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014).

The negative impact of the third quarter earnings release on Exxon Mobil's stock price does not, however, support Plaintiff's claim that Defendants misled the market about Exxon Mobil's use of a proxy cost of carbon. Plaintiff argues that the third quarter earnings release, together with the second and fourth quarter earnings releases also alleged to be Corrective Disclosures, is partially corrective of Defendants' purportedly misleading statements about carbon proxy costs. Doc. No. 104 at 9-10, 26-27. Plaintiff contends that the de-booking and impairments revealed on October 28, 2016, would have happened earlier had Exxon Mobil adhered to its publicly

declared proxy cost. *Id.* Plaintiff alleges that if Exxon Mobil had incorporated its publicly stated carbon proxy cost in its internal models, it would have realized that its reserves were less profitable than it told the market. *See id.* According to Plaintiff, the three earnings releases are thus "linked" in a way that they can be seen as partially correcting the purported proxy cost misstatements. *Id.*

Plaintiff's "linkage" theory is unpersuasive. None of the three earnings releases alleged to be Corrective Disclosures pertained to Exxon Mobil's use of proxy costs of carbon. With the exception of a single analyst report issued after the alleged October 28, 2016, Corrective Disclosure, which mentioned in passing the existence of the state attorneys general's investigations into Exxon Mobil, *see id.*, Plaintiff presents no evidence that the market connected the three earnings releases to Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon, much less evidence that any connection between the releases and Defendants' alleged misstatements impacted the price of Exxon Mobil's stock.

The alleged Corrective Disclosures and similar articles that explicitly pertain to Exxon Mobil's use of carbon proxy costs (*i.e., The New York Times* article, both of *The Guardian* articles, *The Los Angeles Times* article (on a close-to-open basis), *The Washington Post* article, and the EEP Report) had no statistically significant negative impact on Exxon Mobil's stock price. If any subsequent disclosure was corrective of Defendants' alleged carbon proxy cost misstatements, it would be the Oleske Affirmation, filed on June 2, 2017, at 7:50 a.m. ET, which unveiled all of the climate-related allegations pertinent to this case. Plaintiff does not classify the Oleske Affirmation as a corrective disclosure—perhaps because, as Dr. Ferrell demonstrates, the Affirmation did not produce a statistically significant negative change in Exxon Mobil's stock price on either a close-to-open or a close-to-close basis. *See* Doc. No. 98-12 at 21.

**\*20** The Court concludes that Defendants have failed to rebut the *Basic* presumption by a preponderance of the evidence by showing that the alleged October 28, 2016, Corrective Disclosure had no impact on the price of Exxon Mobil stock, except insofar as Plaintiff alleges that Defendants misled the market about Exxon Mobil's use of a proxy cost of carbon.

#### 4.2.1.1.4.6. January 18, 2017: UBS Downgrade

On January 18, 2017, at 5:30 p.m. ET, UBS published the penultimate alleged Corrective Disclosure, an analyst

Fed. Sec. L. Rep. P 101,658

report downgrading Exxon Mobil to "sell" and reducing the target price for its stock from $86 to $77. Doc. No. 36 ¶ 443; Doc. No. 88-7. According to Plaintiff, in downgrading Exxon Mobil and lowering the price target, UBS cited the likely risk that Exxon Mobil would de-book proved reserves at Kearl based on Exxon Mobil's third quarter earnings release. Doc. No. 87 at 12 n.6; Doc. No. 104 at 13, 28. Professor Torchio did not analyze or provide a price impact opinion about the UBS report. *See* Doc. No. 88-1, Doc. No. 103; Doc. No. 104; Doc. No. 176 at 95. Plaintiff, however, claims that the report is partially corrective of certain alleged misrepresentations in the 2015 10-K and other subsequent releases. *See* Doc. No. 87 at 12.

The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing a lack of price impact with respect to the UBS report. Dr. Ferrell's close-to-open analysis revealed no statistically significant negative stock price reaction, though his close-to-close analysis did. Doc. No. 98-12 at 21, 38. Because UBS issued the report after trading hours, Dr. Ferrell contends that a close-to-open window is the proper event window for assessing price impact. *Id.* ¶¶ 19-20, 61. Based on the information before the it, the Court finds that a close-to-open window is probably well-suited to analyzing the impact of the UBS report on Exxon Mobil's stock price, as it was for analyzing the impact of *The Los Angeles Times* article on Exxon Mobil's stock price. UBS issued its brief report many hours before the market opened, and the market for Exxon Mobil stock is highly efficient.

The Court need not decide between close-to-open or close-to-close windows here, as the UBS report merely summarizes parts of Exxon Mobil's third quarter earnings release and makes a recommendation based on that information; it does not offer any new corrective information to the market. Plaintiff does not contend otherwise. *See* Doc. No. 104 at 28-29; Doc. No. 176 at 197 ("[T]he UBS downgrade is a result of Kearl de-booking and the lack of profitability."). As previously mentioned, the Court agrees with Dr. Ferrell that the mere reiteration of already disclosed information should not influence the price of a stock traded in an efficient market.

### 4.2.1.1.4.7. January 31, 2017: Fourth Quarter Earnings Announcement for 2016

The final alleged Corrective Disclosure occurred on January 31, 2017, at 8:00 a.m. ET, when Exxon Mobil

released its fourth quarter earnings for 2016 and confirmed that it would be taking an asset impairment charge of about $2 billion largely related to the RMDG Operations. Doc. No. 36 ¶¶ 446-47; Doc. No. 88-4. Later that morning, in an earnings conference call that took place during the first ninety minutes of trading, Woodbury confirmed that the Kearl proved reserves discussed in the third quarter earnings announcement would be de-booked in the coming weeks. Doc. No. 36 ¶ 234; Doc. No. 104 at 23.

**\*21** The Court concludes that Defendants have rebutted the *Basic* presumption by a preponderance of the evidence by showing a lack of price impact with respect to the fourth quarter earnings release. The fourth quarter release is the only earnings release alleged to be a Corrective Disclosure that is not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis. Dr. Ferrell analyzed Exxon Mobil's price using a close-to-open window and found no statistically significant negative price reaction to the fourth quarter release. Doc. No. 98-12 ¶¶ 63-64. Dr. Ferrell's close-to-close analysis—which would have captured any reaction associated with the de-booking confirmation in the conference call conducted after the market opened—also revealed no statistically significant negative price reaction. *See id.* Professor Torchio, did, however, find a statistically significant negative price reaction by using a two-day window. *E.g.*, Doc. No. 88-1 ¶¶ 83-91; Doc. No. 103 ¶¶ 75-86.

As the Court has already explained in Section 4.2.1.1.3 above, in this case, a two-day window is not appropriate for assessing price impact in the highly efficient market for Exxon Mobil's stock. The failure of the fourth quarter release to significantly affect Exxon Mobil's stock price when measured over a more appropriate window is unsurprising since the market was on notice of the impairments and de-bookings announced in the fourth quarter release as a result of Exxon Mobil's disclosures in its third quarter earnings release.

### 4.2.1.2. Omissions-Based Presumption of Reliance

Apart from invoking the presumption of reliance stemming from the fraud-on-the-market theory, Plaintiff also claims that it is entitled to rely on the presumption of reliance first established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to meet Rule 23(b)(3)'s predominance requirement. In *Affiliated Ute*, the Supreme Court held that proof of reliance is not a necessary condition for recovery in fraud cases primarily

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

involving the omission of material information. *Id.* at 152-53. Following this precedent, the Fifth Circuit holds that in cases where the "defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose," a plaintiff is entitled to a presumption that the plaintiff relied on the omission. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989); *see Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384-85 (5th Cir. 2007). The presumption does not apply "to cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true but misleading incomplete statements." *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 276 (N.D. Tex. 1990) (Fitzwater, J.).

Plaintiff's claims involve a mix of allegedly fraudulent conduct, most of which appears to consist of misrepresentations rather than omissions. That mix may not support application of the *Affiliated Ute* presumption. *See Lehocky*, 220 F.R.D. at 510 (holding that plaintiffs could not rely on *Affiliated Ute* presumption where plaintiffs alleged a mix of misrepresentations and omissions). But the Court need not and does not decide the applicability of *Affiliated Ute* to this case, as it has already found that Plaintiff is entitled to a rebuttable presumption of reliance based on *Basic*'s fraud-on-the-market theory.

### 4.2.2. Superiority

Having found that there are questions of law and fact common to the class that predominate with respect to Plaintiff's non-carbon proxy cost allegations, the Court now turns to the question of whether the class action is the superior way of resolving this matter. Defendants do not contest the superiority of class treatment here. *See generally* Doc. No. 115.

Nonetheless, the Court independently examines whether a class action "is superior to other methods for fairly and efficiently adjudicating th[is] controversy" based on the factors in Rule 23(b)(3)(A)-(D):

**\*22** (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The motivation of any potential class members to individually prosecute separate actions appears minimal. Plaintiff was the sole entity to move for appointment as lead plaintiff in this matter. Doc. No. 87 at 29. There is no indication of any related individual lawsuits; Plaintiff is not aware of any, and Defendants do not point to any either. *See id.*; Doc. No. 115. Considering the probable presence of numerous absent potential class members, each with relatively modest losses that might not justify the associated litigation costs and complexities, the desire for personal control over such cases seems relatively limited. *Id.*

In terms of efficiency, the potential class encompasses thousands of investors who purchased Exxon Mobil stock. The central claim for all investors is identical: Defendants misled them into acquiring Exxon Mobil stock at artificially inflated prices. As the elements of the putative class claims are issues that can be addressed uniformly for the proposed class, the Court believes that trying the claims collectively will be more efficient and cost-effective compared to individual trials.

Finally, the Court finds that the Northern District of Texas is a desirable forum for this class action at least because of the Court's familiarity with the case, and because a high number of the acts complained of occurred in substantial part in this District. *E.g., id.*

### 5. CLASS DEFINITION AND CONCLUSION

The Court will certify Plaintiff's proposed class with modifications. "District courts have significant leeway and discretion over the management of class actions. They may modify the classes to fit the requirements better and should not dismiss an action purely because the proposed class definition is too broad." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933-34 (5th Cir. 2023) (first citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998); and then citing *In re Monumental Life Ins. Co.*, 343 F.3d 331, 338 (5th Cir. 2003)).

As previously explained in Section 4.2.1.1.1, misrepresentations that do not impact the price of a stock are not actionable and cannot establish the starting point for a class period. The Court has determined that

**Ramirez v. Exxon Mobil Corporation, Slip Copy (2023)**

Fed. Sec. L. Rep. P 101,658

Defendants have sufficiently rebutted the alleged price impact of Defendants' alleged misstatements about the carbon proxy costs. The Court therefore **DENIES** Plaintiff's Motion to the extent it seeks to certify claims regarding Defendants' alleged misstatements about carbon proxy costs.

As outlined below, the Court certifies a class with respect to Plaintiff's remaining claims after adjusting the class period to reflect the Court's analysis of price impact. The Court sets the starting date of the class period on the date of the first alleged misstatement relevant to Plaintiff's certified claims: Exxon Mobil's 2015 10-K. As the end date for the class period, the Court sets October 28, 2016—the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut. Accordingly, the Court accordingly **CERTIFIES** the following class:

**\*23** All persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between February 24, 2016, and October 28, 2016 (the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut), inclusive, and were damaged thereby. Excluded from the class are Defendants and their families, the officers and directors of Exxon Mobil, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

The Court appoints Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund as class representative and Robbins Geller Rudman & Dowd LLP as class counsel.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5415315, Fed. Sec. L. Rep. P 101,658

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.