# Case No. 14

**H** KeyCite history available

2019 WL 6111303
United States District Court, S.D. Texas, Houston
Division.

Lawrence ROUGIER, Lead Plaintiff,
v.
APPLIED OPTOELECTRONICS, INC.
Chih-Hsiang (Thompson) Lin, and Stefan
J. Murry, Defendants.

Civil Action No. 4:17-cv-02399
|
Signed 11/13/2019

**Attorneys and Law Firms**

Andrew W. Rocco, Sebastiano Tornatore, Shannon L. Hopkins, Levi & Korsinsky, LLP, Stamford, CT, Jamie J. Gilmore, Tanner and Associates, PC, Fort Worth, TX, Gregory M. Nespole, Levi & Korsinsky LLP, New York, NY, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Lead Plaintiff.

Michael C. Holmes, Emily Schomburger Johnson, Robert Power Ritchie, Vinson and Elkins LLP, Amy Tankersley Perry, Dallas, TX, Allison Lee Fuller, Jeffrey S. Johnston, Vinson Elkins LLP, Houston, TX, for Defendants.

**MEMORANDUM AND RECOMMENDATION**

Christina A. Bryan, United States Magistrate Judge

**\*1** This matter is before the Court on Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Dkt. 105.[1] Having considered the parties' submissions and the law, this Court **RECOMMENDS** that Plaintiffs' Motion for Class Certification be **GRANTED**.

[1]   The District Court has referred this matter to this Magistrate Judge for report and recommendation. Dkt. 120.

**I. BACKGROUND**

**1. Procedural History**
This class action case asserts violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 against Defendant Applied Optoelectronics, Inc. ("AOI"), and violations of Section 20(a) of the Exchange Act against Defendants Chih-Hsiang Thompson Lin and Stefan J. Murry (collectively "Individual Defendants"). Dkt. 103. AOI is a manufacturer of fiber-optic networking products. *Id*. ¶ 38. Defendant Lin founded AOI and has acted as President and Chief Executive Officer since its inception, and as Chairman of the Board since January 2014. *Id*. ¶ 30. Defendant Murry has been AOI's Chief Financial Officer since August 2014, and Chief Strategy Officer since December 2012. *Id*. ¶ 31.

This suit was filed in August 2017 and consolidated with *Ludwig v. Applied Optoelectronics, Inc. et al*, No. 4:17-cv-2399 in October 2017. Dkt. 44 at 2. Five separate parties moved to be appointed as Lead Plaintiff, and on January 19, 2018, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the district court held a hearing on the motions. *Id*. at 1, 3-4. The district court appointed Lawrence Rougier as Lead Plaintiff and approved Rougier's choice of Class Counsel on January 22, 2018. *Id*. at 11. In its order appointing Rougier as Lead Plaintiff, the district court noted that Rougier purchased shares of AOI during the Class Period (February 23, 2017 through February 21, 2018) and that those shares subsequently lost significant value as a result of Defendants' alleged misconduct. *Id*. The district court also found that, for purposes of appointment as Lead Plaintiff, Rougier met the typicality and adequate representation requirements of Rule 23. *Id*.

Lead Plaintiff Rougier filed the First Consolidated Amended Class Action Complaint in March 2018, alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act against all Defendants, and violations of Section 20(a) of the Exchange Act against the Individual Defendants. Dkt. 48. Defendants filed a Motion to Dismiss the First Amended Complaint (Dkt. 53), and Lead Plaintiff responded. Dkt. 56. The district court denied Defendants' Motion to Dismiss in March 2019. Dkt. 81.

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

Lead Plaintiff Rougier and Plaintiffs Richard Hamilton, Kenneth X. Luthy, Roy H. Cetlin, and John Kugel (collectively "Plaintiffs") filed the Second Amended Class Action Complaint in May 2019. Dkt. 103. Plaintiffs have now filed a Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel, seeking to certify a class composed of:

> All persons or entities who purchased or otherwise acquired publicly traded common stock and/or call options of Applied Optoelectronics, Inc., or sold put options of Applied Optoelectronics, Inc., during the period from February 23, 2017 through February 21, 2018, inclusive, and were injured thereby.

**\*2** Dkt. 105 at 6. Defendants filed a timely Response to the Motion, and Plaintiff filed a timely Reply. Dkt. 115; Dkt. 123. Plaintiffs argue in their Motion that the proposed Class and its Class Counsel readily satisfy each requirement of Rule 23(a) and that the proposed Class meets Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. Dkt. 105 at 11-12, 15.

### 2. Factual History

#### A. AOI manufactures and sells optical transceivers to Facebook, Amazon, and others.

AOI manufactures and sells optical transceivers, which connect computer servers at datacenters. Dkt. 103 ¶ 1. Those computer servers communicate with personal computers, mobile phones, and other connected devices. *Id*. AOI sells most of its products to a small group of technology giants including Facebook, Amazon, and Microsoft. *Id*. ¶ 2. These technology giants operate hyperscale datacenters that store, process, and communicate massive amounts of data for websites (Facebook), or for cloud computing services (provided by companies like Amazon and Microsoft). *Id*. ¶ 48. Amazon is AOI's largest customer, representing 68% of AOI's revenue from its datacenter business. *Id*. ¶ 2.

As consumers increase their use of digital bandwidth on websites and cloud computing services, datacenters seek faster data transmission rates to keep up with the growing consumer demand for bandwidth. *Id*. ¶ 48. Because the transmission speed of an optical transceiver limits the speed at which a datacenter can communicate

information, datacenters constantly pursue faster transceivers. *Id*. In 2013, a transceiver that could transmit one gigabit ("1 Gbps" or "1G") of data per second was cutting-edge, but by 2015, 1G transceivers had been almost completely replaced by 40G transceivers (which contain four 10G chips and can transmit forty gigabits of data per second). *Id*. By late 2015, 100G transceivers (which contain four 25G chips and can transmit 100 gigabits of data per second) entered the market. *Id*. ¶ 49. Although the majority of AOI's datacenter sales in 2016 consisted of 40G transceivers, the demand for 100G transceivers was increasing by the beginning of the Class Period. *Id*.

AOI uses a "vertically integrated" manufacturing system, meaning AOI owns the supply chain for its products. For example, AOI manufactures laser chips in Texas and those chips are sent to Taiwan and used in the manufacture of the transceivers AOI sells to Amazon. *Id*. ¶¶ 50, 65, 75. Throughout the Class Period, AOI told investors that its vertical integration model yielded a critical advantage over competitors with respect to the industry transition from 40G to 100G transceivers, allowing AOI to better keep up with increasing demand for faster transceivers. *Id*. ¶ 3. Plaintiffs allege that AOI's vertical integration model actually suffered from major supply chain problems that made it impossible to meet demand. *Id*. ¶ 53.

Plaintiffs argue that Defendants were aware of, but failed to disclose, major competitive threats to AOI posed by the "merchant model," a competing manufacturing model in which end-users direct the custom assembly of transceivers using parts from multiple suppliers. *Id*. ¶ 76. Following an announced partnership between Amazon and a merchant model competitor, Plaintiffs claim Defendants still failed to address the known expected decline in sales to Amazon. *Id*. ¶ 80.

#### B. Defendants' public statements alleged to have violated Section 10(b) and Rule 10b-5.

##### i. The February 23, 2017 Press Release and Earnings Call

**\*3** The proposed Class Period begins on February 23, 2017, the date Defendants issued a press release announcing AOI's fourth quarter and year-end 2016 results. Dkt. 103 ¶ 94. In the press release, AOI touted its vertical integration model as providing competitive

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

advantages that would expand AOI's market leadership during the industry-wide transition to 100G. *Id*. During an earnings call held the same day, Defendants reiterated the supposed competitive advantages of AOI's vertical integration model (*Id*. ¶¶ 96-97) and insisted that it gave AOI an advantage in keeping up with customer demand, particularly within the datacenter market. *Id*. ¶¶ 100-01.

When asked in the earnings call about a decline in demand for 40G products, Defendants responded that the decline would not be problematic for AOI given the company's unique ability to transition its manufacturing operation from 40G to 100G, thereby making up for lost 40G sales with an increase in 100G sales. *Id*. ¶ 99. When asked "how much visibility" the company had into its customers' ramp up to 100G, Defendants stated that they had "good visibility" into customer demand and that customers' purchases were consistent with the projections customers had given to AOI. *Id*. ¶ 102. Following the press release and earnings call, AOI stock price rose from $37.47 per share to $45.98 per share. *Id*. ¶ 103.

**ii. The 2016 Form 10-K Filed on March 9, 2017**

AOI filed its 2016 Form 10-K Annual Report with the SEC on March 9, 2017. Dkt. 103 ¶ 105. The 2016 Form 10-K was signed by the Individual Defendants and listed AOI's "[v]ertically integrated, geographically distributed manufacturing model" as a "key competitive strength[ ]" for AOI. *Id*. ¶¶ 105, 107. The 2016 Form 10-K also stated that AOI expected continued sales of 40G and 100G products in 2017 with 100G sales eventually exceeding 40G sales. *Id*. ¶ 107.

**iii. The March 22, 2017 Investor Session.**

On March 22, 2017, Individual Defendant Murry participated in an investor session at the Optical Fiber Communication Conference and Exhibition, where he spoke about the benefits of AOI's vertical integration model. Dkt. 103 ¶ 109. Murry represented that AOI was one of a "relatively small number of companies" that could manufacture the chips to be used in its transceivers in-house, which was a competitive advantage in terms of quickly scaling production to meet customer demand. *Id*. ¶¶ 109-10. He also stated that AOI was ready for increasing demand from datacenter customers based on what customers had told AOI they would need "this year and next year." *Id*. ¶ 111.

**iv. The May 4, 2017 Press Release and Earnings Call**

On May 4, 2017, AOI issued a press release announcing its first quarter 2017 results. Dkt. 103 ¶ 144. Defendants reported "record performance" and stated that AOI continued to maintain a competitive advantage given its "technology innovation, manufacturing excellence, and customer satisfaction." *Id*.

AOI also held an investor earnings call on May 4, 2017 in which it touted AOI's visibility into Amazon and other customers and again asserted that, due to its vertical integration model, AOI had no issues from competitors. *Id*. ¶ 116. Although Defendants were allegedly aware that their merchant model competitors were increasing business with datacenters like Amazon, the Individual Defendants dismissed suggestions of competitive pressure from the merchant model. *Id*. ¶ 117, 119. Following the press release and earnings call, AOI's stock price rose $9.15 from $46.81 to $55.96 on May 5, 2017. *Id*. ¶ 124.

**v. The July 13, 2017 Press Release**

On July 13, 2017, AOI issued a press release announcing preliminary second quarter 2017 earnings. Dkt. 103 ¶ 26. Plaintiffs allege that, instead of addressing the change in competition posed by the merchant model and the known decline in sales to Amazon, Defendant Lin announced that AOI had delivered "another record quarter with [AOI's] top and bottom-line results expected to exceed [AOI's] guidance." *Id*. Following the July 13, 2017 press release, AOI's share price increased $5.40 to a closing price of $78.04 per share. *Id*. ¶ 127.

**C. Defendants' Partial Corrective Disclosures**

**\*4** Plaintiffs allege that Defendants' materially false statements and omissions caused AOI's share price to be artificially inflated. Dkt. 103 ¶ 177. Plaintiffs further allege that, when the truth of AOI's situation was revealed through a series of partial corrective disclosures, the artificial inflation of the share price was removed. *Id*. ¶ 171. The partial corrective disclosures are described below.

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

### i. The August 3, 2017 Press Release and Earnings Call

On August 3, 2017, AOI held its second quarter 2017 press release and earnings call. Defendants acknowledged weakening demand for AOI's 40G product and that the downturn in demand for 40G products during the transition to 100G was greater than expected. *Id*. ¶ 130. Defendants continued to insist that AOI's vertical integration model gave AOI a significant advantage over merchant model competitors and that the merchant model posed no real threat to AOI. *Id*. ¶ 136. The day following the release of the alleged partial corrective disclosures in the August 3 press release and earnings call, AOI's share price fell over 34% and closed at $64.60 per share. *Id*. ¶ 137.

### ii. The October 12, 2017 Press Release and Earnings Call

During an October 12, 2017 press release and earnings call, AOI informed investors that third quarter demand from Amazon had fallen, blaming Amazon's delay in transitioning from 40G transceivers to 100G transceivers. Dkt. 103. ¶¶ 140-41. Defendants informed investors that they did not believe the disruption in orders was "AOI-specific" and that it was, instead, "related to an ongoing transition from 40G to 100G." *Id*. ¶ 143. Following the October 12, 2017 news, AOI shares fell over 20% or by $11.83 per share. *Id*. ¶ 86, 142.

### iii. November 7, 2017 Press Release and Earnings Call

On November 7, 2017, AOI announced its third quarter 2017 results, which confirmed decreased demand from Amazon resulting in a loss of revenue from Amazon of $46.2 million. Dkt. 103 ¶¶ 146-47. Defendants continued to insist that the decreased demand was "not specific to AOI." *Id*. ¶ 147. Defendant Murry stressed AOI's vertical integration model, its ability to adapt to transitioning markets, and that sales of 100G products to other customers were "actually up" even though those sales did not balance out the overall decline from the "one customer," Amazon. *Id*. ¶ 149-50. Plaintiffs allege that these false reassurances caused the share price to increase by $5.75 per share over its closing price of $37.89 on November 7, 2017. *Id*. ¶ 151.

### iv. February 21, 2018 Press Release and Earnings Call

Plaintiffs claim that on February 21, 2018, AOI disclosed the full financial impact of Amazon's decreased demand. Dkt. 103 ¶ 153. Although AOI had previously blamed the third quarter 2017 sales decline on Amazon's delay in transitioning from 40G transceivers, AOI revealed on February 21 that its sale of 100G transceivers to Amazon had also dropped from 56% of datacenter revenue during the third quarter of 2017 to 35% during the fourth quarter. *Id*. ¶¶ 91, 153-54. Still, Defendant Murry stated that AOI expected to see long-term growth in sales from its datacenter customers despite the short-term drop. *Id*. ¶ 155. Following the disclosure, AOI's share price dropped over 20% from $34.55 to $27.51. *Id*. ¶ 156.

## II. LEGAL STANDARDS FOR CLASS CERTIFICATION

The party seeking class certification bears the burden of showing that the proposed class satisfies the requirements of Rule 23. *In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2013 WL 6388408, at *4 (S.D. Tex. Dec. 6, 2013) (citing *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)). Thus, to obtain certification of the proposed Class, Plaintiffs must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of either Rule 23(b)(1), (b)(2), or (b)(3). *BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at *4 (citing *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012)).

**\*5** To satisfy the requirements of Rule 23(a), Plaintiffs must demonstrate that (1) the class is so numerous that joinder is impracticable; (2) common questions of law or fact exist among the class members; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately represent the interests of the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

With respect to Rule 23(b), Plaintiffs have moved for certification of the proposed Class under Rule 23(b)(3), which requires that questions of law or fact common to the Class Members predominate over any questions affecting only the individual Members, and that a class action is superior to any other available method for fairly and efficiently resolving the controversy. Fed. R. Civ. P. 23(b)(3). This requirement is more demanding than the commonality prong of Rule 23(a) because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger v.*

Fed. Sec. L. Rep. P 100,704

*Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

### III. ANALYSIS OF RULE 23(a) FACTORS

Although Defendants make no argument regarding Plaintiffs' ability to satisfy the prerequisites of Rule 23(a), "it is improper for a district court to certify a class action without first demonstrating that the plaintiff has satisfied each of the requirements of Rule 23." *Vizena v. Union P. R.R. Co.*, 360 F.3d 496, 503 (5th Cir. 2004). Therefore, as set forth below, the Court finds Plaintiffs have demonstrated that the proposed Class meets the requirements of Rule 23(a)(1)-(4).

### 1. Numerosity

To satisfy Rule 23(a)(1)'s numerosity requirement, Plaintiffs must put forward evidence showing that the number of class members is so large that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiffs seek to certify a class composed of:

> All persons or entities who purchased or otherwise acquired publicly traded common stock and/or call options of Applied Optoelectronics, Inc., or sold put options of Applied Optoelectronics, Inc., during the period from February 23, 2017 through February 21, 2018, inclusive, and were injured thereby.[2]

Dkt. 105 at 6 (the "Class Members"). While Plaintiffs do not know the precise number of individuals that make up the proposed Class, they have provided information from which the Court can reasonably conclude that the Class is so numerous that joinder is impracticable.

[2] The class definition excludes (i) Defendants; (ii) Individual Defendants' immediate family members; (iii) any person who was an officer or director of AOI during the Class Period; (iv) any firm, trust, corporation, or other entity in which a defendant has or had a controlling interest; (v) the legal representatives, affiliates, heirs, successors in interest, or assignees of any such excluded person or entity. Dkt. 105 at 6, n. 3.

Throughout the Class Period, AOI common stock was listed on a national exchange, the NASDAQ Global Market. Dkt. 106-1 ¶ 24. On the first day of the Class Period, AOI had 18.4 million shares outstanding. *Id*. ¶ 25.

On the last day of the Class Period, AOI had 19.5 million shares outstanding. *Id*. ¶ 26. During the Class Period, AOI had a total volume of 686,926 call option contracts (representing over 68 million underlying shares) and 744,557 put option contracts (representing over 74 million underlying shares). *Id*. ¶ 134. Based on the number of outstanding shares traded on a national exchange and the volume of put and call option contracts, the Court can reasonably assume that the Class Members are sufficiently numerous and geographically dispersed to make joinder impracticable. *See Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981) ("[A]ny class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be so numerous that joinder of all members is impracticable." (quotations omitted)); *see also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) ("While Plaintiffs have not provided evidence concerning how many contemporaneous traders exist, the Court relies on the sheer number of shareholders alone, which indicates joinder of all class members is impracticable." (citations omitted)).

### 2. Commonality

**\*6** Rule 23(a)(2) requires Plaintiffs demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that Plaintiffs' and the Class Members' claims depend on a common contention that is capable of class-wide resolution, meaning determination of its truth or falsity will resolve an issue central to each Class Members' claim in "one stroke." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. at 350. Furthermore, Plaintiffs must demonstrate, not only that the Class Representatives and the proposed Class suffered a violation of the same provision of law, but that they all suffered the same injury as a result. *Id*. at 349-50.

The claims of all Class Members hinge on common contentions that are capable of being resolved class-wide. For example, Plaintiffs allege that AOI made various misrepresentations and omissions via public press releases (Dkt. 103 ¶¶ 94, 114, 126), earnings calls (*Id*. ¶ 96, 116), and SEC filings (*Id*. ¶ 105). The materiality and veracity of those statements will be proven class-wide and are contentions common to the entire Class. *See Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C. 1993) (finding commonality present in securities fraud cases when claim is based on alleged misrepresentations

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

in annual reports, interim reports, and press releases).

Plaintiffs further allege that those uniform misrepresentations and omissions resulted in inflated prices of AOI securities, an injury affecting the entire Class. Like the issue of whether AOI's statements were material and misleading in violation of the Exchange Act, whether the statements artificially inflated the stock price is a question common to all proposed Class Members. Furthermore, whether AOI possessed the scienter required to impose liability under § 10(b) of the Exchange Act is an issue common to all members of the Class, which will be resolved as to each Class Member "in one stroke." *See Wal-Mart v. Dukes*, 564 U.S. at 350. Because resolution of these common issues applies to the claims of each Class Member, the Court finds that the Plaintiffs have satisfied the commonality prerequisite for class certification. *See In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564-65 (E.D. Tex.) (finding commonality satisfied in securities class action where defendants made uniform misrepresentations to the investing public in SEC filings and press releases and the material misrepresentations and omissions artificially inflated the market price of securities, injuring each class member who purchased the artificially priced securities).

### 3. Typicality

Plaintiffs must also demonstrate the threshold requirement of typicality, which requires that the claims or defenses of the class representative be typical of the claims and defenses of the class. Fed. R. Civ. P. 23(a)(3). Typicality "requires that the representatives' claims share the same essential characteristics with the class members' claims." *Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. at 565 (citations omitted). Typicality exists when the representative plaintiff's claims arise out of the same event or course of conduct as the other class members' claims, and all claims are based on the same legal theories. *Krogman v. Sterritt*, 202 F.R.D. 467, 472 (N.D. Tex. 2001).

Here, Plaintiffs' claims and the Class Members' claims arise from the same events and are based on the same legal theories. First, Plaintiffs and the Class complain of the exact same misrepresentations, omissions, and course of conduct by AOI. Plaintiffs and the purported Class both allege AOI's representations and omissions artificially inflated the value of AOI securities during the Class Period. Second, the claims alleged by Plaintiffs and the Class are based on the same legal theories—violations of Sections 10(b) and 20(a) of the Exchange Act. The

Court finds Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy of Class Representatives

**\*7** Rule 23(a)(4) requires Plaintiffs demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts in the Fifth Circuit assess three factors when considering whether the class representatives will fairly and adequately protect the interests of the Class: (a) "the zeal and competence of the representative[s'] counsel"; (b) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (c) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)).

#### A. Class Counsel has shown itself to be zealous and competent to pursue the litigation.

Plaintiffs' selected Class Counsel, the law firm of Levi & Korinsky, LLP, has demonstrated the zeal and competence required to adequately represent the interests of the Class. The attorneys at Levi & Korinsky have experience in securities and class actions issues and have been appointed lead counsel in a significant number of securities class actions across the country. Dkt. 106-2 at 27-30. The firm has drafted two Amended Complaints (Dkt. 48, 103); defeated Defendants' Motion to Dismiss (Dkt. 81); served and obtained discovery from Defendants and third parties; retained experts; and filed the instant Motion to Certify the Class. Dkt. 105 at 15. Counsel's participation in the suit and their experience in complex securities class actions support a finding that they will adequately represent the interests of the Class. *See In re Loewen Grp. Inc. Sec. Litig.*, 233 F.R.D. 154, 166 (E.D. Pa. 2005) (finding Rule 23(a)(4) satisfied where counsel was experienced in securities fraud disputes and had vigorously pursued the action by preparing memoranda and conducting appropriate discovery).

#### B. Plaintiffs are willing to take an active role in and

**control the litigation.**

When determining adequacy, courts also consider whether the class representatives have enough understanding of the case to be able to control or prosecute the litigation and whether they are willing to take an active role in controlling the litigation. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005) (citing *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001)). Lead Plaintiff Rougier has participated in Levi and Korinsky's work on the case, including drafting Amended Complaints, drafting the Response to the Motion to Dismiss, obtaining discovery, and the preparation of the Motion to Certification of a Class. Dkt. 105 at 15. Plaintiffs have all certified that they would continue to "vigorously monitor and participate in this litigation and [are] available to testify at trial." Dkt. 106-2 at 5, 9, 14, 18, 23. Plaintiffs have also verified that they understand their duty to prosecute the case vigorously and in the best interests of all Class Members, which includes reviewing important filings, consulting with Counsel on proposed strategies, making recommendations as to whether to accept a settlement offer, and testifying in a deposition or trial if required. *Id.* at 3, 8, 13, 17, 22. Plaintiffs have demonstrated their willingness to take an active role in and control the litigation.

**C. Plaintiffs' interests do not conflict with those of the Class.**

There is no evidence of any conflict between the interests of Plaintiffs and those of the Class. All Class Members allege losses from transacting in AOI securities at artificially inflated prices, caused by the same underlying misrepresentations and omissions. Plaintiffs and the Class Members have the same interest in recovering for any loss caused by the alleged misrepresentation and omissions. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. at 502-03 ("[A]s long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class" there is no antagonism between the class and the representatives). The definition of the proposed Class excludes potential Members whose interests could be antagonistic to Plaintiffs' interests. For example, the proposed class definition excludes: (i) Defendants; (ii) the Individual Defendants' immediate family members; (iii) any person who was an officer or director of AOI during the Class Period; (iv) any firm, trust, corporation, or other entity in which a Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity. Finally,

there has been no evidence or argument that Plaintiffs are subject to legal defenses that are different from, or inapplicable to, the Class.

**\*8** Plaintiffs have satisfied their burden of showing that the proposed Class meets each of the Rule 23(a) requirements for class certification. Having satisfied the threshold requirements of Rule 23(a), Plaintiffs must also satisfy the requirements under Rule 23(b)(3).

## IV. ANALYSIS OF RULE 23(b)(3) FACTORS

Plaintiffs moving for certification under Rule 23(b)(3) must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Requiring that common issues predominate over individual issues "prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). Plaintiffs have established that common issues predominate over any individual issues and that a class action is the most fair and efficient method for adjudicating the controversy, thereby satisfying the Rule 23(b)(3) predominance requirement.

### 1. Predominance

"Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires [the Court] to consider 'how a trial on the merits would be conducted if a class were certified.' " *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Ins. Indem. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)). Considering whether the case should be tried as a class action "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class ...." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d at 555 (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

The substantive issues that will control the outcome at trial arise from Plaintiffs' claims that Defendants violated

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

§ 10(b) and the Individual Defendants violated § 20(a) of the Securities and Exchange Act of 1934, and thereby injured the Class Members. To recover for violations of § 10(b) and Rule 10b-5, which prohibit material misstatements or omissions in connection with the purchase or sale of any security, Plaintiffs must prove: (1) a material misrepresentation or omission by Defendants; (2) made with scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").

To recover for a violation of § 20(a), which imposes joint and several liability for an underlying securities fraud violation, Plaintiffs must prove the Individual Defendants had actual power over AOI and induced or participated in the alleged violations. 15 U.S.C.A. § 78t(a); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 749-50 (S.D. Tex. 2012). Because § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof. *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 699 (S.D. Tex. 2006). The additional substantive issue of whether the Individual Defendants had actual power over AOI and participated in or induced the fraud will be proven by the Individual Defendants' conduct, not by the conduct of any Class Members. Therefore, individual issues will not predominate with respect to the § 20(a) claims. *Id.* at 700. Accordingly, the discussion of predominance is limited to the elements of § 10(b).

### A. The alleged fraud, materiality, and scienter all are subject to common proof.

**\*9** No party disputes that whether Defendants made material misrepresentations and omissions, and whether those misrepresentations and omissions were made with the required scienter, are issues capable of class-wide proof. The same alleged misrepresentations and omissions that form the basis of each Class Members' § 10(b) claims were made in press releases and earnings calls on February 23, 2017 and May 4, 2017; the 2016 Form 10-K filed on March 9, 2017; the March 22, 2017 investor session; and the July 13, 2017 press release. The jury will make a single decision regarding the materiality and truthfulness of the alleged misrepresentations and whether Defendants acted with the requisite scienter based on common proof and that decision will apply to all Class Members' claims. The entire Class will be cohesive with respect to its success or failure in proving the materiality

of Defendants' misrepresentations and whether Defendants acted with the requisite scienter. *See Amgen, Inc. v. Conn. Ret. Plans & Tr.*, 568 U.S. 455, 460 (2013).

### B. Reliance is subject to common proof under the fraud on the market presumption.

Requiring proof of the Class Members' individual reliance on Defendants' misrepresentations or omissions in a securities fraud case would overwhelm issues common to the Class and, therefore, preclude class certification under Rule 23(b)(3). *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988). To address this problem, the Supreme Court has held that securities fraud plaintiffs can, in certain circumstances, satisfy the reliance element "by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 268 (discussing *Basic v. Levinson*, 485 U.S. 224 (2014)). The "fraud on the market theory," which underlies the reliance presumption,

> is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements .... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic v. Levinson*, 495 U.S. at 241-42.

The fraud on the market presumption of reliance applies when (1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the proposed Class Members traded the stock between the time the misrepresentations were made and the truth was revealed (market timing); and (4) the stock traded in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 268. Each of these requirements flows from the underlying theory of the fraud on the market presumption: if a misrepresentation is not publicly known or is immaterial, or the market is inefficient, then the misrepresentation could not have distorted the stock price or had an actual impact on the investor's deliberations in buying or selling the stock. *Id.* at 278. Likewise, if the investor did not buy or sell the stock after the misrepresentation was made, but before the truth was revealed, the investor could not have relied on the

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

distorted price. *Id*.

As discussed below, Plaintiffs have demonstrated that they will satisfy the elements required to invoke *Basic's* presumption of reliance arising from the fraud on the market theory.

### i. Plaintiffs allege publicly known misrepresentations.

The alleged misrepresentations by Defendants were publicly known because they were made in SEC filings (Dkt. 103 ¶ 105), press releases (*Id*. ¶¶ 94, 114, 126), and earning calls (*Id*. ¶¶ 96, 116). According to Dr. Hartzmark there were at least 24 research analysts reporting on AOI during the Class Period and over 1,000 articles on Bloomberg and Factiva alone discussing AOI, which further suggests that Defendants' misrepresentations were publicly known. Dkt. 106-1 ¶¶ 34-35.

### ii. Plaintiffs need not prove materiality at this stage.

**\*10** Even though the materiality of the alleged misrepresentations or omissions is a prerequisite for invoking the *Basic* presumption, the Supreme Court has held that materiality should be left for determination at the merits stage because Rule 23(b)(3) requires a showing that common questions predominate, not that they will be answered in favor of the Class on the merits. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 282 (holding that materiality is an objective issue subject to class-wide proof and does not bear on the predominance requirement) (citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. at 459-60). Plaintiffs need not show materiality of the misrepresentations at the class certification stage in order to invoke the fraud on the market presumption of reliance.

### iii. The class definition satisfies the market timing requirement.

Market timing requires that that proposed Class Members traded the stock between the time the misrepresentations were made and when the truth was revealed. The Class must be limited to those investors who invested in AOI securities between the time of the misrepresentation and the correction, based on the assumption that, if an investor did not buy or sell the stock after the misrepresentation

was made but before the truth was revealed, then she could not be said to have acted in reliance on the "fraud-tainted" price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 278. The proposed Class is defined as persons or entities who purchased or acquired shares and/or call options between the first alleged misrepresentation (February 23, 2017) and the last corrective disclosure (February 21, 2018). Dkt. 105 at 6. Thus, the market timing requirement for the presumption has been met.

### iv. Plaintiffs have demonstrated an efficient market.

To invoke the fraud on the market theory and thereby eliminate the need for individual proof of reliance, Plaintiffs must establish that AOI securities were traded in an efficient market. *See Unger v. Amedisys, Inc.*, 401 F.3d at 322. Drawing from *Cammer v. Bloom* and *Krogman v. Sterritt*, the Fifth Circuit has adopted eight factors for gauging whether a security trades in an efficient market. *Id*. at 323; *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. at 477-78. The eight factors recognized by the Fifth Circuit in *Unger*, have been widely used by courts around the country. *Unger v. Amedisys, Inc.*, 401 F.3d at 323.

The first five factors courts in the Fifth Circuit analyze when gauging market efficiency, the *Cammer* factors, include: (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; and (5) the existence of empirical facts that show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Unger v. Amedisys, Inc.*, 401 F.3d at 323 (citing *Cammer v. Bloom*, 711 F. Supp. at 1286-87). Courts then analyze the three *Krogman* factors, which include: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, which is the stock's trading volume without counting insider-owned stock. *Unger v. Amedisys, Inc.*, 401 F.3d at 323 (citing *Krogman v. Sterritt*, 202 F.R.D. at 477-78). As discussed below, analysis of the eight factors demonstrates an efficient market and Plaintiffs therefore will be entitled to a class-wide presumption of reliance.

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

### a. *Cammer* Factor 1: Average weekly trading volume

**\*11** Average trading volume is one of the strongest factors for gauging market efficiency. *Krogman v. Sterritt*, 202 F.R.D. at 474. "A large weekly volume of stock trades suggests significant investor interest in a company and implies that many investors are executing trades based on newly available or disseminated corporate information." *Id*. (citing *Cammer v. Bloom*, 711 F. Supp. at 1286). Turnover measured by average weekly trading of two percent or more of the outstanding shares justifies a strong presumption that the market for the security is an efficient one and one percent turnover justifies a substantial presumption. *Id*.

A report prepared by Plaintiffs' expert, Dr. Hartzmark, describes AOI's weekly trading volume as far in excess of the two percent turnover that justifies a strong presumption of market efficiency:

> [F]or the Class Period a total of 647.0 million shares traded hands with an average daily volume of 2.58 million shares....[A]verage weekly volume was 12.47 million shares. The ratio of average weekly volume to shares outstanding is 65% - more than *30 times* the 2% threshold that *Cammer* held "would justify a strong presumption that the market for the security is an efficient one."

Dkt. 106-1 ¶ 29. Defendants do not contest Dr. Hartzmark's information or his conclusions. The Court finds Plaintiffs have demonstrated an average weekly trading volume far in excess of the two percent turnover courts have found to create a strong presumption of market efficiency and have satisfied the first *Cammer* factor.

### b. *Cammer* Factor 2: Reporting on AOI Stock by Securities Analysts

When a large number of securities analysts review and report on a company's stock, it is likely that the information disseminated by the corporation is relied upon by the stock-trading public because the reports are viewed by investment professionals when making buy and sell recommendations to client investors. *Krogman v. Sterritt*, 202 F.R.D. at 475 (citing *Cammer v. Bloom*, 711 F. Supp. at 1286). According to Dr. Hartzmark's report, at least 24 analysts were reporting on AOI during the Class Period. Dkt. 106-1 ¶ 32. Further, during the Class Period there were 197 reports and over 1,000 articles discussing AOI. *Id*. ¶¶ 32, 35. The number of research analysts following AOI (9) compares favorably to the median

number of analysts following all common stocks on the NYSE (9) and NASDAQ (7) at the end of 2017. *Id*. ¶ 34. These uncontested facts support a finding that AOI securities traded in an efficient market. *See In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (coverage by three securities analysts favored market efficiency); *see also Aranaz v. Catalyst Pharm. Partners, Inc. et al.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (coverage by at least four supported market efficiency); *see also Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153-54 (S.D.N.Y. 2012) (coverage by "numerous securities analysts employed by major brokerage firms" supported market efficiency).

### c. *Cammer* Factor 3: NASDAQ Listing and Market Maker Activity

Most courts agree that whether a security is listed on the NASDAQ is a good indicator that the stock trades in an efficient market. *See Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 448-49 (W.D. Tex. 2019) ("[NASDAQ is "one of the largest markets in the world, and perhaps for this reason, Defendants have not contested that [the company] stock trades in an efficient market."); *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market ...."); *see also Carpenters Pension Tr. Fund of St. Louis, et al. v. Barclays PLC, et al.*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) ("[M]ost courts agree that [listing on the NYSE or NASDAQ] is a good indicator of efficiency."). AOI common stock traded on the NASDAQ Global Select Market. Dkt 106-1 ¶ 40.

**\*12** Market makers are firms that make a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at publicly-quoted prices. *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. at 508 n. 24. "[T]he volume of shares that [market makers] committed to trade, the volume of shares they actually traded, and the prices at which they did so" are indicators of market efficiency. *Krogman v. Sterritt*, 202 F.R.D. at 476. Nine dealers or market makers traded in excess of one percent of the total volume of AOI common stock during the Class Period. Dkt. 106-1 ¶ 43. Dr. Hartzmark also offered data demonstrating that "a large group of sophisticated investors, institutional investors and investment advisors participated in the market for AOI common stock." *Id*. ¶¶ 45-46. "The fact that AOI was listed on the NASDAQ Global Select Market and had a least nine active market makers, as well has many other less active market makers, standing ready to buy or sell ... support[s] the conclusion

Fed. Sec. L. Rep. P 100,704

that [AOI] common stock traded in an efficient market throughout the Class Period." *Id*. ¶ 44.

#### d. *Cammer* Factor 4: Form S-3 Eligibility

Companies that file monthly reports with the SEC for one year and have a public equity float[3] in excess of $75 million are eligible to file Form S-3, a short form securities registration for companies whose stocks are actively traded and widely followed. *See* 17 C.F.R. § 239.13; *Krogman v. Sterritt*, 202 F.R.D. at 476. The SEC's rationale for allowing a company to file a Form S-3 "is predicated on the Commission's belief that the market operates efficiently for [qualifying] companies, i.e., that the disclosure in Exchange Act reports and other communications ... such as press releases, has already been disseminated and accounted for by the market place." *Cammer v. Bloom*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6235 (Sept. 10, 1980)). AOI filed a Form S-3 on June 3, 2015 and again on October 17, 2016, another factor supporting a finding that AOI securities traded in an efficient market during the Class Period. Dkt. 106-1 ¶ 51-52.

[3]    A public equity float is the portion of a company's outstanding shares held in the hands of public investors as opposed to company officers or directors or stockholders that hold a controlling interest.

#### e. *Cammer* Factor 5: Reaction of Stock Price to New Material Information

"Evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the price of the stock is an important indicator of market efficiency." *Barrie v. Intervoice-Brite, Inc.*, Civil Action No. 3:01-CV-1071-K, 2009 WL 3424614, at *11 (N.D. Tex. Oct. 26, 2009) (citing *Krogman v. Sterritt*, 202 F.R.D. at 477). In fact, some courts have deemed the relationship between unexpected events and the response of the stock price "the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. at 1287; *see also In re 2TheMart.com, Inc.*, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000) (stating that the fifth *Cammer* factor may be the most important factor for evaluation of market efficiency).

A rapid change in share price alone does not demonstrate

a causal connection between the news and the price reaction. *Unger v. Amedisys, Inc.*, 401 F.3d at 325. Therefore, to demonstrate the causal relationship between new and unexpected information and the price of AOI stock, Dr. Hartzmark performed an event study to demonstrate the impact of different variables on AOI's stock price.[4] Dkt. 106-1 ¶ 67. Dr. Hartzmark's report describes how his event study demonstrates the cause and effect relationship between the alleged misrepresentations and partial disclosures on stock price. *Id*. ¶¶ 65-121. Based on his analysis, Dr. Hartzmark concludes that disclosures of AOI-specific news "caused rapid and significant movements in the prices of [AOI] common stock" and [t]hese analyses strongly support the conclusion that the marked for [AOI] stock was efficient ...." *Id*. ¶ 122-23. Dr. Hartzmark's report provides sufficient information to support a finding of a causal relationship between the release of information and AOI stock price and supports a finding of market efficiency.

[4]    An event study uses "generally accepted statistical methods ... to test whether stock price movement on a particular date—after adjusting for other influences such as general market performance and AOI's competitors' performance—is statistically significant,—*i.e.*, is large enough to allow a statistician to conclude it is not the consequence of chance." Dkt. 106-1 ¶ 67.

#### f. *Krogman* Factor 1: Market Capitalization

**\*13** Market capitalization is calculated as the number of shares multiplied by the prevailing share price. *Krogman v. Sterritt*, 202 F.R.D. at 478. Larger market capitalizations suggest market efficiency because stock purchasers have a greater incentive to invest in highly capitalized corporations. *Id*. (citations omitted).

At the start of the Class Period, AOI's market capitalization was $689.4 million and peaked at $1.9 billion. Dkt. 106-1 ¶ 55. AOI's market capitalization averaged over $1.0 billion throughout the Class Period and was at least in the 45th percentile of the NASDAQ and NYSE throughout the Class Period (meaning its capitalization was at least 45% higher than that of other listed common stock). *Id*. ¶ 55, 57. Class certification has been granted in securities class actions where the market capitalization of the defendant company was far lower than the average market capitalization of AOI throughout the Class Period. *Id*. ¶ 56 n. 82; *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (finding market efficiency where market capitalization

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

rates ranged from $246,386,421 to $432,150,737); *see also DVI, Inc. Sec. Litig.*, 249 F.R.D. at 212 (E.D. Pa. 2008) (finding market efficiency where market capitalization ranged between $12 million and $300 million); *see also Pa. Ave. Funds et al. v. Inyx Inc. et al.*, No. 08-Civ. 6857 (PKC), 2011 WL 2732544, at *9-10 (S.D.N.Y. 2011) (finding market efficiency where market capitalization rates were consistently in excess of $22.4 million throughout the Class Period). AOI's market capitalization supports a finding that AOI securities traded in an efficient market.

### g. *Krogman* Factor 2: Bid-Ask Spread

A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency. Dkt. 106-1 ¶ 60. Using daily closing bids and ask quotes, Dr. Hartzmark calculated the bid-ask spread for AOI shares. *Id*. ¶ 61. The average daily percent spread for AOI common stock was 0.04% and daily average dollar spread was two cents. *Id*.

Dr. Hartzmark compared AOI's 0.04% bid-ask spread with the bid-ask spread for all 3,795 companies on the NYSE and NASDAQ as of December 29, 2017. *Id*. ¶ 61, 63. The average bid-ask spread for all of the companies on the NYSE and NASDAQ was 0.59%. *Id*. ¶ 63 AOI's 0.04% bid-ask spread was narrower than 79% of the common stocks on the NYSE and NASDAQ, and narrower than those found by other courts to be indicators of market efficiency. *Id*. ¶¶ 62-63 (citing *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, at 574-75 (C.D. Ca. 2012) (bid-ask spread of 0.58%); *In re Scientific-Atlanta*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (bid-ask spread "never exceeded 1.9%"); and *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (bid-ask spread of 2.44%)). AOI's 0.04% average daily bid-ask spread supports a finding that AOI securities traded in an efficient market.

### h. *Krogman* Factor 3: Float

Float is the percentage of a corporation's shares that are held by the public as opposed to insiders. *See Krogman v. Sterritt*, 202 F.R.D. at 478. When stocks are predominantly held by insiders as opposed to the public, stock prices are less likely to reflect all available information about the security. *Id*. A larger float relative to the total number of outstanding shares indicates that

there is a large proportion of shares that are available to non-insiders, who can trade without restrictions and profit by trading on new information in the marketplace. Dkt. 106-1 ¶ 58.

**\*14** On average, AOI insiders held 0.7 million or 3.5% of the average shares outstanding during the Class Period. *Id*. ¶ 59. The public float ranged from 95.8% to 96.7% of AOI's shares. *Id*. AOI's large float supports a finding that AOI stock was traded in an efficient market. *Id*.; *see McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (float of 57% to 69% supported market efficiency).

### v. The same market efficiency factors apply to options.

Plaintiffs' proposed Class includes investors who purchased stock or call options, or sold put options during the Class Period. Dkt. 105 at 6. The fraud on the market presumption of reliance will eliminate the need to prove individual reliance both for Class Members who acquired stock, and also for Class Members who acquired call options or sold put options during the Class Period. The fraud on the market presumption of reliance applies to the purchase or sale of options during the Class Period because, like stock, AOI options traded in an efficient market.

An option is a contract for the right to buy or sell a stock at a specified price or strike price by a specific date. Dkt. 106-1 ¶125. A call option "gives the holder the right, but not the obligation, to purchase shares ... at a specified ... exercise price, on or before the specified expiration ... date." *Id*. A put option "gives the holder the right, but not the obligation to sell shares ... at the specified exercise price on, or possibly before, the expiration date." *Id*. Options are derivative of securities because the price of an option is dependent on the magnitude of the difference between the fixed strike price of the option and the price of the stock. *Id*. ¶ 126. In other words, as the price of the common stock changes, all else being equal, the price of put and call options will change: as the stock price rises, the price of a call option will rise, and the price of a put option will fall. *Id*.

Courts in the Fifth Circuit routinely have held that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d at 754 ("[E]vidence applying the ... factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for ... § 10(b) claims

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

based on the options."). In addition to this general principle, Dr. Hartzmark performed a separate statistical analysis to demonstrate that AOI options traded in an efficient market. Dkt. 106-1 ¶ 124-56. Dr. Hartzmark's unrebutted report establishes that "there was a substantial amount of volume and a large amount of open interest in options on [AOI] common stock during the Class Period." *Id*. ¶ 135. Further, Dr. Hartzmark's statistical analysis of the cause and effect relationship of AOI-specific information on the price of AOI options demonstrated that the information caused rapid and significant movements in the prices of AOI options. *Id*. ¶ 155. His statistical analysis and the evaluation of eight factors support the conclusion that AOI options operated in an efficient market. *Id*.

### C. Damages can be calculated using a common method.

Defendants do not challenge Dr. Hartzmark's opinion that AOI stocks and options traded in an efficient market and, therefore, *Basic's* presumption of reliance will eliminate the need to prove individual reliance. Defendants do challenge, however, Plaintiffs' ability to prove damages on a class-wide basis. Defendants argue that Plaintiffs' proposed damage model fails to track the Class theory of liability and overcompensates Class Members. Dkt. 115 at 7-9. As a result, Defendants contend that Plaintiffs have failed to satisfy their burden to demonstrate a class-wide damages methodology that satisfies Rule 23(b)(3). *Id*. at 9.

### i. Plaintiffs' damages model proposes to calculate out-of-pocket losses resulting from fraud on the market.

**\*15** Plaintiffs' damages model uses empirical methods to calculate Class Members' out-of-pocket losses incurred as a result of Defendants' fraud. Dkt. 106-1 ¶¶ 157-60. Out-of-pocket losses are the difference between the price paid for the stock and the "but for" value of the stock, or what its value would have been absent the misrepresentations and omissions. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) ([T]he out-of-pocket measure ... allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud ....") (quotations omitted).

Plaintiffs' expert, Dr. Hartzmark, uses an event study to calculate the Class Members' out-of-pocket losses on a class-wide basis:

> This common damages methodology using the "out of pocket" loss often begins with the same type of event study I have used to evaluate price-related factors.
>
> * * *
>
> In summary, to calculate damages, I identify the level of price inflation in [AOI] common stock attributable to the specific misrepresentations and omissions ultimately established by Plaintiffs. This "but-for" price does not depend on, nor need to consider, an individual investor's risk tolerance or expected returns. Rather it is common to all investors because it measures how the misrepresented information affected [AOI's] common stock price, which of course is the essence of fraud-on-the-market.

Dkt. 106-1 ¶¶ 159-60. In addition to identifying price inflation due to fraud, the proposed damages model also would use common empirical techniques to identify and disaggregate information affecting the stock price that is *unrelated* to the misrepresentations and omissions at issue. *Id*. ¶ 159; 124-1 ¶ 10. Using the daily levels of artificial inflation *attributable to fraudulent statements or omissions* and the actual trading activity of the Class Members, Dr. Hartzmark can calculate the damages for each Class Member in a methodical and mechanical manner. Dkt. 106 ¶ 159. According to Dr. Hartzmark, any decline in stock price caused by non-fraudulent information will be disaggregated as part of a loss causation analysis. Dkt. 124-1 ¶¶ 10-11. Because option prices are derived from the share price, Dr. Hartzmark's model also can be used to calculate damages arising from option contracts.[5] Dkt. 106-1 ¶¶ 161-62. In short, because empirical techniques allow for the disaggregation of price decline due to factors other than the misrepresentations found by the jury, the proposed damages model would allow recovery only for out-of-pocket losses resulting from fraud on the market.

[5]     Dr. Hartzmark proposes to calculate damages for option holders by modeling the actual prices of options of AOI common stock pursuant to a widely-used pricing model, such as the Black-Scholes option pricing model, and using the output of that model, "re-calculate the theoretical price based on the true value of the common stock (holding other inputs to the options pricing model constant)." Dkt. 106-1 ¶ 162. As with the common stock methodology, the option methodology would be "formulaic" and capable of mechanical application to each individual Class Member. *Id*.

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

Plaintiffs' proposed damages model comports with the requirements of Rule 23(b)(3) as set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). In *Comcast*, the Supreme Court held that Rule 23(b)(3) requires that the method for calculating class damages be consistent with the theory of liability asserted in the case. *Comcast Corp. v. Behrend*, 569 U.S. at 35. The *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock. *See Ludlow v. BP, P.L.C.,* 800 F.3d 674, 691 (5th Cir. 2015) ("Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based upon *price and price alone*."). Furthermore, courts recognize event studies, like the one used by Dr. Hartzmark, as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability. *See BP, P.L.C. Sec. Litig.*, 2013 WL 6388408 at *15 ("Event studies are commonly used in securities fraud class actions."); *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 ("[O]ut -of-pocket damages calculations through an event study analysis ... have been recognized by courts as an accepted method for the evaluation of damages in securities fraud cases ...."). Thus, Plaintiffs have demonstrated an accepted method for calculating Class Members' out-of-pocket damages that are consistent with a fraud on the market theory of liability.

**ii.  Defendants' recasting of Plaintiffs' theory of liability does not preclude certification.**

**\*16** Defendants argue that Dr. Hartzmark's proposed damages model overcompensates Plaintiffs because it allows Plaintiffs to recover for "materialization of risk" liability, which requires individual proof of risk tolerance. Dkt. 115 at 7-12. In support of this argument, Defendants rely on *Comcast* and the line of BP securities fraud cases involving the Deepwater Horizon explosion and oil spill. *See id.* (citing *In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ("*BP I*"); *In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ("*BP II*"); *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)).

An examination of the BP cases illustrates that their reasoning does not preclude class certification. Unlike the

Plaintiffs in this case, the plaintiffs in *BP I* failed to demonstrate that the proposed class was entitled to benefit from the fraud on the market presumption of reliance. *BP P.L.C. Sec. Litig.*, 2013 WL 6388408 at *15 ("[T]he fraud-on-the-market presumption cannot be invoked, and Plaintiffs' claims based on these alleged misstatements are not appropriate for class action treatment."). In addition, the *BP I* plaintiffs failed to meet their burden to present an event study and damages methodology showing damages could be measured on a class-wide basis consistent with their theory of liability. *Id.* at *17. In this case, Plaintiffs *have* met their burden by presenting Dr. Hartzmark's report detailing an event study and a mechanical method for disaggregating price reactions that do not result from fraud on the market. *BP I* does not counsel denying class certification in this case.

In order to overcome the obstacles to class certification identified in *BP I*, the plaintiffs in *BP II* moved to certify two subclasses: a pre-explosion class and a post-explosion class. *BP P.L.C. Sec. Litig.*, 2014 WL 2112823 at *2. The pre-explosion subclass sought to recover for BP's false assurances that misled investors about BP's process safety and the ability to prevent events like the Deepwater Horizon blowout. *Id.* at *2-4. The post-explosion subclass sought to recover for more traditional securities fraud liability based on BP's false statements regarding the amounts of oil being released in the spill. *Id.* at *4-5.

In opposing certification of the pre-explosion subclass, BP argued that "[b]ecause the pre-explosion damages methodology is not based on the 'but for' price that the stock would have traded at absent [BP's] alleged fraud, it represents an impermissible windfall for investors, protecting them from the downside consequences of an assumed (if allegedly understated) risk." *Id.* at *10. Unlike the damages model in this case, it was undisputed in *BP II* that the pre-explosion subclass did not seek out-of-pocket damages based on the artificial inflation of the stock price. *Id.* Instead, the *BP II* plaintiffs claimed to be entitled to the full value of the drop in stock price following the Deepwater Horizon explosion as consequential damages. The district court refused to certify the subclass, stating that causation damages were "antithetical to the fraud on the market theory" of liability by which investors sought class-wide resolution of their claims. *Id.* at *12. In other words, the proposed damages model was inconsistent with the class' theory of liability in violation of *Comcast*.

The Fifth Circuit upheld the district court's refusal to certify the pre-explosion subclass, and expanded on why the materialization of risk theory put forward by the subclass was not entitled to the *Basic* presumption of

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

reliance:

> **\*17** Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based on *price and price alone*. That is, if an investor makes investment decisions based upon price, he or she necessarily buys any particular stock in reliance upon all of the information or misinformation incorporated into its price. But plaintiffs' own model asserts that they relied on something other than price: risk. By claiming that class members may have divested themselves of BP stock if they had known about the true risk of an accident in the Gulf—as distinguished from that risk's impact on BP's stock *price*—the plaintiffs are arguing that their investment decisions were based substantially upon factors other than price. The plaintiff's argument thus undercuts one of the rationales for the *Basic* presumption of reliance.

*Ludlow v. BP, P.L.C.* 800 F.3d at 691.

On the other hand, the post-explosion subclass was a different matter. The post-explosion subclass "proposed to model damages ... by calculating the inflation caused by the fraudulent statements." *BP, P.L.C.*, 2014 WL 2112823 at \*4. Accordingly, the district court found that plaintiffs' damages model met the requirements for class certification under Rule 23(b)(3). *Id.* at \*12-14. The Fifth Circuit affirmed, noting that the liability theory for the post-explosion subclass was consistent with its damage theory: "the liability stems from ... misstatements, and the loss forming the basis for Plaintiff's damages model comes from the inflated stock price caused by those misstatements." *Ludlow v. B.P., P.L.C.*, 800 F.3d at 687.

In this case, like the post-explosion subclass, Plaintiffs ultimately allege that AOI's "liability stems from ... misstatements, and the loss forming the basis for Plaintiffs' damages model comes from the inflated stock price caused by those misstatements." *Id*. With respect to liability allegations, Plaintiffs' Second Amended Complaint sets out a litany of alleged materially false and/or misleading statements and omissions. Dkt. 103 ¶¶ 94-128. With respect to the damages model, the Complaint alleges artificial inflation of the stock price and corrective disclosures that removed the artificial inflation, hallmarks of the fraud on the market theory of liability:

> The artificial inflation created by Defendants' misrepresentations and omissions was removed through a series of partial corrective disclosures by Defendant starting with their announcement on August 3, 2017 that one of their largest data center customers Amazon would be decreasing its demand for the Company's 40 Gbps products. The market was surprised by this

disclosure and reacted swiftly. AOI's stock price declined 34% from a close of $97.99 per share on August 3, 2017, to a close at $64.60 per share on August 4, 2017, on heavier than usual trading volume of more than 17 million shares.

*Id*. ¶ 172. Plaintiffs also allege a corrective disclosure on October 12, 2017 that caused the stock price to drop from $58.84 to $47.01, and a final corrective disclosure on February 21, 2018 that caused the stock price to drop from $34.55 to $27.51. *Id*. ¶ 174, 176. Dr. Hartzmark's report and supplemental report describe at length his method for calculating the "but for" value of the stock, for disaggregating inflation or price fluctuations not related to the misrepresentations found by a jury, and how he would use the inflation ribbon[6] to methodically calculate damages for each Class Member. Dkt. 106-1 ¶¶ 158-63; Dkt. 124 ¶¶ 9-14. Thus, unlike the plaintiffs in *BP I*, the Plaintiffs here have satisfied their burden to demonstrate a damages model that calculates artificial inflation, the but for price, and will disaggregate inflation unrelated to fraud. Also, as was the case for the post-explosion subclass the district court certified in *BP II*, there is no disconnect between Plaintiffs' theory of liability and damages model in violation of *Comcast*.

6    An inflation ribbon is a "time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure from the outset of the Class Period." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16CIV6728CMRWL, 2019 WL 3001084, at \*19 n. 9 (S.D.N.Y. July 10, 2019) (citations omitted).

**\*18** Furthermore, several courts have addressed and rejected similar "materialization of risk" arguments made by other defendants opposing class certification under Rule 23(b)(3). *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, 322 F. Supp. 3d at 692 ("A number of courts have rejected similar attempts by defendants to reframe plaintiffs' theory of liability in order to prevent class certification in Rule 10(b)-5 securities fraud cases relying on the fraud-on-the-market theory of liability."); *see also Baker v. SeaWorld Ent., Inc.*, Case. No. 14cv2129-MMA (AGS), 2017 WL 5885542, at \*14 (S.D. Cal. Nov. 29, 2017) (rejecting defendants' argument that plaintiffs' out-of-pocket damages calculation was not properly tied to their theory of liability); *see also Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010). For example, in *Schleicher v. Wendt*, the Seventh Circuit rejected the defendants' attempt to recast the plaintiffs' fraud on the market case as a materialization of risk case, explaining that:

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

Although "materialization of risk" runs like a mantra through the parties' briefs, we do not think that it has any significance .... If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust .... The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million .... [but] [t]he phrase adds nothing to the analysis .... [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.

*Schleicher v. Wendt*, 618 F.3d at 683-84. Like the defendants *Schleicher v. Wendt*, Defendants in this case attempt to defeat class certification by characterizing the fraud alleged by Plaintiffs as a misrepresentation of "the risks that AOI would experience a significant downturn in its datacenter business later that year[,]" which risk was realized when "the company made a series of reports ... revealing that a downturn in their datacenter business had, in fact, occurred." Dkt. 115 at 6 (citing Dkt. 103). They then argue that the out-of-pocket loss measure of damages described in Dr. Hartzmark's report would overcompensate investors for the materialization of the risk that AOI would suffer a downturn in business. Dkt. 115 at 10-11. As detailed above, Plaintiffs' method for demonstrating class-wide damages is consistent with its fraud on the market theory of liability, Dr. Hartzmark proposes a damage methodology that will disaggregate losses not attributable to fraud found by the jury, and class certification under Rule 23(b)(3) will not violate *Comcast*.

**D. Defendants' loss causation argument does not prevent Rule 23(b)(3) certification.**

Defendants also argue that Plaintiffs' proposed class definition is overbroad because it includes purchasers who, as a matter of law, were not injured and cannot prove the required element of loss causation. Dkt. 115 at 12-13. Defendants allege that the class definition would include purchasers, sometimes called "in-and-out" traders, who purchased shares during the Class Period, but sold them prior to the first relevant disclosures and therefore suffered no loss. *Id.*; *see McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 697 (W.D. Wash. 2010). Defendants then argue that, to the extent the class definition allows for the inclusion of purchasers who suffered no loss, the Class would include investors with no standing to sue and therefore cannot be certified. Dkt. 115 at 9-10.

**\*19** As support for the argument that the Class cannot be certified because it includes Class Members who cannot prove injury and have no standing to sue, Defendants rely on the Second Circuit's decision in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). *Denney*, however, involved the certification of a settlement class. Some courts draw a distinction between the certification of a litigation class and a settlement class. *See In re Deepwater Horizon-Appeals of Econ. & Prop. Damage Class Action Settlement*, 756 F.3d 320, 324 (5th Cir. 2014) (Clement, J., dissenting from denial of rehearing en banc) (enumerating the "sound reasons to evaluate Article III standing differently for pre-trial and settlement class certifications under Rule 23.").

To the extent Defendants' standing argument is based on an inability to prove loss causation, Plaintiffs are not required to do so at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*") ("The Court of Appeals erred by requiring [the plaintiffs] to show loss causation as a condition of obtaining class certification."); *Ludlow v. BP, P.L.C.*, 800 F.3d at 686 ("In *Halliburton I*, the Court unanimously held that loss causation need not be proved in order to certify a class ...."). Furthermore, the Court retains power to modify the class definition at a later stage of these proceedings. Fed. R. Civ. P. 23(c)(1)(C); *see also Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.") (citations omitted)); *see also M.D. v. Perry*, 294 F.R.D. 7, 66 (S.D. Tex. 2013) ("[FRCP] 23(c)(1)(C) authorizes courts to alter and amend class certification orders before final judgment."). Therefore, the current definition of the class does not preclude class certification under Rule 23(b)(3).

**2. Superiority**

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is easily met in this case. Typically, class actions are appropriate vehicles for adjudicating securities fraud cases because they "avoid the time and expense of requiring all class members to litigate individually." *BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at \*18. The Court can assume, based on the number of outstanding shares that traded on a national exchange and

**Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)**

Fed. Sec. L. Rep. P 100,704

the volume of put and call option contracts, that the Class will be so large and geographically dispersed as to make a class action superior to other methods for fairly and efficiently adjudicating the controversy. *See id.* (class action was vastly superior method for resolving the right to damages of approximately 900,000 securities purchasers). Further, the commonality of the purported Class Members' claims suggests that fairness and efficiency would be better served by certifying the class. *See id.* ("Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy than requiring individual adjudications would.").

## V. CONCLUSION

Plaintiffs have satisfied the threshold requirements of Rule 23(a) as well as the additional requirements of 23(b)(3). Plaintiffs have established that common issues controlling their § 10(b) and Rule 10b-5 claims predominate over any individual issues. The Plaintiffs have met their burden to prove the necessary factors for the application of Basic's presumption of reliance. Plaintiffs have also proposed a damages methodology that is common to the class and is properly tethered to their

corrective disclosure theory of liability. Finally, a class action suit is the superior mechanism for adjudicating the controversy at issue given the volume of potential Class Members and the commonality of their claims.

**\*20** For the reasons discussed above, the Court **RECOMMENDS** that Plaintiffs' Motion to Certify a Class pursuant to Rule 23(a) and Rule 23(b)(3) be **GRANTED** and Plaintiffs' proposed Class be **CERTIFIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

## All Citations

Not Reported in Fed. Supp., 2019 WL 6111303, Fed. Sec. L. Rep. P 100,704

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.