# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Case No.: 4:21-cv-02473 |

# SURREPLY REPORT

# OF

# LUCY P. ALLEN

**June 19, 2024**

**TABLE OF CONTENTS**

I.      Scope of Assignment ........................................................................................1

II.     Qualifications and Remuneration .....................................................................1

III.    Materials Considered ........................................................................................1

IV.     The Coffman Rebuttal Fails to Rebut Defendants' Claim that There Is No Price
        Impact from Any of the Individual Category A, B, or C Alleged Misstatements ..............2

        A.  The Coffman Rebuttal mistakenly attempts to analyze price impact by addressing
            all alleged misstatements as a group rather than as individual misstatements and
            thus completely fails to address whether there is price impact from any of the
            individual Category A, B, or C alleged misstatements ..................................................2

        B.  The Coffman Rebuttal fails to do a front-end analysis of price impact, and its
            criticisms of the Allen Report's front-end content analysis are incorrect .....................4

        C.  The Coffman Rebuttal's back-end analysis of price impact not only fails to
            properly analyze any specific alleged misstatement but also fails to show an
            economic or causal link between any price movement and the alleged
            misstatements ........................................................................................8

            1.  The Coffman Rebuttal's back-end analysis of price impact fails to actually
                analyze any specific alleged misstatement, including any individual Category
                A, B, or C alleged misstatement .....................................................................8

            2.  The analyst commentary cited in the Coffman Rebuttal is only topically
                related to the general allegations in the case and does not show price impact
                from any of the individual Category A, B, or C alleged misstatements ..................9

            3.  The Coffman Rebuttal's finding of a statistically significant price decline after
                the alleged corrective disclosure does not establish an economic or causal link
                between this price movement and any of the individual Category A, B, or C
                alleged misstatements ..........................................................................12

            4.  The Coffman Rebuttal ignores that the back-end content analysis in the Allen
                Report provides strong evidence supporting a lack of price impact and merely
                claims that it is not a "bright-line indicator of price impact" ...............................12

V.      The Coffman Rebuttal Fails to Rebut the Issues Raised in the Allen Report Regarding
        the Proposed Common Damages Methodology ..........................................................13

        A.  The Coffman Rebuttal's claim that the damages calculation can be separated from
            a materialization of risk theory is contrary to the underlying nature of Plaintiffs'
            claims ................................................................................................13

        B.  The Coffman Rebuttal, rather than actually addressing the issues raised in the
            Allen Report, merely promises that its proposed common damages methodology
            will "adapt" and "address" them ....................................................................15

C.  The Coffman Rebuttal fails to rebut that former RSP shareholders in the proposed class do not fit Plaintiffs' theory ...................................................................................17

## I.    SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants to review and comment on the Expert Rebuttal Report of Chad Coffman, CFA, dated May 8, 2024 (the "Coffman Rebuttal").

2.      I have previously submitted an expert report in this matter, dated March 15, 2024 (the "Allen Report"). Mr. Coffman previously submitted an expert report in this matter, dated December 7, 2023 (the "Coffman Report").

## II.    QUALIFICATIONS AND REMUNERATION

3.      My qualifications and remuneration were set forth in the Allen Report.

## III.    MATERIALS CONSIDERED

4.      In preparing this report, I considered the materials previously considered in the Allen Report. In addition, I considered the following materials:

a) Defendants' Opposition To Plaintiffs' Motion For Class Certification, filed March 15, 2024;

b) Expert Rebuttal Report of Chad Coffman, CFA, dated May 8, 2024, including materials considered and turned over;

c) RSP Form DEFM14A, filed June 6, 2018; and

d) Legal decisions on class certification and market efficiency.

1

**IV.    THE COFFMAN REBUTTAL FAILS TO REBUT DEFENDANTS' CLAIM THAT THERE IS NO PRICE IMPACT FROM ANY OF THE INDIVIDUAL CATEGORY A, B, OR C ALLEGED MISSTATEMENTS**

**A.    The Coffman Rebuttal mistakenly attempts to analyze price impact by addressing all alleged misstatements as a group rather than as individual misstatements and thus completely fails to address whether there is price impact from any of the individual Category A, B, or C alleged misstatements**

5.    The Coffman Rebuttal completely fails to rebut Defendants' claim that there is no price impact from any of the individual Category A, B, or C alleged misstatements. Mr. Coffman mistakenly attempts to analyze price impact by addressing all alleged misstatements as a group rather than as individual misstatements.[1] Defendants claim that there is no price impact from any of the individual Category A, B, or C alleged misstatements, not from all alleged misstatements.[2] Mr. Coffman's analysis not only does not show price impact from the alleged misstatements as a group but also completely fails to address whether there is price impact from any of the individual Category A, B, or C alleged misstatements.

6.    Mr. Coffman concludes that there is "compelling evidence of price impact" of the alleged misrepresentations.[3] Mr. Coffman comes to this conclusion solely by finding a statistically significant price decline after the alleged corrective disclosure and certain analyst commentary after the alleged corrective disclosure that is only topically related to the general allegations in the case.[4] Importantly, Mr. Coffman has not shown that there is price impact from any of the individual Category A, B, or C alleged misstatements. Mr. Coffman does not analyze any of the individual alleged misstatements or show that there is a link between Concho's price movement and any of the specific Category A, B, or C alleged misstatements. In fact, the Coffman Rebuttal fails to analyze or even mention any of the specific alleged misstatements,

---

[1]    Coffman Rebuttal, ¶14.

[2]    Defendants' Opposition to Plaintiffs' Motion for Class Certification, pp. 13-21.

[3]    Coffman Rebuttal, ¶23.

[4]    Coffman Rebuttal, Section III.

2

except when making an argument that two alleged misstatements had "specific economic meaning" (which, as discussed below, he fails to specify).[5]

7.    The Allen Report analyzed every one of the individual Category A, B, and C alleged misstatements and showed that there is no evidence of price impact from any of those individual alleged misstatements.[6] The Coffman Rebuttal fails to address whether there is price impact from any of the individual Category A, B, or C alleged misstatements or rebut any of the analyses in the Allen Report with regard to the specific alleged misstatements. The Coffman report does not claim that any of the results of the analysis of the specific alleged misstatements in the Allen Report are incorrect and mentions no issues with the content analysis. Instead, the Coffman Rebuttal concludes that a price drop after the alleged corrective disclosure that relates to the general topics of the allegations as a whole (including the Company's rig count and production forecasts) necessarily demonstrates price impact from *all* of the alleged misrepresentations.[7]

8.    The Coffman Rebuttal ironically criticizes the Allen Report for failing to analyze price impact of all alleged misstatements[8] when the problem with the Coffman Rebuttal is that Mr. Coffman fails to actually analyze *any specific* alleged misstatement. Instead, he erroneously groups all alleged misstatements together and attempts to claim a link between them and the later price drop because both are topically "related."[9] The assignment of the Allen Report, as explicitly stated in the section titled "Scope of Assignment," was to analyze specific alleged misstatements, in particular, the 54 alleged misstatements grouped into Categories A, B, and C. There are 18 additional alleged misstatements identified in the Complaint and Defendants are not challenging class certification for those alleged misstatements on lack of price impact grounds.[10]

---

[5]    Coffman Rebuttal, ¶¶41-43.

[6]    Allen Report, Section V and Appendix D.

[7]    Coffman Rebuttal, Section III.

[8]    Coffman Rebuttal, ¶30. ("Even if one were to accept Defendants' categorization scheme, Ms. Allen's analysis fails to address all alleged misstatements. Specifically, Appendix I to Defendants' Motion includes Category D, a fourth category of alleged misstatements not addressed in the Allen Report. Although Ms. Allen states that she "was not asked to analyze those alleged misstatement [sic]," she fails to present any evidence that there is a lack of price impact related to those 18 alleged misstatements.")

[9]    Coffman Rebuttal, ¶¶22-23.

[10]    Defendants' Opposition to Plaintiffs' Motion for Class Certification, p. 7, footnote 1.

3

I was not asked to analyze those other alleged misstatements, and the Allen Report does not address them.[11]

9.      The Coffman Rebuttal claims that there are flaws with the categorization of the alleged misstatements into Category A, B, and C.[12] However, the Coffman Rebuttal's criticism about the categorization of the alleged misstatements is irrelevant to whether any of the individual alleged misstatements had price impact. The Allen Report analyzed each individual alleged misstatement in Category A, B, and C, and that analysis, as well as its results, are independent of the categorization of those alleged misstatements. In other words, the categorization merely acts as an aid in organizing the analysis, not as a tool that affects the results.

## B.      The Coffman Rebuttal fails to do a front-end analysis of price impact, and its criticisms of the Allen Report's front-end content analysis are incorrect

10.      Mr. Coffman fails to do any front-end analysis of price impact, and his criticisms of the Allen Report's front-end content analysis are incorrect.

11.      An analysis of price impact is an analysis of whether the alleged misrepresentations affected the market price when made. The Supreme Court defined price impact in the context of class certification in securities class actions as "whether the alleged misrepresentations affected the market price in the first place."[13] In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misstatement, including analyzing the stock price movement and examining market and analyst commentary following the misstatement ("front-end analysis"), or (2) indirectly by analyzing the market reaction to a disclosure that is corrective

---

[11]   Allen Report, ¶9.

[12]   Coffman Rebuttal, ¶11.

[13]   See, for example, *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011). ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.")

4

of an alleged misstatement ("back-end analysis").[14] Mr. Coffman performs no front-end analysis of price impact for any of the alleged misstatements.

12.    Mr. Coffman claims, without any analysis, that the alleged misstatements in this case are "omissions" or "price maintenance" misstatements, and thus, asserts that the front-end content analysis in the Allen Report is "completely irrelevant to price impact."[15] Not only does Mr. Coffman fail to do any analysis and only makes unsupported assertions, but he also fails to specify whether the alleged misstatements are omissions or price maintenance misstatements. Further, Mr. Coffman also fails to indicate what was omitted for the alleged omissions and, for the alleged price maintenance misstatements, when the statement was first made and whether there was a market reaction when first made.[16]

13.    Moreover, Mr. Coffman's claim that the front-end analysis in this case is "completely irrelevant to price impact" directly contradicts his own finding that several of the alleged misstatements had "specific economic meaning."[17] In particular, Mr. Coffman claims that the alleged misstatements A-11 and A-25 have "specific economic meaning."[18] Alleged

---

[14]    See, for example, *Erica P. John Fund, Inc. v. Halliburton Co.*, 134 S. Ct. 2398 (2014).

Note that simply testing whether there were statistically significant price reactions on the dates of the alleged corrective disclosures may not be a reliable analysis of price impact of the alleged misrepresentations for a number of reasons, including the following:

1.    The alleged corrective disclosures may not actually be corrective of the alleged misrepresentations. (If the alleged corrective disclosures are not in fact corrective, they cannot help one determine the price impact of the alleged misrepresentations).

2.    The alleged corrective disclosure dates may not properly correspond to when the alleged misrepresentations were first corrected in the market. (Since, in an efficient market, only new news should affect a security's price, the reaction to repeated news is not a reliable indicator of what the price impact of the news would be initially. If news that is not new affects the price, then that is an indication that the market is not efficient.)

3.    The price reaction on the alleged corrective disclosure dates may be the result of confounding factors or news unrelated to the alleged fraud.

4.    Market conditions may have changed between the time that the alleged misrepresentations were made and the time of the alleged corrective disclosures.

[15]    Coffman Rebuttal, ¶36.

[16]    Mr. Coffman is completely silent about the Allen Report's point that several of the alleged misstatements were nearly identical to statements made by the Company before the alleged Class Period and that in an efficient market, confirmatory or repeated news (i.e., news that had already been publicly disclosed) should not impact the market. Allen Report, ¶¶48-50.

[17]    Coffman Rebuttal, ¶36, ¶¶41-43.

[18]    Alleged Misstatement A-11:

misstatement A-11 mentions that "intense development" requires "multi-well pads" and "long laterals and all the infrastructure that we're going to be able to use together."[19] Alleged misstatement A-25 mentions that "by drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done."[20]

14.    Tellingly, Mr. Coffman fails to specify what is the specific economic meaning in those alleged misstatements or analyze the relevant question of how the market reacted to those alleged misstatements. Moreover, if there were, as he claims, specific economic meaning, one would expect analysts to incorporate that specific economic meaning into their valuations of the Company. Mr. Coffman fails to analyze any of the analyst reports after those alleged misstatements or show that any of the analysts incorporated that "specific economic meaning" into their valuations. In the Allen Report, I analyzed all of the analyst reports issued after alleged misstatements A-11 and A-25 and found that not only did analysts not change their price targets or valuations of Concho in response to those alleged misstatements but they did not even reference those alleged misstatements.[21] The fact that not a single analyst even mentioned those

---

**Analyst**: Sure, understood. And then, I guess, second, the synergies you talked about and the advantages to quote-unquote manufacturing, can you just give a little bit of additional color detailing around what exactly it is that allows manufacturing mode on these assets to drive those synergies?

Leach: Yes. As Steve mentioned, I mean, the balance sheet to be able to do this ***intense development***, instead of 1 or 2 well pads, to go to ***8 well multiwell pads is one of the drivers***. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. ***All those things will be very additive***. [Allen Report, Appendix C, p. 4]

Alleged Misstatement A-25:

Analyst: That makes a lot of sense. Then lastly, Tim, on your prepared remarks, and certainly in some of your comments earlier, doesn't sound like you're too concerned about upcoming service cost. Kind of sounds like maybe perhaps it'll stay in line. I know I've asked you about this in the past, would you think about -- I know I've talked to some others that are locking in some rigs on a bit longer- term contracts. People seem to be a little more concerned may be on rig inflation than they are on fracs here and then, let's call it, for 2019, could you all maybe just address the drilling or it's completion side. Any concerns you might have there?

Leach: No, I think ***the drilling side of our business is one of the best parts of our business***. And I think ***the way we have approached that in the past will continue***. I mean, you can see that it doesn't require that much of a growth in rigs to accomplish all the future, not just for '19 and '20, but beyond. So, by ***drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done***. And we do have rigs that now are on 6-months contracts or 1-year contracts but ***we do have kind of a portfolio approach on that. But I don't think you should expect us to - any change in strategy based on what we're seeing today***. [Allen Report, Appendix C, p. 11]

19    Coffman Rebuttal, ¶42, Complaint, ¶208.

20    Coffman Rebuttal, ¶41, Complaint, ¶258.

21    Allen Report, ¶¶8-28.

6

alleged misstatements provides strong evidence that those alleged misstatements were not important to the market and thus had no price impact.

15.     Although Mr. Coffman correctly identifies the four questions in the front-end content analysis for the Category A alleged misrepresentations in the Allen Report, Mr. Coffman confusingly criticizes the Allen Report for looking at only two of the four questions.[22] This is flatly incorrect. The Allen Report analyzed all four questions, and Mr. Coffman is completely ignoring the analysis and findings in the Allen Report regarding the third and fourth questions of the content analysis.[23] The methodology described in the Allen Report was to answer four questions (not two) for each alleged misstatement, and the results are meant to be interpreted as such.[24]

16.     As discussed in the Allen Report, the content analysis of analyst reports issued *after the Category A alleged misstatements* yielded the following results for the four questions analyzed:[25]

- o   For each alleged misstatement, there was <u>no</u> indication in any of the analyst reports that the alleged misstatement <u>caused the analyst to change its valuation</u> of Concho and/or its stock.

- o   For each alleged misstatement, there was <u>no</u> indication in any of the analyst reports that the alleged misstatement <u>caused the analyst to change its price targets</u> for Concho.

- o   For 29 of the 33 Category A alleged misstatements, there was no reference to the alleged misstatement in any of the analyst reports. There were 4 analyst reports that mention 4 of the alleged misstatements. The analysts that do reference the alleged misstatements appear to be referencing the alleged misstatement in a different context than what is alleged to be misstated in the Complaint.

---

[22]   Coffman Rebuttal, ¶40.

[23]   Allen Report ¶¶11-14, 23, 26.

[24]   Allen Report, Section V.

[25]   Allen Report, ¶23 and Appendix D, pp. 1-33.

o For the 14 alleged misstatements that were made in earnings calls, 76% of analyst reports did not mention the earnings call at all. For the 2 alleged misstatements that were made in SEC Forms 10-K, none of the analysts mentioned the Forms 10-K. For the 9 alleged misstatements made in investor conferences, none of the analyst reports mentioned these conferences.

17.     The Coffman Rebuttal makes further erroneous criticisms about the front-end analysis in the Allen Report. Mr. Coffman claims that "using Ms. Allen's flawed logic, it would follow that every time an analyst's valuation or price target following an earnings announcement remained the same, all of the revenue and earnings values contained in that announcement could be considered 'generic' and therefore have no price impact, which is clearly incorrect."[26] The Allen Report is not saying that because analysts did not change their valuation or price targets, a statement is "generic." Instead, the Allen Report explains that if a generic statement does not change any analysts' valuation or price targets, it provides evidence that the statement had no price impact.

C.   **The Coffman Rebuttal's back-end analysis of price impact not only fails to properly analyze any specific alleged misstatement but also fails to show an economic or causal link between any price movement and the alleged misstatements**

1.   **The Coffman Rebuttal's back-end analysis of price impact fails to actually analyze any specific alleged misstatement, including any individual Category A, B, or C alleged misstatement**

18.     Mr. Coffman claims that there is a "clear economic and causal link between Plaintiffs' alleged misstatements and the alleged corrective disclosure."[27] However, Mr. Coffman not only fails to actually analyze any specific alleged misstatement, including any individual Category A, B, or C alleged misstatement, but also completely fails to show an economic or causal link between any of these individual alleged misstatements and the alleged corrective disclosure. Instead, Mr. Coffman has a very general summary of the alleged misstatements and merely shows that the alleged corrective disclosure was new bad news that discussed topics that

---

[26]   Coffman Rebuttal, ¶38.

[27]   Coffman Rebuttal, Section III.

8

were generally related to Plaintiffs' allegations and the Company's business.[28] Mr. Coffman's general analysis cannot and does not support his finding of a "clear economic and causal link" between the specific alleged misstatements and the alleged corrective disclosure.[29] Moreover, using Mr. Coffman's flawed logic, any bad news about the Company's wells or its oil production would be evidence of price impact of the alleged misstatements.

19.    Mr. Coffman's analysis actually appears to validate many of the findings of the back-end content analysis in the Allen Report, which show that there is no link between the alleged misstatements in Category A, B and C and the alleged corrective disclosure but instead a mismatch between them. In particular, Mr. Coffman appears to agree with many of the findings of my back-end content analysis by stating the following:

> Her only empirical finding is that after the corrective information was released, there were no analyst reports that (1) specifically mentioned having learned a prior Concho statement was inaccurate or misleading; (2) specifically drew a connection between the corrective information and any specific alleged misstatement; or (3) specifically mentioned one of the alleged misstatements. [Coffman Rebuttal, ¶10]

Mr. Coffman fails to rebut any of these empirical findings.

**2.    The analyst commentary cited in the Coffman Rebuttal is only topically related to the general allegations in the case and does not show price impact from any of the individual Category A, B, or C alleged misstatements**

20.    Mr. Coffman purports to show that analyst commentary after the alleged corrective disclosure supports his view that there is a "clear economic and causal link" between the alleged misstatements and the alleged corrective disclosure.[30] However, even though some of the analyst commentary cited by Mr. Coffman includes statements that are topically related to Plaintiffs' general allegations in the case (e.g., the lower production forecast), Mr. Coffman does not show any economic or causal link between any of the individual Category A, B, or C alleged misstatements and the alleged corrective disclosure.

---

28    Coffman Rebuttal, ¶14.

29    Coffman Rebuttal, Section III.

30    Coffman Rebuttal, Section III.

9

21.    In the Allen Report, my team and I performed a systematic and scientific content analysis of all analyst reports issued after the alleged corrective disclosure. The content analysis demonstrated that there is no basis to conclude that the alleged corrective disclosure was tied to any of the individual alleged misstatements in Category A, B, or C and that the alleged corrective disclosure was not considered corrective of those alleged misstatements.[31]

22.    Mr. Coffman fails to link the alleged corrective disclosure to any of the alleged misstatements, and the analyst commentary that he cites to support his finding of price impact only shows that there was new negative news announced on the alleged corrective disclosure date.[32] For example, Mr. Coffman cites the following quote from a Barclays analyst report on July 31, 2019, the date of the alleged corrective disclosure:

> "However, the market's focus heading into the print was on CXO's ability to maintain operational momentum in H2'19 and potential risk to the 2020 outlook as rig data indicated that CXO currently is running 18 rigs vs. Q1 earnings call commentary of low 20s by the summer and original guidance of 24 rigs in Q3/Q4. […] While the Q2 release validated these concerns (see discussion below), **we were caught off guard by having the old industry albatross of unsuccessful spacing pilots with lasting effects also being a culprit.**" [Coffman Report, ¶15, emphasis from Coffman Rebuttal]

23.    Mr. Coffman fails to link this commentary to any specific Category A, B, or C alleged misstatement. The Barclays commentary is not indicative that the market or the analysts are learning anything new about any of the Category A, B, or C alleged misstatements. Instead, the Barclays commentary is focusing on the new results about the Dominator project and noting that unsuccessful spacing pilots have always been an issue in the industry. The Barclays comment that they were "caught off guard" means they were negatively surprised. Defendants are not arguing that there was no new negative news that surprised the market on this date. Instead, Defendants are arguing that the new negative news was not corrective of prior Category A, B, or C alleged misstatements, so the price decline after that news cannot be evidence of price impact from those alleged misstatements.[33]

---

[31]    Allen Report, Section V.

[32]    Coffman Rebuttal, ¶15.

[33]    Defendants' Opposition to Plaintiffs' Motion for Class Certification, pp. 13-21.

10

24.     Moreover, the Barclays commentary makes no reference to any of the Category A, B, or C alleged misstatements. For example, alleged misstatement A-8, which was made more than a year before the Barclays commentary, discussed how Concho's "accomplishments last year" (i.e., Concho's actual results), which Plaintiffs are not claiming were misrepresented, had validated Concho's "well spacing, lateral placement and completion design."[34]

25.     As the Court in the *Goldman* case noted, "commentary touching upon only the same subject matter… cannot be enough" to show price impact.[35] Mr. Coffman is not tying the alleged corrective disclosure to any of the individual alleged misstatements. The analyst commentary cited in the Coffman Rebuttal only shows that he is trying to tie the alleged corrective disclosure to the general subject matter of the case (e.g., the lower production forecast) and in essence is just parroting Plaintiffs' claims rather than showing price impact from the alleged misstatements.[36]

26.     Mr. Coffman claims that after the alleged corrective disclosure there was evidence of "skepticism" of the alleged misstatements and thus evidence of price impact because the analysts discussed a lack of "credibility" and "confidence."[37] However, Mr. Coffman's claim is incorrect. There is no evidence of skepticism about the alleged misstatements. Analysts do use terms such as "eroded confidence," but not in the context of questioning any of the alleged misstatements. Instead, analysts use the term "eroded confidence" in the context of the Company's current execution capabilities given Concho's strong track record. For example, the J.P. Morgan report cited by Mr. Coffman indicated that there was "eroded confidence in the company's execution capabilities" given their "strong historical performance."[38] Mr. Coffman fails to identify any analyst who questions management's credibility with regard to any of the Category A, B, or C alleged misstatements.

---

[34]    Allen Report, Appendix C, p. 3.

[35]    "In short, although market commentary can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact—commentary touching upon only the same subject matter, given the contours of this case as discussed above, cannot be enough." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 104 (2d Cir. 2023).

[36]    Coffman Rebuttal, Section III.

[37]    Coffman Rebuttal, ¶34.

[38]    J.P. Morgan, August 5, 2019.

**3. The Coffman Rebuttal's finding of a statistically significant price decline after the alleged corrective disclosure does not establish an economic or causal link between this price movement and any of the individual Category A, B, or C alleged misstatements**

27.     Mr. Coffman finds, using his event study, that the drop in Concho's stock price after the alleged corrective disclosure was "highly statistically significant" and that such a result provides "compelling evidence of back-end price impact."[39] However, Mr. Coffman fails to link the alleged corrective disclosure to any alleged misstatements, including any individual Category A, B, or C alleged misstatement. Thus, a finding that there is a statistically significant price decline after the alleged corrective disclosure cannot and does not establish price impact of any alleged misstatement.

**4. The Coffman Rebuttal ignores that the back-end content analysis in the Allen Report provides strong evidence supporting a lack of price impact and merely claims that it is not a "bright-line indicator of price impact"**

28.     Mr. Coffman dismisses the back-end analysis in the Allen Report despite it showing, among other things, that no analysts tied the alleged corrective disclosure to any of the Category A, B, or C alleged misstatements by claiming that the lack of focus from analysts is "not a bright-line indicator" of whether there is economic evidence of back-end price impact.[40] However, the Allen Report did not claim that the content analysis was itself a "bright-line indicator." Instead, based on the back-end content analysis, the Allen Report found that there was no basis at all to conclude that the alleged corrective disclosure was tied to any of the individual Category A, B, or C alleged misstatements.[41] Mr. Coffman has failed to do anything to rebut this finding and has failed to present *any* evidence that ties the alleged corrective disclosure to any individual Category A, B, or C alleged misstatement (or any other misstatement).

---

[39]  Coffman Rebuttal, ¶9.

[40]  Coffman Rebuttal, ¶26.

[41]  Allen Report, Section V.

12

## V.    THE COFFMAN REBUTTAL FAILS TO REBUT THE ISSUES RAISED IN THE ALLEN REPORT REGARDING THE PROPOSED COMMON DAMAGES METHODOLOGY

### A.    The Coffman Rebuttal's claim that the damages calculation can be separated from a materialization of risk theory is contrary to the underlying nature of Plaintiffs' claims

29.    The Allen Report explained that Mr. Coffman's proposed common damages methodology is not well-specified and, given the specific issues in this case, does not measure damages consistent with Plaintiffs' risk materialization theory of liability.[42] In response, the Coffman Rebuttal asserts that the Allen Report's point is moot because Plaintiffs are no longer pursuing a materialization of risk theory of liability, and thus, his common damages methodology is "consistent" with Plaintiffs' theory of loss causation.[43] However, merely saying that Plaintiffs have dropped the words "risk materialization" does not make the problem go away because the risk materialization theory cannot be separated from Plaintiffs' claims in this case.

30.    According to Plaintiffs' own Complaint, the nature of their claims is a series of allegedly understated risks that inflated Concho's stock price during the alleged Class Period, and that caused the stock to drop when those risks materialized. According to their Complaint, Plaintiffs' theory of liability is that Defendants "fraudulently and affirmatively concealed from investors what they had put at stake and what the risks were for their venture."[44] Plaintiffs claim that the "price of Concho common stock fell precipitously when … the risks concealed by the Individual Defendants' misconduct materialized."[45] Plaintiffs use the term "risk" 480 times in their Complaint.

31.    Plaintiffs detail in their Complaint the alleged list of reasons why each of the individual alleged misstatements was misleading. As shown below, each of the specified reasons either explicitly or implicitly relates to undisclosed risks that supposedly materialized during the

---

[42]    Allen Report, Section VII. A.

[43]    Coffman Rebuttal, ¶47.

[44]    Complaint, ¶3.

[45]    Complaint, ¶407.

13

alleged Class Period. Below is a list of all the reasons identified by Plaintiffs in their Complaint for why the alleged misstatements were misleading:

"(a) Concho's manufacturing-style development was an **unverified and extremely high-risk** combination of development methodologies, which included aggressively tight well spacing;

(b) the construction of Concho's manufacturing-style development projects required an **extremely high upfront investment with no verifiable basis that they would deliver** estimated production and capital efficiency;

(c) Concho's manufacturing-style development projects **carried an enormous amount of risk** that production rates and total production would be permanently impaired due to improperly spaced wells;

(d) Concho **lacked a sufficient amount of lower risk projects to balance out the risk** of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e) Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's **materially riskier** manufacturing-style development projects;

(f) the Individual Defendants, including Defendant Giraud, were repeatedly **warned internally of the risks** related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g) Defendants **incorrectly risked** Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h) Defendants failed to conduct, or at the very least ignored, the **necessary facture modeling** and other data collection which **would have indicated** their manufacturing-style development and aggressive well spacing would result in **poorly performing wells**;

(i) while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such **risky projects.**"[46]

32.    As shown above, the word "risk" is explicitly used in seven of Plaintiffs' nine reasons, while the two remaining reasons implicitly refer to risks ("extremely high upfront investment with no verifiable basis that they would deliver" and "the necessary facture modeling… would have indicated… poorly performing wells"). Moreover, Plaintiffs' specified reasons why each alleged misstatement is supposedly misleading ends with the same conclusion:

---

[46]   See, for example, Complaint ¶244, emphasis added.

14

"the above-mentioned risks would and did manifest during the Class Period."[47] Thus, Mr. Coffman's proposed common damages calculation cannot be separated from a materialization of risk theory.

### B.  The Coffman Rebuttal, rather than actually addressing the issues raised in the Allen Report, merely promises that its proposed common damages methodology will "adapt" and "address" them

33.     The Allen Report identifies a number of issues with Mr. Coffman's proposed common damages methodology, including that it is not well-specified, does not measure damages consistent with Plaintiffs' theory, and yields economically unreasonable results for certain proposed class members.[48] According to Mr. Coffman, his "out-of-pocket methodology is capable of addressing all of Ms. Allen's concerns."[49] However, rather than actually addressing the issues raised in the Allen Report, Mr. Coffman just makes promises that his proposed common damages methodology will "adapt" and "address" the issues raised in the Allen Report without offering any specifics.[50]

34.     For example, Mr. Coffman does not explain how his methodology would be capable of measuring damages given Plaintiffs' understated risk theory. Instead, Mr. Coffman merely presents a hypothetical example, saying that if "evidence obtained in discovery suggests that only half of the allegedly corrective information [...] could have been disclosed" then the inflation would be half.[51] This is not a methodology but more of a tautology. Moreover, even if one were able to determine that half of the allegedly corrective information could have been disclosed, Mr. Coffman's methodology does not specify how to determine how much the market understood about the allegedly understated risks at various points in time during the alleged Class Period. Mr. Coffman's example does nothing to explain how his methodology would

---

[47]  See, for example, Complaint ¶244.

[48]  Allen Report, Section VII.

[49]  Coffman Rebuttal, ¶47.

[50]  Coffman Rebuttal, Section VI.

[51]  Coffman Rebuttal, ¶65.

15

separate the impact of the allegedly understated risk (if any) from the impact of the materialization of that risk.

35.     In addition, Mr. Coffman fails to explain how the alleged inflation would be measured given the changing understanding of the risks associated with the alleged fraud throughout the alleged Class Period. Importantly, Mr. Coffman is completely silent about the Allen Report's point that measuring the alleged inflation is particularly problematic in this case because even before the alleged corrective disclosure, market evidence indicates there was a changing understanding of the risks associated with large-scale development, tightening well spacing and Concho's Dominator project.[52] Mr. Coffman provides no evidence that his methodology could account for these changing risks and he does not specify what "evidence obtained in discovery" could or would show how the market valued the risk at different points in time during the alleged Class Period.[53]

36.     The Allen Report raised the fact that Mr. Coffman's proposed common damages methodology yields economically unreasonable results for proposed class members who were Concho shareholders before the RSP merger.[54] Instead of addressing this criticism, Mr. Coffman's response highlights the very issue that was raised in the Allen Report.[55] According to the Coffman Rebuttal, Mr. Coffman's methodology would account for the RSP merger by giving "higher" inflation and damages per share to pre-merger Concho shareholders than to those who bought after the merger, even though the pre-merger shareholders obtained an economic benefit from the RSP merger.[56] This is exactly the economically unreasonable result that the Allen Report highlighted.

---

[52]   Allen Report, ¶¶62-68.

[53]   Mr. Coffman appears to confuse the concepts of disaggregating confounding information at the alleged corrective disclosure with measuring the alleged inflation at different points in time given Plaintiffs' understated risk theory. Coffman Rebuttal, ¶61.

[54]   As discussed in the Allen Report, according to Plaintiffs, pre-merger Concho shareholders used inflated shares to buy RSP, an uninflated company. The RSP acquisition would have diluted the total inflation that existed in Concho before the acquisition across many more shareholders and the economic effect of this combining of shares at the merger would be to reduce the alleged inflation per Concho shareholder. Thus, pre-merger Concho shareholders obtained an economic benefit from the RSP acquisition. Allen Report, ¶¶69-70.

[55]   Coffman Rebuttal, ¶¶68-71.

[56]   Coffman Rebuttal, ¶70. According to Mr. Coffman's damages methodology, giving higher inflation per share to the pre-merger Concho shareholders yields higher damages per share since damage per share is based on the formula purchase inflation minus sale inflation. Coffman Report, ¶79.

16

## C.   The Coffman Rebuttal fails to rebut that former RSP shareholders in the proposed class do not fit Plaintiffs' theory

37.     The Allen Report found that, according to Plaintiffs' theory, former RSP shareholders have a different relationship to the alleged misrepresentations and damages than other proposed class members who did not obtain Concho shares through the RSP acquisition.[57] In response, Mr. Coffman claims that RSP shareholders who exchanged their shares for Concho stock are "just like all other class members."[58] However, Mr. Coffman is incorrect, and he fails to rebut that former RSP shareholders in the proposed class do not fit Plaintiffs' theory.

38.     Mr. Coffman does not dispute that the 29% merger premium of $11.32 per RSP share that RSP shareholders received is substantially greater than his calculated alleged inflation per RSP share of $5.58 (even before disaggregating any confounding information from the price decline).[59] Instead, Mr. Coffman claims that former RSP shareholders are "just like other class members"[60] based on the unsupported and erroneous assumption that RSP would have been able to achieve the same 29% premium absent its acquisition by Concho.[61] However, market evidence, analyst commentary, and RSP's own SEC filings show otherwise.

39.     First, there is strong economic evidence that the market believed Concho overpaid for RSP. Concho's stock price reaction when the deal was announced to the market was a statistically significant price *decline* and market commentary indicated that Concho overpaid for RSP. According to both my own event study as well as Mr. Coffman's event study, there was a statistically significant price drop in Concho's stock when the deal was announced (-8.3% according to my event study and -6.9% according to Mr. Coffman's event study).[62] Analysts indicated that the decline in Concho's stock price after the merger was announced was due to the

---

[57]   Allen Report, ¶¶69-72.

   Before the merger, 67% of RSP shareholders held both RSP and Concho shares. (Based on 13-F institutional data from FactSet Research Systems, as of June 30, 2018, the quarter end before the merger was completed.)

[58]   Coffman Rebuttal, ¶73.

[59]   Coffman Rebuttal, ¶75 and footnote 96.

[60]   Coffman Report, ¶73.

[61]   Coffman Report, ¶¶77-78.

[62]   Allen Report, ¶¶43-45 and Mr. Coffman's turnover file "CONCHO_COFFMAN_0007729.xlsx."

17

market's belief that Concho overpaid for RSP. For example, Bank of America indicated that the deal was very "one sided in favor" of RSP.[63] As another example, RBC noted that there was "investor concern over the price paid" and that some of those concerns could subside if Concho delivered on the proposed synergies for the merger.[64] Similarly, Jefferies commented that the "all-stock deal for RSPP received a cool reception on its initial day of trading" and Credit Suisse said that there was "market pushback" with regard to the deal.[65] The market reaction to the deal provides strong evidence that the market believed Concho overvalued RSP and does not support Mr. Coffman's claim that RSP would have achieved the same premium absent the Concho acquisition.

40.    Second, contrary to Mr. Coffman's unsupported and erroneous assumption that RSP would have been able to achieve the same premium absent the Concho acquisition, analysts indicated that the implied valuation of the deal only made sense if Concho was the buyer given its overlapping and complimentary acreage with RSP. For example, Credit Suisse indicated that the deal was a "perfect strategic fit," KLR concluded that it was an "impeccably complementary acquisition," and Stephens noted that "the deal makes good strategic sense given overlapping footprints within the Midland and Delaware Basins, as well as similarly lean cost structures."[66]

41.    Third, RSP's own SEC Filings show that RSP did not have any other comparable offers, directly contradicting Mr. Coffman's claim that RSP could have obtained the same premium without Concho. In particular, according to RSP's SEC filings, RSP only received one other offer during this time period and that offer was at a premium of less than half (12.5% premium of alternative offer vs. 29% premium of Concho offer).[67]

Lucy P. Allen

---

[63]  Bank of America, March 29, 2018.

[64]  RBC, March 28, 2018.

[65]  Jefferies, March 29, 2018 and Credit Suisse, March 28, 2018.

[66]  Credit Suisse, March 28, 2018, KLR, March 29, 2018, and Stephens, March 28, 2018.

[67]  RSP Form DEFM14A, filed June 6, 2018, p. 71.

18