**APPENDIX II**

**DEFENDANTS' UNPUBLISHED CASES/AUTHORITIES**
**DEFENDANTS' SURREPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION**

| No. | Case/Authority Name |
|-----|---------------------|
| 1 | *In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022), *reconsideration denied*, 2023 WL 4307650 (S.D. Tex. June 30, 2023) |
| 2 | *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) |
| 3 | *Edwards v. McDermott Int'l, Inc.*, 2024 WL 1769325 (S.D. Tex. Apr. 24, 2024) |
| 4 | *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) |
| 5 | *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) |
| 6 | *Pang v. Levitt*, 2023 WL 11643704 (W.D. Tex. Dec. 20, 2023) |
| 7 | *Rougier v. Applied Optoelectronics Inc.*, 2019 WL 6111303 (S.D. Tex Nov. 13, 2019) |

# Case No. 1

2022 WL 4544235
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE: ANADARKO PETROLEUM
CORPORATION SECURITIES LITIGATION

Civil Action No 4:20-cv-00576
|
Signed September 28, 2022,

## ORDER OF CLASS CERTIFICATION

Charles Eskridge, United States District Judge

**\*1** The motion for class certification by Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds is granted. Dkt 86.

### 1. Background§

Defendant Anadarko Petroleum Corporation was a large oil and gas exploration company until it was purchased by Occidental Petroleum Corporation in August 2019. Dkt 55 at ¶ 2. Lead Plaintiff Norfolk County Council and Plaintiff Building Trades United Pension Fund (together *Norfolk County Group*), as well as other putative class members, purchased Anadarko common stock during the dates between February 20, 2015, and May 2, 2017. Dkt 55 at ¶ 15. Those are also dates within which Defendants R.A. Walker, Robert G. Gwin, Robert P. Daniels, and Ernest A. Leyendecker III served as senior Anadarko executives. Dkt 55 at ¶¶ 16–20.

Norfolk County Group alleges that Anadarko and its corporate representatives actively misled investors about the viability and profitability of a deepwater asset in the Gulf of Mexico—the Shenandoah oil field project, known as *Shen*. Dkt 55 at ¶¶ 4–5; Dkt 93 at 8. Norfolk County Group specifically contends that Defendants recklessly overstated the viability of the project and concealed negative information from investors. Dkt 55 at ¶ 5; see also *Frye v Anadarko Petroleum Corp*, 953 F3d 285, 288 (5th Cir 2019).

Anadarko eventually announced that it was suspending Shen appraisal activity, resulting in $435 million in expensed suspended exploratory well costs and a $467 million impairment. Dkt 86-1 at 26. That announcement came at 4:16 PM, after trading concluded on May 2, 2017. Dkt 86-1 at 25–26; Dkt 93-1 at 12. Within the hour, news also broke regarding Anadarko's involvement in a fatal explosion that occurred on April 17, 2017, in Firestone, Colorado. Dkt 93-1 at 12–13, 15–16. Anadarko stock dropped almost eight percent the next day. Dkt 55 at ¶¶ 152–54; see also Dkt 86-1 at 26.

Georgia Firefighters' Pension Fund filed this putative class action in February 2020 for violations of Sections 10(b) and 20(a) of the Exchange Act. Dkt 1; see 15 USC §§ 78j & 78t. Judge Nancy Atlas appointed Norfolk County Group as lead plaintiff and Robbins Geller Rudman & Dowd LLP as lead counsel. Dkt 41. The case was reassigned to Judge Vanessa D. Gilmore in March 2021 and then to this Court in December 2021. Dkts 66 & 91.

Pending is a motion by Norfolk County Group to certify the following class:

> All persons and entities that purchased or acquired the common stock of Anadarko Petroleum Corporation between February 20, 2015, and May 2, 2017, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers, directors, subsidiaries, and affiliates of Anadarko during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to which this litigation is assigned.

Dkt 86 at 9–10; see also Dkt 55 at ¶¶ 1, 165–171 (amended class action complaint).

### 2. Legal standard

**\*2** Class actions proceed under Rule 23 of the Federal Rules of Civil Procedure. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." *Comcast Corp v Behrend*, 569

US 27, 33 (2013) (quotation marks and citation omitted). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." Ibid; see also *Madison v Chalmette Refining LLC*, 637 F3d 551, 554 (5th Cir 2011).

Rule 23(a) begins by listing four prerequisites to class certification—*numerosity*, *commonality*, *typicality*, and *adequacy of representation*. Meeting these requirements isn't alone sufficient. Rule 23(b) instead specifies three class types and the requirements for each. The putative class here seeks to proceed under Rule 23(b)(3), which permits class certification where common questions of law or fact predominate over individual questions. See Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1772, 1775, 1777 (Westlaw 2022).

The reviewing court must "rigorously consider" the Rule 23(a) prerequisites and the requirements specific to the class type under Rule 23(b). *Chavez v Plan Benefit Services Inc*, 957 F3d 542, 546 (5th Cir 2020). This requires a court to look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." *Flecha v Medicredit Inc*, 946 F3d 762, 766 (5th Cir 2020). A court must also consider how any trial on the merits would be conducted if the class was certified. *Prantil v Arkema Inc*, 986 F3d 570, 574 (5th Cir 2021).

### 3. Analysis

Norfolk County Group asserts that this action satisfies all prerequisites of Rule 23. Dkt 86 at 13. The only aspect challenged by Defendants pertains to *predominance* under Rule 23(b)(3). Even with such concessions, the Fifth Circuit holds that Rule 23 nonetheless "requires the court to 'find,' not merely assume, the facts favoring class certification." *Unger v Amedisys Inc*, 401 F3d 316, 321 (5th Cir 2005). Each requirement is thus addressed in turn.

### a. Motion to exclude Steinholt rebuttal report

One evidentiary issue precedes the Rule 23 analysis. Norfolk County Group in support of its motion to certify the class proffers a report and rebuttal report from its expert Bjorn Steinholt. Dkts 86-1 (Steinholt report) & 96-1 at 2– 34 (Steinholt rebuttal report). Defendants move to exclude the rebuttal report on *Daubert* grounds. Dkt 111 at 5.

The motion will be denied. As Norfolk Country Group notes, the motion itself is little more than an attempt to re-urge Defendants' recently denied motion for leave to file a surreply. Dkts 113 at 2 (motion to strike) & 118 (response); see also Dkts 97 & 110. It has already been determined that class certification will rise or fall with what is fairly briefed in the papers under the Local Rules of the Southern District. Dkt 110.

Beyond this, Steinholt easily clears the *Daubert* hurdle. He's a chartered financial analyst and has presented evidence regarding market efficiencies and reliance in over twenty federal securities class actions. See Dkt 86-1 at 4–5.

Defendants don't dispute Steinholt's credentials. They instead assert that his rebuttal report—but not his original report—is "rife with methodological errors," particularly as it relates to a new event study that purportedly controls for news regarding the Firestone explosion. Dkt 111 at 5. The new event study certainly won't be immune from criticism. But it's of sufficient reliability and relevance for *Daubert* purposes. See *Ludlow v BP PLC*, 800 F3d 674, 683 n 37 (5th Cir 2015); *SEC v Cuban*, 2013 WL 3809654, *3 (ND Tex). Most important, it reliably highlights the flaws in the report by Allen Ferrell, the expert for Defendants. Dkt 96-1 at 11–30. And it does so even without the new event study.

**\*3** The Steinholt rebuttal report is thus appropriately considered where pertinent below.

### b. Rule 23(a) requirements

All prerequisites of Rule 23(a) are satisfied.

*As to numerosity*, a plaintiff must show that "the class is so numerous that joinder of all members is impracticable." FRCP 23(a)(1). In addition to the sheer number of purported class members, a court may consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Ibe v Jones*, 836 F3d 516, 528 (5th Cir 2016).

Numerosity " 'is generally assumed to have been met' in a class action suit involving nationally traded securities, since the putative class is likely sufficiently numerous, geographically dispersed, and difficult to identify." *Prause v*

*TechnipFMC PLC*, 2020 WL 3549686, *2 (SD Tex), quoting *Zeidman v J. Ray McDermott & Co*, 651 F2d 1030, 1039 (5th Cir 1981). This action falls squarely within that general rule. Anadarko was listed on the New York Stock Exchange for the entire class period with a trading volume of 2.9 billion shares and over 1,800 institutional investors. Dkt 86-1 at 15 & 20. Joinder of all members is plainly impracticable.

*As to commonality*, a plaintiff must show that "there are questions of law or fact common to the class." FRCP 23(a)(2). As the Supreme Court stated in *Wal-Mart Stores Inc v Dukes*, the class members must have a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 564 US 338, 350 (2011); see also *Ahmad v Old Republic National Title Insurance Co*, 690 F3d 698, 702 (5th Cir 2012). A common instance of the defendant's injurious conduct can establish commonality "even if the amount of damages differs for each injured class member." *Prause*, 2020 WL 3549686 at *3, citing *In re Deepwater Horizon*, 739 F3d 790, 810 (5th Cir 2014).

Whether Defendants made false and misleading statements, what effect those statements had on its stock price, what damages (if any) were sustained by class members—these and others are all common questions capable of classwide resolution within the meaning of *Dukes*. Common evidence will likewise answer these common legal questions. For example, see *Rooney v EZCORP Inc*, 330 FRD 439, 445 (WD Tex) (finding commonality satisfied in securities litigation where multiple questions common to class existed).

*As to typicality*, a plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). This inquiry "focuses on the similarity between the named plaintiffs legal and remedial theories and the theories of those they purport to represent." *Mullen v Treasure Chest Casino LLC*, 186 F3d 620, 625 (5th Cir 1999) (quotation marks and citation omitted). Plaintiffs can satisfy typicality "by showing that class representatives' claims arise from a similar course of conduct and share the same legal theory." *In re Cobalt International Energy Inc Securities Litigation*, 2017 WL 2608243, *2 (SD Tex).

**\*4** Norfolk County Group purchased Anadarko stock during the class period. Its allegations of fraudulent conduct and its

damages theories are shared by the entire class. See Dkts 26-2, 26-3, 55 & 86-2.

*As to adequacy of representation*, a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4). Adequacy explores "the zeal and competence" of lead counsel, the "willingness and ability" of the class representative to "take an active role in and control the litigation and to protect the interests of absentees," and the "risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v Progressive Securities Insurance Co*, 856 F3d 408, 412 (5th Cir 2017) (quotation marks and citation omitted).

Here, lead counsel Robbins Geller has served as lead counsel in multiple securities class actions. And it has demonstrated a willingness to take securities fraud actions to trial and has been active in this litigation. See Dkt 86-4 (firm resume), listing matters including *In re Enron Corp Securities Derivative & ERISA Litigation*, 586 F Supp 2d 732 (SD Tex 2008). Norfolk County Group is similarly well situated for class representation, being composed of large and sophisticated funds. Dkt 86-2 at 3. Such large institutional investors are the preferred named plaintiffs in securities fraud litigation because they generally have the same interests as the plaintiff class. *In re BP PLC Securities Litigation*, 758 F Supp 2d 428, 439 (SD Tex 2010). The interests of the group are also aligned with other class members, as all seek to maximize recovery stemming from the alleged misconduct by Anadarko and its executives. See Dkt 86-2. And the group has demonstrated "a sufficient level of knowledge and understanding" in this litigation to date. *Prause*, 2020 WL 3549686, at *4, quoting *Ibe*, 836 F3d at 529.

### c. Rule 23(b)(3) predominance

Certification under Rule 23(b)(3) requires a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members." This is known as the *predominance* requirement.

The same analytical principles that govern Rule 23(a) pertain, but "Rule 23(b)(3)'s predominance criterion is even more demanding." *Comcast*, 569 US at 34. A court must identify "the substantive issues that will control the outcome" of the case and assess "which issues will predominate." *Madison v Chalmette Refining LLC*, 637 F3d 551, 555 (5th Cir 2011) (quotation marks and citation omitted). It must

therefore consider "how a trial on the merits would be conducted if a class were certified." Ibid (quotation marks and citation omitted). The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Torres v SGE Management LLC*, 838 F3d 629, 636 (5th Cir 2016, *en banc*) (quotation marks and citation omitted). But of note, this showing doesn't require that the court find that the common questions "will be answered, on the merits, in favor of the class." *Amgen Inc v Connecticut Retirement Plans & Trust Funds*, 568 US 455, 459 (2013).

Defendants make two contentions in this regard. The first is that Norfolk County Group fails to establish a critical requirement in securities class actions prosecuted under Rule 23(b)(3)—that being reliance on the alleged misstatements. Dkt 93 at 5. The other is that the posited damages theory is too vague to adequately connect to the liability theory. Id at 7 & 26.

**\*5** Neither point has merit. Plaintiff thus satisfies the predominance requirement of Rule 23(b)(3).

#### i. Showing as to reliance

"In securities law cases, predominance often hinges upon whether or not class members will need to individually demonstrate they relied upon a misrepresentation or omission made by the defendant." *Rooney*, 330 FRD at 448, citing *Amgen*, 568 US at 461. Norfolk County Group proposes to satisfy reliance by pointing to the *Affiliated Ute* and *Basic* presumptions. Dkt 86 at 18. While the former isn't applicable, the latter quite clearly is.

To invoke the *Affiliated Ute* presumption, a plaintiff must "allege a case primarily based on omissions or nondisclosure" and "demonstrate that the defendant owed him a duty of disclosure." *In re Enron Corp Securities, Derivative & ERISA Litigation*, 610 F Supp 2d 600, 610 (SD Tex), quoting *Regents of University of California v Credit Suisse First Boston Inc*, 482 F3d 372, 384 (5th Cir 2007). A defendant omits information when it says "absolutely nothing about matters whose very existence plaintiffs have no reason to consider." *In re Enron*, 610 F Supp 2d at 631 n 33.

This action is primarily based upon certain, affirmative representations by Defendants regarding Shen upon which Norfolk County Group and other putative class members purport to have relied. By contrast, the alleged omissions are those that putatively would have served primarily to *clarify* those representations. In other words, the subject representations are said to be misleading in part *because of* the omissions. And the Fifth Circuit has held that the *Affiliated Ute* presumption doesn't apply to such "true statements that are nonetheless so incomplete as to be misleading." *In re Enron*, 610 F Supp 2d at 631 n 33. As a result, the *Affiliated Ute* presumption isn't applicable.

The *Basic* presumption holds that "a public, material misrepresentation will distort the price of stock traded in an efficient market." *Halliburton Co v Erica P. John Fund Inc (Halliburton II)*, 573 US 258, 283–84 (2014); see also *Basic Inc v Levinson*, 458 US 224, 241–42, 247 (1988). An investor thus relies on the misrepresentation "so long as it was reflected in the market price at the time of his transaction." *Goldman Sachs v Arkansas Teacher Retirement System*, 141 S Ct 1951, 1958 (2021) (quotation marks and citation omitted). As the Supreme Court summarized, "The presumption allows class-action plaintiffs to prove reliance through evidence common to the class," which "in turn makes it easier for plaintiffs to establish the predominance requirement" of Rule 23(b)(3). Id at 1958–59.

To invoke this presumption, a plaintiff must prove that (i) "the alleged misrepresentation was publicly known," (ii) "it was material," (iii) "the stock traded in an efficient market," and (iv) "the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." Id at 1958. Defendants can then rebut this presumption by demonstrating that the misstatements *did not* affect the market price of the stock—a point upon which they bear the burden of persuasion. Id at 1959, 1963. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." Id at 1963.

**\*6** Defendants made the alleged misstatements in public SEC filings, and the misstatements concerned a significant asset. See Dkt 55 at ¶¶ 94–141. The statements were thus both public and material. Additionally, Anadarko stock was traded on the New York Stock Exchange, which alone is indicia of market efficiency. See *Strougo v Barclays PLC*, 312 FRD 307, 318 (SDNY 2016). And Anadarko stock meets three further indicia of market efficiency—large market capitalization, narrow bid-ask spread, and large stock float. See Dkt 86-1 at 26–29; *Krogman v Sterritt*, 202 FRD 467, 478 (ND Tex 2001).

Defendants don't actually dispute that Norfolk County Group properly invokes the *Basic* presumption in the first instance. They instead seek to rebut it on the ground that the Shen disclosures didn't impact the Anadarko stock price. Dkt 93 at 9–11.

*First*, they note that ConocoPhillips—the development partner of Anadarko—disclosed similar information about Shen before markets opened on May 2, 2017. And the stock price of neither ConocoPhillips nor Anadarko dropped during that trading day. Dkt 93 at 14–15. But the disclosure by ConocoPhillips on May 2nd was quite limited, being a single sentence noting, "First-quarter earnings were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shenandoah-6 well in the Gulf of Mexico." Dkt 96-1 at 15. ConocoPhillips didn't disclose the suspension of Shen appraisal activity, it didn't write-down Shen, and it didn't disclose Shen sidetrack well results. Id at 15–18.

*Second*, Defendants observe that ConocoPhillips stock didn't drop after the Shen disclosures by Anadarko, despite ConocoPhillips' $101 million stake in the project. Dkt 93 at 15–16, 10. But ConocoPhillips isn't a proper comparator, given that the Shen project was a minor expenditure relative to its massive market cap. What's more, its $101 million stake paled in comparison to the $902 million stake held by Anadarko. Dkt 96-1 at 15–16. And notably, other Shen development partners with high Shen-stake-to-market-cap ratios suffered major price drops on May 3rd. Id at 22–24.

*Third*, Defendants highlight a potential $140 million in new regulatory costs as a result of the Firestone news. Dkt 93 at 16–18. Be that as it may, the Anadarko stock price dropped 4.1 percent during after-hours trading between the time Anadarko made its Shen disclosures and the time the Firestone news broke. 96-1 at 27. And the Steinholt event study concluded that the price drop on May 3rd remained statistically significant even when controlling for the Firestone news. Id at 30–32.

The Supreme Court admonishes, "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman Sachs*, 141 S Ct at 1960 (quotation marks omitted). Common sense suggests here that, when news broke on the same day of both an *actual* $900 million write-off as well as a *potential* $140 million in new regulatory costs, an eight percent decline

in the company's stock price the following day isn't *solely* attributable to the latter, lesser regulatory costs.

Norfolk Group has adequately invoked the *Basic* presumption, and Defendants haven't met their burden of persuasion to rebut it. Norfolk County Group has established reliance sufficient to satisfy the predominance requirement of Rule 23(b)(3).

### ii. Showing as to damages

Norfolk County Group bears the burden of demonstrating that damages may be measured using a common methodology that's consistent with the theory of liability. *Comcast Corp*, 569 US at 35. But damages at the class-certification stage needn't be exact. *Ludlow v BP PLC*, 800 F3d 674, 683 (5th Cir 2015); see also *Story Parchment Co v Paterson Parchment Paper Co*, 282 US 555, 563. Nor must plaintiff prove loss causation as a condition of obtaining class certification. *Ludlow*, 800 F3d at 687, citing *Erica P. John Fund Inc v Halliburton Co (Halliburton I)*, 563 US 804, 813 (2011).

**\*7** Steinholt in his expert report presents a *stock price inflation* theory (also known as the *out-of-pocket measure*). See Dkt 86-1 at 29–31. "That is, the theory alleges that the stock price was higher than it would have been, and the damage is the difference between the 'true' price and the 'paid' price." *Ludlow*, 800 F3d at 689. Here, the underlying theory is that the alleged misrepresentations inflated the Anadarko stock price. Steinholt proposes calculating the "true" price—the price the stock would have been absent the alleged misrepresentations—by conducting an event study supplemented by fundamental valuation tools that help control for other influencing factors. The individual damages of each class member can then be calculated based on the difference between the price they paid and the "true" price at the time of their respective purchases and sales. See Dkt 86-1 at 29–31.

Defendants contend that this theory is "so vague and imprecise that it is impossible to assess whether Plaintiffs have presented a damages methodology consistent with their theory of liability." Dkt 93 at 26. But the Fifth Circuit approved a nearly identical theory of damages in *Ludlow v BP PLC*, noting that the damages theory remained "tied to a theory of liability common to all" putative class members. See id at 687. The same is true here. Norfolk County Group contends that Defendants are liable to all putative class

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 8 of 117

In re Anadarko Petroleum Corporation Securities Litigation, Not Reported in Fed. Supp....

2022 WL 4544235

members for misstatements regarding the viability of Shen. And the loss forming the basis for its damages model "comes from the inflated stock price caused by those misstatements." See id at 687.

Defendants also attempt to brand the damages theory proposed by Norfolk County Group as a *materialization of the risk* model. Dkt 93 at 27. Under such a theory, "investors are harmed by [ ] corrective events that represent materializations of the risk that was improperly disclosed." *Ludlow*, 800 F3d at 690 (quotation marks and citation omitted, omission in original). The Fifth Circuit has explained that such a model is insufficient because it can't "be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have. It also presumes substantial reliance on factors other than price, a theory not supported by *Basic* and the rationale for fraud-on-the-market theory." Id at 691.

But such problems aren't present here. Norfolk County Group doesn't assert that Defendants underrepresented an *unrealized* risk. It instead asserts that certain risks had *in fact* materialized, yet Defendants actively misled investors to the contrary. For example, see Dkt 55 at ¶¶ 6, 98, 116; see also Dkts 63 at 15. These misrepresentations (they say) artificially inflated the Anadarko stock price, and it is *that* artificial inflation that was subsequently removed via a corrective disclosure. The theory thus bears the "hallmarks of the fraud on the market theory of liability." *Rougier v Applied Optoelectronics Inc*, 2019 WL 6111303, *17 (SD Tex). And it stands in stark contrast to the theory rejected in *Ludlow*, where individual investors relied on their own risk assessment as opposed to the integrity of the market price. *In re BP PLC Securities Litigation*, 2014 WL 2112823, *11 (SD Tex), affirmed by *Ludlow*, 800 F3d at 691.

In sum, the intended damages model measures "only the difference between the price paid and the true value of the security at the time of the initial purchase by the defrauded buyer" without the need to inquire into other factors such as individual risk tolerance. *Ludlow*, 800 F3d at 682, 691 (cleaned up). Norfolk County Group has thus satisfied its burden under *Comcast* to demonstrate that its methodology is "sound" and produces a "commonality of damages." *Comcast Corp*, 569 US at 37.

### d. Rule 23(b)(3) superiority

**\*8**  Certification under Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This is known as the *superiority* requirement.

The inquiry is fact specific on factors of (i) "the interests of members of the class in individually controlling the prosecution or defense of separate actions," (ii) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum", and (iv) "the likely difficulties encountered in managing a class action." *Ibe*, 836 F3d at 529–30, citing *Amgen Products v Windsor*, 521 US 591, 615–16. Courts have routinely found that plaintiffs in securities litigation meet the superiority requirement. For example, see *In re BP PLC Securities Litigation*, 2013 WL 6388408, *18 (SD Tex); *Prause*, 2020 WL 3549686 at *7; *Rooney*, 330 FRD at 451.

Superiority is easily met here. *First*, as is often the case in securities litigation, "the costs and expenses of individual litigation would prove prohibitive for potential class members, who would have little incentive to litigate their claims outside the context of a class action." *Prause*, 2020 WL 3549686 at *7. *Second*, there's no other pending litigation concerning the alleged misconduct of Anadarko and its officials. Dkt 86 at 26. *Third*, concentrating this litigation will promote judicial efficiency, economy, and uniformity by avoiding "the time and expense of requiring all class members to litigate individually." *Rougier*, 2019 WL 6111303 at *19, quoting *In re BP p.l.c. Securities Litigation*, 2013 WL 6388408. *Fourth*, the potential for individualized issues has been adequately addressed above, with no further manageability issues either noted by the parties or readily ascertainable.

The superiority requirement of Rule 23(b)(3) is met.

### 4. Conclusion

The motion by Defendants to exclude the expert rebuttal report of Bjorn I. Steinholt is DENIED. Dkt 111.

The motion by lead Plaintiff Norfolk County Group to strike the Defendants' motion to exclude is DENIED AS MOOT. Dkt 113.

The Court FINDS that Norfolk County Group has established each of the necessary requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

The motion by Norfolk County Group for class certification is GRANTED. Dkt 86.

The following class is CERTIFIED pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities that purchased or acquired the common stock of Anadarko Petroleum Corporation between February 20, 2015, and May 2, 2017, inclusive, and were damaged thereby. Excluded from the Class are Defendants and their families, legal representatives, heirs, successors, or assigns; officers, directors, subsidiaries, and affiliates of Anadarko during the Class Period; any entity in which Defendants have a controlling interest; and any judicial officer to which this litigation is assigned.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4544235

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 2

2013 WL 6388408, Fed. Sec. L. Rep. P 97,754, Fed. Sec. L. Rep. P 97,757

2013 WL 6388408
United States District Court,
S.D. Texas,
Houston Division.

In re BP P.L.C. SECURITIES LITIGATION.

MDL No. 10–md–2185.
|
Civil Action No. 4:10–md–2185.
|
Dec. 6, 2013.

*MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court is Plaintiffs' Motion for Class Certification. (Doc. No. 652.) [1] Having reviewed the motion, Defendants' response (Doc. No. 664), Plaintiffs' reply brief in support of their motion (Doc. No. 677), Defendants' sur-reply (Doc. No. 688), Plaintiffs' response to Defendants' sur-reply (Doc. No. 691–1), all papers in support thereof, and having heard oral argument, the Court finds that Plaintiffs' Motion for Class Certification (Doc. No. 652) must be **DENIED.**

**I. BACKGROUND AND PROCEDURAL HISTORY**

**A. Actionable Misstatements**

This case is a putative class action against three BP corporations and two BP executives ("Defendants"). Plaintiffs assert securities fraud claims on behalf of purchasers of BP American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE") who were allegedly injured by a series of misrepresentations and omissions made by Defendants between 2007 and 2010. According to Plaintiffs, the misleading nature of these statements and omissions was made clear by the April 20, 2010 explosion of the Deepwater Horizon drilling rig; the ensuing oil spill into the Gulf of Mexico; and various events and disclosures in the months following the explosion. Three times, the Court has engaged at length with Plaintiffs' theories of Defendants' liability. A more complete explication of the relevant facts and allegations can be found in the lengthy opinions issued on those occasions. *See In re BP p. l. c. Securities Litig. ("BP I"),* 843 F.Supp.2d 712 (S.D.Tex.2012); *In re BP p. l. c. Securities Litig. ("BP II"),* 852 F.Supp.2d 767 (S.D.Tex.2012); *In re*

*BP p.l.c. Securities Litig. ("BP III"),* 922 F.Supp.2d 600 (S.D.Tex.2013).

Following the Court's decisions on Defendants' three motions to dismiss, Plaintiffs' claims have been narrowed such that only four broad categories of alleged misstatements and omissions remain in the case. These are:

• Statements touting BP's progress in implementing the recommendations of the independent commission known as the "Baker Panel" following the 2005 explosion at the Company's Texas City refinery. The Baker Panel was convened to review and suggest improvements to BP's safety practices, the efficacy of which was seriously in doubt following a series of high-profile safety mishaps. The Baker Panel released a report in January 2007 (the "Baker Report"), which included a series of specific recommendations intended to improve BP's safety culture and processes. Plaintiffs claim that, following the release of the Baker Report, Defendants repeatedly publicized their progress on the Report's recommendations as a way to assuage the public that BP had turned a corner on safety. In reality, according to Plaintiffs, nothing about BP's safety programs had changed, and BP remained an accident waiting to happen. Alleged misstatements in this category were made in November 2007, February 2008, April 2008, December 2008, and March 2010.

**\*2** • Statements describing BP's Operating Management System ("OMS") as a system being applied across all of BP's lines of business, worldwide, in an attempt to standardize safety processes. Statements in this category were allegedly misleading because they omitted that OMS would not govern safety practices at contractor-owned sites, such as the Deepwater Horizon drilling rig. Statements in this category were also allegedly misleading because they represented that OMS had been implemented in the Gulf of Mexico by the time of the Deepwater Horizon explosion, when Plaintiffs claim it had not. Alleged misstatements in this category were made in February 2009, March 2009, April 2009, February 2010, March 2010, and April 2010.

• Statements from two agency filings—the Initial Exploration Plan ("IEP") and the Gulf of Mexico Regional Oil Spill Response Plan ("OSRP")—describing BP's ability to respond to a catastrophic deepwater oil spill. According to Plaintiffs, these statements were grossly inaccurate, and BP had no

contingency plans and no adequate response equipment for a disaster. The documents were filed with the relevant federal agency, the U.S. Department of the Interior's Minerals Management Service ("MMS"), in March 2009 and June 2009 respectively. Plaintiffs claim that they were publicly available documents upon filing. They were also scrutinized in the media following the Deepwater Horizon explosion.

- Statements made after the April 20, 2010 Deepwater Horizon explosion regarding the magnitude of the resulting oil spill. According to Plaintiffs, Defendants perpetuated the fiction that the spill was only approximately 5,000 barrels per day, even as internal BP estimates showed that the true number was much higher. Alleged misstatements in this category were made in late April 2010 and May 2010.

Although all the surviving misrepresentations in this case can be sorted into the above four categories, the first two categories are closely related. Specifically, OMS was a response to one of the Baker Report recommendations. Therefore, the alleged misrepresentations regarding OMS might be considered an extension, or a subset, of the alleged misrepresentations regarding BP's progress on the Baker Panel recommendations.

### B. Lead Plaintiffs

Pursuant to procedures required by the Private Securities Litigation Reform Act ("PSLRA"), the Court previously had occasion to consider and appoint lead plaintiffs and lead counsel in this action. Two groups of prospective lead plaintiffs—"NY/OH" and the "Ludlow Plaintiffs"—vied for appointment.

The NY/OH group consisted of (1) Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("New York"), and (2) Ohio Attorney General Mike DeWine, statutory litigation counsel for the Ohio Public Employees Retirement System ("Ohio").[2] They proposed a fairly long class period, stretching from June 2005 until June 2010. As the proposed class period indicates, they alleged that Defendants engaged in misrepresentations both before and after the Deepwater Horizon explosion itself.[3]

**\*3** The Ludlow Plaintiffs consisted of four individual investors: Robert H. Ludlow, Peter D. Lichtman, Leslie J. Nakagiri, and Paul Huyck. They proposed a much shorter class period, from March 2009 until April 2010. They did not allege that Defendants committed securities fraud after the Deepwater Horizon explosion. They accused NY/OH of proposing an improperly long class period in order to maximize the extent of their BP holdings—a factor for consideration in the lead plaintiff analysis. They also asserted that NY/OH's emphasis on post-explosion fraud would dilute the class's pre-explosion claims.

Following extensive briefing, the Court elected to appoint both sets of plaintiffs: NY/OH as lead plaintiffs for the proposed class, and the Ludlow Plaintiffs as lead plaintiffs for a wholly subsumed subclass. The Court was motivated by concerns that the two groups had articulated significantly different theories of the alleged fraud:

> First, whereas the Ludlow Plaintiffs' claims center on BP's statements about the safety of its drilling operations in the Gulf of Mexico in the thirteen months leading up to the Deepwater Horizon explosion, New York & Ohio argue more generally that BP made fraudulent statements between 2005 and 2010 about its safety precautions both in the Gulf of Mexico and elsewhere. Second, in extending the class period to June 1, 2010, New York & Ohio focus a good deal of attention on fraud allegedly committed *after* April 20, 2010, such as statements about the rate at which oil was escaping from the rig and about BP's attempts to stop the flow. A substantial portion of New York & Ohio's losses derive from purchases of BP [ADSs] by one of the Ohio funds on May 3 and May 25, 2010, several weeks after the Deepwater Horizon explosion.

*In re BP Securities Litig.,* 758 F.Supp.2d 428, 438 (S.D.Tex.2010). The Court attributed the competing theories to the fact that NY/OH were "net sellers" of ADSs during the proposed class period proposed by the Ludlow Plaintiffs. *Id.*

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 13 of 117
In re BP p.l.c. Securities Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 6388408, Fed. Sec. L. Rep. P 97,754, Fed. Sec. L. Rep. P 97,757

In other words, because NY/OH's losses were "concentrated outside of the Ludlow Period," they were incentivized to "present different legal theories than other plaintiffs." *Id.* The Court concluded that NY/OH had not shown themselves to be typical and adequate lead plaintiffs for the so-called Ludlow Period. *Id.* At the same time, the Ludlow Plaintiffs were similarly inadequate to represent plaintiffs who purchased before and after the Ludlow Period. *Id.* at 439. To accommodate the interests of all members of the proposed class, the Court opted to appoint NY/OH as lead plaintiffs of the class, and the Ludlow Plaintiffs as lead plaintiffs of a subclass. *Id.* at 442.

Following the Court's designation of lead plaintiffs, NY/OH and the Ludlow Plaintiffs filed separate complaints. Defendants moved to dismiss both complaints; the Ludlow Complaint was dismissed in its entirety, and the NY/OH Complaint was partially dismissed. *See BP II,* 852 F.Supp.2d at 820; *BP I,* 843 F.Supp.2d at 799. NY/OH and the Ludlow Plaintiffs then jointly filed a single consolidated, amended complaint: the Second Consolidated Amended Class Action Complaint, or "SAC." (Doc. No. 339.) Defendants moved for partial dismissal of the SAC, which was partially granted and partially denied. *See BP III,* 922 F.Supp.2d at 640–41. Discovery has commenced on the surviving claims in the SAC, and the Court has entered a docket control order with trial scheduled for August and September 2014. (Doc. No. 582.)

## II. PLAINTIFFS' PROPOSED CERTIFICATION

 **\*4** New York, Ohio, and the Ludlow Plaintiffs have filed a motion for class certification under Rule 23. They seek the following certification:

> All persons and entities who purchased or otherwise acquired BP's ADSs between November 8, 2007 and May 28, 2010 [and were injured thereby] ("Class"), as well as all persons and entities who purchased or otherwise acquired BP's ADSs between March 4, 2009 and April 20, 2010 [and were injured thereby] ("[Ludlow Subclass]").[4] Excluded from the Class and [Subclass] are Defendants, directors and officers of BP, their families and affiliates, as

well as the retirement accounts of Defendants and BP's directors and officers.

(Doc. No. 652–1 ("Mot."), at 2.) As made clear above, the proposed "Class Period" is November 8, 2007 to May 28, 2010. The proposed "Ludlow Subclass Period" is subsumed within the Class Period and is March 4, 2009 to April 20, 2010 (the date of the Deepwater Horizon explosion). New York and Ohio are proposed representatives for the Class; the Ludlow Plaintiffs are proposed representatives for the Ludlow Subclass.

## III. LEGAL STANDARDS

Federal class actions are governed by the requirements of Federal Rule of Civil Procedure 23. *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005). The party seeking class certification bears the burden of showing that Rule 23 has been satisfied. *Id.* (citing *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479–80 (5th Cir.2001)); *see also Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). The requirements for class certification under Rule 23(a) are:

> (1) The class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)-(4).

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *M.D. ex rel. Stukenberg v. Perry,* 675 F.3d 832, 837 (5th Cir.2012) (citing *Maldonado v. Ochsner Clinic Found.,* 493 F.3d 521, 523 (5th Cir.2007)). Plaintiffs in this case seek certification under Rule 23(b)(3),

which requires the Court to find two additional requirements satisfied: predominance and superiority. *See Unger,* 401 F.3d at 320. "The predominance element requires a finding that common issues of law or fact 'predominate over any questions affecting only individual members.' " *Id.* (quoting Fed.R.Civ.P. 23(b)(3)). This requirement is more demanding than the commonality prong of Rule 23(a) "because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' " *Id.* (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). Finally, a party seeking class certification must show that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

## IV. DEFENDANTS' OPPOSITION

**\*5** Defendants oppose certification. They organize their objections to class certification under the following four principal arguments:

(1) Defendants claim that Rule 23(a) has not been satisfied because New York and Ohio are atypical and inadequate representatives of the proposed Class. Defendants' argument is grounded in the specifics of New York and Ohio's trading activity during the Class Period, as described below. (Doc. No. 664 ("Opp."), at 10–20.)

(2) Defendants contend that the Ludlow Plaintiffs have not established that the Rule 23 prerequisites are satisfied for the proposed Ludlow Subclass. (*Id.* at 20–22.)

(3) Defendants argue that the predominance and superiority requirements of Rule 23(b)(3) are not met with regards to Plaintiffs' claims based on the IEP and OSRP, because the fraud-on-the-market presumption is not available for those claims. (*Id.* at 23–36.)

(4) Defendants contend that the predominance requirement of Rule 23(b)(3) is not met because Plaintiffs have not established that damages can be calculated on a class-wide basis that is consistent with their theories of liability. (*Id.* at 37–40.)

## V. ANALYSIS

To certify a class in this action, the Court must find that Plaintiffs have satisfied each of the four requirements of Rule 23(a), as well as both requirements of Rule 23(b)(3). Each will be addressed in turn.

## A. Rule 23(a)

### 1. Numerosity

"To satisfy the numerosity prong, 'a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.' " *Pederson v. Louisiana State Univ.,* 213 F.3d 858, 868 (5th Cir.2000) (quoting *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir.1981)). In support of numerosity, Plaintiffs cite the following facts:

(1) BP's ADSs are listed on the NYSE. (Doc. No. 652–4, at 137.)

(2) According to BP's 2010 Annual Report, approximately 115,000 registered holders held approximately 815 million ADSs as of February 18, 2011. (*Id.*)

(3) On average, during the Class Period, more than 7.4 million BP ADSs traded each day. (Doc. No. 652–5 ("Coffman Report"), at Exh. 1.)

Defendants do not address numerosity in their opposition, apparently conceding that it exists in this case. By identifying the volume of trading in BP ADSs on an open and efficient market, Plaintiffs have satisfied the requirement that the class is so "numerous" as to make joinder "impracticable." Fed.R.Civ.P. 23(a); *Harman v. LyphoMed, Inc.,* 122 F.R.D. 522, 524 (N.D.Ill.1988) (finding numerosity element met when average weekly trading volume during the class period exceeded one million shares).

### 2. Commonality

Under the commonality prong, a plaintiff must demonstrate that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). To meet this requirement, Plaintiffs' claims "must depend upon a common contention" which is "capable of classwide resolution." *Wal–Mart,* 131 S.Ct. at 2551. In other words, the determination of the truth or falsity of the so-called "common contention" must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

**\*6** Plaintiffs have identified several foundational questions common to the class, primarily concerning Defendants' course of conduct and whether Defendants violated federal securities law. These include whether the alleged misstatements were materially misleading and whether they

were made with the requisite scienter. (Mot. at 5.) Defendants do not contest that commonality is met, and the Court agrees that common questions regarding Defendants' liability satisfy this requirement of Rule 23(a). *See In re IndyMac Mortgage– Backed Securities Litig.,* 286 F.R.D. 226, 233 (S.D.N.Y.2012) ("[Commonality] is 'plainly satisfied' in a securities case where 'the alleged misrepresentations ... relate to all the investors, [because the] existence and materiality of such misrepresentations obviously present important common issues.' ") (quoting *Korn v. Franchard Corp.,* 456 F.2d 1206, 1210 (2d Cir.1972)).

### 3. Typicality

To assess typicality, a court must determine that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(2). "Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Lightbourn v. County of El Paso, Tex.,* 118 F.3d 421, 426 (5th Cir.1997). As the Supreme Court has explained, both the commonality and the typicality requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982).

Plaintiffs contend that their claims share the essential characteristics of claims common to all members, in that (1) they purchased ADSs during the Class Period; (2) at prices artificially inflated by Defendants' misrepresentations; and (3) they suffered losses when the truth was revealed to the market and the price corrected. According to Plaintiffs, they are subject to no unique defenses not applicable to class members generally. (Mot. at 6.)

#### a. New York and Ohio

Defendants dispute that New York and Ohio's claims are typical of the class. They emphasize that New York and Ohio were both net sellers of ADSs during the Class Period, primarily because of their trading activity before the April 20, 2010 explosion. (Opp. at 11–13.) The pertinent details of New York and Ohio's trading activity are as follows:

- At the beginning of the Class Period, Ohio held 528,650 ADSs. By October 24, 2008, Ohio had sold all of its

ADSs. It did not make any more purchases of ADSs until after the Deepwater Horizon explosion. After the explosion, Ohio purchased ADSs on May 3, 2010 and May 25, 2010. At the end of the Class Period, Ohio held 169,000 ADSs. (Doc. No. 677–3, at 2–3.)

**\*7** • At the beginning of the Class Period, New York held 644,000 ADSs. It both bought and sold ADSs between November 8, 2007 and the date of the explosion, but its sales outnumbered its purchases by approximately 2 to 1 (949,368 ADSs sold versus 498,094 ADSs purchased). After the explosion, New York bought ADSs on April 29, 2010 and May 26, 2010, and sold ADSs on May 27, 2010. Post-spill, its purchases outnumbered its sales by approximately 2 to 1 (20,080 ADSs purchased versus 10,510 ADSs sold). At the end of the Class Period, New York held 202,296 ADSs. (Doc. No. 677–2, at 2–3; Doc. No. 23–1, at 87–88.)

According to Defendants, New York and Ohio are atypical of the class because they profited from the alleged fraud. (Opp. at 15–18.) Defendants' expert, Dr. René Stulz, utilizes a methodology known as "constant dollar" to calculate that New York profited between \$12.7–16.4 million, and Ohio profited approximately \$12.6 million during the Class Period. (Doc. No. 664–18 ("Stulz Report"), at ¶¶ 12–13 & Ex. 1.) Because they profited from the alleged fraud, Defendants continue, New York and Ohio are subject to the unique defenses that: (1) they did not rely on Defendants' alleged misstatements and (2) they have no standing because they suffered no injury. (Opp. at 11–13, 15–18.)

New York and Ohio counter that the appropriate inquiry, for purposes of Rule 23(a), is not whether they were net sellers over the Class Period, but whether they suffered losses. (Doc. No. 677 ("Reply"), at 3–4.) New York and Ohio maintain that they did suffer losses during the Class Period, under two recognized accounting methodologies: Last–In–First– Out ("LIFO") and First–In–First–Out ("FIFO"). (Reply at 3.) They also claim to have suffered legally cognizable damages from their investments in BP ADSs, citing a "rudimentary" damages inquiry known as "retained share." (*Id.*5–7.) Before addressing the results of these various calculations, as applied to New York and Ohio's trade histories, it is appropriate to define the terms cited by the parties.

- ***Constant Dollar:*** As described at various points, the "constant dollar" approach appears to equate the amount of a stock price-drop on a given corrective disclosure day (after adjusting for confounding events, such as general

market movement) with the "inflation" created by a preceding misrepresentation.[5] This "constant dollar" amount of inflation is then carried back to the date of the preceding misrepresentation, such that any share purchased in the interim is deemed "inflated" by that amount. (Doc. No. 677–4 ("Coffman Reply"), at ¶ 60.)

- **Retained Share:** This approach involves identifying the number of shares purchased during the class period that are retained at the end of the class period, and "calculating damages by subtracting the purchase price for these retained shares from either (1) the average of the daily closing price of the stock during the 90 day period beginning at the end of the class period (if the share was not sold during the 90 day period) or (2) the higher of the actual sale price or an average of the daily closing price from the end of the class period to the date of sale (if a share was sold within the 90 day period)." *Perlmutter v. Intuitive Surgical, Inc.,* No. 10–CV–03451–LHK, 2011 WL 566814, at *6–7 (N.D.Cal. Feb. 15, 2011).

**\*8** In the Court's understanding, the above terms describe competing methods of calculating securities fraud damages. LIFO and FIFO, by contrast, are methods of accounting for sold shares in order to perform the above "constant dollar" or "retained share" calculations.

- **LIFO:** Under the LIFO method, shares purchased most recently are assumed to have been sold first. (Stulz Report at ¶ 13, n. 6.)

- **FIFO:** Under the FIFO method, shares purchased first are assumed to have been sold first. (*Id.*)

Plaintiffs claim that New York suffered $2.24 million in losses over the Class Period under LIFO or $8.79 million in losses under FIFO. (Reply at 3; Doc. No. 677–2, at 2–3.) They claim that Ohio suffered $1.8M in losses under LIFO or $4.88 million in losses under FIFO. (Reply at 3; Doc. No. 677–3, at 2–3.) In addition to these overall trading losses, Plaintiffs claim that New York and Ohio suffered damages from Defendants' alleged fraud because each "at the end of the Class Period ... held a significant number of shares that were purchased during the Class Period[.]" (Reply at 5 .)

Plaintiffs criticize Defendants' expert for employing the "constant dollar" methodology to calculate Plaintiffs' alleged "gains" over the Class Period. They contend that Dr. Stulz's calculations are unreliable under Federal Rule 702 and should

be struck, and that Defendants' attendant arguments regarding New York and Ohio's atypicality and lack of standing then necessarily fail.[6] (Reply at 7–8.)

Plaintiffs also argue—regardless of whether the constant dollar approach can be used to approximate New York and Ohio's "profits" from the fraud—that it is inappropriate to "net" a plaintiff's alleged profits from any Class Period sale of shares purchased prior to the Class Period against his later losses. Plaintiffs cite a number of cases in which courts conclude that "netting"—or "aggregating"—a plaintiff's unwitting profits from pre-Class Period holdings would not serve the purposes of the securities laws, which is to deter fraud. (Reply at 6–7.) Defendants counter that Plaintiffs have identified the few cases in which "netting" is rejected—none of which is binding—but that the majority view, endorsed by the Fifth Circuit, is that damages from securities fraud should be calculated by netting the gains and losses from the plaintiff's ongoing trading strategy. (Doc. No. 688 ("Sur–Reply"), at 11.)

Even assuming that Defendants are correct that a plaintiff's losses from the alleged fraudulent scheme must be netted against that plaintiff's "profits," the Court finds it unnecessary and inadvisable to attempt such a calculation at this stage.[7] The calculation depends upon variables which are not and cannot be fixed without substantive merits determinations, including: (1) when the "inflationary" period begins (i.e., when the first material and knowingly or recklessly false misrepresentation was made) and (2) what the amount of inflation over the Class Period is.

**\*9** Moreover, the unique defenses indicated by Defendants —absence of injury and lack of standing—can be assessed with a more foundational inquiry. The Supreme Court has indicated that a securities fraud plaintiff has experienced injury if he, at the time of any alleged corrective disclosure, held shares which he purchased during the Class Period at allegedly inflated prices. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342–43 (2005). The Court finds that New York and Ohio meet this standard for injury during the Class Period and thus qualify as typical representatives for the Class regardless of the timing of their purchases. *See Kalodner v.. Michaels Stores, Inc.,* 172 F.R.D. 200, 208 (N.D.Tex.1997) (concluding that a "hypothetical conflict between early and late purchasers does not destroy typicality"). "[W]ere the rule otherwise, there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since on

each day the mix of information available to the public would vary." *Feldman v. Motorola, Inc.,* Civ. A. No. 90 C 5887, 1993 WL 497228, at *6 (N.D.Ill. Oct. 14, 1993).

### b. The Ludlow Plaintiffs

Defendants raise no specific typicality arguments regarding the Ludlow Plaintiffs, although they fault the Ludlow Plaintiffs generally for not attempting to establish that the proposed Ludlow Subclass meets each requirement of Rule 23. (Opp. at 20–22.) The Court agrees that the requirements of Rule 23 must be established for each proposed class and subclass. *See* Fed.R.Civ.P. 23(c) (5) ("[S]ubclasses ... are each treated as a class under this rule."); *see also Simms v. Jones,* ––– F.R.D. ––––, Civil Action Nos. 3:11–CV–0248–M, 3:11–CV–345–M, 2013 WL 3449538, at *9 (N.D.Tex. July 9, 2013) ("When class certification is sought for multiple subclasses, each individual subclass is treated as its own class and must meet the requirements of Rule 23."). It also agrees that Plaintiffs provided scant information in their original motion regarding the need for the Ludlow Subclass or how the Ludlow Subclass independently satisfies Rule 23. Defendants have overstated the latter deficiency, however. Because the Ludlow Subclass Period is wholly subsumed within the Class Period, most of the Rule 23 requirements for the Ludlow Subclass hinge upon the same evidence and the same arguments advanced in support of the Class as a whole.[8] Specifically, in the matter of typicality, the Ludlow Plaintiffs allege that they purchased BP ADSs during the Ludlow Subclass Period which were artificially inflated due to Defendants' misleading statements and omissions, and that they retained those shares until after an alleged corrective disclosure. (Mot. at 6.)

More troubling than the Ludlow Plaintiffs' failure independently to establish their compliance with the requirements of Rule 23 is their silence as to the need for the Ludlow Subclass at all. As described above, the Ludlow Subclass was instituted at the lead plaintiff stage of this case due to concerns that NY/OH and the Ludlow Plaintiffs intended to pursue fundamentally different theories of securities fraud against Defendants. Since that decision was made, Plaintiffs' claims and the Class Period have been significantly narrowed by the Court's rulings on Defendants' motions to dismiss. Indeed, the live pleading is a joint effort by both NY/OH and the Ludlow Plaintiffs. Counsel for both sets of lead plaintiffs report a productive and amicable working relationship—one to which the Court can attest, and one that has proved beneficial to the prosecution of

this case. (Nov. 18, 2013 Hrg. Tr. at 6–7.) In summary, the Court can discern no conflict or competing theory of liability which necessitates the Ludlow Subclass as presently defined. Plaintiffs—including the Ludlow Plaintiffs—do not dispute this analysis and, in fact, have revised their motion to request certification of a single class. (*Id.* at 7.)

**\*10** Anticipating this revised request, Defendants argue that the Ludlow Plaintiffs "have never sought to represent" the longer Class Period and would be unable to do so. (Opp. at 20 n. 11.) To the extent that Defendants base their argument on the claim that the Ludlow Plaintiffs are "atypical" representatives for the Class, this would seem to contradict their position regarding New York and Ohio. It is undisputed that the Ludlow Plaintiffs were net purchasers of ADSs during the Class Period; therefore, they suffered a loss regardless of whether damages are calculated pursuant to a "netting" theory or a "transaction-based" theory. To the extent that Defendants base their argument on the Ludlow Plaintiffs' previous position—from the lead plaintiff stage of the case—that NY/OH's proposed class period was too long and diluted the class's most meritorious claims, the Court declines to judge the Ludlow Plaintiffs' typicality by reference to a position taken in opposition to a proposed class period and a set of claims which are now obsolete. As noted above, a securities fraud plaintiff need not have purchased his shares in any particular time frame of the alleged fraud to be typical of the class. *See Feldman,* 1993 WL 497228, at *6. By any relevant measure, the Ludlow Plaintiffs satisfy Rule 23(a)'s typicality requirement for the proposed Class as a whole.

### 4. Adequacy

Section 4 of Rule 23(a) requires that plaintiffs demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Thus, to assess representativeness, courts must examine "class representatives, their counsel, and the relationship between the two." *Berger,* 257 F.3d at 479. Class representatives must have sufficient knowledge and understanding so as to be able to control or prosecute the litigation. *Feder v. Elec. Data Systems Corp.,* 429 F.3d 125, 129–30 (5th Cir.2005). In other words, they must be willing and able "to take an active role in and control the litigation and to protect the interests of absentees." *Berger,* 257 F.3d at 479 (internal quotation marks omitted). Their counsel should likewise be zealous and competent. *Id.* (citing *Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 484 (5th Cir.1982)). Finally, courts should endeavor to uncover conflicts of interest between named plaintiffs and proposed class members. *Feder,* 429

F.3d at 130. It is commonly acknowledged, however, that "[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create *conflicts* between the named plaintiffs' and the class members' interests." *Berger,* 257 F.3d at 480 (emphasis added).

### a. Conflicts of interest

Although typicality and adequacy are separate components of the analysis, they overlap to the extent that a proposed representative subject to unique defenses may prove an inadequate representative for the class. *See Beck v. Maximus, Inc.,* 457 F.3d 291, 301 (3d Cir.2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."). Defendants argue that this problem exists for Ohio and New York, due to their atypical trading activity and alleged profits from the purported fraudulent scheme. (Opp. at 14–15.) According to Defendants, Ohio and New York have no incentive to establish that the price of ADSs was inflated in the pre-spill period, when Ohio and New York were both net sellers. Put another way, Defendants contend that Ohio and New York have a conflict of interest with class members, due to the timing of their trades, which makes them inadequate class representatives.

**\*11** To fully appreciate Defendants' argument, it is necessary to conceptualize the types of misrepresentations which have been alleged in this case and how they operate over the span of the Class Period. Defendants are alleged to have misrepresented BP's efforts to improve its process safety processes, representations which—if true—would have had the effect of lowering BP's exposure to catastrophic risk. These misrepresentations took the form of statements regarding the Baker Panel and its recommendations, as well as statements regarding a specific Baker Panel recommendation: OMS. All of these statements took place prior to the April 20, 2010 Deepwater Horizon explosion.

Defendants are also alleged to have misrepresented the extent of the oil spill following the April 20, 2010 explosion. All of these statements took place following the explosion.

It is appropriate, therefore, to view the April 20, 2010 Deepwater Horizon explosion as an inflection point in the Class Period. This is because purchases of ADSs prior to the explosion could not have been motivated by Defendants' misrepresentations regarding the oil flow rate. Conversely, purchases of ADSs subsequent to the explosion were not likely motivated by Defendants' misrepresentations regarding its process safety improvements. [9] Viewing the Class Period as relatively self-contained periods both before and after the Deepwater Horizon explosion, it becomes clear that Defendants have identified a conflict among class members that rises above mere hypothesis or speculation. *See Ward v. Dixie Nat. Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir.2010) ("[A] conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical[.]' ") (quoting *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 430 (4th Cir.2003)); *Bradburn Parent/Teacher Store, Inc. v. 3M (Minn. Mining and Manuf. Co.),* No. Civ. A. 02–7676, 2004 WL 414047, at \*5 (E.D.Pa. Mar. 1, 2004) (" '[M]ost courts hold that [a] conflict [between class members] must be more than merely or hypothetical' before a named representative can be deemed inadequate.") (quoting 5 James Wm. Moore, et al., Moore's Federal Practice 23.25[4][b] (3d ed.2003)). Specifically, in the creation of a damages model, Plaintiffs will be tasked with addressing how to account for the multiple frauds which they have alleged. Class members who purchased prior to the Deepwater Horizon explosion may very well have interests different from, and possibly competing with, class members who purchased after that event.

Fortunately, this conflict can be ameliorated by the creation of a "Pre–Explosion Subclass" and a "Post–Explosion Subclass." *See In re PaineWebber Ltd. P'ship Litig.,* 174 F.R.D. 35, 36–37 (S.D.N.Y.1996) ("[S]ubclasses may be created when there are conflicts of interest among class members."); *see also In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on April 20, 2010,* 910 F.Supp.2d 891, 918 (E.D.La.2012) (recognizing that "[s]ubclassing is ... one of many available options for limiting the possibility of intraclass conflicts"). Because Ohio held no ADSs at the time of the Deepwater Horizon explosion, it is an inadequate representative for the Pre–Explosion Subclass. Ohio purchased ADSs following the explosion, however, which it held until the end of the Class Period. Therefore, Ohio is a potentially adequate representative for the "Post–Explosion Subclass."

**\*12** New York also purchased ADSs following the explosion, which it held until the end of the Class Period. But New York, unlike Ohio, held ADSs at the time of the explosion which it had purchased within the pre-explosion portion of the Class Period. [10] Therefore, the Court discerns no conflict or impediment that prevents New York from

serving as a representative of the Class throughout the proposed Class Period.

Finally, the Ludlow Plaintiffs purchased ADSs prior to the explosion which they held through the explosion, but they did not purchase any additional ADSs after the explosion. Therefore, the Ludlow Plaintiffs are potentially adequate representatives for the "Pre–Explosion Subclass" only.

### b. Other measures of adequacy

The adequacy prong of Rule 23(a) is not limited to the absence of a conflict of interest, however. It is also directed to the ability of the class representative to discharge its role of monitoring and directing the litigation. New York and Ohio are both large, sophisticated institutional investors, with significant assets and in-house resources directed specifically at this litigation and experience in other major securities fraud cases. (Mot. at 7–9.) It is clear that they satisfy this measure of adequacy, as Defendants do not dispute.

In their opposition to class certification, Defendants raise concerns about the Ludlow Plaintiffs' adequacy as class representatives. Defendants highlight that several of the Ludlow Plaintiffs, in their depositions, expressed come confusion about what it means to sue in a representative capacity; what misrepresentations Defendants are alleged to have made; and why the Subclass Period differs from the Class Period. (Opp. at 21 n. 12.) The Court has reviewed the relevant portions of the Ludlow Plaintiffs' depositions. It finds that their testimony reflects the very basic knowledge that an individual investor should be expected to have, given the complicated nature of the claims alleged here. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 256 F.R.D. 586, 601 (N.D.Ill.2009) (" '[I]t is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative[.]' ") (quoting *Wagner v. Barrick Gold Corp.,* 251 F.R.D. 112, 118 (S.D.N.Y.2008)). Moreover, the personal information regarding the Ludlow Plaintiffs submitted by Plaintiffs in their reply brief satisfies the Court as to their sophistication and ability to participate in this complex securities fraud case.[11] (Reply at 16–17.)

More troubling is the fact that the Ludlow Plaintiffs have apparently convened with counsel only once during the course of the litigation, in August 2013. (Opp. at 21 n. 12.) This is in contrast to the Ludlow Plaintiffs' collective promise, while vying for Lead Plaintiff position, to meet

on a regular basis. (Doc. No. 48–3, at ¶ 4.) The PSLRA was enacted, in part, to combat a model of securities class action in which plaintiffs serve as mere figureheads, ceding the responsibility to monitor and control the litigation to counsel. *See Berger,* 257 F.3d at 484 ("[I]n complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases."). The Ludlow Plaintiffs' apparent disengagement from this case is of significant concern to the Court.

**\*13** Ultimately, however, the Court sees benefit in the inclusion of individual investors in the prosecution of these claims. It is persuaded that the Ludlow Plaintiffs are sufficiently knowledgeable to serve as representatives. And it is heartened that one of the Ludlow Plaintiffs— Les Nakagiri—personally attended the hearing on class certification. Therefore, while not without reservations, the Court concludes that the Ludlow Plaintiffs are adequate representatives for the Pre–Explosion Subclass.

Finally, adequacy must be assessed for the proposed class representative's counsel. New York is represented by the firm Cohen Milstein Sellers & Toll PLLC; Ohio is represented by the firm Berman deValerio; and the Ludlow Plaintiffs are represented by Cotchett, Pitre & McCarthy, LLP and the Mithoff Law Firm. All of these firms have considerable experience prosecuting class action securities fraud cases, as their respective firm resumes attest. (Doc. No. 652–6; Doc. No. 652–7; Doc. No. 652–8; Doc. No. 652–9.) Additionally, the Court has had the benefit of observing the work performed by Plaintiffs' counsel during the course of this case to date. The work has been more than adequate, as Defendants concede by their silence.

### B. Rule 23(b)(3)

#### 1. Predominance

"To gain class certification under Rule 23(b)(3), a proposed class must satisfy Rule 23(a) and '[c]ommon questions must predominate over any questions affecting only individual members, and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy.' " *Maldonado,* 493 F.3d at 525 (quoting *Amchem,* 521 U.S. at 615) (internal quotation marks omitted). The predominance inquiry is "more demanding than the commonality requirement of Rule 23(a), and as such, mandates caution, particularly where 'individual stakes are

high and disparities among class members great.' " *Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 301–02 (5th Cir.2003) (quoting *Amchem,* 521 U.S. at 625). Defendants argue that the predominance requirement is not met with regards to one category of alleged misstatements—those found within Defendant BP Exploration & Production's regulatory filings with the MMS—because individualized questions of reliance will overwhelm the case. They also argue that the predominance requirement is not met for any of Plaintiffs' claims because they have not established that damages are capable of class-wide measurement.

### a. Reliance

Predominance is a test readily met in cases alleging securities fraud. *See Amchem,* 521 U.S. at 625. This is largely due to the fraud-on-the-market presumption, which excuses securities fraud plaintiffs from establishing individual reliance on an alleged misrepresentation in certain circumstances. *See Smilovits v. First Solar, Inc.,* —— F.R.D. ——, No. CV12–00555–PHX–DGC, 2013 WL 5551096, at *3 (D.Ariz. Oct. 8, 2013).

The fraud-on-the-market presumption theorizes that, when securities are sold on an open and efficient market, public and material information about the company is quickly incorporated into the price of the security, and each investor who trades in the security thereafter is "defrauded" to the extent that the information was false and artificially inflated the price of the security beyond its true value. *See Basic Inc. v. Levinson,* 485 U.S. 224, 244, 247 (1988). Although there had been some doubt in the past regarding what must be shown at the certification stage to invoke the fraud-on-the-market presumption, the Supreme Court has clarified that a proposed class representative need not establish materiality or loss causation to invoke the presumption and thereby satisfy Rule 23(b)(3) predominance. [12] *See Amgen Inc. v. Conn. Retirement Plans and Trust Funds,* 133 S.Ct. 1184, 1195–99 (2013) (explaining that materiality need not be shown at class certification because it is an "objective" question with a "class-wide" answer, therefore necessarily satisfying Rule 23(b) (3) predominance); *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2186 (2011) (explaining that loss causation need not be shown at class certification because it is "has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory"). Rather, the inquiry at this stage is focused on "trade timing, market efficiency, and publicity [.]" *Erica P. John Fund, Inc. v. Halliburton, Inc.,* 718 F.3d 423, 432 (5th

Cir.2013), *cert. granted by Halliburton Co. v. Erica P. John Fund, Inc.,* No. 13–317, 2013 WL 4858670, at *1 (U.S. Nov. 15, 2013).

**\*14** Defendants dispute the applicability of the fraud-on-the-market presumption with regards to alleged misrepresentations found in two MMS regulatory filings: the IEP and OSRP. [13] They claim that Plaintiffs have failed to establish two prerequisites necessary to invoke the presumption: publicity and market efficiency. Because the Court finds Defendants' publicity argument persuasive, it will not address market efficiency.

To invoke fraud-on-the-market, Plaintiffs "must demonstrate that the alleged misrepresentations were publicly known (else how would the market take them into account?)[.]" *Halliburton,* 131 S.Ct. at 2185. Defendants contend that the OSRP was not accessed by any member of the public until after the oil spill, and that the IEP was accessed by only a small handful of people (approximately 22) prior to the spill. (Opp. at 27–32.) They submit affidavits from representatives of the successor agency to MMS and a forensic expert in order to establish these facts. (Doc. No. 664–12 (Miller Decl.); Doc. No. 664–13 (FOIA Chart); Doc. No. 664–15 (Schoennagel Decl.); Doc. No. 664–16 (McGurk Aff.).) According to Defendants, because the preponderance of the evidence does not support that the IEP and OSRP were publicized or otherwise publicly known before the oil spill, the alleged misstatements contained within those documents could not have been incorporated into the ADS price, and each plaintiff will be required to establish his or her own reliance on the documents. (Opp. at 23–32.)

Plaintiffs have very weak retorts to Defendants' analysis. First, Plaintiffs rely on their complaint allegations that the IEP was "available to the public" and that the OSRP was "publicly filed." (SAC ¶¶ 337, 349.) They note that the Court rejected Defendants' argument at the motion to dismiss stage. (Mot. at 18.) But a motion to dismiss must be decided on the allegations in the pleadings, while at class certification the Court must look beyond the pleadings to determine whether a preponderance of the evidence indicates that common questions of fact or law will predominate over individualized questions during the course of the litigation. *See Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (noting that district court faced with motion to certify a class under Rule 23(b)(3) must "take a 'close look' at whether common questions predominate over individual ones") (quoting *Amchem,* 521 U.S. at 615); *see also Wal–*

*Mart,* 131 S.Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard."). This more searching standard indicates that Defendants have raised a valid objection to Plaintiffs' invocation of the fraud-on-the-market presumption.

Plaintiffs also claim that Defendants publicized the OSRP following the oil spill by releasing a statement regarding the resources BP had marshaled to combat the spill. (Mot. at 19.) The press release cited, dated April 22, 2010, contained none of the specific statements of fact from the OSRP which the Court previously found actionable as fraud. As such, it does not assist with the publicity element for fraud-on-the-market.

**\*15** Defendants contend—and Plaintiffs have not shown otherwise—that the alleged misrepresentations from the IEP and OSRP were first publicized in news articles from late April and early May 2010, respectively. (Opp. at 28–29, 31.) Defendants further argue that, because the new articles were critical and cast doubt on the accuracy of the purported misrepresentations, they could not have inflated the price of BP's ADSs. (*Id.* at 29, 31.)

Interestingly, Plaintiffs do not respond to the publicity problem in their reply briefing. They criticize Defendants' market efficiency argument. They claim that Defendants have not rebutted the fraud-on-the-market presumption because their arguments are about materiality. (Reply at 19.) But they do not suggest Defendants have incorrectly stated the law regarding publicity; they do not dispute Defendants' conclusions about publicity; and they do not offer any rebuttal evidence regarding publicity. In short, Plaintiffs have all but conceded that they have no evidence that the IEP and OSRP misstatements were known by the market and incorporated in the ADS price prior to the Deepwater Horizon explosion. As such, the fraud-on-the-market presumption cannot be invoked, and Plaintiffs' claims based on these alleged misstatements are not appropriate for class action treatment.

#### b. Damages

Plaintiffs indicate that class members' damages will be calculated by use of an event study. (Mot. at 20.) "An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *In re Imperial Credit Industries, Inc. Securities Litig.,* 252 F.Supp.2d 1005, 1014 (C.D.Cal.2003). Event studies are commonly used in securities fraud class actions. *See In re Diamond Foods, Inc.*

*Securities Litig.,* —— F.R.D. ——, 2013 WL 1891382, at \*12 (N.D.Cal. May 6, 2013).

Defendants dispute that Plaintiffs' assertion as to what they *will* do satisfies their burden on class certification. They argue that Plaintiffs have not established by a preponderance of the evidence that damages can be calculated on a class-wide basis using a model consistent with their theory of liability. Defendants base their argument on *Comcast Corp. v. Behrend,* 133 S.Ct. 1426 (2013).

The facts in *Comcast* involved Comcast's practice of "clustering" by swapping infrastructure in some geographical areas with the infrastructure of competitors in other geographical areas. This practice permitted Comcast to achieve dominance in certain geographical markets. The market at issue in the case was the Philadelphia "Designated Market Area" ("DMA"). As a result of clustering, Comcast's market share in the Philadelphia DMA went from 23.9% to 69.5% over a 10–year period. *See* 133 S.Ct. at 1430.

Plaintiffs brought antitrust claims against Comcast, theorizing that clustering had "harmed subscribers in the Philadelphia cluster by eliminating competition and holding prices for cable services above competitive levels." *Comcast,* 133 S.Ct. at 1430. Plaintiffs posited that Comcast's anti-competitive behavior resulted in higher prices through four different mechanisms of action, including "reduc[ing] the level of competition from 'overbuilders,' companies that build competing cable networks in areas where an incumbent cable company already operates." *Id.* at 1430–31. The trial court determined that this "overbuilder-deterrence" theory was the only theory capable of class-wide proof and limited certification to this theory. *Id.* at 1431.

**\*16** In support of their motion for certification, plaintiffs submitted the expert report of Dr. James McClave. Dr. McClave had run a regression model comparing actual cable prices in the Philadelphia DMA with "but for" prices derived from benchmark counties outside Philadelphia. *See Comcast,* 133 S.Ct. at 1431, 1438–39. "Dr. McClave acknowledged ... [that] the model did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 1431. As noted above, three of the Plaintiffs' four posited theories had been rejected for class treatment. As a result, the Supreme Court concluded that Dr. McClave's model did not "measure only [the] damages attributable" to the "overbuilder-deterrence" theory and therefore could not "possibly establish that damages are susceptible of measurement across the entire class for

purposes of Rule 23(b)(3)." *Id.* at 1433. The Court further emphasized that it is not sufficient for class action plaintiffs to provide a classwide damages model; they must also show that the damages model is " 'consistent with [their] liability case[.]' " *Id.* (citation omitted). Without this second step, Rule 23(b)(3) predominance would be "reduce[d] ... to a nullity." *Comcast,* 133 S.Ct. at 1433.

In this case, Defendants argue that Plaintiffs' proposed event study methodology will violate the *Comcast* requirement that class-wide damages must hew to Plaintiffs' theories of liability. To illustrate the potential disconnects between an event study and the multiple frauds alleged in this case, Defendants' expert, Dr. Stulz, created an event study similar to the type used by Plaintiffs' expert, Mr. Chad Coffman, in other securities fraud cases. Dr. Stulz's event study assumes a "constant dollar" methodology of damages, and does not disaggregate inflation from multiple alleged disclosures. Thus, assuming an initial misrepresentation on the first day of the Class Period and eight corrective disclosure dates as identified by Mr. Coffman in one of his reports, Dr. Stulz's event study returns $27.26 of inflation, beginning on November 8, 2007 and continuing throughout most of the Class Period. [14] (Doc. No. 689–1, at 2–3.) Defendants assert that Dr. Stulz's event study is substantially similar to one that Plaintiffs will attempt to use at trial. Defendants have identified multiple ways in which this damages methodology is inconsistent with Plaintiffs' theories of liability, including:

(1) Although the pre-spill misrepresentations understated a known risk, the "constant dollar" approach compensates investors for the full value of the stock price drop from the materialization of that risk. This overcompensates investors for their harm. [15] (Stulz Report at ¶¶ 5 8–62.)

(2) The model does not disaggregate "inflation" according to the type of misrepresentation corrected or risk disclosed. This means that investors may receive a measure of damages attributed to misrepresentations which could not have influenced their purchase. (Sur–Reply at 8–9; Doc. No. 688–1 ("Stulz Sur–Reply"), at ¶ 12.)

**\*17** (3) The amount of inflation remains constant over the Class Period. This means that the repetition of certain statements—particularly, the Baker Report and OMS statements—is not shown to have had any cumulative inflationary effect, and that the amount of damages to be awarded will be similarly unresponsive to the jury's specific findings of liability. (Sur–Reply at 4–6.)

Plaintiffs respond to the above criticisms by noting that the event study which prompted them was performed by Defendants, not Plaintiffs. (Nov. 18, 2013 Hrg. Tr. at 99, 103–04.) They also claim that their event study —which, again, has not yet been created—will provide options to the jury to disaggregate inflation by the type of misrepresentation, should the jury agree with Defendants that the misrepresentations were not part of a single, cohesive fraudulent scheme. (*Id.* at 11–14.) Of course, this feature would only address the second of the criticisms noted above; Plaintiffs tacitly concede that they have no plans to address the first or third.

These retorts only crystallize Defendants' point that Plaintiffs have failed to meet *their burden* of showing that damages can be measured on a class-wide basis consistent with their theories of liability. The Court agrees with Defendants that *Comcast* signals a significant shift in the scrutiny required for class certification. (Nov. 18, 2013 Hrg. Tr. at 122–23 (analogizing *Comcast* to the more demanding judicial scrutiny of notice pleading announced by *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)).) Prior to *Comcast,* the Court may have been satisfied that Plaintiffs' invocation of the event study methodology alone showed the predominance of common issues. This is because the need to perform individual calculations of damages will not overwhelm common issues of liability when those calculations are "mathematical and formulaic." *See Bell Atl.,* 339 F.3d at 307. Simply invoking the event study methodology may have been sufficient to indicate that this case would fall into the category of cases in which individual damages calculations are "mathematical or formulaic." In other words, it likely satisfies the first half of *Comcast* 's test: that damages be measurable on a class-wide basis. But it does not satisfy the second half of that test. It does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified. *See* 133 S.Ct. at 1433.

Following *Comcast,* circuit and district courts have rigorously examined proposed damages methodologies in putative class action cases for disconnects between damages and liability. Some of these examinations have resulted in denials of class certification. *See, e.g., Turnbow v. Life Partners, Inc.,* Civil Action No. 3:11–cv–1030–M, 2013 WL 3479884, at \*15–18 (N.D.Tex. July 9, 2013); *see also In re Rail Freight*

*Fuel Surcharge Antitrust Litig.—MDL No. 1869,* 725 F.3d 244, 253–55 (D.C.Cir.2013) (vacating district court's decision to grant class certification and remanding for consideration of whether plaintiffs' proposed damages model satisfies *Comcast* ). Plaintiffs cannot avoid this hard look by refusing to provide the specifics of their proposed methodology. *See In re Montano,* 493 B.R. 852, 860 (Bankr.D.N.M.2013) ("If in fact Class 2 damages could be measured class-wide, Plaintiffs had an obligation to come forward with evidence thereof. They did not, and *Comcast* does not allow them the luxury of waiting until trial."). Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate —and, if necessary, respond to—the various theories of liability, the Court cannot certify this litigation for class action treatment. [16]

### 2. Superiority

**\*18** According to Plaintiffs, resolving the question of Defendants' liability and the right of approximately 900,000 ADS purchasers to receive damages in this consolidated class action is vastly superior to the pursuit of hundreds of thousands of individual actions. (Mot. at 21.) This fact is often acknowledged in securities fraud cases. *See, e.g., In re Deutsche Telekom Ag Securities Litig.,* 229 F.Supp.2d 277, 282 (S.D.N.Y.2002) ("Class actions are generally well-suited to securities fraud cases such as this one because they avoid the time and expense of requiring all class members to litigate individually. Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy than requiring individual adjudications would.").

If Plaintiffs had established that damages can be calculated on a class-wide basis consistent with their theories of liability, the Court would be inclined to agree that the superiority requirement of Rule 23(b)(3) has been met. But such a conclusion is impossible without assurances that Plaintiffs' class-wide damages methodology will accurately reflect any liability findings in this case.

### VI. CONCLUSION

It is ordered that Plaintiffs' Motion for Class Certification (Doc. No. 652) is **DENIED.** Plaintiffs have failed to discharge their burden to establish that damages in this case can be measured on a class-wide basis consistent with their theories of liability. Because the Court's ruling is based in large part on a recent Supreme Court decision that—in this Court's opinion—has appreciably changed the landscape for class certification, the Court finds it would be inequitable to disallow Plaintiffs a second attempt to establish the elements necessary for class action treatment. Therefore, should Plaintiffs wish to supplement and re-urge their Motion, they are instructed to do so in conformity with the rulings expressed in this Order within 30 days.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 6388408, Fed. Sec. L. Rep. P 97,754, Fed. Sec. L. Rep. P 97,757

---

## Footnotes

1    All docket references are to Multi–District Litigation No. 10–md–2185.

2    During the early stages of this case, the Ohio Attorney General represented four Ohio public pension funds. (Doc. No. 113, at ¶ 32.) In the most recent pleading, however, he represents only the Ohio Public Employees Retirement System. (Doc. No. 339 ("SAC"), at ¶ 36.)

3    In addition to their securities fraud claims based on their purchases of BP ADSs on the NYSE, NY/OH brought securities fraud claims based on their purchases of BP Ordinary Shares on the London Stock Exchange. The Ludlow Plaintiffs did not bring these types of claims. The Ordinary Shares claims were dismissed in February

4    2012 and are no longer germane to this case. *In re BP p.l.c. Securities Litig. ("BP I"),* 843 F.Supp.2d 712, 796 (S.D.Tex.2012).

4    The bracketed phrase has been proposed by Defendants in the event that Plaintiffs' motion is granted. (Doc. No. 664 ("Opp."), at 15 n. 6.) Plaintiffs do not oppose the addition. (Doc. No. 677 ("Reply"), at 12 n. 14.)

5    In this opinion, the Court will use the term "corrective disclosure" to refer to any event alleged by Plaintiffs to have revealed that a prior representation made by one of the Defendants was untrue or misleading. The Court notes the potential confusion that this term can engender when some "corrective" events are materializations of concealed or understated risks. *See In re Vivendi Univ., S.A. Securities Litig.,* 634 F.Supp.2d 352, 363 n. 9 (S.D.N.Y.2009) (noting that "many courts in [this] district consider corrective disclosures to be a separate conceptual category from 'materalization of the risk' "). However, because the parties employ the "corrective disclosure" term in their briefing and arguments, the Court will do so as well.

6    To be clear, Plaintiffs' and Defendants' experts agree that the "constant dollar" methodology, in the context of a case alleging misstated or concealed risk, does not yield a "but for" price that the stock would have traded at absent the alleged fraud. (Doc. No. 664–18 ("Stulz Report"), at ¶¶ 58–62; Doc. No. 677–4 ("Coffman Reply"), at ¶¶ 48–52.) Nonetheless, Plaintiffs' expert contends that the "constant dollar" methodology is the appropriate measure of Plaintiffs' damages from the alleged fraud. (Coffman Reply at ¶¶ 53–55.) Neither he nor Plaintiffs have satisfactorily explained the economic or legal justification for this position.

7    The two damages approaches proffered by the parties—"netting" versus "transaction-based"—have been endorsed by various courts at various times and are the source of much confusion in this area of the law. *See* Samuel Francis, Note, *Meet Two–Face: The Dualistic Rule 10b–5 and the Quandary of Offsetting Losses by Gains,* 77 Fordham L.Rev. 3045, 3061–73 (2009). Defendants indicate that the Fifth Circuit has definitively chosen the "netting" approach, relying upon *Wolf v. Frank,* 477 F.2d 467 (5th Cir.1973). Plaintiffs dispute Defendants' interpretation of *Wolf.* (Reply at 6 n. 6.) The Court posits that the law is unsettled in this area precisely because so few securities fraud cases proceed to trial and the determination of damages. It recognizes that, if this case proceeds to summary judgment and trial, it will likely be called upon again to decide whether the "netting" or "transaction-based" approach is appropriate for Plaintiffs' claims. But, as described in the text, it need not wade into these muddy waters to decide the typicality and adequacy of New York and Ohio.

8    The one exception is Rule 23(a)'s adequacy requirement, which obligates the Court to assess the abilities and knowledge of the proposed class representative. Plaintiffs' failure to substantiate the Ludlow Plaintiffs' adequacy in their opening submission is addressed below in Part V.A.4.b of this opinion.

9    Plaintiffs do not concede that the misleading nature of the Baker Panel and OMS statements was fully revealed by the Deepwater Horizon explosion. They contend that the issue of whether any given corrective disclosure is partial or full should be left to a finder of fact. (Reply at 9–11.)

10   Depending upon whether the LIFO or FIFO accounting method is used, at the time of the explosion, New York held either 21,913 or 192,726 BP ADSs which had been purchased within the Class Period. (Doc. No. 677–2, at 2–3.)

11   The Court does not condone Plaintiffs' failure to include this information in their opening submissions. Because Defendants have had the opportunity to respond by way of sur-reply, however, the Court will consider the information submitted in the first instance on reply.

12   For clarity, the applicability of the fraud-on-the-market presumption is vital to class certification because otherwise individualized questions of class members' reliance would overwhelm common questions regarding Defendants' liability, and Rule 23(b)(3) predominance would not be met. *See Basic Inc. v. Levinson,* 485

2013 WL 6388408, Fed. Sec. L. Rep. P 97,754, Fed. Sec. L. Rep. P 97,757

U .S. 224, 242 (1988); *Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 383, 394 (5th Cir.2007).

Defendants contend that it is appropriate to treat each alleged misstatement as a separate claim and analyze predominance accordingly. (Opp. at 24–25.) Plaintiffs have not argued that this approach is improper.

As corrective disclosures occur, this inflation slowly dissipates from the stock price, until the amount of inflation at the time of the last corrective disclosure is $0.

To explain this phenomenon, Dr. Stulz offers the following simplified example:

> Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If the company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would *still* have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, *not* the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble.

(Stulz Report at ¶ 59.)

Specifically, the Court notes the possibility that some of Defendants' alleged misrepresentations may not survive summary judgment, or may not be found meritorious at trial. *Comcast* suggests that a damages model which cannot accommodate variations in the liability findings may be grounds for decertification at a subsequent stage of the case.

---

**End of Document**  
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 3

2024 WL 1769325
United States District Court, S.D. Texas, Houston Division.

Miriam EDWARDS, Plaintiff.

v.

MCDERMOTT INTERNATIONAL,
INC., et al., Defendants.

Civil Action No. 4:18-Cv-04330
|
Signed April 24, 2024

**Attorneys and Law Firms**

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, Joe Kendall, Kendall Law Group, Dallas, TX, for Plaintiff Miriam Edwards.

Chet B. Waldman, Justyn Millamena, Matthew Insley-Pruitt, Omer Kremer, Philip M. Black, Robert C. Finkel, Sasha Marseille, Sean M. Zaroogian, Wolf Popper LLP, New York, NY, John Rizio-Hamilton, Jonathan D'Errico, Lauren Amy Ormsbee, Bernstein Litowitz Berger & Grossmann LLP, New York City, NY, Veronica Montenegro, New York, NY, I Jeffrey W. Chambers, Chambers Law Group, Houston, TX, for Plaintiff Public Employees' Retirement System of Mississippi.

R. Dean Gresham, Gresham Law Group, Dallas, TX, for Plaintiff Wah Kee Ho.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Caleb Glenn Wright, Elizabeth Pennington Furlow, Baker Botts LLP, Houston, TX, James J. Beha, Joseph Charles Perry, Baker Botts L.L.P., New York, NY, Jonathan Mark Little, One Shell Plaza, Houston, TX, for Defendants.

**AMENDED MEMORANDUM
AND RECOMMENDATION**

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before me in this putative securities class action is the § 10(b) Plaintiffs' Motion for Class Certification and Appointment of § 10(b) Class Representatives and § 10(b) Class Counsel ("Motion for Class Certification"). Dkt. 305. On September 27, 2023, I held a hearing on the Motion for Class Certification during which both sides presented expert testimony and voluminous exhibits. *See* Dkt. 412. Following the hearing, I requested supplemental briefing, which the parties provided via letters to the Court. *See* Dkts. 425–429, 450, 460–61, 471.

On February 2, 2024, I issued a Memorandum and Recommendation on the Motion for Class Certification. *See* Dkt. 508. The crux of my analysis and recommendation was that Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia")—a shareholder in Chicago Bridge & Iron Company, N.V. ("CB&I") whose shares were converted into McDermott International, Inc. ("McDermott") stock as a result of the 2018 merger between CB&I and McDermott ("the Merger")—has a fundamental conflict with class members who purchased McDermott stock, which necessitates separate classes. I recommended the Motion for Class Certification be denied without prejudice to refiling a motion to certify two subclasses. *See id.* at 41. Judge George C. Hanks, Jr. adopted my recommendation on March 23, 2024. *See* Dkt. 526.

In subsequent status conferences with the parties, it has become clear to me that my recommendation could have been clearer about the next procedural steps, and that there is no need to delay certifying a class of CB&I shareholders when Nova Scotia and its counsel satisfy all the Rule 23 requirements for such a class. On April 24, 2024, Judge Hanks withdrew his Order Adopting Magistrate Judge's Memorandum and Recommendation and remanded the Motion for Class Certification to me for reconsideration. *See* Dkt. 544. I **WITHDRAW** my February 2, 2024 Memorandum and Recommendation. I now recommend that the Motion for Class Certification be **GRANTED IN PART**, and that the Court require two separate classes—one of CB&I shareholders, and one of purchasers of McDermott stock—due to a fundamental conflict, of which only one class may be certified at this juncture. I further recommend the Court permit lead plaintiff applications for the putative class of purchasers of McDermott stock.

**BACKGROUND**

The Court has already summarized the "pertinent factual allegations" in this litigation. *See Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-4330, 2021 WL 1421609, at \*1–6 (S.D. Tex. Apr. 13, 2021). For efficiency's sake, I will be brief. This litigation concerns the Merger of McDermott with CB&I. McDermott and CB&I announced their potential merger

Edwards v. McDermott International, Inc., Slip Copy (2024)

2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

on December 18, 2017, "whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." Dkt. 105 at 30. McDermott shareholders approved the Merger on May 2, 2018, and the Merger closed on May 10, 2018.

**\*2** Nova Scotia alleges Defendants [1] made pre- and post-Merger material misrepresentations and omissions regarding (1) "four large, challenging CB&I projects" known as the "Focus Projects"; (2) "the importance of McDermott's acquisition of CB&I's technology business, Lummus ... and McDermott's ability to integrate and operate that business as a post-Merger company despite the challenges posed by the Four Focus Projects"; and (3) "the strength and viability of McDermott's post-merger capital structure, balance sheet, liquidity, and financial health in light of its acquisition of CB&I, and specifically the Four Focus Projects." *Id.* at 5. The truth, according to Nova Scotia, was that the Focus Projects "carried undisclosed forecasted costs of well over $1 billion when the merger was announced and when it closed." *Id.* at 34. Moreover, Defendants continuously touted the importance of Lummus to the post-Merger company's long-term success, all the while "fail[ing] to disclose ... that ... the sale of Lummus Technology ... was a necessary component of maintaining adequate cash flows and liquidity." *Id.* at 198.

Plaintiff Miriam Edwards filed the initial class action complaint on November 15, 2018, styled *Edwards v. McDermott, International, Inc.*, No. 4:18-cv-04330 (S.D. Tex.), alleging claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). On January 14, 2019, a related class action complaint—styled *Public Employees' Retirement System of Mississippi v. McDermott International, Inc.*, No. 4:19-cv-00135 (S.D. Tex.)—was filed alleging § 14(a) and § 20(a) Exchange Act claims. On June 4, 2019, both actions were consolidated. *See* Dkt. 84.

Six competing lead plaintiff motions were filed in the § 10(b) Action, including Nova Scotia's motion and the motion of City of Pontiac General Employees' Retirement System ("Pontiac"). Nova Scotia asserted that it expended $517,825 to purchase 25,052 shares of McDermott stock, and "incurred losses of $318,682 in connection with its transactions in McDermott stock during the Class Period." Dkt. 23 at 11. Pontiac asserted that it "purchased 22,442 shares of McDermott stock at artificially inflated prices and

suffered over $373,000 in losses as a result of the alleged wrongdoing." Dkt. 21 at 5. On June 4, 2019, the Court appointed Nova Scotia to serve as the § 10(b) Lead Plaintiff. *See* Dkt. 84.

On October 4, 2019, Nova Scotia filed the operative Consolidated Class Action Complaint (the "Complaint")

> on behalf of the 10(b) Class, consisting of all persons and entities, other than Defendants, their family members, and their subsidiaries, affiliates, and any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and September 17, 2019, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

Dkt. 105 at 257. The Court denied Defendants' motion to dismiss in April 2021. *See* Dkts. 163, 168. Class discovery began in May 2021 and is ongoing.

On September 29, 2021, Nova Scotia moved to supplement the Complaint to (1) expand the Class Period by four months, through January 23, 2020; (2) add Pontiac as an additional, non-lead, named plaintiff; and (3) add Pontiac's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as additional, non-lead plaintiffs' counsel in the § 10(b) action. *See* Dkt. 189. On November 2, 2021, I granted Nova Scotia's motion to supplement the Complaint but denied Nova Scotia's request to add Pontiac and its counsel. *See* Dkt. 216. On November 23, 2021, Defendants moved to dismiss the Supplemental Complaint (Dkt. 190-1). *See* Dkt. 222. On August 30, 2022, I recommended that Defendants' motion to dismiss the Supplemental Complaint be granted, but made clear that my recommendation was "not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to

January 23, 2020 as described in ¶ 4 of the Supplement." Dkt. 265 at 13. The Court adopted my recommendation. *See* Dkt. 268.

**\*3** On October 28, 2022, Nova Scotia timely filed its Motion for Class Certification, seeking certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons and entities (the "§ 10(b) Class members") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5. Excluded from the § 10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

Dkt. 305-2 at 12. Nova Scotia seeks the appointment of itself as Class Representative, of Pomerantz LLP ("Pomerantz") as Lead Counsel, and of the Briscoe Law Firm ("Briscoe") as Liaison Counsel. *See id.* at 10. Defendants oppose class certification, though several issues —numerosity, commonality, superiority, and the adequacy of Lead and Liaison Counsel—are uncontested.

## LEGAL STANDARD

### A. CLASS CERTIFICATION STANDARD
Rule 23 governs the inquiry of whether a proposed class should be certified. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties

only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). Rule 23(a) requires that any purported class meet four "prerequisites":

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class).

*Madison v. Chalmette Refin. L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (cleaned up). These prerequisites—numerosity, commonality, typicality, and adequacy—are necessary but not sufficient conditions for class certification.

Rule 23(b) specifies three class types and sets out requirements—beyond those articulated in Rule 23(a)—for each. The putative class here seeks certification under Rule 23(b)(3), which permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

In considering a motion for class certification, I "must rigorously consider both Rule 23(a)'s prerequisites and the Rule 23(b) class type." *Chavez v. Plan Benefit Servs. Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This rigorous analysis requires me "to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quotation omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

(2013). My "obligation ... to conduct a rigorous analysis of Rule 23's requirements ... is not dispensed with by the parties' stipulation to certification or failure to contest one or more of Rule 23's requirements." *Ward v. Hellerstedt*, 753 F. App'x 236, 244 (5th Cir. 2018). "[T]he court [is] bound to conduct its *own* thorough [R]ule 23(a) inquiry." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002).

 **\*4**  As part of this "rigorous analysis," I must ask whether the proposed class's damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35. "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged effect of the violation." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (cleaned up) (applying *Comcast*'s rationale to a putative securities class action); *see alsoSlade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410–11 (5th Cir. 2017) ("*Comcast* held that when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto plaintiffs' liability theory. Our cases interpreting *Comcast* confirm that what *Comcast* demands is fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory."). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33–34 (quotations omitted).

Finally, I must also "consider how a trial on the merits would be conducted if the class were certified." *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021) (quotation omitted).

## B. THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities

> and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of "any untrue statement of a material fact" or the omission of any "material fact necessary in order to make the statements ... not misleading." 17 C.F.R. § 240.10b–5(b). Plaintiffs may recover damages under § 10(b) by showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 810 (2011) (quotations omitted).

At issue in every securities class action is the intersection between Rule 23(b)(3)'s predominance requirement and § 10(b)'s reliance requirement. Ordinarily, a plaintiff establishes reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021). But this individualized inquiry is impractical in a class action. So, the Supreme Court has permitted presumptions of reliance in certain circumstances. "The two major doctrines that have evolved to provide such a presumption of classwide reliance are the *Affiliated Ute* presumption and the 'fraud on the market' theory" first articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (the "*Basic* presumption"). *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 679 (S.D. Tex. 2006).

Under *Basic*, district courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *SeeHalliburton I*, 563 U.S. at 813. To establish the *Basic* presumption, plaintiffs must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268 (2014).

* *

**\*5** With these principles in mind, I turn to Nova Scotia's Motion for Class Certification.

### ANALYSIS

The disputes here concern (1) Nova Scotia's adequacy and typicality as class representative; (2) the sufficiency of Nova Scotia's damages methodology under *Comcast*; (3) whether the large number of short sellers during the Class Period defeats predominance; (4) whether the market was efficient after September 17, 2019; (5) whether the *Affiliated Ute* presumption applies if the market was *not* efficient after September 17, 2019; and (6) whether the last five alleged corrective disclosures demonstrate price impact. Because I find that Nova Scotia has a fundamental conflict with purchasers of McDermott stock, I reach only the first three of these issues. But first, I must fulfill my obligation "to conduct [my] own thorough [R]ule 23(a) inquiry." *Stirman*, 280 F.3d at 563 n.7 (cleaned up).

### A. THE UNCONTESTED ISSUES

Defendants concede that Nova Scotia has satisfied Rule 23(a)'s numerosity and commonality requirements, as well as Rule 23(b)'s superiority requirement. Defendants also concede that Pomerantz and Briscoe are adequate Class and Liaison Counsel. I also have no trouble finding that Nova Scotia satisfies the requirements of numerosity, commonality, adequacy (as to Class and Liaison Counsel), and superiority.

#### *1. Numerosity*

The putative class is numerous. "During the § 10(b) Class Period, McDermott had an average of approximately 165.5 million shares outstanding and traded heavily, with an average weekly trading volume of 34.4 million shares." Dkt. 305-2 at 32. Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. Unit A July 1981); *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (certifying a class where defendant corporation "had more than 50 million shares of Class A common stock outstanding during the class period, and the average weekly trading volume on the NASDAQ Stock Market during the class period was roughly 2.7 million shares").

#### *2. Commonality*

There are common questions of law and fact between Nova Scotia and the proposed class, including whether Defendants misrepresented or omitted material facts, scienter, materiality, economic loss, and loss causation. *See* Dkt. 305-2 at 33. These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, the requirement of commonality is satisfied.

#### *3. Adequacy*

When assessing adequacy, I must consider "the zeal and competence of the representatives' counsel." *Slade*, 856 at 412 (cleaned up). Pomerantz has served as lead counsel in multiple securities class actions, has devoted substantial time and resources to this case, and has demonstrated a willingness to take this case to trial. *See* Dkts. 305-3, 305-4. Briscoe has served as counsel in numerous securities fraud cases. *See* Dkts. 305-3, 305-5. Accordingly, Lead Counsel and Liaison Counsel are adequate.

#### *4. Superiority*

**\*6** Defendants do not contest "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

> [C]ourts readily agree that class actions are a superior method for resolving security fraud claims for publicly traded stocks. There is little interest in individual investors controlling their own claims, and a class action is more efficient than entertaining a multitude of suits. Finally, Defendants have presented no arguments suggesting the superiority requirement is not satisfied.

*Lumen v. Anderson*, 280 F.R.D. 451, 462 (W.D. Mo. 2012); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 676 (N.D. Ga. 2009) ("As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." (quotation omitted)).

## B. NOVA SCOTIA HAS STANDING

When Nova Scotia moved to be appointed lead plaintiff, it represented to the Court that it "expended $517,825" when it "purchased 25,052 shares of McDermott stock." Dkt. 23 at 11. When Nova Scotia filed the Complaint, it again alleged that it "*purchased* McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud." Dkt. 105 at 15 (emphasis added). Only after class discovery commenced did the parties realize that Nova Scotia *acquired* all of its McDermott stock by converting its CB&I shares at the time of the Merger. Yet, even when Nova Scotia moved to add Pontiac as an additional plaintiff, it failed to mention that Pontiac's "second perspective" would cover more than just "claims in the expanded period"—Pontiac would have been the only actual purchaser of McDermott stock representing the class, albeit in a non-lead role. Dkt. 190 at 24. [2]

Defendants argue Nova Scotia "is an inadequate and atypical class representative because it suffered no economic injury" and thus "cannot satisfy the damages element of its claims." Dkt. 318 at 12. Defendants contend that, under the unique facts that Nova Scotia alleges in this case, Nova Scotia "actually *benefited*" when it exchanged its CB&I shares, which "were allegedly significantly inflated because of the undisclosed losses in CB&I's Focus Projects, and received shares of McDermott, which were untainted by any such issues before the Merger." *Id.* at 13. Defendants highlight that Nova Scotia's "own Complaint admits that CB&I entered the Merger 'to stave off bankruptcy,' " meaning the "Merger and conversion thereby provided CB&I shareholders a lifeline that, at the very least, was better than bankruptcy and the concomitant elimination of their equity interests." *Id.* at 14 (quoting Dkt. 105 at 6).

Defendants argue that "[a]t minimum, [Nova Scotia] is subject to unique defenses" that render it an inadequate and atypical representative. Dkt. 318 at 15. Specifically, Defendants contend Nova Scotia "is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares." *Id.* at 16. Beyond the minimum, Defendants also contend the "lack of damages defeats [Nova Scotia]'s securities fraud claim and is a standing deficiency as well." *Id.* at 14.

**\*7** Before I address Defendants' arguments, I want to establish what Defendants are *not* arguing. Defendants *concede* that shareholders who acquire shares through conversion during a merger *may* be injured, *may* participate in a § 10(b) class, and *may* be adequate and typical class representatives. Defendants' counsel has admitted that "if the shoe were on the other foot [and] the undisclosed problems were on the McDermott side, not the CB&I side[,] and after the merger closed, the McDermott problems became manifest [and] the stock price went down[, we] would agree that the CB&I shareholders are part of the class." Dkt. 412 at 24. Thus, Defendants' arguments turn on Nova Scotia's own theory of the case and the unique manner in which the alleged misrepresentations were reflected in CB&I's stock price prior to the Merger.

I will cut to the chase: Defendants overreach with their attack on Nova Scotia's standing. Defendants' standing argument assumes CB&I's stock was inflated and McDermott's stock was not inflated at all. If true, Nova Scotia (and all other CB&I shareholders) would have only benefitted from the exchange of their shares and could not have suffered any economic injury. But—and this is a big "but"—this argument is based on nothing more than the conclusory assertion of Defendants' expert, Lucy Allen ("Allen"). *See* Dkt. 318 at 13 (citing Dkt. 318-2 at 15–17). The only support Allen offers for that conclusory assertion is a single cite to a general description of Nova Scotia's case in the Complaint. *See* Dkt. 318-2 at 15 n.49 (citing Dkt. 105 at 58). This is far from sufficient.

Defendants' authorities on this point are of no help. [3] Defendants compare Nova Scotia to the plaintiffs in *Earl v. Boeing Co.*, who were found to lack standing because they "offered no plausible theory of economic harm." 53 F.4th 897, 903 (5th Cir. 2022). But that is not the case here. Nova Scotia has alleged that McDermott stock was inflated as a result of Defendants' misrepresentations when Nova Scotia acquired it through conversion. If CB&I's stock was inflated *less* than McDermott's stock, Nova Scotia may indeed have been injured, despite benefitting from McDermott's alleged misrepresentations about the inherent value of the Focus Projects inflating CB&I's stock. Nor is *In re McKesson HBOC, Inc. Securities Litigation* the powerful medicine that Defendants made it out to be at the hearing. Despite the *McKesson* court's "unease with the notion that holders of [the target company] stock are entitled to damages"— given that "[t]heir shares were inflated due to fraud after they had purchased them, and they acquired [the merged company's shares] at a discount because of that fraud"— the court nevertheless acknowledged "one possible way in which [target company] shares acquired before the class period may have sustained a loss as a result of the alleged

fraud." 97 F. Supp. 2d 993, 998 & n.6 (N.D. Cal. 1999). Moreover, the court's passing observation, in a footnote, that such shareholders "are thus ineligible to recover under Section 10(b)" because their "shares were sold into an inflated market," is *ipse dixit.Id.* at 999 n.7. [4]

 **\*8** I am not going to knock out an entire group of plaintiffs based on Allen's conclusory assertion that Defendants' alleged misrepresentations inflated *only* CB&I's stock and not McDermott's stock. Nova Scotia's expert, Dr. Zachary Nye ("Dr. Nye"), reasons the "contention that McDermott's stock price was free of inflation prior to the Merger, while CB&I's stock was full of inflation, is easily demonstrated to be false by examining the contemporaneous stock prices of CB&I and McDermott during that period," which "traded in lockstep" between the announcement and closing of the Merger. Dkt. 342-2 at 11. But herein lies the rub: in offering this opinion, Dr. Nye *admits* that "Defendants' alleged misstatements and omissions were clearly incorporated *in CB&I's* and McDermott's stock price prior to the Merger." *Id.* at 12 (emphasis added). Accordingly, even Nova Scotia's expert concedes that CB&I's stock was *also* inflated *as a result of the alleged fraud.* This inflation may not present a standing problem, but it calls into question Nova Scotia's adequacy as a class representative.

## C. NOVA SCOTIA IS AN INADEQUATE CLASS REPRESENTATIVE OF THE PROPOSED CLASS

Nova Scotia has repeatedly stressed—through its expert, its counsel, and its briefing—that, just like open-market purchasers, CB&I shareholders "took money out of their pocket to acquire new McDermott shares." Dkt. 342-2 at 16–17; *see alsoId.* at 16 ("Thus, rather than use currency, CB&I investors paid for their new McDermott shares using the value of their CB&I shares."). In its reply brief, Nova Scotia takes issue with the fact that

> Defendants fail to explain why CB&I investor A who converted its stock directly into McDermott shares via the Merger lacks damages and standing, whereas CB&I investor B who sold its shares just before the Merger and used the proceeds to buy McDermott shares are differently situated for purposes of damages and standing.

Dkt. 342 at 21 n.27. But there is no explanation because there is no difference.

No one is disputing that "CB&I investors could have easily sold their shares for $16.39 apiece, and then promptly purchased approximately the same number of new McDermott shares the next day." Dkt. 342-2 at 16. Rather, Defendants' point is that, had CB&I investors sold their shares, they would only have received $16.39 apiece *because of the fraud that Nova Scotia is alleging.* In other words, but for the fraud that Nova Scotia is alleging, according to Nova Scotia's own allegations, CB&I's stock would have been worth *less. See* Dkt. 105 at 6 (alleging that the Merger was bad for McDermott, but "may have been prudent for CB&I, to stave off bankruptcy"). Nova Scotia's own expert has conceded that "Defendants' alleged misstatements and omissions were clearly incorporated in CB&I's ... stock price prior to the Merger." Dkt. 342-2 at 12. But unlike the inflation in McDermott's stock, which unquestionably harmed all class members, the acknowledged inflation in CB&I's stock prior to the Merger was a *benefit* to CB&I shareholders. When CB&I shareholders "took money out of their pocket to acquire new McDermott shares" (Dkt. 342-2 at 16–17), they had more money to take because the alleged fraud had inflated CB&I's stock. This benefit renders Nova Scotia an unsuitable class representative for anyone other than CB&I shareholders.

Following the hearing, I gave Nova Scotia an opportunity to direct me to "any cases in which the shareholders of a target company were allowed to participate in a 10(b) class *when the alleged fraud stemmed in part from misrepresentations regarding the health of the target company.*" Dkt. 405 at 1–2. Nova Scotia directed me to three cases, each of which merit discussion.

The first case Nova Scotia cites is *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008). Nova Scotia argues "[t]he *Atlas* case makes clear that ... not only can shareholders of a target company participate in a § 10(b) class when the fraud stemmed in part from misrepresentations regarding the health of the target company, they can clearly ***represent*** the class." Dkt. 429 at 1 (quotation omitted). But the *Atlas* case never even made it to class certification, settling before class certification briefing was complete. *See* Joint Motion to Vacate Class Certification Hearing, Vacate Scheduling Orders, and Adopt Proposed Schedule of Settlement Procedures, *Atlas*, No. 3:07-cv-00488 (S.D. Cal. Apr. 21, 2019), ECF No. 196.

**\*9** Moreover, the target company shareholder in *Atlas* advanced claims under §§ 11, 12, and 15 of the Securities Act of 1933 ("Securities Act"), but ***not*** § 10(b). *See*556 F. Supp. 2d at 1147, 1159–61. "Unlike under § 10(b), under § 11 the plaintiff generally does not have to establish scienter, causation (materiality) or reliance." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 595 (S.D. Tex. 2003). Moreover, § 11 damages are calculated using a statutorily mandated formula. *See*15 U.S.C. § 77k(e). The most any § 11 plaintiff could ever recover under this formula is "the price at which the security was offered to the public." *Id.* In other words, inflation in the target company's stock price at the time of merger—i.e., the benefit that Defendants argue Nova Scotia received here according to Nova Scotia's own allegations—is irrelevant in a § 11 case. Nor is inflation in the target company's stock price at the time of merger relevant to any plaintiff in a § 12 case where the remedy is rescission or, if the plaintiff has sold their stock, rescissionary damages. *See*15 U.S.C. § 77*l*(a); *see also*Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 203 (3d Cir. 1990) ("[S]ection 12(2) liability would be calculated according to different, potentially more pro-plaintiff, measures of damages than would ... liability under rule 10b–5.").

The second § 11 case cited by Nova Scotia is *Freedman v. Value Health, Inc.*, 190 F.R.D. 33 (D. Conn. 1999). In that case, the district court observed that "the question of whether or not the value of the stock used to acquire stock of another company in a merger is artificially inflated is irrelevant to the damages calculus *under § 11*." *Id.* at 35 (emphasis added). Because inflation is simply not a consideration in §§ 11 and 12 cases, it is unsurprising that the *Freedman* court found "no adversity of interests" between open market purchasers of the security at issue and shareholders of the target company who acquired their shares via merger.[5] Dkt. 429 at 2 (quoting *Freedman*, 190 F.R.D. at 35). But *Freedman*'s holding is specific to "the way that damages are calculated under § 11 of the Securities Act of 1933." *Freedman*, 190 F.R.D. at 35 (citing 15 U.S.C. § 77k(e)). *Freedman* says nothing about whether the same is true in § 10(b) cases where inflation is *the* measure of damages.

Nova Scotia's final case—*In re Vivendi Universal, S.A., Securities Litigation*, 242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom.In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016)—is seemingly on all fours with this case, but is short on details that would make clear its applicability or persuasiveness. In *Vivendi*, Defendants challenged the adequacy of a class representative, Gerard, who "exchanged

Vivendi, S.A. shares for Vivendi Universal shares pursuant to the three-way merger with Seagram and Canal Plus." *Id.* at 85. As here, the *Vivendi* defendants argued "that persons such as Gerard who obtained Vivendi Universal shares and/or ADSs only in the one-to-one exchange of Vivendi, S.A. securities may not be properly included in the putative class, because such persons did not suffer economic damage and cannot prove materiality." *Id.* The defendants also argued that "preexisting Vivendi shareholders[ ] cannot show that the alleged misstatement inflating the value of shares or ADSs that they already owned was material to them or caused them any economic damage." *Id.* (quotation omitted).

The *Vivendi* court rejected this argument:

> [I]t is not inappropriate to consider either damages or materiality in assessing the typicality of the individual plaintiffs' claims, even though some assessment of the merits of their claims is required. However, the Court is not persuaded that either issue precludes a finding that the typicality requirement is satisfied here. ***Materiality for all class members will turn on the nature and accuracy of all defendants public statements*** including, obviously, those made in connection with the three-way merger of Vivendi, Seagram and Canal Plus in December, 2000. ***That Vivendi S.A. shareholders received Vivendi Universal shares as a result of the merger does not alter the materiality of defendants alleged misstatements to plaintiff-shareholders' decision to approve the merger and accept shares in a new entity.*** And to the extent that, as alleged, defendants were constructing an ever-expanding house of cards, old Vivendi S.A. shareholders who accepted shares in Vivendi Universal were likely damaged thereby. Therefore, the Court declines to exclude members of the class who acquired their shares in the one-to-one exchange, including Gerard as class representative, on

Edwards v. McDermott International, Inc., Slip Copy (2024)

2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

the basis of defendants' arguments regarding damages or materiality.

 **\*10** *Id.* at 86 (emphasis added).

I obviously agree with *Vivendi*'s reasoning insofar as standing is concerned. Now is not the time to determine whether Nova Scotia suffered economic damage. But that is really all the *Vivendi* court addressed. The *Vivendi* court certified a single class of plaintiffs advancing claims under §§ 10(b) and 20(a) of the Exchange Act, and §§ 11, 12(a), and 15 of the Securities Act. *See* 242 F.R.D. at 79. The *Vivendi* court appointed *five* plaintiffs as class representatives, including Gerard, without commenting on which class representative was lead plaintiff, and without specifying which plaintiffs were advancing which claims, or if all plaintiffs were pursuing all claims. The *Vivendi* court did not discuss whether Gerard was subject to unique defenses [6] or had a fundamental conflict with open market purchasers. Thus, *Vivendi* has limited relevance here.

### 1. Nova Scotia Is Not Subject to Unique Defenses
Defendants argue:

> A class representative fails the typicality requirement if it "is subject to unique defenses that threaten to become the focus of the litigation." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004). While "the presence of an arguable unique defense [does not] necessarily destroy[ ] typicality," "the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137-38 (5th Cir. 2005) (quoting *Lehocky*, 220 F.R.D. at 501-02); *see also* *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (identifying relevant typicality concern as whether "representation of the class will suffer if the named plaintiff is preoccupied with a defense"). Because [Nova Scotia] is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares, it is an inadequate and atypical class representative.

Dkt. 318 at 16. The first two sentences are true statements of law. And Nova Scotia may yet spend "considerable time" rebutting the argument that it benefitted from the alleged fraud. But as Nova Scotia notes, "whatever time is spent will be necessary[ ] for the benefit of the Class Members facing the defense." Dkt. 342 at 22. Given that CB&I shareholders owned 47 percent of post-Merger McDermott, that is likely

a considerable portion of the class. *See* Dkt. 105 at 30 ("McDermott shareholders would own approximately 53% of the combined entity."); *see also* Dkt. 412 at 176 ("CB&I exchangers actually held a large number of shares. So they make up 62 percent.").

"Unique defense" means unique *to Nova Scotia*—not to half (or more) of the class. *See, e.g.,Plymouth Cnty. Ret. Sys. v. Apache Corp.*, 566 F. Supp. 3d 712, 719 (S.D. Tex. 2021) (potential plaintiff subject to unique defense that he is a net seller and net gainer); *Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 567 (E.D. Tex. 2021) (investor subject to unique defense where his "material gain in common stocks [made his] trading practices during the Class Period functionally the same as an investor who traded only in options and materially different from the putative class consisting largely of common stockholders"); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002) (plaintiff subject to unique defense that it did not buy in reliance either on the market or on statements by defendants, or on Registration Statements and Prospectuses). Accordingly, Nova Scotia is not subject to a unique defense that renders it an atypical representative. But that does not end the inquiry. Nova Scotia may yet devote considerable time to a defense that is of no benefit whatsoever to actual purchasers of McDermott stock. That suggests a fundamental conflict. [7]

### 2. Nova Scotia, and All Former CB&I Shareholders, Have a Fundamental Conflict with the Rest of the Class
 **\*11**  "For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." *In re Deepwater Horizon*, 739 F.3d 790, 813 n.99 (5th Cir. 2014) (quoting *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010), and citing *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 186 (3d Cir. 2012); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189. "A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate." *Dewey*, 681 F.3d at 184. "[N]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Valley Drug*, 350 F.3d at 1190.

Edwards v. McDermott International, Inc., Slip Copy (2024)
2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

It is too early to say whether former CB&I shareholders derived a *net* economic benefit from the alleged fraud.[8] "Nobody has quantified the inflationary effect ... on CB&I stock." Dkt. 412 at 53. If CB&I's stock was less inflated than McDermott's stock, then former CB&I shareholders may prove an economic injury. This possibility is why Nova Scotia has standing. But it is also possible that CB&I's stock was more inflated than McDermott's stock, and that former CB&I shareholders derived a net economic benefit from exchanging their shares.[9] This possibility represents a fundamental conflict. This is not a "merely speculative or hypothetical" conflict. 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Nova Scotia's own expert has already conceded that "Defendants' alleged misstatements and omissions were clearly incorporated in CB&I's ... stock price prior to the Merger." Dkt. 342-2 at 12. While this fact will ultimately be decided by the trier of fact, it is not a hypothetical or speculative conflict.

Now is not the time to litigate these issues, but I must "consider how a trial on the merits would be conducted if the class was certified." *Prantil*, 986 F.3d at 574 (quotation omitted). The inflationary effect of the alleged fraud on CB&I's stock simply does not concern purchasers of McDermott stock. To the extent it does concern them, purchasers of McDermott stock only benefit if former CB&I shareholders are excluded, or if former CB&I shareholders must accept an offset to their damages. *See, e.g.*, Dkt. 412 at 177 ("[W]ith a company that's in—has gone through bankruptcy, the pie cannot always get bigger, sort of by definition."). It is fundamentally unfair for absent class members who actually purchased McDermott stock to be represented by Nova Scotia and its counsel, who may yet expend considerable time—as they did during the class certification hearing—on this issue. *See, e.g.*, Dkt. 412 at 74–78, 102–119, 138–151, 217–242.

Having determined that Nova Scotia has a fundamental conflict with purchasers of McDermott stock, I must decide how to manage this conflict. Recognizing that subclassing is not always preferred, I have considered whether this fundamental conflict can be resolved without designating subclasses, such as "bifurcating liability and damage trials with the same or different juries" or "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages." 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Because the possible lack of damages or benefit to Nova Scotia goes to Defendants' liability—an

affirmative defense that need not be addressed by purchasers of McDermott stock—the creation of two classes is the best approach. Accordingly, I recommend: one class of CB&I shareholders who converted their CB&I stock into McDermott stock via the Merger, and one class of purchasers of McDermott stock. *See* FED. R. CIV. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). If certified, class members who both converted CB&I stock into McDermott stock *and* purchased McDermott stock would hold claims in both classes.

**\*12** The things that make Nova Scotia an inadequate representative of those class members who purchased McDermott stock are inapplicable to a class of former CB&I shareholders. But Nova Scotia cannot represent a class of purchasers of McDermott stock. Accordingly, the Court should appoint a lead plaintiff for a putative class of purchasers of McDermott stock.

At the outset of this litigation, five movants timely filed motions seeking appointment as the § 10(b) Lead Plaintiff: Wah Kee Ho, Donald Piliero, Alfred Rodrigues, University of Puerto Rico Retirement System, and City of Pontiac General Employees' Retirement System. *See* Dkts. 10, 14, 18, 20, 21. I recommend the Court permit these five plaintiffs to move to be appointed lead plaintiff of a class of purchasers of McDermott stock. Whichever plaintiff is appointed can then move for certification of a class of purchasers of McDermott stock.

\* \* \*

Having determined that Nova Scotia is an adequate and typical representative of a class of CB&I shareholders, I turn to the remaining certification challenges.

## D. NOVA SCOTIA'S DAMAGES METHODOLOGY IS SUFFICIENT

Defendants attack Nova Scotia's damages methodology on four fronts, arguing that (1) Dr. Nye's methodology leads to economically nonsensical results whether he estimates inflation using the dollar method or the percent method; (2) Dr. Nye's model "does not account whatsoever for the offsetting economic gains that accrued to class members who also owned CB&I shares"; (3) "Dr. Nye glosses over ... [how he will] calculate the alleged inflation during the [ ] almost six-month period between the beginning of the alleged Class Period and when the Merger was completed"; and (4) Dr. Nye

Edwards v. McDermott International, Inc., Slip Copy (2024)
2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

does not identify "how the damages methodology will match purchases and sales together." Dkt. 318 at 18–20. None of these arguments is persuasive.

First, courts in this district routinely find that "[t]he *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-02399, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019). Furthermore, Dr. Nye has explained that the economically nonsensical results Defendants warn of are simply not possible under the "capped-dollar method" in which "the price inflation at that moment is 'capped' at the sale price (*i.e.*, the remaining fraud-related inflation in the stock cannot exceed its price)." Dkt. 342 at 25; *see also* Dkt. 342-2 at 48–50.

Second, Dr. Nye testified that "upon analysis of the actual level of price inflation of damages if there was a reason to have an offset, it could be modeled and applied on a class-wide basis." Dkt. 412 at 78. Nova Scotia's counsel asked Allen: "Let's say the jury accepts your view [that CB&I exchangers had to have received a benefit]. Let's say the jury believes that a $2 offset, a $3 offset, a $4 offset should be applied. Is there any reason that couldn't be applied for each share that was exchanged?" *Id.* at 237. Rather than answer this question and rebut Dr. Nye's testimony, Allen merely reiterated Defendants' position that "the proposed lead plaintiffs and substantial members of the class are benefiting rather than having a damage, [and] they shouldn't be in the class." *Id.* Thus, I have no reason to think that Dr. Nye's methodology cannot account for any offsetting economic gains that may have accrued to CB&I shareholders.

**\*13** Third, "[Dr.] Nye's methodology of determining damages is consistent with the plaintiffs' theory that the class's losses come from the inflated stock price caused by the defendants' misstatements and later price drop when the truth was revealed." *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479, 2023 WL 2337364, at *12 (D. Nev. Mar. 1, 2023). "[D]efendants' argument that [Dr.] Nye's method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage." *Id.* The Second Circuit has addressed this exact argument head-on:

> [W]e are not persuaded by the Defendants' argument that class certification was improper under *Comcast*

because the Plaintiffs' damages model failed to account for variations in inflation over time. *Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that "[c]alculations need not be exact." 569 U.S. at 35, 133 S.Ct. 1426. Thus, even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants' argument fails.

Dr. Nye explained that damages for individual class members could be calculated by applying a method across the entire class that focused on the decline in stock price following the disclosure of the New York Attorney General's lawsuit and then isolating company–specific events from market and industry events. His model also accounted for calculating the damages for individual class members based on their investment history.

Therefore, we conclude that the district court did not abuse its discretion when it certified the Plaintiffs' class over the Defendants' damages–related objections.

*Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). I see no reason to depart from this analysis.

Fourth, Defendants' own expert disavowed the need to match shares to one another in a 10(b) case, stating that "if you think the shares are inflated, you can see how much you benefited from the inflation and you can see how much you were harmed by the inflation. And you don't need to match one share to another. ***It doesn't matter***." Dkt. 342-3 at 37 (emphasis added).

\* \* \*

For these reasons, Nova Scotia's damages methodology satisfies *Comcast*.

## E. SHORT SELLERS DO NOT CREATE A PREDOMINANCE PROBLEM

Lastly, Defendants argue that the "unusually high amount of short selling creates a reliance problem because short sellers' atypical motivations prevent them from invoking the fraud-on-the-market presumption." Dkt. 318 at 22. Defendants contend "that reliance problem devolves into a predominance issue due to the need for individualized reliance inquiries." *Id.* The Fifth Circuit has explained the basics of short selling:

Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.

 **\*14** *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008) (quoting *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988)).

Defendants' argument that short sellers cannot invoke the *Basic* presumption is the minority rule. I greatly appreciate and commend the candor of Defendants' counsel in acknowledging the "competing line of authority that would permit short sellers to invoke the fraud-on-the-market presumption despite their atypical beliefs and motivations." Dkt. 318 at 24. But I agree with the Seventh Circuit and the reasoning of the erudite then-Chief Judge Easterbrook:

That the class includes short sellers (many investors were long at some times and short at others) also is irrelevant. A person buys stock (goes long) because he thinks the current price too low and expects it to rise; a person sells short (sells today and promises to cover in the market and deliver the

shares in the future) because he thinks the price too high and expects it to fall. These positions are mirror images. If a long can participate in a class, so can a short. Both the long and the short are affected by news that influences the price they pay or receive. It may turn out that the shorts do not suffer compensable losses—that, indeed, the shorts' gains should be subtracted from the longs' losses, and only the net treated as damages—but this does not imply that the class definition is defective. *SeeKohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009); *Fry v. UAL Corp.*, 84 F.3d 936, 938–39 (7th Cir. 1996).

Defendants' insistence that short sellers don't rely on the market price suggests that they misunderstand the efficient capital market hypothesis, which underlies the fraud-on-the-market doctrine....

Short sellers play a role in aligning prices with information under any version of the efficient capital market hypothesis. That the resulting price may be inaccurate does not detract from the fact that false statements affect it, and cause loss, whether or not any given investor reads and relies on the false statement. That's all that *Basic* requires.

*Schleicher v. Wendt*, 618 F.3d 679, 684–85 (7th Cir. 2010). Thus, I disagree that the large short position defeats predominance.

\* \* \*

Defendants' remaining arguments against class certification regarding market efficiency after September 19, 2019, and the correctiveness of the last five alleged corrective disclosures, pertain to a period in time that is relevant only to actual purchasers of McDermott stock. Those arguments are best addressed by a lead plaintiff who has, in fact, purchased McDermott stock. Thus, I recommend the Court defer consideration of these arguments until a lead plaintiff for a putative class of purchasers of McDermott stock is appointed and moves for class certification.

## CONCLUSION

For the reasons discussed above, I recommend the Motion for Class Certification (Dkt. 305) be **GRANTED** in part.

Specifically, I recommend the Court hold:

1. Nova Scotia—a former CB&I shareholder—has standing to pursue its claims, and is an adequate representative of a class of CB&I shareholders.

**\*15** 2. Nova Scotia's counsel, Pomerantz and Briscoe, are adequate Lead and Local Counsel, respectively, for a class of CB&I shareholders.

3. Nova Scotia's damages methodology satisfies *Comcast* and can account for any inflation in CB&I's stock as a result of the alleged fraud, and the corresponding economic benefit to CB&I Shareholders.

4. The large number of short sellers does not defeat predominance.

5. Nova Scotia and its counsel have a fundamental conflict with and cannot represent purchasers of McDermott stock. This conflict necessitates two classes and two lead plaintiffs.

6. Nova Scotia and its counsel satisfy all Rule 23 requirements for the following class, which should be certified now:

All persons and entities (the "§ 10(b) CBI Subclass") who converted stock in Chicago Bridge & Iron Company, N.V. (NYSE: CBI) into stock of McDermott International, Inc. (NYSE: MDR) via the merger of CBI and MDR, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

7. The Court will permit motions from the five plaintiffs —Wah Kee Ho, Donald Piliero, Alfred Rodrigues,

University of Puerto Rico Retirement System, and City of Pontiac General Employees' Retirement System— who timely filed to be the § 10(b) Lead Plaintiff at the outset of this litigation to be lead plaintiff for the following class:

All persons and entities (the "§ 10(b) MDR Subclass") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

8. Class members who both converted CB&I stock into McDermott stock and purchased McDermott stock will hold claims in both classes.

9. Arguments regarding market efficiency after the Merger and the price impact of the last five alleged corrective disclosures are best addressed by the Lead Plaintiff of the putative § 10(b) MDR Class once appointed.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

**All Citations**

Slip Copy, 2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

## Footnotes

1   The Defendants are McDermott, David Dickson (McDermott's former President and Chief Executive Officer), Stuart Spence (McDermott's former Executive Vice President and Chief Financial Officer), CB&I, and Patrick Mullen (CB&I's former President and Chief Executive Officer).

2   In considering the long procedural history of this case, it bears remembering that the lead plaintiff appointment process and the first motion to dismiss were briefed and decided without the benefit of this information.

3   Nova Scotia vehemently objects to me considering these "decades old" cases that Defendants submitted only the night before the hearing, contending that any argument Defendants make based on these cases is

2024 WL 1769325, Fed. Sec. L. Rep. P 101,851

waived. Dkt. 412 at 243. I do question why Defendants did not cite these cases earlier, but Nova Scotia's objection is moot because I find that Nova Scotia *has* standing and I do not rely on Defendants' authorities or their arguments based on those authorities. *SeeGonzales v. AutoZoners, LLC*, 860 F. Supp. 2d 333, 337 (S.D. Tex. 2012) ("Many objections raised by Plaintiff's counsel are immaterial because they pertain to statements or evidence upon which the Court does not rely for any rulings.").

4    In the other two cases that Defendants provided at the hearing—*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Security Act (ERISA) Litigation*, 281 F.R.D. 134 (S.D.N.Y. 2012), and *In re Heckmann Corp. Securities Litigation*, No. 1:10-cv-378 (D. Del. Oct. 19, 2012), ECF No. 185—the class definitions sought by plaintiffs did not include target company shareholders. Without either court confronting this issue, these cases have no bearing on my standing analysis here.

5    Section 15 is a "derivative" claim, meaning the measure of damages is determined by the underlying claim. *Atlas*, 556 F. Supp. 2d at 1159; *see also*15 U.S.C. § 77*o*. Thus, inflation is also irrelevant to § 15 claims based on §§ 11 and 12 claims.

6    As discussed above, the defense contemplated here—that the fraud benefited CB&I shareholders—is irrelevant to and unavailable under §§ 11 and 12 claims, where inflation is simply not a consideration. It is impossible to tell from the *Vivendi* class certification order which claims Gerard was advancing.

7    While neither side has raised the issue of a fundamental conflict, as discussed above, I must conduct my own thorough inquiry. *SeeStirman*, 280 F.3d at 563 n.7.

8    It is too early to say whether the alleged fraud was, in fact, fraudulent.

9    It is also possible the Merger was a zero-sum game for CB&I shareholders—that their shares were either going to be eviscerated in a CB&I bankruptcy, or McDermott's bankruptcy.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 4

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 42 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

2019 WL 6168254
United States District Court, M.D.
Tennessee, Nashville Division.

IN RE ENVISION HEALTHCARE
CORPORATION SECURITIES LITIGATION
This Document Relates To:
ALL ACTIONS

No. 3:17-cv-01112
|
(Consolidated with Case No. 3:17-cv-01323,
(Consolidated with Case No. 3:17-cv-01397
|
Filed 11/19/2019

**MEMORANDUM**

WILLIAM L. CAMPBELL, JR., UNITED STATES
DISTRICT JUDGE

**\*1** Pending before the Court is Defendant Envision
Healthcare Corporation and the Individual Defendants'
Motion to Dismiss the Consolidated Amended Complaint
(Doc. No. 125). Also pending before the Court is a motion
to dismiss filed by Clayton, Dublier & Rice, LLC, CD&R
Associations VIII Ltd., Clayton Dubilier & Rice Fund VIII,
L.P., CD&R EMS Co-Investor, L.P., CD&R Advisor Fund
VIII Co-Investor, L.P., and CD&R Friends and Family
Fund VIII, L.P. (the "CD&R Defendants") (Doc. No. 122).
Plaintiffs filed a consolidated response in opposition to both
motions (Doc. No. 131). Defendant Envision Healthcare
Corporation and the Individual Defendants filed a Reply
(Doc. No. 133) and the CD&R Defendants filed a Reply
(Doc. No. 132). For the following reasons, the motion to
dismiss by the CD&R Defendants is **GRANTED**, and the
motion to dismiss by Envision and the Individual Defendants
is **GRANTED** in part, **DENIED** in part.

## I. BACKGROUND

**A. Procedural Background**
On August 4, 2017, Plaintiff Terry W. Bettis filed an initial
complaint against Envision Healthcare Corporation and four
individual defendants: William A. Sanger, Randel G. Owen,
Christopher A. Holden, and Claire M. Gulmi (Doc. No. 1).

That initial complaint alleged violations of the Securities
Act of 1933 (the "1933 Act") and the Securities Exchange
Act of 1934 (the "1934 Act"). (*Id.* ¶¶ 63-78). The case
brought by Beattis was consolidated with two related cases:
*Carpenters Pension Fund of Illinois v. Envision Healthcare
Corporation*, Case No. 3:17-cv-01323 (M.D. Tenn., Sept.
29, 2017); and *Central Laborers' Pension Fund v. Envision
Healthcare Corporation*, Case No. 3:17-cv-01397 (M.D.
Tenn., October 23, 2017). (*See* Doc. Nos. 58 and 60). The
Plaintiffs filed a Consolidated Class Action Complaint on
January 26, 2018 (Doc. No. 88), alleging violations of the
1933 Act and the 1934 Act against Envision Healthcare
Corporation, the private equity firm, Clayton, Dubilier &
Rice, LLP ("CD&R"), four CD&R-associated companies
(together with CD&R, the "CD&R Defendants"), and twenty-
three (23) individual defendants.

**B. The Parties**
Plaintiffs bring this action on behalf of all entities or
individuals who purchased or acquired Envision's common
stock between February 3, 2014, and October 31, 2017 (the
"Class Period"). The Complaint identifies four institutional
investors as lead/named Plaintiffs: Laborers' Pension Trust
Fund for Northern California (lead Plaintiff); Laborers'
International Union of North America National Industrial
Fund (lead Plaintiff); Central Laborers' Pension Fund (named
Plaintiff); and United Food and Commercial Workers Union
Local 655 Food Employers Joint Pension Fund (named
Plaintiff). (*Id.* ¶¶ 25-28).

Defendant Envision Healthcare Corporation ("Envision") [1]
is headquartered in Nashville, Tennessee. EmCare is a
subsidiary of Envision and its largest business unit –
generating approximately 60% of Envision's net revenue (*Id.*
¶¶ 1-2). EmCare provides "facility-based physician services,"
which is essentially physician staffing for hospital emergency
rooms. (*Id.*) On December 1, 2016, Envision merged with
AMSURG Corp. ("AmSurg"). (*Id.* ¶ 257). The combined
company continued to operate EmCare and other legacy
Envision and AmSurg services. (*Id.* ¶¶ 1-2).

**\*2** The Complaint identifies 23 Individual Defendants,
which have been grouped by Plaintiffs as follows:

1. The Envision Officer Defendants served as officers of
Envision prior to and at the time of the merger: William A.
Sanger, Randel G. Owen, Craig A. Wilson, and Todd G.
Zimmerman. William A. Sanger was President and CEO
of Envision from May 2011 until the AmSurg Merger in

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 43 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

December 2016. He served as Chairman of the Envision Board from November 2014 through the Merger, and as Executive Chairman of the Board from December 2016 through December 2017. (*Id.* ¶ 30). Randel G. Owen was CFO and Executive Vice President (May 2011-November 2016) and Chief Operating Officer (September 2012-November 2016) of Envision. (*Id.* ¶ 31). Following the merger with AmSurg on December 1, 2016, Owen was Executive Vice President and President of Envision's Ambulatory Service Group. (*Id.*) Plaintiffs allege Owen signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision before the merger with AmSurg. (*Id.*) Craig A. Wilson is Senior Vice President, General Counsel, and Secretary of Envision. (*Id.* ¶ 32). Todd G. Zimmerman was Executive Vice President of Envision from May 2011 until the AmSurg merger. (*Id.* ¶ 32). He also served EmCare as President (April 2010 – April 2015) and CEO (February 2013 – June 2017). (*Id.*)

2. <u>The Envision Director Defendants</u>, each of whom served as a member of Envision's Board of Directors prior to and at the time of the Merger: Carol J. Burt, Mark V. Mactas, Leonard M. Riggs, Jr., Richard J. Schnall, James D. Shelton, Michael L. Smith, Ronald A. Williams, and William A. Sanger (also an Envision Officer Defendant). (*Id.* ¶ 35). The following directors joined the new Envision Board after the AmSurg merger: Burt, Riggs, Schnall, Shelton, Smith, and Williams.

3. <u>The AmSurg Officer Defendants</u>, each of whom served as an officer of AmSurg at the time of the Merger and an officer of Envision post-Merger: Christopher A. Holden, Claire M. Gulmi, and Kevin D. Eastridge. (*Id.* ¶¶ 37-40). Christopher Holden has been President and CEO of Envision since the December 1, 2016, merger with AmSurg. (*Id.* ¶ 37). Following the merger, Holden signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision. Claire M. Gulmi was Executive Vice President and CFO of Envision from December 1, 2016, to October 2, 2017. (*Id.* ¶ 38). During that time, she signed certifications accompanying each of the annual reports (Form 10-K) and quarterly reports (Form 10-Q) issued by Envision. (*Id.*) Kevin D. Eastridge was Senior Vice President, Finance and Chief Accounting Officer of Envision from December 1, 2016, to October 2, 2017, and Envision's CFO thereafter. (*Id.* ¶ 39).

4. <u>The AmSurg Director Defendants</u>, each of whom served as a member of AmSurg's Board of Directors at the time of the Merger: Christopher A. Holden, Claire M. Gulmi, Kevin D. Eastridge, Thomas G. Cigarran, James A. Deal, John T. Gawaluck, Steven I. Geringer, Henry D. Herr, Joey A. Jacobs, Kevin P. Lavender, Cynthia S. Miller, and John W. Popp, Jr. (*Id.* ¶ 41).

**\*3** The Complaint also names as defendants four CD&R funds, the general partner of those funds, and an independent investment advisor, Clayton, Dubilier & Rice LLC and refers to them all as CD&R. [2] (*Id.* ¶ 43). CD&R includes CD&R LLC, CD&R Associated VIII Ltd., CD&R Fund VIII, L.P., CD&R EMS Co-Investor, L.P., CD&R Advisor Fund VIII Co-Investor L.P., and CD&R Friends and Family Fund VIII L.P. According to Plaintiffs, CD&R "formed Envision in May 2011 ... and owned over 97% of Envision at the time of [Envision's] IPO" in 2013. (*Id.*) CD&R had the right to designate the chairperson of Envision as long as they held 30% of the Envision stock, which was until March 2015, when CD&R sold all of its remaining Envision stock. (*Id.*) CD&R designated Envision Director Defendants Schnall, Giurico, and Williams. (*Id.*) Williams served as Chairman of the Board from May 2011 to November 2014, and Schnall and Williams remained on the Board until March and October 2017, respectively. (*Id.*)

**C. Factual Background**

1. <u>The Alleged Fraudulent Scheme</u>

The overarching allegations of the Complaint are that Envision artificially inflated its earnings through out-of-network billing, illegal upcoding, and inflated facility spending, and failed to disclose to investors that these business practices were substantially responsible for EmCare's revenue growth. Between 2013 and 2016, EmCare almost doubled its annual revenue from $2.3 billion to $4.2 billion. (Compl., Doc. No. 88, ¶ 3). Plaintiffs allege EmCare intentionally staffed its emergency rooms with out-of-network physicians, which allowed it to bill health insurers and patients at "vastly higher rates" and reap the associated profits. (*Id.* ¶ 5). Plaintiffs also allege EmCare engaged in illegal upcoding – billing for services using a billing code that is more expensive than the code associated with services the patient actually received or required. (*Id.* ¶ 6). In a similar vein, Plaintiffs allege EmCare increased facility spending for its hospital partners by increasing hospital admission and imaging rates without regard to medical necessity. (*Id.* ¶ 7).

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 44 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

Increased facility spending had the dual benefit of increasing EmCare's revenue and increasing revenues for the hospitals with which it contracted. As a result, Plaintiffs allege, EmCare was able to parlay this increase in hospital revenue into more contracts and thereby increase its own revenue. (*Id.* ¶¶ 4, 7, 64-65).

According to Plaintiffs, EmCare's out-of-network billing, upcoding, and increased facility spending were uncovered by a study published by the National Bureau of Economic Research (the "NBER study") and brought to public attention by a *New York Times* article (the "Article") published on July 24 (online) and 25 (print), 2017.[3] (*Id.* ¶¶ 15, 16).

The Article reported that the NBER study examined data provided by one insurance company for the time period 2011 to 2015 and found that many of the emergency rooms with the highest rate of out-of-network billing were run by EmCare. (Doc. No. 127-39). The NBER study focused on 16 hospitals that EmCare entered between 2011 and 2015 and found that in eight of those hospitals, out-of-network billing rose "quickly and precipitously." (*Id.* at 5). The NBER study also looked at a larger sample of EmCare operated emergency departments and found an out-of-network billing rate of 62 percent, which it said was higher than the national average. (*Id.*) The Article reported that "[t]he before-and-after analysis [in the NBER study] was limited to the small number of hospitals where researchers could find public records of EmCare's entrance and was based on claims from only one large insurance company. (*Id.*). While the nationwide patterns are consistent with studies that have looked at other insurance companies, the single insurer in the study may not be typical in all cases: EmCare does not participate in some insurer's networks, such as Blue Cross of Texas." (*Id.*). The article reported that EmCare had reached agreements with additional insurers since 2015. (*Id.*).

**\*4** Regarding Plaintiffs' allegation of unlawful upcharging and increased facility spending, the article gives an example of one small hospital north of Spokane, Washington, where the number of patients billed for the most complex level of case increased from 6 percent to 28 percent when EmCare took over. (*Id.* at 1). The Article also quotes a doctor at a California hospital who claimed to have discovered a pattern of "inflated bills and out-of-network bills." (*Id.* at 7). The Article also informed readers that EmCare was named in a 2011 whistle-blower lawsuit (brought by a former EmCare executive) alleging that EmCare and hospitals pressured emergency doctors to increase admission and tests without regard to medical necessity. (*Id.* at 6).

Both the Article and the NBER study acknowledge there are various factors contributing to out-of-network billing, including that some doctors are not willing to accept the rates offered by insurance companies. (*Id.* at 5). Neither the Article nor the NBER study suggests out-of-network billing is illegal, only that patients were upset by "surprise out-of-network billing" and that they complained about it to hospitals. Although the NBER study itself broadly analyzed out-of-network billing trends, the reasons contributing to high levels of out-of-network billing, and existing and potential policy responses to "surprise out-of-network billing," the *New York Times* article, which incorporated data from the NBER study, focused specifically on EmCare. (*See* NBER Study, Doc. No. 127-38; *New York Times* Article, Doc. No. 127-39).

2. Stock Sales

CD&R sold its $ 4.4 billion equity stake in Envision in four stock offerings in February 2014, July 2014, September 2014, and March 2015. (Compl., Doc. No. 88, ¶ 46). Plaintiffs allege certain Envision officers and directors sold Envision stock in 2014 and 2015: William Sanger ($80 million), Randel Owen ($36 million), Todd Zimmerman ($18 million), Ronald Williams ($4.3 million). (*Id.* ¶¶ 30, 31, 33, 35, 147).

3. Underperforming Contracts

In 2014 and 2015 Envision entered into approximately 30 contracts that underperformed expectations. In October 2015, Envision issued drastically reduced earnings and projections and attributed the earning miss to these underperforming contracts. (*Id.* ¶¶ 133-134). The contracts, which had been expected to produce revenue of $3.5 million instead resulted in a loss of $6.5 million – a negative $10 million variance. (*Id.*). William Sanger, speaking at a healthcare conference, revealed the contracts at issue had been performing below expectations for over a year and explained, "we kind of misread what the cash per visit was ... We ran into a set of frankly, poor execution, poor decision about taking those contracts." (*Id.* ¶ 135). Sanger later added that they relied heavily on incomplete data provided by the hospital and made assumptions that were incorrect. (*Id.* ¶ 137). At the same conference, Randel Owen explained that the problems with the contracts were largely due to unexpected challenges recruiting physicians and that they had a "much higher cost of staffing." (*Id.* ¶ 139). Following the October 22, 2015

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 45 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

announcement of reduced earnings and guidance, Envision's stock price fell 30%. (*Id.* ¶ 11).

#### 4. AmSurg Merger

On June 15, 2016, Envision and AmSurg announced a merger agreement between the two companies. (*Id.* ¶ 13). On August 5, 2016, Defendants sent shareholders the Joint Proxy Registration Statement ("Registration Statement"), which estimated revenue growth of 14 percent (to $1.5 billion) in 2017 and revenue growth of 13 percent (to $1.7 billion) in 2018. (*Id.* ¶ 254). Following shareholder approval, the merger was completed on December 1, 2016. (*Id.* ¶ 257). The merged company issued stock to Envision shareholders – 0.334 shares of new stock for each share of pre-merger Envision stock (approximately $4.26 billion). (*Id.*)

#### 5. Transition from Out-of-Network to In-Network

 **\*5**  On February 28, 2017, Envision announced it planned to transition its out-of-network business in-network over the next 18-24 months. (*Id.* ¶ 99). At the time, out-of-network business was valued at approximately $1 billion and constituted somewhere between 17 and 35 percent of post-merger physician services revenue. (*Id.* ¶¶ 14, 94, 102). Envision said it believed the transition would be "revenue neutral" and that the "stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12-18 months" (*Id.* ¶ 99-104). Envision representatives continued to discuss the transition to in-network billing at healthcare conferences and on investor conference calls in the spring and summer of 2017. [4] (*Id.* ¶¶ 101-108). The *New York Times* article acknowledged Envision's plan to move most of its business in-network: "EmCare said in early February that it planned to reach agreements with insurers for most of its doctors." (Doc. No. 127-39 at 7).

#### 6. Final Stock Price Declines

Following the publication of the *New York Times* article, Envision's stock value declined 6 percent by close of market on July 25, 2017. (Compl., Doc. No. 88, ¶ 199).

On September 18, 2017, Envision announced the resignation of the Physician Services Division President. (*Id.* ¶¶ 172, 200). That day, Envision's stock declined an additional 10% on substantial volume of 11.2 million shares. (*Id.* ¶ 201).

On October 31, 2017, Envision released its 2017 third-quarter results and decreased earnings and revenue projections for

2017 and 2018. (*Id.* ¶ 19). The revised projections anticipated 2017 reduction in revenue of 50 percent from predictions made at the time of the merger and a 25%-30% reduction in 2018 revenue predictions. (*Id.*) Envision said the miss and guidance reduction were "essentially all attributable to Physicians Services" specifically to losses caused by Hurricanes Harvey and Irma (approximately $22 million) and reduction in volumes for emergency medicine and anesthesia. (*See* Transcript: Q3 2017 Envision Healthcare Corp. Earnings Call, Nov. 1, 2017, Doc. No. 127-37 at 6; Compl. Doc. No. 88, ¶¶ 195, 203). Envision's stock price fell over 41%. (Compl. Doc. No. 88, ¶¶ 19, 202).

### D. The Claims

The Consolidated Complaint alleges eight counts under the 1933 Act and the 1934 Act:

Count I – claims alleging securities fraud in violation of Section 10(b) of the 1934 Act and Securities and Exchange Commission ("SEC") Rule 10b-5 brought by all Plaintiffs against Envision, the Envision Officer Defendants (Sanger, Owen, Wilson, and Zimmerman), and the AmSurg Officer defendants (Holden, Gulmi, and Eastridge);

Count II – claims for control person liability under Section 20(a) of the 1934 Act brought by all plaintiffs against the Envision Individual Defendants and the AmSurg Defendants (except Ciggaran, Herr, and Popp) alleging these defendants controlled the dissemination of the alleged false and misleading statements at issue in Claim I;

Count III – insider trading in violation of Section 20A of the 1934 Act brought by the UFCW Pension Fund against Williams, Sanger, Owen, and Zimmerman, and the CD&R Defendants;

Counts IV and V – strict liability and negligence claims under Sections 11 and 12(a)(2) of the 1933 Act brought by all Plaintiffs against Envision and the Envision Individual Defendants, alleging these defendants were responsible for false and misleading statements in the Joint Proxy Registration Statement;

Count VII – negligence based claims under § 14(a) of the 1934 Act and SEC Rule 14a-9 brought by all Plaintiffs against Envision, the Envision Individual Defendants, and the AmSurg Defendants for false and misleading statements in the Joint Proxy Registration Statement;

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 46 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

Counts VI and VIII – claims for control person liability under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act. Claims for violation of Section 15 of the 1933 Act are brought against the Envision Individual Defendants. Claims under Section 20(a) of the 1934 Act are brought against CD&R and four associated CD&R companies, the Envision Individual Defendants, and the AmSurg Defendants.

## II. Standard of Review

**\*6** In deciding a motion to dismiss under Rule 12(b)(6), a court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

In considering a Rule 12(b)(6) motion, the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss provided they are referred to in the Complaint and are central to the claims. *Bassett v. National Collegiate Athletic Assn.*, 528 F.3d 426, 430 (6th Cir. 2008). In support of their motion to dismiss, Envision and the Individual Defendants have included numerous documents referenced in the Complaint. (*See* exhibits to Doc. No. 127). These include copies of numerous SEC filings, conference and teleconference transcripts, and the *New York Times* article and NBER study. The CD&R Defendants included a number of public filings in support of their motion to dismiss. (*See* exhibits to Doc. No. 124). For purposes of the pending motions to dismiss, the Court will consider these documents.

## III. Analysis

### A. Securities and Exchange Act Claims: Section 10(b) and Rule 10b-5

Plaintiffs bring claims for securities fraud under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 against

Envision and seven individual defendants who were officers of Envision and AmSurg: William A. Sanger, Randel G. Owen, Craig A. Wilson, Todd G. Zimmerman, Christopher A. Holden, Claire M. Gulmi, and Kevin D. Eastridge.

Section 10(b) and Rule 10b-5 prohibit fraudulent, material misstatements in connection with the sale or purchase of securities. *Indiana St. Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund*, 583 F.3d 935, 942 (6th Cir. 2009) (citing *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008)). Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC to implement Section 10(b), makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for violation of § 10(b) and Rule 10b-5 a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Because the Section 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply. *Frank v. Dana*, 547 F.3d 564, 569-70 (6th Cir. 2008). At a minimum, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Id.* at 570. The PSLRA imposes additional requirements. *Id.* The complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In addition, plaintiffs must "with respect to *each act or omission* alleged to violate this chapter, state with *particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *seeFrank*, 547 F.3d at 570.

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 47 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

**\*7** "For purposes of Rule 10b-5, the 'maker' of a statement is a person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011). The Supreme Court reasoned that "[o]ne 'makes' a statement by stating it," comparing a corporate statement to a speech drafted by a speechwriter – even when drafted by someone else, the content of the speech is entirely within the control of the person who delivers it. *Id.* After *Janus*, courts have consistently held that corporate officers who sign documents on behalf of the corporation "make" the statements in those documents. *SeeZwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at \* 3 (M.D. Tenn. Apr. 19, 2018).

Plaintiffs allege Defendants are liable for false or misleading statements that fall generally into three categories: (1) statements regarding "critical drivers" of revenue growth (including quality of care)[5] that failed to disclose EmCare's high rate of out-of-network billing; (2) statements about the transition from out-of-network to in-network status; and (3) statements about the due diligence conducted in connection with certain 2014-15 contracts and the performance of those contracts.

### 1. Omitting Out-of-Network Billing and Upcoding as Basis of Revenue Growth

#### A. Factual Support for the Allegations

During the class period, Envision made numerous statements about what it considered to be the basis for the company's revenue growth and general success. To summarize, Envision stated that it believed its revenue growth was due to factors such as integrated service offerings, meeting consumer service expectations, and providing quality care. Plaintiffs argue these statements, even those couched as statements of opinion, were misleading because Defendants knew that Envision's revenue was due in large part to EmCare's reliance on out-of-network billing and upcoding, as well as a strategy of increasing facility spending by increasing admission rates and procedures without regard to medical necessity. Defendants argue that the facts alleged by Plaintiffs do not show out-of-network billing was a "prime driver" of revenue or that Envision "inflated" revenue through illegal upcoding and improperly increased facility spending.

The Court must first assess whether Plaintiffs allege facts sufficient to create a plausible inference that Envision actually engaged in these practices or that revenue growth was reliant on them. Defendants cannot be held responsible for failing to disclose that which is not plausibly alleged. *SeeAshcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " (alterations in original) (citing Fed. R. Civ. P. 8(a)(2))).

With regard to out-of-network billing, Defendants claim the practice is neither illegal nor illicit and argue that the NBER study uses too limited a data set to substantiate allegations of a company-wide business practice of out-of-network billing.[6] Plaintiffs respond with evidence of high levels of out-of-network billing, and corresponding revenue, from the NBER study and from Envision's own disclosures. Plaintiffs contend that because EmCare generates approximately 60 percent of Envision's revenue, its business practices and sources of revenue necessarily have an effect on overall revenue. (Compl., Doc. No. 88, ¶ 2). Plaintiffs cite evidence that out-of-network billing at hospitals managed by EmCare was significantly higher than other hospitals (62% on average) and that out-of-network billing at hospitals managed by EmCare increased when EmCare took over. During the transition to in-network billing, Envision disclosed that out-of-network billing represented upwards of 35 percent and $1 billion of EmCare's revenue. (Compl., Doc. No. 88, ¶¶ 102, 110; Doc. No. 127-33 at 4). The Court finds Plaintiffs have sufficiently alleged facts that raise a plausible inference that out-of-network billing was a significant source of revenue.

**\*8** On the other hand, the allegations of upcoding improper hospital admissions and procedures are based entirely on one statistic from the NBER study, which showed the likelihood of a patient being coded as "most severe" increased by 42%, and the likelihood of a patient being admitted to the hospital increased by 23% when EmCare took over management of the emergency department. The NBER study relied on data from one insurer[7] and covered 16 of EmCare's 900 hospitals.[8] (Compl., ¶¶ 63, 67; Article, Doc. No. 127-39). Neither the NBER study nor the Article made accusations of upcoding. In fact, the Article said Envision explained that admissions increased because EmCare "allows hospitals to treat sicker patients." (Article, Doc. No. 127-39).

The question then is whether evidence cited by Plaintiffs indicating that admissions rates and coded severity (as

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 48 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

reported by one insurer) increased at eight emergency departments when EmCare took over, supports a reasonable belief that the company was engaging in systemic, illegal upcoding in an effort to improperly boost revenue. The Court finds the evidence insufficient to plausibly raise this inference. The sample size given is too small to suggest a company-wide policy or practice of unlawful upcoding. Without more, Plaintiffs have not raised a plausible inference of upcoding or improperly increased admissions rates. The statements cannot be considered misleading for failure to discuss that which is not plausibly alleged. *See* *In re Career Educ. Corp. Sec. Litig.*, No. 03C8884, 2006 WL 999988, at * 8 (N.D. Ill., Mar. 28, 2006) (granting motion to dismiss when plaintiffs' allegations of conduct in six of defendants' 78 campuses did not "raise an inference of fraud on a nation-wide level such that [ ] statements and omissions" regarding company-wide statistics were false or misleading); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 897 (S.D. Tex. 2017) (allegations of specific problems with pipes comprising a small fraction of the overall network do not give rise to an inference that statements about pipeline integrity management are false and misleading); *Metzler Inv. GmBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (disclosure of an investigation at one of the schools 88 colleges raised only the "potential" of widespread fraudulent conduct which was insufficient to state a claim under Section 10(b)).

For these reasons, the Court will consider whether the alleged representations are misleading for failure to disclose Envision's alleged out-of-network billing practices.[9]

## B. Material Misrepresentation

Materiality can be established by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Zaluski*, 527 F.3d at 571 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant has a duty to

disclose, and generally this duty does not apply to forecasts, or soft information. *Zaluski*, 527 F.3d at 571. However, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.' " *Id.* at 572.

**\*9** Statements identified as statements of opinion are actionable if it was subjectively false (i.e. not honestly held) or omits material facts about the basis or reliability of the opinion. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). To state a claim for an omission resulting in a misleading opinion statement, "the investor must identify particular (and material) facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

In addition, liability does not attach to mere corporate puffery or statements of corporate optimism. *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004). Courts have consistently found immaterial "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* at 570-71. Vague predictions of positive future results cannot engender reasonable reliance by investors. *Indiana State Dist. Council*, 583 F.3d at 944 ("continuation of outstanding earnings growth" is a vague forward-looking statement entitled to safe-harbor).

The Court finds that a reasonable investor could view a significant level of out-of-network billing as material information. *See* *Zaluski*, 527 F.3d at 571 (material information is that which significantly alters the "total mix" of information made available). Materiality alone, however, does not impose an affirmative duty to disclose. Rather, a company must disclose material information when necessary "to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 44.

The Complaint includes a long list of alleged misleading statements. These are gathered from what appears to be every quarterly and annual filing during the class period and numerous statements made by Envision officers during teleconferences with shareholders and at various healthcare

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 49 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

conventions. (*See* Compl., Doc. No. 88, ¶¶ 71-91; 112-121). Defendants allege these statements are not actionable because they are accurate financial statements, statements of opinion, forward-looking statements, or puffery.

The Court now turns to the statements themselves.

#### i. Accurate Financial Statements

Plaintiffs have included each and every statement of revenue and EBITDA [10] filed with the SEC during the class period and have not alleged these statements of revenue were inaccurate. Instead they claim, "[I]t is the combination of the reported financial results and metrics together with defendants' explanations of the bases for those purportedly extraordinary results that gives rise to plaintiffs' claims." (Pl. Br., Doc. No. 131 at 31). Plaintiffs it seems do not contest the general rule that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Almost Family, Inc. Securities Litig.*, No. 3:10-cv-00520, 2012 WL 443461, at *3 (W.D. Ky. Feb. 10, 2012) (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)). Instead, they argue that the accurate financial statements provide context for the other alleged misstatements. Envision's reports of historical income and EBITDA growth are not themselves actionable statements. However, the Court will consider Envision's historic revenue growth as context for the other allegedly misleading statements.

#### ii. Statements Regarding "Drivers of Revenue and Growth"

 **\*10** Plaintiffs argue Envision's statements regarding the drivers of revenue and growth were materially misleading because they attributed EmCare's growth to new contracts obtained as a result of "differentiated service offerings and ability to deliver efficient, high-quality care," and failed to disclose that out-of-network billing was a significant factor contributing to the company's revenue and growth. Plaintiffs cite statements published in quarterly and annual filings to the SEC and in the preliminary prospectus filed in conjunction with the 2014 secondary stock offering and statements made at healthcare conferences and during investor phone calls by individuals on behalf of Envision. The Court will address them in turn.

#### a. Statements in Envision Filings

Pursuant to the Supreme Court's decision in *Janus*, only the "maker" of the statements can be liable under 10(b) and Rule 10b-5. *Janus Capital*, 564 U.S. at 143. In addition to the corporation itself, corporate officers who sign documents on behalf of the corporation "make" the statements in those documents. *See Zwick Partners*, 2018 WL 2933406, at *3. Plaintiffs allege the SEC quarterly and annual filings made through December 1, 2016, the date of the AmSurg merger, were signed by William Sanger and Randel Owen; and that the 2016 Annual Report, filed in March 2017, was signed by Christopher Holden and Claire Gulmi. Accordingly, there can be no liability for alleged misstatements in these filings against the other individual defendants.

The statements are reviewed in context to determine whether a reasonable investor would have found them misleading in light of the circumstances in which they were made. *See* 17 C.F.R. § 240.10b-5(b) (providing liability for failure to "state a material fact necessary in order to make the statement made, in light of the circumstances in which they were made, not misleading"); *Omnicare*, 135 S. Ct. at 1327 ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."). In *Omnicare*, the Supreme Court emphasized the importance of context specifically noting that a reasonable investor expects statements in a registration statement to have been "carefully wordsmithed to comply with the law." *Omnicare*, 135 S. Ct. at 1328.

The following are a representative sample of the allegedly misleading statements regarding drivers of growth that were published in Envision's quarterly and annual filings in 2013, 2014, and 2015:

- Growth is "primarily driven by revenue increases from net new contract wins and same store revenue growth."

- "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."

- "[N]ew contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross-selling services to their respective customers."

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 50 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

- "We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs."

- "We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers."

- "We have developed strong brand recognition and competitive advantages in clinician recruitment as a result of our market position, clinical best practices and clinician leadership development programs."

- "[W]e believe that our track record of consistently meeting or exceeding our customers' service expectations allows us to continue to compete effectively in the bidding process for new contracts."

**\*11** • "We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions."

- "We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care."

(Compl., Doc. No. 88, ¶¶ 72-75, 91, 113-4).

On February 3, 2014, Envision filed a preliminary prospectus which contained the following statements:

**Strong and Consistent Revenue Growth from Diversified Sources**. We have a history of delivering strong revenue growth through a combination of new contracts, same-contract revenue growth and acquisitions. We believe that our significant new contract revenue growth has been driven by our differentiated service offerings and ability to deliver efficient, high-quality care. Further, new contract growth has been accelerating since 2011 as a result of our integrated service offerings and the success of each of EmCare and AMR in cross-selling services to their respective customers. Our new contract pipeline remains robust across each of our businesses.

* * *

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities**. Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives since 2011, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs.

(*Id.* ¶ 71) (emphasis omitted).

The 2016 Annual Report, issued on March 1, 2017, included the following statements of Envision's "Competitive Strengths":

- We have a track record of delivering strong growth through a combination of organic growth, new contract additions and selective acquisitions. Organic growth has historically been supported by consistent underlying market volume trends, stable pricing and a diversified payor mix. Market volumes have been driven primarily by the non-discretionary nature of our services, aging demographics and primary care physician shortages that drive patients to emergency rooms.

- We have successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care, which has helped us expand our relationships with our existing customers and compete effectively in the bidding process for new contracts.

(*Id.* ¶ 91).

Defendants argue that these statements from annual and quarterly reports are non-actionable opinions and point to the numerous statements preceded by indicia of an opinion statement – "we believe." As an initial matter, the Court notes that not all of the statements are couched as statements of opinion. Several of the statements raised by Plaintiffs state unequivocally the reasons for Envision's

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 51 of 117
In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

growth. For example, the Annual Reports made statements such as, "[w]e have successfully executed on new contract growth by providing a set of differentiated services and delivering integrated, efficient, high-quality care," and "[o]rganic growth has historically been supported by consistent underlying market volume trends, stable pricing and a diversified payor mix." Moreover, merely appending "we believe" or "we think" does not automatically render statements non-actionable. *See* *Omnicare*, 135 S. Ct. 1318, 1331 (such a rule would "nullify that statutory requirement for all sentences starting with the phrases 'we believe' or 'we think' "). A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion. *Id.*

**\*12** Defendants further argue Plaintiffs have not offered facts to show that Envision's stated factors contributing to its success were false or that Envision did not expect its success to continue unless it continued "the illicit practices." (Def. Br., Doc. No. 126 at 17). The case Defendants cite in support of this argument, *In re Almost Family*, 2012 WL 443461, is distinguishable from the facts presented here. In *AlmostFamily*, the court held that statements about a company's "strategy, success, and management" were not misleading even though they failed to disclose the company's growth was "substantially due to its scheme to manipulate Medicare's reimbursement system" because "[the Company's] success could be attributed to several factors, and Plaintiffs have offered no evidence suggesting that the factors discussed ... were farcical." *Id.* at * 7. The statements in *Almost Family* were made, not in a "carefully wordsmithed" formal SEC filing, but by the company owner during a conference presentation. The *Almost Family* opinion does not give enough information about the statements themselves for the Court to know if the owner purported to represent all of the factors contributing to the company's success or just some of them. Moreover, *Almost Family*, applied a standard requiring the statements to be objectively false and did not consider whether a reasonable investor would have considered them misleading. *Id.* ("Absent specifically alleging that statements made by [the CEO] were false, Plaintiffs cannot successfully assert them to be a material misrepresentation.")

Considering the allegations in this case, the Court reaches a different conclusion. Whether stated as an opinion or fact, a reasonable person could view the statements regarding the drivers of success as misleading for omitting information regarding out-of-network-billing as a factor driving revenue.[11] Other courts have found similar statements could be viewed as misleading by a reasonable investor. *See e.g.,* *Norfolk Cty Retirement Sys. v. Cmty Health Sys., Inc.*, No. 3:11-00433, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016), *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017), ("once [defendants] 'put the topic of the cause of [their] financial success at issue,' they were 'obligated to disclose information concerning the source of the success' ") (quoting *Sapssov v. Health Mgmt. Assoc., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014)); *see also*, *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at * 6 (S.D.N.Y. Mar. 28, 2018) ("[W]here a company puts at issue the causes of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices.") (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)); *Garden City Emp. Ret. Sys. v. Psychiatric Sols.*, No. 3:09-00882, 2011 WL 1335803, at * 30-31 (M.D. Tenn. Mar. 31, 2011) (failure to disclose that company's revenue growth was predicated upon an undisclosed practice of cutting expenses below the level necessary to prevent physical and sexual assault was a material omission).

### b. Statements by Individuals on Behalf of Envision

The Court now reviews alleged misrepresentations made by Envision officers at various healthcare conferences in which they discuss "drivers of growth." Once again, the statements are reviewed in context to determine whether a reasonable investor would have found them misleading in light of the circumstances in which they were made.

At a healthcare conference in December 2014, Envision Officers Randel Owen and Todd Zimmerman attributed EmCare's business growth to new contracts and its "integrated service offering." (Compl., Doc. No. 88, ¶ 77.) Plaintiffs allege Zimmerman made the following statement:

> So what differentiates EmCare, and why have we been able to grow? One of the strongest areas that I think differentiates us is our integrated service offering. So if you look at in the industry, you got a lot of hospitals that are contracting with maybe being multiple vendors, maybe somebody for emergency medicine, somebody different for hospitals. And they need to coordinate care across all these specialties. So how do you do that when you've got different companies, different leaders, different budgets? From EmCare's standpoint what we did is we broadened our offering to include the key services.

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 52 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

**\*13** And then we took those key services and we rolled them under a single operational leadership structure, single budget, single strategic plan, single hospital contact. And it really aligns us better with our hospital partners to coordinate care across the specialties. That has been big for us and led to a lot of growth for us.

\* \* \*

So take a look at the revenue growth here. You can see certainly from the same-store contracting standpoint it's pretty consistent year in, year out. So there may be some fluctuation there, but generally we look at it at a 3% to 5% same-store revenue growth. But really, you see that middle ground with the net new contracts – big growth on the EmCare side. And that's really the result of what I was talking about with the integrated service offering and the acceptance of the market on that side.

(*Id.*)

The Court finds that this statement is not misleading, even in light of the allegations that EmCare had a high portion of revenue from out-of-network billing. The context of the statement shows that Zimmerman is explaining his opinion of *one of the reasons* EmCare has been able to grow. He does not purport to provide a complete list of reasons EmCare has been successful. In fact, he only discusses the integrated service offering which he says "has been big for us." His later statement about revenue growth merely states statistics on "same store revenue growth." Plaintiffs do not allege this statement is false and the Court does not find that is could be viewed as misleading.

Speaking at the same conference, Randel Owen affirmed that EmCare's growth is based on new contracts. Owen said:

> Net new contracts is really where the growth has been and continues to be ... So, we still see a great demand for services. A couple things driving that, I think, are, one, hospitals are still – always have been but are more focused on metrics and metric improvement as reimbursement is moving toward differentiation based on outcomes and based on metrics. So we think the backdrop is continuing

to drive hospitals to look for more sophisticated players who can have a broader impact on metrics. A lot of hospitals today still contract a lot with small groups, local or regional groups. That's still predominantly what is served in the market. And while they may have good doctors and run a good department, hospitals are needing more than just good clinicians in one department. They are looking for a broader base. And so, we think that's still a backdrop that continues in terms of that organic growth opportunity.

(*Id.* ¶ 78).

This statement is also not misleading. Like Zimmerman, Owen gave his opinion regarding one of the factors driving contract growth. He did not discuss a comprehensive list of reasons hospitals choose to contract with EmCare. He refers to "a couple of things" driving growth and specifically mentions "one." For this reason, the court finds that his failure to discuss out-of-network billing does not render the statements misleading to the reasonable investor.

**\*14** On May 13, 2015, Randal Owen gave another presentation at a healthcare conference. In response to a question about the drivers behind and sustainability of EmCare's growth in new contracts, Owen essentially repeated his previous statement about reimbursement and "differentiation based on outcomes and metrics":

> I think if you look at the macro backdrop in terms of what's been driving the growth and what we believe will continue to drive that growth is really from a hospital standpoint, reimbursement continues to move to differentiation based on outcomes and metrics... So hospitals are looking for more sophistication, more ability to impact broader metrics, and so that's driven our growth.

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 53 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

(*Id.* ¶ 82.) The Court finds this statement would not be misleading to a reasonable investor. First, it is couched as an opinion. Second, Owen does not purport to give a comprehensive list of the reasons hospitals would choose to contract with EmCare. Instead, Owen says the most important thing to hospitals is EmCare's ability to "impact broader metrics." The statement is vague such that an investor would have no idea what, specifically, EmCare is doing to "impact metrics." In this context, omission of EmCare's out-of-network billing is not misleading, even if that is one of many factors that "impact metrics."

At a healthcare conference in January 2015, Envision Officer William Sanger made the following statements regarding the 2015 17%-20% EBITDA growth projections: "On the EmCare side we believe we've got very strong visibility into the ability to continue that organic growth over the next several years with a very active pipeline on both the organic and the acquisition side."

This statement is not actionable because it is opinion, forward-looking, and puffery. No reasonable investor would take this statement as a guarantee of growth. In fact, the statement vaguely says the company has "strong visibility" into its "ability to continue that organic growth." This is precisely the sort of corporate self-aggrandizement that cannot engender reasonable reliance by reasonable investors.

In summary, the Court finds that the statements regarding the factors driving the company's growth made by individual defendants at healthcare conferences would not be misleading to a reasonable investor. The individual statements were not misleading, nor would a reasonable investor expect to receive a comprehensive picture of a company's business from select statements, many of which were in response to specific questions, in that venue.

### iii. Revenue Projections and Forward Looking Statements

Plaintiffs have included in their long list of alleged misstatements virtually every financial projection made by Envision during the class period. (*See* Compl., Doc. No. 88, ¶¶ 74-76, 81, 85-87). With few exceptions, these revenue projections appear to have been borne out. It is difficult to imagine how revenue projections that were ultimately proved to be correct, can be viewed as misleading. That logical obstacle aside, revenue and earnings projections

are generally considered "forward-looking" within the meaning of the PSLRA. *See* 15 U.S.C. § 78u–5(i)(1) ("The term 'forward-looking statement' means ... a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc) ("projections, statements of plans and objectives, and estimates of future economic performance" do not state a claim absent factual allegations showing actual knowledge of the false or misleading nature of the statement).

**\*15** The PLSRA established a limited safe-harbor for forward-looking statements which "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance." *Helwig*, 251 F.3d at 547-48 (citing 15 U.S.C. § 78u-5(i)(1)). "[A] defendant will not be liable for material forward-looking statement if either (1) the statements is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) 'the plaintiff fails to prove the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." *Dougherty v. Esperion Therapeutics*, 905 F.3d 971, 983 (6th Cir. 2018). Accordingly, the state of mind is irrelevant if the forward-looking statement is accompanied by meaningful cautionary language. *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 910 (M.D. Tenn. 2019) (citing *Miller v. Champion Ents., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003)). In the absence of meaningful cautionary language, the safe harbor still protects against liability if the maker lacked actual knowledge that the statement was false or misleading.

A meaningful cautionary statement conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements. *Helwig*, 251 F.3d at 558-59. A "boilerplate litany of generally applicable risk factors" does not qualify as "meaningful." *Slayton v. Am Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010).

Without identifying specific statements, the parties generally dispute whether Plaintiffs alleged the statements were made with knowledge of the false or misleading nature of the statement and whether the cautionary language was "meaningful." The 2014 preliminary prospectus included

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 54 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

the following cautionary language: "SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS AND INFORMATION" warning, among other things, that "[w]e are subject to decreases in our revenue and profit margin under our fee-for-service contracts, where we bear the risk of changes in volume, payor mix and third-party reimbursement rates." (*See* 2014 Prospectus, Doc. No. 127-2). Similarly, the 2016 Joint Proxy Registration statement contains 13 pages discussing risk factors associated with the transaction. (*See* Joint Proxy Statement, Doc. No. 127-4).

At this juncture in the case, the Court finds that Plaintiffs have pleaded sufficient facts to plausibly allege Defendants were aware of the potentially misleading nature of some of their statements. The only statement Defendants specifically identify as forward-looking in this portion of the Complaint is the revenue projection contained in the Joint Proxy Registration Statement. (Compl., Doc. No. 88, ¶ 89). This statement is only identifiable as forward-looking because Defendants claim "all of the statements" in the registration statement are subject to the safe harbor and this is the only statement in this portion of the complaint from the registration statement. Otherwise, Defendants claim PLSRA safe harbor protection generally as to "most of the statements." [12]

The alleged misrepresentation in the Joint Proxy Registration Statement is the projection that "Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth of 13% (to $1.7 billion) and that the Merger was 'expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings and access to a broader client base.' " (Compl., Doc. No. 88, ¶ 89). Plaintiffs allege that this statement was misleading because: (1) Envision was aware of declining revenues from out-of-network billing that could or would impact its ability to achieve the predicted growth; and (2) it failed to disclose that the predicted growth was based on unsustainable levels of out-of-network billing.

 **\*16** The cautionary statement warning of "the risk of changes in volume, payor mix and third-party reimbursement rates" is only meaningful to the extent that such changes have not already occurred. In *Weiner v. Tivity Health*, 365 F. Supp. 3d at 911, this Court discussed what makes a cautionary statement meaningful: "If a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had

already deteriorated, then ... its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person 'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " *Id.* (quoting *In re Harmon Int'l Indus. Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015)).

In this case, it is evident that the meaningfulness of the cautionary statement cannot be determined without a determination of the facts – i.e. whether Envision was already experiencing changes in payor mix or third-party reimbursement rates at the time it made the statement. The Court cannot make such a factual determination on a motion to dismiss. With regard to other potentially forward-looking statements, the parties have not identified specific statements to which the safe-harbor might apply, and so the Court cannot realistically assess whether the cautionary language was meaningful as to any particular alleged misstatement. Accordingly, the question of whether any statements are protected by the safe-harbor is reserved summary judgment or trial.

2. Statements Regarding Transition to In-Network Billing
On February 28, 2017, Envision announced its intent to transition "the majority of [its] relationships to in-network status." (Compl., Doc. No. 88, ¶ 98). During the course of the following six months, Envision officers participated in a number of healthcare conferences and investor teleconferences in which they discussed the transition to in-network. The central tenant of the statements is that EmCare intended to transition "the majority of [its] out-of-network revenue to in-network status within the next 12-18 months with a revenue neutral impact." (*Id.* ¶ 104). The officers repeatedly stated that they believed the transition could be achieved in a revenue neutral way. The statements include:

- "[W]e believe this can be achieved in a budget neutral or positive way." (*Id.* ¶ 99).

- "We think it can be – it won't be dilutive to make the change." (*Id.* ¶ 100).

- "[W]e think that a contracted rate and moving in network is revenue neutral to the organizations."

- "The strategy is to move that in [net]work in a way that would be neutral to both revenue and EBITDA ... We

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 55 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

think we can achieve this to be revenue neutral." (*Id.* ¶ 102).

- "[O]ur recent success reinforces our confidence in our plan to migrate the majority of our out-of-network to in-network status over the next 18 to 24 months with complete revenue neutrality." (*Id.* ¶ 103).

- "As you may recall, our stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12 to 18 months with a revenue neutral impact." (*Id.* ¶ 104).

Plaintiffs claim the statements about the transition to in-network were misleading because: (1) "defendants had no reasonable basis to believe and did not believe that the transition from out-of-network to in-network was 'revenue neutral' "; (2) the in-network rates were not comparable to the out-of-network rates the company had previously been receiving; (3) Envision was moving business in-network because it was no longer viable to have a large volume of out-of-network payors; (4) that the transition would be revenue neutral only because the reimbursement rate for out-of-network billing had dropped significantly during the preceding years; and (5) that the negative trend for out-of-network reimbursement was expected to continue and to negatively impact Envision's FY17 and FY18 results. (*Id.* ¶ 110).

 **\*17** Defendants respond that these statements are not materially misleading and are non-actionable forward-looking statements of opinion. Moreover, Defendants argue that Envision fully disclosed the reasons for the decision to transition the majority of its business to in-network and the basis of the opinion that the transition could be revenue neutral. (Def. Br., Doc. No. 126 at 32-33).

Once again, the statements are reviewed in context to determine whether a reasonable investor could have found them misleading in light of the circumstances in which they were made. Therefore, the Court begins with a review of the statements regarding the transition to in-network status.

Envision began discussing out-of-network billing in March 2016 after the Florida legislature passed balance billing legislation. On May 5, 2016, during a conference call with investors, Owen specifically addressed Envision's out-of-network billing practices:

I also want to [add] some information on the discussion around out-of-network and balance billing that Bill just noted. While there are recent questions raised on the matter, it's been a part of our business for a long time and it's primarily related to our ED services. It's important to reemphasize that when we are out-of-network with a payer, this approach is negotiated with our hospital partners upfront and throughout the [life] of the contract. In these discussions, hospitals identify which payers they want us to be in network with. Oftentimes, we're also out-of-network with payers during a renegotiation process.

(*Id.* ¶ 95-96.)

On February 28, 2017, almost a year after the Florida legislature passed balance billing legislation, Envision announced its intent to transition a majority of its out of network business to in-network. (*Id.* ¶ 98). Defendants Holden, Gulmi, and Owen represented Envision on a conference call with investors. Holden said, "we believe this can be achieved in a budget neutral or positive way." (*Id.* ¶ 99).

On March 14, 2017, at a healthcare conference, Holden again addressed the transition to in-network billing: "[W]e think that a contracted rate and moving in network is revenue neutral to the organizations." Holden explained that state-level legislation governs how out-of-network payment disputes are remediated and that given the "battle to collect out of network from both the payer and the patient, it's really a wash." (Edited Transcript of Barclays Global Healthcare Conference, March 14, 2017, Doc. No. 127-30 at 8). Holden stated that the move to in-network would take some of the administrative burden out of the collection process and save money. (*Id.* at 9). He concluded, "I feel very confident that over the next 18 to 24 months, we can make a significant debt in the out of network." (*Id.*)

On March 21, 2017, Bob Kneeley presented on behalf of Envision at another healthcare conference. Kneeley stated,

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 56 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

"The strategy is to move that in [net]work in a way that would be neutral to both revenue and EBITDA ... We think we can achieve this to be revenue and EBITDA neutral. We have negotiated several contracts that give us good visibility into that statement and to the results implied in that statement and we feel good about the progress we are making." (*Id.* ¶ 102).

On a May 2, 2017, conference call with investors and analysts, Holden reported on the transition to in-network status:

> We've also migrated our ED services to in-network status with 3 statewide payers in the state of Florida. We are essentially in-network for all services for those payers. And our recent success reinforces our confidence in our plan to migrate the majority of our out-of-network to in-network status over the next 18 to 24 months with complete revenue neutrality.

**\*18** (*Id.* ¶ 103).

On May 16, 2017, Holden repeated this information again when explaining the rationale behind the transition, "[W]e've been migrating to and recording our rates per what we've been getting paid over the last several years, and those rates are very consistent with what you would have in a contracted rate." (Corrected Transcript, Bank of America Merrill Lynch Health Care Conference, May 16, 2017, Doc. No. 127-32). On June 7, 2017, Holden again noted that the "effective yield has been declining for several years." (Transcript, Envision Healthcare Corp at Jefferies Healthcare Conference, FD (Fair Disclosure) Wire, June 7, 2017, Doc. No. 127-33).

On August 8, 2017, on a conference call with investors and analysts, Holden gave an update on the transition: "We believe that progress is moving on our time line and with the expected results. As you may recall, our stated objective is to move the majority of our out-of-network revenue to in-network status within the next 12 to 18 months with a revenue-neutral impact." (Compl., Doc. No. 88, ¶ 104.)

On September 6, 2017, at a healthcare conference, Holden again commented on the plan for a revenue neutral transition from out-of-network to in-network. He said, "I wouldn't have raised this as a strategy if I didn't have very high confidence

in our ability to execute ... this is not a high-risk strategy to execute." (*Id.* ¶ 106). The next day, at another healthcare conference, Holden said:

> But it is truly one of the positives of the merger, and it's a decision I have great confidence in. And I know it's more than directionally correct. It's competitively advantageous, and it is the right decision. And ultimately, we have a whole litany of strategies that are around what we call physician engagement. Again, they go back to that desire to become the employer partner of choice for physicians going forward so we can better serve those increasingly complex customers. And so when we did the math and looked at the waterfall of moving these out of network to in network, it's really a revenue-neutral decision ...

(*Id.* ¶¶ 107-8).

The Court finds that the statements of objective / belief / strategy that the transition to in-network status would be revenue neutral are not misleading because they are forward looking and statements of opinion. Moreover, Plaintiffs have failed to plead any facts showing that the belief that the transition would be revenue neutral was not honestly held or call into question the basis for the opinion that the transition would be revenue neutral. *See Omnicare*, 135 S.Ct. at 1332. To the contrary, the alleged omissions, including the motivation for the transition, were in fact disclosed in numerous public statements.

3. Statements Regarding Performance of Contracts

Plaintiffs' allegations of misrepresentations relating to certain 2014-15 contracts are twofold. First, Plaintiffs claim that Envision failed to perform adequate due diligence regarding the contracts despite assurances to the contrary. Second, Plaintiffs allege Envision failed to disclose or correct problems with these contracts for 12 months, and misleadingly assured investors that the contracts were performing "pretty similar to [its] overall EmCare margins." In October 2015, Envision disclosed that the contracts, which

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 57 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

had been expected to produce revenue of $3.5 million instead resulted in a loss of $6.5 million. (Compl., Doc. No. 88, ¶ 134).

**\*19** Defendants argue that the allegations of misrepresentations regarding the due diligence on the contracts is barred by the two-year statute of limitations for 10(b) claims because Plaintiffs became aware of their potential claim no later than October 22, 2015, when Envision released its third quarter results for 2015. *See*28 U.S.C. § 1658(b) (providing statute of limitations on § 10(b) claims is two years from discovery).

Plaintiffs assert the claim is not time barred because Central Labors' Pension Fund filed a complaint on October 23, 2017 "containing allegations regarding this exact claim." (Pl. Br., Doc. No. 131 at 31). A review of the Central Labors' Complaint, however, shows they did not raise the issues of misstatements regarding due diligence on the contracts, only that "defendants knew of the issues causing the failure to meet Legacy Envision's guidance and necessitating the change in guidance months before the October 22, 2015 announcement." Compl. ¶ 10, *Central Laborers' Pension Fund v. Envision*, Case No. 3:17-cv-01397 (M.D. Tenn. Oct. 23, 2017) (Doc. No. 1).

Insofar as the claim asserts the statements about due diligence were misleading, the Court finds that these claims were raised for the first time in the Consolidated Complaint (Doc. No. 88) on January 26, 2018, more than two years after the claims accrued. Accordingly, claims related to the due diligence on the contracts is barred by the two-year statute of limitations. [13]

However, the second aspect of Plaintiffs claim related to these contracts was timely raised. Plaintiffs allege that Envision knew that some 2014-15 contracts were underperforming for over twelve months and during this time reassured investors that the contracts were performing "on an aggregate basis, pretty similar to our overall EmCare margins." (*Id.* ¶ 127). It was not until October 2015 that Envision adjusted projected revenue and EBITDA to reflect the contracts actual performance and admitted these contracts had never performed well. As to this part of the claim, Plaintiffs have alleged facts sufficient to state a claim that the projections of income and reassurances that the contracts were performing adequately were false and misleading.

### 4. Scienter

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter must be pleaded separately as to each defendant. *SeeDoshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039-43 (6th Cir. 2016) (assessing scienter allegations as to each defendant); *see also*, *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 772 (M.D. Tenn. 2013) ("where fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately).

**\*20** In a securities fraud case, an inference of recklessness is sufficient to satisfy a plaintiff's burden on the scienter element. *Dougherty*, 905 F.3d at 979-80 ("In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." (quoting *Doshi*, 823 F.3d at 1039)). Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care ... akin to conscious disregard." *Id.* at 980 (citing *PR Diamonds, Inc. v. Chandler*, 91 Fed. App'x. 418, 426 (6th Cir. 2004)).

"A strong inference of scienter 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Doshi*, 823 F.3d at 1039 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The proper inquiry for the Court in evaluating allegations of scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

The Sixth Circuit has held that the following factors are usually probative of scienter in securities fraud actions:

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 58 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

(1) Insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending stock sale; (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039 (quoting *Helwig*, 251 F.3d at 552).

Plaintiffs put forward the following theory as to scienter, which the Court will consider holistically, taking all of Plaintiffs' factual allegations into account.[14] The foundation of Plaintiffs' theory is that high level executives must have been aware of the high levels of out-of-network billing because of its overall significance to corporate revenue – upwards of 35% and $1 billion of revenue of Envision's largest division, EmCare. Plaintiffs allege that out-of-network billing was not merely a small technical aspect of EmCare's business, but an overarching strategy designed to maximize revenue. Plaintiffs allege that Envision intentionally concealed the high levels of out-of-network billing from investors in order to maintain high stock value and that while the stock was at artificially high prices in 2014 and 2015, Envision's senior executives and CD&R sold over $4 billion in stock. Plaintiffs suggest Envision merged with AmSurg in December 2016 to conceal the declining out-of-network revenue. Sanger received $3 million in equity

compensation as a result of the merger, which Plaintiffs argue suggests that he concealed out-of-network billing to consummate the merger on favorable terms.

**\*21** Plaintiffs assert that when Envision did begin to discuss out-of-network billing, it did so in a way that was "impossible to understand" and intentionally obscured the level of out of network billing by either being highly specific or overly vague so that investors would not know the true facts. For example, in May 2016, March 2017, and August 2017, Defendant cited different rates of out-of-network billing ranging from "roughly 20%" to "perhaps 30% to 35%" and "$700 to $800 million" or "about $1 billion." Further, Plaintiffs suggest that the decision to transition the majority of accounts to in-network status was further effort to conceal the extent of Envision's reliance on out-of-network billing and the fact that out-of-network recovery rates had declined to below the in-network rate. Finally, they argue that the resignation of "a string of defendants" soon after disclosure of EmCare's out-of-network billing shows the Individual Defendants were motivated to fraudulently conceal the levels of out-of-network billing to save their jobs.

Defendants take issue with Plaintiffs' characterization of the facts and argue that none of the *Helwig* factors supports an inference of scienter and that a more compelling competing inference is "the absence of fraud" – that the statements at issue were nothing more than statements of "misguided optimism."

The Court considers whether the Plaintiffs adequately pleaded scienter with respect to each statement and each defendant. In so doing, the Court considers only those statements it has found could be viewed as materially misleading by a reasonable investor.

### i. Statements and Omissions
### Regarding Out-of-Network Billing

As discussed above, Plaintiffs have sufficiently pleaded that statements in Envision's quarterly and annual filings could be viewed as misleading for failure to include out-of-network billing as a basis for revenue growth. Statements in corporate filings are "made" by the corporation and by the corporate officers who sign documents on behalf of the corporation. *SeeZwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at * 3 (M.D. Tenn. April 19, 2018) (citing *Janus*, 564 U.S. at 143). The quarterly and

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 59 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

annual filings made through December 1, 2016, the date of the AmSurg merger, were signed by William Sanger and Randel Owen. The 2016 Annual Report, filed in March 2017, was signed by Christopher Holden and Claire Gulmi. There can be no liability for alleged misstatements in these filings against the other individual defendants, therefore the Court will consider whether scienter has been sufficiently pleaded as to the four individual defendants who signed the filings with the allegedly misleading statements.

As to corporate scienter, the Sixth Circuit has held that a corporation's state of mind in making false or deceptive statements is assessed by reference to the state of mind of: (1) the individual agent who uttered or issued the misrepresentation; (2) any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; or (3) any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance. *Bondali v. Yum!Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) (citing *Omnicare*, 769 F.3d at 476). Accordingly, if Plaintiffs have adequately pleaded scienter as to the individual officers, they have also pleaded scienter as to Envision.

The Court identifies three allegations supporting a strong inference that Owen and Sanger knew their statements were false and misleading: (1) they were aware of the high volume of out-of-network revenue by virtue of their positions in the company; (2) they engaged in insider trading during the class period; and (3) Sanger received significant stock compensation – $3 million – following the AmSurg merger.

 **\*22** Plaintiffs allege that Owen and Sanger, by virtue of their positions in the company would have been aware that EmCare intentionally staffed emergency rooms with out-of-network physicians and relied on out-of-network billing for a large portion of its revenue. "Courts may presume that high-level executives are aware of matter related to their business's operations where the misrepresentations and omissions pertain to 'central, day-to-day operational matters,' " particularly for facts "critical to a business's core management." *Garden City Ret. Sys. v. Psychiatric Sols*, 3:09-00882, 2011 WL 1335803, at * 57 (M.D. Tenn. Mar. 31, 2011) (quoting *Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) and *In re Ancor Commc'ns, Inc.*

*Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)); *see also*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) (*abrogated in part on other grounds*, *Frank v. Dana Corp.*, 646 F.3d at 680) (affirming the notion that "high-level executives can be presumed to be aware of matters central to their business's operations).

Defendants argue the allegation that the individual defendant had information solely by virtue of their status as directors and officers cannot support an inference of scienter. The cases cited by Defendants, however, consider whether high-level corporate officials were aware of specific details of the business, not their awareness of "core operations." *SeeIn re Rockwell Med., Inc. Sec. Lit.*, No. 16-cv-1691, 2018 WL 1725553, at \*14 (S.D.N.Y. March 30, 2018) (finding insufficient evidence that defendants had knowledge of specific problems related to the commercial viability of the liquid form of a drug and finding the core operations doctrine inapplicable because plaintiffs did not plead what portion of Rockwell's business depended on the drug); *PR Diamonds*, 364 F.3d at 688 (holding company executives, solely by virtue of their positions, could not be presumed to be aware of "relatively arcane" accounting issues that resulted in inaccurate financial statements); *see also, Bondali v. Yum!Brands, Inc.*, 620 F. App'x 483, 492 (6th Cir. 2015) (finding no strong inference that corporate executives were aware of specific food safety test results simply because food safety was important to company operations and the test results at issue were from China, which was the "core" of the business).

Both Sanger and Owen held high-level positions in the company. Prior to the AmSurg merger, Sanger was Chairman of the Board and President of Envision. Owen served as Executive Vice President and Chief Financial Officer before to the AmSurg Merger. After the merger, he was an Executive Vice President and President of the Ambulatory Services Group. EmCare accounted for the vast majority of Envision's revenue – between 63% and 67%. The Defendants admitted that at least 20% of EmCare's commercial collections were from out-of-network revenue. It was later disclosed that revenue from out-of-network billing could be upwards of 35% and $1 billion in annual revenue. In these circumstances it is reasonable to presume that Sanger and Owen were aware of the out-of-network billing practices at EmCare and that the statements regarding the "drivers of growth" were misleading for omitting discussion of out-of-network billing. In *Helwig* terms, this could be considered factor 6: "disregard of the most current factual information before making statements."

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 60 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

The Court views the allegations of insider trading to be less indicative of scienter in this case. First, the timing of the trades is significantly removed from the disclosure of the purportedly false statements. *See In reAxis Capital Holdings, Inc. Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) ("timing is more an indicia of fraud where sales occur shortly after insiders learn undisclosed adverse information or made affirmative misrepresentations, or shortly before correctively disclosures on the market"). However, the volume of the trades, even though many were pursuant to 10b(5)-1 trading plans, may nevertheless indicate a motive to inflate Envision's stock price. *See Psychiatric Sols., Inc.*, 2001 WL 1335803, at * 31 (considering stock sales under 10b5-1 trading plans as evidence of motive). The fact that other Envision Director Defendants increased their stock holdings during this period does not affect the individual allegations of scienter as to Sanger and Owen. This is enough to raise a strong inference of scienter.

 **\*23**  Taken collectively, the allegations give rise to a strong inference that Sanger and Owen knew the extent to which out-of-network billing contributed to Envision's revenue and that omission of this information, when otherwise disclosing the basis for Envision's revenue and growth, was misleading to investors.

Holden and Gulmi became officers at Envision following the AmSurg merger on December 1, 2016, and, therefore, could only be responsible for the statements in the 2016 Annual Report filed on March 1, 2017.[15] Although these officers were at the company for a short amount of time, even post-merger out-of-network billing accounted for $1 billion and as much as 35% of revenue and, like Sanger and Owen, Holden and Gulmi were likely aware of the general high volume of out-of-network billing. Although it is less plausible that out-of-network billing would have been considered a current "competitive strength" at this time, particularly considering that Envision was announcing the intent to transition most of its out-of-network business to in-network and that out-of-network revenue had allegedly decreased dramatically, the annual statement refers in part to historic factors supporting "organic growth" and represents that growth will continue because of these factors. Plaintiffs have stated a plausible theory of scienter that Envision continued to obscure the extent to which it relied on out-of-network billing before the transition and did so to minimize the impact of the transition announcement. Having considered the totality of the allegations, the Court finds Plaintiffs pleaded sufficient facts to raise a strong inference of scienter as to Holden and Gulmi with regard to the statements of "competitive strengths" in the 2016 Annual Report.

### ii. Statements and Omissions Regarding the Contracts

Plaintiffs have raised a strong inference of scienter as to Owen, Sanger, and Envision concerning statements made about the performance of the 2014-15 contracts. The facts pleaded indicate these defendants disregarded current factual information indicating that the contracts were not performing as expected and that they nevertheless made statements affirming projected revenue and assuring investors that the contracts were performing "pretty similar to our overall EmCare margins." This is sufficient to state a strong inference of scienter.

### 5. Loss Causation

In a securities action, the plaintiff bears the burden of pleading and proving loss causation. 15 U.S.C. § 78u-4(b)(4); *Indiana State Dist. Council*, 583 F.3d at 944 (*citingDura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005)). For loss causation claims, the Federal Rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *SeeDura*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.") At the motion to dismiss stage, it is sufficient for the plaintiff's allegations to be plausible. *Ohio Public Emp. Ret. Sys. v. Fed. Home Loan Mort. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (the burden to plead causation is "not meant to impose a great burden"). Loss causation does not require proof that the fraudulent misrepresentation was the sole cause of the security's loss in value, but the plaintiff must still demonstrate that the fraudulent statement was a "substantial" or "significant" cause of the decline in price. *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013); *see also*, *In re Am. Service Grp.*, No. 3:06-0323, 2009 WL 1348163, at * 63 (M.D. Tenn. Mar. 31, 2009).

 **\*24**  The Sixth Circuit has recognized two methods by which a plaintiff can show loss causation: (1) through a corrective disclosure; and (2) through materialization of a concealed risk. *Ohio Pub. Emp.*, F.3d at 384-85. A corrective disclosure reveals the fraud and the market reacts negatively to the disclosure of fraud. *Id.* at 384 (citing *In re*

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 61 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

*Omnicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Indiana State Dist. Council*, 583 F.3d at 944 (citing *Dura*, 544 U.S. at 346-47). This is the easiest loss causation to show because the stock price drop immediately follows the revelation of the fraud to the public. *In re KBC Asset Mgmt.*, 572 F. App'x. 356, 360 (6th Cir. 2014). Sometimes defendants reveal their own fraud via a corrective disclosure, i.e. a statement that reveals what the defendants themselves previously concealed, but revelations can come from other sources, including whistleblowers, analysts, and news reports. *Norfolk Cty. Ret. Sys.*, 877 F.3d at 695. A plaintiff need not rely on a single, complete disclosure; the truth may gradually be revealed through a series of partial disclosures. *Id.* "Of course, for the revelation to cause the plaintiffs' losses, the information must be in a practical sense be new; otherwise the market will have processed and reacted to the information already." *In re Almost Family, Inc. Securities Litigation*, No. 3:10-520, 2012 WL 443461, at *10 (W.D. Ky. Feb. 10, 2012) (citation omitted).

Under the materialization of the risk theory, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Ohio Pub. Emp.*, 830 F.3d at 384 (citations omitted); *see also*, *Norfolk Cty. Ret. Sys.*, 877 F.3d at 695.

Plaintiffs identify two corrective disclosures: (1) the July 25, 2017 *New York Times* article and NBER Study; and (2) the October 31, 2017 announcement of an earnings miss and guidance reduction.[16] Defendants argue the *New York Times* article cannot be viewed as a corrective disclosure because it did not reveal any previously undisclosed misrepresentations. Defendants claim it was a matter of public record that a significant portion of EmCare's revenue was from out-of-network billing and that out-of-network billing was unpopular among patients, and that the *New York Times* article and NBER study did not add any previously undisclosed facts. (Def. Br., Doc. No. 126 at 43). Defendants rely on cases in which the purported disclosure was based entirely on facts already known to the market. *See Meyer*, 710 F.3d at 1199 (analysts opinion that a company's assets were significantly overvalued was based entirely on publicly available information and did not disclose any new information); *Almost Family*, 2012 WL 443461, at *13

(article based entirely on a statistical analysis of financial statements and records already available to the public did not present new information to the public); *KBC Asset Mgmt.*, 572 F. App'x at 359-60 (affidavits admitting the company had not previously complied with discovery obligations and had improperly attempted to influence a judge did not disclose any new information when two years before the admissions in the affidavits, the company was sanctioned $1.5 million for the discovery violations and "the market already knew [the company] had failed to meet its discovery obligations and had had hired [an agent] to improperly influence [the judge]").

Plaintiffs argue that, unlike the cases cited by Defendants, the *New York Times* article and NBER study, reveal previously undisclosed information regarding the nature and extent of EmCare's out of network billing. The Court agrees. While it had been disclosed that out-of-network billing made up a significant portion of EmCare's revenue, the Article and NBER study revealed previously undisclosed details, such as the fact that emergency departments managed by EmCare had a comparatively high rate of out-of-network billing, which the study said showed a "distinct out of network strategy." (NBER Study, Doc. No. 127-38 at 5). The study also quantified the increase in out-of-network billing rates when EmCare took over management of some emergency departments. (*Id.* at 6). These statistics, which the NBER study supports with detailed analysis, were not previously revealed to the public and inform investors of facts indicating that EmCare had more than just "substantial revenue" from out-of-network billing, it had a "distinct out-of-network strategy." (*Id.*) Moreover, the NBER study highlighted the relevance of EmCare's out-of-network billing strategy as it assessed the potential of various regulatory measures to "address out of network surprise billing." (*Id.* at 33).

**\*25** After the October 31, 2017 announcement that Envision missed its third quarter guidance and was significantly reducing its fourth quarter guidance and expectations for 2018, Envision's stock price fell 42%. Though plaintiffs label the announcement of a decline in revenue as a "corrective disclosure," their argument more aptly characterized as materialization of the risk. Plaintiffs' argument is that high levels of out-of-network revenue were unsustainable and that Envision saw decreased revenue when this risk was realized and EmCare began to transition accounts to in-network. Envision has other explanations for the decreased revenue, including hurricanes and a decline in emergency medicine volumes. At this stage in the litigation, Plaintiffs need only allege sufficient facts to plausibly allege causation. *Ohio*

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 62 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

*Public Employees*, 830 F.3d at 388. The Court will not and cannot determine whether the drop in stock value was actually due to other factors.

"Having considered the relationship between the risks allegedly concealed and the risks that subsequently materialized," and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged causation.

### B. Violations of Section 20A of the 1934 Act (Insider Trading)

Only one plaintiff, UFCW Pension Fund ("UFCW"), alleges the CD&R Defendants, Williams, Sanger, Owen, and Zimmerman violated Section 20A of the 1934 Act by engaging in insider trading.

The 1934 Act provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a).

To plead a Section 20A cause of action, a plaintiff must allege a requisite independent, predicate violation of the securities law and show that he purchased or sold securities contemporaneously with the purchase or sale of securities that is the subject of the violation. *SeeBeach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at * 5-6 (M.D. Tenn. Mar. 9, 2009) (citing *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D.Tex. 2003)). When an insider trades in his company's stock, he has a duty to

disclose any nonpublic, material information he knows about the company before trading. *J & R Marketing v. Gen. Motors Corp.*, 549 F.3d 384, 398 (6th Cir.2008). Failure to do so constitutes a violation of Section 10(b) of the 1934 Act that can serve as a predicate for a Section 20A claim. *SeeBeach*, 2009 WL 650408, at * 5-6. Section 20A claims "sound in fraud" and must be pleaded with particularity under Fed. R. Civ. P. 9(b). *SeePicard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1130 (W.D. Mich. 1996).

As discussed above, Plaintiffs have sufficiently alleged the Envision Director Defendants knew of EmCare's out-of-network billing strategy. As to CD&R, [17] however, Plaintiffs have not alleged facts creating a strong inference that CD&R had the same information. Plaintiffs conclusively allege that it is "implausible that CD&R, with this level of control and access, would not have been aware of Envision's fundamental business strategies, including upcoding and out-of-network billing." (Pl. Br., Doc. No. 131 at 76). The allegations are based on the following facts: (1) CD&R owned the majority of Envision stock at the time of the February 5, 2014 and July 10, 2014 offerings (Compl., Doc. No. 88, ¶¶ 44, 45); (2) CD&R designated three board members to serve on Envision's board of directors (*Id.* ¶ 43); and (3) the "billing scheme" constituted central business operations of which the directors must have been aware (*Id.* ¶ 154). The Complaint alleges no facts suggesting the CD&R nominated directors communicated information about the "illicit billing scheme," or anything else, to CD&R. Without more, this is not enough to allege CD&R was in possession of insider information at the time of the sales.

**\*26** Moreover, Plaintiffs' assertion that the size and timing of CD&R stock sales are suspicious and an indication that CD&R sold stock while in possession of material, nonpublic information is unpersuasive. First, CD&R is a private equity fund whose sole purpose is to invest in companies and ultimately sell them. (*See* Compl., Doc. No. 88, ¶ 143 n.8). It is, therefore, not suspicious that it would divest itself of stock in large sales. Second, the stock sales took place 7 to 20 months before the first stock price decline, [18] tempering any implication that CD&R had material nonpublic information that would cause a decline in stock price. The stock sales in and of themselves do not raise a strong inference that CD&R was in possession of material nonpublic information.

Defendants Williams, Sanger, Owen, and Zimmerman argue the period of time between their trades and a subsequent UFCW stock purchase is not close enough in time to

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 63 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

be considered contemporaneous. Plaintiffs must plead the "contemporaneous transaction" component with specificity. *SeeIn re Fed. Nat'l Mortg. Ass'n Sec., Derivatives, and ERISA Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007). The statute does not define "contemporaneous," and the courts have varied on how they define the term. *SeeBeach*, 2009 WL 650408, at * 6. Courts have found that contemporaneous means the insider and the plaintiff must have traded anywhere from on the same day, to less than a week, to within a month, to the entire period while relevant and nonpublic information remained undisclosed. *Id.* (citing *In re Enron*, 258 F. Supp. 2d at 599–600 (listing cases)).

UFCW alleges it purchased stock pursuant to Evision public offerings on February 5, 2014, July 10, 2014, September 23, 2014, and March 5, 2015.[19] CD&R, Owen, Sanger, Zimmerman, and Williams each sold stock pursuant to these offerings. The actual transaction dates are sufficiently close in time that, for purposes of the motion to dismiss, the Court finds they are "contemporaneous."

The Court finds that Plaintiffs have not pleaded facts sufficient to allege that the CD&R defendants traded securities while in possession of material, nonpublic information. Accordingly, the claim against CD&R for violation of Section 20A will be dismissed. However, Plaintiffs have alleged facts as to Defendants Williams, Owen, Sanger, and Zimmerman to sufficiently allege they traded on material nonpublic information contemporaneously with UFCW.

**C. Claims Related to the Joint Proxy Registration Statement**

1. Securities Act Claims: Section 11 and Section 12(a)(2)
All Plaintiffs bring claims for violation of Sections 11 and 12(a)(2) of the Securities Act against Envision and the Envision Individual Defendants based on alleged misrepresentations in the Joint Proxy Registration Statement. As with the Section 10(b) and Rule 10b-5 claims discussed above, Plaintiffs assert the Joint Proxy Registration Statement omitted to include EmCare's reliance on out-of-network billing when it attributed "significant organic growth" to "integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs." In addition, Plaintiffs allege Envision and the Envision Individual Defendants claimed Envision would post FY17 EBITDA growth of 14% (to $1.5 billion) and FY18 EBITDA growth

of 13% (to $1.7 billion) and that the Merger was "expected to achieve approximately $100 million in annual synergies by the third year following their completion, in part from operational cost savings and in part from an acceleration in revenue opportunities through the cross-selling of a broader array of offerings to a broader client base."

**\*27** Section 11 places a relatively minimal burden on a plaintiff, imposing liability for securities registration statements containing materially false or misleading statements or omissions of material fact. *J&R Marketing v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008). Liability against the issuer of the security "is virtually absolute, even for innocent misstatements" and, therefore, a plaintiff is not required to plead scienter." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation. *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

A. Applicability of Rule 9(b) to the
Section 11 and Section 12(a)(2) Claims

Defendants argue Plaintiffs 1933 Act claims are based in fraud and, therefore, Plaintiffs must comply with Rule 9(b) and plead these clams with particularity. Defendants argue that Plaintiffs have failed to meet the Rule 9(b) pleading standard because they "fail to mention even one individual, much less include allegations as to who knew what or how or when they knew it" and the Complaint "address[es] the Joint Proxy Registration Statement in conclusory fashion and make[s] no real effort to plead actionable statement or omission." (Def. Reply, Doc. No. 133 at 28).

Plaintiffs claim to have "carefully segregated" these claims from the fraud claims elsewhere in the Complaint and argue they are "not based in fraud," but in Defendants' "failure to make a reasonable investigation or have a reasonable basis to support their projections of continued EBITDA growth in light of the declining rate of out-of-network reimbursement and the risks to Envision's ability to continue relying on out-of-network billing ... to drive growth." (Pl. Br., Doc. No. 131 at 47).

Courts vary in their application of the Rule 9(b) pleading standard to 1933 Act claims. *See e.g., In re Sirrom Cap.Corp.*

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 64 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

*Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (holding that 9(b) does not apply, but that Plaintiffs will not be allowed to allege or attempt to prove fraud in connection with their Section 11 and Section 12 claims); *EveryWare*, 175 F. Supp. 3d at 869-70 (applying the Rule 9(b) heightened pleading standard to Section 11 and 12 claims against some, but not all, defendants).

Rule 9(b) requires that, for claims alleging fraud, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008). "The particularity requirements of Rule 9(b) serve three purposes: (1) to ensure that fraud allegations are concrete enough to give defendants fair notice of the grounds of the complaint; (2) to protect defendants' reputations or goodwill from the harm that comes from being accused of serious wrongdoing; and (3) to inhibit the filing of complaints that are a pretext for the discovery of unknown wrongs or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves."*In re Sirrom Cap.Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (citing *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 591 (E.D. Mich. 1985)).

The Court notes that Plaintiffs are not required to prove fraud to establish a claim under Sections 11 and 12(a)(2) and they have alleged these claims based only on strict liability and negligence. Regardless of whether they were required to do so, the Court finds that the allegations in the Complaint meet the heightened pleading standard. Plaintiffs have provided sufficient detail of the alleged scheme and which statements are alleged to be false to allow defendants to defend the charges, thereby satisfying the purpose of Rule 9(b).

## B. Forward Looking Statements

**\*28** Defendants assert that "all of the statements" in the 2016 Joint Proxy Registration Statement are non-actionable forward-looking statements accompanied by meaningful cautionary language. The 2016 Joint Proxy Registration Statement indicates on the title page that it "contains forward looking statements" and devotes thirteen pages to discussing risk factors associated with the transaction, warning, among other things, that Envision is "subject to decreases in [its] revenue and profit margin under [ ] fee-for-service contracts,

where [it] bear[s] the risk of changes in volume, payor mix and third-party reimbursement rates." (Def. Br., Doc. No. 126 at 18 (citing Doc. No. 127-4 at 36-49)). This cautionary language, Defendants argue, places the Joint Proxy Registration Statement within the PLSRA safe harbor.

Plaintiffs argue the PLSRA safe harbor does not apply to statements in the Joint Proxy Registration Statement because it is an initial public offering ("IPO"), and IPOs are specifically excluded from the PLSRA safe harbor. (Pl. Br., Doc. No. 131 at 64). Further, Plaintiffs argue that, even absent the express statutory carveout, some of the statements are not forward looking and the cautionary language is not meaningful. (*Id.* at 65).

The Court concludes that, for purposes of the motion to dismiss, Plaintiffs have sufficiently alleged the Joint Proxy Registration Statement is misleading based on non-forward-looking statements, specifically those pertaining to the basis of Envision's success and historic contract growth. At this time, the Court does not reach the question of whether the PLSRA safe harbor applies to the Joint Proxy Registration Statement and if it applies, whether it included meaningful cautionary statements. *See supra*, Section III, A., 1., iii.

## C. Statutory Sellers Under Section 12(a)(2) of the 1933 Act

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), imposes liability for selling a security by means of a prospectus or oral communication containing materially false or misleading statements or omissions of material fact. Section 12(a)(2) differs from Section 11 because a plaintiff has standing to bring a claim only against a "statutory seller" from which plaintiff purchased the security at issue. *SeeIn re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 867 (S.D. Ohio 2016). A statutory seller is one who "either transferred title to the purchaser or successfully solicited the transfer for financial gain." *Id.* (citations omitted). In order to state a claim for relief under Section 12(a)(2), the plaintiff must allege that: (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. *In re Morgan Stanley*, 592 F.3d at 360.

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 65 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

Defendants argue that the Envision Individual Defendants are not "statutory sellers" because merely signing the registration statement does not suffice as solicitation for purposes of Section 12(a)(2). (Def. Br., Doc. No. 126 at 56, 57 n. 52). Indeed, most Courts of Appeals have held that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." *SeeCitiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506, 512 (2d Cir. 2010). Notably, in *Citiline*, the court rejected the plaintiffs' contention that signing the registration statement was alone enough to constitute solicitation.

Here, Plaintiffs allege Defendants have done more than sign the registration statement. They allege defendants have "participated in the solicitation of proxies in support of the Merger." (Compl., Doc. No. 88, ¶ 36). In fact, the Joint Proxy Registration Statement states that "each of the boards of directors of AmSurg and Envision are soliciting proxies from their respective common shareholders and stockholders." (Doc. No. 127-4 at 1). While signing the registration may not be sufficient, in this case the registration statement specifically states that the board is "soliciting proxies." At this stage in the litigation, this is sufficient to allege they were in fact engaged in the activity as they claimed. *SeeIn re Prison Realty Securities Litig.*, 117 F. Supp. 2d 681, 691 (M.D. Tenn. 2000). [20]

 **\*29** The Court finds that Plaintiffs have pleaded facts sufficient to state claims under Section 11 and Section 12(a)(2) of the 1933 Act.

### 2. Section 14(a) of the 1934 Act

Plaintiffs assert claims under Section 14(a) of the Exchange Act against Envision, the Envision Individual Defendants and the AmSurg Defendants alleging that as a result of false and misleading statements in the Joint Proxy Registration Statement, shareholders were induced to vote in favor of the Merger. (Compl., Doc. No. 88, ¶ 287). Section 14(a) makes it "unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe ... *to solicit or to permit the use of his name to solicit* any proxy ...." 15 U.S.C. § 78n(a)(1) (emphasis added). Rule 14a–9 makes it unlawful to issue a proxy statement "which omits to state any material fact necessary in order to make the statement therein not false or misleading." 17 C.F.R. § 240.14a– 9(a). Plaintiffs have adequately alleged Defendants solicited proxies for the same reasons stated above. The voting form and cover letter state that the Board of Directors "recommends" the Merger

and that the proxy is "solicited on behalf of the Board of Directors." (Doc. No. 127-4).

The Court finds that Plaintiffs have sufficiently alleged that Envision, the Envision Individual Defendants, and the AmSurg Individual Defendants solicited proxies in support of the merger. *SeeIn re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 293 (S.D.N.Y. 2010) (finding the board of directors solicited proxies "within the plain language of Section 14(a)" when the joint proxy registration statement stated, "This Proxy is Solicited on Behalf of the Board of Directors"). Accordingly, Plaintiffs have sufficiently stated a claim for violation of Section 14(a) of the 1934 Act. [21]

### D. Control Person Liability – Section 20(a) of the 1934 Act and Section 15 of the 1933 Act

When a primary violation of securities law is shown, that provision imposes joint and several liability on "controlling persons." Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

To state a control-person claim, plaintiffs must plead a predicate Section 10(b) violation by a "controlled person," and a "controlling person" must have directly or indirectly controlled the person liable for the Section 10(b) violation. *PR Diamonds*, 364 F.3d at 696. Similarly, liability under Section 15 of the 1933 Act attaches to every person who "controls any person liable under Section 11 or 12." 15 U.S.C. § 77*o*(a).

 **\*30** Whether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage. *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 66 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

650408, at * 6 (M.D. Tenn. Mar. 9, 2009). Moreover, Defendants have not argued they do not meet the standard for controlling person, only that there has been no predicate violation of the Exchange Act or the Securities Act.

As stated above, except as to the CD&R Defendants, the Court finds that Plaintiffs have sufficiently alleged violations of both the 1933 Act and the 1934 Act.

As to CD&R, Plaintiffs allege that CD&R is liable as a control person for the statements in the Joint Proxy Registration Statement claiming that CD&R "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Joint Proxy Registration Statement." (Compl., Doc. No. 88, ¶ 295). In 2016, CD&R owned no Envision stock and did not have the right to nominate members of Envision's Board of Directors, although two of its previous nominees remained on the Board in 2016. (Compl., Doc. No. 88, ¶¶ 9, 43).

The parties disagree on the standard the Court should apply to determine whether Plaintiffs have stated a plausible claim for control person liability. Plaintiffs argue that they are not required to plead "actual control" over Envision. Defendants argue the Court should apply the standard applied by the Sixth Circuit in *Sanders Confectionary Products, Inc. v. Heller Fin. Inc.*, 973 F.2d 474, 486 (6th Cir. 1992). In *Sanders*, the Sixth Circuit did not adopt a test for control, but held that the plaintiff had failed to meet even the least rigorous test. *Id.* The "least rigorous test" applied in *Sanders* required a showing "(1) that the defendant exercised control over the operations of the violator in general and (2) that the defendant possessed the power to control the transaction or activity upon which the primary violation is predicated." *Id.*

The Sixth Circuit again addressed control person liability in *PR Diamonds*, 364 F.3d at 396-97:

> Section 20(a) thus establishes two requirements for a finding of control person liability. First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

*Id.* (citing 17 C.F.R. § 230.405). The court in *PR Diamonds* did not ultimately decide whether the plaintiffs had adequately pleaded control because plaintiffs did not establish an underlying violation. *Id.*

The fact that two of CD&Rs nominees continued as directors on an eight-person board more than 18 months after CD&R had *any* ownership interest in Envision is insufficient to plausibly allege that CD&R controlled or had the ability to control the content of the Joint Proxy Registration Statement. Nor is there any allegation that the two board members continued to act on behalf of CD&R rather than fulfill their fiduciary duties as board members of Envision. *SeePicard Chemical*, 940 F. Supp. at 1136 (holding "formal means of control which have terminated in the past do not constitute a basis for alleging current control").

**\*31** Plaintiffs have failed to state a plausible claim that any of the CD&R defendants were controlling persons of Envision at the time of the issuance of the Joint Proxy Registration Statement. Accordingly, the claim for control person liability against the CD&R defendants is dismissed.

**E. Request to Amend**
In the last section of their response brief, Plaintiffs "request leave to amend the Complaint to cure any defect identified by the Court." (Doc. No. 131 at 74). The Sixth Circuit has held that a request to amend in a response to a motion to dismiss does not constitute a motion within the meaning of Federal Rule of Civil Procedure 15(a). *SeeLouisiana Sch. Employees' Ret. Sys. v. Ernst & Young*, 622 F.3d, 471, 486 (6th Cir. 2004). Accordingly, the request to amend is denied. Plaintiffs may file a properly supported motion if they desire to amend the Complaint.

### IV. CONCLUSION

For the reasons stated, the Motion of the CD&R Defendants to Dismiss the Consolidated Amended Complaint (Doc. No. 122) is **GRANTED**. Defendant Envision Healthcare and the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint (Doc. No. 125) is **GRANTED** in part, and **DENIED** in part.

Count I alleging violations of Section 10(b) Rule 10b-5 will proceed as to Envision, Sanger, and Owen only with regard to the allegations involving out-of-network billing as a basis of

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 67 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

revenue and growth and the performance of certain 2014-15 contracts. Count I claims against Holden and Gulmi will proceed only with regard to the allegations involving out-of-network billing as a basis of revenue and growth in the 2016 Annual Report. Claims alleged in Count I are dismissed as to Williams, Zimmerman, and Eastridge and with regard to allegations of upcoding and improperly increasing hospital admissions and tests and the transition to in-network status.

Count II alleging control person liability by the Envision Individual Defendants and the AmSurg Defendants (except Cigarran, Herr, and Popp) will proceed.

Count III alleging insider trading in violation of Section 20A of the 1934 Act is dismissed against the CD&R Defendants, and will proceed against Williams, Sanger, Owen, and Zimmerman.

Counts IV and V alleging violations of Sections 11 and 12 of the 1933 Act against Envision and the Envision Individual Defendants will proceed.

Counts VI alleging control person liability under Section 15 of the 1933 Act for the Joint Proxy Registration Statement against the Envision Individual Defendants will proceed.

Count VII alleging violation of Section 14(a) of the 1934 Act against Envision, the Envision Individual Defendants, and the AmSurg Individual Defendants will proceed.

Count VIII alleging control person liability under Section 20(a) of the 1934 Act for the Joint Proxy Registration Statement against the CD&R Defendants, the Envision Individual Defendants, and the AmSurg Defendants will proceed as to the Envision Individual Defendants and the AmSurg Individual Defendants. Count VIII against the CD&R Defendants is dismissed.

It is so **ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

## Footnotes

1 Prior to a merger with AMSURG Corp. on December 1, 2016, Envision was Envision Healthcare Holdings. Following the merger, the combined company is Envision Healthcare Corporation. For simplicity, the Court refers to both companies as Envision throughout. For purposes of this motion, the only relevant distinction between the two companies is that the Officers and Directors changed following the merger.

2 Other than listing each of the CD&R defendants in paragraph 43 of the Complaint, Plaintiffs refer to these six defendants throughout the Complaint as "CD&R."

3 The Article is *The Company Behind Many Surprise Emergency Room Bills* by Julie Cresswell, Reed Abelson, Margot Sanger-Katz, NEW YORK TIMES, July 24, 2017 (Doc. No. 127-39). Defendants' exhibit (Doc. No. 127-39) is a printout of the online version of the article. The Article was also published on page A1 of the *New York Times* on July 25, 2017, with the headline: *Costs Shoot Up As a Company Runs the E.R.* The NBER study is *Surprise Out-of-Network Billing for Emergency Care in the United States* by Zack Cooper, Fiona Scott Morton, Nathan Shekita, NBER Working Paper Series, Working Paper 23623, National Bureau of Economic Research, July 2017, *available at* www.nber.org/papers/w23623, (Doc. No. 127-38).

4 Plaintiffs specifically cite discussion of the transition to in-network status at healthcare conferences and on investor phone calls on March 14, March 17 and May 2, 2017. (Compl. Doc. No. 88 at ¶¶ 101, 102, 103.)

5 The statements regarding quality of care are alleged to be misleading because "it was not the quality of care that was driving Envision's reported revenue growth," but rather out-of-network billing and upcoding. (*See* Compl., Doc. No. 88, ¶ 122). Although the Complaint places statements regarding drivers of growth and

statements regarding quality of care in separate categories, the Court finds that Plaintiffs put forth a singular theory as to the misleading nature of all of these statements and will, therefore, consider them together.

6     The NBER study does not claim that out-of-network billing is "illicit." To the contrary, the study notes a wide range of factors, including state laws, considered by the insurer, employers, hospitals, and physicians when deciding whether physicians will enroll in insurance networks.

7     NBER Study at 9.

8     NBER Study at 12.

9     From this point forward, the Court will refer only to allegations regarding out-of-network billing. As discussed, plaintiffs have not provided facts sufficient to plausibly allege Envision engaged in illegal upcoding or improperly increased facility spending. See *supra*, Section III, A.,1, A.

10     EBITDA stands for "earnings before interest, taxes, depreciation, and amortization."

11     The Court agrees however, that not all of the statements included in this section of the complaint have anything to do with "drivers of growth." These statements cannot be said to be misleading for failure to disclose an out-of-network billing strategy to increase revenue.

12     Defendants argue some of the statements in the 2014 preliminary prospectus and all of the statements in 2016 joint proxy registration statement are protected by the safe-harbor as forward-looking statements. (Def. Br., Doc. No. 126 at 27-28). Later, in their reply, Defendants argue that "most of the challenged statements are forward-looking and accompanied by appropriate cautionary language" and that Plaintiffs have not "pled that any statement by any defendant was knowingly false." (Def. Reply, Doc. No. 133 at 19, 19 n.17). Plaintiffs respond, "Most, if not all, of the statements alleged to be misleading under the 1934 Act are not forward-looking." (Pl. Br., Doc. No. 131 at 34).

13     Even if the claims related to the due diligence on the contract were not time barred, the Court finds that the statements about due diligence are not actionable. The statements that Envision has "a very good understanding of the payer mix [and] a great understanding of reimbursement" and is "99% right" in predicting contract performance are nothing more that corporate puffery. No reasonable investor would consider those statements a guarantee that all new contracts would be profitable and statements that the company has a "great understanding" of various aspects of the contract is not a guarantee of faultless due diligence. *SeeCity of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013).

14     Plaintiffs assertion that Envision's December 2017 settlement of a qui tam action related to allegations of conduct in 2008-2012 supports an inference of scienter is unavailing. The conduct underlying the settlement took place two to six year prior to the start of the class period and was not related to the alleged misrepresentations at issue here.

15     Holden and Gulmi would also be liable for any misleading statements they personally made, but the Court did not find any of these statements could be considered materially misleading.

16     Plaintiffs also point to a decline in share price accompanying Envision's September 18, 2017 announcement of organizational changes, following which Envision's share price dropped 10.05%, but there are no allegations that this organizational change was in any way a corrective disclosure.

17     For purposes of this analysis, the Court will treat CD&R as Plaintiffs have – as a singular entity. The Court notes, however, that CD&R is, in fact, six entities. The evidence in the record shows that only the CD&R Funds held Envision stock.

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 69 of 117

In re Envision Healthcare Corporation Securities Litigation, Not Reported in Fed. Supp....
2019 WL 6168254, Fed. Sec. L. Rep. P 100,705

18 The first stock price decline, which occurred in October 2015, is allegedly associated with underperforming contracts, not anything to do with the alleged "billing scheme." Plaintiffs have not alleged any facts to show that CD&R knew of the details of a series of underperforming contracts.

19 The dates are the effective dates of the sales prospectuses.

20 Defendants also argue in a footnote that Plaintiffs lack standing because there were not "purchasers" of securities; they "received shares ... pursuant to the Joint Proxy Registration Statement" and, therefore lack standing to bring a Section 12(a)(2) claim. The case cited in support of this argument, *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y.), dismissed a Section 12(b)(2) claim where the plaintiffs did not allege they purchased shares in the IPO, but instead purchased shares "pursuant to or traceable to" the Prospectus leaving open the possibility of a secondary market transaction. (*Id.* at 588-89). Accordingly, *In re Cosi* is not dispositive of the question of whether "receiving shares" is enough to confer standing for purposes of Section 12(a)(2). Other than the single footnote, the parties have not briefed this question.

21 As stated above, the Court found that Plaintiffs plausibly allege a material misrepresentation regarding the failure to disclose high levels of out-of-network billing. *SeeGoldberg v. Meridor*, 567 F.2d 209, 222 n. 3 (2d Cir. 1977) (the test of materiality under Section 14a-9 and Rule 10b-5 is the same).

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 28

# Case No. 5

2024 WL 1342800
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: KIRKLAND LAKE GOLD
LTD. SECURITIES LITIGATION

20-CV-4953 (JPO)
|
Signed March 29, 2024

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

**\*1** Plaintiff Stephen Brahms, individually and on behalf of all others similarly situated, brings this suit against Kirkland Lake Gold Ltd., a Canadian company that mines and processes gold, Kirkland's CEO, and the former chairman of Kirkland's board of directors (together, "Defendants" or "Kirkland"), for violations of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5. Plaintiff has moved for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3), as well as to exclude the testimony and report of one of Defendants' proposed experts. For the reasons that follow, Plaintiff's amended class certification and *Daubert* motions are denied.

## I. Background

The Court assumes familiarity with the factual and procedural history, as set forth in its September 2021 Opinion and Order. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) (ECF No. 36). As relevant here, the Court granted Defendants' motion to dismiss with respect to all claims except those based on Kirkland CEO Anthony Makuch's statements about acquisitions. *Id.* at \*6 (ECF No. 26 at 14). Plaintiff filed a motion for class certification on January 31, 2023 (ECF No. 66) and an amended class certification motion on March 6, 2023 (ECF No. 76). On March 30, 2023, Defendants filed their opposition. (ECF No. 88; ECF No. 89.) Plaintiff filed a reply memorandum on May 22, 2023. (ECF No. 104; ECF No. 105.) The same day, Plaintiff also filed a motion to exclude the testimony and report of defense expert James Griffin. (ECF No. 108.) On June 5, 2023, Defendants filed

their opposition to Plaintiff's *Daubert* motion (ECF No. 115; ECF No. 116), and Plaintiff filed his reply memorandum on June 12, 2023 (ECF No. 121; ECF No. 122). On October 5, 2023, the Court held oral argument on the amended motion for class certification and the *Daubert* motion. (ECF No. 146.)

## II. Motion to Exclude
The Court first addresses Plaintiff's motion to exclude the testimony and expert report of James Griffin. Plaintiff seeks to exclude Griffin's testimony and report on the grounds that Griffin is unqualified and that his testimony is irrelevant and unreliable. (ECF No. 109 at 6-15.)

### A. Legal Standard
The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert who is "qualified ... by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data," and is "the product of reliable principles and methods," reliably applied to the facts of the case. Fed. R. Evid. 702. And these factors, in turn, largely have their origins in *Daubert*, in which the Supreme Court held that the district court bears a critical gatekeeping function in assessing the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993). "The district court has broad discretion to carry out [its] gatekeeping function. Its inquiry is necessarily a 'flexible one,' and the types of factors that are appropriate to consider will 'depend[ ] upon the particular circumstances of the particular case at issue.' " *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

**\*2** "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018); *see Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005).

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited

dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *see also Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) ("[T]he Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020). "[C]ourts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.' " *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)).

Accordingly, the Court here applies a *Daubert* analysis to the extent that Plaintiff seeks to exclude testimony relevant to the pending class certification motion. However, "the 'scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.' " *Bowling*, 2019 WL 1760162, at *7 (quoting *Chen-Oster v. Goldman Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)); *see In re LIBOR*, 299 F. Supp. 3d at 471 ("The question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." (quoting *Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013))); *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker.").

Defendants offer James Griffin as "a mining industry expert" to opine on "whether Defendants have shown a lack of price impact for the alleged misstatements at the heart of the case." (ECF No. 115 at 6.) Specifically, Griffin offers three expert opinions. First, Griffin opines that because "[m]ining is a self-depleting business model," both organic growth and mergers and acquisitions (M&A) are "complementary" and irreplaceable strategies for "a company's growth potential." (ECF No. 91-1 ¶ 17(a).) Industry observers and practitioners, therefore, would expect gold mining companies to be "generally on the lookout for M&A opportunities as they arise." (*Id.*) Second, Griffin

offers the opinion that if the financial market understood Makuch's January 25 and February 22, 2019 statements "to mean that Kirkland would no longer consider any potential M&A opportunities, [he] would not have expected a positive price impact on Kirkland's stock price as a result of these statements." (*Id.* ¶ 17(b).) Third, Griffin opines that if the market understood Makuch's January 14, 2019 statement "to reflect that Kirkland had set certain minimum standards that must be met for Kirkland to consider a potential acquisition, based on [his] experience and expertise, [he] would not have expected a positive impact on Kirkland's stock price as a result of this statement." (*Id.* ¶ 17(c).)

**\*3** Plaintiff moves to exclude Griffin's expert report on the grounds (1) that Griffin is not qualified to render an expert opinion, (2) that Griffin's testimony is irrelevant, and (3) that Griffin's opinions are unreliable. (ECF No. 109 at 6-15.) In his filings, Plaintiff focuses his attacks on the second and third of Griffin's opinions. Because Plaintiff offers the same arguments to justify the exclusion of both opinions, the Court addresses the admissibility of Griffin's opinions together rather than separately.

### B. Discussion

#### 1. Qualifications

The Court begins with the first step of the Rule 702 inquiry: whether Griffin is qualified as an expert. To answer this question, the Court must first "examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702— knowledge, skill, experience, training, or education—with respect to a relevant field." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "[A]ny one of these five forms of qualifications will satisfy the rule." *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007). "[A] lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004). Second, courts must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004), and ensure that the expert will actually be testifying "on issues or subject matter within his or her area of expertise," *Haimdas v. Haimdas,* No. 09-CV-2034, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22,

2010) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997)).

Defendants offer Griffin as a mining industry expert based on his degree in mining engineering and his over 40 years of experience in the mining industry, including executive and consultancy roles. He has also worked over 25 years as an investment banker, advising gold and other mining companies on M&A. Plaintiff attacks Griffin's qualifications by arguing that his experience is primarily in coal mining and that he lacks experience specifically in gold mining. Plaintiff further argues that Griffin also lacks the expertise to opine on stock price movements, comparing him unfavorably to Plaintiff's own economics expert, Dr. Steven Feinstein, who holds a Ph.D. in economics and works on issues of market efficiency and price impact.

Based on the totality of his background, the Court determines that Griffin is qualified as a mining industry expert. Griffin is not being offered as an economics expert, and Defendants have offered a separate economics expert to rebut Feinstein's report. Instead, Defendants offer Griffin to opine on how gold mining industry observers and participants would have interpreted Makuch's statements. Plaintiff's critique also understates Griffin's gold mining experience: Griffin has worked on M&A issues related to gold and has worked for gold mining clients. The observation that Griffin's experience has been focused on the coal mining industry, and not primarily on the gold industry, goes, at most, to the weight rather than admissibility of his testimony. The Court, therefore, concludes that Griffin is qualified based on the totality of his education, knowledge, and experience.

The Court also determines that Griffin's background qualifies him to opine on how financial markets would have interpreted Makuch's statements. Griffin is not offering a quantitative analysis of price impact or stock price movements, which is covered by the parties' dueling economics experts. Instead, relying on his industry experience, Griffin opines on how investors would have broadly reacted to Kirkland's statements. Griffin's decades of experience working on M&A related to mining, including gold mining, sufficiently qualify him to testify as an expert on how the reaction of industry observers, analysts, and investors to Kirkland's statements would have broadly affected the stock price. The Court understands the scope of Griffin's expertise and would be capable of weighing his opinions accordingly for the purposes of the class certification motion.

**2. Reliability**

**\*4** The Court now turns to the second step of the Rule 702 inquiry: whether Griffin's report has a sufficiently reliable foundation. "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.' " *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). In *Daubert*, the Supreme Court set forth a list of non-exclusive factors for courts to apply to the reliability inquiry:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-594) (internal citations and quotation marks omitted). These factors, however, "do *not* constitute a definitive checklist." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999). Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Plaintiff argues that Griffin's opinions are not reliable because they are merely statements of subjective belief and speculation, without any objective standards or supporting data. Plaintiff further contends that Griffin did not reliably apply his methodology to the case and that his opinions are based on only generalities about the mining industry as a whole rather than an assessment of the facts of the case. These arguments are unavailing.

First, Plaintiff appears to be applying reliability requirements for scientific or technical testimony rather than experiential testimony, which is subject a less rigid standard. *See, e.g., Gabel v. Richard Spears Kibbe & Orbe, LLP*, No. 07-CV-11031, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) (observing that "testimony from the realm of a person's professional experience ... does not readily lend itself to the *Daubert* framework does not render it inadmissible"). "Where, as here, an expert's opinion is based on the expert's experience, courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co.*, No. 04-CV-2592, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007). In this case, the Court determines that there is a rational relationship between Griffin's decades of mining industry experience and his opinions, which concern industry custom, practices, and perceptions.

Second, contrary to Plaintiff's argument that Griffin's conclusions are purely speculative and subjective, Griffin has set forth a logical chain of reasoning that supports his opinions. Griffin opines that industry practitioners and observers have expectations that a gold mining company would pursue M&A opportunities because of the "self-depleting business model" of the industry. (ECF No. 91-1 ¶ 17(a).) Griffin's second and third opinions are logical conclusions from this starting premise and Griffin's understanding of how investors would react when their expectations are frustrated. (*See id.* ¶¶ 17(a)-(b).) The Court understands that Griffin's opinions are based upon his practical experience working on M&A issues in the industry, and not a data-driven financial model, and would be capable of weighing his opinions accordingly. Finally, Griffin's opinions are sufficiently grounded in the facts of the case—specifically, an analysis of Kirkland's business strategy and historic reliance on M&A for growth. (*See id.* ¶¶ 56-61, 69.) Accordingly, the Court concludes that Griffin's opinions have a sufficiently reliable foundation under Rule 702.

### 3. Relevance and Assistance to the Trier of Fact

 **\*5**  The Court now addresses the final step of the Rule 702 inquiry: whether the expert testimony will assist the trier of fact. This inquiry "goes primarily to relevance." *Daubert*, 509 U.S. at 591. The Second Circuit has instructed "trial court[s] [to] look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant." *Amorgianos*, 303 F.3d at 265. Federal Rule of Evidence 401 provides that

"[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Plaintiff argues that Griffin's opinions are irrelevant because Griffin did not perform an event study or other quantitative analysis of Kirkland's share price movements. Plaintiff thus contends that Griffin's opinions do not make the fact at issue—whether Makuch's statements affected the stock price—more or less likely. Once again, Plaintiff's arguments go to weight rather than admissibility. As already discussed above, Defendants offer Griffin as a mining industry expert, not an economics expert. The relevance of Griffin's experience-based report is two-fold. First, Griffin's opinions would assist the Court's understanding of how Makuch's statements fit into the customary practices of the mining industry. Second, the opinions would aid the Court in understanding how financial markets would have practically interpreted and reacted to the statements at issue. Accordingly, the Court concludes that Griffin's opinions are relevant to the evaluation of Plaintiff's price impact theory.

Because all of Plaintiff's objections to Griffin's expert report at most go to weight and not admissibility, the motion to exclude is denied.

## III. Motion for Class Certification

### A. Legal Standard

To obtain certification of a class pursuant to Rule 23(b)(3), a plaintiff must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). Fed. R. Civ. P. 23(a). A plaintiff must also meet two additional showings: "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) (citing Fed. R. Civ. P. 23(b)(3)). The party seeking class certification must "affirmatively demonstrate" compliance with each of those requirements "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal citation and quotation marks omitted).

### B. Discussion

To certify a class, the Court must conduct a "rigorous analysis" to determine that Rule 23's requirements have been

satisfied. *Comcast Corp.*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Here, that includes Rule 23(b)(3)'s requirement of predominance, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court's analysis begins and ends with the issue of predominance. "Because the Court concludes that Plaintiffs have not adequately demonstrated predominance, it need not address the other [Rule 23] requirements." *Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445, 2019 WL 3812063, at *9 (S.D.N.Y. Aug. 14, 2019).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action," which in a private securities-fraud claim includes "reliance upon the misrepresentation or omission." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that plaintiffs in securities fraud class actions can establish a class-wide presumption that investors relied on any misrepresentations reflected in a security's market price. As the Second Circuit recently summarized in *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc. (ATRS),* 77 F.4th 74 (2d Cir. 2023):

> **\*6** The *Basic* presumption excuses classes of securities fraud plaintiffs from proving that each class member individually relied upon a defendant's alleged misrepresentations. Courts can instead presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock.

*Id.* at 80.

The *Basic* presumption of class-wide reliance is rebuttable. "[D]efendants can rebut the presumption and defeat class certification by demonstrating, by a preponderance of the

evidence, that the misrepresentations did not actually affect, or impact, the market price of the stock." *Id.* Therefore, while a plaintiff's "satisfaction of *Basic*'s prerequisites serves as an 'indirect proxy' for a showing of price impact," *id.* at 86 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278-81 (2014)), "an indirect proxy should not preclude ... a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply," *Halliburton*, 573 U.S. at 281-82. Here, Defendants do not dispute Plaintiff's satisfaction of *Basic*'s prerequisites and instead seek to rebut the *Basic* presumption of reliance by offering evidence that the alleged misrepresentations did not impact Kirkland's stock price.

A threshold question for the Court is determining Plaintiff's theory of price impact. Plaintiffs can either plead a price-inflation theory—alleging that a misrepresentation inflated the stock price—or an inflation-maintenance theory—alleging that a misrepresentation maintained inflation already built into the stock price. *ATRS*, 77 F.4th at 80. Here, it is undisputed that none of the three alleged misrepresentations caused a statistically significant increase in Kirkland's stock price, and Plaintiff offers arguments premised on an inflation-maintenance theory. (*See* ECF No. 88 at 23, 26; ECF No. 105 at 13-16.) Furthermore, Plaintiff's expert submissions make clear that Plaintiff is proceeding with an inflation-maintenance theory. (*See* ECF No. 107-1.) Accordingly, the Court analyzes this case under an inflation-maintenance framework.

In an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick. Instead, the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price. Simply put, the theory goes: back-end price drop equals front-end inflation." *ATRS*, 77 F.4th at 80. As the Supreme Court recently observed, however, the "inference ... that the back-end price drop equals front-end inflation ... starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123.

Accordingly, courts must undertake a mismatch inquiry in price-maintenance cases to determine "whether there is

a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11. This inquiry requires "a closer fit (even if not precise) between the front- and back-end statements" than courts have required when analyzing the loss causation element of securities fraud. *Id.* "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (internal citation and quotation marks omitted).

**\*7** One way, but the not the only way, there could be a mismatch is in situations "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.,* 'our fourth quarter earnings did not meet expectations')." *Id.* at 123. "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

The Second Circuit recently provided guidance on how courts should conduct "a searching price impact analysis" in the specific scenario where (1) "there is a considerable gap" in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission. *ATRS*, 77 F.4th at 102. First, courts must determine how generic the alleged misrepresentations are and whether there is a gap in specificity between the corrective disclosures and the earlier statements. *Id.* at 93. Second, if there is a gap, courts must then "ask ... whether a truthful—but equally generic —substitute for the alleged misrepresentation would have impacted the stock price." *Id.* at 102 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)). Because "the value of the back-end proxy, given the gap in specificity, will be diminished" in this scenario, "courts should consider other indirect evidence of price impact." *Id.* Based on this analysis, the court must ultimately "find whether the defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements did not in fact impact the price of the stock." *Id.* at 103.

In its September 2021 Opinion and Order, the Court narrowed this case to three public remarks made by Makuch that allegedly misled investors about Kirkland's plans to acquire Detour, a Canadian gold mining company. *Kirkland*,

2021 WL 4482151 at \*6 (ECF No. 36 at 14). These remarks comprise a January 25, 2019 statement and a February 21, 2019 statement regarding Kirkland's focus on organic growth (the "M&A Statements") (ECF No. 25 ("AC") ¶¶ 45, 53), as well as a January 14, 2019 statement describing the production levels and costs targets that Kirkland would apply in assessing a potential asset acquisition (the "Minimum Standards Statement") (*id.* ¶ 39). The "corrective disclosure" to the three alleged misstatements was Kirkland's announcement on November 25, 2019, of its acquisition of Detour. (*Id.* ¶ 68.) Applying the inflation-maintenance framework for analyzing price impact, the Court first addresses the M&A Statements before turning to the Minimum Standards Statement.

### 1. M&A Statements

Makuch made the first of the two M&A Statements at an institutional investor conference on January 25, 2019. In response to a question from an analyst about potential M&A activity in 2019 to leverage Kirkland's share price, Makuch said:

> Well, I think, first off, you look at our organic growth strategy and what we're doing, I mean, we're where we have the ability to grow by 275,000 ounces. Currently, we're just the size of some mid-tier juniors. There's a lot of companies talking about the noncore assets in those levels. But we have it internally, we don't have to pay for it and we could finance it. And then if I lead into [ ] what we think might be happening in 2023 onward, we still have some significant organic growth in the company.

> **\*8** So, to do—to use our paper just to—for this to grow, we don't need to do that to grow. We have internal growth, and we're really financing our internal—we're growing the company through diamond drill bit, through development, and through lowering unit cost and improvements.

(AC ¶ 45.) Makuch made the second M&A Statement in a February 21, 2019 earnings call. Replying to an analyst's question about M&A, Makuch said:

> [G]oing forward, I mean, we still see some significant growth and we talk about going to million ounces this year ... So that's the number one driver of our growth instead of going out and

trying to buy that kind of company. We're going to continue to grow with the diamond drill bit. We want to continue to grow with development of our own assets and organically, and then we're going to look seriously at how we give value back to our shareholders.

(*Id.* ¶ 53.) The alleged "corrective disclosure" to these statements came in the form of Kirkland's announcement on November 25, 2019 that it was acquiring Detour in an all-stock deal valued at $3.68 billion. Kirkland's share price declined 17% that day. (*See id.* ¶¶ 6, 68.)

Applying the Second Circuit's recent guidance, the Court first addresses the "baseline question: how generic are the alleged misrepresentations?" *See ATRS*, 77 F.4th at 93. Although the M&A Statements may be more specific in character than the Supreme Court's prototype, *see Goldman*, 594 U.S. at 123, or some of the more platitudinous statements at issue in *ATRS, see* 77 F.4th at 82, the Court nonetheless finds that the alleged misrepresentations are fairly broad and generic statements about the company's growth strategy. In the statements, Makuch broadly discussed Kirkland's goals and focus, which prioritized organic growth over M&A activity: "[T]hat's the number one driver of our growth instead of going out and trying to buy that kind of company." (AC ¶ 53.) Looking out to 2023 and beyond, Makuch also forecast that "we still have some significant organic growth in the company." (*Id.* ¶ 45.) Significantly, neither statement specifically ruled out considering acquisitions in the future, and Makuch's statements about Kirkland not needing M&A for growth did not go much beyond broad generalities.

Comparing the M&A Statements with the Detour acquisition announcement, the Court finds a considerable gap in genericness between the earlier statements and the corrective disclosure. Makuch's broad statements about Kirkland's focus on internal growth are far more generic than the announcement of a specific all-stock acquisition of a specific mine, with unique characteristics, nine months later, at a particular valuation. The Court also finds that the other prerequisites to triggering the searching price analysis required by *ATRS* are satisfied: the Detour announcement did not directly refer to the M&A Statements, and Plaintiff is effectively claiming that the earlier statements were misleading by omission. *See ATRS*, 77 F.4th at 102.

Accordingly, the Court proceeds with the next step of the analysis: asking "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id.* The Court finds that the record does not support Plaintiff's initially pleaded theory that Kirkland was actively negotiating with Detour at the time of the three alleged misstatements in January and February 2019. Instead, the record evidence shows that although Kirkland conducted diligence of Detour in late 2018, discussions between Kirkland and Detour ended in 2018 and did not resume until the summer of 2019—months after the alleged misstatements. (*See* ECF No. 89 at 12-13.) Therefore, a truthful, but equally generic, substitute for the M&A Statements would be: "Although we are focused on delivering significant organic growth, we are also considering external growth through M&A."

**\*9** Having reviewed and considered all the evidence and expert submissions, the Court concludes, by a preponderance of the evidence, that a truthful, but equally generic, substitute for the M&A Statements would not have impacted the stock price. Perhaps the most probative evidence on this question comes from a June 2019 statement in which Kirkland announced that it had opened a "Deal Room" and invited potential acquisition candidates and partners to submit information through an online portal. (*See* ECF No. 91-4 ¶¶ 53-54.) The Deal Room announcement is even more specific about Kirkland's openness to M&A activity than the Court's substitute statement, and it is undisputed that the June 2019 statement did not cause a statistically significant decline in Kirkland's share price. (*See id.* ¶ 57; ECF No. 107-1 at ¶ 17.)

Evidence from contemporaneous analyst reports also supports the absence of price impact. "[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions." *ATRS*, 77 F.4th at 104. Accordingly, the Court considers analyst statements to help determine whether the market relied upon the M&A Statements to infer that Kirkland was not pursuing M&A. The record shows that no analysts referenced or discussed either of the M&A Statements at all—let alone drew the inference that Kirkland was not considering acquisitions. (ECF No. 91-4 ¶¶ 48, 52.) In contrast, market commentary throughout the class period shows that multiple analysts reported on Kirkland's potential to pursue M&A, including noting specific factors that could drive the company toward acquisitions. (*Id.* ¶ 96 & n.155.)

The report of the defense expert, James Griffin, provides further support for the conclusion that the M&A Statements did not have a price impact. Drawing on his experience in the mining industry, Griffin observes that "[m]ining is a self-depleting business model." (ECF No. 91-1 at ¶ 17(a).) Simply put, "a mining company must replace the ore reserves it is extracting in order to simply maintain its production profile and future mine life." (*Id.*) And if a company wants to achieve long-growth growth, "it must also obtain control of incremental ore reserves through exploration and acquisitions." (*Id.*) Griffin states that organic growth and M&A are "complementary" strategies for mining companies, "and no single one can replace the other without hurting a company's growth potential." (*Id.*) On this basis, Griffin opines that "[a] statement by the CEO of a gold mining company that it would not consider M&A opportunities"—which is how Plaintiff interprets Makuch's statements—"would have signaled to the market that the company was placing self-imposed restrictions on potential growth companies. Therefore, I would not expect such a statement to have had a positive price impact." (*Id.* ¶ 17(b).) Based on Griffin's extensive experience in mining and M&A, the Court credits Griffin's expert conclusions to the extent that he is opining on how market participants would have perceived and reacted to a statement that Kirkland was not considering M&A.

The defense's economics expert, Dr. Jennifer Marietta-Westberg, has also offered evidence supporting alternative explanations for the stock decline following the Detour announcement. The academic literature shows that negative stock price reactions are associated with stock-financed deals—like the Detour acquisition—because the market interprets the use of stock as a signal that the acquiring company's stock was overvalued. (ECF No. 91-4 ¶¶ 67-70.) Kirkland's shareholders also expressed concern that the Detour acquisition was a sign that Kirkland's flagship Fosterville mine was underperforming. (*Id.* ¶¶ 72-75.) Analysts also expressed concern that Kirkland, which focused on underground mines, lacked experience operating open-pit mines like Detour's. (*Id.* ¶ 77.) The Court acknowledges that Marietta-Westberg presented this analysis in her critique of the damages methodology offered by Plaintiff's expert and that she did not perform a quantitative analysis disaggregating the factors that caused the price decline. Accordingly, the Court credits Marietta-Westberg's analysis to the extent that it offers credible, but potential, alternative explanations for the price decline.

**\*10** Plaintiff's economics expert, Dr. Steven Feinstein, has offered his own report as well as a rebuttal to Marietta-Westberg. (ECF No. 69-1; ECF No. 107-1.) In his report, Feinstein determines that Kirkland's shares traded in an efficient market throughout the class period (ECF No. 69-1 ¶¶ 17-20)—a conclusion that Defendants do not dispute. Feinstein also proposes a class-wide methodology for calculating the damages stemming from the alleged misstatements, but the report itself does not calculate damages. (*Id.* ¶¶ 154-165.) Specifically on the question of price impact, Feinstein argues that Marietta-Westberg's finding that Kirkland's stock price did not experience a statistically significant decline after the June 2019 Deal Room announcement should be given no weight in the Court's analysis because non-significance is "not proof of no price impact." (ECF No. 107-1 ¶ 17.) Feinstein's contention fatally misunderstands the analytical framework for inflation-maintenance cases. It is true that, under an inflation-maintenance theory, the alleged misrepresentations would not cause a statistically significant increase in share price. Because there are no visible price movements, courts have to seek out indirect proxies for the alleged inflation. That is why the Second Circuit has instructed courts, in cases like this one, to ask "whether an equally generic, truthful substitute would have *dissipated* inflation." *ATRS*, 77 F.4th at 99 (emphasis added). In this case, the June 2019 Deal Room announcement is serving as the closest real-world proxy for the generic, but truthful, substitute for the M&A Statements. Under an inflation-maintenance theory, the June 2019 Deal Room announcement would have dissipated the artificial inflation built into the share price. The undisputed finding that the June 2019 announcement was not followed by a statistically significant decline in share price is, therefore, probative of the absence of price impact.

More generally, Feinstein opines that "the alleged misrepresentations may have introduced artificial inflation into the stock price without moving the stock price when made." (ECF No. 107-1 ¶ 56.) That is a modest conclusion as far as it goes, as it simply restates the theory of inflation maintenance. Once again, it is precisely because inflation maintenance is not directly measurable that courts have to resort to indirect proxies to assess price impact.

Even more crucially, Feinstein's price impact analysis is undermined by his factual assumptions. Feinstein opines: "Misrepresentations consistent with prior understandings and expectations, and concealment of information consistent with those prior understandings and expectations[,] would

generally not cause the stock price to move when made, but will cause inflation nonetheless by propping up the price of the stock." (*Id.* ¶ 51.) He further opines that "nonsignificant movement on the alleged misrepresentation dates is reasonably congruent with investors' prior understanding and expectations about Kirkland." (*Id.* ¶ 53.) Feinstein's confusion arises when he bases his understanding of Kirkland investors' prior expectations on the assumption that the factual allegations contained in the Complaint are completely true (*see id.* ¶¶ 66-71)—even those allegations that have subsequently been disproven. For example, Feinstein expressly relies upon Plaintiff's allegation that Kirkland "was actively considering acquiring Detour at the time of Makuch's statements" (*id.* ¶ 56), even though, as discussed above, the allegation of contemporaneous falsity is now contradicted by the record and has effectively been abandoned by Plaintiff. Feinstein cites the Court's September 2021 Opinion and Order for the proposition that "the Court determined that Plaintiff sufficiently pled that investors were misled by the Company's alleged misrepresentations and omissions" (*id.* ¶ 67)—without recognizing that the Court had to assume the truth of the allegations at the motion-to-dismiss stage. In effect, Feinstein's opinion on price impact is akin to this statement: "The available evidence is consistent with an inflation-maintenance theory, assuming Plaintiff's factual allegations are true, even those that may have disproven by the record." The Court, therefore, affords Feinstein's price impact opinion the modest credit that it is due.

Based on the weight of evidence and expert submissions, the Court finds that a truthful, but equally generic, substitute for the M&A Statements would not have impacted Kirkland's share price. Accordingly, Defendants have demonstrated, by a preponderance of the evidence, that the two M&A Statements did not actually affect or impact the share price. Defendants have therefore rebutted the *Basic* presumption of reliance.

### 2. Minimum Standards Statement

Makuch made the Minimum Standards Statement in a January 14, 2019 meeting with analysts and investors:

> [S]o we're never going to [ ] not look if somebody has some noncore assets for sale. But you've got to recognize why are they for sale, and we have—we've set some standards in terms of Kirkland Lake Gold. Minimum production levels has to be over 100,000 ounces, it has to be meaningful level. I might even say more than 100,000 ounces but it's got to be meaningful level of production. Talk about cas[h] cost of $650 an ounce or under you can get from that asset; and all-in sustaining cost of $950 an ounce or under. I mentioned that those two numbers are important because you can't let the cash cost get too high because you have to have money available to invest in new equipment, to invest in infrastructure, to invest in exploration—in sustainable exploration to maintain the business. So, that's important to us. And we need to see that. As we need to stay at $950 because we have to have a minimum return and minimum risk on the company and if we talk about a 15% hurdle rate, then we're kind of good to $1.050 gold.

**\*11** (AC ¶ 39.) As with the M&A Statements, the "corrective disclosure" was Kirkland's November 2019 announcement of the Detour acquisition.

Once again, the Court begins its analysis by assessing the genericness of the alleged misstatement. Compared with the two M&A Statements and the Supreme Court and Second Circuit prototypes, the Minimum Standards Statements is quite specific. In this statement, Makuch announced specific numerical targets for production levels and costs for potential acquisition targets. Because the specificity of the Minimum Standards Statement allows for a more direct, apples-to-apples comparison with the corrective disclosure, the Court determines that the "truthful, but equally generic" inquiry is unnecessary and inappropriate for this statement. But that does not end the analysis, as a gap in specificity is not the only way there could be a mismatch between the two statements. Under Second Circuit precedent, the Court must still undertake an inquiry comparing the two statements to determine "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11.

Based on a review of the record evidence, the Court determines that there is a substantive mismatch between the Minimum Standards Statement and the Detour acquisition announcement. The Court's analysis turns on a resolution of the parties' competing interpretations of the Minimum Standards Statement. Plaintiff contends that the statement announces specific performance targets—specifically, a cash cost of $650 per ounce or lower, an all-in sustaining cost of $950 per ounce or lower, and quarterly production of 100,000 ounces—for a mine *at the time of acquisition.* (*See* AC ¶¶ 39-40.) Defendants, meanwhile, interpret the performance targets as future metrics applying *over the life of the mine.* (ECF No. 88 at 12-13.) It is undisputed that Detour's all-in sustaining cost exceeded the minimum standard of $950 an ounce at the time of the acquisition, but it is also undisputed that Detour met all three performance metrics by the third quarter of 2021. (*See* ECF No. 91-4 ¶ 38.) The weight of the evidence supports Defendants' interpretation. In an earlier earnings call on October 31, 2018, Makuch discussed the same performance metrics for potential acquisitions:

> [O]ur goal ... in terms of objective of what is a Kirkland lake asset, first off, it has to be a mine that has significant production ... it needs to be a large production similar to what we may be getting annually currently at Macassa and/or Fosterville. And you have to see cash costs below $650 an ounce and all-in sustaining costs below $950 an ounce *over the life of [the] mine[.]*

(*Id.* ¶ 37) (emphasis added). In response to a follow-up question on the same call, Makuch repeated the cost metrics: "[M]aybe in a nutshell, I'd probably say—if I say $650 an ounce cash cost [and] $950 all-in sustaining [cost], it gives you a sense at a minimum of what we want to look for." (*Id.*) Defendants have also adduced evidence of other Kirkland statements from the class period that strongly suggest that the same three performance metrics were long-term goals for acquisition targets. (*Id.* ¶ 37 n. 49.) This future-oriented interpretation is consistent with Makuch's words in the M&A Statement that the cost metrics are what he would want to "get from that asset." (AC ¶ 39.) As the Minimum Standards Statement referred to future targets, rather than rigid requirements at the time of acquisition, there is a mismatch in content between the statement and the corrective

disclosure under Plaintiff's inflation-maintenance theory. Because of this substantive mismatch, the "inference ... that the back-end price drop equals front-end inflation ... starts to break down," *Goldman*, 594 U.S. at 123, and the court must examine all probative evidence in assessing price impact, *see id.* at 122.

**\*12** As with the M&A Statements, evidence from market commentary during the relevant period supports the absence of price impact. Three analysts who covered the January 14, 2019 investor day referred to the Minimum Standards Statement, but none of them indicated that it factored into their valuation of Kirkland's stock. (ECF No. 91-4 ¶ 42.) Furthermore, no analyst who covered the Detour acquisition referred back to the Minimum Standards Statements to state that Detour's failure to meet those targets resulted in the decline in share price. (*Id.*) Although analysts at the time did comment that Detour had higher costs than Kirkland, "commentary touching upon only the same subject matter ... cannot be enough." *ATRS*, 77 F.4th at 74.

Griffin's expert report also supports the conclusion that the M&A Statement did not impact the share price. Griffin opines that if markets had understood the M&A Statement as setting "certain minimum standards that must be met for Kirkland to consider a potential acquisition, ... [he] would not have expected a positive impact on Kirkland's stock price." (ECF No. 91-1 ¶ 17(c).) Griffin arrives at this conclusion because "[a] statement by the CEO of a gold mining company that the company would only target already high-performing mines would have signaled that Kirkland was limiting itself from pursing value-enhancing deals." (*Id.*) As with his opinions on the M&A Statements, the Court credits Griffin's conclusion to the extent he is opining based on his understanding of how markets would have reacted to such a statement. Meanwhile, for the reasons discussed in relation to the M&A Statements, the Court finds Feinstein's expert opinions to be of little probative value on the subject of price impact.

Based on the substantive mismatch between the alleged misrepresentation and the corrective disclosure, as well as the weight of the other probative evidence, the Court finds, by a preponderance of the evidence, that Defendants have "sever[ed] the link between back-end price drop and front-end misrepresentation." *ATRS*, 77 F.4th at 104. Accordingly, Defendants have successfully rebutted the *Basic* presumption of reliance on the M&A Statement.

2024 WL 1342800

Because Defendants have rebutted the *Basic* presumption of reliance on all three statements, Plaintiff has not adequately demonstrated predominance, as required by Rule 23(b)(3). Class certification is therefore denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to exclude the testimony and report of defense expert James Griffin

is DENIED, and Plaintiff's amended motion for class certification is DENIED.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 1342800

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# Case No. 6

2023 WL 11643704
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

Mei PANG, Individually and on Behalf of
All Others Similarly Situated Plaintiffs,
v.
Michael LEVITT, Michael Trzupek,
and Denise Sterling, et al. Defendants.

No. 1:22-cv-01191-DAE
|
Signed December 20, 2023

**Attorneys and Law Firms**

Charles H. Linehan, Pro Hac Vice, Frank R. Cruz, Pro Hac Vice, Pavithra Rajesh, Pro Hac Vice, Glancy Prongay & Murray LLP, Los Angeles, CA, Stuart L. Cochran, Condon Tobin Sladek Thornton Nerenberg, Dallas, TX, Bruce W. Steckler, Steckler Wayne Cherry & Love PLLC, Dallas, TX, for Plaintiff Mei Pang.

Brian Schall, Pro Hac Vice, The Schall Law Firm, Los Angeles, CA, Joshua Baker, The Rosen Law Firm, P.A., Jenkintown, PA, Laurence Rosen, Pro Hac Vice, Phillip Kim, Pro Hac Vice, The Rosen Law Firm, New York, NY, Stuart L. Cochran, Condon Tobin Sladek Thornton Nerenberg, Dallas, TX, for Plaintiff Morgan Hoffman.

J. Alexander Hood, II, Pro Hac Vice, Jeremy A. Lieberman, Pro Hac Vice, Pomerantz LLP, New York, NY, Willie C. Briscoe, The Briscoe Law Firm, Dallas, TX, for Plaintiff David Hughes.

Brenna D. Nelinson, Pro Hac Vice, Jesse Bernstein, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, John Franklin Bash, Quinn, Emanuel, Urquhart & Sullivan, LLP, Austin, TX, John B. Quinn, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

David Alan Ezra, Senior United States District Judge

**\*1** Before the Court is (1) a Motion to Dismiss filed on June 20, 2023, by Defendants Michael Levitt, Michael

Trzupek, Denise Sterling, Darin Feinstein, Brian Neville, Jarvis Hollingsworth, Matt Minnis, Stacie Olivares, Kneeland Youngblood, Patrick C. Eilers, Theodore J. Brombach, Paul Gaynor, Paul Dabbar, Colleen Sullivan, and Scott Widham ("Defendants"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. # 65); and (2) a Motion to Strike portions of Defendants' Reply memorandum. (Dkt. # 70). On August 11, 2023, Plaintiffs filed a response to Defendants' Motion to Dismiss (Dkt. # 67). On September 18, 2023, Defendants replied. (Dkt. # 69). On September 28, 2023, Defendants responded to the Motion to Strike. (Dkt. # 71). The Court finds these matters suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and against the motions, the Court (1) **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 65); and (2) **DENIES** Plaintiffs' Motion to Strike (Dkt. # 70) for the following reasons.

BACKGROUND

Core Scientific, Inc. ("Core") is a prominent player in the digital asset mining sector, specializing in Bitcoin. (Dkt. # 62 at ¶ 5.) The company leverages a vast fleet of specialized computing machines, known as miners, to tackle intricate cryptographic algorithms. This results in the generation of cryptocurrencies, with Bitcoin as the primary focus. (Id.) Core offers critical infrastructure for cryptocurrency mining. The infrastructure encompasses both self-mining where it mines digital assets for its own account, and hosts services tailored for third-party miners. (Id. at ¶ 6.)

Core's operations are intrinsically tied to the volatile cryptocurrency market. Fluctuations in cryptocurrency prices, particularly Bitcoin, significantly impact its operations and financial performance. (Id. at ¶ 59.)

Central to Core's operations is the management of electricity costs. Because cryptocurrency miners consume large amounts of electricity, power is a principal cost for Core's mining fleet. (Id. at ¶ 7.) Core's bottom-line is dependent on power prices set by the public power markets where Core's facilities are located. (Dkt. # 65-1 at 43.) Power prices are influenced by several variables, including the price of natural gas, weather, and location, among others. (Id.) The company strategically seeks long-term power contracts to mitigate power expenses, a practice highly valued by its hosting customers. (Dkt. # 62 at ¶ 7.)

The company relies heavily on its hosting customers. These customers pay a set rate per kilowatt-hour based on their actual monthly energy consumption, providing them with predictability in their energy costs while shielding them from fluctuations in power rates. (Id. at ¶ 8.)

In July 2021, Core entered into an Agreement and Plan of Merger and Reorganization with Power & Digital Infrastructure Acquisition Corp. ("XPDI") to go public via a "de-SPAC." (Id. ¶ 87.) XPDI stockholders approved the merger pursuant to a Proxy Statement and unredeemed shares of XDPI were converted to shares of Core pursuant to a Registration Statement filed on December 30, 2021. (Id. at ¶¶ 88-91)

**\*2** The summer and fall of 2022 brought widespread increases in power costs, plummeting bitcoin prices, and an influx of cryptocurrency miners that strained the states' power grids. (Id. at ¶ 115.)

Due to the power cost increases, Core allegedly initiated an attempt to pass through increased power costs onto its hosting customers, ultimately deviating from its existing fixed-rate contracts. (Id. at ¶ 10.)

Celsius Network LLC ("Celsius"), one of Core's largest hosting customers, disputed these charges and subsequently filed for bankruptcy on July 13, 2022. (Id. at ¶¶ 115-16.) Given Celsius' outstanding balance and Core's impending liquidity issues, Core sought to collect on the charges incurred by Celsius prior to its bankruptcy. (Dkt. # 65-1 at 6.) On September 28, 2022, Celsius filed a motion for civil contempt in bankruptcy publicly alleging that Core breached its agreement with Celsius by attempting to "pass through" power costs to Celsius under its contract. (Dkt. # 62 at ¶¶ 116-17.) That litigation is ongoing. On September 29, 2022, Core's stock price closed at $1.30. (Id. at ¶ 118.)

On October 27, 2022, Core filed a Form 8-K informing investors that, "[a]s previously disclosed, the Company's operating performance and liquidity have been severely impacted by the prolonged decrease in the price of bitcoin, the increase in electricity costs, ... and the litigation with Celsius." The 8-K stated Core was "exploring a number of potential strategic alternatives" and "potentially could seek relief under the applicable bankruptcy or insolvency laws." See October 2022 Form 8-K. That day, Core's stock price closed at $.0221 per share. (Dkt. # 62 at ¶ 134.) On December 21, 2022, Core

filed for bankruptcy. (Id. at ¶ 135.) That day, Core's stock price closed at $.051 per share. (Id. at ¶ 136.)

This dispute revolves around disclosures or lack thereof to investors both prior to and after Core allegedly decided to impose power cost pass-through charges onto its customers. On May 5, 2023, Plaintiffs filed its Amended Complaint and brought claims for violations of the federal securities laws against the current and former officers and directors of Core Scientific, Inc. Plaintiffs allege that Defendants made false and misleading statements and omissions in Core's SEC filings and in public statements, including in the Registration Statement and Proxy Statement issued by Core in connection with its "de-SPAC" merger. Plaintiffs bring negligence claims under Section 11 of the Securities Act of 1933 ("Securities Act") and Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), securities fraud claims under Section 10(b) of the Exchange Act, and control person claims under each statute.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Review is limited to the contents of the complaint and matters properly subject to judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he [C]ourt accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**\*3** A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. See Twombly, 550 U.S. at 555–56. In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. See id. at 556–57. "The tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissal with prejudice, "unless it is clear that the defects are incurable[.]" Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002)

DISCUSSION

I. Plaintiffs Pled with Particularity a Section 11 Securities Act Claim

To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the Registration Statement contained (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1445 (5th Cir. 1993). "A 'material fact' is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." Id. at 1445.

A. A Heightened Pleading Standard Applies

Claims under the Securities Act are evaluated under the normal pleading standard. However, if the claim is based on the same underlying facts and allegations as a fraud claim under the Exchange Act, then a heightened pleading is required under Rule 9(b). Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir. 2001). Merely disclaiming allegations of fraud is insufficient to exempt a claim from Rule 9(b)'s requirements "when the wording and imputations of the complaint are classically associated with

fraud." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (applying Rule 9(b) despite fraud disclaimer in complaint when factual allegations were "indisputably immersed" in fraud). In other words, plaintiffs cannot do an end-run around the requirements of Rule 9(b) by giving their fraud claim a different label.

"Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." Lone Star Ladies Inv. Club, 238 F.3d at 368. In this case, the Section 11 claim essentially alleges Defendants concealed a known business strategy of passing energy costs onto fixed rate customers. The allegations under the Securities Act and the Exchange Act contain overlapping facts and are rooted in concealing from investors pass through costs. These are fraud allegations, which are subject to Rule 9(b)'s pleading standard.

Rule 9(b) requires that the Complaint "(1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading." In re Plains All Am. Pipeline, L.P. Sec. Litig., 307 F. Supp. 3d 583, 614 (S.D. Tex. 2018). Of course, the scienter requirement of Rule 9(b) does not apply to Section 11 claims, as such claims may be based on negligent or innocent misstatements or omissions. See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983) (discussing that Section 11 and Section 10(b) involve distinct causes of action and were intended to address different types of wrongdoing.). Because the claim is grounded in fraud, the Court will apply a heightened pleading standard to the Section 11 claim.

B. Misleading Omissions

**\*4** That said, the Court now turns to a discussion of liability under the 1933 Securities Act. Plaintiffs who purchased a security issued pursuant to a Registration Statement must show a material misstatement or omission to establish their prima facie case. Krim, at 989 F.2d at 1445. The Complaint alleges five statements in the Registration Statement that contain omissions of material fact.

i. Statement 1 and Statement 2 Are Not Misleading

**Statement 1:** "Our financial performance and continued growth depend in large part on our ability ... to attract customers for our hosting services. *Increases in power costs, ... will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.*" (Dkt. # 62 at ¶97.5.)

**Statement 2:** Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. *We may not be able to attract customers to our hosting capabilities for a number of reasons, including if: ... we fail to provide competitive pricing terms or effectively market them to potential customers; ...* If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations." (Id. at ¶101.)

Plaintiffs claim Statement 1 and Statement 2 are misleading because rising costs had already materialized and were not a hypothetical future occurrence. See Lormand v. US Unwired, Inc., 565 F.3d 228, 249 (5th Cir. 2009) (cautionary language was inadequate when defendants "recognized signs that those risks had already materialized").

Defendants argue that courts have repeatedly recognized that risk disclosures like Core's are not guarantees that a company is not presently facing a specific risk. See In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ. 9303, 2010 WL 1372709, at *7-8 (S.D.N.Y. Mar. 31, 2010) ("increases in the cost of raw materials 'could' " impact business "cannot reasonably be read to imply that [ ] cost of raw materials had not increased, to some extent, in the current quarter"). Defendants argue it is conclusory to allege the risks materialized at the time of the Registration Statement. Additionally, Defendants argue the Complaint is contradictory because Core's "acute increase in power costs" did not occur until "the start of Russia's invasion of Ukraine," nearly two months after Core's Registration Statement was filed.

Whether energy prices had already begun to rise at the time of the Registration Statement is irrelevant. The purpose of a risk disclosure statement is to warn investors of potential future risks. In a market as volatile as Crypto, it is especially important to disclose risks that might impact the price of a currency such as Bitcoin.

In this case, Core's disclosure adequately warned investors of future spikes in energy prices that could stem from unforeseen events such as Russia's invasion of Ukraine.

However, Plaintiffs are not solely contesting that the risk disclosure was inadequate because it failed to inform investors of current high energy prices. Those prices, as Defendants note, are publicly available. Rather, Plaintiffs argue the problem with the risk disclosure is that it was allegedly misleading in omitting relevant information about the company's future pricing strategy before going public through de-SPAC. Core was allegedly attempting to foist additional power charges upon its fixed rate customers.

**\*5** Still, the Court does not find this misleading because there is "too attenuated a relationship between the allegedly misleading statements and the omissions, and the [Complaint] makes no attempt to bridge this analytical gap." Magruder v. Halliburton Co., 359 F. Supp. 3d 452, 465 (N.D. Tex. 2018). Neither of these statements refer to fixed rates or to Core's business model for hosting contracts. Plaintiffs fail to connect the risk disclosure to the omitted information. Therefore, Statements 1 and 2 fail to meet 9(b)'s pleading standard.

ii. Statement 3 and Statement 4 Are Not Misleading

**Statement 3:** Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships. ... If these customers reduced spending on our services, ... it could have a material adverse effect on our business, financial condition and results of operations. .... (Dkt. # 62 at ¶103.)

**Statement 4:** If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations. ... (Id. at ¶105.)

Plaintiffs reiterate that Statement 3 and Statement 4 create the impression of a hypothetical, rather than actual representation of facts that had already materialized.

As the Court previously explained, it is not concerned about Core's disclosure as it relates to rising power costs. Whether those price increases occurred before the

Registration Statement or in 2022 does not impact whether Core adequately disclosed its strategic response to future price fluctuations in a volatile market depended on energy pricing. The Courts' rationale as to Statement 3 and Statement 4 is consistent with its rationale as to Statement 1 and Statement 2.

There is too attenuated of a relationship between these statements and what Plaintiff believes should have been stated. The Complaint fails to bridge an analytical gap between the stated disclosure and what should have been said. Magruder, 359 F. Supp. at 459-60. An investor, according to Core, would not think these statements are misleading because disclosing its business strategy within these statements would have been out of place.

Plaintiffs must plead facts showing that the statements "created an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). The Court acknowledges that in late 2021, Levitt instructed Core employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases. (Dkt. # 62 at ¶ 11.) However, Plaintiffs do not allege any facts that any customer even received a pass-through charge before June 2022. The Complaint is devoid of any facts from any time period suggesting that Core struggled to "attract customers," "effectively market" its "competitive pricing terms," or "fail[ed] to meet [its] end-users' expectations" at the time these statements were made. (Dkt. # 62 at ¶¶ 101, 103, 105) See In re Capstead Mortg. Corp. Sec. Litig., 258 F. Supp. 2d 533, 550 (N.D. Tex. 2003). Therefore, the Court does not find Statement 3 or Statement 4 to be misleading because neither statement omits any information that at the time of the registration should have been included.

### iii. Statement 5 Survives Rule 9(b) Pleading

**\*6** Statement 5: "Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis each month for the duration of their contract***, which vary from one to three years in length." (Dkt. # 62 at ¶ 99.)

Plaintiffs claim Statement 5 is misleading because it omitted that Core was billing its customers for its own increased power costs, which violated the fixed-rate terms of those contracts. (Id. at ¶ 100). Plaintiffs further allege Statement 5 misleads because Core sought to migrate "all" of its new and renewing customers to new contracts that permitted Core to pass through power cost increases, and thus did not have fixed rates. (Id. at ¶ 123.) Plaintiffs' theory is Core omitted that it was experiencing rising energy prices and was "foisting" these costs onto customers. The imposition of pass-through charges, according to Plaintiffs, foreseeably jeopardized Core's business.

Defendants argue there is nothing misleading about Statement 5. Core disclosed that its customers are "generally billed on a fixed" basis, not that they are always billed on a fixed basis. (Dkt. # 62 at ¶ 100.) The word "generally" naturally suggests that there are cases where the rule does not apply. See Drzala v. Horizon Blue Cross Blue Shield, No. 15-8392, 2016 WL 2932545, at *4 (D.N.J. May 18, 2016) ("The plain meaning of this term is clear: 'generally' means most of the time (but not always) and necessarily implies exceptions.").

Plaintiffs pled with particularly Statement 5 is misleading because "generally" is not sufficient when, behind closed doors, the company had plans to divert from fixed rates. Plaintiffs pled with particularity that Core should have been clearer and more direct in how it intended to operate as a company. Plaintiffs pled that at the time of the Registration Statement, Core sought to migrate "all" of its new and renewing customers to new contracts that permitted Core to pass through power cost increases, and thus did not have fixed rates. (Dkt. # 62 at ¶123.) This change of strategy could have been highly relevant information for an investor seeking to buy or sell shares of the company. It goes to the heart of the company's business model. To say that Core generally billed at a fixed rate might have been literally truthful. However, it failed to disclose to investors that the literal truth was subject to change in the near future. See In re Cassava Scis., Inc. Sec. Litig., No. 1:21-CV-751-DAE, 2023 WL 3442087, at *12 (W.D. Tex. May 11, 2023); Lormand, 565 F.3d at 248; Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

It is true that "generally" necessarily implies exceptions. However, Plaintiffs particularly pled that Core was not just planning on making exceptions to a few customers. Nor did

Plaintiffs plead that the change in business strategy was some future hypothetical that might occur. Plaintiffs pled that Core was going to overhaul its pricing terms for many of their contracts. Plaintiffs pled with particularity that "generally" was misleading because Core no longer sought protection as to a few outliers that were billed for actual costs. Moreover, that Core stated elsewhere in the Registration statement that contracts were subject to "adjust[ments] for actual costs," does not counter Plaintiffs allegation that Core was planning on changing its pricing.

 **\*7** The Plaintiffs pled that the risk disclosure was misleading because it did not disclose a business strategy central to its future viability as a company. The registration statement was first filed on August 11, 2021. (Dkt. # 62 at ¶ 94). However, it was not effective until December 30, 2021, after it was amended several times. (Id.) By the time the Registration Statement became effective, Plaintiffs plead that Core's CEO instructed employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would charge hosting customers in the event of power cost increases. In late 2021, Plaintiffs allege Core's legal team was instructed to get "comfortable" with the idea that the existing fixed rate agreements allowed Core to pass through its increased power costs. (Id. at ¶ 238.)

Plaintiffs pled with particularity that Core's management had serious discussions about changing its business model before the Registration Statement was implemented. As the Senior Vice President said, it was becoming clear that Core's entire hosting business "might not be viable" unless Core could come up with some way to "improve [its] performance." (Id. at ¶ 123.)

In late 2021, Plaintiffs allege that they were revising the Master Services Agreement ("MSA"), the main form of the agreement with Core's hosting customers, to add new language expressly permitting Core to pass through increased power costs. (Id. at ¶ 238.) This adequately pleads that prior to the Registration Statement, Core sought to change its business strategy.

Defendants argue that Statement 5 cannot be misleading because Plaintiffs fail to allege facts that any hosting customers were charged pass through costs prior to the summer of 2022. Defendants claim it is backwards pleading because it attempts to allege liability for something that was unknowable at the time. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("allegations that defendants should have

anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.") It is true that securities law does not hold the company out to be a perfect fortune teller. However, as stated in Novak, "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Id. (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)). In this case, the Court does not subject Defendants to predict the future. However, Plaintiffs have claimed that there were facts available to the company about the nature of its business going forward that should have been disclosed to protect investors from future risks that may occur. This is especially the case when fixed pricing was central to Core's success as a company.

How Core chose to react to high energy prices was highly relevant to a reasonable investor. In a business dependent on energy prices, it is imperative that risk disclosures provide relevant information on how the company intends to withstand price fluctuations. In this case, Plaintiffs adequately pled that Statement 5 failed to explain to investors how Core planned to remain profitable in times of distress. In this case, Plaintiffs pled that Core's internal management was planning on altering the MSA for the near future. Core then did not disclose to investors that the changes were going to be made. Rather, as Plaintiffs allege in accordance with Rule 9(b), it hid behind vague and misleading language about the nature of its business. Therefore, the Court finds Plaintiffs pled with particularity that Statement 5 is misleading.

The Court finds Statement 5 meets the heightened standard of 9(b). In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers. See Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987). Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and, where possible, the roles of the individual defendants in the misrepresentations. Id. Accordingly, the Complaint meets the 9(b) heightened pleading standard because it (1) specifies the statement that is misleading, (2) identifies Defendants as the speaker, (3) identifies where and when the statement was made (in the Registration Statement), (4) it pleads with particularity the content of the misleading statement, (5) pleads with particularity what Core obtained thereby, and (6) pleads with particularity how the statement may be misleading.

II. Plaintiff Did Not Sufficiently Allege an Item 303 Violation

**\*8** Section 11 of the 1933 Securities Act may also have been violated if Defendants violated Item 303(a)(3)(ii) of SEC Regulation S–K, [1] which requires a public offering prospectus to disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(a)(3)(ii). Item 303(a)(3)(ii) essentially says to a registrant: "If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus." Kapps v. Torch Offshore, Inc., 379 F.3d 207, 218 (5th Cir. 2004) (quoting Oxford Asset Management, Ltd. v. Jaharis, 297 F.3d 1182, 1191-92 (11th Cir. 2002).

Plaintiffs allege that Defendants should have disclosed the rising energy costs that were occurring. The Court does not find this persuasive under the Fifth Circuits holding in Kapps. 379 F.3d at 221 (no Item 303 claim because "the price of natural gas was not a trend required to be disclosed by Item 303.") Power costs are public, and Defendants repeatedly disclosed that increased costs could impact Core's business.

The more relevant contest is the undisclosed "trend" that Core campaigned to impose improper pass-through surcharges on its hosting customers. This trend, according to Plaintiffs, was "known" for the purposes of Item 303 because Core's CEO created and implemented the plan to pass-through Core's power costs to its hosting customers.

While Section 11 claims generally do not require proof of scienter, "[s]ome of the duties of disclosures, the breaches of which Section 11 makes actionable, do require knowledge." J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 392 (6th Cir. 2008). Item 303 mandates the disclosure of "known" trends or events and "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend." Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07–10528, 2010 WL 148617, at \*9–10 (S.D.N.Y. Jan. 14, 2010) (holding on motion to dismiss that news articles and price indices published after defendant's IPO were insufficient evidence of defendant's knowledge of a rising foreclosure trend) (collecting cases); J & R Mktg., SEP, 549 F.3d at 392. Item 303 does not require Plaintiffs to plead that Defendants acted with fraudulent

intent. It "requires the registrant's actual knowledge of the relevant trend or uncertainty." Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016).

The Complaint fails to allege "trends" were "known" as of the date the Registration Statement became effective. Plaintiff impermissibly lumps all defendants—both officers and outside directors alike—together. Such group pleading cannot establish that there was a known trend at the time of the Registration Statement. Plaintiffs failed to plead that any individual within Core knew of the trend. Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190 (10th Cir. 2013) (observing that plaintiffs' allegations that the defendants failed to disclose known trends as required by Item 303 "fail to differentiate between the Defendants, robbing their assertion of plausibility.").

**\*9** The Court must only look to whether there was a known trend at the time the Registration Statement was made effective. As time went on, Defendants allegedly learned more about Core's changing business model and potential liability. However, at the time of the Registration Statement, Plaintiffs have not pled, nor can the Court infer, that Defendants knew of a trend that had to be disclosed under Item 303. Only with hindsight could the allegation potentially be a trend. This does not, however, limit the Court in how it previously analyzed Statement 5 as a misleading disclosure. There, without the need to state a trend, Plaintiffs particularly pled facts that investors should have been informed about how the company intended on orchestrating its energy pricing.

III. Section 14(a) of the Exchange Act

To plead a Section 14(a) claim, Plaintiffs must allege (1) a false or misleading statement or omission of material fact; (2) made with at least negligence; (3) in a proxy statement that was an essential link in the corporate action that caused the plaintiff's injury. Braun v. Eagle Rock Energy Partners, L.P., 223 F. Supp. 3d 644, 649 (S.D. Tex. 2016).

Section 14(a) does not require plaintiffs to prove "fraud, deceit, manipulation, or contrivance" in order to state a claim. Section 14(a) merely requires a plaintiff to prove that the defendant acted "at least negligently." In re Browning-Ferris Industries, Inc. Shareholder Derivative Litigation, 830 F. Supp. 361, 365 (S.D. Tex. 1993). In the present case, Plaintiffs pled a Section 14(a) claim based on mere negligence not fraud. In re Alta Mesa Res., Inc. Sec. Litig., No. 4:19-CV-957, 2023 WL 3873307, at \*5 (S.D. Tex. June 7, 2023)

Plaintiffs' claims under Section 14(a) are based on allegations of misleading omissions in the Proxy Statement, which are identical to the omissions in the Registration Statement, as discussed above. This Proxy Statement applies to to "all persons and entities who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the Merger at the special meeting of XPDI stockholders on January 19, 2022." (Dkt. # 62 at ¶ 2.)

For the reasons above, the Court denies Defendant's Motion to Dismiss as to the 14(a) of the Exchange Act. The Court found that Plaintiff stated with particularity how Statement 5 was misleading at the time of the Proxy Statement.

### IV. Plaintiffs Failed to Plead a Section 10(B) Exchange Act Claim

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege (1) a material misrepresentation or omission, (2) reliance on such misrepresentation or omission; (3) scienter, and (4) loss causation. Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 686 (S.D. Tex. 2013).

Section 10(b) claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b). In re Plains All Am. Pipeline, L.P. Sec. Litig., 307 F. Supp. 3d 583, 614 (S.D. Tex. 2018). To adequately plead a material omission, Plaintiffs must "plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." Magruder, 359 F. Supp. at 459-60. The PSLRA further requires Plaintiffs establish scienter by "stat[ing] with particularity facts giving rise to a strong inference that each defendant acted with intent to deceive, manipulate, or defraud or [with] severe recklessness." Id. at 460.

### A. Some of Core's Statements Were Misleading

Plaintiffs' Section 10(b) claim is premised in large part on statements made in the Company's 2021 annual report ("2021 10-K"), the Company's quarterly reports for the first and second quarters of 2022 ("22Q1 10-Q" and "22Q2 10-Q"), and in the Company's second quarter earnings call ("22Q2 Earnings Call").

 **\*10** Specifically, Plaintiffs claim Statement 6 and Statement 7 from 22Q2 10-Q are misleading as well as Statement 8 from Core's 22Q2 Earnings Call. The Court will evaluate each statement in turn.

#### i. Statement 6 Is Not Misleading

**Statement 6:** Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us and/or seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be subject to factors outside of our control. (Dkt. # 62 at ¶211.) Plaintiffs claim Statement 6 is misleading because it downplayed the risk of Celsius bringing claims against Core. In truth, Plaintiffs allege there was a significant undisclosed risk that Celsius would bring expensive and extensive claims against Core.

The Court does not find this statement misleading. Plaintiffs did not plead with particularity that Core attempted to hide from investors the impact Celsius' bankruptcy might have on the company. Moreover, it is not incumbent upon Core to predict what might occur during Celsius' bankruptcy proceeding. As Core said, much of it is "outside of [Core's] control." Securities law does not require Core to predict the future. Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Defendants' disclosures were consistent with federal securities laws, which do not "require issuers to predict the precise manner in which disclosed risks will manifest themselves." Gomez v. Credit Suisse AG, 2023 WL 2744415, at \*9 (S.D.N.Y. Mar. 31, 2023).

#### ii. Statement 7 Survives Rule 9(b) Pleading

**Statement 7:** Continued increases in power costs and unfavorable prices for digital assets will impact our ability to attract customers for our services, harm our growth prospects and could have a continuing material adverse effect on our business, financial condition and results of operations. ... If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations. (Dkt. # 62 at ¶ 215; 22Q1 10-Q).

Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. Most contracts are renewable, and *our customers are generally billed on a fixed and recurring basis*

each month for the duration of their contracts, which vary from one to three years in length." (Dkt. #62 at ¶ 200; 22Q1 10-Q.)

Plaintiffs claim Statement 7 is misleading because it was not the power costs themselves that were a risk to the business. Rather, it was Core's response to its increased power costs that was jeopardizing the Company's hosting business. Plaintiffs argue Core should have disclosed the receipt of customer complaints.

Defendants argue that just because Core received complaints from some of its hosting customers does not render Core's risk disclosures materially misleading. See In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) ("[C]ourts generally do not impose a duty to disclose ... internal problems merely because those problems were potentially significant").

 **\*11** For reasons explained above, the Court finds Plaintiffs pled particular facts that it was not enough to discuss the fixed pricing without letting investors know of their attempt to foist pass through costs onto their customers. In this 10-Q filing, Core reiterated that it "generally billed a fixed rate." But by this time, the pass-through strategy was allegedly not just a hypothetical future plan. Rather, it was concrete and just a couple months away from when customers began to dispute the pass-through costs. Plaintiffs therefore pled with particular facts this was misleading.

### iii. Statement 8 Survives Rule 9(b) Pleading

**Statement 8:** During the 22Q2 Earnings Call, Levitt stated that: "We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day one. ***We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms. ... ... Initial customer acceptance, ... validate[s] our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our offering.*** (Dkt. # 62 at ¶223.)

Plaintiffs claim Statement 8 was misleading because several hosting customers had disputed Core's improper surcharges and challenged their legality, which did not "validate" Core's strategy and showed that customers were not "eager" to engage in Core's hosting business.

By the time Levitt made Statement 8, Plaintiffs allege following events had occurred:

In June of 2022, Ernst & Young ("EY") evaluated Core's effort at passing through rising powers costs and questioned "the legal validity of passing through [power] cost." EY suggested that Core include in its financials "an offsetting allowance ... as opposed to merely recording of revenue" in case customers disputed the pass through of increased utility costs. (Dkt. # 62 at ¶ 239.)

Just as EY predicted, questions about the pass-through costs began to circulate. On June 19, 2022, Poolin Technology Pte. wrote, "I remembered the hosting fee is 6.5 cents in the hosting contract, could you explain why the hosting price was changed?" (Id. at ¶ 244.) On June 23, 2022, Core had received an email from Atlas stating, "Atlas hereby disputes Core's June 2022 invoice because Core has inappropriately and without any contractual basis increased the price of KWh. (Id. at ¶ 242) On June 25, 2022, Alloy Ventures Management wrote to Core, "This is a bit unexpected as conversations in the past had led me to believe our rate would be guaranteed through end of term in March 2023." (Id. at ¶ 244) On July 15, 2022, Celsius received its first post-petition invoice from Core Scientific, which totaled approximately $4.6 million. (Ex. E at 26.) The July 15 invoice contained a new line item that had never before appeared on any previous (i.e., prepetition) invoice, called "Power Costs Pass-through." One former employee of Core said that in a summer meeting, management discussed that Celsius had pushed back on Core's new pass-through surcharges. (Id.) On July 16, 2022, Core had received a letter from the general counsel of its client CoreWeave, stating, "[Y]ou are hereby notified that CoreWeave disputes charges 1 and 2 namely, the two charges for May and June 2022 'Power Costs Pass-through.' " (Id. at ¶ 123.)

After these events occurred, Core CEO told investors that the change was validated by customers. For this, Plaintiffs pled with particularity that they were misled.

### B. Plaintiffs Pled Particular Facts of Reliance on Misleading Statements

 **\*12** Plaintiffs pled adequate reliance because investors bought stock after Core allegedly misled investors in its SEC filings. On March 30, 2022, Core filed its 2021 annual report with the SEC on Form 10-K ("2021 10-K"). On May 13, 2022, Core filed its quarterly report with the SEC on Form

10-Q for the first quarter of 2022 ("22Q1 10-Q"). In both filings, Core did not change its position or articulate how it would price energy contracts. Just a month later, Core started to receive push-back from clients pertaining to pass-through costs. Plaintiffs pled with particularity that Core should have disclosed its changed business strategy before pushback started to occur a month later. Core allegedly did not disclose how it was planning on changing its business model. Viewing the facts in light most favorable to Plaintiff, it omitted relevant information.

Plaintiffs pled particular facts to show investors relied on this omission when buying stock. As stated, Core made a public filing with the SEC on March 30, 2022 and on May 13, 2022. As pled, class members bought shares after these two SEC filings. Three-hundred shares were purchased by William J. Emanuel on June 17, 2022. [2] Evan Achee bought shares on the following dates in 2022: June 13, June 28, July 6, and July 12. [3] Plaintiffs thus pled that both Emanuel and Achee read the quarterly reporters and bought shares based on potential misinformation.

Moreover, Plaintiffs particularity pled reliance on the second quarter earnings call and accompanying Form 10-Q filed on August 22, 2022. Lead Plaintiff, Morgan Hoffman, purchased 10,000 shares of Core common stock on October 19, 2022. ¶ 29 ("incorporat[ing] by reference" Hoffman's PSLRA certification, Dkt. # 17-2 at 8). Hoffman bought these shares after the August 10-Q. Defendants argue (for the first time in their Reply) that Hoffman cannot allege reliance because his October 2022 purchase occurred after the truth emerged in a September 2022 bankruptcy court filing by Celsius. Thus, Hoffman could no longer rely on the previously misleading statements once the truth entered the marketplace.

This Court has recognized that " 'arguments raised for the first time in a reply brief are generally waived.' " Wilson v. Tessmer Law Firm PLLC, No. 5:18-cv-1056-DAE, 2021 WL 7448751, at *3 (W.D. Tex. Mar. 4, 2021). However, even if the Court entertains this argument, it is unpersuasive. [4] Defendants misread the Complaint because Plaintiffs did not plead that the September Celsius filing fully disclosed the truth. Rather, it was a partial disclosure. (Dkt. # 62 at ¶117.) According to Plaintiffs, more information emerged after the October purchase. (Id. at ¶¶ 120-23.) Courts have held that purchases made after a partial disclosure does not defeat reliance on alleged misstatements. In re Under Armour Sec. Litig., 631 F. Supp. 3d 285, 304 (D. Md. 2022) ("as several courts have observed, a stock purchase after a

partial corrective disclosure is not per se evidence that a class representative ... did not rely on the alleged fraudulent representations."). Lastly, Defendants fail to account for the fact that Hoffman bought shares in June, shortly after Core made public filings with the SEC on March 30, 2022 and on May 13, 2022. Therefore, Hoffman can also adequately pled reliance on alleged misleading statements based on his June stock purchases (Dkt. # 17-2 at 8).

### C. Plaintiffs Failed to Plead Scienter.

The PSLRA requires a securities fraud complaint to state with particularity facts that give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). On a motion to dismiss, the relevant inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322–23 (2007).

#### i. Plaintiffs Engaged in Group Pleading

**\*13** Group pleading occurs when a plaintiff fails to specify which defendants made the alleged misstatements or omissions, and attributes the wrongdoing to defendants collectively. Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 533 (5th Cir. 2008). This type of pleading "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 365 (5th Cir. 2004)

The Fifth Circuit has repeatedly rejected the "group pleading approach to scienter," and instead "focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the collective knowledge of all the corporation's officers and employees." Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 957 (5th Cir. 2016) (internal quotations omitted). As a result, "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002). And "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their

titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded." Southland, 365 F.3d at 365.

In their complaint, Plaintiffs engage in group pleading. For nearly all Defendants, the Complaint alleges only that they signed the Registration Statement, Proxy Statement or SEC filings.

Further, the fact that Defendants executed a statutorily-required Sarbanes–Oxley Act ("SOX") certification does not on its own establish scienter. Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc., 497 F.3d 546, 555 (5th Cir.2007). To infer scienter from SOX certifications, there must be facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." Shaw Group, 537 F.3d at 545

The Complaint need not establish actual knowledge. "Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b)." Stone v. Life Partners Holdings, Inc., 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (citing Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir. 2001) (defining recklessness as "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.")).

As stated above, the Complaint was too vague to support a strong inference of scienter because Plaintiffs engaged in group pleading and individual defendants were not connected to the alleged fraud.

For instance, Plaintiffs pled that Ernst & Young ("EY") disputed the idea that Core's contracts permitted pass through costs. However, Plaintiffs did not allege with specificity as to who in the company was actually aware of EY's alleged recommendations, took part in any discussions, or chose to ignore the supposed advice. The same can be said as to the receipt of customer complaints. Plaintiffs allege that Core's receipt of complaints from hosting customers supports a finding of scienter. However, Plaintiffs did not allege that any Defendant knew about these complaints, who received the complaints, who was responsible for adjudicating them, and when Defendants were otherwise made aware of them. Allegations that "Core executives" received such complaints

are insufficient. See Veal v. LendingClub Corp., 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019) (no scienter where complaint "fails to connect any ... Defendant[ ] to the customer complaints.").

**\*14**  Additionally, Levitt, who was the CEO, cannot be said to have the requisite scienter. Plaintiffs pled that he instructed Core employees to "come up with a suggested plan, including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases. However, that does not mean that Levitt knew it was wrong or that he would mislead investors in future SEC filings. The pleading only suggests that Levitt intended to implement a new business strategy. The Complaint thereafter fails to state with particularity Levitt's future involvement into the execution of that strategy and whether he personally received pushback.

### ii. The Special Circumstances / "Core Operations" Doctrine Does Not Apply

At any rate, the Fifth Circuit's disdain for group pleading is not absolute. In Diodes, the Fifth Circuit held that an officer's position in a company can support scienter where "special circumstances" are alleged, including "transactions critical to the company's continued vitality [and] omitted information readily apparent to the speaker." Carlton v. Cannon, 184 F. Supp. 3d 428, 459 (S.D. Tex. 2016) (citing Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016)). In doing so, the court considered four "special circumstances" sufficient to find scienter based on position alone: (1) whether the company is small, thus making it more likely that executives are familiar with day-to-day operations; (2) whether the transaction was critical to the company's existence; (3) whether the misrepresented or omitted information was readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent. Id. "No one 'special circumstance' is dispositive," such that Plaintiffs need only allege "some combination of four considerations that might tip the scales in favor of an inference of scienter." Id. at 484 (quoting Diodes, 810 F.3d at 959).

The Fifth Circuit and other courts have been reluctant to apply the limited exception recognized in Diodes. See e.g., Rosenzweig, 332 F.3d at 867–68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water-privatization projects—supports the inference that defendants

knew, or recklessly disregarded, Azurix's prospects for success.")

Plaintiffs have not sufficiently alleged that the purported fraud warrants application of the narrow exception. With 118 employees, Core is larger than other companies in which the Fifth Circuit has found a "special circumstance." Ex. A at 267; E.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 425 (5th Cir. 2001) (32 to 35 employees); Neiman v. Bulmahn, 854 F.3d 741, 750 (5th Cir. 2017) (no "special circumstances" where company had "over 60 employees").

Most important, the pleadings fail to allege whether the alleged omitted information would have been apparent to the speaker. Collmer v. U.S. Liquids, Inc., 268 F.Supp.2d 718, 754 (S.D. Tex. 2003) ("[T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (citations omitted) (quotation marks omitted)). In this case, Plaintiffs failed to plead what information Defendants might have had access to. Moreover, Plaintiffs failed to plead that Defendants would know that pass-through costs were improper.

 **\*15**  Plaintiffs have pled that pass-through costs were "critical to the company's continued vitality." Power costs were the primary expense associated with Core's business and the hosting segment comprised approximately 25% of Core's revenues in 2022. (Dkt. # 62 at ¶ 233.) In fact, by mid-July 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes. (Id. at 245.) As a result of these disputes, Core lost customers accounting for as much as 88.7% of its hosting revenues and 22.1% of its total revenues. (Id. at ¶¶126-27.)

However, the importance of the overdue accounts receivables is just one factor in whether to impute knowledge onto Defendants. The Complaint does not state how and why Defendants may have learned of such account receivables. Plaintiffs have not pled that Defendants would have been exposed to internal corporate documents, who received them, or how plaintiffs learned of them. The complaint is bereft of details of specific conversations or board meetings dealing with such problems. Ultimately, it is not enough that Plaintiffs would have known by virtue of their positions. Something

must link the Defendants to show scienter for the special circumstance exception to apply.

In a fraud claim, such specificity is imperative because the scienter requirement must at least allege that Defendants were reckless in knowing, approving, and misleading investors of pass-through costs. Magruder, 359 F. Supp 3d at 460. In this case, the omission of when and how Defendants might have learned about foisting pass through costs onto Defendants is critical. As to many of the Defendants named in the Complaint, it is not clear if they ever knew that such pass-through costs were possibly improper. It also is not clear whether and how some of the Defendants might have heard about the rising accounts receivables. If Defendants were put on notice of the rising accounts receivable in July, there is no scienter for the quarterly statements made earlier in the year.

When Plaintiffs did specify scienter, it negated any wrongdoing. For instance, Defendant Sterling allegedly attended Core's monthly budget review meetings in the summer of 2022 where Core discussed Celsius' pushed back on surcharges. The exact date of these meetings was not specified. On August 22, 2022, Sterling signed the 22Q2 10-Q stating "Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us. ..." (Dkt. # 62 at ¶ 210). In disclosing Celsius attempt to terminate its agreement with Core, Sterling signed off on what he learned during the 2022 summer meetings. (Id.) Plaintiffs fail to allege any facts prior to the summer meetings specific to Sterling where he would have recklessly or knowingly misled investors in earlier 10-Q forms.

It is also possible to infer nonfraudulent intent by way of Defendants seeking input from their audit team and legal team. That Core's legal team signed off on these pass-through charges supports a non-culpable inference. See, e.g., S.E.C. v. Snyder, 292 F. App'x 391, 406 (5th Cir. 2008) (relying on counsel's advice is "a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud").

Motive can be properly considered alongside other allegations of scienter. Owens v. Jastrow, 789 F.3d 529, 540 (5th Cir. 2015). Even if allegations of Defendants' motives do not suffice by themselves to show scienter, they contribute to the holistic analysis of the allegations. See also Spitzberg v. Houston Am. Energy Corp., 758 F.3d 676, 684-85 (5th Cir. 2014) (motive allegations "might meaningfully enhance the strength of scienter," but are not necessary). Plaintiffs pled

that Defendants Levitt and Feinstein each beneficially owned tens of millions of shares of Core common stock. Feinstein capitalized on this new avenue for monetization, selling 6 million shares during the Class Period in a one-week span for over $18 million. However, the Court notes that not a single other Defendant sold stock, negating an inference of scienter among all Defendants. See Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) ("Courts typically find that the fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim of scienter.") (quotations omitted). To the contrary, Defendants acquired Core stock, including over 23 million shares during the Class Period. See In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 50 n.21 (D. Mass. 2016), aff'd, 857 F.3d 34 (1st Cir. 2017) (that defendants increased holdings during class period and suffered significant losses undermined inference of scienter).

**\*16** Because Plaintiff failed to plead scienter, the Court dismisses without prejudice Plaintiffs' 10(b) claim.

### D. Plaintiff Did Not Adequately Plead Loss Causation

The PSLRA requires a plaintiff to prove that the alleged misrepresentation "caused the loss for which the plaintiff seeks to recover" 15 U.S.C. § 78u–4(b)(4). Loss causation under a Section 10(b)(5) claim requires a plaintiff to "adequately allege and prove the traditional elements of causation and loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005). This requires a plaintiff to allege "a plausible causal relationship between the fraudulent statements or omissions ... followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock." Lormand v. US Unwired, Inc., 565 F.3d 228, 258 (5th Cir. 2009).

A corrective disclosure is a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud. It must be a "relevant or related truth about the fraud." Lormand, 565 F.3d at 258. This is because price changes "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events." Dura, 544 U.S. at 343.

Plaintiffs failed to adequately plead a corrective disclosure because it cannot rely on Celsius' motion for civil contempt in its bankruptcy proceedings. On September 28, 2022, during bankruptcy proceedings, Celsius alleged that Core breached

its agreements. (Dkt. #62 at ¶ 116.) This allegedly revealed to investors that Core was passing through its own increased energy costs onto its hosting customers. (Dkt. #62 at ¶ 116.)

The Court cannot rely on the Celsius disclosure because "a corrective disclosure that is entirely based on another party's allegation in a separate suit does not pass muster." Genesee Cnty. Emps' Ret. Sys. v. FirstCash Holdings Inc., No. 4:22-CV-0033, 2023 WL 2752846 at \*20 (Mar. 31, 2023). In Genesee Cnty, the court discussed the presumption of innocence and peril of using a complaint in one matter as a basis of liability in another. Id. While there has been discovery in Core's contract dispute with Celsius, the Court agrees with the rationale behind Genesee Cnty and is wary to transform an unadjudicated breach of contract dispute between Celsius and Core into a corrective disclosure.

Plaintiffs argue that the Court can read the Celsius disclosure with the totality of the other alleged partial disclosures. Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 324 (5th Cir. 2014). Even if the Court chooses to do so, the other partial disclosures do not satisfy the loss causation prong.

On October 27, 2022, Core filed a Form 8-K report with the SEC, revealing that due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius," the Company would not make outstanding payments for financing and was exploring strategic alternatives to its capital structure. (Dkt. # 62 at ¶ 133.) Plaintiffs fail to plead how this statement "revealed" to the market that Defendants' prior statements were false. The 8-K reiterates many of the risks disclosed in prior public statements to the SEC. Therefore, there is a disconnect between the facts allegedly concealed and the purported corrective disclosures. See Magruder v. Halliburton, No. 3:05–CV–1156–M, 2009 WL854656, at \*15 (N.D. Tex. 2009) (no loss causation because "Plaintiffs simply fail to connect the alleged misrepresentations with correlative corrective disclosures during the Class Period.")

**\*17** Plaintiffs also failed to plead how Core's own Bankruptcy filing on December 21, 2022, was a corrective disclosure. During Core's bankruptcy proceedings, Celsius filed an objection to a motion filed by Core "to set the record straight with respect to the terms of the Celsius Contracts." (Dkt. #62 at ¶ 120.) As stated in Genesee Cnty, the Court will refrain from using the unadjudicated

dispute as a means for a corrective disclosure. Moreover, the bankruptcy did not reveal that any past statements were misleading. Core's bankruptcy confirmed what was disclosed in its October 22 Form 8-K.

Plaintiffs argue that the Court should adopt a materialization of the risk theory towards loss causation. Under this this approach, the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss. In re Enron Corp. Securities, Derivative & "Erisa" Litig., 2005 WL 3504860, *18 (S.D. Tex. Dec. 22, 2005) (quoting In re Initial Public Offering Sec. Litig. v. Credit Suisse First Boston Corp., No. MDL 1554(SAS), 21 MC 92(SAS), 2005 WL 1529659, *6 (S.D.N.Y. June 28, 2005). This contrasts with a "corrective disclosure" whereby an alleged misstatement is an intentionally false opinion, and the market does not respond to the truth until the falsity is revealed. In re Initial Public Offering Securities Litig., 399 F.Supp.2d 298, 307 (S.D.N.Y.2005); In re Enron Corp. Securities, Derivative & "Erisa" Litig., 2005 WL 3504860, *18 (S.D. Tex. Dec. 22, 2005). Plaintiffs argue that they prevail under a materialization of the risk theory because investors did not disclose pass-through pricing and disputed charges. Thereafter, the concealed risks materialized.

The Court notes that the Fifth Circuit has yet to comment on the validity of "materialization of the risk" as a method of showing loss causation. Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 709 (S.D. Tex. 2013). At least two district courts in this circuit have permitted securities-suit plaintiffs to rely on the materialization-of-the-risk theory of loss causation. See Aubrey v. Barlin, No. A-10-CA-76-SS, 2010 WL 3909332, at *12 (W.D. Tex. 2010) (permitting the plaintiffs to rely on the materialization-of-the-risk theory); In re Enron Corp. Sec., Derivative & "ERISA" Litig., 439 F.Supp.2d 692, 706 (S.D. Tex. 2006) (permitting the plaintiffs to plead the materialization-of-the-risk theory of loss causation but noting that, when that case was decided, the Fifth Circuit had "not addressed loss causation since Dura Pharmaceuticals was issued"). Another court, however, noted that Fifth Circuit case law appears to require a corrective disclosure to show loss causation. In re Dell Inc., Securities Litig., 591 F.Supp.2d 877 (W.D. Tex. 2008).

The Court declines to adopt the materialization of the risk theory given the uncertainty of its application in the Fifth Circuit and for policy reasons. Specifically, the Court is sensitive to endorse the theory when it is tied to Plaintiffs reliance on Core's dispute with Celsius. The September 28

Celsius disclosure is potential evidence of a materialized risk because Celsius' bankruptcy is a possible byproduct of the pass-through costs that Plaintiffs argue should have been disclosed. The Court will refrain from using the unadjudicated contract dispute to satisfy loss causation. Therefore, the Court must analyze whether the corrective disclosures revealed concealed truths to the marketplace. As stated above, Plaintiffs failed to plausibly plead that either the 8-K or Core's bankruptcy filing brought any new truths to the marketplace.

**\*18** If the Court adopted a materialization of the risk theory, it fears that it would eviscerate Dura's loss causation requirement, as any negative news following a misrepresentation could, arguably, "materialize" the risk of a prior misrepresentation. See In re Williams Sec. Litig., 496 F.Supp.2d at 1265; see also Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir.2007) (if the "risk could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement."). The Court thus finds Plaintiffs have failed to allege the loss causation element of Section 10(B).

In sum, the Court finds that Plaintiffs' pleadings did not satisfy all the elements of Section 10(B) of the Exchange Act. While the Court found Plaintiffs sufficiently pled some statements to be misleading, Plaintiffs failed to plead scienter and loss causation among the Defendants. Therefore, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' claim under Section 10(B) of the Exchange Act. The claim will be dismissed without prejudice.

V. Plaintiffs Failed to Plead a Control Person Claims, Except as to CEO Levitt under Section 15 of the Securities Act.

Plaintiffs alleged that the Defendants are liable as "control persons" of Core under Section 20(a) of the Exchange Act. (Dkt. # 62 at ¶ 146). Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland Securities Corp., 365 F.3d at 383.

To state a control person claim, Plaintiffs must allege: (1) an underlying primary violation; and (2) that the defendant

directly or indirectly possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 957 (5th Cir. 1981).

Although the Fifth Circuit has not directly addressed the issue, other courts have held that the primary violator can be a corporation and need not be named in the same action against the defendant allegedly subject to control-person liability. In re Supreme Specialties, Inc., Sec. Litig., 438 F.3d 256, 285 (3d Cir. 2006), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D., 551 U.S. 308 (2007) ("[T]here is no requirement in the language of [§ 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants."); Kemmerer v. Weaver, 445 F.2d 76, 78 (7th Cir. 1971) (control-person liability adequately alleged based on a primary violation by a nondefendant, since-dissolved association); In re Hayes Lemmerz Int'l, Inc., 271 F. Supp. 2d 1007, 1021 n.11 (E.D. Mich. 2003) ("[I]f the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons.").

Courts have also held that the Bankruptcy Code's automatic-stay provision, 11 U.S.C. § 362(a)(1), does not prevent a plaintiff from asserting a control-person claim when the primary violator, as here, is a corporation in bankruptcy. In re Thornburg Mortg., Inc., Sec. Litig., 824 F. Supp. 2d 1214, 1279 (D. N.M. 2011) (collecting cases). Courts reason that the "liability of the primary violator is simply an element of proof of a section 20(a) claim, and ... liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong." In re CitiSource, Inc., Sec. Litig., 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988). As one district court in this circuit explained, "nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability." Keys v. Wolfe, 540 F. Supp. 1054, 1062 (N.D. Tex. 1982), rev'd in part on other grounds, 709 F.2d 413 (5th Cir. 1983).

**\*19** In this case, Plaintiffs allege that the primary violator was Core as a company. For instance, the Complaint states, "Director Defendants exercised their power and authority to cause *the Company* to engage in the wrongful acts complained

of herein. The XPDI Director Defendants, therefore, were 'controlling persons' *of the Company* within the meaning of Section 20(a) of the Exchange Act." (Dkt. # 62 at ¶ 165.) Core is not a named Defendant. Even so, the complaint may allege violations by Core, for purposes of control person liability, without seeking to hold Core itself liable for those violations. However, Plaintiffs therefore must provide proof and state a primary violation by the Company. See In re Citisource, Inc. Securities Litigation, 694 F.Supp. 1069, 1077 (S.D.N.Y.1988) (holding "liability of the primary violator is simply an element of proof of a section 20(a) claim").

The Complaint seeks to hold Core accountable by virtue of actions by its management. Therefore, proof that Core is a controlled entity and primary violator must come from the Complaint's allegations against named Defendants. As stated in Section IV, *supra*, the Plaintiffs failed to plead fraud under Section 10(b) as to all the Defendants. Thus, when Plaintiffs fail to adequately plead a primary violation by a "controlled person," courts should dismiss the § 20(a) claim. Southland, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.)"

However, Plaintiffs have also stated a Control Persons Claim under Section 15 of the Securities Act, which provides that "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." This operates much like control-person liability under the Exchange Act and the Fifth Circuit gives them the same interpretation. Pharo v. Smith, 621 F.2d 656, 673 (5th Cir.1980); G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 958 & n. 22 (1981).

As stated in Section I, *supra*, the Court found a violation under Section 11 of the Securities Act. This claim can be attributed to Core for the purposes of a control persons claim.

Now, the Complaint must plead that Defendants were controlling persons and had the requisite power to influence the alleged misleading statement highlighted in Section I, *supra*.

A survey of Fifth Circuit caselaw shows that a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." Heck v. Triche, 775 F.3d 265, 283 (5th Cir. 2014) (quoting Meek v. Howard, Weil, Laboisse, Friedrichs, Inc., 95 F.3d 45, at \*3 (5th Cir. 1996) (per curiam) (unpublished)). Control-person liability

demands something beyond a defendant's corporate status but can be something short of culpable participation in the primary violation. The Fifth Circuit looks to see if Defendant had "effective day-to-day control" of the corporation and "actual[ly] exercise[d]...that power." Abbot v. Equity Group, Inc., 2 F.3d 613, 620 (5th Cir. 1993).

The Fifth Circuit has found support for a control-person claim when the defendant's role gave him the power to control the fraudulent transaction or activity. In Thompson, for example, the plaintiff sued several officers, directors, and shareholders in a mortgage-loan-marketing company. 636 F.2d at 949. The Fifth Circuit considered whether the district court erred in failing to grant a director-defendant's motion for judgment as a matter of law dismissing the control-person claim. Because the evidence showed that the defendant "was not only a 24% stockholder and an officer and director, but was apparently involved in the day-to-day coordination of the loan gathering,"—the conduct forming the basis for the primary violation—the Fifth Circuit held that the plaintiff had "established that [the defendant] had the requisite power to directly or indirectly control or influence corporate policy." Id. at 958.

 **\*20**  The primary violator in Heck v. Triche was the CEO of an antique-investment firm who issued allegedly misleading prospectuses to raise money from private investors. 775 F.3d 265 (5th Cir. 2014). The control-person defendant was a certified public accountant who helped draft the prospectuses. Id. at 268. The Fifth Circuit found a sufficient basis to support control-person liability. Id. at 282–84. The court reasoned that the CEO "was dependent" on the defendant "to get him out of debt," that the defendant "contributed and approved the financial concepts detailed in the prospectus," and that the CEO "checked in with [the defendant] after every investment." Id. at 284.

When the Fifth Circuit has found insufficient support for a control-person claim, the defendant's role put the fraudulent transaction or activity outside his ability to control. In Dennis v. Gen. Imaging, Inc., for example, the record showed that one defendant "owned a minority position" in the corporation, another was a director who "had no knowledge" of the allegedly fraudulent operations, and a third was a "nominal shareholder" who had "tried numerous times to obtain information concerning the [allegedly fraudulent] financial conduct... but was always rebuffed." 918 F.2d 496, 509–10 (5th Cir. 1990). The Fifth Circuit affirmed summary judgment for the defendants dismissing the control-person claims against them. Id.

In Zagami v. Natural Health Trends Corp., 540 F. Supp. 2d 705 (N.D. Tex. 2008), the court held that the plaintiffs had sufficiently alleged a control-person claim against a company's internal director. This director allegedly reviewed the company's financial statements and internal accounting controls during the relevant period. The company was the primary violator liable under § 10(b) for failing to disclose related-party transactions. The plaintiffs alleged that the defendant was the "independent director and chair" of the audit committee "charged with reviewing and approving all related-party transactions" when the failure to disclose occurred. Id. at 716. The allegations pled facts showing the defendant's "ability to control the specific transaction or activity upon which the primary violation [was] based." Heck, 775 F.3d at 283.

In this case, Plaintiffs have failed to plead a control persons claim for all named Defendants except CEO Levitt. The Complaint states, "[b]ecause of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace ...." (Dkt. # 62 at ¶ 263.) The Complaint further alleges that "Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendants, therefore, were 'controlling persons' of the Company within the meaning of Section 20(a) of the Exchange Act." Id.

It is simply not enough to allege that because of one's position on the Board or within the company, that the individual was able to exercise control and make decisions pertaining to the alleged fraud. A survey of Fifth Circuit law is clear that there must be some fact that pleads a Defendant had "the requisite power to directly or indirectly control or influence corporate policy." Thompson, 636 F.2d at 957. Outside of Levitt, Plaintiffs have alleged Defendants participated in the day-to-day operations of the Company, but they have pointed to no specific knowledge or facts demonstrating such control.

Plaintiffs have pled that as CEO, Levitt had control over Core's strategy to impose pass-through costs and its ultimate disclosures. Plaintiffs pled that it was Levitt's decision to impose the surcharges. Plaintiffs also pled that Levitt spoke about the restructuring of pricing at an earnings call. Therefore, particular facts were pled to show that Levitt

had control over this strategy before making the alleged misleading statements about them. Therefore, the Court will **DISMISS** all claims control person claims without prejudice, except as to CEO Levitt.

CONCLUSION

**\*21** For the foregoing reasons, the Court **GRANTS IN PART** AND **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 65). The Motion is **GRANTED** as to: (1) Plaintiffs' claim under Section 10(b) of the Exchange Act and said claim is **DISMISSED WITHOUT PREJUDICE**; and (2) Plaintiffs' claim under Section 20(a) of the Exchange Act and said claim is **DISMISSED WITHOUT PREJUDICE**. The Motion is **DENIED** as to: (1) Plaintiffs' claim under Section 11 of the Securities Act; and (2) Plaintiffs' claim under Section 14 of the Exchange Act. The Motion is **FURTHER GRANTED IN PART** and **DENIED IN PART** as to

Plaintiffs' claim under Section 15 of the Securities Act. The Section 15 claim against Michael Trzupek, Denise Sterling, Darin Feinstein, Brian Neville, Jarvis Hollingsworth, Matt Minnis, Stacie Olivares, Kneeland Youngblood, Patrick C. Eilers, Theodore J. Brombach, Paul Gaynor, Paul Dabbar, Colleen Sullivan, and Scott Widham is **DISMISSED WITHOUT PREJUDICE**. The Section 15 claim against Levitt will proceed.

Lastly, the Court **DENIES** Plaintiffs' Motion to Strike as it did not rely on any new arguments advanced in Defendants' reply brief (Dkt. # 70).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 11643704

---

**Footnotes**

1    The Court reads the Complaint to state a violation of Item 303 under Section 11 of the Securities Act. As Defendants note, the Fifth Circuit has "never held that Item 303 creates a duty to disclose under the Securities Exchange Act." <u>Mun. Emps.' Ret. Sys. Of Michigan v. Pier 1 Imports, Inc.</u>, 935 F.3d 424, 436–37 (5th Cir. 2019). A Item 303 claim under Section 10(b) would be dismissed by this Court for this reason. Courts within the Fifth Circuit have extended Item 303 disclosures to encompass Section 11 claims. <u>See</u> <u>McCloskey v. Match Grp., Inc.</u>, No. 3:16-CV-549-S, 2018 WL 4053362, at \*5 (N.D. Tex. Aug. 24, 2018); <u>Kapps v. Torch Offshore, Inc.</u>, 379 F.3d 207, 217 (5th Cir. 2004).

2    (Pl. Ex. 1.)

3    (Pl. Ex. 2.)

4    Because the Court does not rely on Defendants' first-time argument in their reply brief, it denies Plaintiff's Motion to Strike. (Dkt. # 70.)

---

# Case No. 7

Fed. Sec. L. Rep. P 100,704

2019 WL 6111303
United States District Court, S.D. Texas, Houston Division.

Lawrence ROUGIER, Lead Plaintiff,

v.

APPLIED OPTOELECTRONICS, INC. Chih-Hsiang
(Thompson) Lin, and Stefan J. Murry, Defendants.

Civil Action No. 4:17-cv-02399
|
Signed 11/13/2019

**Attorneys and Law Firms**

Andrew W. Rocco, Sebastiano Tornatore, Shannon L. Hopkins, Levi & Korsinsky, LLP, Stamford, CT, Jamie J. Gilmore, Tanner and Associates, PC, Fort Worth, TX, Gregory M. Nespole, Levi & Korsinsky LLP, New York, NY, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Lead Plaintiff.

Michael C. Holmes, Emily Schomburger Johnson, Robert Power Ritchie, Vinson and Elkins LLP, Amy Tankersley Perry, Dallas, TX, Allison Lee Fuller, Jeffrey S. Johnston, Vinson Elkins LLP, Houston, TX, for Defendants.

**MEMORANDUM AND RECOMMENDATION**

Christina A. Bryan, United States Magistrate Judge

**\*1** This matter is before the Court on Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Dkt. 105.[1] Having considered the parties' submissions and the law, this Court **RECOMMENDS** that Plaintiffs' Motion for Class Certification be **GRANTED**.

**I. BACKGROUND**

**1. Procedural History**
This class action case asserts violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 against Defendant Applied Optoelectronics, Inc. ("AOI"), and violations of Section 20(a) of the Exchange Act against Defendants Chih-Hsiang Thompson Lin and Stefan J. Murry (collectively "Individual Defendants"). Dkt. 103. AOI is a manufacturer of fiber-optic networking products. *Id*. ¶ 38.

Defendant Lin founded AOI and has acted as President and Chief Executive Officer since its inception, and as Chairman of the Board since January 2014. *Id*. ¶ 30. Defendant Murry has been AOI's Chief Financial Officer since August 2014, and Chief Strategy Officer since December 2012. *Id*. ¶ 31.

This suit was filed in August 2017 and consolidated with *Ludwig v. Applied Optoelectronics, Inc. et al*, No. 4:17-cv-2399 in October 2017. Dkt. 44 at 2. Five separate parties moved to be appointed as Lead Plaintiff, and on January 19, 2018, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the district court held a hearing on the motions. *Id*. at 1, 3-4. The district court appointed Lawrence Rougier as Lead Plaintiff and approved Rougier's choice of Class Counsel on January 22, 2018. *Id*. at 11. In its order appointing Rougier as Lead Plaintiff, the district court noted that Rougier purchased shares of AOI during the Class Period (February 23, 2017 through February 21, 2018) and that those shares subsequently lost significant value as a result of Defendants' alleged misconduct. *Id*. The district court also found that, for purposes of appointment as Lead Plaintiff, Rougier met the typicality and adequate representation requirements of Rule 23. *Id*.

Lead Plaintiff Rougier filed the First Consolidated Amended Class Action Complaint in March 2018, alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act against all Defendants, and violations of Section 20(a) of the Exchange Act against the Individual Defendants. Dkt. 48. Defendants filed a Motion to Dismiss the First Amended Complaint (Dkt. 53), and Lead Plaintiff responded. Dkt. 56. The district court denied Defendants' Motion to Dismiss in March 2019. Dkt. 81.

Lead Plaintiff Rougier and Plaintiffs Richard Hamilton, Kenneth X. Luthy, Roy H. Cetlin, and John Kugel (collectively "Plaintiffs") filed the Second Amended Class Action Complaint in May 2019. Dkt. 103. Plaintiffs have now filed a Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel, seeking to certify a class composed of:

> All persons or entities who purchased or otherwise acquired publicly traded common stock and/or call options of Applied Optoelectronics, Inc., or sold put options of Applied Optoelectronics, Inc., during the

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

period from February 23, 2017 through February 21, 2018, inclusive, and were injured thereby.

**\*2** Dkt. 105 at 6. Defendants filed a timely Response to the Motion, and Plaintiff filed a timely Reply. Dkt. 115; Dkt. 123. Plaintiffs argue in their Motion that the proposed Class and its Class Counsel readily satisfy each requirement of Rule 23(a) and that the proposed Class meets Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. Dkt. 105 at 11-12, 15.

## 2. Factual History

### A. AOI manufactures and sells optical transceivers to Facebook, Amazon, and others.

AOI manufactures and sells optical transceivers, which connect computer servers at datacenters. Dkt. 103 ¶ 1. Those computer servers communicate with personal computers, mobile phones, and other connected devices. *Id*. AOI sells most of its products to a small group of technology giants including Facebook, Amazon, and Microsoft. *Id*. ¶ 2. These technology giants operate hyperscale datacenters that store, process, and communicate massive amounts of data for websites (Facebook), or for cloud computing services (provided by companies like Amazon and Microsoft). *Id*. ¶ 48. Amazon is AOI's largest customer, representing 68% of AOI's revenue from its datacenter business. *Id*. ¶ 2.

As consumers increase their use of digital bandwidth on websites and cloud computing services, datacenters seek faster data transmission rates to keep up with the growing consumer demand for bandwidth. *Id*. ¶ 48. Because the transmission speed of an optical transceiver limits the speed at which a datacenter can communicate information, datacenters constantly pursue faster transceivers. *Id*. In 2013, a transceiver that could transmit one gigabit ("1 Gbps" or "1G") of data per second was cutting-edge, but by 2015, 1G transceivers had been almost completely replaced by 40G transceivers (which contain four 10G chips and can transmit forty gigabits of data per second). *Id*. By late 2015, 100G transceivers (which contain four 25G chips and can transmit 100 gigabits of data per second) entered the market. *Id*. ¶ 49. Although the majority of AOI's datacenter sales in 2016 consisted of 40G transceivers, the demand for 100G

transceivers was increasing by the beginning of the Class Period. *Id*.

AOI uses a "vertically integrated" manufacturing system, meaning AOI owns the supply chain for its products. For example, AOI manufactures laser chips in Texas and those chips are sent to Taiwan and used in the manufacture of the transceivers AOI sells to Amazon. *Id*. ¶¶ 50, 65, 75. Throughout the Class Period, AOI told investors that its vertical integration model yielded a critical advantage over competitors with respect to the industry transition from 40G to 100G transceivers, allowing AOI to better keep up with increasing demand for faster transceivers. *Id*. ¶ 3. Plaintiffs allege that AOI's vertical integration model actually suffered from major supply chain problems that made it impossible to meet demand. *Id*. ¶ 53.

Plaintiffs argue that Defendants were aware of, but failed to disclose, major competitive threats to AOI posed by the "merchant model," a competing manufacturing model in which end-users direct the custom assembly of transceivers using parts from multiple suppliers. *Id*. ¶ 76. Following an announced partnership between Amazon and a merchant model competitor, Plaintiffs claim Defendants still failed to address the known expected decline in sales to Amazon. *Id*. ¶ 80.

### B. Defendants' public statements alleged to have violated Section 10(b) and Rule 10b-5.

#### i. The February 23, 2017 Press Release and Earnings Call

**\*3** The proposed Class Period begins on February 23, 2017, the date Defendants issued a press release announcing AOI's fourth quarter and year-end 2016 results. Dkt. 103 ¶ 94. In the press release, AOI touted its vertical integration model as providing competitive advantages that would expand AOI's market leadership during the industry-wide transition to 100G. *Id*. During an earnings call held the same day, Defendants reiterated the supposed competitive advantages of AOI's vertical integration model (*Id*. ¶¶ 96-97) and insisted that it gave AOI an advantage in keeping up with customer demand, particularly within the datacenter market. *Id*. ¶¶ 100-01.

When asked in the earnings call about a decline in demand for 40G products, Defendants responded that the decline would

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 103 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

not be problematic for AOI given the company's unique ability to transition its manufacturing operation from 40G to 100G, thereby making up for lost 40G sales with an increase in 100G sales. *Id*. ¶ 99. When asked "how much visibility" the company had into its customers' ramp up to 100G, Defendants stated that they had "good visibility" into customer demand and that customers' purchases were consistent with the projections customers had given to AOI. *Id*. ¶ 102. Following the press release and earnings call, AOI stock price rose from $37.47 per share to $45.98 per share. *Id*. ¶ 103.

### ii. The 2016 Form 10-K Filed on March 9, 2017

AOI filed its 2016 Form 10-K Annual Report with the SEC on March 9, 2017. Dkt. 103 ¶ 105. The 2016 Form 10-K was signed by the Individual Defendants and listed AOI's "[v]ertically integrated, geographically distributed manufacturing model" as a "key competitive strength[ ]" for AOI. *Id*. ¶¶ 105, 107. The 2016 Form 10-K also stated that AOI expected continued sales of 40G and 100G products in 2017 with 100G sales eventually exceeding 40G sales. *Id*. ¶ 107.

### iii. The March 22, 2017 Investor Session.

On March 22, 2017, Individual Defendant Murry participated in an investor session at the Optical Fiber Communication Conference and Exhibition, where he spoke about the benefits of AOI's vertical integration model. Dkt. 103 ¶ 109. Murry represented that AOI was one of a "relatively small number of companies" that could manufacture the chips to be used in its transceivers in-house, which was a competitive advantage in terms of quickly scaling production to meet customer demand. *Id*. ¶¶ 109-10. He also stated that AOI was ready for increasing demand from datacenter customers based on what customers had told AOI they would need "this year and next year." *Id*. ¶ 111.

### iv. The May 4, 2017 Press Release and Earnings Call

On May 4, 2017, AOI issued a press release announcing its first quarter 2017 results. Dkt. 103 ¶ 144. Defendants reported "record performance" and stated that AOI continued to maintain a competitive advantage given

its "technology innovation, manufacturing excellence, and customer satisfaction." *Id*.

AOI also held an investor earnings call on May 4, 2017 in which it touted AOI's visibility into Amazon and other customers and again asserted that, due to its vertical integration model, AOI had no issues from competitors. *Id*. ¶ 116. Although Defendants were allegedly aware that their merchant model competitors were increasing business with datacenters like Amazon, the Individual Defendants dismissed suggestions of competitive pressure from the merchant model. *Id*. ¶ 117, 119. Following the press release and earnings call, AOI's stock price rose $9.15 from $46.81 to $55.96 on May 5, 2017. *Id*. ¶ 124.

### v. The July 13, 2017 Press Release

On July 13, 2017, AOI issued a press release announcing preliminary second quarter 2017 earnings. Dkt. 103 ¶ 26. Plaintiffs allege that, instead of addressing the change in competition posed by the merchant model and the known decline in sales to Amazon, Defendant Lin announced that AOI had delivered "another record quarter with [AOI's] top and bottom-line results expected to exceed [AOI's] guidance." *Id*. Following the July 13, 2017 press release, AOI's share price increased $5.40 to a closing price of $78.04 per share. *Id*. ¶ 127.

### C. Defendants' Partial Corrective Disclosures

 **\*4** Plaintiffs allege that Defendants' materially false statements and omissions caused AOI's share price to be artificially inflated. Dkt. 103 ¶ 177. Plaintiffs further allege that, when the truth of AOI's situation was revealed through a series of partial corrective disclosures, the artificial inflation of the share price was removed. *Id*. ¶ 171. The partial corrective disclosures are described below.

### i. The August 3, 2017 Press Release and Earnings Call

On August 3, 2017, AOI held its second quarter 2017 press release and earnings call. Defendants acknowledged weakening demand for AOI's 40G product and that the downturn in demand for 40G products during the transition to 100G was greater than expected. *Id*. ¶ 130. Defendants continued to insist that AOI's vertical integration model gave AOI a significant advantage over merchant model

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 104 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

competitors and that the merchant model posed no real threat to AOI. *Id*. ¶ 136. The day following the release of the alleged partial corrective disclosures in the August 3 press release and earnings call, AOI's share price fell over 34% and closed at $64.60 per share. *Id*. ¶ 137.

### ii. The October 12, 2017 Press Release and Earnings Call

During an October 12, 2017 press release and earnings call, AOI informed investors that third quarter demand from Amazon had fallen, blaming Amazon's delay in transitioning from 40G transceivers to 100G transceivers. Dkt. 103. ¶¶ 140-41. Defendants informed investors that they did not believe the disruption in orders was "AOI-specific" and that it was, instead, "related to an ongoing transition from 40G to 100G." *Id*. ¶ 143. Following the October 12, 2017 news, AOI shares fell over 20% or by $11.83 per share. *Id*. ¶ 86, 142.

### iii. November 7, 2017 Press Release and Earnings Call

On November 7, 2017, AOI announced its third quarter 2017 results, which confirmed decreased demand from Amazon resulting in a loss of revenue from Amazon of $46.2 million. Dkt. 103 ¶¶ 146-47. Defendants continued to insist that the decreased demand was "not specific to AOI." *Id*. ¶ 147. Defendant Murry stressed AOI's vertical integration model, its ability to adapt to transitioning markets, and that sales of 100G products to other customers were "actually up" even though those sales did not balance out the overall decline from the "one customer," Amazon. *Id*. ¶ 149-50. Plaintiffs allege that these false reassurances caused the share price to increase by $5.75 per share over its closing price of $37.89 on November 7, 2017. *Id*. ¶ 151.

### iv. February 21, 2018 Press Release and Earnings Call

Plaintiffs claim that on February 21, 2018, AOI disclosed the full financial impact of Amazon's decreased demand. Dkt. 103 ¶ 153. Although AOI had previously blamed the third quarter 2017 sales decline on Amazon's delay in transitioning from 40G transceivers, AOI revealed on February 21 that its sale of 100G transceivers to Amazon had also dropped from 56% of datacenter revenue during the third quarter of 2017 to 35% during the fourth quarter. *Id*. ¶¶ 91, 153-54. Still, Defendant Murry stated that AOI expected to see long-term growth in sales from its datacenter customers despite the

short-term drop. *Id*. ¶ 155. Following the disclosure, AOI's share price dropped over 20% from $34.55 to $27.51. *Id*. ¶ 156.

## II. LEGAL STANDARDS FOR CLASS CERTIFICATION

The party seeking class certification bears the burden of showing that the proposed class satisfies the requirements of Rule 23. *In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2013 WL 6388408, at *4 (S.D. Tex. Dec. 6, 2013) (citing *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)). Thus, to obtain certification of the proposed Class, Plaintiffs must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of either Rule 23(b)(1), (b)(2), or (b)(3). *BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at *4 (citing *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012)).

 **\*5**  To satisfy the requirements of Rule 23(a), Plaintiffs must demonstrate that (1) the class is so numerous that joinder is impracticable; (2) common questions of law or fact exist among the class members; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately represent the interests of the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

With respect to Rule 23(b), Plaintiffs have moved for certification of the proposed Class under Rule 23(b)(3), which requires that questions of law or fact common to the Class Members predominate over any questions affecting only the individual Members, and that a class action is superior to any other available method for fairly and efficiently resolving the controversy. FED. R. CIV. P. 23(b)(3). This requirement is more demanding than the commonality prong of Rule 23(a) because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

## III. ANALYSIS OF RULE 23(a) FACTORS

Although Defendants make no argument regarding Plaintiffs' ability to satisfy the prerequisites of Rule 23(a), "it is improper for a district court to certify a class action without first demonstrating that the plaintiff has satisfied each of the

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

requirements of Rule 23." *Vizena v. Union P. R.R. Co.*, 360 F.3d 496, 503 (5th Cir. 2004). Therefore, as set forth below, the Court finds Plaintiffs have demonstrated that the proposed Class meets the requirements of Rule 23(a)(1)-(4).

### 1. Numerosity

To satisfy Rule 23(a)(1)'s numerosity requirement, Plaintiffs must put forward evidence showing that the number of class members is so large that joinder is impracticable. FED. R. CIV. P. 23(a)(1). Plaintiffs seek to certify a class composed of:

> All persons or entities who purchased or otherwise acquired publicly traded common stock and/or call options of Applied Optoelectronics, Inc., or sold put options of Applied Optoelectronics, Inc., during the period from February 23, 2017 through February 21, 2018, inclusive, and were injured thereby. [2]

Dkt. 105 at 6 (the "Class Members"). While Plaintiffs do not know the precise number of individuals that make up the proposed Class, they have provided information from which the Court can reasonably conclude that the Class is so numerous that joinder is impracticable.

Throughout the Class Period, AOI common stock was listed on a national exchange, the NASDAQ Global Market. Dkt. 106-1 ¶ 24. On the first day of the Class Period, AOI had 18.4 million shares outstanding. *Id*. ¶ 25. On the last day of the Class Period, AOI had 19.5 million shares outstanding. *Id*. ¶ 26. During the Class Period, AOI had a total volume of 686,926 call option contracts (representing over 68 million underlying shares) and 744,557 put option contracts (representing over 74 million underlying shares). *Id*. ¶ 134. Based on the number of outstanding shares traded on a national exchange and the volume of put and call option contracts, the Court can reasonably assume that the Class Members are sufficiently numerous and geographically dispersed to make joinder impracticable. *See Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981) ("[A]ny class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security

were traded must necessarily be so numerous that joinder of all members is impracticable." (quotations omitted)); *see also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) ("While Plaintiffs have not provided evidence concerning how many contemporaneous traders exist, the Court relies on the sheer number of shareholders alone, which indicates joinder of all class members is impracticable." (citations omitted)).

### 2. Commonality

**\*6** Rule 23(a)(2) requires Plaintiffs demonstrate that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Commonality requires that Plaintiffs' and the Class Members' claims depend on a common contention that is capable of class-wide resolution, meaning determination of its truth or falsity will resolve an issue central to each Class Members' claim in "one stroke." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. at 350. Furthermore, Plaintiffs must demonstrate, not only that the Class Representatives and the proposed Class suffered a violation of the same provision of law, but that they all suffered the same injury as a result. *Id*. at 349-50.

The claims of all Class Members hinge on common contentions that are capable of being resolved class-wide. For example, Plaintiffs allege that AOI made various misrepresentations and omissions via public press releases (Dkt. 103 ¶¶ 94, 114, 126), earnings calls (*Id*. ¶ 96, 116), and SEC filings (*Id*. ¶ 105). The materiality and veracity of those statements will be proven class-wide and are contentions common to the entire Class. *See Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C. 1993) (finding commonality present in securities fraud cases when claim is based on alleged misrepresentations in annual reports, interim reports, and press releases).

Plaintiffs further allege that those uniform misrepresentations and omissions resulted in inflated prices of AOI securities, an injury affecting the entire Class. Like the issue of whether AOI's statements were material and misleading in violation of the Exchange Act, whether the statements artificially inflated the stock price is a question common to all proposed Class Members. Furthermore, whether AOI possessed the scienter required to impose liability under § 10(b) of the Exchange Act is an issue common to all members of the Class, which will be resolved as to each Class Member "in one stroke." *See Wal-Mart v. Dukes*, 564 U.S. at 350. Because resolution of these common issues applies to the claims of each Class Member, the Court finds that the Plaintiffs have satisfied the

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)
Fed. Sec. L. Rep. P 100,704

commonality prerequisite for class certification. *See In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564-65 (E.D. Tex.) (finding commonality satisfied in securities class action where defendants made uniform misrepresentations to the investing public in SEC filings and press releases and the material misrepresentations and omissions artificially inflated the market price of securities, injuring each class member who purchased the artificially priced securities).

### 3. Typicality

Plaintiffs must also demonstrate the threshold requirement of typicality, which requires that the claims or defenses of the class representative be typical of the claims and defenses of the class. FED. R. CIV. P. 23(a)(3). Typicality "requires that the representatives' claims share the same essential characteristics with the class members' claims." *Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. at 565 (citations omitted). Typicality exists when the representative plaintiff's claims arise out of the same event or course of conduct as the other class members' claims, and all claims are based on the same legal theories. *Krogman v. Sterritt*, 202 F.R.D. 467, 472 (N.D. Tex. 2001).

Here, Plaintiffs' claims and the Class Members' claims arise from the same events and are based on the same legal theories. First, Plaintiffs and the Class complain of the exact same misrepresentations, omissions, and course of conduct by AOI. Plaintiffs and the purported Class both allege AOI's representations and omissions artificially inflated the value of AOI securities during the Class Period. Second, the claims alleged by Plaintiffs and the Class are based on the same legal theories—violations of Sections 10(b) and 20(a) of the Exchange Act. The Court finds Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy of Class Representatives

 **\*7**  Rule 23(a)(4) requires Plaintiffs demonstrate that they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Courts in the Fifth Circuit assess three factors when considering whether the class representatives will fairly and adequately protect the interests of the Class: (a) "the zeal and competence of the representative[s'] counsel"; (b) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (c) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins.*

*Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)).

#### A. Class Counsel has shown itself to be zealous and competent to pursue the litigation.

Plaintiffs' selected Class Counsel, the law firm of Levi & Korinsky, LLP, has demonstrated the zeal and competence required to adequately represent the interests of the Class. The attorneys at Levi & Korinsky have experience in securities and class actions issues and have been appointed lead counsel in a significant number of securities class actions across the country. Dkt. 106-2 at 27-30. The firm has drafted two Amended Complaints (Dkt. 48, 103); defeated Defendants' Motion to Dismiss (Dkt. 81); served and obtained discovery from Defendants and third parties; retained experts; and filed the instant Motion to Certify the Class. Dkt. 105 at 15. Counsel's participation in the suit and their experience in complex securities class actions support a finding that they will adequately represent the interests of the Class. *See In re Loewen Grp. Inc. Sec. Litig.*, 233 F.R.D. 154, 166 (E.D. Pa. 2005) (finding Rule 23(a)(4) satisfied where counsel was experienced in securities fraud disputes and had vigorously pursued the action by preparing memoranda and conducting appropriate discovery).

#### B. Plaintiffs are willing to take an active role in and control the litigation.

When determining adequacy, courts also consider whether the class representatives have enough understanding of the case to be able to control or prosecute the litigation and whether they are willing to take an active role in controlling the litigation. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005) (citing *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001)). Lead Plaintiff Rougier has participated in Levi and Korinsky's work on the case, including drafting Amended Complaints, drafting the Response to the Motion to Dismiss, obtaining discovery, and the preparation of the Motion to Certification of a Class. Dkt. 105 at 15. Plaintiffs have all certified that they would continue to "vigorously monitor and participate in this litigation and [are] available to testify at trial." Dkt. 106-2 at 5, 9, 14, 18, 23. Plaintiffs have also verified that they understand their duty to prosecute the case vigorously and in the best interests of all Class Members, which includes reviewing important filings, consulting with Counsel on proposed strategies, making recommendations as to whether to accept a settlement offer, and testifying in a deposition or trial if required. *Id.* at 3, 8,

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 107 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

13, 17, 22. Plaintiffs have demonstrated their willingness to take an active role in and control the litigation.

### C. Plaintiffs' interests do not conflict with those of the Class.

There is no evidence of any conflict between the interests of Plaintiffs and those of the Class. All Class Members allege losses from transacting in AOI securities at artificially inflated prices, caused by the same underlying misrepresentations and omissions. Plaintiffs and the Class Members have the same interest in recovering for any loss caused by the alleged misrepresentation and omissions. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. at 502-03 ("[A]s long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class" there is no antagonism between the class and the representatives). The definition of the proposed Class excludes potential Members whose interests could be antagonistic to Plaintiffs' interests. For example, the proposed class definition excludes: (i) Defendants; (ii) the Individual Defendants' immediate family members; (iii) any person who was an officer or director of AOI during the Class Period; (iv) any firm, trust, corporation, or other entity in which a Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity. Finally, there has been no evidence or argument that Plaintiffs are subject to legal defenses that are different from, or inapplicable to, the Class.

**\*8**  Plaintiffs have satisfied their burden of showing that the proposed Class meets each of the Rule 23(a) requirements for class certification. Having satisfied the threshold requirements of Rule 23(a), Plaintiffs must also satisfy the requirements under Rule 23(b)(3).

### IV. ANALYSIS OF RULE 23(b)(3) FACTORS

Plaintiffs moving for certification under Rule 23(b)(3) must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Requiring that common issues predominate over individual issues "prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*,

319 F.3d 732, 738 (5th Cir. 2003)). Plaintiffs have established that common issues predominate over any individual issues and that a class action is the most fair and efficient method for adjudicating the controversy, thereby satisfying the Rule 23(b)(3) predominance requirement.

#### 1. Predominance

"Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires [the Court] to consider 'how a trial on the merits would be conducted if a class were certified.' " *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Ins. Indem. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)). Considering whether the case should be tried as a class action "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class ...." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d at 555 (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

The substantive issues that will control the outcome at trial arise from Plaintiffs' claims that Defendants violated § 10(b) and the Individual Defendants violated § 20(a) of the Securities and Exchange Act of 1934, and thereby injured the Class Members. To recover for violations of § 10(b) and Rule 10b-5, which prohibit material misstatements or omissions in connection with the purchase or sale of any security, Plaintiffs must prove: (1) a material misrepresentation or omission by Defendants; (2) made with scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").

To recover for a violation of § 20(a), which imposes joint and several liability for an underlying securities fraud violation, Plaintiffs must prove the Individual Defendants had actual power over AOI and induced or participated in the alleged violations. 15 U.S.C.A. § 78t(a); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 749-50 (S.D. Tex. 2012). Because § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof. *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 699 (S.D. Tex. 2006). The additional substantive issue of whether the Individual Defendants had actual power over AOI and participated in or induced the fraud will be proven by the Individual Defendants' conduct,

Fed. Sec. L. Rep. P 100,704

not by the conduct of any Class Members. Therefore, individual issues will not predominate with respect to the § 20(a) claims. *Id*. at 700. Accordingly, the discussion of predominance is limited to the elements of § 10(b).

### A. The alleged fraud, materiality, and scienter all are subject to common proof.

**\*9** No party disputes that whether Defendants made material misrepresentations and omissions, and whether those misrepresentations and omissions were made with the required scienter, are issues capable of class-wide proof. The same alleged misrepresentations and omissions that form the basis of each Class Members' § 10(b) claims were made in press releases and earnings calls on February 23, 2017 and May 4, 2017; the 2016 Form 10-K filed on March 9, 2017; the March 22, 2017 investor session; and the July 13, 2017 press release. The jury will make a single decision regarding the materiality and truthfulness of the alleged misrepresentations and whether Defendants acted with the requisite scienter based on common proof and that decision will apply to all Class Members' claims. The entire Class will be cohesive with respect to its success or failure in proving the materiality of Defendants' misrepresentations and whether Defendants acted with the requisite scienter. *See Amgen, Inc. v. Conn. Ret. Plans & Tr.*, 568 U.S. 455, 460 (2013).

### B. Reliance is subject to common proof under the fraud on the market presumption.

Requiring proof of the Class Members' individual reliance on Defendants' misrepresentations or omissions in a securities fraud case would overwhelm issues common to the Class and, therefore, preclude class certification under Rule 23(b)(3). *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988). To address this problem, the Supreme Court has held that securities fraud plaintiffs can, in certain circumstances, satisfy the reliance element "by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 268 (discussing *Basic v. Levinson*, 485 U.S. 224 (2014)). The "fraud on the market theory," which underlies the reliance presumption,

> is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company

and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements .... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic v. Levinson*, 495 U.S. at 241-42.

The fraud on the market presumption of reliance applies when (1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the proposed Class Members traded the stock between the time the misrepresentations were made and the truth was revealed (market timing); and (4) the stock traded in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 268. Each of these requirements flows from the underlying theory of the fraud on the market presumption: if a misrepresentation is not publicly known or is immaterial, or the market is inefficient, then the misrepresentation could not have distorted the stock price or had an actual impact on the investor's deliberations in buying or selling the stock. *Id*. at 278. Likewise, if the investor did not buy or sell the stock after the misrepresentation was made, but before the truth was revealed, the investor could not have relied on the distorted price. *Id*.

As discussed below, Plaintiffs have demonstrated that they will satisfy the elements required to invoke *Basic's* presumption of reliance arising from the fraud on the market theory.

### i. Plaintiffs allege publicly known misrepresentations.

The alleged misrepresentations by Defendants were publicly known because they were made in SEC filings (Dkt. 103 ¶ 105), press releases (*Id*. ¶¶ 94, 114, 126), and earning calls (*Id*. ¶¶ 96, 116). According to Dr. Hartzmark there were at least 24 research analysts reporting on AOI during the Class Period and over 1,000 articles on Bloomberg and Factiva alone discussing AOI, which further suggests that Defendants' misrepresentations were publicly known. Dkt. 106-1 ¶¶ 34-35.

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 109 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

### ii. Plaintiffs need not prove materiality at this stage.

**\*10** Even though the materiality of the alleged misrepresentations or omissions is a prerequisite for invoking the *Basic* presumption, the Supreme Court has held that materiality should be left for determination at the merits stage because Rule 23(b)(3) requires a showing that common questions predominate, not that they will be answered in favor of the Class on the merits. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 282 (holding that materiality is an objective issue subject to class-wide proof and does not bear on the predominance requirement) (citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. at 459-60). Plaintiffs need not show materiality of the misrepresentations at the class certification stage in order to invoke the fraud on the market presumption of reliance.

### iii. The class definition satisfies the market timing requirement.

Market timing requires that that proposed Class Members traded the stock between the time the misrepresentations were made and when the truth was revealed. The Class must be limited to those investors who invested in AOI securities between the time of the misrepresentation and the correction, based on the assumption that, if an investor did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then she could not be said to have acted in reliance on the "fraud-tainted" price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. at 278. The proposed Class is defined as persons or entities who purchased or acquired shares and/or call options between the first alleged misrepresentation (February 23, 2017) and the last corrective disclosure (February 21, 2018). Dkt. 105 at 6. Thus, the market timing requirement for the presumption has been met.

### iv. Plaintiffs have demonstrated an efficient market.

To invoke the fraud on the market theory and thereby eliminate the need for individual proof of reliance, Plaintiffs must establish that AOI securities were traded in an efficient market. *See Unger v. Amedisys, Inc.*, 401 F.3d at 322. Drawing from *Cammer v. Bloom* and *Krogman v. Sterritt*, the Fifth Circuit has adopted eight factors for gauging whether a security trades in an efficient market. *Id*. at 323; *Cammer v.*

*Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. at 477-78. The eight factors recognized by the Fifth Circuit in *Unger*, have been widely used by courts around the country. *Unger v. Amedisys, Inc.*, 401 F.3d at 323.

The first five factors courts in the Fifth Circuit analyze when gauging market efficiency, the *Cammer* factors, include: (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; and (5) the existence of empirical facts that show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Unger v. Amedisys, Inc.*, 401 F.3d at 323 (citing *Cammer v. Bloom*, 711 F. Supp. at 1286-87). Courts then analyze the three *Krogman* factors, which include: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, which is the stock's trading volume without counting insider-owned stock. *Unger v. Amedisys, Inc.*, 401 F.3d at 323 (citing *Krogman v. Sterritt*, 202 F.R.D. at 477-78). As discussed below, analysis of the eight factors demonstrates an efficient market and Plaintiffs therefore will be entitled to a class-wide presumption of reliance.

### a. *Cammer* Factor 1: Average weekly trading volume

**\*11** Average trading volume is one of the strongest factors for gauging market efficiency. *Krogman v. Sterritt*, 202 F.R.D. at 474. "A large weekly volume of stock trades suggests significant investor interest in a company and implies that many investors are executing trades based on newly available or disseminated corporate information." *Id*. (citing *Cammer v. Bloom*, 711 F. Supp. at 1286). Turnover measured by average weekly trading of two percent or more of the outstanding shares justifies a strong presumption that the market for the security is an efficient one and one percent turnover justifies a substantial presumption. *Id*.

A report prepared by Plaintiffs' expert, Dr. Hartzmark, describes AOI's weekly trading volume as far in excess of the two percent turnover that justifies a strong presumption of market efficiency:

> [F]or the Class Period a total of 647.0 million shares traded hands with an average daily volume of 2.58 million shares....[A]verage weekly volume was 12.47 million

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

shares. The ratio of average weekly volume to shares outstanding is 65% - more than **30 times** the 2% threshold that *Cammer* held "would justify a strong presumption that the market for the security is an efficient one."

Dkt. 106-1 ¶ 29. Defendants do not contest Dr. Hartzmark's information or his conclusions. The Court finds Plaintiffs have demonstrated an average weekly trading volume far in excess of the two percent turnover courts have found to create a strong presumption of market efficiency and have satisfied the first *Cammer* factor.

### b. *Cammer* Factor 2: Reporting on AOI Stock by Securities Analysts

When a large number of securities analysts review and report on a company's stock, it is likely that the information disseminated by the corporation is relied upon by the stock-trading public because the reports are viewed by investment professionals when making buy and sell recommendations to client investors. *Krogman v. Sterritt*, 202 F.R.D. at 475 (citing *Cammer v. Bloom*, 711 F. Supp. at 1286). According to Dr. Hartzmark's report, at least 24 analysts were reporting on AOI during the Class Period. Dkt. 106-1 ¶ 32. Further, during the Class Period there were 197 reports and over 1,000 articles discussing AOI. *Id*. ¶¶ 32, 35. The number of research analysts following AOI (9) compares favorably to the median number of analysts following all common stocks on the NYSE (9) and NASDAQ (7) at the end of 2017. *Id*. ¶ 34. These uncontested facts support a finding that AOI securities traded in an efficient market. *See In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (coverage by three securities analysts favored market efficiency); *see also Aranaz v. Catalyst Pharm. Partners, Inc. et al.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (coverage by at least four supported market efficiency); *see also Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153-54 (S.D.N.Y. 2012) (coverage by "numerous securities analysts employed by major brokerage firms" supported market efficiency).

### c. *Cammer* Factor 3: NASDAQ Listing and Market Maker Activity

Most courts agree that whether a security is listed on the NASDAQ is a good indicator that the stock trades in an efficient market. *See Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 448-49 (W.D. Tex. 2019) ("[NASDAQ is "one of the largest markets in the world, and perhaps for this reason, Defendants have not contested that [the company] stock trades in an efficient market."); *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market ...."); *see also Carpenters Pension Tr. Fund of St. Louis, et al. v. Barclays PLC, et al.*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) ("[M]ost courts agree that [listing on the NYSE or NASDAQ] is a good indicator of efficiency."). AOI common stock traded on the NASDAQ Global Select Market. Dkt 106-1 ¶ 40.

**\*12** Market makers are firms that make a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at publicly-quoted prices. *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. at 508 n. 24. "[T]he volume of shares that [market makers] committed to trade, the volume of shares they actually traded, and the prices at which they did so" are indicators of market efficiency. *Krogman v. Sterritt*, 202 F.R.D. at 476. Nine dealers or market makers traded in excess of one percent of the total volume of AOI common stock during the Class Period. Dkt. 106-1 ¶ 43. Dr. Hartzmark also offered data demonstrating that "a large group of sophisticated investors, institutional investors and investment advisors participated in the market for AOI common stock." *Id*. ¶¶ 45-46. "The fact that AOI was listed on the NASDAQ Global Select Market and had a least nine active market makers, as well has many other less active market makers, standing ready to buy or sell ... support[s] the conclusion that [AOI] common stock traded in an efficient market throughout the Class Period." *Id*. ¶ 44.

### d. *Cammer* Factor 4: Form S-3 Eligibility

Companies that file monthly reports with the SEC for one year and have a public equity float [3] in excess of $75 million are eligible to file Form S-3, a short form securities registration for companies whose stocks are actively traded and widely followed. *See* 17 C.F.R. § 239.13; *Krogman v. Sterritt*, 202 F.R.D. at 476. The SEC's rationale for allowing a company to file a Form S-3 "is predicated on the Commission's belief that the market operates efficiently for [qualifying] companies, i.e., that the disclosure in Exchange Act reports and other communications ... such as press releases, has already been disseminated and accounted for by the market place." *Cammer v. Bloom*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6235 (Sept. 10, 1980)). AOI filed a Form S-3 on June 3, 2015 and again on October 17, 2016,

Case 4:21-cv-02473    Document 84-5    Filed 06/19/24 in TXSD    Page 111 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

another factor supporting a finding that AOI securities traded in an efficient market during the Class Period. Dkt. 106-1 ¶ 51-52.

### e. *Cammer* Factor 5: Reaction of Stock Price to New Material Information

"Evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the price of the stock is an important indicator of market efficiency." *Barrie v. Intervoice-Brite, Inc.*, Civil Action No. 3:01-CV-1071-K, 2009 WL 3424614, at *11 (N.D. Tex. Oct. 26, 2009) (citing *Krogman v. Sterritt*, 202 F.R.D. at 477). In fact, some courts have deemed the relationship between unexpected events and the response of the stock price "the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer v. Bloom*, 711 F. Supp. at 1287; *see also In re 2TheMart.com, Inc.*, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000) (stating that the fifth *Cammer* factor may be the most important factor for evaluation of market efficiency).

A rapid change in share price alone does not demonstrate a causal connection between the news and the price reaction. *Unger v. Amedisys, Inc.*, 401 F.3d at 325. Therefore, to demonstrate the causal relationship between new and unexpected information and the price of AOI stock, Dr. Hartzmark performed an event study to demonstrate the impact of different variables on AOI's stock price.[4] Dkt. 106-1 ¶ 67. Dr. Hartzmark's report describes how his event study demonstrates the cause and effect relationship between the alleged misrepresentations and partial disclosures on stock price. *Id*. ¶¶ 65-121. Based on his analysis, Dr. Hartzmark concludes that disclosures of AOI-specific news "caused rapid and significant movements in the prices of [AOI] common stock" and [t]hese analyses strongly support the conclusion that the marked for [AOI] stock was efficient ...." *Id*. ¶ 122-23. Dr. Hartzmark's report provides sufficient information to support a finding of a causal relationship between the release of information and AOI stock price and supports a finding of market efficiency.

### f. *Krogman* Factor 1: Market Capitalization

**\*13**  Market capitalization is calculated as the number of shares multiplied by the prevailing share price. *Krogman v. Sterritt*, 202 F.R.D. at 478. Larger market capitalizations suggest market efficiency because stock purchasers have a greater incentive to invest in highly capitalized corporations. *Id*. (citations omitted).

At the start of the Class Period, AOI's market capitalization was $689.4 million and peaked at $1.9 billion. Dkt. 106-1 ¶ 55. AOI's market capitalization averaged over $1.0 billion throughout the Class Period and was at least in the 45th percentile of the NASDAQ and NYSE throughout the Class Period (meaning its capitalization was at least 45% higher than that of other listed common stock). *Id*. ¶ 55, 57. Class certification has been granted in securities class actions where the market capitalization of the defendant company was far lower than the average market capitalization of AOI throughout the Class Period. *Id*. ¶ 56 n. 82; *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (finding market efficiency where market capitalization rates ranged from $246,386,421 to $432,150,737); *see also DVI, Inc. Sec. Litig.*, 249 F.R.D. at 212 (E.D. Pa. 2008) (finding market efficiency where market capitalization ranged between $12 million and $300 million); *see also Pa. Ave. Funds et al. v. Inyx Inc. et al.*, No. 08-Civ. 6857 (PKC), 2011 WL 2732544, at *9-10 (S.D.N.Y. 2011) (finding market efficiency where market capitalization rates were consistently in excess of $22.4 million throughout the Class Period). AOI's market capitalization supports a finding that AOI securities traded in an efficient market.

### g. *Krogman* Factor 2: Bid-Ask Spread

A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency. Dkt. 106-1 ¶ 60. Using daily closing bids and ask quotes, Dr. Hartzmark calculated the bid-ask spread for AOI shares. *Id*. ¶ 61. The average daily percent spread for AOI common stock was 0.04% and daily average dollar spread was two cents. *Id*.

Dr. Hartzmark compared AOI's 0.04% bid-ask spread with the bid-ask spread for all 3,795 companies on the NYSE and NASDAQ as of December 29, 2017. *Id*. ¶ 61, 63. The average bid-ask spread for all of the companies on the NYSE and NASDAQ was 0.59%. *Id*. ¶ 63 AOI's 0.04% bid-ask spread was narrower than 79% of the common stocks on the NYSE and NASDAQ, and narrower than those found by other courts to be indicators of market efficiency. *Id*. ¶¶ 62-63 (citing *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, at 574-75 (C.D. Ca. 2012) (bid-ask spread of 0.58%); *In re Scientific-*

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)
Fed. Sec. L. Rep. P 100,704

*Atlanta*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (bid-ask spread "never exceeded 1.9%"); and *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (bid-ask spread of 2.44%)). AOI's 0.04% average daily bid-ask spread supports a finding that AOI securities traded in an efficient market.

### h. *Krogman* Factor 3: Float

Float is the percentage of a corporation's shares that are held by the public as opposed to insiders. *See Krogman v. Sterritt*, 202 F.R.D. at 478. When stocks are predominantly held by insiders as opposed to the public, stock prices are less likely to reflect all available information about the security. *Id*. A larger float relative to the total number of outstanding shares indicates that there is a large proportion of shares that are available to non-insiders, who can trade without restrictions and profit by trading on new information in the marketplace. Dkt. 106-1 ¶ 58.

**\*14** On average, AOI insiders held 0.7 million or 3.5% of the average shares outstanding during the Class Period. *Id*. ¶ 59. The public float ranged from 95.8% to 96.7% of AOI's shares. *Id*. AOI's large float supports a finding that AOI stock was traded in an efficient market. *Id*.; *see McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (float of 57% to 69% supported market efficiency).

### v. The same market efficiency factors apply to options.

Plaintiffs' proposed Class includes investors who purchased stock or call options, or sold put options during the Class Period. Dkt. 105 at 6. The fraud on the market presumption of reliance will eliminate the need to prove individual reliance both for Class Members who acquired stock, and also for Class Members who acquired call options or sold put options during the Class Period. The fraud on the market presumption of reliance applies to the purchase or sale of options during the Class Period because, like stock, AOI options traded in an efficient market.

An option is a contract for the right to buy or sell a stock at a specified price or strike price by a specific date. Dkt. 106-1 ¶125. A call option "gives the holder the right, but not the obligation, to purchase shares ... at a specified ... exercise price, on or before the specified expiration ... date." *Id*. A put option "gives the holder the right, but not the obligation to sell

shares ... at the specified exercise price on, or possibly before, the expiration date." *Id*. Options are derivative of securities because the price of an option is dependent on the magnitude of the difference between the fixed strike price of the option and the price of the stock. *Id*. ¶ 126. In other words, as the price of the common stock changes, all else being equal, the price of put and call options will change: as the stock price rises, the price of a call option will rise, and the price of a put option will fall. *Id*.

Courts in the Fifth Circuit routinely have held that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d at 754 ("[E]vidence applying the ... factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for ... § 10(b) claims based on the options."). In addition to this general principle, Dr. Hartzmark performed a separate statistical analysis to demonstrate that AOI options traded in an efficient market. Dkt. 106-1 ¶ 124-56. Dr. Hartzmark's unrebutted report establishes that "there was a substantial amount of volume and a large amount of open interest in options on [AOI] common stock during the Class Period." *Id*. ¶ 135. Further, Dr. Hartzmark's statistical analysis of the cause and effect relationship of AOI-specific information on the price of AOI options demonstrated that the information caused rapid and significant movements in the prices of AOI options. *Id*. ¶ 155. His statistical analysis and the evaluation of eight factors support the conclusion that AOI options operated in an efficient market. *Id*.

### C. Damages can be calculated using a common method.

Defendants do not challenge Dr. Hartzmark's opinion that AOI stocks and options traded in an efficient market and, therefore, *Basic's* presumption of reliance will eliminate the need to prove individual reliance. Defendants do challenge, however, Plaintiffs' ability to prove damages on a class-wide basis. Defendants argue that Plaintiffs' proposed damage model fails to track the Class theory of liability and overcompensates Class Members. Dkt. 115 at 7-9. As a result, Defendants contend that Plaintiffs have failed to satisfy their burden to demonstrate a class-wide damages methodology that satisfies Rule 23(b)(3). *Id*. at 9.

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

### i. Plaintiffs' damages model proposes to calculate out-of-pocket losses resulting from fraud on the market.

**\*15** Plaintiffs' damages model uses empirical methods to calculate Class Members' out-of-pocket losses incurred as a result of Defendants' fraud. Dkt. 106-1 ¶¶ 157-60. Out-of-pocket losses are the difference between the price paid for the stock and the "but for" value of the stock, or what its value would have been absent the misrepresentations and omissions. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) ([T]he out-of-pocket measure ... allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud ....") (quotations omitted).

Plaintiffs' expert, Dr. Hartzmark, uses an event study to calculate the Class Members' out-of-pocket losses on a class-wide basis:

> This common damages methodology using the "out of pocket" loss often begins with the same type of event study I have used to evaluate price-related factors.
>
> \* \* \*
>
> In summary, to calculate damages, I identify the level of price inflation in [AOI] common stock attributable to the specific misrepresentations and omissions ultimately established by Plaintiffs. This "but-for" price does not depend on, nor need to consider, an individual investor's risk tolerance or expected returns. Rather it is common to all investors because it measures how the misrepresented information affected [AOI's] common stock price, which of course is the essence of fraud-on-the-market.

Dkt. 106-1 ¶¶ 159-60. In addition to identifying price inflation due to fraud, the proposed damages model also would use common empirical techniques to identify and disaggregate information affecting the stock price that is *unrelated* to the misrepresentations and omissions at issue. *Id*. ¶ 159; 124-1 ¶ 10. Using the daily levels of artificial inflation *attributable to fraudulent statements or omissions* and the actual trading activity of the Class Members, Dr. Hartzmark can calculate the damages for each Class Member in a methodical and mechanical manner. Dkt. 106 ¶ 159. According to Dr. Hartzmark, any decline in stock price caused by non-fraudulent information will be disaggregated as part of a loss causation analysis. Dkt. 124-1 ¶¶ 10-11. Because option prices are derived from the share price, Dr. Hartzmark's model

also can be used to calculate damages arising from option contracts. [5] Dkt. 106-1 ¶¶ 161-62. In short, because empirical techniques allow for the disaggregation of price decline due to factors other than the misrepresentations found by the jury, the proposed damages model would allow recovery only for out-of-pocket losses resulting from fraud on the market.

Plaintiffs' proposed damages model comports with the requirements of Rule 23(b)(3) as set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). In *Comcast*, the Supreme Court held that Rule 23(b)(3) requires that the method for calculating class damages be consistent with the theory of liability asserted in the case. *Comcast Corp. v. Behrend*, 569 U.S. at 35. The *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock. *See Ludlow v. BP, P.L.C.,* 800 F.3d 674, 691 (5th Cir. 2015) ("Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based upon *price and price alone*."). Furthermore, courts recognize event studies, like the one used by Dr. Hartzmark, as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability. *See BP, P.L.C. Sec. Litig.*, 2013 WL 6388408 at \*15 ("Event studies are commonly used in securities fraud class actions."); *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 ("[O]ut -of-pocket damages calculations through an event study analysis ... have been recognized by courts as an accepted method for the evaluation of damages in securities fraud cases ...."). Thus, Plaintiffs have demonstrated an accepted method for calculating Class Members' out-of-pocket damages that are consistent with a fraud on the market theory of liability.

### ii. Defendants' recasting of Plaintiffs' theory of liability does not preclude certification.

**\*16** Defendants argue that Dr. Hartzmark's proposed damages model overcompensates Plaintiffs because it allows Plaintiffs to recover for "materialization of risk" liability, which requires individual proof of risk tolerance. Dkt. 115 at 7-12. In support of this argument, Defendants rely on *Comcast* and the line of BP securities fraud cases involving the Deepwater Horizon explosion and oil spill. *See id*. (citing

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 114 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)
Fed. Sec. L. Rep. P 100,704

*In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ("*BP I*"); *In re BP P.L.C. Sec. Litig.*, Civil Action No. 4:10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ("*BP II*"); *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)).

An examination of the BP cases illustrates that their reasoning does not preclude class certification. Unlike the Plaintiffs in this case, the plaintiffs in *BP I* failed to demonstrate that the proposed class was entitled to benefit from the fraud on the market presumption of reliance. *BP P.L.C. Sec. Litig.*, 2013 WL 6388408 at *15 ("[T]he fraud-on-the-market presumption cannot be invoked, and Plaintiffs' claims based on these alleged misstatements are not appropriate for class action treatment."). In addition, the *BP I* plaintiffs failed to meet their burden to present an event study and damages methodology showing damages could be measured on a class-wide basis consistent with their theory of liability. *Id.* at *17. In this case, Plaintiffs *have* met their burden by presenting Dr. Hartzmark's report detailing an event study and a mechanical method for disaggregating price reactions that do not result from fraud on the market. *BP I* does not counsel denying class certification in this case.

In order to overcome the obstacles to class certification identified in *BP I*, the plaintiffs in *BP II* moved to certify two subclasses: a pre-explosion class and a post-explosion class. *BP P.L.C. Sec. Litig.*, 2014 WL 2112823 at *2. The pre-explosion subclass sought to recover for BP's false assurances that misled investors about BP's process safety and the ability to prevent events like the Deepwater Horizon blowout. *Id.* at *2-4. The post-explosion subclass sought to recover for more traditional securities fraud liability based on BP's false statements regarding the amounts of oil being released in the spill. *Id.* at *4-5.

In opposing certification of the pre-explosion subclass, BP argued that "[b]ecause the pre-explosion damages methodology is not based on the 'but for' price that the stock would have traded at absent [BP's] alleged fraud, it represents an impermissible windfall for investors, protecting them from the downside consequences of an assumed (if allegedly understated) risk." *Id.* at *10. Unlike the damages model in this case, it was undisputed in *BP II* that the pre-explosion subclass did not seek out-of-pocket damages based on the artificial inflation of the stock price. *Id.* Instead, the *BP II* plaintiffs claimed to be entitled to the full value of the drop in stock price following the Deepwater Horizon explosion as consequential damages. The district court refused to certify

the subclass, stating that causation damages were "antithetical to the fraud on the market theory" of liability by which investors sought class-wide resolution of their claims. *Id.* at *12. In other words, the proposed damages model was inconsistent with the class' theory of liability in violation of *Comcast*.

The Fifth Circuit upheld the district court's refusal to certify the pre-explosion subclass, and expanded on why the materialization of risk theory put forward by the subclass was not entitled to the *Basic* presumption of reliance:

> **\*17** Under *Basic*, courts presume reliance because (a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based on *price and price alone*. That is, if an investor makes investment decisions based upon price, he or she necessarily buys any particular stock in reliance upon all of the information or misinformation incorporated into its price. But plaintiffs' own model asserts that they relied on something other than price: risk. By claiming that class members may have divested themselves of BP stock if they had known about the true risk of an accident in the Gulf—as distinguished from that risk's impact on BP's stock *price*—the plaintiffs are arguing that their investment decisions were based substantially upon factors other than price. The plaintiff's argument thus undercuts one of the rationales for the *Basic* presumption of reliance.

*Ludlow v. BP, P.L.C.* 800 F.3d at 691.

On the other hand, the post-explosion subclass was a different matter. The post-explosion subclass "proposed to model damages ... by calculating the inflation caused by the fraudulent statements." *BP, P.L.C.*, 2014 WL 2112823 at *4. Accordingly, the district court found that plaintiffs' damages model met the requirements for class certification under Rule 23(b)(3). *Id.* at *12-14. The Fifth Circuit affirmed, noting

Case 4:21-cv-02473 Document 84-5 Filed 06/19/24 in TXSD Page 115 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

that the liability theory for the post-explosion subclass was consistent with its damage theory: "the liability stems from ... misstatements, and the loss forming the basis for Plaintiff's damages model comes from the inflated stock price caused by those misstatements." *Ludlow v. B.P., P.L.C.*, 800 F.3d at 687.

In this case, like the post-explosion subclass, Plaintiffs ultimately allege that AOI's "liability stems from ... misstatements, and the loss forming the basis for Plaintiffs' damages model comes from the inflated stock price caused by those misstatements." *Id*. With respect to liability allegations, Plaintiffs' Second Amended Complaint sets out a litany of alleged materially false and/or misleading statements and omissions. Dkt. 103 ¶¶ 94-128. With respect to the damages model, the Complaint alleges artificial inflation of the stock price and corrective disclosures that removed the artificial inflation, hallmarks of the fraud on the market theory of liability:

> The artificial inflation created by Defendants' misrepresentations and omissions was removed through a series of partial corrective disclosures by Defendant starting with their announcement on August 3, 2017 that one of their largest data center customers Amazon would be decreasing its demand for the Company's 40 Gbps products. The market was surprised by this disclosure and reacted swiftly. AOI's stock price declined 34% from a close of $97.99 per share on August 3, 2017, to a close at $64.60 per share on August 4, 2017, on heavier than usual trading volume of more than 17 million shares.

*Id*. ¶ 172. Plaintiffs also allege a corrective disclosure on October 12, 2017 that caused the stock price to drop from $58.84 to $47.01, and a final corrective disclosure on February 21, 2018 that caused the stock price to drop from $34.55 to $27.51. *Id*. ¶ 174, 176. Dr. Hartzmark's report and supplemental report describe at length his method for calculating the "but for" value of the stock, for disaggregating inflation or price fluctuations not related to the misrepresentations found by a jury, and how he would

use the inflation ribbon [6] to methodically calculate damages for each Class Member. Dkt. 106-1 ¶¶ 158-63; Dkt. 124 ¶¶ 9-14. Thus, unlike the plaintiffs in *BP I*, the Plaintiffs here have satisfied their burden to demonstrate a damages model that calculates artificial inflation, the but for price, and will disaggregate inflation unrelated to fraud. Also, as was the case for the post-explosion subclass the district court certified in *BP II*, there is no disconnect between Plaintiffs' theory of liability and damages model in violation of *Comcast*.

**\*18** Furthermore, several courts have addressed and rejected similar "materialization of risk" arguments made by other defendants opposing class certification under Rule 23(b)(3). *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, 322 F. Supp. 3d at 692 ("A number of courts have rejected similar attempts by defendants to reframe plaintiffs' theory of liability in order to prevent class certification in Rule 10(b)-5 securities fraud cases relying on the fraud-on-the-market theory of liability."); *see also Baker v. SeaWorld Ent., Inc.*, Case. No. 14cv2129-MMA (AGS), 2017 WL 5885542, at \*14 (S.D. Cal. Nov. 29, 2017) (rejecting defendants' argument that plaintiffs' out-of-pocket damages calculation was not properly tied to their theory of liability); *see also Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010). For example, in *Schleicher v. Wendt*, the Seventh Circuit rejected the defendants' attempt to recast the plaintiffs' fraud on the market case as a materialization of risk case, explaining that:

> Although "materialization of risk" runs like a mantra through the parties' briefs, we do not think that it has any significance .... If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust .... The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million .... [but] [t]he phrase adds nothing to the analysis .... [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.

*Schleicher v. Wendt*, 618 F.3d at 683-84. Like the defendants *Schleicher v. Wendt*, Defendants in this case attempt to defeat class certification by characterizing the fraud alleged by Plaintiffs as a misrepresentation of "the risks that AOI would experience a significant downturn in its datacenter business later that year[,]" which risk was realized when "the company

Case 4:21-cv-02473   Document 84-5   Filed 06/19/24 in TXSD   Page 116 of 117

Rougier v. Applied Optoelectronics, Inc., Not Reported in Fed. Supp. (2019)

Fed. Sec. L. Rep. P 100,704

made a series of reports ... revealing that a downturn in their datacenter business had, in fact, occurred." Dkt. 115 at 6 (citing Dkt. 103). They then argue that the out-of-pocket loss measure of damages described in Dr. Hartzmark's report would overcompensate investors for the materialization of the risk that AOI would suffer a downturn in business. Dkt. 115 at 10-11. As detailed above, Plaintiffs' method for demonstrating class-wide damages is consistent with its fraud on the market theory of liability, Dr. Hartzmark proposes a damage methodology that will disaggregate losses not attributable to fraud found by the jury, and class certification under Rule 23(b)(3) will not violate *Comcast*.

### D. Defendants' loss causation argument does not prevent Rule 23(b)(3) certification.

Defendants also argue that Plaintiffs' proposed class definition is overbroad because it includes purchasers who, as a matter of law, were not injured and cannot prove the required element of loss causation. Dkt. 115 at 12-13. Defendants allege that the class definition would include purchasers, sometimes called "in-and-out" traders, who purchased shares during the Class Period, but sold them prior to the first relevant disclosures and therefore suffered no loss. *Id*.; *see McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 697 (W.D. Wash. 2010). Defendants then argue that, to the extent the class definition allows for the inclusion of purchasers who suffered no loss, the Class would include investors with no standing to sue and therefore cannot be certified. Dkt. 115 at 9-10.

 **\*19**  As support for the argument that the Class cannot be certified because it includes Class Members who cannot prove injury and have no standing to sue, Defendants rely on the Second Circuit's decision in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). *Denney*, however, involved the certification of a settlement class. Some courts draw a distinction between the certification of a litigation class and a settlement class. *See In re Deepwater Horizon-Appeals of Econ. & Prop. Damage Class Action Settlement*, 756 F.3d 320, 324 (5th Cir. 2014) (Clement, J., dissenting from denial of rehearing en banc) (enumerating the "sound reasons to evaluate Article III standing differently for pre-trial and settlement class certifications under Rule 23.").

To the extent Defendants' standing argument is based on an inability to prove loss causation, Plaintiffs are not required to do so at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*") ("The Court of Appeals erred by requiring

[the plaintiffs] to show loss causation as a condition of obtaining class certification."); *Ludlow v. BP, P.L.C.*, 800 F.3d at 686 ("In *Halliburton I*, the Court unanimously held that loss causation need not be proved in order to certify a class ...."). Furthermore, the Court retains power to modify the class definition at a later stage of these proceedings. FED. R. CIV. P. 23(c)(1)(C); *see also Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.") (citations omitted)); *see also M.D. v. Perry*, 294 F.R.D. 7, 66 (S.D. Tex. 2013) ("[FRCP] 23(c)(1)(C) authorizes courts to alter and amend class certification orders before final judgment."). Therefore, the current definition of the class does not preclude class certification under Rule 23(b)(3).

### 2. Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). This requirement is easily met in this case. Typically, class actions are appropriate vehicles for adjudicating securities fraud cases because they "avoid the time and expense of requiring all class members to litigate individually." *BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at *18. The Court can assume, based on the number of outstanding shares that traded on a national exchange and the volume of put and call option contracts, that the Class will be so large and geographically dispersed as to make a class action superior to other methods for fairly and efficiently adjudicating the controversy. *See id*. (class action was vastly superior method for resolving the right to damages of approximately 900,000 securities purchasers). Further, the commonality of the purported Class Members' claims suggests that fairness and efficiency would be better served by certifying the class. *See id*. ("Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy than requiring individual adjudications would.").

## V. CONCLUSION

Plaintiffs have satisfied the threshold requirements of Rule 23(a) as well as the additional requirements of 23(b)(3). Plaintiffs have established that common issues controlling their § 10(b) and Rule 10b-5 claims predominate over any individual issues. The Plaintiffs have met their burden to

Fed. Sec. L. Rep. P 100,704

prove the necessary factors for the application of Basic's presumption of reliance. Plaintiffs have also proposed a damages methodology that is common to the class and is properly tethered to their corrective disclosure theory of liability. Finally, a class action suit is the superior mechanism for adjudicating the controversy at issue given the volume of potential Class Members and the commonality of their claims.

**\*20** For the reasons discussed above, the Court **RECOMMENDS** that Plaintiffs' Motion to Certify a Class pursuant to Rule 23(a) and Rule 23(b)(3) be **GRANTED** and Plaintiffs' proposed Class be **CERTIFIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

### All Citations

Not Reported in Fed. Supp., 2019 WL 6111303, Fed. Sec. L. Rep. P 100,704

### Footnotes

1    The District Court has referred this matter to this Magistrate Judge for report and recommendation. Dkt. 120.

2    The class definition excludes (i) Defendants; (ii) Individual Defendants' immediate family members; (iii) any person who was an officer or director of AOI during the Class Period; (iv) any firm, trust, corporation, or other entity in which a defendant has or had a controlling interest; (v) the legal representatives, affiliates, heirs, successors in interest, or assignees of any such excluded person or entity. Dkt. 105 at 6, n. 3.

3    A public equity float is the portion of a company's outstanding shares held in the hands of public investors as opposed to company officers or directors or stockholders that hold a controlling interest.

4    An event study uses "generally accepted statistical methods ... to test whether stock price movement on a particular date—after adjusting for other influences such as general market performance and AOI's competitors' performance—is statistically significant,—*i.e.*, is large enough to allow a statistician to conclude it is not the consequence of chance." Dkt. 106-1 ¶ 67.

5    Dr. Hartzmark proposes to calculate damages for option holders by modeling the actual prices of options of AOI common stock pursuant to a widely-used pricing model, such as the Black-Scholes option pricing model, and using the output of that model, "re-calculate the theoretical price based on the true value of the common stock (holding other inputs to the options pricing model constant)." Dkt. 106-1 ¶ 162. As with the common stock methodology, the option methodology would be "formulaic" and capable of mechanical application to each individual Class Member. *Id.*

6    An inflation ribbon is a "time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure from the outset of the Class Period." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16CIV6728CMRWL, 2019 WL 3001084, at \*19 n. 9 (S.D.N.Y. July 10, 2019) (citations omitted).

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.