2023 WL 6300569
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

DELAWARE COUNTY EMPLOYEES
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated, Plaintiffs,

v.

CABOT OIL & GAS
CORPORATION, et al., Defendants.

Civil Action No. H-21-2045
|
Signed September 27, 2023

**Attorneys and Law Firms**

Darryl James Alvarado, Pro Hac Vice, Francisco J. Mejia, Pro
Hac Vice, Jack Abbey Gephart, Pro Hac Vice, Kevin Lavelle,
Pro Hac Vice, Robbins Geller Rudman & Dowd, San Diego,
CA, Lawrence F. Stengel, Saxton & Stump LLC, Lancaster,
PA, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for
Plaintiffs.

Gerard G. Pecht, Pro Hac Vice, Kelly A. Potter, Norton
Rose Fullbright US LLP, Houston, TX, Peter Andrew Stokes,
Norton Rose Fulbright US LLP, Austin, TX, Amy L. Barrette,
Buchanan Ingersoll & Rooney PC, Pittsburgh, PA, for
Defendants.

**MEMORANDUM AND OPINION**

Lee H. Rosenthal, United States District Judge

**\*1** This action arises under §§ 10(b) and 20(a) of the
Securities Exchange Act of 1934, as amended by the Private
Securities Litigation Reform Act of 1995, 15 U.S.C. §§
78j(b), 78t(a), and its implementing regulation, Rule 10b–
5, 17 C.F.R. § 240.10b–5. The named plaintiffs are two
retirement plans that purchased common stock in Cabot
Oil & Gas Corporation between February 22, 2016, and
June 12, 2020: the Delaware County Employees Retirement
System and the Iron Workers District Council (Philadelphia
and Vicinity Retirement and Pension Plan) ("the Plans").
The Plans sued Cabot and three of its executive officers:
Dan Dinges, the Chief Operating Officer; Scott Schroeder,
the Chief Financial Officer; and Phil Stalnaker, the Vice
President and Regional Manager (together, "the Cabot

officers"). The Plans allege that Cabot and the Cabot
officers publicly misrepresented Cabot's compliance with the
environmental laws in Susquehanna County, Pennsylvania,
where its most significant well sites are located. According
to the Plans, these misrepresentations kept Cabot's stock
price artificially inflated until the truth about Cabot's
noncompliance was revealed, causing the stock to plummet.
The Plans allege millions of dollars in damages caused by
Cabot's misrepresentations and omissions.

The Plans move for certification of a class "consisting of
all persons or entities who purchased or otherwise acquired
Cabot ... common stock between February 22, 2016 and June
12, 2020, inclusive ..., and were damaged thereby." (Docket
Entry No. 134-1 at 7–8). The Plans also move to be appointed
as class representatives and to have Robbins Geller Rudman
& Dowd LLP and Kessler Topaz Meltzer & Check, LLP
appointed as class counsel. (*Id.* at 8). Based on the parties'
pleadings, the motions and responses, the record, and the
applicable law, the motions are granted. The reasons are set
out below.

**I. Background**

Cabot Oil & Gas Corporation is an oil and gas company
publicly traded on the New York Stock Exchange. (Docket
Entry No. 110 at ¶ 26). Cabot does hydraulic fracturing,
or fracking, in the Marcellus Shale Deposit.[1] (*Id.* at ¶
43). Most of Cabot's production comes from the Marcellus
Shale underneath Susquehanna County, Pennsylvania, and
specifically the Dimock Township. (*Id.* at ¶¶ 30–31, 92).

Cabot began drilling in the Dimock Township in 2006. (*Id.* at
¶ 92). Sometime after, Dimock residents noticed sediment and
"effervescence" in their drinking water. (*Id.* at ¶ 93). Some
residents experienced strange symptoms, including tunnel
vision, nausea and "bodily blotches." (*Id.* at ¶ 96). One
resident decided to hold a lighter to the water and "flames
came flying out of the jug." (*Id.* at ¶ 97). A residential water
well near a Cabot drilling site spontaneously exploded. (*Id.* at
¶ 93). Dimock residents and the Pennsylvania Department of
Environmental Protection (the "Pennsylvania Department")
suspected that Cabot was responsible. (*Id.* at ¶¶ 93–94).

**\*2** The Pennsylvania Department investigated and
concluded that methane gas was migrating from Cabot's
drilling sites into Dimock's aquifer.[2] (*Id.* at ¶ 94). Cabot
entered into a consent order and agreement with the
Pennsylvania Department, which was finalized in December

2010 (the "2010 Consent Order"). The 2010 Consent Order shut down Cabot's operations in a nine-square mile area of Dimock called the "Dimock Box," and required Cabot to remediate Dimock's drinking water and Cabot's wells in the Dimock Box to prevent further contamination. (*Id.*). Cabot also pledged under the 2010 Consent Order to comply with all applicable environmental laws and regulations. (*Id.* at ¶ 47).

The Plans allege that over the next decade, Cabot did not remediate the drinking water or its Dimock wells and continued to violate environmental laws. (*Id.* at ¶ 118). The Pennsylvania Department cited Cabot for 781 violations between January 2011 and March 2020, for wells both within the Dimock Box and elsewhere in Susquehanna County. (*Id.* at ¶ 142).

On February 11, 2020, a Pennsylvania grand jury recommended criminal charges against Cabot based on its findings that Cabot knowingly contaminated residential water supplies in Susquehanna County through its drilling and fracking. (*Id.* at ¶ 84). The grand jury's findings were made public on June 15, 2020, when the Pennsylvania Attorney General released the "Presentment of Charges," charging Cabot with fifteen criminal counts, including nine felonies. (*Id.* at ¶¶ 84, 120). The Attorney General charged Cabot under the Pennsylvania Clean Streams Law for knowingly discharging industrial waste, 35 P.S. § 691.301, and knowingly polluting Pennsylvania waters, 35 P.S. § 691.401. (*Id.* at ¶ 122). The charges were based not only on the Dimock wells covered by the 2010 Consent Order, [3] but also on other wells with similar pollution problems that Cabot had drilled later, outside Dimock. [4] (*Id.* at ¶ 120; Docket Entry No. 142-15 at 3–7, 20). The charges were based on Cabot's operation of its wells "through at least June 11, 2018." [5] (Docket Entry 142-15 at 3–7, 20). The Attorney General also charged Cabot with knowingly failing to comply with the 2010 Consent Order and other orders of the Pennsylvania Department. (Docket Entry No. 110 at ¶ 123). This charge was based on Cabot's conduct "on or about December 15, 2010, through January 9, 2020." (*Id.*). Cabot's stock price dropped by over 3% after the Attorney General released the Presentment of Charges. (*Id.* at ¶ 263).

**\*3** Cabot issued several public statements during the class period (February 22, 2016, to June 12, 2020). The parties have organized these statements into three categories: [6]

**Category 1 Statements.**

Category 1 covers statements that Cabot made in its Form 10-Qs and Form 10-Ks in 2015 and 2016. [7] (Docket Entry No. 110 at ¶ 187–88; Docket Entry No. 134-1 at 12). The relevant representations are that Cabot: had received a notice of violation from the Pennsylvania Department in September 2011 for failing to prevent the migration of methane gas into Susquehanna County groundwater; was "engaged with the [Pennsylvania Department] in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; believed "the source of methane has been remediated and [that it was] working with the [Pennsylvania Department] to reach agreement on the disposition of this matter"; had received a proposed consent order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and would continue to work to bring the matter to a close. (Docket Entry No. 110 at ¶¶ at 187–88).

The September 2011 notice of violation and proposed consent order arose from Cabot's operations at the Stalter well site in Lenox Township, which is within Susquehanna County. (*Id.* at ¶¶ 149, 187; Docket Entry No. 142-5).

**Category 2 Statements.**

Category 2 comprises statements that Cabot made in its 2016 Form 10-K, filed on February 27, 2017. The statements provide an update on the September 2011 notice of violation and proposed consent order that were the subject of the Category 1 Statements:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then,

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

**\*4**  (Docket Entry No. 110 at ¶ 188).

**Category 3 Statements.**
There are two separate substantive components to the Category 3 Statements. The first is a press release that Cabot published at 6:38 a.m. on July 26, 2019. (Docket Entry No. 142-1 at ¶ 32). The second is the disclosure of notices of violation that Cabot had received in June 2017 and November 2017 relating to the Howell and Jeffers Farm wells that Cabot had drilled in Susquehanna County in the Auburn and Harford Townships, respectively. (Docket Entry No. 110 at ¶¶ 127, 129). Cabot first disclosed these notices of violation in its 2Q19 Form 10-Q, filed on July 26, 2019, at 11:42 a.m. (Docket Entry No. 142-1 at ¶ 31).

The relevant part of the press release (the "Guidance Update") follows.

Cabot has provided its third quarter 2019 production guidance range of 2,360 to 2,410 Mmcfe per day. The Company has also adjusted its 2019 production growth guidance to a range of 16 to 18 percent (24 to 26 percent on a debt-adjusted per share basis) due in large

part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad by approximately 28,000 feet (increasing the average lateral length per well from 8,950 feet to 12,450 feet). "This increase in lateral lengths will improve the capital efficiency and economics of the pad; however, the longer cycle time will result in a delay in the wells being placed on production, pushing out the production contribution from this pad to late December or early January," said Dinges. Cabot has updated its 2019 capital budget to a range of $800 million to $820 million to reflect the incremental drilling and completion activity on the previously referenced eight-well pad and an increase in drilling activity for the year by four net wells resulting from continued efficiency gains on the Company's three fully contracted drilling rigs.

...

Cabot has provided its preliminary 2020 production growth guidance of five percent (seven to eight percent on a debt-adjusted per share basis). This production growth is based on a preliminary capital budget range of $700 million to $725 million. The Company's 2020 program is expected to deliver $375 million to $400 million of free cash flow at a $2.50 NYMEX price and $525 million to $550 million of free cash flow at a $2.75 NYMEX price.

(Docket Entry No. 142-14 at 7–8).

The relevant part of the Form 10-Q is:

On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have

performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. We received Notices of Violation ("NOV") from the PaDEP in June and November 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PadEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

 **\*5**  (Docket Entry No. 151-27 at 30).

Cabot's stock price declined on July 26, 2019, the day of the Category 3 Statements, bottoming out 12% lower than when the market opened. [8]  (Docket Entry No. 110 at ¶ 260).

**II. The Legal Standards**

**A. Class Certification**

Under Rule 23(a), plaintiffs seeking class certification must satisfy four elements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

Numerosity means that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Commonality means that "there are questions of law or fact common to the class." *Id.* 23(a)(2). Typicality means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Id.* 23(a)(3). Adequacy means that the representative party and the named class counsel "will fairly and adequately protect the interests of the class." *Id.* 23(a)(4).

Once the plaintiffs satisfy those four elements, they must further show that the class action falls within at least one of the following three categories under Rule 23(b): (1) cases in which prosecuting separate actions by or against individual class members would create a risk of inconsistent adjudication; (2) cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class," so that final injunctive or declaratory relief is appropriate with respect to the class as a whole; or (3) cases in which "questions of law or fact common to class members predominate over any questions affecting only individual members" and the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b).

The Rule 23 analysis is "rigorous," and "a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545 (5th Cir. 2020) (quoting reference omitted). " 'Rule 23 does not set forth a mere pleading standard." *Id.* (quoting *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' and so on." *Id.* (quoting *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541). A district court must often "probe behind the pleadings" and reach considerations " 'that are enmeshed in the factual and legal issues' of the case." *Id.* (first quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), then quoting *Dukes*, 564 U.S. at 351, 131 S.Ct. 2541). The court must "understand the claims, defenses, relevant facts,

and applicable substantive law in order to make a meaningful determination." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020).

### B. The Securities and Exchange Act

**\*6** Section 10(b) of the Securities and Exchange Act of 1934 makes it "unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements ... not misleading." 17 C.F.R. § 240.10b–5(b).

A plaintiff may recover damages under § 10(b) by showing: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

As in many securities class actions, the issue here is the intersection between the reliance element of a § 10(b) claim and the predominance requirement of Rule 23(b)(3). An individual plaintiff may establish reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Group Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. ——, 141 S. Ct. 1951, 1958, 210 L.Ed.2d 347 (2021). But this individualized inquiry is impracticable in a class action. To prove that individual questions of reliance do not predominate over questions common to the class, class-action plaintiffs invoke the presumption established in *Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *Id.* at 1959. Under the *Basic* presumption, courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *See Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 813, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

To establish the *Basic* presumption, plaintiffs must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014). Once the presumption is established, it can be rebutted if the defendant proves, by a preponderance of the evidence, *Goldman*, 141 S. Ct. at 1960, "that an alleged misrepresentation did not actually affect the market price of the stock," *Halliburton II*, 573 U.S. at 284, 134 S.Ct. 2398. This can be done through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248, 108 S.Ct. 978. Courts must consider "*all* probative evidence" of price impact, "aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960 (quoting reference omitted). "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely that not that the alleged misrepresentations had a price impact." *Id.*

The class-certification question of whether the *Basic* presumption has been rebutted by evidence of no price impact overlaps with the merits questions of materiality, reliance, and loss causation. *See id.* at 1961. Nonetheless, district courts must consider all probative evidence. *Id.* In doing so, they must "resist[ ] the temptation" to draw merits conclusions. *Id.* at 1961, n.2 (quoting reference omitted).

**\*7** When a plaintiff's theory is that the defendant's misrepresentations or omissions kept its stock artificially inflated, price impact may be shown on the back end. *See id.* at 1961. Front-end price impact may be inferred from a back-end price drop when a corrective disclosure shows that the defendant's previous statements were untrue or that the defendant failed to disclose the truth, and when the stock price falls after the truth is revealed. *See id.* However, a back-end price drop supports this inference only when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.* If there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See id.* The Supreme Court has given the example of "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our

fourth quarter earnings did not meet expectations')." *Id.* That said, a corrective disclosure need not "precisely mirror" the misrepresentation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). The two need only be "related" or "relevant" to one another. *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014).

## III. Analysis

Cabot does not contest that the Plans have satisfied Rule 23(a). The putative class is numerous. Cabot stock traded on the New York Stock Exchange and had an average weekly trading volume of 33.49 million shares during the class period. (Docket Entry No. 134-1 at 14). *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 672 (S.D. Tex. 2006) (numerosity is "generally assumed" in a class action involving nationally traded securities); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("100 to 150 members[ ] is within the range that generally satisfies the numerosity requirement."). Whether Cabot's representations were materially false and impacted the stock price are common questions of law and fact. (Docket Entry No. 134-1 at 15). *See Dukes*, 564 U.S. at 359, 131 S.Ct. 2541 ("[E]ven a single common question will do.") (internal quotation marks omitted) (alteration adopted). The Plans' claims that Cabot and its officers made misrepresentations that caused them damages are typical of the class members' claims. (Docket Entry No. 134-1 at 16). *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 287–88 (S.D. Tex. 2005). The Plans and their counsel are adequate. The Plans' interests are aligned with those of the class and there are no conflicts between the Plans and the class members. (Docket Entry No. 134-1 at 17). *See In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 522 (5th Cir. 1995); *Buettgen v. Harless*, 2011 WL 1938130, at *5 (N.D. Tex. May 19, 2011). Finally, the Plans' counsel is competent and experienced. (Docket Entry Nos. 134-5, 134-6).

Cabot argues only that the Plans have not satisfied Rule 23(b)(3) because individualized reliance questions predominate. Cabot does not argue that the *Basic* presumption is absent, but rather argues that the presumption is rebutted by evidence that its representations about environmental compliance had no impact on its stock price. Cabot's many arguments can be roughly organized into two buckets. First, Cabot argues that the price drop following the Presentment of Charges is not statistically significant. Second, Cabot argues that there is a "mismatch" between its representations about environmental compliance and the two corrective disclosures: (1) the July 26,

2019, press release and Form 10-Q; and (2) the Presentment of Charges. Each argument is analyzed below.

### A. Statistical Significance

Cabot's stock price fell 3% the day the Pennsylvania Attorney General released the Presentment of Charges. (Docket Entry No. 110 at ¶ 263). The parties' experts disagree whether this drop was statistically significant. Cabot's arguments assume that if the price drop was statistically insignificant, then that equals no price impact. The parties dispute the validity of that assumption as well. The court addresses the validity of Cabot's assumption before analyzing the evidence on both sides of the question of statistical insignificance. But first, the dual role of the Category 3 Statements deserves clarification.

**\*8** The Category 3 Statements are allegedly both misrepresentations and corrective disclosures. If Cabot is correct that its stock price did not materially move following the Presentment of Charges, then there would be no evidence that the Category 3 Statements had a price impact. The Statements would then be relegated to the single duty of corrective disclosures, but that does not determine whether the Rule 23(b)(3) predominance requirement is unmet. To make that showing, Cabot would have to also prove that the Category 1 and 2 Statements had no price impact. As evidence that those statements had price impact, the Plans rely not only on the price drop following the Presentment of Charges, but also on the drop following the Category 3 Statements. Cabot's attacks on that evidence are addressed in the "mismatch" section, Part III.B, *infra*.

Cabot's underlying assumption is that the conclusion of no price impact follows from the statistical insignificance of a back-end price drop. The Plans say no, that as a matter of logic, statistical insignificance does not preclude price impact. (Docket Entry No. 151 at 20–21). They rely on *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019), and *Monroe County Employees' Retirement System v. Southern Company ("Southern")*, 332 F.R.D. 370 (N.D. Ga. 2019). In *Rooney*, the court rejected the defendants' argument that the lack of a statistically significant price adjustment following a corrective disclosure established that those prior misrepresentations had no price impact. *Rooney*, 330 F.R.D. at 450. The court explained that "that is not how hypothesis testing works. A statically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price. The converse, however, is not true—the absence of a statistically significant price adjustment does *not* show the

stock price was unaffected by the misrepresentation." *Id.* The *Southern* court similarly noted that, "[i]n recognition of [a] basic truism of statistics, courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact." 332 F.R.D. at 394. The court held that "[a] non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and corrective disclosures." *Id.* at 395 (quoting *Basic*, 485 U.S. at 248, 108 S.Ct. 978).

The Plans' expert, Dr. Steven P. Feinstein, offers this explanation:

> Price impact and price movement are not the same thing. Information that prevents a stock price decline has price impact even though there may be no movement in the stock price. Therefore, while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction, or even no price movement at all, does not prove there was no price impact.

(Docket Entry No. 151-2 at ¶ 25). When Cabot's expert, Lucy P. Allen, was asked in her deposition whether she agreed with this reasoning, she testified that the statistical insignificance of a price drop is "evidence that there is no price impact." (Docket Entry No. 151-3 at 85).

The reasoning of the *Rooney* and *Southern* courts is persuasive, and the parties have not pointed to convincing contrary authority. If Cabot is right that the price drop following the Presentment of Charges was statistically insignificant, that would be evidence that the misrepresentations had no price impact, but it would not be dispositive.

Here, the question of statistical significance requires the court to decide which sides' expert is more likely correct. Before *Goldman*, district courts often shied away from engaging in a "battle of the experts" at the class-certification stage. *See, e.g., Southern*, 332 F.R.D. at 387–88 ("[T]he Court declines to 'engage in the parties' battle of the experts' with respect to *Cammer* factor five ...."); *Zwick Partners, LP v. Quorum*

*Health Corp.*, 2019 WL 1450546, at *14 (M.D. Tenn. Mar. 29, 2019) (dueling expert reports "create[ ] a factual dispute ... which involves complicated questions of causation better left until trial or at the earliest a summary judgment proceeding"). But the Supreme Court recognized that "most securities-fraud class actions" involve "competing expert evidence on price impact." *Goldman*, 141 S. Ct. at 1963. It instructed district courts "to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* This task requires courts to keep in mind the importance of "common sense" in evaluating expert testimony on price impact. *Id.* at 1960; *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) (the price-impact analysis should be "aided by a good dose of common sense") (quoting reference omitted).

**\*9** The experts' disagreement about statistical significance appears to stem from a methodological difference. Dr. Feinstein applied the "Newey-West Methodology" to account for COVID-19-related market volatility, which he calls "heteroskedasticity."[9] (Docket Entry No. 134-3 at ¶¶ 137–140). He attributes Allen's conclusion of statistical insignificance to her failure to account for this market volatility, in addition to other alleged analytical flaws.[10] (Docket Entry No. 151-2 at ¶ 98). Allen responds that the Newey-West methodology is "non-standard" and "yields clearly erroneous and unreasonable results." (Docket Entry No. 142-1 at ¶ 66). She asserts that Dr. Feinstein's event study[11] "yields the unreasonably [*sic*] result that small excess returns were statistically significant while much larger excess returns during the same time period were not statistically significant." (*Id.* at ¶ 69).

Dr. Feinstein defends his methodology, asserting that the Newey-West methodology "is a peer-reviewed, published, and generally accepted methodology to correct for heteroskedasticity," and that Allen's own firm has endorsed the methodology. (Docket Entry No. 151-2 at ¶¶ 30–36, 108). He explains that the results of his methodology are not "erroneous or unreasonable" simply because "the biggest returns ... are not always the most significant." (*Id.* at ¶ 107). "This is," instead, "a common and expected result when correcting for changing volatility, i.e., heteroskedasticity." (*Id.* at ¶ 101).

Comparing Dr. Feinstein's analysis with Ms. Allen's leads to the conclusion that Dr. Feinstein's is more reliable because it accounts for COVID-19-related market volatility. Although

Allen acknowledged in her deposition that heteroskedasticity can cause errors in a regression analysis, she admits she did not test for heteroskedasticity in her analysis in this case. (Docket Entry No. 151-3 at 108, 111, 114). Ms. Allen's criticism of Dr. Feinstein's use of the Newey-West methodology is undermined by her own firm's endorsement of the methodology in regression models. (*See* Docket Entry No. 151-2 at ¶¶ 99–100). Although Ms. Allen contends that her firm has not endorsed the Newey-West methodology "in the context" that Dr. Feinstein used it here, (Docket Entry No. 151-3 at 117), she does not explain why that is inappropriate. Instead, Ms. Allen criticizes Dr. Feinstein's outputs and notes that he did not apply the Newey-West methodology in an event study he did for other, unrelated litigation, (*see* Docket Entry No 142-1 at ¶¶ 67–78). The court credits Dr. Feinstein's conclusion that the residual return [12] following the Presentment of Charges is statistically significant. (Docket Entry No. 151-2 at ¶ 68).

 **\*10**  Even if Cabot had shown that the price drop following the Presentment of Charges was statistically insignificant, common-sense considerations would discount the probative value of that showing. The announcement of felony criminal charges against Cabot based on its operations in Susquehanna County—which was by far its most productive region—would likely impact its stock price. The evidence shows that Cabot's noncompliance with environmental laws and the 2010 Consent Order in Susquehanna County significantly affected its financials. (*See* Docket Entry No. 151 at 14–17). Cabot could not operate its existing wells or drill new wells in the Dimock Box until it satisfied its obligations under the 2010 Consent Order. (Docket Entry No. 110 at ¶ 138). The record also includes several examples of market commentary linking the June 15, 2020, price drop to the charges against Cabot. (*See* Docket Entry No. 151 at 23–24). *See Ark. Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("[M]arket commentary can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact.....").

Ms. Allen emphasizes that market analysts—as opposed to news outlets—generally did not report on the charges. But she admits that JP Morgan analysts did report on the charges two days after they were announced, and that the analysts changed their price targets for Cabot shortly thereafter. (Docket Entry No. 142-1 at ¶¶ 55–56). Dr. Feinstein points out that Ms. Allen overlooked a second analyst's prediction on the day the Presentment of Charges was announced that the charges

would have a "slightly negative" impact on Cabot's stock price. (Docket Entry No. 151-2 at ¶ 71). In light of this evidence, Cabot's argument that "analysts did not view the criminal charges as information material to Cabot's stock price" is unpersuasive. (Docket Entry No. 141-1 at ¶ 54).

Cabot's argument that the Presentment of Charges was immaterial because the potential fines were small compared to Cabot's revenues is also unpersuasive. (Docket Entry No. 142 at 25–26). The Plans correctly point out that the potential fines were only one consequence of the company's revelations. Other more serious consequences of "the revelation of Cabot's longstanding (but undisclosed) failure to remediate known violations and gas migration incidents" included "fines, regulatory scrutiny, criminal charges, reputational damages, and reduced gas production." (Docket Entry No. 151 at 25).

The price drop following the Presentment of Charges was statistically significant.

### B. Mismatch

Cabot next argues that there is a "mismatch" between its representations about environmental compliance and the two corrective disclosures. The Plans allege that the Category 3 Statements are corrective of the Category 1 and 2 Statements, and that the Presentment of Charges are corrective of the Category 1, Category 2, and Category 3 Statements. The court first analyzes whether there is a mismatch between the Category 3 Statements, as corrective disclosures, and the Category 1 and 2 Statements, then analyzes whether there is a mismatch between the Presentment of Charges and the Category 1, 2, and 3 Statements. In doing so, the court keeps in mind that corrective disclosures need not "precisely mirror" misrepresentations. *Alaska Elec. Pension Fund*, 572 F.3d at 230. The two need only be "related to" or "relevant to" one another. *Amedisys*, 769 F.3d at 321.

### 1. The Category 3 Statements as Corrective Disclosures

Cabot argues that there is a mismatch between the Category 3 Statements and the Category 1 and 2 Statements because the notices of violation disclosed in the 2Q10 Form 10-Q related to the Howell Wells and Jeffers Farms Pad 2 Wells, while the Category 1 and 2 Statements related to the Stalter Wells. (Docket Entry No. 142 at 14–15). Cabot further argues that the Guidance Update issued the same day as the Form 10-Q "had nothing to do with" its environmental compliance

at any of the wells. (*Id.*). Cabot's argument about the Form 10-Q is unpersuasive, but the court agrees that there is a mismatch between the Guidance Update and the Category 1 and 2 Statements.

**\*11** There is no mismatch between the 2Q10 Form 10-Q and the Category 1 and 2 Statements. It would have been apparent to a careful observer that the violations disclosed in the 2Q10 Form 10-Q were distinct from the violation that was the subject of the Category 1 and 2 Statements. The 2Q10 Form 10-Q disclosed notices of violation received in 2017 based on complaints from residents in 2017. (Docket Entry No. 151-27 at 30). By contrast, the Form 10-Ks addressed Statements in Categories 1 and 2 that disclosed a notice of violation received in 2011 based on complaints from residents in 2011. (Docket Entry No. 110 at ¶¶ 187–88). However, it is not facially apparent from these documents that the distinct violations concerned different well sites. Both the 2Q10 Form 10-Q and the Form 10-Ks in Categories 1 and 2 refer generally to "several wells owned and operated by us in Susquehanna County, Pennsylvania. (Docket Entry No. 110 at ¶ 188; Docket Entry No. 151-27 at 30). A public observer could reasonably conclude that the statements in Categories 1 and 2 that the pollution issues "ha[d] been remediated" are contradicted by the 2Q10 Form 10-Q's revelation of continuing pollution issues at well sites "in Susquehanna County." The fine distinctions on which Cabot relies do not create a genuine mismatch.

The court is persuaded, however, that there is a mismatch between the Guidance Update and the statements in Categories 1 and 2. The Guidance Update announced that Cabot had "adjusted its 2019 production growth guidance to a range of 16 to 18 percent ... due in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad by approximately 28,000 feet ...." (Docket Entry No. 142-14 at 7). The Guidance Update went on to explain that extending the pad would "result in a delay in the wells being placed on production, pushing out the production contribution from this pad to late December or early January." (*Id.*). The Guidance Update also announced that Cabot "ha[d] updated its 2019 capital budget to a range of $800 million to $820 million to reflect the incremental drilling and completion activity on the previously referenced eight-well pad and an increase in drilling activity for the year by four net wells resulting from continued efficiency gains on the Company's three fully-contracted drilling rigs." (*Id.*). Finally, the Guidance Update

stated that Cabot's "preliminary 2020 production growth guidance [was] five percent .... based on a preliminary capital budget range of $700 million to $725 million." (*Id.* at 7–8). In sum, the Guidance Update told the public that Cabot expected to produce less and spend more in the second half of 2019, and that it expected five percent production growth in 2020. (*See* Docket Entry No. 142-1 at ¶ 32).

On its face, the Guidance Update had nothing to do with Cabot's environmental compliance in Susquehanna County. The Plans have produced evidence suggesting that Cabot's environmental violations were a hidden cause of its disappointing predicted production, but that would not have been apparent to the public. (*See* Docket Entry No. 151 at 14–17). It is unlikely that the market would infer from the Production Guidance that Cabot's previous representations about environmental compliance and remediation in Susquehanna County were false. Accordingly, there is a mismatch between the Production Guidance and the statements in Categories 1–2.

**\*12** This mismatch, however, is immaterial to the outcome of the class-certification analysis unless Cabot can show that the July 26, 2019, price drop was caused by the Guidance Update and not by the 2Q10 Form 10-Q.[13] Cabot relies on Ms. Allen's analysis of Cabot's "intraday" stock price on July 26, 2019. Ms. Allen's analysis shows that Cabot's stock price fell around the time the market opened at 9:30 a.m. (Docket Entry No. 142-1 at ¶¶ 31–32). Because Cabot issued the Production Guidance at 6:38 a.m. that day, but did not file its 2Q10 Form 10-Q until 11:42 a.m., Ms. Allen concludes that the price drop was caused by the Production Guidance and not by the Form 10-Q. (*Id.* at ¶ 32).



Cabot's argument appears persuasive at first blush, but the Plans point out that the stock price fell another 3% between

11:42 a.m. and market close. (Docket Entry No. 151 at 17 (citing Docket Entry No. 151-21 at 15–19)). Cabot has shown that the price drop was caused in part by the Production Guidance; Cabot has not excluded the Form 10-Q as a contributor to the price drop.

Cabot also relies on analyst commentary to show that the Form 10-Q did not contribute to the price drop. According to Cabot's expert, "*[n]one* of the 18 analysts following Cabot even mentioned the two [notices of violation] in their reports issued on or after July 26, 2019, indicating that the [notices of violation] were not viewed by analyst[s] as information material to Cabot's stock price." (Docket Entry No. 142-1 at ¶ 34). These analysts did, however, treat Cabot's Guidance Update as material to its stock price. (*Id.* at ¶ 35). Market analysis following a corrective disclosure is relevant to whether the earlier misrepresentation had price impact. *See Goldman*, 77 F.4th at 104. And the market analysis here suggests that the market regarded the Guidance Update as more significant than the notices of violation disclosed in the 2Q10 Form 10-Q. But the record is inadequate to conclude that the Form 10-Q did not at least contribute to the price drop.

### 2. The Presentment of Charges

Cabot next argues that there is a mismatch between the Presentment of Charges and the statements in Categories 1 to 3. Cabot argues a mismatch between the Presentment of Charges and the statements in Categories 1 and 2 because Cabot was not charged with violations for its operation of the Stalter Wells, and the statements in Categories 1 and 2 related only to those wells. (Docket Entry No. 142 at 16). Cabot argues that there is a mismatch between the Presentment of Charges and the statements in Category 3 because those statements concern Cabot's conduct at different times. According to Cabot, the charges were for "violations through June 11, 2018," while the 2Q10 Form 10-Q represented only that Cabot had taken "appropriate remediation efforts" as of July 26, 2019. (*Id.* at 16). Put simply, Cabot's argument seems to be that the charge do not

contradict the statements in the 2Q10 Form 10-Q because Cabot could have been noncompliant on June 11, 2018, but not on July 26, 2019. Neither argument is persuasive.

First, as noted, the statements in Categories 1 and 2 were not limited to the Stalter Wells. A reasonable observer could infer that the charges against Cabot revealed the falsity of its representations in 2015 and 2016 that it had remediated the wells in Susquehanna County and was "work[ing] with the [Pennsylvania Department] to bring this matter to a close." (Docket Entry No. 110 at ¶ 188).

Cabot's mismatch argument about the Category 3 Statements is based on a misreading of the 2Q10 Form 10-Q. In that Form 10-Q, Cabot represented that it "ha[d] been engaged with the [Pennsylvania Department] in investigating the incidents and ha[d] performed appropriate remediation efforts" since residents in the area raised complaints "in March and June 2017." (Docket Entry No. 151-27 at 30). The charges for violations "through June 11, 2018" is corrective of Cabot's representation that it had performed "appropriate remediation efforts" between the Spring of 2017 and July 26, 2019. There is no mismatch.

### IV. Conclusion

**\*13** The Plans meet the requirements of Rule 23. Cabot has not rebutted the *Basic* presumption by showing no price impact. The Plans' motion for class certification is granted. (Docket Entry No. 134). The court certifies a class consisting of all persons or entities who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive, and were damaged thereby. The Plans are appointed as class representatives, and Robbins Geller Rudman & Down LLP and Kessler Topaz Meltzer & Check, LLP are appointed as class counsel.

**All Citations**

Slip Copy, 2023 WL 6300569

## Footnotes

1    According to the complaint, "[f]racking is a multistep process that involves drilling down deep into the earth to shale rock deposits. Next, fluid is injected into the rock at high pressures to create fractures in the shale

that release the natural gas otherwise trapped within the rock. The gas is then able to flow freely up to the surface to be captured by oil and gas operators ...." (Docket Entry No. 110 at ¶ 89).

2    "Methane is the chief constituent of natural gas, which contains from 50% to 90% methane, and is a potentially explosive gas that burns readily in air." (Docket Entry No. 110 at ¶ 90). Methane can escape a well when there are problems with the cement that is poured into spaces between a wellbore (that is, a hole drilled in the ground) and its casing (that is, a pipe running through the hole). (*Id.* at ¶ 90). The cement is supposed to secure the pipe and fill gaps through which gasses can escape. (*Id.*) But when, for example, groundwater mixes with the cement and dilutes it, the cement can set imperfectly, allowing gasses like methane to escape. (*Id.* at ¶ 91). Cement problems were what caused Cabot's wells to leak methane. (*Id.* at ¶ 110).

3    These wells were: G Shields 1V, G Shields 2H, G Shields 4H, G Shields 5H, Costello 1V, Costello 2V, Gesford 4H, Gesford 8H, Ratzel 1H, Ratzel 2H, Ratzel 3V, Ely 4H, and Ely 6H. (Docket Entry No. 110 at ¶ 121). The Pennsylvania Department issued notices of violation for the G Shields wells on October 20, 2011, for the Costello and Gesford wells on June 16, 2014, for the Ratzel wells on December 19, 2014, and for the Ely wells on March 21, 2018. (*Id.* at ¶ 126).

4    The wells outside Dimock are the Howell well pad in Auburn Township, the Jeffers Farm wells in Harford Township, and the Powers M wells in Auburn Township. (Docket Entry No. 142-15 at 20). The Pennsylvania Department issued notices of violation for the Howell wells on March 16, 2017 and June 20, 2017, (*id.*), for the Jeffers Farm wells on November 16, 2017, (*id.* at 21), and for a Powers M well on October 18, 2019, (*id.*).

5    June 11, 2018, is the date when the Pennsylvania Department sent a private letter to Cabot detailing its continuing violations of the 2010 Consent Order. The Pennsylvania Department defines "continuing violation" as a "violation that was noted in a previous inspection that is still continuing through current inspection." (Docket Entry No. 110 at ¶ 146). In the letter, the Pennsylvania Department denied Cabot's request to drill new wells within the Dimock Box because "Cabot is not in compliance with its obligation under the 2010 [Consent Order]." (Docket Entry No. 110 at ¶ 138).

6    The court pruned the universe of alleged misrepresentations in its order on Cabot's motion to dismiss, eliminating claims based on "nonactionable opinions"—namely, that Cabot "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations." (Docket Entry No. 118 at 7, 24).

7    A Form 10-Q is a quarterly financial report, and a Form 10-K is an annual financial report, required by the Securities and Exchange Commission pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78m, 78(d).

8    The Plans use the Category 3 Statements not just as alleged misrepresentations but also as alleged "corrective disclosures," that is, revelations that showed the public that the Category 1 and Category 2 statements were false. As explained below, "corrective disclosures" are often important in securities class actions to demonstrate that a company's misrepresentations kept its stock price artificially high. If the stock price falls after the corrective disclosure, it can often be inferred that the misrepresentations had a "price impact." *See Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–21 (5th Cir. 2014); *Goldman Sachs Group, Inc. v. Ark. Teacher Retirement Sys.*, 594 U.S. ——, 141 S. Ct. 1951, 1961, 210 L.Ed.2d 347 (2021).

9    Investopedia explains that "heteroskedasticity" is "when the standard deviations of a predicted variable, monitored over different values of an independent variable or as related to prior time periods, are non-constant." Investopedia, *Heteroscedasticity Definition: Simple Meaning and Types Explained*, https://www.investopedia.com/terms/h/heteroskedasticity.asp.

10    The other alleged flaws include: "failing to correctly remove the effects of Cabot from her market and peer-company indices, testing the wrong dates, omitting dates without explanation, using inconsistent estimation periods, and using an erroneous return that 'dramatically biases Ms. Allen's results toward findings of event nonsignificance' ...." (Docket Entry No. 151 at 20 (citing Docket Entry No. 151-3 at ¶¶ 13–14, 37–48)).

11    The court in *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015), explained that "[a]n event study is generally comprised of two parts: (1) a calculation of the market-adjusted price change in the issuer's share price at the time the corrective disclosure became public ...; and (2) a determination of whether the corrective disclosure is among the ... news that affected the price on the date the disclosure became public .... by comparing the magnitude of the market-adjusted change in [Halliburton's] share price on the date of the corrective disclosure with the historical record of the daily, market-adjusted ups and downs in [Halliburton's] share price."

12    Dr. Feinstein defines "residual return" as "the stock return after removing both the market and industry effects." (Docket Entry No. 151-2 at ¶ 92).

13    The court disagrees with the Plans that whether the 2Q10 Form 10-Q caused the price drop is a question of "loss causation" inappropriate for inquiry at the class-certification stage. (Docket Entry No. 151 at 11–14). *Goldman* instructed district courts "to take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 141 S. Ct. at 1961. When causation-related evidence is relevant to the price-impact question, as it is here, courts must consider it.

---

**End of Document**                                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.