# EXHIBIT 11



NYSE
an ice exchange

# NYSE IPO Guide

## Third Edition

# NYSE IPO Guide
## Third Edition









J.P.Morgan

KPMG

LATHAM & WATKINS LLP



Simpson
Thacher

nyse.com/ipo

**Publisher**
Timothy Dempsey

**Project Manager**
Brian Clarin

**Consulting Editor**
Michael Harris, Global Head of Capital Markets,
NYSE Group

***NYSE IPO Guide*, Third Edition Update,
is published by**
Caxton Business & Legal, Inc.
777 Brickell Avenue #500-9311
Miami, FL  33131
Phone: +1 312 361 0821
Email: tjd@caxtoninc.com
Web: www.caxtoninc.com

ISBN: 978-0-9964982-5-8

Copyright in individual sections rests with the co-publishers. No photocopying: copyright licenses do not apply.

**DISCLAIMER**

The *NYSE IPO Guide*, Third Edition (the "Guide"), contains summary information about legal and regulatory aspects of the IPO process and is current as of August 2023. The Guide should not be relied upon as a substitute for specific legal or financial advice from a professional. Although efforts have been made to ensure that the information herein is correct, the Guide may contain errors or omissions, and the NYSE, the publishers, and the contributing authors disclaim any responsibility for, or duty to update or correct, any such errors or omissions. The views expressed in the Guide are those of the authors alone.

Published by



CAXTON
Business & Legal, Inc.



# NYSE IPO Guide

Third Edition

nyse.com/ipo

**Preface**      **5**

Lynn Martin
President, NYSE Group

**Introduction: Advantages
of listing on the NYSE**      **7**

NYSE

**1. Why go public?**      **9**

1.1   Advantages of conducting
an IPO      10
*J.P. Morgan (Investment
Banking)*

1.2   Potential issues      10
*J.P. Morgan (Investment
Banking)*

1.3   Going public without
an offering      11
*J.P. Morgan (Investment
Banking)*

**2. Planning ahead**      **13**

2.1   Look at your company the
way investors will      14
*Simpson Thacher
& Bartlett*

2.2   Prepare to be a public
company      14
*Simpson Thacher
& Bartlett*

2.3   Revisit risk with a public
company mindset      15
*Simpson Thacher & Bartlett*

2.4   Consider how you will get
to the desired tax and
organizational structure      15
*Simpson Thacher & Bartlett*

2.5   Consider the composition
of your board of directors      15
*Simpson Thacher & Bartlett*

2.6   Review related party
transactions      17
*Simpson Thacher & Bartlett*

2.7   Shareholder arrangements      18
*Simpson Thacher & Bartlett*

2.8   Anti-takeover protections      18
*Simpson Thacher & Bartlett*

2.9   Incentive compensation
arrangements      19
*Simpson Thacher & Bartlett*

2.10   Managing third-party risk      22
*IHS Markit*

**3. Preparing to go public**      **25**

3.1   Choosing advisors      26
*J.P. Morgan (Investment
Banking)*

3.2   Financial information      27
*KPMG LLP*

**4. The IPO process**      **39**

4.1   Process timeline      40
*J.P. Morgan (Investment
Banking)*

4.2   SEC registration and
prospectus      41
*Simpson Thacher & Bartlett*

4.3   Underwriting, marketing,
and sale      43
*J.P. Morgan (Investment
Banking)*

**5. Direct listings**      **47**

*Latham & Watkins*

**6. IR and communications**      **53**

6.1   Preparing an IPO
communications strategy      54
*FTI Consulting*

6.2   Communicating with the
market post-IPO      56
*FTI Consulting*

6.3   Legal framework for
communications      58
*Simpson Thacher &
Bartlett*

6.4   Market intelligence and
surveillance      59
*IHS Markit*

6.5   Investor targeting and outreach      61
*IHS Markit*

6.6   Market perception feedback      61
*IHS Markit*

6.7   Investment community
database and CRM      62
*IHS Markit*

6.8   ESG and the newly public
company      64
*IHS Markit*

**7. Obligations of a public
company**      **67**

7.1   Ongoing reporting      68
*Simpson Thacher & Bartlett*

7.2   Listing standards      71
*NYSE*

**8. A public company and its
shareholders**      **73**

8.1   Proxy statement and
annual meeting      74
*AST*

8.2   Providing shareholders
with proxy material      75
*AST*

8.3   Ownership reporting by
shareholders      77
*Simpson Thacher
& Bartlett*

8.4   Share ownership mechanics      78
*AST*

**9. Managing risk**      **81**

9.1   Liability under the federal
securities laws      82
*Simpson Thacher & Bartlett*

9.2   Class action and derivative
lawsuits      83
*Marsh*

9.3   Indemnification      84
*Marsh/Simpson Thacher &
Bartlett*

9.4   D&O liability insurance      87
*Marsh*

9.5   Personal risk management      91
*Marsh*

**Contents**

**10.  Foreign private issuers                93**

10.1  American depositary
        receipts                              94
        *J.P. Morgan (Depositary
        Receipts Group)*

10.2  The IPO process for
        foreign private issuers              98
        *Simpson Thacher & Bartlett*

10.3  Financial information                  99
        *KPMG LLP*

10.4  IR and communications              100
        *FTI Consulting*

**Appendices                                103**

Appendix I: NYSE domestic
original listing standards,
domestic operating companies,
REITs, and funds                            104

Appendix II: NYSE original
listing standards, FPIs                     106

Appendix III: NYSE American
original listing standards                  108

Appendix IV: NYSE financial
continued listing standards,
US companies                                109

Appendix V: NYSE American
continued listing standards                 110

Appendix VI: Summary of
filing and other requirements
based on issuer category                    111
*KPMG LLP*

**Contributor profiles                      113**

nyse.com/ipo

# Preface



nyse.com/ipo

Preface

### Letter from the president
*NYSE Group*

Congratulations on reaching this important milestone in your company's journey. The success that has brought you to this point comes with rewards, but this next step also brings a series of decisions and responsibilities—and we are here to help you navigate them all. As you embark on your initial public offering (IPO) journey, we hope you will find this edition of the *NYSE IPO Guide* to be a valuable resource. We are grateful to all of our partners who have contributed to this volume and our collective goal is to help guide you through the process and contribute to a positive and successful IPO experience.

As the world's leading exchange, the NYSE is the proud home to thousands of successful companies of all sizes, industries and geographies. We take this responsibility with the utmost seriousness. Our mission is to help companies raise money so they can change the world. In the process, they create jobs and provide opportunities for others to invest alongside them and share in their success. For more than 230 years, our markets, people and technology have helped companies unlock their potential through a commitment to transparent, efficient, and orderly financial markets. The NYSE offers a market model powered by the world's most sophisticated trading technology and backed by human judgment and accountability, resulting in access to the deepest pools of liquidity.

Listing on the NYSE or NYSE American brings a number of benefits, including access to capital and increased visibility. Importantly, it comes with the network associated with membership in the NYSE community. Investors recognize that companies listed on the NYSE have met, and must continue to meet, rigorous listing standards. In addition, our listed companies have access to investor services, including environmental, social and governance (ESG) tools, market intelligence, investor outreach, education and advocacy. From listing day forward, we will help you connect with peers and other business leaders to gain new insights and perspectives and to help your company shine.

When companies go public—whether through an IPO, a Direct Listing, a Special Purpose Acquisition Company (SPAC) or other means—the benefits are broad and substantial. While the companies themselves get access to new capital, the economy benefits as those funds are invested in people, products and services. Investors of all types, including individuals, are able to participate in the future of these companies at an early stage in their life cycle. The journey you are about to embark on can create long term value for your organization, your employees, your stakeholders and many others.

We thank you for playing this important role in economic prosperity. And we look forward to helping you navigate your IPO journey and reach the significant milestone of your listing day.

**Lynn Martin**
President, NYSE Group

nyse.com/ipo

# Introduction: Advantages of listing on the NYSE

**Introduction: Advantages of listing on the NYSE**

### Introduction
*NYSE Group*

One of the most important decisions an issuer will make during the IPO process is selecting the right exchange on which to list the company's securities. You are charting your course for the future. At the NYSE, we realize how much work has gone into building your company up to this point and that this is the beginning of your life as a publicly traded company. Companies choose to go public for a myriad of reasons, but most notably to pursue opportunity.

These opportunities vary from issuer to issuer, but the one constant is that you want an exchange that is prepared to be by your side. The NYSE's key differentiator from other exchanges is our market model. In addition to the competitive market-maker model used by other exchanges, the NYSE also has a Designated Market Maker (DMM). This unique participant is required to maintain a fair and orderly market in the stocks it trades. Paired with industry-leading technology and the human oversight of the trading floor, stocks trade better on the NYSE.

Your listing also comes with benefits the moment you walk through the door. Companies listing on the NYSE and NYSE American join a community of iconic brands and industry disruptors. Within this group you can find great customers, powerful collaborators, peers, mentors, acquisitions and, potentially, your next board member. And, of course, investors.

You can trust us with your future. From our superior trading platform to our dynamic global community and the lifetime of service and value we provide, we are here to support you as a public company.

### Better trading: The NYSE's unique market model

Stocks trade better when you combine accountability and human oversight with world-class technology. At the center of this sits the DMM. DMMs are among the most sophisticated trading firms. Every NYSE-listed company has their own DMM that they select at the time of listing. While these market makers also trade on other exchanges, their behavior is different on the NYSE because our unique rule set includes greater obligations for DMMs. They are responsible for maintaining a fair and orderly market designed to enhance investor protections and support issuers, especially during critical times in the market—they are accountable.

In addition to the DMM, the NYSE overlays human oversight and service through our active trading floor. This means the NYSE is better able to manage complex transactions, navigate special situations and help dampen volatility.

Finally, the underpinning of all this is our proprietary technology known as Pillar. This technology has resulted in significant benefits for our issuers and their investors: more efficient processing, industry-leading response times and more precise trading—a better trading experience found only on the NYSE.

Better trading matters to issuers for key liquidity events like lock-up expirations, follow-ons and share repurchases, but it also matters to your investors. The NYSE model is purpose-built to give you peace of mind when it matters most.

### Membership benefits: Building your community and brand

Beyond trading your stock better, our job is to help make connections, facilitate conversations and create a dynamic and engaged community. We seek to create specific, meaningful ways for NYSE-listed companies to meet, share and benefit from a range of expertise and varying perspectives. That begins with advocacy and leadership councils, extends to our thought leadership and content franchise designed for your benefit, and continues with programming and networking opportunities that allow you to make important connections. Our aim is to create and foster opportunities for you to grow your business and create value for your shareholders.

While the NYSE community starts with the more than 2,000 companies listed on the NYSE, it does not end there. Our influence extends to our more than 3 million followers on social media, allowing you to share your story with new audiences. We also have an extensive network of media relationships that we can leverage to give you the opportunity to tell your story to investors and stakeholders around the globe.

nyse.com/ipo

# 1
# Why go public?



nyse.com/ipo

Why go public?

## 1.1 Advantages of conducting an IPO
*J.P. Morgan (Investment Banking)*

When considering an IPO, a company should evaluate the pros and cons, as well as the motivations for going public. This evaluation process is best conducted in conjunction with an investment bank, which can assist the company in thinking through the key points. There are numerous advantages to going public, the most pertinent of which are detailed in the following section.

### (a)  Access to capital
Going public affords a company access to capital, both at the time of IPO and on an ongoing basis. An IPO can consist of primary and/or secondary proceeds. A company can raise primary capital to fund growth, make investments and/or repay debt. An IPO can also provide liquidity to existing investors and give them an opportunity to sell stock.
Additionally:
- Once the company is public, it has access to an entirely new, deep and liquid source of capital for any future needs it may have.
- Being publicly traded adds equity to the company's capital-raising toolkit, enabling the company to achieve and maintain an optimal capital structure and potentially use stock as an acquisition currency.
- Following the IPO, the company will be able to tap the equity markets via follow-on offerings of primary and/or secondary shares, or a mix thereof. After the company has been public for 12 months, it will be eligible to access the equity capital markets more efficiently via a shelf registration statement.

### (b) Liquidity event
Listing on the NYSE has numerous benefits, not only for the company but also for its shareholders. As previously mentioned, the IPO can be structured such that existing owners of the company can sell down their positions and receive proceeds for their shares. In addition, once the company is public, the existing owners can monetize their holdings in an efficient fashion.

### (c)  Branding event and prestige
An IPO is a significant branding event. By listing on the NYSE, the company will receive far-reaching media coverage, starting on the first day of trading if not before. Subsequent to the IPO, research analysts will begin to write reports on the company, further raising its profile. This can enhance the company's visibility, increase its credibility with existing and potential customers and suppliers and help strengthen its competitive position.

### (d)  Public currency for acquisitions
Once the company is public, it can use its publicly tradable common stock in whole or in part to acquire other companies in conjunction with, or instead of, raising additional capital. Publicly tradable stock with a reference price is more attractive to target shareholders than illiquid private company stock, which is more difficult to value.

### (e)  Enhanced benefits for current employees
Stock-based compensation aligns employees' interests with those of the company and its public shareholders. By allowing employees to benefit alongside the company's financial success, these programs increase productivity and loyalty to the company and serve as a key selling mechanism when attracting top talent. Furthermore, issuing equity-based compensation will allow the company to attract top talent without incurring additional cash expenses. Being a public company provides employees with the ability to monetize the value of their stock-based compensation, whether it is options or restricted stock.

## 1.2 Potential issues
*J.P. Morgan (Investment Banking)*

While there are numerous advantages to going public, there are also several considerations that the company, its management and its shareholders should evaluate prior to embarking on the IPO process. The most seamless IPO processes are for companies that fully evaluate these considerations before embarking on an IPO and begin making the necessary preparations months, if not years, beforehand.

### (a)  Loss of privacy and flexibility
Private companies can operate without disclosing proprietary information in a public forum. However, to comply with securities laws, public companies must disclose potentially sensitive information publicly, which regulatory agencies, as well as competitors, can then access. In addition, the focus of research analysts and investors on quarterly results and stock price performance may constrain the operational flexibility that a private company enjoys.

### (b)  Regulatory requirements and potential liability
Public companies must file various reports with the SEC and other regulators on an ongoing basis. In order to comply with disclosure requirements, companies often need to change or expand their existing policies and infrastructure, which can be costly and time-consuming. In addition, directors and officers are potentially liable for misstatements and omissions in the registration statement and in the company's ongoing reporting under the Securities Exchange Act of 1934 (the Exchange Act).

### (c)  Sarbanes-Oxley
The Sarbanes-Oxley (SOX) Act was passed in 2002 following a number of major corporate and accounting scandals, which cost investors billions of dollars and shook public confidence in US securities' controls and disclosure. SOX set new standards for public companies, including requirements relating to accounting, corporate governance, internal controls and enhanced financial disclosure. Achieving SOX compliance can require significant time, resources and capital. Although the JOBS Act relieves emerging growth companies (EGCs) and SEC rule updates in 2020 relieve smaller reporting companies (SRCs) of the obligation to have their independent auditors provide an attestation on internal controls under Section 404(b), they are still required to put in place internal controls sufficient for management to provide the certifications required by Section 404(a).

### (d) Cost and distraction of management time and attention

Going public is a relatively expensive endeavor, with one-off and ongoing costs for legal counsel, accounting and auditing services, directors and officers (D&O) liability insurance, roadshow expenses and underwriting fees, as well as for additional personnel to handle expanded reporting, compliance and investor relations activities. Furthermore, planning and executing an IPO is a time-consuming process that can distract management from running the business day-to-day. Ongoing public company obligations should also be expected to take up significant management time.

### 1.3 Going public without an offering
*J.P. Morgan (Investment Banking)*

Four avenues to go public in the US without a simultaneous offering are (a) spin-offs/split-offs of existing groups or divisions of already public companies, (b) foreign issuers listing American depositary receipts (ADRs) in the United States, (c) direct listings and (d) special purpose acquisition company (SPAC) mergers.

### (a) Spin-offs/split-offs

A spin-off or split-off occurs when a publicly listed company separates a part of its business into a different publicly listed entity. Typically, that part can function as a separate, stand-alone business, with characteristics distinct from those of the *parent company*. In a spin-off, each existing investor in the parent company will receive shares in the spin-off entity *pro rata* to its ownership in the parent. For example, Investor A, which owns 5% of Parent Company A, will receive 5% of the shares outstanding in SpinCo A. In this transaction, liquidity is generally preserved for the SpinCo, but the investor churn may be considerable. For example, Investor A may be a logical shareholder of Parent Company A, yet dispose of the shares it receives in SpinCo A due to a variety of factors. These can include differences in the business model, growth profile and/or market capitalization, among others. To this end, it can be difficult to control the investor base in a spin-off, whereas during an offering process shares are strategically placed with those investors known to be interested in owning them. In a split-off, each existing investor in the parent company elects to own either the parent company or the separated entity post-separation.

### (b) Foreign issuers listing ADRs

A foreign company that is publicly traded on an international exchange outside the United States can list ADRs on the NYSE without conducting an offering. The stock is tied to the underlying international security and traditionally trades in tandem with that security. While the ADR will give the company incremental exposure to US investors, there are often limitations on certain funds holding ADRs similar to those limitations applying to the holding of international investments, and typically the liquidity and trading of ADRs can suffer when compared to direct listings of the underlying stock.

Through a US listing, foreign private issuers (FPIs) can significantly improve their access to the US equity market. Demand for foreign equities has grown considerably among both US institutional and individual investors. This demand has been driven by a need for enhanced portfolio diversification, which holdings of foreign equities can provide, and a desire to tap into the higher economic growth rates found in many countries outside the United States— emerging markets, in particular.

### (c) Direct listings

In a direct listing, a company's outstanding shares are listed on a stock exchange, such as the NYSE, without an underwritten offering. In a direct listing, the company does not raise capital. Instead, the shares of existing shareholders, such as employees and early-stage investors, are listed on a stock exchange, enabling them to freely sell their shares. Refer to Chapter 5 for additional information on direct listings.

### (d) SPAC mergers

A company can become publicly listed by merging with a SPAC. A SPAC is a publicly traded vehicle that typically has 18 to 24 months from its IPO to complete an *initial business combination*. Securities sold in SPAC IPOs are structured as units, with public investors receiving a common share and a fraction of a (or full) warrant per unit.

After the IPO prices, all proceeds are held in trust and accrue interest, only to be released upon the consummation of the acquisition or upon liquidation of the SPAC.

After an acquisition has been announced, public SPAC investors have two key decisions: (1) redeem their shares for a *pro rata* portion of the cash held in trust, or maintain their common stock ownership; and (2) vote either for or against the acquisition. Investors benefit from both downside protection and warrant coverage, which provides additional upside if an acquisition closes and the stock trades above the $11.50 strike price. Meanwhile, the SPAC management team, or sponsor, forms the SPAC and commits *at risk* capital at the time of IPO. In return, the SPAC sponsor is entitled to entrepreneurial economics, including common stock most typically equating to 20% of the SPAC shares outstanding post-offering and sponsor warrants.

Per NYSE rules, the initial business combination must represent a fair market value of at least 80% of the cash held in trust. The company a SPAC acquires must effectively be public market ready, as it becomes a publicly traded entity as soon as the initial business combination closes. Unlike an IPO where an S-1/F-1 is utilized, the S-4/proxy is the key SEC document. Among other differences, a company includes forward looking projections in the merger document. The S-4/proxy is typically filed shortly after the acquisition is announced. After a several month review period with the SEC, dates are set for the SPAC public shareholders of record, redemption deadline and shareholder vote. The redemption deadline typically precedes the shareholder meeting by two business days, and results are usually announced to the public at or post-closing. The proceeds (minus any redemptions), as well as any incremental capital raised by the SPAC sponsor, can be used as primary and/or secondary consideration to the selling company and its shareholders. Given the proceeds from the SPAC IPO can be redeemed in full, a SPAC sponsor may raise committed equity in the form of either a forward purchase agreement concurrent with the SPAC IPO or a private investment in public equity (PIPE) once the target has been identified.

nyse.com/ipo

# 2
# Planning ahead



Planning ahead

## 2 Planning ahead
*Simpson Thacher & Bartlett*

Companies may take 6, 12, 18 or even 24 or more months to prepare for their initial public offerings (IPOs) before formally engaging underwriters and kicking off the actual transaction. Companies in the early planning stages of an IPO frequently benefit from taking steps that include those discussed here.

### 2.1 Look at your company the way investors will
*Simpson Thacher & Bartlett*

Every company that pursues an IPO is going to be compared by analysts and investors with other companies that are already public. As a result, it is important to begin to understand how your company appears when looked at in this way and, to the maximum extent possible, use this knowledge to take the steps necessary to ensure that your company is positioned correctly.

- What different lines of business is your company involved in?
- What publicly traded companies are in these or similar areas?
- How do the research analysts and the investment community value these peers?
- What metrics are used to evaluate these peers' performance?
- Are there different peer sets (with differing approaches to valuation and multiples) applied to your company's different business lines?

By reading the analyst reports on potential peers while thinking about these questions and even taking the time to meet with investors and analysts, you can start to understand how your company will be viewed by analysts and investors.

The next step is to determine whether you have the ability today to capture and report the metrics that the market is used to seeing for companies like yours. For example, are you able to isolate information about separate lines of business that are valued differently by the market? The answers to such questions will inform whether it makes sense to rework your internal and even external financial reporting so as to be able to do this. Effecting these types of changes in reporting can take time.

Having accessed the information that will allow you to view your own company like a public market analyst or investor, what does this data say? For example, if you want your company to be viewed as primarily belonging with, and valued like, a particular peer set—is that a true reflection of your company's business? Everyone involved should want the company to be valued appropriately in its IPO—even setting aside potential shareholder lawsuits attracted by a stock drop, there is perhaps nothing more painful for a company that has recently completed an IPO than being rerated downward by the market in post-IPO trading. Consider whether there are acquisitions or new products (or, conversely, dispositions or discontinuances) that are on the whiteboard that may make sense to accelerate during this pre-transaction phase in order to bolster the intended investment thesis. As another example, evaluate how your company's results, whether in terms of top line growth or margins or otherwise, compare to the peer set. Do they differ materially and, if so, why? Are there initiatives that may be desirable to undertake now to enhance your company's future relative performance as it will be measured by the market?

Although no one without a deep understanding of your business can predict what specific insights may be gained from going through the exercise of understanding how the market values potential peers and then viewing your own company through the same lens or lenses, it would be quite surprising if such an exercise fails to uncover areas where an investment of your time and attention, and perhaps even dollars, in advance of an IPO would yield attractive returns.

### 2.2 Prepare to be a public company
*Simpson Thacher & Bartlett*

Running a private company with a small number of shareholders or investors can be very different than operating a public company. Private companies usually lack a public company finance infrastructure, almost certainly will not have an investor relations capability and may require additional resources within their legal function. They may also need to expand or reconfigure their management team to ensure that they have senior officers with the skill set to interact with a public company board of directors and public company investors.

During the pre-transaction preparatory phase, you should make yourself aware of the public company requirements to which you will be subjected as part of and following the IPO, and particularly those related to finance and accounting (e.g., public company accounting, internal audit and financial modeling and forecasting). The next step is to evaluate your internal capabilities to identify deficiencies. Some of the key questions to ask include:

- Do we currently have a repeatable monthly and quarterly close process? Do we have the ability to close our books accurately each quarter and to review and report the results to the public on a timely basis and in accordance with Securities and Exchange Commission (SEC) guidelines?
- Do we have a finance department with expertise in SEC accounting and reporting requirements? Many private companies looking to become public companies have inadequate skill sets within their finance departments and hire additional internal staff in connection with going public.
- Do we have a finance team comfortable preparing reliable forecasts and projections and able to analyze current period results for reporting purposes?
- Are our processes and controls adequately documented and tested? Do we have a plan to comply with Sarbanes–Oxley requirements?
- Does our technology infrastructure adequately support our compliance efforts?

Having performed this IPO readiness assessment, create—and then execute on—a realistic work plan that addresses internal gaps and details necessary internal staff hires. It can take many months to address areas of deficiency or weakness, and you should build into your plans the time and cost of evaluating and implementing policies, building the necessary infrastructure and making critical hires. Private companies often underestimate the time it takes to get ready to be a public company—a transformation that needs to take place before, not after, the IPO.

### 2.3  Revisit risk with a public company mindset
*Simpson Thacher & Bartlett*

Every company, whether public or private, makes risk management decisions every day. Whether consciously, such as by deciding to undertake an enterprise-wide risk assessment exercise, or unconsciously, such as by deciding not to hire an additional resource in the compliance function. One way or the other, your company has decided what balance to strike in terms of accepting and mitigating risk.

Undertaking an IPO alters a company's risk profile. First, a company that has gone public is exposed to entirely new types of risk—SEC enforcement actions, insider trading scandals, and stock drop lawsuits, for example. Second, a company that becomes publicly traded is likely to find that this changes the cost-benefit equation it has previously used to decide the right levels of risk appetite and investment in risk mitigation.

A public company has disclosure obligations and is exposed to public scrutiny in ways that a private company is not. Missteps may impair its reputation or attract adverse attention in ways that would not have otherwise been the case, increasing the level of distraction for management and even attracting class action lawsuits if the stock drops as a result of the disclosure or even drops around the same time as the disclosure for a totally unrelated reason. Moreover, the independent directors of the publicly traded company may have different views about risk. Ultimately, the costs of a misstep to the company may be higher following its IPO than it would have been before.

For this reason, consider conducting a thoughtful assessment of your company's risk exposure during the pre-transaction preparatory phase and identify whether there are areas that should be tightened up. As just one example, has the company invested appropriately in cybersecurity? Indeed, putting aside the fact that post-IPO, the cost to the company of a misstep can be meaningfully higher, it will make the IPO process itself go more smoothly if you have thoughtfully assessed the risks impacting your business and consciously decided on the appropriate level of investment in risk mitigation. The company's management should be fully conversant with the key risks to the business and able to convincingly articulate its approach to addressing these. Indeed, investors are increasingly focused on how well the companies they invest in manage risk.

### 2.4  Consider how you will get to the desired tax and organizational structure
*Simpson Thacher & Bartlett*

While it is beyond the scope of this chapter to discuss the countless factors that may determine which tax structure is right for you, it should be noted that it is sometimes more costly (and perhaps even impossible) to effect changes on the eve of an IPO rather than well in advance. For this reason, during the preparatory phase consider whether any significant restructuring will be desirable and, if so, whether any advantage to effecting this earlier in the process outweighs any associated disruption or risk of buyer's remorse in the event the IPO fails to occur as anticipated. Moreover, the adoption of a complex tax or organizational structure can lead to complex accounting, legal and presentational challenges and may introduce the need to take additional time to educate the SEC staff and the market. It cannot be overemphasized how important it is to evaluate your tax and organizational structure early in the process of going public so that unnecessary costs and delays can be avoided.

### 2.5  Consider the composition of your board of directors
*Simpson Thacher & Bartlett*

#### (a) How many independents are needed and when?
The general rule for NYSE-listed companies is that a majority of their board must be "independent," and they must have fully independent audit, compensation and nominating committees. However, the NYSE has a transition rule for IPO companies that requires at least one independent director on each of the three requisite committees at the time of the listing, majority independent committees (i.e., at least two independent directors) within 90 days of the listing and only become fully compliant—with a majority independent board and fully independent committees (i.e., at least three independent directors)—within one year after listing.

In addition, there is also an exception for *controlled companies*—companies where a person or group holds a majority of the voting power for the election of directors. A controlled company is only required to comply with the audit committee requirements and accordingly does not need a majority of its board to be independent or have a compensation or nominating committee at all. When taken together with the transition rule for IPO companies, this still means that a controlled company that undertakes an IPO must have one independent director at the time of listing, a second independent director 90 days thereafter, and a third by the time the first year is up. A company that loses its status as a controlled company (perhaps because its controlling stockholder has sold down to 50% or below) has the benefit of a one-year transition rule, similar to the one available to IPO companies, to come into compliance.

All this being said about the requirements, it is standard operating procedure for underwriters to advise companies they are taking public that it is preferable to be able to disclose to the market at the time of the launch of the marketing for the IPO that the company will have a majority independent audit committee coming out of the gate. Accordingly, it is worth investing some time before and during the IPO process to identify at least two or three independent directors. Identifying and finding independent directors can be difficult and time-consuming. In addition to the fact that an audit committee member must meet heightened independence requirements as described herein, they must also be "financially literate" and at least one member of the audit committee needs to have real finance and accounting expertise (typically a former public company CFO or partner of an accounting firm). Putting aside the technicalities, one of the independent directors is going to have to be able and willing to serve as the chair of the audit committee, which is a tremendous amount of work. The audit committee has the critically important job of overseeing the company's financial reporting. All of this is on top of the fact that you want individuals on your board who understand your industry, can add value by bringing useful skills and

**Planning ahead**

insights to bear and work constructively with the other board members and management.

In addition it may be worth keeping in mind that some investors have become increasingly focused on the diversity of a company's directors.

**(b) What makes a director independent?**

The NYSE requires that its listed public companies have, with a few exceptions (such as controlled companies), a majority of independent board members. The board is required to affirmatively determine that the director in question has no material relationship with the company that would jeopardize his or her ability to act independently. The NYSE has stated that "as the concern is independence from management, [it] does not view ownership of even a significant amount of stock, by itself, as a bar to an independence finding" (*NYSE Listed Company Manual*, 303A.02). In addition to this "determination" requirement, the NYSE imposes a number of bright-line tests that bar a board from determining an individual to be independent—for example, the board member cannot have been an employee of the company within the past

For purposes of the NYSE rules, a director qualifies as "independent" if the board of directors of the company has affirmatively determined that she or he has no material relationship, direct or indirect, with the company. In making this determination, the board of directors should broadly consider all of the relevant facts and circumstances surrounding a director's relationships with the company from the standpoint of the director as well as that of persons or organizations with which the director has an affiliation. The NYSE rules preclude a director from being determined independent if the director or an immediate family member:

- is (or was in the last three fiscal years) an employee of the company (or, in the case of an immediate family member, an executive officer of the company);

- received more than $120,000 per any 12-month period in the last three fiscal years in direct compensation from the company, other than in director and committee fees or pension or other deferred compensation for prior service (provided such compensation is not contingent in any way on continued service);
- is a current partner or employee of the company's internal or external auditor or was in the last three fiscal years a partner or employee of such firm and personally worked on the company's audit;
- has an immediate family member who is a current partner of the company's internal or external auditor or is a current employee of such firm and personally works on the company's audit, or was in the last three fiscal years a partner or employee of such firm and personally worked on the company's audit;
- is (or was in the last three fiscal years) an executive officer of a company that has a compensation committee on which any of the company's present executive officers serves or served; or
- is a current employee (or, in the case of an immediate family member, a current executive officer) of another company that makes payments to, or receives payments from, the company for property or services in an amount that exceeds (in any single fiscal year in the last three fiscal years) the greater of $1 million or 2% of such other company's consolidated gross revenues.

Source: *NYSE Listed Company Manual,* 303A.02

three years and cannot have received compensation from the company (excluding board fees) in excess of $120,000 in any of the last three years. Similar prohibitions apply to the director's immediate family members. The rules also limit how much

business the company can do with the board member's employer.

**(c) Additional requirements for audit committee members**

Audit committee members must qualify under an enhanced independence analysis that imposes additional, stricter independence standards above and beyond those outlined herein. So while a board member can be "independent" for purposes of the rules requiring that a company have a majority of independent directors, even if they own a significant amount of the company's stock or are affiliated with a controlling stockholder for example, the enhanced independence standards would preclude such an affiliated person of the company or any of its subsidiaries from qualifying as independent for purposes

To be independent for audit committee purposes, a committee member must meet the general NYSE independence standards for directors described herein and also the following additional SEC requirements for audit committee members.

SEC rules define an "independent" director, for purposes of serving on an audit committee, as a director who, except in his or her capacity as a director or board committee member: (1) does not accept directly or indirectly any consulting, advisory or other compensatory fee from the company or any of its subsidiaries; and (2) is not an "affiliated person" of the company or any of its subsidiaries.

Direct or indirect acceptance of a compensatory fee by a director includes acceptance of such a fee by (1) a spouse, a minor child or stepchild, or a child or stepchild sharing a home with the director or (2) an entity (a) in which the director is a partner, member, an officer such as a managing director occupying a comparable position, or executive officer, or occupies a similar position

(except limited partners,nonmanaging members and those occupying similar positions who, in each case,

have no active role in providing services to the entity) and (b) that provides accounting, consulting, legal, investment banking or financial advisory services to the company or any of its subsidiaries.

Source: Rule 10A-3 under the Exchange Act

of serving on audit committee. An audit committee member must also not be an affiliated person of the company or any of its subsidiaries. In addition, some proxy advisory firms establish limits on the number of audit committees a director can sit on, and if a board member serves on more than three public audit committees, the NYSE requires an affirmative determination (which is disclosed) that such service will not impair their ability to serve.

In addition to these enhanced independence standards, members of the audit committee must also satisfy the substantive standard that they are "financially literate" (as such qualification is determined by the board). Also, the NYSE requires that at least one member of the audit committee have "accounting or related financial management experience" (*NYSE Listed Company Manual*, 303A.06 and 303A.07). A director who qualifies as an "audit committee financial expert" (as defined by the SEC in Section 407 of the Sarbanes–Oxley Act of 2002) is presumed to satisfy this financial sophistication requirement—public companies are required to disclose whether they have an "audit committee financial expert" and, if not, explain the reasons why not.

**(d) Additional requirements for compensation committee members**
The NYSE requires public companies to consider additional factors when evaluating the independence of compensation committee members. The board of directors must consider all factors specifically relevant to determining whether a director has a relationship to the listed company, which is material to that director's ability to be independent from management in connection with the duties of a compensation committee member. These factors include, but are not limited to: (1) the source of compensation of such director, including any

A "nonemployee director" is a director who:
- is not currently an officer or employee of the issuer or a parent or subsidiary of the issuer;
- does not receive compensation in excess of the amount that would be required to be disclosed under Item 404(a) of Regulation S-K (currently $120,000), either directly or indirectly, from the issuer or a parent or subsidiary of the issuer, for services rendered as a consultant or in any capacity other than as a director; and
- does not possess an interest in any other transaction for which disclosure would be required under Item 404(a) of Regulation S-K.

Source: Rule 16b-3 under the Exchange Act

consulting, advisory or other compensatory fee paid by the company to such director; and (2) whether such director is affiliated with the company, a subsidiary of the company or an affiliate of a subsidiary of the company.

You might also consider constituting a compensation committee with directors who are *nonemployee directors* for purposes of Rule 16b-3 under the Exchange Act, and thereby able to exempt equity awards to directors and officers from the short-swing profit recovery provisions of Section 16 of the Exchange Act.

## 2.6  Review related party transactions
*Simpson Thacher & Bartlett*

The SEC requires companies wishing to go public to include a separate section in their registration statement that details the company's transactions involving its related parties. The overarching disclosure rule is relatively simple: provide the details for any transaction in the last three years involving more than $120,000 in which the company is a participant and any director, executive officer or 5% stockholder (or their immediate family members) had or has a direct or indirect material interest. The rule's complexity comes from its exceptions, which go on for several pages, but in summary, if the company is a participant in a transaction that involves more than

$120,000 and in which a director or officer is also interested, even indirectly, you will probably need to disclose it. In addition, even if related party transaction disclosure is not required, you may nonetheless need to disclose transactions involving your independent directors if these transactions are considered by the board in determining their independence.

With a few exceptions, SEC rules do not prohibit specific activities as long as they are properly disclosed to investors. If the arrangement looks unusual or off-market, it can garner negative public attention. Many companies decide that they would rather forego these arrangements than have them disclosed in SEC filings and then picked up by the press or become the subject of office gossip. In addition, the existence of these types of arrangements can negatively affect the voting recommendations of proxy advisory firms.

However, some things are prohibited whether you disclose them or not. In response to the accounting scandals of the early 2000s, Congress passed a law that prohibits public companies from extending credit, or arranging for the extension of credit, to their directors and executive officers.

One of the unexpected traps in preparing to go public relates to the timing of this prohibition. The limitations and restrictions to which public companies are subject typically begin to apply when the company actually sells its stock to public investors. This insider lending prohibition, by contrast, applies from the time of the first public filing of the registration statement. As a result, insider loans need to be cleaned up before you publicly file with the SEC.

During the preparatory phase, consider reviewing the transactions and arrangements your company has with management and shareholders and see whether these are compatible with your anticipated future public company disclosures. It may be that some level of disclosure in the IPO registration statement cannot be avoided, given that these disclosure requirements look back three years, but it may be more appealing to be able to say that they were wound up prior to the eve of the IPO. Also, it can frequently take time to unravel arrangements so giving all concerned some runway to do this can make it less painful.

**Planning ahead**

## 2.7  Shareholder arrangements
*Simpson Thacher & Bartlett*

Another area that makes sense to focus on well in advance of an IPO is arrangements with and among the company's shareholders to be sure that these are compatible with the IPO and the company's future status as a public company. More specifically, it may make sense to take inventory of all shareholder arrangements to identify if there are consent, participation or other rights shareholders have that may directly or indirectly impede the transaction. This need not be an explicit right to consent to or to participate as a seller in an IPO—if a shareholder has the ability to block amendments to charter documents or corporate reorganizations, this may itself effectively give that shareholder hold up value. Even soft items such as governance rights can be a problem. For example, as discussed above, following an IPO a company's board will be required to ultimately have at least three and possibly more independent directors, and it may not be consistent with the anticipated composition of the company's post-IPO board to include designees of smaller shareholders who may have been granted the right to a seat on the board of the company as a private company. Depending on the dynamics, it can be a tricky thing to ask for consents or take rights away from a stockholder on the eve of a transaction, so consider on a case by case basis whether, if your company has afforded shareholders rights that could be problematic, it makes sense to revisit these arrangements in advance.

In addition, we note that it is standard operating procedure in an IPO for the underwriters to seek to *lock up* all the pre-IPO shareholders for a period of time following the date of the pricing of the IPO (typically 180 days).. So called *lock-up letters* are agreements directly between the pre-IPO shareholders and the underwriters whereby the shareholders agree they will not sell their shares, lend them, margin them or really do anything with them that involves putting money in the shareholders' pockets or shifting away from them the economic consequences of ownership of the shares until the lock-up period has expired. Underwriters will frequently express an interest in locking up as many of the pre-IPO shares as they can out of concern that it could impede the successful marketing of the offering if IPO investors are not able to be assured that there will not be a large volume of stock from pre-IPO holders being dumped into the market shortly after trading starts. Accordingly, in anticipation of making the IPO process run more smoothly, you may wish to consider whether your arrangements with existing shareholders, including employee shareholders, can be designed in such a way that they will prevent these holders from selling during the anticipated IPO lock-up period and even require them to enter into customary lock-up letters directly with the underwriters.

## 2.8  Anti-takeover protections
*Simpson Thacher & Bartlett*

It is worth considering whether to implement *anti-takeover* protections at the time of an IPO that will impede hostile acquirers who may seek to gain control of your company without negotiating with your board. Given that investors may suspect that management is attempting to use such protections to entrench its own position at the expense of shareholders, a company should be thoughtful about its approach to such protections. Such protections could also affect a public company's eligibility for inclusion in certain stock indices.

A number of devices and protections are available to IPO issuers. The most straightforward, and powerful, anti-takeover protection seen with some level of frequency (particularly in specific industries) is a dual-class high-vote/low-vote structure, which affords the holders of a high-vote class of stock (typically founders, family owners, selected pre-IPO owners or insiders) with voting power sufficient to control the election of directors even when public investors, who hold a separate low-vote class of stock, own a majority of the economic interests in the company. While the precise percentage varies significantly from year to year depending in part on market conditions and the nature of the companies going public during that market window, upwards of a quarter of newly public companies in some years may employ disparate voting capital structures. In response to investor preferences, however, a growing proportion of these companies have begun to build in time-based sunsets on these arrangements. In recognition of the prevalence of these multiple class capital structures, following a consultation with market participants that commenced in late 2022, S&P Dow Jones Indices announced in April 2023 that it was reversing a policy adopted in 2017 and will again permit companies with multiple share class structures within the S&P Composite 1500 Index and its component indices. FTSE Russell still excludes companies from its indices if their "unrestricted public shareholders" do not hold at least 5% of the voting power. Another such device is a *classified board*, which is a board of directors divided into multiple classes (almost always three). Each class serves a staggered multi-year term (almost always three years), which prevents a hostile acquirer from replacing more than a specified percentage (almost always one third) of the directors at any single annual meeting. The prospect of having to conduct successful proxy fights at two successive annual meetings to gain control of a company's board can in and of itself be a significant deterrent to a hostile bidder. In contrast to the use of a high-vote/low-vote structure, which remains less common outside of specific industries and can attract investor resistance, the significant majority of IPO issuers have classified boards. For example, based on a survey of certain of the largest IPOs by deal size between July 2020 and September 2022, over 90% of companies going public implemented a classified board. However, among larger publicly traded companies it has become increasingly rare for this board structure to be retained over the long-term in the face of high levels of support from shareholders for proposals to declassify boards. For example in 2020, only approximately 10% of S&P 500 companies had a classified board. As with high vote/low vote structures, proxy advisory firms generally disfavor classified boards absent a reasonable time-based sunset provision (often 3-5 years).

There are also many additional measures that are nearly universally implemented without significant investor resistance. For example, an IPO issuer's certificate of incorporation typically prohibits stockholder action by written consent, which prevents a majority of the shareholders of the company from taking pre-emptive, unilateral action in lieu of a meeting. The

certificate will also typically be drafted to include provisions restricting shareholders' ability to call a special shareholders' meeting, thus further inhibiting their ability to take extraordinary action. A company's bylaws will also almost always require timely advance notice to the company from shareholders before such shareholders may nominate new directors or propose other matters for consideration at a shareholders' meeting. A supermajority of shareholders' votes may also be required in order to amend the company's certificate of incorporation or bylaws. As with classified boards, supermajority voting requirements and certain other of these measures have become less common among larger, seasoned public companies.

It is also almost universal for IPO issuers to authorize in their certificate of incorporation what is referred to as *blank check* preferred stock, which enables a board to create and issue new series of preferred stock with whatever rights and preferences the board may desire at a given time. The board may use this ability to take certain anti-takeover actions, including the implementation of a stockholder rights plan, or *poison pill*, without further stockholder approval. A poison pill generally allows shareholders to purchase a company's common stock at a highly discounted price if a large block of stock is acquired by a third party who has not been pre-approved by the board, the effect of which is to dilute the third party's value. Poison pills are extremely rare in IPO issuers due to the negative reaction they tend to engender among investors and the fact that with the authorization of blank check preferred stock the board may deploy a poison pill later when needed.

You should also be aware that unless you take affirmative action to opt out, Delaware's anti-takeover statute (Section 203 of the Delaware General Corporation Law) will apply to companies incorporated in that state, which is the jurisdiction of most publicly traded US companies. Section 203 of the Delaware General Corporation Law provides that, subject to certain exceptions specified in the law, a publicly held Delaware corporation may not engage in certain "business combinations" with any "interested stockholder" for three years after the date of the transaction in which the person became an interested stockholder.

These provisions generally prohibit or delay the accomplishment of mergers, assets or stock sales, or other takeover or change-in-control attempts that are not approved by a company's board of directors. Other states have adopted similar statutes. Some IPO issuers, such as companies controlled by financial sponsors, typically opt out of these anti-takeover statutes to avoid impeding the sponsors' ability to sell off its stake following the IPO.

## 2.9 Incentive compensation arrangements
*Simpson Thacher & Bartlett*

### (a) Overview
Companies going public often revisit the arrangements they are employing to incentivize management and their employees more broadly. Indeed, the ability to use publicly traded equity as a compensation currency is frequently viewed as a key benefit of pursuing an IPO. This chapter describes various types of management incentive arrangements that might be established in connection with an IPO and a summary of design considerations and significant tax, securities law, and accounting issues relating to such arrangements. Although not covered here, other types of broad-based employee arrangements might also be established once the company is public, such as establishing an employee stock purchase program for company employees. In addition, in connection with a potential IPO, consideration is also commonly given to (1) entering into employment and noncompete agreements with key members of the senior management team; (2) reassessing, potentially with the assistance of a compensation consultant, the appropriate mix of salary, bonus, benefits, perquisites and company stock incentives offered to senior management, relative to other peer group public companies in similar industries; and (3) the impact of an IPO on the financial and estate planning of senior executives and substantial equity holders. Consideration should also be given as to whether any modifications to the company's existing arrangements may be necessary in order to comply with applicable tax and securities law requirements or that may otherwise be appropriate once the company is public.

For purposes of this discussion, management incentive arrangements will be described as falling into two broad categories: (1) stock-based arrangements, in which value is tied to the company's stock price, subject to specified vesting requirements, which are often only subject to continued service with the company, and (2) performance-based compensation arrangements, in which value is subject to the achievement of preestablished performance goals, which may include stock price and/or other company financial metrics as a measure of performance. Of course, as noted herein, frequently arrangements are structured that have characteristics of both stock-based arrangements and performance-based compensation arrangements, such as restricted shares, restricted units or stock options that vest upon achieving specified performance goals. (Restricted shares and restricted units that vest upon achievement of performance goals are often referred to as *performance shares* and *performance units*, respectively.)

In structuring management incentive arrangements, it is important to take into account potential tax, securities law and accounting issues such as (1) potential limitations on the deductibility of compensation in excess of $1 million under Internal Revenue Code (IRC) Section 162(m),[1] (2) reporting and short-swing profit rules applicable to officers, directors and 10% beneficial owners of public companies under Section 16 of the Securities Exchange Act of 1934 described in Chapter 7, and (3)

---

[1] Under current Internal Revenue Service (IRS) guidelines, Section 162(m) generally prohibits public companies from deducting annual compensation in excess of $1,000,000 paid to any "covered employee," which includes any employee who has served as its CEO or CFO and any of its three next-highest paid executive officers who serve in that capacity as of the last day of the company's fiscal year in respect of which the compensation was paid. (For taxable years commencing after December 31, 2026, the next five highest paid executive officers other than those described in the preceding sentence will also constitute "covered employees".) It is important to note that once an employee qualifies as a covered employee, he or she will continue to be treated as a covered employee indefinitely, regardless of when the compensation is payable.

**Planning ahead**

potential earnings charges associated with performance-based compensation and certain types of stock-based awards.

**(b) Stock-based arrangements**
The most typical forms of stock-based arrangements include nonqualified stock options, incentive stock options, stock appreciation rights, restricted shares, restricted share units, phantom share awards and stock purchase programs—although numerous variations of these types of awards are possible.

Most public companies adopt *omnibus* long-term incentive plans, which provide them with the flexibility to make all of these types of awards. In our experience, equity-based awards that are settled in stock (rather than in cash) represent the more favored forms of stock-based incentives because of their comparatively favorable accounting treatment.[2] It is fairly typical to provide the committee administering the plan with broad discretion to determine the terms and provisions of awards issued under the plan including the vesting schedule, "good leaver" and change in control treatment, option term, post-employment exercise period (if applicable) and redemption rights, etc.

**A. Stock options.** A stock option represents the right of the holder of the option to acquire a specified number of shares at a specified purchase price (*exercise price*), subject to the terms and conditions of the award.

Option awards to employees (as well as other stock-based awards) are typically made on a discretionary basis pursuant to an incentive plan administered by a committee of nonemployee outside directors in order to satisfy certain requirements of the listing exchange and Section 16. Awards to nonemployee directors, if desired, may be made under either the same plan that covers employees or pursuant to a separate plan. In either case, pre-determined or formulaic procedures will be used to determine the date of grant, exercise price and number of shares to be awarded.

*1. Nonqualified versus incentive stock options.* There are two principal types of stock options: nonqualified stock options and incentive stock options (ISOs).

Generally, an employee will not be taxed upon the grant of a nonqualified stock option. At the time the options are exercised, the holder of the option will generally be subject to ordinary income tax equal to the spread between the exercise price and the fair market value of the underlying stock (i.e., for a public company, the trading price), and the employer is generally entitled to a corresponding deduction in connection with the exercise (subject to Section 162(m), discussed previously). Any further gain following exercise resulting from appreciation in the value of the underlying stock is taxable to the holder of the option upon disposition of the stock as either long-term or short-term capital gain.

ISOs allow the holder of the option to avoid taxation until the underlying stock is ultimately sold, assuming the statutory holding periods are satisfied. (However, the ISO *spread value* measured on the date of exercise is included in the holder's income for purposes of the alternative minimum tax (AMT) calculations. The application of the AMT frequently can negate many of the tax benefits of ISOs.) Upon the sale of the underlying stock, the entire spread between the exercise price and sale price is then taxed at long-term capital gain rates. However, it should be noted that the employee's benefit comes at a cost to the employer—the employer is not entitled to a deduction at any time with respect to an ISO (assuming the statutory holding periods are satisfied). Consequently, ISOs are tax inefficient from the perspective of a tax-paying employer. ISOs must also conform to IRC statutory requirements, which include a limit on the amount of ISOs that can be granted to any one individual and a statutory holding period of at least two years from the date of the ISO grant and one year from the date of exercise.

Both ISOs and nonqualified stock options must also generally be granted with a strike price that is not less than grant date fair market value in order to avoid running afoul of the deferred compensation rules under IRC Section 409A. Prior to an IPO, great care should be given to the valuation and grant process for stock options to ensure a well-documented process for ensuring compliance with Section 409A. Following an IPO, valuations will be based on public trading and companies should ensure that grants utilize the public trading

prices. Some companies going public will issue stock options with an exercise price linked to the IPO price to provide employees with the benefit of any initial increase in the trading price post-IPO.

*2. Other important option terms.*
*Term of option.* Options are generally granted with a 10-year term. ISOs cannot exceed a 10-year period. Typically, when there is a termination of employment, the holder of an option will be given a specified period of time following the end of employment to exercise his or her vested options. This period is generally 30 to 90 days but may vary depending upon the circumstances of termination. Upon death or disability, it is customary to provide that any vested options can be exercised by the beneficiary or estate for a year or longer.

*Manner of payment.* Options may be exercised by payment of cash, check or money order equal to the exercise price. Many public companies also provide an alternative form of *cashless exercise*, which no longer results in unfavorable liability/ variable accounting. This permits exercise of options upon delivery by the optionee to the company of irrevocable instructions to a broker to sell the underlying shares and remit to the company proceeds from such sale equal to the exercise price of the option. Additionally, with increasing frequency, options are also sometimes structured to allow for *net settlement* of the option directly with the company, which allows the holder of an option to pay for the exercise price and ordinary income tax associated with exercise with shares that would otherwise have been realized in connection with the exercise. This settlement results in the delivery of only the spread value of stock (less an amount of stock used to pay for associated taxes, with the employer paying the cash value of the stock to the government to satisfy the tax obligations).

**B. Stock appreciation rights.** A stock appreciation right (SAR) provides the holder with the right to receive an amount in cash or shares equal to the *excess*, if any, of the fair market value of a share on the date of exercise over the grant date price.

The tax treatment of SARs is similar to that of nonqualified stock options. The holder will generally not be taxed upon

grant of the SAR, and the holder will recognize ordinary income at the time the SARs are exercised equal to the spread between the grant date value and the fair market value of the underlying shares at exercise. Upon exercise, the employer is generally entitled to a corresponding deduction.

If the value of a SAR is settled in cash, the award generally is treated as a liability award under GAAP, with potentially negative accounting consequences. As a result, most public company SAR awards are settled in shares of stock.

**C. Restricted shares.** A restricted share award provides the holder with the right to become the owner of the shares that have been delivered to him or her, subject to potential forfeiture of the restricted shares if specified vesting requirements are not satisfied. These awards typically give the employee the current right to vote the shares and the right to current or deferred dividends on such shares, even though such shares might not vest until some date in the future and might be forfeited.

The holder of a restricted share award will generally recognize ordinary income on the date the shares become vested, unless the holder submits an election to the IRS (referred to as an "83(b) election") within 30 days of grant electing to be taxed on the grant date.

The issuance of restricted shares will result in a charge to earnings to reflect the value of the restricted shares as of the grant date, the charge generally being recognized over the vesting period.

**D. Phantom shares; restricted stock units.** Unlike a restricted share award, neither a phantom share award nor a restricted stock unit (RSU) award provides the holder with any current benefits of ownership and, indeed, no shares are issued at the time of grant. Rather, the award represents an unfunded and unsecured promise by the company to pay the holder the number of shares represented by such award (or its cash equivalent in the case of a phantom share) on a specified date, subject to satisfaction of specified vesting requirements.

The holder of a phantom share award will generally recognize ordinary income on the date the award is settled in shares or in cash, even if the award vests on an earlier date, although normal Federal Insurance Contributions Act (FICA) and Medicare withholding are required on the date of vesting. Depending on the underlying vesting and share delivery (or cash payment) schedule, phantom share awards may constitute "deferred compensation" for purposes of Section 409A, in which case care must be taken to ensure compliance with Section 409A's complex set of rules and regulations. (A violation of Section 409A will generally subject the award holder to accelerated taxation, along with an additional 20% penalty tax plus interest.)

If the value of a phantom share award is settled in cash, the award generally is treated as a liability award under GAAP, with potentially negative tax consequences. As a result, most public companies utilize stock-settled RSUs.

**E. Typical vesting schedule for stock-based awards.**
*1. Time vesting.* Stock-based awards are generally subject to a time-based vesting requirement, commonly 25% each year over a four-year period or 33% each year over a three-year period.

*2. Performance vesting.* In addition to time-vesting stock-based awards, some companies have stock-based awards that vest only if preestablished performance targets are met. Such performance targets may be uniformly applied to all participants (e.g., company earnings before interest, taxes, depreciation and amortization [EBITDA] or return on equity targets) or may be geared toward individual performance (e.g., achieving sales goals of a particular division in which the optionee is employed). Time-accelerated restricted stock options are a variation of performance-based options, which typically vest on a cliff basis after a certain period of time but may accelerate and vest earlier if certain performance goals are met.

**F. Typical forfeiture events for stock-based awards.**
*1. Termination of employment.* The effect of termination of employment may vary based upon the circumstances of termination (e.g, discharge by the company with or without "cause," resignation by the employee

for "good reason," retirement, death or disability).

Typically, only *unvested* awards will be subject to forfeiture in the event of stipulated terminations of employment, although vested stock options and stock appreciation rights often survive termination for only a limited period (e.g., 90 days). In addition, a small minority of companies provide for acceleration of the unvested awards in the event of a discharge by the company without cause or upon the grantee's resignation for good reason. Similarly, the grants may provide for forfeiture or accelerated vesting of unvested awards in the event of the grantee's retirement, death or disability. Equity awards also typically provide for either "single trigger" or "double trigger" vesting following a change in control transaction (as further described below).

*2. Breach of restrictive covenants.* Some companies provide for forfeiture of vested (and of course unvested) awards in the event of a grantee's breach of restrictive covenants, which may be included in the agreement providing for the award. The enforceability of noncompetition agreements in the United States varies from state to state, with several states precluding or substantially limiting their enforceability, while the Federal Trade Commission has proposed generally abolishing most types of noncompete agreements.

*3. Clawback.* Increasingly, public companies have adopted clawback policies that require repayment by equity award recipients upon the occurrence of extraordinary events, such as a restatement of financials or misconduct by the recipient. Market practice continues to develop rapidly in this area, varying by industry and market capitalization of the company. NYSE-listed companies are required to adopt a clawback policy meeting Dodd-Frank requirements no later than December 1, 2023 (with respect to incentive compensation that is received on or after October 2, 2023). The Dodd-Frank rules require public companies to seek recoupment of erroneously paid incentive compensation received by executive officers during the 3 fiscal years preceding a financial restatement.

**G. Typical acceleration events for stock-based awards.**

**Planning ahead**

*1. Termination of employment.* As indicated herein, the company should consider whether to provide for the acceleration of unvested awards if a grantee's employment is terminated by the company without cause or upon the grantee's death, disability, retirement or resignation for good reason. This approach is most commonly (although not exclusively) found in awards to employees with employment agreements.

*2. Other events.* Public companies often provide for the acceleration of unvested awards upon a change of control if the unvested awards are not assumed and continued by the successor company. (Companies may opt to provide for full acceleration of unvested awards in connection with a change in control, although this is looked upon unfavorably by institutional investors and proxy advisory firms.) Alternatives include no acceleration or acceleration following an involuntary termination of employment by the company without cause or by the employee for good reason during a specified period of time (typically one to two years) following a change of control (referred to as *double trigger vesting*).

**H.  Shareholder approval and registration requirements.** Most plans that will result in the issuance of securities to officers and directors will have to be approved by the company's shareholders in order to satisfy applicable stock exchange requirements and IRC Section 422 (with respect to ISOs) and IRC Section 423 (with respect to employee stock purchase plans).

In addition, shares offered under the plan generally must be registered with the SEC on a Form S-8. While pure bonus arrangements (e.g., restricted stock awards) may not require registration in some cases, in most instances registration on a Form S-8 is nevertheless desirable to avoid application of Rule 144 holding period requirements following a plan participant's receipt of the shares.

**I. Performance-based compensation arrangements.** There is a great deal of flexibility in designing performance-based compensation arrangements. Following is a summary of the most significant considerations that should be considered in structuring such arrangements.

*1.  Measure of performance to govern awards.* There are a wide variety of performance measures used by public companies in connection with performance-based compensation arrangements. Among the many possibilities are achievement of preestablished earnings targets, net income targets, growth in market share or revenues, return on equity or invested capital, funds from operations, achievement of cost savings, increase in common share value or comparison of competitor's results. A common measure is total shareholder return (TSR), which combines share price appreciation and dividends paid to give a complete picture of shareholder returns. TSR is often calculated relative to a set of predetermined peer firms to give a *relative TSR* score. Any such financial targets should be objectively measurable using GAAP, if possible.

It may be appropriate to provide different measures of performance for different levels of employees or for different segments of the business. Moreover, multiple goals could be used within a given performance period even for a single group of employees.

*2.  Reward long-term or short-term performance, or both?* The plan could be designed to reward performance over a short- or long-term period, or over a series of sequential or overlapping performance periods. Three- to five-year performance periods are most common in long-term plans. The choice of the duration of the period is oftentimes closely related to the chosen performance metric. Within any multi-year performance period, performance could be measured year-by-year or only at the end of the performance period. If the targets are expressed in yearly increments, consider whether to permit an opportunity to "catch up" if performance goals are not met in one performance period but are achieved in the subsequent performance period.

*3.  Form of payment.* Payments may be made in cash or in shares, or a combination thereof. In lieu of immediate payment in cash or shares, payment could be made in the form of phantom shares. This approach would combine achievement of the specified performance criteria with a

continued period of incentive tied to the underlying value of the common stock. The phantom shares would ultimately be settled in shares or in cash based upon the value of the common stock on the payment date.

*4.  Timing of payments.* Consider whether payments will be made annually based on annual targets or only at the end of the full performance period. Payment only at the end of the performance period subject to continued employment has a retentive aspect and is the more common approach. Also consider permitting participants to defer payment of vested amounts or require mandatory deferral of part or all of the payment until some future date. If mandatory deferral is preferred, some companies condition ultimate payout upon continued employment in order to maximize the retentive power of the award. If a deferral mechanic is considered, the deferral mechanisms will need to be in compliance with the rules and regulations governing deferred compensation found in Section 409A.

*5.  Effect of termination of employment.* Generally, the employee's right to all or a portion of any partially earned award will be contingent upon the circumstances surrounding termination of employment. A voluntary resignation or termination for cause will usually result in a complete forfeiture of the award. Employers should consider whether to include provisions providing for partial vesting or retention of awards upon a qualifying retirement if appropriate for the employee population.

*6.  Change of control.* Typically, performance-based awards provide for a truncated performance period and/or an acceleration of vesting and payment of a portion of the award upon the occurrence of a change of control.

*7.  General tax considerations.* There is a significant difference in the tax effect of stock purchase programs and the phantom or other cash-based performance compensation arrangements described herein. While the typical stock purchase arrangement will afford the participating employee with the opportunity to receive capital gain treatment on the full appreciation in share value subsequent to its acquisition of

the shares, the phantom and performance-based compensation arrangements described previously will generally result in ordinary income to the employee upon payment. This distinction is a favorable one from the company's perspective because it will be entitled to corresponding deduction with respect to any ordinary income recognized by the employee upon payment of the phantom or performance-based award, subject to Section 162(m).

### (c) Conclusion

Whatever approaches companies ultimately elect to pursue, they should consider the types, if any, of incentives compensation arrangements that currently in place and how such existing arrangements will be affected by the adoption of the new programs. In addition, companies may wish to consider engaging the services of a compensation consultant with expertise in their industry who may be able to provide valuable insights as to the appropriate amounts of stock-based compensation and performance-based compensation and the measures of performance relative to their competitors that should be used for purposes of incentivizing senior management under the performance-based arrangements.

Finally, while we have briefly described significant accounting considerations that should be factored into designing any compensatory program, companies should consult with your accountants for their views on the accounting consequences of any compensatory program.

### 2.10  Managing third-party risk
*IHS Markit*

All companies, but particularly those contemplating an IPO, should ensure that they have a strong and deeply embedded third-party risk management capability.

### (a)  The risks of engaging third parties
The term *third party* includes vendors supplying your company with products and services, but also alliances, partnerships and charities, among others. Third-party relationships can be great enablers of growth and innovation, but the benefits must be viewed alongside associated risks: operational, legal, regulatory, financial and

reputational, all of which must be managed. These include:

- Information and cybersecurity—Sharing sensitive data with third parties can expose firms to the risk of data breaches or cyberattacks—exposing sensitive client data, private information or material nonpublic information.
- Business resilience—As reliance on third parties for key business operations increases, there is a heightened risk of business disruption due to individual vendor failure or systemic failure.
- Concentration risk—Increasing industry reliance on a common set of vendors (e.g., cloud providers) has led to growing exposure to single points of failure across supply chains.
- Fourth party, $n^{th}$ party risk—The risk that your vendors (or your vendor's vendors) fail to effectively manage their subcontractors, which leads to operational risk. This may manifest in combination with concentration risk.
- Vendor conduct—Reputational and bribery risk associated with vendors acting on behalf of your firm, being perceived as employees or interacting directly with government officials.

### (b)  The third-party risk management lifecycle

**Onboarding—inherent risk.** When onboarding a relationship with a new or existing third party, it is important to capture key facts about the relationship and the company so these facts can form the basis for an inherent risk assessment. Typical keystone questions include, "Will the third party hold personal information?" and "Will the third party interact directly with my customers?" The answers to these and other questions should define the risk tier assigned and therefore influence the application of your due diligence and oversight.

**Onboarding—residual risk.** Searches of relevant data sources about the third party should be undertaken to cover factors including financial stability, cyber health, adverse media and sanctions and screening checks on the company and key executives. Depending on the nature of the relationship, an assessment may be given, asking the third party to answer questions and supply

documentation to demonstrate suitable policies and controls. Use may be made of company-provided information such as system and organization controls (SOC) 2 reports, certifications and independently commissioned assessments.

**Onboarding.** Control gaps discovered during the assessment phase should be captured and managed with the third party to develop remediation plans that will be tracked to completion. In some cases, the relationship may not be able to proceed; in others, gaps may reasonably be accepted with risks. Finally, the relationship should be subject to a final approval stage. Approved relationships will proceed into oversight.

**Risk-based oversight.** As with onboarding, not all relationships are the same. The types of activities required during oversight (and their frequency) will depend upon the facts and the level of inherent risk. Both relationship owners from the business and subject matter experts (SMEs) have a role to play in carrying out oversight. Activities for SMEs may include information security, privacy or business continuity reviews. Business owners will carry out contract reviews and may conduct operational performance assessments and other activities. Critically, they must also ensure that key facts about relationships are kept up-to-date. A common problem arises when a third-party product formerly used for a nonsensitive and noncritical purpose is adopted by others in your firm for a different purpose. This may be supporting a business-critical process, or it may involve storing or processing sensitive data. Failing to identify this change in the relationship profile can expose your business to reputational, legal or other risks, because the due diligence and oversight regime applied is insufficient, having earlier been determined to be based on outdated facts. Termination. Relationships must be securely terminated, ensuring the necessary actions have been taken, which typically includes destruction of data.

### (c)  Building an effective program
Building a third-party risk management (TPRM) program requires board-level

**Planning ahead**

engagement and a significant investment in people, process and infrastructure:

- TPRM experts—Experienced TPRM experts are required to establish, build and oversee the program. Ongoing training and development are critical to ensuring robust engagement with both business and third parties. TPRM leaders should have a seat at senior operational and technology risk committees.
- Domain risk experts—It is important to have access to specific experts (e.g., cybersecurity) to assess vendors' control frameworks, address identified gaps and react to incidents. These experts

are typically embedded in existing SME groups.

- Infrastructure—An enterprise-wide platform then codifies the firm's TPRM policy and drives it consistently across the organization, plans and performs risk assessments, tracks ongoing oversight and is a single audited repository for associated documentation.
- Reporting and analytics—Actionable reporting at a vendor, business and enterprise level is delivered to the board and/or senior committees.
- Process integration—TPRM should be integrated with associated upstream and downstream processes (e.g., procurement and accounts payable).

nyse.com/ipo

# 3
# Preparing to go public



### 3.1 Choosing advisors
*J.P. Morgan (Investment Banking)*

**Retention of advisors/service providers**

Going public involves assembling a large and experienced team of professionals, including lawyers for the company and the underwriters, independent auditors and the underwriters, as well as other service providers. The company should carefully consider the skills and qualifications of all parties it hires, given the importance of the advice and services provided throughout the process. The key advisors and service providers are as follows.

**Company counsel.** Company counsel works in concert with the company's management team, in particular the company's CFO and general counsel, to represent the company's legal interests throughout the process. Company counsel is integral in carrying out due diligence, drafting the registration statement and advising the company in relation to the various legal agreements it will enter into in connection with the IPO process, such as lock-up and underwriting agreements, as well as generally providing legal advice to the company throughout the process.

In selecting company counsel, it is important to choose a firm that has considerable expertise and a proven track record of executing IPOs, as well as appropriate industry and sector expertise. At a more personal level, it is critical to select individual partners with whom the management team has good rapport, as they will be spending considerable time together throughout the IPO process and beyond.

**Independent auditors and consulting accountants.** The independent accountants are involved in performing an audit and, where relevant, reviewing certain financial statements prepared by management and included in the registration statement. The accountants also provide a *comfort letter* to the underwriters that, among other things, confirms the accuracy of certain numbers included in the registration statement. The underwriters and their counsel conduct in-depth due diligence with the accounting firm around their relationship with the company, their

independence under applicable rules and regulations, the integrity of the company's financial statements and the processes and methodologies underpinning their preparation and audit.

The decision around auditors is of critical importance, given that they will be integral to the company's financial reporting for many years. Auditors should be hired well in advance of the IPO, such that the financial statements and related disclosure to be included in the registration statement are presented on a basis consistent with prior-year audits. The SEC requires three years of annual historical audited financials (two years in the case of emerging growth companies) and these would ideally have been audited by a single firm. Although a *Big 4* firm is most common for a company that is contemplating an IPO, there are a number of boutique and regional auditing firms that are also well-regarded. The company should consider industry expertise, reputation and fit with the company, among other factors, when selecting an auditing firm.

In many cases the company requires assistance in designing enhanced accounting processes and controls, preparing financial statements and other information for the audit and supplementing its staff during the IPO process and transition to a public company. The auditor may be unable to perform some of these tasks due to independence requirements, so a separate accounting consultant may be necessary. Accounting consultants provide useful skills, experience and resources to supplement the company's accounting and controls functions in this time of transition, though the company should ensure that it does not become reliant on them beyond the IPO and has assembled an appropriate team of in-house experts.

**Underwriters.** The underwriting syndicate consists of various banks, each having different roles and status within the syndicate. The lead banks are known as bookrunners because they run the order book for the offering once it is in its marketing phase. The company should carefully choose the lead bookrunners for the IPO because of the significant role that they play throughout the process. The lead bookrunners advise the company on all facets of the IPO process, assist the company in shaping its investment thesis

to be used while marketing the transaction, drive investor engagement and make recommendations around dealt timing, sizing, composition and pricing. Oftentimes, the most senior banks are considered *lead* or *active bookrunners*, while more junior banks are considered *passive bookrunners* or *co-managers*.

All bookrunners will participate in banker diligence leading up to the IPO. Additionally, the bookrunners' research analysts will also be involved in undertaking due diligence on the company and play an important role in providing an independent view on the company to investors during the roadshow. The bookrunners should be chosen based on their relationships with the company, industry expertise, expertise in executing IPOs, track records with issuers and investors, distribution platforms and aftermarket support.

Co-managers are immediately junior to the bookrunners. The co-managers' investment banking teams are significantly less involved in the day-to-day execution. They are, however, involved in due diligence. The co-managers' research analysts will take part in all analyst diligence that is conducted, and they will also play an active role in discussing their views of the company with investors while the roadshow is ongoing. Co-managers should be chosen based on their relationships with the company, industry expertise and aftermarket support.

**Underwriters' counsel.** The lead bookrunners, on behalf of the underwriters, will select a counsel to act for them in connection with the IPO. This role includes advising the underwriters on managing their own liability in connection with the IPO, confirming that the offering disclosure does not contain any material misstatements or omissions and ensuring that any issues that arise in due diligence are thoroughly and appropriately addressed, whether by disclosure or otherwise. In addition, underwriters' counsel prepares drafts of the underwriting agreement and lock-up agreements and negotiates them with company counsel, while also negotiating the terms of the comfort letter to be delivered to the underwriters by the company's auditors.

**Other advisors.** In addition to the aforementioned, it may be appropriate to

appoint various other advisors in connection with the IPO, such as a compensation consultant (to advise the company on the structure of its stock-based compensation and related disclosures in the registration statement), a roadshow coach (to advise the management team on the most effective way of presenting during the roadshow), an investor relations firm and potentially an IPO advisor.

**Other service providers.** Aside from the advisory team, the company will require the services of a number of service providers in connection with its IPO:

*Financial printer and data room provider.* The company will need to appoint a financial printer to typeset and format its registration statement, oversee the submission of it to the SEC via the Electronic Data Gathering, Analysis and Retrieval system (EDGAR) and process subsequent changes to the registration statement resulting from SEC comments and other updates. The financial printer is also likely to provide virtual data room services to the company, enabling documents required for the due diligence process to be uploaded and viewed electronically by the working group.

*Transfer agent.* To list its stock on the NYSE, the company will need to appoint a transfer agent that complies with the connectivity and insurance requirements to operate within the direct registration system of the Depository Trust Company (DTC).

*Electronic roadshow provider.* Companies undertaking an IPO make an electronic roadshow available for both institutional and retail investors. This consists of a taped version of the roadshow presentation, available for viewing electronically, and is usually arranged by the underwriters on behalf of the company.

*Stock option/equity administrator.* Either before or, if not, upon becoming a public company, it is common for the company to appoint a third party to manage and administer its stock option program(s).

**3.2  Financial information**
*KPMG LLP*

**(a)  Registration statement**
An entity making an offering of securities registered with the SEC under the Securities Act of 1933 (the Securities Act) must file a registration statement and distribute a

prospectus in connection with the offering. The registration statement and prospectus must contain financial statements and other financial information regarding the financial condition of the company and the results of its operations.

The Securities Act and the related rules and regulations set out the requirements that the company must follow when making an offer to sell securities that do not meet one of the exceptions from registration. This framework includes the use of forms for registrations of offers (in particular, Forms S-1, S-3, S-4 and S-11). These forms specify the information that must be disclosed under Regulation S-X and Regulation S-K. Regulation S-X generally deals with financial statement form and content, while Regulation S-K generally deals with nonfinancial statement disclosures in the body of the registration statement. Form S-1 is the basic registration form used for a US company's IPO. Form S-3 is generally used for the registration of securities by a company that already has securities registered with the SEC, while Form S-4 is generally used for the registration of debt or equity securities issued in relation to a merger or acquisition. Form S-11 may be used for the registration of securities issued by certain real estate companies, including real estate investment trusts or securities issued by other companies whose business is primarily acquiring and holding real estate investment interests.

The SEC has specific and complex rules regarding the financial statements and other financial information that must be presented in a registration statement for an IPO. Some of the significant financial statement information that may be required includes:

- audited annual financial statements for recent fiscal years;
- unaudited interim financial statements for the most recently completed interim period and the corresponding period of the preceding year;
- selected financial information (usually summarized from the company's financial statements) for the past five fiscal years and most recently completed subsequent interim period and its comparative period;
- separate audited annual and unaudited interim financial statements for businesses that have been acquired or will probably be acquired that

meet certain significance thresholds (described in the following section); depending on the significance of the acquisition, the company may be required to present one to three years of audited financial statements;[1]

- separate audited or unaudited annual financial statements for significant investments accounted for under the equity method that meet certain significance thresholds;
- financial statements or disclosures of guarantors of securities being offered and affiliates whose securities collateralize the securities being offered;
- *pro forma* financial information giving effect to certain events (such as significant business acquisitions/ dispositions, reorganizations, unusual asset exchanges and debt restructurings);
- segment reporting for companies that are engaged in multiple lines of business or with operations in more than one geographic area (required disclosures generally include separate revenues and operating data for each segment);
- supplemental schedules for particular industries and circumstances; and
- enhanced disclosure of financial and operational metrics for companies in certain industries.

Companies that are classified in any of the following categories have modified reporting requirements:

- *Smaller reporting company*, as defined by Item 10(f)(1) of Regulation S-K, generally applies to new issuers with an expected public float of less than $250 million. It also applies to new issuers with $100 million annual revenues and no public float or a public float of less than $700 million when the registration becomes effective.
- *Emerging growth company* (EGC), as defined by Section 2(a)(19) of the Securities Act, generally applies to companies beginning with their initial

---

[1] In May 2020, the SEC adopted a variety of amendments to its rules for separate financial statements of acquired businesses, one of which limits the numbers of years that may be required to be presented to two years. The amendments take effect January 1, 2021, but early adoption is permitted.

**Preparing to go public**

sale of registered equity securities that have *total annual gross revenues* less than $1.07 billion during their most recently completed fiscal year.
■ *Foreign private issuer* (FPI), as defined by Section 3b-4 of the Exchange Act, generally applies to companies incorporated outside the US that meet certain additional criteria.

Some additional details regarding the first two categories, criteria for qualification and some of the differences in reporting requirements are outlined later in this chapter. See Chapter 10 for additional information regarding FPIs. A table containing selected comparative financial statement reporting requirements for these categories is provided in the appendices. The following discussion focuses on the SEC requirements for companies that do not fall into any of the aforementioned three categories.

**Audited financial statements.** Audited annual financial statements required to be included in the registration statement include the following:
■ Their balance sheets as of the end of the two most recent fiscal years. If the company has been in existence for less than one year, an audited balance sheet as of a date within 135 days of the registration statement filing date is required.
■ Their statements of comprehensive income, cash flows and changes in shareholders' equity for each of the most recent three fiscal years or the shorter period during which the company (and its predecessors) has been in existence.[2] Designation of an acquired business as a predecessor is generally required where a company acquires in a single succession, or in a series of related successions, substantially all of the business (or a separately identifiable line of business) of another entity (or group of entities). The company's own operations prior to the succession should appear insignificant relative to the operations assumed or acquired.

Audited financial statements for the company and its predecessor must be accompanied by an audit report issued by independent accountants that are registered with the Public Company Accounting Oversight Board (PCAOB) and audited in accordance with PCAOB standards. If any of the audited financial statements required with the registration statement were audited by a predecessor independent accountant, consent may be needed from that independent accountant to allow for inclusion of those financial statements and their audit report in the registration statement.

The preparation of these financial statements often raises certain data collection, accounting and auditing issues, such as:
■ the need to reevaluate existing accounting policies and consider expanding disclosures to comply with reporting requirements for public companies,[3] such as segment information, tax-rate reconciliation, earnings per share and general compliance with Regulation S-X and SEC interpretations of generally accepted accounting principles (GAAP);
■ the treatment of changes in accounting policies or financial statement presentation that arise during the most recent period, covered by the financial statements that may have a retroactive impact on the financial statements and other financial information presented for previous years; and
■ the retrospective presentation of discontinued operations, consistently across the periods covered by the financial information presented.

Accordingly, a company with financial statements covering the required number of years should revisit those financial statements and ensure that they are compliant with SEC requirements and recent SEC staff interpretations. Any modifications to previously issued audited

financial statements will likely require the independent accountant to perform additional procedures.

**Age of financial statements.** Knowing the periods for which financial statements will be required to complete a particular type of financing is a critical step in planning an IPO. Financial statements must generally comply with the SEC's age of financial statements requirements before the SEC staff will start review of a filing. In certain circumstances, a company may submit draft initial registration statements to the SEC for nonpublic review and omit financial statements that it reasonably believes will not be required to be presented separately at the time it publicly files its registration statement. This includes the financial statements of other companies under Rules 3-05, 3-09 and 3-14 of Regulation S-X. An EGC may omit from its confidential submissions annual and interim financial data that it reasonably believes will not be required at the time of the IPO; however, an EGC must include all required financial statements before it can distribute a preliminary prospectus to investors.

The age of financial statements included in an IPO is measured by the number of days between the date of effectiveness of the registration statement and the date of the latest balance sheet in the filing. The latest audited annual financial statements included in the prospectus cannot be more than 1 year and 45 days old.

If more than 134 days have lapsed since the latest audited annual balance sheet, unaudited interim financial statements must also be included in the registration statement. Whenever updated interim financial statements are included, interim statements of comprehensive income, cash flows and changes in shareholders' equity must be included for the corresponding period of the prior year. Interim financial statements for the first and second quarters must each be updated after 134 days. Interim financial statements for the third quarter must be updated 45 days after the following fiscal year-end, at which time audited financial statements for the recently completed fiscal year are required.

**Unaudited interim financial statements.** Article 10 of Regulation S-X provides guidance on the form and content

---

[2] May be presented in a note to the financial statements.

[3] Any previously elected private company GAAP alternatives created by the Financial Accounting Standards Board (FASB)'s Private Company Council (PCC) alternatives (e.g., amortization of goodwill) are not be permitted in financial statements filed with the SEC.

of condensed interim financial statements. Interim financial statements (also referred to as stub-period financial statements) must be included in the registration statement if the period between the effectiveness date of the registration statement and the date of the latest audited balance sheet in the filing exceeds a specified number of days. (See previous section titled "Age of financial statements.") Interim financial statements include a balance sheet as of the end of the most recent interim fiscal quarter, statements of comprehensive income, shareholders' equity and cash flows for the period between the latest audited balance sheet and interim balance sheet and those for the corresponding period of the preceding year. The interim financial statements can be presented in a condensed format but often are presented in a noncondensed format. The interim financial statements may be unaudited, but the company's underwriters typically request them to be reviewed by an independent accountant prior to filing as part of their requested comfort letter procedures.

**Selected financial information.** Item 301 of Regulation S-K requires a selected statement of comprehensive income and balance sheet data for each of the last five fiscal years (or, if shorter, for the life of the company and its predecessor entities)—and the same financial data for the most recent interim period—to be included in the registration statement, together with comparative information for the corresponding interim period of the prior year. The purpose of the selected financial data is to highlight certain significant trends in the company's financial condition and results of its operations. It must include:
- net sales or operating revenues;
- income (loss) from continuing operations;
- income (loss) from continuing operations per common share;
- total assets;
- long-term obligations and redeemable preferred stock; and
- cash dividends declared per common share.

The selected financial data may also include any additional items that would enhance an understanding of the company's financial condition and trends in its results of operations, such as cash and cash equivalents balances, working capital balances and summary comparative statements of comprehensive income.

**Financial statements of an acquired business.** If the company has made, or is proposing to make, a significant acquisition of a business—an investment that will be accounted for under the equity method or multiple acquisitions of related or unrelated businesses—it may need to include audited financial statements of the acquired business, plus appropriate unaudited interim financial statements, to comply with Rule 3-05 of Regulation S-X.[4]

Whether a proposed acquisition requires inclusion of financial statements in a registered offering depends on the significance of the acquisition and whether the acquisition is probable. The SEC has issued no formal guidance on the standard of probability for business combinations.[5] Generally, the determination is based on the preponderance of evidence supporting the conclusion that an acquisition is probable. However, the SEC views public announcement of a business combination as strong evidence of a probable acquisition. The company must assess the probability of an acquisition by considering factors such as the following, in addition to the advice of its securities counsel:
- progress of the negotiations, considering such factors as progress of discussions among senior executives, execution of confidentiality agreements, execution of letters of intent, conduct

of due diligence procedures, approvals of the board of directors and/or shareholders and submission to appropriate government regulators for acquisition approval;
- economic and legal penalties associated with failure to consummate, including costs incurred to date in pursuing the acquisition; and
- significance of required regulatory approvals.

The independent accountant that has audited the financial statements prepared for purposes of complying with Rule 3-05 need not be registered with the PCAOB, unless the acquired business is a public company in the US. The number of years of audited financial statements required is determined by the size of the acquisition and its significance relative to the company, based on the following three significance tests under Rule 1-02(w) of Regulation S-X:
- the amount of the company's investment in the acquired business compared to its total assets;
- the total assets of the acquired business compared to the company's total assets; and
- the pre-tax income from continuing operations of the acquired business compared to the company's pre-tax income from continuing operations (*pre-tax income from continuing operations* is income before income taxes, exclusive of amounts attributable to any noncontrolling interests).

The rules should be consulted, as they contain specific instructions for modifying the calculation under certain circumstances. In May 2020, the SEC adopted a variety of amendments (the amendments, the amended requirements) to its rules for separate financial statements of acquired businesses.[6] The amendments take effect January 1, 2021, but early adoption is permitted, as long as all the amendments are applied.

The test generally is performed using the company's and the target's most recent audited financial statements prior to the

---

[4] The financial statements are generally the same as if the company were a registrant, with the exception that a nonpublic entity need not provide certain public company disclosures (e.g., for segment information and earnings per share). PCC alternatives are not allowed.

[5] The SEC Codification of Financial Reporting Policies, Section 506.02(c)(ii), provides the following: "Guidance as to when consummation of a transaction is probable cannot be given because such a determination is dependent upon the facts and circumstances. In essence, however, consummation of a transaction is considered to be probable whenever the registrants' financial statements alone would not provide investors with adequate financial information with which to make an investment decision."

---

[6] SEC Release No. 33-10786, Amendments to Financial Disclosures about Acquired and Disposed Businesses.

**Preparing to go public**

date of acquisition. The table summarizes the general rules for acquisitions that occurred more than 75 days before the offering.[7]

In addition, if audited financial statements are required, applicable interim financial information that would be required according to the guidelines described in the sections entitled "Age of financial statements" and "Unaudited interim financial statements" must also be included.

Staff Accounting Bulletin No. 80 (SAB 80) provides a special interpretation of Rule 3-05 of Regulation S-X. This is for IPOs involving companies whose operations have been built by the aggregation of discrete businesses that remain substantially intact after acquisition. SAB 80 allows first-time issuers to consider the significance of businesses recently acquired, or to be acquired based on the *pro forma* financial statements for the issuer's most recently completed fiscal year. Compliance with this interpretation requires an application of SAB 80's guidance and examples on a case-by-case basis. However, this interpretation allows currently insignificant business acquisitions to be excluded from the financial statement requirements. Simultaneously, it still ensures that the registration statement will include not less than three, two and one year(s) of financial statements for not less than 60%, 80% and 90%, respectively, of the constituent businesses of the issuer.

The acquisition or probable acquisition of real estate operations is subject to its own set of disclosure requirements under Rule 3-14 of Regulation S-X, which addresses income-producing real estate operations such as apartment buildings and shopping malls. Rule 3-14(a) requires the following:

Audited statements of comprehensive income must be provided for the three most recent fiscal years for any such acquisition or probable acquisition that would be *significant* (generally, that would account for 10% or more of the company's total assets as of the last fiscal year-end prior to the acquisition). If the property is not acquired from a related party, only a one-year statement of comprehensive income must be provided if certain additional textual disclosure is made. Rule 3-14(a) also requires certain variations from the typical form of statement of comprehensive income.

- If the property is to be operated by the company, a statement must be furnished showing the estimated taxable operating results of the company based on the most recent 12-month period, including such adjustments as can be factually supported. If the property is to be acquired subject to a net lease, the estimated taxable operating results shall be based on the rent to be paid for the first year of the lease. In either case, the estimated amount of cash to be made available by operations shall be shown. An introductory paragraph is required, stating the principal assumptions that have been made in preparing the statements of estimated taxable operating results and cash to be made available by operations.
- If appropriate under the circumstances, a table should be provided. It should disclose the estimated cash distribution per unit for a limited number of years, with the portion thereof reportable as taxable income and the portion representing a return of capital, together with an explanation of annual variations, if any. If taxable net income per unit will become greater than the cash available for distribution per unit, that fact and the approximate year of occurrence should be stated, if significant.

The SEC staff has noted that one element used in distinguishing a real estate operation from an acquired business subject to Rule 3-05 of Regulation S-X is the predictability of cash flows ordinarily associated with apartment and commercial property leasing, which generally includes shopping centers and malls. Nursing homes, hotels, motels, golf courses, auto

dealerships, equipment rental operations and other businesses that are more susceptible to variations in costs and revenues over shorter periods due to market and managerial factors are not considered to be real estate operations. In such cases, the Rule 3-05 requirements will apply.

The May 2020 amended reporting requirements included amendments to Rule 3-14 with the intention of eliminating differences from Rule 3-05 when no unique industry considerations exist.[8] The amendments include the following:

- A new definition of a real estate operation is included in the amendments, which is "a business that generates substantially all of its revenues through the leasing of real property." The term *substantially all* is not meant to be a bright line and therefore was not further defined by the SEC in the amendments. The application of the definition therefore will depend on specific facts and circumstances.
- Aligning the significance thresholds of Rule 3-14 with those of Rule 3-05, other than for acquisitions greater than 40% but less than 50%.
- Eliminating the requirement to provide three years of financial statements for acquisitions of related parties.
- Explicitly requiring financial statements for the most recent year-to-date interim period prior to the acquisition. Rule 3-14 financial statements will be required in registration statements using the same timing requirements as Rule 3-05.
- Allowing for the omission of required financial statements once the acquired real estate operation has been reflected in filed financial statements for nine months.

**Financial statements of an equity method investment.** If the company holds an investment in unconsolidated subsidiaries—or 50%-or-less owned entities accounted for under the equity method that exceed significance thresholds as defined by Rule 3-09 of Regulation S-X—separate financial statements for the

---

[7] An exception to the general requirements occurs for an individual or multiple acquisitions that exceed 50% of any of the significance criteria, for which if they have closed within the 75-day period prior to the offering, or are *probable* at the time of the offering, the financial statements described previously will be required.

Audited financial statements for the earliest of the three fiscal years required may be omitted if net revenues reported by the acquired business in its most recent fiscal year are less than $100 million. Unaudited interim financial statements may need to be included, depending on the time of year that the offering takes place.

---

[8] The amendments to Rule 3-14 take effect January 1, 2021, but early adoption is permitted.

**General rules for acquisitions more than 75 days pre-IPO**

| Acquisition criteria | Reporting requirements[a] | Amended reporting requirements[a] |
|---|---|---|
| The acquisition does not exceed 20% for any of the three significance criteria. | No audited financial statements required. | No change |
| The acquired business (or multiple acquisitions of related businesses) exceeds 20% but not 40% for any of the three significance criteria. | One year of audited financial statements required. | One year of audited financial statements required. No requirement to present financial statements if the acquired business has already been included in the registrant's post-acquisition audited results for at least nine months. If an interim period is required due to the age of financial statements, a comparative period is not required. |
| There have been multiple acquisitions of unrelated businesses whose significance is less than 20% individually but more than 50% for any of the three significance criteria when aggregated. | One year of audited financial statements required for a mathematical majority of the individually insignificant acquisitions. | Provide *pro forma* financial information depicting the aggregate effects of all such businesses in all material aspects and audited financial statements for entities >20% individually significant. |
| The acquired business (or multiple acquisitions of related businesses) exceeds 40% but not 50% for any of the three significance criteria. | Two years of audited financial statements required. | Two years of audited financial statements required. No requirement to present financial statements if the acquired business has already been included in the registrant's post-acquisition audited results for at least one year. |
| The acquired business or any acquisition that is probable at the time of the offering exceeds 50% for any of the three significance criteria (or securities are being registered to be offered to the shareholders of the acquired business). | Three years of audited financial statements required. | This category has been removed. |

*(a) The number of years for which balance sheets and statements of comprehensive income are required to be presented is based upon the level of significance.*

investee company may need to be filed with the registration statement, including an audit for certain periods.

Significance of investees is evaluated under Rule 1-02(w) of Regulation S-X based on the following tests:

- The company's and its other subsidiaries' investments in, and advances to, the investee exceed 20% of the total assets of the company and its subsidiaries consolidated as of the end of the most recently completed fiscal year.
- The company's and its subsidiaries' equity in the pre-tax income from continuing operations of the investee exceed 20% of such income of the company and its subsidiaries consolidated for the most recently completed fiscal year.

If either of these tests is met, separate financial statements of the investee must be filed. Insofar as is practicable, the separate financial statements required shall be as of the same dates and for the same periods as the audited consolidated financial statements required to be filed by the company. The required financial statements of the investee must be audited only for those fiscal years in which either of the aforementioned tests is met; the remaining years can be unaudited. These audited financial statements may or may not require auditing by an independent accountant registered with the PCAOB, depending on the level of reliance placed on these audited financial statements by the company's principal independent accountant. If the registrant's principal independent accountant references the audit of the

investee in its report, the investee audit must be performed by an independent accountant registered with the PCAOB.[9]

Under Rule 4-08(g) of Regulation S-X, for any unconsolidated subsidiaries—and 50%-or-less owned entities accounted for under the equity method that meet any of the three Rule 1-02(w) criteria at the greater than 10% but not more than 20% significance level—summary financial

_____

[9] The auditor of the financial statements of the nonissuer entity must be registered if, in performing the audit, the auditor played a substantial role in the audit of the issuer, as that term is defined in PCAOB Rule 1001(p)(ii). If the substantial role test is not met, the firm is not required to be registered. The inclusion or exclusion of such a report under Rule 2-05 of Regulation S-X does not affect this determination.

**Preparing to go public**

information as described by Rule 1-02(bb) must be presented in the notes to the financial statements.

**Financial statements of guarantors and for collateralizations.** A guarantee of a public security (e.g., a guarantee of a public debt or public preferred equity security) is, itself, considered a security that must be registered under the Securities Act, absent an applicable exemption. Rule 3-10 of Regulation S-X requires each guarantor of registered securities to file the same financial statements required for the company in the filing. If certain criteria are met, condensed consolidating financial information may be provided in the company's financial statements in lieu of separate audited financial statements, unless a guarantor is newly acquired.

Under Rule 3-16 of Regulation S-X, audited financial statements must also be filed for each affiliate whose securities collateralize any class of registered securities if the greater of the aggregate principal amount, par value, book value or market value equals 20% or more of the principal amount of the secured class of securities being offered.

In March 2020, the SEC finalized amendments to Rules 3-10 and 3-16. The final rule amends Rule 3-10 and partly relocates it to new Rule 13-01. Amended Rule 3-10 allows more issuers to provide certain financial and nonfinancial disclosures in lieu of separate audited financial statements if the revised eligibility conditions are met. Similarly, the requirements to provide separate audited financial statements in Rule 3-16 are replaced with summarized financial and nonfinancial disclosures in new Rule 13-02. New Rules 13-01 and 13-02 specify the requirements of these disclosures, which are permitted to be provided outside of the notes to the company's financial statements. The new rules are effective for registration statements first filed or amended on or after January 4, 2021, but early adoption is permitted.

If any of the aforementioned situations are applicable, Rules 3-10, 3-16, 13-01 and 13-02 should be reviewed to determine the extent of financial information required to be included with the registration statement.

***Pro forma* financial information.**
*Pro forma* financial information may be required to assist investors in understanding the nature and effect of significant acquisitions, dispositions, reorganizations, unusual asset exchanges, debt restructurings or other transactions contemplated in the prospectus. In such cases, historical financial information is adjusted in the *pro forma* financial information to reflect the transactions and the impact of the offering on the company's capital structure. All significant assumptions must be disclosed.

Guidance regarding *pro forma* financial information is provided in Article 11 of Regulation S-X.[10] Rule 11-01 of Regulation S-X specifies the circumstances under which *pro forma* financial information is required in filings with the SEC and sets forth general guidelines for the content of that information. Article 11 requires:

■ a condensed *pro forma* balance sheet based on the most recent balance sheet of the company included in the filing, unless the transaction is already reflected in that balance sheet; and
■ a condensed *pro forma* statement of comprehensive income based on the company's most recent fiscal year and the interim period of the company included in the filing, unless the historical statement of comprehensive income reflects the transaction for the entire period.

*Pro forma* adjustments related to the *pro forma* condensed balance sheet and condensed statement of comprehensive income must include adjustments, which give effect to events that are:
■ directly attributable to the transaction;
■ factually supportable; and
■ expected to have a continuing impact on the company (applicable only to the condensed statement of comprehensive income).

As a result, any *pro forma* adjustments for expected future cost synergies or other similar adjustments that are not specifically supported by the acquisition documents will generally not be allowed.[11]

If a business or assets are disposed of (or planned to be disposed of) after the latest balance sheet presented in the registration statement, but before the effective date of the IPO, the effect of the disposal should be reflected in the company's *pro forma* financial statements that are prepared in accordance with Article 11.

**Segment reporting.** For companies that operate in multiple lines of business or geographic regions, additional disclosure data may be required to be presented, which includes separate revenues and operating results information for each major line of business or geographic region. Accounting Standards Codification (ASC) Topic 280, "Segment Reporting," requires disclosures regarding segments for each year in which an audited statement of income is provided. Item 101(b) of Regulation S-K requires disclosure of certain financial information about industry segments. This includes revenues from external customers, profitability measures and total assets for each of the last three fiscal years presented.

ASC Topic 280 establishes standards for the way that public business enterprises report information about operating segments in annual financial statements. It also requires those enterprises to report selected information about operating segments in their interim financial reports and establishes standards for related disclosures about products and services, geographic regions and major customers. It defines an *operating segment* as a component of an enterprise:
■ that engages in business activities from which it may earn revenues and

---

[10] Certain *pro forma* disclosures are required by GAAP—such as FASB Accounting Standards Codification (ASC) Topic 805, "Business Combinations" and ASC Topic 410, "Asset Retirement and Environmental Obligations"— and should be provided in the notes to the financial statements where applicable. Those presentations may differ in style and content from the requirements of Article 11 of Regulation S-X.

[11] Under the Amendments to the SEC's rules for separate financial statement of acquired businesses adopted in May 2020, the *pro forma* information may include management adjustments to include forward-looking information (e.g., synergies and dis-synergies that would, in management's opinion, enhance an understanding of the *pro forma* effects of the transaction). This will take effect January 1, 2021, but early adoption is permitted.

incur expenses (including revenues and expenses relating to transactions with other components of the same enterprise);

■ whose operating results are regularly reviewed by the enterprise's chief operating decision maker, to make decisions about resources to be allocated to the segment and assess its performance;[12] and

■ for which discrete financial information is available.[13]

Determining whether the company has multiple operating segments involves an assessment of how management runs its business. Aggregating two or more operating segments may be highly subjective and involves consideration of the similarities in the economic characteristics and in other factors, such as the nature of the products and services, the nature of the production process, customer type or class, distribution channels and applicable regulatory environment.

The company must provide required disclosure information about an operating segment if it meets any of the following thresholds:

■ Its reported revenue (including both sales to external customers and intersegment sales) is 10% or more of the combined revenue (internal and external) of all reported operating segments.

■ The absolute amount of its reported profit or loss is 10% or more of the greater, in absolute amount, of:
  ■ the combined profit of all operating segments that did not report a loss; or
  ■ the combined loss of all operating segments that did report a loss.

[12] The term *chief operating decision maker* identifies a function, not necessarily a manager, with a specific title. That function is to allocate resources to, and assess the performance of, the segments of an enterprise. Often, the chief operating decision maker of an enterprise is its CEO or COO, but it may be a group consisting of, for example, the enterprise's president, executive vice presidents and others.

[13] Discrete financial information is considered any measure of a business activity's profit or loss. Depending upon the circumstances, this measure could be comprised of revenue and/or expenses.

■ Its assets are 10% or more of the combined assets of all operating segments.

The company must disclose the factors used to identify the enterprise's reportable segments, including the basis of organization and the types of products and services from which each reportable segment derives its revenues. The company must also report for each of its reportable segments a measure of profit or loss, total assets attributable to that segment, revenues from external customers and a reconciliation to the corresponding consolidated amounts. Furthermore, disclosure of items such as interest revenue and expense, depreciation and related expense, equity method investments and capital expenditures may be required under ASC Topic 280 if such amounts are included in the measure of segment profit or loss or in the determination of segment assets, as reviewed by the company's chief operating decision maker on a segment basis.

ASC Topic 280 also requires certain enterprise-wide disclosures, regardless of whether the company has multiple reportable segments, if not already provided as part of the reportable operating segment information. These disclosures include revenues from external customers for each product and service or each group of similar products, as well as services and revenues by geographic area.

For interim periods, disclosure for each segment must include revenues from external customers, intersegment revenues, a measure of profit or loss, a reconciliation to the company's consolidated information and material changes to total assets.

The time and effort required in identifying, gathering and reporting financial information for operating segments may be significant. A first-time issuer should carefully consider the requirements for segment reporting and revisit its reporting obligations whenever (1) it enters into new lines of business, (2) it exits an existing line of business or engages in other restructuring activities or (3) the company's chief operating decision maker begins to analyze its business in a new or a different way.

**Supplemental schedules for certain transactions.** Rule 5-04 of Regulation S-X requires that a number of supplemental schedules be provided for particular industries and under certain circumstances. Each of these schedules contains additional financial information that must be audited by the company's independent accountant:

■ Schedule I—Condensed Financial Information of Registrant must be filed when the restricted net assets of consolidated subsidiaries exceed 25% of consolidated net assets as of the end of the most recently completed fiscal year. For purposes of this test, restricted net assets of consolidated subsidiaries are the amount of the company's proportionate share of net assets of consolidated subsidiaries (after intercompany eliminations), which, as of the end of the most recent fiscal year, may not be transferred to the parent company by subsidiaries in the form of loans, advances or cash dividends without the consent of a third party (e.g., lender, regulatory agency or foreign government).

■ Schedule II—Valuation and Qualifying Accounts must be filed in support of valuation and qualifying accounts (e.g., allowance for doubtful accounts, allowance for inventory obsolescence) included in each balance sheet.

■ Schedule III—Real Estate and Accumulated Depreciation must be filed for real estate held by companies with a substantial portion of their business involving acquiring and holding investment in real estate, interests in real estate or interests in other companies, a substantial portion of whose business is acquiring and holding real estate or interests in real estate for investment. Real estate used in the business is excluded from the schedule.

■ Schedule IV—Mortgage Loans on Real Estate must be filed by certain companies for investments in mortgage loans on real estate.

■ Schedule V—Supplemental Information Concerning Property- Casualty Insurance Operations must be filed when the company, its subsidiaries or 50%-or-less owned investees accounted for under the equity method have liabilities for property–casualty (P/C) insurance claims. The schedule may be omitted, if reserves for unpaid P/C claims—and claims

**Preparing to go public**

adjustment expenses of the company and its consolidated subsidiaries, its unconsolidated subsidiaries and its 50%-or-less owned equity method investees—did not, in aggregate, exceed one half of common shareholders' equity of the company and its consolidated subsidiaries as of the beginning of the fiscal year. For purposes of this test only, the proportionate share of the company and its other subsidiaries in the reserves for unpaid claims and claim adjustment expenses of 50%-or-less owned equity method investees taken in the aggregate after intercompany eliminations shall be taken into account.

Companies in specific industries, including insurance, may have additional supplemental information requirements that vary from those listed previously. The schedule information may be provided separately or in the notes to the audited financial statements.

**Industry guides.** Item 801 of Regulation S-K sets out five industry "guides," requiring enhanced disclosure of financial and operational metrics for companies in certain industries:
- Guide 3—Statistical Disclosure by Bank Holding Companies;
- Guide 4—Prospectuses Relating to Interests in Oil and Gas Programs;
- Guide 5—Preparation of Registration Statements Relating to Interests in Real Estate Limited Partnerships;
- Guide 6—Disclosure Concerning Unpaid Claims and Claim Adjustment Expenses of Property-Casualty Insurance Underwriters; and
- Guide 7—Description of Property by Issuers Engaged or to Be Engaged in Significant Mining Operations.

Guidance for disclosures for companies with oil and gas operations is provided in Item 1200 of Regulation S-K.

New guidance for disclosures by companies engaged in mining operations take effect for fiscal years beginning on or after January 1, 2021, superseding the guidance of Industry Guide 7— Description of Property by Issuers Engaged or to Be Engaged in Significant Mining Operations. The new guidance is provided in Item 1300 of Regulation S-K. Companies may comply with Item 1300 voluntarily prior to its effective date.

**Smaller reporting companies.** Smaller reporting companies, as defined by Item 10(f)(1) of Regulation S-K, may be eligible for scaled reporting requirements. These scaled requirements streamline and simplify the disclosure requirements to make it easier and less costly for smaller reporting companies to comply. Under the rules, a company qualifies as a "smaller reporting company"[14] if it:
- has a public common equity float of less than $250 million as of the last business day of its most recently completed second fiscal quarter; or
- had annual revenues less than $100 million in the prior fiscal year and either
  - has no public float (e.g., companies with no common equity outstanding or no market price for their outstanding common equity); or
  - had public float as of its most recently completed second fiscal quarter of less than $700 million.

In the case of a company filing an initial registration statement, the public float is computed as of a date within 30 days of its initial registration statement by multiplying the aggregate worldwide number of common equity shares held by nonaffiliates before the offering—plus the number of common shares being offered— by the estimated public offering price of the common equity shares. If a company fails to qualify for smaller reporting status, it may recalculate its public float based on the results of the public offering.

If smaller reporting company status is achieved, the registration statement may comply with the SEC's scaled disclosure system. The scaled disclosure requirements are integrated into Regulation S-X (Article 8 for financial statement requirements) and Regulation S-K (for nonfinancial statement disclosure requirements). A few of the key differences in financial statement requirements are as follows:

- Audited annual financial statements— These include statements of income, cash flows, changes in shareholders' equity and comprehensive income for the past two years, as opposed to three years for large companies. The balance sheet requirement is the same.
- Financial statements for significant acquisitions—Rule 8-04 of Regulation S-X requires two years of financial statements for a business acquired by a smaller reporting company if the acquisition is greater than 50% significant. Under Rule 3-05, a third year is required if the acquisition is greater than 50% significant and the acquired business had revenues of at least $50 million in its most recent fiscal year.
- Audited financial statements for significant equity method investments— Article 8 does not require the filing of separate financial statements of investees as would be required under Rule 3-09 but summarized financial information must be disclosed.

If the company qualifies as a smaller reporting company in an initial registration statement, it must reassess this status at the end of its second fiscal quarter in each subsequent fiscal year. If the company fails to meet the test, a transition to the larger company reporting requirements commences with the first quarter of the subsequent fiscal year.

**Emerging growth company.** The Jumpstart Our Business Startups (JOBS) Act created a new category of public equity issuers called EGCs that are exempt from certain SEC reporting requirements for up to five years. An EGC is a company that has not had an initial sale of registered equity securities on or before December 8, 2011 and has total annual gross revenues less than $1.07 billion for its most recently completed fiscal year.[15,16]

---

[14] An FPI that meets the criteria of a smaller reporting company can take advantage of the scaled disclosures, but in doing so, it must file domestic company forms and provide financial statements under US GAAP. See section 10.3 for a further discussion of FPIs.

---

[15] An FPI may also qualify as an EGC.
[16] "Total revenues" means the revenues presented in a company's most recent fiscal year's financial statements prepared under US GAAP (for domestic companies and foreign companies that present a reconciliation to US GAAP) or International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

Among the reduced reporting requirements permitted for an EGC under the JOBS Act are the following:

■ An EGC may limit presentation of audited financial statements in the initial registration statement of its common equity securities to the two most recent fiscal years.[17-19] The JOBS Act does not change the existing requirement that registrants present unaudited financial statements for the most current interim period and comparative prior year period in registration statements.[18,19]

■ An EGC may comply with the management's discussion and analysis (MD&A) and selected financial data requirements of Regulation S-K by presenting information about the same periods for which it presents financial statements in an initial registration statement.

■ As an EGC is not required to present more than two years of audited financial statements in a registration statement for an IPO of its common equity securities, the SEC will not object to limiting the years of financial statements provided under Rule 3-05 or 3-09 to two years. The SEC staff would also not object if an EGC voluntarily provides the third year of audited financial statements in the initial registration statement but chooses to provide only two years of audited financial statements under Rules 3-05 or 3-09 when three years of audited financial statements may otherwise be required based on the significance of the acquired business or equity method investment. An EGC will also be allowed to apply these accommodations to any other registration statement it files.

■ An EGC may apply the effective date provisions applicable to nonpublic companies for adoption of new or revised accounting standards issued by the Financial Accounting Standards Board (FASB) but must make this choice at the time the company is first required to file a registration statement, periodic report or other report with the SEC.[20]

■ An EGC is exempt from the requirement for auditor attestation of internal control over financial reporting (ICFR).[21]

■ An EGC may report using the scaled disclosure requirements available to smaller reporting companies for executive compensation disclosures.

An EGC retains this status until the earliest of:

■ the last day of its fiscal year in which it has total annual gross revenues of $1.07 billion or more;

■ the last day of its fiscal year following the fifth anniversary date of the first sale of common equity securities pursuant to an effective registration statement;

■ the date on which the issuer has issued more than $1.07 billion in nonconvertible debt during the previous three-year period; or

■ the date on which the issuer is deemed to be a large accelerated filer.

An EGC must continually revaluate its ability to qualify for EGC status. If an entity fails to qualify for EGC status at any point, the entity must follow certain transitional rules and commence complying with non-EGC reporting requirements during the year in which the entity no longer qualifies as an EGC.

**Summary.** Planning an IPO is a complex undertaking that requires the compilation and collection of numerous financial statements and related information. Knowing what financial statements and other information will be required to complete a registration statement is a critical step in planning an IPO. The company should consult the SEC rules and regulations, as well as its auditor and other advisors, to determine what financial information requirements might be applicable in its circumstances to allow for the planning of sufficient time and resources to complete the filing within manageable time frames.

**(b) Transition to a public company**
The completion of an IPO marks the start of life as a public company. One of the first challenges for a successful transition is adapting to the new, often more complex, requirements of operating as a public company. New processes may need to be adopted, and management must now consider how decisions affect a much larger group of stakeholders and be conscious of ensuring regulatory compliance. Some of the transition areas that should be considered going forward are outlined in the following section.

**Controls and procedures.** The level of investor confidence in the reliability of financial disclosures can be a key factor in a public company's success. To help ensure investor—and market—confidence, a public company's internal controls systems must comply with all regulatory requirements. These requirements include quarterly certifications by executives and an audit report on the effectiveness of ICFR required by Section 404 of the Sarbanes–Oxley (SOX) Act, typically as of the second fiscal year-end after the IPO. However, an EGC is exempt from the auditor attestation requirement in Section 404(b) of the SOX Act for as long as it qualifies as an EGC.

Complying with Section 404 requires a significant investment of resources over several months to move through a project

---

[17] The JOBS Act provision that permits an EGC to file only two years of audited financial statements is limited to the registration statement for the EGC's IPO of common equity securities. However, an EGC will not be required to include—in its first annual report on Form 10-K or on Form 20-F—audited financial statements for any period prior to the earliest audited period included in the registration statement filed in connection with its IPO of common equity securities.

[18] If an EGC is not a smaller reporting company, it must include three years of audited financial statements in its initial registration statement for debt securities.

[19] An FPI qualifying as an EGC may comply with the scaled disclosure provisions in a Form 20-F. If an FPI takes advantage of any benefit available to an EGC, then it will be treated as an EGC.

[20] EGCs must adhere to public company effective dates for all standards issued prior to April 5, 2012. Any update to the FASB's ASC after April 5, 2012 would be eligible for adoption according to the private company timetable. If an EGC elects to comply with public company effective date provisions, it must comply with them consistently for all new and revised standards throughout the period it qualifies as an EGC.

[21] Under existing SEC rules and regulations, newly public entities, other than nonaccelerated filers, begin complying with Section 404(b) auditor attestation of the Sarbanes–Oxley (SOX) Act with their second annual report filed with the SEC. An EGC will be exempt from this requirement as long as it qualifies as an EGC; however, management's reporting on internal control is still required, as according to Section 404(a).

plan that includes a number of phases, such as:

- assessing financial statement and general and specific fraud risks;
- evaluating the control environment, entity-level controls and general information technology (IT) controls;
- identifying significant accounts and disclosures;
- defining significant locations and business units;
- documenting processes involving major classes of transactions;
- identifying significant risk points and key mitigating controls;
- providing preliminary assessment of effectiveness of design and operation of key controls;
- remediating missing and ineffective controls;
- demonstrating consideration of the regulatory risks and environment; and
- conducting final tests that support an assertion of effective internal controls over financial reporting.

Section 7.1 contains a more detailed discussion of the SOX Act compliance requirements.

**Financial accounting department.** The process leading up to filing the registration statement requires gathering various pieces of financial information. The company can utilize external advisors to assist in gathering this information, but once an IPO is completed, internal resources should be in place to support the ongoing reporting needs of a public company. The company will need to:

- prepare ongoing reports that provide financial and nonfinancial information at a level of detail and in a time frame that generally was not required in the past;
- develop a public entity organizational structure and recruit appropriate personnel to satisfy its public reporting requirements;
- develop sufficient resources or processes to perform regular and consistent financial close and reporting processes to meet reporting requirements;
- develop or enhance its accounting and reporting policies and procedures;
- enhance the training and skills of its existing workforce involving accounting

and reporting requirements of public companies;

- develop or enhance its budgeting, forecasting and financial modeling processes to reflect its operations as a stand-alone entity with public shareholders; and
- change underlying business processes to meet appropriate metrics or best-in-class services.

After the IPO, the company will be subject to strict SEC reporting timelines for quarterly and annual reporting. It will also be required to file current reports on Form 8-K after the occurrence of certain specified material events within four business days of the occurrence. Many private companies are unaccustomed to formal accounting closes for interim reporting periods and the strict reporting timelines for both quarterly and annual periods. In anticipation of going public, the following are some actions that the company should take in advance of the IPO:

- Evaluate the current financial close process in light of post-IPO requirements and consider early implementation of an accelerated close timeline that will be required of an SEC issuer, including the gathering of disclosure information for notes to the financial statements. Reducing the financial close cycle time will most likely involve changes in processes, IT systems and possibly resources. The transition to an established process can take time, but it is imperative that these modifications be in place before the first Form 10-Q or Form 10-K is required.
- Evaluate the finance and accounting departments' organizational structure and skill sets of key personnel in light of post-IPO reporting requirements, and then identify gaps. Gaps can be filled by recruiting additional staff and providing training for current personnel.
- Draft an accounting policy manual. Many private companies have informal policies and procedures, but public companies should have documented accounting policies as a component of their internal control environment.

**Budgeting and forecasting.** After the IPO, investors will expect the company to implement the plans presented in the prospectus. The following are some of the

organizational changes that the company should consider:

- Review business strategies, forecasting processes and cost infrastructure in order to help ensure its competitiveness and meet shareholder expectations.
- Develop an IR infrastructure and resources.
- Develop or enhance budgeting, forecasting and financial modeling processes.
- Determine key performance indicators to be used to communicate business performance to stakeholders that are in line with industry practices.
- Design appropriate compensation programs that align and incentivize employee behavior and focus with the overall business strategy and key objectives.

The company's strategic plan should encompass both external and internal factors that span the entire organization. The plan establishes the framework for the annual budget, providing the top-down direction, financial targets and key assumptions.

The annual budget should focus on key operational drivers of the business for both revenue and cost, with key inputs from senior management. The budget process should be flexible and have a short cycle time to accommodate market-driven changes.

Forecasting should be a periodic update to the budget (and strategic plan) that reflects changes and impacts actually experienced in the marketplace. Although implementation of forecasting is generally the domain of the finance department, ownership of the process belongs with the recipients of the results, including operational management. The process should involve a focused, bottom-up process based on specific, measurable drivers, and it should closely involve operational managers.

If the company does not have adequate sales forecasting, it may consider using key performance indicators, industry trends or other third-party data to benchmark target sales numbers. Similarly, external cost trends and industry averages can help quantify or even qualify expense forecasts. Creating standardized relationships between internal and external financial and

operational sources can provide both insight and consistency in the forecasting process and also identify a baseline to measure the company's performance relative to the industry.

At a minimum, forecasts should be updated semi-annually, but more frequent updates are preferable. The actual results may prompt changes in strategies, priorities and resource allocation, with subsequent period forecasts reflecting the impacts of such changes. Ideally, the subsequent year's budgeting process should be embedded in the forecasting process during the latter part of the current fiscal year.

**Extensible business reporting language.** SEC rules and related guidance require public companies (both domestic and FPIs) to provide their financial statements to the SEC in a separate exhibit containing certain reports and registration statements in an interactive data format using extensible business reporting language (XBRL). The rules are designed to make it easier for analysts and investors to locate and compare data on financial and business performance in a standard format across all public companies. The XBRL rules also require public companies to post their XBRL filings on their corporate websites. With interactive data, all of the items in a financial statement are labeled with unique computer-readable "tags," which make financial information more searchable on the Internet and readable by spreadsheets and other software.

In June 2018, the SEC finalized amendments to the XBRL rules, requiring the use of inline XBRL, which embeds the XBRL-formatted information into the financial statements rather than including the XBRL-formatted information only in a separate exhibit to a filing. Prior to adopting the inline XBRL requirement, companies are required to continue submitting XBRL-formatted financial information as exhibits. The inline XBRL rule is currently effective for large accelerated and accelerated filers that use US GAAP and for all other filers, including International Financial Reporting Standards (IFRS) filers, beginning with the first periodic filing for a period ending on or after June 15, 2021.

XBRL/inline XBRL is not required for IPOs, but a company with an IPO that becomes effective will be required to comply with the applicable XBRL rules, commencing with periodic filings, starting with its first Form 10-Q filed after the registration statement becomes effective. The rules should be consulted regarding when initial compliance with the rule commences, as this will be dependent on the timing of the IPO.[22]

**Technology considerations.** IT is a critical enabler for the company in creating value and achieving financial reporting and regulatory compliance. Public companies that have not adequately invested in technology and tools for financial reporting and business operations may struggle with technology and system limitations in meeting their needs. This may require additional resources to ensure business processes are adapted to meeting IT system needs. In addition, the company may need to implement new technology and systems or customize existing systems and reports.

The IT effort required for compliance with establishing, evaluating and obtaining an audit of ICFR should not be underestimated. IT plays a large role within the internal control structure and is an integral part of SOX Act compliance. A systems-embedded approach to the financial reporting process can include automated key controls to reduce the overall number of controls.

IT strategy can be a key driver in accelerating the accounting close process through the reduction or consolidation of multiple general ledgers, charts of accounts and reporting systems. For systems that have disparate interfaces or lack real-time reporting capabilities, modifying the existing system's capabilities or building the case for an enterprise resource planning system may be warranted.

Greater use of IT systems can also enhance the budgeting and forecasting process and allow for the leveraging of information more effectively. Communication requirements to key stakeholders after the IPO about the performance of the company should be aligned with external reporting. Implementation of an integrated system providing both external and management reporting can provide timely, quality information.

**Summary.** Becoming a public company often requires management to make numerous improvements to business processes and the underlying systems as they react to the demands of investors, government regulators and other stakeholders. Preparing for this change in status may require considerable time and effort. To achieve a more seamless transition, the company should consider taking steps to operate and report like a public company before the IPO becomes effective to ease the post-IPO transition.

---

[22] Applicable for the first Form 20-F filed for an FPI.

nyse.com/ipo

# 4
# The IPO process



### 4.1 Process timeline
*J.P. Morgan (Investment Banking)*

Planning and executing an IPO is time-intensive and typically takes 16–20 weeks or more from organizational meeting to closing. The exact time taken can vary depending on the company's readiness prior to embarking on the IPO process, the complexity of the transaction, market conditions and numerous other factors. Achieving this timeline requires significant preparation, including the completion of required financial disclosure, which is critical for the drafting of the registration statement.

A large team of professionals is involved in the IPO process, overseeing the key workstreams: drafting of the registration statement, due diligence, preparation of transaction documentation and other marketing materials (e.g., analyst presentation, roadshow presentation).

The preparation process can be broken down into the following key stages:

### The pre-filing phase

#### (a)  Week 1

**Organizational meeting.** All key members of the IPO working group meet to discuss the offering, including timing, key tasks and roles and responsibilities for the IPO process. The lead bookrunners typically prepare an organizational book that details the aforementioned items. During this meeting, the CEO, CFO, general counsel and other key executives typically provide an overview of the company, to ensure the working group has a good understanding of the company's business, financial position and any key issues affecting it, as well as clarity on the critical path for execution of the IPO.

#### (b)  Weeks 2 to 5:

**Registration statement drafting.** The registration statement is the principal SEC document for an IPO, with the dual purpose of registering the securities with the SEC and educating investors on the opportunity. Domestic issuers utilize an S-1, while foreign private issuers utilize an F-1. The drafting of the registration statement is a collaborative process among the company, the underwriters (typically led by the lead bookrunners), the company's and underwriters' counsel and the company's

auditors. The company relies heavily on the bookrunners to craft an appropriate marketing story and consults closely with its auditors when preparing the financial disclosure.

**Due diligence.** The purpose of due diligence is twofold: first, and most importantly, to ensure the accuracy and completeness of the company's registration statement; second, to protect the underwriters (and certain other offering participants) against liability arising in connection with any material misstatements and/or omissions in the offering disclosure. Due diligence is conducted by all members of the working group and is iterative in nature, continuing right up to closing of the IPO, though it should be substantially complete by the time of the initial filing of the registration statement.

The underwriters and their counsel will conduct extensive business, financial and accounting due diligence on the company, focusing primarily on the company's operations, procedures, financials (both historical and prospective), competitive position and business strategy, as well as on the management team and key board members. As part of this process, the underwriters will have detailed discussions with the company's management, customers, suppliers and any other relevant parties and will review agreements with and documentation relating to any of the aforementioned parties, workforce, creditors or other related parties.

Counsel to the company and the underwriters will also conduct legal due diligence, which is primarily documentary in nature and focuses on verifying the company's legal records, material contracts, any litigation and compliance with local, state and federal laws and regulations.

**Legal and other documentation.** In addition to assisting with drafting the registration statement and participating in due diligence, the company's and underwriters' counsel will work with the underwriters, the company and the auditors to draft and complete the following documentation:
- underwriting agreement;
- lock-up agreements for existing shareholders (typically signed before filing of the registration statement);
- legal opinions;

- comfort letter; and
- press releases announcing the filing (optional), launch and pricing of the transaction.

**Determining listing venue.** The company, with the assistance of the lead bookrunners, should determine whether it is eligible to list on the NYSE or another exchange, hold discussions with the exchange and reserve a ticker symbol.

#### (c)  Week 6

**Valuation update with the lead bookrunners.** It is prudent to hold periodic valuation updates with the lead bookrunners, particularly as market conditions shift and as the company achieves key milestones throughout the IPO process. This ensures that all parties are aligned on valuation expectations.

**Legal and other documentation.** Continue drafting and negotiating legal documentation and comfort letter.

**Equity research analyst briefing.** The underwriters' or syndicate's equity research analysts also conduct due diligence on the company, with a particular focus on the business and financials. The timing of the fulsome research analyst day can vary, but it is common for the syndicate analysts to speak with management in advance of the initial filing.

**Underwriter internal approvals.** Prior to filing the initial draft registration statement with the SEC, the underwriters will typically need to clear internal committees. This involves presenting the company to an internal committee, a review of the draft registration statement disclosure and a discussion of any issues that came to light during the due diligence process. This is a prerequisite, regardless of whether the initial filing is confidential or public.

**Submission of draft registration statement to the SEC.** While drafting the registration statement can be completed in six weeks or fewer, this workstream often takes longer. The speed at which a company is able to file its registration statement is contingent upon its readiness at the outset of the process. The availability of audited financials is particularly important.

To commence the process of the SEC's review of the registration statement, the company must file it together with various exhibits. All issuers have the ability to file confidentially. Companies that elect to undertake a confidential review must publicly file the draft registration statement at least 15 days before the start of the IPO roadshow. Upon the public filing, all prior confidential filings are made available.

**The waiting period**

**(d) Weeks 7 to 8**

**Roadshow presentation and marketing strategy.** While the IPO working group awaits comments from the SEC on the draft registration statement, it is prudent to further develop the marketing story for the IPO roadshow. The lead bookrunners will generally spearhead this process, while working closely with the company to create an impactful slide deck to be shown to investors during the roadshow. This presentation is typically 20 to 30 slides in length and details the offering, the company's products and/or services, key selling points, industry trends, growth opportunities, competitive positioning and financial performance.

Many companies elect to *test the waters* prior to the launch of the IPO roadshow, which entails a series of investor meetings. An abbreviated version of the roadshow presentation is utilized during these meetings, excluding any mention of the offering itself.

**Legal and other documentation.** Continue drafting and negotiating legal documentation and comfort letter.

**(e) Weeks 9 to 13**

**Receiving and addressing SEC comments.** The SEC takes approximately 30 days to complete its initial review of the draft registration statement. The SEC will respond to the company and its counsel via a formal comment letter in which it makes certain observations on the draft disclosure and invites the company to address these by making revisions and filing a series of amendments. The initial comment letter is the beginning of an iterative process with the SEC, which often requires at least two to three amendments and can last six or more weeks, depending on a number of variables.

**Legal and other documentation.** Continue drafting and negotiating the legal documentation and comfort letter.

**Roadshow presentation.** Continue refining the roadshow presentation and hold rehearsals with CEO/CFO and any other members of the roadshow team.

**Agree on offering structure.** The company, in conjunction with the lead bookrunners, should determine the appropriate proceeds to raise in the IPO in order to be well capitalized after the IPO, taking into account its strategic goals, as outlined in the registration statement. In addition, the company should approach its shareholders and discuss the extent to which they may wish to sell part of their holdings in the IPO. In doing so, the company should be mindful of any IPO participation rights granted to shareholders under registration rights and other similar agreements that may exist with existing shareholders.

**Valuation and price range discussions.** Continue periodic valuation discussions with the underwriters and formulate a preliminary price range to be provided confidentially to the SEC as an indication of what is to be expected when the offering is launched. This often involves a share split or consolidation to achieve the desired dollar price range.

**Agree on marketing strategy.** The company and the lead bookrunners should decide on ideal timing, the length of the roadshow and which investors to target as potential buyers of the IPO.

**The marketing/execution phase**

**(f) Weeks 14 to 15**

**Registration statement and other documentation.** Having cleared all SEC comments and amended the registration statement to reflect any stock split and the offering price range, finalize all other documentation, including the underwriting agreement and comfort letter, and launch the press release. A longer SEC review will push out launch.

**Roadshow preparation.** Finalize the roadshow presentation, hold roadshow rehearsals and make all logistical preparations for the roadshow launch.

**(g) Weeks 16 to 17**

**Launch IPO.** File an amendment to the registration statement with price range (the so-called *red herring*). Conduct management presentations to the underwriters' equity salesforces and commence the roadshow, typically consisting of up to seven and eight days of investor meetings.

**Pricing and closing.** After building a book of demand, the lead bookrunners will agree on the offering price with the company and shareholders, execute the underwriting agreement and allocate the IPO to investors. The following day, the company begins publicly trading on the NYSE or another exchange, rings the opening bell and hosts other key marketing events associated with being a public company. Two business days later, the IPO closes, at which point stock is delivered to investors against payment of the offering price, and various legal opinions are delivered by counsel.

**(h) Aftermarket**
Depending on the trading performance of the stock, the underwriters may either intervene to *stabilize* the stock in order to smooth out short-term volatility (if the stock falls below issue price post-IPO) or exercise the greenshoe (if the stock trades comfortably above issue price post-IPO).

**4.2 SEC registration and prospectus**
*Simpson Thacher & Bartlett*

**(a) The registration statement and the prospectus**
In the United States, the basic regulatory framework governing initial public offerings (IPOs) has been in place since the early 1930s, when Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934 in reaction to the stock market crash of 1929. The Securities Act and the Exchange Act to this day continue to undergird the process by which companies conduct public offerings of their securities and provide ongoing public reporting thereafter. The Securities Act requires a company to file a registration statement with the Securities and Exchange Commission (SEC) and have that registration statement be declared *effective* by the SEC prior to publicly distributing its shares in the United States.

**The IPO process**

By far, the most common type of registration statement for an IPO in the United States is Form S-1. (While real estate investment trusts use Form S-11 and most foreign companies use an alternate form, the basic concepts are the same.) The applicable SEC form specifies the information that must be included in the registration statement and refers to specific SEC regulations (Regulation S-K and Regulation S-X) that provide instructions on what information must be presented and how. If your company qualifies as an emerging growth company (EGC) or smaller reporting company (SRC), you will be able to benefit from reduced disclosure obligations in the IPO registration statement and in your subsequent ongoing SEC reporting. We highlight some of these benefits throughout this guide.

A *smaller reporting company* (SRC) is any issuer that:
- has public float of less than $250 million or
- has less than $100 million in annual revenues and
  - no public float or
  - public float of less than $700 million.

An *emerging growth company* (EGC) is any issuer that had total annual gross revenues of less than $1.235 billion (adjusted for inflation every five years) during its most recently completed fiscal year. A company that is an EGC on the first day of its fiscal year will no longer qualify as an EGC upon the earliest of:
- the last day of its fiscal year following the fifth anniversary of the first sale of its common equity securities in a public offering;
- the last day of a fiscal year during which it had total annual gross revenues of $1.235 billion or more (adjusted for inflation every five years) , with the next reset expected to occur in 2027;
- the date on which it has, during the previous three-year period, issued more than $1 billion in nonconvertible debt; or

- the date on which it is deemed to be a *large accelerated filer* (a company that has been public for at least twelve months, has filed one Form 10-K, and has a public float of at least $700 million).

If you have not already, it would be worthwhile to review the IPO registration statements or the *prospectus* that constitutes the most important part of these filings and subsequent SEC reports of other public companies in your industry. We will not go through in extensive detail the specific requirements for the content of the registration statement, but in short the registration statement is intended to be a comprehensive document that gives investors a balanced view of the company. In addition to describing the terms of the offering itself, it includes financial statements and a discussion and analysis of the company's results of operations and financial condition, a description of the company's business, disclosure regarding the material risks relating to the company's business and an investment in its stock, and information relating to the company's directors, executive officers and significant shareholders. Although the rules can be technical, you should assume that the registration statement will be required to disclose any dealings in which the company is a participant that also directly or indirectly involve any of its directors, officers or significant shareholders.

(The SEC also has specific and sometimes complex rules regarding the content and age of the financial statements that must be presented in a registration statement. Such requirements are explained in Chapter 3.2 of this guide.)

**(b) Overview of the SEC review process**
The SEC's Division of Corporation Finance is tasked, among other responsibilities, with reviewing the registration statements of IPO companies as well as the SEC filings of the thousands of already reporting companies. The Sarbanes–Oxley Act requires that some level of review of each reporting company be undertaken at least once every three years, and the SEC reviews a significant number of companies more frequently.

*Corp Fin* assigns filings by companies based on their industry to one of nine offices, each headed by a chief (such as the Chief of the Office for Energy & Transportation or the Chief of the Office for Life Sciences, etc.). Generally, each industry office is staffed with professionals, primarily lawyers and accountants but also those with specialized expertise such as mining or petroleum engineers who may be involved with the reviews of companies in specific industries.

It is important to understand that when the SEC staff reviews filings they are not doing so to determine whether or not an IPO or any other investment is a good one. Rather, they are focused on ensuring that the SEC's disclosure requirements for the registration statement are being adhered to and that the financial presentation complies with applicable authoritative accounting literature and SEC staff interpretations and policies in regard to accounting and auditing issues. The SEC does not pass on whether the registration statement is adequate or accurate (in fact, it is against the law to say that they have done so).

When your IPO registration statement is first submitted to the SEC, the staff will take about a week to assign it to a review team. Typically, this will include a lawyer and an accountant who are the primary examiners, and a more senior lawyer and accountant who are the reviewers. This team will be overseen by the relevant office chief. After the team is assigned, the legal examiner ordinarily will reach out to your outside counsel to notify them that the filing will be subjected to a full review and to obtain e-mail addresses to which the staff should eventually send their initial comment letter and subsequent correspondence. Your counsel thereafter ordinarily maintains open lines of communication with the SEC staff while the registration statement is being reviewed.

A word on the level of review—the SEC staff does not review each and every SEC filing and, for those filings that are pulled for review, the staff conducts differing levels of review. Although the SEC does not reveal the criteria that it uses to select filings for review, IPO registration statements almost always get a full review (with rare exceptions relating to companies that have publicly traded debt, already have their common stock registered under the Exchange Act for compensation or other

reasons, or were recently public and are re-registering).

The SEC staff will take approximately four weeks to perform their initial review of the registration statement and issue their first comment letter. When this is received, it is usually the catalyst for a frenzy of activity as the company and its counsel and auditors, in consultation with the underwriters and their counsel, rush to prepare appropriate responses. The basic format is to resubmit an amended version of the registration statement that has been revised to reflect the SEC staff's comments and, if required, to provide updated financial statements and other recent developments, accompanied by a letter explaining the company's responses to each of the staff's comments. It usually takes at least a week and a half to two weeks (or more) for this process to be completed in a thoughtful way and to allow time for internal layers of review both within the company and its auditors. Different practitioners have different approaches to the process, but the general advice is to comply with the staff's comments on specific disclosures where possible, notwithstanding that this may result in edits to wording that were painstakingly written during the drafting process leading up to the initial submission or, when a comment is simply inapposite, to explain clearly and respectfully in the response letter why this is the case. Where staff comments relate to accounting matters, the participation and advice of the company's auditors and accounting advisors are critical—the experienced firms will have a wealth of practical experience on just about every issue that the SEC staff may raise. (The big firms each have partners in their national offices who have backgrounds working in senior capacities at the SEC.) When the SEC staff has issued a comment questioning or seeking to understand the company's accounting in a particular area it is important to respond in a way that is explicitly grounded in the relevant accounting standards and literature. Note that the SEC staff's comment letters and the company's responses will eventually become publicly available on the SEC's website after the IPO occurs.

In an IPO there will typically be several rounds of SEC staff comments and resubmissions of the registration statement, with the overall time required for the SEC review phase commonly taking from two-and-a-half to four months. Statistically, studies have shown that in recent years the median time from initial submission to effectiveness for IPO registration statements (which also includes the marketing phase, as effectiveness of the registration statement occurs after the roadshow just prior to pricing) is approximately 16 to 18 weeks. (For purposes of blocking out timetables, the authors generally assume that the SEC staff will take four weeks to respond to the submission of the initial registration statement, two weeks to respond to the submission of the first amendment, one week to respond to the submission of the second amendment, and several days for subsequent amendments. With the exception of the staff's response to the initial submission [which almost invariably appears close to the four-week time frame], response times can vary significantly based on the workload of the review team and other factors, including the difficulty of specific issues that are raised.) To the extent that the overall review period takes longer than this, it is usually due to the fact that the company has decided not to move as quickly as it could have, has chosen to take a *resistant* posture to staff comments, or because problematic questions relating to its historical accounting have been raised. While legal comments on the disclosure can usually ultimately be resolved by revising the relevant disclosure, comments relating to historical accounting may result in the need to restate the financial statements included in the registration statement, a process which can take time and result in a great deal of attention from the company's auditors. Avoiding this unfortunate situation should be a key objective of the company as it is preparing the financial statements to be included in the registration statement and is another reason why it is advisable to engage auditors and accounting advisors with significant relevant experience. In order to make the SEC review process as expeditious as possible, a company should draw on the well of experience of its counsel, accounting advisors and auditors when preparing the entire registration statement, while anticipating the areas that will be of particular interest and concern to the SEC staff.

In some cases, the appropriate application of generally accepted accounting principles may not be clear or there may be questions concerning the age, form or content of financial statements required to be included in a filing. In these circumstances, it may make sense to consult with the accounting staff of the SEC (typically, the SEC's Office of the Chief Accountant addresses the former types of questions while the accounting staff within Corp Fin resolves the latter) prior to the initial submission of the registration statement, which may take additional time on the front end but can save time and aggravation overall. Less frequently, there may be uncertainty about a legal aspect of the proposed transaction and pre-filing consultation with the legal staff of the SEC may be warranted. The SEC has published specific guidelines as to how such consultations should be handled, and your counsel and auditors should have practical experience in doing so. It should be on your pre-filing work plan to expressly consider with your auditors and counsel whether there are any items that warrant such a pre-filing consultation with the SEC staff. In recent years, the SEC staff has been increasingly open to communications and encourages outreaches where necessary.

## 4.3 Underwriting, marketing, and sale
*J.P. Morgan (Investment Banking)*

### (a) Underwriting

**Role of the bookrunners.** The company should carefully choose the lead bookrunners for the IPO because of the significant role that they play throughout the process. The lead bookrunners advise the company on all facets of the IPO process, assist the company in shaping its investment thesis to be used while marketing the transaction, drive investor engagement and make recommendations around deal timing, sizing, composition and pricing. Oftentimes the most senior banks are considered *lead* or *active bookrunners*, while more junior banks are considered *passive bookrunners* or *co-managers*.

**Advising the company.** There are many complexities in an IPO process, including:

**The IPO process**

- IPO sizing, including the primary versus secondary component;
- leverage levels and overall capital structure at and post-IPO;
- investment thesis development for the registration statement and roadshow presentation;
- valuation;
- timing and marketing strategy; and
- roadshow logistics.

**Shaping the investment thesis.** One of the most important contributions that the lead bookrunners make during the IPO process is helping the company shape its investment thesis. From the registration statement that is filed with the SEC to the roadshow presentation that is presented to investors, the marketing message that the company uses during the IPO is critical to its success. Through intensive diligence and drafting sessions, the lead bookrunners will become well versed in the company's strategy and key selling points and will assist the company in effectively communicating those messages to investors. The registration statement and the roadshow presentation are the two most important marketing documents, allowing investors to understand the equity story and evaluate their investment decision.

**Marketing the transaction.** While creating the marketing materials, the lead bookrunners will also develop a cohesive marketing strategy for the company. In order to maximize the success of the offering, the lead bookrunners will determine the ideal timing and roadshow strategy with the goal of reaching the largest number of high-quality investors that will become long-term shareholders of the company. Another topic of discussion with the bookrunners is whether to *test the waters* prior to launch of the IPO, which entails a series of investor meetings. This enables the company and its lead bookrunners to assess potential demand for the offering and identify and address any issues or questions that investors may raise.

**Setting the price range.** Throughout the IPO preparation process, the lead bookrunners will keep the company apprised of market conditions and valuations of its key comparables and the potential implications for the company's proposed

IPO valuation. The lead bookrunners will evaluate comparable companies' valuations, market conditions and recent IPO valuations to determine the appropriate valuation for the company. Once the appropriate equity value range is determined, the lead bookrunners will advise the company on an appropriate *price range* with which to market the offering, which is most frequently $2 wide and falls in the teens (e.g., $14–$16). The company will often need to execute a stock split—or a reverse stock split—to solve for this desired price range.

Key players in the investment bank.
- *Investment banking coverage:* The investment banking coverage team consists of industry experts who typically own the client relationship. This team will be the key point of contact for the company throughout its lifecycle for any investment banking advice or assistance it may need, including on the IPO, mergers and acquisitions, debt and capital structure. As such, the team understands the company and its strengths and areas for development, as well as its overall vision and strategy. The coverage team will act as a liaison with the company and the equity capital markets professionals, who will be the captains of the IPO process, as well as any subsequent equity issuance that is desired.
- *Equity capital markets:* The equity capital markets team sits between the investment banking coverage team and the syndicate, sales and trading and research functions. This team advises the company on all the execution-related decisions, liaises with research to collect public-side feedback and coordinates with the sales, syndicate and trading functions on market and investor color.
- *Syndicate:* During the roadshow, the syndicate coordinates with sales in engaging investors, developing the roadshow and marketing strategy, entering investor orders into the book, assisting in a pricing recommendation and allocating the order book.
- *Sales and trading:* The salesforce is responsible for reaching out to investors upon deal launch, scheduling meetings, soliciting feedback on the transaction (both qualitative and quantitative)

and ultimately entering orders. The salesforce also works closely with the traders in order to execute trades for the investors post-IPO.

Role of the passive bookrunners and/or co-managers. The passive bookrunners and/or co-managers on an IPO are typically significantly less involved in day-to-day advisory roles. They are, however, involved in the majority (if not all) of the diligence conducted. Their research analysts will also take part in all analyst diligence that is conducted. The primary role of the passive bookrunners and co-managers is to underwrite additional shares in the offering, provide additional research coverage post-IPO and assist in market making once the stock is public.

**(b) Roadshow**
The roadshow is the pivotal portion of the IPO process, where the company (accompanied by representatives from the lead bookrunners) conducts a series of one-on-one and group meetings with investors who will potentially purchase the shares being offered in the IPO. Several weeks prior to launching the roadshow, the lead bookrunners will work with the company to determine the length and scope of the roadshow and to identify specific investor targets.

Once the prospectus has been filed with the price range on the cover, the roadshow typically launches with a management presentation to the underwriters' salesforces. The underwriters will also create internal salesforce memos that will be used as a "cheat sheet" by the salesperson when speaking to investors, giving him or her sufficient background to answer key questions.

The lead bookrunners handle all roadshow logistics for the company. The roadshow typically lasts up to seven to eight days, depending on the timing and size of the IPO and the scope of the business, among other things.

The roadshow typically consists of some combination of the following cities/regions globally:
- New York;
- Boston;
- Mid-Atlantic (Philadelphia, Baltimore);
- Mid-West (Chicago, Minneapolis, Kansas City, Denver);

- West Coast (San Francisco, Los Angeles);
- London;
- Frankfurt/Milan; and
- Hong Kong/Singapore.

While meetings have historically occurred in person, given the COVID-19 pandemic, many roadshows are virtual.

A typical roadshow day involves:

- five to seven one-on-one meetings and/or conference calls;
- a group event; and
- travel to the next day's city, if applicable.

Each investor meeting typically lasts 45 to 60 minutes and can take the format of either a formal management presentation of the roadshow slides with subsequent Q&A or simply informal Q&A, depending on the investor's familiarity with the story. Investors have access to the management presentation (audio and video), as well as the roadshow slides via NetRoadshow or another similar site. The SEC also requires similar information to be made available to retail investors via RetailRoadshow or another similar site. Both sites make the management slides available during the marketing period only; upon pricing, all materials are taken down and are no longer accessible. After each investor meeting, the salesperson responsible for covering each respective account will follow up with the investor to get feedback on the meeting, the company, modeling, valuation and whether they are inclined to place an order.

### (c) Bookbuilding process

The goal of the lead bookrunners is to convert accounts into the order book as early as possible. On an IPO roadshow, it is not uncommon for accounts to begin coming into the book during the first several days of the roadshow. Often, these accounts are positioning for larger allocations.

When the book begins to build, investors will fall into two camps: Those without a price limit (market order) and those that have scaled orders at various prices. For example, if the IPO filing range is $16 to $18 per share and Investor A has a market order of 1 million shares, the order stands at 1 million shares at $16, $17, $18 and potentially even above the filing range. A scaled order by Investor B, in contrast, may indicate 1

million shares at $16, 750,000 shares at $17 and 500,000 shares at $18. The goal of the bookrunners is to get as many market orders as possible in order to maximize price for the company, while still balancing appropriate value for investors and ideally achieving a day-one trading performance of approximately +15%. Retail orders are also valuable, but typically retail demand is not a driver of overall pricing.

There are numerous ways to assess the strength of the order book, including the *level of subscription* or *subscription rate*, which shows the number of shares in the order book relative to the number of shares being offered. When the offering is well oversubscribed, demand for the IPO is high and investors' orders will likely be cut back. The amount of price sensitivity in the book is also critical. Another key metric of success for the company is the *one-on-one hit ratio*, which is the percentage of investors that management met with one-on-one during the roadshow that subsequently placed orders. The goal of the company and the bookrunners is to achieve as high a hit ratio as possible, as this typically represents the highest-quality demand.

For most IPOs, the majority of orders will come in the last several days of the roadshow. The lead bookrunners will *scrub* the demand to identify how much is truly *allocable*. The overall demand in the order book is known as gross demand, while the actual shares that the bookrunners can prudently allocate is known as allocable demand.

### (d) Pricing, trading and closing

The pricing meeting typically includes the company, key selling shareholders and the lead bookrunners. In advance of the offering, the board establishes a pricing committee to formally approve the offering. When pricing a deal, numerous factors that occurred over the roadshow are taken into account, including demand in the order book (quality and quantity) and the performance of the overall market and the company's peers during the roadshow. Additionally, new issuance activity and the performance of recent, relevant transactions can have an overall effect on the company's IPO price, either positively or negatively.

After reviewing an overview of accounts with which management met and key feedback, as well as gross demand, allocable demand, the hit ratio and

price sensitivity in the order book, the lead bookrunners will communicate the pricing and sizing recommendation to the company and give the pricing committee time to deliberate. The typical goal of the pricing recommendation is to achieve the best possible price for the company while allocating to the highest-quality shareholder base and ensuring that the stock trades well on the first day and beyond. It is in the best interest of the company, key beneficial shareholders and the bookrunners for the stock to trade well in the aftermarket.

Once the company and its pricing committee have formally agreed on an IPO price with the lead bookrunners, the underwriting agreement is executed by the company, any selling shareholders and the underwriters, pursuant to which the underwriters make a firm commitment (subject to certain customary conditions) to purchase the IPO shares and resell them to investors at the IPO price. The lead bookrunners begin the allocation process, determining exactly how much stock to allocate to each account. The goal of the allocation process is to create a high-quality, long-term focused shareholder base for the company. Once allocations to each account have been agreed upon by the lead bookrunners and the company, the syndicate *breaks* prior to the market opening the day after pricing and allocations are communicated to each of the individual investors.

On the first trading day, the Designated Market Maker (DMM) is responsible for opening the stock. In addition, the stabilization agent is the bookrunner chosen to open the trading in the stock and to provide support to the stock price, if needed. The market will look to the stabilization agent as the syndicate bid in trading support for the offering. The stabilization agent can use the short position created by the IPO over-allotment option or greenshoe to repurchase up to 15% of the shares offered in the event the shares fall below the offer price.

The IPO will officially close two business days after the first trading day of the stock (T+2). At that point, all funds will be wired, stock transfers will be completed, the legal documentation will become unconditional and the IPO will officially close.

Case 4:21-cv-02473     Document 103-14     Filed 01/16/25 in TXSD     Page 52 of 129

nyse.com/ipo

# 5
# Direct listings



nyse.com/ipo

**Direct listings**

*Latham & Watkins*

### (a) Introduction to direct listings

A direct listing is a relatively novel alternative method of becoming a public company in the United States. In a traditional selling shareholder direct floor listing, existing shareholders can list and sell shares on a national stock exchange without an underwritten offering, enabling them to freely sell their shares on such exchange. Additionally, subsequent NYSE rule changes approved by the SEC permit a company to offer its own shares in a primary direct floor listing, as described more fully later in this discussion. Except where indicated, the below discussion relates to selling shareholder direct floor listings.[1]

### (b) Advantages of a direct listing

A direct listing offers certain advantages to companies looking to go public compared to a traditional IPO, including:

- *Market-driven price discovery*. In a traditional IPO process, the underwriters build an order book by collecting indications of interest from potential investors. Based on this order book and discussions with investors and the company (and in some cases its existing equity sponsors), a price is set for the sale of shares to investors in the IPO. By contrast, in a direct listing, the price per share in the opening trade on the first day of trading is determined based on buy and sell orders submitted by a much broader pool of potential investors and sellers through the facilities of a national stock exchange. In theory, due to increased market size and the fact that bids can be more exactly calibrated for size and price, the resulting stock price set by this public market should be a truer market-driven price than the one set through the more constrained IPO

book-building process. In a sense, the direct listing pricing mechanism skips the negotiation step of the book-build process and goes straight to the market-based pricing that applies daily to public company stocks on their respective exchanges.

- *Ability to provide greater liquidity for existing shareholders*. As part of a traditional IPO process, lock-up agreements typically restrict additional sales of shares outside of the IPO by existing shareholders and the company for a period of 180 days post-listing to help manage supply and reduce volatility. In a direct listing, a company is able to provide liquidity to existing shareholders without lock-up agreements (though they can be used if desired), and, as a result, such shareholders are free to sell their shares immediately.
- *Unfettered access to buyers and sellers of shares*. A direct listing provides the possibility for existing shareholders to sell their shares immediately after listing at market prices. The traditional IPO process includes a limited set of participants: a company and possibly existing shareholders who are offering to sell their shares in the IPO, an underwriting syndicate of investment banks that builds an order book of indications of interest from a limited group of potential investors and the subset of investors who receive the initial allocations of shares being offered in the IPO at the price to the public appearing on the front page of the prospectus. Institutional buyers tend to feature prominently in the initial allocation. Because a direct listing does not involve allocations available at a set public offering price, prospective purchasers of shares can place orders with their broker of choice at whatever price and size they believe is appropriate, and that order would be part of the opening trade price-setting process on the stock exchange. This open access feature and the ability of virtually all existing holders to sell their shares on the first day of listing, and of a much broader group of investors to buy those shares, create a powerful, two-sided, market-driven dynamic for the efficient pricing of the shares upon opening of trading.

### (c) Direct listing process

Throughout a direct listing process, it is critical to ensure that all parties understand their respective roles and responsibilities, including the limitations on the types of activities in which the parties may engage. To ensure a smooth process overall, all parties should agree on the rules of the road at the outset, since responsibilities and limitations differ in important ways from the traditional IPO process.

Similar to an IPO, a direct listing process may begin with an organizational meeting to introduce key players, discuss a timeline, and formulate a plan for drafting the registration statement. Once a registration statement is prepared, it is submitted to the SEC, typically confidentially, for the SEC's review and comment. After a company has cleared SEC comments, the registration statement becomes effective and shortly thereafter, trading commences. This process will typically last five to six months.

- *Role of the NYSE*. One of the early decisions a company makes in a direct listing is choosing the exchange on which it will list its stock. The company will need to meet the applicable listing criteria for the particular exchange. The NYSE has been the home of major first of their kind direct listings, having led the way with direct listings for Spotify and Slack. The NYSE provides a Designated Market Maker (DMM) to assist companies with the opening and the trading of their stock on the NYSE. The DMM plays two key roles in a direct listing: (1) to open the stock at the right (i.e., stable) price, which involves a thorough price-discovery process; and (2) to maintain price continuity and minimize the effects of temporary disparity between supply and demand by supplying its own capital, both at the open and through the early days as a public company. The NYSE may list private companies that previously have not been registered with the SEC if the company can demonstrate a $100 million aggregate market value of publicly held shares based on a combination of both (1) an independent third-party valuation; and (2) the most recent trading price for the company's shares in a trading system for unregistered securities operated by a national securities exchange, a registered broker-dealer or a so-called private placement market. With respect to this second prong, the NYSE looks for a sustained trading history over

---

[1] While a direct listing is an innovative structure, there are examples of certain analogous structures in which companies have listed on a US exchange without an underwritten offering. These structures include: (1) a spin-off by a public company of a subsidiary without registration under the Securities Act in accordance with Staff Legal Bulletin No. 4; (2) the emergence of a public company from bankruptcy under Chapter 11 of Title 11 of the United States Bankruptcy Code; and (3) a listing on a US exchange by a foreign private issuer (FPI) that is already listed on a non–US exchange.

several months. Companies that are not able to satisfy the second prong may rely on an exception to this rule if the company: (1) has a recent valuation from an independent third party indicating at least $250 million in aggregate market value of publicly held shares; and (2) engages a financial advisor to be consulted by the DMM in determining the opening trading price. Looking ahead, the NYSE is working with the SEC to further streamline the direct listing rules to enable more companies to use a direct listing.

■ *Role of financial advisors*. In the absence of an underwriting syndicate, the financial advisers assist the company in connection with the drafting of the registration statement and prepare presentations and other public communications. Unlike a traditional IPO process, in order to avoid being deemed "underwriters" and other potential regulatory issues, the financial advisors in a direct listing do not engage in any book-building activities, participate in investor meetings (but may have certain interactions with investors in connection with their stock exchange designated role), or provide any price support or stabilization activities. The financial advisors in general conduct no price discovery activities except as permitted under stock exchange rules. For example, in accordance with NYSE rules, certain financial advisors will be selected by the company to consult with the DMM in opening its stock for trading when there is not a recent sustained history of trading in the company's stock prior to listing. In such a capacity, the financial advisors are expected to provide the DMM with an understanding of the ownership of the company's outstanding shares and pre-listing selling and buying interest that they are aware of from potential investors and shareholders. Importantly, the financial advisors should not consult with the company regarding any of its activities related to its consultations with the DMM.[2]

■ *Registration statement*. Just like in a traditional IPO, the company will be responsible for preparing a registration statement on Form S-1 or, if an FPI,[3] Form F-1. Because a direct listing does not involve a sale of shares by the company and because there are no coordinated sales by any existing shareholders, the registration statement takes the form of a resale registration statement.[4] This

_____

that apply to a traditional IPO under the corporate financing rules of the Financial Industry Regulatory Authority, Inc. (FINRA). Moreover, since there is no "allocation" of shares in a direct listing, FINRA's new issue allocation rules (Rules 5130 and 5131) are likewise not applicable.

[3] An FPI is an entity other than a foreign government incorporated or organized under the laws of a jurisdiction outside of the US unless: (1) more than 50% of its outstanding voting securities are directly or indirectly owned of record by US residents; and (2) any of the following applies: (i) the majority of its executive officers or directors are US citizens or residents; (ii) more than 50% of its assets are located in the United States; or (iii) its business is administered principally in the United States. FPIs enjoy a number of key benefits not available to domestic US issuers, including: (1) FPIs may file financial statements in US GAAP, the English-language version of International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board or local GAAP; (2) FPIs are not required to file quarterly reports on Form 10-Q or current reports on Form 8-K; (3) the financial information of FPIs goes stale more slowly in a registered offering; (4) FPIs are exempt from the US proxy rules; (5) FPIs are exempt from Regulation FD; (6) FPIs are exempt from Section 16 reporting; (7) annual reports of FPIs on Form 20-F are not due until 120 days after fiscal year-end; and (8) FPIs enjoy exemptions from SEC and stock exchange corporate governance and other requirements.

[4] A resale registration statement is a registration statement filed with the SEC that registers under the Securities Act the resale of outstanding securities by the holders of such securities pursuant to the registration statement as long as the registration statement remains effective. Typically, a resale registration statement is filed on Form S-3 or F-3 because such forms allow a company to forward-incorporate reports filed under the Exchange Act and therefore keep the registration statement up-to-date with all material information regarding the company without filing a post-effective amendment or prospectus supplement. However, in order to be eligible to use a Form S-3 or F-3 registration statement,

permits existing shareholders whose shares are registered on the registration statement to resell their shares as long as the registration statement remains effective and the prospectus contained within the registration statement is current. While most of the information in the registration statement for a direct listing tracks the information ordinarily included in a registration statement for an IPO, there are important differences, including:

1. *Shares registered on the registration statement:* In an IPO, the registration statement registers the shares to be sold by the company and any selling shareholders, and substantially all other shares would typically be locked up from sale for a period of 180 days after the IPO. In a direct listing, for existing shareholders to sell, a company needs to either register all or a portion[5] of existing shareholders' shares on a registration statement or allow existing shareholders to sell their shares at such time and in such amounts as they choose when an exemption from Securities Act registration, such as pursuant to Rule 144 under the Securities Act of 1933, as amended (the "Securities Act") is not available. To achieve this, a company will typically look to register all or a portion of the shares held by

_____

a company must, among other requirements, have been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for at least 12 months. As a result, in a direct listing, a company will file its resale registration statement on Form S-1 or F-1 and during the period in which the registration statement remains effective, will also file prospectus supplements to update the resale registration statement for material changes to the company's business, including the release of earnings for any new quarterly period. Due in part to the registration on Form S-1 or Form F-1 being a Securities Act form, a company should observe a traditional *quiet period* for public communications. during the direct listing process and while the registration statement remains effective.

[5] Determining how many shares held by affiliates should be registered is an art, not a science. On the one hand, it is important that enough shares are available for sale to ensure an efficient market. On the other hand, registration entails expense and attendant potential Securities Act liability.

_____

[2] Because financial advisors do not act as underwriters or otherwise participate in investor solicitation or distribution activities on behalf of a company in a direct listing, a direct listing does not trigger the filing and approval requirements

**Direct listings**

affiliates and non-affiliates who had not held their shares for at least one year or otherwise did not meet the requirements for selling under the Rule 144 safe harbor. Additionally, a company may choose to register shares held by employees to address any regulatory concerns that resales of shares by employees around the time of the direct listing may not have been entitled to an exemption from registration under the Securities Act. All non-affiliated shareholders who have held their shares for at least one year are free to resell their shares without registration pursuant to Rule 144.[6]

In addition, a company will need to decide how long to keep the registration statement effective. A company may choose a period of 90 days after the effective date to align the effectiveness of the registration statement to the availability of the Rule 144 resale safe harbor. Under Rule 144, once a company has been subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act") for at least 90 days and has timely filed all required reports, an affiliate or non-affiliate that has held shares for at least six months may sell those shares, subject to compliance with the other requirements of Rule 144. Prior to being subject to those reporting requirements, neither affiliates nor non-affiliates who had held shares for less than a year would have been able to sell shares pursuant to Rule 144.

2. *Bona fide estimate of the price range for the preliminary prospectus:* In a traditional IPO, the cover page of the preliminary prospectus contains a price range of the anticipated sales price of the shares. That range, which is required by the SEC's rules (in particular, Item 501(b)(3) of Regulation S-K), is usually arrived at by the company, any selling shareholders and the underwriters based on the anticipated clearing price for the IPO. Because no specific shares are being offered and traditional price discovery is not conducted in a direct listing, and the company plays no role in the initial pricing, it is not possible to include meaningful disclosure on this topic in the preliminary prospectus. However, under applicable gun jumping rules, a company may not conduct investor education without an appropriate preliminary prospectus.[7] The solution in a direct listing is to rely on the instructions to Item 501(b)(3) of Regulation S-K to explain how the price would be determined. For example, for a direct listing on the NYSE, the cover page of the preliminary prospectus should explain that the opening public price of the shares will be determined by buy and sell orders collected by the NYSE from broker-dealers. The NYSE's DMM, in consultation with a company's designated financial advisors and as required by applicable NYSE rules, will use those orders to determine an opening price for the shares. Additionally, in order to provide supplemental information to investors, companies should consider disclosing recent high and low sale prices per share in recent private transactions on the cover page of the preliminary prospectus and the final prospectus. A company may want to allow pre-listing private placement market trading, which will help develop this disclosure and inform pricing expectations.

3. *Plan of distribution:* Since there is no underwritten offering in a direct listing, the registration statement does not include an underwriting section. Instead, the registration statement will include a plan of distribution section that looks like what is typically seen in a resale registration statement.[8] However, given that there are no underwriters and no organized sales by the existing shareholders, the method of distribution is narrower than many resale registration statements and is limited to brokerage transactions on national securities exchanges or registered alternative trading venues. The plan of distribution section also describes in detail the roles of the NYSE's DMM, including the NYSE's requirement that the DMM consult with the company's designated financial advisors with respect to the establishment by the DMM of the opening price. The plan of distribution also clarifies that the activities of the DMM in opening the shares for trading and facilitating an orderly market for the company's shares will be conducted without coordination with the company.

■ *Investor education*. In a typical IPO, the underwriters take representatives from

---

[6] If an issuer has not been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for a period of at least 90 days immediately before a sale, then Rule 144(d) requires that a minimum of one year must elapse between the latter of the acquisition date of the securities from the issuer or an affiliate and any resale of such securities in reliance on Rule 144 for the account of either the acquirer or any subsequent holder of those securities. Rule 144(d) applies both to sales by an affiliate or a non-affiliate of an issuer. Additionally, any person who is an affiliate of a reporting issuer, or any person who was an affiliate at any time during the 90 days immediately before a sale, must also satisfy, among others, Rule 144(c)(1), which requires the reporting issuer to have been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for a period of at least 90 days immediately before a sale. As a result, for the first 90 days after an issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, neither affiliates nor non-affiliates who have had held shares for less than a year would be able to sell shares pursuant to Rule 144.

[7] In a traditional IPO, the cover page of the preliminary prospectus contains a bona fide estimate of the range of the maximum offering price. That range, which is required by the Item 501(b)(3) of Regulation S-K, is usually arrived at by the issuer, any selling shareholders, and the underwriters based on the anticipated clearing price for the IPO.

[8] Forms S-1 and F-1 require the inclusion of the information required by Item 508 of Regulation S-K. While Item 508 of Regulation S-K is entitled "Plan of Distribution," it is market practice in a registration statement for an underwritten IPO that the information required to be disclosed under Item 508 is included in a section entitled "Underwriting," mainly because of the disclosure requirements regarding the underwriters in that section. In resale registration statements, for which no underwriters are typically named, it is market practice that the information required to be disclosed under Item 508 of Regulation S-K is included in a section entitled "Plan of Distribution."

the company on a one or two-week roadshow, a series of group meetings with buy-side institutional investors, and one-on-one meetings with large institutional investors. Retail investors are offered a video recording of the roadshow, which is made freely available on the Internet.[9] These meetings are designed to help the underwriters build an order book of indications of interest from investors, which helps them gauge the level of demand for a stock. By contrast, in a direct listing, a traditional roadshow with underwriters is not conducted prior to the opening of trading. Instead, in a direct listing, a company will engage in investor education without the assistance of underwriters or financial advisors. For efficiency, in direct listings, a company may choose to host an investor day presentation that is publicly streamed live to the investor community, which may offer the opportunity for investors to ask questions of company management. In addition, a company pursuing a direct listing may elect to meet individually with potential investors (effectively conducting a version of its own roadshow), subject to

certain limitations.[10] Overall, there is no "one size fits all" for investor education in a direct listing. However, each company will need to calibrate the amount and type of investor education activities it undertakes based on various factors, including the profile of the company, the business model, and any existing interest from institutional or retail investors, as it is critical for the market-based pricing of a direct listing that the buy-side understand the company's business.

■ *Post-effectiveness of the registration statement and prior to listing on the NYSE.* In an IPO, effectiveness of the registration statement would mark the end of the roadshow process and would mean that the offering was ready to price and begin trading the following morning. In a direct listing, that is not the case; rather, there typically will be a gap of at least five trading days between effectiveness of the registration statement and commencement of trading on the exchange. There are two primary reasons for such a gap. First, in direct listings, a company may choose to issue standard public company-style guidance to the market after the effectiveness of the registration statement. To the extent a company chooses to release guidance, it will need to allow investors some time with this information before listing and the beginning of trading. Based on guidance from the SEC, this period should be at least five trading days. Additionally,

a company will want to ensure that existing shareholders have sufficient time to establish brokerage accounts (as necessary) and deposit their shares in such accounts so that the shares will be ready for trading through the Depository Trust Company (DTC).[11] Much of the work required to effect such deposits needs to occur after the effectiveness of the registration statement, when the company would be eligible to transfer shares through DTC.

■ *Commencement of trading on the NYSE.* This is the time to celebrate and join the NYSE in ringing the opening bell. The inaugural NYSE direct listing, Spotify, opened at $165.90 per share and closed the first day of trading at $149.01 per share. Slack opened at $38.50 per share and closed the first day of trading at $38.62 per share. With Spotify's intraday volatility of 12.3% and Slack's intraday volatility of 8.9%, their shares both experienced low volatilities compared to other large technology IPOs in the past decade. Further, Spotify's trading volume on the first day of trading was 17% of outstanding shares, and Slack's trading volume on the first day of trading was 27% of outstanding shares. The relatively low volatility and high volume of Spotify and Slack's shares in the opening days of trading have reduced concerns regarding the novel pricing structure and the potential for high volatility and low volume in the opening of trading. However, given the very small sample size of direct listings to date, volume and volatility

---

[9] Securities Act Rule 433(h)(4) provides the formal definition of *roadshow* as an offer (other than a statutory prospectus) that "contains a presentation regarding an offering by one or more members of an issuer's management … and includes discussion of one or more of the issuer, such management and the securities being offered." Securities Act Rule 433(h)(5) defines a *bona fide electronic roadshow* as a roadshow that is a written communication transmitted by graphic means. Although free writing prospectuses (FWPs) are generally required to be filed with the SEC and a roadshow for an offering that is a written communication is an FWP, Rule 433(d)(8) clarifies that such roadshows are not required to be filed (unless an issuer at the time of the roadshow is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act, which is the case in a traditional IPO). Even in the context of an IPO, a roadshow is not required to be filed pursuant to Rule 433(d)(8)(ii) if the issuer makes "at least one version of a bona fide electronic road show available without restriction by means of graphic communication to any person, including any potential investor in the securities … ." In an IPO, the first roadshow presentation is often recorded and posted on the Internet for viewing by all prospective investors. This version is usually called the *retail roadshow.*

[10] Despite its unique features, investor education activities by the company in a direct listing are likely to constitute a roadshow under the SEC's rules. As a result, if a company confidentially submits its registration statement for review with the SEC, then it must publicly file its registration statement at least 15 days before commencing any roadshow activities. The publicly filed registration statement needs to include a "red herring" prospectus meeting the requirements of Section 10(b) of the Securities Act. One of the key features of a red herring prospectus is a bona fide estimate of a price range on the cover, which, as noted above, is satisfied in a direct listing by explaining the method by which the price would be determined and by providing the high and low sales prices per share of recent private transactions. Finally, as is typical practice in an IPO, any investor education materials should be consistent with the information contained in the registration statement.

[11] DTC acts as depository for shares held at a brokerage firm, bank, or other financial institution and facilitates the clearance and settlement of securities transactions among its participants. In a traditional IPO, the shares sold by the company would normally be held through Cede & Co., which acts as the nominee for DTC. In a direct listing, for the shares to be eligible for trading on the applicable exchange, a shareholder interested in selling shares must transfer such shares from being held directly as a shareholder of record to being held in *street name* through DTC. To complete this transition in time for the listing, each individual shareholder will need to work with their broker and the company's transfer agent to ensure that the shares are made available for trading on day one.

**Direct listings**

should remain considerations for working groups in light of the particular pre-listing ownership of the company.

### (d) Regulation M

In the Spotify direct listing, the direct listing process started a number of conversations with the SEC staff as to whether the registration of shares for resale from time to time by existing shareholders under a registration statement constituted an offering, and, if so, whether such offering, particularly when viewed together with the company's investor relations and education activities, would constitute a distribution for purposes of Regulation M under the Exchange Act.

Regulation M contains a set of rules intended to protect the integrity of the securities offering process by preventing persons with a financial interest in a securities offering from taking particular actions that might manipulate the market for the securities being offered.[12] In a traditional IPO, the application of Regulation M is simply assumed and the requirements, including with respect to the delineation of the applicable pre- and post-pricing restricted period, are well-understood and easy to implement. In the case of a direct listing, however, in which there is no underwriter to establish the offering price and no specific number of shares to be allocated and sold to the public, the start and end dates for the Regulation M restricted period, to the extent they apply to a direct listing, are unclear.

To provide some certainty to this question, but without conceding that its direct listing constituted a distribution for Regulation M purposes, Spotify sought and received a no-action letter from the SEC staff. The SEC staff agreed (subject to the facts and circumstances presented) that it would not recommend enforcement action against Spotify, Spotify's financial advisors, or the registered shareholders if

the restricted period observed in this context (in relation to communications or activities not otherwise excepted under Regulation M) both: (i) commenced five business days (the typical pre-pricing period in a traditional IPO) prior to the DMM's determination of the opening price of the Spotify shares on the NYSE; and (ii) ended with the commencement of secondary market trading on the NYSE.

### (e) Direct Listings with a Capital Raise

In November 2019, the NYSE proposed a rule change to the SEC to allow companies to raise capital through a primary direct floor listing, which is a listing in which either (i) only the company itself is selling shares in the opening auction on the first day of trading or (ii) the company is selling shares and selling shareholders may also sell shares in such opening auction. Under the NYSE's rule proposal, a company must sell at least $100 million in market value of shares in the opening auction, or if less, a company could qualify to conduct a primary direct floor listing if the aggregate of the market value of publicly-held shares immediately prior to listing, together with the market value of shares the company will sell in the opening auction, totals at least $250 million. The rule proposal was approved by the SEC on August 26, 2020, but was subsequently stayed by the SEC. On December 22, 2020, the primary direct floor listing was approved by the SEC. Most recently, in December 2022, the SEC approved additional amendments to the NYSE primary direct floor listing rules, which, among other things (i) relaxes the price range limitations for primary direct floor listings to allow the opening auction to proceed at a price up to either 20% below or 80% above the price range disclosed in the registration statement, subject to specified conditions and (ii) requires that the company retain an underwriter to perform substantially similar functions, including those related to establishing and adjusting the price range, to those performed by an underwriter in a traditional IPO. As of the time of this writing, no direct listing under the primary direct floor listing rules of the NYSE has been effectuated. In addition to primary direct floor listings, companies with an immediate need for capital also have options for raising capital prior to, or shortly after, a direct listing. These include a traditional private placement of convertible

preferred stock shortly prior to the direct listing and issuing convertible notes that convert into common stock of the company in connection with a direct listing.

Companies considering a capital raise after a direct listing may consider, among other options, registered equity offerings, issuing debt, and issuing unregistered convertible notes. For companies seeking to issue equity or other registered securities, during the first 12 months following the company's registration under Section 12 of the Exchange Act under certain conditions, the company can sell securities in a primary offering using a Registration Statement on Form S-1 or Form F-1.

Given that the resale Registration Statement for the direct listing would normally be effective for at least 90 days, we expect companies to wait until after this initial 90-day period to sell registered primary shares of the company in an underwritten offering. In addition, after 12 completed months from the date of registration under Section 12 of the Exchange Act, the company may be eligible to sell shares using a Shelf Registration Statement on Form S-3 or Form F-3, which offers greater flexibility and speed in selling shares to the public in a registered offering. Unlike at the time of the IPO, the pricing of these offerings would be able to take into account an existing trading market and trading history on an exchange to inform the pricing in such offering.

As always, companies can issue debt to raise capital to fund operations, or they can establish a revolving debt facility to allow immediate access to debt to fund operations. In addition, companies can issue convertible notes that are available for resale pursuant to Rule 144A of the Securities Act, to qualified institutional buyers.

### (f) Conclusion

The NYSE has led the way for direct listings, which can be a very attractive way for the right company to go public, particularly in light of the new rules allowing companies to effect a primary capital raise concurrently with a direct listing. Even if a company chooses not to do a direct listing, elements of the direct listing process, such as innovations around investor education and lock-up arrangements, may find their way into the traditional IPO process.

---

[12] Among other restrictions, Regulation M prohibits issuers, selling securityholders, and other distribution participants (and their respective affiliated purchasers) from bidding for, purchasing or attempting to induce any person to bid for or purchase the security that is the subject of the distribution during a specified period of time prior to pricing and ending at the completion of the distribution, unless the activity falls within one of certain enumerated exceptions.

nyse.com/ipo

# 6
# IR and communications

**IR and communications**

## 6.1 Preparing an IPO communications strategy
*FTI Consulting*

There is a strong temptation to approach initial public offering (IPO) communications solely as a listing-day event, planning meticulously for the inevitable publicity surrounding the first day of trading. In reality, day one is not the finish line but the start of a company's new life in the public markets. Preparation should begin early, potentially even before the registration statement is filed. This will ensure the narrative being shared with the investment community is one that highlights the company's unique position within the market, is sustainable and is delivered consistently across all communication channels. It is also critical to establish the communications infrastructure needed to operate successfully as a public company and to recognize the paradigm shift in communications and the increased scrutiny that newly public companies face. Anticipating risks as well as addressing the needs of a variety of stakeholders before and after the listing are of paramount importance to ensure sustained momentum and success in the aftermarkets.

### (a) Value of starting the IPO process early
Over the past decade, passive investment strategies like exchange-traded funds have been on the rise. On the other hand, active asset managers who run mutual funds and the like have been under pressure, resulting in smaller investment teams and lower assets under management. In a normal environment, the attention span of active investors is relatively short as they have been asked to do more with less. It is even harder to attract the attention of investors during an IPO roadshow, where companies have only 30 minutes to pitch their business to potential shareholders. Companies that recognize this challenge and raise their corporate profile in the capital markets ahead of their listing often secure higher-quality shareholder bases and stronger overall support for their shares on listing day and beyond.

### (b) Raising the company's profile to elevate its corporate reputation
Financial media can be influential in driving awareness of a company's equity story.

While the IPO will attract attention on its own, the company should establish and maintain relationships with key industry reporters and influential media outlets to ensure they accurately understand the company's business strategy and competitive differentiation in advance of the initial registration statement filing. Media relations efforts could include a series of reporter briefings and interviews for executives, identification of speaking opportunities at conferences and industry events and thought leadership focused on relevant and timely content that highlights aspects of the equity story in action.

Importantly, communications made more than 30 days before the filing of the registration statement will not be considered impermissible *gun jumping* as long as the offering is not discussed. As a result, companies should proactively review their press-release strategy well ahead of the listing to maximize opportunities for a consistent flow of corporate announcements during the IPO *quiet period*. In other words, establishing a baseline of new product and customer announcements, key milestone updates and other corporate news will help to avoid the appearance of *gun jumping* during the registration period.

Similarly, building direct relationships with targeted members of the investment community will be critical to attracting anchor investors that can take sizable positions in the IPO allocation. Proactive outreach to investors ahead of the filing will help avoid a concentration of short-term *IPO traders* and minimize shareholder base turnover following the listing. Having the support of large, long-term–oriented investors that can serve as a safety net for newly public companies can help to mitigate downward pressure on the share price through the critical first few weeks of trading. In addition, it is beneficial to start engaging with a targeted set of sell-side analysts who could act as a sounding board for message development and potentially cover the company post-listing.

### (c) Establishing the company's environmental, social and governance strategy to mitigate risks and access a wider pool of capital
Companies contemplating an IPO need a strategy in place for communicating with investors and other stakeholders around

environmental, social and governance (ESG) matters. Investors are increasingly integrating ESG into their investment decisions, focusing on a wide range of potential risks ranging from climate change to employee health and safety (and many more in between). As a result, ESG-related funds have become one of the fastest growing asset classes, with total assets under management of over $20 trillion. Given the size and prominence of this asset class, the cost of neglecting ESG matters during the IPO process may simply be too great to ignore. An ESG program should be developed before listing and fully integrated into the registration statement and prospectus, ideally serving as a potential driver of incremental demand in the IPO from ESG-focused investors that might have otherwise overlooked the listing.

A successful ESG program is authentic, grounded in data, aligned with the company's strategy and the needs of key stakeholders and integrated throughout the organization. When done well, it can generate significant value for not only investors but also employees, customers and partners. This includes personnel-related benefits, such as enhanced talent-acquisition capabilities and increased employee satisfaction and retention, as well as benefits related to the ongoing sustainability of operations, supply chain diversity and overall business resilience.

Accordingly, companies should approach the exercise thoughtfully and strategically; this includes conducting in-depth benchmarking to identify best practices relating to ESG disclosure, strategy and communication within the industry and among peers. Further, management, the Board of Directors and other key decision makers need to be well-informed about the competitive landscape in which they are operating and aligned internally with agreed-upon and defined objectives and goals. This includes developing risk mitigation strategies to avoid potential investor concerns and other issues that have proven to be major points of contention in other IPO listings.

In regard to IPOs in particular, companies will need to evaluate potential disclosures that could be included in the prospectus while also ensuring they have robust processes in place to source, gather and quality-check relevant sustainability

data material to their businesses, including relevant medium-to-long–term goals and key performance indicators (KPIs) to measure success.

## (d) Preparing for a new communications paradigm as a public company

Increased attention, intensified scrutiny and new regulatory requirements all contribute to new risks associated with the paradigm shift of becoming a public company. This includes increased regulatory oversight from the Securities and Exchange Commission (SEC) and the stock exchange. In addition, enhanced reporting requirements force public companies to provide extensive disclosures about operating results, financial conditions, management compensation and other internal matters that might not otherwise have been disclosed. Public companies also face increased liabilities should they make any material misrepresentations to shareholders or omit required information under applicable securities law. It is therefore critical to establish protocols for how the company will engage with investors, what information and operating metrics it will provide, how it will report its financial results and what communication channels it will use. By developing a comprehensive strategy that provides for consistent communications, meets or exceeds peer standards and provides required disclosures, the company can effectively prepare during the pre-IPO phase to thrive in the public markets.

- Consistency—Investors seek new information in every interaction with management. As a result, messaging, content, tone, frequency and timing of communications are all heavily scrutinized by investors to detect any changes that may have implications for the company's outlook and, ultimately, its stock price. While consistency in communications is paramount, the company must also strike the appropriate balance and allow sufficient flexibility to adjust to business conditions and changes within the industry.
- Nonfinancial disclosures—In addition to meeting SEC disclosure requirements, investors expect management to interpret results and provide additional

qualitative commentary on business developments via the earnings release and conference call. These communications should go beyond the prescribed financials and discuss the company's progress toward its long-term strategic plan as well as important industry trends.
- Online communications tools— Establishing a website to house all investor relations (IR) content is a critical step of infrastructure building, as it is often the first point of contact for prospective investors, sell-side analysts and media representatives seeking more information about the company. As such, it should be user-friendly, interactive and easily accessible, particularly for investors looking to conduct initial due diligence on the company.
- Peer benchmarking research—As part of the pre-IPO preparation process, it is critical to review the IR and disclosure practices within the industry and among peers that the company expects to be evaluated against once it becomes public. This would include evaluating how peers communicate their quarterly results and outlook, with an emphasis on the earnings release and earnings call presentation. This will be particularly important for determining the appropriate financial guidance policy as a publicly traded company. In addition, it is advisable to monitor peer activities on an ongoing basis, including earnings and other corporate announcements as well as stock performance and sell-side feedback.
- Quarterly reporting protocols— Quarterly earnings announcements are critical interactions between a company and the investment community that can set the bar for exchanges with other stakeholders in terms of both metrics and tone. As a result, the company should develop its approach to communicating its financial performance on a quarterly basis well before the listing. This would include creating templates for the earnings release, conference call transcript and earnings presentation. The company should also ensure it has internal systems capable of providing timely and relevant data and

information. To effectively prepare for the quarterly earnings announcement cycle, companies should develop a project plan including a timeline of activities and deliverables with assigned responsibilities. Conducting earnings dry runs can also be helpful in identifying and addressing any potential issues while also training management on how to handle difficult questions from investors and analysts.
- IR policies and procedures—To ensure messaging consistency and protect against improper disclosure, it is strongly recommended that management establish from the outset a formal disclosure policy and necessary protocols to manage incoming investor and financial media inquiries. In addition, most companies decide to implement an earnings quiet-period policy, which essentially serves as a safeguard to reduce the chance of any inappropriate or subjective communications with investors in the weeks leading up to the reporting date. It is also advisable to develop financial and corporate news-dissemination protocols as well as a social media policy. Lastly, companies must have the proper policies and procedures in place to prevent insider trading and address crisis situations quickly and effectively.
- IR toolkit—Building an effective IR infrastructure requires the selection of appropriate IR vendors and tools, including an IR website provider, an audio webcast provider for earnings calls, a financial database, investor intelligence capabilities and CRM tools, among others.

## (e) Preparing for a successful IPO roadshow and listing day

- Equity story development—A key step of pre-IPO preparation is the development of a clear and compelling equity story. This not only underpins the extent to which investors are willing to commit capital to a company, but also has the potential to impact the company's status in its industry, management credibility and ultimately the valuation of its securities in the market. Equity stories that resonate best with investors often contain simple, focused messages that reflect the company's leadership,

**IR and communications**

competitive differentiation and strategy for growth and value creation.

- Roadshow presentation—While the bankers and legal team will drive the roadshow presentation, IR professionals can play a key role in developing management's prepared remarks. It is important to tell the equity story in management's own words while also ensuring it will resonate during and after the IPO. Conducting presentation dry runs and mock Q&A sessions will also ensure management is both prepared and confident in telling the company's story and responding to investors' questions.

- Executive training—To maintain consistency in its communications with the market and avoid any inappropriate disclosure of material nonpublic information prohibited under Regulation Fair Disclosure (Reg. FD), the company should designate the role of discussing business and financial results with the public to a very limited group of thoroughly-trained spokespersons. In preparation for the listing, management teams without public company experience should be trained to understand the parameters of what they can appropriately communicate to investors within the regulatory framework. Trainings may also be helpful for executives unfamiliar with the investment community to better understand the different roles of the sell side and buy side and how that may impact their interactions with different individuals. Lastly, presentation training sessions are a helpful tool for executives to prepare for IPO roadshows, listing-day broadcasts and print media interviews.

- Media and listing-day activities— Leveraging the company's listing-day media opportunity is an important step in building its corporate profile and supporting its longer-term communications efforts. While a company is allowed by SEC rules to participate in media activities on the day of listing, it is strictly limited to discussing only the material that has been published in the prospectus. In addition to day-of media activities, the company may also participate in a bell-ringing ceremony and other events

facilitated by the exchange. As a newly public company, it will also need to activate its IR infrastructure, including the investor website and hotline.

- Multi-stakeholder communications— As a company approaches its IPO, there are a few important steps it needs to take to ensure an effectively integrated communications strategy. These include the creation of a timeline and action plan that incorporates all communications-related activities and the development of multi-stakeholder communications materials. Establishing a common messaging framework for any significant, transformational event will help facilitate understanding of and buy-in for the company's strategy among key stakeholder audiences, including employees. The company should also educate and train its employees ahead of the IPO on disclosure and reporting obligations as well as insider trading rules to coach them on how to best operate within the new regulatory environment. Finally, appropriate engagement strategies and tactics should be developed for communication with key customers and business partners in order to articulate the positive IPO story and better address any concerns or implications for their relationship with the company.

## 6.2 Communicating with the market post-IPO
*FTI Consulting*

While an IPO marks a significant milestone in a company's history, it is only the beginning of a longer journey. An effective IR program can sustain momentum and optimize valuation following the listing by providing useful information and disclosures, driving demand from existing and new investors, and gaining support and validation from key influencers such as sell-side analysts and journalists. The IR function must also handle daily communications with investors and analysts, carefully manage expectations and forward-looking estimates, drive the quarterly earnings process and organize a marketing calendar that includes investor conferences and nondeal roadshows.

### (a) Preparing for the first earnings announcement, a critical milestone for a newly public company

Reporting earnings is one of the most important ways to provide business updates to the investment community. It is critical to properly plan for the inaugural earnings announcement as it sets a precedent for subsequent quarterly announcements. For many newly public companies, the initial earnings period can present unique challenges as they find themselves reporting results for the first time while still in a quiet period. The quiet period is the time between quarter-end and the earnings release date where there are no discussions by management with analysts or investors. It is important to effectively balance quiet period restrictions with the desire to set a strong precedent for transparency and good corporate governance.

The typical earnings process commonly includes issuing a press release and related Form 8-K and hosting a conference call with sell-side analysts and institutional investors. The related and additional SEC filings—Form 10-Q or Form 10-K—are more formal and much more extensive; these can be filed concurrently with the earnings release or at a later point. Collectively, these communications provide an opportunity to demonstrate transparency and establish credibility through the way management speaks about the company's successes, challenges and outlook, all while taking into consideration the period's results versus expectations, the company's long-term strategic objectives and key messages conveyed during the IPO. Effective preparation is essential to do this well while also ensuring that management can anticipate and appropriately address investor and analyst questions.

### (b) Proactively managing the transition in the shareholder base following the IPO

- Buy-side targeting—Following the IPO, the IR function will be responsible for managing the transition in the shareholder base, which can be significant. Based on research FTI Consulting has conducted, approximately 70% of the shareholder base in the US will turn over within two years of listing. To manage this risk,

newly public companies should analyze their shareholder base to gauge its overall stability post-IPO, focusing on investors with buying potential and those at risk of selling. Companies should also widen the aperture of the analysis to include potential new investors that have significant ownership in industry peers as well as those that have a predilection for investing in companies with similar fundamentals and/or ESG profiles.

- Investment community marketing— Once the investor engagement plan is established and the IPO quiet period is lifted, priority should be given to effectively leveraging management's time spent on marketing to existing and potential new investors. Nondeal roadshows, investor conferences and company-sponsored events such as investor days (in-person or virtual) all present valuable opportunities to contextualize financial results and explain growth strategies and competitive differentiators while developing a deeper set of relationships with high-priority investors. Considering the more challenging corporate access landscape following the implementation of the European Union's second Markets in Financial Instruments Directive (MiFID II), forming direct relationships with investors has never been more critical. That said, sell-side–sponsored activities such as nondeal roadshows and investor conferences remain important engagement venues to meet existing and potential investors. However, they should be prioritized and vetted beforehand. This includes prioritizing meetings with long-only institutions and global hedge funds that are either current holders or prospective targets, with a focus on those that are long-term–oriented or *front page* holders as opposed to high-turnover hedge funds. The IR function will also be responsible for revising the investor presentation and providing corresponding talking points and pertinent Q&A materials to ensure that management is adequately prepared for these meetings.

**(c) Engaging with the sell side to provide support for a higher valuation**

- Sell-side targeting—Sell-side sponsorship continues to play a key role in validating what companies say directly while also increasing visibility within the investment community. Companies should target and ultimately secure the appropriate level of coverage from sell-side analysts in order to strike the right balance between time and resource commitment and overall quality of research. Having too many analysts requires considerable attention from the company's internal staff whereas having too few can concentrate coverage in too few and possibly ill-informed analysts. This dynamic has been challenged in the post-MiFID II environment, as the required unbundling of research and trading fees has caused some banks to exit the equity research business entirely or reduce their number of publishing analysts.

- Setting expectations—The financial models generated by the remaining sell-side analysts are still used by many investors. These models are developed independently by the sell-side analysts but can be highly influenced by a company's disclosure and guidance policies. For companies that choose to provide some form of financial guidance, it is important to balance the need to communicate a compelling, best-case outlook with achievable and realistic targets that can be met consistently. Expectations can be established by providing quantitative and/or qualitative guidelines, such as growth rates and margin targets or market share over varying timeframes, depending on industry visibility and the predictability of the business. Additional important factors to consider include the size and seasonality of the business, accuracy of internal forecasting and industry peer practices. Once these parameters are established, companies should continuously monitor sell-side analysts' expectations and carefully consider whether a variance from consensus expectation is material enough to warrant proactive disclosures.

**(d) Executing a high-impact, multi-stakeholder ESG program**

With a proper foundation in place (as described in the previous section), newly public companies should focus on enhancing their ESG disclosures, reporting standards and accountability. This begins with exploring the adoption of ESG reporting frameworks, including the most prominent and widely followed: the Sustainability Accounting Standards Board (SASB), the Task Force on Climate-related Financial Disclosures (TCFD) and the Global Reporting Initiative (GRI). Each reporting framework has its own unique, and in many cases complementary, areas of focus. Companies should evaluate the use of one or more frameworks based, in part, on the type of disclosures being recommended, the extent to which the company has access to the relevant data and whether the company has the appropriate internal controls to consistently report on these measures. Additionally, companies should ensure the chosen frameworks align with their ESG goals and associated KPIs and that both remain in line with best practices. Adherence to a reporting framework can help to provide a clear, fact-based and substantive ESG narrative that will enable companies to meet heightened expectations from investors who are increasingly voicing their frustration with the lack of standards and comparability of ESG disclosures among corporate issuers.

In addition to initiating ongoing engagement with investors and analysts, newly public companies should begin establishing relationships with influential third parties such as ESG rating agencies and proxy advisory firms. ESG ratings are one of several tools that investors use to evaluate potential investment opportunities. These are also a major factor in determining a company's eligibility for sustainability index inclusion. Therefore, it is important that companies ensure ESG rating agencies have access to all relevant ESG information as well as context to guide interpretation of existing disclosures during assigned review and response periods. Companies should also engage regularly with proxy advisory firms (which provide proxy voting recommendations to investors on a range of ESG-related shareholder proposals) and

**IR and communications**

targeted sustainability indices to help inform a strategy for gaining inclusion.

Overall, companies should understand the rapidly evolving ESG landscape and where they fit in so they can best develop the appropriate strategies, goals and plans that align with their overall business objectives. This will help ensure ESG programs are executed with authenticity and impact and that they remain relevant to key stakeholders.

**(e) Successfully navigating events and critical moments of change**
Newly public companies will undoubtedly face critical events and moments of change, which can threaten or enhance their valuation and reputation. Whether introducing new leadership, launching a new strategy, announcing an important transaction or executing a business transformation, IR will be at the center of a company's communications strategy.

During significant moments of change, the objective of the communications strategy should be to effectively and with the appropriate transparency communicate the strategic, operational and financial benefits of the event or announcement to all relevant stakeholders, including at least investors, employees and customers. Companies should prepare and execute a multi-stakeholder engagement strategy and rollout plan, supported by all materials necessary to execute stakeholder-specific communications. Depending on the importance and complexity of the announcement, it may be necessary to hold a conference call or webcast for the investment community, which can create an opportunity for management to provide additional insight on the announcement, discuss how it will affect the company going forward and respond to questions. This might also include facilitating investment community engagement after the announcement. Companies should also engage with key influencers and media to garner support for the announcement and alleviate related risks, including the potential for a leak to the media prior to the announcement.

Finally, as shareholder activism continues to gain momentum, IR must play an active role in mitigating a company's vulnerability to these potential threats. Proactively engaging with shareholders, benchmarking the company's performance against peers and monitoring market sentiment will help the company assess and proactively address any vulnerabilities that may be brought to light. In addition, meeting with leading proxy advisory firms during the off season to discuss the company's strategy, corporate governance and other ESG-related topics can be beneficial in providing necessary context and in creating a better understanding and alignment prior to any proxy-related issue surfacing.

**(f) Leveraging perception research and media channels to enhance the IR program**
■ Perception research—Public companies often leverage perception research to inform their IR program and refine post-IPO investor messaging. While the company's core investor messages should build on those developed in the pre-IPO phase, adjustments should be made as needed to dispel any lingering concerns or misperceptions about the company's positioning in the market, its performance and the dynamics of the industry as a whole. Perception studies are particularly useful in uncovering areas of interest, concern or potential knowledge gaps within the investment community as well as analyzing drivers behind buying and selling activity post-IPO. The research will also set a benchmark against which the IR program and specific messages can be measured over time.

■ Financial, business and trade media—Companies should capitalize on the use of multiple communication channels and ongoing engagement opportunities with the media to augment their IR program and reinforce their key messages, particularly during times of crisis or change. Print and broadcast media allow the company to communicate information to a much wider audience while also bolstering credibility through objective third-party commentary. Whether they are established to position financial results or underscore themes related to management strength and market position, effective financial, business and trade media relations strategies can influence investment decisions and provide a reputational cushion in difficult times.

■ Social and online media—Social media has taken a more prominent role in the communication strategies of public companies. However, disclosure of material nonpublic information through social media channels, such as Facebook and Twitter, has occurred at a much slower pace, with higher concentration in the technology sector. The SEC has provided guidance that social media can be a Reg. FD-compliant means of broad dissemination, if the company has taken adequate steps to alert the market that it intends to disclose such information through that channel. Companies should consider both the risks and opportunities of using social media platforms for IR purposes. Notwithstanding, there is a wealth of data that can and should be analyzed on social media. Leveraging an active social listening program can help companies understand the general conversation and perceptions about them, including which messages are resonating, how they are stacking up relative to competitors and potential issues and concerns among stakeholders.

**6.3 Legal framework for communications**
*Simpson Thacher & Bartlett*

Under the relevant legal framework in the United States, a company that is pursuing an IPO is generally not allowed to offer to sell its stock before filing a registration statement (and this is the *public* filing as opposed to a confidential submission). During the period between the public filing of the registration statement and the time it becomes effective at the conclusion of the roadshow, oral offers are permitted and written offers through the use of the preliminary (or *red herring*) prospectus included in the registration statement may

be made once an anticipated price range has been included. (While SEC rules permit written offers other than the traditional prospectus, referred to as *free-writing prospectuses*, in certain circumstances, IPO issuers are subject to significant constraints on the use of these nontraditional offering documents and counsel should be consulted if consideration is being given to the use of any such documents.) Only once the registration statement becomes effective at the conclusion of the roadshow and prior to pricing, however, may buy orders be accepted and the stock actually sold.

There is a limited exception to these rules permitting IPO issuers and their representatives to *test the waters* (TTW) by communicating with certain institutional investors, either prior to or following publicly filing the registration statement, in order to determine whether the investors have an interest in the offering. The meetings provide feedback for management that can be used later in the actual roadshow. This may prove to be especially valuable if the company's story is complicated or when management has limited experience making investor presentations. Any TTW meetings or other forms of pre-deal investor education should be carefully vetted in advance by counsel, as this exception does not obviate the need to comply with the more generally applicable constraint on offers.

It is important to be familiar with these rules about publicity and communication because the SEC and the courts construe an *offer to sell* broadly to include the publication of information and publicity efforts made in advance of a proposed offering that has the effect of *conditioning the public mind or arousing public interest* in the company or in its securities. A communication may be construed as an *offer to sell* even if it does not reference either the securities being offered or the offering itself. Moreover, the term *writing* is similarly broadly construed, and can include television and press coverage where there has been company involvement.

However, the SEC rules specifically state that communications made by a company more than 30 days prior to

filing the registration statement without reference to the proposed offering are generally permissible, provided that the issuer takes reasonable steps to prevent further distribution or publication of the communication within the 30-day period. In addition, the SEC's rules also expressly permit a company, subject to a number of limitations, to continue to release factual (but not forward-looking) information about its business in a manner consistent with past practice to persons (such as customers) other than in their capacities as investors or potential investors in the issuer's securities. These express rules, taken together with the general principle that only communications that are *offers* (even as broadly defined) are problematic in the first place, should give companies significant comfort that they can go about their day-to-day business throughout the IPO process. You will substantially mitigate the risk of a problem in this area if you simply avoid the following actions:

- public references to the IPO prior to the public filing of the registration statement or outside of legally compliant communications after filing, including via press interviews whether on or off the record, speeches or conferences;
- communications with analysts not in the underwriting syndicate;
- communications with potential investors prior to the public filing (except for legally compliant TTW) or outside the legally compliant process after the filing;
- public disclosure of forward-looking information regarding the company's financial or operational results; and
- unduly *hyping* statements about the company or its prospects.

## 6.4 Market intelligence and surveillance
*IHS Markit*

Sections 6.5 through 6.8 cover a group of advisory services and tools that allow investor relations officers to stay informed of ongoing market activity and perceptions, access the most detailed information possible on investment community participants, effectively implement an

investor relations strategy to prospect for new investors, manage interactions with the investment community efficiently and measure the success of their investor relations efforts. These services and tools are used widely by investor relations officers individually and collectively at listed companies around the world.

Once a company successfully completes the IPO process and begins trading in the secondary market, information regarding that trading and the ownership changes that result are difficult to come by in the absence of a market intelligence and surveillance program. A market intelligence and surveillance program should act as a company's eyes and ears to the investment market and serve as a fundamental service for investor relations officers at a majority of US-listed companies. The type of information and support provided by this program on a regular basis include:

- day-of-trading feedback from active market participants that provides color and context on unusual volatility or trading volume;
- updates on material institutional ownership changes as they are uncovered and a systematic update of institutional ownership on a monthly basis;
- insights on the motivation behind institutional ownership changes and the strengths, weaknesses, opportunities and vulnerabilities of the structure of the shareholder base; and
- access to resources—human, data-oriented and technical—that an investor relations officer can leverage to extend the capabilities of the investor relations team.

Publicly traded companies in the United States are considered by the investment community to be among the most transparent in the world. The investor relations profession is well advanced and the quality of communication from companies to investors is second to none. The transparency provided to companies listed in the United States by the investment market, however, lacks timeliness, and its opaqueness continually frustrates investor relations officers whose

**IR and communications**

organizations are in continuous need of information regarding the trading and ownership of their equities.

The two principal areas of frustration in terms of information flow for publicly traded companies are:

1.  the time lag in the disclosure of institutional ownership positions with the SEC; and
2.  the fragmentation of equity trading in the United States and the resulting inability to get a clear signal from the market to determine drivers of trading on a daily basis.

Let's first address the time lag in the reporting of institutional ownership. SEC Rule 13f-1 mandates that institutional investment managers with at least $100 million in equity assets disclose to the SEC their entire portfolios of equity securities and some equivalents on a quarterly basis. These filings, commonly referred to as 13Fs, are to state the investment managers' complete equity portfolios as of the end of each calendar quarter. However, the SEC allows investment managers 45 days following the end of each quarter to submit the filing. For example, an investment manager's Form 13F stating holdings as of June 30, 2013, would not need to be submitted to the SEC prior to August 15, 2013.

The second issue of fragmentation has been a steady topic of discussion at exchange operators, regulators, trading firms, institutional investors and publicly traded companies themselves. Equities in the United States now get traded on more than 50 venues, which include multiple exchanges, private alternative trading systems (commonly referred to as "dark pools") and internally at specific broker-dealers. Additionally, the size of the average trade in a US-listed equity has been in steady decline over the past 10 years and has moved from an average size of more than 1,000 shares to less than 300 shares today. The fragmentation of the market overall and of the actual transactions have made it challenging to understand the drivers of day-to-day trading in equities.

The role of a company's market intelligence and surveillance provider is

to overcome the hurdles put in place by SEC regulations relating to institutional ownership and today's equity market structure. To do this, the market intelligence and surveillance provider undertakes a thorough research process that starts with a complete understanding of the ownership registration of a company's security via the Depository Trust & Clearing Corporation (DTCC). The vast majority of investors, institutional and retail alike, hold equities in "street name" via banks and brokers that act as custodians of their assets. These custodians, in turn, have accounts at DTCC that allow for the electronic transfer of assets when equities are bought and sold. In the United States, the settlement of a trade—the time at which a buyer delivers cash to the seller and the seller delivers shares to the buyer—occurs two days following a trade, which is known as T+2. This transfer of assets almost always occurs via DTCC. The issuer of the equity, the publicly listed company, has access to these DTCC records for a nominal annual fee. The market intelligence and surveillance provider, who will gain access to the DTCC settlement records with an issuer's permission, utilizes DTCC settlement records as a roadmap for the research process to uncover the ultimate buyers and sellers of the company's shares.

US-listed companies are also at a disadvantage because there is no regulation mandating that custodians holding the company's shares via DTCC disclose the identities of the investors behind their DTCC accounts. This means that the market intelligence and surveillance provider must utilize its expertise to understand the multitude of relationships between institutional investor portfolios and each DTCC nominee to get an initial understanding of who may be buying or selling shares. The inability to access information via custodians requires the market intelligence and surveillance provider to then engage in an outreach or survey process to the institutional community to gain information on the current holdings of their portfolios. Although institutions are not required to disclose this information, many are comfortable doing so to a credible and established market intelligence and surveillance provider that

will also furnish a letter of authorization from the issuer stating its role in conducting this research.

Identifying the buyers and sellers of a US-listed equity is an ongoing and iterative process for any market intelligence and surveillance provider. Given the lack of mandated disclosure rules in the United States outside of Rule l3f-1, an issuer should not expect that every institutional position reported by a market intelligence and surveillance provider is an exact accounting. However, the issuer should expect high-quality information. Most issuers define accuracy of market intelligence and surveillance information as follows:

■ Ownership trends are accurate (i.e., firms reported as purchasing shares are in fact buying the stock).
■ Ownership positions are within a +/- range of 20% (i.e., it is acceptable if a firm is reported as buying 900,000 shares when it actually bought 800,000).
■ There is transparency and a conviction level with each position. A credible market intelligence and surveillance provider will give detailed background on material position changes in order for the issuer to understand its accuracy, as ownership information is often shared with senior management teams and the board of directors.

Identifying ownership changes, while important, is just one aspect of a market intelligence and surveillance program. The provider should be the company's connection to the capital markets and act as an extension of its investor relations team. Feedback from market participants, such as traders, sell-side analysts and buy-side portfolio managers and analysts, should be expected. This feedback should assist the company and its senior management team in understanding the primary drivers behind both short-term trading and longer-term institutional ownership trends. Additionally, a credible market intelligence and surveillance provider has a broad client base, a deep talent pool and access to a variety of data sources. Combined, this exposure, expertise and access to data will allow a company to leverage the team to understand and

implement best practices across a variety of investor relations functions, such as internal and external communications as well as investor outreach, and will allow it to be at the forefront of market issues and developments.

### 6.5  Investor targeting and outreach
*IHS Markit*

Knowing the owners of the stock and their motivations, as described in the market intelligence and surveillance section, are both fundamental to investor relations. Just as fundamental to investor relations are the strategy and execution of outreach to prospective institutional shareholders and the assessment of the investment opportunity and portfolio risk that is inherent in the company's current institutional shareholder base. Investment managers continue to place a high level of importance on gaining access to the senior management teams of publicly listed companies. These interactions play a critical role in the research process that could lead to investment (or divestment) in the stock or peer companies. Given the importance of these interactions to the investment community, the investor relations officer is often deluged with meeting requests directly from investment managers or through sell-side brokerage firms, which provide *corporate access* as a key service to their investment management clients. Of course, time is not unlimited for the investor relations officer and the senior management team, and not all investment managers are equally worthy of time and attention.

An effective investor-targeting program requires five processes:

1. understanding the company as an investment;
2. evaluating the current shareholder base;
3. identifying potential investors;
4. communicating with current and potential investors; and
5. monitoring and measuring effectiveness of outreach.

Each of these is an ongoing process, and an effective provider will be able to contribute to the actions the IR team conducts in each step, as well as help to optimize the usage of scarce resources in maintaining communication with the investment community. The investor relations officer should look for a provider of services that can contribute by providing both information and advice at each step:

1. Understand the company as an investment: having the flexibility to view the company's investment story in the same context as potential investors managing diverse strategies—relative to industry-specific fundamentals, regional focus or even a global perspective—as well as transparency on the inputs to the process.
2. Evaluate the current shareholder base: helping to identify risk within existing positions, as well as opportunities available from current shareholders (either the ability to expand positions in existing portfolios or the ability to build new positions in new portfolios managed by the same firm).
3. Identify potential investors: delivering both qualitative and quantitative information describing not just the match between the company's investment story and the portfolio, but also the communication conduits within the firm (who the decision makers are and how to approach them).
4. Communicate with current and potential investors: offering real-time information to support the company's interactions in any format (conferences, nondeal roadshows, analyst days, phone conversations).
5. Monitor and measure effectiveness of outreach: including both backward-looking and forward-looking advice on the communication process, identifying "success stories" as well as those situations where your time may have been used better.

A provider of targeting and outreach advice will help guide a company to a plan that best utilizes the investor relations officer's and the management team's time and puts the officer in front of the most appropriate and impactful investment managers. The type of analysis and reporting provided generally includes top-down/strategic and bottom-up/tactical.

- Top-down/Strategic encompasses:
  - global analysis of the market-by-market opportunity for additional investment from prospective investors; and
  - a view of positions within your current shareholder base potentially at risk.
- Bottom-up/Tactical includes:
  - real-time money center analyses prior to any nondeal roadshows;
  - analysis of attendees and meeting interest at brokerage-sponsored events to prioritize exposure to the best investors; and
  - detailed pre-meeting briefing on current exposure and portfolio trends for each investor in advance of an interaction.

With an effective investor-targeting provider, the investor relations officer will be able to confidently approach the investment community with the knowledge that time and resources are being used effectively.

### 6.6  Market perception feedback
*IHS Markit*

The market intelligence and surveillance and investor targeting and outreach functions provide critical data and insights on the current and potential states of the shareholder base, which are both imperative to running an impactful IR program. Perception feedback provides a largely qualitative complement that will enable an in-depth assessment of the investment community's view on various facets of the company. The key to gaining valuable feedback from investors and sell-side analysts is the utilization of a third party to conduct the research. Not only will a third party bring expertise to the design and execution of perception research but the indirect connection it has with the company will foster an environment that allows for the free exchange of thoughts and opinions. Perception feedback can be used in advance or after major events, such as an investor day or quarterly earnings announcement, to assess expectations or judge performance. Perception feedback can also be used on a more routine basis

**IR and communications**

to keep a constant finger on the pulse of investor opinion. Regardless of the option chosen, expect the following from the market perception feedback providers:

- assistance and guidance on topics that should be covered and the design of the questionnaire;
- consultation with regard to the participants most applicable for the study and the timing of the project; and
- a comprehensive analysis of the study results that provides a synthesis of the feedback topic by topic and puts forth recommendations to address the concerns held by the investment community.

When conducting an initial perception study, a third party will host a series of conference calls with the investor relations officer to better understand the company's strategic direction, what was discussed during the pre-IPO roadshow and what has been accomplished since the IPO, as well as the company's current disclosure and communication practices. This understanding allows the perception feedback consultant to design an effective questionnaire and ask appropriate probing questions during the telephone interviews. The goal is to keep the questions open-ended to allow the participants to freely discuss the critical factors driving their investment or rating decisions. Themes to cover may include:

- *Overall view as an investment:* competitive strengths, weaknesses, risks, opportunities, reasons for a stock's discount, suggestions for achieving a premium, events that would cause a decrease/increase in position, fundamental metrics used to assess the stock, relative valuation;
- *Business and capital allocation strategies:* confidence in the current strategy and business model, strategic concerns, how investors would prefer the company to utilize their excess cash, potential growth areas for the company;
- *Earnings and guidance:* reaction to latest earnings release, expectations for the full year, biggest challenges going forward from a results perspective, opinion on information presented;
- *Peer and industry intelligence:* preferred investment choice in the

space, best-in-class disclosure and communication practices for the sector;

- *Senior executive team:* overall opinion and quantitative benchmarking of senior management's strategic vision, execution, credibility, capital management, corporate governance structure and expectations for shareholder interactions; and
- *IR efforts:* overall satisfaction with and quantitative benchmarking of IR's articulation of the company story, accessibility, credibility, frequency and content of communication, and addressing misperceptions in the marketplace.

Equally important is choosing the appropriate study participants to ensure unbiased, comprehensive feedback. Participants to be interviewed are typically dispersed among five segments: current buy-side institutional holders, potential buy-side institutional investors, recent buyers and sellers, current sell-side analysts and potential sell-side analysts. Global investors, focusing on North America, the United Kingdom, Continental Europe and Asia, should also be included, as participants' expectations often vary by region. When creating the participant list, investors should be chosen based on their familiarity with the company as well as the management and IR teams. The optimal places to locate this information include the company's pre-IPO roadshow agenda, recent meeting schedules, conference call and webcast participant lists and notes entered in the investment community database and CRM.

The consultant will also provide guidance on the most favorable times to conduct a study. Avoid launching the interviewing period if a major company announcement is expected to affect participants' opinions or during earnings season, major holidays or well-attended industry conferences.

Once the interviews are complete, expect the consultant to provide a comprehensive analysis of the study results that includes in-depth, topic-by-topic summaries, which are supported by verbatim comments from the participants. The final study will also identify any disconnects between what the company is communicating and what the investment

community is hearing and will include actionable, best-in-class communication recommendations to address the investment community's concerns. Based on these findings and recommendations, the company can tailor its disclosure and messages to shift perceptions closer to the preferred state.

Companies most commonly utilize large-scale perception studies annually in order to get an in-depth assessment of investor sentiment. These studies are a terrific benchmarking tool, and the results, in part or in their entirety, are typically a component of the information reviewed by the company's board of directors.

## 6.7 Investment community database and CRM
*IHS Markit*

One of the biggest challenges faced by investor relations professionals is not only the amount of investor intelligence and data they are inundated with on a daily basis but also the challenge of obtaining the high-quality information that is required to plan and implement smart strategy and tactics. To navigate the sea of data effectively, a global investor community database and CRM are required. A global database system will provide access to a wide array of information from the desktop and on the road. Critical elements of a database system include:

- a secure, web-based environment that allows for individual log-in credentials among team members along with the ability to share information and collaborate across the team;
- support from a dedicated, knowledgeable and global account management team that provides 24/7/365 access;
- access to global investment community data and analytics, including:
  - detailed contact and background information on investment staff at buy- and sell-side firms;
  - comprehensive information on the background, investment styles and investment approaches of buy-side institutions at the firm and fund levels;
  - complete portfolio information for every publicly listed equity around the world;

- detailed, global fixed-income portfolio information;
- advanced screening capabilities enabling access to the information required;
- sell-side research reports and detailed earnings estimates;
- calendar of investment community events as well as real-time and corrected transcripts of results and investor presentations; and
- real-time market data and news; and
- a robust CRM system to manage and report on the team's interactions with all participants in the investment community, including:
  - ability to easily manage, input and track one-on-one meetings, group meetings, phone calls and e-mails;
  - ability to customize CRM data points to best fit the company's issues and requirements;
  - list management tools;
  - e-mail distribution;
  - one-click reporting to view items such as event itineraries, institutional and contact profiles and post-roadshow feedback reporting;
  - management-ready reports that highlight the effectiveness of IR and executive meetings with the investment community;
  - ability to export data and reports into Excel, Word, and PDF formats; and
  - integration of proprietary CRM data with surveillance ownership information, investor targeting and perception feedback information.

The investment community database and CRM system are typically the central tools utilized by investor relations departments of any size to coordinate and manage activities daily. A database system has the ability to grow along with investor relations needs and requirements. At its core, a database system provides the user with a wealth of information that is critical and essential to any IR professional. For instance, when an incoming call or meeting request is received from an unfamiliar investor, the database user can quickly pull up the investment firm by name and review its background, investment philosophy, activist history, portfolio composition and

metrics such as investment style and portfolio turnover. Additionally, the user can also view background information such as employment history, coverage details and educational background of the analyst or portfolio manager making the call. This data educates the user as to the investor's relevance and allows the user to make an informed decision about the amount of time he or she will provide to the investor. Is a phone call sufficient? Should there be a one-on-one meeting with this investor? Should this investor be given access to the CFO or CEO? These are all critical questions that need to be answered on an ongoing basis by investor relations professionals to properly manage their own time and the time of their management team.

For a company that has successfully completed the IPO process, the first step in using its investment community database is to seed historical investor activities with the itineraries from the IPO roadshow. Additionally, the notes from the IPO roadshow meetings should also be brought into the system. The IPO is a perfect opportunity to utilize the support of the database provider to understand best practices for managing the data, leveraging their tools to import the company's data and establishing customized views and data tags relevant to the company's story. The activity data from the IPO will provide a perfect foundation for future investment community interactions.

Another opportunity for getting immediate value from the database is to utilize the final share allocations provided by the investment banking team. The database provider will be able to map the investment firms on the allocation list with the investment firms in the database and import the number of shares that were purchased by each firm at the time of the IPO. This will allow tracking the progression of the shareholder base from day one of trading to the time it is first updated by the surveillance provider or by ownership via public filings and beyond.

An investment community database also allows moving beyond the current ownership of stock to access the global portfolios of investment managers and funds from around the world. The owners of the company's peer group can be easily

tracked, and the strengths, weaknesses and opportunities of each company's ownership profile can be analyzed. The database will also allow the user to run detailed screens of investors by categories, such as location, investment style, portfolio turnover or recent buying and selling activity in a particular stock or across a sector or peer group. Investor screening will enhance the user's ability to make informed decisions on upcoming investor relations activities.

Nothing can replace the personal interactions that investor relations officers and management teams have with the investment community. However, e-mail communication and other methods of distribution to broad audiences are necessary. The database should allow the user to easily create and edit lists of investment staff so that regular distributions, such as quarterly results, and one-time events, such as investor days, can be easily managed. These investor lists can then be utilized to quickly send a uniform e-mail to a broad distribution group along with a personalized salutation, embedded links and graphics.

Tracking interactions with the investment community is certainly a worthwhile endeavor, as it will inform future interactions with each investor. Additionally, by closely tracking interactions, the ownership and other data available in the system can be utilized to run reports following investor relations activities in an effort to measure the success of an event through real-world metrics. A sell-side investor conference is an example.

Companies are often bombarded by requests from the sell-side to attend their conferences. If the company has accepted an invitation to a conference, a database user would be able to preview its series of meetings with investors not only from a qualitative perspective (Who are these firms and what are they all about? Is this firm a hedge fund?) but also from a quantitative perspective (How many shares of the company's stock do they own? What is their average turnover? What is their exposure to the company's sector?). Following the conference, as ownership data streams into the database, the user will be able to run reports to assess the impact of meetings from an ownership perspective (Did any

**IR and communications**

potential investors initiate a position? How did the existing shareholders react?). The data from these reports can be used the following year to assist in investor relations planning, including decisions on which conferences to attend.

Another key attribute of an investment community database is the integration of information from the provider of market intelligence and surveillance, investor targeting and market perception feedback. By employing one provider for all of these services, the user will be able to seamlessly integrate critical real-time and client-specific intelligence with the database information and CRM activity, allowing more powerful analysis and a deeper qualitative understanding of current and prospective investors.

The database should also allow quick access to sell-side research reports and earnings estimates for not only the company's stock but also for that of peer companies and others. The sell-side remains an important input into investor sentiment, and integrating this information into the investment community database is critical. Additionally, a calendar of events, such as investor conferences and the earnings calls of peer companies, is critical in that it enables better planning and management of the company's own events. Access to the verbatim transcripts of these events is also a standard requirement for a database tool.

An investment community database and CRM system are tools that are critical for a one-person IR department or a large IR team located in offices around the world. The one-person department can use the database to leverage limited resources and access critical information; the larger IR team can additionally use the database as a tool for collaboration and internal communication. Regardless of the size of the department, it is hard to imagine conducting investor relations in the absence of a global investment community database and integrated CRM.

### 6.8 ESG and the newly public company
*IHS Markit*

As part of the transition from private to public company status, not only will companies' financial disclosures become a matter of public record, but increasingly, stakeholder groups will expect to receive information about the nonfinancial and extra-financial characteristics of a company that are important to making an investment or voting decision on the company's equity. These characteristics are broadly referred to as environmental, social and governance (ESG) measures, and when delivered properly, they can become a conduit to attracting additional investment from both active and passive investment vehicles. In addition, an improved standing among these stakeholders carries both direct and indirect benefits, as well as financial and nonfinancial benefits.

A common roadmap for a company at the outset of an ESG program includes the following four categories.

1.  Diagnostics
    - Regulatory review—Companies may be covered by different regulatory and legal jurisdictions that may require disclosures of ESG characteristics either to the specific body or the general public—a comprehensive view of legal requirements here is an important input to the overall mix of disclosure. Voluntary industry standards and ESG reporting frameworks are typically reviewed as well, often acting alongside or in place of regulatory bodies.
    - Benchmarking and competitive analysis—Awareness of industry "best practices" in both *operations* and *disclosure*, reviewing the progression of similar companies in the industry and their material items and disclosures to gauge stakeholder expectations, is generally conducted. It is recommended to combine both quantitative and qualitative assessment of "gaps" in order to also stay ahead of the very dynamic nature of the development of international ESG requirements.
    - Materiality assessment—A formal process that gathers information and recommendations of *each stakeholder group* facing a company (including, but not limited to, major institutional investors, asset owners,

debtholders, customers, vendors, employees and communities) is undergone to lay out the complete picture of "interest" for disclosure. Items that are material to the company as an investment story need to be disclosed, but nonmaterial items that otherwise generate value for one or more stakeholder groups and the company are typically reviewed and disclosed as well.

2.  ESG program design
    - Internal—Company representatives facing each stakeholder group interface to produce a central ESG strategy designed to maximize value for the organization. This includes a central ESG investment thesis, strategic messaging, ESG Q&A and often targets and scenarios for ESG-related goals.
    - External—A communications strategy for each stakeholder group is then originated with the appropriate message, channel and cadence. While for many companies this will include a formal corporate social responsibility or sustainability report, there are numerous other methods of reaching each group, including digital presence, ESG data packages, fact sheets, management/board statements, press and external communications, social media and others; each company's set of stakeholders and market is unique, as is each program.
3.  ESG program execution
    - Stakeholder engagement—Two-way communication is necessary for any successful program; eliciting feedback on the program is done through both formal and informal methods. Often management will be directly involved in the communication process. Training and workshopping the message with each member of the organization facing each stakeholder is recommended.
    - Reporting cycle management—While most ESG disclosures are long-term in nature, collecting information internally to meet

external demands requires robust processes. Building the system to evaluate information prior to disclosure can help the company meet regulatory, as well as other stakeholder, needs.

4. Return on investment (ROI) and iteration
   - Measurement—Companies will often evaluate their progress on individual key performance indicators that need to be defined and achievable while aligning with stakeholder needs. Some ESG programs generate a clear financial ROI in terms of, say, improved customer or employee retention; others are measured in terms of increased investor interest.
   - Feedback—Processes to collect and review stakeholder feedback are considered, along with the "repeatability" of each part of the process. No disclosure from any company is made only once, so each new inbound and outbound communication is made with future, not just current, stakeholder needs in mind.

nyse.com/ipo

7

# Obligations of a public company

**Obligations of a public company**

## 7.1 Ongoing reporting
*Simpson Thacher & Bartlett*

As discussed earlier in this guide, the preparation for being public should happen in parallel with the IPO. Take stock of your processes and infrastructure so that you can address any gaps well in advance of the IPO date. This preparation process can often be lengthy, depending on the maturity of existing processes. How significant the required improvements are will determine the number of resources required. Many companies have resource constraints during the going public process, where there is so much attention being paid to the IPO filings and marketing efforts that other efforts may find themselves deprioritized. It is worthwhile to find a way to keep these efforts at the forefront.

An understanding of the basics of the ongoing public reporting obligations can inform the work that is needed to prepare your company's finance organization and other functions for the rigors of being public.

### (a) Annual and quarterly reporting
The SEC requires public companies to file quarterly reports on Form 10-Q and annual reports on Form 10-K (these 10-Qs and 10-Ks sometimes being referred to collectively as *periodic reports*), with current information regarding the company's business and financial condition. In a way, these reporting obligations can essentially be viewed as a requirement to periodically update the registration statement that the company used in the IPO. For example, just as the registration statement used in the IPO included the company's financial statements, the company's periodic reports must update those financial statements. Thus, the company's annual report on Form 10-K will need to contain an updated audited balance sheet and audited income statement, cash flows and changes in shareholders' equity. And for the quarterly reports on Form 10-Q, the company will need to provide the public with its interim financial statements (not typically audited but a review by the outside auditors is required).

A new issuer has 90 days after the completion of its fiscal year to file its first annual report on Form 10-K with the SEC. Thereafter, the timetable for a *large*

A *large accelerated filer* is any issuer meeting the following conditions as of the end of its fiscal year:
1. The aggregate worldwide market value of the voting and nonvoting common equity held by nonaffiliates of the issuer was $700 million or more as of the last business day of the issuer's most recently completed second quarter;
2. The issuer has been subject to reporting requirements under the Exchange Act for at least 12 calendar months;
3. The issuer has filed at least one annual report under the Exchange Act; and
4. The issuer had annual revenues of $100 million or more.

An *accelerated filer* is any issuer meeting the following conditions as of the end of its fiscal year:
1. The aggregate worldwide market value of the voting and nonvoting common equity held by nonaffiliates of the issuer was $75 million or more, but less than $700 million, as of the last business day of the issuer's most recently completed second quarter; and
2. The issuer meets conditions 2.–4. of the definition of *large accelerated filer*.

*accelerated filer* (generally, a company that has been reporting with the SEC for at least a year and has a public float of at least $700 million and annual revenues of $100 million or more) is 60 days and the timetable for an *accelerated filer* (generally, a company that has been reporting with the SEC for at least a year and has a public float of at least $75 million (but less than $700 million) and annual revenues of $100 million or more) is 75 days. Note, the thresholds for exiting accelerated and nonaccelerated filer status differ from those used to determine initial filer status. A new issuer has 45 days after the completion of each of the first three fiscal quarters of the year to file its quarterly reports on Form 10-Q prior to its second

annual report on Form 10-K. Thereafter, the timetable for a large accelerated filer and an accelerated filer is 40 days. We should point out that a new issuer is permitted to file its very first quarterly report within 45 days following the effective date of its registration statement if this is later than the due date for the report that would otherwise have applied.

> ***Public float:*** For purposes of determining accelerated filer and large accelerated filer status, public float represents the aggregate market value of the voting and nonvoting common equity held by nonaffiliates of the issuer computed by use of the price at which the common equity was last sold, or the average of the bid and asked prices of such common equity, in the principal market for such common equity, as of the last business day of the issuer's most recently completed second fiscal quarter.

The Sarbanes–Oxley Act requires the chief executive officer and chief financial officer of an issuer to make certifications pursuant to Sections 302 and 906 of the Sarbanes–Oxley Act with respect to its annual reports on Form 10-K and quarterly reports on Form 10-Q. These certifications relate to the accuracy of the annual report, including financial statements. The 906 certifications also cover compliance with applicable SEC rules and the 302 certifications also cover the issuer's internal control over financial reporting and disclosure controls and procedures. These certifications must be filed as exhibits to such reports.

Commencing with their first quarterly report on Form 10-Q, issuers must submit with their periodic reports (and any current report on Form 8-K that contains a revised version of previously filed audited annual financial statements) specified financial information in such financial statements in an interactive data format known as eXtensible Business Reporting Language (XBRL). XBRL consists of computer-readable tags which are used to identify each piece of financial data with the goal of

| Category of filer | Form 10-K deadline | Form 10-Q deadline |
|---|---|---|
| Large accelerated filer | 60 days | 40 days |
| Accelerated filer | 75 days | 40 days |
| Nonaccelerated filer | 90 days | 45 days |

enabling more efficient retrieval and analysis of the information. As part of its efforts to modernize, the SEC may consider additional opportunities for XBRL tagging, such as in proxy-voting disclosures.

**(b) Earnings releases**
As part of the periodic process for reporting earnings, many companies will issue quarterly earnings releases and conduct related conference calls with investors. Companies should carefully consider the process they adopt for releasing earnings to ensure it comports with all applicable regulatory requirements. Among other things, earnings releases are required to be furnished on a Form 8-K report to the SEC and must satisfy SEC rules relating to the use of non-generally accepted accounting principles (GAAP) financial measures. Particular care should be taken with respect to the initial quarterly earnings releases and conference calls following the IPO, as any "surprises" can be used as the basis for a

**Form 8-K Quick Reference Guide[1]**

| Triggering Events | |
|---|---|
| **Business and Operations** | ■ Execution, amendment or termination of a material definitive agreement not made in the ordinary course of business (Items 1.01/1.02).<br>■ Bankruptcy or receivership; court or governmental order confirming plan of reorganization, arrangement or liquidation (Item 1.03). |
| **Financial Information** | ■ Acquisition or disposition of a significant amount of assets other than in the ordinary course of business (Item 2.01).<br>■ Public announcement or release (including any update to earlier announcement or release) disclosing material nonpublic information regarding results of operations and financial condition for a completed quarterly or annual fiscal period (Item 2.02).<br>■ Creation of a material (i) direct financial obligation or (ii) direct or contingent obligation arising out of an off-balance sheet arrangement (Item 2.03).<br>■ A triggering event causing (i) the increase or acceleration of (A) a direct financial obligation or (B) an obligation under an off-balance sheet arrangement or (ii) a contingent obligation under an off-balance sheet arrangement to become a direct financial obligation, and such events under (i) and (ii) having material consequences (Item 2.04).<br>■ Committing to an exit or disposal plan or otherwise disposing of a long-lived asset or terminating employees under certain plans that results in a material charge under GAAP (Item 2.05).<br>■ Conclusion that a material impairment charge to assets is required under GAAP (unless conclusion is made as part of a quarter/year-end process and is disclosed in the next periodic report); includes impairments of securities or goodwill (Item 2.06). |
| **Securities and Trading Markets** | ■ With respect to a national securities exchange/association: (i) notice therefrom of non-satisfaction of a listing rule/standard or of delisting; (ii) notice thereto of a material noncompliance with a listing rule/ standard; (iii) a public reprimand letter or similar communication therefrom for a violation of a listing rule/standard; or (iv) the taking of definitive action to delist therefrom or transfer listing to another securities exchange/association (Item 3.01).<br>■ Unregistered sales of equity securities that in the aggregate constitute 1% or more of the outstanding shares of the class sold (Item 3.02).<br>■ Material modifications, limitations or qualifications to the rights of holders of any class of registered securities (Item 3.03). |

*(Continued)*

**Obligations of a public company**

| Triggering Events | |
|---|---|
| **Accountants and Financial Statements** | ■ Resignation or dismissal of an independent accountant or engagement of a new independent accountant (Item 4.01).<br>■ Concluding, being advised by or receiving notice from the independent accountant that previously issued financial statements should no longer be relied upon (Item 4.02). |
| **Corporate Governance and Management** | ■ Change in control (Item 5.01).<br>■ Director's or certain executive officers' resignation, retirement, termination or removal or director's refusal to stand for reelection. Election of new director or appointment of certain new executive officers. Entry into or adoption of a material compensatory plan, contract or arrangement to which the principal executive officer, principal financial officer, or a named executive officer is a party or participates; all material amendments to such plan, contract or arrangement; or material grants or awards thereunder to any such persons. Calculations of compensation figures for named executive officers if omitted from Summary Compensation Table (Item 5.02).<br>■ Amendments to the articles of incorporation or bylaws (not disclosed in a proxy statement) or a change in fiscal year (Item 5.03).<br>■ Temporary suspension of trading under an employee benefit plan (Item 5.04).<br>■ Amendment to, or waiver from, a provision of the code of ethics that applies to the principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (Item 5.05).<br>■ Submission of matters to a vote of security holders (Item 5.07).<br>■ Shareholder director nominations (Item 5.08). |
| **Regulation FD** | ■ Disclosure of information pursuant to Regulation FD (Item 7.01). |
| **Other Events** | ■ Optional disclosure of other events deemed of importance to security holders (Item 8.01). |
| **Financial Statements and Exhibits** | ■ Disclosure of financial statements, *pro forma* financial information and exhibits, if any, filed as part of the 8-K (Item 9.01). |

1 This guide is only a summary and does not include all situations under which a Current Report on Form 8-K is required to be filed.

lawsuit under Section 11 of the Securities Act asserting that the IPO prospectus contained a material misstatement or omission.

**(c) Current reporting**
A public company is also required to file a current report on Form 8-K (generally within four business days) when certain specified events occur. The above quick reference guide summarizes these events, which notably do not include a "catch-all" requirement that the company must file a Form 8-K whenever something material happens. However, the list continues to grow. For example in March 2022, the SEC proposed rules that would require current reporting of cybersecurity incidents deemed by the registrant to be material.

In addition to the obligation to file current reports on Form 8-K with the SEC, the NYSE expects listed companies to release timely information to the public that might reasonably be expected to materially affect the market for their securities, except under very limited circumstances where it is possible to maintain confidentiality of the information and immediate public disclosure would prejudice the ability of the company to pursue its legitimate corporate objectives. When the announcement of news of a material event or a statement dealing with a rumor that calls for immediate release is made between 7:00 a.m. and 4:00 p.m., New York time, the company must notify NYSE's Market Watch & Proxy Compliance team by telephone at least ten minutes prior to release of the announcement and a copy of the press release must be submitted via email to NYSE.

**(d) Proxy statements**
A proxy statement contains information provided to shareholders so they can decide how to vote in connection with a company's shareholder meeting. Stock exchange rules and, typically, state law require a company to hold an annual shareholder meeting, and stock exchange rules require a company to solicit proxies for all meetings of shareholders. In connection with such solicitation, a proxy statement must be prepared, filed with the SEC and disseminated to the shareholders. In cases where a company's shareholders vote or act by written consent without the solicitation of proxies, SEC rules require the company to provide shareholders with an information statement, which contains disclosure substantially similar to that required in a proxy statement. Certain information required to be disclosed (including the required compensation disclosures) in an issuer's annual report on Form 10-K may be incorporated by reference to the issuer's later-filed proxy statement as long as the proxy statement is filed within 120 days after the end of the issuer's fiscal year.

**(e) Internal control over financial reporting and other disclosure controls and procedures**

A public company must maintain internal control over financial reporting, which is a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

The company must include in its annual reports on Form 10-K a management's assessment of the effectiveness of its internal control over financial reporting. The rules provide that companies are exempt from this requirement for their first annual report on Form 10-K, so it commences with the second annual report on Form 10-K that is filed. In addition, companies that are accelerated filers or large accelerated filers must also, starting with their second annual report on Form 10-K (if the company is an accelerated filer or large accelerated filer for purposes of that report), include an opinion from the issuer's outside auditors on the effectiveness of the issuer's internal control over financial reporting. However, under the JOBS Act a company that qualifies as an emerging growth company (EGC) is excepted from the requirement to include the opinion from the issuer's outside auditors on the effectiveness of the company's internal control over financial reporting. Due to SEC rule updates in 2020, a smaller reporting company with annual revenue of less than $100 million likewise does not have to include an annual attestation report of its auditors, although larger companies (other than EGCs) must do so.

A public company must also disclose in its quarterly reports on Form 10-Q and annual reports on Form 10-K any change materially affecting its internal control over financial reporting that occurred during the issuer's last fiscal quarter, beginning with its first periodic report following its IPO. The issuer's principal executive officer and principal financial officer must certify that they have disclosed to the issuer's auditors and audit committee all significant deficiencies or material weaknesses in the design or operation of internal controls.

In addition, a public company must maintain disclosure controls and procedures, which are controls and other procedures of the issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. An issuer must evaluate the effectiveness of its disclosure controls and procedures and describe its evaluation quarterly in its quarterly reports on Form 10-Q and annual reports on Form 10-K.

**(f) Regulation FD**

Whenever a public company, or any person acting on its behalf, discloses, whether intentionally or not, any material nonpublic information regarding that issuer or its securities to securities market professionals or security holders (if it is reasonably foreseeable that the security holder will trade on the basis of the information), Regulation FD requires the issuer to make general public disclosure of the information. Public disclosure must be made simultaneously for intentional disclosures and promptly (but in no event after the later of 24 hours or the commencement of the next day's trading) in the case of inadvertent disclosures. Regulation FD does not apply to disclosures made to persons who owe a duty of trust or confidence to the issuer, persons with a confidentiality obligation or to certain offering-related communications. Regulation FD also does not apply to communications to employees, but for any broadly-based employee communications, a company should consider whether public disclosure is prudent under Regulation FD.

**7.2  Listing standards**

*NYSE*

When a company's shares are listed on the NYSE or NYSE American, investors generally expect compliance with ongoing financial standards, disclosure policies and corporate governance practices designed to promote integrity and accountability.

**(a) Financial and distribution standards**

The NYSE and NYSE American have established quantitative and qualitative standards for initial listings of US and non-US companies. The financial standards for operating companies listing on the NYSE or NYSE American are summarized in the appendices. Standards reflect the different types of issues and issuers. Listed companies must meet continued listing standards on an ongoing basis. These too are summarized in the appendices. If companies fall below continued listing standards, generally they are afforded a period of time to return to compliance. Please see the appendices for more details.

**(b) Governance requirements**

In addition to these quantitative listing standards, the company must meet NYSE or NYSE American corporate governance listing standards, as applicable. The company must comply with corporate governance requirements at the time of listing and throughout the life of its listing. As with the quantitative standards, different standards are applicable to different types of issuers. In addition, for a company listing in conjunction with an IPO, some of the corporate governance requirements can be phased in. Governance requirements for NYSE American–listed companies, designed to accommodate smaller companies, differ from NYSE requirements.

To learn more about the NYSE and NYSE American financial, distribution and governance requirements, please refer to the complete requirements outlined in the *NYSE Listed Company Manual,* a comprehensive online resource, which can be accessed online at https://nyseguide.srorules.com/listed-company-manual, or to the *NYSE American LLC Company Guide,* which can be referenced at https://nyseamericanguide.srorules.com/company-guide. Alternatively, contact the NYSE or NYSE American directly.

# 8

# A public company and its shareholders

**A public company and its shareholders**

### 8.1 Proxy statement and annual meeting
*AST*

#### (a) Annual meeting requirements

United States federal regulations require all public companies to hold an annual meeting where shareholders can cast votes in one of two ways: either in advance of the meeting by proxy or at the meeting in person. Shareholders are given the opportunity at each year's annual meeting to cast their vote on the election of directors of the corporation and the ratification of the company's auditors; in many cases, shareholders may provide their advisory vote on the past year's executive compensation (known as *Say on Pay*).

The annual meeting provides an opportunity for management to build and strengthen shareholder relationships and engagement. Annual meetings are, generally, formally scripted and planned. The company usually selects the meeting place, which must accommodate the anticipated number of attending shareholders and others. Management and the board of directors decide whether to hold the annual meeting at the same location or at alternative sites.

An individual shareholder or group of shareholders may submit a resolution, known as a shareholder proposal, for action at a company's next available annual meeting. Any shareholder can submit a proposal if they own at least $2,000 in stock of the company or 1% of a company's outstanding shares for at least a year. The company must include the proposal in proxy materials unless it receives SEC authorization to omit it. Generally, shareholder proposals are contrary to the company's corporate policy and, in its communications, the company will encourage other shareholders to vote against the proposals. In some cases, the company may seek to negotiate with activists in hopes of avoiding a shareholder proposal.

In recent years, some annual meetings have either been held via virtual meeting services with no physical location or included a virtual component in addition to the in-person meeting (a hybrid meeting). Virtual meeting services enable shareholders to vote online, listen to and/ or view the live meeting, and in other ways participate without being on-site. In the 2018 proxy season, virtual meetings increased by 30%. In 2020, due to the COVID-19 pandemic, an even larger number of companies sought virtual meeting services as an alternative to in-person meetings. Most transfer agents provide virtual meeting services.

#### (b) Timeline

Generally, the date of the annual meeting is determined by the company's fiscal year-end. Meeting dates do not usually vary greatly from year to year, but rather meetings are held at or around the same time annually. Numerous important events preceding the annual meeting are critical for the company to remain in compliance with state laws, federal government regulations, various regulatory agency policies, and (if applicable) stock exchange listing requirements.

#### (c) Preparation

**Determine agenda and dates.** Management and the board of directors will together decide on any additional matters to present to shareholders besides the standard ones. They will also decide on the timing for the annual meeting. The board is charged with setting the record date (the date of stock ownership that determines eligibility to vote) as well as the meeting date. Management is responsible for communicating this information to all parties impacted. State law sets the length of time between record date and meeting date. For example, in Delaware, the record date cannot exceed 60 days before the meeting and must be at least 10 days before the meeting.

**Communication.** Close and seamless communication is requisite among the issuer, their transfer agent, outside counsel, and (if engaged) the proxy solicitor in order for the entire process to be efficiently and correctly executed.

**Notification of record date and meeting date (broker search).** Generally, the transfer agent will handle the broker search notice unless the company has retained a proxy solicitor. In either case, SEC Rule14a-13 requires all street name holders (brokers, banks and other custodians) to receive advance notice of the record date and meeting date, at least 20 business days before record date. The notice includes the name of the company, the CUSIP number of the security(ies) entitled to vote, the record date and, while not required, may also include the annual meeting date. The notice must be sent to brokers, banks and their agents (as applicable), so that they can indicate the quantity of materials they need to send their beneficial holders to enable them to vote. The company can thus print a sufficient quantity of all materials. Increasingly, shareholders may opt for electronic receipt of materials, but the print quantity remains critical for those who do not consent to electronic delivery.

**Assess whether a proxy solicitor is needed.** A professional proxy solicitation firm can assist with timing and tactical requirements for an annual meeting, as well as offer advice on the best strategy and approach for presenting proposals to shareholders to optimize achieving desired results. A proxy solicitor can help the issuer navigate the proxy process, whether the issuer has only routine agenda items or, as is often the case, has nonroutine ballot items involving equity plans or shareholder proposals.

In the current proxy landscape, issuers often engage a proxy solicitor to help with an array of required actions and related functions, ranging from complying with regulations to proxy solicitation advisory services. Increasing support for certain types of shareholder proposals, notably environmental, social and governance (ESG) proposals, the considerable influence of institutional and activist investors and the influential guidelines of proxy advisory firms have all converged to heighten the urgency of annual meeting planning as well as greatly complexify it and extend the time allotted for adequate preparation. The requirement for a shareholder vote on executive compensation (Say on Pay) adds yet another level of complexity. Additionally, NYSE regulations (which govern member firms, such as brokers, and not only listed companies) significantly affect the voting landscape for public companies. For example, brokers are not permitted to vote on the election of directors unless they have received specific instructions from their clients.

### 8.2 Providing shareholders with proxy material
*AST*

#### (a) Material preparation

**Required shareholder materials.**
The issuer must furnish shareholders with three critical documents in order to solicit their votes for the annual meeting: a proxy statement with the text of any proposals and/or information on other items to vote on; a proxy form to cast votes; and an annual report which may either precede or accompany the other materials. The issuer must file these documents with the SEC concurrently with mailing them to shareholders (*file in use*). Depending on the nature of the proposals, the proxy statement may need to be pre-filed in preliminary draft; this should be discussed with counsel. In light of the fact that the proxy statement not only must meet applicable legal and regulatory requirements, but also serve as management's advocacy piece for their position, it is critical that the proxy statement is clearly written and readily intelligible as to its purpose and design. Shareholders should be engaged by the proxy statement such that they will support management's proposals as being of benefit. As for the proxy form shareholders will use to cast votes—often called a proxy card—the format is usually determined by the transfer agent because the completed card must be readable by the transfer agent's systems. In-house counsel typically ensures that the proxy card meets any applicable legal or regulatory requirements.

#### (b) Material distribution

**Online provision of materials.** SEC rules require all companies soliciting proxies to post their annual meeting material online and inform shareholders of the material's electronic availability. Importantly, the issuer cannot only link to the SEC's EDGAR website, where materials submitted by the issuer to the SEC are hosted. Rather, the issuer must provide a link to a cookie-free website hosted by either the issuer or a third party the issuer has engaged. The site must meet all requirements for accessibility and privacy protection.

**Email distribution of materials.**
Consenting shareholders may receive proxy material electronically via email.

Issuers generally take advantage of this SEC provision for the purpose of realizing often significant savings on printing and postage. Issuers may promote email distribution of materials to shareholders via email; printed communications like the proxy card, proxy statement and annual report; or on the online voting site (for future receipt of materials).

**Notice and Access (E-Proxy).** SEC rules permit issuers to mail shareholders a one-page notice with information on accessing their proxy materials online, without prior shareholder consent for electronic delivery. The SEC prescribes the form the issuer must use, which must include, among other information, the issuer's name, the date of the annual meeting, and a brief description of items to be voted on. The issuer must include a link to the proxy material and/or the voting site if different, as well as a control number specific to the shareholder and which the shareholder uses to access the site. Importantly, the issuer cannot attach a proxy card to the Notice and Access mailing. The mailing must also advise shareholders how to request printed proxy materials if desired. The issuer must fulfill requests for printed copies up to a year after the meeting. A Notice and Access mailing must be sent a minimum of 40 days before the meeting date, and website links for accessing material must be live at the time of mailing. Failure to meet the 40-day time frame reverts the company to its regular print mailing of material. Issuers can decide to use Notice and Access for all shareholders, or they may only use it for select shareholders and mail regular packages to others. This depends on the company's shareholder base and historical vote returns. Generally, the proxy solicitor will advise on such matters based on items to be voted on, vote requirements for each proposal, and other pertinent factors.

**Householding.** Issuers can mail one set of materials to a household (known as householding) when two or more shareholders with the same last name reside at the same address. This SEC rule helps reduce the amount of printed materials required. However, it is necessary for the issuer to include separate proxy cards in the mailing, one for each shareholder.

**Full-set mailing.** An issuer can mail full packages to all shareholders, consisting of the annual report, the proxy statement, the proxy card and a return envelope. The decision will depend on such factors as the number of shareholders, share distribution of holders, and items up for voting. An issuer should also consider the size and weight of the printed documents not only for the economic aspect of printing but also the mail method as this will determine the time it takes for shareholders to receive the material and be able to submit their proxy in a timely fashion. This should be taken into consideration if the solicitation period from mailing to meeting is less than five weeks.

#### (c) Phase three: solicitation and voting
Institutional investors in the US typically vote more than 90% of their positions, while generally less than 30% of retail (or noninstitutional) shareholders vote. When contentious or high-vote proposals are being voted on, some issuers will seek to motivate higher voting turnout from retail investors. Retail shareholders more often support management proposals and management may often look to them for an additional margin of support.

Three voting methods are generally provided to shareholders: (1) traditional mail-in voting, in which the shareholder signs and returns the proxy card in a postage-paid return envelope; (2) telephone voting, in which a shareholder calls a toll-free number, enters the control number from the proxy card, and votes via phone prompts; and (3) online voting on a secure website or mobile-device voting app, in which the shareholder visits a specified website, enters the control number for secure access to a voting portal, and votes. The holder will also be able to opt into future electronic delivery of material.

**Professional proxy solicitation firm versus in-house solicitation.** It is common for public companies to engage a professional proxy solicitation firm to work with them on various aspects of annual meeting planning and preparation. Proxy solicitors offer a wide range of services which may be difficult for a company to perform on its own, as many necessary components of the annual meeting process require specialized staffing and services. These services can include, for example,

**A public company and its shareholders**

the tactical aspects of the solicitation such as the distribution and mailing of material; strategic advisory services regarding the presentation of the information in the proxy statement, including potential likely voting outcomes on proposals; and campaign management to help ensure optimal voting turnout. In addition, the proxy solicitor will send the company daily voting reports and/or may also provide online, real-time access to voting data, campaign trends, and other analytics and reporting related to the campaign as it progresses.

**Proxy solicitation team.** The corporate secretary's office, working together with the general counsel and the legal department, conducts the annual meeting at most public companies. The investor relations department, which can assist in gaining support from institutional investors with whom it has relationships, is also often involved. The human resources department may also have a role due to the requirement for allowing shareholders to cast an advisory vote on executive compensation. If engaged, the proxy solicitor will often help coordinate both individual and institutional shareholder communications.

Many public companies have learned the benefit of hiring a proxy solicitor to provide strategic advisory services on proposals, especially in the current environment in which achieving a successful vote is increasingly challenging. The proxy solicitor can help in determining whether a given issue is controversial or not, and if so, can offer a broad-based perspective on how to obtain a vote. Generally, the corporate secretary and corporate legal counsel retain the proxy solicitation firm.

**Shareholder profiles.** Ownership data management and analytics are critical functions for public companies as they seek to monitor and engage their shareholders at potentially critical junctures for the company, such as the annual meeting and a proxy vote (especially in cases where an activist investor is involved). Ongoing monitoring and engagement of shareholders, including a solid understanding of the composition of types of shareholders and how they may vote on certain types of issues, help the public company determine an effective proxy solicitation strategy. The proxy solicitor and, in

some cases, the transfer agent can provide the necessary ownership data to determine the balance of ownership among various types of shareholders, such as institutional investors, hedge funds, and activists. Ideally, the transfer agent will be able to provide a complete picture of ownership, including registered shareholder and institutional and insider (street) ownership data. All this ownership data converges to help the company and the proxy solicitation team develop and execute an effective, efficient proxy campaign strategy.

**Executing an effective campaign.** Based on an analysis of the ownership data available from the transfer agent and/or proxy solicitor, the office of the corporate secretary will be well-positioned to develop an effective message strategy for the proxy statement, designed to motivate shareholders toward the desired voting results. The proxy statement has the dual function of both satisfying SEC and state law disclosure requirements, as well as serving as a public company's most broadly distributed investor relations communication.

The board of directors is charged with determining which policies and practices will best serve the collective interests of the company as a whole, taking into account shareholder concerns and preferences and balancing the two where necessary to achieve the best overall results for all stakeholders. Ongoing shareholder monitoring and engagement help the board, as well as executive management and their teams, stay in touch with investor concerns and anticipate potential issues that may arise at the annual meeting. The proxy solicitor monitors the voting and identifies institutional investors and how they vote. Additionally, the board and management must be aware of any implications for the company owing to the annual guidelines of the proxy advisory firms.

At specific times, shareholders generally may be engaged in one or more topical issues that have come to the fore. For example, in 2020, ongoing shareholder concerns continue the trend of the past several years in revolving around board diversity, executive compensation, and ESG proposals. Any or all of these or other currently trending issues may impact corporate governance, and can for example,

serve as motivation for an activist investor to seek to influence board composition and/or other aspects of how the company operates. Board and management preparedness are critical, and ownership data management and analytics are the key to understanding and planning for emergent shareholder concerns.

**Understanding the role and influence of the proxy advisory firms.** Institutional Shareholder Services and Glass, Lewis & Co. are the two major proxy advisory firms. They provide institutional investors with annual analyses and voting recommendations on virtually all US-listed companies, as well as many foreign companies, and are generally viewed as highly influential in shareholder voting trends. While most major institutions have their own voting policies and guidelines, many also factor in the proxy advisory firms' guidance. In addition, some may engage one of the proxy advisory firms to vote their proxies, based on that firm's recommendations. The SEC responded to increasing concerns that the proxy advisory firms may hold excessive sway over voting results, and in 2019 issued guidance regarding proxy voting responsibilities of investment advisers to help institutions that work with proxy advisory firms stay in compliance with proxy voting responsibilities. Proxy solicitors can help in understanding the impact of recommendations, and implications based on a company's governance structure. For example, the solicitor may seek to address such questions as, how much of the shareholder base is influenced by the guidelines? Where does the company profile run afoul of the guidelines?

**Understanding the index funds.** Large index funds are sizable investors in every company. BlackRock, Vanguard and State Street, for example, are significant holders in most companies. Index funds are passive investors. This means that when a private company goes public and meets with investors, the index funds as passive investors are not included. As a result, a new company may have no information about index funds which may own 15% of the company. Investor stewardship committees help assess corporate governance at companies.

### 8.3 Ownership reporting by shareholders
*Simpson Thacher & Bartlett*

After a company's IPO, Sections 13(d) and 13(g) require filings by any person (or *group* in the aggregate) that *beneficially owns* more than 5% of a class of voting equity securities registered under the Exchange Act. The filings must be made with the Securities and Exchange Commission (SEC) electronically. The main purpose of the Section 13(d) and 13(g) reporting requirements is to put a company and its shareholders on notice of large shareholders and possible attempts by them to control or take over the company. Whether a person can file a Schedule 13D or 13G statement is often based on facts and circumstances, including when the securities were acquired and whether such a person is passive (as discussed further herein).

The term *beneficial ownership* is defined to include any person who, directly or indirectly—through any contract, arrangement, understanding, relationship, or otherwise—has or shares:

■ voting power, which includes the power to vote, or to direct the voting of, a security; and/or

■ investment power, which includes the power to dispose, or to direct the disposition of, a security.

In addition, a person is deemed to be the beneficial owner of securities that the person has the right to acquire, generally within 60 days. The practical consequence of this rule is that the person is deemed to be the beneficial owner of equity securities which may be obtained on the conversion or exercise of convertible securities, such as convertible debt, convertible preferred stock, warrants, or certain options. Notwithstanding the foregoing, if a person acquires beneficial ownership over a security with the purpose or effect of changing or influencing the control of the issuer—or in connection with or as a participant in any transaction having such purpose or effect—such person shall be deemed to immediately beneficially own such security, even if such security cannot be converted or exercised within 60 days (assuming no other material conditions to convert or exercise exist at such time).

A *group* is formed for Section 13(d) and 13(g) purposes when persons agree to act together, whether through a syndicate, partnership or other group, for the purpose of acquiring, holding, voting or disposing of equity securities of a company. The *group* formed through such an arrangement is deemed to be a *person* for purposes of Sections 13(d) and 13(g) of the Exchange Act and will be required to file, either jointly or separately, a Schedule 13D statement or Schedule 13G statement (described herein) concerning all of their holdings. No written agreement is required to form a group. In connection with an IPO, certain agreements such as voting agreements and shareholder agreements may include provisions that could create a group. If a person is part of a group that collectively beneficially owns more than 5% of the applicable class, such person will be required to file a Schedule 13D or 13G, even if such person individually beneficially owns less than 5%.

#### (a) Reporting on Schedule 13D
In accordance with the provisions of Section 13(d) of the Exchange Act, any person who after acquiring (directly or indirectly) the beneficial ownership of any shares of a voting equity security of a class registered under the Exchange Act, owns (directly or indirectly) more than 5% of that class of securities is required to file a Schedule 13D, unless such person otherwise qualifies to file a Schedule 13G (as discussed herein). A Schedule 13D requires disclosure of the reporting person's identity, the means of payment for such acquisition, the purchaser's intentions concerning control of the company, plans or proposals with respect to the company, 60-day trading history, and disclosure of certain agreements relating to the company's securities, among other things. Schedule 13D reporting is triggered by the acquisition of shares of a registered class of voting equity securities. However, acquisitions by a 5% beneficial owner—which, together with all other acquisitions by the same person of securities of the same class during the preceding 12-month period, do not exceed 2% of that class—are exempt from Schedule 13D reporting. Accordingly, large pre-IPO owners may not be required to file a Schedule 13D if they do not acquire 2% or more following the IPO.

A Schedule 13D is to be filed with the SEC within 10 days after the acquisition that causes such person to cross the 5% threshold.

Amendments to a Schedule 13D must be filed promptly if any material change occurs in the facts set forth in that Schedule 13D. Any acquisition or disposition of beneficial ownership of 1% or more of the class of securities is deemed *material* for this purpose. Acquisitions or dispositions of less than 1% may also be material, depending on the facts and circumstances.

#### (b) Reporting on Schedule 13G
Schedule 13G is a *short-form* version of Schedule 13D and, unlike Schedule 13D, does not require the reporting person to disclose such person's intentions with respect to his or her ownership of the company's securities, any plans or proposals relating to certain events, or most of the other information required by Schedule 13D. A Schedule 13G primarily discloses the identity of the reporting person and such person's beneficial ownership. There are three categories under which a person may be eligible to file a Schedule 13G instead of a Schedule 13D, which are discussed herein.

Pursuant to the rules promulgated by the SEC under Section 13(d) of the Exchange Act, certain 5% beneficial owners (e.g., brokers/dealers, banks, insurance companies, investment companies and employee benefit plans meeting certain requirements—collectively, *Institutional Investors*) that have acquired such securities in the ordinary course of its business and not with the purpose or effect of changing or influencing the control of the company, nor in connection with, or as a participant in, any transaction having such purpose or effect, may instead report their beneficial ownership on a Schedule 13G that is due within 45 days after the end of the calendar year during which that person became subject to Section 13(d) reporting requirements (if such person beneficially owns more than 5% at the end of such year) or, if earlier, within 10 days after the end of the first calendar month when that person beneficially owns more than 10% of the class.

In addition, persons who (1) have not purchased the securities with any purpose, or with the effect of, changing or influencing the control of the company, or in connection

**A public company and its shareholders**

with or as a participant in any transaction having that purpose or effect and (2) beneficially own less than 20% of the registered class of voting equity securities (collectively, *Passive Investors*) may also file a Schedule 13G instead of a Schedule 13D. In the case of Passive Investors, however, the Schedule 13G must be filed within 10 days after the acquisition that causes such person to cross the 5% threshold.

If, however: (1) any of the foregoing persons acquires or holds the securities with a purpose or effect of changing or influencing the control of the company, or in connection with or as a participant in any transaction having that purpose or effect, (2) an Institutional Investor no longer has acquired or holds the securities in the ordinary course of business or (3) a Passive Investor beneficially owns 20% or more of the registered class, then such person must file a Schedule 13D within 10 days after such event. Moreover, in the case of (1) or (3) above, such persons will be prohibited from voting the securities, and from acquiring any additional beneficial ownership in any equity securities of the company or any of its controlling persons for a period beginning on the date such person is no longer passive or crossed the 20% threshold, as applicable, and ending 10 days following the filing of the Schedule 13D. Having board designees typically disqualifies such person from being eligible to file a Schedule 13G as an Institutional Investor or Passive Investor.

In addition, under Section 13(g) of the Exchange Act, persons that beneficially own more than 5% of a registered class of voting equity securities as of the end of a calendar year who may not fall into the foregoing categories but who are otherwise not required to file a Schedule 13D (for example, a person who has not acquired more than 2% of the outstanding shares over any 12-month period, a person who acquired his or her beneficial ownership prior to the company's registration under the Exchange Act or a person who became a 5% owner without an acquisition due to a reduction in the number of shares outstanding) are eligible to report their beneficial ownership on such a Schedule 13G. Therefore, holders of 5% of a registered class of stock who acquired their shares before the company's securities are registered in an IPO may file a Schedule 13G. This Schedule 13G must be filed within 45 days after the end of the

calendar year in which such person became a 5% beneficial owner, provided that such person beneficially owns more than 5% at the end of such year.

Additionally, this Schedule 13G does not require the reporting person to be passive. However, if such a person acquires more than 2% in any 12-month period, such person will lose eligibility to file such a Schedule 13G, and must either qualify as an Institutional Investor or Passive Investor to remain on a Schedule 13G or switch to a Schedule 13D. If part of a group, acquisitions by all group members should be aggregated for purposes of the 2% test.

Amendments to Schedule 13G must, with limited exceptions, be filed within 45 days after the end of any calendar year in which any change occurs in the facts set forth in the Schedule 13G. Moreover, Institutional Investors and Passive Investors have additional amendment requirements upon the occurrence of certain events.

We note that in February 2022, the SEC proposed amendments to modernize the beneficial ownership reporting framework. Among other things, the proposed amendments would accelerate the filing deadlines for Schedules 13D and 13G reports and clarify the meaning of a "group" for purposes of Section 13(d) and (g).  In April 2023, the SEC reopened the comment period for these amendments, and as of the date this publication went to press, no amendments to the beneficial ownership reporting framework have yet been finalized.

### 8.4 Share ownership mechanics
*AST*

#### (a) Types of share ownership
Shareholders fall into two broad categories: registered holders and beneficial holders. The type of share ownership is determined by how and where shares are held and has a significant impact on the company's ability to monitor and engage its shareholders.
- A registered holder (which may be an individual, group or other entity) owns shares directly in their own name. Their identity and share ownership is recorded on the company register. Shares may be held either by physical stock certificate or electronic entry on company records. In general, a transfer agent is engaged by the company to maintain the register of shareholders

and keep track of ownership and the transfer of shares. Companies have information on registered holders and can communicate directly with them.
- A beneficial holder does not keep stock in their own name; rather, ownership is held by a broker, bank or other custodian. This is often called holding in *street name*. The company's shareholder records do not include the beneficial holder who, furthermore, may opt not to disclose their identity to the company. As a result, the company may not be able to directly communicate with a beneficial holder.

As stated, the beneficial shareholder decides whether to disclose their identity to the company. Thus, beneficial holders fall into two categories:
- Objecting beneficial owners (OBOs) do not allow their identity to be disclosed to the company. OBOs will only receive communications from the company through their broker, bank or custodian.
- Nonobjecting beneficial owners (NOBOs) waive the right to remain anonymous and will accept direct communications from the company. For a fee, the company can request a list of NOBO holders, including names, addresses and shareholding amounts (but not which custodian holds the shares).

***Book entry* and printed share certificates.** Registered holders can document their ownership by either a physical, printed share certificate (which was traditionally how shares were held) or book entry, which records ownership electronically on the transfer agent's register of shareholders, without issuing a physical certificate. Book entry is usually the norm in today's digital environment. It greatly facilitates transfer or sale since no certificate needs to be presented to make the transaction. Additionally, book entry removes the risk of losing a certificate and, if a certificate is lost, the need to post a bond to replace it.

All beneficial holders are automatically book entry holders since their ownership is recorded by their custodian and no physical certificate is ever printed.

**Capitalization table.** An important consideration for a private company before

it goes public is to ensure its capitalization table is in proper order. This is especially true as more private companies are waiting longer before going public, and their cap tables become more complex. Ownership data management tools (sometimes called cap table software) exist for private companies to manage their ownership records and must be reviewed by the attorneys and auditors prior to an IPO. Cap table tracking software allows information on and analysis of current executive ownership, equity value across investment rounds, and equity dilution to flow seamlessly across valuation, regulatory, and compliance functions. Systems utilizing private blockchain technology allow a company to understand the historical ownership of their shares, as well as tracking sales and transfer.

### (b) Recordkeeping

As follows from the above distinctions on types of share ownership and categories of shareholders, a public company will likely have two records of ownership. One is the transfer agent, who is retained by the issuer, and maintains a direct record of share ownership which includes holder names and addresses. The second record of ownership is maintained by brokers, banks or other custodians and consists of shares held in their name on behalf of those who actually own the shares. The company is not automatically privy to this second type of ownership record, though it may be obtained via public records and other data compilation. In some cases, the transfer agent may gather information on beneficial holders and provide it to the company along with the record of registered holders.

The transfer agent handles the transfer, issuance and cancellation of shares. They can provide the company with a list of all registered holders upon request. In today's digital environment, the record of registered shareholders is often maintained via an online database and accessible by the company via a secure portal. Most often, the registered holder list becomes critical in relation to the record date for an annual meeting (or special meeting) and is used to determine holders eligible to vote. Generally, the transfer agent custodies the record of common shareholders and may also record-keep other types of securities, such as preferred stock or bonds.

Transfer agent responsibilities also include:
- payment of dividends;
- tax reporting;
- dividend reinvestment plan (DRIP) administration;
- escheatment and lost shareholder reporting;
- stock option issuance;
- restricted stock transfers;
- registrar of shares, acting to ensure the number of shares issued does not exceed the number of shares authorized in the company charter; and
- annual and special meeting services, such as mailing proxy material to all registered holders and tabulation of returned votes.

Transfer agents are regulated by both the SEC and their state of incorporation. The regulations govern many aspects of securities transactions, including:
- processing time for transfers;
- responsiveness to inquiries;
- accuracy of recordkeeping;
- records retention;
- secure handling of stock certificates;
- safeguarding of funds and securities; and
- search for and track lost shareholders.

States govern the handling of lost shareholders and the process for turning over securities in inactive or abandoned accounts (known as escheatment). State requirements for escheatment processes vary greatly and can only be addressed on a state-specific basis. Also, the Internal Revenue Service requires transfer agents to report payment of dividends and shares sales via Form 1099 and may require the transfer agent to begin or cease tax withholding.

**Equity compensation plan.** As a private company going public reassesses its equity compensation plan, it may choose to work with a transfer agent that also offers employee equity plan solutions. Having all shareholder data (including your employee shareholders) in one centralized location, for both shareholder registry and equity plan award purposes, reduces potential issues around data transfer and simplifies another complexity of life as a public company

by consolidating services with a single provider.

### (c) Transfer of shares and voting

As stated above, the transfer agent handles the transfer of shares for registered holders, and generally also handles the mailing of proxy material and vote tabulation. The transfer agent may also provide strategic advisory services on the annual meeting. Some transfer agents are part of a larger professional services firm that may additionally offer proxy solicitation services, with the advantage for the company of working with a one-stop shop and benefiting from having the full range of relevant services managed in an integrated fashion.

For street name shares held by brokers, banks or other custodians, which as a result do not appear on the ownership record maintained by the transfer agent, a different procedure governs. The street name shares are held by the Depository Trust & Clearing Corporation (DTCC). DTCC in turn has a subsidiary, the Depository Trust Company (DTC), which shows as owner on the register under the name of its nominee, CEDE & Co.

DTC was established to help the industry adopt and use book entry instead of physical stock certificates, and thus expedite securities transactions via electronic trading. When shares are bought and sold, DTC allocates them the participating broker, bank or other custodian for whom they hold the shares. Since the shares in DTC's name are not actually owned by them, DTC maintains its own list of beneficial holders and their share ownership. The brokers and banks in turn maintain record of beneficial holders, including contact information.

Corporate dividends are paid on behalf of an issuer by the transfer agent directly to registered holders. For the shares held in street name at DTC, a single payment is made to CEDE & Co. (DTC's nominee). DTC apportions the payment to each participating broker, bank or other custodian, who in turn apportions payments to beneficial holders.

For purposes of mailing communications to shareholders, including material for proxy voting:
- The transfer agent mails all materials of all types to all registered holders, including proxy voting material.

**A public company and its shareholders**

■ The brokers, banks or other custodians mail to all street name beneficial holders. When a proxy vote is involved, the underlying process is somewhat complex, beginning with DTC formally disclaiming share ownership and providing participating brokers, banks and other custodians with an omnibus proxy. The brokers, banks and other custodians in turn mail material to the actual beneficial holders of the shares. Any proxy cards are sent back to the brokers, banks and other custodians, who send them to the transfer agent for tabulation.

Virtually all brokers, banks and other custodians outsource mailing of proxy material to beneficial owners for efficiency and cost savings. They will use an intermediary who mails and tabulates votes on their behalf, and then returns votes to the transfer agent. The intermediary may also be engaged in the distribution of non-proxy materials.

**(d) Escheatment**

All 50 states and all US territories require issuers' transfer agents to report unclaimed or abandoned property. Complete, accurate records must be maintained on all account activity for the purpose of determining the status of property as potentially unclaimed or abandoned. Uncashed dividend checks or returned mail may point to a lost shareholder. Inactivity or abandonment of property triggers escheatment, the process by which abandoned property is transferred to the state or territory.

Property is deemed abandoned once a certain period of account inactivity has passed. This is known as the *dormancy period*. Each state's regulations define the dormancy period, and the types of shareholder activity that avoid dormancy.

Each jurisdiction requires the transfer agent (on behalf of the issuer) to perform due diligence mailings prior to escheating the property. Upon completion of due diligence, if no activity or shareholder validation occurs, the transfer agent (on behalf of the issuer) will file unclaimed property reports with the states, then turn over the property to the state.

Accurate records help protect all parties, ensuring compliance with all lost shareholder and escheatment regulations; timely completion of all required escheatment; and proper conduct of the escheatment. States regularly conduct escheatment audits of companies and their transfer agents.

Additionally, records must be maintained following escheatment, in the case of a lost shareholder seeking return of property at a later date. The shareholder must directly contact the state to retrieve property.

nyse.com/ipo

# 9
# Managing risk



nyse.com/ipo

**Managing risk**

### 9.1  Liability under the federal securities laws
*Simpson Thacher & Bartlett*

Given the legal regime in the United States, inherent in conducting an IPO and life as a public company thereafter is the reality that you can be exposed to vexatious lawsuits.

Liability under the US securities laws in connection with an IPO primarily arises under the Securities Act. Exchange Act claims are also possible. The Securities and Exchange Commission (SEC) has broad powers to investigate public companies and their directors and officers. It can bring civil enforcement proceedings that could result in fines and monetary penalties or other sanctions (such as a bar from serving as a director or officer of a public company). In addition, a public company and its directors and officers could also become subject to criminal liability for, among other things, willful violations of securities laws or interference with a government investigation. Finally, many of the provisions of the securities laws also provide for private rights of action in which investors individually, or as representatives of a class, can bring a lawsuit against the company and its directors and officers. These private class action lawsuits are the most common proceedings to which companies and their directors and officers are subject for alleged misstatements or omissions in connection with registered securities offerings.

■ Securities Act, Section 11 liability: Under Section 11, the issuer, its directors, its principal executive, its financial and accounting officers, its underwriters and a foreign issuer's authorized US representative can be liable for material misstatements or omissions in the issuer's registration statement. "Experts," such as the issuer's accountants, can also be held responsible and sued directly for misrepresentations made on their authority. Section 11 entitles a purchaser of securities in a registered offering, or whose securities are "traceable" to those distributed in such offering, to obtain damages for a violation. While the issuer is subject to strict liability for material misstatements and omissions in its registration statement, nonissuer defendants (i.e., all defendants, other than the issuer itself) are afforded, among other defenses, an affirmative due diligence defense if they can show that "after reasonable investigation, [they had] reasonable ground to believe and did believe" that statements made in the registration statements were not misleading.

■ Securities Act, Section 12 liability: Under Section 12(a)(2), the issuer, its officers and directors, its underwriters and other persons can be liable if they sell or solicit the sale of a security by means of a prospectus or an oral communication containing a material misstatement or omission. Section 12(a)(2) permits a purchaser of securities in a registered offering, or whose securities are "traceable" to those distributed in such an offering, to obtain rescission of the sale or damages in certain circumstances. Nonissuer defendants similarly have an affirmative defense if they "did not know, and in the exercise of reasonable care could not have known," of the misrepresentation.

■ Securities Act, Section 15 liability: Under Section 15, any person who "controls" a primary violator of Section 11 or 12 can also be held liable under a theory of secondary liability. "Control" exists if the defendant has the direct or indirect power "to direct or cause the direction of the management and policies" of the primary violator (typically the issuer) through stock ownership, contract or other means. Control person claims are frequently asserted against officers and directors of issuers and can be brought against a controlling shareholder or group of shareholders, in connection with Section 11 and 12 lawsuits. Defendants have an affirmative defense if they "had no knowledge of or reasonable ground to" know the facts underlying the violation.

■ Exchange Act, Section 10(b) and Rule 10b-5: A Section 10(b) and SEC Rule 10b-5 claim is the most commonly asserted claim against public companies, officers and directors, underwriters and accountants and other persons. A claim can be brought for use of "any device, scheme or artifice to defraud," any material misstatement or omission, or "any act, practice, or course of business" that deceives in connection with the purchase or sale of securities.

A claim can be brought concerning statements made in connection with a public offering or with secondary market trading based on misstatements made in press releases, officer or director communications and periodic reporting, among other things. Unlike the Securities Act claims discussed previously, however, in order to establish a violation of Section 10(b), a defendant must be shown to have had "scienter"— an intent to defraud or otherwise engage in reckless conduct. The plaintiff must also demonstrate "loss causation"—a connection between the defendant's alleged misconduct and the economic harm suffered.

■ Exchange Act, Section 20(a): Similar to Section 15 of the Securities Act discussed previously, Section 20(a) of the Exchange Act provides for secondary liability. Any person who "controls" a primary violator of Section 10(b) or Rule 10b-5 can also be held liable under a theory of secondary liability. Section 20(a) provides an affirmative defense for persons who acted "in good faith and did not directly or indirectly induce […] the violation."

As mentioned previously, Section 11 of the Securities Act provides nonissuer defendants (including directors, officers and underwriters) with an affirmative "due diligence" defense if they can show that "after reasonable investigation, [they had] reasonable ground to believe and did believe" that statements made in the registration statement were not misleading. Similarly, nonissuer defendants have an affirmative defense to a claim under Section 12 of the Securities Act if they "did not know, and in the exercise of reasonable care could not have known" of the alleged misrepresentation. Defendants in a Securities Act, Section 15 or Exchange Act, Section 20 "control person" claim have an affirmative defense if they "had no knowledge of or reasonable ground to" know the facts underlying the violation or acted in "good faith," respectively. A defendant in an Exchange Act, Section 10(b) or Rule 10b-5 claim must be shown to have had an intent to defraud or been reckless. A nonissuer defendant that is able to establish that he, she or it performed a reasonable investigation sufficient to establish an

affirmative defense under Section 11 will typically also be thereby able to defeat claims under each of the other provisions as well. It is for the purposes of establishing such a defense under Section 11 and these other provisions that underwriters and other offering participants engage in extensive due diligence on the issuer and its business in connection with an IPO. It should be noted that, as a procedural matter, the affirmative due diligence defense, typically, is not available at the incipient "motion to dismiss" stage of a securities litigation (when a plaintiff's allegations must be assumed to be true), but rather only after discovery has been taken and the defendant moves for "summary judgment." An issuer arriving at this later stage of a securities litigation will typically have already incurred significant expense, and companies accordingly have a significant incentive to settle these actions.

## 9.2 Class action and derivative lawsuits
*Marsh*

(Note: Some information in the following sections is taken from *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review,* published by NERA Economic Consulting, a unit of Oliver Wyman Group. Marsh and Oliver Wyman are both wholly owned subsidiaries of Marsh & McLennan Companies.)

Imagine the shock if the newly public company were to be served with a federal securities class action lawsuit within three days following the initial public offering (IPO). This happened to a significant new issuer in 2012. In fact, most securities claims are filed within three years of an IPO and there is a significantly higher probability that a securities class action will arise if an IPO is involved. As such, when managing risk in a newly public company, it is critical to understand the primary civil liability exposures faced by directors and officers.

### (a) Direct class actions
The primary exposure for directors and officers of US-listed companies continues to come from federal securities laws—in particular, sections of the Securities Act of 1933, the Exchange Act of 1934 and SOX. Claims made against directors and officers under these statutes are frequently brought

as class action litigation, where damage awards and settlement proceeds go directly to the shareholders allegedly harmed. There are also statutes that may have industry-specific application.

The Securities Act is designed to prevent fraud in securities offerings and to assure that investors receive full disclosure in connection with the offer and sale of securities by the company. As such, the Act imposes a high standard of conduct on directors and officers of the company. Section 11(a) of the Act states that a person who purchased a security covered by a registration statement (e.g., an IPO and secondary public offering of equity or debt) may recover damages from, among others, the company and its directors and officers who sign the registration statement if the registration statement:

- contained a misstatement of material fact; or

- omitted to state a material fact that either was required to be stated or was necessary in order for the registration statement not to be misleading (this includes anyone who has consented to be a director of the company and is named as a director in the registration statement, not just those who have signed the registration statement).

While the company is strictly liable for violations of Section 11 (i.e., there is no need to prove intent), directors and officers may avoid liability if they are successful in establishing their own defense. If the misstatement or omission occurred in a part of the registration statement not passed upon by an expert (e.g., an auditor's report), the director or officer must demonstrate that he or she had, after reasonable investigation, sufficient grounds to believe that the disclosure statements were true or that material statements were not omitted. If the misstatement or omission occurred in a part of the registration statement passed upon by an expert, a director or officer need only show that he or she had no reasonable grounds to believe that that portion was materially untrue or omitted to state a material fact. There is no requirement under Section 11 to show that directors and officers intended to defraud investors. This is often referred to as *scienter*.

With the US Supreme Court's March 2018 ruling in *Cyan, Inc., et al. v. Beaver County Employees Retirement Fund, et al.* (138 S. Ct. 1061, 2018), Section 11 claims have become increasingly problematic for companies contemplating an IPO. In *Cyan*, the Court held that state courts have concurrent subject matter jurisdiction over class actions alleging Section 11 violations. Allowing Section 11 litigation to take place in federal, state or federal and state court at the same time, the *Cyan* decision creates the possibility for inconsistent outcomes, increased defense costs and settlement values. However, since that decision, several state courts have affirmed the validity of federal forum provisions when they are written into the corporate charter as part of the registration statement.

A related but separate issue is whether directors and officers liability (D&O) insurance policies should also include affirmative coverage for violations of Section 15 of the Securities Act. Section 15 provides that any person who is deemed to control any person found liable under Section 11 or 12 will share liability for the damages imposed on the controlled person. Companies undergoing an initial public offering might seek such affirmative coverage, particularly companies whose directors and officers might be deemed control persons following the IPO.

Turning to the Exchange Act, the objective of this legislation is to increase the information available to public company investors through the implementation of disclosure requirements and to prevent unfair practices in US securities markets. As discussed earlier, Rule 10b-5 has broad application and includes statements or omissions in the company's Exchange Act filings (e.g., Forms 10-K, 10-Q and 8-K). The rule prohibits any practice to defraud investors, including making any untrue statement of material fact or omitting a material fact in the company's filings. Actions may be brought against the company and/or its officers or directors by private parties, the Securities and Exchange Commission (SEC) or the Department of Justice. In general, Rule 10b-5 liability is broader than Section 11 liability as applied to the directors and officers of the company. Moreover, plaintiffs' lawyers must demonstrate *scienter*, which is an intention by a defendant director or officer to defraud.

**Managing risk**

**(b) Shareholder derivative suits**

Another frequent source of potential liability and expense is what is commonly called a *derivative suit*. These are lawsuits brought by shareholders on behalf of the company against individual directors and officers and typically allege violations of state and common law fiduciary duties owed to the company or other wrongdoing. Historically, most shareholder derivative suits were resolved through payment of fees to plaintiff's counsel and by the company's adoption of certain corporate governance and management reforms negotiated between the company and the plaintiffs, the purposes of which are to strengthen protections for investors and enhance shareholder value.

Until recently, derivative actions had rarely resulted in substantial monetary recoveries. But over the last five years, there have been a number of derivative actions with settlements exceeding $175 million. When monetary settlements or damages are involved, such awards generally go to the benefit of the company itself and not directly to shareholders. Shareholder derivative lawsuits, which have been increasing in frequency, usually settle in tandem with outstanding class action litigation and are often called *companion* or *tagalong* cases. These suits are often brought in multiple jurisdictions and can sometimes involve inconsistent outcomes (*In re Oracle Corp. Derivative Litigation*, 2003 WL 21396449 [Del Ch June 17, 2003]).

Two common bases of liability in shareholder derivative actions include violations of the duty of care and the duty of loyalty, discussed in more detail in the following section, but may also include excessive officer compensation, proxy violations, option plan violations, related party transactions, misappropriation of corporate opportunities and corporate waste:

■ Duty of care—Directors and officers owe the company and its shareholders a duty of care. They must act on an informed basis and in a manner that they reasonably believe to be in the company's best interests, exercising the degree of care that an ordinarily prudent person in a similar position would exercise. The duty of care focuses on the decision-making process. When

directors or officers are accused of breaching their duty of care, generally the *business judgment rule* shields their decision by presuming that in making the decision, the directors and officers were informed, acted in good faith and honestly believed that the decision was in the best interests of the company and its shareholders. To support application of the business judgment rule, directors and officers generally should be proactive and attentive, regularly attend board meetings, meaningfully evaluate alternatives and deliberate as a board with adequate and complete information. Where appropriate, the board of directors should also consider retaining financial advisors, counsel and other experts to provide input and guidance.

■ Duty of loyalty—Directors and officers owe the company and its shareholders a duty of loyalty. Again, they must act in good faith and in the reasonable belief that their actions are in the best interests of the company. Loyalty issues arise when a director or officer has a conflict of interest or lacks independence with regard to a particular business decision or personally profits from an opportunity at the expense of the company. In evaluating claims for breaches of the duty of loyalty, courts generally will examine the decision-making process but may also evaluate the substance of the business decision to determine fairness to the company and its shareholders. To help avoid liability, interested directors should disclose potential conflicts and opportunities to other directors and abstain from deliberations and voting on any decisions where an actual conflict exists and consider abstaining where the appearance of a conflict exists.

**(c) Frequency and severity of securities class action suits**

According to NERA, the total number of securities class actions suits dropped each year from 2019 through 2022.

It is important to recognize recent trends in securities class action litigation. An understanding of these trends can impact decisions concerning D&O insurance,

including limits purchased, coverage selection and premium trends.

Total suits were 421 in 2019 and 205 in 2022. However, this is driven primarily by merger objection claims no longer being filed as a class action in federal court. The number of standard cases (Rule 10b-5, Section 11, or Section 12) have remained more consistent over this time period.

Given the IPO boom in 2020 and 2021, the number of publicly traded companies has reverted back to 2002-2003 levels. With the reduction in the number of suits, in 2022, the average listed company in the United States had a 3.3% change of being the target of a securities class action.

The average settlement value of these lawsuits increased from $21 million in 2021 to $38 million in 2022. The median settlement value in 2022 was $13million from $8 million in 2022. It is important to note that these numbers do not include defense costs which can be substantial.

**9.3 Indemnification**
*Marsh/Simpson Thacher & Bartlett*

Generally, indemnification of officers and directors is governed by the law of the state of incorporation. All 50 states provide for corporate indemnification and address situations where the company may indemnify its officers and directors and situations where the company must indemnify its officers and directors. To understand when indemnification is permitted by the company, look to the company bylaws or charter.

In Delaware, for example, the statute merely authorizes indemnification where not considered mandatory by statute (as further discussed later), meaning a director or officer is not necessarily entitled to indemnification unless the company charter or bylaws contain necessary authorizing language to permit indemnification. Delaware corporations may structure their certificates of incorporation to limit the liability of their directors to situations involving:

**Federal Filings and Number of Companies Listed in the United States
January 1996-December 2022**



Note: Listed companies include those listed on the NYSE and Nasdaq. Listings data obtained from World Federation of Exchanges (WFE).
The 2022 listings data is as of November 2022.

Source: NERA Economic Consulting

- breaches of their duty of loyalty (including improper personal benefit) to the company and its shareholders; and
- acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of the law.

It is important for directors and officers of public and nonpublic companies to seek counsel on and understand the indemnification provisions of company bylaws and/or indemnification agreements to which they will be subject. Review of the provisions and/or agreements should occur not simply prior to an IPO, but on a periodic basis as well.

Be mindful of features (or absence of features) in the company bylaws, charter or corporate indemnification agreements that could impair one's ability to seek indemnification. Two examples of such provisions include:

- a provision that fails to obligate the company to reimburse a director's or officer's claim for costs and expenses for enforcing the company's obligation to indemnify; and
- a provision that forces a director or officer to bear the burden of proof to demonstrate entitlement to indemnification.

Several common questions that arise regarding indemnification follow.

When must the company indemnify its directors and officers? Section 145(c) of the Delaware General Corporation Law requires a corporation to indemnify a director or officer when the person to be indemnified has been successful on the merits with respect to a claim against him or her. In other words, if the director or officer defends the claim on the merits and is vindicated of any wrongdoing, it is mandatory that the company indemnify that individual for the costs and expenses, including attorneys' fees, incurred in connection with the claim. Section 145(c) was recently amended and now provides that, effective December 31, 2020, the "officers" entitled by statutory

default to mandatory indemnification under Section 145(c) will generally be (1) the corporation's president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer and (2) any individual identified in public filings as one of the most highly compensated officers of the corporation. The amendments also provide that a corporation has the flexibility to specify other officers who will be entitled to mandatory indemnification.

What is the nature of the conduct required for the company to indemnify its directors and officers? Under Section 145(a) of the Delaware General Corporation Law, a corporation may (but need not) indemnify a director or officer only "if such person acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the corporation." In the criminal context, a director or officer must also have had no reason to believe his or her conduct was unlawful in order to be indemnified. Outside of the mandatory indemnification

**Managing risk**

## Federal Filings by Type
## January 2013-December 2022



Source: NERA Economic Consulting

discussed in the prior paragraph, companies frequently provide broader indemnification protections in recognition that only a small proportion of situations may require a company to indemnify with a larger proportion of situations permitting a company to indemnify.

Even if a director's or officer's conduct is of the type that can be indemnified, the company's ability to indemnify him or her may be limited or prohibited by state statute. For example, the Delaware statute authorizes the company to indemnify directors and officers only for expenses incurred by them in defending shareholder derivative suits brought by or on behalf of the company. The Delaware statute does not authorize indemnification of settlements or judgments in such actions. The rationale is that if the company indemnified the directors or officers for amounts they owed to the company, the result would be a return of funds back from the company, rendering the debt owed to the company meaningless.

To what extent is an individual's liability limited as a matter of law? The state in which the company is incorporated will determine the extent to which a director's

or officer's liability to the company is limited as a matter of law. Almost all states have adopted statutes that limit the liability of directors—and, in some instances, officers—under state law. Like Delaware, many states allow companies in their charters to limit or eliminate the personal liability of directors for damages in claims by the company and its shareholders (Section 102(b)(7) of the Delaware General Corporation Law). Notably, the Delaware statute does not eliminate liability for conduct not taken in good faith or for breach of a director's duty of loyalty.

From whom does a director or officer seek indemnification? In short, it depends. Indemnification is not self-executing. The company bylaws, charter and any corporate indemnification agreement between a director or officer and the company will determine:

- who evaluates and approves requests for indemnification; and
- whether a director or officer may be indemnified in a particular case and, if so, whether the director or officer may receive an advancement from the company to pay for expenses incurred in connection with the matter.

In the absence of specific provisions related to who evaluates and approves requests for indemnification, the decision is generally made by a majority vote of disinterested (nondefendant) directors, a committee of disinterested (nondefendant) directors or upon the recommendation of independent legal counsel in a written opinion.

If the company is either unwilling or unable to indemnify a director or officer for expenses, damages or settlement amounts, the director or officer may be able to seek payment directly from insurers, depending on the nature and breadth of insurance coverage under insuring agreement A of the company's D&O insurance policy (commonly called *Side A*). Notably, the ability of a director or officer to seek timely reimbursement directly from insurers may differ significantly, depending on the exact terms, conditions, exclusions and limits of liability of insurance that are purchased by the company. Today, most Side A policies are poised to begin responding to a loss on behalf of a director or officer within 60 days if the director or officer has not received a response from his or her company regarding whether it

will indemnify the director or officer for the matter in question.

Does the company have to advance the costs and expenses incurred in defending against a claim made against a director or officer? The ability of the company to advance defense costs in a timely manner to its directors and officers can be critical in attracting independent directors because the cost of defending a lawsuit can be immediate and substantial and may directly influence both the nature and quality of the defense presented on behalf of the directors and officers.

Rights to advancement are governed under a combination of state law, corporate bylaws and corporate indemnification agreements of the company and are separate and distinct from the obligation of indemnification. For example, a right to advancement of defense costs may be broader and less restrictive than an individual's right to indemnification. Because the determination as to whether an officer's or director's conduct is indemnifiable generally cannot be made until the end of a claim or proceeding, Section 145(e) of the Delaware General Corporation Code permits (but does not require) a corporation to advance defense costs, including attorneys' fees, to defend against a claim for something that, if true, would be an indemnifiable claim; but only if the claimant submits to the company a written undertaking to repay the amounts advanced if it is ultimately determined that he or she is not entitled to indemnification. Specific attention also should be paid to other conditions that may have to be met in order to receive timely advancement.

A note of caution: in light of a 2008 Delaware court decision in *Schoon . Troy Corp* (948 A 2d 1157 [Del Ch 2008]), directors and officers relying on indemnification provisions in company bylaws should understand whether:

- the bylaws include language stating that the rights of directors and officers to advancement of legal expenses vest upon commencement of services;
- these rights are contract rights; and
- the bylaws state that they cannot be amended retroactively to impair those rights.

Although Delaware has since amended its corporations code to reverse the

effect of *Schoon v. Troy Corp*, it serves to highlight the potential importance for directors and officers to consider separate indemnification agreements with the company that specifically address advancement of expenses, including provisions that prohibit modifications to such an agreement without the written consent of the director or officer.

## 9.4  D&O liability insurance
*Marsh*

It is clear that companies and their boards of directors may well face lawsuits at some point. While most boards take their responsibilities seriously and try to execute them properly, that intent does not confer immunity. Shareholders and other stakeholders—often prompted by an aggressive plaintiffs' bar—can be expected to sue when they see themselves as having been wronged. Thus, in addition to doing everything possible to execute their responsibilities properly and effectively, those charged with corporate governance should also protect themselves with D&O insurance.

Most D&O insurance policies for public companies provide financial protection to more than just individual directors and officers. They also afford a significant degree of protection for certain financial obligations of the company. As a result of this dual protection, directors and officers must be aware that, at certain times, their interests and those of the company may diverge, particularly if claims are made that may approach or exceed the shared limits of liability for all the insureds taken as a whole. Directors and officers should understand the basic coverage and limits of their particular policies.

D&O policies are generally written on a *claims-made* basis. Under such policies, the making of a claim against the insured during the term of the policy—not the occurrence of injury or damage—is the operative threshold event to which the policy responds. Some policies also require that the insured report the claim to the insurer within the policy period (or within a brief window of time thereafter).

Most D&O insurance policies have one or more of the following three basic insuring agreements (see chart in (a) Overview of D&O Contract Construction):

- Side A: Personal asset protection for officers and directors—Insuring Agreement A, commonly referred to as *Side A*, covers a loss incurred by individual directors and officers resulting from claims for which the company has not indemnified them. A director or officer need not pay a retention or deductible in the event Side A insurance proceeds are sought if the company is unable or unwilling to indemnify the individual director or officer directly.
- Side B: Corporate reimbursement insurance—Insuring Agreement B, also called *Side B*, reimburses the company for its indemnification of an officer or director for claims made against them. Side B coverage is commonly referred to as corporate reimbursement coverage. A deductible or retention applies for claims made under Side B.
- Side C: Corporate coverage against securities claims—Insuring Agreement C, also called *Side C*, protects the company against a loss resulting from, in the public company context, a securities claim made directly against it. Side C coverage is commonly referred to as balance sheet protection. A deductible or retention also applies for claims made under Side C.

A D&O insurance program can be customized to meet the particular demands of a public company and its officers and directors. Many companies, however, commonly purchase a D&O insurance policy in which a single limit of liability is shared equally among all three insuring agreements. The effect of this is that a single policy limit protects both the personal assets of directors and officers and certain financial obligations of the company. Companies also frequently purchase additional, dedicated limits of Side A coverage, with broad policy terms and conditions, and a difference in conditions (DIC) feature (see discussion in (b) D&O insurance and indemnification). Companies purchase these additional limits for a number of reasons, including considerations related to premium pricing, philosophical predispositions and the dedicated nature (the company cannot access the limits) of the broader protection afforded individual officers and directors in such Side A policies.

Managing risk

**(a) D&O policy provisions**

Certain provisions in a D&O policy may affect the extent to which the policy responds favorably. Some of the key concepts are discussed in the following section.

**Rescission.** Material misrepresentations or nondisclosure of material information in the course of the application process for a D&O insurance policy may result in the insurer seeking the drastic remedy of policy rescission or avoidance. Through rescission, an insurer voids coverage under the policy for all insureds and returns the premium paid by the company. Rescission of an insurance policy by an insurer may result in severe consequences for the company and its directors and officers. A successful rescission results in all or a portion of the D&O insurance policy becoming null and void and, ultimately, can result in a loss of coverage for all named insureds on the policy, including innocent directors and officers. Many D&O policies today can be negotiated to make some or all insuring agreements nonrescindable.

As another—and perhaps better—alternative, the company may seek a policy that is not rescindable for any reason. Obtaining a fully nonrescindable policy may involve trade-offs in other coverage or additional premium.

Frequently, the company's periodic securities filings and financial statements under the Exchange Act and registration statements under the Securities Act are expressly made part of the application for D&O insurance. Claims of inaccurate or incomplete disclosure in such filings incorporated into the application for insurance may be the basis for claims made by insurers that the application was materially false or misleading. As a result, accounting restatements—depending on their nature, scope and magnitude—may provide insurers with an additional basis to attempt to rescind a D&O insurance policy.

**Severability of the application.**

Rescission raises the concept of severability. In this context, severability simply relates to the question of whether the knowledge of one or a limited number of covered officers or directors will be imputed to (and potentially result in a loss of coverage for) all the insureds named in a policy (including the company itself). Severability imposes a limit on the extent to which the knowledge of one individual insured is imputed to the company and other insured individuals. As a result, nearly all D&O insurance policies contain provisions which state that no insured person's knowledge will be imputed to any other insured and which limit the identified individuals—usually the CEO and CFO—whose knowledge will be imputed to the company (as an insured itself).

**Conduct exclusion.** Almost all D&O policies contain exclusions barring coverage for certain "bad conduct" by directors or officers. Generally, they include:

- intentionally dishonest acts or omissions;
- fraudulent acts or omissions;
- criminal acts;
- willful violations of any statute, rule or law;
- an insured's obtaining an illegal profit; and
- an insured's obtaining an illegal remuneration.

From an insured's perspective, each of these exclusions should be limited as much as possible. For example, as noted previously, it is important to consider enhancements to a policy so that the conduct of any one insured director or officer will not be imputed to any other insured. This should limit the exclusion of coverage to the individual directors or officers who actually committed the excluded conduct, while maintaining coverage for other insureds.

It is also important to clarify the point at which coverage exclusions apply or are triggered. Policies should state that the exclusions apply only if the excluded conduct was established in connection with a *final non-appealable adjudication* in the underlying claim, as this generally better protects directors and officers. However, although *pure* final adjudication language provides broad protection for individual directors and officers, it could result in the depletion of limits, leaving less in available limits to protect "white hat" directors and officers.

**Priority of payment provisions.** Unlike many other types of commercial insurance, traditional D&O policies protect two distinct sets of beneficiaries: the company's individual directors and officers and the company. Because there is a limit of liability for D&O insurance programs, situations may arise in which insurance proceeds may have to be prioritized among the insured parties. Typically, a priority of payments provision requires that the claims against the individual directors and officers be satisfied first, before claims against the company are satisfied.

However, sometimes this provision may have unintended consequences. For example, a situation may arise in which a number of concurrent claims are made against the company and its individual directors and officers. This could include shareholder derivative suits (settlements of which may not be indemnifiable by the company) and securities class actions (settlements of which are indemnifiable). If the securities class action suits are settled before the settlement of the shareholder derivative actions, insurers may delay payment of any proceeds under the policy for a securities claim until settlement of the shareholder derivative action. A delay in such a settlement payment may adversely affect timing or funding of a proposed settlement of such a claim.

***Entity versus insured* exclusion.**

Many D&O policies contain a so-called entity versus insured exclusion, which bars coverage for a claim brought by an insured company against an insured director or officer or another insured corporate entity. This exclusion has historically been broader than it is today, so many of the concerns about the overreaching nature of this exclusion have been eliminated. However, there remain certain exceptions to this exclusion that should be considered, most of which relate to situations in which a company finds itself in insolvency or bankruptcy.

**(b) D&O insurance and indemnification**

Directors and officers no doubt find it especially troubling when the company is financially able to indemnify or advance defense costs to them but chooses not to or simply ignores their requests. Many directors and officers assume that in such a circumstance, the company's D&O insurance policy would respond. But that might not be the case. In a traditional D&O policy, if the company is permitted to indemnify an officer or director but chooses

**Overview of D&O Contract Construction**



not to, the insurer often will first seek the application of a *self-insured retention* (in other words, a deductible) that under ordinary circumstances would not apply. This is sometimes called a *presumptive indemnification* requirement. Under this circumstance, the self-insured retention would have to be paid by an officer or director prior to accessing any proceeds of a D&O policy. In some cases, the self-insured retention may be substantial. Directors and officers should seek clarification from their insurance brokers and counsel on the extent to which their D&O insurance policies allow directors and officers to access the policy proceeds in the event the company is able but unwilling to indemnify or advance defense costs to them. In fact, most

traditional primary D&O policies, similar to Side A D&O policies, are now responding to a loss on behalf of a director or officer within 60 days if the director or officer has not received a response from his or her company regarding whether it will indemnify the director or officer for the matter in question. This has significantly reduced the punitive aspect of presumptive indemnification.

A properly constructed D&O policy generally is meant to provide a level of protection for individual directors and officers in the event the company's indemnification or advancement obligation inadequately protects them. Outlined in the following section are some specific circumstances where an individual officer or director may expect such protection.

**Derivative suit judgments or settlements.** The ability of the company to indemnify its officers and directors for judgments or settlements resulting from a shareholder derivative action may be significantly limited or prohibited by statute in a company's state of incorporation. For example, Delaware generally does not allow indemnification of settlements or judgments in an action brought by or on behalf of the company unless the court permits such action. In such circumstances, Side A coverage may apply as long as the conduct of individual directors and officers also complies with the limitations and exclusions of the insurance policy.

Public policy prohibition against indemnification. Indemnification for claims

**Managing risk**

related to registration of securities and antifraud provisions of the federal securities laws (and other federal statutes, such as the Racketeer Influenced and Corrupt Organizations Act and antitrust laws) may be precluded by public policy. The SEC's view is that such indemnification is against public policy because it undermines the securities laws' deterrent effect. However, the SEC does not regard the maintenance of D&O insurance as against public policy, even where the company pays the premium. As a result, it may be possible for insurance to respond to protect individual directors and officers in such circumstances where indemnification from the company is prohibited as a matter of public policy.

**Conduct not in *good faith* and *reasonable belief*.** The company may indemnify a director or officer only if such person acted in good faith and in a manner that he or she reasonably believed to be in, or not opposed to, the best interests of the company. As a result, acts that do not satisfy the *good faith* and *reasonable belief* standard may not be indemnified by the company. In such circumstances, claims made against an individual director or officer may be insurable so long as the conduct of such individual also complies with the limitations and exclusions of the insurance policy.

**Refusal by board to indemnify.** If the board or other authorized designee either declines in writing to indemnify an individual or fails to make or initiate a determination to indemnify an individual, insurance may respond to protect individual directors and officers, but it may be subject to a retention or deductible depending on the structure of the program.

To avoid a circumstance where an individual insured might be personally responsible to pay a retention, many public companies today purchase either excess Side A coverage or a variation of Side A insurance often referred to as Side A DIC (the *DIC* refers to the *difference in conditions* provisions that are contained in this type of insurance policy). Side A DIC insurance provides broader coverage and is often purchased in addition to and in excess of the traditional D&O (Sides A, B and C) insurance described previously. In a circumstance where the board or other authorized designee declines to indemnify

an individual as described previously, Side A DIC insurance, or excess Side A only coverage, could be called upon to provide directors and officers coverage at the primary level of the program (no retention).

**Near insolvency.** Should the company approach insolvency, it will approach the *zone of insolvency*, where officers and directors may be deemed to owe certain fiduciary duties to creditors of the company. Although not yet insolvent, the company might choose not to indemnify a particular director or officer for fear that such act may be a breach of fiduciary duty owed to creditors of the company or may be the subject of an order by a bankruptcy trustee to return those proceeds. Insurance may respond if limits of the policy are not otherwise eroded.

**Actual insolvency or bankruptcy.** The company either may be insolvent or, in the context of US bankruptcy laws, may be unable or unwilling to indemnify an officer or director if the bankruptcy trustee determines that such indemnification is either unwarranted or improper. Moreover, assuming that such indemnification of an officer or director was warranted and proper, the proceeds of the policy might be deemed an asset of the *estate* and subject to an automatic stay. The obligation to indemnify may be deemed an unsecured obligation, placing the affected officer's or director's interest behind the interests of secured creditors and on par with other unsecured creditors awaiting payment or settlement.

If there is some risk that the company may avail itself of the protection of US bankruptcy laws, it may be useful to seek an explanation from the company's insurance advisor and counsel as to how the company's D&O insurance policy may respond to a number of potential issues. Key issues to understand would include identifying any issues related to:
- how limits in the policy are either allocated or prioritized to coverage other than coverage of claims made against a director's or officer's personal assets;
- whether the design of the company's D&O insurance program is such that directors or officers will not be subject to a retention or deductible if the company is permitted to but fails to indemnify such an individual; and

- what—if any—language exists in the policy to waive an automatic stay as regards the company's policy.

**Choosing a D&O policy structure, limits, retention and insurers.** The company should consider several questions before selecting the limits and structure of its D&O policy, including the following:
- How susceptible is the company to a class action lawsuit or government enforcement action?
- If the company suffers a class action lawsuit, what might it cost to defend and settle?
- What limits, structures and retentions do the company's peers purchase?
- How can the balance between coverage, limit, retention and price be optimized?
- What is the overall financial stability of each insurer on the program?
- How can the program most cost-effectively address exposure for foreign directors and officers?
- What is the claims-paying reputation of each insurer on the program?

Constructing a D&O liability program leading into an IPO is a dynamic process. The goal is to understand the choices and trade-offs and to achieve an optimal balance that properly reflects the values of the company and its directors and officers. For example, many companies purchase policies that protect both the company and the individual directors and officers for nonindemnifiable claims. This structure involves a shared limit of liability that protects the company and its directors and officers. If a very large claim is made against the company, it may exhaust the limits made available to individual directors and officers. One potential solution is to purchase additional limits of coverage dedicated solely to protect individual directors and officers. Alternatively, dedicated coverage may also be purchased solely for independent directors of the board, excluding nonindependent board members and officers.

Selecting an appropriate level of limits is now more science than art. Peer benchmarking data is only one element to consider in choosing the right amount of insurance and retention. Analysis of a particular company's susceptibility to

securities class actions and projections of realistic settlement amounts can provide greater confidence in limit decisions.

Turbulence affecting the financial condition of insurers several years ago has raised concerns regarding insurer stability; an in-depth comparative analysis of an insurer's creditworthiness and financial strength is a precursor to an assessment of the company's counterparty risk. Just as important is the ongoing monitoring of the financial condition of the company's partner insurers.

One of the more complex and evolving areas of D&O coverage involves subsidiaries located outside the United States. It is important to understand the tax, regulatory and coverage issues associated with D&O exposures outside the United States to ascertain whether exposure exists. There are a number of solutions to address such exposure, depending on location and magnitude, some of which may impact the company's choice of primary insurer.

### (c) Timing the D&O liability insurance purchase for an IPO

A D&O policy for a newly public company generally becomes effective on the date the company's registration statement covering the traded securities becomes effective. The process and timeline leading up to the commencement of the policy period differ depending on the situation and can be tailored to meet the specific needs of the company. The following is a suggested timeline for meeting key milestones in the process of obtaining D&O coverage.

**D&O strategy meeting.** It is recommended that the company meet with its insurance brokers and outside counsel, if needed, sometime within 90 days before the filing of Form S-1. The purpose of this meeting is to strategize on D&O program design options, selection of carriers, coverage issues, limit analysis, timeline and cost. Being beneficiaries of D&O insurance, the entire board of directors or certain key members may need to be engaged.

**Filing of Form S-1.** Once the company's registration statement is filed, a submission can be made to the underwriters, which would include the draft Form S-1. Given the passage of the JOBS Act in 2012, a draft registration statement might be filed confidentially with the SEC. In such event, additional time and consideration should be given to obtaining nondisclosure agreements with insurers from which a company wishes to solicit a quote. The submission, combined with calls and/or face-to-face meetings with the underwriters, will allow the insurers to assess the company's D&O risk profile.

**Meetings with underwriters.** It is generally expected that senior representatives of the company will meet with the underwriters, either in person or by teleconference, before a premium quotation will be given for a D&O policy. It is an opportunity for the insurers to better understand the company's financial and operating conditions and its prospects and to speak directly with management about corporate governance issues and concerns. These meetings typically take place in the days leading up to the roadshow detailed in Chapter 3.

**Analysis.** Once quotes have been submitted by the insurers, insurance advisors—sometimes working in concert with outside counsel—provide the company's management and/or board with a detailed comparative analysis to allow the company to ultimately make a number of decisions on the nature of its D&O program, including the appropriate structure, limits, retentions, coverage and insurers.

**Binding of insurance.** Once decisions have been made by the company, insurance advisors will execute those decisions to build the D&O program and bind the insurers in time for the effectiveness of the registration statement.

### 9.5  Personal risk management
*Marsh*

An IPO will certainly have an impact on your professional life, but it will also have a considerable effect on your personal lifestyle. The complexity of a high-net-worth lifestyle requires a new way of thinking about risk and customized solutions to help address it. Many ultrawealthy individuals and families find they benefit by working with a personal risk manager that can provide comprehensive resources to properly align protection for their property, liability, family and lifestyle. And because you and your

company will now be more prominent, it is imperative to have total coordination between your business and estate plans.

### (a) Protecting yourself and your assets

**Personal liability.** Multi-million dollar liability lawsuits are more common in the US than ever before, and affluent individuals and families may find themselves targets of expensive, high-stakes litigation.

There are many reasons someone might legitimately have a large claim against you for personal damages. These can include a fatality or catastrophic injury in an auto accident, an accidental injury that occurs on your property, or accidental damage that you cause to someone else's property. Even reputational damage that you may cause by an offhand public remark or hasty online post can create liability on your part. A personal excess liability insurance policy is designed to protect against multimillion-dollar settlements resulting from personal injury, bodily injury, or property damage lawsuits.

Consider this example: The teenage son of a wealthy business owner is involved in an auto collision with a cyclist. Although there is no indication that the driver acted irresponsibly, the court awards a $20 million judgment to the cyclist. The young driver carries only $5 million in excess liability insurance, meaning his family's financial situation may be severely harmed for years to come. Consulting with a personal risk management expert can help you set appropriate liability limits for your lifestyle.

**Personal property.** As you acquire additional wealth, it's likely you will also acquire valuable property and assets. Key areas of risk to consider include the following:
- Homes—High-value homes are often built with unique materials and features. Not all insurance policies provide for appropriate replacement costs in their loss settlement provisions. Homeowners policies from premier insurance companies typically offer guaranteed replacement cost coverage, which covers replacement with materials of similar kind and quality, as well as replacement coverage for other structures, such as cabanas or detached garages.
- Automobiles—Individuals who have accumulated wealth often invest in

**Managing risk**

**Timeline**



| −90–0 days | 0 days | 30 days | 35–50 days | 45–60 days | 60–75 days | 90–180 days |
|---|---|---|---|---|---|---|
| Organization meeting | Initial s1 filed confidentially | Comments from the SEC filing of an amended S1 confidentially | Amended S1 filed publicly | Roadshow | IPO | Public company |
| D&O strategy meeting execute NDAs with insurers | Information to insurers | Insurer meeting | Quote D&O program / Present D&O quotes board presentation decide on program limits and structure | | Bind public company D&O program / Cancel or Run-off private company D&O program | |

antique and exotic car collections. For adequate protection of extensive, highly valued car collections or a new luxury car, premier insurers offer policy enhancements that may ensure original equipment parts are used in repairs or may include an agreed value provision to get you back on the road sooner after a total loss.

■ Valuables—Valuable possessions, such as jewelry, fine art, silver, antiques and furs, are afforded only limited financial protection under homeowners insurance, even when covered through a premier insurance provider. Specialized valuables coverage purchased through an insurance broker can help properly protect these assets and investments.

**Benefits of working with a single insurance broker.** When individuals accumulate new property—such as new homes in different states across the US—homeowners insurance is typically purchased, as needed, through a local broker. However, working with various agents or brokers in different states can lead to gaps or overlaps in coverage. By working with a single broker who specializes

in addressing the risks associated with successful individuals and families, you can benefit from innovative solutions and access to broad, customized coverage.

**Protecting yourself and your business.** There's no doubt that you are now looking to the future with the anticipation that your business and family will long benefit from all of your hard work. Now is the time, however, to consider the effects that events beyond your control—such as death and disability—may have on your business. It is critical to evaluate the risks inherent in your business and in your estate plan. Coordination of the two will help protect your business and ensure continuity of the legacy you have created.

**Wealth transfer.** It is important to evaluate an IPO's impact on your estate plan, including the risks in transferring wealth to succeeding generations. Those potential risks can include:
■ significant taxes upon your death; or
■ unwise dissipation by heirs, their divorcing spouses, and creditors.

Properly drafted and executed wills and trusts can protect your assets

from taxes and creditors. Many wealthy individuals choose to fund trusts with assets and life insurance. The proceeds of a life insurance policy that is properly owned by an irrevocable trust are paid into the trust, free of both income and estate tax and unavailable to creditors. Careful planning in this manner with your tax and/or legal advisors can allow wealth and assets you have created to pass to your family intact.

**Key person.** You may be the "brains behind the business," but you also may have irreplaceable employees. Would your business suffer if something unexpected happened to one of them? Key person insurance helps you cover additional costs when such a situation arises. You may even be able to combine protection for your business with an agreement designed to reward a vital employee for continued employment.

These are just some of the concerns that may arise as a result of your new wealth. Again, you may benefit greatly by working with a personal risk manager to design the right protection for your family and your business.

nyse.com/ipo

# 10
# Foreign private issuers



**Foreign private issuers**

### 10.1 American depositary receipts
*J.P. Morgan (Depositary Receipts Group)*

The tranche of shares that foreign issuers sell to US investors when going public often takes the form of American depositary shares, commonly known as ADRs. These instruments subsequently trade just like ordinary shares on the NYSE, another US stock exchange or in the over-the-counter market.

#### (a) Advantages for issuers
For foreign issuers, having publicly traded securities in the United States has numerous advantages beyond an initial capital raise.

**Ready access to world's largest equity market.** A US listing affords access to the world's largest equity market, facilitating future capital raising.

**Diversification of shareholder base and valuation support.** By going public in the United States and maintaining a listing there, US investors can more easily invest in a foreign issuer. For some foreign issuers, a US listing results in higher corporate governance standards, further increasing its appeal. Attracting US investors helps broaden and diversify a foreign issuer's

shareholder base, reducing the issuer's dependence on investors in its home market for its capital needs. Moreover, the incremental demand from investors in the US market can enhance the valuation—lowering a company's cost of capital—over the long term.

**US acquisition currency.** Because the ADRs used to raise capital in the United States are dollar denominated, they can eventually be used to make stock-based acquisitions of US companies. Generally, US shareholders are more likely to accept ADRs than foreign shares.

**Stock-based compensation for US employees.** Because ADRs are dollar denominated, they allow foreign issuers to establish stock purchase and option plans for US-based employees. Absent these plans, foreign issuers can be at a significant disadvantage when competing for talent in the US labor market. ADRs also allow for the creation of direct purchase and dividend reinvestment plans, which can enhance the investment appeal of a foreign issuer.

**Enhanced corporate visibility in the United States.** Finally, by going public in the United States, a foreign issuer

can increase its visibility not just in the US investment community, but in the commercial and consumer markets that make up the world's largest economy. Many US citizens own equities and tend to follow publicly traded companies. Consequently, a US listing can raise a foreign issuer's corporate profile as well as capital.

The effectiveness of ADRs is why 458 foreign issuers have used this instrument to raise $8.4 billion in capital in the United States during the past decade alone. As of December 31, 2019, 231 foreign issuers had ADRs listed on the NYSE.[1]

#### (b) Advantages for investors
The effectiveness of ADRs for raising capital in the United States is due to their appeal to investors—these instruments are a convenient way to directly invest in international companies while avoiding many of the risks typically associated with securities held in other countries. For US investors, ADRs:
- are easier to purchase and hold than a foreign issuer's underlying ordinary shares;

---

[1] Source: J.P. Morgan, Bloomberg, other depositary banks, stock exchanges, December 2019.



**Capital raised using ADRs, by region – 2010 to 2020 ($MM)**



- 30.5% – LATAM
- 19.3% – LATAM
- 50.2% – APAC

Source: J.P. Morgan, Bloomberg, other depositary banks, stock exchanges

**Capital raised using ADRs, by sector – 2010 to 2020**



- 25.3% – Technology
- 4.8% – Industrial
- 6.5% – Energy
- 8.8% – Financial
- 19.7% – Consumer, non-cyclical
- 6.6% – Consuer, cyclical
- 24.6% – Comunications
- 3.7% – Basic materials

- trade easily and conveniently in US dollars and settle through established clearinghouses;
- pay dividends in US dollars;
- eliminate local custody arrangements; and
- provide notifications of corporate actions in English.

### (c) Establishing an ADR program

**ADR structures.** A Level III ADR program listed on the NYSE (or on another US stock exchange) allows a foreign issuer to realize all of the aforementioned benefits of ADRs, including raising capital from individual investors. Alternatively, capital can be raised from qualified institutional investors only via a private placement, known as a Rule 144A offering.

A Level II ADR program allows a foreign issuer to list on a US stock exchange, but not raise capital.

Under a Level I program, the ADRs are not listed and are instead traded in the over-the-counter market.

**How ADRs are created.** ADRs are normally created when the shares of a foreign issuer—either those currently trading in its local market or newly issued shares in connection with an offering of securities— are deposited with a depositary bank's custodian in the issuer's home market. The depository then issues ADRs representing those shares to investors. At any time thereafter, an investor can sell these ADRs in the secondary market (e.g., the NYSE) or have the sponsoring depositary bank cancel the ADRs and receive the underlying ordinary shares that can be sold in the foreign issuer's local market.

**Setting up an ADR program.** Once a foreign issuer has chosen an ADR structure, it will work closely with a depository bank to establish and maintain the ADR program. Time frames and requirements for launching a program will vary. However, certain characteristics are common to any ADR structure.

**Setting the ADR-to-share ratio.** Each ADR issued will represent a certain number of underlying ordinary shares held in custody in the foreign issuer's home market. There is no official rule for setting the ratio for

ADRs. However, the share prices of sector peers should be taken into consideration to establish a ratio that will result in an initial price per ADR that investors will perceive to be appropriate.

The ratio initially selected may affect the transaction costs that a foreign issuer's investors will pay. For instance, since fees for issuance (and cancellation) are assessed in cents per ADR, an ADR that is priced "too low" can add incremental transaction costs for investors.

**Parties that work with the foreign issuer.** Establishing an ADR program requires close coordination between the foreign issuer, its chosen depositary bank and each firm's legal counsel. When raising capital in the United States, the issuer also relies on other advisors, such as accountants, investment bankers and investor relations firms. The chart "Establishing an ADR program: roles and responsibilities of foreign issuer, depositary bank and other parties" summarizes the roles and responsibilities of each party involved. On page 101 is a sample timetable for the establishment of a Level III ADR program.



US investment in foreign equities (ADR and local shares), 1992–2019 ($bn)

**% of all holdings**

**Market value, foreign holdings ($BN)**

*Key drivers:*
- US Investors seeking growth/diversification
- Foreign issuers seeking capital/valuations
- Changing geopolitical/regulatory landscape

| Year | Value |
|------|-------|
| 1992 | 314 |
| 1993 | 544 |
| 1994 | 628 |
| 1995 | 777 |
| 1996 | 1,003 |
| 1997 | 1,208 |
| 1998 | 1,475 |
| 1999 | 2,004 |
| 2000 | 1,853 |
| 2001 | 1,613 |
| 2002 | 1,375 |
| 2003 | 2,079 |
| 2004 | 2,560 |
| 2005 | 3,318 |
| 2006 | 3,941 |
| 2007 | 4,786 |
| 2008 | 2,678 |
| 2009 | 4,097 |
| 2010 | 4,403 |
| 2011 | 3,863 |
| 2012 | 4,920 |
| 2013 | 6,803 |
| 2014 | 6,720 |
| 2015 | 6,732 |
| 2016 | 6,997 |
| 2017 | 8,980 |
| 2018 | 7,898 |
| 1Q19 | 8,720 |
| 2Q19 | 8,930 |
| 3Q19 | 8,743 |
| 4Q19 | 9,526 |

Source: Federal Reserve,  March 2020

Foreign private issuers

**Establishing an ADR program: roles and responsibilities of foreign issuer, depositary bank and other parties**

**Custodian**
- Receive local shares in issuer's home country.
- Confirm deposit of underlying shares.
- Hold shares in custody for the account of depositary in the home market.

**Depositary**
- Provide advice/perspective on type of program, exchange or market on which to list or quote.
- Advise on ratio of depositary shares to ordinary shares.
- Appoint custodian.
- File Form F-6 if Level I, II or III program.
- Review draft registration statement or offering memorandum, depending on type of program to be established.
- Coordinate with all partners to complete program implementation steps on schedule.
- Coordinate with legal counsel on deposit agreement and securities law matters.
- Prepare and issue certificates and/or direct registration statements.
- Announce DR program to market (brokers, traders, media, retail/ institutional investors via news releases and internet.

**Issuer**
- Provide depositary and custodian with notices of dividends, rights offerings and other corporate actions, including notices of annual and special shareholder meetings.
- Ongoing compliance with stock exchange and SEC regulations, including disclosure and reporting (coordinating with legal counsel/accountants).
- Execute US-focused, investor relations plan.

**Legal counsel (depositary's and issuer's)**
- Prepare draft deposit agreement (depositary bank's counsel) and file required registration statements with the SEC.
- Manage compliance with US securities laws, rules and regulations and perfect any securities law exemptions (if Rule 144A/Reg S program) (issuer counsel).

**Accountants (Level II/III ADRs only)**
- Prepare issuer's financial statements in accordance with, or reconcile to, US GAAP or accepted IFRS standard.
- Review registration statement or offering circular and provide requisite opinions.

**Investor relations advisor/firm**
- Develop long-term plan to raise awareness of issuer's program in the United States.
- Develop communications plan and information materials for launch activities (roadshow and presentations to investors, launch day promotion, meetings with financial media).
- Coordinate with issuer's advertising and public relations teams on specific program plans to support and develop company image in the United States.

**Investment banks/Underwriters (Level II/III/Rule 144A/Regulation S ADRs only)**
- Advise on type of program to launch and exchange or market on which to list or quote.
- Advise on ratio of depositary shares to ordinary shares.
- Cover issuer through research reports/promote DRs to investors.
- Advise on roadshows, investor meetings, investors to target.
- Advise on capital market issues.
- Where applicable, advise on potential merger/acquisition candidates, and other matters such as rights offerings, stock distributions, spin-offs, proxy contests, etc.
If concurrent public offering:
- Advise on size, pricing and marketing of offering.
- Act as placement agent or underwriter in offering.
- Conduct roadshows with management/introduce issuer to institutional and other investors.
- Line up selected dealers and co-underwriters for offering.

## Level III ADR program—Sample

| Parties involved | | | | | | | Weeks | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Action | I | D | L | A | IB | IR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Ongoing |
| Establish and organize transaction team. | • | • | • | • | • | • | | | | | | | | | | | | | | | |
| Begin US roadshow and ongoing investor relations program: create communications materials, target institutional investors, organize direct purchase programs for retail investors and establish employee ownership plans. Select ratio. | • | • | | | • | • | | | | | | | | | | | | | | | |
| Underwriter conducts preliminary due diligence. | | | | | • | | | | | | | | | | | | | | | | |
| Prepare and submit to SEC offering circular/prospectus and Form F-1. Commit to file Form 20-F within 12 months (if not already being filed in conjunction with an existing Level II ADR). Resolve any and all matters involving registration and disclosure. | • | • | • | • | • | | | | | | | | | | | | | | | | |
| Negotiate deposit agreement. | • | • | • | | | | | | | | | | | | | | | | | | |
| Submit exchange listing or exchange quotation application and agreement. Receive approval. | • | • | • | | | | | | | | | | | | | | | | | | |
| Prepare Form F-6 and submit to SEC with deposit agreement. | • | • | • | | | | | | | | | | | | | | | | | | |
| Receive SEC comments on Form F-1 and other forms. Amend if necessary. | • | • | • | | | | | | | | | | | | | | | | | | |
| Complete requirements for trading and settlement: obtain DTC eligibility, CUSIP number and ticker symbol; and prepare ADR certificates. | • | • | • | | • | | | | | | | | | | | | | | | | |
| Receive SEC declarations of effectiveness on Forms F-1 and F-6. Execute DA. | • | • | • | | | | | | | | | | | | | | | | | | |
| Conduct roadshow meetings with US investors (group and one-on-one). | • | • | | | • | | | | | | | | | | | | | | | | |
| Print final prospectus, price offering and sell ADRs. ADRs are listed and begin trading. | • | | | | • | | | | | | | | | | | | | | | | |
| **Closing.** Underwriter delivers cash proceeds to issuer, depositary's custodian receives underlying shares and depositary delivers ADRs to syndicate for forward delivery to investors. | • | • | | | • | | | | | | | | | | | | | | | | |
| Distribute press release and broker announcements to media and investment community. | • | • | • | | • | • | | | | | | | | | | | | | | | |
| Place tombstone advertisement. | • | • | • | | • | • | | | | | | | | | | | | | | | |

Time frames provided are indicative. Regulator's involvement and issuers' program specifics may vary and can materially affect timing. The SEC generally provides comments on Form F-1 registration statements within 30 days of the date filed.

Key to parties involved: I = Issuer; D = Depositary Bank; L = Legal Counsel (for depositary and/or issuer); A = Accountant; IB = Investment Bank; IR = Investor Relations firm.

**Foreign private issuers**

**The deposit agreement.** As a first step toward establishing an ADR program, the foreign issuer and its chosen depositary bank negotiate a deposit agreement. This contract details the legal relationship and obligations of the depositary bank and the issuer, describes the services the depositary and issuer will provide and sets forth the rights of ADR holders and the fees they must pay the depositary bank. Some terms are standard, but deposit agreement provisions may vary from program to program depending on the legal requirements of the foreign issuer's home market, the objectives of the depositary bank and individual issuer specifications.

The deposit agreement includes provisions relating to the following:
- deposit of the issuer's shares;
- execution and delivery of the ADRs;
- issuance of additional shares by the issuer in compliance with applicable securities laws;
- transfer and surrender of the ADRs;
- setting of record dates by the depositary;
- voting of the foreign issuer's underlying shares (i.e., the shares evidenced by the ADRs);
- obligations and rights of the depositary bank and the holders of the ADRs;
- distribution by the depositary of cash dividends, stock dividends, rights to acquire additional shares of the issuer and other distributions made by the issuer;
- circumstances in which reports and proxies are to be made available to ADR holders;
- tax obligations of depositary receipt holders;
- fees and expenses to be incurred by the issuer, the depositary and ADR holders;
- prerelease of ADRs; and
- protections for the depositary and the issuer (i.e., limitations on liabilities).

**SEC registration.** As a US-listed company, a foreign issuer must comply with the registration provisions and continued reporting requirements of the Securities Exchange Act, as amended, as well as certain registration provisions of this act. For more information about the SEC registration and reporting requirements, please refer to Chapter 6.

## 10.2 The IPO process for foreign private issuers
*Simpson Thacher & Bartlett*

### (a) Foreign private issuer determination
Foreign companies that pursue an IPO in the United States may qualify as foreign private issuers (FPIs). An FPI is defined as a foreign issuer other than a foreign government, except if:
- more than 50% of its outstanding voting securities are directly or indirectly owned of record by US residents; and
- any of the following:
  - the majority of executive officers or directors are US citizens or residents;
  - more than 50% of the assets of the issuer are located in the United States; or
  - the business of the issuer is administered principally in the United States.

In the case of pre-IPO companies, the FPI determination is made within 30 days prior to the filing of the initial registration statement with the Securities and Exchange Commission (SEC). Thereafter, the FPI determination is made annually as of the last business day of the most recently completed second fiscal quarter. In the event a company fails to qualify as an FPI as of the last business day of its most recently completed second fiscal quarter, it will no longer be eligible to use the SEC forms and rules designated for FPIs beginning on the first day of the next fiscal year. FPIs may also be large accelerated filers, accelerated filers, a controlled company or an emerging growth company (EGC) (see Chapters 4.2 or 7.1 for further discussion).

### (b) Registration statement
While the registration statement requirements for FPIs and domestic issuers are similar, an FPI registers its IPO on form F-1, and Form F-6 for American depositary receipts (ADRs). Form F-1 requires substantially similar disclosure as Form S-1, except that Form S-1 has more extensive executive compensation disclosure requirements. FPIs can provide aggregate data for executive compensation; disclosure is only required on an individual basis if it is also required in the company's home

country or otherwise publicly disclosed by the company. Additionally (as discussed more extensively in Chapter 10.3), FPIs can take advantage of certain financial reporting accommodations and are allowed prepare their financial statements in accordance with (1) US generally accepted accounting principles (GAAP), (2) International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB) or (3) local GAAP with a reconciliation to US GAAP.

### (c) Ongoing reporting requirements
FPIs are subject to reduced, ongoing reporting requirements compared to domestic issuers.

**Annual reports.** An FPI's annual report is on Form 20-F, which includes CEO and CFO certifications (as described in Chapter 7.1), and is due within four months after the end of the fiscal year. The annual report of FPIs listed on the NYSE must include a summary of any significant ways in which the company's corporate governance practices differ from those followed by US domestic companies under the listing standards of that exchange.

**Interim reports.** FPIs are not required to report quarterly results on Form 10-Q unless otherwise required in their home country. NYSE-listed FPIs are required to submit a Form 6-K to the SEC containing semiannual unaudited financial information no later than six months following the end of the company's second fiscal quarter. FPIs are not subject to Form 8-K's current reporting requirements. However, FPIs are required to promptly report on Form 6-K whatever information such company:
- makes or is required to make public pursuant to the laws of its home country;
- files or is required to file with a stock exchange on which its securities are traded and that was made public by that exchange; or
- distributes or is required to distribute to its security holders.

**Proxy rules.** FPIs are not subject to the SEC's proxy rules and instead comply with local rules. To the extent an FPI provides a meeting circular, proxy statement or similar document to shareholders in accordance with home market requirements or

voluntarily, such information must also be disclosed on Form 6-K.

**Regulation Fair Disclosure (FD).** FPIs are exempt from Regulation FD, although it is recommended that they comply and adopt an internal policy to facilitate compliance.

**Related party transactions.** While FPIs must disclose related party transactions, there is no required review and approval process, nor are they required to disclose their policies for approval of such transactions.

### (d) Corporate governance

**NYSE requirements.** FPIs are generally allowed to follow home country practices in lieu of NYSE requirements, subject to a few exceptions:

- FPIs must meet SEC requirements for audit committees;
- FPIs must notify the exchange of noncompliance with exchange corporate governance rules; and
- FPIs must provide an annual written affirmation to the NYSE.

**Audit committees.** Like domestic issuers, FPIs are required to have an audit committee whose members are independent within the meaning of SEC Rule 10A-3. FPIs can take advantage of the IPO transition period, which provides that only one member must be independent at the time of the initial listing, a majority must be independent within 90 days and the committee must be fully independent within one year of listing. In cases where SEC audit committee requirements conflict with home country legal requirements, corporate governance standards and the methods for providing auditor oversight, several limited exceptions may apply. These include exceptions relating to employee representation, two-tier board systems, controlling shareholder representation, foreign government representation/foreign governments and boards of auditors or similar bodies.

**Other committees.** Unlike domestic issuers, FPIs are not required to have an independent compensation committee or nominating committee. FPIs also do not have to comply with NYSE requirements to have a majority independent board of directors.

### (e) Accounting and disclosure control requirements

**Internal control over financial reporting.** Similar to domestic companies, FPIs are required to maintain a system of internal control over financial reporting (ICFR). Management is required to assess the effectiveness of ICFR as of the end of each fiscal year and the company is required to disclose whether or not ICFR is effective. Newly public companies are required to make this disclosure for the first time in the second 20-F filed after their IPO.

**Disclosure controls and procedures.** FPIs are required to maintain disclosure controls and procedures similar to domestic issuers and management must evaluate the effectiveness of the company's disclosure controls and procedures and disclose in the issuer's annual report on Form 20-F its conclusions about the effectiveness of disclosure controls and procedures, as of the end of the fiscal year. Unlike domestic companies that must disclose their management's assessment of the effectiveness of the company's disclosure controls every quarter, FPIs are only required to make such disclosures annually.

### (f) Stockholder filing requirements

Stockholders that beneficially own more than 5% of an FPI's listed voting security are required to file reports under Sections 13(d) and 13(g) of the Exchange Act. See Section 8.3 for further information on these reporting requirements. Stockholders of FPIs, however, are not subject to Section 16 of the Exchange Act, unlike US domestic issuers.

### 10.3  Financial information
*KPMG LLP*

The financial statement requirements for an initial registration statement of a foreign private issuer (FPI) is found in Items 3, 8, 17 and 18 of Form 20-F and in Regulation S-X. The financial statement requirements differ in a number of significant ways from those of domestic US issuers. Some of the key differences in the requirements are as follows:

- Audited financial statements generally must cover each of the latest three fiscal years, with certain exceptions:
  - if the issuer has been in existence less than the required three years, financial information covering the

issuer's predecessor entities (if any) may need to be provided;
  - if a jurisdiction outside the US does not require a balance sheet for the earliest year of the three-year period, that balance sheet may be omitted; and
  - audited financial statements are required only for the most recent two years if the financial statements presented are prepared in accordance with US generally accepted accounting principles (GAAP).

- FPIs may use GAAP other than US GAAP, but they may need to reconcile to US GAAP. This reconciliation is not required if the company uses International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

- Regardless of the basis of presentation, the audited financial statements must be accompanied by an audit report issued by independent accountants that are registered with the Public Company Accounting Oversight Board (PCAOB) and audited in accordance with PCAOB standards. Financial statements audited under the International Auditing Standards (IAS) or other local country generally accepted auditing standards (GAAS) would not be considered "audited" financial statements for SEC purposes. The accountants must meet SEC and PCAOB standards for independence. The SEC staff will not object if the audit report states that the audit was also conducted in accordance with home-country GAAS.

- The latest audited annual financial statements included in the registration statement must be as of a date not older than 12 months prior to the date the registration statement is filed. The SEC will waive this requirement in cases where the company can represent adequately that it is not required to comply with this requirement in any other jurisdiction outside the US, and that complying with the requirement is impracticable or involves undue hardship. Regardless, the latest audited annual financial statements included in the filing cannot be more than 15 months old as of the date the registration statement becomes effective.

**Foreign private issuers**

- If a registration statement becomes effective more than nine months after the end of the last audited fiscal year, the company must provide unaudited interim financial statements in accordance with, or reconciled to, US GAAP (this reconciliation is not required if the company uses IFRS as issued by the IASB) covering at least the first six months of the year.
- FPIs may report in any currency.
- Financial statements of an acquired foreign business need not be reconciled from local GAAP to US GAAP[1] when the acquired business is less than 30% for any of the Rule S-X 1-02(w) significance tests. This reconciliation is not required if the acquired business uses IFRS as issued by the IASB.
- Financial statements of a significant equity method investment meeting the significance threshold of Rule 3-09 of Regulation S-X need not be reconciled to US GAAP (or, if applicable, IFRS as issued by the IASB), unless either of the two tests is greater than 30% as calculated on a US GAAP (or, if applicable, IFRS as issued by the IASB) basis. A description of the differences in accounting methods is required, however, regardless of the significance levels.

## 10.4 IR and communications
*FTI Consulting*

From an IR standpoint, going public in the US—through either a cross-border or dual listing—can present several benefits for foreign companies, including increased visibility and prestige, as well as access to the largest pool of capital in the world. However, the US market is highly

competitive and operates very differently than markets in other parts of the world. In addition to overcoming any cultural hurdles, there are a few imperatives for successfully becoming and remaining a US-listed company.

### (a) Elevating the foreign company's profile in the US

While profile raising ahead of an IPO can be beneficial to any company, it is particularly imperative to foreign companies that may be relatively unknown outside of their home country or region. This, however, comes with its fair share of challenges given the limitations of executive travel schedules, language differences and cultural barriers, among others. At the same time, the success of profile-raising campaigns is often determined based on the level, duration, consistency and robustness of outreach activities as well as the degree to which these activities are coordinated and complementary to the company's future listing goals. These campaigns should leverage US executives, where available, to serve as external spokespeople and company advocates in the US market. In addition, it is imperative to leverage the executive team's time spent in the US, including setting up desk-side briefings with US reporters from top-tier and target media outlets. It is also advisable to develop a thought leadership agenda in which centrally created content and messaging can be used to engage US stakeholders and influencers across various channels. Lastly, foreign companies will need to ensure they deliver a consistent narrative across all communication channels and regions to help protect and drive their reputations in the US and around the world.

### (b) Building an effective global IR program following the US listing

Cross-border listings, including dual listings, require greater commitment from the management team. This is particularly true in investor marketing, where companies must compete for capital across borders to attract attention, and ultimately secure ownership from US-based and international investors. This is particularly challenging for small- and mid-cap companies, which often have less resources to commit to IR, yet would benefit from this the most given

they are less visible and less known to US investors. Additionally, the corporate access challenges and related global ramifications spurred by the implementation of MiFID II regulations make thoughtful sell-side and buy-side targeting strategies even more vital to the ultimate success of a global IR program. Based on FTI Consulting's experience and research, US investors expect to meet with management teams between two to four times on average before making an investment, indicating that successful programs require a robust and consistent approach to investor marketing.

To expand and diversify their shareholder base geographically, foreign companies should maintain a prioritized target list of active, high-quality investors. Marketing to target investors in regions in which the company does not have sell-side coverage will also require more time and effort, and therefore should be contemplated in the overall marketing plan. To maximize the return on investment (ROI) of time spent marketing overseas in a non-COVID-19 environment, the target list should be segmented by region with a focus on key investors that have been deemed a priority. The shift towards virtual investor events presents a number of advantages including the ability to target a large number of high quality investors regardless of geography. Regardless of the format of the meeting, investor-related content and materials should be aligned with the types of information generally required by US investors to make an informed decision on investing in foreign companies. There are also some nuances that should be incorporated to reflect the preferences and behaviors of investors in the region.

### (c) Adjusting to high environmenal, social and governance (ESG) demands

While the pre- and post-IPO environmental, social and governance (ESG) communications strategy for a foreign company going public in the US should be aligned with the strategy noted previously, there are special considerations these companies should assess to ensure they are communicating effectively with the US investment community.

From a governance standpoint, it is imperative that foreign companies proactively address any potential areas of concern to mitigate the risk of shareholder

---

[1] In May 2020, the SEC adopted a variety of amendments to its rules for separate financial statements of acquired businesses, one of which allows the financial statements of an acquired foreign business prepared in accordance to local generally accepted accounting principles (GAAP) to be reconciled to either US GAAP or International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). The amendments take effect January 1, 2021, but early adoption is permitted.

activism. US investors tend to have higher thresholds when evaluating corporate governance risks of foreign companies and may place particular emphasis on key, hot-button issues, such as minority interests, pay-for-performance plans, dual- or multi-class share structures, existing geopolitical uncertainty, extensive insider or family ties, board structure and the separation of the Chairman and CEO roles. From a social and environmental standpoint, foreign companies need to prepare themselves for difficult proposals from environmental and social activists, which have accounted for a significant portion of shareholder proposals in the US over the past few years.

As compared to the US, other parts of the world, including the European Union, have established more concrete guidance on incorporating ESG- and sustainability-related disclosures into financial reporting. While the focus on individual components of ESG-programs often varies by region, foreign companies—particularly those operating in countries honoring the Paris Agreement and United Nations Framework Convention on Climate Change—may determine their existing disclosures related to climate and environmental concerns are sufficient for the US investment community. However, in order to be viewed as more in line with US-based peers, foreign companies may determine further refinement to their social and governance strategies, communications and disclosures would be required.

For companies operating in emerging markets, investors will desire a higher level of transparency regarding the company's policies and strategy around a variety of issues, such as employee safety, environmental impact, human rights issues, supply chain management and anti-corruption efforts.

Specifically, these companies should proactively provide US investors with a breakdown of ethics policies and historical data to alleviate potential concerns and enhance regulatory compliance.

Finally, foreign companies with existing ESG programs should engage with US-centric ESG rating agencies to ensure their efforts are being properly recognized. Proactive rating-agency engagement will help ensure key disclosures are presented in the correct format and through the proper channels. In turn, this will help ensure the information is being interpreted accurately by the rating analysts.

nyse.com/ipo

# Appendices



**Appendices**

**Appendix I: NYSE domestic original listing standards, domestic operating companies, REITs and funds**

US domestic companies applying to list on the NYSE must meet the financial requirements of either the Earnings Test or the Global Market Capitalization Test as detailed in the table below. Real Estate Investment Trusts (REITs) with less than three years of operating history and Business Development Companies (BDCs) can qualify if they meet the financial requirements of the applicable REIT or BDC tests detailed below.

Non–US companies that are foreign private issuers (FPIs) may meet the financial requirements applicable to US domestic companies or those applicable to FPIs (see Appendix II). For a complete discussion of original listing financial requirements, please see Section 102 of the NYSE Listed Company Manual.

| | Earnings test | Global market capitalization test | REIT test | BDC test |
|---|---|---|---|---|
| **Listed company manual section** | 102.01C(I) | 102.01C(II) | 102.05 | 102.04B |
| **Adjusted pre-tax income** | A. At least $10 million in the aggregate for the last three fiscal years with at least $2 million in each of the two most recent fiscal years. Positive amounts in all three fiscal years, *or* | | | |
| **Adjusted pre-tax income** | B. At least $12 million in the aggregate for the last three fiscal years with at least $5 million in the most recent fiscal year and $2 million in the next most recent fiscal year.<br><br>EGCs only: At least $10 million in the aggregate for the last two fiscal years, with at least $2 million in each year. | | | |
| **Global market capitalization** | | $200 million | | $75 million |
| **Shareholders' equity (*pro forma* for offering)** | | | $60 million (<3 year operating history only) | |

*EGC = emerging growth company.*

(*Continued*)

**Appendix I: continued**

US domestic companies applying to list on the NYSE are required to meet certain distribution standards in order to ensure a liquid trading market for their securities. If a company is applying to list in connection with an IPO, spin-off or carve-out transaction, it must meet the applicable distribution metrics set forth in the table below. A company applying to transfer its listing to the NYSE must meet one of the three distribution tests applicable to transfers.

For a complete discussion of original listing liquidity requirements, please see Section 102.01 of the NYSE Listed Company Manual.

| | IPO, spin-off, carve-out | Direct listing | Transfer (must meet the requirements of one of the three standards below) | | |
|---|---|---|---|---|---|
| **Listed company manual section** | 102.01A-B | 102.01A-B | 102.01A-B | 102.01A-B | 102.01A-B |
| **Number of shareholders** | 400 round lot | 400 round lot | 400 round lot | 2,200 total | 500 total |
| **Publicly held shares** | 1.1 million | 1.1 million | 1.1 million | 1.1 million | 1.1 million |
| **Market value of publicly held shares** | $40 million<br><br>Closed-end funds only: $20 million<br><br>BDCs only: $60 million | $100 million or $250 million (see 102.01B) | $100 million<br><br>Closed-end funds only: $20 million<br><br>BDCs only: $60 million | $100 million<br><br>Closed-end funds only: $20 million<br><br>BDCs only: $60 million | $100 million<br><br>Closed-end funds only: $20 million<br><br>BDCs only: $60 million |
| **Share price** | $4.00 | $4.00 | $4.00 | $4.00 | $4.00 |
| **Average monthly share trading volume** | N/A | N/A | N/A | 100,000 | 1 million |

Appendices

### Appendix II: NYSE original listing standards, FPIs

Foreign private issuers (FPIs) may qualify for listing on the NYSE by meeting one of the financial requirements set forth below provided there is a broad, liquid market for the company's shares in its country of origin, or by meeting one of the financial requirements applicable to US domestic companies (See Appendix I).

| | Earnings test | Valuation/revenue with cash flow test | Pure valuation/ revenue test | Affiliated company test |
|---|---|---|---|---|
| **Listed company manual section** | 103.01B(I) | 103.01B(II)(a) | 103.01B(II)(b) | 103.01B(III) |
| **Adjusted pre-tax income** | At least $100 million in the aggregate for the last three fiscal years with at least $25 million in each of the two most recent fiscal years.<br><br>EGCs only: At least $100 million in the aggregate for the last two fiscal years, with at least $25 million in each year. | | | |
| **Adjusted cash flows** | | At least $100 million in the aggregate for the last three fiscal years with at least $25 million in each of the two most recent fiscal years.<br><br>EGCs only: At least $100 million in the aggregate for the last two fiscal years, with at least $25 million in each year. | | |
| **Global market capitalization** | | $500 million | $750 million | $500 million |
| **Revenues** | | $100 million in most recent 12-month period | $75 million in most recent fiscal year | |
| **Operating history** | | | | 12 months |

*EGC = emerging growth company.*

(*Continued*)

**Appendix II: continued**

Non–US companies that are FPIs and list under the standards set forth in this appendix must meet the liquidity requirements set forth in the table below.

   If an FPI elects to qualify to list under the US Domestic Company Original Listing Financial Requirements, it must then also meet the Liquidity Requirements applicable to US Domestic Companies (see Appendix I).

|  | Affiliated company | All other listings |
| --- | --- | --- |
| **Listed company manual section** | 103.01A | 103.01A |
| **Round lot shareholders** | 5,000 worldwide | 5,000 worldwide |
| **Publicly held shares** | 2.5 million worldwide | 2.5 million worldwide |
| **Market value of publicly held shares** | $60 million worldwide | $100 million worldwide |
| **Share price** | $4.00 | $4.00 |

**Appendices**

### Appendix III: NYSE American original listing standards

NYSE American has established certain quantitative and qualitative standards for initial listing of US and foreign companies, as follows.

To learn more about NYSE American quantitative, distribution and governance requirements, please refer to the complete requirements outlined in the *NYSE American Company Guide,* which can be referenced at https://nyseamericanguide.srorules.com/company-guide.

| Criteria | Original listing standards | | | |
|---|---|---|---|---|
| | **Standard 1** | **Standard 2** | **Standard 3** | **Standard 4** |
| Pre-tax income[a] | $750,000 | n/a | n/a | n/a |
| Market capitalization | n/a | n/a | $50 million | $75 million OR<br><br>At least $75 million in total assets and $75 million in revenues in the last fiscal year, or two of the three most recent fiscal years |
| Market value of publicly held shares | $3 million | $15 million | $15 million | $20 million |
| Minimum stock price | $3 | $3 | $2 | $3 |
| Operating history | n/a | 2 years | n/a | n/a |
| Stockholders' equity | $4 million | $4 million | $4 million | n/a |
| Distribution[b] | 800 public shareholders and 500,000 shares publicly held; OR<br><br>400 public shareholders and 1 million shares publicly held; OR<br><br>400 public shareholders, 500,000 shares publicly held and average daily trading volume of 2,000 shares for previous six months. | | | |

*(a) Required in the latest fiscal year or two of the three most recent fiscal years.*
*(b) Foreign companies which do not meet the share distribution requirements set forth above may be considered for listing under the alternate requirements set forth below:*

| Share distribution | |
|---|---|
| Round-lot public shareholders | 800 worldwide |
| Publicly held shares | 1,000,000 worldwide |
| Aggregate market value of publicly held shares | $3,000,000 worldwide |

## Appendix IV: NYSE financial continued listing standards, US companies

The NYSE has both quantitative and qualitative continued listing criteria. When a company falls below any criterion, the NYSE will review the appropriateness of continued listing. The following is a summary of the NYSE's quantitative continued listing standards. For a more complete discussion of the NYSE's continued listing standards, as well as the procedures followed when a company falls below any of the continued listing criteria, see Section 802.00 of the *NYSE Listed Company Manual,* which can be accessed at https://nyseguide.srorules.com/listed-company-manual.

| *Required to meet all of the following:* | |
|---|---|
| Total shareholders | At least 400 |
| At least 1,200 total shareholders, if average monthly trading volume <100,000 shares (for most recent 12 months) | |
| Public shares | At least 600,000 |

| *Required to meet all of the following:* |
|---|
| Minimum average closing share price of at least $1.00 over a consecutive 30 trading-day period |
| Minimum of $15 million average global market cap over a consecutive 30 trading-day period |
| Market cap of at least $50 million or shareholders' equity of at least $50 million |

**Appendices**

### Appendix V: NYSE American continued listing standards

NYSE American has both quantitative and qualitative continued listing criteria. When a company falls below any criterion, NYSE American will review the appropriateness of continued listing. The following is a summary of NYSE American's quantitative continued listing standards. For a more complete discussion of NYSE American's continued listing standards, as well as the procedures followed when a company falls below any of the continued listing criteria, see Part 10 of the *NYSE American Company Guide*, which can be accessed at https://nyseamericanguide.srorules.com/company-guide.

A company falls below compliance if its shareholders' equity is less than:

- $2 million and the company has two out of three years of losses from continuing operations and/or net losses.
- $4 million and the company has three out of four years of losses from continuing operations and/or net losses.
- $6 million and the company has five consecutive years of losses from continuing operations and/or net losses.

A company is not subject to shareholders' equity continued listing requirements if it has:

- Market capitalization of $50 million; OR
- Total assets AND total revenue of $50 million each (in last fiscal year or two of the last three); AND (in each case)
- Distribution: 1.1 million shares publicly held, $15 million market value of public float, and 400 round-lot shareholders.

Common Stock Distribution Requirements:
The Exchange will normally consider suspending dealing in, or removing from the list, a security when:

- The number of publicly held shares is less than 200,000; OR
- It has fewer than 300 shareholders; OR
- The market value of publicly held shares is less than $1 million (if below for 90 consecutive days).

### Appendix VI: Summary of filing and other requirements based on issuer category
*KPMG LLP*

The following table summarizes some of the most common financial statement filing requirements, Regulation S-K disclosure requirements, and other rules for nonaccelerated filers, smaller reporting companies, emerging growth companies (EGCs) and foreign private issuers (FPIs).

| Requirement | Nonaccelerated reporting company | Categories with modified reporting requirements | | |
|---|---|---|---|---|
| | | **Smaller reporting company** | **EGC** | **FPI** |
| **Audited financial statements in initial registration statement** | | | | |
| Balance sheet | Most recent two fiscal year-ends | Most recent two fiscal year-ends | Most recent two fiscal year-ends | Most recent two fiscal year-ends if financial statements are presented in accordance with US GAAP. Most recent three fiscal year-ends if presented in accordance with IFRS as issued by the IASB[a] |
| Statement of comprehensive income, cash flows, changes in shareholders' equity | Most recent three fiscal years | Most recent two fiscal years | Most recent two fiscal years | Most recent three fiscal years[b] |
| Financial statements of a significant acquired business | Up to three years may be required, depending upon level of significance | Limited to up to two years, depending upon significance[c] | Limited to up to two years, depending upon significance | Up to three years may be required, depending upon level of significance[d] |
| **Initial SOX Act compliance after an IPO** | | | | |
| Quarterly section 302/906 certifications | First periodic filing (10-Q/10-K) after the IPO | First periodic filing (10-Q/10-K) after the IPO | First periodic filing (10-Q/10-K) after the IPO[e] | First Form 20-F filed after the IPO |
| Section 404(a) management report | Second 10-K filed after the IPO | Second 10-K filed after the IPO | Second 10-K filed after the IPO | Second 20-F filed after the IPO |
| Section 404(b) auditor attestation[f] | Second 10-K filed after the IPO if an accelerated filer | Not required | Transition period of up to five years | Second 20-F filed after the IPO |

*(Continued)*

**Appendices**

**Appendix VI: continued**

| Requirement | Nonaccelerated reporting company | Categories with modified reporting requirements | | |
|---|---|---|---|---|
| | | **Smaller reporting company** | **EGC** | **FPI** |
| **Select Regulation S-K disclosure requirements** | | | | |
| Selected financial information | Last five fiscal years and interim periods presented | Not required | Last two fiscal years and interim periods presented[(g)] | Last five fiscal years and interim periods presented |
| | | **Smaller reporting company** | **EGC** | **FPI** |
| MD&A | three years | two years | two years | three years |
| Initial compliance with XBRL | First 10-Q filed after the IPO | First 10-Q filed after the IPO | First 10-Q filed after the IPO | First 20-F filed after the IPO |

*GAAP = generally accepted accounting principles; IASB = International Accounting Standards Board; IFRS = International Financial Reporting Standards; MD&A = management's discussion and analysis; SOX = Sarbanes–Oxley; XBRL = eXtensible Business Reporting Language.*

*(a) IFRS requires a first-time adopter to present an opening IFRS statement of financial position at the date of transition to IFRS, which results in the presentation of three statements of financial position. An FPI that is not a first-time adopter of IFRS is also required to provide three statements of financial position if it makes retrospective revisions to its financial statements, which is required upon adoption of a new accounting policy, a restatement or a reclassification in the financial statements. Even if an FPI is an EGC, it would still be required to provide three statements of financial position in these instances to assert that its financial statements are prepared in compliance with IFRS as issued by the IASB.*

*(b) In an initial registration statement, if the financial statements are presented in accordance with US GAAP (rather than reconciled to US GAAP), the earliest of the three years of financial statements may be omitted if that information has not previously been included in a filing made under the Securities Act of 1933 or the Exchange Act. This accommodation does not apply to financial statements presented in accordance with IFRS as issued by the IASB, unless the issuer is applying IFRS as issued by the IASB for the first time. Instruction G to Form 20-F provides for an accommodation that permits an FPI in its first year of reporting under IFRS as issued by the IASB to file two years rather than three years of statements of income, changes in shareholders' equity and cash flows prepared in accordance IFRS as issued by the IASB.*

*(c) A third year is required if the acquisition is greater than 50% significant and the acquired business had revenues of at least $100 million in its most recent fiscal year.*

*(d) An FPI is required to comply with the reporting requirements of Rule 3-05 for material acquisitions when registering securities. An FPI is not subject to the ongoing reporting filing requirements of Rule 3-05 for a material acquisition (FPIs are not subject to the reporting filing requirements of Form 8-K).*

*(e) If an FPI qualifies as an EGC, this is required with the first Form 20-F filed after the IPO.*

*(f) Under existing SEC rules and regulations, newly public entities, other than nonaccelerated filers, begin complying with Section 404(b) auditor attestation of the SOX Act with their second annual report filed with the SEC. An EGC will be exempt from this requirement as long as it qualifies as an EGC; however, management's reporting on internal control is still required.*

*(g) After going public, an EGC will file annual, quarterly and periodic reports under existing SEC rules and regulations. An EGC filing that includes selected financial data in a filing is not required to provide this information for periods earlier than those presented in the EGC's initial registration statement.*

nyse.com/ipo

# Contributor profiles



nyse.com/ipo

**Contributor profiles**





| | |
|---|---|
| **NYSE** | **AST** |
| 11 Wall Street | 6201 15th Avenue |
| New York, NY 10005 | Brooklyn, NY 11219 |
| Tel: +1 212 656 4050 | Tel: +1 877 814 9687 |
| Web: nyse.com | Web: www.astfinancial.com |

**Michael Harris**
Global Head of Capital Markets
NYSE Group
Michael.Harris@nyse.com

Michael Harris is the Global Head of Capital Markets for NYSE Group, a part of Intercontinental Exchange, Inc. (NYSE: ICE).

Mr. Harris is responsible for attracting the world's leading companies to list on the NYSE, the world's largest and most liquid exchange. He leads a global team focused on facilitating dialogue and building strategic relationships with key stakeholders within the private company ecosystem including founders/CEO's, venture capital and private equity firms, advisory firms and market makers.

Prior to joining the NYSE, Mr. Harris spent over four years at Citadel Securities as its Head of Capital Markets and Business Development, where he was responsible for building out corporate relationships and expanding Citadel's presence with financial sponsors, VCs, corporate clients, and equity advisors.

Earlier in his career, Mr. Harris served as the Deputy Chief Investment Officer at the U.S. Treasury Department where he was responsible for managing the successful disposition of the government's investments in the TARP program.  Prior to, he held a number of senior investment banking and capital market advisory positions at JPMorgan and UBS Investment Bank.

Mr. Harris earned a BA in Economics and a BS in Social Policy from Northwestern University. He currently serves on the board of directors at TriState Capital Holdings, an independently chartered specialty finance and banking subsidiary of Raymond James that provides commercial, industrial, and private banking solutions.

**Robert M. Carney, Sr.**
President, Issuer & Investor Services
ipos@astfinancial.com

Robert (Bob) Carney oversees all operational and procedural functions of AST, including supervising AST's relationship management teams. Bob has spent over 30 years in the industry, beginning his career at Mellon Investor Services, now The Bank of New York Mellon. During his tenure at Mellon Investor Services, he managed product development, marketing, management, operations and technology investments for its Shareholder Services Group and was instrumental in merging each company's stock transfer business units.

Bob is a member of the Shareholder Services Association and Unclaimed Property Liaison Group. He also served as Vice President and Board Member of the Stock Transfer Association. He graduated summa cum laude from Saint Peter's College with a BS in business management and an MBA in international business.

**Richard Grubaugh**
Senior Vice President, D.F. King & Co., an AST Company
ipos@astfinancial.com

Richard (Rick) Grubaugh serves as co-Director of D.F. King's corporate proxy division, with experience in proxy solicitation, corporate actions and investor communications businesses. Rick primarily advises corporations and shareholders involved in complex shareholder transactions specializing in corporate control situations such as proxy contests, mergers and acquisitions, unsolicited tender offers and corporate governance issues.

Rick has extensive experience advising clients in efforts to maximize support for the board of directors, anti-takeover matters and comprehensive institutional and retail solicitation programs, including strategy formulation, shareholder profile analysis, design of effective communications initiatives and message development to maximize support for the board's position. Advice on such matters includes experience with known institutional investor voting guidelines, the influence of voting recommendations of proxy advisory firms and the coordination with board members and senior management on effective solicitation programs to maximize positive results.

Recent representations in contested assignments includes representation of eBay, GCP Applied Technologies, Colony Capital, Bed Bath & Beyond and Procter & Gamble. Rick also provides annual proxy solicitation advice to corporations in the telecommunications, chemical, defense, technology and retail industries, among others.

Prior to joining D.F. King, Rick was a founding partner of Beacon Hill Partners. Rick began his proxy solicitation career at the Carter Organization, joining that firm in 1986.

**Carine Schneider**
President, Private Company Solutions
ipos@astfinancial.com

Carine Schneider, Fellow of Global Equity, President, AST Private Company Solutions, is an experienced and well-connected entrepreneur in the private company market and global compensation industry. She has held positions including President of Nasdaq Private Market Equity Solutions, CEO and Board Director at Certent and



**FTI Consulting**
555 12th St., NW Suite 700
Washington, D.C., 20004
Tel: +1 202 312 9100
Web: www.fticonsulting.com

Founder, CEO and Board Director at Global Shares.

Carine was formerly a partner with PricewaterhouseCoopers and Nua Group and has held senior roles at Morgan Stanley and Towers Watson. Schneider was also named one of Silicon Valley's 100 "Women of Influence" by the *Silicon Valley Business Journal* in 2017, among other honors.

In 1993, Carine founded the National Association of Stock Plan Professionals; in 1999, she founded the Global Equity Organization; and over the years, she has launched several other related industry organizations.

### Bryan Armstrong, CFA
Senior Managing Director
Bryan.Armstrong@fticonsulting.com

Bryan M. Armstrong is a Senior Managing Director in the Strategic Communications segment of FTI Consulting and serves as head of the Capital Markets Communications practice in the Americas.

For over 20 years, Bryan has provided strategic communications advice on mergers and acquisitions; initial public offerings; SPAC transactions; environmental, social and governance and other complex issues facing public clients.

Bryan's experience also includes advising clients through a variety of crises, including shareholder activism and other dissident shareholder relations issues, financial restatements, exchange delistings, unplanned leadership departures and strategic transformations.

Bryan received his BBA in finance at the University of Wisconsin–Madison with a concentration in international business. In addition, Bryan holds the Chartered Financial Analyst (CFA) designation and is a member of the CFA Institute.

### Melanie Dambre, IRC
Managing Director
Melanie.Dambre@fticonsulting.com

Melanie Dambre is a Managing Director in the Strategic Communications segment at FTI Consulting and is based in New York. She is part of the segment's Financial Communications practice, working across its capital markets, activism defense, and mergers and acquisitions specialty teams.

Melanie develops and implements best-in-class investor relations programs for a large variety of US-based and non–US based public companies. She also supports clients with strategic communications and research-driven counsel on initial public offerings, SPAC transactions, mergers and acquisitions, business transformations, proxy fights, environmental, social and governance strategies and restructuring activities. She has worked with a range of industry-leading companies in the retail, consumer, technology, industrial and energy sectors.

Melanie graduated with a MSc in Management from HEC Paris. In addition, Melanie earned the Investor Relations Charter (IRC ) from the National Investor Relations Institute and received a Certificate in Investor Relations from New York University School of Professional Studies.

### Ben Herskowitz
Managing Director
Ben.Herskowitz@fticonsulting.com

Ben Herskowitz is a Managing Director in the Strategic Communications segment at FTI Consulting and is based in New York. He is part of the segment's Financial Communications practice, working across its capital markets, activism defense, mergers and acquisitions, and environmental, social and governance specialty teams. He is also a member of the industrials sector team.

Ben has extensive experience covering multiple industries including greater industrials, FinTech, renewables, consumer lending, online gaming, and cloud software,

**Contributor profiles**



**IHS Markit**
450 West 33rd Street,
New York, NY, 10001
Tel: +1 212 931 4900
Web: www.ihsmarkit.com

among others. In these sectors, Ben's experience encompasses optimizing investor messaging, capital-allocation-focused strategic repositioning, enhancing shareholder engagement, maximizing enterprise value around transformative announcements, sustainability program construction, and shareholder activism preparedness.

Ben has worked on a variety of M&A transactions during his career, in addition to perception due diligence studies, investor/sell-side targeting and nondeal roadshow formation, and IPO-readiness strategies.

Ben graduated cum laude from Wake Forest University in 2014 with a BS in finance.

**Kelly McGeehan**
Managing Director & Global Head,
IHS Markit Issuer Solutions
kelly.mcgeehan@ihsmarkit.com

Kelly McGeehan is the Managing Director & Global Head of IHS Markit's Issuer Solutions, responsible for all aspects of strategy and execution for the business, which provides investor relations clients with the intelligence, technology and expertise required to run successful investor relations programs. She leads a global team, with offices across North America, Europe, Asia-Pacific and Africa. Prior to her current role, Kelly drove revenue growth and client acquisition as Global Head of Client Service and Sales for the business.

Kelly has over 20 years of experience in corporate investor relations and capital markets. Prior to IHS Markit, she held senior leadership roles in product, client service, sales and operations at Ipreo and Thomson Financial.

She is a graduate of the University of California at Berkeley, and currently serves as the Vice President of Programs for NIRI San Francisco.

**Richard Blore**
Chief Executive Officer, KY3P,
IHS Markit
Richard.blore@ihsmarkit.com

Richard Blore leads strategic business initiatives for Know Your Third Party (KY3P ), the industry standard for third-party risk management.

Richard is responsible for managing product and business development teams for KY3P, a solution designed in partnership with leading global financial institutions

to increase efficiency and standardize third-party due diligence and assessment processes. Previously, he worked at Goldman Sachs where he was Global Head of Vendor Management, Global Head of Procurement and Vendor Management and Global Co-Head of Supply Chain. He was accountable for the firm's third-party risk management, shared services management as well as all aspects of procurement including strategic sourcing, procurement operations, supply chain environmental, social and governance (ESG) and enabling technologies. Richard also represented Goldman Sachs as a member of the KY3P Board from 2017 to 2019. Prior to his time in the financial service industry, Richard held a number of supply chain leadership roles across fast-moving consumer goods (Coca-Cola), construction (Anglo America) and manufacturing (Rolls-Royce). He holds a BSc in Applied Physics from Nottingham Trent University and is qualified with the Chartered Institute of Purchasing and Supply.

**Andreas Posavac**
Executive Director, Head of Global ESG, M&A and Governance Advisory, IHS Markit
Andreas.Posavac@ihsmarkit.com

Andreas Posavac runs a global team that supports companies and their C-suite and investor relations teams as well as their banking and legal advisers with market intelligence, risk analytics and advisory services focused on institutional investors in the lead up to M&A transactions, general meetings or special situations. His team also works with companies to develop a coherent ESG and engagement strategy to follow legal and industry best-practice

## J.P.Morgan

**JPMorgan Chase & Co.**
383 Madison Avenue
New York, NY 10017
www.jpmorgan.com

standards and take advantage of the opportunities in sustainable investments and increased ESG integration. Andreas has deep knowledge of the ESG and corporate governance sensitivities of institutional investors, their relationships to external advisors as proxy advisory and ESG rating firms and can help stakeholders better understand how to address governance and ESG in order to have the greatest impact in minimizing risks and maximizing opportunities in the current capital markets landscape.

**Achintya Mangla**
Global Head of Equity Capital Markets
achintya.mangla@jpmorgan.com

Achintya Mangla is the Global Head of Equity Capital Markets at J.P. Morgan. Prior to this, Achintya was the Head of European ECM. He has been with J.P. Morgan for over 19 years and, prior to taking the global responsibility, held various roles at the firm in Asia-Pacific and Europe. Achintya originally trained as an engineer and holds an MBA from the Indian Institute of Management Ahmedabad (IIMA).

**Elizabeth Myers**
Global Chairman of Investment Banking
elizabeth.p.myers@jpmorgan.com

Elizabeth Myers is a Global Chairman of Investment Banking at J.P. Morgan. Elizabeth joined J.P. Morgan 28 years ago. Prior to assuming the Chairman role, she served as the Head of both Global Equity Capital Markets and Americas Equity Capital Markets (ECM). Over the past 23 years in ECM, she has executed numerous IPOs, follow-ons and convertibles for clients across the globe, spanning a range of industries including financials, technology, real estate, industrials, healthcare, natural resources and consumer/retail. Prior to joining ECM, she worked for several years in J.P. Morgan's mergers & acquisitions group and focused on transactions across a range of industries. Elizabeth has an MBA from Harvard Business School and a BA in Economics from Princeton University.

**Contributor profiles**

**Brittany Collier**
Executive Director
brittany.a.collier@jpmorgan.com

Brittany Collier is the Head of Consumer Equity Capital Markets at J.P. Morgan and also helps lead the special purpose acquisition company (SPAC) effort. Brittany has worked within ECM since 2009. Prior to her current role, she was a member of the Financial Institutions Investment Banking coverage group, focusing on mergers and acquisitions (M&A) advisory as well as equity and debt capital raising for bank clients. Brittany received a BS in Commerce with Distinction from the McIntire School of Commerce of the University of Virginia.

**Stephanie Casey**
Vice President Client Advisory,
Global Lead
Ex-Asia Pac, London
stephanie.casey@jpmorgan.com

Stephanie Casey re-joined J.P. Morgan in 2016 having had a career in corporate access for over 10 years. Leading the client advisory services, Stephanie brings a deep knowledge of the institutional investor landscape, strategic engagement with the buy-side and leveraging the J.P. Morgan Corporate Investment Bank. Prior to joining J.P. Morgan, Stephanie played a similar role at Citi, UBS and Morgan Stanley.

Stephanie advises J.P. Morgan DR clients on various aspects of investor relations within the equities markets. Scanning the IR landscape, Stephanie assesses the range of key topics impacting the industry, from the rise of blockchain, AI and exchange-traded funds (ETFs) to passive investing to environmental, social and governance (ESG) and beyond.

Stephanie tracks trends and identifies the real challenges for IR as the market ecosystem continues to evolve (i.e., strong emergence of buy-side in-house corporate access teams post MiFID II). Stephanie develops relationships across strategic market participants, for example with the heads of ESG research at institutional houses.

Additionally, Stephanie curates and distributes a number of strategic, economic and thematic research pieces published by J.P. Morgan.

Stephanie also offers insight and advice relating to corporate access and can assist in formulating an IR strategy, building an effective IR infrastructure, training executives new to investor relations and analyzing changes in institutional ownership.



**KPMG LLP**
345 Park Avenue
New York, NY 10154-0102
Tel: +1 212 758 9700
Web: www.kpmg.com

**Aamir Husain**
Global and National Leader Capital Markets Readiness
Partner, New York
ahusain@kpmg.com

Aamir Husain is a Partner at KPMG in the firm's New York office where he is the global and US national leader of the IPO Advisory practice. He has more than 25 years of experience providing capital markets advisory services to global private equity funds, investment banks and other strategic investors. Aamir advises clients with technical and project management advice on complex accounting and finance reporting issues associated with the SEC registration process, IPOs, SPAC transactions, 144a debt offerings, carve-outs and conversions to and from International Financial Reporting Standards (IFRS) and US generally accepted accounting principles (GAAP). He has extensive experience in cross-border transactions and has assisted major international institutions in the US, Europe and Asia list on the New York Stock Exchange, as well as on exchanges in London, Hong Kong and Toronto. During his career, Mr. Husain has worked on more than 50 IPOs. He received his BA from Boston University and is a member of the American Institute of Certified Public Accountants (AICPA) and the Institute of Chartered Accountants in England and Wales (ICAEW).

**John Lambert**
Partner, Dallas
jlambert@kpmg.com

John Lambert is a Partner at KPMG in the firm's Accounting Advisory Services. He provides accounting and advisory services to a global client base including IPOs, special-purpose acquisition company (SPAC) transactions and 144a debt offerings. His experience includes a three-year rotation in KPMG's Department of Professional Practice and a three-year secondment in a capital market's European headquarters. He received his MA and BBA from the University of Texas at Austin.

**Shari Mager**
Partner, Silicon Valley
smager@kpmg.com

Shari Mager is a Partner at KPMG in the firm's Accounting Advisory practice. She is based in the Silicon Valley office, providing capital markets advisory services to private equity and venture-backed companies. Shari provides clients with accounting, financial reporting and project management advice for both public and private equity and debt offerings, including IPOs, SPAC transactions and 144a debt offerings, as well as mergers, acquisitions and divestitures. This includes assisting clients with SEC filings and reporting matters, as well as sell-side assistance including carve-outs, US GAAP technical accounting issues and post-merger financial integrations, such as accounting conversion and business combination issues.

**Sarmed Malik**
Partner, New York
sarmedmalik@kpmg.com

Sarmed Malik is a Partner at KPMG in the firm's Accounting Advisory practice. He is based in the New York office, providing mergers and acquisitions (M&A) and capital markets advisory services to private equity and venture-backed companies. Sarmed has led engagements that assist clients with meeting initial listing and post-listing regulatory requirements on the US, London and Hong Kong stock exchanges. He specializes in SPAC and IPO transactions and has led more than 50 IPOs and 10 SPAC transactions during his career at KPMG.

Contributor profiles

# LATHAM&WATKINS LLP

**Latham & Watkins LLP**
1271 Ave. of the Americas
New York, NY 10020
Tel: +1 212 906 1200
Web: www.lw.com

## Marc Jaffe
New York Office Managing Partner
marc.jaffe@lw.com

Marc Jaffe is the Managing Partner of Latham & Watkins' New York office. He previously served as Global Chair of the firm's Corporate Department and Global Co-Chair of the Capital Markets Practice. Marc represents leading issuers, investment banking firms and investors in both public and private debt and equity offerings, as well as in lending transactions. He handles high-profile and precedent-setting corporate finance matters on behalf of prominent US and foreign investment banks, public companies, non-US corporations, private equity funds and mezzanine investment funds. He also advises on general securities and corporate matters. In addition, Marc co-led the Latham teams that represented Spotify in its groundbreaking direct listing on the NYSE in 2018 and has advised on the direct listings of Coinbase, Squarespace, Warby Parker, and ZipRecruiter.

## Ian Schuman
Partner & Global Capital Markets and Public Company Representation Practices Chair
ian.schuman@lw.com

Ian Schuman is a Partner in the New York office of Latham & Watkins and Global Chair of the firm's Capital Markets and Public Company Representation Practices. Ian represents issuers and underwriters in complex, high-profile equity and debt offerings, both in the United States and internationally. Ian also represents companies with respect to general corporate and securities matters. He advises on cross-border transactions, debt exchange offers, high-yield debt offerings, IPOs, public and private equity offerings, tender offers and consent solicitations. Ian advised on the direct listing of ZipRecruiter.

## Greg Rodgers
Partner & Global Corporate Department Vice Chair
greg.rodgers@lw.com

Greg Rodgers is a Partner in the New York office of Latham & Watkins, Global Vice Chair of the Corporate Department, and a member of the firm's Capital Markets and Public Company Representation and Derivatives Practices. In corporate finance matters, Greg represents issuers, investors, and investment banks in public and private equity, debt and hybrid capital markets transactions, commercial lending transactions, restructurings and other financing transactions, with a particular focus on equity-linked securities and investment grade and high-yield debt securities. In addition, Greg co-led the Latham team that represented Spotify in its groundbreaking direct listing on the NYSE in 2018 and has advised on the direct listings of Amplitude, Asana, Coinbase, Slack, Squarespace, and Wise.

## Benjamin Cohen
Partner
benjamin.cohen@lw.com

Benjamin Cohen is a Partner in the New York office of Latham & Watkins. Benjamin is a member of the Corporate Department and focuses on capital markets, general securities and corporate matters. He primarily handles a broad range of capital markets and other financial transactions, including IPOs, direct listings, high-yield debt offerings, leveraged buy-outs, public and private equity offerings, debt exchange offers, tender offers and consent solicitations. In addition, Ben was part of the Latham team that represented Spotify in its groundbreaking direct listing on the NYSE in 2018 and has advised on the direct listings of Coinbase, Slack, Squarespace, and Warby Parker.

## Alex Cohen
Partner & National Office Co-Chair
alexander.cohen@lw.com

Alex Cohen is a Partner in the Washington, D.C. office of Latham & Watkins and Co-Chair of the firm's National Office, a central resource for clients and Latham lawyers facing complex issues arising under the US securities laws. Alex served as the SEC's Deputy General Counsel for Legal Policy and Administrative Practice and later as Deputy Chief of Staff.

## Paul Dudek
Partner & National Office Co-Chair
paul.dudek@lw.com

Paul Dudek is a Partner in the Washington, D.C. office of Latham & Watkins and Co-Chair of the firm's National Office. Paul served for 23 years as Chief of the Office of International Corporate Finance in the US SEC Division of Corporation Finance. His practice covers all aspects of cross-border capital market transactions involving non-US companies and sovereigns, as well as related regulatory matters.

## Joel Trotter
Partner & National Office Co-Chair
joel.trotter@lw.com

Joel Trotter is a Partner in the Washington, D.C. office of Latham & Watkins and Co-Chair of the firm's National Office. He is the former Global Co-Chair of the Public Company Representation Practice and previously served for 10 years as Co-Chair of the Corporate Department in the Washington, D.C. office. Joel's practice focuses on capital markets transactions, mergers and acquisitions, securities regulation and corporate governance. He represents issuers and underwriters in the public offering process and other SEC-related matters. He counsels boards of directors on governance issues, corporate crises and business combination proposals.



**Marsh**
1166 Avenue of the Americas,
New York, NY 10036
Tel: +1 212 345 5000
Web: www.marsh.com

As one of two lawyers on the IPO Task Force, Joel served as a principal author of the IPO-related provisions of the Jumpstart our Business Startups Act of 2012, enacted by a nearly unanimous Congress to reform the IPO process for emerging growth companies.

**Michele Anderson**
Partner
michele.anderson@lw.com

Michele Anderson is a Partner in the Washington, D.C. office of Latham & Watkins and member of the National Office, a central resource for clients and Latham lawyers facing complex issues arising under the US securities laws. Prior to joining Latham, Michele served for 24 years in the US Securities and Exchange Commission's Division of Corporation Finance. She held a number of senior positions in the Division, including most recently serving as Associate Director and Acting Deputy Director. For nearly 15 years she led and then oversaw the Division's Office of Mergers and Acquisitions. Michele leverages her extensive knowledge and SEC experience to help the firm's lawyers and clients navigate the disclosure requirements and other SEC rules that affect domestic and cross-border M&A and capital markets transactions. She also advises public company clients confronting shareholder activism and corporate governance issues.

**Brittany Ruiz**
Partner
brittany.ruiz@lw.com

Brittany Ruiz is a partner in the New York and Los Angeles offices of Latham & Watkins. Brittany is a member of the Corporate Department and her practice focuses on capital markets, general securities and corporate matters. She advises issuers and investment banks on a variety of equity and debt capital markets matters, including IPOs, direct listings and high-yield debt securities. In addition, Brittany was part of the Latham team that represented Spotify in its groundbreaking direct listing on the NYSE in 2018 and also advised on the direct listings of Coinbase, Slack, and Warby Parker.

**Matthew McLellan**
D&O Liability Product Leader, FINPRO, Marsh Specialty
matthew.mclellan@marsh.com

As the Marsh Directors and Officers (D&O) Product Leader, Matthew McLellan is responsible for developing and implementing Marsh's strategy with respect to the D&O product overall and with regard to interactions with colleagues, clients and prospects. Matt leads the team responsible for interactions with Marsh's D&O insurer trading partners regarding coverage and leads Marsh's efforts in the creation and delivery of D&O thought leadership. As a client advisor, Matt specializes in renewal strategies and negotiations, as well as complex D&O liability coverage and claims issues. He also advises on policy language and endorsements to seek the best possible coverage afforded by the insurance markets and produces content for internal and external distribution. Prior to joining Marsh, Matt was in private practice at Troutman Pepper and Hunton Andrews Kurth LLP. Matt also spent a year in an in-house legal role counseling financial institution clients on risk relating to litigation and M&A activity.

**Contributor profiles**

# Simpson
## Thacher

**Simpson Thacher & Bartlett**
425 Lexington Ave.
New York, Ny 10017
Tel: +1 212 455 2000
Web: www.simpsonthacher.com

**Kate Friis**
Senior Vice President, Professional
Excellence Leader
Marsh Private Client Services
kate.friis@marsh.com

Kate Friis leads the business compliance and quality assurance functions for Marsh Private Client Services as a part of the national client experience team. She has spent almost 20 years in the personal lines industry, focused on private client advising and the unique risk management challenges of affluent individuals. As an experienced insurance industry professional, she has an extensive background in client/partner relationship management, compliance, data privacy and organizational excellence. She has provided subject matter expertise on insurance risk and mitigation topics such as cybercrime, flood and wildfire to various publications. Kate earned a BA in communications from Western Connecticut State University, an MS in management and organizational behavior from Benedictine University, and a certificate in instructional design from the University of Wisconsin's Stout Graduate School. She believes in the value of continued learning and is in the process of completing a second master's degree as well as earning her Chartered Private Risk Insurance Advisor (CPRIA) designation.

**Janeen McIntosh**
Senior Consultant
NERA Economic Consulting
janeen.mcintosh@nera.com

Janeen McIntosh has over 15 years of experience in financial and economic advisory and litigation consulting for securities and finance, product liability and mass torts, and labor and employment matters. She has consulted on securities class actions examining materiality, loss causation and liability. Her work on these cases has included estimating inflation, damages and settlement ranges. She has also done analyses for class certification and market efficiency. She frequently works with large data sets, designing models to evaluate liability and performing various statistical analyses. Janeen is also the lead author for NERA's annual securities class action trends report series. She earned her BA in mathematics and economics from Grinnell College and her MS in statistics from Texas A&M University.

**Joshua Ford Bonnie**
Partner, Co-Head of the Global Capital Markets practice, and Co-Managing Head of the  Washington, D.C. Office
jbonnie@stblaw.com

Joshua Ford Bonnie is the Co-Head of the Global Capital Markets practice and Co-Managing Partner of the Washington, D.C. office of Simpson Thacher & Bartlett LLP. Josh is one of the preeminent IPO lawyers in the nation and regularly counsels public companies on spin-offs and other significant strategic transactions, capital markets offerings and general corporate and securities law matters. Josh has extensive experience with cross-border and complex IPOs, including those employing UP-C and other multiple-tier umbrella partnership structures. His experience also includes business combinations involving special purpose acquisition companies. Josh has been featured as a "Dealmaker of the Year" by *The American Lawyer*, is recognized by *Chambers Global, Chambers USA* and *The Legal 500 United States* as one of the leading capital markets practitioners in the United States and is endorsed by *PLC Which Lawyer*?

**William B. Brentani**
Partner and Head of the Palo Alto Office
wbrentani@stblaw.com

William B. Brentani is a Partner in the Corporate Department of Simpson Thacher & Bartlett LLP and serves as Head of the firm's Palo Alto office and Co-Chair of the firm's Opinion Committee. Bill regularly works for issuers and underwriters in a broad range of public and private debt, equity and equity-linked offerings. Bill also represents private equity sponsors in acquisition financings and advises companies on corporate governance and securities law-related matters. He has

worked on offerings involving issuers from a variety of industries, including technology, healthcare, real estate, entertainment, energy and transportation, as well as SPAC and de-SPAC transactions. *Chambers USA* has recognized Bill as a leading lawyer for a number of years and describes him as "highly sought after for his expert counsel on transactions in diverse sectors." Clients laud him as "highly technically knowledgeable," "great to work with" and, tellingly, that "our needs are his needs" (*Chambers USA*).

**William R. Golden III**
Partner
wgolden@stblaw.com

William R. Golden III is a Partner in the Capital Markets practice of Simpson Thacher & Bartlett LLP and based in the Washington, D.C. office. Will represents issuers, private equity sponsors and underwriters in a wide range of securities offerings, including IPOs, follow-on and secondary equity offerings, spin-offs, high yield and investment grade debt offerings and acquisition financing transactions, as well as exchange offers and other liability management transactions. Will also advises clients on ongoing public reporting, compliance and corporate governance matters. Will has experience with complex IPOs, including those employing UP-C and other multiple-tier umbrella partnership structures. He co-authored a practice note on UP-C IPO structures in *Practical Law Corporate & Securities*.

**Joseph H. Kaufman**
Partner
jkaufman@stblaw.com

Joseph H. Kaufman is a New York-based Partner in the Capital Markets practice of Simpson Thacher & Bartlett LLP. He has a rich and varied practice assisting clients on private and public debt and equity offerings, as well as on corporate governance, business combinations and general corporate and securities law matters. Joe has advised Avantor on its $4.37 billion IPO and HCA on its $4.35 billion IPO—the two largest healthcare IPOs in US history. Joe has been recognized as a leading lawyer in capital markets by *Chambers USA* and *The Legal 500 United States*, and *The National Law Journal* has cited him as one of the top three "Most Influential Lawyers" in finance and capital markets.

**Edgar J. Lewandowski**
Partner
elewandowski@stblaw.com

Edgar J. Lewandowski is a New York-based Partner in the Corporate Department of Simpson Thacher & Bartlett LLP. Concentrating on securities law and corporate governance, he has wide-ranging experience advising a variety of issuers, private equity sponsors and investment banks. Edgar advises on IPOs, spin-offs, high yield and investment-grade debt offerings and various other capital markets transactions. He also advises boards of directors on general corporate and compliance matters. He represents clients in numerous industries, including real estate, hospitality, health care, construction materials and information technology. Edgar has been recognized as a "Next Generation Lawyer" by *The Legal 500* and as a "BTI Client Service All-Star," an award based solely on unprompted feedback from corporate counsel at large and Fortune 1000 organizations that are asked to identify outside counsel attorneys who deliver the absolute best in client service.

**Jonathan H. Pacheco**
Counsel
jonathan.pacheco@stblaw.com

Jonathan Pacheco is Counsel in the Capital Markets Practice of Simpson Thacher & Bartlett LLP and based in the Washington, D.C. office. Jonathan represents issuers, private equity sponsors and underwriters in a wide range of securities offerings, including IPOs, follow-on and secondary equity offerings, preferred equity offerings and high yield and investment grade debt offerings, as well as exchange offers and other liability management transactions. Jonathan also advises clients on ongoing public reporting, compliance and corporate governance matters.

**Kenneth B. Wallach**
Partner
kwallach@stblaw.com

Kenneth B. Wallach is a Corporate Partner in the New York office of Simpson Thacher & Bartlett LLP. He regularly advises corporate, private equity and investment banking clients on a wide array of corporate finance transactions, particularly in IPOs, high yield offerings and restructurings, as well as on corporate governance issues and other general corporate matters. Ken serves on the firm's Executive Committee and as a Co-Chair of the firm's Business Development Committee. Ken has been recognized by *The Legal 500 United States* and *Chambers USA*, where he was cited "as one of the firm's next generation of leading specialists and an attorney who can easily take on extremely complicated deals."



11 Wall Street
New York, NY 10005
+1 212 656 4050
nyse.com/ipo