# EXHIBIT 34

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC. SECURITIES LITIGATION | Case No. 4:21-cv-02473 |

**EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA**

**May 8, 2024**

1

## Table of Contents

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | SUMMARY OF OPINIONS | 4 |
| III. | THERE IS A CLEAR ECONOMIC AND CAUSAL LINK BETWEEN PLAINTIFFS' ALLEGED MISSTATEMENTS AND THE ALLEGED CORRECTIVE DISCLOSURE, WHICH RESULTED IN A STATISTICALLY SIGNIFICANT STOCK PRICE DECLINE, THUS DEMONSTRATING PRICE IMPACT | 7 |
| IV. | MS. ALLEN'S "CONTENT ANALYSIS" OF ANALYST REPORTS AFTER THE ALLEGED CORRECTIVE DISCLOSURE DOES NOT IMPLY A LACK OF BACK-END PRICE IMPACT | 16 |
| V. | MS. ALLEN'S "CONTENT ANALYSIS" OF ANALYST REPORTS AT THE TIME OF THE "CATEGORY A" MISREPRESENTATIONS AND/OR OMISSIONS IS IRRELEVANT AND FLAWED | 23 |
| VI. | THE OUT-OF-POCKET METHODOLOGY IS FLEXIBLE ENOUGH TO ACCOMMODATE ALL OF MS. ALLEN'S LOSS CAUSATION CONCERNS | 28 |
| | A. THE OUT-OF-POCKET METHODOLOGY CAN ADAPT TO THE VALUATION DIFFERENCE BETWEEN AN UNDERSTATED RISK AND THE MATERIALIZATION OF THAT RISK IF PLAINTIFFS WERE PURSUING THAT LOSS CAUSATION THEORY | 34 |
| | B. TO THE EXTENT IT IS A VALID LOSS CAUSATION CONCERN, THE OUT-OF-POCKET METHODOLOGY CAN ADDRESS CHANGES IN INFORMATION OVER TIME | 37 |
| | C. THE OUT-OF-POCKET METHODOLOGY CAN EASILY ADDRESS PRE-MERGER CONCHO SHAREHOLDERS | 39 |
| VII. | MS. ALLEN'S DISCUSSION OF THE PREMIUM RECEIVED BY RSP IN THE MERGER HAS NOTHING TO DO WITH ARTIFICIAL INFLATION OR PLAINTIFFS' DAMAGES | 40 |

## I.  INTRODUCTION

1.  My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.[1]

2.  On December 7, 2023, I submitted an expert report (the "Coffman Report" or my "Report") in this matter, in which I opined that the market for Concho Resources, Inc. ("Concho" or the "Company") Common Stock was efficient throughout the Class Period and that damages in this matter are subject to a common approach and a methodology that can be applied class-wide.[2]

3.  Following the submission of my Report, Plaintiffs' Counsel provided me with the March 15, 2024 Defendants' Opposition to Plaintiffs' Motion for Class Certification (the "Defendants' Motion"), and the March 15, 2024 Expert Report of Lucy P. Allen (the "Allen Report").  Plaintiffs' Counsel has asked me to review, evaluate, and respond to the Allen Report. My responses to the Allen Report are set forth in this document (my "Rebuttal Report").

4.  In formulating my opinions set forth in this Rebuttal Report, I have relied upon the analyses already described in my Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this lawsuit.  All of the materials I considered in forming my opinions are identified in **Appendix A** to this report.

---

[1] Since the time of my initial Report, I co-founded Peregrine Economics and terminated my employment with Global Economics Group.  Prior to January 1, 2024, Global Economics Group was being compensated for my work on this matter and for work performed by members of my staff acting under my supervision and direction.  My agreement with counsel for Plaintiffs transferred to Peregrine Economics on January 1, 2024 and the terms of that agreement otherwise remain unchanged.

[2] Coffman Report ¶¶ 6-7, 85.  Unless otherwise noted, capitalized terms in this report have the same meaning as in my Report, all emphasis in this report is added, and all times cited in this report are in Eastern Time.

5. My qualifications and rate of compensation for work in this matter were identified in my Report and I do not repeat them here. I have attached an updated version of my curriculum vitae as **Appendix B**.

6. I reserve the right to amend this Rebuttal Report to reflect new information that becomes available to me in light of further proceedings in this matter, including additional discovery and/or future rulings from the Court.

## II. SUMMARY OF OPINIONS

7. In summary, nothing in the Allen Report or Defendants' Motion disturbs my opinions that the market for Concho Common Stock was efficient during the Class Period and that economic damages in this matter can be calculated on a class-wide basis using a common methodology. Furthermore, there is compelling economic evidence of price impact on the alleged corrective disclosure date.

8. Ms. Allen does not dispute my opinion, or any of the analysis supporting my opinion, that the market for Concho Common Stock was efficient.[3]

9. There is clear and compelling economic evidence of back-end price impact in this matter that is not addressed in the Allen Report. Despite performing event study tests at the time of the alleged misrepresentations, the Allen Report is devoid of any statistical analysis of the alleged corrective disclosure event. Indeed, I find there is a highly statistically significant decline in the market price of Concho Common Stock caused by the alleged corrective disclosure. There is also a clear economic causal link between the information that Plaintiffs allege was concealed by the misrepresentations and the information that was revealed on the corrective disclosure event. Contemporaneously issued analyst reports identify the allegedly

---

[3] Coffman Report Section VII.

4

corrective information as new negative information that impacted the value of Concho Common Stock.

10. Ms. Allen's "content analysis" of analyst reports in the wake of the alleged corrective disclosure does not establish a lack of price impact. Her only empirical finding is that after the corrective information was released, there were no analyst reports that (1) specifically mentioned having learned a prior Concho statement was inaccurate or misleading; (2) specifically drew a connection between the corrective information and any specific alleged misstatement; or (3) specifically mentioned one of the alleged misstatements.[4] But Ms. Allen's analysis completely ignores that the analyst reports *do* focus on the new negative information Plaintiffs claim was corrective and that it impacted the value of Concho Common Stock. The role of securities analysts is to provide investment recommendations, which is necessarily a forward-looking analysis since the value of securities is based upon the present value of future cash flows to holders of those securities.[5] Analyst reports often discuss newly released information and how it impacts the analysts' views on the value of the firm and consequently, their recommendations. It is *not* the role of analysts to evaluate or be the arbiters of whether there are, or could potentially be, previous false or misleading statements or to catalog all of the potential economic links between prior statements and current events.

11. I understand that establishing a lack of price impact requires showing both (1) that there was no evidence of back-end price impact at the time of any corrective disclosure; *and* (2) that there is no evidence of front-end price impact at the time of the alleged misstatements. *Given that there is clear economic evidence of back-end price impact in this matter, the*

---

[4] Allen Report ¶¶ 28, 30, 34.

[5] *See*, Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, John Wiley & Sons, 2006, pp. 9-10.

*portions of the Allen Report that are directed at front-end price impact are irrelevant.* Nevertheless, her analysis of front-end price impact is flawed. First, the Allen Report completely ignores that Plaintiffs' theory is that the alleged misstatements and/or omissions failed to disclose negative information and thereby prevented the market price of Concho Common Stock from falling *and* that the alleged corrective disclosure corrected misstatements at a later time at which point the market price of Concho Common Stock fell, rather than alleging that the misstatements had a specifically positive price impact at the time they were made. Again, this renders her analysis irrelevant. Second, Ms. Allen's "content analysis" is entirely dependent upon a categorization of Plaintiffs' alleged misstatements that is incomplete and appears to be inherently flawed. Nothing in Ms. Allen's "content analysis" of analyst reports precludes the market price of Concho Common Stock from being artificially inflated. Whether analysts mentioned or focused on the alleged misstatements and/or omissions says nothing about whether further disclosure of negative information inconsistent with those statements would have impacted the market price of Concho Common Stock.

12. As it relates to damages, Ms. Allen does not dispute that the general damages framework/methodology that I detailed in the Coffman Report (i.e., the out-of-pocket methodology, by which I mean that damages are equal to the artificial inflation at time of purchase less the artificial inflation at the time of sale) is standard and virtually always used in securities class action matters alleging fraud under Section 10(b) of the Exchange Act to calculate damages on a class-wide basis.[6] Instead, Ms. Allen raises loss causation issues that are ubiquitous in class action securities litigation and some of which, to my understanding, are not required of Plaintiffs to address at this stage of the litigation. In particular, the out-of-pocket

---

[6] Coffman Report ¶ 79.

methodology is perfectly capable of handling the concerns raised by Ms. Allen related to the materialization of risks, changing information during the Class Period, and pre-merger purchasers of Concho Common Stock, and all of these issues can be analyzed on a class-wide basis.

13. Ms. Allen's comparison of the "premium" received by former shareholders of RSP Permian ("RSP") common stock and the size of the price reaction on the corrective disclosure is economically incoherent, unsupported by literature, and has nothing to do with class-wide damages in this matter. The premium to which she refers is the price that RSP shareholders received as part of Concho's acquisition of RSP over and above RSP's prior trading price.[7] This premium is not a windfall, but rather a gain in value that reflects both a share of the perceived synergies and benefits of the merger as well as the value of providing a controlling interest to the acquirer. These are legitimate economic benefits to shareholders that are completely and totally unrelated to whether the investor was harmed by a securities fraud. To suggest that the acquisition premium reflects a benefit that would have to be netted against the impact of a securities fraud makes no economic sense and there is no authority (and Ms. Allen cites none) to suggest otherwise.

### III. THERE IS A CLEAR ECONOMIC AND CAUSAL LINK BETWEEN PLAINTIFFS' ALLEGED MISSTATEMENTS AND THE ALLEGED CORRECTIVE DISCLOSURE, WHICH RESULTED IN A STATISTICALLY SIGNIFICANT STOCK PRICE DECLINE, THUS DEMONSTRATING PRICE IMPACT

14. The alleged corrective disclosure in this matter was made in Concho's Q2 2019 financial results, the press release for which was released after market close on July 31, 2019, revealed a reduced active rig count and weak production forecasts caused directly by wells that

---

[7] Allen Report ¶ 72.

were spaced too tightly, including at the Dominator.[8]  The misrepresentations alleged by

Plaintiffs (even some of those incorrectly categorized by Defendants as being "generic")

explicitly discuss well spacing,[9] well productivity/performance,[10] the Dominator project,[11] and

growth in production,[12] and all allegedly concealed that Concho was employing an unverified

and experimental development methodology, which included aggressively tight well spacing.[13]

This development methodology allegedly required an extremely high upfront investment that

would cause permanent impairment to production rates and total production due to improperly

spaced wells if unsuccessful.[14]  Plaintiffs allege that Defendants (1) declared the transition to

large-scale development as a success and touted its benefits despite having no basis to assert it

would work as intended;[15] (2) falsely stated to investors that "manufacturing mode" was the

product of gradual learning and verified techniques despite being experimental;[16] (3) issued non-

---

[8] Complaint ¶¶ 162-163, 298-300; "Concho Resources Inc. Reports Second-Quarter 2019 Results," *Business Wire*, July 31, 2019, 4:21 PM ("While the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), *performance from the project indicates the well spacing was too tight*."); "FQ2 2019 Earnings Call Transcripts," *S&P Capital IQ*, August 1, 2019, 9:00 AM ("In the Delaware Basin, the 23-well Dominator project was designed to test logistical capabilities and well spacing that was approximately 50% tighter than our current resource assessment. *While initial rates were solid, current performance data indicates that we developed [it] too densely*.").

[9] *See* misrepresentations A-8, A-15, A-17, A-25, A-31, A-32, B-2, and B-6 in Allen Report Appendix C.

[10] *See* misrepresentations A-19, A-27, B-7, and B-9 in Allen Report Appendix C, and a "Category D" misrepresentation for which Defendants do not dispute price impact as shown in Complaint ¶ 290 (*see* Appendix I to Defendants' Motion).

[11] *See* misrepresentations B-4 and B-8 in Allen Report Appendix C; and "Category D" misrepresentations for which Defendants do not dispute price impact as shown in Complaint ¶¶ 286, 292, and 294 (*see* Appendix I to Defendants' Motion).

[12] *See* misrepresentations A-21, A-24, C-2, and C-4 in Allen Report Appendix C; and "Category D" misrepresentations for which Defendants do not dispute price impact as shown in Complaint ¶¶ 285, 292, 253, 266, 288, 292, 293, 294, and 296 (*see* Appendix I to Defendants' Motion).

[13] Complaint ¶ 175.

[14] Complaint ¶ 175.

[15] Memorandum and Recommendation filed February 23, 2023, in *Re Concho Resources Inc., Securities Litigation*, No. 4:21-cv-02473 (the "Court's Memorandum"), p. 21, citing Complaint ¶¶ 172, 192, 195, 210, 213, 216, 219, 235, 241, 246, 256, 261, 263, 276, 279, 297.

[16] Court's Memorandum, p. 22, citing Complaint ¶¶ 172, 177, 192, 195, 200, 210, 213, 226, 232, 246, 248, 297.

risk-adjusted production forecasts despite internal understanding that the forecasts were inaccurate and overstated;[17] and (4) stated that large-scale development projects were dispersed when exposure was company-wide.[18,19]

15.    Plaintiffs allege that the reduced rig count and lower production forecast that is the corrective disclosure in this matter reflected (1) that the large-scale development was not a success; (2) that "manufacturing mode" had not been the result of gradual learning, but was experimental; (3) that the previous forecasts were inaccurate and overstated; and (4) that the lowered production forecast resulted from issues with well spacing on numerous projects, not just the Dominator project.[20]  Consistent with this interpretation, on the alleged corrective disclosure event, Defendants disclosed that the Company was running fewer rigs than expected (18 versus 33 that had been running in the previous fiscal quarter, Q1 2019) and lowered production forecasts across the Company (based on learning that wells were too tightly spaced).[21]  Furthermore, there was analyst commentary that was entirely consistent with this interpretation and expressed surprise at the negative developments:

> *Barclays*: However, the market's focus heading into the print was on CXO's ability to maintain operational momentum in H2'19 and potential risk to the 2020 outlook as rig data indicated that CXO currently is

---

[17] Court's Memorandum, p. 24, citing Complaint ¶¶ 173, 175, 179, 183, 187, 192, 241, 254, 263, 267, 269, 272.

[18] Court's Memorandum, p. 25, citing Complaint ¶¶ 172, 181, 192, 198, 202, 226, 244, 261, 284.

[19] Ms. Allen only provides a brief and overly simplistic characterization of Plaintiffs' claims: "the Company engaged in 'undisclosed, highly risky activities,' which included 'aggressively tight well spacing.'" (Allen Report ¶ 55).  The Allen Report fails to articulate the full scope of Plaintiffs' allegations as the Court described them. *See*, Court's Memorandum pp. 20-26.

[20] Court's Memorandum pp. 44-45 ("Defendants continued to pump money into the program, dedicating 80% of its capital to larger scale developments in 2019. [...] After the Dominator failed, well spacing 'tests' led to a 16% total reduction in Concho's proved reserves, which directly impacts the company's financial reporting used by investors and analysts to model future returns.") and p. 48 ("Defendants' admissions show that the transition to manufacturing mode was a risk that did not align with their expectations or their attestations to investors and analysts. According to the [former employees], Concho's projects were unsupported by data, the risks associated with the densely spaced wells was well known, Defendants purposefully under-risked the models when issuing financial forecasts, and Defendants knew in real time that the projects were performing under expectations.").

[21] "Concho Resources Inc. Reports Second-Quarter 2019 Results," *Business Wire*, July 31, 2019, 4:21 PM.

running 18 rigs vs. Q1 earnings call commentary of low 20s by the summer and original guidance of 24 rigs in Q3/Q4. […] While the Q2 release validated these concerns (see discussion below), *we were caught off guard by having the old industry albatross of unsuccessful spacing pilots with lasting effects also being a culprit.*[22]

*Raymond James*: The issue for Concho was not necessarily 2Q results, but rather the *surprise reduction in 2H19 activity and oil guidance*. The market is hitting the stock hard in after hours trading. […] Concho reported IP30 and IP60 results for its large 23 well Dominator well-spacing test, deeming that the project was spaced too tightly. Going forward, the company plans to revert to wider spacing on future activity to optimize well performance.[23]

*Mizuho*: How companies still, after all these years we have wailed and gnashed our teeth, manage to over-promise and under-deliver, remains an infuriating mystery. *Do we really need to repeat, that a company, much least in the most hated sector of the market, with a premium valuation, must never, ever, over-promise and under-deliver?*[24]

*Jefferies*: [..] *[T]he company blindsided the market with a sharp reduction in 2H19 oil volume guidance*. Asset productivity suffered as a result of well density and the company cut 2H19 activity to stay within CF and capital guidance. While it turns out much of its 2H18 and 1H19 program was spaced too densely, CXO is reversing course and we expect to see benefits from better asset productivity by YE19 and into 2020. […] CXO stated that [issues with the Dominator were] not representative of the company's development plans. While it's difficult to say how much of the guidance reduction is due to reduced activity vs. asset performance, it turns out operations were not consistent with that message. *We do spend a lot of time looking at well data, and while we had noticed performance degradation in several areas of the portfolio, including the Midland Spraberry which we discussed in our Midland Basin Deep Dive, given the production guidance increase in 1Q19 and management's strong execution track record historically, this was difficult to see coming.*[25]

*J.P. Morgan*: The execution missteps have included the combination of higher capex and unexpected gyrations in the company's 2019 oil guidance, *which has eroded confidence in the company's execution capabilities.* In our view, the first step in fixing the situation is to provide more transparency

---

[22] "Q2'19 EBITDAX Misses Street; 18 is the new 24." *Barclays*, July 31, 2019.

[23] "2Q19 Quick Take: Scaled Back Activity Catches Market by Surprise." *Raymond James*, July 31, 2019.

[24] "Morning Sankey." *Mizuho*, August 1, 2019.

[25] "Valuation Implies Core Permian Being Condemned; Reiterate Buy." *Jefferies*, August 5, 2019.

on the factors that drove the guidance cut, yet no change to capex. ***In particular, we think the company should reconcile the updated oil guide from the previous oil guide and quantify how much of the lower oil output was driven by the spacing tests vs. lower activity and why capex remained the same. [...]*** In 2018, CXO began its evolutionary shift to a future E&P business model, which will include a focus on peer leading production growth on a debt adjusted basis, FCF generation, and the return of cash to shareholders. ***However, the company's development approach appeared more NPV-focused given the magnitude of spacing tests underway. [...] [T]here will be a number of projects in 2H19 that are in progress, which will include spacing that is too tight.***[26]

16. Moreover, there were post-Class Period events that confirmed this interpretation. Specifically, in one of its issues, the *Journal of Petroleum Technology* included the journal paper titled "'Dominator Project' Raises Questions About Future of Cube Drilling" which outlined the project's well spacing problems:

> In Lea County, New Mexico, shale producers drill an average of 10 wells per 640-acre section.
>
> But last year, Concho Resources, the third-largest producer of oil and gas in the Permian Basin, decided to push the envelope. The company assembled seven drilling rigs owned by six different contractors and five fracturing fleets on a mile-long tract of land to build the "Dominator Project."
>
> The effort took the better part of a year and, in the end, it delivered 23 wells targeting five individual target horizons in the Wolfcamp Shale formation. The location, in the northern Delaware Basin, was carefully selected for sitting atop some of highest-quality geology within one of the highest producing unconventional plays on the planet.
>
> But when executives revealed the first oil production results in July, new doubts were raised about the success of the experiment. They said the well spacing, which averaged a horizontal distance of 230 ft. compared with the area average of 600 ft., was "too tight" and that future projects would execute wider intervals.
>
> Independently developed type curves show that the Dominator wells are now on pace to fall short of initial estimates, maybe by as much as 45%. The news triggered one of the sharpest selloffs ever seen in the shale

---

[26] "Monday Morning Quarterback: What Went Wrong and How to Fix It," *J.P. Morgan*, August 5, 2019.

business, sending Concho's share price down 22% for a single-day market value loss of close to $4.4 billion.[27]

17.    The Company also stated on September 4, 2019 at the Barclays CEO Energy-Power Conference:

> The lower oil outlook also incorporates the performance from spacing test [sic]. The Dominator project is the most high-profile example of our density work, ***but we have other projects at tested spacing, mainly in the Northern Delaware Basin***.[28]

18.    To evaluate whether the allegedly corrective information impacted the market price of Concho Common Stock, I performed an event study.  As described in my Report, an event study is a well-accepted statistical method utilized to measure the effect of new information on the market prices of a company's publicly traded securities, such as Concho Common Stock. New information may include, for example, press releases, earnings reports, news reports, SEC filings, or analyst reports.  An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.[29]  As I described in my Report, a well-accepted method for performing an event study is to estimate a regression model over an estimation window in order to observe the typical relationship between the market price of the relevant security and broad market factors.[30]

19.    For purposes of performing an event study of the alleged corrective disclosure, I rely upon the same event study methodology I used to analyze cause-and-effect in my Report.

---

[27] Jacobs, Trent. "'Dominator Project' Raises Key Questions About Future of Cube Drilling," *Journal of Petroleum Technology,* 71 (2019); 40–42.

[28] "Company Conference Presentation," *S&P Capital IQ,* September 4, 2019, 9:05 AM.

[29] A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. ECON. LITERATURE, 13 (1997).

[30] Coffman Report ¶ 49.

In particular, I use two estimation windows, demarcated by the date of the announcement of Concho's merger with RSP,[31] to evaluate the relationship between the daily returns of Concho Common Stock and those of a broad Market Index (the S&P 500 Total Return Index) and a Peer Index (an equal-weighted index consisting of the members of the S&P 500 Oil & Gas Exploration & Production Index during the period from February 21, 2017 to February 28, 2020, excluding Concho). I then use the returns of these control indices on the alleged corrective disclosure date to evaluate the expected return of Concho Common Stock. In this case, as **Table A** below shows, the expected return of Concho Common Stock on August 1, 2019 is -4.38%. On this date, the Market Index was down 0.89% and the Peer Index was down 3.15%.

20. On August 1, 2019, the raw return of Concho Common Stock was -22.23%. This implies that the firm-specific return after controlling for market and industry movements (i.e., the "abnormal return") was -17.84%. I then tested whether this negative abnormal return was sufficiently far from zero that I could reject random chance as the cause and conclude that the new information disclosed on this event caused the observed abnormal return. The "p-value," or probability of observing an abnormal return of -17.84% based on randomness alone, is vanishingly small and does not have a non-zero digit within 6 places of the decimal point (0.000000, or less than 1 in 100,000). The threshold level for finding a statistically significant result with 95% confidence is a p-value of 0.05 or less; therefore, the decline in the market price

---

[31] Coffman Report ¶ 50 ("For each trading day analyzed from the start of the Analysis Period until March 27, 2018 – prior to the announcement of the merger with RSP Permian – I constructed a regression model using data from the prior 120 trading days (roughly six months). From March 28, 2018 until the end of the Analysis Period, I use a fixed-to-rolling regression. More specifically, from March 28, 2018 through September 17, 2018, the following 120 trading days after the announcement of the merger with RSP Permian, I use a fixed regression, and from September 18, 2018 onwards, I use a rolling regression of the previous 120 days.").

of Concho Common Stock on August 1, 2019 was highly statistically significant. With virtually 100% certainty, this price decline was not due to random chance.

## Table A

### Event Study Regression Statistics for Concho Common Stock on the Alleged Corrective Disclosure Date

| | |
|---|---|
| Closing Price | $75.97 |
| Raw Return | -22.23% |
| Market Index Return | -0.89% |
| Peer Index Return | -3.15% |
| Expected Return | -4.38% |
| Abnormal Return | -17.84% |
| Abnormal Dollar Change | -$17.43 |
| Abnormal Return t-Statistic | -12.94 |
| p-Value | 0.00 |

Source: Rolling Regression event study as described in Coffman Report Section VII.F.

Note: The results are based on a rolling regression of the previous 120 trading days through March 27, 2018, followed by a fixed-to-rolling regression to account for the announcement that Concho would acquire RSP Permian. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index consisting of the members of the S&P 500 Oil & Gas Exploration & Production Index during the Analysis Period, excluding Concho. Earnings announcements and the alleged corrective disclosure date have been removed from estimation.

21.    As already described above, there was also contemporaneous analyst commentary supporting that the allegedly corrective information was important new negative information that impacted the value of Concho Common Stock.

22.    While the Allen Report ignores all of the direct evidence described above (i.e., the specific new negative announcement from the Company and related to the very topics of the alleged misrepresentations, the contemporaneous negative analyst reaction to that new news, and the negative statistically significant stock price response), Ms. Allen, as part of her discussion of loss causation issues, asserts that "new information about the Dominator project was coming out throughout the alleged Class Period and updating the market's expectation about the risk of the

14

Dominator project."[32] However, to be clear, Ms. Allen never suggests or opines that this information corrected the alleged misstatements or suggests a lack of price impact at the time of the alleged corrective disclosure. The alleged corrective disclosure provided new and far more detailed information and guidance about the issues with well spacing and their financial impact on the Company. At most, Ms. Allen is suggesting that a loss causation analysis, which I understand is not necessary at this stage of the litigation, would have to evaluate how the set of information available to investors may have changed over time.[33] As will be described below, this loss causation issue is ubiquitous in class action securities litigation.

23. Taken together, the event study and analyst commentary in reaction to the allegedly corrective information provides compelling evidence of price impact. While I have not eliminated the possibility that other non-fraud related information also contributed to the price decline, there is clear economic evidence that the alleged corrective disclosure had a substantial impact on the market price of Concho Common Stock. Despite having performed event study analyses on other days, Ms. Allen does not perform an event study of her own that examines the statistical significance of the alleged corrective disclosure, and she makes no attempt to disaggregate any non-fraud related information (if any) from this alleged corrective disclosure.

24. Notably, Ms. Allen does not suggest a lack of a causal link between the alleged misstatements and the allegedly corrective information. As will be discussed below, Ms. Allen's approach to the analysis of the alleged corrective disclosure event is to evaluate specific questions about what in analyst reports is novel; her approach is not determinative of whether

---

[32] Allen Report ¶ 63.

[33] Allen Report ¶ 62.

there is a causal economic link between the alleged misrepresentations and the corrective disclosure.

## IV. MS. ALLEN'S "CONTENT ANALYSIS" OF ANALYST REPORTS AFTER THE ALLEGED CORRECTIVE DISCLOSURE DOES NOT IMPLY A LACK OF BACK-END PRICE IMPACT

25. Whether analysts tie allegedly corrective information back to the alleged misstatements in a Rule 10b-5 case is neither a necessary nor standard way of evaluating price impact and Ms. Allen cites to no authority suggesting otherwise. This is for a good reason. The roles and responsibilities of analysts are to be forward-looking – they generally focus on how newly-released information might change their valuation and forecast of a company's future cash flows to provide investment recommendations to their clients.[34] Their charge is not to evaluate or catalog potential economic causal links between new disclosures and past company statements.

26. To be clear, I am not opining that analyst commentary is irrelevant, or that it is inconceivable that an analyst might anecdotally refer to prior company statements. However, Ms. Allen's observation that analysts, in the wake of the alleged corrective disclosure, "focused on Concho's specific financial results… and its financial guidance given these new results"[35] instead of specifically identifying a prior misstatement is neither surprising nor affirmative

---

[34] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association – Research Reports*, Vol. II, No. 7, August 22, 2001 ("A securities analyst, generally employed by a brokerage firm, bank or investment institution, has the principal task of performing diligent and thorough investigations of specific securities, companies and industries. The results of these investigations are presented as a research report, which serves as a basis for making an investment recommendation. Analysts examine all aspects of the current and prospective financial condition of certain publicly traded companies. These examinations should cover all pertinent publicly available information about the company and its businesses. […] All analysts begin their work by engaging in what is largely a descriptive function: gathering and assessing all meaningful qualitative and quantitative information about a company's past and present, and presenting it in a coherent, readily intelligible manner. After completing what is principally an objective evaluation, *an analyst must then go further, prognosticating and expressing specific judgments of his own about a company's and a security's future prospects*.").

[35] Allen Report ¶ 28.

economic evidence suggesting a lack of price impact. Analysts are not the arbiters of whether or not new information relates back to prior misstatements, and discussing this new information, especially quarterly financial results, is precisely their job. Whether analysts focused on alleged misstatements is certainly not a bright-line indicator of whether there is economic evidence of back-end price impact. Ms. Allen's suggestion that a lack of analyst reports that make this connection demonstrates that "there is no link between the alleged misstatements… and the alleged corrective disclosure *but instead a mismatch between them*" is simply illogical, and she cites no authority to suggest such an analysis is appropriate or sufficient.[36,37]

27. Ms. Allen performs this novel and unnecessary content analysis as a fundamentally flawed test of price impact, while ignoring the most relevant and scientifically sound test of price impact, which is to evaluate whether (1) there was a release of information that revealed the relevant truth that was allegedly concealed by the misstatements; and (2) whether there was a

---

[36] Allen Report ¶ 28.

[37] For unknown reasons, Ms. Allen limits her "content analysis" just to analyst reports and completely ignores other obvious sources of public information like the financial press and other media outlets.

statistically significant price reaction to the information. This is the standard method of establishing price impact that Ms. Allen has herself acknowledged as necessary.[38,39]

28. Ms. Allen contends that "[c]ourts have recommended the use of content analyses for analyzing stock price movements" and cites a journal article titled, "Estimating Financial Fraud Damages with Response Coefficients" authored by Esther Bruegger and Frederick C. Dunbar to support this claim.[40] However, the article she cites does not support using "content analysis" in the manner she applies. Instead, the Bruegger and Dunbar article describes how using an event study is the appropriate approach to evaluating price impact, and content analysis is only listed as something relevant to evaluating the relative weight of simultaneous confounding events.[41] Furthermore, she quotes that same article which states, "'[C]ontent analysis' is now part of the tool kit for determining *which among a number of simultaneous news*

---

[38] See Expert Report of Lucy P. Allen, dated March 1, 2022, in *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.*, Case No. 2:20-cv-00200-GAM ¶ 16 ("In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price movement and examining market and analyst commentary following the alleged misrepresentations, or (2) indirectly by analyzing the market reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure.").

[39] Event studies are the standard to test for the statistical significance of alleged corrective disclosures in securities litigation contexts. *See,* Tabak, David I. and Dunbar, Frederick C. "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert* (3rd ed. 2001) ("Many texts discuss how to perform an event study. While there are some differences in exposition, there is a uniform agreement in the literature on the necessary steps and general procedures to be followed. First, one must identify the event or events to be studied. In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud and/or the dates when fraudulent statements were made. When one is trying to measure lost profits, the relevant dates would be those dates on which the public received information about the alleged wrongful act."); Fisch, Jill E., et al., "The Logic and Limits of Event Studies in Securities Fraud Litigation" (2018). *Faculty Scholarship*, p. 571 ("Experts typically address the first step (selecting the event date) by using the date on which the representation or disclosure was publicly made. For purposes of public-market securities fraud, the information must be communicated widely enough that the market price can be expected to react to the information. The second step (calculating a security's actual return) requires only public information about daily security prices.").

[40] Allen Report ¶ 15.

[41] Esther Bruegger & Frederick C. Dunbar, Estimating Financial Fraud Damages with Response Coefficients, 35 J. Corp. L. 11, 25 (2009), p. 16.

*events* had effects on the stock price."[42] Again, the literature may discuss using "content analysis" as a way to evaluate relative importance of contemporaneously released information, but a "content analysis" does not substitute for the event study approach when evaluating price impact of disclosures that clearly relate to Plaintiffs' claims.[43]

29. On August 1, 2019, the market date on which information clearly related to Plaintiffs' claims is released to the market, Ms. Allen does not dispute that there is a statistically significant price decline. In fact, while the event study model detailed in my Report and described above finds a highly statistically significant stock price reaction to the release of the allegedly corrective information, Ms. Allen provides no statistical test for that date at all in the Allen Report, even though she tests many other dates during the Class Period (i.e., price movements on the alleged misrepresentations).[44]

30. Instead, Ms. Allen engages in a "content analysis" from which she purportedly concludes that there is a mismatch between what Plaintiffs allege was concealed and what was revealed on the alleged corrective disclosure. She does this by focusing on a categorization of the alleged misstatements, which I understand was decided upon by Defendants' Counsel,[45] and

---

[42] Allen Report ¶ 15, footnote 9, citing Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. Corp. L. 11, 25 (2009), p. 16.

[43] As economists, neither Ms. Allen nor I are in a position to characterize what "courts recommend" as she states. Her citation to the *Goldman Sachs* case glosses over a critical factual distinction in that case (*see* Allen Report footnote 9). There, I understand a content analysis was used to showed that the topic of interest in that matter was never discussed in analyst reports. Here, Ms. Allen does not attempt to claim that analysts failed to discuss the issues at the heart of Plaintiffs' case here, namely Concho's drilling strategy, the role of well spacing, and the anticipated versus actual productivity of the methods Concho was employing. Plaintiffs' Complaint, the Allen Report, and the quotes in multiple sections of this report all clearly indicate these were topics covered closely by analysts in this matter.

[44] Moreover, Ms. Allen's event study analysis is flawed as she does not control for a broad market index, such as the S&P 500 Total Return Index, and instead only controls for the movements of the industry using the S&P Oil & Gas Exploration & Production Select Industry Index (*see* Allen Report ¶¶ 44, 45). She provides no explanation for this decision in the Allen Report.

[45] Allen Report ¶ 9.

was performed in a way that I understand is inconsistent with Plaintiffs' view of the misstatements.[46] Even if one were to accept Defendants' categorization scheme, Ms. Allen's analysis fails to address all alleged misstatements. Specifically, Appendix I to Defendants' Motion includes Category D,[47] a fourth category of alleged misstatements not addressed in the Allen Report. Although Ms. Allen states that she "was not asked to analyze those alleged misstatement [sic],"[48] she fails to present any evidence that there is a lack of price impact related to those 18 alleged misstatements.[49]

31.   Indeed, Ms. Allen ignores analyst commentary from *Barclays* acknowledging that these issues were the focus of the market and expressing surprise and concern that their effects would be lasting:

> However, the market's focus heading into the print was on CXO's ability to maintain operational momentum in H2'19 and potential risk to the 2020 outlook as rig data indicated that CXO currently is running 18 rigs vs. Q1 earnings call commentary of low 20s by the summer and original guidance of 24 rigs in Q3/Q4. [...] While the Q2 release validated these concerns (see discussion below), *we were caught off guard by having the old industry albatross of unsuccessful spacing pilots with lasting effects also being a culprit.*[50]

---

[46] I understand that Defendants' system of categorization is inconsistent with Plaintiffs' theory of liability because Defendants exclusively rely on their own interpretation of Plaintiffs' allegations and not on any basis set forth by the Court nor agreed upon by participating parties. The resultant inapt framework that Ms. Allen uses to assess, insufficiently, price impact reflects these inaccuracies and fails to consider that Plaintiffs allege false and misleading statements and omissions regarding Concho's manufacturing style, portfolio wide commitment of assets to experimentation, and incomplete production forecasts. Instead, Defendants splinter Plaintiffs' theory of liability into groups based on whether or not the Company met its financial projections.

[47] Note that Appendix I to Defendants' Motion appears in the Allen Report as Appendix C.

[48] Allen Report ¶ 9.

[49] Defendants' Motion p. 4 ("Defendants have therefore shown a lack of correctiveness for the alleged corrective disclosures when it comes to the statements in Categories A-C. Class certification should be denied as to these statements."), p. 7 footnote 1 ("A fourth category of alleged misstatements exists for which Defendants do not challenge class certification on lack of price impact grounds, but for which class certification is inappropriate based on Plaintiffs' failure to come forward with a legally viable class-wide damages model."), and p. 13-14 ("Defendants rebut the *Basic* presumption as to the statements in the first three of those categories—labeled Categories A, B, and C in Appendix I—by showing that neither back-end nor front-end price impact can be ascribed to these statements.").

[50] "Q2'19 EBITDAX Misses Street; 18 is the new 24." *Barclays*, July 31, 2019.

32. Ms. Allen further ignores the evidence of analysts from *Raymond James* specifically tying the decline in the price of Concho Common Stock with these revelations:

> ***Concho missed EPS/EBITDA estimates on lower than expected oil production.*** Specifically, while overall production volumes beat the RJ/Street forecast by 3%/2%, oil volumes missed by 2% (64% oil cut vs RJ/Street 66%). Operating costs were largely inline with guidance, while pricing was pre-announced. Capex came in 2% below the RJ/Street forecast. ***The issue for Concho was not necessarily 2Q results, but rather the surprise reduction in 2H19 activity and oil guidance. The market is hitting the stock hard in after hours trading.***[51]

33. Similarly, analysts from *J.P. Morgan* acknowledged Concho's apparent contradictory business decisions and the decrease in operating rigs, predicting "a negative reaction to the print given the sharp reduction in the company's 2019 oil guide with no change to full-year capex:"[52]

> […] CXO has decided to moderate its activity levels in 2019 to reinforce its focus on capital discipline and to maximize FCF, ***which has resulted in a reduction in the company's 2019 oil guide to +24% from +29% (JPMe/STe +29.3%/+29.4%).*** While this reads like a prudent decision, the challenge here is the fact that CXO did not reduce its 2019 capital budget (remains $2.8 to $3.0 billion), citing its plan to build a DUC inventory, which will likely be seen as incongruent with their commentary on capital discipline. […]
>
> ***What is perplexing for investors is the gyration in the company's guidance commentary regarding 2019.*** […] Management raised its oil guide on the 1Q19 call, but has now lowered the oil guide for the back half of 2019 well below consensus expectations. […] Key for the shares tomorrow is their outlook comments on 2020 FCF and ***confidence that the company can still deliver competitive oil growth next year.*** […]
>
> CXO averaged 26 rigs and 8 completion crews during 2Q19 and is currently running 18 rigs and 7 completion crews vs. 33 rigs and 8 completion crews in 1Q19. ***A reduction in activity was planned as CXO expected to run 26***

---

[51] "2Q19 Quick Take: Scaled Back Activity Catches Market by Surprise," *Raymond James*, July 31, 2019.

[52] "2Q19: Moderating Activity/Growth, But DUC Build Appears Incongruent with Capital Discipline; Stock Reaction-Negative," *J.P. Morgan*, July 31, 2019.

*rigs in 2Q19 and 24 rigs in 3Q and 4Q, but the magnitude of the decline was steeper than expected.*[53]

34. Ms. Allen's methodology also failed to detect specific skepticism of Defendants' previous statements and analysts' suggestions of a lack of credibility given the Company's prior statements:

> *Evercore ISI*: We expect some skepticism on the read through for the broader Delaware asset base, noting the company added 62 Delaware wells during 2Q (not just Dominator TILs) with avg IP30s of ~1.4 mboepd down from ~1.8 mboepd during 1Q. ***Reestablishing operational credibility will be key for 2H*** […] [54]

> *J.P. Morgan*: The execution missteps have included the combination of higher capex and unexpected gyrations in the company's 2019 oil guidance, ***which has eroded confidence in the company's execution capabilities.*** *In* our view, the first step in fixing the situation is to provide more transparency on the factors that drove the guidance cut, yet no change to capex. In particular, we think the company should reconcile the updated oil guide from the previous oil guide and quantify how much of the lower oil output was driven by the spacing tests vs. lower activity and why capex remained the same.[55]

> *RBC Capital Markets*: We believe management needs to address the variables that caused spending to differ over such a short time frame. We think it could be a combination of factors that include higher OBO activity, underperforming wells (such as the Dominator project), and challenges in executing early large scale development.[56]

35. In summary, nothing in Ms. Allen's "content analysis" precludes price impact from the alleged misstatements.

---

[53] "2Q19: Moderating Activity/Growth, But DUC Build Appears Incongruent with Capital Discipline; Stock Reaction-Negative," *J.P. Morgan*, July 31, 2019.

[54] "More Questions than Answers," *Evercore ISI*, August 1, 2019.

[55] "Monday Morning Quarterback: What Went Wrong and How to Fix It," *J.P. Morgan*, August 5, 2019.

[56] "A Show Me Story," *RBC Capital Markets*, August 1, 2019.

## V.  MS. ALLEN'S "CONTENT ANALYSIS" OF ANALYST REPORTS AT THE TIME OF THE "CATEGORY A" MISREPRESENTATIONS AND/OR OMISSIONS IS IRRELEVANT AND FLAWED

36.  In order to prove a lack of price impact, I understand one needs to prove that there is no price impact *both* at the time of the alleged misstatements and/or omissions as well as at the time of the alleged corrective disclosure.  In a case where Plaintiffs are alleging omissions, price maintenance, *and* back-end price impact, performing a content analysis of analyst reports and an event study at the time of the alleged misrepresentations alone is completely irrelevant to price impact.[57]

37.  Nevertheless, Ms. Allen's analysis is flawed.  For each analyst report issued after each alleged misstatement, her method was to evaluate price impact by indicating whether analysts (1) changed their valuation specifically as a result of the alleged misstatement; (2) changed their target price specifically as a result of the alleged misstatement; (3) referenced the alleged misstatement; and/or (4) referenced the event that contained the alleged misstatement (if not an earnings announcement).[58]  Under Ms. Allen's "content analysis" methodology, she apparently concludes that if the first two conditions did not apply to an alleged misstatement,

---

[57] Regarding price maintenance, the alleged misstatements served to maintain the price at a higher level than it would have otherwise traded at had the truth been revealed.  In such circumstances, one cannot evaluate price impact by evaluating whether there was a change in price at the time of the alleged misstatement.  Thus, the fact that the alleged misstatements did not result in statistically significant price changes is absolutely consistent with the idea of price maintenance (and market efficiency).  Moreover, statements that are not surprising to the market would not be expected to generate a statistically significant market reaction.  *See*, Bens, D. A., Heltzer, W., & Segal, B. (2011). The Information Content of Goodwill Impairments and SFAS 142. *Journal of Accounting, Auditing & Finance*, 26(3), 527-555 ("When firms record charges that exceed the expected amount, the market reaction is negative. When firms record charges less than expectations, there is no market reaction."); Fisch, Jill E., et al., "The Logic and Limits of Event Studies in Securities Fraud Litigation" (2018). *Faculty Scholarship*, p. 556 ("Second, event studies only measure the movement of a stock price in response to the release of unanticipated, material information. *In circumstances in which fraudulent statements falsely confirm prior statements, the stock price would not be expected to move*. Event studies are not capable of measuring the effect of these so-called confirmatory disclosures on stock price. Similarly, in cases involving multiple 'bundled' disclosures, event studies have limited capacity to identify the particular contribution of each piece of information or the degree to which the effects of multiple disclosures may offset each other.").

[58] Allen Report ¶¶ 11-14.

then it supports that the statement was "generic" (i.e., labeled a "Category A" misstatement) and had no price impact.[59]

38.    As an example of how absurd this approach is, using Ms. Allen's flawed logic, it would follow that every time an analyst's valuation or price target following an earnings announcement remained the same, all of the revenue and earnings values contained in that announcement could be considered "generic" and therefore have no price impact, which is clearly incorrect.  Simply because a piece of information did not cause an analyst to change their price target does not mean that the information has no relevance to the value of the company's stock.  Clearly, quarterly earnings announcements, even if they are in line with expectations and do not cause changes in analyst recommendations and/or price targets, are important company statements that are not "generic."[60]

39.    But even more importantly, her approach to this entire question is completely novel and for which Ms. Allen provides no economic or legal authority.  In my more than 20 years of working on securities matters, whether engaged by plaintiffs, defendants, or neutrals, I have never seen an expert attempt to characterize the nature of an alleged misstatement (i.e., whether it is "generic" or not) or conclude whether an alleged misstatement exerted a price impact by relying on such a method.  I note that there is not even a definition provided by Ms. Allen of

---

[59] Allen Report ¶ 27 ("At the time that the alleged misstatements in Category A were made, the market evidence shows that no analyst changed their valuation . . . Furthermore, there is no indication that any alleged misstatement in Category A caused any analyst to change its price target for Concho.  Thus, the market evidence is consistent with analysts finding the alleged misstatements to be merely generic statements that did not affect the value of Concho's stock.").

[60] See, for example, A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. ECON. LITERATURE, 13 (1997), p. 25: ("The results of this example are largely consistent with the existing literature on the information content of earnings. The evidence strongly supports the hypothesis that earnings announcements do indeed convey information useful for the valuation of firms.").

what "generic" means in this context, and I am not aware of that term as having any technical economic definition in this context.

40. Furthermore, I note that the conclusory sentence in the Allen Report on this point makes no mention of her third or fourth criteria – i.e., whether analysts mentioned the misstatements or referenced the event at which the statement was made.[61] Ms. Allen did find some evidence that analysts mentioned certain of the Category A misstatements[62] and some talked about the earnings calls in which alleged misstatements were made.[63] Nevertheless, through some method that remains undescribed, she dismisses these instances in reaching her conclusion that the "content analysis" somehow provides evidence of the alleged misstatements' genericness and a lack of price impact.

41. Moreover, some of the alleged misstatements that Defendants' Counsel classifies as "generic" are, on their face, specific to certain economic aspects of Concho's operations. Specifically, Ms. Allen lists the following exchange between an analyst and Defendant Leach as Statement A-25:

> Analyst: That makes a lot of sense. Then lastly, Tim, on your prepared remarks, and certainly in some of your comments earlier, doesn't sound like you're too concerned about upcoming service cost. Kind of sounds like maybe perhaps it'll stay in line. I know I've asked you about this in the past, would you think about -- I know I've talked to some others that are locking in some rigs on a bit longer- term contracts. People seem to be a little more concerned may be [sic.] on rig inflation than they are on fracs here and then, let's call it, for 2019, could you all maybe just address the drilling or it's [sic.] completion side. Any concerns you might have there?
>
> Leach: No, I think the drilling side of our business is one of the best parts of our business. And I think the way we have approached that in the past will continue. I mean, you can see that it doesn't require that much of a growth

---

[61] Allen Report ¶ 27.

[62] Allen Report ¶ 23(c).

[63] Allen Report ¶ 23(d).

25

in rigs to accomplish all the future, not just for '19 and '20, but beyond. So, by drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done. And we do have rigs that now are on 6-months contracts or 1-year contracts but we do have kind of a portfolio approach on that. But I don't think you should expect us to - any change in strategy based on what we're seeing today.[64]

42. Defendant Leach's statement quoted above clearly goes beyond vague or generic language. As an economist, I understand that the statement suggesting an improvement of production efficiency "by drilling longer laterals and the spacing we're using" has a very specific economic meaning: that production is enhanced as a result of their specific drilling strategies and well spacing – the specific relationship that I understand Plaintiffs are alleging was misrepresented to the market. Likewise, Statement A-11 was the following response from Defendant Leach:

> Analyst: Sure, understood. And then, I guess, second, the synergies you talked about and the advantages to quote-unquote manufacturing, can you just give a little bit of additional color detailing around what exactly it is that allows manufacturing mode on these assets to drive those synergies?

> Leach: Yes. As Steve mentioned, I mean, the balance sheet to be able to do this intense development, instead of 1 or 2 well pads, to go to 8 well multi-well pads is one of the drivers. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. All those things will be very additive.[65]

43. Again, as an economist, I understand this statement to have specific economic meaning, that by using a means of production (drilling pads) more intensely along with other infrastructure, the Company will achieve greater productivity. The very fact that this alleged misstatement is labeled as "generic," in my view, calls into question the reliability of the categorization scheme upon which Ms. Allen has based her analysis.

---

[64] Allen Report Appendix C, p. 11.

[65] Allen Report Appendix C, p. 4.

44.    Nevertheless, as described above, this entire analysis is moot when it comes to price impact because alleged misstatements often conceal the relevant truth but do not provide new and unexpected information to the market. For example, if a company makes a misrepresentation that the quality of its loan portfolio has remained consistent (even though, in reality, this had become untrue), one would not necessarily expect to observe a price increase, or changes in analyst recommendations or price targets, associated with this misstatement, because it likely represents what the market was expecting to hear. In such a case, the misstatement would serve to maintain the price at a higher level than the level at which it would have otherwise traded, had the truth been revealed, without causing the price to increase further. From an economic and statistical point of view, one could not reliably ascertain whether such a misstatement had price impact by evaluating whether there was a change in price, analyst recommendations, or analyst price targets at the time of the misstatement.

45.    Here, as I understand Defendants acknowledge,[66] many of the alleged misstatements were alleged to be price-maintaining statements,[67] and accordingly, measuring the price change (or analyst reaction) at the time of the misrepresentations is not a reliable way to evaluate their price impact. Indeed, there is nothing I am aware of in Plaintiffs' claims that, from an economic point of view, would require the price of Concho Common Stock to increase in response to any specific alleged misrepresentation. There is no evidence of which I am aware, and none offered by Ms. Allen, that would suggest that the alleged misstatements would contradict existing market beliefs or surprise the market. Thus, the lack of price reaction or

---

[66] Defendants' Motion p. 2 ("In this case, all but one of the Complaint's 13 alleged misstatement dates did not result in any statistically significant stock price movement. Plaintiffs therefore rely on an inflation-maintenance theory—that is, a theory that the alleged misstatements affected Concho's stock price not by introducing new price inflation, but rather by maintaining inflation that purportedly already existed in the stock price.").

[67] See Complaint ¶¶ 410, 413, 428.

27

analyst reaction to the misstatements is neither surprising nor sufficient evidence to preclude price impact.

## VI. THE OUT-OF-POCKET METHODOLOGY IS FLEXIBLE ENOUGH TO ACCOMMODATE ALL OF MS. ALLEN'S LOSS CAUSATION CONCERNS

46. Ms. Allen argues the following:

> Mr. Coffman's proposed common damages methodology is not well-specified and, given the specific issues in this case, does not measure damages consistent with Plaintiffs' risk materialization theory of liability.[68]

47. Ms. Allen is incorrect. This contention is misplaced for three fundamental reasons: (1) although Plaintiffs' Complaint alleged a "corrective disclosure" theory of loss causation and an alternate "materialization of the risk" theory of loss causation, Plaintiffs' Counsel has informed me that they are pursuing the corrective disclosure theory alone; (2) the damages methodology outlined in my Report is precisely consistent with Plaintiffs' theory of liability that the misstatements artificially inflated and/or maintained the market price of Concho; (3) the out-of-pocket damages methodology that I described in my Report is widely accepted at the class certification stage without specifying precisely how the artificial inflation might be quantified

---

[68] Allen Report ¶ 54.

through a detailed loss causation analysis of the alleged corrective disclosure event;[69] and (4)

regardless of what assumptions and procedures are used in a detailed loss causation analysis, the

results would be applied on a class-wide basis. As I demonstrate below, the out-of-pocket

methodology is capable of addressing all of Ms. Allen's concerns under either theory of loss

causation.

48. I concluded in my Report that damages in this action are subject to a well-settled,

common methodology that can be applied to the Class as a whole.[70] Specifically, I described:

---

[69] Numerous courts have endorsed that my description of the out-of-pocket methodology as described in my Report is sufficient for purposes of determining that there is a class-wide damages approach. For example, *Beaver County Employees' Retirement Fund, et al., Plaintiffs, v. Tile Shop Holdings Inc., et al., Defendants*, No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota filed July 28, 2016; *In Re Intuitive Surgical Securities Litigation*, No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California, San Jose Division filed December 22, 2016; *Lou Baker, individually and on behalf of all others similarly situated, Plaintiffs, v. SeaWorld Entertainment, Inc., et al., Defendants*, No. 3:14-cv-02129-MMA-AGS, United States District Court for the Southern District of California filed November 29, 2017; *In Re: SanDisk LLC Securities Litigation*, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California filed September 4, 2018; *City of Sunrise General Employees' Retirement Plan, on behalf of itself and all others similarly situated, Plaintiff, v. FleetCor Technologies, Inc., et al., Defendants*, No. 1:17-cv-02207-LMM, United States District Court for the Northern District of Georgia, Atlanta Division filed July 17, 2019; *Richard Di Donato, individually and on behalf of all others similarly situated, Plaintiff, v. Insys Therapeutics Inc., et al., Defendants*, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona filed September 20, 2019; *Eric Weiner, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tivity Health, Inc., et al., Defendants*, No. 3:17-cv-01469, United States District Court for the Middle District of Tennessee, Nashville Division filed January 29, 2020; *Public Employees' Retirement System of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., et al., Defendants*, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois, Eastern Division filed February 26, 2020; *Kevin L. Dougherty, et al., Plaintiffs, v. Esperion Therapeutics, Inc., et al., Defendants*, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern District of Michigan, Southern Division filed November 19, 2020; *The Police Retirement System of St. Louis, Plaintiff, v. Granite Construction Incorporated, et al., Defendants*, No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California filed January 21, 2021; *John Utesch, et al., Plaintiffs, v. Lannett Company, Inc., et al., Defendants*, No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania filed August 12, 2021; *In Re Conduent Inc. Securities Litigation*, No. 2:19-cv-08237-SDW-AME, United States District Court for the District of New Jersey filed February 28, 2022; *Julia Junge and Richard Junge, on behalf of themselves and similarly situated investors, Plaintiffs, v. Geron Corporation and John A. Scarlett, Defendants*, No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California filed April 2, 2022; *Boston Retirement System, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Alexion Pharmaceuticals, Inc., et al., Defendants*, No. 3:16-cv-02127-AWT, United States District Court for the District of Connecticut filed April 13, 2023; *Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc., et al., Defendants*, No. 1:19-cv-00128-DBB-DAO, United States District Court for the District of Utah filed December 27, 2023.

[70] Coffman Report ¶ 84.

There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide). The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.[71]

49. Importantly, Ms. Allen does not dispute the use of the out-of-pocket methodology in calculating damages in securities cases. She also does not dispute that damages under the out-of-pocket methodology are measured as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale.[72] Nor does she dispute that the methodology I described in my Report measures damages consistent with a corrective disclosure theory of loss causation. Rather, Ms. Allen's arguments are strictly limited to supposed "specific issues in this case" and her unsupported claim that the method I described "does not measure damages consistent with Plaintiffs' risk materialization theory of liability."[73] In other words, while Ms. Allen does not contest that I provided a well-accepted *formula* for calculating damages, she takes issue with my approach because I have not yet explained how I would

---

[71] Coffman Report ¶¶ 79-80.

[72] Allen Report ¶ 69.

[73] Allen Report ¶ 54. My understanding is that Plaintiffs' Counsel have pled claims not limited just to materialization of the risk.

calculate the *specific inputs* to that damages formula for a theory of loss causation, i.e., risk materialization, which Plaintiffs are not advancing.

50. As an initial matter, regardless of which theory of loss causation is being advanced, Ms. Allen is conflating two concepts: the damages formula *itself* and the *inputs* to the damages formula. I made clear in my Report that quantifying artificial inflation per share for each day in the Class Period – the inputs to the damages formula – is a question separate and apart from whether there is a common methodology for computing damages for the Class.[74]

51. Despite agreeing that I do not need to calculate damages yet, as only a damages *methodology* is required at this stage of the litigation,[75] Ms. Allen takes issue with the fact that I have not explicitly demonstrated "a model capable of measuring the actual likelihood that the risk would materialize on each date of the alleged class period and the likelihood of the risk materializing implied by the alleged misstatements disclosed to market participants on each date of the alleged class period."[76] Specifically, Ms. Allen criticizes the damages methodology described in my Report by claiming that I have not articulated how I would appropriately: (1) "separate the impact of the allegedly understated risk (if any) from the impact of the materialization of that risk;"[77] (2) employ the valuation techniques described in my Report "to measure the 'true' risk (if it was concealed), or the degree to which the risk was underestimated by the market over time, or how it would be capable of converting these estimates into a measure of inflation in Concho's stock price;"[78] and (3) account for "market evidence indicat[ing] there

---

[74] Coffman Report ¶ 81.

[75] Allen Report ¶ 61.

[76] Allen Report ¶ 60.

[77] Allen Report ¶ 58.

[78] Allen Report ¶ 61.

31

was a changing understanding of the risks associated with large-scale development, tightening well spacing and Concho's Dominator project."[79]

52. Again, Plaintiffs' Counsel has informed me that they are not pursuing a risk materialization theory of loss causation, but nonetheless, I address these three flawed arguments in detail below. In summary, none of Ms. Allen's objections relate to whether the general out-of-pocket damages methodology can be applied uniformly and formulaically in this matter using common proof on a class-wide basis. Instead, all of her arguments with respect to the damages methodology concern how artificial inflation would ultimately be quantified in a detailed loss causation analysis.

53. Indeed, these questions of loss causation are present in virtually every securities class action matter, can substantially depend on information obtained during discovery,[80] and are determined based upon proof that is common to all class members. For example, in many cases, there is a dispute about whether the newly released information that is alleged to be corrective is confounded by other information unrelated to the fraud, and if so, how to reasonably estimate the value of that potentially confounding information. In addition, in many cases, there is typically a battle of the experts at the merits stage regarding how artificial inflation per share evolved during the class period. Answering these questions, and those raised by Ms. Allen, requires a detailed loss causation analysis, which I understand is not required at this stage of the litigation, and, as a result, I have not been asked to perform.

---

[79] Allen Report ¶ 62.

[80] For instance, internal emails obtained in discovery may indicate what Defendants were aware of at the start of a class period, which provides useful information in determining whether it is reasonable to back-cast the full amount of artificial inflation dissipated on the alleged corrective disclosure date to the start of the class period. As another example, internal financial estimates and projections may be useful in evaluating how much of the stock price reaction on an alleged corrective disclosure date was due to corrective versus confounding information.

54. Nevertheless, as I described in my Report, whatever approach is ultimately used to determine the quantification and evolution of artificial inflation per share throughout the Class Period, it would be class-wide in nature and does not depend on the identity or circumstance of any specific investor.[81] I am not aware of any evidence, and Ms. Allen has not presented any, to demonstrate that there are unique circumstances in this matter that would preclude the quantification of artificial inflation per share for each day during the Class Period (i.e., the inputs to the out-of-pocket damages formula) from being calculated for the Class *as a whole*.

55. Ms. Allen further attempts to discredit the damages methodology described in my Report by describing my language as "general"[82] and the methodology as "not well-specified."[83] This is simply incorrect. The out-of-pocket methodology as I described it has a very specific economic meaning. Damages are the difference between the artificial inflation per share at the time of purchase and the artificial inflation per share at the time of sale.[84] That definition distinguishes damages from many other potential approaches and describes specifically what needs to be quantified for each class member to compute damages.[85]

56. At most, Ms. Allen is suggesting that in calculating the precise artificial inflation per share, in other words, the inputs to the out-of-pocket damages model, one would have to

---

[81] Coffman Report ¶¶ 82-83.

[82] Allen Report ¶ 53.

[83] Allen Report ¶ 54.

[84] *See*, Tabak, David and Okongwu, Chudozie, "Inflation Methodologies in Securities Fraud Cases: Theory and Practice," *NERA Economic Consulting*, July 2002, pp. 7-8 ("One of the elements in proving damages in a securities fraud case is to show that plaintiffs' losses were caused by the alleged fraud. This analysis is often thought of either as separate from the calculation of inflation, or else is considered to be accomplished by calculating damages as the difference between inflation at the time of purchase and at the time of sale (or simply inflation at the time of purchase if a share is held to the end of a class period.)"); Tabak, David, "Inflation and Damages in a Post-Dura World," *NERA Economic Consulting*, September 25, 2007, p. 9 ("Thus, if one measures damages using the standard out-of-pocket measure as the economic loss (meaning the excess of purchase inflation over sale inflation)…").

[85] In other words, it specifically requires considering the economic question of how the market price of Concho Common Stock would have been different upon an earlier corrective disclosure of the relevant truth.

account for the value of certain information. Ms. Allen seems to be asserting (as an economist) that unless I can articulate, prior to any merits discovery, exactly how one would precisely quantify artificial inflation and specify exactly how it evolved over the Class Period, then Plaintiffs have not met her interpretation of Plaintiffs' burden. My understanding is that this type of loss causation proof is not required at this stage of the proceedings.

### A. THE OUT-OF-POCKET METHODOLOGY CAN ADAPT TO THE VALUATION DIFFERENCE BETWEEN AN UNDERSTATED RISK AND THE MATERIALIZATION OF THAT RISK IF PLAINTIFFS WERE PURSUING THAT LOSS CAUSATION THEORY

57. Ms. Allen asserts that, "In general, when an alleged corrective disclosure represents a materialization of an understated risk, the price decline at the alleged corrective disclosure (i.e., the 'back end' price decline) would not be expected to equate to the price decline that would have occurred had the true degree of the understated risk been disclosed earlier (i.e., at the 'front end')."[86] She then describes how, under certain conditions, the market price decline at the time of a corrective disclosure would overstate the amount by which the stock was inflated because at earlier points in time it was a risk rather than a certainty that some negative information would be disclosed.[87]

58. To be clear, there is nothing in my Report that suggests that the inflation per share during the Class Period necessarily equates numerically with the size of the price drop on the back end (i.e., at the time of the alleged corrective disclosure). To the extent that there are economically valid reasons to believe the disclosure of the full truth at an earlier time would have caused a smaller price decline than what occurred at the time of the alleged corrective

---

[86] Allen Report ¶ 56.

[87] Allen Report ¶ 58.

disclosure, then the artificial inflation at that time would be lower than the price decline on the corrective disclosure.

59. The out-of-pocket methodology can easily handle this. For example, if there is a $10 per share price decline on a corrective disclosure, but a loss causation analysis determines that there was only an 80% chance of this outcome at earlier points in time, then the inflation could be lowered to $8 per share (i.e., the expected value of $10 outcome multiplied by 80% chance of that outcome occurring) at those earlier points in time.[88] Under this circumstance, the out-of-pocket methodology described in my Report still applies, and damages for an investor who purchased when the inflation was $8 per share and held through the corrective disclosure would be $8 (the artificial inflation at time of purchase minus $0, the artificial inflation after the corrective disclosure). In other words, the out-of-pocket methodology already described easily handles this situation. Yet Ms. Allen goes on to assert that "Plaintiffs must show that they have a model capable of measuring the actual likelihood that the risk would materialize on each date of the alleged class period and the likelihood of the risk materializing implied by the alleged misstatements disclosed to market participants on each date of the alleged class period."[89] This assertion is flawed for several reasons.

---

[88] When there is a probability of a known outcome, one can multiply the outcome by the probability of it occurring to obtain its expected value. *See*, for example, Berk, Jonathan and DeMarzo, Peter, "Corporate Finance," *Pearson*, Third Edition, 2014, p. 553 ("Baxter executives are considering a new strategy that seemed promising initially but appears risky after closer analysis. The new strategy requires no upfront investment, but it has only a 50% chance of success. If it succeeds, it will increase the value of the firm's assets to $1.3 million. If it fails, the value of the firm's assets will fall to $300,000. Therefore, the *expected value* of the firm's assets under the new strategy is 50% * $1.3 million + 50% * $300,000 = $800,000, a decline of $100,000 from their value of $900,000 under the old strategy."); Mendenhall, William, et al., "Introduction to Probability and Statistics," *Brooks/Cole CENGAGE Learning*, 13th Edition, 2009, p. 167 ("Let x be a discrete random variable with probability distribution $p(x)$. The mean or expected value of x is given as $\mu = E(x) = \Sigma\, xp(x)$ where the elements are summed over all values of the random variable x.").

[89] Allen Report ¶ 60.

60. First, Ms. Allen cites no authority to suggest what Plaintiffs "must" do. Indeed, Plaintiffs are not proceeding on a risk materialization theory of loss causation and Ms. Allen's characterization of the corrective disclosure as a materialization of the risk is superfluous. Second, Ms. Allen is calling for a specific loss causation methodology, contrary to Plaintiffs' chosen one, without the benefit of (1) merits discovery; (2) what assumptions Plaintiffs may be able to provide the damages expert based upon their evaluation of the evidence; and (3) what data may or may not be available through discovery. While Plaintiffs' Counsel has made a choice as to what theory to pursue, it would be premature and speculative for me (or any other expert) to specify an alternative loss causation methodology at this stage without any of that information.

61. In making these claims, Ms. Allen fails to acknowledge not only that the out-of-pocket methodology is easily adaptable to this scenario (if it is even a relevant consideration), but also that an event study could, as proposed, be used to measure the full price decline on the alleged corrective disclosure date. Specifically, even crediting Ms. Allen's alternative theory of loss causation, a portion of the decline could be disaggregated to account for the contemporaneous release of confounding information (i.e., what Ms. Allen refers to as the materialization of the risk separate from the understatement of the risk)[90] if necessary, as described in the example above. This analysis, if Plaintiffs were in fact pursuing a materialization of the risk theory of loss causation, would directly address Ms. Allen's concern

---

[90] Allen Report ¶ 58.

that damages would somehow be overstated because the analysis isolates the economic impact of only the fraud-related information.[91]

62.    In any event, even if the finder of fact were to determine that disaggregation is impossible in this case (an opinion that Ms. Allen does not express), the out-of-pocket formula could easily handle that outcome on a class-wide basis by assigning no artificial inflation to the alleged newly disclosed corrective information.

**B.    TO THE EXTENT IT IS A VALID LOSS CAUSATION CONCERN, THE OUT-OF-POCKET METHODOLOGY CAN ADDRESS CHANGES IN INFORMATION OVER TIME**

63.    Ms. Allen also raises concerns about how the information available to the Company and the public was changing over time.[92] The out-of-pocket method can be similarly adjusted to account for changes during the Class Period of what the market knew and what Concho could and should have disclosed, or, in other words, time-varying artificial inflation. In determining the appropriate assumption for the quantification of artificial inflation, the relevant inputs depend on the facts and evidence that existed and were concealed, and what could and should have been disclosed at different points in time. This is the essence of what the parties investigate during discovery and what the finder of fact is asked to ultimately determine. The role of a damages

---

[91] For example, even using Ms. Allen's extreme hypothetical cited from the *BP* matter (which differs in important ways from this matter even if Plaintiffs were pursuing a materialization of the risk theory), suppose an event study analysis determines there was a $9.90 per-share decline in the share price (after controlling for market and industry factors) on the day on which the company announced an adverse outcome, and that $0.10 per share of this related to the understatement of risk and $9.80 per share of the decline related to simply an unlucky outcome. Here, the $9.80 would be confounding information and $0.10 would be the artificial inflation that was dissipated (these are the numbers from the hypothetical cited by Ms. Allen (Allen Report ¶ 57) divided by 100,000 and quoted on a per-share basis for expositional ease). However, as I have demonstrated in this example, this analysis still begins from an event study, from which one would need to determine the portion of the per-share decline in the share price attributable only to the concealed risk. Damages in this instance would not be overstated, because the impact of any confounding information would be removed before using the artificial inflation per share estimate as an input in the out-of-pocket formula.

[92] *See* Allen Report ¶¶ 62-67.

37

expert is to assist the finder of fact in determining artificial inflation/damages based upon those findings. It is premature to specify these details before conducting a loss causation analysis that considers information learned in merits discovery. It is premature at the class certification stage to: (1) speculate that the evidence will show something different from what Plaintiffs allege; or (2) attempt to specify how these details would hypothetically impact Plaintiffs' quantification of artificial inflation without actually knowing what the evidence will show.

64. In any event, even if it is revealed through merits discovery that true economic artificial inflation was not constant over the Class Period, the out-of-pocket methodology outlined in my Report can account for such a circumstance and mechanically calculate damages on a class-wide basis. Indeed, the out-of-pocket damages methodology described in my Report has accounted for artificial inflation that developed throughout a class period in other matters.

65. For example, assume an event study analysis determines that there was a $10.00 decline in the share price attributable to the fraud on a day on which allegedly corrective information was released. Under a constant dollar back-casting methodology, such a finding would imply that $10.00 per share of artificial inflation existed on each day of the class period prior to this corrective disclosure.[93] Now assume that the evidence obtained in discovery suggests that only half of the allegedly corrective information, or $5.00 per share, could have been disclosed for the first month of the Class Period. In that case, purchasers during the first month of the class period who held through the corrective disclosure would have purchased shares with $5.00 of artificial inflation (50% of $10.00) whereas shares purchased after the first month contained the full $10.00 of artificial inflation per share.

---

[93] I am not committing to using a constant dollar methodology; this is simply a theoretical example for the sake of simplicity.

66.     The same out-of-pocket formula set out in my Report (per-share artificial inflation at the time of purchase minus per-share artificial inflation at the time of sale, which Ms. Allen does not dispute) still results in the appropriate assessment of damages.  The purchasers during the first month that held through the corrective disclosure have $5 in damages per share, while the later purchasers have $10 in damages per share.  This example shows that artificial inflation need not be constant over time for the out-of-pocket damages methodology to be applicable class-wide.

67.     Further, this example demonstrates that even under a theory of the materialization of risk, which Plaintiffs are not pursuing, the out-of-pocket damages model can incorporate the changing economic impact of information at different points during the Class Period.  No matter how the finder of fact weighs the evidence, whether it is determined that artificial inflation was constant over the Class Period, or 90% or 50% during different periods, for instance, of the full amount of artificial inflation was present in Concho Common Stock at certain points in the Class Period, the result can easily be applied to any daily artificial inflation table that would accompany a loss causation report after merits discovery is complete.  In other words, regardless of what the finder of fact decides, the methodology for calculating damages will remain the same and apply equally to each Class member.

### C.     THE OUT-OF-POCKET METHODOLOGY CAN EASILY ADDRESS PRE-MERGER CONCHO SHAREHOLDERS

68.     In her report, Ms. Allen asserts that I have not properly accounted for Concho's acquisition of RSP in my description of a damages methodology.  Ms. Allen opines that artificial inflation was partially transferred from one entity to another when Concho acquired RSP.  This can easily be addressed using the out-of-pocket methodology.  For example, if there is artificial inflation worth $100 million in Concho Common Stock the day before the merger and $100

39

million of artificial inflation the day after the merger – because the nature and extent of the fraud did not change – then addressing the inflation per share is a simple adjustment based upon how the number of shares outstanding changed.

69. For example, if prior to the merger there were 100 million shares, then the inflation per share would be $1 per share. If the merger were effected by issuing an additional 50 million shares, then the inflation per share after the merger would be $100 million / 150 million shares, or $0.66 per share. In other words, the per-share inflation could be easily converted on the merger date.

70. Furthermore, to the extent that the artificial inflation per share is determined based upon some portion of the stock price decline that occurred at the time of the alleged corrective disclosure (i.e. after the merger), then the per share artificial inflation would need to be adjusted *higher* for an investor that bought before the merger. In this circumstance, use of "constant dollar" inflation back-casting would actually understate the per share artificial inflation.

71. In sum, the out-of-pocket methodology still applies and the artificial inflation per share can easily be adjusted to properly reflect the impact of the merger.

## VII. MS. ALLEN'S DISCUSSION OF THE PREMIUM RECEIVED BY RSP IN THE MERGER HAS NOTHING TO DO WITH ARTIFICIAL INFLATION OR PLAINTIFFS' DAMAGES

72. The final section of the Allen Report, titled, "The proposed class members that were former RSP shareholders do not fit Plaintiffs' theory," focuses on RSP shareholders that became Concho shareholders through the acquisition. The rationale for Ms. Allen's statements and the calculations and comparisons she performs in this section are pure nonsense.

73. To break this down, the actual theory Plaintiffs assert with respect to former shareholders of RSP is that by accepting Concho shares as currency in the merger, they received

40

artificially inflated shares.[94] In other words, they purchased Concho shares during the Class Period by giving up their RSP shares. Thus, just like all other class members, they purchased artificially inflated shares and then were allegedly damaged upon the corrective disclosure.

74. Ms. Allen correctly notes that as part of the backup to my Report filed December 7, 2023, I showed that the abnormal stock price decline (i.e., the decline in the price of Concho Common Stock after controlling for market and industry factors) on the alleged corrective disclosure date was $17.43 per share.[95] She uses this as a proxy for the potential inflation per share even though neither Ms. Allen nor I are opining that that represents a proper measure of the artificial inflation per share.

75. Ms. Allen then compares this $17.43 per Concho share (or $5.58 when converted to per RSP share terms)[96] to what she refers to as the "premium" received by RSP shareholders of $11.32 per RSP share. Based on this comparison, Ms. Allen claims that these investors on net "benefited from the acquisition"[97] and that this somehow implies that they are different from other class members and are not entitled to recover the artificial inflation per share at the time of purchase minus the artificial inflation at time of sale.[98]

76. To see how this argument is illogical, I will clearly define the merger "premium" to which Ms. Allen refers. The "premium" is the amount by which the merger consideration

---

[94] *See*, for example, Complaint ¶¶ 318, 408, 413.

[95] Note that Ms. Allen uses this figure to represent the maximum damage per Concho share. *See* Allen Report ¶ 72, footnote 81.

[96] Allen Report ¶ 72 ("[S]ince the RSP shares were converted to Concho shares at a 0.32 rate, the corresponding price decline per RSP share would be $5.58 ($17.43 multiplied by 0.32)."). *See also*, "Concho Resources Inc. Completes Acquisition of RSP Permian, Inc.," *Business Wire*, July 19, 2018, 4:15 PM ("Under the terms of the merger, each share of RSP common stock was converted into the right to receive 0.320 shares of Concho common stock.").

[97] Allen Report ¶ 71.

[98] Allen Report ¶¶ 71-72.

exceeded the prevailing market price of RSP when the deal was announced. As cited by Ms. Allen, RSP's stock price was $38.92 before the announcement of the merger.[99] Based upon market prices at the time, a Concho press release claimed that the consideration to be received by RSP shareholders (in the form of Concho Common Stock) was 29% higher than the prevailing market price – which translates to $11.32 per RSP share.[100] This is what Ms. Allen calls the "premium."[101]

77. The premium paid to the shareholder of a target company that is being acquired is not an economic windfall, but rather reflects anticipated value being created by the merger.[102] When a company is being acquired, minority shareholders (such as those that held shares of RSP common stock) share in the anticipated economic benefits of the merger. The premium reflects some or all of the economic value of combining the firms (i.e., synergies or cost savings that the merger creates) as well as a control premium. In other words, when a company is acquired, the acquirer is willing to pay more than the market price of secondary shares that are trading in the market, because the merger offers control of the target.[103] Furthermore, the parties involved in a merger will negotiate a price that allows the target to share in the economic benefits of the business combination. Therefore, the "premium" reflects economic benefits that the

---

[99] Allen Report footnote 80.

[100] Allen Report ¶ 72. *See also*, "Concho Resources Inc. to Acquire RSP Permian, Inc. in All-Stock Transaction," *Business Wire*, March 28, 2018, 6:01 AM ("The consideration represents an approximately 29% premium to RSP's closing price of $38.92 on March 27, 2018.").

[101] For purposes of this discussion, I am setting aside whether or not the 29% premium is properly calculated and taking Ms. Allen's numbers as given without endorsing them. Whatever the exact level of the premium, the comparison she performs is economically flawed and illogical.

[102] Brealey, R., et al., "Principles of Corporate Finance," McGraw-Hill, Tenth Edition, 2011, pp. 801-805.

[103] Brealey, R., et al., "Principles of Corporate Finance," McGraw-Hill, Tenth Edition, 2011, pp. 801-805.

shareholders of RSP are validly entitled to as a result of their investment; in other words, it is not a windfall.[104]

78. Put differently, RSP negotiated to receive what it believed was a fair price (which included the premium) in light of the control it was ceding to Concho and a portion of the anticipated benefits of the merger, but RSP allegedly received artificially inflated shares of Concho Common Stock in return. Therefore, as an economic matter, the subsequent decline in the price of Concho Common Stock damaged these investors by the *same amount* as any other purchaser that paid cash in the open market. Stated another way, RSP shareholders received a share that had less value than the market price reflected as a result of Defendants' alleged misstatements, just like every other open market purchaser.

79. Ms. Allen's suggestion that a later loss suffered by RSP shareholders as a result of the alleged fraud should somehow be netted against this premium is baseless and makes no economic sense. Ms. Allen cites to no authority, because there is not one, that such an approach or comparison is economically valid or appropriate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Chad Coffman

Executed on May 8, 2024.

---

[104] Similarly, Ms. Allen also cites the Complaint which notes that certain former employees opined that Concho had overpaid for RSP (*See*, Allen Report ¶ 71, citing Complaint ¶ 152). One cannot draw any conclusion about whether Concho "paid 'way too much'" for RSP simply because there was a premium paid relative to RSP's closing price the prior trading day, for the reasons discussed in the literature cited above. I understand that Plaintiffs' claims of fraud do not rely in any way on whether Concho "paid 'way too much'" for RSP and neither Ms. Allen nor I have offered any analysis or opinion on whether Concho overpaid for RSP, nor is it clear how that would be relevant. Therefore, these references to a possible overpayment for RSP have nothing to do with whether the price of Concho Common Stock was artificially inflated or with the applicability of the out-of-pocket damages methodology to RSP shareholders who received shares of Concho Common Stock in the merger.

43