# EXHIBIT 35

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473 <br><br> <u>CLASS ACTION</u> |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS'</u>**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

**Page**

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ..................................... 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................. 1

BACKGROUND .................................................................................................................. 6

      I.      The Alleged Misstatements..................................................................................... 6

      II.     The Alleged Corrective Disclosures ....................................................................... 7

ARGUMENT ...................................................................................................................... 8

      I.      Legal Standard ........................................................................................................ 8

           a.     Rule 23 establishes a demanding standard for class certification.............. 8

           b.     A securities fraud action may not proceed as a class action unless Plaintiffs establish—and avoid rebuttal of—a class-wide presumption of reliance............................................................................... 8

               i.     Defendants can rebut the *Basic* presumption—and render class certification inappropriate—by showing that an alleged misrepresentation had no price impact. ........................... 9

               ii.    In *Goldman I*, the Supreme Court held that a "mismatch" between an alleged misrepresentation and its corrective disclosure severs any basis for inferring price impact based on a "back end" price drop.............................................................. 10

               iii.   Courts evaluate predominance on a statement-by-statement basis.................................................................................................... 12

           c.     *Comcast* instructs that a plaintiff's proposed damages methodology must measure damages on a class-wide basis and align with its theory of liability.................................................................................... 13

      II.     Most of the alleged misstatements cannot be certified for class treatment because they are not entitled to a presumption of reliance. ................................ 13

           a.     The mismatch between the generic Category A statements and the specific alleged corrective disclosures severs the link between the statements and Concho's back-end price movement. ............................. 14

b.      Concho's back-end stock drop following the 2Q 2019 results does not demonstrate price impact as to any Category B statement. ................ 18

c.      Concho's back-end stock drop following the 2Q 2019 results does not demonstrate price impact as to any statement in Category C. ............ 19

d.      Plaintiffs cannot salvage certification with front-end price movement. .................................................................................................. 21

III.    Plaintiffs separately fail to satisfy *Comcast*'s requirement of a damages methodology capable of measuring only those damages stemming from the alleged fraud. ............................................................................................. 23

a.      Plaintiffs have not shown that they can calculate damages consistent with their risk materialization theory of liability. .................... 24

b.      Plaintiffs' damages methodology yields economically nonsensical results and does not fit Plaintiffs' liability theory regarding the RSP acquisition. .................................................................................... 28

CONCLUSION ................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                      **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)............................................................................................................8

*In re Anadarko Petroleum Corp. Sec. Litig.*,
   2022 WL 4544235 (S.D. Tex. Sept. 28, 2022), *reconsideration denied*, 2023
   WL 4307650 (S.D. Tex. June 30, 2023) ...............................................................................28

*In re Apache Corp. Sec. Litig.*,
   2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ...........................................................................13

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
   597 F.3d 330, *vacated on other grounds*, 563 U.S. 804 (2011) ...........................................11

*In re Azurix Corp. Sec. Litig.*,
   198 F. Supp. 2d 862 (S.D. Tex. 2002), *aff'd sub nom. Rosenzweig v. Azurix
   Corp.*, 332 F.3d 854 (5th Cir. 2003) ....................................................................................15

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................... *passim*

*In re BP p.l.c. Sec. Litig.*,
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)........................................................... *passim*

*In re BP p.l.c. Sec. Litig.*,
   2014 WL 2112823 (S.D. Tex. May 20, 2014) ..............................................................25, 27

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)......................................................................13

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
   HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018) ....................................................................................12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)....................................................................................................... *passim*

*ECA v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................................15

*Edwards v. McDermott Int'l Inc.*,
   2024 WL 873054 (S.D. Tex. Feb. 29, 2024) .......................................................................30

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
   905 F.3d 892 (5th Cir. 2018) ..............................................................................................15



*In re Envision Healthcare Corp. Sec. Litig.*,
 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ...................................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 309 F.R.D. 251 (N.D. Tex. 2015) .......................................................................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011)..............................................................................................................9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 718 F.3d 423 (5th Cir. 2013), *vacated on other grounds*, 573 U.S. 258 (2014)......................10

*In re Finisar Corp. Sec. Litig.*,
 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ........................................................................21

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
 579 F. Supp. 3d 520 (S.D.N.Y. 2021), *rev'd and remanded sub nom. Ark.*
 *Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023)........................ passim

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
 141 S. Ct. 1951 (2021)........................................................................................ passim

*Greenberg v. Crossroads Sys., Inc.*,
 364 F.3d 657 (5th Cir. 2004) ...........................................................................................3, 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)............................................................................................ passim

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
 818 F.3d 775 (8th Cir. 2016) .............................................................................................22

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)...................................................................26

*In re Intuitive Surgical Sec. Litig.*,
 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ......................................................................13

*In re Kosmos Energy Ltd. Sec. Litig.*,
 299 F.R.D. 133 (N.D. Tex. 2014) ....................................................................................23, 27

*Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*,
 2015 WL 1143081 (S.D. Tex. Mar. 13, 2015).......................................................................15

*Ludlow v. BP, P.L.C.*,
 800 F.3d 674 (5th Cir. 2015) ..............................................................................................13

*Nathenson v. Zonagen Inc.*,
 267 F.3d 400 (5th Cir. 2001) ..............................................................................................15

v

*Prantil v. Arkema Inc.*,
   986 F.3d 570 (5th Cir. 2021) ...................................................................................12

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ............................................12, 17, 18

*Ramirez v. Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023).................................17, 18, 19, 20, 21

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ........................................................................3, 10, 17

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...................................................................................15

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).......................................................................................29

*Rougier v. Applied Optoelectronics Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) .........................................................28

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ...................................................................................23

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...............................................................................30

**Rules**

Fed. R. Civ. P. 23(b)(3).................................................................................... *passim*

Defendants file this Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Motion" or "Mot.") (ECF 54).

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

This is a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 on behalf of all shareholders who acquired Concho common stock from February 21, 2018 through July 31, 2019 (the "Class Period").

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

This Opposition raises two issues:

- *First*, whether Defendants have rebutted the presumption of class-wide reliance as to the majority of Plaintiffs' alleged misrepresentations by demonstrating a lack of price impact. In evaluating this issue, the "court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) ("*Goldman I*").

- *Second*, whether Plaintiffs have carried their burden of showing that damages can be measured on a class-wide basis consistent with their theory of liability. In evaluating this issue, the Court conducts a "rigorous analysis" to determine whether Plaintiffs have met their burden by a preponderance of the evidence. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs' Motion invites this Court to directly contravene two separate Supreme Court precedents, *Goldman I* and *Comcast*. As these cases and those of this Circuit make clear, the decision to certify a class is of utmost importance in a securities fraud action. In seeking class certification, Plaintiffs ask the Court to grant them the power to bind thousands of shareholders that have not asserted any claims and are absent from this action in order to greatly amplify their claim for damages against the defendants in the action. The Supreme Court and the Fifth Circuit have imposed strict requirements that plaintiffs seeking to represent—and bind—a class of absent shareholders must meet. Critical among them is that, even where a proposed class satisfies the

1

prerequisites listed in Rule 23(a), a plaintiff must show that "questions of law or fact common to class members predominate" over individualized issues. Fed. R. Civ. P. 23(b)(3). Here, Plaintiffs fail to meet this burden in two independent respects.

*First*, the proposed class cannot be certified for the vast majority of the alleged misstatements because Plaintiffs are not entitled to a presumption that shareholders relied on those statements. Reliance is an essential element of a Rule 10b-5 claim. And the Supreme Court has recognized that, if a class representative must prove the individual reliance of each class member, "common issues would not predominate over individual ones, as required by Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281-82 (2014) ("*Halliburton II*") (citation and internal quotation marks omitted). Thus, unless a "presumption of reliance" applies to a securities plaintiff's claims, "a Rule 10b-5 suit cannot proceed as a class action." *Id.*

Here, Plaintiffs seek to invoke the fraud-on-the-market presumption of reliance announced in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Under *Basic*, absent shareholders can be presumed to rely on any statement that had an impact on the price of a security trading in an efficient market. But if "the alleged misrepresentation did not, for whatever reason, actually affect the market price … then the presumption of reliance would not apply" and class certification would be inappropriate. *Halliburton II*, 573 U.S. at 269.

In this case, all but one of the Complaint's 13 alleged misstatement dates did not result in any statistically significant stock price movement. Plaintiffs therefore rely on an inflation-maintenance theory—that is, a theory that the alleged misstatements affected Concho's stock price not by introducing new price inflation, but rather by maintaining inflation that purportedly already existed in the stock price. The Supreme Court articulated the requirements for class certification under a price-maintenance theory in *Goldman I*. As that opinion and the subsequent opinions in

that litigation make clear, price impact in a price-maintenance case "must be measured via stock price decreases occurring after the alleged misstatements were revealed to be false." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 527 (S.D.N.Y. 2021), *rev'd and remanded sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) ("*Goldman II*"). To infer price impact based on such a "back-end" stock drop, it is imperative that the alleged corrective disclosures "actually corrected" the earlier alleged misrepresentation. *Goldman I*, 141 S. Ct. at 1961. If "there is a mismatch between the contents of the misrepresentation and the corrective disclosure," there is no price impact. *Id*.

Thus, if a disclosure does not "reveal[] to the market the pertinent truth that was previously concealed or obscured by the company's fraud," *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014)—but is simply negative news—there is a lack of correctiveness that rebuts the existence of price impact. *See Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 665 (5th Cir. 2004) (presumption of reliance not triggered by "evidence of any decrease in price following the release of negative information"). Likewise, as the Supreme Court noted in *Goldman I*—and the Second Circuit reinforced by denying class certification on remand in *Goldman II*—when an "earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')," there is a specificity mismatch that undermines any inference of price impact. *Goldman I*, 141 S. Ct. at 1961; *Goldman II*, 77 F.4th at 105. Courts must perform this analysis **at the class certification stage**. *Goldman I*, 141 S. Ct. at 1960-61. And class certification must be denied as to any alleged misrepresentations that had no price impact. *Id*.

Applying those principles here, there is no price impact—and class certification should be denied—for most of the alleged misrepresentations. The bulk of the alleged misrepresentations—

3

which Defendants have grouped into Category A in Appendix I—are exceedingly generic. Rather than reciting specific historical facts or making particular predictions of future financial results, the Category A statements provide vaguely optimistic sentiments about Concho's use of large-scale development, such as: "We believe [large-scale] development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term." CC ¶ 216. By contrast, the alleged corrective disclosures consist of specific results from the second quarter of 2019. Thus, like the examples given by the Supreme Court in *Goldman I*, there is a mismatch between the alleged misrepresentations in Category A and the alleged corrective disclosures that forecloses class certification as to these statements.

The next group of alleged misrepresentations—grouped into Category B in Appendix I—involve operational facts and financial results from 2017 and 2018. These facts and financial results long predate—and are in no way corrected by—Concho's second quarter 2019 results. Similarly, the alleged misrepresentations grouped into Category C in Appendix I involve projections that Concho ***actually met***. The second quarter 2019 results thus could not—and certainly did not—correct these statements. Defendants have therefore shown a lack of correctiveness for the alleged corrective disclosures when it comes to the statements in Categories A-C. Class certification should be denied as to these statements.

*Second*, the Motion also fails to satisfy Rule 23(b)(3)—and should be denied in its entirety—because it does not comport with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Under *Comcast*, before an action may be certified for class treatment under Rule 23(b)(3), "courts must conduct a 'rigorous analysis' to determine whether" the "plaintiff's damages case [is] consistent with its liability case" and "measure[s] only those damages attributable to [its] theory [of liability]." *Id*. at 35. Plaintiffs effectively ignore this requirement.

*See* Mot. at 18-19. In a skeletal section of their Motion, they state that they will measure damages "through the 'out-of-pocket' methodology and employ an event study." *Id.* at 19. Plaintiffs argue that this damages methodology can be applied on a "Class-wide basis" that is common to all investors. *Id.* But *Comcast* expressly rejects the contention that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide." *Comcast*, 569 U.S. 27 at 36. Rather, to obtain class certification, a plaintiff must also show that its class-wide damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Id.* at 35.

The bare-bones theory of damages presented by the Motion does not satisfy this requirement. Plaintiffs' theory of liability is that Defendants failed to disclose certain risks about Concho's large-scale development efforts that ultimately materialized in its second quarter 2019 results. As Judge Ellison recognized in the *BP* litigation, a plaintiff relying on this type of risk materialization theory of liability must do more than simply invoke an event study to satisfy *Comcast*. *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*BP I*"). This is because an event study measures not the value of the undisclosed risk that an event *might* occur (which is what Plaintiffs' theory of liability contends was misrepresented), but rather the full value of an event that has *in fact* occurred. *Id.* at *17-18. To meet their burden under *Comcast*, Plaintiffs were thus required to come forward with evidence that they could "measure only those damages attributable to" the risk Plaintiffs contend Defendants should have disclosed. *Comcast*, 569 U.S. at 35.

Here, the Motion at most gestures at the possibility that Plaintiffs will ***later*** provide such evidence. But an appeal to trust does not suffice under *Comcast*. Plaintiffs have "failed to meet ***their burden*** of showing that damages can be measured on a class-wide basis consistent with their theor[y] of liability." *BP I*, 2013 WL 6388408, at *17.

5

Equally problematic is Plaintiffs' failure to explain how their and their expert's yet-to-be-revealed class-wide damages methodology will—or even could—address the fundamental conflict that, under Plaintiffs' liability theory, necessarily exists between (a) shareholders who acquired their Concho stock before Concho acquired RSP Permian, Inc. ("RSP") in a stock-for-stock transaction just a few months into the Class Period, and (b) the former RSP shareholders whose RSP stock was converted into Concho stock. As Defendants' expert, Lucy Allen, explains, Plaintiffs and their expert acknowledge the transformative nature of the RSP transaction but completely ignore the resulting economic realities for legacy Concho shareholders (who, according to Plaintiffs' liability theory, would have benefited from using inflated Concho stock to acquire non-tainted RSP stock) and legacy RSP shareholders (who, according to Plaintiffs' theory, were overpaid for their RSP stock). Plaintiffs and their expert fail to offer a class-wide damages methodology that could account for those fundamentally different economic positions, let alone one that could overcome the conflict that necessarily exists between legacy Concho and legacy RSP shareholders under Plaintiffs' liability theory. This too undermines Plaintiffs' attempt to certify their proposed Class.

## BACKGROUND

### I.     The Alleged Misstatements

Plaintiffs allege that they acquired Concho stock at prices inflated by various purportedly false or misleading statements relating to Concho's "large-scale development" or "manufacturing mode" projects—*i.e*., projects in which Concho sought to develop multiple wells from a single well-pad. Consolidated Compl. for Violations of Securities Laws (ECF 25) ("CC") ¶¶ 4, 59, 188, 199. There are 13 dates throughout the proposed Class Period on which Defendants made allegedly false or misleading statements, ranging from February 21, 2018 to May 1, 2019.

In Appendix I, Defendants organize the alleged misstatements for which class certification is inappropriate into three categories: (A) general statements about Concho's large-scale development projects and operations, (B) statements describing operational facts and financial results from the fourth quarter of 2017 through the end of 2018, and (C) statements regarding financial projections of what Defendants expected to occur during the year 2018.[1] For example, Plaintiffs claim that the following statements were materially false and misleading:

- Category A: "The fourth quarter was an excellent end to a great year for Concho. *Our operational and financial performance demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position.*" CC ¶ 169.

- Category B: "Concho … *deliver[ed] outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin* and in the Midland Basin." CC ¶ 170.

- Category C: "*[Y]ou should expect more of the same in '18 as you saw in previous years from Concho. It's going to be a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects that we've been describing to you.*" CC ¶ 197.

## II.    The Alleged Corrective Disclosures

Plaintiffs claim that these allegedly false and misleading statements were corrected when Concho released its financial results for the second quarter 2019 at the close of trading on July 31, 2019, and held its quarterly earnings call before trading opened the following morning. CC ¶¶ 298, 302. The alleged corrective disclosures consist of specific financial results for the second quarter of 2019, specific production forecasts for future periods, and Defendants' observation that "performance from the [Dominator] project indicates the well spacing [on that project] was too tight."  CC ¶¶ 298-300. The Complaint also alleges that analysts "voic[ed] their surprise and

---

[1] A fourth category of alleged misstatements exists for which Defendants do not challenge class certification on lack of price impact grounds, but for which class certification is inappropriate based on Plaintiffs' failure to come forward with a legally viable class-wide damages model. *See infra* § III.

negative sentiment towards [Concho's] meaningful reduction in guidance and production" and provides examples of this analyst coverage. CC ¶¶ 301, 306.

## ARGUMENT

### I.      Legal Standard

#### a.      Rule 23 establishes a demanding standard for class certification.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33 (citations omitted). It is available only if a party "affirmatively demonstrate[s] his compliance with Rule 23." *Id.* "[P]arties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Here, Plaintiffs seek certification under Rule 23(b)(3). Mot. at 3, 10. Plaintiffs must therefore show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

#### b.      A securities fraud action may not proceed as a class action unless Plaintiffs establish—and avoid rebuttal of—a class-wide presumption of reliance.

To prevail in a 10b-5 action, a plaintiff "must prove, among other things, [1] a material misrepresentation or omission by the defendant and [2] the plaintiff's reliance on that misrepresentation or omission." *Goldman I*, 141 S. Ct. at 1958. Traditionally, the reliance element doomed efforts to certify securities fraud claims for class treatment because individual proof of reliance would predominate over questions common to the class members, preventing plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement. *Halliburton II*, 573 U.S. at 268. The Supreme Court has, however, held that securities fraud plaintiffs can avoid this impediment to class certification if they are able to successfully invoke—and avoid rebuttal of—a presumption

8

of reliance. The most common such presumption (and the one Plaintiffs seek to invoke here) is the fraud-on-the-market presumption announced in *Basic*.

> **i.** **Defendants can rebut the *Basic* presumption—and render class certification inappropriate—by showing that an alleged misrepresentation had no price impact.**

In *Basic*, the Supreme Court allowed plaintiffs to "invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory" where the alleged misrepresentation affected the market price of a security in an efficient market. *Goldman I*, 141 S. Ct. at 1958. The *Basic* presumption applies only when (1) the plaintiffs have shown that the "*Basic* prerequisites— publicity, market efficiency, and market timing"—are satisfied as to the purported misstatements for which certification is sought, and (2) the defendants are unable to "rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Id*. at 1959 (citation and internal quotation marks omitted).

Defendants' opportunity to rebut *Basic* exists because the "fundamental premise" underlying the *Basic* presumption is "that an investor presumptively relies on a misrepresentation" that "was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). Thus, if an alleged misstatement "in fact did not lead to a distortion of price," "[t]he basis for finding that the fraud had been transmitted through market price would be gone," and plaintiffs would be no longer entitled to the presumption as to that alleged misstatement. *Basic*, 485 U.S. at 248; *see also Goldman I*, 141 S. Ct. at 1959 (if a misrepresentation "did not actually affect the market price of the stock," *Basic*'s fundamental premise "completely collapses, rendering class certification inappropriate"). "Price impact is thus an essential precondition" for the application of *Basic*. *Halliburton II*, 573 U.S. at 282.

> ii. In *Goldman I*, the Supreme Court held that a "mismatch" between an alleged misrepresentation and its corrective disclosure severs any basis for inferring price impact based on a "back end" price drop.

Securities plaintiffs typically try to prove price impact by pointing to a back-end price movement and "claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman I*, 141 S. Ct. at 1961. But since price impact in fact refers to "whether the alleged misrepresentations affected the market price in the first place," a "back-end" price drop is not itself price impact. *Halliburton II*, 573 U.S. at 278. Rather, it is "at most, backward-looking, indirect evidence, of the price impact at the time of *purchase*." *Goldman II*, 77 F.4th at 93 (citation and internal quotation marks omitted).

The "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 141 S. Ct. at 1961. "[W]hen there is a mismatch between the contents of the misrepresentation and the corrective disclosure," "it is less likely that the [corrective] disclosure actually corrected" the alleged misrepresentation, "which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* Accordingly, "[t]he central focus" of a court assessing alleged price impact based on a back-end price drop "is ensuring that the front-end disclosure and back-end event stand on equal footing." *Goldman II*, 77 F.4th at 102. If they do not stand on "equal footing," front-end price impact cannot be inferred based on the back-end price drop. *Id.*

To "match" an alleged misrepresentation, an alleged corrective disclosure must "actually correct[]" the alleged misrepresentation. *Goldman I*, 141 S. Ct. at 1961. Indeed, a corrective disclosure is, by definition, "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 434 (5th Cir. 2013) (price

10

impact shown by "a decrease in price following a revelation of the fraud"), *vacated on other grounds*, 573 U.S. 258 (2014). If the price decline was caused by something other than "revelation of the truth," then it does not "raise an inference that the price was actually affected by … alleged misrepresentations." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated on other grounds*, 563 U.S. 804 (2011). Consequently, if defendants can show that a disclosure did not reveal the pertinent truth that was allegedly previously concealed or obscured by the company's fraud—but was simply negative news—there is a content-based mismatch that rebuts the existence of price impact.

Another type of mismatch exists when, as in *Goldman*, an "earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Goldman I*, 141 S. Ct. at 1961. Such a mismatch undermines any inference of price impact and thus precludes class certification. *Id.* For example, in *Goldman*, the plaintiff challenged statements including:

- "Most importantly, and the basic reason for our success, is our extraordinary focus on our clients";

- "Our clients' interests always come first";

- "Integrity and honesty are at the heart of our business";

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles"; and

- "[W]e increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict … with the interests of another client."

*Goldman II*, 77 F.4th at 82. The plaintiffs argued that these statements were corrected by disclosures revealing that Goldman Sachs actually had been betting against investment vehicles it was touting to investors. *Id.* at 83.

11

Despite the considerable gap in specificity between the alleged misstatements and corrective disclosures, the plaintiffs attempted to "craft a link between a generic misrepresentation and specific corrective disclosure" by contending that "nestled [within the specific corrective disclosures] was the more generic revelation that the company's earlier, general statement that it aims to act lawfully was a lie." *Id.* at 99. The Second Circuit rejected the attempt, finding that the Supreme Court's opinion in "*Goldman* dispels that notion." *Id. Goldman* "requires that any gap among the front- and back-end statements as written be limited." *Id.* Thus, because the gap in specificity between the front- and back-end statements was substantial, the Second Circuit found that plaintiffs could not infer price impact based on the back-end stock drop and denied certification. *Id.* at 105 ("there is an insufficient link between the corrective disclosures and the alleged misrepresentations" and, as such, "the misrepresentations did not impact Goldman's stock price").[2]

### iii. Courts evaluate predominance on a statement-by-statement basis.

On a motion for class certification, "[c]ourts should consider predominance on a claim-by-claim basis." *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021). In securities fraud actions, each alleged misrepresentation is a separate claim. *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018). Courts thus evaluate the *Basic* presumption on a statement-by-statement basis and deny certification as to any statements for which the presumption does not apply or has been rebutted. *See, e.g.*, *Qualcomm*, 2023 WL 2583306, at *12-14 (denying motion for class certification as to statements which did

---

[2] *See also In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (finding a lack of price impact where the back-end disclosure "is far more specific than Defendants' generic [front-end] statements" and their connection "is not apparent when the alleged misrepresentations and corrective disclosures are viewed side by side").

12

not match corrective disclosures).[3]  In doing so, courts assess rebuttal of price impact under a preponderance of the evidence standard:  "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman I*, 141 S. Ct. at 1963.[4]

      **c.**    ***Comcast* instructs that a plaintiff's proposed damages methodology must measure damages on a class-wide basis and align with its theory of liability.**

In addition, to obtain class certification, Rule 23(b)(3) requires that a plaintiff present evidence that it possesses a method of measuring damages that (i) is consistent with its theory of liability and (ii) demonstrates that damages are capable of measurement on a class-wide basis. *See Comcast*, 569 U.S. at 34-35. As the Supreme Court explained in *Comcast*, "at the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case" and must "measure *only* those damages attributable to that theory." *Id.* at 35 (emphasis added) (citation omitted).[5]

**II.**    **Most of the alleged misstatements cannot be certified for class treatment because they are not entitled to a presumption of reliance.**

Here, Defendants have organized the alleged misstatements into four categories in Appendix I. Below, Defendants rebut the *Basic* presumption as to the statements in the first three of those categories—labeled Categories A, B, and C in Appendix I—by showing that neither back-

---

[3] *See also Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015) (denying class certification as to statements and corrective disclosures for which there was no price impact); *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *14 (S.D. Tex. Feb. 9, 2024) (denying class certification as to three alleged corrective disclosures where price impact was rebutted); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *39 (S.D.N.Y. Oct. 18, 2019) (finding price impact rebutted for alleged corrective disclosure that released no new information), *R&R adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14-17 (N.D. Cal. Dec. 22, 2016) (finding price impact rebutted on two of five disclosure dates).
[4] While the burden of persuasion lies with Defendants, the Supreme Court has stressed that this burden allocation is not relevant except in extraordinary circumstances.  *Goldman I*, 141 S. Ct. at 1963 (The "burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise."); *id.* at 1958 ("We emphasize ... that the burden of persuasion should rarely be outcome determinative.").
[5] *See also Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015) (noting that a damages model that would allow plaintiff to "recover damages other than those resulting from the particular ... injury on which [defendant's] liability in this action is premised" travels "to a place forbidden by *Comcast*" (citation omitted)).

end nor front-end price impact can be ascribed to these statements.

        **a.**      **The mismatch between the generic Category A statements and the specific alleged corrective disclosures severs the link between the statements and Concho's back-end price movement.**

The same principles that led to a denial of certification in *Goldman*, *see supra* § I(b)(ii), compel the conclusion that the Category A statements here had no price impact. Those statements concern Concho's large-scale development projects and operations generally, such as:

- "Our operational and financial performance demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position." CC ¶ 169.

- "High-quality acreage and scale within the Permian Basin enables Concho to efficiently allocate capital while continuing to advance manufacturing-style development with leading-edge drilling and completion techniques." *Id*. ¶ 171.

- "We believe [large-scale] development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term." *Id*. ¶ 216.

- "Our wells are continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well." *Id*. ¶ 240.

- "We use multi-well pad drilling and project development where practical." *Id*. ¶ 270.

- "I think that's the exciting thing about what we've been able to do and are going to continue to do [is] deliver really compelling returns while continuing to learn." *Id*. ¶ 294.

Like the statements in *Goldman*, the Category A statements are generic. None, for example, provides a numeric forecast of future Concho results, let alone one tied to the results of the second quarter of 2019 that are the topic of the alleged corrective disclosures. Instead, like *Goldman I*'s prototype generic statement ("we have faith in our business model"), 141 S. Ct. at 1961, the Category A statements express vaguely positive sentiments about Defendants' faith in one aspect of Concho's business plan (its transition to large-scale development).

Comparing the Category A statements to those "courts have labeled … as generic" in "case

law bearing on materiality," as *Goldman II* invites courts to do, further confirms the mismatch. *Goldman II*, 77 F.4th at 96. Under that case law, "generalized positive statements about a company's progress" are generic as a matter of law. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (finding "general statements that the Phase III results were 'positive'" to be generic). For example, statements such as, "[t]he pipeline of private transactions and announced public tenders that we are pursuing remains strong," "[o]ur fundamentals are strong," and the company is "making steady progress" are immaterial "generalized positive statements." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869-70 (5th Cir. 2003).[6] The Fifth Circuit has also noted that statements that are "untethered [from] anything measurable" are paradigmatic generic statements. *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." (citations omitted)). The Category A statements fit precisely that generic mold and analysts treated them as such, scarcely referencing these statements—much less relying on them in their valuations. *See* Ex. 1, Allen Report ¶ 23.

The alleged corrective disclosures, by contrast, are far more specific—detailed financial results for the second quarter of 2019, particular production forecasts for future periods, and Concho's observation that second quarter 2019 "performance from the [Dominator] project

---

[6] *See also, e.g., Local 210 Unity Pension & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *7 (S.D. Tex. Mar. 13, 2015) (finding all of the following to be generalized immaterial statements: "the Company's positive 3Q2012 results would 'keep [it] on track for solid 2012 financial performance' for the remainder of the year; the defendants 'remain[ed] positive' and 'belie[ved] that it [was] highly likely' that they could make profitable (in 2013) their operations in the Atlantic region, where they maintained a 'stable,' 'competitive situation'; they 'fe[lt] good about [their] strength in the Middle East'; Johnson remained 'quite bullish' concerning McDermott's Atlantic presence; the Company was 'well positioned to meet the growing customer demand in each of [its] market segments'; and the Company was 'equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control.'"); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 887 (S.D. Tex. 2002) (Representations in press releases that corporation's "pipeline of private transactions and announced public tenders remain[ed] very strong," and that company had "assembled the core assets and capabilities for strong growth in [its] key markets" were too generic to be material.), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (characterizing as generic "puffery" statements that issuer's risk management program was "highly disciplined").

indicates the well spacing [on that project] was too tight." CC ¶¶ 298-300. In other words, they compare similarly to *Goldman I*'s prototype of a specific corrective disclosure ("our fourth quarter earnings did not meet expectations") held up against a generic alleged misstatement. *Goldman I*, 141 S. Ct. at 1961. Thus, as in *Goldman*, there is a stark mismatch between the generic alleged misrepresentations in Category A and the specific alleged corrective disclosures. As a result, Plaintiffs cannot "use[] the price drop following [such] detailed, specific corrective disclosures as a proxy for the inflation-maintaining capacity of the broad, generic misrepresentations" in Category A. *Goldman II*, 77 F.4th at 90.

Moreover, the evidence establishes that the alleged corrective disclosures do not actually correct the Category A statements. Defendants' expert, Lucy Allen, reviewed all the analyst reports following the alleged corrective disclosures, and not one analyst referenced the Category A statements, let alone attributed the stock drop to a correction of these statements. Allen Report ¶¶ 26-28. Even Lead Plaintiff Construction Laborers Pension Trust for Southern California ("SoCal") confirmed the lack of correctiveness in its deposition when confronted with statements from Category A, SoCal's 30(b)(6) representative admitted they were not corrected by the 2Q19 results—the only alleged corrective disclosures in this case. *See* Ex. 2, Glaza Dep. 214:18-20 (Q. "The July 2019 statement did not correct this statement?" A. "Yes."); *Id*. 215:15-19 (similar); *Id*. 216:7-24 (similar); *Id*. 217:6-19 (similar).

The fact that the Category A statements and the alleged corrective disclosures bear on a common subject—Concho's transition to large-scale manufacturing—is not enough to attribute the stock movement following the alleged corrective disclosures to the Category A statements. As the Second Circuit held, *Goldman I* requires far more than a subject matter overlap between misstatement and corrective disclosure to infer price impact. *Goldman II*, 77 F.4th at 100-01

("requiring only a general front-end—back-end subject matter match ... does not meaningfully account for the Supreme Court's guidance in *Goldman*"); *id.* at 102 (in cases "based on the [inflation-maintenance] theory..., a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place").[7] Instead, a corrective disclosure must "reveal[] to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321. "Were it otherwise, securities plaintiffs could find a road to success in the rearview mirror: they would need only find negative news … and then point to any previous disclosure from the company which touches upon a similar subject." *Goldman II*, 77 F.4th at 101. Strict application of *Goldman I*'s mismatch framework is thus essential to "avoid[] turning securities claims into a game of litigation-by-hindsight." *Id.*

As explained above, when that framework is applied here, the mismatch in specificity between the Category A statements and the alleged corrective disclosures and the utter lack of correctiveness undercuts any inference that the Category A statements had price impact. The *Basic* presumption is thus rebutted as to the Category A statements. *See id.* at 105 (finding *Basic* rebutted on similar grounds); *Qualcomm*, 2023 WL 2583306, at *12, *14 (similar). And no class can be certified as to any of the Category A statements as a result.

---

[7] *See also Goldman II,* 77 F.4th at 104 (a lack of analyst reference to alleged misstatements "sever[s] the link between back-end price drop and front-end misrepresentation"); *id.* at 99 (*Goldman* "dispels th[e] notion" that a plaintiff may "(a) identify a highly specific corrective disclosure, and (b) identify and extract a generic truth purportedly embodied therein, in order to (c) craft a link between a generic misrepresentation and specific corrective disclosure"); *accord Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *16 (N.D. Tex. Aug. 21, 2023) (stating that "the dearth of analyst commentary … suggests that the market likely did not consider [the corrective disclosure] to be significant" and concluding that "Defendants have rebutted the *Basic* presumption by a preponderance of the evidence"); *Qualcomm*, 2023 WL 2583306, at *12 (finding a lack of price impact even though the back-end disclosures and the front-end statements both pertained to the company's "licensing" because the back-end disclosures were "far more specific than Defendants' generic [front-end] statements" and thus "the generic nature of the alleged misrepresentations makes it less likely that those misrepresentations deceived the market in the way Plaintiffs theorize, and therefore, less likely that they caused 'front-end price inflation'").

**b.** **Concho's back-end stock drop following the 2Q 2019 results does not demonstrate price impact as to any Category B statement.**

The statements in Category B describe operational facts and financial results from the fourth quarter of 2017 through the end of 2018, such as:

- Concho "deliver[ed] outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin" in the fourth quarter of 2017. CC ¶ 170.

- Concho had "been building up to this kind of larger-scale development mode, and we're very excited about what we're seeing" as of May 2018. *Id*. ¶ 223.

- In September 2018, Concho noted that "real-time information" had helped Concho "to drill a 13,000-foot well with 1 drill bit." *Id*. ¶ 247.

- Also in September 2018, Concho noted that "the Dominator project in Lea County, New Mexico, is 23 wells being drilled by 7 rigs all at the same time on 1 section of land." *Id*. ¶ 249.

- In describing results for the fourth quarter of 2018 on February 20, 2019, Concho noted that it was "seeing the results [it] expect[s]" on its large-scale projects. *Id*. ¶ 277.

Nothing in the alleged corrective disclosures even remotely corrects any of the Category B statements. The Category B statements describe the state of affairs at Concho during periods in 2017 and 2018. The alleged corrective disclosures, by contrast, state Concho's financial results for the second quarter of 2019—six to 18 months later. The price movement following the disclosure of Concho's second quarter 2019 results cannot be attributed to Category B's factual observations about periods from months before. *Id*.; *see also Ramirez*, 2023 WL 5415315 at *19 (finding the *Basic* presumption rebutted due to, among other things, a content mismatch where "none of the … [c]orrective [d]isclosures pertained to [the front-end statements]").

Nothing in the alleged corrective disclosures suggests that the early results Concho saw from its large-scale projects in 2017 and 2018—months before the Dominator project on which the Complaint focuses is alleged to have first begun producing in early 2019, *see* CC ¶ 69—were

18

somehow inaccurate. *See* CC ¶¶ 170, 259, 277.[8] Nor do the alleged corrective disclosures suggest that Concho's description of the locations of its large-scale projects in early 2018 was incorrect. *See* CC ¶¶ 201, 220. And the alleged corrective disclosures do not challenge Concho's descriptions of its large-scale development program in 2018. *See* CC ¶¶ 223, 247, 249. The alleged corrective disclosures simply do not say anything about—and certainly do not "actually correct[]"—the Category B statements. *Goldman I*, 141 S. Ct. at 1961.

This disconnect is confirmed by the evidentiary record. Ms. Allen systematically surveyed all analyst commentary on the alleged corrective disclosures, and ***not one*** referenced a Category B statement—let alone suggested that such a statement had been corrected by the alleged corrective disclosures. Allen Report ¶ 30; *see also Ramirez*, 2023 WL 5415315, at \*16 (lack of analyst commentary evidences a lack of price impact). Accordingly, the corrective disclosures do not "actually correct[]" the Category B statements, negating any basis to infer that the decline in Concho's stock price following the corrective disclosures is attributable to price impact of the Category B statements. *Goldman I*, 141 S. Ct. at 1961. Consequently, no class can be certified as to any of the Category B statements.

    c.    **Concho's back-end stock drop following the 2Q 2019 results does not demonstrate price impact as to any statement in Category C.**

The back-end price drop cannot be ascribed to the Category C statements for similar reasons. Statements C-1, C-2, and C-3 are financial projections of what Defendants expected to occur during the year 20*18*. *See* CC ¶¶ 171, 185-86, 197. The alleged corrective disclosures pertain to results for the second quarter of 20*19*. *See* CC ¶¶ 298-300. The corrective disclosures thus do nothing to correct these three statements, which had grown stale months before the alleged

---

[8] To the contrary, the Complaint cites a former Concho employee to state that, during this earlier period, "the Company had been immensely successful and was growing fast." CC ¶ 144.

corrective disclosures were made. *See* Allen Report ¶¶ 35-36.

Statements C-4, C-5, and C-6 were also in no way "actually corrected" by the second quarter 2019 results. *Goldman I*, 141 S. Ct. at 1961. Statement C-4 states Concho's expectation "to grow total production at a compound annual growth rate of 20% from 2017 to 2020." CC ¶ 174. But from the beginning of 2017 through the alleged corrective disclosure date of July 31, 2019, Concho's total production grew at a compound annual growth rate well above 20%. In fact, Concho experienced a 36.3% compound annual growth rate in total production from FY17 to FY18, and a 30.96% compound annual growth rate in total production from FY17 to FY19. *See* Allen Report ¶ 37, n. 32. The second quarter results thus in no way corrected Statement C-4's expectation that production would grow at a rate of a mere 20%.[9] Statements C-5 and C-6 state that "Concho's estimated proved reserves totaled 840 MMBoe" as of December 31, 2017. CC ¶¶ 178, 182. Again, the alleged corrective disclosures in no way "actually corrected" this. To the contrary, Plaintiffs concede that Concho's proved reserves were "1,002 MMBoe" as of December 31, 2019—162 MMBoe *more* than predicted as of December 31, 2017 in these statements. CC ¶ 314. The price movement at the date of the alleged corrective disclosures thus cannot be attributed to these statements. *See* Allen Report ¶ 38.

Finally, Statements C-7, C-8, and C-9 concern synergies that Concho expected to obtain from its merger with RSP Permian, Inc. ("RSP") in early 2018. *See* CC ¶¶ 206, 207, 209. The alleged corrective disclosures make no mention of the merger or its synergies and thus do nothing to contradict these projections. *See* Allen Report ¶ 39; *see also Ramirez*, 2023 WL 5415315, at *19 (finding a lack of price impact because, among other things, "[n]one of the … Corrective Disclosures pertained to Exxon Mobil's" alleged front-end misrepresentations).

---

[9] This is especially so given that Concho acquired RSP Permian in July 2018, effectively mooting Statement C-4. *See* Allen Report ¶ 37.

20

Moreover, Ms. Allen did not find a single analyst commenting on any of the Category C statements in the wake of the alleged corrective disclosures, confirming their disconnection. *See* Allen Report ¶ 34.[10] The alleged corrective disclosures were therefore not corrective at all of the Category C statements, which "severs the link between the [Category C statements] and … the price received (or paid) by the plaintiff[s]." *Halliburton II*, 573 U.S. at 281; *see also Goldman I*, 141 S. Ct. at 1961. Plaintiffs cannot infer price impact for the Category C statements based on Concho's back-end price drop, the *Basic* presumption has been rebutted, and no class can be certified as to any of the Category C statements.

### d.      Plaintiffs cannot salvage certification with front-end price movement.

Where "Plaintiffs' claims fall within the inflation-maintenance, rather than the inflation-introduction, strain of Rule 10(b) claims, any price impact must be measured via stock price decreases occurring after the alleged misstatements were revealed to be false." *In re Goldman Sachs*, 579 F. Supp. 3d at 527. Securities plaintiffs "typically" pursue their claims under this inflation-maintenance strain. *Goldman I*, 141 S. Ct. at 1961.

Here, Plaintiffs have no choice but to at least primarily rely on the inflation-maintenance theory and Concho's back-end price drop in seeking to establish price impact since both sides' experts agree that following 12 of the 13 dates on which alleged misrepresentations were made, there was no statistically significant increase in Concho's stock price.  *See* Allen Report ¶ 45.[11] Thus, there can be no "front-end" price impact attributable to any of the alleged misrepresentations made on those 12 dates. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal.

---

[10] *Ramirez*, 2023 WL 5415315, at *19 ("With the exception of a single analyst report issued after the alleged … Corrective Disclosure … Plaintiff presents no evidence that the market connected the three earnings releases to Defendants' alleged misstatements … much less evidence that any connection between the releases and Defendants' alleged misstatements impacted the price of Exxon Mobil's stock.").

[11] *See* Allen Report ¶ 45 (table showing lack of statistically significant movement following statements on 2/21/18, 3/5/18, 3/28/18, 5/1-5/2/18, 5/15/18, 8/1-8/2/18, 9/5/18, 10/30-10/31/18, 2/19/19, 2/20/19, 3/4/19, and 4/30-5/1/19).

Dec. 5, 2017) (finding no price impact because of the lack of a statistically significant front-end price movement).[12]

As to the statements made on the one remaining date—February 20-21, 2018—the alleged misrepresentations from this date in Category A likewise cannot fit under an inflation-introduction framework. Statements that merely reiterate market expectations cannot introduce new inflation into a stock price. Allen Report ¶ 42.[13] And, here prior to the beginning of the Class Period, Concho had already expressed the same information expressed in the Category A statements made on February 20-21, 2018.

In an October 31, 2017 Press Release, for example, Concho noted that "improving returns from large scale project development underpin a solid outlook for continued capital discipline and differentiated per share growth." Ex. 4 at 1 (3Q 2017 Press Release). In a presentation released the same day, Concho noted that "Large-Scale Project Development" allows for "Maximizing Returns & Recoveries of High-Quality Resource" and that the company was "[d]riving [e]fficiencies" by "[o]ptimiz[ing] well spacing and development pattern[s]." Ex. 5 at 6, 11 (3Q 2017 Presentation). On an earnings call the next day, Concho "spoke about reaching a new inflection point ... driven by the shift to large scale project development," noted Concho's "premier position in the Midland Basin," and stated that "Concho [was] in a great position with a great asset base" and the next year "2/3, plus or minus" of Concho's capital would be "allocated to those type of large-scale projects."

---

[12] In other words, Plaintiffs *must* rely on "back-end" price movement in an attempt to show price impact for the statements made on those dates. And, for the reasons shown in the preceding sections, they cannot do so as to the statements in Categories A-C made on those dates (*i.e.*, Statements A-10-A-33, B-3-B-12, C-1, and C-7-C-9).

[13] *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("common sense" that "statements add[ing] nothing to what was already public" had no price impact); *Greenberg*, 364 F.3d at 663 (explaining the "market reality" that "a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market"); Ex. 3, *In re Banco Bradesco S.A. Sec. Litig.*, No. 1:16-cv-04155-GHW (S.D.N.Y.), ECF 165-2, Expert Rebuttal Report of Chad Coffman, CFA (Dec. 14, 2018) ¶ 19 ("[S]tatements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market.").

Ex. 6 at 4-5, 11 (3Q 2017 Earnings Call). As a result, any price movement following the making of the Category A statements made on February 20-21, 2018 cannot be attributed to such statements, severing any potential inference of front-end price impact. *See* Allen Report ¶¶ 47, 51.[14]

**III.   Plaintiffs separately fail to satisfy *Comcast*'s requirement of a damages methodology capable of measuring only those damages stemming from the alleged fraud.**

"*Comcast* signal[ed] a significant shift in the scrutiny required for class certification." *BP I*, 2013 WL 6388408, at *17. "Prior to *Comcast*, [courts in this District] may have been satisfied [by the mere] invocation" of a methodology showing that "damages [are] measurable on a class-wide basis." *Id*. But, following *Comcast*, it is "not sufficient for class action plaintiffs to provide a classwide damages model; they must also show that the damages model is 'consistent with their liability case.'" *Id.* at *16 (quoting *Comcast*, 569 U.S. at 35).  And this burden may only be met with evidence—not self-serving conclusory assertions. *Unger v. Amedisys Inc.*, 401 F.3d 316, 319 (5th Cir. 2005) ("[F]indings must be made based on adequate admissible evidence to justify class certification."); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 151 (N.D. Tex. 2014) (similar).

Here, as explained below, Plaintiffs have failed to satisfy "*their burden* of showing that damages can be measured on a class-wide basis consistent with their theor[y] of liability" in at least two ways, each of which requires denial of class certification. *BP I*, 2013 WL 6388408 at *17.

---

[14] As to the statements in Categories B and C made on February 20-21, 2018, Plaintiffs have not yet made clear whether they intend to pursue an inflation-maintenance or inflation-introduction theory.  If Plaintiffs intend to pursue an inflation-introduction theory as to those statements, Defendants will address the issues raised by such an election— including whether Plaintiffs have shown a basis to pursue such a theory as to those statements despite treating all other statements Categories B and C as inflation-maintenance statements—on sur-reply.

a. **Plaintiffs have not shown that they can calculate damages consistent with their risk materialization theory of liability.**

In this action, Plaintiffs are pursuing what is referred to as a "materialization of the risk" theory of liability.[15] Specifically, Plaintiffs contend that throughout 2018 and early 2019, Defendants made allegedly false or misleading statements that purportedly concealed certain risks about Concho's transition to large-scale development. *See, e.g.*, Plfs' Opp. to Mot. to Dismiss (ECF 33) at 1-3 ("This case falls squarely into a classic pattern of securities fraud—marketing a highly risky investment as anything but."); Plfs' Resp. to Objections to R&R (ECF 42) at 1 (summarizing Plaintiffs' theory of liability as Defendants' not "disclosing the true nature of the risk to investors"); CC ¶ 3 ("[Defendants] fraudulently and affirmatively concealed from investors what they had put at stake and what the risks were for their venture."). Plaintiffs contend that these statements were "corrected" not by any statement revealing that they were inaccurate or untrue, but based on the fact that previously "concealed" risks later "materialized" in subsequent financial results. *See, e.g.*, CC ¶ 407 ("The price of Concho common stock fell precipitously when ... the risks concealed by the Individual Defendants' misconduct materialized."). The District Court recognized and relied on Plaintiffs' risk materialization theory in its Order denying Defendants' Motion to Dismiss, *see* Order (ECF 43) at 2 ("Generally, Plaintiffs' theory is that the Defendants oversold the probable success of the drilling program while underselling the risk involved[.]"), as did Magistrate Judge Sheldon in his recommendation, *see* Memorandum and Recommendation

---

[15] *See* Ex. 2, Glaza Dep. 199:2-8 (Q. You are alleging "that [Defendants] concealed risk or the true risk?" A. "Yes." Q. "And that when that risk materialized, that's when the stock price fell?" A. "Yes."). The nature of that theory of liability is well illustrated in *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019). There, Section 10(b) plaintiffs challenged a healthcare company's statement that, "We believe that [the company] is well-positioned to continue to generate significant organic growth…." *Id*. at *10. The plaintiffs argued that these statements undersold the problems the company was facing and were revealed to be false when, on October 31, 2017, the company announced "an earnings miss and guidance reduction." *Id.* at *24. As the court noted, such a theory of liability is best "characterized as materialization of the risk." *Id.*; *see also BP I*, 2013 WL 6388408, at *11 (contending that statements about BP's safety practices were revealed to have understated "BP's exposure to catastrophic risk" when the Deepwater Horizon drilling rig exploded).

24

(ECF 38) at 15 (describing Plaintiffs' theory as alleging "that Defendants knowingly and/or recklessly spoke in misleading half-truths while omitting the true risks associated with manufacturing style development").

As Judge Ellison explained in *BP I*, a plaintiff that pursues a risk-materialization theory of liability faces an additional hurdle to meeting *Comcast*'s requirement to show that it can measure damages consistent with that theory of liability. As here, in *BP I* the plaintiffs argued that "damages will be calculated by use of an event study."  *BP I*, 2013 WL 6388408, at *15.[16] But, as Judge Ellison observed, merely pointing to the existence of an event study is not enough to show that a plaintiff can measure damages consistent with a risk-materialization theory of liability. *See id.* at *16-17. This is because when a plaintiff asserts that theory of liability, a damages model must account for the reality that the full value of the stock price drop at the date of correction does not provide an accurate measure of damages:

> [W]hen [a] corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized) will *not* equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent. If the probability is less than 100 percent, the stock price correction after the risk materializes will be *larger* than the pre-materialization inflation.

*In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) *("BP II")*.[17]

---

[16] The plaintiff's expert in *BP I* was Chad Coffman, Plaintiff's expert here.  *BP I*, 2013 WL 6388408, at *16.

[17] To see why this is so, consider a scenario in which a company properly discloses that it has a 20% risk of having to pay a $1 million fine. In an efficient market, the company's stock price would reflect the expected value of the possible loss prior to any fine being levied. The value would be discounted by $200,000, or 20% of $1 million. If that company is later fined $1 million, the stock price would then impound that $1 million loss and drop by $800,000. On the other hand, if the company had disclosed a 10% chance of a $1 million fine—i.e., it only disclosed *half* of the regulatory risk it was actually facing—then the disclosure would have incorporated an expected value of a possible loss of $100,000, or 10% of $1 million. In this second scenario, after the company's $1 million fine is announced, the stock price would then incorporate a loss of value of $900,000, rather than $800,000. The actionable amount of damages would be the difference between $900,000—the loss that occurred based on materialization of both known and concealed risks—and $800,000—the loss resulting from realization of a known risk. The concealment of risk resulted in the company's value to be inflated by $100,000. If plaintiffs were to assert a risk materialization theory of liability against this company, they could only satisfy Rule 23's requirements discussed in *Comcast* by presenting evidence that they possessed a damages model that could measure the actual $100,000 damages, rather than the full $900,000 stock price drop. *See BP I*, 2013 WL 6388408, at *16-17 n.15 (offering a similar hypothetical to prove the same point);

Thus, in the context of alleged understatement of risks, a plaintiff seeking class certification must present evidence that it has a damages methodology capable of measuring *only* the difference between (1) the observed market value of the stock before the risk materialized and (2) "what the market value would have been, prior to the [materialization of the risk], had the company [disclosed the true risk]." *BP I*, 2013 WL 6388408, at *16 n.15; *see also Comcast*, 569 U.S. at 35 (plaintiffs must show they have a methodology capable of "measur[ing] only those damages attributable to [their] theory [of liability]"); Allen Report ¶ 59. To calculate this, a damages model must be able to calculate (1) the likelihood that the risk would materialize on each date of the class period, (2) the likelihood of the risk materializing implied by the alleged misstatements, and (3) how investors would value the difference between these two likelihoods. Allen Report ¶ 60.

By merely asserting that damages would be calculated based on an "event study methodology," the *BP I* plaintiffs failed to show that they could calculate any of these figures. *See BP I,* 2013 WL 6388408, at *16. Accordingly, the *BP I* plaintiffs "failed to meet *their burden* of showing that damages can be measured on a class-wide basis consistent with their theory of liability," and Judge Ellison denied class certification. *Id.* at *17; *see also Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *24 (M.D. Tenn. Feb. 24, 2023) (denying class certification as to certain claims because the plaintiffs and their expert "omit[ted] any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory").

Plaintiffs' expert recognizes this issue but offers no evidence that his model can account for it. Rather, he only notes that "the determination of how artificial inflation evolved over the class period is [] a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous

---

Allen Report ¶ 59.

26

valuations or documents, or some combination of the above." Coffman Report ¶ 83. "Plaintiffs bear the burden of proving all relevant elements of Rule 23" with "quality evidence." *BP II*, 2014 WL 2112823, at \*12; *see also Kosmos*, 299 F.R.D. at 151 ("[P]laintiffs seeking certification must produce quality evidence for each Rule 23 element—period."). "That burden is not met by asking the Court simply to trust them." *BP II*, 2014 WL 2112823, at \*12; *see also BP I*, 2013 WL 6388408, at \*17 ("Plaintiffs cannot avoid th[e] hard look [required by Rule 23] by refusing to provide the specifics of their proposed methodology."); *id.* at \*19 ("Plaintiffs had an obligation to come forward with evidence ... *Comcast* does not allow them the luxury of waiting until trial." (citation omitted)).

But an appeal for trust is all Plaintiffs offer. As in *BP I*, Plaintiffs entirely fail to offer ***any*** specific evidence showing how their model will determine (1) the likelihood that a concealed risk would materialize on each date of the class period, (2) the likelihood of the risk materializing implied by the alleged misstatements, and (3) how investors would value the difference between these two likelihoods. Allen Report ¶ 60. Nor is it apparent how Plaintiffs' expert's generic list of "valuation techniques" could accomplish this daunting task. Allen Report ¶ 61. Plaintiffs' hand waving thus falls far short of their burden to demonstrate that "the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified." *BP I*, 2013 WL 6388408, at \*17 ("Without a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages ... the Court cannot certify this litigation for class action treatment.").

Accordingly, Plaintiffs have failed to satisfy either the predominance or the superiority elements of Rule 23(b)(3), and the Motion should be denied in its entirety and as to all statements. *Id.* at \*4, 17-18 ("without assurances that Plaintiffs' class-wide damages methodology will

27

accurately reflect any liability findings in th[e] case," Plaintiffs fail to satisfy both Rule 23(b)(3)'s predominance and superiority requirements).[18]

### b. Plaintiffs' damages methodology yields economically nonsensical results and does not fit Plaintiffs' liability theory regarding the RSP acquisition.

On July 19, 2018, a few months into the Class Period, Concho acquired RSP in a stock-for-stock transaction. Allen Report ¶ 6. Through that transaction, former RSP shareholders received 0.320 Concho shares in exchange for each RSP share, with former RSP shareholders owning 25.5% of post-merger Concho (with heritage Concho shareholders owning the remaining 74.5%). *Id.* The Complaint acknowledges the RSP transaction, CC. ¶¶ 203-04, as does Plaintiffs' expert, who admits that it "altered the makeup of the Company." Coffman Report ¶ 50. But critically, Plaintiffs and their expert do not attempt to square their proposed damages methodology with the economic realities of that makeup-altering transaction. That results in two glaring problems under *Comcast*, both with respect to pre-acquisition Concho shareholders and former RSP shareholders who converted their RSP stock.

*Pre-Acquisition Concho Shareholders.* Plaintiffs' fundamental liability theory is that the alleged fraud inflated the price of Concho's stock as early as February 21, 2018 (the start of the Class Period). CC ¶¶ 1. If that is true, then Concho necessarily used those purportedly inflated shares as merger consideration in acquiring RSP—an uninflated company—in July 2018, thus

---

[18] Although two courts in this district have granted class certification despite defendants arguing that *Comcast* precluded class certification because of the plaintiffs' materialization-of-the-risk damages theory, *see In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *7 (S.D. Tex. Sept. 28, 2022), *reconsideration denied*, 2023 WL 4307650 (S.D. Tex. June 30, 2023); *Rougier v. Applied Optoelectronics Inc.*, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), Plaintiffs' claims here are distinguishable from those in both *Andarko* and *Rougier*. In *Anadarko*, the plaintiffs did not allege that the defendants "underrepresented an *unrealized* risk," but instead plaintiffs pled that "certain risks had *in fact* materialized, yet Defendants actively misled investors to the contrary." *Id.* at *7. Similarly, in *Rougier*, the court found that, contrary to defendants' argument, plaintiff had not pled "a materialization of [the] risk case." 2019 WL 6111303 at *18. Here, as explained above, like *BP I*, there can be no dispute that Plaintiffs are pursuing a materialization-of-the-risk theory. Plaintiffs have admitted as much. *See supra*. Thus, like in *BP I*, class certification is improper because Plaintiffs have not provided a "complete explication" of how they will measure damages consistent with that theory of liability. *BP I*, 2013 WL 6388408, at *17.

bestowing an economic *benefit* on heritage Concho shareholders by diluting existing inflation (if any) and spreading it out over many more shareholders in the post-acquisition Concho. Allen Report ¶ 70; *see Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (allegation that "artificially inflated … stock price" allowed company to "concretely benefit" "by using less … stock as consideration to acquire four companies").

Yet Plaintiffs' proposed damages methodology makes no effort to account for the materially different position of pre-acquisition Concho shareholders. Plaintiffs' expert simply describes using an event study to measure alleged inflation and calculate damages as the difference between purchase inflation and sale inflation. Coffman Report ¶ 82. But that methodology would award *more* damages to pre-acquisition Concho shareholders, which makes no economic sense given the inflation-diluting effect of the RSP acquisition that is the logical byproduct of Plaintiffs' liability theory. Allen Report ¶ 70. And simply pointing to the "mathematical or formulaic" nature of Plaintiffs' proposed damages methodology cannot absolve that discrepancy or satisfy the "rigorous[]" nature of the post-*Comcast* damages inquiry. *BP I*, 2013 WL 6388408, at \*17.

***Former RSP Shareholders.*** Likewise confounding is the mismatch between Plaintiffs' theory and the economic position of those former RSP shareholders who converted their RSP stock into Concho stock.[19] According to the Complaint, Concho "paid 'way too much' for the acquisition of RSP"—"an approximately 29% premium" above the then-market price for RSP stock. CC ¶¶ 152, 204. That premium more than offsets any alleged losses suffered by the former RSP shareholders on account of their receipt of supposedly inflated Concho stock and the subsequent alleged corrective disclosure. Allen Report ¶ 72. In other words, Concho shareholders who

---

[19] The proposed class definition in Plaintiffs' Motion is "all other persons and entities who purchased or *otherwise acquired* Concho publicly traded common stock during the" Class Period, Mot. 1 (emphasis added), which would include those who acquired their Concho stock through conversion.

acquired their shares through the RSP acquisition actually received a *net benefit* in the very transaction giving rise to their purported injury in this case. *Id.*

That is more than just an idiosyncratic damages problem for former RSP shareholders—it creates a fundamental rift in the interests of the putative Class vis-à-vis Plaintiffs' theory, pitting former RSP shareholders against the remaining members of the class. "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). And "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Id.* at 1190; *see also Edwards v. McDermott Int'l Inc.*, 2024 WL 873054, at *12 (S.D. Tex. Feb. 29, 2024) (finding class conflict in 10b-5 case when proposed class included members who potentially benefitted as part of merger transaction that was topic of alleged fraud). That dissonance supplies another reason to deny class certification here.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied. In the alternative, if the Court were to find certification appropriate as to certain misstatements, the Court should grant the Motion for Class Certification in part and only as to those claims.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*
David D. Sterling
Attorney-In-Charge
State Bar No. 19170000
Federal I.D. No. 07079
Amy Pharr Hefley
State Bar No. 24046046
Anthony J. Lucisano
State Bar No. 24102118
Federal I.D. No. 3369146
C. Frank Mace
State Bar No. 24110609
Federal I.D. No. 3385915
910 Louisiana Street
Houston, Texas 77002
(713) 229-1946
(713) 229-7946 (Fax)
david.sterling@bakerbotts.com
amy.hefley@bakerbotts.com
anthony.lucisano@bakerbotts.com
frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS
CONCHO RESOURCES INC.,
CONOCOPHILLIPS, AS SUCCESSOR IN
INTEREST TO CONCHO RESOURCES
INC., TIMOTHY LEACH, JACK F. HARPER,
AND C. WILLIAM GIRAUD

31

By: */s/ Michael C. Holmes*
Michael C. Holmes
Texas Bar No. 24002307
Southern District Bar No. 23716
Robert Ritchie
Texas Bar No. 24079213
Southern District Bar No. 3089959
K. Virginia Burke DeBeer
Texas Bar No. 24097437
Southern District Bar No. 3472047
VINSON & ELKINS LLP
2001 Ross Ave., Suite 3900
Dallas, TX 75201
Tel: (214) 220-7700
Fax: (214) 999-7923
mholmes@velaw.com
rritchie@velaw.com
vdebeer@velaw.com

CO-COUNSEL FOR DEFENDANTS TIMOTHY
LEACH, AND C. WILLIAM GIRAUD

32

# CERTIFICATE OF SERVICE

I hereby certify that, on March 15, 2024, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Robert P. Ritchie*