# EXHIBIT 47
# (part 2)

24.     Moreover, the Barclays commentary makes no reference to any of the Category A, B, or C alleged misstatements. For example, alleged misstatement A-8, which was made more than a year before the Barclays commentary, discussed how Concho's "accomplishments last year" (i.e., Concho's actual results), which Plaintiffs are not claiming were misrepresented, had validated Concho's "well spacing, lateral placement and completion design."[34]

25.     As the Court in the *Goldman* case noted, "commentary touching upon only the same subject matter… cannot be enough" to show price impact.[35] Mr. Coffman is not tying the alleged corrective disclosure to any of the individual alleged misstatements. The analyst commentary cited in the Coffman Rebuttal only shows that he is trying to tie the alleged corrective disclosure to the general subject matter of the case (e.g., the lower production forecast) and in essence is just parroting Plaintiffs' claims rather than showing price impact from the alleged misstatements.[36]

26.     Mr. Coffman claims that after the alleged corrective disclosure there was evidence of "skepticism" of the alleged misstatements and thus evidence of price impact because the analysts discussed a lack of "credibility" and "confidence."[37] However, Mr. Coffman's claim is incorrect. There is no evidence of skepticism about the alleged misstatements. Analysts do use terms such as "eroded confidence," but not in the context of questioning any of the alleged misstatements. Instead, analysts use the term "eroded confidence" in the context of the Company's current execution capabilities given Concho's strong track record. For example, the J.P. Morgan report cited by Mr. Coffman indicated that there was "eroded confidence in the company's execution capabilities" given their "strong historical performance."[38] Mr. Coffman fails to identify any analyst who questions management's credibility with regard to any of the Category A, B, or C alleged misstatements.

---

[34]   Allen Report, Appendix C, p. 3.

[35]   "In short, although market commentary can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact— commentary touching upon only the same subject matter, given the contours of this case as discussed above, cannot be enough." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 104 (2d Cir. 2023).

[36]   Coffman Rebuttal, Section III.

[37]   Coffman Rebuttal, ¶34.

[38]   J.P. Morgan, August 5, 2019.

11

**3. The Coffman Rebuttal's finding of a statistically significant price decline after the alleged corrective disclosure does not establish an economic or causal link between this price movement and any of the individual Category A, B, or C alleged misstatements**

27.     Mr. Coffman finds, using his event study, that the drop in Concho's stock price after the alleged corrective disclosure was "highly statistically significant" and that such a result provides "compelling evidence of back-end price impact."[39] However, Mr. Coffman fails to link the alleged corrective disclosure to any alleged misstatements, including any individual Category A, B, or C alleged misstatement. Thus, a finding that there is a statistically significant price decline after the alleged corrective disclosure cannot and does not establish price impact of any alleged misstatement.

**4. The Coffman Rebuttal ignores that the back-end content analysis in the Allen Report provides strong evidence supporting a lack of price impact and merely claims that it is not a "bright-line indicator of price impact"**

28.     Mr. Coffman dismisses the back-end analysis in the Allen Report despite it showing, among other things, that no analysts tied the alleged corrective disclosure to any of the Category A, B, or C alleged misstatements by claiming that the lack of focus from analysts is "not a bright-line indicator" of whether there is economic evidence of back-end price impact.[40] However, the Allen Report did not claim that the content analysis was itself a "bright-line indicator." Instead, based on the back-end content analysis, the Allen Report found that there was no basis at all to conclude that the alleged corrective disclosure was tied to any of the individual Category A, B, or C alleged misstatements.[41] Mr. Coffman has failed to do anything to rebut this finding and has failed to present *any* evidence that ties the alleged corrective disclosure to any individual Category A, B, or C alleged misstatement (or any other misstatement).

---

[39]   Coffman Rebuttal, ¶9.

[40]   Coffman Rebuttal, ¶26.

[41]   Allen Report, Section V.

12

## V. THE COFFMAN REBUTTAL FAILS TO REBUT THE ISSUES RAISED IN THE ALLEN REPORT REGARDING THE PROPOSED COMMON DAMAGES METHODOLOGY

### A. The Coffman Rebuttal's claim that the damages calculation can be separated from a materialization of risk theory is contrary to the underlying nature of Plaintiffs' claims

29. The Allen Report explained that Mr. Coffman's proposed common damages methodology is not well-specified and, given the specific issues in this case, does not measure damages consistent with Plaintiffs' risk materialization theory of liability.[42] In response, the Coffman Rebuttal asserts that the Allen Report's point is moot because Plaintiffs are no longer pursuing a materialization of risk theory of liability, and thus, his common damages methodology is "consistent" with Plaintiffs' theory of loss causation.[43] However, merely saying that Plaintiffs have dropped the words "risk materialization" does not make the problem go away because the risk materialization theory cannot be separated from Plaintiffs' claims in this case.

30. According to Plaintiffs' own Complaint, the nature of their claims is a series of allegedly understated risks that inflated Concho's stock price during the alleged Class Period, and that caused the stock to drop when those risks materialized. According to their Complaint, Plaintiffs' theory of liability is that Defendants "fraudulently and affirmatively concealed from investors what they had put at stake and what the risks were for their venture."[44] Plaintiffs claim that the "price of Concho common stock fell precipitously when … the risks concealed by the Individual Defendants' misconduct materialized."[45] Plaintiffs use the term "risk" 480 times in their Complaint.

31. Plaintiffs detail in their Complaint the alleged list of reasons why each of the individual alleged misstatements was misleading. As shown below, each of the specified reasons either explicitly or implicitly relates to undisclosed risks that supposedly materialized during the

---

[42]  Allen Report, Section VII. A.

[43]  Coffman Rebuttal, ¶47.

[44]  Complaint, ¶3.

[45]  Complaint, ¶407.

alleged Class Period. Below is a list of all the reasons identified by Plaintiffs in their Complaint for why the alleged misstatements were misleading:

"(a) Concho's manufacturing-style development was an **unverified and extremely high-risk** combination of development methodologies, which included aggressively tight well spacing;

(b) the construction of Concho's manufacturing-style development projects required an **extremely high upfront investment with no verifiable basis that they would deliver** estimated production and capital efficiency;

(c) Concho's manufacturing-style development projects **carried an enormous amount of risk** that production rates and total production would be permanently impaired due to improperly spaced wells;

(d) Concho **lacked a sufficient amount of lower risk projects to balance out the risk** of its manufacturing-style development projects, the concentration of which was aberrational compared to the Company's historic development approach, and significantly heightened Concho's overall risk profile;

(e) Defendants' Class Period statements, including production forecasts, failed to account for the concentration of Concho's **materially riskier** manufacturing-style development projects;

(f) the Individual Defendants, including Defendant Giraud, were repeatedly **warned internally of the risks** related to Concho's manufacturing-style projects, including warnings related to well spacing, which warnings were ignored;

(g) Defendants **incorrectly risked** Concho's development-style projects which incorporated tight well spacing, including by treating each well in a multi-well pad as if it were isolated as opposed to in close proximity with other wells;

(h) Defendants failed to conduct, or at the very least ignored, the **necessary facture modeling** and other data collection which **would have indicated** their manufacturing-style development and aggressive well spacing would result in **poorly performing wells**;

(i) while the Dominator may have been one of Concho's largest and most aggressive manufacturing-style development projects, it was one of many such **risky projects.**"[46]

32.     As shown above, the word "risk" is explicitly used in seven of Plaintiffs' nine reasons, while the two remaining reasons implicitly refer to risks ("extremely high upfront investment with no verifiable basis that they would deliver" and "the necessary facture modeling… would have indicated… poorly performing wells"). Moreover, Plaintiffs' specified reasons why each alleged misstatement is supposedly misleading ends with the same conclusion:

---

[46]    See, for example, Complaint ¶244, emphasis added.

14

"the above-mentioned risks would and did manifest during the Class Period."[47] Thus, Mr. Coffman's proposed common damages calculation cannot be separated from a materialization of risk theory.

### B. The Coffman Rebuttal, rather than actually addressing the issues raised in the Allen Report, merely promises that its proposed common damages methodology will "adapt" and "address" them

33. The Allen Report identifies a number of issues with Mr. Coffman's proposed common damages methodology, including that it is not well-specified, does not measure damages consistent with Plaintiffs' theory, and yields economically unreasonable results for certain proposed class members.[48] According to Mr. Coffman, his "out-of-pocket methodology is capable of addressing all of Ms. Allen's concerns."[49] However, rather than actually addressing the issues raised in the Allen Report, Mr. Coffman just makes promises that his proposed common damages methodology will "adapt" and "address" the issues raised in the Allen Report without offering any specifics.[50]

34. For example, Mr. Coffman does not explain how his methodology would be capable of measuring damages given Plaintiffs' understated risk theory. Instead, Mr. Coffman merely presents a hypothetical example, saying that if "evidence obtained in discovery suggests that only half of the allegedly corrective information [...] could have been disclosed" then the inflation would be half.[51] This is not a methodology but more of a tautology. Moreover, even if one were able to determine that half of the allegedly corrective information could have been disclosed, Mr. Coffman's methodology does not specify how to determine how much the market understood about the allegedly understated risks at various points in time during the alleged Class Period. Mr. Coffman's example does nothing to explain how his methodology would

---

[47] See, for example, Complaint ¶244.

[48] Allen Report, Section VII.

[49] Coffman Rebuttal, ¶47.

[50] Coffman Rebuttal, Section VI.

[51] Coffman Rebuttal, ¶65.

15

separate the impact of the allegedly understated risk (if any) from the impact of the materialization of that risk.

35. In addition, Mr. Coffman fails to explain how the alleged inflation would be measured given the changing understanding of the risks associated with the alleged fraud throughout the alleged Class Period. Importantly, Mr. Coffman is completely silent about the Allen Report's point that measuring the alleged inflation is particularly problematic in this case because even before the alleged corrective disclosure, market evidence indicates there was a changing understanding of the risks associated with large-scale development, tightening well spacing and Concho's Dominator project.[52] Mr. Coffman provides no evidence that his methodology could account for these changing risks and he does not specify what "evidence obtained in discovery" could or would show how the market valued the risk at different points in time during the alleged Class Period.[53]

36. The Allen Report raised the fact that Mr. Coffman's proposed common damages methodology yields economically unreasonable results for proposed class members who were Concho shareholders before the RSP merger.[54] Instead of addressing this criticism, Mr. Coffman's response highlights the very issue that was raised in the Allen Report.[55] According to the Coffman Rebuttal, Mr. Coffman's methodology would account for the RSP merger by giving "higher" inflation and damages per share to pre-merger Concho shareholders than to those who bought after the merger, even though the pre-merger shareholders obtained an economic benefit from the RSP merger.[56] This is exactly the economically unreasonable result that the Allen Report highlighted.

---

[52] Allen Report, ¶¶62-68.

[53] Mr. Coffman appears to confuse the concepts of disaggregating confounding information at the alleged corrective disclosure with measuring the alleged inflation at different points in time given Plaintiffs' understated risk theory. Coffman Rebuttal, ¶61.

[54] As discussed in the Allen Report, according to Plaintiffs, pre-merger Concho shareholders used inflated shares to buy RSP, an uninflated company. The RSP acquisition would have diluted the total inflation that existed in Concho before the acquisition across many more shareholders and the economic effect of this combining of shares at the merger would be to reduce the alleged inflation per Concho shareholder. Thus, pre-merger Concho shareholders obtained an economic benefit from the RSP acquisition. Allen Report, ¶¶69-70.

[55] Coffman Rebuttal, ¶¶68-71.

[56] Coffman Rebuttal, ¶70. According to Mr. Coffman's damages methodology, giving higher inflation per share to the pre-merger Concho shareholders yields higher damages per share since damage per share is based on the formula purchase inflation minus sale inflation. Coffman Report, ¶79.

16

## C. The Coffman Rebuttal fails to rebut that former RSP shareholders in the proposed class do not fit Plaintiffs' theory

37.     The Allen Report found that, according to Plaintiffs' theory, former RSP shareholders have a different relationship to the alleged misrepresentations and damages than other proposed class members who did not obtain Concho shares through the RSP acquisition.[57] In response, Mr. Coffman claims that RSP shareholders who exchanged their shares for Concho stock are "just like all other class members."[58] However, Mr. Coffman is incorrect, and he fails to rebut that former RSP shareholders in the proposed class do not fit Plaintiffs' theory.

38.     Mr. Coffman does not dispute that the 29% merger premium of $11.32 per RSP share that RSP shareholders received is substantially greater than his calculated alleged inflation per RSP share of $5.58 (even before disaggregating any confounding information from the price decline).[59] Instead, Mr. Coffman claims that former RSP shareholders are "just like other class members"[60] based on the unsupported and erroneous assumption that RSP would have been able to achieve the same 29% premium absent its acquisition by Concho.[61] However, market evidence, analyst commentary, and RSP's own SEC filings show otherwise.

39.     First, there is strong economic evidence that the market believed Concho overpaid for RSP. Concho's stock price reaction when the deal was announced to the market was a statistically significant price *decline* and market commentary indicated that Concho overpaid for RSP. According to both my own event study as well as Mr. Coffman's event study, there was a statistically significant price drop in Concho's stock when the deal was announced (-8.3% according to my event study and -6.9% according to Mr. Coffman's event study).[62] Analysts indicated that the decline in Concho's stock price after the merger was announced was due to the

---

[57]   Allen Report, ¶¶69-72.

Before the merger, 67% of RSP shareholders held both RSP and Concho shares. (Based on 13-F institutional data from FactSet Research Systems, as of June 30, 2018, the quarter end before the merger was completed.)

[58]   Coffman Rebuttal, ¶73.

[59]   Coffman Rebuttal, ¶75 and footnote 96.

[60]   Coffman Report, ¶73.

[61]   Coffman Report, ¶¶77-78.

[62]   Allen Report, ¶¶43-45 and Mr. Coffman's turnover file "CONCHO_COFFMAN_0007729.xlsx."

17

market's belief that Concho overpaid for RSP. For example, Bank of America indicated that the deal was very "one sided in favor" of RSP.[63] As another example, RBC noted that there was "investor concern over the price paid" and that some of those concerns could subside if Concho delivered on the proposed synergies for the merger.[64] Similarly, Jefferies commented that the "all-stock deal for RSPP received a cool reception on its initial day of trading" and Credit Suisse said that there was "market pushback" with regard to the deal.[65] The market reaction to the deal provides strong evidence that the market believed Concho overvalued RSP and does not support Mr. Coffman's claim that RSP would have achieved the same premium absent the Concho acquisition.

40.     Second, contrary to Mr. Coffman's unsupported and erroneous assumption that RSP would have been able to achieve the same premium absent the Concho acquisition, analysts indicated that the implied valuation of the deal only made sense if Concho was the buyer given its overlapping and complimentary acreage with RSP. For example, Credit Suisse indicated that the deal was a "perfect strategic fit," KLR concluded that it was an "impeccably complementary acquisition," and Stephens noted that "the deal makes good strategic sense given overlapping footprints within the Midland and Delaware Basins, as well as similarly lean cost structures."[66]

41.     Third, RSP's own SEC Filings show that RSP did not have any other comparable offers, directly contradicting Mr. Coffman's claim that RSP could have obtained the same premium without Concho. In particular, according to RSP's SEC filings, RSP only received one other offer during this time period and that offer was at a premium of less than half (12.5% premium of alternative offer vs. 29% premium of Concho offer).[67]

_____

Lucy P. Allen

---

[63]   Bank of America, March 29, 2018.

[64]   RBC, March 28, 2018.

[65]   Jefferies, March 29, 2018 and Credit Suisse, March 28, 2018.

[66]   Credit Suisse, March 28, 2018, KLR, March 29, 2018, and Stephens, March 28, 2018.

[67]   RSP Form DEFM14A, filed June 6, 2018, p. 71.

18