# EXHIBIT 48

# RESEARCH REPORTS

Vol. II, No. 7      August 22, 2001

## SIA Research Department

- **Frank A. Fernandez**, Senior Vice President, Chief Economist and Director, Research
- **Erin Burke**, Survey Analyst
- **Stephen L. Carlson**, Vice President and Director, Surveys
- **Judith Chase**, Vice President and Director, Securities Research
- **George R. Monahan**, Vice President and Director, Industry Studies
- **Grace Toto**, Assistant Vice President and Director, Statistics

## THE ROLES AND RESPONSIBILITIES OF SECURITIES ANALYSTS
*Frank Fernandez*

## CUSTOMER COMPLAINTS AND ARBITRATIONS: BEHIND THE NUMBERS
*George Monahan and Judith Chase*

## SELIGMAN ADVISORY COMMITTEE ON MARKET INFORMATION: MEETING SIX
*Judith Chase*

## SII PANEL PROVES PRESCIENT
*Frank Fernandez*

## MONTHLY STATISTICAL REVIEW
*Grace Toto*



SECURITIES INDUSTRY ASSOCIATION • http://www.sia.com • info@sia.com
120 Broadway, 35th Floor, New York, NY 10271-0080 • 212-608-1500, fax 212-608-1604
1401 Eye Street, NW, Washington, DC 20005-2225 • 202-296-9410, fax 202-296-9775
*Prepared by SIA Research Department • Copyright© 2001 Securities Industry Association • ISSN 1532-6667*

# Table of Contents

Page 3    **The Roles and Responsibilities of Securities Analysts**, by Frank Fernandez. This article provides a fuller understanding of the traditional roles and responsibilities of securities research analysts to investors, the media, as well as federal, legislative, and regulatory officials. This is particularly relevant now, given concerns over the adequacy of safeguards for analyst integrity and independence and the dramatic structural changes in the marketplace and in investor demographics in recent years.

Page 15   **Customer Complaints and Arbitrations: Behind the Numbers**, by George Monahan and Judith Chase. The number of sales practice complaints, related to broker activity such as unauthorized trading, has fallen over the past five years. They have also fallen steadily on a relative basis over the past five years, when shown as a percent of both equity trades and shares trades. When discussing arbitration, a key point to remember is that a significant portion of arbitration cases filed are intra-industry cases, not customer cases. The total number of small claims filed (claims for under $25,000) are flat to down, while the number of stock trades has soared.

Page 20   **Seligman Advisory Committee on Market Information: Meeting Six**, by Judith Chase. The meeting on July 19, 2001 at the SEC was the last Seligman meeting, and the only one devoted exclusively to market data in options. A majority of participants agreed that: quote mitigation strategies make sense for the options market; options markets should not move to penny increments; OPRA should calculate an NBBO for options; the NBBO effort should be coordinated with some kind of linkage or access system; market identifiers should be used; and that other consolidators should be given permission to compete with OPRA/SIAC.

Page 26   **SII Panel Proves Prescient**, by Frank Fernandez. Attendees at the 2001 session of the Securities Industry Institute benefited from the foresight of "The New Economy" panel's participants. They pointed to problems in calculating productivity and the increase in unit labor costs five months before the Labor Department released its official revisions. The panelists also forewarned that the current downturn would extend into the second half of the year, when the consensus was still for a shorter, V-shaped correction.

Page 27   **Monthly Statistical Review**, by Grace Toto. After four straight quarterly declines in stock prices, the Nasdaq Composite and S&P 500 indices posted solid gains in 2Q01. Recently, however, a continuing stream of weak corporate profit reports and mixed economic signals sent stock prices south and investors to the beaches. Despite the slowdown in trading during July, volume on both Nasdaq and the NYSE year-to-date remain ahead of 2000's record levels. Overall underwriting volume in the U.S. market slumped in July, reflecting the typically slower syndicate calendar during the summer months.

# THE ROLES AND RESPONSIBILITIES OF SECURITIES ANALYSTS

Public scrutiny has increasingly focused in recent months on allegations of conflicts of interest that financial services firms and their analysts confront and on concerns that the quality and independence of their research have been compromised.[1] The following is intended to provide a fuller understanding of the traditional roles and responsibilities of securities research analysts to investors, the media, as well as federal legislative and regulatory officials in order to help illuminate and frame the ongoing debate. Although the proper methods, scope and limitations of securities analysis have been well established for decades,[2] periodic reassessment is required. This is particularly relevant now, given concerns over the adequacy of safeguards for analyst integrity and independence and the dramatic structural changes in the marketplace and in investor demographics in recent years

## The Roles Of The Analyst

A securities analyst, generally employed by a brokerage firm, bank or investment institution, has the principal task of performing diligent and thorough investigations of specific securities, companies and industries. The results of these investigations are presented as a research report, which serves as a basis for making an investment recommendation. Analysts examine all aspects of the current and prospective financial condition of certain publicly traded companies. These examinations should cover all pertinent publicly available information about the company and its businesses. This includes, but is hardly limited to financial statements, research on the company, industry, product or sector, and public statements by and interviews of executives of the company, its customers and suppliers. The analysis and opinions are generally presented on a relative basis--

comparing companies' performance within a sector or industry.

Different analysts perform distinctly different roles. An analyst performing fundamental analysis will examine, among other things, historical earnings, ownership of assets, outstanding contracts and other business factors, while a quantitative analyst will concentrate on applying statistical analysis techniques to as broad as possible a sample of meaningful and accurate data. Other analysts, such as economists or industry specialists, provide additional input into the assessment process such as information concerning the firm's operating environment and the impact of changes in the general business climate. All these types of analysts perform functions that are descriptive, selective and critical.

All analysts begin their work by engaging in what is largely a *descriptive* function: gathering and assessing all meaningful qualitative and quantitative information about a company's past and present, and presenting it in a coherent, readily intelligible manner. After completing what is principally an objective evaluation, an analyst must then go further, prognosticating and expressing specific judgments of his own about a company's and a security's future prospects. An analyst makes evaluations of a company's expected earnings, revenue and cash flow, operating and financial strengths and weaknesses, long term viability and dividend potential. Analysts assess the sensitivity of these projections to cyclical factors and various types of risk, including market risk or credit risk. Projections may extend to the movements of securities prices over different investment time horizons. These steps are the prelude for the *selective* function of the securities analyst: drawing conclusions based on his experience, established principles and

3

sound logic and recommending whether a given issue should be bought, sold or retained.

The preparation of research reports and recommendations for public distribution (to both institutional and individual customers) is the principal activity of **sell-side** analysts, who are employed by broker-dealers. **Buy-side** analysts, who typically work for institutional investors such as mutual funds, hedge funds or investment advisers, prepare similar reports, recommendations and statistical data, principally for internal use in the formulation of their firm's investment policies. Analysts are expected to conform to individual firm and industry guidelines for the preparation and dissemination of these reports as well as to codes of professional conduct.[3] Internal monitoring of quality and compliance standards is complemented by supervisory and regulatory efforts of the self-regulatory organizations,[4] all of which come under the purview of the Securities and Exchange Commission.

Analysts' role with regard to corporate financing departments varies widely across firms. Many securities analysts do not do due diligence in order to further corporate financing objectives. Sometimes those departments have their own analysts. Securities analysts perform independent diligence as a balance and a check to determine the suitability of the firm proceeding with the underwriting deal.

At other firms, securities analysts assist the corporate financing departments of their firms in securing and executing mandates, such as participating in "roadshows." The most important contribution comes in assisting in carrying out due diligence responsibilities[5] with regard to initial public offerings, private placements and secondary offerings. These responsibilities require the securities analyst to carry out a **critical** function: providing analytical judgments reached by applying standards to facts. The analyst's concern here is with the soundness of the standards of selection for these issuances, which involve a highly critical assessment of accounting methods and examination of all corporate policies, including capitalization, managerial compensation, dividend policies and expansion plans. Only a small subset of the analyst community, specifically those employed by underwriting firms, undertakes this role, which reflects the high degree of concentration observed in the underwriting business. The top 15 investment banking operations account for more than 95 percent of all lead or co-managed positions in securities underwriting. Although it involves only a small percentage of the industry's firms and analysts, the capital raising function is of paramount importance to the expansion of our economy and the global preeminence of our financial markets. Last year, U.S. underwriters raised $1.85 trillion for American companies and nearly $12 trillion cumulatively in the last 10 years. The federal securities laws impose extensive disclosure requirements on corporations that issue securities to ensure that the public has complete information about a new company.[6] A significant part of the task of gathering and assessing that information rests with securities analysts[7], who are regulated in this capacity as well.[8]

As you can see the role of the analyst is multifaceted. However, the analyst has limits and it is vital to understand what an analyst does and does not do. The roles of a securities analyst do **not** include functioning as a financial advisor. Although analysts focus on a company's value as an investment, it is not their job to advise individual investors on their portfolio holdings. That is the responsibility of financial advisors and, of course, the investors themselves, who are familiar with investors' portfolios, investment objectives and risk preferences.

4

## The Scope And Limitations Of Analysts' Recommendations

Despite criticism of analyst recommendations, recent academic research suggests that they have a solid track record and add significant value. One academic paper (published in April's issue of *Journal of Finance* and updated in May)[9] reviewed approximately 500,000 analyst recommendations from 1986-2000, and concluded that the consensus recommendations analysts made on specific stocks proved prescient and profitable. The authors found "sell-side analysts' stock recommendations have significant value."

Securities analysis produces information that is the lifeblood of the markets and of those who participate in them. As the SEC acknowledged in a November 1998 statement: "Analysts fulfill an important function by keeping investors informed. They digest information from Exchange Act reports and other sources, actively pursuing new company information, put all of it into context, and act as conduits in the flow of information." This process and the value added by securities analysts have been widely appreciated. For example, the U.S. Supreme Court and the SEC have both said that "the value to the entire market of analysts' efforts cannot be gainsaid; market efficiency in pricing is significantly enhanced by their initiatives to ferret out and analyze information, and thus the analysts' work redounds to the benefit of all investors."[10]

Criticism of the work of securities analysts has risen sharply in the wake of the sharp declines in the stock market that began in the spring of 2000. The longest bull market and the longest economic expansion in U.S. history came abruptly to an end, and most analysts failed to forecast this reversal or adjust quickly to the dramatic shift. This is particularly true of those sectors of the market—technology, media and telecommunications—that experienced the most dramatic inflation of valuations in 1998 and 1999. Most analysts failed to explain this "bubble", forecast its sudden collapse or to advise investors to sell prior to the sharp reversal in stock prices.

Although these were significant mistakes, they were not, as some now charge, mistakes caused by a conflict of interest on the part of the analysts. In addition, while securities analysts failed to predict these events, so too did portfolio managers, manufacturers, inventory supervisors, government economists,[11] company executives and media commentators. Many, indeed perhaps the majority, of these people were swept up by "irrational exuberance" and caught off guard as both stock valuations and the financial fundamentals of businesses collapsed at the same time.

Nonetheless, the question persists: ***Should the end of the bull market have come as a surprise?*** Perhaps in hindsight we can address that question, but in early 2000 at the market peak, the perspective was not so clear.[12] Even now there are a number of reasons, apart from optimistic earnings expectations, why one might have expected stock prices and price-to-earnings ratios to rise to, and be sustained at higher average levels than had historically prevailed.[13] These reasons included sharply reduced costs of acquiring and holding shares, greater diversification potential, expectations of tax cuts, in particular, capital gains tax cuts, and declines in the required rate of return (discount rate). Other reasons can be offered, but part of the answer lies with the abruptness of the change in the direction of the market and the economy. Analysts, being human, found it difficult to identify and react to this abrupt reversal in direction.

Still, it is clear that some part of the reason lies in phenomena which while unusual, are not unprecedented. In 1934, Graham and Dodd wrote:

5

"(In recent years), the prestige of securities analysis in Wall Street has experienced both a brilliant rise and an ignominious fall—a history related but by no means parallel to the course of stock prices. The advance of security analysis proceeded uninterruptedly, covering a long period in which increasing attention was paid on all sides to financial reports and statistical data. But the "new era" involved at bottom the abandonment of the analytical approach; and while emphasis was still seemingly placed on facts and figures, these were manipulated by a sort of pseudoanalysis to support the delusions of the period. The market collapse was no surprise to such analysts as had kept their heads, but the extent of the business collapse which later developed, with its devastating effects on established earning power, again threw their calculations out of gear. Hence the ultimate result was that serious analysis suffered a double discrediting: the first prior to the crash—due to the persistence of imaginary values, and the second—after the crash—due the disappearance of real values."[14]

The foregoing quotation, while discussing the singular period of 1927-1934, does provide insight into our current, much more benign environment. The analyst can not be right all the time. However, the events of 2000 should not be considered the norm by which to judge the future of investing or the future of analysis. "The extreme fluctuations and vicissitudes of that (distant) period (or the more recent past) are not likely to be duplicated soon again. Successful analysis, like successful investment, requires a fairly rational atmosphere to work *in* and at least some stability of values to work *with*."[15]

Graham and Dodd identified **three principal obstacles to an analyst's success**: (a) the **inadequacy or incorrectness of the data**; (b) the uncertainties of the future, and; (c) the irrational behavior of the market. The first of these impediments, then as now, while serious, is the least important of the three. Then, as now, deliberate falsification of data is rare; most of inadequate data has flowed from the use of accounting and valuation techniques, which

have subsequently been questioned and revised (and which a capable analyst will try to detect). Restatements have increased in the past few years, as have press reports of alleged major financial frauds[16]. However, it should be noted that principal economic indicators upon which analysts rely, such as GDP and its components, productivity growth and unit labor costs have undergone dramatic revisions as well for the period 1998-2000.

The second impediment, **the uncertainties of the future**, is more important. Assessments and conclusions warranted by the facts and apparent prospects at hand can be vitiated by new and largely unpredictable future changes. This is especially true during periods of rapid structural change, greater uncertainty and sustained high volatility when the past affords a poor guide for the future and unpredictability rises. Such a period has been prevailing in financial markets for the past few years.

The third obstacle, **the irrational behavior of the market,** is the most serious impediment. Much has been said and written of the "irrational exuberance," which propelled the market in the late 1990s. One would be hard pressed to dispute that a form of "mania" did prevail. One lesson to be learned is that sound securities analysis can rely on two old and well-established assumptions. First, that the market price of a security is frequently out of line with its true value and second, that there is an inherent tendency for these disparities to correct themselves—eventually. The longer these disparities persist, the larger they are likely to become and the more profound the ultimate adjustment when it does come, with "overshooting" common in both directions.

## Analysts' Recommendations: Disparities And Biases

Analysts use different rating systems and a variety of terms—strong buy, buy, near-term or

long-term accumulate, near-term or long-term over-perform or under-perform, neutral, hold, reduce, sell, strong sell—to describe their recommendations. Critics frequently point to the large disparity between the number of analysts' "buy" and "sell" recommendations during the last year as "evidence" that analysts objectivity and independence were compromised. At first glance, the argument that analysts were irresponsibly encouraging investors, appears to have merit. Indeed, the relative paucity of "sell" or "strong sell" recommendations (less than 2 percent of the total) have led some industry professionals to interpret "hold" (as well as "neutral") recommendations to mean "sell".[17] A closer examination, however, is necessary to understand this situation.

Certain biases do exist, such as **selection bias**, which are inherent and benign. The selection process used by analysts to decide which companies to cover introduces selection bias. Only a fraction of publicly traded stocks receive "buy" ratings from analysts, a fact most media reports have chosen to ignore. There are some 14,500 stocks that are publicly traded in the U.S. The majority of those are not covered by U.S.-based research analysts. Sell-side analysts reportedly cover 5,860 individual equities. Of those covered, less than half are **actively** covered (meaning covered by more than two analysts so that a basis for comparison of analysts' opinions exists). A single analyst generally covers no more than 12 to 14 individual securities in his particular sector, industry or area of expertise. He generally will select or initiate coverage of companies that he feels have positive prospects, particularly if, as is often the case, the overwhelming majority of his firms' customers (individual investors and many conservative institutional investors) are "long only accounts," meaning that they are unable or unwilling to "short" a security and may act on a negative or sell recommendation only if they own it already or are willing and able to engage in various "hedging" techniques

that may be both expensive and difficult to understand. This selectivity or "selection bias" helps partially explain the disproportionate share of "buy" recommendations. Of those stocks covered, which are reported to services such as Thompson Financial/First Call, the percentage that were "positively" rated ("strong buy" or "buy") declined from 72.6 percent on March 1, 2000 to 67.7 percent on April 2, 2001.[18]  While one would expect a greater decline, analysts might well be inhibited by the hazards of a tardy adjustment.[19] Indeed, it is common for periods of over-optimism to be followed by overly pessimistic periods[20] with the possibility of moving to more negative recommendations just as a "bottom" begins to form.

A second factor, which helps explain the distribution of recommendations, is that **analysts have a long-term orientation.** Analysts do spend a lot of time assessing how a stock will react to news and trying to anticipate short-term earnings trends and resulting price action. However, they also know that advising longer-term "buy-and-hold" strategies is in the best interest of investors, as studies have shown that frequency of trading is inversely related to investment performance. To understand this, it is important to note that most of the time the market moves up. In fact in 69 out of the last 101 years the direction was up. On average, the market produces a positive total return of just under 10 percent in the long term. Pullbacks, historically, are short and vicious, and a falling stock market is not generally considered an appropriate time to exit from a viable, long-term investment. Therefore, analysts tend to be biased toward "buy" recommendations as they "ride" the long term trend in the market. Furthermore, while it is sound financial advice to develop and hold fast to a long-term investment strategy ("buy and hold") and ignore market fluctuations, in practice, investors often do not heed this advice. Market participants are interested in the movement of market prices, and while this interest may be

7

less than a pure speculator or "day trader," these fluctuations do have a strong psychological, if not financial, effect on their behavior. It is the responsibility of the financial adviser and the investor himself, not the analyst, to recognize this obstacle to successful investing and follow sound investment fundamentals that do not focus on short-term strategies.

## Dealing With Possible Conflicts Of Interest

Many people, in every profession, including analysts, encounter potential conflicts of interest, and confront and successfully resolve them in the course of daily activities. The existence of possible conflicts of interest is not misconduct. Although acting as an intermediary between buyers and sellers of securities poses an inherent conflict for employees of financial services firms, an extensive body of securities law and regulations and the supervision of the SEC and the SROs provides for its resolution. Periodic reexamination of the adequacy of these safeguards, such as now with respect to the issue of analyst integrity, reinvigorates this process. Such a review is particularly appropriate given the dramatic changes that have and will continue to transform the market place and the makeup of the investment community. As SEC Acting Chair Laura Unger pointed out recently "The increased popularity of investing in stocks coupled with the media's intense focus on recommendations has dramatically raised the public profile of analysts."[21] Although the majority of securities analysts work in an environment that generates little or no notoriety, the heightened popularity of a highly visible few has focused public scrutiny on analysts employed by the industry's major underwriting firms.

Potential conflicts of interest can also arise from the sales and trading areas of a securities firm, from the firms' institutional investor client base, from analyst compensation structures and if the analyst, his firm or his firms employees have ownership interest in the company the analyst covers.

SIA has published a number of policies and procedures designed to protect the independence and integrity of analysts' research. The research directors of major underwriting firms formulated these "Best Practices for Research" over the first half of this year. They were issued in mid-June and are presented as an attachment following this piece. These "Best Practices" are intended to strengthen ethical and professional standards for securities analysts and underscore broker-dealers' commitment to the best interest of our clients and buttress the overall integrity of the securities markets. Following endorsement by the SIA's Board of Directors and by the senior management of the major underwriting firms, we are now witnessing a thorough review of individual firms' standards and practices and appropriate implementation throughout the securities industry. The SEC views our Best Practices as "useful guidelines for brokerage firms and their analysts in addressing situations that can give rise to analysts conflicts that impair the value of their research for investors. The SIA importantly notes that the investor, not the firm or the analyst, is the intended beneficiary of research."[22]

This initiative will help reduce or more effectively manage the potential conflicts that, if left unaddressed, threaten to undermine the public's trust and confidence in the analysts' fairness and objectivity. In addition, appropriate amendments to SRO rules, which already create a high level of transparency of analysts' research, coupled with vigilant enforcement of these SRO rules and effective SEC monitoring of all these efforts should help resolve these potential conflicts of interest.

These efforts should prove successful. Heightened public scrutiny of the work of analysts has become an intrinsic aspect of the

8

profession. There is broad recognition by both analysts and the firms that employ them that their most valuable asset is their integrity and the quality of the information and research they provide. This will only become more important as the financial services industry continues to change from a predominantly transaction driven business to one which increasingly focuses on the provision of financial information and advice. There is no long-term benefit for the analysts or the institutions that employ them to compromise the integrity of the research product. Analysts who would offer biased or unreliable research reports would quickly lose credibility and whatever value they have to employers and investors alike. Firms that allow such practices to occur would quickly lose customers in this highly competitive industry. Better public understanding of the work of research analysts – and more realistic expectations on the part of those who use their products would also support this process. When both institutional and retail investors understand the scope and limitations of securities research, they are better able to assess its appropriate role in investment decisions.

**Frank A. Fernandez**
*Senior Vice President, Chief Economist*
*and Director, Research*

## Footnotes

[1] See for example: Hearings on these issues before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives on June 14, 2001 and July 31, 2001; The U.S. Securities and Exchange Commission's "Investor Alert: Analyzing Analyst Recommendation", July 13, 2001 (www.sec.gov/investor/analysts.htm); and The Association for Investment Management and Research, "Preserving the Integrity of Research", proposed issues paper, July 10, 2001 (www.aimr.org).

[2] Benjamin Graham and David Dodd, *Securities Analysis*, New York, McGraw-Hill, 1934, which is now in its fifth printing and still considered the fundamental text for securities analysis.

[3] Association for Investment Management and Research, *Standards and Practice Handbook*, 1999.

[4] In particular, see NYSE Rule 472 and NASD Rule 2210. See also NASDR Notice to Members 01-45, proposed amendments to Rule 2210.

[5] "It should be noted that there may be benefits from research analysts working with investment bankers. For example, an investment banker underwriting a company's offering will sometimes employ its firms' research analysts to help it conduct its due diligence investigation into the company it is underwriting. The due diligence investigation helps ensure that the prospectus contains all material information required to be disclosed. In these cases, research analysts can play an important role in facilitating the due diligence process, especially in expedited offerings." Written Testimony Concerning Conflicts of Interest Faced by Brokerage Firms and Their Research Analysts, Laura S. Unger, Acting Chair, SEC, before the U.S. House of Representatives, July 31, 2001, footnote 15. www.sec.gov/news/testimony/071011slu.

[6] Section 11(a) of the Securities Act of 1933 makes issuers absolutely liable for untrue statements or material omissions in a registration statement. Section 11(b)(3)(A) of the 1933 Act affords underwriters a defense to that liability only if they can show affirmatively that they had reasonable ground to believe that the statements were true after reasonable investigation. Accordingly, analysts can help challenge the veracity of assertions that an issuer proposes to make in conjunction with a public offering. See also Johnson and McLaughlin, Corporate Finance and the Securities Laws, (1997) 2d. ed. at 259. "[Analysts] also play a major role in the underwriter's due diligence investigation, particularly in the case of high-technology

companies where an analyst familiar in general terms with the issuer's products or services can often better analyze the subtle competitive, managerial and technological advantages that make the issuer' securities a good investment." *Id.* At 283.

[7] Analysts can only verbally discuss the prospective issuers' prospects and earnings estimates. The company going public generally writes the prospectus and the prospectus is the only written document permitted in marketing IPOs. Analysts who are part of the distribution are restricted for 25 days from the effective date of the deal from reporting on the company in question.

[8] See SEC Rules 137 and 138. See also NASD Rule 2210 and NYSE Rule 472.

[9] "Can Investors Profit from the Prophets? Security Analysts Recommendations and Stock Returns" *Journal of Finance*, Vol. LVI, no. 2, April 2001, covered the period 1985 to 1996 and a database of 360,000 separate pieces of advice from 269 brokerage houses and 4,340 analysts over this 10 year period. "Prophets and Losses: Reassessing the Returns to Analysts' Stock Recommendations" Journal of Finance, May 2001, updates the study, covering the period 1997-2000. Although investors would have outperformed the market indexes following the consensus recommendations of analysts, to implement this trading strategy would require buying and selling stocks frequently—since so many analysts were included in the study and they changed their recommendations frequently, with turnover rates at times in excess of 400% annually would produce significant transaction costs. In other words, analysts do a good job picking stocks, but an investor following all their recommendations would incur commissions and other costs, such as taxes, that could reduce the investor's performance to that of the market indices. This is not to say that analysts' recommendations are not valuable. As the authors point out, "there is one group of investors who can take advantage of our findings—those who are otherwise considering buying or selling, and so will be incurring transaction costs in any case. For these investors, analysts' recommendations remain valuable."

[10] *Dirks v. SEC*, 463 U.S. 646, 659, n.17 (citing 21 SEC 1401, 1406 (1981)).

[11] See "The Uncertainty of Budget Estimates" Rudolf G. Penner, *Business Economics*, The Journal of the National Association of Business Economists, Vol. XXXVI, No. 3, July 2001, pp. 20-32.

[12] "When we look back at the 1990s....we may conceivably conclude that at the turn of the millennium, the American economy was experiencing a once-in-a century acceleration of innovation, which propelled forward productivity, output, corporate profits, and stock prices at a pace not seen in generations, if ever. Alternatively, that retrospective might well conclude that a good deal of what we are currently experiencing was just one of the many euphoric bubbles that have dotted human history. And, of course, we cannot rule out that we may look back and conclude that elements of both scenarios have been in play in recent years." Federal Reserve Chairman Alan Greenspan, Excerpt from a speech given to the Economics Club of New York on January 13, 2000.

[13] "A Retrospective on the Stock Market in 2000", *Economic Commentary*, Federal Reserve Bank of Cleveland, January 15, 2001.

[14] Op. cit. 2, p.14.

[15] Ibid, p.15.

[16] "The State of Financial Reporting Today: An Unfinished Chapter III", Remarks by Lynn E. Turner, Chief Accountant, SEC, A speech before the Third Annual SEC Disclosure & Accounting Conference, June 21, 2001. www.sec.gov/news/speech/spch508.

[17] "Investor Alert: Analyzing Analyst Recommendations," op. cit 1.

[18] Op. cit. 15, p. 12.

[19] Op. cit. 2, p. 22.

[20] Op. cit. 10.

[21] Written testimony concerning conflicts of interest faced by brokerage firms and their research analysts by Laura S. Unger, Acting Chair, U.S. Securities and Exchange Commission, before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, July 31, 2001, p. 1.

[22] Ibid, p. 5.

# BEST PRACTICES FOR RESEARCH

## A STATEMENT OF VALUES

Recognizing their fundamental role in the continued growth and development of the capital markets, as well as their responsibility to issuers and investors, SIA member-firms uphold these values: adherence to ethical and professional standards; commitment to the best interests of clients; and exercise of unquestioned integrity in business and personal dealings in the industry and within the firms.

SIA member-firms uphold these values through responsible management; superior products and services; thorough and ongoing professional education for employees; and, clear, consistent, and complete information for clients about products, services, and the risks and rewards associated with investing and the capital markets.

*The statement above articulates the Securities Industry Association's values for the guidance of member-firms and employees in the securities industry. Upon this foundation, SIA pledges to earn, inspire, and maintain the public's trust and confidence in the securities industry and the U.S. capital markets.*

*These "Best Practices For Research," developed by the Securities Industry Association's Ad Hoc Committee on Analyst Integrity, are the latest in a series of guidelines developed by the securities industry to continue enhancing our industry's professionalism.*

*These recommendations embody our industry's aspirations to strengthen ethical and professional standards for securities analysts, underscore broker-dealers' commitment to the best interest of our clients, and buttress the overall integrity of the securities markets. Endorsed by SIA's board of directors, we expect that they will be carefully considered and appropriately implemented throughout the securities industry.*

*At the heart of these and other best practices adopted by SIA is the core principle that the investors' interests must come first. This principle is the source of the trust and confidence that the securities industry has earned from the public.*

*To abide by the highest professional standards is a responsibility we incurred when we chose to manage other peoples' money. Anything less would be inconsistent with the trust our clients have in us and a betrayal of our professional obligation.*

Sincerely,

*Mark B. Sutton*

Mark B. Sutton
SIA Chairman, 2001

*Marc E. Lackritz*

Marc E. Lackritz
SIA President

11

# BEST PRACTICES FOR RESEARCH

## MISSION STATEMENT

**The integrity of research should be fostered and respected throughout a securities firm.**

Research should be conducted at all times in a manner consistent with the firm's business principles and its investing clients' objectives. Each firm should have a written statement reflecting these Best Practices and affirming a commitment to the integrity of research (including ratings, price targets/valuation methodology, and earnings estimates) and should distribute this statement, at a minimum, internally to all relevant employees once a year.

*Note: These best practices were designed to help foster ethical standards in the conduct of a securities business. They provide general guidance and do not create legally enforceable obligations or duties. Adherence to these practices is voluntary, and specific situations may require appropriate modifications. Given the differences among firms, each firm may need to adapt these practices to its particular circumstances.*

## INTEGRITY OF RESEARCH

**The firm, research management, analysts, investment bankers, and other relevant constituencies should together ensure the integrity of research, in practice and in appearance.**

- Corporate governance. Research should not report to investment banking; it should also not report to any other business unit in a way that compromises its integrity.

- The investing client comes first. It is a key responsibility of research management to be an effective advocate for analyst integrity with all constituencies.

- Recommendations should be transparent and consistent. Research management should ensure that recommendations fall within the overall framework of the firm's standards and quality guidelines and are consistent with the analyst's fundamental analysis, valuation work, and view of the security. A formal rating system should have clear definitions that are published in every report or otherwise readily available. Management should encourage analysts to indicate both when a security should be bought and when it should be sold (or when it is expected to outperform a specified benchmark or not), and management should support use of the full ratings spectrum. Management should also regularly evaluate the performance of analysts' investment recommendations. At least annually, management should review and each analyst should publish the rationale for and overall distribution of his or her security ratings.

- Assessment of compensation. While compensation will inevitably vary with market conditions and a firm's overall profitability, a research analyst's pay should not be directly linked to specific investment banking transactions, sales and trading revenues, or asset management fees, but should reflect all aspects of the analyst's job performance, including, among other factors, the performance of his or her investment recommendations.

- No outside or investment banking approval of investment recommendations. An analyst should not submit research to investment banking or to corporate managements for approval of his or her opinions or recommendations. Draft research reports may be shared with an issuer of securities as necessary only to verify facts, and only when the research recommendation has been removed. A company whose rating will be changed may be notified after the close of trading in its principal market the evening prior to morning announcement of the change.

- Investment banking and all other business units should support research integrity. Bankers or other business producers should not promise or propose specific ratings to current or prospective clients when pursuing business. Firms should maintain effective confidential information barriers between investment banking and research and follow appropriate and clear procedures for any crossing of those barriers in connection with investment banking transactions. Bankers should initiate the crossing of confidential information barriers by analysts only after appropriate review by research management, legal, and/or compliance personnel.

## THE RESEARCH PROCESS

**Research should clearly communicate the relevant parameters and practical limits of every investment recommendation.**

- Objective and independent judgment required. Analysts should be independent observers of the industries they follow. Within the overall framework of the firm's standards and quality guidelines established by research management, their opinions should be their own, not determined by those of other business constituencies. In research reports, analysts should use good judgment in deciding the relevant issues to include, identify the major assumptions used in preparing projections, and distinguish between facts and opinions. Earnings estimates should represent an analyst's best judgment and should never be bound solely by company input.

- Valuations and risks of recommended securities should be explicitly described. Reports on securities should outline the valuation methods used and, for recommended securities, should specify a price objective with a reasonable basis. Reports on securities should identify and evaluate the investment risks.

- Disclaimers should be clear and comprehensive. Disclaimers should be legible, straightforward, and written in "plain English." In addition to complying with all relevant rules of self-regulatory organizations, disclaimers should include all material factors that are likely to affect the independence of specific security recommendations.

13

## CONFLICTS OF INTEREST

**Personal trading and investments should avoid conflicts of interest and should be disclosed whenever relevant.**

- Analysts and other research employees should always put customer interests ahead of personal investments. Analysts should not trade a security while they are preparing research on it or within a reasonable period of time after issuing research on it. Analysts and other employees should not trade when they are aware of material non-public information or "market-sensitive" research information (e.g., pending initial opinions, or estimate or opinion changes).

- Personal trading should be consistent with investment recommendations. Analysts should not be allowed to trade against their recommendations (for example, by selling positively rated stocks), except after discussion with research management, legal, and/or compliance personnel, and only for appropriate reasons that are clearly defined.

- Personal interests should be disclosed. Analysts should disclose whether they or members of their households hold direct ownership positions in securities they cover (or derivatives of those securities) in all research reports concerning those securities.

- Private investments or business interests should not conflict with securities analysis. When a firm is bringing a company public and a member of the analyst team that will cover the stock owns a stake, that fact should be disclosed. Other private investments or outside business interests should also be disclosed in related company reports when these are likely to create conflicts of interest. In addition, analysts should not cover securities of companies in which they or members of their household or immediate family are officers, directors, or advisory board members.

14

# CUSTOMER COMPLAINTS AND ARBITRATIONS: BEHIND THE NUMBERS

## Real Customer Complaints Hold Steady While Securities Activity Zooms

One visiting the SEC's web page on investor complaints would initially be confronted with the seemingly startling statement that "In 2000, the SEC received and responded to 81,507 complaints and questions, an increase of nearly 10% compared to 1999." This may sound large, but would still seem a completely reasonable outcome for 2000. It was, after all, the first year in over a decade when the stock market didn't keep rising, it fell. In such a year one would expect investor complaints to rise as portfolio values sagged vs. the preceding 10 years when investors experienced double-digit, sometimes triple, gains in their investments. It's simply human nature. And it certainly is a lot easier to lodge a complaint in today's internet world -- a simple click of the mouse takes one to a dozen SEC standard categories about which to complain online, vs. the manually intensive previous single option of sitting down, composing and mailing a letter to the SEC, which was the procedure just four years ago.

These SEC standard complaint categories also run the gamut from telephone cold calling, any problems experienced with mutual funds, 401Ks, and retirement plans, complaints about issuers and their filings, complaints about the inability to get an IPO allocation, and a host of issues not necessarily dealing with securities firm sales practices or securities firms at all.

The first striking fact about this data is that two-thirds of that 81,000-plus total are simply questions to the SEC, not complaints. And these questions alone have accounted for all of the overall growth in the totals. Questions have increased 225% since 1995, growing from 23,687 in 1995 to 53,137 last year.



Meanwhile, total *complaints*, half of which do not even deal with securities firms *per se*, grew just 44% from 1995 to 2000 (19,349 to 27,920). The bulk of that growth came after the SEC launched its online complaints/question service. Over the same time frame, average daily trading volume on the NYSE, Amex and Nasdaq grew by 371% – more than eight times as fast as *total* investor complaints.

15

To put that in perspective, in 1995 there were 10 total complaints (of *any* kind) for every 100 million shares traded; last year that fell to only 4 for every 100 million.

The picture is even more striking if we look at the number of trades executed, which has grown a much larger 671% over the same time frame. In 1995, there were just under 14 total complaints (again, for any reason) for every 100,000 trades executed on NYSE, Amex and Nasdaq; last year there were only 3 per every 100,000 trades.



Moreover, the half of all complaints that involve a broker or brokerage firm for *any* reason at all, including sales practice complaints and operational complaints, such as late or incorrect account statements and problems with account transfers, etc., grew a much smaller 26% from 1995 to 2000. The number of brokerage firm-related complaints during this time frame hovered around 10,000 for the first four years before climbing somewhat in 1999 and again last year. Here again, this modest growth is decidedly dwarfed by the overall growth of stock volume and stock trades over the same time frame of 371% and 671%, respectively. Broker-dealer total complaints have therefore fallen steadily to less

than 2/1,000ths of one percent of all equity trades last year, and about 2/1,000,000ths of one percent of shares traded.



When we break down sales practice complaints and operational complaints, we see in the chart below that the only actual growth in brokerage firm-related complaints has been in the operational category. The real number of complaints related to broker activity such as unauthorized trading has fallen over the past five years.



Sales practice complaints have also fallen steadily on a relative basis over the past five years, when shown as a percent of both equity trades and shares trades. These types of

16

complaints fell to 1/1,000th of one percent of all equity trades last year, and 1/1,000,000ths of one percent of shares traded.



## Complaints Per Investor Have Fallen Dramatically

Another way to put these figures into perspective is to look at how many overall complaints or specific kinds of complaints were made vs. the individual investing community. Last year, there were over 80 million adult Americans who owned stocks either directly or through mutual funds or employer-sponsored retirement plans such as 401Ks. Since there was a grand total of 27,920 complaints of any kind about anyone made to the SEC last year, there was merely one complaint for every 3,000 investors (if the average complainant made 2 complaints per year, this rises to 1 complainant per 6,000 investors; if 3 per year, 1 in 9,000, etc.).

Looking at the total complaints of any kind concerning a broker-dealer (13,599 in 2000), this works out to 1 complaint per 6,000 investors (again, if the average complainant made 2 complaints per year it rises to 1 complainant per 12,000 investors, and so on).

Finally, for those broker-dealer complaints that were sales practice-related and not just operational in nature (4,476 in 2000), this works out to one complaint per 18,000 investors (again, if the average complainant made two complaints, this rises to one complainant per 36,000 investors and so on).

## Online Investors Create the Bulge in Broker-Dealer Complaints

The rise in broker-dealer complaints over the past five years is attributable to online investors. Non-online complaints were flat to down. Investors making a conscious choice not to use a full-service broker should expect that there would be some differences between the online and full-service brokerage business models. Online investors are also probably more apt to make use of the SEC's online complaint service.



The net increase in broker-dealer complaints is wholly online-driven; non-online complaints fell in 1997 and 1998, and rose only slightly in 1999 and 2000.

17



Certainly investors are unhappy that equity prices are down, particularly those who had technology-heavy portfolios. Still, most never click the send button on the SEC's online complaint form. There is always some degree of risk that investments will lose value. This information is found in ubiquitous statements from financial service providers. Smart investors heed these statements. They as adult investors choose to invest, and they recognize that they are responsible for bearing that risk.

## Arbitration Numbers in Perspective

Just as important as the number of complaints to the SEC are statistics on customer arbitrations filed with SROs. This is particularly true because engaging in arbitration takes more time and resources than simply sending a complaint to the SEC online.

There has been some press attention about the fact that the number of NASD arbitration cases filed through July this year (3,950) has risen by 25 percent since the same time last year.[1] It does appear to be true that some investors who lost money after the burst of the "tech bubble" are investigating arbitration as a way to get the money back. A *Barron's* article quoted several

attorneys reporting increased investor activity in this area.[2]

However, when discussing these trends in arbitration, a key point to remember is that a significant portion of arbitration cases filed are *intra-industry cases*, not customer cases. For example, according to the NASD Code of Arbitration, arbitrations can be based on "any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member... between or among members..."[3] In other words, brokers who have been fired file cases against the firm, and firms can file against other firms for poaching their talent. Arbitrations can even involve clearing firms, the settlement end of the trade cycle.

One way to get a better perspective on arbitrations involving retail investor arbitrations is to look at the "small claims" statistics. Any claim under $25,000, according to the NASD, is considered a "small claim." Of the 5,558 total cases received by the NASD in the year 2000, only 828 of these were small claims.[4] The composite arbitration figures are similar: of 6,156 cases received by any SRO, only 866 of these were small claims.[5]

## Number of Small Claims Filed Fall Sharply Relative to Trading Volume

As we did with customer complaints sent to the SEC, we looked at small claims filed with all the SROs over the past twenty years relative to the number of equity trades. We see that the total number of small claims filed are flat to down, while the number of stock trades has soared. This data is even more striking when it is

considered that the SROs raised the small claims threshold from $10,000 to $25,000, creating a jump of 53% in small claims filings between 1998 and 2000.[6]



**Stock Trades vs. Small Claims Filed**

Source: SICA

**George R. Monahan**
*Vice President and Director, Industry Studies*

**Judith L. Chase**
*Vice President and Director, Securities Research*

## Footnotes

[1] Gretchen Morgenstern, "Why Investors May Find Arbitrators on Their Side," *The New York Times,* Sunday, August 19, 2001, Section 3, p.1.

[2] Richard Karp, "Disputed Calls: A Year After Nasdaq's Peak, Arbitration Claims Against Brokers Soar," *Barron's,* May 21, 2001.

[3] NASD Code of Arbitration, http://www.nasdadr.com/arb_code/arb_code.asp#10101.

[4] "Historical Statistics on Arbitration Cases Filed With Self-Regulatory Organizations," *Securities Industry Conference on Arbitration (SICA).*

[5] Ibid.

[6] "SICA Announces Year 2000 SRO Filing Statistics," *Securities Arbitration Commentator*, Vol.XI, No.10.

19

# SELIGMAN ADVISORY COMMITTEE ON MARKET INFORMATION: MEETING SIX

Note: This meeting overview is not meant to be an actual transcript of the meeting, and therefore does not reflect direct quotes from participants. For background on the formation of this Committee, as well as a short summary from the first, second, third, fourth, and fifth meetings, please see the Appendix following this article.

## Summary of Sixth Meeting

The meeting on July 19, 2001 at the SEC was the last Seligman meeting, and the only one devoted exclusively to market data in options. The committee is now engaged in exchanging the draft report with one another, which is due to be submitted to the SEC this September. In addition to the regular committee participants, there were representatives from the options exchanges present. The three main topics for discussion included 1) *transparency* concerns for options market data, particularly how capacity concerns should be addressed; 2) *consolidated information*, and whether the Display Rule should be extended to options markets; and 3) *single vs. competing consolidators*, and whether competing consolidators should be introduced into the options markets.

First, however, Annette Nazareth of the SEC discussed differences in regulatory treatment of stock and options market data. Then Michael Meyer, counsel to the Options Price Reporting Authority discussed OPRA issues. Michael Atkin of the Software & Information Industry Association discussed vendor issues, and finally Brian Faughnan of SIAC discussed technological issues.

## Presentations on Options Markets Issues

Annette Nazareth mentioned as background information that today, standardized options only trade on five exchanges: Amex, CBOE,

ISE, PCX, and Phlx, and not over-the-counter or on alternative trading systems. Options trade in either ten-cent or five-cent increments, depending on the option premium. She discussed the fact that OPRA, the securities information processor for options, is run by representatives of the exchanges that trade options. SIAC consolidates last sale and quote information, as is required. Quote traffic represents a huge part of options traffic, because when an equity price changes, the quotes of the associated option are automatically updated. She also noted that in 1989, the SEC removed its ban on multiple listings of option instruments, leading to more traffic. There is an Exclusivity Clause that states that options market data can only be disseminated through OPRA, with several exemptions.

She noted that Congress did want to integrate options more fully into the National Market System, and that the SEC tries to help accomplish that. In 2000, for example, the SEC extended the Quote Rule that governs equities to options. There is no consolidated NBBO for options, however. Each exchange calculates a best bid and offer for its own purposes. The exchanges had already agreed that OPRA should calculate an NBBO. The new order routing rules apply to options as well. Several options exchanges have also proposed rule changes to enforce the Limit Order Display Rule.

Michael Meyer added that vendors who display options data are not permitted to exclude reports based on the market in which a transaction took place. He also highlighted the facts that each exchange in OPRA has one vote, and that OPRA has a full-time staff of ten people. Regarding capacity, he noted that the fact that options are traded in multiple series, that there is no primary market for options, and decimalization of stocks were all bound to

20

affect the capacity needed for options market data. He presented a chart showing that OPRA message traffic grew from an average of 3.5 million per day in 1995 to an average of 45 million per day in 2000. A second chart shows that the 1-minute peak rate as of January 1999 was approximately 700 messages. As of May 2001, the 1-minute peak rate hit 7,000 messages. A last chart by the Financial Information Forum showed that the average1-minute peak for OPRA in April 2001 was 5,941 messages, as opposed to the average 1-minute peak rate for CTS that same month, 167 messages, and CQS, 509 messages.

Meyer said that he believes that OPRA and SIAC have for the most part kept ahead of this growth, and that today there is no capacity problem at OPRA. He relayed that OPRA's response to the need for extra capacity is in part to investigate quote mitigation initiatives and to expand the system from 24,000 messages per second to 38,000 messages per second. Part of OPRA's plan regarding capacity going forward would be to allow each exchange in effect to notify an independent authority about how much capacity it needs. The independent authority will build the capacity required, and the exchange will pay for it. Furthermore, the independent authority not to build the capacity if it thinks it is not necessary.

OPRA fees, according to Meyer, have a relatively simple structure. There is an Enterprise License Fee available, and 44% of brokers take advantage of this. SIA helps to review the fees on an annual basis. Regarding OPRA developing its own NBBO, Meyer said that there is a agreement on most aspects of how this would be done except for whether or not a market identifier should be included. He noted that if OPRA provides an NBBO, there would be no effect on SIAC's system.

Michael Atkin presented a memo on the impact of options data on vendors and user firms. He spoke with representatives from both types of organizations as well as industry consultants in order to get a sense of the relevant issues. He found that both vendors and users were very concerned about "the growth of options traffic as well as with the accuracy of projected capacity requirements." He noted that while many are investing in increased capacity, many cannot now accept 24,000 messages per second. Moreover, the majority of quotes, those "away from the market" are not useful to them. Atkin also noted that option pricing accounts for somewhere between 70-80% of US market data traffic.

Vendors, said Atkin, know that as a business requirement they must collect and process all available data. They also, however, want the flexibility to be able to filter the data in such a way that corresponds with individual customer preferences as opposed to by regulatory mandate. There are, he also noted, several quote mitigation strategies that most seem to feel would be beneficial. These include: 1) avoiding penny MPV increments, 2) creating a market-wide NBBO with inter-market linkages and size indicators, and 3) changing the Quote Rule in such a way to mitigate auto quoting that is not useful. He said that none of the quote mitigation strategies that appear in his memo necessarily appeared to be favored over the others.

Brian Faughnan of SIAC created a slide explaining the way in which OPRA is configured. He also presented some statistics comparing OPRA capacity needs with the capacity needs of CTS and CQS. He said that there are 50 direct data recipients of OPRA data, and 86 recipients of CTS data and 83 recipients of CQS data. He discussed the fact that OPRA's technological considerations are similar to CTS/CQS except in certain ways relating to: 1) the sequencing of information, meaning that for example in OPRA there are currently no NBBO/last sale databases or

calculations; 2) validation tolerances, in that OPRA requires minimal message validation; and 3) high transaction rates in OPRA require greater capacity.

## Discussion

### Transparency

The question regarding transparency in the options markets that was posed to the meeting participants was this:

*Does the greater volume of options market data necessitate a different type of transparency than for market data of the underlying stocks (e.g., less transparency for less actively-traded options series; a "request for quote" system; strategies for "flickering" quotes)? How should capacity concerns be addressed, both at the consolidator and vendor levels?*

In the main part of this part of the discussion, the representative of one options exchange voiced the opinion that the main thing necessary to maintain transparency is the NBBO. He also acknowledged that a better job should be done at quote mitigation. In particular, he pointed out the auto quote system should in fact be desensitized so that the quotes are not flickering, and that this has been begun at the exchange level. However, if the product is active, there should be continuous quoting. A buy-side representative suggested that the exchanges should be aggressive in delisting infrequently traded options. This representative was also in favor of a request for quote system. Another options exchange representative warned that if all exchanges move toward desensitizing the auto quote system, then there may be different views and quotes. This may lead to electronic differences and the opportunity for electronic arbitrage.

Seligman summarized the overall discussion. He said that the final report could say that there was agreement that quote mitigation strategies make sense for the options market. However, deciding which should be adopted would be premature, because there are many strategies and the topics are complex. Some of the participants voiced the opinion that there should be a market solution in terms of choosing the strategies, and that there should be no SEC mandate. Seligman also noted that the whole section on options would only constitute a very small part of the final report.

## Consolidated Information

The question regarding consolidated information in the options markets that was posed to the meeting participants was this:

*Should the Display Rule be extended to the options markets? To what extent would mandatory dissemination of an NBBO mitigate capacity concerns? Should options market participants be permitted to distribute separately information beyond the mandatory minimum?*

Seligman began by asking if any of the meeting participants favored moving to penny increments in the options markets at this time. The participants unanimously voted that the options markets should not move to penny increments. As the participants voiced their opinions, it became clear that there was a large consensus in favor of OPRA calculating an NBBO for options, as had been decided previously by options exchanges in the spring. A majority of participants also favored coordinating this effort with some kind of linkage or access system. A majority of participants also favored market identifiers, except for a majority of options exchanges, who resisted the idea because of capacity concerns.

22

Later in the discussion, however, it became apparent that just because some participants favored the calculation of an NBBO by OPRA, they did not necessarily mean that the NBBO should be required to be displayed. If that were the case, all vendors would be forced to buy it from OPRA and pass the cost along to the customer, even if that customer wanted a different set of data and did not want the market-wide NBBO.

## Single vs. Competing Consolidators

The question regarding single vs. competing consolidators in the options markets that was posed to the meeting participants was this:

*Does a majority of the Advisory Committee believe that the competing consolidators model should be introduced in the options markets? Would the volume of options data, and the related capacity issues, make entry by competing consolidators more difficult?*

Given that the committee plans to recommend a competing consolidator regime for the equities markets, Seligman asked if the same regime should be recommended for options. A majority of participants said that other consolidators should be given permission to compete with OPRA/SIAC. However, the options exchanges and several other participants, while intrigued with the idea, thought it would be prudent to wait to see how the experiment turned out for the equities markets first, to make sure that there was enough value-added in equities to justify the switch for options. Those participants who believe that a competing consolidator regime represents large disruptive risks for equities with little or no return felt even more strongly that the chance should not be taken in the options markets prior to observing the reaction in the equities markets.

**Judith L. Chase**
*Vice President and Director, Securities Research*

23

## Appendix

## Background of the Formation of the Committee

On July 25, 2000, the SEC announced the establishment a federal advisory committee to assist it in evaluating issues relating to the public availability of market information in the equities and options markets. The Advisory Committee on Market Information has a broad mandate to explore both fundamental matters, such as the benefits of price transparency and consolidated market information, and practical issues such as the most effective methods of consolidating market data. Joel Seligman, Dean of the Washington University School of Law in St. Louis, chairs the Committee.

## Summary of First Meeting

The agenda for the first meeting on October 10, 2000 at the SEC was first to have an overview of the three current market data plans, and then discuss 1) the value of transparency to the markets, and 2) the merits of providing consolidated information. Everyone agreed on the theoretical value of transparency to the markets, but many complained that transparency is poorly defined and means different things to different kinds of market participants. As for consolidation, there was disagreement about whether any information consolidation should be mandated, whether participants should instead compete on that basis, or some combination of the two. There was also disagreement about whether the position of consolidator should be a for-profit or non-profit utility. Many agreed about the necessity of at least displaying last sale information and NBBO.

## Summary of Second Meeting

The central question posed for the second meeting on December 14, 2000 at the SEC was, "Should the Committee proceed to attempt to develop an alternative model for disseminating market information, in addition to exploring ways to improve the existing model? Or should we focus solely on improving the existing model?" The plan was to review five alternative models that had been sent to Dean Seligman, have the SEC staff make some general comments about what they are looking for in an ideal model, and then to discuss whether or not to consider alternative models at all. It was decided that alternative models would be considered after ways to fix the current system were considered.

## Summary of Third Meeting

There were several questions on the agenda for the March 1, 2001 meeting at the SEC. The first question was, "What market information should vendors and broker/dealers be required to provide to customers?" The second question was, "How should market information be consolidated?" The third question was, "How should the consolidators be governed?" The fourth question was, "How should user fees be determined and revenues allocated among plan participants?" There was not enough time left to address the last question fully.

24

## Summary of Fourth Meeting

There main question on the agenda for the April 12, 2001 meeting at the SEC was, "How should user fees be determined and revenues allocated among plan participants?" This question was to be addressed in the context of reforming the current market data system. The discussion began with deciding whether transparency in the fee-setting process, by making data contracts available, would act as a check on pricing power. Comments seemed to indicate that what is already provided and out there is adequate. The next discussion revolved around SROs offering their data on a strictly non-discriminatory basis – in effect, "most favored nation" pricing – as a way to mitigate perceived pricing abuses. One participant said that this may lead to unintended consequences, such as the exchanges refusing to lower fees for one party on the basis of the fact that the fees would have to be lowered for all parties. There did not appear to be a consensus on this issue.

## Summary of Fifth Meeting

The last meeting on market data as it relates to equities was held at the SEC on May 14, 2001. This meeting focused on the idea of an alternative market data model with competing consolidators that had been addressed in a subcommittee meeting. The four relevant issues for the subcommittee, as well as the committee as a whole, were: 1) technology issues of the alternative model, 2) policy/economic issues of the alternative model, 3) whether or not the Display Rule should be retained, and 4) how information not subject to the Display Rule should be treated. A majority of the committee participants voted to recommend multiple consolidators while retaining the Display Rule.

25

# SII PANEL PROVES PRESCIENT

Attendees at the 2001 session of the Securities Industry Institute benefited from the foresight of Dr. Jeremy J. Siegel, professor of finance at the Wharton School of the University of Pennsylvania, Bear Stearns' Senior Economist John Ryding, and Michael Shamosh of Tucker Anthony in predicting revisions to key economic indicators. In "The New Economy" panel[1], moderated by SIA's Chief Economist, Frank Fernandez, they pointed to problems in calculating productivity and the increase in unit labor costs five months before the Labor Department released its official revisions. The panelists also forewarned that the current downturn would extend into the second half of the year, when the consensus was still for a shorter, V-shaped correction.

Specifically, the view expressed by the panel in March was that 1Q 2001 productivity growth would be "negligible" and that revision of data for the preceding years would reduce the annual average rate of growth of productivity by ½ to ¾ of a percentage point, while raising the growth of unit labor costs by a comparable amount. On August 7, 2001 the Labor Department revised 1Q 2001 productivity growth to 0.1%. In addition, they revised the figures for 1998-2000, cutting annual average growth of productivity from 3.2% to 2.6%, while raising the rise in average annual unit labor cost during the period from 1.7% to 2.6%.

Why is this important to investors? As the Federal Reserve has frequently pointed out, stock valuations, in part, will hinge on investor confidence that strong productivity growth will continue. This along with earlier (and ongoing) downward revisions in corporate profits and investment spending may further dampen capital spending plans. In May, a study by Goldman Sachs estimated that structural productivity growth[2] may have been only 2.25%, rather than the 3% rate used to support the "New Economy" paradigm, but

with these revisions, the number now appears to be 2% or slightly less. This in turn would lower the likely long-term rate of growth of GDP to 3% or less. Over the long term, profit growth moves in line with growth of the real economy. Revisions to past productivity and profits and expectations for further declines in profits and less robust productivity growth leave current P/E ratios relatively high by historical standards, and largely unchanged despite significant prices declines in the past year.

*Frank A. Fernandez*
*Senior Vice President, Chief Economist and Director, Research*

## FOOTNOTES

[1] For background on the issues addressed by the panel see *"The Aging of the New Economy"*, SIA Research Reports, Vol. II, No. 3, March 30, 2001.

[2] The growth rate after adjustment for procyclical factors, in effect "stripping out the cyclical impact of the boom" of the late 1990's.

# MONTHLY STATISTICAL REVIEW

## U.S. Equity Market Activity

**Stock Prices** – After four straight quarterly declines in stock prices, the Nasdaq Composite and S&P 500 indices posted solid gains in 2Q01. Thanks to a strong April rally, the Nasdaq Composite surged 17.4% and the S&P 500 rose 5.5% in the second quarter. The DJIA increased 6.3% in 2Q01, its best quarterly performance since the end of 1999.

More recently, however, a continuing stream of weak corporate profit reports and mixed economic signals sent stock prices south and investors to the beaches. The beleaguered tech sector dragged the Nasdaq Composite Index down 6.2% in July, the worst monthly showing since March. Large-cap stocks, as measured by the S&P 500, shed 1.1%. Meanwhile, the Dow Jones Industrials managed to eke out a slight 0.2% gain in July. As a result, all major market indices are in negative territory since the start of the year. The Nasdaq Composite Index has tumbled 17.9% through July, while the S&P 500 declined 8.3% and the DJIA fell 2.4%.

**Trading Volume** – Trading activity on Nasdaq continued to trend downward from record levels in January. Average daily trades on Nasdaq sank to its lowest level since December 1999. At 2.03 million trades daily in July, activity was 14.9% below June's average and 36.4% below the record 3.19 million daily trades posted in January 2001. Still, the year-to-date average of 2.49 million trades daily is running slightly ahead of last year's average of 2.54 million trades daily.

In contrast to Nasdaq, NYSE trading activity has generally been on the upswing this year. Nearly 1.33 million daily trades were executed on the NYSE in July, up 2.6% from



Daily Stock Price Movements
(Indexed to 12/31/99)



Average Daily Trades



Average Daily Share Volume

27

June's average and the highest trading level since April's record 1.39 million daily trades. Year to date, at 1.27 million daily, NYSE trading activity is running 45.7% ahead of 2000's 877,141 average daily trading level.

*Share Volume* – Average daily share volume on the major U.S. equity markets in July subsided as most investors chose to stay on the sidelines. On the NYSE, 1.14 billion shares traded daily in July, 3.2% shy of June's average. Nasdaq's daily share volume of 1.50 billion shares in July was 16.3% short of June's average and an 11-month low.

Despite the slowdown in trading during July, volume on both Nasdaq and the NYSE year-to-date remain ahead of 2000's record levels. At 1.97 billion shares daily, volume on Nasdaq is 12.0% higher than 2000's 1.76 billion average, while NYSE daily volume of 1.21 billion shares year-to-date is 15.8% above last year's 1.04 billion daily average.

*Dollar Volume* – In July, the dollar value of trading on the major exchanges sank to their lowest levels of the year amid faltering stock prices and curtailed trading activity. Investor disillusionment with stocks was evident, as an estimated $14.7 billion was pulled from stock funds in July, the first outflow since March. Average daily dollar volume in Nasdaq stocks slid 16.0% from June's level to $34.1 billion daily in July, its lowest level in over two years. That dragged down the year-to-date average to $50.6 billion daily, a 37.5% drop from 2000's $80.9 billion daily average.

The value of trading on the NYSE slipped 6.3% from June's level to an 11-month low of $39.0 billion daily in July. Even still, at $44.1 billion daily year to date, the value of trading in NYSE stocks remains slightly ahead of 2000's $43.9 billion daily record pace.



Average Daily Dollar Volume



Stock Mutual Fund Net New Cash Flow



Short vs. Long-Term Interest Rates

*Interest Rates* – Yields on 3-month T-bills averaged 3.51% in July, up a mere 2 basis points from June yet still 245 basis points below where it stood a year ago. Meanwhile, 30-year Treasury yields slipped to a four-month low of 5.61% in July, down 6 basis points from June and 24 basis points below its year-earlier level. As a result, the spread between 3-month and 30-year Treasuries narrowed to 210 basis points. In stark contrast, the spread was inverted a year ago with the 30-year Treasury yield 10 basis points below the 3-month T-bill yield.

## U.S. Underwriting Activity

*Total Underwriting* – Overall underwriting volume in the U.S. market slumped in July, reflecting the typically slower syndicate calendar during the summer months. Total underwriting activity plunged to $157.2 billion, down 29.1% from June's level and the slowest pace so far this year. Dollar proceeds from corporate bond offerings, which sank to $143.9 billion in July, were down 27.0% from June's level and marked a new 2001 monthly low. Common and preferred stock offerings combined, at $13.3 billion in July, were down a whopping 46.2% from this year's monthly record of $24.7 billion set in June.

Despite July's woes, total underwriting results year-to-date was up 23.2% from the same period a year ago, as the 30.7% increase in corporate debt issuance so far this year offset the 31.8% decline in equity offerings.

*Equity Underwriting* – IPO volume plummeted 80.0% to $2.1 billion in July from June's 2001 monthly record of $10.5 billion. However, one jumbo IPO deal kept June's volume total misleadingly high, as Kraft Foods Inc.'s $7.3 billion deal (the second largest IPO in U.S. history) accounted for







29

nearly 70% of the total proceeds. For the year-to-date, IPO dollar proceeds, at $26.4 billion, are down 52% from $55.0 billion a year ago. Deal volume is down a dramatic 73.5%, as only 78 deals were completed in this year's first seven months compared with 294 deals in the year earlier period.

Follow-on common stock offerings fell for the second straight month to $8.2 billion in July, down 23.4% from $10.7 billion in June. Through this year's first seven months, $51.4 billion was raised via follow-on deals, a 30.5% decline from $73.9 billion in the same period a year ago.

***Corporate Debt Underwriting*** – Straight corporate bond issuance, which peaked at $163.7 billion in May, tailed off during the ensuing two months to a yearly low of $100.4 billion in July. But because of the first half's vigorous activity, the year-to-date total of $921.6 billion was 14.6% above the $804.2 billion posted in the same period in 2000.

New issuance of asset-backed securities dropped 42.1% to $41.0 billion in July from June's $70.8 billion. Still, year-to-date volume, at $386.4 billion, was 93.2% higher than the $200.0 billion offered in last year's like period.

New offerings of convertible debt securities climbed from this year's monthly low of $0.9 billion in June to $2.5 billion in July. That boosted the year-to-date total to $17.4 billion, which already exceeds 2000's full-year record of $17.0 billion.







**Grace Toto**
*Assistant Vice President and Director, Statistics*

## U.S. CORPORATE UNDERWRITING ACTIVITY
(In $ Billions)

| | Straight Corporate Debt | Con-vertible Debt | Asset-Backed Debt | TOTAL DEBT | High-Yield Bonds | Common Stock | Preferred Stock | TOTAL EQUITY | All IPOs | Follow-Ons | TOTAL UNDER-WRITINGS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 76.4 | 7.5 | 20.8 | 104.7 | 14.2 | 24.7 | 8.6 | 33.3 | 8.5 | 16.2 | 138.0 |
| 1986 | 149.8 | 10.1 | 67.8 | 227.7 | 31.9 | 43.2 | 13.9 | 57.1 | 22.3 | 20.9 | 284.8 |
| 1987 | 117.8 | 9.9 | 91.7 | 219.4 | 28.1 | 41.5 | 11.4 | 52.9 | 24.0 | 17.5 | 272.3 |
| 1988 | 120.3 | 3.1 | 113.8 | 237.2 | 27.7 | 29.7 | 7.6 | 37.3 | 23.6 | 6.1 | 274.5 |
| 1989 | 134.1 | 5.5 | 135.3 | 274.9 | 25.3 | 22.9 | 7.7 | 30.6 | 13.7 | 9.2 | 305.5 |
| 1990 | 107.7 | 4.7 | 176.1 | 288.4 | 1.4 | 19.2 | 4.7 | 23.9 | 10.1 | 9.0 | 312.3 |
| 1991 | 203.6 | 7.8 | 300.0 | 511.5 | 10.0 | 56.0 | 19.9 | 75.9 | 25.1 | 30.9 | 587.4 |
| 1992 | 319.8 | 7.1 | 427.0 | 753.8 | 37.8 | 72.5 | 29.3 | 101.8 | 39.6 | 32.9 | 855.7 |
| 1993 | 448.4 | 9.3 | 474.8 | 932.5 | 55.2 | 102.4 | 28.4 | 130.8 | 57.4 | 45.0 | 1,063.4 |
| 1994 | 381.2 | 4.8 | 253.5 | 639.5 | 33.3 | 61.4 | 15.5 | 76.9 | 33.7 | 27.7 | 716.4 |
| 1995 | 466.0 | 6.9 | 152.4 | 625.3 | 28.9 | 82.0 | 15.1 | 97.1 | 30.2 | 51.8 | 722.4 |
| 1996 | 564.8 | 9.3 | 252.9 | 827.0 | 37.2 | 115.5 | 36.5 | 151.9 | 50.0 | 65.5 | 979.0 |
| 1997 | 769.8 | 8.5 | 385.6 | 1,163.9 | 31.4 | 120.2 | 33.3 | 153.4 | 44.2 | 75.9 | 1,317.3 |
| 1998 | 1,142.5 | 6.3 | 566.8 | 1,715.6 | 42.9 | 115.0 | 37.8 | 152.7 | 43.7 | 71.2 | 1,868.3 |
| 1999 | 1,264.8 | 16.1 | 487.1 | 1,768.0 | 36.6 | 164.3 | 27.5 | 191.7 | 66.8 | 97.5 | 1,959.8 |
| 2000 | 1,236.2 | 17.0 | 393.4 | 1,646.6 | 25.2 | 189.1 | 15.4 | 204.5 | 76.1 | 112.9 | 1,851.0 |
| **2000** | | | | | | | | | | | |
| Jan | 123.9 | 0.5 | 20.5 | 144.9 | 4.1 | 15.3 | 0.5 | 15.8 | 3.5 | 11.8 | 160.7 |
| Feb | 118.8 | 1.8 | 33.4 | 153.9 | 3.1 | 27.9 | 3.3 | 31.2 | 7.1 | 20.9 | 185.1 |
| Mar | 134.0 | 2.7 | 41.2 | 177.9 | 3.3 | 26.7 | 1.7 | 28.3 | 12.1 | 14.6 | 206.3 |
| Apr | 87.2 | 0.7 | 20.4 | 108.3 | 0.4 | 21.4 | 2.3 | 23.8 | 14.9 | 6.5 | 132.0 |
| May | 109.8 | 3.2 | 27.3 | 140.3 | 0.8 | 8.5 | 0.1 | 8.6 | 2.2 | 6.3 | 148.9 |
| June | 118.0 | 0.3 | 38.3 | 156.5 | 1.9 | 16.5 | 1.4 | 17.9 | 6.5 | 10.0 | 174.4 |
| July | 112.5 | 1.1 | 19.0 | 132.6 | 4.5 | 12.6 | 0.6 | 13.2 | 8.7 | 3.9 | 145.8 |
| Aug | 94.6 | 0.4 | 34.3 | 129.3 | 1.9 | 15.7 | 2.0 | 17.6 | 7.1 | 8.6 | 146.9 |
| Sept | 104.5 | 0.3 | 52.9 | 157.7 | 3.8 | 10.2 | 0.6 | 10.9 | 5.1 | 5.1 | 168.6 |
| Oct | 77.3 | 1.6 | 33.0 | 111.9 | 0.7 | 17.5 | 0.9 | 18.4 | 5.7 | 11.8 | 130.3 |
| Nov | 86.9 | 3.6 | 43.5 | 134.0 | 0.0 | 12.9 | 0.9 | 13.8 | 2.3 | 10.6 | 147.8 |
| Dec | 68.8 | 1.0 | 29.7 | 99.5 | 0.6 | 3.8 | 1.2 | 4.9 | 1.0 | 2.8 | 104.4 |
| **2001** | | | | | | | | | | | |
| Jan | 149.6 | 1.7 | 41.4 | 192.7 | 5.9 | 5.3 | 2.7 | 8.0 | 0.4 | 4.9 | 200.7 |
| Feb | 127.6 | 3.3 | 39.3 | 170.3 | 4.1 | 11.3 | 1.5 | 12.8 | 3.2 | 8.2 | 183.1 |
| Mar | 135.6 | 2.3 | 83.8 | 221.7 | 1.3 | 10.2 | 1.4 | 11.6 | 5.1 | 5.1 | 233.3 |
| Apr | 119.4 | 1.3 | 42.9 | 163.5 | 3.1 | 5.0 | 1.3 | 6.3 | 2.2 | 2.8 | 169.8 |
| May | 163.7 | 5.4 | 67.2 | 236.3 | 3.2 | 14.4 | 3.5 | 17.9 | 2.9 | 11.5 | 254.2 |
| June | 125.3 | 0.9 | 70.8 | 197.1 | 3.7 | 21.3 | 3.5 | 24.7 | 10.5 | 10.7 | 221.8 |
| July | 100.4 | 2.5 | 41.0 | 143.9 | 0.4 | 10.2 | 3.0 | 13.3 | 2.1 | 8.2 | 157.2 |
| Aug | | | | | | | | | | | |
| Sept | | | | | | | | | | | |
| Oct | | | | | | | | | | | |
| Nov | | | | | | | | | | | |
| Dec | | | | | | | | | | | |
| YTD '00 | 804.2 | 10.1 | 200.0 | 1,014.3 | 18.3 | 128.9 | 9.9 | 138.8 | 55.0 | 73.9 | 1,153.1 |
| YTD '01 | 921.6 | 17.4 | 386.4 | 1,325.5 | 21.6 | 77.8 | 16.9 | 94.7 | 26.4 | 51.4 | 1,420.1 |
| % Change | 14.6% | 71.8% | 93.2% | 30.7% | 18.4% | -39.7% | 71.3% | -31.8% | -52.0% | -30.5% | 23.2% |

Note: High-yield bonds is a subset of straight corporate debt. IPOs and follow-ons are subsets of common stock.
Source: Thomson Financial Securities Data

31

## MUNICIPAL BOND UNDERWRITINGS
(In $ Billions)

## INTEREST RATES
(Averages)

| | Compet. Rev. Bonds | Nego. Rev. Bonds | TOTAL REVENUE BONDS | Compet. G.O.s | Nego. G.O.s | TOTAL G.O.s | TOTAL MUNICIPAL BONDS | 3-Mo. T Bills | 30-Year Treasuries | SPREAD |
|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 10.2 | 150.8 | 161.0 | 17.6 | 22.8 | 40.4 | 201.4 | 7.47 | 10.79 | 3.32 |
| 1986 | 10.0 | 92.6 | 102.6 | 23.1 | 22.6 | 45.7 | 148.3 | 5.97 | 7.80 | 1.83 |
| 1987 | 7.1 | 64.4 | 71.5 | 16.3 | 14.2 | 30.5 | 102.0 | 5.78 | 8.58 | 2.80 |
| 1988 | 7.6 | 78.1 | 85.7 | 19.2 | 12.7 | 31.9 | 117.6 | 6.67 | 8.96 | 2.29 |
| 1989 | 9.2 | 75.8 | 85.0 | 20.7 | 17.2 | 37.9 | 122.9 | 8.11 | 8.45 | 0.34 |
| 1990 | 7.6 | 78.4 | 86.0 | 22.7 | 17.5 | 40.2 | 126.2 | 7.50 | 8.61 | 1.11 |
| 1991 | 11.0 | 102.1 | 113.1 | 29.8 | 28.1 | 57.9 | 171.0 | 5.38 | 8.14 | 2.76 |
| 1992 | 12.5 | 139.0 | 151.6 | 32.5 | 49.0 | 81.5 | 233.1 | 3.43 | 7.67 | 4.24 |
| 1993 | 20.0 | 175.6 | 195.6 | 35.6 | 56.7 | 92.4 | 287.9 | 3.00 | 6.59 | 3.59 |
| 1994 | 15.0 | 89.2 | 104.2 | 34.5 | 23.2 | 57.7 | 161.9 | 4.25 | 7.37 | 3.12 |
| 1995 | 13.5 | 81.7 | 95.2 | 27.6 | 32.2 | 59.8 | 155.0 | 5.49 | 6.88 | 1.39 |
| 1996 | 15.6 | 100.1 | 115.7 | 31.3 | 33.2 | 64.5 | 180.2 | 5.01 | 6.70 | 1.69 |
| 1997 | 12.3 | 130.2 | 142.6 | 35.5 | 36.5 | 72.0 | 214.6 | 5.06 | 6.61 | 1.55 |
| 1998 | 21.4 | 165.6 | 187.0 | 43.7 | 49.0 | 92.8 | 279.8 | 4.78 | 5.58 | 0.80 |
| 1999 | 14.3 | 134.9 | 149.2 | 38.5 | 31.3 | 69.8 | 219.0 | 4.64 | 5.87 | 1.23 |
| 2000 | 13.6 | 116.2 | 129.7 | 35.0 | 29.3 | 64.3 | 194.0 | 5.82 | 5.94 | 0.13 |
| **2000** | | | | | | | | | | |
| Jan | 1.0 | 5.2 | 6.2 | 2.0 | 1.3 | 3.4 | 9.5 | 5.32 | 6.63 | 1.31 |
| Feb | 0.8 | 7.0 | 7.8 | 3.3 | 1.2 | 4.5 | 12.3 | 5.55 | 6.23 | 0.68 |
| Mar | 1.3 | 11.1 | 12.4 | 2.4 | 2.3 | 4.7 | 17.1 | 5.69 | 6.05 | 0.36 |
| Apr | 0.6 | 9.9 | 10.5 | 3.1 | 1.8 | 4.9 | 15.5 | 5.66 | 5.85 | 0.19 |
| May | 0.8 | 8.8 | 9.7 | 2.6 | 3.0 | 5.6 | 15.3 | 5.79 | 6.15 | 0.36 |
| June | 1.4 | 12.7 | 14.0 | 4.5 | 4.1 | 8.6 | 22.6 | 5.69 | 5.93 | 0.24 |
| July | 1.2 | 9.5 | 10.7 | 2.4 | 1.6 | 4.0 | 14.7 | 5.96 | 5.85 | (0.10) |
| Aug | 0.8 | 10.3 | 11.2 | 2.8 | 2.8 | 5.5 | 16.7 | 6.09 | 5.72 | (0.37) |
| Sept | 1.4 | 7.8 | 9.2 | 3.0 | 3.8 | 6.8 | 16.0 | 6.00 | 5.83 | (0.17) |
| Oct | 1.8 | 11.8 | 13.6 | 3.6 | 2.2 | 5.8 | 19.4 | 6.11 | 5.80 | (0.31) |
| Nov | 1.5 | 12.6 | 14.0 | 3.7 | 2.2 | 5.8 | 19.9 | 6.17 | 5.78 | (0.39) |
| Dec | 1.0 | 9.4 | 10.4 | 1.6 | 3.1 | 4.6 | 15.1 | 5.77 | 5.49 | (0.28) |
| **2001** | | | | | | | | | | |
| Jan | 1.2 | 4.7 | 5.9 | 4.4 | 1.8 | 6.2 | 12.1 | 5.15 | 5.54 | 0.39 |
| Feb | 0.8 | 10.4 | 11.2 | 4.7 | 5.1 | 9.8 | 21.0 | 4.88 | 5.45 | 0.57 |
| Mar | 1.2 | 16.3 | 17.5 | 2.7 | 5.1 | 7.7 | 25.2 | 4.42 | 5.34 | 0.92 |
| Apr | 1.0 | 10.4 | 11.3 | 3.6 | 3.4 | 7.0 | 18.4 | 3.87 | 5.65 | 1.78 |
| May | 1.2 | 18.4 | 19.6 | 4.4 | 4.4 | 8.7 | 28.4 | 3.62 | 5.78 | 2.16 |
| June | 1.8 | 17.8 | 19.6 | 5.1 | 4.6 | 9.6 | 29.2 | 3.49 | 5.67 | 2.18 |
| July | 1.6 | 10.7 | 12.2 | 3.8 | 1.9 | 5.7 | 17.9 | 3.51 | 5.61 | 2.10 |
| Aug | | | | | | | | | | |
| Sept | | | | | | | | | | |
| Oct | | | | | | | | | | |
| Nov | | | | | | | | | | |
| Dec | | | | | | | | | | |
| YTD '00 | 7.1 | 64.2 | 71.3 | 20.3 | 15.4 | 35.7 | 107.0 | 5.66 | 6.10 | 0.43 |
| YTD '01 | 8.8 | 88.6 | 97.5 | 28.6 | 26.2 | 54.8 | 152.3 | 4.13 | 5.58 | 1.44 |
| % Change | 25.2% | 38.1% | 36.8% | 40.5% | 70.7% | 53.5% | 42.4% | -27.0% | -8.6% | 232.2% |

Sources: Thomson Financial Securities Data; Federal Reserve

| | STOCK MARKET PERFORMANCE INDICES (End of Period) | | | | STOCK MARKET VOLUME (Daily Avg., Mils. of Shs.) | | | VALUE TRADED (Daily Avg., $ Bils.) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dow Jones Industrial Average | S&P 500 | NYSE Composite | Nasdaq Composite | NYSE | AMEX | Nasdaq | NYSE | Nasdaq |
| 1985 | 1,546.67 | 211.28 | 121.58 | 324.93 | 109.2 | 8.3 | 82.1 | 3.9 | 0.9 |
| 1986 | 1,895.95 | 242.17 | 138.58 | 348.83 | 141.0 | 11.8 | 113.6 | 5.4 | 1.5 |
| 1987 | 1,938.83 | 247.08 | 138.23 | 330.47 | 188.9 | 13.9 | 149.8 | 7.4 | 2.0 |
| 1988 | 2,168.57 | 277.72 | 156.26 | 381.38 | 161.5 | 9.9 | 122.8 | 5.4 | 1.4 |
| 1989 | 2,753.20 | 353.40 | 195.04 | 454.82 | 165.5 | 12.4 | 133.1 | 6.1 | 1.7 |
| 1990 | 2,633.66 | 330.22 | 180.49 | 373.84 | 156.8 | 13.2 | 131.9 | 5.2 | 1.8 |
| 1991 | 3,168.83 | 417.09 | 229.44 | 586.34 | 178.9 | 13.3 | 163.3 | 6.0 | 2.7 |
| 1992 | 3,301.11 | 435.71 | 240.21 | 676.95 | 202.3 | 14.2 | 190.8 | 6.9 | 3.5 |
| 1993 | 3,754.09 | 466.45 | 259.08 | 776.80 | 264.5 | 18.1 | 263.0 | 9.0 | 5.3 |
| 1994 | 3,834.44 | 459.27 | 250.94 | 751.96 | 291.4 | 17.9 | 295.1 | 9.7 | 5.8 |
| 1995 | 5,117.12 | 615.93 | 329.51 | 1,052.13 | 346.1 | 20.1 | 401.4 | 12.2 | 9.5 |
| 1996 | 6,448.27 | 740.74 | 392.30 | 1,291.03 | 412.0 | 22.1 | 543.7 | 16.0 | 13.0 |
| 1997 | 7,908.25 | 970.43 | 511.19 | 1,570.35 | 526.9 | 24.4 | 647.8 | 22.8 | 17.7 |
| 1998 | 9,181.43 | 1,229.23 | 595.81 | 2,192.69 | 673.6 | 28.9 | 801.7 | 29.0 | 22.9 |
| 1999 | 11,497.12 | 1,469.25 | 650.30 | 4,069.31 | 808.9 | 32.7 | 1,081.8 | 35.5 | 43.7 |
| 2000 | 10,786.85 | 1,320.28 | 656.87 | 2,470.52 | 1,041.6 | 52.9 | 1,757.0 | 43.9 | 80.9 |
| **2000** | | | | | | | | | |
| Jan | 10,940.53 | 1,394.46 | 621.73 | 3,940.35 | 1,074.2 | 49.5 | 1,693.0 | 47.6 | 87.5 |
| Feb | 10,128.31 | 1,366.42 | 592.64 | 4,696.69 | 1,045.9 | 52.9 | 1,812.0 | 44.3 | 91.4 |
| Mar | 10,921.92 | 1,498.58 | 647.70 | 4,572.83 | 1,138.4 | 61.4 | 1,902.8 | 51.0 | 106.4 |
| Apr | 10,733.91 | 1,452.43 | 644.16 | 3,860.66 | 1,060.0 | 65.5 | 1,876.2 | 48.8 | 92.0 |
| May | 10,522.33 | 1,420.60 | 643.60 | 3,400.91 | 905.4 | 46.2 | 1,417.5 | 39.4 | 64.2 |
| June | 10,447.89 | 1,454.60 | 642.93 | 3,966.11 | 986.5 | 44.3 | 1,537.5 | 41.8 | 73.3 |
| July | 10,521.98 | 1,430.83 | 640.63 | 3,766.99 | 953.8 | 38.5 | 1,567.9 | 40.0 | 80.4 |
| Aug | 11,215.10 | 1,517.68 | 674.53 | 4,206.35 | 886.1 | 37.5 | 1,458.7 | 36.9 | 65.0 |
| Sept | 10,650.92 | 1,436.51 | 663.04 | 3,672.82 | 1,041.3 | 48.9 | 1,756.7 | 44.0 | 82.4 |
| Oct | 10,971.14 | 1,429.40 | 666.02 | 3,369.63 | 1,180.6 | 59.7 | 2,026.9 | 47.4 | 88.3 |
| Nov | 10,414.49 | 1,314.95 | 629.78 | 2,597.93 | 1,033.4 | 58.1 | 1,840.4 | 40.8 | 70.7 |
| Dec | 10,786.85 | 1,320.28 | 656.87 | 2,470.52 | 1,208.8 | 73.9 | 2,247.4 | 45.5 | 71.1 |
| **2001** | | | | | | | | | |
| Jan | 10,887.36 | 1,366.01 | 663.64 | 2,772.73 | 1,325.9 | 72.5 | 2,387.3 | 52.0 | 75.6 |
| Feb | 10,495.28 | 1,239.94 | 626.94 | 2,151.83 | 1,138.5 | 70.9 | 1,947.6 | 43.8 | 59.7 |
| Mar | 9,878.78 | 1,160.33 | 595.66 | 1,840.26 | 1,271.4 | 82.5 | 2,071.4 | 45.9 | 49.2 |
| Apr | 10,734.97 | 1,249.46 | 634.83 | 2,116.24 | 1,276.5 | 78.4 | 2,162.8 | 45.1 | 49.6 |
| May | 10,911.94 | 1,255.82 | 641.67 | 2,110.49 | 1,116.7 | 66.7 | 1,909.1 | 41.4 | 46.4 |
| June | 10,502.40 | 1,224.42 | 621.76 | 2,160.54 | 1,175.0 | 63.8 | 1,793.9 | 41.6 | 40.6 |
| July | 10,522.81 | 1,211.23 | 616.94 | 2,027.13 | 1,137.1 | 55.1 | 1,501.9 | 39.0 | 34.1 |
| Aug | | | | | | | | | |
| Sept | | | | | | | | | |
| Oct | | | | | | | | | |
| Nov | | | | | | | | | |
| Dec | | | | | | | | | |
| YTD '00 | 10,521.98 | 1,430.83 | 640.63 | 3,766.99 | 1,023.5 | 51.2 | 1,684.1 | 44.7 | 85.0 |
| YTD '01 | 10,522.81 | 1,211.23 | 616.94 | 2,027.13 | 1,206.1 | 70.0 | 1,967.0 | 44.1 | 50.6 |
| % Change | 0.0% | -15.3% | -3.7% | -46.2% | 17.8% | 36.8% | 16.8% | -1.2% | -40.5% |

33

## MUTUAL FUND ASSETS
### ($ Billions)

## MUTUAL FUND NET NEW CASH FLOW*
### ($ Billions)

| | Equity | Hybrid | Bond | Money Market | TOTAL ASSETS | Equity | Hybrid | Bond | Money Market | TOTAL | Total Long-Term Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 116.9 | 12.0 | 122.6 | 243.8 | 495.4 | 8.5 | 1.9 | 63.2 | -5.4 | 68.2 | 73.6 |
| 1986 | 161.4 | 18.8 | 243.3 | 292.2 | 715.7 | 21.7 | 5.6 | 102.6 | 33.9 | 163.8 | 129.9 |
| 1987 | 180.5 | 24.2 | 248.4 | 316.1 | 769.2 | 19.0 | 4.0 | 6.8 | 10.2 | 40.0 | 29.8 |
| 1988 | 194.7 | 21.1 | 255.7 | 338.0 | 809.4 | -16.1 | -2.5 | -4.5 | 0.1 | -23.0 | -23.1 |
| 1989 | 248.8 | 31.8 | 271.9 | 428.1 | 980.7 | 5.8 | 4.2 | -1.2 | 64.1 | 72.8 | 8.8 |
| 1990 | 239.5 | 36.1 | 291.3 | 498.3 | 1,065.2 | 12.8 | 2.2 | 6.2 | 23.2 | 44.4 | 21.2 |
| 1991 | 404.7 | 52.2 | 393.8 | 542.5 | 1,393.2 | 39.4 | 8.0 | 58.9 | 5.5 | 111.8 | 106.3 |
| 1992 | 514.1 | 78.0 | 504.2 | 546.2 | 1,642.5 | 78.9 | 21.8 | 71.0 | -16.3 | 155.4 | 171.7 |
| 1993 | 740.7 | 144.5 | 619.5 | 565.3 | 2,070.0 | 129.4 | 39.4 | 73.3 | -14.1 | 228.0 | 242.1 |
| 1994 | 852.8 | 164.5 | 527.1 | 611.0 | 2,155.4 | 118.9 | 20.9 | -64.6 | 8.8 | 84.1 | 75.2 |
| 1995 | 1,249.1 | 210.5 | 598.9 | 753.0 | 2,811.5 | 127.6 | 5.3 | -10.5 | 89.4 | 211.8 | 122.4 |
| 1996 | 1,726.1 | 252.9 | 645.4 | 901.8 | 3,526.3 | 216.9 | 12.3 | 2.8 | 89.4 | 321.3 | 232.0 |
| 1997 | 2,368.0 | 317.1 | 724.2 | 1,058.9 | 4,468.2 | 227.1 | 16.5 | 28.4 | 102.1 | 374.1 | 272.0 |
| 1998 | 2,978.2 | 364.7 | 830.6 | 1,351.7 | 5,525.2 | 157.0 | 10.2 | 74.6 | 235.3 | 477.1 | 241.8 |
| 1999 | 4,041.9 | 383.2 | 808.1 | 1,613.1 | 6,846.3 | 187.7 | -12.4 | -5.5 | 193.6 | 363.4 | 169.8 |
| 2000 | 3,962.3 | 349.7 | 808.0 | 1,845.3 | 6,965.2 | 309.6 | -31.8 | -48.6 | 159.6 | 388.8 | 229.2 |
| **2000** | | | | | | | | | | | |
| Jan | 3,951.6 | 368.8 | 793.9 | 1,657.3 | 6,771.6 | 44.5 | -6.3 | -12.7 | 41.8 | 67.3 | 25.6 |
| Feb | 4,218.5 | 360.7 | 796.7 | 1,680.5 | 7,056.4 | 55.6 | -5.1 | -8.2 | 14.8 | 57.2 | 42.3 |
| Mar | 4,441.6 | 371.6 | 793.1 | 1,697.0 | 7,303.3 | 40.2 | -5.7 | -7.7 | 12.7 | 39.5 | 26.8 |
| Apr | 4,250.3 | 359.8 | 781.0 | 1,649.4 | 7,040.5 | 35.5 | -1.9 | -6.7 | -52.2 | -25.4 | 26.9 |
| May | 4,106.5 | 348.1 | 777.3 | 1,675.6 | 6,907.4 | 17.3 | -2.1 | -5.1 | 18.7 | 28.8 | 10.1 |
| June | 4,316.6 | 350.8 | 791.5 | 1,658.6 | 7,117.5 | 22.0 | -1.9 | 0.1 | -23.0 | -2.8 | 20.2 |
| July | 4,244.1 | 352.1 | 796.2 | 1,697.3 | 7,089.7 | 17.3 | -1.5 | -0.7 | 33.3 | 48.4 | 15.1 |
| Aug | 4,579.8 | 363.0 | 802.5 | 1,729.8 | 7,475.1 | 24.0 | -1.3 | -1.8 | 22.5 | 43.3 | 20.9 |
| Sept | 4,397.5 | 354.9 | 797.8 | 1,728.0 | 7,278.2 | 17.3 | -2.1 | -3.0 | -8.6 | 3.5 | 12.2 |
| Oct | 4,293.4 | 354.2 | 795.4 | 1,760.0 | 7,203.0 | 19.2 | -1.2 | -2.0 | 26.0 | 42.0 | 16.0 |
| Nov | 3,854.9 | 342.9 | 795.3 | 1,821.3 | 6,814.3 | 5.5 | -0.3 | -0.6 | 56.1 | 60.7 | 4.6 |
| Dec | 3,962.3 | 349.7 | 808.0 | 1,845.3 | 6,965.2 | 11.6 | -1.6 | -0.7 | 16.4 | 25.8 | 9.3 |
| **2001** | | | | | | | | | | | |
| Jan | 4,093.3 | 356.9 | 830.0 | 1,955.5 | 7,235.7 | 25.1 | 1.1 | 8.8 | 103.0 | 138.0 | 34.9 |
| Feb | 3,689.7 | 344.4 | 845.2 | 2,019.3 | 6,898.6 | -3.3 | 1.2 | 8.8 | 58.0 | 64.7 | 6.7 |
| Mar | 3,408.0 | 333.4 | 852.8 | 2,035.5 | 6,629.7 | -20.6 | -0.4 | 7.9 | 13.6 | 0.6 | -13.1 |
| Apr | 3,716.0 | 347.9 | 846.6 | 2,031.5 | 6,942.0 | 19.2 | 1.3 | 1.3 | -10.5 | 11.3 | 21.9 |
| May | 3,744.9 | 353.2 | 859.0 | 2,071.7 | 7,028.8 | 18.1 | 1.4 | 6.2 | 35.0 | 60.8 | 25.8 |
| June | 3,676.9 | 349.1 | 861.7 | 2,055.3 | 6,943.0 | 10.6 | 1.1 | 2.9 | -24.1 | -9.5 | 14.6 |
| July | | | | | | | | | | | |
| Aug | | | | | | | | | | | |
| Sept | | | | | | | | | | | |
| Oct | | | | | | | | | | | |
| Nov | | | | | | | | | | | |
| Dec | | | | | | | | | | | |
| YTD '00 | 4,316.6 | 350.8 | 791.5 | 1,658.6 | 7,117.5 | 215.0 | -23.0 | -40.2 | 12.7 | 164.6 | 151.8 |
| YTD '01 | 3,676.9 | 349.1 | 861.7 | 2,055.3 | 6,943.0 | 49.2 | 5.7 | 36.0 | 175.1 | 265.9 | 90.9 |
| % Change | -14.8% | -0.5% | 8.9% | 23.9% | -2.5% | -77.1% | NM | NM | 1275.6% | 61.6% | -40.2% |

New sales (excluding reinvested dividends) minus redemptions, combined with net exchanges
Source: Investment Company Institute

34



**Securities Industry Association**

120 Broadway, New York, NY 10271-0080
(212) 608-1500, Fax (212) 608-1604
info@sia.com, www.sia.com