# EXHIBIT 49

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,

          Plaintiffs,

vs.

ENERGY TRANSFER LP, KELCY L. WARREN, THOMAS E. LONG, MARSHALL MCCREA, and MATTHEW S. RAMSEY,

          Defendants.

Case No. 2:20-cv-0200-GAM

---

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**March 1, 2022**

**TABLE OF CONTENTS**

I. Scope of assignment ...........................................................................................................1

II. Summary of findings..........................................................................................................1

III. Qualifications and remuneration ........................................................................................2

    A. Qualifications................................................................................................................2

    B. Remuneration...............................................................................................................3

IV. Materials considered ..........................................................................................................3

V. Background ........................................................................................................................5

    A. Company background ...................................................................................................5

    B. Summary of allegations ...............................................................................................5

VI. Methodology ....................................................................................................................11

VII. The alleged misrepresentations did not have price impact ...............................................18

    A. There is no evidence that the alleged misrepresentations caused a statistically significant increase in Energy Transfer's stock price when made................................18

    B. The fact that Energy Transfer's stock price did not react to the Revolution Pipeline "explosion" – a substantial event that is clearly corrective of the alleged misstatements – or other similar announcements demonstrates that the alleged misrepresentations did not have price impact...........................................................27

    C. Energy Transfer's stock price did not decline following the four alleged corrective disclosures that provided new, corrective information, which is clear evidence of no price impact...........................................................................................................33

        1. Energy Transfer's stock price did not react following the August 9, 2018 announcement of the so-called "Frankenpipe".....................................................33

        2. Energy Transfer's stock price did not react following the December 19, 2018 announcement of the Chester County DA's investigation of the Company..........37

        3. Energy Transfer's stock price did not react following the August 8, 2019 announcement that two Pennsylvania constables who were allegedly "bribed" by the Company to "intimidate" local residents had been arrested ......................40

        4. Energy Transfer's stock price did not react following the December 3, 2019 announcement of "criminal bribery and conspiracy charges" against the Company's head of security for the Mariner East project ....................................42

    D. The two alleged corrective disclosures following which Energy Transfer's stock price did react did not provide any new, corrective information, and thus, any price decline is *not* evidence of price impact of the alleged misstatements ...............44

1.  The decline in Energy Transfer's stock price on October 29, 2018 is *not* evidence of price impact of the alleged misstatements..........................................44

2.  The decline in Energy Transfer's stock price on November 12, 2019 is *not* evidence of price impact of the alleged misstatements..........................................47

## I.     SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants to analyze price impact of the allegedly false and misleading statements and/or omissions that Plaintiffs claim inflated the price of Energy Transfer, L.P. ("Energy Transfer" or "the Company") common units between February 25, 2017 and December 2, 2019 (the alleged "Class Period").[1]

## II.    SUMMARY OF FINDINGS

2.      Plaintiffs claim that Energy Transfer made alleged misstatements about three Pipeline Projects under construction in Pennsylvania that impacted and inflated the Company's stock price during the alleged Class Period. Plaintiffs claim that the alleged misstatements concealed from investors "the serious safety risks that threatened local citizens and construction setbacks that jeopardized the pipelines' completion timelines and throughput."[2] According to Plaintiffs, the inflation in Energy Transfer's stock price was eliminated by six alleged corrective disclosures.[3]

3.      I find that the alleged misstatements and omissions did not have price impact because there is no link between Energy Transfer's stock price movements and the alleged misstatements and/or the correction of the alleged misstatements. In particular, Energy Transfer's stock price did not decline when information that was "corrective" of the alleged misstatements was released to the market. Energy Transfer's stock price did not decline following the "explosion" of the Revolution Pipeline in September 2018 – a substantial event that Plaintiffs themselves claim revealed "the real threat the Pipeline Projects posed to Pennsylvania citizens after Energy Transfer had failed to act in compliance with state environmental, safety and criminal laws, as well as with its own Code of Conduct."[4] Energy

---

[1]   Because Energy Transfer is a master limited partnership it has common units, not common stock. In all respects relevant to this report, Energy Transfer's common units trade in a manner equivalent to the common stock of corporations and thus, the terms common stock and common units are used interchangeably.

[2]   Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 2.

[3]   Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 5.

[4]   Operative Complaint, ¶218.

1

Transfer's stock price did not decline following announcements of stop work orders and articles describing construction and safety issues on the Pipeline Projects published prior to the Revolution Pipeline incident. Energy Transfer's stock price did not decline following the four alleged corrective disclosures (August 9, 2018, December 19, 2018, August 8, 2019 and December 3, 2019) that provided new, corrective information. The fact that Energy Transfer's stock price did not decline following announcements that are clearly corrective of the alleged misstatements and omissions, including announcements that Plaintiffs themselves claim as corrective, affirmatively demonstrates that the alleged misstatements did not have price impact when made.

4.      In addition, I analyzed the price reactions following the alleged misstatements and found no evidence that the alleged misstatements caused any statistically significant increase in Energy Transfer's stock price when made. There was no statistically significant increase in Energy Transfer's stock price following 24 of the 26 alleged misrepresentations. An analysis of the two alleged misstatement dates on which there was a statistically significant price reaction shows that the price reaction on these dates was not caused by the alleged misrepresentations. Rather, on these two dates, the increase in Energy Transfer's stock price occurred either before the alleged misstatement was made and/or was in response to an announcement not claimed by Plaintiffs as an alleged misrepresentation.

## III.   QUALIFICATIONS AND REMUNERATION

### A.   Qualifications

5.      I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

2

6.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B.   Remuneration

7.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,050 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## IV.   MATERIALS CONSIDERED

8.      In preparing this report, I considered the following materials:

a)  Operative Class Action Complaint for Violation of the Federal Securities Laws, filed June 15, 2020 ("Operative Complaint");

b)  Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021;

c)  Expert Report of Chad Coffman, dated September 17, 2021 ("Coffman Report"), including exhibits, appendices and materials turned over;

d)  Deposition of Chad Coffman, November 18, 2021 ("Coffman Deposition");

e)  Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021;

3

f) Memorandum of Law in Support of the Motion of the Institutional Investor Group for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Class Counsel, filed January 21, 2020;

g) Analyst reports on Energy Transfer and associated entities from Thomson Reuters and documents produced in discovery (a full list of reports considered is included as Appendix B);

h) Filings by Energy Transfer and associated entities with the Securities and Exchange Commission ("SEC filings") between 2017 and 2020;

i) Press releases and conference call transcripts by Energy Transfer and associated entities between 2017 and 2020 from Factiva;

j) News stories on Energy Transfer and associated entities and the oil and gas transportation industry between 2017 and 2020 from Factiva and Bloomberg, L.P.;

k) Price, total return, trading volume, implied volatility, and short interest data for Energy Transfer and associated entities from FactSet Research Systems, Inc. and Bloomberg, L.P.;

l) Intraday price and volume data from Bloomberg, L.P. and Tick Data, LLC;

m) Price and total return data for market and industry indices from FactSet Research Systems, Inc. and Bloomberg, L.P.;

n) Institutional and insider holdings data for Energy Transfer and associated entities from FactSet Research Systems, Inc.; and

o) Academic literature and textbooks on finance, securities, valuation and statistics.

4

## V.   BACKGROUND

### A.   Company background

9.      Energy Transfer is a Delaware limited partnership that, through its operating subsidiaries, provides logistics and transportation services for natural gas, natural gas liquids ("NGLs"), crude oil, and refined petroleum products.[5]

10.     Throughout the alleged Class Period, Energy Transfer was, among other activities, engaged in the construction and/or operation of three NGL pipelines in Pennsylvania – the Revolution Pipeline, the Mariner East 2 ("ME2") Pipeline and the Mariner East 2X ("ME2X") Pipeline (collectively, the "Pipeline Projects").[6]

### B.   Summary of allegations

11.     Plaintiffs allege that Energy Transfer made misstatements about the Pipeline Projects during the alleged Class Period that impacted and inflated the Company's stock price.

12.     In general, Plaintiffs allege that Energy Transfer concealed "the serious risks posed by its approach to constructing the Pipeline Projects, its misconduct in obtaining the pipeline permits and intimidating residents as it constructed them, and the fact that it experienced such significant obstacles in constructing the Pipeline Projects that Energy Transfer's claimed in-service dates and throughputs were unachievable and materially misleading when issued."[7]

13.     It is my understanding that, following the Court's decision on Defendants' Motion to Dismiss, there are 34 alleged misstatements on 26 dates remaining in the case. According to the Court's decision and the Operative Complaint, these alleged misstatements fall into five categories. The five alleged misstatement categories, along with examples of associated

---

[5]   See, for example, Energy Transfer FY19 Form 10-K, filed February 21, 2020, p. 1.

Prior to 2018, Energy Transfer's energy transportation operations were conducted through Energy Transfer Partners, L.P. ("ETP"), a Delaware limited partnership whose common units were publicly traded on the New York Stock Exchange. ETP was managed by ETP Managing GP, a wholly owned subsidiary of Energy Transfer (known at the time as "Energy Transfer Equity, L.P." or "ETE") and ETPs operations were consolidated in ETE's financial statements. On October 19, 2018, ETE and ETP completed a merger that resulted in the combined Energy Transfer company. See, for example, Energy Transfer FY17 Form 10-K, filed February 23, 2018, p. 4, ETP Form DEFM14A, filed September 11, 2018, p. 4, and "Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. Complete Merger, Simplify Structure," *Business Wire*, October 19, 2018.

[6]   Operative Complaint, ¶3.

[7]   Operative Complaint, ¶3.

statements and the reasons why these statements were allegedly false and/or misleading, are listed in the table below. A full list of the surviving alleged misstatements is included as Appendix C.

| | Alleged Misrep. Category | Example Alleged Misrep. | Reason Allegedly False/Misleading |
|---|---|---|---|
| 1. | Timeline of pipeline construction | "Well, as we said in our opening statements, we do expect to have [ME2] in service sometime in the fourth quarter."[8] (8/9/17)<br><br>"On our Revolution project, construction is scheduled to be completed in the fourth quarter of 2017."[9] (8/9/17) | Plaintiffs claim these statements were false because Defendants allegedly knew that the publicly disclosed timelines were "impossible to achieve" as the permits to begin construction on the pipelines "were obtained through illegal means and significant geological risks were ignored."[10] |
| 2. | Pipeline capacity | ME2: "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day"[11] (5/31/17)<br><br>"The utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted."[12] (8/9/18) | Plaintiffs claim these statements were false because Defendants allegedly knew they would need to use a smaller pipe with lower throughput capacity "long before" this fact was publicly disclosed on August 9, 2018.[13] |

---

[8] Operative Complaint, ¶343.

[9] Operative Complaint, ¶343.

[10] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, pp. 5-6.

[11] Operative Complaint, ¶340.

[12] Operative Complaint, ¶364.

[13] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, p. 19.

| | Alleged Misrep. Category | Example Alleged Misrep. | Reason Allegedly False/Misleading |
|---|---|---|---|
| 3. | Safety and compliance with orders | "We . . . reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work."[14] (1/3/18)<br><br>"Safety is paramount for any energy infrastructure project that we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment."[15] (2/8/18) | Plaintiffs claim these statements were false because Defendants were allegedly "repeatedly and knowingly" violating Pennsylvania Department of Environmental Protection ("DEP") orders, leading to "numerous consequent disasters."[16] |
| 4. | Code of ethics | "The Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."[17] (2/24/17) | Plaintiffs claim these statements were false because Defendants allegedly had an "unwritten policy to hire armed, uniformed constables to create an appearance that they were acting in their official capacity."[18] |

---

[14] Operative Complaint, ¶367.

[15] Operative Complaint, ¶368.

[16] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, p. 24.

[17] Operative Complaint, ¶382.

[18] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, p. 34.

7

| | Alleged Misrep. Category | Example Alleged Misrep. | Reason Allegedly False/Misleading |
|---|---|---|---|
| 5. | Criminal investigations and cases | "We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property"[19] (1/22/19)<br><br>"In its own statement, Energy Transfer stressed that constables Johnson and Robel 'were not Sunoco or Energy Transfer employees.'"[20] (8/8/19) | Plaintiffs claim that these statements were false because Defendants allegedly had not been complying with the law.[21] |

14.     Plaintiffs claim that the alleged "truth" regarding the alleged misrepresentations was disclosed to the market through six "corrective disclosures."[22] The alleged corrective disclosures are described below:

a) <u>August 9, 2018</u>: On this date, Energy Transfer held a conference call to discuss its earnings for 2Q18.[23] According to Plaintiffs, Energy Transfer allegedly revealed that "it will not complete ME2 on time," and will instead "seek to achieve reduced flows on the pipeline" by joining 20-inch diameter ME2 pipes to 12-inch "older, existing pipes."[24]

b) <u>October 27-29, 2018</u>: Plaintiffs allege two events: (i) on Saturday, October 27, when the *Associated Press* reprinted an "exposé" from the *Pittsburgh Post-Gazette* allegedly "detailing Energy Transfer's failure to disclose the risks Pennsylvania's

---

[19] Operative Complaint, ¶394.

[20] Operative Complaint, ¶398.

[21] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, p. 39.

[22] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 5.

[23] The 2Q18 conference call occurred before market open on August 9. See, for example, "Energy Transfer Equity Reports Second Quarter Results," *Business Wire*, August 8, 2018 ("The Partnership has scheduled a conference call for 8:00 a.m. Central Time, Thursday, August 9, 2018 to discuss its second quarter 2018 results.").

[24] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 5-6.

8

geology posed to the Pipeline Projects," and (ii) on Monday, October 29, when Plaintiffs claim the Pennsylvania DEP "ordered construction of Energy Transfer's Revolution Pipeline to cease, after inspections the prior week revealed 'unreported landslides and erosion off the [Revolution] pipeline's construction sites into nearby streams.'"[25]

c) <u>December 19, 2018</u>: On this date, Tom Hogan, the District Attorney for Chester County, Pennsylvania, issued a press release announcing an investigation into Energy Transfer related to the construction of the Pipeline Projects and stating that he would "bring into play all of the tools of the criminal justice system" against the Company.[26]

d) <u>August 8, 2019</u>: On this date, Chester County DA Tom Hogan announced that two Pennsylvania state constables who were allegedly hired by Energy Transfer to "guard pipeline construction sites" and "intimidate" local citizens had been arrested and charged with bribery.[27]

e) <u>November 12, 2019</u>: On this date, the *Associated Press* published an article reporting that the FBI was investigating the permitting process for ME2, including whether the administration of Pennsylvania governor Tom Wolf had "forced environmental

---

[25] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 6.

[26] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 6-7.

The DA's press release was publicly released during market hours on December 19. See, for example, a tweet by NBC News reporter Deanna Durante reporting on the investigation and attaching the press release published at 11:36 a.m. (https://twitter.com/deannadurante/status/1075429618981765120?s=20, last accessed February 28, 2022).

[27] Operative Complaint, ¶¶6, 24. See, also, Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7.

News of the arrests was publicly released during market hours on August 8. See, for example, "State Constables Charged With Oppression At Mariner East Pipeline," *Patch.com*, August 8, 2019, 1:12 p.m. (https://patch.com/pennsylvania/westchester/state-constables-charged-oppression-mariner-east-pipeline, last accessed February 23, 2022) and "Two State Constables Arrested for Illegal Work as Security Contractors on Mariner East Pipeline Project in Chester County," *Fox43*, August 8, 2019, 1:47 p.m. (https://www.fox43.com/article/news/local/contests/two-state-constables-arrested-for-illegal-work-as-security-contractors-on-mariner-east-pipeline-project-in-chester-county/521-03404bee-4ff5-4371-8d3d-c7cd94e3b566, last accessed February 23, 2022).

9

protection staff to approve construction permits and whether Wolf or his administration received anything in return."[28]

    f) <u>December 3, 2019</u>: On this date, Chester County DA Tom Hogan issued a press release announcing "criminal bribery and conspiracy" charges against Energy Transfer's head of security for the Mariner East system in connection with the alleged hiring of Pennsylvania state constables to provide security for the Pipeline Projects.[29]

15. The chart below shows Energy Transfer's stock price and trading volume, along with the alleged misrepresentations and the alleged corrective disclosures:

---

[28] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7, citing "FBI Eyes How Pennsylvania Approved Pipeline," *Associated Press*, November 12, 2019, 3:29 p.m.

[29] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 8.



**Energy Transfer Stock Price, Trading Volume and Allegation-Related Dates**

Sources: Data from FactSet Research Systems, Inc. Events from the Operative Class Action Complaint.

## VI. METHODOLOGY

16.     An analysis of price impact is an analysis of whether the alleged misrepresentations affected the market price when made.[30] In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price movement and examining market and analyst commentary following the alleged misrepresentations, or (2) indirectly by analyzing the market reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure.[31]

---

[30]  See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011) ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.").

[31]  See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

11

17.     To analyze price impact of the alleged misrepresentations in this case, I examined publicly available information related to Energy Transfer and Plaintiffs' allegations. I reviewed Plaintiffs' claims in the Operative Complaint and other pleadings, as well as Plaintiffs' expert Mr. Coffman's report, and examined the alleged misrepresentations and the alleged corrective disclosures (including what information was allegedly false, when the alleged truth was purportedly revealed to the market and what information was alleged to be corrective). I analyzed publicly available information on Energy Transfer, including analyst reports, SEC filings, and news stories from Bloomberg and Factiva.[32] I focused on what the market knew about the alleged misrepresentations, and on how the market reacted in terms of analyst and other market commentary and price reactions.

18.     Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. Analysts evaluate companies by studying information about the company and the stock, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries using financial techniques such as discounted cash flow models and valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share), and give recommendations to buy, hold or sell the stock.[33] Analysts covering a company typically issue reports after new information about the company that could impact the stock price is released and are a valuable source of information on market knowledge and sentiment at the time. For a stock with substantial analyst coverage, the absence of analyst reports would suggest that the information released was not important to the market

---

[32]  Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

[33]  See, for example, Jonathan Berk and Peter DeMarzo, *Corporate Finance* (Pearson: Boston, MA, 3rd ed., 2014), p. 965 ("Securities analysts produce independent valuations of the firms they cover so that they can make buy and sell recommendations to clients. They collect as much information as they can, becoming an expert on the firm and its competitors by poring over a company's financial statements and filings. As a result, they are in a position to uncover irregularities first. Analysts often ask difficult and probing questions of CEOs and CFOs during quarterly earnings releases. Anyone can listen to these conference calls, which are typically simulcast on the company's investor relations Web site.").

12

and/or to the valuation of the company's stock. The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock.[34]

19.     As noted by Mr. Coffman, there was an "abundance of analyst coverage" of Energy Transfer during the alleged Class Period.[35] In particular, during the alleged Class Period, Energy Transfer was covered by professional market analysts from at least 20 different investment banks and brokerage firms, whose jobs were to closely follow and value Energy Transfer and the oil and gas transportation industry, and these analysts issued over 340 reports on the Company and the industry. These analyst reports provide contemporaneous, written documentation of what information was important to the market, why it was important, and what caused Energy Transfer's stock price to move during the alleged Class Period. A list of analyst reports considered is included as Appendix B.

20.     Plaintiffs and Mr. Coffman claim that the market for Energy Transfer's stock was efficient during the alleged Class Period,[36] and thus, that Energy Transfer's stock price reflected "all publicly available information" and impounded "new publicly available information rapidly and in an unbiased fashion."[37]

21.     There is a vast and detailed literature on how markets function, how stock prices behave and how information affects stock prices. Numerous studies have shown that, in an efficient market, market forces and the competition between buyers and sellers causes available

---

[34]  Courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements. See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla., March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex., Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated."). The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary. See, *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[35]  Coffman Report, ¶34.

[36]  Coffman Report, ¶6.

[37]  Coffman Report, ¶18.

13

information to be incorporated rapidly into the stock price.[38] Investors compete to discover information before the rest of the market and then to trade on that information (*i.e.*, buy or sell the stock) to make money. As investors trade the stock, the value of the information gets incorporated into the stock price.[39] For example, if there is information in the market indicating that a stock is underpriced, investors will attempt to profit by buying the stock and bidding up its price until the price reaches an appropriate level and the mispricing is corrected (thus eliminating the profit opportunity). Investors, therefore, have an incentive to review public information such as company filings, news stories and analyst reports as they are released to identify new information that has not yet been incorporated into the stock price.[40] Once the information is publicly disclosed and impounded into the price, the reiteration of previously disclosed information in an efficient market will not impact the stock price.[41]

---

[38] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330 and Jonathan Berk and Peter DeMarzo, *Corporate Finance* (Pearson: Boston, MA, 3rd ed., 2014), pp. 295-296 ("The idea that markets aggregate the information of many investors, and that this information is reflected in security prices, is a natural consequence of investor competition.").

[39] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330 and Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10th ed., 2014), pp. 350-353.

[40] See, for example, Jonathan Berk and Peter DeMarzo, *Corporate Finance* (Pearson: Boston, MA, 3rd ed., 2014), p. 296 ("Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or in other public data sources. If the impact of this information on the firm's future cash flows can be readily ascertained, then all investors can determine the effect of this information on the firm's value. In this situation, we expect competition between investors to be fierce and the stock price to react nearly instantaneously to such news.").

[41] See, for example, Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10th ed., 2014), p. 351 and Stephen A. Ross, Randolph Westerfield, and Jeffrey F. Jaffe, *Corporate Finance* (McGraw-Hill/Irwin: Boston, MA, 6th ed., 2002), p. 351 ("According to the efficient-market hypothesis, a stock's abnormal return […] should reflect the release of information at the same time[.] Any information released before then, though, should have no effect on abnormal returns in this period, because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices.").

See also, for example, Expert Rebuttal Report of Chad Coffman, *In Re. Banco Bradesco S.A. Securities Litigation* (1:16-cv-04155), dated December 14, 2018 ("I agree that statements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market.") and Coffman Deposition, 35:7-36:3 ("Q. Okay. But if a company states a particular fact and then states that same fact again without any significant new context, then that wouldn't generally be considered new news? A. […] [I]f a company is just stating a fact and they had previously stated that fact, and there's absolutely no reason to believe that fact had changed or that the fact that they can still report that fact has no further economic meaning, then I think you're right.").

Courts have similarly noted that repeated or confirmatory news should not cause the price to move. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

14

22.     Researchers have found that when new information enters the market, stock prices react quickly to impound this new information.[42] For example, as reported in *Investments*, a commonly cited finance textbook, most of the stock price response to company announcements of earnings or dividends occurs within five to ten minutes of the announcement.[43] This finding, that stock prices react "almost immediately" to the release of new information,[44] is not surprising because one would expect investors to respond quickly and trade the stock in an attempt to profit from the new information. Thus, in an efficient market, one would expect a stock to begin reacting to new news affecting that company or stock no later than the first trading day on which the news was publicly disseminated and/or it became possible for investors to trade on the new information.[45] If the stock does not begin to react on the day that the information is made public, that shows either that the information did not impact the price or that the market is not efficient.[46] The notion that stock prices in an efficient market will begin to react no later than the first trading day on which new information was publicly disseminated is consistent with empirical finance literature (discussed above), with prior court decisions,[47] and with Mr. Coffman's

---

[42]   See, for example, Bradford Cornell, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993), pp. 38, 41-42.

[43]   Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 10th ed., 2014), p. 351, citing James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics*, 13: 1984. See, also, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003), pp. 351-353.

[44]   See, for example, Bradford Cornell, *Corporate Valuation* (McGraw-Hill: New York, NY, 1993), p. 42 and Stephen A. Ross, Randolph Westerfield, and Jeffrey F. Jaffe, *Corporate Finance* (McGraw-Hill/Irwin: Boston, MA, 6th ed., 2002), p. 342 ("In an efficient market, the price of shares […] will immediately adjust to this new information. Investors should not be able to buy the stock on Wednesday afternoon and make a profit on Thursday. This would imply that it took the stock market a day to realize the implication of the FCC press release. The efficient-market hypothesis predicts that the price […] on Wednesday afternoon will already reflect the information contained in the Wednesday morning press release.").

[45]   See, for example, Stephen A. Ross, Randolph Westerfield, and Jeffrey F. Jaffe, *Corporate Finance* (McGraw-Hill/Irwin: Boston, MA, 6th ed., 2002), p. 342. See, also, Deposition of Chad Coffman, *Lewis Cosby et al., v. KPMG LLP* (3:16-cv-00121), dated April 12, 2019, 63:25-64:2 ("[G]enerally in an efficient market, you expect to see a reaction the first day.").

   Thus, if new information was publicly disseminated prior to or during market hours on a particular trading day, one would expect the stock to begin reacting to the new information on that same day. In contrast, if the news was publicly disseminated after the close of trading on a particular day, one would expect the stock to begin reacting on the next trading day. This is consistent with Mr. Coffman's event study and market efficiency analysis. See, Coffman Report, Exhibit 7.

[46]   Note that this discussion is only addressing when the stock should be expected to *begin* reacting to news, not when it should be expected to finish reacting.

[47]   In particular, courts have recognized that "[a]n efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not

15

analysis of market efficiency.[48] For the purpose of this analysis of price impact, I have been asked to assume Plaintiffs' claim of market efficiency.

23.     To analyze how Energy Transfer's stock price reacted to new information, I used the event study methodology. An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[49] Academics often use an event study to determine how stock prices respond to new information.[50]

24.     An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices, often over a control period.[51] Using the regression results and the returns of the indices, the predicted stock price movement and excess stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the event being tested. Then, the statistical significance of the excess stock price movement can be tested. A statistically significant price reaction means that the price movement on a particular day, after controlling for market and industry movements, is outside the range of normal expected daily variation in the stock price and thus, can be statistically distinguished from zero. In contrast, a statistically *in*significant price reaction means that the price movement on a particular day, after controlling for market and industry movements, is *within* the range of normal expected daily variation in the

---

show price impact as to the alleged corrective disclosure." See, *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015).

[48] In particular, to analyze whether Energy Transfer's stock price reacted to earnings announcements, Mr. Coffman tested Energy Transfer's stock price reaction on the first trading day on which the news was publicly disseminated. In no case did Mr. Coffman examine whether Energy Transfer's stock began to react days after the earnings information was publicly released. See, Coffman Report, Exhibit 7 and Coffman Deposition, 74:13-17.

[49] See, for example, Janet C. Alexander, "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994, Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, 38: 1982, and Frederick C. Dunbar and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[50] See, for example, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Robert G. Bowman, "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983.

[51] Regression analysis is used to estimate the relationship between two or more variables. See, for example, Robert V. Hogg and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

stock price and thus, cannot be statistically distinguished from zero.[52] The standard typically used by financial economists to assess statistical significance of stock price movements is the 5% significance level.[53]

25.      I tested Energy Transfer's stock price reactions using both the event study methodology put forward by Mr. Coffman, as well as an alternative event study methodology. The main difference between the Coffman Report event study and the Allen Report event study model is the industry index used. In particular, while both models use the S&P 500 index to control for market movements, the Coffman Report model uses the S&P Oil, Gas & Consumable Fuels Index, an off-the-shelf index, to control for industry movements,[54] while the Allen Report model uses a custom index of the peer companies discussed in Energy Transfer's SEC filings.[55] The index of the peer companies is a better fit for Energy Transfer's stock price movements during the alleged Class Period compared to the S&P Oil, Gas & Consumable Fuels Index used by Mr. Coffman.[56] An additional difference between the models is whether any dates are excluded from the control period. While both models use a rolling control period of 120 trading days (approximately six months) prior to each event tested, the Coffman Report model excludes

---

[52]  The concept of statistical significance in an event study was explained by the Second Circuit as follows: "An event study isolates the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) and then examines whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock. If the isolated stock price movement falls outside the range of typical random stock price fluctuations, it is statistically significant. If the stock price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-specific information announced on the event date." See, *Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018), citing Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities & Exchange Commission," *The Business Lawyer*, 49(2): 1994.

[53]  David A. Freedman and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), pp. 211-302, and Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980. See, also, Coffman Deposition, 70:23-71:18.

[54]  Coffman Report, ¶50.

[55]  In particular, the Allen Report event study model uses an equal-weighted index of the of the peer companies listed in Energy Transfer's FY17 Form 10-K, filed February 23, 2018. These companies are: Conoco Phillips, Enterprise Products Partners, L.P., Halliburton Company, Kinder Morgan, Inc., Marathon Petroleum Company, Phillips 66, Plains All American Pipeline, L.P., The Williams Companies, Inc. and Valero Energy Corporation. Anadarko Petroleum Corporation was not included as it was acquired during the alleged Class Period.

[56]  For example, in a regression of Energy Transfer's daily returns over the alleged Class Period, the adjusted R-squared was higher, and the root mean square error was lower, for the peer index compared to the industry index selected by Mr. Coffman. According to Mr. Coffman, this would indicate that a model using the peer index would have higher "predictive power" (*i.e.*, a better ability to explain and/or predict movements in Energy Transfer's stock price) than a model using Mr. Coffman's industry index. See, Coffman Deposition, 102:16-103:16.

earnings announcements and the alleged corrective disclosures from its control periods,[57] whereas the Allen Report event study model does not exclude any dates. My conclusion of no price impact from the alleged misrepresentations is robust to the use of either event study model.

## VII.  THE ALLEGED MISREPRESENTATIONS DID NOT HAVE PRICE IMPACT

### A.  There is no evidence that the alleged misrepresentations caused a statistically significant increase in Energy Transfer's stock price when made

26.  As part of the analysis of price impact, I analyzed whether the alleged misrepresentations caused a statistically significant increase in Energy Transfer's stock price when made. Using both the Coffman Report event study and the Allen Report event study model (described in section VI above), I calculated the excess stock price movement (*i.e.*, the company-specific movement in Energy Transfer's stock price after controlling for market and industry movements) following each alleged misrepresentation, and tested the excess movement to determine if it was statistically significant.

27.  Plaintiffs allege 26 dates on which Defendants made alleged misrepresentations that purportedly inflated Energy Transfer's stock price. I find that there was no statistically significant increase in Energy Transfer's stock price on 24 of the 26 alleged misrepresentation dates (or, if the misrepresentation occurred after market close, on the following trading day).[58] In other words, for at least 24 of the 26 alleged misrepresentations, there is no evidence of a statistically significant price increase that can be attributed to the alleged misrepresentations.

28.  The results of the Coffman Report event study as well as the Allen Report event study model following the 26 alleged misrepresentation dates are shown in the table below:

---

[57]  Coffman Report, Exhibits 5-7.

[58]  See ¶24 above for a discussion of the event study methodology and statistical significance.

18

## Price Reactions Following the Alleged Misrepresentations

| | Event Date | Reaction Date | Event | Coffman Event Study | | Allen Event Study | |
|---|---|---|---|---|---|---|---|
| | | | | Excess Return | Stat. Sig. Increase?[1] | Excess Return | Stat. Sig. Increase?[1] |
| 1. | 2/24/17 | 2/27/17 | 2016 10-K | -0.19% | No | -0.19% | No |
| 2. | 5/31/17 | 5/31/17 | 2017 MLPA Investor Conference | -0.31% | No | -0.52% | No |
| 3. | 8/9/17 | 8/9/17 | 2Q17 Conference Call | 5.64% | Yes | 5.69% | Yes |
| 4. | 11/8/17 | 11/8/17 | 3Q17 Conference Call | -4.20% | No | -4.27% | No |
| 5. | 11/15/17 | 11/15/17 | RBC Capital Markets Conference | 0.17% | No | -0.20% | No |
| 6. | 11/29/17 | 11/29/17 | Jefferies Energy Conference | -2.22% | No | -1.24% | No |
| 7. | 12/6/17 | 12/6/17 | Wells Fargo Pipeline Symposium | -0.46% | No | 0.13% | No |
| 8. | 1/3/18 | 1/3/18 | *Philadelphia Inquirer* Article | -1.06% | No | -1.98% | No |
| 9. | 1/9/18 | 1/9/18 | UBS Midstream and MLP Conference | 0.40% | No | -0.01% | No |
| 10. | 2/8/18 | 2/8/18 | *StateImpact Pennsylvania* article | -0.57% | No | -0.28% | No |
| 11. | 2/22/18 | 2/22/18 | 4Q17 and FY17 Conference Call | 1.91% | No | 2.40% | No |
| 12. | 2/23/18 | 2/26/18 | 2017 10-K | -3.09% | No | -1.96% | No |
| 13. | 2/28/18 | 2/28/18 | Morgan Stanley Energy Conference | -0.93% | No | -0.30% | No |
| 14. | 3/22/18 | 3/22/18 | ET Spokesperson Statement | 0.61% | No | 0.22% | No |
| 15. | 4/9/18 | 4/9/18 | Mizuho Energy Summit | 0.24% | No | 0.38% | No |
| 16. | 5/10/18 | 5/10/18 | 1Q18 Conference Call | -3.26% | No | -2.68% | No |
| 17. | 5/24/18 | 5/24/18 | Energy Infrastructure Conference | -1.34% | No | -1.23% | No |
| 18. | 6/1/18 | 6/1/18 | ET Report to DEP | 0.51% | No | 0.14% | No |
| 19. | 6/19/18 | 6/19/18 | JP Morgan Energy Conference | 0.23% | No | 0.35% | No |
| 20. | 8/9/18 | 8/9/18 | 2Q18 Conference Call | -0.54% | No | -0.78% | No |
| 21. | 9/25/18 | 9/26/18 | *StateImpact Pennsylvania* Article | -1.41% | No | -1.24% | No |
| 22. | 10/21/18 | 10/22/18 | *Pittsburgh Post-Gazette* Article | -3.02% | No | -2.81% | No |
| 23. | 11/1/18 | 11/1/18 | *Observer-Reporter* Article | 0.84% | No | 0.46% | No |
| 24. | 12/19/18 | 12/19/18 | ET Press Release | 1.85% | No | 1.30% | No |
| 25. | 1/22/19 | 1/22/19 | *NBC Philadelphia* Article | -0.83% | No | -1.00% | No |
| 26. | 8/8/19 | 8/8/19 | *PhillyMag* Article | 2.92% | Yes | 3.31% | Yes |

**Notes and Sources:**

Events from Operative Complaint. Data from Factset Research Systems, Inc. and "ET_COFFMAN_0000014.XLSX."

[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price increase is statistically significant at the 5% level.

29.     For the two dates on which there was a statistically significant price increase (August 9, 2017 and August 8, 2019), I reviewed the timing of the announcements and analyst commentary following the events, and compared the alleged misrepresentations to prior

19

statements made by the Company to determine whether there was any evidence that the price increase was caused by the alleged misrepresentations.

30.     I find that the statistically significant price increase on both dates was *not* caused by the alleged misrepresentations. Instead, as discussed below, in both cases I find that Energy Transfer's stock price did not increase in response to the alleged misrepresentations, but instead, according to analysts, increased in response to announcements not claimed by Plaintiffs as alleged misrepresentations. Furthermore, in the case of August 8, 2019, an analysis of the timing of the announcement shows that essentially all of the increase in Energy Transfer's stock price occurred *before* the alleged misrepresentation was made.

31.     In sum, an analysis of the stock price reaction after the alleged misrepresentations yields no evidence that the alleged misrepresentations impacted Energy Transfer's stock price when made. Details for the two dates on which there was a statistically significant price increase are discussed below.

### *August 9, 2017 alleged misrepresentations*

32.     Plaintiffs claim that Energy Transfer made alleged misstatements in its 2Q17 earnings conference call, held on August 9, 2017. Plaintiffs claim that, during this call, Defendants allegedly falsely stated: (i) that ME2 would be online "sometime in the fourth quarter" of 2017, and (ii) that construction on the Revolution Pipeline "is scheduled to be completed in the fourth quarter of 2017" and that the Revolution Pipeline "will be up and ready for service in the fourth quarter" of 2017.[59]

33.     There was a statistically significant increase in Energy Transfer's stock price on August 9, 2017. However, I find that Energy Transfer's stock price did not increase in response to the alleged misrepresentations, but instead increased in response to statements not claimed by Plaintiffs as false or misleading.

34.     Analysts covering Energy Transfer attributed the August 9, 2017 price increase to other information disclosed in the Company's 2Q17 earnings announcement and conference call, and *not* to the information about the Revolution and ME2 completion timelines. In particular, a review of analyst reports issued following the earnings announcement shows that analysts

---

[59]   Operative Complaint, ¶343. See, also, Operative Complaint, ¶¶62, 215.

20

focused on Energy Transfer's better-than-expected 2Q17 financial results, the impact of the recent partial sale of the Company's ownership stake in the Rover Pipeline (not one of the Pipeline Projects) to Blackstone Energy Partners on the Company's liquidity position, and Energy Transfer's disclosure that it would not pursue any major acquisitions in the short term. These are positive factors that are unconnected to the alleged misstatements and/or the Revolution and ME2 completion timelines.

35.    For example, the Credit Suisse analysts stated that the statement about future M&A activity was the "biggest takeaway" from the 2Q17 conference call, while the other highlight was the "liquidity boost" and reduction in leverage from the sale of the Rover Pipeline stake and the prospect of similar potential sales in the future. Importantly, the Credit Suisse analysts made *no* mention of the alleged misstatements and/or the Revolution and ME2 completion timelines.

> Bottom Line: With M&A being synonymous with Energy Transfer, perhaps **the biggest takeaway from the 2Q call was mgmt.'s revelation about not having any appetite for major M&A in the near term**. This removes the risk associated with large transactions especially at ETP, whose ~16% total cost of equity (incl. IDRs and waivers) makes M&A uncompetitive. […] **ETP Liquidity Boost Supports Deleveraging**; Fixes Equity Overhang: In our view, ETP has access to over $4Bn of funding sources which provide a clear path to deleveraging below 5.0x by 4Q17, improving to sub-4.0x levels in 2019. This is also supported by EBITDA from growth projects being placed in service. At ETE, this would drive consolidated (ETE/ETP/SUN) leverage to sub-5.0x levels in 2018/19. [Credit Suisse, 8/9/17, emphasis added]

36.    The Wells Fargo analysts similarly did not mention the allegedly misstated timelines for Revolution and ME2 and instead, like the Credit Suisse analysts, discussed the positive impact of the Rover stake sale on the Company's financial position and future capital needs.

> Key Takeaways. ETP's Q2 results were above our forecast and ETE was in line. ETP provided an updated capex forecast for the year, which was higher than our prior forecast. However, **after incorporating the impact of the recently announced Blackstone/Rover transaction (see inside), we now project ETP's remaining equity needs are $1.0B, down from our prior estimate of $1.5B**. Additional joint venture announcements could further decrease our equity issuance estimate, driving long-term unitholder value. We are lowering our price targets for ETP and ETE by $2 to $30/unit and $23/unit, respectively, but continue to see meaningful upside. [Wells Fargo, 8/11/17, emphasis added]

21

37.     Furthermore, I find that Energy Transfer's stock price did not increase in response to the alleged misrepresentations because the alleged misstatements *did not* provide new and/or positive information that would be expected to cause an increase in Energy Transfer's stock price. As discussed above, in an efficient market, stock prices react rapidly to incorporate new information when it is released and do not react in response to stale news (*i.e.*, news that has been previously disclosed and has already been impounded into the stock price, including confirmatory or repeated news).[60] Furthermore, as Mr. Coffman testified, in an efficient market, one would expect the direction of the price movement to be consistent with the "nature of the information that was disclosed."[61]

38.     Regarding the Revolution Pipeline, Energy Transfer's statement that the project "will be up and ready for service in the fourth quarter" of 2017 was *not* new news as Energy Transfer had previously provided the *same* completion timeline for the Revolution Pipeline. In particular, during an earnings conference call held on May 4, 2017, Energy Transfer stated that the Revolution Pipeline was "still on schedule to be in service in the fourth quarter of 2017,"[62] and similarly stated during May 31, 2017 and June 27, 2017 investor conferences that the Revolution Project would be "in-service Q4 2017."[63] Given that analysts covering the Company reported the same 4Q17 timeline for Revolution both before and after the August 9, 2017 alleged misstatement,[64] there is no indication that the August 9, 2017 alleged misstatements provided analysts with any new information about Revolution's completion.

39.     Regarding ME2, Energy Transfer's statement that ME2 would be online "sometime in the fourth quarter" of 2017 was actually a more *pessimistic* timeline than had been

---

[60]   See ¶21 above, including Expert Rebuttal Report of Chad Coffman, *In Re. Banco Bradesco S.A. Securities Litigation* (1:16-cv-04155), dated December 14, 2018 ("I agree that statements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market.").

[61]   Coffman Deposition, 51:10. See, also, Coffman Deposition, 52:24-53:7 ("I was looking for clear violations of what I would expect in an efficient market. So if the news was unambiguously positive and there was no, sort of, confounding negative information or no worse than expected information in the earnings release, then it would be hard to say why the stock price would go down in a significant way.").

[62]   Operative Complaint, ¶334, citing Energy Transfer 1Q17 earnings conference call, May 4, 2017.

[63]   Operative Complaint, ¶¶336, 338, citing Energy Transfer presentation at the 2017 MLPA Investor Conference, May 31, 2017 and Energy Transfer presentation at the 2017 J.P. Morgan Equity Conference, June 27, 2017.

[64]   See, for example, Morgan Stanley analyst reports, dated February 23, 2017 ("Management noted that the project remains on schedule for 4Q17") and August 9, 2017 ("Management indicated that Revolution remains on track to be completed in 4Q17").

disclosed prior to August 9, 2017. In particular, during its May 4, 2017 earnings conference call, Energy Transfer stated that it "continue[s] to target an end of the **third quarter** completion" for ME2,[65] and similarly stated during the May 31, 2017 and June 27, 2017 investor conferences that Mariner East 2 was "expected to be in service by the end of Q3 2017."[66] Given that analysts covering Energy Transfer had previously incorporated the more optimistic 3Q17 timeline for ME2 into their valuations of Energy Transfer's stock,[67] there is no indication that the August 9, 2017 alleged misstatements provided analysts with any new, positive information about ME2's completion.

40.      In sum, the alleged misstatements on August 9, 2017 did not provide new, positive information about the Pipeline Projects. Thus, the increase in Energy Transfer's stock price on this date cannot be attributed to the alleged misstatements, given Plaintiffs' claim that the market for Energy Transfer's stock was efficient during the alleged Class Period. Furthermore, rather attribute the August 9, 2017 price increase to the alleged misstatements and/or the information about the Revolution and ME2 completion timelines, analysts covering Energy Transfer explicitly attributed the August 9, 2017 price increase to reasons unconnected to the alleged misstatements. These facts clearly demonstrate that the alleged misrepresentations did not cause the increase in Energy Transfer's stock price on August 9, 2017.

### *August 8, 2019 alleged misrepresentations*

41.      Plaintiffs claim that Energy Transfer made alleged misstatements in a news article by *PhillyMag.com* issued on August 8, 2019.[68] Plaintiffs claim that the *PhillyMag.com* article reported on Energy Transfer's statements that two constables charged by Chester County DA Tom Hogan "were not Sunoco or Energy Transfer employees" and that the Company has a "code of conduct for all contractors and third party vendors."[69]

---

[65]  Energy Transfer 1Q17 earnings conference call, May 4, 2017 (emphasis added).

[66]  Operative Complaint, ¶¶336, 338, citing Energy Transfer presentation at the 2017 MLPA Investor Conference, May 31, 2017 and Energy Transfer presentation at the 2017 J.P. Morgan Equity Conference, June 27, 2017.

[67]  See, for example, Stephens analyst report, dated June 15, 2017 ("Mariner East 2 remains on track to start up by the end of 3Q17 with an initial capacity of 275 Mbblpd.").

[68]  "Chesco DA Announces Criminal Charges Against Mariner East Security Workers," *PhillyMag.com*, August 8, 2019, 2:01 p.m. (https://www.phillymag.com/news/2019/08/08/mariner-east-charges-security-workers/, last accessed February 2, 2022).

[69]  Operative Complaint, ¶398.

23

42. There was a statistically significant increase in Energy Transfer's stock price on August 8, 2019.[70] However, I find that Energy Transfer's stock price did not increase in response to the alleged misrepresentations, but instead increased in response to an announcement not claimed by Plaintiffs as an alleged misrepresentation. In particular, I find that Energy Transfer's stock price increased in response to the Company's 2Q19 financial results – specifically, the Company's earnings press release, published after market close on August 7, 2019,[71] and conference call, which occurred in the morning on August 8, 2019.[72] Energy Transfer's 2Q19 results were well above analysts' expectations, and analysts explicitly stated that they believed the stock price would increase on August 8 in response to the news.

43. For example, the Barclays analysts covering Energy Transfer stated that the Company's results were a "bright spot" and "surpassed" the analysts' already-high expectations, and that they expected the stock price to react positively in response:

> **Results this evening are a bright spot** in what has otherwise been a rough few days in the midstream sector. **ET's earnings surpassed our expectations (which were above the Street)**, and showcased the durability of the business model despite a deteriorating commodity price backdrop. After 1Q results, we had some questions about the quality of the beat as the performance seemed to have been driven by timing on realizations and hedges. Not so this quarter. The outperformance versus our expectations was mostly driven by the Midstream and NGL & Refined Products segments where margins and volume generally held steadier than we had anticipated given the commodity volatility in the period. In other words, there are not many points to nit-pick in ET's release this afternoon, and we believe the strength of the release should erase lingering doubts following 1Q results. **ET meaningfully outperformed on earnings**, raised the 2019 EBITDA guidance, and lowered the capex outlook – **we expect the reaction tomorrow will be positive**. [Barclays, 8/7/19, emphasis added]

44. Although the majority of analyst reports on the Company were issued on August 7, prior to the alleged misstatements, the two reports that were issued after the misstatement likewise focused on the Company's 2Q19 results and, importantly, made *no* mention of the

---

[70] The *PhillyMag.com* article was publicly disseminated during market hours (at 2:01 p.m.) on August 8, 2019, and thus, in an efficient market, any reaction in Energy Transfer's stock price to the release of this information would be expected to begin on August 8.

[71] "Energy Transfer Reports Second Quarter 2019 Results," *Business Wire*, August 7, 2019, 4:30 p.m.

[72] "Energy Transfer Reports Second Quarter 2019 Results," *Business Wire*, August 7, 2019 ("The Partnership has scheduled a conference call for 8:00 a.m. Central Time, Thursday, August 8, 2019 to discuss its second quarter 2019 results.").

24

constable arrests or Energy Transfer's comments on the arrests. For example, a Wells Fargo report issued on August 8 *after* the alleged misstatement focused entirely on the Company's 2Q19 earnings and made no mention of the alleged misstatements:

> **ET: Q2 Beat & Raise - Positive Outlook Intact**
> Key Takeaways. Q2 results beat and ET raised its full-year guidance despite declining commodity prices and producer slowdowns in the Permian. Additionally, ET was able to realize cost savings on its project backlog and now projects full-year capex of $4.6-4.8B, down from $5.0B previously. […] **The beat was broad based with every segment reporting higher than forecasted results**. […] We are raising our 2019 and 2020 DCF per unit estimates to $2.31 and $2.27, respectively, from $2.27 and $2.23 primarily to reflect the positive Q2 variance, inclusion of an assumed DAPL [Dakota Access Pipeline] expansion to 800 MBbls/d, and higher volume projections across multiple segments. [Wells Fargo, 8/8/19, emphasis added]

45. Furthermore, an analysis of Energy Transfer's intraday stock price movements and the timing of the announcement shows that essentially all of the increase in Energy Transfer's stock price occurred before the alleged misrepresentation was made, and thus the price increase is not due to the *PhillyMag.com* article. In particular, as shown in the chart below, while Energy Transfer's stock price closed at $13.33 on August 7 (prior to the 2Q19 earnings announcement), the price had already increased by 3.75%, to $13.83, by market open on August 8, and by 11:00 a.m., following the conclusion of the 2Q19 earnings call, had already reached $14.01. For the remainder of the trading day, including both before and after the publication of the *PhillyMag.com* article, the stock stayed roughly stable and closed at $14.03 on August 8, 2019.[73]

---

[73] Based on price data obtained from Bloomberg, L.P. and Tick Data, LLC.

25



**Intraday Stock Price and Trading Volume for 8/7/19 and 8/8/19**

46.     Thus, the fact that (i) analysts covering Energy Transfer made *no* mention of the constable arrests or the alleged misstatements, (ii) Energy Transfer's stock price did not increase following the publication of the *Phillymag.com* article, and (iii) analysts covering Energy Transfer explicitly attributed the August 8, 2019 price increase to reasons unconnected to the alleged misstatements clearly demonstrates that the alleged misrepresentations did not cause the increase in Energy Transfer's stock price on August 8, 2019.

26

**B.** **The fact that Energy Transfer's stock price did not react to the Revolution Pipeline "explosion" – a substantial event that is clearly corrective of the alleged misstatements – or other similar announcements demonstrates that the alleged misrepresentations did not have price impact**

47.    Plaintiffs claim that the alleged misstatements concealed the "serious risks" posed by Energy Transfer's approach to constructing the Pipeline Projects, including the risks associated with drilling in "landslide-prone and sinkhole-prone areas."[74]

48.    According to the Operative Complaint, the risks created by Energy Transfer's approach to constructing the Pipeline Projects "materialized" on September 10, 2018, when the Revolution Pipeline "dramatically exploded."[75] Plaintiffs state that the pipeline exploded in a "geyser" of fire, "destroying one home, scorching three acres of land, forcing residents to flee, and knocking out power for over 1,500 people."[76]

49.    Thus, although not claimed as an alleged corrective disclosure, the Revolution Pipeline "explosion" is clearly corrective of the alleged misstatements. In fact, the Operative Complaint itself states that the incident revealed "the real threat the Pipeline Projects posed to Pennsylvania citizens after Energy Transfer had failed to act in compliance with state environmental, safety and criminal laws, as well as with its own Code of Conduct."[77]

50.    However, there was no statistically significant reaction in Energy Transfer's stock price on September 10, 2018, following the Revolution Pipeline incident.[78] In other words, Energy Transfer's stock price reaction on September 10, 2018, after controlling for market and industry factors, is within the range of normal expected daily variation in the stock price, and thus, is statistically indistinguishable from zero. The table below shows the results of the

---

[74]  Operative Complaint, ¶3.

[75]  Operative Complaint, ¶¶4, 21.

[76]  Operative Complaint, ¶¶4, 21.

[77]  Operative Complaint, ¶218.

[78]  News of the Revolution Pipeline incident was publicly disseminated during market hours on September 10, 2018, and thus, in an efficient market, any reaction in Energy Transfer's stock price to the release of this information would be expected to begin on September 10. See, for example, "Natural Gas Pipeline Blast in Beaver County Prompts Evacuation," *StateImpact Pennsylvania*, September 10, 2018, 12:25 p.m. (https://stateimpact.npr.org/pennsylvania/2018/09/10/natural-gas-pipeline-blast-in-beaver-county-prompts-evacuation/, last accessed February 15, 2022).

Coffman Report event study, as well as the Allen Report event study model, for September 10, 2018:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Energy Transfer Stock Price Reaction on September 10, 2018** | | | | | | | |
| **Event Study Model** | **Company Return** | **Market Index Return** | **Industry Index Return** | **Excess Return** | **t-stat** | **Statistically Significant?**[1] | |
| Coffman Report | 1.73% | 0.19% | -0.24% | 1.51% | 1.34 | No | |
| Allen Report | 1.73% | 0.19% | -0.14% | 1.72% | 1.66 | No | |

**Notes and Sources:**
Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

51.     The fact that the release of information that is clearly corrective of the alleged misrepresentations did not cause any statistically significant negative reaction in Energy Transfer's stock price is further evidence that the alleged misrepresentations did not have price impact.[79] Furthermore, the lack of any price reaction following the September 10, 2018 Revolution Pipeline incident seriously undermines Plaintiffs' contention that Energy Transfer's stock price reacted to other, less substantial events (including, for example, news articles published *after* the incident that discussed construction risks), and that any reaction to these events is evidence that the alleged misstatements had price impact when made.

52.     Along with no reaction to the September 10, 2018 Revolution Pipeline incident, Energy Transfer's stock price did not react following announcements of stop work orders and articles describing construction and safety issues on the Pipeline Projects published prior to the incident. These events disclosed the very information that Plaintiffs allege was concealed by the alleged misstatements, and in some cases are substantially similar to the later events/articles that Plaintiffs have alleged as corrective disclosures. Examples of these earlier events are as follows:

- July 19, 2017: *StateImpact Pennsylvania* published an article, based on "newly released documents" from the Pennsylvania DEP, reporting that "at least 61 drilling mud spills"

---

[79]   Energy Transfer's stock price actually increased on September 10, 2018, following the Revolution Pipeline incident (both in absolute terms and after controlling for market and industry factors), but this price increase is not statistically significant, and thus, is indistinguishable from normal expected daily variation in the stock price.

had occurred during the construction of ME2 between April 25 and June 17, 2017.[80] These spills ranged from "minor releases of five gallons" to "larger more serious releases of tens of thousands of gallons," and primarily contained bentonite, "a muddy clay substance used as a lubricant in drilling beneath waterways," which can "damage" drinking water wells and harm aquatic life. The article included, in their entirety, a number of the Pennsylvania DEP documents. There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- July 25, 2017: The *Philadelphia Inquirer* published an article reporting that a Pennsylvania Environmental Hearing Board had granted a two week halt to construction on ME2 in response to complaints by environmental groups that the process had "polluted local waterways in Pennsylvania" and "inflicted significant, irreparable harm upon the environment."[81] There was no statistically significant decline in Energy Transfer's stock price following news of this construction halt according to both the Coffman Report event study as well as the Allen Report event study model.

- January 3, 2018: The Pennsylvania DEP halted construction on ME2, citing "a series of spills and leaks of drilling fluid" and other "egregious and willful violations" of state law. The DEP further stated that Energy Transfer and its affiliated entities had "demonstrated a 'lack of ability or intention' to comply with the state's clean streams law and other environmental regulations."[82] There was no statistically significant decline in Energy Transfer's stock price following news of this construction halt according to both the Coffman Report event study as well as the Allen Report event study model.

- March 7, 2018: The Pennsylvania Public Utility Commission ("PUC") issued a stop work order on the Mariner East 1 ("ME1") Pipeline, citing the risk of sinkholes.[83] The PUC explained that it was concerned about the potential "catastrophic" consequences of continued operation of the line and risks to public safety if certain safety requirements were not met. There was no statistically significant decline in Energy Transfer's stock price following news of this stop work order according to both the Coffman Report event study as well as the Allen Report event study model.

---

[80] "Mariner East 2 Construction has Resulted in Dozens of Spills, Documents Show," *StateImpact Pennsylvania*, July 19, 2017, 10:36 p.m. (https://stateimpact.npr.org/pennsylvania/2017/07/19/mariner-east-2-construction-has-resulted-in-dozens-of-spills-documents-show/, last accessed February 23, 2022).

[81] "Pa. Judge Temporarily Halts Mariner East 2 Pipeline Drilling Construction," *Philadelphia Inquirer*, July 25, 2017. According to a tweet by the *Philadelphia Inquirer*, this article was published after market close (at 6:29 p.m.) on July 25. See, https://twitter.com/PhillyInquirer/status/889975928864067584 (last accessed February 15, 2022).

[82] "Pennsylvania Shuts Down Construction on Sunoco Gas Pipeline," *Associated Press Newswires*, January 3, 2018, 12:47 p.m. See, also, "State Stops Construction of Sunoco Gas Pipeline," *Pittsburgh Post-Gazette*, January 4, 2018.

[83] "PUC Shuts Down Mariner East 1 Pipeline, Citing Public Safety Concerns Raised by Sinkholes," *StateImpact Pennsylvania*, March 7, 2018, 12:05 p.m. See, also, "Pennsylvania Shuts Down Pipeline Over Sinkhole," *Associated Press Newswires*, March 7, 2018.

- March 8, 2018: The *Pittsburgh Post-Gazette* released an article describing the geological risks associated with the construction of the Pipeline Projects in Pennsylvania.[84] In particular, the article described the use of "horizontal directional drilling" to construct the Pipeline Projects, the risk of subsidence and sinkholes due to Eastern Pennsylvania's coal mining history and limestone geology, and concerns over contamination of local water supplies. There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- March 9, 2018: *StateImpact Pennsylvania* published an article detailing sinkholes, regulatory scrutiny, "unstable geology," and landowner complaints related to the Mariner East pipeline project.[85] There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- March 12, 2018: *FracTracker Alliance* published an article that detailed "the number, location, and status of ME2's HDD spills" and the "growing list of violations and settlements related to these events," and highlighted "the most recent concerns related to ME2's construction," including "sinkholes emerging along the pipeline's path in karst geological formations." The article concluded that, "[a]s illustrated by the continuing saga of spills, violations, and omissions, it is clear that Sunoco has not maintained a high standard of construction in building ME2 from the onset."[86] There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- March 22, 2018: *PhillyMag.com* published an article describing property that had been "plagued by sinkholes, intrusive workers, and mysterious security guards from out of state" based on issues related to the construction of the Mariner East pipeline project.[87] The article focuses on a resident who was reported to be "terrified for his life" after he came home to "roughly 1,000 gallons of drilling mud" that was "gushing" and flowing "like a river" through his yard. There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

---

[84] "Sunoco Gas Pipeline Temporarily Shut Down; Construction Blamed for Sinkholes Near Phila," *Pittsburgh Post-Gazette*, March 8, 2018. Note that this article included most of the information that was later repeated in the October 21, 2018 *Pittsburgh Post-Gazette* and October 27, 2018 *Associated Press* articles discussed in section VII D 1 below.

[85] "'It's Crazy, Man': Sinkholes, Sunoco's Pipeline Inspection Stir Safety Fears in Chester County," *StateImpact Pennsylvania*, March 9, 2018, 6:39 p.m. (https://stateimpact.npr.org/pennsylvania/2018/03/09/its-crazy-man-sinkholes-sunocos-pipeline-inspection-stir-safety-fears-in-chester-county/, last accessed February 15, 2022).

[86] "Mariner East 2: More Spills & More Sinkholes Too?" *FracTracker Alliance*, March 12, 2018 (https://www.fractracker.org/2018/03/me2-spills-sinkholes/, last accessed February 15, 2022).

[87] "'I'm Terrified': Life on the Front Lines of the Sunoco Pipeline," *PhillyMag.com*, March 22, 2018, 1:45 p.m. https://www.phillymag.com/news/2018/03/22/sunoco-mariner-east-pipeline-sinkholes/ (last accessed February 15, 2022).

- April 6, 2018: The *Philadelphia Inquirer* published an article providing extensive details on the water contamination issues connected to the construction of ME2.[88] The article described how drilling associated with the pipeline had "fouled" water wells and caused residents' drinking water to turn "smelly and cloudy." There was no statistically significant decline in Energy Transfer's stock price following the publication of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- April 17, 2018: Greenpeace USA and Waterkeeper Alliance release a report claiming that, between 2002 and 2017, pipelines operated by Energy Transfer and its associated entities had spilled 3.6 million gallons of hazardous liquids and produced an estimated $115 million in property damage. The report also stated that state agencies and the Federal Energy Regulatory Commission ("FERC") had issued over 100 notices of violation and/or non-compliance regarding the construction of the Mariner East system, and six stop work orders in 2017-2018.[89] There was no statistically significant decline in Energy Transfer's stock price following news of this stop work order according to both the Coffman Report event study as well as the Allen Report event study model.

- May 24, 2018: A Pennsylvania judge halted construction of ME2 and ME2x, and suspended operation of ME1, citing an "imminent risk to the public" and potential for a "catastrophic event" to occur.[90] The judge specifically criticized Energy Transfer for its "decisions to proceed in what appears to be a rushed manner in an apparent prioritization of profit over the best engineering practices" and consideration for public safety.[91] There was no statistically significant decline in Energy Transfer's stock price following news of this stop work order according to both the Coffman Report event study as well as the Allen Report event study model.

- June 1, 2018: The *Philadelphia Inquirer* published an article describing the history of Mariner East pipeline construction issues and detailing the ways in which the construction had negatively affected real estate values along the pipeline's route.[92] There was no statistically significant decline in Energy Transfer's stock price following news of this article according to both the Coffman Report event study as well as the Allen Report event study model.

- June 14, 2018: *StateImpact Pennsylvania* published an article reporting that, while the PUC had lifted a stop work order for ME1, the PUC voted to continue the shutdown for

---

[88] "How Sunoco's Drilling Methods May be Causing Mariner East 2's Problems," *Philadelphia Inquirer*, April 6, 2018.

[89] "Oil and Water: ETP and Sunoco's History of Pipeline Spills," April 17, 2018 (https://www.greenpeace.org/usa/oil-water-etp-sunocos-history-pipeline-spills/, accessed December 14, 2021).

[90] "Mariner East Construction, Operation Halted Again in Chester County," *StateImpact Pennsylvania*, May 24, 2018, 12:03 p.m. (https://stateimpact.npr.org/pennsylvania/2018/05/24/mariner-east-construction-operation-halted-again-in-chester-county/, last accessed February 15, 2022).

[91] "Judge Shuts Down Work on Sunoco Pipelines, Cites Danger," *Pittsburgh Post-Gazette*, May 24, 2018, 5:09 p.m.

[92] "How Sunoco's Mariner East Pipeline is Affecting Real Estate Prices in Pa.'s Chester and Delaware Counties," *Philadelphia Inquirer*, June 1, 2018.

all construction on ME2 and ME2x in Chester County in light of ongoing safety concerns.[93] There was no statistically significant decline in Energy Transfer's stock price following the publication of the news of the continued stop work order according to both the Coffman Report event study as well as the Allen Report event study model.

53.    The results of the Coffman Report event study as well as the Allen Report event study model following these events are shown in the table below:

### Price Reactions Following News Relating to Construction and Safety Issues On the Pipeline Projects Prior to 9/10/18

| | Event Date | Reaction Date | Event | Coffman Event Study | | Allen Event Study | |
|---|---|---|---|---|---|---|---|
| | | | | Excess Return | Statistically Significant?[1] | Excess Return | Statistically Significant?[1] |
| 1. | 7/19/17 | 7/20/17 | *StateImpact Pennsylvania* Article | 0.36% | No | -0.06% | No |
| 2. | 7/25/17 | 7/26/17 | *Philadelphia Inquirer* Article | -0.67% | No | -0.52% | No |
| 3. | 1/3/18 | 1/3/18 | DEP Order | -1.06% | No | -1.98% | No |
| 4. | 3/7/18 | 3/7/18 | PUC Order | -0.59% | No | -0.75% | No |
| 5. | 3/8/18 | 3/8/18 | *Pittsburgh Post-Gazette* Article | 0.57% | No | 0.23% | No |
| 6. | 3/9/18 | 3/12/18 | *StateImpact Pennsylvania* Article | 0.00% | No | -0.34% | No |
| 7. | 3/12/18 | 3/12/18 | *FrackTracker Alliance* Article | 0.00% | No | -0.34% | No |
| 8. | 3/22/18 | 3/22/18 | *PhillyMag.com* Article | 0.61% | No | 0.22% | No |
| 9. | 4/6/18 | 4/6/18 | *Philadelphia Inquirer* Article | 0.63% | No | 0.09% | No |
| 10. | 4/17/18 | 4/17/18 | *Greenpeace* Report | 2.38% | No | 1.90% | No |
| 11. | 5/24/18 | 5/24/18 | PA judge halts ME2 construction | -1.34% | No | -1.23% | No |
| 12. | 6/1/18 | 6/1/18 | *Philadelphia Inquirer* Article | 0.51% | No | 0.14% | No |
| 13. | 6/14/18 | 6/14/18 | *StateImpact Pennsylvania* Article | 0.18% | No | 0.08% | No |

**Notes and Sources:**
Events from Operative Complaint. Data from Factset Research Systems, Inc. and "ET_COFFMAN_0000014.XLSX."
[1]  Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

54.    In sum, the fact that Energy Transfer's stock price did not react to the September 10, 2018 Revolution Pipeline "explosion" – an event that Plaintiffs themselves cite as a "materialization" of the risks allegedly concealed by Energy Transfer – as well as to earlier

---

[93]  "PUC Keeps Lid on Mariner East 2 Work, but Allows ME1 to Re-start," *StateImpact Pennsylvania*, June 14, 2018, 11:35 a.m. (https://stateimpact.npr.org/pennsylvania/2018/06/14/puc-keeps-lid-on-mariner-east-2-work-but-allows-me1-to-re-start/, last accessed February 15, 2022). See, also, "PUC Allows Contentious Mariner East 1 Pipeline to Restart," *Philadelphia Inquirer*, June 14, 2018.

disclosures of construction and safety issues on the Pipeline Projects severs the link between the alleged misstatements and Energy Transfer's stock price and demonstrates that the alleged misstatements did not have price impact.

### C. Energy Transfer's stock price did not decline following the four alleged corrective disclosures that provided new, corrective information, which is clear evidence of no price impact

#### 1. Energy Transfer's stock price did not react following the August 9, 2018 announcement of the so-called "Frankenpipe"

55.     On August 9, 2018, Energy Transfer held a conference call to discuss its earnings for 2Q18. According to Plaintiffs, Energy Transfer allegedly revealed that "it will not complete ME2 on time," and will instead seek to achieve "reduced flows on the pipeline" by joining 20-inch diameter ME2 pipes to 12-inch "older, existing pipes," thereby creating a so-called "Frankenpipe."[94] Plaintiffs claim that this disclosure revealed the "truth" about the alleged misstatements and caused Energy Transfer's stock price to decline.[95]

56.     However, contrary to Plaintiffs' claims, there was no statistically significant decline in Energy Transfer's stock price on August 9, 2018, following the 2Q18 conference call, according to both the Coffman Report event study as well as the Allen Report event study model.[96] The fact that the release of the very information that Plaintiffs themselves claim was corrective of the alleged misrepresentations did not cause any statistically significant reaction in Energy Transfer's stock price affirmatively demonstrates that the alleged misrepresentations did not have price impact. The table below shows the results of the event study models for August 9, 2018:

---

[94]   Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 5-6.

[95]   Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 5-6.

[96]   The 2Q18 conference call occurred before market open on August 9, and thus, in an efficient market, any reaction in Energy Transfer's stock price to the release of this information would be expected to begin on August 9. See, for example, "Energy Transfer Equity Reports Second Quarter Results," *Business Wire*, August 8, 2018 ("The Partnership has scheduled a conference call for 8:00 a.m. Central Time, Thursday, August 9, 2018 to discuss its second quarter 2018 results.").

33

| | | Energy Transfer Stock Price Reaction on August 9, 2018 | | | | |
|---|---|---|---|---|---|---|
| Event Study Model | Company Return | Market Index Return | Industry Index Return | Excess Return | t-stat | Statistically Significant?[1] |
| Coffman Report | -0.92% | -0.12% | -0.68% | -0.54% | -0.45 | No |
| Allen Report | -0.92% | -0.14% | -0.12% | -0.78% | -0.72 | No |

**Notes and Sources:**
Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

57.     Moreover, no portion of the price reaction on August 9, 2018 can, in an efficient market, be attributed to the alleged misstatements because the allegedly corrective information regarding ME2 was not new news. In particular, as Plaintiffs themselves acknowledge, news that Energy Transfer was "planning to pump NGLs through an existing 12-inch pipeline" was publicly disclosed on July 3, 2018, over a month prior to the alleged corrective disclosure.[97] As noted above, in an efficient market, stock prices react rapidly to incorporate new information when it is released and do not react in response to stale news (*i.e.*, news that has been previously disclosed and has already been impounded into the stock price, including confirmatory or repeated news).[98] Furthermore, there was no statistically significant reaction in Energy Transfer's stock price on July 5, 2018, after the allegedly corrective information about ME2 and the 12-inch pipe was first released,[99] according to the Coffman Report event study as well as the Allen Report event study model. Thus, the market reaction on August 9, 2018 provides no evidence that the alleged misstatements had price impact when made.[100]

---

[97]   Operative Complaint, ¶171, citing "Sunoco Wants to Use Older Pipeline to Pump NGLs Over Unfinished Sections of ME2," *StateImpact Pennsylvania*, July 3, 2018, 5:27 p.m.

[98]   See ¶21 above, including, for example, Expert Rebuttal Report of Chad Coffman, *In Re. Banco Bradesco S.A. Securities Litigation* (1:16-cv-04155), dated December 14, 2018 ("I agree that statements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market.").

[99]   The article disclosing the allegedly corrective information was published after market close (at 5:27 p.m.) on July 3, 2018 and thus, in an efficient market, any reaction in Energy Transfer's stock price to the release of this article would be expected to begin on the next trading day, July 5.

[100]   Note that of the four analysts that issued reports on Energy Transfer on August 9, 2018, only two – Bank of America and Morgan Stanley – discussed Company's use of an existing pipeline on ME2. However, neither analyst provided any indication that the news negatively impacted their estimates of ME2's completion or of Energy Transfer's future financial performance. See, Bank of America analyst report, dated August 9, 2018

34

58.     Along with the 2Q18 conference call, it appears that Plaintiffs are claiming two analyst reports issued on August 10, 2018 – by Wells Fargo and Wolfe Research – as part of the alleged corrective disclosure.[101] According to Plaintiffs, these analyst reports provided "further clarification" of Energy Transfer's August 9 disclosures and supposedly "criticized" Energy Transfer for its "confusing" discussion of ME2 on the 2Q18 conference call.[102] However, the release of these analyst reports did not impact Energy Transfer's stock price and the reports did not provide any information corrective of the alleged misstatements, as detailed below.

59.     First, there was no statistically significant decline in Energy Transfer's stock price on August 10, 2018, following the release of the two analyst reports before the start of trading on that date.[103] The table below shows the results of the Coffman Report event study and the Allen Report event study model for August 10, 2018:

| **Energy Transfer Stock Price Reaction on August 10, 2018** | | | | | | |
|---|---|---|---|---|---|---|
| **Event Study Model** | **Company Return** | **Market Index Return** | **Industry Index Return** | **Excess Return** | **t-stat** | **Statistically Significant?**[1] |
| Coffman Report | -0.93% | -0.68% | 1.13% | -0.96% | -0.82 | No |
| Allen Report | -0.93% | -0.71% | 0.58% | -1.30% | -1.21 | No |

**Notes and Sources:**
Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

---

("The conversion of an existing pipeline would allow ETE to put ME II into service around the end of 3Q18.") and Morgan Stanley analyst report, dated August 9, 2018 ("Management confirmed their use of an existing pipeline to facilitate timely in-service for Mariner East 2. The existing pipeline will allow for them to meet their contractual commitments with shippers and enable an in-service date by the end of 3Q18.").

[101] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 5-6.

[102] Operative Complaint, ¶¶405-406.

[103] The Wells Fargo report explicitly included a timestamp of 7:59 a.m., while the Wolfe Research report was posted at 7:56 a.m. according to S&P Capital IQ, a widely used provider of financial data (and one that Mr. Coffman relies on). Thus, the Wells Fargo and the Wolfe Research analyst reports were both published before market open on August 10, and, in an efficient market, any reaction in Energy Transfer's stock price to the release of these reports would be expected to begin on August 10.

35

60.     Second, contrary to Plaintiffs' claims, neither the Wolfe Research nor the Wells Fargo reports stated that the news about ME2 on August 9 had constituted a substantial delay or had substantially changed their estimates of Energy Transfer's future financial performance. In particular, the Wolfe Research analysts explained that, while the ME2 timeline was "messier than expected," the expected volumes were in the range of what the analysts had modeled:

> Mariner East is messier than expected but **consistent with our conservative modeling**. Discussion of ME 2 on the call was confusing. We talked to the company afterward. The "interim solution" with re-purposing of pipes is **large enough to satisfy contracts** plus some walk-up volumes. […] While transparency and disclosure on this project are very low, **we are comfortable** with the conservative contribution we assume in our outlook. [Wolfe Research, 8/10/18, emphasis added]

61.     The Wells Fargo analysts similarly stated that the news about ME2 was not substantial enough to change their estimates of the Company's future financial performance:

> During the call, management provided an updated timeline for ME2 and ME2X, which seemed to confuse the market. We followed up with the company post the earnings call to gain clarity and present our understanding below. Importantly, ME2X is, by and large, NOT being delayed to 2020 but is still scheduled to (mostly) come into service in Q3'19. […] By and large, **our pro forma ETE estimates do not materially change post the release of Q2 earnings**. [Wells Fargo, 8/10/18, emphasis original]

Thus, there is no market reaction following the release of these analyst reports that can be linked to the alleged misstatements and/or that can provide any evidence that the alleged misstatements had price impact when made.

62.     Note that the Operative Complaint appears to suggest that the movement in Energy Transfer's stock price on the following trading day – Monday, August 13, 2018 – is evidence of price impact of the alleged misstatements.[104] However, Plaintiffs have not pointed to *any* allegedly corrective information disclosed between the close of trading on August 10, 2018 and the close of trading on August 13, 2018, and thus, any reaction in Energy Transfer's stock price on August 13, 2018 cannot be evidence of price impact of the alleged misstatements.

63.     Any attempt to attribute the movement in Energy Transfer's stock price on August 13, 2018 to the Wells Fargo and Wolfe Research analyst reports that were published prior to market open on August 10, 2018 would contradict Plaintiffs' and Mr. Coffman's claim

---

[104] Operative Complaint, ¶408.

that Energy Transfer's stock traded in an efficient market. This is because, as discussed above, in an efficient market stock prices react rapidly to impound new information when it is released, and one would expect a stock to begin reacting to new information no later than the first trading day on which the news was publicly disseminated (in this case, August 10).[105] Thus, in an efficient market, any reaction in Energy Transfer's stock price on August 13, 2018 cannot be attributable to the release of any allegedly corrective information and cannot be evidence of price impact of the alleged misstatements.

### 2. Energy Transfer's stock price did not react following the December 19, 2018 announcement of the Chester County DA's investigation of the Company

64. On December 19, 2018, Tom Hogan, the District Attorney for Chester County, Pennsylvania, issued a press release announcing an investigation into Energy Transfer related to the construction of the Pipeline Projects and stating that he would "bring into play all of the tools of the criminal justice system" against the Company.[106] Plaintiffs claim that this disclosure revealed the "truth" about the alleged misstatements and caused Energy Transfer's stock price to decline.[107]

65. However, contrary to Plaintiffs' claims, there was no statistically significant decline in Energy Transfer's stock price on December 19, 2018, following the announcement of the DA's investigation, according to both the Coffman Report event study as well as the Allen Report event study model.[108] The fact that the release of the very information that Plaintiffs themselves claim was corrective of the alleged misrepresentations did not cause any statistically

---

[105] See ¶22 above, including Deposition of Chad Coffman, *Lewis Cosby et al., v. KPMG LLP* (3:16-cv-00121), dated April 12, 2019, 63:25-64:2 ("[G]enerally in an efficient market, you expect to see a reaction the first day."). In other words, if it took Energy Transfer's stock multiple days to *begin* reacting to the Wells Fargo and Wolfe Research analyst reports, that would be contrary to Mr. Coffman's claim that Energy Transfer's stock price "adjust[ed] to new publicly available information rapidly and in an unbiased fashion" such that it was "impossible" to profit by trading on already-disclosed information. See, Coffman Report, ¶18.

[106] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 6-7.

[107] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 6-7.

[108] The DA's press release was publicly released during market hours on December 19, and thus, any reaction in Energy Transfer's stock price would be expected to begin on December 19. See, for example, a tweet by NBC News reporter Deanna Durante reporting on the investigation and attaching the press release published at 11:36 a.m. (https://twitter.com/deannadurante/status/1075429618981765120?s=20, last accessed February 28, 2022).

37

significant reaction in Energy Transfer's stock price affirmatively demonstrates that the alleged misrepresentations did not have price impact. The table below shows the results of the Coffman Report event study and the Allen Report event study model for December 19, 2018:

| Energy Transfer Stock Price Reaction on December 19, 2018 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Event Study Model | Company Return | Market Index Return | Industry Index Return | Excess Return | t-stat | Statistically Significant?[1] |
| Coffman Report | 0.23% | -1.53% | 0.32% | 1.85% | 1.39 | No |
| Allen Report | 0.23% | -1.54% | -0.53% | 1.30% | 1.00 | No |

**Notes and Sources:**
  Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

66.     Further evidence demonstrating no market reaction to the announcement of the DA's investigation, and thus, no price impact of the alleged misrepresentations is the fact that there were no analyst reports on Energy Transfer published following the December 19 alleged corrective disclosure. As discussed above, analysts typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst reports is consistent with the lack of a price reaction, and demonstrates that the allegedly corrective information was not important to the market's valuation of Energy Transfer or its stock.

67.     Note that the Operative Complaint suggests that the movement in Energy Transfer's stock price on the following two trading days – December 20, 2018 and December 21, 2018 – is attributable to the announcement of the DA's investigation.[109] However, Plaintiffs' claim is incorrect for the following reasons.

68.     First, any reaction in Energy Transfer's stock price on December 20, 2018 cannot be due to the DA's investigation because, as noted above, news of the investigation was publicly

---

[109] Operative Complaint, ¶416.

released during market hours on December 19.[110] Thus, any reaction in Energy Transfer's stock price would be expected to begin on December 19, not December 20.[111] Moreover, even if Plaintiffs' claim were correct (which it is not), there was **_no_** statistically significant decline in Energy Transfer's stock price on December 20, 2018 according to both the Coffman Report event study as well as the Allen Report event study model. Thus, the market reaction on December 20, 2018 provides no evidence that the alleged misstatements had price impact when made.

69.     Second, given that news of the DA's investigation was publicly disseminated during market hours on December 19, any attempt to attribute the movement in Energy Transfer's stock price on December 21 to the investigation would contradict Plaintiffs' and Mr. Coffman's claim that Energy Transfer's stock traded in an efficient market. As discussed above, in an efficient market stock prices react rapidly to impound new information when it is released and one would expect a stock to begin reacting to new, material news on the first trading day on which the news was publicly disseminated (in this case, on December 19, not two days later).[112] Furthermore, Plaintiffs' suggestion that the news of the DA's investigation was not publicly disseminated until late in the afternoon on December 20[113] is plainly incorrect given that major news sources, including the *Associated Press*, reported on the investigation on December 19.[114] Thus, in an efficient market, any reaction in Energy Transfer's stock price on December 21, 2018 cannot be attributable to the release of any allegedly corrective information and cannot be evidence of price impact of the alleged misstatements.

---

[110] See, for example, a tweet by NBC News reporter Deanna Durante reporting on the investigation and attaching the DA's press release published at 11:36 a.m. (https://twitter.com/deannadurante/status/1075429618981765120?s=20, last accessed February 28, 2022).

[111] See ¶22 above, including Deposition of Chad Coffman, *Lewis Cosby et al., v. KPMG LLP* (3:16-cv-00121), dated April 12, 2019, 63:25-64:2 ("[G]enerally in an efficient market, you expect to see a reaction the first day.").

[112] See ¶22 above, including Deposition of Chad Coffman, *Lewis Cosby et al., v. KPMG LLP* (3:16-cv-00121), dated April 12, 2019, 63:25-64:2 ("[G]enerally in an efficient market, you expect to see a reaction the first day.").

[113] Operative Complaint, ¶415.

[114] See, for example, "Prosecutor Opens Investigation on Mariner East Pipeline Work," *Associated Press*, December 19, 2018.

> **3.** **Energy Transfer's stock price did not react following the August 8, 2019 announcement that two Pennsylvania constables who were allegedly "bribed" by the Company to "intimidate" local residents had been arrested**

70. On August 8, 2019, Chester County DA Tom Hogan announced that two Pennsylvania state constables who were allegedly hired by Energy Transfer to "guard pipeline construction sites" and "intimidate" local citizens had been arrested and charged with bribery.[115] Plaintiffs claim that this disclosure revealed the "truth" about the alleged misstatements and caused Energy Transfer's stock price to decline.[116]

71. However, contrary to Plaintiffs' claims, instead of a price decline, there was a statistically significant ***increase*** in Energy Transfer's stock price on August 8, 2019, despite the announcement of the constable arrests, according to both the Coffman Report event study as well as the Allen Report event study model.[117] The fact that the release of the very information that Plaintiffs themselves claim was corrective of the alleged misrepresentations did not cause any statistically significant decline in Energy Transfer's stock price (and instead, was associated with a price increase) affirmatively demonstrates that the alleged misrepresentations did not have price impact. The table below shows the results of the Coffman Report event study and the Allen Report event study model for August 8, 2019:

---

[115] Operative Complaint, ¶¶6, 24. See, also, Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7.

[116] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7.

[117] News of the arrests was publicly released during market hours on August 8, and thus, any reaction in Energy Transfer's stock price would be expected to begin on August 8. See, for example, "State Constables Charged With Oppression At Mariner East Pipeline," *Patch.com*, August 8, 2019, 1:12 p.m. and "Two State Constables Arrested for Illegal Work as Security Contractors on Mariner East Pipeline Project in Chester County," *Fox43*, August 8, 2019, 1:47 p.m.

Note that Energy Transfer's stock was trading at a price of $13.91 immediately prior to the publication of these news reports on the constable arrests on August 8, 2019, and subsequently closed at $14.03 at the end of the day. In other words, the intraday data does not show any decline in Energy Transfer's stock price following the alleged corrective disclosure. Based on intraday data from Tick Data, LLC and Bloomberg, L.P.

**Energy Transfer Stock Price Reaction on August 8, 2019**

| Event Study Model | Company Return | Market Index Return | Industry Index Return | Excess Return | t-stat | Statistically Significant?[1] |
|---|---|---|---|---|---|---|
| Coffman Report | 5.25% | 1.90% | 1.10% | 2.92% | 2.96 | Yes |
| Allen Report | 5.25% | 1.88% | 2.22% | 3.31% | 3.45 | Yes |

**Notes and Sources:**
Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

72.     Further evidence demonstrating no market reaction to the announcement of the constable arrests, and thus, no price impact of the alleged misrepresentations is the fact that there were no analyst reports on Energy Transfer published following the August 8, 2019 alleged corrective disclosure that mentioned the allegedly corrective information. In particular, there were two analyst reports on Energy Transfer published in the week following the August 8 alleged corrective disclosure – both on August 8 – and these reports made **_no_** mention of the constable arrests. Instead, these analyst reports focused on Energy Transfer's 2Q19 earnings that were announced after market close on the prior day, August 7.[118] As discussed above, analysts typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst commentary is consistent with the lack of a price reaction, and demonstrates that the allegedly corrective information was not important to the market's valuation of Energy Transfer or its stock.

73.     Note that while the Operative Complaint asserts that the announcement of the constable arrests occurred after market close on August 8, 2019,[119] this claim is factually incorrect since, as noted above, news articles reporting on the arrests were publicly released

---

[118] "Energy Transfer Reports Second Quarter 2019 Results," *Business Wire*, August 7, 2019, 4:30 p.m. Analysts' comments on the 2Q19 earnings announcement are discussed in ¶¶34-36 above.

[119] Operative Complaint, ¶418.

41

during market hours on August 8.[120] Thus, any reaction in Energy Transfer's stock price would be expected to begin on August 8, 2019. Moreover, even if Plaintiffs' claim were correct (which it is not), there was **_no_** statistically significant decline in Energy Transfer's stock price on August 9, 2019 according to both the Coffman Report event study as well as the Allen Report event study model. Thus, the market reaction on August 9, 2019 provides no evidence that the alleged misstatements had price impact when made.

74.	In addition, the Operative Complaint suggests that the movement in Energy Transfer's stock price on August 12, 2019 is attributable to the news of the constable arrests.[121] However, given that news of the constable arrests was publicly disseminated during market hours on August 8, any attempt to attribute the movement in Energy Transfer's stock price on August 12 to the investigation would contradict Plaintiffs' and Mr. Coffman's claim that Energy Transfer's stock traded in an efficient market. As discussed above, in an efficient market stock prices react rapidly to impound new information when it is released and one would expect a stock to begin reacting to new information on the first trading day on which the news was publicly disseminated (in this case, on August 8, not two trading days later).[122] Thus, in an efficient market, any reaction in Energy Transfer's stock price on August 12, 2019 cannot be attributable to the release of any allegedly corrective information and cannot be evidence of price impact of the alleged misstatements.

### 4.	Energy Transfer's stock price did not react following the December 3, 2019 announcement of "criminal bribery and conspiracy charges" against the Company's head of security for the Mariner East project

75.	On December 3, 2019, Chester County DA Tom Hogan issued a press release announcing "criminal bribery and conspiracy" charges against Energy Transfer's head of security for the Mariner East system in connection with the alleged hiring of Pennsylvania state

---

[120] See, for example, "State Constables Charged With Oppression At Mariner East Pipeline," *Patch.com*, August 8, 2019, 1:12 p.m. and "Two State Constables Arrested for Illegal Work as Security Contractors on Mariner East Pipeline Project in Chester County," *Fox43*, August 8, 2019, 1:47 p.m.

[121] Operative Complaint, ¶421.

[122] See ¶22 above, including Deposition of Chad Coffman, *Lewis Cosby et al., v. KPMG LLP* (3:16-cv-00121), dated April 12, 2019, 63:25-64:2 ("[G]enerally in an efficient market, you expect to see a reaction the first day.").

42

constables to provide security for the Pipeline Projects.[123] Plaintiffs claim that this disclosure revealed the "truth" about the alleged misstatements and caused Energy Transfer's stock price to decline.[124]

76.      However, contrary to Plaintiffs' claims, there was no statistically significant decline in Energy Transfer's stock price on December 3, 2019, following the announcement of the bribery charges, according to both the Coffman Report event study as well as the Allen Report event study model. The fact that the release of the very information that Plaintiffs themselves claim was corrective of the alleged misrepresentations did not cause any statistically significant reaction in Energy Transfer's stock price affirmatively demonstrates that the alleged misrepresentations did not have price impact. The table below shows the results of the Coffman Report event study and the Allen Report event study model for December 3, 2019:

| | | | | | | |
|---|---|---|---|---|---|---|
| **Energy Transfer Stock Price Reaction on December 3, 2019** | | | | | | |
| **Event Study Model** | **Company Return** | **Market Index Return** | **Industry Index Return** | **Excess Return** | **t-stat** | **Statistically Significant?**[1] |
| Coffman Report | -1.98% | -0.66% | -0.70% | -0.85% | -0.64 | No |
| Allen Report | -1.98% | -0.66% | -1.65% | -0.45% | -0.33 | No |

**Notes and Sources:**
Data from FactSet Research Systems, Inc., "ET_COFFMAN_0000014.xlsx" and "ET_COFFMAN_0000031.XLSX."
[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price movement is statistically significant at the 5% level.

77.      Further evidence demonstrating no market reaction to the announcement of the constable arrests, and thus, no price impact of the alleged misrepresentations is the fact that there were no analyst reports on Energy Transfer published following the December 3, 2019 alleged corrective disclosure that mentioned the allegedly corrective information. In particular, there was only one analyst report on Energy Transfer published in the week following the December 3 alleged corrective disclosure – a December 5 report by Wells Fargo – and this report made ***no***

---

[123]  Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, pp. 7-8.

[124]  Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 8.

mention of the bribery charges. Instead, the December 5 Wells Fargo report focused on Energy Transfer's acquisition of SemGroup Corporation, a pipeline company,[125] which was completed that day.[126] As discussed above, analysts typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst commentary is consistent with the lack of a price reaction, and demonstrates that the allegedly corrective information was not important to the market's valuation of Energy Transfer or its stock.[127]

### D. The two alleged corrective disclosures following which Energy Transfer's stock price did react did not provide any new, corrective information, and thus, any price decline is <u>not</u> evidence of price impact of the alleged misstatements

#### 1. The decline in Energy Transfer's stock price on October 29, 2018 is <u>not</u> evidence of price impact of the alleged misstatements

78. Plaintiffs claim two allegedly corrective events that supposedly caused Energy Transfer's stock price to decline on October 29, 2018 – (i) on Saturday, October 27, when the *Associated Press* reprinted an "exposé" from the *Pittsburgh Post-Gazette* allegedly "detailing Energy Transfer's failure to disclose the risks Pennsylvania's geology posed to the Pipeline Projects," and (ii) on Monday, October 29, when Plaintiffs claim the Pennsylvania DEP "ordered construction of Energy Transfer's Revolution Pipeline to cease, after inspections the prior week

---

[125] For example, the title of the December 5 Wells Fargo Report was: "ET: Updating Model For SEMG Merger."

[126] "Energy Transfer and SemGroup Announce Successful Completion of Merger," *Business Wire*, December 5, 2019, 9:05 a.m.

[127] Note that the conduct underlying the December 3, 2019 announcement was not new to the market. Rather, as discussed in section VII C 3 above, Chester County DA Tom Hogan had already charged two Pennsylvania constables in connection with the alleged "buy-a-badge" scheme. The only new information disclosed on December 3, 2019 was that DA Hogan was also bringing a charge against an Energy Transfer employee in connection with the already-disclosed conduct – however, the charges against the employee, Frank Recknagel, were eventually dismissed. See, for example, "Charges Dismissed Against Pipeline Security Manager in Constable Case," *Delaware Valley Journal*, June 26, 2020 and "Charges Dismissed in Alleged Mariner East Buy-A-Badge Scheme," *StateImpact Pennsylvania*, July 2, 2020 (https://stateimpact.npr.org/pennsylvania/2020/07/02/charges-dismissed-in-alleged-mariner-east-buy-a-badge-scheme-chesco-residents-push-d-a-to-re-file-charges/, last accessed February 25, 2020).

44

revealed 'unreported landslides and erosion off the [Revolution] pipeline's construction sites into nearby streams.'"[128]

79.     While there was a statistically significant decline in Energy Transfer's stock price on October 29, 2018, this decline is not evidence of price impact of the alleged misstatements for a number of reasons including the following.

80.     First, the DEP stop work order that Plaintiffs claim was released on October 29, was actually publicly released the next day, October 30,[129] and thus, could not have caused the October 29 price drop. In other words, Plaintiffs have simply identified the wrong date for the publication of the DEP order. The October 29 price decline was, therefore, not caused by the release of any new, corrective information and thus, is not evidence that the alleged misstatements had price impact when made. (Note that there was no statistically significant decline in Energy Transfer's stock price on October 30, 2018 according to both the Coffman Report event study as well as the Allen Report event study model.)

81.     Second, the October 27 *Associated Press* article cited by Plaintiffs could not have caused the October 29 price drop because it was not new news. In particular, the October 27 article was previously published by the *Associated Press* on October 23,[130] and originally appeared in the *Pittsburgh Post-Gazette* on Sunday, October 21, 2018.[131] As discussed above, in

---

[128] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 6.

[129] The DEP's press release announcing the stop work order was issued on October 30, 2018 and stated that the DEP had "today issued" the order. See, for example, "DEP Issues Compliance Order To ETC For Violations On Revolution Pipeline," dated October 30, 2018 (https://www.media.pa.gov/Pages/DEP_details.aspx?newsid=1091, last accessed February 28, 2022). Furthermore, it is my understanding that the DEP, in response to a Right-to-Know request issued by counsel for the Defendants in this action, indicated that it possessed no records of this press release being disseminated, published, or externally communicated prior to October 30, 2018.

[130] "Pipeline Ruptures Bring New Scrutiny to Pennsylvania Geology," *Associated Press Newswires*, October 23, 2018, 12:11 p.m. There was no statistically significant decline in Energy Transfer's stock price on October 23, 2018 according to both the Coffman Report event study as well as the Allen Report event study model.

[131] "As New Pipelines Cut Into Appalachia, Rain, Slides, Coal Mines Bedevil Projects; Subsidence Proves Disruptive Force," *Pittsburgh Post-Gazette*, October 21, 2018.

Note that while there was a statistically significant decline in Energy Transfer's stock price on October 22, 2018, there is no evidence linking this decline to the October 21 *Post-Gazette* article. In particular, the October 21 *Pittsburgh Post-Gazette* article did not reveal any new, corrective information, and instead merely repeated previously disclosed information, including the use of "horizontal directional drilling" to construct the Pipeline Projects, the risk of subsidence and sinkholes due to Eastern Pennsylvania's coal mining history and limestone geology, and the September 2018 Revolution Pipeline incident. These issues had all been previously disclosed to

45

an efficient market, stock prices react rapidly to incorporate new information when it is released and do not react in response to stale news (*i.e.*, news that has been previously disclosed and has already been impounded into the stock price, including confirmatory or repeated news).[132] Thus, if the market for Energy Transfer's stock was efficient, as Plaintiffs and Mr. Coffman claim, then the October 29 price decline could not have been caused by the October 27 *Associated Press* article and provides no evidence of price impact of the alleged misstatements.

82.     Third, the allegedly corrective information in the October 27 *Associated Press* article and the DEP Order was not mentioned by any analyst covering Energy Transfer. In fact, there was only one analyst report on Energy Transfer published in the week of October 29 – an October 31 report by RBC Capital Markets – and this report made *no* mention of the allegedly corrective information. As discussed above, analysts typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst commentary demonstrates that the allegedly corrective information was not important to the market's valuation of Energy Transfer or its stock.

83.     Fourth, as discussed above, Energy Transfer's stock price did not react following earlier announcements of stop work orders and articles describing construction and safety issues on the Pipeline Project and, most notably, did not react to the "explosion" of the Revolution Pipeline on September 10, 2018. Not only did these events disclose the very information that Plaintiffs allege was concealed by the alleged misstatements and revealed by the alleged corrective disclosure, but in the case of the Revolution Pipeline incident, disclosed information

---

the market and, therefore, given Plaintiffs' claim of market efficiency, already impounded Energy Transfer's trading price before October 21, 2018 (see ¶52 above for examples of these prior disclosures).

Moreover, analysts covering Energy Transfer made *no* mention of the October 21 *Post-Gazette* article or the allegedly corrective information, and instead discussed the merger between ETE and ETP, which was completed on October 19, 2018, resulted in the combined Energy Transfer company, and was one of the largest transactions ever in the pipelines industry. Thus, any movement in Energy Transfer's stock price on October 22 is most likely attributable to volatility associated with the merger, including to changes in analyst coverage of the combined company and to market participants revising their valuation models and estimates of the combined company's future financial performance. See, "Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. Complete Merger, Simplify Structure," *Business Wire*, October 19, 2018.

[132] See ¶21 above, including Expert Rebuttal Report of Chad Coffman, *In Re. Banco Bradesco S.A. Securities Litigation* (1:16-cv-04155), dated December 14, 2018 ("I agree that statements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market.").

46

that was far more serious than the October 27, 2018 *Associated Press* article. As noted above, the lack of any price reaction following the Revolution Pipeline incident seriously undermines Plaintiffs contention that Energy Transfer's stock price reacted to other, less substantial events (such as the October 27 *Associated Press* article) and is further evidence that the October 29, 2018 price drop was *not* caused by the release of any new, corrective information and is *not* evidence that the alleged misstatements had price impact when made.

### 2. The decline in Energy Transfer's stock price on November 12, 2019 is _not_ evidence of price impact of the alleged misstatements

84. On November 12, 2019, the *Associated Press* published an article reporting that the FBI was investigating the permitting process for ME2 and whether the administration of Pennsylvania governor Tom Wolf had "forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."[133] The article never suggests Energy Transfer or any of its subsidiaries or employees were being investigated or were accused of any wrongdoing. Plaintiffs claim that this disclosure revealed the "truth" about the alleged misstatements and caused Energy Transfer's stock price to decline.[134]

85. The Operative Complaint attributes the movement in Energy Transfer's stock price on November 12 and November 13, 2019 to the alleged corrective information.[135] However, while there was a statistically significant price decline over this period, this decline is not evidence of price impact of the alleged misstatements as the alleged corrective disclosure did not reveal any "truth" concealed by the alleged misstatements. In particular, following the Court's decision on Defendants' Motion to Dismiss, there is no link between the surviving alleged misstatements and/or misstatement categories and the allegedly corrective information released on November 12.

86. For example, although Plaintiffs allege misstatements associated with "criminal investigations and cases," the only two surviving alleged misstatements in this category are about

---

[133] Operative Complaint, ¶432 and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7, citing "FBI Eyes How Pennsylvania Approved Pipeline," *Associated Press*, November 12, 2019, 3:29 p.m.

[134] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed September 17, 2021, p. 7.

[135] Operative Complaint, ¶425.

Energy Transfer's alleged hiring of the Pennsylvania constables,[136] the "truth" of which was revealed on August 8, 2019 and December 2, 2019 (both to no statistically significant price reaction). The FBI investigation reported in the November 12 *Associated Press* article was about the permitting process for ME2, *not* the constable investigation,[137] and thus, there is no link between the surviving alleged misstatements and the allegedly corrective information regarding the FBI investigation released on November 12.

87.     Furthermore, there is no new news in the November 12 article that would be corrective of any of the *other* alleged misstatements. The only new information regarding the Pipeline Projects in the November 12 article was the news regarding the FBI investigation. The other information and allegations in the article were not new. In particular, while the November 12 article claimed that the Wolf administration had allegedly "appl[ied] pressure to approve the pipeline permits" and "push[ed] through incomplete permits that violated the law," this information had been previously disclosed. For example, a March 10, 2017 article published by *StateImpact Pennsylvania* stated that permits for ME2 had been approved even though Sunoco, the pipeline's builder, "had not met all regulatory requirements at the time of issuance" and Sunoco's permit applications contained "hundreds of deficiencies." In addition, the *StateImpact* article quoted a "former DEP official" who claims that the permits were issued because of "pressure from Gov. Tom Wolf's office to approve the documents" and that "some DEP staffers were threatened with dismissal from their jobs if they did not approve the permits."[138] A subsequent article published in January 2018, also by *StateImpact Pennsylvania*, detailed additional allegations that Governor Wolf had "injected political pressure into a decision that should be based solely on environmental standards" and that "those standards and regulations

---

[136] Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, pp. 41-42.

[137] It is my understanding that the Court similarly evaluated the alleged misstatements associated with Energy Transfer's "code of ethics" in the context of the "buy-a-badge scheme" and the alleged hiring of Pennsylvania state constables, and not in connection with the permitting process for ME2 and/or the FBI investigation. See, Memorandum of the Court on Defendants' Motion to Dismiss the Operative Complaint, filed April 6, 2021, p. 38 ("The "unwritten policy" of hiring uniformed officers described above, which I must assume to be true, directly contradicts the sensitive payments policy proffered in the Code of Ethics. […] Although Plaintiffs passingly refer to the FBI investigation of the permitting process when alleging that the Sensitive Payment policy was misleading, they do not allege anywhere in the complaint that payments were made to government officials. I do not rely on the FBI investigation in finding that the Code was in part misleading.").

[138] "DEP Approved Mariner East 2 Permits Despite Deficiencies, Documents Show," *StateImpact Pennsylvania*, March 10, 2017 (https://stateimpact.npr.org/pennsylvania/2017/03/10/dep-approved-mariner-east-2-permits-despite-deficiencies-documents-show/, last accessed February 15, 2022).

48

were subverted to help Sunoco make its projected timeline on the project."[139] In addition to the allegations regarding the Wolf Administration, the November 12 article summarized the already-public history of the ME2 project, including the stop work orders and DA investigations discussed in section VII C above. In an efficient market, this previously disclosed information would have already been impounded in Energy Transfer's stock price. Thus, the November 12 *Associated Press* article did not provide any new information that is corrective of the remaining alleged misstatements and, as a result, any decline in Energy Transfer's stock price following the release of this article is not evidence that the alleged misstatements had price impact when made.

88.     Furthermore, although the FBI investigation was reported by news publications, neither the FBI nor Energy Transfer confirmed the existence of the investigation (and, in fact, Energy Transfer explicitly denied knowledge of any investigation).[140] There has been no news or update on the investigation in the more than two years that have passed since the November 12, 2019 alleged corrective disclosure.

Lucy P. Allen

---

[139] "Mariner East 2: Texts Raise Questions About Wolf Administration Role in Permitting Process," *StateImpact Pennsylvania*, January 26, 2018 (https://stateimpact.npr.org/pennsylvania/2018/01/26/mariner-east-2-texts-raise-questions-about-wolf-administration-role-in-permitting-process/, last accessed February 15, 2022).

See, also, for example, "Pennsylvania Governor Under Scrutiny for Role in Approving Pipeline," *The Guardian*, April 8, 2019 ("Internal government records obtained by the Guardian raise questions about the role of Pennsylvania governor Tom Wolf in permitting construction of [ME2] […] Emails, text messages and regulatory records show that the secretary of Pennsylvania's department of environmental protection (DEP), Patrick McDonnell, directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application. The department also appeared to be under pressure from Wolf's office at the time.").

[140] See, for example, "FBI Now Investigating the Way in which Pennsylvania Approved Mariner East Pipeline," *Philadelphia Inquirer*, November 12, 2019 ("Energy Transfer said the company had not been contacted by the FBI about the Mariner East.").



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

Appendix A

## LUCY P. ALLEN
## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present    **National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993    **Council of Economic Advisers, Executive Office of the President**
Staff Economist.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups.  Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984    **Ayers, Whitmore & Company (General Management Consultants)**
Senior Associate.  Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

Marketing plan to increase international market share for major accounting firm.

Summer 1985      **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>. Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983      **Arthur Andersen & Company**
<u>Consultant</u>. Designed, programmed and installed management information systems. Participated in redesign/conversion of New York State's accounting system. Developed municipal bond fund management system, successfully marketed to brokers. Participated in President's Private Sector Survey on Cost Control (Grace Commission). Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992      <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," *Regulation*, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Case 2:20-cv-04730-DcoAM Document 108-54 Filed 04/06/25 01/17/22 Page 59 60 of 78 79

Testimony and Deposition Testimony before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

## Appendix B – Analyst Reports Considered

1. 2016.12.02 - RBC Capital Markets (1)
2. 2016.12.02 - RBC Capital Markets (2)
3. 2016.12.02 - RBC Capital Markets (3)
4. 2016.12.05 - Bank of Montreal
5. 2016.12.09 - Wells Fargo Securities, LLC
6. 2016.12.19 - Wells Fargo Securities, LLC
7. 2016.12.20 - UBS Equities
8. 2016.12.21 - Credit Suisse
9. 2016.12.22 - Wells Fargo Securities, LLC
10. 2017.01.09 - Deutsche Bank
11. 2017.01.12 - Jefferies
12. 2017.01.24 - RBC Capital Markets
13. 2017.01.31 - Wells Fargo Securities, LLC
14. 2017.02.03 - Credit Suisse
15. 2017.02.03 - Wells Fargo Securities, LLC
16. 2017.02.07 - Wells Fargo Securities, LLC
17. 2017.02.14 - Morgan Stanley
18. 2017.02.14 - UBS Equities
19. 2017.02.15 - J.P. Morgan
20. 2017.02.22 - Bank of America
21. 2017.02.22 - Jefferies
22. 2017.02.22 - J.P. Morgan
23. 2017.02.22 - MUFG Securities Americas Inc.
24. 2017.02.22 - RBC Capital Markets
25. 2017.02.22 - Stephens Inc.
26. 2017.02.23 - Bank of America (1)
27. 2017.02.23 - Bank of America (2)
28. 2017.02.23 - Deutsche Bank
29. 2017.02.23 - Jefferies
30. 2017.02.23 - Morgan Stanley
31. 2017.02.23 - RBC Capital Markets
32. 2017.02.23 - Scotiabank GBM
33. 2017.02.23 - Stephens Inc.
34. 2017.02.23 - UBS Equities (1)
35. 2017.02.23 - UBS Equities (2)
36. 2017.02.23 - Wells Fargo Securities, LLC (1)
37. 2017.02.23 - Wells Fargo Securities, LLC (2)
38. 2017.02.24 - Bank of Montreal (1)
39. 2017.02.24 - Bank of Montreal (2)
40. 2017.02.24 - Wells Fargo Securities, LLC
41. 2017.02.27 - Wells Fargo Securities, LLC
42. 2017.02.28 - Credit Suisse
43. 2017.03.01 - Jefferies
44. 2017.03.01 - RBC Capital Markets (1)
45. 2017.03.01 - RBC Capital Markets (2)
46. 2017.03.30 - Jefferies

1

# Appendix B – Analyst Reports Considered

47.  2017.03.31 - Credit Suisse
48.  2017.03.31 - Deutsche Bank
49.  2017.03.31 - Jefferies
50.  2017.03.31 - RBC Capital Markets
51.  2017.04.06 - Morgan Stanley
52.  2017.04.06 - MUFG Securities Americas Inc.
53.  2017.04.06 - Wells Fargo Securities, LLC
54.  2017.04.17 - Bank of Montreal
55.  2017.04.17 - Deutsche Bank
56.  2017.04.19 - Bank of Montreal
57.  2017.04.26 - Stephens Inc.
58.  2017.04.28 - Jefferies
59.  2017.04.28 - RBC Capital Markets
60.  2017.05.01 - Credit Suisse (1)
61.  2017.05.01 - Credit Suisse (2)
62.  2017.05.02 - Bank of America
63.  2017.05.02 - Bank of Montreal
64.  2017.05.02 - Credit Suisse
65.  2017.05.02 - J.P. Morgan
66.  2017.05.02 - Wells Fargo Securities, LLC
67.  2017.05.03 - Jefferies
68.  2017.05.03 - J.P. Morgan
69.  2017.05.04 - Bank of Montreal
70.  2017.05.04 - Morgan Stanley
71.  2017.05.04 - Stephens Inc.
72.  2017.05.04 - UBS Equities
73.  2017.05.05 - Scotiabank GBM
74.  2017.05.05 - Wells Fargo Securities, LLC (1)
75.  2017.05.05 - Wells Fargo Securities, LLC (2)
76.  2017.05.07 - J.P. Morgan
77.  2017.05.08 - J.P. Morgan
78.  2017.05.09 - Credit Suisse
79.  2017.05.10 - Morgan Stanley
80.  2017.05.11 - Wolfe Research
81.  2017.05.17 - Bank of Montreal
82.  2017.05.19 - Deutsche Bank
83.  2017.05.19 - Wells Fargo Securities, LLC
84.  2017.05.21 - RBC Capital Markets (1)
85.  2017.05.21 - RBC Capital Markets (2)
86.  2017.05.30 - RBC Capital Markets
87.  2017.06.05 - Bank of Montreal
88.  2017.06.06 - EVERCORE ISI
89.  2017.06.13 - Wells Fargo Securities, LLC
90.  2017.06.15 - Stephens Inc.
91.  2017.06.19 - Wells Fargo Securities, LLC
92.  2017.06.20 - RBC Capital Markets

# Appendix B – Analyst Reports Considered

93.    2017.07.11 - Bank of Montreal
94.    2017.07.17 - Bank of Montreal
95.    2017.07.27 - RBC Capital Markets (1)
96.    2017.07.27 - RBC Capital Markets (2)
97.    2017.07.28 - RBC Capital Markets
98.    2017.07.31 - J.P. Morgan
99.    2017.07.31 - RBC Capital Markets
100.    2017.07.31 - Stephens Inc.
101.    2017.07.31 - Wells Fargo Securities, LLC
102.    2017.08.04 - UBS Equities
103.    2017.08.08 - Jefferies
104.    2017.08.08 - J.P. Morgan
105.    2017.08.08 - RBC Capital Markets
106.    2017.08.08 - Stephens Inc.
107.    2017.08.09 - Bank of Montreal
108.    2017.08.09 - Credit Suisse
109.    2017.08.09 - Morgan Stanley
110.    2017.08.09 - Scotiabank GBM
111.    2017.08.11 - Wells Fargo Securities, LLC
112.    2017.08.17 - Bank of America
113.    2017.08.18 - Bank of Montreal
114.    2017.08.24 - EVERCORE ISI
115.    2017.08.29 - Wells Fargo Securities, LLC
116.    2017.08.31 - RBC Capital Markets
117.    2017.09.08 - Jefferies
118.    2017.09.08 - RBC Capital Markets
119.    2017.09.11 - Jefferies
120.    2017.09.14 - Wells Fargo Securities, LLC
121.    2017.09.25 - EVERCORE ISI
122.    2017.10.05 - Morgan Stanley
123.    2017.10.23 - Jefferies
124.    2017.10.23 - UBS Equities
125.    2017.10.24 - Wells Fargo Securities, LLC
126.    2017.11.07 - Bank of Montreal
127.    2017.11.07 - Jefferies
128.    2017.11.07 - J.P. Morgan
129.    2017.11.07 - RBC Capital Markets
130.    2017.11.07 - Stephens Inc.
131.    2017.11.07 - UBS Equities (1)
132.    2017.11.07 - UBS Equities (2)
133.    2017.11.08 - Morgan Stanley
134.    2017.11.08 - Scotiabank GBM
135.    2017.11.08 - UBS Equities
136.    2017.11.09 - Wells Fargo Securities, LLC
137.    2017.11.13 - Bank of Montreal
138.    2017.11.14 - Bank of Montreal

3

# Appendix B – Analyst Reports Considered

| | | |
|---|---|---|
| 139. | 2017.11.14 - RBC Capital Markets (1) |
| 140. | 2017.11.14 - RBC Capital Markets (2) |
| 141. | 2017.11.15 - Wells Fargo Securities, LLC |
| 142. | 2017.12.17 - Wolfe Research |
| 143. | 2018.01.04 - Credit Suisse |
| 144. | 2018.01.09 - Bank of America |
| 145. | 2018.01.16 - EVERCORE ISI |
| 146. | 2018.01.16 - Morgan Stanley |
| 147. | 2018.01.16 - RBC Capital Markets |
| 148. | 2018.01.16 - Scotiabank GBM (1) |
| 149. | 2018.01.16 - Scotiabank GBM (2) |
| 150. | 2018.01.16 - Stephens Inc. |
| 151. | 2018.01.16 - Wells Fargo Securities, LLC |
| 152. | 2018.01.17 - Bank of America |
| 153. | 2018.01.22 - J.P. Morgan |
| 154. | 2018.02.21 - Bank of Montreal |
| 155. | 2018.02.21 - J.P. Morgan |
| 156. | 2018.02.21 - RBC Capital Markets |
| 157. | 2018.02.21 - Stephens Inc. |
| 158. | 2018.02.22 - Bank of America |
| 159. | 2018.02.22 - Jefferies |
| 160. | 2018.02.22 - Morgan Stanley |
| 161. | 2018.02.22 - Scotiabank GBM |
| 162. | 2018.02.22 - UBS Equities |
| 163. | 2018.02.23 - Wells Fargo Securities, LLC |
| 164. | 2018.02.26 - RBC Capital Markets |
| 165. | 2018.03.06 - Credit Suisse (1) |
| 166. | 2018.03.06 - Credit Suisse (2) |
| 167. | 2018.03.13 - Wells Fargo Securities, LLC |
| 168. | 2018.03.15 - EVERCORE ISI |
| 169. | 2018.04.22 - Wells Fargo Securities, LLC |
| 170. | 2018.04.24 - Scotiabank GBM |
| 171. | 2018.05.08 - Jefferies |
| 172. | 2018.05.09 - Bank of Montreal |
| 173. | 2018.05.09 - Jefferies |
| 174. | 2018.05.09 - J.P. Morgan |
| 175. | 2018.05.09 - RBC Capital Markets |
| 176. | 2018.05.09 - Stephens Inc. |
| 177. | 2018.05.09 - UBS Equities |
| 178. | 2018.05.10 - Morgan Stanley |
| 179. | 2018.05.10 - Scotiabank GBM |
| 180. | 2018.05.11 - Scotiabank GBM |
| 181. | 2018.05.11 - Wells Fargo Securities, LLC |
| 182. | 2018.05.14 - Bank of America (1) |
| 183. | 2018.05.14 - Bank of America (2) |
| 184. | 2018.05.15 - RBC Capital Markets |

4

## Appendix B – Analyst Reports Considered

| | | |
|---|---|---|
| 185. | 2018.05.17 - Bank of America |
| 186. | 2018.06.14 - UBS Equities |
| 187. | 2018.07.01 - Wolfe Research |
| 188. | 2018.07.17 - RBC Capital Markets |
| 189. | 2018.08.01 - Bank of Montreal |
| 190. | 2018.08.01 - J.P. Morgan |
| 191. | 2018.08.01 - RBC Capital Markets |
| 192. | 2018.08.01 - Wells Fargo Securities, LLC |
| 193. | 2018.08.01 - Wolfe Research |
| 194. | 2018.08.02 - Bank of America (1) |
| 195. | 2018.08.02 - Bank of America (2) |
| 196. | 2018.08.02 - Bank of America (3) |
| 197. | 2018.08.02 - Morgan Stanley (1) |
| 198. | 2018.08.02 - Morgan Stanley (2) |
| 199. | 2018.08.02 - RBC Capital Markets |
| 200. | 2018.08.02 - Scotiabank GBM |
| 201. | 2018.08.02 - Stephens Inc. |
| 202. | 2018.08.02 - Wolfe Research |
| 203. | 2018.08.03 - Scotiabank GBM |
| 204. | 2018.08.03 - Wells Fargo Securities, LLC |
| 205. | 2018.08.08 - Bank of Montreal |
| 206. | 2018.08.08 - J.P. Morgan |
| 207. | 2018.08.08 - RBC Capital Markets |
| 208. | 2018.08.08 - Stephens Inc. |
| 209. | 2018.08.09 - Bank of America (1) |
| 210. | 2018.08.09 - Bank of America (2) |
| 211. | 2018.08.09 - Jefferies |
| 212. | 2018.08.09 - Morgan Stanley |
| 213. | 2018.08.09 - Scotiabank GBM |
| 214. | 2018.08.10 - Wells Fargo Securities, LLC |
| 215. | 2018.08.10 - Wolfe Research |
| 216. | 2018.08.12 - RBC Capital Markets |
| 217. | 2018.08.14 - RBC Capital Markets |
| 218. | 2018.08.14 - Wells Fargo Securities, LLC |
| 219. | 2018.08.14 - Wolfe Research |
| 220. | 2018.08.17 - J.P. Morgan |
| 221. | 2018.08.28 - J.P. Morgan |
| 222. | 2018.09.24 - J.P. Morgan |
| 223. | 2018.10.04 - Bank of Montreal |
| 224. | 2018.10.08 - WM Smith |
| 225. | 2018.10.12 - J.P. Morgan |
| 226. | 2018.10.17 - Morgan Stanley |
| 227. | 2018.10.18 - UBS Equities |
| 228. | 2018.10.19 - Bank of America |
| 229. | 2018.10.19 - Morgan Stanley |
| 230. | 2018.10.19 - UBS Equities |

# Appendix B – Analyst Reports Considered

231.    2018.10.19 - Wells Fargo Securities, LLC (1)
232.    2018.10.19 - Wells Fargo Securities, LLC (2)
233.    2018.10.22 - Scotiabank GBM (1)
234.    2018.10.22 - Scotiabank GBM (2)
235.    2018.10.23 - Bank of America
236.    2018.10.23 - Barclays
237.    2018.10.25 - Wells Fargo Securities, LLC
238.    2018.10.31 - RBC Capital Markets
239.    2018.11.06 - Wells Fargo Securities, LLC
240.    2018.11.07 - Credit Suisse
241.    2018.11.07 - J.P. Morgan
242.    2018.11.07 - RBC Capital Markets
243.    2018.11.07 - UBS Equities
244.    2018.11.07 - Wells Fargo Securities, LLC
245.    2018.11.07 - Wolfe Research
246.    2018.11.08 - Bank of Montreal
247.    2018.11.08 - Morgan Stanley
248.    2018.11.08 - UBS Equities (1)
249.    2018.11.08 - UBS Equities (2)
250.    2018.11.09 - Bank of America
251.    2018.11.09 - Morgan Stanley
252.    2018.11.09 - Wells Fargo Securities, LLC
253.    2018.11.12 - Credit Suisse (1)
254.    2018.11.12 - Credit Suisse (2)
255.    2018.11.15 - Wells Fargo Securities, LLC
256.    2018.12.07 - Jefferies
257.    2018.12.12 - J.P. Morgan
258.    2018.12.17 - RBC Capital Markets
259.    2018.12.18 - RBC Capital Markets
260.    2019.01.07 - Credit Suisse
261.    2019.02.05 - Credit Suisse
262.    2019.02.07 - Barclays
263.    2019.02.10 - Wolfe Research
264.    2019.02.15 - J.P. Morgan
265.    2019.02.20 - Bank of Montreal
266.    2019.02.20 - Barclays
267.    2019.02.20 - Credit Suisse
268.    2019.02.20 - Jefferies
269.    2019.02.20 - J.P. Morgan
270.    2019.02.20 - RBC Capital Markets
271.    2019.02.20 - UBS Equities
272.    2019.02.20 - Wells Fargo Securities, LLC
273.    2019.02.20 - Wolfe Research
274.    2019.02.21 - Bank of America (1)
275.    2019.02.21 - Bank of America (2)
276.    2019.02.21 - EVERCORE ISI

6

# Appendix B – Analyst Reports Considered

| | | |
|---|---|---|
| 277. | 2019.02.21 - Wolfe Research |
| 278. | 2019.02.22 - Wells Fargo Securities, LLC |
| 279. | 2019.02.28 - RBC Capital Markets |
| 280. | 2019.03.03 - Wells Fargo Securities, LLC |
| 281. | 2019.03.06 - EVERCORE ISI |
| 282. | 2019.03.11 - J.P. Morgan |
| 283. | 2019.03.12 - Credit Suisse |
| 284. | 2019.03.19 - Credit Suisse |
| 285. | 2019.03.20 - EVERCORE ISI |
| 286. | 2019.03.31 - EVERCORE ISI |
| 287. | 2019.04.18 - Credit Suisse |
| 288. | 2019.04.24 - UBS Equities |
| 289. | 2019.05.08 - Bank of America |
| 290. | 2019.05.08 - Bank of Montreal |
| 291. | 2019.05.08 - Barclays |
| 292. | 2019.05.08 - Credit Suisse |
| 293. | 2019.05.08 - Jefferies |
| 294. | 2019.05.08 - J.P. Morgan |
| 295. | 2019.05.08 - RBC Capital Markets |
| 296. | 2019.05.08 - UBS Equities |
| 297. | 2019.05.08 - Wells Fargo Securities, LLC |
| 298. | 2019.05.08 - Wolfe Research |
| 299. | 2019.05.09 - Bank of America |
| 300. | 2019.05.09 - EVERCORE ISI |
| 301. | 2019.05.09 - Wolfe Research |
| 302. | 2019.05.10 - UBS Equities |
| 303. | 2019.05.10 - Wells Fargo Securities, LLC |
| 304. | 2019.05.17 - EVERCORE ISI |
| 305. | 2019.05.20 - Credit Suisse |
| 306. | 2019.05.24 - RBC Capital Markets |
| 307. | 2019.05.29 - Credit Suisse |
| 308. | 2019.06.04 - Credit Suisse |
| 309. | 2019.06.05 - J.P. Morgan |
| 310. | 2019.06.18 - EVERCORE ISI |
| 311. | 2019.06.21 - UBS Equities |
| 312. | 2019.06.21 - Wolfe Research |
| 313. | 2019.06.26 - CFRA Research |
| 314. | 2019.07.10 - Credit Suisse |
| 315. | 2019.07.15 - Wells Fargo Securities, LLC |
| 316. | 2019.07.16 - Credit Suisse |
| 317. | 2019.08.07 - Bank of America |
| 318. | 2019.08.07 - Bank of Montreal |
| 319. | 2019.08.07 - Barclays |
| 320. | 2019.08.07 - Credit Suisse |
| 321. | 2019.08.07 - EVERCORE ISI |
| 322. | 2019.08.07 - Jefferies |

## Appendix B – Analyst Reports Considered

323.    2019.08.07 - J.P. Morgan
324.    2019.08.07 - Piper Sandler Companies
325.    2019.08.07 - RBC Capital Markets
326.    2019.08.07 - UBS Equities
327.    2019.08.07 - Wells Fargo Securities, LLC
328.    2019.08.07 - Wolfe Research
329.    2019.08.08 - UBS Equities
330.    2019.08.08 - Wells Fargo Securities, LLC
331.    2019.08.15 - RBC Capital Markets
332.    2019.08.19 - Credit Suisse
333.    2019.09.10 - Credit Suisse
334.    2019.09.16 - Bank of Montreal
335.    2019.09.16 - Barclays
336.    2019.09.16 - Credit Suisse (1)
337.    2019.09.16 - Credit Suisse (2)
338.    2019.09.16 - EVERCORE ISI
339.    2019.09.16 - Piper Sandler Companies
340.    2019.09.16 - RBC Capital Markets
341.    2019.09.16 - UBS Equities (1)
342.    2019.09.16 - UBS Equities (2)
343.    2019.09.16 - Wells Fargo Securities, LLC
344.    2019.09.16 - Wolfe Research
345.    2019.09.17 - Bank of America
346.    2019.09.17 - Wells Fargo Securities, LLC
347.    2019.09.23 - RBC Capital Markets
348.    2019.09.23 - UBS Equities
349.    2019.09.25 - Barclays
350.    2019.09.25 - UBS Equities
351.    2019.09.25 - Wells Fargo Securities, LLC
352.    2019.09.26 - RBC Capital Markets
353.    2019.09.27 - CFRA Research
354.    2019.10.03 - Credit Suisse
355.    2019.10.07 - Bank of Montreal
356.    2019.10.10 - Credit Suisse
357.    2019.10.24 - CFRA Research
358.    2019.11.05 - Wolfe Research
359.    2019.11.06 - Bank of Montreal
360.    2019.11.06 - Barclays
361.    2019.11.06 - Credit Suisse
362.    2019.11.06 - EVERCORE ISI
363.    2019.11.06 - J.P. Morgan
364.    2019.11.06 - Piper Sandler Companies
365.    2019.11.06 - RBC Capital Markets
366.    2019.11.06 - UBS Equities
367.    2019.11.06 - Wells Fargo Securities, LLC
368.    2019.11.06 - Wolfe Research

# Appendix B – Analyst Reports Considered

369.    2019.11.07 - Bank of America (1)
370.    2019.11.07 - Bank of America (2)
371.    2019.11.07 - CFRA Research
372.    2019.11.07 - UBS Equities
373.    2019.11.08 - Wells Fargo Securities, LLC
374.    2019.11.12 - CFRA Research
375.    2019.11.13 - Piper Sandler Companies
376.    2019.11.13 - UBS Equities
377.    2019.11.13 - Wells Fargo Securities, LLC
378.    2019.11.15 - RBC Capital Markets
379.    2019.11.21 - Credit Suisse (1)
380.    2019.11.21 - Credit Suisse (2)
381.    2019.11.23 - Wright Reports
382.    2019.11.26 - CFRA Research
383.    2019.11.29 - Wolfe Research
384.    2019.12.05 - Wells Fargo Securities, LLC
385.    2019.12.12 - UBS Equities
386.    2019.12.13 - Bank of America
387.    2019.12.16 - Bank of America
388.    2019.12.16 - Wells Fargo Securities, LLC
389.    2019.12.17 - RBC Capital Markets
390.    2019.12.18 - Jefferies
391.    2019.12.18 - UBS Equities
392.    2020.01.07 - Credit Suisse
393.    2020.01.14 - Piper Sandler Companies
394.    2020.01.30 - EVERCORE ISI
395.    2020.02.06 - Bank of America
396.    2020.02.06 - Credit Suisse
397.    2020.02.19 - Credit Suisse
398.    2020.02.19 - EVERCORE ISI
399.    2020.02.19 - Jefferies
400.    2020.02.19 - J.P. Morgan
401.    2020.02.19 - Piper Sandler Companies (1)
402.    2020.02.19 - Piper Sandler Companies (2)
403.    2020.02.19 - RBC Capital Markets
404.    2020.02.19 - UBS Equities
405.    2020.02.19 - Wells Fargo Securities, LLC
406.    2020.02.20 - Bank of America
407.    2020.02.20 - Barclays
408.    2020.02.20 - Wells Fargo Securities, LLC
409.    2020.02.27 - RBC Capital Markets
410.    2020.02.28 - Piper Sandler Companies
411.    2020.02.28 - RBC Capital Markets

9

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 340 | 5/31/17 | 2017 MLPA Investor Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[1] |
| | 11/15/17 | RBC Capital Markets Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[2] |
| | 11/29/17 | Jefferies Energy Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[3] |
| | 12/6/17 | Wells Fargo Pipeline, MLP and Utility Symposium | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[4] |
| | 1/9/18 | UBS Midstream and MLP Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[5] |
| | 2/28/18 | Morgan Stanley Energy Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[6] |
| | 4/9/18 | Mizuho Energy Summit | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[7] |
| | 5/24/18 | MLP & Infrastructure Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[8] |

[1] Operative Complaint, ¶340, citing Energy Transfer 2017 MLPA Investor Conference presentation, May 31, 2017, p. 16.

[2] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2017 RBC Capital Markets Conference.

[3] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2017 Jefferies Energy Conference.

[4] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2017 Wells Fargo Pipeline, MLP and Utility Symposium.

[5] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2018 UBS Midstream and MLP Conference.

[6] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2018 Morgan Stanley Energy Conference.

[7] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2018 Mizuho Energy Summit.

[8] Operative Complaint, ¶340, citing Energy Transfer presentation at the 2018 Energy Infrastructure Conference.

1

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| | 6/19/18 | JP Morgan Energy Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[9] |
| 343 | 8/9/17 | 2Q17 Conference Call | Timeline of pipeline construction | "Well, as we said in our opening statements, we do expect to have [ME2] in service sometime in the fourth quarter."[10]<br><br>"On our Revolution project, construction is scheduled to be completed in the fourth quarter of 2017."[11]<br><br>"The only update is, [Revolution] will be up and ready for service in the fourth quarter."[12] |

---

[9]   Operative Complaint, ¶340, citing Energy Transfer presentation at the 2018 JP Morgan Energy Conference. Note, the same statement is alleged in ¶357 of the Operative Complaint.

[10]   Operative Complaint, ¶343, citing Energy Transfer 2Q17 earnings conference call, August 9, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Quarterly Cash Distribution," *Bloomberg*, July 27, 2017.

[11]   Operative Complaint, ¶343, citing Energy Transfer 2Q17 earnings conference call, August 9, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Quarterly Cash Distribution," *Bloomberg*, July 27, 2017.

[12]   Operative Complaint, ¶343, citing Energy Transfer 2Q17 earnings conference call, August 9, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Quarterly Cash Distribution," *Bloomberg*, July 27, 2017.

2

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 345 | 11/8/17 | 3Q17 Conference Call | Timeline of pipeline construction | "Regarding construction activity in West Goshen, the Pennsylvania Public Utilities Commission issued an order last week that resulted in suspension of our underground drilling efforts. The focus of this order was related to a valve that was proposed to be installed in this township. We are evaluating the relocation or elimination of this valve, as well as other alternatives that we believe will allow us to move forward with this portion of the project in the near future. Additionally, we continue to work with the Pennsylvania Department of Environmental Protection to secure approvals in order to move our remaining HDDs forward. As a result of these delays, we believe that this will push our in-service timing for ME2 to the second quarter of 2018. On our Revolution project. Construction is scheduled to be completed in the first quarter of 2018, and we'll be waiting to go into full-service once Rover and ME2 are in service.[13] |
| 346 | 11/8/17 | 3Q17 Conference Call | Timeline of pipeline construction | "[Energy Transfer is] doing everything we can to work with PA DEP and to get all the HDDs completed and on time."[14]<br><br>"And sometimes the PA DEP uses their full-time allotment to respond back to us, that slows us down."[15] |

---

[13]   Operative Complaint, ¶345, citing Energy Transfer 3Q17 earnings conference call, November 8, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Increase in Quarterly Cash Distribution," *Business Wire,* October 26, 2017.

[14]   Operative Complaint, ¶346, citing Energy Transfer 3Q17 earnings conference call, November 8, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Increase in Quarterly Cash Distribution," *Business Wire,* October 26, 2017.

[15]   Operative Complaint, ¶346, citing Energy Transfer 3Q17 earnings conference call, November 8, 2017. The conference call was held at 9:00 a.m. See, "Energy Transfer Equity Announces Increase in Quarterly Cash Distribution," *Business Wire,* October 26, 2017.

3

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 348 | 2/22/18 | 4Q17 and FY17 Conference Call | Timeline of pipeline construction | "Now moving on to Mariner East 2 and 2X. We continue to make progress on the construction of this project, with 94% of mainline construction complete and 83% of HDDs completed or underway. At this time, we continue to target placing ME2 into service by the end of the second quarter of 2018."[16] |
| 349 | 2/22/18 | 4Q17 and FY17 Conference Call | Timeline of pipeline construction | "I think we have a good working relationship with PA DEP. We have a weekly meeting with them, where we look at the gating items. We are still under court order deadlines that we have to adhere to and they have to adhere to. But I think our progress is good, and so I don't see a change in the timeline from what we've given you before."[17] |
| 350 | 2/22/18 | 4Q17 and FY17 Conference Call | Timeline of pipeline construction | "On our Revolution project, construction is mechanically complete, and we will go into full service once Rover and Mariner East 2 are in service"[18]<br><br>"Revolution, as you know, that is built to feed Rover, and it's built to feed Mariner… We're very close on that soon and that sometime in the second quarter, we'll have Mariner on and ready to take barrels from Revolution."[19]<br><br>"And so we know and we understand we've got to get Mariner on. We've got to get Rover to the finish line. We're very close to both of those…"[20] |

---

[16] Operative Complaint, ¶348, citing Energy Transfer 4Q17 and FY17 earnings conference call, February 22, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire,* January 29, 2018.

[17] Operative Complaint, ¶349, citing Energy Transfer 4Q17 and FY17 earnings conference call, February 22, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire,* January 29, 2018.

[18] Operative Complaint, ¶350, citing Energy Transfer 4Q17 and FY17 earnings conference call, February 22, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire*, January 29, 2018.

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 351 | 6/1/18 | ET Report to DEP | Timeline of pipeline construction | "ETC reported that the Revolution Pipeline was mechanically complete and ready to be placed into commercial service on or about June 1, 2018."[21] |
| 355 | 3/22/18 | ET Spokesperson Statement | Safety and compliance with orders | "[P]rofessional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception […] construction through this area is safe. There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."[22] |
| 356 | 5/10/18 | 1Q18 Conference Call | Timeline of pipeline construction | "And then in the third quarter, early, mid, late, is your expectation? [...] I thought you said mid to late [third quarter 2018]. Yes."[23] |
| 357 | 6/19/18 | JP Morgan Energy Conference | Pipeline capacity | "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[24] |

---

[19]  Operative Complaint, ¶350, citing Energy Transfer 4Q17 and FY17 earnings conference call, February 22, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire*, January 29, 2018.

[20]  Operative Complaint, ¶350, citing Energy Transfer 4Q17 and FY17 earnings conference call, February 22, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire*, January 29, 2018.

[21]  Operative Complaint, ¶351, citing ETC's DEP Consent Form and Agreement, January 3, 2020, p. 3.

[22]  Operative Complaint, ¶355, citing, for example, "'I'm Terrified': Life on the Front Lines of the Sunoco Pipeline," *Phillymag.com,* March 22, 2018. Note, the same statement is alleged in ¶371 of the Operative Complaint.

[23]  Operative Complaint, ¶356, citing Energy Transfer's 1Q18 Conference Call, May 10, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Announces Quarterly Cash Distribution," *Business Wire,* April 26, 2018.

[24]  Operative Complaint, ¶357, citing Energy Transfer presentation at the 2018 JP Morgan Energy Conference. Note, the same statement is alleged in ¶340 of the Operative Complaint.

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 360 | 8/9/18 | ET Spokesperson Statement | Timeline of pipeline construction | "100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP."[25] |
| | | | | "Let me expand on that a little bit. On ME2, I guess it's the, obviously, the first issue with use of the 12-inch line through there. We have, kind of repeating what was said in the earlier remarks, 99% of the mainline construction is complete, the 1% that remains on mainline construction is associated with the HDD's that we are completing right now. So we have 16 HDD's to complete, all those have been approved by PA DEP and they're either drilling ahead or they're in the stage where we're going back to PA DEP with – when we have an inadvertent return. But they've all been approved so we don't have to have any changes approved by PA DEP going forward like that. All the road bores are finished. And as Tom said in the early remarks, 80% of the line has been hydro tested. So we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year."[26] |

---

[25] Operative Complaint, ¶360, citing Energy Transfer's 2Q18 Conference Call, August 9, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Reports Second Quarter Results," *Business Wire,* August 8, 2018.

[26] Operative Complaint, ¶360, citing Energy Transfer's 2Q18 Conference Call, August 9, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Reports Second Quarter Results," *Business Wire,* August 8, 2018.

6

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 364 | 8/9/18 | ET Spokesperson Statement | Timeline of pipeline construction, pipeline capacity | "The Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteland Township. To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service. This plan does not require any new permits and we have made all applicable regulatory notification."[27]<br><br>"As a result, we continue to expect to place ME2 in service by the end of this quarter. This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments."[28]<br><br>"The utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted"[29] |
| 367 | 1/3/18 | *Philadelphia Inquirer* and other News Articles | Safety and compliance with orders | "We . . . reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work."[30] |

---

[27]  Operative Complaint, ¶364, citing Energy Transfer's 2Q18 Conference Call, August 9, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Reports Second Quarter Results," *Business Wire,* August 8, 2018.

[28]  Operative Complaint, ¶364, citing Energy Transfer's 2Q18 Conference Call, August 9, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Reports Second Quarter Results," *Business Wire,* August 8, 2018.

[29]  Operative Complaint, ¶364, citing Energy Transfer's 2Q18 Conference Call, August 9, 2018. The conference call was held at 9:00 a.m. See, "Energy Transfer Partners Reports Second Quarter Results," *Business Wire,* August 8, 2018.

[30]  Operative Complaint, ¶367, citing, for example, "DEP halts construction of Sunoco's $2.5B Mariner East 2 pipeline," *The Philadelphia Inquirer*, January 3, 2018.

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 368 | 2/8/18 | *StateImpact Pennsylvania, Reuters,* and other News Articles | Safety and compliance with orders | "[Sunoco was] committed to fully complying with the DEP order, which includes following all permit requirements"[31] <br><br> "Safety is paramount for any energy infrastructure project that we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment."[32] |
| 371 | 3/22/18 | ET Spokesperson Statement | Safety and compliance with orders | "[P]rofessional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception […] construction through this area is safe. There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."[33] |
| 376 | 9/25/18 | *StateImpact Pennsylvania* Article | Safety and compliance with orders | "Lisa Dillinger, a spokeswoman for Sunoco's parent, Energy Transfer Partners, said . . . that since Sunoco Pipeline's integration with ETP on May 1, 2017, accidents have been "drastically reduced," and that the company spent $429 million on assets in 2017. "It is our priority to maintain and operate our assets to the highest safety standards, not just because it makes good business sense, but because it is the right thing to do," she said."[34] |

[31] Operative Complaint, ¶368, citing, for example, "Sunoco to resume work, pay $12.6 million for Mariner East 2 pipeline violations," *StateImpact Pennsylvania,* February 8, 2018. See, also, "Pennsylvania allows Sunoco to resume work on Mariner NGL pipeline," *Reuters,* February 8, 2018.

[32] Operative Complaint, ¶368, citing, for example, "Sunoco to resume work, pay $12.6 million for Mariner East 2 pipeline violations," *StateImpact Pennsylvania,* February 8, 2018.

[33] Operative Complaint, ¶371, citing, for example, "'I'm Terrified': Life on the Front Lines of the Sunoco Pipeline," *Phillymag.com,* March 22, 2018. Note, the same statement is alleged in ¶355 of the Operative Complaint.

[34] Operative Complaint, ¶376, citing "Mariner East 2: Sunoco' Pennsylvania incidents, fines and shutdowns fuel residents' safety concerns," *StateImpact Pennsylvania,* September 25, 2018.

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 377 | 10/21/18 | *Pittsburgh Post-Gazette* Article | Safety and compliance with orders | "That was rectified about eight months ago […] We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."[35] |
| 378 | 11/1/18 | *Observer-Reporter* Article | Safety and compliance with orders | "We have been and will continue to comply with their orders," adding that the safety of the surrounding area is "our first priority."[36] |
| 380 | 12/19/18 | ET Statement | Safety and compliance with orders | The safety of all those who live and work along our pipeline is our first priority and this project was planned and implemented based on that fact.[37] |
| 382 | 2/24/17 | 2016 10-K | Code of ethics | "The Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board. Current copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."[38] |
| 390 | 2/23/18 | 2017 10-K | Code of ethics | "The Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board. Current copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."[39] |

---

[35] Operative Complaint, ¶377, citing "A Massive Pipeline Boring Through Pennsylvania," *Pittsburgh Post-Gazette,* October 21, 2018.

[36] Operative Complaint, ¶378, citing "DEP orders halt to pipeline work after explosion," *Observer-Reporter*, November 1, 2018.

[37] Operative Complaint, ¶380, citing, for example, "Chester County district attorney opens criminal investigation into Mariner East pipeline project," *StateImpact Pennsylvania,* December 19, 2018.

[38] Operative Complaint, ¶382, citing Energy Transfer FY16 Form 10-K, filed February 24, 2017, 4:44 p.m., p. 120.

[39] Operative Complaint, ¶390, citing Energy Transfer FY17 Form 10-K, filed February 23, 2018, 4:58 p.m., p. 131.

9

## Appendix C – Alleged Misrepresentations

| Paragraph | Date | Event | Alleged Misrep. Category | Alleged Misrep. from Operative Complaint |
|---|---|---|---|---|
| 394 | 1/22/19 | *NBC Philadelphia* Article | Criminal investigations and cases | "We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property," company spokeswoman Lisa Dillinger said in a statement. "I will decline to discuss any further details of our security efforts, beyond that we do use security on our projects as needed to ensure the safety of our employees, our assets and those who live in the area."[40] |
| 398 | 8/8/19 | *PhillyMag.com* Article | Criminal investigations and cases | "In its own statement, Energy Transfer stressed that constables Johnson and Robel "were not Sunoco or Energy Transfer employees." "They were employed by Raven Knights, who provided security services and personnel," the Energy Transfer statement continued. "We have a code of conduct for all of contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that."[41] |

---

[40]  Operative Complaint, ¶394, citing "'Hired Guns Flashing Badges' Improperly Protected Pipeline Sinkhole in Chester County, District Attorney Says," *NBC Philadelphia,* January 22, 2019.

[41]  Operative Complaint, ¶398, citing "Chesco DA Announces Criminal Charges Against Mariner East Security Workers," *PhillyMag.com*, August 8, 2019.

10