# EXHIBIT 57





Journal of Accounting,
Auditing & Finance
26(3) 527–555
©The Author(s) 2011
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0148558X11401551
http://jaaf.sagepub.com
SAGE

# The Information Content of Goodwill Impairments and SFAS 142

**Daniel A. Bens[1], Wendy Heltzer[2], and Benjamin Segal[3]**


## Abstract

Accounting standard setters face a perpetual challenge in balancing relevance and reliability when establishing generally accepted accounting principles. This tension is especially heightened when the nature of the economic information concerns intangible assets. This article presents exploratory evidence about standard setters' response to this challenge by examining whether Statement of Financial Accounting Standards No. 142 (SFAS 142): *Goodwill and Other Intangible Assets* altered the information content of goodwill write-offs. To more accurately capture the information of goodwill write-offs, the authors first create a model to estimate expected impairments. The difference between actual write-offs and expected write-offs represents write-off surprises or unexpected goodwill write-offs. The authors document a negative and significant stock market reaction to unexpected goodwill write-offs. On a cross-sectional basis, they find that the market reaction is attenuated for firms with low information asymmetry (their proxy is a high analyst following) and for firms that find it relatively costly to implement impairment tests (their proxy is the inverse of firm size). The authors find no variation in market reaction based on firm complexity (their proxy is the number of firm segments). The negative reaction for the high information asymmetry and larger firms weakens following the adoption of SFAS 142. The latter result is consistent with SFAS 142 critics' claims that more relevant accounting information, captured by fair value methods, is difficult to implement reliably and thus can reduce the information content of accounting reports.



## Keywords

fair value accounting, goodwill, impairments, SFAS 142, write-offs


## Introduction

In this article, we analyze the stock price effects of Statement of Financial Accounting Standards No. 142 (SFAS 142): *Goodwill and Other Intangible Assets*. We examine the impact of this standard on the information content (short window stock returns) of

[1]University of Arizona, Tucson, AZ, USA
[2]DePaul University, Chicago, IL, USA
[3]Boulevard de Constance, Fontainbleau, France

**Corresponding Author:**
Daniel A. Bens, University of Arizona, Eller College of Management, 1130 East Helen Street, P.O. Box 210108, Tucson, AZ 85721
Email: dbens@email.arizona.edu

impairments of goodwill and other intangible assets.[1] Accounting standard setters always struggle with the balance between the relevance and reliability of accounting information when establishing generally accepted accounting principles. This tension is especially prevalent when the economic information concerns intangible assets. U.S. standard setters recently struggled with this tension when they codified new accounting rules for goodwill and other intangible assets in SFAS 142.

We study the effects of SFAS 142 for two main reasons. First, SFAS 142 changes both the impairment trigger (from undiscounted future cash flows to discounted future cash flows) and internal segment allocation relating to goodwill. Thus, the study of goodwill write-offs provides us with a rich testing environment regarding how a shift towards more relevant accounting information, possibly at the expense of reliability, affects the information content of accounting information. Second, goodwill impairments have been found to be the largest types of long-lived asset write-offs (Francis, Hanna, & Vincent, 1996), and therefore the study of these charges is important in its own right.

We analyze the information content of goodwill write-offs before and after the adoption of SFAS 142. The preadoption period spans the years 1996 to 2001, and the postadoption period includes the last half of 2002 and the years 2003 to 2006. We enforce a high materiality threshold for these charges, as sample firms took goodwill write-offs of at least 5% of prior period assets. This allows us to focus on firms where the standard had the largest impact. The cost of this research design choice is reduced generalizability. As discussed in the ''Sample'' section, our sample is concentrated in the business services industry (two-digit standard industrial classification (SIC) code = 73); these firms comprise approximately 31% of our sample.

In addition to the temporal analysis, we conduct cross-sectional tests to determine if the association between returns and write-offs varies with three firm characteristics: information asymmetry among market participants (our proxy is analyst following), the ability of the firm to efficiently implement impairment tests (our proxy is firm size), and the complexity of the firm's structure (our proxy is number of reported segments). We use these analyses to assess how the information content of impairments differs based on these firm fundamentals that might affect its interpretation by the market as well as implementation by the firm.

We find that the information content of write-offs, measured as the size-adjusted stock return over a 2-day window beginning with the write-off day, is significant over the sample period. The mean (median) return across the entire sample is −3.3% (−2.9%). Because much of the valuation effect of the impairment is likely impounded into price prior to the write-off itself, we use a model to estimate the expected impairment to isolate the unexpected charge as the main explanatory variable in our multivariate tests.

We find that the association between the event window return and the magnitude of the unexpected impairment is negative and significant only for two types of firms: those with low analyst following and large firms. The former is consistent with the goodwill impairment accrual being more informative when there are fewer analysts generating publicly available information about the firm. The latter is consistent with small firms being unable to effectively implement a goodwill impairment test that is informative to the market.

We also find evidence that the association between the unexpected impairment and the event window returns declines significantly following SFAS 142 for the low analyst following and the larger firms. This is consistent with a loss of information content under the new accounting rule, in line with the predictions of SFAS 142 critics.

We do not find any variation in the market reaction to the unexpected impairment due to firm complexity. This lack of variation exists both pre-142 and post-142. This is not

consistent with the claims of critics that goodwill impairments are less informative for complex firms because of the difficulty in assigning synergistic intangibles to various business units.

We make three contributions with this study. First, we assess whether using a fair value trigger for determining impairments provides more information to equity investors when compared with an approach that uses undiscounted cash flows to set the impairment measurement process in motion. Second, we examine the cross-sectional forces that might alter the information content of goodwill impairments. Finally, we develop an expectations model for measuring goodwill impairment surprises.

The remainder of the article summarizes the accounting for goodwill impairments, reviews the existing literature, presents our hypotheses, discusses the sample, presents our results, outlines our sensitivity analyses, and ultimately concludes.

## Accounting for Goodwill Impairments

Before the issuance of Statement of Financial Accounting Standards No. 121 (SFAS 121): *Accounting for the Impairment of Long-Lived Assets and Long-Lived Assets to Be Disposed Of.*, there was little guidance on accounting for asset impairments. This lack of authoritative guidance had a major undesirable effect: Such reporting was not conducted in a consistent manner. Accounting Principles Board 17, *Intangible Assets*, issued in 1970, viewed goodwill as associated with the enterprise as a whole. Accordingly, impairment testing would be done only at the enterprise level. In addition, it did not provide guidance for determining when or how to measure impairment losses. This allowed for substantial discretion in deciding on write-downs for intangibles. As stated in SFAS 121, ‘‘Accounting standards generally have not addressed when impairment losses should be recognized or how impairment losses should be measured. As a result, practice has been diverse’’ (p. 3).

SFAS 121 was intended in part to address the problems with long-lived asset impairment (including goodwill). It provided a clearer (though still general) signal for review of assets—whenever events or changes in circumstances indicated their carrying amounts might not be recoverable. The standard addressed goodwill that related to specific groups of assets. Nevertheless, research suggests that the rule did not succeed in enhancing the reporting for long-lived assets in general (Riedl, 2004). Moreover, the Financial Accounting Standards Board (FASB) concluded in SFAS 142: ‘‘Previous standards provided little guidance about how to determine and measure goodwill impairment; as a result, the accounting for goodwill impairments was not consistent and yielded information of questionable usefulness’’ (p. 1).

SFAS 142 drastically changed the timing of the impairment test and its mechanics. It is more explicit on three main issues: when to test for impairment, what level of reporting unit to test, and how to determine the amount of the impairment. Whereas SFAS 121 required testing only in certain circumstances, SFAS 142 calls for goodwill impairment testing at least annually and under certain enumerated circumstances. The standard also requires that the test be performed at the same time every year, blocking any attempt to time the test so as to affect its results.

The SFAS 142 impairment test is applied at the *reporting unit* level. A reporting unit is an SFAS 131–defined operating segment or a business component one level below the segment, provided that management regularly reviews the component’s performance. This lower level of testing is designed to reduce the possibility of overlooking impaired goodwill due to setting off between business units (i.e., unrecognized ‘‘internally developed’’ goodwill from one part of the business offsets impaired goodwill from another).

Most importantly, the impairment trigger and the calculation of the impairment amount are better defined under SFAS 142. Impairments under this standard are more sensitive to changes in the *present value* of future cash flows compared with SFAS 121. Under the previous standard, impairments were to be recorded whenever the *undiscounted* cash flows for a group of operationally related assets fell below book value. The amount of the impairment equaled the amount by which the book value exceeded fair value for the asset group.

SFAS 142 provides a two-step procedure for calculating a goodwill impairment. In the first step, the fair value of the reporting unit is estimated. If this amount is less than the unit's book value, then the second step is to determine the fair value of goodwill by subtracting estimates of the fair value of all other net assets from the initial aggregate estimate. If this residual is less than the book value of goodwill, the difference is written off as an impairment. If implemented properly, the fair value test of SFAS 142 should trigger impairments more quickly than the undiscounted cash flow test of SFAS 121. Appendix A summarizes the accounting for impairments under SFAS 121 and SFAS 142.

## Literature Review

The results of studies of the market effects of asset write-downs are generally mixed. For example, Strong and Meyer (1987) report a positive average cumulative abnormal return (CAR) before the announcement period, while finding a negative average CAR for the announcement itself. These results, however, reversed over periods following the announcement. They interpret their results as consistent with the anticipated write-down and restructuring charges that may be perceived as insufficient. Elliott and Shaw (1988), on the other hand, conclude that the opposite is true and that write-downs occur in periods of sustained economic difficulty. Zucca and Campbell (1992) find no significant market reaction in the 120 days surrounding the write-down announcement. They also find that firms with larger ratios of write-downs to total assets experienced lower financial strength in subsequent periods, refuting the notion that firms that clean their books outperform their peers later.

Prior research generally has not looked at or tested for specific types of write-down announcements to examine their effect. Francis et al. (1996) are an exception; they find that the market reaction to write-downs is overall negative but is conditional on the type of asset written down. They do not observe a significant market reaction to goodwill write-offs.

Information content studies typically use the entire write-down amount as the independent variable in returns regressions, implicitly assuming the expected write-down amount is 0. The extent to which the write-down amount is expected and anticipated by the market is important not only for model specification and measurement but also for interpreting the results.

In summary, although there is some evidence regarding the market reaction to asset impairments, results are frequently mixed and fail to control for expectation of the write-off as well as cross-sectional variation in firm characteristics that might influence such reactions. Our study will address these issues in the context of goodwill impairments. Our main objective is to assess whether the rule designed to standardize accounting for goodwill impairments, SFAS 142, actually changed the information content of this economically significant accounting choice. The next section further motivates and formalizes our hypotheses.

## Hypotheses

Due to the shift from an *undiscounted* cash flow impairment trigger under SFAS 121 to a *discounted* cash flow impairment trigger under SFAS 142, goodwill write-offs have the potential to provide more timely information in the post–SFAS 142 period. As noted in SFAS 142 (Paragraph 88 of Appendix B), the undiscounted cash flows associated with goodwill might continue many years beyond all earnings from traditional assets. Nominally, these cash flows might make the reporting unit appear more valuable in impairment tests vis-à-vis a setting where present value is taken into account. In addition, the assignment of goodwill to more specific reporting units might make the write-offs more informative. Goodwill now pertains to a particular unit's cash flows, removing management's ability to simply assign the asset to the overall firm where imperfectly correlated cash flows across segments might offset each other, precluding the recognition of an impairment.

FASB had these improvements in mind when it passed the standard, and its logic is compelling. However, critics claim that such rules are only as relevant as management's implementation of them (Watts, 2003). According to Watts (2003), the amount of discretion allowed managers in determining SFAS 142 impairments undercuts even the relaxed verifiability requirement for losses under generally accepted accounting principles (GAAP) (see Basu, 1997, for a discussion of the asymmetry in GAAP gain vs. loss recognition). Watts also notes the difficulty a neutral practitioner would have with assigning intangible assets to reporting units. This ''joint cost/benefit problem'' arises because intangibles are frequently the result of *synergies* between distinct operating units, and precisely identifying the source of the synergy is at best nontrivial, at worst ''arbitrary and meaningless'' (Watts, 2003, p. 218).

Our a priori view on this debate is agnostic. We conduct our empirical analyses as an exploratory study with the purpose of informing the debate. We believe this issue is relevant as standard setters increasingly move towards fair value measurement. We explore whether changes in the write-down trigger and reporting unit allocation alter the information content of goodwill write-offs. We capture the information content of goodwill write-offs by comparing the 2-day abnormal return surrounding impairment announcements, and we estimate how this market reaction changes after SFAS 142.[2] Because of the exploratory nature of this research question, our first hypothesis, stated in alternative form, is unsigned:

*Hypothesis 1 (H1)*: The information content of goodwill impairments changed following the implementation of SFAS 142.

SFAS 142 required firms to conduct an initial impairment test of existing goodwill, to be completed by the second quarter after adoption. Ideally, these charges were to reflect a ''catch up'' by firms for past impairments. However, a transition charge might also be used to ''clear the decks'' of existing goodwill, as it is recorded as a cumulative effect of an accounting change. This would allow management to avoid reporting future impairments in operating income and was specifically advocated in some practitioner journals (Ketz, 2002). Beatty and Weber (2006) provide evidence that the transition charges were used strategically by some firms. Because our primary concern pertains to the change in fair value implementation and its effect on the information content of accounting information, rather than the strategic use of adoption period write-offs, we eliminate adoption period write-offs from our main analyses to sharpen the focus of our study.[3]

In cross-sectional analyses, we explore whether there are certain firm fundamentals that are associated with the valuation of goodwill impairments and whether these fundamentals

impact the effects of SFAS 142. In choosing cross-sectional variables, we sought out firm characteristics that may affect a firm's ability to implement SFAS 142 and/or characteristics that may impact the market interpretation of impairments.

The first firm characteristic we examine is information asymmetry. One general role of a financial reporting system is to alleviate the information asymmetry between management and outsiders so that investors may improve on their allocation of capital.[4] Thus, as information asymmetry increases, so does the potential usefulness of an accrual that communicates to investors asset impairments on a timely basis. When investors rely more on management communication about firm performance instead of from other sources (e.g., securities analysts), then an accrual based on management's internal valuation estimates might be more informative than in a setting where the market is relatively informed.

The role of analysts in the capital markets has been extensively studied by academics. Roulstone (2003) discusses the conflicting research on whether the dominant role of analysts is to harbor private information or, alternatively, whether they disseminate more information to the public. Roulstone's empirical analyses suggest the latter. As such, we use high analyst following to proxy for low information asymmetry. In our setting, we predict that in the presence of a large analyst following, the market reaction to goodwill impairments will be lower, as more of the information contained in the accrual will already be known by investors:

*Hypothesis 2 (H2)*: The information content of goodwill impairments is reduced for high analyst following firms.

Whether the implementation of SFAS 142 affected this association is an empirical issue for which we present an unsigned hypothesis:

*Hypothesis 3 (H3)*: The effect of analyst following on the information content of goodwill impairments changed following the implementation of SFAS 142.

The second firm characteristic we examine is the ability of a firm to implement SFAS 142. We use firm size to proxy for this characteristic. Small firms are likely less able to handle the complexity surrounding the implementation of a fair value–based standard (or hire valuation consultants to do so) due to limited resources and limited regulatory guidance. The cost of implementing SFAS 142 was a consideration in FASB's deliberations and conclusions (see Paragraphs 142–144 of Appendix B). Furthermore, size appears to affect the ability of firms to conform to financial reporting standards. For example, Engel, Hayes, and Wang (2007) suggest that the Sarbanes-Oxley Act (SOX) dramatically increased compliance costs for some publicly traded firms. Their evidence suggests that smaller firms with greater inside ownership are more likely to go private post-SOX, presumably because these firms find compliance costs too high. Doyle, Ge, and McVay (2007) also find that smaller firms are more likely to report a material weakness in internal control as defined by SOX. Thus, write-offs might be *less* informative if size captures the noise in the accrual estimation process.

As noted in our discussion regarding H2 and H3, information asymmetry may impact the market's reaction to goodwill write-offs, as the market may have a weakened reaction to a write-off announcement made by a firm with lower information asymmetry. Although we use high analyst following to control for low information asymmetry, it may be the case that firm size also captures information asymmetry. Firm size has frequently been

used as a conditioning variable in tests of price–earnings relationships (Collins, Kothari, & Rayburn, 1987; Freeman, 1987). The evidence suggests that size captures the richness of a firm's information environment and is inversely related to information asymmetry. As such, while goodwill impairments may be less informative for smaller firms if size captures the noise in the accrual estimation process, it is possible that goodwill impairments might be *more* informative for smaller firms if size captures information asymmetry.[5] Because of these conflicting dynamics, we do not sign our hypothesis regarding the relationship between the information content of goodwill impairments and firm size:

*Hypothesis 4 (H4)*: The information content of goodwill impairments is impacted by firm size.

*Hypothesis 5 (H5)*: The effect of firm size on the information content of goodwill impairments changed following the implementation of SFAS 142.

Our final cross-sectional measure captures firm complexity, as measured by the concentration of sales across segments. Prior research suggests that analysts find multisegment firms more difficult to follow. Gilson, Healy, Noe, and Palepu (2001) find that analyst following and forecast accuracy are lower at conglomerate firms; this is partially resolved when the firm becomes more focused. Berger and Hann (2003) find that an increase in the quality of disclosed segment information improves analyst forecast accuracy. Per Watts (2003), it may be precisely for such firms where the joint cost/benefit problem of assigning synergy-based intangibles to unique operating divisions is most pronounced. Accordingly, the impairments to these somewhat arbitrarily assigned intangibles would be less informative to market participants. Our sixth hypothesis formalizes this prediction, whereas our final hypothesis is again unsigned as to whether SFAS 142 exacerbated or reduced this problem.

*Hypothesis 6 (H6)*: The information content of goodwill impairments is reduced for complex firms.

*Hypothesis 7 (H7)*: The effect of firm complexity on the information content of goodwill impairments changed following the implementation of SFAS 142.

## Sample

We gathered our sample by identifying firms on Compustat that took intangible asset write-offs of at least 5% of lagged assets over the period 1996–2006. We identified potential pre-142 (i.e., during the period 1996–2001) goodwill write-offs by selecting firms with a decrease in intangibles (Item 33) of at least 5% of lagged assets, after excluding the effects of amortization (Item 65) for the year. To increase the likelihood that this decline actually occurred from a write-off (as opposed to the disposition of a business segment that had been assigned goodwill), we selected the subset of firms with negative special items (Item 17) in excess of 2% of lagged assets (we lowered the cutoff from 5% to 2% to allow for positive special item transactions that might partially offset the goodwill impairment).

Compustat added Item 368 ''Impairments of Goodwill Pretax'' after the adoption of SFAS 142 in 2002. A firm qualified for our post–adoption sample in fiscal years 2002–2006 if Item 368 was greater than 5% of total lagged assets.[6]

From this preliminary sample, we searched the Factiva database for goodwill write-off announcements to ensure that there was an actual impairment and to find any

contemporaneously announced news. We found the announcement date of each different write-off by searching the following sources: Dow Jones News Service, PR Newswire, Business Wire, and *The Wall Street Journal* using the key words ''goodwill,'' ''intangible,'' ''writeoff,'' ''write-off,'' ''impair,'' ''charge,'' ''writedown,'' or ''write-down.'' We identified the first announcement mentioning the amount of the write-off. The amounts identified in the press releases were the values actually used in our analyses, as opposed to estimates derived from Compustat. If a range of write-off values was disclosed, we used the midpoint.[7]

We eliminated all firms that ''hinted'' at the write-off before announcing the amount, to increase the likelihood that the announcement of the actual charge was a surprise to the market. We also eliminated firms from our initial sample for the following reasons: the necessary Center for Research in Security Prices (CRSP) or Compustat data were not available; the announcement did not separate the goodwill impairment from other charges; the write-off pertained to discontinued operations or software; the firm was revaluing its assets as it emerged from bankruptcy; the firm was foreign; the value of the write-off was less than US$1 million; and the sum of multiple goodwill write-offs for the year was greater than 5% of assets, but the individual write-offs were less than 5% of assets, or the write-off was taken during the adoption period. A summary of write-off announcements found per year by way of our sample selection can be seen in Table 1. The sample of 388 represents our broadest sample for the information content tests.

Regarding the industry makeup of our sample, it is underrepresented in Depository Institutions (SIC 60), which makes up 9.0% of Compustat but 0% of our sample. This result is not surprising as banks are not intangible asset intensive.[8] Our sample is overrepresented in both electronic equipment (SIC 36) with 16.2% of our sample versus 6.6% on Compustat and business services (SIC 73) with 31.4% of our sample versus 12.2% on Compustat. These results are not surprising, as much of the equity market run-up in the 1990s was driven by high-tech companies from these industries. This indicates an industry bias in our sample, and all of our results are subject to the caveat that they might not generalize to a larger population. However, these are the types of firms that one would expect to be the most intangible intensive. Hence, they are the companies most affected by SFAS 142.

Table 2 presents some fundamental characteristics of the sample, as well as comparable statistics for the Compustat universe. Note the difference in magnitudes of the write-offs when considering alternative deflators. When lagged assets are used as the scalar, the write-off variable has a mean of 19% of assets and a median of 13%. To control for outliers, we cap the magnitude of the write-offs at 100% of beginning assets.[9] When lagged market value of equity (MVE) is the deflator, the distribution of the deflated write-off amount is shifted to the right and skewed. The mean is 28% of lagged market value, whereas the median is 17%. Moreover, 6% of the observations involve write-offs that exceed the entire market capitalization as of the beginning of the year. To prevent extreme values of the main treatment variable from overly influencing our results, we use the asset deflated measure of write-off intensity in our tests.[10] Also, as discussed in the following section, we develop an expectations model for the impairment.

The sample firms are smaller than the mean Compustat size measures; based on medians, our sample firms are larger than the Compustat population. Also, our firms are intangible intensive. The mean percentage of lagged total intangibles to total assets is 35%; the median is 32%. By contrast, for the Compustat population over this time period the mean is 9% and the median is 1%.[11]

Case 4:21-cv-02473 Document 103-62 Filed 01/16/25 in TXSD Page 10 of 30



**Table 1.** Sample Selection

| | Fiscal year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-SFAS 142 sample | | | | | | Post-SFAS 142 Sample | | | | | |
| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
| Total observations found in initial search | 36 | 22 | 36 | 29 | 64 | 164 | 495 | 84 | 102 | 139 | 105 | 1,276 |
| Elimination causes: | | | | | | | | | | | | |
| Point or range estimate of charge not given in initial announcement | 0 | (2) | 0 | (5) | (7) | (10) | (67) | (9) | (6) | (8) | (2) | (116) |
| Necessary CRSP and/or Compustat data not available | (2) | 0 | (2) | (1) | (2) | (8) | (29) | (2) | (8) | (21) | (8) | (83) |
| Announcement not found on Factiva | (16) | (3) | (6) | (5) | (9) | (21) | (33) | (11) | (31) | (36) | (14) | (185) |
| Specific charges not specified | (6) | (6) | (6) | (5) | (6) | (31) | (12) | (10) | (5) | (5) | (4) | (96) |
| Write-off pertains to discontinued operations or software | 0 | (1) | (4) | (1) | (5) | 0 | (1) | 0 | 0 | 0 | 0 | (12) |
| Write-off taken as part of Chapter 11 reorganization plan | 0 | (1) | (3) | (2) | (6) | (1) | (5) | (3) | 0 | 0 | 0 | (21) |
| Write-off firm is foreign | (1) | (3) | (2) | (1) | (2) | (19) | (40) | 0 | (8) | (11) | (15) | (102) |
| Write-off is less than $1M | 0 | 0 | 0 | 0 | (1) | (4) | (2) | 0 | 0 | (1) | 0 | (8) |
| Total value of annual write-offs is greater than 5% of lagged assets, but individual write-off is less than 5% of lagged assets | (1) | (2) | (2) | (2) | (4) | (5) | (19) | (2) | (6) | (9) | (10) | (62) |
| Adoption period observations | | | | | | | (168) | | | | | (168) |
| Other | (2) | 0 | 0 | (1) | 0 | 0 | (24) | (3) | (3) | (1) | (1) | (35) |
| Total eliminations | (28) | (18) | (25) | (23) | (42) | (99) | (400) | (40) | (67) | (92) | (54) | (888) |
| Final sample | 8 | 4 | 11 | 6 | 22 | 65 | 95 | 44 | 35 | 47 | 51 | 388 |
| | Pre–SFAS 142 sample 116 | | | | | | Post–SFAS 142 sample 272 | | | | | 388 |

Note: This table pertains to all firms found via our initial search per fiscal year and outlines the reasons for eliminating observations.

## Results

### *Information Content Analyses—Temporal Effects Only*

We calculated the short-window abnormal return (AR) for each firm in the pre–SFAS 142 and post–SFAS 142 samples. ARs are calculated as size-adjusted, buy-and-hold returns over the period beginning the day of the announcement and ending on the first trading day after the announcement.[12]

Univariate statistics can be seen in Table 3. The mean and median ARs are negative in both the pre–SFAS 142 and post–SFAS 142 periods. Economically, the magnitudes of the

**Table 2.** Descriptive Statistics of Our Sample and the Compustat Universe

Panel A—Sample

| Variable | *N* | *M* | *SD* | Minimum | 10th percentile | 25th percentile | Median | 75th percentile | 90th percentile | Maximum |
|---|---|---|---|---|---|---|---|---|---|---|
| *RAW WO* | 388 | 267.92 | 1,163.85 | 1.30 | 5.50 | 12.50 | 33.84 | 134.37 | 433.00 | 17,997.10 |
| *RAW WO/ASSETS* | 388 | 0.19 | 0.16 | 0.05 | 0.06 | 0.08 | 0.13 | 0.23 | 0.39 | 1.00 |
| *RAW WO/MVE* | 388 | 0.28 | 0.27 | 0.00 | 0.05 | 0.09 | 0.17 | 0.37 | 0.72 | 1.00 |
| *LAGGED ASSETS* | 388 | 1,642.99 | 6,490.71 | 7.20 | 39.30 | 90.40 | 205.60 | 779.10 | 2,657.40 | 89,848.60 |
| *LAGGED MVE* | 388 | 1,474.68 | 6,013.64 | 0.05 | 27.53 | 62.55 | 208.09 | 719.38 | 2,495.93 | 76,981.50 |
| *GW INTENSE* | 388 | 0.35 | 0.21 | 0.00 | 0.10 | 0.18 | 0.32 | 0.50 | 0.67 | 0.92 |

Panel B—Compustat Universe

| Variable | *N* | *M* | *SD* | Minimum | 10th percentile | 25th percentile | Median | 75th percentile | 90th percentile | Maximum |
|---|---|---|---|---|---|---|---|---|---|---|
| *LAGGED ASSETS* | 92,701 | 4,629.72 | 39,614.93 | 0.00 | 4.82 | 24.83 | 154.80 | 841.95 | 4,142.74 | 1,588,784.81 |
| *LAGGED MVE* | 92,674 | 2,203.85 | 13,340.47 | 0.00 | 4.88 | 21.46 | 109.67 | 630.65 | 3,001.57 | 1,819,780.00 |
| *GW INTENSE* | 92,390 | 0.09 | 0.16 | 0.00 | 0.00 | 0.00 | 0.01 | 0.11 | 0.31 | 1.00 |

Note: Above are descriptive statistics pertaining to the complete sample as well as summary statistics pertaining to the Compustat universe for the years in our study (1996–2006). The variables are as follows: the absolute value of the raw goodwill write-off (*RAW WO*); the absolute value of the raw goodwill write-off scaled by lagged assets and capped at 1.00 (*RAW WO/ASSETS*); the absolute value of the raw goodwill write-off scaled by lagged market value of equity and capped at 1.00 (*RAW WO/MVE*); lagged assets (*LAGGED ASSETS*); lagged market value of equity (*LAGGED MVE*); and lagged total intangible assets divided by lagged total assets (*GWINTENSE*). All dollar amounts are in millions.

**Table 3.** Summary Statistics of Abnormal Returns and Unexpected Earnings

| Variable Name | Pre–SFAS 142 Sample | | | | Post–SFAS 142 Sample | | | |
|---|---|---|---|---|---|---|---|---|
| | *n* | *M* | Median | *SD* | *n* | *M* | Median | *SD* |
| *AR* | 116 | −0.034* | −0.028*** | 0.192 | 272 | −0.033*** | −0.030*** | 0.124 |
| *WO* | 116 | 0.214*** | 0.140*** | 0.187 | 272 | 0.179*** | 0.131*** | 0.153 |
| *UERW* | 116 | −0.051*** | −0.027*** | 0.159 | 272 | 0.030*** | 0.000* | 0.148 |
| *UEFE* | 78 | −0.023*** | −0.001*** | 0.0542 | 198 | −0.014*** | 0.000*** | 0.049 |
| *LOSS* | 116 | 0.035*** | 0.008*** | 0.100 | 272 | 0.014*** | 0.000*** | 0.033 |
| *GAIN* | 116 | 0.004** | 0.000*** | 0.017 | 272 | 0.001** | 0.000*** | 0.006 |

Note: Above are summary statistics pertaining to variables used in our information content tests. The variables are as follows: the short window abnormal returns calculated as size-adjusted, buy-and-hold returns over the period beginning the day of the announcement and ending on the first trading day after the announcement (*AR*); the absolute value of the raw goodwill write-off scaled by lagged assets (*WO*); change in quarterly earnings from the prior year excluding the goodwill write-off scaled by lagged assets (*UERW*); unexpected quarterly earnings based on analyst forecast errors scaled by lagged assets (*UEFE*); the absolute value of contemporaneously announced nonrecurring decreases to income, net of tax, scaled by lagged assets (*LOSS*); and contemporaneously announced nonrecurring positive increases to income, net of tax, scaled by lagged assets (*GAIN*). *, **, and *** denote significance at the 10%, 5%, and 1% levels, respectively.

market reactions are fairly large. This finding contradicts that of Francis et al. (1996), who found that short-window ARs surrounding goodwill write-off announcements were insignificantly different from 0.[13] The difference between the short-window ARs in the pre–SFAS 142 and post–SFAS 142 samples is not statistically significant, irrespective of whether means or medians are compared, suggesting that the change in impairment trigger of SFAS 142 does not impact the information content of accounting data. This result should be interpreted with caution since the majority of write-off announcements are announced with contemporaneous information.[14] Moreover, there is no control for market expectations of the magnitude of the impairment in this table. Furthermore, observations in the post–SFAS 142 sample appear to perform better, vis-à-vis observations in the pre–SFAS 142 sample. This performance discrepancy is likely due to the fact that approximately 75% of the pre–SFAS 142 sample is comprised of observations in years 2000 and 2001, just after the burst of the technology bubble. We control for this performance discrepancy in our multivariate analyses. Therefore, we next present our multivariate tests and discuss our expectations model.

We examine whether the adoption of SFAS 142 alters the information content of goodwill impairments, per our first hypothesis, by estimating the following regression:

$$AR_i = \alpha_0 + \alpha_1 UE_i + \alpha_2 UWO_i + \alpha_3 UWO_i \times POST_i + \alpha_4 LOSS_i + \alpha_5 GAIN_i \qquad (1)$$

Where *AR* is the short-window abnormal return for firm *i*; *UE* is unexpected quarterly earnings announced contemporaneously, excluding the goodwill write-off, using either a seasonal random walk model to form earnings expectations in one specification or analyst forecast and actual amounts per Institutional Brokers' Estimate System (IBES) in another specification when such data are available;[15] *UWO* is the unexpected goodwill write-off, net of tax;[16] *POST* is a dummy variable equal to one in the post–SFAS 142 period; *LOSS* is the absolute value of contemporaneously announced negative special charges; and *GAIN* is contemporaneously announced positive special charges.[17] The unexpected earnings and write-off variables are deflated by lagged assets. In regard to H1, the coefficient on

*UWO* × *POST* ($\alpha_3$) will be statistically significant if SFAS 142 alters the information content of goodwill write-offs.[18]

Clearly, the market will have some expectations that a goodwill impairment might occur. Hence, we do not use the total write-off amount as our main treatment variable. Yet identifying an impairment expectations model is a difficult task. Hayn and Hughes (2006) conclude that publicly available disclosures do a very poor job of predicting goodwill impairments.

Our approach is to extend an expectations model used by Beatty and Weber (2006). They examine the discretionary component of SFAS 142 transition charges and hypothesize that it is a function of contracting, equity market, and regulatory incentives of management. In their model, if the MVE exceeds the book value of equity (BVE), then the expected impairment is 0. If BVE exceeds MVE, then the difference between those values is the expected impairment, subject to a cap of the prior year goodwill balance (Beatty & Weber, p. 285).

Beatty and Weber's (2006) model appears to be better specified for single-segment firms (see Bens, 2006, p. 294). Therefore, we use it for the single-segment firms in our sample, with MVE and BVE values coming from the last quarter prior to the impairment. We refine their model for the multisegment firms in our sample. We first assign the prior year intangible assets to the segments on a sales-weighted basis. We also assign BVE to the segments on a sales-weighted basis to create an implied book value of equity (IBVE). We then calculate an implied market value of equity (IMVE) for the segment by following the procedures found in much of the ''diversification discount'' literature (e.g., Berger & Ofek, 1995). We multiply the segment's prior year sales by the median ratio of MVE to sales for all single-segment firms in the same industry.[19] This allows us to calculate an expected impairment at the segment level using Beatty and Weber's method. If IMVE exceeds IBVE, then the expected impairment is 0. If the opposite is true, then the expected impairment is the amount by which IBVE exceeds IMVE, subject to the cap of the intangible asset balance we assigned to the segment.[20]

Finally, we followed two additional procedures. First, if the expected impairment for a multisegment firm is larger using the original Beatty and Weber (2006) test at the *firm level* (i.e., firm BVE vs. MVE), then we use that value. Second, we noticed that for 10 firms (roughly 2.6% of the sample), the impairment amount exceeded the prior year intangible asset balance per Compustat. We found that for each observation, this was caused by the firm making an acquisition subsequent to the prior year end and then impairing the newly created goodwill within the same year. For these firms, we adjusted the prior year balance used as a cap for expected impairments by including the intangibles created by current year acquisitions. Table 4 provides an overview of the process.[21]

The importance of developing this expectations model is illustrated in our first set of analyses. In Table 4, Panel A, we estimate several variations of Model (1) where the non-goodwill earnings expectations are formed using a seasonal random walk; Panel B presents the comparable results on the smaller sample of firms with coverage on IBES and earnings expectations based on analyst forecasts.

Focusing on Panel A, the first column of results presents the basic Model (1) estimated on the full sample. The coefficient of the unexpected write-off is negative and significant, whereas the temporal interaction is insignificant. However, the explanatory power is modest with an adjusted $R^2$ of 1.60%. In Panel B, the coefficient on the unexpected write-off is not significantly different from 0 in the first column of results.

These models constrain the coefficient on unexpected impairments to be the same, whether the forecast error is positive or negative. That is, a negative coefficient would

**Table 4.** Information Content Tests—Temporal Analyses

Panel A—Random Walk Used for Earnings Expectations

| Explanatory variables | Predicted sign | All firms | All firms | *UWO* > 0 | *UWO* < 0 |
|---|---|---|---|---|---|
| *Intercept* | ? | −0.03 (−3.03)*** | −0.01 (−1.28) | −0.014 (−1.07) | −0.01 (−0.48) |
| *UE* | + | 0.04 (0.71) | 0.02 (0.46) | 0.043 (0.74) | −0.40 (−0.38) |
| *UWO* | − | −0.16 (−2.53)*** | | −0.22 (−2.94)*** | 0.06 (0.27) |
| *UWO* × *POST* | ? | 0.09 (1.22) | | 0.11 (1.30) | −0.01 (−0.03) |
| *UWOPOS* | − | | −0.23 (−3.12)*** | | |
| *UWOPOS* × *POST* | ? | | 0.11 (1.40) | | |
| *UWONEG* | ? | | 0.13 (0.74) | | |
| *UWONEG* × *POST* | ? | | −0.07 (−0.35) | | |
| *LOSS* | − | −0.07 (−0.55) | −0.07 (−0.55) | −0.04 (−0.28) | −0.42 (−1.02) |
| *GAIN* | + | 0.01 (1.40)* | 1.14 (1.57)* | 1.18 (1.60)* | −2.76 (−0.55) |
| Adjusted $R^2$ | | 1.60% | 2.00% | 3.35% | −2.77% |
| *n* | | 388 | 388 | 264 | 124 |

Panel B—Analyst Forecast Used for Earnings Expectations

| Explanatory variables | Predicted sign | All firms | All firms | *UWO* > 0 | *UWO* < 0 |
|---|---|---|---|---|---|
| *Intercept* | ? | 0.02 (−1.91)* | 0.00 (0.28) | 0.00 (0.24) | 0.01 (0.33) |
| *UE* | + | 0.43 (2.62)*** | 0.43 (2.65)*** | 0.38 (2.06)** | 0.72 (1.72)** |
| *UWO* | − | −0.07 (−0.82) | | −0.20 (−1.75)** | 0.09 (0.43) |
| *UWO* × *POST* | ? | −0.02 (−0.18) | | −0.01 (−0.13) | 0.13 (0.59) |
| *UWOPOS* | − | | −0.19 (−1.82)** | | |
| *UWOPOS* × *POST* | ? | | −0.02 (−0.18) | | |
| *UWONEG* | ? | | 0.18 (0.99) | | |
| *UWONEG* × *POST* | ? | | 0.03 (0.12) | | |
| *LOSS* | − | −0.06 (−0.54) | −0.08 (−0.67) | −0.07 (−0.52) | −0.22 (−0.48) |
| *GAIN* | + | 0.12 (0.13) | 0.10 (0.12) | 0.24 (0.25) | −4.23 (−0.93) |
| Adjusted $R^2$ | | 1.98% | 3.55% | 3.53% | 1.65% |
| *n* | | 276 | 276 | 192 | 84 |

Note: This table presents regression results from estimating the following models:
$AR_i = \alpha_0 + \alpha_1 UE_i + \alpha_2 UWO_i + \alpha_3 UWO_i \times POST_i + \alpha_4 LOSS_i + \alpha_5 GAIN_i$

**Table 4** (continued)

$AR_i = \alpha_0 + \alpha_1 UE_i + \alpha_2 UWOPOS_i + \alpha_3 UWOPOS_i \times POST_i + \alpha_4 UWONEG_i + \alpha_5 UWONEG_i \times POST_i + \alpha_6 LOSS_i + \alpha_7 GAIN_i$

This table provides empirical evidence for Hypothesis 1 (H1): The information content of goodwill impairments changed following the implementation of SFAS 142. H1 will be supported if the coefficient on *UWO* $\times$ *POST* is statistically significant.

Dependent variables are the short window abnormal returns (*AR*) calculated as size-adjusted, buy-and-hold returns over the period beginning the day of the announcement and ending on the first trading day after the announcement. Independent variables (all scaled by lagged assets except for dummy variables) are as follows: *UE* is unexpected quarterly earnings announced contemporaneously, excluding the goodwill write-off, using either a seasonal random walk model to form earnings expectations in one specification, or analyst forecast and actual amounts per IBES in another specification when such data are available; *UWO* is the unexpected goodwill write-off (actual minus expected), net of tax; *POST* is a dummy variable equal to 1 if the period is the postadoption period, 0 otherwise; *UWOPOS* equals *UWO* if positive, 0 otherwise; and *UWONEG* equals *UWO* if negative, 0 otherwise; *LOSS* is the absolute value of contemporaneously announced nonrecurring decreases to income, net of tax; *GAIN* is contemporaneously announced nonrecurring positive increases to income, net of tax.

The impairment expectations model is as follows:

MVE = market value of equity; BVE = book value of equity; IBVE = implied book value of equity; IMVE = implied market value of equity.

For single-segment firms,

1. If MVE > BVE, then the expected write-off is 0 and *UWO* equals the entire impairment amount.
2. If MVE < BVE, then the expected write-off is MVE – BVE up to the book amount of goodwill.

For multisegment firms,

1. Assign goodwill to each segment on a sales-weighted basis.
2. Assign BVE to each segment on a sales-weighted basis.
3. Calculate segment IMVE = (segment sales $\times$ industry median single-segment MVE/sales).
4. If IMVE > IBVE, then the expected write-off is 0 and *UWO* equals the entire impairment amount.
5. If IMVE < IBVE, then the expected write-off is IMVE – IBVE up to the assigned amount of goodwill.
6. If applying the single-segment methodology yields a higher expected write-off, use that value.

The first column of results pertains to the first model above, whereas the second column presents the second model. The third and fourth columns present the results on separate subsamples when *UWO* is positive and negative, respectively. *, **, and *** denote significance at the 10%, 5%, and 1% levels, respectively (one-tailed tests for signed predictions, two-tailed for unsigned). Panel A presents results using the random walk model for earnings expectations; Panel B uses analyst forecasts for earnings expectations. Coefficients are presented first, with *t*-statistics in parentheses.

suggest that the penalty applied to every unit of a positive forecast error (actual exceeds expected) is equal to the reward applied to every unit of a negative error (actual is less than expected). Although this is possible, we have no reason to believe it to be the dominant result. Thus, in the second column of results, we respecify the models to allow for different coefficients for positive and negative unexpected impairments. In both Panels A and B, the market reaction to positive unexpected impairments is negative, whereas the reaction to negative unexpected impairments is 0. In the third and fourth columns of results, we reestimate model (1) on two subsamples: those with positive versus negative unexpected impairments. The results tell the same story as column 2. Of the 388 firms in the larger random walk sample, 264 (68%) experienced impairments where the actual write-off exceeds expectations. The market reaction is negative and significant among firms in this subsample (the *UWO* coefficient is negative). The temporal interaction does not provide support for our first hypothesis, as the negative market reaction among firms with positive forecast errors is not altered in the post–SFAS 142 period (the *UWO* × *POST* coefficient is insignificant). For the analyst forecast sample of 276 firms, 192 (70%) experience impairments where the actual write-off exceeds expectations. Similar to Panel A, the market reaction to *UWO* is negative and significant for this subsample, and the temporal coefficient of *UWO* × *POST* is not significant.

We draw the following conclusions from Table 4. First, having an expectations model helps isolate the firms where a portion of the charge is truly a ''surprise'' to the market. In addition, it helps increase the explanatory power of the model, as evidenced by the increase in adjusted $R^2$ due to the inclusion of separate positive and negative unexpected write-offs. When firms record charges that exceed the expected amount, the market reaction is negative. When firms record charges less than expectations, there is no market reaction. Perhaps the market believes that a greater impairment actually exists, but management is delaying its recognition. For our remaining cross-sectional analyses, we focus only on that subsample with positive unexpected impairments (i.e., actual write-offs exceed expectations).

Our second conclusion from Table 4 is that there is no support for H1 based on these tests. Specifically, the temporal change in market reaction across accounting regimes, represented by *POST*, is insignificant across all variants of the information content tests. However, these analyses ignore any firm characteristics that might affect the valuation implications of the impairments. We examine this issue in the next section.

### *Information Content Analyses—Cross-Sectional and Temporal Effects*

We hypothesize that three firm characteristics alter the impairment–returns relationship: analyst following, firm size, and firm complexity. We also examine whether these conditional effects change following SFAS 142.

We use the following variables as proxies for our cross-sectional analyses: *HIFOLL* is a dummy variable equal to 1 if analyst following per IBES exceeds the median following of all Compustat firms for that year, 0 otherwise. *SMALL* is a dummy variable equal to 1 if lagged assets are less than the median Compustat asset balance for that year, 0 otherwise. *COMPLEX* is a dummy variable equal to 1 if a firm level Herfindahl index, measured across segment sales, is less than the median Compustat sales concentration for that year, 0 otherwise.[22] Because each year the median Compustat firm consists of a single segment, this variable is equivalent to an indicator of whether the firm is a multisegment corporation.

Before we study the cross-sectional impact of these three firm characteristics, we first examine the correlation across such variables in Panel A of Table 5. As expected, there is

*(text continues on p. 19)*

**Table 5.** Information Content Tests—Cross-Sectional and Temporal Analyses

Panel A—Pearson Correlations of Cross-Sectional Variables

| | *HIFOLL* | *SMALL* | *COMPLEX* |
|---|---|---|---|
| *HIFOLL* | 1.00 | | |
| *SMALL* | −0.47 (0.00)*** | 1.00 | |
| *COMPLEX* | −0.03 (0.60) | −0.13 (0.01)** | 1.00 |

Panel B—Cross-Sectional Variables and Random Walk Used for Earnings Expectations

| Explanatory variables | Predicted sign | *CSV* proxies: *HIFOLL* | *CSV* proxies: *SMALL* | *CSV* proxies: *COMPLEX* |
|---|---|---|---|---|
| *Intercept* | ? | −0.00 (0.18) | −0.00 (−0.19) | 0.00 (−0.18) |
| *UE* | + | 0.03 (0.58) | 0.06 (0.98) | 0.03 (0.56) |
| *UWO* | − | −0.30 (−3.57)*** | −0.44 (−3.84)*** | −0.27 (−2.94)*** |
| *UWO* × *POST* | ? | 0.21 (2.11)** | 0.25 (1.98)** | 0.10 (1.02) |
| *CSV* | ? | −0.04 (−1.34) | −0.01 (−0.47) | −0.02 (−0.96) |
| *UWO* × *CSV* | +/?/+ | 0.34 (1.98)** | 0.36 (2.44)** | 0.13 (0.85) |
| *UWO* × *CSV* × *POST* | ? | −0.37 (−2.05)** | −0.25 (−1.54) | 0.04 (0.24) |
| *LOSS* | − | −0.04 (−0.32) | −0.04 (−0.28) | −0.05 (−0.38) |
| *GAIN* | + | 1.31 (1.77)** | 0.82 (1.11) | 1.01 (1.32)* |
| Adjusted $R^2$ | | 4.48% | 4.93% | 2.97% |
| *N* | | 264 | 264 | 264 |
| $H_0$: *UWO* + *UWO* × *POST* = 0 (*p* value) | | −0.09 (0.23) | −0.19 (0.05)** | |
| $H_0$: *UWO* + *UWO* × *CSV* = 0 (*p* value) | | 0.04 (0.79) | −0.08 (0.39) | |
| $H_0$: *UWO* + *UWO* × *POST* + *UWO* × *CSV* + *UWO* × *CSV* × *POST* = 0 (*p* value) | | −0.12 (0.21) | | |

(*continued*)

**Table 5.** continued

Panel C—Cross-Sectional Variables and Analyst Forecast Used for Earnings Expectations

| | | *CSV* proxies | | |
|---|---|---|---|---|
| Explanatory variables | Predicted sign | *HIFOLL* | *SMALL* | *COMPLEX* |
| *Intercept* | ? | 0.03 (1.47) | 0.01 (0.54) | 0.02 (0.87) |
| *UE* | + | 0.38 (2.04)** | 0.40 (2.15)** | 0.36 (1.96)** |
| *UWO* | − | −0.44 (−2.51)*** | −0.34 (−2.34)** | −0.28 (−2.14)** |
| *UWO* × *POST* | ? | 0.25 (1.42) | −0.00 (−0.01) | −0.02 (−0.17) |
| *CSV* | ? | −0.05 (−1.56) | −0.01 (−0.26) | −0.05 (−1.41) |
| *UWO* × *CSV* | +/?/+ | 0.40 (1.70)** | 0.36 (1.46) | 0.46 (1.19) |
| *UWO* × *CSV* × *POST* | ? | −0.48 (−2.03)** | −0.17 (−0.69) | −0.14 (−0.39) |
| *LOSS* | − | −0.06 (−0.48) | −0.08 (−0.60) | −0.08 (−0.59) |
| *GAIN* | + | 0.37 (0.39) | 0.02 (0.02) | 0.18 (0.19) |
| Adjusted $R^2$ | | 6.31% | 4.14% | 3.41% |
| *N* | | 192 | 192 | 192 |
| $H_0$: *UWO* + *UWO* × *POST* = 0 (*p* value) | | −0.19 (0.08)* | −0.34 (0.02)** | |
| $H_0$: *UWO* + *UWO* × *CSV* = 0 (*p* value) | | −0.04 (0.79) | 0.02 (0.90) | |
| $H_0$: *UWO* + *UWO* × *POST* + *UWO* × *CSV* + *UWO* × *CSV* × *POST* = 0 (*p* value) | | −0.27 (0.05)* | | |

Note: Panels B and C present regression results from estimating the following model:

$AR_i = \beta_0 + \beta_1 UE_i + \beta_2 UWO_i + \beta_3 UWO_i \times POST_i + \beta_4 CSV_i + \beta_5 UWO_i \times CSV_i + \beta_6 UWO_i \times CSV_i \times POST_i + \beta_7 LOSS_i + \beta_8 GAIN_i$

This table provides evidence for the following hypotheses:

Columns 1, 2, and 3:

*Hypothesis 1 (H1)*: The information content of goodwill impairments changed following the implementation of SFAS 142. H1 will be supported if the coefficient on *UWO* × *POST* is statistically significant.

Column 1:

*Hypothesis 2 (H2)*: The information content of goodwill impairments is reduced for high analyst following firms. H2 will be supported if the coefficient on *UWO* × *CSV* is positive.

*Hypothesis 3 (H3)*: The effect of analyst following on the information content of goodwill impairments changed following the implementation of SFAS 142. H3 will be supported if the sum of the coefficients on *UWO*, *UWO* × *CSV*, *UWO* × *POST*, and *UWO* × *POST* × *CSV* is statistically significant.

Column 2:

*Hypothesis 4 (H4)*: The information content of goodwill impairments is impacted by firm size. H4 will be supported if the coefficient on *UWO* × *CSV* is different from 0.

**Table 5.** (continued)

*Hypothesis 5 (H5)*: The effect of firm size on the information content of goodwill impairments changed following the implementation of SFAS 142. H5 will be supported if the sum of the coefficients on *UWO*, *UWO* × *CSV*, *UWO* × *POST*, and *UWO* × *POST* × *CSV* is statistically significant.

Column 3:

*Hypothesis 6 (H6)*: The information content of goodwill impairments is reduced for complex firms. H6 will be supported if the coefficient on *UWO* × *CSV* is positive.

*Hypothesis 7 (H7)*: The effect of firm complexity on the information content of goodwill impairments changed following the implementation of SFAS 142. H7 will be supported if the sum of the coefficients on *UWO*, *UWO* × *CSV*, *UWO* × *POST*, and *UWO* × *POST* × *CSV* is statistically significant.

All of the variables are defined in Table 4 with the exception of *CSV* (cross-sectional variable), for which we use three proxies: *HIFOLL*, *SMALL*, and *COMPLEX*. *HIFOLL* equals 1 if analyst following per IBES exceeds the median following for Compustat firms, 0 otherwise; *SMALL* equals 1 if lagged assets are less than the median Compustat firm's, 0 otherwise; and *COMPLEX* equals 1 if the firm is a multisegment corporation, 0 otherwise.

The sample consists of all firms where the unexpected goodwill write-off (*UWO*) is positive (i.e., the actual impairment exceeded expectations). Panel A contains Pearson correlations of cross-sectional variables, with *p* values in parentheses. Panel B presents results using the random walk model for earnings expectations; Panel C uses analyst forecasts for earnings expectations. In both Panels B and C, coefficients are presented first, with *t* statistics in parentheses. When the interactive variables are significant, the bottom of the panel presents tests of the restriction that the base coefficient and the interaction terms sum to 0. The actual sum of the coefficients is presented with the *p* value from the *F*-test reported in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels, respectively (one-tailed tests for signed predictions, two-tailed for unsigned).

a negative and significant correlation between *HIFOLL* and *SMALL*. There is also a negative and significant correlation between *COMPLEX* and *SMALL*; however, there is no significant correlation between *COMPLEX* and *HIFOLL*. Due to the collinearity problems that will undoubtedly arise due to estimating a regression, including all of these conditional and temporal effects simultaneously on a relatively small sample, we introduce each firm characteristic separately via the following regression, where *CSV* stands for cross-sectional variable:

$$AR_i = \beta_0 + \beta_1 UE_i + \beta_2 UWO_i + \beta_3 UWO_i \times POST_i + \beta_4 CSV_i + \beta_5 UWO \times CSV_i + \beta_6 UWO_i \times CSV_i \times POST_i + \beta_7 LOSS_i + \beta_8 GAIN_i. \quad (2)$$

Table 5, Panel B presents the results of estimating Model (2) with earnings expectations determined per a random walk model, whereas Panel C presents the results of estimating Model (2) with earnings expectations determined using analyst forecasts. Consistent with the previous analysis, the main effect of the unexpected impairment is negative across all models.

The first column of Panel B provides evidence that the information content of the impairments declined for low analyst following firms post–SFAS 142, consistent with H1, as the coefficient on *UWO* × *POST* is positive and significant. More specifically, low analyst firms experienced a negative reaction to impairments before SFAS 142 (evidenced by a negative and significant coefficient on *UWO*); but low analyst firms experienced no reaction to impairments post–SFAS 142, as the sum of *UWO* + *UWO* × *POST* is statistically indistinguishable from 0 in the random walk sample (though this result is weaker in the analyst forecast sample of Panel C).

The first columns of Panels B and C further provide evidence regarding our information asymmetry predictions outlined in H2 and H3. H2 predicts that the market reaction will be attenuated for high analyst following firms, whereas H3 predicts that the effect of analyst following on the information content of goodwill impairments changed following the implementation of SFAS 142. Consistent with H2, the negative market reaction to unexpected impairments is significantly reduced for high analyst following firms, as evidenced by the positive coefficient on the *UWO* × *CSV* interaction in column 1. This result holds for both the random walk subsample (Panel B) and the smaller analyst following subsample (Panel C). In each subsample, the null that the sum of *UWO* + *UWO* × *CSV* is 0 cannot be rejected. Thus, consistent with H2, it appears as if the negative market reaction to goodwill write-offs in the pre–SFAS 142 period only applies to firms with high information asymmetry and not to those with low information asymmetry. In regard to H3, we can determine if firms with high analyst following still exhibit a lower level of information content of goodwill impairments following the implementation of SFAS 142 by assessing whether the sum of *UWO*, *UWO* × *HIFOLL*, *UWO* × *POST*, and *UWO* × *POST* × *HIFOLL* is significantly different from 0. The sum equals 0, statistically speaking, in the random walk model but not in the analyst forecast model. The latter result suggests that there may have been some increase in the information content of goodwill impairments, although this is a unique subsample (i.e., firms followed by analysts where following is relatively high).

The second columns of Table 5 provide information regarding firm size and its relationship to the information content of goodwill write-offs. Similar to the high analyst following tests, the tests in Panel B provide additional support for H1. In the random walk model, we find that the information content of the impairments declined significantly for large firms post–SFAS 142, as the coefficient on *UWO* × *POST* is positive and significant.

Regarding our predictions concerning firm size and the relationship between returns and write-offs, H4 predicts an unsigned market reaction for small firms, whereas H5 predicts that the effect of firm size on the information content of goodwill impairments changed following the implementation of SFAS 142. In regard to H4, in both Panels B and C, the impairment impact on stock returns is reduced for smaller firms, as the coefficient on $UWO \times CSV$ is positive. While this finding is statistically significant in Panel B, it falls just below two-tailed significance in Panel C (where the two-tailed $p$ value is .15). The sum of $UWO + UWO \times CSV$ in both panels is statistically indistinguishable from 0, implying that the pre–SFAS 142 market reaction to goodwill write-offs is only negative for larger firms. In regard to H5, we do not find any evidence that the market reaction to impairments is significantly altered for smaller firms following the adoption of SFAS 142.

In the last columns of Panels B and C of Table 5 we examine how firm complexity alters the impairment–returns relationship, through the *COMPLEX* variable. H6 predicts that the market reaction will be attenuated for multisegment firms, whereas H7 predicts an unsigned change following SFAS 142. However, the table suggests that the null cannot be rejected for this cross-sectional cut. The unexpected impairment is still negative and significant, but this does not change with firm complexity or through time.

In summary, we present evidence consistent with our prediction that goodwill impairments have greater valuation impact when there is more information asymmetry in the market, where low analyst following is our proxy for this condition. We also find evidence that goodwill impairments are less informative to the market when a firm is smaller, suggesting that smaller firms are less able to handle the complex valuation techniques needed to implement the tests. We find no evidence that the complexity of the firm, captured by whether it is multisegment or not, affects the information content of goodwill impairments. Finally, the implementation of SFAS 142 appears to have reduced the information content of goodwill impairments for the low analyst following as well as the larger firms.

## Sensitivity Analyses

In this section, we present the results of our sensitivity analyses. In the section titled ‘‘Prediction Model Limitations,’’ we address the limitations of our prediction model and examine the sensitivity of our results to such limitations through out-of-sample testing and the use of raw write-offs (as opposed to unexpected write-offs) in our main regressions. In the section titled ‘‘Inclusion of Both Size and Alternative Measures of Information Asymmetry,’’ we address the high correlation between *SMALL* and *HIFOLL* by creating a model that includes a size variable as well as two alternative measures of information asymmetry. Because the adoption of SFAS 142 allowed for write-offs to be taken ‘‘below the line’’ net of tax, we separately examine the impact of adoption period write-offs in the section titled ‘‘Adoption Period.’’ Less involved yet still important sensitivity analyses are presented in sections titled ‘‘Industry Effects,’’ "Exclusion of Definite Lived Intangible Impairments," and ‘‘Temporal Interactions on Unexpected Earnings.’’ In general, our main results are not altered across any of the sensitivity tests contained herein.

### *Prediction Model Limitations*

While we believe in the necessity of using a prediction model to isolate the unexpected component of goodwill write-offs, we acknowledge that there are certain restrictions in our model. First, the difference between MVE and BVE is a crude proxy for the value of

goodwill. Goodwill impairments are to be calculated at the operating unit level, which may be lower than an operating segment; hence, even for single-segment firms this is an imperfect measure. Second, for multisegment firms, while our methodology for estimating the segment's implied MVE is well grounded in the literature, the assignment of intangibles and book values to segments on a sales-weighted basis implicitly assumes proportionate contribution of benefits across all assets, which may not be descriptive.

To help validate our model, we test its predictive abilities during an out-of-sample period. Using a sample of firms with intangibles balances greater than 5% of total assets in 2006 and 2007, we test the ability of our model to predict write-offs up to 2 years in the future (10,750 Compustat observations meet our screening criteria and data availability requirements). In a binary sense, the model correctly predicts write-offs approximately 75% of the time. Specifically, in 67% of the cases, the model does not anticipate a write-off and indeed a write-off does not occur; in 8% of the cases, the model anticipates a write-off and indeed a write-off does occur. Furthermore, using a continuous measure, the correlation between the expected and actual write-offs is .20. All of these tests achieve statistical significance at the .01 level.

While the findings above instill confidence in our model, we additionally reestimate all regressions using raw write-offs. Our main results remain unchanged. Specifically, the market reaction to the raw write-offs is negative and significant when controlling for unexpected earnings using both a random walk and an analyst forecast error model in model (1). This holds when we include the cross-sectional and temporal terms in model (2) (with one exception of raw write-offs falling just below statistical significance when we control for *HIFOLL* and analyst forecasts are used to determine unexpected earnings). In addition, similar to our main results, when raw write-offs are used in our models, we find evidence that the market reaction to impairments is attenuated for firms with low information and smaller firms. However, unlike in our main analyses, when raw returns are used in our models, we find evidence that the market reaction to impairments is attenuated for complex firms.

### *Inclusion of Both Size and Alternative Measures of Information Asymmetry*

In choosing cross-sectional determinants, we sought out variables that might impact the market's reaction to unexpected write-offs and/or impact a firm's ability to implement SFAS 142. Two such variables we chose are (a) high analyst following (*HIFOLL*) to proxy for information asymmetry and (b) the inverse of firm size (*SMALL*) to proxy for a firm's ability to implement SFAS 142. However, as discussed above and demonstrated in the correlation matrix, these proxies are related, likely because smaller firms tend to have greater information asymmetry. Our results in Table 5 suggest that our *SMALL* variable is indeed picking up the ability of a firm to implement SFAS 142, rather than information asymmetry, as our findings show the market reacts more strongly to unexpected write-offs by larger firms than to smaller firms. In this section, we conduct two additional tests to ensure that our *SMALL* proxy is indeed capturing a firm's ability to implement SFAS 142, rather than information asymmetry.

First, we control for both information asymmetry and size in the same regression. Due to high correlations between these variables (see Panel A of Table 5), multicollinearity can be a severe problem if we include both variables in the same regression along with all of their interactions with the write-off variable and the temporal dummies. To mitigate this problem, we orthoganalize them by estimating a regression of analyst following on the log

of assets. We then use the residual of this regression to separate the firms into high and low analyst following groups. If the residual is positive, then the orthoganalized high analyst following variable, *OHIFOLL*, equals 1; otherwise it equals 0. The *SMALL* classification is the same as in the previous analyses. Second, we use institutional ownership as another measure that should capture information asymmetry. Since institutional ownership is also highly correlated with firm size (the correlation between percentage shares held by institutions and the log of assets is 0.50), we follow the same procedure to orthoganalize the variables. *OHIINST*, the orthoganalized high institutional following value, equals 1 if the residual from the regression of the percentage shares held by institutions on firm size is positive, and it equals 0 otherwise.

Table 6 presents the results of estimating the information content model, including both size and alternative measures of information asymmetry. The results suggest that both firm size and analyst following (after conditioning on firm size) affect the impairment–returns relationship. This conclusion is similar to that reached following the analyses in Table 5, where the variables entered the model in separate regressions. In addition, the negative reaction to a goodwill impairment is attenuated when institutional holdings (after conditioning on firm size) are high. This result holds for both the random walk and the smaller analyst following subsample. The results in Table 6 further provide evidence that the information content of the impairments declined following SFAS 142, consistent with H1, as $UWO \times POST$ is positive and significant across both orthoganolized information asymmetry proxies in Panel A; it is positive for both proxies in Panel B, but only statistically significant for the high analyst following measure.

### Adoption Period

The adoption of SFAS 142 took place largely during the first two quarters of 2002. Write-offs taken during the adoption period were allowed to be taken ‘‘below the line’’ net of tax. Because of strategic use of adoption period write-offs (Beatty & Weber, 2006), we have eliminated the adoption period write-offs from our main sample.

In an untabulated test, we include these observations and then reestimate our main regressions, including an additional dummy variable, *XI*, which equals 1 if the write-off took place during the adoption period. Including adoption period write-offs, but still excluding observations with negative unexpected write-offs, our enlarged sample size is 376 observations in the random walk sample and 268 observations in the analyst forecast sample.

Inclusion of the *XI* variable does not impact the finding that the market reacts negatively to unexpected write-offs. Furthermore, our results suggest that the market does not respond differently to write-offs taken during the adoption period, as the coefficient on $UWO + XI$ is insignificant in both the random walk and analyst forecast model. Thus, while evidence does exist regarding strategic behavior regarding write-offs taken during the adoption period, the market reaction to such results, in our sample, is not attenuated. We also included the *XI* variable in regression equation (2), along with all the cross-sectional interaction terms, and we did not find any significance in regard to this temporal variable.

### Industry Effects

As discussed in the section titled ‘‘Sample,’’ there is some industry concentration in our sample. Therefore, we isolate the first set of firms in an industry to record impairments. We identify the initial firm and all other firms from the two-digit SIC code that recorded

**Table 6.** Information Content Tests—Inclusion of Both Size and Alternative Measures of Information Asymmetry

Panel A—Random Walk Used for Earnings Expectations

| | | *INFOASYM* proxies | |
|---|---|---|---|
| Explanatory variables | Predicted sign | *OHIFOLL* | *OHIINS* |
| *Intercept* | ? | 0.01 (0.32) | 0.05 (1.72)* |
| *UE* | + | 0.04 (0.68) | 0.04 (0.78) |
| *UWO* | − | −0.65 (−4.45)*** | −0.70 (−5.10)*** |
| *UWO* × *POST* | ? | 0.46 (2.65)*** | 0.40 (2.54)** |
| *INFOASYM* | ? | −0.02 (−0.67) | −0.07 (−2.54)** |
| *UWO* × *INFOASYM* | + | 0.36 (2.43)*** | 0.63 (3.13)*** |
| *UWO* × *INFOASYM* × *POST* | ? | −0.36 (−2.08)** | −0.47 (−2.26)** |
| *SMALL* | ? | −0.01 (−0.52) | −0.04 (−1.31) |
| *UWO* × *SMALL* | ? | 0.42 (2.83)*** | 0.55 (3.49)*** |
| *UWO* × *SMALL* × *POST* | ? | −0.32 (−1.95)* | −0.36 (−2.05)** |
| *LOSS* | − | −0.05 (−0.38) | −0.07 (−0.54) |
| *GAIN* | + | 0.23 (0.30) | 0.56 (0.76) |
| Adjusted $R^2$ | | 6.22% | 8.19% |
| *N* | | 264 | 264 |

Panel B—Analyst Forecast Used for Earnings Expectations

| | | *INFOASYM* proxies | |
|---|---|---|---|
| Explanatory variables | Predicted sign | *OHIFOLL* | *OHIINS* |
| *Intercept* | ? | 0.08 (1.83)* | 0.09 (2.48)** |
| *UE* | + | 0.30 (1.59)* | 0.42 (2.25)** |
| *UWO* | − | −1.25 (−4.29)*** | −0.76 (−3.76)*** |
| *UWO* × *POST* | ? | 0.70 (2.15)** | 0.25 (1.25) |
| *INFOASYM* | ? | −0.08 (−1.78)* | −0.10 (−2.56)** |
| *UWO* × *INFOASYM* | + | 1.06 (3.61)*** | 0.69 (2.66)*** |
| *UWO* × *INFOASYM* × *POST* | ? | −0.81 (−2.56)** | −0.47 (−1.94)* |
| *SMALL* | ? | −0.01 (−0.42) | −0.04 (−1.09) |
| *UWO* × *SMALL* | ? | 0.60 (2.39)** | 0.58 (2.22)** |
| *UWO* × *SMALL* × *POST* | ? | −0.41 (−1.64) | −0.28 (−1.12) |
| *LOSS* | − | −0.09 (−0.72) | −0.09 (−0.68) |
| *GAIN* | + | −0.37 (−0.39) | −0.54 (−0.56) |
| Adjusted $R^2$ | | 9.59% | 7.77% |
| *N* | | 192 | 192 |

Note: This table presents regression results from estimating the following model:
$AR_i = \gamma_0 + \gamma_1 UE_i + \gamma_2 UWO_i + \gamma_3 UWO_i \times POST_i + \gamma_4 INFOASYM_i + \gamma_5 UWO_i \times INFOASYM_i + \gamma_6 UWO_i \times INFOASYM_i \times POST_i + \gamma_7 SMALL_i + \gamma_8 UWO_i \times SMALL_i + \gamma_9 UWO_i \times SMALL_i \times POST_i + \gamma_{10} LOSS_i + \gamma_{11} GAIN_i$
All of the variables are defined in Tables 4 or 5 with the exception of *INFOASYM* (information asymmetry), for which we use two proxies: *OHIFOLL* and *OHIINS*. *OHIFOLL* equals 1 if the residual from a regression of analyst following on firm size is positive, 0 otherwise; *OHIINS* equals 1 if the residual from a regression of percentage of firm shares held by institutional investors on firm size is positive, 0 otherwise. The sample consists of all firms where the unexpected goodwill write-off (*UWO*) is positive (i.e., the actual impairment exceeded expectations). Panel A presents results using the random walk model for earnings expectations; Panel B uses analyst forecasts for earnings expectations. Coefficients are presented first, with *t*-statistics to the right in parentheses. *, **, and *** denote significance at the 10%, 5%, and 1% levels, respectively (one-tailed tests for signed predictions, two-tailed for unsigned).

impairments within 7 days of the initial firm; these are all coded as the ''first'' round of charges in the industry. It is possible that these firms' write-offs are more of a surprise to the market than subsequent impairments within the industry. If a year lapses without a firm in an industry recording an impairment that makes it into our sample, then the next impairment in that industry is considered a ''first.'' We include an additional interaction term between *UWO* and this first indicator (all firms recording impairments after the ''first'' are coded 0). None of our conclusions change, and the first firm interaction is never significant. Also, given the heavy concentration in two-digit SIC code 73, we also include an interaction on *UWO* for these firms. Again, our previous conclusions are unchanged, and the SIC 73 interactions are insignificant.

### *Exclusion of Definite-Lived Intangible Impairments*

We also removed impairments that might have been for ''wasting intangibles'' because these assets are not subject to a fair value impairment trigger.[23] For example, for a finite-lived patent acquired in a business combination, a firm will still follow the impairment rules according to the SFAS 121 methodology (as now codified in SFAS 144). We removed 18 observations from the base sample of 388 firms that were either wasting intangibles or indeterminate based on the procedures of Note 23. For the sample of 264 firms with positive impairment surprises, we removed 15 observations. Our conclusions are unchanged after removing these observations.

### *Temporal Interactions on Unexpected Earnings*

We included time interactions for unexpected earnings not related to goodwill impairments (*UE*) to control for possible changes in the earnings capitalization rate over time. Our conclusions do not change when we allow the coefficient on unexpected earnings to vary across the pre-142 and post-142 periods.

## Conclusions

Standard setters will always struggle to find a balance between relevance and reliability in accounting information, especially with respect to intangible assets. In general, fair market values reflect the most relevant information to shareholders; however, in many instances, fair values are hard to verify, and therefore, reporting relevant accounting information may cause reliability to be compromised. More specifically, proponents of fair value accounting claim that more relevant accounting information leads to a more meaningful economic measure of a firm's performance and financial position. Critics counter that the discretion allowed in generating estimates is inherently unverifiable, inducing excess noise and potentially bias into accounting reports. Moreover, assigning *synergistic* intangibles to a single segment may be impossible.

This article presents an exploratory analysis by examining how changes in a fair value measurement system affect the information content of accounting information. We study the reporting of goodwill and other intangible assets, focusing specifically on how changes to the impairment trigger and reporting unit allocation affect market reactions to these write-offs.

We find that, on average, goodwill impairments induce a significant negative stock market reaction in an event study analysis. In cross-sectional analyses, we find that this reaction is attenuated for firms with low information asymmetry (high analyst following or

high percentage of shares held by institutional investors), suggesting that the market impounds this information into price for these firms prior to the public announcement by the company. The market reaction is also less significant for firms facing the greatest difficulty in conducting sophisticated impairment tests (small firms), suggesting that the market views these write-offs as less credible. Following the adoption of SFAS 142, the reaction to the impairment is weakened for the high information asymmetry and larger firms and does not strengthen for firms with low information asymmetry and a smaller size.

We conduct this analysis as an exploratory study, to advance our knowledge of a controversial standard. We do not directly test why the information content of goodwill write-offs decreases following SFAS 142 adoption in certain circumstances; we leave that analysis for future research. We suspect that the decrease in information content is due in part to the increasing complexities of applying SFAS 142, as outlined in ''Accounting for Goodwill Impairments'' section. The process is tedious, complex, and requires management estimations throughout. As such, the noise level of impairments may have risen from the pre–SFAS 142 regime, resulting in a decrease in information content in certain conditions. In addition, nonwasting intangible assets are no longer subject to systematic amortization under SFAS 142. In the pre–SFAS 142 period, when book value of goodwill is being regularly written down via amortization every period and the impairment trigger is much less sensitive to so many management assumptions, such a write-down may indeed be more meaningful.

To the best of our knowledge, this is the first article to examine the change in the information content of impairment announcements following SFAS 142, a controversial standard. While the new rule is not a literal adoption of pure fair value techniques, it is a move in that direction with its use of fair value measures to trigger impairment accruals. Our results suggest that this has not increased the information content of goodwill write-offs but rather has somewhat reduced it. These results are consistent with critics of SFAS 142, who argue that fair value tests are easier for managers to manipulate and therefore their outcomes are less informative to investors (Watts, 2003).

## Authors' Note

This manuscript is the result of combining two related working papers, ''The Information Content and Timeliness of Fair Value Asset Impairment Triggers: Goodwill Write-offs Before, During and After SFAS 142'' by Bens and Heltzer, and ''Goodwill Writedowns, SFAS No. 121 and the Adoption of SFAS No. 142'' by Segal. The authors thank Ryan Ridge for his research assistance. This research has benefited from workshop participants at the following universities: Arizona, Berkeley, Boston, UC-Davis, UCLA, Chicago, Illinois at Urbana-Champaign, INSEAD, LBS, Minnesota, NYU, Notre Dame, Ohio State, SMU, Stanford, Texas-Austin, Toronto, and Wharton as well as the comments of an anonymous reviewer, Anne Beatty, Doug Hanna, Rachel Hayes, Rick Johnston, Lil Mills, Steve Monahan, and Frank Zhang.

## Declaration of Conflicting Interests

The author(s) declared that they had no conflicts of interests with respect to their authorship or the publication of this article.

## Funding

The author(s) disclosed receipt of the following financial support for the authorship, and/or publication of this article: Bens gratefully acknowledges the financial support of the Frank and Susan Parise Fellowship.

**Appendix A** Intangible Asset Impairment Rules Under Two Accounting Regimes

| | SFAS 121 (1996–2002) | SFAS 142 (2002–present) |
|---|---|---|
| Scope of impairment rules | All long-lived assets excluding the following: financial instruments, long-term customer relationships for banks, mortgage servicing rights, deferred policy acquisition costs, and deferred tax assets (see Paragraph 3 of SFAS 121) | Goodwill that an entity recognizes in accordance with SFAS 141 and other intangible assets acquired individually or with a group of other assets (see Paragraph 4 of SFAS 142) |
| When to measure impairment | Whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable (see Paragraph 4 of SFAS 121) | At least annually, or more frequently if events or changes in circumstances indicate that the asset might be impaired (see Paragraph 17 of SFAS 142) |
| Unit of analysis for determining impairment | Group assets at the lowest level for which there are identifiable cash flows that are largely independent of the cash flows of other asset groupings (see Paragraph 8 of SFAS 121) | For goodwill: the *reporting unit*, which is either an operating segment (as defined in SFAS 131) or one level below such a segment (see Paragraph 18 of SFAS 142)<br>For other intangibles: each asset is evaluated on a stand-alone basis (see Paragraph 17 of SFAS 142) |
| Trigger for determining impairment | When the forecasted undiscounted cash flows of the asset group fall below the book value of the assets (see Paragraph 6 of SFAS 121) | For goodwill: when the fair value of the reporting unit falls below its book value (see Paragraph 19 of SFAS 142)<br>For other intangibles: when the fair value of the asset falls below its book value (see Paragraph 17 of SFAS 142) |
| Impairment magnitude | Amount by which the book value of the collection of assets exceeds the fair value (see Paragraph 7 of SFAS 121) | For goodwill: Amount by which the book value of goodwill exceeds the implied fair value of goodwill. Implied fair value of goodwill equals the fair value of the reporting unit less the fair value of all other identifiable net assets other than goodwill which have been assigned to that unit (see Paragraphs 20 and 21 of SFAS 142)<br>For other intangibles: Amount by which the current book value exceeds the fair value (see Paragraph 17 of SFAS 142) |

Note: SFAS = Statement of Financial Accounting Standards.

## Notes

1. While our analyses include write-offs of both goodwill and other intangible assets, we hereafter refer to the sampling units as ''goodwill'' write-offs or charges, as the observations are generally goodwill impairments. As discussed in the section titled ''Exclusion of Definite-Lived Intangible Impairments,'' our conclusions are unchanged if we exclude impairments that may have been to ''wasting'' intangible assets that were largely unaffected by Statement of Financial Accounting Standards 142 (SFAS 142).

2. This is, admittedly, a limited perspective for studying the informativeness of accounting information; it focuses on equity investors while ignoring the other uses of financial statements such as in debt and compensation contracts (Holthausen & Watts, 2001). However, it is difficult to observe the effects of SFAS 142 in these settings in such a short time period (i.e., contracts are static and will only evolve over a longer time period). In addition, the primary claimants of intangible assets are more likely equity investors. Debt contracts tend to focus on tangible assets (Watts, 2003), and compensation contracts will often shield managers from such charges (Dechow, Huson, & Sloan, 1994). Thus, we do not view the focus on returns to infer information content as a severe limitation.
3. We explore the information content of goodwill write-offs during the adoption period in the section titled ''Adoption Period.''
4. The Financial Accounting Standards Board (FASB) conceptual framework puts it the following way: ''The objectives [of external reporting] stem primarily from the needs of external users who lack the authority to prescribe the information they want and must rely on information management communicates to them'' (FASB Concepts No. 1).
5. We explore the relationship between analyst following and firm size in detail in the section titled ''Inclusion of Both Size and Alternative Measures of Information Asymmetry.''
6. SFAS 142 transition charges were *not* coded in Item 368; therefore, we identified adoption period firms in 2002 as those companies with negative extraordinary items (Compustat classifies cumulative effects of accounting changes as extraordinary items in its Item 192) that were greater than 5% of lagged assets. Although we do not use transition charges in our main analyses, we retain them for sensitivity analyses in the section titled ''Adoption Period.''
7. To assess the relationship between goodwill impairments per the press releases and those per Compustat, we examine the 30 largest write-offs, as these are more likely to be subject to measurement error at the time of the announcement. There is no difference in write-off values between the press release and Compustat for 17 observations (57% of subsample). Of the remaining 13 observations, nine differences (30% of subsample) are insignificant (due to rounding), as they represent 5% or less of the Compustat values. The remaining four differences (13% of subsample), which range from 10% to 37% of the Compustat values, were due to reporting estimated write-offs by the respective companies. These results provide confidence that the actual write-offs in Compustat resemble those initially announced by the companies.
8. Of the 9,279 firm year observations in Compustat for this industry over our sample period, only 3.1% (291 firm years) reported intangibles that exceeded 5% of assets.
9. There are five firms with write-off magnitudes in excess of 100% of lagged assets. This situation occurs when a firm expands its asset base significantly during the year via an acquisition but then writes off a significant portion of the goodwill before the end of the year. These situations also explain why the minimum value of goodwill intensity in Table 2, Panel A, is 0.
10. Christie (1987) suggests that market value of equity is the natural deflator for returns studies. Our rationale for using total assets in lieu of market value is to mitigate measurement error. Christie allows that this might be a reasonable alternative, although he finds it unlikely (p. 240).
11. We considered using a measure of intangible intensity as another proxy for information asymmetry in our cross-sectional tests. However, as documented above, the vast majority of our firms are intangible asset intensive. Thus, we believe there is little meaningful variation within our sample on this dimension.
12. The sample firms frequently do not have long enough time series of stock returns to estimate firm-specific market model parameters that could be used to define abnormal returns (ARs). Thus, we use size-adjusted returns as our measure of market expectations.
13. The difference across studies may be due to different sample periods (Francis, Hanna, & Vincent, 1996, study write-offs pre–SFAS 121) or the fact that our study focuses on much larger write-offs (5% of assets vs. 1% in the previous study).

14. We searched the 5-day window surrounding each date to ensure that contemporaneous news releases were collected. In our sample, approximately 89% of the goodwill impairments were disclosed along with earnings announcements or preannouncements.
15. Unexpected earnings in the random walk sample are calculated as earnings before discontinued operations, extraordinary items, and the contemporaneously announced goodwill write-off, less earnings from the same quarter one year prior. When calculating expected earnings during the post–SFAS 142 period, intangible asset amortization was added back to lagged earnings, as the standard halted goodwill amortization. If earnings were not announced along with the write-off, then unexpected earnings are set to zero. For the sake of simplicity, we have not excluded goodwill impairments and other special items from prior year earnings. However, we have conducted sensitivity analysis and removed goodwill impairments and other special items from prior year earnings; our results are unchanged.
16. A goodwill impairment under generally accepted accounting principles does not imply an impairment for tax purposes. When a company provides pretax and posttax goodwill write-off values, we use the posttax value. If no tax information is provided, we assume that the goodwill is not tax deductible, and thus, the pretax and posttax values are equal.
17. In our sample, 47% of the firms announced a significant nonrecurring loss in the press release announcing the goodwill impairment, and 11% of the firms announced a significant nonrecurring gain.
18. We do not include main treatment effects for *POST* because we use size-adjusted returns as the dependent variable, and we have no reason to believe that this returns expectations model should be altered for different time periods. In our sensitivity tests, discussed in the section titled ''Temporal Interactions on Unexpected Earnings,'' we include temporal interactions for earnings variables.
19. Industry is defined as the most specific SIC code with at least five firms with complete data on Compustat.
20. Our expectations model is closer in its mechanics to the procedures firms follow under SFAS 142, which may cause our results to be biased towards finding a greater reaction to unexpected charges in that period. Unfortunately, it is impractical to develop a forecast of *undiscounted* cash flows as required per SFAS 121. Hence, we hold the model constant across both periods.
21. See the section titled ''Prediction Model Limitations'' for a discussion regarding the limitations of our expectations model.
22. We assess the robustness of these proxies by defining the variables using quartiles rather than medians, and our results are generally unchanged.
23. To remove these impairments, we first reviewed the press release announcing the write-off. If the charge occurred during the SFAS 142 era and management attributed it to SFAS 142, then we retained the observation. For other observations, if the press release gave details of the asset (e.g., specifically referred to it as ''goodwill'') and we could objectively determine that it fell under SFAS 142 guidelines, then we retained the observation. Finally, if the press release was ambiguous (e.g., it simply referred to ''intangibles''), we reviewed the prior year financial statements to determine if the firm broke out its intangible assets in a footnote; if more than two thirds of the balance was goodwill or a nonwasting intangible, then we retained the observation.

## References

Accounting Principles Board. (1970). *Opinion No. 17: Intangible assets*. New York, NY: Author.

Basu, S. (1997). The conservatism principle and the asymmetric timeliness of earnings. *Journal of Accounting and Economics*, *24*, 3–37.

Beatty, A., & Weber, J. (2006). Accounting discretion in fair value estimates: An examination of SFAS 142 goodwill impairments. *Journal of Accounting Research*, *44*, 257–288.

Bens, D. A. (2006). Discussion of accounting discretion in fair value estimates: An examination of SFAS 142 goodwill impairments. *Journal of Accounting Research*, *44*, 289–296.

Berger, P. G., & Hann, R. (2003). The impact of SFAS No. 131 on information and monitoring. *Journal of Accounting Research*, *41*, 163–223.

Berger, P. G., & Ofek, E. (1995). Diversification's effect on firm value. *Journal of Financial Economics*, *37*, 39–65.

Christie, A. (1987). On cross-sectional analysis in accounting research. *Journal of Accounting and Economics*, *9*, 231–258.

Collins, D., Kothari, S., & Rayburn, J. (1987). Firm size and information content of prices with respect to earnings. *Journal of Accounting and Economics*, *9*, 111–138.

Dechow, P. M., Huson, M. R., & Sloan, R. G. (1994). The effect of restructuring charges on executives' cash compensation. *Accounting Review*, *69*, 138–156.

Doyle, J., Ge, W., & McVay, S. (2007). Determinants of weaknesses in internal control over financial reporting. *Journal of Accounting and Economics*, *44*, 193–223.

Elliott, J., & Shaw, W. (1988). Write-offs as accounting procedures to manage perceptions. *Journal of Accounting Research*, *26*(Suppl.), 91–119.

Engel, E., Hayes, R., & Wang, X. (2007). The Sarbanes-Oxley Act and firms' going private decisions. *Journal of Accounting and Economics*, *44*, 116–145.

Financial Accounting Standards Board. (1978). *Statement of Financial Accounting Concepts No. 1: Objectives of financial reporting by business enterprises*. Norwalk, CT: Author.

Financial Accounting Standards Board. (1995). *Statement of Financial Accounting Standards No. 121: Accounting for the impairment of long-lived assets and long-lived assets to be disposed of*. Norwalk, CT: Author.

Financial Accounting Standards Board. (2001). *Statement of Financial Accounting Standards No. 142: Goodwill and other intangible assets*. Norwalk, CT: Author.

Francis, J., Hanna, J. D., & Vincent, L. (1996). Causes and effects of discretionary asset write-offs. *Journal of Accounting Research*, *34*(Suppl.), 117–134.

Freeman, R. (1987). The association between accounting earnings and security returns for large and small firms. *Journal of Accounting and Economics*, *9*, 195–228.

Gilson, S. C., Healy, P. M., Noe, C. F., & Palepu, K. G. (2001). Analyst specialization and conglomerate stock breakups. *Journal of Accounting Research*, *39*, 565–582.

Hayn, C., & Hughes, P. J. (2006). Leading indicators of goodwill impairment. *Journal of Accounting, Auditing & Finance*, *21*, 223–265.

Holthausen, R., & Watts, R. (2001). The relevance of value relevance. *Journal of Accounting and Economics*, *31*, 3–75.

Ketz, J. E. (2002). A critical look at the new purchase accounting for M&A transactions. *Journal of Corporate Accounting & Finance*, *13*, 61–64.

Riedl, E. J. (2004). An examination of long-lived asset impairments. *Accounting Review*, *79*, 823–852.

Roulstone, D. T. (2003). Analyst following and market liquidity. *Contemporary Accounting Research*, *20*, 551–578.

Strong, J. S., & Meyer, J. R. (1987). Asset writedowns: Managerial incentives and security returns. *Journal of Finance*, *42*, 643–661.

Watts, R. L. (2003). Conservatism in accounting Part I: Explanations and implications. *Accounting Horizons*, *17*, 207–221.

Zucca, L. J., & Campbell, D. R. (1992). A closer look at discretionary writedowns of impaired assets. *Accounting Horizons*, *6*, 30–41.