# EXHIBIT 66

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN L. DOUGHERTY, ET AL.,

       Plaintiffs,

          v.

ESPERION THERAPEUTICS, INC., ET AL.,

       Defendants.

_____/

Case No. 16-10089

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

**ORDER OVERRULING DEFENDANTS' OBJECTIONS [159] AND ADOPTING
MAGISTRATE JUDGE WHALEN'S REPORT & RECOMMENDATION [152]**

This is a securities fraud case brought pursuant to sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. §§ 78j(b), 78t(a), and

Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240. On

May 31, 2020, Magistrate Judge R. Steven Whalen granted Plaintiffs' Motion for

Class Certification and to Appoint Class Representatives and Class Counsel [66].

(ECF No. 152). On June 19, 2020, in response to a Joint Motion to Amend/Correct

[154], Magistrate Judge Whalen issued a follow-up Order [157] designating the

original Order [152] a Report and Recommendation ("R&R") pursuant to 28 U.S.C.

§ 636(b)(1)(B). (ECF No. 157, PageID.7502). Defendants filed Objections to the

R&R on July 6, 2020. (ECF No. 159). Plaintiffs responded on July 20, 2020. (ECF

No. 161). Defendants filed a reply on July 27, 2020. (ECF No. 162). The Court heard

1

arguments on October 6, 2020.

For the reasons stated below, the Court **OVERRULES** Defendants' Objections [159] and **ADOPTS** the R&R [152].

## FACTUAL BACKGROUND

Defendant, Esperion Therapeutics, Inc. ("Esperion"), is a pharmaceutical company whose "sole focus is the development of ECT-1002, a first-in-class oral medication designed to lower LDL-cholesterol, also known as 'bad cholesterol.'" *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 975 (6th Cir. 2018). "Defendant Tim M. Mayleben is Esperion's CEO and a member of its Board of Directors. As such, he was heavily involved in Esperion's efforts to secure Food and Drug Administration ('FDA') approval for ETC-1002." (ECF No. 152, PageID.7462). "Plaintiffs, the purchasers of Esperion common stock between August 18 and September 28, [2015,] brought this class action against Esperion and Mayleben for violating §§ 10(b) and 20(a) of the [SEA], as well as SEC Rule 10b-5." *Dougherty*, 905 F.3d at 977.

The thrust of Plaintiffs' claim is that, following an August 2015 meeting between Esperion executives and FDA officials, Esperion and Mayleben made false statements about ETC-1002's approval trajectory, misleading investors and "causing Esperion stock to trade at artificially inflated levels during the class period." *Id.* at 976, 978. Specifically, Esperion issued a press release on August 17, 2015, stating

1) that "[t]he FDA [had] confirmed that LDL-C remain[ed] an acceptable clinical surrogate endpoint for the approval of an LDL-C lowering therapy such as ETC-1002 in patient populations [with HeFH or ASCVD]," and 2) that "[b]ased upon feedback from the FDA, approval of ETC-1002 in the HeFH and ASCVD patient populations [would] not require the completion of a cardiovascular outcomes trial." (ECF No. 152, PageID.7462). Additionally, in a conference call with market analysts that same day, Mayleben stated that "[ETC-]1002 will not require a CV outcomes trial to be completed prior to approval in patients with [HeFH] and ASCVD." *Dougherty*, 905 F.3d at 976-77 (alterations in original).

As the Sixth Circuit noted in its order reversing this Court's initial dismissal of Plaintiffs' complaint:

> These statements require some explanation to be fully understood in context. A cardiovascular outcomes trial (CVOT) is a costly, lengthy study that measures a drug's effectiveness in reducing cardiovascular risk over several years. Because lower LDL-cholesterol is presumed to improve overall heart health, the FDA does not typically require companies seeking approval of a new cholesterol-lowering drug to complete a CVOT and prove that the drug actually reduces cardiovascular risk. Instead, the FDA treats LDL-cholesterol as a "surrogate endpoint," or proxy, for cardiovascular risk. In other words, if a new drug is shown to lower LDL-cholesterol, the FDA assumes that it also improves overall cardiovascular health. By saying that the FDA would continue to use LDL-cholesterol as a proxy for cardiovascular risk, and that the FDA would not require a completed CVOT prior to approving ETC-1002, Esperion was essentially telling its investors that ETC-1002 had a clear path to regulatory approval.

*Id.* at 976.

3

The problem, however, was that the FDA's minutes of the August 11, 2015 meeting—the official record—were contrary to Esperion's and Mayleben's assertions. (ECF No. 152, PageID.7464). As Magistrate Judge Whalen explained:

> When the minutes were released [publicly], Esperion issued another press release . . . stating, contrary to its earlier position, that the "FDA ha[d] encouraged the Company to initiate a cardiovascular outcomes trial promptly . . . since any concern regarding the benefit/risk assessment of ETC-1002 could necessitate a completed cardiovascular outcomes trial before approval." In a subsequent conference call, Mayleben characterized Esperion's latest press release as "slightly different" than the language used in the August release. As the Sixth Circuit observed, "Market analysts seized on this change in position, and Esperion's stock dropped 48% the next day, from $35.09 per share to $18.33 per share." *Dougherty*, 905 F.3d at 977.

(*Id.*).

Plaintiffs thus filed this suit for damages on January 12, 2016. (ECF No. 1). The Court appointed Ronald E. Wallace and Walter J. Minett as Lead Plaintiffs on April 5, 2016. (ECF No. 25). Plaintiffs amended their complaint on May 20, 2016, and on July 5, 2016, Defendants moved to dismiss. (ECF No. 29; ECF No. 30). On December 27, 2016, the Court granted Defendants Motion to Dismiss [30]. (ECF No. 38). The Sixth Circuit reversed on September 27, 2018 and remanded the case back to this Court. *Daugherty*, 905 F.3d at 984.

## LEGAL STANDARD

Plaintiffs argue that "Defendants' Objections simply regurgitate their class certification Opposition" and that, consequently, a "clear error" standard of review

Case 2:21-cv-00473-RSW Document 103, PageID.7665 Filed 01/19/20 Page 6 of 25

is appropriate. (ECF No. 161, PageID.7665). While it is true that "[a] district court need not provide *de novo* review where the objections are 'frivolous, conclusive or general,'" that exception does not apply here. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982)). Defendants' Objections each point to specific, allegedly defective, sections of the R&R. Accordingly, the Court reviews them *de novo* pursuant to 28 U.S.C. § 636(b)(1). *See, e.g.*, *DiPonio Constr. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 739 F. Supp. 2d 986, 992 (E.D. Mich. 2010).

## ANALYSIS

**OBJECTION I: THE FRAUD-ON-THE MARKET PRESUMPTION OF RELIANCE DOES NOT APPLY BECAUSE PLAINTIFFS HAVE FAILED TO PROVE THAT THE MARKET FOR ESPERION STOCK WAS EFFICIENT DURING THE CLASS PERIOD.**

### A. Context: The Fraud-on-the-Market Theory and the Role of Efficiency

In order for Plaintiffs seeking class certification to satisfy the predominance requirement of FED. R. CIV. P. 23(b)(3), they must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." This inquiry "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011). The element at issue here is Plaintiffs' reliance upon Defendants' alleged misrepresentations and/or omissions. *See Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 267 (2014) (listing elements

5

of claim). To satisfy the predominance inquiry with respect to reliance, Plaintiffs have invoked the "fraud-on-the-market" presumption, endorsed by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 250 (1988), and reaffirmed in *Halliburton II*, 573 U.S. at 266.

In *Basic*, the Supreme Court explained that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed" in a securities fraud claim such as the one at issue here. 485 U.S. at 247. "The Court based [this] presumption on what is known as the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton II*, 573 U.S. at 258 (quoting *Basic*, 485 U.S. at 247). Thus, "to demonstrate that the presumption of reliance applies in a given case," a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268 (citing *Basic*, 485 U.S. at 248, n.27). Importantly, this presumption is "rebuttable rather than conclusive." *Id.* at 268-69.

Defendants' first objection focuses on the applicability of the fraud-on-the-market presumption, and specifically, the Magistrate Judge's analysis of whether

Esperion's common stock traded in an efficient market during the class period. (ECF No. 159, PageID.7557). While there is no bright-line test for market efficiency, the Sixth Circuit has cited with approval the five-factor test laid out in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). These factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Id.* (citing *Cammer*, 711 F. Supp at 1286-87).

In addition to the *Cammer* factors, many courts, including several in this circuit, have also considered the three factors enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys.*, 332 F.R.D. 556, 575-76 (M.D. Tenn. 2019). These include: (1) market capitalization ("the number of shares multiplied by the prevailing share price"); (2) bid-ask spread ("the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares"); and (3) float ("the percentage of shares held by the public, rather than insiders"). *Krogman*, 202 F.R.D. at 478.

## B. Failing to Satisfy the Fifth *Cammer* Factor Is Not a *Per Se* Bar

Defendants' principal objection to the R&R is that it failed to give proper

weight to the fifth *Cammer* factor. (ECF No. 159, PageID.7557). Defendants argue that, as a matter of law, a positive showing under the fifth *Cammer* factor must be made in order for a plaintiff to benefit from the fraud-on-the-market presumption, regardless of whether other indirect indicia of efficiency are present. (ECF No. 159, PageID.7556). In making this argument, Defendants rely heavily on *OPERS*, a case in which the court declined to find efficiency in spite of the first three *Cammer* factors being satisfied. *See Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.* (*OPERS*), No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229 (N.D. Ohio Aug. 14, 2018), *perm. app. denied sub nom.*, *In re Ohio Pub. Emps.' Ret. Sys.*, No. 18-0310, 2019 U.S. App. LEXIS 2337 (6th Cir. Jan. 23, 2019).

The Sixth Circuit has not addressed the question of whether the fifth *Cammer* factor is dispositive and district courts in this circuit have come out both ways. *Compare, e.g.*, *OPERS*, 2018 U.S. Dist. LEXIS 137229, at \*47 ("The [first four] *Cammer* factors are not enough, alone, to establish market efficiency."), *with, e.g.*, *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216 DP, 2006 U.S. Dist. LEXIS 97621, at \*33 (W.D. Tenn. Mar. 7, 2006) ("In order for the court to conclude that a market is efficient, 'it is not necessary that a stock satisfy all five factors.'" (quoting *Simpson v. Specialty Retail Concepts, Inc.*, 823 F. Supp. 353, 355 (M.D.N.C. 1993))), *R&R adopted*, 2006 U.S. Dist. LEXIS 97620.

Ultimately, while Defendants are correct that several courts have found the fifth *Cammer* factor to provide the best evidence of efficiency, most do not treat it as strictly necessary in making the market efficiency determination. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2014); *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 133 (M.D. Tenn. 2020) ("[T]he Sixth Circuit has not mandated use of [the *Cammer*] factors, and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist."); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 385 n.8 (N.D. Ga. 2019) (collecting cases). Against this backdrop, *OPERS*, on which Defendants so heavily rely, appears to be an outlier.

## C. Plaintiffs Have Demonstrated Efficiency

The Court now examines whether Plaintiffs have provided sufficient evidence of efficiency to invoke the fraud-on-the-market presumption of reliance. They have.

The Sixth Circuit has noted that "securities traded in national secondary markets . . . are well suited for application of the fraud on the market theory." *Freeman*, 915 F.2d at 199. Thus, the fact that Esperion's common stock traded on the NASDAQ during the Class Period is persuasive, though not conclusive, evidence of market efficiency. (ECF No. 66-11, PageID.1787).

9

The *Krogman* factors point in the same direction. During the Class Period, Esperion's market capitalization averaged $1.08 billion, its bid-ask spread averaged between 0.22% and 0.29%, and 97% of its outstanding shares stock were held by outsiders. (ECF No. 66-11, PageID.1800-02). These figures all suggest an efficient market. *See, e.g.*, *Norfolk*, 332 F.R.D. at 576; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003).

As to the *Cammer* factors, Defendants do not dispute that Esperion's stock satisfies the first four. (ECF No. 161-2, PageID.7716). Defendants also admit "that the volume of trading in Esperion's common stock supports a finding that the market was efficient." (ECF No. 66-10, PageID.1765). Indeed, this is an understatement. During the Class Period, the average weekly trading volume was 29.76% and there were sixty market makers. (ECF No. 66-11, PageID.1782, 1788). This Court has previously found a "substantial presumption" of efficiency where, during the class period, the stock at issue had an average weekly trading volume above 1% and more than ten market makers. *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 343 (E.D. Mich. 2012); *see Cammer*, 711 F. Supp. at 1293 (noting that an even stronger presumption would apply to a trading volume above 2%). Consequently, even if Plaintiffs lacked direct evidence of cause and effect under the fifth *Cammer* factor, they would have, at this point, presented sufficient evidence of efficiency to invoke the fraud-on-the-market presumption.

Plaintiffs *do* have direct evidence of cause and effect, however. Plaintiffs' expert, Chad Coffman, performed an event study examining the response of Esperion's common stock to earnings announcements and press releases ("news") in the year leading up to the Class Period, during the class period, and in the year following the class period. (ECF No. 66-11, PageID.1780 n.25). Coffman then compared the stock's post-news movement with the stock's movement following days without news. (ECF No. 66-11, PageID.1790). After controlling for market and industry factors, Coffman found that "[t]he earnings announcement and press release days had a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news." (ECF No. 66-11, PageID.1799). This, he concluded, "demonstrate[s] a clear cause-and-effect relationship between new material news and changes in the market price of Esperion common stock." (*Id.*). Defendants challenge this conclusion, not with an independent study, but rather by arguing that Coffman's analysis was flawed. (ECF No. 159, PageID.7559-60).

The Court finds these arguments unpersuasive. Coffman's analysis of the corrective disclosure date does not undermine the reliability of his findings. *See Wilkof*, 280 F.R.D. at 346; *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2017 U.S. Dist. LEXIS 38933, at *12 (S.D. Ohio Mar. 17, 2017). Additionally, the Court's confidence as to market efficiency is not diminished by the fact that two of the

11

statistically significant price movements Coffman noted were declines following positive news. *See Willis*, 2017 U.S. Dist. LEXIS 38993 at *14; *see also In re Accredo*, 2006 U.S. Dist. LEXIS 97621, at *29-30. Nor is it diminished by the fact that some of the price movements Coffman noted were on the second trading day. *See Wilkof*, 280 F.R.D. at 345-46 (analyzing price movements over two-day periods). Indeed, even assuming the validity of Defendants' concerns, Coffman's analysis would still demonstrate that approximately twenty-six percent of news days resulted in statistically significant movements, which Courts have found to be indicative of efficiency. (ECF No. 161, PageID.7671); *see, e.g.*, *Angley v. UTI Worldwide Inc.*, 311 F. Supp. 3d 1117, 1123 (C.D. Cal. 2018); *McIntire v. China Media Express Holdings, Inc.*, 38 F. Supp. 3d 415, 430, 433 (S.D.N.Y. 2014). Accordingly, the Court finds that, at least for class-certification purposes, Coffman's results are sound, and Plaintiffs have provided sufficient evidence of efficiency for the fraud-on-the-market presumption to apply.

**OBJECTION II: DEFENDANTS HAVE REBUTTED THE PRESUMPTION OF RELIANCE UNDER *HALLIBURTON II*.**

As discussed above, the fraud-on-the-market presumption is rebuttable. *See Basic*, 485 U.S. at 248; *see also Halliburton II*, 573 U.S. at 269. In their second objection, Defendants argue that even if the fraud-on-the-market presumption applies, it has been rebutted, and that "[t]he R&R treated the presumption . . . as if

12

it were irrebuttable."[1] (ECF No. 159, PageID.7562). Specifically, Defendants point to the fact that Coffman's report shows a statistically significant *decrease* in the price of Esperion common stock immediately following the August 17, 2015 statements. (ECF No. 159, PageID.7563).

*Halliburton II* makes clear that defendants can rebut the fraud-on-the-market presumption at the class-certification stage by showing "evidence that the asserted misrepresentation (or its correction) did not affect the market price." 573 U.S. at 280. The Sixth Circuit has clarified, however, that "price impact may be demonstrated either at the time that the alleged misrepresentations were made, *or at the time of their correction.*" *In re BancorpSouth, Inc.*, No. 17-0508, 2017 U.S. App. LEXIS 18044, at *4 (6th Cir. Sep. 18, 2017) (emphasis added). Defendants entirely skip over this precedent in their briefing, despite the fact that the vast majority of local courts have consistently followed this approach. *See, e.g.*, *Willis*, 242 F. Supp. 3d at 656, 659; *see also Kasper v. AAC Holdings, Inc.*, No. 15-cv-00923-JPM-jsf, 2017 U.S. Dist. LEXIS 109608, at *35 (M.D. Tenn. July 14, 2017) ("Price impact can be shown either by an increase in price following a fraudulent public statement *or a decrease in price following a revelation of the fraud.*" (emphasis added) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 434 (5th Cir. 2013),

---

[1] While Defendants are correct that the R&R did not specifically address the issue of rebuttal, the Magistrate Judge's comments at the hearing make clear that he understood and considered this argument. (ECF No. 161-2, PageID.7703).

*vacated and remanded on other grounds by Halliburton II*, 573 U.S. 258)).

As there is no dispute that the prices of Esperion common stock fell precipitously following the corrective disclosure on September 28, 2015, the Court finds that Defendants have failed to rebut the fraud-on-the-market presumption by showing lack of price-impact. (ECF No. 161-2, PageID.7700). Accordingly, the issue of reliance is common to all Plaintiffs.

**OBJECTION III: PLAINTIFFS HAVE NOT ARTICULATED A DAMAGES METHODOLOGY SATISFYING RULE 23(B)(3).**

In *Comcast Corp. v. Behrend*, the Supreme Court elaborated upon the predominance requirement of FED. R. CIV. P. 23(b)(3) as it pertains to theories of damages at the class-certification stage. 569 U.S. 27, 34-35 (2013). Specifically, the Court explained that in order to satisfy predominance, plaintiffs must establish that "damages are capable of measurement on a class-wide basis" and that "[the] model purporting to serve as evidence of damages . . . measure[s] only those damages attributable to [the plaintiff's] theory [of liability]." *Id.* at 34-35. The Sixth Circuit has since clarified, however, that *Comcast* "breaks no new ground on the standard for certifying a class action." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (quoting *Comcast*, 568 U.S. at 41 (Ginsburg, J., dissenting)).

Defendants' third objection to the R&R is that it incorrectly concluded that Coffman's proposed damages model satisfied *Comcast* "merely because similar

14

models have been consistent with theories of liability in other cases." (ECF No. 159, PageID.7564). According to Defendants, Plaintiffs' proposed model fails to satisfy *Comcast* because it measures damages that are attributable to "confounding information" and uses "copied-and-pasted" language. (ECF No. 159, PageID.7565-66). These arguments are unpersuasive.

As the Magistrate Judge explained, Plaintiffs' sole theory of liability is that "Defendants' fraudulent misstatements and omissions concerning the EOP2 Meeting artificially inflated Esperion's stock price, causing Class members out-of-pocket damages when that inflation was removed as the truth emerged." (ECF No. 152, PageID.7474) (quoting ECF No. 98, PageID.3563). The essence of Plaintiffs' damages methodology, as articulated by Coffman in his initial report, is as follows:

> [T]he standard and well-settled formula for assessing damages for each class member seeking relief under Section 10(b) and Rule 10b-5 is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale . . . . [T]he most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).

(ECF No. 66-11, PageID.1805-06).

Measuring damages using "the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale" matches precisely with Plaintiffs' out-of-pocket theory of liability. (ECF No. 66-11, PageID.1805-06). Moreover, because "there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns [from *Comcast*] do not apply." *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015). Indeed, as the R&R correctly noted, numerous courts in the Sixth Circuit (and beyond) have found Plaintiffs' proposed methodology sufficient in securities fraud claims based on misstatements or omissions. *See, e.g.*, *Weiner*, 334 F.R.D. at 137-38; *Kasper*, 2017 U.S. Dist. LEXIS 109608, at *39-40; *see also, e.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019).

While Defendants are correct that confounding information (other negative information released alongside the corrective disclosure) cannot be disaggregated using only an event study, their framing of Coffman's deposition testimony is highly misleading. Coffman does not concede that his event study precludes disaggregation. (ECF No. 87-3, PageID.2827, 2865). Moreover, Defendants' argument is really a merits inquiry into loss causation, an element of Plaintiffs' claim under SEA § 10(b) and SEC Rule 10b-5. *See Halliburton II*, 573 U.S. at 265 (defining loss causation). Such an inquiry is not required for class certification. *Halliburton I*, 563 U.S. at 813; *see, e.g.*, *Weiner*, 334 F.R.D. at 137-38 ("Plaintiffs must prove that the portion of the

16

price fall they seek in damages is directly attributable to the misrepresentation, . . . *[but] they do not need to prove it at the certification stage.*" (alteration in original) (emphasis added) (quoting *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687-88 (5th Cir. 2015))). Indeed, even if Defendants are correct that other negative information in the September 27, 2015 disclosure was partially responsible for the decline in Esperion's stock price, the extent to which damages would need to be disaggregated is an issue common to all class members. (ECF No. 98-2, PageID.3636).

Finally, Defendants' "copied-and-pasted" argument is grasping at straws. (ECF No. 159, PageID.7565). Defendants cite no authority for this proposition, and other courts have rejected similar arguments. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.* (*PERSM*), No. 16-cv-10632, 2020 U.S. Dist. LEXIS 32586, at *25-26 (N.D. Ill. Feb. 26, 2020). Accordingly, the Court finds that Plaintiffs' have satisfied predominance under FED. R. CIV. P. 23(b)(3).

**OBJECTION IV: THE PSLRA FOCUSES ON THE ADEQUACY OF PLAINTIFFS, NOT THEIR COUNSEL, AND PLAINTIFFS HAVE FAILED TO ESTABLISH ADEQUACY UNDER RULE 23(A)(4).**

FED R. CIV. P. 23(a)(4) requires that "[t]he representative parties [to a class action] . . . fairly and adequately protect the interests of the class." In the Sixth Circuit, courts determine whether class representatives have met this requirement using a two-part test: "1) [T]he representative[s] must have common interests with unnamed members of the class, and 2) it must appear that the representatives will

17

vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). "Put another way, [courts] 'review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another.'" *Pelzer v. Vassalle*, 655 F. App'x 352, 364 (6th Cir. 2016) (second alteration in original) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)).

The Private Securities Litigation Reform Act ("PSLRA") does not alter this general approach. "Although Congress made several important changes in the [PSLRA], it pointedly did not change the requirements of Rule 23. Indeed, it . . . enacted language that is identical to Rule 23's typicality and adequacy requirements . . . ." *In re Cavanaugh*, 306 F.3d 726, 738-39 (9th Cir. 2002) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)). Consequently, "where the class is represented by competent and zealous counsel, . . . a perceived lack of . . . interest on the part of the named plaintiffs [does not preclude certification] unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 451 (S.D. Ohio 2009) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987)).

18

Defendants argue in their fourth objection that the Magistrate Judge focused too heavily on the adequacy of Class Counsel without sufficiently "consider[ing] the adequacy of . . . Lead Plaintiffs themselves." (ECF No. 159, PageID.7569). Specifically, Defendants contend that Lead Plaintiffs are inadequate for failing to sufficiently supervise class counsel, as evidenced by their allegedly insufficient knowledge of the litigation. (ECF No. 159, PageID.7569, 7572). Defendants attempt to support these claims by invoking "Congress's emphatic command [in the PSLRA] that competent plaintiffs, rather than lawyers, direct [securities] cases." (ECF No. 159, PageID.7568 (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001)). But these arguments ignore the Sixth Circuit's two-factor test. Under this Circuit's standard, the Magistrate Judge arrived at the correct conclusion: Lead Plaintiffs satisfy FED. R. CIV. P. 23(a)(4). (ECF No. 152, PageID.7469).

First, Lead Plaintiffs plainly have "common interests with unnamed members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). Both Walter and Minett purchased Esperion common stock during the Class Period and suffered major losses following the corrective disclosure. (ECF No. 24-2, PageID.520). Second, Lead Plaintiffs have "vigorously prosecute[d] the interests of the class *through qualified counsel*." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (emphasis added) (quoting *Senter*, 532 F.2d at 525). In March 2016, Lead Plaintiffs selected, and this Court approved, Robbins Geller Rudman & Dowd LLP ("RGRD")

19

and Kahn Swick & Foti, LLC ("KSF"), to serve as Class Counsel. (ECF No. 18, PageID.350; ECF No. 24-2, PageID.521; ECF No. 25, PageID.527). Both of these firms, which "have significant collective experience in class [action] litigation," satisfy FED. R. CIV. P. 23(g). (ECF 152, PageID.7469). Moreover, since 2016, Lead Plaintiffs, through Class Counsel, have filed an amended complaint, prevailed at the Sixth Circuit, prepared and filed numerous pleadings, and pursued discovery. (*Id.*).

At bottom, by arguing that Lead Plaintiffs are inadequate for not having detailed knowledge of the litigation and not exercising control over the day-to-day management of the case, Defendants seek to apply a more rigorous standard to the adequacy determination than courts in the Sixth Circuit typically do. *See, e.g.*, *Rankin v. Rots*, 220 F.R.D. 511, 520 (E.D. Mich. 2004) ("The Sixth Circuit appears to focus on the adequacy of plaintiff's counsel and whether plaintiff has a conflicting interest, not the personal qualifications of the named plaintiff."); *see also PERSM*, 2020 U.S. Dist. LEXIS 32586, at *21 n.5 (describing the Fifth Circuit's heightened adequacy standard, which Defendants rely upon, as "idiosyncratic").

While Lead Plaintiffs are not micromanaging all aspects of the litigation, "their participation is [not] so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Ross*, 257 F.R.D. at 451 (quoting *Kirkpatrick*, 827 F.2d at 727). Through their respective deposition transcripts, Lead Plaintiffs demonstrate not only that they understand their fiduciary responsibilities as class

representatives, but also that they have been adequately discharging those responsibilities by reviewing case documents, communicating with Class Counsel as necessary, and participating in discovery. (ECF No. 87-4, PageID.2916-17, 2937-38, 2944; ECF No. 87-5, PageID.2996, 3020-23). Courts in this circuit have found plaintiffs adequate who do far less. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 521 (N.D. Ohio 2013); *see also Ballan v. UpJohn, Co.*, 159 F.R.D. 473, 482 (E.D. Mich. 1994) ("To satisfy the adequacy test, the named representative of a class need only be adequate and need not be the best of all possible plaintiffs."). Accordingly, despite the fact that Plaintiffs could be more informed as to certain details of the litigation—for example, knowing the name of their expert—the Court finds them adequate under FED. R. CIV. P. 23(a)(4).

**OBJECTION V: WALLACE'S TRADING ACTIVITY IN ESPERION STOCK RENDERS HIM AN ATYPICAL CLASS MEMBER UNDER RULE 23(A)(3).**

"[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Wilkof*, 280 F.R.D. at 338-39 (alteration in original) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). The "claim need not always involve the same facts or law, provided there is a common element of fact or law." *Id.* at 339 (quoting *Senter*, 532 F.2d at 525 n.31). "The purpose of the typicality requirement is to assure that the named representative's interests align with those of the class and that the plaintiff will advance the interest of the class."

21

*Id.* (citing *In re Am. Med. Sys.*, 75 F.3d at 1082). One way a plaintiff might be found atypical is if they are subject to "unique defenses." *O'Neil v. Appel*, 165 F.R.D. 479, 492 (W.D. Mich. 1995) (citing *Ballan*, 159 F.R.D. at 479-81). However, "[t]he presence of a unique defense will not automatically destroy typicality." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (citing *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D. Ill. 1999)). Rather, "[typicality] is only [destroyed] when the defense will 'skew the focus of the litigation' and create 'a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* at 304-05 (quoting *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997)).

These principles provide helpful context to Defendants' fifth and final objection to the R&R. In this last objection, Defendants argue that the R&R failed to consider whether Wallace's trading of Esperion shares after the corrective disclosure date subjects him to a unique defense sufficient to render him atypical. (ECF No. 159, PageID.7574). Wallace purchased 7,500 shares of Esperion stock during the Class Period at prices ranging between $41.80 and $64.84. (ECF No. 18-3, PageID.364). He also traded a significant number of Esperion shares following the Class Period at prices ranging from $14.45 to $28.60. (ECF No. 61, PageID.7683; ECF No. 87-4, PageID.2899). His final trade was on March 29, 2016, two weeks after he requested to be lead plaintiff. (ECF No. 18; ECF No. 87-4,

PageID.2952; ECF No. 100-18, PageID.448).

Though it is somewhat of a close question, the majority of courts appear to hold that post-disclosure purchases, particularly those at lower prices, do not "skew the focus of the litigation" to such an extent that the interests of unnamed class members are endangered. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 304-05 (quoting *Alaska*, 123 F.3d at 1321); *see PERSM*, 2020 U.S. Dist. LEXIS 32586, at *14; *see also Weiner*, 334 F.R.D. at 130 ("[C]ourts routinely certify a class with representatives who purchased stock during and after a class period." (quoting *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 (D. Minn. 2001))). *Compare, e.g.*, *Ballan*, 159 F.R.D. at 481 (finding plaintiff atypical in part because he had "purchased [Defendant's] stock *at the same price* both several months before and shortly after [the alleged disclosure date]" (emphasis added)), *with, e.g.*, *Ross*, 257 F.R.D. at 446 (finding "Plaintiff's purchase of stock six days after the Class Period" to be "irrelevant" and noting that "[i]t is not inconsistent with the pleadings for Plaintiff to have purchased stock *after its price had been deflated* by curative disclosures" (emphasis added)).

Against this backdrop, the cases cited by Defendants appear to reflect a minority view. *See Weiner*, 334 F.R.D. at 130 (describing *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007), on which Defendants lean, as "against 'the weight of authority,' a 'deviat[ion] from th[e] general rule,' and 'not generally

23

accepted'" (alterations in original) (citations omitted) (first quoting *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009); then quoting *Local 703*, 762 F.3d at 1260; and then quoting *Feder*, 429 F.3d at 137)). Accordingly, because Wallace's claims are based on the same legal theory as other Class members, and because the unique defense against Wallace will not distract the litigation to the detriment of those members, the Court finds Wallace typical under FED. R. CIV. P. 23(a)(3).

**CONCLUSION**

**IT IS ORDERED** that Defendants' Objections [159] are **OVERRULED**.

**IT IS FURTHER ORDERED** that the R&R [152] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Class Certification [66] is **GRANTED**. The Class is certified, and Class Representatives and Class Counsel are appointed, as specified in the R&R. (ECF No. 152, PageID.7477).

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: November 19, 2020          Senior United States District Judge

24
