# EXHIBIT 67

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE POLICE RETIREMENT SYSTEM OF
ST. LOUIS,

        Plaintiff,

    v.

GRANITE CONSTRUCTION
INCORPORATED, JAMES H ROBERTS,
JIGISHA DESAI, and LAUREL J
KRZEMINSKI,

        Defendants.

No. C 19-04744 WHA

**ORDER CERTIFYING CLASS,
APPOINTING CLASS
REPRESENTATIVE, AND
APPOINTING CLASS COUNSEL**

**INTRODUCTION**

In this securities action, lead plaintiff moves to certify a class. They also move for appointment of class representative and lead counsel. For the below reasons, the motion is **GRANTED**.

**STATEMENT**

A prior order set forth the background of this action at length (Dkt. No. 98). Simply put, the action stems from accusations that Granite Construction Incorporated misled investors by

making false or misleading public statements between April 2018 and October 2019, which artificially inflated the value of its stock. Granite bids on and completes large infrastructure projects for public and private clients. The Police Retirement System of St. Louis serves as the court-appointed lead plaintiff in this putative class action (Amd. Compl. at ¶¶ 1–2, 19, 32, 299, 322).

The amended complaint herein asserts claims against Granite, as well as individuals James Roberts, its Chief Executive Officer; Jigisha Desai, its Chief Financial Officer; and Laurel Krzeminski, its former Chief Financial Officer. The claims concern four infrastructure contracts that Granite won between 2012 and 2014: (1) a $2.3 billion contract on interstate highway in Florida (I-4 Ultimate Project); (2) a $3.14 billion contract for work on the Tappan Zee Bridge in New York (Tappan Zee Project); (3) a $1.1 billion contract for a bridge in Pennsylvania (PennDOT Project); and (4) a $1.2 billion project to rebuild a substantial stretch of highway in Texas (Texas Project). The complaint alleges that fixed-price contracts governed each project, meaning that Granite agreed to complete the work "for a fixed price"; Granite therefore had "extremely limited options to obtain additional compensation" if extra expenses arose. Moreover, Granite undertook each project as a joint venture with other construction companies. Thus, its "financial interest in the projects (including its share of profits and losses) was tied to its ownership stake in each . . . ." Granite took a 30% stake in the I-4 Ultimate Project, a 23.3% stake in the Tappan Zee Project, a 40% stake in the PennDOT Project, and a 35% stake in the Texas Project (*id.* at ¶¶ 4, 43–48, 52, 55, 157).

Granite employed allegedly fraudulent accounting techniques in preparing financial reports for the four projects. The complaint alleges that each of the projects experienced significant cost overruns, which defendants either understated or hid in Granite's prepared financial reports. The cost overruns from the four projects allegedly totaled about $1.4 billion. Given Granite's financial stake in each joint venture, the complaint alleges the company should have been responsible for at least $14.4 million from the I-4 Project, $209.7 million from the Tappan Zee

2

Project, $105.6 million from the PennDOT Project, and $8.75 million from the Texas Project, totaling $338.45 million in overruns. Had Granite reported its overruns honestly in financial statements, the complaint argues, its recognized profits and losses would have been roughly consistent with the joint ventures' profits and losses (on a *pro rata* basis). This did not happen. Instead, throughout 2018, and in the first quarter of 2019, Granite reported more profits than the joint venture as a whole, which sometimes recorded losses. For instance, in the first quarter of 2018, the joint venture "sustained a massive $141 million loss," whereas Granite "recorded a $2.6 million gain." The complaint attributes the disparities to two types of accounting misconduct. The first concerns Accounting Standards Codification (ASC) "Topic 606 – Revenue from Contracts with Customers." The second concerns ASC 450-20-50, which requires disclosure of "reasonably possible" additional costs (*id*. at ¶¶ 11, 13, 119–121, 157, 159, 184; Dkt. No. 74 at 7).

ASC Topic 606 pertains to revenue calculation. Per the complaint, in preparing its reports, Granite estimated revenue for each project using the "percentage of completion" method. The method, when employed correctly, comports with the United States Generally Accepted Accounting Principles (GAAP). To calculate revenue for a project under the "percentage of completion" approach, a company first divides the *actual costs incurred to date* by the *total estimated costs* to determine the percentage completed. Then, the company multiplies that percentage by the project's transaction price to estimate the total revenue recognized for the project. *Ceteris paribus*, the discovery of new, previously unexpected costs will increase the denominator (the total estimated costs), thereby *de*creasing revenue (Amd. Compl. at ¶¶ 53–55, 159–161).

Plaintiff's complaint alleges that defendants abused the percentage of completion method in two ways. *First*, defendants artificially inflated the revenue it recognized for the four projects by "intentionally excluding known costs," and by overstating its likely recovery on disputed, unaccounted-for expenses. (Granite's fixed-price contracts allegedly made claims for recovering new expenses very difficult to win.) The complaint concludes that together, these misstatements

3

inflated the revenue recognized for each project in violation of GAAP (*id*. at ¶¶ 5, 75–78, 91, 94, 156–158, 168–171, 179).

*Second*, ASC 450-20-50 concerns the requirement to reveal "reasonably possible" expenses. The complaint alleges that defendants consistently failed to disclose reasonably possible additional costs, flouting ASC 450-20-50. Although the entities that contracted to complete the projects in question "had asserted or threatened over $1.3 billion in claims to recover" additional costs that had arisen in the course of the projects, the complaint alleges that Granite underreported or did not report its share of these additional costs (an estimated *$338.45 million*). For the first three quarters of 2018, Granite's financial reports did represent that three or four of its projects presented "additional costs [that] were reasonably possible in excess of the probable amounts included in the cost forecast," but according to its reports, these costs never had the potential to impact Granite's bottom line by more than $47 million. Moreover, from the fourth quarter of 2018 through the second quarter of 2019, Granite omitted *any* additional costs from its disclosures. The complaint alleges that Granite acted intentionally, thus contravening ASC 450-20-50 and violating GAAP (Amd. Compl. at ¶¶ 22–25, 105–10, 183–86).

Finally, the complaint alleges that defendants knew Granite was reporting "false and/or misleading" information, in violation of GAAP, in financial statements and quarterly earnings calls throughout the class period. By way of alleged proof, it avers that eight former employees (FEs) confirm the conscious misrepresentations; the FEs have already stated that Granite's senior executives, including the individual defendants, knew about cost overruns, specific write-downs, and the faulty balance sheet. Additionally, the complaint points to Granite's use of its stock to acquire the Layne Christensen Company, an action which gave Granite an alleged motive to fudge the balance sheets and thereby inflate the value of its stock (*id*. at ¶¶ 9–10, 18–21, 25, 37, 73, 88, 143–53, 204, 212, 298).

In mid-2019, the complaint contends, Granite's practice of concealing losses came home to roost: it reported losses in the second and third quarters of 2019 that, as a percentage of its

4

interest, far exceeded that of the joint venture. During those two quarters, Granite announced charges of $242 million, driven by the four projects, which reduced profits and caused its stock price to drop over 40%. The complaint alleges that these charges could not have been attributed to unanticipated costs emerging in 2019, but rather resulted from losses incurred throughout the class period that had been "improperly delayed" (*id*. at ¶¶ 2, 13, 15, 17, 28, 132, 140, 154, 133, 272, 307).

Lead Plaintiff claims to have acquired stock in Granite at an inflated price before the sharp decline in 2019. The complaint accuses Granite of violations of 10(b) of the Securities Exchange Act of 1934, attributes to all defendants violations of SEC Rule 10b-5, and alleges violations of Section 20(a) of the Securities Exchange Act against individual defendants Roberts, Desai, and Krzeminski. Defendants earlier moved to dismiss, arguing the following: (1) plaintiff failed to allege an actionable misrepresentation; (2) plaintiff failed to plead scienter; (3) the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provides a defense; and (4) plaintiff failed to allege control person liability (Dkt. No. 74 at 5–8). An order herein granted the motion with respect to certain Section 20(a) claims against two individual defendants and denied the remainder (*id*. at ¶¶ 322–25, 332, 336, Dkt. No. 98).

In July 2020 (following the commencement of this action), Granite stated that it would re-report its class-period financials and admitted in a Form 8-K that the 2018 Form 10-K and the 10-Q reports for the first three quarters of 2019 "should no longer be relied upon due to misstatements contained in such financial statements . . . ." In November 2020, Granite reported that an Audit Committee investigation "is substantially complete," and that Granite is "evaluating the impact of the investigation on its prior period financial statements and implementing appropriate remediation actions." In the same month, Granite filed a Form 8-K, which announced an agreement with its lenders to file audited financial statements (for 2019's Form 10-K and for its unaudited financial statements for the first three quarters of 2020) by the end of February 2021 (Borkon Decl. Exh.s D–F.)

Lead Plaintiff now moves to certify the class consisting of:

> All persons and entities who purchased or otherwise acquired Granite common stock during the period of April 30, 2018, through October 24, 2019, inclusive (the "Class Period") and were damaged thereby.[1]

In support of this motion, Lead Plaintiff submits an expert report by Chad Coffman, CFA, and copies of the SEC filings that contain some of the alleged misrepresentations. It also moves to appoint St. Louis as Class Representative and to appoint BFA as Class Counsel. Defendants filed a notice of non-opposition. This order follows full briefing and oral argument (Decl. of Peter E. Borkon, Exh.s A–E, Dkt. No. 121).

## ANALYSIS

Certification under Rule 23(b)(3) is a two-step process. A plaintiff must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. For a damages class under Rule 23(b)(3), a plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A plaintiff bears the burden of demonstrating that these requirements are met. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).

---

[1] Excluded from the proposed class are (i) defendants and any affiliates or subsidiaries thereof, (ii) present and former officers and directors of Granite and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any defendant has or has had a controlling interest; (v) Granite's employee retirement and benefits plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories (Mot. at n. 3).

6

United States District Court
Northern District of California

The Supreme Court has "cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); however, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 464–65 (2013).

### 1.    RULE 23(a)

#### A.    NUMEROSITY

Lead Plaintiff estimates that there are hundreds "if not thousands of" members in the class, based on the between 40 and 49 million shares then-outstanding on the New York Stock Exchange (NYSE) during the class period.  There are also 453 institutional investors, which is sufficient to satisfy numerosity.  While the class number is uncertain at present, this volume of shares and high trade volume (2.16 million weekly) will likely make joinder impractical.  This satisfies the numerosity requirement of Rule 23(a)(1) (Mot. at 5, Coffman Decl. ¶71§).

#### B.    COMMONALITY

To show commonality, a plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution.  So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014).  Here, the plaintiffs' allegations that investors were defrauded by the same public misrepresentations, in SEC filings and earnings calls, and suffered similar losses as a result, fulfill Rule 23(a)'s commonality requirement.  Even if individual damages calculations differ, the "artificial inflation per share" will be the same for each class member (Mot. at 11, 18).

#### C.    TYPICALITY

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Rule 23(a)(3).  "Under the rule's permissive standards,

7

representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Class certification is inappropriate, however, if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). In the instant action, the alleged risks and additional costs related to the joint-venture constructions projects, coupled with Granite's alleged misrepresentations and subsequent disclosures, caused St. Louis and absent class members alike to suffer financial loss. As a result, St. Louis' claims rest on the same legal theories as do the claims of other class members.

### D. ADEQUACY

The adequacy requirement of Rule 23(a)(4) permits certification only if "the representative parties will fairly and adequately protect the interests of the class." The two key inquiries are (1) whether there are conflicts within the class; and (2) whether plaintiff and counsel will vigorously fulfill their duties to the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Here, Lead Plaintiff "purchased or otherwise acquired Granite common stock during the period of April 30, 2018 through October 24, 2019" and was "damaged thereby," thus it falls neatly within the putative class definition. St. Louis, which has already litigated this case at the motion to dismiss and discovery stages, is undoubtedly familiar with the basis for this suit. St. Louis also details its understanding of its responsibilities as Lead Plaintiff and has engaged in due diligence to select lead counsel. St. Louis previously identified Mark Lawson, its Executive Director, as the individual in charge of managing litigation. He remains in charge. Mr. Lawson was previously Secretary and General Counsel to the St. Louis Board of Police Commissioners. St. Louis has been or is currently lead plaintiff in six other class actions and has also asserted that neither travel impediments nor conflicts in carrying out its responsibilities as Lead Plaintiff here exist. This order concludes that St. Louis shares class members' task. All claims require proof

8

that defendants violated Section 10(b), Rule 10b-5, and Rule 20(a); no differences appear in St. Louis' interests or circumstances that would derail certification in this securities class action. St. Louis has shown adequacy (Lawson Decl. ¶3, Mot. at 7–8).

Based on the foregoing, St. Louis has satisfied the elements of Rule 23(a). Accordingly, this order now turns to the requirements of Rule 23(b).

### 2. RULE 23(b)

#### A. PREDOMINANCE

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This requirement is satisfied when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. *See Comcast v. Behrend*, 569 U.S. 27 (2013). Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered on the merits in favor of the class. The office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the "metho[d]" best suited to adjudication of the controversy "fairly and efficiently." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 461 (2013).

Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security. To recover damages for a violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267

United States District Court
Northern District of California

9

(2014). To prevail under Section 10(b) of the Exchange Act and Rule 10b-5, Lead Plaintiff must prove all six elements.

Elements (1) and (2) plainly affect all members of this putative class because they relate to Granite's actions or inactions and their generalized effect on stock prices, not circumstances unique to individual class members. Elements (3) and (4), regarding reliance, and (5) and (6), addressing damages, require further discussion.

### *(i)* *Reliance*

Lead Plaintiff relies on the "fraud-on-the-market" theory to establish reliance. In *Halliburton Co.*, *supra*, 573 U.S. at 266, the Supreme Court rearticulated the principle that plaintiffs may establish a rebuttable presumption of reliance in securities cases under a "fraud-on-the-market" theory. *See also Basic Inc. v. Levinson*, 485 U.S. 224, 242–43 (1988). *Halliburton* affirmed *Basic*, which had "created a rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 n. 12 (9th Cir. 2003). Without the presumption, class certification would be virtually impossible, as individual questions regarding reliance would predominate over common questions. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). To establish the "fraud-on-the-market" theory, Lead Plaintiff must show that it traded in a market that is "efficient," *i.e.* one that fully digests all available material information about a security and incorporates it into the security's price. *See Halliburton, supra,* 573 U.S. at 268; *see also Basic*, *supra*, 485 U.S. at 243–44. An efficient market in effect acts as the agent of the investor, informing the investor that, "given all the information available to it, the value of the stock is worth the market price." *Basic, supra*, 485 U.S. at 244. To rebut the presumption, the defendants must show that no link exists between the alleged misrepresentation or omission and the investors' decisions to trade. *See ibid.*

10

Granite stock traded on the NYSE, a quintessentially efficient market.  Lead Plaintiff's expert, Chad Coffman, CFA, analyzed efficiency during the class period.  He used tests "regularly considered by financial economists and courts in determining whether the market for a particular security is efficient":  the five *Cammer* factors and three *Krogman* factors, plus he weighs other considerations, which are detailed below.  *See Cammer v. Bloom*, 711 F. Supp. 1264, 1273 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (adding additional factors to the *Cammer* test) (Borkon Decl. Exh. E at ¶¶ 6, 24, 19, 25–70).

The *Cammer* factors examine "1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information."  *First*, Coffman concludes, Granite's 2.16 million average weekly trading volume exceeded the average security on either the NYSE or the NASDAQ.  *Second*, numerous security analysists reported on Granite's securities.  *Third*, Granite stock was actively traded on the NYSE.  *Fourth*, Granite qualified to file a Form S-3 during the class period.  Only issuers with sufficiently large public floats or individual offerings may file such a form, which is intended to both attract investors and protect participants from liability in the registration process.  *Fifth*, shifts in Granite-specific information prompted changes in Granite's prices during the class period, and beyond.  To test this, Coffman performed an event study and concluded that changes in the Market Index and Peer Index helped to explain changes in Granite common stock's expected returns during the class period (*id*. at ¶¶ 20, 25, 51, 56).

With respect to the first *Krogman* factor, Coffman found that Granite showed market capitalization greater than the majority of NYSE and NASDAQ stocks during the class period. The second marker, bid-ask spread represents the cost to transact and indicates greater efficiency when the spread is "narrow."  In November 2018, Granite's bid-ask spread was narrow (between 0.034% and 0.078%), well below average spread of 100 randomly-selected common stocks Coffman chose this sample month because, in it, Granite had the largest bid-spread of any time

United States District Court
Northern District of California

during the class period. The third *Krogman* factor, public float (the percentage of shares not held by insiders), pointed to efficiency: 99% of shares were held by outsiders (*id.* at ¶¶ 68–70).

Coffman considered a few additional indicators: he found zero autocorrelation of Granite stocks in the class period. Autocorrelation represents the degree to which past price movements predict future ones, which, when non-zero, indicates inefficiency. He also noted "considerable option trading," which points to efficiency (*id.* at ¶¶ 72–76).

Having shown his work, Lead Plaintiff's expert has established a rebuttable presumption of reliance because Granite common stocks were traded in an efficient market during the class period. Defendant, to repeat, does not oppose the motion. The presumption stands.

### *(ii)* **Damages**

In *Comcast*, the Supreme Court reiterated the principle that under Rule 23(b), a plaintiff must establish that damages are capable of measurement on a class-wide basis. *citing Comcast*, *supra*, 569 U.S. at 34. This requires plaintiffs to "show that their damages stemmed from the defendant's actions that created the legal liability" and can "feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), *citing Comcast*, *supra*, 569 U.S. at 34.

Securities class-action plaintiffs widely employ the "out-of-pocket" method to calculate damages for a class of stockholders: damages are equal to the artificial inflation at time of purchase less that at time of sale. Coffman, asked to propose a method of class-wide damages calculation, suggests the out-of-pocket method, for which he would employ an "event study" to determine the two price inflation levels. Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of "loss causation." Loss causation requires a plaintiff to examine how "inflation per share may have evolved over the class period." This can be accomplished via "constant dollar inflation," "constant percentage inflation," or other methods. This stage does not require proof of loss causation for any individual class member, it merely requires establishing that a class-wide approach can be

12

employed once (and if) the aggrieved side meets its burden. *See Halliburton*, *supra*, 563 U.S. at 809 (*id.* at ¶ 81). The out-of-pocket method will be suitable and fulfills the damages element of Rule 23(b).

### B. SUPERIORITY

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations and quotations omitted). The factors to be considered in determining whether a class action is superior to other available methods include class members' interests in individual litigation, the extent and nature of other litigation already commenced by members of the class, the forum, and manageability. *See* Rule 23(b)(3)(B). This class action is superior to other types of action because individual class members would find it difficult to litigate such resource-intensive claims, the record reflects no state-law actions, the federal forum is appropriate, and no special manageability issues confound case resolution.

This showing satisfies the superiority element of Rule 23(b). Having met both (a) and (b), Lead Plaintiff's motion to certify the class is **GRANTED**.

### 3. LEAD COUNSEL

A November 2019 order herein directed Lead Plaintiff to conduct a due diligence process to select Lead Counsel, and then move for appointment and approval of its selection. Lead Plaintiff has timely moved and has submitted under seal declarations and exhibits explaining its process for choosing counsel as well as an explanation of why it favors selected counsel over other potential candidates.

Pursuant to the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u–4(a)(3)(B)(v). "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Cohen v. U.S. Dist. Court for N. Dist. Of Cal.*, 586 F.3d 703, 712 (9th Cir. 2009).

13

The undersigned has reviewed the explanations by Lead Plaintiff and the materials submitted, which detail the request for proposal, the comparably low fee structure of Bleichmar Fonti & Auld LLP (BFA), and BFA's experience. Based on that review, this order appoints Lead Plaintiff's choice, BFA. The Court appreciates the time and effort undertaken by the other firms that applied to serve as counsel for Lead Plaintiff.

## CONCLUSION

The motion to certify the above-quoted class is **GRANTED**. St. Louis shall serve as Class Representative and Plaintiff and Bleichmar Fonti & Auld LLP as Lead Counsel. Within **FOURTEEN CALENDAR DAYS** of the date of entry of this order, all parties shall submit jointly an agreed-upon form of notice, which must incorporate the information set forth above regarding the parallel actions. St. Louis along with defendants must also submit a joint proposal for dissemination of the notice, and the timeline for opting out of the action. Lead Plaintiff must bear the costs of the notice, which shall include mailing by first-class mail.

**IT IS SO ORDERED.**

Dated: January 21, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14