# EXHIBIT 70

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JULIA JUNGE and RICHARD JUNGE, on
behalf of themselves and similarly situated
investors,

Plaintiffs,

v.

GERON CORPORATION and
JOHN A. SCARLETT,

Defendants.

No.  C 20-00547-WHA

**ORDER RE MOTION TO CERTIFY
CLASS, APPOINT CLASS
REPRESENTATIVES, AND
APPOINT CLASS COUNSEL**

**INTRODUCTION**

In this PSLRA securities action, lead plaintiffs move to certify a class.  They also move
for appointment as class representatives and for appointment of lead counsel.  To the extent
stated below, the motion is **GRANTED**.

**STATEMENT**

A prior order detailed the facts of the operative complaint (Dkt. Nos. 103, 124).  In brief,
court-appointed lead plaintiffs Julia and Richard Junge invested in defendant Geron
Corporation.  At all material times, defendants Geron and its President and CEO John A.
Scarlett worked to develop a single drug, imetelstat.  Defendants hoped that imetelstat could

improve quality of life and/or survival for patients with myelofibrosis, a cancer affecting bone marrow (Amd. Compl. ¶¶ 51, 52).

The putative class period (March 19, 2018, through September 26, 2018) covered the late stages of Geron's phase-two clinical trial, which was titled IMbark. To conduct the trial, Geron partnered with Janssen Biotech Inc. The companies sought to measure whether imetelstat could improve certain health markers, known as study "endpoints." Three of the endpoints were total symptom score (TSS), complete and/or partial remission (CR/PR), and spleen volume reduction (SVR).

Our prior order granted in part defendants' motion to dismiss but let claims proceed as to certain categories of statements (Dkt. No. 124 at 9–11). Specifically, Geron and Scarlett allegedly warmed the market on Geron common stock by issuing optimistic statements about IMbark's TSS and CR/PR endpoints, when really the data disappointed. As alleged, the first disclosure occurred March 19, 2018, whereupon it artificially inflated the price of Geron common stock. Numerous other disclosures, too, allegedly inflated stock prices throughout the class period.

The truth eventually came out, per the complaint. Geron revealed TSS and CR/PR data after the market closed on September 26, 2018. Before the market opened the next day, Janssen announced it would quit the partnership with Geron. These two disclosures therefore shared the same "market date" of September 27 (Campisi Decl. Exh. A, n. 67, Exh. 7). Over the two days that followed, Geron stock price plunged by approximately 70% (*ibid*.; Amd. Compl. ¶¶ 14, 41).

Lead plaintiffs now move to certify a class under FRCP 23(a) and 23(b)(3) consisting of:

> All persons who purchased Geron common stock during the period from March 19, 2018, to September 26, 2018, inclusive, and who were damaged thereby (the "Class").[1]

---

[1] Excluded from the class would be defendants; directors and officers of Geron; and their families and affiliates (Amd. Compl. ¶ 169).

United States District Court
Northern District of California

In support of this motion, lead plaintiffs submit an expert report by Chad Coffman, CFA, and copies of SEC filings that contain some of the alleged misrepresentations. They also move to appoint plaintiffs Julia and Richard Junge as class representatives and to appoint Kaplan Fox as class counsel. Defendants oppose certification, arguing that predominance is not met as to damages. This order follows full briefing and oral argument (Dkt. No. 141, Campisi Decl. ¶¶ 3, 4).

## ANALYSIS

Certification under Rule 23(b)(3) is a two-step process. A plaintiff must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact exist common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. For a damages class under Rule 23(b)(3), a plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A plaintiff bears the burden of demonstrating that these requirements are met. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).

The Supreme Court has "cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up); however, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 464–65 (2013).

Defendants oppose class certification because, they argue, plaintiffs have failed to propose a viable class-wide damages model. This order examines each requirement of the class certification analysis to ensure that the putative class satisfies the requirements of Rule 23(a) and (b)(3).

3

United States District Court
Northern District of California

### 1. RULE 23(a).

#### A. NUMEROSITY.

At all material times, Geron common stock was registered and traded on the NASDAQ stock exchange, with more than 173 million shares outstanding; defendants admit that Geron sold over ten million shares during the class period; and a FINRA registered broker sold Geron stock to at least 100 unique account holders during the class period (Campisi Decl. Exh. A ¶¶ 26–30, 67; Exh. B at 13–15). Thus, "[j]oinder of all members is impracticable." FRCP 23(a).

#### B. COMMONALITY.

To show commonality, a plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (cleaned up). Here, plaintiffs' allegations that the same public misrepresentations in Securities and Exchange Commission (SEC) filings and earnings calls defrauded investors and that the investors suffered similar losses as a result fulfill Rule 23(a)'s commonality requirement. Even if individual damages calculations ultimately will differ, it appears that the artificial inflation per share (if any) will be the same for each class member.

#### C. TYPICALITY.

Typicality suffices if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). A district court cannot, however, certify a class if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). In the instant action, the surviving alleged misrepresentations and subsequent disclosures caused the Junges, and absent class members alike, to suffer financial loss. The Junges' claims rest on the same legal theories as the claims of absent class members, so the Junges appear typical.

4

### D. ADEQUACY.

The adequacy requirement of Rule 23(a)(4) permits certification only if "the representative parties will fairly and adequately protect the interests of the class." The two key inquiries are (1) whether there are conflicts within the class; and (2) whether plaintiff and counsel will vigorously fulfill their duties to the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Here, the Junges purchased or acquired Geron common stock during the class period and were damaged thereby. They do not appear to have special interests or vulnerability to special defenses that would cause conflict with other class members. All claims require proof that one or more defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and the SEC's Rule 10b-5; no differences appear in the Junges' interests or circumstances that would derail competent class representation.

The Junges, along with counsel Kaplan Fox, have already participated in twice filing complaints herein and litigating a complex motion to dismiss (Dkt Nos. 92, 103, 105–107, 110, 117, 124). They undoubtedly know the case well. Kaplan Fox appears otherwise well-qualified (*see* Campisi Decl. Exh. D). This order understands that in addition to the motion to dismiss, Kaplan Fox has undertaken vigorous discovery and has been litigating discovery disputes (*id*. ¶¶ 3–4). Kaplan Fox appears satisfactory under Rule 23(g).

### 2. RULE 23(b).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. *See Comcast v. Behrend*, 569 U.S. 27, 34–35 (2013).

Section 10(b) and Rule 10b-5 prohibit making a material misstatement or omission in connection with the purchase or sale of any security. To recover damages for a violation of

United States District Court
Northern District of California

5

Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*). This applies to claims under Section 10(b) as well as Section 20(a), which simply extends liability to qualifying corporate leaders. Class certification requires this order to determine whether common questions predominate as to all elements.

Elements (1), (2), and (6) plainly affect all members of this putative class because the elements all relate to Geron's actions or inactions and their causal effect on stock prices, not circumstances unique to individual class members. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 563 U.S. 804, 814 (2011) (*Halliburton I*) (establishing loss causation as a merits determination). Elements (3) and (4), concerning reliance, and (5), damages, require further discussion.

### A. PREDOMINANCE AND RELIANCE.

Lead plaintiffs advance a "fraud-on-the-market" theory to establish reliance. Under this theory, plaintiffs may establish a rebuttable presumption of reliance as to all class members. *Halliburton II*, 573 U.S. at 266; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 242–43 (1988). *Halliburton II* affirmed *Basic*, which formulated the rebuttable presumption "based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 934 n. 12 (9th Cir. 2003).

To establish a "fraud-on-the-market" presumption of reliance, lead plaintiffs must show that they traded in a market that was at all relevant times "efficient," *i.e.*, one that digested all "publicly-available" material information about securities and incorporated it into the securities' prices. *See Halliburton II,* 573 U.S. at 268, 271 (cleaned up); *see also Basic*, 485 U.S. at 243–44. An efficient market acts as the "unpaid agent of the investor, informing" the investor "that given all the information available to it, the value of the stock is worth the

United States District Court
Northern District of California

6

market price." *Basic,* 485 U.S. at 244 (cleaned up). To rebut the presumption, once established, defendants must show that no link existed between the alleged misrepresentation or omission and investors' decisions to trade.

Geron common stock traded on the NASDAQ, a quintessentially efficient market. Lead plaintiffs' expert, Coffman, analyzed efficiency during the class period. He used tests "regularly considered by financial economists and courts in determining whether the market for a particular security is efficient" (Campisi Decl. Exh. A ¶ 20): the five *Cammer* factors and three *Krogman* factors. *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (adding additional factors to the *Cammer* test). Plus, he weighed other considerations as detailed below (Campisi Decl. Exh. A at ¶¶ 11, 26, 29, 40).

The *Cammer* decision examined: "1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information." *Cammer*, 711 F. Supp. at 1286. The following summary is not exhaustive. *First*, Coffman concluded, Geron's 20.59% average weekly trading volume (35.44 million shares traded weekly, on average) exceeded that of the average security on the NASDAQ during the class period. *Second*, numerous securities analysts reported on Geron securities (*id*. at ¶¶ 33–37). *Third*, Geron stock was actively traded on the NASDAQ, not over the counter. While Coffman opined that the number of market makers is not especially relevant here, at least seventy-five market makers traded Geron common stock (*id*. at ¶¶ 38–42; Campisi Decl. Exh. B at 8). *Fourth*, Geron filed Form S-3s before, during, and after the class period. Only issuers with sufficiently large public floats or individual offerings could file such a form, which was at all material times intended to both attract investors and protect participants from liability in the registration process (*id*. at ¶¶ 43–45). *Fifth*, shifts in Geron-specific information prompted changes in the price of Geron stock during the class period, and beyond (*id*. at ¶¶ 46–65).

With respect to the *first Krogman* factor, Coffman found that Geron showed market capitalization in the 35th to 46th percentiles of NYSE and NASDAQ markets during the class

7

period (Campisi Decl. Exh. A at ¶¶ 66–69). The *second* factor, bid-ask spread, represented the cost to transact and indicated greater efficiency when the spread was "narrow." During the class period, the market capitalization averaged $731.69 million and reached heights of more than one billion dollars. The *third Krogman* factor, public float (the percentage of shares not held by insiders), pointed to efficiency: insiders held just 0.52% of Geron shares (*id*. at ¶¶ 68–72; Coffman Rep. Exh. 11).

Coffman considered a few additional indicators: he opined that approximately 204 institutional investors reported owning between approximately 60 and 74 million shares of Geron common stock during the class period. This suggested market efficiency. He also found no evidence of "persistent" "autocorrelation," which represented the degree to which past price movement could have predicted future movement and could have indicated inefficiency (*id*. at ¶¶ 73–77; Coffman Rep. Exh. 12).

According to the above analysis, investors traded Geron common stock in an efficient market during the class period. Coffman has established for plaintiffs a rebuttable presumption of reliance.

Defendants, to repeat, do not oppose the motion on this ground. The presumption stands, subject to proof at trial. Consequently, this order does not reach plaintiffs' other argument for a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151–54 (1972).

### B. PREDOMINANCE AND DAMAGES.

#### (i) "Methodology."

Broadly speaking, defendants argue that (1) plaintiffs have not shown a *methodology* to calculate damages on a class-wide basis compliant with *Comcast*, 569 U.S. at 35, in part because "out-of-pocket" damages are merely a *type* of damages, not a methodology for calculating them; (2) Coffman has failed to commit to any damages model (including an "event study"); (3) he has failed to "engage with the facts and nuances of this case" in opining about calculation of damages (Opp. Br. 12); (4) plaintiffs fail to specify the corrective disclosures they will rely upon to "account for" the dismissal of certain alleged grounds for liability, thus

concealing the true "theories" of liability and presumably requiring us to find that the plan for calculating damages fails under *Comcast*; and (5) to the extent plaintiffs will argue materialization of the risk as a "theory of liability," an event study would overstate damages (Opp. Br. 2). Specifically, defendants argue, the "back-end stock drop" of Geron common stock price after September 26, 2018, cannot accurately represent the amount of artificial inflation caused by concealing the risk that Janssen might quit on account of disappointing data (TSS and CR/PR) (*id*. 18).

Defendants' damages expert, René M. Stulz, concluded that Coffman "proposes no methodology capable of providing an estimate of the difference between the market's expectation regarding the probability that the [collaboration] would be terminated and what the market's expectation *would have been* but-for the alleged misrepresentation" (*id*. 19, quoting Stulz Report ¶ 46 (emphasis in original)).

These arguments misapprehend *Comcast*'s requirements for class certification.

In *Comcast*, the district court had held that only one of plaintiffs' four alleged theories of antitrust liability survived class certification. The district court had approved a damages model that used a figure that "assum[ed] the validity of all four theories" when the only antitrust violation plaintiffs would be permitted to pursue was "over-builder competition." 569 U.S. at 35–37. On this, the district court had erred. The Supreme Court explained:

> [R]espondents would be entitled only to damages resulting from reduced overbuilder competition. A model that does not attempt to measure only those damages attributable to that theory cannot establish that damages are susceptible of measurement across the entire class for Rule 23(b)(3) purposes.

*Id.* at 28. The Supreme Court found that the proposed damages model did not satisfy Rule 23(b)(3)'s predominance requirement because, with no apparent way to isolate the damages associated with the one actionable theory of liability, it did not measure damages on a class-wide basis.

Unlike *Comcast*, in which a damages figure swept in theories of liability that had been eliminated from the case, lead plaintiffs' proposed damages model relies on just one theory of

United States District Court
Northern District of California

9

liability: that Geron's misleading statements about TSS and CR/PR artificially inflated Geron common stock price, and that the price declined when the true nature of those transactions came to light. This accounts for the rulings in our order regarding the motion to dismiss. Coffman has posited the following as one method for calculating damages: he could use an event study combined with statistical tools (cash flow analyses, valuation multiples analyses, and more) to isolate the effects of independent, unwanted variables (Campisi Decl. Exh. A at ¶¶ 50, n. 56, ¶¶ 80–82). This represents an "accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250–51 (N.D. Cal. 2013) (cleaned up).

Defendants' objections to plaintiffs' damages approach boil down to loss causation, which plaintiffs need not show at this stage. *See Amgen Inc.,* 568 U.S. at 475; *Halliburton I*, 563 U.S. at 814. Specifically, objections (1) through (3) relate to the required showing of a damages method or methodology, and the extent to which details on disaggregation are required at class certification. Defendants argue that *Comcast* requires Coffman to "commit" to a detailed explanation of his "technique" or "methodology" or even his "method" (measuring out-of-pocket loss), and that his failure to do so alone "should end the inquiry" (Opp. Br. 9–10). They also argue that the price drop after September 27, 2018, exceeded the price of the stock during most of the class period (Opp. Br. 20).

While our court of appeals has not spoken to the issue, many district court decisions have found that damages models just like ours were adequate for class certification. Our own decision in *Luna v. Marvell Tech. Grp., Ltd.* rejected materially identical attacks on class certification for damages. 2017 WL 4865559, at *5 (N.D. Cal. Oct. 27, 2017) (cleaned up). That order found the proffered damages model adequate even though defendants had objected that "major confounding news . . . was disclosed on the same corrective disclosure dates" as the actionable, allegedly-fraudulent disclosures. *Ibid.* Defendants attempt to distinguish *Luna* by arguing that the report had committed to a damages methodology, whereas Coffman has not. The damages report, however, matched the report herein in all material ways. Coffman has explained that further discovery will inform his final analysis. Most importantly, our order

held that defendants' concern in *Luna* related to loss causation, not predominance. *Id.* at 6. The same is true here.

Other district court decisions after *Comcast* that accepted damages models very similar to ours and thereon certified classes include: *In re RH, Inc. Sec. Litig.*, No. C 17-0554, ECF Nos. 95-1, 111 (N.D. Cal. Oct. 11, 2018) (Judge Yvonne Gonzalez Rogers); *Mulderrig v. Amyris, Inc.*, No. C 19-1765, ECF Nos. 84-1, 101 (N.D. Cal. Dec. 8, 2021) (Judge Yvonne Gonzalez Rogers) (finding, in part, the damages model adequate but ruling that pursuing materialization of the risk would defy predominance); *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, *7 (N.D. Ga. Aug. 25, 2020) (Judge Mark H. Cohen); *In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, *14–15 (C.D. Cal. 2017) (Judge Christina A. Synder); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, *17 (N.D. Cal. 2016) (Judge Edward J. Davila); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, *13 (N.D. Cal. 2016) (Judge Susan Illston); *In re Teva Sec. Litig.*, 2021 WL 872156, *41–42 (D. Conn. 2021) (Judge Stefan R. Underhill); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D. N.Y. 2016); *see also* 7 Newberg on Class Actions § 22:81 (5th Ed.) (collecting cases).

Some class-certification decisions, however, have agreed with our defendants' principal arguments that *Comcast* requires PLSRA plaintiffs to provide a detailed plan for damages and that the plan must explain exactly how it would track only the damages permitted by any theories of liability left in the case. Specifically, these decisions have required their plaintiffs to detail exactly what damages model they would use and exactly how it would disaggregate independent variables at issue in the suit, all prior to certification on damages. *See, e.g.*, *Loritz v. Exide Tech.*, 2015 WL 6790247, *22 (C.D. Cal. July 21, 2015) (Judge Stephen V. Wilson) (rejecting a damages model similar to ours); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (same). *Loritz* and *Fort Worth* certified liability classes only. This order finds the former line of decisions most persuasive. It now joins those that have found the damages model offered herein consistent with *Comcast*.

Defendants' other authorities interpreting *Comcast*, outside of the securities context, also do not undermine predominance. *Werdebaugh v. Blue Diamond Growers* involved tort claims

11

for misleading labels on packages of almond milk (*e.g.*, labels read "all natural" when the milk really wasn't). 2014 WL 7148923, *11–13 (N.D. Cal. Dec. 15, 2014) (Judge Lucy Koh). At class certification, the plaintiff's damages expert proposed a regression model that failed to separate the effects of price variables (*e.g.*, advertising practices that could drive up demand and thus price) from increased price stemming from the alleged lies printed on the package. *Ibid.* Also as in *Comcast*, the *Werdebaugh* plaintiff's measure of financial loss to putative class members *necessarily* swept in some price-gouging effects of issues unrelated to the alleged harms. In *Curtis v. Extra Space Storage, Inc.*, storage-unit renters alleged the rental contracts harmed them in various ways, only some theories survived motion to dismiss, and damages proved impossible to disaggregate. 2013 WL 6073448, *4 (N.D. Cal. Nov. 18, 2013). In *In re POM Wonderful LLC*, the court decertified a class because the damages model provided a full refund, but the lost-value theory of liability did not match. 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (Judge Dean Pregerson). The alleged liability in those suits differs from liability under the PLSRA. When seeking out-of-pocket damages, investors' injury corresponds to inflated stock prices. Also, unlike the reports in *Werdebaugh* and *Curtis*, Coffman's approach appears at this stage plausibly able to disaggregate the effects of other factors that could impact stock prices, such that this issue does not defeat predominance. *See Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 140 (D.D.C. 2017).

Plaintiffs' plan for damages appears sufficient. This order finds that common issues of damages will predominate.

### (ii) Materialization of the Risk and Damages.

Defendants object that plaintiffs have not identified which "corrective" disclosures they continue to allege and have not limited their "theor[ies]" of liability to those permitted in our prior order. These points appear in arguments (4) and (5) and a portion of (3). This, defendants contend, would wrongfully permit a materialization-of-the-risk "theory of liability" (Opp. Br. 2, 15–16, 18). A prior order herein approved plaintiffs' theory of legal injury, namely that Geron gave rosy forecasts about TSS and CR/PR when the data actually looked bleak. A materialization-of-the-risk "theory" would defy *Comcast*, argue defendants, because

12

the "event study methodology" associated with out-of-pocket damages would overstate class losses and introduce individualized inquiries, defying predominance.

The materialization-of-the-risk approach to *loss causation* provides "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (cleaned up). This means the loss proximately flowed from the alleged hazard, which the false or misleading statements obscured. *See Nuveen Mun. High Income Opp. Fund v. Cty. of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quoting *Lentell* 396 F.3d at 173) (emphasis in the original). Defendants argue that the remaining, actionable misrepresentations in our suit contain a latent materialization-of-the-risk theory. Plaintiffs have neither confirmed nor denied that they will use materialization of the risk as a basis for seeking damages. The theory would go as follows: Geron's efforts to conceal the TSS and CR/PR data also concealed the risk that Janssen would quit on account of the lousy TSS and CR/PR data. When Janssen learned of the lousy data, it quit. Losses followed. Since plaintiffs could pursue this reasoning, defendants urge that this order deny class certification because Coffman has failed to account for the theory in his damages report.

Not so. Materialization of the risk is not a theory of liability. It is a form of loss causation. Defendants disagree, citing *Shane Mulderrig, et al. v. Amyris, Inc., et al.*, which called materialization of the risk a "legal theory of the harmful event." 2021 WL 5832786, *10–11 (N.D. Cal., Dec. 8, 2021) (Judge Yvonne Gonzalez Rogers) (quoting *Comcast*, 569 U.S. at 38) (*see* Dkt. No. 159). *Mulderrig* then held that it would have denied class certification, citing *Comcast*, but for the plaintiffs' additional claim of direct loss causation. Many other district court decisions, however, have disagreed with that conclusion, which "reframe[d]" materialization of the risk as a liability theory. *Cty. of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) (collecting cases). This decision joins them. Materialization of the risk articulates a loss-causation theory. Any approach to loss causation herein remains plaintiffs' burden to prove at the merits stage. The possible existence of such a theory does not contravene

*Comcast* or defeat predominance. *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 683–84 (7th Cir. 2010); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*20 (S.D.N.Y. July 10, 2019) (Judge Colleen McMahon); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at \*18–19 (E.D.N.Y. Jan. 11, 2022) (Judge Sanket J. Bulsara).

Defendants' argument about Coffman failing to consider nuances of the case goes to the same issue. Their argument includes this grievance: "Coffman and Plaintiffs' explanations of the damages sought in this case ***directly contradict*** each other. For example, both Coffman and Richard Junge "were asked whether Plaintiffs 'are seeking damages based on the market learning that Janssen had terminated the collaboration and licensing agreement with Geron'" (Opp. Br. 14 (emphasis in the original)). Coffman answered yes, and Junge, no. The question was unclear. The question itself conflated loss causation and a theory of liability. A deponent might have taken the query to ask whether plaintiffs were seeking to prove that the alleged misrepresentations about TSS and CR/PR concealed a risk that Janssen would quit the partnership, *i.e.*, materialization of the risk. Or a deponent might have thought he was being asked to answer whether plaintiffs were inappropriately seeking damages that flowed from the market's reaction to the fact of Janssen quitting, that is, quitting for any reason at all. Yes and no answers could both be consistent with the single theory of liability in our case.

Defendants further cite *In re BP p.l.c. Sec. Litig.* to argue that an event study would overstate damages. 2013 WL 6388408, at \*16–17 (S.D. Tex. Dec. 6, 2013) (Judge Keith P. Ellison) (*BP I*). The comparison does not persuade. *BP I* addressed certification for two putative investor classes: one for shares held after the infamous British Petroleum oil spill and one for a pre-spill class. Relevant here, the pre-spill class asserted materialization of the risk. *BP I* denied its bid for certification because the damages methodology was not sufficiently detailed. The decision held that the model did not appear to have accounted for the mismatch between back-end price drop and damages flowing from materialization of the risk. This order finds persuasive the district court decisions that have disagreed with defendants. Those decisions held that since loss causation is a merits inquiry, a damages plan was either not necessary for class certification or did not need to spell out precisely how it would account for

14

United States District Court
Northern District of California

confounding variables. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (possibility that plaintiffs would pursue materialization of the risk did not defeat predominance on damages though plaintiffs proffered no expert damages report); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at \*19 (event-study damages plan was sufficient for class certification); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019) (Coffman's damages model was adequate). *Comcast* requires that the damages sought be directly related to a live theory of liability, a requirement met herein (*see, supra*, Section 2(B)(i)). *See Comcast*, 569 U.S. at 38.

Defendants similarly argue that individualized considerations would defeat predominance if plaintiffs were to pursue materialization of the risk, citing *In re BP p.l.c. Sec. Litig.,* 2014 WL 2112823, \*12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) (Judge Keith P. Ellison) (*BP II*) (Opp. Br. 20). *BP II* denied class certification to the pre-spill investors for a second time. In their second motion, plaintiffs sought consequential damages for their entire economic loss following the spill. *Ludlow*'s explanation is useful. *Ludlow* affirmed that class certification was inappropriate in part because the out-of-pocket damages model introduced individualized inquiries. The opinion noted that the plaintiffs had alleged "each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations." *Ludlow*, 800 F.3d at 690 (emphasis in the original). On that reasoning, the plaintiffs were seeking consequential damages, *i.e.*, the "full stock price decline" after the spill. *Ibid*. The correct measure of damages would therefore have "require[d] individualized inquiry" into whether the risk of spill would have caused a given investor to forgo purchasing any BP stock. *Ibid*. This would have defeated predominance. Unlike *BP II*, plaintiffs do not seek consequential damages or argue that investors would have refused to purchase Geron stock had they known the truth about TSS and CR/PR data. They contend that Geron concealed information from the market, thus artificially inflating price. This order perceives no similar need for individualized inquiry.

Finally, defendants point to *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, in which the defendant attempted to rebut the *Basic* presumption that shareholders relied on the plaintiff's "generic" misstatements in making stock purchases. 594 U.S. ___ (2021). The

defendant argued that the statements did not impact price. Our defendants do not so argue, thus their reliance on *Goldman*'s discussion of "back-end price" drops does not convince (Opp. Br. 17).

At the hearing, the attorney for defendants was asked what methodology he would find capable of measuring the damages at issue. Counsel punted, noting that it was not his burden to offer one. True, but this points to a fundamental issue with defendants' argument. The level of detail that defendants demand is not required to show a tether between liability and damages at class certification.

It would appear, at this stage, that Coffman can offer a methodology capable of calculating appropriate damages consistent with *Comcast*. That is, he will calculate damages associated with whichever false or misleading statements plaintiffs can prove. At the merits stage, however, plaintiffs will be required to establish all the necessary elements, including loss causation. They will also be required to establish a damages model capable of disaggregating causes of inflation outside of the actionable harms alleged herein. If they cannot, the class may be decertified (Campisi Decl. Exh. A ¶ 82; Campisi Rep. Decl. Exh. B ¶¶ 22–26).

### C. SUPERIORITY

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations and quotations omitted). The factors to be considered in determining whether a class action is superior to other available methods include class members' interests in individual litigation, the extent and nature of other litigation already commenced by members of the class, the forum, and manageability. *See* Rule 23(b)(3)(B). This class action is superior to other types of action because individual class members would find it difficult to litigate such resource-intensive claims, the federal forum is appropriate, no state actions appear in our record, and no special manageability issues confound case resolution. This showing satisfies the superiority element of Rule 23(b).

Lead plaintiffs have satisfied the requirements of Rule 23(a) and (b)(3). They have therefore shown that class certification is appropriate.

16

**CONCLUSION**

For the reasons stated, plaintiffs' motion for class certification is **GRANTED**. The following class is **CERTIFIED**:

> All persons who purchased Geron common stock during the period from March 19, 2018, to September 26, 2018, inclusive, and who were damaged thereby (the "Class").

Explicitly excluded from the class are defendants; directors and officers of Geron; and their families and affiliates (*see* Amd. Compl. ¶ 169). For the reasons stated, the Court **APPOINTS** Julia and Richard Junge as class representatives and Kaplan Fox as class counsel. Within **SIXTEEN CALENDAR DAYS** of the date of entry of this order, all parties shall submit jointly an agreed-upon form of notice. It should note all related dockets. The parties must also submit a joint proposal for dissemination of the notice, and the timeline for opting out of the action. Lead plaintiffs must bear the costs of the notice, which shall include mailing by first-class mail.

**IT IS SO ORDERED.**

Dated: April 2, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

17