# EXHIBIT 71

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------- x
BOSTON RETIREMENT SYSTEM,        :
Individually and On Behalf of    :
All Others Similarly Situated,   :
                                 :
          Plaintiff,             :
                                 :
v.                               :
                                 :  Civil No. 3:16-cv-2127 (AWT)
ALEXION PHARMACEUTICALS, INC.,   :
LEONARD BELL, DAVID L. HALLAL,   :
VIKAS SINHA, DAVID BRENNAN,      :
DAVID J. ANDERSON, LUDWIG N.     :
HANTSON, and CARSTEN THIEL,      :
                                 :
          Defendants.            :
-------------------------------- x
```

## RULING ON MOTION FOR CLASS CERTIFICATION

Lead Plaintiffs Erste-Sparinvest Kapitalanlagegesellschaft mbH ("Erste") and the Public Employee Retirement System of Idaho ("PERSI") move for class certification pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and appointment of class representatives and co-class counsel. For the reasons set forth below, the plaintiffs' motion is being granted.

### I.   BACKGROUND

Alexion is a Boston, Massachusetts-based pharmaceutical company that specializes in the development and manufacture of drugs used to treat diseases affecting fewer than 200,000 people in the United States. Between January 2014 and May 2017, Alexion

-1-

had only one commercial drug, Soliris, which is used to reduce symptoms of paroxysmal nocturnal hemoglobinuria ("PNH") and atypical hemolytic uremic syndrome ("aHUS"). During this time period, Soliris was Alexion's only money-making drug.

The defendants attributed growing revenue from sales of Soliris to increased physician demand for the drug in other countries, as a result of Alexion conducting successful disease-education programs that helped to identify new patients with PNH and aHUS. The plaintiffs claim that the defendants' disease-awareness and diagnostic initiatives, which increased sales of Soliris, were illegal and unethical. The plaintiffs claim that these practices included pressuring or frightening patients and physicians to begin or continue treatment with Soliris, obtaining confidential personal health information in violation of the Health Insurance Portability and Accountability Act, and funneling illegal kickbacks through charities in violation of federal law. The plaintiffs claim that investors became aware of these issues through a series of corrective disclosures that began in November 2016 with an announcement by Alexion that it was investigating whether employees violated company policies and procedures and ended in May 2017 with the publication of an article by Bloomberg examining the company's practices, which was based on interviews with confidential witnesses and a review of thousands of pages of internal documents. Between November 4,

2016 and May 24, 2017, the share price of Alexion stock declined more than thirty percent.

## II. LEGAL STANDARD

"A class may be certified only if, 'after a rigorous analysis,' the district court is satisfied that the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met." Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)). Rule 23(a) sets forth the following four requirements:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law and fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "Although . . . a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent --

that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 365-66 (2011)).

Plaintiffs must also satisfy the requirements of Fed. R. Civ. P. 23(b). With respect to Rule 23(b)(3):

> A class action may be maintained if Rule 23(a) is satisfied and if . . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

In addition, "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class

-4-

counsel, the court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class," Fed. R. Civ. P. 23(g)(1)(A), in addition to "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B).

### III. DISCUSSION

The plaintiffs seek to certify the following class pursuant to Rule 23(a) and 23(b)(3):

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. from January 30, 2014 to May 26, 2017, inclusive (the "Class Period") and who were damaged thereby (the "Class").

Pls.' Mem. (ECF No. 198-1) at 3.[1]

In addition, in accordance with Rule 23(g), the plaintiffs "request that the Court appoint Motley Rice and Labaton Sucharow

---

[1] "Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Alexion's subsidiaries and affiliates; any person who is or was an officer or director of Alexion or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity." Pls.' Mem. at 3 n.3.

as Co-Class Counsel." Id. at 31.

## A. Rule 23(a)

### 1. Numerosity

With respect to the first requirement under Rule 23(a), "numerosity is 'presumed at a level of 40 members.'" Leber v. Citigroup 401(k) Plan Inv. Comm., 323 F.R.D. 145, 155 (S.D.N.Y. 2017) (quoting Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by showing that a large number of shares were outstanding and traded during the relevant period." In re Bank of Am. Corp. Sec., Derivative, & Empl. Ret. Income Sec. Act (ERISA) Litig., 281 F.R.D. 134, 138 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). Here, "there were 197.8 million shares of Alexion common stock outstanding throughout the Class Period," and "1,381 separate institutions owned Alexion common stock during the Class Period." Pls.' Mem. at 6-7. In addition, "Alexion stock had an average weekly volume on the NASDAQ of 8.96 million shares." Id. at 7. Joinder on this scale would be impracticable. Thus, the plaintiffs have satisfied the numerosity requirement.

### 2. Commonality and Typicality

With respect to the second requirement, "[c]ommonality requires the plaintiff to demonstrate that the class members

-6-

'have suffered the same injury.'" <u>Wal-Mart Stores, Inc. v.</u>

<u>Dukes</u>, 564 U.S. 338, 349-50 (2011) (quoting <u>Gen. Tel. Co. of Sw.</u>

<u>v. Falcon</u>, 457 U.S. 147, 156 (1982)). The proposed class's

"claims must depend upon a common contention . . . [which] must

be of such a nature that it is capable of classwide

resolution--which means that determination of its truth or

falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." <u>Id.</u> at 350.

With respect to the third requirement, typicality requires

that "each class member's claim [arise] from the same course of

events" and that "each class member [make] similar legal

arguments to prove the defendant's liability." <u>In re Flag</u>

<u>Telecom Holdings, Ltd. Sec. Litig.</u>, 574 F.3d 29, 35 (2d Cir.

2009) (quoting <u>Robidoux v. Celani</u>, 987 F.2d 931, 936 (2d Cir.

1993)). "Typicality does not require that the situations of the

named representatives and the class members be identical." <u>In re</u>

<u>Oxford Health Plans, Inc.</u>, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

Courts have held that "[t]he commonality and typicality

requirements of Rule 23(a) tend to merge." <u>Gen. Tel. Co. of Sw.</u>

<u>v. Falcon</u>, 457 U.S. 147, 157 n.13 (1982). Here, the lead

plaintiffs' claims and those of proposed class members "arise

out of the same misstatements and omissions in Defendants' SEC

filings and other public statements," and they present common

questions of law and fact. Pls.' Mem. at 8. "Other than

-7-

asserting that Plaintiff[s] [are] subject to a unique defense," the defendants do "not otherwise contest Plaintiffs' assertions that the commonality and typicality requirements of Rule 23(a) are met." Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y. 2008). Thus, in light of the of the discussion below with respect to issues relating to unique defenses, the plaintiffs have satisfied the commonality and typicality requirements.

### 3. Adequacy

With respect to the fourth requirement, adequacy "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). In reviewing a class representative's adequacy, "[t]he focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" Flag Telecom Holdings, Ltd., 574 F.3d at 35 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). "In order to defeat a motion for certification, however, the conflict must be fundamental." Id. (internal quotation marks and citations omitted). Thus, "a proposed class representative may not satisfy the adequacy prong if his or her case involves problems that 'could become the focus of cross-

-8-

examination and unique defenses at trial, to the detriment of the class.'" Lapin, 254 F.R.D. at 177 (quoting In re NYSE Specialists Sec. Litig., 240 F.R.D. 128, 144 (S.D.N.Y. 2007)). "The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." Id. at 179 (internal quotation marks and citations omitted). In addition, "[a] lead plaintiff must also possess a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation." Id. at 176 (internal quotation marks and citations omitted).

The defendants contend that Erste and PERSI are inadequate class representatives for three reasons. First, the defendants argue that Erste and PERSI are each subject to a unique defense which might "threaten to become the focus of the litigation" because neither relied on the alleged misrepresentations. Baffa, 222 F.3d at 59. See Defs.' Opp. (ECF No. 237) at 4 ("Erste . . . demonstrably did not rely on the alleged misrepresentations at issue."); id. at 35 ("[N]either PERSI nor its investment managers relied on the alleged misrepresentations."). Second, the defendants argue that Erste "is subject to the unique defense that it lacks standing under Austrian law to assert claims for alleged losses incurred in its managed funds." Id. at

3. Third, the defendants argue that both Erste and PERSI are inadequate class representatives in terms of their management of litigation in this case. See id. at 29 ("Erste's unwillingness or inability to make its outside investment managers available for discovery also renders Erste an inappropriate class representative."); id. at 34 ("Erste is inadequate because it has not coordinated with PERSI in managing the litigation."); id. at 40 ("PERSI has been minimally involved in this litigation.").

### a. Reliance on Alleged Misrepresentations

The defendants have not shown that either Erste or PERSI is subject to a unique defense that is meritorious enough to require them to devote considerable time to rebut it and thus threatens to become the focus of the litigation.

### i. Transactions During the Class Period

The defendants contend that Erste is an inadequate class representative because "[t]wo of the three Erste funds-- including the internally managed fund--bought and held substantial quantities of Alexion stock after the alleged corrective disclosures, and after Erste concluded that Alexion had committed securities fraud and sought appointment as lead plaintiff in this case." Defs.' Opp. at 33. The Class Period in this action includes all dates "between January 30, 2014 and May 26, 2017, inclusive." Am. Compl. at 1. By January 2017, "Erste

-10-

believe[d] that the defendants had committed securities fraud," Exh. 9, Defs.' Opp. (ECF No. 237-10), at 11 of 38, Ln. 3-8, and on April 12, 2017, Erste was appointed as a lead plaintiff in this action, see Appointment of Lead Pl. and Lead Counsel (ECF No. 44). Erste's "Biotec fund purchased 20,000 shares of Alexion stock on April 24, 2017," Exh. 9, Defs.' Opp., at 11 of 38, Ln. 14-18, and the Biotec fund still held Alexion stock several months later, see Exh. 19, Defs.' Opp. (ECF No. 237-20), at 1, 5 of 6. In addition, Erste's Passive World Equities Fund continued to hold Alexion stock. The defendants contend that this purchase and these holdings "after the alleged corrective disclosures plainly show a lack of reliance." Defs.' Opp. at 33.

Similarly, the defendants maintain that PERSI is atypical because it "both purchased and sold Alexion securities during the class period," including sales by PERSI of "more than 40,000 shares of Alexion stock" "[t]hroughout the class period." Defs.' Opp. at 39.

Although post-disclosure purchasers may be "subject to unique defenses" that "threaten to become the focus of the litigation," that is not the situation here. George v. China Auto. Sys., Inc., 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013).

First, the defendants made only partial disclosures in the lead-up to Biotec's purchase of Alexion shares on April 24,

2017, and the plaintiff's claim is that these "partial disclosures made during the Class Period were coupled with misrepresentations and omissions that continued to mislead investors," KBC Asset Mgmt. NV v. 3D Sys. Corp., 2017 WL 4297450, at *4 (D.S.C. Sept. 28, 2017), at least until further developments on May 8, May 23, and May 24, 2017, see Am. Compl. ¶¶ 202-20. See also In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 487 (S.D.N.Y. 2011) ("A corrective disclosure is some public statement, not necessarily from the company itself, which reveals to the market the falsity of a prior representation."). The PERSI sale was on March 22, 2017 and the Biotec purchase was on April 24, 2017. After these disclosures in May 2017, the price of Alexion shares fell from $129.12 at opening on May 8, 2017 to $97.70 at closing on May 26, 2017. See id. ¶¶ 207, 219. Thus, the plaintiffs contend that it was not until May 2017 that "the investing public" became aware of "the scope of the Company's pervasive misconduct." Id. ¶ 201. While Erste may have suspected that Alexion engaged in improper conduct in January 2017, it was unaware before May 2017 that "the conduct already disclosed," i.e., pull-in sales, was not in fact "the extent of Alexion's improper conduct." Id. ¶ 199. Given Alexion's status as a publicly traded company with hundreds of millions of shares, it is likely that Erste and PERSI are not the only potential class members that bought or sold Alexion shares

-12-

between the defendants' disclosures in January 2017 and the additional disclosures in May 2017. Thus, Erste's purchase of Alexion shares before these additional disclosures in May 2017 does not present a time-consuming unique defense that would render Erste inadequate or atypical with respect to its ability to represent other class members.

Second, while certain post-disclosure purchases may render plaintiffs "atypical when those plaintiffs possessed information that had not been disclosed to the investing public or when plaintiffs made a 'disproportionately large percentage' of their purchases post-disclosure, those circumstances are simply not present here." City of Livonia Employees' Ret. Sys. v. Wyeth, 284 F.R.D. 173, 178 (S.D.N.Y. 2012) (quoting In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 204 n.13 (E.D. Pa. 2008)).

As to Erste, Biotec's April 24, 2017 purchase accounted for just over fourteen percent of its purchases of 138,750 shares of Alexion stock during the Class Period. See Sch. A, Erste Cert. (ECF No. 70), at 3 of 4. The fact that Erste "purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [it] relied on the integrity of the market during the class period." Wyeth, 284 F.R.D. at 178 (quoting In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008)). See In re Facebook, Inc., IPO Sec. &

-13-

Derivative Litig., 288 F.R.D. 26, 38 (S.D.N.Y. 2012) ("[C]ourts have consistently rejected the argument that post-disclosure purchases preclude a proposed class representative from meeting Rule 23(a) requirements.").

As to PERSI, excluding shares PERSI received as a result of the Synageva BioPharma Corp. acquisition, PERSI engaged in 26 transactions involving Alexion shares during the Class Period. See Exh. A, PERSI Cert. (ECF No. 69), at 3 of 3. During the Class Period, PERSI purchased nearly 120,000 Alexion shares, and by March 21, 2017, it had sold less than three percent of those shares. See id. PERSI's March 22, 2017 sale of a third of its Alexion holdings, which was its largest sale and last transaction during the Class Period, does not show that PERSI engaged in "in-and-out" trading such as might make it atypical when compared to other traders during the same period. See Wilson v. LSB Indus., Inc., 2018 WL 3913115, at *6 (S.D.N.Y. Aug. 13, 2018) ("An 'in-and-out' trader who sells all of his shares before a company discloses information that corrects an earlier mistake may be subject to a unique defense insofar as he is unable to establish 'loss causation'--i.e., that the 'alleged loss was both foreseeable and caused by a materialization of the concealed risk.'" (quoting Moody's Corp., 274 F.R.D. 480, 487 (S.D.N.Y. 2011))). Here, PERSI still held the vast majority of its purchased Alexion shares at the end of the class period, and

-14-

the $97.70 price per share on May 26, 2017 was significantly lower than the price per share at which it purchased Alexion stock during the Class Period. See Exh. A, PERSI Cert., at 3 of 3 (lowest purchase price was $151.52 per share on Feb. 4, 2016).

Finally, even if the defendants have a potentially meritorious unique defense with respect to Erste or PERSI, the litigation of such a defense does not "threaten to become the focus of this litigation," Baffa, 222 F.3d at 59-60, "because it does not go to the heart of Plaintiff's case and will not require considerable time and effort to rebut," Lapin, 254 F.R.D. at 180. Any concern that Erste's purchase of Alexion stock in April 2017 will subject it to "unique inquiries regarding [its] trading patterns and why [it] made investment decisions, whether the fraud was in fact irrelevant to [its] purchasing and sale decisions, and whether on individual trades [it] profited" is offset by the fact that the defendants have identified only one purchase by Erste during the relevant period, and that purchase was made before significant revelations came to light in May 2017. George, 2013 WL 3357170, at *7. Any such concern with respect to PERSI is offset by the fact that, during the Class Period, PERSI made all its purchases of Alexion stock on or before June 2, 2016, well before even the first corrective disclosure identified in the Amended Complaint. See Am. Compl. ¶ 5; Exh. A, PERSI Cert., at 3 of 3.

-15-

### ii.  Transactions After the Class Period

The defendants argue that "PERSI is not a typical class representative because it continued purchasing large amounts of Alexion stock after the end of the class period." Defs.' Opp. at 38. See also id. at 33 (discussing post-Class Period purchases by Erste). However as discussed above, the fact that plaintiffs "purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [they] relied on the integrity of the market during the class period." Wyeth, 284 F.R.D. at 178 (quoting Monster Worldwide, Inc., 251 F.R.D. at 135). See also Facebook, Inc., 288 F.R.D. at 38; Moody's Corp., 274 F.R.D. at 488 ("The decision to purchase shares after a fraud is revealed does not necessarily give rise to . . . an inference" that the plaintiff "did not rely on the alleged misrepresentations in his initial purchasing decisions."). Thus, PERSI's purchase transactions after the Class Period do not present a time-consuming unique defense that might threaten to become the focus of this litigation.

### iii. Inconsistent Contemporaneous Views

The defendants argue that "neither PERSI nor its investment managers relied on the alleged misrepresentations" because, first, "the views expressed by . . . PERSI's investment manager . . . at the time of the alleged corrective disclosures are

-16-

squarely inconsistent with plaintiffs' litigation position here," and second, "neither PERSI nor its investment managers relied on any alleged fraud or even the market price before choosing to purchase Alexion securities." Defs.' Opp. at 35.

As to the first point, the defendants have not shown how PERSI's investment manager's views are material to the determination of whether PERSI acted in reliance on the market price. As the Supreme Court has explained, "it is hard to imagine that there is ever a buyer or seller who does not rely on market integrity." Basic Inc. v. Levinson, 485 U.S. 224, 246-47 (1988). Beach v. Healthways, Inc., cited by the defendants, is inapposite because the investment manager in that case "met with officers of the Company . . . individually" and "conducted his own investigation" of the company. 2009 WL 3245393, at *5 (M.D. Tenn. Oct. 5, 2009). Those circumstances rendered the plaintiff in that case "atypical" because the plaintiff, through its investment manager, "possessed information that had not been disclosed to the investing public." Wyeth, 284 F.R.D. at 178. See Beach, 2009 WL 3245393, at *5 ("It is beyond reality to suggest that any potential shareholder could meet with corporate officers to discuss information that was already available to the public. Personal contact with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class." (quoting Grace v. Perception Tech. Corp.,

-17-

128 F.R.D. 165, 169 (D. Mass. 1989))).

The defendants' second point "is largely irrelevant in a case, like this, where plaintiff's theory of liability is premised on the 'fraud on the market' presumption that 'an investor's reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action.'" Monster Worldwide, Inc., 251 F.R.D. at 134 (quoting Basic, 485 U.S. at 247). See also Wyeth, 284 F.R.D. at 179 (rejecting argument that the plaintiff was "atypical of the proposed class" because the plaintiff "and its investment managers did not rely on the stock market price or on [the defendant's] alleged misstatements and omissions"); In re Indep. Energy Holdings PLC Sec. Litig., 210 F.R.D. 476, 484 (S.D.N.Y. 2002) ("While the extent of any non-reliance on [the part of lead plaintiffs] will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

### b. Standing

The defendants argue that "Erste is an atypical class representative because it is subject to the unique defense that it does not have standing to prosecute claims . . . based upon losses incurred not by Erste, but by funds that it manages." Defs.' Opp. at 26. The defendants contend that although Erste may "dispose of assets in the funds" and "exercise the rights to

-18-

the assets" in accordance with Section 52 of the Austrian Investment Funds Act, these rights do not extend to "tort claims such as those asserted here that are not tied to continuing ownership of the fund assets," which instead belong to "the fund's investors" and to them alone "[a]bsent express authorization" by the investors. Id. Thus, the defendants argue, Erste lacks standing under Austrian law to pursue the claims at issue here.

To have Article III standing, a party must have suffered an injury-in-fact. See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008). "As a general rule, the 'injury-in-fact' requirement means that a plaintiff must have personally suffered an injury.'" Id. at 107. "[T]he minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim." Id. at 108 However, this requirement does not foreclose "other types of 'representative' litigation (in which one party sues over another's injury)," including in cases in which the party itself has not suffered a direct injury, where "historical practice [has] supported it." Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin., 13 F.4th 531, 538 (6th Cir. 2021). Thus, the Supreme Court has held that "a private 'relator' may bring a 'qui tam' suit on behalf of the government," "an assignee of a claim may sue over the claim even if the assignor

-19-

receives the proceeds," and "a party may sometimes sue as the 'next friend' of a person subject to a legal disability." Id. (citations omitted). Similarly, in Huff the court recognized "third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." Huff, 549 F.3d at 109. See id. at 109-10 (citing cases permitting suits by trustees, guardians ad litem, receivers, assignees, and executors). Although "the plaintiffs often possess some aspect of title to the underlying assets," as is true of trustees and receivers, this is not always the case, for example, in the case of guardians. In re Vivendi Universal, S.A. Sec. Litig., 605 F.Supp.2d 570, 576 (S.D.N.Y. 2009). Nevertheless, "owing to the special nature of their relationship to the assets' beneficial owners, the law grants these plaintiffs the right--if not imposes on them the duty--to bring these claims." Id. See also RESTATEMENT (SECOND) OF TRUSTS § 280 ("The trustee can maintain such actions at law and equity or other proceedings against a third person as he could maintain if he held the trust property free of trust."); id. § 281 ("Where the trustee could maintain an action at law or suit in equity or other proceeding against a third person if the trustee held the trust property free of trust, the beneficiary cannot maintain an action at law against the third person . . . [except when] the beneficiary is in

-20-

possession of the subject matter of the trust.").

Courts have generally found that investment management companies and investment managers have standing under the standard in Huff where such companies have "exclusive authority to sue on behalf of their funds," i.e., where "[t]he funds are not considered legal entities and so cannot bring suit on their own behalf" and where "investors in the funds" may not "bring suit," much less "have the ability to transfer or dispose of fund assets." Boynton Beach Firefighters' Pension Fund v. HCP, Inc., 2017 WL 5759361, at *4 (N.D. Ohio Nov. 28, 2017). Under such circumstances, the investment manager "has a close relationship with its funds and investors" and "there is a barrier to the funds and investors bringing suits." Id. See Vivendi Universal, 605 F.Supp.2d at 581-82 (finding "that the relationship between Austrian funds and their management companies qualifies for the Huff exception" and that an Austrian management company was "authorized to sue as a matter of law"). See also OFI Risk Arbitrages v. Cooper Tire & Rubber Co., 63 F.Supp.3d 394, 404 (D. Del. 2014) (finding investment manager had standing to sue where funds have "no legal personality and cannot on their own" and where manager had "exclusive right" and "legal mandate" to "engage in litigation on behalf of the . . . funds").

-21-

First, Erste has demonstrated "a close relationship to the injured party," Huff, 549 F.3d at 109--i.e., to investors in the funds that Erste manages--akin to that which allows "[t]rustees [to] bring suits to benefit their trusts," id. at 109-10 (quoting Sprint Comms. Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 287 (2008)). See Sprint, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting) (describing trustees' "independent fiduciary obligation to sue to preserve [investors'] assets" and the "discharge of [the trustee's] legal obligation [a]s an independent, personal benefit that supports the trustee's standing to sue in federal court"). Erste's relationship to the funds at issue here is regulated under the Austrian Investment Fund Act 2011 ("InvFG 2011").[2] With respect to the legislative history of the act, "the explanatory comments of the historic legislator to BGBl 1963/192" describe the investment manager as a trustee ("Treuhänder") of persons saving for investments ("Investmentsparer"). Thomale Decl. (ECF No. 237-16) at 28 n.96. See European Commission, Report from the Commission to the European Parliament and the Council Assessing Whether Member

---

[2] Two of Erste's three funds operate as Undertakings for Collective Investment in Transferable Securities (UCITS), or ordinary funds under Austrian law, while the third operates as a special fund under Austrian law. See Karollus Reply (ECF No. 248-5) ¶ 17. "[T]he applicable Austrian law for both types of funds is the same." Thomale Decl. (ECF No. 237-16) ¶ 27.

-22-

States Have Duly Identified and Made Subject to the Obligations of Directive (EU) 2015/849 All Trusts and Similar Legal Arrangements Governed Under Their Laws (Sept. 16, 2020) at 7 (describing certain kinds of "Treuhände" as "legal arrangements similar to trusts"). Under Austrian law, the management company is similar to a common-law trustee in that the company owes a fiduciary duty to investors. See InvFG 2011 § 52 ("[The management company] must protect the interests of the unitholders, exercise the diligence of a prudent manager . . . and comply with the provisions of this federal law and the ordinances issued on the basis of this federal law as well as the fund regulations."). It may be the case that, under Austrian law, as "under German law[,] the difference between legal and equitable title is not known." Tibor Tajti & Robert Whitman, *Common Law Trusts in Hungary and Other Continental European Civil Law Systems*, 49 J. Marshall L. Rev. 709, 709 n.1 (2016). But see Charles E. Rounds, Jr. & Andreas Dehio, *Publicly-Traded Open End Mutual Funds in Common Law and Civil Law Jurisdictions: A Comparison of Legal Structures*, 3 N.Y.U. J.L. & Bus. 473, 499 (2007) ("As is the case with a common law trustee, the Treuhänder takes legal title to the subject property."). Nevertheless, the "organizational structure [of Erste's funds] appears to be analogous to the structure of U.S. mutual funds," Karollus Reply (ECF No. 248-5) at 3 n.5, in that the "management

-23-

company is installed to act for the account of a fund" which is comprised "of the unit holders who are the co-owners of the fund's assets," id. at 3. Compare Charles E. Rounds, Jr., *State Common Law Aspects of the Global Unwindings of the Madoff Ponzi Scheme and the Sub-Prime Mortgage Securitization Debacle*, 27 Wis. Int'l L.J. 99, 109 (2009) ("In the case of a mutual fund that is sponsored by Fidelity, Vanguard, or the Bank of America, legal title to the underlying assets is held jointly by individual trustees who have contracted with the sponsor for investment management agency services.") with Jan-Michael Klett, *Die Prozessführrungsbefugnis von Kapitalverwaltungsgesellschaften unter deutschem und US-amerikanischem Recht*, 72-19 Zeitschrift für Wirtschafts- und Bankrecht 892, 893 (stating that investment manager's "main task . . . is the comprehensive management of the deposit assets provided by the investors," "includ[ing] the investment of the investment fund"); id. at 896 (stating that in "funds with a co-ownership solution," the investment manager "has no legal title" to the underlying assets). Section 52 of the InvFG 2011 further underscores the trustee-like relationship that Erste, like managers of certain U.S. mutual funds, shares with investors: "Only the management company is entitled to dispose of the assets of a UCITS it manages and to exercise the rights to the assets; it acts in its own name for the account of the unitholders." Thomale Decl. at 21 n.79 (quoting InvFG 2011 §

52). Erste thus has "a close relationship to the injured party" for purposes of asserting third-party standing. Huff, 549 F.3d at 109.

Second, Erste has demonstrated that there is "a barrier to the injured party's ability to assert its own interests." Id. at 109. A barrier exists "[i]f there is some genuine obstacle to such assertion," not only when an obstacle is "insurmountable." Singleton v. Wulff, 428 U.S. 106, 116-17 (1976) (plurality opinion). See Al-Aulaqi v. Obama, 727 F.Supp.2d 1, 30 (D.D.C. 2010) (noting that "the presence of a hindrance or genuine obstacle preventing the third party from asserting his own legal rights reduces the likelihood that the third party's absence is due to the fact that his rights are either 'not truly at stake or not truly important to him'" (quoting Singleton, 428 U.S. at 116)).

Erste has shown that such a barrier exists with respect to the investment funds. "[I]nvestment funds, in contrast to companies, do not have any legal personality separate from the co-owning unit holders." Thomale Decl. ¶ 88(b). See id. at 13 n.42 ("A UCITS . . . has no legal personality of its own." (quoting InvFG 2011 § 46 para. 1)). See also Karollus Decl. (ECF No. 198-6) ¶ 18 ("The fund as such has no legal personality of its own."). It is uncontested that "[o]nly the management company is entitled to act for the account of a fund." Id. See

-25-

Thomale Decl. ¶ 57 ("[O]nly the management company is entitled to 'dispose of the assets' of a fund it manages and 'to exercise the rights to the assets.'" (quoting InvFG 2011 § 52)). Thus, the funds at issue have "no legal personality" and "cannot on their own" bring suit against the defendants to seek redress for any alleged wrongs. OFI Risk Arbitrages, 63 F.Supp.3d at 404.

In addition, Erste has shown that a genuine barrier exists with respect to the unit holders of the funds' assets. Under Austrian law, the management company "acts in its own name for the account of the unitholders" when it acts "to dispose of the assets of a UCITS it manages and to exercise the rights to the assets." Thomale Decl. at 21 n.79 (quoting InvFG 2011 § 57). This right is exclusive. See Karollus Decl. ¶ 22. Although unit holders co-own the funds' assets, they "can neither influence nor instruct the management company on how to manage the fund assets." Thomale Decl. ¶ 76. Their power is limited to their "right to divest [from the fund] at any time." Id. Insofar as the investment manager acts, it "act[s] in its own name on behalf of the unit holders," not directly "in the co-owning unit holders' names." Id. ¶ 75 (emphasis added). Thus, Erste--and not its funds or any particular unit holder--is the only party related to the funds that has a cause of action under Rule 10b-5 because Erste--and not its funds or any particular unit holder-- is the actual purchaser of Alexion stock. See Blue Chip Stamps

-26-

v. Manor Drug Stores, 421 U.S. 723, 731 (1975) ("[T]he plaintiff class in a Rule 10b-5 action [is] limited to actual purchasers and sellers."). The unit holders themselves "never purchased or sold shares of [Alexion], and thus could not themselves bring suit." In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 444 (S.D.N.Y. 2013).

Moreover, Erste's fiduciary relationship to the unit holders raises questions about the unit holders' ability to bring suit against the defendants. See RESTATEMENT (SECOND) OF TRUSTS § 281 ("Where the trustee could maintain an action at law or suit in equity or other proceeding against a third person if the trustee held the trust property free of trust, the beneficiary cannot maintain an action at law against the third person . . . [except when] the beneficiary is in possession of the subject matter of the trust.").

The defendants contend that Erste has not shown that it has a close relationship to the unit holders because "[t]he Second Circuit has held that making investment decisions on another's behalf 'is not the type of close relationship courts have recognized' for this purpose." Defs.' Opp. at 28 (quoting Huff, 549 F.3d at 110). In Huff, the Second Circuit rejected the plaintiff's argument that it had standing as an investment manager "because of its authority to make investment decisions on behalf of its clients." Huff, 549 F.3d at 109. The court

-27-

noted that "Huff's clients have not transferred ownership of, or title to, their claims to Huff" and that "Huff's power-of-attorney is not purported to be a valid assignment and does not confer a legal title to the claims Huff brings." Id. As the court explained, "Huff's only interest in this litigation as an attorney-in-fact is the recovery of its legal fees." Id. Here, the facts are different from the facts in Huff in material respects. Unlike the plaintiff in Huff, Erste has asserted standing on the basis of its fiduciary duties to the unit holders, and Erste has shown that it alone can act to recover losses to the funds, both on behalf of the funds themselves and on behalf of the unit holders. As other courts have held with respect to similarly situated plaintiffs, these facts are sufficient to establish that Erste has a close relationship with the unit holders of its funds. See HCI, 2017 WL 5759361, at *4; OFI Risk Arbitrages, 63 F.Supp.3d at 404; Winstar Commc'ns, 290 F.R.D. at 444; Vivendi Universal, 605 F.Supp.2d at 581-82.

The defendants also contend that, despite the opinion of Erste's expert, "Erste has made no showing that the funds' unit holders have any hindrance to asserting their own claims." Defs.' Opp. at 28. The defendants rely heavily on their own expert's declaration. See id. at 26 ("Under the Austrian Civil Code, co-owners (such as the unit holders here with respect to fund assets) have the right to assert tort claims for money

-28-

damages arising from losses relating to the assets."); id. at 27 ("Reading Section 52 of the Investment Funds Act . . . to divest individual unit holders of the right to pursue claims violates the fundamental Austrian legal principle that tort victims should not be precluded from asserting claims in their own behalf."). But as the defendants' expert recognizes, unit holders of Erste funds own merely "equal units" of "an aggregate portfolio of assets" which are "evidenced by securities." Thomale Decl. ¶ 36. The unit holders do not directly hold the individual components of the portfolio of assets, and they are unable to exercise control over purchases and sales of these individual components. See id. ¶ 63 ("[T]he management company has the exclusive competence to sell and buy or otherwise dispose of the fund assets."). In addition, the unit holders' primary--and perhaps sole--engagement with the fund is through the purchase and sale of units of the fund. See id. ¶ 44 ("[T]he unit holders of an investment fund do not engage with each other in any substantial way."); id. ¶ 76 ("[T]he unit holders of ordinary funds have the right to divest at any time."). It is not apparent how the unit holders, who purchased units of Erste funds but had no role in Erste's purchase of Alexion stock, could be considered actual purchasers of shares in Alexion so as to enable them to bring the claims that Erste has brought here.

In addition, the defendants contend that Erste "lacks standing under Austrian law to assert the claims in this action." Defs.' Opp. at 25. Here too, the defendants rely heavily on their expert's declaration. See Thomale Decl. ¶¶ 57-108 (reasoning that Austrian law does not allow Erste to sue on behalf of unit holders). The defendants argue specifically that the Austrian Investment Fund Act "does not give fund managers authority to pursue claims such as those asserted here that are not tied to continuing ownership of the fund assets." Defs.' Opp. at 27. But even if the defendants are correct,[3] the

---

[3] The court notes that "[a] management company may perform the following activities: . . . b) administration: aa) legal and fund management accounting services." Thomale Decl. at 10 n.28 (quoting InvFG 2011 § 5(2)(1)). Although the text never refers directly to litigation, this may reflect less an intent to prevent investment managers from conducting litigation than the reality that "[i]n the E.U., private shareholder litigation is rare, [and] fund investor litigation even more so." John C. Coates IV, *Reforming the Taxation and Regulation of Mutual Funds: A Comparative Legal and Economic Analysis*, 1 J. Legal Analysis 591, 650 (2009). See also Jan-Michael Klett, *Die Prozessführungsbefugnis von Kapitalverwaltungsgesellschaften unter deutschem und US-amerikanischem Recht*, 72-19 Zeitschrift für Wirtschafts- und Bankrecht at 895 (discussing how, under German law, if an investment manager "of a fund set up according to the co-ownership model were now denied the right to conduct proceedings, this would represent a fundamental deviation from the situation under procedural law in the case of the fiduciary solution and would thus lead to a result that was neither intended by the legislator nor sufficiently takes into account the historical background of the two alternative forms of investment").

defendants have not shown how the fact that Austrian law employs different formal categories to describe the relationship between Erste and its funds' unit holders means that Erste cannot establish that it has a trustee-like fiduciary duty to unit holders or a close relationship to them as required under Huff.

### c. Management of Litigation

The defendants contend that Erste is "an inappropriate class representative" due to its "unwillingness or inability to make its outside investment managers available for discovery." Defs.' Opp. at 29. The defendants also contend that PERSI is inadequate because "PERSI has been minimally involved in this litigation." Id. at 40. The defendants contend that both are inadequate "because [Erste] has not coordinated with PERSI in managing the litigation." Id. at 34.

With respect to discovery disputes involving Erste, "courts may consider the honesty and trustworthiness of the named plaintiff" in judging "the adequacy of representation." Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998). Thus, "abusive discovery practices" may render plaintiffs "inadequate to serve as class representatives." McIntire v. China MediaExpress Holdings, Inc., 38 F.Supp.3d 415, 425 (S.D.N.Y. 2014). The defendants have not shown that any of the conduct that Erste "engaged in was serious enough to render [it] inadequate to represent the proposed Class and compel a denial

-31-

of Plaintiffs' class certification motion." Id. Nor have the defendants shown that information they might have obtained or might yet obtain from Erste's external managers relates to class counsel's qualifications or Erste's ability to protect the interests of the class.

With respect to the degree of PERSI's involvement in the litigation, "class certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Flag Telecom Holdings, Ltd., 574 F.3d at 42 (internal quotation marks, brackets, and citations omitted). Thus, a party's adequacy depends on the party having sufficient "knowledge to be able to protect the interests of the class." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 62 (2d Cir. 2000). Such knowledge includes whether the party "understood that the [particular] investments were the subject of this litigation" and that the party "understood that [it] and others had sustained a loss due to the alleged fraud." Id. "[I]n complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 177 (S.D.N.Y. 2008)(quoting In re Omnicom

-32-

Group Inc. Sec. Litig., 2007 WL 1280640, at *6 (S.D.N.Y. Apr. 30, 2007)). "Far from showing [a party's] ignorance of the litigation or [its] inability to serve as class representative," a party's reliance on outside experts "demonstrates [its] ability to appreciate the limits of [its] knowledge and rely on those with the relevant expertise." Baffa, 222 F.3d at 62. The record reflects that PERSI has been involved throughout the litigation. See Exh. J, Pls.' Reply (ECF No. 248-11). PERSI has met with its counsel several dozen times to discuss the case, see id. at 8 of 15, Ln. 8-15, understands its role in filing the operative complaint, see id. at 9 of 15, Ln. 15-20, reviewed the amended complaint before it was filed, see id. at 10 of 15, Ln. 4, 6-7, knows the identities of the defendants, see id. at 11 of 15, Ln. 14-17, reviewed the motion for class certification before it was filed, see id. at 13 of 15, Ln. 8-9, and understands the class definition and the class period, see id. at 14 of 15, Ln. 3-11. These facts establish that PERSI is sufficiently involved and has the knowledge necessary to protect the interests of the class.

With respect to coordination between Erste and PERSI, "courts regularly require proposed lead plaintiff 'groups' to demonstrate their ability to function as a cohesive and independent unit to protect the interests of the class." In re Petrobras Sec. Litig., 104 F.Supp.3d 618, 622 (S.D.N.Y. 2015).

"Relevant considerations include whether the group's members have a pre-existing relationship, whether they have cooperated effectively thus far, and whether they have a coherent plan for dividing responsibilities, resolving conflicts, and managing the litigation." Id. A primary purpose of this requirement is to determine "whether the grouping operates to circumvent the purposes of the PSLRA." Galmi v. Teva Pharms. Indus. Ltd., 302 F.Supp.3d 485, 493 (D. Conn. 2017). See Petrobras, 104 F.Supp.3d at 622 ("A plaintiff group will generally be rejected if the court determines that it is 'simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as "lead plaintiff."'" (quoting In re Razorfish, Inc. Sec. Litig., 143 F.Supp.2d 304, 308 (S.D.N.Y. 2001))). No such concern is present here. "Erste-Sparinvest and PERSI have demonstrated not only that they have the largest combined loss in connection with the transactions in Alexion Pharmaceuticals, Inc.'s ('Alexion') securities during the Class Period, but also that each, standing alone, incurred larger losses than any other competing lead plaintiff movant." Order re Mots. for Appt. of Lead Pl. and Approval of Selection of Counsel (ECF No. 43) at 1-2. While Erste and PERSI had no pre-existing relationship prior to their appointment as lead plaintiffs, Erste and PERSI are actively involved in managing the litigation through their attorneys and

-34-

are committed to addressing issues as they arise. See Exh. 8, Defs.' Opp. (ECF No. 237-9) at 16 of 23, Ln. 18 to 17 of 23, Ln. 2. The defendants have not shown that there is any issue regarding the joint management of this litigation that raises a serious question about the lead plaintiffs' ability to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

### B.    Rule 23(b)(3)

Erste and PERSI have shown "that the questions of law or fact common to class members predominate over any questions affecting only individual matters, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id. R. 23(b)(3).

### 1.    Predominance

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Halliburton I") (quoting Fed. R. Civ. P. 23(b)(3)). A claim "based on violations of § 10(b) and Rule 10b-5" has the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

-35-

(6) loss causation." Id. at 809-10 (quoting Matrixx Initiaves, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011)). Similar elements apply to claims alleging a deceptive scheme under Rules 10b-5(a) and 10b-5(c). See U.S. Sec. & Exch. Comm'n v. Winemaster, 529 F.Supp.3d 880, 917-18 (N.D. Ill. 2021). It is uncontested that the plaintiffs have shown predominance as to alleged material misrepresentations and omissions by the defendants, scienter, the connection between the misrepresentations and omissions and the purchase or sale of Alexion shares, and economic loss. However, the defendants do contest the plaintiffs' ability to "establish reliance on a classwide basis . . . as to the vast majority of the alleged misrepresentations at issue." Defs.' Opp. at 1. They also argue that the "plaintiffs have failed to establish predominance with respect to damages." Id. at 13.

### a. Classwide Reliance

Plaintiffs may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283-84 (2011) ("Halliburton II"). See Basic Inc. v. Levinson, 485 U.S. 224, 244-48 (1988). In order to invoke the Basic presumption, "plaintiffs in a

securities fraud class action [must] establish certain prerequisites--namely, that defendants' misstatements were publicly known, their shares traded in an efficient market, and plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed." Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 481 (2d Cir. 2018) ("ATRS I"). This presumption is rebuttable. However, because "class certification is not the proper procedural stage for the Court to determine, as a matter of law, whether the relevant disclosures were corrective," Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 260 (N.D. Tex. 2015) ("Halliburton III"), the question at the class certification stage is whether there is a lack of price impact associated with the disclosures, see id. at 256 (noting that Halliburton II permits a defendant to "introduce evidence of a lack of price impact at the class certification stage to show the absence of predominance"). To rebut the Basic presumption once it has been invoked, defendants must show that "the alleged misstatements caused no price impact whatsoever," City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ, 322 F.Supp.3d 676, 687 (D. Md. 2018), and the defendants must make this showing as to all of the alleged corrective disclosures, see Monroe Cty. Employees' Ret. Sys. v. S. Co., 332 F.R.D. 370, 395-96 (N.D. Ga. 2019). "[T]he defendant

-37-

bears the burden of persuasion to prove a lack of price impact," and "the defendant must carry that burden by a preponderance of the evidence." Goldman Sachs Grp., Inc. v. Ark. Tchrs. Ret. Sys., 141 S.Ct. 1951, 1963 (2021). Although defendants may attempt to show lack of price impact by a statistically-based event study, courts have cautioned that "the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 95 (S.D.N.Y. 2015). Thus, once the Basic presumption is invoked, "the defendant is burdened with the daunting task of proving that the publicly known statement had no price impact." Aranaz v. Catalyst Pharm. Partners Inc., 302 F.R.D. 657, 673 (S.D. Fla. 2014).

It is uncontested that the "defendants' misstatements were publicly known, their shares traded in an efficient market, and plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed." ATRS I, 879 F.3d at 481. Thus, the Basic presumption of reliance applies. The defendants attempt to rebut this presumption by pointing to a lack of price impact with respect to several of the alleged corrective disclosures. Specifically, the defendants argue that market efficiency itself shows an absence of price impact for at least several of the alleged corrective

-38-

disclosures because "prices in an efficient market fully incorporate value-relevant news in a matter of minutes, and certainly within a trading day." Defs.' Opp. at 16. See Defs.' Surreply (ECF No. 251) at 5 (arguing there is no evidence to support a conclusion that "in an efficient market the price impact of new, value-relevant information can be delayed by more than a day"). The defendants contend that there is "undisputed evidence that there was no statistically significant price impact" for disclosures on the following dates: November 4, 2016; November 9-10, 2016; March 6, 2017; and May 8, 2017. Defs.' Opp. at 15. The defendants also contend that "price changes more than a day after an alleged corrective disclosure are insufficient to show significant price impact," which relates to "alleged stock drops on November 7, 2016; November 11, 2016; December 13, 2016; March 7, 2016; and May 25-26, 2017." Id. at 17. Nevertheless, the defendants do not contest the plaintiffs' identification of statistically significant price impacts on December 12, 2016; May 23, 2017; and May 24, 2017. See id. at 14-15.

The defendants have failed to prove an absence of price impact. As a preliminary matter, the defendants have conceded that there were statistically significant decreases in the price of Alexion shares with respect to at least some of the alleged corrective disclosures, i.e., on December 12, 2016; May 23,

-39-

2017; and May 24, 2017. See Exh. 13, Defs.' Opp. (ECF No. 237-14), at 86 of 211 (showing statistically significant abnormal returns on these "Expected Impact Date[s]"). "This concession dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage." Monroe Cty. Employees' Ret. Sys. v. Southern Co., 332 F.R.D. 370, 395 (N.D. Ga. 2019). Although the defendants seek to exclude the other dates from the class period, see Defs.' Opp. at 14-15, "numerous courts addressing class certification have refused to shorten class periods by dismissing subsequent corrective disclosures where some but not all of the stock price declines following the alleged corrective disclosures were statistically significant," Southern Co., 332 F.R.D. at 395. Rather, "the question of what caused the stock price to decline is an ultimate merits question for which plaintiffs bear the burden at trial, not at class certification." Id. at 395-96.

This point is significant for an additional reason: the defendants have also not contested that every alleged corrective disclosure was accompanied by an abnormal return, even if the difference was not statistically significant. See Exh. 13,

Defs.' Opp. (ECF No. 237-14), at 86 of 211. The defendants'
expert limited himself to "us[ing] the results of Mr. Coffman's
regression analysis to evaluate the statistical significance of
Alexion common stock abnormal returns" and did not "endeavor[]
to independently confirm its results." Id. at 23 of 211 n.56.
However, as noted above, lack of statistical significance does
not prove an absence of price impact because "the failure of an
event study to disprove the null hypothesis with respect to an
event does not prove that the event had no impact on the stock
price." Barclays, 310 F.R.D. at 95. The defendants' expert
reviewed residual returns around alleged corrective disclosure
days for statistical significance. Based on that review, the
defendants cannot dispute that Alexion underperformed the
industry on every date listed except May 26, 2017, when both
Alexion and the industry underperformed the market, leading to
an abnormal return. See Exh. 13, Defs.' Opp., at 86 of 211. Nor
can the defendants dispute that Alexion underperformed the
market on every date listed except November 4, 2016, when
Alexion nevertheless underperformed the industry. See id. These
abnormal returns do not conclusively demonstrate that the
alleged disclosures affected the stock price, but the court
cannot conclude, from the fact that the negative returns are not
statistically significant, that there was "a complete lack of
price impact." In re Goldman Sachs Grp., Inc. Sec. Litig., 579

F.Supp.3d 520, 526 (S.D.N.Y. 2021). See Struogo v. Tivity

Health, Inc., ___ F.Supp.3d ____, 2022 WL 2037966, at *7

(M.D. Tenn. June 7, 2022) ("To sever the link in this case,

Tivity must show a complete lack of price impact."); Southern

Co., 332 F.R.D. at 395 (same). See also Waggoner v. Barclays

PLC, 875 F.3d 79, 104 (2d Cir. 2017) (permitting plaintiffs to

show price impact through "statements that merely maintain

inflation already extant in a company's stock price, but do not

add to that inflation" (quoting In re Vivendi, S.A. Sec. Litig.,

838 F.3d 223, 256 (2d Cir. 2016))); Am. Compl. ¶ 231 (alleging

that defendants' "statements artificially inflated or

artificially maintained the price of Alexion's publicly traded

common stock"); id. ¶ 342 ("[A]ll purchasers of Alexion common

stock during the Class Period suffered similar injury through

their purchase of Alexion common stock at artificially inflated

prices."). For these reasons, the defendants have not met their

burden to rebut the Basic presumption.

### b. Classwide Damages

"[A] model for determining classwide damages relied upon

to certify a class under Rule 23(b)(3) must actually measure

damages that result from the class's asserted theory of injury."

Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015).

"[F]or purposes of Rule 23, courts must conduct a rigorous

analysis to determine whether that is so." Comcast Corp. v.

Behrend, 569 U.S. 27, 35 (2013) (internal quotation marks and citations omitted). Although a court must "evaluate whether the individualized damages questions predominate over the common questions of liability," Roach, 778 F.3d at 409, the Supreme Court's decision in Comcast "did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations," i.e., where "damages are not measurable on a classwide basis," id. at 408.

The plaintiffs have met their burden under Comcast. The plaintiffs' theory of the case is that the defendants' alleged misrepresentations and omissions "inflated the value of [Alexion] stock, that this inflation was removed following a series of corrective disclosures, and that Plaintiffs suffered damages as a result." Pirnik v. Fiat Chrysler Automobiles, N.V., 327 F.R.D. 38, 47 (S.D.N.Y. 2018). The plaintiffs' damages model is based on an "out-of-pocket," or event study, methodology:

> [This model] involves determining the change in a security's price caused by a corrective disclosure by isolating price movements specific to [Alexion] through an event study; analyzing, for each day of the Class Period, the amount of inflation in the stock price due to the alleged fraud and then mechanically calculating damages on an individual basis by analyzing a class member's actual trading activity.

Id. (internal quotation marks, citations, and brackets omitted). As required by Comcast, this methodology is consistent with the plaintiff's theory of the case. See Pirnik, 327 F.R.D. at 47

(discussing the Second Circuit's holding in <u>Waggoner</u> "that a damages model satisfied <u>Comcast</u> where the plaintiffs alleged harm when defendants' share price significantly dropped after statements about defendants' business practices were shown to be false and plaintiffs' damages model measured that harm by examining the drop in share price after corrective disclosures").

The defendants here raise the same kinds of objections to the plaintiffs' damages model as were raised in <u>Pirnik</u>. <u>Compare id.</u> at 47 ("Defendants contend that Dr. Nye's damages model (1) fails to account for the possibility of variation in inflation over time; (2) rests on flawed assumptions, such as that FCA could have disclosed the truth of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed corrective disclosures; and (3) does not control for confounding information." (internal quotation marks and citations omitted)) <u>with</u> Defs.' Opp. at 23 (arguing that expert fails to account for "how inflation changes over the class period"); <u>id.</u> at 24 (arguing that expert fails to account for effect of information which "could not have been disclosed before the relevant events occurred"); <u>id.</u> at 21 (arguing that expert fails to control for "confounding information"). As to the first point, the Second Circuit has rejected the "Defendants' argument that class certification was improper

under Comcast because the Plaintiffs' damages model failed to account for variations in inflation over time." Waggoner, 875 F.3d at 106. As to the second and third points, these "challenges go to the question of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors)." Pirnik, 327 F.R.D. at 47. But loss causation "need not be adjudicated before a class is certified." Amgen, 568 U.S. at 475.

The defendants argue that "Plaintiffs' motion also should be denied because they have not satisfied their obligation to demonstrate that damages can be determined on a classwide basis," and they maintain that "[t]he Second Circuit has emphasized the importance of establishing that damages can be determined on a classwide basis before certifying a class in a securities action." Defs.' Opp. at 20. However, the Second Circuit has made clear that while "damages questions should be considered at the certification stage when weighing predominance issues," Roach, 778 F.3d at 408, "Comcast . . . did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis," id. at 407. See id. at 409 (vacating district court order denying class certification where order was based on conclusion that "damages were not capable of measurement on a classwide basis"). The plaintiffs' damages model, the "out-of-pocket" methodology, is a

-45-

recognized measurement of damages in Section 10(b) securities cases. See e.g. In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985 at *4 (S.D.N.Y. 2017); Di Donato v. Insys Therapeutics, Inc., 333 F.R.D. 427,447 (D.Ariz. 2019); Howard v. Liquidity Servs. Inc., 322 F.R.D. 103, 139 (D.D.C. 2017); Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co., 2018 WL1535156 at *3 (N.D.Ill. 2018); Police Ret. Sys. St. Louis v. Granite Constr. Inc., 2021 WL229310 at *6-7 (N.D.Cal. 2021); KBC Asset Mgmt. NV v. 3D Sys. Corp., 2017 WL4297450 at *7 (D.S.C. 2017); Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc., 2016 WL4098741 at *11 (D.Minn. 2016).

### 2. Superiority

In order to certify the class, the court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 identifies four factors pertinent to this finding: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Id. Courts "have regularly held that securities class actions are presumed to be

-46-

superior to individual suits." Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 142 (S.D.N.Y. 2014). Given the large number of purchasers of Alexion shares, the complexity of this litigation, the desirability of concentrating litigation in this forum, and the lack of unique difficulties in managing this action, the plaintiffs have shown that the superiority requirement is satisfied.

### 3. Ascertainability

Finally, the court must also ensure "that the members of a proposed class [are] readily identifiable." In re Petrobras Sec. Litig., 862 F.3d 250, 264 (2d Cir. 2017) (quoting Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992, 995 (8th Cir. 2016)). To be ascertainable, "a class [must] be defined using objective criteria that establish a membership with definite boundaries." Id. The plaintiffs have proposed a class that includes "[a]ll persons or entities who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. from January 30, 2014 to May 26, 2017, inclusive . . . and who were damaged thereby." Pls.' Mem. at 3. Because the class members can be readily identified from the defendants' books and records, the plaintiffs have shown that the ascertainability requirement is satisfied.

### C. Rule 23(g)

Rule 23 provides that "a court that certifies a class must

-47-

appoint class counsel." Fed. R. Civ. P. 23(g)(1). On the basis of their work in this litigation and the submissions filed with the plaintiffs' motion for class certification, the court concludes that Motley Rice and Labaton Sucharow satisfy the requirements of Rule 23(g) and appoints the firms as co-class counsel.

**IV.  CONCLUSION**

For the reasons set forth above, Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Co-Class Counsel (ECF No. 198) is hereby GRANTED.

The following class is certified pursuant to Rules 23(a) and 23(b)(3):

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Alexion Pharmaceuticals, Inc. from January 30, 2014 to May 26, 2017, inclusive (the "Class Period") and who were damaged thereby (the "Class"), excluding Defendants; members of the immediate families of the Individual Defendants; Alexion's subsidiaries and affiliates; any person who is or was an officer or director of Alexion or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

Lead Plaintiffs Erste Asset Management GmbH and the Public Employee Retirement System of Idaho are each appointed Class Representatives of the Class pursuant to Rules 23(a) and 23(b)(3).

Lead Counsel Motley Rice LLC and Labaton Sucharow LLP are

-48-

appointed as Co-Class Counsel for the Class pursuant to Rule 23(g).

It is so ordered.

Dated this 13th day of April 2023, at Hartford, Connecticut.

/s/AWT

Alvin W. Thompson

United States District Judge
