# EXHIBIT 72

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, Individually and on behalf of all others similarly situated, | **MEMORANDUM DECISION AND ORDER GRANTING [177] LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** |
| Plaintiffs, | Case No. 1:19-cv-00128-DBB-DAO |
| v. | District Judge David Barlow |
| PLURALSIGHT, INC., AARON SKONNARD, and JAMES BUDGE, | |
| Defendants. | |

This matter is before the court on Plaintiffs Indiana Public Retirement System ("INPRS") and Public School Teachers' Pension and Retirement Fund of Chicago's ("CTPF") (collectively "Lead Plaintiffs") Motion for Class Certification and Appointment of Class Representative and Class Counsel.[1] Lead Plaintiffs seek to represent a class of investors who purchased Pluralsight, Inc. ("Pluralsight" or the "Company") Class A common stock from January 16, 2019, to July 31, 2019. Defendants Pluralsight, James Budge ("Mr. Budge"), and Aaron Skonnard ("Mr. Skonnard") (collectively "Defendants") take no position on class certification.[2] For the following reasons, the court grants Lead Plaintiffs' motion.

---

[1] Lead Pls.' Mot. for Class Certification & Appointment of Class Representatives & Class Counsel ("Mot. Certify Class"), ECF No. 177, filed Mar. 3, 2023.

[2] Defendants state that while they do not expressly oppose the motion, they "do not concede that this action should be certified as a class action or that any of the proposed lead plaintiffs are proper class representatives." Def.'s Resp. to Lead Pls.' Mot. for Class Certification ("Resp.") 1, ECF No. 213.

## BACKGROUND[3]

Pluralsight is a software company that sells a cloud-based technology platform offering skills courses, skill and role assessments, learning paths, and business analytic tools.[4] The Company sought to attract investors with a metric called "billings."[5] "Billings . . . represented not merely revenue . . . but also new subscriptions and subscription renewals in future quarterly periods."[6] Investors relied heavily on the billings figure to "evaluate the Company's deal volume and the amount the [C]ompany would recognize as revenue over the next several fiscal quarters."[7] Pluralsight indicated that the primary factor in billings was the health of its sales force, both in terms of its size and experience.[8] The sales force represented at least 85% of total billings. Consequently, market analysts closely scrutinized Pluralsight's sales force because "so much of the Company's positive spin on its financial performance" depended on the sales force's health.[9] To ease investors' and analysts' concerns, Pluralsight "made detailed, positive statements about the growth in the number of sales representatives and about the sales force's increasing productivity and effectiveness."[10]

For eight straight quarters through 2019, the Company advertised a 40–50% year-over-year billings growth.[11] Investors were informed that this figure was "built into the Company's

---

[3] When deciding whether to grant class certification, the court "must accept the substantive allegations of the complaint as true,' though it 'need not blindly rely on conclusory allegations of the complaint which parrot Rule 23.'" *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) (quoting *Shook v. El Paso County*, 386 F.3d 963, 968 (10th Cir. 2004)).

[4] Second Am. Compl. ("SAC") ¶ 2, ECF No. 173, filed Nov. 4, 2022.

[5] *Id.* at ¶ 3.

[6] *Id.*

[7] *Id.*

[8] *Id.* at ¶ 4.

[9] SAC ¶¶ 4–5.

[10] *Id.* at ¶ 5.

[11] *Id.* at ¶ 3.

2

long-term business model."[12] In reality, the Company's sales force was unable to maintain such growth.[13] Lead Plaintiffs allege that Pluralsight's CEO, Mr. Budge, and its CFO, Mr. Skonnard (collectively "Officer Defendants"), knew this fact but still made multiple misleading statements and omissions.[14] At an investors' conference on January 16, 2019,[15] Mr. Budge indicated to investors and analysts that Pluralsight's sales force had about 250 representatives and described plans to grow the force to over 300 by the end of 2019.[16] He stated that the sales representatives were "killing it" due to the Company's "great infrastructure[.]"[17] Yet the Company had only about 200 sales representatives.[18]

In February 2019, Mr. Budge failed to mention the deficiencies in Pluralsight's sales force on an earnings call with investors and analysts even though the call was about the Company's "productivity and efficiency."[19] Mr. Skonnard was present and likewise did not disclose the capacity gap.[20] Three months later, Officer Defendants shared their "exuberan[ce] about the purported strength and efficacy of the sales[]force."[21] Mr. Budge made specific statements about the sales force's health: "'we like where we are with our sales reps'; 'love our growth there'; 'We have a plan to grow . . . which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force'; 'we do have a pace to [hiring]'; 'we're on pace'; and 'we like the direction we're going.'"[22]

---

[12] *Id.*
[13] *Id.* at ¶ 6.
[14] SAC ¶¶ 6–7, 57–59.
[15] *Id.* at ¶ 131 (Needham & Company, LLC Growth Conference, held in New York, N.Y.).
[16] *Id.* at ¶ 132.
[17] *Id.* at ¶ 57.
[18] *Id.* at ¶ 133.
[19] SAC ¶ 7.
[20] *Id.*
[21] *Id.*
[22] *Id.* (citations omitted).

Pluralsight Class A common stock traded as low as $19.01 in December 2018.[23] The stock price rose to $29.99 within two months and remained near that price until Defendants' truthful disclosures on July 31, 2019.[24] Overall, the Company's three most senior officers sold $47 million in stock during the seven-month putative class period.[25]

On July 31, 2019, Mr. Skonnard and Mr. Budge disclosed the actual state of the sales force to investors and analysts on an earnings call.[26] The stock price immediately fell by 39.52% to $18.56 on a trading volume of 22.135 million shares.[27] On the July 31 earnings call, Mr. Budge admitted that the sales force had lacked "ramped capacity" in the first and second quarters.[28] He indicated that at the end of 2018, the Company had "'needed to bring on board' 'dozens of reps' 'so they would . . . become fully productive in the second quarter' but Pluralsight had instead been 'a few months behind.'"[29] Mr. Skonnard made a similar disclosure: "[T]here 'was not enough capacity in the system to sustain our high-growth expectations as we entered the year [2019.]'"[30] These disclosures "shocked and troubled" analysts because it "was so fundamentally contrary to what [Defendants] had led analysts and investors to believe about the sales force" over the previous seven months.[31] When a securities analyst asked Officer Defendants why they did not disclose these facts earlier, Mr. Budge responded: "Well, we were still hitting our numbers[.]"[32]

---

[23] *Id.*
[24] SAC ¶¶ 7–17. The stock price reached $35.49 on April 30, 2019. *Id.* at ¶ 110.
[25] *Id.* at ¶¶ 8–11.
[26] *Id.* at ¶ 12.
[27] *Id.* at ¶ 17.
[28] *Id.*
[29] SAC ¶ 12 (citation omitted).
[30] *Id.* (emphasis removed) (citation omitted).
[31] *Id.* at ¶ 13.
[32] *Id.* (emphasis removed).

On August 13, 2019, Lead Plaintiffs filed their Complaint,[33] alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5. On November 4, 2022, they filed their Second Amended Complaint.[34] Four months later, they moved for class certification and appointment of class counsel.[35] Lead Plaintiffs, through Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein" or the "Firm"), seek to represent investors harmed by buying Pluralsight Class A common stock at allegedly artificially inflated prices because of Defendants' materially false misrepresentations and omissions about Pluralsight's sales force.[36] Lead Plaintiffs define the putative class period as January 16, 2019, through July 31, 2019, inclusive.[37] Defendants filed their response on August 14,[38] and Lead Plaintiffs replied thirty days later.[39]

## STANDARD

A plaintiff may litigate on behalf of a class under Federal Rule of Civil Procedure 23(a) if

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.[40]

---

[33] ECF No. 1.
[34] *See* SAC.
[35] *See* Mot. Certify Class.
[36] *Id.* at 2.
[37] SAC ¶ 1.
[38] *See* Resp.
[39] ECF No. 223.
[40] Fed. R. Civ. P. 23(a).

Put simply, the plaintiff must show numerosity, commonality, typicality, and adequacy.[41] Courts must employ a "rigorous analysis" to ensure "that the prerequisites . . . have been satisfied."[42]

Parties must also satisfy Rule 23(b). Under Rule 23(b)(3), "[a] class action may be maintained . . . if . . . the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy."[43] "[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation."[44]

## DISCUSSION

Lead Plaintiffs seek to certify "all persons who purchased the Class A common stock of Pluralsight from January 16, 2019, through July 31, 2019, inclusive . . . and [who] were damaged thereby . . . ."[45] Defendants make no specific argument against certification.

### I. Rule 23(a)

First, Lead Plaintiffs must satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. The court discusses each requirement in turn.

---

[41] *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 655 (2022), *reh'g denied*, 143 S. Ct. 60 (2022); *see Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (holding that the party seeking certification "must show 'under a strict burden of proof' that all four requirements are clearly met" (quoting *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988))).

[42] *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1174 (10th Cir. 2023) (noting with approval that a district court did not simply "presume compliance with Rule 23" but instead "carefully reviewed whether [the p]laintiffs had affirmatively demonstrated each requirement for [class] certification").

[43] Fed. R. Civ. P. 23(b)(3) (emphases added); *see Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (requiring predominance and superiority).

[44] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).

[45] Mot. Certify Class 2.

## A.   Numerosity

"[P]laintiffs seeking to represent a class [must first] establish that the class is so numerous as to make joinder impracticable."[46] "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."[47] While "[p]laintiffs must offer 'some evidence of established, ascertainable numbers constituting the class,'" there is "no set formula to determine if the class is so numerous that it should be so certified."[48] The court has "wide latitude" to determine this factor.[49]

Pluralsight stock is traded nationally.[50] The Company had about 101 million shares of Class A stock issued and outstanding during the proposed class period.[51] In its March 2019 secondary public offering, Pluralsight sold over 13 million Class A shares.[52] Lead Plaintiffs' expert, Chad Coffman ("Mr. Coffman"), stated that Pluralsight Class A common stock held an average weekly trading volume of about 8.51 million shares.[53] As such, Lead Plaintiffs contend the putative class members are likely geographically dispersed and number in the thousands.[54]

---

[46] *Trevizo*, 455 F.3d at 1162; *see* Fed. R. Civ. P. 23(a)(1).

[47] *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980).

[48] *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (quoting *Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978)).

[49] *Trevizo*, 455 F.3d at 1162.

[50] SAC ¶¶ 26 (trading on the NASDAQ stock market); *see United States v. Clark*, 717 F.3d 790, 796 n.1 (10th Cir. 2013) (describing NASDAQ as a national exchange). In securities fraud cases such as the one here, the numerosity requirement is often presumed satisfied if the relevant stock is nationally traded. *See McEwen v. Digitran Sys., Inc.*, 160 F.R.D. 631, 636 (D. Utah 1994); *accord In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268–69 (S.D. Tex. 2005); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002); *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989).

[51] SAC ¶ 26 (101,096,472 Class A shares, 24,664,133 Class B shares, and 14,186,856 Class C shares issued and outstanding as of July 31, 2019).

[52] *Id.*

[53] Expert Report of Chad Coffman ("Coffman Report") ¶ 25, ECF No. 178-1.

[54] SAC ¶ 165; *see* Mot. Certify Class 9.

7

Joinder of so many parties in the instant action would indeed prove impracticable.[55] The proposed class is thus sufficiently numerous.

### B. Commonality

Class certification requires "questions of law or fact common to the class."[56] "[C]ommonality does not require that every member of the class share a fact situation *identical* to that of the named plaintiff."[57] "[F]or purposes of Rule 23(a)(2) even a single common question will do[.]"[58] But simply *raising* a common question is not enough.[59] "[T]he common contention 'must be of such a nature that it is capable of *classwide resolution*—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"[60]

Plaintiffs assert three common questions of law or fact: (1) whether Defendants made any untrue statements of material fact for purposes of a Section 10(b) claim;[61] (2) whether Officer Defendants had "the power and ability to control the actions of Pluralsight and its employees" as required under a Section 20(a) controlling persons liability claim;[62] and (3) whether Defendants traded Pluralsight securities "'on the basis of material nonpublic information about th[e] security

---

[55] *See, e.g.*, *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1233 (D.N.M. 2012) (finding joinder impracticable when lead plaintiffs estimated that the class numbered in the thousands).

[56] Fed. R. Civ. P. 23(a)(2).

[57] *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1192 (10th Cir. 2023) (cleaned up).

[58] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up); *see Sherman*, 84 F.4th at 1192 ("A finding of commonality requires only a single question of law or fact common to the entire class." (citation omitted)).

[59] *XTO Energy*, 725 F.3d at 1218.

[60] *Id.* (quoting *Wal-Mart*, 564 U.S. at 359).

[61] Mot. Certify Class 10. Lead Plaintiffs assert that this same question will also fulfill the first prong of their Section 20(a) controlling persons liability claim, which requires the plaintiff to show "a primary violation of the securities laws[.]" *Id.* (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003)).

[62] *Id.* The second prong of a Section 20(a) controlling persons liability claim requires "control over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107.

8

or issuer' and 'in breach of a duty of trust confidence'" for Lead Plaintiffs' insider trading claim.[63] These questions are common to the putative class for the following reasons.

First, it is unlawful under the Exchange Act to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"[64] To that end, Lead Plaintiffs allege Defendants "repeatedly failed to disclose a critical adverse fact: that by the end of 2018, Pluralsight was behind in . . . the number of seasoned sales representatives needed to sustain its [planned] growth."[65] Lead Plaintiffs allege Mr. Budge represented that the sales team "w[as] 'killing it' [because] the 'great infrastructure around them' . . . had 'improved [Pluralsight's] retention massively and [the Company was] now at scale."[66] Mr. Budge also allegedly stated that the Company had "about 250" sales representatives with a plan to expand that number to 300 in 2019.[67] Whether these allegations were untrue statements of material fact or misleading omissions are questions common to the putative class.

Second, liability for controlling persons under Section 20(a) of the Exchange Act extends to "[e]very person who, directly or indirectly, controls any person liable under [Section 20(a)] or of any rule or regulation . . . ."[68] To make out a prima facie case, a plaintiff must show "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged

---

[63] Mot. Certify Class 11; *see* 17 C.F.R. § 240.10b5–1(a) (requiring "the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information").

[64] 17 C.F.R. § 240.10b–5(b).

[65] SAC ¶¶ 6, 58.

[66] *Id.* at ¶ 57 (citation omitted).

[67] *Id.* at ¶ 58.

[68] 15 U.S.C. § 78t(a).

9

controlling person."[69] As discussed, whether Defendants violated securities laws involve common questions about whether Officer Defendants made untrue statements of material fact. The second prong requires a plaintiff to "point to facts which indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person[.]'"[70] The question of whether Officer Defendants held positions of sufficient control must be resolved for putative class members to prevail. This question is also common to the putative class.

Third, to state a claim for insider trading liability, a plaintiff must demonstrate that defendants purchased or sold a security "on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders . . . , or to any other . . . who is the source of the . . . information."[71] Here, the insider trading claims depend on whether Defendants owed a duty of trust or confidence to the issuer of securities.[72] Lead Plaintiffs allege Officer Defendants "had a duty to promptly disseminate accurate and truthful information" about Pluralsight's finances and performance.[73] This is a question of law common to all putative class members and so the commonality factor is satisfied.

---

[69] *Adams*, 340 F.3d at 1107 (citing *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270 (10th Cir. 2001)).

[70] *Id.* at 1108 (citing *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).

[71] 17 C.F.R. § 240.10b5-1(a); *see In re Thornburg*, 824 F. Supp. 2d at 1246 ("An insider must thus abstain from trading in the shares of the corporation unless the insider has first disclosed all material nonpublic information in the insider's possession.").

[72] *See* SAC ¶¶ 10, 12, 106–21 (alleging insider training).

[73] *Id.* at ¶¶ 36, 133(c).

## C.    Typicality

Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."[74] "[T]ypicality "do[es] not require that every member of the class share a fact situation identical to that of the named plaintiff."[75] Class representatives must simply "have interests coextensive with and not antagonistic to the interests of the class"[76] so that the two groups "share common objectives . . . ."[77]

Here, Lead Plaintiffs are part of the putative class.[78] They purchased stock at an allegedly artificially inflated price because of Defendants' material misrepresentations and omissions.[79] On March 7, 2019, INPRS bought 65,200 shares of Pluralsight Class A common stock for $29.25, and CTPF bought 7,900 shares.[80] Lead Plaintiffs owned the stock after Defendants revealed the truth about the sales force on July 31, 2019, and the prices fell. As a result, Lead Plaintiffs make a sufficient showing of economic loss.[81]

Lead Plaintiffs also have the same interest and injury as the typical putative class member. Specifically, Lead Plaintiffs allege violations of the Exchange Act and SEC Rule 10b-5. Putative class members have an identical interest in litigating these claims. If Defendants made material misrepresentations or omitted key facts that caused artificial price inflation, other

---

[74] Fed. R. Civ. P. 23(a)(3); *see Tennille v. W. Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015) ("[T]o protect the class's interest adequate and fairly, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997))).

[75] *Sherman*, 84 F.4th at 1193 (alteration in original) (quoting *Colo. Cross*, 765 F.3d at 1216).

[76] *Ogden v. Figgins*, 315 F.R.D. 670, 674 (D. Kan. 2016) (citation omitted).

[77] *Tennille*, 785 F.3d at 430 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1769 (3d ed. 2005)).

[78] SAC ¶¶ 22–24.

[79] *Id.*

[80] *Id.* at ¶ 23.

[81] *Id.* at ¶ 24.

members who bought stock and then owned it when prices fell suffer the same economic loss. Lead Plaintiffs accordingly satisfy the typicality requirement.

### D. Adequacy

Representative parties must "fairly and adequately protect the interests of the class."[82] Two questions are relevant: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[83]

Lead Plaintiffs allege no conflicts of interest exist between themselves and the rest of the putative class.[84] Defendants do not argue otherwise. And the court finds no potential conflicts that would impair Lead Plaintiffs' representation.

Next, Lead Plaintiffs would likely prosecute vigorously on behalf of the putative class. Indeed, Lead Plaintiffs' self-interest supports the presumption that they will advance the interests of the putative class because success for the class is success for all members.[85] Lead Plaintiffs have also shown an ability and willingness to litigate. They have prosecuted the action for more than three years.[86] In that time, Lead Plaintiffs have opposed a motion to dismiss, won an appeal, filed multiple pleadings, and engaged in discovery.[87] Lead Plaintiffs declare that they owe a

---

[82] Fed. R. Civ. P. 23(a)(4); *see Viking River*, 596 U.S. at 654–55.

[83] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Put differently, the court considers conflicts and competency. *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 330 (W.D. Okla. 2018) (citing *Rutter*, 314 F.3d at 1187–88).

[84] SAC ¶ 168.

[85] *See, e.g.*, *Morris v. Davita Healthcare Partners, Inc.*, 308 F.R.D. 360, 373 (D. Colo. 2015) (noting that the named plaintiffs' and putative class member's interests were aligned because "all would benefit" from litigating the issues); *see also Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) ("The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members.").

[86] *See* Docket.

[87] *See* ECF Nos. 94, 119–20, 140, 155, 173, 177, 187, 201, 210, 225; Joint Decl. of Indiana Pub. Ret. Sys. & Pub. School Teachers' Pension & Ret. Fund of Chi. in Support of Lead Pls.' Mot. for Class Cert. & Appointment of Class Representatives & Class Counsel ("Lead Plaintiffs' Decl.") ¶ 7, ECF No. 178-2.

12

fiduciary duty to putative class members to "provide fair and adequate representation" and to "obtain the largest recovery . . . consistent with good faith and meritorious advocacy."[88] This is enough to show a likelihood of vigorous prosecution.

The associated inquiry is whether Cohen Milstein would provide adequate representation as Lead Plaintiffs' counsel. No party raises any potential conflict of interest, and the court finds none. As to the Firm's competency, Cohen Milstein has prosecuted the action since March 2020.[89] It has filed pleadings, provided status reports, advised Lead Plaintiffs, and pursued discovery.[90] The Firm also previously served as class counsel in cases alleging violations of antitrust, securities, consumer protection, civil rights, ERISA,[91] employment, and human rights laws.[92] And the Firm has significant resources[93] and employs counsel experienced in securities law and class actions.[94] For these reasons, the court recognizes Lead Plaintiffs' and Cohen Milstein's competence to represent the putative class and their lack of conflicts of interest.

In sum, Lead Plaintiffs satisfy Rule 23(a)'s requirements for class certification.[95]

---

[88] Lead Plaintiffs' Decl. ¶ 8.

[89] *See* ECF No. 87 (docketed Mar. 25, 2020).

[90] Lead Plaintiffs' Decl. ¶ 6.

[91] Employment Retirement Income Security Act of 1974.

[92] Cohen Milstein Sellers & Toll PLLC Resume ("Firm Resume") 2, ECF No. 178-3. The firm has litigated at least eight securities-law class actions. *See id.* at 2–11.

[93] Lead Plaintiffs' Decl. ¶ 6.

[94] *See* Firm Resume 23–144 (attorney profiles).

[95] Lead Plaintiffs note that some courts consider "ascertainability" as a requirement for class certification. Mot. Certify Class 14 n.3 (citing *Rodriguez v. Cascade Collections LLC*, 532 F. Supp. 3d 1099, 1121–22 (D. Utah 2021)). Lead Plaintiffs contend the putative class is ascertainable "[t]o the extend that analysis applies[.]" *Id.* But the court need not address this factor. Rule 23 does not explicitly impose an ascertainability requirement and the Tenth Circuit has not adopted it. *See* Fed. R. Civ. P. 23; *Evans v. Brigham Young Univ.*, No. 22-4050, 2023 WL 3262012, at *8 (10th Cir. May 5, 2023) (not selected for publication) ("We have not adopted either [ascertainability] standard[.]"). And Defendants make no argument that this factor applies. *See* Resp.

## II.    Rule 23(b)(3)

Lead Plaintiffs must next show that the class action can be maintained under Rule 23(b)(3). This rule "requires a showing of predominance and superiority."[96]

### A.    Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[97] "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive."[98] "Predominance" means simply that "the common, aggregation-enabling, issue in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."[99] In practice, the court sifts common questions from individual questions. If putative class members would need to present evidence "that varies from member to member," that implicates an individual question.[100] But a common question exists where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."[101] The court "must characterize the issues in the case as common or not, and then weigh which issues predominate."[102]

The instant case has several issues common to the putative class. In Count I, Lead Plaintiffs allege Defendants violated Section 10(b) of the Exchange Act and SEC rule 10b-5.[103]

---

[96] *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 837 (10th Cir. 2023); Fed. R. Civ. P. 23(b)(3).

[97] *Amchem*, 521 U.S. at 623.

[98] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

[99] *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (citation omitted).

[100] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

[101] *Id.* (citation omitted).

[102] *CGC Holding*, 773 F.3d at 1087.

[103] SAC ¶¶ 146–54. (17 C.F.R. § 240.10b-5 states: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

14

A plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[104] Prongs one through three are common issues for the reasons discussed earlier.

The issues of alleged misrepresentation or omission, scienter, and causal connection are also relevant for Count II, as Lead Plaintiffs allege Officer Defendants violated Section 20(a) of the Exchange Act by acting as "controlling persons."[105] These issues tend to prove prong one as to whether there was "a primary violation of securities law."[106] Prong two, the question of whether or not there was "control over the primary violator by the alleged controlling person,"[107] also raises a common issue because it would not change from purchaser to purchaser.

Last, Lead Plaintiffs in Count III allege Officer Defendants violated Section 20A of the Exchange Act[108] by selling stock at inflated prices "on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence."[109] At issue is whether Defendants were aware of material nonpublic information leading to inflated prices when they sold stock to shareholders. This is a question common to the putative class.

The court now turns to the remaining issues raised by Count I: reliance, economic loss, and loss causation.

---

circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.")

[104] *Amgen*, 568 U.S. at 460–61 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011)).

[105] SAC ¶¶ 155–57.

[106] *Adams*, 340 F.3d at 1107.

[107] *Id.*

[108] SAC ¶¶ 158–63.

[109] 17 C.F.R. § 240.10b5-1.

15

### 1. Reliance

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."[110] This is true because "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would . . . prevent[] respondents from proceeding with a class action, since individual issues then would . . . overwhelm[] the common ones."[111] The traditional way "for a plaintiff to prove reliance is to show that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation."[112] But requiring plaintiffs to make such a showing "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market."[113] For this reason, the Supreme Court adopted a fraud-on-the-market theory in *Basic, Inc. v. Levinson*.[114]

A plaintiff can invoke the *Basic* presumption by showing "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."[115] A successful showing allows a plaintiff to satisfy the predominance requirement.[116]

---

[110] *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 810 (2011); *see Amgen*, 568 U.S. at 462.

[111] *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).

[112] *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. ____, 141 S. Ct. 1951, 1958 (2021).

[113] *Basic*, 485 U.S. at 245.

[114] *See Halliburton I*, 563 U.S. at 810; *Amgen*, 568 U.S. at 462 ("[T]he doctrine has particular significance in securities-fraud class actions.").

[115] *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 268 (2014).

[116] *See id.* at 276.

Here, Lead Plaintiffs allege Mr. Budge knew or with reckless disregard for the truth made "materially false and misleading" statements and "omitted material facts" at a January 2019 investors' conference.[117] "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."[118] There is no dispute that investors would attach importance to Mr. Budge's comments about Pluralsight's current financial strength and outlook. And the session transcript containing Mr. Budge's remarks became publicly available.[119] The temporal requirement is also satisfied. Lead Plaintiffs declare they purchased Pluralsight securities[120] between January 2019, when Defendants made alleged material misrepresentations and omissions, and July 2019, when the public learned the truth.[121]

The remaining requirement is whether Pluralsight common stock traded on an efficient market. Lead Plaintiffs rely on Mr. Coffman's expert report to assert market efficiency during the putative class period.[122] Courts in this circuit apply the commonly-known *Cammer* factors, first described in *Cammer v. Bloom*.[123] The factors include "(1) the average trade volume; (2) the number of securities analysts following the stock; (3) the number of market makers; (4) whether the company was entitled to file an S–3 Registration Statement; and (5) evidence of a cause and

---

[117] SAC ¶¶ 131–34.

[118] *SEC v. GenAudio Inc.*, 32 F.4th 902, 921 (10th Cir. 2022) (citation omitted).

[119] SAC ¶ 131.

[120] *See* Decl. of Keith M. Woodwell in Support of Pluralsight Inst. Invs. Grp.'s Mot. for Appointment as Lead Pl. & Appointment of Lead Counsel & Exs. 2, 4, ECF No. 76.

[121] SAC ¶¶ 57–59, 84–85.

[122] Coffman Report ¶ 6.

[123] 711 F. Supp. 1264, 1286–87 (D.N.J. 1989); *see Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 507 (D. Kan. 2014); *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 662 (D. Utah 2008); *Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990).

effect relationship between unexpected news and stock-price changes."[124] "[N]o single factor . . . is dispositive."[125] The court addresses each factor in turn.

### a. Trade Volume

The first factor concerns the average weekly trading volume. "[A]n actively traded market, as evidenced by a large weekly volume of stock trades, suggests [that] there is an efficient market . . . because it implies significant investor interest in the company."[126] "Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[127] Courts have found this factor met with an average weekly trading volume of 2%[128] and 2.7%.[129] Here, Pluralsight stock during the putative class period had an average weekly trading volume of 8.51 million shares, or 10.27% of shares outstanding.[130] By comparison, the New York Stock Exchange and the National Association of Securities Dealers Automatic Quotations ("NASDAQ") exchanges had an average weekly trading volume of 2.12%.[131] Pluralsight's trading volume thus "easily surpasses the threshold level of average weekly trading volume necessary for an efficient market."[132]

### b. Number of Security Analysts

Next, a significant number of securities analysts tracking a company's stock could indicate market efficiency. "The existence of such analysts would imply . . . the [company's

---

[124] *Gelt Trading Ltd. v. Co-Diagnostics, Inc.*, No. 2:20-cv-00368, 2023 WL 5334623, at *8 (D. Utah Aug. 18, 2023) (citing *Cammer*, 711 F. Supp. at 1286–87).
[125] *Id.*; *see Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016), *aff'd but criticized on other grounds sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).
[126] *Cammer*, 711 F. Supp. at 1286.
[127] *Id.*
[128] *Id.* at 1292–93.
[129] *In re Nature's Sunshine*, 251 F.R.D. at 662.
[130] Coffman Report ¶ 25.
[131] *Id.* at ¶ 28.
[132] *Id.*

financial] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[133] Courts have found this factor relevant when at least six analysts issued reports.[134] Here, Mr. Coffman notes that 12 firms issued 48 securities analyst reports on Pluralsight during the putative class period.[135] And some of these firms are well-known financial institutions.[136] As such, the number of security analysis "provides evidence of a robust and active market for public information about the Company and evidence that Pluralsight Common Stock traded in an efficient market during the class period."[137]

### c.     Number of Market Makers

The third factor pertains to market makers. In the context of NASDAQ-traded stocks, a market maker is "a brokerage house that announces itself ready to buy or sell a specified number of shares at specified prices."[138] "The existence of market makers . . . ensure[s] completion of the market mechanism [because] these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[139] The court in *Cammer* reasoned that more than ten market makers "justifies a 'substantial presumption' that the market for a security is efficient."[140] Here, Pluralsight stock traded on the NASDAQ exchange.[141] And Mr. Coffman found 81 market makers for Pluralsight common

---

[133] *Cammer*, 711 F. Supp. at 1286.

[134] *In re Nature's Sunshine*, 251 F.R.D. at 663 (citing *In re Amerifirst Sec. Litig.,* 139 F.R.D. 423, 431 (S.D. Fla. 1991)); *see Gelt Trading*, 2023 WL 5334623, at *8.

[135] Coffman Report Ex. 4.

[136] *Id.* at ¶ 33; *see, e.g.*, *Welch v. United States*, No. 1:12 CV 2238, 2012 WL 5399665, at *1 (N.D. Ohio Nov. 5, 2012) (describing J.P. Morgan as a "major financial institution[]"); *In re Drexel Burnham Lambert Grp. Inc.*, 129 B.R. 22, 24 (Bankr. S.D.N.Y. 1991) (describing Barclays as "well[-]known by any standard").

[137] Coffman Report ¶ 36.

[138] *In re Nature's Sunshine*, 251 F.R.D. at 663.

[139] *Cammer*, 711 F. Supp. at 1286–87.

[140] *Gelt Trading*, 2023 WL 5334623, at *8 (quoting *Cammer*, 71 F. Supp. at 1293).

[141] SAC ¶ 26.

19

stock during the putative class period.[142] While Mr. Coffman admits "the number of 'market makers' itself is not a particularly relevant metric in this case[,]" he concludes that the facts show Pluralsight stock "meets the letter and spirit of this factor[.]"[143] The court agrees and finds that the factor slightly favors a finding of market efficiency.

### d.    SEC Form S-3 Eligibility

The fourth factor, whether a company can file an S-3 Registration Statement,[144] is "helpful because the SEC permits registration 'only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.'"[145] Mr. Coffman found "no evidence that Pluralsight was not S-3 eligible throughout the [c]lass [p]eriod."[146] Consequently, this factor supports market efficiency.

### e.    Cause and Effect Relationship

The final *Cammer* factor concerns whether a plaintiff can "allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[147] This factor "is, perhaps, the most important."[148] It "is often proven with an event study."[149] An event study is used to measure how new information

---

[142] Coffman Report ¶ 41 (citing Bloomberg broker dealer rankings).

[143] *Id.*

[144] A Form S-3 "allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available." *Id.* at ¶ 43.

[145] *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) (quoting *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996)); *see Cammer*, 711 F. Supp. at 1287.

[146] Coffman Report ¶ 44.

[147] *Cammer*, 711 F. Supp. at 1287.

[148] *In re Nature's Sunshine*, 251 F.R.D. at 663 (citing *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000)).

[149] *Gelt Trading*, 2023 WL 5334623 (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015)).

affects the market prices of publicly-traded securities.[150] Here, Mr. Coffman employed a regression model over a rolling six-month period to analyze whether there was any positive correlation between Pluralsight common stock and control variables.[151] He found such a positive correlation.[152] After testing the results,[153] Mr. Coffman concluded that a "clear cause-and-effect relationship" existed "between new public information about Pluralsight and the market price of Pluralsight Common Stock."[154] Mr. Coffman's report shows that the average magnitude of stock-price movement on days with earnings announcements was over 4.4 times greater than non-news days.[155] Defendants offer no rebuttal expert testimony or argument. The cause-and-effect factor accordingly favors Lead Plaintiffs.

On this record, all *Cammer* factors weigh in favor of presuming market efficiency.[156] Lead Plaintiffs may rely on the "fraud-on-the-market presumption" to show that issues of reliance predominate for the instant motion for class certification.

### 2. Economic Loss

Lead Plaintiffs contend whether putative class members suffered economic loss is a common question. They assert putative class members suffered harm after buying Pluralsight

---

[150] Coffman Report ¶ 47.

[151] *Id.* at ¶¶ 49–50.

[152] *Id.* at ¶ 51.

[153] *See id.* at ¶¶ 52–63.

[154] *Id.* at ¶ 64.

[155] Coffman Report ¶ 60. The report highlights that the "daily trading volume of Pluralsight Common Stock also tends to be much higher than on days where there is no news." *Id.* at ¶ 62.

[156] Mr. Coffman partly bases his conclusions on factors from *Krogman v. Sterritt*. Coffman Report 11 (analyzing "1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading"); *see* Mot. Certify Class 16 n.4 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). Because the court finds Mr. Coffman's analysis persuasive under the *Cammer* factors, the court need not discuss the *Krogman* factors. In any event, courts in this circuit have not traditionally applied the *Krogman* factors to assess market efficiency. *See, e.g.*, *Brokop v. Farmland Partners Inc.*, No. 18-cv-02104, 2021 WL 4916240, at *10 (D. Colo. July 23, 2021), *R. & R. adopted in part*, 2021 WL 4913970 (D. Colo. Sept. 30, 2021).

Class A stock at artificially high prices and then experiencing losses when the prices fell.[157] Lead Plaintiffs argue that they can measure class-wide damages with an "out-of-pocket" method.[158]

Parties do not need to calculate class-wide damages at the class certification stage. They need only show a "a common, classwide *method* for determining individual damages."[159] To that end, courts have recognized the "out-of-pocket" method for calculating class-wide damages.[160] As Mr. Coffman outlines in his report, this methodology would allow a formulaic computation of class members' damages "based upon information collected in the claims process [such as] the investor's purchase and sale history for the security[.]"[161] The methodology also links to Lead Plaintiffs' theory of liability.[162]

Still, each member's damages calculation could necessitate individual determinations because "evidence to prove [specific] damage varies from class member to class member[.]"[163] Such determinations would implicate an individual question for the predominance inquiry. But

---

[157] SAC ¶ 135.

[158] Mot. Certify Class 20; *see* Coffman Report ¶ 78 ("This method . . . states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale . . . .").

[159] *In re Marriott Int'l, Inc.*, 78 F.4th 677, 683 (4th Cir. 2023) (citation omitted); *see Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 986 (D. Minn. 2021).

[160] *See In re Synchrony Fin. Sec. Litig.*, No. 3:18-cv-1818, 2023 WL 1503032, at *12 (D. Conn. Feb. 3, 2023); *In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089, 2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021); *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, No. 17-cv-00554, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018).

[161] Coffman Report ¶ 79; *see In re Myriad Genetics, Inc. Sec. Litig.*, No. 2:19-cv-00707, 2021 WL 5882259, at *7 (D. Utah Dec. 13, 2021) ("The fifth element, economic loss, could require individualized determinations as to each plaintiff, but these calculations are mechanical and formulaic.").

[162] "The Supreme Court has emphasized that 'at the class-certification stage (as at trial), any model supporting a plaintiff's damages case *must be consistent* with its liability case." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). *See, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) ("Plaintiffs make clear that they are alleging that because of [d]efendants' misrepresentations [the] stock was artificially inflated, and, as a result, investors suffered losses when the truth was revealed by the . . . corrective disclosure. The amount of inflation resulting from the misrepresentations, therefore, would be same for each investor; regardless of their individual threshold for risk."); *see also* Coffman Report ¶ 89.

[163] *See, e.g.*, *Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 108 (D. Utah 2022).

even if the damages calculation for class members requires individual determinations, "[t]he possibility that individual issues may predominate . . . does not defeat class certification by making [the liability] aspect of the case unmanageable."[164] That is the case here. Given Lead Plaintiffs' allegations, the complex liability issues—common to the putative class—predominate over the damages issue.

### 3. Loss Causation

The final issue is loss causation. As the Supreme Court explains, "loss causation is the 'causal connection between the material misrepresentation and the [economic] loss' suffered by investors."[165] It "addresses a matter different from whether an investor relied on a misrepresentation . . . when buying or selling a stock."[166] Lead Plaintiffs allege that by purchasing Pluralsight Class A stock during the putative class period, combined with "Defendants' material misstatement and omissions, Lead Plaintiffs and the other [putative c]lass members suffered real economic loss . . . under the federal securities laws."[167] This issue is common to the putative class. Evidence that Defendants' misrepresentations or omissions led to the drop in Pluralsight stock price will allow each member to show economic loss necessary for a successful Section 10(b) claim.[168] In sum, common questions of law and fact predominate over questions affecting individual putative class members.

---

[164] *In re Motor Fuel Temperature Sales Pracs. Litig.*, 279 F.R.D. 598, 613 (D. Kan. 2012) (alterations in original); *see Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88 (D.N.J. 2019) (collecting cases). The court in *In re Motor Fuel* explained that a class action could be bifurcated into a liabilities and damages phase pursuant to Rule 23(c)(4). 279 F.R.D. at 613; *see* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

[165] *Halliburton I*, 563 U.S. at 808 (internal quotation marks omitted and citation omitted).

[166] *Id.*

[167] SAC ¶ 135.

[168] *Matrixx Initiatives*, 563 U.S. at 37–38.

## B. Superiority

Rule 23(b)(3) also requires "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."[169] The "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."[170] Courts are directed to consider a set of four non-exclusive factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."[171]

First, Lead Plaintiffs argue that most putative class members "have likely suffered losses that are of insufficient magnitude to justify bringing separate and individual actions."[172] Lead Plaintiffs base their assertion on 101 million issued and outstanding Pluralsight shares, an average weekly trading volume of 8.51 million shares, and 335 institutions reporting owning stock during the putative class period that "h[eld] virtually the entirety of the public float."[173]

---

[169] Fed. R. Civ. P. 23(b)(3); *see Sec. Sys., Inc v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186, 1198 (D. Utah 2019) ("[It] must be better than, not merely as good as, other methods of adjudication." (emphasis removed) (quoting *Porcell v. Lincoln Wood Prod., Inc.*, 713 F. Supp. 2d 1305, 1325 (D.N.M. 2010))).

[170] *Amchem*, 521 U.S. at 617 (citation omitted). "A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Id.* (citation omitted); *see CGC Holding*, 773 F.3d at 1096 ("[C]lass treatment is superior because it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" (quoting *Amchem*, 521 U.S. at 615)).

[171] Fed. R. Civ. P. 23(b)(3)(A)–(D).

[172] Mot. Certify Class 22.

[173] Coffman Report ¶¶ 25, 72. The term "public float" refers to "the percentage of shares held by the public as opposed to corporate insiders." *Bennett*, 298 F.R.D. at 511.

24

Together, these facts make it likely that thousands of investors owned relatively few shares and so their economic loss is too small to justify taking on lengthy and expensive litigation.

Second, Lead Plaintiffs assert they are unaware of any members would prefer to litigate on their own.[174] This factor weighs in favor of certifying the class.

Third, Plaintiffs argue that "concentrating the litigation in this [c]ourt prevents inconsistent adjudication and promotes the efficient use of the judicial system, particularly given that Pluralsight has its corporate headquarters in Utah."[175] Focusing claims in Utah where the corporate defendant resides would likely lead to greater efficiency.[176]

Finally, Lead Plaintiffs contend there are no unusual management issues surrounding this case.[177] Defendants do not contest this point. Of course, class actions inherently involve more complexity and generally require more time to litigate than non-class actions. But these inherent characteristics do not necessarily extend to this case. The court thus finds that a class action is the superior method for litigating the action.

In conclusion, Lead Plaintiffs satisfy Rule 23's requirements. The court certifies the instant action for a class of all persons other than Defendants and their affiliates who purchased Pluralsight Class A common stock between January 16, 2019, and July 31, 2019, inclusive.[178]

---

[174] Mot. Certify Class 22.

[175] *Id.*; SAC ¶ 25.

[176] *See, e.g.*, *Grimes v. Evergreen Recreational Vehicles, LLC*, No. 3:16-cv-472, 2018 WL 1257237, at *9 (N.D. Ind. Mar. 12, 2018) ("It is also desirable to consolidate the claims . . . in this district, where [the corporate defendant] has its base of operations and where many documents and witnesses are likely to be located."); *Yarger v. ING Bank*, 285 F.R.D. 308, 328 (D. Del. 2012) (same).

[177] *Id.*

[178] "In a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Ribozyme*, 205 F.R.D. at 579. Lead Plaintiffs contend the class period began when Defendants made materially false misrepresentations and omissions at an investors conference on January 16, 2019. SAC ¶¶ 6, 57–59. On July 31, 2019, Defendants then disclosed the Company's true financial health. *Id.* at ¶¶ 12, 84–93. Analysts and investors were "shocked and troubled by the failure to disclose these adverse facts" and Pluralsight shares dropped

25

## III. Appointment of Class Counsel

Lead Plaintiffs move to appoint Cohen Milstein as class counsel.[179] Under Rule 23(g), a court must appoint class counsel after certifying a class. In making this decision, the court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]"[180] For the reasons explained in Section I.D of this Memorandum Decision and Order, the court finds that Cohen Milstein will fairly and adequately represent the class's interests.

## ORDER

For the foregoing reasons, the court GRANTS Plaintiffs' Motion for Class Certification.[181] IT IS HEREBY ORDERED THAT:

1. The class of plaintiffs (the "Class") is defined as follows:

   All persons who purchased the Class A common stock of Pluralsight from January 16, 2019 through July 31, 2019, inclusive and were damaged thereby. Excluded from the Class are (i) all defendants; (ii) members of the immediate families of the defendants; (iii) any of the selling stockholders listed in the Offering Documents;[182] (iv) members of the immediate families of any of the selling stockholders listed in the Offering Documents; (v) the subsidiaries and affiliates of any defendants or the

---

39.52% in a single day. *Id.* at ¶¶ 13–17. "[W]here there is 'no substantial doubt as to the curative effect' of the later-in-time announcement, . . . courts 'will simply define the class period accordingly' without risk of improperly wading into the merits at the class certification stage." *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 18 (D. Mass. 2019), *aff'd*, 6 F.4th 123 (1st Cir. 2021) (quoting *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 247 F.R.D. 32, 39 (D.D.C. 2008)). The court does so here. Defendants' statements and omissions on January 16, 2019, and the disclosure of truthful information on July 31, 2019, define the class period.

[179] Lead Plaintiffs' Decl. ¶ 10.

[180] Fed. R. Civ. P. 23(g)(1)(A). Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

[181] ECF No. 177.

[182] Lead Plaintiffs define "Offering Documents" as (1) the final prospectus filed with the SEC pursuant to Rule 424(b)(4) on March 7, 2019, and (2) the secondary public offering registration statement filed with the SEC on Form S-1 on March 4, 2019, which the SEC declared effective on March 6, 2019. SAC ¶¶ 10 n.3, 71–72.

selling stockholders listed in the Offering Documents; (vi) any person or entity who is a partner, executive officer, director or controlling person of any defendants or selling stockholders listed in the Offering Documents (including any of their subsidiaries or affiliates); (vii) any entity in which any defendant has a controlling interest; and (viii) the legal representatives, heirs, successors and assigns of any such excluded party.

2. Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago are appointed as Class representatives.

3. The firm of Cohen Milstein Sellers & Toll PLLC is appointed as Class counsel.

4. The parties shall meet and confer on the form and manner of providing notice, and within 60 days of this Memorandum Decision and Order, submit a joint proposal for notice to the Class for the court's approval.

Signed December 27, 2023.

BY THE COURT

David Barlow
United States District Judge

27