# EXHIBIT 73
# (part 2)

## The Performance of Fund Managers

The previous results suggest that though it may not be easy to profit simply by trading on news, sophisticated investors might be able to do so (for example, by being better able to predict takeover outcomes, or short small stocks). Presumably, professional fund managers, such as those who manage mutual funds, should be in the best position to take advantage of such opportunities. Are they able to find profit-making opportunities in financial markets?

**Fund Manager Value-Added.** The answer is yes. Calculating a fund's gross alpha (before fees) and scaling it by the fund's assets under management (AUM) indicates that the average mutual fund manager is able to identify profitable trading opportunities worth approximately $2 million per year.[24]

Of course, the fact that the average mutual fund manager is able to find profitable trading opportunities does not imply that all managers do so. In fact, most cannot. The median mutual fund actually destroys value; that is, most fund managers appear to behave much like individual investors by trading so much that their trading costs exceed the profits from any trading opportunities they may find.

**Returns to Investors.**  Do investors benefit by identifying the profit-making funds and investing in them? This time the answer is no—on average investors do not benefit from investing in actively managed mutual funds. As reported in Figure 13.7, typical studies find that the returns to investors of the average domestic U.S. equity fund has a negative alpha. While including funds that hold international stocks leads to an average alpha that is not significantly different from zero, all the studies consistently agree on one thing: on



### FIGURE 13.7

**Estimated Alphas for U.S. Mutual Funds (1975–2002)**

The figure shows average annual alphas for mutual funds by fund type. For each category, the average fund has a negative estimated alpha.

*Source*: Adapted from R. Kosowski, A. Timmermann, R. Wermers, H. White, "Can Mutual Fund 'Stars' Really Pick Stocks? New Evidence from a Bootstrap Analysis," *Journal of Finance* 61 (2006): 2551–2596.

---

[24]J.B. Berk and J. van Binsbergen, *Measuring Managerial Skill in the Mutual Fund Industry*, NBER working paper #18184 (2012).

average actively managed mutual funds don't appear to provide superior returns for their investors compared to investing in passive index funds.[25]

Again, the fact that the average mutual fund has a negative alpha does not imply that all mutual funds do. Can investors identify funds that consistently deliver positive alphas to their investors? Morningstar ranks fund managers each year based on their historical performance. For example, Morningstar named Legg Mason's William Miller, whose performance we highlighted in the introduction to this chapter, as manager of the year in 1998 and manager of the decade the following year. As we have already noted, investors who were motivated to invest based on these awards saw poor performance over the next 10 years. Miller's experience is not exceptional. At the end of each year Forbes publishes an Honor Roll of top mutual funds based on an analysis of the past performance and riskiness of the fund. In a famous 1994 study, Vanguard CEO John Bogle compared the returns from investing in the market index with the returns from investing each year in the newly announced Honor Roll funds. Over a 19-year period, the Honor Roll portfolio had an annual return of 11.2%, whereas the market index fund had an annual return of 13.1%.[26] Thus, the superior past performance of these funds was not a good predictor of their future ability to outperform the market. Other studies have confirmed this result, and found little predictability in fund performance.[27]

While these results regarding mutual fund performance might seem surprising, they are consistent with a competitive capital market. If investors could predict that a skilled manager would generate a positive alpha in the future, they would rush to invest with this manager, who would then be flooded with capital. During Legg Mason manager William Miller's meteoric rise, his capital under management grew from about $700 million in 1992 to $28 billion in 2007. But the more capital the manager has to invest, the harder it is to find profitable trading opportunities. If these opportunities are exhausted, the manager can no longer produce better-than-average performance. Ultimately, as new capital arrives the fund's returns should fall until its alpha is no longer positive.[28] Indeed, alphas could be somewhat negative to reflect other benefits these funds provide, or could result

---

[25]Many studies report negative average alphas for mutual funds; see e.g., R. Kosowski, A. Timmermann, R. Wermers, and H. White, "Can Mutual Fund 'Stars' Really Pick Stocks? New Evidence from a Bootstrap Analysis," *Journal of Finance* 61 (2006): 2551–2596 and E. Fama, and K. French, "Luck versus Skill in the Cross Section of Mutual Fund Alpha Estimates," Tuck School of Business Working Paper No. 2009–2056. Using an expanded time period, and considering funds that hold international as well as domestic stocks, J. B. Berk and J. van Binsbergen, find that alphas are not significantly different from zero (*Measuring Managerial Skill in the Mutual Fund Industry*, NBER working paper #18184, 2012).

[26]J. Bogle, *Bogle on Mutual Funds: New Perspectives for the Intelligent Investor*, McGraw-Hill, 1994.

[27]One possible exception is fund fees—ironically, funds that charge a higher percentage fee seem to generate predictably *lower* returns for their investors. See M. Carhart, "On Persistence in Mutual Fund Performance," *Journal of Finance* 52 (1997): 57–82.

[28]This mechanism was proposed by J. Berk and R. Green, "Mutual Fund Flows in Rational Markets," *Journal of Political Economy* 112 (2004): 1269–1295. The following studies all find that new capital flows into funds that do well and out of funds that do poorly: M. Gruber, "Another Puzzle: The Growth in Actively Managed Mutual Funds," *Journal of Finance* 51 (1996): 783–810; E. Sirri and P. Tufano, "Costly Search and Mutual Fund Flows," *Journal of Finance* 53 (1998): 1589–1622; J. Chevalier and G. Ellison, "Risk Taking by Mutual Funds as a Response to Incentives," *Journal of Political Economy* 105 (1997): 1167–1200.

from overconfidence. Investors put too much confidence in their ability to select fund managers and thus commit too much capital to them.[29]

The argument above suggests that when investors identify skilled managers, they should flock to them, so that these managers will manage the largest funds. Consequently, fund size is a strong predictor of the future value added by fund managers.[30] So while investors appear to be good at picking managers, in the end they derive little benefit, because this superior performance is captured by the manager in the form of fees—mutual funds charge approximately the same percentage fee, so the larger funds collect higher aggregate fees. This result is exactly as we should expect: In a competitive labor market, the fund manager should capture the economic rents associated with his or her unique skill.

In summary, while the profits of mutual fund managers imply it is possible to find profitable trading opportunities in markets, being able to do so consistently is a rare talent possessed by only the most skilled fund managers.

Researchers have obtained similar results when evaluating institutional fund managers responsible for managing retirement plans, pension funds, and endowment assets. A study investigating the hiring decisions of plan sponsors found that sponsors picked managers that had significantly outperformed their benchmarks historically (see Figure 13.8). Once



**FIGURE 13.8**     **Before and After Hiring Returns of Investment Managers**

While plan sponsors tend to hire managers that have significantly outperformed their benchmarks historically, after-hiring performance is similar to the excess return of the average fund (0.64% on a value-weighted basis). Data based on 8755 hiring decisions of 3400 plan sponsors from 1994–2003, and returns are gross of management fees (which tend to range from 0.5%–0.7%/year).

*Sources*: A. Goyal and S. Wahal, "The Selection and Termination of Investment Management Firms by Plan Sponsors," *Journal of Finance* 63 (2008): 1805–1847 and with J. Busse, "Performance and Persistence in Institutional Investment Management," *Journal of Finance* 63 (2008): 1805–1847.

---

[29]In Miller's case most investors paid dearly for their confidence in him—although his losses post-2007 equaled his gains from 1992, most investors were not invested in 1992, and so they experienced overall performance that lagged the S&P 500. Not surprisingly, after 2007 he experienced large capital outflows, so by the end of 2008 he had only about $1.2 billion under management.

[30]J. B. Berk and J. van Binsbergen, *Measuring Managerial Skill in the Mutual Fund Industry*, NBER working paper #18184 (2012).

hired, however, the performance of these new managers looked very similar to the average fund, with returns exceeding their benchmarks by an amount roughly equal to their management fees.

### The Winners and Losers

The evidence in this section suggests that while it may be possible to improve on the market portfolio, it isn't easy. This result is perhaps not so surprising, for as we noted in Section 13.2, the average investor (on a value-weighted basis) earns an alpha of zero, *before* including trading costs. So beating the market should require special skills, such as better analysis of information, or lower trading costs.

Because individual investors are likely to be at a disadvantage on both counts, as well as subject to behavioral biases, the CAPM wisdom that investors should "hold the market" is probably the best advice for most people. Indeed, a comprehensive study of the Taiwan stock market found that individual investors there lose an average of 3.8% per year by trading, with roughly 1/3 of the losses due to poor trades and the remaining 2/3 due to transactions costs.[31]

The same study reported that institutions earn 1.5% per year on average from their trades. But while professional fund managers may profit due to their talent, information, and superior trading infrastructure, the results in this section suggest that little of those profits go to the investors who invest with them.

**CONCEPT CHECK**

1. Should uninformed investors expect to make money by trading based on news announcements?

2. If fund managers are talented, why do the returns of their funds to investors not have positive alphas?

## 13.6  Style-Based Techniques and the Market Efficiency Debate

In Section 13.5, we looked for evidence that professional investors could profit at small investors' expense and outperform the market. In this section, we will take a different tack. Rather than looking at managers' profits, we will look at possible *trading strategies*. In particular, many fund managers distinguish their trading strategies based on the types of stocks they tend to hold; specifically, small versus large stocks, and value versus growth stocks. In this section, we will consider these alternative investment styles, and see whether some strategies have generated higher returns historically than the CAPM predicts.

### Size Effects

As we reported in Chapter 10, small stocks (those with smaller market capitalizations) have historically earned higher average returns than the market portfolio. Moreover, while small stocks do tend to have high market risk, their returns appear high even accounting for their higher beta, an empirical result we call the **size effect**.

---

[31]Taiwan provides a unique opportunity to study how profits are distributed, because unlike the U.S., the identity of buyers and sellers is tracked for all trades. See B. Barber, Y. Lee, Y. Liu, and T. Odean, "Just How Much Do Individual Investors Lose by Trading?" *Review of Financial Studies* 22 (2009): 609–632.

**Excess Return and Market Capitalizations.**  To compare the performance of portfolios formed based on size, researchers Eugene Fama and Kenneth French[32] divided stocks each year into ten portfolios by ranking them based on their market capitalizations, and collecting the smallest 10% of stocks into the first portfolio, the next 10% into the second portfolio, up to the biggest 10% into the tenth portfolio. They then recorded the monthly excess returns of each decile portfolio over the following year. After repeating this process for each year, they calculated the average excess return of each portfolio and the beta of the portfolio; Figure 13.9 shows the result. As you can see, although the portfolios with higher betas yield higher returns, most portfolios plot above the security market line (SML)—all except one portfolio had a positive alpha. The smallest deciles exhibit the most extreme effect.

Of course, this result could be due to estimation error; as the figure shows, the standard errors are large and none of the alpha estimates is significantly different from zero. However, nine of the ten portfolios plot above the SML. If the positive alphas were due purely to statistical error, we would expect as many portfolios to appear above the line as below it.



**FIGURE 13.9**  **Excess Return of Size Portfolios, 1926–2011**

The plot shows the average monthly excess return (the return minus the one-month risk-free rate) for ten portfolios formed in each year based on firms' market capitalizations, plotted as a function of the portfolio's estimated beta. The black line is the security market line. If the market portfolio is efficient and there is no measurement error, all portfolios would plot along this line. The error bars mark the 95% confidence bands of the beta and expected excess return estimates. Note the tendency of small stocks to be above the security market line.

*Source*: Data courtesy of Kenneth French.

---

[32]See E. Fama and K. French, "The Cross-Section of Stock Returns," *Journal of Finance* 47 (1992): 427–465.

## FIGURE 13.10

**Excess Return of Book-to-Market Portfolios, 1926–2011**

The plot shows the same data as Figure 13.9, with portfolios formed based on stocks' book-to-market ratios rather than size. Note the tendency of value stocks (high book-to-market) to be above the security market line, and growth stocks (low book-to-market) to be near or below the line.

*Source*: Data courtesy of Kenneth French.



Consequently, a test of whether the alphas of all ten portfolios are jointly all equal to zero can be statistically rejected.

**Excess Return and Book-to-Market Ratio.** Researchers have found similar results using the **book-to-market ratio**, the ratio of the book value of equity to the market value of equity, to form stocks into portfolios. Recall from Chapter 2 that practitioners refer to stocks with high book-to-market ratios as value stocks, and those with low book-to-market ratios as growth stocks. Figure 13.10 demonstrates that value stocks tend to have positive alphas, and growth stocks tend to have low or negative alphas. Once again, a joint test of whether all 10 portfolios have an alpha of zero is rejected.

**Size Effects and Empirical Evidence.** The size effect—the observation that small stocks (or stocks with a high book-to-market ratio) have positive alphas—was first discovered in 1981 by Rolf Banz.[33] At the time, researchers did not find the evidence to be convincing because financial economists had been *searching* the data, looking for stocks with positive alphas. Because of estimation error, it is always possible to find stocks with estimated positive alphas; indeed, if we look hard enough, it is also always possible to find something these stocks have in common. As a consequence, many researchers were inclined to attribute Banz's findings to a **data snooping bias**, which is the idea that given enough characteristics, it will always be possible to find some characteristic that by pure chance happens to be correlated with the estimation error of average returns.[34]

---

[33]See R. Banz, "The Relationship between Return and Market Values of Common Stock," *Journal of Financial Economics* 9 (1981): 3–18. A similar relation between stock price (rather than size) and future returns was found by M. Blume and F. Husic, "Price, Beta and Exchange Listing," *Journal of Finance* 28 (1973): 283–299.

[34]David Leinweber, in his book *Nerds on Wall Street* (Wiley Financial, 2008), illustrates this point by searching the data for a patently absurd characteristic that is correlated with returns. He found that over a 13-year period annual butter production in Bangladesh can "explain" annual variation in S&P 500 returns!

After the publication of Banz's study, however, a theoretical reason emerged that explained the relationship between market capitalization and expected returns. Financial economists realized that as long as beta is not a *perfect* measure of risk—either due to estimation error, or because the market portfolio is not efficient—we should *expect* to observe the size effect.[35] To understand why, consider a stock with a positive alpha. All else equal, a positive alpha implies that the stock also has a relatively high expected return. A higher expected return implies a lower price—the only way to offer a higher expected return is for investors to buy the stock's dividend stream at a lower price. A lower price means a lower market capitalization (and similarly a higher book-to-market ratio—market capitalization is in the *denominator* of the book-to-market ratio). Thus, when a financial economist forms a portfolio of stocks with low market capitalizations (or high book-to-market ratios), that collection contains stocks that will likely have higher expected returns and, if the market portfolio is not efficient, positive alphas. Similarly, a stock that plots below the security market line will have a lower expected return and, all else equal, a higher price, implying that it has a higher market capitalization and lower book-to-market ratio. Hence a portfolio of stocks with high market capitalizations or low book-to-market ratios will have negative alphas if the market portfolio is not efficient. Let's illustrate with a simple example.

| EXAMPLE 13.2 | Risk and the Market Value of Equity |
| --- | --- |

**Problem**

Consider two firms, SM Industries and BiG Corporation, which are expected to pay dividends of $1 million per year in perpetuity. SM's dividend stream is riskier than BiG's, so its cost of capital is 14% per year. BiG's cost of capital is 10%. Which firm has the higher market value? Which firm has the higher expected return? Now assume both stocks have the same estimated beta, either because of estimation error, or because the market portfolio is not efficient. Based on this beta, the CAPM would assign an expected return of 12% to both stocks. How do the market values of the firms relate to their alphas?

**Solution**

The timeline of dividends is the same for both firms:



To calculate the market value of SM, we calculate the present value of its future expected dividends using the perpetuity formula and a cost of capital of 14%:

$$\text{Market Value of SM} = \frac{1}{0.14} = \$7.143 \text{ million}$$

Similarly, the market value of BiG is

$$\text{Market Value of BiG} = \frac{1}{0.10} = \$10 \text{ million}$$

---

[35]See J. Berk, "A Critique of Size-Related Anomalies," *Review of Financial Studies* 8 (1995): 275–286.

SM has the lower market value, and a higher expected return (14% vs. 10%). It also has the higher alpha:

$$\alpha_{SM} = 0.14 - 0.12 = 2\%$$

$$\alpha_{BiG} = 0.10 - 0.12 = -2\%$$

Consequently, the firm with the lower market value has the higher alpha.

When the market portfolio is not efficient, theory predicts that stocks with low market capitalizations or high book-to-market ratios will have positive alphas. In light of this observation, the size effect is, indeed, potential evidence against the efficiency of the market portfolio.

## Momentum

Researchers have also used past stock returns to form portfolios with positive alphas. For example, for the years 1965 to 1989, Narishiman Jegadeesh and Sheridan Titman[36] ranked stocks each month by their realized returns over the prior 6–12 months. They found that the best-performing stocks had positive alphas over the next 3–12 months. This evidence goes against the CAPM: When the market portfolio is efficient, past returns should not predict alphas.

Investors can exploit this result by buying stocks that have had past high returns and (short) selling stocks that have had past low returns, which is called a **momentum strategy**. Jegadeesh and Titman showed that over the period 1965–1989, this strategy would have produced an alpha of over 12% per year.

## Implications of Positive-Alpha Trading Strategies

Over the years since the discovery of the CAPM, it has become increasingly clear to researchers and practitioners alike that by forming portfolios based on market capitalization, book-to-market ratios, and past returns, investors can construct trading strategies that have a positive alpha. Given these results, we are left to draw one of two conclusions:

1. Investors are systematically ignoring positive-NPV investment opportunities. That is, the CAPM correctly computes required risk premiums, but investors are ignoring opportunities to earn extra returns without bearing any extra risk, either because they are unaware of them or because the costs to implement the strategies are larger than the NPV of undertaking them.

2. The positive-alpha trading strategies contain risk that investors are unwilling to bear but the CAPM does not capture. That is, a stock's beta with the market portfolio does not adequately measure a stock's systematic risk, and so the CAPM does not correctly compute the risk premium.

The only way a positive-NPV opportunity can persist in a market is if some barrier to entry restricts competition. In this case, it is very difficult to identify what these barriers might be. The existence of these trading strategies has been widely known for more than 15 years. Not only is the information required to form the portfolios readily available, but

---

[36]See N. Jegadeesh and S. Titman, "Returns to Buying Winners and Selling Losers: Implications for Market Efficiency," *Journal of Finance* 48 (1993): 65–91.

## Market Efficiency and the Efficiency of the Market Portfolio

In Chapter 9 we introduced the *efficient markets hypothesis*, which states that competition should eliminate positive-NPV trading opportunities or, equivalently, that securities with equivalent risk should have the same expected return. But because "equivalent risk" is not well defined, we cannot test the efficient markets hypothesis directly. The risk measure is well defined under the CAPM assumptions, however, and thus we can test the idea that no positive-NPV trading opportunities exist in the CAPM by testing whether the market portfolio is efficient and all trading strategies have zero alpha.

Some researchers further categorize such tests as tests of *weak form, semi-strong form*, and *strong form efficiency*. **Weak form efficiency** states that it should not be possible to profit by trading on information in past prices by, for example, selling winners and hanging on to losers or, conversely, by trading on momentum. **Semi-strong form efficiency** states that it should not be possible to consistently profit by trading on any public information, such as news announcements or analysts' recommendations. Finally **strong form efficiency** states that it should not be possible to consistently profit even by trading on private information.

Note that the efficient markets hypothesis does *not* state that market prices are always correct given *future* information. For example, the 2008 financial crisis made clear that the share prices of many banks and other firms were overvalued in 2007. Given this information, selling bank stocks in 2007 would have been a positive-NPV trading opportunity. But this fact on its own does not contradict market efficiency. We would need to demonstrate that the financial crisis was easily predictable in 2007, and that many investors profited by trading on that knowledge. The scarcity of "winners" in the wake of the financial crisis makes clear that this prediction was by no means obvious at the time. Indeed, the trader most famous for anticipating the banking crisis by shorting mortgage-backed securities, John Paulson, has had mediocre performance since then, with his Advantage Plus fund recording a *52% loss* in 2011, suggesting, perhaps, that his earlier bet might have had to do more with luck, and a healthy appetite for risk, rather than skill.

As the evidence in this chapter makes clear, when we use the CAPM to measure risk, the evidence for market efficiency is mixed: individual investors don't seem to "beat the market" on average, yet at the same time certain trading strategies do appear to be profitable. The key question facing finance researchers is how to correctly measure risk. Do these "profitable" strategies entail systematic risks not identified by the CAPM—making them fairly priced according to some more general model of risk than the CAPM? Or do they represent a true opportunity to earn higher returns without increasing risk?

many mutual funds follow momentum-based and market capitalization/book-to-market–based strategies. Hence, the first conclusion does not seem likely.

That leaves the second possibility: The market portfolio is not efficient, and therefore a stock's beta with the market is not an adequate measure of its systematic risk. Stated another way, the profits (positive alphas) from the trading strategy are really returns for bearing risk that investors are averse to and the CAPM does not capture. There are several reasons why the market portfolio might not be efficient. Let's examine each possibility in turn.

**Proxy Error.** The true market portfolio may be efficient, but the proxy we have used for it may be inaccurate. The true market portfolio consists of all traded investment wealth in the economy, including bonds, real estate, art, precious metals, and so on. We cannot include most of these investments in the market proxy because competitive price data is not available. Consequently, standard proxies like the S&P 500 may be inefficient compared with the true market, and stocks will have nonzero alphas.[37] In this case, the

---

[37]When the true market portfolio is efficient, even a small difference between the proxy and true market portfolio can lead to an insignificant relation between beta and returns. See R. Roll and S. Ross, "On the Cross-Sectional Relation between Expected Returns and Beta," *Journal of Finance* 49 (1) (1994): 101–121.

alphas merely indicate that the wrong proxy is being used; they do not indicate forgone positive-NPV investment opportunities.[38]

**Behavioral Biases.**  As we discussed in Section 13.4, some investors may be subject to systematic behavioral biases. For example, they may be attracted to large growth stocks that receive greater news coverage. Or they may sell winners and hang on to losers, following a contrarian strategy. By falling prey to these biases, these investors are holding inefficient portfolios. More sophisticated investors hold an efficient portfolio, but because supply must equal demand, this efficient portfolio must include more small, value, and momentum stocks to offset the trades of biased investors. While alphas are zero with respect to this efficient portfolio, they are positive when compared with the market portfolio (which is the combined holdings of the biased and sophisticated investors).

**Alternative Risk Preferences and Non-Tradable Wealth.**  Investors may also choose inefficient portfolios because they care about risk characteristics other than the volatility of their traded portfolio. For example, they may be attracted to investments with skewed distributions that have a small probability of an extremely high payoff. As a result, they might be willing to hold some diversifiable risk in order to obtain such a payoff. In addition, investors are exposed to other significant risks outside their portfolio that are not tradable, the most important of which is due to their human capital.[39] For example, a banker at Goldman Sachs is exposed to financial sector risk, while a software engineer is exposed to risk in the high-tech sector. When choosing a portfolio, investors may deviate from the market portfolio to offset these inherent exposures.[40]

It is important to appreciate that just because the market portfolio is not efficient, this does not rule out the possibility of *another* portfolio being efficient. In fact, as we pointed out in Chapter 11, the CAPM pricing relationship holds with *any* efficient portfolio. Consequently, in light of the evidence against the efficiency of the market portfolio, researchers have developed alternative models of risk and return that do not rely on the efficiency of the market portfolio in particular. We develop such a model in Section 13.7.

**CONCEPT CHECK**

1. What does the existence of a positive-alpha trading strategy imply?

2. If investors have a significant amount of non-tradable (but risky) wealth, why might the market portfolio not be efficient?

---

[38]Because we cannot actually construct the *true* market portfolio of *all* risky investments, the CAPM theory is in some sense untestable (see R. Roll, "A Critique of the Asset Pricing Theory's Tests," *Journal of Financial Economic*s 4 (1977): 129–176). Of course, from a corporate manager's perspective, whether the CAPM is testable is irrelevant—as long as an efficient portfolio can be identified, he or she can use it to compute the cost of capital.

[39]Although rare, there are innovative new markets that allow people to trade their human capital to finance their education; see M. Palacios, *Investing in Human Capital: A Capital Markets Approach to Student Funding*, Cambridge University Press, 2004.

[40]Indeed, human capital risk can explain some of the inefficiency of common market proxies. See R. Jagannathan and Z. Wang, "The Conditional CAPM and the Cross-Sections of Expected Returns," *Journal of Finance* 51 (1996): 3–53; and I. Palacios-Huerta, "The Robustness of the Conditional CAPM with Human Capital," *Journal of Financial Econometrics* 1 (2003): 272–289.

## 13.7  Multifactor Models of Risk

In Chapter 11, we presented the expected return of any marketable security as a function of the expected return of the efficient portfolio:

$$E[R_s] = r_f + \beta_s^{eff} \times (E[R_{eff}] - r_f) \tag{13.3}$$

When the market portfolio is not efficient, to use Eq.13.3 we need to find an alternative method to identify an efficient portfolio.

As a practical matter, it is extremely difficult to identify portfolios that are efficient because we cannot measure the expected return and the standard deviation of a portfolio with great accuracy. Yet, although we might not be able to identify the efficient portfolio itself, we do know some characteristics of the efficient portfolio. First, any efficient portfolio will be well diversified. Second, we can construct an efficient portfolio from other well-diversified portfolios. This latter observation may seem trivial, but it is actually quite useful: It implies that *it is not actually necessary to identify the efficient portfolio itself*. As long as we can identify a *collection* of well-diversified portfolios from which an efficient portfolio can be constructed, we can use the collection itself to measure risk.

### Using Factor Portfolios

Assume that we have identified portfolios that we can combine to form an efficient portfolio; we call these portfolios **factor portfolios**. Then, as we show in the appendix, if we use $N$ factor portfolios with returns $R_{F1}, \ldots, R_{FN}$, the expected return of asset $s$ is given by

**Multifactor Model of Risk**

$$E[R_s] = r_f + \beta_s^{F1}(E[R_{F1}] - r_f) + \beta_s^{F2}(E[R_{F2}] - r_f) + \cdots + \beta_s^{FN}(E[R_{FN}] - r_f)$$

$$= r_f + \sum_{n=1}^{N} \beta_s^{Fn}(E[R_{Fn}] - r_f) \tag{13.4}$$

Here $\beta_s^{F1}, \ldots, \beta_s^{FN}$ are the **factor betas**, one for each risk factor, and have the same interpretation as the beta in the CAPM. Each factor beta is the expected % change in the excess return of a security for a 1% change in the excess return of the factor portfolio (holding the other factors constant).

Equation 13.4 says that we can write the risk premium of any marketable security as the sum of the risk premium of each factor multiplied by the sensitivity of the stock with that factor—the *factor betas*. There is nothing inconsistent between Eq.13.4, which gives the expected return in terms of multiple factors, and Eq.13.3, which gives the expected return in terms of just the efficient portfolio. *Both* equations hold; the difference between them is simply the portfolios that we use. When we use an efficient portfolio, it alone will capture all systematic risk. Consequently, we often refer to this model as a **single-factor model**. If we use multiple portfolios as factors, then together these factors will capture all systematic risk, but note that each factor in Eq.13.4 captures different components of the systematic risk. When we use more than one portfolio to capture risk, the model is known as a **multifactor model**. Each portfolio can be interpreted as either a risk factor itself or a portfolio of stocks

correlated with an unobservable risk factor.[41] The model is also referred to as the **Arbitrage Pricing Theory (APT)**.

We can simplify Eq.13.4 a bit further. Think of the expected excess return of each factor, $E[R_{Fn}] - r_f$, as the expected return of a portfolio in which we borrow the funds at rate $r_f$ to invest in the factor portfolio. Because this portfolio costs nothing to construct (we are borrowing the funds to invest), it is called a **self-financing portfolio**. We can also construct a self-financing portfolio by going long some stocks, and going short other stocks with equal market value. In general, a self-financing portfolio is any portfolio with portfolio weights that sum to zero rather than one. If we require that all factor portfolios are self-financing (either by borrowing funds or shorting stocks), then we can rewrite Eq.13.4 as

**Multifactor Model of Risk with Self-Financing Portfolios**

$$E[R_s] = r_f + \beta_s^{F1}E[R_{F1}] + \beta_s^{F2}E[R_{F2}] + \cdots + \beta_s^{FN}E[R_{FN}]$$

$$= r_f + \sum_{n=1}^{N}\beta_s^{Fn}E[R_{Fn}] \tag{13.5}$$

To recap, it is possible to calculate the cost of capital without actually identifying the efficient portfolio using a multifactor risk model. Rather than relying on the efficiency of a single portfolio (such as the market), multifactor models rely on the weaker condition that we can construct an efficient portfolio from a collection of well-diversified portfolios or factors. We next explain how to select the factors.

## Selecting the Portfolios

The most obvious portfolio to use when identifying a collection of portfolios that contain the efficient portfolio is the market portfolio itself. Historically, the market portfolio has commanded a large premium over short-term risk-free investments, such as Treasury bills. Even if the market portfolio is not efficient, it still captures many components of systematic risk. As Figures 13.9 and 13.10 demonstrate, even when the model fails, portfolios with higher average returns *do* tend to have higher betas. Thus, the first portfolio in the collection is a self-financing portfolio that consists of a long position in the market portfolio that is financed by a short position in the risk-free security.

How do we go about picking the other portfolios? As we pointed out earlier, trading strategies based on market capitalization, book-to-market ratios, and momentum appear to have positive alphas, meaning that the portfolios that implement the trading strategy capture risk that is not captured by the market portfolio. Hence, these portfolios are good candidates for the other portfolios in a multifactor model. We will construct three additional portfolios out of these trading strategies: The first trading strategy selects stocks based on their market capitalization, the second uses the book-to-market ratio, and the third uses past returns.

**Market Capitalization Strategy.** Each year, we place firms into one of two portfolios based on their market value of equity: Firms with market values below the median of NYSE firms form an equally weighted portfolio, S, and firms above the median market value form an equally weighted portfolio, B. A trading strategy that each year buys portfolio S

---

[41]This form of the multifactor model was originally developed by Stephen Ross, although Robert Merton had developed an alternative multifactor model earlier. See S. Ross, "The Arbitrage Theory of Capital Asset Pricing," *Journal of Economic Theory* 13 (1976): 341–360; and R. Merton, "An Intertemporal Capital Asset Pricing Model," *Econometrica* 41 (1973): 867–887.

(small stocks) and finances this position by short selling portfolio B (big stocks) has produced positive risk-adjusted returns historically. This self-financing portfolio is widely known as the **small-minus-big (SMB) portfolio**.

**Book-to-Market Ratio Strategy.**  A second trading strategy that has produced positive risk-adjusted returns historically uses the book-to-market ratio to select stocks. Each year firms with book-to-market ratios less than the 30th percentile of NYSE firms form an equally weighted portfolio called the low portfolio, L. Firms with book-to-market ratios greater than the 70th percentile of NYSE firms form an equally weighted portfolio called the high portfolio, H. A trading strategy that each year takes a long position in portfolio H, which it finances with a short position in portfolio L, has produced positive risk-adjusted returns. We add this self-financing portfolio (high minus low book-to-market stocks) to our collection and call it the **high-minus-low (HML) portfolio** (we can also think of this portfolio as long value stocks, and short growth stocks).

**Past Returns Strategy.**  The third trading strategy is a momentum strategy. Each year we rank stocks by their return over the last one year,[42] and construct a portfolio that goes long the top 30% of stocks and short the bottom 30%. This trading strategy requires holding this portfolio for a year; we then form a new self-financing portfolio and hold it for another year. We repeat this process annually. The resulting self-financing portfolio is known as the **prior one-year momentum (PR1YR) portfolio**.

**Fama-French-Carhart Factor Specification.**  The collection of these four portfolios—the excess return of the market $(Mkt - r_f)$, SMB, HML, and PR1YR—is currently the most popular choice for the multifactor model. Using this collection, the expected return of security $s$ is given by:

**Fama-French-Carhart Factor Specification**

$$E[R_s] = r_f + \beta_s^{Mkt}(E[R_{Mkt}] - r_f) + \beta_s^{SMB}E[R_{SMB}]$$
$$+ \beta_s^{HML}E[R_{HML}] + \beta_s^{PR1YR}E[R_{PR1YR}] \qquad (13.6)$$

where $\beta_s^{Mkt}$, $\beta_s^{SMB}$, $\beta_s^{HML}$, and $\beta_s^{PR1YR}$ are the factor betas of stock $s$ and measure the sensitivity of the stock to each portfolio. Because the four portfolios in Eq. 13.6 were identified by Eugene Fama, Kenneth French, and Mark Carhart, we will refer to this collection of portfolios as the **Fama-French-Carhart (FFC) factor specification**.

### The Cost of Capital with Fama-French-Carhart Factor Specification

Multifactor models have a distinct advantage over single-factor models in that it is much easier to identify a collection of portfolios that captures systematic risk than just a single portfolio. They also have an important disadvantage, however: We must estimate the expected return of *each* portfolio. Because expected returns are not easy to estimate, each portfolio we add to the collection increases the difficulty of implementing the model. This task is especially complex because it is unclear *which* economic risk the portfolios capture, so we cannot hope to come up with a reasonable estimate of what the return should be

---

[42]Because of short-term trading effects, the most recent month's return is often dropped, so we actually use an 11-month return.

(as we did with the CAPM) based on an economic argument. To implement the model, we have little choice other than to use historical average returns on the portfolios.[43]

Because the returns on the FFC portfolios are so volatile, we use over 80 years of data to estimate the expected return. Table 13.1 shows the monthly average return as well as the 95% confidence bands of the FFC portfolios (we use a value-weighted portfolio of all NYSE, AMEX, and NASDAQ stocks as the proxy for the market portfolio). Even with 80 years of data, however, all of the estimates of the expected returns are imprecise.

| TABLE 13.1 | FFC Portfolio Average Monthly Returns, 1927–2012 | |
|---|---|---|
| **Factor Portfolio** | **Average Monthly Return (%)** | **95% Confidence Band (%)** |
| Mkt $-r_f$ | 0.61 | ±0.34 |
| SMB | 0.25 | ±0.20 |
| HML | 0.38 | ±0.22 |
| PR1YR | 0.70 | ±0.29 |

*Source*: Kenneth French http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/data_library.html

---

**EXAMPLE 13.3**

**Using the FFC Factor Specification to Calculate the Cost of Capital**

**Problem**

You are considering making an investment in a project in the fast food industry. You determine that the project has the same level of non-diversifiable risk as investing in McDonald's stock. Determine the cost of capital by using the FFC factor specification.

**Solution**

You decide to use data over the past nine years to estimate the factor betas of McDonald's stock (ticker: MCD). Therefore, you regress the monthly excess return (the realized return in each month minus the risk-free rate) of McDonald's stock on the return of each portfolio. The coefficient estimates are the factor betas. Here are the estimates of the four factor betas and their 95% confidence interval based on data from years 2003 through 2011:

| Factor | Beta Estimate | Lower 95% | Upper 95% |
|---|---|---|---|
| Mkt | 0.687 | 0.449 | 0.926 |
| SMB | −0.299 | −0.725 | 0.127 |
| HML | −0.156 | −0.561 | 0.249 |
| PR1YR | 0.123 | −0.068 | 0.314 |

Using these estimates and a risk-free monthly rate of $1.5\%/12 = 0.125\%$, you can calculate the monthly expected return for investing in McDonald's stock:

---

[43]There is a second, more subtle disadvantage to most factor models. Because factor models are designed to price traded securities, there is no guarantee that they will accurately price risks that are not currently traded (e.g., the risk associated with a new technology). In practice, it is assumed that any non-traded risk is idiosyncratic, and therefore does not command a risk premium.

$$E[R_{MCD}] = r_f + \beta_{MCD}^{Mkt}(E[R_{Mkt}] - r_f) + \beta_{MCD}^{SMB} E[R_{SMB}] + \beta_{MCD}^{HML} E[R_{HML}] + \beta_{MCD}^{PR1YR} E[R_{PR1YR}]$$

$$= 0.125\% + 0.687 \times 0.61\% - 0.299 \times 0.25\% - 0.156 \times 0.38\% + 0.123 \times 0.70\%$$

$$= 0.496\%$$

Expressed as an APR, the expected return is $0.496\% \times 12 = 5.95\%$. Thus, the annual cost of capital of the investment opportunity is about 6%. (Note, however the substantial uncertainty both in the factor betas and their expected returns.)

As a comparison, a standard CAPM regression over the same time period leads to an estimated market beta of 0.54 for McDonald's—the market beta differs from the estimate of 0.687 above because we are using only a single factor in the CAPM regression. Using the historical excess return on the market implies an expected return of $0.125\% + 0.54 \times 0.61\% = 0.454\%$ per month, or about 5.5% per year.

The FFC factor specification was identified a little more than 20 years ago. Although it is widely used in academic literature to measure risk, much debate persists about whether it really is a significant improvement over the CAPM.[44] The one area where researchers have found that the FFC factor specification does appear to do better than the CAPM is measuring the risk of actively managed mutual funds. Researchers have found that funds with high returns in the past have positive alphas under the CAPM.[45] When Mark Carhart repeated the same test using the FFC factor specification to compute alphas, he found no evidence that mutual funds with high past returns had future positive alphas.[46]

**CONCEPT CHECK**

1. What is the advantage of a multifactor model over a single factor model?

2. How can you use the Fama-French-Carhart factor specification to estimate the cost of capital?

## 13.8  Methods Used in Practice

Given the evidence for and against the efficiency of the market portfolio, what method do managers actually use to calculate the cost of capital? A survey of 392 CFOs conducted by John Graham and Campbell Harvey found that 73.5% of the firms that they questioned use the CAPM to calculate the cost of capital, as indicated in Figure 13.11. They also found that larger firms were more likely to use the CAPM than were smaller firms.

What about the other methods? Among the firms Graham and Harvey surveyed, only about one-third reported using a multifactor model to calculate the cost of capital. Two other methods that some firms in the survey reported using are historical average returns (40%) and the dividend discount model (16%). By dividend discount model, practitioners mean Eq. 9.7 in Chapter 9: They estimate the firm's expected future growth rate and add the current dividend yield to determine the stock's expected total return.

---

[44]See M. Cooper, R. Gutierrez, Jr., and B. Marcum, "On the Predictability of Stock Returns in Real Time," *Journal of Business* 78 (2005): 469–500.

[45]See M. Grinblatt and S. Titman, "The Persistence of Mutual Fund Performance," *Journal of Finance* 47 (1992): 1977–1984; and D. Hendricks, J. Patel, and R. Zeckhauser, "Hot Hands in Mutual Funds: Short-Run Persistence of Performance 1974–1988," *Journal of Finance* 4 (1993): 93–130.

[46]See M. Carhart, "On Persistence in Mutual Fund Performance," *Journal of Finance* 52 (1997): 57–82.

466        **Chapter 13** Investor Behavior and Capital Market Efficiency



**FIGURE 13.11**    **How Firms Calculate the Cost of Capital**

The figure shows the percentage of firms that use the CAPM, multifactor models, the historical average return, and the dividend discount model. The dividend discount model was presented in Chapter 9.

*Source*: J. R. Graham and C. R. Harvey, "The Theory and Practice of Corporate Finance: Evidence from the Field," *Journal of Financial Economics* 60 (2001): 187–243.

In short, there is no clear answer to the question of which technique is used to measure risk in practice—it very much depends on the organization and the sector. It is not difficult to see why there is so little consensus in practice about which technique to use. *All the techniques we covered are imprecise.* Financial economics has not yet reached the point where we can provide a theory of expected returns that gives a precise estimate of the cost of capital. Consider, too, that all techniques are not equally simple to implement. Because the trade-off between simplicity and precision varies across sectors, practitioners apply the techniques that best suit their particular circumstances.

When making a capital budgeting decision, the cost of capital is just one of several imprecise estimates that go into the NPV calculation. Indeed, in many cases, the imprecision in the cost of capital estimate is less important than the imprecision in the estimate of future cash flows. Often the least complicated models to implement are used most often. In this regard, the CAPM has the dual virtues of being both simple to implement and reasonably reliable.

**CONCEPT CHECK**

1. Which is the most popular method used by corporations to calculate the cost of capital?

2. What other techniques do corporations use to calculate the cost of capital?

**MyFinanceLab**    Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 13.1 Competition and Capital Markets

■ The difference between a stock's expected return and its required return according to the security market line is the stock's alpha:

$$\alpha_s = E[R_s] - r_s \tag{13.2}$$

■ While the CAPM conclusion that the market is always efficient may not literally be true, competition among savvy investors who try to "beat the market" and earn a positive alpha should keep the market portfolio close to efficient much of the time.

### 13.2  Information and Rational Expectations

- If all investors have homogeneous expectations, which states that all investors have the same information, all investors would be aware that the stock had a positive alpha and none would be willing to sell. The only way to restore the equilibrium in this case is for the price to rise immediately so that the alpha is zero.
- An important conclusion of the CAPM is that investors should hold the market portfolio (combined with risk-free investments), and this investment advice *does not depend on the quality of an investor's information or trading skill*. By doing so they can avoid being taken advantage of by more sophisticated investors.
- The CAPM requires only that investors have rational expectations, which means that all investors correctly interpret and use their own information, as well as information that can be inferred from market prices or the trades of others.
- The market portfolio can be inefficient only if a significant number of investors either do not have rational expectations or care about aspects of their portfolios other than expected return and volatility.

### 13.3  The Behavior of Individual Investors

- There is evidence that individual investors fail to diversify their portfolios adequately (underdiversification bias) and favor investments in companies they are familiar with (familiarity bias).
- Investors appear to trade too much. This behavior stems, at least in part, from investor overconfidence: the tendency of uninformed individuals to overestimate the precision of their knowledge.

### 13.4  Systematic Trading Biases

- In order for the behavior of uninformed investors to have an impact on the market, there must be patterns to their behavior that lead them to depart from the CAPM in systematic ways, thus imparting systematic uncertainty into prices.
- Examples of behavior that could be systematic across investors include the disposition effect (the tendency to hang on to losers and sell winners), investor mood swings that result from common events like weather, and putting too much weight on their own experience. Investors could also herd—actively trying to follow each other's behavior.

### 13.5  The Efficiency of the Market Portfolio

- It is not easy to profit simply by trading on news, but professional investors might be able to do so by, for example, being better able to predict takeover outcomes. However, in equilibrium, individual investors should not expect to share any of the benefit of this skill by investing with such professional investors. The empirical evidence supports this—on average, investors earn zero alphas when they invest in managed mutual funds.
- Because beating the market requires enough trading skill to overcome transaction costs as well as behavioral biases, CAPM wisdom that investors should "hold the market" is probably the best advice for most people.

### 13.6  Style-Based Techniques and the Market Efficiency Debate

- The size effect refers to the observation that historically stocks with low market capitalizations have had positive alphas compared to the predictions of the CAPM. The size effect is evidence that the market portfolio is not efficient, which suggests that the CAPM does not accurately model expected returns. Researchers find similar results using the book-to-market ratio instead of firm size.
- A momentum trading strategy that goes long stocks with high past risk-adjusted returns and short stocks with low past returns also generates positive CAPM alphas, providing further evidence that the market portfolio is not efficient and that the CAPM does not accurately model expected returns.

- Securities may have non-zero alphas if the market portfolio that is used is not a good proxy for the true market portfolio.
- The market portfolio will be inefficient if some investors' portfolio holdings are subject to systematic behavioral biases.
- The market portfolio will be inefficient if either investors care about risk characteristics other than the volatility of their traded portfolio or if investors are exposed to other significant risks outside their portfolio that are not tradable, the most important of which is due to their human capital.

## 13.7 Multifactor Models of Risk

- When more than one portfolio is used to capture risk, the model is known as a multifactor model. This model is also sometimes called the Arbitrage Pricing Theory (APT). Using a collection of $N$ well-diversified portfolios, the expected return of stock $s$ is

$$E[R_s] = r_f + \beta_s^{F1}(E[R_{F1}] - r_f) + \beta_s^{F2}(E[R_{F2}] - r_f) + \cdots + \beta_s^{FN}(E[R_{FN}] - r_f)$$

$$= r_f + \sum_{n=1}^{N} \beta_s^{Fn}(E[R_{Fn}] - r_f) \tag{13.4}$$

- A simpler way to write multifactor models is to express risk premiums as the expected return on a self-financing portfolio. A self-financing portfolio is a portfolio that costs nothing to construct. By using the expected returns of self-financing portfolios, the expected return of a stock can be expressed as

$$E[R_s] = r_f + \beta_s^{F1}E[R_{F1}] + \beta_s^{F2}E[R_{F2}] + \cdots + \beta_s^{FN}E[R_{FN}]$$

$$= r_f + \sum_{n=1}^{N} \beta_s^{Fn}E[R_{Fn}] \tag{13.5}$$

- The portfolios that are most commonly used in a multifactor model are the market portfolio (Mkt), small-minus-big (SMB) portfolio, high-minus-low (HML) portfolio, and prior one-year momentum (PR1YR) portfolio. This model is known as the Fama-French-Carhart factor specification:

$$E[R_s] = r_f + \beta_s^{Mkt}(E[R_{Mkt}] - r_f) + \beta_s^{SMB}E[R_{SMB}]$$

$$+ \beta_s^{HML}E[R_{HML}] + \beta_s^{PR1YR}E[R_{PR1YR}] \tag{13.6}$$

## 13.8 Methods Used in Practice

- The CAPM is the most commonly used method in practice to estimate the cost of capital, likely because of its combined simplicity and relative reliability.

## Key Terms

Arbitrage Pricing Theory (APT) *p. 462*
book-to-market ratio *p. 456*
cumulative abnormal return *p. 448*
data snooping bias *p. 456*
disposition effect *p. 445*
factor betas *p. 461*
factor portfolios *p. 461*
Fama-French-Carhart (FFC) factor
    specification *p. 463*

familiarity bias *p. 442*
herd behavior *p. 447*
high-minus-low (HML) portfolio *p. 463*
informational cascade effect *p. 447*
momentum strategy *p. 458*
multifactor model *p. 461*
overconfidence bias *p. 443*
prior one-year momentum (PR1YR)
    portfolio *p. 463*

rational expectations *p. 441*

relative wealth concerns *p. 442*

self-financing portfolio *p. 462*

semi-strong form efficiency *p. 459*

sensation seeking *p. 444*

single-factor model *p. 461*

size effect *p. 454*

small-minus-big (SMB) portfolio *p. 463*

strong form efficiency *p. 459*

weak form efficiency *p. 459*

## Further Reading

For a simple insightful discussion of why some investors must lose if others win and what this means for mutual fund managers, see W. Sharpe, "The Arithmetic of Active Management," *Financial Analysts Journal*, 47(1) ( January–February, 1991): 7–9. The ideas on how information affects markets were developed in a series of influential articles: P. Milgrom and N. Stokey, "Information, Trade and Common Knowledge," *Journal of Economic Theory* 26(11) (1982): 17–27; S. Grossman and J. Stiglitz, "On the Impossibility of Informationally Efficient Markets," *The American Economic Review* 70(3) ( June 1980): 393–408; M. Hellwig, "On the Aggregation of Information in Competitive Markets," *Journal of Economic Theory* 22 (1980): 477–498; D. Diamond and R. Verrecchia, "Information Aggregation in a Noisy Rational Expectations Economy," *Journal of Financial Economics* 9 (September 1981): 221–235.

For an overview of the Barber and Odean results on individual investor behavior, see B. Barber and T. Odean, "The Courage of Misguided Convictions: The Trading Behavior of Individual Investors," *Financial Analyst Journal* (November/December 1999): 41–55. For a broad introduction to the topic of behavioral finance, see N. Barberis and R. Thaler, "A Survey of Behavioral Finance," in G. Constantinides, M. Harris, and R. Stulz (ed.), *Handbook of the Economics of Finance Vol. 1*, Elsevier, 2003. For a review of the impact of behavioral theories on corporate finance, see M. Baker, Malcolm, R. Ruback, and J. Wurgler, "Behavioral Corporate Finance: A Survey," in E. Eckbo (ed.), *The Handbook of Corporate Finance: Empirical Corporate Finance*, Elsevier/North Holland, 2007.

For a review of rational explanations for herd behavior in financial markets, see S. Sharma and S. Bikhchandani, "Herd Behavior in Financial Markets—A Review," IMF Working Papers 00/48, 2000. For its role in mispricing and crashes, see M. Brunnermeier, *Asset Pricing under Asymmetric Information: Bubbles, Crashes, Technical Analysis, and Herding*, Oxford University Press, 2001.

Readers interested in a more in-depth exposition of the performance of active managers can consult: J. B. Berk, "Five Myths of Active Portfolio Management," *Journal of Portfolio Management* 31(3): 27.

More detail on the theoretical relation between firm size and returns can be found in J. B. Berk, "Does Size Really Matter?" *Financial Analysts Journal* (September/October 1997): 12–18.

A summary of the empirical evidence on the relationship between risk-adjusted return and market value can be found in the following article: E. Fama and K. French, "The Cross-Section of Expected Stock Returns," *Journal of Finance* 47 (June 1992): 427–465.

The evidence that momentum strategies produce positive risk-adjusted returns was first published in the following article: N. Jegadeesh and S. Titman, "Returns to Buying Winners and Selling Losers: Implications for Stock Market Efficiency," *Journal of Finance* 48 (March 1993): 65–91.

The following two articles provide details on the FFC factor specification: E. Fama and K. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics* 33 (1993): 3–56; and M. Carhart, "On Persistence in Mutual Fund Performance," *Journal of Finance* 52 (March 1997): 57–82.

Finally, because the value of a firm also includes the value of future growth options, Z. Da, R. Guo, and R. Jagannathan, "CAPM for Estimating the Cost of Equity Capital: Interpreting the Empirical Evidence," *Journal of Financial Economics* 103 (2012): 204–220 argue that when it comes to evaluating projects (rather than securities), the CAPM may be *more* reliable than multifactor models.

# Problems

*All problems are available in* MyFinanceLab *. An asterisk (\*) indicates problems with a higher level of difficulty.*

## Competition and Capital Markets

**1.** Assume that all investors have the same information and care only about expected return and volatility. If new information arrives about one stock, can this information affect the price and return of other stocks? If so, explain why?

 **2.** Assume that the CAPM is a good description of stock price returns. The market expected return is 7% with 10% volatility and the risk-free rate is 3%. New news arrives that does not change any of these numbers but it does change the expected return of the following stocks:

|                    | Expected Return | Volatility | Beta |
| ------------------ | --------------- | ---------- | ---- |
| Green Leaf         | 12%             | 20%        | 1.5  |
| NatSam             | 10%             | 40%        | 1.8  |
| HanBel             | 9%              | 30%        | 0.75 |
| Rebecca Automobile | 6%              | 35%        | 1.2  |

  a. At current market prices, which stocks represent buying opportunities?
  b. On which stocks should you put a sell order in?

**3.** Suppose the CAPM equilibrium holds perfectly. Then the risk-free interest rate increases, *and nothing else changes*.
  a. Is the market portfolio still efficient?
  b. If your answer to part a is yes, explain why. If not, describe which stocks would be buying opportunities and which stocks would be selling opportunities.

## Information and Rational Expectations

**4.** You know that there are informed traders in the stock market, but you are uninformed. Describe an investment strategy that guarantees you will not lose money to the informed traders and explain why it works.

**5.** What are the only conditions under which the market portfolio might not be an efficient portfolio?

**6.** Explain what the following sentence means: The market portfolio is a fence that protects the sheep from the wolves, but nothing can protect the sheep from themselves.

**7.** You are trading in a market in which you know there are a few highly skilled traders who are better informed than you are. There are no transaction costs. Each day you randomly choose five stocks to buy and five stocks to sell (by, perhaps, throwing darts at a dartboard).
  a. Over the long run will your strategy outperform, underperform, or have the same return as a buy and hold strategy of investing in the market portfolio?
  b. Would your answer to part a change if all traders in the market were equally well informed and were equally skilled?

## The Behavior of Individual Investors

**8.** Why does the CAPM imply that investors should trade very rarely?

**9.** Your brother Joe is a surgeon who suffers badly from the overconfidence bias. He loves to trade stocks and believes his predictions with 100% confidence. In fact, he is uninformed like most investors. Rumors are that Vital Signs (a startup that makes warning labels in the medical industry) will receive a takeover offer at $20 per share. Absent the takeover offer, the stock will trade at $15 per share. The uncertainty will be resolved in the next few hours. Your brother believes that the takeover

will occur with certainty and has instructed his broker to buy the stock at any price less than $20. In fact, the true probability of a takeover is 50%, but a few people are informed and know whether the takeover will actually occur. They also have submitted orders. Nobody else is trading in the stock.

   a. Describe what will happen to the market price once these orders are submitted if in fact the takeover will occur in a few hours. What will your brother's profits be: positive, negative, or zero?
   b. What range of possible prices could result once these orders are submitted if the takeover does not occur? What will your brother's profits be: positive, negative, or zero?
   c. What are your brother's expected profits?

10. To put the turnover of Figure 13.3 into perspective, let's do a back of the envelope calculation of what an investor's average turnover per stock would be were he to follow a policy of investing in the S&P 500 portfolio. Because the portfolio is value weighted, the trading would be required when Standard and Poor's changes the constituent stocks. (Let's ignore additional, but less important reasons like new share issuances and repurchases.) Assuming they change 23 stocks a year (the historical average since 1962) what would you estimate the investor's per stock share turnover to be? Assume that the average total number of shares outstanding for the stocks that are added or deleted from the index is the same as the average number of shares outstanding for S&P 500 stocks.

## Systematic Trading Biases

11. How does the disposition effect impact investors' tax obligations?

12. Consider the price paths of the following two stocks over six time periods:

|         | 1  | 2  | 3  | 4  | 5  | 6  |
|---------|----|----|----|----|----|----|
| Stock 1 | 10 | 12 | 14 | 12 | 13 | 16 |
| Stock 2 | 15 | 11 | 8  | 16 | 15 | 18 |

Neither stock pays dividends. Assume you are an investor with the disposition effect and you bought at time 1 and right now it is time 3. Assume throughout this question that you do no trading (other than what is specified) in these stocks.

   a. Which stock(s) would you be inclined to sell? Which would you be inclined to hold on to?
   b. How would your answer change if right now is time 6?
   c. What if you bought at time 3 instead of 1 and today is time 6?
   d. What if you bought at time 3 instead of 1 and today is time 5?

13. Suppose that all investors have the disposition effect. A new stock has just been issued at a price of $50, so all investors in this stock purchased the stock today. A year from now the stock will be taken over, for a price of $60 or $40 depending on the news that comes out over the year. The stock will pay no dividends. Investors will sell the stock whenever the price goes up by more than 10%.

   a. Suppose good news comes out in 6 months (implying the takeover offer will be $60). What equilibrium price will the stock trade for after the news comes out, that is, the price that equates supply and demand?
   b. Assume that you are the only investor who does not suffer from the disposition effect and your trades are small enough to not affect prices. Without knowing what will actually transpire, what trading strategy would you instruct your broker to follow?

## The Efficiency of the Market Portfolio

14. Davita Spencer is a manager at Half Dome Asset Management. She can generate an alpha of 2% a year up to $100 million. After that her skills are spread too thin, so cannot add value and her alpha is zero. Half Dome charges a fee of 1% per year on the total amount of money under management (at the beginning of each year). Assume that there are always investors looking for positive alpha and no investor would invest in a fund with a negative alpha. In equilibrium, that is, when no investor either takes out money or wishes to invest new money,

    a. What alpha do investors in Davita's fund expect to receive?
    b. How much money will Davita have under management?
    c. How much money will Half Dome generate in fee income?

15. Assume the economy consisted of three types of people. 50% are fad followers, 45% are passive investors (they have read this book and so hold the market portfolio), and 5% are informed traders. The portfolio consisting of all the informed traders has a beta of 1.5 and an expected return of 15%. The market expected return is 11%. The risk-free rate is 5%.
    a. What alpha do the informed traders make?
    b. What is the alpha of the passive investors?
    c. What is the expected return of the fad followers?
    d. What alpha do the fad followers make?

### Style-Based Techniques and the Market Efficiency Debate

16. Explain what the size effect is.

*17. Assume all firms have the same expected dividends. If they have different expected returns, how will their market values and expected returns be related? What about the relation between their dividend yields and expected returns?

18. Each of the six firms in the table below is expected to pay the listed dividend payment every year in perpetuity.

| Firm | Dividend ($ million) | Cost of Capital (%/Year) |
|------|----------------------|--------------------------|
| S1 | 10 | 8 |
| S2 | 10 | 12 |
| S3 | 10 | 14 |
| B1 | 100 | 8 |
| B2 | 100 | 12 |
| B3 | 100 | 14 |

    a. Using the cost of capital in the table, calculate the market value of each firm.
    b. Rank the three S firms by their market values and look at how their cost of capital is ordered. What would be the expected return for a self-financing portfolio that went long on the firm with the largest market value and shorted the firm with the lowest market value? (The expected return of a self-financing portfolio is the weighted average return of the constituent securities.) Repeat using the B firms.
    c. Rank all six firms by their market values. How does this ranking order the cost of capital? What would be the expected return for a self-financing portfolio that went long on the firm with the largest market value and shorted the firm with the lowest market value?
    d. Repeat part c but rank the firms by the dividend yield instead of the market value. What can you conclude about the dividend yield ranking compared to the market value ranking?

19. Consider the following stocks, all of which will pay a liquidating dividend in a year and nothing in the interim:

| | Market Capitalization ($ million) | Expected Liquidating Dividend ($ million) | Beta |
|---|---|---|---|
| Stock A | 800 | 1000 | 0.77 |
| Stock B | 750 | 1000 | 1.46 |
| Stock C | 950 | 1000 | 1.25 |
| Stock D | 900 | 1000 | 1.07 |

a. Calculate the expected return of each stock.

b. What is the sign of correlation between the expected return and market capitalization of the stocks?

 **20.** In Problem 19, assume the risk-free rate is 3% and the market risk premium is 7%.

a. What does the CAPM predict the expected return for each stock should be?

b. Clearly, the CAPM predictions are not equal to the actual expected returns, so the CAPM does not hold. You decide to investigate this further. To see what kind of mistakes the CAPM is making, you decide to regress the actual expected return onto the expected return predicted by the CAPM.[47] What is the intercept and slope coefficient of this regression?

c. What are the residuals of the regression in (b)? That is, for each stock compute the difference between the actual expected return and the best fitting line given by the intercept and slope coefficient in (b).

d. What is the sign of the correlation between the residuals you calculated in (b) and market capitalization?

e. What can you conclude from your answers to part b of the previous problem and part d of this problem about the relation between firm size (market capitalization) and returns? (The results do not depend on the particular numbers in this problem. You are welcome to verify this for yourself by redoing the problems with another value for the market risk premium, and by picking the stock betas and market capitalizations randomly.[48])

**21.** Explain how to construct a positive-alpha trading strategy if stocks that have had relatively high returns in the past tend to have positive alphas and stocks that have had relatively low returns in the past tend to have negative alphas.

**\*22.** If you can use past returns to construct a trading strategy that makes money (has a positive alpha), it is evidence that market portfolio is not efficient. Explain why.

**23.** Explain why you might expect stocks to have nonzero alphas if the market proxy portfolio is not highly correlated with the true market portfolio, even if the true market portfolio is efficient.

**24.** Explain why if some investors are subject to systematic behavioral biases, while others pick efficient portfolios, the market portfolio will not be efficient.

**25.** Explain why an employee who cares only about expected return and volatility will likely underweight the amount of money he invests in his own company's stock relative to an investor who does not work for his company.

### Multifactor Models of Risk

*For Problems 26–28, refer to the following table of estimated factor betas based on data from 2003–2011.*

| Factor | MSFT | XOM | GE |
|--------|------|-----|-----|
| MKT | 0.965 | 0.808 | 1.183 |
| SMB | −0.295 | −0.812 | −0.475 |
| HML | −0.099 | 0.196 | 0.965 |
| PR1YR | 0.089 | 0.376 | −0.200 |

[47]The Excel function SLOPE will produce the desired answers.
[48]The Excel command RAND will produce a random number between 0 and 1.

474          **Chapter 13** Investor Behavior and Capital Market Efficiency

**26.** Using the factor beta estimates in the table shown here and the monthly expected return estimates in Table 13.1, calculate the risk premium of General Electric stock (ticker: GE) using the FFC factor specification. (Annualize your result by multiplying by 12.) GE's CAPM beta over the same time period was 1.33. How does the risk premium you would estimate from the CAPM compare?

**27.** You are currently considering an investment in a project in the energy sector. The investment has the same riskiness as Exxon Mobil stock (ticker: XOM). Using the data in Table 13.1 and the table above, calculate the cost of capital using the FFC factor specification if the current risk-free rate is 3% per year.

**28.** You work for Microsoft Corporation (ticker: MSFT), and you are considering whether to develop a new software product. The risk of the investment is the same as the risk of the company.
   a. Using the data in Table 13.1 and in the table above, calculate the cost of capital using the FFC factor specification if the current risk-free rate is 3% per year.
   b. Microsoft's CAPM beta over the same time period was 0.84. What cost of capital would you estimate using the CAPM?

<table>
<tr><td>CHAPTER 13<br>APPENDIX</td></tr>
</table>

# Building a Multifactor Model

In this appendix, we show that if an efficient portfolio can be constructed out of a collection of well-diversified portfolios, the collection of portfolios will correctly price assets. To keep things simple, assume that we have identified two portfolios that we can combine to form an efficient portfolio; we call these portfolios factor portfolios and denote their returns by $R_{F1}$ and $R_{F2}$. The efficient portfolio consists of some (unknown) combination of these two factor portfolios, represented by portfolio weights $x_1$ and $x_2$:

$$R_{eff} = x_1 R_{F1} + x_2 R_{F2} \tag{13A.1}$$

To see that we can use these factor portfolios to measure risk, consider regressing the excess returns of some stock $s$ on the excess returns of *both* factors:

$$R_s - r_f = \alpha_s + \beta_s^{F1}(R_{F1} - r_f) + \beta_s^{F2}(R_{F2} - r_f) + \varepsilon_s \tag{13A.2}$$

This statistical technique is known as a multiple regression—it is exactly the same as the linear regression technique we described in Chapter 12, except now we have two regressors, $R_{F1} - r_f$ and $R_{F2} - r_f$, whereas in Chapter 12 we only had one regressor, the excess return of the market portfolio. Otherwise the interpretation is the same. We write the excess return of stock $s$ as the sum of a constant, $\alpha_s$, plus the variation in the stock that is related to each factor, and an error term $\varepsilon_s$ that has an expectation of zero and is uncorrelated with either factor. The error term represents the risk of the stock that is unrelated to either factor.

If we can use the two factor portfolios to construct the efficient portfolio, as in Eq. 13A.1, then the constant term $\alpha_s$ in Eq. 13A.2 is zero (up to estimation error). To see why, consider a portfolio in which we buy stock $s$, then sell a fraction $\beta_s^{F1}$ of the first factor portfolio and $\beta_s^{F2}$ of the second factor portfolio, and invest the proceeds from these sales in the risk-free investment. This portfolio, which we call $P$, has return

$$\begin{aligned}R_P &= R_s - \beta_s^{F1}R_{F1} - \beta_s^{F2}R_{F2} + (\beta_s^{F1} + \beta_s^{F2})r_f \\ &= R_s - \beta_s^{F1}(R_{F1} - r_f) - \beta_s^{F2}(R_{F2} - r_f)\end{aligned} \tag{13A.3}$$

Using Eq. 13A.2 to replace $R_s$ and simplifying, the return of this portfolio is

$$R_P = r_f + \alpha_s + \varepsilon_s \tag{13A.4}$$

That is, portfolio $P$ has a risk premium of $\alpha_s$ and risk given by $\varepsilon_s$. Now, because $\varepsilon_s$ is uncorrelated with each factor, it must be uncorrelated with the efficient portfolio; that is,

$$\begin{aligned}Cov(R_{eff}, \varepsilon_s) &= Cov(x_1 R_{F1} + x_2 R_{F2}, \varepsilon_s) \\ &= x_1 Cov(R_{F1}, \varepsilon_s) + x_2 Cov(R_{F2}, \varepsilon_s) = 0\end{aligned} \tag{13A.5}$$

But recall from Chapter 11 that *risk that is uncorrelated with the efficient portfolio is firm-specific risk that does not command a risk premium.* Therefore, the expected return of portfolio $P$ is $r_f$, which means $\alpha_s$ must be zero.[49]

Setting $\alpha_s$ equal to zero and taking expectations of both sides of Eq. 13A.2, we get the following two-factor model of expected returns:

$$E[R_s] = r_f + \beta_s^{F1}(E[R_{F1}] - r_f) + \beta_s^{F2}(E[R_{F2}] - r_f) \tag{13A.6}$$

---

[49]That is, Eq. 13A.5 implies $\beta_P^{eff} = \dfrac{Cov(R_{eff}, \varepsilon_s)}{Var(R_{eff})} = 0$. Substituting this result into Eq. 13.3 gives $E[R_p] = r_f$.

But from Eq. 13A.4, $E[R_p] = r_f + \alpha_s$, and hence $\alpha_s = 0$.

*This page intentionally left blank*

**PART**

**5**

# Capital Structure

**THE LAW OF ONE PRICE CONNECTION.** One of the fundamental questions in corporate finance is how a firm should choose the set of securities it will issue to raise capital from investors. This decision determines the firm's capital structure, which is the total amount of debt, equity, and other securities that a firm has outstanding. Does the choice of capital structure affect the value of the firm? In Chapter 14, we consider this question in a perfect capital market. There we apply the Law of One Price to show that as long as the cash flows generated by the firm's assets are unchanged, then the value of the firm—which is the total value of its outstanding securities—does not depend on its capital structure. Therefore, if capital structure has a role in determining the firm's value, it must come from changes to the firm's cash flows that result from market imperfections. We explore important market imperfections in subsequent chapters. In Chapter 15, we analyze the role of debt in reducing the taxes a firm or its investors will pay, while in Chapter 16, we consider the costs of financial distress and changes to managerial incentives that result from leverage. Finally, in Chapter 17, we consider the firm's choice of payout policy and ask: Which is the best method for the firm to return capital to its investors? The Law of One Price implies that the firm's choice to pay dividends or repurchase its stock will not affect its value in a perfect capital market. We then examine how market imperfections affect this important insight and shape the firm's optimal payout policy.

CHAPTER 14
Capital Structure
in a Perfect Market

CHAPTER 15
Debt and Taxes

CHAPTER 16
Financial Distress,
Managerial
Incentives, and
Information

CHAPTER 17
Payout Policy

477

CHAPTER

# 14

# Capital Structure in a Perfect Market

## NOTATION

$PV$ present value

$NPV$ net present value

$E$ market value of levered equity

$D$ market value of debt

$U$ market value of unlevered equity

$A$ market value of firm assets

$R_D$ return on debt

$R_E$ return on levered equity

$R_U$ return on unlevered equity

$r_D$ expected return (cost of capital) of debt

$r_E$ expected return (cost of capital) of levered equity

$r_U$ expected return (cost of capital) of unlevered equity

$r_A$ expected return (cost of capital) of firm assets

$r_{wacc}$ weighted average cost of capital

$r_f$ risk-free rate of interest

$\beta_E$ beta of levered equity

$\beta_U$ beta of unlevered equity

$\beta_D$ beta of debt

$EPS$ earnings per share

**WHEN A FIRM NEEDS TO RAISE NEW FUNDS TO UNDERTAKE** its investments, it must decide which type of security it will sell to investors. Even absent a need for new funds, firms can issue new securities and use the funds to repay debt or repurchase shares. What considerations should guide these decisions?

Consider the case of Dan Harris, Chief Financial Officer of Electronic Business Services (EBS), who has been reviewing plans for a major expansion of the firm. To pursue the expansion, EBS plans to raise $50 million from outside investors. One possibility is to raise the funds by selling shares of EBS stock. Due to the firm's risk, Dan estimates that equity investors will require a 10% risk premium over the 5% risk-free interest rate. That is, the company's equity cost of capital is 15%.

Some senior executives at EBS, however, have argued that the firm should consider borrowing the $50 million instead. EBS has not borrowed previously and, given its strong balance sheet, it should be able to borrow at a 6% interest rate. Does the low interest rate of debt make borrowing a better choice of financing for EBS? If EBS does borrow, will this choice affect the NPV of the expansion, and therefore change the value of the firm and its share price?

We explore these questions in this chapter in a setting of *perfect capital markets*, in which all securities are fairly priced, there are no taxes or transaction costs, and the total cash flows of the firm's projects are not affected by how the firm finances them. Although in reality capital markets are not perfect, this setting provides an important benchmark. Perhaps surprisingly, with perfect capital markets, the Law of One Price implies that the choice of debt or equity financing will *not* affect the total value of a firm, its share price, or its cost of capital. Thus, in a perfect world, EBS will be indifferent regarding the choice of financing for its expansion.

478

## 14.1  Equity Versus Debt Financing

The relative proportions of debt, equity, and other securities that a firm has outstanding constitute its **capital structure**. When corporations raise funds from outside investors, they must choose which type of security to issue. The most common choices are financing through equity alone and financing through a combination of debt and equity. We begin our discussion by considering both of these options.

### Financing a Firm with Equity

Consider an entrepreneur with the following investment opportunity. For an initial investment of $800 this year, a project will generate cash flows of either $1400 or $900 next year. The cash flows depend on whether the economy is strong or weak, respectively. Both scenarios are equally likely, and are shown in Table 14.1.

| TABLE 14.1 | The Project Cash Flows | |
|---|---|---|
| **Date 0** | **Date 1** | |
| | **Strong Economy** | **Weak Economy** |
| −$800 | $1400 | $900 |

Because the project cash flows depend on the overall economy, they contain market risk. As a result, investors demand a risk premium. The current risk-free interest rate is 5%, and suppose that given the market risk of the investment the appropriate risk premium is 10%.

What is the NPV of this investment opportunity? Given a risk-free interest rate of 5% and a risk premium of 10%, the cost of capital for this project is 15%. Because the expected cash flow in one year is $\frac{1}{2}(\$1400) + \frac{1}{2}(\$900) = \$1150$, we get

$$NPV = -\$800 + \frac{\$1150}{1.15} = -\$800 + \$1000$$
$$= \$200$$

Thus, the investment has a positive NPV.

If this project is financed using equity alone, how much would investors be willing to pay for the firm's shares? Recall from Chapter 3 that, in the absence of arbitrage, the price of a security equals the present value of its cash flows. Because the firm has no other liabilities, equity holders will receive all of the cash flows generated by the project on date 1. Hence, the market value of the firm's equity today will be

$$PV(\text{equity cash flows}) = \frac{\$1150}{1.15} = \$1000$$

So, the entrepreneur can raise $1000 by selling the equity in the firm. After paying the investment cost of $800, the entrepreneur can keep the remaining $200—the project's NPV—as a profit. In other words, the project's NPV represents the value to the initial owners of the firm (in this case, the entrepreneur) created by the project.

| TABLE 14.2 | | **Cash Flows and Returns for Unlevered Equity** | | | |
|---|---|---|---|---|---|
| | Date 0 | Date 1: Cash Flows | | Date 1: Returns | |
| | Initial Value | Strong Economy | Weak Economy | Strong Economy | Weak Economy |
| Unlevered equity | $1000 | $1400 | $900 | 40% | −10% |

Equity in a firm with no debt is called **unlevered equity**. Because there is no debt, the date 1 cash flows of the unlevered equity are equal to those of the project. Given equity's initial value of $1000, shareholders' returns are either 40% or −10%, as shown in Table 14.2.

The strong and weak economy outcomes are equally likely, so the expected return on the unlevered equity is $\frac{1}{2}(40\%) + \frac{1}{2}(-10\%) = 15\%$. Because the risk of unlevered equity equals the risk of the project, shareholders are earning an appropriate return for the risk they are taking.

## Financing a Firm with Debt and Equity

Financing the firm exclusively with equity is not the entrepreneur's only option. She can also raise part of the initial capital using debt. Suppose she decides to borrow $500 initially, in addition to selling equity. Because the project's cash flow will always be enough to repay the debt, the debt is risk free. Thus, the firm can borrow at the risk-free interest rate of 5%, and it will owe the debt holders $500 \times 1.05 = \$525$ in one year.

Equity in a firm that also has debt outstanding is called **levered equity**. Promised payments to debt holders must be made *before* any payments to equity holders are distributed. Given the firm's $525 debt obligation, the shareholders will receive only $1400 − $525 = $875 if the economy is strong and $900 − $525 = $375 if the economy is weak. Table 14.3 shows the cash flows of the debt, the levered equity, and the total cash flows of the firm.

What price $E$ should the levered equity sell for, and which is the best capital structure choice for the entrepreneur? In an important paper, researchers Franco Modigliani and Merton Miller proposed an answer to this question that surprised researchers and practitioners at the time.[1] They argued that with perfect capital markets, the total value of a firm should not depend on its capital structure. Their reasoning: The firm's total cash flows

| TABLE 14.3 | **Values and Cash Flows for Debt and Equity of the Levered Firm** | | |
|---|---|---|---|
| | Date 0 | Date 1: Cash Flows | |
| | Initial Value | Strong Economy | Weak Economy |
| Debt | $500 | $525 | $525 |
| Levered equity | $E = ?$ | $875 | $375 |
| Firm | $1000 | $1400 | $900 |

[1]F. Modigliani and M. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *American Economic Review* 48(3) (1958): 261–297.

still equal the cash flows of the project, and therefore have the same present value of $1000 calculated earlier (see the last line in Table 14.3). Because the cash flows of the debt and equity sum to the cash flows of the project, by the Law of One Price the combined values of debt and equity must be $1000. Therefore, if the value of the debt is $500, the value of the levered equity must be $E = \$1000 - \$500 = \$500$.

Because the cash flows of levered equity are smaller than those of unlevered equity, levered equity will sell for a lower price ($500 versus $1000). However, the fact that the equity is less valuable with leverage does not mean that the entrepreneur is worse off. She will still raise a total of $1000 by issuing both debt and levered equity, just as she did with unlevered equity alone. As a consequence, she will be indifferent between these two choices for the firm's capital structure.

### The Effect of Leverage on Risk and Return

Modigliani and Miller's conclusion went against the common view, which stated that even with perfect capital markets, leverage would affect a firm's value. In particular, it was thought that the value of the levered equity would exceed $500, because the present value of its expected cash flow at 15% is

$$\frac{\frac{1}{2}(\$875) + \frac{1}{2}(\$375)}{1.15} = \$543$$

The reason this logic is *not* correct is that leverage increases the risk of the equity of a firm. Therefore, it is inappropriate to discount the cash flows of levered equity at the same discount rate of 15% that we used for unlevered equity. Investors in levered equity require a higher expected return to compensate for its increased risk.

Table 14.4 compares the equity returns if the entrepreneur chooses unlevered equity financing with the case in which she borrows $500 and raises an additional $500 using levered equity. Note that the returns to equity holders are very different with and without leverage. Unlevered equity has a return of either 40% or $-10\%$, for an expected return of 15%. But levered equity has higher risk, with a return of either 75% or $-25\%$. To compensate for this risk, levered equity holders receive a higher expected return of 25%.

We can evaluate the relationship between risk and return more formally by computing the sensitivity of each security's return to the systematic risk of the economy. (In our simple two-state example, this sensitivity determines the security's beta; see also the discussion of

| TABLE 14.4 | **Returns to Equity with and without Leverage** | | | | | |
|---|---|---|---|---|---|---|
| | Date 0 | Date 1: Cash Flows | | Date 1: Returns | | |
| | Initial Value | Strong Economy | Weak Economy | Strong Economy | Weak Economy | Expected Return |
| Debt | $500 | $525 | $525 | 5% | 5% | 5% |
| Levered equity | $500 | $875 | $375 | 75% | −25% | 25% |
| Unlevered equity | $1000 | $1400 | $900 | 40% | −10% | 15% |

| TABLE 14.5 | **Systematic Risk and Risk Premiums for Debt, Unlevered Equity, and Levered Equity** | |
|---|---|---|
| | **Return Sensitivity (Systematic Risk)** | **Risk Premium** |
| | $\Delta R = R(\text{strong}) - R(\text{weak})$ | $E[R] - r_f$ |
| Debt | $5\% - 5\% = \quad 0\%$ | $5\% - 5\% = \quad 0\%$ |
| Unlevered equity | $40\% - (-10\%) = \quad 50\%$ | $15\% - 5\% = 10\%$ |
| Levered equity | $75\% - (-25\%) = 100\%$ | $25\% - 5\% = 20\%$ |

risk in the appendix to Chapter 3.) Table 14.5 shows the return sensitivity and the risk premium for each security. Because the debt's return bears no systematic risk, its risk premium is zero. In this particular case, however, levered equity has twice the systematic risk of unlevered equity. As a result, levered equity holders receive twice the risk premium.

To summarize, in the case of perfect capital markets, if the firm is 100% equity financed, the equity holders will require a 15% expected return. If the firm is financed 50% with debt and 50% with equity, the debt holders will receive a lower return of 5%, while the levered equity holders will require a higher expected return of 25% because of their increased risk. As this example shows, *leverage increases the risk of equity even when there is no risk that the firm will default.* Thus, while debt may be cheaper when considered on its own, it raises the cost of capital for equity. Considering both sources of capital together, the firm's average cost of capital with leverage is $\frac{1}{2}(5\%) + \frac{1}{2}(25\%) = 15\%$, the same as for the unlevered firm.

---

**EXAMPLE 14.1**    **Leverage and the Equity Cost of Capital**

**Problem**

Suppose the entrepreneur borrows only $200 when financing the project. According to Modigliani and Miller, what should the value of the equity be? What is the expected return?

**Solution**

Because the value of the firm's total cash flows is still $1000, if the firm borrows $200, its equity will be worth $800. The firm will owe $200 × 1.05 = $210 in one year. Thus, if the economy is strong, equity holders will receive $1400 − $210 = $1190, for a return of $1190/$800 − 1 = 48.75%. If the economy is weak, equity holders will receive $900 − $210 = $690, for a return of $690/$800 − 1 = −13.75%. The equity has an expected return of

$$\tfrac{1}{2}(48.75\%) + \tfrac{1}{2}(-13.75\%) = 17.5\%.$$

Note that the equity has a return sensitivity of 48.75% − (−13.75%) = 62.5%, which is 62.5%/50% = 125% of the sensitivity of unlevered equity. Its risk premium is 17.5% − 5% = 12.5%, which is also 125% of the risk premium of the unlevered equity, so it is appropriate compensation for the risk.

---

**CONCEPT CHECK**    1. Why are the value and cash flows of levered equity less than if the firm had issued unlevered equity?

2. How does the risk and cost of capital of levered equity compare to that of unlevered equity? Which is the superior capital structure choice in a perfect capital market?

## 14.2 Modigliani-Miller I: Leverage, Arbitrage, and Firm Value

In the previous section, we used the Law of One Price to argue that leverage would not affect the total value of the firm (the amount of money the entrepreneur can raise). Instead, it merely changes the allocation of cash flows between debt and equity, without altering the total cash flows of the firm. Modigliani and Miller (or simply MM) showed that this result holds more generally under a set of conditions referred to as **perfect capital markets:**

1. Investors and firms can trade the same set of securities at competitive market prices equal to the present value of their future cash flows.
2. There are no taxes, transaction costs, or issuance costs associated with security trading.
3. A firm's financing decisions do not change the cash flows generated by its investments, nor do they reveal new information about them.

Under these conditions, MM demonstrated the following result regarding the role of capital structure in determining firm value:[2]

**MM Proposition I:** *In a perfect capital market, the total value of a firm is equal to the market value of the total cash flows generated by its assets and is not affected by its choice of capital structure.*

### MM and the Law of One Price

MM established their result with the following simple argument. In the absence of taxes or other transaction costs, the total cash flow paid out to all of a firm's security holders is equal to the total cash flow generated by the firm's assets. Therefore, by the Law of One Price, the firm's securities and its assets must have the same total market value. Thus, as long as the firm's choice of securities does not change the cash flows generated by its assets, this decision will not change the total value of the firm or the amount of capital it can raise.

We can also view MM's result in terms of the Separation Principle introduced in Chapter 3: If securities are fairly priced, then buying or selling securities has an NPV of zero and, therefore, should not change the value of a firm. The future repayments that the firm must make on its debt are equal in value to the amount of the loan it receives upfront. Thus, there is no net gain or loss from using leverage, and the value of the firm is determined by the present value of the cash flows from its current and future investments.

### Homemade Leverage

MM showed that the firm's value is not affected by its choice of capital structure. But suppose investors would prefer an alternative capital structure to the one the firm has chosen. MM demonstrated that in this case, investors can borrow or lend on their own and achieve the same result. For example, an investor who would like more leverage than the firm has chosen can borrow and add leverage to his or her own portfolio. When investors use

---

[2]Although it was not widely appreciated at the time, the idea that a firm's value does not depend on its capital structure was argued even earlier by John Burr Williams in his pathbreaking book, *The Theory of Investment Value* (North Holland Publishing, 1938; reprinted by Fraser Publishing, 1997).

### MM and the Real World

Students often question why Modigliani and Miller's results are important if, after all, capital markets are not perfect in the real world. While it is true that capital markets are not perfect, all scientific theories begin with a set of idealized assumptions from which conclusions can be drawn. When we apply the theory, we must then evaluate how closely the assumptions hold, and consider the consequences of any important deviations.

As a useful analogy, consider Galileo's law of falling bodies. Galileo overturned the conventional wisdom by showing that, without friction, free-falling bodies will fall at the same rate independent of their mass. If you test this law, you will likely find it does not hold exactly. The reason, of course, is that unless we are in a vacuum, air friction tends to slow some objects more than others.

MM's results are similar. In practice, we will find that capital structure can have an effect on firm value. But just as Galileo's law of falling bodies reveals that we must look to air friction, rather than any underlying property of gravity, to explain differences in the speeds of falling objects, MM's proposition reveals that any effects of capital structure must similarly be due to frictions that exist in capital markets. After exploring the full meaning of MM's results in this chapter, we look at the important sources of these frictions, and their consequences, in subsequent chapters.

leverage in their own portfolios to adjust the leverage choice made by the firm, we say that they are using **homemade leverage**. As long as investors can borrow or lend at the same interest rate as the firm,[3] homemade leverage is a perfect substitute for the use of leverage by the firm.

To illustrate, suppose the entrepreneur uses no leverage and creates an all-equity firm. An investor who would prefer to hold levered equity can do so by using leverage in his own portfolio—that is, he can buy the stock on margin, as illustrated in Table 14.6.

| TABLE 14.6 | Replicating Levered Equity Using Homemade Leverage | | |
|---|---|---|---|
| | **Date 0** | **Date 1: Cash Flows** | |
| | **Initial Cost** | **Strong Economy** | **Weak Economy** |
| Unlevered equity | $1000 | $1400 | $900 |
| Margin loan | −$500 | −$525 | −$525 |
| Levered equity | $500 | $875 | $375 |

If the cash flows of the unlevered equity serve as collateral for the margin loan, then the loan is risk-free and the investor should be able to borrow at the 5% rate. Although the firm is unlevered, by using homemade leverage, the investor has replicated the payoffs to the levered equity illustrated in Table 14.3, for a cost of $500. Again, by the Law of One Price, the value of levered equity must also be $500.

Now suppose the entrepreneur uses debt, but the investor would prefer to hold unlevered equity. The investor can replicate the payoffs of unlevered equity by buying both the debt *and* the equity of the firm. Combining the cash flows of the two securities produces cash flows identical to unlevered equity, for a total cost of $1000, as we see in Table 14.7.

In each case, the entrepreneur's choice of capital structure does not affect the opportunities available to investors. Investors can alter the leverage choice of the firm to suit their

---

[3]This assumption is implied by perfect capital markets because the interest rate on a loan should depend only on its risk.

| TABLE 14.7 | Replicating Unlevered Equity by Holding Debt and Equity | | |
|---|---|---|---|
| | Date 0 | Date 1: Cash Flows | |
| | Initial Cost | Strong Economy | Weak Economy |
| Debt | $500 | $525 | $525 |
| Levered equity | $500 | $875 | $375 |
| Unlevered Equity | $1000 | $1400 | $900 |

personal tastes either by borrowing and adding more leverage or by holding bonds and reducing leverage. With perfect capital markets, because different choices of capital structure offer no benefit to investors, they do not affect the value of the firm.

---

**EXAMPLE 14.2**

### Homemade Leverage and Arbitrage

**Problem**

Suppose there are two firms, each with date 1 cash flows of $1400 or $900 (as shown in Table 14.1). The firms are identical except for their capital structure. One firm is unlevered, and its equity has a market value of $990. The other firm has borrowed $500, and its equity has a market value of $510. Does MM Proposition I hold? What arbitrage opportunity is available using homemade leverage?

**Solution**

MM Proposition I states that the total value of each firm should equal the value of its assets. Because these firms hold identical assets, their total values should be the same. However, the problem assumes the unlevered firm has a total market value of $990, whereas the levered firm has a total market value of $510 (equity) + $500 (debt) = $1010. Therefore, these prices violate MM Proposition I.

Because these two identical firms are trading for different total prices, the Law of One Price is violated and an arbitrage opportunity exists. To exploit it, we can borrow $500 and buy the equity of the unlevered firm for $990, re-creating the equity of the levered firm by using homemade leverage for a cost of only $990 − 500 = $490. We can then sell the equity of the levered firm for $510 and enjoy an arbitrage profit of $20.

| | Date 0 | Date 1: Cash Flows | |
|---|---|---|---|
| | Cash Flow | Strong Economy | Weak Economy |
| Borrow | $500 | −$525 | −$525 |
| Buy unlevered equity | −$990 | $1400 | $900 |
| Sell levered equity | $510 | −$875 | −$375 |
| Total cash flow | $20 | $0 | $0 |

Note that the actions of arbitrageurs buying the unlevered firm and selling the levered firm will cause the price of the unlevered firm's stock to rise and the price of the levered firm's stock to fall until the firms' values are equal and MM Proposition I holds.

---

### The Market Value Balance Sheet

In Section 14.1, we considered just two choices for a firm's capital structure. MM Proposition I, however, applies much more broadly to any choice of debt and equity. In fact, it

applies even if the firm issues other types of securities, such as convertible debt or warrants, a type of stock option that we discuss later in the text. The logic is the same: Because investors can buy or sell securities on their own, no value is created when the firm buys or sells securities for them.

One application of MM Proposition I is the useful device known as the market value balance sheet of the firm. A **market value balance sheet** is similar to an accounting balance sheet, with two important distinctions. First, *all* assets and liabilities of the firm are included—even intangible assets such as reputation, brand name, or human capital that are missing from a standard accounting balance sheet. Second, all values are current market values rather than historical costs. On the market value balance sheet, shown in Table 14.8, the total value of all securities issued by the firm must equal the total value of the firm's assets.

The market value balance sheet captures the idea that value is created by a firm's choice of assets and investments. By choosing positive-NPV projects that are worth more than their initial investment, the firm can enhance its value. Holding fixed the cash flows generated by the firm's assets, however, the choice of capital structure does not change the value of the firm. Instead, it merely divides the value of the firm into different securities. Using the market value balance sheet, we can compute the value of equity as follows:

$$\text{Market Value of Equity} = \text{Market Value of Assets} - \text{Market Value of Debt and Other Liabilities} \quad (14.1)$$

| EXAMPLE 14.3 | **Valuing Equity When There Are Multiple Securities** |
|---|---|

**Problem**

Suppose our entrepreneur decides to sell the firm by splitting it into three securities: equity, $500 of debt, and a third security called a warrant that pays $210 when the firm's cash flows are high and nothing when the cash flows are low. Suppose that this third security is fairly priced at $60. What will the value of the equity be in a perfect capital market?

**Solution**

According to MM Proposition I, the total value of all securities issued should equal the value of the assets of the firm, which is $1000. Because the debt is worth $500 and the new security is worth $60, the value of the equity must be $440. (You can check this result by verifying that at this price, equity has a risk premium commensurate with its risk in comparison with the securities in Table 14.5.)

## Application: A Leveraged Recapitalization

So far, we have looked at capital structure from the perspective of an entrepreneur who is considering financing an investment opportunity. In fact, MM Proposition I applies to capital structure decisions made at any time during the life of the firm.

Let's consider an example. Harrison Industries is currently an all-equity firm operating in a perfect capital market, with 50 million shares outstanding that are trading for $4 per share. Harrison plans to increase its leverage by borrowing $80 million and using the funds to repurchase 20 million of its outstanding shares. When a firm repurchases a significant percentage of its outstanding shares in this way, the transaction is called a **leveraged recapitalization**.

We can view this transaction in two stages. First, Harrison sells debt to raise $80 million in cash. Second, Harrison uses the cash to repurchase shares. Table 14.9 shows the market value balance sheet after each of these stages.

| TABLE 14.8 | The Market Value Balance Sheet of the Firm |

| Assets | Liabilities |
| --- | --- |
| Collection of Assets and Investments Undertaken by the Firm: | Collection of Securities Issued by the Firm: |
| Tangible Assets<br>　Cash<br>　Plant, property, and equipment<br>　Inventory and other working capital<br>　(and so on) | Debt<br>　Short-term debt<br>　Long-term debt<br>　Convertible debt |
| Intangible Assets<br>　Intellectual property<br>　Reputation<br>　Human capital<br>　(and so on) | Equity<br>　Common stock<br>　Preferred stock<br>　Warrants (options) |
| **Total Market Value of Firm Assets** | **Total Market Value of Firm Securities** |

Initially, Harrison is an all-equity firm. That is, the market value of Harrison's equity, which is 50 million shares × $4 per share = $200 million, equals the market value of its existing assets. After borrowing, Harrison's liabilities grow by $80 million, which is also equal to the amount of cash the firm has raised. Because both assets and liabilities increase by the same amount, the market value of the equity remains unchanged.

To conduct the share repurchase, Harrison spends the $80 million in borrowed cash to repurchase $80 million ÷ $4 per share = 20 million shares. Because the firm's assets decrease by $80 million and its debt remains unchanged, the market value of the equity must also fall by $80 million, from $200 million to $120 million, for assets and liabilities to remain balanced. The share price, however, is unchanged—with 30 million shares remaining, the shares are worth $120 million ÷ 30 million shares = $4 per share, just as before.

The fact that the share price did not change should not come as a surprise. Because the firm has sold $80 million worth of new debt and purchased $80 million worth of

| TABLE 14.9 | Market Value Balance Sheet after Each Stage of Harrison's Leveraged Recapitalization (in $ million) |

| | Initial | | After Borrowing | | After Share Repurchase | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Assets** | **Liabilities** | **Assets** | **Liabilities** | **Assets** | **Liabilities** |
| | | | Cash | Debt | Cash | Debt |
| | | | 80 | 80 | 0 | 80 |
| | Existing assets | Equity | Existing assets | Equity | Existing assets | Equity |
| | 200 | 200 | 200 | 200 | 200 | 120 |
| | **200** | **200** | **280** | **280** | **200** | **200** |
| Shares outstanding (million) | | 50 | | 50 | | 30 |
| Value per share | | $4.00 | | $4.00 | | $4.00 |

existing equity, this zero-NPV transaction (benefits = costs) does not change the value for shareholders.

CONCEPT CHECK
1. Why are investors indifferent to the firm's capital structure choice?

2. What is a market value balance sheet?

3. In a perfect capital market, how will a firm's market capitalization change if it borrows in order to repurchase shares? How will its share price change?

## 14.3 Modigliani-Miller II: Leverage, Risk, and the Cost of Capital

Modigliani and Miller showed that a firm's financing choice does not affect its value. But how can we reconcile this conclusion with the fact that the cost of capital differs for different securities? Consider again our entrepreneur from Section 14.1. When the project is financed solely through equity, the equity holders require a 15% expected return. As an alternative, the firm can borrow at the risk-free rate of 5%. In this situation, isn't debt a cheaper and better source of capital than equity?

Although debt does have a lower cost of capital than equity, we cannot consider this cost in isolation. As we saw in Section 14.1, while debt itself may be cheap, it increases the risk and therefore the cost of capital of the firm's equity. In this section, we calculate the impact of leverage on the expected return of a firm's stock, or the equity cost of capital. We then consider how to estimate the cost of capital of the firm's assets, and show that it is unaffected by leverage. In the end, the savings from the low expected return on debt, the debt cost of capital, are exactly offset by a higher equity cost of capital, and there are no net savings for the firm.

### Leverage and the Equity Cost of Capital

We can use Modigliani and Miller's first proposition to derive an explicit relationship between leverage and the equity cost of capital. Let $E$ and $D$ denote the market value of equity and debt if the firm is levered, respectively; let $U$ be the market value of equity if the firm is unlevered; and let $A$ be the market value of the firm's assets. Then MM Proposition I states that

$$E + D = U = A \tag{14.2}$$

That is, the total market value of the firm's securities is equal to the market value of its assets, whether the firm is unlevered or levered.

We can interpret the first equality in Eq. 14.2 in terms of homemade leverage: By holding a portfolio of the firm's equity and debt, we can replicate the cash flows from holding unlevered equity. Because the return of a portfolio is equal to the weighted average of the returns of the securities in it, this equality implies the following relationship between the returns of levered equity ($R_E$), debt ($R_D$), and unlevered equity ($R_U$):

$$\frac{E}{E+D}R_E + \frac{D}{E+D}R_D = R_U \tag{14.3}$$

If we solve Eq. 14.3 for $R_E$, we obtain the following expression for the return of levered equity:

$$R_E = R_U + \underbrace{\frac{D}{E}(R_U - R_D)}$$

(14.4)

$$\underset{\text{Risk without}}{} \quad \underset{\text{Additional risk}}{}$$
$$\underset{\text{leverage}}{} \quad \underset{\text{due to leverage}}{}$$

This equation reveals the effect of leverage on the return of the levered equity. The levered equity return equals the unlevered return, plus an extra "kick" due to leverage. This extra effect pushes the returns of levered equity even higher when the firm performs well $(R_U > R_D)$, but makes them drop even lower when the firm does poorly $(R_U < R_D)$. The amount of additional risk depends on the amount of leverage, measured by the firm's market value debt-equity ratio, $D/E$. Because Eq. 14.4 holds for the realized returns, it holds for the *expected* returns as well (denoted by $r$ in place of $R$). This observation leads to Modigliani and Miller's second proposition:

**MM Proposition II:** *The cost of capital of levered equity increases with the firm's market value debt-equity ratio,*

### Cost of Capital of Levered Equity

$$r_E = r_U + \frac{D}{E}(r_U - r_D)$$

(14.5)

We can illustrate MM Proposition II for the entrepreneur's project in Section 14.1. Recall that if the firm is all-equity financed, the expected return on unlevered equity is 15% (see Table 14.4). If the firm is financed with $500 of debt, the expected return of the debt is the risk-free interest rate of 5%. Therefore, according to MM Proposition II, the expected return on equity for the levered firm is

$$r_E = 15\% + \frac{500}{500}(15\% - 5\%) = 25\%$$

This result matches the expected return calculated in Table 14.4.

---

| EXAMPLE 14.4 | **Computing the Equity Cost of Capital** |
| --- | --- |

**Problem**

Suppose the entrepreneur of Section 14.1 borrows only $200 when financing the project. According to MM Proposition II, what will be the firm's equity cost of capital?

**Solution**

Because the firm's assets have a market value of $1000, by MM Proposition I the equity will have a market value of $800. Then, using Eq. 14.5,

$$r_E = 15\% + \frac{200}{800}(15\% - 5\%) = 17.5\%$$

This result matches the expected return calculated in Example 14.1.

---

## Capital Budgeting and the Weighted Average Cost of Capital

We can use the insight of Modigliani and Miller to understand the effect of leverage on the firm's cost of capital for new investments. If a firm is financed with both equity and debt, then the risk of its underlying assets will match the risk of a portfolio of its equity and

debt. Thus, the appropriate cost of capital for the firm's assets is the cost of capital of this portfolio, which is simply the weighted average of the firm's equity and debt cost of capital:

**Unlevered Cost of Capital (Pretax WACC)**

$$r_U \equiv \left(\begin{array}{c}\text{Fraction of Firm Value}\\\text{Financed by Equity}\end{array}\right)\left(\begin{array}{c}\text{Equity}\\\text{Cost of Capital}\end{array}\right) + \left(\begin{array}{c}\text{Fraction of Firm Value}\\\text{Financed by Debt}\end{array}\right)\left(\begin{array}{c}\text{Debt}\\\text{Cost of Capital}\end{array}\right)$$

$$= \frac{E}{E+D}r_E + \frac{D}{E+D}r_D \tag{14.6}$$

In Chapter 12 we called this cost of capital the firm's unlevered cost of capital, or pretax WACC. There we also introduced the firm's effective after-tax weighted average cost of capital, or WACC, which we compute using the firm's after-tax cost of debt. Because we are in a setting of perfect capital markets, there are no taxes, so the firm's WACC and unlevered cost of capital coincide:

$$r_{wacc} = r_U = r_A \tag{14.7}$$

That is, *with perfect capital markets, a firm's WACC is independent of its capital structure and is equal to its equity cost of capital if it is unlevered, which matches the cost of capital of its assets.*

Figure 14.1 illustrates the effect of increasing the amount of leverage in a firm's capital structure on its equity cost of capital, its debt cost of capital, and its WACC. In the figure,

## FIGURE 14.1

**WACC and Leverage with Perfect Capital Markets**

As the fraction of the firm financed with debt increases, both the equity and the debt become riskier and their cost of capital rises. Yet, because more weight is put on the lower-cost debt, the weighted average cost of capital remains constant. (a) Equity, debt, and weighted average costs of capital for different amounts of leverage. The rate of increase of $r_D$ and $r_E$, and thus the shape of the curves, depends on the characteristics of the firm's cash flows. (b) Calculating the WACC for alternative capital structures. Data in this table correspond to the example in Section 14.1.



(a)

| $E$ | $D$ | $r_E$ | $r_D$ | $\dfrac{E}{E+D}r_E + \dfrac{D}{E+D}r_D$ | $= r_{wacc}$ |
|---|---|---|---|---|---|
| 1000 | 0 | 15.0% | 5.0% | $1.0 \times 15.0\% + 0.0 \times 5.0\%$ | $= 15\%$ |
| 800 | 200 | 17.5% | 5.0% | $0.8 \times 17.5\% + 0.2 \times 5.0\%$ | $= 15\%$ |
| 500 | 500 | 25.0% | 5.0% | $0.5 \times 25.0\% + 0.5 \times 5.0\%$ | $= 15\%$ |
| 100 | 900 | 75.0% | 8.3%[4] | $0.1 \times 75.0\% + 0.9 \times 8.3\%$ | $= 15\%$ |

(b)

---

[4]With this level of leverage, the debt is risky with a face value of 1050 and thus a promised yield of 16.67%. Because the firm defaults with 50% probability, the expected return of the debt, $r_D$, is only 8.33%. The debt, therefore, has a risk premium of 3.33%, which is justified given its return sensitivity of 16.67%.

we measure the firm's leverage in terms of its **debt-to-value ratio**, $D/(E + D)$, which is the fraction of the firm's total value that corresponds to debt. With no debt, the WACC is equal to the unlevered equity cost of capital. As the firm borrows at the low cost of capital for debt, its equity cost of capital rises according to Eq. 14.5. The net effect is that the firm's WACC is unchanged. Of course, as the amount of debt increases, the debt becomes more risky because there is a chance the firm will default; as a result, the debt cost of capital $r_D$ also rises. With 100% debt, the debt would be as risky as the assets themselves (similar to unlevered equity). But even though the debt and equity costs of capital both rise when leverage is high, because more weight is put on the lower-cost debt, the WACC remains constant.

Recall from Chapter 9 that we can calculate the enterprise value of the firm by discounting its future free cash flow using the WACC. Thus, Eq. 14.7 provides the following intuitive interpretation of MM Proposition I: Although debt has a lower cost of capital than equity, leverage does not lower a firm's WACC. As a result, the value of the firm's free cash flow evaluated using the WACC does not change, and so the enterprise value of the firm does not depend on its financing choices. This observation allows us to answer the questions posed for the CFO of EBS at the beginning of this chapter: With perfect capital markets, the firm's weighted average cost of capital, and therefore the NPV of the expansion, is unaffected by how EBS chooses to finance the new investment.

## EXAMPLE 14.5    Reducing Leverage and the Cost of Capital

**Problem**

NRG Energy, Inc. (NRG) is an energy company with a market debt-equity ratio of 2. Suppose its current debt cost of capital is 6%, and its equity cost of capital is 12%. Suppose also that if NRG issues equity and uses the proceeds to repay its debt and reduce its debt-equity ratio to 1, it will lower its debt cost of capital to 5.5%. With perfect capital markets, what effect will this transaction have on NRG's equity cost of capital and WACC? What would happen if NRG issues even more equity and pays off its debt completely? How would these alternative capital structures affect NRG's enterprise value?

**Solution**

We can calculate NRG's initial WACC and unlevered cost of capital using Eqs. 14.6 and 14.7:

$$r_{wacc} = r_U = \frac{E}{E + D}r_E + \frac{D}{E + D}r_D = \frac{1}{1 + 2}(12\%) + \frac{2}{1 + 2}(6\%) = 8\%$$

Given NRG's unlevered cost of capital of 8%, we can use Eq. 14.5 to calculate NRG's equity cost of capital after the reduction in leverage:

$$r_E = r_U + \frac{D}{E}(r_U - r_D) = 8\% + \frac{1}{1}(8\% - 5.5\%) = 10.5\%$$

The reduction in leverage will cause NRG's equity cost of capital to fall to 10.5%. Note, though, that with perfect capital markets, NRG's WACC remains unchanged at $8\% = \frac{1}{2}(10.5\%) + \frac{1}{2}(5.5\%)$, and there is no net gain from this transaction.

If NRG pays off its debt completely, it will be unlevered. Thus, its equity cost of capital will equal its WACC and unlevered cost of capital of 8%.

In either scenario, NRG's WACC and free cash flows remain unchanged. Thus, with perfect capital markets, its enterprise value will not be affected by these different capital structure choices.

---

COMMON MISTAKE    **Is Debt Better Than Equity?**

Because debt has a lower cost of capital than equity, a common mistake is to assume that a firm can reduce its overall WACC by increasing the amount of debt financing. If this strategy works, shouldn't a firm take on as much debt as possible, at least as long as the debt is not risky?

This argument ignores the fact that even if the debt is risk free and the firm will not default, adding leverage increases the risk of the equity. Given the increase in risk, equity holders will demand a higher risk premium and, therefore, a higher expected return. The increase in the cost of equity exactly offsets the benefit of a greater reliance on the cheaper debt capital, so that the firm's overall cost of capital remains unchanged.

---

## Computing the WACC with Multiple Securities

We calculated the firm's unlevered cost of capital and WACC in Eqs. 14.6 and 14.7 assuming that the firm has issued only two types of securities (equity and debt). If the firm's capital structure is more complex, however, then $r_U$ and $r_{wacc}$ are calculated by computing the weighted average cost of capital of *all* of the firm's securities.

---

EXAMPLE 14.6    **WACC with Multiple Securities**

**Problem**

Compute the WACC for the entrepreneur's project with the capital structure described in Example 14.3.

**Solution**

Because the firm has three securities in its capital structure (debt, equity, and the warrant), its weighted average cost of capital is the average return it must pay these three groups of investors:

$$r_{wacc} = r_U = \frac{E}{E + D + W} r_E + \frac{D}{E + D + W} r_D + \frac{W}{E + D + W} r_W$$

From Example 14.3, we know $E = 440$, $D = 500$, and $W = 60$. What are the expected returns for each security? Given the cash flows of the firm, the debt is risk free and has an expected return of $r_D = 5\%$. The warrant has an expected payoff of $\frac{1}{2}(\$210) + \frac{1}{2}(\$0) = \$105$, so its expected return is $r_w = \$105/\$60 - 1 = 75\%$. Equity has a payoff of ($\$1400 - \$525 - \$210) = \$665$ when cash flows are high and ($\$900 - \$525) = \$375$ when cash flows are low; thus, its expected payoff is $\frac{1}{2}(\$665) + \frac{1}{2}(\$375) = \$520$. The expected return for equity is then $r_E = \$520/\$440 - 1 = 18.18\%$. We can now compute the WACC:

$$r_{wacc} = \frac{\$440}{\$1000}(18.18\%) + \frac{\$500}{\$1000}(5\%) + \frac{\$60}{\$1000}(75\%) = 15\%$$

Once again, the firm's WACC and unlevered cost of capital is 15%, the same as if it were all-equity financed.

---

## Levered and Unlevered Betas

Note that Eqs. 14.6 and 14.7 for the weighted-average cost of capital match our calculation in Chapter 12 of a firm's unlevered cost of capital. There, we showed that a firm's unlevered or asset beta is the weighted average of its equity and debt beta:

$$\beta_U = \frac{E}{E + D}\beta_E + \frac{D}{E + D}\beta_D \tag{14.8}$$

Recall that the unlevered beta measures the market risk of the firm's underlying assets, and thus can be used to assess the cost of capital for comparable investments. When a firm changes its capital structure without changing its investments, its unlevered beta will remain unaltered. However, its equity beta will change to reflect the effect of the capital structure change on its risk.[5] Let's rearrange Eq. 14.8 to solve for $\beta_E$:

$$\beta_E = \beta_U + \frac{D}{E}(\beta_U - \beta_D) \tag{14.9}$$

Eq. 14.9 is analogous to Eq. 14.5, with beta replacing the expected returns. It shows that the firm's equity beta also increases with leverage.

---

**EXAMPLE 14.7**

**Betas and Leverage**

**Problem**

Suppose drug retailer CVS has an equity beta of 0.80 and a debt-equity ratio of 0.10. Estimate its asset beta assuming its debt beta is zero. Suppose CVS were to increase its leverage so that its debt-equity ratio was 0.50. Assuming its debt beta were still zero, what would you expect its equity beta to be after the increase in leverage?

**Solution**

We can estimate the unlevered or asset beta for CVS using Eq. 14.8:

$$\beta_U = \frac{E}{E+D}\beta_E + \frac{D}{E+D}\beta_D = \frac{1}{1+D/E}\beta_E = \frac{1}{1+0.1} \times 0.8 = 0.73$$

With the increase in leverage, CVS's equity beta will increase according to Eq. 14.9:

$$\beta_E = \beta_U + \frac{D}{E}(\beta_U - \beta_D) = 0.73 + 0.5(0.73 - 0) = 1.09$$

Thus, CVS's equity beta (and equity cost of capital) will increase with leverage. Note that if CVS's debt beta also increased, the impact of leverage on its equity beta would be somewhat lower—if debt holders share some of the firm's market risk, the equity holders will need to bear less of it.

---

The assets on a firm's balance sheet include any holdings of cash or risk-free securities. Because these holdings are risk-free, they reduce the risk—and therefore the required risk premium—of the firm's assets. For this reason, holding excess cash has the opposite effect of leverage on risk and return. From this standpoint, we can view cash as negative debt. Thus, as we stated in Chapter 12, when we are trying to assess a firm's enterprise value— its business assets separate from any cash holdings—it is natural to measure leverage in terms of the firm's net debt, which is its debt less its holdings of excess cash or short-term investments.

---

[5]The relationship between leverage and equity betas was developed by R. Hamada in "The Effect of the Firm's Capital Structure on the Systematic Risk of Common Stocks," *Journal of Finance* 27(2) (1972): 435–452, and by M. Rubinstein in "A Mean-Variance Synthesis of Corporate Financial Theory," *Journal of Finance* 28(1) (1973): 167–181.

**EXAMPLE 14.8**  **Cash and the Cost of Capital**

**Problem**

In July 2012, Cisco Systems had a market capitalization of $102.4 billion. It had debt of $16.2 billion as well as cash and short-term investments of $48.6 billion. Its equity beta was 1.23 and its debt beta was approximately zero. What was Cisco's enterprise value at the time? Given a risk-free rate of 2% and a market risk premium of 5%, estimate the unlevered cost of capital of Cisco's business.

**Solution**

Because Cisco had $16.2 billion in debt and $48.6 billion in cash, Cisco's net debt = $16.2 billion − $48.6 billion = −$32.4 billion. Its enterprise value was therefore $102.4 billion − $32.4 billion = $70 billion.

Given a zero beta for its net debt, Cisco's unlevered beta was

$$\beta_U = \frac{E}{E+D}\beta_E + \frac{D}{E+D}\beta_D = \frac{\$102.4}{\$70}(1.23) + \frac{-\$32.4}{\$70}(0) = 1.80$$

and we can estimate its unlevered cost of capital as $r_U = 2\% + 1.80 \times 5\% = 11\%$. Note that because of its cash holdings, Cisco's equity is less risky than its underlying business.

**CONCEPT CHECK**

1. How do we compute the weighted average cost of capital of a firm?

2. With perfect capital markets, as a firm increases its leverage, how does its debt cost of capital change? Its equity cost of capital? Its weighted average cost of capital?

**NOBEL PRIZE**  **Franco Modigliani and Merton Miller**

Franco Modigliani and Merton Miller, the authors of the Modigliani-Miller Propositions, have each won the Nobel Prize in economics for their work in financial economics, including their capital structure propositions. Modigliani won the Nobel Prize in 1985 for his work on personal savings and for his capital structure theorems with Miller. Miller earned his prize in 1990 for his analysis of portfolio theory and capital structure.

Miller once described the MM propositions in an interview this way:

*People often ask: Can you summarize your theory quickly? Well, I say, you understand the M&M theorem if you know why this is a joke: The pizza delivery man comes to Yogi Berra after the game and says, "Yogi, how do you want this pizza cut, into quarters or eighths?" And Yogi says, "Cut it in eight pieces. I'm feeling hungry tonight."*

*Everyone recognizes that's a joke because obviously the number and shape of the pieces don't affect the size of*

*the pizza. And similarly, the stocks, bonds, warrants, et cetera, issued don't affect the aggregate value of the firm. They just slice up the underlying earnings in different ways.*[*]

Modigliani and Miller each won the Nobel Prize in large part for their observation that the value of a firm should be unaffected by its capital structure in perfect capital markets. While the intuition underlying the MM propositions may be as simple as slicing pizza, their implications for corporate finance are far-reaching. The propositions imply that the true role of a firm's financial policy is to deal with (and potentially exploit) financial market imperfections such as taxes and transactions costs. Modigliani and Miller's work began a long line of research into these market imperfections, which we look at over the next several chapters.

_____

[*]Peter J. Tanous, *Investment Gurus* (Prentice Hall Press, 1997).

## 14.4  Capital Structure Fallacies

MM Propositions I and II state that with perfect capital markets, leverage has no effect on firm value or the firm's overall cost of capital. Here we take a critical look at two incorrect arguments that are sometimes cited in favor of leverage.

### Leverage and Earnings per Share

Leverage can increase a firm's expected earnings per share. An argument sometimes made is that by doing so, leverage should also increase the firm's stock price.

Consider the following example. Levitron Industries (LVI) is currently an all-equity firm. It expects to generate earnings before interest and taxes (EBIT) of $10 million over the next year. Currently, LVI has 10 million shares outstanding, and its stock is trading for a price of $7.50 per share. LVI is considering changing its capital structure by borrowing $15 million at an interest rate of 8% and using the proceeds to repurchase 2 million shares at $7.50 per share.

Let's consider the consequences of this transaction in a setting of perfect capital markets. Suppose LVI has no debt. Because LVI pays no interest, and because in perfect capital markets there are no taxes, LVI's earnings would equal its EBIT. Therefore, without debt, LVI would expect earnings per share of

$$EPS = \frac{\text{Earnings}}{\text{Number of Shares}} = \frac{\$10 \text{ million}}{10 \text{ million}} = \$1$$

The new debt will obligate LVI to make interest payments each year of

$$\$15 \text{ million} \times 8\% \text{ interest/year} = \$1.2 \text{ million/year}$$

As a result, LVI will have expected earnings after interest of

$$\text{Earnings} = \text{EBIT} - \text{Interest} = \$10 \text{ million} - \$1.2 \text{ million} = \$8.8 \text{ million}$$

The interest payments on the debt will cause LVI's total earnings to fall. But because the number of outstanding shares will also have fallen to 10 million − 2 million = 8 million shares after the share repurchase, LVI's expected earnings per share is

$$EPS = \frac{\$8.8 \text{ million}}{8 \text{ million}} = \$1.10$$

As we can see, LVI's expected earnings per share increases with leverage.[6] This increase might appear to make shareholders better off and could potentially lead to an increase in the stock price. Yet we know from MM Proposition I that as long as the securities are fairly priced, these financial transactions have an NPV of zero and offer no benefit to shareholders. How can we reconcile these seemingly contradictory results?

The answer is that the risk of earnings has changed. Thus far, we have considered only *expected* earnings per share. We have not considered the consequences of this transaction on the risk of the earnings. To do so, we must determine the effect of the increase in leverage on earnings per share in a variety of scenarios.

Suppose earnings before interest payments are only $4 million. Without the increase in leverage, EPS would be $4 million ÷ 10 million shares = $0.40. With the new debt, however, earnings after interest payments would be $4 million − $1.2 million = $2.8 million, leading to earnings per share of $2.8 million ÷ 8 million shares = $0.35. So, when

---

[6]More generally, leverage will increase expected EPS whenever the firm's after-tax borrowing cost is less than the ratio of expected earnings to the share price (i.e., the reciprocal of its forward P/E multiple, also called the *earnings yield*). For LVI, with no taxes, $8\% < EPS/P = 1/7.50 = 13.33\%$.

## FIGURE 14.2

**LVI Earnings per Share with and without Leverage**

The sensitivity of EPS to EBIT is higher for a levered firm than for an unlevered firm. Thus, given assets with the same risk, the EPS of a levered firm is more volatile.



earnings are low, leverage will cause EPS to fall even further than it otherwise would have. Figure 14.2 presents a range of scenarios.

As Figure 14.2 shows, if earnings before interest exceed $6 million, then EPS is higher with leverage. When earnings fall below $6 million, however, EPS is lower with leverage than without it. In fact, if earnings before interest fall below $1.2 million (the level of the interest expense), then after interest LVI will have negative EPS. So, although LVI's expected EPS rises with leverage, the risk of its EPS also increases. The increased risk can be seen because the line showing EPS with leverage in Figure 14.2 is steeper than the line without leverage, implying that the same fluctuation in EBIT will lead to greater fluctuations in EPS once leverage is introduced. Taken together, these observations are consistent with MM Proposition I. While EPS increases on average, this increase is necessary to compensate shareholders for the additional risk they are taking, so LVI's share price does not increase as a result of the transaction. Let's check this result in an example.

## EXAMPLE 14.9    The MM Propositions and Earnings per Share

**Problem**

Assume that LVI's EBIT is not expected to grow in the future and that all earnings are paid as dividends. Use MM Propositions I and II to show that the increase in expected EPS for LVI will not lead to an increase in the share price.

**Solution**

Without leverage, expected earnings per share and therefore dividends are $1 each year, and the share price is $7.50. Let $r_U$ be LVI's cost of capital without leverage. Then we can value LVI as a perpetuity:

$$P = 7.50 = \frac{Div}{r_U} = \frac{EPS}{r_U} = \frac{1.00}{r_U}$$

Therefore, LVI's current share price implies $r_U = 1/7.50 = 13.33\%$.

The market value of LVI stock without leverage is $7.50 per share ×10 million shares = $75 million. If LVI uses debt to repurchase $15 million worth of the firm's equity (that is, 2 million shares), then the remaining equity will be worth $75 million − $15 million = $60 million

## GLOBAL FINANCIAL CRISIS    Bank Capital Regulation and the ROE Fallacy

In banking jargon, a "capital requirement" obligates a bank to finance itself with a certain minimum amount of equity to ensure that its debt-to-equity ratio will stay below a set level. The permitted level of leverage is very high—international standards allow common equity to represent as little as 2% of a bank's total funding.[7] To put this number in perspective, the equity of a typical non-financial firm exceeds 50% of firm value. Such extreme leverage makes bank equity very risky.

These extreme levels of bank leverage were an important contributing factor to the financial meltdown in 2008 and the subsequent recession: With such a small equity cushion, even a minor drop in asset values can lead to insolvency. Post-crisis, banks have come under increased pressure to reduce leverage with new international rules more than doubling the required proportion of equity financing. Many policymakers believe capital requirements should be increased much more to reduce the risk of the financial sector and the consequent spillovers to the broader economy.

Bankers counter that decreased leverage will lower their return on equity, limiting their ability to compete effectively. According to Josef Ackermann, then CEO of Deutsche Bank, new capital requirements would "depress ROE to levels that make investment into the banking sector unattractive relative to other business sectors."[8] The return on equity is indeed a function of the firm's leverage. As with EPS, lower leverage will tend to decrease the firm's ROE on average, though it will raise the ROE in bad times. But this decrease in average ROE is compensated for by a reduction in the riskiness of equity and therefore the required risk premium. Thus, from an investor's perspective, the reduction in ROE that results solely from a decrease in leverage does *not* make investing in the firm any less attractive. Franco Modigliani and Merton Miller were awarded the Nobel Prize for pointing out that in a perfect market the bank's capital structure cannot affect its competitiveness.

The only way a change in leverage can affect the "attractiveness" of equity (and the competiveness of banks) is if there is a market imperfection. In the next two chapters we will discuss these imperfections and explain why they do give banks a strong incentive to maximize their leverage. Unfortunately, the most important imperfections derive from government subsidies, so the banks' gains from leverage come largely at taxpayer expense.

according to MM Proposition I. After the transaction, LVI's debt-equity ratio is $15 million ÷ $60 million $= \frac{1}{4}$. Using MM Proposition II, LVI's equity cost of capital with leverage will be

$$r_E = r_U + \frac{D}{E}(r_U - r_D) = 13.33\% + \frac{1}{4}(13.33\% - 8\%) = 14.66\%$$

Given that expected EPS is now $1.10 per share, the new value of the shares equals

$$P = \frac{\$1.10}{r_E} = \frac{\$1.10}{14.66\%} = \$7.50 \text{ per share}$$

Thus, even though EPS is higher, due to the additional risk, shareholders will demand a higher return. These effects cancel out, so the price per share is unchanged.

Because the firm's earnings per share and price-earnings ratio are affected by leverage, we cannot reliably compare these measures across firms with different capital structures. The same is true for accounting-based performance measures such as return on equity (ROE). Therefore, most analysts prefer to use performance measures and valuation multiples that are based on the firm's earnings before interest has been deducted. For example, the ratio of enterprise value to EBIT (or EBITDA) is more useful when analyzing firms with very different capital structures than is comparing their P/E ratios.

---

[7]Two percent is the Tier 1 Common Equity Requirement of the Basel II Accord, the global regulatory standard for bank capital. Starting in 2013, the new Basel III Accord will raise this requirement gradually to 4.5% by 2015.

[8]J. Ackermann, "The new architecture of financial regulation: Will it prevent another crisis?" Special Paper 194, FMG Deutsche Bank Conference, London School of Economics, October 2010.

498        **Chapter 14** Capital Structure in a Perfect Market

## Equity Issuances and Dilution

Another often-heard fallacy is that issuing equity will dilute existing shareholders' owner-ship, so debt financing should be used instead. By **dilution**, the proponents of this fallacy mean that if the firm issues new shares, the cash flows generated by the firm must be divided among a larger number of shares, thereby reducing the value of each individual share. The problem with this line of reasoning is that it ignores the fact that the cash raised by issuing new shares will increase the firm's assets. Let's consider an example.

Suppose Jet Sky Airlines (JSA) is a highly successful discount airline serving the south-eastern United States. It currently has no debt and 500 million shares of stock outstanding. These shares are currently trading at $16. Last month the firm announced that it would expand its operations to the Northeast. The expansion will require the purchase of $1 bil-lion of new planes, which will be financed by issuing new equity. How will the share price change when the new equity is issued today?

Based on the current share price of the firm (prior to the issue), the equity and therefore the assets of the firm have a market value of 500 million shares × $16 per share = $8 billion. Because the expansion decision has already been made and announced, in perfect capital markets this value incorporates the NPV associated with the expansion.

Suppose JSA sells 62.5 million new shares at the current price of $16 per share to raise the additional $1 billion needed to purchase the planes.

| Assets (in $ million) | Before Equity Issue | After Equity Issue |
|---|---|---|
| Cash | | 1000 |
| Existing assets | 8000 | 8000 |
| Total Value | 8000 | 9000 |
| Shares outstanding (million) | 500 | 562.5 |
| Value per share | $16.00 | $16.00 |

Two things happen when JSA issues equity. First, the market value of its assets grows because of the additional $1 billion in cash the firm has raised. Second, the number of shares increases. Although the number of shares has grown to 562.5 million, the value per share is unchanged: $9 billion ÷ 562.5 million shares = $16 per share.

In general, as long as the firm sells the new shares of equity *at a fair price*, there will be no gain or loss to shareholders associated with the equity issue itself. The money taken in by the firm as a result of the share issue exactly offsets the dilution of the shares. *Any gain or loss associated with the transaction will result from the NPV of the investments the firm makes with the funds raised.*

**CONCEPT CHECK**

1. If a change in leverage raises a firm's earnings per share, should this cause its share price to rise in a perfect market?

2. True or False: When a firm issues equity, it increases the supply of its shares in the market, which should cause its share price to fall.

## 14.5  MM: Beyond the Propositions

Since the publication of their original paper, Modigliani and Miller's ideas have greatly influenced finance research and practice. Perhaps more important than the specific propositions themselves is the approach that MM took to derive them. Proposition I was one of the first arguments to show that the Law of One Price could have strong implications for security prices and firm values in a competitive market; it marks the beginning of the modern theory of corporate finance.

Modigliani and Miller's work formalized a new way of thinking about financial markets that was first put forth by John Burr Williams in his 1938 book, *The Theory of Investment Value*. In it Williams argues:

> If the investment value of an enterprise as a whole is by definition the present worth of all its future distributions to security holders, whether on interest or dividend account, then this value in no wise depends on what the company's capitalization is. Clearly, if a single individual or a single institutional investor owned all of the bonds, stocks and warrants issued by the corporation, it would not matter to this investor what the company's capitalization was (except for details concerning the income tax). Any earnings collected as interest could not be collected as dividends. To such an individual it would be perfectly obvious that total interest- and dividend-paying power was in no wise dependent on the kind of securities issued to the company's owner. Furthermore no change in the investment value of the enterprise as a whole would result from a change in its capitalization. Bonds could be retired with stock issues, or two classes of junior securities could be combined into one, without changing the investment value of the company as a whole. Such constancy of investment value is analogous to the indestructibility of matter or energy: it leads us to speak of the Law of the Conservation of Investment Value, just as physicists speak of the Law of the Conservation of Matter, or the Law of the Conservation of Energy.

Thus, the results in this chapter can be interpreted more broadly as the **conservation of value principle** for financial markets: *With perfect capital markets, financial transactions neither add nor destroy value, but instead represent a repackaging of risk (and therefore return).*

The conservation of value principle extends far beyond questions of debt versus equity or even capital structure. It implies that any financial transaction that appears to be a good deal in terms of adding value either is too good to be true or is exploiting some type of market imperfection. To make sure the value is not illusory, it is important to identify the market imperfection that is the source of value. In the next several chapters we will examine different types of market imperfections and the potential sources of value that they introduce for the firm's capital structure choice and other financial transactions.

**CONCEPT CHECK**

1. Consider the questions facing Dan Harris, CFO of EBS, at the beginning of this chapter. What answers would you give based on the Modigliani-Miller Propositions? What considerations should the capital structure decision be based on?

2. State the conservation of value principle for financial markets.

**MyFinanceLab**   Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 14.1 Equity Versus Debt Financing

- The collection of securities a firm issues to raise capital from investors is called the firm's capital structure. Equity and debt are the securities most commonly used by firms. When equity is used without debt, the firm is said to be unlevered. Otherwise, the amount of debt determines the firm's leverage.
- The owner of a firm should choose the capital structure that maximizes the total value of the securities issued.

### 14.2 Modigliani-Miller I: Leverage, Arbitrage, and Firm Value

- Capital markets are said to be perfect if they satisfy three conditions:
  - Investors and firms can trade the same set of securities at competitive market prices equal to the present value of their future cash flows.
  - There are no taxes, transaction costs, or issuance costs associated with security trading.
  - A firm's financing decisions do not change the cash flows generated by its investments, nor do they reveal new information about them.
- According to MM Proposition I, with perfect capital markets the value of a firm is independent of its capital structure.
  - With perfect capital markets, homemade leverage is a perfect substitute for firm leverage.
  - If otherwise identical firms with different capital structures have different values, the Law of One Price would be violated and an arbitrage opportunity would exist.
- The market value balance sheet shows that the total market value of a firm's assets equals the total market value of the firm's liabilities, including all securities issued to investors. Changing the capital structure therefore alters how the value of the assets is divided across securities, but not the firm's total value.
- A firm can change its capital structure at any time by issuing new securities and using the funds to pay its existing investors. An example is a leveraged recapitalization in which the firm borrows money (issues debt) and repurchases shares (or pays a dividend). MM Proposition I implies that such transactions will not change the share price.

### 14.3 Modigliani-Miller II: Leverage, Risk, and the Cost of Capital

- According to MM Proposition II, the cost of capital for levered equity is

$$r_E = r_U + \frac{D}{E}(r_U - r_D) \tag{14.5}$$

- Debt is less risky than equity, so it has a lower cost of capital. Leverage increases the risk of equity, however, raising the equity cost of capital. The benefit of debt's lower cost of capital is offset by the higher equity cost of capital, leaving a firm's weighted average cost of capital (WACC) unchanged with perfect capital markets:

$$r_{wacc} = r_A = r_U = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D \tag{14.6, 14.7}$$

- The market risk of a firm's assets can be estimated by its unlevered beta:

$$\beta_U = \frac{E}{E+D}\beta_E + \frac{D}{E+D}\beta_D \tag{14.8}$$

- Leverage increases the beta of a firm's equity:

$$\beta_E = \beta_U + \frac{D}{E}(\beta_U - \beta_D) \tag{14.9}$$

- A firm's net debt is equal to its debt less its holdings of cash and other risk-free securities. We can compute the cost of capital and the beta of the firm's business assets, excluding cash, by using its net debt when calculating its WACC or unlevered beta.

### 14.4  Capital Structure Fallacies

- Leverage can raise a firm's expected earnings per share and its return on equity, but it also increases the volatility of earnings per share and the riskiness of its equity. As a result, in a perfect market shareholders are not better off and the value of equity is unchanged.
- As long as shares are sold to investors at a fair price, there is no cost of dilution associated with issuing equity. While the number of shares increases when equity is issued, the firm's assets also increase because of the cash raised, and the per-share value of equity remains unchanged.

### 14.5  MM: Beyond the Propositions

- With perfect capital markets, financial transactions are a zero-NPV activity that neither add nor destroy value on their own, but rather repackage the firm's risk and return. Capital structure—and financial transactions more generally—affect a firm's value only because of its impact on some type of market imperfection.

## Key Terms

capital structure *p. 479*
conservation of value principle *p. 499*
debt-to-value ratio *p. 491*
dilution *p. 498*
homemade leverage *p. 484*

leveraged recapitalization *p. 486*
levered equity *p. 480*
market value balance sheet *p. 486*
perfect capital markets *p. 483*
unlevered equity *p. 480*

## Further Reading

For further details on MM's argument, especially their use of the Law of One Price to derive their results, see MM's original paper: F. Modigliani and M. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *American Economic Review* 48(3) (1958): 261–297.

For a retrospective look at the work of Modigliani and Miller and its importance in corporate finance, see the collection of articles in Volume 2, Issue 4 of the *Journal of Economic Perspectives* (1988), which includes: "The Modigliani-Miller Propositions After Thirty Years," by M. Miller (pp. 99–120), "Comment on the Modigliani-Miller Propositions," by S. Ross (pp. 127–133), "Corporate Finance and the Legacy of Modigliani and Miller," by S. Bhattacharya (pp. 135–147), and "MM—Past, Present, Future," by F. Modigliani (pp. 149–158).

For an interesting interview with Merton Miller about his work, see: P. Tanous, *Investment Gurus* (Prentice Hall Press, 1997).

For a more recent discussion of MM's contribution to the development of capital structure theory, see: R. Cookson, "A Survey of Corporate Finance ('The Party's Over' and 'Debt Is Good for You')," *The Economist* (January 27, 2001): 5–8.

A historical account of Miller-Modigliani's result is provided in these sources: P. Bernstein, *Capital Ideas: The Improbable Origins of Modern Wall Street* (Free Press, 1993); and M. Rubinstein, "Great Moments in Financial Economics: II. Modigliani-Miller Theorem," *Journal of Investment Management* 1(2) (2003).

For more insight into the debate regarding bank capital requirements, and many of the fallacies that have arisen in that debate, see A. Admati, P. DeMarzo, M. Hellwig, and P. Pfleiderer,

502      **Chapter 14** Capital Structure in a Perfect Market

"Fallacies, Irrelevant Facts, and Myths in the Discussion of Capital Regulation: Why Bank Equity Is Not Expensive," Rock Center for Corporate Governance Research Paper No. 86, August 2010.

## Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

### Equity Versus Debt Financing

**1.** Consider a project with free cash flows in one year of $130,000 or $180,000, with each outcome being equally likely. The initial investment required for the project is $100,000, and the project's cost of capital is 20%. The risk-free interest rate is 10%.
   a. What is the NPV of this project?
   b. Suppose that to raise the funds for the initial investment, the project is sold to investors as an all-equity firm. The equity holders will receive the cash flows of the project in one year. How much money can be raised in this way—that is, what is the initial market value of the unlevered equity?
   c. Suppose the initial $100,000 is instead raised by borrowing at the risk-free interest rate. What are the cash flows of the levered equity, and what is its initial value according to MM?

**2.** You are an entrepreneur starting a biotechnology firm. If your research is successful, the technology can be sold for $30 million. If your research is unsuccessful, it will be worth nothing. To fund your research, you need to raise $2 million. Investors are willing to provide you with $2 million in initial capital in exchange for 50% of the unlevered equity in the firm.
   a. What is the total market value of the firm without leverage?
   b. Suppose you borrow $1 million. According to MM, what fraction of the firm's equity will you need to sell to raise the additional $1 million you need?
   c. What is the value of your share of the firm's equity in cases (a) and (b)?

**3.** Acort Industries owns assets that will have an 80% probability of having a market value of $50 million in one year. There is a 20% chance that the assets will be worth only $20 million. The current risk-free rate is 5%, and Acort's assets have a cost of capital of 10%.
   a. If Acort is unlevered, what is the current market value of its equity?
   b. Suppose instead that Acort has debt with a face value of $20 million due in one year. According to MM, what is the value of Acort's equity in this case?
   c. What is the expected return of Acort's equity without leverage? What is the expected return of Acort's equity with leverage?
   d. What is the lowest possible realized return of Acort's equity with and without leverage?

**4.** Wolfrum Technology (WT) has no debt. Its assets will be worth $450 million in one year if the economy is strong, but only $200 million in one year if the economy is weak. Both events are equally likely. The market value today of its assets is $250 million.
   a. What is the expected return of WT stock without leverage?
   b. Suppose the risk-free interest rate is 5%. If WT borrows $100 million today at this rate and uses the proceeds to pay an immediate cash dividend, what will be the market value of its equity just after the dividend is paid, according to MM?
   c. What is the expected return of WT stock after the dividend is paid in part (b)?

### Modigliani-Miller I: Leverage, Arbitrage, and Firm Value

 **5.** Suppose there are no taxes. Firm ABC has no debt, and firm XYZ has debt of $5000 on which it pays interest of 10% each year. Both companies have identical projects that generate free cash

flows of $800 or $1000 each year. After paying any interest on debt, both companies use all remaining free cash flows to pay dividends each year.

a. Fill in the table below showing the payments debt and equity holders of each firm will receive given each of the two possible levels of free cash flows.

| | ABC | | XYZ | |
| FCF | Debt Payments | Equity Dividends | Debt Payments | Equity Dividends |
|---|---|---|---|---|
| $ 800 | | | | |
| $1000 | | | | |

b. Suppose you hold 10% of the equity of ABC. What is another portfolio you could hold that would provide the same cash flows?

c. Suppose you hold 10% of the equity of XYZ. If you can borrow at 10%, what is an alternative strategy that would provide the same cash flows?

**6.** Suppose Alpha Industries and Omega Technology have identical assets that generate identical cash flows. Alpha Industries is an all-equity firm, with 10 million shares outstanding that trade for a price of $22 per share. Omega Technology has 20 million shares outstanding as well as debt of $60 million.

a. According to MM Proposition I, what is the stock price for Omega Technology?

b. Suppose Omega Technology stock currently trades for $11 per share. What arbitrage opportunity is available? What assumptions are necessary to exploit this opportunity?

**7.** Cisoft is a highly profitable technology firm that currently has $5 billion in cash. The firm has decided to use this cash to repurchase shares from investors, and it has already announced these plans to investors. Currently, Cisoft is an all-equity firm with 5 billion shares outstanding. These shares currently trade for $12 per share. Cisoft has issued no other securities except for stock options given to its employees. The current market value of these options is $8 billion.

a. What is the market value of Cisoft's non-cash assets?

b. With perfect capital markets, what is the market value of Cisoft's equity after the share repurchase? What is the value per share?

**8.** Schwartz Industry is an industrial company with 100 million shares outstanding and a market capitalization (equity value) of $4 billion. It has $2 billion of debt outstanding. Management have decided to delever the firm by issuing new equity to repay all outstanding debt.

a. How many new shares must the firm issue?

b. Suppose you are a shareholder holding 100 shares, and you disagree with this decision. Assuming a perfect capital market, describe what you can do to undo the effect of this decision.

 **9.** Zetatron is an all-equity firm with 100 million shares outstanding, which are currently trading for $7.50 per share. A month ago, Zetatron announced it will change its capital structure by borrowing $100 million in short-term debt, borrowing $100 million in long-term debt, and issuing $100 million of preferred stock. The $300 million raised by these issues, plus another $50 million in cash that Zetatron already has, will be used to repurchase existing shares of stock. The transaction is scheduled to occur today. Assume perfect capital markets.

a. What is the market value balance sheet for Zetatron

   i. Before this transaction?

   ii. After the new securities are issued but before the share repurchase?

   iii. After the share repurchase?

b. At the conclusion of this transaction, how many shares outstanding will Zetatron have, and what will the value of those shares be?

### Modigliani-Miller II: Leverage, Risk, and the Cost of Capital

10. Explain what is wrong with the following argument: "If a firm issues debt that is risk free, because there is no possibility of default, the risk of the firm's equity does not change. Therefore, risk-free debt allows the firm to get the benefit of a low cost of capital of debt without raising its cost of capital of equity."

11. Consider the entrepreneur described in Section 14.1 (and referenced in Tables 14.1–14.3). Suppose she funds the project by borrowing $750 rather than $500.
    a. According to MM Proposition I, what is the value of the equity? What are its cash flows if the economy is strong? What are its cash flows if the economy is weak?
    b. What is the return of the equity in each case? What is its expected return?
    c. What is the risk premium of equity in each case? What is the sensitivity of the levered equity return to systematic risk? How does its sensitivity compare to that of unlevered equity? How does its risk premium compare to that of unlevered equity?
    d. What is the debt-equity ratio of the firm in this case?
    e. What is the firm's WACC in this case?

12. Hardmon Enterprises is currently an all-equity firm with an expected return of 12%. It is considering a leveraged recapitalization in which it would borrow and repurchase existing shares.
    a. Suppose Hardmon borrows to the point that its debt-equity ratio is 0.50. With this amount of debt, the debt cost of capital is 6%. What will the expected return of equity be after this transaction?
    b. Suppose instead Hardmon borrows to the point that its debt-equity ratio is 1.50. With this amount of debt, Hardmon's debt will be much riskier. As a result, the debt cost of capital will be 8%. What will the expected return of equity be in this case?
    c. A senior manager argues that it is in the best interest of the shareholders to choose the capital structure that leads to the highest expected return for the stock. How would you respond to this argument?

13. Suppose The Washington Post Company (WPO) has no debt and an equity cost of capital of 9.2%. The average debt-to-value ratio for the publishing industry is 13%. What would its cost of equity be if it took on the average amount of debt for its industry at a cost of debt of 6%?

14. Global Pistons (GP) has common stock with a market value of $200 million and debt with a value of $100 million. Investors expect a 15% return on the stock and a 6% return on the debt. Assume perfect capital markets.
    a. Suppose GP issues $100 million of new stock to buy back the debt. What is the expected return of the stock after this transaction?
    b. Suppose instead GP issues $50 million of new debt to repurchase stock.
        i. If the risk of the debt does not change, what is the expected return of the stock after this transaction?
        ii. If the risk of the debt increases, would the expected return of the stock be higher or lower than in part (i)?

15. Hubbard Industries is an all-equity firm whose shares have an expected return of 10%. Hubbard does a leveraged recapitalization, issuing debt and repurchasing stock, until its debt-equity ratio is 0.60. Due to the increased risk, shareholders now expect a return of 13%. Assuming there are no taxes and Hubbard's debt is risk free, what is the interest rate on the debt?

16. Hartford Mining has 50 million shares that are currently trading for $4 per share and $200 million worth of debt. The debt is risk free and has an interest rate of 5%, and the expected return of Hartford stock is 11%. Suppose a mining strike causes the price of Hartford stock to fall 25% to $3 per share. The value of the risk-free debt is unchanged. Assuming there are no taxes and the risk (unlevered beta) of Hartford's assets is unchanged, what happens to Hartford's equity cost of capital?

**17.** Mercer Corp. is an all-equity firm with 10 million shares outstanding and $100 million worth of debt outstanding. Its current share price is $75. Mercer's equity cost of capital is 8.5%. Mercer has just announced that it will issue $350 million worth of debt. It will use the proceeds from this debt to pay off its existing debt, and use the remaining $250 million to pay an immediate dividend. Assume perfect capital markets.

   a. Estimate Mercer's share price just after the recapitalization is announced, but before the transaction occurs.

   b. Estimate Mercer's share price at the conclusion of the transaction. (*Hint*: Use the market value balance sheet.)

   c. Suppose Mercer's existing debt was risk-free with a 4.25% expected return, and its new debt is risky with a 5% expected return. Estimate Mercer's equity cost of capital after the transaction.

**18.** In mid-2012, AOL Inc. had $100 million in debt, total equity capitalization of $3.1 billion, and an equity beta of 0.90 (as reported on Yahoo! Finance). Included in AOL's assets was $1.5 billion in cash and risk-free securities. Assume that the risk-free rate of interest is 3% and the market risk premium is 4%.

   a. What is AOL's enterprise value?

   b. What is the beta of AOL's business assets?

   c. What is AOL's WACC?

**\*19.** Indell stock has a current market value of $120 million and a beta of 1.50. Indell currently has risk-free debt as well. The firm decides to change its capital structure by issuing $30 million in additional risk-free debt, and then using this $30 million plus another $10 million in cash to repurchase stock. With perfect capital markets, what will be the beta of Indell stock after this transaction?

## Capital Structure Fallacies

 **20.** Yerba Industries is an all-equity firm whose stock has a beta of 1.2 and an expected return of 12.5%. Suppose it issues new risk-free debt with a 5% yield and repurchases 40% of its stock. Assume perfect capital markets.

   a. What is the beta of Yerba stock after this transaction?

   b. What is the expected return of Yerba stock after this transaction?

   Suppose that prior to this transaction, Yerba expected earnings per share this coming year of $1.50, with a forward P/E ratio (that is, the share price divided by the expected earnings for the coming year) of 14.

   c. What is Yerba's expected earnings per share after this transaction? Does this change benefit shareholders? Explain.

   d. What is Yerba's forward P/E ratio after this transaction? Is this change in the P/E ratio reasonable? Explain.

**21.** You are CEO of a high-growth technology firm. You plan to raise $180 million to fund an expansion by issuing either new shares or new debt. With the expansion, you expect earnings next year of $24 million. The firm currently has 10 million shares outstanding, with a price of $90 per share. Assume perfect capital markets.

   a. If you raise the $180 million by selling new shares, what will the forecast for next year's earnings per share be?

   b. If you raise the $180 million by issuing new debt with an interest rate of 5%, what will the forecast for next year's earnings per share be?

   c. What is the firm's forward P/E ratio (that is, the share price divided by the expected earnings for the coming year) if it issues equity? What is the firm's forward P/E ratio if it issues debt? How can you explain the difference?

**22.** Zelnor, Inc., is an all-equity firm with 100 million shares outstanding currently trading for $8.50 per share. Suppose Zelnor decides to grant a total of 10 million new shares to employees

as part of a new compensation plan. The firm argues that this new compensation plan will motivate employees and is a better strategy than giving salary bonuses because it will not cost the firm anything.

a. If the new compensation plan has no effect on the value of Zelnor's assets, what will be the share price of the stock once this plan is implemented?

b. What is the cost of this plan for Zelnor's investors? Why is issuing equity costly in this case?

*23. Suppose Levered Bank is funded with 2% equity and 98% debt. Its current market capitalization is $10 billion, and its market to book ratio is 1. Levered Bank earns a 4.22% expected return on its assets (the loans it makes), and pays 4% on its debt.

New capital requirements will necessitate that Levered Bank increase its equity to 4% of its capital structure. It will issue new equity and use the funds to retire existing debt. The interest rate on its debt is expected to remain at 4%.

a. What is Levered Bank's expected ROE with 2% equity?

b. Assuming perfect capital markets, what will Levered Bank's expected ROE be after it increases its equity to 4%?

c. Consider the difference between Levered Bank's ROE and its cost of debt. How does this "premium" compare before and after the Bank's increase in leverage?

d. Suppose the return on Levered Bank's assets has a volatility of 0.25%. What is the volatility of Levered Bank's ROE before and after the increase in equity?

e. Does the reduction in Levered Bank's ROE after the increase equity reduce its attractiveness to shareholders? Explain.

# Data Case

You work in the corporate finance division of The Home Depot and your boss has asked you to review the firm's capital structure. Specifically, your boss is considering changing the firm's debt level. Your boss remembers something from his MBA program about capital structure being irrelevant, but isn't quite sure what that means. You know that capital structure is irrelevant under the conditions of perfect markets and will demonstrate this point for your boss by showing that the weighted average cost of capital remains constant under various levels of debt. So, for now, suppose that capital markets are perfect as you prepare responses for your boss.

You would like to analyze relatively modest changes to Home Depot's capital structure. You would like to consider two scenarios: the firm issues $1 billion in new debt to repurchase stock, and the firm issues $1 billion in new stock to repurchase debt. Use Excel to answer the following questions using Eqs. 14.5 and 14.6, and assuming a cost of unlevered equity ($r_U$) of 12%.

1. Obtain the financial information you need for Home Depot.

a. Go to www.nasdaq.com, and under "Quotes and Research" click "Summary Quotes." Enter Home Depot's stock symbol (HD) and click "Go Now." From the Stock Quote & Summary Data page, get the current stock price. Click "Stock Report" in the left column and find the number of shares outstanding.

b. Click "Income Statement" and the annual income statement should appear. Put the cursor in the middle of the statement, right-click your mouse, and select "Export to Microsoft Excel." (You will not need the income statement until Chapter 15, but collect all of the background data in one step.) On the Web page, click the Balance Sheet tab. Export the balance sheet to Excel as well and then cut and paste the balance sheet to the same worksheet as the income statement.

c. To get the cost of debt for Home Depot, go to NASD BondInfo (http://cxa.marketwatch .com/finra/BondCenter/Default.aspx). Select the "Corporate" option, enter Home Depot's symbol, and click "Search." The next page will contain information for all of Home Depot's outstanding and recently matured bonds. Select the latest yield on an outstanding bond with the shortest remaining maturity (the maturity date is on the line describing each issue; sometimes the list also contains recently retired bonds, so make sure not to use one of those). For simplicity, since you are just trying to illustrate the main concepts for your boss, you may use the existing yield on the outstanding bond as $r_D$.

2. Compute the market D/E ratio for Home Depot. Approximate the market value of debt by the book value of net debt; include both Long-Term Debt and Short-Term Debt/Current Portion of Long-Term Debt from the balance sheet and subtract any cash holdings. Use the stock price and number of shares outstanding to calculate the market value of equity.

3. Compute the cost of levered equity ($r_E$) for Home Depot using their current market debt-to-equity ratio and Eq. 14.5.

4. Compute the current weighted average cost of capital (WACC) for Home Depot using Eq. 14.6 given their current debt-to-equity ratio.

5. Repeat Steps 3 and 4 for the two scenarios you would like to analyze, issuing $1 billion in debt to repurchase stock, and issuing $1 billion in stock to repurchase debt. (Although you realize that the cost of debt capital $r_D$ may change with changes in leverage, for these modestly small changes you decide to assume that $r_D$ remains constant. We will explore the relation between changing leverage and changing $r_D$ more fully in Chapter 24.) What is the market D/E ratio in each of these cases?

6. Prepare a written explanation for your boss explaining the relationship between capital structure and the cost of capital in this exercise.

7. What implicit assumptions in this exercise generate the results found in Question 5? How might your results differ in the "real world"?

# CHAPTER

# 15

# Debt and Taxes

## NOTATION

$Int$  interest expense

$PV$  present value

$r_f$  risk-free interest rate

$D$  market value of debt

$r_E$  equity cost of capital

$\tau_c$  marginal corporate tax rate

$E$  market value of equity

$r_{wacc}$  weighted average cost of capital

$r_D$  debt cost of capital

$V^U$  value of the unlevered firm

$V^L$  value of the firm with leverage

$\tau_i$  marginal personal tax rate on income from debt

$\tau_e$  marginal personal tax rate on income from equity

$\tau^*$  effective tax advantage of debt

$\tau_{ex}^*$  effective tax advantage on interest in excess of EBIT

**I**N A PERFECT CAPITAL MARKET, THE LAW OF ONE PRICE IMPLIES that all financial transactions have an NPV of zero and neither create nor destroy value. Consequently, in Chapter 14, we found that the choice of debt versus equity financing does not affect the value of a firm: The funds raised from issuing debt equal the present value of the future interest and principal payments the firm will make. While leverage increases the risk and cost of capital of the firm's equity, the firm's weighted average cost of capital (WACC), total value, and share price are unaltered by a change in leverage. That is, *in a perfect capital market, a firm's choice of capital structure is unimportant*.

This statement is at odds, however, with the observation that firms invest significant resources, both in terms of managerial time and effort and investment banking fees, in managing their capital structures. In many instances, the choice of leverage is of critical importance to a firm's value and future success. As we will show, there are large and systematic variations in the typical capital structures for different industries. For example, in July 2012, Amgen, a biotechnology and drug company, had debt of $24 billion, cash of $22 billion, and equity worth more than $64 billion, giving the firm a market debt-equity ratio of 0.38, with very little net debt. In contrast, Navistar International, an auto and truck manufacturer, had a debt-equity ratio of 2.6. Truck manufacturers in general have higher debt ratios than biotechnology and drug companies. If capital structure is unimportant, why do we see such consistent differences in capital structures across firms and industries? Why do managers dedicate so much time, effort, and expense to the capital structure choice?

As Modigliani and Miller made clear in their original work, capital structure does not matter in *perfect* capital markets. Recall from Chapter 14 that a perfect capital market exists under the following assumptions:

1. Investors and firms can trade the same set of securities at competitive market prices equal to the present value of their future cash flows.

2. There are no taxes, transaction costs, or issuance costs associated with security trading.

3. A firm's financing decisions do not change the cash flows generated by its investments, nor do they reveal new information about them.

Thus, if capital structure *does* matter, then it must stem from a market *imperfection*. In this chapter, we focus on one such imperfection—taxes. Corporations and investors must pay taxes on the income they earn from their investments. As we will see, a firm can enhance its value by using leverage to minimize the taxes it, and its investors, pay.

# 15.1  The Interest Tax Deduction

Corporations must pay taxes on the income that they earn. Because they pay taxes on their profits after interest payments are deducted, interest expenses reduce the amount of corporate tax firms must pay. This feature of the tax code creates an incentive to use debt.

Let's consider the impact of interest expenses on the taxes paid by Macy's, Inc., a retail department store. Macy's had earnings before interest and taxes of approximately $2.5 billion in 2012, and interest expenses of about $430 million. Given Macy's marginal corporate tax rate of 35%,[1] the effect of leverage on Macy's earnings is shown in Table 15.1.

| TABLE 15.1 | Macy's Income with and without Leverage, Fiscal Year 2012 ($ million) | |
|---|---|---|
| | With Leverage | Without Leverage |
| EBIT | $2500 | $2500 |
| Interest expense | −430 | 0 |
| Income before tax | 2070 | 2500 |
| Taxes (35%) | −725 | −875 |
| Net income | $1345 | $1625 |

As we can see from Table 15.1, Macy's net income in 2012 was lower with leverage than it would have been without leverage. Thus, Macy's debt obligations reduced the income available to equity holders. But more importantly, the *total* amount available to *all* investors was higher with leverage:

| | With Leverage | Without Leverage |
|---|---|---|
| Interest paid to debt holders | 430 | 0 |
| Income available to equity holders | 1345 | 1625 |
| **Total available to all investors** | $1775 | $1625 |

With leverage, Macy's was able to pay out $1775 million in total to its investors, versus only $1625 million without leverage, representing an increase of $150 million.

---

[1]Macy's paid an average tax rate of approximately 35.6 % in 2012, after accounting for other credits and deferrals. Because we are interested in the impact of a change in leverage, Macy's marginal tax rate—the tax rate that would apply to additional taxable income—is relevant to our discussion.

It might seem odd that a firm can be better off with leverage even though its earnings are lower. But recall from Chapter 14 that the value of a firm is the total amount it can raise from all investors, not just equity holders. Because leverage allows the firm to pay out more in total to its investors—including interest payments to debt holders—it will be able to raise more total capital initially.

Where does the additional $150 million come from? Looking at Table 15.1, we can see that this gain is equal to the reduction in taxes with leverage: $875 million − $725 million = $150 million. Because Macy's does not owe taxes on the $430 million of earnings it used to make interest payments, this $430 million is *shielded* from the corporate tax, providing the tax savings of 35% × $430 million = $150 million.

In general, the gain to investors from the tax deductibility of interest payments is referred to as the **interest tax shield**. The interest tax shield is the additional amount that a firm would have paid in taxes if it did not have leverage. We can calculate the amount of the interest tax shield each year as follows:

$$\text{Interest Tax Shield} = \text{Corporate Tax Rate} \times \text{Interest Payments} \qquad (15.1)$$

---

**EXAMPLE 15.1**

**Computing the Interest Tax Shield**

**Problem**

Shown below is the income statement for D.F. Builders (DFB). Given its marginal corporate tax rate of 35%, what is the amount of the interest tax shield for DFB in years 2009 through 2012?

| DFB Income Statement ($ million) | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Total sales | $3369 | $3706 | $4077 | $4432 |
| Cost of sales | −2359 | −2584 | −2867 | −3116 |
| Selling, general, and administrative expense | −226 | −248 | −276 | −299 |
| Depreciation | −22 | −25 | −27 | −29 |
| **Operating income** | 762 | 849 | 907 | 988 |
| Other income | 7 | 8 | 10 | 12 |
| **EBIT** | 769 | 857 | 917 | 1000 |
| Interest expense | −50 | −80 | −100 | −100 |
| **Income before tax** | 719 | 777 | 817 | 900 |
| Taxes (35%) | −252 | −272 | −286 | −315 |
| **Net income** | $467 | $505 | $531 | $585 |

**Solution**

From Eq. 15.1, the interest tax shield is the tax rate of 35% multiplied by the interest payments in each year:

| ($ million) | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Interest expense | −50 | −80 | −100 | −100 |
| **Interest tax shield** (35% × **interest expense**) | 17.5 | 28 | 35 | 35 |

Thus, the interest tax shield enabled DFB to pay an additional $115.5 million to its investors over this period.

CONCEPT CHECK    1. With corporate income taxes, explain why a firm's value can be higher with leverage even though its earnings are lower.

2. What is the interest tax shield?

## 15.2 Valuing the Interest Tax Shield

When a firm uses debt, the interest tax shield provides a corporate tax benefit each year. To determine the benefit of leverage for the value of the firm, we must compute the present value of the stream of future interest tax shields the firm will receive.

### The Interest Tax Shield and Firm Value

Each year a firm makes interest payments, the cash flows it pays to investors will be higher than they would be without leverage by the amount of the interest tax shield:

$$\begin{pmatrix} \text{Cash Flows to Investors} \\ \text{with Leverage} \end{pmatrix} = \begin{pmatrix} \text{Cash Flows to Investors} \\ \text{without Leverage} \end{pmatrix} + (\text{Interest Tax Shield})$$

Figure 15.1 illustrates this relationship. Here you can see how each dollar of pretax cash flows is divided. The firm uses some fraction to pay taxes, and it pays the rest to investors. By increasing the amount paid to debt holders through interest payments, the amount of the pretax cash flows that must be paid as taxes decreases. The gain in total cash flows to investors is the interest tax shield.

Because the cash flows of the levered firm are equal to the sum of the cash flows from the unlevered firm plus the interest tax shield, by the Law of One Price the same must be true for the present values of these cash flows. Thus, letting $V^L$ and $V^U$ represent the value of the firm with and without leverage, respectively, we have the following change to MM Proposition I in the presence of taxes:

*The total value of the levered firm exceeds the value of the firm without leverage due to the present value of the tax savings from debt:*

$$V^L = V^U + PV(\text{Interest Tax Shield}) \tag{15.2}$$

**FIGURE 15.1**

**The Cash Flows of the Unlevered and Levered Firm**

By increasing the cash flows paid to debt holders through interest payments, a firm reduces the amount paid in taxes. The increase in total cash flows paid to investors is the interest tax shield. (The figure assumes a 40% marginal corporate tax rate.)



512        **Chapter 15** Debt and Taxes

Clearly, there is an important tax advantage to the use of debt financing. But how large is this tax benefit? To compute the increase in the firm's total value associated with the interest tax shield, we need to forecast how a firm's debt—and therefore its interest payments—will vary over time. Given a forecast of future interest payments, we can determine the interest tax shield and compute its present value by discounting it at a rate that corresponds to its risk.

---

**EXAMPLE 15.2**

### Valuing the Interest Tax Shield without Risk

**Problem**

Suppose DFB plans to pay $100 million in interest each year for the next 10 years, and then to repay the principal of $2 billion in year 10. These payments are risk free, and DFB's marginal tax rate will remain 35% throughout this period. If the risk-free interest rate is 5%, by how much does the interest tax shield increase the value of DFB?

**Solution**

In this case, the interest tax shield is $35\% \times \$100$ million $= \$35$ million each year for the next 10 years. Therefore, we can value it as a 10-year annuity. Because the tax savings are known and not risky, we can discount them at the 5% risk-free rate:

$$PV(\text{Interest Tax Shield}) = \$35 \text{ million} \times \frac{1}{0.05}\left(1 - \frac{1}{1.05^{10}}\right)$$

$$= \$270 \text{ million}$$

The final repayment of principal in year 10 is not deductible, so it does not contribute to the tax shield.

---

## The Interest Tax Shield with Permanent Debt

In Example 15.2, we know with certainty the firm's future interest payments and associated tax savings. In practice, this case is rare. Typically, the level of future interest payments varies due to changes the firm makes in the amount of debt outstanding, changes in the interest rate on that debt, and the risk that the firm may default and fail to make an interest payment. In addition, the firm's marginal tax rate may fluctuate due to changes in the tax code and changes in the firm's income bracket.

Rather than attempting to account for all possibilities here, let's consider the special case in which the firm issues debt and plans to keep the dollar amount of debt constant forever.[2] For example, the firm might issue a perpetual consol bond, making only interest payments but never repaying the principal. More realistically, suppose the firm issues short-term debt, such as a five-year coupon bond. When the principal is due, the firm raises the money needed to pay it by issuing new debt. In this way, the firm never pays off the principal but simply refinances it whenever it comes due. In this situation, the debt is effectively permanent.

Many large firms have a policy of maintaining a certain amount of debt on their balance sheets. As old bonds and loans mature, new borrowing takes place. The key assumption here is that the firm maintains a *fixed* dollar amount of outstanding debt, rather than an amount that changes with the size of the firm.

---

[2]We discuss how to value the interest tax shield with more complicated leverage policies in Chapter 18.

### Pizza and Taxes

In Chapter 14, we mentioned the pizza analogy that Merton Miller once used to describe the MM Propositions with perfect capital markets: No matter how you slice it, you still have the same amount of pizza.

We can extend this analogy to the setting with taxes, but the story is a bit different. In this case, every time equity holders get a slice of pizza, Uncle Sam gets a slice as a tax payment.

But when debt holders get a slice, there is no tax. Thus, by allocating more slices to debt holders rather than to equity holders, more pizza will be available to investors. While the total amount of pizza does not change, there is more pizza left over for investors to consume because less pizza is consumed by Uncle Sam in taxes.

Suppose a firm borrows debt $D$ and keeps the debt permanently. If the firm's marginal tax rate is $\tau_c$, and if the debt is riskless with a risk-free interest rate $r_f$, then the interest tax shield each year is $\tau_c \times r_f \times D$, and we can value the tax shield as a perpetuity:

$$PV(\text{Interest Tax Shield}) = \frac{\tau_c \times \text{Interest}}{r_f} = \frac{\tau_c \times (r_f \times D)}{r_f}$$

$$= \tau_c \times D$$

The above calculation assumes the debt is risk free and the risk-free interest rate is constant. These assumptions are not necessary, however. As long as the debt is fairly priced, no arbitrage implies that its market value must equal the present value of the future interest payments:[3]

$$\text{Market Value of Debt} = D = PV(\text{Future Interest Payments}) \qquad (15.3)$$

If the firm's marginal tax rate is constant,[4] then we have the following general formula:

**Value of the Interest Tax Shield of Permanent Debt**

$$PV(\text{Interest Tax Shield}) = PV(\tau_c \times \text{Future Interest Payments})$$

$$= \tau_c \times PV(\text{Future Interest Payments})$$

$$= \tau_c \times D \qquad (15.4)$$

This formula shows the magnitude of the interest tax shield. Given a 35% corporate tax rate, it implies that for every $1 in new permanent debt that the firm issues, the value of the firm increases by $0.35.

### The Weighted Average Cost of Capital with Taxes

The tax benefit of leverage can also be expressed in terms of the weighted average cost of capital. When a firm uses debt financing, the cost of the interest it must pay is offset to some extent by the tax savings from the interest tax shield. For example, suppose a firm

---

[3]Equation 15.3 holds even if interest rates fluctuate and the debt is risky, as long as any new debt is also fairly priced. It requires only that the firm never repay the principal on the debt (it either refinances or defaults on the principal). The result follows by the same argument used in Chapter 9 to show that the price of equity should equal the present value of all future dividends.

[4]The tax rate may not be constant if the firm's taxable income fluctuates sufficiently to change the firm's tax bracket (we discuss this possibility further in Section 15.5).

with a 35% tax rate borrows $100,000 at 10% interest per year. Then its net cost at the end of the year is

|  |  | Year-End |
|---|---|---|
| **Interest expense** | $r \times \$100,000 =$ | $10,000 |
| **Tax savings** | $-\tau_c \times r \times \$100,000 =$ | $-3,500$ |
| **Effective after-tax cost of debt** | $r \times (1 - \tau_c) \times \$100,000 =$ | $6,500 |

The effective cost of the debt is only $\$6,500/\$100,000 = 6.50\%$ of the loan amount, rather than the full 10% interest. Thus, the tax deductibility of interest lowers the effective cost of debt financing for the firm. More generally,[5]

*With tax-deductible interest, the effective after-tax borrowing rate is $r(1 - \tau_c)$.*

In Chapter 14, we showed that without taxes, the firm's WACC was equal to its unlevered cost of capital, which is the average return that the firm must pay to its investors (equity holders and debt holders). The tax-deductibility of interest payments, however, lowers the effective after-tax cost of debt *to the firm*. As we discussed in Chapter 12, we can account for the benefit of the interest tax shield by calculating the WACC using the effective after-tax cost of debt:

**Weighted Average Cost of Capital (After Tax)[6]**

$$r_{wacc} = \frac{E}{E + D} r_E + \frac{D}{E + D} r_D (1 - \tau_c) \tag{15.5}$$

The WACC represents the effective cost of capital to the firm, after including the benefits of the interest tax shield. It is therefore lower than the pretax WACC, which is the average return paid to the firm's investors. From Eq. 15.5, we have the following relationship between the WACC and the firm's pretax WACC:

$$r_{wacc} = \underbrace{\frac{E}{E + D} r_E + \frac{D}{E + D} r_D}_{\text{Pretax WACC}} - \underbrace{\frac{D}{E + D} r_D \tau_c}_{\substack{\text{Reduction Due} \\ \text{to Interest Tax Shield}}} \tag{15.6}$$

As we will show in Chapter 18, even in the presence of taxes, a firm's target leverage ratio does not affect the firm's pretax WACC, which equals its unlevered cost of capital and depends only on the risk of the firm's assets.[7] Thus, the higher the firm's leverage, the more the firm exploits the tax advantage of debt, and the lower its WACC is. Figure 15.2 illustrates this decline in the WACC with the firm's leverage ratio.

### The Interest Tax Shield with a Target Debt-Equity Ratio

Earlier we calculated the value of the tax shield assuming the firm maintains a constant level of debt. In many cases this assumption is unrealistic—rather than maintain a constant

---

[5]We derived this same result in Chapter 5 when considering the implications of tax-deductible interest for individuals (e.g., with a home mortgage).

[6]We will derive this formula in Chapter 18. See Chapter 12 for methods of estimating the cost of debt (and Eq. 12.12 and footnote 18 on page 422 in the context of the WACC.)

[7]Specifically, if the firm adjusts its leverage to maintain a target debt-equity ratio or interest coverage ratio, then its pretax WACC remains constant and equal to its unlevered cost of capital. See Chapter 18 for a full discussion of the relationship between the firm's levered and unlevered costs of capital.

| FIGURE 15.2 | The WACC with and without Corporate Taxes |
|---|---|



We compute the WACC as a function of the firm's target debt-to-value ratio using Eq. 15.5. As shown in Figure 14.1, the firm's unlevered cost of capital or pretax WACC is constant, reflecting the required return of the firm's investors based on the risk of the firm's assets. However, the (effective after-tax) WACC, which represents the after-tax cost to the firm, declines with leverage as the interest tax shield grows. The figure assumes a marginal corporate income tax rate of $\tau_c = 35\%$.

level of debt, many firms target a specific debt-equity ratio instead. When a firm does so, the level of its debt will grow (or shrink) with the size of the firm.

As we will show formally in Chapter 18, when a firm adjusts its debt over time so that its debt-equity ratio is expected to remain constant, we can compute its value with leverage, $V^L$, by discounting its free cash flow using the WACC. The value of the interest tax shield can be found by comparing $V^L$ to the unlevered value, $V^U$, of the free cash flow discounted at the firm's unlevered cost of capital, the pretax WACC.

| EXAMPLE 15.3 | Valuing the Interest Tax Shield with a Target Debt-Equity Ratio |
|---|---|

**Problem**

Western Lumber Company expects to have free cash flow in the coming year of $4.25 million, and its free cash flow is expected to grow at a rate of 4% per year thereafter. Western Lumber has an equity cost of capital of 10% and a debt cost of capital of 6%, and it pays a corporate tax rate of 35%. If Western Lumber maintains a debt-equity ratio of 0.50, what is the value of its interest tax shield?

**Solution**

We can estimate the value of Western Lumber's interest tax shield by comparing its value with and without leverage. We compute its unlevered value by discounting its free cash flow at its pretax WACC:

$$\text{Pretax WACC} = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D = \frac{1}{1+0.5}10\% + \frac{0.5}{1+0.5}6\% = 8.67\%$$

Because Western Lumber's free cash flow is expected to grow at a constant rate, we can value it as a constant growth perpetuity:

$$V^U = \frac{4.25}{8.67\% - 4\%} = \$91 \text{ million}$$

To compute Western Lumber's levered value, we calculate its WACC:

$$\text{WACC} = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D(1 - \tau_c)$$

$$= \frac{1}{1+0.5}10\% + \frac{0.5}{1+0.5}6\%(1 - 0.35) = 7.97\%$$

Thus, Western Lumber's value including the interest tax shield is

$$V^L = \frac{4.25}{7.97\% - 4\%} = \$107 \text{ million}$$

The value of the interest tax shield is therefore

$$PV(\text{Interest Tax Shield}) = V^L - V^U = 107 - 91 = \$16 \text{ million}$$

**CONCEPT CHECK**
1. With corporate taxes as the only market imperfection, how does the value of the firm with leverage differ from its value without leverage?

2. How does leverage affect a firm's weighted average cost of capital?

## 15.3 Recapitalizing to Capture the Tax Shield

When a firm makes a significant change to its capital structure, the transaction is called a recapitalization (or simply a "recap"). In Chapter 14, we introduced a leveraged recapitalization in which a firm issues a large amount of debt and uses the proceeds to pay a special dividend or to repurchase shares. Leveraged recaps were especially popular in the mid- to late-1980s, when many firms found that these transactions could reduce their tax payments.

Let's see how such a transaction might benefit current shareholders. Midco Industries has 20 million shares outstanding with a market price of $15 per share and no debt. Midco has had consistently stable earnings, and pays a 35% tax rate. Management plans to borrow $100 million on a permanent basis through a leveraged recap in which they would use the borrowed funds to repurchase outstanding shares. Their expectation is that the tax savings from this transaction will boost Midco's stock price and benefit shareholders. Let's see if this expectation is realistic.

### The Tax Benefit

First, we examine the tax consequences of Midco's leveraged recap. Without leverage, Midco's total market value is the value of its unlevered equity. Assuming the current stock price is the fair price for the shares without leverage:

$$V^U = (20 \text{ million shares}) \times (\$15/\text{share}) = \$300 \text{ million}$$

With leverage, Midco will reduce its annual tax payments. If Midco borrows $100 million using permanent debt, the present value of the firm's future tax savings is

$$PV(\text{Interest Tax Shield}) = \tau_c D = 35\% \times \$100 \text{ million} = \$35 \text{ million}$$

Thus, the total value of the levered firm will be

$$V^L = V^U + \tau_c D = \$300 \text{ million} + \$35 \text{ million} = \$335 \text{ million}$$

This total value represents the combined value of the debt and the equity after the recapitalization. Because the value of the debt is $100 million, the value of the equity is

$$E = V^L - D = \$335 \text{ million} - \$100 \text{ million} = \$235 \text{ million}$$

While total firm value has increased, the value of equity dropped after the recap. How do shareholders benefit from this transaction?

Even though the value of the shares outstanding drops to $235 million, don't forget that shareholders will also receive the $100 million that Midco will pay out through the share repurchase. In total, they will receive the full $335 million, a gain of $35 million over the value of their shares without leverage. Let's trace the details of the share repurchase and see how it leads to an increase in the stock price.

### The Share Repurchase

Suppose Midco repurchases its shares at their current price of $15 per share. The firm will repurchase $100 million ÷ $15 per share = 6.667 million shares, and it will then have 20 − 6.667 = 13.333 million shares outstanding. Because the total value of equity is $235 million, the new share price is

$$\frac{\$235 \text{ million}}{13.333 \text{ million shares}} = \$17.625$$

The shareholders who keep their shares earn a capital gain of $17.625 − $15 = $2.625 per share, for a total gain of

$$\$2.625/\text{share} \times 13.333 \text{ million shares} = \$35 \text{ million}$$

In this case, the shareholders who remain after the recap receive the benefit of the tax shield. However, you may have noticed something odd in the previous calculations. We assumed that Midco was able to repurchase the shares at the initial price of $15 per share, and then demonstrated that the shares would be worth $17.625 after the transaction. Why would a shareholder agree to sell the shares for $15 when they are worth $17.625?

### No Arbitrage Pricing

The previous scenario represents an arbitrage opportunity. Investors could *buy* shares for $15 immediately before the repurchase, and they could sell these shares immediately afterward at a higher price. But this activity would raise the share price above $15 even before the repurchase: Once investors know the recap will occur, the share price will rise immediately to a level that reflects the $35 million value of the interest tax shield that the firm will receive. That is, the value of the Midco's equity will rise *immediately* from $300 million to $335 million. With 20 million shares outstanding, the share price will rise to

$$\$335 \text{ million} \div 20 \text{ million shares} = \$16.75 \text{ per share}$$

Midco must offer at least this price to repurchase the shares.

518    **Chapter 15** Debt and Taxes

With a repurchase price of $16.75, the shareholders who tender their shares and the shareholders who hold their shares both gain $16.75 − $15 = $1.75 per share as a result of the transaction. The benefit of the interest tax shield goes to all 20 million of the original shares outstanding for a total benefit of $1.75/share × 20 million shares = $35 million. In other words,

*When securities are fairly priced, the original shareholders of a firm capture the full benefit of the interest tax shield from an increase in leverage.*

| EXAMPLE 15.4 | **Alternative Repurchase Prices** |
|---|---|

**Problem**

Suppose Midco announces a price at which it will repurchase $100 million worth of its shares. Show that $16.75 is the lowest price it could offer and expect shareholders to tender their shares. How will the benefits be divided if Midco offers more than $16.75 per share?

**Solution**

For each repurchase price, we can compute the number of shares Midco will repurchase, as well as the number of shares that will remain after the share repurchase. Dividing the $235 million total value of equity by the number of remaining shares gives Midco's new share price after the transaction. No shareholders will be willing to sell their shares unless the repurchase price is at least as high as the share price after the transaction; otherwise, they would be better off waiting to sell their shares. As the table shows, the repurchase price must be at least $16.75 for shareholders to be willing to sell rather than waiting to receive a higher price.

| Repurchase Price ($/share) | Shares Repurchased (million) | Shares Remaining (million) | New Share Price ($/share) |
|---|---|---|---|
| $P_R$ | $R = 100/P_R$ | $N = 20 - R$ | $P_N = 235/N$ |
| 15.00 | 6.67 | 13.33 | $17.63 |
| 16.25 | 6.15 | 13.85 | 16.97 |
| 16.75 | 5.97 | 14.03 | 16.75 |
| 17.25 | 5.80 | 14.20 | 16.55 |
| 17.50 | 5.71 | 14.29 | 16.45 |

If Midco offers a price above $16.75, then all existing shareholders will be eager to sell their shares, because the shares will have a lower value after the transaction is completed. In this case, Midco's offer to repurchase shares will be oversubscribed and Midco will need to use a lottery or some other rationing mechanism to choose from whom it will repurchase shares. In that case, more of the benefits of the recap will go to the shareholders who are lucky enough to be selected for the repurchase.

### Analyzing the Recap: The Market Value Balance Sheet

We can analyze the recapitalization using the market value balance sheet, a tool we developed in Chapter 14. It states that the total market value of a firm's securities must equal the total market value of the firm's assets. In the presence of corporate taxes, *we must include the interest tax shield as one of the firm's assets.*

We analyze the leveraged recap by breaking this transaction into steps, as shown in Table 15.2. First, the recap is announced. At this point, investors anticipate the future interest tax shield, raising the value of Midco's assets by $35 million. Next, Midco issues $100 million in new debt, increasing both Midco's cash and liabilities by that amount. Finally, Midco uses the cash to repurchase shares at their market price of $16.75. In this step, Midco's cash declines, as does the number of shares outstanding.

| TABLE 15.2 | | Market Value Balance Sheet for the Steps in Midco's Leveraged Recapitalization | | |
|---|---|---|---|---|
| Market Value Balance Sheet ($ million) | Initial | Step 1: Recap Announced | Step 2: Debt Issuance | Step 3: Share Repurchase |
| **Assets** | | | | |
| Cash | 0 | 0 | 100 | 0 |
| Original assets $(V^U)$ | 300 | 300 | 300 | 300 |
| Interest tax shield | 0 | 35 | 35 | 35 |
| Total assets | 300 | 335 | 435 | 335 |
| **Liabilities** | | | | |
| Debt | 0 | 0 | 100 | 100 |
| Equity = Assets − Liabilities | 300 | 335 | 335 | 235 |
| Shares outstanding (million) | 20 | 20 | 20 | 14.03 |
| Price per share | $15.00 | $16.75 | $16.75 | $16.75 |

Note that the share price rises at the announcement of the recap. This increase in the share price is due solely to the present value of the (anticipated) interest tax shield. Thus, even though leverage reduces the total value of equity, shareholders capture the benefits of the interest tax shield upfront.[8]

**CONCEPT CHECK**

1. How can shareholders benefit from a leveraged recap when it reduces the total value of equity?

2. How does the interest tax shield enter into the market value balance sheet?

# 15.4 Personal Taxes

So far, we have looked at the benefits of leverage with regard to the taxes a corporation must pay. By reducing a firm's corporate tax liability, debt allows the firm to pay more of its cash flows to investors.

Unfortunately for investors, after they receive the cash flows, they are generally taxed again. For individuals, interest payments received from debt are taxed as income. Equity investors also must pay taxes on dividends and capital gains. What are the consequences to firm value of these additional taxes?

## Including Personal Taxes in the Interest Tax Shield

The value of a firm is equal to the amount of money the firm can raise by issuing securities. The amount of money an investor will pay for a security ultimately depends on the benefits the investor will receive—namely, the cash flows the investor will receive *after all taxes have been paid*. Thus, just like corporate taxes, personal taxes reduce the cash flows to investors and diminish firm value. As a result, the actual interest tax shield depends on the reduction in the total taxes (both corporate and personal) that are paid.[9]

---

[8]We are ignoring other potential side effects of leverage, such as costs of future financial distress. We discuss such costs in Chapter 16.

[9]This point was made most forcefully in yet another pathbreaking article by Merton Miller, "Debt and Taxes," *Journal of Finance* 32 (1977): 261–275. See also M. Miller and M. Scholes, "Dividends and Taxes," *Journal of Financial Economics* 6 (1978): 333–364.

Personal taxes have the potential to offset some of the corporate tax benefits of leverage that we have described. In particular, in the United States and many other countries, interest income has historically been taxed more heavily than capital gains from equity. Table 15.3 shows recent top federal tax rates in the United States. The average rate on equity income listed in the table is an average of the top capital gains and dividend tax rates.

To determine the true tax benefit of leverage, we need to evaluate the combined effect of both corporate and personal taxes. Consider a firm with $1 of earnings before interest and taxes. The firm can either pay this $1 to debt holders as interest, or it can use the $1 to pay equity holders directly, with a dividend, or indirectly, by retaining earnings so that shareholders receive a capital gain. Figure 15.3 shows the tax consequences of each option.

Using 2012 tax rates, debt offers a clear tax advantage with respect to corporate taxes: For every $1 in pretax cash flows that debt holders receive, equity holders receive $\tau_c = 35\%$ less under current tax rates. But at the personal level, the income tax rate on interest income is $\tau_i = 35\%$, whereas the tax rate on equity income is only $\tau_e = 15\%$. Combining corporate and personal rates leads to the following comparison:

|  | After-Tax Cash Flows | Using Current Tax Rates |
|---|---|---|
| To debt holders | $(1 - \tau_i)$ | $(1 - 0.35) = 0.65$ |
| To equity holders | $(1 - \tau_c)(1 - \tau_e)$ | $(1 - 0.35)(1 - 0.15) = 0.5525$ |

While a tax advantage to debt remains, it is not as large as we calculated based on corporate taxes alone. To express the comparison in relative terms, note that equity holders receive

$$\tau^* = \frac{0.65 - 0.5525}{0.65} = 15\%$$

### FIGURE 15.3

**After-Tax Investor Cash Flows Resulting from $1 in EBIT**

Interest income is taxed at rate $\tau_i$ for the investor. Dividend or capital gain income is taxed at rate $\tau_c$ for the corporation, and again at rate $\tau_e$ for the investor.



| TABLE 15.3 | Top Federal Tax Rates in the United States, 1971–2012 | | | | |
|---|---|---|---|---|---|
| | | Personal Tax Rates* | | | |
| Year | Corporate Tax Rate† | Interest Income | Average Rate on Equity Income | Dividends | Capital Gains |
| 1971–1978 | 48% | 70% | 53% | 70% | 35% |
| 1979–1981 | 46% | 70% | 49% | 70% | 28% |
| 1982–1986 | 46% | 50% | 35% | 50% | 20% |
| 1987 | 40% | 39% | 33% | 39% | 28% |
| 1988–1990 | 34% | 28% | 28% | 28% | 28% |
| 1991–1992 | 34% | 31% | 30% | 31% | 28% |
| 1993–1996 | 35% | 40% | 34% | 40% | 28% |
| 1997–2000 | 35% | 40% | 30% | 40% | 20% |
| 2001–2002 | 35% | 39% | 30% | 39% | 20% |
| 2003–2012 | 35% | 35% | 15% | 15% | 15% |

*Interest income is taxed as ordinary income. Until 2003, dividends were also taxed as ordinary income. The average tax rate on equity income is an average of dividend and capital gain tax rates (consistent with a 50% dividend payout ratio and annual realization of capital gains), where the capital gain tax rate is the long-term rate applicable to assets held more than one year.

†The corporate rate shown is for C corporations with the highest level of income. Marginal rates can be higher for lower brackets. (For example, since 2000, the 35% tax rate applies to income levels above $18.3 million, while the tax rate for income levels between $100,000 and $335,000 is 39%.)

less after taxes than debt holders. In this case, personal taxes reduce the tax advantage of debt from 35% to 15%.

In general, every $1 received after taxes by debt holders from interest payments costs equity holders $$(1 - \tau^*)$$ on an after-tax basis, where

**Effective Tax Advantage of Debt**

$$\tau^* = \frac{(1 - \tau_i) - (1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} = 1 - \frac{(1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} \tag{15.7}$$

When there are no personal taxes, or when the personal tax rates on debt and equity income are the same ($\tau_i = \tau_e$), this formula reduces to $\tau^* = \tau_c$. But when equity income is taxed less heavily ($\tau_i > \tau_e$), then $\tau^*$ is less than $\tau_c$.

| EXAMPLE 15.5 | Calculating the Effective Tax Advantage of Debt |
|---|---|

**Problem**

What was the effective tax advantage of debt in 1980? In 1990?

**Solution**

Using Eq. 15.7 and the tax rates in Table 15.3, we can calculate

$$\tau^*_{1980} = 1 - \frac{(1 - 0.46)(1 - 0.49)}{(1 - 0.70)} = 8.2\%$$

$$\tau^*_{1990} = 1 - \frac{(1 - 0.34)(1 - 0.28)}{(1 - 0.28)} = 34\%$$

Given the tax rates at the time, the effective tax advantage of debt was much lower in 1980 than in 1990.

**FIGURE 15.4**

**The Effective Tax Advantage of Debt with and without Personal Taxes, 1971–2012**

After adjusting for personal taxes, the tax advantage of debt $\tau^*$ is generally below $\tau_c$, but still positive. It has also varied widely with changes to the tax code.



Figure 15.4 shows the effective tax advantage of debt since 1971 in the United States. It has varied widely over time with changes in the tax code.

## Valuing the Interest Tax Shield with Personal Taxes

How does the forgoing analysis of personal taxes affect our valuation of the debt tax shield? We postpone a detailed answer to this question until Chapter 18, and limit our discussion here to a few important observations. First, as long as $\tau^* > 0$, then despite any tax disadvantage of debt at the personal level, a net tax advantage for leverage remains. In the case of permanent debt, the value of the firm with leverage becomes

$$V^L = V^U + \tau^* D \tag{15.8}$$

Because the personal tax disadvantage of debt generally implies $\tau^* < \tau_c$, comparing Eq. 15.8 with Eq. 15.4 we see that the benefit of leverage is reduced.

Personal taxes have a similar, but indirect, effect on the firm's weighted average cost of capital. While we still compute the WACC using the corporate tax rate $\tau_c$ as in Eq. 15.5, with personal taxes the firm's equity and debt costs of capital will adjust to compensate investors for their respective tax burdens. The net result is that a personal tax disadvantage for debt causes the WACC to decline more slowly with leverage than it otherwise would.

**EXAMPLE 15.6**    **Estimating the Interest Tax Shield with Personal Taxes**

**Problem**

Estimate the value of Midco after its $100 million leveraged recap, accounting for personal taxes in 2012.

**Solution**

Given $\tau^* = 15\%$ in 2012, and given Midco's current value $V^U = \$300$ million, we estimate $V^L = V^U + \tau^* D = \$300$ million $+ 15\%(\$100$ million$) = \$315$ million. With 20 million original shares outstanding, the stock price would increase by $15 million ÷ 20 million shares $= \$0.75$ share.

### Determining the Actual Tax Advantage of Debt

In estimating the effective tax advantage of debt after taking personal taxes into account, we made several assumptions that may need adjustment when determining the actual tax benefit for a particular firm or investor.

First, with regard to the capital gains tax rate, we assumed that investors paid capital gains taxes every year. But unlike taxes on interest income or dividends, which are paid annually, capital gains taxes are paid only at the time the investor sells the stock and realizes the gain. Deferring the payment of capital gains taxes lowers the present value of the taxes, which can be interpreted as a lower *effective* capital gains tax rate. For example, given a capital gains tax rate of 15% and an interest rate of 6%, holding the asset for 10 more years lowers the effective tax rate this year to $(15\%)/1.06^{10} = 8.4\%$. Also, investors with accrued losses that they can use to offset gains face a zero effective capital gains tax rate. As a consequence, investors with longer holding periods or with accrued losses face a lower tax rate on equity income, decreasing the effective tax advantage of debt.

A second key assumption in our analysis is the computation of the tax rate on equity income $\tau_e$. Using the average dividend and capital gains tax rate is reasonable for a firm that pays out 50% of its earnings as dividends, so that shareholder gains from additional earnings were evenly split between dividends and capital gains. For firms with much higher or much lower payout ratios, however, this average would not be accurate. For example, for firms that do not pay dividends, the capital gains tax rate should be used as the tax rate on equity income.

Finally, we assumed the top marginal federal income tax rates for the investor. In reality, rates vary for individual investors, and many investors face lower rates. (We have also ignored state taxes, which vary widely by state and have an additional impact.) At lower rates, the effects of personal taxes are less substantial. Moreover, *many investors face no personal taxes*. Consider investments held in retirement savings accounts or pension funds that

---

### Cutting the Dividend Tax Rate

In January 2003, President George W. Bush unveiled a proposal to boost the U.S. economy with a $674 billion tax cut plan, half of which would come from eliminating taxes on dividends. From the moment it was announced, this tax cut generated tremendous controversy.

Proponents argued that easing the tax bite on investors' dividend income would boost the stock market and stimulate the sluggish economy. Critics quickly denounced it as a tax cut for the rich. But one of the underlying motives of the plan, authored in large part by economist R. Glenn Hubbard, was to end the current distortion in tax laws that encourage companies to accumulate debt because interest is deductible but dividend payments are not.

Levying taxes both on corporate earnings and on the dividends or capital gains paid to investors is known as *double taxation*. The lower rates on capital gains have provided some relief from double taxation. In 2002, however, dividends were still taxed at the same rate as ordinary income, leading to a combined tax rate in excess of 60% on dividends—one of the highest tax rates on dividends of any industrialized nation. As we have seen, this double taxation results in a tax advantage to debt financing.

Ultimately, policymakers agreed to a compromise that reduced the tax rate for individuals on both dividends (for stocks held for more than 60 days) and capital gains (for assets held for more than one year) to 15%. This compromise still gives a tax advantage to debt, but at a decreased level from prior years (see Figure 15.4).

The "Bush tax cuts" (which also lowered income and capital gains tax rates) were originally set to expire at the end of 2010. Fearing their expiration would slow the nascent economic recovery, in December 2010 Congress extended the tax cuts through 2012. As of mid-2012 there is renewed debate regarding a further extension of the tax cuts, which may stimulate growth but would widen the federal deficit.

are not subject to taxes.[10] For these investors, the effective tax advantage of debt is $\tau^* = \tau_c$, the full corporate tax rate. This full tax advantage would also apply to securities dealers for whom interest, dividends, and capital gains are all taxed equivalently as income.

What is the bottom line? Calculating the effective tax advantage of debt accurately is extremely difficult, and this advantage will vary across firms (and from investor to investor). A firm must consider the tax bracket of its typical debt holders to estimate $\tau_i$, and the tax bracket and holding period of its typical equity holders to determine $\tau_e$. If, for instance, a firm's investors hold shares primarily through their retirement accounts, $\tau^* \approx \tau_c$. While $\tau^*$ is likely to be somewhat below $\tau_c$ for the typical firm, exactly how much lower is open to debate. Our calculation of $\tau^*$ in Figure 15.4 should be interpreted as a very rough guide at best.[11]

<table>
<tr><td>CONCEPT CHECK</td><td>1. Under current law (in 2012), why is there a personal tax disadvantage of debt?</td></tr>
<tr><td></td><td>2. How does this personal tax disadvantage of debt change the value of leverage for the firm?</td></tr>
</table>

## 15.5 Optimal Capital Structure with Taxes

In Modigliani and Miller's setting of perfect capital markets, firms could use any combination of debt and equity to finance their investments without changing the value of the firm. In effect, any capital structure was optimal. In this chapter we have seen that taxes change that conclusion because interest payments create a valuable tax shield. Even after adjusting for personal taxes, the value of a firm with leverage exceeds the value of an unlevered firm, and there is a tax advantage to using debt financing.

### Do Firms Prefer Debt?

Do firms show a preference for debt in practice? Figure 15.5 illustrates the net new issues of equity and debt by U.S. corporations. For equity, the figure shows the total amount of new equity issued, less the amount retired through share repurchases and acquisitions. For debt, it shows the total amount of new borrowing less the amount of loans repaid.

Figure 15.5 makes clear that when firms raise new capital from investors, they do so primarily by issuing debt. In fact, in most years, aggregate equity issues are negative, meaning that firms are reducing the amount of equity outstanding by buying shares. (This observation does not mean that *all* firms raised funds using debt. Many firms may have sold equity to raise funds. However, at the same time, other firms were buying or repurchasing an equal or greater amount.) The data show a clear preference for debt as a source of external financing for the total population of U.S. firms. Indeed, in aggregate, firms appear to be borrowing in excess of the funds they need for internal use in order to repurchase equity.

While firms seem to prefer debt when raising external funds, not all investment is externally funded. As Figure 15.5 also shows, capital expenditures greatly exceed firms' external financing, implying that most investment and growth is supported by internally generated funds, such as retained earnings. Thus, even though firms have not *issued* new equity, the market value of equity has risen over time as firms have grown. In fact, as shown in

---

[10]Evidence from the mid-1990s suggests that the growth in pension funds has lowered the average marginal tax rate for investors to about half the rates shown in Table 15.3. See J. Poterba, "The Rate of Return to Corporate Capital and Factor Shares: New Estimates Using Revised National Income Accounts and Capital Stock Data," NBER working paper no. 6263 (1997).

[11]For a discussion of methods of estimating $\tau^*$ and the need to include personal taxes, see J. Graham, "Do Personal Taxes Affect Corporate Financing Decisions?" *Journal of Public Economics* 73 (1999): 147–185.

**FIGURE 15.5**

**Net External Financing and Capital Expenditures by U.S. Corporations, 1975–2011**

In aggregate, firms have raised external capital primarily by issuing debt. These funds have been used to retire equity and fund investment, but the vast majority of capital expenditures are internally funded. (Amounts adjusted for inflation to reflect 2011 dollars.)

*Source*: Federal Reserve, *Flow of Funds Accounts of the United States*, 2012.



Figure 15.6, debt as a fraction of firm value has varied in a range from 30–50% for the average firm. The average debt-to-value ratio fell during the 1990s bull market, with the trend reversing post-2000 due to declines in the stock market as well as a dramatic increase in debt issuance in response to falling interest rates.

The aggregate data in Figure 15.6 masks two important tendencies. First, the use of leverage varies greatly by industry. Second, many firms retain large cash balances to reduce their effective leverage. These patterns are revealed in Figure 15.7, which shows *net* debt as a fraction of firm enterprise value for a number of industries and the overall market. Note that net debt is negative if a firm's cash holdings exceed its outstanding debt. Clearly, there are large differences in net leverage across industries. Firms in growth industries like biotechnology or high technology carry very little debt and maintain large cash reserves,

**FIGURE 15.6**

**Debt-to-Value Ratio [$D/(E+D)$] of U.S. Firms, 1975–2011**

Although firms have primarily issued debt rather than equity, the average proportion of debt in their capital structures has not increased due to the growth in value of existing equity.

*Source*: Compustat and Federal Reserve, *Flow of Funds Accounts of the United States*, 2012.



526    **Chapter 15** Debt and Taxes

FIGURE 15.7

**Net Debt-to-Enterprise Value Ratio for Select Industries**

Figure shows industry median levels of net debt (total book value of debt less cash and short-term investments) as a percentage of firm enterprise value (equity market capitalization plus net debt). While the median level of net debt for all U.S. stocks was about 17.5% of firm value, note the large differences by industry.

*Source*: Capital IQ, 2012.



whereas airlines, real estate firms, trucking and automotive firms, and utilities have high leverage ratios. Thus, the differences in the leverage ratios of Amgen and Navistar International noted in the introduction to this chapter are not unique to these firms, but rather are typical of their respective industries.

These data raise important questions. If debt provides a tax advantage that lowers a firm's weighted average cost of capital and increases firm value, why does debt make up less

than half of the capital structure of most firms? And why does the leverage choice vary so much across industries, with some firms having no net leverage? To begin to answer these questions, let's consider a bit more carefully what the optimal capital structure is from a tax perspective.

### Limits to the Tax Benefit of Debt

To receive the full tax benefits of leverage, a firm need not use 100% debt financing. A firm receives a tax benefit only if it is paying taxes in the first place. That is, the firm must have taxable earnings. This constraint may limit the amount of debt needed as a tax shield.

   To determine the optimal level of leverage, compare the three leverage choices shown in Table 15.4 for a firm with earnings before interest and taxes (EBIT) equal to $1000 and a corporate tax rate of $\tau_c = 35\%$. With no leverage, the firm owes tax of $350 on the full $1000 of EBIT. If the firm has high leverage with interest payments equal to $1000, then it can shield its earnings from taxes, thereby saving the $350 in taxes. Now consider a third case, in which the firm has excess leverage so that interest payments exceed EBIT. In this case, the firm has a net operating loss, but there is no increase in the tax savings. Because the firm is paying no taxes already, there is no immediate tax shield from the excess leverage.[12]

   Thus, no corporate tax benefit arises from incurring interest payments that regularly exceed EBIT. And, because interest payments constitute a tax disadvantage at the investor level as discussed in Section 15.4, investors will pay higher personal taxes with excess leverage, making them worse off.[13] We can quantify the tax disadvantage for excess interest payments by setting $\tau_c = 0$ (assuming there is no reduction in the corporate tax for excess interest payments) in Eq. 15.7 for $\tau^*$:

$$\tau^*_{ex} = 1 - \frac{(1-\tau_e)}{(1-\tau_i)} = \frac{\tau_e - \tau_i}{(1-\tau_i)} < 0 \tag{15.9}$$

| TABLE 15.4 | Tax Savings with Different Amounts of Leverage | | |
|---|---|---|---|
| | No Leverage | High Leverage | Excess Leverage |
| EBIT | $1000 | $1000 | $1000 |
| Interest expense | 0 | −1000 | −1100 |
| Income before tax | 1000 | 0 | 0 |
| Taxes (35%) | −350 | 0 | 0 |
| Net income | 650 | 0 | −100 |
| Tax savings from leverage | $0 | $350 | $350 |

---

[12]If the firm paid taxes during the prior two years, it could "carry back" the current year's net operating loss to apply for a refund of some of those taxes. Alternatively, the firm could "carry forward" the net operating loss up to 20 years to shield future income from taxes (although waiting to receive the credit reduces its present value). Thus, there can be a tax benefit from interest in excess of EBIT if it does not occur on a regular basis. For simplicity, we ignore carrybacks and carryforwards in this discussion.

[13]Of course, another problem can arise from having excess leverage: The firm may not be able to afford the excess interest and could be forced to default on the loan. We discuss financial distress (and its potential costs) in Chapter 16.

528        **Chapter 15** Debt and Taxes

Andrew Balson is a Managing Director of Bain Capital, a leading private investment firm with nearly $57 billion in assets under management. Bain Capital specializes in private equity (PE) and leveraged buyout (LBO) transactions, in which a firm is purchased and recapitalized with debt-to-value ratios often exceeding 70%. Bain Capital has invested in many well-known companies including Burger King, Domino's Pizza, Dunkin' Brands, HCA, Michael's Stores, Sealy Mattress Company, and Toys 'R Us.

### INTERVIEW WITH
## Andrew Balson



QUESTION: *What is the role of private investment firms such as Bain Capital, and what types of firms make the best LBO candidates?*

ANSWER: Our business serves as an alternate capital market for companies that don't really belong as public companies, either during a transition period or permanently, and don't have a logical fit within another larger corporation. In that context, we've done buyouts for companies across many different industries and types. There really isn't one particular type that is best. We look for companies that are well positioned in their industries, have advantages relative to their competitors, and provide real value to their customers. Some may be underperforming but change can enable them to turn around. Others may be performing well but could do even better. Perhaps the management team has not been given appropriate incentives, or the company has not been optimized or managed aggressively enough. Occasionally, we find a company we can buy at a low price compared to its inherent value. That was a big part of our business 10 years ago but is less so today. We pay relatively full valuations compared to the company's current earnings. This approach works because of our ability to improve current earnings or cash flow.

QUESTION: *How does leverage affect risk and return for investors?*

ANSWER: Based on my experience, if we've found interesting companies where we can change the profit trajectory, leverage will ultimately serve to magnify both the impact of the investments we make and the returns for our investors. Over the past 20 years, the Bain Capital portfolio has far outperformed any equity benchmarks. That performance comes from improved operating profits that are magnified by leverage. Growth is an important driver of our success, so we strive to create efficient capital structures that complement our strategy and enable us to invest in business opportunities. The line between too much and not enough is not distinct, however. We try to use as much debt as we can without changing how our management teams run our businesses.

QUESTION: *How will the 2008 financial crisis affect capital structure and financing policies in the future?*

ANSWER: From 2006 to 2008, debt became more available, and the amount of leverage per $1 of earnings went up dramatically. Companies that typically borrowed four to six times earnings before interest, taxes, depreciation, and amortization (EBITDA) were now borrowing seven to eight times EBITDA. The cost of borrowing went down, spreads tightened, and borrowing terms became more lenient, resulting in "covenant-lite" loans. The market opened its wallet and threw money at PE firms, ultimately driving returns down.

The PE markets began to crack in late spring 2008. Banks had to shore up their balance sheets, leaving no money for buyouts. The PE markets are now reverting to pre-2006 leverage—five times EBITDA—rates, and terms.

QUESTION: *What challenges and opportunities does the financial crisis present for PE firms?*

ANSWER: The fundamental benefits of PE for many companies will persist. PE remains an attractive asset class—at the right leverage and price. The economic uncertainty creates less incentive for sellers of companies, who are more likely to wait out these difficult capital markets. It's a great time to be a PE investor with capital, however. We were able to take substantial minority stakes in companies that interest us, at attractive terms. PE financing is now more expensive, and I think it will remain that way for some time. Companies that need financing now, to grow or make a strategic move, will tap higher-cost capital sources such as PE.

It's also a challenging time for our portfolio companies. Sales in most companies have declined precipitously. We are working with our companies to cut costs and generate liquidity to get them "across the icy river"; and we expect the vast majority to make it.

Note that $\tau_{ex}^*$ is negative because equity is taxed less heavily than interest for investors $(\tau_e > \tau_i)$. At 2012 tax rates, this disadvantage is

$$\tau_{ex}^* = \frac{15\% - 35\%}{(1 - 35\%)} = -30.8\%$$

*Therefore, the optimal level of leverage from a tax saving perspective is the level such that interest equals EBIT.* The firm shields all of its taxable income, and it does not have any tax-disadvantaged excess interest. Figure 15.8 shows the tax savings at different levels of interest payments when EBIT equals $1000 with certainty. In this case, an interest payment of $1000 maximizes the tax savings.

Of course, it is unlikely that a firm can predict its future EBIT precisely. If there is uncertainty regarding EBIT, then with a higher interest expense there is a greater risk that interest will exceed EBIT. As a result, the tax savings for high levels of interest falls, possibly reducing the optimal level of the interest payment, as shown in Figure 15.8.[14] In general, as a firm's interest expense approaches its expected taxable earnings, the marginal tax advantage of debt declines, limiting the amount of debt the firm should use.

### Growth and Debt

In a tax-optimal capital structure, the level of interest payments depends on the level of EBIT. What does this conclusion tell us about the optimal fraction of debt in a firm's capital structure?

If we examine young technology or biotechnology firms, we often find that these firms do not have any taxable income. Their value comes mainly from the prospect that they will produce high future profits. A biotech firm might be developing drugs with tremendous potential, but it has yet to receive any revenue from these drugs. Such a firm will not have taxable earnings. In that case, a tax-optimal capital structure does not include debt.

## FIGURE 15.8

**Tax Savings for Different Levels of Interest**

When EBIT is known with certainty, the tax savings is maximized if the interest expense is equal to EBIT. When EBIT is uncertain, the tax savings declines for high levels of interest because of the risk that the interest payment will be in excess of EBIT.



---

[14]Details of how to compute the optimal level of debt when earnings are risky can be found in a paper by J. Graham, "How Big Are the Tax Benefits of Debt?" *Journal of Finance* 55(5) (2000): 1901–1941.

We would expect such a firm to finance its investments with equity alone. Only later, when the firm matures and becomes profitable, will it have taxable cash flows. At that time it should add debt to its capital structure.

Even for a firm with positive earnings, growth will affect the optimal leverage ratio. To avoid excess interest, this type of firm should have debt with interest payments that are below its expected taxable earnings:

$$\text{Interest} = r_D \times \text{Debt} \leq EBIT \quad \text{or} \quad \text{Debt} \leq EBIT/r_D$$

That is, from a tax perspective, the firm's optimal level of debt is proportional to its current earnings. However, the value of the firm's equity will depend on the growth rate of earnings: The higher the growth rate, the higher the value of equity is (and equivalently, the higher the firm's price-earnings multiple is). As a result, *the optimal proportion of debt in the firm's capital structure* $[D/(E + D)]$ *will be lower, the higher the firm's growth rate*.[15]

## Other Tax Shields

Up to this point, we have assumed that interest is the only means by which firms can shield earnings from corporate taxes. But there are numerous other provisions in the tax laws for deductions and tax credits, such as depreciation, investment tax credits, carryforwards of past operating losses, and the like. For example, many high-tech firms paid little or no taxes in the late 1990s because of tax deductions related to employee stock options (see the box on page 532 for further discussion). To the extent that a firm has other tax shields, its taxable earnings will be reduced and it will rely less heavily on the interest tax shield.[16]

## The Low Leverage Puzzle

Do firms choose capital structures that fully exploit the tax advantages of debt? The results of this section imply that to evaluate this question, we should compare the level of firms' interest payments to their taxable income, rather than simply consider the fraction of debt in their capital structures. Figure 15.9 compares interest expenses and EBIT for firms in the S&P 500. It reveals two important patterns. First, firms have used debt to shield less than one third of their income from taxes on average, and only about 50% in downturns (when earnings tend to fall). Second, only about 10% of the time do firms have negative taxable income, and thus would not benefit from an increased interest tax shield. Overall, firms have far less leverage than our analysis of the interest tax shield would predict.[17]

This low level of leverage is not unique to U.S. firms. Table 15.5 shows international leverage levels from a 1995 study by Raghuram Rajan and Luigi Zingales using 1990 data. Note that firms worldwide have similar low proportions of debt financing, with firms in the United Kingdom exhibiting especially low leverage. Also, with the exception of Italy and Canada, firms shield less than half of their taxable income using interest payments. The corporate tax

---

[15]This explanation for the low leverage of high growth firms is developed in a paper by J. Berens and C. Cuny, "The Capital Structure Puzzle Revisited," *Review of Financial Studies* 8 (1995): 1185–1208.

[16]See H. DeAngelo and R. Masulis, "Optimal Capital Structure Under Corporate and Personal Taxation," *Journal of Financial Economics* 8 (1980): 3–27. For a discussion of methods to estimate a firm's marginal tax rate to account for these effects, see J. Graham, "Proxies for the Corporate Marginal Tax Rate," *Journal of Financial Economics* 42 (1996): 187–221.

[17]Additional evidence is provided by J. Graham in "How Big Are the Tax Benefits of Debt?" *Journal of Finance* 55 (2000): 1901–1941, where he estimates that the typical firm exploits less than half of the potential tax benefits of debt.

## FIGURE 15.9

**Interest Payments as a Percentage of EBIT and Percentage of Firms with Negative Pretax Income, S&P 500 1975–2011**

On average, firms shield less than one third of their income via interest expenses, and these expenses exceed taxable income only about 10% of the time.

*Source*: Compustat.



codes are similar across all countries in terms of the tax advantage of debt. Personal tax rates vary more significantly, however, leading to greater variation in $\tau^*$.[18]

Why are firms under-leveraged? Either firms are content to pay more taxes than necessary rather than maximize shareholder value, or there is more to the capital structure story than we have uncovered so far. While some firms may deliberately choose a suboptimal capital structure, it is hard to accept that most firms are acting suboptimally. The consensus of so many managers in choosing low levels of leverage suggests that debt financing has other costs that prevent firms from using the interest tax shield fully.

Talk to financial managers and they will quickly point out a key cost of debt missing from our analysis: Increasing the level of debt increases the probability of bankruptcy. Aside from taxes, another important difference between debt and equity financing is that

| TABLE 15.5 | International Leverage and Tax Rates (1990) | | | | |
|---|---|---|---|---|---|
| Country | $D/(E + D)$ | Net of Cash $D/(E + D)$ | Interest/EBIT | $\tau_c$ | $\tau^*$ |
| United States | 28% | 23% | 41% | 34.0% | 34.0% |
| Japan | 29% | 17% | 41% | 37.5% | 31.5% |
| Germany | 23% | 15% | 31% | 50.0% | 3.3% |
| France | 41% | 28% | 38% | 37.0% | 7.8% |
| Italy | 46% | 36% | 55% | 36.0% | 18.6% |
| United Kingdom | 19% | 11% | 21% | 35.0% | 24.2% |
| Canada | 35% | 32% | 65% | 38.0% | 28.9% |

*Source*: R. Rajan and L. Zingales, "What Do We Know About Capital Structure? Some Evidence from International Data," *Journal of Finance* 50 (1995): 1421–1460. Data is for median firms and top marginal tax rates.

[18]Similar low leverage results continue to hold using more recent data from 2006; see J. Fan, S. Titman, and G. Twite, "An International Comparison of Capital Structure and Debt Maturity Choices," SSRN working paper, 2008.

### Employee Stock Options

Employee stock options can serve as an important tax shield for some firms. The typical employee stock option allows employees of a firm to buy the firm's stock at a discounted price (often, the price of the stock when they started employment). When an employee exercises a stock option, the firm is essentially selling shares to the employee at a discount. If the discount is large, the employee can exercise the option and earn a large profit.

The amount of the discount is a cost for the firm's equity holders because selling shares at a price below their market value dilutes the value of the firm's shares. To reflect this cost, the IRS allows firms to deduct the amount of the discount from their earnings for tax purposes. (The IRS taxes employees on the gain, so the tax burden does not go away, but moves from the firm to the employees.) Unlike the interest tax shield, the tax deduction from employee stock options does not add to the value of the firm. If the same amounts were paid to employees through salary rather than options, the firm would be able to deduct the extra salary from its taxable income as well. Until recently, however, employee stock options did not affect EBIT, so that EBIT overstated the taxable income of firms with option expenses.

During the stock market boom of the late 1990s, many technology firms and other firms that issued a large number of employee stock options were able to claim these deductions and lower their taxes relative to what one would naively have imputed from EBIT. In 2000, some of the most profitable companies in the United States (based on net income), such as Microsoft, Cisco Systems, Dell, and Qualcomm, had *no* taxable income—using the stock option deduction, they were able to report a loss for tax purposes.[*] A study by J. Graham, M. Lang, and D. Shackelford reported that in 2000, stock option deductions for the entire NASDAQ 100 exceeded aggregate pretax earnings.[†] For these firms, there would have been no tax advantage associated with debt—which may help explain why they used little to no debt financing.

Since 2006, firms have been required to expense employee stock options. However, the rules for expensing the options are not the same as the tax deduction. As a consequence, even after this rule change, stock options may continue to result in a significant difference between firms' accounting income and their income for tax purposes. For example, Mark Zuckerberg's founding options in Facebook led to an accounting expense of under $10 million, yet provided Facebook with a tax deduction exceeding $2 billion.

_____

[*]See M. Sullivan, "Stock Options Take $50 Billion Bite Out of Corporate Taxes," *Tax Notes* (March 18, 2002): 1396–1401.

[†]"Employee Stock Options, Corporate Taxes and Debt Policy," *Journal of Finance* 59 (2004): 1585–1618.

debt payments *must* be made to avoid bankruptcy, whereas firms have no similar obligation to pay dividends or realize capital gains. If bankruptcy is costly, these costs might offset the tax advantages of debt financing. We explore the role of financial bankruptcy costs and other market imperfections in Chapter 16.

**CONCEPT CHECK**

1. How does the growth rate of a firm affect the optimal fraction of debt in the capital structure?

2. Do firms choose capital structures that fully exploit the tax advantages of debt?

**MyFinanceLab**

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 15.1 The Interest Tax Deduction

- Because interest expense is tax deductible, leverage increases the total amount of income available to all investors.
- The gain to investors from the tax deductibility of interest payments is called the interest tax shield.

$$\text{Interest Tax Shield} = \text{Corporate Tax Rate} \times \text{Interest Payments} \qquad (15.1)$$

### 15.2 Valuing the Interest Tax Shield

- When we consider corporate taxes, the total value of a levered firm equals the value of an unlevered firm plus the present value of the interest tax shield.

$$V^L = V^U + PV(\text{Interest Tax Shield}) \qquad (15.2)$$

- When a firm's marginal tax rate is constant, and there are no personal taxes, the present value of the interest tax shield from permanent debt equals the tax rate times the value of the debt, $\tau_c D$.
- The firm's pretax WACC measures the required return to the firm's investors. Its effective after-tax WACC, or simply the WACC, measures the cost to the firm after including the benefit of the interest tax shield. The two notions are related as follows:

$$r_{wacc} = \frac{E}{E + D} r_E + \frac{D}{E + D} r_D (1 - \tau_c) \qquad (15.5)$$

$$= \underbrace{\frac{E}{E + D} r_E + \frac{D}{E + D} r_D}_{\text{Pretax WACC}} - \underbrace{\frac{D}{E + D} r_D \tau_c}_{\substack{\text{Reduction Due} \\ \text{to Interest Tax Shield}}} \qquad (15.6)$$

Absent other market imperfections, the WACC declines with a firm's leverage.

- When the firm maintains a target leverage ratio, we compute its levered value $V^L$ as the present value of its free cash flows using the WACC, whereas its unlevered value $V^U$ is the present value of its free cash flows using its unlevered cost of capital or pretax WACC.

### 15.3 Recapitalizing to Capture the Tax Shield

- When securities are fairly priced, the original shareholders of a firm capture the full benefit of the interest tax shield from an increase in leverage.

### 15.4 Personal Taxes

- Personal taxes offset some of the corporate tax benefits of leverage. Every $1 received after taxes by debt holders from interest payments costs equity holders $\$(1 - \tau^*)$ on an after-tax basis, where

$$\tau^* = 1 - \frac{(1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} \qquad (15.7)$$

### 15.5 Optimal Capital Structure with Taxes

- The optimal level of leverage from a tax-saving perspective is the level such that interest equals EBIT. In this case, the firm takes full advantage of the corporate tax deduction of interest, but avoids the tax disadvantage of excess leverage at the personal level.
- The optimal fraction of debt, as a proportion of a firm's capital structure, declines with the growth rate of the firm.
- The interest expense of the average firm is well below its taxable income, implying that firms do not fully exploit the tax advantages of debt.

## Key Term    interest tax shield *p. 510*

534    **Chapter 15** Debt and Taxes

## Further Reading

In their 1963 paper, "Corporate Income Taxes and the Cost of Capital: A Correction," *American Economic Review* 53 (June 1963): 433–443, Modigliani and Miller adjusted their analysis to incorporate the tax benefits of leverage. Other classic works in how taxation affects the cost of capital and optimal capital structure include: M. King, "Taxation and the Cost of Capital," *Review of Economic Studies* 41 (1974): 21–35; M. Miller, "Debt and Taxes," *Journal of Finance* 32 (1977): 261–275; M. Miller and M. Scholes, "Dividends and Taxes," *Journal of Financial Economics* 6 (1978): 333–364; and J. Stiglitz, "Taxation, Corporate Financial Policy, and the Cost of Capital," *Journal of Public Economics* 2 (1973): 1–34.

For an analysis of how firms respond to tax incentives, see J. MacKie-Mason, "Do Taxes Affect Corporate Financing Decisions?" *Journal of Finance* 45 (1990): 1471–1493. For a recent review of the literature of taxes and corporate finance, see J. Graham, "Taxes and Corporate Finance: A Review," *Review of Financial Studies* 16 (2003): 1075–1129.

These articles analyze in depth several issues regarding taxation and optimal capital structure: M. Bradley, G. Jarrell, and E. Kim, "On the Existence of an Optimal Capital Structure: Theory and Evidence," *The Journal of Finance* 39 (1984): 857–878; M. Brennan and E. Schwartz, "Corporate Income Taxes, Valuation, and the Problem of Optimal Capital Structure," *Journal of Business* 51 (1978): 103–114; H. DeAngelo and R. Masulis, "Optimal Capital Structure Under Corporate and Personal Taxation," *Journal of Financial Economics* 8 (1980): 3–29; and S. Titman and R. Wessels, "The Determinants of Capital Structure Choice," *Journal of Finance* 43 (1988): 1–19.

The following articles contain information on what managers say about their capital structure decisions: J. Graham and C. Harvey, "How Do CFOs Make Capital Budgeting and Capital Structure Decisions?" *Journal of Applied Corporate Finance* 15 (2002): 8–23; R. Kamath, "Long-Term Financing Decisions: Views and Practices of Financial Managers of NYSE Firms," *Financial Review* 32 (1997): 331–356; E. Norton, "Factors Affecting Capital Structure Decisions," *Financial Review* 26 (1991): 431–446; and J. Pinegar and L. Wilbricht, "What Managers Think of Capital Structure Theory: A Survey," *Financial Management* 18 (1989): 82–91.

For additional insight into capital structure decisions internationally, see also F. Bancel and U. Mittoo, "Cross-Country Determinants of Capital Structure Choice: A Survey of European Firms," *Financial Management* 33 (2004): 103–132; R. La Porta, F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, "Legal Determinants of External Finance," *Journal of Finance* 52 (1997): 1131–1152; and L. Booth, V. Aivazian, A. Demirguq-Kunt, and V. Maksimovic, "Capital Structures in Developing Countries," *Journal of Finance* 56 (2001): 87–130.

## Problems

*All problems are available in* MyFinanceLab. *An asterisk (\*) indicates problems with a higher level of difficulty.*

### The Interest Tax Deduction

1. Pelamed Pharmaceuticals has EBIT of $325 million in 2006. In addition, Pelamed has interest expenses of $125 million and a corporate tax rate of 40%.
   a. What is Pelamed's 2006 net income?
   b. What is the total of Pelamed's 2006 net income and interest payments?
   c. If Pelamed had no interest expenses, what would its 2006 net income be? How does it compare to your answer in part b?
   d. What is the amount of Pelamed's interest tax shield in 2006?

2. Grommit Engineering expects to have net income next year of $20.75 million and free cash flow of $22.15 million. Grommit's marginal corporate tax rate is 35%.
   a. If Grommit increases leverage so that its interest expense rises by $1 million, how will its net income change?
   b. For the same increase in interest expense, how will free cash flow change?

3. Suppose the corporate tax rate is 40%. Consider a firm that earns $1000 before interest and taxes each year with no risk. The firm's capital expenditures equal its depreciation expenses each year, and it will have no changes to its net working capital. The risk-free interest rate is 5%.
   a. Suppose the firm has no debt and pays out its net income as a dividend each year. What is the value of the firm's equity?
   b. Suppose instead the firm makes interest payments of $500 per year. What is the value of equity? What is the value of debt?
   c. What is the difference between the total value of the firm with leverage and without leverage?
   d. The difference in part c is equal to what percentage of the value of the debt?

 4. Braxton Enterprises currently has debt outstanding of $35 million and an interest rate of 8%. Braxton plans to reduce its debt by repaying $7 million in principal at the end of each year for the next five years. If Braxton's marginal corporate tax rate is 40%, what is the interest tax shield from Braxton's debt in each of the next five years?

### Valuing the Interest Tax Shield

 5. Your firm currently has $100 million in debt outstanding with a 10% interest rate. The terms of the loan require the firm to repay $25 million of the balance each year. Suppose that the marginal corporate tax rate is 40%, and that the interest tax shields have the same risk as the loan. What is the present value of the interest tax shields from this debt?

6. Arnell Industries has just issued $10 million in debt (at par). The firm will pay interest only on this debt. Arnell's marginal tax rate is expected to be 35% for the foreseeable future.
   a. Suppose Arnell pays interest of 6% per year on its debt. What is its annual interest tax shield?
   b. What is the present value of the interest tax shield, assuming its risk is the same as the loan?
   c. Suppose instead that the interest rate on the debt is 5%. What is the present value of the interest tax shield in this case?

 7. Ten years have passed since Arnell issued $10 million in perpetual interest only debt with a 6% annual coupon, as in Problem 6. Tax rates have remained the same at 35% but interest rates have dropped, so Arnell's current cost of debt capital is 4%.
   a. What is Arnell's annual interest tax shield?
   b. What is the present value of the interest tax shield today?

8. Bay Transport Systems (BTS) currently has $30 million in debt outstanding. In addition to 6.5% interest, it plans to repay 5% of the remaining balance each year. If BTS has a marginal corporate tax rate of 40%, and if the interest tax shields have the same risk as the loan, what is the present value of the interest tax shield from the debt?

9. Safeco Inc. has no debt, and maintains a policy of holding $10 million in excess cash reserves, invested in risk-free Treasury securities. If Safeco pays a corporate tax rate of 35%, what is the cost of permanently maintaining this $10 million reserve? (*Hint*: What is the present value of the additional taxes that Safeco will pay?)

10. Rogot Instruments makes fine violins and cellos. It has $1 million in debt outstanding, equity valued at $2 million, and pays corporate income tax at rate of 35%. Its cost of equity is 12% and its cost of debt is 7%.
    a. What is Rogot's pretax WACC?
    b. What is Rogot's (effective after-tax) WACC?

11. Rumolt Motors has 30 million shares outstanding with a price of $15 per share. In addition, Rumolt has issued bonds with a total current market value of $150 million. Suppose Rumolt's equity cost of capital is 10%, and its debt cost of capital is 5%.
    a. What is Rumolt's pretax weighted average cost of capital?
    b. If Rumolt's corporate tax rate is 35%, what is its after-tax weighted average cost of capital?

12. Summit Builders has a market debt-equity ratio of 0.65 and a corporate tax rate of 40%, and it pays 7% interest on its debt. The interest tax shield from its debt lowers Summit's WACC by what amount?

13. NatNah, a builder of acoustic accessories, has no debt and an equity cost of capital of 15%. Suppose NatNah decides to increase its leverage and maintain a market debt-to-value ratio of 0.5. Suppose its debt cost of capital is 9% and its corporate tax rate is 35%. If NatNah's pretax WACC remains constant, what will its (effective after-tax) WACC be with the increase in leverage?

14. Restex maintains a debt-equity ratio of 0.85, and has an equity cost of capital of 12% and a debt cost of capital of 7%. Restex's corporate tax rate is 40%, and its market capitalization is $220 million.
    a. If Restex's free cash flow is expected to be $10 million in one year, what constant expected future growth rate is consistent with the firm's current market value?
    b. Estimate the value of Restex's interest tax shield.

15. Acme Storage has a market capitalization of $100 million and debt outstanding of $40 million. Acme plans to maintain this same debt-equity ratio in the future. The firm pays an interest rate of 7.5% on its debt and has a corporate tax rate of 35%.
    a. If Acme's free cash flow is expected to be $7 million next year and is expected to grow at a rate of 3% per year, what is Acme's WACC?
    b. What is the value of Acme's interest tax shield?

16. Milton Industries expects free cash flow of $5 million each year. Milton's corporate tax rate is 35%, and its unlevered cost of capital is 15%. The firm also has outstanding debt of $19.05 million, and it expects to maintain this level of debt permanently.
    a. What is the value of Milton Industries without leverage?
    b. What is the value of Milton Industries with leverage?

17. Suppose Microsoft has 8.75 billion shares outstanding and pays a marginal corporate tax rate of 35%. If Microsoft announces that it will pay out $50 billion in cash to investors through a combination of a special dividend and a share repurchase, and if investors had previously assumed Microsoft would retain this excess cash permanently, by how much will Microsoft's share price change upon the announcement?

18. Kurz Manufacturing is currently an all-equity firm with 20 million shares outstanding and a stock price of $7.50 per share. Although investors currently expect Kurz to remain an all-equity firm, Kurz plans to announce that it will borrow $50 million and use the funds to repurchase shares. Kurz will pay interest only on this debt, and it has no further plans to increase or decrease the amount of debt. Kurz is subject to a 40% corporate tax rate.
    a. What is the market value of Kurz's existing assets before the announcement?
    b. What is the market value of Kurz's assets (including any tax shields) just after the debt is issued, but before the shares are repurchased?
    c. What is Kurz's share price just before the share repurchase? How many shares will Kurz repurchase?
    d. What are Kurz's market value balance sheet and share price after the share repurchase?

19. Rally, Inc., is an all-equity firm with assets worth $25 billion and 10 billion shares outstanding. Rally plans to borrow $10 billion and use these funds to repurchase shares. The firm's corporate tax rate is 35%, and Rally plans to keep its outstanding debt equal to $10 billion permanently.
    a. Without the increase in leverage, what would Rally's share price be?
    b. Suppose Rally offers $2.75 per share to repurchase its shares. Would shareholders sell for this price?
    c. Suppose Rally offers $3.00 per share, and shareholders tender their shares at this price. What will Rally's share price be after the repurchase?
    d. What is the lowest price Rally can offer and have shareholders tender their shares? What will its stock price be after the share repurchase in that case?

## Personal Taxes

20. Suppose the corporate tax rate is 40%, and investors pay a tax rate of 15% on income from dividends or capital gains and a tax rate of 33.3% on interest income. Your firm decides to add debt so it will pay an additional $15 million in interest each year. It will pay this interest expense by cutting its dividend.
    a. How much will debt holders receive after paying taxes on the interest they earn?
    b. By how much will the firm need to cut its dividend each year to pay this interest expense?
    c. By how much will this cut in the dividend reduce equity holders' annual after-tax income?
    d. How much less will the government receive in total tax revenues each year?
    e. What is the effective tax advantage of debt $\tau^*$?

21. Apple Corporation had no debt on its balance sheet in 2011, but paid $8 billion in taxes. Suppose Apple were to issue sufficient debt to reduce its taxes by $1 billion per year permanently. Assume Apple's marginal corporate tax rate is 35% and its borrowing cost is 4.5%.
    a. If Apple's investors do not pay personal taxes (because they hold their Apple stock in tax-free retirement accounts), how much value would be created (what is the value of the tax shield)?
    b. How does your answer change if instead you assume that Apple's investors pay a 15% tax rate on income from equity and a 35% tax rate on interest income?

22. Markum Enterprises is considering permanently adding $100 million of debt to its capital structure. Markum's corporate tax rate is 35%.
    a. Absent personal taxes, what is the value of the interest tax shield from the new debt?
    b. If investors pay a tax rate of 40% on interest income, and a tax rate of 20% on income from dividends and capital gains, what is the value of the interest tax shield from the new debt?

*23. Garnet Corporation is considering issuing risk-free debt or risk-free preferred stock. The tax rate on interest income is 35%, and the tax rate on dividends or capital gains from preferred stock is 15%. However, the dividends on preferred stock are not deductible for corporate tax purposes, and the corporate tax rate is 40%.
    a. If the risk-free interest rate for debt is 6%, what is the cost of capital for risk-free preferred stock?
    b. What is the after-tax debt cost of capital for the firm? Which security is cheaper for the firm?
    c. Show that the after-tax debt cost of capital is equal to the preferred stock cost of capital multiplied by $(1 - \tau^*)$.

*24. Suppose the tax rate on interest income is 35%, and the average tax rate on capital gains and dividend income is 10%. How high must the marginal corporate tax rate be for debt to offer a tax advantage?

## Optimal Capital Structure with Taxes

25. With its current leverage, Impi Corporation will have net income next year of $4.5 million. If Impi's corporate tax rate is 35% and it pays 8% interest on its debt, how much additional debt can Impi issue this year and still receive the benefit of the interest tax shield next year?

*26. Colt Systems will have EBIT this coming year of $15 million. It will also spend $6 million on total capital expenditures and increases in net working capital, and have $3 million in depreciation expenses. Colt is currently an all-equity firm with a corporate tax rate of 35% and a cost of capital of 10%.
    a. If Colt's free cash flows are expected to grow by 8.5% per year, what is the market value of its equity today?
    b. If the interest rate on its debt is 8%, how much can Colt borrow now and still have non-negative net income this coming year?
    c. Is there a tax incentive today for Colt to choose a debt-to-value ratio that exceeds 50%? Explain.

 *27. PMF, Inc., is equally likely to have EBIT this coming year of $10 million, $15 million, or $20 million. Its corporate tax rate is 35%, and investors pay a 15% tax rate on income from equity and a 35% tax rate on interest income.

    a. What is the effective tax advantage of debt if PMF has interest expenses of $8 million this coming year?

    b. What is the effective tax advantage of debt for interest expenses in excess of $20 million? (Ignore carryforwards.)

    c. What is the expected effective tax advantage of debt for interest expenses between $10 million and $15 million? (Ignore carryforwards.)

    d. What level of interest expense provides PMF with the greatest tax benefit?

## Data Case

Your boss was impressed with your presentation regarding the irrelevance of capital structure from Chapter 14 but, as expected, has realized that market imperfections like taxes must be accounted for. You have now been asked to include taxes in your analysis. Your boss knows that interest is deductible and has decided that the stock price of Home Depot should increase if the firm increases its use of debt. Thus, your boss wants to propose a share repurchase program using the proceeds from a new debt issue and wants to present this plan to the CEO and perhaps to the Board of Directors.

Your boss would like you to examine the impact of two different scenarios, adding a modest level of debt and adding a higher level of debt. In particular, your boss would like to consider issuing $1 billion in new debt or $5 billion in new debt. In either case, Home Depot would use the proceeds to repurchase stock.

1. Using the financial statements for Home Depot that you downloaded in Chapter 14, determine the average corporate tax rate for Home Depot over the last four years by dividing Income Tax by Earnings before Tax for each of the last four years.

2. Begin by analyzing the scenario with $1 billion in new debt. Assuming the firm plans to keep this new debt outstanding forever, determine the present value of the tax shield of the new debt. What additional assumptions did you need to make for this calculation?

3. Determine the new stock price if the $1 billion in debt is used to repurchase stock.

    a. Use the current market value of Home Depot's equity that you calculated in Chapter 14.

    b. Determine the new market value of the equity if the repurchase occurs.

    c. Determine the new number of shares and the stock price after the repurchase is announced.

4. What will Home Depot's D/E ratio based on book values be after it issues new debt and repurchases stock? What will its market value D/E ratio be?

5. Repeat Steps 2–4 for the scenario in which Home Depot issues $5 billion in debt and repurchases stock.

6. Based on the stock price, do the debt increase and stock repurchase appear to be a good idea? Why or why not? What issues might the executives of Home Depot raise that aren't considered in your analysis?

# Financial Distress, Managerial Incentives, and Information

**M**ODIGLIANI AND MILLER DEMONSTRATED THAT CAPITAL structure does not matter in a perfect capital market. In Chapter 15, we found a tax benefit of leverage, at least up to the point that a firm's EBIT exceeds the interest payments on the debt. Yet we saw that the average U.S. firm shields less than half of its earnings in this way. Why don't firms use more debt?

We can gain some insight by looking at United Airlines (UAL Corporation). For the five-year period 1996 through 2000, UAL paid interest expenses of $1.7 billion, relative to EBIT of more than $6 billion. During this period, it reported a total provision for taxes on its income statement exceeding $2.2 billion. The company appeared to have a level of debt that did not fully exploit its tax shield. Even so, as a result of high fuel and labor costs, a decline in travel following the terrorist attacks of September 11, 2001, and increased competition from discount carriers, UAL filed for bankruptcy court protection in December 2002. United ultimately emerged from bankruptcy in 2006; after a profitable 2007, it suffered losses and renewed creditor concerns in the wake of the financial crisis in 2008. The airline returned to profitability in 2010 when it announced plans to acquire Continental Airlines. The merger was completed by the end of 2011, although the company attributed a 37% drop in profits in the second quarter of 2012 to ongoing costs associated with the merger. As this case demonstrates, firms such as airlines whose future cash flows are unstable and highly sensitive to shocks in the economy run the risk of bankruptcy if they use too much leverage.

When a firm has trouble meeting its debt obligations we say the firm is in **financial distress**. In this chapter, we consider how a firm's choice of capital structure can, due to market imperfections, affect its costs of financial distress, alter managers' incentives, and signal information to investors. Each of these consequences of the capital structure decision

## NOTATION

| | |
|---|---|
| $E$ | market value of equity |
| $D$ | market value of debt |
| $PV$ | present value |
| $\beta_E$ | equity beta |
| $\beta_D$ | debt beta |
| $I$ | investment |
| $NPV$ | net present value |
| $V^U$ | value of the unlevered firm |
| $V^L$ | value of the firm with leverage |
| $\tau^*$ | effective tax advantage of debt |

can be significant, and each may offset the tax benefits of leverage when leverage is high. Thus, these imperfections may help to explain the levels of debt that we generally observe. In addition, because their effects are likely to vary widely across different types of firms, they may help to explain the large discrepancies in leverage choices that exist across industries, as documented in Figure 15.7 in the previous chapter.

## 16.1   Default and Bankruptcy in a Perfect Market

Debt financing puts an obligation on a firm. A firm that fails to make the required interest or principal payments on the debt is in **default**. After the firm defaults, debt holders are given certain rights to the assets of the firm. In the extreme case, the debt holders take legal ownership of the firm's assets through a process called bankruptcy. Recall that equity financing does not carry this risk. While equity holders hope to receive dividends, the firm is not legally obligated to pay them.

Thus, it seems that an important consequence of leverage is the risk of bankruptcy. Does this risk represent a disadvantage to using debt? Not necessarily. As we pointed out in Chapter 14, Modigliani and Miller's results continue to hold in a perfect market even when debt is risky and the firm may default. Let's review that result by considering a hypothetical example.

### Armin Industries: Leverage and the Risk of Default

Armin Industries faces an uncertain future in a challenging business environment. Due to increased competition from foreign imports, its revenues have fallen dramatically in the past year. Armin's managers hope that a new product in the company's pipeline will restore its fortunes. While the new product represents a significant advance over Armin's competitors' products, whether that product will be a hit with consumers remains uncertain. If it is a hit, revenues and profits will grow, and Armin will be worth $150 million at the end of the year. If it fails, Armin will be worth only $80 million.

Armin Industries may employ one of two alternative capital structures: (1) It can use all-equity financing or (2) it can use debt that matures at the end of the year with a total of $100 million due. Let's look at the consequences of these capital structure choices when the new product succeeds, and when it fails, in a setting of perfect capital markets.

**Scenario 1: New Product Succeeds.**   If the new product is successful, Armin is worth $150 million. Without leverage, equity holders own the full amount. With leverage, Armin must make the $100 million debt payment, and Armin's equity holders will own the remaining $50 million.

But what if Armin does not have $100 million in cash available at the end of the year? Although its assets will be worth $150 million, much of that value may come from anticipated *future* profits from the new product, rather than cash in the bank. In that case, if Armin has debt, will it be forced to default?

With perfect capital markets, the answer is no. As long as the value of the firm's assets exceeds its liabilities, Armin will be able to repay the loan. Even if it does not have the cash immediately available, it can raise the cash by obtaining a new loan or by issuing new shares.

For example, suppose Armin currently has 10 million shares outstanding. Because the value of its equity is $50 million, these shares are worth $5 per share. At this price, Armin can raise $100 million by issuing 20 million new shares and use the proceeds to pay off the debt. After the debt is repaid, the firm's equity is worth $150 million. Because there is now a total of 30 million shares, the share price remains $5 per share.

This scenario shows that if a firm has access to capital markets and can issue new securities at a fair price, *then it need not default as long as the market value of its assets exceeds its liabilities.* That is, whether default occurs depends on the relative values of the firm's assets and liabilities, not on its cash flows. Many firms experience years of negative cash flows yet remain solvent.

**Scenario 2: New Product Fails.** If the new product fails, Armin is worth only $80 million. If the company has all-equity financing, equity holders will be unhappy but there is no immediate legal consequence for the firm. In contrast, if Armin has $100 million in debt due, it will experience financial distress. The firm will be unable to make its $100 million debt payment and will have no choice except to default. In bankruptcy, debt holders will receive legal ownership of the firm's assets, leaving Armin's shareholders with nothing. Because the assets the debt holders receive have a value of $80 million, they will suffer a loss of $20 million relative to the $100 million they were owed. Equity holders in a corporation have limited liability, so the debt holders cannot sue Armin's shareholders for this $20 million—they must accept the loss.

**Comparing the Two Scenarios.** Table 16.1 compares the outcome of each scenario without leverage and with leverage. Both debt and equity holders are worse off if the product fails rather than succeeds. Without leverage, if the product fails equity holders lose $150 million − $80 million = $70 million. With leverage, equity holders lose $50 million, and debt holders lose $20 million, *but the total loss is the same*—$70 million. Overall, *if the new product fails, Armin's investors are equally unhappy whether the firm is levered and declares bankruptcy or whether it is unlevered and the share price declines.*[1]

| TABLE 16.1 | Value of Debt and Equity with and without Leverage (in $ million) | | | |
|---|---|---|---|---|
| | Without Leverage | | With Leverage | |
| | Success | Failure | Success | Failure |
| Debt value | — | — | 100 | 80 |
| Equity value | 150 | 80 | 50 | 0 |
| Total to all investors | 150 | 80 | 150 | 80 |

This point is important. When a firm declares bankruptcy, the news often makes headlines. Much attention is paid to the firm's poor results and the loss to investors. But the decline in value is not *caused* by bankruptcy: The decline is the same whether or not the firm has leverage. That is, if the new product fails, Armin will experience **economic distress**, which is a significant decline in the value of a firm's assets, whether or not it experiences financial distress due to leverage.

## Bankruptcy and Capital Structure

With perfect capital markets, Modigliani-Miller (MM) Proposition I applies: The total value to all investors does not depend on the firm's capital structure. Investors as a group are *not* worse off because a firm has leverage. While it is true that bankruptcy results from

---

[1]There is a temptation to look only at shareholders and to say they are worse off when Armin has leverage because their shares are worthless. In fact, shareholders lose $50 million relative to success when the firm is levered, versus $70 million without leverage. What really matters is the total value to all investors, which will determine the total amount of capital the firm can raise initially.

a firm having leverage, bankruptcy alone does not lead to a greater reduction in the total value to investors. Thus, there is no disadvantage to debt financing, and a firm will have the same total value and will be able to raise the same amount initially from investors with either choice of capital structure.

| EXAMPLE 16.1 | Bankruptcy Risk and Firm Value |
|---|---|

**Problem**

Suppose the risk-free rate is 5%, and Armin's new product is equally likely to succeed or to fail. For simplicity, suppose that Armin's cash flows are unrelated to the state of the economy (i.e., the risk is diversifiable), so that the project has a beta of 0 and the cost of capital is the risk-free rate. Compute the value of Armin's securities at the beginning of the year with and without leverage, and show that MM Proposition I holds.

**Solution**

Without leverage, the equity is worth either $150 million or $80 million at year-end. Because the risk is diversifiable, no risk premium is necessary and we can discount the expected value of the firm at the risk-free rate to determine its value without leverage at the start of the year:[2]

$$\text{Equity (unlevered)} = V^U = \frac{\frac{1}{2}(150) + \frac{1}{2}(80)}{1.05} = \$109.52 \text{ million}$$

With leverage, equity holders receive $50 million or nothing, and debt holders receive $100 million or $80 million. Thus,

$$\text{Equity (levered)} = \frac{\frac{1}{2}(50) + \frac{1}{2}(0)}{1.05} = \$23.81 \text{ million}$$

$$\text{Debt} = \frac{\frac{1}{2}(100) + \frac{1}{2}(80)}{1.05} = \$85.71 \text{ million}$$

Therefore, the value of the levered firm is $V^L = E + D = 23.81 + 85.71 = \$109.52$ million. With or without leverage, the total value of the securities is the same, verifying MM Proposition I. The firm is able to raise the same amount from investors using either capital structure.

| CONCEPT CHECK | 1. With perfect capital markets, does the possibility of bankruptcy put debt financing at a disadvantage? |
|---|---|
| | 2. Does the risk of default reduce the value of the firm? |

## 16.2 The Costs of Bankruptcy and Financial Distress

With perfect capital markets, the *risk* of bankruptcy is not a disadvantage of debt—bankruptcy simply shifts the ownership of the firm from equity holders to debt holders without changing the total value available to all investors.

Is this description of bankruptcy realistic? No. Bankruptcy is rarely simple and straightforward—equity holders don't just "hand the keys" to debt holders the moment the firm defaults on a debt payment. Rather, bankruptcy is a long and complicated process that imposes both direct and indirect costs on the firm and its investors, costs that the assumption of perfect capital markets ignores.

---

[2]If the risk were not diversifiable and a risk premium were needed, the calculations here would become more complicated but the conclusion would not change.

### The Bankruptcy Code

When a firm fails to make a required payment to debt holders, it is in default. Debt holders can then take legal action against the firm to collect payment by seizing the firm's assets. Because most firms have multiple creditors, without coordination it is difficult to guarantee that each creditor will be treated fairly. Moreover, because the assets of the firm might be more valuable if kept together, creditors seizing assets in a piecemeal fashion might destroy much of the remaining value of the firm.

The U.S. bankruptcy code was created to organize this process so that creditors are treated fairly and the value of the assets is not needlessly destroyed. According to the provisions of the 1978 Bankruptcy Reform Act, U.S. firms can file for two forms of bankruptcy protection: Chapter 7 or Chapter 11.

In **Chapter 7 liquidation**, a trustee is appointed to oversee the liquidation of the firm's assets through an auction. The proceeds from the liquidation are used to pay the firm's creditors, and the firm ceases to exist.

In the more common form of bankruptcy for large corporations, **Chapter 11 reorganization**, all pending collection attempts are automatically suspended, and the firm's existing management is given the opportunity to propose a reorganization plan. While developing the plan, management continues to operate the business. The reorganization plan specifies the treatment of each creditor of the firm. In addition to cash payment, creditors may receive new debt or equity securities of the firm. The value of cash and securities is generally less than the amount each creditor is owed, but more than the creditors would receive if the firm were shut down immediately and liquidated. The creditors must vote to accept the plan, and it must be approved by the bankruptcy court.[3] If an acceptable plan is not put forth, the court may ultimately force a Chapter 7 liquidation of the firm.

### Direct Costs of Bankruptcy

The bankruptcy code is designed to provide an orderly process for settling a firm's debts. However, the process is still complex, time-consuming, and costly. When a corporation becomes financially distressed, outside professionals, such as legal and accounting experts, consultants, appraisers, auctioneers, and others with experience selling distressed assets, are generally hired. Investment bankers may also assist with a potential financial restructuring.

These outside experts are costly. Between 2003 and 2005, United Airlines paid a team of over 30 advisory firms an average of $8.6 million per month for legal and professional services related to its Chapter 11 reorganization. Enron spent a then-record $30 million per month on legal and accounting fees in bankruptcy, with the total cost exceeding $750 million. WorldCom paid its advisors $620 million as part of its reorganization to become MCI, and the Lehman Brothers bankruptcy, the largest in history, has reportedly entailed fees of $1.6 billion.[4]

---

[3]Specifically, management holds the exclusive right to propose a reorganization plan for the first 120 days, and this period may be extended indefinitely by the bankruptcy court. Thereafter, any interested party may propose a plan. Creditors who will receive full payment or have their claims fully reinstated under the plan are deemed unimpaired, and do not vote on the reorganization plan. All impaired creditors are grouped according to the nature of their claims. If the plan is approved by creditors holding two-thirds of the claim amount in each group and a majority in the number of the claims in each group, the court will confirm the plan. Even if all groups do not approve the plan, the court may still impose the plan (in a process commonly known as a "cram down") if it deems the plan fair and equitable with respect to each group that objected.

[4]M. Farrell, "Lehman bankruptcy bill: $1.6 billion," CNNMoney, March 6, 2012.

In addition to the money spent by the firm, the creditors may incur costs during the bankruptcy process. In the case of Chapter 11 reorganization, creditors must often wait several years for a reorganization plan to be approved and to receive payment. To ensure that their rights and interests are respected, and to assist in valuing their claims in a proposed reorganization, creditors may seek separate legal representation and professional advice.

Whether paid by the firm or its creditors, these direct costs of bankruptcy reduce the value of the assets that the firm's investors will ultimately receive. In some cases, such as Enron, reorganization costs may approach 10% of the value of the assets. Studies typically report that the average direct costs of bankruptcy are approximately 3% to 4% of the pre-bankruptcy market value of total assets.[5] The costs are likely to be higher for firms with more complicated business operations and for firms with larger numbers of creditors, because it may be more difficult to reach agreement among many creditors regarding the final disposition of the firm's assets. Because many aspects of the bankruptcy process are independent of the size of the firm, the costs are typically higher, in percentage terms, for smaller firms. A study of Chapter 7 liquidations of small businesses found that the average direct costs of bankruptcy were 12% of the value of the firm's assets.[6]

Given the substantial legal and other direct costs of bankruptcy, firms in financial distress can avoid filing for bankruptcy by first negotiating directly with creditors. When a financially distressed firm is successful at reorganizing outside of bankruptcy, it is called a **workout**. Consequently, the direct costs of bankruptcy should not substantially exceed the cost of a workout. Another approach is a **prepackaged bankruptcy** (or "prepack"), in which a firm will *first* develop a reorganization plan with the agreement of its main creditors, and *then* file Chapter 11 to implement the plan (and pressure any creditors who attempt to hold out for better terms). With a prepack, the firm emerges from bankruptcy quickly and with minimal direct costs.[7]

## Indirect Costs of Financial Distress

Aside from the direct legal and administrative costs of bankruptcy, many other *indirect* costs are associated with financial distress (whether or not the firm has formally filed for bankruptcy). While these costs are difficult to measure accurately, they are often much larger than the direct costs of bankruptcy.

*Loss of Customers.* Because bankruptcy may enable or encourage firms to walk away from commitments to their customers, customers may be unwilling to purchase

[5]See J. Warner, "Bankruptcy Costs: Some Evidence," *Journal of Finance* 32 (1977): 337–347; L. Weiss, "Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims," *Journal of Financial Economics* 27 (1990): 285–314; E. Altman, "A Further Empirical Investigation of the Bankruptcy Cost Question," *Journal of Finance* 39 (1984): 1067–1089; and B. Betker, "The Administrative Costs of Debt Restructurings: Some Recent Evidence," *Financial Management* 26 (1997): 56–68. L. LoPucki and J. Doherty estimate that due to speedier resolution, the direct costs of bankruptcy fell by more than 50% during the 1990s to approximately 1.5% of firm value ("The Determinants of Professional Fees in Large Bankruptcy Reorganization Cases," *Journal of Empirical Legal Studies* 1 (2004): 111–141).

[6]R. Lawless and S. Ferris, "Professional Fees and Other Direct Costs in Chapter 7 Business Liquidations," *Washington University Law Quarterly* (1997): 1207–1236. For comparative international data, see K. Thorburn, "Bankruptcy Auctions: Costs, Debt Recovery and Firm Survival," *Journal of Financial Economics* 58 (2000): 337–368, and A. Raviv and S. Sundgren, "The Comparative Efficiency of Small-firm Bankruptcies: A Study of the U.S. and the Finnish Bankruptcy Codes," *Financial Management* 27 (1998): 28–40.

[7]See E. Tashjian, R. Lease, and J. McConnell, "An Empirical Analysis of Prepackaged Bankruptcies," *Journal of Financial Economics* 40 (1996): 135–162.

products whose value depends on future support or service from the firm. For example, customers will be reluctant to buy plane tickets in advance from a distressed airline that may cease operations, or to purchase autos from a distressed manufacturer that may fail to honor its warranties or provide replacement parts. Similarly, many technology firms' customers may hesitate to commit to a hardware or software platform that may not be supported or upgraded in the future. In contrast, the loss of customers is likely to be small for producers of raw materials (such as sugar or aluminum), as the value of these goods, once delivered, does not depend on the seller's continued success.[8]

*Loss of Suppliers.*  Customers are not the only ones who retreat from a firm in financial distress. Suppliers may also be unwilling to provide a firm with inventory if they fear they will not be paid. For example, Kmart Corporation filed for bankruptcy protection in January 2002 in part because the decline in its stock price scared suppliers, which then refused to ship goods. Similarly, Swiss Air was forced to shut down because its suppliers refused to fuel its planes. This type of disruption is an important financial distress cost for firms that rely heavily on trade credit. In many cases, the bankruptcy filing itself can alleviate these problems through **debtor-in-possession (DIP) financing**. DIP financing is new debt issued by a bankrupt firm. Because this kind of debt is senior to all existing creditors, it allows a firm that has filed for bankruptcy renewed access to financing to keep operating.

*Loss of Employees.*  Because firms in distress cannot offer job security with long-term employment contracts, they may have difficulty hiring new employees, and existing employees may quit or be hired away. Retaining key employees may be costly: Pacific Gas and Electric Corporation implemented a retention program costing over $80 million to retain 17 key employees while in bankruptcy.[9] This type of financial distress cost is likely to be high for firms whose value is derived largely from their human resources.

*Loss of Receivables.*  Firms in financial distress tend to have difficulty collecting money that is owed to them. According to one of Enron's bankruptcy lawyers, "Many customers who owe smaller amounts are trying to hide from us. They must believe that Enron will never bother with them because the amounts are not particularly large in any individual case."[10] Knowing that the firm might go out of business or at least experience significant management turnover reduces the incentive of customers to maintain a reputation for timely payment.

*Fire Sales of Assets.*  In an effort to avoid bankruptcy and its associated costs, companies in distress may attempt to sell assets quickly to raise cash. To do so, the firm may accept a lower price than would be optimal if it were financially healthy. Indeed, a study of airlines by Todd Pulvino shows that companies in bankruptcy or financial distress sell their aircraft at prices that are 15% to 40% below the prices received by healthier rivals.[11]

---

[8]See S. Titman, "The Effect of Capital Structure on a Firm's Liquidation Decision," *Journal of Financial Economics* 13 (1984): 137–151. T. Opler and S. Titman report 17.7% lower sales growth for highly leveraged firms compared to their less leveraged competitors in R&D-intensive industries during downturns ("Financial Distress and Corporate Performance," *Journal of Finance* 49 (1994): 1015–1040).

[9]R. Jurgens, "PG&E to Review Bonus Program," *Contra Costa Times*, December 13, 2003.

[10]K. Hays, "Enron Asks Judge to Get Tough on Deadbeat Customers," *Associated Press*, August 19, 2003.

[11]"Do Asset Fire-Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," *Journal of Finance* 53 (1998): 939–978, and "Effects of Bankruptcy Court Protection on Asset Sales," *Journal of Financial Economics* 52 (1999): 151–186. For examples from other industries, see T. Kruse, "Asset Liquidity and the Determinants of Asset Sales by Poorly Performing Firms," *Financial Management* 31 (2002): 107–129.

Discounts are also observed when distressed firms attempt to sell subsidiaries. The costs of selling assets below their value are greatest for firms with assets that lack competitive, liquid markets.

*Inefficient Liquidation.* Bankruptcy protection can be used by management to delay the liquidation of a firm that should be shut down. A study by Lawrence Weiss and Karen Wruck estimates that Eastern Airlines lost more than 50% of its value while in bankruptcy because management was allowed to continue making negative-NPV investments.[12] On the other hand, companies in bankruptcy may be forced to liquidate assets that would be more valuable if held. For example, as a result of its default, Lehman Brothers was forced to terminate 80% of its derivatives contracts with counterparties, in many cases at purportedly unattractive terms.[13]

*Costs to Creditors.* Aside from the direct legal costs that creditors may incur when a firm defaults, there may be other indirect costs to creditors. If the loan to the firm was a significant asset for the creditor, default of the firm may lead to costly financial distress *for the creditor*.[14] For example, in the 2008 financial crisis, the Lehman Brothers' bankruptcy in turn helped push many of Lehman's creditors into financial distress as well.

Because bankruptcy is a *choice* the firm's investors and creditors make, there is a limit to the direct and indirect costs on them that result from the firm's decision to go through the bankruptcy process. If these costs were too large, they could be largely avoided by negotiating a workout or doing a prepackaged bankruptcy. Thus, these costs should not exceed the cost of renegotiating with the firm's creditors.[15]

On the other hand, there is no such limit on the indirect costs of financial distress that arise from the firm's customers, suppliers, or employees. Many of these costs are incurred even *prior* to bankruptcy, in anticipation of the fact that the firm may use bankruptcy as an opportunity to renegotiate its contracts and commitments. For example, the firm may use bankruptcy as a way to renege on promises of future employment or retirement benefits for employees, to stop honoring warranties on its products, or to back out of unfavorable delivery contracts with its suppliers. Because of this fear that the firm will not honor its long-term commitments in bankruptcy, highly levered firms may need to pay higher wages to their employees, charge less for their products, and pay more to their suppliers than similar firms with less leverage. Because these costs are not limited by the cost of renegotiating to avoid bankruptcy, they may be substantially greater than other kinds of bankruptcy costs.[16]

---

[12]"Information Problems, Conflicts of Interest, and Asset Stripping: Ch. 11's Failure in the Case of Eastern Airlines," *Journal of Financial Economics* 48, 55–97.

[13]See C. Loomis, "Derivatives: The risk that still won't go away," *Fortune*, June 24, 2009.

[14]While these costs are borne by the creditor and not by the firm, the creditor will consider these potential costs when setting the rate of the loan.

[15]For an insightful discussion of this point, see R. Haugen and L. Senbet, "Bankruptcy and Agency Costs: Their Significance to the Theory of Optimal Capital Structure," *Journal of Financial and Quantitative Analysis* 23 (1988): 27–38.

[16]There is evidence that firms can use bankruptcy to improve efficiency (A. Kalay, R. Singhal, and E. Tashjian, "Is Chapter 11 really costly?" *Journal of Financial Economics*, 84 (2007) 772–796) but that these gains may come at the expense of workers (L. Jacobson, R. LaLonde, and D. Sullivan, "Earnings losses of displaced workers," *American Economic Review* 83 (1993) 685–709). J. Berk, R. Stanton, and J. Zechner, "Human Capital, Bankruptcy and Capital Structure," *Journal of Finance*, 65 (2009) 891–925, argue that firms may choose not to issue debt in order to increase their ability to commit to long-term labor contracts.

**GLOBAL FINANCIAL CRISIS**    **The Chrysler Prepack**

In November 2008, Chrysler CEO Robert Nardelli flew by private jet to Washington with a simple message: Without a government bailout, a Chrysler bankruptcy was inevitable. Congress was not convinced—it felt that bankruptcy was inevitable with or without a bailout and that the automaker needed to provide a more convincing plan to justify government funding. A return trip in December (this time by automobile) yielded a similar result. Bypassing Congress, outgoing President Bush decided to bail out Chrysler with funds from the Troubled Asset Relief Program (TARP). In the end the government provided Chrysler with $8 billion in debt financing.

As a durable goods manufacturer, a lengthy bankruptcy would have entailed significant bankruptcy costs. Indeed, sales were already suffering in part due to customer concerns about Chrysler's future. In response, President Obama took the unprecedented step of guaranteeing warranties on all new Chrysler cars in March 2009.

Despite all this assistance, on April 30, 2009, Chrysler declared bankruptcy as part of a government-orchestrated prepack. Just 41 days later, Chrysler emerged from bankruptcy as a Fiat-run, employee-owned,[17] and government-financed corporation.

Many potential bankruptcy costs were avoided because of the speed with which Chrysler transited the bankruptcy process following the prepack agreement. Yet, getting the debt holders to agree required additional government capital commitments and unprecedented political pressure. In many cases, the senior debt holders were banks that were already receiving TARP aid. Perhaps as a cost of receiving this aid, they accepted a deal that put the claims of unsecured creditors such as the United Auto Workers ahead of their more senior claims.[18] So, while some creditors may have been harmed, there is no doubt that the unprecedented cooperation among investors, and more importantly, government intervention, avoided a long and costly bankruptcy.

**Overall Impact of Indirect Costs.**  In total, the indirect costs of financial distress can be substantial. When estimating them, however, we must remember two important points. First, we need to identify losses to total firm value (and not solely losses to equity holders or debt holders, or transfers between them). Second, we need to identify the incremental losses that are associated with financial distress, above and beyond any losses that would occur due to the firm's economic distress. A study of highly levered firms by Gregor Andrade and Steven Kaplan estimated a potential loss due to financial distress of 10% to 20% of firm value.[19] Next, we consider the consequences of these potential costs of leverage for firm value.

**CONCEPT CHECK**

1. If a firm files for bankruptcy under Chapter 11 of the bankruptcy code, which party gets the first opportunity to propose a plan for the firm's reorganization?

2. Why are the losses of debt holders whose claims are not fully repaid not a cost of financial distress, whereas the loss of customers who fear the firm will stop honoring warranties is?

---

[17]The Chrysler employee pension plan owned 55% of Chrysler, Fiat 20%, the U.S. Treasury 8%, and the Canadian government 2%. The rest of the equity was split amongst the remaining debt claimants.

[18]Not all creditors bowed willingly to the government pressure. A group of pension funds opposed the prepack. In the end the Supreme Court sided with the company and refused to hear their appeal. Perhaps not surprisingly, as a result of this intervention, other unionized firms with large underfunded pensions saw their borrowing costs increase as creditors anticipated the possibility of similar resolutions. (See B. Blaylock, A. Edwards, and J. Stanfield, "Creditor Rights and Government Intervention," 2012, http://ssrn.com/abstract=1685618).

[19]"How Costly Is Financial (Not Economic) Distress? Evidence from Highly Leveraged Transactions That Became Distressed," *Journal of Finance* 53 (1998): 1443–1493.

## 16.3 Financial Distress Costs and Firm Value

The costs of financial distress described in the previous section represent an important departure from Modigliani and Miller's assumption of perfect capital markets. MM assumed that the cash flows of a firm's assets do not depend on its choice of capital structure. As we have discussed, however, levered firms risk incurring financial distress costs that reduce the cash flows available to investors.

### Armin Industries: The Impact of Financial Distress Costs

To illustrate how these financial distress costs affect firm value, consider again the example of Armin Industries. With all-equity financing, Armin's assets will be worth $150 million if its new product succeeds and $80 million if the new product fails. In contrast, with debt of $100 million, Armin will be forced into bankruptcy if the new product fails. In this case, some of the value of Armin's assets will be lost to bankruptcy and financial distress costs. As a result, debt holders will receive less than $80 million. We show the impact of these costs in Table 16.2, where we assume debt holders receive only $60 million after accounting for the costs of financial distress.

As Table 16.2 shows, the total value to all investors is now less with leverage than it is without leverage when the new product fails. The difference of $80 million − $60 million = $20 million is due to financial distress costs. These costs will lower the total value of the firm with leverage, and MM's Proposition I will no longer hold, as illustrated in Example 16.2.

---

**EXAMPLE 16.2**

### Firm Value When Financial Distress Is Costly

**Problem**

Compare the current value of Armin Industries with and without leverage, given the data in Table 16.2. Assume that the risk-free rate is 5%, the new product is equally likely to succeed or fail, and the risk is diversifiable.

**Solution**

With and without leverage, the payments to equity holders are the same as in Example 16.1. There we computed the value of unlevered equity as $109.52 million and the value of levered equity as $23.81 million. But due to bankruptcy costs, the value of the debt is now

$$\text{Debt} = \frac{\frac{1}{2}(100) + \frac{1}{2}(60)}{1.05} = \$76.19 \text{ million}$$

The value of the levered firm is $V^L = E + D = 23.81 + 76.19 = \$100$ million, which is less than the value of the unlevered firm, $V^U = \$109.52$ million. Thus, due to bankruptcy costs, the value of the levered firm is $9.52 million less than its value without leverage. This loss equals the present value of the $20 million in financial distress costs the firm will pay if the product fails:

$$PV(\text{Financial Distress Costs}) = \frac{\frac{1}{2}(0) + \frac{1}{2}(20)}{1.05} = \$9.52 \text{ million}$$

---

### Who Pays for Financial Distress Costs?

The financial distress costs in Table 16.2 reduce the payments to the debt holders when the new product has failed. In that case, the equity holders have already lost their investment and have no further interest in the firm. It might seem as though these costs are irrelevant

| TABLE 16.2 | Value of Debt and Equity with and without Leverage (in $ million) | | | |
| --- | --- | --- | --- | --- |
| | Without Leverage | | With Leverage | |
| | Success | Failure | Success | Failure |
| Debt value | — | — | 100 | 60 |
| Equity value | 150 | 80 | 50 | 0 |
| Total to all investors | 150 | 80 | 150 | 60 |

from the shareholders' perspective. Why should equity holders care about costs borne by debt holders?

It is true that after a firm is in bankruptcy, equity holders care little about bankruptcy costs. But debt holders are not foolish—they recognize that when the firm defaults, they will not be able to get the full value of the assets. As a result, they will pay less for the debt initially. How much less? Precisely the amount they will ultimately give up—the present value of the bankruptcy costs.

But if the debt holders pay less for the debt, there is less money available for the firm to pay dividends, repurchase shares, and make investments. That is, this difference is money out of the equity holders' pockets. This logic leads to the following general result:

*When securities are fairly priced, the original shareholders of a firm pay the present value of the costs associated with bankruptcy and financial distress.*

## EXAMPLE 16.3    Financial Distress Costs and the Stock Price

**Problem**

Suppose that at the beginning of the year, Armin Industries has 10 million shares outstanding and no debt. Armin then announces plans to issue one-year debt with a face value of $100 million and to use the proceeds to repurchase shares. Given the data in Table 16.2, what will the new share price be? As in the previous examples, assume the risk-free rate is 5%, the new product is equally likely to succeed or fail, and this risk is diversifiable.

**Solution**

From Example 16.1, the value of the firm without leverage is $109.52 million. With 10 million shares outstanding, this value corresponds to an initial share price of $10.952 per share. In Example 16.2, we saw that with leverage, the total value of the firm is only $100 million. In anticipation of this decline in value, the price of the stock should fall to $100 million ÷ 10 million shares = $10.00 per share on announcement of the recapitalization.

Let's check this result. From Example 16.2, due to bankruptcy costs, the new debt is worth $76.19 million. Thus, at a price of $10 per share, Armin will repurchase 7.619 million shares, leaving 2.381 million shares outstanding. In Example 16.1, we computed the value of levered equity as $23.81 million. Dividing by the number of shares gives a share price after the transaction of

$$\$23.81 \text{ million} \div 2.381 \text{ million shares} = \$10.00 \text{ per share}$$

Thus, the recapitalization will cost shareholders $0.952 per share or $9.52 million in total. This cost matches the present value of financial distress costs computed in Example 16.2. Thus, although debt holders bear these costs in the end, shareholders pay the present value of the costs of financial distress upfront.

**CONCEPT CHECK**

1. Armin incurred financial distress costs only in the event that the new product failed. Why might Armin incur financial distress costs even *before* the success or failure of the new product is known?

2. True or False: If bankruptcy costs are only incurred once the firm is in bankruptcy and its equity is worthless, then these costs will not affect the initial value of the firm.

## 16.4  Optimal Capital Structure: The Trade-Off Theory

We can now combine our knowledge of the benefits of leverage from the interest tax shield (discussed in Chapter 15) with the costs of financial distress to determine the amount of debt that a firm should issue to maximize its value. The analysis presented in this section is called the **trade-off theory** because it weighs the benefits of debt that result from shielding cash flows from taxes against the costs of financial distress associated with leverage.

According to this theory, *the total value of a levered firm equals the value of the firm without leverage plus the present value of the tax savings from debt, less the present value of financial distress costs:*

$$V^L = V^U + PV(\text{Interest Tax Shield}) - PV(\text{Financial Distress Costs}) \qquad (16.1)$$

Equation 16.1 shows that leverage has costs as well as benefits. Firms have an incentive to increase leverage to exploit the tax benefits of debt. But with too much debt, they are more likely to risk default and incur financial distress costs.

### The Present Value of Financial Distress Costs

Aside from simple examples, calculating the precise present value of financial distress costs is quite complicated. Three key factors determine the present value of financial distress costs: (1) the probability of financial distress, (2) the magnitude of the costs if the firm is in distress, and (3) the appropriate discount rate for the distress costs. In Example 16.2, when Armin is levered, the present value of its financial distress costs depends on the probability that the new product will fail (50%), the magnitude of the costs if it does fail ($20 million), and the discount rate (5%).

What determines each of these factors? The probability of financial distress depends on the likelihood that a firm will be unable to meet its debt commitments and therefore default. This probability increases with the amount of a firm's liabilities (relative to its assets). It also increases with the volatility of a firm's cash flows and asset values. Thus, firms with steady, reliable cash flows, such as utility companies, are able to use high levels of debt and still have a very low probability of default. Firms whose value and cash flows are very volatile (for example, semiconductor firms) must have much lower levels of debt to avoid a significant risk of default.

The magnitude of the financial distress costs will depend on the relative importance of the costs discussed in Section 16.2, and is also likely to vary by industry. For example, firms, such as technology firms, whose value comes largely from human capital, are likely to incur high costs when they risk financial distress, due to the potential for loss of customers and the need to hire and retain key personnel, as well as a lack of tangible assets that can be easily liquidated. In contrast, firms whose main assets are physical capital, such as real estate firms, are likely to have lower costs of financial distress, because a greater portion of their value derives from assets that can be sold relatively easily.

Finally, the discount rate for the distress costs will depend on the firm's market risk. Note that because distress costs are high when the firm does poorly, the beta of distress costs will have an opposite sign to that of the firm.[20] Also, the higher the firm's beta, the more likely it will be in distress in an economic downturn, and thus the more negative the beta of its distress costs will be. Because a more negative beta leads to a lower cost of capital (below the risk-free rate), other things equal *the present value of distress costs will be higher for high beta firms.*

## Optimal Leverage

Figure 16.1 shows how the value of a levered firm, $V^L$, varies with the level of permanent debt, $D$, according to Eq. 16.1. With no debt, the value of the firm is $V^U$. For low levels of debt, the risk of default remains low and the main effect of an increase in leverage is an increase in the interest tax shield, which has present value $\tau^* D$, where $\tau^*$ is the effective tax advantage of debt calculated in Chapter 15. If there were no costs of financial distress, the value would continue to increase at this rate until the interest on the debt exceeds the firm's earnings before interest and taxes and the tax shield is exhausted.

The costs of financial distress reduce the value of the levered firm, $V^L$. The amount of the reduction increases with the probability of default, which in turn increases with the level of the debt $D$. The trade-off theory states that firms should increase their leverage until it reaches the level $D^*$ for which $V^L$ is maximized. At this point, the tax savings that result from increasing leverage are just offset by the increased probability of incurring the costs of financial distress.

### FIGURE 16.1

**Optimal Leverage with Taxes and Financial Distress Costs**

As the level of debt, $D$, increases, the tax benefits of debt increase by $\tau^* D$ until the interest expense exceeds the firm's EBIT (see Figure 15.8). The probability of default, and hence the present value of financial distress costs, also increase with $D$. The optimal level of debt, $D^*$, occurs when these effects balance out and $V^L$ is maximized. $D^*$ will be lower for firms with higher costs of financial distress.



---

[20]For intuition, consider a law firm specializing in bankruptcy. Because profits will be higher in downturns, the law firm will have negative beta. Formally, the beta of distress costs is similar to the beta of a put option on the firm, which we calculate in Chapter 21 (see Figure 21.8). See also H. Almeida and T. Philippon, "The risk-adjusted cost of financial distress," *Journal of Finance* 62 (2007) 2557–2586.

Figure 16.1 also illustrates the optimal debt choices for two types of firms. The optimal debt choice for a firm with low costs of financial distress is indicated by $D^*_{low}$, and the optimal debt choice for a firm with high costs of financial distress is indicated by $D^*_{high}$. Not surprisingly, with higher costs of financial distress, it is optimal for the firm to choose lower leverage.

The trade-off theory helps to resolve two puzzles regarding leverage that arose in Chapter 15. First, the presence of financial distress costs can explain why firms choose debt levels that are too low to fully exploit the interest tax shield. Second, differences in the magnitude of financial distress costs and the volatility of cash flows can explain the differences in the use of leverage across industries. That said, bankruptcy costs alone may not be sufficient to explain all of the variation observed. Fortunately, the trade-off theory can be easily extended to include other effects of leverage—which may be even more important than financial distress costs—that we discuss next.

---

**EXAMPLE 16.4**

**Choosing an Optimal Debt Level**

**Problem**

Greenleaf Industries is considering adding leverage to its capital structure. Greenleaf's managers believe they can add as much as $35 million in debt and exploit the benefits of the tax shield (for which they estimate $\tau^* = 15\%$). However, they also recognize that higher debt increases the risk of financial distress. Based on simulations of the firm's future cash flows, the CFO has made the following estimates (in millions of dollars):[21]

| Debt | 0 | 10 | 20 | 25 | 30 | 35 |
|---|---|---|---|---|---|---|
| **PV(Interest tax shield)** | 0.00 | 1.50 | 3.00 | 3.75 | 4.50 | 5.25 |
| **PV(Financial distress costs)** | 0.00 | 0.00 | 0.38 | 1.62 | 4.00 | 6.38 |

What is the optimal debt choice for Greenleaf?

**Solution**

From Eq. 16.1, the net benefit of debt is determined by subtracting $PV$(Financial distress costs) from $PV$(Interest tax shield). The net benefit for each level of debt is

| Debt | 0 | 10 | 20 | 25 | 30 | 35 |
|---|---|---|---|---|---|---|
| **Net benefit** | 0.00 | 1.50 | 2.62 | 2.13 | 0.50 | −1.13 |

The level of debt that leads to the highest net benefit is $20 million. Greenleaf will gain $3 million due to tax shields, and lose $0.38 million due to the present value of distress costs, for a net gain of $2.62 million.

---

**CONCEPT CHECK**

1. What is the "trade-off" in the trade-off theory?

2. According to the trade-off theory, all else being equal, which type of firm has a higher optimal level of debt: a firm with very volatile cash flows or a firm with very safe, predictable cash flows?

---

[21]The PV of the interest tax shield is computed as $\tau^* D$. The PV of financial distress costs is generally difficult to estimate and requires option valuation techniques we introduce in Part 7.

## 16.5 Exploiting Debt Holders: The Agency Costs of Leverage

In this section, we consider another way that capital structure can affect a firm's cash flows: It can alter managers' incentives and change their investment decisions. If these changes have a negative NPV, they will be costly for the firm.

The type of costs we describe in this section are examples of **agency costs**—costs that arise when there are conflicts of interest between stakeholders. Because top managers often hold shares in the firm and are hired and retained with the approval of the board of directors, which itself is elected by shareholders, managers will generally make decisions that increase the value of the firm's equity. When a firm has leverage, a conflict of interest exists if investment decisions have different consequences for the value of equity and the value of debt. Such a conflict is most likely to occur when the risk of financial distress is high. In some circumstances, managers may take actions that benefit shareholders but harm the firm's creditors and lower the total value of the firm.

We illustrate this possibility by considering Baxter Inc., a firm that is facing financial distress. Baxter has a loan of $1 million due at the end of the year. Without a change in its strategy, the market value of its assets will be only $900,000 at that time, and Baxter will default on its debt. In this situation, let's consider several types of agency costs that might arise.

### Excessive Risk-Taking and Asset Substitution

Baxter executives are considering a new strategy that seemed promising initially but appears risky after closer analysis. The new strategy requires no upfront investment, but it has only a 50% chance of success. If it succeeds, it will increase the value of the firm's assets to $1.3 million. If it fails, the value of the firm's assets will fall to $300,000. Therefore, the expected value of the firm's assets under the new strategy is $50\% \times \$1.3$ million $+ 50\% \times \$300,000 = \$800,000$, a decline of $100,000 from their value of $900,000 under the old strategy. Despite the negative expected payoff, some within the firm have suggested that Baxter should go ahead with the new strategy, in the interest of better serving its shareholders. How can shareholders benefit from this decision?

As Table 16.3 shows, if Baxter does nothing, it will ultimately default and equity holders will get nothing with certainty. Thus, equity holders have nothing to lose if Baxter tries the risky strategy. If the strategy succeeds, equity holders will receive $300,000 after paying off the debt. Given a 50% chance of success, the equity holders' expected payoff is $150,000.

Clearly, equity holders gain from this strategy, even though it has a negative expected payoff. Who loses? The debt holders: If the strategy fails, they bear the loss. As shown in Table 16.3, if the project succeeds, debt holders are fully repaid and receive $1 million. If the project fails, they receive only $300,000. Overall, the debt holders' expected payoff is

| | | New Risky Strategy | | |
|---|---|---|---|---|
| TABLE 16.3 — **Outcomes for Baxter's Debt and Equity under Each Strategy (in $ thousand)** | Old Strategy | Success | Failure | Expected |
| Value of assets | 900 | 1300 | 300 | 800 |
| Debt | 900 | 1000 | 300 | 650 |
| Equity | 0 | 300 | 0 | 150 |

$650,000, a loss of $250,000 relative to the $900,000 they would have received under the old strategy. This loss corresponds to the $100,000 expected loss of the risky strategy and the $150,000 gain of the equity holders. Effectively, the equity holders are gambling with the debt holders' money.

This example illustrates a general point: *When a firm faces financial distress, shareholders can gain from decisions that increase the risk of the firm sufficiently, even if they have a negative NPV.* Because leverage gives shareholders an incentive to replace low-risk assets with riskier ones, this result is often referred to as the **asset substitution problem**.[22] It can also lead to over-investment, as shareholders may gain if the firm undertakes negative-NPV, but sufficiently risky, projects.

In either case, if the firm increases risk through a negative-NPV decision or investment, the total value of the firm will be reduced. Anticipating this bad behavior, security holders will pay less for the firm initially. This cost is likely to be highest for firms that can easily increase the risk of their investments.

## Debt Overhang and Under-Investment

Suppose Baxter does not pursue the risky strategy. Instead, the firm's managers consider an attractive investment opportunity that requires an initial investment of $100,000 and will generate a risk-free return of 50%. That is, it has the following cash flows (in thousands of dollars):



If the current risk-free rate is 5%, this investment clearly has a positive NPV. The only problem is that Baxter does not have the cash on hand to make the investment.

Could Baxter raise the $100,000 by issuing new equity? Unfortunately, it cannot. Suppose equity holders were to contribute the $100,000 in new capital required. Their payoff at the end of the year is shown in Table 16.4.

Thus, if equity holders contribute $100,000 to fund the project, they get back only $50,000. The other $100,000 from the project goes to the debt holders, whose payoff increases from $900,000 to $1 million. Because the debt holders receive most of the benefit, this project is a negative-NPV investment opportunity for equity holders, even though it offers a positive NPV for the firm.

This example illustrates another general point: *When a firm faces financial distress, it may choose not to finance new, positive-NPV projects.* In this case, when shareholders prefer not to

| TABLE 16.4 | Outcomes for Baxter's Debt and Equity with and without the New Project (in $ thousand) | |
|---|---|---|
| | Without New Project | With New Project |
| Existing assets | 900 | 900 |
| New project | | 150 |
| Total firm value | 900 | 1050 |
| Debt | 900 | 1000 |
| Equity | 0 | 50 |

[22]See M. Jensen and W. Meckling, "Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure," *Journal of Financial Economics* 3 (1976): 305–360.

---

### GLOBAL FINANCIAL CRISIS    Bailouts, Distress Costs, and Debt Overhang

Firms and financial institutions in or near financial distress in the midst of the 2008 financial crisis experienced many of the costs associated with financial distress that we have described, creating further negative consequences for the real economy.

Of particular concern was the seeming unwillingness of banks to make loans to borrowers at reasonable terms. One possible explanation was that the borrowers were not creditworthy and so lending to them was a negative NPV investment. But many, including the banks themselves, pointed to another culprit: banks were subject to debt overhang that made it extremely difficult to raise the capital needed to make positive-NPV loans. Thus, a primary rationale for governmental bailouts during the crisis was to provide banks with capital directly, alleviating their debt overhang and increasing the availability of credit to the rest of the economy.

---

invest in a positive-NPV project, we say there is a **debt overhang** or **under-investment problem**.[23] This failure to invest is costly for debt holders and for the overall value of the firm, because it is giving up the NPV of the missed opportunities. The cost is highest for firms that are likely to have profitable future growth opportunities requiring large investments.

**Cashing Out.** When a firm faces financial distress, shareholders have an incentive to withdraw cash from the firm if possible. As an example, suppose Baxter has equipment it can sell for $25,000 at the beginning of the year. It will need this equipment to continue normal operations during the year; without it, Baxter will have to shut down some operations and the firm will be worth only $800,000 at year-end. Although selling the equipment reduces the value of the firm by $100,000, if it is likely that Baxter will default at year-end, this cost would be borne by the debt holders. So, equity holders gain if Baxter sells the equipment and uses the $25,000 to pay an immediate cash dividend. This incentive to liquidate assets at prices below their actual value to the firm is an extreme form of under-investment resulting from the debt overhang.

**Estimating the Debt Overhang.**  How much leverage must a firm have for there to be a significant debt overhang problem? While difficult to estimate precisely, we can use a useful approximation. Suppose equity holders invest an amount $I$ in a new investment project with similar risk to the rest of the firm. Let $D$ and $E$ be the market value of the firm's debt and equity, and let $\beta_D$ and $\beta_E$ be their respective betas. Then the following approximate rule applies: equity holders will benefit from the new investment only if[24]

$$\frac{NPV}{I} > \frac{\beta_D D}{\beta_E E} \tag{16.2}$$

---

[23]This agency cost of debt was formalized by S. Myers, "Determinants of Corporate Borrowing," *Journal of Financial Economics* 5 (1977): 147–175.

[24]To understand this result, let $dE$ and $dD$ be the change in the value of equity and debt resulting from an investment with total value $dE + dD = I + NPV$. Equity holders benefit if they gain more than they invest, $I < dE$, which is equivalent to debt holders capturing less than the investment's NPV, $NPV > dD$. Dividing the second inequality by the first, we have $NPV/I > dD/dE$. Eq. 16.2 follows from the approximation $dD/dE \approx \beta_D D/\beta_E E$; that is, the relative sensitivity of debt and equity to changes in asset values are similar whether those changes arise from investment decisions or market conditions. We derive this approximation in Chapter 21.

That is, the project's profitability index ($NPV/I$) must exceed a cutoff equal to the relative riskiness of the firm's debt ($\beta_D/\beta_E$) times its debt-equity ratio ($D/E$). Note that if the firm has no debt ($D = 0$) or its debt is risk free ($\beta_D = 0$), then Eq. 16.2 is equivalent to $NPV > 0$. But if the firm's debt is risky, the required cutoff is positive and increases with the firm's leverage. Equity holders will reject positive-NPV projects with profitability indices below the cutoff, leading to under-investment and reduction in firm value.

---

**EXAMPLE 16.5**    **Estimating the Debt Overhang**

**Problem**

In Example 12.7, we estimated that Sears had an equity beta of 1.36, a debt beta of 0.17, and a debt-equity ratio of 0.30, while Saks had an equity beta of 1.85, a debt beta of 0.31, and a debt-equity ratio of 1.0. For both firms, estimate the minimum NPV such that a new $100,000 investment (which does not change the volatility of the firm) will benefit shareholders. Which firm has the more severe debt overhang?

**Solution**

We can use Eq. 16.2 to estimate the cutoff level of the profitability index for Sears as $(0.17/1.36) \times 0.30 = 0.0375$. Thus, the NPV would need to equal at least $3750 for the investment to benefit shareholders. For Saks, the cutoff is $(0.31/1.85) \times 1.0 = 0.1675$. Thus, the minimum NPV for Saks is $16,750. Saks has the more severe debt overhang, as its shareholders will reject projects with positive NPVs up to this higher cutoff. Similarly, Saks shareholders would benefit if the firm "cashed out" by liquidating up to $116,750 worth of assets to pay out an additional $100,000 in dividends.

---

## Agency Costs and the Value of Leverage

These examples illustrate how leverage can encourage managers and shareholders to act in ways that reduce firm value. In each case, the equity holders benefit at the expense of the debt holders. But, as with financial distress costs, it is the shareholders of the firm who ultimately bear these agency costs. Although equity holders may benefit at debt holders' expense from these negative-NPV decisions in times of distress, debt holders recognize this possibility and pay less for the debt when it is first issued, reducing the amount the firm can distribute to shareholders. The net effect is a reduction in the initial share price of the firm corresponding to the negative NPV of the decisions.

These agency costs of debt can arise only if there is some chance the firm will default and impose losses on its debt holders. The magnitude of the agency costs increases with the risk, and therefore the amount, of the firm's debt. Agency costs, therefore, represent another cost of increasing the firm's leverage that will affect the firm's optimal capital structure choice.

---

**EXAMPLE 16.6**    **Agency Costs and the Amount of Leverage**

**Problem**

Would the agency costs described previously arise if Baxter had less leverage and owed $400,000 rather than $1 million?

**Solution**

If Baxter makes no new investments or changes to its strategy, the firm will be worth $900,000. Thus, the firm will remain solvent and its equity will be worth $900,000 − $400,000 = $500,000.

Consider first the decision to increase risk. If Baxter takes the risky strategy, its assets will be worth either $1.3 million or $300,000, so equity holders will receive $900,000 or $0. In this case, the equity holders' expected payoff with the risky project is only $900,000 \times 0.5 = $450,000. Thus equity holders will reject the risky strategy.

What about under-investment? If Baxter raises $100,000 from equity holders to fund a new investment that increases the value of assets by $150,000, the equity will be worth

$$\$900,000 + \$150,000 - \$400,000 = \$650,000$$

This is a gain of $150,000 over the $500,000 equity holders would receive without the investment. Because their payoff has gone up by $150,000 for a $100,000 investment, they will be willing to invest in the new project.

Similarly, Baxter has no incentive to cash out and sell equipment to pay a dividend. If the firm pays the dividend, equity holders receive $25,000 today. But their future payoff declines to $800,000 - $400,000 = $400,000. Thus, they give up $100,000 in one year for a $25,000 gain today. For any reasonable discount rate, this is a bad deal and stockholders will reject the dividend.

## The Leverage Ratchet Effect

As we have seen, when an unlevered firm issues new debt, equity holders will bear any anticipated agency or bankruptcy costs via a discount in the price they receive for that new debt. This discount deters the firm from taking on high leverage initially if doing so would reduce the value of the firm.

However, once a firm has debt already in place, some of the agency or bankruptcy costs that result from taking on additional leverage will fall on *existing* debt holders. Because that debt has already been sold, the negative consequences for these debt holders will not be borne by shareholders. As a result, shareholders may benefit from taking on higher leverage even though it might reduce the total value of the firm. (This result is another manifestation of the "cashing out" effect of debt overhang—levered firms may have an incentive to borrow further and disburse the proceeds to shareholders.)

Finally, debt overhang will inhibit firms from reducing leverage once it is in place. In this case, if the firm tries to buy back debt, existing debt holders will gain (and debt holders who sell will demand a premium) due to the reduction in risk, agency costs, and bankruptcy costs associated with lower leverage.

The **leverage ratchet effect** captures the observations that, once existing debt is in place, (1) shareholders may have an incentive to increase leverage even if it decreases the value of the firm,[25] and (2) shareholders will not have an incentive to decrease leverage by buying back debt, even if it will increase the value of the firm.[26]

| EXAMPLE 16.7 | **Debt Overhang and the Leverage Ratchet Effect** |

**Problem**

Show that Baxter's shareholders would not gain by reducing leverage from $1 million to $400,000, even though firm value would increase by eliminating the cost of underinvestment.

---

[25]For an analysis of this effect and its consequence on loan markets, see D. Bizer and P. DeMarzo, "Sequential Banking," *Journal of Political Economy*, 100 (1992): 41–61.

[26]This result holds quite generally as long as the debt must be repurchased at its ex-post fair value; see A. Admati, P. DeMarzo, M. Hellwig, and P. Pfleiderer, "Debt Overhang and Capital Regulation," http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2031204.

**Solution**

Recall that with $1 million in debt, Baxter would choose to forgo an investment in a positive NPV risk-free project (see Table 16.4). Thus, its equity would be worth zero, and its debt would be worth $900,000. Also, as shown in Example 16.6, if the debt level were $400,000 instead of $1 million, the problem would not exist–equity holders would choose to take the positive NPV investment and firm value would increase by the NPV of the project.

Even so, equity holders will not choose to reduce debt. Because the debt will be default-free after the buyback, and given the risk-free rate of 5%, each debt holder must be repaid at least $1/1.05 = $0.952 per dollar of principal, or would otherwise prefer to hold onto their debt while others sell. Therefore, to reduce its debt to $400,000, Baxter would need to raise $600,000/1.05 = $571,429 from equity holders. Baxter could then raise another $100,000 from equity holders to invest in the new project. In the end, the value of the firm would be $1.05 million, and after paying $400,000 in debt, equity holders would receive $650,000. But this amount is less than the total of $671,429 equity holders would need to invest upfront.

The reason equity holders do not gain by reducing debt in Example 16.7 is that in order to buy back the debt, the company must pay its post-transaction market value, which includes the value of the anticipated investment. A similar outcome would apply to the case of excessive risk-taking. By reducing debt, equity holders lose their incentive to take on a risky negative NPV investment. While this effect increases the value of the firm, equity holders would not gain as they would be forced to pay a price for the debt that reflects the value of eliminating the incentives for excessive risk-taking.

## Debt Maturity and Covenants

Firms can do several things to mitigate the agency costs of debt. First, note that the magnitude of agency costs likely depends on the maturity of debt. With long-term debt, equity holders have more opportunities to profit at the debt holders' expense before the debt matures. Thus, agency costs are smallest for short-term debt.[27] For example, if Baxter's debt were due today, the firm would be forced to default or renegotiate with debt holders before it could increase risk, fail to invest, or cash out. However, by relying on short-term debt the firm will be obligated to repay or refinance its debt more frequently. Short-term debt may also increase the firm's risk of financial distress and its associated costs.

Second, as a condition of making a loan, creditors often place restrictions on the actions that the firm can take. Such restrictions are referred to as **debt covenants**. Covenants may limit the firm's ability to pay large dividends or restrict the types of investments that the firm can make. They also typically limit the amount of new debt the firm can take on. By preventing management from exploiting debt holders, these covenants may help to reduce agency costs. Conversely, because covenants hinder management flexibility, they have the potential to get in the way of positive NPV opportunities and so can have costs of their own.[28]

**CONCEPT CHECK**

1. Why do firms have an incentive to both take excessive risk and under-invest when they are in financial distress?

2. Why would debt holders desire covenants that restrict the firm's ability to pay dividends, and why might shareholders also benefit from this restriction?

---

[27] See S. Johnson, "Debt Maturity and the Effects of Growth Opportunities and Liquidity on Leverage," *Review of Financial Studies* 16 (March 2003): 209–236.

[28] For an analysis of the costs and benefits of bond covenants, see C. Smith and J. Warner, "On Financial Contracting: An Analysis of Bond Covenants," *Journal of Financial Economics* 7 (1979): 117–161.

## 16.6 Motivating Managers: The Agency Benefits of Leverage

In Section 16.5, we took the view that managers act in the interests of the firm's equity holders, and we considered the potential conflicts of interest between debt holders and equity holders when a firm has leverage. Of course, managers also have their own personal interests, which may differ from those of both equity holders and debt holders. Although managers often do own shares of the firm, in most large corporations they own only a very small fraction of the outstanding shares. And while the shareholders, through the board of directors, have the power to fire managers, they rarely do so unless the firm's performance is exceptionally poor.[29]

This separation of ownership and control creates the possibility of **management entrenchment**: facing little threat of being fired and replaced, managers are free to run the firm in their own best interests. As a result, managers may make decisions that benefit themselves at investors' expense. In this section, we consider how leverage can provide incentives for managers to run the firm more efficiently and effectively. The benefits we describe in this section, in addition to the tax benefits of leverage, give the firm an incentive to use debt rather than equity financing.

### Concentration of Ownership

One advantage of using leverage is that it allows the original owners of the firm to maintain their equity stake. As major shareholders, they will have a strong interest in doing what is best for the firm. Consider the following simple example:

Ross Jackson is the owner of a successful furniture store. He plans to expand by opening several new stores. Ross can either borrow the funds needed for expansion or raise the money by selling shares in the firm. If he issues equity, he will need to sell 40% of the firm to raise the necessary funds.

If Ross uses debt, he retains ownership of 100% of the firm's equity. As long as the firm does not default, any decision Ross makes that increases the value of the firm by $1 increases the value of his own stake by $1. But if Ross issues equity, he retains only 60% of the equity. Thus, Ross gains only $0.60 for every $1 increase in firm value.

The difference in Ross's ownership stake changes his incentives in running the firm. Suppose the value of the firm depends largely on Ross's personal effort. Ross is then likely to work harder, and the firm will be worth more, if he receives 100% of the gains rather than only 60%.

Another effect of issuing equity is Ross's temptation to enjoy corporate perks, such as a large office with fancy artwork, a corporate limo and driver, a corporate jet, or a large expense account. With leverage, Ross is the sole owner and will bear the full cost of these perks. But with equity, Ross bears only 60% of the cost; the other 40% will be paid for by the new equity holders. Thus, with equity financing, it is more likely that Ross will overspend on these luxuries.

The costs of reduced effort and excessive spending on perks are another form of agency cost. These agency costs arise in this case due to the dilution of ownership that occurs when equity financing is used. Who pays these agency costs? As always, if securities are fairly

---

[29]See, for example, J. Warner, R. Watts, and K. Wruck, "Stock Prices and Top Management Changes," *Journal of Financial Economics* 20 (1988): 461–492, though more recent evidence suggests that management turnover may be more sensitive to poor performance than previously measured (see D. Jenter and K. Lewellen, "Performance-induced CEO turnover," working paper, 2012).

priced, the original owners of the firm pay the cost. In our example, Ross will find that if he chooses to issue equity, the new investors will discount the price they will pay to reflect Ross's lower effort and increased spending on perks. In this case, using leverage can benefit the firm by preserving ownership concentration and avoiding these agency costs.[30]

## Reduction of Wasteful Investment

While ownership is often concentrated for small, young firms, ownership typically becomes diluted over time as a firm grows. First, the original owners of the firm may retire, and the new managers likely will not hold a large ownership stake. Second, firms often need to raise more capital for investment than can be sustained using debt alone (recall the discussion of growth and leverage in Chapter 15). Third, owners will often choose to sell off their stakes and invest in a well-diversified portfolio to reduce risk.[31] As a result, for large U.S. firms, most CEOs own less than 1% of their firms' shares.

With such low ownership stakes, the potential for conflict of interest between managers and equity holders is high. Appropriate monitoring and standards of accountability are required to prevent abuse. While most successful firms have implemented appropriate mechanisms to protect shareholders, each year scandals are revealed in which managers have acted against shareholders' interests.

While overspending on personal perks may be a problem for large firms, these costs are likely to be small relative to the overall value of the firm. A more serious concern for large corporations is that managers may make large, unprofitable investments: Bad investment decisions have destroyed many otherwise successful firms. But what would motivate managers to make negative-NPV investments?

Some financial economists explain a manager's willingness to engage in negative-NPV investments as *empire building*. According to this view, managers prefer to run large firms rather than small ones, so they will take on investments that increase the size—rather than the profitability—of the firm. One potential reason for this preference is that managers of large firms tend to earn higher salaries, and they may also have more prestige and garner greater publicity than managers of small firms. As a result, managers may expand (or fail to shut down) unprofitable divisions, pay too much for acquisitions, make unnecessary capital expenditures, or hire unnecessary employees.

Another reason that managers may over-invest is that they are overconfident. Even when managers attempt to act in shareholders' interests, they may make mistakes. Managers tend to be bullish on the firm's prospects and so may believe that new opportunities are better than they actually are. They may also become committed to investments the firm has already made and continue to invest in projects that should be canceled.[32]

---

[30]This potential benefit of leverage is discussed by M. Jensen and W. Meckling, "Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure," *Journal of Financial Economics* 3 (1976): 305–360. However, because managers who own a large block of shares are more difficult to replace, increasing ownership concentration at lower levels (e.g., in the 5%–25% range) may increase entrenchment and *reduce* incentives; see R. Morck, A. Shleifer, and R. Vishny, "Management Ownership and Market Valuation," *Journal of Financial Economics* 20 (1988): 293–315.

[31]According to one study, original owners tend to reduce their stake by more than 50% within nine years after the firm becomes a public company (B. Urošević, "Essays in Optimal Dynamic Risk Sharing in Equity and Debt Markets," 2002, University of California, Berkeley).

[32]For evidence of the relationship between CEO overconfidence and investment distortions, see U. Malmendier and G. Tate, "CEO Overconfidence and Corporate Investment," *Journal of Finance* 60 (2005): 2661–2700; J. Heaton "Managerial Optimism and Corporate Finance," *Financial Management* 31 (2002): 33–45; and R. Roll, "The Hubris Hypothesis of Corporate Takeovers," *Journal of Business* 59 (1986): 197–216.

### Excessive Perks and Corporate Scandals

While most CEOs and managers exercise proper restraint when spending shareholders' money, there have been some highly publicized exceptions that have come to light as corporate scandals.

Former Enron CFO Andrew Fastow reportedly used complicated financial transactions to enrich himself with at least $30 million of shareholder money. Tyco Corporation's ex-CEO Dennis Kozlowski will be remembered for his $6000 shower curtain, $6300 sewing basket, and $17 million Fifth Avenue condo, all paid for with Tyco funds. In total, he and former CFO Mark Swartz were convicted of pilfering $600 million from company coffers.* Former WorldCom CEO Bernie Ebbers, who was convicted for his role in the firm's $11 billion accounting scandal, borrowed more than $400 million from the company at favorable terms from late 2000 to early 2002. Among other things, he used the money from these loans to give gifts to friends and family, as well as build a house.† John Rigas and his son Timothy, former CEO and CFO of Adelphia Communications, were convicted of stealing $100 million from the firm as well as hiding $2 billion in corporate debt.

But these are exceptional cases. And they were not, in and of themselves, the cause of the firms' downfalls, but rather a symptom of a broader problem of a lack of oversight and accountability within these firms, together with an opportunistic attitude of the managers involved.

_____

*M. Warner, "Exorcism at Tyco," *Fortune*, April 28, 2003.
†A. Backover, "Report Slams Culture at WorldCom," *USA Today*, November 5, 2002.

For managers to engage in wasteful investment, they must have the cash to invest. This observation is the basis of the **free cash flow hypothesis**, the view that wasteful spending is more likely to occur when firms have high levels of cash flow in excess of what is needed to make all positive-NPV investments and payments to debt holders.[33] Only when cash is tight will managers be motivated to run the firm as efficiently as possible. According to this hypothesis, leverage increases firm value because it commits the firm to making future interest payments, thereby reducing excess cash flows and wasteful investment by managers.[34]

A related idea is that leverage can reduce the degree of managerial entrenchment because managers are more likely to be fired when a firm faces financial distress. Managers who are less entrenched may be more concerned about their performance and less likely to engage in wasteful investment. In addition, when the firm is highly levered, creditors themselves will closely monitor the actions of managers, providing an additional layer of management oversight.[35]

### Leverage and Commitment

Leverage may also tie managers' hands and commit them to pursue strategies with greater vigor than they would without the threat of financial distress. For example, when American Airlines was in labor negotiations with its unions in April 2003, the firm was able to win wage concessions by explaining that higher costs would push it into bankruptcy. (A similar situation enabled Delta Airlines to persuade its pilots to accept a 33% wage cut in November 2004.) Without the threat of financial distress,

_____

[33]The hypothesis that excess cash flow induces empire building was put forth by M. Jensen, "Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers," *American Economic Review* 76 (1986): 323–329.

[34]Of course, managers could also raise new capital for wasteful investment. But investors would be reluctant to contribute to such an endeavor and would offer unfavorable terms. In addition, raising external funds would attract greater scrutiny and public criticism regarding the investment.

[35]See, for example, M. Harris and A. Raviv, "Capital Structure and the Informational Role of Debt," *Journal of Finance* 45 2 (1990): 321–349.

### GLOBAL FINANCIAL CRISIS   Moral Hazard, Government Bailouts, and the Appeal of Leverage

The term **moral hazard** refers to the idea that individuals will change their behavior if they are not fully exposed to its consequences. Discussion of moral hazard's role in the 2008 financial crisis has centered on mortgage brokers, investment bankers, and corporate managers who earned large bonuses when their businesses did well, but did not need to repay these bonuses later when things turned sour. The agency costs described in this chapter represent another form of moral hazard, as equity holders may take excessive risk or pay excessive dividends if the negative consequences will be borne by bondholders.

How are such abuses by equity holders normally held in check? Bondholders will either charge equity holders for the risk of this abuse by increasing the cost of debt, or, more likely, equity holders will credibly commit not to take on excessive risk by, for example, agreeing to very strong bond covenants and other monitoring.

Ironically, despite the potential immediate benefits of the federal bailouts in response to the 2008 financial crisis, by protecting the bondholders of many large corporations, the government may have simultaneously weakened this disciplining mechanism and thereby increased the likelihood of future crises. With this precedent in place, all lenders to corporations deemed "too big to fail" may presume they have an implicit government guarantee, thus lowering their incentives to insist on strong covenants and to monitor whether those covenants are being satisfied.[36] Without this monitoring the likelihood of future abuses by equity holders and managers has likely been increased, as has the government's liability.

Moral hazard might also help to explain why bankers are opposed to higher capital requirements. As we pointed out in Chapter 14, in a perfect market, capital requirements cannot affect the competitiveness of banks. However, because both deposit insurance and government bailouts subsidize bank debt, banks' borrowing costs do not reflect either their risk or the costs associated with default. Thus, higher leverage *both* reduces banks' tax obligations and increases the benefit they receive in bankruptcy from these subsidies, greatly favoring debt in the trade-off between tax subsidies and bankruptcy costs. Because taxpayers ultimately pay for these subsidies, the benefits of leverage to bank shareholders come largely at taxpayer expense.[37]

American's managers might not have reached agreement with the union as quickly or achieved the same wage concessions.[38]

A firm with greater leverage may also become a fiercer competitor and act more aggressively in protecting its markets because it cannot risk the possibility of bankruptcy. This commitment to aggressive behavior can scare off potential rivals. (This argument could work in reverse: A firm weakened by too much leverage might become so financially fragile that it crumbles in the face of competition, allowing other firms to erode its markets.)[39]

---

[36]As an example, a number of large banks continued to pay dividends during the crisis even after receiving bailout funds. Had the funds been raised from outside investors without any government guarantee, it is very likely the new investors would have restricted such payouts.

[37]See A. Admati, P. DeMarzo, M. Hellwig, and P. Pfleiderer, "Fallacies, Irrelevant Facts, and Myths in the Discussion of Capital Regulation: Why Bank Equity Is Not Expensive," Rock Center for Corporate Governance Research Paper No. 86, August 2010.

[38]See E. Perotti and K. Spier, "Capital Structure as a Bargaining Tool: The Role of Leverage in Contract Renegotiation," *American Economic Review* 83 (1993): 1131–1141. Debt can also affect a firm's bargaining power with its suppliers; see S. Dasgupta and K. Sengupta, "Sunk Investment, Bargaining and Choice of Capital Structure," *International Economic Review* 34 (1993): 203–220; O. Sarig, "The Effect of Leverage on Bargaining with a Corporation," *Financial Review* 33 (1998): 1–16; and C. Hennessy and D. Livdan, "Debt, Bargaining, and Credibility in Firm-Supplier Relationships," *Journal of Financial Economics* 93 (2009): 382–399. Debt may also enhance a target's bargaining power in a control contest; see M. Harris and A. Raviv, "Corporate Control Contests and Capital Structure," *Journal of Financial Economics* 20 (1988): 55–86; and R. Israel, "Capital Structure and the Market for Corporate Control: The Defensive Role of Debt Financing," *Journal of Finance* 46 (1991): 1391–1409.

[39]See J. Brander and T. Lewis, "Oligopoly and Financial Structure: The Limited Liability Effect," *American Economic Review* 76 (1986): 956–970. In an empirical study, J. Chevalier finds that leverage reduces the competitiveness of supermarket firms ("Capital Structure and Product-Market Competition: Empirical Evidence from the Supermarket Industry," *American Economic Review* 85 (1995): 415–435). P. Bolton and D. Scharfstein discuss the effects of not having deep pockets in "A Theory of Predation Based on Agency Problems in Financial Contracting," *American Economic Review* 80 (1990): 93–106.

CONCEPT CHECK  **1.** In what ways might managers benefit by overspending on acquisitions?

**2.** How might shareholders use the firm's capital structure to prevent this problem?

## 16.7 Agency Costs and the Trade-Off Theory

We can now adjust Eq. 16.1 for the value of the firm to include the costs and benefits of the incentives that arise when the firm has leverage. This more complete equation follows:

$$V^L = V^U + PV(\text{Interest Tax Shield}) - PV(\text{Financial Distress Costs})$$
$$- PV(\text{Agency Costs of Debt}) + PV(\text{Agency Benefits of Debt}) \quad (16.3)$$

The net effect of the costs and benefits of leverage on the value of a firm is illustrated in Figure 16.2. With no debt, the value of the firm is $V^U$. As the debt level increases, the firm benefits from the interest tax shield (which has present value $\tau^*D$). The firm also benefits from improved incentives for management, which reduce wasteful investment and perks. If the debt level is too large, however, firm value is reduced due to the loss of tax benefits (when interest exceeds EBIT), financial distress costs, and the agency costs of leverage. The optimal level of debt, $D^*$, balances the costs and benefits of leverage.

### The Optimal Debt Level

It is important to note that the relative magnitudes of the different costs and benefits of debt vary with the characteristics of the firm. Likewise, the optimal level of debt varies. As an example, let's contrast the optimal capital structure choice for two types of firms.[40]

### FIGURE 16.2

**Optimal Leverage with Taxes, Financial Distress, and Agency Costs**

As the level of debt, $D$, increases, the value of the firm increases from the interest tax shield as well as improvements in managerial incentives. If leverage is too high, however, the present value of financial distress costs, as well as the agency costs from debt holder–equity holder conflicts, dominates and reduces firm value. The optimal level of debt, $D^*$, balances these benefits and costs of leverage.



[40]For an empirical estimation of the variation in Figure 16.2 across firms and industries, see J. van Binsbergen, J. Graham, and J. Yang, "The Cost of Debt," *Journal of Finance*, 65 (2010): 2089–2136, and A. Korteweg, "The Net Benefits to Leverage," *Journal of Finance*, 65 (2010): 2137–2170.

**R&D-Intensive Firms.** Firms with high R&D costs and future growth opportunities typically maintain low debt levels. These firms tend to have low current free cash flows, so they need little debt to provide a tax shield or to control managerial spending. In addition, they tend to have high human capital, so there will be large costs as a result of financial distress. Also, these firms may find it easy to increase the risk of their business strategy (by pursuing a riskier technology) and often need to raise additional capital to fund new investment opportunities. Thus, their agency costs of debt are also high. Biotechnology and technology firms often maintain less than 10% leverage.

**Low-Growth, Mature Firms.** Mature, low-growth firms with stable cash flows and tangible assets often fall into the high-debt category. These firms tend to have high free cash flows with few good investment opportunities. Thus, the tax shield and incentive benefits of leverage are likely to be high. With tangible assets, the financial distress costs of leverage are likely to be low, as the assets can be liquidated for close to their full value. Examples of low-growth industries in which firms typically maintain greater than 20% leverage include real estate, utilities, and supermarket chains.

### Debt Levels in Practice

The trade-off theory explains how firms *should* choose their capital structures to maximize value to current shareholders. Evaluating whether they actually do so is not so straightforward, however, as many of the costs of leverage are hard to measure.

Why might firms *not* choose an optimal capital structure? Capital structure decisions, like investment decisions, are made by managers who have their own incentives. Proponents of the **management entrenchment theory** of capital structure believe that managers choose a capital structure primarily to avoid the discipline of debt and maintain their own entrenchment. Thus, managers seek to *minimize* leverage to prevent the job loss that would accompany financial distress. Managers are constrained from using too little debt, however, to keep shareholders happy. If managers sacrifice too much firm value, disgruntled shareholders may try to replace them or sell the firm to an acquirer. Under this hypothesis, firms will have leverage that is less than the optimal level $D^*$ in Figure 16.2, and increase it toward $D^*$ only in response to a takeover threat or the threat of shareholder activism.[41]

**CONCEPT CHECK**

1. Describe how management entrenchment can affect the value of the firm.

2. Coca-Cola Enterprises is almost 50% debt financed, while Intel, a technology firm, has no net debt. Why might these firms choose such different capital structures?

## 16.8  Asymmetric Information and Capital Structure

Throughout this chapter, we have assumed that managers, stockholders, and creditors have the same information. We have also assumed that securities are fairly priced: The firm's shares and debt are priced according to their true underlying value. These assumptions may not always be accurate in practice. Managers' information about the firm and its future cash flows is likely to be superior to that of outside investors—there is **asymmetric information**

---

[41]See J. Zwiebel, "Dynamic Capital Structure Under Managerial Entrenchment," *American Economic Review* 86 (1996): 1197–1215; L. Zingales and W. Novaes, "Capital Structure Choice When Managers Are in Control: Entrenchment versus Efficiency," *Journal of Business* 76 (2002): 49–82; and E. Morellec, "Can Managerial Discretion Explain Observed Leverage Ratios?" *Review of Financial Studies* 17 (2004): 257–294.

between managers and investors. In this section, we consider how asymmetric information may motivate managers to alter a firm's capital structure.

### Leverage as a Credible Signal

Consider the plight of Kim Smith, CEO of Beltran International, who believes her company's stock is undervalued. Market analysts and investors are concerned that several of Beltran's key patents will expire soon, and that new competition will force Beltran to cut prices or lose customers. Smith believes that new product innovations and soon-to-be-introduced manufacturing improvements will keep Beltran ahead of its competitors and enable it to sustain its current profitability well into the future. She seeks to convince investors of Beltran's promising future and to increase Beltran's current stock price.

One potential strategy is to launch an investor relations campaign. Smith can issue press releases, describing the merits of the new innovations and the manufacturing improvements. But Smith knows that investors may be skeptical of these press releases if their claims cannot be verified. After all, managers, much like politicians, have an incentive to sound optimistic and confident about what they can achieve.

Because investors expect her to be biased, to convince the market Smith must take actions that give credible signals of her knowledge of the firm. That is, she must take actions that the market understands she would be unwilling to do unless her statements were true. This idea is more general than manager–investor communication; it is at the heart of much human interaction. We call it the **credibility principle**:

*Claims in one's self-interest are credible only if they are supported by actions that would be too costly to take if the claims were untrue.*

This principle is the essence behind the adage, "Actions speak louder than words."

One way a firm can credibly convey its strength to investors is by making statements about its future prospects that investors and analysts can ultimately verify. Because the penalties for intentionally deceiving investors are large,[42] investors will generally believe such statements.

For example, suppose Smith announces that pending long-term contracts from the U.S., British, and Japanese governments will increase revenues for Beltran by 30% next year. Because this statement can be verified after the fact, it would be costly to make it if untrue. For deliberate misrepresentation, the U.S. Securities and Exchange Commission (SEC) would likely fine the firm and file charges against Smith. The firm could also be sued by its investors. These large costs would likely outweigh any potential benefits to Smith and Beltran for temporarily misleading investors and boosting the share price. Thus, investors will likely view the announcement as credible.

But what if Beltran cannot yet reveal specific details regarding its future prospects? Perhaps the contracts for the government orders have not yet been signed or cannot be disclosed for other reasons. How can Smith credibly communicate her positive information regarding the firm?

One strategy is to commit the firm to large future debt payments. If Smith is right, then Beltran will have no trouble making the debt payments. But if Smith is making false claims and the firm does not grow, Beltran will have trouble paying its creditors and will experience financial distress. This distress will be costly for the firm and also for Smith, who will likely lose her job. Thus, Smith can use leverage as a way to convince investors that she does have information that the firm will grow, even if she cannot provide verifiable details about the sources of growth. Investors know that Beltran would be at risk of defaulting without

---

[42]The Sarbanes-Oxley Act of 2002 increased the penalties for securities fraud to include up to 10 years of imprisonment.

growth opportunities, so they will interpret the additional leverage as a credible signal of the CEO's confidence. The use of leverage as a way to signal good information to investors is known as the **signaling theory of debt**.[43]

| EXAMPLE 16.7 | **Debt Signals Strength** |
|---|---|

**Problem**

Suppose that Beltran currently uses all-equity financing, and that Beltran's market value in one year's time will be either $100 million or $50 million depending on the success of the new strategy. Currently, investors view the outcomes as equally likely, but Smith has information that success is virtually certain. Will leverage of $25 million make Smith's claims credible? How about leverage of $55 million?

**Solution**

If leverage is substantially less than $50 million, Beltran will have no risk of financial distress regardless of the outcome. As a result, there is no cost of leverage even if Smith does not have positive information. Thus, leverage of $25 million would not be a credible signal of strength to investors.

However, leverage of $55 million is likely to be a credible signal. If Smith has no positive information, there is a significant chance that Beltran will face bankruptcy under this burden of debt. Thus Smith would be unlikely to agree to this amount of leverage unless she is certain about the firm's prospects.

## Issuing Equity and Adverse Selection

Suppose a used-car dealer tells you he is willing to sell you a nice looking sports car for $5000 less than its typical price. Rather than feel lucky, perhaps your first reaction should be one of skepticism: If the dealer is willing to sell it for such a low price, there must be something wrong with the car—it is probably a "lemon."

The idea that buyers will be skeptical of a seller's motivation for selling was formalized by George Akerlof.[44] Akerlof showed that if the seller has private information about the quality of the car, then his *desire to sell* reveals the car is probably of low quality. Buyers are therefore reluctant to buy except at heavily discounted prices. Owners of high-quality cars are reluctant to sell because they know buyers will think they are selling a lemon and offer only a low price. Consequently, the quality and prices of cars sold in the used-car market are both low. This result is referred to as **adverse selection**: The selection of cars sold in the used-car market is worse than average.

Adverse selection extends beyond the used-car market. In fact, it applies in any setting in which the seller has more information than the buyer. Adverse selection leads to the **lemons principle**:

*When a seller has private information about the value of a good, buyers will discount the price they are willing to pay due to adverse selection.*

We can apply this principle to the market for equity.[45] Suppose the owner of a start-up company tells you that his firm is a wonderful investment opportunity—and then offers to

[43]See S. Ross, "The Determination of Financial Structure: The Incentive-Signalling Approach," *Bell Journal of Economics* 8 (1977): 23–40.

[44]"The Market for Lemons: Quality, Uncertainty, and the Market Mechanism," *Quarterly Journal of Economics* 84 (1970): 488–500.

[45]See H. Leland and D. Pyle, "Information Asymmetries, Financial Structure and Financial Intermediation," *Journal of Finance* 32 (1977): 371–387.

| NOBEL PRIZE | **The 2001 Nobel Prize in Economics** |
|---|---|

In 2001, George Akerlof, Michael Spence, and Joseph Stiglitz jointly received the Nobel Prize in economics for their analyses of markets with asymmetric information and adverse selection. In this chapter, we discuss the implications of their theory for firm capital structure. This theory, however, has much broader applications. As described on the Nobel Prize Web site (www.nobelprize.org):

*Many markets are characterized by asymmetric information: Actors on one side of the market have much better information than those on the other. Borrowers know more than lenders about their repayment prospects, managers*

*and boards know more than shareholders about the firm's profitability, and prospective clients know more than insurance companies about their accident risk. During the 1970s, this year's Laureates laid the foundation for a general theory of markets with asymmetric information. Applications have been abundant, ranging from traditional agricultural markets to modern financial markets. The Laureates' contributions form the core of modern information economics.*

© The Nobel Foundation.

sell you 70% of his stake in the firm. He states that he is selling *only* because he wants to diversify. Although you appreciate this desire, you also suspect the owner may be eager to sell such a large stake because he has negative information about the firm's future prospects. That is, he may be trying to cash out before the bad news becomes known.[46]

As with the used-car dealer, a firm owner's desire to sell equity may lead you to question how good an investment opportunity it really is. Based on the lemons principle, you therefore reduce the price you are willing to pay. This discount of the price due to adverse selection is a potential cost of issuing equity, and it may make owners with good information refrain from issuing equity.

| EXAMPLE 16.8 | **Adverse Selection in Equity Markets** |
|---|---|

**Problem**

Zycor stock is worth either $100 per share, $80 per share, or $60 per share. Investors believe each case is equally likely, and the current share price is equal to the average value of $80.

Suppose the CEO of Zycor announces he will sell most of his holdings of the stock to diversify. Diversifying is worth 10% of the share price—that is, the CEO would be willing to receive 10% less than the shares are worth to achieve the benefits of diversification. If investors believe the CEO knows the true value, how will the share price change if he tries to sell? Will the CEO sell at the new share price?

**Solution**

If the true value of the shares were $100, the CEO would not be willing to sell at the market price of $80 per share, which would be 20% below their true value. So, if the CEO tries to sell, shareholders can conclude the shares are worth either $80 or $60. In that case, share price should fall to the average value of $70. But again, if the true value were $80, the CEO would be willing to sell for $72, but not $70 per share. So, if he still tries to sell, investors will know the true value is $60 per share. Thus, the CEO will sell only if the true value is the lowest possible price, $60 per share. If the CEO knows the firm's stock is worth $100 or $80 per share, he will not sell even though he would prefer to diversify.

---

[46]Again, if the owner of the firm (or the car, in the earlier example) has very specific information that can be verified ex-post, there are potential legal consequences for not revealing that information to a buyer. Generally, however, there is a great deal of subtle information the seller might have that would be impossible to verify.

In explaining adverse selection, we considered an owner of a firm selling his or her *own* shares. What if a manager of the firm decides to sell securities on the *firm's* behalf? If the securities are sold at a price below their true value, the buyer's windfall represents a cost for the firm's current shareholders. Acting on behalf of the current shareholders, the manager may be unwilling to sell.[47]

Let's consider a simple example. Gentec is a biotech firm with no debt, and its 20 million shares are currently trading at $10 per share, for a total market value of $200 million. Based on the prospects for one of Gentec's new drugs, management believes the true value of the company is $300 million, or $15 per share. Management believes the share price will reflect this higher value after the clinical trials for the drug are concluded next year.

Gentec has already announced plans to raise $60 million from investors to build a new research lab. It can raise the funds today by issuing 6 million new shares at the current price of $10 per share. In that case, after the good news comes out, the value of the firm's assets will be $300 million (from the existing assets) plus $60 million (new lab), for a total value of $360 million. With 26 million shares outstanding, the new share price will be $360 million ÷ 26 million shares = $13.85 per share.

But suppose Gentec waits for the good news to come out and the share price to rise to $15 *before* issuing the new shares. At that time, the firm will be able to raise the $60 million by selling 4 million shares. The firm's assets will again be worth a total of $360 million, but Gentec will have only 24 million shares outstanding, which is consistent with the share price of $360 million ÷ 24 million shares = $15 per share.

Thus, issuing new shares when management knows they are underpriced is costly for the original shareholders. Their shares will be worth only $13.85 rather than $15. As a result, if Gentec's managers care primarily about the firm's current shareholders, they will be reluctant to sell securities at a price that is below their true value. If they believe the shares are underpriced, managers will prefer to wait until after the share price rises to issue equity.

This preference not to issue equity that is underpriced leads us to the same lemons problem we had before: Managers who know securities have a high value will not sell, and those who know they have a low value will sell. Due to this adverse selection, investors will be willing to pay only a low price for the securities. The lemons problem creates a cost for firms that need to raise capital from investors to fund new investments. If they try to issue equity, investors will discount the price they are willing to pay to reflect the possibility that managers are privy to bad news.

## Implications for Equity Issuance

Adverse selection has a number of important implications for equity issuance. First and foremost, the lemons principle directly implies that

1. **The stock price declines on the announcement of an equity issue.**   When a firm issues equity, it signals to investors that its equity may be overpriced. As a result, investors are not willing to pay the pre-announcement price for the equity and so the stock price declines. Numerous studies have confirmed this result,

---

[47]S. Myers and N. Majluf demonstrated this result, and a number of its implications for capital structure, in an influential paper, "Corporate Financing and Investment Decisions When Firms Have Information that Investors Do Not Have," *Journal of Financial Economics* 13 (1984): 187–221.

finding that the stock price falls about 3% on average on the announcement of an equity issue by a publicly traded U.S. firm.[48]

As was true for Gentec, managers issuing equity have an incentive to delay the issue until any news that might positively affect the stock price becomes public. In contrast, there is no incentive to delay the issue if managers expect negative news to come out. These incentives lead to the following pattern:

2. **The stock price tends to rise prior to the announcement of an equity issue.**   This result is also supported empirically, as illustrated in Figure 16.3 using data from a study by Deborah Lucas and Robert McDonald. They found that stocks with equity issues outperformed the market by almost 50% in the year and a half prior to the announcement of the issue.

Managers may also try to avoid the price decline associated with adverse selection by issuing equity at times when they have the smallest informational advantage over investors. For example, because a great deal of information is released to investors at the time of earnings announcements, equity issues are often timed to occur immediately after these announcements. That is,

3. **Firms tend to issue equity when information asymmetries are minimized, such as immediately after earnings announcements.**   Studies have confirmed this timing and reported that the negative stock price reaction is smallest immediately after earnings announcements.[49]

## FIGURE 16.3

**Stock Returns Before and After an Equity Issue**

Stocks tend to rise (relative to the market) before an equity issue is announced. Upon announcement, stock prices fall on average. This figure shows the average return relative to the market before and after announcements using data from D. Lucas and R. McDonald, "Equity Issues and Stock Price Dynamics," *Journal of Finance* 45 (1990): 1019–1043.



[48]See, e.g., P. Asquith and D. Mullins, "Equity Issues and Offering Dilution," *Journal of Financial Economics* 15 (1986): 61–89; R. Masulis and A. Korwar, "Seasoned Equity Offerings: An Empirical Investigation," *Journal of Financial Economics* 15 (1986): 91–118; and W. Mikkelson and M. Partch, "Valuation Effects of Security Offerings and the Issuance Process," *Journal of Financial Economics* 15 (1986): 31–60.
[49]R. Korajczyk, D. Lucas, and R. McDonald, "The Effect of Information Releases on the Pricing and Timing of Equity Issues," *Review of Financial Studies* 4 (1991): 685–708.

## Implications for Capital Structure

Because managers find it costly to issue equity that is underpriced, they may seek alternative forms of financing. While debt issues may also suffer from adverse selection, because the value of low-risk debt is not very sensitive to managers' private information about the firm (but is instead determined mainly by interest rates), the degree of underpricing will tend to be smaller for debt than for equity. Of course, a firm can avoid underpricing altogether by financing investment using its cash (retained earnings) when possible. Thus,

> *Managers who perceive the firm's equity is underpriced will have a preference to fund investment using retained earnings, or debt, rather than equity.*

The converse to this statement is also true: Managers who perceive the firm's equity to be overpriced will prefer to issue equity, as opposed to issuing debt or using retained earnings, to fund investment. However, due to the negative stock price reaction when issuing equity, it is less likely that equity will be overpriced. In fact, absent other motives to issue equity, if both managers and investors behave rationally, the price drop upon announcement may be sufficient to deter managers from issuing equity except as a last resort.

The idea that managers will prefer to use retained earnings first, and will issue new equity only as a last resort, is often referred to as the **pecking order hypothesis**, put forth by Stewart Myers.[50] While difficult to test directly, this hypothesis is consistent with the aggregate data on corporate financing in Figure 16.4, which shows that firms tend to be net repurchasers (rather than issuers) of equity, whereas they are issuers of debt. Moreover, the vast majority of investment is funded by retained earnings, with net external financing amounting to less than 25% of capital expenditures in most years, and about 10% on average. These observations can also be consistent with the trade-off theory of capital structure, however, and there is substantial evidence that firms do not follow a *strict* pecking order, as firms often issue equity even when borrowing is possible.[51]

### FIGURE 16.4

**Aggregate Sources of Funding for Capital Expenditures, U.S. Corporations**

The chart shows net equity and debt issues as a percentage of total capital expenditures. In aggregate, firms tend to repurchase equity and issue debt. But more than 75% of capital expenditures are funded from retained earnings.

*Source*: Federal Reserve Flow of Funds



[50]S. Myers, "The Capital Structure Puzzle," *Journal of Finance* 39 (1984): 575–592.
[51]For example, see M. Leary and M. Roberts, "The Pecking Order, Debt Capacity, and Information Asymmetry," *Journal of Financial Economics*, 95 (2010) 332–355.

EXAMPLE 16.9

### The Pecking Order of Financing Alternatives

**Problem**

Axon Industries needs to raise $10 million for a new investment project. If the firm issues one-year debt, it may have to pay an interest rate of 7%, although Axon's managers believe that 6% would be a fair rate given the level of risk. However, if the firm issues equity, they believe the equity may be underpriced by 5%. What is the cost to current shareholders of financing the project out of retained earnings, debt, and equity?

**Solution**

If the firm spends $10 million out of retained earnings, rather than paying that money out to shareholders as a dividend, the cost to shareholders is $10 million. Using debt costs the firm $10 \times (1.07) = \$10.7$ million in one year, which has a present value based on management's view of the firm's risk of $10.7 \div (1.06) = \$10.094$ million. Finally, if equity is underpriced by 5%, then to raise $10 million the firm will need to issue $10.5 million in new equity. Thus, the cost to existing shareholders will be $10.5 million. Comparing the three, retained earnings are the cheapest source of funds, followed by debt, and finally by equity.

Aside from a general preference for using retained earnings or debt as a source of funding rather than equity, adverse selection costs do not lead to a clear prediction regarding a firm's overall capital structure. Instead, these costs imply that the managers' choice of financing will depend, in addition to the other costs and benefits discussed in this chapter, on whether they believe the firm is currently underpriced or overpriced by investors. This dependence is sometimes referred to as the **market timing** view of capital structure: The firm's overall capital structure depends in part on the market conditions that existed when it sought funding in the past. As a result, similar firms in the same industry might end up with very different, but nonetheless optimal, capital structures.[52]

Indeed, even the pecking order hypothesis does not provide a clear prediction regarding capital structure on its own. While it argues that firms should prefer to use retained earnings, then debt, and then equity as funding sources, retained earnings are merely another form of equity financing (they increase the value of equity while the value of debt remains unchanged). Therefore, firms might have low leverage either because they are unable to issue additional debt and are forced to rely on equity financing or because they are sufficiently profitable to finance all investment using retained earnings.

CONCEPT CHECK

1. How does asymmetric information explain the negative stock price reaction to the announcement of an equity issue?

2. Why might firms prefer to fund investments using retained earnings or debt rather than issuing equity?

---

[52]See J. Wurgler and M. Baker, "Market Timing and Capital Structure," *Journal of Finance* 57 (2002): 1–32.

## 16.9 Capital Structure: The Bottom Line

Over the past three chapters, we have examined a number of factors that might influence a firm's choice of capital structure. What is the bottom line for a financial manager?

The most important insight regarding capital structure goes back to Modigliani and Miller: With perfect capital markets, a firm's security choice alters the risk of the firm's equity, but it does not change its value or the amount it can raise from outside investors. Thus, the optimal capital structure depends on market imperfections, such as taxes, financial distress costs, agency costs, and asymmetric information.

Of all the different possible imperfections that drive capital structure, the most clear-cut, and possibly the most significant, is taxes. The interest tax shield allows firms to repay investors and avoid the corporate tax. Each dollar of permanent debt financing provides the firm with a tax shield worth $\tau^*$ dollars, where $\tau^*$ is the effective tax advantage of debt. For firms with consistent taxable income, this benefit of leverage is important to consider.

While firms should use leverage to shield their income from taxes, how much of their income should they shield? If leverage is too high, there is an increased risk that a firm may not be able to meet its debt obligations and will be forced to default. While the risk of default is not itself a problem, financial distress may lead to other consequences that reduce the value of the firm. Firms must, therefore, balance the tax benefits of debt against the costs of financial distress.

Agency costs and benefits of leverage are also important determinants of capital structure. Too much debt can motivate managers and equity holders to take excessive risks or under-invest in a firm. When free cash flows are high, too little leverage may encourage wasteful spending. This effect may be especially important for firms in countries lacking strong protections for investors against self-interested managers.[53] When agency costs are significant, short-term debt may be the most attractive form of external financing.

A firm must also consider the potential signaling and adverse selection consequences of its financing choice. Because bankruptcy is costly for managers, increasing leverage can signal managers' confidence in the firm's ability to meet its debt obligations. When managers have different views regarding the value of securities, managers can benefit current shareholders by issuing the most overpriced securities. However, new investors will respond to this incentive by lowering the price they are willing to pay for securities that the firm issues, leading to negative price reaction when a new issue is announced. This effect is most pronounced for equity issues, because the value of equity is most sensitive to the manager's private information. To avoid this "lemons cost," firms should rely first on retained earnings, then debt, and finally equity. This pecking order of financing alternatives will be most important when managers are likely to have a great deal of private information regarding the value of the firm.

Finally, it is important to recognize that because actively changing a firm's capital structure (for example, by selling or repurchasing shares or bonds) entails transactions costs, firms may be unlikely to change their capital structures unless they depart significantly from the optimal level. As a result, most changes to a firm's debt-equity ratio are likely to occur passively, as the market value of the firm's equity fluctuates with changes in the firm's stock price.[54]

---

[53]See J. Fan, S. Titman, and G. Twite, "An International Comparison of Capital Structure and Debt Maturity Choices," SSRN working paper, 2008.

[54]See I. Strebulaev, "Do Tests of Capital Structure Theory Mean What They Say?," *Journal of Finance* 62 (2007) 1747–1787.

CONCEPT CHECK

1. Consider the differences in leverage across industries shown in Figure 15.7. To what extent can you account for these differences?

2. What are some reasons firms might depart from their optimal capital structure, at least in the short run?

## MyFinanceLab

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 16.1 Default and Bankruptcy in a Perfect Market

- In the Modigliani-Miller setting, leverage may result in bankruptcy, but bankruptcy alone does not reduce the value of the firm. With perfect capital markets, bankruptcy shifts ownership from the equity holders to debt holders without changing the total value available to all investors.

### 16.2 The Costs of Bankruptcy and Financial Distress

- U.S. firms can file for bankruptcy protection under the provisions of the 1978 Bankruptcy Reform Act.
  - In a Chapter 7 liquidation, a trustee oversees the liquidation of the firm's assets.
  - In a Chapter 11 reorganization, management attempts to develop a reorganization plan that will improve operations and maximize value to investors. If the firm cannot successfully reorganize, it may be liquidated under Chapter 7 bankruptcy.
- Bankruptcy is a costly process that imposes both direct and indirect costs on a firm and its investors.
  - Direct costs include the costs of experts and advisors such as lawyers, accountants, appraisers, and investment bankers hired by the firm or its creditors during the bankruptcy process.
  - Indirect costs include the loss of customers, suppliers, employees, or receivables during bankruptcy. Firms also incur indirect costs when they need to sell assets at distressed prices.

### 16.3 Financial Distress Costs and Firm Value

- When securities are fairly priced, the original shareholders of a firm pay the present value of the costs associated with bankruptcy and financial distress.

### 16.4 Optimal Capital Structure: The Trade-Off Theory

- According to the trade-off theory, the total value of a levered firm equals the value of the firm without leverage plus the present value of the tax savings from debt minus the present value of financial distress costs:

$$V^L = V^U + PV(\text{Interest Tax Shield}) - PV(\text{Financial Distress Costs}) \qquad (16.1)$$

Optimal leverage is the level of debt that maximizes $V^L$.

### 16.5 Exploiting Debt Holders: The Agency Costs of Leverage

- Agency costs arise when there are conflicts of interest between stakeholders. A highly levered firm with risky debt faces the following agency costs:
  - Asset substitution: Shareholders can gain by making negative-NPV investments or decisions that sufficiently increase the firm's risk.
  - Debt overhang: Shareholders may be unwilling to finance new, positive-NPV projects.
  - Cashing out: Shareholders have an incentive to liquidate assets at prices below their market values and distribute the proceeds as a dividend.

- With debt overhang, equity holders will benefit from new investment only if

$$\frac{NPV}{I} > \frac{\beta_D D}{\beta_E E} \tag{16.2}$$

- When a firm has existing debt, debt overhang leads to a leverage ratchet effect:
  - Shareholders may have an incentive to increase leverage even if it decreases the value of the firm.
  - Shareholders will not have an incentive to decrease leverage by buying back debt, even if it will increase the value of the firm.

## 16.6 Motivating Managers: The Agency Benefits of Leverage

- Leverage has agency benefits and can improve incentives for managers to run a firm more efficiently and effectively due to
  - Increased ownership concentration: Managers with higher ownership concentration are more likely to work hard and less likely to consume corporate perks.
  - Reduced free cash flow: Firms with less free cash flow are less likely to pursue wasteful investments.
  - Reduced managerial entrenchment and increased commitment: The threat of financial distress and being fired may commit managers more fully to pursue strategies that improve operations.

## 16.7 Agency Costs and the Trade-Off Theory

- We can extend the trade-off theory to include agency costs. The value of a firm, including agency costs and benefits, is:

$$V^L = V^U + PV(\text{Interest Tax Shield}) - PV(\text{Financial Distress Costs})$$

$$- PV(\text{Agency Costs of Debt}) + PV(\text{Agency Benefits of Debt}) \tag{16.3}$$

Optimal leverage is the level of debt that maximizes $V^L$.

## 16.8 Asymmetric Information and Capital Structure

- When managers have better information than investors, there is asymmetric information. Given asymmetric information, managers may use leverage as a credible signal to investors of the firm's ability to generate future free cash flow.
- According to the lemons principle, when managers have private information about the value of a firm, investors will discount the price they are willing to pay for a new equity issue due to adverse selection.
- Managers are more likely to sell equity when they know a firm is overvalued. As a result,
  - The stock price declines when a firm announces an equity issue.
  - The stock price tends to rise prior to the announcement of an equity issue because managers tend to delay equity issues until after good news becomes public.
  - Firms tend to issue equity when information asymmetries are minimized.
  - Managers who perceive that the firm's equity is underpriced will have a preference to fund investment using retained earnings, or debt, rather than equity. This result is called the pecking order hypothesis.

## 16.9 Capital Structure: The Bottom Line

- There are numerous frictions that drive the firm's optimal capital structure. However, if there are substantial transactions costs to changing the firm's capital structure, most changes in the firm's leverage are likely to occur passively, based on fluctuations in the firm's stock price.

## Key Terms

<div style="display:flex">

adverse selection *p. 566*
agency costs *p. 553*
asset substitution problem *p. 554*
asymmetric information *p. 564*
Chapter 7 liquidation *p. 543*
Chapter 11 reorganization *p. 543*
credibility principle *p. 565*
debt covenants *p. 558*
debt overhang *p. 555*
debtor-in-possession (DIP) financing *p. 545*
default *p. 540*
economic distress *p. 541*
financial distress *p. 539*

free cash flow hypothesis *p. 561*
lemons principle *p. 566*
leverage ratchet effect *p. 557*
management entrenchment *p. 559*
management entrenchment theory *p. 564*
market timing *p. 571*
moral hazard *p. 562*
pecking order hypothesis *p. 570*
prepackaged bankruptcy *p. 544*
signaling theory of debt *p. 566*
trade-off theory *p. 550*
under-investment problem *p. 555*
workout *p. 544*

</div>

## Further Reading

For a survey of alternative theories of capital structure, see M. Harris and A. Raviv, "The Theory of Capital Structure," *Journal of Finance* 46 (1991): 197–355. For a textbook treatment, see J. Tirole, *The Theory of Corporate Finance*, Princeton University Press, 2005.

In this chapter, we did not discuss how firms dynamically manage their capital structures. Although this topic is beyond the scope of this book, interested readers can consult the following papers: R. Goldstein, N. Ju, and H. Leland, "An EBIT-Based Model of Dynamic Capital Structure," *Journal of Business* 74 (2001): 483–512; O. Hart and J. Moore, "Default and Renegotiation: A Dynamic Model of Debt," *Quarterly Journal of Economics* 113(1) (1998): 1–41; C. Hennessy and T. Whited, "Debt Dynamics," *Journal of Finance* 60(3) (2005): 1129–1165; and H. Leland, "Agency Costs, Risk Management, and Capital Structure," *Journal of Finance* 53(4) (1998): 1213–1243.

For an empirical study of how firms' capital structures evolve in response to changes in their stock price, and how these dynamics relate to existing theories, see I. Welch, "Capital Structure and Stock Returns," *Journal of Political Economy* 112 (2004): 106–131. See also I. Strebulaev, "Do Tests of Capital Structure Theory Mean What They Say?" *Journal of Finance* 62 (2007): 1747–1787, for an analysis of the importance of adjustment costs in interpreting firms' capital structure choices.

Explaining much of the within-industry variation in capital structure remains an important puzzle. Interested readers should consult M. Lemmon, M. Roberts, and J. Zender, "Back to the beginning: Persistence and the cross-section of corporate capital structure," *Journal of Finance* 63 (2008): 1575–1608. For an empirical estimation of Figure 16.2 by industry, see A. Korteweg, "The Net Benefits to Leverage," *Journal of Finance*, 65 (2010), 2137–2170.

Results of empirical tests of the pecking order theory can be found in E. Fama and K. French, "Testing Tradeoff and Pecking Order Predictions About Dividends and Debt," *Review of Financial Studies* 15(1): 1–33; M. Frank and V. Goyal, "Testing the Pecking Order Theory of Capital Structure," *Journal of Financial Economics* 67(2) (2003): 217–248; and L. Shyam-Sunder and S. Myers, "Testing Static Tradeoff Against Pecking Order Models of Capital Structure," *Journal of Financial Economics* 51(2) (1999): 219–244.

## Problems

*All problems in are available in* MyFinanceLab. *An asterisk (\*) indicates problems with a higher level of difficulty.*

### Default and Bankruptcy in a Perfect Market

 **1.** Gladstone Corporation is about to launch a new product. Depending on the success of the new product, Gladstone may have one of four values next year: $150 million, $135 million, $95 million, or $80 million. These outcomes are all equally likely, and this risk is diversifiable.

Gladstone will not make any payouts to investors during the year. Suppose the risk-free interest rate is 5% and assume perfect capital markets.

a. What is the initial value of Gladstone's equity without leverage?

Now suppose Gladstone has zero-coupon debt with a $100 million face value due next year.

b. What is the initial value of Gladstone's debt?

c. What is the yield-to-maturity of the debt? What is its expected return?

d. What is the initial value of Gladstone's equity? What is Gladstone's total value with leverage?

2. Baruk Industries has no cash and a debt obligation of $36 million that is now due. The market value of Baruk's assets is $81 million, and the firm has no other liabilities. Assume perfect capital markets.

a. Suppose Baruk has 10 million shares outstanding. What is Baruk's current share price?

b. How many new shares must Baruk issue to raise the capital needed to pay its debt obligation?

c. After repaying the debt, what will Baruk's share price be?

### The Costs of Bankruptcy and Financial Distress

3. When a firm defaults on its debt, debt holders often receive less than 50% of the amount they are owed. Is the difference between the amount debt holders are owed and the amount they receive a *cost* of bankruptcy?

4. Which type of firm is more likely to experience a loss of customers in the event of financial distress:

a. Campbell Soup Company or Intuit, Inc. (a maker of accounting software)?

b. Allstate Corporation (an insurance company) or Adidas AG (maker of athletic footwear, apparel, and sports equipment)?

5. Which type of asset is more likely to be liquidated for close to its full market value in the event of financial distress:

a. An office building or a brand name?

b. Product inventory or raw materials?

c. Patent rights or engineering "know-how"?

6. Suppose Tefco Corp. has a value of $100 million if it continues to operate, but has outstanding debt of $120 million that is now due. If the firm declares bankruptcy, bankruptcy costs will equal $20 million, and the remaining $80 million will go to creditors. Instead of declaring bankruptcy, management proposes to exchange the firm's debt for a fraction of its equity in a workout. What is the minimum fraction of the firm's equity that management would need to offer to creditors for the workout to be successful?

7. You have received two job offers. Firm A offers to pay you $85,000 per year for two years. Firm B offers to pay you $90,000 for two years. Both jobs are equivalent. Suppose that firm A's contract is certain, but that firm B has a 50% chance of going bankrupt at the end of the year. In that event, it will cancel your contract and pay you the lowest amount possible for you to not quit. If you did quit, you expect you could find a new job paying $85,000 per year, but you would be unemployed for 3 months while you search for it.

a. Say you took the job at firm B. What is the least firm B can pay you next year in order to match what you would earn if you quit?

b. Given your answer to part (a), and assuming your cost of capital is 5%, which offer pays you a higher present value of your expected wage?

c. Based on this example, discuss one reason why firms with a higher risk of bankruptcy may need to offer higher wages to attract employees.

### Financial Distress Costs and Firm Value

 8. As in Problem 1, Gladstone Corporation is about to launch a new product. Depending on the success of the new product, Gladstone may have one of four values next year: $150 million,

$135 million, $95 million, or $80 million. These outcomes are all equally likely, and this risk is diversifiable. Suppose the risk-free interest rate is 5% and that, in the event of default, 25% of the value of Gladstone's assets will be lost to bankruptcy costs. (Ignore all other market imperfections, such as taxes.)

a. What is the initial value of Gladstone's equity without leverage?

Now suppose Gladstone has zero-coupon debt with a $100 million face value due next year.

b. What is the initial value of Gladstone's debt?
c. What is the yield-to-maturity of the debt? What is its expected return?
d. What is the initial value of Gladstone's equity? What is Gladstone's total value with leverage?

Suppose Gladstone has 10 million shares outstanding and no debt at the start of the year.

e. If Gladstone does not issue debt, what is its share price?
f. If Gladstone issues debt of $100 million due next year and uses the proceeds to repurchase shares, what will its share price be? Why does your answer differ from that in part (e)?

9. Kohwe Corporation plans to issue equity to raise $50 million to finance a new investment. After making the investment, Kohwe expects to earn free cash flows of $10 million each year. Kohwe currently has 5 million shares outstanding, and it has no other assets or opportunities. Suppose the appropriate discount rate for Kohwe's future free cash flows is 8%, and the only capital market imperfections are corporate taxes and financial distress costs.

a. What is the NPV of Kohwe's investment?
b. Given these plans, what is Kohwe's value per share today?

Suppose Kohwe borrows the $50 million instead. The firm will pay interest only on this loan each year, and it will maintain an outstanding balance of $50 million on the loan. Suppose that Kohwe's corporate tax rate is 40%, and expected free cash flows are still $10 million each year.

c. What is Kohwe's share price today if the investment is financed with debt?

Now suppose that with leverage, Kohwe's expected free cash flows will decline to $9 million per year due to reduced sales and other financial distress costs. Assume that the appropriate discount rate for Kohwe's future free cash flows is still 8%.

d. What is Kohwe's share price today given the financial distress costs of leverage?

10. You work for a large car manufacturer that is currently financially healthy. Your manager feels that the firm should take on more debt because it can thereby reduce the expense of car warranties. To quote your manager, "If we go bankrupt, we don't have to service the warranties. We therefore have lower bankruptcy costs than most corporations, so we should use more debt." Is he right?

## Optimal Capital Structure: The Trade-Off Theory

11. Apple Computer has no debt. As Problem 21 in Chapter 15 makes clear, by issuing debt Apple can generate a very large tax shield potentially worth over $10 billion. Given Apple's success, one would be hard pressed to argue that Apple's management are naïve and unaware of this huge potential to create value. A more likely explanation is that issuing debt would entail other costs. What might these costs be?

12. Hawar International is a shipping firm with a current share price of $5.50 and 10 million shares outstanding. Suppose Hawar announces plans to lower its corporate taxes by borrowing $20 million and repurchasing shares.

a. With perfect capital markets, what will the share price be after this announcement?

Suppose that Hawar pays a corporate tax rate of 30%, and that shareholders expect the change in debt to be permanent.

b. If the only imperfection is corporate taxes, what will the share price be after this announcement?
c. Suppose the only imperfections are corporate taxes and financial distress costs. If the share price rises to $5.75 after this announcement, what is the PV of financial distress costs Hawar will incur as the result of this new debt?

**13.** Your firm is considering issuing one-year debt, and has come up with the following estimates of the value of the interest tax shield and the probability of distress for different levels of debt:

| | Debt Level (in $ million) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0 | 40 | 50 | 60 | 70 | 80 | 90 |
| PV (interest tax shield, in $ million) | 0.00 | 0.76 | 0.95 | 1.14 | 1.33 | 1.52 | 1.71 |
| Probability of Financial Distress | 0% | 0% | 1% | 2% | 7% | 16% | 31% |

Suppose the firm has a beta of zero, so that the appropriate discount rate for financial distress costs is the risk-free rate of 5%. Which level of debt above is optimal if, in the event of distress, the firm will have distress costs equal to
a. $2 million?
b. $5 million?
c. $25 million?

**14.** Marpor Industries has no debt and expects to generate free cash flows of $16 million each year. Marpor believes that if it permanently increases its level of debt to $40 million, the risk of financial distress may cause it to lose some customers and receive less favorable terms from its suppliers. As a result, Marpor's expected free cash flows with debt will be only $15 million per year. Suppose Marpor's tax rate is 35%, the risk-free rate is 5%, the expected return of the market is 15%, and the beta of Marpor's free cash flows is 1.10 (with or without leverage).
a. Estimate Marpor's value without leverage.
b. Estimate Marpor's value with the new leverage.

**15.** Real estate purchases are often financed with at least 80% debt. Most corporations, however, have less than 50% debt financing. Provide an explanation for this difference using the trade-off theory.

## Exploiting Debt Holders: The Agency Costs of Leverage

**16.** On May 14, 2008, General Motors paid a dividend of $0.25 per share. During the same quarter GM lost a staggering $15.5 billion or $27.33 *per share*. Seven months later the company asked for billions of dollars of government aid and ultimately declared bankruptcy just over a year later, on June 1, 2009. At that point a share of GM was worth only a little more than a dollar.
a. If you ignore the possibility of a government bailout, the decision to pay a dividend given how close the company was to financial distress is an example of what kind of cost?
*b. What would your answer be if GM executives anticipated that there was a possibility of a government bailout should the firm be forced to declare bankruptcy?

**17.** Dynron Corporation's primary business is natural gas transportation using its vast gas pipeline network. Dynron's assets currently have a market value of $150 million. The firm is exploring the possibility of raising $50 million by selling part of its pipeline network and investing the $50 million in a fiber-optic network to generate revenues by selling high-speed network bandwidth. While this new investment is expected to increase profits, it will also substantially increase Dynron's risk. If Dynron is levered, would this investment be more or less attractive to equity holders than if Dynron had no debt?

**18.** Consider a firm whose only asset is a plot of vacant land, and whose only liability is debt of $15 million due in one year. If left vacant, the land will be worth $10 million in one year. Alternatively, the firm can develop the land at an upfront cost of $20 million. The developed land will be worth $35 million in one year. Suppose the risk-free interest rate is 10%, assume all cash flows are risk-free, and assume there are no taxes.
a. If the firm chooses not to develop the land, what is the value of the firm's equity today? What is the value of the debt today?
b. What is the NPV of developing the land?

c. Suppose the firm raises $20 million from equity holders to develop the land. If the firm develops the land, what is the value of the firm's equity today? What is the value of the firm's debt today?

d. Given your answer to part (c), would equity holders be willing to provide the $20 million needed to develop the land?

19. Sarvon Systems has a debt-equity ratio of 1.2, an equity beta of 2.0, and a debt beta of 0.30. It currently is evaluating the following projects, none of which would change the firm's volatility (amounts in $ million):

| Project | A | B | C | D | E |
|---|---|---|---|---|---|
| Investment | 100 | 50 | 85 | 30 | 75 |
| NPV | 20 | 6 | 10 | 15 | 18 |

a. Which project will equity holders agree to fund?
b. What is the cost to the firm of the debt overhang?

20. Zymase is a biotechnology start-up firm. Researchers at Zymase must choose one of three different research strategies. The payoffs (after-tax) and their likelihood for each strategy are shown below. The risk of each project is diversifiable.

| Strategy | Probability | Payoff (in $ million) |
|---|---|---|
| A | 100% | 75 |
| B | 50% | 140 |
|  | 50% | 0 |
| C | 10% | 300 |
|  | 90% | 40 |

a. Which project has the highest expected payoff?
b. Suppose Zymase has debt of $40 million due at the time of the project's payoff. Which project has the highest expected payoff for equity holders?
c. Suppose Zymase has debt of $110 million due at the time of the project's payoff. Which project has the highest expected payoff for equity holders?
d. If management chooses the strategy that maximizes the payoff to equity holders, what is the expected agency cost to the firm from having $40 million in debt due? What is the expected agency cost to the firm from having $110 million in debt due?

21. Petron Corporation's management team is meeting to decide on a new corporate strategy. There are four options, each with a different probability of success and total firm value in the event of success, as shown below:

| | Strategy | | | |
|---|---|---|---|---|
| | A | B | C | D |
| Probability of Success | 100% | 80% | 60% | 40% |
| Firm Value if Successful (in $ million) | 50 | 60 | 70 | 80 |

Assume that for each strategy, firm value is zero in the event of failure.
a. Which strategy has the highest expected payoff?
b. Suppose Petron's management team will choose the strategy that leads to the highest expected value of Petron's equity. Which strategy will management choose if Petron currently has

      i.  No debt?

      ii.  Debt with a face value of $20 million?

      iii.  Debt with a face value of $40 million?

  c.  What agency cost of debt is illustrated in your answer to part (b)?

 **22.**  Consider the setting of Problem 21, and suppose Petron Corp. has debt with a face value of $40 million outstanding. For simplicity assume all risk is idiosyncratic, the risk-free interest rate is zero, and there are no taxes.

  a.  What is the expected value of equity, assuming Petron will choose the strategy that maximizes the value of its equity? What is the total expected value of the firm?

  b.  Suppose Petron issues equity and buys back its debt, reducing the debt's face value to $5 million. If it does so, what strategy will it choose after the transaction? Will the total value of the firm increase?

  c.  Suppose you are a debt holder, deciding whether to sell your debt back to the firm. If you expect the firm to reduce its debt to $5 million, what price would you demand to sell your debt?

  d.  Based on your answer to (c), how much will Petron need to raise from equity holders in order to buy back the debt?

  e.  How much will equity holders gain or lose by recapitalizing to reduce leverage? How much will debt holders gain or lose? Would you expect Petron's management to choose to reduce its leverage?

 **\*23.**  Consider the setting of Problems 21 and 22, and suppose Petron Corp. must pay a 25% tax rate on the amount of the final payoff that is paid to equity holders. It pays no tax on payments to, or capital raised from, debt holders.

  a.  Which strategy will Petron choose with no debt? Which will it choose with a face value of $10 million, $30 million, or $50 million in debt? (Assume management maximizes the value of equity, and in the case of ties, will choose the safer strategy.)

  b.  Given your answer to (a), show that the total combined value of Petron's equity and debt is maximized with a face value of $30 million in debt.

  c.  Show that if Petron has $30 million in debt outstanding, shareholders can gain by increasing the face value of debt to $50 million, even though this will reduce the total value of the firm.

  d.  Show that if Petron has $50 million in debt outstanding, shareholders will lose by buying back debt to reduce the face value of debt to $30 million, even though that will increase the total value of the firm.

### Motivating Managers: The Agency Benefits of Leverage

**24.**  You own your own firm, and you want to raise $30 million to fund an expansion. Currently, you own 100% of the firm's equity, and the firm has no debt. To raise the $30 million solely through equity, you will need to sell two-thirds of the firm. However, you would prefer to maintain at least a 50% equity stake in the firm to retain control.

  a.  If you borrow $20 million, what fraction of the equity will you need to sell to raise the remaining $10 million? (Assume perfect capital markets.)

  b.  What is the smallest amount you can borrow to raise the $30 million without giving up control? (Assume perfect capital markets.)

 **25.**  Empire Industries forecasts net income this coming year as shown below (in thousands of dollars):

| | |
|---|---|
| EBIT | $1000 |
| Interest expense | 0 |
| Income before tax | 1000 |
| Taxes | −350 |
| **Net income** | $650 |

Approximately $200,000 of Empire's earnings will be needed to make new, positive-NPV investments. Unfortunately, Empire's managers are expected to waste 10% of its net income on needless perks, pet projects, and other expenditures that do not contribute to the firm. All remaining income will be returned to shareholders through dividends and share repurchases.

a. What are the two benefits of debt financing for Empire?

b. By how much would each $1 of interest expense reduce Empire's dividend and share repurchases?

c. What is the increase in the *total* funds Empire will pay to investors for each $1 of interest expense?

26. Ralston Enterprises has assets that will have a market value in one year as follows:

| Probability | 1% | 6% | 24% | 38% | 24% | 6% | 1% |
|---|---|---|---|---|---|---|---|
| Value (in $ million) | 70 | 80 | 90 | 100 | 110 | 120 | 130 |

That is, there is a 1% chance the assets will be worth $70 million, a 6% chance the assets will be worth $80 million, and so on. Suppose the CEO is contemplating a decision that will benefit her personally but will reduce the value of the firm's assets by $10 million. The CEO is likely to proceed with this decision unless it substantially increases the firm's risk of bankruptcy.

a. If Ralston has debt due of $75 million in one year, the CEO's decision will increase the probability of bankruptcy by what percentage?

b. What level of debt provides the CEO with the biggest incentive not to proceed with the decision?

## Agency Costs and the Trade-Off Theory

27. Although the major benefit of debt financing is easy to observe—the tax shield—many of the indirect costs of debt financing can be quite subtle and difficult to observe. Describe some of these costs.

28. If it is managed efficiently, Remel Inc. will have assets with a market value of $50 million, $100 million, or $150 million next year, with each outcome being equally likely. However, managers may engage in wasteful empire building, which will reduce the firm's market value by $5 million in all cases. Managers may also increase the risk of the firm, changing the probability of each outcome to 50%, 10%, and 40%, respectively.

a. What is the expected value of Remel's assets if it is run efficiently?

Suppose managers will engage in empire building unless that behavior increases the likelihood of bankruptcy. They will choose the risk of the firm to maximize the expected payoff to equity holders.

b. Suppose Remel has debt due in one year as shown below. For each case, indicate whether managers will engage in empire building, and whether they will increase risk. What is the expected value of Remel's assets in each case?

   i. $44 million

   ii. $49 million

   iii. $90 million

   iv. $99 million

c. Suppose the tax savings from the debt, after including investor taxes, is equal to 10% of the expected payoff of the debt. The proceeds from the debt, as well as the value of any tax savings, will be paid out to shareholders immediately as a dividend when the debt is issued. Which debt level in part (b) is optimal for Remel?

29. Which of the following industries have low optimal debt levels according to the trade-off theory? Which have high optimal levels of debt?
    a. Tobacco firms
    b. Accounting firms
    c. Mature restaurant chains
    d. Lumber companies
    e. Cell phone manufacturers

30. According to the managerial entrenchment theory, managers choose capital structure so as to preserve their control of the firm. On the one hand, debt is costly for managers because they risk losing control in the event of default. On the other hand, if they do not take advantage of the tax shield provided by debt, they risk losing control through a hostile takeover.

    Suppose a firm expects to generate free cash flows of $90 million per year, and the discount rate for these cash flows is 10%. The firm pays a tax rate of 40%. A raider is poised to take over the firm and finance it with $750 million in permanent debt. The raider will generate the same free cash flows, and the takeover attempt will be successful if the raider can offer a premium of 20% over the current value of the firm. According to the managerial entrenchment hypothesis, what level of permanent debt will the firm choose?

## Asymmetric Information and Capital Structure

31. Info Systems Technology (IST) manufactures microprocessor chips for use in appliances and other applications. IST has no debt and 100 million shares outstanding. The correct price for these shares is either $14.50 or $12.50 per share. Investors view both possibilities as equally likely, so the shares currently trade for $13.50.

    IST must raise $500 million to build a new production facility. Because the firm would suffer a large loss of both customers and engineering talent in the event of financial distress, managers believe that if IST borrows the $500 million, the present value of financial distress costs will exceed any tax benefits by $20 million. At the same time, because investors believe that managers know the correct share price, IST faces a lemons problem if it attempts to raise the $500 million by issuing equity.
    a. Suppose that if IST issues equity, the share price will remain $13.50. To maximize the long-term share price of the firm once its true value is known, would managers choose to issue equity or borrow the $500 million if
       i.  They know the correct value of the shares is $12.50?
       ii. They know the correct value of the shares is $14.50?
    b. Given your answer to part (a), what should investors conclude if IST issues equity? What will happen to the share price?
    c. Given your answer to part (a), what should investors conclude if IST issues debt? What will happen to the share price in that case?
    d. How would your answers change if there were no distress costs, but only tax benefits of leverage?

32. During the Internet boom of the late 1990s, the stock prices of many Internet firms soared to extreme heights. As CEO of such a firm, if you believed your stock was significantly overvalued, would using your stock to acquire non-Internet stocks be a wise idea, even if you had to pay a small premium over their fair market value to make the acquisition?

*33. "We R Toys" (WRT) is considering expanding into new geographic markets. The expansion will have the same business risk as WRT's existing assets. The expansion will require an initial investment of $50 million and is expected to generate perpetual EBIT of $20 million per year. After the initial investment, future capital expenditures are expected to equal depreciation, and no further additions to net working capital are anticipated.

WRT's existing capital structure is composed of $500 million in equity and $300 million in debt (market values), with 10 million equity shares outstanding. The unlevered cost of capital is 10%, and WRT's debt is risk free with an interest rate of 4%. The corporate tax rate is 35%, and there are no personal taxes.

a. WRT initially proposes to fund the expansion by issuing equity. If investors were not expecting this expansion, and if they share WRT's view of the expansion's profitability, what will the share price be once the firm announces the expansion plan?

b. Suppose investors think that the EBIT from WRT's expansion will be only $4 million. What will the share price be in this case? How many shares will the firm need to issue?

c. Suppose WRT issues equity as in part (b). Shortly after the issue, new information emerges that convinces investors that management was, in fact, correct regarding the cash flows from the expansion. What will the share price be now? Why does it differ from that found in part (a)?

d. Suppose WRT instead finances the expansion with a $50 million issue of permanent risk-free debt. If WRT undertakes the expansion using debt, what is its new share price once the new information comes out? Comparing your answer with that in part (c), what are the two advantages of debt financing in this case?

CHAPTER

# 17

# Payout Policy

## NOTATION

$PV$ present value

$P_{cum}$ cum-dividend stock price

$P_{ex}$ ex-dividend stock price

$P_{rep}$ stock price with share repurchase

$\tau_d$ dividend tax rate

$\tau_g$ capital gains tax rate

$\tau_d^*$ effective dividend tax rate

$\tau_c$ corporate tax rate

$P_{retain}$ stock price if excess cash is retained

$\tau_i$ tax rate on interest income

$\tau_{retain}^*$ effective tax rate on retained cash

$Div$ dividend

$r_f$ risk free rate

**FOR MANY YEARS, MICROSOFT CORPORATION CHOSE TO** distribute cash to investors primarily by repurchasing its own stock. During the five fiscal years ending June 2004, for example, Microsoft spent an average of $5.4 billion per year on share repurchases. Microsoft began paying dividends to investors in 2003, with what CFO John Connors called "a starter dividend" of $0.08 per share. Then, on July 20, 2004, Microsoft stunned financial markets by announcing plans to pay the largest single cash dividend payment in history, a one-time dividend of $32 billion, or $3 per share, to all shareholders of record on November 17, 2004. Since then Microsoft has repurchased over $100 billion in shares, and raised its quarterly dividend 7 times, so that by late 2012 its dividend was $0.23 per share, representing a 3.5% annual dividend yield.

When a firm's investments generate free cash flow, the firm must decide how to use that cash. If the firm has new positive-NPV investment opportunities, it can reinvest the cash and increase the value of the firm. Many young, rapidly growing firms reinvest 100% of their cash flows in this way. But mature, profitable firms such as Microsoft often find that they generate more cash than they need to fund all of their attractive investment opportunities. When a firm has excess cash, it can hold those funds as part of its cash reserves or pay the cash out to shareholders. If the firm decides to follow the latter approach, it has two choices: It can pay a dividend or it can repurchase shares from current owners. These decisions represent the firm's payout policy.

In this chapter, we show that, as with capital structure, a firm's payout policy is shaped by market imperfections, such as taxes, agency costs, transaction costs, and asymmetric information between managers and investors. We look at why some firms prefer to pay dividends, whereas others rely exclusively on share repurchases. In addition, we explore why some firms build up large cash reserves, while others pay out their excess cash.

## 17.1  Distributions to Shareholders

Figure 17.1 illustrates the alternative uses of free cash flow.[1] The way a firm chooses between these alternatives is referred to as its **payout policy**. We begin our discussion of a firm's payout policy by considering the choice between paying dividends and repurchasing shares. In this section, we examine the details of these methods of paying cash to shareholders.

### Dividends

A public company's board of directors determines the amount of the firm's dividend. The board sets the amount per share that will be paid and decides when the payment will occur. The date on which the board authorizes the dividend is the **declaration date**. After the board declares the dividend, the firm is legally obligated to make the payment.

The firm will pay the dividend to all shareholders of record on a specific date, set by the board, called the **record date**. Because it takes three business days for shares to be registered, only shareholders who purchase the stock at least three days prior to the record date receive the dividend. As a result, the date two business days prior to the record date is known as the **ex-dividend date**; anyone who purchases the stock on or after the ex-dividend date will not receive the dividend. Finally, on the **payable date** (or **distribution date**), which is generally about a month after the record date, the firm mails dividend checks to the registered shareholders. Figure 17.2 shows these dates for Microsoft's $3.00 dividend.

Most companies that pay dividends pay them at regular, quarterly intervals. Companies typically adjust the amount of their dividends gradually, with little variation in the amount of the dividend from quarter to quarter. Occasionally, a firm may pay a one-time, **special dividend** that is usually much larger than a regular dividend, as was Microsoft's $3.00 dividend in 2004. Figure 17.3 shows the dividends paid by GM from 1983 to 2008. In addition to regular dividends, GM paid special dividends in December 1997 and again in May 1999 (associated with spin-offs of subsidiaries, discussed further in Section 17.7).



**FIGURE 17.1**

**Uses of Free Cash Flow**

A firm can retain its free cash flow, either investing or accumulating it, or pay out its free cash flow through a dividend or share repurchase. The choice between these options is determined by the firm's payout policy.

---

[1]Strictly speaking, Figure 17.1 is for an all-equity firm. For a levered firm, free cash flow would also have to be used to support interest and principal payments to debt holders.



**FIGURE 17.2**    **Important Dates for Microsoft's Special Dividend**

| Declaration Date | Ex-Dividend Date | Record Date | Payable Date |
| --- | --- | --- | --- |
| Board declares special dividend of $3.00/share | Buyers of stock on or after this date do not receive dividend | Shareholders recorded by this date receive dividend | Eligible shareholders receive payments of $3.00/share |
| July 20, 2004 | November 15, 2004 | November 17, 2004 | December 2, 2004 |

Microsoft declared the dividend on July 20, 2004, payable on December 2 to all shareholders of record on November 17. The ex-dividend date was two business days earlier, or November 15, 2004.

Notice that GM split its stock in March 1989 so that each owner of one share received a second share. This kind of transaction is called a 2-for-1 stock split. More generally, in a **stock split** or **stock dividend**, the company issues additional shares rather than cash to its shareholders. In the case of GM's stock split, the number of shares doubled, but the dividend per share was cut in half (from $1.50 per share to $0.75 per share), so that the total amount GM paid out as a dividend was the same just before and just after the split. (We discuss stock splits and stock dividends further in Section 17.7.) While GM raised its dividends throughout the 1980s, it cut its dividend during the recession in the early 1990s. GM raised its dividends again in the late 1990s, but was forced to cut its dividend again in early 2006 and suspend them altogether in July 2008 in response to financial difficulties. One year later GM filed for Chapter 11 bankruptcy and its existing shareholders were

**FIGURE 17.3**

**Dividend History for GM Stock, 1983–2008**

Until suspending its dividends in July 2008, GM had paid a regular dividend each quarter since 1983. GM paid additional special dividends in December 1997 and May 1999, and had a 2-for-1 stock split in March 1989. GM ultimately filed for bankruptcy in June of 2009 wiping out all existing equity holders. GM has since emerged from bankruptcy and issued new stock, but as of 2012, has yet to pay a dividend.



wiped out. GM has since emerged from bankruptcy and issued new shares, but has not (as of 2012) reintroduced a dividend payment.

Dividends are a cash outflow for the firm. From an accounting perspective, dividends generally reduce the firm's current (or accumulated) retained earnings. In some cases, dividends are attributed to other accounting sources, such as paid-in capital or the liquidation of assets. In this case, the dividend is known as a **return of capital** or a **liquidating dividend**. While the source of the funds makes little difference to a firm or to investors directly, there is a difference in tax treatment: A return of capital is taxed as a capital gain rather than as a dividend for the investor.[2]

## Share Repurchases

An alternative way to pay cash to investors is through a share repurchase or buyback. In this kind of transaction, the firm uses cash to buy shares of its own outstanding stock. These shares are generally held in the corporate treasury, and they can be resold if the company needs to raise money in the future. We now examine three possible transaction types for a share repurchase.

**Open Market Repurchase.**  An **open market repurchase** is the most common way that firms repurchase shares. A firm announces its intention to buy its own shares in the open market, and then proceeds to do so over time like any other investor. The firm may take a year or more to buy the shares, and it is not obligated to repurchase the full amount it originally stated. Also, the firm must not buy its shares in a way that might appear to manipulate the price. For example, SEC guidelines recommend that the firm not purchase more than 25% of the average daily trading volume in its shares on a single day, nor make purchases at the market open or within 30 minutes of the close of trade.[3]

While open market share repurchases represent about 95% of all repurchase transactions,[4] other methods are available to a firm that wants to buy back its stock. These methods are used when a firm wishes to repurchase a substantial portion of its shares, often as part of a recapitalization.

**Tender Offer.**  A firm can repurchase shares through a **tender offer** in which it offers to buy shares at a prespecified price during a short time period—generally within 20 days. The price is usually set at a substantial premium (10%–20% is typical) to the current market price. The offer often depends on shareholders tendering a sufficient number of shares. If shareholders do not tender enough shares, the firm may cancel the offer and no buyback occurs.

A related method is the **Dutch auction** share repurchase, in which the firm lists different prices at which it is prepared to buy shares, and shareholders in turn indicate how many shares they are willing to sell at each price. The firm then pays the lowest price at which it can buy back its desired number of shares.

**Targeted Repurchase.**  A firm may also purchase shares directly from a major shareholder in a **targeted repurchase**. In this case the purchase price is negotiated directly with the seller. A targeted repurchase may occur if a major shareholder desires to sell a large number of shares but the market for the shares is not sufficiently liquid to sustain such a large

---

[2]There is also a difference in the accounting treatment. A cash dividend reduces the cash and retained earnings shown on the balance sheet, whereas a return of capital reduces paid-in capital. This accounting difference has no direct economic consequence, however.

[3]SEC Rule 10b-18, introduced in 1983, defines guidelines for open market share repurchases.

[4]G. Grullon and D. Ikenberry, "What Do We Know About Stock Repurchases?" *Journal of Applied Corporate Finance* 13(1) (2000): 31–51.

sale without severely affecting the price. Under these circumstances, the shareholder may be willing to sell shares back to the firm at a discount to the current market price. Alternatively, if a major shareholder is threatening to take over the firm and remove its management, the firm may decide to eliminate the threat by buying out the shareholder—often at a large premium over the current market price. This type of transaction is called **greenmail**.

**CONCEPT CHECK**

**1.** How is a stock's ex-dividend date determined, and what is its significance?

**2.** What is a Dutch auction share repurchase?

## 17.2  Comparison of Dividends and Share Repurchases

If a corporation decides to pay cash to shareholders, it can do so through either dividend payments or share repurchases. How do firms choose between these alternatives? In this section, we show that in the perfect capital markets setting of Modigliani and Miller, the method of payment does not matter.

Consider the case of Genron Corporation, a hypothetical firm. Genron has $20 million in excess cash and no debt. The firm expects to generate additional free cash flows of $48 million per year in subsequent years. If Genron's unlevered cost of capital is 12%, then the enterprise value of its ongoing operations is

$$\text{Enterprise Value} = PV(\text{Future FCF}) = \frac{\$48 \text{ million}}{12\%} = \$400 \text{ million}$$

Including the cash, Genron's total market value is $420 million.

Genron's board is meeting to decide how to pay out its $20 million in excess cash to shareholders. Some board members have advocated using the $20 million to pay a $2 cash dividend for each of Genron's 10 million outstanding shares. Others have suggested repurchasing shares instead of paying a dividend. Still others have proposed that Genron raise additional cash and pay an even larger dividend today, in anticipation of the high future free cash flows it expects to receive. Will the amount of the current dividend affect Genron's share price? Which policy would shareholders prefer?

Let's analyze the consequences of each of these three alternative policies and compare them in a setting of perfect capital markets.

### Alternative Policy 1: Pay Dividend with Excess Cash

Suppose the board opts for the first alternative and uses all excess cash to pay a dividend. With 10 million shares outstanding, Genron will be able to pay a $2 dividend immediately. Because the firm expects to generate future free cash flows of $48 million per year, it anticipates paying a dividend of $4.80 per share each year thereafter. The board declares the dividend and sets the record date as December 14, so that the ex-dividend date is December 12. Let's compute Genron's share price just before and after the stock goes ex-dividend.

The fair price for the shares is the present value of the expected dividends given Genron's equity cost of capital. Because Genron has no debt, its equity cost of capital equals its unlevered cost of capital of 12%. Just before the ex-dividend date, the stock is said to trade **cum-dividend** ("with the dividend") because anyone who buys the stock will be entitled to the dividend. In this case,

$$P_{cum} = \text{Current Dividend} + PV(\text{Future Dividends}) = 2 + \frac{4.80}{0.12} = 2 + 40 = \$42$$

After the stock goes ex-dividend, new buyers will not receive the current dividend. At this point the share price will reflect only the dividends in subsequent years:

$$P_{ex} = PV(\text{Future Dividends}) = \frac{4.80}{0.12} = \$40$$

The share price will drop on the ex-dividend date, December 12. The amount of the price drop is equal to the amount of the current dividend, $2. We can also determine this change in the share price using a simple market value balance sheet (values in millions of dollars):

| | December 11 (Cum-Dividend) | December 12 (Ex-Dividend) |
|---|---|---|
| Cash | 20 | 0 |
| Other assets | 400 | 400 |
| Total market value | 420 | 400 |
| Shares (millions) | 10 | 10 |
| Share price | $42 | $40 |

As the market value balance sheet shows, the share price falls when a dividend is paid because the reduction in cash decreases the market value of the firm's assets. Although the stock price falls, holders of Genron stock do not incur a loss overall. Before the dividend, their stock was worth $42. After the dividend, their stock is worth $40 and they hold $2 in cash from the dividend, for a total value of $42.[5]

The fact that the stock price falls by the amount of the dividend also follows from the assumption that no opportunity for arbitrage exists. If it fell by less than the dividend, an investor could earn a profit by buying the stock just before it goes ex-dividend and selling it just after, as the dividend would more than cover the capital loss on the stock. Similarly, if the stock price fell by more than the dividend, an investor could profit by selling the stock just before it goes ex-dividend and buying it just after. Therefore, no arbitrage implies

> In a perfect capital market, when a dividend is paid, the share price drops by the amount of the dividend when the stock begins to trade ex-dividend.

## Alternative Policy 2: Share Repurchase (No Dividend)

Suppose that Genron does not pay a dividend this year, but instead uses the $20 million to repurchase its shares on the open market. How will the repurchase affect the share price?

With an initial share price of $42, Genron will repurchase $20 million ÷ $42 per share $=0.476$ million shares, leaving only $10 - 0.476 = 9.524$ million shares outstanding. Once again, we can use Genron's market value balance sheet to analyze this transaction:

| | December 11 (Before Repurchase) | December 12 (After Repurchase) |
|---|---|---|
| Cash | 20 | 0 |
| Other assets | 400 | 400 |
| Total market value of assets | 420 | 400 |
| Shares (millions) | 10 | 9.524 |
| Share price | $42 | $42 |

---

[5]For simplicity, we have ignored the short delay between the ex-dividend date and the payable date of the dividend. In reality, the shareholders do not receive the dividend immediately, but rather the *promise* to receive it within several weeks. The stock price adjusts by the present value of this promise, which is effectively equal to the amount of the dividend unless interest rates are extremely high.

In this case, the market value of Genron's assets falls when the company pays out cash, but the number of shares outstanding also falls. The two changes offset each other, so the share price remains the same.

**Genron's Future Dividends.** We can also see why the share price does not fall after the share repurchase by considering the effect on Genron's future dividends. In future years, Genron expects to have $48 million in free cash flow, which can be used to pay a dividend of $48 million ÷ 9.524 million shares = $5.04 per share each year. Thus, with a share repurchase, Genron's share price today is

$$P_{rep} = \frac{5.04}{0.12} = \$42$$

In other words, by not paying a dividend today and repurchasing shares instead, Genron is able to raise its dividends *per share* in the future. The increase in future dividends compensates shareholders for the dividend they give up today. This example illustrates the following general conclusion about share repurchases:

> *In perfect capital markets, an open market share repurchase has no effect on the stock price, and the stock price is the same as the cum-dividend price if a dividend were paid instead.*

**Investor Preferences.** Would an investor prefer that Genron issue a dividend or repurchase its stock? Both policies lead to the same *initial* share price of $42. But is there a difference in shareholder value *after* the transaction? Consider an investor who currently holds 2000 shares of Genron stock. Assuming the investor does not trade the stock, the investor's holdings after a dividend or share repurchase are as follows:

| Dividend | Repurchase |
|---|---|
| $40 × 2000 = $80,000 stock | $42 × 2000 = $84,000 stock |
| $ 2 × 2000 = $ 4,000 cash | |

In either case, the value of the investor's portfolio is $84,000 immediately after the transaction. The only difference is the distribution between cash and stock holdings. Thus, it might seem the investor would prefer one approach or the other based on whether she needs the cash.

But if Genron repurchases shares and the investor wants cash, she can raise cash by selling shares. For example, she can sell $4000 ÷ $42 per share = 95 shares to raise about $4000 in cash. She will then hold 1905 shares, or 1905 × $42 ≈ $80,000 in stock. Thus, in the case of a share repurchase, by selling shares an investor can create a **homemade dividend**.

Similarly, if Genron pays a dividend and the investor does not want the cash, she can use the $4000 proceeds of the dividend to purchase 100 additional shares at the ex-dividend share price of $40 per share. As a result she will hold 2100 shares, worth 2100 × $40 = $84,000.[6] We summarize these two cases below:

| Dividend + Buy 100 shares | Repurchase + Sell 95 shares |
|---|---|
| $40 × 2100 = $84,000 stock | $42 × 1905 ≈ $80,000 stock |
| | $42 × 95    ≈ $ 4,000 cash |

---

[6]In fact, many firms allow investors to register for a dividend reinvestment program, or *DRIP*, which automatically reinvests any dividends into new shares of the stock.

> **COMMON MISTAKE**   **Repurchases and the Supply of Shares**
>
> There is a misconception that when a firm repurchases its own shares, the price rises due to the decrease in the supply of shares outstanding. This intuition follows naturally from the standard supply and demand analysis taught in microeconomics. Why does that analysis not apply here?
>
> When a firm repurchases its own shares, two things happen. First, the supply of shares is reduced. At the same time, however, the value of the firm's assets declines when it spends its cash to buy the shares. If the firm repurchases its shares at their market price, these two effects offset each other, leaving the share price unchanged.
>
> This result is similar to the dilution fallacy discussed in Chapter 14: When a firm issues shares at their market price, the share price does not fall due to the increase in supply. The increase in supply is offset by the increase in the firm's assets that results from the cash it receives from the issuance.

By selling shares or reinvesting dividends, the investor can create any combination of cash and stock desired. As a result, the investor is indifferent between the various payout methods the firm might employ:

> *In perfect capital markets, investors are indifferent between the firm distributing funds via dividends or share repurchases. By reinvesting dividends or selling shares, they can replicate either payout method on their own.*

### Alternative Policy 3: High Dividend (Equity Issue)

Let's look at a third possibility for Genron. Suppose the board wishes to pay an even larger dividend than $2 per share right now. Is that possible and, if so, will the higher dividend make shareholders better off?

Genron plans to pay $48 million in dividends starting next year. Suppose the firm wants to start paying that amount today. Because it has only $20 million in cash today, Genron needs an additional $28 million to pay the larger dividend now. It could raise cash by scaling back its investments. But if the investments have positive NPV, reducing them would lower firm value. An alternative way to raise more cash is to borrow money or sell new shares. Let's consider an equity issue. Given a current share price of $42, Genron could raise $28 million by selling $28 million ÷ $42 per share = 0.67 million shares. Because this equity issue will increase Genron's total number of shares outstanding to 10.67 million, the amount of the dividend per share each year will be

$$\frac{\$48 \text{ million}}{10.67 \text{ million shares}} = \$4.50 \text{ per share}$$

Under this new policy, Genron's cum-dividend share price is

$$P_{cum} = 4.50 + \frac{4.50}{0.12} = 4.50 + 37.50 = \$42$$

As in the previous examples, the initial share value is unchanged by this policy, and increasing the dividend has no benefit to shareholders.

> **EXAMPLE 17.1**   **Homemade Dividends**
>
> **Problem**
> Suppose Genron does not adopt the third alternative policy, and instead pays a $2 dividend per share today. Show how an investor holding 2000 shares could create a homemade dividend of $4.50 per share × 2000 shares = $9000 per year on her own.

**Solution**

If Genron pays a $2 dividend, the investor receives $4000 in cash and holds the rest in stock. To receive $9000 in total today, she can raise an additional $5000 by selling 125 shares at $40 per share just after the dividend is paid. In future years, Genron will pay a dividend of $4.80 per share. Because she will own $2000 − 125 = 1875$ shares, the investor will receive dividends of $1875 \times \$4.80 = \$9000$ per year from then on.

## Modigliani–Miller and Dividend Policy Irrelevance

In our analysis we considered three possible dividend policies for the firm this year: (1) pay out all cash as a dividend, (2) pay no dividend and use the cash instead to repurchase shares, or (3) issue equity to finance a larger dividend. These policies are illustrated in Table 17.1.

Table 17.1 shows an important trade-off: If Genron pays a higher *current* dividend per share, it will pay lower *future* dividends per share. For example, if the firm raises the current dividend by issuing equity, it will have more shares and therefore smaller free cash flows per share to pay dividends in the future. If the firm lowers the current dividend and repurchases its shares, it will have fewer shares in the future, so it will be able to pay a higher dividend per share. The net effect of this trade-off is to leave the total present value of all future dividends, and hence the current share price, unchanged.

The logic of this section matches that in our discussion of capital structure in Chapter 14. There we explained that in perfect capital markets, buying and selling equity and debt are zero-NPV transactions that do not affect firm value. Moreover, any choice of leverage by a firm could be replicated by investors using homemade leverage. As a result, the firm's choice of capital structure is irrelevant.

Here we have established the same principle for a firm's choice of a dividend. Regardless of the amount of cash the firm has on hand, it can pay a smaller dividend (and use the remaining cash to repurchase shares) or a larger dividend (by selling equity to raise cash). Because buying or selling shares is a zero-NPV transaction, such transactions have no effect on the initial share price. Furthermore, shareholders can create a homemade dividend of any size by buying or selling shares themselves.

Modigliani and Miller developed this idea in another influential paper published in 1961.[7] As with their result on capital structure, it went against the conventional wisdom

| TABLE 17.1 | Genron's Dividends per Share Each Year Under the Three Alternative Policies | | | |
|---|---|---|---|---|
| | | Dividend Paid ($ per share) | | |
| | Initial Share Price | Year 0 | Year 1 | Year 2 | . . . |
| Policy 1: | $42.00 | 2.00 | 4.80 | 4.80 | . . . |
| Policy 2: | $42.00 | 0 | 5.04 | 5.04 | . . . |
| Policy 3: | $42.00 | 4.50 | 4.50 | 4.50 | . . . |

[7]See M. Modigliani and M. Miller, "Dividend Policy, Growth, and the Valuation of Shares," *Journal of Business* 34 (1961): 411–433. See also J. B. Williams, *The Theory of Investment Value* (Harvard University Press, 1938).

---

**COMMON MISTAKE** | **The Bird in the Hand Fallacy**

*"A bird in the hand is worth two in the bush."*

The **bird in the hand hypothesis** states that firms choosing to pay higher current dividends will enjoy higher stock prices because shareholders prefer current dividends to future ones (with the same present value). According to this view, alternative policy 3 would lead to the highest share price for Genron.

Modigliani and Miller's response to this view is that with perfect capital markets, shareholders can generate an equivalent homemade dividend at any time by selling shares. Thus, the dividend choice of the firm should not matter.*

_____

*The bird in the hand hypothesis is proposed in early studies of dividend policy. See M. Gordon, "Optimal Investment and Financing Policy," *Journal of Finance* 18 (1963): 264–272, and J. Lintner, "Dividends, Earnings, Leverage, Stock Prices and the Supply of Capital to Corporations," *Review of Economics and Statistics* 44 (1962): 243–269.

---

that dividend policy could change a firm's value and make its shareholders better off even absent market imperfections. We state here their important proposition:

*MM Dividend Irrelevance: In perfect capital markets, holding fixed the investment policy of a firm, the firm's choice of dividend policy is irrelevant and does not affect the initial share price.*

### Dividend Policy with Perfect Capital Markets

The examples in this section illustrate the idea that by using share repurchases or equity issues a firm can easily alter its dividend payments. Because these transactions do not alter the value of the firm, neither does dividend policy.

This result may at first seem to contradict the idea that the price of a share should equal the present value of its future dividends. As our examples have shown, however, a firm's choice of dividend today affects the dividends it can afford to pay in the future in an offsetting fashion. Thus, while dividends *do* determine share prices, a firm's choice of dividend policy does not.

As Modigliani and Miller make clear, the value of a firm ultimately derives from its underlying free cash flow. A firm's free cash flow determines the level of payouts that it can make to its investors. In a perfect capital market, whether these payouts are made through dividends or share repurchases does not matter. Of course, in reality capital markets are not perfect. As with capital structure, it is the imperfections in capital markets that should determine the firm's dividend and payout policy.

**CONCEPT CHECK**

1. True or False: When a firm repurchases its own shares, the price rises due to the decrease in the supply of shares outstanding.

2. In a perfect capital market, how important is the firm's decision to pay dividends versus repurchase shares?

## 17.3 The Tax Disadvantage of Dividends

As with capital structure, taxes are an important market imperfection that influences a firm's decision to pay dividends or repurchase shares.

| TABLE 17.2 | Long-Term Capital Gains Versus Dividend Tax Rates in the United States, 1971–2012 | |
| --- | --- | --- |
| **Year** | **Capital Gains** | **Dividends** |
| 1971–1978 | 35% | 70% |
| 1979–1981 | 28% | 70% |
| 1982–1986 | 20% | 50% |
| 1987 | 28% | 39% |
| 1988–1990 | 28% | 28% |
| 1991–1992 | 28% | 31% |
| 1993–1996 | 28% | 40% |
| 1997–2000 | 20% | 40% |
| 2001–2002 | 20% | 39% |
| 2003–* | 15% | 15% |

*The current tax rates are set to expire in 2013 unless they are extended by Congress. The tax rates shown are for financial assets held for more than one year. For assets held one year or less, capital gains are taxed at the ordinary income tax rate (currently 35% for the highest bracket); the same is true for dividends if the assets are held for less than 61 days. Because the capital gains tax is not paid until the asset is sold, for assets held for longer than one year the *effective* capital gains tax rate is equal to the present value of the rate shown, when discounted by the after-tax risk-free interest rate for the additional number of years the asset is held.

## Taxes on Dividends and Capital Gains

Shareholders typically must pay taxes on the dividends they receive. They must also pay capital gains taxes when they sell their shares. Table 17.2 shows the history of U.S. tax rates applied to dividends and long-term capital gains for investors in the highest tax bracket.

Do taxes affect investors' preferences for dividends versus share repurchases? When a firm pays a dividend, shareholders are taxed according to the dividend tax rate. If the firm repurchases shares instead, and shareholders sell shares to create a homemade dividend, the homemade dividend will be taxed according to the capital gains tax rate. If dividends are taxed at a higher rate than capital gains, which has been true until the most recent change to the tax code, shareholders will prefer share repurchases to dividends.[8] And although recent tax code changes equalized the tax rates on dividends and capital gains, because capital gains taxes are deferred until the asset is sold, there is still a tax advantage for share repurchases over dividends for long-term investors.

The higher tax rate on dividends also makes it undesirable for a firm to raise funds to pay a dividend. Absent taxes and issuance costs, if a firm raises money by issuing shares and then gives that money back to shareholders as a dividend, shareholders are no better or worse off—they get back the money they put in. When dividends are taxed at a higher rate than capital gains, however, this transaction hurts shareholders because they will receive less than their initial investment.

---

[8]Some countries tax dividends at a lower rate than capital gains. The same holds currently in the U.S. for stocks held between 61 days and one year.

| EXAMPLE 17.2 | Issuing Equity to Pay a Dividend |
| --- | --- |

**Problem**

Suppose a firm raises $10 million from shareholders and uses this cash to pay them $10 million in dividends. If the dividend is taxed at a 40% rate, and if capital gains are taxed at a 15% rate, how much will shareholders receive after taxes?

**Solution**

Shareholders will owe 40% of $10 million, or $4 million in dividend taxes. Because the value of the firm will fall when the dividend is paid, shareholders' capital gain on the stock will be $10 million less when they sell, lowering their capital gains taxes by 15% of $10 million or $1.5 million. Thus, in total, shareholders will pay $4 million − $1.5 million = $2.5 million in taxes, and they will receive back only $7.5 million of their $10 million investment.

## Optimal Dividend Policy with Taxes

When the tax rate on dividends exceeds the tax rate on capital gains, shareholders will pay lower taxes if a firm uses share repurchases for all payouts rather than dividends. This tax savings will increase the value of a firm that uses share repurchases rather than dividends. We can also express the tax savings in terms of a firm's equity cost of capital. Firms that use dividends will have to pay a higher pre-tax return to offer their investors the same after-tax return as firms that use share repurchases.[9] As a result, the optimal dividend policy when the dividend tax rate exceeds the capital gain tax rate is to *pay no dividends at all*.

While firms do still pay dividends, substantial evidence shows that many firms have recognized their tax disadvantage. For example, prior to 1980, a majority of firms used dividends exclusively to distribute cash to shareholders (see Figure 17.4 ). But the fraction of dividend-paying firms declined dramatically from 1978–2002, falling by more than half.

| FIGURE 17.4 | Trends in the Use of Dividends and Repurchases |
| --- | --- |

This figure shows the percentage of publicly traded U.S. industrial firms each year that paid dividends or repurchased shares. Note the broad decline in the fraction of firms using dividends from 1975 to 2002, falling from 75% to 35%. This trend has reversed since the 2003 dividend tax cut. The fraction of firms repurchasing shares each year has averaged about 30%.

*Source*: Compustat.



[9]For an extension of the CAPM that includes investor taxes, see M. Brennan, "Taxes, Market Valuation and Corporation Financial Policy," *National Tax Journal* 23 (1970): 417–427.

596        **Chapter 17** Payout Policy

| FIGURE 17.5 | **The Changing Composition of Shareholder Payouts** |

This figure shows the value of share repurchases as a percentage of total payouts to shareholders (dividends and repurchases). By the late 1990s share repurchases surpassed dividends to become the largest form of corporate payouts for U.S. industrial firms. Note, however, the declines in repurchases during economic downturns.

*Source*: Compustat data for U.S. firms, excluding financial firms and utilities.



The trend away from dividends has noticeably reversed, however, since the 2003 reduction in the dividend tax rate.[10]

Figure 17.4 does not tell the full story of the shift in corporate payout policy, however. We see a more dramatic trend if we compare the dollar amounts of both forms of corporate payouts. Figure 17.5 shows the relative importance of share repurchases as a proportion of total payouts to shareholders. While dividends accounted for more than 80% of corporate payouts until the early 1980s, the importance of share repurchases grew dramatically in the mid-1980s after the SEC gave guidelines that provided firms a "safe harbor" from accusations of stock-price manipulation.[11] Repurchase activity slowed during the 1990–1991 recession, but by the end of the 1990s repurchases exceeded the value of dividend payments for U.S. industrial firms.[12]

While this evidence is indicative of the growing importance of share repurchases as a part of firms' payout policies, it also shows that dividends still remain a key form of payouts to shareholders. The fact that firms continue to issue dividends despite their tax disadvantage is often referred to as the **dividend puzzle**.[13] In the next section, we consider some factors that may mitigate this tax disadvantage. In Section 17.6, we examine alternative motivations for using dividends based on asymmetric information.

[10]See G. Grullon and R. Michaely, "Dividends, Share Repurchase, and the Substitution Hypothesis," *Journal of Finance* 57 (2002): 1649–1684, and E. Fama and K. French, "Disappearing Dividends: Changing Firm Characteristics or Lower Propensity to Pay?" *Journal of Financial Economics* 60 (2001): 3–43. For an examination of recent trends since 2000, see B. Julio and D. Ikenberry, "Reappearing Dividends," *Journal of Applied Corporate Finance* 16 (2004): 89–100.

[11]SEC Rule 10b-18 (adopted in 1982 and amended in 2003) provides guidelines on the manner of purchase (a single broker on a given day), their timing and price (not at the open nor close of trade, no higher than last transaction or published bid price), and their volume (less than 25% of trading volume).

[12]For further evidence that repurchases are replacing dividends, see A. Dittmar and R. Dittmar, "Stock Repurchase Waves: An Examination of the Trends in Aggregate Corporate Payout Policy," 2004 working paper, University of Michigan, and G. Grullon and R. Michaely, "Dividends, Share Repurchases, and the Substitution Hypothesis," *Journal of Finance* 57 (2002): 1649–1684.

[13]See F. Black, "The Dividend Puzzle," *Journal of Portfolio Management* 2 (1976): 5–8.

**CONCEPT CHECK**

1. What is the optimal dividend policy when the dividend tax rate exceeds the capital gains tax rate?

2. What is the dividend puzzle?

## 17.4 Dividend Capture and Tax Clienteles

While many investors have a tax preference for share repurchases rather than dividends, the strength of that preference depends on the difference between the dividend tax rate and the capital gains tax rate that they face. Tax rates vary by income, jurisdiction, investment horizon, and whether the stock is held in a retirement account. Because of these differences, firms may attract different groups of investors depending on their dividend policy. In this section, we look in detail at the tax consequences of dividends as well as investor strategies that may reduce the impact of dividend taxes on firm value.

### The Effective Dividend Tax Rate

To compare investor preferences, we must quantify the combined effects of dividend and capital gains taxes to determine an effective dividend tax rate for an investor. For simplicity, consider an investor who buys a stock today just before it goes ex-dividend, and sells the stock just after.[14] By doing so, the investor will qualify for, and capture, the dividend. If the stock pays a dividend of amount $Div$, and the investor's dividend tax rate is $\tau_d$, then her after-tax cash flow from the dividend is $Div(1 - \tau_d)$.

In addition, because the price just before the stock goes ex-dividend, $P_{cum}$, exceeds the price just after, $P_{ex}$, the investor will expect to incur a capital loss on her trade. If her tax rate on capital gains is $\tau_g$, her after-tax loss is $(P_{cum} - P_{ex})(1 - \tau_g)$.

Therefore, the investor earns a profit by trading to capture the dividend if the after-tax dividend exceeds the after-tax capital loss. Conversely, if the after-tax capital loss exceeds the after-tax dividend, the investor benefits by selling the stock just before it goes ex-dividend and buying it afterward, thereby avoiding the dividend. In other words, there is an arbitrage opportunity unless the price drop and dividend are equal after taxes:

$$(P_{cum} - P_{ex})(1 - \tau_g) = Div(1 - \tau_d) \tag{17.1}$$

We can write Eq. 17.1 in terms of the share price drop as

$$P_{cum} - P_{ex} = Div \times \left( \frac{1 - \tau_d}{1 - \tau_g} \right) = Div \times \left( 1 - \frac{\tau_d - \tau_g}{1 - \tau_g} \right) = Div \times (1 - \tau_d^*) \tag{17.2}$$

where we define $\tau_d^*$ to be the **effective dividend tax rate**:

$$\tau_d^* = \left( \frac{\tau_d - \tau_g}{1 - \tau_g} \right) \tag{17.3}$$

---

[14]We could equally well consider a long-term investor deciding between selling the stock just before or just after the ex-dividend date. The analysis would be identical (although the applicable tax rates will depend on the holding period).

The effective dividend tax rate $\tau_d^*$ measures the additional tax paid by the investor per dollar of after-tax capital gains income that is instead received as a dividend.[15]

| EXAMPLE 17.3 | **Changes in the Effective Dividend Tax Rate** |
|---|---|

**Problem**

Consider an individual investor in the highest U.S. tax bracket who plans to hold a stock for more than one year. What was the effective dividend tax rate for this investor in 2002? How did the effective dividend tax rate change in 2003? (Ignore state taxes.)

**Solution**

From Table 17.2 , in 2002 we have $\tau_d = 39\%$ and $\tau_g = 20\%$. Thus,

$$\tau_d^* = \frac{0.39 - 0.20}{1 - 0.20} = 23.75\%$$

This indicates a significant tax disadvantage of dividends; each $1 of dividends is worth only $0.7625 in capital gains. However, after the 2003 tax cut, $\tau_d = 15\%$, $\tau_g = 15\%$, and

$$\tau_d^* = \frac{0.15 - 0.15}{1 - 0.15} = 0\%$$

Therefore, the 2003 tax cut eliminated the tax disadvantage of dividends for a one-year investor.

### Tax Differences Across Investors

The effective dividend tax rate $\tau_d^*$ for an investor depends on the tax rates the investor faces on dividends and capital gains. These rates differ across investors for a variety of reasons.

*Income Level.* Investors with different levels of income fall into different tax brackets and face different tax rates.

*Investment Horizon.* Capital gains on stocks held one year or less, and dividends on stocks held for less than 61 days, are taxed at higher ordinary income tax rates. Long-term investors can defer the payment of capital gains taxes (lowering their effective capital gains tax rate even further). Investors who plan to bequeath stocks to their heirs may avoid the capital gains tax altogether.

*Tax Jurisdiction.* U.S. investors are subject to state taxes that differ by state. For example, New Hampshire imposes a 5% tax on income from interest and dividends, but no tax on capital gains. Foreign investors in U.S. stocks are subject to 30% withholding for dividends they receive (unless that rate is reduced by a tax treaty with their home country). There is no similar withholding for capital gains.

*Type of Investor or Investment Account.* Stocks held by individual investors in a retirement account are not subject to taxes on dividends or capital gains.[16] Similarly,

---

[15]For identification and empirical support for Eq. 17.2 and 17.3, see E. Elton and M. Gruber, "Marginal Stockholder Tax Rates and the Clientele Effect," *Review of Economics and Statistics* 52 (1970): 68–74. For investor reaction to major tax code changes see J. Koski, "A Microstructure Analysis of Ex-Dividend Stock Price Behavior Before and After the 1984 and 1986 Tax Reform Acts," *Journal of Business* 69 (1996): 313–338.

stocks held through pension funds or nonprofit endowment funds are not subject to dividend or capital gains taxes. Corporations that hold stocks are able to exclude 70% of dividends they receive from corporate taxes, but are unable to exclude capital gains.[17]

To illustrate, consider four different investors: (1) a "buy and hold" investor who holds the stock in a taxable account and plans to transfer the stock to her heirs, (2) an investor who holds the stock in a taxable account but plans to sell it after one year, (3) a pension fund, and (4) a corporation. Under the current maximum U.S. federal tax rates, the effective dividend tax rate for each would be as follows:

1.  Buy and hold individual investor: $\tau_d = 15\%$, $\tau_g = 0$, and $\tau_d^* = 15\%$
2.  One-year individual investor: $\tau_d = 15\%$, $\tau_g = 15\%$, and $\tau_d^* = 0$
3.  Pension fund: $\tau_d = 0$, $\tau_g = 0$, and $\tau_d^* = 0$
4.  Corporation: Given a corporate tax rate of 35%, $\tau_d = (1 - 70\%) \times 35\% = 10.5\%$, $\tau_g = 35\%$, and $\tau_d^* = -38\%$

As a result of their different tax rates, these investors have varying preferences regarding dividends. Long-term investors are more heavily taxed on dividends, so they would prefer share repurchases to dividend payments. One-year investors, pension funds, and other non-taxed investors have no tax preference for share repurchases over dividends; they would prefer a payout policy that most closely matches their cash needs. For example, a non-taxed investor who desires current income would prefer high dividends so as to avoid the brokerage fees and other transaction costs of selling the stock.

Finally, the negative effective dividend tax rate for corporations implies that corporations enjoy a tax *advantage* associated with dividends. For this reason, a corporation that chooses to invest its cash will prefer to hold stocks with high dividend yields.

## Clientele Effects

Table 17.3 summarizes the different preferences across investor groups. These differences in tax preferences create **clientele effects**, in which the dividend policy of a firm is optimized for the tax preference of its investor clientele. Individuals in the highest tax brackets have a preference for stocks that pay no or low dividends, whereas tax-free investors and corporations have a preference for stocks with high dividends. In this case, a firm's dividend policy is optimized for the tax preference of its investor clientele.

Evidence supports the existence of tax clienteles. For example, Franklin Allen and Roni Michaely[18] report that in 1996 individual investors held 54% of all stocks by market value, yet received only 35% of all dividends paid, indicating that individuals tend to hold stocks with low dividend yields. Of course, the fact that high-tax investors receive any dividends at

---

[16]While taxes (or penalties) may be owed when the money is withdrawn from the retirement account, these taxes do not depend on whether the money came from dividends or capital gains.

[17]Corporations can exclude 80% if they own more than 20% of the shares of the firm paying the dividend.

[18]F. Allen and R. Michaely, "Payout Policy," in G. Constantinides, M. Harris, and R. Stulz, eds., *Handbook of the Economics of Finance: Corporate Finance Volume* 1A (Elsevier, 2003).

600        **Chapter 17**  Payout Policy

| TABLE 17.3 | Differing Dividend Policy Preferences Across Investor Groups | |
|---|---|---|
| **Investor Group** | **Dividend Policy Preference** | **Proportion of Investors** |
| Individual investors | Tax disadvantage for dividends Generally prefer share repurchase (except for retirement accounts) | ~52% |
| Institutions, pension funds | No tax preference Prefer dividend policy that matches income needs | ~47% |
| Corporations | Tax advantage for dividends | ~1% |

*Source*: Proportions based on *Federal Reserve Flow of Funds Accounts*.

all implies that the clienteles are not perfect—dividend taxes are not the only determinants of investors' portfolios.

Another clientele strategy is a dynamic clientele effect, also called the **dividend-capture theory**.[19] This theory states that absent transaction costs, investors can trade shares at the time of the dividend so that non-taxed investors receive the dividend. That is, non-taxed investors need not hold the high-dividend-paying stocks all the time; it is necessary only that they hold them when the dividend is actually paid.

An implication of this theory is that we should see large volumes of trade in a stock around the ex-dividend day, as high-tax investors sell and low-tax investors buy the stock in anticipation of the dividend, and then reverse those trades just after the ex-dividend date. Consider Figure 17.6, which illustrates the price and volume for the stock of Value Line, Inc., during 2004. On April 23, Value Line announced it would use its accumulated cash to pay a special dividend of $17.50 per share, with an ex-dividend date of May 20. Note the substantial increase in the volume of trade around the time of the special dividend. The volume of trade in the month following the special dividend announcement was more than 25 times the volume in the month prior to the announcement. In the three months following the announcement of the special dividend, the cumulative volume exceeded 65% of the total shares available for trade.

While this evidence supports the dividend-capture theory, it is also true that many high-tax investors continue to hold stocks even when dividends are paid. For a small ordinary dividend, the transaction costs and risks of trading the stock probably offset the benefits associated with dividend capture.[20] Only large special dividends, such as in the case of Value Line, tend to generate significant increases in volume. Thus, while clientele

---

[19]This idea is developed by A. Kalay, "The Ex-Dividend Day Behavior of Stock Prices: A Reexamination of the Clientele Effect," *Journal of Finance* 37 (1982): 1059–1070. See also J. Boyd and R. Jagannathan, "Ex-Dividend Price Behavior of Common Stocks," *Review of Financial Studies* 7 (1994): 711–741, who discuss the complications that arise with multiple tax clienteles.

[20]Dividend-capture strategies are risky because the stock price may fluctuate for unrelated reasons before the transaction can be completed. J. Koski and R. Michaely, "Prices, Liquidity, and the Information Content of Trades," *Review of Financial Studies* 13 (2000): 659–696, show that this risk can be eliminated by negotiating a purchase and sale simultaneously, but with settlement dates before and after the ex-dividend date. When such transactions are possible, the amount of dividend-related volume is greatly increased.



**FIGURE 17.6**    **Volume and Share Price Effects of Value Line's Special Dividend**

On announcement of the special dividend of $17.50 per share, Value Line's share price rose, as did the volume of trade. The share price dropped by $17.91 on the ex-dividend date, and the volume gradually declined over the following weeks. This pattern of volume is consistent with non-taxed investors buying the stock before the ex-dividend date and selling it afterward. (We consider reasons for the jump in the stock price on the announcement of the dividend in Sections 17.5 and 17.6 .)

effects and dividend-capture strategies reduce the relative tax disadvantage of dividends, they do not eliminate it.[21]

**CONCEPT CHECK**

1. Under what conditions will investors have a tax preference for share repurchases rather than dividends?

2. What does the dividend-capture theory imply about the volume of trade in a stock around the ex-dividend day?

---

[21]Dividend capture strategies are one reason it is difficult to find evidence that dividend yields affect the equity cost of capital. While evidence was found by R. Litzenberger and K. Ramaswamy ["The Effects of Personal Taxes and Dividends on Capital Asset Prices: Theory and Empirical Evidence," *Journal of Financial Economics* 7 (1979): 163–195], this evidence is contradicted by F. Black and M. Scholes ["The Effects of Dividend Yield and Dividend Policy on Common Stock Prices and Returns," *Journal of Financial Economics* 1 (1974): 1–22]. A. Kalay and R. Michaely provide an explanation for these differing results, and do not find a significant impact of dividend yields on expected returns ["Dividends and Taxes: A Reexamination," *Financial Management* 29 (2000): 55–75].

## 17.5 Payout Versus Retention of Cash

Looking back at Figure 17.1, we have thus far considered only one aspect of a firm's payout policy: the choice between paying dividends and repurchasing shares. But how should a firm decide the amount it should pay out to shareholders and the amount it should retain?

To answer this question, first, we must consider what the firm will do with cash that it retains. It can invest the cash in new projects or in financial instruments. We will demonstrate that in the context of perfect capital markets, once a firm has taken all positive-NPV investments, it is indifferent between saving excess cash and paying it out. But once we consider market imperfections, there is a trade-off: Retaining cash can reduce the costs of raising capital in the future, but it can also increase taxes and agency costs.

### Retaining Cash with Perfect Capital Markets

If a firm retains cash, it can use those funds to invest in new projects. If new positive-NPV projects are available, this decision is clearly the correct one. Making positive-NPV investments will create value for the firm's investors, whereas saving the cash or paying it out will not. However, once the firm has already taken all positive-NPV projects, any additional projects it takes on are zero or negative-NPV investments. Taking on negative-NPV investments will reduce shareholder value, as the benefits of such investments do not exceed their costs.

Of course, rather than waste excess cash on negative-NPV projects, a firm can hold the cash in the bank or use it to purchase financial assets. The firm can then pay the money to shareholders at a future time or invest it when positive-NPV investment opportunities become available.

What are the advantages and disadvantages of retaining cash and investing in financial securities? In perfect capital markets, buying and selling securities is a zero-NPV transaction, so it should not affect firm value. Shareholders can make any investment a firm makes on their own if the firm pays out the cash. Thus, it should not be surprising that with perfect capital markets, the retention versus payout decision—just like the dividend versus share repurchase decision—is irrelevant to total firm value.

---

**EXAMPLE 17.4**  **Delaying Dividends with Perfect Markets**

**Problem**

Barston Mining has $100,000 in excess cash. Barston is considering investing the cash in one-year Treasury bills paying 6% interest, and then using the cash to pay a dividend next year. Alternatively, the firm can pay a dividend immediately and shareholders can invest the cash on their own. In a perfect capital market, which option will shareholders prefer?

**Solution**

If Barston pays an immediate dividend, the shareholders receive $100,000 today. If Barston retains the cash, at the end of one year the company will be able to pay a dividend of

$$\$100{,}000 \times (1.06) = \$106{,}000$$

This payoff is the same as if shareholders had invested the $100,000 in Treasury bills themselves. In other words, the present value of this future dividend is exactly $106,000 \div (1.06) = \$100,000$. Thus, shareholders are indifferent about whether the firm pays the dividend immediately or retains the cash.

As Example 17.4 illustrates, there is no difference for shareholders if the firm pays the cash immediately or retains the cash and pays it out at a future date. This example provides yet another illustration of Modigliani and Miller's fundamental insight regarding financial policy irrelevance in perfect capital markets:

**MM Payout Irrelevance:** *In perfect capital markets, if a firm invests excess cash flows in financial securities, the firm's choice of payout versus retention is irrelevant and does not affect the initial value of the firm.*

Thus, the decision of whether to retain cash depends on market imperfections, which we turn to next.

### Taxes and Cash Retention

Example 17.4 assumed perfect capital markets, and so ignored the effect of taxes. How would our result change with taxes?

---

**EXAMPLE 17.5**

### Retaining Cash with Corporate Taxes

**Problem**

Suppose Barston must pay corporate taxes at a 35% rate on the interest it will earn from the one-year Treasury bill paying 6% interest. Would pension fund investors (who do not pay taxes on their investment income) prefer that Barston use its excess cash to pay the $100,000 dividend immediately or retain the cash for one year?

**Solution**

If Barston pays an immediate dividend, shareholders receive $100,000 today. If Barston retains the cash for one year, it will earn an after-tax return on the Treasury bills of

$$6\% \times (1 - 0.35) = 3.90\%$$

Thus, at the end of the year, Barston will pay a dividend of $100,000 \times (1.039) = $103,900.

This amount is less than the $106,000 the investors would have earned if they had invested the $100,000 in Treasury bills themselves. Because Barston must pay corporate taxes on the interest it earns, there is a tax disadvantage to retaining cash. Pension fund investors will therefore prefer that Barston pays the dividend now.

---

As Example 17.5 shows, corporate taxes make it costly for a firm to retain excess cash. This effect is the very same effect we identified in Chapter 15 with regard to leverage: When a firm pays interest, it receives a tax deduction for that interest, whereas when a firm receives interest, it owes taxes on the interest. As we discussed in Chapter 14, cash is equivalent to *negative* leverage, so the tax advantage of leverage implies a tax disadvantage to holding cash.

---

**EXAMPLE 17.6**

### Microsoft's Special Dividend

**Problem**

In the introduction to this chapter, we described Microsoft's special dividend of $3 per share, or $32 billion, during late 2004. If Microsoft had instead retained that cash permanently, what would the present value of the additional taxes be?

**Solution**

If Microsoft retained the cash, the interest earned on it would be subject to a 35% corporate tax rate. Because the interest payments are risk free, we can discount the tax payments at the risk-free interest rate (assuming Microsoft's marginal corporate tax rate will remain constant or that changes to it have a beta of zero). Thus, the present value of the tax payments on Microsoft's additional interest income would be

$$\frac{\$32 \text{ billion} \times r_f \times 35\%}{r_f} = \$32 \text{ billion} \times 35\% = \$11.2 \text{ billion}$$

Equivalently, on a per share basis, Microsoft's tax savings from paying out the cash rather than retaining it is $\$3 \times 35\% = \$1.05$ per share.

## Adjusting for Investor Taxes

The decision to pay out versus retain cash may also affect the taxes paid by shareholders. While pension and retirement fund investors are tax exempt, most individual investors must pay taxes on interest, dividends, and capital gains. How do investor taxes affect the tax disadvantage of retaining cash?

We illustrate the tax impact with a simple example. Consider a firm whose only asset is $100 in cash, and suppose all investors face identical tax rates. Let's compare the option of paying out this cash as an immediate dividend of $100 with the option of retaining the $100 permanently and using the interest earned to pay dividends.

Suppose the firm pays out its cash immediately as a dividend and shuts down. Because the ex-dividend price of the firm is zero (it has shut down), using Eq. 17.2 we find that before the dividend is paid the firm has a share price of

$$P_{cum} = P_{ex} + Div_0 \times \left(\frac{1 - \tau_d}{1 - \tau_g}\right) = 0 + 100 \times \left(\frac{1 - \tau_d}{1 - \tau_g}\right) \tag{17.4}$$

This price reflects the fact that the investor will pay tax on the dividend at rate $\tau_d$, but will receive a tax credit (at capital gains tax rate $\tau_g$) for the capital loss when the firm shuts down.

Alternatively, the firm can retain the cash and invest it in Treasury bills, earning interest at rate $r_f$ each year. After paying corporate taxes on this interest at rate $\tau_c$, the firm can pay a perpetual dividend of

$$Div = 100 \times r_f \times (1 - \tau_c)$$

each year and retain the $100 in cash permanently. What price will an investor pay for the firm in this case? The investor's cost of capital is the after-tax return that she could earn by investing in Treasury bills on her own: $r_f \times (1 - \tau_i)$, where $\tau_i$ is the investor's tax rate on interest income. Because the investor must pay taxes on the dividends as well, the value of the firm if it retains the $100 is[22]

$$P_{retain} = \frac{Div \times (1 - \tau_d)}{r_f \times (1 - \tau_i)} = \frac{100 \times r_f \times (1 - \tau_c) \times (1 - \tau_d)}{r_f \times (1 - \tau_i)}$$

$$= 100 \times \frac{(1 - \tau_c)(1 - \tau_d)}{(1 - \tau_i)} \tag{17.5}$$

---

[22]There is no capital gains tax consequence in this case because the share price will remain the same each year.

Comparing Eq. 17.4 and Eq. 17.5,

$$P_{retain} = P_{cum} \times \frac{(1 - \tau_c)(1 - \tau_g)}{(1 - \tau_i)} = P_{cum} \times (1 - \tau^*_{retain}) \qquad (17.6)$$

where $\tau^*_{retain}$ measures the effective tax disadvantage of retaining cash:

$$\tau^*_{retain} = \left( 1 - \frac{(1 - \tau_c)(1 - \tau_g)}{(1 - \tau_i)} \right) \qquad (17.7)$$

Because the dividend tax will be paid whether the firm pays the cash immediately or retains the cash and pays the interest over time, the dividend tax rate does not affect the cost of retaining cash in Eq. 17.7.[23] The intuition for Eq. 17.7 is that when a firm retains cash, it must pay corporate tax on the interest it earns. In addition, the investor will owe capital gains tax on the increased value of the firm. In essence, the interest on retained cash is taxed twice. If the firm paid the cash to its shareholders instead, they could invest it and be taxed only once on the interest that they earn. The cost of retaining cash therefore depends on the combined effect of the corporate and capital gains taxes, compared to the single tax on interest income. Using 2012 tax rates (see Table 15.3), $\tau_c = \tau_i = 35\%$ and $\tau_g = 15\%$, we get an effective tax disadvantage of retained cash of $\tau^*_{retain} = 15\%$. Thus, after adjusting for investor taxes, there remains a substantial tax *disadvantage* for the firm to retaining excess cash.

## Issuance and Distress Costs

If there is a tax disadvantage to retaining cash, why do some firms accumulate large cash balances? Generally, they retain cash balances to cover potential future cash shortfalls. For example, if there is a reasonable likelihood that future earnings will be insufficient to fund future positive-NPV investment opportunities, a firm may start accumulating cash to make up the difference. This motivation is especially relevant for firms that may need to fund large-scale research and development projects or large acquisitions.

The advantage of holding cash to cover future potential cash needs is that this strategy allows a firm to avoid the transaction costs of raising new capital (through new debt or equity issues). The direct costs of issuance range from 1% to 3% for debt issues and from 3.5% to 7% for equity issues. There can also be substantial indirect costs of raising capital due to the agency and adverse selection (lemons) costs discussed in Chapter 16. Therefore, a firm must balance the tax costs of holding cash with the potential benefits of not having to raise external funds in the future. Firms with very volatile earnings may also build up

---

[23]Equation 17.7 also holds if the firm uses any (constant) mix of dividends and share repurchases. However, if the firm initially retains cash by cutting back only on share repurchases, and then later uses the cash to pay a mix of dividends and repurchases, then we would replace $\tau_g$ in Eq. 17.7 with the average tax rate on dividends and capital gains, $\tau_e = \alpha \tau_d + (1 - \alpha)\tau_g$, where $\alpha$ is the proportion of dividends versus repurchases. In that case, $\tau^*_{retain}$ equals the effective tax disadvantage of debt $\tau^*$ we derived in Eq. 15.7, where we implicitly assumed that debt was used to fund a share repurchase (or avoid an equity issue), and that the future interest payments displaced a mix of dividends and share repurchases. Using $\tau_g$ here is sometimes referred to as the "new view" or "trapped-equity" view of retained earnings; see, for example, A. Auerbach, "Tax Integration and the 'New View' of the Corporate Tax: A 1980s Perspective," *Proceedings of the National Tax Association–Tax Institute of America* (1981): 21–27. Using $\tau_e$ corresponds to the "traditional view"; see, for example, J. Poterba and L. Summers, "Dividend Taxes, Corporate Investment, and 'Q'," *Journal of Public Economics* 22 (1983): 135–167.

cash reserves to enable them to weather temporary periods of operating losses. By holding sufficient cash, these firms can avoid financial distress and its associated costs.

### Agency Costs of Retaining Cash

There is no benefit to shareholders when a firm holds cash above and beyond its future investment or liquidity needs, however. In fact, in addition to the tax cost, there are likely to be agency costs associated with having too much cash in the firm. As discussed in Chapter 16, when firms have excessive cash, managers may use the funds inefficiently by continuing money-losing pet projects, paying excessive executive perks, or over-paying for acquisitions. In addition, unions, the government, or other entities may take advantage of the firm's "deep pockets."[24] Leverage is one way to reduce a firm's excess cash and avoid these costs; dividends and share repurchases perform a similar role by taking cash out of the firm.

For highly levered firms, equity holders have an additional incentive to pay out cash. Due to the debt overhang problem discussed in Chapter 16, some of the value of the retained cash will benefit debt holders. As a result, equity holders may prefer to "cash out" and increase the firm's payouts. Anticipating this, debt holders will charge a higher cost of debt, or include covenants restricting the firm's payout policy (see the discussion in Section 16.5).

Thus, paying out excess cash through dividends or share repurchases can boost the stock price by reducing waste or the transfer of the firm's resources to other stakeholders. This potential savings, together with tax benefits, likely explains the roughly $10 increase in Value Line's stock price on the announcement of its special dividend, shown in Figure 17.6.

---

**EXAMPLE 17.7**

### Cutting Negative-NPV Growth

**Problem**

Rexton Oil is an all-equity firm with 100 million shares outstanding. Rexton has $150 million in cash and expects future free cash flows of $65 million per year. Management plans to use the cash to expand the firm's operations, which will in turn increase future free cash flows by 12%. If the cost of capital of Rexton's investments is 10%, how would a decision to use the cash for a share repurchase rather than the expansion change the share price?

**Solution**

If Rexton uses the cash to expand, its future free cash flows will increase by 12% to $65 million × 1.12 = $72.8 million per year. Using the perpetuity formula, its market value will be $72.8 million ÷ 10% = $728 million, or $7.28 per share.

If Rexton does not expand, the value of its future free cash flows will be $65 million ÷ 10% = $650 million. Adding the cash, Rexton's market value is $800 million, or $8.00 per share. If Rexton repurchases shares, there will be no change to the share price: It will repurchase $150 million ÷ $8.00/share = 18.75 million shares, so it will have assets worth $650 million with 81.25 million shares outstanding, for a share price of $650 million ÷ 81.25 million shares = $8.00/share.

---

[24]For example, while Ford's larger cash balances helped it weather the 2008 financial crisis, it also did not receive the same government subsidies or labor concessions as its more troubled competitors.

> In this case, cutting investment and growth to fund a share repurchase increases the share price by $0.72 per share. The reason is the expansion has a negative NPV: It costs $150 million, but increases future free cash flows by only $7.8 million, for an NPV of
>
> $$-\$150 \text{ million} + \$7.8 \text{ million}/10\% = -\$72 \text{ million, or} -\$0.72 \text{ per share}$$

Ultimately, firms should choose to retain cash for the same reasons they would use low leverage[25]—to preserve financial slack for future growth opportunities and to avoid financial distress costs. These needs must be balanced against the tax disadvantage of holding cash and the agency cost of wasteful investment. It is not surprising, then, that high-tech and biotechnology firms, which typically choose to use little debt, also tend to retain and accumulate large amounts of cash. See Table 17.4 for a list of some U.S. firms with large cash balances.

As with capital structure decisions, however, payout policies are generally set by managers whose incentives may differ from those of shareholders. Managers may prefer to retain and maintain control over the firm's cash rather than pay it out. The retained cash can be used to fund investments that are costly for shareholders but have benefits for managers (for instance, pet projects and excessive salaries), or it can simply be held as a means to reduce leverage and the risk of financial distress that could threaten managers' job security. According to the managerial entrenchment theory of payout policy, managers pay out cash only when pressured to do so by the firm's investors.[26]

**CONCEPT CHECK**

1. Is there an advantage for a firm to retain its cash instead of paying it out to shareholders in perfect capital markets?

2. How do corporate taxes affect the decision of a firm to retain excess cash?

| TABLE 17.4 | Firms with Large Cash Balances (September 2012) | | |
|---|---|---|---|
| Ticker | Company | Cash & ST Investments ($ billion) | Percentage of Market Capitalization |
| MSFT | Microsoft Corporation | 62.0 | 24% |
| CSCO | Cisco Systems, Inc. | 48.7 | 47% |
| GOOG | Google Inc. | 43.3 | 19% |
| JNJ | Johnson & Johnson | 32.3 | 17% |
| GM | General Motors Company | 31.6 | 84% |
| ORCL | Oracle Corporation | 30.7 | 19% |

*Source*: Google Finance.

---

[25]As discussed in Chapter 14, we can interpret excess cash as negative debt. As a consequence, the trade-offs from holding excess cash are very similar to those involved in the capital structure decision.

[26]Recall from Section 16.7 that the managerial entrenchment theory of capital structure argued that managers choose low leverage to avoid the discipline of debt and preserve their job security. Applied to payout policy, the same theory implies that managers will reduce leverage further by choosing to hold too much cash.

## 17.6 Signaling with Payout Policy

One market imperfection that we have not yet considered is asymmetric information. When managers have better information than investors regarding the future prospects of the firm, their payout decisions may signal this information. In this section, we look at managers' motivations when setting a firm's payout policy, and we evaluate what these decisions may communicate to investors.

### Dividend Smoothing

Firms can change dividends at any time, but in practice they vary the sizes of their dividends relatively infrequently. For example, General Motors (GM) changed the amount of its regular dividend only eight times over a 20-year period. Yet during that same period, GM's earnings varied widely, as shown in Figure 17.7.

The pattern seen with GM is typical of most firms that pay dividends. Firms adjust dividends relatively infrequently, and dividends are much less volatile than earnings. This practice of maintaining relatively constant dividends is called **dividend smoothing**. Firms also increase dividends much more frequently than they cut them. For example, from 1971 to 2001, only 5.4% of dividend changes by U.S. firms were decreases.[27] In a classic survey of corporate executives, John Lintner[28] suggested that these observations resulted from (1) management's belief that investors prefer stable dividends with sustained growth, and (2) management's desire to maintain a long-term target level of dividends as a fraction of earnings. Thus firms raise their dividends only when they perceive

### FIGURE 17.7

**GM's Earnings and Dividends per Share, 1985–2008**

Compared to GM's earnings, its dividend payments were relatively stable. (Data adjusted for splits, earnings exclude extraordinary items.)

*Source*: Compustat and CapitalIQ.



---

[27]F. Allen and R. Michaely, "Payout Policy," in G. Constantinides, M. Harris, and R. Stulz, eds., *Handbook of the Economics of Finance: Corporate Finance Volume* 1A (Elsevier, 2003).

[28]J. Lintner, "Distribution of Incomes of Corporations Among Dividends, Retained Earnings and Taxes," *American Economic Review* 46 (1956): 97–113.

a long-term sustainable increase in the expected level of future earnings, and cut them only as a last resort.[29]

How can firms keep dividends smooth as earnings vary? As we have already discussed, firms can maintain almost any level of dividend in the short run by adjusting the number of shares they repurchase or issue and the amount of cash they retain. However, due to the tax and transaction costs of funding a dividend with new equity issues, managers do not wish to commit to a dividend that the firm cannot afford to pay out of regular earnings. For this reason, firms generally set dividends at a level they expect to be able to maintain based on the firm's earnings prospects.

## Dividend Signaling

If firms smooth dividends, the firm's dividend choice will contain information regarding management's expectations of future earnings. When a firm increases its dividend, it sends a positive signal to investors that management expects to be able to afford the higher dividend for the foreseeable future. Conversely, when managers cut the dividend, it may signal that they have given up hope that earnings will rebound in the near term and so need to reduce the dividend to save cash. The idea that dividend changes reflect managers' views about a firm's future earnings prospects is called the **dividend signaling hypothesis**.

Studies of the market's reaction to dividend changes are consistent with this hypothesis. For example, during the period 1967–1993, firms that raised their dividend by 10% or more saw their stock prices rise by 1.34% after the announcement, while those that cut their dividend by 10% or more experienced a price decline of −3.71%.[30] The average size of the stock price reaction increases with the magnitude of the dividend change, and is larger for dividend cuts.[31]

Dividend signaling is similar to the use of leverage as a signal that we discussed in Chapter 16. Increasing debt signals that management believes the firm can afford the future interest payments, in the same way that raising the dividend signals the firm can afford to maintain the dividends in the future. However, while cutting the dividend is costly for managers in terms of their reputation and the reaction of investors, it is by no means as costly as failing to make debt payments. As a consequence, we would expect dividend changes to be a somewhat weaker signal than leverage changes. Indeed, empirical studies have found average stock price increases of more than 10% when firms replace equity with debt, and decreases of 4% to 10% when firms replace debt with equity.[32]

---

[29]While perhaps a good description of how firms *do* set their dividends, as we have shown in this chapter there is no clear reason why firms *should* smooth their dividends, nor convincing evidence that investors prefer this practice.

[30]See G. Grullon, R. Michaely, and B. Swaminathan, "Are Dividend Changes a Sign of Firm Maturity?" *Journal of Business* 75 (2002): 387–424. The effects are even larger for dividend initiations (+3.4%) and omissions (−7%), according to studies by R. Michaely, R. Thaler, and K. Womack, "Price Reactions to Dividend Initiations and Omissions: Overreaction or Drift?" *Journal of Finance* 50 (1995): 573–608, and similar results by P. Healy and K. Palepu, "Earnings Information Conveyed by Dividend Initiations and Omissions," *Journal of Financial Economics* 21 (1988): 149–176.

[31]Not all of the evidence is consistent with dividend signaling, however. For example, it has been difficult to document a relationship between dividend changes and realized future earnings [S. Benartzi, R. Michaely, and R. Thaler, "Do Changes in Dividends Signal the Future or the Past?" *Journal of Finance* 52 (1997): 1007–1034].

[32]C. Smith, "Raising Capital: Theory and Evidence," in D. Chew, ed., *The New Corporate Finance* (McGraw-Hill, 1993).

610 **Chapter 17** Payout Policy

### Royal & SunAlliance's Dividend Cut

In some quarters, Julian Hance must have seemed like a heretic. On November 8, 2001, the finance director of Royal & SunAlliance, a U.K.-based insurance group with £12.6 billion (€20.2 billion) in annual revenue, did the unthinkable—he announced that he would cut the firm's dividend.

Many observers gasped at the decision. Surely, they argued, cutting the dividend was a sign of weakness. Didn't companies only cut their dividend when profits were falling?

Quite the contrary, countered Hance. With insurance premiums rising around the world, particularly following the World Trade Center tragedy, Royal & SunAlliance believed that its industry offered excellent growth opportunities. "The outlook for business in 2002 and beyond makes a compelling case for reinvesting capital in the business rather than returning it to shareholders," explained Hance.

The stock market agreed with him, sending Royal & SunAlliance's shares up 5% following its dividend news. "Cutting the dividend is a positive move," observes Matthew Wright, an insurance analyst at Credit Lyonnais. "It shows the company expects future profitability to be good."

*Source*: Justin Wood, CFO Europe.com, December 2001.

While an increase of a firm's dividend may signal management's optimism regarding its future cash flows, it might also signal a lack of investment opportunities. For example, Microsoft's move to initiate dividends in 2003 was largely seen as a result of its declining growth prospects as opposed to a signal about its increased future profitability.[33] Conversely, a firm might cut its dividend to exploit new positive-NPV investment opportunities. In this case, the dividend decrease might lead to a positive—rather than negative—stock price reaction (see the box on Royal and SunAlliance's dividend cut). In general, we must interpret dividends as a signal in the context of the type of new information managers are likely to have.

### Signaling and Share Repurchases

Share repurchases, like dividends, may also signal managers' information to the market. However, several important differences distinguish share repurchases and dividends. First, managers are much less committed to share repurchases than to dividend payments. As we noted earlier, when firms announce authorization for an open market share repurchase, they generally announce the maximum amount they plan to spend on repurchases. The actual amount spent, however, may be far less. Also, it may take several years to complete the share repurchase.[34] Second, unlike with dividends, firms do not smooth their repurchase activity from year to year. As a result, announcing a share repurchase today does not necessarily represent a long-term commitment to repurchase shares. In this regard, share repurchases may be less of a signal than dividends about future earnings of a firm.

A third key difference between dividends and share repurchases is that the cost of a share repurchase depends on the market price of the stock. If managers believe the stock is currently overvalued, a share repurchase will be costly to the shareholders who choose to hold on to their shares because buying the stock at its current (overvalued) price is a negative-NPV investment. By contrast, repurchasing shares when managers perceive the stock to

---

[33]See "An End to Growth?" *The Economist* (July 22, 2004): 61.

[34]C. Stephens and M. Weisbach, "Actual Share Reacquisitions in Open-Market Repurchase Programs," *Journal of Finance* 53 (1998): 313–333, consider how firms' actual repurchases compare to their announced plans. For details on share repurchase programs' implementation, see D. Cook, L. Krigman, and J. Leach, "On the Timing and Execution of Open Market Repurchases," *Review of Financial Studies* 17 (2004): 463–498.

be undervalued is a positive-NPV investment for these shareholders. Thus, if managers are acting in the interest of long-term shareholders and attempting to maximize the firm's future share price, they will be more likely to repurchase shares if they believe the stock to be undervalued. (If, on the other hand, managers act in the interest of all shareholders—including those who sell—then there is no such incentive: Any gain to those who remain is a cost to those who sell at the low price.)

In a 2004 survey, 87% of CFOs agreed that firms should repurchase shares when their stock price is a good value relative to its true value,[35] implicitly indicating that most CFOs believe that they should act in the interests of the long-term shareholders. Share repurchases are therefore a credible signal that management believes its shares are underpriced. Thus, if investors believe that managers have better information regarding the firm's prospects than they do, then investors should react favorably to share repurchase announcements. Indeed they do: The average market price reaction to the announcement of an open market share repurchase program is about 3% (with the size of the reaction increasing in the portion of shares outstanding sought).[36] The reaction is much larger for fixed-price tender offers (12%) and Dutch auction share repurchases (8%).[37] Recall that these methods of repurchase are generally used for very large repurchases conducted in a very short timeframe and are often part of an overall recapitalization. Also, the shares are repurchased at a premium to the current market price. Thus, tender offers and Dutch auction repurchases are even stronger signals than open market repurchases that management views the current share price as undervalued.

| EXAMPLE 17.8 | **Share Repurchases and Market Timing** |
| --- | --- |

**Problem**

Clark Industries has 200 million shares outstanding, a current share price of $30, and no debt. Clark's management believes that the shares are underpriced, and that the true value is $35 per share. Clark plans to pay $600 million in cash to its shareholders by repurchasing shares at the current market price. Suppose that soon after the transaction is completed, new information comes out that causes investors to revise their opinion of the firm and agree with management's assessment of Clark's value. What is Clark's share price after the new information comes out? How would the share price differ if Clark waited until after the new information came out to repurchase the shares?

**Solution**

Clark's initial market cap is $30/\text{share} \times 200$ million shares $= \$6$ billion, of which $600 million is cash and $5.4 billion corresponds to other assets. At the current share price, Clark will

[35]A. Brav, J. Graham, C. Harvey, and R. Michaely, "Payout Policy in the 21st Century," *Journal of Financial Economics* 77 (2005): 483–527.

[36]See D. Ikenberry, J. Lakonishok, and T. Vermaelen, "Market Underreaction to Open Market Share Repurchases," *Journal of Financial Economics* 39 (1995): 181–208, and G. Grullon and R. Michaely, "Dividends, Share Repurchases, and the Substitution Hypothesis," *Journal of Finance* 57 (2002): 1649–1684. For a signaling explanation of why the stock price will positively react to the announcement even though it is not a commitment to purchase shares, see J. Oded, "Why Do Firms Announce Open-Market Repurchase Programs?" *Review of Financial Studies* 18 (2005): 271–300.

[37]R. Comment and G. Jarrell, "The Relative Signaling Power of Dutch-Auction and Fixed-Price Self-tender Offers and Open-Market Share Repurchases," *Journal of Finance* 46 (1991): 1243–1271.

repurchase $600 million ÷ $30/share = 20 million shares. The market value balance sheet before and after the transaction is shown below (in millions of dollars):

|  | Before Repurchase | After Repurchase | After New Information |
|---|---|---|---|
| Cash | 600 | 0 | 0 |
| Other assets | 5400 | 5400 | 6400 |
| Total market value of assets | 6000 | 5400 | 6400 |
| Shares (millions) | 200 | 180 | 180 |
| Share Price | $30 | $30 | $35.56 |

According to management, Clark's initial market capitalization should be $35/share × 200 million shares = $7 billion, of which $6.4 billion would correspond to other assets. As the market value balance sheet shows, after the new information comes out, Clark's share price will rise to $35.556.

If Clark waited for the new information to come out before repurchasing the shares, it would buy shares at a market price of $35 per share. Thus, it would repurchase only 17.1 million shares. The share price after the repurchase would be $6.4 billion ÷ 182.9 shares = $35.

By repurchasing shares while the stock is underpriced, the ultimate share price is $0.556 higher, representing a gain of $0.556 × 180 million shares = $100 million for long-term shareholders. This gain equals the loss to the selling shareholders from selling 20 million shares at a price that is $5 below their true value.

As this example shows, the gain from buying shares when the stock is underpriced leads to an increase in the firm's long-run share price. Similarly, buying shares when the stock is overpriced will reduce the long-run share price. The firm may therefore try to time its repurchases appropriately. Anticipating this strategy, shareholders may interpret a share repurchase as a signal that the firm is undervalued.

**CONCEPT CHECK**

1. What possible signals does a firm give when it cuts its dividend?

2. Would managers acting in the interests of long-term shareholders be more likely to repurchase shares if they believe the stock is undervalued or overvalued?

# 17.7 Stock Dividends, Splits, and Spin-Offs

In this chapter, we have focused on a firm's decision to pay cash to its shareholders. But a firm can pay another type of dividend that does not involve cash: a stock dividend. In this case, each shareholder who owns the stock before it goes ex-dividend receives additional shares of stock of the firm itself (a stock split) or of a subsidiary (a spin-off). Here we briefly review these two types of transactions.

## Stock Dividends and Splits

If a company declares a 10% stock dividend, each shareholder will receive one new share of stock for every 10 shares already owned. Stock dividends of 50% or higher are generally referred to as stock splits. For example, with a 50% stock dividend, each shareholder will receive one new share for every two shares owned. Because a holder of two shares will end up holding three new shares, this transaction is also called a 3:2 ("3-for-2") stock split. Similarly, a 100% stock dividend is equivalent to a 2:1 stock split.

John Connors was Senior Vice President and Chief Financial Officer of Microsoft. He retired in 2005 and is now a partner at Ignition Partners, a Seattle venture capital firm.

QUESTION: *Microsoft declared a dividend for the first time in 2003. What goes into the decision of a company to initiate a dividend?*

ANSWER: Microsoft was in a unique position. The company had never paid a dividend and was facing shareholder pressure to do something with its $60 billion cash buildup. The company considered five key questions in developing its distribution strategy:

1. Can the company sustain payment of a cash dividend in perpetuity and increase the dividend over time? Microsoft was confident it could meet that commitment and raise the dividend in the future.

2. Is a cash dividend a better return to stockholders than a stock buyback program? These are capital structure decisions: Do we want to reduce our shares outstanding? Is our stock attractively priced for a buyback, or do we want to distribute the cash as a dividend? Microsoft had plenty of capacity to issue a dividend *and* continue a buyback program.

3. What is the tax effect of a cash dividend versus a buyback to the corporation and to shareholders? From a tax perspective to shareholders, it was largely a neutral decision in Microsoft's case.

4. What is the psychological impact on investors, and how does it fit the story of the stock for investors? This is a more qualitative factor. A regular ongoing dividend put Microsoft on a path to becoming an attractive investment for income investors.

5. What are the public relations implications of a dividend program? Investors don't look to Microsoft to hold cash but to be a leader in software development and provide equity growth. So they viewed the dividend program favorably.

QUESTION: *How does a company decide whether to increase its dividend, have a special dividend, or repurchase its stock to return capital to investors?*

## INTERVIEW WITH
# John Connors



ANSWER: The decision to increase the dividend is a function of cash flow projections. Are you confident that you have adequate cash flow to sustain this and future increases? Once you increase the dividend, investors expect future increases as well. Some companies establish explicit criteria for dividend increases. In my experience as a CFO, the analytic framework involves a set of relative comparables. What are the dividend payouts and dividend yields of the market in general and of your peer group, and where are we relative to them? We talk to significant investors and consider what is best for increasing shareholder value long-term.

A special dividend is a very efficient form of cash distribution that generally involves a nonrecurring situation, such as the sale of a business division or a cash award from a legal situation. Also, companies without a comprehensive distribution strategy use special dividends to reduce large cash accumulations. For Microsoft, the 2004 special dividend and announcement of the stock dividend and stock buyback program resolved the issue of what to do with all the cash and clarified our direction going forward.

QUESTION: *What other factors go into dividend decisions?*

ANSWER: Powerful finance and accounting tools help us to make better and broader business decisions. But these decisions involve as much psychology and market thinking as math. You have to consider non-quantifiable factors such as the psychology of investors. Not long ago, everyone wanted growth stocks; no one wanted dividend-paying stocks. Now dividend stocks are in vogue. You must also take into account your industry and what the competition is doing. In many tech companies, employee ownership in the form of options programs represents a fairly significant percentage of fully diluted shares. Dividend distributions reduce the price of the stock and hence the value of options.

At the end of the day, you want to be sure that your cash distribution strategy helps your overall story with investors.

With a stock dividend, a firm does not pay out any cash to shareholders. As a result, the total market value of the firm's assets and liabilities, and therefore of its equity, is unchanged. The only thing that is different is the number of shares outstanding. The stock price will therefore fall because the same total equity value is now divided over a larger number of shares.

Let's illustrate a stock dividend for Genron. Suppose Genron paid a 50% stock dividend (a 3:2 stock split) rather than a cash dividend. Table 17.5 shows the market value balance sheet and the resulting share price before and after the stock dividend.

| TABLE 17.5 | Cum- and Ex-Dividend Share Price for Genron with a 50% Stock Dividend ($ million) | |
| --- | --- | --- |
| | December 11(Cum-Dividend) | December 12(Ex-Dividend) |
| Cash | 20 | 20 |
| Other assets | 400 | 400 |
| Total market value of assets | 420 | 420 |
| Shares (millions) | 10 | 15 |
| Share price | $42 | $28 |

A shareholder who owns 100 shares before the dividend has a portfolio worth $42 \times 100 = \$4200$. After the dividend, the shareholder owns 150 shares worth $28, giving a portfolio value of $28 \times 150 = \$4200$. (Note the important difference between a stock split and a share issuance: When the company issues shares, the number of shares increases, but the firm also raises cash to add to its existing assets. If the shares are sold at a fair price, the stock price should not change.)

Unlike cash dividends, stock dividends are not taxed. Thus, from both the firm's and shareholders' perspectives, there is no real consequence to a stock dividend. The number of shares is proportionally increased and the price per share is proportionally reduced so that there is no change in value.

Why, then, do companies pay stock dividends or split their stock? The typical motivation for a stock split is to keep the share price in a range thought to be attractive to small investors. Stocks generally trade in lots of 100 shares, and in any case do not trade in units less than one share. As a result, if the share price rises significantly, it might be difficult for small investors to afford one share, let alone 100. Making the stock more attractive to small investors can increase the demand for and the liquidity of the stock, which may in turn boost the stock price. On average, announcements of stock splits are associated with a 2% increase in the stock price.[38]

Most firms use splits to keep their share prices from exceeding $100. From 1990 to 2000, Cisco Systems split its stock nine times, so that one share purchased at the IPO split into 288 shares. Had it not split, Cisco's share price at the time of its last split in March 2000 would have been $288 \times \$72.19$, or $20,790.72.

---

[38]S. Nayak and N. Prabhala, "Disentangling the Dividend Information in Splits: A Decomposition Using Conditional Event-Study Methods," *Review of Financial Studies* 14 (2001): 1083–1116. For evidence that stock splits attract individual investors, see R. Dhar, W. Goetzmann, and N. Zhu, "The Impact of Clientele Changes: Evidence from Stock Splits," *Yale ICF Working Paper* no. 03-14 (2004). While splits seem to increase the number of shareholders, evidence of their impact on liquidity is mixed; see, for example, T. Copeland, "Liquidity Changes Following Stock Splits," *Journal of Finance* 34 (1979): 115–141, and J. Lakonishok and B. Lev, "Stock Splits and Stock Dividends: Why, Who and When," *Journal of Finance* 42 (1987): 913–932.

Firms also do not want their stock prices to fall too low. First, a stock price that is very low raises transaction costs for investors. For example, the spread between the bid and ask price for a stock has a minimum size of one tick ($0.01 for the NYSE and NASDAQ exchanges) independent of the stock price. In percentage terms, the tick size is larger for stocks with a low price than for stocks with a high price. Also, exchanges require stocks to maintain a minimum price to remain listed on an exchange (for example, the NYSE and NASDAQ require listed firms to maintain a price of at least $1 per share).

If the price of the stock falls too low, a company can engage in a **reverse split** and reduce the number of shares outstanding. For example, in a 1:10 reverse split, every 10 shares of stock are replaced with a single share. As a result, the share price increases tenfold. Reverse splits became necessary for many dot-coms after the Internet bust in 2000, and similarly for some financial firms in the wake of the financial crisis. Citigroup, for instance, split its stock 7 times between 1990 and 2000, for a cumulative increase of 12:1. But in May 2011 it implemented a 1:10 reverse split to increase its stock price from $4.50 to $45 per share.

Through a combination of splits and reverse splits, firms can keep their share prices in any range they desire. As Figure 17.8 shows, almost all firms have share prices below $100 per share, with 90% of firms' share prices between $2.50 and $65 per share.

## Spin-Offs

Rather than pay a dividend using cash or shares of its own stock, a firm can also distribute shares of a subsidiary in a transaction referred to as a **spin-off**. Non-cash special dividends are commonly used to spin off assets or a subsidiary as a separate company. For example, after selling 15% of Monsanto Corporation in an IPO in October 2000, Pharmacia Corporation announced in July 2002 that it would spin off its remaining 85% holding of Monsanto Corporation. The spin-off was accomplished through a special dividend in which each Pharmacia shareholder received 0.170593 share of Monsanto per share of Pharmacia owned. After receiving the Monsanto shares, Pharmacia shareholders could trade them separately from the shares of the parent firm.

### FIGURE 17.8

**Distribution of Share Prices on the NYSE (January 2012)**

By using splits and reverse splits, most firms keep their share prices between $2.50 and $65 to reduce transaction costs for investors. The median share price is $18.



### Berkshire Hathaway's A & B Shares

Many managers split their stock to keep the price affordable for small investors, making it easier for them to buy and sell the stock. Warren Buffett, chairman and chief executive of Berkshire Hathaway, disagrees. As he commented in Berkshire's 1983 annual report: "We are often asked why Berkshire does not split its stock . . . we want [shareholders] who think of themselves as business owners with the intention of staying a long time. And, we want those who keep their eyes focused on business results, not market prices." In its 40-year history, Berkshire Hathaway has never split its stock.

As a result of Berkshire Hathaway's strong performance and the lack of stock splits, the stock price climbed. By 1996, it exceeded $30,000 per share. Because this price was much too expensive for some small investors, several financial intermediaries created unit investment trusts whose only investment was Berkshire shares. (Unit investment trusts are similar to mutual funds, but their investment portfolio is fixed.) Investors could buy smaller interests in these trusts, effectively owning Berkshire stock with a much lower initial investment.

In response, in February 1996, Buffett announced the creation of a second class of Berkshire Hathaway stock, the Class B shares. Each owner of the original shares (now called Class A shares) was offered the opportunity to convert each A share into 30 B shares. "We're giving shareholders a do-it-yourself split, if they care to do it," Buffett said. Through the B shares, investors could own Berkshire stock with a smaller investment, and they would not have to pay the extra transaction costs required to buy stock through the unit trusts.

Meanwhile, the value of the A shares has continued to rise. After reaching a peak of $148,000 in late 2007, the price of one share of Berkshire Hathaway Class A shares was more than $130,000 per share in November 2012.*

_____

*Buffet's logic for not splitting the stock is a bit puzzling. If an extremely high stock price were advantageous, Buffet could have obtained it much sooner through a reverse split of the stock.

On the distribution date of August 13, 2002, Monsanto shares traded for an average price of $16.21. Thus, the value of the special dividend was

$$0.170593 \text{ Monsanto shares} \times \$16.21 \text{ per share} = \$2.77 \text{ per share}$$

A shareholder who initially owned 100 shares of Pharmacia stock would receive 17 shares of Monsanto stock, plus cash of $0.0593 \times \$16.21 = \$0.96$ in place of the fractional shares.

Alternatively, Pharmacia could have sold the shares of Monsanto and distributed the cash to shareholders as a cash dividend. The transaction Pharmacia chose offers two advantages over a cash distribution: (1) It avoids the transaction costs associated with such a sale, and (2) the special dividend is not taxed as a cash distribution. Instead, Pharmacia shareholders who received Monsanto shares are liable for capital gains tax only at the time they sell the Monsanto shares.[39]

Here we have considered only the methods of distributing the shares of the firm that has been spun off, either by paying a stock dividend or by selling the shares directly and then distributing (or retaining) the cash. The decision of whether to do the spin-off in the first place raises a new question: When is it better for two firms to operate as separate entities, rather than as a single combined firm? The issues that arise in addressing this question are the same as those that arise in the decision to merge two firms, which we discuss further in Chapter 28.

CONCEPT CHECK    **1.** What is the difference between a stock dividend and a stock split?

**2.** What is the main purpose of a reverse split?

_____

[39]The capital gain is computed by allocating a fraction of the cost basis of the Pharmacia shares to the Monsanto shares received. Because Pharmacia was trading at an ex-dividend price of $42.54 on the distribution date, the special dividend amounted to $6.1\% = 2.77/(2.77 + 42.54)$ of total value. Thus, the original cost basis of the Pharmacia stock was divided by allocating 6.1% to the Monsanto shares and the remaining 93.9% to the Pharmacia shares.

MyFinanceLab    Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 17.1 Distributions to Shareholders

- When a firm wants to distribute cash to its shareholders, it can pay a cash dividend or it can repurchase shares.
  - Most companies pay regular, quarterly dividends. Sometimes firms announce one-time, special dividends.
  - Firms repurchase shares using an open market repurchase, a tender offer, a Dutch auction repurchase, or a targeted repurchase.
- On the declaration date, firms announce that they will pay dividends to all shareholders of record on the record date. The ex-dividend date is the first day on which the stock trades without the right to an upcoming dividend; it is usually two trading days prior to the record date. Dividend checks are mailed on the payment date.
- In a stock split or a stock dividend, a company distributes additional shares rather than cash to shareholders.

### 17.2 Comparison of Dividends and Share Repurchases

- In perfect capital markets, the stock price falls by the amount of the dividend when a dividend is paid. An open market share repurchase has no effect on the stock price, and the stock price is the same as the cum-dividend price if a dividend were paid instead.
- The Modigliani-Miller dividend irrelevance proposition states that in perfect capital markets, holding fixed the investment policy of a firm, the firm's choice of dividend policy is irrelevant and does not affect the initial share price.

### 17.3 The Tax Disadvantage of Dividends

- In reality, capital markets are not perfect, and market imperfections affect firm dividend policy.
- If taxes are the only important market imperfection, when the tax rate on dividends exceeds the tax rate on capital gains, the optimal dividend policy is for firms to pay no dividends. Firms should use share repurchases for all payouts.

### 17.4 Dividend Capture and Tax Clienteles

- The effective dividend tax rate, $\tau_d^*$, measures the net tax cost to the investor per dollar of dividend income received:

$$\tau_d^* = \left( \frac{\tau_d - \tau_g}{1 - \tau_g} \right) \tag{17.3}$$

- The effective dividend tax rate varies across investors for several reasons, including income level, investment horizon, tax jurisdiction, and type of investment account.
- Different investor taxes create clientele effects, in which the dividend policy of a firm suits the tax preference of its investor clientele.

### 17.5 Payout Versus Retention of Cash

- Modigliani-Miller payout policy irrelevance says that, in perfect capital markets, if a firm invests excess cash flows in financial securities, the firm's choice of payout versus retention is irrelevant and does not affect the value of the firm.

618        **Chapter 17** Payout Policy

- Corporate taxes make it costly for a firm to retain excess cash. Even after adjusting for investor taxes, retaining excess cash brings a substantial tax disadvantage for a firm. The effective tax disadvantage of retaining cash is given by

$$\tau^*_{retain} = \left(1 - \frac{(1 - \tau_c)(1 - \tau_g)}{(1 - \tau_i)}\right) \tag{17.7}$$

- Even though there is a tax disadvantage to retaining cash, some firms accumulate cash balances. Cash balances help firms minimize the transaction costs of raising new capital when they have future potential cash needs. However, there is no benefit to shareholders from firms holding cash in excess of future investment needs.
- In addition to the tax disadvantage of holding cash, agency costs may arise, as managers may be tempted to spend excess cash on inefficient investments and perks. Without pressure from shareholders, managers may choose to horde cash to spend in this way or as a means of reducing a firm's leverage and increasing their job security.
- Dividends and share repurchases help minimize the agency problem of wasteful spending when a firm has excess cash. They also reduce the transfer of value to debt holders or other stakeholders.
- Firms typically maintain relatively constant dividends. This practice is called dividend smoothing.

## 17.6  Signaling with Payout Policy

- The idea that dividend changes reflect managers' views about firms' future earnings prospects is called the dividend signaling hypothesis.
  - Managers usually increase dividends only when they are confident the firm will be able to afford higher dividends for the foreseeable future.
  - When managers cut the dividend, it may signal that they have lost hope that earnings will improve.
- Share repurchases may be used to signal positive information, as repurchases are more attractive if management believes the stock is undervalued at its current price.

## 17.7  Stock Dividends, Splits, and Spin-Offs

- With a stock dividend, shareholders receive either additional shares of stock of the firm itself (a stock split) or shares of a subsidiary (a spin-off ). The stock price generally falls proportionally with the size of the split.
- A reverse split decreases the number of shares outstanding, and therefore results in a higher share price.

## Key Terms

bird in the hand hypothesis *p. 593*
clientele effects *p. 599*
cum-dividend *p. 588*
declaration date *p. 585*
dividend-capture theory *p. 600*
dividend puzzle *p. 596*
dividend signaling hypothesis *p. 609*
dividend smoothing *p. 608*
Dutch auction *p. 587*
effective dividend tax rate *p. 597*
ex-dividend date *p. 586*
greenmail *p. 588*
liquidating dividend *p. 587*

open market repurchase *p. 587*
payable date (distribution date) *p. 586*
payout policy *p. 585*
record date *p. 586*
return of capital *p. 587*
reverse split *p. 615*
special dividend *p. 586*
spin-off *p. 615*
stock dividend *p. 586*
stock split *p. 586*
targeted repurchase *p. 587*
tender offer *p. 587*

## Further Reading

For a comprehensive review of the literature on payout policy, see F. Allen and R. Michaely, "Payout Policy," in G. Constantinides, M. Harris, and R. Stulz, eds., *Handbook of the Economics of Finance: Corporate Finance Volume* 1A (Elsevier, 2003).

The literature on payout policy is extensive. Readers interested in specific issues might find the following articles interesting:

On the information content of payout policy: K. Dewenter and V. Warther, "Dividends, Asymmetric Information, and Agency Conflicts: Evidence from a Comparison of the Dividend Policies of Japanese and U.S. Firms," *Journal of Finance* 53 (1998): 879–904; E. Dyl and R. Weigand, "The Information Content of Dividend Initiations: Additional Evidence," *Financial Management* 27 (1998): 27–35; and G. Grullon and R. Michaely, "The Information Content of Share Repurchase Programs," *Journal of Finance* 59 (2004): 651–680.

On the decision corporations make between dividends and share repurchases: L. Bagwell and J. Shoven, "Cash Distributions to Shareholders," *Journal of Economic Perspectives* 3 (1989): 129–140; M. Barclay and C. Smith, "Corporate Payout Policy: Cash Dividends Versus Open-Market Repurchases," *Journal of Financial Economics* 22 (1988): 61–82; A. Dittmar, "Why Do Firms Repurchase Stock?" *Journal of Business* 73 (2000): 331–355; G. Fenn and N. Liang, "Corporate Payout Policy and Managerial Stock Incentives," *Journal of Financial Economics* 60 (2001): 45–72; W. Guay and J. Harford, "The Cash-Flow Permanence and Information Content of Dividend Increases Versus Repurchases," *Journal of Financial Economics* 57 (2000): 385–415; M. Jagannathan, C. Stephens, and M. Weisbach, "Financial Flexibility and the Choice Between Dividends and Stock Repurchases," *Journal of Financial Economics* 57 (2000): 355–384; K. Kahle, "When a Buyback Isn't a Buyback: Open Market Repurchases and Employee Options," *Journal of Financial Economics* 63 (2002): 235–261; and M. Rozeff, "How Companies Set Their Dividend Payout Ratios," in Joel M. Stern and Donald H. Chew, eds., *The Revolution in Corporate Finance* (Basil Blackwell, 1986).

On tax clienteles: F. Allen, A. Bernardo, and I. Welch, "A Theory of Dividends Based on Tax Clienteles," *Journal of Finance* 55 (2000): 2499–2536.

On the timing of share repurchases: P. Brockman and D. Chung, "Managerial Timing and Corporate Liquidity: Evidence from Actual Share Repurchases," *Journal of Financial Economics* 61 (2001): 417–448; and D. Cook, L. Krigman, and J. Leach, "On the Timing and Execution of Open Market Repurchases," *Review of Financial Studies* 17 (2004): 463–498.

## Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

### Distributions to Shareholders

1. What options does a firm have to spend its free cash flow (after it has satisfied all interest obligations)?

2. ABC Corporation announced that it will pay a dividend to all shareholders of record as of Monday, April 2, 2012. It takes three business days of a purchase for the new owners of a share of stock to be registered.
   a. When is the last day an investor can purchase ABC stock and still get the dividend payment?
   b. When is the ex-dividend day?

3. Describe the different mechanisms available to a firm to use to repurchase shares.

### Comparison of Dividends and Share Repurchases

4. RFC Corp. has announced a $1 dividend. If RFC's price last price cum-dividend is $50, what should its first ex-dividend price be (assuming perfect capital markets)?

5. EJH Company has a market capitalization of $1 billion and 20 million shares outstanding. It plans to distribute $100 million through an open market repurchase. Assuming perfect capital markets:
   a. What will the price per share of EJH be right before the repurchase?
   b. How many shares will be repurchased?
   c. What will the price per share of EJH be right after the repurchase?

6. KMS Corporation has assets with a market value of $500 million, $50 million of which are cash. It has debt of $200 million, and 10 million shares outstanding. Assume perfect capital markets.
   a. What is its current stock price?
   b. If KMS distributes $50 million as a dividend, what will its share price be after the dividend is paid?
   c. If instead, KMS distributes $50 million as a share repurchase, what will its share price be once the shares are repurchased?
   d. What will its new market debt-equity ratio be after either transaction?

7. Natsam Corporation has $250 million of excess cash. The firm has no debt and 500 million shares outstanding with a current market price of $15 per share. Natsam's board has decided to pay out this cash as a one-time dividend.
   a. What is the ex-dividend price of a share in a perfect capital market?
   b. If the board instead decided to use the cash to do a one-time share repurchase, in a perfect capital market what is the price of the shares once the repurchase is complete?
   c. In a perfect capital market, which policy, in part a or b, makes investors in the firm better off?

8. Suppose the board of Natsam Corporation decided to do the share repurchase in Problem 7 part b, but you, as an investor, would have preferred to receive a dividend payment. How can you leave yourself in the same position as if the board had elected to make the dividend payment instead?

9. Suppose you work for Oracle Corporation, and part of your compensation takes the form of stock options. The value of the stock option is equal to the difference between Oracle's stock price and an exercise price of $10 per share at the time that you exercise the option. As an option holder, would you prefer that Oracle use dividends or share repurchases to pay out cash to shareholders? Explain.

10. Suppose B&E Press paid dividends at the end of each year according to the schedule below. It also reduced its share count by repurchasing 5 million shares at the end of each year at the ex-dividend stock prices shown. (Assume perfect capital markets.)

|                                   | 2009  | 2010  | 2011 | 2012  | 2013  |
|-----------------------------------|-------|-------|------|-------|-------|
| Ex-Dividend Stock Price ($/share) | 10.00 | 12.00 | 8.00 | 11.00 | 15.00 |
| Dividend ($/share)                |       | 0.50  | 0.50 | 0.50  | 0.50  |
| Shares Outstanding (millions)     | 100   | 95    | 90   | 85    | 80    |

   a. What is total market value of B&E's equity, and what is the total amount paid out to shareholders, at the end of each year?
   b. If B&E had made the same total payouts using dividends only (and so kept is share count constant), what dividend would it have paid and what would its ex-dividend share price have been each year?
   c. If B&E had made the same total payouts using repurchases only (and so paid no dividends), what share count would it have had and what would its share price have been each year?
   d. Consider a shareholder who owns 10 shares of B&E initially, does not sell any shares, and reinvests all dividends at the ex-dividend share price. Would this shareholder have preferred the payout policy in (b), (c), or the original policy?

## The Tax Disadvantage of Dividends

11. The HNH Corporation will pay a constant dividend of $2 per share, per year, in perpetuity. Assume all investors pay a 20% tax on dividends and that there is no capital gains tax. Suppose that other investments with equivalent risk to HNH stock offer an after-tax return of 12%.

a. What is the price of a share of HNH stock?

b. Assume that management makes a surprise announcement that HNH will no longer pay dividends but will use the cash to repurchase stock instead. What is the price of a share of HNH stock now?

12. Using Table 17.2, for each of the following years, state whether dividends were tax disadvantaged or not for individual investors with a one-year investment horizon:
    a. 1985     b. 1989     c. 1995     d. 1999     e. 2005

## Dividend Capture and Tax Clienteles

13. What was the effective dividend tax rate for a U.S. investor in the highest tax bracket who planned to hold a stock for one year in 1981? How did the effective dividend tax rate change in 1982 when the Reagan tax cuts took effect? (Ignore state taxes.)

14. The dividend tax cut passed in 2003 lowered the effective dividend tax rate for a U.S. investor in the highest tax bracket to a historic low. During which other periods in the last 35 years was the effective dividend tax rate as low?

15. Suppose that all capital gains are taxed at a 25% rate, and that the dividend tax rate is 50%. Arbuckle Corp. is currently trading for $30, and is about to pay a $6 special dividend.
    a. Absent any other trading frictions or news, what will its share price be just after the dividend is paid?
    Suppose Arbuckle made a surprise announcement that it would do a share repurchase rather than pay a special dividend.
    b. What net tax savings per share for an investor would result from this decision?
    c. What would happen to Arbuckle's stock price upon the announcement of this change?

16. You purchased CSH stock for $40 one year ago and it is now selling for $50. The company has announced that it plans a $10 special dividend. You are considering whether to sell the stock now, or wait to receive the dividend and then sell.
    a. Assuming 2008 tax rates, what ex-dividend price of CSH will make you indifferent between selling now and waiting?
    b. Suppose the capital gains tax rate is 20% and the dividend tax rate is 40%, what ex-dividend price would make you indifferent now?

17. On Monday, November 15, 2004, TheStreet.com reported: "An experiment in the efficiency of financial markets will play out Monday following the expiration of a $3.08 dividend privilege for holders of Microsoft." The story went on: "The stock is currently trading ex-dividend both the special $3 payout and Microsoft's regular $0.08 quarterly dividend, meaning a buyer doesn't receive the money if he acquires the shares now." Microsoft stock ultimately opened for trade at $27.34 on the ex-dividend date (November 15), down $2.63 from its previous close.
    a. Assuming that this price drop resulted only from the dividend payment (no other information affected the stock price that day), what does this decline in price imply about the effective dividend tax rate for Microsoft?
    b. Based on this information, which of the following investors are most likely to be the marginal investors (the ones who determine the price) in Microsoft stock:   i. long-term individual investors,    ii. one-year individual investors,    iii. pension funds,   iv. corporations

18. At current tax rates, which of the following investors are most likely to hold a stock that has a high dividend yield:  i. individual investors,  ii. pension funds,    iii. mutual funds,  iv. corporations

19. Que Corporation pays a regular dividend of $1 per share. Typically, the stock price drops by $0.80 per share when the stock goes ex-dividend. Suppose the capital gains tax rate is 20%, but investors pay different tax rates on dividends. Absent transactions costs, what is the highest dividend tax rate of an investor who could gain from trading to capture the dividend?

**20.** A stock that you know is held by long-term individual investors paid a large one-time dividend. You notice that the price drop on the ex-dividend date is about the size of the dividend payment. You find this relationship puzzling given the tax disadvantage of dividends. Explain how the dividend-capture theory might account for this behavior.

### Payout Versus Retention of Cash

**21.** Clovix Corporation has $50 million in cash, 10 million shares outstanding, and a current share price of $30. Clovix is deciding whether to use the $50 million to pay an immediate special dividend of $5 per share, or to retain and invest it at the risk-free rate of 10% and use the $5 million in interest earned to increase its regular annual dividend of $0.50 per share. Assume perfect capital markets.
   a. Suppose Clovix pays the special dividend. How can a shareholder who would prefer an increase in the regular dividend create it on her own?
   b. Suppose Clovix increases its regular dividend. How can a shareholder who would prefer the special dividend create it on her own?

 **22.** Assume capital markets are perfect. Kay Industries currently has $100 million invested in short-term Treasury securities paying 7%, and it pays out the interest payments on these securities each year as a dividend. The board is considering selling the Treasury securities and paying out the proceeds as a one-time dividend payment.
   a. If the board went ahead with this plan, what would happen to the value of Kay stock upon the announcement of a change in policy?
   b. What would happen to the value of Kay stock on the ex-dividend date of the one-time dividend?
   c. Given these price reactions, will this decision benefit investors?

 **23.** Redo Problem 21, but assume that Kay must pay a corporate tax rate of 35%, and investors pay no taxes.

**24.** Harris Corporation has $250 million in cash, and 100 million shares outstanding. Suppose the corporate tax rate is 35%, and investors pay no taxes on dividends, capital gains, or interest income. Investors had expected Harris to pay out the $250 million through a share repurchase. Suppose instead that Harris announces it will permanently retain the cash, and use the interest on the cash to pay a regular dividend. If there are no other benefits of retaining the cash, how will Harris' stock price change upon this announcement?

 **25.** Redo Problem 21, but assume the following:
   a. Investors pay a 15% tax on dividends but no capital gains taxes or taxes on interest income, and Kay does not pay corporate taxes.
   b. Investors pay a 15% tax on dividends and capital gains, and a 35% tax on interest income, while Kay pays a 35% corporate tax rate.

**26.** Raviv Industries has $100 million in cash that it can use for a share repurchase. Suppose instead Raviv invests the funds in an account paying 10% interest for one year.
   a. If the corporate tax rate is 40%, how much additional cash will Raviv have at the end of the year net of corporate taxes?
   b. If investors pay a 20% tax rate on capital gains, by how much will the value of their shares have increased, net of capital gains taxes?
   c. If investors pay a 30% tax rate on interest income, how much would they have had if they invested the $100 million on their own?
   d. Suppose Raviv retained the cash so that it would not need to raise new funds from outside investors for an expansion it has planned for next year. If it did raise new funds, it would have to pay issuance fees. How much does Raviv need to save in issuance fees to make retaining the cash beneficial for its investors? (Assume fees can be expensed for corporate tax purposes.)

**27.** Use the data in Table 15.3 to calculate the tax disadvantage of retained cash in the following:
   a. 1998
   b. 1976

### Signaling with Payout Policy

**28.** Explain under which conditions an increase in the dividend payment can be interpreted as a signal of the following:
   a. Good news
   b. Bad news

**29.** Why is an announcement of a share repurchase considered a positive signal?

 **\*30.** AMC Corporation currently has an enterprise value of $400 million and $100 million in excess cash. The firm has 10 million shares outstanding and no debt. Suppose AMC uses its excess cash to repurchase shares. After the share repurchase, news will come out that will change AMC's enterprise value to either $600 million or $200 million.
   a. What is AMC's share price prior to the share repurchase?
   b. What is AMC's share price after the repurchase if its enterprise value goes up? What is AMC's share price after the repurchase if its enterprise value declines?
   c. Suppose AMC waits until after the news comes out to do the share repurchase. What is AMC's share price after the repurchase if its enterprise value goes up? What is AMC's share price after the repurchase if its enterprise value declines?
   d. Suppose AMC management expects good news to come out. Based on your answers to parts (b) and (c), if management desires to maximize AMC's ultimate share price, will they undertake the repurchase before or after the news comes out? When would management undertake the repurchase if they expect bad news to come out?
   e. Given your answer to part d, what effect would you expect an announcement of a share repurchase to have on the stock price? Why?

### Stock Dividends, Splits, and Spin-Offs

**31.** Berkshire Hathaway's A shares are trading at $120,000. What split ratio would it need to bring its stock price down to $50?

 **32.** Suppose the stock of Host Hotels & Resorts is currently trading for $20 per share.
   a. If Host issued a 20% stock dividend, what will its new share price be?
   b. If Host does a 3:2 stock split, what will its new share price be?
   c. If Host does a 1:3 reverse split, what will its new share price be?

**33.** Explain why most companies choose to pay stock dividends (split their stock).

**34.** When might it be advantageous to undertake a reverse stock split?

**35.** After the market close on May 11, 2001, Adaptec, Inc., distributed a dividend of shares of the stock of its software division, Roxio, Inc. Each Adaptec shareholder received 0.1646 share of Roxio stock per share of Adaptec stock owned. At the time, Adaptec stock was trading at a price of $10.55 per share (cum-dividend), and Roxio's share price was $14.23 per share. In a perfect market, what would Adaptec's ex-dividend share price be after this transaction?

## Data Case

In your role as a consultant at a wealth management firm, you have been assigned a very powerful client who holds one million shares of Cisco Systems, Inc. purchased on February 28, 2003. In researching Cisco, you discovered that they are holding a large amount of cash. Additionally, your client is upset that the Cisco stock price has been somewhat stagnant as of late. The client is considering approaching the Board of Directors with a plan for half of the cash the firm has accumulated,

but can't decide whether a share repurchase or a special dividend would be best. You have been asked to determine which initiative would generate the greatest amount of money after taxes, assuming that with a share repurchase your client would keep the same proportion of ownership. Because both dividends and capital gains are taxed at the same rate (15%), your client has assumed that there is no difference between the repurchase and the dividend. To confirm, you need to "run the numbers" for each scenario.

1. Go to http://finance.yahoo.com, enter the symbol for Cisco (CSCO), and click "Key Statistics."
    a. Record the current price and the number of shares outstanding.
    b. Click on "Balance Sheet" under "Financials." Copy and paste the balance sheet data into Excel.

2. Using one-half of the most recent cash and cash equivalents reported on the balance sheet (in thousands of dollars), compute the following:
    a. The number of shares that would be repurchased given the current market price.
    b. The dividend per share that could be paid given the total number of shares outstanding.

3. Go to http://finance.yahoo.com to obtain the price at which your client purchased the stock on February 28, 2003.
    a. Enter the symbol for Cisco and click "Get Quotes."
    b. Click "Historical Prices," enter the date your client purchased the stock as the start date and the end date, and hit "Enter." Record the adjusted closing price.

4. Compute the total cash that would be received by your client under the repurchase and the dividend both before taxes and after taxes.

5. The calculation in Step 4 reflects your client's immediate cash flow and tax liability, but it does not consider the final payoff for the client after any shares not sold in a repurchase are liquidated. To incorporate this feature, you first decide to see what happens if the client sells all remaining shares of stock immediately after the dividend or the repurchase. Assume that the stock price will fall by the amount of the dividend if a dividend is paid. What are the client's total after-tax cash flows (considering both the payout and the capital gain) under the repurchase of the dividend in this case?

6. Under which program would your client be better off before taxes? Which program is better after taxes, assuming the remaining shares are sold immediately after the dividend is paid?

7. Because your client is unlikely to sell all 1 million shares today, at the time of dividend/repurchase, you decide to consider two longer holding periods: Assume that under both plans the client sells all remaining shares of stock 5 years later, or the client sells 10 years later. Assume that the stock will return 10% per year going forward. Also assume that Amazon will pay no other dividends over the next 10 years.
    a. What would the stock price be after 5 years or 10 years if a dividend is paid now?
    b. What would the stock price be after 5 years or 10 years if Amazon repurchases shares now?
    c. Calculate the total after-tax cash flows at both points in time (when the dividend payment or the share repurchase takes place, and when the rest of the shares are sold) for your client if the remaining shares are sold in 5 years under both initiatives. Compute the difference between the cash flows under both initiatives at each point in time. Repeat assuming the shares are sold in 10 years.

8. Repeat Question 7 assuming the stock will return 20% per year going forward. What do you notice about the difference in the cash flows under the two initiatives when the return is 20% and 10%?

9. Calculate the NPV of the difference in the cash flows under both holding period assumptions for a range of discount rates. Based on your answer to Question 8, what is the correct discount rate to use?

**PART**

**6**

# Advanced Valuation

***THE LAW OF ONE PRICE CONNECTION.*** In this part of the text, we return to the topic of valuation and integrate our understanding of risk, return, and the firm's choice of capital structure. Chapter 18 combines the knowledge of the first five parts of the text and develops the three main methods for capital budgeting with leverage and market imperfections: The weighted average cost of capital (WACC) method, the adjusted present value (APV) method, and the flow-to-equity (FTE) method. While the Law of One Price guarantees that all three methods ultimately lead to the same assessment of value, we will identify conditions that can make one method easiest to apply. Chapter 19 applies Chapter 18's methods of valuation to value a corporation in the context of a leveraged acquisition. Chapter 19 thus serves as a capstone case that illustrates how all the concepts developed thus far in the text are used to make complex real-world financial decisions.

**CHAPTER 18**
Capital Budgeting and Valuation with Leverage

**CHAPTER 19**
Valuation and Financial Modeling: A Case Study

<div style="float:left">

**CHAPTER**

# 18

## NOTATION

$FCF_t$ free cash flows at date $t$

$r_{wacc}$ weighted average cost of capital

$r_E, r_D$ equity and debt costs of capital

$r_D^*$ equity-equivalent debt cost of capital

$E$ market value of equity

$D$ market value of debt (net of cash)

$\tau_c$ marginal corporate tax rate

$D_t$ incremental debt of project on date $t$

$V_t^L$ value of a levered investment on date $t$

$d$ debt-to-value ratio

$r_U$ unlevered cost of capital

$V^U$ unlevered value of investment

$T^s$ value of predetermined tax shields

$k$ interest coverage ratio

$Int_t$ interest expense on date $t$

$D^s$ debt net of predetermined tax shields

$\phi$ permanence of the debt level

$\tau_e, \tau_i$ tax rate on equity and interest income

$\tau^*$ effective tax advantage of debt

626

</div>

# Capital Budgeting and Valuation with Leverage

**I**N FALL 2012, GENERAL ELECTRIC COMPANY HAD A MARKET capitalization of approximately $235 billion. With net debt of over $354 billion, GE's total enterprise value was $589 billion, making it the second most valuable business in the world (just behind Apple, and ahead of Exxon Mobil). GE's businesses include power generation and air transportation equipment, health care and medical equipment, consumer appliances, consumer and commercial financing and insurance, as well as entertainment through its affiliate, NBC Universal. With a debt-to-value ratio exceeding 50%, leverage is clearly part of GE's business strategy. How should a firm that uses leverage, like GE, incorporate the costs and benefits associated with leverage into its capital budgeting decisions? And how should a firm adjust for the differences in risk, and debt capacity, associated with its different business activities?

We introduced capital budgeting in Chapter 7. There, we outlined the following basic procedure: First, we estimate the incremental free cash flow generated by the project; then we discount the free cash flow based on the project's cost of capital to determine the NPV. Thus far, we have focused on all-equity financed projects. In this chapter, we integrate the lessons from Parts 4 and 5 into our capital budgeting framework and consider alternative financing arrangements. In particular, we address how the financing decision of the firm can affect both the cost of capital and the set of cash flows that we ultimately discount.

We begin by introducing the three main methods for capital budgeting with leverage and market imperfections: the weighted average cost of capital (WACC) method, the adjusted present value (APV) method, and the flow-to-equity (FTE) method. While their details differ, when appropriately applied each method produces the same estimate of an investment's (or firm's) value. As we shall see, the choice of method is thus guided by which is the simplest to use in a given setting. Ultimately, we will develop

recommendations regarding the best method to use depending on the firm's financing policy.

Throughout this chapter, we focus on the intuition and implementation of the main capital budgeting methods. The appendix to this chapter provides additional details about the justification for and assumptions behind some of the results we use in the chapter. It also introduces advanced computational techniques that can be used in Excel to solve for leverage and value simultaneously.

## 18.1  Overview of Key Concepts

We introduce the three main methods of capital budgeting in Sections 18.2 through 18.4. Before we turn to the specifics, we will revisit some important ideas we encountered earlier in the text that underpin the valuation methods.

Chapter 15 demonstrated that because interest payments are deductible as an expense for the corporation, debt financing creates a valuable interest tax shield for the firm. We can include the value of this tax shield in the capital budgeting decision in several ways. First, we can use the *WACC method*, explained in Section 18.2, in which we discount the unlevered free cash flows using the weighted-average cost of capital, or WACC. Because we calculate the WACC using the effective *after-tax* interest rate as the cost of debt, this method incorporates the tax benefit of debt implicitly through the cost of capital.

Alternatively, we can first value a project's free cash flows without leverage by discounting them using the unlevered cost of capital. We can then separately estimate and add the present value of the interest tax shields from debt. This method, in which we explicitly add the value of the interest tax shields to the project's unlevered value, is called the *adjusted present value (APV) method*, which we explain in Section 18.3.

Our third method makes use of the observation in Chapter 9 that rather than value the firm based on its free cash flows, we can also value its equity based on the total payouts to shareholders. The *flow-to-equity (FTE) method*, introduced in Section 18.4, applies this idea to value the incremental payouts to equity associated with a project.

To illustrate these methods most clearly, we begin the chapter by applying each method to a single example in which we have made a number of simplifying assumptions:

1. *The project has average risk.* We assume initially that the market risk of the project is equivalent to the average market risk of the firm's investments. In that case, the project's cost of capital can be assessed based on the risk of the firm.

2. *The firm's debt-equity ratio is constant.* Initially, we consider a firm that adjusts its leverage to maintain a constant debt-equity ratio in terms of market values. This policy determines the amount of debt the firm will take on when it accepts a new project. It also implies that the risk of the firm's equity and debt, and therefore its weighted average cost of capital, will not fluctuate due to leverage changes.

3. *Corporate taxes are the only imperfection.* We assume initially that the main effect of leverage on valuation is due to the corporate tax shield. We ignore personal taxes and issuance costs, and we assume that other imperfections (such as financial distress or agency costs) are not significant at the level of debt chosen.

While these assumptions are restrictive, they are also a reasonable approximation for many projects and firms. The first assumption is likely to fit typical projects of firms with

investments concentrated in a single industry. The second assumption, while unlikely to hold exactly, reflects the fact that firms tend to increase their levels of debt as they grow larger; some may even have an explicit target for their debt-equity ratio. Finally, for firms without very high levels of debt, the interest tax shield is likely to be the most important market imperfection affecting the capital budgeting decision. Hence, the third assumption is a reasonable starting point to begin our analysis.

Of course, while these three assumptions are reasonable in many situations, there are certainly projects and firms for which they do not apply. The remainder of the chapter therefore relaxes these assumptions and shows how to generalize the methods to more complicated settings. In Section 18.5, we adjust these methods for projects whose risk or debt capacity is substantially different from the rest of the firm. These adjustments are especially important for multidivisional firms, such as GE. In Section 18.6, we consider alternative leverage policies for the firm (rather than maintaining a constant debt-equity ratio) and adapt the APV method to handle such cases. We consider the consequence of other market imperfections, such as issuance, distress, and agency costs, on valuation in Section 18.7. Finally, in Section 18.8, we investigate a number of advanced topics, including periodically adjusted leverage policies and the effect of investor taxes.

**CONCEPT CHECK**

1. What are the three methods we can use to include the value of the tax shield in the capital budgeting decision?

2. In what situation is the risk of a project likely to match that of the overall firm?

## 18.2 The Weighted Average Cost of Capital Method

The WACC method takes the interest tax shield into account by using the after-tax cost of capital as the discount rate. When the market risk of the project is similar to the average market risk of the firm's investments, then its cost of capital is equal to the firm's weighted average cost of capital (WACC). As we showed in Chapter 15, the WACC incorporates the benefit of the interest tax shield by using the firm's *after-tax* cost of capital for debt:

$$r_{wacc} = \frac{E}{E + D} r_E + \frac{D}{E + D} r_D (1 - \tau_c) \tag{18.1}$$

In this formula,

$E =$ market value of equity                    $r_E =$ equity cost of capital

$D =$ market value of debt (net of cash)        $r_D =$ debt cost of capital

$\tau_c =$ marginal corporate tax rate

For now, we assume that the firm maintains a constant debt-equity ratio and that the WACC calculated in Eq. 18.1 remains constant over time.[1] Because the WACC incorporates the tax savings from debt, we can compute the *levered value* of an investment, which is its value including the benefit of interest tax shields given the firm's leverage policy, by discounting its future free cash flow using the WACC. Specifically, if $FCF_t$ is the expected

---

[1] In Section 18.8, we consider the case in which the WACC changes over time due to changes in leverage.

free cash flow of an investment at the end of year $t$, then the investment's initial levered value, $V_0^L$, is[2]

$$V_0^L = \frac{FCF_1}{1 + r_{wacc}} + \frac{FCF_2}{(1 + r_{wacc})^2} + \frac{FCF_3}{(1 + r_{wacc})^3} + \cdots \qquad (18.2)$$

## Using the WACC to Value a Project

Let's apply the WACC method to value a project. Avco, Inc., is a manufacturer of custom packaging products. Avco is considering introducing a new line of packaging, the RFX series, that will include an embedded radio-frequency identification (RFID) tag, which is a miniature radio antenna and transponder that allows a package to be tracked much more efficiently and with fewer errors than standard bar codes.

Avco engineers expect the technology used in these products to become obsolete after four years. During the next four years, however, the marketing group expects annual sales of $60 million per year for this product line. Manufacturing costs and operating expenses are expected to be $25 million and $9 million, respectively, per year. Developing the product will require upfront R&D and marketing expenses of $6.67 million, together with a $24 million investment in equipment. The equipment will be obsolete in four years and will be depreciated via the straight-line method over that period. Avco bills the majority of its customers in advance, and it expects no net working capital requirements for the project. Avco pays a corporate tax rate of 40%. Given this information, the spreadsheet in Table 18.1 forecasts the project's expected free cash flow.[3]

The market risk of the RFX project is expected to be similar to that for the company's other lines of business. Thus, we can use Avco's equity and debt to determine the weighted average cost of capital for the new project. Table 18.2 shows Avco's current market value balance sheet and equity and debt costs of capital. Avco has built up $20 million in cash for

| TABLE 18.1 SPREADSHEET | Expected Free Cash Flow from Avco's RFX Project | | | | | |
|---|---|---|---|---|---|---|
| **Year** | | **0** | **1** | **2** | **3** | **4** |
| **Incremental Earnings Forecast ($ million)** | | | | | | |
| 1  Sales | | — | 60.00 | 60.00 | 60.00 | 60.00 |
| 2  Cost of Goods Sold | | — | (25.00) | (25.00) | (25.00) | (25.00) |
| 3  **Gross Profit** | | — | 35.00 | 35.00 | 35.00 | 35.00 |
| 4  Operating Expenses | | (6.67) | (9.00) | (9.00) | (9.00) | (9.00) |
| 5  Depreciation | | — | (6.00) | (6.00) | (6.00) | (6.00) |
| 6  **EBIT** | | (6.67) | 20.00 | 20.00 | 20.00 | 20.00 |
| 7  Income Tax at 40% | | 2.67 | (8.00) | (8.00) | (8.00) | (8.00) |
| 8  **Unlevered Net Income** | | (4.00) | 12.00 | 12.00 | 12.00 | 12.00 |
| **Free Cash Flow** | | | | | | |
| 9  Plus: Depreciation | | — | 6.00 | 6.00 | 6.00 | 6.00 |
| 10  Less: Capital Expenditures | | (24.00) | — | — | — | — |
| 11  Less: Increases in NWC | | — | — | — | — | — |
| 12  **Free Cash Flow** | | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |

---

[2]See this chapter's appendix for a formal justification of this result.
[3]The spreadsheets shown in this chapter are available for download from MyFinanceLab.

| TABLE 18.2 | | Avco's Current Market Value Balance Sheet ($ million) and Cost of Capital without the RFX Project | | | | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | **Cost of Capital** | |
| Cash | 20 | Debt | 320 | Debt | 6% | |
| Existing Assets | 600 | Equity | 300 | Equity | 10% | |
| Total Assets | 620 | Total Liabilities and Equity | 620 | | | |

investment needs, so that its *net* debt is $D = 320 - 20 = \$300$ million. Avco's enterprise value, which is the market value of its non-cash assets, is $E + D = \$600$ million. Avco intends to maintain a similar (net) debt-equity ratio for the foreseeable future, including any financing related to the RFX project.

With this capital structure, Avco's weighted average cost of capital is

$$r_{wacc} = \frac{E}{E + D} r_E + \frac{D}{E + D} r_D (1 - \tau_c) = \frac{300}{600}(10.0\%) + \frac{300}{600}(6.0\%)(1 - 0.40)$$

$$= 6.8\%$$

We can determine the value of the project, including the tax shield from debt, by calculating the present value of its future free cash flows, $V_0^L$, using the WACC:

$$V_0^L = \frac{18}{1.068} + \frac{18}{1.068^2} + \frac{18}{1.068^3} + \frac{18}{1.068^4} = \$61.25 \text{ million}$$

Because the upfront cost of launching the product line is only $28 million, this project is a good idea—taking the project results in an NPV of $61.25 - 28 = \$33.25$ million for the firm.

## Summary of the WACC Method

To summarize, the key steps in the WACC valuation method are as follows:

1. Determine the free cash flow of the investment.
2. Compute the weighted average cost of capital using Eq. 18.1.
3. Compute the value of the investment, including the tax benefit of leverage, by discounting the free cash flow of the investment using the WACC.

In many firms, the corporate treasurer performs the second step, calculating the firm's WACC. This rate can then be used throughout the firm as the companywide cost of capital for new investments *that are of comparable risk to the rest of the firm and that will not alter the firm's debt-equity ratio*. Employing the WACC method in this way is very simple and straightforward. As a result, it is the method that is most commonly used in practice for capital budgeting purposes.

---

**EXAMPLE 18.1**    **Valuing an Acquisition Using the WACC Method**

**Problem**

Suppose Avco is considering the acquisition of another firm in its industry that specializes in custom packaging. The acquisition is expected to increase Avco's free cash flow by $3.8 million the first year, and this contribution is expected to grow at a rate of 3% per year from then on. Avco

has negotiated a purchase price of $80 million. After the transaction, Avco will adjust its capital structure to maintain its current debt-equity ratio. If the acquisition has similar risk to the rest of Avco, what is the value of this deal?

**Solution**

The free cash flows of the acquisition can be valued as a growing perpetuity. Because its risk matches the risk for the rest of Avco, and because Avco will maintain the same debt-equity ratio going forward, we can discount these cash flows using the WACC of 6.8%. Thus, the value of the acquisition is

$$V^L = \frac{3.8}{6.8\% - 3\%} = \$100 \text{ million}$$

Given the purchase price of $80 million, the acquisition has an NPV of $20 million.

## Implementing a Constant Debt-Equity Ratio

Thus far, we have simply assumed the firm adopted a policy of keeping its debt-equity ratio constant. In fact, an important advantage of the WACC method is that you do not need to know how this leverage policy is implemented in order to make the capital budgeting decision. Nevertheless, keeping the debt-equity ratio constant has implications for how the firm's total debt will change with new investment. For example, Avco currently has a debt-equity ratio of $300/300 = 1$ or, equivalently, a debt-to-value ratio $[D/(E + D)]$ of 50%. To maintain this ratio, the firm's new investments must be financed with debt equal to 50% of their market value.

By undertaking the RFX project, Avco adds new assets to the firm with initial market value $V_0^L = \$61.25$ million. Therefore, to maintain its debt-to-value ratio, Avco must add $50\% \times 61.25 = \$30.625$ million in new net debt.[4] Avco can add this net debt either by reducing cash or by borrowing and increasing debt. Suppose Avco decides to spend its $20 million in cash and borrow an additional $10.625 million. Because only $28 million is required to fund the project, Avco will pay the remaining $30.625 - 28 = \$2.625$ million to shareholders through a dividend (or share repurchase). Table 18.3 shows Avco's market value balance sheet with the RFX project in this case.

| TABLE 18.3 | | Avco's Current Market Value Balance Sheet ($ million) with the RFX Project | |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash | — | Debt | 330.625 |
| Existing Assets | 600.00 | | |
| RFX Project | 61.25 | Equity | 330.625 |
| Total Assets | 661.25 | Total Liabilities and Equity | 661.25 |

---

[4]We can also evaluate the project's debt as follows: Of the $28 million upfront cost of the project, 50% ($14 million) will be financed with debt. In addition, the project generates an NPV of $33.25 million, which will increase the market value of the firm. To maintain a debt-equity ratio of 1, Avco must add debt of $50\% \times 33.25 = \$16.625$ million at the time when the NPV of the project is anticipated (which could occur before the new investment is made). Thus, the total new debt is $14 + 16.625 = \$30.625$ million.

This financing plan maintains Avco's 50% debt-to-value ratio. The market value of Avco's equity increases by $330.625 - 300 = \$30.625$ million. Adding the dividend of \$2.625 million, the shareholders' total gain is $30.625 + 2.625 = \$33.25$ million, which is exactly the NPV we calculated for the RFX project.

What happens over the life of the project? First, we define an investment's **debt capacity**, $D_t$, as the amount of debt at date $t$ that is required to maintain the firm's target debt-to-value ratio, $d$. If $V_t^L$, is the project's levered continuation value on date $t$—that is, the levered value of its free cash flow after date $t$—then

$$D_t = d \times V_t^L \tag{18.3}$$

We compute the debt capacity for the RFX project in the spreadsheet in Table 18.4. Starting with the project's free cash flow, we compute its levered continuation value at each date (line 2) by discounting the future free cash flow at the WACC as in Eq. 18.2. Because the continuation value at each date includes the value of all subsequent cash flows, it is even simpler to compute the value at each date by working backward from period 4, discounting next period's free cash flow and continuation value:

$$V_t^L = \frac{FCF_{t+1} + \overbrace{V_{t+1}^L}^{\substack{\text{Value of FCF in year} \\ t+2 \text{ and beyond}}}}{1 + r_{wacc}} \tag{18.4}$$

Once we have computed the project's value $V_t^L$ at each date, we apply Eq. 18.3 to compute the project's debt capacity at each date (line 3). As the spreadsheet shows, the project's debt capacity declines each year, and falls to zero by the end of year 4.

| TABLE 18.4 SPREADSHEET | **Continuation Value and Debt Capacity of the RFX Project over Time** | | | | | |
|---|---|---|---|---|---|---|
| **Year** | | **0** | **1** | **2** | **3** | **4** |
| **Project Debt Capacity ($ million)** | | | | | | |
| 1  Free Cash Flow | | | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2  Levered Value, $V^L$ (at $r_{wacc}$ = 6.8%) | | 61.25 | 47.41 | 32.63 | 16.85 | — |
| 3  Debt Capacity, $D_t$ (at $d$ = 50%) | | 30.62 | 23.71 | 16.32 | 8.43 | — |

---

| EXAMPLE 18.2 | **Debt Capacity for an Acquisition** |
|---|---|

**Problem**

Suppose Avco proceeds with the acquisition described in Example 18.1. How much debt must Avco use to finance the acquisition and still maintain its debt-to-value ratio? How much of the acquisition cost must be financed with equity?

**Solution**

From the solution to Example 18.2, the market value of the assets acquired in the acquisition, $V^L$, is \$100 million. Thus, to maintain a 50% debt-to-value ratio, Avco must increase its debt by \$50 million. The remaining \$30 million of the \$80 million acquisition cost will be financed with new equity. In addition to the \$30 million in new equity, the value of Avco's existing shares will increase by the \$20 million NPV of the acquisition, so in total the market value of Avco's equity will rise by \$50 million.

CONCEPT CHECK 1. Describe the key steps in the WACC valuation method.

2. How does the WACC method take into account the tax shield?

## 18.3 The Adjusted Present Value Method

The **adjusted present value (APV)** method is an alternative valuation method in which we determine the levered value $V^L$ of an investment by first calculating its *unlevered value* $V^U$, which is its value without any leverage, and then adding the value of the interest tax shield. That is, as we showed in Chapter 15:[5]

**The APV Formula**

$$V^L = APV = V^U + PV \,(\text{Interest Tax Shield}) \tag{18.5}$$

As we did with the WACC method, we focus solely on the corporate tax benefits of debt for now and defer the discussion of other consequences of leverage to Section 18.7. As Eq. 18.5 shows, the APV method incorporates the value of the interest tax shield directly, rather than by adjusting the discount rate as in the WACC method. Let's demonstrate the APV method by returning to Avco's RFX project.

### The Unlevered Value of the Project

From the free cash flow estimates in Table 18.1, the RFX project has an upfront cost of $28 million, and it generates $18 million per year in free cash flow for the next four years. The first step in the APV method is to calculate the value of these free cash flows using the project's cost of capital if it were financed without leverage.

What is the project's unlevered cost of capital? Because the RFX project has similar risk to Avco's other investments, its unlevered cost of capital is the same as for the firm as a whole. Thus, as we did in Chapter 12, we can calculate the unlevered cost of capital using Avco's pretax WACC, the average return the firm's investors expect to earn:

**Unlevered Cost of Capital with a Target Leverage Ratio**

$$r_U = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D = \text{Pretax WACC} \tag{18.6}$$

To understand why the firm's unlevered cost of capital equals its pretax WACC, note that the pretax WACC represents investors' required return for holding the entire firm (equity and debt). Thus, it will depend only on the firm's overall risk. So long as the firm's leverage choice does not change the overall risk of the firm, the pretax WACC must be the same whether the firm is levered or unlevered—recall Figure 15.2 on page 515.

Of course, this argument relies on the assumption that the overall risk of the firm is independent of the choice of leverage. As we showed in Chapter 14, this assumption always holds in a perfect market. It will also hold in a world with taxes whenever the risk of the tax shield is the same as the risk of the firm (so the size of the tax shield will not change the overall riskiness of the firm). In this chapter's appendix, we show that the tax shield will have the same risk as the firm if the firm maintains a *target leverage ratio*. A **target leverage ratio**

---

[5]Stewart Myers developed the application of APV to capital budgeting, see "Interactions of Corporate Financing and Investment Decisions—Implications for Capital Budgeting," *Journal of Finance* 29 (1974): 1–25.

means that the firm adjusts its debt proportionally to the project's value, or its cash flows, so that a constant debt-equity ratio is a special case.

Applying Eq. 18.6 to Avco, we find its unlevered cost of capital to be

$$r_U = 0.50 \times 10.0\% + 0.50 \times 6.0\% = 8.0\%$$

Avco's unlevered cost of capital is less than its equity cost of capital of 10.0% (which includes the financial risk of leverage), but is more than its WACC of 6.8% (which incorporates the tax benefit of leverage).

Given our estimate of the unlevered cost of capital $r_U$ and the project's free cash flows, we calculate the project's value without leverage:

$$V^U = \frac{18}{1.08} + \frac{18}{1.08^2} + \frac{18}{1.08^3} + \frac{18}{1.08^4} = \$59.62 \text{ million}$$

### Valuing the Interest Tax Shield

The value of the unlevered project, $V^U$, calculated above does not include the value of the tax shield provided by the interest payments on debt—it is the value of the project were it purely equity financed. Given the project's debt capacity from Table 18.4, we can estimate the expected interest payments and the tax shield as shown in the spreadsheet in Table 18.5. The interest paid in year $t$ is estimated based on the amount of debt outstanding at the end of the prior year:

$$\text{Interest paid in year } t = r_D \times D_{t-1} \tag{18.7}$$

The interest tax shield is equal to the interest paid multiplied by the corporate tax rate $\tau_c$.

| TABLE 18.5 SPREADSHEET | Expected Debt Capacity, Interest Payments, and Tax Shield for Avco's RFX Project | | | | | |
|---|---|---|---|---|---|---|

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| **Interest Tax Shield ($ million)** | | | | | | |
| 1    **Debt Capacity, $D_t$ (at $d = 50\%$)** | | 30.62 | 23.71 | 16.32 | 8.43 | — |
| 2    Interest Paid (at $r_D = 6\%$) | | | 1.84 | 1.42 | 0.98 | 0.51 |
| 3    **Interest Tax Shield (at $\tau_c = 40\%$)** | | | 0.73 | 0.57 | 0.39 | 0.20 |

To compute the present value of the interest tax shield, we need to determine the appropriate cost of capital. The interest tax shields shown in Table 18.5 are expected values, and the true amount of the interest tax shield each year will vary with the cash flows of the project. Because Avco maintains a fixed debt-equity ratio, if the project does well, its value will be higher, it will support more debt, and the interest tax shield will be higher. If the project goes poorly, its value will fall, Avco will reduce its debt level, and the interest tax shield will be lower. Thus, the tax shield will fluctuate with, and therefore share the risk of, the project itself:[6]

> *When the firm maintains a target leverage ratio, its future interest tax shields have similar risk to the project's cash flows, so they should be discounted at the project's unlevered cost of capital.*

---

[6]In Section 18.6, we consider the case in which the debt levels are fixed in advance, and so do *not* fluctuate with the project cash flows. As we will see, in that case the tax shield has lower risk, and thus a lower cost of capital, than the project.

For Avco's RFX project, we have

$$PV(\text{interest tax shield}) = \frac{0.73}{1.08} + \frac{0.57}{1.08^2} + \frac{0.39}{1.08^3} + \frac{0.20}{1.08^4} = \$1.63 \text{ million}$$

To determine the value of the project with leverage, we add the value of the interest tax shield to the unlevered value of the project:[7]

$$V^L = V^U + PV(\text{interest tax shield}) = 59.62 + 1.63 = \$61.25 \text{ million}$$

Again, given the $28 million initial investment required, the RFX project has an NPV with leverage of $61.25 - 28 = \$33.25$ million, which matches precisely the value we computed in Section 18.2 using the WACC approach.

## Summary of the APV Method

To determine the value of a levered investment using the APV method, we proceed as follows:

1. Determine the investment's value without leverage, $V^U$, by discounting its free cash flows at the unlevered cost of capital, $r_U$. With a constant debt-equity ratio, $r_U$ may be estimated using Eq. 18.6.
2. Determine the present value of the interest tax shield.
   a. Determine the expected interest tax shield: Given expected debt $D_t$ on date $t$, the interest tax shield on date $t + 1$ is $\tau_c \, r_D \, D_t$.[8]
   b. Discount the interest tax shield. If a constant debt-equity ratio is maintained, using $r_U$ is appropriate.
3. Add the unlevered value, $V^U$, to the present value of the interest tax shield to determine the value of the investment with leverage, $V^L$.

The APV method is more complicated than the WACC method because we must compute two separate valuations: the unlevered project and the interest tax shield. Furthermore, in this example, to determine the project's debt capacity for the interest tax shield calculation, we relied on the calculation in Table 18.4, *which depended on the value of the project.* Thus, we need to know the debt level to compute the APV, but with a constant debt-equity ratio we need to know the project's value to compute the debt level. As a result, implementing the APV approach with a constant debt-equity ratio requires solving for the project's debt and value *simultaneously.* (See this chapter's appendix for an example of this calculation.)

Despite its complexity, the APV method has some advantages. As we shall see in Section 18.6, it can be easier to apply than the WACC method when the firm does not maintain a constant debt-equity ratio. It also provides managers with an explicit valuation of the tax shield itself. In the case of Avco's RFX project, the benefit of the interest tax shield is

---

[7]Because we are using the same discount rate for the free cash flow and the tax shield, the cash flows of the project and the tax shield can be combined first and then discounted at the rate $r_U$. These combined cash flows are also referred to as the capital cash flows (CCF): CCF = FCF + Interest Tax Shield. This method is known as the CCF or "compressed APV" method [see S. Kaplan and R. Ruback, "The Valuation of Cash Flow Forecasts: An Empirical Analysis," *Journal of Finance* 50 (1995): 1059–1093; and R. Ruback, "Capital Cash Flows: A Simple Approach to Valuing Risky Cash Flows," *Financial Management* 31 (2002): 85–103].

[8]The return on the debt need not come solely from interest payments, so this value is an approximation. The same approximation is implicit in the definition of the WACC (for additional precision, see footnote 28 in this chapter's appendix).

relatively small. Even if tax rates were to change, or if Avco decided for other reasons not to increase its debt, the profitability of the project would not be jeopardized. However, this need not always be the case. Consider again the acquisition in Example 18.1, where the APV method makes clear that the gain from the acquisition crucially depends on the interest tax shield.

| EXAMPLE 18.3 | **Using the APV Method to Value an Acquisition** |

**Problem**

Consider again Avco's acquisition from Examples 18.1 and 18.2. The acquisition will contribute $3.8 million in free cash flows the first year, which will grow by 3% per year thereafter. The acquisition cost of $80 million will be financed with $50 million in new debt initially. Compute the value of the acquisition using the APV method, assuming Avco will maintain a constant debt-equity ratio for the acquisition.

**Solution**

First, we compute the value without leverage. Given Avco's unlevered cost of capital of $r_U = 8\%$, we get

$$V^U = 3.8/(8\% - 3\%) = \$76 \text{ million}$$

Avco will add new debt of $50 million initially to fund the acquisition. At a 6% interest rate, the interest expense the first year is $6\% \times 50 = \$3$ million, which provides an interest tax shield of $40\% \times 3 = \$1.2$ million. Because the value of the acquisition is expected to grow by 3% per year, the amount of debt the acquisition supports—and, therefore, the interest tax shield—is expected to grow at the same rate. The present value of the interest tax shield is

$$PV \text{ (interest tax shield)} = 1.2/(8\% - 3\%) = \$24 \text{ million}$$

The value of the acquisition with leverage is given by the APV:

$$V^L = V^U + PV \text{ (interest tax shield)} = 76 + 24 = \$100 \text{ million}$$

This value is identical to the value computed in Example 18.1 and implies an NPV of $100 - 80 = \$20$ million for the acquisition. Without the benefit of the interest tax shield, the NPV would be $76 - 80 = -\$4$ million.

We can easily extend the APV approach to include other market imperfections such as financial distress, agency, and issuance costs. We discuss these complexities further in Section 18.7.

| CONCEPT CHECK | 1. Describe the adjusted present value (APV) method. |
|  | 2. At what rate should we discount the interest tax shield when a firm maintains a target leverage ratio? |

## 18.4 The Flow-to-Equity Method

In the WACC and APV methods, we value a project based on its free cash flow, which is computed ignoring interest and debt payments. Some students find these methods confusing because, if the goal is to determine the benefit of the project to shareholders, it seems to them that we should focus on the cash flows that *shareholders* will receive.

In the **flow-to-equity (FTE)** valuation method, we explicitly calculate the free cash flow available to equity holders *after taking into account all payments to and from debt holders.* The cash flows to equity holders are then discounted using the *equity* cost of capital.[9] Despite this difference in implementation, the FTE method produces the same assessment of the project's value as the WACC or APV methods.

## Calculating the Free Cash Flow to Equity

The first step in the FTE method is to determine the project's **free cash flow to equity (FCFE)**. The FCFE is the free cash flow that remains after adjusting for interest payments, debt issuance, and debt repayment. The spreadsheet shown in Table 18.6 calculates the FCFE for Avco's RFX project.

Comparing the FCFE estimates in Table 18.6 with the free cash flow estimates in Table 18.1, we notice two changes. First, we deduct interest expenses (from Table 18.5) on line 7, before taxes. As a consequence, we compute the incremental net income of the project on line 10, rather than its *unlevered* net income as we do when computing free cash flows. The second change is line 14, where we add the proceeds from the firm's net borrowing activity. These proceeds are positive when the firm increases its net debt; they are negative when the firm reduces its net debt by repaying principal (or retaining cash). For the RFX project, Avco issues $30.62 million in debt initially. At date 1, however, the debt capacity of the project falls to $23.71 million (see Table 18.4), so that Avco must repay $30.62 - 23.71 = \$6.91$ million of the debt.[10] In general, given the project's debt capacity $D_t$,

$$\text{Net Borrowing at Date } t = D_t - D_{t-1} \qquad (18.8)$$

| TABLE 18.6 SPREADSHEET | Expected Free Cash Flows to Equity from Avco's RFX Project | | | | |
|---|---|---|---|---|---|
| Year | 0 | 1 | 2 | 3 | 4 |
| **Incremental Earnings Forecast ($ million)** | | | | | |
| 1  Sales | — | 60.00 | 60.00 | 60.00 | 60.00 |
| 2  Cost of Goods Sold | — | (25.00) | (25.00) | (25.00) | (25.00) |
| 3  **Gross Profit** | — | 35.00 | 35.00 | 35.00 | 35.00 |
| 4  Operating Expenses | (6.67) | (9.00) | (9.00) | (9.00) | (9.00) |
| 5  Depreciation | — | (6.00) | (6.00) | (6.00) | (6.00) |
| 6  **EBIT** | (6.67) | 20.00 | 20.00 | 20.00 | 20.00 |
| 7  Interest Expense | — | (1.84) | (1.42) | (0.98) | (0.51) |
| 8  **Pretax Income** | (6.67) | 18.16 | 18.58 | 19.02 | 19.49 |
| 9  Income Tax at 40% | 2.67 | (7.27) | (7.43) | (7.61) | (7.80) |
| 10  **Net Income** | (4.00) | 10.90 | 11.15 | 11.41 | 11.70 |
| **Free Cash Flow to Equity** | | | | | |
| 11  Plus: Depreciation | — | 6.00 | 6.00 | 6.00 | 6.00 |
| 12  Less: Capital Expenditures | (24.00) | — | — | — | — |
| 13  Less: Increases in NWC | — | — | — | — | — |
| 14  Plus: Net Borrowing | 30.62 | (6.92) | (7.39) | (7.89) | (8.43) |
| 15  **Free Cash Flow to Equity** | **2.62** | **9.98** | **9.76** | **9.52** | **9.27** |

---

[9]The FTE approach is very similar to the total payout method for valuing the firm described in Chapter 9. In that method, we value the total dividends and repurchases that the firm pays to shareholders. It is also equivalent to the residual income valuation method used in accounting.

[10]The $0.01 million difference in the spreadsheet is due to rounding.

As an alternative to Table 18.6, we can compute a project's FCFE directly from its free cash flow. Because interest payments are deducted before taxes in line 7, we adjust the firm's FCF by their after-tax cost. We then add net borrowing to determine FCFE:

**Free Cash Flow to Equity**

$$FCFE = FCF - \underbrace{(1 - \tau_c) \times (\text{Interest Payments})}_{\text{After-tax interest expense}} + (\text{Net Borrowing}) \qquad (18.9)$$

We illustrate this alternative calculation for Avco's RFX project in Table 18.7. Note that the project's FCFE is lower than its FCF in years 1 through 4 due to the interest and principal payments on the debt. In year 0, however, the proceeds from the loan more than offset the negative free cash flow, so FCFE is positive (and equal to the dividend we calculated in Section 18.2).

## Valuing Equity Cash Flows

The project's free cash flow to equity shows the expected amount of additional cash the firm will have available to pay dividends (or conduct share repurchases) each year. Because these cash flows represent payments to equity holders, they should be discounted at the project's equity cost of capital. Given that the risk and leverage of the RFX project are the same as for Avco overall, we can use Avco's equity cost of capital of $r_E = 10.0\%$ to discount the project's FCFE:

$$NPV(FCFE) = 2.62 + \frac{9.98}{1.10} + \frac{9.76}{1.10^2} + \frac{9.52}{1.10^3} + \frac{9.27}{1.10^4} = \$33.25 \text{ million}$$

The value of the project's FCFE represents the gain to shareholders from the project. It is identical to the NPV we computed using the WACC and APV methods.

Why isn't the project's NPV lower now that we have deducted interest and debt payments from the cash flows? Recall that these costs of debt are offset by cash received when the debt is issued. Looking back at Table 18.6, the cash flows from debt in lines 7 and 14 have an NPV of zero assuming the debt is fairly priced.[11] In the end, the only effect on value comes from a reduction in the tax payments, leaving the same result as with the other methods.

## Summary of the Flow-to-Equity Method

The key steps in the flow-to-equity method for valuing a levered investment are as follows:

1. Determine the free cash flow to equity of the investment using Eq. 18.9.
2. Determine the equity cost of capital, $r_E$.
3. Compute the contribution to equity value, $E$, by discounting the free cash flow to equity using the equity cost of capital.

---

[11]The interest and principal payments for the RFX project are as follows:

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| 1 | Net Borrowing | 30.62 | (6.92) | (7.39) | (7.89) | (8.43) |
| 2 | Interest Expense | — | (1.84) | (1.42) | (0.98) | (0.51) |
| 3 | **Cash Flow from Debt** | **30.62** | **(8.76)** | **(8.81)** | **(8.87)** | **(8.93)** |

Because these cash flows have the same risk as the debt, we discount them at the debt cost of capital of 6% to compute their NPV:

$$30.62 + \frac{-8.76}{1.06} + \frac{-8.81}{1.06^2} + \frac{-8.87}{1.06^3} + \frac{-8.93}{1.06^4} = 0.$$

| TABLE 18.7 SPREADSHEET | Computing FCFE from FCF for Avco's RFX Project | | | | | |
|---|---|---|---|---|---|---|
| | **Year** | **0** | **1** | **2** | **3** | **4** |
| **Free Cash Flow to Equity ($ million)** | | | | | | |
| 1   **Free Cash Flow** | | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2   After-tax Interest Expense | | — | (1.10) | (0.85) | (0.59) | (0.30) |
| 3   Net Borrowing | | 30.62 | (6.92) | (7.39) | (7.89) | (8.43) |
| 4   **Free Cash Flow to Equity** | | **2.62** | **9.98** | **9.76** | **9.52** | **9.27** |

Applying the FTE method was simplified in our example because the project's risk and leverage matched the firm's, and the firm's equity cost of capital was expected to remain constant. Just as with the WACC, however, this assumption is reasonable only if the firm maintains a constant debt-equity ratio. If the debt-equity ratio changes over time, the risk of equity—and, therefore, its cost of capital—will change as well.

In this setting, the FTE approach has the same disadvantage associated with the APV approach: We need to compute the project's debt capacity to determine interest and net borrowing before we can make the capital budgeting decision. For this reason, in most settings the WACC is easier to apply. The FTE method can offer an advantage when calculating the value of equity for the entire firm, if the firm's capital structure is complex and the market values of other securities in the firm's capital structure are not known. In that case, the FTE method allows us to compute the value of equity directly. In contrast, the WACC and APV methods compute the firm's enterprise value, so that a separate valuation of the other components of the firm's capital structure is needed to determine the value of equity. Finally, by emphasizing a project's implication for equity, the FTE method may be viewed as a more transparent method for discussing a project's benefit to shareholders—a managerial concern.

## What Counts as "Debt"?

Firms often have many types of debt as well as other liabilities, such as leases. Practitioners use different guidelines to determine which to include as debt when computing the WACC. Some use only long-term debt. Others use both long-term and short-term debt, plus lease obligations. Students are often confused by these different approaches and are left wondering: Which liabilities should be included as debt?

In fact, any choice will work if done correctly. We can view the WACC and FTE methods as special cases of a more general approach in which we *value the after-tax cash flows from a set of the firm's assets and liabilities by discounting them at the after-tax weighted average cost of capital of the firm's remaining assets and liabilities.* In the WACC method, the FCF does not include the interest and principal payments on

debt, so debt is included in the calculation of the weighted average cost of capital. In the FTE method, the FCFE incorporates the after-tax cash flows to and from debt holders, so debt is excluded from the weighted average cost of capital (which is simply the equity cost of capital).

Other combinations are also possible. For example, long-term debt can be included in the weighted average cost of capital, and short-term debt can be included as part of the cash flows. Similarly, other assets (such as cash) or liabilities (such as leases) can be included either in the weighted average cost of capital or as part of the cash flow. All such methods, if applied consistently, will lead to an equivalent valuation. Typically, the most convenient choice is the one for which the assumption of a constant debt-to-value ratio is a reasonable approximation.

---

| EXAMPLE 18.4 | **Using the FTE Method to Value an Acquisition** |
|---|---|

**Problem**

Consider again Avco's acquisition from Examples 18.1 through 18.3. The acquisition will contribute $3.8 million in free cash flows the first year, growing by 3% per year thereafter. The acquisition cost of $80 million will be financed with $50 million in new debt initially. What is the value of this acquisition using the FTE method?

**Solution**

Because the acquisition is being financed with $50 million in new debt, the remaining $30 million of the acquisition cost must come from equity:

$$FCFE_0 = -80 + 50 = -\$30 \text{ million}$$

In one year, the interest on the debt will be $6\% \times 50 = \$3$ million. Because Avco maintains a constant debt-equity ratio, the debt associated with the acquisition is also expected to grow at a 3% rate: $50 \times 1.03 = \$51.5$ million. Therefore, Avco will borrow an additional $51.5 - 50 = \$1.5$ million in one year.

$$FCFE_1 = +3.8 - (1 - 0.40) \times 3 + 1.5 = \$3.5 \text{ million}$$

After year 1, FCFE will also grow at a 3% rate. Using the cost of equity $r_E = 10\%$, we compute the NPV:

$$NPV(FCFE) = -30 + 3.5/(10\% - 3\%) = \$20 \text{ million}$$

This NPV matches the result we obtained with the WACC and APV methods.

---

| CONCEPT CHECK | 1. Describe the key steps in the flow to equity method for valuing a levered investment. |
|---|---|
| | 2. Why does the assumption that the firm maintains a constant debt-equity ratio simplify the flow-to-equity calculation? |

## 18.5 Project-Based Costs of Capital

Up to this point, we have assumed that both the risk and the leverage of the project under consideration matched those characteristics for the firm as a whole. This assumption allowed us, in turn, to assume that the cost of capital for a project matched the cost of capital of the firm.

In the real world, specific projects often differ from the average investment made by the firm. Consider General Electric Company, discussed in the introduction to this chapter. Projects in its health care division are likely to have different market risk than projects in air transportation equipment or at NBC Universal. Projects may also vary in the amount of leverage they will support—for example, acquisitions of real estate or capital equipment are often highly levered, whereas investments in intellectual property are not. In this section, we show how to calculate the cost of capital for the project's cash flows when a project's risk and leverage differ from those for the firm overall.

### Estimating the Unlevered Cost of Capital

We begin by reviewing the method introduced in Chapter 12 to calculate the unlevered cost of capital of a project with market risk that is very different from the rest of the firm. Suppose Avco launches a new plastics manufacturing division that faces different market

risks than its main packaging business. What unlevered cost of capital would be appropriate for this division?

We can estimate $r_U$ for the plastics division by looking at other single-division plastics firms that have similar business risks. For example, suppose two firms are comparable to the plastics division and have the following characteristics:

| Firm | Equity Cost of Capital | Debt Cost of Capital | Debt-to-Value Ratio, $D/(E+D)$ |
|------|------------------------|----------------------|--------------------------------|
| Comparable #1 | 12.0% | 6.0% | 40% |
| Comparable #2 | 10.7% | 5.5% | 25% |

Assuming that both firms maintain a target leverage ratio, we can estimate the unlevered cost of capital for each competitor by using the pretax WACC from Eq. 18.6:

$$\text{Competitor 1:} \quad r_U = 0.60 \times 12.0\% + 0.40 \times 6.0\% = 9.6\%$$

$$\text{Competitor 2:} \quad r_U = 0.75 \times 10.7\% + 0.25 \times 5.5\% = 9.4\%$$

Based on these comparable firms, we estimate an unlevered cost of capital for the plastics division of about 9.5%.[12] With this rate in hand, we can use the APV approach to calculate the value of Avco's investment in plastic manufacturing. To use either the WACC or FTE method, however, we need to estimate the project's equity cost of capital, which will depend on the incremental debt the firm will take on as a result of the project.

### Project Leverage and the Equity Cost of Capital

Suppose the firm will fund the project according to a target leverage ratio. This leverage ratio may differ from the firm's overall leverage ratio, as different divisions or types of investments may have different optimal debt capacities. We can rearrange terms in Eq. 18.6 to get the following expression for the equity cost of capital:[13]

$$r_E = r_U + \frac{D}{E}(r_U - r_D) \tag{18.10}$$

Equation 18.10 shows that the project's equity cost of capital depends on its unlevered cost of capital, $r_U$, and the debt-equity ratio of the incremental financing that will be put in place to support the project. For example, suppose that Avco plans to maintain an equal mix of debt and equity financing as it expands into plastics manufacturing, and it expects its borrowing cost to remain at 6%. Given its 9.5% unlevered cost of capital, the plastics division's equity cost of capital is

$$r_E = 9.5\% + \frac{0.50}{0.50}(9.5\% - 6\%) = 13.0\%$$

Once we have the equity cost of capital, we can use Eq. 18.1 to determine the division's WACC:

$$r_{wacc} = 0.50 \times 13.0\% + 0.50 \times 6.0\% \times (1 - 0.40) = 8.3\%$$

---

[12]If we are using the CAPM to estimate expected returns, this procedure is equivalent to unlevering the betas of comparable firms using Eq. 12.9:

$$\beta_U = [E/(E+D)]\,\beta_E + [D/(D+E)]\,\beta_D.$$

[13]We derived this same expression with perfect capital markets in Eq. 14.5.

Based on these estimates, Avco should use a WACC of 8.3% for the plastics division, compared to the WACC of 6.8% for the packaging division that we calculated in Section 18.2.

In fact, we can combine Eq. 18.1 and Eq. 18.10 to obtain a direct formula for the WACC when the firm maintains a target leverage ratio for the project. If $d$ is the project's debt-to-value ratio, $D/(E + D)$, then[14]

### Project-Based WACC Formula

$$r_{wacc} = r_U - d\tau_c r_D \qquad (18.11)$$

For example, in the case of Avco's plastics division:

$$r_{wacc} = 9.5\% - 0.50 \times 0.40 \times 6\% = 8.3\%$$

---

| EXAMPLE 18.5 | **Computing Divisional Costs of Capital** |
|---|---|

**Problem**

Hasco Corporation is a multinational provider of lumber and milling equipment. Currently, Hasco's equity cost of capital is 12.7%, and its borrowing cost is 6%. Hasco has traditionally maintained a 40% debt-to-value ratio. Hasco engineers have developed a GPS-based inventory control tracking system, which the company is considering developing commercially as a separate division. Management views the risk of this investment as similar to that of other technology companies' investments, with comparable firms typically having an unlevered cost of capital of 15%. Suppose Hasco plans to finance the new division using 10% debt financing (a constant debt-to-value ratio of 10%) with a borrowing rate of 6%, and its corporate tax rate is 35%. Estimate the unlevered, equity, and weighted average costs of capital for each division.

**Solution**

For the lumber and milling division, we can use the firm's current equity cost of capital $r_E = 12.7\%$ and debt-to-value ratio of 40%. Then

$$r_{wacc} = 0.60 \times 12.7\% + 0.40 \times 6\% \times (1 - 0.35) = 9.2\%$$
$$r_U = 0.60 \times 12.7\% + 0.40 \times 6\% = 10.0\%$$

For the technology division, we estimate its unlevered cost of capital using comparable firms: $r_U = 15\%$. Because Hasco's technology division will support 10% debt financing,

$$r_E = 15\% + \frac{0.10}{0.90}(15\% - 6\%) = 16\%$$
$$r_{wacc} = 15\% - 0.10 \times 0.35 \times 6\% = 14.8\%$$

Note that the cost of capital is quite different across the two divisions.

---

### Determining the Incremental Leverage of a Project

To determine the equity or weighted average cost of capital for a project, we need to know the amount of debt to associate with the project. For capital budgeting purposes, the project's financing is the *incremental* financing that results if the firm takes on the project. That is, it is the change in the firm's total debt (net of cash) with the project versus without the project.

---

[14]We derive Eq. 18.11 (which is equivalent to Eq. 12.13) by comparing the WACC and pretax WACC in Eq. 18.1 and Eq. 18.6. This formula was proposed by R. Harris and J. Pringle, "Risk Adjusted Discount Rates: Transition from the Average Risk Case," *Journal of Financial Research* 8 (1985): 237–244.

| COMMON MISTAKE | Re-Levering the WACC |
| --- | --- |

When computing the WACC using its definition in Eq. 18.1, always remember that the equity and debt costs of capital, $r_E$ and $r_D$, will change for different choices of the firm's leverage ratio. For example, consider a firm with a debt-to-value ratio of 25%, a debt cost of capital of 6.67%, an equity cost of capital of 12%, and a tax rate of 40%. From Eq. 18.1, its current WACC is

$$r_{wacc} = 0.75(12\%) + 0.25(6.67\%)(1 - 0.40)$$
$$= 10\%$$

Suppose the firm increases its debt-to-value ratio to 50%. It is tempting to conclude that its WACC will fall to

$$0.50(12\%) + 0.50(6.67\%)(1 - 0.40) = 8\%$$

In fact, when the firm increases leverage, its equity and debt cost of capital will rise. To compute the new WACC correctly, we must first determine the firm's unlevered cost of capital from Eq. 18.6:

$$r_U = 0.75(12\%) + 0.25(6.67\%) = 10.67\%$$

If the firm's debt cost of capital rises to 7.34% with the increase in leverage, then from Eq. 18.10 its equity cost of capital will rise as well:

$$r_E = 10.67\% + \frac{0.50}{0.50}(10.67\% - 7.34\%) = 14\%$$

Using Eq. 18.1, with the new equity and debt cost of capital, we can correctly compute the new WACC:

$$r_{wacc} = 0.50(14\%) + 0.50(7.34\%)(1 - 0.40)$$
$$= 9.2\%$$

We can also calculate the new WACC using Eq. 18.11:

$$r_{wacc} = 10.67\% - 0.50(0.40)(7.34\%) = 9.2\%$$

Note that if we fail to incorporate the effect of an increase in leverage on the firm's equity and debt costs of capital, we will overestimate the reduction in its WACC.

The incremental financing of a project need not correspond to the financing that is directly tied to the project. As an example, suppose a project involves buying a new warehouse, and the purchase of the warehouse is financed with a mortgage for 90% of its value. However, if the firm has an overall policy to maintain a 40% debt-to-value ratio, it will reduce debt elsewhere in the firm once the warehouse is purchased in an effort to maintain that ratio. In that case, the appropriate debt-to-value ratio to use when evaluating the warehouse project is 40%, not 90%.

Here are some important concepts to remember when determining the project's incremental financing.

**Cash Is Negative Debt.** A firm's leverage should be evaluated based on its debt net of any cash. Thus, if an investment will reduce the firm's cash holdings, it is equivalent to the firm adding leverage. Similarly, if the positive free cash flow from a project will increase the firm's cash holdings, then this growth in cash is equivalent to a reduction in the firm's leverage.

**A Fixed Equity Payout Policy Implies 100% Debt Financing.** Consider a firm whose dividend payouts and expenditures on share repurchases are set in advance and will not be affected by a project's free cash flow. In this case, the only source of financing is *debt*—any cash requirement of the project will be funded using the firm's cash or borrowing, and any cash that the project produces will be used to repay debt or increase the firm's cash. As a result, the incremental effect of the project on the firm's financing is to change the level of debt, so this project is 100% debt financed (that is, its debt-to-value ratio $d = 1$). If the firm's payout policy is fixed for the life of a project, the appropriate WACC for the project is $r_U - \tau_c r_D$. This case can be relevant for a highly levered firm that devotes its free cash flow to paying down its debt or for a firm that is hoarding cash.

**Optimal Leverage Depends on Project *and* Firm Characteristics.** Projects with safer cash flows can support more debt before they increase the risk of financial distress for the firm. But, as we discussed in Part 5, the likelihood of financial distress that a firm can bear depends on the magnitude of the distress, agency, and asymmetric information costs that it may face. These costs are not specific to a project, but rather depend on the characteristics of the entire firm. As a consequence, the optimal leverage for a project will depend on the characteristics of both the project and the firm.

**Safe Cash Flows Can Be 100% Debt Financed.** When an investment has risk-free cash flows, a firm can offset these cash flows 100% with debt and leave its overall risk unchanged. If it does so, the appropriate discount rate for safe cash flows is $r_D(1 - \tau_c)$.

---

**EXAMPLE 18.6**

**Debt Financing at Apple**

**Problem**

In mid-2012, Apple Inc. held nearly $28 billion in cash and securities and no debt. Consider a project with an unlevered cost of capital of $r_U = 12\%$. Suppose Apple's payout policy is completely fixed during the life of this project, so that the free cash flow from the project will affect only Apple's cash balance. If Apple earns 4% interest on its cash holdings and pays a 35% corporate tax rate, what cost of capital should Apple use to evaluate the project?

**Solution**

Because the inflows and outflows of the project change Apple's cash balance, the project is financed by 100% debt; that is, $d = 1$. The appropriate cost of capital for the project is

$$r_{wacc} = r_U - \tau_c r_D = 12\% - 0.35 \times 4\% = 10.6\%$$

Note that the project is effectively 100% debt financed, because even though Apple itself had no debt, if the cash had not been used to finance the project, Apple would have had to pay taxes on the interest the cash earned.

---

**CONCEPT CHECK**

1. How do we estimate a project's unlevered cost of capital when the project's risk is different from that of a firm?

2. What is the incremental debt associated with a project?

---

## 18.6 APV with Other Leverage Policies

To this point, we have assumed that the incremental debt of a project is set to maintain a constant debt-equity (or, equivalently, debt-to-value) ratio. While a constant debt-equity ratio is a convenient assumption that simplifies the analysis, not all firms adopt this leverage policy. In this section, we consider two alternative leverage policies: constant interest coverage and predetermined debt levels.

When we relax the assumption of a constant debt-equity ratio, the equity cost of capital and WACC for a project will change over time as the debt-equity ratio changes. As a result, the WACC and FTE method are difficult to implement (see Section 18.8 for further details). The APV method, however, is relatively straightforward to use and is therefore the preferred method with alternative leverage policies.

## Constant Interest Coverage Ratio

As discussed in Chapter 15, if a firm is using leverage to shield income from corporate taxes, then it will adjust its debt level so that its interest expenses grow with its earnings. In this case, it is natural to specify the firm's incremental interest payments as a target fraction, $k$, of the project's free cash flow:[15]

$$\text{Interest Paid in Year } t = k \times FCF_t \qquad (18.12)$$

When the firm keeps its interest payments to a target fraction of its FCF, we say it has a **constant interest coverage ratio**.

To implement the APV approach, we must compute the present value of the tax shield under this policy. Because the tax shield is proportional to the project's free cash flow, it has the same risk as the project's cash flow and so should be discounted at the same rate—that is, the unlevered cost of capital, $r_U$. But the present value of the project's free cash flow at rate $r_U$ is the unlevered value of the project. Thus,

$$PV(\text{Interest Tax Shield}) = PV(\tau_c k \times FCF) = \tau_c k \times PV(FCF)$$
$$= \tau_c k \times V^U \qquad (18.13)$$

That is, with a constant interest coverage policy, the value of the interest tax shield is proportional to the project's unlevered value. Using the APV method, the value of the project with leverage is given by the following formula:

**Levered Value with a Constant Interest Coverage Ratio**

$$V^L = V^U + PV(\text{Interest Tax Shield}) = V^U + \tau_c k \times V^U$$
$$= (1 + \tau_c k) V^U \qquad (18.14)$$

For example, we calculated the unlevered value of Avco's RFX project as $V^U = \$59.62$ million in Section 18.3. If Avco targets interest to be 20% of its free cash flow, the value with leverage is $V^L = [1 + 0.4 (20\%)] 59.62 = \$64.39$ million. (This result differs from the value of $61.25 million for the project that we calculated in Section 18.3, where we assumed a different leverage policy of a 50% debt-to-value ratio.)

Equation 18.14 provides a simple rule to determine an investment's levered value based on a leverage policy that may be appropriate for many firms.[16] Note also that if the investment's free cash flows are expected to grow at a constant rate, then the assumption of constant interest coverage and a constant debt-equity ratio are equivalent, as in the following example.

---

[15]It might be even better to specify interest as a fraction of taxable earnings. Typically, however, taxable earnings and free cash flows are roughly proportional, so the two specifications are very similar. Also, for Eq. 18.12 to hold exactly, the firm must adjust debt continuously throughout the year. We will relax this assumption in Section 18.8 to a setting in which the firm adjusts debt periodically based on its expected level of future free cash flow (see Example 18.10).

[16]J. Graham and C. Harvey report that a majority of firms target a credit rating when issuing debt ["The Theory and Practice of Corporate Finance: Evidence from the Field," *Journal of Financial Economics* 60 (2001)]. The interest coverage ratios are important determinants of credit ratings. Firms and rating agencies also consider the *book* debt-equity ratio, which often fluctuates more closely with a firm's cash flows, rather than with its market value. (For example, book equity increases when the firm invests in physical capital to expand, which generally results in higher cash flows.)

646          **Chapter 18** Capital Budgeting and Valuation with Leverage

| EXAMPLE 18.7 | **Valuing an Acquisition with Target Interest Coverage** |

**Problem**

Consider again Avco's acquisition from Examples 18.1 and 18.2. The acquisition will contribute $3.8 million in free cash flows the first year, growing by 3% per year thereafter. The acquisition cost of $80 million will be financed with $50 million in new debt initially. Compute the value of the acquisition using the APV method assuming Avco will maintain a constant interest coverage ratio for the acquisition.

**Solution**

Given Avco's unlevered cost of capital of $r_U = 8\%$, the acquisition has an unlevered value of

$$V^U = 3.8/(8\% - 3\%) = \$76 \text{ million}$$

With $50 million in new debt and a 6% interest rate, the interest expense the first year is $6\% \times 50 = \$3$ million, or $k = \text{Interest}/FCF = 3/3.8 = 78.95\%$. Because Avco will maintain this interest coverage, we can use Eq. 18.14 to compute the levered value:

$$V^L = (1 + \tau_c k)V^U = [1 + 0.4 \,(78.95\%)] \, 76 = \$100 \text{ million}$$

This value is identical to the value computed using the WACC method in Example 18.1, where we assumed a constant debt-equity ratio.

## Predetermined Debt Levels

Rather than set debt according to a target debt-equity ratio or interest coverage level, a firm may adjust its debt according to a fixed schedule that is known in advance. Suppose, for example, that Avco plans to borrow $30.62 million and then will reduce the debt on a fixed schedule to $20 million after one year, to $10 million after two years, and to zero after three years. The RFX project will have no other consequences for Avco's leverage, regardless of its success. How can we value an investment like this one when its future *debt levels*, rather than the *debt-equity ratio*, are known in advance?

Because the debt levels are known, we can immediately compute the interest payments and the corresponding interest tax shield, as shown in Table 18.8.

At what rate should we discount this tax shield to determine the present value? In Section 18.3, we used the project's unlevered cost of capital because the amount of debt—and, therefore, the tax shield—fluctuated with the value of the project itself and so had similar risk. However, with a fixed debt schedule, the amount of the debt will not fluctuate. In this case, the tax shield is less risky than the project, so it should be discounted at a lower rate.

| TABLE 18.8 SPREADSHEET | **Interest Payments and Interest Tax Shield Given a Fixed Debt Schedule for Avco's RFX Project** |

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| **Interest Tax Shield ($ million)** | | | | | | |
| 1 | **Debt Capacity, $D_t$ (fixed schedule)** | 30.62 | 20.00 | 10.00 | — | — |
| 2 | Interest Paid (at $r_D = 6\%$) | | 1.84 | 1.20 | 0.60 | — |
| 3 | **Interest Tax Shield (at $\tau_c = 40\%$)** | | 0.73 | 0.48 | 0.24 | — |

Indeed, the risk of the tax shield is similar to the risk of the debt payments. Therefore, we advise the following general rule:[17]

*When debt levels are set according to a fixed schedule, we can discount the predetermined interest tax shields using the debt cost of capital, $r_D$.*

In Avco's case, $r_D = 6\%$:

$$PV\,(\text{Interest Tax Shield}) = \frac{0.73}{1.06} + \frac{0.48}{1.06^2} + \frac{0.24}{1.06^3} = \$1.32 \text{ million}$$

We then combine the value of the tax shield with the unlevered value of the project (which we already computed in Section 18.3) to determine the APV:

$$V^L = V^U + PV\,(\text{Interest Tax Shield}) = 59.62 + 1.32 = \$60.94 \text{ million}$$

The value of the interest tax shield computed here, $1.32 million, differs from the value of $1.63 million we computed in Section 18.3 based on constant debt-equity ratio. Comparing the firm's debt in the two cases, we see that it is paid off more rapidly in Table 18.8 than in Table 18.4. Also, because the debt-equity ratio for the project changes over time in this example, the project's WACC also changes, making it difficult—though not impossible—to apply the WACC method to this case. We show how to do so, and verify that we get the same result, as part of the advanced topics in Section 18.8.

A particularly simple example of a predetermined debt level occurs when the firm has permanent fixed debt, maintaining the same level of debt forever. We discussed this debt policy in Section 15.2 and showed that if the firm maintains a fixed level of debt, $D$, the value of the tax shield is $\tau_c \times D$.[18] Hence, the value of the levered project in this case is

**Levered Value with Permanent Debt**

$$V^L = V^U + \tau_c \times D \tag{18.15}$$

*A Cautionary Note*: When debt levels are predetermined, the firm will not adjust its debt based on fluctuations to its cash flows or value according to a target leverage ratio, and the risk of the interest tax shield differs from the risk of the cash flows. As a result, *the firm's pretax WACC no longer coincides with its unlevered cost of capital, so Eq. 18.6, Eq. 18.10, and Eq. 18.11 do not apply.* (For example, if we compute the WACC using Eq. 18.11 and apply it in the case of permanent debt, the value we estimate will *not* be consistent with Eq. 18.15.) For the correct relationship between the firm's WACC, unlevered, and equity cost of capital, we need to use more general versions of these equations, which we provide in Eq. 18.20 and Eq. 18.21 in Section 18.8.

## A Comparison of Methods

We have introduced three methods for valuing levered investments: WACC, APV, and FTE. How do we decide which method to use in which circumstances?

When used consistently, each method produces the same valuation for the investment. Thus, the choice of method is largely a matter of convenience. As a general rule, the

---

[17]The risk of the tax shield is not literally equivalent to that of the debt payments, because it is based on only the interest portion of the payments and is subject to the risk of fluctuations in the firm's marginal tax rate. Nevertheless, this assumption is a reasonable approximation absent much more detailed information.

[18]Because the interest tax shield is $\tau_c r_D D$ in perpetuity, using the discount rate $r_D$ we get $PV(\text{Interest Tax Shield}) = \tau_c r_D D / r_D = \tau_c D$.

WACC method is the easiest to use when the firm will maintain a fixed debt-to-value ratio over the life of the investment. For alternative leverage policies, the APV method is usually the most straightforward approach. The FTE method is typically used only in complicated settings for which the values of other securities in the firm's capital structure or the interest tax shield are themselves difficult to determine.

**CONCEPT CHECK**

1. What condition must the firm meet to have a constant interest coverage policy?

2. What is the appropriate discount rate for tax shields when the debt schedule is fixed in advance?

## 18.7 Other Effects of Financing

The WACC, APV, and FTE methods determine the value of an investment incorporating the tax shields associated with leverage. However, as we discussed in Chapter 16, some other potential imperfections are associated with leverage. In this section, we investigate ways to adjust our valuation to account for imperfections such as issuance costs, security mispricing, and financial distress and agency costs.

### Issuance and Other Financing Costs

When a firm takes out a loan or raises capital by issuing securities, the banks that provide the loan or underwrite the sale of the securities charge fees. Table 18.9 lists the typical fees for common transactions. The fees associated with the financing of the project are a cost that should be included as part of the project's required investment, reducing the NPV of the project.

For example, suppose a project has a levered value of $20 million and requires an initial investment of $15 million. To finance the project, the firm will borrow $10 million and fund the remaining $5 million by reducing dividends. If the bank providing the loan charges fees (after any tax deductions) totaling $200,000, the project NPV is

$$NPV = V^L - (\text{Investment}) - (\text{After Tax Issuance Costs}) = 20 - 15 - 0.2 = \$4.8 \text{ million}$$

| TABLE 18.9 | Typical Issuance Costs for Different Securities, as a Percentage of Proceeds[19] |
|---|---|
| **Financing Type** | **Underwriting Fees** |
| Bank loans | < 2% |
| Corporate bonds | |
|     Investment grade | 1–2% |
|     Non-investment grade | 2–3% |
| Equity issues | |
|     Initial public offering | 8–9% |
|     Seasoned equity offering | 5–6% |

[19]Fees vary by transaction size; estimates here are based on typical legal, underwriting, and accounting fees for a $50 million transaction. For example, see I. Lee, S. Lochhead, J. Ritter, and Q. Zhao, "The Cost of Raising Capital," *Journal of Financial Research* 19 (1996): 59–74.

## Security Mispricing

With perfect capital markets, all securities are fairly priced and issuing securities is a zero-NPV transaction. However, as discussed in Chapter 16, sometimes management may believe that the securities they are issuing are priced at less than (or more than) their true value. If so, the NPV of the transaction, which is the difference between the actual money raised and the true value of the securities sold, should be included when evaluating the decision. For example, if the financing of the project involves an equity issue, and if management believes that the equity will sell at a price that is less than its true value, this mispricing is a cost of the project for the *existing* shareholders.[20] It can be deducted from the project NPV in addition to other issuance costs.

When a firm borrows funds, a mispricing scenario arises if the interest rate charged differs from the rate that is appropriate given the actual risk of the loan. For example, a firm may pay an interest rate that is too high if news that would improve its credit rating has not yet become public. With the WACC method, the cost of the higher interest rate will result in a higher weighted average cost of capital and a lower value for the investment. With the APV method, we must add to the value of the project the NPV of the loan cash flows when evaluated at the "correct" rate that corresponds to their actual risk.[21]

| EXAMPLE 18.8 | Valuing a Loan |
| --- | --- |

### Problem

Gap, Inc., is considering borrowing $100 million to fund an expansion of its stores. Given investors' uncertainty regarding its prospects, Gap will pay a 6% interest rate on this loan. The firm's management knows, however, that the actual risk of the loan is extremely low and that the appropriate rate on the loan is 5%. Suppose the loan is for five years, with all principal being repaid in the fifth year. If Gap's marginal corporate tax rate is 40%, what is the net effect of the loan on the value of the expansion?

### Solution

Shown below are the cash flows (in $ million) and interest tax shields of a fair loan, at a 5% interest rate, and of the above-market rate loan Gap will receive, with a 6% interest rate. For each loan, we compute both the NPV of the loan cash flows and the present value of the interest tax shields, using the correct rate $r_D = 5\%$.

| | Year | 0 | 1 | 2 | 3 | 4 | 5 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | Fair Loan | 100.00 | (5.00) | (5.00) | (5.00) | (5.00) | (105.00) |
| 2 | Interest Tax Shield | | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| 3 | At $r_D = 5\%$: | | | | | | |
| 4 | NPV(Loan Cash Flows) | 0.00 | | | | | |
| 5 | PV(Interest Tax Shield) | 8.66 | | | | | |
| 6 | Actual Loan | 100.00 | (6.00) | (6.00) | (6.00) | (6.00) | (106.00) |
| 7 | Interest Tax Shield | | 2.40 | 2.40 | 2.40 | 2.40 | 2.40 |
| 8 | At $r_D = 5\%$: | | | | | | |
| 9 | NPV(Loan Cash Flows) | (4.33) | | | | | |
| 10 | PV(Interest Tax Shield) | 10.39 | | | | | |

For the fair loan, note that the NPV of the loan cash flows is zero. Thus, the benefit of the loan on the project's value is the present value of the interest tax shield of $8.66 million. For

---

[20] New shareholders, of course, benefit from receiving the shares at a low price.
[21] We must also use the correct rate for $r_D$ when levering or unlevering the cost of capital.

the actual loan, the higher interest rate increases the value of the interest tax shield but implies a negative NPV for the loan cash flows. The combined effect of the loan on the project's value is

$$NPV \text{ (Loan Cash Flows)} + PV \text{ (Interest Tax Shield)} = -4.33 + 10.39 = \$6.06 \text{ million}$$

While leverage is still valuable due to the tax shields, paying the higher interest rate reduces its benefit to the firm by $8.66 - 6.06 = \$2.60$ million.

## Financial Distress and Agency Costs

As discussed in Chapter 16, one consequence of debt financing is the possibility of financial distress and agency costs. Because these costs affect the future free cash flows that will be generated by the project, they can be incorporated directly into the estimates of the project's expected free cash flows. When the debt level—and, therefore, the probability of financial distress—is high, the expected free cash flow will be reduced by the expected costs associated with financial distress and agency problems. (Conversely, as we also noted in Chapter 16, in some situations the threat of default can also prompt management to improve efficiency and thereby increase the firm's free cash flow.)

Financial distress and agency costs also have consequences for the cost of capital. For example, financial distress is more likely to occur when economic times are bad. As a result, the costs of distress cause the value of the firm to fall further in a market downturn. Financial distress costs therefore tend to increase the sensitivity of the firm's value to market risk, further raising the cost of capital for highly levered firms.[22]

How do we incorporate financial distress costs into the valuation methods described in this chapter? One approach is to adjust our free cash flow estimates to account for the costs, and increased risk, resulting from financial distress. An alternative method is to first value the project ignoring these costs, and then add the present value of the incremental cash flows associated with financial distress and agency problems separately. Because these costs tend to occur only when a firm is in (or near) default, valuing them is complicated and best done using the option valuation techniques introduced in Part 7. In some special

---

**GLOBAL FINANCIAL CRISIS**   **Government Loan Guarantees**

In times of crisis, firms may appeal to the federal government for financial assistance. Often, such aid comes in the form of subsidized loans or loan guarantees. For example, in the wake of the September 11, 2001 tragedy, the U.S. government made available $10 billion in loan guarantees to enable air carriers to obtain credit. U.S. Airways received the largest loan guarantee of $900 million, and America West Airlines received the second largest, for $429 million. Ultimately, these loans were repaid without taxpayer expense.

Loan guarantees were also an important part of the government's response to the 2008 financial crisis. The U.S. government has insured over $1 trillion in debt issued by financial institutions or assets held by the banks. The government also made over $500 billion in direct loans to distressed firms. Moreover, firms and banks viewed as "too big to fail" were thought to have implicit guarantees even if they did not have explicit ones.

These guarantees enabled firms to obtain loans at a lower interest rate than they otherwise would have received without government assistance. If these loans were fairly priced at market rates, then the loans obtained with the help of the federal guarantee had a positive NPV for the borrowers, and were equivalent to a direct cash subsidy. If, on the other hand, market rates for these loans were too high—due perhaps to asymmetric information or a lack of available lenders—then these loans and guarantees may have improved terms for borrowers at a lower cost to taxpayers than a direct cash bailout.

---

[22]In other words, distress costs tend to have a negative beta (they are higher in bad times). Because they are a *cost*, including them in the firm's free cash flows will raise the beta of the firm.

cases, however, we can use the values of the firm's existing securities to estimate the value of distress costs, as in the following example.

---

**EXAMPLE 18.9**

**Valuing Distress Costs**

**Problem**

Your firm has zero coupon debt with a face value of $100 million due in 5 years time, and no other debt outstanding. The current risk-free rate is 5%, but due to default risk the yield to maturity of the debt is 12%. You believe that in the event of default, 1/3 of the losses are attributable to bankruptcy and distress costs. (For example, if the debt holders lose $60 million and recover $40 million, $20 million of the loss in value would not have occurred if the firm had been unlevered and thus avoided bankruptcy.) Estimate the present value of the distress costs.

**Solution**

With a 12% yield, the current market value of the firm's debt is $100/1.12^5 = $56.74$ million. If the firm's debt were risk-free, its market value would be $100/1.05^5 = $78.35$ million. The difference in these values, $78.35 - $56.74 = $21.61$ million, is the present value of the debt holders' expected losses in default. If 1/3 of these losses is due to bankruptcy and distress costs, then the present value of these costs is $21.61/3 = $7.2$ million.

---

**CONCEPT CHECK**

1. How do we deal with issuance costs and security mispricing costs in our assessment of a project's value?

2. How would financial distress and agency costs affect a firm's use of leverage?

## 18.8  Advanced Topics in Capital Budgeting

In the previous sections, we have highlighted the most important methods for capital budgeting with leverage and demonstrated their application in common settings. In this section, we consider several more complicated scenarios and show how our tools can be extended to these cases. First, we consider leverage policies in which firms keep debt fixed in the short run, but adjust to a target leverage ratio in the long run. Second, we look at the relationship between a firm's equity and unlevered cost of capital for alternative leverage policies. Third, we implement the WACC and FTE methods when the firm's debt-equity ratio changes over time. We then conclude the section by incorporating the effects of personal taxes.

### Periodically Adjusted Debt

To this point, we have considered leverage policies in which debt is either adjusted continuously to a target leverage ratio[23] or set according to a fixed plan that will never change. As Figure 18.1 shows, most real-world firms do not, in fact, appear to adjust debt levels continuously to maintain a target leverage ratio at all times. (See Figure 15.6 in Chapter 15 for the behavior of aggregate leverage ratios over time.) Instead, most firms allow the debt-equity ratio of the firm to stray from the target and periodically adjust leverage to bring it back into line with the target. Next, we consider the effect of such a debt policy.

---

[23]While we have simplified our exposition earlier in the chapter by calculating debt and interest payments on an annual basis, the formulas we have used in the case of a target leverage ratio or interest coverage ratio are based on the assumption that the firm maintains the target leverage ratio or interest coverage during the year.



**FIGURE 18.1**        **Firms' Leverage Policies**

Of 392 CFOs surveyed by Professors J. Graham and C. Harvey, 81% reported having a target debt-equity ratio. However, only 10% of respondents viewed the target as set in stone. Most were willing to let the debt-equity ratio of the firm stray from the target and periodically adjust leverage to bring it back into line.

*Source:* J. R. Graham and C. Harvey, "The Theory and Practice of Corporate Finance: Evidence from the Field," *Journal of Financial Economics* 60 (2001): 187–243.

Suppose the firm adjusts its leverage every $s$ periods, as shown in Figure 18.2. Then the firm's interest tax shields up to date $s$ are predetermined, so they should be discounted at rate $r_D$. In contrast, interest tax shields that occur after date $s$ depend on future adjustments the firm will make to its debt, so they are risky. If the firm will adjust the debt according to a target debt-equity ratio or interest coverage level, then the future interest tax shields should be discounted at rate $r_D$ for the periods that they are known, but at rate $r_U$ for all earlier periods when they are still risky.

An important special ase is when the debt is adjusted annually. In that case, the expected interest expense on date $t$, $Int_t$, is known as of date $t - 1$. Therefore, we discount the interest tax shield at rate $r_D$ for one period, from date $t$ to $t - 1$ (because it will be known at that time), and then discount it from date $t - 1$ to 0 at rate $r_U$:

$$PV(\tau_c \times Int_t) = \frac{\tau_c \times Int_t}{(1 + r_U)^{t-1}(1 + r_D)} = \frac{\tau_c \times Int_t}{(1 + r_U)^t} \times \left(\frac{1 + r_U}{1 + r_D}\right) \qquad (18.16)$$

Equation 18.16 implies that we can value the tax shield by discounting it at rate $r_U$ as before, and then multiply the result by the factor $(1 + r_U)/(1 + r_D)$ to account for the fact that the tax shield is known one year in advance.

This same adjustment can be applied to other valuation methods as well. For example, when the debt is adjusted annually rather than continuously to a target debt-to-value ratio $d$, the project-based WACC formula of Eq. 18.11 becomes[24]

$$r_{wacc} = r_U - d\,\tau_c\,r_D\frac{1 + r_U}{1 + r_D} \qquad (18.17)$$

---

[24]An equivalent WACC formula was proposed by J. Miles and J. Ezzell, "The Weighted Average Cost of Capital, Perfect Capital Markets and Project Life: A Clarification," *Journal of Financial and Quantitative Analysis* 15 (1980): 719–730.



FIGURE 18.2        Discounting the Tax Shield with Periodic Adjustments

If the debt is reset to a target leverage ratio every $s$ periods, then interest tax shields within the first $s$ periods are known and should be discounted at rate $r_D$. Interest tax shields that occur after date $s$ are not yet known, so they should be discounted at rate $r_D$ for the periods when they will be known and at rate $r_U$ for earlier periods.

Similarly, when the firm sets debt annually based on its expected future free cash flow, the constant interest coverage model in Eq. 18.14 becomes

$$V^L = \left(1 + \tau_c k \frac{1 + r_U}{1 + r_D}\right) V^U \qquad (18.18)$$

Example 18.10 illustrates these methods in a constant growth setting.

## EXAMPLE 18.10      Annual Debt Ratio Targeting

**Problem**

Celmax Corporation expects free cash flows this year of $7.36 million and a future growth rate of 4% per year. The firm currently has $30 million in debt outstanding. This leverage will remain fixed during the year, but at the end of each year Celmax will increase or decrease its debt to maintain a constant debt-equity ratio. Celmax pays 5% interest on its debt, pays a corporate tax rate of 40%, and has an unlevered cost of capital of 12%. Estimate Celmax's value with this leverage policy.

**Solution**

Using the APV approach, the unlevered value is $V^U = 7.36/(12\% - 4\%) = \$92.0$ million. In the first year, Celmax will have an interest tax shield of $\tau_c\, r_D\, D = 0.40 \times 5\% \times \$30$ million $= \$0.6$ million. Because Celmax will adjust its debt after one year, the tax shields are expected to grow by 4% per year with the firm. The present value of the interest tax shield is therefore

$$PV\,(\text{Interest Tax Shield}) = \underbrace{\frac{0.6}{(12\% - 4\%)}}_{PV \text{ at rate } r_U} \times \underbrace{\left(\frac{1.12}{1.05}\right)}_{\substack{\text{Debt is set 1 year} \\ \text{in advance}}} = \$8.0 \text{ million}$$

Therefore, $V^L = V^U + PV\,(\text{Interest Tax Shield}) = 92.0 + 8.0 = \$100.0$ million.

We can also apply the WACC method. From Eq. 18.17, Celmax's WACC is

$$r_{wacc} = r_U - d\,\tau_c\,r_D\frac{1 + r_U}{1 + r_D} = 12\% - \frac{30}{100}(0.40)(5\%)\frac{1.12}{1.05}$$

$$= 11.36\%$$

Therefore, $V^L = 7.36/(11.36\% - 4\%) = \$100$ million.

Finally, the constant interest coverage model can be applied (in this setting with constant growth, a constant debt-equity ratio implies a constant interest coverage ratio). Given interest of $5\% \times \$30$ million $= \$1.50$ million this year, from Eq. 18.18,

$$V^L = \left(1 + \tau_c\,k\,\frac{1 + r_U}{1 + r_D}\right)V^U$$

$$= \left(1 + 0.40 \times \frac{1.50}{7.36} \times \frac{1.12}{1.05}\right)92.0 = \$100\text{ million}$$

## Leverage and the Cost of Capital

The relationship between leverage and the project's costs of capital in Eq. 18.6, Eq. 18.10, and Eq.18.11 relies on the assumption that the firm maintains a target leverage ratio. That relationship holds because in that case the interest tax shields have the same risk as the firm's cash flows. But when debt is set according to a fixed schedule for some period of time, the interest tax shields for the scheduled debt are known, relatively safe cash flows. These safe cash flows will reduce the effect of leverage on the risk of the firm's equity. To account for this effect, we should deduct the value of these "safe" tax shields from the debt—in the same way that we deduct cash—when evaluating a firm's leverage. That is, if $T^s$ is the present value of the interest tax shields from predetermined debt, the risk of a firm's equity will depend on its *debt net of the predetermined tax shields:*

$$D^s = D - T^s \tag{18.19}$$

We show in this chapter's appendix that Eq. 18.6 and Eq. 18.10 continue to apply with $D$ replaced by $D^s$, so that the more general relationship between the unlevered and equity costs of capital are related as follows:

### Leverage and the Cost of Capital with a Fixed Debt Schedule

$$r_U = \frac{E}{E + D^s}r_E + \frac{D^s}{E + D^s}r_D \quad \text{or, equivalently,} \quad r_E = r_U + \frac{D^s}{E}(r_U - r_D) \tag{18.20}$$

We can also combine Eq. 18.20 with the definition of the WACC in Eq. 18.1 and generalize the project-based WACC formula in Eq. 18.11:

### Project WACC with a Fixed Debt Schedule

$$r_{wacc} = r_U - d\,\tau_c\,[r_D + \phi(r_U - r_D)] \tag{18.21}$$

where $d = D/(D + E)$ is the debt-to-value ratio, and $\phi = T^s/(\tau_c D)$ is a measure of the permanence of the debt level, $D$. Here are three cases commonly used in practice, which

differ according to the frequency with which the debt is assumed to adjust to the growth of the investment:[25]

1.  Continuously adjusted debt: $T^s = 0$, $D^s = D$, and $\phi = 0$

2.  Annually adjusted debt: $T^s = \dfrac{\tau_c r_D D}{1 + r_D}$, $D^s = D\left(1 - \tau_c \dfrac{r_D}{1 + r_D}\right)$, and $\phi = \dfrac{r_D}{1 + r_D}$

3.  Permanent debt: $T^s = \tau_c D$, $D^s = D(1 - \tau_c)$, and $\phi = 1$

Finally, note that unless $d$ and $\phi$ remain constant over time, the WACC and equity cost of capital must be computed period by period.

---

**EXAMPLE 18.11**

**APV and WACC with Permanent Debt**

**Problem**

International Paper Company is considering the acquisition of additional forestland in the southeastern United States. The wood harvested from the land will generate free cash flows of $4.5 million per year, with an unlevered cost of capital of 7%. As a result of this acquisition, International Paper will permanently increase its debt by $30 million. If International Paper's tax rate is 35%, what is the value of this acquisition using the APV method? Verify this result using the WACC method.

**Solution**

Using the APV method, the unlevered value of the land is $V^U = FCF/r_U = 4.5/0.07 = \$64.29$ million. Because the debt is permanent, the value of the tax shield is $\tau_c D = 0.35(30) = 10.50$. Therefore, $V^L = 64.29 + 10.50 = \$74.79$ million.

To use the WACC method, we apply Eq. 18.21 with $\phi = T^s/(\tau_c D) = 1$ and $d = 30/74.79 = 40.1\%$. Therefore, the WACC for the investment is

$$r_{wacc} = r_U - d\,\tau_c r_U = 7\% - 0.401 \times 0.35 \times 7\% = 6.017\%$$

and $V^L = 4.5/0.06017 = \$74.79$ million.

---

## The WACC or FTE Method with Changing Leverage

When a firm does not maintain a constant debt-equity ratio for a project, the APV method is generally the most straightforward method to apply. The WACC and FTE methods become more difficult to use because when the proportion of debt financing changes, the project's equity cost of capital and WACC will not remain constant over time. With a bit of care, however, these methods can still be used (and, of course, will lead to the same result as the APV method).

As an example, let's see how we would apply the WACC or FTE methods to the RFX project when Avco has the fixed debt schedule we analyzed earlier using the APV method. The spreadsheet in Table 18.10 computes the equity cost of capital and WACC for the

---

[25]Case 1 reduces to the Harris-Pringle formula (see footnote 14), case 2 is the Miles-Ezzell formula (see footnote 24), and case 3 is equivalent to the Modigliani-Miller-Hamada formula with permanent debt. See F. Modigliani and M. Miller, "Corporate Income Taxes and the Cost of Capital: A Correction," *American Economic Review* 53 (1963): 433–443; and R. Hamada, "The Effect of a Firm's Capital Structure on the Systematic Risks of Common Stocks," *Journal of Finance* 27 (1972): 435–452.

| TABLE 18.10 SPREADSHEET | **Adjusted Present Value and Cost of Capital for Avco's RFX Project with a Fixed Debt Schedule** |
|---|---|

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| **Unlevered Value ($ million)** | | | | | | |
| 1   Free Cash Flow | | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2   Unlevered Value, $V^U$ (at $r_u = 8.0\%$) | | 59.62 | 46.39 | 32.10 | 16.67 | — |
| **Interest Tax Shield** | | | | | | |
| 3   Debt Schedule, $D_t$ | | 30.62 | 20.00 | 10.00 | — | — |
| 4   Interest Paid (at $r_d = 6\%$) | | — | 1.84 | 1.20 | 0.60 | — |
| 5   Interest Tax Shield (at $\tau_c = 40\%$) | | — | 0.73 | 0.48 | 0.24 | — |
| 6   Tax Shield Value, $T^s$ (at $r_D = 6.0\%$) | | 1.32 | 0.67 | 0.23 | — | — |
| **Adjusted Present Value** | | | | | | |
| 7   **Levered Value, $V^L = V^U + T^s$** | | 60.94 | 47.05 | 32.33 | 16.67 | — |
| **Effective Leverage and Cost of Capital** | | | | | | |
| 8   Equity, $E = V^L - D$ | | 30.32 | 27.05 | 22.33 | 16.67 | — |
| 9   Effective Debt, $D^s = D - T^s$ | | 29.30 | 19.33 | 9.77 | — | — |
| 10  Effective Debt-Equity Ratio, $D^s/E$ | | 0.966 | 0.715 | 0.438 | 0.000 | |
| 11  **Equity Cost of Capital, $r_E$** | | 9.93% | 9.43% | 8.88% | 8.00% | |
| 12  **WACC, $r_{wacc}$** | | 6.75% | 6.95% | 7.24% | 8.00% | |

RFX project each year given the fixed debt schedule shown in line 3. The project's value is computed using the APV method in line 7 as the total of the unlevered and tax shield values. With the project's equity value and net debt $D^s$ in hand, we can use Eq. 18.20 to calculate the project's equity cost of capital each year (line 11). Note that the equity cost of capital declines over time as the project's leverage ratio $D^s/E$ declines. By year 3, the debt is fully repaid and the equity cost of capital equals the unlevered cost of capital of 8%.

Given the project's equity cost of capital, we compute its WACC using Eq. 18.1 in line 12. For example, at the beginning of the project,

$$r_{wacc} = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D(1 - \tau_c)$$

$$= \frac{30.32}{60.94}9.93\% + \frac{30.62}{60.94}6\%(1 - 0.40) = 6.75\%$$

Note that as the leverage of the project falls, its WACC rises, until it eventually equals the unlevered cost of capital of 8% when the project debt is fully repaid at year 3.

Once we have computed the WACC or the equity cost of capital, we can value the project using the WACC or FTE method. Because the cost of capital changes over time, we must use a different discount rate each year when applying these methods. For example, using the WACC method, the levered value each year is computed as

$$V^L_t = \frac{FCF_{t+1} + V^L_{t+1}}{1 + r_{wacc}(t)} \tag{18.22}$$

where $r_{wacc}(t)$ is the project's WACC in year $t$. This calculation is shown in Table 18.11. Note that the levered value matches the result from the APV method (line 7 in Table 18.10). The same approach can be used when applying the FTE method.[26]

---

[26]You will notice, however, that we used the APV to compute the debt-equity ratio each period, which we needed to calculate $r_E$ and $r_{wacc}$. If we had not already solved for the APV, we would need to determine the project's value and WACC simultaneously, using the approach described in this chapter's appendix.

| TABLE 18.11 SPREADSHEET | WACC Method for Avco's RFX Project with a Fixed Debt Schedule | | | | |
|---|---|---|---|---|---|

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| **WACC Method ($ million)** | | | | | | |
| 1  Free Cash Flow | | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2  WACC, $r_{wacc}$ | | | 6.75% | 6.95% | 7.24% | 8.00% |
| 3  **Levered Value $V^L$ (at $r_{wacc}$)** | | 60.94 | 47.05 | 32.33 | 16.67 | — |

## Personal Taxes

As we discussed in Chapter 15, leverage has tax consequences for both investors and corporations. For individuals, interest income from debt is generally taxed more heavily than income from equity (capital gains and dividends). So how do personal taxes affect our valuation methods?

If investors are taxed on the income they receive from holding equity or debt, it will raise the return they require to hold those securities. That is, the equity and debt cost of capital in the market *already* reflects the effects of investor taxes. As a result, *the WACC method does not change in the presence of investor taxes*; we can continue to compute the WACC according to Eq. 18.1 and compute the levered value as in Section 18.2.

The APV approach, however, requires modification in the presence of investor taxes because it requires that we compute the unlevered cost of capital. This computation *is* affected by the presence of investor taxes. Let $\tau_e$ be the tax rate investors pay on equity income (dividends) and $\tau_i$ be the tax rate investors pay on interest income. Then, given an expected return on debt $r_D$, define $r_D^*$ as the expected return on equity income that would give investors the same after-tax return: $r_D^*(1 - \tau_e) = r_D(1 - \tau_i)$. So

$$r_D^* \equiv r_D \frac{(1 - \tau_i)}{(1 - \tau_e)} \tag{18.23}$$

Because the unlevered cost of capital is for a hypothetical firm that is all equity, investors' tax rates on income for such a firm are the equity rates, so we must use the rate $r_D^*$ when computing the unlevered cost of capital. Therefore, Eq. 18.20 becomes

### Unlevered Cost of Capital with Personal Taxes

$$r_U = \frac{E}{E + D^s} r_E + \frac{D^s}{E + D^s} r_D^* \tag{18.24}$$

Next, we must compute the interest tax shield using the effective tax advantage of debt, $\tau^*$, in place of $\tau_c$. The effective tax rate $\tau^*$ incorporates the investors' tax rate on equity income, $\tau_e$, and on interest income, $\tau_i$, and was defined in Chapter 15 as follows:

$$\tau^* = 1 - \frac{(1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} \tag{18.25}$$

Then, we calculate the interest tax shield using tax rate $\tau^*$ and interest rate $r_D^*$:

$$\text{Interest Tax Shield in Year } t = \tau^* \times r_D^* \times D_{t-1} \tag{18.26}$$

Finally we discount the interest tax shields at rate $r_U$ if the firm maintains a target leverage ratio or at rate $r_D^*$ if the debt is set according to a predetermined schedule.[27]

---

**EXAMPLE 18.12**

### Using the APV Method with Personal Taxes

**Problem**

Apex Corporation has an equity cost of capital of 14.4% and a debt cost of capital of 6%, and the firm maintains a debt-equity ratio of 1. Apex is considering an expansion that will contribute $4 million in free cash flows the first year, growing by 4% per year thereafter. The expansion will cost $60 million and will be financed with $40 million in new debt initially with a constant debt-equity ratio maintained thereafter. Apex's corporate tax rate is 40%; the tax rate on interest income is 40%; and the tax rate on equity income is 20%. Compute the value of the expansion using the APV method.

**Solution**

First, we compute the value without leverage. From Eq. 18.23, the debt cost of capital of 6% is equivalent to an equity rate of

$$r_D^* = r_D \frac{1 - \tau_i}{1 - \tau_e} = 6\% \times \frac{1 - 0.40}{1 - 0.20} = 4.5\%$$

Because Apex maintains a constant debt-equity ratio, $D^s = D$ and Apex's unlevered cost of capital is, using Eq. 18.24,

$$r_U = \frac{E}{E + D^s} r_E + \frac{D^s}{E + D^s} r_D^* = 0.50 \times 14.4\% + 0.50 \times 4.5\% = 9.45\%$$

Therefore, $V^U = 4/(9.45\% - 4\%) = \$73.39$ million.

From Eq. 18.25, the effective tax advantage of debt is

$$\tau^* = 1 - \frac{(1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} = 1 - \frac{(1 - 0.40)(1 - 0.20)}{(1 - 0.40)} = 20\%$$

Apex will add new debt of $40 million initially, so from Eq. 18.26 the interest tax shield is $20\% \times 4.5\% \times 40 = \$0.36$ million the first year (note that we use $r_D^*$ here). With a growth rate of 4%, the present value of the interest tax shield is

$$PV \text{ (Interest Tax Shield)} = 0.36/(9.45\% - 4\%) = \$6.61 \text{ million}$$

Therefore, the value of the expansion with leverage is given by the APV:

$$V^L = V^U + PV \text{ (Interest Tax Shield)} = 73.39 + 6.61 = \$80 \text{ million}$$

Given the cost of $60 million, the expansion has an NPV of $20 million.

Let's check this result using the WACC method. Note that the expansion has the same debt-to-value ratio of $40/80 = 50\%$ as the firm overall. Thus, its WACC is equal to the firm's WACC:

$$r_{wacc} = \frac{E}{E + D} r_E + \frac{D}{E + D} r_D (1 - \tau_c)$$

$$= 0.50 \times 14.4\% + 0.50 \times 6\% \times (1 - 0.40) = 9\%$$

Therefore, $V^L = 4/(9\% - 4\%) = \$80$ million, as before.

---

[27] If the debt is permanent, for example, the value of the tax shield is $\tau^* r_D^* D / r_D^* = \tau^* D$. as shown in Chapter 15.

As Example 18.12 illustrates, the WACC method is much simpler to apply than the APV method in the case with investor taxes. More significantly, the WACC approach does not require knowledge of investors' tax rates. This fact is important because in practice, estimating the marginal tax rate of the investor can be very difficult.

However, if the investment's leverage or risk does not match the firm's, then investor tax rates are required even with the WACC method, as we must unlever and/or re-lever the firm's cost of capital using Eq. 18.24. When the investor's tax rate on interest income exceeds that on equity income, an increase in leverage will lead to a smaller reduction in the WACC (see Problem 26).

**CONCEPT CHECK**

1. When a firm has pre-determined tax shields, how do we measure its net debt when calculating its unlevered cost of capital?

2. If the firm's debt-equity ratio changes over time, can the WACC method still be applied?

# MyFinanceLab

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

## 18.1 Overview of Key Concepts

■ The three main methods of capital budgeting are weighted average cost of capital (WACC), adjusted present value (APV), and flow-to-equity (FTE).

## 18.2 The Weighted Average Cost of Capital

■ The key steps in the WACC valuation method are as follows:
  ■ Determine the unlevered free cash flows of the investment.
  ■ Compute the weighted average cost of capital:

$$r_{wacc} = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D(1 - \tau_c) \qquad (18.1)$$

  ■ Compute the value with leverage, $V^L$, by discounting the free cash flows of the investment using the WACC.

## 18.3 The Adjusted Present Value Method

■ To determine the value of a levered investment using the APV method, proceed as follows:
  ■ Determine the investment's value without leverage, $V^U$, by discounting its free cash flows at the unlevered cost of capital, $r_U$.
  ■ Determine the present value of the interest tax shield.
    a. Given debt $D_t$ on date $t$, the tax shield on date $t + 1$ is $\tau_c r_D D_t$.
    b. If the debt level varies with the investment's value or free cash flow, use discount rate $r_U$. (If the debt is predetermined, discount the tax shield at rate $r_D$. See Section 18.6.)
  ■ Add the unlevered value $V^U$ to the present value of the interest tax shield to determine the value of the investment with leverage, $V^L$.

## 18.4 The Flow-to-Equity Method

■ The key steps in the flow-to-equity method for valuing a levered investment are as follows:
  ■ Determine the free cash flow to equity of the investment:

$$FCFE = FCF - (1 - \tau_c) \times (\text{Interest Payments}) + (\text{Net Borrowing}) \qquad (18.9)$$

  ■ Compute the contribution to equity value, $E$, by discounting the free cash flow to equity using the equity cost of capital.

### 18.5 Project-Based Costs of Capital

- If a project's risk is different from that of the firm as a whole, we must estimate its cost of capital separately from the firm's cost of capital. We estimate the project's unlevered cost of capital by looking at the unlevered cost of capital for other firms with similar market risk as the project.
- With a target leverage ratio, the unlevered, equity, and weighted average costs of capital are related as follows:

$$r_U = \frac{E}{E+D} r_E + \frac{D}{E+D} r_D = \text{Pretax WACC} \tag{18.6}$$

$$r_E = r_U + \frac{D}{E}(r_U - r_D) \tag{18.10}$$

$$r_{wacc} = r_U - d\,\tau_c\,r_D, \tag{18.11}$$

where $d = D/(D + E)$ is the project's debt-to-value ratio.

- When assessing the leverage associated with a project, we must consider its incremental impact on the debt, net of cash balances, of the firm overall and not just the specific financing used for that investment.

### 18.6 APV with Other Leverage Policies

- A firm has a constant interest coverage policy if it sets debt to maintain its interest expenses as a fraction, $k$, of free cash flow. The levered value of a project with such a leverage policy is $V^L = (1 + \tau_c k) V^U$.
- When debt levels are set according to a fixed schedule:
  - We can discount the predetermined interest tax shields using the debt cost of capital, $r_D$.
  - The unlevered cost of capital can no longer be computed as the pretax WACC (see Section 18.8).
- If a firm chooses to keep the level of debt at a constant level, $D$, permanently, then the levered value of a project with such a leverage policy is $V^L = V^U + \tau_c \times D$.
- In general, the WACC method is the easiest to use when a firm has a target debt-equity ratio that it plans to maintain over the life of the investment. For other leverage policies, the APV method is usually the most straightforward method.

### 18.7 Other Effects of Financing

- Issuance costs and any costs or gains from mispricing of issued securities should be included in the assessment of a project's value.
- Financial distress costs are likely to (1) lower the expected free cash flow of a project and (2) raise the firm's cost of capital. Taking these effects into account, together with other agency and asymmetric information costs, may limit a firm's use of leverage.

### 18.8 Advanced Topics in Capital Budgeting

- If a firm adjusts its debt annually to a target leverage ratio, the value of the interest tax shield is enhanced by the factor $(1 + r_U)/(1 + r_D)$.
- If the firm does not adjust leverage continuously, so that some of the tax shields are predetermined, the unlevered, equity, and weighted average costs of capital are related as follows:

$$r_U = \frac{E}{E+D^s} r_E + \frac{D^s}{E+D^s} r_D \;\; \text{or, equivalently,} \;\; r_E = r_U + \frac{D^s}{E}(r_U - r_D) \tag{18.20}$$

$$r_{wacc} = r_U - d\,\tau_c\,[r_D + \phi(r_U - r_D)] \tag{18.21}$$

where $d = D/(D + E)$ is the debt-to-value ratio of the project, $D^s = D - T^s$, and $T^s$ is the value of predetermined interest tax shields, and $\phi = T^s/(\tau_c D)$ reflects the permanence of the debt level.

■ The WACC method does not need to be modified to account for investor taxes. For the APV method, we use the interest rate

$$r_D^* \equiv r_D \frac{(1 - \tau_i)}{(1 - \tau_e)} \qquad (18.23)$$

in place of $r_D$ and we replace $\tau_c$ with the effective tax rate:

$$\tau^* = 1 - \frac{(1 - \tau_c)(1 - \tau_e)}{(1 - \tau_i)} \qquad (18.25)$$

■ If the investment's leverage or risk does not match the firm's, then investor tax rates are required even with the WACC method, as we must unlever and/or re-lever the firm's cost of capital using

$$r_U = \frac{E}{E + D^s} r_E + \frac{D^s}{E + D^s} r_D^* \qquad (18.24)$$

## Key Terms

adjusted present value (APV) *p. 633*
constant interest coverage ratio *p. 645*
debt capacity *p. 632*

flow-to-equity (FTE) *p. 637*
free cash flow to equity (FCFE) *p. 637*
target leverage ratio *p. 633*

## Further Reading

For a further treatment of the valuation with leverage, see: T. Copeland, T. Koller, and J. Murrin, *Valuation: Measuring and Managing the Value of Companies* (McGraw-Hill, 2000); and S. Pratt, R. Reilly, and R. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (McGraw-Hill, 2000).

For a more detailed treatment of the issues discussed in this chapter, see: E. Arzac and L. Glosten, "A Reconsideration of Tax Shield Valuation," *European Financial Management* 11 (2005): 453–461; R. Harris and J. Pringle, "Risk-Adjusted Discount Rates—Extensions from the Average-Risk Case," *Journal of Financial Research* 8 (1985): 237–244; I. Inselbag and H. Kaufold, "Two DCF Approaches in Valuing Companies Under Alternative Financing Strategies (and How to Choose Between Them)," *Journal of Applied Corporate Finance* 10 (1997): 114–122; T. Luehrman, "Using APV: A Better Tool for Valuing Operations," *Harvard Business Review* 75 (1997): 145–154; J. Miles and J. Ezzell, "The Weighted Average Cost of Capital, Perfect Capital Markets, and Project Life: A Clarification," *Journal of Financial and Quantitative Analysis* 15 (1980): 719–730; J. Miles and J. Ezzell, "Reformulation Tax Shield Valuation: A Note," *Journal of Finance* 40 (1985): 1485–1492; R. Ruback, "Capital Cash Flows: A Simple Approach to Valuing Risky Cash Flows," *Financial Management* 31 (2002): 85–104; and R. Taggart, "Consistent Valuation and Cost of Capital Expressions with Corporate and Personal Taxes," *Financial Management* 20 (1991): 8–20.

## Problems

*All problems are available in* MyFinanceLab. *An asterisk (*) indicates problems with a higher level of difficulty.*

### Overview of Key Concepts

1. Explain whether each of the following projects is likely to have risk similar to the average risk of the firm.
   a. The Clorox Company considers launching a new version of Armor All designed to clean and protect notebook computers.
   b. Google, Inc., plans to purchase real estate to expand its headquarters.

c. Target Corporation decides to expand the number of stores it has in the southeastern United States.

d. GE decides to open a new Universal Studios theme park in China.

2. Suppose Caterpillar, Inc., has 665 million shares outstanding with a share price of $74.77, and $25 billion in debt. If in three years, Caterpillar has 700 million shares outstanding trading for $83 per share, how much debt will Caterpillar have if it maintains a constant debt-equity ratio?

3. In 2012, Intel Corporation had a market capitalization of $121 billion, debt of $7.2 billion, cash of $14.7 billion, and EBIT of nearly $18 billion. If Intel were to increase its debt by $1 billion and use the cash for a share repurchase, which market imperfections would be most relevant for understanding the consequence for Intel's value? Why?

## The Weighted Average Cost of Capital Method

4. Suppose Goodyear Tire and Rubber Company is considering divesting one of its manufacturing plants. The plant is expected to generate free cash flows of $1.5 million per year, growing at a rate of 2.5% per year. Goodyear has an equity cost of capital of 8.5%, a debt cost of capital of 7%, a marginal corporate tax rate of 35%, and a debt-equity ratio of 2.6. If the plant has average risk and Goodyear plans to maintain a constant debt-equity ratio, what after-tax amount must it receive for the plant for the divestiture to be profitable?

5. Suppose Alcatel-Lucent has an equity cost of capital of 10%, market capitalization of $10.8 billion, and an enterprise value of $14.4 billion. Suppose Alcatel-Lucent's debt cost of capital is 6.1% and its marginal tax rate is 35%.

a. What is Alcatel-Lucent's WACC?

b. If Alcatel-Lucent maintains a constant debt-equity ratio, what is the value of a project with average risk and the following expected free cash flows?

| Year | 0 | 1 | 2 | 3 |
|------|------|-----|-----|----|
| FCF | −100 | 50 | 100 | 70 |

c. If Alcatel-Lucent maintains its debt-equity ratio, what is the debt capacity of the project in part b?

6. Acort Industries has 10 million shares outstanding and a current share price of $40 per share. It also has long-term debt outstanding. This debt is risk free, is four years away from maturity, has annual coupons with a coupon rate of 10%, and has a $100 million face value. The first of the remaining coupon payments will be due in exactly one year. The riskless interest rates for all maturities are constant at 6%. Acort has EBIT of $106 million, which is expected to remain constant each year. New capital expenditures are expected to equal depreciation and equal $13 million per year, while no changes to net working capital are expected in the future. The corporate tax rate is 40%, and Acort is expected to keep its debt-equity ratio constant in the future (by either issuing additional new debt or buying back some debt as time goes on).

a. Based on this information, estimate Acort's WACC.

b. What is Acort's equity cost of capital?

## The Adjusted Present Value Method

7. Suppose Goodyear Tire and Rubber Company has an equity cost of capital of 8.5%, a debt cost of capital of 7%, a marginal corporate tax rate of 35%, and a debt-equity ratio of 2.6. Suppose Goodyear maintains a constant debt-equity ratio.

a. What is Goodyear's WACC?

b. What is Goodyear's unlevered cost of capital?

c. Explain, intuitively, why Goodyear's unlevered cost of capital is less than its equity cost of capital and higher than its WACC.

8. You are a consultant who was hired to evaluate a new product line for Markum Enterprises. The upfront investment required to launch the product line is $10 million. The product will generate free cash flow of $750,000 the first year, and this free cash flow is expected to grow at a rate of 4% per year. Markum has an equity cost of capital of 11.3%, a debt cost of capital of 5%, and a tax rate of 35%. Markum maintains a debt-equity ratio of 0.40.
   a. What is the NPV of the new product line (including any tax shields from leverage)?
   b. How much debt will Markum initially take on as a result of launching this product line?
   c. How much of the product line's value is attributable to the present value of interest tax shields?

9. Consider Alcatel-Lucent's project in Problem 5.
   a. What is Alcatel-Lucent's unlevered cost of capital?
   b. What is the unlevered value of the project?
   c. What are the interest tax shields from the project? What is their present value?
   d. Show that the APV of Alcatel-Lucent's project matches the value computed using the WACC method.

### The Flow-to-Equity Method

10. Consider Alcatel-Lucent's project in Problem 5.
    a. What is the free cash flow to equity for this project?
    b. What is its NPV computed using the FTE method? How does it compare with the NPV based on the WACC method?

11. In year 1, AMC will earn $2000 before interest and taxes. The market expects these earnings to grow at a rate of 3% per year. The firm will make no net investments (i.e., capital expenditures will equal depreciation) or changes to net working capital. Assume that the corporate tax rate equals 40%. Right now, the firm has $5000 in risk-free debt. It plans to keep a constant ratio of debt to equity every year, so that on average the debt will also grow by 3% per year. Suppose the risk-free rate equals 5%, and the expected return on the market equals 11%. The asset beta for this industry is 1.11.
    a. If AMC were an all-equity (unlevered) firm, what would its market value be?
    b. Assuming the debt is fairly priced, what is the amount of interest AMC will pay next year? If AMC's debt is expected to grow by 3% per year, at what rate are its interest payments expected to grow?
    c. Even though AMC's debt is *riskless* (the firm will not default), the future growth of AMC's debt is uncertain, so the exact amount of the future interest payments is risky. Assuming the future interest payments have the same beta as AMC's assets, what is the present value of AMC's interest tax shield?
    d. Using the APV method, what is AMC's total market value, $V^L$? What is the market value of AMC's equity?
    e. What is AMC's WACC? (*Hint*: Work backward from the FCF and $V^L$.)
    f. Using the WACC method, what is the expected return for AMC equity?
    g. Show that the following holds for AMC: $\beta_A = \dfrac{E}{D+E}\beta_E + \dfrac{D}{D+E}\beta_D$.
    h. Assuming that the proceeds from any increases in debt are paid out to equity holders, what cash flows do the equity holders expect to receive in one year? At what rate are those cash flows expected to grow? Use that information plus your answer to part f to derive the market value of equity using the FTE method. How does that compare to your answer in part d?

### Project-Based Costs of Capital

12. Prokter and Gramble (PKGR) has historically maintained a debt-equity ratio of approximately 0.20. Its current stock price is $50 per share, with 2.5 billion shares outstanding. The firm enjoys very stable demand for its products, and consequently it has a low equity beta of 0.50

and can borrow at 4.20%, just 20 basis points over the risk-free rate of 4%. The expected return of the market is 10%, and PKGR's tax rate is 35%.

a. This year, PKGR is expected to have free cash flows of $6.0 billion. What constant expected growth rate of free cash flow is consistent with its current stock price?

b. PKGR believes it can increase debt without any serious risk of distress or other costs. With a higher debt-equity ratio of 0.50, it believes its borrowing costs will rise only slightly to 4.50%. If PKGR announces that it will raise its debt-equity ratio to 0.5 through a leveraged recap, determine the increase in the stock price that would result from the anticipated tax savings.

**13.** Amarindo, Inc. (AMR), is a newly public firm with 10 million shares outstanding. You are doing a valuation analysis of AMR. You estimate its free cash flow in the coming year to be $15 million, and you expect the firm's free cash flows to grow by 4% per year in subsequent years. Because the firm has only been listed on the stock exchange for a short time, you do not have an accurate assessment of AMR's equity beta. However, you do have beta data for UAL, another firm in the same industry:

| | Equity Beta | Debt Beta | Debt-Equity Ratio |
|---|---|---|---|
| UAL | 1.5 | 0.30 | 1 |

AMR has a much lower debt-equity ratio of 0.30, which is expected to remain stable, and its debt is risk free. AMR's corporate tax rate is 40%, the risk-free rate is 5%, and the expected return on the market portfolio is 11%.

a. Estimate AMR's equity cost of capital.

b. Estimate AMR's share price.

 **14.** Remex (RMX) currently has no debt in its capital structure. The beta of its equity is 1.50. For each year into the indefinite future, Remex's free cash flow is expected to equal $25 million. Remex is considering changing its capital structure by issuing debt and using the proceeds to buy back stock. It will do so in such a way that it will have a 30% debt-equity ratio after the change, and it will maintain this debt-equity ratio forever. Assume that Remex's debt cost of capital will be 6.5%. Remex faces a corporate tax rate of 35%. Except for the corporate tax rate of 35%, there are no market imperfections. Assume that the CAPM holds, the risk-free rate of interest is 5%, and the expected return on the market is 11%.

a. Using the information provided, complete the following table:

| | Debt-Equity Ratio | Debt Cost of Capital | Equity Cost of Capital | Weighted Average Cost of Capital |
|---|---|---|---|---|
| Before change in capital structure | 0 | N/A | | |
| After change in capital structure | 0.30 | 6.5% | | |

b. Using the information provided and your calculations in part a, determine the value of the tax shield acquired by Remex if it changes its capital structure in the way it is considering.

### APV with Other Leverage Policies

 **15.** You are evaluating a project that requires an investment of $90 today and provides a single cash flow of $115 for sure one year from now. You decide to use 100% debt financing, that is, you will borrow $90. The risk-free rate is 5% and the tax rate is 40%. Assume that the investment is fully depreciated at the end of the year, so without leverage you would owe taxes on the difference between the project cash flow and the investment, that is, $25.

a. Calculate the NPV of this investment opportunity using the APV method.
b. Using your answer to part a, calculate the WACC of the project.
c. Verify that you get the same answer using the WACC method to calculate NPV.
d. Finally, show that flow-to-equity also correctly gives the NPV of this investment opportunity.

16. Tybo Corporation adjusts its debt so that its interest expenses are 20% of its free cash flow. Tybo is considering an expansion that will generate free cash flows of $2.5 million this year and is expected to grow at a rate of 4% per year from then on. Suppose Tybo's marginal corporate tax rate is 40%.
a. If the unlevered cost of capital for this expansion is 10%, what is its unlevered value?
b. What is the levered value of the expansion?
c. If Tybo pays 5% interest on its debt, what amount of debt will it take on initially for the expansion?
d. What is the debt-to-value ratio for this expansion? What is its WACC?
e. What is the levered value of the expansion using the WACC method?

17. You are on your way to an important budget meeting. In the elevator, you review the project valuation analysis you had your summer associate prepare for one of the projects to be discussed:

|  | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| EBIT |  | 10.0 | 10.0 | 10.0 | 10.0 |
| Interest (5%) |  | −4.0 | −4.0 | −3.0 | −2.0 |
| Earnings Before Taxes |  | 6.0 | 6.0 | 7.0 | 8.0 |
| Taxes |  | −2.4 | −2.4 | −2.8 | −3.2 |
| Depreciation |  | 25.0 | 25.0 | 25.0 | 25.0 |
| Cap Ex | −100.0 |  |  |  |  |
| Additions to NWC | −20.0 |  |  |  | 20.0 |
| Net New Debt | 80.0 | 0.0 | −20.0 | −20.0 | −40.0 |
| FCFE | −40.0 | 28.6 | 8.6 | 9.2 | 9.8 |
| NPV at 11% Equity Cost of Capital | 5.9 |  |  |  |  |

Looking over the spreadsheet, you realize that while all of the cash flow estimates are correct, your associate used the flow-to-equity valuation method and discounted the cash flows using the *company's* equity cost of capital of 11%. However, the project's incremental leverage is very different from the company's historical debt-equity ratio of 0.20: For this project, the company will instead borrow $80 million upfront and repay $20 million in year 2, $20 million in year 3, and $40 million in year 4. Thus, the *project's* equity cost of capital is likely to be higher than the firm's, not constant over time—invalidating your associate's calculation.

Clearly, the FTE approach is not the best way to analyze this project. Fortunately, you have your calculator with you, and with any luck you can use a better method before the meeting starts.
a. What is the present value of the interest tax shield associated with this project?
b. What are the free cash flows of the project?
c. What is the best estimate of the project's value from the information given?

18. Your firm is considering building a $600 million plant to manufacture HDTV circuitry. You expect operating profits (EBITDA) of $145 million per year for the next 10 years. The plant will be depreciated on a straight-line basis over 10 years (assuming no salvage value for tax purposes). After 10 years, the plant will have a salvage value of $300 million (which, since it will

be fully depreciated, is then taxable). The project requires $50 million in working capital at the start, which will be recovered in year 10 when the project shuts down. The corporate tax rate is 35%. All cash flows occur at the end of the year.

a.  If the risk-free rate is 5%, the expected return of the market is 11%, and the asset beta for the consumer electronics industry is 1.67, what is the NPV of the project?

b.  Suppose that you can finance $400 million of the cost of the plant using 10-year, 9% coupon bonds sold at par. This amount is incremental new debt associated specifically with this project and will not alter other aspects of the firm's capital structure. What is the value of the project, including the tax shield of the debt?

### Other Effects of Financing

 **19.** DFS Corporation is currently an all-equity firm, with assets with a market value of $100 million and 4 million shares outstanding. DFS is considering a leveraged recapitalization to boost its share price. The firm plans to raise a fixed amount of permanent debt (i.e., the outstanding principal will remain constant) and use the proceeds to repurchase shares. DFS pays a 35% corporate tax rate, so one motivation for taking on the debt is to reduce the firm's tax liability. However, the upfront investment banking fees associated with the recapitalization will be 5% of the amount of debt raised. Adding leverage will also create the possibility of future financial distress or agency costs; shown below are DFS's estimates for different levels of debt:

| Debt amount ($ million): | 0 | 10 | 20 | 30 | 40 | 50 |
|---|---|---|---|---|---|---|
| Present value of expected distress and agency costs ($ million): | 0.0 | −0.3 | −1.8 | −4.3 | −7.5 | −11.3 |

a.  Based on this information, which level of debt is the best choice for DFS?

b.  Estimate the stock price once this transaction is announced.

**20.** Your firm is considering a $150 million investment to launch a new product line. The project is expected to generate a free cash flow of $20 million per year, and its unlevered cost of capital is 10%. To fund the investment, your firm will take on $100 million in permanent debt.

a.  Suppose the marginal corporate tax rate is 35%. Ignoring issuance costs, what is the NPV of the investment?

b.  Suppose your firm will pay a 2% underwriting fee when issuing the debt. It will raise the remaining $50 million by issuing equity. In addition to the 5% underwriting fee for the equity issue, you believe that your firm's current share price of $40 is $5 per share less than its true value. What is the NPV of the investment including any tax benefits of leverage? (Assume all fees are on an after-tax basis.)

**21.** Consider Avco's RFX project from Section 18.3. Suppose that Avco is receiving government loan guarantees that allow it to borrow at the 6% rate. Without these guarantees, Avco would pay 6.5% on its debt.

a.  What is Avco's unlevered cost of capital given its true debt cost of capital of 6.5%?

b.  What is the unlevered value of the RFX project in this case? What is the present value of the interest tax shield?

c.  What is the NPV of the loan guarantees? (*Hint*: Because the actual loan amounts will fluctuate with the value of the project, discount the expected interest savings at the unlevered cost of capital.)

d.  What is the levered value of the RFX project, including the interest tax shield and the NPV of the loan guarantees?

### Advanced Topics in Capital Budgeting

**22.** Arden Corporation is considering an investment in a new project with an unlevered cost of capital of 9%. Arden's marginal corporate tax rate is 40%, and its debt cost of capital is 5%.

    a. Suppose Arden adjusts its debt continuously to maintain a constant debt-equity ratio of 50%. What is the appropriate WACC for the new project?

    b. Suppose Arden adjusts its debt once per year to maintain a constant debt-equity ratio of 50%. What is the appropriate WACC for the new project now?

    c. Suppose the project has free cash flows of $10 million per year, which are expected to decline by 2% per year. What is the value of the project in parts a and b now?

**23.** XL Sports is expected to generate free cash flows of $10.9 million per year. XL has permanent debt of $40 million, a tax rate of 40%, and an unlevered cost of capital of 10%.

    a. What is the value of XL's equity using the APV method?

    b. What is XL's WACC? What is XL's equity value using the WACC method?

    c. If XL's debt cost of capital is 5%, what is XL's equity cost of capital?

    d. What is XL's equity value using the FTE method?

 **\*24.** Propel Corporation plans to make a $50 million investment, initially funded completely with debt. The free cash flows of the investment and Propel's incremental debt from the project follow:

| Year | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| Free cash flows | −50 | 40 | 20 | 25 |
| Debt | 50 | 30 | 15 | 0 |

Propel's incremental debt for the project will be paid off according to the predetermined schedule shown. Propel's debt cost of capital is 8%, and its tax rate is 40%. Propel also estimates an unlevered cost of capital for the project of 12%.

    a. Use the APV method to determine the levered value of the project at each date and its initial NPV.

    b. Calculate the WACC for this project at each date. How does the WACC change over time? Why?

    c. Compute the project's NPV using the WACC method.

    d. Compute the equity cost of capital for this project at each date. How does the equity cost of capital change over time? Why?

    e. Compute the project's equity value using the FTE method. How does the initial equity value compare with the NPV calculated in parts a and c?

**\*25.** Gartner Systems has no debt and an equity cost of capital of 10%. Gartner's current market capitalization is $100 million, and its free cash flows are expected to grow at 3% per year. Gartner's corporate tax rate is 35%. Investors pay tax rates of 40% on interest income and 20% on equity income.

    a. Suppose Gartner adds $50 million in permanent debt and uses the proceeds to repurchase shares. What will Gartner's levered value be in this case?

    b. Suppose instead Gartner decides to maintain a 50% debt-to-value ratio going forward. If Gartner's debt cost of capital is 6.67%, what will Gartner's levered value be in this case?

 **\*26.** Revtek, Inc., has an equity cost of capital of 12% and a debt cost of capital of 6%. Revtek maintains a constant debt-equity ratio of 0.5, and its tax rate is 35%.

    a. What is Revtek's WACC given its current debt-equity ratio?

    b. Assuming no personal taxes, how will Revtek's WACC change if it increases its debt-equity ratio to 2 and its debt cost of capital remains at 6%?

    c. Now suppose investors pay tax rates of 40% on interest income and 15% on income from equity. How will Revtek's WACC change if it increases its debt-equity ratio to 2 in this case?

    d. Provide an intuitive explanation for the difference in your answers to parts b and c.

## Data Case

Toyota Motor Company is expanding the production of their gas-electric hybrid drive systems and plans to shift production in the United States. To enable the expansion, they are contemplating investing $1.5 billion in a new plant with an expected 10-year life. The anticipated free cash flows from the new plant would be $220 million the first year of operation and grow by 10% for each of the next two years and then 5% per year for the remaining seven years. As a newly hired MBA in the capital budgeting division you have been asked to evaluate the new project using the WACC, Adjusted Present Value, and Flow-to-Equity methods. You will compute the appropriate costs of capital and the net present values with each method. Because this is your first major assignment with the firm, they want you to demonstrate that you are capable of handling the different valuation methods. You must seek out the information necessary to value the free cash flows but will be provided some directions to follow. (This is an involved assignment, but at least you don't have to come up with the actual cash flows for the project!)

1. Go to Yahoo! Finance (http://finance.yahoo.com) and get the quote for Toyota (symbol: TM).

    a. Under "Financials," click on the income statement. The income statements for the last three fiscal years will appear. Copy and paste the data into Excel.

    b. Go back to the Web page and select "Balance Sheets" from the top of the page. Repeat the download procedure for the balance sheets, then copy and paste them into the same worksheet as the income statements.

    c. Click "Historical prices" in the left column, and find Toyota's stock price for the last day of the month at the end of each of the past four fiscal years. Record the stock price on each date in your spreadsheet.

2. Create a timeline in Excel with the free cash flows for the 10 years of the project.

3. Determine the WACC using Eq. 18.1.

    a. For the cost of debt, $r_D$:

        i. Go to NasdBondInfo.com (http://cxa.marketwatch.com/finra/BondCenter/Default.aspx) and click to search by symbol. Enter Toyota's symbol, select the Corporate toggle, and press "Enter."

        ii. Look at the average credit rating for Toyota long-term bonds. If you find that they have a rating of A or above, then you can make the approximation that the cost of debt is the risk-free rate. If Toyota's credit rating has slipped, use Table 12.3 to estimate the beta of debt from the credit rating.

    b. For the cost of equity, $r_E$:

        i. Get the yield on the 10-year U.S. Treasury Bond from Yahoo! Finance (http://finance.yahoo.com). Scroll down to the Market Summary. Enter that yield as the risk-free rate.

        ii. Find the beta for Toyota from Yahoo! Finance. Enter the symbol for Toyota and click "Key Statistics." The beta for Toyota will be listed there.

        iii. Use a market risk premium of 4.50% to compute $r_E$ using the CAPM. If you need to, repeat the exercise to compute $r_D$.

    c. Determine the values for $E$ and $D$ for Eq. 18.1 for Toyota and the debt-to-value and equity-to-value ratios.

        i. To compute the net debt for Toyota, add the long-term debt and the short-term debt and subtract cash and cash equivalents for each year on the balance sheet.

        ii. Obtain the historical number of shares outstanding from Google Finance (www.google.com/finance). Enter Toyota's ticker in the search box, click "Financials." Look on the income statement for "Diluted Weighted Average Shares." Multiply the historical stock prices by the number of shares outstanding you collected to compute Toyota's market capitalization at the end of each fiscal year.

iii. Compute Toyota's enterprise value at the end of each fiscal year by combining the values obtained for its equity market capitalization and its net debt.

iv. Compute Toyota's debt-to-value ratio at the end of each year by dividing its net debt by its enterprise value. Use the average ratio from the last four years as an estimate for Toyota's target debt-to-value ratio.

d. Determine Toyota's tax rate by dividing the income tax by earnings before tax for each year. Take the average of the four rates as Toyota's marginal corporate tax rate.

e. Compute the WACC for Toyota using Eq. 18.1.

4. Compute the NPV of the hybrid engine expansion given the free cash flows you calculated using the WACC method of valuation.

5. Determine the NPV using the Adjusted Present Value Method, and also using the Flow-to-Equity method. In both cases, assume Toyota maintains the target leverage ratio you computed in Question 3c.

6. Compare the results under the three methods and explain how the resulting NPVs are achieved under each of the three different methods.

**CHAPTER 18
APPENDIX**

# Foundations and Further Details

In this appendix, we look at the foundations for the WACC method, and for the relationship between a firm's levered and unlevered costs of capital. We also address how we can solve for a firm's leverage policy and value simultaneously.

## Deriving the WACC Method

The WACC can be used to value a levered investment, as in Eq. 18.2. Consider an investment that is financed by both debt and equity. Because equity holders require an expected return of $r_E$ on their investment and debt holders require a return of $r_D$, the firm will have to pay investors a total of

$$E(1 + r_E) + D(1 + r_D) \tag{18.A1}$$

next year. What is the value of the investment next year? The project generates free cash flows of $FCF_1$ at the end of the year. In addition, the interest tax shield of the debt provides a tax savings of $\tau_c \times$ (interest on debt) $\approx \tau_c r_D D$.[28] Finally, if the investment will continue beyond next year, it will have a continuation value of $V_1^L$. Thus, to satisfy investors, the project cash flows must be such that

$$E(1 + r_E) + D(1 + r_D) = FCF_1 + \tau_c r_D D + V_1^L \tag{18A.2}$$

Because $V_0^L = E + D$, we can write the WACC definition in Eq. 18.1 as

$$r_{wacc} = \frac{E}{V_0^L} r_E + \frac{D}{V_0^L} r_D (1 - \tau_c) \tag{18.A3}$$

If we move the interest tax shield to the left side of Eq. 18A.2, we can use the definition of the WACC to rewrite Eq. 18A.2 as follows:

$$\underbrace{E(1 + r_E) + D[1 + r_D(1 - \tau_c)]}_{V_0^L(1 + r_{wacc})} = FCF_1 + V_1^L \tag{18.A4}$$

---

[28]The return on the debt $r_D$ need not come solely from interest payments. If $C_t$ is the coupon paid and $D_t$ is the market value of the debt in period $t$, then in period $t$, $r_D$ is defined as

$$r_D = \frac{E[\text{Coupon Payment} + \text{Capital Gain}]}{\text{Current Price}} = \frac{E[C_{t+1} + D_{t+1} - D_t]}{D_t}$$

The return that determines the firm's interest expense is

$$\bar{r}_D = \frac{E[C_{t+1} + \overline{D}_{t+1} - \overline{D}_t]}{\overline{D}_t}$$

where $\overline{D}_t$ is the value of the debt on date $t$ according to a fixed schedule set by the tax code based on the difference between the bond's initial price and its face value, which is called the bond's *original issue discount* (OID). (If the bond is issued at par and the firm will not default on the next coupon, then $\overline{D}_t = \overline{D}_{t+1}$ and $\bar{r}_D = C_{t+1}/D_t$, which is the bond's *current yield*.) Thus, the true after-tax cost of debt is $(r_D - \tau_c \bar{r}_D)$. In practice, the distinction between $r_D$ and $\bar{r}_D$ is often ignored, and the after-tax cost of debt is computed as $r_D(1 - \tau_c)$. Also, the debt's yield to maturity is often used in place of $r_D$. Because the yield ignores default risk, it overstates $r_D$ and thus the WACC. See Chapter 12 for alternative methods.

Dividing by $(1 + r_{wacc})$, we can express the value of the investment today as the present value of next period's free cash flows and continuation value:

$$V_0^L = \frac{FCF_1 + V_1^L}{1 + r_{wacc}} \tag{18.A5}$$

In the same way, we can write the value in one year, $V_1^L$, as the discounted value of the free cash flows and continuation value of the project in year 2. If the WACC is the same next year, then

$$V_0^L = \frac{FCF_1 + V_1^L}{1 + r_{wacc}} = \frac{FCF_1 + \dfrac{FCF_2 + V_2^L}{1 + r_{wacc}}}{1 + r_{wacc}} = \frac{FCF_1}{1 + r_{wacc}} + \frac{FCF_2 + V_2^L}{(1 + r_{wacc})^2} \tag{18.A6}$$

By repeatedly replacing each continuation value, and *assuming the WACC remains constant*, we can derive Eq. 18.2:[29]

$$V_0^L = \frac{FCF_1}{1 + r_{wacc}} + \frac{FCF_2}{(1 + r_{wacc})^2} + \frac{FCF_3}{(1 + r_{wacc})^3} + \cdots \tag{18.A7}$$

That is, *the value of a levered investment is the present value of its future free cash flows using the weighted average cost of capital.*

# The Levered and Unlevered Cost of Capital

In this appendix, we derive the relationship between the levered and unlevered cost of capital for the firm. Suppose an investor holds a portfolio of all of the equity and debt of the firm. Then the investor will receive the free cash flows of the firm plus the tax savings from the interest tax shield. These are the same cash flows an investor would receive from a portfolio of the unlevered firm (which generates the free cash flows) and a separate "tax shield" security that paid the investor the amount of the tax shield each period. Because these two portfolios generate the same cash flows, by the Law of One Price they have the same market values:

$$V^L = E + D = V^U + T \tag{18.A8}$$

where $T$ is the present value of the interest tax shield. Equation 18.A8 is the basis of the APV method. Because these portfolios have equal cash flows, they must also have identical expected returns, which implies

$$E\, r_E + D\, r_D = V^U r_U + T\, r_T \tag{18.A9}$$

where $r_T$ is the expected return associated with the interest tax shields. The relationship between $r_E$, $r_D$, and $r_U$ will depend on the expected return $r_T$, which is determined by the risk of the interest tax shield. Let's consider the two cases discussed in the text.

## Target Leverage Ratio

Suppose the firm adjusts its debt continuously to maintain a target debt-to-value ratio, or a target ratio of interest to free cash flow. Because the firm's debt and interest payments will vary with the firm's value and cash flows, it is reasonable to expect the risk of the interest

---

[29]This expansion is the same approach we took in Chapter 9 to derive the discounted dividend formula for the stock price.

tax shield will equal that of the firm's free cash flow, so $r_T = r_U$. Making this assumption, which we return to below, Eq. 18A.9 becomes

$$E\,r_E + D\,r_D = V^U r_U + T r_U = (V^U + T)r_U$$
$$= (E + D)r_U \qquad (18.A10)$$

Dividing by $(E + D)$ leads to Eq. 18.6.

## Predetermined Debt Schedule

Suppose some of the firm's debt is set according to a predetermined schedule that is independent of the growth of the firm. Suppose the value of the tax shield from the scheduled debt is $T^s$, and the remaining value of the tax shield $T - T^s$ is from debt that will be adjusted according to a target leverage ratio. Because the risk of the interest tax shield from the scheduled debt is similar to the risk of the debt itself, Eq. 18A.9 becomes

$$E\,r_E + D\,r_D = V^U r_U + T r_T = V^U r_U + (T - T^s)r_U + T^s r_D \qquad (18.A11)$$

Subtracting $T^s r_D$ from both sides, and using $D^s = D - T^s$,

$$E\,r_E + D^s r_D = (V^U + T - T^s)r_U = (V^L - T^s)r_U$$
$$= (E + D^s)r_U \qquad (18.A12)$$

Dividing by $(E + D^s)$ leads to Eq. 18.20.

## Risk of the Tax Shield with a Target Leverage Ratio

Above, we assumed that with a target leverage ratio, it is reasonable to assume that $r_T = r_U$. Under what circumstances should this be the case?

We define a target leverage ratio as a setting in which the firm adjusts its debt at date $t$ to be a proportion $d(t)$ of the investment's value, or a proportion $k(t)$ of its free cash flow. (The target ratio for either policy need not be constant over time, but can vary according to a predetermined schedule.)

With either policy, the value at date $t$ of the incremental tax shield from the project's free cash flow at date $s$, $FCF_s$, is proportional to the value of the cash flow $V_t^L(FCF_s)$, so it should be discounted at the same rate as $FCF_s$. Therefore, the assumption $r_T = r_U$ follows as long as at each date the cost of capital associated with the value of each future free cash flow is the same (a standard assumption in capital budgeting).[30]

# Solving for Leverage and Value Simultaneously

When we use the APV method, we need to know the debt level to compute the interest tax shield and determine the project's value. But if a firm maintains a constant debt-to-value ratio, we need to know the project's value to determine the debt level. How can we apply the APV method in this case?

When a firm maintains a constant leverage ratio, to use the APV method we must solve for the debt level and the project value simultaneously. While complicated to do by hand, it is (fortunately) easy to do in Excel. We begin with the spreadsheet shown in Table 18A.1, which illustrates the standard APV calculation outlined in Section 18.3 of the text. For now, we have just inserted arbitrary values for the project's debt capacity in line 3.

---

[30]If the risk of the individual cash flows differs, then $r_T$ will be a weighted average of the unlevered costs of capital of the individual cash flows, with the weights depending on the schedule $d$ or $k$. See P. DeMarzo, "Discounting Tax Shields and the Unlevered Cost of Capital," 2005, http://ssrn.com/abstract=1488437.

| TABLE 18A.1 SPREADSHEET | Adjusted Present Value for Avco's RFX Project with Arbitrary Debt Levels | | | | |
| --- | --- | --- | --- | --- | --- |
| Year | 0 | 1 | 2 | 3 | 4 |
| **Unlevered Value ($ million)** | | | | | |
| 1  Free Cash Flow | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2  Unlevered Value, $V^U$ (at $r_u = 8.0\%$) | 59.62 | 46.39 | 32.10 | 16.67 | — |
| **Interest Tax Shield** | | | | | |
| 3  Debt Capacity (arbitrary) | 30.00 | 20.00 | 10.00 | 5.00 | — |
| 4  Interest Paid (at $r_d = 6\%$) | — | 1.80 | 1.20 | 0.60 | 0.30 |
| 5  Interest Tax Shield (at $\tau_c = 40\%$) | — | 0.72 | 0.48 | 0.24 | 0.12 |
| 6  Tax Shield Value, $T$ (at $r_u = 8.0\%$) | 1.36 | 0.75 | 0.33 | 0.11 | — |
| **Adjusted Present Value** | | | | | |
| 7  **Levered Value, $V^L = V^U + T$** | **60.98** | **47.13** | **32.42** | **16.78** | **—** |

Note that the debt capacity specified in line 3 is not consistent with a 50% debt-to-value ratio for the project. For example, given the value of $60.98 million in year 0, the initial debt capacity should be 50% × $60.98 million = $30.49 million in year 0. But if we change each debt capacity in line 3 to a *numerical* value that is 50% of the value in line 7, the interest tax shield and the project's value will change, and we will still not have a 50% debt-to-value ratio.

The solution is to enter in line 3 a *formula* that sets the debt capacity to be 50% of the project's value in line 7 in the same year. Now line 7 depends on line 3, and line 3 depends on line 7, creating a circular reference in the spreadsheet (and you will most likely receive an error message). By changing the calculation option in Excel to calculate the spreadsheet iteratively (File > Options > Formulas and check the Enable iterative calculation box), Excel will keep calculating until the values in line 3 and line 7 of the spreadsheet are consistent, as shown in Table 18A.2.

| TABLE 18A.2 SPREADSHEET | Adjusted Present Value for Avco's RFX Project with Debt Levels Solved Iteratively | | | | |
| --- | --- | --- | --- | --- | --- |
| Year | 0 | 1 | 2 | 3 | 4 |
| **Unlevered Value ($ million)** | | | | | |
| 1  Free Cash Flow | (28.00) | 18.00 | 18.00 | 18.00 | 18.00 |
| 2  Unlevered Value, $V^U$ (at $r_u = 8.0\%$) | 59.62 | 46.39 | 32.10 | 16.67 | — |
| **Interest Tax Shield** | | | | | |
| 3  Debt Capacity (at $d = 50\%$) | 30.62 | 23.71 | 16.32 | 8.43 | — |
| 4  Interest Paid (at $r_d = 6\%$) | — | 1.84 | 1.42 | 0.98 | 0.51 |
| 5  Interest Tax Shield (at $\tau_c = 40\%$) | — | 0.73 | 0.57 | 0.39 | 0.20 |
| 6  Tax Shield Value, $T$ (at $r_u = 8.0\%$) | 1.63 | 1.02 | 0.54 | 0.19 | — |
| **Adjusted Present Value** | | | | | |
| 7  **Levered Value, $V^L = V^U + T$** | **61.25** | **47.41** | **32.63** | **16.85** | **—** |

The same method can be applied when using the WACC method with known debt levels. In that case, we need to know the project's value to determine the debt-to-value ratio and compute the WACC, and we need to know the WACC to compute the project's value. Again, we can use iteration within Excel to determine simultaneously the project's value and debt-to-value ratio.

# CHAPTER

# 19

# Valuation and Financial Modeling: A Case Study

## NOTATION

| | |
|---|---|
| $R_s$ | return on security $s$ |
| $r_f$ | risk-free rate |
| $\alpha_s$ | the alpha of security $s$ |
| $\beta_s$ | the beta of security $s$ |
| $R_{mkt}$ | return of the market portfolio |
| $E[R_{mkt}]$ | expected return of the market portfolio |
| $\varepsilon_s$ | the regression error term |
| $\beta_U$ | the beta of an unlevered firm |
| $\beta_E$ | the beta of equity |
| $\beta_D$ | the beta of debt |
| $r_U$ | unlevered cost of capital |
| $r_{wacc}$ | weighted average cost of capital |
| $r_D$ | debt cost of capital |
| $V_T^L$ | continuing value of a project at date $T$ |
| $V^U$ | unlevered value |
| $FCF_t$ | free cash flow at date $t$ |
| $g$ | growth rate |
| $T^s$ | predetermined tax shield value |

**T**HE GOAL OF THIS CHAPTER IS TO APPLY THE FINANCIAL tools we have developed thus far to demonstrate how they are used in practice to build a valuation model of a firm. In this chapter, we will value a hypothetical firm, Ideko Corporation. Ideko is a privately held designer and manufacturer of specialty sports eyewear based in Chicago. In mid-2005, its owner and founder, June Wong, has decided to sell the business, after having relinquished management control about four years ago. As a partner in KKP Investments, you are investigating purchasing the company. If a deal can be reached, the acquisition will take place at the end of the current fiscal year. In that event, KKP plans to implement operational and financial improvements at Ideko over the next five years, after which it intends to sell the business.

Ideko has total assets of $87 million and annual sales of $75 million. The firm is also quite profitable, with earnings this year of almost $7 million, for a net profit margin of 9.3%. You believe a deal could be struck to purchase Ideko's equity at the end of this fiscal year for an acquisition price of $150 million, which is almost double Ideko's current book value of equity. Is this price reasonable?

We begin the chapter by estimating Ideko's value using data for comparable firms. We then review KKP's operating strategies for running the business after the acquisition, to identify potential areas for improvements. We build a financial model to project cash flows that reflect these operating improvements. These cash flow forecasts enable us to value Ideko using the APV model introduced in Chapter 18 and estimate the return on KKP's investment. Finally, we explore the sensitivity of the valuation estimates to our main assumptions.

# 19.1 Valuation Using Comparables

As a result of preliminary conversations with Ideko's founder, you have estimates of Ideko's income and balance sheet information for the current fiscal year shown in Table 19.1. Ideko currently has debt outstanding of $4.5 million, but it also has a substantial cash balance. To obtain your first estimate of Ideko's value, you decide to value Ideko by examining comparable firms.

A quick way to gauge the reasonableness of the proposed price for Ideko is to compare it to that of other publicly traded firms using the method of comparable firms introduced in Chapter 9. For example, at a price of $150 million, Ideko's price-earnings (P/E) ratio is $150{,}000/6939 = 21.6$, roughly equal to the market average P/E ratio in mid-2005.

It is even more informative to compare Ideko to firms in a similar line of business. Although no firm is exactly comparable to Ideko in terms of its overall product line, three firms with which it has similarities are Oakley, Inc.; Luxottica Group; and Nike, Inc. The closest competitor is Oakley, which also designs and manufactures sports eyewear. Luxottica Group is an Italian eyewear maker, but much of its business is prescription eyewear; it also owns and operates a number of retail eyewear chains. Nike is a manufacturer of specialty sportswear products, but its primary focus is footwear. You also decide to compare Ideko to a portfolio of firms in the sporting goods industry.

A comparison of Ideko's proposed valuation to this peer set, as well as to the average firm in the sporting goods industry, appears in Table 19.2. The table not only lists P/E ratios, but also shows each firm's enterprise value (EV) as a multiple of sales and EBITDA (earnings before interest, taxes, depreciation, and amortization). Recall that enterprise value is the total value of equity plus net debt, where net debt is debt less cash and investments in marketable securities that are not required as part of normal operations. Ideko has $4.5 million in debt, and you estimate that it holds $6.5 million of cash in excess of its working capital needs. Thus, Ideko's enterprise value at the proposed acquisition price is $150 + 4.5 - 6.5 = \$148$ million.

At the proposed price, Ideko's P/E ratio is low relative to those of Oakley and Luxottica, although it is somewhat above the P/E ratios of Nike and the industry overall. The same

| TABLE 19.1 SPREADSHEET | Estimated 2005 Income Statement and Balance Sheet Data for Ideko Corporation |
|---|---|

| Income Statement ($ 000) | Year 2005 | Balance Sheet ($ 000) | Year 2005 |
|---|---|---|---|
| **Sales** | 75,000 | **Assets** | |
| Cost of Goods Sold | | Cash and Equivalents | 12,664 |
| Raw Materials | (16,000) | Accounts Receivable | 18,493 |
| Direct Labor Costs | (18,000) | Inventories | 6,165 |
| **Gross Profit** | 41,000 | **Total Current Assets** | 37,322 |
| Sales and Marketing | (11,250) | Property, Plant, and Equipment | 49,500 |
| Administrative | (13,500) | Goodwill | — |
| **EBITDA** | 16,250 | **Total Assets** | 86,822 |
| Depreciation | (5,500) | **Liabilities and Stockholders' Equity** | |
| **EBIT** | 10,750 | Accounts Payable | 4,654 |
| Interest Expense (net) | (75) | Debt | 4,500 |
| **Pretax Income** | 10,675 | **Total Liabilities** | 9,154 |
| Income Tax | (3,736) | **Stockholders' Equity** | 77,668 |
| **Net Income** | 6,939 | **Total Liabilities and Equity** | 86,822 |

| TABLE 19.2 | Ideko Financial Ratios Comparison, Mid-2005 | | | | |
|---|---|---|---|---|---|
| Ratio | Ideko (Proposed) | Oakley, Inc. | Luxottica Group | Nike, Inc. | Sporting Goods Industry |
| P/E | 21.6× | 24.8× | 28.0× | 18.2× | 20.3× |
| EV/Sales | 2.0× | 2.0× | 2.7× | 1.5× | 1.4× |
| EV/EBITDA | 9.1× | 11.6× | 14.4× | 9.3× | 11.4× |
| EBITDA/Sales | 21.7% | 17.0% | 18.5% | 15.9% | 12.1% |

can be said for Ideko's valuation as a multiple of sales. Thus, based on these two measures, Ideko looks "cheap" relative to Oakley and Luxottica, but is priced at a premium relative to Nike and the average sporting goods firm. The deal stands out, however, when you compare Ideko's enterprise value relative to EBITDA. The acquisition price of just over nine times EBITDA is below that of all of the comparable firms as well as the industry average. Ideko's low EBITDA multiple is a result of its high profit margins: At $16{,}250/75{,}000 = 21.7\%$, its EBITDA margin exceeds that of all of the comparables.

While Table 19.2 provides some reassurance that the acquisition price is reasonable compared to other firms in the industry, it by no means establishes that the acquisition is a good investment opportunity. As with any such comparison, the multiples in Table 19.2 vary substantially. Furthermore, they ignore important differences such as the operating efficiency and growth prospects of the firms, and they do not reflect KKP's plans to improve Ideko's operations. To assess whether this investment is attractive requires a careful analysis both of the operational aspects of the firm and of the ultimate cash flows the deal is expected to generate and the return that should be required.

## EXAMPLE 19.1    Valuation by Comparables

### Problem

What range of acquisition prices for Ideko is implied by the range of multiples for P/E, EV/Sales, and EV/EBITDA in Table 19.2?

### Solution

For each multiple, we can find the highest and lowest values across all three firms and the industry portfolio. Applying each multiple to the data for Ideko in Table 19.1 yields the following results:

| Multiple | Range | | Price (in $ million) | |
|---|---|---|---|---|
| | Low | High | Low | High |
| P/E | 18.2× | 28.0× | 126.3 | 194.3 |
| EV/Sales | 1.4× | 2.7× | 107.0 | 204.5 |
| EV/EBITDA | 9.3× | 14.4× | 153.1 | 236.0 |

For example, Nike has the lowest P/E multiple of 18.2. Multiplying this P/E by Ideko's earnings of $6.94 million gives a value of $18.2 \times 6.94 = 126.3$ million. The highest multiple of enterprise value to sales is 2.7 (Luxottica); at this multiple, Ideko's enterprise value is $2.7 \times 75 = \$202.5$ million. Adding Ideko's excess cash and subtracting its debt implies a purchase price of $202.5 + 6.5 - 4.5 = \$204.5$ million. The table above demonstrates that while comparables provide a useful benchmark, they cannot be relied upon for a precise estimate of value.

CONCEPT CHECK   1. What is the purpose of the valuation using comparables?

2. If the valuation using comparables indicates the acquisition price is reasonable compared to other firms in the industry, does it establish that the acquisition is a good investment opportunity?

## 19.2 The Business Plan

While comparables provide a useful starting point, whether this acquisition is a successful investment for KKP depends on Ideko's post-acquisition performance. Thus, it is necessary to look in detail at Ideko's operations, investments, and capital structure, and to assess its potential for improvements and future growth.

### Operational Improvements

On the operational side, you are quite optimistic regarding the company's prospects. The market is expected to grow by 5% per year, and Ideko produces a superior product. Ideko's market share has not grown in recent years because current management has devoted insufficient resources to product development, sales, and marketing. Conversely, Ideko has overspent on administrative costs. Indeed, Table 19.1 reveals that Ideko's current administrative expenses are $13,500/75,000 = 18\%$ of sales, a rate that exceeds its expenditures on sales and marketing (15% of sales). This is in stark contrast to its rivals, which spend less on administrative overhead than they do on sales and marketing.

KKP plans to cut administrative costs immediately and redirect resources to new product development, sales, and marketing. By doing so, you believe Ideko can increase its market share from 10% to 15% over the next five years. The increased sales demand can be met in the short run using the existing production lines by increasing overtime and running some weekend shifts. However, once the growth in volume exceeds 50%, Ideko will definitely need to undertake a major expansion to increase its manufacturing capacity.

The spreadsheet in Table 19.3 shows sales and operating cost assumptions for the next five years based on this plan. In the spreadsheet, numbers in blue represent data that has been entered, whereas numbers in black are calculated based on the data provided. For example, given the current market size of 10 million units and an expected growth rate of 5% per year, the spreadsheet calculates the expected market size in years 1 through 5. Also shown is the expected growth in Ideko's market share.

**TABLE 19.3 SPREADSHEET**  **Ideko Sales and Operating Cost Assumptions**

| | Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Sales Data** | Growth/Year | | | | | | |
| Market Size (000 units) | 5.0% | 10,000 | 10,500 | 11,025 | 11,576 | 12,155 | 12,763 |
| Market Share | 1.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% |
| Average Sales Price ($/unit) | 2.0% | 75.00 | 76.50 | 78.03 | 79.59 | 81.18 | 82.81 |
| **Cost of Goods Data** | | | | | | | |
| Raw Materials ($/unit) | 1.0% | 16.00 | 16.16 | 16.32 | 16.48 | 16.65 | 16.82 |
| Direct Labor Costs ($/unit) | 4.0% | 18.00 | 18.72 | 19.47 | 20.25 | 21.06 | 21.90 |
| **Operating Expense and Tax Data** | | | | | | | |
| Sales and Marketing (% sales) | | 15.0% | 16.5% | 18.0% | 19.5% | 20.0% | 20.0% |
| Administrative (% sales) | | 18.0% | 15.0% | 15.0% | 14.0% | 13.0% | 13.0% |
| Tax Rate | | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% |

Note that Ideko's average selling price is expected to increase because of a 2% inflation rate each year. Likewise, manufacturing costs are expected to rise. Raw materials are forecast to increase at a 1% rate and, although you expect some productivity gains, labor costs will rise at a 4% rate due to additional overtime. The table also shows the reallocation of resources from administration to sales and marketing over the five-year period.

| EXAMPLE 19.2 | **Production Capacity Requirements** |
|---|---|

**Problem**

Based on the data in Table 19.3, what production capacity will Ideko require each year? When will an expansion be necessary?

**Solution**

Production volume each year can be estimated by multiplying the total market size and Ideko's market share in Table 19.3:

| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Production Volume (000 units)** | | | | | | |
| 1   Market Size | 10,000 | 10,500 | 11,025 | 11,576 | 12,155 | 12,763 |
| 2   Market Share | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% |
| 3   Production Volume (1 × 2) | 1,000 | 1,155 | 1,323 | 1,505 | 1,702 | 1,914 |

Based on this forecast, production volume will exceed its current level by 50% by 2008, necessitating an expansion then.

## Capital Expenditures: A Needed Expansion

The spreadsheet in Table 19.4 shows the forecast for Ideko's capital expenditures over the next five years. Based on the estimates for capital expenditures and depreciation, this spreadsheet tracks the book value of Ideko's plant, property, and equipment starting from its level at the beginning of 2005. Note that investment is expected to remain at its current level over the next two years, which is roughly equal to the level of depreciation. Ideko will expand its production during this period by using its existing plant more efficiently. In 2008, however, a major expansion of the plant will be necessary, leading to a large increase in capital expenditures in 2008 and 2009.

The depreciation entries in Table 19.4 are based on the appropriate depreciation schedule for each type of property. Those calculations are quite specific to the nature of the property and are not detailed here. The depreciation shown will be used for tax purposes.[1]

| TABLE 19.4 SPREADSHEET | **Ideko Capital Expenditure Assumptions** |
|---|---|

| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Fixed Assets and Capital Investment ($ 000)** | | | | | | |
| 1   Opening Book Value | 50,000 | 49,500 | 49,050 | 48,645 | 61,781 | 69,102 |
| 2   Capital Investment | 5,000 | 5,000 | 5,000 | 20,000 | 15,000 | 8,000 |
| 3   Depreciation | (5,500) | (5,450) | (5,405) | (6,865) | (7,678) | (7,710) |
| 4   Closing Book Value | 49,500 | 49,050 | 48,645 | 61,781 | 69,102 | 69,392 |

[1]Firms often maintain separate books for accounting and tax purposes, and they may use different depreciation assumptions for each. Remember that because depreciation affects cash flows through its tax consequences, tax depreciation is more relevant for valuation.

## Working Capital Management

To compensate for its weak sales and marketing efforts, Ideko has sought to retain the loyalty of its retailers in part by maintaining a very lax credit policy. This policy affects Ideko's working capital requirements: For every extra day that customers take to pay, another day's sales revenue is added to accounts receivable (rather than received in cash). From Ideko's current income statement and balance sheet (Table 19.1), we can estimate the number of days of receivables:

$$\text{Accounts Receivable Days} = \frac{\text{Accounts Receivable (\$)}}{\text{Sales Revenue (\$/yr)}} \times 365 \text{ days/yr}$$

$$= \frac{18{,}493}{75{,}000} \times 365 \text{ days} = 90 \text{ days} \qquad (19.1)$$

The standard for the industry is 60 days, and you believe that Ideko can tighten its credit policy to achieve this goal without sacrificing sales.

You also hope to improve Ideko's inventory management. Ideko's balance sheet in Table 19.1 lists inventory of $6.165 million. Of this amount, approximately $2 million corresponds to raw materials, while the rest is finished goods. Given raw material expenditures of $16 million for the year, Ideko currently holds $(2/16) \times 365 = 45.6$ days' worth of raw material inventory. While maintaining a certain amount of inventory is necessary to avoid production stoppages, you believe that, with tighter controls of the production process, 30 days' worth of inventory will be adequate.

## Capital Structure Changes: Levering Up

With little debt, excess cash, and substantial earnings, Ideko appears to be significantly underleveraged. You plan to greatly increase the firm's debt, and have obtained bank commitments for loans of $100 million should an agreement be reached. These term loans will have an interest rate of 6.8%, and Ideko will pay interest only during the next five years. The firm will seek additional financing in 2008 and 2009 associated with the expansion of its manufacturing plant, as shown in the spreadsheet in Table 19.5. While Ideko's credit quality should improve over time, the steep slope of the yield curve suggests interest rates may increase; therefore, on balance, you expect Ideko's borrowing rate to remain at 6.8%.

Given Ideko's outstanding debt, its interest expense each year is computed as[2]

$$\text{Interest in Year } t = \text{Interest Rate} \times \text{Ending Balance in Year } (t - 1) \qquad (19.2)$$

The interest on the debt will provide a valuable tax shield to offset Ideko's taxable income.

| TABLE 19.5 SPREADSHEET | Ideko's Planned Debt and Interest Payments | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Debt and Interest Table ($ 000)** | | | | | | | |
| 1  Outstanding Debt | | 100,000 | 100,000 | 100,000 | 115,000 | 120,000 | 120,000 |
| 2  Interest on Term Loan | 6.80% | | (6,800) | (6,800) | (6,800) | (7,820) | (8,160) |

---

[2]Equation 19.2 assumes that changes in debt occur at the end of the year. If debt changes throughout the year, it is more accurate to compute interest expenses based on the average level of debt during the year.

| TABLE 19.6 SPREADSHEET | Sources and Uses of Funds for the Ideko Acquisition | | | |
|---|---|---|---|---|

**Acquisition Financing ($ 000)**

| | Sources | | Uses | |
|---|---|---|---|---|
| 1 | New Term Loan | 100,000 | Purchase Ideko Equity | 150,000 |
| 2 | Excess Ideko Cash | 6,500 | Repay Existing Ideko Debt | 4,500 |
| 3 | KKP Equity Investment | 53,000 | Advisory and Other Fees | 5,000 |
| 4 | Total Sources of Funds | 159,500 | Total Uses of Funds | 159,500 |

In addition to the tax benefit, the loan will allow KKP to limit its investment in Ideko and preserve its capital for other investments and acquisitions. The sources and uses of funds for the acquisition are shown in Table 19.6. In addition to the $150 million purchase price for Ideko's equity, $4.5 million will be used to repay Ideko's existing debt. With $5 million in advisory and other fees associated with the transaction, the acquisition will require $159.5 million in total funds. KKP's sources of funds include the new loan of $100 million as well as Ideko's own excess cash (which KKP will have access to). Thus, KKP's required equity contribution to the transaction is $159.5 - 100 - 6.5 = \$53$ million.

**CONCEPT CHECK**

1. What are the different operational improvements KKP plans to make?

2. Why is it necessary to consider these improvements to assess whether the acquisition is attractive?

## 19.3　Building the Financial Model

The value of any investment opportunity arises from the future cash flows it will generate. To estimate the cash flows resulting from the investment in Ideko, we begin by projecting Ideko's future earnings. We then consider Ideko's working capital and investment needs and estimate its free cash flow. With these data in hand, we can forecast Ideko's balance sheet and statement of cash flows.

### Forecasting Earnings

We can forecast Ideko's income statement for the five years following the acquisition based on the operational and capital structure changes proposed. This income statement is often referred to as a **pro forma** income statement, because it is not based on actual data but rather depicts the firm's financials under a given set of hypothetical assumptions. The pro forma income statement translates our expectations regarding the operational improvements KKP can achieve at Ideko into consequences for the firm's earnings.

To build the pro forma income statement, we begin with Ideko's sales. Each year, sales can be calculated from the estimates in Table 19.3 as follows:

$$\text{Sales} = \text{Market Size} \times \text{Market Share} \times \text{Average Sales Price} \quad (19.3)$$

For example, in 2006, Ideko has projected sales of 10.5 million $\times$ 11% $\times$ 76.5 = \$88.358 million. The spreadsheet in Table 19.7 shows Ideko's current (2005) sales as well as projections for five years after the acquisition (2006–2010).

| TABLE 19.7 SPREADSHEET | Pro Forma Income Statement for Ideko, 2005–2010 | | | | | |
|---|---|---|---|---|---|---|
| **Year** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
| **Income Statement ($ 000)** | | | | | | |
| 1   **Sales** | 75,000 | 88,358 | 103,234 | 119,777 | 138,149 | 158,526 |
| 2   Cost of Goods Sold | | | | | | |
| 3     Raw Materials | (16,000) | (18,665) | (21,593) | (24,808) | (28,333) | (32,193) |
| 4     Direct Labor Costs | (18,000) | (21,622) | (25,757) | (30,471) | (35,834) | (41,925) |
| 5   **Gross Profit** | 41,000 | 48,071 | 55,883 | 64,498 | 73,982 | 84,407 |
| 6   Sales and Marketing | (11,250) | (14,579) | (18,582) | (23,356) | (27,630) | (31,705) |
| 7   Administrative | (13,500) | (13,254) | (15,485) | (16,769) | (17,959) | (20,608) |
| 8   **EBITDA** | 16,250 | 20,238 | 21,816 | 24,373 | 28,393 | 32,094 |
| 9   Depreciation | (5,500) | (5,450) | (5,405) | (6,865) | (7,678) | (7,710) |
| 10   **EBIT** | 10,750 | 14,788 | 16,411 | 17,508 | 20,715 | 24,383 |
| 11   Interest Expense (net) | (75) | (6,800) | (6,800) | (6,800) | (7,820) | (8,160) |
| 12   **Pretax Income** | 10,675 | 7,988 | 9,611 | 10,708 | 12,895 | 16,223 |
| 13   Income Tax | (3,736) | (2,796) | (3,364) | (3,748) | (4,513) | (5,678) |
| 14   **Net Income** | **6,939** | **5,193** | **6,247** | **6,960** | **8,382** | **10,545** |

The next items in the income statement detail the cost of goods sold. The raw materials cost can be calculated from sales as

$$\text{Raw Materials} = \text{Market Size} \times \text{Market Share} \times \text{Raw Materials per Unit} \quad (19.4)$$

In 2006, the cost of raw materials is $10.5$ million $\times 11\% \times 16.16 = \$18.665$ million. The same method can be applied to determine the direct labor costs. Sales, marketing, and administrative costs can be computed directly as a percentage of sales. For example:

$$\text{Sales and Marketing} = \text{Sales} \times (\text{Sales and Marketing \% of Sales}) \quad (19.5)$$

Therefore, sales and marketing costs are forecast to be $\$88.358$ million $\times 16.5\% = \$14.579$ million in 2006.

Deducting these operating expenses from Ideko's sales, we can project EBITDA over the next five years as shown in line 8 of Table 19.7. Subtracting the depreciation expenses we estimated in Table 19.4, we arrive at Ideko's earnings before interest and taxes. Next, we deduct interest expenses according to the schedule given in Table 19.5.[3] The final expense is the corporate income tax, which we computed using the tax rate in Table 19.3 as

$$\text{Income Tax} = \text{Pretax Income} \times \text{Tax Rate} \quad (19.6)$$

After income taxes, we are left with Ideko's projected pro forma net income as the bottom line in Table 19.7. Based on our projections, net income will rise by 52% from $6.939 million to $10.545 million at the end of five years, although it will drop in the near term due to the large increase in interest expense from the new debt.

---

[3]This interest expense should be offset by any interest earned on investments. As we discuss later in this chapter, we assume that Ideko does not invest its excess cash balances, but instead pays them out to its owner, KKP. Thus, net interest expenses are solely due to Ideko's outstanding debt.

| EXAMPLE 19.3 | **Forecasting Income** |

**Problem**

By what percentage is Ideko's EBITDA expected to grow over the five-year period? By how much would it grow if Ideko's market share remained at 10%?

**Solution**

EBITDA will increase from \$16.25 million to \$32.09 million, or $(32.09/16.25) - 1 = 97\%$, over the five years. With a 10% market share rather than a 15% market share, sales will be only $(10\%/15\%) = 66.7\%$ of the forecast in Table 19.7. Because Ideko's operating expenses are proportional to its unit sales, its expenses and EBITDA will also be 66.7% of the current estimates. Thus, EBITDA will grow to $66.7\% \times 32.09 = \$21.40$ million, which is an increase of only $(21.40/16.25) - 1 = 32\%$.

## Working Capital Requirements

The spreadsheet in Table 19.8 lists Ideko's current working capital requirements and forecasts the firm's future working capital needs. (See Chapter 26 for a further discussion of working capital requirements and their determinants.) This forecast includes the plans to tighten Ideko's credit policy, speed up customer payments, and reduce Ideko's inventory of raw materials.

Based on these working capital requirements, the spreadsheet in Table 19.9 forecasts Ideko's net working capital (NWC) over the next five years. Each line item in the spreadsheet is found by computing the appropriate number of days' worth of the corresponding revenue or expense from the income statement (Table 19.7). For example, accounts receivable in 2006 is calculated as[4]

$$\text{Accounts Receivable} = \text{Days Required} \times \frac{\text{Annual Sales}}{365 \text{ days/yr}}$$

$$= 60 \text{ days} \times \frac{\$88.358 \text{ million/yr}}{365 \text{ days/yr}} = \$14.525 \text{ million} \quad (19.7)$$

| TABLE 19.8 SPREADSHEET | **Ideko's Working Capital Requirements** |

| | | Year | 2005 | >2005 |
|---|---|---|---|---|
| **Working Capital Days** | | | | |
| **Assets** | **Based on:** | | **Days** | **Days** |
| 1  Accounts Receivable | Sales Revenue | | 90 | 60 |
| 2  Raw Materials | Raw Materials Costs | | 45 | 30 |
| 3  Finished Goods | Raw Materials + Labor Costs | | 45 | 45 |
| 4  Minimum Cash Balance | Sales Revenue | | 30 | 30 |
| **Liabilities** | | | | |
| 5  Wages Payable | Direct Labor + Admin Costs | | 15 | 15 |
| 6  Other Accounts Payable | Raw Materials + Sales and Marketing | | 45 | 45 |

---

[4]If products are highly seasonal, large fluctuations in working capital may occur over the course of the year. When these effects are important, it is best to develop forecasts on a quarterly or monthly basis so that the seasonal effects can be tracked.

| TABLE 19.9 SPREADSHEET | Ideko's Net Working Capital Forecast | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
| **Working Capital ($ 000)** | | | | | | | |
| **Assets** | | | | | | | |
| 1  Accounts Receivable | | 18,493 | 14,525 | 16,970 | 19,689 | 22,709 | 26,059 |
| 2  Raw Materials | | 1,973 | 1,534 | 1,775 | 2,039 | 2,329 | 2,646 |
| 3  Finished Goods | | 4,192 | 4,967 | 5,838 | 6,815 | 7,911 | 9,138 |
| 4  Minimum Cash Balance | | 6,164 | 7,262 | 8,485 | 9,845 | 11,355 | 13,030 |
| 5  Total Current Assets | | 30,822 | 28,288 | 33,067 | 38,388 | 44,304 | 50,872 |
| **Liabilities** | | | | | | | |
| 6  Wages Payable | | 1,294 | 1,433 | 1,695 | 1,941 | 2,211 | 2,570 |
| 7  Other Accounts Payable | | 3,360 | 4,099 | 4,953 | 5,938 | 6,900 | 7,878 |
| 8  Total Current Liabilities | | 4,654 | 5,532 | 6,648 | 7,879 | 9,110 | 10,448 |
| **Net Working Capital** | | | | | | | |
| 9  Net Working Capital (5 − 8) | | 26,168 | 22,756 | 26,419 | 30,509 | 35,194 | 40,425 |
| 10  Increase in Net Working Capital | | | (3,412) | 3,663 | 4,089 | 4,685 | 5,231 |

Similarly, Ideko's inventory of finished goods will be $45 \times (18.665 + 21.622)/365 = \$4.967$ million.

Table 19.9 also lists Ideko's minimum cash balance each year. This balance represents the minimum level of cash needed to keep the business running smoothly, allowing for the daily variations in the timing of income and expenses. Firms generally earn little or no interest on these balances, which are held in cash or in a checking or short-term savings accounts. As a consequence, we account for this opportunity cost by including the minimal cash balance as part of the firm's working capital.

We assume that Ideko will earn no interest on this minimal balance. (If it did, this interest would reduce the firm's net interest expense in the income statement.) We also assume that Ideko will pay out as dividends all cash not needed as part of working capital. Therefore, Ideko will hold no excess cash balances or short-term investments above the minimal level reported in Table 19.9. If Ideko were to retain excess funds, these balances would be considered part of its financing strategy (reducing its net debt), and not as part of its working capital.[5]

Ideko's net working capital for each year is computed in Table 19.9 as the difference between the forecasted current assets and current liabilities. Increases in net working capital represent a cost to the firm. Note that as a result of the improvements in accounts receivable and inventory management, Ideko will reduce its net working capital by more than $3.4 million in 2006. After this initial savings, working capital needs will increase in conjunction with the growth of the firm.

### Forecasting Free Cash Flow

We now have the data needed to forecast Ideko's free cash flows over the next five years. Ideko's earnings are available from the income statement (Table 19.7), as are its depreciation and interest expenses. Capital expenditures are available from Table 19.4, and changes in net working capital can be found in Table 19.9. We combine these items to estimate the free cash flows in the spreadsheet in Table 19.10.

---

[5]Firms often hold excess cash in anticipation of future investment needs or possible cash shortfalls. Because Ideko can rely on KKP to provide needed capital, excess cash reserves are unnecessary.

684     **Chapter 19** Valuation and Financial Modeling: A Case Study

| TABLE 19.10 SPREADSHEET | Ideko's Free Cash Flow Forecast | | | | | |
|---|---|---|---|---|---|---|
| **Year** | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Free Cash Flow ($ 000)** | | | | | | |
| 1   **Net Income** | | 5,193 | 6,247 | 6,960 | 8,382 | 10,545 |
| 2   Plus: After-Tax Interest Expense | | 4,420 | 4,420 | 4,420 | 5,083 | 5,304 |
| 3   **Unlevered Net Income** | | 9,613 | 10,667 | 11,380 | 13,465 | 15,849 |
| 4   Plus: Depreciation | | 5,450 | 5,405 | 6,865 | 7,678 | 7,710 |
| 5   Less: Increases in NWC | | 3,412 | (3,663) | (4,089) | (4,685) | (5,231) |
| 6   Less: Capital Expenditures | | (5,000) | (5,000) | (20,000) | (15,000) | (8,000) |
| 7   **Free Cash Flow of Firm** | | 13,475 | 7,409 | (5,845) | 1,458 | 10,328 |
| 8   Plus: Net Borrowing | | — | — | 15,000 | 5,000 | — |
| 9   Less: After-Tax Interest Expense | | (4,420) | (4,420) | (4,420) | (5,083) | (5,304) |
| 10   **Free Cash Flow to Equity** | | 9,055 | 2,989 | 4,735 | 1,375 | 5,024 |

To compute Ideko's free cash flow, which excludes cash flows associated with leverage, we first adjust net income by adding back the after-tax interest payments associated with the net debt in its capital structure:[6]

$$\text{After-Tax Interest Expense} =$$
$$(1 - \text{Tax Rate}) \times (\text{Interest on Debt} - \text{Interest on Excess Cash}) \quad (19.8)$$

Because Ideko has no excess cash, its after-tax interest expense in 2006 is $(1 - 35\%) \times 6.8 = \$4.42$ million, providing unlevered net income of $5.193 + 4.42 = \$9.613$ million. We could also compute the unlevered net income in Table 19.10 by starting with EBIT and deducting taxes. In 2006, for example, EBIT is forecasted as $14.788 million, which amounts to $14.788 \times (1 - 35\%) = \$9.613$ million after taxes.

To compute Ideko's free cash flow from its unlevered net income, we add back depreciation (which is not a cash expense), and deduct Ideko's increases in net working capital and capital expenditures. The free cash flow on line 7 of Table 19.10 shows the cash the firm will generate for its investors, both debt and equity holders. While Ideko will generate substantial free cash flow over the next five years, the level of free cash flow varies substantially from year to year. It is highest in 2006 (due mostly to the large reduction in working capital) and is forecasted to be negative in 2008 (when the plant expansion will begin).

To determine the free cash flow to equity, we first add Ideko's net borrowing (that is, increases to net debt):

$$\text{Net Borrowing in Year } t = \text{Net Debt in Year } t - \text{Net Debt in Year } (t - 1) \quad (19.9)$$

Ideko will borrow in 2008 and 2009 as part of its expansion. We then deduct the after-tax interest payments that were added in line 2.

As shown in the last line of Table 19.10, during the next five years Ideko is expected to generate a positive free cash flow to equity, which will be used to pay dividends to KKP. The free cash flow to equity will be highest in 2006; by 2010, KKP will recoup a significant fraction of its initial investment.

---

[6]If Ideko had some interest income or expenses from working capital, we would *not* include that interest here. We adjust only for interest that is related to the firm's *financing*—that is, interest associated with debt and *excess* cash (cash not included as part of working capital).

Joseph L. Rice, III is a founding partner and the former chairman of Clayton, Dubilier & Rice (CD&R). The firm is among the most respected private equity firms in the world. Its investments span a number of industry segments with enterprise values ranging from $1 billion to $15 billion.

### INTERVIEW WITH
## Joseph L. Rice, III



QUESTION: *How has private equity business changed since you began in the industry?*

ANSWER: The term "private equity" is very broad and today can cover virtually every kind of investing, short of investing in the stock or bond markets. The buyout business represents a significant component of the private equity market. Since I started in 1966, I've seen many changes as the asset class has matured. In the 1960s and 1970s, the buyout business had relatively little following. Limited capital availability kept transactions small, and we relied on unconventional funding sources. The total purchase price of my first transaction was approximately $3 million, financed through a secured bank line and from individuals contributing amounts ranging from $25,000 to $50,000. In contrast, in 2005, we bought Hertz from Ford for approximately $15 billion.

As the industry has evolved, the attractive returns generated from buyout investments has attracted broader interest from both institutions and high net worth individuals. Buyout firms apply a variety of value creation models, including financial engineering, multiple arbitrage, and industry sector bets, such as technology or healthcare. Today there is more focus on generating returns from improving business performance—which has always been CD&R's underlying investment approach. The character of the businesses that we buy has also changed. Traditionally, this was an asset-heavy business, with much of the financing coming from banks that lent against percentages of inventory and receivables and the liquidation value of hard assets. Now it's become more of a cash flow business.

QUESTION: *What makes a company a good buyout candidate?*

ANSWER: We look to acquire good businesses at fair prices. Acquiring non-core, underperforming divisions

of large companies and making them more effective has been a fertile investment area for CD&R. These divestiture buyouts tend to be complex and require experience and patience to execute. For example, we were in discussions with Ford management for three years prior to leading the Hertz division acquisition.

After running a series of projections based on information from management, we develop a capital structure designed to insure the viability of the acquisition candidate. We are relatively unconcerned with EPS but are very return conscious, focusing on cash and creating long-term shareholder value. We must also believe that we can generate a return on equity that meets our standards and justifies our investors' commitments to us.

We also acquire businesses confronting strategic issues where our operating expertise can bring value, such as Kinko's, a great brand franchise that we reorganized and expanded. We prefer service and distribution businesses to large manufacturers because of the wage differential between Asia and the United States and Europe. We also prefer businesses with a diversity of suppliers and customers and where there are multiple levers under our control to improve operating performance.

QUESTION: *Post acquisition, what is the role of the private equity firm?*

ANSWER: CD&R brings both a hands-on ownership style and capital. After closing a transaction, we assess current management's capability to do the job our investment case calls for. If necessary, we build and strengthen the management team. Then we work with them to determine the appropriate strategy to produce outstanding results. Finally, we aggressively pursue productivity, cost reduction, and growth initiatives to enhance operating and financial performance. At Kinko's, we restructured 129 separate S-corporations into one centralized corporation and installed a new management team. Our key strategic decision was transforming Kinko's from a loose confederation of consumer and small business-oriented copy shops into a highly networked company serving major corporations. In the end, that is what made the company an attractive acquisition for FedEx in 2004.

| EXAMPLE 19.4 | **Leverage and Free Cash Flow** |
|---|---|

**Problem**

Suppose Ideko does not add leverage in 2008 and 2009, but instead keeps its debt fixed at $100 million until 2010. How would this change in its leverage policy affect its expected free cash flow? How would it affect the free cash flow to equity?

**Solution**

Because free cash flow is based on unlevered net income, it will not be affected by Ideko's leverage policy. Free cash flow to equity will be affected, however. Net borrowing will be zero each year, and the firm's after-tax interest expense will remain at the 2006 level of $4.42 million:

| | Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Free Cash Flow ($ 000)** | | | | | | | |
| 1 | **Free Cash Flow of Firm** | | 13,475 | 7,409 | (5,845) | 1,458 | 10,328 |
| 2 | Plus: Net Borrowing | | — | — | — | — | — |
| 3 | Less: After-Tax Interest Expense | | (4,420) | (4,420) | (4,420) | (4,420) | (4,420) |
| 4 | **Free Cash Flow to Equity** | | 9,055 | 2,989 | (10,265) | (2,962) | 5,908 |

In this case, Ideko will have a negative free cash flow to equity in 2008 and 2009. That is, without additional borrowing, KKP will have to invest additional capital in the firm to fund the expansion.

## The Balance Sheet and Statement of Cash Flows (Optional)

The information we have calculated so far can be used to project Ideko's balance sheet and statement of cash flows through 2010. While these statements are not critical for our valuation, they often prove helpful in providing a more complete picture of how a firm will grow during the forecast period. These statements for Ideko are shown in the spreadsheets in Table 19.11 and Table 19.12.

The statement of cash flows in Table 19.11 starts with net income. Cash from operating activities includes depreciation as well as changes to working capital items (other than cash) from Table 19.9. Note that increases in accounts receivable or inventory are a *use* of cash, whereas an increase in accounts payable is a *source* of cash. Cash from investing activities includes the capital expenditures in Table 19.4. Cash from financing activities includes changes in outstanding debt from Table 19.5, and dividends or stock issuance determined by the free cash flow to equity in Table 19.10. (If free cash flow to equity were negative in any year, it would appear as stock issuance in line 13 in Table 19.11.) As a final check on the calculations, note that the change in cash and cash equivalents on line 15 in Table 19.11 equals the change in the minimum cash balance shown in Table 19.9.

For the balance sheet, we must begin by adjusting Ideko's closing 2005 balance sheet from Table 19.1 to account for the transaction. The transaction will affect the firm's goodwill, stockholders' equity, and its cash and debt balances. We show these changes by constructing a new "pro forma" 2005 balance sheet that represents the firm just after the transaction closes (see Table 19.12). Let's consider how each change is determined.

First, we calculate goodwill as the difference between the acquisition price and the value of the net assets acquired:

$$\text{New Goodwill} = \text{Acquisition Price} - \text{Value of Net Assets Acquired} \qquad (19.10)$$

In this case, the acquisition price is the $150 million purchase price for Ideko's existing equity. For the net assets acquired, we use Ideko's existing book value of equity, $77.668

| TABLE 19.11 SPREADSHEET | Pro Forma Statement of Cash Flows for Ideko, 2005–2010 | | | | | |
|---|---|---|---|---|---|---|
| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |

| Statement of Cash Flows ($ 000) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| 1 **Net Income** | | 5,193 | 6,247 | 6,960 | 8,382 | 10,545 |
| 2 Depreciation | | 5,450 | 5,405 | 6,865 | 7,678 | 7,710 |
| 3 Changes in Working Capital | | | | | | |
| 4 Accounts Receivable | | 3,968 | (2,445) | (2,719) | (3,020) | (3,350) |
| 5 Inventory | | (336) | (1,112) | (1,242) | (1,385) | (1,544) |
| 6 Accounts Payable | | 878 | 1,116 | 1,231 | 1,231 | 1,338 |
| 7 **Cash from Operating Activities** | | 15,153 | 9,211 | 11,095 | 12,885 | 14,699 |
| 8 Capital Expenditures | | (5,000) | (5,000) | (20,000) | (15,000) | (8,000) |
| 9 Other Investment | | — | — | — | — | — |
| 10 **Cash from Investing Activities** | | (5,000) | (5,000) | (20,000) | (15,000) | (8,000) |
| 11 Debt Issuance (or Repayment) | | — | — | 15,000 | 5,000 | — |
| 12 Dividends | | (9,055) | (2,989) | (4,735) | (1,375) | (5,024) |
| 13 Sale (or Purchase) of Stock | | — | — | — | — | — |
| 14 **Cash from Financing Activities** | | (9,055) | (2,989) | 10,265 | 3,625 | (5,024) |
| 15 **Change in Cash** (7 + 10 + 14) | | **1,098** | **1,223** | **1,360** | **1,510** | **1,675** |

million, *excluding* any pre-existing goodwill ($0). Thus, new goodwill is $150 - (77.668 - 0) = \$72.332$ million.[7]

| TABLE 19.12 SPREADSHEET | Pro Forma Balance Sheet for Ideko, 2005–2010 | | | | | |
|---|---|---|---|---|---|---|
| Year | 2005PF | 2006 | 2007 | 2008 | 2009 | 2010 |

| Balance Sheet ($ 000) | 2005PF | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| 1 Cash and Cash Equivalents | 6,164 | 7,262 | 8,485 | 9,845 | 11,355 | 13,030 |
| 2 Accounts Receivable | 18,493 | 14,525 | 16,970 | 19,689 | 22,709 | 26,059 |
| 3 Inventories | 6,165 | 6,501 | 7,613 | 8,854 | 10,240 | 11,784 |
| 4 **Total Current Assets** | 30,822 | 28,288 | 33,067 | 38,388 | 44,304 | 50,872 |
| 5 Property, Plant, and Equipment | 49,500 | 49,050 | 48,645 | 61,781 | 69,102 | 69,392 |
| 6 Goodwill | 72,332 | 72,332 | 72,332 | 72,332 | 72,332 | 72,332 |
| 7 **Total Assets** | 152,654 | 149,670 | 154,044 | 172,501 | 185,738 | 192,597 |
| **Liabilities** | | | | | | |
| 8 Accounts Payable | 4,654 | 5,532 | 6,648 | 7,879 | 9,110 | 10,448 |
| 9 Debt | 100,000 | 100,000 | 100,000 | 115,000 | 120,000 | 120,000 |
| 10 **Total Liabilities** | 104,654 | 105,532 | 106,648 | 122,879 | 129,110 | 130,448 |
| **Stockholders' Equity** | | | | | | |
| 11 Starting Stockholders' Equity | | 48,000 | 44,138 | 47,396 | 49,621 | 56,628 |
| 12 Net Income | (5,000) | 5,193 | 6,247 | 6,960 | 8,382 | 10,545 |
| 13 Dividends | | (9,055) | (2,989) | (4,735) | (1,375) | (5,024) |
| 14 Sale (or Purchase) of Stock | 53,000 | — | — | — | — | — |
| 15 **Stockholders' Equity** | 48,000 | 44,138 | 47,396 | 49,621 | 56,628 | 62,149 |
| 16 **Total Liabilities and Equity** | 152,654 | 149,670 | 154,044 | 172,501 | 185,738 | 192,597 |

---

[7]We have simplified somewhat the balance sheet adjustments in the goodwill calculation. In particular, the book values of Ideko's assets and liabilities may be "stepped up" to reflect current fair values, and a portion of the excess purchase price may be allocated to intangible assets as opposed to goodwill.

**USING EXCEL**

**Auditing Your Financial Model**

Building a three-statement financial model is complex, and even experienced financial modelers make mistakes. Audit your model to check for errors using the following best practices.

**Do Not Use Stockholders' Equity as a Plug**

Because the balance sheet must balance, it is tempting to calculate stockholders' equity in the spreadsheet as the difference between total assets and total liabilities. Doing so, however, nullifies a key benefit of the balance sheet as an audit tool on the rest of the financial model. As a best practice, always calculate stockholders' equity directly as shown here. Then, in a line below the balance sheet, include a "check" line that tests whether total assets equal total liabilities and equity each year—and if the difference is non-zero, display it in a bold red font so the errror is apparent.

   If the model does have an error, the amount of the difference will provide a clue to its source: If the difference is a constant each year, it is likely to result from one of the adjustments in the initial pro forma balance sheet; if it varies over time, check each line of the balance sheet to be sure the trends make sense (e.g., that inventories grow with sales), and check the sign of each line item in the statement of cash flows to make sure all sources of cash are positive and all uses of cash are negative (especially working capital).

**Check the Cash and Payout Policy**

Check that the firm's cash and payouts match its intended policy. In this case, we forecast that Ideko would pay out all excess cash going forward. Thus, its cash balances in the balance sheet should match the minimum balances specified in Table 19.9. If not, be sure to audit the free cash flow to equity calculation in Table 19.10. Note also that in this example, free cash flow to equity (i.e., dividends) was an output of the model. We could have alternatively assumed Ideko would retain its excess cash. In that case, free cash flow to equity would be zero (no dividends would be paid), and changes in cash (and thus the firm's net borrowing) would be outputs.

Next, consider stockholders' equity, which we calculate as

$$\text{New Stockholders' Equity} = \text{Equity Contributions} - \text{Expensed Transaction Fees} \quad (19.11)$$

In this case, we deduct the $5 million in advisory fee expenses from KKP's initial equity contribution of $53 million to calculate new shareholders' equity of $48 million.[8]

   Finally, we adjust Ideko's cash and debt balances by deducting the excess cash of $6.5 million used to help fund the transaction, eliminating Ideko's existing debt (which will be repaid), and adding the new debt incurred of $100 million. These steps complete the pro forma 2005 balance sheet as of the completion of the transaction and are shown in Table 19.12.

   To construct the balance sheet going forward, adjust the cash balance to reflect the change in cash from line 15 of the statement of cash flows in Table 19.11. All other current assets and liabilities come from the net working capital spreadsheet (Table 19.9). The inventory entry on the balance sheet includes both raw materials and finished goods. Property, plant, and equipment information comes from the capital expenditure spreadsheet (Table 19.4), and the debt comes from Table 19.5. From Eq. 2.7, stockholders' equity increases each year through retained earnings (net income less dividends) and new capital

---

[8]Under SFAS 141R, as of December 2008, acquisition-related advisory and legal fees should be expensed as incurred. To illustrate this method, we have applied it here. Financing fees related to debt issuance, on the other hand, are not deducted from shareholders' equity, but are instead capitalized as a new asset and amortized over the loan's term. For simplicity, we have ignored these fees and any related tax consequences.

contributions (stock issuances net of repurchases). Dividends after 2005 are equal to positive free cash flows to equity from Table 19.10, whereas negative free cash flows to equity represent a stock issuance. As a check on the calculations, note that the balance sheet does, indeed, balance: Total assets equal total liabilities and equity.[9]

Ideko's book value of equity will decline in 2006, as Ideko reduces its working capital and pays out the savings as part of a large dividend. The firm's book value will then rise as it expands. Ideko's book debt-equity ratio will decline from $100,000/48,000 = 2.1$ to $120,000/62,149 = 1.9$ during the five-year period.

**CONCEPT CHECK**

1. What is a pro forma income statement?

2. How do we calculate the firm's free cash flow, and the free cash flow to equity?

## 19.4  Estimating the Cost of Capital

To value KKP's investment in Ideko, we need to assess the risk associated with Ideko and estimate an appropriate cost of capital. Because Ideko is a private firm, we cannot use its own past returns to evaluate its risk, but must instead rely on comparable publicly traded firms. In this section, we use data from the comparable firms identified earlier to estimate a cost of capital for Ideko.

Our approach is as follows. First, we use the techniques developed in Part 4 to estimate the equity cost of capital for Oakley, Luxottica Group, and Nike. Then, we estimate the unlevered cost of capital for each firm based on its capital structure. We use the unlevered cost of capital of the comparable firms to estimate Ideko's unlevered cost of capital. Once we have this estimate, we can use Ideko's capital structure to determine its equity cost of capital or WACC, depending on the valuation method employed.

### CAPM-Based Estimation

To determine an appropriate cost of capital, we must first determine the appropriate measure of risk. KKP's investment in Ideko will represent a large fraction of its portfolio. As a consequence, KKP itself is not well diversified. But KKP's investors are primarily pension funds and large institutional investors, which are themselves well diversified and which evaluate their performance relative to the market as a benchmark. Thus, you decide that estimating market risk using the CAPM approach is justified.

Using the CAPM, we can estimate the equity cost of capital for each comparable firm based on the beta of its equity. As outlined in Chapter 12, the standard approach to estimating an equity beta is to determine the historical sensitivity of the stock's returns to the market's returns by using linear regression to estimate the slope coefficient in the equation:

$$\underbrace{R_s - r_f}_{\substack{\text{Excess return} \\ \text{of stock } s}} = \alpha_s + \beta_s \underbrace{(R_{mkt} - r_f)}_{\substack{\text{Excess return} \\ \text{of market portfolio}}} + \varepsilon_s \tag{19.12}$$

---

[9]In Table 19.12, goodwill is assumed to remain constant. If the transaction were structured as an acquisition of assets (as opposed to stock), the goodwill would be amortizable over 15 years for tax reporting as per section 197 of the Internal Revenue Code. For financial accounting purposes, goodwill is not amortized but is subject to an impairment test at least once a year as specified in FASB 142 (though changes in goodwill due to impairment have no tax accounting consequence).

| TABLE 19.13 | Equity Betas with Confidence Intervals for Comparable Firms | | | |
|---|---|---|---|---|
| | Monthly Returns | | 10-Day Returns | |
| Firm | Beta | 95% C.I. | Beta | 95% C.I. |
| Oakley | 1.99 | 1.2 to 2.8 | 1.37 | 0.9 to 1.9 |
| Luxottica | 0.56 | 0.0 to 1.1 | 0.86 | 0.5 to 1.2 |
| Nike | 0.48 | −0.1 to 1.0 | 0.69 | 0.4 to 1.0 |

As a proxy for the market portfolio, we will use a value-weighted portfolio of all NYSE, AMEX, and NASDAQ stocks. With data from 2000 to 2004, we calculate the excess return—the realized return minus the yield on a one-month Treasury security—for each firm and for the market portfolio. We then estimate the equity beta for each firm by regressing its excess return onto the excess return of the market portfolio. We perform the regression for both monthly returns and 10-day returns. The estimated equity betas, together with their 95% confidence intervals, are shown in Table 19.13.

While we would like to assess risk and, therefore, estimate beta based on longer horizon returns (consistent with our investors' investment horizon), the confidence intervals we obtain using monthly data are extremely wide. These confidenc intervals narrow somewhat when we use 10-day returns. In any case, the results make clear that a fair amount of uncertainty persists when we estimate the beta for an individual firm.

## Unlevering Beta

Given an estimate of each firm's equity beta, we next "unlever" the beta based on the firm's capital structure. Here we use Eq. 12.9 (which is equivalent, in terms of returns, to calculating the pretax WACC as in Eq. 18.6):

$$\beta_U = \left( \frac{\text{Equity Value}}{\text{Enterprise Value}} \right) \beta_E + \left( \frac{\text{Net Debt Value}}{\text{Enterprise Value}} \right) \beta_D \qquad (19.13)$$

Recall that we must use the *net* debt of the firm—that is, we must subtract any cash from the level of debt—so we use the enterprise value of the firm as the sum of debt and equity in the formula.[10] Table 19.14 shows the capital structure for each comparable firm. Oakley has no debt, while Luxottica has about 17% debt in its capital structure. Nike holds cash that exceeds its debt, leading to a negative net debt in its capital structure.

Table 19.14 also estimates the unlevered beta of each firm. Here, we have used an equity beta for each firm within the range of the results from Table 19.13. Given the low or negative debt levels for each firm, assuming a beta for debt of zero is a reasonable approximation. Then, we compute an unlevered beta for each firm according to Eq. 19.13.

The range of the unlevered betas for these three firms is large. Both Luxottica and Nike have relatively low betas, presumably reflecting the relative noncyclicality of their core businesses (prescription eyewear for Luxottica and athletic shoes for Nike). Oakley has a much

---

[10]Recall from Chapter 18 that Eq. 19.13 assumes that the firm will maintain a target leverage ratio. If the debt is expected to remain fixed for some period, we should also deduct the value of the predetermined tax shields from the firm's net debt.

| TABLE 19.14 | Capital Structure and Unlevered Beta Estimates for Comparable Firms | | | | |
| --- | --- | --- | --- | --- | --- |
| Firm | $\dfrac{E}{E+D}$ | $\dfrac{D}{E+D}$ | $\beta_E$ | $\beta_D$ | $\beta_U$ |
| Oakley | 1.00 | 0.00 | 1.50 | — | 1.50 |
| Luxottica | 0.83 | 0.17 | 0.75 | 0 | 0.62 |
| Nike | 1.05 | −0.05 | 0.60 | 0 | 0.63 |

higher unlevered beta, perhaps because the high-end specialty sports eyewear it produces is a discretionary expense for most consumers.

## Ideko's Unlevered Cost of Capital

The data from the comparable firms provides guidance to us for estimating Ideko's unlevered cost of capital. Ideko's products are not as high end as Oakley's eyewear, so their sales are unlikely to vary as much with the business cycle as Oakley's sales do. However, Ideko does not have a prescription eyewear division, as Luxottica does. Ideko's products are also fashion items rather than exercise items, so we expect Ideko's cost of capital to be closer to Oakley's than to Nike's or Luxottica's. Therefore, we use 1.20 as our preliminary estimate for Ideko's unlevered beta, which is somewhat above the average of the comparables in Table 19.14.

We use the security market line of the CAPM to translate this beta into a cost of capital for Ideko. In mid-2005, one-year Treasury rates were approximately 4%; we use this rate for the risk-free interest rate. We also need an estimate of the market risk premium. Since 1960, the average annual return of the value-weighted market portfolio of U.S. stocks has exceeded that of one-year Treasuries by approximately 5%. However, this estimate is a backward-looking number. As we mentioned in Chapter 12, some researchers believe that future stock market excess returns are likely to be lower than this historical average. To be conservative in our valuation of Ideko, we will use 5% as the expected market risk premium.

Based on these choices, our estimate of Ideko's unlevered cost of capital is

$$r_U = r_f + \beta_U(E[R_{mkt}] - r_f) = 4\% + 1.20(5\%)$$
$$= 10\%$$

Of course, as our discussion has made clear, this estimate contains a large amount of uncertainty. Thus, we will include sensitivity analysis with regard to the unlevered cost of capital in our analysis.

---

**EXAMPLE 19.5**

**Estimating the Unlevered Cost of Capital**

**Problem**

Using the monthly equity beta estimates for each firm in Table 19.13, what range of unlevered cost of capital estimates is possible?

**Solution**

Oakley has the highest equity beta of 1.99, which is also its unlevered beta (it has no debt). With this beta, the unlevered cost of capital would be $r_U = 4\% + 1.99(5\%) = 13.95\%$. At the other extreme, given its capital structure, Luxottica's equity beta of 0.56 implies an

unlevered beta of $(0.56)(0.83) = 0.46$. With this beta, the unlevered cost of capital would be $r_U = 4\% + 0.46(5\%) = 6.3\%$.

As with any analysis based on comparables, experience and judgment are necessary to come up with a reasonable estimate of the unlevered cost of capital. In this case, our choice would be guided by industry norms, an assessment of which comparable is closest in terms of market risk, and possibly knowledge of how cyclical Ideko's revenues have been historically.

**CONCEPT CHECK**

1. What is a standard approach to estimate an equity beta?

2. How do we estimate a firm's unlevered cost of capital using data from comparable publicly traded firms?

## 19.5  Valuing the Investment

Thus far, we have forecasted the first five years of cash flows from KKP's investment in Ideko, and we have estimated the investment's unlevered cost of capital. In this section, we combine these inputs to estimate the value of the opportunity. The first step is to develop an estimate of Ideko's value at the end of our five-year forecast horizon. To do so, we consider both a multiples approach and a discounted cash flow (DCF) valuation using the WACC method. Given Ideko's free cash flow and continuation value, we then estimate its total enterprise value in 2005 using the APV method. Deducting the value of debt and KKP's initial investment from our estimate of Ideko's enterprise value gives the NPV of the investment opportunity. In addition to NPV, we look at some other common metrics, including IRR and cash multiples.

### The Multiples Approach to Continuation Value

Practitioners generally estimate a firm's continuation value (also called the terminal value) at the end of the forecast horizon using a valuation multiple. While forecasting cash flows explicitly is useful in capturing those specific aspects of a company that distinguish the firm from its competitors in the short run, in the long run firms in the same industry typically have similar expected growth rates, profitability, and risk. As a consequence, multiples are likely to be relatively homogeneous across firms. Thus, applying a multiple is potentially as reliable as estimating the value based on an explicit forecast of distant cash flows.

Of the different valuation multiples available, the EBITDA multiple is most often used in practice. In most settings, the EBITDA multiple is more reliable than sales or earnings multiples because it accounts for the firm's operating efficiency and is not affected by leverage differences between firms. We estimate the continuation value using an EBITDA multiple as follows:

$$\text{Continuation Enterprise Value at Forecast Horizon} =$$
$$\text{EBITDA at Horizon} \times \text{EBITDA Multiple at Horizon} \qquad (19.14)$$

From the income statement in Table 19.7, Ideko's EBITDA in 2010 is forecast to be $32.09 million. If we assume its EBITDA multiple in 2010 is unchanged from the value of 9.1 that we calculated at the time of the original purchase, then Ideko's continuation value in 2010 is $32.09 \times 9.1 = \$292.05$ million. This calculation is shown in the spreadsheet in Table 19.15. Given Ideko's outstanding debt of $120 million in 2010, this estimate corresponds to an equity value of $172.05 million.

| TABLE 19.15 SPREADSHEET | Continuation Value Estimate for Ideko | | | |
|---|---|---|---|---|
| **Continuation Value: Multiples Approach ($ 000)** | | | | |
| 1  EBITDA in 2010 | 32,094 | **Common Multiples** | | |
| 2  EBITDA multiple | 9.1× | EV/Sales | | 1.8× |
| 3  **Continuation Enterprise Value** | **292,052** | P/E (levered) | | 16.3× |
| 4  Debt | (120,000) | P/E (unlevered) | | 18.4× |
| 5  **Continuation Equity Value** | **172,052** | | | |

Table 19.15 also shows Ideko's sales and P/E multiples based on this continuation value. The continuation value is 1.8 times Ideko's 2010 sales, and the equity value is 16.3 times Ideko's 2010 earnings. Because the P/E multiple is affected by leverage, we also report Ideko's **unlevered P/E ratio**, which is calculated as its continuing enterprise value divided by its unlevered net income in 2010 (listed in Table 19.10). Ideko would have this P/E ratio if it had no debt in 2010, so this information is useful when comparing Ideko to unlevered firms in the industry.

We can use the various multiples to assess the reasonableness of our estimated continuation value. While the value-to-sales ratio is high compared to the overall sporting goods industry, these multiples are otherwise low relative to the comparables in Table 19.2. If we expect these industry multiples to remain stable, this estimate of Ideko's continuation value seems reasonable (if not relatively conservative).

## The Discounted Cash Flow Approach to Continuation Value

One difficulty with relying solely on comparables when forecasting a continuation value is that we are comparing *future* multiples of the firm with *current* multiples of its competitors. In 2010, the multiples of Ideko and the comparables we have chosen may all be very different, especially if the industry is currently experiencing abnormal growth. To guard against such a bias, it is wise to check our estimate of the continuation value based on fundamentals using a discounted cash flow approach.

To estimate a continuation value in year $T$ using discounted cash flows, we assume a constant expected growth rate, $g$, and a constant debt-equity ratio. As explained in Chapter 18, when the debt-equity ratio is constant, the WACC valuation method is the simplest to apply:

$$\text{Enterprise Value in Year } T = V_T^L = \frac{FCF_{T+1}}{r_{wacc} - g} \tag{19.15}$$

To estimate free cash flow in year $T + 1$, recall that free cash flow is equal to unlevered net income plus depreciation, less capital expenditures and increases in net working capital (see Table 19.10):

$$FCF_{T+1} = \text{Unlevered Net Income}_{T+1} + \text{Depreciation}_{T+1}$$
$$- \text{Increases in NWC}_{T+1} - \text{Capital Expenditures}_{T+1} \tag{19.16}$$

Suppose the firm's sales are expected to grow at a nominal rate $g$. If the firm's operating expenses remain a fixed percentage of sales, then its unlevered net income will also grow at rate $g$. Similarly, the firm's receivables, payables, and other elements of net working capital will grow at rate $g$.

What about capital expenditures? The firm will need new capital to offset depreciation; it will also need to add capacity as its production volume grows. Given a sales growth rate $g$, we may expect that the firm will need to expand its investment in fixed assets at about the same rate. In that case,[11]

$$\text{Capital Expenditures}_{T+1} = \text{Depreciation}_{T+1} + g \times \text{Fixed Assets}_T$$

Thus, given a growth rate of $g$ for the firm, we can estimate its free cash flow as

$$FCF_{T+1} = (1+g) \times \text{Unlevered Net Income}_T$$
$$-g \times \text{Net Working Capital}_T - g \times \text{Fixed Assets}_T \qquad (19.17)$$

Together, Eq. 19.15 and Eq. 19.17 allow us to estimate a firm's continuation value based on its long-run growth rate.

---

**EXAMPLE 19.6**

### A DCF Estimate of the Continuation Value

**Problem**

Estimate Ideko's continuation value in 2010 assuming a future expected growth rate of 5%, a future debt-to-value ratio of 40%, and a debt cost of capital of 6.8%.

**Solution**

In 2010, Ideko's unlevered net income is forecasted to be $15.849 million (Table 19.10), with working capital of $40.425 million (Table 19.9). It has fixed assets of $69.392 million (Table 19.4). From Eq. 19.17, we can estimate Ideko's free cash flow in 2011:

$$FCF_{2011} = (1.05)(15.849) - (5\%)(40.425) - (5\%)(69.392) = \$11.151 \text{ million}$$

This estimate represents nearly an 8% increase over Ideko's 2010 free cash flow of $10.328 million. It exceeds the 5% growth rate of sales due to the decline in the required additions to Ideko's net working capital as its growth rate slows.

With a debt-to-value ratio of 40%, Ideko's WACC can be calculated from Eq. 18.11 or Eq. 12.13:

$$r_{wacc} = r_U - d\,\tau_c\,r_D = 10\% - 0.40(0.35)\,6.8\% = 9.05\%$$

Given the estimate of Ideko's free cash flow and WACC, we can estimate Ideko's continuation value in 2010:

$$V_{2010}^L = \frac{11.151}{9.05\% - 5\%} = \$275.33 \text{ million}$$

This continuation value represents a terminal EBITDA multiple of $275.33/32.09 = 8.6$.

---

Both the multiples approach and the discounted cash flow approach are useful in deriving a realistic continuation value estimate. Our recommendation is to combine both approaches, as we do in Table 19.16. As shown in the spreadsheet, our projected EBITDA

---

[11]Here, fixed assets are measured according to their book value net of accumulated depreciation. This level of capital expenditures is required to maintain the firm's ratio of sales to fixed assets (also called its fixed asset turnover ratio). An alternative approach—which is preferable if we anticipate a change in the turnover ratio—is to estimate increases in NWC and net investment (capital expenditures in excess of depreciation) in Eq. 19.16 as a target percentage of the *change* in sales, as we did in Chapter 9 (see Example 9.7), where the target percentage is the expected long-run ratio of NWC and PP&E to sales.

| TABLE 19.16 SPREADSHEET | Discounted Cash Flow Estimate of Continuation Value, with Implied EBITDA Multiple |
|---|---|

**Continuation Value: DCF and EBITDA Multiple ($ 000)**

| | | | | |
|---|---|---|---|---|
| 1 | Long-Term Growth Rate | 5.3% | | |
| 2 | Target $D/(E + D)$ | 40.0% | | |
| 3 | Projected WACC | 9.05% | | |
| | Free Cash Flow in 2011 | | | |
| 4 | Unlevered Net Income | 16,695 | **Continuation Enterprise Value** | **292,052** |
| 5 | Less: Increase in NWC | (2,158) | | |
| 6 | Less: Net Investment* | (3,705) | **Implied EBITDA Multiple** | **9.1×** |
| 7 | Free Cash Flow | 10,832 | | |

*Net investment equals the difference between capital expenditures and depreciation, so subtracting this amount is equivalent to adding back depreciation and subtracting capital expenditures (see Eq. 9.20).

multiple of 9.1 can be justified by the discounted cash flow method with a nominal long-term growth rate of about 5.3%.[12] Given an expected future inflation rate of 2.5%, this nominal rate represents a real growth rate of about 2.8%. This implied growth rate is another important reality check for our continuation value estimate. If it is much higher than our expectations of long-run growth for the industry as a whole, we should be more skeptical of the estimate being used.

### APV Valuation of Ideko's Equity

Our estimate of Ideko's continuation value summarizes the value of the firm's free cash flow beyond the forecast horizon. We can combine it with our forecast for free cash flow through 2010 (Table 19.10, line 7) to estimate Ideko's value today. Recall from Chapter 18

---

**COMMON MISTAKE** | **Continuation Values and Long-Run Growth**

The continuation value is one of the most important estimates when valuing a firm. A common mistake is to use an overly optimistic continuation value, which will lead to an upward bias in the estimated current value of the firm. Be aware of the following pitfalls:

**Using multiples based on current high growth rates.** Continuation value estimates are often based on current valuation multiples of existing firms. But if these firms are currently experiencing high growth that will eventually slow down, their multiples can be expected to decline over time. In this scenario, if we estimate a continuation value based on today's multiples without accounting for this decline as growth slows, the estimate will be biased upward.

**Ignoring investment necessary for growth.** When using the discounted cash flow method, we cannot assume

that $FCF_{T+1} = FCF_T (1 + g)$ if the firm's growth rate has changed between $T$ and $T + 1$. Whenever the growth rate changes, expenditures on working and fixed capital will be affected, and we must take this effect into account as we do in Eq. 19.17.

**Using unsustainable long-term growth rates.** When using the discounted cash flow method, we must choose a long-term growth rate for the firm. By choosing a high rate, we can make the continuation value estimate extremely high. In the long run, however, firms cannot continue to grow faster than the overall economy. Thus, we should be suspicious of long-term growth rates that exceed the expected rate of GDP growth, which has averaged between 2.5% and 3.5% in *real* terms (that is, not including inflation) in the United States over the past several decades.

---

[12]The exact nominal growth rate needed to match an EBITDA multiple of 9.1 is 5.33897%, which can be found using Solver in Excel.

| TABLE 19.17 SPREADSHEET | APV Estimate of Ideko's Initial Equity Value | | | | | |
|---|---|---|---|---|---|---|
| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **APV Method ($ 000)** | | | | | | |
| 1  Free Cash Flow | | 13,475 | 7,409 | (5,845) | 1,458 | 10,328 |
| 2  **Unlevered Value** $V^U$ (at 10%) | 202,732 | 209,530 | 223,075 | 251,227 | 274,891 | 292,052 |
| 3  Interest Tax Shield | | 2,380 | 2,380 | 2,380 | 2,737 | 2,856 |
| 4  **Tax Shield Value** $T^S$ (at 6.8%) | 10,428 | 8,757 | 6,972 | 5,067 | 2,674 | — |
| 5  **APV:** $V^L = V^U + T^S$ | 213,160 | 218,287 | 230,047 | 256,294 | 277,566 | 292,052 |
| 6  Debt | (100,000) | (100,000) | (100,000) | (115,000) | (120,000) | (120,000) |
| 7  **Equity Value** | **113,160** | **118,287** | **130,047** | **141,294** | **157,566** | **172,052** |

that because the debt is paid on a fixed schedule during the forecast period, the APV method is the easiest valuation method to apply.

The steps to estimate Ideko's value using the APV method are shown in the spreadsheet in Table 19.17. First, we compute Ideko's unlevered value $V^U$, which is the firm's value if we were to operate the company without leverage during the forecast period and sell it for its continuation value at the end of the forecast horizon. Thus, the final value in 2010 would be the continuation value we estimated in Table 19.15. The value in earlier periods includes the free cash flows paid by the firm (from Table 19.10) discounted at the unlevered cost of capital $r_U$ that we estimated in Section 19.4[13]:

$$V_{t-1}^U = \frac{FCF_t + V_t^U}{1 + r_U} \tag{19.18}$$

Next, we incorporate Ideko's interest tax shield during the forecast horizon. The interest tax shield equals the tax rate of 35% (Table 19.3) multiplied by Ideko's scheduled interest payments (see Table 19.5). Because the debt levels are predetermined, we compute the value $T^s$ of the tax shield by discounting the tax savings at the debt interest rate, $r_D = 6.80\%$:

$$T_{t-1}^s = \frac{\text{Interest Tax Shield}_t + T_t^s}{1 + r_D} \tag{19.19}$$

Combining the unlevered value and the tax shield value gives the APV, which is Ideko's enterprise value given the planned leverage policy. By deducting debt, we obtain our estimate for the value of Ideko's equity during the forecast period.

Thus, our estimate for Ideko's initial enterprise value is $213 million, with an equity value of $113 million. As KKP's initial cost to acquire Ideko's equity is $53 million (see Table 19.6), based on these estimates the deal looks attractive, with an NPV of $113 million − $53 million = $60 million.

## A Reality Check

At this point, it is wise to step back and assess whether our valuation results make sense. Does an initial enterprise value of $213 million for Ideko seem reasonable compared to the values of other firms in the industry?

---

[13]Note that in 2010, we use the continuation value of $292 million as the final "unlevered" value, even though this value might include future tax shields (as in Example 19.6). This approach is correct as we are using the APV calculation only to value the additional tax shields earned during the forecast horizon. Combining discounting methodologies as we have done here is very useful in situations like this one in which the firm is likely to be recapitalized at the exit horizon.

| COMMON MISTAKE | Missing Assets or Liabilities |
|---|---|

When computing the enterprise value of a firm from its free cash flows, remember that we are valuing only those assets and liabilities whose cash flow consequences are included in our projections. Any "missing" assets or liabilities must be added to the APV estimate to determine the value of equity. In this case, we deduct the firm's debt and add any excess cash or other marketable securities that have not been included (for Ideko, excess cash has already been paid out and will remain at zero, so no adjustment is needed). We also adjust for any other assets or liabilities that have not been explicitly considered. For example, if a firm owns vacant land, or if it has patents or other rights whose potential cash flows were not included in the projections, the value of these assets must be accounted for separately. The same is true for liabilities such as stock option grants, potential legal liabilities, leases (if the lease payments were not included in earnings), or underfunded pension liabilities.

Here again, multiples are helpful. Let's compute the initial valuation multiples that would be implied by our estimated enterprise value of $213 million and compare them to Ideko's closest competitors as we did in Table 19.2. Table 19.18 provides our results.

Naturally, the valuation multiples based on the estimated enterprise value of $213 million, which would correspond to a purchase price of $215 million given Ideko's existing debt and excess cash, are higher than those based on a purchase price of $150 million. They are now at the top end or somewhat above the range of the values of the other firms that we used for comparison. While these multiples are not unreasonable given the operational improvements that KKP plans to implement, they indicate that our projections may be somewhat optimistic and depend critically on KKP's ability to achieve the operational improvements it plans.

Our estimated initial EBITDA multiple of 13.1 also exceeds the multiple of 9.1 that we assumed for the continuation value. Thus, our estimate forecasts a decline in the EBITDA multiple, which is appropriate given our expectation that growth will be higher in the short run. If the multiple did not decline, we should question whether our continuation value is too optimistic.

## IRR and Cash Multiples

While the NPV method is the most reliable method when evaluating a transaction like KKP's acquisition of Ideko, real-world practitioners often use IRR and the *cash multiple* (or multiple of money) as alternative valuation metrics. We discuss both of these methods in this section.

To compute the IRR, we must compute KKP's cash flows over the life of the transaction. KKP's initial investment in Ideko, from Table 19.6, is $53 million. KKP will then receive cash dividends from Ideko based on the free cash flow to equity reported in Table 19.10. Finally, we assume that KKP will sell its equity share in Ideko at the end of five years,

| TABLE 19.18 | Ideko Financial Ratios Comparison, Mid-2005, Based on Discounted Cash Flow Estimate Versus Proposed Purchase Price |
|---|---|

| Ratio | Ideko (Estimated Value) | Ideko (Purchase Price) | Oakley, Inc. | Luxottica Group | Nike, Inc. | Sporting Goods |
|---|---|---|---|---|---|---|
| P/E | 31.0× | 21.6× | 24.8× | 28.0× | 18.2× | 20.3× |
| EV/Sales | 2.8× | 2.0× | 2.0× | 2.7× | 1.5× | 1.4× |
| EV/EBITDA | 13.1× | 9.1× | 11.6× | 14.4× | 9.3× | 11.4× |

698        **Chapter 19**  Valuation and Financial Modeling: A Case Study

| TABLE 19.19 SPREADSHEET | IRR and Cash Multiple for KKP's Investment in Ideko | | | | | |
|---|---|---|---|---|---|---|
| **Year** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
| **IRR and Cash Multiple** | | | | | | |
| 1  Initial Investment | (53,000) | | | | | |
| 2  Free Cash Flow to Equity | | 9,055 | 2,989 | 4,735 | 1,375 | 5,024 |
| 3  Continuation Equity Value | | | | | | 172,052 |
| 4  KKP Cash Flows | (53,000) | 9,055 | 2,989 | 4,735 | 1,375 | 177,077 |
| 5  **IRR** | **33.3%** | | | | | |
| 6  **Cash Multiple** | **3.7×** | | | | | |

receiving the continuation equity value. We combine these data to determine KKP's cash flows in the spreadsheet in Table 19.19. Given the cash flows, we compute the IRR of the transaction, which is 33.3%.

While an IRR of 33.3% might sound attractive, it is not straightforward to evaluate in this context. To do so, we must compare it to the appropriate cost of capital for KKP's investment. Because KKP holds an equity position in Ideko, we should use Ideko's equity cost of capital. Of course, Ideko's leverage ratio changes over the five-year period, which will change the risk of its equity. Thus, there is no single cost of capital to compare to the IRR.[14]

The spreadsheet in Table 19.19 also computes the cash multiple for the transaction. The **cash multiple** (also called the **multiple of money** or **absolute return**) is the ratio of the total cash received to the total cash invested. The cash multiple for KKP's investment in Ideko is

$$\text{Cash Multiple} = \frac{\text{Total Cash Received}}{\text{Total Cash Invested}}$$

$$= \frac{9055 + 2989 + 4735 + 1375 + 177{,}077}{53{,}000} = 3.7 \qquad (19.20)$$

That is, KKP expects to receive a return that is 3.7 times its investment in Ideko. The cash multiple is a common metric used by investors in transactions such as this one. It has an obvious weakness: The cash multiple does not depend on the amount of time it takes to receive the cash, nor does it account for the risk of the investment. It is therefore useful only for comparing deals with similar time horizons and risk.

CONCEPT CHECK

1. What are the main methods of estimating the continuation value of the firm at the end of the forecast horizon?

2. What are the potential pitfalls of analyzing a transaction like this one based on its IRR or cash multiple?

---

[14]See the appendix to this chapter for a calculation of Ideko's annual equity cost of capital.

## 19.6  Sensitivity Analysis

Any financial valuation is only as accurate as the estimates on which it is based. Before concluding our analysis, it is important to assess the uncertainty of our estimates and to determine their potential impact on the value of the deal.

Once we have developed the spreadsheet model for KKP's investment in Ideko, it is straightforward to perform a sensitivity analysis to determine the impact of changes in different parameters on the deal's value. For example, the spreadsheet in Table 19.20 shows the sensitivity of our estimates of the value of KKP's investment to changes in our assumptions regarding the exit EBITDA multiple that KKP obtains when Ideko is sold, as well as Ideko's unlevered cost of capital.

In our initial analysis, we assumed an exit EBITDA multiple of 9.1. Table 19.20 shows that each 1.0 increase in the multiple represents about $20 million in initial value.[15] KKP will break even on its $53 million investment in Ideko with an exit multiple of slightly more than 6.0. The table also shows, however, that an exit multiple of 6.0 is consistent with a future growth rate for Ideko of less than 2%, which is even less than the expected rate of inflation and perhaps unrealistically low.

| TABLE 19.20 SPREADSHEET | Sensitivity Analysis for KKP's Investment in Ideko | | | | | |
|---|---|---|---|---|---|---|
| **Exit EBITDA Multiple** | **6.0** | **7.0** | **8.0** | **9.1** | **10.0** | **11.0** |
| Implied Long-Run Growth Rate | 1.60% | 3.43% | 4.53% | **5.34%** | 5.81% | 6.21% |
| Ideko Enterprise Value  (in $ million) | 151.4 | 171.3 | 191.2 | **213.2** | 231.1 | 251.0 |
| KKP Equity Value        (in $ million) | 51.4 | 71.3 | 91.2 | **113.2** | 131.1 | 151.0 |
| KKP IRR | 14.8% | 22.1% | 28.0% | **33.3%** | 37.1% | 40.8% |
| | | | | | | |
| **Unlevered Cost of Capital** | **9.0%** | **10.0%** | **11.0%** | **12.0%** | **13.0%** | **14.0%** |
| Implied Long-Run Growth Rate | 3.86% | **5.34%** | 6.81% | 8.29% | 9.76% | 11.24% |
| Ideko Enterprise Value  (in $ million) | 222.1 | **213.2** | 204.7 | 196.7 | 189.1 | 181.9 |
| KKP Equity Value        (in $ million) | 122.1 | **113.2** | 104.7 | 96.7 | 89.1 | 81.9 |

Table 19.20 also illustrates the effect of a change to our assumption about Ideko's unlevered cost of capital. A higher unlevered cost of capital reduces the value of KKP's investment; yet, even with a rate as high as 14%, the equity value exceeds KKP's initial investment. However, if the unlevered cost of capital exceeds 12%, the implied long-term growth rate that justifies the assumed exit EBITDA multiple of 9.1 is probably unrealistically high. Thus, if we believe the unlevered cost of capital falls within this range, we should lower our forecast for the exit EBITDA multiple, which will further reduce the value of KKP's equity. Conversely, if we are confident in our estimate of the exit multiple, this analysis lends further support to our choice for the unlevered cost of capital.

The exercises at the end of this chapter continue the sensitivity analysis by considering different levels of market share growth and changes to working capital management.

**CONCEPT CHECK**

1. What is the purpose of the sensitivity analysis?

2. Table 19.20 shows the sensitivity analysis for KKP's investment in Ideko. Given this information, do you recommend the acquisition of Ideko?

---

[15]In fact, we can calculate this directly as the present value of Ideko's projected EBITDA in 2010: ($32.094 million)/$(1.10^5)$ = $19.928 million.

700    **Chapter 19** Valuation and Financial Modeling: A Case Study

**MyFinanceLab** — Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 19.1 Valuation Using Comparables

- Valuation using comparables may be used as a preliminary way to estimate the value of a firm. Common multiples include the price-earnings ratio, and the ratio of enterprise value to sales or EBITDA.

### 19.2 The Business Plan

- When evaluating an acquisition it is necessary to look in detail at the company's operations, investments, and capital structure, and to assess its potential for improvements and future growth.

### 19.3 Building the Financial Model

- The value of an investment ultimately depends on the firm's future cash flows. To estimate cash flows, one must first develop forecasts for the target firm's operations, investments, and capital structure.
- A financial model may be used to project the future cash flows from an investment.
  - A pro forma income statement projects the firm's earnings under a given set of hypothetical assumptions.
  - The financial model should also consider future working capital needs and capital expenditures to estimate future free cash flows.
  - Based on these estimates, we can forecast the balance sheet and statement of cash flows.
- When forecasting the balance sheet, we must first adjust the firm's initial balance sheet to reflect the transaction, including:

$$\text{New Goodwill} = \text{Acquisition Price} - \text{Value of Net Assets Acquired} \quad (19.10)$$

$$\text{New Stockholders' Equity} = \text{Equity Contributions} - \text{Expensed Transaction Fees} \quad (19.11)$$

- Checking whether the balance sheet balances is an important audit tool for the consistency of the financial model.

### 19.4 Estimating the Cost of Capital

- To value an investment, we need to assess its risk and estimate an appropriate cost of capital. One method for doing so is to use the CAPM.
  - Use the CAPM to estimate the equity cost of capital for comparable firms, based on their equity betas.
  - Given an estimate of each comparable firm's equity beta, unlever the beta based on the firm's capital structure.
  - Use the CAPM and the estimates of unlevered betas for comparable firms to estimate the unlevered cost of capital for the investment.

### 19.5 Valuing the Investment

- In addition to forecasting cash flows for a few years, we need to estimate the firm's continuation value at the end of the forecast horizon.
  - One method is to use a valuation multiple based on comparable firms.
  - To estimate a continuation value in year $T$ using discounted cash flows, it is common practice to assume a constant expected growth rate $g$ and a constant debt-equity ratio:

$$\text{Enterprise Value in Year } T = V_T^L = \frac{FCF_{T+1}}{r_{wacc} - g} \quad (19.15)$$

- Given the forecasted cash flows and an estimate of the cost of capital, the final step is to combine these inputs to estimate the value of the opportunity. We may use the valuation methods described in Chapter 18 to calculate firm value.

- While the NPV method is the most reliable approach for evaluating an investment, practitioners often use the IRR and cash multiple as alternative valuation metrics.
  - We use the cash flows over the lifetime of the investment to calculate the IRR.
  - The cash multiple for an investment is the ratio of the total cash received to the total cash invested:

$$\text{Cash Multiple} = \frac{\text{Total Cash Received}}{\text{Total Cash Invested}} \qquad (19.20)$$

### 19.6 Sensitivity Analysis

- Sensitivity analysis is useful for evaluating the uncertainty of estimates used for valuation, and the impact of this uncertainty on the value of the deal.

## Key Terms

cash multiple (multiple of money, absolute return) *p. 698*

pro forma *p. 680*
unlevered P/E ratio *p. 693*

## Further Reading

For more detail on the issues involved in the valuation and financial modeling of companies and projects, see: T. Koller, M. Goedhart, and D. Wessels, *Valuation: Measuring and Managing the Value of Companies* (John Wiley & Sons, 2010); S. Benninga and O. Sarig, *Corporate Finance: A Valuation Approach* (McGraw-Hill/Irwin, 1996); E. Arzac, *Valuation for Mergers, Buyouts and Restructuring* (John Wiley & Sons, 2007); S. Pratt, R. Reilly, and R. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (McGraw-Hill, 2007); and J. Rosenbaum and J. Pearl, *Investment Banking* (John Wiley & Sons, 2009).

## Problems

*All problems are available in* MyFinanceLab. *An asterisk (\*) indicates problems with a higher level of difficulty.*

1. You would like to compare Ideko's profitability to its competitors' profitability using the EBITDA/sales multiple. Given Ideko's current sales of $75 million, use the information in Table 19.2 to compute a range of EBITDA for Ideko assuming it is run as profitably as its competitors.

### The Business Plan

2. Assume that Ideko's market share will increase by 0.5% per year rather than the 1% used in the chapter. What production capacity will Ideko require each year? When will an expansion become necessary (when production volume will exceed the current level by 50%)?

3. Under the assumption that Ideko market share will increase by 0.5% per year, you determine that the plant will require an expansion in 2010. The cost of this expansion will be $15 million. Assuming the financing of the expansion will be delayed accordingly, calculate the projected interest payments and the amount of the projected interest tax shields (assuming that the interest rates on the term loans remain the same as in the chapter) through 2010.

### Building the Financial Model



4. Under the assumption that Ideko's market share will increase by 0.5% per year (and the investment and financing will be adjusted as described in Problem 3), you project the following depreciation:

| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Fixed Assets and Capital Investment ($ 000)** | | | | | | |
| 2   New Investment | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 |
| 3   Depreciation | (5,500) | (5,450) | (5,405) | (5,365) | (5,328) | (6,795) |

Using this information, project net income through 2010 (that is, reproduce Table 19.7 under the new assumptions).

 5. Under the assumptions that Ideko's market share will increase by 0.5% per year (implying that the investment, financing, and depreciation will be adjusted as described in Problems 3 and 4) and that the forecasts in Table 19.8 remain the same, calculate Ideko's working capital requirements though 2010 (that is, reproduce Table 19.9 under the new assumptions).

 6. Under the assumptions that Ideko's market share will increase by 0.5% per year (implying that the investment, financing, and depreciation will be adjusted as described in Problems 3 and 4) but that the projected improvements in net working capital do not transpire (so the numbers in Table 19.8 remain at their 2005 levels through 2010), calculate Ideko's working capital requirements though 2010 (that is, reproduce Table 19.9 under these assumptions).

 7. Forecast Ideko's free cash flow (reproduce Table 19.10), assuming Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital occur (that is, under the assumptions in Problem 5).

 8. Forecast Ideko's free cash flow (reproduce Table 19.10), assuming Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital do *not* occur (that is, under the assumptions in Problem 6).

 *9. Reproduce Ideko's balance sheet and statement of cash flows, assuming Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital occur (that is, under the assumptions in Problem 5).

 *10. Reproduce Ideko's balance sheet and statement of cash flows, assuming Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital do *not* occur (that is, under the assumptions in Problem 6).

## Estimating the Cost of Capital

11. Calculate Ideko's unlevered cost of capital when Ideko's unlevered beta is 1.1 rather than 1.2, and all other required estimates are the same as in the chapter.

12. Calculate Ideko's unlevered cost of capital when the market risk premium is 6% rather than 5%, the risk-free rate is 5% rather than 4%, and all other required estimates are the same as in the chapter.

## Valuing the Investment

13. Using the information produced in the income statement in Problem 4, use EBITDA as a multiple to estimate the continuation value in 2010, assuming the current value remains unchanged (reproduce Table 19.15). Infer the EV/sales and the unlevered and levered P/E ratios implied by the continuation value you calculated.

14. How does the assumption on future improvements in working capital affect your answer to Problem 13?

15. Approximately what expected future long-run growth rate would provide the same EBITDA multiple in 2010 as Ideko has today (i.e., 9.1)? Assume that the future debt-to-value ratio is held constant at 40%; the debt cost of capital is 6.8%; Ideko's market share will increase by 0.5% per year until 2010; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital occur (i.e., the assumptions in Problem 5).

16. Approximately what expected future long-run growth rate would provide the same EBITDA multiple in 2010 as Ideko has today (i.e., 9.1)? Assume that the future debt-to-value ratio is held constant at 40%; the debt cost of capital is 6.8%; Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital do *not* occur (i.e., the assumptions in Problem 6).

17. Using the APV method, estimate the value of Ideko and the NPV of the deal using the continuation value you calculated in Problem 13 and the unlevered cost of capital estimate in Section 19.4. Assume that the debt cost of capital is 6.8%; Ideko's market share will increase by 0.5% per year until 2010; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital occur (i.e., the assumptions in Problem 5).

18. Using the APV method, estimate the value of Ideko and the NPV of the deal using the continuation value you calculated in Problem 13 and the unlevered cost of capital estimate in Section 19.4. Assume that the debt cost of capital is 6.8%; Ideko's market share will increase by 0.5% per year; investment, financing, and depreciation will be adjusted accordingly; and the projected improvements in working capital do *not* occur (i.e., the assumptions in Problem 6).

19. Use your answers from Problems 17 and 18 to infer the value today of the projected improvements in working capital under the assumptions that Ideko's market share will increase by 0.5% per year and that investment, financing, and depreciation will be adjusted accordingly.

**CHAPTER 19 APPENDIX**

**NOTATION**

$r_E$ equity cost of capital

# Compensating Management

The success of KKP's investment critically depends on its ability to execute the operational improvements laid out in its business plan. KKP has learned from experience that it is much more likely to achieve its goals if the management team responsible for implementing the changes is given a strong incentive to succeed. KKP therefore considers allocating 10% of Ideko's equity to a management incentive plan. This equity stake would be vested over the next five years, and it would provide Ideko's senior executives with a strong financial interest in the success of the venture. What is the cost to KKP of providing this equity stake to the management team? How will this incentive plan affect the NPV of the acquisition?

To determine the value of the acquisition to KKP, we must include the cost of the 10% equity stake granted to management. Because the grant vests after five years, management will not receive any of the dividends paid by Ideko during that time. Instead, management will receive the equity in five years time, at which point we have estimated the value of Ideko's equity to be $172 million (see Table 19.15). Thus, the cost of management's stake in 2010 is equal to $10\% \times \$172$ million $= \$17.2$ million according to our estimate. We must determine the present value of this amount today.

Because the payment to the managers is an equity claim, to compute its present value we must use an equity cost of capital. We take an FTE valuation approach to estimate the cost of management's share in Ideko, shown in the spreadsheet in Table 19A.1.

To compute Ideko's equity cost of capital $r_E$, we use Eq. 18.20, which applies when the debt levels of the firm follow a known schedule:

$$r_E = r_U + \frac{D - T^s}{E}(r_U - r_D)$$

Using the debt, equity, and tax shield values from the spreadsheet in Table 19.17 to compute the effective leverage ratio $(D - T^s)/E$, we compute $r_E$ each year as shown in the spreadsheet. We then compute the cost of management's equity share by discounting at this rate:

$$\text{Cost of Management's Share}_t = \frac{\text{Cost of Management's Share}_{t+1}}{1 + r_E(t)} \qquad (19A.1)$$

Once we have determined the cost of management's equity share, we deduct it from the total value of Ideko's equity (from Table 19.17) to determine the value of KKP's share of Ideko's equity, shown as the last line of the spreadsheet. Given the initial cost of the acquisition to KKP of $53 million, KKP's NPV from the investment, including the cost of management's compensation, is $103.58 million $-$ $53 million $= \$50.58$ million.

**TABLE 19A.1 SPREADSHEET**    **FTE Estimate of the Cost of Management's Share and KKP's Equity Value**

| Year | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Management/KKP Share ($ 000)** | | | | | | |
| 1  Management Payoff (10% share) | | | | | | 17,205 |
| 2  Effective Leverage $(D - T^s)/E$ | 0.792 | 0.771 | 0.715 | 0.778 | 0.745 | |
| 3  Equity Cost of Capital $r_E$ | 12.53% | 12.47% | 12.29% | 12.49% | 12.38% | |
| 4  **Cost of Management's Share** | **(9,576)** | **(10,777)** | **(12,120)** | **(13,610)** | **(15,309)** | **(17,205)** |
| 5  Ideko Equity Value | 113,160 | 118,287 | 130,047 | 141,294 | 157,566 | 172,052 |
| 6  **KKP Equity** | **103,583** | **107,511** | **117,927** | **127,684** | **142,256** | **154,847** |

**PART**

# 7

# Options

*THE LAW OF ONE PRICE CONNECTION.* Having developed the tools to make current investment decisions, we turn to settings in which the firm or an investor has the option to make a future investment decision. Chapter 20 introduces financial options, which give investors the right to buy or sell a security in the future. Financial options are an important tool for corporate financial managers seeking to manage or evaluate risk. Options are an example of a derivative security. In the last 30 years, there has been enormous growth in the derivative securities markets in general and options markets in particular. This growth can be traced directly to the discovery of methods for valuing options, which we derive in Chapter 21 using the Law of One Price. An important corporate application of option theory is in the area of real investment decision making. Future investment decisions within the firm are known as real options and Chapter 22 applies real option theory to corporate decision making.

**CHAPTER 20**
Financial Options

**CHAPTER 21**
Option Valuation

**CHAPTER 22**
Real Options

**CHAPTER**

# 20

# Financial Options

## NOTATION

| | |
|---|---|
| $PV$ | present value |
| $Div$ | dividend |
| $C$ | call option price |
| $P$ | put option price |
| $S$ | stock price |
| $K$ | strike price |
| $dis$ | discount from face value |
| $NPV$ | net present value |

I N THIS CHAPTER, WE INTRODUCE THE FINANCIAL OPTION, A financial contract between two parties. Since the introduction of publicly traded options on the Chicago Board Options Exchange (CBOE) in 1973, financial options have become one of the most important and actively traded financial assets and important tools for corporate financial managers. Many large corporations have operations in different parts of the world, so they face exposure to exchange rate risk and other types of business risk. To control this risk, they use options as part of their corporate risk management practices. In addition, we can think of the capitalization of the firm itself—that is, its mix of debt and equity—as options on the underlying assets of the firm. As we will see, viewing the firm's capitalization in this way yields important insights into the firm's capital structure as well as the conflicts of interests that arise between equity investors and debt investors.

Before we can discuss the corporate applications of options, we first need to understand what options are and what factors affect their value. In this chapter, we provide an overview of the basic types of financial options, introduce important terminology, and describe the payoffs to various option-based strategies. We next discuss the factors that affect option prices. Finally, we model the equity and debt of the firm as options to gain insight into the conflicts of interest between equity and debt holders, as well as the pricing of risky debt.

## 20.1  Option Basics

A **financial option** contract gives its owner the right (but not the obligation) to purchase or sell an asset at a fixed price at some future date. Two distinct kinds of option contracts exist: call options and put options. A **call option** gives the owner the right to *buy* the asset; a **put option** gives the owner the right to *sell* the asset. Because an option is a contract between two parties, for every owner of a financial option, there is also an **option writer**, the person who takes the other side of the contract.

The most commonly encountered option contracts are options on shares of stock. A stock option gives the holder the option to buy or sell a share of stock on or before a given date for a given price. For example, a call option on 3M Corporation stock might give the holder the right to purchase a share of 3M for $75 per share at any time up to, for example, January 16, 2015. Similarly, a put option on 3M stock might give the holder the right to sell a share of 3M stock for $50 per share at any time up to, say, January 17, 2014.

### Understanding Option Contracts

Practitioners use specific words to describe the details of option contracts. When a holder of an option enforces the agreement and buys or sells a share of stock at the agreed-upon price, he is **exercising** the option. The price at which the holder buys or sells the share of stock when the option is exercised is called the **strike price** or **exercise price**.

There are two kinds of options. **American options**, the most common kind, allow their holders to exercise the option on any date up to and including a final date called the **expiration date**. **European options** allow their holders to exercise the option *only* on the expiration date—holders cannot exercise before the expiration date. The names *American* and *European* have nothing to do with the location where the options are traded: Both types are traded worldwide.

An option contract is a contract between two parties. The option buyer, also called the option holder, holds the right to exercise the option and has a *long* position in the contract. The option seller, also called the option writer, sells (or writes) the option and has a *short* position in the contract. Because the long side has the option to exercise, the short side has an *obligation* to fulfill the contract. For example, suppose you own a call option on Hewlett-Packard stock with an exercise price of $10. Hewlett-Packard stock is currently trading for $25, so you decide to exercise the option. The person holding the short position in the contract is obligated to sell you a share of Hewlett-Packard stock for $10. Your gain, the $15 difference between the price you pay for the share of stock and the price at which you can sell the share in the market, is the short position's loss.

Investors exercise options only when they stand to gain something. Consequently, whenever an option is exercised, the person holding the short position funds the gain. That is, the obligation will be costly. Why, then, do people write options? The answer is that when you sell an option you get paid for it—options always have positive prices. The market price of the option is also called the **option premium**. This upfront payment compensates the seller for the risk of loss in the event that the option holder chooses to exercise the option.

### Interpreting Stock Option Quotations

Stock options are traded on organized exchanges. The oldest and largest is the Chicago Board Options Exchange (CBOE). By convention, all traded options expire on the Saturday following the third Friday of the month.

708    **Chapter 20** Financial Options

| TABLE 20.1 | **Option Quotes for Amazon.com Stock** |
| --- | --- |

**AMZN**                                                                                                                                                   **77.03** **+1.40**

Jul 08 2009 @ 15:26 ET                                                                        **Bid** 77.02  **Ask** 77.03  **Size** 1 x 3  **Vol** 6548487

| Calls | Last Sale | Net | Bid | Ask | Vol | Open Int | Puts | Last Sale | Net | Bid | Ask | Vol | Open Int |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 09 Jul 70.00 (ZQN GN-E) | 7.65 | 1.60 | 7.20 | 7.30 | 221 | 2637 | 09 Jul 70.00 (ZQN SN-E) | 0.36 | –0.18 | 0.36 | 0.38 | 684 | 11031 |
| 09 Jul 75.00 (ZQN GO-E) | 3.35 | 0.86 | 3.20 | 3.30 | 943 | 6883 | 09 Jul 75.00 (ZQN SO-E) | 1.30 | –0.66 | 1.38 | 1.40 | 2394 | 15545 |
| 09 Jul 80.00 (QZN GP-E) | 0.94 | 0.24 | 0.93 | 0.96 | 2456 | 9877 | 09 Jul 80.00 (QZN SP-E) | 4.15 | –1.05 | 4.00 | 4.10 | 700 | 10718 |
| 09 Jul 85.00 (QZN GQ-E) | 0.22 | 0.07 | 0.19 | 0.21 | 497 | 26679 | 09 Jul 85.00 (QZN SQ-E) | 8.25 | –1.25 | 8.25 | 8.35 | 112 | 7215 |
| 09 Aug 70.00 (ZQN HN-E) | 9.75 | 1.04 | 9.60 | 9.70 | 51 | 326 | 09 Aug 70.00 (ZQN TN-E) | 2.77 | –0.39 | 2.75 | 2.79 | 225 | 1979 |
| 09 Aug 75.00 (ZQN HO-E) | 6.50 | 0.70 | 6.40 | 6.50 | 65 | 1108 | 09 Aug 75.00 (ZQN TO-E) | 4.60 | –0.55 | 4.55 | 4.60 | 2322 | 6832 |
| 09 Aug 80.00 (QZN HP-E) | 4.00 | 0.50 | 3.90 | 4.00 | 172 | 2462 | 09 Aug 80.00 (QZN TP-E) | 6.95 | –0.95 | 7.05 | 7.15 | 145 | 2335 |
| 09 Aug 85.00 (QZN HQ-E) | 2.15 | 0.15 | 2.22 | 2.26 | 833 | 5399 | 09 Aug 85.00 (QZN TQ-E) | 10.15 | –1.00 | 10.30 | 10.40 | 43 | 4599 |

*Source*: Chicago Board Options Exchange at www.cboe.com

Table 20.1 shows near-term options on Amazon taken from the CBOE Web site (www.cboe.com) on July 8, 2009. Call options are listed on the left and put options on the right. Each line corresponds to a particular option. The first two digits in the option name refer to the year of expiration. The option name also includes the month of expiration, the strike or exercise price, and the ticker symbol of the individual option (in parentheses). Looking at Table 20.1, the first line of the left column is a call option with an exercise price of $70 that expires on the Saturday following the third Friday of July 2009 (July 18). The columns to the right of the name display market data for the option. The first of these columns shows the last sale price, followed by the net change from the previous day's last reported sales price, the current bid and ask prices, and the daily volume.[1] The final column is the **open interest**, the total number of outstanding contracts of that option.

Above the table, we find information about the stock itself. In this case, Amazon's stock last traded at a price of $77.03 per share. We also see the current bid and ask prices for the stock, the size trade (in hundreds of shares) available at these prices, as well as the volume of trade.

When the exercise price of an option is equal to the current price of the stock, the option is said to be **at-the-money**. Notice that, especially for the near-term options, much of the trading occurs in options that are closest to being at-the-money—that is, calls and puts with exercise prices of either $75 or $80. Note how the July 80 calls have high volume. They last traded for $0.94, midway between the current bid price ($0.93) and the ask price ($0.96), which indicates that the trade likely occurred recently. If it were not recent, the last sale price might be far from the current bid and ask.

Stock option contracts are always written on 100 shares of stock. If, for instance, you decided to purchase one July 75 call contract, you would be purchasing an option to buy 100 shares at $75 per share. Option prices are quoted on a per-share basis, so the ask price of $3.30 implies that you would pay $100 \times 3.30 = \$330$ for the contract. Similarly, if you decide to buy a July 70 put contract, you would pay $100 \times 0.38 = \$38$ for the option to sell 100 shares of Amazon stock for $70 per share.

---

[1]If no trade has occurred that day, the last sale price is from the previous day, and "pc" appears in the net change column.

Note from Table 20.1 that for each expiration date, call options with lower strike prices have higher market prices—the right to buy the stock at a lower price is more valuable than the right to buy it for a higher price. Conversely, because the put option gives the holder the right to sell the stock at the strike price, for the same expiration date, puts with higher strikes are more valuable. On the other hand, holding fixed the strike price, both calls and puts are more expensive for a longer time to expiration. Because these options are American-style options that can be exercised at any time, having the right to buy or sell for a longer period is more valuable.

If the payoff from exercising an option immediately is positive, the option is said to be **in-the-money**. Call options with strike prices below the current stock price are in-the-money, as are put options with strike prices above the current stock price. Conversely, if the payoff from exercising the option immediately is negative, the option is **out-of-the-money**. Call options with strike prices above the current stock price are out-of-the-money, as are put options with strike prices below the current stock price. Of course, a holder would not exercise an out-of-the-money option. Options where the strike price and the stock price are very far apart are referred to as **deep in-the-money** or **deep out-of-the-money**.

---

### EXAMPLE 20.1    Purchasing Options

**Problem**

It is the afternoon of July 8, 2009, and you have decided to purchase 10 August call contracts on Amazon stock with an exercise price of $80. Because you are buying, you must pay the ask price. How much money will this purchase cost you? Is this option in-the-money or out-of-the-money?

**Solution**

From Table 20.1, the ask price of this option is $4.00. You are purchasing 10 contracts and each contract is on 100 shares, so the transaction will cost $4.00 \times 10 \times 100 = \$4,000$ (ignoring any brokerage fees). Because this is a call option and the exercise price is above the current stock price ($77.03), the option is currently out-of-the-money.

---

### Options on Other Financial Securities

Although the most commonly traded options are written on stocks, options on other financial assets do exist. Perhaps the most well-known are options on stock indexes such as the S&P 100 index, the S&P 500 index, the Dow Jones Industrial index, and the NYSE index. These options have become very popular because they allow investors to protect the value of their investments from adverse market changes. As we will see shortly, a stock index put option can be used to offset the losses on an investor's portfolio in a market downturn. Using an option to reduce risk in this way is called **hedging**. Options also allow investors to **speculate**, or place a bet on the direction in which they believe the market is likely to move. Purchasing a call, for example, allows investors to bet on a market rise with a much smaller investment than investing in the market index itself.

Options are also traded on Treasury securities. These options allow investors to bet on or hedge interest rate risk. Similarly, options on currencies and commodities allow investors to hedge or speculate on risks in these markets.

710   **Chapter 20** Financial Options

CONCEPT CHECK

1. What is the difference between an American option and a European option?

2. Does the holder of an option have to exercise it?

3. Why does an investor who writes (shorts) an option have an obligation?

## 20.2 Option Payoffs at Expiration

From the Law of One Price, the value of any security is determined by the future cash flows an investor receives from owning it. Therefore, before we can assess what an option is worth, we must determine an option's payoff at the time of expiration.

### Long Position in an Option Contract

Assume you own an option with a strike price of $20. If, on the expiration date, the stock price is greater than the strike price, say $30, you can make money by exercising the call (by paying $20, the strike price, for the stock) and immediately selling the stock in the open market for $30. The $10 difference is what the option is worth. Consequently, when the stock price on the expiration date exceeds the strike price, the value of the call is the difference between the stock price and the strike price. When the stock price is less than the strike price at expiration, the holder will not exercise the call, so the option is worth nothing. We plot these payoffs in Figure 20.1.[2]

Thus, if $S$ is the stock price at expiration, $K$ is the exercise price, and $C$ is the value of the call option, the value of the call at expiration is

**Call Value at Expiration**

$$C = max(S - K, 0) \tag{20.1}$$

**FIGURE 20.1**

**Payoff of a Call Option with a Strike Price of $20 at Expiration**

If the stock price is greater than the strike price ($20), the call will be exercised, and the holder's payoff is the difference between the stock price and the strike price. If the stock price is less than the strike price, the call will not be exercised, and so has no value.



_____

[2]Payoff diagrams like the ones in this chapter seem to have been introduced by Louis Bachelier in 1900 in his book, *Theorie de la Speculation* (Villars, 1900). Reprinted in English in P. Cootner (ed.), *The Random Character of Stock Market Prices* (M.I.T. Press, 1964).

where *max* is the maximum of the two quantities in the parentheses. The call's value is the maximum of the difference between the stock price and the strike price, $S - K$, and zero.

The holder of a put option will exercise the option if the stock price $S$ is below the strike price $K$. Because the holder receives $K$ when the stock is worth $S$, the holder's gain is equal to $K - S$. Thus, the value of a put at expiration is

**Put Price at Expiration**

$$P = max(K - S, 0) \tag{20.2}$$

---

**EXAMPLE 20.2**

### Payoff of a Put Option at Maturity

**Problem**

You own a put option on Oracle Corporation stock with an exercise price of $20 that expires today. Plot the value of this option as a function of the stock price.

**Solution**

Let $S$ be the stock price and $P$ be the value of the put option. The value of the option is

$$P = max(20 - S, 0)$$

Plotting this function gives



---

## Short Position in an Option Contract

An investor holding a short position in an option has an obligation: This investor takes the opposite side of the contract to the investor who is long. Thus, the short position's cash flows are the negative of the long position's cash flows. Because an investor who is long an option can only receive money at expiration—that is, the investor will not exercise an option that is out-of-the-money—a short investor can only pay money.

To demonstrate, assume you have a short position in a call option with an exercise price of $20. If the stock price is greater than the strike price of a call—for example, $25—the holder will exercise the option. You then have the obligation to sell the stock for the strike price of $20. Because you must purchase the stock at the market price of $25, you lose the difference between the two prices, or $5. However, if the stock price is less than the strike price at the expiration date, the holder will not exercise the option, so in this case you lose nothing; you have no obligation. We plot these payoffs in Figure 20.2.

712        **Chapter 20** Financial Options

FIGURE 20.2

**Short Position in a Call Option at Expiration**

If the stock price is greater than the strike price, the call will be exercised, so a person on the short side of a call will lose the difference between the stock price and the strike price. If the stock price is less than the strike price, the call will not be exercised, and the seller will have no obligation.



EXAMPLE 20.3

**Payoff of a Short Position in a Put Option**

**Problem**

You are short in a put option on Oracle Corporation stock with an exercise price of $20 that expires today. What is your payoff at expiration as a function of the stock price?

**Solution**

If $S$ is the stock price, your cash flows will be

$$-max(20 - S, 0)$$

If the current stock price is $30, then the put will not be exercised and you will owe nothing. If the current stock price is $15, the put will be exercised and you will lose $5. The figure plots your cash flows:



Notice that because the stock price cannot fall below zero, the downside for a short position in a put option is limited to the strike price of the option, as in Example 20.3. A short position in a call, however, has no limit on the downside (see Figure 20.2).



**FIGURE 20.3**

**Profit from Holding a Call Option to Expiration**

The curves show the profit per share from purchasing the August call options in Table 20.1 on July 8, 2009, financing this purchase by borrowing at 3%, and holding the position until the expiration date.

## Profits for Holding an Option to Expiration

Although payouts on a long position in an option contract are never negative, the profit from purchasing an option and holding it to expiration could well be negative because the payout at expiration might be less than the initial cost of the option.

To see how this works, let's consider the potential profits from purchasing the 09 August 80 call option on Amazon stock quoted in Table 20.1. The option costs $4.00 and expires in 45 days. Assume you choose to finance the purchase by borrowing $4.00 at an interest rate of 3% per year. If the stock price at expiration is $S$, then the profit is the call payoff minus the amount owed on the loan: $max(S - 80, 0) - 4.00 \times 1.03^{45/365}$, shown as the red curve in Figure 20.3. Once the cost of the position is taken into account, you make a positive profit only if the stock price exceeds $84.01. As we can see from Table 20.1, the further in-the-money the option is, the higher its initial price and so the larger your potential loss. An out-of-the-money option has a smaller initial cost and hence a smaller potential loss, but the probability of a gain is also smaller because the point where profits become positive is higher.

Because a short position in an option is the other side of a long position, the profits from a short position in an option are just the negative of the profits of a long position. For example, a short position in an out-of-the-money call like the 09 August 85 Amazon call in Figure 20.3 produces a small positive profit if Amazon's stock is below $87.23, but leads to losses if the stock price is above $87.23.

---

**EXAMPLE 20.4**

**Profit on Holding a Position in a Put Option until Expiration**

**Problem**

Assume you decided to purchase each of the August put options quoted in Table 20.1 on July 8, 2009, and you financed each position by shorting a two-month bond with a yield of 3%. Plot the profit of each position as a function of the stock price on expiration.

**Solution**

Suppose $S$ is the stock price on expiration, $K$ is the strike price, and $P$ is the price of each put option on July 8. Then your cash flows on the expiration date will be

$$\max(K - S, 0) - P \times 1.03^{\,45/365}$$

The plot is shown below. Note the same trade-off between the maximum loss and the potential for profit as for the call options.



## Returns for Holding an Option to Expiration

We can also compare options based on their potential returns. Figure 20.4 shows the return from purchasing one of the August 2009 options in Table 20.1 on July 8, 2009, and holding it until the expiration date. Let's begin by focusing on call options, shown in panel (a). In all cases, the maximum loss is 100%—the option may expire worthless. Notice how the curves change as a function of the strike price—the distribution of returns for out-of-the-money call options are more extreme than those for in-the-money calls. That is, an out-of-the-money call option is more likely to have a −100% return, but if the stock goes up sufficiently it will also have a much higher return than an in-the-money call option. Similarly, all call options have more extreme returns than the stock itself (given Amazon's initial price of $77.03, the range of stock prices shown in the plot represents returns of ±30%). As a consequence, the risk of a call option is amplified relative to the risk of the stock, and the amplification is greater for deeper out-of-the-money calls. Thus, if a stock had a positive beta, call options written on the stock will have even higher betas and expected returns than the stock itself.[3]

Now consider the returns for put options. Look carefully at panel (b) in Figure 20.4. The put position has a higher return with *low* stock prices; that is, if the stock has a positive beta, the put has a negative beta. Hence, put options on positive beta stocks have lower expected returns than the underlying stock. The deeper out-of-the-money the put option is, the more negative its beta, and the lower its expected return. As a result, put options are generally not held as an investment, but rather as insurance to hedge other risk in a portfolio.

---

[3]In Chapter 21, we explain how to calculate the expected return and risk of an option. In doing so, we will derive these relations rigorously.



FIGURE 20.4     **Option Returns from Purchasing an Option and Holding It to Expiration**



(a) The return on the expiration date from purchasing one of the August call options in Table 20.1 on July 8, 2009, and holding the position until the expiration date; (b) the same return for the August put options in the table.

## Combinations of Options

Sometimes investors combine option positions by holding a portfolio of options. In this section, we describe the most common combinations.

**Straddle.** What would happen at expiration if you were long both a put option and a call option with the same strike price? Figure 20.5 shows the payout on the expiration date of both options.

FIGURE 20.5

**Payoff and Profit from a Straddle**

A combination of a long position in a put and a call with the same strike price and expiration date provides a positive payoff (solid line) so long as the stock price does not equal the strike price. After deducting the cost of the options, the profit is negative for stock prices close to the strike price and positive elsewhere (dashed line).



By combining a call option (blue line) with a put option (red line), you will receive cash so long as the options do not expire at-the-money. The farther away from the money the options are, the more money you will make (solid line). However, to construct the combination requires purchasing both options, so the profits after deducting this cost are negative for stock prices close to the strike price and positive elsewhere (dashed line). This combination of options is known as a **straddle**. This strategy is sometimes used by investors who expect the stock to be very volatile and move up or down a large amount, but who do not necessarily have a view on which direction the stock will move. Conversely, investors who expect the stock to end up near the strike price may choose to sell a straddle.

---

**EXAMPLE 20.5**

### Strangle

#### Problem

You are long both a call option and a put option on Hewlett-Packard stock with the same expiration date. The exercise price of the call option is $40; the exercise price of the put option is $30. Plot the payoff of the combination at expiration.

#### Solution

The red line represents the put's payouts and the blue line represents the call's payouts. In this case, you do not receive money if the stock price is between the two strike prices. This option combination is known as a **strangle**.



---

**Butterfly Spread.** The combination of options in Figure 20.5 makes money when the stock and strike prices are far apart. It is also possible to construct a combination of options with the opposite exposure: one that pays off when the stock price is close to the strike price.

Suppose you are long two call options with the same expiration date on Intel stock: one with an exercise price of $20 and the other with an exercise price of $40. In addition, suppose you are short two call options on Intel stock, both with an exercise price of $30. Figure 20.6 plots the value of this combination at expiration.

The yellow line in Figure 20.6 represents the payoff at expiration from the long position in the $20 call. The red line represents the payoff from the long position in the $40 call. The blue line represents the payoff from the short position in the two $30 calls. The black line shows the payoff of the entire combination. For stock prices less than $20, all options are out-of-the-money, so the payoff is zero. For stock prices greater than $40, the losses from the short position in the $30 calls exactly offset the gain from $20 and $40 options,



**FIGURE 20.6**

**Butterfly Spread**
The yellow line represents the payoff from a long position in a $20 call. The red line represents the payoff from a long position in a $40 call. The blue line represents the payoff from a short position in two $30 calls. The black line shows the payoff of the entire combination, called a butterfly spread, at expiration.

and the value of the entire portfolio of options is zero.[4] Between $20 and $40, however, the payoff is positive. It reaches a maximum at $30. Practitioners call this combination of options a **butterfly spread**.

Because the payoff of the butterfly spread is positive, it must have a positive initial cost. (Otherwise, it would be an arbitrage opportunity.) Therefore, the cost of the $20 and $40 call options must exceed the proceeds from selling two $30 call options.

**Portfolio Insurance.**  Let's see how we can use combinations of options to insure a stock against a loss. Assume you currently own Amazon stock and you would like to insure the stock against the possibility of a price decline. To do so, you could simply sell the stock, but you would also give up the possibility of making money if the stock price increases. How can you insure against a loss without relinquishing the upside? You can purchase a put option, sometimes known as a **protective put**.

For example, suppose you want to insure against the possibility that the price of Amazon stock will drop below $45. You decide to purchase an August 45 European put option. The orange line in Figure 20.7 (a) shows the value of the combined position on the expiration date of the option. If Amazon stock is above $45 in August, you keep the stock, but if it is below $45 you exercise your put and sell it for $45. Thus, you get the upside, but are insured against a drop in the price of Amazon's stock.

You can use the same strategy to insure against a loss on an entire portfolio of stocks by using put options on the portfolio of stocks as a whole rather than just a single stock. Consequently, holding stocks and put options in this combination is known as **portfolio insurance**.

Purchasing a put option is not the only way to buy portfolio insurance. You can achieve exactly the same effect by purchasing a bond and a call option. Let's return to the insurance we purchased on Amazon stock. Amazon stock does not pay dividends, so there are no cash

---

[4]To see this, note that $(S - 20) + (S - 40) - 2(S - 30) = 0$.

**FIGURE 20.7**        **Portfolio Insurance**



The plots show two different ways to insure against the possibility of the price of Amazon stock falling below $45. The orange line in (a) indicates the value on the expiration date of a position that is long one share of Amazon stock and one European put option with a strike of $45 (the blue dashed line is the payoff of the stock itself). The orange line in (b) shows the value on the expiration date of a position that is long a zero-coupon risk-free bond with a face value of $45 and a European call option on Amazon with a strike price of $45 (the green dashed line is the bond payoff).

flows before the expiration of the option. Thus, instead of holding a share of Amazon stock and a put, you could get the same payoff by purchasing a risk-free zero-coupon bond with a face value of $45 and a European call option with a strike price of $45. In this case, if Amazon is below $45, you receive the payoff from the bond. If Amazon is above $45, you can exercise the call and use the payoff from the bond to buy the stock for the strike price of $45. The orange line in Figure 20.7(b) shows the value of the combined position on the expiration date of the option; it achieves exactly the same payoffs as owning the stock itself along with a put option.

**CONCEPT CHECK**   1. What is a straddle?

2. Explain how you can use put options to create portfolio insurance. How can you create portfolio insurance using call options?

## 20.3 Put-Call Parity

Consider the two different ways to construct portfolio insurance illustrated in Figure 20.7: (1) purchase the stock and a put or (2) purchase a bond and a call. Because both positions provide exactly the same payoff, the Law of One Price requires that they must have the same price.

Let's write this concept more formally. Let $K$ be the strike price of the option (the price we want to ensure that the stock will not drop below), $C$ be the call price, $P$ be the put price, and $S$ be the stock price. Then, if both positions have the same price,

$$S + P = PV(K) + C$$

The left side of this equation is the cost of buying the stock and a put (with a strike price of $K$); the right side is the cost of buying a zero-coupon bond with face value $K$ and a call option (with a strike price of $K$). Recall that the price of a zero-coupon bond is just the present value of its face value, which we have denoted by $PV(K)$. Rearranging terms gives an expression for the price of a European call option for a non-dividend-paying stock:

$$C = P + S - PV(K) \qquad (20.3)$$

This relationship between the value of the stock, the bond, and call and put options is known as **put-call parity**. It says that the price of a European call equals the price of the stock plus an otherwise identical put minus the price of a bond that matures on the exercise date of the option. In other words, you can think of a call as a combination of a levered position in the stock, $S - PV(K)$, plus insurance against a drop in the stock price, the put $P$.

| EXAMPLE 20.6 | Using Put-Call Parity |
|---|---|

**Problem**

You are an options dealer who deals in non-publicly traded options. One of your clients wants to purchase a one-year European call option on HAL Computer Systems stock with a strike price of $20. Another dealer is willing to write a one-year European put option on HAL stock with a strike price of $20, and sell you the put option for a price of $3.50 per share. If HAL pays no dividends and is currently trading for $18 per share, and if the risk-free interest rate is 6%, what is the lowest price you can charge for the option and guarantee yourself a profit?

**Solution**

Using put-call parity, we can replicate the payoff of the one-year call option with a strike price of $20 by holding the following portfolio: Buy the one-year put option with a strike price of $20 from the dealer, buy the stock, and sell a one-year risk-free zero-coupon bond with a face value of $20. With this combination, we have the following final payoff depending on the final price of HAL stock in one year, $S_1$:

| | Final HAL Stock Price | |
|---|---|---|
| | $S_1 < \$20$ | $S_1 > \$20$ |
| **Buy Put Option** | $20 - S_1$ | $0$ |
| **Buy Stock** | $S_1$ | $S_1$ |
| **Sell Bond** | $-20$ | $-20$ |
| **Portfolio** | $0$ | $S_1 - 20$ |
| **Sell Call Option** | $0$ | $-(S_1 - 20)$ |
| **Total Payoff** | $0$ | $0$ |

Note that the final payoff of the portfolio of the three securities matches the payoff of a call option. Therefore, we can sell the call option to our client and have future payoff of zero no matter what happens. Doing so is worthwhile as long as we can sell the call option for more than the cost of the portfolio, which is

$$P + S - PV(K) = \$3.50 + \$18 - \$20/1.06 = \$2.632$$

What happens if the stock pays a dividend? In that case, the two different ways to construct portfolio insurance do not have the same payout because the stock will pay a dividend while the zero-coupon bond will not. Thus, the two strategies will cost the same

to implement only if we add the present value of future dividends to the combination of the bond and the call:

$$S + P = PV(K) + PV(Div) + C$$

The left side of this equation is the value of the stock and a put; the right side is the value of a zero-coupon bond, a call option, and the future dividends paid by the stock during the life of the options, denoted by *Div*. Rearranging terms gives the general put-call parity formula:

**Put-Call Parity**

$$C = P + S - PV(K) - PV(Div) \tag{20.4}$$

In this case, the call is equivalent to having a levered position in the stock without dividends plus insurance against a fall in the stock price.

CONCEPT CHECK

1. Explain put-call parity.

2. If a put option trades at a higher price from the value indicated by the put-call parity equation, what action should you take?

## 20.4   Factors Affecting Option Prices

Put-call parity gives the price of a European call option in terms of the price of a European put, the underlying stock, and a zero-coupon bond. Therefore, to compute the price of a call using put-call parity, you have to know the price of the put. In Chapter 21, we explain how to calculate the price of a call without knowing the price of the put. Before we get there, let's first investigate the factors that affect option prices.

### Strike Price and Stock Price

As we noted earlier for the Amazon option quotes in Table 20.1, the value of an otherwise identical call option is higher if the strike price the holder must pay to buy the stock is lower. Because a put is the right to sell the stock, puts with a lower strike price are less valuable.

For a given strike price, the value of a call option is higher if the current price of the stock is higher, as there is a greater likelihood the option will end up in-the-money. Conversely, put options increase in value as the stock price falls.

### Arbitrage Bounds on Option Prices

We have already seen that an option's price cannot be negative. Furthermore, because an American option carries all the same rights and privileges as an otherwise equivalent European option, it cannot be worth less than a European option. If it were, you could make arbitrage profits by selling a European call and using part of the proceeds to buy an otherwise equivalent American call option. Thus, *an American option cannot be worth less than its European counterpart.*

The maximum payoff for a put option occurs if the stock becomes worthless (if, say, the company files for bankruptcy). In that case, the put's payoff is equal to the strike price. Because this payoff is the highest possible, *a put option cannot be worth more than its strike price.*

For a call option, the lower the strike price, the more valuable the call option. If the call option had a strike price of zero, the holder would always exercise the option and receive the stock at no cost. This observation gives us an upper bound on the call price: *A call option cannot be worth more than the stock itself.*

The **intrinsic value** of an option is the value it would have if it expired immediately. Therefore, the intrinsic value is the amount by which the option is currently in-the-money, or zero if the option is out-of-the-money. If an American option is worth less than its intrinsic value, you could make arbitrage profits by purchasing the option and immediately exercising it. Thus, *an American option cannot be worth less than its intrinsic value.*

The **time value** of an option is the difference between the current option price and its intrinsic value. Because an American option cannot be worth less than its intrinsic value, it cannot have a negative time value.

## Option Prices and the Exercise Date

For American options, the longer the time to the exercise date, the more valuable the option. To see why, let's consider two options: an option with one year until the exercise date and an option with six months until the exercise date. The holder of the one-year option can turn her option into a six-month option by simply exercising it early. That is, the one-year option has all the same rights and privileges as the six-month option, so by the Law of One Price, it cannot be worth less than the six-month option: *An American option with a later exercise date cannot be worth less than an otherwise identical American option with an earlier exercise date.* Usually the right to delay exercising the option is worth something, so the option with the later exercise date will be more valuable.

What about European options? The same argument will not work for European options, because a one-year European option cannot be exercised early at six months. As a consequence, a European option with a later exercise date may potentially trade for less than an otherwise identical option with an earlier exercise date. For example, think about a European call on a stock that pays a liquidating dividend in eight months (a liquidating dividend is paid when a corporation chooses to go out of business, sells off all of its assets, and pays out the proceeds as a dividend). A one-year European call option on this stock would be worthless, but a six-month call would be worth something.

## Option Prices and Volatility

An important criterion that determines the price of an option is the volatility of the underlying stock. Consider the following simple example.

| EXAMPLE 20.7 | Option Value and Volatility |
|---|---|

### Problem

Two European call options with a strike price of $50 are written on two different stocks. Suppose that tomorrow, the *low-volatility* stock will have a price of $50 for certain. The *high-volatility* stock will be worth either $60 or $40, with each price having equal probability. If the exercise date of both options is tomorrow, which option will be worth more today?

### Solution

The expected value of *both* stocks tomorrow is $50—the low-volatility stock will be worth this amount for sure, and the high-volatility stock has an expected value of $\frac{1}{2}(\$40) + \frac{1}{2}(\$60) = \$50$. However, the options have very different values. The option on the low-volatility stock is worth

nothing because there is no chance it will expire in-the-money (the low-volatility stock will be worth $50 and the strike price is $50). The option on the high-volatility stock is worth a positive amount because there is a 50% chance that it will be worth $60 − $50 = $10, and a 50% chance that it will be worthless. The value today of a 50% chance of a positive payoff (with no chance of a loss) is positive.

Example 20.7 illustrates an important principle: *The value of an option generally increases with the volatility of the stock*. The intuition for this result is that an increase in volatility increases the likelihood of very high and very low returns for the stock. The holder of a call option benefits from a higher payoff when the stock goes up and the option is in-the-money, but earns the same (zero) payoff no matter how far the stock drops once the option is out-of-the-money. Because of this asymmetry of the option's payoff, an option holder gains from an increase in volatility.[5]

Recall that adding a put option to a portfolio is akin to buying insurance against a decline in value. Insurance is more valuable when there is higher volatility—hence put options on more volatile stocks are also worth more.

**CONCEPT CHECK**

1. What is the intrinsic value of an option?

2. Can a European option with a later exercise date be worth less than an identical European option with an earlier exercise date?

3. How does the volatility of a stock affect the value of puts and calls written on the stock?

## 20.5 Exercising Options Early

One might guess that the ability to exercise the American option early would make an American option more valuable than an equivalent European option. Surprisingly, this is not always the case—sometimes, they have equal value. Let's see why.

### Non-Dividend-Paying Stocks

Let's consider first options on a stock that will not pay any dividends prior to the expiration date of the options. In that case, the put-call parity formula for the value of the call option is (see Eq. 20.3):

$$C = P + S - PV(K)$$

We can write the price of the zero-coupon bond as $PV(K) = K - dis(K)$, where $dis(K)$ is the amount of the discount from face value to account for interest. Substituting this expression into put-call parity gives

$$C = \underbrace{S - K}_{\text{Intrinsic value}} + \underbrace{dis(K) + P}_{\text{Time value}} \qquad (20.5)$$

---

[5]This relation between the stock's volatility and the value of an option holds for realistic distributions of stock prices assumed by practitioners (described in detail in Chapter 21), in which an increase in volatility implies a more "spread out" distribution for the entire range of future stock prices. That said, it need not hold, for example, if the volatility of the stock increases in some ranges but falls in others.

In this case, both terms that make up the time value of the call option are positive before the expiration date: As long as interest rates remain positive, the discount on a zero-coupon bond before the maturity date is positive, and the put price is also positive, so a European call always has a positive time value. Because an American option is worth at least as much as a European option, it must also have a positive time value before expiration. Hence, *the price of any call option on a non-dividend-paying stock always exceeds its intrinsic value.*

This result implies that it is *never* optimal to exercise a call option on a non-dividend-paying stock early—you are always better off just selling the option. It is straightforward to see why. When you exercise an option, you get its intrinsic value. But as we have just seen, the price of a call option on a non-dividend-paying stock always exceeds its intrinsic value. Thus, if you want to liquidate your position in a call on a non-dividend-paying stock, you will get a higher price if you sell it rather than exercise it. Because it is never optimal to exercise an American call on a non-dividend-paying stock early, the right to exercise the call early is worthless. For this reason, *an American call on a non-dividend-paying stock has the same price as its European counterpart.*

To understand the economics underlying this result, note that there are two benefits to delaying the exercise of a call option. First, the holder delays paying the strike price, and second, by retaining the right not to exercise, the holder's downside is limited. (These benefits are represented by the discount and put values in Eq. 20.5.)

What about an American put option on a non-dividend-paying stock? Does it ever make sense to exercise it early? The answer is yes, under certain circumstances. To see why, note that we can rearrange the put-call parity relationship as expressed in Eq. 20.5 to get the price of a European put option:

$$P = \underbrace{K - S}_{\text{Intrinsic value}} + \underbrace{C - dis(K)}_{\text{Time value}} \tag{20.6}$$

In this case, the time value of the option includes a negative term, the discount on a bond with face value $K$; this term represents the opportunity cost of waiting to receive the strike price $K$. When the strike price is high and the put option is sufficiently deep in-the-money, this discount will be large relative to the value of the call, and the time value of a European put option will be negative. In that case, the European put will sell for less than its intrinsic value. However, its American counterpart cannot sell for less than its intrinsic value (because otherwise arbitrage profits would be possible by immediately exercising it), which implies that the American option can be worth more than an otherwise identical European option. Because the only difference between the two options is the right to exercise the option early, this right must be valuable—there must be states in which it is optimal to exercise the American put early.

Let's examine an extreme case to illustrate when it is optimal to exercise an American put early: Suppose the firm goes bankrupt and the stock is worth nothing. In such a case, the value of the put equals its upper bound—the strike price—so its price cannot go any higher. Thus, no future appreciation is possible. However, if you exercise the put early, you can get the strike price today and earn interest on the proceeds in the interim. Hence it makes sense to exercise this option early. Although this example is extreme, it illustrates that it can be optimal to exercise deep in-the-money put options early.

| EXAMPLE 20.8 | **Early Exercise of a Put Option on a Non-Dividend-Paying Stock** |
|---|---|

**Problem**

Table 20.2 lists the quotes from the CBOE on September 10, 2012, for options on Google stock expiring in October 2012. Google will not pay a dividend during this period. Identify any option for which exercising the option early is better than selling it.

**Solution**

Because Google pays no dividends during the life of these options (September 2012 to October 2012), it should not be optimal to exercise the call options early. In fact, we can check that the bid price for each call option exceeds that option's intrinsic value, so it would be better to sell the call than to exercise it. For example, the payoff from exercising a call with a strike of 660 early is $700.77 - 660 = \$40.77$, while the option can be sold for $50.20.

On the other hand, a Google shareholder holding a put option with a strike price of $835 or higher would be better off exercising—rather than selling—the option. For example, by exercising the 850 put the shareholder would receive $850 for her stock, whereas by selling the stock and the option she would only receive $700.36 + 148.70 = \$849.06$. The same is not true of the puts with strikes below $835, however. For example, the holder of the 800 put option who exercises it early would receive $800 for her stock, but would net $700.36 + 100.50 = \$800.86$ by selling the stock and the put instead. Thus, early exercise is only optimal for the deep in-the-money put options.[6]

## Dividend-Paying Stocks

When stocks pay dividends, the right to exercise an option on them early is generally valuable for both calls and puts. To see why, let's write out the put-call parity relationship for a dividend-paying stock:

$$C = \underbrace{S - K}_{\text{Intrinsic value}} + \underbrace{dis(K) + P - PV(Div)}_{\text{Time value}} \tag{20.7}$$

| TABLE 20.2 | **Google Option Quotes** |
|---|---|

**GOOG (GOOGLE INC)**    700.77  −5.38

Sep 10 2012 @ 21:39 ET          Bid 700.36        Ask 700.77        Size 1 × 4        Vol 2560067

| Calls | Bid | Ask | Open Int | Puts | Bid | Ask | Open Int |
|---|---|---|---|---|---|---|---|
| 12 Oct 660.00 (GOOG1220J660-E) | 50.20 | 52.00 | 202 | 12 Oct 660.00 (GOOG1220V660-E) | 10.20 | 10.90 | 488 |
| 12 Oct 670.00 (GOOG1220J670-E) | 43.00 | 44.60 | 622 | 12 Oct 670.00 (GOOG1220V670-E) | 12.90 | 13.70 | 798 |
| 12 Oct 680.00 (GOOG1220J680-E) | 36.30 | 37.70 | 1189 | 12 Oct 680.00 (GOOG1220V680-E) | 16.20 | 16.90 | 644 |
| 12 Oct 690.00 (GOOG1220J690-E) | 30.40 | 31.60 | 1167 | 12 Oct 690.00 (GOOG1220V690-E) | 20.20 | 21.30 | 1042 |
| 12 Oct 700.00 (GOOG1220J700-E) | 25.50 | 26.00 | 1717 | 12 Oct 700.00 (GOOG1220V700-E) | 24.70 | 25.30 | 349 |
| 12 Oct 710.00 (GOOG1220J710-E) | 20.10 | 21.30 | 706 | 12 Oct 710.00 (GOOG1220V710-E) | 29.90 | 30.50 | 230 |
| 12 Oct 800.00 (GOOG1220J800-E) | 1.40 | 2.20 | 311 | 12 Oct 800.00 (GOOG1220V800-E) | 100.50 | 102.40 | 2 |
| 12 Oct 835.00 (GOOG1220J835-E) | 0.55 | 0.80 | 0 | 12 Oct 835.00 (GOOG1220V835-E) | 134.30 | 135.90 | 6 |
| 12 Oct 840.00 (GOOG1220J840-E) | 0.30 | 0.70 | 11 | 12 Oct 840.00 (GOOG1220V840-E) | 139.20 | 140.70 | 5 |
| 12 Oct 850.00 (GOOG1220J850-E) | 0.10 | 0.55 | 32 | 12 Oct 850.00 (GOOG1220V850-E) | 148.70 | 150.90 | 0 |

*Source*: Chicago Board Options Exchange at www.cboe.com

---

[6]Selling versus exercising may have different tax consequences or transaction costs for some investors, which could also affect this decision.

If *PV(Div)* is large enough, the time value of a European call option can be negative, implying that its price could be less than its intrinsic value. Because an American option can never be worth less than its intrinsic value, the price of the American option can exceed the price of a European option.

To understand when it is optimal to exercise the American call option early, note that when a company pays a dividend, investors expect the price of the stock to drop to reflect the cash paid out. This price drop hurts the owner of a call option because the stock price falls, but unlike the owner of the stock, the option holder does not get the dividend as compensation. However, by exercising early, the owner of the call option can capture the value of the dividend. Thus, the decision to exercise early trades off the benefits of waiting to exercise the call option versus the loss of the dividend. Because a call should only be exercised early to capture the dividend, it will only be optimal to do so just before the stock's ex-dividend date.

Dividends have the opposite effect on the time value of a put option. Again, from the put-call parity relation, we can write the put value as:

$$P = \underbrace{K - S}_{\text{Intrinsic value}} + \underbrace{C - dis(K) + PV(Div)}_{\text{Time value}} \qquad (20.8)$$

Intuitively, when a stock pays dividends, the holder of a put option will benefit by waiting for the stock price to drop after it goes ex-dividend before exercising. Thus, it is less likely that a put option on a dividend-paying stock will be exercised early.

---

**EXAMPLE 20.9**

**Early Exercise of Options on a Dividend-Paying Stock**

**Problem**

General Electric (ticker: GE) stock went ex-dividend on December 22, 2005 (only equity holders on the previous day are entitled to the dividend). The dividend amount was $0.25. Table 20.3 lists the quotes for GE options on December 21, 2005. From the quotes, identify the options that should be exercised early rather than sold.

**Solution**

The holder of a call option on GE stock with a strike price of $32.50 or less is better off exercising—rather than selling—the option. For example, exercising the 06 January 10 call and immediately selling the stock would net $35.52 − 10 = $25.52$. The option itself can be sold for $25.40, so the holder is better off by $0.12 by exercising the call rather than selling it. To understand why early exercise can be optimal in this case, note that interest rates were about 0.33% per month, so the value of delaying payment of the $10 strike price until January was worth only $0.033, and the put option was worth less than $0.05. Thus, from Eq. 20.7, the benefit of delay was much less than the $0.25 value of the dividend.[7]

On the other hand, all of the put options listed have a positive time value and thus should not be exercised early. In this case, waiting for the stock to go ex-dividend is more valuable than the cost of delaying the receipt of the strike price.

---

[7]Again, we have analyzed the early exercise decision ignoring taxes. Some investors may face higher taxes if they exercise the option early rather than sell or hold it.

726    **Chapter 20** Financial Options

| TABLE 20.3 | **Option Quotes for GE on December 21, 2005 (GE paid $0.25 dividend with ex-dividend date of December 22, 2005)** |
|---|---|

**GE**                                                                                    **35.52** −0.02

Dec 21, 2005 @ 11:50 ET                                                                   **Vol** 8103000

| Calls | Bid | Ask | Open Interest | Puts | Bid | Ask | Open Interest |
|---|---|---|---|---|---|---|---|
| 06 Jan 10.00 (GE AB-E) | 25.40 | 25.60 | 738 | 06 Jan 10.00 (GE MB-E) | 0 | 0.05 | 12525 |
| 06 Jan 20.00 (GE AD-E) | 15.40 | 15.60 | 1090 | 06 Jan 20.00 (GE MD-E) | 0 | 0.05 | 8501 |
| 06 Jan 25.00 (GE AE-E) | 10.40 | 10.60 | 29592 | 06 Jan 25.00 (GE ME-E) | 0 | 0.05 | 36948 |
| 06 Jan 30.00 (GE AF-E) | 5.40 | 5.60 | 37746 | 06 Jan 30.00 (GE MF-E) | 0 | 0.05 | 139548 |
| 06 Jan 32.50 (GE AZ-E) | 2.95 | 3.10 | 13630 | 06 Jan 32.50 (GE MZ-E) | 0 | 0.05 | 69047 |
| 06 Jan 35.00 (GE AG-E) | 0.70 | 0.75 | 146682 | 06 Jan 35.00 (GE MG-E) | 0.30 | 0.35 | 140014 |
| 06 Jan 40.00 (GE AH-E) | 0 | 0.05 | 84366 | 06 Jan 40.00 (GE MH-E) | 4.70 | 4.80 | 4316 |
| 06 Jan 45.00 (GE AI-E) | 0 | 0.05 | 7554 | 06 Jan 45.00 (GE MI-E) | 9.70 | 9.80 | 767 |
| 06 Jan 50.00 (GE AJ-E) | 0 | 0.05 | 17836 | 06 Jan 50.00 (GE MJ-E) | 14.70 | 14.80 | 383 |
| 06 Jan 60.00 (GE AL-E) | 0 | 0.05 | 7166 | 06 Jan 60.00 (GE ML-E) | 24.70 | 24.80 | 413 |

*Source*: Chicago Board Options Exchange at www.cboe.com

Although most traded options are American, options on stock indices, such as the S&P 500, are typically European. Table 20.4 shows quotes for European calls and puts on the S&P 500 index, together with their intrinsic values. At the time of these quotes, the aggregate dividend yield was approximately 2.8% while interest rates were 1.6% for the maturity of the options. Because these are European-style options, it is possible for the option's price to be below its intrinsic value, so that its time value is negative. As the table shows, this occurs for calls with strikes of 400 or below and for puts with strikes of 1600 or above. For the deep in-the-money calls, the present value of the dividends is larger than the interest earned on the low strike prices, making it costly to wait to exercise the option. For the deep in-the-money puts, the interest on the high strike prices exceeds the dividends earned, again making it costly to wait.

| TABLE 20.4 | **Two-Year Call and Put Options on the S&P 500 Index** |
|---|---|

**SPX**                                                                                   **879.56** −1.47

JUL 08 2009 @16:25ET

| Calls | Bid | Ask | Intrinsic Value | Puts | Bid | Ask | Intrinsic Value |
|---|---|---|---|---|---|---|---|
| 11 Dec 200.00 (SZD-LH-E) | 632.5 | 638.2 | 679.56 | 11 Dec 200.00 (SZD-XH-E) | 2.20 | 3.40 | 0.00 |
| 11 Dec 400.00 (SZD-LP-E) | 454.9 | 461.3 | 479.56 | 11 Dec 400.00 (SZD-XP-E) | 14.7 | 19.0 | 0.00 |
| 11 Dec 600.00 (SZJ-LR-E) | 299.3 | 306.0 | 279.56 | 11 Dec 600.00 (SZJ-XR-E) | 53.5 | 59.3 | 0.00 |
| 11 Dec 800.00 (SZJ-LL-E) | 172.2 | 179.2 | 79.56 | 11 Dec 800.00 (SZJ-XL-E) | 118.7 | 125.4 | 0.00 |
| 11 Dec 1000.00 (SZT-LR-E) | 82.0 | 88.7 | 0.00 | 11 Dec 1000.00 (SZT-XR-E) | 220.1 | 227.5 | 120.44 |
| 11 Dec 1200.00 (SZT-LU-E) | 30.5 | 36.5 | 0.00 | 11 Dec 1200.00 (SZT-XU-E) | 360.4 | 367.9 | 320.44 |
| 11 Dec 1400.00 (SZT-LA-E) | 8.60 | 11.8 | 0.00 | 11 Dec 1400.00 (SZT-XA-E) | 530.5 | 537.7 | 520.44 |
| 11 Dec 1600.00 (SZV-LO-E) | 2.20 | 3.40 | 0.00 | 11 Dec 1600.00 (SZV-XO-E) | 716.5 | 721.8 | 720.44 |
| 11 Dec 1800.00 (SZV-LD-E) | 0.00 | 1.15 | 0.00 | 11 Dec 1800.00 (SZV-XD-E) | 907.6 | 912.0 | 920.44 |
| 11 Dec 2000.00 (SZV-LE-E) | 0.00 | 0.65 | 0.00 | 11 Dec 2000.00 (SZV-XE-E) | 1099.9 | 1103.9 | 1120.44 |

*Source*: Chicago Board Options Exchange at www.cboe.com

**CONCEPT CHECK**

1. Is it ever optimal to exercise an American call on a non-dividend paying stock early?
2. When might it be optimal to exercise an American put option early?
3. When might it be optimal to exercise an American call early?

# 20.6  Options and Corporate Finance

Although we will delay much of the discussion of how corporations use options until after we have explained how to value an option, one very important corporate application does not require understanding how to price options: interpreting the capital structure of the firm as options on the firm's assets. We begin by explaining why we can think of equity as an option.

## Equity as a Call Option

Think of a share of stock as a call option on the assets of the firm with a strike price equal to the value of debt outstanding.[8] To illustrate, consider a single-period world in which at the end of the period the firm is liquidated. If the firm's value does not exceed the value of debt outstanding at the end of the period, the firm must declare bankruptcy and the equity holders receive nothing. Conversely, if the value exceeds the value of debt outstanding, the equity holders get whatever is left once the debt has been repaid. Figure 20.8 illustrates this payoff. Note how the payoff to equity looks exactly the same as the payoff of a call option.

## Debt as an Option Portfolio

We can also represent debt using options. In this case, you can think of the debt holders as owning the firm *and* having sold a call option with a strike price equal to the required debt

---

**FIGURE 20.8**

**Equity as a Call Option**

If the value of the firm's assets exceeds the required debt payment, the equity holders receive the value that remains after the debt is repaid; otherwise, the firm is bankrupt and its equity is worthless. Thus, the pay-off to equity is equivalent to a call option on the firm's assets with a strike price equal to the required debt payment.



---

[8]Fischer Black and Myron Scholes discussed this insight in their path-breaking option valuation paper, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81 (1973): 637–654.

payment. If the value of the firm exceeds the required debt payment, the call will be exercised; the debt holders will therefore receive the strike price (the required debt payment) and "give up" the firm. If the value of the firm does not exceed the required debt payment, the call will be worthless, the firm will declare bankruptcy, and the debt holders will be entitled to the firm's assets. Figure 20.9 illustrates this payoff.

There is also another way to view corporate debt: as a portfolio of risk-free debt and a short position in a put option on the firm's assets with a strike price equal to the required debt payment:

$$\text{Risky debt} = \text{Risk-free debt} - \text{Put option on firm assets} \tag{20.9}$$

When the firm's assets are worth less than the required debt payment, the put is in-the-money; the owner of the put option will therefore exercise the option and receive the difference between the required debt payment and the firm's asset value (see Figure 20.9). This leaves the portfolio holder (debt holder) with just the assets of the firm. If the firm's value is greater than the required debt payment, the put is worthless, leaving the portfolio holder with the required debt payment.

## Credit Default Swaps

By rearranging Equation 20.9, notice that we can eliminate a bond's credit risk by buying the very same put option to protect or insure it:

$$\text{Risk-free debt} = \text{Risky debt} + \text{Put option on firm assets}$$

We refer to this put option, which can insure a firm's credit risk, as a credit default swap (or CDS). In a **credit default swap**, the buyer pays a premium to the seller (often in the form of periodic payments) and receives a payment from the seller to make up for the loss if the underlying bond defaults.



### FIGURE 20.9

**Debt as an Option Portfolio**

If the value of the firm's assets exceeds the required debt payment, debt holders are fully repaid. Otherwise, the firm is bankrupt and the debt holders receive the value of the assets. Note that the payoff to debt (orange line) can be viewed either as (1) the firm's assets, less the equity call option, or (2) a risk-free bond, less a put option on the assets with a strike price equal to the required debt payment.

> **GLOBAL FINANCIAL CRISIS** | **Credit Default Swaps**
>
> Ironically, in the wake of the 2008 financial crisis the CDS market itself became a critical *source* of credit risk of concern to regulators. American International Group (AIG) required a federal bailout in excess of $100 billion due to (1) losses on CDS protection it had sold, and (2) concern that if it defaulted on paying this insurance, banks and other firms who had purchased this insurance to hedge their own exposures would default as well. To reduce these systemic risks in the future, regulators have moved to standardize CDS contracts, as well as provided for trading through a central clearing house that acts as a counterparty to all trades. To protect itself against counterparty default, the clearing house would impose strict margin requirements. In addition to improving transparency, this process allows contracts that offset each other to be cancelled rather than simply offset, which should help reduce the creation of new credit risk by the very market designed to help control it!

Investment banks developed and began trading CDSs in the late 1990s as a means to allow bond investors to insure the credit risk of the bonds in their portfolios. Many hedge funds and other investors soon began using these contracts as a means to speculate on the prospects of a firm and its likelihood of default even if they did not hold its bonds. By late 2007, credit default swaps on over $45 trillion worth of bonds were outstanding—an amount far larger than the total size of the corporate bond market (about $6 trillion).

While this market's large size is impressive, it is also misleading: Because CDSs are contracts written between counterparties, a buyer of a contract who wants to unwind the position cannot simply sell the contract on an exchange like a standard stock option. Instead, the buyer must enter a new offsetting CDS contract with a possibly new counterparty (e.g., a buyer of insurance on GE could then sell insurance on GE to someone else, leaving no net exposure to GE). In this way, a new contract is created with each trade, even if investors' net exposure is not increased. For example, when Lehman Brothers defaulted in September 2009, buyers of CDS protection against such a default were owed close to $400 billion. However, after netting all offsetting positions, only about $7 billion actually changed hands.

## Pricing Risky Debt

Viewing debt as an option portfolio is useful, as it provides insight into how credit spreads for risky debt are determined. Let's illustrate with an example.

---

**EXAMPLE 20.10** | **Calculating the Yield on New Corporate Debt**

**Problem**

As of September 2012, Google (ticker: GOOG) had no debt. Suppose the firm's managers consider recapitalizing the firm by issuing zero-coupon debt with a face value of $163.5 billion due in January of 2014, and using the proceeds to pay a special dividend. Suppose too that Google had 327 million shares outstanding, trading at $700.77 per share, implying a market value of $229.2 billion. The risk-free rate over this horizon is 0.25%. Using the call option quotes in Figure 20.10, estimate the credit spread Google would have to pay on the debt assuming perfect capital markets.

**Solution**

Assuming perfect capital markets, the total value of Google's equity and debt should remain unchanged after the recapitalization. The $163.5 billion face value of the debt is equivalent to a claim of $163.5 billion/(327 million shares) = $500 per share on Google's current assets. Because Google's shareholders will only receive the value in excess of this debt claim, the value

of Google's equity after the recap is equivalent to the current value of a call option with a strike price of $500. From the quotes in Figure 20.10, such a call option has a value of approximately $222.05 per share (using the average of the bid and ask quotes). Multiplying by Google's total number of shares, we can estimate the total value of Google's equity after the recap as $222.05 × 327 million shares = $72.6 billion.

To estimate the value of the new debt, we can subtract the estimated equity value from Google's total value of $229.2 billion; thus, the estimated debt value is 229.2 − 72.6 = $156.6 billion. Because the debt matures 16 months from the date of the quotes, this value corresponds to a yield to maturity of

$$\left(\frac{163.5}{156.6}\right)^{12/16} - 1 = 3.29\%$$

Thus, Google's credit spread for the new debt issue would be about 3.29% − 0.25% = 3.04%.

Using the methodology in Example 20.10, Figure 20.10 plots this yield on Google debt as a function of the amount borrowed and illustrates the relation between the amount borrowed and the yield. The analysis in this example demonstrates the use of option valuation methods to assess credit risk and value risky debt. While here we used data from option quotes, in the next chapter we will develop methods to value options as well as risky debt and other distress costs based on firm fundamentals.

## Agency Conflicts

In addition to pricing, the option characterization of equity and debt securities provides a new interpretation of the agency conflicts between debt and equity holders that we

### FIGURE 20.10    Google Call Option Quotes and Implied Debt Yields



**GOOG (GOOGLE INC)**      700.77 − 5.38
Sep 10 2012 @ 21:39 ET      **Vol** 2560067

| Calls | Bid | Ask | Open Int |
|---|---|---|---|
| 14 Jan 300.00 (GOOG1418A300-E) | 402.90 | 405.90 | 4 |
| 14 Jan 350.00 (GOOG1418A350-E) | 355.30 | 358.00 | 34 |
| 14 Jan 400.00 (GOOG1418A400-E) | 308.20 | 311.60 | 471 |
| 14 Jan 450.00 (GOOG1418A450-E) | 263.00 | 266.50 | 25 |
| 14 Jan 500.00 (GOOG1418A500-E) | 220.20 | 223.90 | 229 |
| 14 Jan 550.00 (GOOG1418A550-E) | 181.00 | 184.70 | 122 |
| 14 Jan 600.00 (GOOG1418A600-E) | 145.20 | 148.60 | 303 |
| 14 Jan 650.00 (GOOG1418A650-E) | 114.30 | 117.30 | 292 |
| 14 Jan 660.00 (GOOG1418A660-E) | 108.50 | 111.60 | 63 |
| 14 Jan 680.00 (GOOG1418A680-E) | 97.80 | 101.70 | 91 |
| 14 Jan 700.00 (GOOG1418A700-E) | 87.60 | 91.00 | 508 |
| 14 Jan 750.00 (GOOG1418A750-E) | 66.20 | 68.10 | 534 |

Given the CBOE call option quotes for Google stock, we can calculate the implied debt yield given perfect markets if Google were to borrow by issuing 16-month, zero-coupon bonds. Note the increase in the debt yield with the amount borrowed.

discussed in Chapter 16. Recall that the price of an option generally increases with the volatility level of the underlying security. Because equity is like a call option on the firm's assets, equity holders will benefit from investments that increase the risk of the firm. On the other hand, debt holders are short a put option on the firm's assets. Thus, they will be hurt by an increase in the firm's risk. This conflict of interest regarding risk-taking is the asset substitution problem (see Section 16.5), and we can quantify it in terms of the sensitivity of the option values to the firm's volatility.

Similarly, when the firm makes new investments that increase the value of the firm's assets, the value of a put option on the firm will decline. Because debt holders are short a put option, the value of the firm's debt will increase. Thus, some fraction of each dollar increase in the value of the firm's assets will go to debt holders, rather than equity holders, reducing equity holders' incentive to invest. This problem is the debt overhang problem we discussed in Section 16.5, and we can quantify it in terms of the sensitivity of the call and put values to the value of the firm's underlying assets.

The usefulness of options to corporate managers is by no means limited to the applications we discuss in this section. However, to understand the other applications, and to quantify the results we have discussed here, we need deeper knowledge of what determines the option price. In Chapter 21, we develop these tools and explore how to calculate the price of an option.

**CONCEPT CHECK**    1. Explain how equity can be viewed as a call option on the firm.

2. Explain how debt can be viewed as an option portfolio.

## MyFinanceLab

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 20.1 Option Basics

- A call option gives the holder the right (but not the obligation) to purchase an asset at some future date. A put option gives the holder the right to sell an asset at some future date.
- When a holder of an option enforces the agreement and buys or sells the share of stock at the agreed-upon price, the holder is exercising the option.
- The price at which the holder agrees to buy or sell the share of stock when the option is exercised is called the strike price or exercise price.
- The last date on which the holder has the right to exercise the option is known as the expiration date.
- An American option can be exercised on any date up to, and including, the exercise date. A European option can be exercised only on the expiration date.
- If the payoff from exercising the option immediately is positive, the option is in-the-money. If the stock price equals the strike price, the option is at-the-money. Finally, if you would lose money by exercising an option immediately, the option is out-of-the-money.

### 20.2 Option Payoffs at Expiration

- Given stock price $S$ and strike price $K$, the value of a call option at expiration is

$$C = max\,(S - K, 0) \tag{20.1}$$

- The value of a put option at expiration is

$$P = max\,(K - S, 0) \tag{20.2}$$

732    **Chapter 20** Financial Options

- An investor holding a short position in an option has an obligation; he or she takes the opposite side of the contract to the investor who is long.
- The value an option would have if it expired today is its intrinsic value. The time value of an option is the difference between its current value and its intrinsic value.

### 20.3 Put-Call Parity

- Put-call parity relates the value of the European call to the value of the European put and the stock.

$$C = P + S - PV(K) - PV(Div) \tag{20.4}$$

### 20.4 Factors Affecting Option Prices

- Call options with lower strike prices are more valuable than otherwise identical calls with higher strike prices. Conversely, put options are more valuable with higher strike prices.
- Call options increase in value, and put options decrease in value, when the stock price rises.
- Arbitrage bounds for option prices:
  - An American option cannot be worth less than its European counterpart.
  - A put option cannot be worth more than its exercise price.
  - A call option cannot be worth more than the stock itself.
  - An American option cannot be worth less than its intrinsic value.
  - An American option with a later exercise date cannot be worth less than an otherwise identical American option with an earlier exercise date.
- The value of an option generally increases with the volatility of the stock.

### 20.5 Exercising Options Early

- It is never optimal to exercise an American call option on a non-dividend-paying stock early. Thus, an American call option on a non-dividend-paying stock has the same price as its European counterpart.
- It can be optimal to exercise a deep in-the-money American put option. It can be optimal to exercise an American call option just before the stock goes ex-dividend.

### 20.6 Options and Corporate Finance

- Equity can be viewed as a call option on the firm's assets.
- The debt holders can be viewed as owning the firm's assets *and* having sold a call option with a strike price equal to the required debt payment.
- Alternatively, corporate debt is a portfolio of riskless debt and a short position in a put option on the firm's cash flow with a strike price equal to the required debt payment. This put option is also referred to as a credit default swap.
- Option valuations can be used to estimate the appropriate yield for risky debt, as well as to estimate the magnitude of agency cost problems within the firm.

## Key Terms

American options *p. 707*
at-the-money *p. 708*
butterfly spread *p. 717*
call option *p. 707*
credit default swap (CDS) *p. 728*
deep in-the-money *p. 709*
deep out-of-the-money *p. 709*
European options *p. 707*

exercising (an option) *p. 707*
expiration date *p. 707*
financial option *p. 707*
hedging *p. 709*
in-the-money *p. 709*
intrinsic value *p. 721*
open interest *p. 708*
option premium *p. 707*

option writer *p. 707*
out-of-the-money *p. 709*
portfolio insurance *p. 717*
protective put *p. 717*
put-call parity *p. 719*
put option *p. 707*

speculate *p. 709*
straddle *p. 716*
strangle *p. 716*
strike (exercise) price *p. 707*
time value *p. 721*

## Further Reading

For a deeper discussion of options and other derivative securities, see the following books: R. McDonald, *Derivative Markets* (Prentice Hall, 2009), and J. Hull, *Options, Futures, and Other Derivatives* (Prentice Hall, 2011).

## Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

### Option Basics

1. Explain the meanings of the following financial terms:
   a. Option
   b. Expiration date
   c. Strike price
   d. Call
   e. Put

2. What is the difference between a European option and an American option? Are European options available exclusively in Europe and American options available exclusively in the United States?

3. Below is an option quote on IBM from the CBOE Web site showing options expiring in September and October 2012.
   a. Which option contract had the most trades today?
   b. Which option contract is being held the most overall?
   c. Suppose you purchase one option with symbol IBM1222I210-E. How much will you need to pay your broker for the option (ignoring commissions)?
   d. Explain why the last sale price is not always between the bid and ask prices.
   e. Suppose you sell one option with symbol IBM1222I210-E. How much will you receive for the option (ignoring commissions)?
   f. The calls with which strike prices are currently in-the-money? Which puts are in-the-money?
   g. What is the difference between the option with symbol IBM1222I200-E and the option with symbol IBM1220J200-E?
   h. On what date does the option with symbol IBM1222U200-E expire? In what range must IBM's stock price be at expiration for this option to be valuable?

**IBM (INTL BUSINESS MACHINES)**                                                                                          **206.36**   **2.59**

Sep 13 2012 @ 16:18 ET                                                         **Bid** 205.29    **Ask** 206.30   **Size** 1 × 1           **Vol** 3879539

| Calls | Last Sale | Net | Bid | Ask | Vol | Open Int | Puts | Last Sale | Net | Bid | Ask | Vol | Open Int |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 Sep 200.00 (IBM1222I200-E) | 6.26 | 1.96 | 6.45 | 6.65 | 193 | 6898 | 12 Sep 200.00 (IBM1222U200-E) | 0.23 | −0.42 | 0.19 | 0.22 | 946 | 3351 |
| 12 Sep 205.00 (IBM1222I205-E) | 2.35 | 1.14 | 2.36 | 2.49 | 1800 | 7390 | 12 Sep 205.00 (IBM1222U205-E) | 1.10 | −1.35 | 1.03 | 1.10 | 592 | 1184 |
| 12 Sep 210.00 (IBM1222I210-E) | 0.32 | 0.15 | 0.36 | 0.42 | 508 | 2818 | 12 Sep 210.00 (IBM1222U210-E) | 4.15 | −2.50 | 3.95 | 4.15 | 118 | 625 |
| 12 Sep 215.00 (IBM1222I215-E) | 0.06 | 0.03 | 0.04 | 0.08 | 36 | 1010 | 12 Sep 215.00 (IBM1222U215-E) | 18.20 | *pc* | 8.60 | 8.95 | 0 | 36 |
| 12 Oct 200.00 (IBM1220J200-E) | 8.20 | 1.53 | 8.30 | 8.45 | 242 | 5786 | 12 Oct 200.00 (IBM1220V200-E) | 2.04 | −0.88 | 1.98 | 2.05 | 150 | 2646 |
| 12 Oct 205.00 (IBM1220J205-E) | 4.85 | 1.05 | 4.90 | 5.00 | 382 | 8141 | 12 Oct 205.00 (IBM1220V205-E) | 3.50 | −1.31 | 3.55 | 3.65 | 211 | 1335 |
| 12 Oct 210.00 (IBM1220J210-E) | 2.36 | 0.58 | 2.45 | 2.54 | 186 | 7074 | 12 Oct 210.00 (IBM1220V210-E) | 6.37 | −1.54 | 6.05 | 6.20 | 35 | 1234 |
| 12 Oct 215.00 (IBM1220J215-E) | 1.11 | 0.36 | 1.04 | 1.10 | 115 | 3983 | 12 Oct 215.00 (IBM1220V215-E) | 10.80 | −9.90 | 9.65 | 9.75 | 5 | 238 |

*Source*: Chicago Board Options Exchange at www.cboe.com

### Option Payoffs at Expiration

4. Explain the difference between a long position in a put and a short position in a call.

5. Which of the following positions benefit if the stock price increases?
   a. Long position in a call
   b. Short position in a call
   c. Long position in a put
   d. Short position in a put



6. You own a call option on Intuit stock with a strike price of $40. The option will expire in exactly three months' time.
   a. If the stock is trading at $55 in three months, what will be the payoff of the call?
   b. If the stock is trading at $35 in three months, what will be the payoff of the call?
   c. Draw a payoff diagram showing the value of the call at expiration as a function of the stock price at expiration.



7. Assume that you have shorted the call option in Problem 6.
   a. If the stock is trading at $55 in three months, what will you owe?
   b. If the stock is trading at $35 in three months, what will you owe?
   c. Draw a payoff diagram showing the amount you owe at expiration as a function of the stock price at expiration.



8. You own a put option on Ford stock with a strike price of $10. The option will expire in exactly six months' time.
   a. If the stock is trading at $8 in six months, what will be the payoff of the put?
   b. If the stock is trading at $23 in six months, what will be the payoff of the put?
   c. Draw a payoff diagram showing the value of the put at expiration as a function of the stock price at expiration.



9. Assume that you have shorted the put option in Problem 8.
   a. If the stock is trading at $8 in three months, what will you owe?
   b. If the stock is trading at $23 in three months, what will you owe?
   c. Draw a payoff diagram showing the amount you owe at expiration as a function of the stock price at expiration.

10. What position has more downside exposure: a short position in a call or a short position in a put? That is, in the worst case, in which of these two positions would your losses be greater?

11. Consider the September 2012 IBM call and put options in Problem 3. Ignoring any interest you might earn over the remaining few days' life of the options:
    a. Compute the break-even IBM stock price for each option (i.e., the stock price at which your total profit from buying and then exercising the option would be zero).
    b. Which call option is most likely to have a return of $-100\%$?
    c. If IBM's stock price is $216 on the expiration day, which option will have the highest return?

12. You are long both a call and a put on the same share of stock with the same exercise date. The exercise price of the call is $40 and the exercise price of the put is $45. Plot the value of this combination as a function of the stock price on the exercise date.

13. You are long two calls on the same share of stock with the same exercise date. The exercise price of the first call is $40 and the exercise price of the second call is $60. In addition, you are short two otherwise identical calls, both with an exercise price of $50. Plot the value of this combination as a function of the stock price on the exercise date. What is the name of this combination of options?

*14. A forward contract is a contract to purchase an asset at a fixed price on a particular date in the future. Both parties are obligated to fulfill the contract. Explain how to construct a forward contract on a share of stock from a position in options.

15. You own a share of Costco stock. You are worried that its price will fall and would like to insure yourself against this possibility. How can you purchase insurance against this possibility?

16. It is September 13, 2012, and you own IBM stock. You would like to insure that the value of your holdings will not fall significantly. Using the data in Problem 3, and expressing your answer in terms of a percentage of the current value of your portfolio:
    a. What will it cost to insure that the value of your holdings will not fall below $200 per share between now and the third Friday in September?
    b. What will it cost to insure that the value of your holdings will not fall below $200 per share between now and the third Friday in October?
    c. What will it cost to insure that the value of your holdings will not fall below $205 per share between now and the third Friday in October?

## Put-Call Parity

17. Dynamic Energy Systems stock is currently trading for $33 per share. The stock pays no dividends. A one-year European put option on Dynamic with a strike price of $35 is currently trading for $2.10. If the risk-free interest rate is 10% per year, what is the price of a one-year European call option on Dynamic with a strike price of $35?

18. You happen to be checking the newspaper and notice an arbitrage opportunity. The current stock price of Intrawest is $20 per share and the one-year risk-free interest rate is 8%. A one-year put on Intrawest with a strike price of $18 sells for $3.33, while the identical call sells for $7. Explain what you must do to exploit this arbitrage opportunity.

19. Consider the September 2012 IBM call and put options in Problem 3. Ignoring the negligible interest you might earn on T-bills over the remaining few days' life of the options, show that there is no arbitrage opportunity using put-call parity for the options with a $205 strike price. Specifically:
    a. What is your profit/loss if you buy a call and T-bills, and sell IBM stock and a put option?
    b. What is your profit/loss if you buy IBM stock and a put option, and sell a call and T-bills?
    c. Explain why your answers to (a) and (b) are not both zero.

## Factors Affecting Option Prices

20. Suppose Amazon stock is trading for $70 per share, and Amazon pays no dividends.
    a. What is the maximum possible price of a call option on Amazon?
    b. What is the maximum possible price of a put option on Amazon with a strike price of $100?
    c. What is the minimum possible value of a call option on Amazon stock with a strike price of $50?
    d. What is the minimum possible value of an American put option on Amazon stock with a strike price of $100?

21. Consider the data for IBM options in Problem 3. Suppose a new American-style put option on IBM is issued with a strike price of $215 and an expiration date of October 1st.
    a. What is the maximum possible price for this option?
    b. What is the minimum possible price for this option?

22. You are watching the option quotes for your favorite stock, when suddenly there is a news announcement. Explain what type of news would lead to the following effects:
    a. Call prices increase, and put prices fall.
    b. Call prices fall, and put prices increase.
    c. Both call and put prices increase.

## Exercising Options Early

*23. Explain why an American call option on a non-dividend-paying stock always has the same price as its European counterpart.

24. Consider an American put option on XAL stock with a strike price of $55 and one year to expiration. Assume XAL pays no dividends, XAL is currently trading for $10 per share, and the one-year interest rate is 10%. If it is optimal to exercise this option early:
    a. What is the price of a one-year American put option on XAL stock with a strike price of $60 per share?
    b. What is the maximum price of a one-year American call option on XAL stock with a strike price of $55 per share?

25. The stock of Harford Inc. is about to pay a $0.30 dividend. It will pay no more dividends for the next month. Consider call options that expire in one month. If the interest rate is 6% APR (monthly compounding), what is the maximum strike price where it could be possible that early exercise of the call option is optimal? (Round to the nearest dollar.)

26. Suppose the S&P 500 is at 900, and a one-year European call option with a strike price of $400 has a negative time value. If the interest rate is 5%, what can you conclude about the dividend yield of the S&P 500? (Assume all dividends are paid at the end of the year.)

27. Suppose the S&P 500 is at 900, and it will pay a dividend of $30 at the end of the year. Suppose also that the interest rate is 2%. If a one-year European put option has a negative time value, what is the lowest possible strike price it could have?

## Options and Corporate Finance

28. Wesley Corp. stock is trading for $25/share. Wesley has 20 million shares outstanding and a market debt-equity ratio of 0.5. Wesley's debt is zero-coupon debt with a 5-year maturity and a yield to maturity of 10%.
    a. Describe Wesley's equity as a call option. What is the maturity of the call option? What is the market value of the asset underlying this call option? What is the strike price of this call option?
    b. Describe Wesley's debt using a call option.
    c. Describe Wesley's debt using a put option.

*29. Express the position of an equity holder in terms of put options.

30. Use the option data from July 13, 2009 in the following table to determine the rate Google would have paid if it had issued $128 billion in zero-coupon debt due in January 2011. Suppose Google currently had 320 million shares outstanding, implying a market value of $135.1 billion. (Assume perfect capital markets.)

| GOOG | | | 422.27 +7.87 |
| --- | --- | --- | --- |
| Jul 13 2009 @ 13:10 ET | | | **Vol** 2177516 |
| **Calls** | **Bid** | **Ask** | **Open Int** |
| 11 Jan 150.0 (OZF AJ) | 273.60 | 276.90 | 100 |
| 11 Jan 160.0 (OZF AL) | 264.50 | 267.20 | 82 |
| 11 Jan 200.0 (OZF AA) | 228.90 | 231.20 | 172 |
| 11 Jan 250.0 (OZF AU) | 186.50 | 188.80 | 103 |
| 11 Jan 280.0 (OZF AX) | 162.80 | 165.00 | 98 |
| 11 Jan 300.0 (OZF AT) | 148.20 | 150.10 | 408 |
| 11 Jan 320.0 (OZF AD) | 133.90 | 135.90 | 63 |
| 11 Jan 340.0 (OZF AI) | 120.50 | 122.60 | 99 |
| 11 Jan 350.0 (OZF AK) | 114.10 | 116.10 | 269 |
| 11 Jan 360.0 (OZF AM) | 107.90 | 110.00 | 66 |
| 11 Jan 380.0 (OZF AZ) | 95.80 | 98.00 | 88 |
| 11 Jan 400.0 (OZF AU) | 85.10 | 87.00 | 2577 |
| 11 Jan 420.0 (OUP AG) | 74.60 | 76.90 | 66 |
| 11 Jan 450.0 (OUP AV) | 61.80 | 63.30 | 379 |

**\*31.** Suppose that in July 2009, Google were to issue $96 billion in zero-coupon senior debt, and another $32 billion in zero-coupon junior debt, both due in January 2011. Use the option data in the preceding table to determine the rate Google would pay on the junior debt issue. (Assume perfect capital markets.)

## Data Case

Your uncle owns 10,000 shares of Wal-Mart stock. He is concerned about the short-term outlook for Wal-Mart's stock due to an impending "major announcement." This announcement has received much attention in the press so he expects the stock price will change significantly in the next month, but is unsure whether it will be a profit or a loss. He hopes the price will increase, but he also doesn't want to suffer if the price were to fall in the short term.

His broker recommended he buy a "protective put" on the stock, but your uncle has never traded options before and is not much of a risk taker. He wants you to devise a plan for him to capitalize if the announcement is positive but to still be protected if the news causes the price to drop. You realize that a protective put will protect him from the downside risk, but you think a straddle may offer similar downside protection, while increasing the upside potential. You decide to show him both strategies and the resulting profits and returns he could face from each.

1. Download option quotes on options that expire in approximately one month on Wal-Mart from the Chicago Board Options Exchange (www.cboe.com) into an Excel spreadsheet (click the Quotes & Data tab at the top left portion of the screen and then select "Delayed Quotes"). If you choose to download "near term at-the-money" options you will get a range of options expiring in about a month. *Note*: You can only get active quotes while the exchange is open; bid or ask prices are not available when it is closed.

2. Determine your uncle's profit and return using the protective put.
   a. Identify the expiring put with an exercise price closest to, but not below, the current stock price. Determine the investment required to protect all 10,000 shares.
   b. Determine the put price at expiration for each stock price at $5 increments within a range of $40 of Wal-Mart's current price using Eq. 20.2.
   c. Compute the profit (or loss) on the put for each stock price used in part (b).
   d. Compute the profit on the stock from the current price for each stock price used in part (b).
   e. Compute his overall profit (or loss) of the protective put, that is, combining the put and his stock for each price used in parts (c) and (d).
   f. Compute the overall return of the protective put.

3. Determine your uncle's profit and return using the straddle.
   a. Compute the investment your uncle would have to make to purchase the call and put with the same exercise price and expiration as the put option in Question 2, to cover all 10,000 of his shares.
   b. Determine the value at expiration of the call and the put options at each $5 increment of stock prices within a range of $40 of Wal-Mart's current price using Eqs. 20.1 and 20.2.
   c. Determine the profit (or loss) on the options at each stock price used in part (b).
   d. Determine the profit (or loss) on the stock from the current price for each stock price used in part (b).
   e. Compute his overall profit (or loss) of the stock plus straddle, that is, combining the position in both options and his stock for each price used in parts (c) and (d).
   f. Compute the overall return of this position.

4. Was the broker correct that the protective put would prevent your uncle from losing if the announcement caused a large decrease in the stock value? What is your uncle's maximum possible loss using the protective put?

5. What is the maximum possible loss your uncle could experience using the straddle?

6. Which strategy, the protective put or the straddle, provides the maximum upside potential for your uncle? Why does this occur?

**CHAPTER**

# 21

# Option Valuation

## NOTATION

| | |
|---|---|
| $\Delta$ | shares of stock in the replicating portfolio; sensitivity of option price to stock price |
| $B$ | risk-free investment in the replicating portfolio |
| $S$ | stock price |
| $r_f$ | risk-free rate of interest |
| $C$ | call option price |
| $T$ | years until the exercise date of an option |
| $K$ | strike price |
| $\sigma$ | volatility of stock's return |
| $N(d)$ | cumulative normal distribution |
| $ln$ | natural logarithm |
| $PV$ | present value |
| $P$ | put option price |
| $S^x$ | value of stock excluding dividends |
| $q$ | dividend yield |
| $\rho$ | risk-neutral probability |
| $\beta_S, \beta_B$ | beta of the stock, bond |
| $\beta_E, \beta_D$ | beta of the levered equity, debt |
| $\beta_U$ | beta of the firm's assets; beta of unlevered equity |
| $A, E, D$ | market value of assets, equity, debt |

738

**R**OBERT MERTON AND MYRON SCHOLES WERE AWARDED the 1997 Nobel Prize in economics for their 1973 discovery, together with Fischer Black,[1] of a formula to calculate the price of an option: the *Black-Scholes Option Pricing Model*. Although the formula itself represented an enormous contribution to economics, even more important were the techniques that Black, Scholes, and Merton developed to value options. These techniques changed the course of financial economics and gave birth to a new profession: financial engineering. Routinely, financial engineers use formulas to price financial securities in much the same way as mechanical engineers use Newton's laws to build bridges. The most important factor contributing to the huge growth in the types of financial securities available in the market are the techniques financial engineers use to price them. All of these techniques can be traced to the Black-Scholes formula. Today, most large corporations rely on these financial securities to manage risk. Without the Black-Scholes formula, the job of corporate managers would be very different: Many corporations would be forced to bear much more risk than they presently do.

These formulas rely primarily on the Law of One Price. That is, they do not depend on knowing unobservable parameters such as investor tastes and beliefs. In most applications, it is the need to model human preferences that makes economics an inexact science. The great insight that Black, Scholes, and Merton brought to economics is that in the case of options it is not necessary to model preferences. As we will explain in this chapter, their work demonstrated how to apply the Law of One Price to value a vast new range of financial securities based on the current market prices of stocks and bonds.

---

[1]The Black-Scholes formula was derived in a paper jointly written by Fischer Black and Myron Scholes ("The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, 81, 1973), which relied on earlier work by Robert Merton. Unfortunately, Black died two years before the prize was awarded (Nobel Prizes cannot be awarded posthumously).

Our objective in this chapter is to explain the most commonly used techniques (all of which derive from Black and Scholes' insights) for calculating the price of an option: the *Binomial Option Pricing Model*, the *Black-Scholes formula*, and *risk-neutral probabilities*. We apply these techniques to show how to value stock options and quantify their risk and return. We then show how to use the Black-Scholes formula to estimate the beta of risky debt. With this foundation in place, in subsequent chapters we will be able to cover important applications of option pricing for corporate managers.

## 21.1  The Binomial Option Pricing Model

We begin our study of option pricing with the **Binomial Option Pricing Model**.[2] The model prices options by making the simplifying assumption that at the end of the next period, the stock price has only two possible values. Under this assumption, we demonstrate the key insight of Black and Scholes—that option payoffs can be replicated exactly by constructing a portfolio out of a risk-free bond and the underlying stock. Furthermore, we will see that the model can be quite realistic if we consider stock price movements over very short time intervals.

### A Two-State Single-Period Model

Let's start by calculating the price of a single-period option in a very simple world. We will value the option by first constructing a **replicating portfolio**, a portfolio of other securities that has exactly the same value in one period as the option. Then, because they have the same payoffs, the Law of One Price implies that the current value of the call and the replicating portfolio must be equal.

Consider a European call option that expires in one period and has an exercise price of $50. Assume that the stock price today is equal to $50. Assume here and throughout the chapter that the stock pays no dividends (unless explicitly indicated). In one period, the stock price will either rise by $10 or fall by $10. The one-period risk-free rate is 6%. We can summarize this information on a **binomial tree**—a timeline with two branches at every date representing the possible events that could happen at those times:



The binomial tree contains all the information we currently know: the value of the stock, bond, and call options in each state in one period, as well as the price of the stock and bond today (for simplicity, we assume the bond price today is $1, so in one period it will be worth $1.06). We define the state in which the stock price goes up (to $60) as the *up* state and the state in which the stock price goes down (to $40) as the *down* state.

[2]This technique was originally derived by J. Cox, S. Ross, and M. Rubinstein, "Option Pricing, A Simplified Approach," *Journal of Financial Economics* 7 (1979): 229–263 and J. Rendleman, and B. Bartter, "Two-State Option Pricing," *Journal of Finance* 34 (December 1979): 1093–1110.

In order to determine the value of the option using the Law of One Price, we must show that we can replicate its payoffs using a portfolio of the stock and the bond. Let $\Delta$ be the number of shares of stock we purchase, and let $B$ be our initial investment in bonds. To create a call option using the stock and the bond, the value of the portfolio consisting of the stock and bond must match the value of the option in every possible state. Thus, in the up state, the value of the portfolio must be $10 (the value of the call in that state):

$$60\Delta + 1.06B = 10 \tag{21.1}$$

In the down state, the value of the portfolio must be zero (the value of the call in that state):

$$40\Delta + 1.06B = 0 \tag{21.2}$$

Equations 21.1 and 21.2 are two simultaneous equations with two unknowns, $\Delta$ and $B$. We'll write down the general formula to solve these equations shortly, but in this case, we can check that the solution is

$$\Delta = 0.5$$
$$B = -18.8679$$

A portfolio that is long 0.5 share of stock and short approximately $18.87 worth of bonds (i.e., we have borrowed $18.87 at a 6% interest rate) will have a value in one period that matches the value of the call exactly. Let's verify this explicitly:

$$60 \times 0.5 - 1.06 \times 18.87 = 10$$
$$40 \times 0.5 - 1.06 \times 18.87 = 0$$

Therefore, by the Law of One Price, the price of the call option today must equal the current market value of the replicating portfolio. The value of the portfolio today is the value of 0.5 shares at the current share price of $50, less the amount borrowed:

$$50\Delta + B = 50(0.5) - 18.87 = 6.13 \tag{21.3}$$

Thus, the price of the call today is $6.13.[3]

Figure 21.1 illustrates how we can use the stock and the bond to replicate the payoff of the call option in this case. As a function of the future stock price, the payoff of the replicating portfolio is a line with a slope of $\Delta = 0.5$, and an intercept of $FV(B) = 1.06(-18.87) = -20$. This line is very different from the line showing the payoff of the call option, which is zero below the strike price of $50 and increases 1:1 with the stock price above $50. The secret of the binomial model is that while the option and the replicating portfolio do not have the same payoffs in general, they have the same payoffs given the only two outcomes we have assumed possible for the stock price: $40 and $60.

Note that by using the Law of One Price, we are able to solve for the price of the option *without knowing the probabilities of the states in the binomial tree.* That is, we did not need to specify the likelihood that the stock would go up versus down. This remarkable result was a very important discovery because the probabilities of future states are part of investor beliefs, so they are very difficult to estimate. The preceding argument shows that we do not need to know these probabilities to value options. It also means that we do not need to know the expected return of the stock, which will depend on these probabilities.

---

[3]If the call's price were different, there would be an arbitrage opportunity. For example, if the call price were $6.50, we could earn a profit by buying the replicating portfolio for $6.13 and selling the call option for $6.50. Because they have the same future payoff, we have taken no risk, and earn an immediate profit of $6.50 - 6.13 = $0.37 per option sold.

## The Binomial Pricing Formula

Now that we have seen the basic idea, let's consider a more general example. Suppose the current stock price is $S$, and the stock price will either go up to $S_u$ or down to $S_d$ next period. The risk-free interest rate is $r_f$. Let's determine the price of an option that has a value of $C_u$ if the stock goes up, and $C_d$ if the stock goes down:



Note that in the depiction of the binomial tree above, for simplicity, we did not write down the bond payoff since it earns a return of $r_f$ in either case.

What is the value of the option today? Again, we must determine the number of shares of stock, $\Delta$, and the position in the bond, $B$, such that the payoff of the replicating portfolio matches the payoff of the option if the stock goes up or down:

$$S_u \Delta + (1 + r_f)B = C_u \quad \text{and} \quad S_d \Delta + (1 + r_f)B = C_d \qquad (21.4)$$

Solving these two equations for the two unknowns $\Delta$ and $B$, we get the general formula for the replicating formula in the binomial model:

**Replicating Portfolio in the Binomial Model**

$$\Delta = \frac{C_u - C_d}{S_u - S_d} \quad \text{and} \quad B = \frac{C_d - S_d \Delta}{1 + r_f} \qquad (21.5)$$

Note that the formula for $\Delta$ in Eq. 21.5 can be interpreted as the sensitivity of the option's value to changes in the stock price. It is equal to the slope of the line showing the payoff of the replicating portfolio in Figure 21.1.

### FIGURE 21.1

**Replicating an Option in the Binomial Model**

The red line shows the payoff of the replicating portfolio and the blue line shows the payoff of the call option, as a function of next period's stock price. While they do not match everywhere, they do match for the two possible outcomes of the stock price next period, $40 and $60.



Once we know the replicating portfolio, we can calculate the value $C$ of the option today as the cost of this portfolio:

**Option Price in the Binomial Model**
$$C = S\Delta + B \tag{21.6}$$

Equations 21.5 and 21.6 summarize the binomial option pricing model. Although they are relatively simple, by applying them in different ways we will see that they are quite powerful. For one thing, they do not require that the option we are valuing is a call option—we can use them to value *any* security whose payoff depends on the stock price. For example, we can use them to price a put, as presented in Example 21.1.

---

**EXAMPLE 21.1**

**Valuing a Put Option**

**Problem**

Suppose a stock is currently trading for $60, and in one period will either go up by 20% or fall by 10%. If the one-period risk-free rate is 3%, what is the price of a European put option that expires in one period and has an exercise price of $60?

**Solution**

We begin by constructing a binomial tree:



Thus, we can solve for the value of the put by using Eq. 21.5 and Eq. 21.6 with $C_u = 0$ (the value of the put when the stock goes up) and $C_d = 6$ (the value of the put when the stock goes down). Therefore,

$$\Delta = \frac{C_u - C_d}{S_u - S_d} = \frac{0 - 6}{72 - 54} = -0.3333 \text{ and } B = \frac{C_d - S_d \Delta}{1 + r_f} = \frac{6 - 54(-0.3333)}{1.03} = 23.30$$

This portfolio is short 0.3333 shares of the stock, and has $23.30 invested in the risk-free bond. Let's check that it replicates the put if the stock goes up or down:

$$72(-0.3333) + 1.03(23.30) = 0 \text{ and } 54(-0.3333) + 1.03(23.30) = 6$$

Thus, the value of the put is the initial cost of this portfolio. Using Eq. 21.6:

$$\text{Put value} = C = S\Delta + B$$
$$= 60(-0.3333) + 23.30 = \$3.30$$

---

You might be skeptical at this point. Showing that we can value call and put options in a simple two-state one-period example is one thing; pricing real-world options is another matter altogether. Yet, as we show in the next section, this simple two-state model is easily generalized.

## A Multiperiod Model

The problem with the simple two-state example is that there are many more than two possible outcomes for the stock price in the real world. To make the model more realistic, we must allow for the possibility of many states and periods.

Let's consider a two-period binomial tree for the stock price:[4]



The key property of the binomial model is that in each period, there are only two possible outcomes—the stock either goes up or down. But by adding an additional period, the number of possible stock prices at the end has increased. Let's assume again that the risk-free rate of interest is 6% per period and consider how to price a call option with a strike price of $50 that expires in two periods.

To calculate the value of an option in a multiperiod binomial tree, we start at the end of the tree and work backward. At time 2, the option expires, so its value is equal to its intrinsic value. In this case, the call will be worth $10 if the stock price goes up to $60, and will be worth zero otherwise.

Next, let's determine the value of the option in each possible state at time 1. What is the value of the option if the stock price has gone up to $50 at time 1? In this case, because the option expires next period, the remaining part of the binomial tree is as follows:



This binomial tree is exactly the same tree that we considered in the one-period model at the start of this section. There, we computed the replicating portfolio as having $\Delta = 0.5$ shares of stock and a bond position of $B = -\$18.87$, for an initial call value of $6.13 (see Eq. 21.3).

What if the stock price has dropped to $30 at time 1? In that case, the binomial tree for the next period is



---
[4]The multiperiod tree is sometimes referred to as a *binomial lattice*.

The option is worthless in both states at time 2, so the value of the option in the down state at time 1 must also be zero (and the replicating portfolio is simply $\Delta = 0$ and $B = 0$).

Given the value of the call option in either state at time 1, we can now work backward and determine the value of the call at time 0. In that case, we can write the binomial tree over the next period as follows:



In this case, the call values at the end of the tree (time 1) are not the final payoffs of the option, but are the values of the option one period prior to expiration. Nonetheless, we can use the same binomial formulas to calculate the replicating portfolio at time 0, which is a portfolio whose value will match the value of the option at time 1. From Eq. 21.5:

$$\Delta = \frac{C_u - C_d}{S_u - S_d} = \frac{6.13 - 0}{50 - 30} = 0.3065 \quad \text{and}$$

$$B = \frac{C_d - S_d \Delta}{1 + r_f} = \frac{0 - 30(0.3065)}{1.06} = -8.67$$

From Eq. 21.6, the initial value of the call option is equal to the initial cost of this portfolio:

$$C = S\Delta + B = 40(0.3065) - 8.67 = \$3.59$$

Therefore, the initial value of the call option at time 0 is $3.59.

For this two-period call option, while we can still construct the option out of the stock and the bond, we now need to adjust our replicating portfolio at the end of each period. That is, we start off long 0.3065 shares of stock and borrow $8.67 (for an initial cost of $3.59). If the stock price drops to $30, our shares are worth $30 \times 0.3065 = \$9.20$, and our debt has grown to $8.67 \times 1.06 = \$9.20$. Thus, the net value of the portfolio is worthless (matching the option value), and we can liquidate the portfolio (at no cost). If the stock price rises to $50, the net value of the portfolio rises to $6.13. In that case, the new $\Delta$ of the replicating portfolio is 0.5. Therefore, to match the new $\Delta$, we buy $0.50 - 0.3065 = 0.1935$ more shares of stock and pay for it by borrowing $0.1935 \times \$50 = \$9.67$. This re-trading requires no new money; at the end our total debt will be $8.67 \times 1.06 + \$9.67 = \$18.87$, which matches the value for $B$ we calculated earlier. Finally, on the expiration date at time 2, the value of the portfolio is $10 if the stock goes up to $60, and is zero otherwise.

The idea that you can replicate the option payoff by dynamically trading in a portfolio of the underlying stock and a risk-free bond was one of the most important contributions of the original Black-Scholes paper. Today, this kind of replication strategy is called a **dynamic trading strategy**.

| EXAMPLE 21.2 | **Using the Binomial Option Pricing Model to Value a Put Option** |

**Problem**

Suppose the current price of Narver Network Systems stock is $50 per share. In each of the next two years, the stock price will either increase by 20% or decrease by 10%. The 3% one-year risk-free rate of interest will remain constant. Calculate the price of a two-year European put option on Narver Network Systems stock with a strike price $60.

**Solution**

Here is the binomial tree for the stock price, together with the final payoffs of the put option:



If the stock goes up to $60 at time 1, we are in exactly the same situation as in Example 21.1. Using our result there, we see that if the stock is worth $60 at time 1, the value of the put option is $3.30.

If the stock goes down to $45 at time 1, then at time 2 the put option will be worth either $6 if the stock goes up or $19.50 if the stock goes down. Using Eq. 21.5:

$$\Delta = \frac{C_u - C_d}{S_u - S_d} = \frac{6 - 19.5}{54 - 40.5} = -1 \quad \text{and} \quad B = \frac{C_d - S_d\Delta}{1 + r_f} = \frac{19.5 - 40.5(-1)}{1.03} = 58.25$$

This portfolio is short one share of the stock, and has $58.25 invested in the risk-free bond. Because the value of the bond will grow to $58.25 × 1.03 = $60 at time 2, the value of the replicating portfolio will be $60 less the final price of the stock, matching the payoff of the put option. Thus, the value of the put is the cost of this portfolio. Using Eq. 21.6:

$$\text{Put value} = C = S\Delta + B = 45(-1) + 58.25 = \$13.25$$

Now consider the value of the put option at time 0. In period 1, we have calculated that the put will be worth $3.30 if the stock goes up to $60 and $13.25 if the stock falls to $45. The binomial tree at time 0 is



Using Eq. 21.5 and Eq. 21.6, the replicating portfolio and put value at time 0 are

$$\Delta = \frac{C_u - C_d}{S_u - S_d} = \frac{3.30 - 13.25}{60 - 45} = -0.6633,$$

$$B = \frac{C_d - S_d\Delta}{1 + r_f} = \frac{13.25 - 45(-0.6633)}{1.03} = 41.84, \quad \text{and}$$

$$\text{Put value} = C = S\Delta + B = 50(-0.6633) + 41.84 = \$8.68$$

Thus, the value of a European put option at time 0 is $8.68.

## Making the Model Realistic

Using the methods of the previous section, we can value options given any number of periods in the binomial stock price tree. But of course, to price an option for an actual stock, the binomial tree must be a realistic model of the way the stock is likely to evolve in the future.

While binary up or down movements are not the way stock prices behave on an annual or even daily basis, they are a much more reasonable description of stock prices over very short time periods, such as the time between trades. By decreasing the length of each period, and increasing the number of periods in the stock price tree, we can construct a realistic model for the stock price. Figure 21.2 shows an example of a stock price path in which the stock price moves up or down by 1% in each of 900 periods over the year. With many short periods, these stock price paths look very similar to the price charts for real stocks. Practitioners routinely use this method to calculate the prices of options and other types of derivative securities. With a fast computer, prices can be computed very quickly even with thousands of periods.[5]

As mentioned earlier, the techniques of the binomial option pricing model are not specific to European call and put options. We can use it to price any security whose payoff depends on the stock price. But for the special case of European call and put options, there is an alternative approach. If we let the length of each period shrink to zero, and the number of periods per year grows to infinity, the results of the binomial option pricing model can be calculated using a single, simple formula: the Black-Scholes formula. We consider it next.

### FIGURE 21.2

**A Binomial Stock Price Path**

The figure depicts a stock price path with 900 periods during the year, and a random stock return of +1% or −1% each period. With a large number of periods, and small movements in the stock price each period, the binomial model is a realistic model of stock price behavior.



CONCEPT CHECK

1. What is the key assumption of the binomial option pricing model?

2. Why don't we need to know the probabilities of the states in the binominal tree in order to solve for the price of the option?

3. What is a replicating portfolio?

[5]There is a question of how to calibrate the up or down movements each period. A standard approach is to assume the stock's return each period is $\pm\sigma/\sqrt{n}$, where $\sigma$ is the stock's volatility and $n$ is the number of periods per year.

## 21.2 The Black-Scholes Option Pricing Model

Although Fischer Black and Myron Scholes did not originally derive it that way, the **Black-Scholes Option Pricing Model** can be derived from the Binomial Option Pricing Model by making the length of each period, and the movement of the stock price per period, shrink to zero and letting the number of periods grow infinitely large. Rather than derive the formula here, we will state it and focus on its applications.

### The Black-Scholes Formula

Before stating the Black-Scholes formula for the price of an option, it is necessary to introduce some terminology. Let $S$ be the current price of the stock, $T$ be the number of years left to expiration, $K$ be the exercise price, and $\sigma$ be the annual volatility (standard deviation) of the stock's return. Then, the value, at time $t$, of a call option on a stock that does not pay dividends prior to the option's expiration date is given by

**Black-Scholes Price of a Call Option on a Non-Dividend-Paying Stock**

$$C = S \times N(d_1) - PV(K) \times N(d_2) \tag{21.7}$$

where $PV(K)$ is the present value (price) of a risk-free zero-coupon bond that pays $K$ on the expiration date of the option, $N(d)$ is the **cumulative normal distribution**—that is, the probability, as shown in Figure 21.3, that a normally distributed variable is less than $d$—and

$$d_1 = \frac{\ln[S/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} \quad \text{and} \quad d_2 = d_1 - \sigma\sqrt{T} \tag{21.8}$$



| FIGURE 21.3 | Normal Distribution |

$N(d)$

0   $d$

$N(d)$, the cumulative normal distribution, is the probability that a normally distributed random variable will take on a value less than $d$. This probability is equal to the area under the normal distribution (bell curve) to the left of the point $d$—the shaded area in the figure. Because it is a probability, $N(d)$ has a minimum value of 0 and a maximum value of 1. It can be calculated in Excel by using the function NORMSDIST($d$).

We need only five input parameters to price the call: the stock price, the strike price, the exercise date, the risk-free interest rate (to compute the present value of the strike price), and the volatility of the stock. What is equally notable is what we do *not* need. Just as we do not need to know the probabilities in the Binomial Option Pricing Model, we do not need to know the expected return on the stock to calculate the option price in the Black-Scholes Option Pricing Model. The expected return of the stock is difficult to measure with great accuracy as we learned in Part 4; if it were a required input, we could not expect the formula to deliver the option price with much accuracy. Indeed, the only parameter in the Black-Scholes formula that we need to forecast is the stock's volatility. Because a stock's volatility is much easier to measure (and forecast) than its expected return, the Black-Scholes formula can be very precise.

You might wonder how it is possible to compute the value of a security like an option that appears to depend critically on the future stock price without knowing the expected return of the stock. In fact, the expected return of the stock is already reflected in the stock's current price (which is the discounted value of its future payoffs). The Black-Scholes formula depends on the stock's current price, and so, in a sense, uses this information implicitly.

The Black-Scholes formula is derived assuming that the call is a European option. Recall from Chapter 20 that an American call option on a non-dividend-paying stock always has the same price as its European counterpart. Thus, the Black-Scholes formula can be used to price American or European call options on non-dividend-paying stocks.

---

**EXAMPLE 21.3**    **Valuing a Call Option with the Black-Scholes Formula**

**Problem**

JetBlue Airways does not pay dividends. Using the data in Table 21.1, compare the price on July 24, 2009, for the December 2009 American call option on JetBlue with a strike price of $6 to the price predicted by the Black-Scholes formula. Assume that the volatility of JetBlue is 65% per year and that the risk-free rate of interest is 1% per year.

**Solution**

We use $5.03 (the closing price) for the per-share price of JetBlue stock. Because the December contract expires on the Saturday following the third Friday of December (December 19), there are 148 days left until expiration. The present value of the strike price is $PV(K) = 6.00/(1.01)^{148/365} = \$5.976$. Calculating $d_1$ and $d_2$ from Eq. 21.8 gives

$$d_1 = \frac{\ln[S/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2}$$

$$= \frac{\ln(5.03/5.976)}{0.65\sqrt{\frac{148}{365}}} + \frac{0.65\sqrt{\frac{148}{365}}}{2} = -0.209$$

$$d_2 = d_1 - \sigma\sqrt{T} = -0.209 - 0.65\sqrt{\frac{148}{365}} = -0.623$$

Substituting $d_1$ and $d_2$ into the Black-Scholes formula given by Eq. 21.7 results in

$$C = S \times N(d_1) - PV(K) \times N(d_2)$$
$$= 5.03 \times 0.417 - 5.976 \times 0.267$$
$$= \$0.50$$

In Table 21.1, the bid and ask prices for this option are $0.45 and $0.55.

| TABLE 21.1 | JetBlue Option Quotes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

**JBLU**  **5.03 +0.11**

Jul 24 2009 @ 17:17 ET    **Bid** 5.03    **Ask** 5.04    **Size** 168 × 96    **Vol** 7335887

| Calls | Bid | Ask | Vol | Open Int | Puts | Bid | Ask | Vol | Open Int |
|---|---|---|---|---|---|---|---|---|---|
| 09 Dec 5.00 (JGQ LA) | 0.80 | 0.90 | 47 | 5865 | 09 Dec 5.00 (JGQ XA) | 0.80 | 0.90 | 6 | 1000 |
| 09 Dec 6.00 (JGQ LF) | 0.45 | 0.55 | 2 | 259 | 09 Dec 6.00 (JGQ XF) | 1.40 | 1.50 | 0 | 84 |
| 10 Jan 5.00 (JGQ AA) | 0.85 | 1.00 | 125 | 6433 | 10 Jan 5.00 (JGQ MA) | 0.85 | 0.95 | 10 | 14737 |
| 10 Jan 6.00 (JGQ AF) | 0.50 | 0.60 | 28 | 0 | 10 Jan 6.00 (JGQ MF) | 1.45 | 1.55 | 0 | 22 |
| 10 Jan 9.00 (JGQ AI) | 0.05 | 0.15 | 0 | 818 | 10 Jan 9.00 (JGQ MI) | 4.00 | 4.10 | 0 | 0 |
| 10 Mar 5.00 (JGQ CA) | 1.05 | 1.15 | 0 | 50 | 10 Mar 5.00 (JGQ OA) | 1.00 | 1.10 | 0 | 40 |
| 10 Mar 6.00 (JGQ CF) | 0.65 | 0.75 | 0 | 146 | 10 Mar 6.00 (JGQ OF) | 1.60 | 1.70 | 10 | 41 |
| 10 Mar 7.00 (JGQ CG) | 0.40 | 0.50 | 5 | 3 | 10 Mar 7.00 (JGQ OG) | 2.30 | 2.45 | 10 | 0 |

*Source*: Chicago Board Options Exchange at www.cboe.com

Figure 21.4 plots the value of the call option in Example 21.3 as a function of JetBlue's current stock price. Notice how the value of the option always lies above its intrinsic value.

**European Put Options.** We can use the Black-Scholes formula to compute the price of a European put option on a non-dividend-paying stock by using the put-call parity formula we derived in Chapter 20 (see Eq. 20.3). The price of a European put from put-call parity is

$$P = C - S + PV(K)$$

Substituting for $C$ using the Black-Scholes formula gives

**Black-Scholes Price of a European Put Option on a Non-Dividend-Paying Stock**

$$P = PV(K)[1 - N(d_2)] - S[1 - N(d_1)] \tag{21.9}$$



**FIGURE 21.4**

**Black-Scholes Value on July 24, 2009, of the December 2009 $6 Call on JetBlue Stock**

The red curve shows the Black-Scholes value of the call option as a function of JetBlue's stock price. The circle shows the value at JetBlue's current price of $5.03. The black line is the intrinsic value of the call.

**EXAMPLE 21.4**  **Valuing a Put Option with the Black-Scholes Formula**

**Problem**

Using the Black-Scholes formula and the data in Table 21.1, compute the price of a January 2010 $5 put option and compare it to the price in the market. Is the Black-Scholes formula the correct way to price these options? (As before, assume that the volatility of JetBlue is 65% per year and that the risk-free rate of interest is 1% per year.)

**Solution**

The contract expires on January 16, 2010, or 176 days from the quote date. The present value of the strike price is $PV(K) = 5.00/(1.01)^{176/365} = \$4.976$. Calculating $d_1$ and $d_2$ from Eq. 21.8 gives

$$d_1 = \frac{\ln[S/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2}$$

$$= \frac{\ln(5.03/4.976)}{0.65\sqrt{\frac{176}{365}}} + \frac{0.65\sqrt{\frac{176}{365}}}{2} = 0.250$$

$$d_2 = d_1 - \sigma\sqrt{T} = 0.250 - 0.65\sqrt{\frac{176}{365}} = -0.201$$

Substituting $d_1$ and $d_2$ into the Black-Scholes formula for a put option, using Eq. 21.9, gives

$$P = PV(K)[1 - N(d_2)] - S[1 - N(d_1)]$$

$$= 4.976 \times (1 - 0.420) - 5.03 \times (1 - 0.599)$$

$$= \$0.87$$

Given the bid and ask prices of $0.85 and $0.95, respectively, for the option, this estimate is within the bid-ask spread. But the Black-Scholes formula for puts is valid for European options, and the quotes are for American options. Hence, in this case, the Black-Scholes option price is a lower bound on the actual value of the put, as an American put might be exercised early to benefit from interest on the strike price. However, given that interest on the $5 strike price is less than $0.03, in this case the approximation is a close one.

Figure 21.5 plots the Black-Scholes value of the European put option in Example 21.4 as a function of JetBlue's stock price. Recall from Chapter 20 that the time value of deep-in-the-money European puts can be negative. While the put value does falls below its intrinsic value in Figure 21.5, the effect is slight in this case given low current interest rates and the relatively short time to expiration of the option.

**Dividend-Paying Stocks.** The Black-Scholes formula applies to call options on non-dividend-paying stocks. However, we can easily adjust the formula for European options on dividend-paying stocks.

The holder of a European call option does not receive the benefit of any dividends that will be paid prior to the expiration date of the option. Indeed, as we saw in Chapter 17, the stock price tends to drop by the amount of the dividend when the stock goes ex-dividend. Because the final stock price will be lower, dividends decrease the value of a call option.

Let $PV(Div)$ be the present value of any dividends paid prior to the expiration date of the option. Then, a security that is identical to the stock, but that did not pay any of these dividends, would have a current market price of

$$S^x = S - PV(Div) \tag{21.10}$$

FIGURE 21.5

**Black-Scholes Value on July 24, 2009, of the January 2010 $5 Put on JetBlue Stock**

The red curve shows the Black-Scholes value of the put option as a function of JetBlue's stock price. The circle shows the value at JetBlue's current price of $5.03. The black line is the intrinsic value of the put. For stock prices below $2.25, the European put's value is slightly less than its intrinsic value.



The value $S^x$ is the current price of the stock excluding any dividends prior to expiration. *Because a European call option is the right to buy the stock without these dividends, we can evaluate it using the Black-Scholes formula with $S^x$ in place of S.*

A useful special case is when the stock will pay a dividend that is proportional to its stock price at the time the dividend is paid. If $q$ is the stock's (compounded) dividend yield until the expiration date, then[6]

$$S^x = S/(1 + q) \qquad (21.11)$$

EXAMPLE 21.5

**Valuing a Dividend-Paying European Call Option with the Black-Scholes Formula**

**Problem**

World Wide Plants will pay an annual dividend yield of 5% on its stock. Plot the value of a one-year European call option with a strike price of $20 on World Wide Plants stock as a function of the stock price. Assume that the volatility of World Wide Plants stock is 20% per year and that the one-year risk-free rate of interest is 4%.

**Solution**

The price of the call is given by the standard Black-Scholes formula, Eq. 21.7, but with the stock price replaced throughout with $S^x = S/(1.05)$. For example, with a stock price of $30, $S^x = 30/(1.05) = 28.57$, $PV(K) = 20/1.04 = 19.23$, and

---

[6]To see why, suppose that whenever the dividend is paid, we reinvest it. Then, if we buy $1/(1 + q)$ shares today, at expiration we will own $[1/(1 + q)] \times (1 + q) = 1$ share. Thus, by the Law of One Price, the value today of receiving 1 share at expiration is $S/(1 + q)$.

$$d_1 = \frac{\ln[S^x/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2}$$

$$= \frac{\ln(28.57/19.23)}{0.2} + 0.1 = 2.08$$

$$d_2 = d_1 - \sigma\sqrt{T} = 2.08 - 0.2 = 1.88$$

so

$$C(S) = S^x N(d_1) - PV(K)N(d_2) = 28.57(0.981) - 19.23(0.970) = 9.37$$

The plot below shows the value of the call (in red) for different levels of the stock price. When the stock price is sufficiently high, the call is worth less than its intrinsic value.



## Implied Volatility

Of the five required inputs in the Black-Scholes formula, four are directly observable: *S, K, T,* and the risk-free interest rate. Only one parameter, $\sigma$, the volatility of the stock price, is not directly observable. Practitioners use two strategies to estimate the value of this variable. The first, most straightforward approach is to use historical data on daily stock returns to estimate the volatility of the stock over the past several months. Because volatility tends to be persistent, such estimates can provide a reasonable forecast for the stock's volatility in the near future.

The second approach is to use the current market prices of traded options to "back out" the volatility that is consistent with these prices based on the Black-Scholes formula. An estimate of a stock's volatility that is implied by an option's price is known as an **implied volatility**. The implied volatility from one option can be used to estimate the value of other options on the stock with the same expiration date (as well as those with different expiration dates if the stock's volatility is not expected to change over time).

## EXAMPLE 21.6 — Computing the Implied Volatility from an Option Price

### Problem

Use the price of the March 2010 call on JetBlue with a strike price of $5 in Table 21.1 to calculate the implied volatility for JetBlue from July 2009 to March 2010. Assume the risk-free rate of interest is 1% per year.

### Solution

The call expires on March 20, 2010, or 239 days after the quote date. The stock price is $5.03, and $PV(K) = 5.00/(1.01)^{239/365} = \$4.968$. Substituting these values into the Black-Scholes formula, Eq. 21.7, gives

$$C = 5.03N(d_1) - 4.968N(d_2)$$

where

$$d_1 = \frac{\ln(5.03/4.968)}{\sigma\sqrt{\frac{239}{365}}} + \frac{\sigma\sqrt{\frac{239}{365}}}{2} \quad \text{and} \quad d_2 = d_1 - \sigma\sqrt{\frac{239}{365}}$$

We can compute the Black-Scholes option value $C$ for different volatilities using this equation. The option value $C$ increases with $\sigma$, and equals $1.10 (average bid and ask price for the call) when $\sigma \approx 67\%$. (You can find this value by trial and error or by using Excel's Solver tool.) If we look at the bid price of $1.05, the implied volatility is about 64%, and at the ask price of $1.15, the implied volatility is about 70%. Thus, the 65% volatility we used in Example 21.3 and Example 21.4 is within the bid-ask spread for the option.

## GLOBAL FINANCIAL CRISIS — The VIX Index

The use of the Black-Scholes option pricing formula to compute implied volatility has become so ubiquitous that in January 1990 the Chicago Board Options Exchange introduced the **VIX Index**, which tracks the one-month implied volatility of options written on the S&P 500 index. Quoted in percent per annum, this index has since become one of the most-cited measures of market volatility. Because it characterizes the level of investor uncertainty, it is often referred to as the "fear index."

As the figure below shows, while the average level of the VIX is about 20%, the index does indeed rise during times of crisis and heightened uncertainty. This effect is illustrated most dramatically during the U.S. financial crisis, with the VIX nearly quadrupling between September and October 2008, to a level almost twice its previous all-time high. The index remained at these historically high levels for several months, reflecting the unprecedented uncertainty that accompanied the financial crisis. As this uncertainty dissipated in mid-2009, the index began to drop, reflecting renewed investor confidence. Since then, however, uncertainty in Europe has driven time periods when the VIX has again topped 40%.



*Source:* Yahoo Finance

## The Replicating Portfolio

Although we introduced the concept of the replicating portfolio in the discussion of the Binomial Option Pricing Model, it was actually Fischer Black and Myron Scholes who discovered this important insight while deriving their model. To see how the replicating portfolio is constructed in the Black-Scholes Model, recall from the Binomial Option Pricing Model that the price of a call option is given by the price of the replicating portfolio, as shown in Eq. 21.6:

$$C = S\Delta + B$$

Comparing this expression to the Black-Scholes formula from Eq. 21.7 gives the shares of stock and amount in bonds in the Black-Scholes replicating portfolio:

### Black-Scholes Replicating Portfolio of a Call Option

$$\Delta = N(d_1)$$
$$B = -PV(K)N(d_2) \tag{21.12}$$

Recall that $N(d)$ is the cumulative normal distribution function; that is, it has a minimum value of 0 and a maximum value of 1. So, $\Delta$ is between 0 and 1, and $B$ is between $-K$ and 0. The **option delta**, $\Delta$, has a natural interpretation: It is the change in the price of the option given a $1 change in the price of the stock. Because $\Delta$ is always less than 1, the change in the call price is always less than the change in the stock price.

---

**EXAMPLE 21.7**

### Computing the Replicating Portfolio

**Problem**

PNA Systems pays no dividends and has a current stock price of $10 per share. If its returns have a volatility of 40% and the risk-free rate is 5%, what portfolio would you hold today to replicate a one-year at-the-money call option on the stock?

**Solution**

We can apply the Black-Scholes formula with $S = 10$, $PV(K) = 10/1.05 = 9.524$, and

$$d_1 = \frac{\ln[S/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} = \frac{\ln(10/9.524)}{40\%} + \frac{40\%}{2} = 0.322$$

$$d_2 = d_1 - \sigma\sqrt{T} = 0.322 - 0.40 = -0.078$$

From Eq. 21.12, the replicating portfolio for the option is

$$\Delta = N(d_1) = N(0.322) = 0.626$$

$$B = -PV(K)N(d_2) = -9.524 \times N(-0.078) = -4.47$$

That is, we should buy 0.626 shares of the PNA stock, and borrow $4.47, for a total cost of $10(0.626) - 4.47 = $1.79, which is the Black-Scholes value of the call option.

---

Figure 21.6 illustrates the replicating portfolio (yellow line) and call option value (red curve), as a function of the stock price, for Example 21.7. Because the red curve and yellow line are tangent (with slope $\Delta$) at the initial stock price, the value of the replicating portfolio will approximate the value of the call option for small changes to the stock price. But as the stock price changes, the replicating portfolio will need to be updated to

## FIGURE 21.6

**Replicating Portfolio for the Call Option in Example 21.7**

The replicating portfolio has the same initial value as the call option, and the same initial sensitivity to the stock price (given by $\Delta$). Because the red curve and the yellow line are tangent, the value of the replicating portfolio will approximate the value of the call option for small changes to the stock price. But to maintain accuracy, the replicating portfolio must be updated as the stock price changes.



maintain accuracy. For example, if the stock price increases, the replicating portfolio will correspond to a new, steeper tangent line higher on the red curve. Because a steeper line corresponds to a higher $\Delta$, to replicate the option it is necessary to buy shares as the stock price increases.

This dynamic trading strategy is analogous to the ones we derived earlier for the Binomial Option Pricing Model. In the binomial model, we were able to replicate the payoff of an option because we only needed to match two of its payoffs at any time. The great insight of Black, Scholes, and Merton was that if we can update our portfolio continuously, we can replicate an option on the stock by constantly adjusting our portfolio to remain on a line that is tangent to the value of the option.

Notice that the replicating portfolio of a call option always consists of a long position in the stock and a short position in the bond; in other words, the replicating portfolio is a leveraged position in the stock. Because a leveraged position in a stock is riskier than the stock itself, this implies that call options on a positive beta stock are *more* risky than the underlying stock and therefore have higher returns and higher betas.

We can also derive the replicating portfolio for a put option. Comparing the Black-Scholes price of a put from Eq. 21.9 with Eq. 21.6 gives

**Black-Scholes Replicating Portfolio of a Put Option**

$$\Delta = -[1 - N(d_1)]$$
$$B = PV(K)[1 - N(d_2)] \tag{21.13}$$

In this case, $\Delta$ is between $-1$ and 0, and $B$ is between 0 and $K$. Thus, the replicating portfolio of a put option always consists of a long position in the bond and a short position in the stock, implying that put options on a positive beta stock will have a negative beta.

---

### COMMON MISTAKE    Valuing Employee Stock Options

In the last 20 years, it has become common practice to compensate executives by granting them **executive stock options (ESOs)**—call options on their company's stock. Until 2005, U.S. accounting standards did not require firms to include stock option grants as part of their compensation expense. Now, however, firms are required to expense these options when calculating their earnings. Regardless of the accounting requirement, both firms and employees would like to know the value of this compensation. While it is tempting to use the Black-Scholes formula to value an ESO, there are several important pitfalls to be aware of when doing so.

To understand the difficulties of using the Black-Scholes formula to value ESOs, it is important to appreciate how they are usually granted. ESOs are typically American-style options with exercise dates up to 10 years in the future. However, there is usually a vesting period (often as long as four years) during which the employee does not actually own the option. Instead, he or she owns a right to the option at the end of the vesting period. If the employee leaves the firm during this period, the individual forfeits this right and so does not get the option. Once the vesting period has passed, the employee owns the option but *it is not tradable*—the only way the employee can liquidate the option is by exercising it. Furthermore, most executives face restrictions in trading their own company stock, so they effectively cannot construct a replicating portfolio. Because of these restrictions, ESOs are not worth the same amount to the employee and the firm.

One obvious difficulty with applying the Black-Scholes formula to such options is that the formula requires an estimate of the volatility of the stock over the life of the option. Forecasting volatility up to 10 years in the future is extremely difficult. But even if the stock's volatility were known, the Black-Scholes formula does not account for the following important differences between ESOs and ordinary stock options:

1. *ESOs are dilutive.*   When exercised, they increase the number of shares outstanding of the firm.

2. *ESOs may be forfeited.*   If the employee leaves the firm, options that are not vested are immediately forfeited. Options already vested are forfeited if not exercised within three months of the employee's departure.

3. *ESOs may be exercised early.*   Once vested, the employee can exercise the options at any time.

Unless the number of options is large relative to the total number of shares outstanding, the first difference is not that important. The second difference is important for employees and firms with high employee turnover.

The third difference is very important for employees and all firms. Employees are risk-averse, but are not permitted to hedge the risk of the option by trading the replicating portfolio. As a consequence, the employee's preferences and beliefs matter in computing the ESO's value: A more risk-averse or pessimistic employee will attach a lower value to the option than a less risk-averse or optimistic employee. Furthermore, the only way an employee can eliminate his or her risk from the option is to exercise it and sell the stock. *Hence, most employees choose to exercise early.*[*] In this case, employees are forfeiting the (often substantial) remaining time value of their options in exchange for a reduction in their risk.

Thus, the Black-Scholes formula (which assumes no early exercise) overestimates the cost of the option to the firm and its benefit to the employee. Because the firm can hedge its option liabilities, risk is not an issue when evaluating the cost of the option to the firm. Thus, the Black-Scholes formula overstates the cost by not accounting for forfeitures and early exercise. Because the employee cannot sell or hedge the risk of the option, the Black-Scholes formula overstates the value of the option to the employee even further by not accounting for the personal cost of bearing risk.

How important are these differences? The answer appears to be *very* important. In a recent paper, Ashish Jain and Ajay Subramanian adjust for these differences and find that for reasonable parameter values, the Black-Scholes formula can overestimate the *cost to the firm* of a vested five-year option by as much as 40%.[†] And once one considers the personal cost of being under-diversified while holding the option, its value to the employee can be as low as one third of the cost of the option to the firm. To account for these discrepancies, researchers have developed methods based on the binomial model in Section 21.1, that incorporate the probability and effect of forfeiture and early exercise directly into the binomial tree (see Further Readings).

---

[*]See S. Huddart and M. Lang, "Employee Stock Option Exercises: An Empirical Analysis," *Journal of Accounting and Economics* 21 (1996): 5–43.

[†]"The Intertemporal Exercise and Valuation of Employee Options," *Accounting Review* 79 (2004): 705–743.

Professor Myron S. Scholes is co-inventor of the Black-Scholes options pricing model, for which he won the Nobel Prize for Economic Sciences in 1997. He is the Frank E. Buck Professor of Finance, Emeritus, at Stanford Graduate School of Business.

### INTERVIEW WITH
# Myron S. Scholes



QUESTION: *At the time you derived the Black-Scholes formula, did you anticipate its influence in the financial world?*

ANSWER: Fischer Black and I believed that the option-pricing technology would be used to value existing contracts such as options on stock, warrants, corporate debt, and mortgage contracts. We did not anticipate that in the future our technology would be used to develop and price new instruments, although we were not alone. For example, several journals rejected our paper. Only after Merton Miller explained to the editors of the *Journal of Political Economy* that our findings were not arcane but had general importance did it accept our paper. Fischer and I rewrote the paper to include a description of the importance of options in the economy, such as how to value the stock of a corporation with risky debt in its capital structure.

QUESTION: *What is the most important contribution of the Black-Scholes formula?*

ANSWER: The Black-Scholes option paper has two parts: a technology to value options and an illustration of that technology to the pricing of options under a stylized set of assumptions that was later called the Black-Scholes options pricing model. The Nobel Prize was awarded, in part, for developing the technology to value derivatives. We showed that if investors could hedge the systematic components of asset returns, then the remaining risks were unsystematic and the expected return of a portfolio of unsystematic risks will equal the risk-free rate. Moreover, as trading-time became continuous, the unsystematic risk would disappear.

When we developed the model we did not believe that the risk-free rate or the volatility of an asset remained constant. We assumed that to be the case, however, to illustrate the application of the model. This illustration became the Black-Scholes model. The underlying technology does not assume the constancy of either parameter. What impressed and particularly pleased me was the realization that investors could price an option without knowing the expected rate of return on the underlying asset or the expected terminal value of the option at its maturity. I believe that the technology to value options and the underlying economics to support its development were the most important part of our paper.

QUESTION: *How did you arrive at the insight that you could create a risk-free portfolio trading the stock and option?*

ANSWER: We first needed to determine how much stock to short against a long position in the underlying option, such that small movements in the price of the underlying stock would be offset by opposite movements in the price of the option—a hedged position. As explained above, if the returns on this combined stock and option investment were uncorrelated with the market portfolio (assuming that CAPM held over short time periods—i.e., the returns were normally distributed) or riskless in continuous time (if investors could trade continuously to adjust their stock position), to prevent arbitrage profits the return on the hedged position had to be equal to the risk-free rate.

QUESTION: *What words of wisdom might you offer future practitioners on using the Black-Scholes formula in light of the 2007–2009 financial crisis?*

ANSWER: Some blamed models such as ours for the financial crisis. In part, the model can't be correct other than for relatively short-dated options; it would not make economic sense to use the same calibration of the pricing technology over long periods of time. Most of the difficulties in using models arise from the incorrect use of technology and assumptions of how to calibrate the models. The crisis highlighted once again that assumptions are important in building and calibrating models.

---

**CONCEPT CHECK**

1. What are the inputs of the Black-Scholes option pricing formula?
2. What is the implied volatility of a stock?
3. How does the delta of a call option change as the stock price increases?

**21.3** **Risk-Neutral Probabilities**

In both the Binomial and Black-Scholes Pricing Models, we do not need to know the probability of each possible future stock price to calculate the option price. But what if we did know these probabilities? In that case, we could calculate the price of the option as we have done for other financial assets: We could calculate the expected payoff of the option and discount it at the appropriate cost of capital. The drawback of this approach is that even if we know the probabilities, it is very difficult to estimate the cost of capital for a particular asset, and options are no exception. There is, however, one case in which the cost of capital can be precisely estimated. If all market participants were risk neutral, then *all* financial assets (including options) would have the same cost of capital—the risk-free rate of interest. Let's consider that scenario and see its implications for option prices.

### A Risk-Neutral Two-State Model

Imagine a world consisting of only risk-neutral investors, and consider the two-state example in Section 21.1 in the risk-neutral world. Recall that the stock price today is equal to $50. In one period it will either go up by $10 or go down by $10, and the one-period risk-free rate of interest is 6%. Let $\rho$ be the probability that the stock price will increase, which means $(1 - \rho)$ is the probability that it will go down. The value of the stock today must equal the present value of the expected price next period discounted at the risk-free rate:

$$50 = \frac{60\rho + 40(1 - \rho)}{1.06} \tag{21.14}$$

This equation is solved with $\rho = 65\%$. Because we now know the probability of each state, we can price the call by calculating the present value of its expected payoff next period. Recall that the call option had an exercise price of $50, so it will be worth either $10 or nothing at expiration. The present value of the expected payouts is

$$\frac{10(0.65) + 0(1 - 0.65)}{1.06} = 6.13 \tag{21.15}$$

This is precisely the value we calculated in Section 21.1 using the Binomial Option Pricing Model where we did *not* assume that investors were risk neutral. It is not a coincidence. Because no assumption on the risk preferences of investors is necessary to calculate the option price using either the Binomial Model or the Black-Scholes formula, the models must work for any set of preferences, *including* risk-neutral investors.

### Implications of the Risk-Neutral World

Let's take a step back and consider the importance of the conclusion that if we use the Binomial Model or Black-Scholes Model to price options, we do not need to make any assumption regarding investor risk preferences, the probability of each state, or the stock's expected return. These models *give the same option price no matter what the actual risk preferences and expected stock returns are*. To understand how these two settings can be consistent with the same prices for securities, consider the following:

- In the real world, investors are risk averse. Thus, the expected return of a typical stock includes a positive risk premium to compensate investors for risk.

■ In the hypothetical risk-neutral world, investors do not require compensation for risk. So for the stock price to be the same as in real world, investors must be more pessimistic. Thus, stocks that in reality have expected returns above the risk-free rate, when evaluated using these more pessimistic probabilities, have expected returns that equal the risk-free rate.

In other words, the $\rho$ in Eq. 21.14 and Eq. 21.15 is *not* the *actual* probability of the stock price increasing. Rather, it represents how the actual probability would have to be adjusted to keep the stock price the same in a risk-neutral world. For this reason, we refer to $\rho$ and $(1 - \rho)$ as **risk-neutral probabilities**. These risk-neutral probabilities are known by other names as well: **state-contingent prices**, **state prices**, or **martingale prices**.

To illustrate, suppose the stock considered above, with a current price of $50, will increase to $60 with a true probability of 75%, or fall to $40 with a true probability of 25%:



This stock's true expected return is therefore

$$\frac{60 \times 0.75 + 40 \times 0.25}{50} - 1 = 10\%$$

Given the risk-free interest rate of 6%, this stock has a 4% risk premium. But as we calculated earlier in Eq. 21.14, the risk-neutral probability that the stock will increase is $\rho = 65\%$, which is less than the true probability. Thus, the expected return of the stock in the risk-neutral world is $(60 \times 0.65 + 40 \times 0.35)/50 - 1 = 6\%$ (equal to the risk-free rate). To ensure that all assets in the risk-neutral world have an expected return equal to the risk-free rate, relative to the true probabilities, the risk-neutral probabilities overweight the bad states and underweight the good states.

### Risk-Neutral Probabilities and Option Pricing

We can exploit the insight that if the stock price dynamics are the same in the risk-neutral and risk-averse worlds, the option prices must be the same, to develop another technique for pricing options. Consider again the general binomial stock price tree:



760        **Chapter 21** Option Valuation

First, we can compute the risk-neutral probability that makes the stock's expected return equal to the risk-free interest rate:

$$\frac{\rho S_u + (1 - \rho)S_d}{S} - 1 = r_f$$

Solving this equation for the risk-neutral probability $\rho$ we get

$$\rho = \frac{(1 + r_f)S - S_d}{S_u - S_d} \tag{21.16}$$

We can then compute the value of the option by computing its expected payoff using the risk-neutral probabilities, and discount the expected payoff at the risk-free interest rate.

---

### EXAMPLE 21.8 — Option Pricing with Risk-Neutral Probabilities

**Problem**

Using Narver Network Systems stock from Example 21.2, imagine all investors are risk neutral and calculate the probability of every state in the next two years. Use these probabilities to calculate the price of a two-year call option on Narver Network Systems stock with a strike price $60. Then, price a two-year European put option with the same strike price.

**Solution**

The binomial tree in the three-state example is



First, we use Eq. 21.16 to compute the risk-neutral probability that the stock price will increase. At time 0, we have

$$\rho = \frac{(1 + r_f)S - S_d}{S_u - S_d} = \frac{(1.03)50 - 45}{60 - 45} = 0.433$$

Because the stock has the same returns (up 20% or down 10%) at each date, we can check that the risk-neutral probability is the same at each date as well.

Consider the call option with a strike price of $60. This call pays $12 if the stock goes up twice, and zero otherwise. The risk-neutral probability that the stock will go up twice is $0.433 \times 0.433$, so the call option has an expected payoff of

$$0.433 \times 0.433 \times \$12 = \$2.25$$

We compute the current price of the call option by discounting this expected payoff at the risk-free rate: $C = \$2.25/1.03^2 = \$2.12$.

Next, consider the European put option with a strike price of $60. The put ends up in the money if the stock goes down twice, if it goes up and then down, or if it goes down and then up. Because the risk-neutral probability of a drop in the stock price is $1 - 0.433 = 0.567$, the expected payoff of the put option is

$$0.567 \times 0.567 \times \$19.5 + 0.433 \times 0.567 \times \$6 + 0.567 \times 0.433 \times \$6 = \$9.21$$

The value of the put today is therefore $P = \$9.21/1.03^2 = \$8.68$, which is the price we calculated in Example 21.2.

As the calculation of the put price in Example 21.8 makes clear, by using the probabilities in the risk-neutral world we can price any **derivative security**—that is, any security whose payoff depends solely on the prices of other marketed assets. After we have constructed the tree and calculated the probabilities in the risk-neutral world, we can use them to price the derivative by simply discounting its expected payoff (using the risk-neutral probabilities) at the risk-free rate.

The risk-neutral pricing method is the basis for a common technique for pricing derivative securities called **Monte Carlo simulation**. In this approach, the expected payoff of the derivative security is estimated by calculating its average payoff after simulating many random paths for the underlying stock price. In the randomization, the risk-neutral probabilities are used, and so the average payoff can be discounted at the risk-free rate to estimate the derivative security's value.

**CONCEPT CHECK**

1. What are risk-neutral probabilities? How can they be used to value options?

2. Does the binominal model or Black-Scholes model assume that investors are risk neutral?

## 21.4 Risk and Return of an Option

To measure the risk of an option, we must compute the option beta. The simplest way to do so is to compute the beta of the replicating portfolio. Recall that the beta of a portfolio is just the weighted average beta of the constituent securities that make up the portfolio. In this case, the portfolio consists of $S \times \Delta$ dollars invested in the stock and $B$ dollars invested in the bond, so the beta of an option is

$$\beta_{option} = \frac{S\Delta}{S\Delta + B}\beta_S + \frac{B}{S\Delta + B}\beta_B$$

where $\beta_S$ is the stock's beta and $\beta_B$ is the bond's beta. In this case the bond is riskless, so $\beta_B = 0$. Thus, the option beta is

**Option Beta**

$$\beta_{option} = \frac{S\Delta}{S\Delta + B}\beta_S \tag{21.17}$$

Recall that for a call option, $\Delta$ is greater than zero and $B$ is less than zero. Thus, for a call written on a stock with positive beta, the beta of the call always exceeds the beta of the stock. For a put option, $\Delta$ is less than zero and $B$ is greater than zero; thus the beta of a put option written on a positive beta stock is always negative. This result should not be surprising. A put option is a hedge, so its price goes up when the stock price goes down.

762      **Chapter 21** Option Valuation

### EXAMPLE 21.9

**Option Beta**

**Problem**

Calculate the betas of the JetBlue call and put options in Examples 21.3 and 21.4, assuming JetBlue's stock has a beta of 0.85.

**Solution**

From Example 21.3, the December 2009 $6 call option has a value of $C = \$0.50$ and a delta of $N(d_1) = 0.417$. Thus, its beta is given by

$$\beta_{Call} = \frac{S\Delta}{S\Delta + B}\beta_{Stock} = \frac{S \times N(d_1)}{C}\beta_{Stock}$$

$$= \frac{5.03 \times 0.417}{0.50} \times 0.85 = 3.57$$

Similarly, the beta of the January 2010 $5 put option is given by

$$\beta_{Put} = \frac{S\Delta}{S\Delta + B}\beta_{Stock} = \frac{-S[1 - N(d_1)]}{P}\beta_{Stock}$$

$$= \frac{-5.03[1 - 0.599]}{0.87} \times 0.85 = -1.97$$

The expression $S\Delta/(S\Delta + B)$ is the ratio of the amount of money in the stock position in the replicating portfolio to the value of the replicating portfolio (or the option price); it is known as the option's **leverage ratio**. Figure 21.7 shows how the leverage ratio changes for puts and calls. As the figure shows, the magnitude of the leverage ratio for options can

### FIGURE 21.7

**Leverage Ratios of Options**

The leverage ratio for a call option is always greater than 1, but out-of-the-money calls have higher leverage ratios than in-the-money calls. Put leverage ratios are always negative, and out-the-money puts have more negative leverage ratios than in-the-money puts. Data shown is for one-year options on a stock with a 30% volatility, given a risk-free interest rate of 5%.





**FIGURE 21.8**

**Security Market Line and Options**

The figure shows how the expected return of different options are related.

CONCEPT CHECK

be very large, especially for inexpensive out-of-the-money options. Thus, calls and puts on a positive beta stock have very large positive and negative betas, respectively. Note also that as the stock price changes, the beta of an option will change, with its magnitude falling as the option goes in-the-money.

Recall that expected returns and beta are linearly related. Hence, out-of-the-money calls have the highest expected returns and out-of-the-money puts have the lowest expected returns. The expected returns of different options are plotted on the security market line in Figure 21.8.

1. Is the beta of a call greater or smaller than the beta of the underlying stock?

2. What is the leverage ratio of a call?

## 21.5 Corporate Applications of Option Pricing

We close this chapter by developing two corporate applications of option pricing: (1) unlevering the beta of equity and calculating the beta of risky debt and (2) deriving the approximation formula to value debt overhang that we introduced in Chapter 16.

### Beta of Risky Debt

In Chapter 14, we explained how to calculate the beta of equity from the unlevered beta of equity. If we make the common approximation that the beta of debt is zero, then

$$\beta_E = \beta_U + \frac{D}{E}(\beta_U - \beta_D) \approx \left(1 + \frac{D}{E}\right)\beta_U \tag{21.18}$$

where $\beta_E$ is the beta of equity and $\beta_U$ is the beta of unlevered equity (or the beta of the firm's assets). However, for companies with high debt-to-equity ratios, the approximation that the beta of debt is zero is unrealistic; such corporations have a positive probability of bankruptcy, and this uncertainty usually has systematic components.

To derive an expression for the beta of equity when the beta of debt is not zero, recall from the discussion in Chapter 20 that equity can be viewed as a call option on the firm's

NOBEL PRIZE        **The 1997 Nobel Prize in Economics**

*In a modern market economy, it is essential that firms and households are able to select an appropriate level of risk in their transactions. Markets for options and other so-called derivatives are important in the sense that agents who anticipate future revenues or payments can ensure a profit above a certain level or insure themselves against a loss above a certain level. A prerequisite for efficient management of risk, however, is that such instruments are correctly valued, or priced. A new method to determine the value of derivatives stands out among the foremost contributions to economic sciences over the last 25 years.*

*This year's laureates, Robert Merton and Myron Scholes, developed this method in close collaboration with Fischer Black, who died in his mid-fifties in 1995. Black, Merton, and Scholes thus laid the foundation for the rapid growth of markets for derivatives in the last ten years. Their method has more general applicability, however, and has created new areas of research—inside as well as outside of financial economics. A similar method may be used to value insurance contracts and guarantees, or the flexibility of physical investment projects.*

Quoted from www.nobelprize.org

assets.[7] If we let $A$ be the value of the firm's assets, $E$ be the value of equity, and $D$ be the value of debt, then because equity is a call option on the assets of the firm, we can write the value of equity in terms of a replicating portfolio of the firm's assets and a risk-free bond,

$$E = A\Delta + B$$

where the value of the firm's assets $A = E + D$ is used in place of the stock price $S$ to represent the underlying asset on which the option is written. Substituting these expressions into Eq. 21.17 gives an expression for the beta of equity that does not assume the beta of the firm's debt is zero:

$$\beta_E = \frac{A\Delta}{A\Delta + B}\beta_U = \frac{(E+D)\Delta}{E}\beta_U = \Delta\left(1 + \frac{D}{E}\right)\beta_U \qquad (21.19)$$

Note that when the debt is risk free, the firm's equity is always in-the-money; thus $\Delta = 1$ and Eq. 21.19 reduces to Eq. 21.18.

We can derive the beta of debt in a similar fashion. Debt, $D$, is equal to a portfolio consisting of a long position in the assets of the firm and a short position in its equity; i.e., $D = A - E$. The beta of debt is therefore the weighted-average beta of this portfolio:

$$\beta_D = \frac{A}{D}\beta_U - \frac{E}{D}\beta_E$$

Using Eq. 21.19 and simplifying gives an expression for the beta of debt in terms of the beta of assets:

$$\beta_D = (1 - \Delta)\frac{A}{D}\beta_U = (1 - \Delta)\left(1 + \frac{E}{D}\right)\beta_U \qquad (21.20)$$

Again, when the debt is riskless, $\Delta = 1$ and $\beta_D = 0$, the assumption we made in Eq. 21.18.

Figure 21.9 plots an example of the beta of debt and equity as a function of the firm's leverage using Eq. 21.12. For low levels of debt, the approximation that the beta of debt is zero works reasonably well. As the debt-to-equity ratio becomes larger, however, the beta of debt begins to rise above zero and the beta of equity no longer increases proportionally with the debt-equity ratio.

---

[7]The idea to view debt and equity as options was first developed by R. Merton in "On the Pricing of Corporate Debt: The Risk Structure of Interest Rates," *Journal of Finance* 29 (1974): 449–470.

## FIGURE 21.9

**Beta of Debt and Equity**

The blue curve is the beta of equity and the red curve is the beta of debt as a function of the firm's debt-to-equity ratio. The black line shows the beta of equity when the beta of debt is assumed to be zero. The firm is assumed to hold five-year zero-coupon debt and reinvest all its earnings. The firm's beta of assets is one, the risk-free interest rate is 3% per year, and the volatility of assets is 30% per year.



In most applications, the beta of equity can be estimated. Using the beta of equity, we can calculate the beta of debt and the unlevered beta. For example, to unlever the beta, we can solve Eq. 21.19 for $\beta_U$:

$$\beta_U = \frac{\beta_E}{\Delta\left(1 + \dfrac{D}{E}\right)} \tag{21.21}$$

## EXAMPLE 21.10    Computing the Beta of Debt

**Problem**

You would like to know the beta of debt for BB Industries. The value of BB's outstanding equity is $40 million, and you have estimated its beta to be 1.2. However, you cannot find enough market data to estimate the beta of its debt, so you decide to use the Black-Scholes formula to find an approximate value for the debt beta. BB has four-year zero-coupon debt outstanding with a face value of $100 million that currently trades for $75 million. BB pays no dividends and reinvests all of its earnings. The four-year risk-free rate of interest is currently 5.13%. What is the beta of BB's debt?

**Solution**

We can interpret BB's equity as a four-year call option on the firm's assets with a strike price of $100 million. The present value of the strike price is $100 million/$(1.0513)^4 = \$81.86$ million. The current market value of BB's assets is $40 + 75 = \$115$ million. Therefore, the implied volatility of BB's assets is equal to the implied volatility of a call option whose price is 40 when the stock price is 115 and the present value of the strike price is 81.86. Using trial and error, we find an implied volatility of about 25%. With this volatility, the delta of the call option is

$$\Delta = N(d_1) = N\left(\frac{\ln(115/81.86)}{0.25(2)} + 0.25\right) = 0.824$$

First, we use Eq. 21.21 to solve for BB's unlevered beta:

$$\beta_U = \frac{\beta_E}{\Delta\left(1 + \dfrac{D}{E}\right)} = \frac{1.2}{0.824\left(1 + \dfrac{75}{40}\right)} = 0.51$$

We can then use Eq. 21.20 to estimate the beta of BB's debt:

$$\beta_D = (1 - \Delta)\left(1 + \frac{E}{D}\right)\beta_U = (1 - 0.824)\left(1 + \frac{40}{75}\right)0.51 = 0.14$$

## Agency Costs of Debt

In Chapter 16 we noted that leverage can distort equity holders' incentives to invest. These distortions can be readily understood when we view equity as a call option on the firm's assets. First, leverage creates an asset substitution problem because the value of the equity call option increases with the firm's volatility. Thus, equity holders may have an incentive to take excessive risk. Second, because $\Delta < 1$ for a call option, equity holders gain less than $1 for each $1 increase in the value of the firm's assets, reducing their incentive to invest and leading to a debt overhang or underinvestment problem. Example 21.11 illustrates how we can use the methods of this chapter to quantify both of these effects.

### EXAMPLE 21.11    Evaluating Potential Agency Costs

**Problem**
Consider BB Industries from Example 21.10. Suppose BB can embark on a risky strategy that would increase the volatility of BB's assets from 25% to 35%. Show that shareholders benefit from this risky strategy even if it has an NPV of −$5 million. Alternatively, suppose BB tries to raise $100,000 from shareholders to invest in a new positive NPV project that does not change the firm's risk. What minimum NPV is required for this investment to benefit shareholders?

**Solution**
Recall that we can interpret BB's equity as a four-year call option on the firm's assets with a strike price of $100 million. Given the current risk-free rate of 5.13%, asset value of $115 million, and asset volatility of 25%, the current value of the equity call option is $40 million, with $\Delta = 0.824$.

If BB follows the risky strategy, the value of its assets will fall to $115 − 5 = $110 million, and the volatility of the assets will increase to 35%. Applying the Black-Scholes formula with these new parameters, we find the value of the equity call option would *increase* to $42.5 million, or a $2.5 million gain for equity holders. Thus, leverage may cause equity holders to support risky negative NPV decisions.

Second, suppose BB raises and invests $I = $100,000 in a new project with NPV = $V$. Then the value of the firm's assets will increase by $100,000 + V. Because $\Delta$ represents the sensitivity of a call option to the underlying asset value, the value of equity will increase by approximately $\Delta$ times this amount, and so equity holders gain more than they invest if

$$\Delta(100,000 + V) > 100,000$$

Using Eq. 21.19 and Eq. 21.20, we can rewrite this condition as

$$\frac{NPV}{I} = \frac{V}{100,000} > \frac{1 - \Delta}{\Delta} = \frac{\beta_D D}{\beta_E E}$$

which matches precisely Eq. 16.2. Using the betas from Example 21.10, we see that the investment benefits shareholders only if its profitability index exceeds $(0.14 \times 75)/(1.2 \times 40) = 0.21875$, so that the project's NPV must exceed \$21,875. Because equity holders may reject projects with a positive NPV below this amount, the debt overhang induced by leverage may cause the firm to underinvest.

Thus, option pricing methods can be used to assess potential investment distortions that might arise due to debt overhang, or the incentive for asset substitution and risk-taking. We can also use these methods to evaluate state-contingent costs, such as financial distress costs.

In the above cases, management's and equity holders' option to default imposes costs on the firm. But in many situations, having "options" when investing can be a good thing, and enhance the value of the firm. We explore these situations in the next chapter.

**CONCEPT CHECK**

1. How can we estimate the beta of debt?
2. The fact that equity is a call option on the firm's assets leads to what agency costs?

---

**MyFinanceLab**    Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 21.1 The Binomial Option Pricing Model

- An option can be valued using a portfolio that replicates the payoffs of the option in different states. The Binomial Option Pricing Model assumes two possible states for the next time period, given today's state.
- The value of an option is the value of the portfolio that replicates its payoffs. The replicating portfolio will hold the underlying asset and risk-free debt, and will need to be rebalanced over time.
- The replicating portfolio for the Binomial Option Pricing Model is

$$\Delta = \frac{C_u - C_d}{S_u - S_d} \quad \text{and} \quad B = \frac{C_d - S_d \Delta}{1 + r_f} \tag{21.5}$$

- Given the replicating portfolio, the value of the option is

$$C = S\Delta + B \tag{21.6}$$

### 21.2 The Black-Scholes Option Pricing Model

- The Black-Scholes option pricing formula for the price of a call option on a non-dividend-paying stock is

$$C = S \times N(d_1) - PV(K) \times N(d_2) \tag{21.7}$$

where $N(d)$ is the cumulative normal distribution and

$$d_1 = \frac{\ln[S/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2}$$

$$d_2 = d_1 - \sigma\sqrt{T} \tag{21.8}$$

- Only five input parameters are required to price a call: the stock price, the strike price, the exercise date, the risk-free rate, and the volatility of the stock. We do not need to know the expected return on the stock to calculate the option price.
- The Black-Scholes option pricing formula for the price of a European put option on a non-dividend-paying stock is

$$P = PV(K)[1 - N(d_2)] - S[1 - N(d_1)] \tag{21.9}$$

- We can evaluate a European option on a stock that pays dividends using the Black-Scholes formula with $S^x$ in place of $S$ where

$$S^x = S - PV(Div) \tag{21.10}$$

If the stock pays a (compounded) dividend yield of $q$ prior to the expiration date, then

$$S^x = S/(1 + q) \tag{21.11}$$

- The Black-Scholes replicating portfolio is
  - For a call option on a non-dividend-paying stock

$$\Delta = N(d_1) \quad \text{and} \quad B = -PV(K)N(d_2) \tag{21.12}$$

  - For a European put option on a non-dividend-paying stock

$$\Delta = -[1 - N(d_1)] \quad \text{and} \quad B = PV(K)[1 - N(d_2)] \tag{21.13}$$

  - The replicating portfolio must be continuously updated to remain tangent to the option value

### 21.3 Risk-Neutral Probabilities

- Risk-neutral probabilities are the probabilities under which the expected return of all securities equals the risk-free rate. These probabilities can be used to price any other asset for which the payoffs in each state are known.
- In a binomial tree, the risk-neutral probability $\rho$ that the stock price will increase is given by

$$\rho = \frac{(1 + r_f)S - S_d}{S_u - S_d} \tag{21.16}$$

- The price of any derivative security can be obtained by discounting the expected cash flows computed using the risk-neutral probabilities at the risk-free rate.

### 21.4 Risk and Return of an Option

- The beta of an option can also be calculated by computing the beta of its replicating portfolio. For stocks with positive betas, calls will have larger betas than the underlying stock, while puts will have negative betas. The magnitude of the option beta is higher for options that are further out of the money.
- The beta of an option is the beta of the underlying stock times the option's leverage ratio:

$$\beta_{option} = \frac{S\Delta}{S\Delta + B}\beta_S \tag{21.17}$$

### 21.5 Corporate Applications of Option Pricing

- When debt is risky, the betas of equity and debt increase with leverage according to

$$\beta_E = \Delta\left(1 + \frac{D}{E}\right)\beta_U, \quad \beta_D = (1 - \Delta)\left(1 + \frac{E}{D}\right)\beta_U \tag{21.19), (21.20}$$

We can also use Eq. 21.19 to solve for the firm's unlevered beta and debt beta, given an estimate of the beta and delta of the firm's equity.

■ Option valuation methods can be used to assess the magnitude of agency costs:

■ As a result of debt overhang, equity holders benefit from new investment only if

$$\frac{NPV}{I} > \frac{1 - \Delta}{\Delta} = \frac{\beta_D \, D}{\beta_E \, E}$$

verifying Eq. 16.2.

■ Equity holders' incentive to increase volatility can be estimated as the sensitivity of the value of the equity call option to an increase in volatility.

## Key Terms

Binomial Option Pricing Model *p. 739*
binomial tree *p. 739*
Black-Scholes Option Pricing Model *p. 747*
cumulative normal distribution *p. 747*
derivative security *p. 761*
dynamic trading strategy *p. 744*
executive stock options (ESOs) *p. 756*
implied volatility *p. 752*
leverage ratio (of an option) *p. 762*

martingale prices *p. 759*
Monte Carlo simulation *p. 761*
option delta *p. 754*
replicating portfolio *p. 739*
risk-neutral probabilities *p. 759*
state-contingent prices *p. 759*
state prices *p. 759*
VIX index *p. 753*

## Further Reading

The seminal article on options was written by Fischer Black and Myron Scholes: "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81 (1973): 637–654. It followed an earlier article by Robert Merton, "Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4 (1973): 141–183.

For a deeper discussion of options and other derivative securities, see: R. McDonald, *Derivative Markets* (Prentice Hall, 2006); J. Hull, *Options, Futures, and Other Derivatives* (Prentice Hall, 2008); R. Jarrow and S. Turnbull, *Derivative Securities* (South-Western, 1999); and P. Wilmott, *Paul Wilmott on Quantitative Finance* (John Wiley & Sons, 2006).

The following articles by Fischer Black contain an interesting account of the development of the Black-Scholes formula as well as some of its limitations: "How We Came Up with the Option Formula," *Journal of Portfolio Management* 15 (1989): 4–8; "The Holes in Black-Scholes," *RISK Magazine* 1 (1988): 30–33; and "How to Use the Holes in Black-Scholes," *Journal of Applied Corporate Finance* 1 (Winter 1989): 67–73.

For alternative methods of valuing employee stock options, see, for example, M. Rubinstein, "On the Accounting Valuation of Employee Stock Options," *Journal of Derivatives*, Fall 1995; J. Hull and A. White, "How to Value Employee Stock Options," *Financial Analysts Journal* 60 (2004) 114–119; and N. Brisley and C. Anderson, "Employee Stock Option Valuation with an Early Exercise Boundary," *Financial Analysts Journal* 64 (2008) 88–100.

The use of option pricing methods to gain a deeper understanding of the role of agency costs in the determination of optimal capital structure is developed in H. Leland, "Agency Costs, Risk Management, and Capital Structure," *Journal of Finance* (1998) 1213–1243.

## Problems

*All problems are available in* MyFinanceLab. *An asterisk (\*) indicates problems with a higher level of difficulty.*

### The Binomial Option Pricing Model

1. The current price of Estelle Corporation stock is $25. In each of the next two years, this stock price will either go up by 20% or go down by 20%. The stock pays no dividends. The one-year

risk-free interest rate is 6% and will remain constant. Using the Binomial Model, calculate the price of a one-year call option on Estelle stock with a strike price of $25.

2. Using the information in Problem 1, use the Binomial Model to calculate the price of a one-year put option on Estelle stock with a strike price of $25.

3. The current price of Natasha Corporation stock is $6. In each of the next two years, this stock price can either go up by $2.50 or go down by $2. The stock pays no dividends. The one-year risk-free interest rate is 3% and will remain constant. Using the Binomial Model, calculate the price of a two-year call option on Natasha stock with a strike price of $7.

4. Using the information in Problem 3, use the Binomial Model to calculate the price of a two-year European put option on Natasha stock with a strike price of $7.

5. Suppose the option in Example 21.1 actually sold in the market for $8. Describe a trading strategy that yields arbitrage profits.

*6. Suppose the option in Example 21.2 actually sold today for $5. You do not know what the option will trade for next period. Describe a trading strategy that will yield arbitrage profits.

7. Eagletron's current stock price is $10. Suppose that over the current year, the stock price will either increase by 100% or decrease by 50%. Also, the risk-free rate is 25% (EAR).
   a. What is the value today of a one-year at-the-money European put option on Eagletron stock?
   b. What is the value today of a one-year European put option on Eagletron stock with a strike price of $20?
   c. Suppose the put options in parts a and b could either be exercised immediately, or in one year. What would their values be in this case?

8. What is the highest possible value for the delta of a call option? What is the lowest possible value? (*Hint*: See Figure 21.1.)

*9. Hema Corp. is an all equity firm with a current market value of $1000 million (i.e., $1 billion), and will be worth $900 million or $1400 million in one year. The risk-free interest rate is 5%. Suppose Hema Corp. issues zero-coupon, one-year debt with a face value of $1050 million, and uses the proceeds to pay a special dividend to shareholders. Assuming perfect capital markets, use the binomial model to answer the following:
   a. What are the payoffs of the firm's debt in one year?
   b. What is the value today of the debt today?
   c. What is the yield on the debt?
   d. Using Modigliani-Miller, what is the value of Hema's equity before the dividend is paid? What is the value of equity just after the dividend is paid?
   e. Show that the ex-dividend value of Hema's equity is consistent with the binomial model. What is the $\Delta$ of the equity, when viewed as a call option on the firm's assets?

*10. Consider the setting of Problem 9. Suppose that in the event Hema Corp. defaults, $90 million of its value will be lost to bankruptcy costs. Assume there are no other market imperfections.
   a. What is the present value of these bankruptcy costs, and what is their delta with respect to the firm's assets?
   b. In this case, what is the value and yield of Hema's debt?
   c. In this case, what is the value of Hema's equity before the dividend is paid? What is the value of equity just after the dividend is paid?

## The Black-Scholes Option Pricing Model

11. Roslin Robotics stock has a volatility of 30% and a current stock price of $60 per share. Roslin pays no dividends. The risk-free interest is 5%. Determine the Black-Scholes value of a one-year, at-the-money call option on Roslin stock.

12. Rebecca is interested in purchasing a European call on a hot new stock, Up, Inc. The call has a strike price of $100 and expires in 90 days. The current price of Up stock is $120, and the stock has a standard deviation of 40% per year. The risk-free interest rate is 6.18% per year.

a.  Using the Black-Scholes formula, compute the price of the call.
b.  Use put-call parity to compute the price of the put with the same strike and expiration date.

13. Using the data in Table 21.1, compare the price on July 24, 2009, of the following options on JetBlue stock to the price predicted by the Black-Scholes formula. Assume that the standard deviation of JetBlue stock is 65% per year and that the short-term risk-free rate of interest is 1% per year.
a.  December 2009 call option with a $5 strike price
b.  December 2009 put option with a $6 strike price
c.  March 2010 put option with a $7 strike price

14. Using the market data in Figure 20.10 and a risk-free rate of 0.25% per annum, calculate the implied volatility of Google stock in September 2012, using the bid price of the 700 January 2014 call option.

15. Using the implied volatility you calculated in Problem 14, and the information in that problem, use the Black-Scholes option pricing formula to calculate the value of the 750 January 2014 call option.

16. Plot the value of a two-year European put option with a strike price of $20 on World Wide Plants as a function of the stock price. Recall that World Wide Plants has a constant dividend yield of 5% per year and that its volatility is 20% per year. The two-year risk-free rate of interest is 4%. Explain why there is a region where the option trades for less than its intrinsic value.

17. Consider the at-the-money call option on Roslin Robotics evaluated in Problem 11. Suppose the call option is not available for trade in the market. You would like to replicate a long position in 1000 call options.
a.  What portfolio should you hold today?
b.  Suppose you purchase the portfolio in part a. If Roslin stock goes up in value to $62 per share today, what is the value of this portfolio now? If the call option were available for trade, what would be the difference in value between the call option and the portfolio (expressed as percent of the value of the call)?
c.  After the stock price change in part b, how should you adjust your portfolio to continue to replicate the options?

18. Consider again the at-the-money call option on Roslin Robotics evaluated in Problem 11. What is the impact on the value of this call option of each of the following changes (evaluated separately)?
a.  The stock price increases by $1 to $61.
b.  The volatility of the stock goes up by 1% to 31%.
c.  Interest rates go up by 1% to 6%.
d.  One month elapses, with no other change.
e.  The firm announces a $1 dividend, paid immediately.

## Risk-Neutral Probabilities

19. Harbin Manufacturing has 10 million shares outstanding with a current share price of $20 per share. In one year, the share price is equally likely to be $30 or $18. The risk-free interest rate is 5%.
a.  What is the expected return on Harbin stock?
b.  What is the risk-neutral probability that Harbin's stock price will increase?

20. Using the information on Harbin Manufacturing in Problem 19, answer the following:
a.  Using the risk-neutral probabilities, what is the value of a one-year call option on Harbin stock with a strike price of $25?
b.  What is the expected return of the call option?
c.  Using the risk-neutral probabilities, what is the value of a one-year put option on Harbin stock with a strike price of $25?
d.  What is the expected return of the put option?

21. Using the information in Problem 1, calculate the risk-neutral probabilities. Then use them to price the option.

22. Using the information in Problem 3, calculate the risk-neutral probabilities. Then use them to price the option.

23. Explain the difference between the risk-neutral and actual probabilities. In which states is one higher than the other? Why?

24. Explain why risk-neutral probabilities can be used to price derivative securities in a world where investors are risk averse.

### Risk and Return of an Option

25. Calculate the beta of the January 2010 $9 call option on JetBlue listed in Table 21.1. Assume that the volatility of JetBlue is 65% per year and its beta is 0.85. The short-term risk-free rate of interest is 1% per year. What is the option's leverage ratio?

26. Consider the March 2010 $5 put option on JetBlue listed in Table 21.1. Assume that the volatility of JetBlue is 65% per year and its beta is 0.85. The short-term risk-free rate of interest is 1% per year.
    a. What is the put option's leverage ratio?
    b. What is the beta of the put option?
    c. If the expected risk premium of the market is 6%, what is the expected return of the put option based on the CAPM?
    d. Given its expected return, why would an investor buy a put option?

### Corporate Applications of Option Pricing

27. Return to Example 20.10 (on p. 729), in which Google was contemplating issuing zero-coupon debt due in 16 months with a face value of $163.5 billion, and using the proceeds to pay a special dividend. Google currently has a market value of $229.2 billion and the risk-free rate is 0.25%. Using the market data in Figure 20.10, answer the following:
    a. If Google's current equity beta is 1.2, estimate Google's equity beta after the debt is issued.
    b. Estimate the beta of the new debt.

*28. You would like to know the unlevered beta of Schwartz Industries (SI). SI's value of outstanding equity is $400 million, and you have estimated its beta to be 1.2. SI has four-year zero-coupon debt outstanding with a face value of $100 million that currently trades for $75 million. SI pays no dividends and reinvests all of its earnings. The four-year risk-free rate of interest is currently 5.13%. Use the Black-Scholes formula to estimate the unlevered beta of the firm.

*29. The J. Miles Corp. has 25 million shares outstanding with a share price of $20 per share. Miles also has outstanding zero-coupon debt with a 5-year maturity, a face value of $900 million, and a yield to maturity of 9%. The risk-free interest rate is 5%.
    a. What is the implied volatility of Miles' assets?
    b. What is the minimum profitability index required for equity holders to gain by funding a new investment that does not change the volatility of the Miles' assets?
    c. Suppose Miles is considering investing cash on hand in a new investment that will increase the volatility of its assets by 10%. What is the minimum NPV such that this investment will increase the value of Miles' shares?

# Real Options

**T**HE MOST IMPORTANT APPLICATION OF OPTIONS IN corporate finance is in the capital budgeting decision. Let's use Amgen, a global biotechnology company, as an example. Amgen had 2011 revenues of $15.6 billion, and it spent 20% of its revenues on research and development. Even though only a very small number of early-stage drug development projects ultimately reach the market, the ones that do can be highly successful. How does Amgen manage its research and development expenses to maximize value?

For Amgen, investing in R&D is like purchasing a call option. When research results on early-stage drug development projects are favorable, Amgen commits additional resources to the next stage of product development. If research results are not promising, Amgen stops funding the project. Amgen, by selectively investing in those technologies that prove to be the most promising, exercises its option to develop a product: The additional investment is equivalent to paying the strike price and acquiring the underlying asset—in this case, the benefits of further product development. By choosing not to make further investments (thereby mothballing or abandoning the research and development project) Amgen chooses not to exercise its option.

While real investment options like Amgen's can be very important in capital budgeting, the effect of such real options on the capital budgeting decision is generally very specific to the particular application. Unlike the material we have covered so far, no standard theory exists that applies across all applications. In light of this fact, in this chapter we show how the general principles we have already developed that govern capital budgeting and option pricing can be applied to evaluate real options in the capital budgeting decision. Using these principles we illustrate, in the context of a few stylized examples, the three most common options that occur in capital budgeting: the option to wait for the optimal time to invest, the option to grow in the future, and the option to abandon a poorly performing project. We then consider

## NOTATION

| | |
|---|---|
| $NPV$ | net present value |
| $S^x$ | value of stock excluding dividends |
| $S$ | stock price |
| $PV$ | present value |
| $Div$ | dividend |
| $K$ | strike price |
| $\ln$ | natural logarithm |
| $T$ | years until the exercise date of an option |
| $\sigma$ | volatility of the return of the underlying asset |
| $C$ | call option price |
| $N(d)$ | cumulative normal distribution |
| $\rho$ | risk-neutral probability |
| $r_f$ | risk-free rate of interest |

two important applications: deciding the order in which to complete a staged investment opportunity and deciding which of two mutually exclusive projects of different lengths is the wiser investment. Finally, we explain rules of thumb that managers often use to account for real options in the capital budgeting decision.

## 22.1 Real Versus Financial Options

The financial options we have studied in the previous two chapters give their holders the right to buy, or sell, a traded asset such as a stock. Amgen's option to invest in research and development for new products is an example of a different type of option, called a *real option*. A **real option** is the right to make a particular business decision, such as a capital investment. A key distinction between a real option and a financial option is that real options, and the underlying assets on which they are based, are often not traded in competitive markets; for example, there is no market for Amgen's R&D in a particular drug.

Despite this distinction, many of the principles that we developed in the last two chapters for financial options also apply to real options. In particular, because real options allow a decision maker to choose the most attractive alternative after new information becomes available, the presence of real options adds value to an investment opportunity. This value can be substantial, especially in environments with a great deal of uncertainty. Thus, to make the most accurate investment decisions, the value of these options must be included in the decision-making process.

Our approach to capital budgeting thus far has focused on the initial investment decision without explicitly considering future decisions that may be required over the life of a project. Rather, we assumed that our forecast of the project's expected future cash flows already incorporated the effect of any future decisions made. In this chapter, we take a closer look at how these cash flows, and therefore the NPV of a project, are determined when a firm must react to changing business conditions over the life of a project. To do so, we begin by introducing a new analytical tool called a *decision tree*.

**CONCEPT CHECK**
1. What is the difference between a real option and a financial option?
2. Why does a real option add value to an investment decision?

## 22.2 Decision Tree Analysis

Most investment projects allow for the possibility of reevaluating the decision to invest at a later point in time. Let's illustrate this with a simple example. Suppose Megan is financing part of her MBA education by running a small business. She purchases goods on eBay and resells the merchandise at farmers' markets and swap meets. Megan would like to run her business more efficiently, so she decides to use some of the knowledge she has gained in graduate school. Swap meets and farmers' markets typically charge her $500 in advance to set up her small booth. Ignoring the cost of the booth, if she goes to every meet, her average profit on the goods that she sells is $1100 per meet. Let's represent Megan's options with regard to setting up her booth on a **decision tree**, a graphical representation of future decisions and uncertainty resolution.

A decision tree differs from the binomial trees used in Chapter 21. In a binomial tree, the branches of the tree represent uncertainty that cannot be controlled. In a decision tree, we also include branches to represent different choices available to the decision maker.

FIGURE 22.1

**Megan's Choices**

The optimal decision appears in blue.



FIGURE 22.1

**Megan's Choices**

The optimal decision appears in blue.

Megan's initial decision tree is shown in Figure 22.1. The square box at the node indicates that Megan must decide which branch to follow. Because the NPV of setting up a booth is $1100 − $500 = $600, the optimal decision (shown in blue) is to go to the meet.

## Mapping Uncertainties on a Decision Tree

While going to the swap meet appears to be the optimal decision, Megan is aware that attendance at swap meets and farmers' markets is weather dependent: In good weather her profits are much higher (usually around $1500); in bad weather, which occurs about 25% of the time, business is so slow that she usually drops her prices and, including her setup costs, averages a small loss of about $100. This adds another element of uncertainty for Megan's consideration. Figure 22.2 represents this uncertainty on a decision tree.

Notice that the decision tree now contains two kinds of nodes: **decision nodes** marked with square boxes (pay the fee and go to the meet versus do nothing), and **information nodes** in which uncertainty is involved that is out of the control of the decision maker (rain or sunshine), marked with circles. Figure 22.2 also indicates the point at which each cash flow is committed. Because the booth fee is paid in advance, the cash flow is incurred before Megan finds out about the weather.

Notice, however, that the decision tree in Figure 22.2 is not a full description of Megan's alternatives. Although the fee for the booth is sunk once Megan finds out about the weather, she is not forced to go to the meet, sit in the booth, and lose the additional $100. That is, it does not make sense for her to commit to go to the swap meet *before* she finds out what the weather is like. Figure 22.3 represents Megan's decision tree when she chooses to wait until the day of the meet to decide whether she will go: If it rains, she optimally chooses to stay at home. The $500 loss for the booth is unavoidable, but in bad weather she does not incur the additional $100 loss at the meet.

FIGURE 22.2

**Effect of the Weather on Megan's Options**

The optimal decision appears in blue.



**FIGURE 22.3**

**Megan's Decision Tree When She Can Observe the Weather before Making the Decision to Go to the Meet**

Her optimal decisions are shown in blue.



## Real Options

The difference between the decision trees in Figure 22.2 and Figure 22.3 is an example of a real option. Megan has the option to wait until she finds out what the weather is like before she decides whether she should go to the meet. This flexibility has value (she can avoid a further $100 loss). By committing ahead of time, she gives up this value.

How valuable is the real option to Megan? Let's assume for simplicity that Megan is risk neutral about the risk from the weather, and that the time delays are short so that we can ignore discounting. We can compute the value of the real option by comparing her expected profit *without the real option* to wait until the weather is revealed (Figure 22.1 or Figure 22.2) to the value *with the option* to wait (Figure 22.3). If Megan commits to go regardless of the weather, her expected profit is $0.75 \times \$1500 + 0.25 \times (-\$100) = \$1100$, her average profit if she goes to every meet. However, if she goes only when the weather is good, her profit is $0.75 \times \$1500 = \$1125$. The value of the real option is the difference, $\$1125 - \$1100 = \$25$.

Should Megan pay for the booth? Let's assume she has to pay for the booth only the day before the meet, so we can ignore the time value of money. Then, the NPV of paying for the booth is $\$1125 - \$500 = \$625$, which is positive. Thus, Megan should always pay for the booth.

Many corporate investment decisions contain real options like Megan's. Unfortunately, in most cases these options are investment specific, so it is impossible to present a general theory of real options. Instead, we will concentrate on the three kinds of real options that are most frequently encountered in practice: (1) the option to delay an investment opportunity, (2) the option to grow, and (3) the option to abandon an investment opportunity. We will then consider several applications and heurisitics.

CONCEPT CHECK   1. What is the difference between an information node and a decision node on a decision tree?

2. What makes a real option valuable?

## 22.3 The Option to Delay an Investment Opportunity

The simple example of Megan's swap meet illustrates how choosing the optimal time to commit to an investment opportunity has value. In this case the decision about when to commit (go to the swap meet) is easy: Once the booth is paid for, there is no cost to waiting to find out about the weather. In the real world, of course, there is often a cost to delaying an investment decision. For example, by choosing to wait for more information you give up any profits the project might generate in the interim. In addition, a competitor could use the delay to develop a competing product. The decision to wait, therefore, involves a trade-off between these costs and the benefit of remaining flexible.

### Investment as a Call Option

Consider the following investment opportunity. You have negotiated a deal with a major electric car manufacturer to open a dealership in your hometown. The terms of the contract specify that you must open the dealership either immediately or in exactly one year. If you do neither, you lose the right to open the dealership at all. Figure 22.4 shows these choices on a decision tree.

You are wondering how much you should pay for this opportunity. It will cost you $5 million to open the dealership, whether you open it now or in one year. If you open the dealership immediately, you expect it to generate $600,000 in free cash flow the first year. While future cash flows will vary with consumer tastes and the state of the economy, on average these cash flows are expected to grow at a rate of 2% per year. The appropriate cost of capital for this investment is 12%, so you estimate that the value of the dealership, if it were open today, would be

$$V = \frac{\$600,000}{12\% - 2\%} = \$6 \text{ million} \tag{22.1}$$

You also double-check this value using comparables. Suppose there exists a publicly traded firm operating dealerships elsewhere in the state, and this firm provides an essentially perfect comparable for your investment. This firm has an enterprise value equal to 10 times its free cash flow, leading to an equivalent valuation.

---

### FIGURE 22.4

**Electric Car Dealership Investment Opportunity**

The electric car dealership must be opened either immediately or in exactly one year. If we wait to open the dealership, our decision can be based on new information about the dealership's value, which can take on many values.



Thus, the NPV of opening the dealership immediately is $1 million, implying that the contract is worth at least $1 million. But given the flexibility you have to delay opening for one year, should you be willing to pay more? And when should you open the dealership?

To answer these questions, we need to evaluate the NPV for waiting to open the dealership. If we wait, then one year from now we will have the choice to invest $5 million to open the dealership, or lose our right to open it and receive nothing. Thus, at that time, the decision is easy—we will open the dealership if its value at that time, based on any new information about the economy and consumer tastes and trends, is above $5 million. But because trends in this industry can change quickly, there is a great deal of uncertainty as to what the expected cash flows and the value of the dealership will be at that time.

We can incorporate this uncertainty into our estimate of the contract's value by recognizing that our payoff if we delay is equivalent to the payoff of a one-year European call option on the dealership with a strike price of $5 million. Because the final payoff in one year is equivalent to a call option, we can use the techniques from Chapter 21 to value it. Suppose that the risk-free interest rate is 5%. We can estimate the volatility of the value of the dealership by looking at the return volatility of the publicly traded comparable firm; suppose this volatility is 40%. Finally, if we wait to open the dealership we will lose out on the $600,000 in free cash flow we would have earned in the first year. In terms of a financial option, this free cash flow is equivalent to a dividend paid by a stock—the holder of a call option does not receive the dividend until the option is exercised. Let's assume for now this cost is the only cost of delay—there are no additional costs in terms of lost growth of the dealership's cash flows, for example.

Table 22.1 shows how we can reinterpret the parameters for the Black-Scholes formula for financial options to evaluate this real option to invest in the dealership. To apply the Black-Scholes formula, recall from Eq. 21.10 that we must compute the current value of the asset *without* the dividends that will be missed:

$$S^x = S - PV(Div) = \$6 \text{ million} - \frac{\$0.6 \text{ million}}{1.12} = \$5.46 \text{ million}$$

Note that we compute the present value of the lost cash flow using the project's cost of capital of 12%. Next, we need to compute the present value of the cost to open the dealership in one year. Because this cash flow is certain, we discount it at the risk-free rate:

$$PV(K) = \frac{\$5 \text{ million}}{1.05} = \$4.76 \text{ million}$$

| TABLE 22.1 | | **Black-Scholes Option Value Parameters for Evaluating a Real Option to Invest** |
|---|---|---|
| **Financial Option** | | **Real Option** | **Example** |
| Stock Price | $S$ | Current Market Value of Asset | $6 million |
| Strike Price | $K$ | Upfront Investment Required | $5 million |
| Expiration Date | $T$ | Final Decision Date | 1 year |
| Risk-Free Rate | $r_f$ | Risk-Free Rate | 5% |
| Volatility of Stock | $\sigma$ | Volatility of Asset Value | 40% |
| Dividend | $Div$ | FCF Lost from Delay | $0.6 million |

Now we can compute the value of the call option to open the dealership using Eq. 21.7 and Eq. 21.8:

$$d_1 = \frac{\ln[S^x/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} = \frac{\ln(5.46/4.76)}{0.40} + 0.20 = 0.543$$

$$d_2 = d_1 - \sigma\sqrt{T} = 0.543 - 0.40 = 0.143$$

and therefore,

$$C = S^x N(d_1) - PV(K)N(d_2)$$
$$= (\$5.46 \text{ million}) \times (0.706) - (\$4.76 \text{ million}) \times (0.557)$$
$$= \$1.20 \text{ million} \tag{22.2}$$

The result in Eq. 22.2 states that the value today from waiting to invest in the dealership next year, and only opening it if it is profitable to do so, is $1.20 million. This value exceeds the NPV of $1 million from opening the dealership today. Thus, we are better off waiting to invest, and the value of the contract is $1.20 million.

What is the advantage of waiting in this case? If we wait, we will learn more about the likely success of the business by observing the performance of the comparable firm. Because our investment in the dealership is not yet committed, we can cancel our plans if the popularity of electric cars should decline. By opening the dealership today, we give up this option to "walk away."[1]

Of course, there is a trade-off—if we wait to invest we give up the profits the dealership will generate the first year. Whether it is optimal to invest today will depend on the magnitude of these lost profits, compared to the benefit of preserving our right to change our decision. To see this trade-off, suppose instead that the first-year free cash flow of the dealership is projected to be $700,000, so that the current value of the dealership is $7 million (using the 10x multiple of the comparable, or a similar calculation to Eq. 22.1). In this case, the same analysis shows that the value of the call option would be $1.91 million. Because the

### Why Are There Empty Lots in Built-Up Areas of Big Cities?

Have you ever wondered why there are empty lots (for example, a parking lot) right next to multi-story buildings in a city? After all, if it was optimal for the next-door neighbor to build a multi-story building, why would someone choose to leave the lot empty? In many cases, the property taxes exceed the revenue generated by the empty lot, so by putting a revenue-producing building on the lot, the owner could turn a negative cash flow into a positive cash flow. However, by building on the lot, the owner gives up the option to construct a different building in the future. If there is a large amount of uncertainty about the kind of building to put on the lot, and if this uncertainty might be resolved in the future, it might make sense to wait for additional information before breaking ground on a building. The value of waiting might exceed the net present value of building today.*

Notice a similar effect in the price of agricultural land that is close to big cities. Even though the land might produce the same agricultural revenue as similar land 100 miles away, the price of the land closer to the city is higher because the price reflects the possibility that the city might grow to the point that it becomes economical to put the land to non-agricultural use—that is, subdivide it and build single-family housing. The option to one day use the land in this way is reflected in the current price of the land.

_____

*S. Titman, "Urban Land Prices Under Uncertainty," *American Economic Review* 75 (1985): 505–514, develops this idea.

_____

[1]A second benefit from waiting is that the cost of opening the dealership is assumed to stay the same ($5 million), so the present value of this cost declines if we wait. This benefit is specific to the example. Depending on the scenario, the cost of investing may rise or fall over time.

value of opening the dealership today is $7 million $-$ 5 million $=$ $2 million, in this case it would not be optimal to wait, and we would open the dealership immediately.

Figure 22.5 plots the NPV of investing today and the value of waiting as we vary the expected first-year free cash flow of the dealership, and thus its current operating value. As the figure makes clear, you should invest today (and give up the option to wait) only if the current value of the dealership exceeds $6.66 million. Thus, your optimal invest-ment strategy is to invest today only if the NPV of the investment opportunity exceeds $6.66 million $-$ 5 million $=$ $1.66 million.

## Factors Affecting the Timing of Investment

This example illustrates how the real option to wait affects the capital budgeting decision. Without the option of when to invest, it is optimal to invest as long as NPV $>$ 0. *But when you have the option of deciding when to invest, it is usually optimal to invest only when the NPV is substantially greater than zero.*

To understand this result, think of the timing decision as a choice between two mutually exclusive projects: (1) invest today or (2) wait. Faced with mutually exclusive choices, we should choose the project with the higher NPV. That is, we should invest today only if the NPV of investing today exceeds the value of the option of waiting. If we can always walk away from the project, the option of waiting will be positive, so the NPV of investing today must be even higher for us to choose not to wait.

An interesting aspect of the dealership investment opportunity is the value of the deal when the ongoing value of a dealership is less than $5 million. In this case, the NPV of opening a dealership is negative, so without the option to wait the investment opportunity is worthless. But from Figure 22.5 we see that, with the option to wait, the investment opportunity is clearly not worthless. Even if the current value of an electric car dealership is $4 million (which means the NPV of investing today is $-$$1 million), the value of the opportunity is still worth about $248,000. That is, you would still be willing to pay up to $248,000 to sign the deal. Thus, *given the option to wait, an investment that currently has a negative NPV can have a positive value.*



## FIGURE 22.5

**The Decision to Invest in the Dealership**

The red line denotes the NPV of investing today. The yellow curve shows the value today of waiting one year to make the decision (i.e., the value of the call option). The black curve indicates the value of the contract, which gives us the option to invest today, in one year, or not at all. The optimal investment strategy is to invest today only if the value of an operating dealership exceeds $6.66 million.

Aside from the current NPV of the investment, what other factors affect the value of an investment and the decision to wait? From Figure 22.5 we can see that factors that increase the value of the call option will increase the benefit of waiting. Recall from our study of financial options in Chapters 20 and 21 that both the volatility and the dividends of the stock affect the value of a call option and the optimal time to exercise the call. These factors have their counterparts for real options:

- *Volatility*: By delaying an investment, we can base our decision on additional information. The option to wait is most valuable when there is a great deal of uncertainty regarding what the value of the investment will be in the future. If there is little uncertainty, the benefit of waiting is diminished.

- *Dividends*: Recall that absent dividends, it is not optimal to exercise a call option early. In the real option context, the dividends correspond to any value from the investment that we give up by waiting. It is always better to wait unless there is a cost to doing so. The greater the cost, the less attractive the option to delay becomes.

---

**EXAMPLE 22.1**

**Evaluating the Decision to Wait**

**Problem**

Suppose your current estimate of the electric car dealership's value is $6 million. What would be the value of the dealership contract if the volatility of the dealership's value were 25% rather than 40%? Alternatively, suppose the volatility is 40%, but waiting would lead competitors to expand and reduce the future free cash flows of the dealership by 10%. What is the value of the contract in this case?

**Solution**

With a lower volatility of 25%, we have

$$d_1 = \frac{\ln[S^x/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} = \frac{\ln(5.46/4.76)}{0.25} + 0.125 = 0.674$$

$$d_2 = d_1 - \sigma\sqrt{T} = 0.674 - 0.25 = 0.424$$

The value of the call option is

$$C = S^x N(d_1) - PV(K)N(d_2)$$

$$= (\$5.46 \text{ million}) \times (0.750) - (\$4.76 \text{ million}) \times (0.664)$$

$$= \$0.93 \text{ million}$$

Therefore, it is better to invest immediately and get an NPV of $1 million, rather than wait. With the lower volatility, not enough information will be learned over the next year to justify the cost of waiting.

Now let's suppose the volatility is 40%, but waiting leads to increased competition. In this case, we should deduct the loss from increased competition as an additional "dividend" that we forgo by waiting. Thus,

$$S^x = S - PV(\text{First-Year FCF}) - PV(\text{Lost FCF from Competition})$$

$$= \left(\$6 \text{ million} - \frac{\$0.6 \text{ million}}{1.12}\right) \times (1 - 0.10) = \$4.92 \text{ million}$$

782        **Chapter 22** Real Options

Now,

$$d_1 = \frac{\ln[S^x/PV(K)]}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} = \frac{\ln(4.92/4.76)}{0.40} + 0.20 = 0.283$$

$$d_2 = d_1 - \sigma\sqrt{T} = 0.283 - 0.40 = 0.117$$

The value of the call option in this case is

$$C = S^x N(d_1) - PV(K)N(d_2)$$

$$= (\$4.92 \text{ million}) \times (0.611) - (\$4.76 \text{ million}) \times (0.453)$$

$$= \$0.85 \text{ million}$$

Again, it would not be optimal to wait. In this case, despite the information to be gained, the costs associated with waiting are too high.

## Investment Options and Firm Risk

Imagine that you formed a corporation and, acting on behalf of this corporation, you signed the electric car dealership contract. If the corporation has no other assets, what is the value of the corporation and how risky is it?

We have already calculated the value of the contract as a real option. Indeed, when the value of an operating dealership is $6 million, the contract—and thus your firm—is worth $1.2 million. To assess risk, you note that electric car dealerships are very sensitive to the economy and have a beta of about 2. Your firm, however, will not begin operating the dealership immediately; instead, it will wait until next year to decide whether to invest. The beta of your firm will therefore equal the beta of the option on a dealership, which we can calculate using the Black-Scholes formula and Equation 21.17 from the last chapter. Given the $6 million value of the operating dealership, and using the values from Eq. 22.2, the beta of the option to open the dealership—and therefore the beta of the corporation—is

$$\beta_{\text{corp}} = \frac{S^x \times N(d_1)}{C}\beta_{\text{dealer}} = \frac{(\$5.46 \text{ million}) \times (0.706)}{\$1.2 \text{ million}}\beta_{\text{dealer}} = 3.2 \times \beta_{\text{dealer}} = 6.4$$

Notice that the beta of a corporation with the option to open a dealership (that is, 6.4) is considerably larger than the beta of a dealership itself (2.0). Moreover, the beta of the corporation will fluctuate with the value of the option, and it will only be equal to the beta of a dealership if it is optimal to open the dealership immediately.

As this example shows, when comparing firms in the same industry, betas may vary depending upon the firms' growth opportunities. All else equal, firms for which a higher fraction of their value depends on future growth will tend to have higher betas.[2]

The fact that the beta of the firm includes the beta of the firm's growth options has implications for capital budgeting. Because the beta of growth options tend to be higher

---

[2]The apparent failure of the CAPM to explain the cross-section of stock returns has been at least partially attributed to ignoring the effect of future investment options on the beta of the firm—see Z. Da, R. J. Guo, and R. Jagannathan, "CAPM for estimating the cost of equity capital: Interpreting the empirical evidence," *Journal of Financial Economics*, 103 (2012): 204–220.

**GLOBAL FINANCIAL CRISIS**    **Uncertainty, Investment, and the Option to Delay**

In mid-September 2008, with the markets for investment capital frozen, the Treasury announced an unprecedented program to help unfreeze credit markets and stave off a deep recession. The well-founded worry was that the dysfunctional financial markets would effectively cut off business activity and thus precipitate a crash in the real economy. Despite the passage of a $750 billion relief program (the Troubled Asset Relief Program—TARP), the economy plunged into the deepest recession since the Great Depression. What went wrong?

One likely factor was lawmakers' insensitivity to the effect of uncertainty on the real option to delay investment. The original idea behind TARP was to reduce uncertainty by making a huge capital commitment to buy troubled assets and effectively signal the government's intention to stabilize markets. By stabilizing markets and reducing uncertainty, it was hoped that TARP would help stimulate investment.

Unfortunately, however, TARP failed in its primary mission to decrease uncertainty. Indeed, concerns about whether the program would be implemented and how it would be implemented contributed significantly to overall uncertainty in the economy, making the option to delay investment until the uncertainty was resolved more valuable. In the end, the combination of this increased uncertainty together with a gloomy economic forecast led to a 19.1% decline in business investment in the fourth quarter of 2008, the largest decline since 1975.

than the beta of the firm's investments in place, the beta of the firm typically overstates the beta of its existing assets. Hence, when financial analysts estimate an individual project beta by using the beta of a firm with substantial growth options, they may be overestimating the project beta.[3]

**CONCEPT CHECK**

1. What is the economic trade-off between investing immediately or waiting?

2. How does the option to wait affect the capital budgeting decision?

3. Does an option to invest have the same beta as the investment itself?

## 22.4  Growth and Abandonment Options

When a firm has a real option to invest in the future, as in the dealership example, it is known as a **growth option**. In other situations, the firm may have the option to reduce the scale of its investment in the future; the option to disinvest is known as an **abandonment option**. Because these options have value, they contribute to the value of any firm with future possible investment opportunities.

### Valuing Growth Potential

Future growth opportunities can be thought of as a collection of real call options on potential projects. Out-of-the-money calls are riskier than in-the-money calls, and because most growth options are likely to be out-of-the-money, the growth component of firm value is likely to be riskier than the ongoing assets of the firm. This observation might explain why young firms (and small firms) have higher returns than older, established firms. It also explains why R&D-intensive firms often have higher expected returns even when much of the R&D risk is idiosyncratic.[4]

---

[3]For an analysis of this potential bias and an approach to correct it, see A. Bernardo, B. Chowdhry, and A. Goyal, "Assessing Project Risk," *Journal of Applied Corporate Finance* 24 (2012): 94–100.

[4]Readers interested in a more in-depth discussion of the relation between R&D risk and returns can consult J. Berk, R. Green, and V. Naik, "The Valuation and Return Dynamics of New Ventures," *Review of Financial Studies* 17 (2004): 1–35.

In the dealership example, the main source of uncertainty was the investment's expected cash flows. Let's consider a second example of a growth option in which the uncertainty is instead about the investment's cost of capital. In this case, we will also illustrate how to value the option using the technique of risk-neutral probabilities introduced in Chapter 21.[5]

StartUp Incorporated is a new company whose only asset is a patent on a new drug. If produced, the drug will generate certain profits of $1 million per year for the life of the patent, which is 17 years (after that, competition will drive profits to zero). It will cost $10 million today to produce the drug. Assume that the yield on a 17-year risk-free annuity is currently 8% per year. What is the value of the patent?

Using the formula for the present value of an annuity, the NPV of investing today in the drug is

$$NPV = \frac{1}{0.08}\left(1 - \frac{1}{1.08^{17}}\right) - 10 = -\$878,362$$

Based on this calculation, it does not make sense to invest in the drug today. But what if interest rates change? Let's assume that interest rates will change in exactly one year. At that time, all risk-free interest rates will be either 10% per year or 5% per year, and then will remain at that level forever. Clearly, an increase in interest rates will make matters worse. Because interest rates will remain at the new higher level forever, it will never be optimal to invest. Thus, the value of this growth option is zero in that state. However, if rates drop, the NPV of undertaking the investment, given that the patent will have a remaining life of 16 years, is

$$NPV = \frac{1}{0.05}\left(1 - \frac{1}{1.05^{16}}\right) - 10 = \$837,770$$

In this case, it is optimal to invest. We can put this information on a decision tree, as shown in Figure 22.6.



## FIGURE 22.6

**StartUp's Decision to Invest in the Drug**

If interest rates rise, it does not make sense to invest. If rates fall, it is optimal to develop the drug.

---

[5]Using risk-neutral probabilities in a decision tree is more general than Black-Scholes, which assumes a log-normal distribution for the asset's value and that the option can only be exercised at a fixed point in time.

Recall from Chapter 21 that to find risk-neutral probabilities, we solve for the probabilities so that the expected return of all financial assets is equal to the current risk-free rate. In Chapter 21, we used stock as the financial asset; in this case, we use the 17-year risk-free annuity that pays $1000 per year as the financial asset. The value today of this annuity is

$$S = \frac{1000}{0.08}\left(1 - \frac{1}{1.08^{17}}\right) = \$9122$$

A year from now, the annuity will pay $1000, and it will have 16 years left to maturity. Therefore, including the payment, it will be worth either

$$S_u = 1000 + \frac{1000}{0.1}\left(1 - \frac{1}{1.1^{16}}\right) = \$8824$$

if interest rates go up, or, if interest rates fall,

$$S_d = 1000 + \frac{1000}{0.05}\left(1 - \frac{1}{1.05^{16}}\right) = \$11,838$$

Suppose the current one-year risk-free interest rate is equal to 6%. (Note that this rate is below the current 17-year annuity rate of 8%; thus, the current yield curve is upward-sloping.) We can calculate the risk-neutral probability of interest rates increasing, which we denote by $\rho$ using Eq. 21.16:

$$\rho = \frac{(1 + r_f)S - S_d}{S_u - S_d} = \frac{1.06 \times 9122 - 11,838}{8824 - 11,838} = 71.95\%$$

That is, a risk-neutral probability of 71.95% that interest rates will rise is required for the annuity to have an expected return equal to the risk-free rate of 6% over the next year.

Now that we have calculated the risk-neutral probabilities for the interest rate movements, we can use them to value StartUp's patent. The value today of the investment opportunity is the present value of the expected cash flows (using risk-neutral probabilities) discounted at the risk-free rate:

$$PV = \frac{837,770 \times (1 - 0.7195) + 0 \times 0.7195}{1.06} = \$221,693$$

In this example, even though the cash flows of the project are known with certainty, the uncertainty regarding future interest rates creates substantial option value for the firm. The firm's ability to use the patent and grow should interest rates fall is worth close to a quarter of a million dollars.

## The Option to Expand

Future growth options are not only important to firm value, but can also be important in the value of an individual project. By undertaking a project, a firm often gets the opportunity to invest in new projects that firms outside the industry cannot easily access. For example, a fashion designer might introduce a new line of clothes knowing that if the line proves popular, he has the option to launch a new line of accessories based on those clothes.

786    **Chapter 22** Real Options

Consider an investment opportunity with an option to grow that requires a $10 million investment today. In one year, we will find out whether the project, which entails introducing a new product into the business machines market, is successful. The risk-neutral probability that the project will generate $1 million per year in perpetuity is 50%; otherwise, the project will generate nothing. At any time, we can double the size of the project on the original terms. Figure 22.7 represents these decisions on a decision tree.

Assume that the risk-free rate is constant at 6% per year. If we ignore the option to double the size of the project and we invest today, then the expected cash flows are $1 million × 0.5 = $500,000 per year. Computing the NPV gives

$$NPV_{\text{without growth option}} = \frac{500,000}{0.06} - 10,000,000 = -\$1.667 \text{ million}$$

Based on this analysis, it appears that it is not optimal to undertake the project today. Of course, that also means we will never find out whether the project is successful.

Consider undertaking the project and exercising the growth option to double the size in a year if the product takes off. The NPV of doubling the size of the project in a year in this state is

$$NPV_{\text{doubling if successful}} = \frac{1,000,000}{0.06} - 10,000,000 = \$6.667 \text{ million}$$

The risk-neutral probability that this state will occur is 50%, so the expected value of this growth option is 6.667 × 0.5 = $3.333 million. The present value of this amount today is

$$PV_{\text{growth option}} = \frac{3.333}{1.06} = \$3.145 \text{ million}$$

We have this option only if we choose to invest today (otherwise, we never find out how the product performs), so the NPV of undertaking this investment is the NPV we calculated above plus the value of the growth option we obtain by undertaking the project:

$$NPV = NPV_{\text{without growth option}} + PV_{\text{growth option}}$$
$$= -1.667 + 3.145 = \$1.478 \text{ million}$$

### FIGURE 22.7

**Staged Investment Opportunity**

At any time, the size of the project can be doubled on the original terms. It is optimal to make this decision after we find out whether the project is a success. This growth option can make the initial investment worthwhile.



Scott Mathews is a Technical Fellow with the Computational Finance and Stochastic Modeling team within Boeing's advanced research and development division. He has expertise in "Business Engineering," a technology that features complex financial and investment risk models applying real asset option pricing for new products and strategically significant projects. Mr. Mathews has a number of patents in the field of real options.

## INTERVIEW WITH
## Scott Mathews



QUESTION: *How can real options be used to manage projects?*

ANSWER: High-potential projects typically have substantial uncertain cash flows owing to technology and market uncertainties, and therefore your corporate finance team has to be more active in managing these projects. Essentially they act as internal venture capitalists, seeking high payoffs from risky projects. We use real options to evaluate these types of investment opportunities. With real options, we can answer the questions: Given the technical and market risks of the project, how much should we spend at the early stages? Does each incremental investment increase my return opportunities or decrease risk, and how? What amount of technology and market "learning" must be accomplished to merit a follow-on investment?

Real options are call options on an opportunity, giving you the right to stop, start, or modify a project at some future date. They are contingent, so you can make a strategic, rather than tactical, investment. By investing a small amount at each stage, you can gather enough information to decide what to do next. This limits your losses but still lets you capitalize on opportunities that arise. You don't reject (or approve) the project outright, but make incremental investments in the technology or market to gather sufficient information to determine whether this investment optimizes the company's strategy and produces positive returns over the long term.

QUESTION: *Explain the concepts of "pilot" and "commercial" stages?*

ANSWER: The "pilot" stage refers to the incremental staged investments we make to move projects through "decision gates," investing a small and appropriate amount to gather information about the technology and the market, while driving down the project risks. At the end of each decision gate, the project is re-evaluated. If there is a reasonable weighted probability of a successful outcome, we invest again and continue to the next decision gate. Projects go through several gates, and at each one we focus on reducing uncertainty, until arriving at a decision point of whether to make a large, discretionary, one-time investment (the "strike price") that launches the "piloted" concepts into production—the "commercial" stage—or terminate the project.

QUESTION: *How does staging development create a real option with value?*

ANSWER: Staging development is how we use real options to manage projects. By staging development we are buying knowledge, especially about the project risks and opportunities. As a project moves through gates, projects compete for funding, and we use this knowledge to decide which projects should proceed and which ones should be deferred. The approach brings together the engineering, marketing, and finance disciplines to give a uniform look at risks and investment opportunities. This is one of the huge powers of the technique.

Boeing's ability to solve aviation challenges with a high degree of efficiency is our competitive advantage and allows us to "buy" these options at below their market value through investments (the "premium") in our engineering processes. Buying an option for less provides direct value to shareholders. We can leverage our internal knowledge with a relatively small amount of money and hedge the risks. It's a tricky process, and is not completely financial. It often requires judgment as well.

Our analysis shows that the NPV of the investment opportunity is positive and the firm should undertake it.

Notice that it is optimal to undertake the investment today only because of the existence of the future expansion option. If we could find out how well the product would sell without actually producing it, then it would not make sense to invest until we found out this information. Because the only way to find out if the product is successful is to make

and market it, it is optimal to proceed. In this case, the project is viable because we can experiment at a low scale and preserve the option to grow later.

This project is an example of a strategy that many firms use when they undertake big projects. Rather than commit to the entire project initially, a firm experiments by undertaking the project in stages. It implements the project on a smaller scale first; if the small-scale project proves successful, the firm then exercises the option to grow the project.

### The Option to Abandon

The previous two examples consider cases in which the firm has the option to grow or expand if the project proves successful. Alternatively, when a project is unsuccessful, the firm may be able to mitigate its loss by abandoning the project. An abandonment option is the option to walk away. Abandonment options can add value to a project because a firm can drop a project if it turns out to be unsuccessful.

To illustrate, assume you are the CFO of a publicly traded nationwide chain of gourmet food stores. Your company is considering opening a new store in the renovated Ferry Building in Boston. If you do not sign the lease on the store today, someone else will, so you will not have the opportunity to open a store later. There is a clause in the lease that allows you to break the lease at no cost in two years.

Including the lease payments, the new store will cost $10,000 per month to operate. Because the building has just recently reopened, you do not know what the pedestrian traffic will be. If your customers are mainly limited to morning and evening commuters, you expect to generate $8000 per month in revenue in perpetuity. If, however, the building follows the lead of the Ferry Building in San Francisco and becomes a tourist attraction, you believe that your revenue will be double that amount. You estimate there is a 50% probability that the Ferry Building will become a tourist attraction. The costs to set up the store will be $400,000. Assume that the cost of capital for the business is 7% per year.

Whether the Boston Ferry Building becomes a tourist attraction represents idiosyncratic uncertainty that investors in your company can costlessly diversify, and hence we do not need to adjust its probability for risk (i.e., the risk-neutral probability equals the true probability of 50%). If you were forced to operate the store under all circumstances, then the expected revenue will be $8000 \times 0.5 + \$16,000 \times 0.5 = \$12,000$. Given the monthly discount rate of $1.07^{1/12} - 1 = 0.565\%$, the NPV of the investment is

$$NPV = \frac{12,000 - 10,000}{0.00565} - 400,000 = -\$46,018$$

It would not make sense to open the store.

Of course, you do not have to keep operating the store. You have an option to get out of the lease after two years at no cost, and after the store is open it will be immediately obvious whether the Ferry Building is a tourist attraction. In this case, the decision tree looks like Figure 22.8.

If the Ferry Building is a tourist attraction, the NPV of the investment opportunity is

$$NPV = \frac{16,000 - 10,000}{0.00565} - 400,000 = \$661,947$$

If the Ferry Building does not become a tourist attraction, you will close the store after two years. The NPV of the investment opportunity in this state is just the NPV of operating for two years:

$$NPV = \frac{8000 - 10,000}{0.00565}\left(1 - \frac{1}{1.00565^{24}}\right) - 400,000$$
$$= -\$444,770$$



**FIGURE 22.8**

**Decision to Open a Store in the Boston Ferry Building**

You must decide now whether to sign the lease and open the store, but you have an option to abandon the lease in 24 months (2 years). The profitability of the store depends on whether the Ferry Building becomes a tourist attraction.

There is an equal probability of each state and again, because the risk is idiosyncratic, the actual and risk-neutral probabilities are the same. Thus, the NPV of opening the store is just the expected value using the actual probabilities:

$$\$661,947 \times 0.5 - \$444,770 \times 0.5 = \$108,589$$

By exercising the option to abandon the venture, you limit your losses and so the NPV of undertaking the investment is positive. The value of the option to abandon is the difference between the NPV with and without the option: $108,589 - (-46,018) = \$154,607$.[6]

It is easy to ignore or understate the importance of the option to abandon. In many applications, killing an economically unsuccessful venture can add more value than starting a new venture. Often, however, managers focus on the value created by starting new ventures and de-emphasize the value created by abandoning old ventures. Some of this behavior undoubtedly results from the same behavioral biases that we discussed in Chapter 13 that cause individual investors to hold onto losers. It is also closely tied to the sunk cost fallacy, the idea that once a manager makes a large investment, he should not abandon a project. As we pointed out in Chapter 8, sunk costs should have no bearing on an investment decision. If continuing a project is a negative-NPV undertaking, you can create value by abandoning, regardless of how much investment has already been sunk into the project.

**CONCEPT CHECK**

1. Why can a firm with no ongoing projects, and investment opportunities that currently have negative NPVs, still be worth a positive amount?

2. Why is it sometimes optimal to invest in stages?

3. How can an abandonment option add value to a project?

## 22.5 Applications to Multiple Projects

As we have already explained, although the types of real options we have discussed thus far occur in most investments, there is no "boilerplate" application that we can present that can be generalized to all cases. So, in this section we describe two important specific

---

[6]We can also calculate the option value directly; with a 50% probability, we avoid the losses of $2000 per month starting in two years:

$$50\% \times \frac{1}{1.00565^{24}} \times \frac{2000}{0.00565} = \$154,607$$

applications: how to decide between investing in two mutually exclusive projects of different lengths, and how to determine the order of investment for a staged investment opportunity.

## Comparing Mutually Exclusive Investments with Different Lives

Consider the following problem faced by a financial analyst at Canadian Motors. Last year, an engineering firm named Advanced Mechanics was asked to design a new machine that will attach car chassis to bodies. The firm has produced two designs. The cheaper design will cost $10 million to implement and last five years. The more expensive design will cost $16 million and last 10 years. In both cases, the machines are expected to save Canadian Motors $3 million per year. If the cost of capital is 10%, which design should Canadian Motors approve?

**Standalone NPV of Each Design.** Let's first calculate the NPV of each decision on a standalone basis. The NPV of adopting the five-year machine is

$$NPV_{5\ yr} = \frac{3}{0.10}\left(1 - \frac{1}{1.10^5}\right) - 10 = \$1.37\ \text{million}$$

The NPV of the 10-year machine is

$$NPV_{10\ yr} = \frac{3}{0.10}\left(1 - \frac{1}{1.10^{10}}\right) - 16 = \$2.43\ \text{million}$$

If the analyst simply picked the design with the higher standalone NPV, he would choose the longer-lived design. However, the preceding NPV calculation ignores the difference in these projects' life spans. The longer-lived design embodies a 10-year production plan. The shorter-lived design only captures what will happen over the next five years. To truly compare the two options, we must consider what will happen once the shorter-lived equipment wears out. Let's consider three possibilities: (1) the technology is not replaced; (2) it is replaced at the same terms; or (3) technological advances allow us to replace it at improved terms.

**No Replacement.** If the shorter-lived technology is not replaced (and the firm reverts to its old production process), there will be no additional benefits once its five-year life ends. In that case, the original comparison is correct, and the 10-year machine will increase firm value by $2.43 - 1.37 = \$1.06$ million more than the shorter-lived design.

One reason we might not replace the technology is if we expect its cost to increase. For example, suppose its cost in five years' time will be $11.37 million or higher (an increase of 2.6% per year). In that case, because the cost of the machine has gone up by more than its current NPV of $1.37 million, replacement will not be optimal.

**Replacement at the Same Terms.** Suppose that we expect the costs and benefits of the shorter-lived design to be the same in five years. In that case, it will be optimal to replace the machine with a new equivalent machine, as we will again earn its NPV of $1.37 million. We should include this benefit when we evaluate the NPV of the five-year design, leading to a total NPV over the 10-year horizon of

$$NPV_{5\ yr,\ \text{with replacement}} = 1.37 + \frac{1.37}{1.10^5} = \$2.22\ \text{million}$$

Allowing for replacement at the same terms substantially increases the NPV we calculated for the five-year design. However, it is still inferior to the $2.43 million NPV from the 10-year design.

## Equivalent Annual Benefit Method

Traditionally, managers have accounted for the difference in project lengths by calculating the **equivalent annual benefit (EAB)** of each project, which is the constant annuity payment over the life of the project that is equivalent to receiving its NPV today. The **equivalent annual benefit method** then selects the project with the highest equivalent annual benefit.

For example, in the case of Canadian Motors, the equivalent annual benefit of each machine is

$$EAB_{5\text{ yr}} = \frac{1.37}{\frac{1}{0.10}\left(1 - \frac{1}{1.10^5}\right)} = \$0.361 \text{ million},$$

$$EAB_{10\text{ yr}} = \frac{2.43}{\frac{1}{0.10}\left(1 - \frac{1}{1.10^{10}}\right)} = \$0.395 \text{ million}$$

Thus, the 10-year machine has the higher equivalent annual benefit and would be chosen under this method.

The equivalent annual benefit method assumes that we earn the project's EAB over the entire forecast horizon. For the five-year machine, this assumption means that we would earn an NPV over 10 years of

$$NPV_{5\text{ yr }EAB} = \frac{0.361}{0.10}\left(1 - \frac{1}{1.10^{10}}\right) = \$2.22 \text{ million}$$

Comparing this result with our earlier analysis, we see that using the EAB method is equivalent to assuming that we can replace the project at identical terms over the entire horizon. While this assumption may be correct, in most instances there is significant uncertainty regarding the project terms in the future. In that case, real option methods must be used to determine the correct choice.

**Replacement at Improved Terms.**  In reality, the future cost of a machine is uncertain. Because of technological advances, machines may become less expensive rather than more expensive (think about the steadily declining prices of computers). Suppose we expect the cost of the new technology to fall to $7 million at the end of five years. Because the cost has declined by $3 million, its NPV will rise to $3 + 1.37 = \$4.37$ million. In that case, the NPV of the five-year design over a 10-year horizon is

$$NPV_{5\text{ yr, with improved replacement}} = 1.37 + \frac{4.37}{1.10^5} = \$4.08 \text{ million}$$

Thus, if terms are expected to improve in this way, the five-year design is optimal for the firm, increasing firm value by $4.08 - 2.43 = \$1.65$ million compared to the 10-year machine.

**Valuing the Replacement Option.**  As the above analysis reveals, adopting the five-year machine provides the firm with a replacement option in five years' time. In order to compare the two designs correctly, we must determine the value of this replacement option, which will depend on the likelihood that the cost of the machine will decrease or increase.

### EXAMPLE 22.2    Valuing the Replacement Option

#### Problem

Suppose the cost of the shorter-lived machine is equally likely to rise to $13 million, stay equal to $10 million, or fall to $7 million, and suppose this risk is idiosyncratic and does not change the project's cost of capital. Which machine should the firm choose?

#### Solution

If the cost rises to $13 million, the firm will choose not to replace the machine and get an NPV of 0. If the cost stays the same or falls, the firm will replace the machine and get an NPV of $1.37

million or $4.37 million, respectively. Given the probabilities, the NPV of the five-year machine over the 10-year horizon is

$$NPV_{5 \text{ yr, with uncertain replacement}} = 1.37 + \frac{\frac{1}{3}(0) + \frac{1}{3}(1.37) + \frac{1}{3}(4.37)}{1.10^5} = \$2.56 \text{ million}$$

Thus, given this uncertainty, the shorter-lived machine offers a higher NPV over 10 years than the $2.43 million NPV of the longer-lived machine. By committing to the longer-lived project, the firm would give up its real option to react to technological and market changes.

## Staging Mutually Dependent Investments

In analyzing the value of the option to grow, we considered the real option value of a staged investment opportunity. The advantage of staging is that it allows us to postpone investment until after we learn important new information. We can avoid making the investment unless the new information suggests it is worthwhile.

In many applications, the stages have a natural order, for example, investing in a proto-type before developing on a large scale. But in some situations, we can choose the order of the development stages. If so, how can we maximize the value of the real options that we create?

**An Example: Eclectic Motors.** Eclectic Motors is considering developing an electric car that would compete directly with gasoline-powered cars. They must overcome three technological hurdles to produce a successful car:

1. Develop materials to significantly reduce the car's body weight.
2. Develop a method to rapidly recharge the batteries.
3. Advance battery technology to reduce weight and increase storage capacity.

As shown in Table 22.2, although Eclectic's engineers have already made significant break-throughs, further research and substantial risk remain for each task:

Suppose all three risks are idiosyncratic, and the risk-free interest rate is 6%. Given Eclectic's resources, the company can only work on one technology at a time. Eclectic's managers know that by appropriately staging these investments, they can enhance the firm's value. The question is, assuming that it makes sense to proceed, which technology should they tackle first?

**Mutually Dependent Investments.** Eclectic's electric car project represents a situation with **mutually dependent investments**, in which the value of one project depends upon the outcome of the others. In this case, we assume that all three challenges must be

| TABLE 22.2 | Required Time, Cost, and Likelihood of Success for Eclectic's Project | | |
|---|---|---|---|
| Technology | Cost | Time | Probability of Success |
| Materials | $100 million | 1 year | 50% |
| Recharger | $400 million | 1 year | 50% |
| Battery | $100 million | 4 years | 25% |

overcome, or there will be no benefit. Thus, we need to determine the optimal order of investment that will minimize the expected cost of development.

**Investment Scale.**  Consider first the materials and recharger technologies. These two are identical except for the upfront investment costs. Let's compare the expected cost of completing them in different orders. If we begin with the materials technology, the expected cost to complete both is

$$\underbrace{100}_{\substack{\text{Investment} \\ \text{in materials}}} + \underbrace{0.50}_{\substack{\text{Probability} \\ \text{materials} \\ \text{technology} \\ \text{succeeds}}} \times \underbrace{\frac{1}{1.06}}_{\substack{\text{PV of} \\ \text{delay}}} \times \underbrace{400}_{\substack{\text{Investment} \\ \text{in recharger}}} = \$288.7 \text{ million}$$

If we begin with the recharger technology, the expected cost is

$$\underbrace{400}_{\substack{\text{Investment} \\ \text{in recharger}}} + \underbrace{0.50}_{\substack{\text{Probability} \\ \text{recharger} \\ \text{technology} \\ \text{succeeds}}} \times \underbrace{\frac{1}{1.06}}_{\substack{\text{PV of} \\ \text{delay}}} \times \underbrace{100}_{\substack{\text{Investment} \\ \text{in materials}}} = \$447.2 \text{ million}$$

Thus, it is clear that Eclectic should invest in the materials technology before working on the recharger. Because the cost of the recharger is greater, we don't want to waste our investment in it if the materials technology fails. As this example shows, other things being equal, it is beneficial to make the least costly investments first, delaying more expensive investments until it is clear they are warranted.

**Investment Time and Risk.**  Next, let's compare the materials and battery technologies. These projects have the same cost, but the battery technology will take longer and has a greater chance of failure. Considering only these two projects, if we begin with the materials technology, the expected cost of completing both is

$$\underbrace{100}_{\substack{\text{Investment} \\ \text{in materials}}} + \underbrace{0.50}_{\substack{\text{Probability} \\ \text{materials} \\ \text{technology} \\ \text{succeeds}}} \times \underbrace{\frac{1}{1.06}}_{\substack{\text{PV of} \\ \text{delay}}} \times \underbrace{100}_{\substack{\text{Investment} \\ \text{in battery}}} = \$147.2 \text{ million}$$

If we begin with the battery technology, the expected cost is

$$\underbrace{100}_{\substack{\text{Investment} \\ \text{in battery}}} + \underbrace{0.25}_{\substack{\text{Probability} \\ \text{battery} \\ \text{technology} \\ \text{succeeds}}} \times \underbrace{\frac{1}{1.06^4}}_{\substack{\text{PV of} \\ \text{delay}}} \times \underbrace{100}_{\substack{\text{Investment} \\ \text{in materials}}} = \$119.80 \text{ million}$$

Thus, Eclectic should work on the battery technology before working on the materials. Given its greater risk, we will learn more if the battery project succeeds regarding the viability of the overall project. Due to its longer time requirement, we also benefit from the time value of postponing the following investments further. In general, other things being equal, it is beneficial to invest in riskier and lengthier projects first, delaying future investments until the greatest amount of information can be learned.

**A General Rule.** As we have seen, the cost, time, and risk of each project will determine the optimal order in which to invest. Intuitively, by making smaller, riskier investments first, we gain the most additional information at the lowest cost. (Thus, the battery project should definitely come before the recharger project.) In general, we can find the optimal order to stage mutually dependent projects by ranking each, from highest to lowest, according to

$$\frac{1 - PV(\text{success})}{PV(\text{investment})} \qquad (22.3)$$

where $PV(\text{success})$ is the value at the start of the project of receiving \$1 if the project succeeds (i.e., the present value of the risk-neutral probability of success) and $PV(\text{investment})$ is the project's required investment, again expressed as a present value at the project's start.

| EXAMPLE 22.3 | Deciding the Order of Investment with Multiple Stages |
|---|---|

**Problem**

Use Eq. 22.3 to rank the stages of Eclectic's electric car project and determine the optimal order.

**Solution**

Evaluating Eq. 22.3 for each stage, we have

| Materials: | $[1 - (0.50/1.06)]/100 = 0.00528$ |
|---|---|
| Recharger: | $[1 - (0.50/1.06)]/400 = 0.00132$ |
| Battery: | $[1 - (0.25/1.06^4)]/100 = 0.00802$ |

So, Eclectic should develop the batteries first, then the body materials, and finally the charger, matching our earlier analysis.

Until now, we have ignored the decision about whether it is optimal to develop at all. In evaluating the overall investment decision, the first step is to decide the optimal order of investment in each stage. Once that order has been determined, we can calculate the overall NPV of the opportunity and reach a decision on whether to proceed.

| EXAMPLE 22.4 | Deciding Whether to Invest in a Project with Multiple Stages |
|---|---|

**Problem**

Eclectic's managers estimate that once they make these technological breakthroughs, they can develop the electric car, and the present value of all future profits will be \$4 billion. Does the decision to develop the car make sense?

**Solution**

To decide whether development makes sense, we must compute the NPV given the optimal order from Example 22.3:

$$NPV = -100 - 0.25\frac{100}{1.06^4} - 0.25 \times 0.5\frac{400}{1.06^5} + 0.25 \times 0.5 \times 0.5\frac{4000}{1.06^6} = \$19.1 \text{ million}$$

Thus, it is profitable to develop the electric car. However, this result crucially depends on the optimal staging—the NPV would be negative if Eclectic chose any other order!

**CONCEPT CHECK**

1. Why is it inappropriate to simply pick the higher NPV project when comparing mutually exclusive investment opportunities with different lives?

2. What is a major shortcoming of the equivalent annual benefit method?

3. How can you decide the order of investment in a staged investment decision?

## 22.6  Rules of Thumb

One of the major drawbacks of using the concepts introduced in this chapter is that they are difficult to implement. In practice, correctly modeling the sources of uncertainty and appropriate dynamic decisions usually requires an extensive amount of time and financial expertise. Furthermore, in most cases, the solutions are problem-specific, so the time and expertise spent on one problem are not transferable to other problems. Consequently, many firms resort to following rules of thumb.[7] Here, we examine two commonly used rules of thumb: the profitability index and hurdle rates.

### The Profitability Index Rule

As we explained in Section 22.1, when an investment opportunity can be delayed, it is optimal to invest only when the NPV of the investment project is sufficiently high. In most applications, it is quite difficult to calculate precisely how high the NPV must be to trigger investment. As a result, some firms use the following rule of thumb: *Invest whenever the profitability index exceeds a specified level.*

Recall from Chapter 7 that in the simple case of a project where the only resource is the upfront investment, the profitability index is

$$\text{Profitability Index} = \frac{\text{NPV}}{\text{Initial Investment}}$$

The **profitability index rule** directs you to invest whenever the profitability index exceeds some predetermined number. When the investment cannot be delayed, the optimal rule is to invest whenever the profitability index is greater than zero. When there is an option to delay, a common rule of thumb is to invest only when the index exceeds a higher threshold, such as one. Often, firms set high thresholds because the cost of investing at the wrong time is usually asymmetric. It is often better to wait too long (use a profitability index criterion that is too high) than to invest too soon (use a profitability index criterion that is too low).

### The Hurdle Rate Rule

The profitability index rule raises the bar on the NPV to take into account the option to wait. Rather than invest when the NPV is zero, you wait until the NPV is a multiple of the initial investment. Instead of raising the bar on the NPV, the **hurdle rate rule** raises the discount rate. The hurdle rate rule uses a higher discount rate than the cost of capital to compute the NPV, but then applies the regular NPV rule: *Invest whenever the NPV calculated using this higher discount rate is positive.* This higher discount rate is known as the

---

[7]See Robert McDonald, "Real Options and Rules of Thumb in Capital Budgeting," in M. Brennan and L. Trigeorgis (eds.), *Project Flexibility, Agency, and Competition* (Oxford University Press, 2000), for a detailed analysis of the performance of different rules of thumb.

**hurdle rate** because if the project can jump this hurdle—that is, have a positive NPV at this higher discount rate—then it should be undertaken.

When the source of uncertainty that creates a motive to wait is interest rate uncertainty, there is a natural way to approximate the optimal hurdle rate. In this case, the rule of thumb is to multiply the cost of capital by the ratio of the **callable annuity rate**, which is the rate on a risk-free annuity that can be repaid (or *called*) at any time, to the risk-free rate:

$$\text{Hurdle Rate} = \text{Cost of Capital} \times \frac{\text{Callable Annuity Rate}}{\text{Risk-Free Rate}} \qquad (22.4)$$

We should then invest whenever the NPV of the project is positive using this hurdle rate as the discount rate.

What is the intuition for this rule? Let's assume you have a risk-free project that you can delay. It currently has a positive NPV. You intend to borrow the initial investment but you are unsure whether you should wait in the hope that interest rates will fall. If you take out a regular loan and interest rates decrease, you will be stuck paying a higher rate. However, if you take out a callable loan and interest rates fall, then you can refinance the loan and take advantage of the lower rates. So, if the project has a positive NPV using the callable annuity rate as the discount rate, you can have your cake and eat it too: You can immediately get the benefits of the investment by undertaking it and still take advantage of a lower rate if rates fall. Thus, it makes sense to invest immediately. The rule of thumb approximately implements this decision rule.

How large is the difference between the hurdle rate and the cost of capital? Because government-guaranteed mortgages are insured against default and repayable by the borrower at any time, they are an example of a callable annuity (as the box on the next page explains). Based on the difference between mortgage and risk-free rates, using a hurdle rate 20% higher than the firm's cost of capital might be a reasonable adjustment to account for the firm's ability to wait until interest rates are sufficiently favorable to invest.

---

| EXAMPLE 22.5 | **Using the Hurdle Rate Rule for the Option to Delay** |
|---|---|

**Problem**

You can invest in a risk-free technology that requires an upfront payment of $1 million and will provide a perpetual annual cash flow of $90,000. Suppose all interest rates will be either 10% or 5% in one year and remain there forever. The risk-neutral probability that interest rates will drop to 5% is 90%. The one-year risk-free interest rate is 8%, and today's rate on a risk-free perpetual bond is 5.4%. The rate on an equivalent perpetual bond that is repayable at any time (the callable annuity rate) is 9%.[8] Should you invest in the technology today, or wait and see if rates drop and then invest?

**Solution**

Because the investment is risk free, the cost of capital is the risk-free rate. Thus, Eq. 22.4 suggests using a hurdle rate equal to the callable annuity rate of 9%. With that rate,

$$NPV = \frac{90,000}{0.09} - 1,000,000 = 0$$

---

[8]To check that these rates make sense, note that a $1000 perpetual bond paying $54 per year would be worth $54 + 54/.05 = $1134 if interest rates fall and $54 + 54/.10 = $594 if rates rise, for a (risk-neutral) expected payoff of $0.9 \times 1134 + 0.1 \times 594 = $1080$, and an expected return equal to the one-year risk-free rate of 8%. Similarly, a $1000 callable bond with a coupon of $90 would be worth $90 + 1000 = $1090 if rates fall and the bond is prepaid, and $90 + 90/.10 = $990 if rates rise, again for a risk-neutral expected payoff of $0.9 \times 1090 + 0.1 \times 990 = $1080$.

The hurdle rate rule implies that you are indifferent. Let's see if this is correct. The actual cost of capital is 5.4% (the rate offered on a risk-free perpetuity), so the investment opportunity clearly has a positive NPV:

$$NPV = \frac{90,000}{.054} - 1,000,000 = \$666,667$$

Let's see what the NPV of waiting is. If we delay the investment, it makes sense to invest only if rates drop to 5%, in which case

$$NPV_{\text{rates go down}} = \frac{90,000}{0.05} - 1,000,000 = \$800,000$$

The present value today of the expected NPV using risk-neutral probabilities is therefore

$$\frac{800,000 \times 0.90}{1.08} = \$666,667$$

The hurdle rate rule is correct: You really are indifferent between investing today and waiting.

In situations like Example 22.5, when the cash flows are constant and perpetual, and the reason to wait derives solely from interest rate uncertainty, the rule of thumb is exact.[9] However, when these conditions are not satisfied, the rule of thumb merely approximates the correct decision.

While using a hurdle rate rule for deciding when to invest might be a cost-effective way to make investment decisions, it is important to remember that this rule does not provide an accurate measure of *value*. The value of making an investment is the NPV calculated using the cost of capital as the discount rate, not the hurdle rate. Thus, while the rule of thumb provides the correct time to invest in Example 22.5, the actual value of undertaking the investment is $666,667—the NPV when the correct cost of capital is used as the discount rate.

Potentially, there could be an advantage to using the hurdle rate and profitability index rules of thumb simultaneously. That is, the decision when to invest can be made by first computing

### The Option to Repay a Mortgage

As most homeowners know, mortgage interest rates are higher than comparable risk-free rates like the yield on the 30-year U.S. Treasury bond. One reason mortgage rates are higher than Treasury rates is the risk that the homeowner will default. But, for high-quality borrowers, this risk has remained relatively small, even through the financial crisis. Furthermore, in many cases, mortgage lenders are insured against default by government agencies. Yet, mortgage rates for the best borrowers still exceed even the rates on some corporate debt.

Mortgage interest rates are higher than Treasury rates because mortgages have a repayment option that Treasuries do not have: You can repay your mortgage at any time, while the U.S. government cannot. Consequently, if interest rates drop, a mortgage holder can **refinance**—that is, repay the existing mortgage and take out a new mortgage at a lower rate. This option to refinance is valuable to the borrower but costly to the lender: If rates fall, the mortgage holder will repay the mortgage and replace it with a new mortgage at a lower rate, whereas if rates rise, the bank is stuck with a loan that is now below the market rate. Of course, banks understand they have written this option, and so demand a higher rate on the loan than the rate they would if the mortgage did not have the repayment option. As a result, mortgage rates have tended to be at least 20% higher than long-term risk-free interest rates.

---

[9]See J. B. Berk, "A Simple Approach for Deciding When to Invest," *American Economic Review* 89 (1999): 1319–1326.

the NPV using the hurdle rate in Eq. 22.4 to account for interest rate uncertainty. The profitability index can then be calculated using this NPV, with the firm accepting the project only if the profitability index exceeds a threshold that accounts for cash flow uncertainty.

**CONCEPT CHECK**

1. Explain the profitability index rule of thumb.

2. What is the hurdle rate rule, and what uncertainty does it reflect?

## 22.7  Key Insights from Real Options

Although a general rule for how to account for all real options does not exist, there are a few simple principles that we have covered in this chapter. In closing, it is worth restating these principles:

**Out-of-the-Money Real Options Have Value.** Even if an investment opportunity currently has a negative NPV, it does not imply that the opportunity is worthless. So long as there is a chance that the investment opportunity could have a positive NPV in the future, the opportunity is worth something today.

**In-the-Money Real Options Need Not Be Exercised Immediately.** You should not necessarily take on an investment opportunity that has a positive NPV today. If you can delay the investment opportunity, the option to delay might be worth more than the NPV of undertaking the investment immediately. In this case, you should not undertake the investment and instead delay it.

**Waiting Is Valuable.** Value can be created by waiting for uncertainty to resolve because once uncertainty is resolved, you can make better decisions with better information. Thus, if there is no cost to waiting, investing early never makes sense. If there is a cost, always weigh the benefits of waiting for resolution of uncertainty against the costs of waiting.

**Delay Investment Expenses as Much as Possible.** Because waiting is valuable, you should only incur investment expenses at the last possible moment. Committing capital before it is absolutely necessary reduces value because it gives up the option to make a better decision once uncertainty has been resolved.

**Create Value by Exploiting Real Options.** In an uncertain environment, real options create value for the firm. To realize this value, the firm must continually re-evaluate its investment opportunities and optimize its decision-making dynamically. It is important to keep in mind that often as much value can be created by optimally delaying or abandoning projects as by creating or growing them.

Combining these insights, we find that by staging investments, and using clear valuation-based methods to determine at each stage if the firm should abandon, defer, continue, or grow an investment opportunity, managers can substantially increase firm value.

**MyFinanceLab**

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 22.1  Real Versus Financial Options

■ A real option is an option where the underlying asset is physical rather than financial.

### 22.2  Decision Tree Analysis

- A decision tree is a graphical way to represent alternative decisions and potential outcomes in an uncertain economy. It contains decision nodes and information nodes.

### 22.3  The Option to Delay an Investment Opportunity

- By waiting before committing to an investment, a firm can obtain more information about the investment's returns. By correctly choosing the time to invest, it can add value.
- When you have the option of deciding when to invest, it is usually optimal to invest only when the NPV is substantially greater than zero.
- Given the option to wait, an investment that currently has a negative NPV can have a positive value.
- The option to wait is most valuable when there is a great deal of uncertainty regarding what the value of the investment will be in the future.
- In the real option context, the dividends correspond to any value from the investment that we give up by waiting. Absent dividends, a call option should not be exercised early.
- The beta of the option to invest is a multiple of the beta of the underlying investment opportunity, and varies with its value.

### 22.4  Growth and Abandonment Options

- By undertaking a project, a firm often gets the opportunity to make investments that it would not have otherwise. The opportunity to invest in projects in the future—that is, the firm's growth options—is worth something today.
- When firms find themselves involved in a project that is losing money, with little prospect of turning things around in the future, they can exercise their abandonment option and walk away.

### 22.5  Applications to Multiple Projects

- In choosing between investments with different lives, a firm must take into account its option to replace or extend the shorter-lived project at the end of its original life.
- Managers sometimes use the equivalent annual benefit method to compare projects of different lengths. It implicitly assumes that the projects can be replaced at their original terms. Using the equivalent annual benefit method might produce different recommendations when future uncertainty is taken into account.

### 22.6  Rules of Thumb

- When deciding the order of investment for a multi-stage investment decision, there is a benefit to making smaller and riskier investments first in order to gain additional information at low cost. If the projects are mutually dependent so that all projects must succeed for the firm to realize any benefit, the optimal order can be determined by ranking the projects according to Eq. 22.3.
- The profitability index rule of thumb calls for investing whenever the profitability index exceeds some predetermined number. It is a way of accounting for the option to wait when there is cash flow uncertainty.
- The hurdle rate rule of thumb computes the NPV using the hurdle rate, a discount rate higher than the cost of capital, and specifies that the investment should be undertaken only when the NPV computed this way is positive. It is a way of accounting for the option to wait when there is interest rate uncertainty.

### 22.7  Key Insights from Real Options

- Out-of-the-money real options have value.
- In-the-money real options need not be exercised immediately.

- Waiting is valuable.
- Delay investment expenses as much as possible.
- Create value by exploiting real options.

## Key Terms

abandonment option *p. 783*
callable annuity rate *p. 796*
decision node *p. 775*
decision tree *p. 774*
equivalent annual benefit (EAB) *p. 792*
equivalent annual benefit method *p. 792*
growth option *p. 783*

hurdle rate *p. 796*
hurdle rate rule *p. 795*
information node *p. 775*
mutually dependent investments *p. 792*
profitability index rule *p. 795*
real option *p. 774*
refinance *p. 797*

## Further Reading

Many people believe that by not explicitly accounting for the real options described in this chapter, managers make costly mistakes. For an in-depth discussion of this issue, see T. Copeland, V. Antikarov, and T. Texere, *Real Options: A Practitioner's Guide* (W. W. Norton & Company, 2003). For a discussion of how to adjust firm betas for capital budgeting purposes see A. Bernardo, B. Chowdhry and A. Goyal, "Assessing Project Risk," *Journal of Applied Corporate Finance* 24 (2012): 94–100.

These books cover the topics of this chapter in more detail and depth: M. Amran and N. Kulatilaka, *Real Options: Managing Strategic Investments in an Uncertain World* (Harvard Business School Press, 1999); M. Brennan and L. Trigeorgis, eds., *Flexibility, Natural Resources, and Strategic Options* (Oxford University Press, 1998); A. Dixit and R. Pindyck, *Investment Under Uncertainty* (Princeton University Press, 1994); H. Smit and L. Trigeorgis, *Strategic Investment, Real Options and Games* (Princeton University Press, 2004); and L. Trigeorgis, *Real Options* (MIT Press, 1996).

For a discussion of how well the rules of thumb covered in this chapter perform in practice, see R. McDonald, "Real Options and Rules of Thumb in Capital Budgeting," in M. Brennan and L. Trigeorgis (eds.), *Project Flexibility, Agency, and Competition* (Oxford University Press, 2000).

For more information on how real options affect the view academics and practitioners have of corporate finance, see T. Luehrman, "Strategy as a Portfolio of Real Options," *Harvard Business Review* (September–October 1998): 89–99; S. Mason and R. Merton, "The Role of Contingent Claims Analysis in Corporate Finance," in E. Altman and M. Subrahmanyan (eds.), *Recent Advances in Corporate Finance* (Richard D. Irwin, 1985); and A. Triantris and A. Borison, "Real Options: State of the Practice," *Journal of Applied Corporate Finance* 14(2) (2001): 8–24.

## Problems

*All problems are available in* MyFinanceLab. *An asterisk (\*) indicates problems with a higher level of difficulty.*

### Decision Tree Analysis

1. Your company is planning on opening an office in Japan. Profits depend on how fast the economy in Japan recovers from its current recession. There is a 50% chance of recovery this year. You are trying to decide whether to open the office now or in a year. Construct the decision tree that shows the choices you have to open the office either today or one year from now.

 2. You are trying to decide whether to make an investment of $500 million in a new technology to produce Everlasting Gobstoppers. There is a 60% chance that the market for these candies will produce profits of $100 million annually, a 20% chance the market will produce profits of $50 million, and a 20% chance that there will be no profits. The size of the market will become clear one year from now. Currently, the cost of capital of the project is 11% per year. There is a 20% chance that the cost of capital will drop to 9% in a year and stay at that level forever, and

an 80% chance that it will stay at 11% forever. Movements in the cost of capital are unrelated to the size of the candy market. Construct the decision tree that shows the choices you have to make the investment either today or one year from now.

3. Using the information in Problem 2, rework the problem assuming you find out the size of the Everlasting Gobstopper market one year *after* you make the investment. That is, if you do not make the investment, you do not find out the size of the market. Construct the decision tree that shows the choices you have under these circumstances.

## The Option to Delay an Investment Opportunity

4. Describe the benefits and costs of delaying an investment opportunity.

5. You are a financial analyst at Global Conglomerate and are considering entering the shoe business. You believe that you have a very narrow window for entering this market. Because of Christmas demand, the time is right today and you believe that exactly a year from now would also be a good opportunity. Other than these two windows, you do not think another opportunity will exist to break into this business. It will cost you $35 million to enter the market. Because other shoe manufacturers exist and are public companies, you can construct a perfectly comparable company. Hence, you have decided to use the Black-Scholes formula to decide when and if you should enter the shoe business. Your analysis implies that the current value of an operating shoe company is $40 million and it has a beta of 1. However, the flow of customers is uncertain, so the value of the company is volatile—your analysis indicates that the volatility is 25% per year. Fifteen percent of the value of the company is attributable to the value of the free cash flows (cash available to you to spend how you wish) expected in the first year. If the one-year risk-free rate of interest is 4%:
    a. Should Global enter this business and, if so, when?
    b. How will the decision change if the current value of a shoe company is $36 million instead of $40 million?
    c. Plot the value of your investment opportunity as a function of the current value of a shoe company.
    d. Plot the beta of the investment opportunity as a function of the current value of a shoe company.

6. It is the beginning of September and you have been offered the following deal to go heli-skiing. If you pick the first week in January and pay for your vacation now, you can get a week of heli-skiing for $2500. However, if you cannot ski because the helicopters cannot fly due to bad weather, there is no snow, or you get sick, you do not get a refund. There is a 40% probability that you will not be able to ski. If you wait until the last minute and go only if you know that the conditions are perfect and you are healthy, the vacation will cost $4000. You estimate that the pleasure you get from heli-skiing is worth $6000 per week to you (if you had to pay any more than that, you would choose not to go). If your cost of capital is 8% per year, should you book ahead or wait?

 7. A professor in the Computer Science department at United States Institute of Technology has just patented a new search engine technology and would like to sell it to you, an interested venture capitalist. The patent has a 17-year life. The technology will take a year to implement (there are no cash flows in the first year) and has an upfront cost of $100 million. You believe this technology will be able to capture 1% of the Internet search market, and currently this market generates profits of $1 billion per year. Over the next five years, the risk-neutral probability that profits will grow at 10% per year is 20% and the risk-neutral probability that profits will grow at 5% per year is 80%. This growth rate will become clear one year from now (after the first year of growth). After five years, profits are expected to decline 2% annually. No profits are expected after the patent runs out. Assume that all risk-free interest rates are constant (regardless of the term) at 10% per year.
    a. Calculate the NPV of undertaking the investment today.
    b. Calculate the NPV of waiting a year to make the investment decision.
    c. What is your optimal investment strategy?

8. Consider again the electric car dealership in Section 22.3. Suppose the current value of a dealership is $5 million because the first-year free cash flow is expected to be $500,000 rather than $600,000. What is the beta of a corporation whose only asset is a one-year option to open a dealership? What is the beta if the first year's cash flows are expected to be $700,000, so a working dealership is worth $7 million?

9. Under the same assumptions as in Section 22.3, suppose your corporation owns an operating electric car dealership, together with one-year options to open five more.
   a. What is the value and beta of your firm if the expected first-year free cash flow for all dealerships is $600,000?
   b. What is the value and beta of your firm if the expected first-year free cash flow for all dealerships is $300,000?
   c. In which case do your options have higher beta? In which case does your firm have higher beta? Why?

*10. The management of Southern Express Corporation is considering investing 10% of all future earnings in growth. The company has a single growth opportunity that it can take either now or in one period. Although the managers do not know the return on investment with certainty, they know it is equally likely to be either 10% or 14% per year. In one period, they will find out which state will occur. Currently the firm pays out all earnings as a dividend of $10 million; if it does not make the investment, dividends are expected to remain at this level forever. If Southern Express undertakes the investment, the new dividend will reflect the realized return on investment and will grow at the realized rate forever. Assuming the opportunity cost of capital is 10.1%, what is the value of the company just before the current dividend is paid (the cum-dividend value)?

*11. What decision should you make in Problem 2 if the one-year cost of capital is 15.44% and the profits last forever?

### Growth and Abandonment Options

12. Your R&D division has just synthesized a material that will superconduct electricity at room temperature; you have given the go-ahead to try to produce this material commercially. It will take five years to find out whether the material is commercially viable, and you estimate that the probability of success is 25%. Development will cost $10 million per year, paid at the beginning of each year. If development is successful and you decide to produce the material, the factory will be built immediately. It will cost $1 billion to put in place, and will generate profits of $100 million at the end of every year in perpetuity. Assume that the current five-year risk-free interest rate is 10% per year, and the yield on a perpetual risk-free bond will be 12%, 10%, 8%, or 5% in five years. Assume that the risk-neutral probability of each possible rate is the same. What is the value today of this project?

*13. You are an analyst working for Goldman Sachs, and you are trying to value the growth potential of a large, established company, Big Industries. Big Industries has a thriving R&D division that has consistently turned out successful products. You estimate that, on average, the R&D division generates two new product proposals every three years, so that there is a two-thirds chance that a project will be proposed every year. Typically, the investment opportunities the R&D division produces require an initial investment of $10 million and yield profits of $1 million per year that grow at one of three possible growth rates in perpetuity: 3%, 0%, and −3%. All three growth rates are equally likely for any given project. These opportunities are always "take it or leave it" opportunities: If they are not undertaken immediately, they disappear forever. Assume that the cost of capital will always remain at 12% per year. What is the present value of all future growth opportunities Big Industries will produce?

*14. Repeat Problem 13, but this time assume that all the probabilities are risk-neutral probabilities, which means the cost of capital is always the risk-free rate and risk-free rates are as follows: The current interest rate for a risk-free perpetuity is 8%; in one year, there is a 64.375% chance that all risk-free interest rates will be 10% and stay there forever, and a 35.625% chance that they will be 6% and stay there forever. The current one-year risk-free rate is 7%.

15. You own a small networking startup. You have just received an offer to buy your firm from a large, publicly traded firm, JCH Systems. Under the terms of the offer, you will receive 1 million shares of JCH. JCH stock currently trades for $25 per share. You can sell the shares of JCH that you will receive in the market at any time. But as part of the offer, JCH also agrees that at the end of the next year, it will buy the shares back from you for $25 per share if you desire. Suppose the current one-year risk-free rate is 6.18%, the volatility of JCH stock is 30%, and JCH does not pay dividends.
    a. Is this offer worth more than $25 million? Explain.
    b. What is the value of the offer?

16. You own a wholesale plumbing supply store. The store currently generates revenues of $1 million per year. Next year, revenues will either decrease by 10% or increase by 5%, with equal probability, and then stay at that level as long as you operate the store. You own the store outright. Other costs run $900,000 per year. There are no costs for shutting down; in that case, you can always sell the store for $500,000. What is the business worth today if the cost of capital is fixed at 10%?

*17. You own a copper mine. The price of copper is currently $1.50 per pound. The mine produces 1 million pounds of copper per year and costs $2 million per year to operate. It has enough copper to operate for 100 years. Shutting the mine down would entail bringing the land up to EPA standards and is expected to cost $5 million. Reopening the mine once it is shut down would be an impossibility given current environmental standards. The price of copper has an equal (and independent) probability of going up or down by 25% each year for the next two years and then will stay at that level forever. Calculate the NPV of continuing to operate the mine if the cost of capital is fixed at 15%. Is it optimal to abandon the mine or keep it operating?

18. An original silver dollar from the late eighteenth century consists of approximately 24 grams of silver. At a price of $0.19 per gram ($6 per troy ounce), the silver content of the coin is worth about $4.50. Assume that these coins are in plentiful supply and are not collector's items, so they have no numismatic value. If the current price of silver is $0.19 per gram, will the price of the coin be greater than, less than, or equal to $4.50? Justify your answer.

### Applications to Multiple Projects

19. What implicit assumption is made when managers use the equivalent annual benefit method to decide between two projects with different lives that use the same resource?

20. You own a cab company and are evaluating two options to replace your fleet. Either you can take out a five-year lease on the replacement cabs for $500 per month per cab, or you can purchase the cabs outright for $30,000, in which case the cabs will last eight years. You must return the cabs to the leasing company at the end of the lease. The leasing company is responsible for all maintenance costs, but if you purchase the cabs, you will buy a maintenance contract that will cost $100 per month for the life of each cab. Each cab will generate revenues of $1000 per month. Assume the cost of capital is fixed at 12%.
    a. Calculate the NPV per cab of both possibilities: purchasing the cabs or leasing them.
    b. Calculate the equivalent monthly annual benefit of both opportunities.
    c. If you are leasing a cab, you have the opportunity to buy the used cab after five years. Assume that in five years a five-year-old cab will cost either $10,000 or $16,000 with equal likelihood, will have maintenance costs of $500 per month, and will last three more years. Which option should you take?

*21. You own a piece of raw land in an up-and-coming area in Gotham City. The costs to construct a building increase disproportionately with the size of the building. A building of $q$ square feet costs $0.1 \times q^2$ to build. After you construct a building on the lot, it will last forever but you are committed to it: You cannot put another building on the lot. Buildings currently rent at $100 per square

foot per month. Rents in this area are expected to increase in five years. There is a 50% chance that they will rise to $200 per square foot per month and stay there forever, and a 50% chance that they will stay at $100 per square foot per month forever. The cost of capital is fixed at 12% per year.

a. Should you construct a building on the lot right away? If so, how large should the building be?

b. If you choose to delay the decision, how large a building will you construct in each possible state in five years?

22. Genenco is developing a new drug that will slow the aging process. In order to succeed, two breakthroughs are needed: one to increase the potency of the drug, and the second to eliminate toxic side effects. Research to improve the drug's potency is expected to require an upfront investment of $10 million and take 2 years; the drug has a 5% chance of success. Reducing the drug's toxicity will require a $30 million upfront investment, take 4 years, and has a 20% chance of success. If both efforts are successful, Genenco can sell the patent for the drug to a major drug company for $2 billion. All risk is idiosyncratic, and the risk-free rate is 6%.

a. What is the NPV of launching both research efforts simultaneously?

b. What is the optimal order to stage the investments?

c. What is the NPV with the optimal staging?

23. Your engineers are developing a new product to launch next year that will require both software and hardware innovations. The software team requests a budget of $5 million and forecasts an 80% chance of success. The hardware team requests a $10 million budget and forecasts a 50% chance of success. Both teams will need 6 months to work on the product, and the risk-free interest rate is 4% APR with semiannual compounding.

a. Which team should work on the project first?

b. Suppose that before anyone has worked on the project, the hardware team comes back and revises their proposal, changing the estimated chance of success to 75% based on new information. Will this affect your decision in (a)?

## Rules of Thumb

24. Your firm is thinking of expanding. If you invest today, the expansion will generate $10 million in FCF at the end of the year, and will have a continuation value of either $150 million (if the economy improves) or $50 million (if the economy does not improve). If you wait until next year to invest, you will lose the opportunity to make $10 million in FCF, but you will know the continuation value of the investment in the following year (that is, in a year from now, you will know what the investment continuation value will be in the following year). Suppose the risk-free rate is 5%, and the risk-neutral probability that the economy improves is 45%. Assume the cost of expanding is the same this year or next year.

a. If the cost of expanding is $80 million, should you do so today or wait until next year to decide?

b. At what cost of expanding would there be no difference between expanding now and waiting? To what profitability index does this correspond?

25. Assume that the project in Example 22.5 pays an annual cash flow of $100,000 (instead of $90,000).

a. What is the NPV of investing today?

b. What is the NPV of waiting and investing tomorrow?

c. Verify that the hurdle rate rule of thumb gives the correct time to invest in this case.

26. Assume that the project in Example 22.5 pays an annual cash flow of $80,000 (instead of $90,000).

a. What is the NPV of investing today?

b. What is the NPV of waiting and investing tomorrow?

c. Verify that the hurdle rate rule of thumb gives the correct time to invest in this case.

**PART**

# 8

# Long-Term Financing

***THE LAW OF ONE PRICE CONNECTION***. How should a firm raise the funds it needs to undertake its investments? In the capital structure part of the text, we discussed the financial manager's choice between the major categories of financing, debt, and equity. In this part of the book, we explain the mechanics of implementing these decisions. Chapter 23 describes the process a company goes through when it raises equity capital. In Chapter 24, we review firms' use of debt markets to raise capital. Chapter 25 introduces an alternative to long-term debt financing—leasing. By presenting leasing as a financing alternative, we apply the Law of One Price to determine that the benefits of leasing must derive from tax differences, incentive effects, or other market imperfections.

**CHAPTER 23**
Raising Equity Capital

**CHAPTER 24**
Debt Financing

**CHAPTER 25**
Leasing

**CHAPTER**

# 23

# Raising Equity Capital

**A**S WE POINTED OUT IN CHAPTER 1, MOST BUSINESSES in the United States are small sole proprietorships and partnerships. Yet, these firms generate only 10% of total U.S. sales. One limitation of a sole proprietorship is that it does not allow access to outside equity capital, so the business has relatively little capacity for growth. Another limitation is that the sole proprietor is forced to hold a large fraction of his or her wealth in a single asset—the company—and therefore is likely to be undiversified. By incorporating, businesses can gain access to capital and founders can reduce the risk of their portfolios by selling some of their equity and diversifying. Consequently, even though corporations make up less than 20% of U.S. businesses, they account for nearly 85% of sales in the U.S. economy.

In this chapter, we discuss how companies raise equity capital. To illustrate this concept, we follow the case of a real company, RealNetworks, Inc. (ticker: RNWK). RealNetworks is a leading creator of digital media services and software. Customers use RealNetworks' products to find, play, purchase, and manage digital music, videos, and games. RealNetworks was founded in 1993 and incorporated in 1994. Using the example of RealNetworks, we first discuss the alternative ways new companies can raise capital and then examine the impact of these funding alternatives on current and new investors.

## 23.1 Equity Financing for Private Companies

The initial capital that is required to start a business is usually provided by the entrepreneur herself and her immediate family. However, few families have the resources to finance a growing business, so growth almost always requires outside capital. A private company must seek sources that can provide this capital, but it must also understand how the infusion of outside capital will affect the control of the company, particularly when outside investors decide to cash out their investments in the company.

### Sources of Funding

When a private company decides to raise outside equity capital, it can seek funding from several potential sources: angel investors, venture capital firms, institutional investors, and corporate investors.

**Angel Investors.** Individual investors who buy equity in small private firms are called **angel investors**. For many start-ups, the first round of outside private equity financing is often obtained from angels. Frequently, these investors are friends or acquaintances of the entrepreneur. Because their capital investment is often large relative to the amount of capital already in place at the firm, they typically receive a sizable equity share in the business in return for their funds. As a result, these investors may have substantial influence in the business decisions of the firm. Angels may also bring expertise to the firm that the entrepreneur lacks.

Although in some cases the capital available from angel investors is sufficient, in most cases firms need more capital than what a few angels can provide. Finding angels is difficult—often it is a function of how well connected the entrepreneur is in the local community. Most entrepreneurs, especially those launching their first start-up company, have few relationships with people with substantial capital to invest. At some point, many firms that require equity capital for growth must turn to the venture capital industry.

**Venture Capital Firms.** A **venture capital firm** is a limited partnership that specializes in raising money to invest in the private equity of young firms. Table 23.1 lists the 10 most active U.S. venture capital firms in 2011, based on the number of deals completed.

| TABLE 23.1 | Most Active U.S. Venture Capital Firms in 2011 (by number of deals completed) | |
|---|---|---|
| **Venture Capital Firm** | **Number of Deals** | **Average Invested per Deal (in $ million)** |
| New Enterprise Associates | 100 | 8.7 |
| Kleiner Perkins Caufield & Byers | 90 | 8.3 |
| Sequoia Capital | 75 | 8.2 |
| Draper Fisher Jurvetson | 72 | 2.4 |
| Accel Partners | 69 | 4.7 |
| Intel Capital | 69 | 3.7 |
| First Round Capital | 60 | 1.6 |
| 500 Startups | 57 | 1.1 |
| True Ventures | 49 | 1.3 |
| Canaan Partners | 47 | 3.8 |

*Source*: "Most Active U.S.-based Venture Firms," *Venture Capital Journal*, December 27, 2011

| FIGURE 23.1 | **Venture Capital Funding in the United States** |



Columns show the aggregate funds raised and amount invested annually by U.S. venture capital firms. The line chart shows the number of separate deals. Note the peak in activity in 2000, followed by a sharp decline after the Internet bust. While activity dipped again in the financial crisis, by 2011 investment had returned to its pre-crisis average.

*Source*: National Venture Capital Association

Typically, institutional investors, such as pension funds, are the limited partners. The general partners run the venture capital firm; they are called **venture capitalists**. Venture capital firms offer limited partners a number of advantages over investing directly in start-ups themselves. Venture firms invest in many start-ups, so limited partners get the benefit of this diversification. More importantly, limited partners also benefit from the expertise of the general partners. However, these advantages come at a cost—general partners charge substantial fees to run the firm. In addition to an annual management fee of about 1.5%–2.5% of the fund's committed capital, general partners also take a share of any positive return generated by the fund in a fee referred to as **carried interest**. Most firms charge 20%, but some take up to 30%, of any profits as carried interest.

Venture capital firms can provide substantial capital for young companies. For example, in 2011, venture capital firms invested $29.5 billion in 3834 separate deals, for an average investment of about $7.7 million per deal. In return, venture capitalists often demand a great deal of control. Paul Gompers and Josh Lerner[1] report that venture capitalists typically control about one-third of the seats on a start-up's board of directors, and often represent the single largest voting block on the board. Although entrepreneurs generally view this control as a necessary cost of obtaining venture capital, it can actually be an important

[1]P. Gompers and J. Lerner, *The Venture Capital Cycle* (MIT Press, 1999).

## FIGURE 23.2

**Total U.S. LBO Volume and Number of Deals**

U.S. leveraged buyout volume as measured by dollar volume and number of deals. Private equity activity surged during the 2003–2007 period, reflected in record volume, deal size, and number of deals. Activity declined dramatically, however, with the 2008 financial crisis.

*Source*: Standard & Poors Leveraged Buyout Review



benefit of accepting venture financing. Venture capitalists use their control to protect their investments; therefore, they may perform a key nurturing and monitoring role for the firm.

The importance of the venture capital sector has grown enormously in the last 50 years. As Figure 23.1 shows, growth in the sector increased in the 1990s and peaked at the height of the Internet boom. Although the size of the industry has decreased substantially since then, it remains larger than it was in 1997.

**Private Equity Firms.** A **private equity firm** is organized very much like a venture capital firm, but it invests in the equity of existing privately held firms rather than start-up companies. Often, private equity firms initiate their investment by finding a publicly traded firm and purchasing the outstanding equity, thereby taking the company private in a transaction called a **leveraged buyout (LBO)**. In most cases, the private equity firms use debt as well as equity to finance the purchase.

Private equity firms share the advantages of venture capital firms, and also charge similar fees. One key difference between private equity and venture capital is the magnitude invested. For example, Figure 23.2 shows that the total LBO transaction volume in 2007 (the peak of the private equity market) was over $400 billion, implying an average deal size exceeding $2 billion. Table 23.2 lists the top 10 private equity funds in 2011 based on the total amount of investment capital each firm raised over the last five years.

**Institutional Investors.** Institutional investors such as pension funds, insurance companies, endowments, and foundations manage large quantities of money. They are major investors in many different types of assets, so, not surprisingly, they are also active investors in private companies. Institutional investors may invest directly in private firms, or they may invest indirectly by becoming limited partners in venture capital or private equity firms. Institutional interest in private equity has grown dramatically in recent years. For example, in 2011, the California Public Employees' Retirement System (CalPERS) reported that it had $33 billion of its $237 billion portfolio invested in private equity, with another $11 billion in capital committed to the sector.

| TABLE 23.2 | Top 10 Private Equity Funds in 2011 | | |
|---|---|---|---|
| Rank | Firm name | Headquarters | Five-Year Fundraising Total (in $ billion) |
| 1 | TPG Capital | Fort Worth | 50.6 |
| 2 | Goldman Sachs Principal Investment Area | New York | 47.2 |
| 3 | The Carlyle Group | Washington, D.C. | 40.5 |
| 4 | Kohlberg Kravis Roberts | New York | 40.2 |
| 5 | The Blackstone Group | New York | 36.4 |
| 6 | Apollo Global Management | New York | 33.8 |
| 7 | Bain Capital | Boston | 29.4 |
| 8 | CVC Capital Partners | London | 25.1 |
| 9 | First Reserve Corporation | Greenwich | 19.1 |
| 10 | Hellman & Friedman | San Francisco | 17.2 |

*Source*: Private Equity International, http://www.peimedia.com/pei300

**Corporate Investors.** Many established corporations purchase equity in younger, private companies. A corporation that invests in private companies is called many different names, including **corporate investor**, **corporate partner**, **strategic partner**, and **strategic investor**. Most of the other types of investors in private firms that we have considered so far are primarily interested in the financial return that they will earn on their investments. Corporate investors, by contrast, might invest for corporate strategic objectives in addition to the desire for investment returns. For example, in May 2009, automaker Daimler invested $50 million for a 10% equity stake in electric car maker Tesla as part of a strategic collaboration on the development of lithium-ion battery systems, electric drive systems, and individual vehicle projects.

## Outside Investors

When a company founder decides to sell equity to outside investors for the first time, it is common practice for private companies to issue preferred stock rather than common stock to raise capital. **Preferred stock** issued by mature companies such as banks usually has a preferential dividend and seniority in any liquidation and sometimes special voting rights. Conversely, the preferred stock issued by young companies typically does not pay regular cash dividends. However, this preferred stock usually gives the owner an option to convert it into common stock on some future date, so it is often called **convertible preferred stock**. If the company runs into financial difficulties, the preferred stockholders have a senior claim on the assets of the firm relative to any common stockholders (who are often the employees of the firm). If things go well, then these investors will convert their preferred stock and receive all the rights and benefits of common stockholders.

RealNetworks, which was founded by Robert Glaser in 1993, was initially funded with an investment of approximately $1 million by Glaser. As of April 1995, Glaser's $1 million initial investment in RealNetworks represented 13,713,439 shares of Series A preferred stock, implying an initial purchase price of about $0.07 per share. RealNetworks needed more capital, and management decided to raise this money by selling equity in the form of convertible preferred stock.

The company's first round of outside equity funding was Series B preferred stock. RealNetworks sold 2,686,567 shares of Series B preferred stock at $0.67 per share in April

1995.[2] After this funding round, the distribution of ownership was as follows:

|  | Number of Shares | Price per Share ($) | Total Value (in $ million) | Percentage Ownership |
|---|---|---|---|---|
| Series A | 13,713,439 | 0.67 | 9.2 | 83.6% |
| Series B | 2,686,567 | 0.67 | 1.8 | 16.4% |
|  | 16,400,006 |  | 11.0 | 100.0% |

The Series B preferred shares were new shares of stock being sold by RealNetworks. At the price the new shares were sold for, Glaser's shares were worth $9.2 million and represented 83.6% of the outstanding shares. The value of the prior shares outstanding at the price in the funding round ($9.2 million in this example) is called the **pre-money valuation**. The value of the whole firm (old plus new shares) at the funding round price ($11.0 million) is known as the **post-money valuation**. The difference between the pre- and post-money valuation is the amount invested. In other words,

$$\text{Post-money Valuation} = \text{Pre-money Valuation} + \text{Amount Invested} \quad (23.1)$$

### EXAMPLE 23.1

### Funding and Ownership

**Problem**

You founded your own firm two years ago. Initially, you contributed $100,000 of your money and, in return, received 1,500,000 shares of stock. Since then, you have sold an additional 500,000 shares to angel investors. You are now considering raising even more capital from a venture capitalist. The venture capitalist has agreed to invest $6 million with a post-money valuation of $10 million for the firm. Assuming that this is the venture capitalist's first investment in your company, what percentage of the firm will she end up owning? What percentage will you own? What is the value of your shares?

**Solution**

Because the VC will invest $6 million out of the $10 million post-money valuation, her ownership percentage is $6/10 = 60\%$. From Eq. 23.1, the pre-money valuation is $10 - 6 = \$4$ million. As there are 2 million pre-money shares outstanding, this implies a share price of $4 million/2 million shares = $2 per share. Thus, the VC will receive 3 million shares for her investment, and after this funding round, there will be a total of 5,000,000 shares outstanding. You will own $1,500,000/5,000,000 = 30\%$ of the firm, and the post-transaction valuation of your shares is $3 million.

Over the next few years, RealNetworks raised three more rounds of outside equity in addition to the Series B funding round. Note the increase in the amount of capital raised as the company matured:

| Series | Date | Number of Shares | Share Price ($) | Capital Raised (in $ million) |
|---|---|---|---|---|
| B | April 1995 | 2,686,567 | 0.67 | 1.8 |
| C | Oct. 1995 | 2,904,305 | 1.96 | 5.7 |
| D | Nov. 1996 | 2,381,010 | 7.53 | 17.9 |
| E | July 1997 | 3,338,374 | 8.99 | 30.0 |

[2]The number of shares of RealNetworks' preferred stock given here for this and subsequent funding comes from the IPO prospectus (available on EDGAR at http://www.sec.gov/edgar/searchedgar/webusers.htm). For simplicity, we have ignored warrants to purchase additional shares that were also issued and a small amount of employee common stock that existed.

812    **Chapter 23** Raising Equity Capital

In each case, investors bought preferred stock in the private company. These investors were very similar to the profile of typical investors in private firms that we described earlier. Angel investors purchased the Series B stock. The investors in Series C and D stock were primarily venture capital funds. Microsoft purchased the Series E stock as a corporate investor.

### Exiting an Investment in a Private Company

Over time, the value of a share of RealNetworks' stock and the size of its funding rounds increased. Because investors in Series E were willing to pay $8.99 for a share of preferred stock with essentially equivalent rights in July 1997, the valuation of existing preferred stock had increased significantly, representing a substantial capital gain for early investors. Because RealNetworks was still a private company, however, investors could not liquidate their investment by selling their stock in the public stock markets.

An important consideration for investors in private companies is their **exit strategy**—how they will eventually realize the return from their investment. Investors exit in two main ways: through an acquisition or through a public offering. Often, large corporations purchase successful start-up companies. In such a case, the acquiring company purchases the outstanding stock of the private company, allowing all investors to cash out. Roughly 88% of venture capital exits from 2002–2012 occurred through mergers or acquisitions with typical deal sizes in the range of $100 million to $150 million.[3]

The alternative way to provide liquidity to its investors is for the company to become a publicly traded company, which we discuss next.

<div style="color:maroon">CONCEPT CHECK</div>

1. What are the main sources of funding for private companies to raise outside equity capital?
2. What is a venture capital firm?

## 23.2    The Initial Public Offering

The process of selling stock to the public for the first time is called an **initial public offering (IPO)**. In this section, we look at the mechanics of IPOs and discuss some related puzzles.

### Advantages and Disadvantages of Going Public

The two advantages of going public are greater liquidity and better access to capital. By going public, companies give their private equity investors the ability to diversify. In addition, public companies typically have access to much larger amounts of capital through the public markets, both in the initial public offering and in subsequent offerings. For example, Table 23.3 shows the largest U.S. IPOs with proceeds in excess of $5 billion (as of Fall 2012). Of course, most IPOs are smaller, with a median size of $150 million in 2011. In RealNetworks' case, its last round of private equity funding raised about $30 million in July 1997. The firm raised $43 million when it went public in November of the same year; less than two years later, it raised an additional $267 million by selling more stock to the public. Thus, as a public company, RealNetworks was able to raise substantially more money than it did as a private firm.

The major advantage of undertaking an IPO is also one of the major disadvantages of an IPO: When investors diversify their holdings, the equity holders of the corporation

---

[3]The National Venture Capital Association.

become more widely dispersed. This lack of ownership concentration undermines investors' ability to monitor the company's management, and investors may discount the price they are willing to pay to reflect the loss of control. Moreover, several high-profile corporate scandals during the early part of the twenty-first century prompted tougher regulations designed to address corporate abuses. Organizations such as the Securities and Exchange Commission (SEC), the securities exchanges (including the New York Stock Exchange and the NASDAQ), and Congress (through the Sarbanes-Oxley Act of 2002 and other legislation) adopted new standards that focused on more thorough financial disclosure, greater accountability, and more stringent requirements for the board of directors. These standards, in general, were designed to provide better protection for investors. However, compliance with the new standards is costly and time-consuming for public companies.

## Types of Offerings

After deciding to go public, managers of the company work with an **underwriter**, an investment banking firm that manages the offering and designs its structure. Choices include the type of shares to be sold and the mechanism the financial advisor will use to sell the stock.

**Primary and Secondary Offerings.**  At an IPO, a firm offers a large block of shares for sale to the public for the first time. The shares that are sold in the IPO may either be new shares that raise new capital, known as a **primary offering**, or existing shares that are sold by current shareholders (as part of their exit strategy), known as a **secondary offering**.

**Best-Efforts, Firm Commitment, and Auction IPOs.**  For smaller IPOs, the underwriter commonly accepts the deal on a **best-efforts IPO** basis. In this case, the underwriter does not guarantee that the stock will be sold, but instead tries to sell the stock for the best possible price. Often, such deals have an all-or-none clause: either all of the shares are sold in the IPO, or the deal is called off.

   More commonly, an underwriter and an issuing firm agree to a **firm commitment IPO**, in which the underwriter guarantees that it will sell all of the stock at the offer price. The underwriter purchases the entire issue (at a slightly lower price than the offer price) and then resells it at the offer price. If the entire issue does not sell out, the underwriter is on

| TABLE 23.3 | Largest U.S. IPOs | | | | |
|---|---|---|---|---|---|
| **Company Name** | **Offer Date** | **Exchange** | **Industry** | **Underwriter** | **Deal Size (in $ million)** |
| Visa | 3/18/2008 | NYSE | Financial | J.P. Morgan | $17,864 |
| Enel SpA | 11/1/1999 | NYSE | Utilities | Merrill Lynch | $16,452 |
| Facebook | 5/17/2012 | NASDAQ | Internet Services | Morgan Stanley | $16,007 |
| General Motors | 11/17/2010 | NYSE | Autos | Morgan Stanley | $15,774 |
| Deutsche Telekom | 11/17/1996 | NYSE | Telecom | Goldman Sachs | $13,034 |
| AT&T Wireless Group | 4/26/2000 | NYSE | Telecom | Goldman Sachs | $10,620 |
| Kraft Foods | 6/12/2001 | NYSE | Packaged Foods | Credit Suisse | $8,680 |
| France Telecom | 10/17/1997 | NYSE | Telecom | Merrill Lynch | $7,289 |
| Telstra Corporation | 11/17/1997 | NYSE | Telecom | Credit Suisse | $5,646 |
| Swisscom | 10/4/1998 | NYSE | Telecom | Warburg Dillon Read | $5,582 |
| United Parcel Service | 11/9/1999 | NYSE | Air Freight | Morgan Stanley | $5,470 |
| Infineon | 3/12/2000 | NYSE | Semiconductors | Goldman Sachs | $5,230 |

*Source*: Renaissance Capital IPO Home

814        **Chapter 23** Raising Equity Capital

the hook: The remaining shares must be sold at a lower price and the underwriter must take the loss. The most notorious loss in the industry happened when the British government privatized British Petroleum. In a highly unusual deal, the company was taken public gradually. The British government sold its final stake in British Petroleum at the time of the October 1987 stock market crash. The offer price was set just before the crash, but the offering occurred after the crash.[4] At the end of the first day's trading, the underwriters were facing a loss of $1.29 billion. The price then fell even further, until the Kuwaiti Investment Office stepped in and purchased a large stake in the company.

In the late 1990s, the investment banking firm of WR Hambrecht and Company attempted to change the IPO process by selling new issues directly to the public using an online **auction IPO** mechanism called OpenIPO. Rather than setting the price itself in the traditional way, Hambrecht lets the market determine the price of the stock by auctioning off the company.[5] Investors place bids over a set period of time. An auction IPO then sets the highest price such that the number of bids at or above that price equals the number of offered shares. All winning bidders pay this price, even if their bid was higher. The first OpenIPO was the $11.55 million IPO for Ravenswood Winery, completed in 1999.

---

EXAMPLE 23.2     **Auction IPO Pricing**

**Problem**

Fleming Educational Software, Inc., is selling 500,000 shares of stock in an auction IPO. At the end of the bidding period, Fleming's investment bank has received the following bids:

| Price ($) | Number of Shares Bid |
|---|---|
| 8.00 | 25,000 |
| 7.75 | 100,000 |
| 7.50 | 75,000 |
| 7.25 | 150,000 |
| 7.00 | 150,000 |
| 6.75 | 275,000 |
| 6.50 | 125,000 |

What will the offer price of the shares be?

**Solution**

First, we compute the total number of shares demanded at or above any given price:

| Price ($) | Cumulative Demand |
|---|---|
| 8.00 | 25,000 |
| 7.75 | 125,000 |
| 7.50 | 200,000 |
| 7.25 | 350,000 |
| 7.00 | 500,000 |
| 6.75 | 775,000 |
| 6.50 | 900,000 |

For example, the company has received bids for a total of 125,000 shares at $7.75 per share or higher (25,000 + 100,000 = 125,000).

---

[4]This deal was exceptional in that the offer price was determined more than a week before the issue date. In the United States, the underwriter usually sets the final offer price within a day of the IPO date.
[5]You can find details about Hambrecht's auction IPO process at http://www.openipo.com.

> Fleming is offering a total of 500,000 shares. The winning auction price would be $7 per share, because investors have placed orders for a total of 500,000 shares at a price of $7 or higher. All investors who placed bids of at least this price will be able to buy the stock for $7 per share, even if their initial bid was higher.
>
> In this example, the cumulative demand at the winning price exactly equals the supply. If total demand at this price were greater than the supply, all auction participants who bid prices higher than the winning price would receive their full bid (at the winning price). Shares would be awarded on a pro rata basis to bidders who bid exactly the winning price.

In 2004, Google went public using the auction mechanism, generating substantial interest in this alternative. In May 2005, Morningstar raised $140 million in its IPO using a Hambrecht OpenIPO auction.[6] But although the auction IPO mechanism seems to represent a viable alternative to traditional IPO procedures, it has not been widely adopted either in the United States or abroad. After completing fewer than 30 transactions between 1999 and 2008, Hambrecht has not completed another auction IPO since.

### The Mechanics of an IPO

The traditional IPO process follows a standardized form. In this section, we explore the steps that underwriters go through during an IPO.

**Underwriters and the Syndicate.** Many IPOs, especially the larger offerings, are managed by a group of underwriters. The **lead underwriter** is the primary banking firm responsible for managing the deal. The lead underwriter provides most of the advice and

---

#### Google's IPO

On April 29, 2004, Google, Inc., announced plans to go public. Breaking with tradition, Google startled Wall Street by declaring its intention to rely heavily on the auction IPO mechanism for distributing its shares. Google had been profitable since 2001, so, according to Google executives, access to capital was not the only motive to go public. The company also wanted to provide employees and private equity investors with liquidity.

One of the major attractions of the auction mechanism was the possibility of allocating shares to more individual investors. Google also hoped to discourage short-term speculation by letting market bidders set the IPO price. After the Internet stock market boom, there were many lawsuits related to the way underwriters allocated shares. Google hoped to avoid the allocation scandals by letting the auction allocate shares.

Investors who wanted to bid opened a brokerage account with one of the deal's underwriters and then placed their bids with the brokerage house. Google and its underwriters identified the highest bid that allowed the company to sell all of the shares being offered. They also had the flexibility to choose to offer shares at a lower price.

On August 18, 2004, Google sold 19.6 million shares at $85 per share. At the time, the $1.67 billion raised was easily the largest auction IPO ever in the United States. Google stock (ticker: GOOG) opened trading on the NASDAQ market the next day at $100 per share. Although the Google IPO sometimes stumbled along the way, it represented the most significant example of the use of the auction mechanism as an alternative to the traditional IPO mechanism.

*Sources*: K. Delaney and R. Sidel, "Google IPO Aims to Change the Rules," *The Wall Street Journal*, April 30, 2004, p. C1; R. Simon and E. Weinstein, "Investors Eagerly Anticipate Google's IPO," *The Wall Street Journal*, April 30, 2004, p. C1; and G. Zuckerman, "Google Shares Prove Big Winners—for a Day," August 20, 2004, p. C1.

---

[6]For a comparison of auction and traditional IPOs see A. Sherman, "Global Trends in IPO Methods: Book Building versus Auctions with Endogenous Entry," *Journal of Financial Economics* 78(3) (2005): 615–649.

| TABLE 23.4 | Global IPO Offerings by U.S. Issuers, Ranked by 2011 Proceeds | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | | |
| Manager | Proceeds ($ billion) | Market Share | No. of Issues | Proceeds ($ billion) | 2010 Rank | Market Share | No. of Issues |
| Goldman Sachs | $11.3 | 6.7% | 54 | $17.7 | 3 | 6.7% | 72 |
| Morgan Stanley | 10.1 | 6.0% | 67 | 23.0 | 1 | 8.2% | 100 |
| Deutsche Bank | 9.0 | 5.4% | 56 | 15.0 | 5 | 5.3% | 61 |
| Citi | 8.7 | 5.2% | 54 | 10.6 | 8 | 3.8% | 49 |
| Credit Suisse | 8.5 | 5.1% | 51 | 14.8 | 6 | 5.3% | 76 |
| JPMorgan | 8.2 | 4.9% | 59 | 18.6 | 2 | 6.6% | 94 |
| Bank of America Merrill Lynch | 7.5 | 4.5% | 44 | 15.4 | 4 | 5.5% | 58 |
| Barclays Capital | 5.7 | 3.4% | 33 | 6.1 | 12 | 2.2% | 26 |
| UBS | 4.7 | 2.8% | 36 | 11.0 | 7 | 3.9% | 64 |
| Ping An Securities Co Ltd | 4.5 | 2.7% | 33 | 5.3 | 13 | 1.9% | 40 |
| Top 10 Totals | $78.2 | 46.7% | 244* | $137.7 | | 49.4% | 334* |
| Industry Totals | 168.1 | 100.0% | 1285 | 281.1 | | 100.0% | 1484 |

*Source*: *The Wall Street Journal Year End Review of Markets and Finance*, 12/30/11

*Total issues is less than the sum of individual totals as there are often multiple managers for the same issue.

arranges for a group of other underwriters, called the **syndicate**, to help market and sell the issue. Table 23.4 shows the underwriters who were responsible for the largest number of IPOs in the United States during 2011. As you can see, the major investment and commercial banks dominate the underwriting business, with the top 10 firms capturing about one-half of the total market. The data for 2010–2011 also reveal a strong turn around from 2008, when the aggregate number of issues was a paltry 29, with only $26 billion raised.

Underwriters market the IPO, and they help the company with all the necessary filings. More importantly, they actively participate in determining the offer price. In many cases, the underwriter will also commit to making a market in the stock after the issue, thereby guaranteeing that the stock will be liquid.

**SEC Filings.** The SEC requires that companies prepare a **registration statement**, a legal document that provides financial and other information about the company to investors, prior to an IPO. Company managers work closely with the underwriters to prepare this registration statement and submit it to the SEC. Part of the registration statement, called the **preliminary prospectus** or **red herring**, circulates to investors before the stock is offered.

The SEC reviews the registration statement to make sure that the company has disclosed all of the information necessary for investors to decide whether to purchase the stock. Once the company has satisfied the SEC's disclosure requirements, the SEC approves the stock for sale to the general public. The company prepares the final registration statement and **final prospectus** containing all the details of the IPO, including the number of shares offered and the offer price.[7]

To illustrate this process, let's return to RealNetworks. Figure 23.3 shows the cover page for the final prospectus for RealNetworks' IPO. This cover page includes the name of the

---

[7]Registration statements may be found at EDGAR, the SEC Web site providing registration information to investors: http://www.sec.gov/edgar/searchedgar/webusers.htm.



**FIGURE 23.3**

**The Cover Page of RealNetworks' IPO Prospectus**

The cover page includes the name of the company, a list of underwriters, and summary information about the pricing of the deal.

*Source*: Courtesy RealNetworks, Inc.

company, the list of underwriters (with the lead underwriter shown first) and summary information about the pricing of the deal. The offering was a primary offering of 3 million shares.

**Valuation.**  Before the offer price is set, the underwriters work closely with the company to come up with a price range that they believe provides a reasonable valuation for the firm using the techniques described in Chapter 9. As we pointed out in that chapter, there are two ways to value a company: estimate the future cash flows and compute the present value, or estimate the value by examining comparable companies. Most underwriters use both techniques. However, when these techniques give substantially different answers, they often rely on comparables based on recent IPOs.

818    **Chapter 23**  Raising Equity Capital

Once an initial price range is established, the underwriters try to determine what the market thinks of the valuation. They begin by arranging a **road show**, in which senior management and the lead underwriters travel around the country (and sometimes around the world) promoting the company and explaining their rationale for the offer price to the underwriters' largest customers—mainly institutional investors such as mutual funds and pension funds.

| EXAMPLE 23.3 | **Valuing an IPO Using Comparables** |

**Problem**

Wagner, Inc. is a private company that designs, manufactures, and distributes branded consumer products. During the most recent fiscal year, Wagner had revenues of $325 million and earnings of $15 million. Wagner has filed a registration statement with the SEC for its IPO. Before the stock is offered, Wagner's investment bankers would like to estimate the value of the company using comparable companies. The investment bankers have assembled the following information based on data for other companies in the same industry that have recently gone public. In each case, the ratios are based on the IPO price.

| Company | Price/Earnings | Price/Revenues |
|---|---|---|
| Ray Products Corp. | 18.8× | 1.2× |
| Byce-Frasier, Inc. | 19.5× | 0.9× |
| Fashion Industries Group | 24.1× | 0.8× |
| Recreation International | 22.4× | 0.7× |
| Mean | 21.2× | 0.9× |

After the IPO, Wagner will have 20 million shares outstanding. Estimate the IPO price for Wagner using the price/earnings ratio and the price/revenues ratio.

**Solution**

If the IPO price of Wagner is based on a price/earnings ratio that is similar to those for recent IPOs, then this ratio will equal the mean of recent deals, or 21.2. Given earnings of $15 million, the total market value of Wagner's stock will be ($15 million)(21.2) = $318 million. With 20 million shares outstanding, the price per share should be $15.90.

Similarly, if Wagner's IPO price implies a price/revenues ratio equal to the recent average of 0.9, then using its revenues of $325 million, the total market value of Wagner will be ($325 million)(0.9) = $292.5 million, or ($292.5 million/20) = $14.63 per share.

Based on these estimates, the underwriters will probably establish an initial price range for Wagner stock of $13 to $17 per share to take on the road show.

At the end of the road show, customers inform the underwriters of their interest by telling the underwriters how many shares they may want to purchase. Although these commitments are nonbinding, the underwriters' customers value their long-term relationships with the underwriters, so they rarely go back on their word. The underwriters then add up the total demand and adjust the price until it is unlikely that the issue will fail. This process for coming up with the offer price based on customers' expressions of interest is called **book building**.

Because no offer price is set in an auction IPO, book building is not as important in that venue as it is in traditional IPOs. Ravi Jagannathan and Ann Sherman examined why auctions have failed to become a popular IPO method and have been plagued by inaccurate pricing and poor aftermarket performance. They suggest that, since auctions do not use the

book-building process which aids in price discovery, investors are discouraged from participating in auctions.[8]

**Pricing the Deal and Managing Risk.** In the RealNetworks' IPO, the final offer price was $12.50 per share.[9] Also, the company agreed to pay the underwriters a fee, called an **underwriting spread**, of $0.875 per share—exactly 7% of the issue price. Because this was a firm commitment deal, the underwriters bought the stock from RealNetworks for $12.50 − $0.875 = $11.625 per share and then resold it to their customers for $12.50 per share.

Recall that when an underwriter provides a firm commitment, it is potentially exposing itself to the risk that the banking firm might have to sell the shares at less than the offer price and take a loss. However, according to Tim Loughran and Jay Ritter, between 1990 and 1998, just 9% of U.S. IPOs experienced a fall in share price on the first day.[10] For another 16% of firms, the price at the end of the first day was the same as the offer price. Therefore, the vast majority of IPOs experienced a price increase on the first day of trading, indicating that the initial offer price was generally lower than the price that stock market investors were willing to pay.

Underwriters appear to use the information they acquire during the book-building stage to intentionally underprice the IPO, thereby reducing their exposure to losses. Furthermore, once the issue price (or offer price) is set, underwriters may invoke another mechanism to protect themselves against a loss—the **over-allotment allocation**, or **greenshoe provision**.[11] This option allows the underwriter to issue more stock, amounting to 15% of the original offer size, at the IPO offer price. Look at footnote 4 on the front page of the RealNetworks' prospectus in Figure 23.3. This footnote is a greenshoe provision.

Let's illustrate how underwriters use the greenshoe provision to protect themselves against a loss and thereby manage risk. The RealNetworks' prospectus specified that 3 million shares would be offered at $12.50 per share. In addition, the greenshoe provision allowed for the issue of an additional 450,000 shares at $12.50 per share. Underwriters initially market both the initial and the greenshoe allotment—in RealNetworks' case, the $12.50 per share price is set so that all 3.45 million shares are expected to sell—and thereby "short sell" the greenshoe allotment. Then, if the issue is a success, the underwriter exercises the greenshoe option, covering its short position. If the issue is not a success and its price falls, the underwriter covers the short position by repurchasing the greenshoe allotment (450,000 shares in the RealNetworks' IPO) in the aftermarket, thereby supporting the price.[12]

Once the IPO process is complete, the company's shares trade publicly on an exchange. The lead underwriter usually makes a market in the stock and assigns an analyst to cover it. By doing so, the underwriter increases the liquidity of the stock in the secondary market.

---

[8]"Why Do IPO Auctions Fail?," NBER working paper 12151, March 2006.

[9]Stock prices for RealNetworks throughout this chapter have not been adjusted for stock splits. (RealNetworks split 2:1 in 1999 and again in 2000, followed by a 1:4 reverse split in 2011.)

[10]"Why Don't Issuers Get Upset About Leaving Money on the Table in IPOs?" *Review of Financial Studies* 15(2) (2002): 413–443.

[11]The name derives from the Green Shoe Company, the first issuer to have an over-allotment option in its IPO.

[12]R. Aggarwal, "Stabilization Activities by Underwriters After IPOs," *Journal of Finance* 55(3) (2000): 1075–1103, finds that underwriters initially oversell by an average of 10.75% and then cover themselves if necessary using the greenshoe option.

This service is of value to both the issuing company and the underwriter's customers. A liquid market ensures that investors who purchased shares via the IPO are able to easily trade those shares. If the stock is actively traded, the issuer will have continued access to the equity markets in the event that the company decides to issue more shares in a new offering. In most cases, the preexisting shareholders are subject to a 180-day **lockup**; they cannot sell their shares for 180 days after the IPO. Once the lockup period expires, they are free to sell their shares.

<table>
<tr><td>CONCEPT CHECK</td><td>1. What are some advantages and disadvantages of going public?<br>2. Explain the mechanics of an auction IPO.</td></tr>
</table>

## 23.3  IPO Puzzles

Four characteristics of IPOs puzzle financial economists and are relevant for the financial manager:

1. On average, IPOs appear to be underpriced: The price at the end of trading on the first day is often substantially higher than the IPO price.
2. The number of issues is highly cyclical: When times are good, the market is flooded with new issues; when times are bad, the number of issues dries up.
3. The costs of an IPO are very high, and it is unclear why firms willingly incur them.
4. The long-run performance of a newly public company (three to five years from the date of issue) is poor. That is, on average, a three- to five-year buy and hold strategy appears to be a bad investment.

We will now examine each of these puzzles that financial economists seek to understand.

### Underpricing

Generally, underwriters set the issue price so that the average first-day return is positive. For RealNetworks, the underwriters offered the stock at an IPO price of $12.50 per share on November 21, 1997. RealNetworks' stock opened trading on the NASDAQ market at a price of $19.375 per share, and it closed at the end of its first trading day at $17.875. Such performance is not atypical. On average, between 1960 and 2011, the price in the U.S. aftermarket was 17% higher at the end of the first day of trading. As is evident in Figure 23.4, the one-day average return for IPOs has historically been very large around the world.

Who benefits from the underpricing? We have already explained how the underwriters benefit by controlling their risk. Of course, investors who are able to buy stock from underwriters at the IPO price also gain from the first-day underpricing. Who bears the cost? The pre-IPO shareholders of the issuing firms. In effect, these owners are selling stock in their firm for less than they could get in the aftermarket.

So why do shareholders of issuing firms put up with this underpricing? A naive view is that they have no choice because a relatively small number of underwriters controls the market. In fact, this is unlikely to be the explanation. The industry, at least anecdotally, appears to be highly competitive. In addition, entrants offering cheaper alternatives to the traditional underwriting process, like WR Hambrecht, have not been very successful at gaining significant market share.

| FIGURE 23.4 | International Comparison of First-Day IPO Returns |
|---|---|



The bars show the average initial returns from the offer price to the first closing market price. For China, the bar shows the average initial return on A share IPOs, available only to residents of China. The dates indicate the sample period for each country.

*Source*: Adapted courtesy of Jay Ritter (http://bear.warrington.ufl.edu/ritter/)

Given the existence of underpricing, it might appear that investing in new IPOs would be a very lucrative deal. If the average one-day return is 17%, and you could invest in a new IPO at the beginning of every working day and sell your shares at the end of the day for 250 business days per year, your cumulative annual return would be $(1.17)^{250} - 1 = 11{,}129{,}238{,}168{,}937{,}200{,}000\%$. Why don't all investors do this?

The preceding calculation assumes that each day you can invest all of the proceeds of the previous day's investment. However, when an IPO goes well, the demand for the stock exceeds the supply. (This is another way of saying that the stock is underpriced.) Thus, the allocation of shares for each investor is rationed. Conversely, when an IPO does not go well, demand at the issue price is weak, so all initial orders are filled completely. In this scenario, if you followed the strategy of reinvesting whatever you made on the last IPO in the next one, your orders would be completely filled when the stock price goes down, but you would be rationed when it goes up. This is a form of adverse selection referred to as the **winner's curse**: You "win" (get all the shares you requested) when demand for the shares by others is low, and the IPO is more likely to perform poorly. This effect may be substantial enough so that the strategy of investing in every IPO does not even yield above-market returns, never mind the stratospheric number calculated above.[13] Furthermore, this effect implies that it may be necessary for the underwriter to underprice its issues on average in order for less informed investors to be willing to participate in IPOs, as the following example demonstrates.

| EXAMPLE 23.4 | **IPO Investors and the Winner's Curse** |
|---|---|

**Problem**

Thompson Brothers, a large underwriter, is offering its customers the following opportunity: Thompson will guarantee a piece of every IPO it is involved in. Suppose you are a customer. On each deal you must commit to buying 2000 shares. If the shares are available, you get them. If the deal is oversubscribed, your allocation of shares is rationed in proportion to the oversubscription. Your market research shows that typically 80% of the time Thompson's deals are oversubscribed 16 to 1 (there are 16 orders for every 1 order that can be filled), and this excess demand leads to a price increase on the first day of 20%. However, 20% of the time Thompson's deals are not oversubscribed, and while Thompson supports the price in the market (by not exercising the greenshoe provision and instead buying back shares), on average the price tends to decline by 5% on the first day. Based on these statistics, what is the average underpricing of a Thompson IPO? What is your average return as an investor?

**Solution**

First, note that the average first-day return for Thompson Brothers deals is large: $0.8(20\%) + 0.2(-5\%) = 15\%$. If Thompson had one IPO per month, after a year you would earn an annual return of $1.15^{12} - 1 = 435\%$!

In reality, you cannot earn this return. For successful IPOs you will earn a 20% return, but you will only receive $2000/16 = 125$ shares. Assuming an average IPO price of $15 per share, your profit is

$$\$15/\text{share} \times (125 \text{ shares}) \times (20\% \text{ return}) = \$375$$

---

[13]This explanation was first proposed by K. Rock: "Why New Issues Are Underpriced," *Journal of Financial Economics* 15(2) (1986): 197–212. See also M. Levis, "The Winner's Curse Problem, Interest Costs and the Underpricing of Initial Public Offerings," *Economic Journal* 100 (1990): 76–89.

For unsuccessful IPOs you will receive your full allocation of 2000 shares. Because these stocks tend to fall by 5%, your profit is

$$\$15/\text{share} \times (2000 \text{ shares}) \times (-5\% \text{ return}) = -\$1500$$

Because 80% of Thompson's IPOs are successful, your average profit is therefore

$$0.80(\$375) + 0.20(-\$1500) = \$0$$

That is, on average you are just breaking even! As this example shows, even though the average IPO may be profitable, because you receive a higher allocation of the less successful IPOs, your average return may be much lower. Also, if Thompson's average underpricing were less than 15%, uninformed investors would lose money and be unwilling to participate in its IPOs.

## Cyclicality

Figure 23.5 shows the number and dollar volume of IPOs by year from 1975 to 2011. As the figure makes clear, the dollar volume of IPOs reached a peak in 1999–2000. An even more important feature of the data is the clear cycle pattern in the volume and number of issues. Sometimes, such as in 2000, the volume of IPOs is unprecedented by historical standards; yet, within a year or two, the volume of IPOs may decrease significantly. This cyclicality by itself is not particularly surprising. We would expect there to be a greater need for capital in times with more growth opportunities than in times with fewer growth

**FIGURE 23.5**    **Cyclicality of Initial Public Offerings in the United States**



The graph shows the number of IPOs and the annual cumulative dollar volume of shares offered. The number and volume of IPOs reached a peak in the late 1990s and is highly cyclical.

*Source*: Adapted courtesy of Jay R. Ritter from "Initial Public Offerings: Tables Updated through 2011" (http://bear.warrington.ufl.edu/ritter/).

### GLOBAL FINANCIAL CRISIS    Worldwide IPO Deals in 2008–2009

The drop in IPO issues during the 2008 financial crisis was both global and dramatic. The figure below shows the total worldwide dollar volume of IPO proceeds in billions of dollars (blue bars) and number of deals (red line) by quarter, from the last quarter of 2006 to the first quarter of 2009. Comparing the fourth quarter of 2007 (a record quarter for IPO issues) to the fourth quarter of 2008, dollar volume dropped a stunning 97% from $102 billion to just $3 billion. Things got even worse in the first quarter of 2009 with just $1.4 billion raised. The market for IPOs essentially dried up altogether.

During the 2008 financial crisis, IPO markets were not the only equity issue markets that saw a collapse in volume. Markets for seasoned equity offerings and leveraged buyouts also collapsed. The extreme market uncertainty at the time created a "flight to quality." Investors, wary of taking risk, sought to move their capital into risk-free investments like U.S. Treasury securities. The result was a crash in existing equity prices and a greatly reduced supply of new capital to risky asset classes.



*Source*: Shifting Landscape—Are You Ready? Global IPO Trends report 2009, Ernst & Young

opportunities. What is surprising is the magnitude of the swings. It is very difficult to believe that the availability of growth opportunities and the need for capital changed so drastically between 2000 and 2003 as to cause a decline of more than 75% in the dollar volume of new issues. It appears that the number of IPOs is not solely driven by the demand for capital. Sometimes firms and investors seem to favor IPOs; at other times firms appear to rely on alternative sources of capital and financial economists are not sure why.

### Cost of an IPO

A typical spread—that is, the discount below the issue price at which the underwriter purchases the shares from the issuing firm—is 7% of the issue price. For an issue size of $50 million, this amounts to $3.5 million. By most standards, this fee is large, especially considering the additional cost to the firm associated with underpricing. As Figure 23.6 shows, compared to other security issues, the total cost of issuing stock for the first time is substantially larger than the costs for other securities.

Even more puzzling is the seeming lack of sensitivity of fees to issue size. Although a large issue requires some additional effort, one would not expect the increased effort to be rewarded as lucratively. For example, Hsuan-Chi Chen and Jay Ritter found that almost all issues ranging in size from $20 million to $80 million paid fees of about 7%.[14] It is

---

[14]"The Seven Percent Solution," *Journal of Finance* 55(3) (2000): 1105–1131.



**FIGURE 23.6**

**Relative Costs of Issuing Securities**

This figure shows the total direct costs (all underwriting, legal, and auditing costs) of issuing securities as a percentage of the amount of money raised. The figure reports results for IPOs, seasoned equity offerings, convertible bonds, and straight bonds, for issues of different sizes from 1990–1994.

*Source*: Adapted from I. Lee, S. Lochhead, J. Ritter, and Q. Zhao, "The Costs of Raising Capital," *Journal of Financial Research* 19(1) (1996): 59–74.

difficult to understand how a $20 million issue can be profitably done for "only" $1.4 million, while an $80 million issue requires paying fees of $5.6 million.

No researcher has provided a satisfactory answer to this puzzle. Chen and Ritter argue for implicit collusion by the underwriters, but in response to their paper Robert Hansen finds no evidence of any such collusion.[15] He shows that there is low underwriting industry concentration, that there have been significant new entrants in the IPO-underwriting market, and that a 7% spread is less profitable than normal investment banking activities.

One possible explanation is that by attempting to undercut its rivals, an underwriter may risk signaling that it is not the same quality as its higher-priced competitors, making firms less likely to select that underwriter. Craig Dunbar examined this hypothesis.[16] He found that underwriters charging slightly lower fees appear to enjoy a greater market share, but those charging significantly lower fees have smaller market shares. Indeed, in support of the idea that the quality of the underwriter is important, underwriters that charge very high fees gain market share.

## Long-Run Underperformance

We know that the shares of IPOs generally perform very well immediately following the public offering. It is perhaps surprising, then, that Jay Ritter found that newly listed firms subsequently appear to perform relatively poorly over the following three to five years after

---

[15]"Do Investment Banks Compete in IPOs?: The Advent of the '7% Plus Contract,'" *Journal of Financial Economics* 59(3) (2001): 313–346.

[16]"Factors Affecting Investment Banks Initial Public Offering Market Share," *Journal of Financial Economics* 55(1) (2000): 3–41.

their IPOs.[17] In follow-up studies, Alon Brav, Christopher Geczy, and Paul Gompers found that IPOs between 1975 and 1992 underperformed by an average of 44% relative to the S&P 500 over the subsequent five years.[18] Jay Ritter and Ivo Welch found that IPOs between 1980 and 2001 underperformed the market by an average of 23.4% during the subsequent three years.[19]

As we will see in the next section, underperformance is not unique to an initial public issuance of equity: It is associated with subsequent issuances as well, raising the possibility that underperformance might not result from the issue of equity itself, but rather from the conditions that motivated the equity issuance in the first place. We will explain this idea in more detail in the next section after we explain how a public company issues additional equity.

**CONCEPT CHECK**

1. List and discuss four characteristics about IPOs that financial economists find puzzling.

2. What is a possible explanation for IPO underpricing?

## 23.4  The Seasoned Equity Offering

A firm's need for outside capital rarely ends at the IPO. Usually, profitable growth opportunities occur throughout the life of the firm, and in some cases it is not feasible to finance these opportunities out of retained earnings. Thus, more often than not, firms return to the equity markets and offer new shares for sale, a type of offering called a **seasoned equity offering (SEO)**.

### The Mechanics of an SEO

When a firm issues stock using an SEO, it follows many of the same steps as for an IPO. The main difference is that a market price for the stock already exists, so the price-setting process is not necessary.

RealNetworks has conducted several SEOs since its IPO in 1997. On June 17, 1999, the firm offered 4 million shares in an SEO at a price of $58 per share. Of these shares, 3,525,000 were **primary shares**—new shares issued by the company. The remaining 475,000 shares were **secondary shares**—shares sold by existing shareholders, including the company's founder, Robert Glaser, who sold 310,000 of his shares. Most of the rest of RealNetworks' SEOs occurred between 1999 and 2004 and included secondary shares sold by existing shareholders rather than directly by RealNetworks.

Historically, intermediaries would advertise the sale of stock (both IPOs and SEOs) by taking out advertisements in newspapers called **tombstones**. Through these ads, investors would know who to call to buy stock. Today, investors become informed about the impending sale of stock by the news media, from the Internet, via a road show, or through the book-building process, so these tombstones are purely ceremonial.

Two kinds of seasoned equity offerings exist: a cash offer and a rights offer. In a **cash offer**, the firm offers the new shares to investors at large. In a **rights offer**, the firm offers the new shares only to existing shareholders. In the United States, most offers are cash

[17]"The Long-Run Performance of Initial Public Offerings," *Journal of Finance* 46(1) (1991): 3–27.

[18]"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56 (2000): 209–249.

[19]"A Review of IPO Activity, Pricing, and Allocations," *Journal of Finance* 57(4) (2002): 1795–1828.

offers, but the same is not true internationally. For example, in the United Kingdom, most seasoned offerings of new shares are rights offers.

Rights offers protect existing shareholders from underpricing. To see how, suppose a company holds $100 in cash and has 50 shares outstanding. Each share is worth $2. The company announces a cash offer for 50 shares at $1 per share. Once this offer is complete, the company will have $150 in cash and 100 shares outstanding. The price per share is now $1.50 to reflect the fact that the new shares were sold at a discount. The new shareholders therefore receive a $0.50 windfall at the expense of the old shareholders.

The old shareholders would be protected if, instead of a cash offer, the company did a rights offer. In this case, rather than offer the new shares for general sale, every shareholder would have the right to purchase an additional share for $1 per share. If all shareholders chose to exercise their rights, then after the sale, the value of the company would be the same as with a cash offer: It would be worth $150 with 100 shares outstanding and a price of $1.50 per share. In this case, however, the $0.50 windfall accrues to existing shareholders, which exactly offsets the drop in the stock price. Thus, if a firm's management is concerned that its equity may be underpriced in the market, by using a rights offering the firm can continue to issue equity without imposing a loss on its current shareholders.

---

**EXAMPLE 23.5**

### Raising Money with Rights Offers

**Problem**

You are the CFO of a company that is currently worth $1 billion. The firm has 100 million shares outstanding, so the shares are trading at $10 per share. You need to raise $200 million and have announced a rights issue. Each existing shareholder is sent one right for every share he or she owns. You have not decided how many rights you will require to purchase a share of new stock. You will require either four rights to purchase one share at a price of $8 per share, or five rights to purchase two new shares at a price of $5 per share. Which approach will raise more money?

**Solution**

If all shareholders exercise their rights, then in the first case, 25 million new shares will be purchased at a price of $8 per share, raising $200 million. In the second case, 40 million new shares will be purchased at a price of $5 per share, also raising $200 million. If all shareholders exercise their rights, both approaches will raise the same amount of money.

In both cases, the value of the firm after the issue is $1.2 billion. In the first case, there are 125 million shares outstanding, so the price per share after the issue is $9.60. This price exceeds the issue price of $8, so the shareholders will exercise their rights. In the second case, the number of shares outstanding will grow to 140 million, resulting in a post-issue stock price of $1.2 billion for 140 million shares = $8.57 per share (also higher than the issue price). Again, the shareholders will exercise their rights. In both cases, the same amount of money is raised.

---

## Price Reaction

Researchers have found that, on average, the market greets the news of an SEO with a price decline. Often the value destroyed by the price decline can be a significant fraction of the new money raised. This price decline is consistent with the adverse selection we discussed in Chapter 16. Because a company concerned about protecting its existing shareholders will tend to sell only at a price that correctly values or overvalues the firm, investors infer from the decision to sell that the company is likely to be overvalued; hence, the price drops with the announcement of the SEO.

828    **Chapter 23** Raising Equity Capital

**FIGURE 23.7**

**Post-SEO Performance**

The figure plots the cumulative abnormal returns (realized alpha using the Fama-French-Carhart factor specification) for portfolios made up of seasoned equity offerings between 1976 and 1996. The long-run underperformance appears much more pronounced among smaller firms.

*Source*: Adapted from A. Brav, C. Geczy, and P. Gompers, "Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56 (2000): 209–249, Figure 3.



Although adverse selection is a plausible explanation for SEO price reaction, some puzzles remain unexplained. First, by offering a rights issue, a company can mitigate the adverse selection. It is not clear, then, at least in the United States, why companies do not initiate more rights issues. Second, as with IPOs, evidence suggests that companies underperform following a seasoned offering (see Figure 23.7). At first glance, this underperformance appears to suggest that the stock price decrease is not large enough, because underperformance implies that the price following the issue was too high.

A possible explanation for SEO subsequent underperformance, put forward by Murray Carlson, Adlai Fisher, and Ron Giammarino, is that this outcome might not have to do with the SEO announcement itself, but rather with the conditions that led the firm to choose an SEO.[20] The decision to raise financing externally usually implies that a firm plans to pursue an investment opportunity. As explained in Chapter 22, when a firm invests, it is exercising its growth options. Growth options are riskier than projects themselves, so upon exercise, the firm's beta decreases, which explains the post-SEO lower returns. Researchers have found empirical support for this hypothesis.[21]

---

[20]M. Carlson, A. Fisher, and R. Giammarino, "Corporate Investment and Asset Price Dynamics: Implications for the Cross-section of Returns," *Journal of Finance* 59(6) (2004): 2577–2603.

[21]A. Brav, C. Geczy, and P. Gompers (see footnote 18); B. E. Eckbo, R. Masulis, and O. Norli, "Seasoned Public Offerings: Resolution of the New Issues Puzzle," *Journal of Financial Economics* 56(2) (2000): 251–291; E. Lyandres, L. Sun, and L. Zhang, "The New Issues Puzzle: Testing the Investment-Based Explanation" *Review of Financial Studies* 21 (6) (2008): 2825–2855; and M. Carlson, A. Fisher, and R. Giammarino, "SEO Risk Dynamics," University of British Columbia working paper (2009).

### Issuance Costs

Although not as costly as IPOs, as Figure 23.6 shows, seasoned offerings are still expensive. Underwriting fees amount to 5% of the proceeds of the issue and, as with IPOs, the variation across issues of different sizes is relatively small. Furthermore, rights offers have lower costs than cash offers.[22] Given the other advantages of a rights offer, it is a puzzle why the majority of offers in the United States are cash offers. The one advantage of a cash offer is that the underwriter takes on a larger role and, therefore, can credibly certify the issue's quality. If there is a large amount of asymmetric information and a large proportion of existing shareholders are buying the offering anyway, the benefits of certification might overcome the cost difference. Espen Eckbo and Ronald Masulis have found empirical support for this hypothesis.[23]

**CONCEPT CHECK**

1. What is the difference between a cash offer and a rights offer for a seasoned equity offering?

2. What is the average stock price reaction to an SEO?

## MyFinanceLab

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 23.1 Equity Financing for Private Companies

- Private companies can raise outside equity capital from angel investors, venture capital firms, private equity firms, institutional investors, or corporate investors.
- When a company founder sells stock to an outsider to raise capital, the founder's ownership share and control over the company are reduced.
- Equity investments in private firms are often negotiated in terms of the pre-money valuation of the firm, which is the number of prior shares outstanding times the share price used in the funding round.
- Given the pre-money valuation and the amount invested:

$$\text{Post-money Valuation} = \text{Pre-money Valuation} + \text{Amount Invested} \qquad (23.1)$$

and the share of the firm held by new investors = amount invested/post-money valuation.
- Equity investors in private companies plan to sell their stock eventually through one of two main exit strategies: an acquisition or a public offering.

### 23.2 The Initial Public Offering

- An initial public offering (IPO) is the first time a company sells its stock to the public.
- The main advantages of going public are greater liquidity and better access to capital. Disadvantages include regulatory and financial reporting requirements and the undermining of the investors' ability to monitor the company's management.
- During an IPO, the shares sold may represent either a primary offering (if the shares are being sold to raise new capital) or a secondary offering (if the shares are sold by earlier investors).

---

[22]In the United Kingdom, M. Slovin, M. Sushka, and K. Lai [*Journal of Financial Economics* 57(2) (2000)] found that the average fee for a cash offer is 6.1% versus 4.6% for an underwritten rights offer.

[23]"Adverse Selection and the Rights Offer Paradox," *Journal of Financial Economics* 32 (1992): 293–332.

- Stock may be sold during an IPO on a best-efforts basis, as a firm commitment IPO, or using an auction IPO. The firm commitment process is the most common practice in the United States.
- An underwriter is an investment bank that manages the IPO process and helps the company sell its stock.
  - The lead underwriter is responsible for managing the IPO.
  - The lead underwriter forms a group of underwriters, called the syndicate, to help sell the stock.
- The SEC requires that a company file a registration statement prior to an IPO. The preliminary prospectus is part of the registration statement that circulates to investors before the stock is offered. After the deal is completed, the company files a final prospectus.
- Underwriters value a company before an IPO using valuation techniques and by book building.
- Underwriters face risk during an IPO. A greenshoe provision is one way underwriters manage the risk associated with IPOs.

### 23.3  IPO Puzzles

- Several puzzles are associated with IPOs.
  - IPOs are underpriced on average.
  - New issues are highly cyclical.
  - The transaction costs of an IPO are high.
  - Long-run performance after an IPO is poor on average.

### 23.4  The Seasoned Equity Offering

- A seasoned equity offering (SEO) is the sale of stock by a company that is already publicly traded.
- Two kinds of SEOs exist: a cash offer (when new shares are sold to investors at large) and a rights offer (when new shares are offered only to existing shareholders).
- The stock price reaction to an SEO is negative on average.

## Key Terms

angel investors *p. 807*
auction IPO *p. 814*
best-efforts IPO *p. 813*
book building *p. 818*
carried interest *p. 808*
cash offer *p. 826*
convertible preferred stock *p. 810*
corporate investor *p. 810*
corporate partner *p. 810*
exit strategy *p. 812*
final prospectus *p. 816*
firm commitment IPO *p. 813*
initial public offering (IPO) *p. 812*
lead underwriter *p. 815*
leveraged buyout (LBO) *p. 809*
lockup *p. 820*
over-allotment allocation
   (greenshoe provision) *p. 819*
post-money valuation *p. 811*
preferred stock *p. 810*

preliminary prospectus (red herring) *p. 816*
pre-money valuation *p. 811*
primary offering *p. 813*
primary shares *p. 826*
private equity firm *p. 809*
registration statement *p. 816*
rights offer *p. 826*
road show *p. 818*
seasoned equity offering (SEO) *p. 826*
secondary offering *p. 813*
secondary shares *p. 826*
strategic investor *p. 810*
strategic partner *p. 810*
syndicate *p. 816*
tombstone *p. 826*
underwriter *p. 813*
underwriting spread *p. 819*
venture capital firm *p. 807*
venture capitalists *p. 808*
winner's curse *p. 822*

## Further Reading

For more detailed coverage of the topics in this chapter, read one of the following survey articles on security issuance: B. E. Eckbo, R. Masulis, and O. Norli, "Security Offerings: A Survey," in B. E. Eckbo (ed.), *Handbook of Corporate Finance, Vol. 1: Empirical Corporate Finance* (Elsevier/North Holland, 2007); and J. Ritter, "Investment Banking and Securities Issuance," in G. Constantinides, M. Harris, and R. Stulz (eds.), *Handbook of the Economics of Finance* (North-Holland, 2012).

For more detailed coverage of specific topics, consult the following resources:

**Venture Capital**. P. Gompers, "Venture Capital," in B. E. Eckbo (ed.), *Handbook of Corporate Finance, Vol. 1: Empirical Corporate Finance* (Elsevier/North Holland, 2007); P. Gompers and L. Lerner, "The Venture Capital Revolution," *Journal of Economic Perspectives* 15(2) (2001): 145–168; and S. Kaplan and P. Stromberg, "Contract, Characteristics and Actions: Evidence from Venture Capitalist Analysis," *Journal of Finance* 59(5) (2004): 2177–2210.

**IPOs**. Jay Ritter's Web site (http://bear.warrington.ufl.edu/ritter/) contains a wealth of information and links to cutting-edge research on the subject of IPOs. Other references of interest include L. Benveniste and W. Wilhelm, "Initial Public Offerings: Going by the Book," *Journal of Applied Corporate Finance* 10(1) (1997): 98–108; F. Cornelli and D. Goldreich, "Bookbuilding and Strategic Allocation," *Journal of Finance* 56(6) (2001): 2337–2369; A. Ljungqvist, "IPO Underpricing," in B. E. Eckbo (ed.), *Handbook of Corporate Finance, Vol. 1: Empirical Corporate Finance* (Elsevier/North Holland, 2007); T. Jenkinson and A. Ljungqvist, *Going Public: The Theory and Evidence on How Companies Raise Equity Finance* (Oxford University Press, 2001); M. Lowry and G. W. Schwert, "IPO Market Cycles: Bubbles or Sequential Learning?" *Journal of Finance* 57(3) (2002): 1171–1200; M. Pagano, F. Panetta, and L. Zingales, "Why Do Companies Go Public? An Empirical Analysis," *Journal of Finance* 53(1) (1998): 27–64; L. Pastor and P. Veronesi, "Rational IPO Waves," *Journal of Finance* 60(4) (2005): 1713–1757; and I. Welch, "Seasoned Offerings, Imitation Costs and the Underpricing of Initial Public Offerings," *Journal of Finance* 44(2) (1989): 421–449.

**SEOs**. A. Brav, C. Geczy, and P. Gompers, "Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56(2) (2000): 209–249; J. Clarke, C. Dunbar, and K. Kahle, "Long-Run Performance and Insider Trading in Completed and Canceled Seasoned Equity Offerings," *Journal of Financial and Quantitative Analysis* 36(2) (2001): 415–430; and B. E. Eckbo and R. Masulis, "Seasoned Equity Offerings: A Survey." In R. Jarrow et al. (eds.), *Handbooks in Operations Research and Management Science*, 9th ed. (1995: 1017–1059).

**Costs of Raising Equity**. O. Altinkilic and R. Hansen, "Are There Economies of Scale in Underwriting Fees? Evidence of Rising External Financing Costs," *Review of Financial Studies* 13(1) (2000): 191–218.

## Problems

*All problems are available in MyFinanceLab.*

### Equity Financing for Private Companies

1. What are some of the alternative sources from which private companies can raise equity capital?

2. What are the advantages and the disadvantages to a private company of raising money from a corporate investor?

3. Starware Software was founded last year to develop software for gaming applications. Initially, the founder invested $800,000 and received 8 million shares of stock. Starware now needs to raise a second round of capital, and it has identified an interested venture capitalist. This venture capitalist will invest $1 million and wants to own 20% of the company after the investment is completed.
   a. How many shares must the venture capitalist receive to end up with 20% of the company? What is the implied price per share of this funding round?
   b. What will the value of the whole firm be after this investment (the post-money valuation)?

 **4.** Suppose venture capital firm GSB partners raised $100 million of committed capital. Each year over the 10-year life of the fund, 2% of this committed capital will be used to pay GSB's management fee. As is typical in the venture capital industry, GSB will only invest $80 million (committed capital less lifetime management fees). At the end of 10 years, the investments made by the fund are worth $400 million. GSB also charges 20% carried interest on the profits of the fund (net of management fees).

a. Assuming the $80 million in invested capital is invested immediately and all proceeds were received at the end of 10 years, what is the IRR of the investments GSB partners made? That is, compute IRR ignoring all management fees.

b. Of course, as an investor, or limited partner, you are more interested in your own IRR— that is, the IRR including all fees paid. Assuming that investors gave GSB partners the full $100 million up front, what is the IRR for GSB's limited partners (that is, the IRR net of *all* fees paid).

 **5.** Three years ago, you founded your own company. You invested $100,000 of your money and received 5 million shares of Series A preferred stock. Since then, your company has been through three additional rounds of financing.

| Round | Price ($) | Number of Shares |
|---|---|---|
| Series B | 0.50 | 1,000,000 |
| Series C | 2.00 | 500,000 |
| Series D | 4.00 | 500,000 |

a. What is the pre-money valuation for the Series D funding round?

b. What is the post-money valuation for the Series D funding round?

c. Assuming that you own only the Series A preferred stock (and that each share of all series of preferred stock is convertible into one share of common stock), what percentage of the firm do you own after the last funding round?

### The Initial Public Offering

**6.** What are the main advantages and disadvantages of going public?

**7.** Do underwriters face the most risk from a best-efforts IPO, a firm commitment IPO, or an auction IPO? Why?

**8.** Roundtree Software is going public using an auction IPO. The firm has received the following bids:

| Price ($) | Number of Shares |
|---|---|
| 14.00 | 100,000 |
| 13.80 | 200,000 |
| 13.60 | 500,000 |
| 13.40 | 1,000,000 |
| 13.20 | 1,200,000 |
| 13.00 | 800,000 |
| 12.80 | 400,000 |

Assuming Roundtree would like to sell 1.8 million shares in its IPO, what will the winning auction offer price be?

 **9.** Three years ago, you founded Outdoor Recreation, Inc., a retailer specializing in the sale of equipment and clothing for recreational activities such as camping, skiing, and hiking. So far, your company has gone through three funding rounds:

| Round | Date | Investor | Shares | Share Price ($) |
|-------|------|----------|--------|-----------------|
| Series A | Feb. 2009 | You | 500,000 | 1.00 |
| Series B | Aug. 2010 | Angels | 1,000,000 | 2.00 |
| Series C | Sept. 2011 | Venture capital | 2,000,000 | 3.50 |

Currently, it is 2012 and you need to raise additional capital to expand your business. You have decided to take your firm public through an IPO. You would like to issue an additional 6.5 million new shares through this IPO. Assuming that your firm successfully completes its IPO, you forecast that 2012 net income will be $7.5 million.

a. Your investment banker advises you that the prices of other recent IPOs have been set such that the P/E ratios based on 2012 forecasted earnings average 20.0. Assuming that your IPO is set at a price that implies a similar multiple, what will your IPO price per share be?

b. What percentage of the firm will you own after the IPO?

### IPO Puzzles

**10.** What is IPO underpricing? If you decide to try to buy shares in every IPO, will you necessarily make money from the underpricing?

**11.** Margoles Publishing recently completed its IPO. The stock was offered at a price of $14 per share. On the first day of trading, the stock closed at $19 per share. What was the initial return on Margoles? Who benefited from this underpricing? Who lost, and why?

**12.** Chen Brothers, Inc., sold 4 million shares in its IPO, at a price of $18.50 per share. Management negotiated a fee (the underwriting spread) of 7% on this transaction. What was the dollar cost of this fee?

**13.** Your firm has 10 million shares outstanding, and you are about to issue 5 million new shares in an IPO. The IPO price has been set at $20 per share, and the underwriting spread is 7%. The IPO is a big success with investors, and the share price rises to $50 the first day of trading.

a. How much did your firm raise from the IPO?

b. What is the market value of the firm after the IPO?

c. Assume that the post-IPO value of your firm is its fair market value. Suppose your firm could have issued shares directly to investors at their fair market value, in a perfect market with no underwriting spread and no underpricing. What would the share price have been in this case, if you raise the same amount as in part (a)?

d. Comparing part (b) and part (c), what is the total cost to the firm's original investors due to market imperfections from the IPO?

**14.** You have an arrangement with your broker to request 1000 shares of all available IPOs. Suppose that 10% of the time, the IPO is "very successful" and appreciates by 100% on the first day, 80% of the time it is "successful" and appreciates by 10%, and 10% of the time it "fails" and falls by 15%.

a. By what amount does the average IPO appreciate the first day; that is, what is the average IPO underpricing?

b. Suppose you expect to receive 50 shares when the IPO is very successful, 200 shares when it is successful, and 1000 shares when it fails. Assume the average IPO price is $15. What is your expected one-day return on your IPO investments?

834 **Chapter 23** Raising Equity Capital

### The Seasoned Equity Offering

15. On January 20, Metropolitan, Inc., sold 8 million shares of stock in an SEO. The current market price of Metropolitan at the time was $42.50 per share. Of the 8 million shares sold, 5 million shares were primary shares being sold by the company, and the remaining 3 million shares were being sold by the venture capital investors. Assume the underwriter charges 5% of the gross proceeds as an underwriting fee (which is shared proportionately between primary and secondary shares).
    a. How much money did Metropolitan raise?
    b. How much money did the venture capitalists receive?

16. What are the advantages to a company of selling stock in an SEO using a cash offer? What are the advantages of a rights offer?

17. MacKenzie Corporation currently has 10 million shares of stock outstanding at a price of $40 per share. The company would like to raise money and has announced a rights issue. Every existing shareholder will be sent one right per share of stock that he or she owns. The company plans to require five rights to purchase one share at a price of $40 per share.
    a. Assuming the rights issue is successful, how much money will it raise?
    b. What will the share price be after the rights issue? (Assume perfect capital markets.)
       Suppose instead that the firm changes the plan so that *each* right gives the holder the right to purchase one share at $8 per share.
    c. How much money will the new plan raise?
    d. What will the share price be after the rights issue?
    e. Which plan is better for the firm's shareholders? Which is more likely to raise the full amount of capital?

## Data Case

Few IPOs have garnered as much attention as social media giant Facebook's public offering on May 18, 2012. It was the biggest IPO in Internet history, easily topping Google's initial public offering eight years earlier. Let's take a closer look at the IPO itself, as well as the payoffs to some of Facebook's early investors.

1. Begin by navigating to the SEC EDGAR Web site, which provides access to company filings: http://www.sec.gov/edgar.shtml. Choose "Search for Company Filings" and pick search by company name. Enter "Facebook" and then search for its IPO prospectus, which was filed on the date of the IPO and is listed as filing "424B4" (this acronym derives from the rule number requiring the firm to file a prospectus, Rule 424(b)(4)). From the prospectus, calculate the following information:
    a. The underwriting spread in percentage terms. How does this spread compare to a typical IPO?
    b. The fraction of the offering that comprised primary shares and the fraction that comprised secondary shares.
    c. The size, in number of shares, of the greenshoe provision. What percent of the deal did the greenshoe provision represent?

2. Next, navigate to Google Finance and search for "Facebook." Determine the closing price of the stock on the day of the IPO (use the "Historical prices" link). What was the first day return? How does this return compare to the typical IPO?

3. Using the data provided by Google Finance, calculate the performance of Facebook in the three-month post-IPO period. That is, calculate the annualized return an investor would have received if he had invested in Facebook at the closing price on the IPO day and sold the stock three months later. What was the return for a one-year holding period?

4. Prior to the public offering, Facebook was able to raise capital from all the sources mentioned in the chapter. Let's concentrate on one particular source, Microsoft Corporation.

   a. Microsoft made one investment in Facebook, during October 2007. Go to Facebook's corporate news Web site (http://newsroom.fb.com) and locate the press release announcing this investment. Using the information in that press release and the number of shares owned by Microsoft listed in the IPO prospectus, calculate the per share price Microsoft paid.

   b. Calculate the return (expressed on an annual basis) Microsoft earned on its investment up to the IPO (using the IPO price).

   c. How much money did Microsoft receive from the IPO?

5. Facebook had only one angel investor, Peter Thiel (the founder of PayPal). Mr. Thiel invested more than once in Facebook, both as an angel and, in later rounds, on behalf of investors in his venture capital firm, Founders Fund. As an angel, Mr. Thiel invested $500,000 in September 2004. Assuming that all the shares he received in the angel round were registered under the name Rivendell One LLC,[24] use the information in the prospectus to calculate:

   a. The per share price he paid as an angel.

   b. The annualized return (using the IPO price) he made on his investment.

   c. The amount of angel money Mr. Thiel received from the proceeds of the IPO (that is, from his Rivendell investments alone).

---

[24]How Mr. Thiel holds his investments in Facebook is private information, so there is no substantive basis on which to make this assumption. That said, Mr. Thiel is reported to be a fan of *The Lord of the Rings*.

**CHAPTER**

# 24

# Debt Financing

## NOTATION

$YTC$  yield to call on a
callable bond

$YTM$  yield to maturity
on a bond

$PV$  present value

I N THE MIDDLE OF 2005, FORD MOTOR COMPANY DECIDED TO
put one of its subsidiaries, Hertz Corporation, up for competitive bid.
On September 13, 2005, *The Wall Street Journal* reported that a group
of private investors led by Clayton, Dubilier & Rice (CDR), a private equity
firm, had reached a deal with Ford to purchase Hertz's outstanding equity
for $5.6 billion. In addition, Hertz had $9.1 billion in existing debt that
needed to be refinanced as part of the deal. CDR planned to finance the
transaction in part by raising over $11 billion in new debt. Using this Hertz
deal as an illustrative example, in this chapter, we examine how corpora-
tions use the debt markets to raise capital.

When companies raise capital by issuing debt, they have several
potential sources from which to seek funds. To complete the Hertz pur-
chase, the group led by CDR ended up relying on at least four differ-
ent kinds of debt: domestic- and foreign-denominated high-yield bonds,
bank loans, and asset-backed securities. In addition, each debt issue
has its own specific terms, determined at the time of issue. We there-
fore begin our exploration of debt financing by explaining the process
of issuing debt.

Corporations are not the only entities that use debt financing.
Governments, municipalities, and other local entities as well as quasi-
government entities (such as state-owned corporations) also use the debt
markets to raise capital. Hence, the scope of this chapter is necessarily
broader than that of Chapter 23. Here, we introduce all of the important
types of debt that exist—not just corporate debt. Finally, we discuss some
of the more advanced features of bonds such as call provisions and con-
version options.

## 24.1  Corporate Debt

Recall from Chapter 23 our discussion of how private companies become public companies. The deal in which CDR bought Hertz is an example of the opposite transition—a public company becoming private, in this case through a leveraged buyout. Recall that in a leveraged buyout (LBO), a group of private investors purchases all the equity of a public corporation.[1] With a total value of $15.2 billion,[2] the leveraged buyout of Hertz was the second largest transaction of its kind at the time of its announcement (the largest LBO at the time was the $31.3 billion takeover of RJR-Nabisco in 1989). Taking a public corporation private in this way requires issuing large amounts of corporate debt. Table 24.1 shows the debt that was issued to finance the Hertz LBO. Using these debt issues as an example, let's begin by explaining how corporations issue debt.

| TABLE 24.1 | New Debt Issued as Part of the Hertz LBO |
|---|---|
| **Type of Debt** | **Amount (in $ million)** |
| Public debt | |
| Junk bond issues | 2,668.9 |
| Private debt | |
| Term loan | 1,707.0 |
| Asset-backed revolving line of credit | 400.0 |
| Asset-backed "fleet" debt | 6,348.0 |
| **Total** | **$11,123.9** |

### Public Debt

Corporate bonds are securities issued by corporations. They account for a significant amount of invested capital. As of mid-2012, the value of outstanding U.S. corporate bonds was about $8.5 trillion.

**The Prospectus.** A public bond issue is similar to a stock issue. A prospectus or offering memorandum must be produced that describes the details of the offering (see Figure 24.1). In addition, for public offerings, the prospectus must include an **indenture**, a formal contract between the bond issuer and a trust company. The trust company represents the bondholders and makes sure that the terms of the indenture are enforced. In the case of default, the trust company represents the bondholders' interests.

While corporate bonds almost always pay coupons semiannually, a few corporations (e.g., Coca-Cola) have issued zero-coupon bonds. Historically, corporate bonds have been

---

[1]At the time of the deal, Hertz was a wholly owned subsidiary of Ford Motor Company, which itself is a public company. Prior to Ford's acquisition of Hertz's outstanding shares in 2001, Hertz was publicly traded.

[2]The total value includes $5.6 billion in equity, $9.1 billion in debt, and $0.5 billion in fees and expenses. In addition to $11.1 billion in new debt, the transaction was financed using $1.8 billion of Hertz's own cash and securities (including a $1.2 billion obligation from Ford, which was forgiven as part of the payment to Ford). The remaining $2.3 billion in private equity was contributed by Clayton, Dubilier & Rice; The Carlyle Group; and Merrill Lynch Global Private Equity.

## FIGURE 24.1

**Front Cover of the Offering Memorandum of the Hertz Junk Bond Issue**

*Source*: Courtesy Hertz Corporation

OFFERING MEMORANDUM                                                    CONFIDENTIAL



**CCMG Acquisition Corporation**
to be merged with and into The Hertz Corporation
$1,800,000,000 8.875% Senior Notes due 2014
$600,000,000 10.5% Senior Subordinated Notes due 2016
€225,000,000 7.875% Senior Notes due 2014

The Company is offering $1,800,000,000 aggregate principal amount of its 8.875% Senior Notes due 2014 (the "Senior Dollar Notes"), $600,000,000 aggregate principal amount of its 10.5% Senior Subordinated Notes due 2016 (the "Senior Subordinated Notes" and, together with the Senior Dollar Notes, the "Dollar Notes"), and €225,000,000 aggregate principal amount of its 7.875% Senior Notes due 2014 (the "Senior Euro Notes"). The Senior Dollar Notes and the Senior Euro Notes are collectively referred to as the "Senior Notes," and the Dollar Notes and the Senior Euro Notes are collectively referred to as the "Notes."

The Senior Notes will mature on January 1, 2014 and the Senior Subordinated Notes will mature on January 1, 2016. Interest on the Notes will accrue from December 21, 2005. We will pay interest on the Notes on January 1 and July 1 of each year, commencing July 1, 2006.

We have the option to redeem all or a portion of the Senior Notes and the Senior Subordinated Notes at any time (1) before January 1, 2010 and January 1, 2011, respectively, at a redemption price equal to 100% of their principal amount plus the applicable make-whole premium set forth in this offering memorandum and (2) on or after January 1, 2010 and January 1, 2011, respectively, at the redemption prices set forth in this offering memorandum. In addition, on or before January 1, 2009, we may, on one or more occasions, apply funds equal to the proceeds from one or more equity offerings to redeem up to 35% of each series of Notes at the redemption prices set forth in this offering memorandum. If we undergo a change of control or sell certain of our assets, we may be required to offer to purchase Notes from holders.

The Senior Notes will be senior unsecured obligations and will rank equally with all of our senior unsecured indebtedness. The Senior Subordinated Notes will be unsecured obligations and subordinated in right of payment to all of our existing and future senior indebtedness. Each of our domestic subsidiaries that guarantees specified bank indebtedness will guarantee the Senior Notes with guarantees that will rank equally with all of the senior unsecured indebtedness of such subsidiaries and the Senior Subordinated Notes with guarantees that will be unsecured and subordinated in right of payment to all existing and future senior indebtedness of such subsidiaries.

We have agreed to make an offer to exchange the Notes for registered, publicly tradable notes that have substantially identical terms as the Notes. The Dollar Notes are expected to be eligible for trading in the Private Offering, Resale and Trading Automated Linkages (PORTAL℠) market. This offering memorandum includes additional information on the terms of the Notes, including redemption and repurchase prices, covenants and transfer restrictions.

**Investing in the Notes involves a high degree of risk. See "Risk Factors" beginning on page 23.**

We have not registered the Notes under the federal securities laws of the United States or the securities laws of any other jurisdiction. The Initial Purchasers named below are offering the Notes only to qualified institutional buyers under Rule 144A and to persons outside the United States under Regulation S. See "Notice to Investors" for additional information about eligible offerees and transfer restrictions.

Price for each series of Notes: 100%

We expect that (i) delivery of the Dollar Notes will be made to investors in book-entry form through the facilities of The Depository Trust Company on or about December 21, 2005 and (ii) delivery of the Senior Euro Notes will be made to investors in book-entry form through the facilities of the Euroclear System and Clearstream Banking, S.A. on or about December 21, 2005.

*Joint Book-Running Managers*

**Deutsche Bank Securities**                                    **Lehman Brothers**

**Merrill Lynch & Co.**      **Goldman, Sachs & Co.**                **JPMorgan**

*Co-Lead Managers*

**BNP PARIBAS**          **RBS Greenwich Capital**                    **Calyon**

The date of this offering memorandum is December 15, 2005.

issued with a wide range of maturities. Most corporate bonds have maturities of 30 years or less, although in the past there have been original maturities of up to 999 years. In July 1993, for example, Walt Disney Company issued $150 million in bonds with a maturity of 100 years; these bonds soon became known as the "Sleeping Beauty" bonds.

The face value or principal amount of the bond is denominated in standard increments, most often $1000. The face value does not always correspond to the actual money raised because of underwriting fees and the possibility that the bond might not actually sell for its face value when it is offered for sale initially. If a coupon bond is issued at a discount, it is called an **original issue discount (OID)** bond.

**Bearer Bonds and Registered Bonds.**  In a public offering, the indenture lays out the terms of the bond issue. Most corporate bonds are coupon bonds, and coupons are paid in one of two ways. Historically, most bonds were bearer bonds. **Bearer bonds** are like currency: Whoever physically holds the bond certificate owns the bond. To receive a coupon payment, the holder of a bearer bond must provide explicit proof of ownership. The holder does so by literally clipping a coupon off the bond certificate and remitting it to the paying agent. Anyone producing such a coupon is entitled to the payment—hence, the name "coupon" payment. Besides the obvious hassles associated with clipping coupons and mailing them in, there are serious security concerns with bearer bonds. Losing such a bond certificate is like losing currency.

Consequently, almost all bonds that are issued today are **registered bonds**. The issuer maintains a list of all holders of its bonds. Brokers keep issuers informed of any changes in ownership. On each coupon payment date, the bond issuer consults its list of registered owners and mails each owner a check (or directly deposits the coupon payment into the owner's brokerage account). This system also facilitates tax collection because the government can easily keep track of all interest payments made.

**Types of Corporate Debt.**  Four types of corporate debt are typically issued: **notes**, **debentures**, **mortgage bonds**, and **asset-backed bonds** (see Table 24.2). Debentures and notes are **unsecured debt**, which means that in the event of a bankruptcy bondholders have a claim to only the assets of the firm that are not already pledged as collateral on other debt. Typically, notes have shorter maturities (less than 10 years) than debentures. Asset-backed bonds and mortgage bonds are **secured debt**: Specific assets are pledged as collateral that bondholders have a direct claim to in the event of bankruptcy. Mortgage bonds are secured by real property, whereas asset-backed bonds can be secured by any kind of asset. Although the word "bond" is commonly used to mean any kind of debt security, technically a corporate bond must be secured.

| TABLE 24.2 | Types of Corporate Debt | |
|---|---|---|
| **Secured** | | **Unsecured** |
| Mortgage bonds (secured with property) | | Notes (original maturity less than 10 years) |
| Asset-backed bonds (secured with any asset) | | Debentures |

Let's illustrate these concepts by returning to the Hertz LBO. Recall that CDR intended to refinance approximately $9 billion of existing Hertz corporate debt. So, subsequent to the agreement, Hertz made a tender offer—a public announcement of an offer to all existing bondholders to buy back its existing debt. This debt repurchase was financed by issuing several kinds of new debt (both secured and unsecured), all of which were claims on Hertz's corporate assets.

840      **Chapter 24** Debt Financing

| TABLE 24.3 | Hertz's December 2005 Junk Bond Issues | | |
|---|---|---|---|
| | Senior Dollar-Denominated Note | Senior Euro-Denominated Note | Subordinated Dollar-Denominated Note |
| Face value | $1.8 billion | €225 million | $600 million |
| Maturity | December 1, 2014 | December 1, 2014 | December 1, 2016 |
| Coupon | 8.875% | 7.875% | 10.5% |
| Issue price | Par | Par | Par |
| Yield | 8.875% | 7.875% | 10.5% |
| Call features | Up to 35% of the outstanding principal callable at 108.875% in the first three years. | Up to 35% of the outstanding principal callable at 107.875% in the first three years. | Up to 35% of the outstanding principal callable at 110.5% in the first three years. |
| | After four years, fully callable at: | After four years, fully callable at: | After five years, fully callable at: |
| | • 104.438% in 2010 | • 103.938% in 2010 | • 105.25% in 2011 |
| | • 102.219% in 2011 | • 101.969% in 2011 | • 103.50% in 2012 |
| | • Par thereafter | • Par thereafter | • 101.75% in 2013 |
| | | | • Par thereafter |
| Settlement | December 21, 2005 | December 21, 2005 | December 21, 2005 |
| Rating | | | |
| Standard & Poor's | B | B | B |
| Moody's | B1 | B1 | B3 |
| Fitch | BB− | BB− | B+ |

As part of the financing, CDR planned to issue $2.7 billion worth of unsecured debt[3]—in this case, high-yield notes known as junk bonds (bonds rated below investment grade).[4] The high-yield issue was divided into three kinds of debt or **tranches** (see Table 24.3), all of which made semiannual coupon payments and were issued at par. The largest tranche was a $1.8 billion face-value note maturing in nine years. It paid a coupon of 8.875%, which at the time represented a 4.45% spread over Treasuries. A second tranche was denominated in euros, and the third tranche was junior to the other two and paid a coupon of 10.5%. The rest of the debt financing was made up of asset-backed debt that was sold privately, and bank loans.

**Seniority.** Recall that debentures and notes are unsecured. Because more than one debenture might be outstanding, the bondholder's priority in claiming assets in the event of default, known as the bond's **seniority**, is important. As a result, most debenture issues contain clauses restricting the company from issuing new debt with equal or higher priority than existing debt.

When a firm conducts a subsequent debenture issue that has lower priority than its outstanding debt, the new debt is known as a **subordinated debenture**. In the event of default, the assets not pledged as collateral for outstanding bonds cannot be used to pay

---

[3]In the end, the firm issued only $2 billion in debt because fewer existing bondholders tendered their bonds than expected ($1.6 billion of existing debt remained on the balance sheet after the LBO was completed).

[4]A description of corporate credit ratings can be found in Chapter 6 (see Table 6.4).

off the holders of subordinated debentures until all more senior debt has been paid off. In Hertz's case, one tranche of the junk bond issue is a note that is subordinated to the other two tranches. In the event of bankruptcy, this note has a lower-priority claim on the firm's assets. Because holders of this tranche are likely to receive less in the event of a Hertz default, the yield on this debt is higher than that of the other tranches—10.5% compared to 8.875% for the first tranche.

**Bond Markets.**  The remaining tranche of Hertz's junk bond issue is a note that is denominated in euros rather than U.S. dollars—it is an international bond. International bonds are classified into four broadly defined categories. **Domestic bonds** are bonds issued by a local entity and traded in a local market, but purchased by foreigners. They are denominated in the local currency. **Foreign bonds** are bonds issued by a foreign company in a local market and are intended for local investors. They are also denominated in the local currency. Foreign bonds in the United States are known as **Yankee bonds**. In other countries, foreign bonds also have special names. For example, in Japan they are called **Samurai bonds**; in the United Kingdom, they are known as **Bulldogs**.

**Eurobonds** are international bonds that are not denominated in the local currency of the country in which they are issued. Consequently, there is no connection between the physical location of the market on which they trade and the location of the issuing entity. They can be denominated in any number of currencies that might or might not be connected to the location of the issuer. The trading of these bonds is not subject to any particular nation's regulations. **Global bonds** combine the features of domestic, foreign, and Eurobonds, and are offered for sale in several different markets simultaneously. The Hertz junk bond issue is an example of a global bond issue: It was simultaneously offered for sale in the United States and Europe.

A bond that makes its payments in a foreign currency contains the risk of holding that currency and, therefore, is priced off the yields of similar bonds in that currency. Hence, the euro-denominated note of the Hertz junk bond issue has a different yield from the dollar-denominated note, even though both bonds have the same seniority and maturity. While they have the same default risk, they differ in their exchange rate risk—the risk that the foreign currency will depreciate in value relative to the local currency.

### Private Debt

In addition to the junk bond issue, Hertz took out more than $2 billion in bank loans. Bank loans are an example of **private debt**, debt that is not publicly traded. The private debt market is larger than the public debt market. Private debt has the advantage that it avoids the cost of registration but has the disadvantage of being illiquid.

There are two segments of the private debt market: term loans and private placements.

**Term Loans.**  Hertz negotiated a $1.7 billion **term loan**, a bank loan that lasts for a specific term. The term of the Hertz loan was seven years. This particular loan is an example of a **syndicated bank loan**: a single loan that is funded by a group of banks rather than just a single bank. Usually, one member of the syndicate (the lead bank) negotiates the terms of the bank loan. In the Hertz case, Deutsche Bank AG negotiated the loan with CDR and then sold portions of it off to other banks—mostly smaller regional banks that had excess cash but lacked the resources to negotiate a loan of this magnitude by themselves.

Most syndicated loans are rated as investment grade. However, Hertz's term loan is an exception. Term loans such as Hertz's that are associated with LBOs are known as leveraged syndicated loans and are rated as speculative grade; in Hertz's case, Standard and Poor's rated the term loan as BB and Moody's rated it as Ba2.

In addition to the term loan, Dow Jones reported that Hertz negotiated an asset-backed revolving line of credit. A **revolving line of credit** is a credit commitment for a specific time period up to some limit (five years and $1.6 billion in Hertz's case), which a company can use as needed. Hertz's initial draw on the line of credit was $400 million. Because the line of credit is backed by specific assets, it is more secure than the term loan, so Standard and Poor's gave it a BB+ rating.

**Private Placements.** A **private placement** is a bond issue that does not trade on a public market but rather is sold to a small group of investors. Because a private placement does not need to be registered, it is less costly to issue. Instead of an indenture, often a simple promissory note is sufficient. Privately placed debt also need not conform to the same standards as public debt; as a consequence, it can be tailored to the particular situation.

Returning to the Hertz deal, CDR privately placed an additional $4.2 billion of U.S. asset-backed securities and $2.1 billion of international asset-backed securities. In this case, the assets backing the debt were the fleet of rental cars Hertz owned; hence, this debt was termed "Fleet Debt" in the offering memorandum.

In 1990, the U.S. Securities and Exchange Commission (SEC) issued Rule 144A, which significantly increased the liquidity of certain privately placed debt. Private debt issued under this rule can be traded by large financial institutions among themselves. The rule was motivated by a desire to increase the access of foreign corporations to U.S. debt markets. Bonds that are issued under this rule are nominally private debt, but because they are tradable between financial institutions they are only slightly less liquid than public debt. In fact, the $2.8 billion Hertz junk bond issue in Table 24.3 is actually debt issued under Rule 144A (which explains why the offering document in Figure 24.1 is called an "offering memorandum" rather than a "prospectus," because the latter term is reserved for public offerings). As part of the offering, however, the issuers agreed to publicly register the bonds within 390 days.[5] Because the debt was marketed and sold with the understanding that it would become public debt, we classified that issue as public debt.

CONCEPT CHECK

1. List four types of corporate debt that are typically issued.
2. What are the four categories of international bonds?

## 24.2    Other Types of Debt

Corporations are not the only entities that use debt. We begin with the largest debt sector—loans to government entities.

### Sovereign Debt

Recall from Chapter 6 that **sovereign debt** is debt issued by national governments. Recall too that bonds issued by the U.S. government are called Treasury securities. Treasury securities represent the single largest sector of the U.S. bond market. On June 29, 2012, the market value of outstanding Treasury securities was $11.03 trillion. These bonds enable the U.S. government to borrow money so that it can engage in deficit spending (that is, spending more than what is received in tax revenues).

The U.S. Treasury issues four kinds of securities (see Table 24.4). Treasury bills are pure discount bonds with maturities ranging from a few days to one year. Currently,

---

[5]If Hertz failed to fulfill this commitment, the interest rate on all the outstanding bonds would increase by 0.5%.

| TABLE 24.4 | Existing U.S. Treasury Securities | |
|---|---|---|
| **Treasury Security** | **Type** | **Original Maturity** |
| Bills | Discount | 4, 13, 26, and 52 weeks |
| Notes | Coupon | 2, 3, 5, 7, and 10 years |
| Bonds | Coupon | 30 years |
| Inflation indexed | Coupon | 5, 10, and 30 years |

the Treasury issues bills with original maturities of 4, 13, 26, and 52 weeks. Treasury notes are semiannual coupon bonds with original maturities of between 1 and 10 years. The Treasury issues notes with maturities of 2, 3, 5, 7, and 10 years at the present time. Treasury bonds are semiannual coupon bonds with maturities longer than 10 years. The Treasury currently issues bonds with maturities of 30 years (often called **long bonds**). All of these Treasury securities trade in the bond market.

The last type of security that the U.S. Treasury is currently issuing is inflation-indexed bonds called **TIPS** (Treasury Inflation-Protected Securities) with maturities of 5, 10, and 30 years. These bonds are standard coupon bonds with one difference: The outstanding principal is adjusted for inflation. Thus, although the coupon *rate* is fixed, the dollar coupon varies because the semiannual coupon payments are a fixed rate of the inflation-adjusted principal. In addition, the final repayment of principal at maturity (but not the interest payments) is protected against deflation. That is, if the final inflation-adjusted principal amount is less than the original principal amount, the original principal amount is repaid.

---

**EXAMPLE 24.1**

**Coupon Payments on Inflation-Indexed Bonds**

**Problem**

On January 15, 2004, the U.S. Treasury issued a 10-year inflation-indexed note with a coupon of 2%. On the date of issue, the consumer price index (CPI) was 184.77419. On January 15, 2012, the CPI had increased to 226.33474. What coupon payment was made on January 15, 2012?

**Solution**

Between the issue date and January 15, 2012, the CPI appreciated by 226.33474/184.77419 = 1.22493. Consequently, the principal amount of the bond increased by this amount; that is, the original face value of $1000 increased to $1224.93. Because the bond pays semiannual coupons, the coupon payment was $1224.93 × 0.02/2 = $12.25.

---

Treasury securities are initially sold to the public by auction. Two kinds of bids are allowed: competitive bids and noncompetitive bids. Noncompetitive bidders (usually individuals) just submit the amount of bonds they wish to purchase and are guaranteed to have their orders filled at the auction. All competitive bidders submit sealed bids in terms of yields and the amount of bonds they are willing to purchase. The Treasury then accepts the lowest-yield (highest-price) competitive bids up to the amount required to fund the deal. The highest yield accepted is termed the **stop-out yield**. All successful bidders (including the noncompetitive bidders) are awarded this yield. In the case of a Treasury bill offering, the stop-out yield is used to set the price of the bill and all bidders then pay this price. In the case of a Treasury note or Treasury bond offering, this yield determines the coupon of the bond and then all bidders pay the par value for the bond

or note.[6] All income from Treasury securities is taxable at the federal level. This income, however, is not taxable at the state or local level.[7]

Zero-coupon Treasury securities with maturities longer than one year also trade in the bond market. They are called **STRIPS** (Separate Trading of Registered Interest and Principal Securities). The Treasury itself does not issue STRIPS. Instead, investors (or, more commonly, investment banks) purchase Treasury notes and bonds and then resell each coupon and principal payment separately as a zero-coupon bond.

## Municipal Bonds

**Municipal bonds** ("munis") are issued by state and local governments. Their distinguishing characteristic is that the income on municipal bonds is not taxable at the federal level. Consequently, municipal bonds are sometimes also referred to as tax-exempt bonds. Some issues are also exempt from state and local taxes.

Most municipal bonds pay semiannual coupons. A single issue will often contain a number of different maturity dates. Such issues are often called **serial bonds** because the bonds are scheduled to mature serially over a number of years. The coupons on municipal bonds can be either *fixed* or *floating*. A fixed-coupon bond has the same coupon over the life of the bond. In a floating-rate issue, the coupon of the bond is adjusted periodically. The reset formula is a spread over a reference rate like the rate on Treasury bills that is established when the bond is first issued. There are also a few zero-coupon municipal bond issues.

Municipal bonds can differ in terms of the source of funds that guarantee them. **Revenue bonds** pledge specific revenues generated by projects that were initially financed by the bond issue. For example, the State of Nevada issued revenue bonds to finance the Las Vegas Monorail, to be repaid from fare revenues. Bonds backed by the full faith and credit of a local government are known as **general obligation bonds**. Sometimes local governments strengthen the commitment further by tying the promise to a particular revenue source, such as a special fee. Because a local government can always use its general revenue to repay such bonds, this commitment is over and above the usual commitment, so these bonds are called **double-barreled**. Despite these protections, municipal bonds are not nearly as secure as bonds backed by the federal government. Indeed, as a consequence of the severe economic downturn in 2008, over 136 municipal bonds, totaling more than $8 billion, defaulted (including the aforementioned Las Vegas Monorail bonds). A 2012 study by the Federal Reserve Bank of New York reports that between 1970 and 2011, approximately 4% of municipal bonds have defaulted.[8]

## Asset-Backed Securities

An **asset-backed security** (ABS) is a security that is made up of other financial securities; that is, the security's cash flows come from the cash flows of the underlying financial securities that "back" it. We refer to the process of creating an asset-backed security—packaging a portfolio of financial securities and issuing an asset-backed security backed by this portfolio—as **asset securitization**.

By far, the largest sector of the asset-backed security market is the *mortgage-backed security* market. A **mortgage-backed security (MBS)** is an asset-backed security backed by home mortgages. U.S. government agencies and sponsored enterprises, such as The

---

[6]Because coupons are specified in eighths, if the winning yield is not divisible by eight, the coupon is set at the rate that produces a price closest to, but not over, par.

[7]For more details, see the U.S. Treasury Web site: http://www.treasurydirect.gov/.

[8]M. Walsh, "Muni Bonds Not as Safe as Thought," *The New York Times*, August 15, 2012.

Government National Mortgage Association (GNMA, or "Ginnie Mae") are the largest issuers in this sector. When homeowners in the underlying mortgages make their mortgage payments, this cash is passed through (minus servicing fees) to the holders of the mortgage-backed security. The cash flows of mortgage-backed securities therefore mirror the cash flows of home mortgages.

In the case of GNMA-issued mortgage-backed securities, the U.S. government provides an explicit guarantee to investors against default risk. This guarantee does not mean that these securities are risk-free, however. As discussed in Chapter 22, a mortgage borrower always has an option to repay some or all of the mortgage loan early (often because the borrower moves or refinances), and this early repayment of principal is passed through to owners of mortgage-backed securities. Thus, holders of mortgage-backed securities face **prepayment risk**—the risk that the bond will be partially (or wholly) repaid earlier than expected.

Other government-sponsored enterprises issuing mortgage-backed securities are the Federal National Mortgage Association (FNMA or "Fannie Mae") and the Federal Home Loan Mortgage Corporation (FHLMC or "Freddie Mac"). The Student Loan Marketing Association ("Sallie Mae") issues asset-backed securities backed by student loans. While, unlike Ginnie Mae, these enterprises are not explicitly backed by the full faith and credit of the U.S. government, most investors doubt that the government would allow any of its agencies to default and so believe these issues contain an implicit guarantee. In September 2008, this confidence was borne out when both Fannie Mae and Freddie Mac, which were both on the brink of failure, were placed into conservatorship of the Federal Housing Finance Agency, effectively bailing them out. On June 16, 2010, Fannie Mae's and Freddie Mac's stocks were delisted from the NYSE.

Private organizations, such as banks, also issue asset-backed securities. These securities can be backed by home mortgages (typically loans that do not meet the criteria to be included in the asset-backed securities issued by the government agencies) or other kinds of consumer loans such as automobile loans and credit card receivables. In addition, private asset-backed securities can be backed by other asset-backed securities. When banks re-securitize asset-backed and other fixed income securities, the new asset-backed security is known as a **collateralized debt obligation (CDO)**. CDO cash flows are usually divided into different tranches that are assigned different priorities. For example, investors in the junior tranche of an asset-backed security do not receive any cash flows until investors in the senior tranche have received their promised cash flows. Because of this prioritization, different CDO securities can have very different risk characteristics from each other, and from the underlying assets themselves (see the box on page 846).

CONCEPT CHECK

1. List four different kinds of securities issued by the U.S. Treasury.

2. What is the distinguishing characteristic of municipal bonds?

3. What is an asset-backed security?

## 24.3 Bond Covenants

**Covenants** are restrictive clauses in a bond contract that limit the issuer from taking actions that may undercut its ability to repay the bonds. One might guess that such covenants would not be necessary—after all, why would managers voluntarily take actions that increase the firm's default risk? However, recall from Chapter 16 that when a firm is levered, managers may have an incentive to take actions that benefit equity holders at the expense of debt holders.

## GLOBAL FINANCIAL CRISIS　CDOs, Subprime Mortgages, and the Financial Crisis

GNMA and the other government agencies that issue mortgage-backed securities restrict the type of mortgages that they are prepared to securitize. For example, they will only securitize mortgages below a certain face value and, more importantly, that meet certain credit criteria. Mortgages that do not satisfy these criteria and have a high default probability are known as **subprime mortgages**. Part of the housing boom in the mid-2000s can be attributed to the increased availability of subprime mortgages. As the number of subprime mortgages exploded so, too, did the incentives to securitize them. Private institutions, such as banks, issued large amounts of mortgage-backed securities backed by subprime mortgages.

To understand the origins of the crisis, it is helpful to understand how subprime loans were securitized. Banks originating these loans first combined them into large **asset pools**. The cash flows from these mortgage-backed security pools were then used to back promises to different tranches of securities, distinguished by their seniority, known as **collateralized mortgage obligations (CMOs)**. By first pooling and diversifying the mortgages, and then tranching them into senior and subordinated securities, it is possible to create senior securities that have much lower risk than the underlying mortgages themselves. For example, consider a security with a senior claim to any principal repayments, for up to one half of the total principal outstanding. This security would be impaired only if more than 50% of the mortgages in the pool defaulted.

The figure below illustrates this idea, showing the flow of mortgage cash flows, first into MBS pools, and then into buckets representing the CMO security tranches. The buckets that are first in line are very likely to be filled. These senior tranches received AAA ratings and were attractive to investors



Cash flows from individual mortgages are first pooled together in an MBS, diversifying their risk.

The cash flows of the pool are then tranched into CMO securities with differing priority. Senior securities carry less risk than more junior ones.

The riskiest tranches of these mortgage-backed secuities were often re-pooled and re-tranched as CDOs.

For example, once bonds are issued, equity holders have an incentive to increase dividends at the expense of debt holders. Think of an extreme case in which a company issues a bond, and then immediately liquidates its assets, pays out the proceeds (including those from the bond issue) in the form of a dividend to equity holders, and declares bankruptcy. In this case, the equity holders receive the value of the firm's assets plus the proceeds from the bond, while bondholders are left with nothing. Consequently, bond agreements often contain covenants that restrict the ability of management to pay dividends. Other covenants may restrict the level of further indebtedness and specify that the issuer must maintain a minimum amount of working capital. If the issuer fails to live up to any covenant, the bond goes into default. Covenants in the Hertz junk bond issue limited Hertz's ability to incur more debt, make dividend payments, redeem stock, make investments, create

because of their high yields given their perceived safety. Of course, as we move further down, the later buckets face a much higher risk of not filling completely. The most junior tranches had low ratings (or were even unrated), and were much riskier than the original pools (if even one mortgage in the entire pool defaulted, these securities would be affected). As a result, these junior tranches appealed only to very sophisticated investors with an appetite for, and an ability to assess, their risk.

As the subprime market grew, finding investors willing to hold the junior tranches became more problematic. To resolve this problem, investment banks created pools of these junior securities, which they then tranched into a new series of senior and junior securities (CDOs). By the same reasoning as before, the senior tranches of these new CDOs were perceived to be very low risk and received AAA ratings, making them easy to sell to a wide range of investors. (Note also that, due to diversification, the CDO securities can have a higher average rating than the individual assets backing them.)

What went wrong? From 2002 through 2005, default rates on subprime mortgages were quite low, dropping to below 6%. As a result, ratings agencies relaxed their requirements and increased the size of the tranches that received AAA ratings. However, these low default rates occurred because house prices were rising, making it easy for subprime borrowers to refinance their loans and avoid default. Once the housing market slowed and began to decline in 2006–2007, refinancing was no longer possible (as banks would not lend more than the house was worth), and the default rate skyrocketed to over 40%.

The increased default rate had two important consequences. First, the original mortgage-backed securities turned out to be riskier than anticipated: Securities that were protected against default rates in excess of 20%, which seemed extremely safe in 2005, began to experience losses. But the damage was even more dramatic in the CDO securities that were created from the junior mortgage-backed securities. The safety of the senior tranches of these CDOs relied on diversification—if no more than 20% of the junior mortgage-backed securities defaulted, these securities would be fully repaid. But the unexpectedly pervasive nature of the housing crisis meant that almost *all* of the securities that were backing these CDOs were running dry. As a result, many of the most senior, AAA-rated, CDO tranches were virtually wiped out, with their values declining to pennies on the dollar. This outcome was an extreme shock for the many investors who held them believing they were safe investments.



**Subprime Mortgage Delinquency Rate**

liens, transfer or sell assets, and merge or consolidate. They also included a requirement to offer to repurchase the bonds at 101% of face value if the corporation experiences a change in control.

Recall that CDR made a tender offer to repurchase all of Hertz's outstanding debt. CDR made this offer because the outstanding debt had a restrictive covenant that made it difficult to complete a merger or takeover of Hertz. Once the group led by CDR owned more that 50% of this debt, the terms of the prospectus gave CDR the ability to unilaterally change any covenant, thus allowing them to proceed with the LBO.

You might expect that equity holders would try to include as few covenants as possible in a bond agreement. In fact, this is not necessarily the case. The stronger the covenants in the bond contract, the less likely the issuer will default on the bond, and so the lower the

interest rate required by investors who buy the bond. That is, by including more covenants, issuers can reduce their costs of borrowing. As discussed in Chapter 16, if the covenants are designed to reduce agency costs by restricting management's ability to take negative NPV actions that exploit debt holders, then the reduction in the firm's borrowing cost can more than outweigh the cost of the loss of flexibility associated with covenants.

**CONCEPT CHECK**

1. What happens if an issuer fails to live up to a bond covenant?

2. Why can bond covenants reduce a firm's borrowing cost?

## 24.4 Repayment Provisions

A bond issuer repays its bonds by making coupon and principal payments as specified in the bond contract. However, this is not the only way an issuer can repay bonds. For example, the issuer can repurchase a fraction of the outstanding bonds in the market, or it can make a tender offer for the entire issue, as Hertz did on its existing bonds. Another way issuers repay bonds is to exercise a *call* provision that allows the issuer to repurchase the bonds at a predetermined price. Bonds that contain such a provision are known as **callable bonds**.

### Call Provisions

Hertz's junk bonds are examples of callable bonds. Table 24.3 lists the call features in each tranche. A call feature allows the issuer of the bond the right (but not the obligation) to retire all outstanding bonds on (or after) a specific date (the **call date**), for the **call price**. The call price is generally set at or above, and expressed as a percentage of, the bond's face value. In Hertz's case, the call dates of the two senior tranches are at the end of the fourth year. For the duration of 2010, the $1.8 billion issue could be called at price of 104.438% of the face value of the bond. In the following years, the call price declined until in 2012 the bond could be called at par. The euro-denominated bond has similar terms at slightly different call prices. The subordinated tranche's call date is a year later and has a different call price structure.

The Hertz bonds could also be partially called in the first three years. Hertz had the option to retire up to 35% of the outstanding principal at the call prices listed in Table 24.3, as long as the funds needed to repurchase the bonds were derived from the proceeds of an equity issuance.

To understand how call provisions affect the price of a bond, we first need to consider when an issuer will exercise its right to call the bond. An issuer can always retire one of its bonds early by repurchasing the bond in the open market. If the call provision offers a cheaper way to retire the bonds, however, the issuer will forgo the option of purchasing the bonds in the open market and call the bonds instead.

Let's examine a more concrete example. Consider a case in which an issuer has issued two bonds that are identical in every respect except that one is callable at par (redeemable at face value) and the other is not callable. This issuer wants to retire one of the two bonds. How does it decide which bond to retire? If bond yields have dropped since the issue date, the non-callable bond will be trading at a premium. Thus, if the issuer wished to retire this bond (by repurchasing it in the open market), it would have to repay more than the outstanding principal. If it chose to call the callable bond instead, the issuer

would simply pay the outstanding principal. Hence, if yields have dropped, it is cheaper to retire the callable bond. In other words, by exercising the call on the callable bond and then immediately refinancing, the issuer can lower its borrowing costs. Conversely, if yields have increased after the issue date, there is no reason to refinance. Both bonds would be trading at a discount. Even if the issuer wished to retire some bonds, it would be better off by repurchasing either bond at less than par in the market than by calling the callable bond for par. Thus, when yields have risen, the issuer will not choose to exercise the call on the callable bond.

Let's consider this scenario from the perspective of a bondholder. As we have seen, the issuer will exercise the call option only when the coupon rate of the bond exceeds the prevailing market rate. Therefore, the only time the call is exercised, the bondholder finds herself in the position of looking for an alternative investment when market rates are lower than the bond's coupon rate. That is, the holder of a callable bond faces reinvestment risk precisely when it hurts: when market rates are lower than the coupon rate she is currently receiving. This makes the callable bond relatively less attractive to the bondholder than the identical non-callable bond. Consequently, a callable bond will trade at a lower price (and therefore a higher yield) than an otherwise equivalent non-callable bond.

Let's take a concrete example—a bond that is callable at par on only one specific date. Figure 24.2 plots the price of a callable bond and an otherwise identical non-callable bond on the call date as a function of the yield on the non-callable bond. When the yield of the non-callable bond is less than the coupon, the callable bond will be called, so its price is $100. If this yield is greater than the coupon, then the callable bond will not be called, so it has the same price as the non-callable bond. Note that the callable bond price is capped at par: The price can be low when yields are high, but does not rise above the par value when the yield is low.



**FIGURE 24.2**

**Prices of Callable and Non-Callable Bonds on the Call Date**

This figure shows the prices of a callable bond (gold line) and an otherwise identical non-callable bond (blue line) on the call date as a function of the yield on the non-callable bond. Both bonds have a 5% coupon rate. (The callable bond is assumed to be callable at par on one date only.)

FIGURE 24.3

**Prices of Callable and Non-Callable Bonds Prior to the Call Date**

When non-callable bond yields are high relative to the callable bond coupon, investors anticipate that the likelihood of exercising the call is low and the callable bond price is similar to that of an otherwise identical non-callable bond. When market yields are low relative to the bond coupon, investors anticipate that the bond will likely be called, so its price is close to the price of a non-callable bond that matures on the call date.



Before the call date, investors anticipate the optimal strategy that the issuer will follow, and the bond price reflects this strategy, as Figure 24.3 illustrates. When market yields are high relative to the bond coupon, investors anticipate that the likelihood of exercising the call is low and the bond price is similar to an otherwise identical non-callable bond. On the other hand, when market yields are low relative to the bond coupon, investors anticipate that the bond will likely be called, so its price is close to the price of a non-callable bond that matures on the call date. Because the issuer holds the option of whether to call the bond, the callable bond's price is always below that of the non-callable bonds.

### New York City Calls Its Municipal Bonds

In November 2004, New York City announced plans to call $430 million of its municipal bonds. New York City was an AAA-rated borrower, and these bonds paid relatively high interest rates of 6% to 8%. The city would be refinancing the bonds with new bonds that paid interest rates between 3% and 5%. In total, New York City called 63 individual bond issues with original maturities between 2012 and 2019.

Investors were attracted to the older municipal bonds because of their higher yields. Despite these yields, they did not expect New York City to call these bonds, so the market price for these bonds earlier in the year was 10% to 20% higher than their face value. When New York City announced its plans to call the bonds at prices slightly higher than the face value investors were caught off guard and the

market value of the bonds fell accordingly. Investors suffered losses of 15% or more on their AAA-rated investment.

Investors did not expect New York City to call these bonds because it had already refinanced the debt in the early 1990s. According to Internal Revenue Service rules, the city could not refinance again with another tax-exempt issue. However, New York City surprised the market when it decided to refinance the bonds by issuing taxable bonds instead. Although it happens rarely, this example illustrates that investors are sometimes surprised by issuer call strategies.

*Source*: A. Lucchetti, Copyright 2005 by DOW JONES & COMPANY, INC. Reproduced with permission of DOW JONES & COMPANY, Inc. via Copyright Clearance Center.

The yield to maturity of a callable bond is calculated as if the bond were not callable. That is, the yield is still defined as the discount rate that sets the present value of the promised payments equal to the current price, *ignoring* the call feature. We can think of the yield of a callable bond as the interest rate the bondholder receives if the bond is not called and repaid in full. Because the price of a callable bond is lower than the price of an otherwise identical non-callable bond, the yield to maturity of a callable bond will be higher than the yield to maturity for its non-callable counterpart.

The assumption that underlies the yield calculation of a callable bond—that it will not be called—is not always realistic, so bond traders often quote the *yield to call*. The **yield to call (YTC)** is the annual yield of a callable bond assuming that the bond is called at the earliest opportunity. Again, because the issuer has the option not to call the bond on its call date, its yield to call will be higher than an identical non-callable bond that matures on the call date.

### EXAMPLE 24.2          Calculating the Yield to Call

**Problem**

IBM has just issued a callable (at par) five-year, 8% coupon bond with annual coupon payments. The bond can be called at par in one year or anytime thereafter on a coupon payment date. It has a price of $103 per $100 face value. What is the bond's yield to maturity and yield to call?

**Solution**

The timeline of the promised payments for this bond (if it is not called) is



Setting the present value of the payments equal to the current price gives

$$103 = \frac{8}{(YTM)}\left(1 - \frac{1}{(1 + YTM)^5}\right) + \frac{100}{(1 + YTM)^5}$$

Solving for YTM (using the annuity spreadsheet) gives the bond's yield to maturity:

|              | NPER | RATE  | PV    | PMT | FV  | Excel Formula          |
|--------------|------|-------|-------|-----|-----|------------------------|
| Given        | 5    |       | −103  | 8   | 100 |                        |
| Solve for Rate |    | 7.26% |       |     |     | =RATE(5,8,−103,100)    |

The bond has a yield to maturity of 7.26%.

The timeline of the payments if the bond is called at the first available opportunity is



Setting the present value of these payments equal to the current price gives

$$103 = \frac{108}{(1 + YTC)}$$

Solving for YTC gives the yield to call:

$$YTC = \frac{108}{103} - 1 = 4.85\%$$

The annuity spreadsheet can be used to derive the same result:

| | NPER | RATE | PV | PMT | FV | Excel Formula |
|---|---|---|---|---|---|---|
| Given | 1 | | −103 | 8 | 100 | |
| Solve for Rate | | 4.85% | | | | =RATE(1,8,−103,100) |

## Sinking Funds

Another way bonds are repaid is through a **sinking fund**. Instead of repaying the entire principal balance on the maturity date, the company makes regular payments into a sinking fund administered by a trustee over the life of the bond. These payments are then used to repurchase bonds. In this way, the company can reduce the amount of outstanding debt without affecting the cash flows of the remaining bonds.

How does the trustee decide which bonds to repurchase? If the bonds are trading below their face value, the company simply repurchases the bonds in the market. But if a bond is trading above its face value, because the bonds are repurchased at par the decision is made by lottery.

Sinking fund provisions usually specify a minimum rate at which the issuer must contribute to the fund. In some cases, the issuer has the option to accelerate these payments. Because the sinking fund allows the issuer to repurchase the bonds at par, the option to accelerate the payments is another form of call provision.

The manner in which an outstanding balance is paid off using a sinking fund depends on the issue. Some issues specify equal payments over the life of the bond, ultimately retiring the issue on the maturity date of the bond. In other cases, the sinking fund payments are not sufficient to retire the entire issue and the company must make a large payment on the maturity date, known as a **balloon payment**. Often, sinking fund payments start only a few years after the bond issue. Bonds can be issued with both a sinking fund and call provision.

## Convertible Provisions

Another way bonds are retired is by converting them into equity. Some corporate bonds have a provision that gives the bondholder an option to convert each bond owned into a fixed number of shares of common stock at a ratio called the **conversion ratio**. Such bonds are called **convertible bonds**. The provision usually gives bondholders the right to convert the bond into stock at any time up to the maturity date for the bond.[9]

To understand how a conversion feature changes the value of a bond, note that this provision gives a call option to the holder of a bond. Thus, a convertible bond can be thought of as a regular bond plus a special type of call option called a **warrant**. A warrant is a call option written by the company itself on *new* stock (whereas a regular call option is written on existing stock). That is, when a holder of a warrant exercises it and thereby

---

[9]Some convertible bonds do not allow conversion for a specified amount of time after the issue date.

purchases stock, the company delivers this stock by issuing new stock. In all other respects, a warrant is identical to a call option.[10]

On the maturity date of the bond, the strike price of the embedded warrant in a convertible bond is equal to the face value of the bond divided by the conversion ratio—that is, the **conversion price**. So, on the maturity date of a convertible bond with a $1000 face value and a conversion ratio of 15, if you converted the bond into stock, you would receive 15 shares. If you did not convert, you would receive $1000. Hence, by converting, you essentially "paid" $1000 for 15 shares, implying a price per share of 1000/15 = $66.67. If the price of the stock exceeds $66.67, you would choose to convert; otherwise, you would take the cash. At maturity, you will choose to convert whenever the stock price exceeds the conversion price. As shown in Figure 24.4, the value of the bond is the maximum of its face value ($1000) and the value of 15 shares of stock.

What about prior to the maturity date? If the stock does not pay a dividend, then we know from our discussion of call options in Chapter 20 that it is never optimal to exercise a call early. Hence, the holder of a convertible bond should wait until the maturity date of the bond before deciding whether to convert. The value of the bond prior to maturity is plotted in Figure 24.4. If the stock price is low so that the embedded warrant is deep out-of-the-money, the conversion provision is not worth much and the bond's value is close to the value of a straight bond—an otherwise identical bond without the conversion provision. When the stock price is high and the embedded warrant is deep in-the-money, then the convertible bond trades close to—but higher than (to reflect the time value of the option)—the value of the bond if converted.



### FIGURE 24.4

**Convertible Bond Value**

At maturity, the value of a convertible bond is the maximum of the value of a $1000 straight bond and 15 shares of stock, and will be converted if the stock is above the conversion price. Prior to maturity, the value of the convertible bond will depend upon the likelihood of conversion, and will be above that of a straight bond or 15 shares of stock.

---

[10]When a regular call is exercised, the loss incurred by the writer of the call accrues to an unknown third party. However, when a warrant is exercised, the loss accrues to the equity holders of the firm (because they are forced to sell new equity at below-market value), which *includes* the holder of the warrant (upon exercise, the warrant holder becomes an equity holder). This dilution effect implies that the gain from exercising a warrant is less than that from a call, so warrants are worth less than calls.

Often, companies issue convertible bonds that are callable. With these bonds, if the issuer calls them, the holder can choose to convert rather than let the bonds be called. When the bonds are called, the holder faces exactly the same decision as he would on the maturity date of the bonds: He will choose to convert if the stock price exceeds the conversion price and let the bonds be called otherwise. Thus, by calling the bonds, a company can force bondholders to make their decision to exercise the conversion option earlier than they would otherwise like to. Therefore, calling a convertible bond transfers the remaining time value of the conversion option from bondholders to shareholders.

When a corporation issues convertible debt, it is giving the holder an option—a warrant, in this case. As we learned in Chapter 20, options always have a positive value; hence, a convertible bond is worth more than an otherwise identical straight bond. Consequently, if both bonds are issued at par, the non-convertible bond must offer a higher interest rate. Many people point to the lower interest rates of convertible bonds and argue that therefore convertible debt is cheaper than straight debt.

As we learned in Chapter 14, in a perfect market, the choice of financing cannot affect the value of a firm. Hence, the argument that convertible debt is cheaper because it has a lower interest rate is fallacious. Convertible debt carries a lower interest rate because it has an embedded warrant. If the price of a firm were subsequently to rise so that the bondholders choose to convert, the current shareholders will have to sell an equity stake in their firm for below-market value. The lower interest rate is compensation for the possibility that this event will occur.

**CONCEPT CHECK**

1. What is a sinking fund?

2. Do callable bonds have a higher or lower yield than otherwise identical bonds without a call feature? Why?

3. Why does a convertible bond have a lower yield than an otherwise identical bond without the option to convert?

---

**MyFinanceLab**    Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 24.1 Corporate Debt

- Companies can raise debt using different sources. Typical types of debt are public debt, which trades in a public market, and private debt, which is negotiated directly with a bank or a small group of investors. The securities that companies issue when raising debt are called corporate bonds.

- For public offerings, the bond agreement takes the form of an indenture, a formal contract between the bond issuer and a trust company. The indenture lays out the terms of the bond issue.

- Four types of corporate bonds are typically issued: notes, debentures, mortgage bonds, and asset-backed bonds. Notes and debentures are unsecured; mortgage bonds and asset-backed bonds are secured.

- Corporate bonds differ in their level of seniority. In case of bankruptcy, senior debt is paid in full first before subordinated debt is paid.

- International bonds are classified into four broadly defined categories: domestic bonds, which trade in foreign markets; foreign bonds, which are issued in a local market by a foreign entity; Eurobonds, which are not denominated in the local currency of the country in which they are issued; and global bonds, which trade in several markets simultaneously.

- Private debt can be in the form of term loans or private placements. A term loan is a bank loan that lasts for a specific term. A private placement is a bond issue that is sold to a small group of investors.

### 24.2  Other Types of Debt

- Governments, states, and other state-sponsored enterprises issue bonds as well.
- The U.S. Treasury has issued four different kinds of securities: Treasury bills, Treasury notes, Treasury bonds, and TIPS.
- Municipal bonds ("munis") are issued by state and local governments. Their distinguishing characteristic is that the income on municipal bonds is not taxable at the federal level.
- An asset-backed security (ABS) is a security that is made up of other financial securities, that is, the security's cash flows come from the cash flows of the underlying financial securities that "back" it.
- A mortgage-backed security (MBS) is an asset-backed security backed by home mortgages. U.S. government agencies, such as the Government National Mortgage Association (GNMA, or "Ginnie Mae"), are the largest issuers in this sector.
- Holders of agency-issued mortgage-backed securities face prepayment risk, which is the risk that they will find that the bond will be partially (or wholly) repaid earlier than expected. Holders of privately issued mortgage-backed securities also face default risk.
- A collateralized debt obligation is an asset-backed security that is backed by other asset-backed securities.

### 24.3  Bond Covenants

- Covenants are restrictive clauses in the bond contract that help investors by limiting the issuer's ability to take actions that will increase the default risk and reduce the value of the bonds.

### 24.4  Repayment Provisions

- A call provision gives the issuer of the bond the right (but not the obligation) to retire the bond after a specific date (but before maturity).
- A callable bond will generally trade at a lower price than an otherwise equivalent non-callable bond.
- The yield to call is the yield of a callable bond assuming that the bond is called at the earliest opportunity.
- Another way in which a bond is repaid before maturity is by periodically repurchasing part of the debt through a sinking fund.
- Some corporate bonds, known as convertible bonds, have a provision that allows the holder to convert them into equity.
- Convertible debt carries a lower interest rate than other comparable non-convertible debt.

## Key Terms

asset-backed bonds *p. 839*
asset-backed security (ABS) *p. 844*
asset pools *p. 846*
asset securitization *p. 844*
balloon payment *p. 852*
bearer bonds *p. 839*
Bulldogs *p. 841*
call date *p. 848*
call price *p. 848*
callable bonds *p. 848*
collateralized debt obligation (CDO) *p. 845*
collateralized mortgage obligation (CMO) *p. 846*

conversion price *p. 853*
conversion ratio *p. 852*
convertible bonds *p. 852*
covenants *p. 845*
debentures *p. 839*
domestic bonds *p. 841*
double-barreled *p. 844*
Eurobonds *p. 841*
foreign bonds *p. 841*
general obligation bonds *p. 844*
global bonds *p. 841*
indenture *p. 837*

long bonds *p. 843*

mortgage-backed security (MBS) *p. 844*

mortgage bonds *p. 839*

municipal bonds *p. 844*

notes *p. 839*

original issue discount (OID) *p. 839*

prepayment risk *p. 845*

private debt *p. 841*

private placement *p. 842*

registered bonds *p. 839*

revenue bonds *p. 844*

revolving line of credit *p. 842*

Samurai bonds *p. 841*

secured debt *p. 839*

seniority *p. 840*

serial bonds *p. 844*

sinking fund *p. 852*

sovereign debt *p. 842*

stop-out yield *p. 843*

STRIPS *p. 844*

subordinated debenture *p. 840*

subprime mortgages *p. 846*

syndicated bank loan *p. 841*

term loan *p. 841*

TIPS *p. 843*

tranches *p. 840*

unsecured debt *p. 839*

warrant *p. 852*

Yankee bonds *p. 841*

yield to call (YTC) *p. 851*

## Further Reading

For a comprehensive summary of the bond market, consult either of the following texts: F. Fabozzi (ed.), *Handbook of Fixed Income Securities* (McGraw-Hill, 2011); M. Stigum and A. Crescenzi, *The Money Market* (McGraw-Hill, 2007).

Readers interested in more depth on subjects covered in this chapter can consult the following sources:

**Convertible Debt**. R. Billingsley and D. Smith, "Why Do Firms Issue Convertible Debt?" *Financial Management* 25(2) (1996): 93–99; M. Brennan and E. Schwartz, "The Case for Convertibles," *Journal of Applied Corporate Finance* 1(1) (1988): 55–64; W. Bühler and C. Koziol, "Valuation of Convertible Bonds with Sequential Conversion," *Schmalenbach Business Review* 54 (October 2002): 302–334; R. Green, "Investment Incentives, Debt and Warrants," *Journal of Financial Economics* 13 (1984), 115–136; C. Hennessy and Y. Tserlukevich, "Taxation, Agency Conflicts and the Choice between Callable and Convertible Debt," *Journal of Economic Theory* 143 (2008): 374–404; and J. Stein, "Convertible Bonds as Backdoor Equity Financing," *Journal of Financial Economics* 32(1) (1992): 3–21.

**Callable Debt**. P. Asquith, "Convertible Bonds Are Not Called Late," *Journal of Finance* 50(4) (1995): 1275–1289; and M. Brennan and E. Schwartz, "Savings Bonds, Retractable Bonds, and Callable Bonds," *Journal of Financial Economics* 5(1) (1997): 67–88.

For an analysis of how callable convertible debt may reduce the lemons problem, see B. Yilmaz and A. Chakraborty, "Adverse Selection and Convertible Bonds," *Review of Economic Studies* (2011) 78: 148–175.

**Bond Covenants**. C. Smith and J. Warner, "On Financial Contracting: An Analysis of Bond Covenants," *Journal of Financial Economics* 7 (1979): 117–161; and M. Bradley and M. Roberts, "The Structure and Pricing of Corporate Debt Covenants," SSRN working paper (2004).

## Problems

*All problems are available in* MyFinanceLab.

### Corporate Debt

1. Explain some of the differences between a public debt offering and a private debt offering.

2. Why do bonds with lower seniority have higher yields than equivalent bonds with higher seniority?

3. Explain the difference between a secured corporate bond and an unsecured corporate bond.

4. What is the difference between a foreign bond and a Eurobond?

## Other Types of Debt

5. Describe the kinds of securities the U.S. government uses to finance the federal debt.

6. On January 15, 2010, the U.S. Treasury issued a five-year inflation-indexed note with a coupon of 3%. On the date of issue, the consumer price index (CPI) was 250. By January 15, 2015, the CPI had increased to 300. What principal and coupon payment was made on January 15, 2015?

7. On January 15, 2020, the U.S. Treasury issued a 10-year inflation-indexed note with a coupon of 6%. On the date of issue, the CPI was 400. By January 15, 2030, the CPI had decreased to 300. What principal and coupon payment was made on January 15, 2030?

8. Describe what prepayment risk in a GNMA is.

9. What is the distinguishing feature of how municipal bonds are taxed?

## Bond Covenants

10. Explain why bond issuers might voluntarily choose to put restrictive covenants into a new bond issue.

## Repayment Provisions

 11. General Electric has just issued a callable 10-year, 6% coupon bond with annual coupon payments. The bond can be called at par in one year or anytime thereafter on a coupon payment date. It has a price of $102. What is the bond's yield to maturity and yield to call?

 12. Boeing Corporation has just issued a callable (at par) three-year, 5% coupon bond with semiannual coupon payments. The bond can be called at par in two years or anytime thereafter on a coupon payment date. It has a price of $99. What is the bond's yield to maturity and yield to call?

13. Explain why the yield on a convertible bond is lower than the yield on an otherwise identical bond without a conversion feature.

 14. You own a bond with a face value of $10,000 and a conversion ratio of 450. What is the conversion price?

## Data Case

You are still employed at The Home Depot. Recall the presentation of Chapter 15's plan to increase leverage to the Board of Directors. The idea of changing Home Depot's capital structure stirred some conversations among top executives. The CFO and other top managers in the finance division are all aware that increasing the debt load will have ramifications in the credit markets. Specifically, they realize that the firm's debt rating could change, which will raise the cost of borrowing as well as possibly lower the value of the existing debt. No one is exactly sure what the impact will be, but they all agree that it deserves investigation.

Because you prepared the spreadsheet data, you have been summoned to an executive-level meeting and asked to estimate the impact of increasing the debt of the firm. Use the spreadsheet from Chapter 15's Data Case as a starting point. You are to consider four different scenarios: issuing $1 billion, $10 billion, $20 billion, and $30 billion in new debt. In each case, proceeds from the debt will be used to repurchase stock. The CFO believes that the $1 billion level will not affect the firm's credit rating. However, each larger increase in debt will cause the debt to be downgraded one letter

grade (e.g., from Baa to Ba). For example, the $10 billion scenario will lower the current debt rating one level, the $20 billion scenario would lower the rating still another level, and so on. Your job is to determine the impact of additional debt on borrowing costs at each debt level. Assume the new debt will be raised by issuing 10-year bonds.

1.  Determine the current debt rating for The Home Depot.
    - Research the current bond rating at FINRA (http://cxa.marketwatch.com/finra/BondCenter/Default.aspx). Select the "Corporate" toggle, enter the symbol for Home Depot (HD), and click "Search."
    - What is the Moody's bond rating on the Home Depot bond with the maturity closest to 10 years from today? What is the yield on this bond?

2.  Because lower bond ratings will lead to higher interest costs, you will need to determine those costs. Go to Bonds Online (www.bondsonline.com) and click "Today's Market." Next, click "US Corporate Bond Spreads." You will see a table of bond spreads prepared by Reuters and the date the table was prepared right below it. These spreads represent the increased yield a bond must pay over the U.S. Treasury of the same maturity. Choose the 10-year spread for Home Depot's current rating and the three ratings below it. The spreads are in basis points; a basis point is 1/100th of a percentage point (thus, 50 basis points is 0.5%). We will adjust these old spreads to estimate the current spread.
    - Because these spreads are dated, you will need to create new yield spreads for the various ratings. Use the current difference between the Home Depot bond's yield and the 10-year Treasury as the true spread for the rating. Using Excel, compute the spreads for the other ratings, by adding the *difference* in spreads from the table to the new true spread for Home Depot's rating. Finally, determine the yield for each rating by adding the new spread to the yield on the 10-year Treasury bond.
    - Compute the required yields on 10-year bonds at each of the new debt levels requested.

3.  What factors cause the bond rating to fall, and the bond yields to increase, as Home Depot increases its debt levels?

**CHAPTER**

# 25

# Leasing

NOTATION

| | |
|---|---|
| $L$ | lease payments |
| $PV$ | present value |
| $r_D$ | debt cost of capital |
| $\tau_c$ | marginal corporate income tax rate |
| $r_U$ | unlevered cost of capital |
| $r_{wacc}$ | weighted average cost of capital |

**T**O IMPLEMENT AN INVESTMENT PROJECT, A FIRM MUST acquire the necessary property, plant, and equipment. As an alternative to purchasing these assets outright, the firm can lease them. You are probably familiar with leases if you have leased a car or rented an apartment. These consumer rentals are similar to the leases used by businesses: The owner retains title to the asset, and the firm pays for its use of the asset through regular lease payments. When firms lease property, plant, or equipment, the leases generally exceed one year. This chapter focuses on such long-term leases.

If you can purchase an asset, you can probably lease it. Commercial real estate, computers, trucks, copy machines, airplanes, and even power plants are examples of assets that firms can lease rather than buy. Equipment leasing is a rapidly growing industry, with more than one-half of the world's leasing now being done by companies in Europe and Japan. In 2012 more than 33% of the productive assets acquired by U.S. companies were procured through leasing contracts, for a total leasing volume exceeding $264 billion. Eighty-five percent of U.S. companies lease all or some of their equipment.[1] For example, it may come as a surprise that airlines do not own many of their own airplanes. The top aircraft leasing company by fleet size at the start of 2012 was GE Commercial Aviation Services. GE owns and manages over 1725 aircraft, the world's largest commercial airplane fleet.[2] GE leases these commercial aircraft to some 235 airline customers in 75 countries.

As you will learn, leases are not merely an alternative to purchasing; they also function as an important financing method for tangible assets. In fact, long-term leasing is the most common method of equipment

---

[1] Beacon Funding (http://www.beaconfunding.com/vendor_programs/statistics.aspx).

[2] GE Capital Aviation Services Global Fact Sheet http://www.gecas.com/en/docs/GECASFSJ2012.pdf.

financing. How do companies such as GE Commercial Aviation Services set the terms for their leases? How do their customers—the commercial airlines—evaluate and negotiate these leases? In this chapter, we first discuss the basic types of leases and provide an overview of the accounting and tax treatment of leases. We next show how to evaluate the lease-versus-buy decision. Firms often cite various benefits to leasing as compared to purchasing property and equipment, and we conclude the chapter with an evaluation of their reasoning.

## 25.1 The Basics of Leasing

A lease is a contract between two parties: the *lessee* and the *lessor*. The **lessee** is liable for periodic payments in exchange for the right to use the asset. The **lessor** is the owner of the asset, who is entitled to the lease payments in exchange for lending the asset.

Most leases involve little or no upfront payment. Instead, the lessee commits to make regular lease (or rental) payments for the term of the contract. At the end of the contract term, the lease specifies who will retain ownership of the asset and at what terms. The lease also specifies any cancellation provisions, the options for renewal and purchase, and the obligations for maintenance and related servicing costs.

### Examples of Lease Transactions

Many types of lease transactions are possible based on the relationship between the lessee and the lessor. In a **sales-type lease**, the lessor is the manufacturer (or a primary dealer) of the asset. For example, IBM both manufactures and leases computers. Similarly, Xerox leases its copy machines. Manufacturers generally set the terms of these leases as part of a broader sales and pricing strategy, and they may bundle other services or goods (such as software, maintenance, or product upgrades) as part of the lease.

In a **direct lease**, the lessor is not the manufacturer, but is often an independent company that specializes in purchasing assets and leasing them to customers. For example, Ryder Systems, Inc., owns more than 135,000 commercial trucks, tractors, and trailers, which it leases to small businesses and large enterprises throughout the United States, Canada, and the United Kingdom. In many instances of direct leases, the lessee identifies the equipment it needs first and then finds a leasing company to purchase the asset.

If a firm already owns an asset it would prefer to lease, it can arrange a **sale and leaseback** transaction. In this type of lease, the lessee receives cash from the sale of the asset and then makes lease payments to retain the use of the asset. In 2002, San Francisco Municipal Railway (Muni) used the $35 million in proceeds from the sale and leaseback of 118 of its light-rail vehicles to offset a large operating budget deficit. The purchaser, CIBC World Markets of Canada, received a tax benefit from depreciating the rail cars, something Muni could not do as a public transit agency.

With many leases, the lessor provides the initial capital necessary to purchase the asset, and then receives and retains the lease payments. In a **leveraged lease**, however, the lessor borrows from a bank or other lender to obtain the initial capital for the purchase, using the lease payments to pay interest and principal on the loan. Also, in some circumstances, the lessor is not an independent company but rather a separate business partnership, called a **special-purpose entity (SPE)**, which is created by the lessee for the sole purpose of obtaining the lease. SPEs are commonly used in **synthetic leases**, which are designed to obtain specific accounting and tax treatment (discussed further in Section 25.2).

### Lease Payments and Residual Values

Suppose your business needs a new $20,000 electric forklift for its warehouse operations, and you are considering leasing the forklift for four years. In this case, the lessor will purchase the forklift and allow you to use it for four years. At that point, you will return the forklift to the lessor. How much should you expect to pay for the right to use the forklift for the first four years of its life?

The cost of the lease will depend on the asset's **residual value**, which is its market value at the end of the lease. Suppose the residual value of the forklift in four years will be $6000. If lease payments of amount $L$ are made monthly, then the lessor's cash flows from the transaction are as follows (note that lease payments are typically made at the beginning of each payment period):



In a perfect capital market (where lessors compete with one another in initiating leases), the lease payment should be set so that the NPV of the transaction is zero and the lessor breaks even:

$$PV(\text{Lease Payments}) = \text{Purchase Price} - PV(\text{Residual Value}) \qquad (25.1)$$

In other words, *in a perfect market, the cost of leasing is equivalent to the cost of purchasing and reselling the asset.*

Thus, the amount of the lease payment will depend on the purchase price, the residual value, and the appropriate discount rate for the cash flows.

---

**EXAMPLE 25.1**

### Lease Terms in a Perfect Market

**Problem**

Suppose the purchase price of the forklift is $20,000, its residual value in four years is certain to be $6000, and there is no risk that the lessee will default on the lease. If the risk-free interest rate is a 6% APR with monthly compounding, what would be the monthly lease payment for a four-year lease in a perfect capital market?

**Solution**

Because all cash flows are risk free, we can discount them using the risk-free interest rate of $6\%/12 = 0.5\%$ per month. From Eq. 25.1,

$$PV(\text{Lease Payments}) = \$20,000 - \$6000/1.005^{48} = \$15,277.41$$

What monthly lease payment $L$ has this present value? We can interpret the lease payments as an annuity. Because the first lease payment starts today, we can view the lease as an initial payment of $L$ plus a 47-month annuity of $L$. Thus, using the annuity formula, we need to find $L$ so that

$$15,277.41 = L + L \times \frac{1}{0.005}\left(1 - \frac{1}{1.005^{47}}\right) = L \times \left[1 + \frac{1}{0.005}\left(1 - \frac{1}{1.005^{47}}\right)\right]$$

Solving for $L$, we get

$$L = \frac{15{,}277.41}{1 + \dfrac{1}{0.005}\left(1 - \dfrac{1}{1.005^{47}}\right)} = \$357.01 \text{ per month}$$

## Leases Versus Loans

Alternatively, you could obtain a four-year loan for the purchase price and buy the forklift outright. If $M$ is the monthly payment for a fully amortizing loan, the lender's cash flows will be as follows:



Assuming the loan is fairly priced, the loan payments would be such that

$$PV(\text{Loan Payments}) = \text{Purchase Price} \tag{25.2}$$

Comparing Eq. 25.2 with Eq. 25.1, we see that while with a standard loan we are financing the entire cost of the asset, with a lease we are financing only the cost of the economic depreciation of the asset during the term of the lease. Because we are getting the entire asset when we purchase it with the loan, the loan payments are higher than the lease payments.

---

| EXAMPLE 25.2 | **Loan Payments in a Perfect Market** |
|---|---|

**Problem**

Suppose that you purchase the forklift for $20,000 by borrowing the purchase price using a four-year annuity loan. What would the monthly loan payment be in a perfect capital market where the risk-free interest rate is a 6% APR with monthly compounding, assuming no risk of default? How does this compare with the lease payment of Example 25.1?

**Solution**

Because all cash flows are risk free, we can discount them using the risk-free interest rate of $6\%/12 = 0.5\%$ per month. Because loan payments are made at the end of each month, using the annuity formula to value the loan payments, Eq. 25.2 becomes

$$M \times \frac{1}{0.005}\left(1 - \frac{1}{1.005^{48}}\right) = 20{,}000$$

Solving for $M$ gives the loan payments:

$$M = \frac{20{,}000}{\dfrac{1}{0.005}\left(1 - \dfrac{1}{1.005^{48}}\right)} = \$469.70 \text{ per month}$$

Of course, while the lease payments are lower, with the lease, we have the use of the forklift for four years only. With the loan, we own the forklift for its entire life.

### Calculating Auto Lease Payments

Rather than use the annuity formula to calculate the lease payments, as we did in Example 25.1, in many cases, practitioners use the following approximation to calculate the lease payments:

$$L = \underbrace{\frac{\text{Purchase Price} - \text{Residual Value}}{\text{Term}}}_{\text{Avg. Depreciation}}$$

$$+ \underbrace{\left(\frac{\text{Purchase Price} + \text{Residual Value}}{2}\right) \times \text{Interest Rate}}_{\text{Financing Cost}}$$

where the purchase price includes any fees charged on the lease (and is net of any down payment), the term is the number of payment periods, and the interest rate is for a payment period. The idea behind this approximation is that the first term is the average depreciation over a payment period and the second term is the interest cost associated with the average value of the asset. The sum is what you have to pay to use the asset over one payment period.

Despite its simplicity, this formula is very accurate for lease terms up to five years and interest rates up to 10%. Using it to calculate the lease payments in Example 25.1 gives

$$\frac{20,000 - 6000}{48} + \left(\frac{20,000 + 6000}{2}\right) \times 0.005 = \$356.67$$

which is within \$1 of the amount calculated in Example 25.1.

This approximation for the lease payment is used to calculate the payment on automobile leases. In that case, the formula is often stated as

$$L = \frac{\text{Purchase Price} - \text{Residual Value}}{\text{Term}}$$

$$+ (\text{Purchase Price} + \text{Residual Value}) \times \text{Money Factor}$$

leaving many first-time car lessees wondering why they have to pay interest on *both* the purchase price and the residual value. In reality, all that has happened is that the factor of 2 is subsumed into the money factor; that is, the money factor is half the interest rate.

The monthly loan payments in Example 25.2 exceed the lease payments in Example 25.1. This difference does not mean the lease is superior to the loan. While the lease payments are lower, with the lease, we have use of the forklift for four years only. If we purchase the forklift using the loan, we own it after four years and can sell it for its residual value of \$6000. Alternatively, if we lease the forklift and want to keep it after the lease terminates, we can purchase it for its fair market value of \$6000. Once we consider the benefit of this residual value, by the Law of One Price, the total cost of purchasing with either the loan or the lease is the same. That is, combining Eq. 25.2 and Eq. 25.1, we have

$$PV(\text{Lease Payments}) + PV(\text{Residual Value}) = PV(\text{Loan Payments}) \qquad (25.3)$$

In other words, *in a perfect market, the cost of leasing and then purchasing the asset is equivalent to the cost of borrowing to purchase the asset.*[3]

### End-of-Term Lease Options

In Example 25.1, we assumed that at the end of the lease the forklift would be returned to the lessor, who would then obtain its residual market value of \$6000. In reality, other lease terms are possible. In many cases, the lease allows the lessee to obtain ownership of the asset for some price.

- A **fair market value (FMV) lease** gives the lessee the option to purchase the asset at its fair market value at the termination of the lease. (Depending on the asset, determining

---

[3]For a theoretical analysis of competitive lease pricing, see M. Miller and C. Upton, "Leasing, Buying, and the Cost of Capital Services," *Journal of Finance* 31(3) (1976): 761–786; and W. Lewellen, M. Long, and J. McConnell, "Asset Leasing in Competitive Capital Markets," *Journal of Finance* 31(3) (1976): 787–798.

its fair market value may be complicated. The lease will typically stipulate a procedure for doing so, and it often will require estimates of the fair market value to be provided by an independent third party.) With perfect capital markets, there is no difference between an FMV lease and a lease in which the assets are retained by the lessor, because acquiring the asset at its fair market value is a zero-NPV transaction.

- In a **$1.00 out lease** (also known as a finance lease), ownership of the asset transfers to the lessee at the end of the lease for a nominal cost of $1.00. Thus, the lessee will continue to have use of the asset for its entire economic life. The lessee has effectively purchased the asset by making the lease payments. As a result, this type of lease is in many ways equivalent to financing the asset with a standard loan.

- In a **fixed price lease**, the lessee has the option to purchase the asset at the end of the lease for a fixed price that is set upfront in the lease contract. This type of lease is very common for consumer leases (such as for autos). Notice that this kind of lease gives the lessee an option: At the end of the lease, if the market value of the asset exceeds the fixed price, the lessee can buy the asset at below its market value; if the market value of the asset does not exceed the fixed price, however, the lessee can walk away from the lease and purchase the asset for less money elsewhere. Consequently, the lessor will set a higher lease rate to compensate for the value of this option to the lessee.

- In a **fair market value cap lease**, the lessee can purchase the asset at the minimum of its fair market value and a fixed price (the "cap"). The lessee has the same option as in a fixed price lease, although the option in this case is easier to exercise because the lessee does not have to find a similar asset elsewhere to buy when the fixed price exceeds the market value.

---

**EXAMPLE 25.3**

### Lease Payments and End-of-Lease Options

**Problem**

Compute the lease payments for the forklift lease of Example 25.1 if the lease is (a) a fair market value lease, (b) a $1.00 out lease, or (c) a fixed price lease that allows the lessee to buy the asset at the end of the lease for $4000.

**Solution**

With the FMV lease, the lessee can buy the forklift for its fair market value of $6000 at the end of the lease. The lessor obtains a residual value of $6000, either from the forklift itself or from the payment from the lessee. Thus, the lease payments will be unchanged from Example 25.1, or $357 per month.

With the $1.00 out lease, the lessor receives essentially no residual value. Thus, the lease payments themselves will have to compensate the lessor for the full $20,000 purchase price. The lease payments are therefore

$$L = \frac{20{,}000}{1 + \frac{1}{0.005}\left(1 - \frac{1}{1.005^{47}}\right)} = \$467.36 \text{ per month}$$

These payments are slightly less than the loan payments of $470 per month calculated in Example 25.2 because the lease payments occur at the beginning—rather than the end—of the month.

With the fixed price lease, because the forklift will be worth $6000 for certain, the lessee will exercise the option to purchase it for $4000. As a result, the lessor will receive only $4000 at the

end of the lease. For the lease to have an NPV of zero, the present value of the lease payments must be $20,000 - \$4000/1.005^{48} = \$16,851.61$. Therefore, the lease payment will be

$$L = \frac{16,851.61}{1 + \dfrac{1}{0.005}\left(1 - \dfrac{1}{1.005^{47}}\right)} = \$393.79 \text{ per month}$$

This payment exceeds that of the FMV lease due to the lessee's ability to buy the asset at a discount at the end of the lease.

## Other Lease Provisions

Leases are privately negotiated contracts and can contain many more provisions than are described here. For example, they may include early cancellation options that allow the lessee to end the lease early (perhaps for a fee). They may contain buyout options that allow the lessee to purchase the asset before the end of the lease term. Clauses may allow the lessee to trade in and upgrade the equipment to a newer model at certain points in the lease. Each lease agreement can be tailored to fit the precise nature of the asset and the needs of the parties at hand.

These features of leases will be priced as part of the lease payment. Terms that give valuable options to the lessee raise the amount of the lease payments, whereas terms that restrict these options will lower them. Absent market imperfections, leases represent another form of zero-NPV financing available to a firm, and the Modigliani-Miller propositions apply: Leases neither increase nor decrease firm value, but serve only to divide the firm's cash flows and risks in different ways.[4]

CONCEPT CHECK

1. In a perfect capital market, how is the amount of a lease payment determined?

2. What types of lease options would raise the amount of the lease payment?

## 25.2 Accounting, Tax, and Legal Consequences of Leasing

We have seen that with perfect capital markets, leasing represents yet another zero-NPV financing alternative for a firm. Thus, the decision to lease is often driven by real-world market imperfections related to leasing's accounting, tax, and legal treatment.[5] In particular, when a firm leases an asset, a number of important questions arise: Should the firm list the asset on its balance sheet and deduct depreciation expenses? Should the firm list the lease as a liability? Can the lease payments be deducted for tax purposes? In the event of bankruptcy, is the leased asset protected from creditors? As we will see in this section, the answers to these questions depend on how the lease is structured.

_____

[4]For an analysis of options embedded in lease contracts, see J. McConnell and J. Schallheim, "Valuation of Asset Leasing Contracts," *Journal of Financial Economics* 12(2) (1983): 237–261; and S. Grenadier, "Valuing Lease Contracts: A Real-Options Approach," *Journal of Financial Economics* 38(3) (1995): 297–331.

[5]Anyone who has ever considered leasing a car will be familiar with one such imperfection. In most states, lessees do not pay sales tax on the purchase price of the car, only on the lease payments, which usually means lessees can avoid paying a substantial part of the sales tax purchasers must pay.

## Lease Accounting

When publicly traded firms disclose leasing transactions in their financial statements, they must follow the recommendations of the Financial Accounting Standards Board (FASB). For lessees, the FASB distinguishes two types of leases based on the lease terms, and this classification determines the lease's accounting treatment:

- An **operating lease** is viewed as a rental for accounting purposes. In this case, the lessee reports the entire lease payment as an operating expense. The lessee does not deduct a depreciation expense for the asset and does not report the asset, or the lease payment liability, on its balance sheet. Operating leases are disclosed in the footnotes of the lessee's financial statements.

- A **capital lease** (also called a **finance lease**) is viewed as an acquisition for accounting purposes. The asset acquired is listed on the lessee's balance sheet, and the lessee incurs depreciation expenses for the asset. In addition, the present value of the future lease payments is listed as a liability, and the interest portion of the lease payment is deducted as an interest expense.[6]

The different accounting treatment for each type of lease will affect the firm's balance sheet as well as its debt-equity ratio, as shown in Example 25.4.

---

**EXAMPLE 25.4**  |  **Leasing and the Balance Sheet**

**Problem**

Harbord Cruise Lines currently has the following balance sheet (in millions of dollars):

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | 100 | Debt | 900 |
| Property, Plant, and Equipment | 1500 | Equity | 700 |
| **Total Assets** | 1600 | **Total Debt plus Equity** | 1600 |

Harbord is about to add a new fleet of cruise ships. The price of the fleet is $400 million. What will Harbord's balance sheet look like if (a) it purchases the fleet by borrowing the $400 million, (b) it acquires the fleet through a $400 million capital lease, or (c) it acquires the fleet through an operating lease?

**Solution**

For parts (a) and (b), the balance sheet consequences are the same: The fleet becomes a new asset of the firm, and the $400 million becomes an additional liability.

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | 100 | Debt | 1300 |
| Property, Plant, and Equipment | 1900 | Equity | 700 |
| **Total Assets** | 2000 | **Total Debt plus Equity** | 2000 |

Note that the firm's debt-equity ratio increases in this case (from $900/700 = 1.29$ to $1300/700 = 1.86$).

---

[6]The accounting treatment of a capital lease for the lessor will depend on whether it is a sales-type lease, a direct lease, or a leveraged lease (a direct lease in which the lessor obtains more than 60% debt financing to purchase the asset, and the debt is non-recourse in that it is backed solely by the income from the asset).

> If the fleet is acquired through an operating lease, as described in part (c), there is no change in the original balance sheet: The fleet is not listed as an asset, and the lease is not viewed as a liability. Thus, the apparent leverage ratio is unchanged.

Because capital leases increase the apparent leverage on the firm's balance sheet, firms sometimes prefer to have a lease categorized as an operating lease to keep it off the balance sheet. In its Statement of Financial Accounting Standards No. 13 (FAS13), the FASB provides specific criteria that distinguish an operating lease from a capital lease. The lease is treated as a capital lease for the lessee and must be listed on the firm's balance sheet if it satisfies any of the following conditions:

1. Title to the property transfers to the lessee at the end of the lease term.
2. The lease contains an option to purchase the asset at a bargain price that is substantially less than its fair market value.
3. The lease term is 75% or more of the estimated economic life of the asset.
4. The present value of the minimum lease payments at the start of the lease is 90% or more of the asset's fair market value.

These conditions are designed to identify situations in which the lease provides the lessee with use of the asset for a large fraction of its useful life. For example, a $1.00 out lease satisfies the second condition and so would be ruled a capital lease for accounting purposes. Firms that prefer to keep a lease off-balance-sheet will often structure lease contracts to avoid these conditions.[7]

### Operating Leases at Alaska Air Group

Alaska Air Group, Inc., was incorporated in 1985 as a holding company with two main subsidiaries: Alaska Airlines, Inc., and Horizon Air Industries. Alaska Airlines is a major airline with flights throughout the United States. Horizon Air is a regional airline concentrated in the Pacific Northwest. Typical for airlines, Alaska Air Group leases many of its aircraft, as is summarized in the following table:

|                | Owned | Leased | Total |
|----------------|-------|--------|-------|
| Alaska Airlines | 86    | 31     | 117   |
| Horizon Air     | 33    | 15     | 48    |

Source: Alaska Air Group, Inc., December 2011 10-K

Alaska Airlines leases more than a quarter of its aircraft, and Horizon leases almost one third. These leases are almost exclusively operating leases. (In many cases, the lessors are trusts established by a third party specifically to purchase, finance, and lease aircraft to Alaska.) In addition, Alaska leases the majority of its airport and terminal facilities.

Because these leases are operating leases, Alaska Air Group reports the entire lease payment as an operating expense. During 2011, Alaska Air reported aircraft rent expenses of $116.3 million relative to operating revenues of $4.3 billion. The firm did not deduct a depreciation expense for its leased aircraft, and these aircraft did not show up as an asset on its balance sheet (although Alaska Air does report the value of the aircraft that it owns as assets on its balance sheet). And though the lease obligations are not listed as a liability, if they were they would more than double Alaska Air's reported debt.

---

[7]As of mid-2012, the FASB and IASB were negotiating new standards for lease accounting, likely to be finalized in 2013. While the final outcome is still uncertain, early drafts suggest that the new standards will require that *all* leases be reported on the balance sheet.

868     **Chapter 25** Leasing

| EXAMPLE 25.5 | **Operating Versus Capital Leases** |
| --- | --- |

**Problem**

Consider a seven-year fair market value lease for a $12.5 million Gulfstream Jet with a remaining useful life of 10 years. Suppose the monthly lease payments are $175,000 and the appropriate discount rate is a 6% APR with monthly compounding. Would this lease be classified as an operating lease or a capital lease for the lessee? What if the lease contract gave the lessee the option to cancel the contract after five years?

**Solution**

We compute the present value of the monthly lease payments at the beginning of the lease using the annuity formula with a monthly interest rate of $6\%/12 = 0.5\%$ and $7 \times 12 - 1 = 83$ monthly payments after the initial payment. Thus,

$$PV(\text{Lease Payments}) = 175,000 \times \left[1 + \frac{1}{0.005}\left(1 - \frac{1}{1.005^{83}}\right)\right] = \$12.04 \text{ million}$$

Because the present value of the lease payments is $12.04/12.50 = 96.3\%$ of the value of the jet, the lease satisfies condition 4 and so it is a capital lease.

If the lessee can cancel the contract after five years, then the minimum number of lease payments is 60 under the contract. In this case,

$$PV(\text{Lease Payments}) = 175,000 \times \left[1 + \frac{1}{0.005}\left(1 - \frac{1}{1.005^{59}}\right)\right] = \$9.10 \text{ million}$$

This is only $9.10/12.5 = 73\%$ of the value of the jet. As no other conditions for a capital lease are satisfied, the lease would be classified as an operating lease.

## The Tax Treatment of Leases

The categories used to report leases on the financial statements affect the values of assets on the balance sheet, but they have no direct effect on the cash flows that result from a leasing transaction. The IRS has its own classification rules that determine the tax treatment of a lease. Because the tax treatment does affect the cash flows, these rules are more significant from a financial valuation perspective.

The IRS separates leases into two broad categories: true tax leases and non-tax leases. These categories are roughly equivalent to operating and capital leases, although the defining criteria are not identical.

In a **true tax lease**, the lessor receives the depreciation deductions associated with the ownership of the asset. The lessee can deduct the full amount of the lease payments as an operating expense, and these lease payments are treated as revenue for the lessor.

Although the legal ownership of the asset resides with the lessor, in a **non-tax lease**, the lessee receives the depreciation deductions. The lessee can also deduct the interest portion of the lease payments as an interest expense. The interest portion of the lease payment is interest income for the lessor.

IRS Revenue Ruling 55–540 provides the conditions that determine the tax classification of a lease. If the lease satisfies any of these conditions, it is treated as a non-tax lease:

1. The lessee obtains equity in the leased asset.
2. The lessee receives ownership of the asset on completion of all lease payments.
3. The total amount that the lessee is required to pay for a relatively short period of use constitutes an inordinately large proportion of the total value of the asset.

4. The lease payments greatly exceed the current fair rental value of the asset.

5. The property may be acquired at a bargain price in relation to the fair market value of the asset at the time when the option may be exercised.

6. Some portion of the lease payments is specifically designated as interest or its equivalent.[8]

As with the accounting criteria, these rules attempt to identify cases in which a lease is likely to provide the lessee with use of the asset for a large fraction of its useful life. These rules are somewhat vague and are designed to provide the IRS with sufficient latitude to prevent the use of leases solely for tax avoidance.

For example, suppose a $200,000 asset was required to be depreciated by $20,000 per year for 10 years for tax purposes. By acquiring the asset through a four-year $1.00 out lease with payments of $50,000 per year, a firm could receive the same $200,000 total deduction at a faster rate if the lease were categorized as a true tax lease.[9] The IRS rules prevent this type of transaction by categorizing such a lease as a non-tax lease (via conditions 3 and 5).

### Leases and Bankruptcy

Recall from Chapter 16 that when a firm files for bankruptcy under Chapter 11 of the U.S. bankruptcy code, its assets are protected from seizure by the firm's creditors while existing management is given the opportunity to propose a reorganization plan. Even secured lenders are prevented from taking the assets that serve as collateral for their loans during this period, which can last from a few months to several years. Instead, bankruptcy law permits the firm to continue to use the assets in an effort to remain a going concern.

The treatment of leased property in bankruptcy will depend on whether the lease is classified as a security interest or a true lease by the bankruptcy judge. If the lease is deemed to be a **security interest**, the firm is assumed to have effective ownership of the asset and the asset is protected against seizure. The lessor is then treated as any other secured creditor and must await the firm's reorganization or ultimate liquidation.

If the lease is classified as a **true lease** in bankruptcy, then the lessor retains ownership rights over the asset. Within 120 days of filing Chapter 11, the bankrupt firm must choose whether to assume or reject the lease. If it assumes the lease, it must settle all pending claims and continue to make all promised lease payments. If it rejects the lease, the asset must be returned to the lessor (with any pending claims of the lessor becoming unsecured claims against the bankrupt firm).

Thus, if a lease contract is characterized as a true lease in bankruptcy, the lessor is in a superior position than a lender if the firm defaults. By retaining ownership of the asset, the lessor has the right to repossess it if the lease payments are not made, even if the firm seeks bankruptcy protection. A lease therefore allows the lessee to commit to give the lessor superior treatment in default compared to ordinary creditors. Such commitment is efficient if the asset would be more valuable in the hands of the lessor than if retained by the defaulted firm. In this case, the firm might choose to lease assets it would otherwise choose not to finance.[10]

---

[8]IRS Revenue Ruling 55–540, 1955. Additional considerations exist for the tax treatment for the lessor if the lease is a leveraged lease.

[9]This transaction would have the opposite tax consequence for the lessor: The lease payments would be taxed as revenues, but the cost of the asset would be depreciated at the slower rate. However, there can be an advantage if the lessor is in a lower tax bracket than the lessee.

[10]For an analysis of the consequences of this treatment of leases for a firm's borrowing capacity, see A. Eisfeldt and A. Rampini, "Leasing, Ability to Repossess, and Debt Capacity," *Review of Financial Studies* 22(4) (2008): 1621–1657.

### Synthetic Leases

Synthetic leases are designed to be treated as an operating lease for accounting purposes and as a non-tax lease for tax purposes. With a synthetic lease, the lessee is able to deduct depreciation and interest expenses for tax purposes, just as if it had borrowed to purchase the asset, but does not need to report the asset or the debt on its balance sheet.

To obtain this accounting and tax treatment, synthetic leases have typically been structured by creating a special-purpose entity that will act as the lessor and obtain financing, acquire the asset, and lease it to the firm. To ensure that the lease qualifies as an operating lease, the lease is structured so that it (1) provides a fixed purchase price at the end of the lease term based on an initial appraised value (and so is not a bargain price), (2) has a term less than 75% of the economic life of the asset (which is renewable under certain conditions), and (3) has minimum lease payments with a present value less than 90% of the fair value of the property. In addition, to avoid balance sheet consolidation, the owner of record of the SPE must make an initial minimum equity investment of 3% that remains at risk during the entire lease term. The lease can qualify as a non-tax lease by designating some portion of the lease payments as interest.

A major motivation for such leases appears to be that they allow firms to use debt while avoiding the accounting consequences of debt. In particular, by keeping the debt off the balance sheet, the firm's debt-equity ratio is improved, its return on assets is generally raised, and, if the lease payments are less than the interest and depreciation expenses, its reported earnings per share will be higher.

These types of transactions were used and abused by Enron Corporation to boost its earnings and hide its liabilities prior to its downfall. In the wake of the Enron scandal, the FASB has significantly tightened the requirements for SPEs, raising the at-risk equity investment of the SPE to 10% and requiring that ownership truly be independent from the lessor. Investors have also reacted skeptically to such deals, forcing many firms to avoid synthetic leases or unwind structures that were already in place. For example, in 2002, Krispy Kreme Doughnuts Corporation reversed its decision to use a synthetic lease to fund a new $35 million plant after an article critical of the transaction was published in *Forbes* magazine.

Whether a transaction is classified as a true lease or a security interest will depend on the facts of each case, but the distinction is very similar to the accounting and tax distinctions made earlier. Operating and true tax leases are generally viewed as true leases by the courts, whereas capital and non-tax leases are more likely to be viewed as a security interest. In particular, leases for which the lessee obtains possession of the asset for its remaining economic life (either within the contract or through an option to renew or purchase at a nominal charge) are generally deemed security interests.[11]

**CONCEPT CHECK**

1. How is a $1.00 out lease characterized for accounting and tax purposes?

2. Is it possible for a lease to be treated as an operating lease for accounting purposes and as a non-tax lease for tax purposes?

## 25.3  The Leasing Decision

How should a firm decide whether to buy or lease an asset? Recall that in a perfect market the decision is irrelevant, so the real-world decision depends on market frictions. In this section, we consider one important market friction—taxes—and evaluate the financial consequences of the leasing decision from the perspective of the lessee. We show how to determine whether it is more attractive to lease an asset or to buy it and (potentially)

---

[11]See Article 1 of the Uniform Commercial Code, Section 1-203 at http://www.law.upenn.edu/bll/ulc/ulc.htm#ucc1.

finance the purchase with debt. First, we consider a true tax lease; then, we turn to non-tax leases at the end of the section.

## Cash Flows for a True Tax Lease

If a firm purchases a piece of equipment, the expense is a capital expenditure. Therefore, the purchase price can be depreciated over time, generating a depreciation tax shield. If the equipment is leased and the lease is a true tax lease, there is no capital expenditure, but the lease payments are an operating expense.

Let's compare the cash flows arising from a true tax lease with those arising from a purchase using an example. Emory Printing needs a new high-speed printing press. It can purchase one for $50,000 in cash. The machine will last five years, and it will be depreciated for tax purposes using straight-line depreciation over that period.[12] This means that Emory can deduct $10,000 per year for depreciation. Given its tax rate of 35%, Emory will therefore save $3500 per year in taxes from the depreciation deduction.

Alternatively, Emory can lease the machine instead of purchasing it. A five-year lease contract will cost $12,500 per year. Emory must make these payments at the beginning of each year. Because the lease is a true tax lease, Emory deducts the lease payments as an operating expense when they are paid. Thus, the after-tax cost of each lease payment is $(1 - 35\%) \times 12,500 = \$8125$. The lease contract does not provide for maintenance or servicing of the machine, so these costs are identical whether the machine is leased or purchased.

Table 25.1 shows the free cash flow consequences of buying and leasing. Here, we consider only the cash flows that differ as a result of leasing versus buying. We do not need to consider cash flows that would be the same in both situations, such as the sales revenues generated by having the machine and maintenance expenses. We have also assumed the machine has no residual value after five years if it is purchased. If any of these differences existed, we would include them in the cash flows. Recall from Eq. 8.6 of Chapter 8 that free cash flow can be calculated as EBITDA less taxes, capital expenditures and increases in net working capital, plus the depreciation tax shield (i.e., tax rate $\times$ depreciation expense). Thus, if Emory buys, the only change to FCF is from capital expenditures and the depreciation tax shield, and if Emory leases, the only change is a reduction in EBITDA, and therefore taxes, from the lease payment.

| TABLE 25.1 SPREADSHEET | Cash Flow ($) Consequences from Leasing Versus Buying | | | | | |
|---|---|---|---|---|---|---|

| Year | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| **Buy** | | | | | | |
| 1  Capital Expenditures | (50,000) | — | — | — | — | — |
| 2  Depreciation Tax Shield at 35% | — | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| 3  **Free Cash Flow (Buy)** | (50,000) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| **Lease** | | | | | | |
| 4  Lease Payments | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | — |
| 5  Income Tax Savings at 35% | 4,375 | 4,375 | 4,375 | 4,375 | 4,375 | — |
| 6  **Free Cash Flow (Lease)** | (8,125) | (8,125) | (8,125) | (8,125) | (8,125) | — |

---

[12]In practice, a more accelerated depreciation schedule would be used for tax purposes. We use straight-line depreciation here for simplicity.

Note that the cash flows of leasing differ from buying. A purchase requires a large initial outlay followed by a series of depreciation tax credits. In contrast, the cost of a leased machine is more evenly spread over time.

## Lease Versus Buy (An Unfair Comparison)

Is it better for Emory to lease or buy the printing press? To begin to answer this question, let's compare the present value of the cash flows in each transaction (or, equivalently, we can compute the NPV of the difference between the cash flows). To compute the present value, we need to determine the cost of capital.

The appropriate cost of capital depends, of course, on the risk of the cash flows. Lease payments are a fixed obligation of the firm. If Emory fails to make the lease payments, it will default on the lease. The lessor will seek the remaining lease payments and, in addition, will take back the printing press. In that sense, a lease is similar to a loan secured with the leased asset as collateral. Moreover, as discussed in Section 25.2, in a true lease the lessor is in an even better position than a secured creditor if the firm files for bankruptcy. Thus, *the risk of the lease payments is no greater than the risk of secured debt*, so it is reasonable to discount the lease payments at the firm's secured borrowing rate.

The tax savings from the lease payments and from depreciation expenses are also low-risk cash flows, as they are predetermined and will be realized as long as the firm generates positive income.[13] Therefore, a common assumption in practice is to use the firm's borrowing rate for these cash flows as well.

If Emory's borrowing rate is 8%, the cost of buying the machine has present value

$$PV(\text{Buy}) = -50{,}000 + \frac{3500}{1.08} + \frac{3500}{1.08^2} + \frac{3500}{1.08^3} + \frac{3500}{1.08^4} + \frac{3500}{1.08^5}$$

$$= -\$36{,}026$$

The cost of leasing the machine has present value

$$PV(\text{Lease}) = -8125 - \frac{8125}{1.08} - \frac{8125}{1.08^2} - \frac{8125}{1.08^3} - \frac{8125}{1.08^4}$$

$$= -\$35{,}036$$

Thus, leasing is cheaper than buying, with a net savings of $36{,}026 - \$35{,}036 = \$990$.

The preceding analysis ignores an important point, however. When a firm enters into a lease, it is committing to lease payments that are a fixed future obligation of the firm. If the firm is in financial distress and cannot make the lease payments, the lessor can seize the machine. Moreover, the lease obligations themselves could trigger financial distress. Therefore, when a firm leases an asset, it is effectively adding leverage to its capital structure (whether or not the lease appears on the balance sheet for accounting purposes).

Because leasing is a form of financing, we should compare it to other financing options that Emory may have. Rather than buy the asset outright, Emory could borrow funds (or reduce its planned cash balances, and thereby increase its net debt) to finance the purchase of the machine, thus matching the leverage of the lease. If Emory does borrow, it

---

[13]Even if income is negative, these tax benefits may still be obtained through carryback or carryforward provisions that allow the firm to apply these credits against income that was generated in past or future years.

will also benefit from the interest tax shield provided by leverage. This tax advantage may make borrowing to buy the machine more attractive than leasing. Thus, to evaluate a lease correctly, we should compare it to purchasing the asset using an equivalent amount of leverage. In other words, the appropriate comparison is not lease versus buy, but rather lease versus borrow.

## Lease Versus Borrow (The Right Comparison)

To compare leasing to borrowing, we must determine the amount of the loan that leads to the same level of fixed obligations that Emory would have with the lease. We call this loan the **lease-equivalent loan**. That is, the lease-equivalent loan is the loan that is required on the purchase of the asset that leaves the purchaser with the same obligations as the lessee would have.[14]

**The Lease-Equivalent Loan.** To compute the lease-equivalent loan in Emory's case, we first compute the difference between the cash flows from leasing versus buying, which we refer to as the incremental free cash flow of leasing. As Table 25.2 shows, relative to buying, leasing saves cash upfront but results in lower future cash flows. The incremental free cash flow in years 1 through 5 represents the effective leverage the firm takes on by leasing. Alternatively, Emory could take on this same leverage by purchasing the printing press and taking on a loan with these same after-tax debt payments. How much could Emory borrow by taking on such a loan? Because the future incremental cash flows are the after-tax payments Emory will make on the loan, the initial balance on the lease-equivalent loan is the present value of these cash flows using Emory's after-tax cost of debt:

$$\text{Loan Balance} = PV\,[\text{Future FCF of Lease Versus Buy at } r_D(1 - \tau_c)] \qquad (25.4)$$

Using Emory's after-tax borrowing cost of 8% $(1 - 35\%) = 5.2\%$, the initial loan balance is

$$\text{Loan Balance} = \frac{11{,}625}{1.052} + \frac{11{,}625}{1.052^2} + \frac{11{,}625}{1.052^3} + \frac{11{,}625}{1.052^4} + \frac{3500}{1.052^5} = \$43{,}747 \qquad (25.5)$$

Eq. 25.5 implies that if Emory is willing to take on the future obligations implied by leasing, it could instead buy the printing press and borrow $43,747. This exceeds the savings of $41,875 in year 0 from leasing shown in Table 25.2. Thus, by buying and borrowing using the lease-equivalent loan, Emory saves an additional $43,747 − 41,875 = $1872 initially, and so leasing the machine is unattractive relative to this alternative.

| TABLE 25.2 SPREADSHEET | Incremental Free Cash Flows of Leasing Versus Buying | | | | | |
|---|---|---|---|---|---|---|
| Year | 0 | 1 | 2 | 3 | 4 | 5 |
| **Lease vs. Buy ($)** | | | | | | |
| 1  FCF Lease (Line 6, Table 25.1) | (8,125) | (8,125) | (8,125) | (8,125) | (8,125) | — |
| 2  Less: FCF Buy (Line 3, Table 25.1) | 50,000 | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) |
| 3  **Lease–Buy** | **41,875** | **(11,625)** | **(11,625)** | **(11,625)** | **(11,625)** | **(3,500)** |

---

[14]See S. Myers, D. Dill, and A. Bautista, "Valuation of Financial Lease Contracts," *Journal of Finance* 31(3) (1976): 799–819, for a development of this method.

874          **Chapter 25** Leasing

| | Year | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|
| **Lease–Equivalent Loan ($)** | | | | | | | |
| 1  Loan Balance (PV at 5.2%) | | 43,747 | 34,397 | 24,561 | 14,213 | 3,327 | — |
| **Buy with Lease Equivalent Loan ($)** | | | | | | | |
| 2  Net Borrowing (Repayment) | | 43,747 | (9,350) | (9,836) | (10,348) | (10,886) | (3,327) |
| 3  Interest (at 8%) | | | (3,500) | (2,752) | (1,965) | (1,137) | (266) |
| 4  Interest Tax Shield at 35% | | | 1,225 | 963 | 688 | 398 | 93 |
| 5  Cash Flows of Loan (After-Tax) | | 43,747 | (11,625) | (11,625) | (11,625) | (11,625) | (3,500) |
| 6  FCF Buy | | (50,000) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| 7  Cash Flows of Borrow + Buy | | (6,253) | (8,125) | (8,125) | (8,125) | (8,125) | — |

**TABLE 25.3 SPREADSHEET** — **Cash Flows from Buying and Borrowing Using the Lease-Equivalent Loan**

We verify this result explicitly in the spreadsheet in Table 25.3. There, we compute the cash flows that result from buying the machine and borrowing using the lease-equivalent loan. Line 1 shows the lease-equivalent loan balance, which we compute at each date by applying Eq. 25.4. Line 2 shows the initial borrowing and principal payments of the loan (computed as the change in the loan balance from the prior year). Line 3 shows the interest due each year (8% of the prior loan balance), and line 4 computes the interest tax shield (35% of the interest amount). Line 5 then totals the after-tax cash flows of the loan, which we combine with the free cash flow from buying the printing press, to compute the total cash flow from buying and borrowing on line 7.

Comparing the cash flows from buying the printing press and financing it with the lease-equivalent loan (line 7 of Table 25.3) with the cash flows of the lease (e.g., line 1 of Table 25.2), we see that in both cases Emory has a net future obligation of $8125 per year for four years. But while the leverage is the same for the two strategies, the initial cash flow is not. With the lease, Emory will pay $8125 initially; with the loan, Emory will pay the purchase price of the printing press minus the amount borrowed, or $50,000 − $43,747 = $6253. Again, we see that borrowing to buy the machine is cheaper than the lease, with a savings of $8125 − $6253 = $1872. For Emory, the lease is not attractive. If Emory is willing to take on that much leverage, it would be better off doing so by borrowing to purchase the printing press, rather than leasing it.

**A Direct Method.**  Now that we have seen the role of the lease-equivalent loan, we can use the tools of Chapter 18 to directly compare leasing with an equivalent debt-financed purchase. Recall from Chapter 18 that when the cash flows of an investment will be offset completely with leverage, the appropriate weighted average cost of capital is given by $r_U - \tau_c\, r_D$, where $r_U$ is the unlevered cost of capital for the investment (see Eq. 18.11 and the discussion on pages 642–644). Because the incremental cash flows from leasing versus borrowing are relatively safe, $r_U = r_D$ and so $r_{wacc} = r_D(1 - \tau_c)$. Thus, *we can compare leasing to buying the asset using equivalent leverage by discounting the incremental cash flows of leasing versus buying using the after-tax borrowing rate.*

In Emory's case, discounting the incremental free cash flow in Table 25.2 at Emory's after-tax borrowing cost of 8% × (1 − 35%) = 5.2%, we get

$$PV(\text{Lease Versus Borrow}) = 41,875 - \frac{11,625}{1.052} - \frac{11,625}{1.052^2} - \frac{11,625}{1.052^3} - \frac{11,625}{1.052^4} - \frac{3500}{1.052^5}$$

$$= -\$1872$$

Note that this is precisely the difference we calculated earlier.

**The Effective After-Tax Lease Borrowing Rate.** We can also compare leasing and buying in terms of an effective after-tax borrowing rate associated with the lease. This is given by the IRR of the incremental lease cash flows in Table 25.2, which we can calculate as 7%:

$$41{,}875 - \frac{11{,}625}{1.07} - \frac{11{,}625}{1.07^2} - \frac{11{,}625}{1.07^3} - \frac{11{,}625}{1.07^4} - \frac{3500}{1.07^5} = 0$$

Thus, the lease is equivalent to borrowing at an after-tax rate of 7%. This option is not attractive compared to the after-tax rate of only $8\% \times (1 - 35\%) = 5.2\%$ that Emory pays on its debt. Because we are borrowing (positive followed by negative cash flows), a lower IRR is better. But be careful with this approach—as discussed in Chapter 7, if the cash flows alternate signs more than once, the IRR method cannot be relied upon.

## Evaluating a True Tax Lease

In summary, when evaluating a true-tax lease, we should compare leasing to a purchase that is financed with equivalent leverage. We suggest the following approach:

1. Compute the *incremental cash flows* for leasing versus buying, as we did in Table 25.2. Include the depreciation tax shield (if buying) and the tax deductibility of the lease payments if leasing.

2. Compute the NPV of leasing versus buying using equivalent leverage by discounting the incremental cash flows at the *after-tax borrowing rate*.

If the NPV computed in Step 2 is negative, then leasing is unattractive compared to traditional debt financing. In this case, the firm should not lease, but rather should acquire the asset using an optimal amount of leverage (based on the trade-offs and techniques discussed in Parts 5 and 6).

   If the NPV computed in Step 2 is positive, then leasing does provide an advantage over traditional debt financing and should be considered. Management should recognize, however, that while it may not be listed on the balance sheet, the lease increases the firm's effective leverage by the amount of the lease-equivalent loan.[15]

| EXAMPLE 25.6 | **Evaluating New Lease Terms** |
| --- | --- |

**Problem**

Suppose Emory rejects the lease we analyzed, and the lessor agrees to lower the lease rate to $11,800 per year. Does this change make the lease attractive?

**Solution**

The incremental cash flows are shown in the following table:

| | Year | 0 | 1 | 2 | 3 | 4 | 5 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Buy** | | | | | | | |
| 1   Capital Expenditures | | (50,000) | — | — | — | — | — |
| 2   Depreciation Tax Shield at 35% | | — | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| 3   **Free Cash Flow (Buy)** | | (50,000) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| **Lease** | | | | | | | |
| 4   Lease Payments | | (11,800) | (11,800) | (11,800) | (11,800) | (11,800) | — |
| 5   Income Tax Savings at 35% | | 4,130 | 4,130 | 4,130 | 4,130 | 4,130 | — |
| 6   **Free Cash Flow (Lease)** | | (7,670) | (7,670) | (7,670) | (7,670) | (7,670) | — |
| **Lease vs. Buy** | | | | | | | |
| 7   **Lease–Buy** | | 42,330 | (11,170) | (11,170) | (11,170) | (11,170) | (3,500) |

---

[15] If financial distress or other costs of leverage are large, the firm may wish to offset some of this increase in leverage by reducing other debt of the firm.

Using Emory's after-tax borrowing cost of 5.2%, the gain from leasing versus an equivalently leveraged purchase is

$$NPV(\text{Lease Versus Borrow}) = 42{,}330 - \frac{11{,}170}{1.052} - \frac{11{,}170}{1.052^2} - \frac{11{,}170}{1.052^3} - \frac{11{,}170}{1.052^4} - \frac{3500}{1.052^5}$$

$$= 42{,}330 - 42{,}141$$

$$= \$189$$

Therefore, the lease is attractive at the new terms.

## Evaluating a Non-Tax Lease

Evaluating a non-tax lease is much more straightforward than evaluating a true tax lease. For a non-tax lease, the lessee still receives the depreciation deductions (as though the asset were purchased). Only the interest portion of the lease payment is deductible, however. Thus, in terms of cash flows, a non-tax lease is directly comparable to a traditional loan. Therefore, it is attractive if it offers a better interest rate than would be available with a loan. To determine whether it does offer a better rate, we can discount the lease payments at the firm's *pretax* borrowing rate and compare it to the purchase price of the asset.

| EXAMPLE 25.7 | **Comparing a Non-Tax Lease with a Standard Loan** |
|---|---|

**Problem**

Suppose the lease in Example 25.6 is a non-tax lease. Would it be attractive for Emory in this case?

**Solution**

Instead of purchasing the machine for $50,000, Emory will pay lease payments of $11,800 per year. That is, Emory is effectively borrowing $50,000 by making payments of $11,800 per year. Given Emory's 8% borrowing rate, payments of $11,800 per year on a standard loan would allow Emory to borrow

$$PV(\text{Lease Payments}) = 11{,}800 + \frac{11{,}800}{1.08} + \frac{11{,}800}{1.08^2} + \frac{11{,}800}{1.08^3} + \frac{11{,}800}{1.08^4} = \$50{,}883$$

That is, by making the same payments on a loan, Emory could raise more than $50,000. Thus, the lease is not attractive at these terms if it is a non-tax lease.

For both the true tax lease and the non-tax lease, we have ignored the residual value of the asset, any differences in the maintenance and service arrangements with a lease versus a purchase, and any cancellation or other lease options. If these features are present, they should also be included when comparing leasing versus a debt-financed purchase.

| CONCEPT CHECK | 1. Why is it inappropriate to compare leasing to buying? |
|---|---|
| | 2. What discount rate should be used for the incremental lease cash flows to compare a true tax lease to borrowing? |
| | 3. How can we compare a non-tax lease to borrowing? |

## 25.4 Reasons for Leasing

In Section 25.3, we saw how to determine whether a lease is attractive for the potential lessee. A similar, but reverse argument can be used from the standpoint of the lessor. The lessor could compare leasing the equipment to lending the money to the firm so that it can

purchase the equipment. Under what circumstances would leasing be profitable for both the lessor and the lessee? If a lease is a good deal for one of the parties, is it a bad deal for the other? Or are there underlying economic sources of value in a lease contract?

## Valid Arguments for Leasing

For a lease to be attractive to both the lessee and the lessor, the gains must come from some underlying economic benefits that the leasing arrangement provides. Here, we consider some valid reasons for leasing.

**Tax Differences.** With a true tax lease, the lessee replaces depreciation and interest tax deductions with a deduction for the lease payments. Depending on the timing of the payments, one set of deductions will have a larger present value. A tax gain occurs if the lease shifts the more valuable deductions to the party with the higher tax rate. Generally speaking, if the asset's tax depreciation deductions are more rapid than its lease payments, a true tax lease is advantageous if the lessor is in a higher tax bracket than the lessee.[16] In contrast, if the asset's tax depreciation deductions are slower than its lease payments, there are tax gains from a true tax lease if the lessor is in a lower tax bracket than the lessee.

| EXAMPLE 25.8 | **Exploiting Tax Differences Through Leasing** |

**Problem**

Suppose Emory is offered a true tax lease for the printing press at a lease rate of $11,800 per year. Show that this lease is profitable for Emory as well as for a lessor with a 15% tax rate and an 8% borrowing cost.

**Solution**

We already evaluated the lease with these terms in Example 25.6. There, we found that the NPV of leasing versus borrowing was $189 for Emory. Now let's consider the lease from the standpoint of the lessor. The lessor will buy the printing press and then lease it to Emory. The incremental cash flows for the lessor from buying and leasing are as follows:

| | Year | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|
| **Buy** | | | | | | | |
| 1 | Capital Expenditures | (50,000) | — | — | — | — | — |
| 2 | Depreciation Tax Shield at 15% | — | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| 3 | **Free Cash Flow (Buy)** | (50,000) | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| **Lease** | | | | | | | |
| 4 | Lease Payments | 11,800 | 11,800 | 11,800 | 11,800 | 11,800 | — |
| 5 | Income Tax at 15% | (1,770) | (1,770) | (1,770) | (1,770) | (1,770) | — |
| 6 | **Free Cash Flow (Lease)** | 10,030 | 10,030 | 10,030 | 10,030 | 10,030 | — |
| **Lessor Free Cash Flow** | | | | | | | |
| 7 | **Buy and Lease** | (39,970) | 11,530 | 11,530 | 11,530 | 11,530 | 1,500 |

Evaluating the cash flows at the after-tax rate of $8\% \times (1 - 15\%) = 6.8\%$, we find the NPV = $341 > 0$ for the lessor. (Using the after-tax rate for the lessor implies that the lessor will borrow against the future free cash flows of the transaction.) Thus, both sides gain from the transaction due to the difference in tax rates. The gain comes from the fact that for Emory, the lease provides more accelerated tax deductions than the company would receive from depreciating the printing press. Because Emory is in a higher tax bracket than the leasing company, shifting the faster tax deductions to Emory is advantageous.

---

[16]See J. Graham, M. Lemmon, and J. Schallheim, "Debt, Leases, Taxes, and the Endogeneity of Corporate Tax Status," *Journal of Finance* 53(1) (1998): 131–162, for evidence that low tax rate firms tend to lease more than high tax rate firms.

**Reduced Resale Costs.** Many assets are time consuming and costly to sell. If a firm only needs to use the asset for a short time, it is probably less costly to lease it than to buy and resell the asset. In this case, the lessor is responsible for finding a new user for the asset, but lessors are often specialized to do so and so face much lower costs. For example, car dealerships are in a better position to sell a used car at the end of a lease than a consumer is. Some of this advantage can be passed along through a lower lease rate. In addition, while owners of assets are likely to resell them only if the assets are "lemons," a short-term lease can commit the user of an asset to return it regardless of its quality. In this way, leases can help mitigate the adverse selection problem in the used goods market.[17]

**Efficiency Gains from Specialization.** Lessors often have efficiency advantages over lessees in maintaining or operating certain types of assets. For example, a lessor of office copy machines can employ expert technicians and maintain an inventory of spare parts required for maintenance. Some types of leases may even come with an operator, such as a truck with a driver (in fact, the term "operating lease" originated from such leases). By offering assets together with these complementary services, lessors can achieve efficiency gains and offer attractive lease rates. In addition, if the value of the asset depends upon these additional services, then a firm that purchases the asset would be dependent on the service provider, who could then raise the price for services and exploit the firm.[18] By leasing the asset and the services as a bundle, the firm maintains its bargaining power by retaining its flexibility to switch to competing equipment.

**Reduced Distress Costs and Increased Debt Capacity.** As noted in Section 25.2, assets leased under a true lease are not afforded bankruptcy protection and can be seized in the event of default. As a result, lease obligations effectively have higher priority and lower risk than even secured debt. In addition, the lessor may be better able to recover the full economic value of the asset (by releasing it) than a lender would. Because of the reduced risk and higher recovery value in the event of default, a lessor may be able to offer more attractive financing through the lease than an ordinary lender could. Studies suggest that this effect is important for small firms and firms that are capital constrained.[19]

**Mitigating Debt Overhang.** Leasing may have an additional benefit to firms that suffer from debt overhang. Recall that with debt overhang, a firm may fail to make positive NPV investments because the existing debt holders will capture much of the value of any new assets. Because of its effective seniority, a lease may allow the firm to finance its expansion while effectively segregating the claim on the new assets, and thus overcome the debt overhang problem.[20]

For example, suppose clothing designer Andreano Ltd. has an opportunity that requires use of a new $1.1 million robotic sewing machine. The machine does not depreciate and so can be sold for $1.1 million at the end of the year, and the project will generate an

---

[17]For evidence of this effect, see T. Gilligan, "Lemons and Leases in the Used Business Aircraft Market," *Journal of Political Economy* 112(5) (2004): 1157–1180.

[18]This concern is often referred to as the hold-up problem. The importance of the hold-up problem in determining the optimal ownership of assets was identified by B. Klein, R. Crawford, and A. Alchian, "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," *Journal of Law and Economics* 21 (1978): 297–326.

[19]See S. Sharpe and H. Nguyen, "Capital Market Imperfections and the Incentive to Lease," *Journal of Financial Economics* 39(2–3) (1995): 271–294; and A. Eisfeldt and A. Rampini (referenced in footnote 10).

[20]See R. Stulz and H. Johnson, "An Analysis of Secured Debt," *Journal of Financial Economics*, 14 (1985): 501–521.

additional $550,000 with certainty, for a total payoff of $1.65 million. If the risk-free rate is 10%, then this opportunity has NPV of $1.65 million/1.10 − 1.1 million = $400,000.

But suppose there is a 40% probability that Andreano will be in bankruptcy next year and its equity will be wiped out. In that case, the present value of the project's payoff to equity holders is only 60% × $1.65 million/1.10 = $900,000, and it will not be willing to invest the $1.1 million needed to purchase the machine upfront.[21]

On the other hand, suppose Andreano can lease the machine for the year. From Eq. 25.1, the competitive one-year lease rate is $1.1 million − 1.1 million/1.10 = $100,000. Equity holders would be willing to contribute this amount, as the present value of the equity holders' payoff from the new project is 60% × $550,000/1.10 = $300,000. Leasing solves the debt overhang by allowing Andreano to use the machine without giving existing debt holders a claim to it in the event of default.[22]

**Transferring Risk.**  At the beginning of a lease, there may be significant uncertainty about the residual value of the leased asset, and whoever owns the asset bears this risk. Leasing allows the party best able to bear the risk to hold it. For example, small firms with a low tolerance for risk may prefer to lease rather than purchase assets.

**Improved Incentives.**  When the lessor is the manufacturer, a lease in which the lessor bears the risk of the residual value can improve incentives and lower agency costs. Such a lease provides the manufacturer with an incentive to produce a high-quality, durable product that will retain its value over time. In addition, if the manufacturer is a monopolist, leasing the product gives the manufacturer an incentive not to overproduce and lower the product's residual value, as well as an ability to restrict competition from sales of used goods.

Despite these potential benefits, significant agency costs may also be associated with leasing. For leases in which the lessor retains a substantial interest in the asset's residual value, the lessee has less of an incentive to take proper care of an asset that is leased rather than purchased.[23]

### Suspect Arguments for Leasing

Some reasons that lessees and lessors cite for preferring leasing to purchasing are difficult to justify economically. While they may be important in some circumstances, they deserve careful scrutiny.

**Avoiding Capital Expenditure Controls.**  One reason some managers will choose to lease equipment rather than purchase it is to avoid the scrutiny from superiors that often accompanies large capital expenditures. For example, some companies may place limits on the dollar amounts a manager can invest over a certain period; lease payments may fall below these limits, whereas the cost of the purchase would not. By leasing, the manager

---

[21]For simplicity, we have assumed in this example that all risk is idiosyncratic so that we can discount at the risk-free rate. More generally, the same results hold even if the risk is not idiosyncratic as long as we interpret the probabilities as risk-neutral probabilities, as discussed in Chapter 21.

[22]While secured debt might also be beneficial in this example, there is some risk that secured debt holders might not be able to repossess the assets in a timely fashion in the event of bankruptcy, and thus would not receive its full liquidation value.

[23]As an example, auto manufacturers require individuals who lease their cars to provide proper maintenance. Without such requirements, individuals would be tempted to avoid paying for oil changes and other maintenance near the end of the lease term. Of course, there are other ways lessees may abuse their cars (driving at excessive speeds, for example) that cannot be easily controlled.

avoids having to make a special request for funds. This reason for leasing is also apparent in the public sector, where large assets are often leased to avoid asking the government or the public to approve the funds necessary to purchase the assets. However, the lease may cost more than the purchase, wasting stockholder or taxpayer dollars in the long run.

**Preserving Capital.**  A common argument made in favor of leasing is that it provides "100% financing" because no down payment is required, so the lessee can save cash to use for other needs. Of course, in a perfect market financing is irrelevant, so for leases to have a financing advantage, some friction must exist. Possible imperfections include the distress costs, debt overhang, and tax differentials discussed above. But it is important to appreciate that the advantage of a lease derives from its differential treatment for tax purposes and in bankruptcy, not because leases provide 100% financing. For firms that are not subject to these frictions, the amount of leverage the firm can obtain through a lease is unlikely to exceed the amount of leverage the firm can obtain through a loan.

**Reducing Leverage Through Off-Balance-Sheet Financing.**  By carefully avoiding the four criteria that define a capital lease for accounting purposes, a firm can avoid listing the long-term lease as a liability. Because a lease is equivalent to a loan, the firm can increase its actual leverage without increasing the debt-to-equity ratio on its balance sheet. But whether they appear on the balance sheet or not, lease commitments are liabilities for the firm. As a result, they will have the same effect on the risk and return characteristics of the firm as other forms of leverage do. Most financial analysts and sophisticated investors understand this fact and consider operating leases (which must be listed in the footnotes of the financial statements) to be additional sources of leverage.

CONCEPT CHECK   1. What are some of the potential gains from leasing if the lessee plans to hold the asset for only a small fraction of its useful life?

2. If a lease is not listed as a liability on the firm's balance sheet, does it mean that a firm that leases rather than borrows is less risky?

MyFinanceLab   Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 25.1 The Basics of Leasing

- A lease is a contract between two parties: the lessee and the lessor. The lessee is liable for periodic payments in exchange for the right to use the asset. The lessor, who is the owner of the asset, is entitled to the lease payments in exchange for lending the asset.
- Many types of lease transactions are possible depending on the relationship between the lessee and the lessor.
  - In a sales-type lease, the lessor is the manufacturer or primary dealer of the asset.
  - In a direct lease, the lessor is an independent company that specializes in purchasing assets and leasing them to customers.
  - If a firm already owns an asset it would prefer to lease, it can arrange a sale and leaseback transaction.
- In a perfect market, the cost of leasing is equivalent to the cost of purchasing and reselling the asset. Also, the cost of leasing and then purchasing the asset is equivalent to the cost of borrowing to purchase the asset.

■ In many cases, the lease provides options for the lessee to obtain ownership of the asset at the end of the lease. Some examples include fair market value leases, $1.00 out leases, and fixed price or fair market value cap leases.

### 25.2  Accounting, Tax, and Legal Consequences of Leasing

■ The FASB recognizes two types of leases based on the lease terms: operating leases and capital leases. Operating leases are viewed as rentals for accounting purposes. Capital leases are viewed as purchases.

■ The IRS separates leases into two broad categories: true tax leases and non-tax leases. With a true tax lease, the lessee deducts lease payments as an operating expense. A non-tax lease is treated as a loan for tax purposes, so the lessee must depreciate the asset and can expense only the interest portion of the lease payments.

■ In a true lease, the asset is not protected in the event that the lessee declares bankruptcy, and the lessor can seize the asset if lease payments are not made. If the lease is deemed a security interest by the bankruptcy court, then the asset is protected and the lessor becomes a secured creditor.

### 25.3  The Leasing Decision

■ To evaluate the leasing decision for a true tax lease, managers should compare the cost of leasing with the cost of financing using an equivalent amount of leverage.
   ■ Compute the incremental cash flows for leasing versus buying.
   ■ Compute the NPV by discounting the incremental cash flows at the after-tax borrowing rate.

■ The cash flows of a non-tax lease are directly comparable to the cash flows of a traditional loan, so a non-tax lease is attractive only if it offers a better interest rate than a loan.

### 25.4  Reasons for Leasing

■ Good reasons for leasing include tax differences, reduced resale costs, efficiency gains from specialization, reduced bankruptcy costs, mitigating debt overhang, risk transfer, and improved incentives.

■ Suspect reasons for leasing include avoiding capital expenditure controls, preserving capital, and reducing leverage through off-balance-sheet financing.

## Key Terms

$1.00 out lease *p. 864*
capital (finance) lease *p. 866*
direct lease *p. 860*
fair market value (FMV) lease *p. 863*
fair market value cap lease *p. 864*
fixed price lease *p. 864*
lease-equivalent loan *p. 873*
lessee *p. 860*
lessor *p. 860*
leveraged lease *p. 860*

non-tax lease *p. 868*
operating lease *p. 866*
residual value *p. 861*
sale and leaseback *p. 860*
sales-type lease *p. 860*
security interest *p. 869*
special-purpose entity (SPE) *p. 860*
synthetic lease *p. 860*
true lease *p. 869*
true tax lease *p. 868*

## Further Reading

The following books analyze leasing in greater depth: P. Nevitt and F. Fabozzi, *Equipment Leasing* (Frank Fabozzi Associates, 2000); and J. Schallheim, *Lease or Buy? Principles for Sound Decision Making* (Harvard Business School Press, 1994).

The academic literature on leasing has been active since the 1970s. Empirical studies on the use and effects of leasing include: J. Ang and P. Peterson, "The Leasing Puzzle," *Journal of Finance* 39(4)

(1984): 1055–1065; R. Bowman, "The Debt Equivalence of Leases: An Empirical Investigation," *Accounting Review* 55(2) (1980): 237–253; T. Mukherjee, "A Survey of Corporate Leasing Analysis," *Financial Management* 20(3) (1991): 96–107; and C. Smith and L. Wakeman, "Determinations of Corporate Leasing Policy," *Journal of Finance* 40(3) (1985): 895–908.

Readers interested in exploring the effects of other market frictions on the leasing decision can consult the following sources: I. Hendel and A. Lizzeri, "The Role of Leasing Under Adverse Selection," *Journal of Political Economy* 110(1) (2002): 113–143; J. Schallheim and K. Wells, "Debt and Taxes: A New Measure for Non-debt Tax Shields," Working paper, 2006; and K. Sivarama and R. Moyer, "Bankruptcy Costs and Financial Leasing Decisions," *Financial Management* 23(2) (1994): 31–42.

An in-depth analysis of lease valuation is beyond the scope of this book. Readers interested in some of the issues that complicate the analysis can consult these sources: S. Grenadier, "An Equilibrium Analysis of Real Estate Leases," *Journal of Business* 78(4) (2005): 1173–1214; J. McConnell and J. Schallheim, "Valuation of Asset Leasing Contracts," *Journal of Financial Economics* 12(2) (1983): 237–261; J. Schallheim, R. Johnson, R. Lease, and J. McConnell, "The Determinants of Yields on Financial Leasing Contracts," *Journal of Financial Economics* 19(1) (1987): 45–67; and R. Stanton and N. Wallace, "An Empirical Test of a Contingent Claims Lease Valuation Model," *Journal of Real Estate Research* 31 (2008): 1–26.

# Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

## The Basics of Leasing

1. Suppose an H1200 supercomputer has a cost of $200,000 and will have a residual market value of $60,000 in five years. The risk-free interest rate is 5% APR with monthly compounding.
   a. What is the risk-free monthly lease rate for a five-year lease in a perfect market?
   b. What would be the monthly payment for a five-year $200,000 risk-free loan to purchase the H1200?

2. Suppose the risk-free interest rate is 5% APR with monthly compounding. If a $2 million MRI machine can be leased for seven years for $22,000 per month, what residual value must the lessor recover to break even in a perfect market with no risk?

3. Consider a five-year lease for a $400,000 bottling machine, with a residual market value of $150,000 at the end of the five years. If the risk-free interest rate is 6% APR with monthly compounding, compute the monthly lease payment in a perfect market for the following leases:
   a. A fair market value lease
   b. A $1.00 out lease
   c. A fixed price lease with an $80,000 final price

## Accounting, Tax, and Legal Consequences of Leasing

 4. Acme Distribution currently has the following items on its balance sheet:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | 20 | Debt | 70 |
| Property, Plant, and Equipment | 175 | Equity | 125 |

How will Acme's balance sheet change if it enters into an $80 million capital lease for new warehouses? What will its book debt-equity ratio be? How will Acme's balance sheet and debt-equity ratio change if the lease is an operating lease?

5. Your firm is considering leasing a $50,000 copier. The copier has an estimated economic life of eight years. Suppose the appropriate discount rate is 9% APR with monthly compounding. Classify each lease below as a capital lease or operating lease, and explain why:
   a. A four-year fair market value lease with payments of $1150 per month
   b. A six-year fair market value lease with payments of $790 per month
   c. A five-year fair market value lease with payments of $925 per month
   d. A five-year fair market value lease with payments of $1000 per month and an option to cancel after three years with a $9000 cancellation penalty

## The Leasing Decision

6. Craxton Engineering will either purchase or lease a new $756,000 fabricator. If purchased, the fabricator will be depreciated on a straight-line basis over seven years. Craxton can lease the fabricator for $130,000 per year for seven years. Craxton's tax rate is 35%. (Assume the fabricator has no residual value at the end of the seven years.)
   a. What are the free cash flow consequences of buying the fabricator if the lease is a true tax lease?
   b. What are the free cash flow consequences of leasing the fabricator if the lease is a true tax lease?
   c. What are the incremental free cash flows of leasing versus buying?

7. Riverton Mining plans to purchase or lease $220,000 worth of excavation equipment. If purchased, the equipment will be depreciated on a straight-line basis over five years, after which it will be worthless. If leased, the annual lease payments will be $55,000 per year for five years. Assume Riverton's borrowing cost is 8%, its tax rate is 35%, and the lease qualifies as a true tax lease.
   a. If Riverton purchases the equipment, what is the amount of the lease-equivalent loan?
   b. Is Riverton better off leasing the equipment or financing the purchase using the lease-equivalent loan?
   c. What is the effective after-tax lease borrowing rate? How does this compare to Riverton's actual after-tax borrowing rate?



8. Suppose Clorox can lease a new computer data processing system for $975,000 per year for five years. Alternatively, it can purchase the system for $4.25 million. Assume Clorox has a borrowing cost of 7% and a tax rate of 35%, and the system will be obsolete at the end of five years.
   a. If Clorox will depreciate the computer equipment on a straight-line basis over the next five years, and if the lease qualifies as a true tax lease, is it better to lease or finance the purchase of the equipment?
   b. Suppose that if Clorox buys the equipment, it will use accelerated depreciation for tax purposes. Specifically, suppose it can expense 20% of the purchase price immediately and can take depreciation deductions equal to 32%, 19.2%, 11.52%, 11.52%, and 5.76% of the purchase price over the next five years. Compare leasing with purchase in this case.

*9. Suppose Procter and Gamble (P&G) is considering purchasing $15 million in new manufacturing equipment. If it purchases the equipment, it will depreciate it on a straight-line basis over the five years, after which the equipment will be worthless. It will also be responsible for maintenance expenses of $1 million per year. Alternatively, it can lease the equipment for $4.2 million per year for the five years, in which case the lessor will provide necessary maintenance. Assume P&G's tax rate is 35% and its borrowing cost is 7%.
   a. What is the NPV associated with leasing the equipment versus financing it with the lease-equivalent loan?
   b. What is the break-even lease rate—that is, what lease amount could P&G pay each year and be indifferent between leasing and financing a purchase?

### Reasons for Leasing

 *10. Suppose Amazon is considering the purchase of computer servers and network infrastructure to facilitate its move into cloud-based computing. In total, it will purchase $48 million in new equipment. This equipment will qualify for accelerated depreciation: 20% can be expensed immediately, followed by 32%, 19.2%, 11.52%, 11.52%, and 5.76% over the next five years. However, because of the firm's substantial loss carryforwards and other credits, Amazon estimates its marginal tax rate to be 10% over the next five years, so it will get very little tax benefit from the depreciation expenses. Thus, Amazon considers leasing the equipment instead. Suppose Amazon and the lessor face the same 8% borrowing rate, but the lessor has a 35% tax rate. For the purpose of this question, assume the equipment is worthless after five years, the lease term is five years, and the lease qualifies as a true tax lease.

   a. What is the lease rate for which the lessor will break even?

   b. What is the gain to Amazon with this lease rate?

   c. What is the source of the gain in this transaction?

11. Western Airlines is considering a new route that will require adding an additional Boeing 777 to its fleet. Western can purchase the airplane for $225 million or lease it for $25 million per year. If it purchases the airplane, its seating can be optimized, and the new route is expected to generate profits of $50 million per year. If leased, the route will only generate profits of $35 million per year. Suppose the appropriate cost of capital is 12.5% and that, if purchased, the plane can be sold at any time for an expected resale price of $225 million. Ignore taxes.

   a. As a one-year decision, does purchasing or leasing the plane have higher NPV?

   b. Suppose the funds to purchase or lease the plane will come from equity holders (for example, by reducing the amount of Western's current dividend). Western also has one-year debt outstanding, and there is a 10% (risk-neutral[24]) probability that over the next year Western will declare bankruptcy and its equity holders will be wiped out. Otherwise, the debt will be rolled over at the end of the year. Is purchasing or leasing the plane more attractive to equity holders?

   c. At what (risk-neutral) probability of default would equity holders' preference for leasing versus purchasing the plane change?

---

[24]Chapter 21 explains risk-neutral probabilities. If you have not read that chapter, you can work the problem and get the same answers by assuming that the specified probabilities are the actual probabilities of default but the risk of default is purely idiosyncratic risk.

# 9

# Short-Term Financing

***THE LAW OF ONE PRICE CONNECTION***. Most of the financial decisions we have studied so far have been long term, that is, decisions involving cash flows that occur over a period of time longer than one year. In Part 9, we turn to the details of running the financial side of a corporation and focus on short-term financial management. In a perfect capital market, the Law of One Price and the Modigliani-Miller propositions imply that the way a firm chooses to manage its short-term financial needs does not affect the value of the firm. In reality, short-term financial policy does matter because of the existence of market frictions. In this part of the book, we identify these frictions and explain how firms set their short-term financial policies. In Chapter 26, we discuss how firms manage their working capital requirements, including accounts receivable, accounts payable, and inventory. In Chapter 27, we explain how firms finance their short-term cash needs.

**CHAPTER 26**
Working Capital
Management

**CHAPTER 27**
Short-Term
Financial
Planning

# Working Capital Management

NOTATION

CCC  cash conversion cycle

*NPV*  net present value

*EAR*  effective annual rate

**I**N CHAPTER 2, WE DEFINED A FIRM'S NET WORKING CAPITAL as its current assets minus its current liabilities. Net working capital is the capital required in the short term to run the business. Thus, working capital management involves short-term asset accounts such as cash, inventory, and accounts receivable, as well as short-term liability accounts such as accounts payable.

The level of investment in each of these accounts differs from firm to firm and from industry to industry. It also depends on factors such as the type of business and industry standards. Some firms, for example, require heavy inventory investments because of the nature of their business. Consider The Kroger Company, a retail grocery chain, and Carnival Corporation, a cruise ship operator. Inventory amounted to over 20% of Kroger's total assets at the start of 2012, whereas Carnival's investment in inventory was less than 1%. A grocery store requires a large investment in inventory, while a cruise line's profitability is generated primarily from its investment in plant, property, and equipment—that is, its 99 cruise ships.

There are opportunity costs associated with investing in inventories and accounts receivable, and from holding cash. Excess funds invested in these accounts could instead be used to pay down debt or returned to shareholders in the form of a dividend or share repurchase. This chapter focuses on the tools firms use to manage their working capital efficiently and thereby minimize these opportunity costs. We begin by discussing why firms have working capital and how it affects firm value. In a perfectly competitive market, many of the working capital accounts would be irrelevant. Not surprisingly, the existence of these accounts for real firms can be traced to market frictions. We discuss the costs and benefits of trade credit and evaluate the trade-offs firms make in managing various working capital accounts. Finally, we discuss the cash balance of a firm and provide an overview of the short-term investments in which a firm may choose to invest its cash.

## 26.1 Overview of Working Capital

Most projects require the firm to invest in net working capital. The main components of net working capital are cash, inventory, receivables, and payables. Working capital includes the cash that is needed to run the firm on a day-to-day basis. It does not include excess cash, which is cash that is not required to run the business and can be invested at a market rate. As we discussed in Chapter 14, excess cash may be viewed as part of the firm's capital structure, offsetting firm debt. In Chapter 8, we discussed how any increases in net working capital represent an investment that reduces the cash that is available to the firm. Therefore, working capital alters a firm's value by affecting its free cash flow. In this section, we examine the components of net working capital and their effects on the firm's value.

### The Cash Cycle

The level of working capital reflects the length of time between when cash goes out of a firm at the beginning of the production process and when it comes back in. A company first buys inventory from its suppliers, in the form of either raw materials or finished goods. A firm typically buys its inventory on credit, which means that the firm does not have to pay cash immediately at the time of purchase. After receiving the inventory, even if the inventory is in the form of finished goods, it may sit on the shelf for some time. Finally, when the inventory is ultimately sold, the firm may extend credit to its customers, delaying when it will receive the cash. A firm's **cash cycle** is the length of time between when the firm pays cash to purchase its initial inventory and when it receives cash from the sale of the output produced from that inventory. Figure 26.1 illustrates the cash cycle.

Some practitioners measure the cash cycle by calculating the cash conversion cycle. The **cash conversion cycle (CCC)** is defined as

$$CCC = \text{Accounts Receivable Days} + \text{Inventory Days} - \text{Accounts Payable Days} \quad (26.1)$$

where

$$\text{Accounts Receivable Days} = \frac{\text{Accounts Receivable}}{\text{Average Daily Sales}}$$

$$\text{Inventory Days} = \frac{\text{Inventory}}{\text{Average Daily Cost of Goods Sold}}$$

$$\text{Accounts Payable Days} = \frac{\text{Accounts Payable}}{\text{Average Daily Cost of Goods Sold}}$$

### FIGURE 26.1

**The Cash and Operating Cycles for a Firm**

The cash cycle is the average time between when a firm pays for its inventory and when it receives cash from the sale of its product.



888      **Chapter 26** Working Capital Management

The firm's **operating cycle** is the average length of time between when a firm originally purchases its inventory and when it receives the cash back from selling its product. If the firm pays cash for its inventory, this period is identical to the firm's cash cycle. However, most firms buy their inventory on credit, which reduces the amount of time between the cash investment and the receipt of cash from that investment.

The longer a firm's cash cycle, the more working capital it has, and the more cash it needs to carry to conduct its daily operations. Table 26.1 provides data on the working capital needs for selected firms in a variety of industries.

Because of the characteristics of different industries, working capital levels vary significantly. For example, grocery stores (Kroger) and fast-food restaurants (Chipotle Mexican Grill) typically sell on a cash-only basis, and thus have very short accounts receivable days.[1] Similar results hold for Southwest Airlines, because many of its customers pay in advance for airline tickets with cash or credit cards. Inventory represents the largest percentage of

| TABLE 26.1 | **Working Capital in Various Industries (2012)** | | | | | |
|---|---|---|---|---|---|---|
| Company | Ticker | Industry | Accounts Receivable Days | Inventory Days | Accounts Payable Days | CCC |
| Verizon Communications | VZ | Telecommunications | 36 | 8 | 116 | −72 |
| The Washington Post | WPO | Publishing | 34 | 1 | 95 | −60 |
| Apple | AAPL | Computer Hardware | 19 | 5 | 77 | −53 |
| Pepsico | PEP | Beverages | 38 | 45 | 118 | −35 |
| Southwest Airlines | LUV | Airlines | 8 | 12 | 31 | −11 |
| Amazon.com | AMZN | Internet Retail | 14 | 41 | 66 | −11 |
| Chipotle Mexican Grill | CMG | Restaurants | 1 | 2 | 11 | −8 |
| Microsoft | MSFT | Software | 67 | 28 | 93 | 2 |
| Bristol-Myers Squibb | BMY | Pharmaceuticals | 59 | 125 | 180 | 4 |
| The Kroger Co. | KR | Grocery Stores | 4 | 24 | 22 | 6 |
| Wal-Mart Stores | WMT | Superstores | 4 | 44 | 40 | 8 |
| FedEx | FDX | Air Freight | 40 | 5 | 19 | 26 |
| Starbucks | SBUX | Restaurants | 12 | 77 | 24 | 65 |
| Nordstrom | JWN | Department Stores | 64 | 67 | 60 | 71 |
| Sears Holdings | SHLD | Department Stores | 6 | 115 | 43 | 78 |
| Nike | NKE | Footwear | 47 | 83 | 36 | 94 |
| Sotheby's | BID | Auction Services | 183 | 88 | 60 | 211 |
| Constellation Brands | STZ | Distillers and Vintners | 65 | 324 | 34 | 355 |
| KB Home | KBH | Homebuilding | 18 | 392 | 20 | 390 |
| Tiffany & Co. | TIF | Luxury Goods | 18 | 525 | 57 | 486 |
| **Major U.S. Firms (value-weighted Average)** | | | **44** | **65** | **66** | **43** |

*Source*: www.capitaliq.com

---

[1]When you use your Visa or MasterCard to pay for your groceries, it is a cash sale for the store. The credit card company pays the store cash upon receipt of the credit slip, even if you do not pay your credit card bill on time.

sales for firms such as Constellation Brands and KB Home, whose products have long production and sales cycles, whereas *The Washington Post* holds minimal inventory. Note also the wide variation in the firms' cash conversion cycles; Amazon.com and Southwest's cash conversion cycle is negative, reflecting the fact that they receive cash from their customers before having to pay suppliers, whereas firms such as Tiffany & Co. must spend cash to produce their products more than one year before they receive revenues from them.

## Firm Value and Working Capital

Any reduction in working capital requirements generates a positive free cash flow that the firm can distribute immediately to shareholders. For example, if a firm is able to reduce its required net working capital by $50,000 permanently, it will be able to distribute this $50,000 as a dividend to its shareholders immediately and thus increase firm value by the same amount. Similarly, when evaluating a project, reducing the project's net working capital needs over the project's life reduces the opportunity cost associated with this use of capital.

---

**EXAMPLE 26.1**

### Costly Working Capital for a Project

**Problem**

Emerald City Paints would like to construct a new facility that will manufacture paint. In addition to the capital expenditure on the plant, management estimates that the project will require an investment today of $450,000 for net working capital. The firm will recover the investment in net working capital eight years from today, when management anticipates closing the plant. The discount rate for this type of cash flow is 6% per year. What is the present value of the cost of working capital for the paint facility? What is the value of an inventory policy that would halve the plant's net working capital requirements?

**Solution**

The cash flows for the investment in net working capital are −$450,000 today and +$450,000 eight years from today. Putting this on a timeline:



Given a discount rate of 6% per year, the NPV of these cash flows is

$$NPV = -\$450,000 + \frac{\$450,000}{(1 + 0.06)^8} = -\$167,664$$

Although Emerald City Paints receives back all of its investment in working capital, it loses the time value of money on this cash. If a new inventory policy could halve this requirement, it would be worth $167,664/2 = $83,832 to the firm.

---

Managing working capital efficiently will maximize firm value. We now turn our attention to some specific working capital accounts.

**CONCEPT CHECK**

1. What is the difference between a firm's cash cycle and operating cycle?

2. How does working capital impact a firm's value?

## 26.2 Trade Credit

When a firm allows a customer to pay for goods at some date later than the date of purchase, it creates an account receivable for the firm and an account payable for the customer. Accounts receivable represent the credit sales for which a firm has yet to receive payment. The accounts payable balance represents the amount that a firm owes its suppliers for goods that it has received but for which it has not yet paid. The credit that the firm is extending to its customer is known as **trade credit**. A firm would, of course, prefer to be paid in cash at the time of purchase, but a "cash-only" policy may cause it to lose its customers to competition. In this section, we demonstrate how managers can compare the costs and benefits of trade credit to determine optimal credit policies.

### Trade Credit Terms

To see how the terms of trade credit are quoted, let's consider some examples. If a supplier offers its customers terms of "Net 30," payment is not due until 30 days from the date of the invoice. Essentially, the supplier is letting the customer use its money for an extra 30 days. (Note that "30" is not a magic number; the invoice could specify "Net 40," "Net 15," or any other number of days as the payment due date.)

Sometimes the selling firm will offer the buying firm a discount if payment is made early. The terms "2/10, Net 30" mean that the buying firm will receive a 2% discount if it pays for the goods within 10 days; otherwise, the full amount is due in 30 days. Firms offer discounts to encourage customers to pay early so that the selling firm gets cash from the sale sooner. However, the amount of the discount also represents a cost to the selling firm because it does not receive the full selling price for the product.

### Trade Credit and Market Frictions

In a perfectly competitive market, trade credit is just another form of financing. Under the Modigliani-Miller assumptions of perfect capital markets, the amounts of payables and receivables are therefore irrelevant. In reality, product markets are rarely perfectly competitive, so firms can maximize their value by using their trade credit options effectively.

**Cost of Trade Credit.** Trade credit is, in essence, a loan from the selling firm to its customer. The price discount represents an interest rate. Often, firms offer favorable interest rates on trade credit as a price discount to their customers. Therefore, financial managers should evaluate the terms of trade credit to decide whether to use it.

How do we compute the interest rate on trade credit? Suppose a firm sells a product for $100 but offers its customer terms of 2/10, Net 30. The customer doesn't have to pay anything for the first 10 days, so it effectively has a zero-interest loan for this period. If the customer takes advantage of the discount and pays within the 10-day discount period, the customer pays only $98 for the product. The cost of the discount to the selling firm is equal to the discount percentage times the selling price. In this case, it is $0.02 \times \$100$, or $2.

Rather than pay within 10 days, the customer has the option to use the $98 for an additional 20 days $(30 - 10 = 20)$. The interest rate for the 20-day term of the loan is $2/$98 = 2.04\%. With a 365-day year, this rate over 20 days corresponds to an effective annual rate of[2]

$$EAR = (1.0204)^{365/20} - 1 = 44.6\%$$

---

[2]See Eq. 5.1 in Chapter 5.

Thus, by not taking the discount, the firm is effectively paying 2.04% to borrow the money for 20 days, which translates to an effective annual rate of 44.6%! If the firm can obtain a bank loan at a lower interest rate, it would be better off borrowing at the lower rate and using the cash proceeds of the loan to take advantage of the discount offered by the supplier.

**EXAMPLE 26.2**

**Estimating the Effective Cost of Trade Credit**

**Problem**

Your firm purchases goods from its supplier on terms of 1/15, Net 40. What is the effective annual cost to your firm if it chooses not to take advantage of the trade discount offered?

**Solution**

Because the discount is 1%, for a $100 purchase your firm must pay either $99 in 15 days or $100 in 40 days. Given the difference of 25 days (40 − 15), these terms correspond to an effective annual rate of $(100/99)^{365/25} - 1 = 15.8\%$.

**Benefits of Trade Credit.**  For a number of reasons, trade credit can be an attractive source of funds. First, trade credit is simple and convenient to use, and it therefore has lower transaction costs than alternative sources of funds. For example, no paperwork must be completed, as would be the case for a loan from a bank. Second, it is a flexible source of funds, and can be used as needed. Finally, it is sometimes the only source of funding available to a firm.

**Trade Credit Versus Standard Loans.**  You might wonder why companies would ever provide trade credit. After all, most companies are not banks, so why are they in the business of making loans? Several reasons explain their willingness to offer trade credit.[3] First, providing financing at below-market rates is an indirect way to lower prices for only certain customers. Consider, for example, an automobile manufacturer. Rather than lower prices on all cars, the financing division may offer specific credit terms that are attractive to customers with bad credit, but unattractive to customers with good credit. In this way, the car manufacturer is able to discount the price only for those customers with bad credit who otherwise might not be able to afford the car.

Second, because a supplier may have an ongoing business relationship with its customer, it may have more information about the credit quality of the customer than a traditional outside lender such as a bank. The supplier may also be able to increase the likelihood of payment by threatening to cut off future supplies if payment is not made. Finally, if the buyer defaults, the supplier may be able to seize the inventory as collateral. This inventory is likely to be more valuable to a company within the industry such as the supplier (which presumably has other customers) than to an outsider.

## Managing Float

One factor that contributes to the length of a firm's receivables and payables is the delay between the time a bill is paid and the cash is actually received. This delay, or processing float, will impact a firm's working capital requirements.

[3]For a detailed discussion of these issues, see B. Biais and C. Gollier, "Trade Credit and Credit Rationing," *Review of Financial Studies* 10 (1997): 903–937; and M. Petersen and R. Rajan, "Trade Credit: Theories and Evidence," *Review of Financial Studies* 10 (1997): 661–691.

**Collection Float.** **Collection float** is the amount of time it takes for a firm to be able to use funds after a customer has paid for its goods. Firms can reduce their working capital needs by reducing their collection float. Collection float is determined by three factors:

- **Mail float**: How long it takes the firm to receive the check after the customer has mailed it
- **Processing float**: How long it takes the firm to process the check and deposit it in the bank
- **Availability float**: How long it takes before the bank gives the firm credit for the funds

**Disbursement Float.** **Disbursement float** is the amount of time it takes before payments to suppliers actually result in a cash outflow for the firm. Like collection float, it is a function of mail time, processing time, and check-clearing time. Although a firm may try to extend its disbursement float in order to lengthen its payables and reduce its working capital needs, it risks making late payments to suppliers. In such a case, the firm may be charged an additional fee for paying late or may be required to pay cash before delivery (CBD) or on delivery (COD) for future purchases. In some cases, the supplier may refuse to do business in the future with the delinquent firm.

**Electronic Check Processing.** Firms can employ several methods to reduce their collection and disbursement floats. The **Check Clearing for the 21st Century Act (Check 21)**, which became effective on October 28, 2004, eliminated the disbursement float due to the check-clearing process. Under the Act, banks can process check information electronically, and the funds are deducted from a firm's checking account on the same day that the firm's supplier deposits the check in its bank in most cases. Unfortunately, even though under Check 21 the funds are taken out of the check writer's account almost immediately, the check recipient's account is not credited as quickly. As a result, the act does not serve to reduce collection float.

There are, however, several ways that a firm *can* reduce its collection float. For example, the firm may streamline its in-house check-processing procedures. In addition, with electronic collection, funds are automatically transferred from the customer's bank account to the firm's bank account on the payment date, reducing the collection float to zero. The methods a firm employs to reduce its collection float are not without costs, of course. Therefore, to decide which, if any, to employ, the firm must compare the costs and benefits of systems that allow it to use its cash for a longer period.

CONCEPT CHECK

1. What does the term "2/10, Net 30" mean?
2. Why do companies provide trade credit?

## 26.3 Receivables Management

So far, we have discussed the costs and benefits of trade credit in general. Next, we look at some issues that arise specifically from the management of a firm's accounts receivable. In particular, we focus on how a firm adopts a policy for offering credit to its customers and how it monitors its accounts receivable on an ongoing basis.

### Determining the Credit Policy

Establishing a credit policy involves three steps that we will discuss in turn:

1. Establishing credit standards
2. Establishing credit terms
3. Establishing a collection policy

**Establishing Credit Standards.**  Management must first decide on its credit standards. Will it extend credit to anyone who applies for it? Or will it be selective and extend credit only to those customers who have very low credit risk? Unless the firm adopts the former policy, it will need to assess the credit risk of each customer before deciding whether to grant credit. Large firms often perform this analysis in-house with their own credit departments. Many small firms purchase credit reports from credit rating agencies such as Dun & Bradstreet.

The decision of how much credit risk to assume plays a large role in determining how much money a firm ties up in its receivables. While a restrictive policy can result in a lower sales volume, the firm will have a smaller investment in receivables. Conversely, a less selective policy will produce higher sales, but the level of receivables will also rise.

**Establishing Credit Terms.**  After a firm decides on its credit standards, it must next establish its credit terms. The firm decides on the length of the period before payment must be made (the "net" period) and chooses whether to offer a discount to encourage early payments. If it offers a discount, it must also determine the discount percentage and the discount period. If the firm is relatively small, it will probably follow the lead of other firms in the industry in establishing these terms.

**Establishing a Collection Policy.**  The last step in the development of a credit policy is to decide on a collection policy. The content of this policy can range from doing nothing if a customer is paying late (generally not a good choice), to sending a polite letter of inquiry, to charging interest on payments extending beyond a specified period, to threatening legal action at the first late payment.

## Monitoring Accounts Receivable

After establishing a credit policy, a firm must monitor its accounts receivable to analyze whether its credit policy is working effectively. Two tools that firms use to monitor the accounts receivable are the accounts receivable days (or average collection period) and the aging schedule.

**Accounts Receivable Days.**  The accounts receivable days is the average number of days that it takes a firm to collect on its sales. A firm can compare this number to the payment policy specified in its credit terms to judge the effectiveness of its credit policy. If the credit terms specify "Net 30" and the accounts receivable days outstanding is 50 days, the firm can conclude that its customers are paying 20 days late, on average.

The firm should also look at the trend in the accounts receivable days over time. If the accounts receivable days ratio of a firm has been approximately 35 days for the past few years and it is 43 days this year, the firm may want to reexamine its credit policy. Of course, if the economy is sluggish, the entire industry may be affected. Under these circumstances, the increase might have little to do with the firm itself.

Because accounts receivable days can be calculated from the firm's financial statements, outside investors commonly use this measure to evaluate a firm's credit management policy. A major weakness of the accounts receivable days is that it is merely one number and conceals much useful information. Seasonal sales patterns may cause the number calculated for the accounts receivable days to change, depending on when the calculation takes place. The number can also look reasonable even when a substantial percentage of the firm's customers are paying late.

**Aging Schedule.** An **aging schedule** categorizes accounts by the number of days they have been on the firm's books. It can be prepared using either the number of accounts or the dollar amount of the accounts receivable outstanding. For example, assume that a firm selling on terms of 2/15, Net 30, has $530,000 in accounts receivable that has been on the books for 15 or fewer days in 220 accounts. Another $450,000 has been on the books for 16 to 30 days and is made up of 190 accounts, and $350,000 has been on the books for 31 to 45 days and represents 80 accounts. The firm has $200,000 that has been on the books for 46 to 60 days in 60 accounts. Yet another $70,000 has been on the books for more than 60 days and is made up of 20 accounts. Table 26.2 includes aging schedules based on the number of accounts and dollar amounts outstanding.

In this case, if the firm's average daily sales is $65,000, its accounts receivable days is $1,600,000/$65,000 = 25 days. But on closer examination, using the aging schedules in Table 26.2, we can see that 28% of the firm's credit customers (and 39% by dollar amounts) are paying late.

| TABLE 26.2 | Aging Schedules | | | |
|---|---|---|---|---|
| Days Outstanding | Number of Accounts | Percentage of Accounts (%) | Amount Outstanding ($) | Percentage Outstanding (%) |
| 1–15 | 220 | 38.6 | 530,000 | 33.1 |
| 16–30 | 190 | 33.3 | 450,000 | 28.1 |
| 31–45 | 80 | 14.0 | 350,000 | 21.9 |
| 46–60 | 60 | 10.5 | 200,000 | 12.5 |
| 60+ | 20 | 3.5 | 70,000 | 4.4 |
| | 570 | 100.0 | 1,600,000 | 100.0 |

**EXAMPLE 26.3**   **Aging Schedules**

**Problem**

Financial Training Systems (FTS) bills its accounts on terms of 3/10, Net 30. The firm's accounts receivable include $100,000 that has been outstanding for 10 or fewer days, $300,000 outstanding for 11 to 30 days, $100,000 outstanding for 31 to 40 days, $20,000 outstanding for 41 to 50 days, $10,000 outstanding for 51 to 60 days, and $2000 outstanding for more than 60 days. Prepare an aging schedule for FTS.

**Solution**

With the available information, we can calculate the aging schedule based on dollar amounts outstanding.

| Days Outstanding | Amount Outstanding ($) | Percentage Outstanding (%) |
|---|---|---|
| 1–10 | 100,000 | 18.8 |
| 11–30 | 300,000 | 56.4 |
| 31–40 | 100,000 | 18.8 |
| 41–50 | 20,000 | 3.8 |
| 51–60 | 10,000 | 1.9 |
| 60+ | 2,000 | 0.3 |
| | 532,000 | 100.0 |

If the aging schedule gets "bottom-heavy"—that is, if the percentages in the lower half of the schedule begin to increase—the firm will likely need to revisit its credit policy. The aging schedule is also sometimes augmented by analysis of the **payments pattern**, which provides information on the percentage of monthly sales that the firm collects in each month after the sale. By examining past data, a firm may observe that 10% of its sales are usually collected in the month of the sale, 40% in the month following the sale, 25% two months after the sale, 20% three months after the sale, and 5% four months after the sale. Management can compare this normal payments pattern to the current payments pattern. Knowledge of the payments pattern is also useful for forecasting the firm's working capital requirements.

**CONCEPT CHECK**

1. Describe three steps in establishing a credit policy.
2. What is the difference between accounts receivable days and an aging schedule?

## 26.4  Payables Management

A firm should choose to borrow using accounts payable only if trade credit is the cheapest source of funding. The cost of the trade credit depends on the credit terms. The higher the discount percentage offered, the greater the cost of forgoing the discount. The cost of forgoing the discount is also higher with a shorter loan period. When a company has a choice between trade credit from two different suppliers, it should take the less expensive alternative.

In addition, a firm should always pay on the latest day allowed. For example, if the discount period is 10 days and the firm is taking the discount, payment should be made on day 10, not on day 2. If the discount is not taken and the terms are 2/10, Net 30, the full payment should be made on day 30, not on day 16. A firm should strive to keep its money working for it as long as possible without developing a bad relationship with its suppliers or engaging in unethical practices. In this section, we examine two techniques that firms use to monitor their accounts payable.

### Determining Accounts Payable Days Outstanding

Similar to the situation with its accounts receivable, a firm should monitor its accounts payable to ensure that it is making its payments at an optimal time. One method is to calculate the accounts payable days outstanding and compare it to the credit terms. The accounts payable days outstanding is the accounts payable balance expressed in terms of the number of days of cost of goods sold. If the accounts payable outstanding is 40 days and the terms are 2/10, Net 30, the firm can conclude that it generally pays late and may be risking supplier difficulties. Conversely, if the accounts payable days outstanding is 25 days and the firm has not been taking the discount, the firm is paying too early. It could be earning another five days' interest on its money.

**EXAMPLE 26.4**

**Accounts Payable Management**

**Problem**

The Rowd Company has an average accounts payable balance of $250,000. Its average daily cost of goods sold is $14,000, and it receives terms of 2/15, Net 40, from its suppliers. Rowd chooses to forgo the discount. Is the firm managing its accounts payable well?

**Solution**

The firm is not managing its accounts payable well. Rowd's accounts payable days outstanding is $250,000/$14,000 = 17.9$ days. If Rowd made payment three days earlier, it could take advantage of the 2% discount. If for some reason it chooses to forgo the discount, it should not be paying the full amount until the fortieth day.

### Stretching Accounts Payable

Some firms ignore the payment due period and pay later, in a practice referred to as **stretching the accounts payable**. Given terms of 2/10, Net 30, for example, a firm may choose to not pay until 45 days have passed. Doing so reduces the direct cost of trade credit because it lengthens the time that a firm has use of the funds. While the interest rate per period remains the same—$2/\$98 = 2.04\%$—the firm is now using the $98 for 35 days beyond the discount period, rather than 20 days as provided by the trade credit terms.

---

**EXAMPLE 26.5**

### Cost of Trade Credit with Stretched Accounts Payable

**Problem**

What is the effective annual cost of credit terms of 1/15, Net 40, if the firm stretches the accounts payable to 60 days?

**Solution**

The interest rate per period is $\$1/\$99 = 1.01\%$. If the firm delays payment until the sixtieth day, it has use of the funds for 45 days beyond the discount period. There are $365/45 = 8.11$ 45-day periods in one year. Thus, the effective annual cost is $(1.0101)^{8.11} - 1 = 8.49\%$.

---

Firms may also make a payment on the thirtieth day but pay only the discounted price. Some may pay only the discounted price and pay even later than the thirtieth day. While all of these actions will reduce the effective annual rate associated with the trade credit, the firm may incur costs as a result of these actions. Suppliers may react to a firm whose payments are always late by imposing terms of cash on delivery (COD) or cash before delivery (CBD). The delinquent firm then bears the additional costs associated with these terms and may have to negotiate a bank loan to have the cash available to pay. The supplier may also discontinue business with the delinquent customer, leaving the customer to find another source, which may be more expensive or of lower quality. A poor credit rating might also result, making it difficult for the firm to obtain good terms with any other supplier. Moreover, when a firm explicitly agrees to the terms of the sale, violating these terms constitutes unethical business behavior in most people's minds.

**CONCEPT CHECK**

1. What is accounts payable days outstanding?
2. What are the costs of stretching accounts payable?

## 26.5 Inventory Management

As we discussed earlier, in a perfect markets setting, firms would not need payables or receivables. Interest rates on trade credit would be competitive, and firms could use alternative sources of financing. However, unlike trade credit, inventory represents one of the required factors of production. Therefore, even in a perfect markets setting in which the Modigliani-Miller propositions hold, firms still need inventory.

Inventory management receives extensive coverage in courses on operations management. Nevertheless, it is the firm's financial manager who must arrange for the financing necessary to support the firm's inventory policy and who is responsible for ensuring the firm's overall profitability. Therefore, the role of the inventory manager is to balance the costs and benefits associated with inventory. Because excessive inventory uses cash, efficient management of inventory increases firm value.

## Benefits of Holding Inventory

A firm needs its inventory to operate for several reasons. First, inventory helps minimize the risk that the firm will not be able to obtain an input it needs for production. If a firm holds too little inventory, **stock-outs**, the situation when a firm runs out of goods, may occur, leading to lost sales. Disappointed customers may switch to one of the firm's competitors.

Second, firms may hold inventory because factors such as seasonality in demand mean that customer purchases do not perfectly match the most efficient production cycle. Consider the case of the Sandpoint Toy Company. As is typical for many toy manufacturers, 80% of Sandpoint's annual sales occur between September and December, during the holiday gift season. It is more efficient for Sandpoint to manufacture toys at relatively constant levels throughout the year. If Sandpoint produces its toys at a constant rate, its inventory levels will increase to very high levels by August, in anticipation of the increase in sales beginning in September. In contrast, Sandpoint may consider a seasonal manufacturing strategy, producing more toys between September and December when sales are high. Under this strategy, inventory would not accumulate, freeing up cash flow from working capital and reducing the costs of inventory. However, seasonal manufacturing incurs additional costs, such as increased wear and tear on the manufacturing equipment during peak demand and the need to hire and train seasonal workers. Sandpoint must weigh the costs of the inventory buildup under constant production against the benefits of more efficient production. The optimal choice is likely to involve a compromise between the two extremes, so that Sandpoint will carry some inventory throughout the year.

## Costs of Holding Inventory

As suggested by the Sandpoint Toy example, tying up capital in inventory is costly for a firm. We can classify the direct costs associated with inventory into three categories:

- *Acquisition costs* are the costs of the inventory itself over the period being analyzed (usually one year).
- *Order costs* are the total costs of placing an order over the period being analyzed.
- *Carrying costs* include storage costs, insurance, taxes, spoilage, obsolescence, and the opportunity cost of the funds tied up in the inventory.

Minimizing these total costs involves some trade-offs. For example, if we assume no quantity discounts are available, the lower the level of inventory a firm carries, the lower its carrying cost, but the higher its annual order costs, because it needs to place more orders during the year.

That said, the benefits from reducing inventory requirements can be substantial. In 2003, the apparel chain GAP reduced its investment in inventory significantly by reducing its inventory days outstanding by 24%. This change freed up $344 million for other purposes. GAP invested some of this cash in short-term securities—primarily in U.S.

government and agency securities and in bank certificates of deposits with maturities between three months and one year. The firm reported an increase of $1.2 million in interest income in fiscal year 2003 compared with fiscal year 2002. It attributed the increase to increases in the average cash balances available for investment.[4]

Some firms seek to reduce their carrying costs as much as possible. With **"just-in-time" (JIT) inventory management**, a firm acquires inventory precisely when needed so that its inventory balance is always zero, or very close to it. This technique requires exceptional coordination with suppliers as well as a predictable demand for the firm's products. In addition, there may be a trickle-down effect when one firm in an industry adopts JIT. For example, in 1999, Toys 'R Us instituted JIT, which caused one of its suppliers, toy manufacturer Hasbro, to make changes in its production schedule.[5]

**CONCEPT CHECK**

**1.** What are the benefits and costs of holding inventory?

**2.** Describe "just-in-time" inventory management.

## 26.6  Cash Management

In the Modigliani-Miller setting, the level of cash is irrelevant. With perfect capital markets, a firm is able to raise new money instantly at a fair rate, so it can never be short of cash. Similarly, the firm can invest excess cash at a fair rate to earn an NPV of zero.

In the real world, of course, markets are not perfect. Liquidity has a cost; for example, holding liquid assets may earn a below-market return, and a firm may face transaction costs if it needs to raise cash quickly. Similarly, recall from Chapters 15 and 17 that due to the double taxation of corporate interest income, holding excess cash has a tax disadvantage. In these cases, the optimal strategy for a firm is to hold cash in anticipation of seasonalities in its operating or investment cash flows, as well as to buffer random shocks that affect the business. Risky firms and firms with high-growth opportunities tend to hold a relatively high percentage of assets as cash. Firms with easy access to capital markets (for which the transaction costs of raising cash are lower) tend to hold less cash.[6] In this section, we examine the firm's motivation for holding cash, tools for managing cash, and the short-term securities in which firms invest.

### Motivation for Holding Cash

There are three reasons why a firm holds cash:

- To meet its day-to-day needs
- To compensate for the uncertainty associated with its cash flows
- To satisfy bank requirements

Let's discuss each of these motivations in more detail.

**Transactions Balance.** Just like you, a firm must hold enough cash to pay its bills. The amount of cash a firm needs to be able to pay its bills is sometimes referred to as a **transactions balance**. The amount of cash a firm needs to satisfy the transactions balance

---

[4]GAP 2003 annual report.

[5]Hasbro 1999 annual report.

[6]See T. Opler, L. Pinkowitz, R. Stulz, and R. Williamson, "The Determinants and Implications of Corporate Cash Holdings," *Journal of Financial Economics* 52(1) (1999): 3–46.

requirement depends on both the average size of the transactions made by the firm and the firm's cash cycle, discussed earlier in the chapter. Firms set the transactions balance so that the firm's cash and other liquid securities are adequate to pay its near-term liabilities. One common measure used to assess whether the firm has adequate liquidity to meet short-term needs is its quick ratio, which is the ratio of current assets other than inventory to current liabilities. By increasing its cash balance, the firm can raise its quick ratio to its desired level.

**Precautionary Balance.**  The amount of cash a firm holds to counter the uncertainty surrounding its future cash needs is known as a **precautionary balance**. The size of this balance depends on the degree of uncertainty surrounding a firm's cash flows. The more uncertain future cash flows are, the harder it is for a firm to predict its transactions need, so the larger the precautionary balance must be. A useful measure to assess the firm's desired precautionary balance is the volatility of its operating cash flows over different horizons. Firms will typically choose to maintain liquid assets equal to some multiple of this volatility, in order to avoid the risk of experiencing a cash shortfall.

**Compensating Balance.**  A firm's bank may require it to hold a **compensating balance** in an account at the bank as compensation for services that the bank performs. Compensating balances are typically deposited in accounts that either earn no interest or pay a very low interest rate. This arrangement is similar to a bank offering individuals free checking so long as their balances do not fall below a certain level—say, $1000. Essentially, the customer has $1000 cash that he cannot use unless he is willing to pay a service charge. Similarly, the cash that a firm has tied up to meet a compensating balance requirement is unavailable for other uses.

## Alternative Investments

In our discussion of collection and disbursement floats, we assumed that the firm will invest any cash in short-term securities. In fact, the firm may choose from a variety of short-term securities that differ somewhat with regard to their default risk and liquidity

---

### GLOBAL FINANCIAL CRISIS    Hoarding Cash

Corporate liquidity is measured as corporate investments in short-term, marketable securities. According to IRS statistics, the cash holdings of U.S. corporations more than tripled between 1999 and 2009, rising from $1.6 trillion to more than $4.8 trillion. Indeed, a survey of more than 360 companies conducted by Treasury Strategies, Inc., a Chicago consultant, found that a majority of firms consider themselves to be net investors, having more short-term investments than short-term debt outstanding.

Why have companies been accumulating more cash? Factors include a shift away from industries such as manufacturing that spend heavily on plant and equipment, growth in service sectors that have low capital expenditures and high cash flows, and a desire by companies to preserve liquidity in the wake of the financial crisis. As a result, corporate savings has reached an all-time high.

How are companies investing their cash? A 2007 survey by Treasury Strategies indicated that 20% is invested in money market funds (which in turn invest in a diversified portfolio of the short-term securities described in Table 26.3), 18% is invested in bonds and notes, and the remainder is invested directly in commercial paper, CDs, repurchase agreements, and other investments.

During the 2008 financial crisis, short-term credit markets froze and many businesses that relied on short-term credit found themselves unable to conduct business. Even firms with sufficient cash balances had to worry about how secure their cash was: many banks were in or on the verge of default, and even traditionally safe money market funds risked losses. As a result, the breakdown in credit markets in the early days of the financial crisis was potentially as disruptive for firms that relied on cash balances to conduct business as it was for firms that relied on credit.

risk. The greater the risk, the higher the expected return on the investment. The financial manager must decide how much risk she is willing to accept in return for a higher yield. If her firm expects to need the funds within the next 30 days, the manager will probably avoid the less liquid options. Table 26.3 briefly describes the most frequently used short-term investments; these short-term debt securities are collectively referred to as money market securities.

| TABLE 26.3 | **Money Market Investment Options** | | | |
|---|---|---|---|---|
| **Investment** | **Description** | **Maturity** | **Risk** | **Liquidity** |
| Treasury Bills | Short-term debt of the U.S. government. | Four weeks, three months (91 days), six months (182 days), or one year when newly issued | Default risk free. | Very liquid and marketable. |
| Certificates of Deposit (CDs) | Short-term debt issued by banks, minimum denomination of $100,000. | Varying maturities up to one year | If the issuing bank is insured by the FDIC, any amount up to $250,000 is free of default risk because it is covered by the insurance. Any amount in excess of $250,000 is not insured and is subject to default risk. | Unlike CDs purchased by individuals, these CDs sell on the secondary market, but are less liquid than Treasury bills. |
| Repurchase Agreements | Essentially a loan arrangement wherein a securities dealer is the "borrower" and the investor is the "lender"; the investor buys securities, such as U.S. Treasury bills, from the securities dealer, with an agreement to sell the securities back to the dealer at a later date for a specified higher price. | Very short term, ranging from overnight to approximately three months in duration | The security serves as collateral for the loan, and therefore the investor is exposed to very little risk. However, the investor needs to consider the creditworthiness of the securities dealer when assessing the risk. | No secondary market for repurchase agreements. |
| Banker's Acceptances | Drafts written by the borrower and guaranteed by the bank on which the draft is drawn, typically used in international trade transactions; the borrower is an importer who writes the draft in payment for goods. | Typically one to six months | Because both the borrower and a bank have guaranteed the draft, there is usually very little risk. | When the exporter receives the draft, he may hold it until maturity and receive its full value or he may sell the draft at a discount prior to maturity. |
| Commercial Paper | Short-term, unsecured debt issued by large corporations. The minimum denomination is $25,000, but most commercial paper has a face value of $100,000 or more. | Typically one to six months | Default risk depends on the creditworthiness of the issuing corporation. | No active secondary market, but issuer may repurchase commercial paper. |
| Short-Term Tax Exempts | Short-term debt of state and local governments; these instruments pay interest that is exempt from federal taxation, so their pre-tax yield is lower than that of a similar-risk, fully taxable investment. | Typically one to six months | Default risk depends on the creditworthiness of the issuing government. | Moderate secondary market. |

Thus, a financial manager who wants to invest the firm's funds in the least risky security will choose to invest in Treasury bills. However, if the financial manager wishes to earn a higher return on the firm's short-term investments, she may opt to invest some or all of the firm's excess cash in a riskier alternative, such as commercial paper.

**CONCEPT CHECK**

1. List three reasons why a firm holds cash.

2. What trade-off does a firm face when choosing how to invest its cash?

**MyFinanceLab**

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 26.1 Overview of Working Capital

- Working capital management involves managing the firm's short-term assets and short-term liabilities.
- A firm's cash cycle is the length of time between when the firm pays cash to purchase its initial inventory and when it receives cash from the sale of the output produced from that inventory. The operating cycle is the average length of time between when a firm originally purchases its inventory and when it receives the cash back from selling its product.

### 26.2 Trade Credit

- Trade credit is effectively a loan from the selling firm to its customer. The cost of trade credit depends on the credit terms. The cost of not taking a discount that is offered by a supplier implies an interest rate for the loan.
- Companies provide trade credit to their customers for two reasons: (1) as an indirect way to lower prices, and (2) because they may have advantages in making loans to their customers relative to other potential sources of credit.
- A firm should compare the cost of trade credit with the cost of alternative sources of financing in deciding whether to use the trade credit offered.
- Establishing a credit policy involves three steps: establishing credit standards, establishing credit terms, and establishing a collection policy.

### 26.3 Receivables Management

- Accounts receivable days and the aging schedule are two methods used to monitor the effectiveness of a firm's credit policy.

### 26.4 Payables Management

- Firms should monitor accounts payable to ensure that they are making payments at an optimal time.

### 26.5 Inventory Management

- Firms hold inventory to avoid lost sales due to stock-outs and because of factors such as seasonal demand.
  - Because excessive inventory uses cash, efficient inventory management increases the firm's free cash flow and thus increases firm value.
  - The costs of inventory include acquisition costs, order costs, and carrying costs.

### 26.6 Cash Management

■ If a firm's need to hold cash is reduced, the funds can be invested in a number of different short-term securities, including Treasury bills, certificates of deposit, commercial paper, repurchase agreements, banker's acceptances, and short-term tax exempts.

## Key Terms

aging schedule *p. 893*
availability float *p. 892*
cash conversion cycle (CCC) *p. 887*
cash cycle *p. 887*
Check Clearing for the 21st Century Act (Check 21) *p. 892*
collection float *p. 892*
compensating balance *p. 899*
disbursement float *p. 892*
"just-in-time" (JIT) inventory management *p. 898*

mail float *p. 892*
operating cycle *p. 888*
payments pattern *p. 894*
precautionary balance *p. 899*
processing float *p. 892*
stock-outs *p. 897*
stretching the accounts payable *p. 896*
trade credit *p. 890*
transactions balance *p. 898*

## Further Reading

For more advanced analysis of working capital management, consult the following textbooks: R. Cole and L. Mishler, *Consumer and Business Credit Management* (McGraw-Hill, 1998); F. Fabozzi, S. Mann, and M. Choudhry, *The Global Money Markets* (John Wiley, 2002); and T. Maness and J. Zietlow, *Short-Term Financial Management* (South-Western, 2004).

The following articles address some of the research questions in working capital management.

**Cash Management Issues**. H. Almeida, M. Campello, and M. Weisbach, "The Cash Flow Sensitivity of Cash," *Journal of Finance* 59(4), (2004): 1777–1804; W. Baumol, "The Transactions Demand for Cash: An Inventory Theoretic Approach," *Quarterly Journal of Economics* 66(4) (1952): 545–556; J. Gentry, "State of the Art of Short-Run Financial Management," *Financial Management* 17(2) (1988): 41–57; M. Miller and D. Orr, "A Model of the Demand for Money by Firms," *Quarterly Journal of Economics* 80(3) (1966): 413–435; T. Opler, L. Pinkowitz, R. Stulz, and R. Williamson, "The Determinants and Implications of Corporate Cash Holdings," *Journal of Financial Economics* 52(1) (1999): 3–46; C. Payne, "The ABCs of Cash Management," *Journal of Corporate Accounting and Finance* 16(1) (2004): 3–8; L. Pinkowitz and R. Williamson, "What Is the Market Value of a Dollar of Corporate Cash?" *Journal of Applied Corporate Finance* 19 (2007): 74–81; and L. Pinkowitz, R. Stulz, and R. Williamson, "Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A cross-country analysis," *Journal of Finance* 61 (2006): 2725–2751.

**Trade Credit**. Y. Lee and J. Stowe, "Product Risk, Asymmetric Information and Trade Credit," *Journal of Financial and Quantitative Analysis* 28(2) (1993): 285–300; M. Long, I. Malitz, and S. A. Ravid, "Trade Credit, Quality Guarantees, and Product Marketability," *Financial Management* 22(4) (1993): 117–127; S. Mian and C. Smith, "Extending Trade Credit and Financing Receivables," *Journal of Applied Corporate Finance* 7(1) (1994): 75–84; S. Mian and C. Smith, "Accounts Receivable Management Policy: Theory and Evidence," *Journal of Finance* 47(1) (1992): 169–200; O. Ng, J. Smith, and R. Smith, "Evidence on the Determinants of Credit Terms Used in Interfirm Trade," *Journal of Finance* 54(3) (1999): 1109–1129; F. Scherr, "Optimal Trade Credit Limits," *Financial Management* 25(1) (Spring 1996): 71–85; and J. Smith, "Trade Credit and Information Asymmetry," *Journal of Finance* 42(4) (1987): 863–872.

# Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

## Overview of Working Capital

1. Answer the following questions:
   a. What is the difference between a firm's cash cycle and its operating cycle?
   b. How will a firm's cash cycle be affected if a firm increases its inventory, all else being equal?
   c. How will a firm's cash cycle be affected if a firm begins to take the discounts offered by its suppliers, all else being equal?

2. Does an increase in a firm's cash cycle necessarily mean that a firm is managing its cash poorly?

3. Aberdeen Outboard Motors is contemplating building a new plant. The company anticipates that the plant will require an initial investment of $2 million in net working capital today. The plant will last 10 years, at which point the full investment in net working capital will be recovered. Given an annual discount rate of 6%, what is the net present value of this working capital investment?

 4. The Greek Connection had sales of $32 million in 2012, and a cost of goods sold of $20 million. A simplified balance sheet for the firm appears below:

**THE GREEK CONNECTION**
**Balance Sheet**
**As of December 31, 2012**
**(in $ thousand)**

| Assets | | | Liabilities and Equity | | |
|---|---|---|---|---|---|
| Cash | $ | 2,000 | Accounts payable | $ | 1,500 |
| Accounts receivable | | 3,950 | Notes payable | | 1,000 |
| Inventory | | 1,300 | Accruals | | 1,220 |
| Total current assets | $ | 7,250 | Total current liabilities | $ | 3,720 |
| | | | Long-term debt | | 3,000 |
| Net plant, property, | | | Total liabilities | $ | 6,720 |
| and equipment | $ | 8,500 | Common equity | | 9,030 |
| Total assets | $ | 15,750 | Total liabilities and equity | $ | 15,750 |

   a. Calculate The Greek Connection's net working capital in 2012.
   b. Calculate the cash conversion cycle of The Greek Connection in 2012.
   c. The industry average accounts receivable days is 30 days. What would the cash conversion cycle for The Greek Connection have been in 2012 had it matched the industry average for accounts receivable days?

## Trade Credit

5. Assume the credit terms offered to your firm by your suppliers are 3/5, Net 30. Calculate the cost of the trade credit if your firm does not take the discount and pays on day 30.

6. Your supplier offers terms of 1/10, Net 45. What is the effective annual cost of trade credit if you choose to forgo the discount and pay on day 45?

7. The Fast Reader Company supplies bulletin board services to numerous hotel chains nationwide. The owner of the firm is investigating the benefit of employing a billing firm to do her billing and collections. Because the billing firm specializes in these services, collection float will be reduced by 20 days. Average daily collections are $1200, and the owner can earn 8% annually (expressed as an APR with monthly compounding) on her investments. If the billing firm charges $250 per month, should the owner employ the billing firm?

8. The Saban Corporation is trying to decide whether to switch to a bank that will accommodate electronic funds transfers from Saban's customers. Saban's financial manager believes the new system would decrease its collection float by as much as five days. The new bank would require a compensating balance of $30,000, whereas its present bank has no compensating balance requirement. Saban's average daily collections are $10,000, and it can earn 8% on its short-term investments. Should Saban make the switch? (Assume the compensating balance at the new bank will be deposited in a non-interest-earning account.)

## Receivables Management

9. What are the three steps involved in establishing a credit policy?

10. The Manana Corporation had sales of $60 million this year. Its accounts receivable balance averaged $2 million. How long, on average, does it take the firm to collect on its sales?

11. The Mighty Power Tool Company has the following accounts on its books:

| Customer | Amount Owed ($) | Age (days) |
|---|---|---|
| ABC | 50,000 | 35 |
| DEF | 35,000 | 5 |
| GHI | 15,000 | 10 |
| KLM | 75,000 | 22 |
| NOP | 42,000 | 40 |
| QRS | 18,000 | 12 |
| TUV | 82,000 | 53 |
| WXY | 36,000 | 90 |

The firm extends credit on terms of 1/15, Net 30. Develop an aging schedule using 15-day increments through 60 days, and then indicate any accounts that have been outstanding for more than 60 days.

## Payables Management

12. What is meant by "stretching the accounts payable"?

 13. Simple Simon's Bakery purchases supplies on terms of 1/10, Net 25. If Simple Simon's chooses to take the discount offered, it must obtain a bank loan to meet its short-term financing needs. A local bank has quoted Simple Simon's owner an interest rate of 12% on borrowed funds. Should Simple Simon's enter the loan agreement with the bank and begin taking the discount?

14. Your firm purchases goods from its supplier on terms of 3/15, Net 40.
   a. What is the effective annual cost to your firm if it chooses not to take the discount and makes its payment on day 40?
   b. What is the effective annual cost to your firm if it chooses not to take the discount and makes its payment on day 50?

 *15. Use the financial statements supplied below for International Motor Corporation (IMC) to answer the following questions.
   a. Calculate the cash conversion cycle for IMC for both 2012 and 2013. What change has occurred, if any? All else being equal, how does this change affect IMC's need for cash?
   b. IMC's suppliers offer terms of Net 30. Does it appear that IMC is doing a good job of managing its accounts payable?

**INTERNATIONAL MOTOR CORPORATION**

**Income Statement (in $ million)**
**for the Years Ending December 31**

|  | 2012 | 2013 |
|---|---|---|
| Sales | $ 60,000 | $ 75,000 |
| Cost of goods sold | 52,000 | 61,000 |
| Gross profit | $ 8,000 | $ 14,000 |
| Selling and general and administrative expenses | 6,000 | 8,000 |
| Operating profit | $ 2,000 | $ 6,000 |
| Interest expense | 1,400 | 1,300 |
| Earnings before tax | $ 600 | $ 4,700 |
| Taxes | 300 | 2,350 |
| Earnings after tax | $ 300 | $ 2,350 |

**INTERNATIONAL MOTOR CORPORATION**

**Balance Sheet (in $ million)**
**as of December 31**

| Assets | 2012 | 2013 | Liabilities | 2012 | 2013 |
|---|---|---|---|---|---|
| Cash | $ 3,080 | $ 6,100 | Accounts payable | $ 3,600 | $ 4,600 |
| Accounts receivable | 2,800 | 6,900 | Notes payable | 1,180 | 1,250 |
| Inventory | 6,200 | 6,600 | Accruals | 5,600 | 6,211 |
| Total current assets | $ 12,080 | $ 19,600 | Total current liabilities | $ 10,380 | $ 12,061 |
| Net plant, property, and equipment | $ 23,087 | $ 20,098 | Long-term debt | $ 6,500 | $ 7,000 |
| Total assets | $ 35,167 | $ 39,698 | Total liabilities | $ 16,880 | $ 19,061 |
|  |  |  | **Equity** |  |  |
|  |  |  | Common stock | $ 2,735 | $ 2,735 |
|  |  |  | Retained earnings | $ 15,552 | $ 17,902 |
|  |  |  | Total equity | $ 18,287 | $ 20,637 |
|  |  |  | Total liabilities and equity | $ 35,167 | $ 39,698 |

### Inventory Management

16. Ohio Valley Homecare Suppliers, Inc. (OVHS) had $20 million in sales in 2009. Its cost of goods sold was $8 million, and its average inventory balance was $2,000,000.
    a. Calculate the average number of inventory days outstanding for OVHS.
    b. The average days of inventory in the industry is 73 days. By how much would OVHS reduce its investment in inventory if it could improve its inventory days to meet the industry average?

### Cash Management

17. Which of the following short-term securities would you expect to offer the highest before-tax return: Treasury bills, certificates of deposit, short-term tax exempts, or commercial paper? Why?

## Data Case

You are the Chief Financial Officer (CFO) of BP. This afternoon you played golf with a member of the company's board of directors. Somewhere during the back nine, the board member enthusiastically described a recent article she had read in a leading management journal. This article noted several companies that had improved their stock price performance through effective working capital management, and the board member was intrigued. She wondered whether BP was managing its working capital effectively and, if not, whether BP could accomplish something similar. How was BP managing its working capital, and how does it compare to its competitors?

Upon returning home, you decide to do a quick preliminary investigation using information freely available on the Internet.

1. Obtain BP's financial statements for the past three years from Yahoo! Finance (http://finance.yahoo.com).

   a. Enter the stock symbol (BP) in the box and click "Get Quotes."

   b. Under "Financials," click "Income Statement." Copy and paste the statement into Excel (if using Internet Explorer, place the cursor in the statement and right-click the mouse, then choose "Export to Microsoft Excel" from the menu).

   c. Go back to the Web page and under "Financials," click "Balance Sheet"; repeat the download procedure for the balance sheet.

   d. Copy and paste the balance sheet so that it is on the same worksheet as the income statement.

2. Obtain the competitors' ratios for comparison from Yahoo! Finance (http://finance.yahoo.com).

   a. Enter Exxon Mobil Corporation's stock symbol (XOM) in the box at the top and click "Get Quotes."

   b. Follow the steps in Part 1 to obtain "net receivables" and "inventory" from the most recent annual balance sheet, and "total revenue" and "cost of revenue" from the most recent annual income statement.

   c. Repeat the two steps above for Chevron Corporation (CVX).

3. Compute the cash conversion cycle for BP for each of the last three years.

   a. Compute the inventory days using "cost of revenue" as cost of goods sold and a 365-day year.

   b. Compute accounts receivable days using a 365-day year.

   c. Compute accounts payable days.

   d. Compute the cash conversion cycle for each year.

4. How has BP's CCC changed over the last few years?

5. Compare BP's inventory and receivables turnover ratios for the most recent year to those of its competitors.

   a. Compute BP's inventory turnover ratio as cost of revenue/inventory.

   b. Compute BP's receivable turnover ratio as total revenue/net receivables.

   c. Compute the average inventory turnover ratio and average receivable turnover ratio of Chevron and Exxon Mobil. How do BP's numbers compare to the average ratios of its competitors? Do they confirm or refute your answer to Question 4?

6. Determine how BP's free cash flow would change if BP's inventory and accounts receivable balances were adjusted to meet the industry averages.

7. Determine the amount of additional free cash flow that would be available if BP adjusted its accounts payable days to 75 days.

8. Determine the net amount of additional free cash flow and BP's cash conversion cycle if its inventory and receivables turnover ratios were at the industry average and its payable days were 75 days.

9. What are your impressions regarding BP's working capital management based on this preliminary analysis? Discuss any advantages and disadvantages of bringing the cash conversion cycle more in line with the industry averages.

10. You are somewhat concerned about the reliability of financial data from the Internet, and decide to check the data versus BP's SEC filings. To obtain these filings, go to the SEC Web site and use the EDGAR system to search for BP's financial statements: http://www.sec.gov/edgar/searchedgar/webusers.htm. Pick search by company name, enter BP in the ticker symbol field, click "Find Companies," and then enter 20-F in the "Filing Type" field, and click "Search." Click on the latest 20-F, "Annual and transition report of foreign private issuers," and then click on the 20-F document link. Once you are in the document, scroll down to the table of contents and select "Financial Statements," and then find either the balance sheet or income statement to find the numbers you need. Is there any discrepancy between these numbers and the data you downloaded originally?

**CHAPTER**

# 27

# Short-Term Financial Planning

NOTATION

*EAR* effective annual rate

*APR* annual percentage rate

**M**ATTEL, INC. IS A COMPANY IN THE STANDARD AND POOR'S 500 index, with year-end 2011 assets of over \$5.6 billion. Mattel designs and manufactures toys throughout the world; its major product lines include the Barbie, Fisher-Price, and American Girl brands. The demand for toys is typically highly seasonal, peaking during the fall in anticipation of December's holiday retailing season. As a result, Mattel's revenues vary dramatically throughout the calendar year. For example, revenues during the fourth quarter of the calendar year are typically more than twice as high as revenues in the first quarter.

Mattel's varying business revenues cause its cash flows to be highly cyclical. The firm generates surplus cash during some months; it has a great demand for capital during other months. These seasonal financing requirements are quite different from its ongoing, long-term demand for permanent capital. How does a company such as Mattel manage its short-term cash needs within each calendar year?

In this chapter, we analyze short-term financial planning. We begin by showing how companies forecast their cash flows to determine their short-term financing needs, and we explore reasons why firms use short-term financing. We next discuss financing policies that guide these financing decisions. Finally, we compare alternative ways a company can finance a shortfall during periods when it is not generating enough cash, including short-term financing with bank loans, commercial paper, and secured financing.

908

## 27.1  Forecasting Short-Term Financing Needs

The first step in short-term financial planning is to forecast the company's future cash flows. This exercise has two distinct objectives. First, a company forecasts its cash flows to determine whether it will have surplus cash or a cash deficit for each period. Second, management needs to decide whether that surplus or deficit is temporary or permanent. If it is permanent, it may affect the firm's long-term financial decisions. For example, if a company anticipates an ongoing surplus of cash, it may choose to increase its dividend payout. Deficits resulting from investments in long-term projects are often financed using long-term sources of capital, such as equity or long-term bonds.

In this chapter, we focus specifically on short-term financial planning. With this perspective, we are interested in analyzing the types of cash surpluses or deficits that are temporary and, therefore, short term in nature. When a company analyzes its short-term financing needs, it typically examines cash flows at quarterly intervals. To illustrate, let's assume that it is currently December 2012 and consider the case of Springfield Snowboards, Inc. Springfield manufactures snowboarding equipment, which it sells primarily to sports retailers. Springfield anticipates that in 2013 its sales will grow by 10% to $20 million and its total net income will be $1,950,000. Assuming that both sales and production will occur uniformly throughout the year, management's forecast of its quarterly net income and statement of cash flows for 2013 is presented in the spreadsheet in Table 27.1 (also shown, in gray, is the income statement for the fourth quarter of 2012).[1]

From this forecast, we see that Springfield is a profitable company. Its quarterly net income is almost $500,000. Springfield's capital expenditures are equal to depreciation, and while Springfield's working capital requirements increase in the first quarter due to the increase in sales, they remain constant thereafter and so have no further cash flow consequence. Based on these projections, Springfield will be able to fund projected sales growth from its operating profit and, in fact, will accumulate excess cash on an ongoing basis. Given similar growth forecasts for next year and beyond, this surplus is likely to be long term. Springfield could reduce the surplus by paying some of it out as a dividend or by repurchasing shares.

Let's now turn to Springfield's potential short-term financing needs. Firms typically require short-term financing for three reasons: seasonalities, negative cash flow shocks, and positive cash flow shocks.

### Seasonalities

For many firms, sales are seasonal. When sales are concentrated during a few months, sources and uses of cash are also likely to be seasonal. Firms in this position may find themselves with a surplus of cash during some months that is sufficient to compensate for a shortfall during other months. However, because of timing differences, such firms often have short-term financing needs.

To illustrate, let's return to the example of Springfield Snowboards. In Table 27.1, management assumed that Springfield's sales occur uniformly throughout the year. In reality, for a snowboard manufacturer, sales are likely to be highly seasonal. Assume that 20% of sales occur during the first quarter, 10% during each of the second and third quarters

---

[1]Given the extensive coverage we have provided in Chapters 2 and 19 on how to construct pro forma financial statements, we do not rehash those details here. The full Excel model for all spreadsheets in this chapter is available from MyFinanceLab or www.pearsonhighered.com/berk_demarzo. Note that, for simplicity, we have assumed Springfield has no debt, and earns no interest on retained cash.

| TABLE 27.1 SPREADSHEET | Projected Financial Statements for Springfield Snowboards, 2013, Assuming Level Sales | | | | |
|---|---|---|---|---|---|

| Quarter | 2012Q4 | 2013Q1 | 2013Q2 | 2013Q3 | 2013Q4 |
|---|---|---|---|---|---|
| **Income Statement ($000)** | | | | | |
| 1  Sales | 4,545 | 5,000 | 5,000 | 5,000 | 5,000 |
| 2  Cost of Goods Sold | (2,955) | (3,250) | (3,250) | (3,250) | (3,250) |
| 3  Selling, General and Administrative | (455) | (500) | (500) | (500) | (500) |
| 4  EBITDA | 1,136 | 1,250 | 1,250 | 1,250 | 1,250 |
| 5  Depreciation | (455) | (500) | (500) | (500) | (500) |
| 6  EBIT | 682 | 750 | 750 | 750 | 750 |
| 7  Taxes | (239) | (263) | (263) | (263) | (263) |
| 8  **Net Income** | 443 | 488 | 488 | 488 | 488 |
| **Statement of Cash Flows** | | | | | |
| 9  Net Income | | 488 | 488 | 488 | 488 |
| 10  Depreciation | | 500 | 500 | 500 | 500 |
| 11  Changes in Working Capital | | | | | |
| 12    Accounts Receivable | | (136) | — | — | — |
| 13    Inventory | | — | — | — | — |
| 14    Accounts Payable | | 48 | — | — | — |
| 15  **Cash from Operating Activities** | | 899 | 988 | 988 | 988 |
| 16  Capital Expenditures | | (500) | (500) | (500) | (500) |
| 17  Other Investment | | — | — | — | — |
| 18  **Cash from Investing Activities** | | (500) | (500) | (500) | (500) |
| 19  Net Borrowing | | — | — | — | — |
| 20  Dividends | | — | — | — | — |
| 21  Capital Contributions | | — | — | — | — |
| 22  **Cash from Financing Activities** | | — | — | — | — |
| 23  **Change in Cash and Equivalents** (15 + 18 + 22) | | 399 | 488 | 488 | 488 |

(largely Southern Hemisphere sales), and 60% occur in the fourth quarter, in anticipation of the (Northern Hemisphere) winter snowboarding season. The spreadsheet in Table 27.2 presents the resulting statement of cash flows. These forecasts continue to assume production occurs uniformly throughout the year.

From Table 27.2, we see that Springfield is still a profitable company, and its annual net income still totals $1,950,000. However, the introduction of seasonal sales creates some dramatic swings in Springfield's short-term cash flows. There are two effects of seasonality on cash flows. First, while cost of goods sold fluctuates proportionally with sales, other costs (such as administrative overhead and depreciation) do not, leading to large changes in the firm's net income by quarter. Second, net working capital changes are more pronounced. In the first quarter, Springfield receives cash by collecting the receivables from last year's high fourth quarter sales. During the second and third quarters, the company's inventory balance increases. Given capacity constraints in its manufacturing equipment, Springfield produces snowboards throughout the year, even though sales during the summer are low. Because production occurs uniformly, accounts payable do not vary over the year. Inventory, however, builds up in anticipation of fourth quarter sales—and increases in inventory use cash. As a consequence, Springfield has negative net cash flows during the second and third quarters, primarily to fund its inventory. By the fourth quarter, high sales recover cash for the company.

Seasonal sales create large short-term cash flow deficits and surpluses. During the second and third quarters, the company will need to find additional short-term sources of cash to

| TABLE 27.2 SPREADSHEET | Projected Financial Statements for Springfield Snowboards, 2013, Assuming Seasonal Sales | | | | |
|---|---|---|---|---|---|

| | Quarter | 2012Q4 | 2013Q1 | 2013Q2 | 2013Q3 | 2013Q4 |
|---|---|---|---|---|---|---|
| **Income Statement ($000)** | | | | | | |
| 1 | Sales | 10,909 | 4,000 | 2,000 | 2,000 | 12,000 |
| 2 | Cost of Goods Sold | (7,091) | (2,600) | (1,300) | (1,300) | (7,800) |
| 3 | Selling, General and Administrative | (773) | (450) | (350) | (350) | (850) |
| 4 | EBITDA | 3,045 | 950 | 350 | 350 | 3,350 |
| 5 | Depreciation | (455) | (500) | (500) | (500) | (500) |
| 6 | EBIT | 2,591 | 450 | (150) | (150) | 2,850 |
| 7 | Taxes | (907) | (158) | 53 | 53 | (998) |
| 8 | **Net Income** | 1,684 | 293 | (98) | (98) | 1,853 |
| **Statement of Cash Flows** | | | | | | |
| 9 | Net Income | | 293 | (98) | (98) | 1,853 |
| 10 | Depreciation | | 500 | 500 | 500 | 500 |
| 11 | Changes in Working Capital | | | | | |
| 12 | Accounts Receivable | | 2,073 | 600 | — | (3,000) |
| 13 | Inventory | | (650) | (1,950) | (1,950) | 4,550 |
| 14 | Accounts Payable | | 48 | — | — | — |
| 15 | **Cash from Operating Activities** | | 2,263 | (948) | (1,548) | 3,903 |
| 16 | Capital Expenditures | | (500) | (500) | (500) | (500) |
| 17 | Other Investment | | — | — | — | — |
| 18 | **Cash from Investing Activities** | | (500) | (500) | (500) | (500) |
| 19 | Net Borrowing | | — | — | — | — |
| 20 | Dividends | | — | — | — | — |
| 21 | Capital Contributions | | — | — | — | — |
| 22 | **Cash from Financing Activities** | | — | — | — | — |
| 23 | **Change in Cash and Equivalents** (15 + 18 + 22) | | 1,763 | (1,448) | (2,048) | 3,403 |

fund inventory. During the fourth quarter, Springfield will have a large short-term surplus. Given that its seasonal cash flow needs are likely to recur next year, Springfield may choose to invest this cash in one of the short-term investment options discussed in Chapter 26. Management can then use this cash to fund some of its short-term working capital needs during the following year.

## Negative Cash Flow Shocks

Occasionally, a company will encounter circumstances in which cash flows are temporarily negative for an unexpected reason. We refer to such a situation as a negative cash flow shock. Like seasonalities, negative cash flow shocks can create short-term financing needs.

Returning to the Springfield Snowboards example, assume that during April 2013, management learns that some manufacturing equipment has broken unexpectedly. It will cost an additional $1,000,000 to replace the equipment.[2] To illustrate the effect of this

---

[2]For simplicity, assume that the book value of the replaced equipment is zero, so that the equipment change does not have any immediate tax implications. Also, assume that Springfield obtains the replacement equipment quickly, so that any interruption in production is negligible. Finally, assume that Springfield increases investment going forward to offset the additional depreciation of this new equipment. The general results contained in the discussion still hold if we relax these assumptions, although the calculations are somewhat more complex.

| TABLE 27.3 SPREADSHEET | Projected Financial Statements for Springfield Snowboards, 2013, Assuming Level Sales and a Negative Cash Flow Shock |
|---|---|

| | Quarter | 2012Q4 | 2013Q1 | 2013Q2 | 2013Q3 | 2013Q4 |
|---|---|---|---|---|---|---|
| **Income Statement ($000)** | | | | | | |
| 1 | Sales | 4,545 | 5,000 | 5,000 | 5,000 | 5,000 |
| 2 | Cost of Goods Sold | (2,955) | (3,250) | (3,250) | (3,250) | (3,250) |
| 3 | Selling, General and Administrative | (455) | (500) | (500) | (500) | (500) |
| 4 | EBITDA | 1,136 | 1,250 | 1,250 | 1,250 | 1,250 |
| 5 | Depreciation | (455) | (500) | (500) | (525) | (525) |
| 6 | EBIT | 682 | 750 | 750 | 725 | 725 |
| 7 | Taxes | (239) | (263) | (263) | (254) | (254) |
| 8 | **Net Income** | 443 | 488 | 488 | 471 | 471 |
| **Statement of Cash Flows** | | | | | | |
| 9 | Net Income | | 488 | 488 | 471 | 471 |
| 10 | Depreciation | | 500 | 500 | 525 | 525 |
| 11 | Changes in Working Capital | | | | | |
| 12 | Accounts Receivable | | (136) | — | — | — |
| 13 | Inventory | | — | — | — | — |
| 14 | Accounts Payable | | 48 | — | — | — |
| 15 | **Cash from Operating Activities** | | 899 | 988 | 996 | 996 |
| 16 | Capital Expenditures | | (500) | (1,500) | (525) | (525) |
| 17 | Other Investment | | — | — | — | — |
| 18 | **Cash from Investing Activities** | | (500) | (1,500) | (525) | (525) |
| 19 | Net Borrowing | | — | — | — | — |
| 20 | Dividends | | — | — | — | — |
| 21 | Capital Contributions | | — | — | — | — |
| 22 | **Cash from Financing Activities** | | — | — | — | — |
| 23 | **Change in Cash and Equivalents** (15 + 18 + 22) | | 399 | (513) | 471 | 471 |

negative cash flow shock, we return to the base case in which Springfield's sales are level rather than seasonal. (The marginal impact of this negative shock given seasonal sales would be similar.) The spreadsheet in Table 27.3 presents cash flows with level sales and the broken equipment.

In this case, the one-time expenditure of $1 million to replace equipment results in a negative net cash flow of $513,000 during the second quarter of 2013. If its cash reserves are insufficient, Springfield will have to borrow (or arrange for another financing source) to cover the $513,000 shortfall. However, the company continues to generate positive cash flow in subsequent quarters, and by the fourth quarter it will have generated enough in cumulative cash flow to repay any loan. Therefore, this negative cash flow shock has created the need for short-term financing.

## Positive Cash Flow Shocks

We next analyze a case in which a positive cash flow shock affects short-term financing needs. Although this surprise is good news, it still creates demand for short-term financing.

During the first quarter of 2013, the director of marketing at Springfield Snowboards announces a deal with a chain of outdoor sporting goods stores located in the Midwest. Springfield will be the exclusive supplier to this customer, leading to an overall sales increase of 20% for the firm, with other operating expenses expected to increase accordingly. The increased sales will begin in the second quarter. As part of the deal, Springfield has agreed

| TABLE 27.4 SPREADSHEET | Projected Financial Statements for Springfield Snowboards, 2013, Assuming Level Sales and a Growth Opportunity |
|---|---|

| Quarter | 2012Q4 | 2013Q1 | 2013Q2 | 2013Q3 | 2013Q4 |
|---|---|---|---|---|---|
| **Income Statement ($000)** | | | | | |
| 1  Sales | 4,545 | 5,000 | 6,000 | 6,000 | 6,000 |
| 2  Cost of Goods Sold | (2,955) | (3,250) | (3,900) | (3,900) | (3,900) |
| 3  Selling, General and Administrative | (455) | (1,000) | (600) | (600) | (600) |
| 4  EBITDA | 1,136 | 750 | 1,500 | 1,500 | 1,500 |
| 5  Depreciation | (455) | (500) | (525) | (525) | (525) |
| 6  EBIT | 682 | 250 | 975 | 975 | 975 |
| 7  Taxes | (239) | (88) | (341) | (341) | (341) |
| 8  **Net Income** | 443 | 163 | 634 | 634 | 634 |
| **Statement of Cash Flows** | | | | | |
| 9  Net Income | | 163 | 634 | 634 | 634 |
| 10  Depreciation | | 500 | 525 | 525 | 525 |
| 11  Changes in Working Capital | | | | | |
| 12    Accounts Receivable | | (136) | (300) | — | — |
| 13    Inventory | | — | — | — | — |
| 14    Accounts Payable | | 48 | 105 | — | — |
| 15  **Cash from Operating Activities** | | 574 | 964 | 1,159 | 1,159 |
| 16  Capital Expenditures | | (1,500) | (525) | (525) | (525) |
| 17  Other Investment | | — | — | — | — |
| 18  **Cash from Investing Activities** | | (1,500) | (525) | (525) | (525) |
| 19  Net Borrowing | | — | — | — | — |
| 20  Dividends | | — | — | — | — |
| 21  Capital Contributions | | — | — | — | — |
| 22  **Cash from Financing Activities** | | — | — | — | — |
| 23  **Change in Cash and Equivalents** (15 + 18 + 22) | | (926) | 439 | 634 | 634 |

to a one-time expense of $500,000 for marketing in areas where the stores are located. An extra $1 million in capital expenditures is also required during the first quarter to increase production capacity. Likewise, sales growth will affect required working capital.

Managers at Springfield prepared the projected financial statement in Table 27.4 to reflect this new business. Notice that net income is lower during the first quarter, reflecting the $500,000 increase in marketing expenses. By contrast, net income in subsequent quarters is higher, reflecting the higher sales. Sales increases in each of the first two quarters result in increases in accounts receivable and accounts payable.

Even though the unexpected event in this case—the opportunity to grow more rapidly—is positive, it results in a negative net cash flow during the first quarter, due primarily to the new marketing expenses and capital expenditures. However, because the company will be even more profitable in subsequent quarters, this financing need is temporary.

Now that we have explained how a company determines its short-term needs, let's explore how these needs are financed.

CONCEPT CHECK

1. How do we forecast the firm's future cash requirements?

2. What is the effect of seasonalities on short-term cash flows?

## 27.2 The Matching Principle

In a perfect capital market, the choice of financing is irrelevant; thus, how the firm chooses to finance its short-term cash needs cannot affect value. In reality, important market frictions exist, including transaction costs. For example, one transaction cost is the opportunity cost of holding cash in accounts that pay little or no interest. Firms also face high transaction costs if they need to negotiate a loan on short notice to cover a cash shortfall. Firms can increase their value by adopting a policy that minimizes these kinds of costs. One such policy is known as the matching principle. The **matching principle** states that short-term needs should be financed with short-term debt and long-term needs should be financed with long-term sources of funds.

### Permanent Working Capital

**Permanent working capital** is the amount that a firm must keep invested in its short-term assets to support its continuing operations. Because this investment in working capital is required so long as the firm remains in business, it constitutes a long-term investment. The matching principle indicates that the firm should finance this permanent investment in working capital with long-term sources of funds. Such sources have lower transaction costs than short-term sources of funds, which would have to be replaced more often.

### Temporary Working Capital

Another portion of a firm's investment in its accounts receivable and inventory is temporary and results from seasonal fluctuations in the firm's business or unanticipated shocks. This **temporary working capital** is the difference between the actual level of investment in short-term assets and the permanent working capital investment. Because temporary working capital represents a short-term need, the firm should finance this portion of its investment with short-term financing.

To illustrate the distinction between permanent and temporary working capital, we return to the Springfield Snowboards example. Table 27.2 presented cash flow forecasts assuming seasonal sales. In the spreadsheet in Table 27.5, we report the underlying levels of working capital that correspond to these forecasts.

In Table 27.5, we see that working capital for Springfield varies from a minimum of $2,125,000 in the first quarter of 2013 to $5,425,000 in the third quarter. The minimum level of working capital, or $2,125,000, can be thought of as the firm's permanent working

| TABLE 27.5 SPREADSHEET | Projected Levels of Working Capital for Springfield Snowboards, 2013, Assuming Seasonal Sales |

| | Quarter | 2012Q4 | 2013Q1 | 2013Q2 | 2013Q3 | 2013Q4 |
|---|---|---|---|---|---|---|
| **Net Working Capital Requirements ($000)** | | | | | | |
| 1 | Minimum Cash Balance | 500 | 500 | 500 | 500 | 500 |
| 2 | Accounts Receivable | 3,273 | 1,200 | 600 | 600 | 3,600 |
| 3 | Inventory | 300 | 950 | 2,900 | 4,850 | 300 |
| 4 | Accounts Payable | (477) | (525) | (525) | (525) | (525) |
| 5 | **Net Working Capital** | 3,595 | 2,125 | 3,475 | 5,425 | 3,875 |

capital. The difference between this minimum level and the higher levels in subsequent quarters (for example, $5,425,000 − $2,125,000 = $3,300,000$ in the third quarter) reflects Springfield's temporary working capital requirements.

## Financing Policy Choices

Following the matching principle should, in the long run, help minimize a firm's transaction costs.[3] But what if, instead of using the matching principle, a firm financed its permanent working capital needs with short-term debt? When the short-term debt comes due, the firm will have to negotiate a new loan. This new loan will involve additional transaction costs, and it will carry whatever market interest rate exists at the time. As a result, the firm is also exposed to interest rate risk. Financing part or all of the permanent working capital with short-term debt is known as an **aggressive financing policy**. An ultra-aggressive policy would involve financing even some of the plant, property, and equipment with short-term sources of funds.

When the yield curve is upward sloping, the interest rate on short-term debt is lower than the rate on long-term debt. In that case, short-term debt may appear cheaper than long-term debt. However, we know that with perfect capital markets, Modigliani and Miller's results from Chapter 14 apply: The benefit of the lower rate from short-term debt is offset by the risk that the firm will have to refinance the debt in the future at a higher rate. This risk is borne by the equity holders, and so the firm's equity cost of capital will rise to offset any benefit from the lower borrowing rate.

Why, then, might a firm choose an aggressive financing policy? Such a policy might be beneficial if the market imperfections mentioned in Chapter 16, such as agency costs and asymmetric information, are important. The value of short-term debt is less sensitive to the firm's credit quality than long-term debt; therefore, its value will be less affected by management's actions or information. As a result, short-term debt can have lower agency and "lemons" costs than long-term debt, and an aggressive financing policy can benefit shareholders. On the other hand, by relying on short-term debt, the firm exposes itself to **funding risk**, which is the risk of incurring financial distress costs, should the firm not be able to refinance its debt in a timely manner or at a reasonable rate.

Alternatively, a firm could finance its short-term needs with long-term debt, a practice known as a **conservative financing policy**. For example, when following such a policy, a firm would use long-term sources of funds to finance its fixed assets, permanent working capital, and some of its seasonal needs. The firm would use short-term debt very sparingly to meet its peak seasonal needs. To implement such a policy effectively, there will necessarily be periods when excess cash is available—those periods when the firm requires little or no investment in temporary working capital. While a conservative financing policy reduces funding risk, it entails other costs: First, excess cash may earn a below-market interest rate, thereby reducing the firm's value. Second, even if the cash is invested at a competitive rate, interest income on the cash will be subject to double taxation, an additional cost. Finally, holding excess cash within the firm also increases the possibility that managers of the firm will use it nonproductively—for example, on perquisites for themselves.

---

[3]Some evidence indicates that most firms appear to follow the matching principle. See W. Beranek, C. Cornwell, and S. Choi, "External Financing, Liquidity, and Capital Expenditures," *Journal of Financial Research* (Summer 1995): 207–222; and M. Stohs and D. Mauer, "The Determinants of Corporate Debt Maturity Structure," *Journal of Business* 69(3) (1996): 279–312.

Once a firm determines its short-term financing needs, it must choose which instruments it will use for this purpose. In the rest of this chapter, we survey the specific financing options available: bank loans, commercial paper, and secured financing.

<div style="border-left:4px solid #8b2b23;padding-left:8px">

**CONCEPT CHECK**

1. What is the matching principle?

2. What is the difference between temporary and permanent working capital?

</div>

## 27.3 Short-Term Financing with Bank Loans

One of the primary sources of short-term financing, especially for small businesses, is the commercial bank. Bank loans are typically initiated with a **promissory note**, which is a written statement that indicates the amount of the loan, the date payment is due, and the interest rate. In this section, we examine three types of bank loans: single, end-of-period payment loans; lines of credit; and bridge loans. In addition, we compare the interest rates, common stipulations, and fees associated with these bank loans.

### Single, End-of-Period Payment Loan

The most straightforward type of bank loan is a single, end-of-period-payment loan. Such a loan agreement requires that the firm pay interest on the loan and pay back the principal in one lump sum at the end of the loan. The interest rate may be fixed or variable. With a fixed interest rate, the specific rate that the commercial bank will charge is stipulated at the time the loan is made. With a variable interest rate, the terms of the loan may indicate that the rate will vary with some spread relative to a benchmark rate, such as the yield on one-year Treasury securities or the prime rate. The **prime rate** is the rate banks charge their most creditworthy customers. However, large corporations can often negotiate bank loans at an interest rate that is *below* the prime rate. For example, in its 2007 annual report, Mattel indicated that the weighted average interest rate it paid on average short-term borrowings from domestic institutions was 5.5% in 2007. By comparison, the average prime rate in 2007 was 8.05%.[4] Another common benchmark rate is the **London Inter-Bank Offered Rate**, or **LIBOR**, which is the rate of interest at which banks borrow funds from each other in the London interbank market. It is quoted for maturities of one day to one year for 10 major currencies. As it is a rate paid by banks with the highest credit quality, most firms will borrow at a rate that exceeds LIBOR.

### Line of Credit

Another common type of bank loan arrangement is a **line of credit**, in which a bank agrees to lend a firm any amount up to a stated maximum. This flexible agreement allows the firm to draw upon the line of credit whenever it chooses.

Firms frequently use lines of credit to finance seasonal needs.[5] The line of credit may be an **uncommitted line of credit**, meaning it is an informal agreement that does not legally bind the bank to provide the funds. As long as the borrower's financial condition remains

[4]Mattel 2007 annual report and *Federal Reserve Statistical Release* Web site

[5]Lines of credit may be used for other purposes as well. For example, Gartner, Inc., which provides research and analysis on information technology, announced that it would use both cash on hand and an existing bank line of credit to finance its 2005 acquisition of competitor Meta Group (Craig Schneider, "Dealwatch," CFO.com, January 5, 2005).

good, the bank is happy to advance additional funds. A **committed line of credit** consists of a written, legally binding agreement that obligates the bank to provide the funds regardless of the financial condition of the firm (unless the firm is bankrupt), as long as the firm satisfies any restrictions in the agreement. These arrangements are typically accompanied by a compensating balance requirement (that is, a requirement that the firm maintain a minimum level of deposits with the bank) and restrictions regarding the level of the firm's working capital. The firm pays a commitment fee based on a percentage of the unused portion of the line of credit plus interest on the amount that the firm borrowed. The line of credit agreement may also stipulate that at some point in time the outstanding balance must be zero. This policy ensures that the firm does not use the short-term financing to finance its long-term obligations.

Banks usually renegotiate the terms of a line of credit on an annual basis. A **revolving line of credit** is a committed line of credit that involves a solid commitment from the bank for a longer period of time, typically two to three years. A revolving line of credit with no fixed maturity is called **evergreen credit**. In its 2011 annual report, Mattel reported that it relied on a $1.4 billion revolving credit facility as the primary source of financing for its seasonal working capital requirements.

## Bridge Loan

A **bridge loan** is another type of short-term bank loan that is often used to "bridge the gap" until a firm can arrange for long-term financing. For example, a real estate developer may use a bridge loan to finance the construction of a shopping mall. After the mall is completed, the developer will obtain long-term financing. Other firms use bridge loans to finance their plant and equipment costs until they receive the proceeds from the sale of a long-term debt or an equity issue. After a natural disaster, lenders may provide businesses with short-term loans to serve as bridges until they receive insurance payments or long-term disaster relief.

Bridge loans are often quoted as discount loans with fixed interest rates. With a **discount loan**, the borrower is required to pay the interest at the *beginning* of the loan period. The lender deducts interest from the loan proceeds when the loan is made.

## Common Loan Stipulations and Fees

We now turn to common loan stipulations and fees that affect the effective interest rate on a loan. Specifically, we look at loan commitment fees, loan origination fees, and compensating balance requirements.

**Commitment Fees.** Various loan fees charged by banks affect the effective interest rate that the borrower pays. For example, the commitment fee associated with a committed line of credit increases the effective cost of the loan to the firm. The "fee" can really be considered an interest charge under another name. Suppose that a firm has negotiated a committed line of credit with a stated maximum of $1 million and an interest rate of 10% (EAR) with a bank. The commitment fee is 0.5% (EAR). At the beginning of the year, the firm borrows $800,000. It then repays this loan at the end of the year, leaving $200,000 unused for the rest of the year. The total cost of the loan is

| | | |
|---|---|---|
| Interest on borrowed funds = 0.10($800,000) | = | $80,000 |
| Commitment fee paid on unused portion = 0.005($200,000) | = | $ 1,000 |
| Total cost | | $81,000 |

**Loan Origination Fee.** Another common type of fee is a **loan origination fee**, which a bank charges to cover credit checks and legal fees. The firm pays the fee when the loan is initiated; like a discount loan, it reduces the amount of usable proceeds that the firm receives. And like the commitment fee, it is effectively an additional interest charge.

To illustrate, assume that Timmons Towel and Diaper Service is offered a $500,000 loan for three months at an APR of 12%. This loan has a loan origination fee of 1%. The loan origination fee is charged on the principal of the loan. In this case, the fee amounts to $0.01 \times \$500,000 = \$5000$, so the actual amount borrowed is $495,000. The interest payment for three months is $500,000(0.12/4) = \$15,000$. Putting these cash flows on a timeline:



Thus, the actual three-month interest rate paid is

$$\frac{515,000}{495,000} - 1 = 4.04\%$$

Expressing this rate as an EAR gives $1.0404^4 - 1 = 17.17\%$.

**Compensating Balance Requirements.** Regardless of the loan structure, the bank may include a compensating balance requirement in the loan agreement that reduces the usable loan proceeds. Recall from Chapter 26 that a compensating balance requirement means that the firm must hold a certain percentage of the principal of the loan in an account at the bank. Assume that, rather than charging a loan origination fee, Timmons Towel and Diaper Service's bank requires that the firm keep an amount equal to 10% of the loan principal in a non-interest-bearing account with the bank as long as the loan remains outstanding. The loan was for $500,000, so this requirement means that Timmons must hold $0.10 \times 500,000 = \$50,000$ in an account at the bank. Thus, the firm has only $450,000 of the loan proceeds actually available for use, although it must pay interest on the full loan amount. At the end of the loan period, the firm owes $500,000 \times (1 + 0.12/4) = \$515,000$, and so must pay $515,000 - 50,000 = \$465,000$ after using its compensating balance. Putting these cash flows on a timeline:



The actual three-month interest rate paid is

$$\frac{465,000}{450,000} - 1 = 3.33\%$$

Expressing this as an EAR gives $1.0333^4 - 1 = 14.01\%$.

We assumed that Timmons' compensating balance is held in a non-interest-earning account. Sometimes a bank will allow the compensating balance to be held in an account that pays a small amount of interest to offset part of the interest expense of the loan.

**EXAMPLE 27.1**

**Compensating Balance Requirements and the Effective Annual Rate**

**Problem**

Assume that Timmons Towel and Diaper Service's bank pays 1% (APR with quarterly compounding) on its compensating balance accounts. What is the EAR of Timmons' three-month loan?

**Solution**

The balance held in the compensating balance account will grow to $50,000(1 + 0.01/4) = \$50,125$. Thus, the final loan payment will be $500,000 + 15,000 - 50,125 = \$464,875$. Notice that the interest on the compensating balance accounts offsets some of the interest that Timmons pays on the loan. Putting the new cash flows on a timeline:



The actual three-month interest rate paid is

$$\frac{464,875}{450,000} - 1 = 3.31\%$$

Expressing this as an EAR gives $1.0331^4 - 1 = 13.89\%$.

**CONCEPT CHECK**

1. What is the difference between an uncommitted line of credit and a committed line of credit?

2. Describe common loan stipulations and fees.

# 27.4  Short-Term Financing with Commercial Paper

**Commercial paper** is short-term, unsecured debt used by large corporations that is usually a cheaper source of funds than a short-term bank loan. The minimum face value is $25,000, and most commercial paper has a face value of at least $100,000. The interest on commercial paper is typically paid by selling it at an initial discount.

The average maturity of commercial paper is 30 days and the maximum maturity is 270 days. Extending the maturity beyond 270 days triggers a registration requirement with the Securities and Exchange Commission (SEC), which increases issue costs and creates a time delay in the sale of the issue. Commercial paper is referred to as either direct paper or dealer paper. With **direct paper**, the firm sells the security directly to investors. With **dealer paper**, dealers sell the commercial paper to investors in exchange for a spread (or fee) for their services. The spread decreases the proceeds that the issuing firm receives, thereby increasing the effective cost of the paper. Like long-term debt, commercial paper is rated by credit rating agencies.

**EXAMPLE 27.2**

**The Effective Annual Rate of Commercial Paper**

**Problem**

A firm issues three-month commercial paper with a $100,000 face value and receives $98,000. What effective annual rate is the firm paying for its funds?

920    **Chapter 27**  Short-Term Financial Planning

**Solution**

Let's put the firm's cash flows on a timeline:

```
        0              1
        ├──────────────┤
   $98,000        −$100,000
```

The actual three-month interest rate paid is

$$\frac{100{,}000}{98{,}000} - 1 = 2.04\%$$

Expressing this as an EAR gives $1.0204^4 - 1 = 8.42\%$.

---

## GLOBAL FINANCIAL CRISIS    Short-Term Financing in Fall 2008

One of the biggest problems firms faced during the financial crisis was short-term financing. In the weeks following the bankruptcy of Lehman Brothers, the short-term credit markets froze. Many investors lost confidence in money market mutual funds and withdrew their capital. In response, fund managers liquidated their short-term investments, causing the availability of short-term credit to contract dramatically and short-term yields to skyrocket. Nowhere was this more evident than in the commercial paper market. The figure below shows the spread (difference) between the yields on the highest-rated commercial paper (P1) and the second-highest-rated commercial paper (P2) for two maturities: overnight (red) and 30 day (blue).

Before the collapse of housing prices and the subprime crisis in 2007, spreads were tiny—less than 0.2%. Then, in the latter half of 2007, spreads increased dramatically, at times exceeding 1% and consistently remaining above

0.5%. The onset of the financial crisis in the fall of 2008 precipitated an explosion in the spread. By October, spreads were over 4%. Government intervention helped reduce the overnight spread, but the more risky 30-day spread remained elevated and actually topped 6% on the last day of the year. The new year brought more calm to the short-term debt markets and by late 2009 spreads were back to their fall 2007 levels. Since that time, spreads have remained low (although have trended mildly upward through 2012).

Credit spreads at the level witnessed during the financial crisis effectively shut firms like Mattel out of the commercial paper market and severely hampered their ability to conduct business. In addition, the increased uncertainty in financial markets made firms less likely to invest. Both effects were significant contributors to the global recession that accompanied the financial crisis.



*Source*: Federal Reserve Board (http://www.federalreserve.gov/DataDownload/Choose.aspx?rel=CP)

**CONCEPT CHECK**

1. What is commercial paper?
2. How is interest paid on commercial paper?

## 27.5  Short-Term Financing with Secured Financing

Businesses can also obtain short-term financing by using **secured loans**, which are loans collateralized with short-term assets—most typically the firm's accounts receivables or inventory. Commercial banks, finance companies, and **factors**, which are firms that purchase the receivables of other companies, are the most common sources for secured short-term loans.

### Accounts Receivable as Collateral

Firms can use accounts receivable as security for a loan by pledging or factoring.

**Pledging of Accounts Receivable.**  In a **pledging of accounts receivable** agreement, the lender reviews the invoices that represent the credit sales of the borrowing firm and decides which credit accounts it will accept as collateral for the loan, based on its own credit standards. The lender then typically lends the borrower some percentage of the value of the accepted invoices—say, 75%. If the borrowing firm's customers default on their bills, the firm is still responsible to the lender for the money.

**Factoring of Accounts Receivable.**  In a **factoring of accounts receivable** arrangement, the firm sells receivables to the lender (i.e., the factor), and the lender agrees to pay the firm the amount due from its customers at the end of the firm's payment period. For example, if a firm sells its goods on terms of Net 30, then the factor will pay the firm the face value of its receivables, less a factor's fee, at the end of 30 days. The firm's customers are usually instructed to make payments directly to the lender. In many cases, the firm

### A Seventeenth-Century Financing Solution

In recent years, it has become more difficult for small businesses to obtain funding in order to purchase inventory. Several factors have contributed to this trend. First, bigger banks have acquired many small, regional banks that were traditionally important sources of loans to small businesses. Second, large banks have tightened lending requirements for small borrowers. Third, many small businesses rely increasingly on foreign suppliers that demand payment upfront, increasing the immediate demand for capital by small businesses.

Some small businesses have started to rely on a 400-year-old solution: venture merchant financing. This type of financing arrangement began in the seventeenth century, when groups of investors would provide capital for the voyages of Dutch sea captains. The captains would travel the seas, using the capital to purchase exotic merchandise. On their return, the merchant bankers would take about one-third of the captain's profits when the goods were sold as compensation for the financing.

Now consider the Kosher Depot, which sells exotic kosher foods to restaurants and supermarkets in Westbury, New York. It wanted to grow but lacked access to capital to purchase more specialty-foods inventory. Kosher Depot arranged a two-year, $3.3 million venture merchant financing arrangement with Capstone Business Credit. Kosher Depot would prearrange sales and notify Capstone, which would use its capital to buy the goods for Kosher Depot. Capstone would purchase and import the goods, storing them in its own warehouses. The warehouses then filled the orders received by Kosher Depot. For its services, Capstone received about 30% of the profits.

The cost of this arrangement—the 30% margin charged by the venture merchant—may be expensive relative to some of the alternative financing arrangements discussed in this chapter. However, the price may be worthwhile for a small business with no other short-term alternatives.

*Source*: Marie Leone, "Capital Ideas: A Little Cash'll Do Ya," CFO.com, March 3, 2005

can borrow as much as 80% of the face value of its receivables from the factor, thereby receiving its funds in advance. In such a case, the lender will charge interest on the loan in addition to the factor's fee. The lender charges the factor's fee, which may range from 1% to 2% of the face value of the accounts receivable, whether or not the firm borrows any of the available funds. Both the interest rate and the factor's fee vary depending on such issues as the size of the borrowing firm, the dollar volume of its receivables, and the creditworthiness of its customers. The dollar amounts involved in factoring agreements may be substantial. In 2011, for example, Mattel had sold nearly $30 million of its accounts receivable under factoring arrangements.

A factoring arrangement may be **with recourse**, meaning that the lender can seek payment from the borrower should the borrower's customers default on their bills. Alternatively, the financing arrangement may be **without recourse**, in which case the lender bears the risk of bad-debt losses. In this latter case, the factor will pay the firm the amount due regardless of whether the factor receives payment from the firm's customers. If the arrangement is with recourse, the lender may not require that it approve the customers' accounts before sales are made. If the factoring agreement is without recourse, the borrowing firm must receive credit approval for a customer from the factor prior to shipping the goods. If the factor gives its approval, the firm ships the goods and the customer is directed to make payment directly to the lender.

## Inventory as Collateral

Inventory can be used as collateral for a loan in one of three ways: as a floating lien, as a trust receipt, or in a warehouse arrangement.

**Floating Lien.**  In a **floating lien**, **general lien**, or **blanket lien** arrangement, all of the inventory is used to secure the loan. This arrangement is the riskiest setup from the standpoint of the lender because the value of the collateral used to secure the loan dwindles as inventory is sold. When a firm becomes financially distressed, management may be tempted to sell the inventory without making payments on the loan. In such a case, the firm may not have enough funds to replenish its inventory. As a result, the loan may become under-collateralized. To counter this risk, this type of loan bears a higher interest rate than the next two arrangements that we discuss. In addition, lenders will loan a low percentage of the value of the inventory.

**Trust Receipt.**  With a **trust receipts loan** or **floor planning**, distinguishable inventory items are held in a trust as security for the loan. As these items are sold, the firm remits the proceeds from their sale to the lender in repayment of the loan. The lender will periodically send someone to ensure that the borrower has not sold some of the specified inventory and failed to make a repayment on the loan. Car dealerships often use this type of secured financing arrangement to obtain the funds needed to purchase vehicles from the manufacturer.

**Warehouse Arrangement.**  In a **warehouse arrangement**, the inventory that serves as collateral for the loan is stored in a warehouse. A warehouse arrangement is the least risky collateral arrangement from the standpoint of the lender. This type of arrangement can be set up in one of two ways.

The first method is to use a **public warehouse**, which is a business that exists for the sole purpose of storing and tracking the inflow and outflow of the inventory. The lender extends a loan to the borrowing firm, based on the value of the inventory stored. When the

borrowing firm needs the inventory to sell, it returns to the warehouse and retrieves it upon receiving permission from the lender. This arrangement provides the lender with the tightest control over the inventory. Public warehouses work well for some types of inventory, such as wine and tobacco products, which must age before they are ready to be sold. It is not practical for items that are subject to spoilage or are bulky and, therefore, difficult to transport to and from the warehouse.

The second option, a **field warehouse**, is operated by a third party, but is set up on the borrower's premises in a separate area so that the inventory collateralizing the loan is kept apart from the borrower's main plant. This type of arrangement is convenient for the borrower but gives the lender the added security of having the inventory that serves as collateral controlled by a third party.

Warehouse arrangements are expensive. The business operating the warehouse charges a fee on top of the interest that the borrower must pay the lender for the loan. However, the borrower may also save on the costs of storing the inventory herself. Because the warehouser is a professional at inventory control, there is likely to be little loss due to damaged goods or theft, which in turn lowers insurance costs. Because the control of the inventory remains in the hands of a third party, lenders may be willing to lend a greater percentage of the market value of the inventory than they would under other inventory arrangements.

| EXAMPLE 27.3 | **Calculating the Effective Annual Cost of Warehouse Financing** |
|---|---|

**Problem**

The Row Cannery wants to borrow $2 million for one month. Using its inventory as collateral, it can obtain a 12% (APR) loan. The lender requires that a warehouse arrangement be used. The warehouse fee is $10,000, payable at the end of the month. Calculate the effective annual rate of this loan for Row Cannery.

**Solution**

The monthly interest rate is $12\%/12 = 1\%$. At the end of the month, Row will owe $2,000,000 \times 1.01 = \$2,020,000$ plus the warehouse fee of $10,000. Putting the cash flows on a timeline gives:

```
          0                              1
          |_____|
      $2,000,000                  -$2,030,000
```

The actual one-month interest rate paid is

$$\frac{2,030,000}{2,000,000} - 1 = 1.5\%$$

Expressing this as an EAR gives $1.015^{12} - 1 = 19.6\%$.

The method that a firm adopts when using its inventory to collateralize a loan will affect the ultimate cost of the loan. The blanket lien agreement exposes the lender to the most risk, and will therefore carry the highest interest rate of the three types of arrangements discussed. While a warehousing arrangement provides the greatest amount of control over the inventory to the lender, resulting in a lower interest rate on the loan itself, the borrowing firm must pay the additional fees charged by the warehouser and accept the inconvenience

associated with the loss of control. Although a trust receipts arrangement may offer a lower interest rate than a blanket lien, and it allows the firm to avoid the high fees associated with a warehouse arrangement, it can be used only with certain types of inventory.

**CONCEPT CHECK**

1. What is factoring of accounts receivable?

2. What is the difference between a floating lien and a trust receipt?

**MyFinanceLab**   Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 27.1 Forecasting Short-Term Financing Needs

- The first step in short-term financial planning is to forecast future cash flows. The cash flow forecasts allow a company to determine whether it has a cash flow surplus or deficit, and whether the surplus or deficit is short term or long term.
- Firms need short-term financing to deal with seasonal working capital requirements, negative cash flow shocks, or positive cash flow shocks.

### 27.2 The Matching Principle

- The matching principle specifies that short-term needs for funds should be financed with short-term sources of funds, and long-term needs with long-term sources of funds.

### 27.3 Short-Term Financing with Bank Loans

- Bank loans are a primary source of short-term financing, especially for small firms.
  - The most straightforward type of bank loan is a single, end-of-period payment loan.
  - Bank lines of credit allow a firm to borrow any amount up to a stated maximum. The line of credit may be uncommitted, which is a nonbinding informal agreement, or may more typically be committed.
  - A bridge loan is a short-term bank loan that is used to bridge the gap until the firm can arrange for long-term financing.
- The number of compounding periods and other loan stipulations, such as commitment fees, loan origination fees, and compensating balance requirements, affect the effective annual rate of a bank loan.

### 27.4 Short-Term Financing with Commercial Paper

- Commercial paper is a method of short-term financing that is usually available only to large, well-known firms. It is a low-cost alternative to a short-term bank loan for those firms with access to the commercial paper market.

### 27.5 Short-Term Financing with Secured Financing

- Short-term loans may also be structured as secured loans. The accounts receivable and inventory of a firm typically serve as collateral in short-term secured financing arrangements.
- Accounts receivable may be either pledged as security for a loan or factored. In a factoring arrangement, the accounts receivable are sold to the lender (or factor), and the firm's customers are usually instructed to make payments directly to the factor.
- Inventory can be used as collateral for a loan in several ways: a floating lien (also called a general or blanket lien), a trust receipts loan (or floor planning), or a warehouse arrangement. These arrangements vary in the extent to which specific items of inventory are identified as collateral; consequently, they vary in the amount of risk the lender faces.

## Key Terms

aggressive financing policy *p. 915*
blanket lien *p. 922*
bridge loan *p. 917*
commercial paper *p. 919*
committed line of credit *p. 917*
conservative financing policy *p. 915*
dealer paper *p. 919*
direct paper *p. 919*
discount loan *p. 917*
evergreen credit *p. 917*
factoring of accounts receivable *p. 921*
factors *p. 921*
field warehouse *p. 923*
floating lien *p. 922*
floor planning *p. 922*
funding risk *p. 915*
general lien *p. 922*

line of credit *p. 916*
loan origination fee *p. 918*
London Inter-Bank Offered Rate (LIBOR) *p. 916*
matching principle *p. 914*
permanent working capital *p. 914*
pledging of accounts receivable *p. 921*
prime rate *p. 916*
promissory note *p. 916*
public warehouse *p. 922*
revolving line of credit *p. 917*
secured loans *p. 921*
temporary working capital *p. 914*
trust receipts loan *p. 922*
uncommitted line of credit *p. 916*
warehouse arrangement *p. 922*
with recourse *p. 922*
without recourse *p. 922*

## Further Reading

For an in-depth discussion of short-term financing, see: G. Gallinger and B. Healey, *Liquidity Analysis and Management* (Addison-Wesley, 1991); N. Hill and W. Sartoris, *Short-Term Financial Management: Text and Cases* (Prentice-Hall, 1994); J. Kallberg and K. Parkinson, *Corporate Liquidity: Management and Measurement* (Irwin/McGraw Hill, 1996); F. Scherr, *Modern Working Capital Management: Text and Cases* (Prentice-Hall, 1989); and K. Smith and G. Gallinger, *Readings on Short-Term Financial Management* (West, 1988).

## Problems

*All problems are available in* MyFinanceLab.

### Forecasting Short-Term Financing Needs

1. Which of the following companies are likely to have high short-term financing needs? Why?
   a. A clothing retailer
   b. A professional sports team
   c. An electric utility
   d. A company that operates toll roads
   e. A restaurant chain

2. Sailboats Etc. is a retail company specializing in sailboats and other sailing-related equipment. The following table contains financial forecasts as well as current (month 0) working capital levels. During which months are the firm's seasonal working capital needs the greatest? When does it have surplus cash?

| ($000) | | | | Month | | | |
|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
| Net Income | | $10 | $12 | $15 | $25 | $30 | $18 |
| Depreciation | | 2 | 3 | 3 | 4 | 5 | 4 |
| Capital Expenditures | | 1 | 0 | 0 | 1 | 0 | 0 |
| Levels of Working Capital | | | | | | | |
| Accounts Receivable | $2 | 3 | 4 | 5 | 7 | 10 | 6 |
| Inventory | 3 | 2 | 4 | 5 | 5 | 4 | 2 |
| Accounts Payable | 2 | 2 | 2 | 2 | 2 | 2 | 2 |

926     **Chapter 27** Short-Term Financial Planning

### The Matching Principle

**3.** What is the difference between permanent working capital and temporary working capital?

 **4.** Quarterly working capital levels for your firm for the next year are included in the following table. What are the permanent working capital needs of your company? What are the temporary needs?

| | Quarter | | | |
|---|---|---|---|---|
| ($000) | 1 | 2 | 3 | 4 |
| Cash | $100 | $100 | $100 | $100 |
| Accounts Receivable | 200 | 100 | 100 | 600 |
| Inventory | 200 | 500 | 900 | 50 |
| Accounts Payable | 100 | 100 | 100 | 100 |

**5.** Why might a company choose to finance permanent working capital with short-term debt?

### Short-Term Financing with Bank Loans

 **6.** The Hand-to-Mouth Company needs a $10,000 loan for the next 30 days. It is trying to decide which of three alternatives to use:

*Alternative A*:   Forgo the discount on its trade credit agreement that offers terms of 2/10, Net 30.

*Alternative B*:   Borrow the money from Bank A, which has offered to lend the firm $10,000 for 30 days at an APR of 12%. The bank will require a (no-interest) compensating balance of 5% of the face value of the loan and will charge a $100 loan origination fee, which means Hand-to-Mouth must borrow even more than the $10,000.

*Alternative C*:   Borrow the money from Bank B, which has offered to lend the firm $10,000 for 30 days at an APR of 15%. The loan has a 1% loan origination fee.

Which alternative is the cheapest source of financing for Hand-to-Mouth?

**7.** Consider two loans with a 1-year maturity and identical face values: an 8% loan with a 1% loan origination fee and an 8% loan with a 5% (no-interest) compensating balance requirement. Which loan would have the higher effective annual rate? Why?

**8.** What is the difference between evergreen credit and a revolving line of credit?

**9.** Which of the following one-year $1000 bank loans offers the lowest effective annual rate?
a.  A loan with an APR of 6%, compounded monthly
b.  A loan with an APR of 6%, compounded annually, that also has a compensating balance requirement of 10% (on which no interest is paid)
c.  A loan with an APR of 6%, compounded annually, that has a 1% loan origination fee

**10.** The Needy Corporation borrowed $10,000 from Bank Ease. According to the terms of the loan, Needy must pay the bank $400 in interest every three months for the three-year life of the loan, with the principal to be repaid at the maturity of the loan. What effective annual rate is Needy paying?

### Short-Term Financing with Commercial Paper

**11.** The Treadwater Bank wants to raise $1 million using three-month commercial paper. The net proceeds to the bank will be $985,000. What is the effective annual rate of this financing for Treadwater?

12. Magna Corporation has an issue of commercial paper with a face value of $1,000,000 and a maturity of six months. Magna received net proceeds of $973,710 when it sold the paper. What is the effective annual rate of the paper to Magna?

13. What is the difference between direct paper and dealer paper?

14. The Signet Corporation has issued four-month commercial paper with a $6 million face value. The firm netted $5,870,850 on the sale. What effective annual rate is Signet paying for these funds?

## Short-Term Financing with Secured Financing

15. What is the difference between pledging accounts receivable to secure a loan and factoring accounts receivable?

16. The Ohio Valley Steel Corporation has borrowed $5 million for one month at a stated annual rate of 9%, using inventory stored in a field warehouse as collateral. The warehouser charges a $5000 fee, payable at the end of the month. What is the effective annual rate of this loan?

17. Discuss the three different arrangements under which a firm may use inventory to secure a loan.

18. The Rasputin Brewery is considering using a public warehouse loan as part of its short-term financing. The firm will require a loan of $500,000. Interest on the loan will be 10% (APR, annual compounding) to be paid at the end of the year. The warehouse charges 1% of the face value of the loan, payable at the beginning of the year. What is the effective annual rate of this warehousing arrangement?

*This page intentionally left blank*

# Special Topics

***THE LAW OF ONE PRICE CONNECTION.*** In Part 10, the final section of the text, we address special topics in corporate financial management. The Law of One Price continues to provide a unifying framework as we consider these topics. Chapter 28 discusses mergers and acquisitions and Chapter 29 provides an overview of corporate governance. In Chapter 30, we focus on corporations' use of derivatives to manage risk. We use the Law of One Price to evaluate the costs and benefits of risk management. Chapter 31 introduces the issues a firm faces when making a foreign investment and addresses the valuation of foreign projects. We value foreign currency cash flows in the context of internationally integrated capital markets, a condition that we demonstrate with the Law of One Price.

CHAPTER 28
Mergers and
Acquisitions

CHAPTER 29
Corporate
Governance

CHAPTER 30
Risk Management

CHAPTER 31
International
Corporate Finance

**CHAPTER**

# 28

# Mergers and Acquisitions

## NOTATION

| | |
|---|---|
| *EPS* | earnings per share |
| P/E | price-earnings ratio |
| *A* | premerger total value of acquirer |
| *T* | premerger total value of target |
| *S* | value of all synergies |
| $N_A$ | premerger number of shares of acquirer outstanding |
| *x* | number of new shares issued by acquirer to pay for target |
| $P_T$ | premerger share price of target |
| $P_A$ | premerger share price of acquirer |
| $N_T$ | premerger number of shares of target outstanding |

**O**N JULY 14, 2008, ST. LOUIS-BASED ANHEUSER-BUSCH agreed to an acquisition by Belgian-based beer giant InBev for $70 per share in cash. The agreement ended 150 years of independence for the brewer of iconic Budweiser beer. In fact, Anheuser-Busch's board flatly rejected InBev's initial $65 per share offer, preferring to remain independent. However, the sweetened offer, valuing the company at $60 billion, was too compelling a deal for Anheuser's board to pass up. Next, InBev's managers faced the daunting task of integrating Anheuser's organization and brands into their global company and generating enough value from the transaction to justify the price they paid. Given the complexity and potential sums of money at stake, it is clear that some of the most important decisions financial managers make concern mergers and acquisitions.

In this chapter, we first provide some historical background about the market for mergers and acquisitions. Next, we discuss some of the reasons why a corporate financial manager may decide to pursue an acquisition. We then review the takeover process. Finally, we address the question of who benefits from the value that is added when a takeover occurs.

## 28.1  Background and Historical Trends

Mergers and acquisitions are part of what is often referred to as "the market for corporate control." When one firm acquires another, there is typically a buyer, the **acquirer** or **bidder**, and a seller, the **target** firm. There are two primary mechanisms by which ownership and control of a public corporation can change: Either another corporation or group of individuals can acquire the target firm, or the target firm can merge with another firm. In both cases, the acquiring entity must purchase the stock or existing assets of the target either for cash or for something of equivalent value (such as shares in the acquiring or newly merged corporation). For simplicity, we refer to either mechanism as a **takeover**.

The global takeover market is highly active, averaging more than $1 trillion per year in transaction value. Table 28.1 lists the twenty largest transactions completed from 1998 through fall 2012. As the table indicates, takeovers happen between well-known companies, and individual transactions can involve huge sums of money.

### Merger Waves

The takeover market is also characterized by **merger waves**—peaks of heavy activity followed by quiet troughs of few transactions. Figure 28.1 displays the time series of takeover activity from 1926 to 2012. Merger activity is greater during economic expansions than during contractions and correlates with bull markets. Many of the same technological and

| TABLE 28.1 | Twenty Largest Merger Transactions, 1998–2012 | | | |
|---|---|---|---|---|
| Date Announced | Date Completed | Target Name | Acquirer Name | Equity Value (in $ billion) |
| Nov. 1999 | June 2000 | Mannesmann AG | Vodafone AirTouch PLC | 203 |
| Oct. 2004 | Aug. 2005 | Shell Transport & Trading Co. | Royal Dutch Petroleum Co. | 185 |
| Jan. 2000 | Jan. 2001 | Time Warner | America Online Inc. | 182 |
| Apr. 2007 | Nov. 2007 | ABN-AMRO Holding NV | RFS Holdings BV | 98 |
| Mar. 2006 | Dec. 2006 | BellSouth Corp. | AT&T Inc. | 89 |
| Nov. 1999 | June 2000 | Warner-Lambert Co. | Pfizer Inc. | 89 |
| Dec. 1998 | Nov. 1999 | Mobil Corp. | Exxon Corp. | 85 |
| Jan. 2000 | Dec. 2000 | SmithKline Beecham PLC | Glaxo Wellcome PLC | 79 |
| Feb. 2006 | July 2008 | Suez SA | Gaz de France SA | 75 |
| Apr. 1998 | Oct. 1998 | Citicorp | Travelers Group Inc. | 73 |
| July 1998 | June 2000 | GTE Corp. | Bell Atlantic Corp. | 71 |
| May 1998 | Oct. 1999 | Ameritech Corp. | SBC Communications Inc. | 70 |
| June 1998 | Mar. 1999 | Tele-Communications Inc. (TCI) | AT&T Corp. | 70 |
| Jan. 2010 | Oct. 2010 | Wyeth | Pfizer Inc. | 67 |
| Jan. 1999 | June 1999 | AirTouch Communications Inc. | Vodafone Group PLC | 66 |
| Jan. 2004 | Aug. 2004 | Aventis SA | Sanofi-Synthelabo SA | 66 |
| Apr. 1998 | Sep. 1998 | BankAmerica Corp. | NationsBank Corp. | 62 |
| July 2002 | Apr. 2003 | Pharmacia Corp. | Pfizer Inc. | 61 |
| June 2008 | Nov. 2008 | Anheuser-Busch Cos Inc. | InBev NV | 60 |
| June 1999 | June 2000 | US West | Qwest Communications | 59 |

*Source*: Thomson Reuters' SDC M&A Database



**FIGURE 28.1**

**Percentage of Public Companies Taken Over Each Quarter, 1926–2012**

Mergers appear to occur in distinct waves, with the most recent waves occurring in the 1980s, 1990s, and 2000s.

*Source*: Authors' calculations based on Center for Research in Securities Prices data

economic conditions that lead to bull markets also motivate managers to reshuffle assets through mergers and acquisitions. Thus, the same economic activities that drive expansions most likely also drive peaks in merger activity.[1]

Figure 28.1 shows that the periods of the greatest takeover activity occurred in the 1960s, 1980s, 1990s, and 2000s. Each merger wave was characterized by a typical type of deal. The increase in activity in the 1960s is known as the "conglomerate wave" because firms typically acquired firms in unrelated businesses. At the time, it was thought that managerial expertise was portable across business lines and that the conglomerate business form offered great financial advantages. This conglomerate fad eventually fell out of favor, and the 1980s were known for hostile, "bust-up" takeovers, in which the acquirer purchased a poorly performing conglomerate and sold off its individual business units for more than the purchase price. The 1990s, in contrast, were known for "strategic" or "global" deals that were more likely to be friendly and to involve companies in related businesses; these mergers often were designed to create strong firms on a scale that would allow them to compete globally. At the end of 2004, takeover activity began to pick up again, starting the next big merger wave, marked by consolidation in many industries such as telecommunications and software. This wave also saw private equity playing a larger role than it had in the past, with some private equity groups such as KKR, TPG, Blackrock, and Cerberus taking ever-larger firms such as Hertz (see Chapter 24), Chrysler, and Harrah's private. The financial crisis and severe contraction of credit in 2008 brought an abrupt end to the latest merger wave, though we are beginning to see a slow recovery.

---

[1]See J. Harford, "What Drives Merger Waves," *Journal of Financial Economics* 77 (2005): 529–560, for an analysis of why these waves occur.

### Types of Mergers

While we tend to talk about merger waves and mergers in general, the term "merger," as commonly used, encompasses several types of transactions that vary by the relation between the target and the acquirer and by the method of payment used in the transaction. If the target and acquirer are in the same industry, the merger is typically called a **horizontal merger**, whereas if the target's industry buys or sells to the acquirer's industry, it is called a **vertical merger**. Finally, if the target and acquirer operate in unrelated industries, the deal is a **conglomerate merger**. Conglomerate mergers, while popular in the 1960s, have generally fallen out of favor with shareholders because of the difficulty in creating value when combining two unrelated businesses.

Deals also vary based on whether the target shareholders receive stock or cash as payment for target shares. When they receive stock, the deal is often called a **stock swap**, because target shareholders are swapping their old stock for new stock in either the acquirer or the newly created merged firm. The consideration paid to target shareholders can be very complex, including debt instruments, options, and mixes of any of these with cash and/or stock. Commonly, however, target shareholders receive stock, cash, or a mix of the two.

While news reports understandably focus on the price and method of payment, the structure of a merger transaction, summarized in a **term sheet**, can be simple or incredibly complex. The items to negotiate include, among other things, who will run the new company, the size and composition of the new board, the location of the headquarters, and even the name of the new company.

---

**CONCEPT CHECK**

1. What are merger waves?

2. What is the difference between a horizontal and vertical merger?

---

## 28.2  Market Reaction to a Takeover

In most U.S. states, the law requires that when existing shareholders of a target firm are forced to sell their shares, they receive a fair value for their shares. Typically this concept is interpreted as the value exclusive of any value that arises because of the merger itself. For practical purposes, this principle translates into the share price prior to the merger. As a consequence, a bidder is unlikely to acquire a target company for less than its current market value. Instead, most acquirers pay a substantial **acquisition premium**, which is the percentage difference between the acquisition price and the premerger price of the target firm.

Table 28.2 lists the average historical premium and market reaction to a takeover.[2] As the table shows, acquirers pay an average premium of 43% over the premerger price of the

---

[2]The original research done in the 1970s and 1980s documented that shareholders experience significant gains (between 20% and 30%) upon a successful takeover of their firms. See G. Mandelker, "Risk and Return: The Case of the Merging Firm," *Journal of Financial Economics* 1(4) (1974): 303–335; M. Jensen and R. Ruback, "The Market for Corporate Control: The Scientific Evidence," *Journal of Financial Economics* 11(1) (1983): 5–50; and M. Bradley, A. Desai, and E. Kim, "The Rationale Behind Interfirm Tender Offers: Information or Synergy?" *Journal of Financial Economics* 11(1) (1983): 183–206. More recent papers have found combined losses on the order of $240 billion in capitalization at the announcement of takeover bids. This finding appears to be driven by spectacular losses from some large takeovers of public targets, especially in the late 1990s. See T. Loughran and A. Vijh, "Do Long-Term Shareholders Benefit from Corporate Acquisitions?" *Journal of Finance* 52(5) (1997): 1765–1790; and S. Moeller, R. Stulz, and F. Schlingemann, "Wealth Destruction on a Massive Scale: A Study of Acquiring Firm Returns in the Recent Merger Wave," *Journal of Finance* 60(2) (2005): 757–782.

| TABLE 28.2 | **Average Acquisition Premium and Stock Price Reactions to Mergers** | | |
|---|---|---|---|
| **Premium Paid over Premerger Price** | | **Announcement Price Reaction** | |
| | | Target | Acquirer |
| 43% | | 15% | 1% |

*Source*: Data based on all U.S. deals from 1980 to 2005, as reported in *Handbook of Corporate Finance: Empirical Corporate Finance*, Vol. 2, Chapter 15, pp. 291–430, B. E. Eckbo, ed., Elsevier/North-Holland Handbook of Finance Series, 2008.

target. When a bid is announced, the target shareholders enjoy a gain of 15% on average in their stock price. Although acquirer shareholders see an *average* gain of 1%, in half of the transactions, the bidder price *decreases*. These facts raise three important questions that we answer in this chapter:

1. Why do acquirers pay a premium over the market value for a target company?
2. Although the price of the target company rises on average upon the announcement of the takeover, why does it rise less than the premium offered by the acquirer?
3. If the transaction is a good idea, why does the acquirer not consistently experience a large price increase?

Let's start with the first question—why do acquirers pay a premium over market value? In fact, this question has two parts: (1) Why is the target worth a premium over the current market value? and (2) Even if the target is worth more than its premerger value, why do acquirers pay more than the premerger market price? In the next section, we answer the first part of this question. We delay the discussion of the second part until the end of the chapter, when we fully understand the mechanics of the takeover process.

**CONCEPT CHECK**

1. On average, what happens to the target share price on the announcement of a takeover?
2. On average, what happens to the acquirer share price on the announcement of a takeover?

## 28.3 Reasons to Acquire

For most investors, an investment in the stock market is a zero-NPV investment. How, then, can an acquirer pay a premium for a target and still satisfy the requirement that the investment is a positive-NPV investment opportunity? The answer is that an acquirer might be able to add economic value, as a result of the acquisition, that an individual investor cannot add.

Large synergies are by far the most common justification that bidders give for the premium they pay for a target. An extreme example is SBC's acquisition of AT&T in 2005 for more than $15 billion. In interviews immediately after the announcement, SBC's Chairman Ed Whitacre was quick to point out that the projected synergies of $15 billion alone could justify the price SBC agreed to pay for AT&T, let alone AT&T's assets.

Such synergies usually fall into two categories: cost reductions and revenue enhancements. Cost-reduction synergies are more common and easier to achieve because they generally translate into layoffs of overlapping employees and elimination of redundant

resources. This was the case in the SBC/AT&T acquisition, which forecasted 13,000 lay-offs in the first year. If the merger will create possibilities to expand into new markets or gain more customers, then the merger partners will predict synergies that enhance their revenue. For example, when Delta and Northwest airlines announced their merger agreement in April 2008, they forecasted $200–$300 million per year in revenue-enhancement synergies because their expanded network and flight options would bring in more customers and increase customer loyalty.

Let's examine in detail the synergies most often cited by acquirers to justify takeovers.

## Economies of Scale and Scope

A large company can enjoy **economies of scale**, or savings from producing goods in high volume, that are not available to a small company. For example, in Stride Rite's acquisition of sports shoemaker Saucony in 2005, one motivation was to reduce Saucony's manufacturing costs because, due to its larger size, Stride Rite could negotiate superior manufacturing contracts in China. Larger firms can also benefit from **economies of scope**, which are savings that come from combining the marketing and distribution of different types of related products (e.g., soft drinks and snack foods). Many analysts believed that Kraft's decision in 2009 to purchase the British chocolate maker Cadbury was motivated by a desire to expand Kraft's snack foods into emerging markets where Cadbury already had a large presence.

There may also be costs associated with size. Chief among these is that larger firms are more difficult to manage. In a small firm, the CEO is often close to the firm's operations. He or she can keep in touch with the firm's largest customers and most important personnel, thereby keeping abreast of changing market conditions and potential problems. Because they receive information quickly, small firms are often able to react in a timely way to changes in the economic environment.

## Vertical Integration

**Vertical integration** refers to the merger of two companies in the same industry that make products required at different stages of the production cycle. A company might conclude that it can enhance its product if it has direct control of the inputs required to make the product. Similarly, another company might not be happy with how its products are being distributed, so it might decide to take control of its distribution channels.

The principal benefit of vertical integration is coordination. By putting two companies under central control, management can ensure that both companies work toward a common goal. For example, oil companies are often vertically integrated. They generally own all stages of the production process, from the oil fields to the refineries and so on, even down to the gas stations that distribute their primary product—gasoline. Many also have divisions that prospect for new oil.

Vertically integrated companies are large, and as we have already pointed out, large corporations are more difficult to run. Consequently, not all successful corporations are vertically integrated. A good example is Microsoft Corporation. Microsoft has chosen to make the operating system that the vast majority of computers use, but not the computers themselves. Many experts have argued that a key factor in Microsoft's early success over rivals IBM and Apple was its decision not to integrate vertically.

## Expertise

Firms often need expertise in particular areas to compete more effectively. Faced with this situation, a firm can enter the labor market and attempt to hire personnel with the required skills. However, hiring experienced workers with the appropriate talent might be

difficult with an unfamiliar, new technology. A more efficient solution may be to purchase the talent as an already functioning unit by acquiring an existing firm. For example, in 2000 Paris-based AXA bought Sanford C. Bernstein, a Wall Street private partnership, to gain expertise and a preexisting client base in the huge U.S. asset management market. Similarly, U.K. builder Amec bought a large stake in Spie Batignolles, a French contractor, to gain local contacts and expertise in the French building industry. Such mergers are common in high-tech industries. Networking firm Cisco Systems is known for its strategy of buying young startup firms that have developed promising new networking technologies.

## Monopoly Gains

It is often argued that merging with or acquiring a major rival enables a firm to substantially reduce competition within the industry and thereby increase profits. Society as a whole bears the cost of monopoly strategies, so most countries have antitrust laws that limit such activity.

The extent to which these laws are enforced tends to vary across countries and over time depending on the policy of current leaders. When General Electric (GE) agreed to buy Honeywell in October 2000, the U.S. Justice Department approved the deal with limited conditions. However, the European Commission (EC) determined that putting GE's aircraft leasing division and Honeywell's extensive avionics product line under the same management would lead to unacceptable anticompetitive effects in the avionics market. Despite substantial concessions by GE and top-level political lobbying by U.S. officials, the EC refused to approve the deal, and it was eventually called off. The GE/Honeywell deal was the first time a merger of two U.S. companies that had been approved by U.S. authorities was blocked by European officials. The EC had no direct jurisdiction over the merger of the companies, but it was in the position to impose crippling restrictions on sales inside the European Union.[3]

Monopoly power could be very valuable, and we would expect that in the absence of strong antitrust laws, many companies would merge. However, while all companies in an industry benefit when competition is reduced, only the merging company pays the associated costs (from, for instance, integrating the target and managing a larger corporation). Perhaps this reason, along with existing antitrust regulation, accounts for the lack of convincing evidence that monopoly gains result from the reduction of competition following takeovers. For example, financial researchers have found that the share prices of other firms in the same industry did not significantly increase following the announcement of a merger within the industry.[4]

## Efficiency Gains

Another justification acquirers cite for paying a premium for a target is efficiency gains, which are often achieved through an elimination of duplication—for example, as in the SBC/AT&T merger mentioned earlier. Acquirers also often argue that they can run the target organization more efficiently than existing management could.

While in theory a chief executive of an inefficiently run corporation can be ousted by current shareholders voting to replace the board of directors, very few managers are

---

[3]The European Commissioner for Competition at the time was Mario Monti, who in 2011 became the prime minister of Italy to help resolve the Italian debt crisis.

[4]See B. E. Eckbo, "Horizontal Mergers, Collusion and Stockholder Wealth," *Journal of Financial Economics* 11(1) (1983): 241–273, and R. Stillman, "Examining Antitrust Policy Toward Horizontal Mergers," *Journal of Financial Economics* 11(1) (1983): 225–240.

replaced in this way. Instead, unhappy investors typically sell their stock, so the stock of a corporation with an inept chief executive trades at a discount relative to the price at which it would trade if it had more capable leadership. In such a situation, an acquirer could purchase shares at the discounted price to take control of the corporation and replace the chief executive with a more effective one. Once the benefits of the new management team become obvious to investors, the discount for the old management will likely disappear and the acquirer can resell its shares for a profit.

Although identifying poorly performing corporations is relatively easy, fixing them is another matter entirely. Takeovers relying on the improvement of target management are difficult to complete, and post-takeover resistance to change can be great. Thus, not all inefficiently run organizations necessarily become more efficient following a takeover.

### Tax Savings from Operating Losses

When a firm makes a profit, it must pay taxes on the profit. However, when it incurs a loss, the government does not rebate taxes. Thus, it might appear that a conglomerate has a tax advantage over a single-product firm simply because losses in one division can be offset by profits in another division. Let's illustrate this scenario with an example.

---

**EXAMPLE 28.1**

**Taxes for a Merged Corporation**

**Problem**

Consider two firms, Ying Corporation and Yang Corporation. Both corporations will either make $50 million or lose $20 million every year with equal probability. The only difference is that the firms' profits are perfectly negatively correlated. That is, any year Yang Corporation earns $50 million, Ying Corporation loses $20 million, and vice versa. Assume that the corporate tax rate is 34%. What are the total expected after-tax profits of both firms when they are two separate firms? What are the expected after-tax profits if the two firms are combined into one corporation called Ying-Yang Corporation, but are run as two independent divisions? (Assume it is not possible to carry back or carry forward any losses.)

**Solution**

Let's start with Ying Corporation. In the profitable state, the firm must pay corporate taxes, so after-tax profits are $50 \times (1 - 0.34) = \$33$ million. No taxes are owed when the firm reports losses, so the expected after-tax profits of Ying Corporation are $33(0.5) - 20(0.5) = \$6.5$ million. Because Yang Corporation has identical expected profits, its expected profits are also $6.5 million. Thus, the expected profit of both companies operated separately is $13 million.

The merged corporation, Ying-Yang Corporation, always makes a pretax profit equal to $50 - 20 = \$30$ million. After taxes, expected profits are therefore $30 \times (1 - 0.34) = \$19.8$ million. So Ying-Yang Corporation has significantly higher after-tax profits than the total stand-alone after-tax profits of Ying Corporation and Yang Corporation.

---

Although Example 28.1 is an extreme case, it illustrates a benefit of conglomeration. In the United States, however, these benefits are mitigated because the IRS typically allows companies to carry back losses up to 2 years, or forward up to 20 years, to offset earnings. While that rule would reduce the tax benefit in Example 28.1, it also creates a motive for profitable firms to acquire targets with large tax loss carryforwards in order to reap the tax savings from them. However, the IRS will disallow a tax break if it can show that the principal reason for a takeover is tax avoidance, so it is unlikely that such a tax benefit could, by itself, be a valid reason to acquire another firm.

## Diversification

The benefits of diversification are frequently cited as a reason for a conglomerate merger. The justification for these benefits comes in three forms: direct risk reduction, lower cost of debt or increased debt capacity, and liquidity enhancement. We discuss each in turn.

**Risk Reduction.** Like a large portfolio, large firms bear less idiosyncratic risk, so often mergers are justified on the basis that the combined firm is less risky. The problem with this argument is that it ignores the fact that investors can achieve the benefits of diversification themselves by purchasing shares in the two separate firms. Because most stockholders will already be holding a well-diversified portfolio, they get no further benefit from the firm diversifying through acquisition. Moreover, as we have already pointed out, there are costs associated with merging and with running a large diversified firm. Because it may be harder to measure performance accurately in a conglomerate, agency costs may increase and resources may be inefficiently allocated across divisions.[5] As a result, it is cheaper for investors to diversify their own portfolios than to have the corporation do it through acquisition.

**Debt Capacity and Borrowing Costs.** All else being equal, larger, more diversified firms have a lower probability of bankruptcy given the same degree of leverage. Consequently, such firms can increase leverage further and enjoy greater tax savings without incurring significant costs of financial distress. Thus, increased tax benefits and reduction in bankruptcy costs from leverage are potential benefits of diversifying mergers. Of course, to justify a merger, these gains must be large enough to offset any disadvantages of running a larger, less-focused firm.

**Liquidity.** Shareholders of private companies are often under-diversified: They have a disproportionate share of their wealth invested in the private company. Consequently, when an acquirer buys a private target, it provides the target's owners with a way to reduce their risk exposure by cashing out their investment in the private target and reinvesting in a diversified portfolio. This liquidity that the bidder provides to the owners of a private firm can be valuable and often is an important incentive for the target shareholders to agree to the takeover.

## Earnings Growth

It is possible to combine two companies with the result that the earnings per share of the merged company exceed the premerger earnings per share of either company, *even when the merger itself creates no economic value*. Let's look at how this can happen.

| EXAMPLE 28.2 | **Mergers and Earnings per Share** |
|---|---|

**Problem**

Consider two corporations that both have earnings of $5 per share. The first firm, OldWorld Enterprises, is a mature company with few growth opportunities. It has 1 million shares that are currently outstanding, priced at $60 per share. The second company, NewWorld Corporation, is a young company with much more lucrative growth opportunities. Consequently, it has a higher value: Although it has the same number of shares outstanding, its stock price is $100 per share. Assume NewWorld acquires OldWorld using its own stock, and the takeover adds no value. In a perfect market, what is the value of NewWorld after the acquisition? At current market prices, how many shares must NewWorld offer to OldWorld's shareholders in exchange for their shares? Finally, what are NewWorld's earnings per share after the acquisition?

---

[5]See, for example, A. Goel, V. Nanda, and M. P. Narayanan, "Career Concerns and Resource Allocation in Conglomerates," *Review of Financial Studies* 17(1) (2004): 99–128.

**Solution**

Because the takeover adds no value, the post-takeover value of NewWorld is just the sum of the values of the two separate companies: $100 \times 1$ million $+ 60 \times 1$ million $= \$160$ million. To acquire OldWorld, NewWorld must pay $60 million. At its pre-takeover stock price of $100 per share, the deal requires issuing 600,000 shares. As a group, OldWorld's shareholders will then exchange 1 million shares in OldWorld for 600,000 shares in NewWorld, or each shareholder will get 0.6 share in NewWorld for each 1 share in OldWorld. Notice that the price per share of NewWorld stock is the same after the takeover: The new value of NewWorld is $160 million and there are 1.6 million shares outstanding, giving it a stock price of $100 per share.

However, NewWorld's earnings per share have changed. Prior to the takeover, both companies earned $5/share $\times$ 1 million shares $= \$5$ million. The combined corporation thus earns $10 million. There are 1.6 million shares outstanding after the takeover, so NewWorld's post-takeover earnings per share are

$$EPS = \frac{\$10 \text{ million}}{1.6 \text{ million shares}} = \$6.25/\text{share}$$

By taking over OldWorld, NewWorld has raised its earnings per share by $1.25.

As Example 28.2 demonstrates, by acquiring a company with low growth potential (and thus a low P/E multiple), a company with high growth potential (and high P/E multiple) can raise its earnings per share. In the past, people have cited this increase as a reason to merge. Of course, a savvy investor will see that the merger *adds no economic value*. All that has happened is that the high-growth company, by combining with a low-growth company, has lowered its overall growth rate. As a result, its P/E multiple should fall, which results from its earnings per share rising. Thus, we can draw no conclusion regarding whether a merger was beneficial solely by looking at its impact on the acquirer's earnings.

| EXAMPLE 28.3 | **Mergers and the Price-Earnings Ratio** |
|---|---|

**Problem**

Calculate NewWorld's price-earnings ratio before and after the takeover described in Example 28.2.

**Solution**

Before the takeover, NewWorld's price-earnings ratio is

$$P/E = \frac{\$100/\text{share}}{\$5/\text{share}} = 20$$

After the takeover, NewWorld's price-earnings ratio is

$$P/E = \frac{\$100/\text{share}}{\$6.25/\text{share}} = 16$$

The price-earnings ratio has dropped to reflect the fact that after taking over OldWorld, more of the value of NewWorld comes from earnings from current projects than from its future growth potential.

## Managerial Motives to Merge

Most of the reasons given so far are economically motivated, shareholder-driven incentives to merge. However, managers sometimes have their own reasons to merge. Studies have consistently found that the stock price of large bidders drops on average when a bid is

announced, especially when the target is publicly traded. Two possible explanations might be conflicts of interest with their shareholders and overconfidence.

**Conflicts of Interest.**  Managers may prefer to run a larger company due to the additional pay and prestige it brings. Because most CEOs hold only a small fraction of their firm's stock, they may not bear enough of the cost of an otherwise bad merger that increases their personal benefits.[6] For example, a CEO who owns 1% of her firm's stock bears 1% of every dollar lost on a bad acquisition, but enjoys 100% of the gains in compensation and prestige that come with being the CEO of a larger company. If the acquisition destroys $100 million in shareholder value, but increases the present value of her compensation by more than $1 million, she will prefer to execute the merger anyway. Why would the board of directors create these incentives? Either due to poor monitoring of the manager, or belief that the strategy is correct even if the stock market disagrees, boards typically increase the pay of CEOs along with the size of the firm, even if the size comes at the expense of poorly performing acquisitions.[7] We will discuss corporate governance further in the next chapter.

**Overconfidence.**  As explained in Chapter 13, people in general tend to be overconfident in their abilities. Psychological research has shown that it takes repeated failures for a person to change his belief that he is above-average at some activity. Most CEOs perform at most one large acquisition during their tenure as CEO. In a well-known 1986 paper,[8] Richard Roll proposed the "hubris hypothesis" to explain takeovers, which maintains that overconfident CEOs pursue mergers that have low chance of creating value because they truly believe that their ability to manage is great enough to succeed. The critical distinction between this hypothesis and the incentive conflict discussed above is that overconfident managers believe they are doing the right thing for their shareholders, but irrationally overestimate their own abilities. Under the incentive conflict explanation, managers know they are destroying shareholder value, but personally gain from doing so.

**CONCEPT CHECK**

1. What are the reasons most often cited for a takeover?

2. Explain why risk diversification benefits and earnings growth are not good justifications for a takeover intended to increase shareholder wealth.

## 28.4 The Takeover Process

In this section, we explore how the takeover process works. We begin by establishing how a bidder determines the initial offer. We then review the tax and accounting issues specific to a takeover and explain the regulatory approval process. We end by discussing board approval, including defensive strategies that boards implement to discourage takeovers.

---

[6]M. Jensen highlighted the agency conflict in acquisition decisions in his 1986 paper, "Agency costs of free cash flow, corporate finance and takeovers," *American Economic Review* 76 (1986): 323–329.

[7]J. Harford and K. Li, "Decoupling CEO Wealth and Firm Performance: The Case of Acquiring CEOs," *Journal of Finance* 62 (2007): 917–949, shows that in 75% of mergers where the acquiring shareholders lose money, acquiring CEOs are financially better off.

[8]R. Roll, "The Hubris Hypothesis of Corporate Takeovers," *Journal of Business* 59(2) (1986): 197–216.

### Valuation

In Chapter 19, we demonstrated how a bidder values a target company. Recall that we explained, in the context of a case study, how an acquirer values a target by using two different approaches. The first—and simpler—approach compares the target to other comparable companies. Although this approach is easy to implement, it gives at best a rough estimate of value. Valuing the target using a multiple based on comparable firms does not directly incorporate the operational improvements and other synergistic efficiencies that the acquirer intends to implement. Purchasing a corporation usually constitutes a very large capital investment decision, so it requires a more accurate estimate of value including careful analysis of both operational aspects of the firm and the ultimate cash flows the deal will generate. Thus, the second approach to valuation requires making a projection of the expected cash flows that will result from the deal, and valuing those cash flows.

A key issue for takeovers is quantifying and discounting the value added as a result of the merger. In Chapter 19, the acquirer was expected to implement operational improvements and make adjustments to the target's capital structure, thereby shielding additional income from taxes. As demonstrated in Section 28.3, a takeover can generate other sources of value. For simplicity, in this section we refer to any additional value created as the **takeover synergies**.

We know that the price paid for a target is equal to the target's pre-bid market capitalization plus the premium paid in the acquisition. If we view the pre-bid market capitalization as the stand-alone value of the target,[9] then from the bidder's perspective, the takeover is a positive-NPV project only if the premium it pays does not exceed the synergies created. Although the premium that is offered is a concrete number, the synergies are not—investors might well be skeptical of the acquirer's estimate of their magnitude. The bidder's stock price reaction to the announcement of the merger is one way to gauge investors' assessments of whether the bidder overpaid or underpaid for the target. As Table 28.2 shows, the average stock price reaction is 1%, but the median is closer to zero. Thus, the market, on average, believes that the premium is approximately equal to the synergies. Nonetheless, there is large variation in the premium across deals. One large-scale study of the value effects of mergers found that positive reactions to bids are concentrated in smaller bidders. In fact, during the 1990s, 87 large public acquirers announced bids that resulted in $1 billion or more in value reduction at announcement.[10] This finding is likely related to some of the managerial motives discussed in the previous section.

### The Offer

Once the acquirer has completed the valuation process, it is in the position to make a tender offer—that is, a public announcement of its intention to purchase a large block of shares for a specified price. A bidder can use either of two methods to pay for a target: cash or stock. In a cash transaction, the bidder simply pays for the target, including any premium, in cash. In a stock-swap transaction, the bidder pays for the target by issuing new stock and giving it to the target shareholders. The "price" offered is determined by

---

[9]Rumors about a potential bid for the target will often push its share price up in anticipation of the premium offer. Practitioners refer to the "unaffected" target price, meaning the target's share price before it was affected by rumors of a takeover. This price would be used to compute the stand-alone value of the target.

[10]S. Moeller, R. Stulz, and F. Schlingemann, "Wealth Destruction on a Massive Scale: A Study of Acquiring Firm Returns in the Recent Merger Wave," *Journal of Finance* 60(2) (2005): 757–782.

the **exchange ratio**—the number of bidder shares received in exchange for each target share—multiplied by the market price of the acquirer's stock.

A stock-swap merger is a positive-NPV investment for the acquiring shareholders if the share price of the merged firm (the acquirer's share price after the takeover) exceeds the premerger price of the acquiring firm. We can write this condition as follows. Let $A$ be the premerger, or stand-alone, value of the acquirer, and $T$ be the premerger (stand-alone) value of the target. Let $S$ be the value of the synergies created by the merger. If the acquirer has $N_A$ shares outstanding before the merger, and issues $x$ new shares to pay for the target, then the acquirer's share price should increase post-acquisition if

$$\frac{A + T + S}{N_A + x} > \frac{A}{N_A} \qquad (28.1)$$

The left side of Eq. 28.1 is the share price of the merged firm. The numerator indicates the total value of the merged firm: the stand-alone value of the acquirer and target plus the value of the synergies created by the merger. The denominator represents the total number of shares outstanding once the merger is complete. The ratio is the post-merger share price. The right side of Eq. 28.1 is the premerger share price of the acquirer: the total premerger value of the acquirer divided by the premerger number of shares outstanding.

Solving Eq. 28.1 for $x$ gives the maximum number of new shares the acquirer can offer and still achieve a positive NPV:

$$x < \left(\frac{T+S}{A}\right)N_A \qquad (28.2)$$

We can express this relationship as an exchange ratio by dividing by the premerger number of target shares outstanding, $N_T$:

$$\text{Exchange ratio} = \frac{x}{N_T} < \left(\frac{T+S}{A}\right)\frac{N_A}{N_T} \qquad (28.3)$$

We can also rewrite Eq. 28.3 in terms of the *premerger* target and acquirer share prices, $P_T = T/N_T$ and $P_A = A/N_A$:

$$\text{Exchange ratio} < \frac{P_T}{P_A}\left(1 + \frac{S}{T}\right) \qquad (28.4)$$

---

| EXAMPLE 28.4 | **Maximum Exchange Ratio in a Stock Takeover** |
|---|---|

**Problem**

At the time Sprint announced plans to acquire Nextel in December 2004, Sprint stock was trading for $25 per share and Nextel stock was trading for $30 per share. If the projected synergies were $12 billion, and Nextel had 1.033 billion shares outstanding, what is the maximum exchange ratio Sprint could offer in a stock swap and still generate a positive NPV? What is the maximum cash offer Sprint could make?

**Solution**

Nextel's premerger market cap was $T = 1.033 \times 30 = \$31$ billion. Thus using Eq. 28.4,

$$\text{Exchange ratio} < \frac{P_T}{P_A}\left(1 + \frac{S}{T}\right) = \frac{30}{25}\left(1 + \frac{12}{31}\right) = 1.665$$

That is, Sprint could offer up to 1.665 shares of Sprint stock for each share of Nextel stock and generate a positive NPV. For a cash offer, given synergies of \$12 billion/1.033 billion shares = \$11.62 per share, Sprint could offer up to \$30 + 11.62 = \$41.62. Note that this cash amount equals the cash value of the exchange offer: \$25 × 1.665 = \$41.62.

### Merger "Arbitrage"

Once a tender offer is announced, there is no guarantee that, in fact, the takeover will take place at this price. Often acquirers have to raise the price to consummate the deal. Alternatively, the offer may fail. When an acquirer bids for a target, the target firm's board may not accept the bid and recommend that existing shareholders not tender their shares, even when the acquirer offers a significant premium over the pre-offer share price. Even if the target board supports the deal, there is also the possibility that regulators might not approve the takeover. Because of this uncertainty about whether a takeover will succeed, the market price generally does not rise by the amount of the premium when the takeover is announced.

This uncertainty creates an opportunity for investors to speculate on the outcome of the deal. Traders known as **risk arbitrageurs**, who believe that they can predict the outcome of a deal, take positions based on their beliefs. While the strategies these traders use are sometimes referred to as arbitrage, they are actually quite risky, so they do not represent a true arbitrage opportunity in the sense we have defined in this book. Let's illustrate the strategy using the 2002 stock-swap merger of Hewlett-Packard (HP) and Compaq.

In September 2001, HP announced that it would purchase Compaq by swapping 0.6325 shares of HP stock for each share of Compaq stock. After the announcement, HP traded for \$18.87 per share, so the implied value of HP's offer was \$18.87 × 0.6325 = \$11.9353. Yet, the price of Compaq was only \$11.08 per share after the announcement, \$0.8553 below the value of HP's offer. Thus, a risk arbitrageur who simultaneously purchased 10,000 Compaq shares and short sold 6325 HP shares, would net 6325 × \$18.87 − 10,000 × \$11.08 = \$8553 immediately. Then, if the takeover was successfully completed on the original terms, the 10,000 Compaq shares would convert into 6325 HP shares, allowing the risk arbitrageur to cover the short position in HP and be left with no net exposure. Thus, the arbitrageur would pocket the original \$8553 as a profit.[11]

The potential profit described above arises from the difference between the target's stock price and the implied offer price, and is referred to as the **merger-arbitrage spread**. However, it is not a true arbitrage opportunity because there is a risk that the deal will not go through. If the takeover did not ultimately succeed, the risk arbitrageur would eventually have to unwind his position at whatever market prices prevailed. In most cases, these prices would have moved against him (in particular, the price of Compaq would be likely to decline if the takeover did not occur), so he would face losses on the position.

The HP-Compaq takeover was distinctive in that the uncertainty about the success of the deal stemmed largely from acquirer discomfort with the deal rather than from target shareholder discomfort. Although initially supportive of the merger, the Hewlett family got cold feet. About two months after the deal was announced, Walter Hewlett disclosed his family's opposition to it. On the day of Walter Hewlett's announcement,

---

[11]For simplicity, we are ignoring dividend payments made during the period. HP paid \$0.24 and Compaq paid \$0.075 in dividends prior to the completion of the merger, reducing slightly the profit from the trade by 10,000 × \$0.075 − 6325 × \$0.24 = −\$768.



**FIGURE 28.2**

**Merger-Arbitrage Spread for the Merger of HP and Compaq**

The plot shows the potential profit, given that the merger was ultimately successfully completed, from purchasing 10,000 Compaq shares and short-selling 6325 HP shares on the indicated date. A risk arbitrageur who expects the deal to go through can profit by opening the position when the spread is large, and closing the position after it declines.

the price of HP stock rose to $19.81, while Compaq's stock price fell to $8.50, causing the merger-arbitrage spread to widen to $19.81 × 6325 − $8.5 × 10,000 = $40,298$. We plot the merger-arbitrage spread for the HP-Compaq merger in Figure 28.2. The risk-arbitrage strategy outlined above is effectively a short position on this spread, which pays off if the spread declines. Thus, an arbitrageur who opened the strategy when the deal was announced and closed it after Walter Hewlett announced his opposition would face a loss of $40,298 − $8553 = $31,745$.

Although the Hewlett family members were large shareholders of HP, they were not controlling shareholders; they did not have enough shares to block the deal single-handedly. Hence, a battle for control of HP ensued between the Hewlett family and CEO Carly Fiorina, the driving force behind the acquisition of Compaq. This conflict was only resolved months later when HP shareholders, by a slim margin, voted in favor of issuing new shares, thereby effectively approving the merger and netting a profit for any risk arbitrageur who stayed the course. As is clear from Figure 28.2, arbitrageurs who did not have the stomach to hold on would have faced large losses at several points during the roller-coaster ride. And while HP CEO Carly Fiorina survived this early challenge to her authority, the performance of HP following the merger vindicated Hewlett's position. HP's board ultimately fired Fiorina in 2005.

## Tax and Accounting Issues

Once the terms of trade have been decided, the tax and accounting implications of a merger can be determined. How the acquirer pays for the target affects the taxes of both the target shareholders and the combined firm. Any cash received in full or partial exchange for shares triggers an immediate tax liability for target shareholders. They will have to pay a capital gains tax on the difference between the price paid for their shares in the takeover and the price they paid when they first bought the shares. If the acquirer pays for the takeover

entirely by exchanging bidder stock for target stock, then the tax liability is deferred until the target shareholders actually sell their new shares of bidder stock.

If the acquirer purchases the target assets directly (rather than the target stock), then it can **step up** the book value of the target's assets to the purchase price. This higher depreciable basis reduces future taxes through larger depreciation charges. Further, any goodwill created could also be amortized for tax purposes over 15 years. The same treatment applies to a forward cash-out merger, where the target is merged into the acquirer and target shareholders receive cash in exchange for their shares.

Many transactions are carried out as acquisitive reorganizations under the tax code. These structures allow the target shareholders to defer their tax liability on the part of the payment made in acquirer stock but they do not allow the acquirer to step up the book value of the target assets. However, they provide a mechanism for isolating the target's assets and liabilities in a subsidiary of the acquirer. This can be very attractive for an acquirer that does not want to be exposed to the known (or unknown) liabilities of the target.

While the method of payment (cash or stock) affects how the value of the target's assets is recorded for tax purposes, it does not affect the combined firm's financial statements for financial reporting. The combined firm must mark up the value assigned to the target's assets on the financial statements by allocating the purchase price to target assets according to their fair market value. If the purchase price exceeds the fair market value of the target's identifiable assets, then the remainder is recorded as goodwill and is examined annually by the firm's accountants to determine whether its value has decreased. For example, in HP's takeover of Compaq, HP recorded more than $10 billion in goodwill. The footnotes to the statements attributed the goodwill to the value of the Compaq brand name, which is assumed to have an indefinite life.

Even when a merger has a positive NPV, bidding managers are typically very concerned with the effect of the merger on earnings. This is the other side of the earnings-growth argument as a reason to merge. Just as merging two companies can increase earnings without affecting economic value, it can also decrease earnings without affecting economic value. Nevertheless, acquirers are hesitant to commit to a deal that would be dilutive to earnings per share, even if only in the short run.

### Board and Shareholder Approval

For a merger to proceed, both the target and the acquiring board of directors must approve the deal and put the question to a vote of the shareholders of the target (and, in some cases, the shareholders of the acquiring firm as well).

In a **friendly takeover**, the target board of directors supports the merger, negotiates with potential acquirers, and agrees on a price that is ultimately put to a shareholder vote. Although it is rare for acquiring boards to oppose a merger, target boards sometimes do not support the deal even when the acquirer offers a large premium. In a **hostile takeover**, the board of directors (together with upper-level management) fights the takeover attempt. To succeed, the acquirer must garner enough shares to take control of the target and replace the board of directors. When a takeover is hostile, the acquirer is often called a **raider**.

If the shareholders of a target company receive a premium over the current market value of their shares, why would a board of directors ever oppose a takeover? There are a number of reasons. The board might legitimately believe that the offer price is too low. In this case, a suitor that is willing to pay more might be found or the original bidder might be convinced to raise its offer. Alternatively, if the offer is a stock-swap, target management may oppose the offer because they feel the acquirer's shares are over-valued, and therefore that

the value of the offer is actually less than the stand-alone value of the target. Finally, managers (and the board) might oppose a takeover because of their own self-interests, especially if the primary motivation for the takeover is efficiency gains. In this case, the acquirer most likely plans to undertake a complete change of leadership of the corporation. Upper-level managers could view opposing the merger as a way of protecting their jobs (and the jobs of their employees). In fact, this concern is perhaps the single biggest reason for the negative associations that hostile takeovers generate. Bear in mind that if substantial efficiency gains are indeed possible, current management is not doing an effective job. A takeover, or threat thereof, might be the only recourse investors have to fix the problem.

In theory, the duty of the target board of directors is to choose the course of action that is in the best interests of the target shareholders. In practice, the courts have given target directors wide latitude under what is called the "business judgment rule" to determine the best course for their companies, including spurning a premium offer if the directors can reasonably argue that more value will eventually be realized for their shareholders by remaining independent. The premise of this rule is that absent evidence of misconduct or self-dealing, the court will not substitute its judgment for that of the elected, informed directors.

In merger transactions, however, there is heightened judicial scrutiny under what is commonly referred to as the "Revlon duties" and "Unocal," named after the cases in which they were established. The Revlon duties state that if a change of control is going to occur, then directors must seek the highest value (they cannot favor one controlling entity over another based on anything other than value to shareholders). The Unocal case established that when the board takes actions deemed as defensive (we discuss these in detail in the next section), its actions are subject to extra scrutiny to ensure that they are not coercive or designed simply to preclude a deal. The board must believe that there is a threat to its corporate strategy and its defenses must be proportional to the magnitude of the threat.

**CONCEPT CHECK**

1. What are the steps in the takeover process?

2. What do risk arbitrageurs do?

## 28.5 Takeover Defenses

For a hostile takeover to succeed, the acquirer must go around the target board and appeal directly to the target shareholders. The acquirer can do this by making an unsolicited offer to buy target stock directly from the shareholders (a tender offer). The acquirer will usually couple this with a **proxy fight**: The acquirer attempts to convince target shareholders to unseat the target board by using their proxy votes to support the acquirers' candidates for election to the target board. Target companies have a number of strategies available to them to stop this process. These strategies can force a bidder to raise its bid or entrench management more securely, depending on the independence of the target board. We begin with the most effective defensive strategy, the poison pill.

### Poison Pills

A **poison pill** is a rights offering that gives existing target shareholders the right to buy shares in the target at a deeply discounted price once certain conditions are met. The acquirer is specifically excluded from this right. Because target shareholders can purchase shares at less than the market price, the rights offering dilutes the value of any shares held by the acquirer. This dilution makes the takeover so expensive for the acquiring shareholders that they choose to pass on the deal.

The poison pill was invented in 1982 by a takeover lawyer, Martin Lipton, who successfully warded off a takeover attempt of El Paso Electric by General American Oil.[12] Because the original poison pill goes into effect only in the event of a complete takeover (that is, a purchase of 100% of the outstanding shares), one way to circumvent it is to not do a complete takeover. The first time this work-around was used was by Sir James Goldsmith, who took control of Crown Zellerbach by purchasing slightly more than 50% of the outstanding stock. Because he did not purchase the rest, Crown Zellerbach's poison pill was ineffective.

In response to the takeover of Crown Zellerbach, corporate lawyers have perfected the original poison pill. Most poison pills now specify that if a raider acquires more than a trigger amount (typically 20%) of the target shares (but chooses not to execute a complete takeover by purchasing all outstanding shares), existing shareholders—with the exception of the acquirer—have the right to buy more shares in the target at a discounted price.

The name *poison pill* comes from the world of espionage. Once caught, a spy is supposed to take his own life by swallowing a poison pill rather than give up important secrets. Poison pills are very effective in stopping takeovers, but where is the suicide analogy? The answer is that by adopting a poison pill, a company effectively entrenches its management by making it much more difficult for shareholders to replace bad managers, thereby potentially destroying value. Financial research has verified this effect. A firm's stock price typically drops when it adopts a poison pill. Furthermore, once adopted, firms with poison pills have below-average financial performance.[13]

Not surprisingly, companies adopting poison pills are harder to take over, and when a takeover occurs, the premium that existing shareholders receive for their stock is higher. Therefore, because a poison pill increases the cost of a takeover, all else being equal, a target company must be in worse shape (there must be a greater opportunity for profit) to justify the expense of waging a takeover battle.

Poison pills also increase the bargaining power of the target firm when negotiating with the acquirer because they make it difficult to complete the takeover without the cooperation of the target board. If used effectively, this bargaining power can allow target shareholders to capture more of the takeover gains by negotiating a higher premium than they would get if no pill existed. Numerous studies on the impact of anti-takeover provisions on takeovers have found that such provisions result in higher premiums accruing to existing shareholders of the target company.[14]

### Staggered Boards

A determined bidder in the face of a poison pill has another available option: Get its own slate of directors elected to the target board, which it can submit at the next annual shareholders meeting. If the target shareholders elect those candidates, then the new directors

---

[12]For a brief history, see Len Costa, "The Perfect Pill," *Legal Affairs* (March 2005), http://www.legalaffairs.org.

[13]P. Malatesta and R. Walkling, "Poison Pill Securities: Stockholder Wealth, Profitability and Ownership Structure," *Journal of Financial Economics* 20(1) (1988): 347–376; and M. Ryngaert, "The Effects of Poison Pills Securities on Stockholder Wealth," *Journal of Financial Economics* 20(1) (1988): 377–417.

[14]Georgeson and Company (1988) study; R. Comment and G. W. Schwert, "Poison or Placebo: Evidence on the Deterrence and Wealth Effects of Modern Antitakeover Measures," *Journal of Financial Economics* 39(1) (1995): 3–43; N. Varaiya, "Determinants of Premiums in Acquisition Transactions," *Managerial and Decision Economics* 8(3) (1987): 175–184; and R. Heron and E. Lie, "On the Use of Poison Pills and Defensive Payouts by Takeover Targets," *Journal of Business* 79(4) (2006): 1783–1807.

can cancel the poison pill and accept the bidder's offer. To prevent such a coup from happening, about two-thirds of public companies have a **staggered (or classified) board**. In a typical staggered board, every director serves a three-year term and the terms are staggered so that only one-third of the directors are up for election each year. Thus, even if the bidder's candidates win board seats, it will control only a minority of the target board. A bidder's candidate would have to win a proxy fight two years in a row before the bidder had a majority presence on the target board. The length of time required to execute this maneuver can deter a bidder from making a takeover attempt when the target board is staggered. Most experts consider a poison pill combined with a staggered board to be the most effective defense available to a target company.

## White Knights

When a hostile takeover appears to be inevitable, a target company will sometimes look for another, friendlier company to acquire it. This company that comes charging to the target's rescue is known as a **white knight**. The white knight will make a more lucrative offer for the target than the hostile bidder. Incumbent managers of the target maintain control by reaching an agreement with the white knight to retain their positions.

One variant on the white knight defense is the **white squire** defense. In this case, a large investor or firm agrees to purchase a substantial block of shares in the target with special voting rights. This action prevents a hostile raider from acquiring control of the target. The idea is that the white squire itself will not choose to exercise its control rights.

## Golden Parachutes

A **golden parachute** is an extremely lucrative severance package that is guaranteed to a firm's senior managers in the event that the firm is taken over and the managers are let go. For example, when Ronald Perelman successfully acquired Revlon Corporation, the firm's former chairman, Michael Bergerac, was reported to have received a golden parachute compensation package worth in excess of $35 million.

Golden parachutes have been criticized because they are seen both as excessive and a misuse of shareholder wealth. In fact, the empirical evidence does not support this view.[15] If anything, it supports the view that an adoption of a golden parachute actually creates value. If a golden parachute exists, management will be more likely to be receptive to a takeover. This means the existence of golden parachutes lessens the likelihood of managerial entrenchment. Researchers have found that stock prices rise on average when companies announce that they plan to implement a golden parachute policy, and that the number of firms bidding against one another for the target and the size of the takeover premium are higher if a golden parachute agreement exists.

## Recapitalization

Another defense against a takeover is a recapitalization, in which a company changes its capital structure to make itself less attractive as a target. For example, a company with a lot of cash might choose to pay out a large dividend. Companies without a lot of cash might instead choose to issue debt and then use the proceeds to pay a dividend or repurchase stock.

Why does increasing leverage make a firm less attractive as a target? In many cases, a substantial portion of the synergy gains that an acquirer anticipates from a takeover are

---

[15]M. Narayanan and A. Sundaram, "A Safe Landing? Golden Parachutes and Corporate Behavior," *University of Michigan Business School Working Paper No. 98015* (1998).

from tax savings from an increase in leverage as well as other cost reductions. By increasing leverage on its own, the target firm can reap the benefit of the interest tax shields. In addition, the need to generate cash to meet the debt service obligations provides a powerful motivation to managers to run a corporation efficiently. In effect, the restructuring itself can produce efficiency gains, often removing the principal motivation for the takeover in the first place.

## Other Defensive Strategies

Corporate managers and defense advisors have devised other mechanisms to forestall a takeover. A corporation's charter can require a supermajority (sometimes as much as 80%) of votes to approve a merger. It can also restrict the voting rights of very large shareholders. Finally, a firm can require that a "fair" price be paid for the company, where the determination of what is "fair" is up to the board of directors or senior management. Beauty is always in the eye of the beholder, so "fair" in this case usually implies an optimistic determination of value.

We might expect the presence of defensive strategies to reduce firm value. However, Gregg Jarrell and Annette Poulsen[16] found that, on average, the public announcement of anti-takeover amendments by 600 firms in the period 1979–1985 had an insignificant effect on the value of announcing firms' shares.

## Regulatory Approval

All mergers must be approved by regulators. In Section 28.2, we discussed monopoly gains from takeovers and the use of antitrust regulations to limit them. In the United States, antitrust enforcement is governed by three main statutes: the Sherman Act, the Clayton Act, and the Hart-Scott-Rodino Act. The Sherman Act of 1890, which was passed in response to the formation of huge oil trusts such as Standard Oil, prohibits mergers that would create a monopoly or undue market control. The Clayton Act, enacted in 1914, strengthened the government's hand by prohibiting companies from acquiring the stock (or, as later amended, the assets) of another company if it would adversely affect competition. Under both the Sherman and Clayton acts, the government had to sue to block a merger. Often by the time a decision was rendered, the merger had taken place and it was difficult to undo it. The Hart-Scott-Rodino (HSR) Act of 1976 put the burden of proof on the merging parties. Under HSR, all mergers above a certain size (the formula for determining whether a transaction qualifies is complicated, but it comes out to approximately $60 million) must be approved by the government before the proposed takeovers occur. The government cannot delay the deal indefinitely, however, because it must respond with approval or a request for additional information within 20 days of receiving notification of the proposed merger.

The European Commission has established a process similar to the HSR process, which requires merging parties to notify the EC, provide additional information if requested about the proposed merger, and wait for approval before proceeding. As discussed in the Honeywell/GE example, even though the EC technically lacks legal authority to block a merger of U.S. companies, it can stop a takeover by imposing restrictions on the combined firm's operations and sales in Europe. Although globally a proposed takeover might have to satisfy antitrust rules in more than 80 jurisdictions, practically the most important jurisdictions besides the home jurisdiction of the firm are Europe and the United States.

---

[16]G. Jarrell and A. Poulsen, "Shark Repellents and Stock Prices: The Effects of Antitakeover Amendments Since 1980," *Journal of Financial Economics* 19 (1988): 127–168.

950     **Chapter 28** Mergers and Acquisitions

---

### Weyerhaeuser's Hostile Bid for Willamette Industries

In November 2000, Weyerhaeuser, a forest products company based in Federal Way, Washington, announced a hostile bid of $48 per share for its smaller neighbor, Willamette Industries, based in Portland, Oregon. Weyerhaeuser had been pursuing Willamette in private since 1998, when Steve Rogel unexpectedly resigned as CEO of Willamette to become CEO of Weyerhaeuser. Each time Rogel approached his old employer in private, he was rebuffed. The response to the hostile tender offer was no different. Despite the fact that the bid represented a substantial premium to the firm's pre-bid stock price, the Willamette board rejected the offer and urged its shareholders not to tender their shares to Weyerhaeuser.

Willamette's defenses included a staggered board and a poison pill, so Weyerhaeuser made its tender offer conditional on Willamette's board canceling the poison pill. Consequently, Weyerhaeuser initiated a proxy fight at the next annual shareholders' meeting in June 2001. One of the directors up for reelection at that time was Duane McDougall, Willamette's CEO. One month before the meeting, Weyerhaeuser increased its offer to $50 per share, but Willamette's board still believed that the offer was too low and worried that too many of its long-time employees would face layoffs after the merger. Nonetheless, at the annual meeting, Weyerhaeuser's slate received 1.4% more votes than Willamette's, thereby removing Willamette's CEO from its board.

The loss of the board seats did not change Willamette's position. Willamette unsuccessfully searched for a white knight to generate a bidding contest that would force Weyerhaeuser to up its bid. It also entered into talks to buy Georgia-Pacific's building products division. Such a deal would have increased its size and added enough debt to its balance sheet to render the firm unattractive to Weyerhaeuser.

In the end, Weyerhaeuser increased its offer to $55.50 per share in January 2002, and Willamette finally agreed to a deal and called off its negotiations with Georgia-Pacific. Even without the presence of other bidders, Willamette's board was able to get what it considered to be a fair price from Weyerhaeuser.

---

**CONCEPT CHECK**

1. What defensive strategies are available to help target companies resist an unwanted takeover?

2. How can a hostile acquirer get around a poison pill?

---

## 28.6 Who Gets the Value Added from a Takeover?

Now that we have explained the takeover process, we can return to the remaining questions posed at the beginning of this chapter: why the price of the acquiring company does not rise at the announcement of the takeover and why the bidder is forced to pay a premium for the target.

You might imagine that the people who do the work of acquiring the corporation and replacing its management will capture the value created by the merger. Based on the average stock price reaction, it does not appear that the acquiring corporation generally captures this value. Instead, the premium the acquirer pays is approximately equal to the value it adds, which means the *target* shareholders ultimately capture the value added by the acquirer. To see why, we need to understand how market forces react to a takeover announcement.

### The Free Rider Problem

Assume you are one of the 1 million shareholders of HighLife Corporation, all of whom own 1 share of stock. HighLife has no debt. Its chief executive is not doing a good job, preferring to spend his time using the company's jets to fly to the corporate condo in Aspen, Colorado, rather than running the company in Chicago. As such, the shares are trading at a substantial discount. They currently have a price of $45 per share, giving HighLife a market value of $45 million. Under a competent manager, the company would be worth

$75 million. HighLife's corporate charter specifies that a simple majority is required to make all decisions, so to take control of HighLife a shareholder must purchase half the outstanding shares.

T. Boone Icon decides to fix the situation (and make a profit at the same time) by making a tender offer to buy half the outstanding shares for $60 per share in cash. If fewer than 50% of the shareholders tender their shares, the deal is off.

In principle, this idea could land T. Boone a handsome profit. If 50% of shareholders tender their shares, those shares will cost him $60 \times 500,000 = $30 million. Once he has control of the firm, he can replace the managers. When the executive jets and the Aspen condo are sold and the market realizes that the new managers are serious about improving performance, the market value of the firm will rise to $75 million. Hence T. Boone's shares will be worth $75 per share, netting him a profit of $15 \times 500,000 = $7.5 million. But will 50% of the shareholders tender their shares?

The offer price of $60 per share exceeds the value of the firm if the takeover does not go through ($45 per share). Hence, the offer is a good deal for shareholders overall. But if all shareholders tender their shares, as an individual shareholder, you could do better by not tendering your share. Then if T. Boone takes control, each of your shares will be worth $75 rather than the $60 you would get by tendering. In this case it is wiser to not tender. Of course, if all shareholders think this way no one will tender their shares, and T. Boone's deal will not get off the ground. The only way to persuade shareholders to tender their shares is to offer them at least $75 per share, which removes any profit opportunity for T. Boone. The problem here is that existing shareholders do not have to invest time and effort, but they still participate in all the gains from the takeover that T. Boone Icon generates—hence the term "free rider problem." By sharing the gains in this way, T. Boone Icon is forced to give up substantial profits and thus will likely choose not to bother at all.[17]

### Toeholds

One way for T. Boone to get around the problem of shareholders' reluctance to tender their shares is to buy the shares in the market anonymously. However, SEC rules make it difficult for investors to buy much more than about 10% of a firm in secret.[18] After T. Boone acquires such an initial stake in the target, called a **toehold**, he would have to make his intentions public by informing investors of his large stake. To successfully gain control of HighLife, he would have to announce a tender offer to buy an additional 40% of the shares for $75 per share. Once in control, he would be able to sell his stake for $75 per share. Assuming he accumulated the first 10% for $50 per share, his profits in this case will be $25 \times 100,000 = $2.5 million. Not bad, but substantially less than the value he is adding.

Why should investors care whether T. Boone's profits are substantially lower than the value he is adding? The answer is that people like T. Boone perform an important service. Because of the threat that such a person might attempt to take over their company and fire them, chief executives are less likely to shirk their duties. Thus, the more profitable we

---

[17]A rigorous analysis of the free rider problem in mergers can be found in S. Grossman and O. Hart, "Takeover Bids, the Free-Rider Problem, and the Theory of the Corporation," *Bell Journal of Economics* 11(1) (1980): 42–64.

[18]The rules actually require that any shareholder who owns more than 5% of a firm publicly disclose this fact, but the time delays in the disclosure process allow investors to accumulate more than 5% of the firm before this information is made public.

make this activity, the less likely we will have to resort to it. If $2.5 million is not enough to justify T. Boone's time and effort, he will not try to acquire HighLife. Current management will remain entrenched and T. Boone will think about acquiring the company only if further erosion in the stock price makes the deal lucrative enough for him.

A number of legal mechanisms exist that allow acquirers to avoid the free rider problem and capture more of the gains from the acquisition. We describe the two most common, the leveraged buyout and the freezeout merger, next.

## The Leveraged Buyout

The good news for shareholders is that another significantly lower-cost mechanism allows people like T. Boone Icon to take over companies and fire underperforming managers. Recall from Chapter 24 that this mechanism is called the leveraged buyout (LBO). Let's illustrate how it works by returning to HighLife Corporation.[19]

Assume that T. Boone chooses not to buy any shares in the market secretly, but instead announces a tender offer for half the outstanding shares at a price of $50 per share. However, instead of using his own cash to pay for these shares, he borrows the money through a shell corporation by *pledging the shares themselves as collateral on the loan*. The only time he will need the money is if the tender offer succeeds, so the banks lending the money can be certain that he will have control of the collateral. Even more important, if the tender offer succeeds, with control of the company, T. Boone can merge the target with the shell corporation, effectively attaching the loans directly to the target—that is, it is as if the

### The Leveraged Buyout of RJR-Nabisco by KKR

By the summer of 1988, Ross Johnson, CEO of RJR Nabisco (RJR), was becoming increasingly worried about the poor stock price performance of the conglomerate. Despite a strong earnings record, management had not been able to shake loose its image as a tobacco company, and the stock price was languishing at $55 per share. In October 1988, Johnson and a small team of RJR's executives, backed by the Wall Street firms of Shearson Lehman Hutton and Salomon Brothers, announced a bid of $75 per share for the company. At this price, the deal would have been valued at $17.6 billion, more than twice as large as the largest LBO completed up to that point. Because this deal involved the current management of the company, it falls into a special category of LBO deals called **management buyouts (MBOs)**.

The announcement focused Wall Street's attention on RJR. Even at this substantial premium, the MBO appeared to be a good deal for Johnson and his team, because soon after the offer went public, it became hotly contested. Foremost among the contenders was the firm of Kohlberg, Kravis, and Roberts (KKR). KKR launched its own bid with a cash offer of $90 per share. A bidding war ensued that saw the offer price ultimately rise to $109 per share, valuing the deal at more than $25 billion. In the end, both Johnson

and KKR offered very similar deals, although management's final bid was slightly higher than KKR's. Eventually, RJR's board accepted KKR's bid of $109 per RJR share. The offer price comprised $81 per share in cash, $18 per share in preferred stock, and $10 per share in debenture securities.

From an economic point of view, this outcome is surprising. One would think that given their inside knowledge of the company, management would be in the best position not only to value it, but also to run it. Why, then, would an outsider choose to outbid an insider for a company? The answer in RJR's case appeared to point to the managers themselves. As the deal proceeded, it became increasingly obvious to investors that executives (and members of the board of directors) enjoyed perks that were unprecedented. For example, Johnson had the personal use of numerous corporate apartments in different cities and literally a fleet of corporate jets that he, the top executives, and members of the corporate board used for personal travel. In their leveraged buyout proposal, they had obtained a 4% equity stake for top executives that was worth almost $1 billion, $52.5 million in golden parachutes, and assurances that the RJR air force (the fleet of corporate jets) and the flamboyant Atlanta headquarters would not be subject to budget cutting.

---

[19]For a further discussion of this mechanism, see H. Mueller and F. Panunzi, "Tender Offers and Leverage," *The Quarterly Journal of Economics* 119 (2004): 1217–1248.

target corporation, and not T. Boone, has borrowed the money. At the end of this process, T. Boone still owns half the shares, but the *corporation* is responsible for repaying the loan. T. Boone has effectively acquired half the shares without paying for them!

You might imagine that no shareholder would be willing to tender her shares under these circumstances. Surprisingly, this conclusion is wrong. If you tender your shares, you will receive $50 for each of them. If you do not tender your shares, but enough other shareholders do, then T. Boone will take control of the company. After he replaces the managers, the enterprise value of the company will be $75 million. What will your shares be worth if you did not tender them?

For simplicity, assume that there are no frictions or taxes. To gain control of the firm, T. Boone borrowed $25 million to purchase half the outstanding shares ($50 \times 500{,}000$). Because this debt is now attached to HighLife, the total value of HighLife's equity is just the total value of the company, minus the value of debt:

$$\text{Total Value of HighLife's Equity} = \$75 \text{ million} - \$25 \text{ million} = \$50 \text{ million}$$

The total number of outstanding shares is the same (remember that T. Boone purchased existing shares), so the price per share is $50 million $\div$ 1 million $= \$50$/share. If the tender offer succeeds, you will be indifferent. Whether you tender your shares or keep them, each is always worth $50. If you keep your shares and the tender offer fails, the price per share stays at $45. Clearly, it is always in your best interests to tender your shares, so T. Boone's tender offer will succeed. T. Boone also makes substantially more profits than he would if he used a toehold strategy—his profits are the value of his shares upon completion of the takeover: $50 \times 500{,}000 = \$25$ million.

| EXAMPLE 28.5 | **Leveraged Buyout** |
|---|---|

**Problem**

FAT Corporation stock is currently trading at $40 per share. There are 20 million shares outstanding, and the company has no debt. You are a partner in a firm that specializes in leveraged buyouts. Your analysis indicates that the management of this corporation could be improved considerably. If the managers were replaced with more capable ones, you estimate that the value of the company would increase by 50%. You decide to initiate a leveraged buyout and issue a tender offer for at least a controlling interest—50% of the outstanding shares. What is the maximum amount of value you can extract and still complete the deal?

**Solution**

Currently, the value of the company is $40 \times 20$ million $= \$800$ million, and you estimate you can add an additional 50%, or $400 million. If you borrow $400 million and the tender offer succeeds, you will take control of the company and install new management. The total value of the company will increase by 50% to $1.2 billion. You will also attach the debt to the company, so the company will now have $400 million in debt. The value of the equity once the deal is done is the total value minus the debt outstanding:

$$\text{Total Equity} = 1200 - 400 = \$800 \text{ million}$$

The value of the equity is the same as the premerger value. You own half the shares, which are worth $400 million, and paid nothing for them, so you have captured the value you anticipated adding to FAT.

What if you borrowed more than $400 million? Assume you were able to borrow $450 million. The value of equity after the merger would be

$$\text{Total Equity} = 1200 - 450 = \$750 \text{ million}$$

This is lower than the premerger value. Recall, however, that in the United States, existing shareholders must be offered at least the premerger price for their shares. Because existing shareholders anticipate that the share price will be lower once the deal is complete, all shareholders will tender their shares. This implies that you will have to pay $800 million for these shares, and so to complete the deal, you will have to pay $800 − 450 = $350 million out of your own pocket. In the end, you will own all the equity, which is worth $750 million. You paid $350 million for it, so your profit is again $400 million. Thus, you cannot extract more value than the value you add to the company by taking it over.

The examples we have illustrated are extreme in that the acquirer takes over the target without paying any premium and with no initial investment. In practice, premiums in LBO transactions are often quite substantial—while they can avoid the free rider problem, acquirers must still get board approval to overcome other defenses such as poison pills, as well as outbid other potential acquirers. And while in earlier times it was possible to fund deals with over 90% leverage, lenders today typically require that the acquirer have a significant equity stake as protection for the debt holders, in case the claimed post-acquisition benefits do not materialize. In the $15.2 billion Hertz LBO (at the time in 2006, the second largest in history), which we described in Chapter 24, the acquirers contributed $2.3 billion in equity out of $12.9 billion of total capital raised. As shown in Figure 28.3, recent LBOs tend to have equity stakes closer to 40%.

From 2003 to 2007, there was a surge in leveraged buyout activity, fueled by a combination of huge flows of capital to buy out (private equity) firms, and increased appetite for risk by lenders willing to allow buyout groups to leverage their equity investment at attractive terms (see Figure 23.2 on page 809). Buyout firms took many companies private with the stated goal of increasing their performance without concern for perceived pressure from public investors to meet short-term earnings targets. They also employed so-called "roll-up" strategies whereby they would buy many smaller, already private firms

## FIGURE 28.3

**Average Equity Stake in LBO Transactions, 1987–2012**

While early LBOs were often financed with over 90% leverage, average equity stakes for U.S. LBOs have averaged about 40% over the past decade. They exceeded 50% during the 2008–2009 financial crisis, when debt markets were extremely tight.

*Source*: Standard & Poor's Leveraged Commentary & Data (LCD), 2012



in a particular industry and consolidate them into a larger player. The typical LBO has a planned exit in five years, either by taking the firm public again, or selling it to an operating firm or another private equity group. In 2008, the financial crisis and contraction of credit put an almost complete halt to private equity activity. Some highly levered private equity transactions from the peak faltered under their debt load during the recession. For example, Chrysler, which had been purchased and taken private from Daimler Chrysler AG by private equity firm Cerberus Group, declared bankruptcy in 2009, wiping out Cerberus' stake in the firm.

### The Freezeout Merger

Although a leveraged buyout is an effective tool for a group of investors to use to purchase a company, it is less well suited to the case of one company acquiring another. An alternative is the **freezeout merger**: The laws on tender offers allow the acquiring company to freeze existing shareholders out of the gains from merging by forcing non-tendering shareholders to sell their shares for the tender offer price. Let's see how this is accomplished.

An acquiring company makes a tender offer at an amount slightly higher than the current target stock price. If the tender offer succeeds, the acquirer gains control of the target and merges its assets into a new corporation, which is fully owned by the acquirer. In effect, the non-tendering shareholders lose their shares because the target corporation no longer exists. In compensation, non-tendering shareholders get the right to receive the tender offer price for their shares. The bidder, in essence, gets complete ownership of the target for the tender offer price.[20]

Because the value the non-tendering shareholders receive for their shares is equal to the tender price (which is more than the premerger stock price), the law generally recognizes it as fair value and non-tendering shareholders have no legal recourse. Under these circumstances, existing shareholders will tender their stock, reasoning that there is no benefit to holding out: If the tender offer succeeds, they get the tender price anyway; if they hold out, they risk jeopardizing the deal and forgoing the small gain. Hence the acquirer is able to capture almost all the value added from the merger and, as in a leveraged buyout, is able to effectively eliminate the free rider problem.

The freezeout tender offer has a significant advantage over a leveraged buyout because an acquiring corporation need not make an all-cash offer. Instead of paying the target's shareholders in cash, it can use shares of its own stock to pay for the acquisition. In this case, the bidder offers to exchange each shareholder's stock in the target for stock in the acquiring company. As long as the exchange rate is set so that the value in the acquirer's stock exceeds the premerger market value of the target stock, the non-tendering shareholders will receive fair value for their shares and will have no legal recourse.

### Competition

The empirical evidence in Table 28.2 suggests that, despite the availability of both the freezeout merger and the leveraged buyout as acquisition strategies, most of the value added still appears to accrue to the target shareholders. That is, on average, acquirers do not have a positive price reaction on the announcement of a takeover. Why do acquirers choose to pay so large a premium that they effectively hand the value they create to the target company's shareholders?

---

[20] Y. Amihud, M. Kahan, and R. K. Sundaram, "The Foundations of Freezeout Laws in Takeovers," *Journal of Finance* 59 (2004): 1325–1344, contains a detailed discussion of the mechanics of freezeout mergers.

In addition to the presence of the takeover defenses we have previously discussed, the most likely explanation is the competition that exists in the takeover market. Once an acquirer starts bidding on a target company and it becomes clear that a significant gain exists, other potential acquirers may submit their own bids. The result is effectively an auction in which the target is sold to the highest bidder. Even when a bidding war does not result, most likely it is because, rather than participate in a bidding war, an acquirer offered a large enough initial premium to forestall the process. In essence, it must give up most of the value added to the target shareholders.

**CONCEPT CHECK**

1. What mechanisms allow corporate raiders to get around the free rider problem in takeovers?

2. Based on the empirical evidence, who gets the value added from a takeover? What is the most likely explanation of this fact?

**MyFinanceLab**  Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 28.1 Background and Historical Trends

- Mergers can be horizontal, vertical, or conglomerate. The global takeover market is active, averaging more than $1 trillion per year in transaction value. The periods of greatest activity have been the 1960s, 1980s, 1990s, and 2000s. During the 1960s, deals were aimed at building conglomerates. In the 1980s, the trend reversed and conglomerates were split into individual businesses. The 1990s saw a rise in "strategic" or "global" deals designed to create firms that could compete globally. From 2004–2008, further consolidation and global-scale deals contributed to the most recent merger wave.

### 28.2 Market Reaction to a Takeover

- While on average the shareholders of the acquiring firm obtain small or no gains, shareholders from the acquired firm typically enjoy gains of 15% on the announcement of a takeover bid.

### 28.3 Reasons to Acquire

- The most common justifications given for acquiring a firm are the synergies that can be gained through an acquisition. The most commonly cited sources of synergies are economies of scale and scope, the control provided by vertical integration, gaining monopolistic power, the expertise gained from the acquired company, improvements in operating efficiency, and benefits related to diversification such as increased borrowing capacity and tax savings. Shareholders of a private company that is acquired gain by switching to a more liquid investment. Some mergers are motivated by incentive conflicts or overconfidence of the acquirer's management.
- From the bidder's perspective, a takeover is a positive-NPV project only if the premium paid does not exceed the synergies created. The bidder's stock price reaction to the announcement of the merger is one way to gauge investors' assessments of whether the bidder overpaid or underpaid for the target.

### 28.4 The Takeover Process

- A tender offer is a public announcement of an intention to purchase a large block of shares for a specified price. Making a tender offer does not guarantee that a deal will take place.
- Bidders use either of two methods to pay for a target: cash or stock. In a cash transaction, the bidder simply pays for the target in cash. In a stock-swap transaction, the bidder pays for the target by issuing new stock and giving it to the target shareholders. The method used by the bidder to pay for the acquired firm has tax and accounting implications.
- For a merger to proceed, both the target and the acquiring board of directors must approve the merger and put the question to a vote of the shareholders of the target (and, in some cases, the shareholders of the acquiring firm as well). In a friendly takeover, the target board of directors supports the merger and negotiates with the potential acquirers. If the target board opposes the merger, then the acquirer must go around the target board and appeal directly to the target shareholders, asking them to elect a new board that will support the merger.

### 28.5 Takeover Defenses

- The most effective takeover defense strategy is the poison pill, which gives target shareholders the right to buy shares in either the target or the acquirer at a deeply discounted price. The purchase is effectively subsidized by the existing shareholders of the acquirer, making the takeover very expensive.
- Another effective defense strategy is having a staggered board, which prevents a bidder from acquiring control over the board in a short period of time.
- Other defenses include looking for a friendly bidder (a white knight), making it expensive to replace management, and changing the capital structure of the firm.

### 28.6 Who Gets the Value Added from a Takeover?

- When a bidder makes an offer for a firm, the target shareholders can benefit by keeping their shares and letting other shareholders sell at a low price. However, because all shareholders have the incentive to keep their shares, no one will sell. This scenario is known as the free rider problem. To overcome this problem, bidders can acquire a toehold in the target, attempt a leveraged buyout, or, in the case when the acquirer is a corporation, offer a freeze-out merger.

## Key Terms

acquirer (bidder) *p. 931*
acquisition premium *p. 933*
conglomerate merger *p. 933*
economies of scale *p. 935*
economies of scope *p. 935*
exchange ratio *p. 942*
freezeout merger *p. 955*
friendly takeover *p. 945*
golden parachute *p. 948*
horizontal merger *p. 933*
hostile takeover *p. 945*
management buyout (MBO) *p. 952*
merger-arbitrage spread *p. 943*
merger waves *p. 931*
poison pill *p. 946*

proxy fight *p. 946*
raider *p. 945*
risk arbitrageurs *p. 943*
staggered (classified) board *p. 948*
step up *p. 945*
stock swap *p. 933*
takeover *p. 931*
takeover synergies *p. 941*
target *p. 931*
term sheet *p. 933*
toehold *p. 951*
vertical integration *p. 935*
vertical merger *p. 933*
white knight *p. 948*
white squire *p. 948*

## Further Reading

The literature on mergers and acquisitions is extensive. It is impossible to cover it all in a single chapter, but the following books address the topics of this chapter in more detail: J. Weston, M. Mitchell, and J. Mulherin, *Takeovers, Restructuring and Corporate Finance* (Prentice-Hall, 2004); L. Herzel and R. Shepro, *Bidders and Targets: Mergers and Acquisitions in the U.S.* (Basil Blackwell, 1990); and S. Kaplan (ed.), *Mergers and Productivity* (University of Chicago Press, 2000).

## Problems

*All problems are available in* MyFinanceLab.

### Background and Historical Trends

1. What are the two primary mechanisms under which ownership and control of a public corporation can change?

2. Why do you think mergers cluster in time, causing merger waves?

3. What are some reasons why a horizontal merger might create value for shareholders?

### Market Reaction to a Takeover

4. Why do you think shareholders from target companies enjoy an average gain when acquired, while acquiring shareholders on average often do not gain anything?

### Reasons to Acquire

5. If you are planning an acquisition that is motivated by trying to acquire expertise, you are basically seeking to gain intellectual capital. What concerns would you have in structuring the deal and the post-merger integration that would be different from the concerns you would have when buying physical capital?

6. Do you agree that the European Union should be able to block mergers between two U.S.-based firms? Why or why not?

7. How do the carryforward and carryback provisions of the U.S. tax code affect the benefits of merging to capture operating losses?

8. Diversification is good for shareholders. So why shouldn't managers acquire firms in different industries to diversify a company?

 9. Your company has earnings per share of $4. It has 1 million shares outstanding, each of which has a price of $40. You are thinking of buying TargetCo, which has earnings per share of $2, 1 million shares outstanding, and a price per share of $25. You will pay for TargetCo by issuing new shares. There are no expected synergies from the transaction.
    a. If you pay no premium to buy TargetCo, what will your earnings per share be after the merger?
    b. Suppose you offer an exchange ratio such that, at current pre-announcement share prices for both firms, the offer represents a 20% premium to buy TargetCo. What will your earnings per share be after the merger?
    c. What explains the change in earnings per share in part (a)? Are your shareholders any better or worse off?
    d. What will your price-earnings ratio be after the merger (if you pay no premium)? How does this compare to your P/E ratio before the merger? How does this compare to TargetCo's premerger P/E ratio?

 10. If companies in the same industry as TargetCo (from Problem 9) are trading at multiples of 14 times earnings, what would be one estimate of an appropriate premium for TargetCo?

**11.** You are invested in GreenFrame, Inc. The CEO owns 3% of GreenFrame and is considering an acquisition. If the acquisition destroys $50 million of GreenFrame's value, but the present value of the CEO's compensation increases by $5 million, will he be better or worse off?

## The Takeover Process

**12.** Loki, Inc., and Thor, Inc., have entered into a stock swap merger agreement whereby Loki will pay a 40% premium over Thor's premerger price. If Thor's premerger price per share was $40 and Loki's was $50, what exchange ratio will Loki need to offer?

**13.** The NFF Corporation has announced plans to acquire LE Corporation. NFF is trading for $35 per share and LE is trading for $25 per share, implying a premerger value of LE of approximately $4 billion. If the projected synergies are $1 billion, what is the maximum exchange ratio NFF could offer in a stock swap and still generate a positive NPV?

 **14.** Let's reconsider part (b) of Problem 9. The actual premium that your company will pay for TargetCo will not be 20%, because on the announcement the target price will go up and your price will go down to reflect the fact that you are willing to pay a premium for TargetCo. Assume that the takeover will occur with certainty and all market participants know this on the announcement of the takeover.
   a. What is the price per share of the combined corporation immediately after the merger is completed?
   b. What is the price of your company immediately after the announcement?
   c. What is the price of TargetCo immediately after the announcement?
   d. What is the actual premium your company will pay?

**15.** ABC has 1 million shares outstanding, each of which has a price of $20. It has made a takeover offer of XYZ Corporation, which has 1 million shares outstanding and a price per share of $2.50. Assume that the takeover will occur with certainty and all market participants know this. Furthermore, there are no synergies to merging the two firms.
   a. Assume ABC made a cash offer to purchase XYZ for $3 million. What happens to the price of ABC and XYZ on the announcement? What premium over the current market price does this offer represent?
   b. Assume ABC makes a stock offer with an exchange ratio of 0.15. What happens to the price of ABC and XYZ this time? What premium over the current market price does this offer represent?
   c. At current market prices, both offers are offers to purchase XYZ for $3 million. Does that mean that your answers to parts (a) and (b) must be identical? Explain.

## Takeover Defenses

 **16.** BAD Company's stock price is $20, and the firm has 2 million shares outstanding. You believe you can increase the company's value if you buy it and replace the management. Assume that BAD has a poison pill with a 20% trigger. If it is triggered, all BAD's shareholders—other than the acquirer—will be able to buy one new share in BAD for each share they own at a 50% discount. Assume that the price remains at $20 while you are acquiring your shares. If BAD's management decides to resist your buyout attempt, and you cross the 20% threshold of ownership:
   a. How many new shares will be issued and at what price?
   b. What will happen to your percentage ownership of BAD?
   c. What will happen to the price of your shares of BAD?
   d. Do you lose or gain from triggering the poison pill? If you lose, where does the loss go (who benefits)? If you gain, from where does the gain come (who loses)?

### Who Gets the Value Added from a Takeover?

**17.** How does a toehold help overcome the free rider problem?

**18.** You work for a leveraged buyout firm and are evaluating a potential buyout of UnderWater Company. UnderWater's stock price is $20, and it has 2 million shares outstanding. You believe that if you buy the company and replace its management, its value will increase by 40%. You are planning on doing a leveraged buyout of UnderWater, and will offer $25 per share for control of the company.

   a. Assuming you get 50% control, what will happen to the price of non-tendered shares?

   b. Given the answer in part (a), will shareholders tender their shares, not tender their shares, or be indifferent?

   c. What will your gain from the transaction be?

# Corporate Governance

**THE TURN OF THE TWENTY-FIRST CENTURY WITNESSED** scandals and corporate fraud in the United States. The names of once well-respected companies like Enron, WorldCom, Tyco, and Adelphia filled the news. Enron, with stock worth $68 billion at its peak, became almost worthless in a matter of months, wiping out the retirement savings of thousands of employees and other stockholders. The story at WorldCom was similar. The once high-flying stock peaked at a market value of $115 billion after a string of acquisitions that included well-known phone company MCI. In 2002, WorldCom filed what was at the time the largest bankruptcy ever. After building one of the nation's largest cable companies from scratch, the Rigas family of Adelphia was forced to endure the indignity of watching their own cable system convey the image of Adelphia's demise into millions of homes.

The common theme among these companies is the accusation of fraud, perpetrated by the manipulation of accounting statements. Shareholders, analysts, and regulators were kept in the dark as the companies' financial situations became ever more precarious, resulting, in the end, in total collapse. How did this happen? Aren't managers supposed to act in the interests of shareholders? Why did auditors go along with the fraud? Where were the boards of directors when all of this was happening?

There is an opportunity cost to bad governance; thus, by replacing bad governance with good governance, it is possible to increase firm *value*—in other words, good governance is a positive-NPV project. Hence, we begin by discussing various governance mechanisms that are designed to mitigate the agency conflicts between managers and owners. These agency conflicts cannot be removed completely by a firm's governance mechanisms, so we next discuss regulations that are designed to prohibit managers from taking certain acts that are not in the interests of shareholders. We conclude the chapter with a discussion of corporate governance around the world.

## 29.1 Corporate Governance and Agency Costs

Any discussion of **corporate governance**—the system of controls, regulations, and incentives designed to prevent fraud—is a story of conflicts of interest and attempts to minimize them. As we saw in Chapter 16, the different stakeholders in a firm all have their own interests. When those interests diverge, we may have agency conflicts. That chapter emphasized the sources of conflicts between bondholders and shareholders. In this chapter, we focus on the conflicts between managers and investors.

The conflict of interest between managers and investors derives from the separation of ownership and control in a corporation. As we pointed out in Chapter 1, the separation of ownership and control is perhaps the most important reason for the success of the corporate organizational form. Because any investor can hold an ownership stake in a corporation, investors are able to diversify and thus reduce their risk exposures without cost. This is especially true for the managers of a corporation: Because they are not also required to own the firm, their risk exposures are much lower than they would be if ownership and control were not separate.

Once control and ownership are separated, however, a conflict of interest arises between the owners and the people in control of a corporation. For example, in Chapter 28, we talked about mergers that are motivated by managers' desire to manage a larger firm, gaining them more prestige and greater pay, even if that might not be in the best interests of shareholders. Other examples of agency problems are excessive perquisites, such as using corporate jets for family vacations, or managers not working as diligently as they would if it were their own business. Agency conflicts are likely to arise any time the manager does not internalize the full cost of his or her actions—just think about how you order at a restaurant when you are paying compared to when the company is paying!

The seriousness of this conflict of interest depends on how closely aligned the interests of the managers and shareholders are. Aligning their interests comes at a cost—it increases the risk exposure of the managers. For example, tying managerial compensation to performance aligns managers' incentives with investors' interests, but then managers are exposed to the firm's risk (because the firm might do poorly for reasons unrelated to the manager's performance).

The role of the corporate governance system is to mitigate the conflict of interest that results from the separation of ownership and control without unduly burdening managers with the risk of the firm. The system attempts to align these interests by providing incentives for taking the right action and punishments for taking the wrong action. The incentives come from owning stock in the company and from compensation that is sensitive to performance. Punishment comes when a board fires a manager for poor performance or fraud, or when, upon failure of the board to act, shareholders or raiders launch control contests to replace the board and management. As we will see, these actions interact in complicated ways. For example, as a manager owns more stock in the firm, his incentives become better aligned, but, in addition to the increase in risk the manager must bear, the manager also becomes harder to fire because the block of stock gives him significant voting rights.

Let's now take a closer look at the components of the corporate governance system.

---

**CONCEPT CHECK**

1. What is corporate governance?

2. What agency conflict do corporate governance structures address?

## 29.2 Monitoring by the Board of Directors and Others

At first glance, one might think that there is a simple solution to the conflict of interest problem: monitor the firm's managers closely. The problem with this reasoning is that it ignores the cost of monitoring. When the ownership of a corporation is widely held, no one shareholder has an incentive to bear this cost (because she bears the full cost of monitoring but the benefit is divided among all shareholders). Instead, the shareholders as a group elect a board of directors to monitor managers. The directors themselves, however, have the same conflict of interest—monitoring is costly and in many cases directors do not get significantly greater benefits than other shareholders from monitoring the managers closely. Consequently, in most cases, shareholders understand that there are reasonable limits on how much monitoring they can expect from the board of directors.

In principle, the board of directors hires the executive team, sets its compensation, approves major investments and acquisitions, and dismisses executives if necessary. In the United States, the board of directors has a clear fiduciary duty to protect the interests of the owners of the firm—the shareholders. Most other countries give some weight to the interests of other stakeholders in the firm, such as the employees. In Germany, this concept is formalized through a two-tier board structure that gives half of the seats on the upper board—called the supervisory board—to employees.

### Types of Directors

Generally, researchers have categorized directors into three groups: inside, gray, and outside (or independent). **Inside directors** are employees, former employees, or family members of employees. **Gray directors** are people who are not as directly connected to the firm as insiders are, but who have existing or potential business relationships with the firm. For example, bankers, lawyers, and consultants who are already retained by the firm or who would be interested in being retained may sit on a board. Thus, their judgment could be compromised by their desire to keep the CEO happy. Finally, all other directors are considered **outside (**or **independent) directors** and are the most likely to make decisions solely in the interests of the shareholders.

### Board Independence

Researchers have hypothesized that boards with a majority of outside directors are better monitors of managerial effort and actions. One early study showed that a board was more likely to fire the firm's CEO for poor performance if the board had a majority of outside directors.[1] Other studies have found that firms with independent boards make fewer value-destroying acquisitions and are more likely to act in shareholders' interests if targeted in an acquisition.[2]

---

[1]M. Weisbach, "Outside Directors and CEO Turnover," *Journal of Financial Economics* 20(1–2) (1988): 431–460.

[2]J. Byrd and K. Hickman, "Do Outside Directors Monitor Managers? Evidence from Tender Offer Bids," *Journal of Financial Economics* 32(2) (1992): 195–207; and J. Cotter, A. Shivdasani, and M. Zenner, "Do Independent Directors Enhance Target Shareholder Wealth During Tender Offers?" *Journal of Financial Economics* 43(2) (1997): 195–218. H. Ryan and R. Wiggins show that firms with more outsiders on their boards award directors more equity-based compensation, increasing incentives for the board to monitor. ("Who Is in Whose Pocket? Director Compensation, Board Independence, and Barriers to Effective Monitoring," *Journal of Financial Economics* 73 (2204): 497–525.

Despite evidence that board independence matters for major activities such as firing CEOs and making corporate acquisitions, researchers have struggled to find a connection between board structure and firm performance. Although the firm's stock price increases on the announcement of its addition of an independent board member, the increased firm value appears to come from the potential for the board to make better decisions on acquisitions and CEO turnover rather than from improvements in the firm's operating performance. Researchers have argued, however, that so many other factors affect firm performance that the effect of a more or less independent board is very difficult to detect.

Another reason why it may be difficult to explicate a relationship between board independence and firm performance is the nature of the role of the independent director. On a board composed of insider, gray, and independent directors, the role of the independent director is really that of a watchdog. But because independent directors' personal wealth is likely to be less sensitive to performance than that of insider and gray directors, they have less incentive to closely monitor the firm. However, there has been a trend toward more equity-based pay for outside directors. As recently as the early 1990s, it was very common for directors to be paid a fixed annual cash fee plus perhaps an extra nominal fee per meeting attended. It is now standard for outside directors to be granted shares of stock and/or options to more closely align their interests with those of the shareholders they serve.

Incentives notwithstanding, even the most active independent directors spend only one or two days per month on firm business, and many independent directors sit on multiple boards, further dividing their attention. In fact, some studies have found value decreases when too many of a board's directors are "busy," meaning that they sit on three or more boards.[3]

A board is said to be **captured** when its monitoring duties have been compromised by connections or perceived loyalties to management. Theoretical and empirical research support the notion that the longer a CEO has served, especially when that person is also chairman of the board, the more likely the board is to become captured. Over time, most of the independent directors will have been nominated by the CEO. Even though they have no business ties to the firm, they are still likely to be friends or at least acquaintances of the CEO. The CEO can be expected to stack the board with directors who are less likely to challenge her. When the CEO is also chairman of the board, the nominating letter offering a seat to a new director comes from her. This process merely serves to reinforce the sense that the outside directors owe their positions to the CEO and work for the CEO rather than for the shareholders.

The Sarbanes-Oxley Act of 2002 (SOX), which we discuss in more depth in Section 29.5, required that the audit committee of the board, charged with overseeing the audit of the firm's financial statements, be composed entirely of independent directors. Following the implementation of SOX, major U.S. exchanges (NYSE and NASDAQ) changed their listing requirements such that firms listed on those exchanges must have a majority of independent directors on their board. Most recently, the Dodd-Frank Act of 2010 further requires that *all* members of a firm's compensation committee be independent board members. Ideally, these changes will reduce entrenchment and improve governance. However, all such changes come at a cost, because the other major role of the board is to advise managers on strategic issues. Independent directors, while unbiased, are also the least likely to be experts in the firm's business, thus reducing their ability to advise.

---

[3]E. Fich and A. Shivdasani, "Are Busy Boards Effective Monitors?," *Journal of Finance* 61(2) (2006): 689–724.

### Board Size and Performance

Researchers have found the surprisingly robust result that smaller boards are associated with greater firm value and performance.[4] The likely explanation for this phenomenon comes from the psychology and sociology research, which finds that smaller groups make better decisions than larger groups. Most firms that have just gone public either as young companies or as older firms returning to public status after a leveraged buyout (LBO) choose to start with smaller boards. Boards tend to grow over time as members are added for various reasons. For example, boards are often expanded by one or two seats after an acquisition to accommodate the target CEO and perhaps one other target director.

### Other Monitors

The board is complemented by other monitors, both inside and outside the firm. We discuss direct shareholder monitoring and action in Section 29.4, but other monitors include security analysts, lenders, the SEC, and employees within the firm itself.

Securities analysts produce independent valuations of the firms they cover so that they can make buy and sell recommendations to clients. They collect as much information as they can, becoming an expert on the firm and its competitors by poring over a company's financial statements and filings. As a result, they are in a position to uncover irregularities first. Analysts often ask difficult and probing questions of CEOs and CFOs during quarterly earnings releases. Anyone can listen to these conference calls, which are typically simulcast on the company's investor relations Web site.

Lenders also carefully monitor firms to which they are exposed as creditors. Loans and lines of credit also contain financial covenants designed to provide early warning signs of trouble. These covenants, such as requiring maintenance of a certain quick ratio or profitability level, are primarily designed to capture the firm's ability to repay the loan. Nonetheless, they complement other signals of potential governance problems. A stockholder must keep in mind, however, that her interests are not perfectly aligned with the creditors' interests. The creditor, lacking upside participation, is particularly interested in minimizing risk, even at the expense of some positive-NPV projects.

Employees of the firm are most likely to detect outright fraud because of their inside knowledge. However, they do not always have strong incentives to report the fraud. They may personally benefit from the fraud, or they may fear retribution from "blowing the whistle." Some states have whistle-blower statutes to protect employees who report fraud to the authorities; there are federal statutes to protect employees who expose fraud against the U.S. government.

The SEC is charged with the task of protecting the investing public against fraud and stock price manipulation. But while the SEC's enforcement powers are extensive and carry with them the weight of criminal prosecution, its detection resources are limited. Out of necessity, the SEC must rely on the array of other monitors, each with vested interests in detecting governance problems, to alert it to potential wrongdoing.

<div style="color:#9e2b25">CONCEPT CHECK</div>

1. What is the difference between gray directors and outside directors?

2. What does it mean for a board to be captured?

---

[4]D. Yermack, "Higher Market Valuation of Companies with Small Boards of Directors," *Journal of Financial Economics* 40(2) (1996): 185–211.

## 29.3 Compensation Policies

In the absence of monitoring, the other way the conflict of interest between managers and owners can be mitigated is by closely aligning their interests through the managers' compensation policy. That is, by tying compensation to performance, the shareholders effectively give the manager an ownership stake in the firm.

### Stock and Options

Managers' pay can be linked to the performance of a firm in many ways. The most basic approach is through bonuses based on, for example, earnings growth. During the 1990s, most companies adopted compensation policies that more directly gave managers an ownership stake by including grants of stock or stock options to executives. These grants give managers a direct incentive to increase the stock price to make their stock or options as valuable as possible. Consequently, stock and option grants naturally tie managerial wealth to the wealth of shareholders.

Many studies have examined firms' compensation policies. One of the earlier studies examined the sensitivity of managers' compensation to the performance of their firms.[5] The authors found that for every $1000 increase in firm value, CEO pay changed, on average, by $3.25. Most of this increase came from changes in the value of their stock ownership ($2). The rest was driven by options, bonuses, and other compensation changes. The authors of the study argued that this seemed too small a sensitivity to provide managers with the proper incentives to exert extra effort on the behalf of shareholders. Recall, however, that increasing the pay-for-performance sensitivity comes at the cost of burdening managers with risk. As a consequence, the optimal level of sensitivity depends on the managers' level of risk aversion, which is hard to measure.

### Pay and Performance Sensitivity

Figure 29.1 shows the dramatic rise in CEO pay during the economic expansion of the 1990s. The median cash pay, consisting of salary and bonuses, rose only moderately.

### FIGURE 29.1

**CEO Compensation**

This figure shows the median cash pay, stock and option grants, and other pay (for example, long-term incentive payouts and deferred compensation) for CEOs of the 1600 largest public companies (thousands of dollars) over the period 1993 through 2011.

*Source*: Execucomp



---

[5]M. Jensen and K. Murphy, "Performance Pay and Top-Management Incentives," *Journal of Political Economy* 98(2) (1990): 225–264.

Instead, the factor contributing most to the climb in CEO total compensation was the sharp increase in the value of stock and options granted each year. The median value of options granted rose from less than $200,000 in 1993 to more than $1 million in 2001. Not surprisingly, the substantial use of stock and option grants in the 1990s greatly increased managers' pay-for-performance sensitivity. Consequently, recent estimates put this sensitivity at $25 per $1000 change in wealth.[6] Lately, however, firms have been reducing the fraction of stock and option grants in executive compensation packages (see Figure 29.1), suggesting that that level of sensitivity might have been too high.

Besides increasing managers' risk exposure, increasing the sensitivity of managerial pay and wealth to firm performance has some other negative effects. For example, often options are granted "at the money," meaning that the exercise price is equal to the current stock price. Therefore, managers have an incentive to manipulate the release of financial forecasts so that bad news comes out before options are granted (to drive the exercise price down) and good news comes out after options are granted. Studies have found evidence that the practice of timing the release of information to maximize the value of CEO stock options is widespread.[7]

More recently, Erik Lie has found evidence suggesting that many executives have engaged in a more direct form of manipulating their stock option compensation: backdating their option grants.[8] **Backdating** refers to the practice of choosing the grant date of a stock option retroactively, so that the date of the grant would coincide with a date when the stock price was at its low for the quarter or for the year. By backdating the option in this way, the executive receives a stock option that is already in-the-money, with a strike price equal to the lower price on the supposed grant date.

The use of backdating suggests that some executive stock option compensation may not truly have been earned as the result of good *future* performance of the firm. Furthermore, unless it is reported in a timely manner to the IRS and to shareholders, and reflected in the firm's financial statements, backdating is illegal. In mid-2006, SEC and U.S. Justice Department investigations into alleged backdating were ongoing for more than 70 firms. New SEC rules require firms to report option grants within two days of the grant date, which may help prevent further abuses.

**CONCEPT CHECK**

1. What is the main reason for tying managers' compensation to firm performance?

2. What is the negative effect of increasing the sensitivity of managerial pay to firm performance?

---

[6]B. Hall and J. Liebman, "Are CEOs Really Paid Like Bureaucrats?" *Quarterly Journal of Economics* 103(3) (1998): 653–691.

[7]D. Yermack, "Good Timing: CEO Stock Option Awards and Company News Announcements," *Journal of Finance* 52(2) (1997): 449–476. For evidence the option compensation may induce misreporting, see N. Burns and S. Kedia, "The Impact of Performance-Based Compensation on Misreporting," *Journal of Financial Economics* 79 (2006): 35–67.

[8]See E. Lie, "On the Timing of CEO Stock Option Awards," *Management Science* 51 (2005): 802–812. Also, R. Heron and E. Lie show that new rules enacted as part of the Sarbanes-Oxley legislation in 2002 that require grants to be reported within two business days have curbed the practice of backdating ("Does Backdating Explain the Stock Price Pattern Around Executive Stock Option Grants?" *Journal of Financial Economics* 83(2) (2007): 271–295).

## 29.4 Managing Agency Conflict

Even with the risk benefits of separating ownership and control, there are still examples of corporations in which the top managers have substantial ownership interests (for example, Microsoft Corporation). One might conjecture that such corporations have suffered less from the conflict of interest between managers and shareholders.

Academic studies have supported the notion that greater managerial ownership is associated with fewer value-reducing actions by managers.[9] But while increasing managerial ownership may reduce perquisite consumption, it also makes managers harder to fire—thus reducing the incentive effect of the threat of dismissal. Therefore, the relationship between managerial ownership and firm value is unlikely to be the same for every firm, or even for different executives of the same firm. Shareholders will use all of the tools at their disposal to manage the agency conflict. Thus, if managers have small ownership stakes, shareholders may use compensation policies or a stronger board to create the desired incentives. Harold Demsetz and Kenneth Lehn argue that if you look at a group of firms at any time, you should not necessarily see any relationship between ownership and value, unless you are able to control for all of the other, sometimes unobservable, parts of the governance system, including the risk aversion of the manager.[10] More recent studies have supported their position.[11]

### Direct Action by Shareholders

If all else fails, the shareholders' last line of defense against expropriation by self-interested managers is direct action. Recall that shareholders elect the board of directors. Typically, these elections look like those in the former Soviet Union—there is only one slate of candidates and you vote "yes" or "no" for the slate as a whole. When shareholders are angry about the management of the company and frustrated by a board unwilling to take action, however, they have at their disposal a variety of options for expressing that displeasure.

**Shareholder Voice.** First, any shareholder can submit a resolution that is put to a vote at the annual meeting. A resolution could direct the board to take a specific action, such as discontinue investing in a particular line of business or country, or remove a poison pill. Such resolutions rarely receive majority support, but if large shareholders back them, they can be embarrassing for the board. Studies show that the market responds positively when such resolutions are adopted, presumably indicating that they positively impact the governance of firms.[12] Some large public pension funds, such as the California Public Employees Retirement System (CalPERS), take an activist role in corporate governance. Typically, these funds

---

[9]See, for example, R. Walkling and M. Long, "Agency Theory, Managerial Welfare, and Takeover Bid Resistance," *Rand Journal of Economics* 15(1) (1984): 54–68.

[10]H. Demsetz and K. Lehn, "The Structure of Corporate Ownership: Causes and Consequences," *Journal of Political Economy* 93(6) (1985): 1155–1177.

[11]C. Himmelberg, R. G. Hubbard, and D. Palia, "Understanding the Determinants of Managerial Ownership and the Link Between Ownership and Performance," *Journal of Financial Economics* 53(3) (1999): 353–384; and J. Coles, M. Lemmon, and J. Meschke, "Structural Models and Endogeneity in Corporate Finance: the Link Between Managerial Ownership and Corporate Performance," *Journal of Financial Economics* 103(1) (2012): 149–168.

[12]See D. Levit and N. Malenko, "Non-Binding Voting for Shareholder Proposals," *Journal of Finance* 66(5) (2011): 1579–1614, for a theoretical analysis of the informativeness and effectiveness of such votes and V. Cuñat, M. Guadalupe, and M. Gine, "The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value. *The Journal of Finance* 67 (2012): 1943–1977.

target firms that are taking actions without considering the concerns of the stockholders; for example, they may privately approach the board of the firm and ask it to reverse its course. The explicit threat at that stage is that if the board fails to comply, the pension fund will put the issue to a shareholder vote. Studies have reported that such activist investors are usually successful in achieving their goals without having to take matters public.[13]

Recently, shareholders have started organizing "no" votes. That is, when they are dissatisfied with a board, they simply refuse to vote to approve the slate of nominees for the board. The most high-profile example of this type of action occurred in 2004 with the Walt Disney Company. Major shareholders were dissatisfied with the recent performance of Disney under long-time CEO and Chairman Michael Eisner. They began an organized campaign to convince the majority of Disney shareholders to withhold their approval of the reelection of Eisner as director and chairman of the board. When the votes were counted, 45% of Disney's shareholders had voted to withhold approval of Eisner. While Eisner technically had won reelection, a 45% "no" vote is practically unprecedented in large public companies. The signal was clear, and an embarrassed Eisner and the Disney board decided that Eisner would remain CEO, but relinquish the chairman title. Shortly thereafter, Eisner announced plans to retire completely in 2006.

**Shareholder Approval.** In addition to electing the directors of the company, shareholders must approve many major actions taken by the board. For example, target shareholders must approve merger agreements and, in some cases, so must bidder shareholders. Even in cases where bidder shareholders are not required to approve a merger directly, listing requirements on the NYSE, for example, demand that shareholders approve any large issue of new shares, such as might be necessary in a stock-swap merger. Normally, approval is perfunctory, but it cannot be taken for granted. As we saw in Chapter 28, after Hewlett-Packard CEO Carly Fiorina negotiated the merger of HP and Compaq, the Hewlett family used their board seats and voting block to oppose the deal.

A recent movement, which gained momentum and regulators' interest during the 2008 financial crisis, is to let shareholders have a "say on pay," vote. Typically, this is a nonbinding

---

### Shareholder Activism at *The New York Times*

New York Times Co., publisher of *The New York Times*, is closely controlled by the Ochs-Sulzberger family, which owns most of the Class B voting shares, allowing it to elect 70% of the board members. However, in December 2007 and January 2008, two hedge funds working together started acquiring a large stake in the publicly traded Class A shares. The two funds, Harbinger Capital Partners and Firebrand Partners, initially acquired 5% of the shares, subsequently raising the stake to 19%. The funds also filed to nominate four dissident directors to the NYT Co. board, arguing that the *Times* was moving too slowly to develop digital content and should shed non-core assets. After initially resisting, the Company agreed to accept two of the funds' nominees and the funds withdrew their competing proxy statement. Over the two-month period starting when the funds began their activism, the stock price of the Company increased by close to 30%. This episode is indicative of two emerging trends in investor activism: hedge funds taking a more activist role and working in concert to effect change at a company, and an increased willingness of targeted companies to negotiate a settlement with activists (see Figure 29.2).

*Source*: "New York Times Co. Relents on Board Seats—Dissident Group Secures 2 on Expanded Panel; Dual-Stock Handcuffs," Merissa Marr, 18 March 2008, *The Wall Street Journal*, B3.

---

[13]W. Carleton, J. Nelson, and M. Weisbach, "The Influence of Institutions on Corporate Governance Through Private Negotiations: Evidence from TIAA-CREF," *Journal of Finance* 53(4) (1998): 1335–1362.



**FIGURE 29.2**

**Recent Proxy Contest Outcomes**

*To Fight or Not to Fight.* Outcomes of formal proxy contests for board seats. More companies are choosing to settle with dissidents, rather than take the matter to shareholder vote.

*Source*: FactSet SharkWatch

vote to approve or disapprove of the compensation plan for senior executives each year. Even though the votes are nonbinding, firms that narrowly passed shareholder resolutions requiring say on pay votes subsequently saw their stock prices increase in response (relative to firms that narrowly rejected such resolutions).[14]

In 2010 the Dodd-Frank Act required advisory votes of shareholders on executive pay for *all* large U.S. corporations. While shareholders do tend to support executive pay packages—voting them down a mere 8% of the time in 2011—firms with poor performance or unusually high executive pay are more likely to see their compensation proposals rejected by shareholders.[15]

**Proxy Contests.**  Perhaps the most extreme form of direct action that disgruntled shareholders can take is to hold a proxy contest and introduce a rival slate of directors for election to the board (see Figure 29.2). This action gives shareholders an actual choice between the nominees put forth by management and the current board and a completely different slate of nominees put forth by dissident shareholders. One early study of proxy contests found that the announcement of a contest increased firm stock price by 8% on average, even if the challenge was eventually unsuccessful and the incumbents won reelection.[16]

## Management Entrenchment

Given the importance of shareholder action in corporate governance, researchers and large investors alike have become increasingly interested in measuring the balance of power between shareholders and managers in a firm. Over time, the tools that managers can use to entrench themselves have evolved, including anti-takeover protections such as those discussed in Chapter 28. The Investor Responsibility Research Center (IRRC) has collected information on 24 different characteristics that can entrench, or give more power, to managers vis-à-vis shareholders. These provisions include state antitakeover statutes, poison pills, staggered boards, and restrictions on the ability of shareholders to call special meetings themselves.

Researchers have begun using data from the IRRC as a way of measuring how entrenched managers are. One study found that firms with more restrictions on shareholder power

---

[14]V. Cuñat, M. Guadalupe, and M. Gine, "Say Pays!: Shareholder Voice and Firm Performance," *Financial Markets Group Working Paper*, The London School of Economics (2012).

[15]ISS White Paper: 2011 U.S. Postseason Report, and J. Cotter, A. Palmiter, and R. Thomas "The First Year of 'Say on Pay' Under Dodd-Frank: An Empirical Analysis and Look Forward" (October 15, 2012). Vanderbilt Law and Economics Research Paper No. 12–32.

[16]P. Dodd and J. Warner, "On Corporate Governance: A Study of Proxy Contests," *Journal of Financial Economics* 11(1) (1983): 401–438.

performed worse than firms with fewer restrictions during the 1990s.[17] Other studies have found connections between the degree of entrenchment and the compensation offered to managers, and even to the value of acquisitions made.[18] While the index offered by the IRRC does not capture every aspect of corporate governance, many practitioners are finding it to be a useful summary measure of the degree to which managers are entrenched and less likely to have their actions checked by shareholders.

### The Threat of Takeover

Many of the provisions listed in the IRRC index concern protection from takeovers. As we discussed in Chapter 28, one motivation for a takeover can be to replace poorly performing management. When internal governance systems such as ownership, compensation, board oversight, and shareholder activism fail, the one remaining way to remove poorly performing managers is by mounting a hostile takeover. Thus, the effectiveness of the corporate governance structure of a firm depends on how well protected its managers are from removal in a hostile takeover.

An active takeover market is part of the system through which the threat of dismissal is maintained. In fact, some research has suggested that an active takeover market complements a board's own vigilance in dismissing incompetent managers. That research found that boards are actually more likely to fire managers for poor performance during active takeover markets than they are during lulls in takeover activity.[19] This finding also has implications internationally because some countries have much more active takeover markets than others. In particular, hostile takeovers are far more common in the United States than in other countries.

CONCEPT CHECK

**1.** Describe and explain a proxy contest.

**2.** What is the role of takeovers in corporate governance?

## 29.5  Regulation

So far, we've focused on those parts of the corporate governance system that have evolved over time as economic responses to the need for shareholders to mitigate the conflict of interest between themselves and managers. For example, boards of directors came into being long before there was any regulation of the governance of a company, and CEOs have long appointed independent directors to their boards without being required to do so. Nonetheless, from time to time, government has added to existing requirements by passing laws that force minimum standards of governance. Recent examples include the Sarbanes-Oxley Act of 2002 (SOX) and the Dodd-Frank Act of 2010.

---

[17]P. Gompers, J. Ishii, and A. Metrick, "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118(1) (2003): 107–155. The cause of this effect, however, is not clear; see J. Core, W. Guay, and T. Rusticus, "Does Weak Governance Cause Weak Stock Returns? An Examination of Firm Operating Performance and Investors' Expectations," *Journal of Finance* 61(2) (2006): 655–687.

[18]G. Garvey and T. Milbourn, "Asymmetric Benchmarking in Compensation: Executives Are Paid for Good Luck but Not Punished for Bad," *Journal of Financial Economics* (2006) 82: 197–225; and R. Masulis, C. Wang, and F. Xie, "Corporate Governance and Acquirer Returns," *Journal of Finance* 62(4) (2007): 1851–1889.

[19]W. Mikkelson and M. Partch, "The Decline of Takeovers and Disciplinary Managerial Turnover," *Journal of Financial Economics* 44(2) (1997): 205–228.

In the wake of the massive failures of large public companies and corporate fraud scandals in the early 2000s mentioned in the introduction to this chapter, Congress rushed to enact legislation to fix what it saw as inadequate safeguards against malfeasance by managers of public corporations. The result was the Sarbanes-Oxley Act. Prior to SOX, the largest overhaul of securities markets and introduction of regulation came in response to the stock market crash of 1929 and the Great Depression that followed. The Exchange Acts of 1933 and 1934, among other things, established the Securities and Exchange Commission (SEC) and prohibited trading on private information gained as an insider of a firm.

## The Sarbanes-Oxley Act

One of the most critical inputs to the monitoring process is accurate information. If a board of directors has inaccurate information, it cannot do its job. While SOX contains many provisions, the overall intent of the legislation was to improve the accuracy of information given to both boards and to shareholders. SOX attempted to achieve this goal in three ways: (1) by overhauling incentives and independence in the auditing process, (2) by stiffening penalties for providing false information, and (3) by forcing companies to validate their internal financial control processes.

Many of the problems at Enron, WorldCom, and elsewhere were kept hidden from boards and shareholders until it was too late. In the wake of these scandals, many people felt that the accounting statements of these companies, while often remaining true to the letter of GAAP, did not present an accurate picture of the financial health of the company.

Auditing firms are supposed to ensure that a company's financial statements accurately reflect the financial state of the firm. In reality, most auditors have a long–standing relationship with their audit clients; this extended relationship and the auditors' desire to keep the lucrative auditing fees makes auditors less willing to challenge management. More important perhaps, most accounting firms have developed large and extremely profitable consulting divisions. Obviously, if an audit team refuses to accommodate a request by a client's management, that client will be less likely to choose the accounting firm's consulting division for its next consulting contract. SOX addressed this concern by putting strict limits on the amount of non-audit fees (consulting or otherwise) that an accounting firm can earn from the same firm that it audits. It also required that audit partners rotate every five years to limit the likelihood that auditing relationships become too cozy over long periods of time. Finally, SOX called on the SEC to force companies to have audit committees that are dominated by outside directors and required that at least one outside director have a financial background.

SOX also stiffened the criminal penalties for providing false information to shareholders. It required both the CEO and the CFO to personally attest to the accuracy of the financial statements presented to shareholders and to sign a statement to that effect. Penalties for providing false or misleading financial statements were increased under SOX—fines of as much as $5 million and imprisonment of a maximum of 20 years are permitted. Furthermore, CEOs and CFOs must return bonuses or profits from the sale of stock or the exercise of options during any period covered by statements that are later restated.

Finally, Section 404 of SOX requires senior management and the boards of public companies to be comfortable enough with the process through which funds are allocated and controlled, and outcomes monitored throughout the firm, to be willing to attest to their effectiveness and validity. Section 404 has arguably garnered more attention than any other section in SOX because of the potentially enormous burden it places on every firm to validate its entire financial control system. When the SEC estimated the cost of implementing

## INTERVIEW WITH
# Lawrence E. Harris

As Chief Economist of the U.S. Securities and Exchange Commission from 2002 to 2004, Dr. Lawrence E. Harris was the primary advisor to the SEC on all economic issues. He participated extensively in the development of Sarbanes-Oxley (SOX) regulations. Currently Dr. Harris holds the Fred V. Keenan Chair in Finance at the University of Southern California's Marshall School of Business.



QUESTION: *Why is legislation such as Sarbanes-Oxley necessary to protect shareholders?*

ANSWER: Public investors will supply capital to entrepreneurs seeking to fund new business ventures only if they believe it will be used wisely. Regrettably, history has shown that management too often has violated that trust.

The interests of managers and shareholders often conflict. To solve this agency problem, shareholders rely upon information produced by corporate accounting systems. Sarbanes-Oxley mandated accounting and audit standards to improve the quality of corporate financial disclosure.

Opponents of governance regulation believe that shareholders can—and should—take care of themselves. Unfortunately, shareholders often cannot exercise the control necessary to solve agency problems that they could not have anticipated when the firm was first founded. The firm's governance structure, which may have been sensible when the firm was a small company funded primarily by its founders, may no longer be appropriate for a large, widely held corporation operating in the modern economy. Management with little ownership stake may be entrenched, and the directors may be conflicted. When shareholders cannot solve their agency problems, the government must intervene with the lightest possible hand.

QUESTION: *What are the costs and benefits of Sarbanes-Oxley?*

ANSWER: Good corporate disclosure is essential to public finance. SOX improved the quality of disclosure by strengthening accounting and auditing standards. By requiring the CEO and CFO to sign accounts and attest to their accuracy, SOX also put teeth into enforcement if fraud is discovered.

What many people perceive as costs of SOX are really expenditures that weak firms avoided. All well-managed firms must ensure the integrity of their accounting. SOX merely requires that people adopt *existing* best practice. Many companies were already fully compliant with SOX in most essential respects.

Critics claim that SOX made going public more difficult for small firms by increasing the cost of being a public firm. But a public firm *must* have secure control mechanisms to protect shareholders. SOX may decrease the number of firms that go public, but it will also decrease the losses suffered by public investors.

SOX established the Public Corporation Auditing Oversight Board (PCAOB) to regulate auditors. Previous efforts at self-regulation failed because accountants would not discipline their peers. Following numerous notable failures, Congress stepped in and created the PCAOB.

QUESTION: *Is SOX a good law?*

ANSWER: Regulators are blamed for failing to regulate when crises occur, but they do not bear the costs of their regulations. This asymmetry often causes them to underestimate the costs of their regulations and thus adopt unnecessary regulations. The problem is greatest when political considerations force Congress to write regulations that would be better written by well-informed specialists in regulatory agencies such as the SEC. Congress wrote SOX in response to the financial accounting crises that greatly offended the public. Although SOX permits the SEC to essentially rewrite any provision that it determines not to be in the public interest, under the circumstances, it could not do so.

SOX is generally good regulation, but it has some notable unintended consequences. The power it gives audit firms over their corporate clients allows them to interpret SOX to their advantage and thereby increase the work necessary to comply with SOX. SOX also imposes unnecessary costs upon mutual funds. Investment companies are subject to SOX because they are public corporations, but they do not face the same accounting problems that operating companies face. In its haste to appease the public, Congress failed to be as discriminating as it could have been.

Section 404, its staff economists put the total cost at $1.24 billion. Recent estimates based on surveys by Financial Executives International and the American Electronics Association predict that the actual cost will be between $20 billion and $35 billion.[20] The burden of complying with this provision is greater, as a fraction of revenue, for smaller companies. The surveys cited earlier found that multibillion-dollar companies will pay less than 0.05% of their revenues to comply, whereas small companies with less than $20 million in revenues will pay more than 3% of their revenues to comply.

## The Cadbury Commission

It is difficult to determine definitively whether the costs of SOX outweigh its benefits: Even if we could measure the total direct and indirect costs of a law, we could never accurately estimate how much fraud is deterred by that law. One place to turn to for guidance is the experiences of other countries. The following quote from *The Independent*[21] sounds like it was written to describe the motivation behind the Sarbanes-Oxley legislation:

> *Prompted by public concern over a string of unexpected collapses of recently audited firms and over big rises in executive pay, exchanges and public officials rode a wave of public outrage to institute corporate governance reforms to strengthen the independence of the board and address the conflicts of interest in the auditing process.*

In actuality, this passage was written in 1992, and it described what happened in the United Kingdom in 1991. Following the collapse of some large public companies, the U.K. government commissioned Sir Adrian Cadbury to form a committee to develop a code of best practices in corporate governance. Sir Cadbury, in introducing his recommendations, reportedly said the following:

> *The fundamental issue is one of pressure. There is pressure on the company to show the results that the market expects. There is pressure on the auditors who don't want to lose their jobs. The question is whether a structure can emerge out of the dialogue which is robust enough to give the shareholders what they ought to get and what they can rely upon. Internal controls are a part of the legitimate expectations of those who receive accounts.*[22]

The problems that the Cadbury Commission identified are the same as those that SOX attempted to address in the United States 10 years later. Perhaps not surprisingly, the resulting recommendations were quite similar as well. According to the commission's findings, audit and compensation committees should be made up entirely of independent directors or, at least, have a majority of them. The CEO should not be chairman of the board, and at the very least there should be a lead independent director with similar agenda-setting powers. Auditors should be rotated, and there should be fuller disclosure of non-audit work. Unlike SOX, these recommendations were not backed up by the force of law. Rather, companies could adopt them or instead explain why they chose not to adopt them in their annual reports. Some researchers have studied firms that adopted the Cadbury recommendations versus those that did not. The results are mixed. While one study found that those firms that separated the position of CEO and chairman performed better,

---

[20]American Electronics Association, "Sarbanes-Oxley Section 404: The 'Section' of Unintended Consequences and Its Impact on Small Business" (2005).

[21]S. Pincombe, "Accountancy and Management: Auditors Look to Pass the Buck as Pressure for Reform Increases," *The Independent* (London), November 12, 1991, p. 21.

[22]Ibid.

another found no relation between the independence of key board committees and firm performance in the post-Cadbury era.[23]

## Dodd-Frank Act

As the previous cases illustrate, regulatory change is often prompted by crisis. As we explained in Chapter 1, the Dodd-Frank Act of 2010 was spurred by the 2008 financial crisis. Many people believed that poor corporate governance was an important factor that contributed to the crisis and so the act has numerous clauses designed to strengthen governance, including:

- **Independent Compensation Committee:**  All U.S. exchanges must require that the listed firms' compensation committees be composed of only independent board members, and have the authority to hire outside compensation consultants.
- **Nominating Directors:**  Large shareholders owning at least 3% of a company's stock for at least three years may nominate candidates for the board of directors, with the candidates listed on the firm's proxy statement alongside the nominees of management.
- **Vote on Executive Pay and Golden Parachutes:**  At least once every three years, firms must provide shareholders with a nonbinding vote on the compensation of the firm's CEO, CFO, and the three other most highly paid executives. While the vote is nonbinding, companies must formally respond regarding how they have taken into account the results of the vote.
- **Clawback Provisions:**  Public companies must establish policies that allow firms to take back up to three years of any executive incentive compensation erroneously awarded in the event of an accounting restatement.
- **Pay Disclosure:**  Companies must disclose the ratio of CEO annual total compensation to that of the median employee. Companies are also required to disclose the relationship between executive compensation and the firm's financial performance. Finally, firms are required to disclose whether they permit employees and directors to hedge against decreases in the market value of the company's stock.

## Insider Trading

One aspect of the conflict of interest between managers and outside shareholders that we have not yet addressed is **insider trading**. Insider trading occurs when a person makes a trade based on privileged information. Managers have access to information that outside investors do not have. By using this information, managers can exploit profitable trading opportunities that are not available to outside investors. If they were allowed to trade on their information, their profits would come at the expense of outside investors and, as a result, outside investors would be less willing to invest in corporations. Insider trading regulation was passed to address this problem.

In the United States, regulation against insider trading traces back to the Great Depression—specifically, to the Exchange Act of 1934. Insiders of a company are defined broadly to include managers, directors, and anyone else who has access to material non-public information, including temporary insiders—for example, lawyers working on a

---

[23]J. Dahya, A. Lonie, and D. Power, "The Case for Separating the Roles of Chairman and CEO: An Analysis of Stock Market and Accounting Data," *Corporate Governance* 4(2) (1996): 71–77; and N. Vafeas and E. Theodorou, "The Association Between Board Structure and Firm Performance in the UK," *British Accounting Review* 30(4) (1998): 383–407.

976        **Chapter 29** Corporate Governance

### Martha Stewart and ImClone

One of the most famous insider trading cases involved Martha Stewart, self-made celebrity, billionaire, and CEO of a media empire built around her name. Stewart sold 3928 shares of ImClone Systems in December 2001, just before the Food and Drug Administration announced that it was rejecting ImClone's application to review a new cancer drug. The SEC investigated, alleging that Stewart sold the shares after receiving a tip from her broker that the ImClone founder and his family had been selling shares. Even though Stewart was not an employee of ImClone, insider trading laws prohibited her from trading on information gained through a tip, as the origin of the information violated the duty of trust. Nonetheless, in the end, Stewart was charged only with lying to a federal officer and conspiracy to obstruct justice (the investigation of her trades). She was convicted and served five months in prison and an additional five months of home confinement. In addition, she was fined $30,000.

While Stewart's case made the headlines, it was relatively minor by SEC standards. From 2009–2012, the SEC has charged nearly 400 individuals for insider trading with illicit profits of over $600 million, with some of those convicted facing penalties close to $100 million and jail terms of up to 11 years.

_Source_: "Stewart Likely to Get Time in Prison Camp," Thomas S. Mulligan, _L.A. Times_, July 16, 2004.

merger deal or commercial printers contracted to print the merger agreement documents. Whether information is material has been defined in the courts as referring to whether the information would have been a significant factor in an investor's decision about the value of the security. Some examples include knowledge of an upcoming merger announcement, earnings release, or change in payout policy. The law is especially strict with regard to takeover announcements, prohibiting anyone (whether an insider or not) with nonpublic information about a pending or ongoing tender offer from trading on that information or revealing it to someone who is likely to trade on it.

The penalties for violating insider trading laws include jail time, fines, and civil penalties. Only the U.S. Justice Department—on its own or at the request of the SEC—can bring charges that carry the possibility of a prison sentence. However, the SEC can bring civil actions if it chooses. In 1984, Congress stiffened the civil penalties for insider trading by passing the Insider Trading Sanctions Act, which allowed for civil penalties of up to three times the gain from insider trading.

CONCEPT CHECK

1. Describe the main requirements of the Sarbanes-Oxley Act of 2002.
2. What new requirements for corporate governance were added in the Dodd-Frank Act of 2010?
3. What is insider trading, and how can it harm investors?

## 29.6  Corporate Governance Around the World

Most of our discussion in this chapter has focused on corporate governance in the United States. Yet, both the protection of shareholder rights and the basic ownership and control structure of corporations vary across countries. We explore some of those differences here.

### Protection of Shareholder Rights

Recent events notwithstanding, investor protection in the United States is generally seen as being among the best in the world. The degree to which investors are protected against expropriation of company funds by managers and even the degree to which their rights are enforced vary widely across countries and legal regimes. In an important study, researchers

collected data on aspects of shareholder rights across more than 30 countries.[24] They claimed that the degree of investor protection was largely determined by the legal origin of the country—specifically, whether its legal system was based on British common law (more protection) or French, German, and Scandinavian civil law (less protection). This purported link between legal origin and investor protection has been challenged by other researchers, however, who demonstrate that formal legal protection for investors is a relatively recent development in Great Britain.[25] In the late nineteenth and early twentieth centuries, there was essentially no formal legal protection of minority investors.

## Controlling Owners and Pyramids

Much of the focus in the United States is on the agency conflict between shareholders, who own the majority of a firm but are a dispersed group, and managers, who own little of the firm and must be monitored. In many other countries, the central conflict is between what are called "controlling shareholders" and "minority shareholders." In Europe, many corporations are run by families that own controlling blocks of shares. For most practical purposes, blocks of shares in excess of 20% are considered to be controlling, as long as no one else has any large concentration of shares. The idea is that if you own 20% and the other 80% is dispersed among many different shareholders, you will have considerable say in the operation of the firm; other shareholders would have to coordinate their activities to try to outvote you—a formidable challenge.

In these firms, there is usually little conflict between the controlling family and the management (it is often made up of family members). Instead, the conflict arises between the minority shareholders (those without the controlling block) and the controlling shareholders. Controlling shareholders can make decisions that benefit them disproportionately relative to the minority shareholders, such as employing family members rather than the most talented managers or establishing contracts favorable to other family-controlled firms.

**Dual Class Shares and the Value of Control.**  One way for families to gain control over firms even when they do not own more than half the shares is to issue **dual class shares**—a scenario in which companies have more than one class of shares and one class has superior voting rights over the other class. For example, Mark Zuckerberg controls more than 50% of the voting power of Facebook because he controls the majority of Facebook's class B shares, and these shares have ten votes for every one vote of a class A share. Controlling shareholders—often families—will hold all or most of the shares with superior voting rights and issue the inferior voting class to the public. This approach allows the controlling shareholders to raise capital without diluting their control. Dual class shares are common in Brazil, Canada, Denmark, Finland, Germany, Italy, Korea, Mexico, Norway, Sweden, and Switzerland. In the United States, they are far less common. Some countries, such as Belgium, China, Japan, Singapore, and Spain, outlaw differential voting rights altogether.

**Pyramid Structures.**  Another way families can control a corporation without owning 50% of the equity is to create a pyramid structure. In a **pyramid structure**, a family first creates a company in which it owns more than 50% of the shares and therefore has a controlling interest. This company then owns a controlling interest—that is, at least 50% of

[24]R. La Porta, F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, "Law and Finance," *Journal of Political Economy* 106 (1998): 1113–1155.

[25]J. Franks, C. Mayer, and S. Rossi, "Ownership: Evolution and Regulation," *Review of Financial Studies* 22 (2009): 4009–4056.

978    **Chapter 29** Corporate Governance

the shares—in another company. Notice that the family controls *both* companies, but *owns* only 25% of the second company. Indeed, if the second company purchased 50% of the shares of a third company, then the family would control all three companies, even though it would own only 12.5% of the third company. The farther you move down the pyramid the less ownership the family has, but it still remains in complete control of all the companies. Although this example is stylized, a variety of pyramid structures based on this idea are quite common outside the United States.

Figure 29.3 details the actual pyramid controlled by the Pesenti family in Italy as of 1995.[26] The Pesenti family effectively controls five companies primarily concentrated in the construction industry—Italmobiliare, Italcementi, Franco Tosi, Cementerie Siciliane, and Cementeri de Sardegna—even though it does not have more than 50% ownership of any one of them. In this case, the family uses a pyramid structure plus shares with special voting rights to control companies even when its ownership share is as little as 7%.

A controlling family has many opportunities to expropriate minority shareholders in a pyramid structure. The source of the problem is that as you move down the pyramid, the difference between the family's control and its cash flow rights increases. Cash flow rights

---



**FIGURE 29.3**    **Pesenti Family Pyramid, 1995**

Each box contains both ownership and voting rights (which can differ when preferred stock with superior voting rights is used). The first set of numbers (in blue) indicates the rights of the preceding company one step up the pyramid. The second set of numbers (in red) shows the effective rights of the Pesenti family in that company. For example, Italmobiliare controls Italcementi through its 54% voting block, but it owns only 32% of the company. The Pesenti family's investment in Italmobiliare gives it a 10% ownership of Italcementi but, because it is controlled by Italmobiliare, 45% of the effective voting rights in Italcementi.

---

[26]P. Volpin, "Governance with Poor Investor Protection: Evidence from Top Executive Turnover in Italy," *Journal of Financial Economics* 64(1) (2002): 61–90.

refer simply to the family's direct ownership stake and, therefore, the portion of the cash flows generated by the firm that the family has a right to. Notice that Italcementi gets 74% of the dividends of Cementerie Siciliane; Italmobiliare gets 32% of the dividends of Italcementi. Finally, the Pesenti family has rights to 29% of the dividends of Italmobiliare. Thus, the family receives only 29% × 32% × 74% = 7% of the dividends of Cementerie Siciliane but still controls it.

A conflict of interest arises because the family has an incentive to try to move profits (and hence dividends) up the pyramid—that is, away from companies in which it has few cash flow rights and toward firms in which it has more cash flow rights. This process is called **tunneling**. An example of how this might occur is if the Pesenti family would have Cementerie Siciliane enter into an agreement to be supplied by Italmobiliare at prices that are extremely favorable to Italmobiliare. Such a move would reduce Cementerie Siciliane's profits and increase Italmobiliare's profits.

Of course, if you are a minority shareholder in one of these subsidiaries, you would rationally anticipate this expropriation and so you would pay less for the shares of firms in which a family has control, especially if it is low in the pyramid. In effect, you would factor in your expected loss from being a minority shareholder rather than a controlling shareholder. Many studies have confirmed this intuition, finding sharp differences between the value of controlling blocks and minority shares.[27] Thus, controlling shareholders pay for their control rights because the firm effectively faces a higher cost of equity for outside capital.

## The Stakeholder Model

The agency costs and the ways to control them that we have discussed are general to all companies anywhere in the world. However, the United States is somewhat of an exception, in that it focuses solely on maximizing shareholder welfare. Most countries follow what is called the **stakeholder model**, giving explicit consideration to other stakeholders—in particular, rank-and-file employees. As noted earlier, countries such as Germany give employees board representation. Others have mandated works councils, local versions of labor unions that are to be informed and consulted on major corporate decisions.

---

[27]For estimates based on research on mergers and acquisitions, see P. Hanouna, A. Sarin, and A. Shapiro, "Value of Corporate Control: Some International Evidence," SSRN working paper (2004). Estimates of the value of control have also been done comparing the value of shares with different voting rights. In the United States, see C. Doidge, "U.S. Cross-listings and the Private Benefits of Control: Evidence from Dual Class Shares," *Journal of Financial Economics* 72(3) (2004): 519–553. Italy is a country where the value of control is much larger. Zingales reports a premium of 82% on voting shares, presumably because of lower protection to minority investors. See L. Zingales, "The Value of the Voting Right: A Study of the Milan Stock Exchange Experience," *Review of Financial Studies* 7(1) (1994): 125–148. Other work includes H. Almeida and D. Wolfenzon, "A Theory of Pyramidal Ownership and Family Business Groups," *Journal of Finance* 61(6) (2006): 2637–2680; L. Bebchuk, R. Kraakman, and G. Triantis, "Stock Pyramids, Cross-Ownership, and Dual Class Equity," in R. Morck (ed.), *Concentrated Corporate Ownership* (Chicago: University of Chicago Press, 2000): 295–318; M. Bertrand, P. Mehta, and S. Mullainathan, "Ferreting Out Tunneling: An Application to Indian Business Groups," *Quarterly Journal of Economics* 117(1) (2002): 121–148; S. Johnson, R. La Porta, F. Lopez-de-Silanes, and A. Shleifer, "Tunneling," *American Economic Review* 90(2) (2000): 22–27.

Finally, some countries mandate employee participation in decision making in their constitutions. Table 29.1 summarizes employee standing in the governance of firms in OECD (Organization for Economic Cooperation and Development) countries.

## Cross-Holdings

While in the United States it is rare for one company's largest shareholder to be another company, in many countries, such as Germany, Japan, and Korea, it is the norm. In Japan, groups of firms connected through cross-holdings and a common relation to a bank are known as *keiretsu*. Monitoring of each company comes from others in the group holding blocks of its stock and primarily from the main bank of the group, which as a creditor monitors the financial well-being of the group companies closely. In Korea, huge conglomerate

| TABLE 29.1 | Employee Participation in Corporate Governance in OECD Countries | | |
|---|---|---|---|
| Country | Employees Appoint Some Board Members | Works Councils Mandated by Law | Constitutional Reference to Employee Participation in the Management of the Company |
| Australia | No | No | No |
| Austria | Yes | Yes | No |
| Belgium | No | Yes | No |
| Canada | No | No | No |
| Czech Republic | Yes | No | No |
| Denmark | Yes | Yes | No |
| Finland | No | Yes | No |
| France | No | Yes | Constitutional right |
| Germany | Yes | Yes | No |
| Greece | No | Yes | No |
| Hungary | No | Yes | No |
| Ireland | No | No | No |
| Italy | No | No | Constitutional right |
| Japan | No | No | No |
| Korea | No | Yes | No |
| Mexico | No | No | No |
| Netherlands | No | Yes | No |
| New Zealand | No | No | No |
| Norway | Yes | No | Constitutional right |
| Poland | No | No | No |
| Portugal | No | Yes | No |
| Slovak Republic | No | No | No |
| Spain | No | Yes | No |
| Sweden | Yes | No | No |
| Switzerland | No | No | No |
| Turkey | No | No | No |
| United Kingdom | No | No | No |
| United States | No | No | No |

*Source*: Organization for Economic Cooperation and Development, *Survey of Corporate Governance Developments in OECD Countries* (2004).

groups such as Hyundai, Samsung, LG, and SK comprise companies in widely diversified lines of business and are known as *chaebol*. For example, SK Corporation has subsidiary and group companies in energy, chemicals, pharmaceuticals, and telecommunications. An important difference between the Korean chaebol and the Japanese keiretsu is that in Korea the firms do not share a common relationship with a single bank.

**CONCEPT CHECK**

1. How does shareholder protection vary across countries?

2. How can a minority owner in a business gain a controlling interest?

## 29.7 The Trade-Off of Corporate Governance

Corporate governance is a system of checks and balances that trades off costs and benefits. As this chapter makes clear, this trade-off is very complicated. No one structure works for all firms. For example, it would be hard to argue that having Bill Gates as a controlling shareholder of Microsoft was bad for minority investors. For Microsoft, the alignment of incentives assured by Gates' large stake in Microsoft appeared to outweigh the costs of having such an entrenched CEO. In other cases, however, this is unlikely to be true.

The costs and benefits of a corporate governance system also depend on cultural norms. Acceptable business practice in one culture is unacceptable in another culture, and thus it is not surprising that there is such wide variation in governance structures across countries.[28]

It is important to keep in mind that good governance is value enhancing and so, in principle, is something investors in the firm should strive for. Because there are many ways to implement good governance, one should expect firms to display—and firms do display—wide variation in their governance structures.

**MyFinanceLab**

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 29.1 Corporate Governance and Agency Costs

- Corporate governance refers to the system of controls, regulations, and incentives designed to prevent fraud from happening.
- The conflicts between those who control the operations of a firm and those who supply capital to the firm are as old as the corporate organizational structure. Shareholders use a combination of incentives and threats of dismissal to mitigate this conflict.

### 29.2 Monitoring by the Board of Directors and Others

- The board of directors hires managers, sets their compensation, and fires them if necessary. Some boards become captured, meaning that they act in the interests of managers rather than

---

[28]Resources that detail how governance differs across the world include J. Charkham, *Keeping Good Company: A Study of Corporate Governance in Five Countries* (Oxford: Clarendon Press, 1994); J. Franks and C. Mayer, "Corporate Ownership and Control in the U.K., Germany and France," *Journal of Applied Corporate Finance* 9(4) (1997): 30–45; R. La Porta, F. Lopez-de-Silanes, and A. Shleifer, "Corporate Ownership Around the World," *Journal of Finance* 54(4) (1999): 471–517; and D. Denis and J. McConnell, "International Corporate Governance," *Journal of Financial and Quantitative Analysis* 38(1) (2003): 1–38.

shareholders. Boards with strong, outside directors who were nominated before the current CEO took the helm of the firm are the least likely to be captured.

## 29.3  Compensation Policies

- Ownership of a company's stock by management can reduce managers' perquisite consumption. However, moderate holdings of shares can have a negative effect by making the managers harder to fire (reducing the threat of dismissal), without fully aligning their interests with those of shareholders.
- By tying managers' compensation to firm performance, boards can better align managers' interests with shareholders' interests. Care must be taken to make sure managers do not have incentives to try to manipulate the firm's stock price to garner a big compensation payout.

## 29.4  Managing Agency Conflict

- If a board fails to act, shareholders are not without recourse. They can propose an alternate slate of directors or vote not to ratify certain actions of the board.
- A board and management can adopt provisions, such as staggered boards and limitations on special shareholder meetings that serve to entrench them. These provisions also have the effect of limiting the efficacy of a hostile takeover bid.
- Despite the defenses that a determined management can erect, one source of the threat of dismissal comes from a hostile acquirer, which can take over a firm and fire the management, even if the board fails to do so.

## 29.5  Regulation

- Regulation is an important piece of the total corporate governance environment. Regulation can be beneficial by reducing asymmetric information between managers and capital providers and thus reducing the overall cost of capital. Regulation also carries with it costs of compliance and enforcement. Good regulation balances these forces to produce a net benefit for society.
- The Sarbanes-Oxley Act was intended to improve shareholder monitoring of managers by increasing the accuracy of their information.
  - It overhauls incentives and independence in the auditing process.
  - It stiffens the penalties for providing false information.
  - It forces companies to validate their internal financial control process.
- The most recent overhaul of U.S. governance regulation is the Dodd-Frank Act of 2010. The act requires that firms
  - Choose independent compensation committees and allow long-term large shareholders to nominate directors.
  - Allow shareholders to vote on executive pay and to clawback incentive pay that was erroneously awarded.
  - Disclose how executive pay compares with that of the median employee, as well as how it is related to the firm's financial performance.
- The Exchange Acts of 1933 and 1934 are the basis of insider trading regulation. Over time, the SEC and the courts have developed interpretations of the law that
  - Prohibit insiders with a fiduciary duty to their shareholders from trading on material nonpublic information in that stock.
  - Prohibit anyone with nonpublic information about a pending or ongoing tender offer from trading on that information or revealing it to someone who is likely to trade on it.

## 29.6  Corporate Governance Around the World

- Corporate governance, regulations, and practices vary widely across countries.
  - Some studies suggest that countries with common-law roots generally provide better shareholder protection than countries with civil-law origin.

- Ownership structures in Europe and Asia often involve pyramidal control of a group of companies by a single family. In these situations, the controlling family has many opportunities for expropriation of minority shareholders through tunneling.
- Dual class shares with differential voting rights allow a controlling shareholder or family to maintain control of a company or group even if their cash flow rights are relatively small. Dual class shares are common outside the United States.
- Most countries give employees some role in governing a firm. Employee involvement usually takes the form of board seats or works councils that are consulted before major decisions.
- It is common outside the United States for a company's largest shareholder to be another company. These cross-holdings create incentives for firms to monitor each other.

### 29.7 The Trade-Off of Corporate Governance

- Corporate governance is a system of checks and balances that trades off costs and benefits.
- Good governance is value enhancing and so, in principle, is something investors in the firm should strive for. Because there are many ways to implement good governance, one should expect firms to display—and firms do display—wide variation in their governance structures.

## Key Terms

backdating *p. 967*
captured *p. 964*
corporate governance *p. 962*
dual class shares *p. 977*
gray directors *p. 963*
inside directors *p. 963*

insider trading *p. 975*
outside (independent) directors *p. 963*
pyramid structure *p. 977*
stakeholder model *p. 979*
tunneling *p. 979*

## Further Reading

The literature on corporate governance is extensive; we cannot hope to do it justice in this single chapter. Readers interested in delving into this subject more thoroughly can begin by consulting the following surveys: M. Becht, P. Bolton, and A. Roell, "Corporate Governance and Control," in G. Constantinides, M. Harris, and R. Stulz (eds.), *Handbook of the Economics of Finance* (North-Holland, 2003: 1–109); and A. Shleifer and R. W. Vishny, "A Survey of Corporate Governance," *Journal of Finance* 52(2) (1997): 737–783.

## Problems

*All problems are available in* MyFinanceLab.

### Corporate Governance and Agency Costs

1. What inherent characteristic of corporations creates the need for a system of checks on manager behavior?

2. What are some examples of agency problems?

3. What are the advantages and disadvantages of the corporate organizational structure?

### Monitoring by the Board of Directors and Others

4. What is the role of the board of directors in corporate governance?

5. How does a board become captured by a CEO?

6. What role do security analysts play in monitoring?

7. How are lenders part of corporate governance?

8. What is a whistle-blower?

### Compensation Policies

9. What are the advantages and disadvantages of increasing the options granted to CEOs?

### Managing Agency Conflict

10. Is it necessarily true that increasing managerial ownership stakes will improve firm performance?

11. How can proxy contests be used to overcome a captured board?

12. What is a say-on-pay vote?

13. What are a board's options when confronted with dissident shareholders?

### Regulation

14. What is the essential trade-off faced by government in designing regulation of public firms?

15. Many of the provisions of the Sarbanes-Oxley Act of 2002 were aimed at auditors. How does this affect corporate governance?

16. The Dodd-Frank Act requires that firms disclose whether employees and directors are permitted to hedge against declines in the firm's stock price. Why might this matter for corporate governance?

17. What are the costs and benefits of prohibiting insider trading?

18. How do the laws on insider trading differ for merger- versus non-merger-related trading?

### Corporate Governance Around the World

19. Are the rights of shareholders better protected in the United States or in France?

20. How can a controlling family use a pyramidal control structure to benefit itself at the expense of other shareholders?

# Risk Management

**A**LL FIRMS ARE SUBJECT TO RISK FROM A VARIETY OF sources: changes in consumer tastes and demand for their products, fluctuations in the cost of raw materials, employee turnover, the entry of new competitors, and countless other uncertainties. Entrepreneurs and corporate managers willingly take on these risks in the pursuit of high returns and accept them as part of the cost of doing business. But as with any other cost, firms should manage risk to minimize the effect on the value of the firm.

The primary method of risk management is prevention. For example, firms can avoid or at least reduce many potential risks by increasing safety standards in the workplace, by making prudent investment decisions, and by conducting appropriate due diligence when entering into new relationships. But some risks are too costly to prevent and are inevitable consequences of running a business. As discussed in Part 5, the firm shares these business risks with its investors through its capital structure. Some of the risk is passed on to debt holders, who bear the risk that the firm will default. Most of the risk is held by equity holders, who are exposed to the volatility of the stock's realized return. Both types of investors can reduce their risk by holding the firm's securities in a well-diversified portfolio.

Not all risks need to be passed on to the firm's debt and equity holders. Insurance and financial markets allow firms to trade risk and shield their debt and equity holders from some types of risk. For example, after a fire shut down its processing plant in January 2005, Suncor Energy received more than $200 million in settlements from insurance contracts covering both the damage to the plant and the lost business while the plant was being repaired. Much of the loss from the fire was thus borne by Suncor's insurers rather than by its investors. In 2008, Southwest Airlines received $1.3 billion from financial contracts that compensated it for the rise in the cost of jet fuel. In June 2011, Cisco held contracts to protect more than $5 billion worth of projected foreign revenues from fluctuations in exchange rates, and General Electric held contracts, with a total market value exceeding $10 billion, designed to reduce its exposure to interest rate fluctuations.

## NOTATION

$r_f$ risk-free interest rate

$r$ current interest rate

$r_L$ cost of capital for an insured loss

$\beta_L$ beta of an insured loss

$r_\$, r_\epsilon$ dollar and euro interest rate

$S$ spot exchange rate

$F, F_T$ one-year and $T$-year forward exchange rate

$K$ option strike price

$\sigma$ exchange rate volatility

$T$ option (or forward) expiration date

$N(\ )$ normal distribution function

$C_t$ cash flow on date $t$

$P$ price of a security

$\varepsilon$ change in interest rate

$k$ compounding periods per year

$A, L, E$ market value of assets, liabilities, equity

$D_P$ duration of security or portfolio $P$

$\tilde{r}_t$ floating interest rate on date $t$

$\delta_t$ credit spread on date $t$

$N$ notational principal of a swap contract

$NPV$ net present value

985

In this chapter, we consider the strategies that firms use to manage and reduce the risk borne by their investors. We begin with the most common form of risk management, insurance. After carefully considering the costs and benefits of insurance, we look at the ways firms can use financial markets to offload the risks associated with changes in commodity prices, exchange rate fluctuations, and interest rate movements.

## 30.1  Insurance

Insurance is the most common method firms use to reduce risk. Many firms purchase **property insurance** to insure their assets against hazards such as fire, storm damage, vandalism, earthquakes, and other natural and environmental risks. Other common types of insurance include:

- **Business liability insurance**, which covers the costs that result if some aspect of the business causes harm to a third party or someone else's property
- **Business interruption insurance**, which protects the firm against the loss of earnings if the business is interrupted due to fire, accident, or some other insured peril
- **Key personnel insurance**, which compensates for the loss or unavoidable absence of crucial employees in the firm

In this section, we illustrate the role of insurance in reducing risk and examine its pricing and potential benefits and costs for a firm.

### The Role of Insurance: An Example

To understand the role of insurance in reducing risk, consider an oil refinery with a 1-in-5000, or 0.02%, chance of being destroyed by a fire in the next year. If it is destroyed, the firm estimates that it will lose $150 million in rebuilding costs and lost business. We can summarize the risk from fire with a probability distribution:

| Event | Probability | Loss (in $ million) |
|-------|-------------|---------------------|
| No fire | 99.98% | 0 |
| Fire | 0.02% | 150 |

Given this probability distribution, the firm's expected loss from fire each year is

$$99.98\% \times (\$0) + 0.02\% \times (\$150 \text{ million}) = \$30,000$$

While the expected loss is relatively small, the firm faces a large downside risk if a fire does occur. If the firm could completely eliminate the chance of fire for less than the present value of $30,000 per year, it would do so; such an investment would have a positive NPV. But avoiding *any* chance of a fire is probably not feasible with current technology (or at least would cost far more than $30,000 per year). Consequently, the firm can manage the risk by instead purchasing insurance to compensate its loss of $150 million. In exchange, the firm will pay an annual fee, called an **insurance premium**, to the insurance company. In this way, insurance allows the firm to exchange a random future loss for a certain upfront expense.

### Insurance Pricing in a Perfect Market

When a firm buys insurance, it transfers the risk of the loss to an insurance company. The insurance company charges an upfront premium to take on that risk. At what price will the insurance company be willing to bear the risk in a perfect market?

In a perfect market without other frictions, insurance companies should compete until they are just earning a fair return and the NPV from selling insurance is zero. The NPV is zero if the price of insurance equals the present value of the expected payment; in that case, we say the price is **actuarially fair**. If $r_L$ is the appropriate cost of capital given the risk of the loss, we can calculate the actuarially fair premium as follows:[1]

### Actuarially Fair Insurance Premium

$$\text{Insurance Premium} = \frac{\Pr(\text{Loss}) \times E[\text{Payment in the Event of Loss}]}{1 + r_L} \tag{30.1}$$

where Pr(loss) is the probability that the loss will occur, $E[\cdot]$ is the expected payment if the loss occurs, and $r_L$ is the appropriate cost of capital.

The cost of capital $r_L$ used in Eq. 30.1 depends on the risk being insured. Consider again the oil refinery. The risk of fire is surely unrelated to the performance of the stock market or the economy. Instead, this risk is specific to this firm and, therefore, diversifiable in a large portfolio. As we discussed in Chapter 10, by pooling together the risks from many policies, insurance companies can create very-low-risk portfolios whose annual claims are relatively predictable. In other words, the risk of fire has a beta of zero, so it will not command a risk premium. In this case, $r_L = r_f$, the risk-free interest rate.

Not all insurable risks have a beta of zero. Some risks, such as hurricanes and earthquakes, create losses of tens of billions of dollars and may be difficult to diversify completely.[2] Other types of losses may be correlated across firms. Increases in the cost of health care or more stringent environmental regulations raise the potential claims from health insurance and liability insurance for all firms. Finally, some risks can have a causal effect on the stock market: The September 11, 2001, terrorist attacks cost insurers $34 billion[3] and also led to a 12% decline in the S&P 500 in the first week of trading following the attacks.

For risks that cannot be fully diversified, the cost of capital $r_L$ will include a risk premium.[4] By its very nature, insurance for nondiversifiable hazards is generally a negative-beta asset (it pays off in bad times); the insurance payment to the firm tends to be *larger* when total losses are high and the market portfolio is low. Thus, the risk-adjusted rate $r_L$ for losses is *less than* the risk-free rate $r_f$, leading to a *higher* insurance premium in Eq. 30.1. While firms that purchase insurance earn a return $r_L < r_f$ on their investment, because of the negative beta of the insurance payoff, it is still a zero-NPV transaction.[5]

---

[1]Equation 30.1 assumes insurance premiums are paid at the start of the year, and payments in the event of loss are made at the end of the year. It is straightforward to extend it to alternative timing assumptions.

[2]For example, insured losses from hurricanes Katrina, Rita, and Wilma, which pummeled the southeastern United States in 2005, exceeded $40 billion, with total economic losses topping $100 billion. Losses from hurricane Sandy in 2012 are likely to be a similar magnitude. When insuring large risks like these, many insurance companies buy insurance on their own portfolios from reinsurance companies. Reinsurance firms pool risks globally from different insurance companies worldwide. For natural disasters, typically, one-fourth to one-third of the insured losses is passed on to reinsurers.

[3]This number includes property, life, and liability insurance, as estimated by the Insurance Information Institute, http://www.iii.org.

[4]Alternatively, we can use *risk-neutral* probabilities, as defined in Chapter 21, to calculate the expected loss in the numerator of Eq. 30.1, in which case we would continue to discount using the risk-free interest rate.

[5]Not all insurance must have a zero or negative beta; a positive beta is possible if the amount of the insured loss is higher when market returns are also high.

| EXAMPLE 30.1 | **Insurance Pricing and the CAPM** |
|---|---|

**Problem**

As the owner of a landmark Chicago skyscraper, you decide to purchase insurance that will pay $1 billion in the event the building is destroyed by terrorists. Suppose the likelihood of such a loss is 0.1%, the risk-free interest rate is 4%, and the expected return of the market is 10%. If the risk has a beta of zero, what is the actuarially fair insurance premium? What is the premium if the beta of terrorism insurance is $-2.5$?[6]

**Solution**

The expected loss is $0.1\% \times \$1$ billion $= \$1$ million. If the risk has a beta of zero, we compute the insurance premium using the risk-free interest rate: ($1 million)/1.04 = $961,538.

If the beta of the risk is not zero, we can use the CAPM to estimate the appropriate cost of capital. Given a beta for the loss, $\beta_L$, of $-2.5$, and an expected market return, $r_{mkt}$, of 10%:

$$r_L = r_f + \beta_L(r_{mkt} - r_f) = 4\% - 2.5(10\% - 4\%) = -11\%$$

In this case, the actuarially fair premium is ($1 million)/(1 − 0.11) = $1.124 million. Although this premium exceeds the expected loss, it is a fair price given the negative beta of the risk.

## The Value of Insurance

In a perfect capital market, insurance will be priced so that it has an NPV of zero for both the insurer and the insured. But if purchasing insurance has an NPV of zero, what benefit does it have for the firm?

Modigliani and Miller have already provided us with the answer to this question: In a perfect capital market, there is no benefit to the firm from any financial transaction, *including insurance*. Insurance is a zero-NPV transaction that has no effect on value. Although insurance allows the firm to divide its risk in a new way (e.g., the risk of fire is held by insurers, rather than by debt and equity holders), the firm's total risk—and, therefore, its value—remains unchanged.

Thus, just like a firm's capital structure, the value of insurance must come from reducing the cost of market imperfections on the firm. Let's consider the potential benefits of insurance with respect to the market imperfections that we considered in Part 5.

**Bankruptcy and Financial Distress Costs.** When a firm borrows, it increases its chances of experiencing financial distress. In Chapter 16, we saw that financial distress may impose significant direct and indirect costs on the firm, including agency costs such as excessive risk taking and underinvestment. By insuring risks that could lead to distress, the firm can reduce the likelihood that it will incur these costs.

For example, for an airline with a large amount of leverage, the losses associated with an accident involving one of its planes may lead to financial distress. While the actual losses from the incident might be $150 million, the costs from distress might be an additional $40 million. The airline can avoid these distress costs by purchasing insurance that will cover the $150 million loss. In this case, the $150 million paid by the insurer is worth $190 million to the firm.

**Issuance Costs.** When a firm experiences losses, it may need to raise cash from outside investors by issuing securities. Issuing securities is an expensive endeavor. In addition to underwriting fees and transaction costs, there are costs from underpricing due to adverse

---

[6]Given a market volatility of 18%, a beta of $-2.5$ is consistent with a market decline of roughly 9% in the event of an attack.

selection as well as potential agency costs due to reduced ownership concentration. Because insurance provides cash to the firm to offset losses, it can reduce the firm's need for external capital and thus reduce issuance costs.

| EXAMPLE 30.2 | **Avoiding Distress and Issuance Costs** |
|---|---|

**Problem**

Suppose the risk of an airline accident for a major airline is 1% per year, with a beta of zero. If the risk-free rate is 4%, what is the actuarially fair premium for a policy that pays $150 million in the event of a loss? What is the NPV of purchasing insurance for an airline that would experience $40 million in financial distress costs and $10 million in issuance costs in the event of a loss if it were uninsured?

**Solution**

The expected loss is $1\% \times \$150$ million $= \$1.50$ million, so the actuarially fair premium is $1.50 million/1.04 = $1.44 million.

The total benefit of the insurance to the airline is $150 million plus an additional $50 million in distress and issuance costs that it can avoid if it has insurance. Thus, the NPV from purchasing the insurance is

$$NPV = -1.44 + 1\% \times (150 + 50)/1.04 = \$0.48 \text{ million}$$

**Tax Rate Fluctuations.**  When a firm is subject to graduated income tax rates, insurance can produce a tax savings if the firm is in a higher tax bracket when it pays the premium than the tax bracket it is in when it receives the insurance payment in the event of a loss.

Consider an almond grower with a 10% chance of a weather-related crop failure. If the risk of crop failure has a beta of zero and the risk-free rate is 4%, the actuarially fair premium per $100,000 of insurance is

$$\frac{1}{1.04} \times 10\% \times \$100,000 = \$9615$$

Suppose the grower's current tax rate is 35%. In the event of a crop failure, however, the grower expects to earn much less income and face a lower 15% tax rate. Then, the grower's NPV from purchasing insurance is positive:

$$NPV = -\$9615 \times (1 - 0.35) + \underbrace{\frac{1}{1.04} \times 10\% \times \$100,000}_{= \$9615} \times (1 - 0.15)$$

$$= \$1923$$

The benefit arises because the grower is able to shift income from a period in which it has a high tax rate to a period in which it has a low rate. This tax benefit of insurance can be large if the potential losses are significant enough to have a substantial impact on the firm's marginal tax rate.

**Debt Capacity.**  Firms limit their leverage to avoid financial distress costs. Because insurance reduces the risk of financial distress, it can relax this trade-off and allow the firm to increase its use of debt financing.[7] In Chapter 16, we found that debt financing provides

---

[7]Indeed, it is not unusual for creditors to require the firm to carry insurance as part of a covenant.

several important advantages for the firm, including lower corporate tax payments due to the interest tax shield, lower issuance costs, and lower agency costs (through an increase in equity ownership concentration and a reduction in excess cash flow).

**Managerial Incentives.**  By eliminating the volatility that results from perils outside management's control, insurance turns the firm's earnings and share price into informative indicators of management's performance. Therefore, the firm can increase its reliance on these measures as part of performance-based compensation schemes, without exposing managers to unnecessary risk. In addition, by lowering the volatility of the stock, insurance can encourage concentrated ownership by an outside director or investor who will monitor the firm and its management.

**Risk Assessment.**  Insurance companies specialize in assessing risk. In many instances, they may be better informed about the extent of certain risks faced by the firm than the firm's own managers. This knowledge can benefit the firm by improving its investment decisions. Requiring the firm to purchase fire insurance, for example, implies that the firm will consider differences in fire safety, through their effects on the insurance premium, when choosing a warehouse. Otherwise, the managers might overlook such differences. Insurance firms also routinely monitor the firms they insure and can make value-enhancing safety recommendations.

## The Costs of Insurance

When insurance premiums are actuarially fair, using insurance to manage the firm's risk can reduce costs and improve investment decisions. But in reality, market imperfections exist that can raise the cost of insurance above the actuarially fair price and offset some of these benefits.

**Insurance Market Imperfections.**  Three main frictions may arise between the firm and its insurer. First, transferring the risk to an insurance company entails administrative and overhead costs. The insurance company must employ sales personnel who seek out clients, underwriters who assess the risks of a given property, appraisers and adjusters who assess the damages in the event of a loss, and lawyers who can resolve potential disputes that arise over the claims. Insurance companies will include these expenses when setting their premiums. In 2011, expenses for the property and casualty insurance industry amounted to over 29% of premiums charged.[8]

A second factor that raises the cost of insurance is adverse selection. Just as a manager's desire to sell equity may signal that the manager knows the firm is likely to perform poorly, so a firm's desire to buy insurance may signal that it has above-average risk. If firms have private information about how risky they are, insurance companies must be compensated for this adverse selection with higher premiums.

Agency costs are a third factor that contributes to the price of insurance. Insurance reduces the firm's incentive to avoid risk. For example, after purchasing fire insurance, a firm may decide to cut costs by reducing expenditures on fire prevention. This change in behavior that results from the presence of insurance is referred to as **moral hazard**. The extreme case of moral hazard is insurance fraud, in which insured parties falsify or deliberately cause losses to collect insurance money. Property and casualty insurance companies estimate that moral hazard costs account for more than 11% of premiums.[9]

---

[8]"2011 Year End Results," Insurance Information Institute.
[9]Insurance Research Council estimate (2002).

**Addressing Market Imperfections.** Insurance companies try to mitigate adverse selection and moral hazard costs in a number of ways. To prevent adverse selection, they screen applicants to assess their risk as accurately as possible. Just as medical examinations are often required for individuals seeking life insurance, plant inspections and reviews of safety procedures are required to obtain large commercial insurance policies. To deter moral hazard, insurance companies routinely investigate losses to look for evidence of fraud or deliberate intent.

Insurance companies also structure their policies in such a way as to reduce these costs. For example, most policies include both a **deductible**, which is the initial amount of the loss that is not covered by insurance, and **policy limits**, which limit the amount of the loss that is covered regardless of the extent of the damage. These provisions mean that the firm continues to bear some of the risk of the loss even after it is insured. In this way, the firm retains an incentive to avoid the loss, reducing moral hazard. Also, because risky firms will prefer lower deductibles and higher limits (because they are more likely to experience a loss), insurers can use the firm's policy choice to help identify its risk and reduce adverse selection.[10]

---

| EXAMPLE 30.3 | Adverse Selection and Policy Limits |
| --- | --- |

**Problem**

Your firm faces a potential $100 million loss that it would like to insure. Because of tax benefits and the avoidance of financial distress and issuance costs, each $1 received in the event of a loss is worth $1.50 to the firm. Two policies are available: One pays $55 million and the other pays $100 million if a loss occurs. The insurance company charges 20% more than the actuarially fair premium to cover administrative expenses. To account for adverse selection, the insurance company estimates a 5% probability of loss for the $55 million policy and a 6% probability of loss for $100 million policy.

Suppose the beta of the risk is zero and the risk-free rate is 5%. Which policy should the firm choose if its risk of loss is 5%? Which should it choose if its risk of loss is 6%?

**Solution**

The premium charged for each policy is

$$\text{Premium (\$55 million policy)} = \frac{5\% \times \$55 \text{ million}}{1.05} \times 1.20 = \$3.14 \text{ million}$$

$$\text{Premium (\$100 million policy)} = \frac{6\% \times \$100 \text{ million}}{1.05} \times 1.20 = \$6.86 \text{ million}$$

If the risk of a loss is 5%, the NPV of each policy is

$$NPV(\$55 \text{ million policy})$$

$$= -\$3.14 \text{ million} + \frac{5\% \times \$55 \text{ million}}{1.05} \times 1.50 = \$0.79 \text{ million}$$

---

[10]Articles that investigate optimal insurance policy design include A. Raviv, "The Design of an Optimal Insurance Policy," *American Economic Review* 69 (1979): 84–96; G. Huberman, D. Mayers, and C. Smith, "Optimal Insurance Policy Indemnity Schedules," *Bell Journal of Economics* 14 (1983): 415–426; and M. Rothschild and J. Stiglitz, "Equilibrium in Competitive Insurance Markets: An Essay on the Economics of Imperfect Information," *Quarterly Journal of Economics* 90 (1976): 629–649.

*NPV*($100 million policy)

$$= -\$6.86 \text{ million} + \frac{5\% \times \$100 \text{ million}}{1.05} \times 1.50 = \$0.28 \text{ million}$$

Thus, with a 5% risk, the firm should choose the policy with lower coverage. If the risk of a loss is 6%, the policy with higher coverage is superior:

*NPV*($55 million policy)

$$= -\$3.14 \text{ million} + \frac{6\% \times \$55 \text{ million}}{1.05} \times 1.50 = \$1.57 \text{ million}$$

*NPV*($100 million policy)

$$= -\$6.86 \text{ million} + \frac{6\% \times \$100 \text{ million}}{1.05} \times 1.50 = \$1.71 \text{ million}$$

Note that the insurance company's concerns regarding adverse selection are justified: Firms that are riskier will choose the higher-coverage policy.

### The Insurance Decision

In a perfect capital market, purchasing insurance does not add value to the firm. It can add value in the presence of market imperfections, but market imperfections are also likely to raise the premiums charged by insurers. For insurance to be attractive, the benefit to the firm must exceed the additional premium charged by the insurer.

For these reasons, insurance is most likely to be attractive to firms that are currently financially healthy, do not need external capital, and are paying high current tax rates. They will benefit most from insuring risks that can lead to cash shortfalls or financial distress, and that insurers can accurately assess and monitor to prevent moral hazard.

Full insurance is unlikely to be attractive for risks about which firms have a great deal of private information or that are subject to severe moral hazard. Also, firms that are already in financial distress have a strong incentive not to purchase insurance—they need cash today and have an incentive to take risk because future losses are likely to be borne by their debt holders.

CONCEPT CHECK    **1.** How can insurance add value to a firm?

**2.** Identify the costs of insurance that arise due to market imperfections.

## 30.2  Commodity Price Risk

Firms use insurance to protect against the unlikely event that their real assets are damaged or destroyed by hazards such as fires, hurricanes, accidents, and other catastrophes that are outside their normal course of business. At the same time, many risks that firms face arise naturally as part of their business operations. For many firms, changes in the market prices of the raw materials they use and the goods they produce may be the most important source of risk to their profitability. For example, in the airline industry, the second-largest expense after labor is jet fuel. With oil prices increasing from a low of $17 a barrel in 2001, to nearly $150 a barrel in mid-2008, most major carriers struggled to achieve profitability. Industry analysts estimate that each $1 per barrel increase in the price of oil equates to a $425 million increase in the industry's annual jet fuel expenses. United Airlines alone

spent more than $12 billion on fuel in 2011, over 30% of its annual revenue. For an airline, oil price fluctuations are clearly an important source of risk.

In this section, we discuss ways firms can reduce, or *hedge*, their exposure to commodity price movements. Like insurance, hedging involves contracts or transactions that provide the firm with cash flows that offset its losses from price changes.

## Hedging with Vertical Integration and Storage

Firms can hedge risk by making real investments in assets with offsetting risk. The most common strategies are vertical integration and storage.

**Vertical integration** entails the merger of a firm and its supplier (or a firm and its customer). Because an increase in the price of the commodity raises the firm's costs and the supplier's revenues, these firms can offset their risks by merging. For example, in 2005 Japanese tire maker Bridgestone purchased a large Indonesian rubber plantation to control its costs. As the price of rubber increases, so will the profits of the rubber plantation, offsetting the higher costs of making tires. Similarly, airlines could offset their oil price risk by merging with an oil company.

While vertical integration can reduce risk, it does not always increase value. Recall the key lesson of Modigliani and Miller: Firms add no value by doing something investors can do for themselves. Investors concerned about commodity price risk can diversify by "vertically integrating" their portfolios and buying shares of the firm and its supplier. Because the acquiring firm often pays a substantial premium over the current share price of the firm being acquired, the shareholders of the acquiring firm would generally find it cheaper to diversify on their own.

Vertical integration can add value if combining the firms results in important synergies. For example, Boeing ultimately decided to purchase a number of its suppliers involved in its 787 "Dreamliner" to improve quality control and coordination, and reduce production delays. In many instances, however, diseconomies would be the more likely outcome of vertical integration, as the combined firm would lack a strategic focus (e.g., airlines and oil producers). Finally, vertical integration is not a perfect hedge: A firm's supplier is exposed to many other risks besides commodity prices. By integrating vertically, the firm eliminates one risk but acquires others.

A related strategy is the long-term storage of inventory. An airline concerned about rising fuel costs could purchase a large quantity of fuel today and store the fuel until it is needed. By doing so, the firm locks in its cost for fuel at today's price plus storage costs. But for many commodities, storage costs are much too high for this strategy to be attractive. Such a strategy also requires a substantial cash outlay upfront. If the firm does not have the required cash, it would need to raise external capital—and consequently would suffer issuance and adverse selection costs. Finally, maintaining large amounts of inventory would dramatically increase working capital requirements, a cost for the firm.

## Hedging with Long-Term Contracts

An alternative to vertical integration or storage is a long-term supply contract. Firms routinely enter into long-term lease contracts for real estate, fixing the price at which they will obtain office space many years in advance. Similarly, utility companies sign long-term supply contracts with power generators, and steelmakers sign long-term contracts with mining firms for iron ore. Through these contracts, both parties can achieve price stability for their product or input.

A good example is provided by Southwest Airlines. In early 2000, when oil prices were close to $20 per barrel, Chief Financial Officer Gary Kelly developed a strategy to protect the airline from a surge in oil prices. By the time oil prices soared above $30 per barrel later

### FIGURE 30.1

**Commodity Hedging Smoothes Earnings**

By locking in its fuel costs through long-term supply contracts, Southwest Airlines has kept its earnings stable in the face of fluctuating fuel prices. With a long-term contract at a price of $23 per barrel, Southwest would gain by buying at this price if oil prices go above $23 per barrel. If oil prices fall below $23 per barrel, Southwest would lose from its commitment to buy at a higher price.



that year and put the airline industry into a financial crisis, Southwest had signed contracts guaranteeing a price for its fuel equivalent to $23 per barrel. The savings from its fuel hedge amounted to almost 50% of Southwest's earnings that year, as shown in Figure 30.1. Kelly went on to become Southwest's CEO, and Southwest has continued this strategy to hedge fuel costs. Between 1998 and 2008, Southwest saved $3.5 billion over what it would have spent if it had paid the industry's average price for jet fuel, accounting for 83% of the company's profits during that period.

Of course, like insurance, commodity hedging does not always boost a firm's profits. Had oil prices fallen below $23 per barrel in the fall of 2000, Southwest's hedging policy would have *reduced* the firm's earnings by obligating it to pay $23 per barrel for its oil (and perhaps Kelly might not have gone on to be CEO). Presumably, Southwest felt that it could afford to pay $23 per barrel for oil even if the price fell. In fact, in 2011 and 2012, Southwest and several other airlines posted large hedging losses due to falling oil prices. The long-term contracts stabilized Southwest's earnings at an acceptable level, no matter what happened to oil prices. Figure 30.1 illustrates how hedging stabilizes earnings.

### EXAMPLE 30.4    Hedging with Long-Term Contracts

**Problem**

Consider a chocolate maker that will need 10,000 tons of cocoa beans next year. Suppose the current market price of cocoa beans is $1400 per ton. At this price, the firm expects earnings before interest and taxes of $22 million next year. What will the firm's EBIT be if the price of cocoa beans rises to $1950 per ton? What will EBIT be if the price of cocoa beans falls to $1200 per ton? What will EBIT be in each scenario if the firm enters into a supply contract for cocoa beans for a fixed price of $1450 per ton?

**Solution**

If the price of cocoa beans increases to $1950 per ton, the firm's costs will increase by (1950 − 1400) × 10,000 = $5.5 million. Other things equal, EBIT will decline to $22 million − $5.5 million = $16.5 million. If the price of cocoa beans falls to $1200 per ton, EBIT will rise to $22 million − (1200 − 1400) × 10,000 = $24 million. Alternatively, the firm can avoid this risk by entering into the supply contract that fixes the price in either scenario at $1450 per ton, for an EBIT of $22 million − (1450 − 1400) × 10,000 = $21.5 million.

Often, long-term supply contracts are bilateral contracts negotiated by a buyer and a seller. Such contracts have several potential disadvantages. First, they expose each party to the risk that the other party may default and fail to live up to the terms of the contract. Thus, while they insulate the firms from commodity price risk, they expose them to credit risk. Second, such contracts cannot be entered into anonymously; the buyer and seller know each other's identity. This lack of anonymity may have strategic disadvantages. Finally, the market value of the contract at any point in time may not be easy to determine, making it difficult to track gains and losses, and it may be difficult or even impossible to cancel the contract if necessary.

An alternative strategy that avoids these disadvantages is to hedge with futures contracts. We investigate this strategy in the next section.

## Hedging with Futures Contracts

A commodity futures contract is a type of long-term contract designed to avoid the disadvantages cited above. A **futures contract** is an agreement to trade an asset on some future date, at a price that is locked in today. Futures contracts are traded anonymously on an exchange at a publicly observed market price and are generally very liquid. Both the buyer and the seller can get out of the contract at any time by selling it to a third party at the current market price. Finally, through a mechanism we will describe shortly, futures contracts are designed to eliminate credit risk.

Figure 30.2 shows the prices in September 2012 of futures contracts for light, sweet crude oil traded on the New York Mercantile Exchange (NYMEX). Each contract represents a

---

**FIGURE 30.2**

**Futures Prices for Light, Sweet Crude Oil, September 2012**

Each point represents the futures price per barrel that was available in September 2012 for the delivery of oil in the month indicated. While the spot price of oil was $90 per barrel, the futures contract price for delivery in November 2015 was $87.



commitment to trade 1000 barrels of oil at the futures price on its delivery date. For example, by trading the November 2015 contract, buyers and sellers in September 2012 agreed to exchange 1000 barrels of oil in November 2015 at a price of $87 per barrel. By doing so, they were able to lock in the price they will pay or receive for oil more than three years in advance.

The futures prices shown in Figure 30.2 are not prices that are paid today. Rather, they are prices *agreed to* today, to be paid in the future. The futures prices are determined in the market based on supply and demand for each delivery date. They depend on expectations of future oil prices, adjusted by an appropriate risk premium.[11]

**Eliminating Credit Risk.** If a buyer commits to purchase crude oil in November 2015 for $87 per barrel, how can the seller be assured that the buyer will honor that commitment? If the actual price of oil in November 2015 is only $50 per barrel, the buyer will have a strong incentive to renege and default on the contract. Similarly, the seller will have an incentive to default if the actual price of oil is more than $87 in November 2015.

Futures exchanges use two mechanisms to prevent buyers or sellers from defaulting. First, traders are required to post collateral, called **margin**, when buying or selling commodities using futures contracts. This collateral serves as a guarantee that traders will meet their obligations. In addition, rather than waiting until the end of the contract, there is **daily settlement** of all profits and losses through a procedure called **marking to market**. That is, gains and losses are computed and exchanged each day based on the change in the price of the futures contract.

**Marking to Market: An Example.** Suppose that the price of the November 2015 futures contract varies as shown in Table 30.1 over the 800 remaining trading days between September 2012 and the delivery date in November 2015. A buyer who enters into the

| TABLE 30.1 | **Example of Marking to Market and Daily Settlement for the November 2015 Light, Sweet Crude Oil Futures Contract ($/bbl)** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | September 2012 | | | | | | | | November 2015 |
| **Trading Day** | **0** | **1** | **2** | **3** | **4** | **. . .** | **798** | **799** | **800** |
| Futures price | 87 | 85 | 86 | 84 | 83 | . . . | 62 | 64 | 65 |
| Daily marked to market profit/loss | | −2 | 1 | −2 | −1 | . . . | . . . | 2 | 1 |
| Cumulative profit/loss | | −2 | −1 | −3 | −4 | . . . | −25 | −23 | −22 |

---

[11]If we let $P_t$ be the market price of oil at the time of delivery, and $F_t$ be the futures price agreed to today for delivery on date $t$, then the buyer of a futures contract receives oil worth $P_t$ and pays $F_t$ at delivery, for a net payoff of $P_t - F_t$. The seller's payoff is $F_t - P_t$. We compute the NPV of the contract by discounting the futures price at the risk-free rate (because it is known when we enter the contract) and the expected oil price at a rate $r_p$ that reflects a risk premium for uncertainty regarding the price of oil. Because competition should drive the NPV to zero, we have

$$0 = \frac{E[P_t]}{(1 + r_p)^t} - \frac{F_t}{(1 + r_f)^t} \quad \text{or} \quad F_t = E[P_t]\frac{(1 + r_f)^t}{(1 + r_p)^t}$$

Also, the futures price cannot exceed the cost of storing, or "carrying," oil for the future: $F_t \leq P_0 (1 + r_f)^t + FV(\text{storage costs})$. Otherwise, buying, storing, and selling oil using futures contracts would offer an arbitrage opportunity. (Because the cheapest way to store oil is to leave it in the ground, the futures price is often well below this "cost-of-carry" price. Thus, the relationship between the current price, $P_0$, and the futures price, $F_t$, will depend on oil producers' ability to shift production across time.)

| COMMON MISTAKE | Hedging Risk |
| --- | --- |

There are several common mistakes to be avoided when hedging risk:

**Account for Natural Hedges.** Even though purchases of a commodity may be a firm's largest expense, they may not be a source of risk if the firm can pass along those costs to its customers. For example, gas stations do not need to hedge their cost of oil, because the price of gasoline—and thus their revenues—fluctuate with it. When a firm can pass on cost increases to its customers or revenue decreases to its suppliers, it has a **natural hedge** for these risks. A firm should hedge risks to its profits only after such natural hedges are accounted for, lest it over-hedge and increase risk.

**Liquidity Risk.** When hedging with futures contracts, the firm stabilizes its earnings by offsetting business losses with gains on the futures contracts and by offsetting business gains with losses on the futures contracts. In the latter scenario, the firm runs the risk of receiving margin calls on its futures positions before it realizes the cash flows from the business gains.

To effectively hedge, the firm must have, or be able to raise, the cash required to meet these margin calls or it may be forced to default on its positions. Hence, when hedging with future contracts, the firm is exposed to **liquidity risk**. Such was the case for Metallgesellschaft Refining and Marketing (MGRM), which shut down in 1993 with more than $1 billion in losses in the oil futures market. MGRM had written long-term contracts to supply oil to its customers and hedged its risk that oil prices might rise by buying oil futures. When oil prices subsequently dropped, MGRM faced a cash flow crisis and could not meet the margin calls on its futures positions.

**Basis Risk.** Futures contracts are available only for a set of standardized commodities, with specific delivery dates and locations. Thus, while a futures contract that promises to deliver crude oil in Oklahoma in June 2015 is a reasonable hedge for the cost of jet fuel in Dallas in July 2015, it will not be a perfect match. **Basis risk** is the risk that arises because the value of the futures contract will not be perfectly correlated with the firm's exposure.

---

contract on date 0 has committed to pay the futures price of $87 per barrel for oil. If the next day the futures price is only $85 per barrel, the buyer has a loss of $2 per barrel on her position. This loss is settled immediately by deducting $2 from the buyer's margin account. If the price rises to $86 per barrel on day 2, the gain of $1 is added to the buyer's margin account. This process continues until the contract delivery date, with the daily gains and losses shown. The buyer's cumulative loss is the sum of these daily amounts and always equals the difference between the original contract price of $87 per barrel and the current contract price.

In November 2015, delivery takes place at the final futures price, which is equal to the actual price of oil at that time.[12] In the example in Table 30.1, the buyer ultimately pays $65 per barrel for oil and has lost $22 per barrel in her margin account. Thus, her total cost is $65 + $22 = $87 per barrel, the price for oil she originally committed to. Through this daily marking to market, buyers and sellers pay for any losses as they occur, rather than waiting until the final delivery date. Thus, as long as the margin balance is sufficient to cover the daily variation in price, this mechanism avoids the risk of default.[13]

In essence, the November 2015 futures contract is the same as a long-term supply contract with a set price of $87 per barrel of oil.[14] But unlike a bilateral contract, the buyer and the seller can close their positions at any time (and accept the cumulative losses or gains

---

[12]At its delivery date, a futures contract is a contract for immediate delivery. Thus, by the Law of One Price, its price must be the actual price of oil in the market.

[13]The futures exchange sets a minimum balance for the margin account to be sure it is sufficient to cover one day's loss. If a buyer's remaining margin in the account is too low, the exchange will require the buyer to replenish the account in a margin call. If a buyer fails to do so, the account will be closed and the buyer's contract will be assigned to a new buyer.

[14]Because the daily marked-to-market gains and losses occur over the life of the contract rather than at the end, after we account for interest, the future value of the loss is somewhat higher with a futures contract than with a supply contract. To account for this effect, which can be sizable for a multiyear contract, practitioners generally reduce the magnitude of their initial futures position to reflect the interest earned over the life of the contract. This adjustment is called *tailing the hedge*.

### Differing Hedging Strategies

In mid-2005, oil prices rose to more than $60 per barrel. As a result of its aggressive hedging policy, Southwest Airlines was paying slightly more than $26 per barrel for 85% of its oil at the time. Many of the major U.S. airlines, however, lacked the cash or creditworthiness necessary to enter into long-term contracts. In 2004, Delta was forced to sell its supply contracts to raise cash so as to avoid defaulting on its debt. United Airlines, which filed for bankruptcy protection in December 2002, had only 30% of its fuel hedged in 2005 at a price of $45 per barrel. Researchers have documented these patterns more generally: Risk management drops substantially as airlines approach distress and recovers only slowly afterward.*

These differences in strategy are somewhat understandable given the airlines' differing financial positions.

Southwest was profitable and desired to reduce its risk of becoming financially distressed by hedging its fuel costs. Moreover, it had the collateral necessary to do so. Delta and United were already financially constrained and in financial distress. Hedging would therefore tie up scarce collateral without avoiding distress costs. And for Delta and United's equity holders, taking a risk by not hedging may be the best strategy—a sudden drop in oil prices would lead to a windfall for equity holders, while losses from further increases would likely be borne by debt holders in default.

———————

*A. Rampini, A. Sufi, and S. Viswanathan, "Dynamic Risk Management," http://ssrn.com/abstract=1875051, 2012.

in their margin accounts), and the contract will then be reassigned to a new buyer or seller at its current price. Because of this liquidity and the lack of credit risk, commodity futures contracts are the predominant method by which many firms hedge oil price risk. Similar futures contracts exist for many other commodities, including natural gas, coal, electricity, silver, gold, aluminum, soybeans, corn, wheat, rice, cattle, pork bellies, cocoa, sugar, carbon dioxide emissions, and even frozen orange juice.

### Deciding to Hedge Commodity Price Risk

In a perfect market, commodity supply contracts and futures contracts are zero-NPV investments that do not change the value of the firm. But hedging commodity price risk can benefit the firm by reducing the costs of other frictions. Just as with insurance, the potential benefits include reduced financial distress and issuance costs, tax savings, increased debt capacity, and improved managerial incentives and risk assessment. Commodity futures markets, in particular, provide valuable information to commodity producers and users. For example, an oil firm can lock in the future price of oil before it spends millions of dollars on drilling a new well. A farmer unsure of future crop prices can lock in the futures price of wheat when deciding the quantity to plant.

But while hedging commodity price risk has similar potential benefits as buying insurance, it does not have the same costs. In comparison to the market for hazard insurance, the commodity markets are less vulnerable to the problems of adverse selection and moral hazard. Firms generally do not possess better information than outside investors regarding the risk of future commodity price changes, nor can they influence that risk through their actions. Also, futures contracts are very liquid and do not entail large administrative costs.

Trading in these contracts carries other costs, however. First, as Figure 30.1 illustrates, when a firm hedges, sometimes it will lose money. These losses will be offset by other gains or savings, but the firm must be sure it can weather the losses until it realizes the offsetting gains. Therefore, the firm must have access to capital it can post as collateral until the ultimate delivery date. Second, the firm may speculate by entering into contracts that do not offset its actual risks. Speculating increases the firm's risk rather than reducing it. When a firm authorizes managers to trade contracts to hedge, it opens the door to the possibility of speculation. The firm must guard against the potential to speculate and add risk to the firm through appropriate governance procedures.

CONCEPT CHECK  1. Discuss risk management strategies that firms use to hedge commodity price risk.

2. What are the potential risks associated with hedging using futures contracts?

# 30.3 Exchange Rate Risk

Multinational firms face the risk of exchange rate fluctuations. In this section, we consider two strategies that firms use to hedge this risk: currency forward contracts and currency options.

## Exchange Rate Fluctuations

Recall from Chapter 3 that an exchange rate is the market rate at which one currency can be exchanged for another currency. Consider the relationship between the U.S. dollar and the euro. In April 2008, the value of the euro (€) relative to the dollar peaked at an exchange rate of 0.625 euros per dollar or, equivalently,

$$\frac{1}{€0.625/\$} = \$1.60 \text{ per euro}$$

Like most foreign exchange rates, the dollar/euro rate is a **floating rate**, which means it changes constantly depending on the quantity supplied and demanded for each currency in the market. The supply and demand for each currency is driven by three factors:

- *Firms trading goods*: A U.S. dealer exchanges dollars for euros to buy cars from a German automaker.
- *Investors trading securities*: A Japanese investor exchanges yen for dollars to purchase U.S. bonds.
- *The actions of central banks in each country*: The British central bank may exchange pounds for euros to attempt to keep down the value of the pound.

Because the supply and demand for currencies varies with global economic conditions, exchange rates are volatile. Figure 30.3 shows the dollar price of euros from January 1999 through mid-2012. Notice that the price of the euro often varies by as much as 20% over

FIGURE 30.3

**Dollars per Euro ($/€), 1999–2012**

Note the dramatic changes in the exchange rate over short periods.



periods as short as a few months. From its low in 2000 to the summer of 2008, the value of the euro nearly doubled relative to the dollar, only to fall by close to 20% between August and October in the wake of the financial crisis.

Fluctuating exchange rates cause a problem, known as the *importer–exporter dilemma*, for firms doing business in international markets. To illustrate, consider the problem faced by Manzini Cyclery, a small U.S. maker of custom bicycles. Manzini needs to import parts from an Italian supplier, Campagnolo. If Campagnolo sets the price of its parts in euros, then Manzini faces the risk that the dollar may fall, making euros, and therefore the parts, more expensive. If Campagnolo sets its prices in dollars, then Campagnolo faces the risk that the dollar may fall and it will receive fewer euros for the parts it sells to the U.S. manufacturer.

The problem of exchange rate risk is a general problem in any import–export relationship. If neither company will accept the exchange rate risk, the transaction may be difficult or impossible to negotiate. Example 30.5 demonstrates the potential magnitude of the problem.

| EXAMPLE 30.5 | **The Effect of Exchange Rate Risk** |
|---|---|

**Problem**

In December 2002, when the exchange rate was $1 per euro, Manzini ordered parts for next year's production from Campagnolo. They agreed to a price of 500,000 euros, to be paid when the parts were delivered in one year's time. One year later, the exchange rate was $1.22 per euro. What was the actual cost in dollars for Manzini when the payment was due? If the price had instead been set at $500,000 (which had equivalent value at the time of the agreement), how many euros would Campagnolo have received?

**Solution**

With the price set at 500,000 euros, Manzini had to pay ($1.22/euro) × (500,000 euros) = $610,000. This cost is $110,000, or 22% higher than it would have been if the price had been set in dollars.

If the price had been set in dollars, Manzini would have paid $500,000, which would have been worth only $500,000 ÷ ($1.22/euro) = 409,836 euros to Campagnolo, or more than 18% less. Whether the price was set in euros or dollars, one of the parties would have suffered a substantial loss.

## Hedging with Forward Contracts

Exchange rate risk naturally arises whenever transacting parties use different currencies: One of the parties will be at risk if exchange rates fluctuate. The most common method firms use to reduce the risk that results from changes in exchange rates is to hedge the transaction using currency forward contracts.

A **currency forward contract** is a contract that sets the exchange rate in advance. It is usually written between a firm and a bank, and it fixes a currency exchange rate for a transaction that will occur at a future date. A currency forward contract specifies (1) an exchange rate, (2) an amount of currency to exchange, and (3) a delivery date on which the exchange will take place. The exchange rate set in the contract is referred to as the **forward exchange rate**, because it applies to an exchange that will occur in the future. By entering into a currency forward contract, a firm can lock in an exchange rate in advance and reduce or eliminate its exposure to fluctuations in a currency's value.

| EXAMPLE 30.6 | Using a Forward Contract to Lock In an Exchange Rate |
|---|---|

**Problem**

In December 2002, banks were offering one-year currency forward contracts with a forward exchange rate of $0.987/€. Suppose that at that time, Manzini placed the order with Campagnolo with a price of 500,000 euros and simultaneously entered into a forward contract to purchase 500,000 euros at a forward exchange rate of $0.987/€ in December 2003. What payment would Manzini be required to make in December 2003?

**Solution**

Even though the exchange rate rose to $1.22/€ in December 2003, making the euro more expensive, Manzini would obtain the 500,000 euros using the forward contract at the forward exchange rate of $0.987/€. Thus, Manzini must pay

$$500{,}000 \text{ euros} \times \$0.987/€ = \$493{,}500 \text{ in December } 2003$$

Manzini would pay this amount to the bank in exchange for 500,000 euros, which are then paid to Campagnolo.

This forward contract would have been a good deal for Manzini because without the hedge, it would have had to exchange dollars for euros at the prevailing rate of $1.22/€, raising its cost to $610,000. However, the exchange rate could have moved the other way. If the exchange rate had fallen to $0.85/€, the forward contract still commits Manzini to pay $0.987/€. In other words, the forward contract locks in the exchange rate and eliminates the risk—whether the movement of the exchange rate is favorable or unfavorable.

If the forward contract allows the importer to eliminate the risk of a stronger euro, where does the risk go? At least initially, the risk passes to the bank that has written the forward contract. Because the bank agrees to exchange dollars for euros at a fixed rate, it will experience a loss if the euro increases in value. In Example 30.6, the bank receives only $493,500 in the forward contract, but gives up euros that are worth $610,000.

Why is the bank willing to bear this risk? First, generally the bank is much larger and has more capital than a small importer, so it can bear the risk without being in jeopardy of financial distress. More importantly, in most settings the bank will not even hold the risk. Instead, the bank will find another party willing to trade euros for dollars. By entering into a second forward contract with offsetting risk, the bank can eliminate its risk altogether.

This situation is illustrated in Figure 30.4. A U.S. importer, who must pay for goods with euros, purchases euros from the bank through a forward contract with a forward exchange rate of $0.987 per euro. This transaction locks in the importer's cost at $493,500. Similarly, a U.S. exporter, who will receive payment in euros, uses a forward contract to sell the euros to the bank, locking in the exporter's revenue at $493,500. The bank holds both forward contracts—the first to exchange dollars for euros and the second to exchange euros for dollars. The bank bears no exchange rate risk and earns fees from both the exporter and the importer.

## Cash-and-Carry and the Pricing of Currency Forwards

An alternative method, the cash-and-carry strategy, also enables a firm or bank to eliminate exchange rate risk. Because this strategy provides the same cash flows as the forward contract, we can use it to determine the forward exchange rate using the Law of One Price. Let's begin by considering the different ways investors can exchange foreign currency in the future for dollars in the future.

1002    **Chapter 30** Risk Management



**FIGURE 30.4**

**The Use of Currency Forwards to Eliminate Exchange Rate Risk**

In this example, the U.S. importer and the U.S. exporter both hedge their exchange rate risk by using currency-forward contracts (shown in blue). By writing offsetting contracts, the bank bears no exchange rate risk and earns a fee from each transaction.

**The Law of One Price and the Forward Exchange Rate.** Currency forward contracts allow investors to exchange a foreign currency in the future for dollars in the future at the forward exchange rate. We illustrate such an exchange in the **currency timeline** in Figure 30.5, which indicates time horizontally by dates (as in a standard timeline) and currencies vertically (dollars and euros). Thus, "dollars in one year" corresponds to the upper-right point in the timeline and "euros in one year" corresponds to the lower-right point in the timeline. To convert cash flows between points, we must convert them at an appropriate rate. The forward exchange rate, indicated by $F\$/€$, tells us the rate at which we can exchange euros for dollars in one year using a forward contract.

Figure 30.5 also illustrates other transactions that we can use to move between dates or currencies in the timeline. We can convert euros to dollars today at the current exchange rate, also referred to as the **spot exchange rate**, $S\$/€$. By borrowing or lending at the dollar interest rate $r_\$$, we can exchange dollars today for dollars in one year. Finally, we can convert euros today for euros in one year at the euro interest rate $r_€$, which is the rate at which banks will borrow or lend on euro-denominated accounts.

**FIGURE 30.5**

**Currency Timeline Showing Forward Contract and Cash-and-Carry Strategy**

The cash-and-carry strategy (three transactions in red) replicates the forward contract (in blue) by borrowing in one currency, converting to the other currency at the spot exchange rate, and investing in the new currency.



As Figure 30.5 shows, combining these other transactions provides an alternative way to convert euros to dollars in one year. The **cash-and-carry strategy** consists of the following three simultaneous trades:

1. Borrow euros today using a one-year loan with the interest rate $r_\mathrm{€}$.
2. Exchange the euros for dollars today at the spot exchange rate $S$ \$/€.
3. Invest the dollars today for one year at the interest rate $r_\$$.

In one year's time, we will owe euros (from the loan in transaction 1) and receive dollars (from the investment in transaction 3). That is, we have converted euros in one year to dollars in one year, just as with the forward contract. This method is called a cash-and-carry strategy because we borrow cash that we then carry (invest) in the future.

---

## GLOBAL FINANCIAL CRISIS    Arbitrage in Currency Markets?

Currency markets are amongst the largest and most liquid markets in the world. Consequently, they are one of the last places we would expect to find arbitrage opportunities. Yet, for a short time during the 2008 financial crisis there were arbitrage opportunities in these markets when the cash-and-carry strategy and the forward exchange rate did not provide the same rate of exchange in the forward market. The figure below shows the profits per dollar from borrowing for one month in dollars, converting the proceeds into euros at the spot exchange rate, investing for one month in euros, and simultaneously entering into a forward contract to convert euros back to dollars in a month. Prior to the 2008 crisis, the strategy did not make economically meaningful profits, but during the crisis the strategy appears to have been quite profitable—at the peak generating about $0.25 for each borrowed dollar.

What explains these apparent profits? One possibility is the risk of default. The arbitrage requires borrowing and lending, and during the crisis the risk of default was perceived to be very high. In addition, there is also counterparty risk—the entity on the other side of the forward contract might default on their obligation. Because of the heightened uncertainty during the crisis, investors might very well have viewed this one-month commitment as risky. Hence, the strategy was not really risk free—these "profits" were at least in part compensation for this risk. Finally, T. M. Griffoli and A. Ranaldo[15] provide evidence that liquidity might also have been a contributing factor. U.S. short-term credit markets (including even overnight markets) froze during the crisis, so banks and other traders might have had difficulty taking advantage of the apparent arbitrage opportunity because borrowing dollars was very difficult. In other words, during the financial crisis the natural arbitrageurs in these markets were themselves capital constrained!



*Source*: Adapted from T. Griffoli and A. Ranaldo, "Deviations from covered interest parity during the crisis; a story of funding liquidity constraints," Swiss National Bank, 2009.

---

[15]"Deviations from covered interest parity during the crisis; a story of funding liquidity constraints," Swiss National Bank.

Because the forward contract and the cash-and-carry strategy accomplish the same conversion, by the Law of One Price they must do so at the same rate. Combining the rates used in the cash-and-carry strategy leads to the following no-arbitrage formula for the forward exchange rate:

$$\text{Covered Interest Parity}$$

$$\underbrace{F}_{\substack{\text{\$ in one year} \\ \text{€ in one year}}} = \underbrace{S}_{\substack{\text{\$ today} \\ \text{€ today}}} \times \underbrace{\frac{1 + r_\$}{1 + r_€}}_{\substack{\text{\$ in one year/\$ today} \\ \text{€ in one year/€ today}}} \tag{30.2}$$

Equation 30.2 expresses the forward exchange rate in terms of the spot exchange rate and the interest rates in each currency. Note that on both sides of the equation, the ultimate units are $/€ in one year.

Let's evaluate Eq. 30.2 in an example. In December 2002, the spot exchange rate was $1/€, while one-year interest rates were 1.66% for dollars and 3% for euros. From Eq. 30.2, the no-arbitrage forward exchange rate in December 2002 for an exchange to take place one year later was

$$F = S \times \frac{1 + r_\$}{1 + r_€} = (\$1/€) \times \frac{1.0166}{1.0300} = \$0.987/€$$

which is the rate offered by the bank in Example 30.6.

Equation 30.2 is referred to as the **covered interest parity equation**; it states that the difference between the forward and spot exchange rates is related to the interest rate differential between the currencies. When the interest rate differs across countries, investors have an incentive to borrow in the low-interest rate currency and invest in the high-interest rate currency. Of course, there is always the risk that the high-interest rate currency could depreciate while the investment is held. If you try to avoid this risk by locking in the future exchange rate using a forward contract, Eq. 30.2 implies that the forward exchange rate will exactly offset any benefit from the higher interest rate, eliminating any arbitrage opportunity.

---

**EXAMPLE 30.7**    **Computing the No-Arbitrage Forward Exchange Rate**

**Problem**

Suppose that in December 2015, the spot exchange rate for the Japanese yen is ¥116/$. At the same time, the one-year interest rate in the United States is 4.85% and the one-year interest rate in Japan is 0.10%. Based on these rates, what forward exchange rate is consistent with no arbitrage?

**Solution**

We can compute the forward exchange rate using Eq. 30.2. Because the exchange rate is in terms of ¥/$ rather than $/¥, we also need to invert the interest rates in the formula:

$$F = S\frac{1 + r_¥}{1 + r_\$} = ¥116/\$ \times \frac{1.0010}{1.0485} = ¥110.7/\$ \text{ in one year}$$

(A useful rule to remember is that the ratio of interest rates must match the units of the exchange rate. Because the exchange rate is ¥/$, we multiply by the yen interest rate and divide by the dollar interest rate. Of course, we could also solve the problem by converting all the rates to $/¥.) The forward exchange rate is lower than the spot exchange rate, offsetting the higher interest rate on dollar investments.

**Advantages of Forward Contracts.** Why do firms use forward contracts rather than the cash-and-carry strategy? First, the forward contract is simpler, requiring one transaction rather than three, so it may have lower transaction fees. Second, many firms are not able to borrow easily in different currencies and may pay a higher interest rate if their credit quality is poor. Generally speaking, cash-and-carry strategies are used primarily by large banks, which can borrow most easily and face the lowest transaction costs. Banks use such a strategy to hedge their currency exposures that result from commitments to forward contracts.

---

**EXAMPLE 30.8**

**Using the Cash-and-Carry Strategy**

**Problem**

In December 2015, a Japanese bank enters into a forward contract with Japanese exporter Shimano, in which Shimano agrees to exchange $100 million for yen in December 2016 at the forward exchange rate of ¥110.7/$. If the current exchange rate is ¥116/$, and one-year interest rates are 4.85% in the United States and 0.10% in Japan, how can the bank hedge its risk if it has no other clients interested in currency forward contracts?

**Solution**

The forward contract specifies that Shimano will pay $100 million to the bank in exchange for $100 million × ¥110.7/$ = 11.07 billion yen. To hedge its risk, the bank may find another client or clients who would like to exchange yen for dollars. When no such clients can be found, the bank can still hedge its risk using a cash-and-carry strategy:

1.  Borrow dollars today at the dollar interest rate of 4.85%. The bank can borrow $100 million/1.0485 = $95.37 million today and repay the loan using the cash received from Shimano.

2.  Convert dollars to yen at the spot exchange rate of ¥116/$. The bank can convert the dollars borrowed to $95.37 million × ¥116/$ = ¥11.06 billion.

3.  Invest the yen today at the yen interest rate of 0.10%. By depositing the yen for one year, the bank will have 11.06 billion × 1.001 = ¥11.07 billion in one year.

Through this combination of transactions, the bank can lock in its ability to convert dollars to yen at the rate agreed upon in the forward contract with Shimano.

---

Equation 30.2 easily generalizes to a forward contract longer than one year. Using the same logic, but investing or borrowing for $T$ years rather than one year, the no-arbitrage forward rate for an exchange that will occur $T$ years in the future is

$$F_T = S \times \frac{(1 + r_\$)^T}{(1 + r_€)^T}$$

(30.3)

where the spot and forward rates are in units of $/€ and the interest rates are the current risk-free $T$-year rates from the yield curve for each currency.

## Hedging with Options

*Currency options* are another method that firms commonly use to manage exchange rate risk. Currency options, like the stock options introduced in Chapter 20, give the holder the right—but not the obligation—to exchange currency at a given exchange rate. Currency forward contracts allow firms to lock in a future exchange rate; currency options allow firms to insure themselves against the exchange rate moving beyond a certain level.

1006        **Chapter 30** Risk Management

| TABLE 30.2 | **Cost of Euros ($/€) When Hedging with a Currency Option with a Strike Price of $1.20/€ and an Initial Premium of $0.05/€** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Dec. 2006 Spot Exchange Rate** | **Exercise Option?** | **Exchange Rate Taken** | **+** | **Cost of Option** | **=** | **Total Cost** |
| 1.00 | No | 1.00 | | 0.05 | | 1.05 |
| 1.15 | No | 1.15 | | 0.05 | | 1.20 |
| 1.30 | Yes | 1.20 | | 0.05 | | 1.25 |
| 1.45 | Yes | 1.20 | | 0.05 | | 1.25 |

To demonstrate the difference between hedging with forward contracts and hedging with options, let's examine a specific situation. In December 2005, the one-year forward exchange rate was $1.20 per euro. Instead of locking in this exchange rate using a forward contract, a firm that will need euros in one year can buy a call option on the euro, giving it the right to buy euros at a maximum price.[16] Suppose a one-year European call option on the euro with a strike price of $1.20 per euro trades for $0.05 per euro. That is, for a cost of $0.05 per euro, the firm can buy the right—but not the obligation—to purchase euros for $1.20 per euro in one year's time. By doing so, the firm protects itself against a large increase in the value of the euro, but still benefits if the euro declines.

Table 30.2 shows the outcome from hedging with a call option if the actual exchange rate in one year is one of the values listed in the first column. If the spot exchange rate is less than the $1.20 per euro strike price of the option, the firm will not exercise the option and will convert dollars to euros at the spot exchange rate. If the spot exchange rate is more than $1.20 per euro, the firm will exercise the option and convert dollars to euros at the rate of $1.20 per euro (see the second and third columns). We then add the initial cost of the option (fourth column) to determine the total dollar cost per euro paid by the firm (fifth column).[17]

**FIGURE 30.6**

**Comparison of Hedging the Exchange Rate Using a Forward Contract, an Option, or No Hedge**

The forward hedge locks in an exchange rate and thus eliminates all risk. Not hedging leaves the firm fully exposed. Hedging with an option allows the firm to benefit if the exchange rate falls and protects the firm from a very large increase.



---

[16]Currency options can be purchased over the counter from a bank or on an exchange. The Philadelphia Stock Exchange (PHLX, now part of NASDAQ OMX) is one exchange offering currency options.
[17]In computing the total cost, we have ignored the small amount of interest that could be earned on the option premium.

We plot the data from Table 30.2 in Figure 30.6, where we compare hedging with options to the alternative of hedging with a forward contract or not hedging at all. If the firm does not hedge at all, its cost for euros is simply the spot exchange rate. If the firm hedges with a forward contract, it locks in the cost of euros at the forward exchange rate and the firm's cost is fixed. As Figure 30.6 shows, hedging with options represents a middle ground: The firm puts a *cap* on its potential cost, but will benefit if the euro depreciates in value. (In this case, the actual exchange rate turned out to be $1.30/€ in December 2006, for a total cost of $1.25.)

**Options Versus Forward Contracts.**  Why might a firm choose to hedge with options rather than forward contracts? Many managers want the firm to benefit if the exchange rate moves in their favor, rather than being stuck paying an above-market rate. Firms also prefer options to forward contracts if the transaction they are hedging might not take place. In this case, a forward contract could commit them to making an exchange at an unfavorable rate for currency they do not need, whereas an option allows them to walk away from the exchange.

| EXAMPLE 30.9 | Using Options to Hedge a Conditional Exposure |
| --- | --- |

**Problem**

ICTV is a U.S. company that develops software for cable television networks. Executives at ICTV have just negotiated a £20 million deal with British cable operator Telewest. ICTV will receive the payment in six months' time, after ICTV demonstrates a prototype proving the viability of its technology. If Telewest is not satisfied with the technology, it can cancel the contract at that time and pay nothing. ICTV executives have two major concerns: (1) their engineers may not be able to meet Telewest's technology requirements and (2) even if the deal succeeds, the British pound may fall, reducing the dollar value of the £20 million payment.

Suppose the current exchange rate is $1.752/£, the six-month forward exchange rate is $1.75/£, and a six-month put option on the British pound with a strike price of $1.75/£ is trading for $0.05/£. Compare ICTV's outcomes if it does not hedge, hedges using a forward contract, or hedges using the put option.

**Solution**

First, let's plot ICTV's revenue if it chooses not to hedge (the red lines in the plot):



Suppose ICTV does not hedge, and the British pound falls to $1.50/£. Then, ICTV's dollar revenue from the deal will be only £20 million × $1.50/£ = $30 million. However, if ICTV hedges the £20 million payment using a forward contract, it will be guaranteed revenue of £20 million × $1.75/£ = $35 million if the deal succeeds (the upper blue line). But if Telewest cancels the deal, ICTV will still be obligated by the forward contract to pay the bank £20 million in exchange for $35 million. If the spot exchange rate rises to $2.00/£, then the £20 million will be worth £20 million × $2.00/£ = $40 million, and ICTV will have a loss of 40 − 35 = $5 million on its forward contract (see the lower blue line).

Thus, if ICTV does not hedge or hedges with a forward contract, there are scenarios that lead to large losses. Now consider hedging with the put option. The upfront cost of the put option is £20 million × $0.05/£ = $1 million, and the results of this hedge are plotted as the yellow curves. For example, if the deal succeeds and the pound falls below $1.75/£, ICTV can exercise the put and receive, net of the cost of the put,

£20 million × $1.75/£ − $1 million = $35 million − $1 million = $34 million

(We have ignored the small amount of interest on the cost of the put over six months.) If Telewest cancels the deal and the spot exchange rate rises, ICTV will lose the $1 million cost of the put. In either case, Telewest has limited its potential losses.

**Currency Option Pricing.** In the preceding example, we assumed that ICTV could purchase a currency option at a price of $0.05/£. But how do we determine the price of a currency option? Just as we determined the forward exchange rate by assessing banks' ability to replicate a forward contract using a cash-and-carry strategy, the prices of currency options are determined by identifying banks' ability to replicate them using dynamic trading strategies of the type introduced in Chapter 21 for stock options. In fact, we can apply the same pricing methodologies discussed in Chapter 21, such as the Black-Scholes formula or the binomial model, to currency options. In this case, the underlying asset is the currency, so we use the spot exchange rate in place of the stock price. The foreign interest rate you earn while holding the currency is analogous to the dividend yield for a stock.

Recall that to price a European option on a dividend-paying stock, you simply replace the stock price, $S$, in the Black-Scholes formula with $S^x$, the current value of the stock excluding any dividends paid during the life of the option. In the case of a currency option, we exclude the foreign interest earned, so that if $r_\epsilon$ is the foreign interest rate, then from Eq. 21.11, $S^x = S/(1 + r_\epsilon)^T$. Thus, the price of a European call option on the euro that expires in $T$ years with a strike price of $K$ dollars per euro is[18]

### Price of a Call Option on a Currency

$$C = \frac{S}{(1 + r_\epsilon)^T} N(d_1) - \frac{K}{(1 + r_\$)^T} N(d_2) \tag{30.4}$$

where $N()$ is the normal distribution function and $d_1$ and $d_2$ are calculated using the fact that $S^x/PV(K) = F_T/K$, where $F_T$ is the forward exchange rate from Eq. 30.3:

$$d_1 = \frac{\ln(F_T/K)}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} \quad \text{and} \quad d_2 = d_1 - \sigma\sqrt{T} \tag{30.5}$$

---

[18]This formula for the price of a currency option was first derived by M. Garman and S. Kohlhagen, "Foreign-Currency Option Values," *Journal of International Money and Finance* 2 (1983): 231–237.

We can also use option pricing techniques to estimate the implied volatility of the exchange rate.

---

**EXAMPLE 30.10**

**Implied Volatility of Exchange Rates**

**Problem**

Suppose the current exchange rate is $1.752/£, the interest rate in the United States is 4.25%, the interest rate in the United Kingdom is 4.5%, and a six-month European call option on the British pound with a strike price of $1.75/£ trades for a price of $0.05/£. Use the Black-Scholes formula to determine the implied volatility of the $/£ exchange rate.

**Solution**

We can use Eq. 30.4 and Eq. 30.5 to compute the Black-Scholes price of a call option on the British pound. The inputs are $S =$ spot exchange rate $= 1.752$, $K = 1.75$, $T = 0.5$, $r_\$ = 4.25\%$, and the U.K. interest rate $r_£ = 4.5\%$. The forward exchange rate is $F_{0.5} = 1.752 \times (1.0425)^{1/2}/(1.045)^{1/2} = 1.75$. With a volatility of 10%, we have $d_1 = 0.035$ and $d_2 = -0.035$, with $N(d_1) = 0.514$ and $N(d_2) = 0.486$, so the Black-Scholes value of the call is $.048/£. With a volatility of 11%, the Black-Scholes value is $.055/£. Thus, the implied volatility of the $/£ exchange rate is between 10% and 11% per year.

---

**CONCEPT CHECK**

1. How can firms hedge exchange rate risk?

2. Why may a firm prefer to hedge exchange rate risk with options rather than forward contracts?

# 30.4  Interest Rate Risk

Firms that borrow must pay interest on their debt. An increase in interest rates raises firms' borrowing costs and can reduce their profitability. In addition, many firms have fixed long-term future liabilities, such as capital leases or pension fund liabilities. A decrease in interest rates raises the present value of these liabilities and can lower the value of the firm. Thus, when interest rates are volatile, interest rate risk is a concern for many firms.

In this chapter, we have considered several methods that firms use to manage interest rate risk. Before firms can manage it, however, they must be able to measure it. Thus, we begin by discussing the primary tool used to measure interest rate risk, duration. We will then see how firms can use *duration-hedging* to minimize their interest rate risk.

## Interest Rate Risk Measurement: Duration

In Chapter 6, we informally introduced the notion of a bond's duration as a measure of its sensitivity to interest rate changes. There, we saw that the sensitivity of zero-coupon bonds to interest rates increases with their maturity. For example, for a 10-year, zero-coupon bond, an increase of one percentage point in the yield to maturity from 5% to 6% causes the bond price per $100 face value to fall from

$$\frac{100}{1.05^{10}} = \$61.39 \quad \text{to} \quad \frac{100}{1.06^{10}} = \$55.84$$

or a price change of $(55.84 - 61.39)/61.39 = -9\%$. The price of a five-year bond drops only 4.6% for the same yield change. The interest rate sensitivity of a *single* cash flow is roughly proportional to its maturity. The farther away the cash flow is, the larger the effect of interest rate changes on its present value.

Now consider a bond or portfolio with *multiple* cash flows. How will its value change if interest rates rise? As we saw in Chapter 11, the return of a portfolio is the value-weighted average of the returns of the elements of the portfolio. Because the interest rate sensitivity of a cash flow depends on its maturity, the interest rate sensitivity of a security with multiple cash flows depends on their value-weighted maturity. Thus, we formally define a security's duration as follows:[19]

**Duration of a Security**

$$\text{Duration} = \sum_t \frac{PV(C_t)}{P} \times t \tag{30.6}$$

where $C_t$ is the cash flow on date $t$, $PV(C_t)$ is its present value (evaluated at the bond's yield), and $P = \sum_t PV(C_t)$ is the total present value of the cash flows, which is equal to the bond's current price. Therefore, the duration weights each maturity $t$ by the percentage contribution of its cash flow to the total present value, $PV(C_t)/P$.

---

**EXAMPLE 30.11**

**The Duration of a Coupon Bond**

**Problem**

What is the duration of a 10-year, zero-coupon bond? What is the duration of a 10-year bond with 10% annual coupons trading at par?

**Solution**

For a zero-coupon bond, there is only a single cash flow. Thus, in Eq. 30.6, $PV(C_{10}) = P$ and the duration is equal to the bond's maturity of 10 years.

For the coupon bond, because the bond trades at par, its yield to maturity equals its 10% coupon rate. Table 30.3 shows the calculation of the duration of the bond using Eq. 30.6.

Note that, because the bond pays coupons prior to maturity, its duration is shorter than its 10-year maturity. Moreover, the higher the coupon rate, the more weight is put on these earlier cash flows, shortening the duration of the bond.

---

**TABLE 30.3**    **Computing the Duration of a Coupon Bond**

| $t$(years) | $C_t$ | $PV(C_t)$ | $PV(C_t)/P$ | $[PV(C_t)/P] \times t$ |
|---|---|---|---|---|
| 1 | 10 | 9.09 | 9.09% | 0.09 |
| 2 | 10 | 8.26 | 8.26% | 0.17 |
| 3 | 10 | 7.51 | 7.51% | 0.23 |
| 4 | 10 | 6.83 | 6.83% | 0.27 |
| 5 | 10 | 6.21 | 6.21% | 0.31 |
| 6 | 10 | 5.64 | 5.64% | 0.34 |
| 7 | 10 | 5.13 | 5.13% | 0.36 |
| 8 | 10 | 4.67 | 4.67% | 0.37 |
| 9 | 10 | 4.24 | 4.24% | 0.38 |
| 10 | 110 | 42.41 | 42.41% | 4.24 |
| | | Bond price = 100.00 | 100.00% | Duration = 6.76 yrs |

---

[19]This measure is also called the Macaulay duration.

Just as the interest rate sensitivity of a single cash flow increases with its maturity, the interest rate sensitivity of a stream of cash flows increases with its duration, as shown by the following result:

**Duration and Interest Rate Sensitivity:** *If r, the APR used to discount a stream of cash flows, increases to $r + \varepsilon$, where $\varepsilon$ is a small change, then the present value of the cash flows changes by approximately*[20]

$$\text{Percent Change in Value} \approx -\text{Duration} \times \frac{\varepsilon}{1 + r/k} \qquad (30.7)$$

*where k is the number of compounding periods per year of the APR.*

---

**EXAMPLE 30.12**

**Estimating Interest Rate Sensitivity Using Duration**

**Problem**

Suppose the yield of a 10-year bond with 10% annual coupons increases from 10% to 10.25%. Use duration to estimate the percentage price change. How does it compare to the actual price change?

**Solution**

In Example 30.11, we found that the duration of the bond is 6.76 years. We can use Eq. 30.7 to estimate the percentage price change:

$$\%\text{Price Change} \approx -6.76 \times \frac{0.25\%}{1.10} = -1.54\%$$

Indeed, calculating the bond's price with a 10.25% yield to maturity, we get

$$10 \times \frac{1}{0.1025}\left(1 - \frac{1}{(1.1025)^{10}}\right) + \frac{100}{(1.1025)^{10}} = \$98.48$$

which represents a 1.52% price drop.

---

As we see, we can use duration to measure the interest rate sensitivity of a security or a portfolio. We now consider ways firms can hedge this risk.

### Duration-Based Hedging

A firm's market capitalization is determined by the difference in the market value of its assets and its liabilities. If changes in interest rates affect these values, they will affect the firm's equity value. We can measure a firm's sensitivity to interest rates by computing the duration of its balance sheet. Moreover, by restructuring the balance sheet to reduce its duration, we can hedge the firm's interest rate risk.

---

[20]The term Duration/$(1 + r/k)$ is called the *modified duration*. Thus, Eq. 30.7 can also be written as

$$\% \text{ change in value} \approx -(\text{Modified Duration}) \times \varepsilon$$

To see how Eq. 30.7 is derived, note that the approximate price change for a small change in $r$ is equal to the derivative of the price with respect to $r$:

$$\partial P/\partial r = \sum_t \frac{\partial}{\partial r}\left(\frac{C_t}{(1 + r/k)^{kt}}\right) = \sum_t -\left(\frac{C_t}{(1 + r/k)^{kt+1}}\right)t = -\frac{1}{1 + r/k}\sum_t -PV(C_t)^t$$

Equation 30.7 follows by dividing by $P$ to express the price change in percentage terms.

**Savings and Loans: An Example.** Consider a typical savings and loan (S&L). These institutions hold short-term deposits, in the form of checking and savings accounts, as well as certificates of deposit. They also make long-term loans such as car loans and home mortgages. Most S&Ls face a problem because the duration of the loans they make is generally longer than the duration of their deposits. When the durations of a firm's assets and liabilities are significantly different, the firm has a **duration mismatch**. This mismatch puts the S&L at risk if interest rates change significantly.

As an example, Table 30.4 provides the market-value balance sheet for Acorn Savings and Loan, listing the market value and duration of each asset and liability. What is the combined duration of Acorn's assets and liabilities? The duration of a portfolio of investments is the value-weighted average of the durations of each investment in the portfolio. That is, a portfolio of securities with market values $A$ and $B$ and durations $D_A$ and $D_B$, respectively, has the following duration:

**Duration of a Portfolio**

$$D_{A+B} = \frac{A}{A+B}D_A + \frac{B}{A+B}D_B \tag{30.8}$$

Therefore, the duration of Acorn's assets is

$$D_A = \frac{10}{300} \times 0 + \frac{120}{300} \times 2 + \frac{170}{300} \times 8 = 5.33 \text{ years}$$

Similarly, the duration of Acorn's liabilities is

$$D_L = \frac{120}{285} \times 0 + \frac{90}{285} \times 1 + \frac{75}{285} \times 12 = 3.47 \text{ years}$$

Note the mismatch between Acorn's assets and liabilities. Given their long duration, if interest rates rise, Acorn's assets will fall in value much faster than its liabilities. As a result, the value of equity, which is the difference between assets and liabilities, may drop significantly with a rise in interest rates.

In fact, we can calculate the duration of Acorn's equity by expressing it as a portfolio that is long the assets and short the liabilities:

$$\text{Equity} = \text{Assets} - \text{Liabilities}$$

| TABLE 30.4 | Market-Value Balance Sheet for Acorn Savings and Loan | |
|---|---|---|
| | **Market Value (in $ million)** | **Duration (years)** |
| **Assets** | | |
| Cash Reserves | 10 | 0 |
| Auto Loans | 120 | 2 |
| Mortgages | 170 | 8 |
| Total Assets | 300 | |
| **Liabilities** | | |
| Checking and Savings | 120 | 0 |
| Certificates of Deposit | 90 | 1 |
| Long-Term Financing | 75 | 12 |
| Total Liabilities | 285 | |
| Owner's Equity | 15 | |
| Total Liabilities and Equity | 300 | |

We can then apply Eq. 30.8 to compute the duration of equity:

**Equity Duration**

$$D_E = D_{A-L} = \frac{A}{A-L}D_A - \frac{L}{A-L}D_L$$

$$= \frac{300}{15} \times 5.33 - \frac{285}{15} \times 3.47 = 40.67 \text{ years} \tag{30.9}$$

Therefore, if interest rates rise by 1%, the value of Acorn's equity will fall by about 40%. This decline in the value of equity will occur as a result of the value of Acorn's assets decreasing by approximately $5.33\% \times 300 = \$16$ million, while the value of its liabilities decrease by only $3.47\% \times 285 = \$9.9$ million. Acorn's market value of equity therefore declines by about $16 - 9.9 = \$6.1$ million or $(6.1/15) = 40.67\%$.

How can Acorn reduce its sensitivity to interest rates? To fully protect its equity from an overall increase or decrease in the level of interest rates, Acorn needs an equity duration of zero. A portfolio with a zero duration is called a **duration-neutral portfolio** or an **immunized portfolio**, which means that for small interest rate fluctuations, the value of equity should remain unchanged.

To make its equity duration neutral, Acorn must reduce the duration of its assets or increase the duration of its liabilities. The firm can lower the duration of its assets by selling some of its mortgages in exchange for cash. We compute the amount to sell from the following formula:[21]

$$\text{Amount to Exchange} = \frac{\text{Change in Portfolio Duration} \times \text{Portfolio Value}}{\text{Change in Asset Duration}} \tag{30.10}$$

To reduce its risk from interest rate fluctuations, Acorn would like to reduce the duration of its equity from 40.7 to 0. Because the duration of the mortgages will change from 8 to 0 if the S&L sells the mortgages for cash, Eq. 30.10 implies that Acorn must sell $(40.7 - 0) \times 15/(8 - 0) = \$76.3$ million worth of mortgages. If it does so, the duration of its assets will decline to

$$\underbrace{\frac{10 + 76.3}{300} \times 0}_{\text{Increased cash balance}} + \frac{120}{300} \times 2 + \underbrace{\frac{170 - 76.3}{300} \times 8}_{\text{Decreased mortgage holdings}} = 3.30 \text{ years}$$

Thus, its equity duration will fall to $\frac{300}{15} \times 3.30 - \frac{285}{15} \times 3.47 = 0$, as desired.

Adjusting a portfolio to make its duration neutral is sometimes referred to as **immunizing** the portfolio, a term that indicates it is being protected against interest rate changes. Table 30.5 shows Acorn's market-value balance sheet after immunization. Note that the duration of equity is now zero.

**A Cautionary Note.** While duration matching is a useful method of interest rate risk management, it has some important limitations. First, the duration of a portfolio depends on the current interest rate. As interest rates change, the market values of the

---

[21]To derive Eq. 30.10, let $P$ be the value of the original portfolio and $S$ be the amount of assets sold, and let $D_P$ and $D_S$ be their respective durations. Let $D_B$ be the duration of the new assets bought. Then, new portfolio duration $D_P^*$ is

$$D_P^* = \frac{P}{P}D_P + \frac{S}{P}D_B - \frac{S}{P}D_S$$

Solving for $S$ leads to $S = (D_P - D_P^*)P/(D_S - D_B)$.

| TABLE 30.5 | Market-Value Balance Sheet for Acorn Savings and Loan After Immunization | |
|---|---|---|
| | Market Value (in $ million) | Duration (years) |
| **Assets** | | |
| Cash Reserves | 86.3 | 0 |
| Auto Loans | 120 | 2 |
| Mortgages | 93.7 | 8 |
| Total Assets | 300 | 3.30 |
| **Liabilities** | | |
| Checking and Savings | 120 | 0 |
| Certificates of Deposit | 90 | 1 |
| Long-Term Financing | 75 | 12 |
| Total Liabilities | 285 | 3.47 |
| Owner's Equity | 15 | 0 |
| Total Liabilities and Equity | 300 | 3.30 |

securities and cash flows in the portfolio change as well, which in turn alters the weights used when computing the duration as the value-weighted average maturity. Hence, maintaining a duration-neutral portfolio will require constant adjustment as interest rates change.[22]

The second important limitation is that a duration-neutral portfolio is only protected against interest rate changes that affect *all yields identically*. In other words, it offers protection in the case of parallel up or down movements in the yield curve. If short-term interest rates were to rise while long-term rates remained stable, then short-term securities would fall in value relative to long-term securities, despite their shorter duration. Additional methods (beyond the scope of this text) are required to hedge the risk of such changes in the slope of the yield curve.

Finally, even if assets have similar maturities, if the assets have different credit risks, duration-based hedging will not protect against fluctuations in the relative credit spreads of the assets. For example, during the financial crisis in the fall of 2008, Treasury interest rates fell dramatically, while at the same time the yields of similar maturity corporate bonds increased (e.g., see the Global Financial Crisis box on page 189.)

## Swap-Based Hedging

Acorn Savings and Loan was able to reduce its interest rate sensitivity by selling assets. For most firms, selling assets is not an attractive prospect, as those assets are typically necessary to conduct the firms' normal business operations. Interest rate swaps are an alternative means of modifying the firm's interest rate risk exposure without buying or selling assets. An **interest rate swap** is a contract entered into with a bank, much like a forward contract, in which the firm and the bank agree to exchange the coupons from two different types

---

[22]Another measure of interest rate sensitivity, convexity, provides a measure of the change in duration of a portfolio as interest rates change. For example, see F. Fabozzi, *Duration, Convexity, and Other Bond Risk Measures* (John Wiley & Sons, 1999).

of loans. In this section, we describe interest rate swaps and explore how they are used to manage interest rate risk.[23]

In a standard interest rate swap, one party agrees to pay coupons based on a fixed interest rate in exchange for receiving coupons based on the prevailing market interest rate during each coupon period. An interest rate that adjusts to current market conditions is called a *floating rate*. Thus, the parties exchange a fixed-rate coupon for a floating-rate coupon, which explains why this swap is also called a "fixed-for-floating interest rate swap."

To demonstrate how an interest swap works, consider a five-year, $100 million interest rate swap with a 7.8% fixed rate. Standard swaps have semiannual coupons, so the fixed coupon amounts would be $\frac{1}{2}(7.8\% \times \$100 \text{ million}) = \$3.9$ million every six months. The floating-rate coupons are typically based on a six-month market interest rate, such as the six-month Treasury bill rate or the six-month London Interbank Offered Rate (LIBOR).[24] This rate varies over the life of the contract. Each coupon is calculated based on the six-month interest rate that prevailed in the market six months prior to the coupon payment date. Table 30.6 calculates the cash flows of the swap under a hypothetical scenario for LIBOR rates over the life of the swap. For example, at the first coupon date in six months, the fixed coupon is $3.9 million and the floating-rate coupon is $\frac{1}{2}(6.8\% \times \$10 \text{ million}) = \$3.4$ million, for a net payment of $0.5 million from the fixed- to the floating-rate payer.

Each payment of the swap is equal to the difference between the fixed- and floating-rate coupons. Unlike with an ordinary loan, there is no payment of principal. Because the $100 million swap amount is used only to calculate the coupons but is never actually paid, it is referred to as the **notional principal** of the swap. Finally, there is no initial cash flow associated with the swap. That is, the swap contract—like forward and futures contracts—is typically structured as a "zero-cost" security. The fixed rate of the swap contract is set based on current market conditions so that the swap is a fair deal (i.e., has an NPV of zero) for both sides.

| TABLE 30.6 | Cash Flows (in $ million) for a $100 Million Fixed-for-Floating Interest Rate Swap | | | |
|---|---|---|---|---|
| Year | Six-Month LIBOR | Fixed Coupon | Floating-Rate Coupon | Swap Cash Flow: Fixed–Floating |
| 0.0 | 6.8% | | | 0.0 |
| 0.5 | 7.2% | 3.9 | 3.4 | 0.5 |
| 1.0 | 8.0% | 3.9 | 3.6 | 0.3 |
| 1.5 | 7.4% | 3.9 | 4.0 | −0.1 |
| 2.0 | 7.8% | 3.9 | 3.7 | 0.2 |
| 2.5 | 8.6% | 3.9 | 3.9 | 0.0 |
| 3.0 | 9.0% | 3.9 | 4.3 | −0.4 |
| 3.5 | 9.2% | 3.9 | 4.5 | −0.6 |
| 4.0 | 8.4% | 3.9 | 4.6 | −0.7 |
| 4.5 | 7.6% | 3.9 | 4.2 | −0.3 |
| 5.0 | | 3.9 | 3.8 | 0.1 |

---

[23]Interest rate forward contracts, futures contracts, and options contracts also exist and can be used to manage interest rate risk. Swaps, however, are by far the most common strategy used by corporations.

[24]LIBOR is the rate at which major international banks with offices in London estimate they would be able to borrow in the interbank market. It is a common benchmark interest rate for swaps and other financial agreements. However, charges emerged in 2012 that some banks were skewing their estimates to manipulate LIBOR, prompting calls for its redefinition.

1016        **Chapter 30** Risk Management

### The Savings and Loan Crisis

In the late 1970s, many U.S. savings and loans were in exactly the same position as Acorn. The rates offered on deposits by S&Ls were highly regulated by the government, which encouraged these institutions to use their deposits to make long-term home loans at fixed rates to borrowers. As in our Acorn example, these S&Ls were especially vulnerable to a rise in interest rates.

That increase in rates occurred in the early 1980s, with rates rising from less than 9% to more than 15% in less than one year. As a result, many S&Ls quickly became insolvent, with the value of their liabilities being close to or exceeding the value of their assets.

Most firms in this situation would be unable to raise new funds and would quickly default. However, because their deposits were protected by federal deposit insurance, these insolvent S&Ls were able to attract new depositors to pay off old ones and keep their doors open. Many of them embarked on a strategy of making very risky investments in junk bonds and other securities in hopes of a high return that would reestablish their solvency. (Recall the discussion in Chapter 16 regarding the incentives of equity holders to take excessive risk when the firm is near default.) Most of these risky investments also failed, compounding the S&Ls' problems. By the late 1980s, the U.S. government had to shut down more than 50% of the nation's S&Ls and fulfill its deposit insurance obligations by bailing out S&L depositors at a cost of more than $100 billion to taxpayers.

**Combining Swaps with Standard Loans.** Corporations use interest rate swaps routinely to alter their exposure to interest rate fluctuations. The interest rate a firm pays on its loans can fluctuate for two reasons. First, the risk-free interest rate in the market may change. Second, the firm's credit quality, which determines the spread the firm must pay over the risk-free interest rate, can vary over time. By combining swaps with loans, firms can choose which of these sources of interest rate risk they will tolerate and which they will eliminate. Let's consider a typical example.

Alloy Cutting Corporation (ACC), a manufacturer of machine tools, is in the process of expanding its operations. It needs to borrow $10 million to fund this expansion. Currently, the six-month interest rate (LIBOR) is 4% and the 10-year interest rate is 6%—but these rates are for AA-rated firms. Given ACC's low current credit rating, the bank will charge the firm a spread of 1% above these rates.

ACC's managers are considering whether they should borrow on a short-term basis and then refinance the loan every six months or whether they should borrow using a long-term, 10-year loan. If they borrow for the short term, they worry that if interest rates rise substantially, the higher interest rates they will have to pay when they refinance the debt could lead to financial distress for ACC. They can avoid this risk if they borrow for the long term and lock in the interest rate for 10 years. But long-term borrowing also has a downside. ACC's managers believe that their firm's credit rating will improve over the next few years as the expansion generates additional revenue. If they borrow using a 10-year loan, ACC will be stuck paying a spread based on its current credit quality.

Table 30.7 highlights these trade-offs. Borrowing long term has the advantage of locking in interest rates, but the disadvantage of not allowing ACC to get the benefit of its improving credit quality. Borrowing short term enables ACC to benefit as its credit quality improves, but it risks an increase in interest rates.

In this situation, ACC can use an interest rate swap to combine the best of both strategies. First, ACC can borrow the $10 million it needs for expansion using a short-term loan that is rolled over every six months. The interest rate on each loan will be $\tilde{r}_t + \delta_t$, where $\tilde{r}_t$ is the new (LIBOR) market rate and $\delta_t$ is the spread ACC must pay based on its credit rating at the time. Given ACC's belief that its credit quality will improve over time, $\delta_t$ should decline from its current 1% level.

| TABLE 30.7 | Trade-Offs of Long-Term Versus Short-Term Borrowing for ACC | |
|---|---|---|
| **Strategy** | **Pro** | **Con** |
| Borrow long term at 6% + 1% = 7% fixed rate | Lock in current low interest rates at 6% | Lock in current high spread of 1% given low initial credit rating |
| Borrow short-term at $\tilde{r}_t + \delta_t$ | Get benefit of spread $\delta_t$ falling below 1% as credit rating improves | Risk of an increase in interest rates $\tilde{r}_t$ above 6% |

*Note*: $\tilde{r}_t$ is the six-month interest rate (LIBOR) on date $t$. $\delta_t$ is the spread ACC must pay based on its credit rating on date $t$.

Next, to eliminate the risk of an increase in the interest rate it will pay in the future, $\tilde{r}_t$, ACC can enter into a 10-year interest rate swap in which it agrees to pay a fixed rate of 6% per year in exchange for receiving the floating rate $\tilde{r}_t$.[25] Combining the cash flows from the swap with ACC's short-term borrowing, we can compute ACC's net borrowing cost as follows:

| Short-Term Loan Rate | | Fixed Rate Due on Swap | | Floating Rate Received from Swap | | Net Borrowing Cost |
|---|---|---|---|---|---|---|
| $\tilde{r}_t + \delta_t$ | $+$ | 6% | $-$ | $\tilde{r}_t$ | $=$ | 6% + $\delta_t$ |

That is, ACC will have an initial net borrowing cost of 7% (given its current credit spread of 1%), but this cost will decline in the future as its credit rating improves and the spread $\delta_t$ declines. At the same time, this strategy protects ACC from an increase in interest rates.

---

**EXAMPLE 30.13**     **Using Interest Rate Swaps**

**Problem**

Bolt Industries is facing increased competition and wants to borrow $10 million in cash to protect against future revenue shortfalls. Currently, long-term AA rates are 10%. Bolt can borrow at 10.5% given its credit rating. The company is expecting interest rates to fall over the next few years, so it would prefer to borrow at short-term rates and refinance after rates drop. However, Bolt's management is afraid that its credit rating may deteriorate as competition intensifies, which may greatly increase the spread the firm must pay on a new loan. How can Bolt benefit from declining interest rates without worrying about changes in its credit rating?

**Solution**

Bolt can borrow at the long-term rate of 10.5% and then enter into a swap in which it *receives* a fixed rate of 10% and *pays* the short-term rate $\tilde{r}_t$. Its net borrowing cost will then be

| Long-Term Loan Rate | | Floating Rate Due on Swap | | Floating Rate Received from Swap | | Net Borrowing Cost |
|---|---|---|---|---|---|---|
| 10.5% | $+$ | $\tilde{r}_t$ | $-$ | 10% | $=$ | $\tilde{r}_t + 0.5\%$ |

In this way, Bolt locks in its current credit spread of 0.5% but gets the benefit of lower rates as rates decline.

---

[25]The fixed rate on the swap corresponds to the 10-year market rate for a AA-rated borrower. ACC would be able to get this rate on a swap, even though it is not AA-rated, because there is very little credit risk in a swap (because there is no exchange of the $10 million principal associated with a swap contract). As a result, swap rates are relatively independent of the user's credit quality.

**Using a Swap to Change Duration.** Firms can also use interest rate swaps with duration-hedging strategies. The value of a swap, while initially zero, will fluctuate over time as interest rates change. When interest rates rise, the swap's value will fall for the party receiving the fixed rate; conversely, it will rise for the party paying the fixed rate.

For the party receiving the fixed rate, we can calculate the interest rate sensitivity of a swap by thinking of it as a portfolio that is long a long-term bond and short a short-term bond, each with a face value equal to the notional principal. Thus, a 10-year, $10 million interest swap with a 6% fixed rate is equivalent to a portfolio that is long a 10-year, $10 million bond with a 6% coupon rate, and short a six-month, $10 million bond at the current short-term rate. Likewise, the party paying the fixed rate is short a 10-year bond and long a six-month bond.

A swap contract will therefore alter the duration of a portfolio according to the difference in the duration of the corresponding long-term and short-term bonds. We can apply Eq. 30.10 to compute the notional principal required to achieve a particular change in duration. Used in this way, swaps are a convenient way to alter the duration of a portfolio without buying or selling assets.

| EXAMPLE 30.14 | **Using a Swap to Immunize a Portfolio** |
|---|---|

**Problem**

How can Acorn Savings and Loan use a swap to hedge its interest rate exposure rather than sell its mortgages?

**Solution**

Acorn needs to reduce the duration of its $15 million in equity from 40.7 to 0. To compute the correct notional amount of the swap, we must first compute the duration of a current 10-year bond. Suppose the duration is 6.76. The duration of a six-month bond is 0.5. Then, from Eq. 30.10,

$$N = \frac{40.7 \times 15}{(6.76 - 0.5)} = \$97.5 \text{ million}$$

Acorn should enter into a swap with the notional amount of $97.5 million. Because Acorn would like to reduce the duration of its equity, it should enter into a swap of this size in which it *pays* fixed and *receives* floating interest rates, as this swap will increase in value if interest rates rise, immunizing its balance sheet.

| CONCEPT CHECK | 1. How do we calculate the duration of a portfolio? |
|---|---|
| | 2. How do firms manage interest rate risk? |

**MyFinanceLab**    Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 30.1 Insurance

- Insurance is a common method firms use to reduce risk. In a perfect market, the price of insurance is actuarially fair. An actuarially fair insurance premium is equal to the present value of the expected loss:

$$\frac{\Pr(\text{Loss}) \times E[\text{Payment in the Event of Loss}]}{1 + r_L} \tag{30.1}$$

- Insurance for large risks that cannot be well diversified has a negative beta, which raises its cost.
- The value of insurance comes from its ability to reduce the cost of market imperfections for the firm. Insurance may be beneficial to a firm because of its effects on bankruptcy and financial distress costs, issuance costs, taxes, debt capacity, and risk assessment.
- The costs of insurance include administrative and overhead costs, adverse selection, and moral hazard.

## 30.2 Commodity Price Risk

- Firms use several risk management strategies to hedge their exposure to commodity price movements.
  - Firms can make real investments in assets with offsetting risk using techniques such as vertical integration and storage.
  - Firms can enter into long-term contracts with suppliers or customers to achieve price stability.
  - Firms can hedge risk by trading commodity futures contracts in financial markets.
  - Futures contracts eliminate credit risk of long-term contracts via margin requirements, marking to market, and daily settlement.
  - While futures contracts are liquid and therefore easy to enter into or cancel, they expose the firm to liquidity risk from possible margin calls, as well as basis risk if the hedge is imperfect.

## 30.3 Exchange Rate Risk

- Firms can manage exchange rate risk in financial markets using currency forward contracts to lock in an exchange rate in advance and currency option contracts to protect against an exchange rate moving beyond a certain level.
- The cash-and-carry strategy is an alternative strategy that provides the same cash flows as the currency forward contract. By the Law of One Price, we determine the forward exchange rate by the cost-of-carry formula, called the covered interest parity equation. For an exchange that will take place in $T$ years, the corresponding forward exchange rate (in $\$/\euro$) is:

$$F_T = S \times \frac{(1 + r_\$)^T}{(1 + r_\euro)^T} \tag{30.3}$$

- Currency options allow firms to insure themselves against the exchange rate moving beyond a certain level. A firm may choose to use options rather than forward contracts if
  - It would like to benefit from favorable exchange rate movements but not be obligated to make an exchange at unfavorable rates.
  - There is some chance that the transaction it is hedging will not take place.
- Currency options can be priced (in $\$/\euro$) using the Black-Scholes formula, with the foreign interest rate as a dividend yield:

$$C = \frac{S}{(1 + r_\euro)^T} N(d_1) - \frac{K}{(1 + r_\$)^T} N(d_2) \tag{30.4}$$

where

$$d_1 = \frac{\ln(F_T/K)}{\sigma\sqrt{T}} + \frac{\sigma\sqrt{T}}{2} \text{ and } d_2 = d_1 - \sigma\sqrt{T} \tag{30.5}$$

- Firms face interest rate risk when exchange rates are volatile. The primary tool they use to measure interest rate risk is duration. Duration measures the value-weighted maturity of an asset.

$$\text{Duration} = \sum_t \frac{PV(C_t)}{P} \times t \tag{30.6}$$

### 30.4 Interest Rate Risk

- The interest rate sensitivity of a stream of cash flows increases with its duration. For a small change, $\varepsilon$, in the interest rate, the change in the present value of a stream of cash flows is given by

$$\text{Percent Change in Value} \approx -\text{Duration} \times \frac{\varepsilon}{1 + r/k} \tag{30.7}$$

  where $r$ is the current interest rate, expressed as an APR with $k$ compounding periods per year.

- The duration of a portfolio is equal to the value-weighted average duration of each security in the portfolio. The duration of a firm's equity is determined from the duration of its assets and liabilities:

$$D_E = D_{A-L} = \frac{A}{A - L} D_A - \frac{L}{A - L} D_L \tag{30.9}$$

- Firms manage interest rate risk by buying or selling assets to make their equity duration neutral.
- Interest rate swaps allow firms to separate the risk of interest rate changes from the risk of fluctuations in the firm's credit quality.
  - By borrowing long term and entering into an interest rate swap in which the firm receives a fixed coupon and pays a floating-rate coupon, the firm will pay a floating interest rate plus a spread that is fixed based on its initial credit quality.
  - By borrowing short term and entering into an interest rate swap in which the firm receives a floating-rate coupon and pays a fixed coupon, the firm will pay a fixed interest rate plus a spread that will float with its credit quality.
- Firms use interest rate swaps to modify their interest rate risk exposure without buying or selling assets.

## Key Terms

actuarially fair *p. 987*
basis risk *p. 997*
business interruption insurance *p. 986*
business liability insurance *p. 986*
cash-and-carry strategy *p. 1003*
covered interest parity equation *p. 1004*
currency forward contract *p. 1000*
currency timeline *p. 1002*
daily settlement *p. 996*
deductible *p. 991*
duration mismatch *p. 1012*
duration-neutral portfolio *p. 1013*
floating rate *p. 999*
forward exchange rate *p. 1000*
futures contract *p. 995*

immunized portfolio *p. 1013*
immunizing *p. 1013*
insurance premium *p. 986*
interest rate swap *p. 1015*
key personnel insurance *p. 986*
liquidity risk *p. 997*
margin *p. 996*
marking to market *p. 996*
moral hazard *p. 990*
natural hedge *p. 997*
notional principal *p. 1015*
policy limits *p. 991*
property insurance *p. 986*
spot exchange rate *p. 1002*
vertical integration *p. 993*

## Further Reading

For a discussion of the benefits of insurance and risk management for the corporation, see the following article: D. Mayers and C. Smith, "On the Corporate Demand for Insurance," *Journal of Business* 55(2) (1982): 281–296.

Several textbooks specialize in risk management topics: D. Chance and R. Brooks, *An Introduction to Derivatives and Risk Management* (South-Western College Publishing, 2009); M. Crouhy, D. Galai, and R. Mark, *Risk Management* (McGraw-Hill Professional, 2000); C. Smith, C. Smithson,

and D. Wilford, *Managing Financial Risk* (McGraw-Hill, 1998); and S. Sundaresan, *Fixed Income Markets and Their Derivatives* (Academic Press, 2009).

Other textbooks have an emphasis on international risk management: D. Eiteman, A. Stonehill, and M. Moffett, *Multinational Business Finance* (Prentice Hall, 2012); P. Sercu and R. Uppal, *International Financial Markets and the Firm* (South-Western College Publishing, 1995); and A. Shapiro, *Multinational Financial Management* (John Wiley & Sons, 2009).

For an in-depth treatment of the use of forwards, futures, and options for risk management, see the following text: R. McDonald, *Derivatives Markets* (Pearson, 2012).

These two articles integrate risk management and the overall strategy of the firm: K. Froot, D. Scharfstein, and J. Stein, "A Framework for Risk Management," *Harvard Business Review* 72 (November–December 1994): 59–71; and P. Tufano, "How Financial Engineering Can Advance Corporate Strategy," *Harvard Business Review* (January–February 1996).

Interested readers can look deeper into why firms may want to hedge and how to implement a hedging strategy: K. Brown and D. Smith, "Default Risk and Innovations in the Design of Interest Rate Swaps," *Financial Management* 22(2) (1993): 94–105; P. DeMarzo and D. Duffie, "Corporate Incentives for Hedging and Hedge Accounting," *Review of Financial Studies* 8(3) (1995): 743–771; W. Dolde, "The Trajectory of Corporate Financial Risk Management," *Journal of Applied Corporate Finance* 6(3) (1993): 33–41; K. Froot, D. Scharfstein, and J. Stein, "Risk Management: Coordinating Corporate Investment and Financing Policies," *Journal of Finance* 48(5) (1993): 1629–1658; J. Graham and C. Smith, "Tax Incentives to Hedge," *Journal of Finance* 54(6) (1999): 2241–2262; M. Levi and P. Sercu, "Erroneous and Valid Reasons for Hedging Foreign Exchange Exposure," *Journal of Multinational Financial Management* 1(2) (1991): 25–37; and R. Stulz, "Rethinking Risk Management," *Journal of Applied Corporate Finance* 9(3) (1996): 8–24.

Many articles have been written on what firms actually do to manage their risks and on the impact of risk management on stock returns: G. Allayannis and E. Ofek, "Exchange Rate Exposure, Hedging, and the Use of Foreign Currency Derivatives," *Journal of International Money and Finance* 20 (2001): 273–296; H. Berkman and M. Bradbury, "Empirical Evidence on the Corporate Use of Derivatives," *Financial Management* 25(2) (1996): 5–13; D. Carter, D. Rogers, and B. Simkins, "Hedging and Value in the US Airline Industry," *Journal of Applied Corporate Finance* 18 (2006): 21–33. C. Geczy, B. Minton, and C. Schrand, "Why Firms Use Currency Derivatives," *Journal of Finance* 52(4) (1997): 1323–1354; R. Graham and D. Rogers, "Do Firms Hedge in Response to Tax Incentives?" *Journal of Finance* 58(2) (2002): 815–839; W. Guay and S. Kothari, "How Much Do Firms Hedge with Derivatives?" *Journal of Financial Economics* 70(3) (2003): 423–461; S. Howton and S. Perfect, "Currency and Interest-Rate Derivatives Use in U.S. Firms," *Financial Management* 27(4) (1998): 111–121; J. Koski and J. Pontiff, "How Are Derivatives Used? Evidence from the Mutual Fund Industry," *Journal of Finance* 54(2) (1999): 791–816; S. Mian, "Evidence on Corporate Hedging Policy," *Journal of Financial and Quantitative Analysis* 31(3) (1996): 419–439; D. Nance, C. Smith, and C. Smithson, "On the Determinants of Corporate Hedging," *Journal of Finance* 48(1) (1993): 267–284; A. Rampini, A. Sufi, and S. Viswanathan, "Dynamic Risk Management," http://ssrn.com/abstract=1875051, 2012; and P. Tufano, "The Determinants of Stock Price Exposure: Financial Engineering and the Gold Mining Industry," *Journal of Finance* 53(3) (1998): 1014–1052.

## Problems

*All problems are available in* MyFinanceLab.

### Insurance

1. The William Companies (WMB) owns and operates natural gas pipelines that deliver 12% of the natural gas consumed in the United States. WMB is concerned that a major hurricane could disrupt its Gulfstream pipeline, which runs 691 miles through the Gulf of Mexico. In the event

of a disruption, the firm anticipates a loss of profits of $65 million. Suppose the likelihood of a disruption is 3% per year, and the beta associated with such a loss is −0.25. If the risk-free interest rate is 5% and the expected return of the market is 10%, what is the actuarially fair insurance premium?

2. Genentech's main facility is located in South San Francisco. Suppose that Genentech would experience a direct loss of $450 million in the event of a major earthquake that disrupted its operations. The chance of such an earthquake is 2% per year, with a beta of −0.5.
   a. If the risk-free interest rate is 5% and the expected return of the market is 10%, what is the actuarially fair insurance premium required to cover Genentech's loss?
   b. Suppose the insurance company raises the premium by an additional 15% over the amount calculated in part (a) to cover its administrative and overhead costs. What amount of financial distress or issuance costs would Genentech have to suffer if it were not insured to justify purchasing the insurance?

3. Your firm imports manufactured goods from China. You are worried that U.S.–China trade negotiations could break down next year, leading to a moratorium on imports. In the event of a moratorium, your firm expects its operating profits to decline substantially and its marginal tax rate to fall from its current level of 40% to 10%.

   An insurance firm has agreed to write a trade insurance policy that will pay $500,000 in the event of an import moratorium. The chance of a moratorium is estimated to be 10%, with a beta of −1.5. Suppose the risk-free interest rate is 5% and the expected return of the market is 10%.
   a. What is the actuarially fair premium for this insurance?
   b. What is the NPV of purchasing this insurance for your firm? What is the source of this gain?

4. Your firm faces a 9% chance of a potential loss of $10 million next year. If your firm implements new policies, it can reduce the chance of this loss to 4%, but these new policies have an upfront cost of $100,000. Suppose the beta of the loss is 0, and the risk-free interest rate is 5%.
   a. If the firm is uninsured, what is the NPV of implementing the new policies?
   b. If the firm is fully insured, what is the NPV of implementing the new policies?
   c. Given your answer to part (b), what is the actuarially fair cost of full insurance?
   d. What is the minimum-size deductible that would leave your firm with an incentive to implement the new policies?
   e. What is the actuarially fair price of an insurance policy with the deductible in part (d)?

### Commodity Price Risk

5. BHP Billiton is the world's largest mining firm. BHP expects to produce 2 billion pounds of copper next year, with a production cost of $0.90 per pound.
   a. What will be BHP's operating profit from copper next year if the price of copper is $1.25, $1.50, or $1.75 per pound, and the firm plans to sell all of its copper next year at the going price?
   b. What will be BHP's operating profit from copper next year if the firm enters into a contract to supply copper to end users at an average price of $1.45 per pound?
   c. What will be BHP's operating profit from copper next year if copper prices are described as in part (a), and the firm enters into supply contracts as in part (b) for only 50% of its total output?
   d. Describe situations for which each of the strategies in parts (a), (b), and (c) might be optimal.

 6. Your utility company will need to buy 100,000 barrels of oil in 10 days' time, and it is worried about fuel costs. Suppose you go long 100 oil futures contracts, each for 1000 barrels of oil, at the current futures price of $60 per barrel. Suppose futures prices change each day as follows:



a. What is the mark-to-market profit or loss (in dollars) that you will have on each date?
b. What is your total profit or loss after 10 days? Have you been protected against a rise in oil prices?
c. What is the largest cumulative loss you will experience over the 10-day period? In what case might this be a problem?

7. Suppose Starbucks consumes 100 million pounds of coffee beans per year. As the price of coffee rises, Starbucks expects to pass along 60% of the cost to its customers through higher prices per cup of coffee. To hedge its profits from fluctuations in coffee prices, Starbucks should lock in the price of how many pounds of coffee beans using supply contracts?

## Exchange Rate Risk



8. Your start-up company has negotiated a contract to provide a database installation for a manufacturing company in Poland. That firm has agreed to pay you $100,000 in three months' time when the installation will occur. However, it insists on paying in Polish zloty (PLN). You don't want to lose the deal (the company is your first client!), but are worried about the exchange rate risk. In particular, you are worried the zloty could depreciate relative to the dollar. You contact Fortis Bank in Poland to see if you can lock in an exchange rate for the zloty in advance.
   a. You find the following table posted on the bank's Web site, showing zloty per dollar, per euro, and per British pound:

|  | 1 week | 2 weeks | 1 month | 2 months | 3 months |
|---|---|---|---|---|---|
| | | | USD | | |
| purchase | 3.1433 | 3.1429 | 3.1419 | 3.1390 | 3.1361 |
| sale | 3.1764 | 3.1761 | 3.1755 | 3.1735 | 3.1712 |
| | | | EUR | | |
| purchase | 3.7804 | 3.7814 | 3.7836 | 3.7871 | 3.7906 |
| sale | 3.8214 | 3.8226 | 3.8254 | 3.8298 | 3.8342 |
| | | | GBP | | |
| purchase | 5.5131 | 5.5131 | 5.5112 | 5.5078 | 5.5048 |
| sale | 5.5750 | 5.5750 | 5.5735 | 5.5705 | 5.5681 |

What exchange rate could you lock in for the zloty in three months? How many zloty should you demand in the contract to receive $100,000?

    b. Given the bank forward rates in part (a), were short-term interest rates higher or lower in Poland than in the United States at the time? How did Polish rates compare to euro or pound rates? Explain.

 9. You are a broker for frozen seafood products for Choyce Products. You just signed a deal with a Belgian distributor. Under the terms of the contract, in one year you will deliver 4000 kilograms of frozen king crab for 100,000 euros. Your cost for obtaining the king crab is $110,000. All cash flows occur in exactly one year.

    a. Plot your profits in one year from the contract as a function of the exchange rate in one year, for exchange rates from $0.75/€ to $1.50/€. Label this line "Unhedged Profits."

    b. Suppose the one-year forward exchange rate is $1.25/€, and that you enter into a forward contract to sell the euros you will receive at this rate. In the figure from part (a), plot your combined profits from the crab contract and the forward contract as a function of the exchange rate in one year. Label this line "Forward Hedge."

    c. Suppose that instead of using a forward contract, you consider using options. A one-year call option to buy euros at a strike price of $1.25/€ is trading for $0.10/€. Similarly a one-year put option to sell euros at a strike price of $1.25/€ is trading for $0.10/€. To hedge the risk of your profits, should you buy or sell the call or the put?

    d. In the figure from parts (a) and (b), plot your "all in" profits using the option hedge (combined profits of crab contract, option contract, and option price) as a function of the exchange rate in one year. Label this line "Option Hedge." (*Note*: You can ignore the effect of interest on the option price.)

    e. Suppose that by the end of the year, a trade war erupts, leading to a European embargo on U.S. food products. As a result, your deal is cancelled, and you don't receive the euros or incur the costs of procuring the crab. However, you still have the profits (or losses) associated with your forward or options contract. In a new figure, plot the profits associated with the forward hedge and the options hedge (labeling each line). When there is a risk of cancellation, which type of hedge has the least downside risk? Explain briefly.

10. Suppose the current exchange rate is $1.80/£, the interest rate in the United States is 5.25%, the interest rate in the United Kingdom is 4%, and the volatility of the $/£ exchange rate is 10%. Use the Black-Scholes formula to determine the price of a six-month European call option on the British pound with a strike price of $1.80/£.

### Interest Rate Risk

11. Assume each of the following securities has the same yield-to-maturity: a five-year, zero-coupon bond; a nine-year, zero-coupon bond; a five-year annuity; and a nine-year annuity. Rank these securities from lowest to highest duration.

 12. You have been hired as a risk manager for Acorn Savings and Loan. Currently, Acorn's balance sheet is as follows (in millions of dollars):

| Assets | | Liabilities | |
|---|---|---|---|
| Cash Reserves | 50 | Checking and Savings | 80 |
| Auto Loans | 100 | Certificates of Deposit | 100 |
| Mortgages | 150 | Long-Term Financing | 100 |
| Total Assets | 300 | Total Liabilities | 280 |
| | | Owner's Equity | 20 |
| | | Total Liabilities and Equity | 300 |

When you analyze the duration of loans, you find that the duration of the auto loans is two years, while the mortgages have a duration of seven years. Both the cash reserves and the checking and savings accounts have a zero duration. The CDs have a duration of two years and the long-term financing has a 10-year duration.

a. What is the duration of Acorn's equity?
b. Suppose Acorn experiences a rash of mortgage prepayments, reducing the size of the mortgage portfolio from $150 million to $100 million, and increasing cash reserves to $100 million. What is the duration of Acorn's equity now? If interest rates are currently 4% but fall to 3%, estimate the approximate change in the value of Acorn's equity.
c. Suppose that after the prepayments in part (b), but before a change in interest rates, Acorn considers managing its risk by selling mortgages and/or buying 10-year Treasury STRIPS (zero-coupon bonds). How many should the firm buy or sell to eliminate its current interest rate risk?

 **13.** The Citrix Fund has invested in a portfolio of government bonds that has a current market value of $44.8 million. The duration of this portfolio of bonds is 13.5 years. The fund has borrowed to purchase these bonds, and the current value of its liabilities (i.e., the current value of the bonds it has issued) is $39.2 million. The duration of these liabilities is four years. The equity in the Citrix Fund (or its net worth) is obviously $5.6 million. The market-value balance sheet below summarizes this information:

| Assets | | Liabilities (Debt) and Equity | |
|---|---|---|---|
| Portfolio of Government Bonds (duration = 13.5) | $44,800,000 | Short- and Long-Term Debt (duration = 4.0) | $39,200,000 |
| | | Equity | $5,600,000 |
| Total | $44,800,000 | Total | $44,800,000 |

Assume that the current yield curve is flat at 5.5%. You have been hired by the board of directors to evaluate the risk of this fund.
a. Consider the effect of a surprise increase in interest rates, such that the yields rise by 50 basis points (i.e., the yield curve is now flat at 6%). What would happen to the value of the assets in the Citrix Fund? What would happen to the value of the liabilities? What can you conclude about the change in the value of the equity under these conditions?
b. What is the initial duration of the Citrix Fund (i.e., the duration of the equity)?
c. As a result of your analysis, the board of directors fires the current manager of the fund. You are hired and given the objective of minimizing the fund's exposure to interest rate fluctuations. You are instructed to do so by liquidating a portion of the fund's assets and reinvesting the proceeds in short-term Treasury bills and notes with an average duration of two years. How many dollars do you need to liquidate and reinvest to minimize the fund's interest rate sensitivity?
d. Rather than immunizing the fund using the strategy in part (c), you consider using a swap contract. If the duration of a 10-year, fixed-coupon bond is seven years, what is the notational amount of the swap you should enter into? Should you receive or pay the fixed-rate portion of the swap?

**14.** Your firm needs to raise $100 million in funds. You can borrow short term at a spread of 1% over LIBOR. Alternatively, you can issue 10-year, fixed-rate bonds at a spread of 2.50% over 10-year Treasuries, which currently yield 7.60%. Current 10-year interest rate swaps are quoted at the LIBOR rate versus the 8% fixed rate.

Management believes that the firm is currently "underrated" and that its credit rating is likely to improve in the next year or two. Nevertheless, the managers are not comfortable with the interest rate risk associated with using short-term debt.
a. Suggest a strategy for borrowing the $100 million. What is your effective borrowing rate?
b. Suppose the firm's credit rating does improve three years later. It can now borrow at a spread of 0.50% over Treasuries, which now yield 9.10% for a seven-year maturity. Also, seven-year interest rate swaps are quoted at LIBOR versus 9.50%. How would you lock in your new credit quality for the next seven years? What is your effective borrowing rate now?

**CHAPTER**

# 31

# International Corporate Finance

## NOTATION

| | |
|---|---|
| $C_{FC}$ | foreign currency cash flow |
| $S$ | spot exchange rate |
| $F$ | forward exchange rate |
| $r_\$^*$ | dollar cost of capital |
| $r_\$$ | dollar risk-free interest rate |
| $r_{FC}^*$ | foreign currency cost of capital |
| $r_{FC}$ | foreign currency risk-free interest rate |
| $r_{wacc}$ | weighted average cost of capital |
| $D$ | market value of debt |
| $E$ | market value of equity |
| $r_E$ | required return on equity |
| $r_D$ | required return on debt |
| $\tau_C$ | corporate tax rate |

**I**N THE 1990s, STARBUCKS COFFEE COMPANY IDENTIFIED JAPAN as a potentially lucrative new market for its coffee products and decided to invest as much as $10 million in fiscal year 1996 to begin operations there. Because Starbucks realized it needed specialized knowledge of the Japanese market, it established a joint venture with Sazaby, Inc., a Japanese retailer and restaurateur. This venture, called Starbucks Coffee Japan Ltd., intended to open as many as 12 stores in this initial phase. Although stores opened more slowly than expected, the venture had more than 200 stores and sales of ¥29 billion ($252 million) by 2001, and it opened its 500th store in November 2003. To finance this growth, Starbucks Coffee Japan Ltd. used the Japanese capital markets. It held an initial public offering of shares on the Osaka Stock Exchange in October 2001 with a market capitalization of ¥90.88 billion ($756 million), raising ¥18.8 billion ($156 million) in additional capital for expansion. As of 2012, Starbucks had nearly 1000 stores in Japan. How did Starbucks' managers decide to undertake this investment opportunity? Why did they decide to use the Japanese domestic market to finance it rather than U.S. markets?

This chapter focuses on some of the factors a firm faces when making a foreign investment that it does not encounter when making a domestic investment. There are three key issues that arise when considering an investment in a foreign project like Starbucks Coffee Japan Ltd.:

- The project will most likely generate foreign currency cash flows, although the firm cares about the home currency value of the project.

- Interest rates and costs of capital will likely be different in the foreign country as a result of the macroeconomic environment.

- The firm will probably face a different tax rate in the foreign country and will be subject to both foreign and domestic tax codes.

As a first step toward evaluating foreign projects, this chapter discusses international capital markets. We begin by examining internationally integrated capital markets, which provide a useful benchmark for comparing different methods of valuing a foreign project. We next explain how to value a foreign project and address the three key issues mentioned above. We then value foreign currency cash flows using two valuation methodologies and consider the implications of foreign and domestic tax codes. Finally, we explore the implications of internationally segmented capital markets.

## 31.1 Internationally Integrated Capital Markets

We begin our examination of valuing foreign projects by developing a conceptual benchmark based on the integration of capital markets across currencies and borders. In this framework, capital markets are internationally integrated when the value of a foreign investment does not depend on the currency (home or foreign) we use in the analysis.

Consider a risky foreign asset that is expected to pay the cash flow, $C_{FC}$, in one period. In a normal market, the price of this asset in a foreign market is the present value of this cash flow using the cost of capital of a local investor:

$$C_{FC}/(1 + r^*_{FC}) \qquad (31.1)$$

A U.S. investor who wants to purchase this asset in dollars will have to pay

$$S \times \frac{C_{FC}}{(1 + r^*_{FC})} \qquad (31.2)$$

where $S$ is the current spot exchange rate in dollars per foreign currency. Now any U.S. investor who actually purchased this security would have to convert the future cash flow into dollars, so the payoff to such an investor is the dollar cash flow it produces. To value this cash flow, assume that the U.S. investor contracts today to convert the *expected* cash flow in one period at the forward rate, $F$, quoted as dollars per foreign currency. If we assume that spot exchange rates and the foreign currency cash flows of the security are uncorrelated, then this U.S. investor's expected dollar cash flow is $F \times C_{FC}$.[1] If $r^*_\$$ is the appropriate cost of capital from the standpoint of a U.S. investor, the present value of this expected cash flow is

$$\frac{F \times C_{FC}}{(1 + r^*_\$)} \qquad (31.3)$$

By the Law of One Price, this value must be equal to what the U.S. investor paid for the security:

$$S \times \frac{C_{FC}}{(1 + r^*_{FC})} = \frac{F \times C_{FC}}{(1 + r^*_\$)}$$

---

[1]The actual cash flow in foreign currency will be $C_{FC} + \varepsilon$ where $\varepsilon$ is the uncertainty in the cash flow and has an expected value of zero. In U.S. dollars, this cash flow is $F \times C_{FC} + S_1 \times \varepsilon$ because the forward contract is only for the amount $C_{FC}$; the rest must be converted at the prevailing spot rate in one period, $S_1$. Then, because spot rates are uncorrelated with the project cash flows, $E[S_1 \times \varepsilon] = E[S_1] \times E[\varepsilon] = E[S_1] \times 0 = 0$.

Rearranging terms gives

$$F = \frac{(1 + r_\$^*)}{(1 + r_{FC}^*)} S \tag{31.4}$$

This condition ought to look familiar from Chapter 30, because Eq. 31.4 is simply covered interest parity, here derived for risky rather than riskless discount rates.

At this point, it is worth taking a step back and considering the assumptions specific to the international context that we needed to derive Eq. 31.4. Recall from Chapter 3 that in a normal market, prices are competitive. In this context, this concept means, among other things, that any investor can exchange either currency in any amount at the spot rate or forward rates, and is free to purchase or sell any security in any amount in either country at their current market prices. Under these conditions, which we term **internationally integrated capital markets**, the value of an investment does not depend on the currency we use in the analysis.

| EXAMPLE 31.1 | **Present Values and Internationally Integrated Capital Markets** |
|---|---|

**Problem**

You are an American who is trying to calculate the present value of a ¥10 million cash flow that will occur one year in the future. You know that the spot exchange rate is $S = ¥110/\$$ and the one-year forward rate is $F = ¥105.8095/\$$. You also know that the appropriate dollar cost of capital for this cash flow is $r_\$^* = 5\%$ and that the appropriate yen cost of capital for this cash flow is $r^* = 1\%$. What is the present value of the ¥10 million cash flow from the standpoint of a Japanese investor, and what is the dollar equivalent of this amount? What is the present value of the ¥10 million cash flow from the standpoint of a U.S. investor who first converts the ¥10 million into dollars, and then applies the dollar discount rate?

**Solution**

The present value of the yen cash flow is ¥10,000,000/(1.01) = ¥9,900,990, and the dollar equivalent is ¥9,900,990/(110 ¥/$) = $90,009. (Note that we adjusted the formula in Eq. 31.2 because the exchange rate is expressed as yen per dollar rather than dollars per yen.) The present value from the standpoint of a U.S. investor who first converts the ¥10 million into dollars using the forward rate and then applies the dollar cost of capital is (¥10,000,000 ÷ 105.8095 ¥/$)/1.05 = $90,009. (Again, we have adjusted the formula in Eq. 31.3 because the exchange rate is expressed as yen per dollar.) Because the U.S. and Japanese capital markets are internationally integrated, both methods produce the same result.

| CONCEPT CHECK | 1. What assumptions are necessary for internationally integrated capital markets? |
|---|---|
| | 2. What implication do internationally integrated capital markets have for the value of the same asset in different countries? |

## 31.2 Valuation of Foreign Currency Cash Flows

The most obvious difference between a domestic project and a foreign project is that the foreign project will most likely generate cash flows in a foreign currency. If the foreign project is owned by a domestic corporation, managers and shareholders need to determine the home currency value of the foreign currency cash flows.

In an internationally integrated capital market, two equivalent methods are available for calculating the NPV of a foreign project: Either we can calculate the NPV in the foreign

country and convert it to the local currency at the spot rate, or we can convert the cash flows of the foreign project into the local currency and then calculate the NPV of these cash flows. The first method is essentially what we have done throughout this book (calculating the NPV of a project in a single currency) with the added step at the end of converting the NPV into the local currency using spot rates. Because this method should be familiar to you at this stage, we will concentrate on the second method.

## WACC Valuation Method in Domestic Currency

The second valuation method requires converting the expected dollar value of the foreign currency cash flows and then proceeding to value the project as if it were a domestic project.

**Application: Ityesi, Inc.** Ityesi, Inc., a manufacturer of custom packaging products headquartered in the United States, wants to apply the weighted average cost of capital (WACC) technique to value a project in the United Kingdom. Ityesi is considering introducing a new line of packaging in the United Kingdom that will be its first foreign project. The project will be completely self-contained within the United Kingdom, such that all revenues are generated and all costs are incurred there.

Engineers expect the technology used in the new products to be obsolete after four years. The marketing group expects annual sales of £37.5 million per year for this product line. Manufacturing costs and operating expenses are expected to total £15.625 million and £5.625 million per year, respectively. Developing the product will require an upfront investment of £15 million in capital equipment that will be obsolete in four years, and an initial marketing expense of £4.167 million. Ityesi pays a corporate tax rate of 40% regardless of where it manufactures its products. The expected pound free cash flows of the proposed project are projected in the spreadsheet in Table 31.1.

Ityesi's managers have determined that there is no correlation between the uncertainty in these cash flows and the uncertainty in the spot dollar-pound exchange rate. As we explained in the last section, under this condition, the expected value of the future cash flows in dollars is the expected value in pounds multiplied by the forward exchange rate. Obtaining forward rate quotes for as long as four years in the future is difficult, so

| TABLE 31.1 SPREADSHEET | **Expected Foreign Free Cash Flows from Ityesi's U.K. Project** | | | | |
|---|---|---|---|---|---|
| **Year** | **0** | **1** | **2** | **3** | **4** |
| **Incremental Earnings Forecast (£ millions)** | | | | | |
| 1  Sales | — | 37.500 | 37.500 | 37.500 | 37.500 |
| 2  Cost of Goods Sold | — | (15.625) | (15.625) | (15.625) | (15.625) |
| 3  **Gross Profit** | — | 21.875 | 21.875 | 21.875 | 21.875 |
| 4  Operating Expenses | (4.167) | (5.625) | (5.625) | (5.625) | (5.625) |
| 5  Depreciation | — | (3.750) | (3.750) | (3.750) | (3.750) |
| 6  **EBIT** | (4.167) | 12.500 | 12.500 | 12.500 | 12.500 |
| 7  Income tax at 40% | 1.667 | (5.000) | (5.000) | (5.000) | (5.000) |
| 8  **Unlevered Net Income** | (2.500) | 7.500 | 7.500 | 7.500 | 7.500 |
| **Free Cash Flow** | | | | | |
| 9  Plus: Depreciation | — | 3.750 | 3.750 | 3.750 | 3.750 |
| 10  Less: Capital Expenditures | (15.000) | — | — | — | — |
| 11  Less: Increases in NWC | — | — | — | — | — |
| 12  **Pound Free Cash Flow** | (17.500) | 11.250 | 11.250 | 11.250 | 11.250 |

Ityesi's managers have decided to use the covered interest rate parity formula (Eq. 30.3 in Chapter 30) to compute the forward rates.

**Forward Exchange Rates.** The current spot exchange rate, $S$, is \$1.60/£. Suppose that the yield curve in both countries is flat: The risk-free rate on dollars, $r_\$$, is 4%, and the risk-free interest rate on pounds, $r_£$, is 7%. Using the covered interest parity condition for a multi-year forward exchange rate (Eq. 30.3):

$$F_1 = S \times \frac{(1 + r_\$)}{(1 + r_£)} = (\$1.60/£)\frac{(1.04)}{(1.07)} = \$1.5551/£$$

$$F_2 = S \times \frac{(1 + r_\$)^2}{(1 + r_£)^2} = (\$1.60/£)\frac{(1.04)^2}{(1.07)^2} = \$1.5115/£$$

$$F_3 = S \times \frac{(1 + r_\$)^3}{(1 + r_£)^3} = (\$1.60/£)\frac{(1.04)^3}{(1.07)^3} = \$1.4692/£$$

$$F_4 = S \times \frac{(1 + r_\$)^4}{(1 + r_£)^4} = (\$1.60/£)\frac{(1.04)^4}{(1.07)^4} = \$1.4280/£$$

**Free Cash Flow Conversion.** Using these forward exchange rates, we can now calculate the expected free cash flows in dollars by multiplying the expected cash flows in pounds by the forward exchange rate, as shown in the spreadsheet in Table 31.2.

**The Value of Ityesi's Foreign Project with WACC.** With the cash flows of the U.K. project now expressed in dollars, we can value the foreign project as if it were a domestic U.S. project. We proceed, as we did in Chapter 18, under the assumption that the market risk of the U.K. project is similar to that of the company as a whole. As a consequence, we can use Ityesi's costs of equity and debt in the United States to calculate the WACC.[2]

Ityesi has built up \$20 million in cash for investment needs and has debt of \$320 million, so its net debt is $D = 320 - 20 = \$300$ million. This amount is equal to the market value of its equity, implying a (net) debt-equity ratio of 1. Ityesi intends to maintain a similar (net) debt-equity ratio for the foreseeable future. The WACC thus assigns equal weights to equity and debt (Table 31.3).

| TABLE 31.2 SPREADSHEET | Expected Dollar Free Cash Flows from Ityesi's U.K. Project | | | | |
|---|---|---|---|---|---|
| | **0** | **1** | **2** | **3** | **4** |
| **Dollar Free Cash Flow (\$ millions)** | | | | | |
| 1   Pound FCF (£ millions) | (17.500) | 11.250 | 11.250 | 11.250 | 11.250 |
| 2   Forward Exchange Rate (\$/£) | 1.600 | 1.555 | 1.512 | 1.469 | 1.428 |
| 3   **Dollar Value of Pound FCF** (1 × 2) | (28.000) | 17.495 | 17.004 | 16.528 | 16.065 |

[2]The risk of the foreign project is unlikely to be *exactly* the same as the risk of domestic projects (or the firm as a whole), because it may be exposed to foreign economic and exchange rate risk factors. Ityesi's managers have assessed these additional risks to be small, and so for practical purposes have chosen to ignore it. Alternatively, one could estimate a domestic cost of capital for the project based on return data for a foreign firm in the same industry with stock that is traded on the U.S. market.

| TABLE 31.3 | Ityesi's Current Market Value Balance Sheet ($ million) and Cost of Capital without the U.K. Project | | | | |
|---|---|---|---|---|---|
| **Assets** | | **Liabilities** | | **Cost of Capital** | |
| Cash | 20 | Debt | 320 | Debt | 6% |
| Existing Assets | 600 | Equity | 300 | Equity | 10% |
| | 620 | | 620 | | |

With Ityesi's cost of equity at 10% and its cost of debt at 6%, we calculate Ityesi's WACC as follows:

$$r_{wacc} = \frac{E}{E+D}r_E + \frac{D}{E+D}r_D(1-\tau_C)$$

$$= (0.5)(10.0\%) + (0.5)(6.0\%)(1-40\%) = 6.8\%$$

We can now determine the value of the foreign project, including the tax shield from debt, by calculating the present value of the future free cash flows using the WACC:

$$\frac{17.495}{1.068} + \frac{17.004}{1.068^2} + \frac{16.528}{1.068^3} + \frac{16.065}{1.068^4} = \$57.20 \text{ million}$$

Because the up-front cost of launching the product line in dollars is only $28 million, the net present value is $57.20 - 28 = \$29.20$ million. Thus, Ityesi should undertake the U.K. project.

## Using the Law of One Price as a Robustness Check

To arrive at the NPV of Ityesi's project requires making a number of assumptions—for example, that international markets are integrated, and that the exchange rate and the cash flows of the project are uncorrelated. The managers of Ityesi will naturally worry about whether these assumptions are justified. Luckily, there is a way to check the analysis.

Recall that there are two ways to compute the NPV of the foreign project. Ityesi could just have easily computed the foreign NPV by discounting the foreign cash flows at the foreign cost of capital and converting this result to a domestic NPV using the spot rate. Except for the last step, this method requires doing the same calculation we have performed throughout this book—that is, calculate the NPV of a (domestic) project. Determining the NPV requires knowing the cost of capital—in this case, the cost of capital for an investment in the United Kingdom. Recall that to estimate this cost of capital we use return data for publicly traded single-product companies—in this case, U.K. firms. For this method to provide the same answer as the alternative method, the estimate for the foreign cost of capital, $r_£^*$, must satisfy the Law of One Price, which from Eq. 31.4 implies:

$$(1 + r_£^*) = \frac{S}{F}(1 + r_\$^*) \qquad (31.5)$$

If it does not, then Ityesi's managers should be concerned that the simplifying assumptions in their analysis are not valid: Either there are market frictions that prevent integration, or there is a significant correlation between the project's cash flows and the exchange rate.

We can further interpret Eq. 31.5 by using the covered interest rate parity relation derived in Chapter 30 (Eq. 30.3):

$$\frac{S}{F} = \frac{1 + r_£}{1 + r_\$} \tag{31.6}$$

where $r_£$ and $r_\$$ are the foreign and domestic risk-free interest rates, respectively. Combining Eq. 31.5 and Eq. 31.6 and rearranging terms gives the foreign cost of capital in terms of the domestic cost of capital and interest rates:

**The Foreign-Denominated Cost of Capital**

$$r_£^* = \frac{1 + r_£}{1 + r_\$}(1 + r_\$^*) - 1$$

$$\approx r_£ + (r_\$^* - r_\$) \tag{31.7}$$

In other words, the foreign risk premium is approximately equal to the domestic risk premium, so the foreign cost of capital is roughly equal to the foreign risk-free rate plus the domestic risk premium. If the simplifying assumptions Ityesi made in calculating the NPV of its U.K. project are valid, then the cost of capital estimate calculated using Eq. 31.7 will be close to the cost of capital estimate calculated directly using comparable single-product companies in the United Kingdom.

---

**EXAMPLE 31.2**

**Internationalizing the Cost of Capital**

**Problem**

Use the Law of One Price to infer the pound WACC from Ityesi's dollar WACC. Verify that the NPV of Ityesi's project is the same when its pound free cash flows are discounted at this WACC and converted at the spot rate.

**Solution**

Using Eq. 31.7 to compute the pound WACC gives

$$r_£^* = \frac{1 + r_£}{1 + r_\$}(1 - r_\$^*) - 1\left(\frac{1.07}{1.04}\right)(1.068) - 1 = 0.0988$$

The pound WACC is 9.88%.

We can now use Ityesi's pound WACC to calculate the present value of the pound free cash flows in Table 31.3:

$$\frac{11.25}{1.0988} + \frac{11.25}{1.0988^2} + \frac{11.25}{1.0988^3} + \frac{11.25}{1.0988^4} = £35.75 \text{ million}$$

The NPV in pounds of the investment opportunity is $35.75 - 17.5 = £18.25$ million. Converting this amount to dollars at the spot rate gives £18.25 million $\times 1.6\$/£ = \$29.20$ million, which is exactly the NPV we calculated before.

---

**CONCEPT CHECK**   1. Explain two methods we use to calculate the NPV of a foreign project.

2. When do these two methods give the same NPV of the foreign project?

## 31.3 Valuation and International Taxation

In this chapter, we assume that Ityesi pays a corporate tax rate of 40% no matter where its earnings are generated. In practice, determining the corporate tax rate on foreign income is complicated because corporate income taxes must be paid to two national governments:

the host government (the United Kingdom in this example) and the home government (the United States). If the foreign project is a separately incorporated subsidiary of the parent, the amount of taxes a firm pays generally depends on the amount of profits **repatriated** (brought back to the home country).

### Single Foreign Project with Immediate Repatriation of Earnings

We begin by assuming that the firm has a single foreign project and that all foreign profits are repatriated immediately. The general international arrangement prevailing with respect to taxation of corporate profits is that the host country gets the first opportunity to tax income produced within its borders. The home government then gets an opportunity to tax the income from a foreign project to the domestic firm. In particular, the home government must establish a tax policy specifying its treatment of foreign income and foreign taxes paid on that income. In addition, it needs to establish the timing of taxation.

U.S. tax policy requires U.S. corporations to pay taxes on their foreign income at the same rate as profits earned in the United States. However, a full tax credit is given for foreign taxes paid *up to* the amount of the U.S. tax liability. In other words, if the foreign tax rate is less than the U.S. tax rate, the company pays total taxes equal to the U.S. tax rate on its foreign earnings. In this case, all of the company's earnings are taxed at the same rate no matter where they are earned—the working assumption we used for Ityesi.

If the foreign tax rate exceeds the U.S. tax rate, companies must pay this higher rate on foreign earnings. Because the U.S. tax credit exceeds the amount of U.S. taxes owed, no tax is owed in the United States. Note that U.S. tax policy does not allow companies to apply the part of the tax credit that is not used to offset domestic taxes owed, so this extra tax credit is wasted. In this scenario, companies pay a higher tax rate on foreign income and a lower (U.S.) tax rate on income generated in the United States.

### Multiple Foreign Projects and Deferral of Earnings Repatriation

Thus far, we have assumed that the firm has only one foreign project and that it repatriates earnings immediately. Neither assumption is realistic. Firms can lower their taxes by pooling multiple foreign projects and deferring the repatriation of earnings. Let's begin by considering the benefits of pooling the income on all foreign projects.

**Pooling Multiple Foreign Projects.**  Under U.S. tax law, multinational corporations may use any excess tax credits generated in high-tax foreign countries to offset their net U.S. tax liabilities on earnings in low-tax foreign countries. Thus, if the U.S. tax rate exceeds the combined tax rate on all foreign income, it is valid to assume that the firm pays the same tax rate on all income no matter where it is earned. Otherwise, the firm must pay a higher tax rate on its foreign income.

**Deferring Repatriation of Earnings.**  Now consider an opportunity to defer repatriation of foreign profits. This consideration is important because U.S. tax liability is not incurred until the profits are brought back home, if the foreign operation is set up as a separately incorporated subsidiary (rather than as a foreign branch). If a company chooses not to repatriate £12.5 million in pre-tax earnings, for example, it effectively reinvests those earnings abroad and defers its U.S. tax liability. When the foreign tax rates exceed the U.S. tax rates, there are no benefits to deferral because in such a case there is no additional U.S. tax liability.

When the foreign tax rate is less than the U.S. tax rate, deferral can provide significant benefits. Deferring repatriation of earnings lowers the overall tax burden in much the same

way as deferring capital gains lowers the tax burden imposed by the capital gains tax. Other benefits from deferral arise because the firm effectively gains a real option to repatriate income at times when repatriation might be cheaper. For example, we have already noted that by pooling foreign income, the firm effectively pays the combined tax rate on all foreign income. Because the income generated across countries changes, this combined tax rate will vary from year to year. In years in which it exceeds the U.S. tax rate, the repatriation of additional income does not incur an additional U.S. tax liability, so the earnings can be repatriated tax-free. In addition, there have been occasions in the past when the U.S. Congress has granted a "tax holiday," allowing firms to repatriate funds at a temporarily reduced tax rate. (For example, the American Jobs Creation Act passed in 2004 allowed firms to repatriate funds at a 5.25% tax rate rather than the standard 35% corporate tax rate.)

This tax treatment leads many U.S. firms with significant profits abroad to opt to defer repatriation and accumulate cash overseas. For instance, in March 2012, Cisco reported total cash and short-term investments on its balance sheet of nearly $45 billion. However, over 90% of this cash was held overseas, with only $4 billion held in the United States.

**CONCEPT CHECK**

1.  What tax rate should we use to value a foreign project?
2.  How can a U.S. firm lower its taxes on foreign projects?

## 31.4 Internationally Segmented Capital Markets

To this point, we have worked under the assumption that international capital markets are integrated. Often, however, this assumption is not appropriate. In some countries, especially in the developing world, all investors do not have equal access to financial securities. In this section, we consider why countries' capital markets might not be integrated—a case called **segmented capital markets**.

Many of the interesting questions in international corporate finance address the issues that result when capital markets are internationally segmented. In this section, we briefly consider the main reasons for segmentation of the capital markets and the implications for international corporate finance.

### Differential Access to Markets

In some cases, a country's risk-free securities are internationally integrated but markets for a specific firm's securities are not. Firms may face differential access to markets if there is any kind of asymmetry with respect to information about them. For example, Ityesi may be well known in the United States and enjoy easy access to dollar equity and debt markets there because it regularly provides information to an established community of analysts tracking the firm. It may not be equally well known in the United Kingdom and, therefore, may have difficulty tapping into the pound capital markets because it has no track record there. For this reason, investors in the United Kingdom may require a higher rate of return to persuade them to hold pound stocks and bonds issued by the U.S. firm.

With differential access to national markets, Ityesi would face a higher pound WACC than the pound WACC implied by Eq. 31.7. Ityesi would then view the foreign project as less valuable if it raises capital in the United Kingdom rather than in the United States. In fact, to maximize shareholder value, the firm should raise capital at home; the method of valuing the foreign project as if it were a domestic project would then provide the correct NPV. Differential access to national capital markets is common enough that it provides the best explanation for the existence of **currency swaps**, which are like the interest rate swap

contracts we discussed in Chapter 30, but with the holder receiving coupons in one currency and paying coupons denominated in a different currency. Currency swaps generally also have final face value payments, also in different currencies. Using a currency swap, a firm can borrow in the market where it has the best access to capital, and then "swap" the coupon and principal payments to the currency in which it would prefer to make payments. Thus, swaps allow firms to mitigate their exchange rate risk exposure between assets and liabilities, while still making investments in the most profitable locales and raising funds where their cost of capital is lowest.

## Macro-Level Distortions

Markets for risk-free instruments may also be segmented. Important macroeconomic reasons for segmented capital markets include capital controls and foreign exchange controls that create barriers to international capital flows, and thus segment national markets. Many countries regulate or limit capital inflows or outflows, and many do not allow their currencies to be freely converted into dollars, thereby creating capital market segmentation. Similarly, some countries restrict who can hold financial securities.

Political, legal, social, and cultural characteristics that differ across countries may require compensation in the form of a country risk premium. For example, the rate of interest paid on government bonds or other securities in a country with a tradition of weak enforcement of property rights is likely not really a risk-free rate. Instead, interest rates in the country will reflect a risk premium for the possibility of default, so relations such as covered interest rate parity will not hold exactly.

---

**EXAMPLE 31.3**

### Risky Government Bonds

**Problem**

On July 27, 2009, the spot ruble-dollar exchange rate was R30.9845/\$ and the one-year forward exchange rate was R33.7382/\$. At the time, the yield on short-term Russian government bonds was about 11%, while the comparable one-year yield on U.S. Treasury securities was 0.5%. Using the covered interest parity relationship, calculate the implied one-year forward rate. Compare this rate to the actual forward rate, and explain why the two rates differ.

**Solution**

Using the covered interest parity formula, the implied forward rate is

$$F = S \times \frac{(1 + r_R)}{(1 + r_\$)} = (R30.9845/\$)\frac{1.110}{1.005} = R34.2217/\$$$

The implied forward rate is higher than the current spot rate because Russian government bonds have higher yields than U.S. government bonds. The difference between the implied forward rate and the actual forward rate likely reflects the default risk in Russian government bonds (the Russian government defaulted on its debt as recently as 1998). A holder of 100,000 rubles seeking a true risk-free investment could convert the rubles to dollars, invest in U.S. Treasuries, and convert the proceeds back to rubles at a rate locked in with a forward contract. By doing so, the investor would earn

$$\frac{R100,000}{R30.9845/\$ \text{ today}} \times \frac{\$1.005 \text{ in 1 year}}{\$ \text{ today}} \times (R33.7382/\$ \text{ in 1 year}) = R109,432 \text{ in 1 year}$$

for an effective ruble risk-free rate of 9.432%. The higher rate of 11% on Russian bonds reflects a credit spread of $11\% - 9.432\% = 1.568\%$ to compensate bondholders for default risk.

### Implications

A segmented financial market has an important implication for international corporate finance: One country or currency has a higher rate of return than another country or currency, when the two rates are compared in the same currency. If the return difference results from a market friction such as capital controls, corporations can exploit this friction by setting up projects in the high-return country/currency and raising capital in the low-return country/currency. Of course, the extent to which corporations can capitalize on this strategy is naturally limited: If such a strategy were easy to implement, the return difference would quickly disappear as corporations competed to use the strategy. Nevertheless, certain corporations might realize a competitive advantage by implementing such a strategy. For example, as an incentive to invest, a foreign government might strike a deal with a particular corporation that relaxes capital controls for that corporation alone.

---

**EXAMPLE 31.4**

**Valuing a Foreign Acquisition in a Segmented Market**

**Problem**

Camacho Enterprises is a U.S. company that is considering expanding by acquiring Xtapa, Inc., a firm in Mexico. The acquisition is expected to increase Camacho's free cash flows by 21 million pesos the first year; this amount is then expected to grow at a rate of 8% per year. The price of the investment is 525 million pesos, which is $52.5 million at the current exchange rate of 10 pesos/$. Based on an analysis in the Mexican market, Camacho has determined that the appropriate after-tax peso WACC is 12%. If Camacho has also determined that its after-tax dollar WACC for this expansion is 7.5%, what is the value of the Mexican acquisition? Assume that the Mexican and U.S. markets for risk-free securities are integrated and that the yield curve in both countries is flat. U.S. risk-free interest rates are 6%, and Mexican risk-free interest rates are 9%.

**Solution**

Let's begin by calculating the NPV of the expansion in pesos and converting the result into dollars at the spot rate. Putting the free cash flows on a timeline:

| 0 | 1 | 2 | 3 | |
|---|---|---|---|---|
| $-525$ pesos | 21 pesos | 21 (1.08) pesos | 21 $(1.08)^2$ pesos | $\cdots$ |

The net present value of these cash flows at the peso WACC is

$$NPV = \frac{21}{0.12 - 0.08} - 525 = 0$$

so the purchase is a zero-NPV transaction. Presumably, Camacho is competing with other Mexican companies for the purchase, and they have bid up the price to the point that NPV = 0.

We can also compute the NPV in dollars by converting the expected cash flows into dollars using forward rates. The $N$-year forward rate (Eq. 30.3 in Chapter 30) expressed in pesos/$ is

$$F_N = S \times \frac{(1 + r_p)^N}{(1 + r_\$)^N} = 10 \times \left(\frac{1.09}{1.06}\right)^N = 10 \times 1.0283^N = 10.283 \times 1.0283^{N-1}$$

Thus, the dollar expected cash flows are the peso cash flows (from the earlier timeline) converted at the appropriate forward rate (we divide by the forward rate because it is in pesos/$):

$$C_p^N / F_N = \frac{21(1.08)^{N-1}}{10.283 \times 1.0283^{N-1}} = 2.0422 \times 1.0503^{N-1}$$

The dollar expected cash flows are therefore



so the dollar cash flows grow at about 5% per year. The NPV of these cash flows is

$$NPV = \frac{2.0422}{0.075 - 0.0503} - 52.5 = \$30.18 \text{ million}$$

Which NPV more accurately represents the benefits of the expansion? The answer depends on the source of the difference. To compute the dollar expected cash flows by converting the peso expected cash flows at the forward rate, we must accept the assumption that spot rates and the project cash flows are uncorrelated. The difference might simply reflect that this assumption failed to hold. Another possibility is that the difference reflects estimation error in the respective WACC estimates.

If Camacho is relatively confident in its assumptions about spot rates and its WACC estimates, a third possibility is that Mexican and U.S. capital markets are not integrated. In this case, Camacho, because of its access to U.S. capital markets, might have a competitive advantage. Perhaps other companies with which it is competing for the purchase of Xtapa are all Mexican firms that do not have access to capital markets outside of Mexico. Hence Camacho can raise capital at a cheaper rate. Of course, this argument also requires that other U.S. companies are not competing for the purchase of Xtapa. Camacho, however, might have special knowledge of Xtapa's markets that other U.S.-based companies lack. This knowledge would give Camacho a competitive advantage in the product market over other U.S. companies and puts it on an equal footing in the product market with other Mexican companies. Because it has a competitive advantage in capital markets over other Mexican companies, the NPV of the purchase is positive for Camacho, but zero for the other bidders for Xtapa.

As Example 31.4 demonstrates, the existence of segmented capital markets makes many decisions in international corporate finance more complicated but potentially more lucrative for a firm that is well positioned to exploit the market segmentation.

**CONCEPT CHECK**

1. What is the main implication for international corporate finance of a segmented financial market?

2. What are the reasons for segmentation of the capital markets?

# 31.5 Capital Budgeting with Exchange Risk

The final issue that arises when a firm is considering a foreign project is that the cash flows of the project may be affected by exchange rate risk. The risk is that the cash flows generated by the project will depend upon the future level of the exchange rate. A large part of international corporate finance addresses this foreign exchange risk. This section offers an overview with respect to valuation of foreign currency cash flows.

The working assumptions made thus far in this chapter are that the project's free cash flows are uncorrelated with the spot exchange rates. Such an assumption often makes sense if the firm operates as a local firm in the foreign market—it purchases its inputs and sells its

outputs in that market, and price changes of the inputs and outputs are uncorrelated with exchange rates. However, many firms use imported inputs in their production processes or export some of their output to foreign countries. These scenarios alter the nature of a project's foreign exchange risk and, in turn, change the valuation of the foreign currency cash flows.

As an example, let's reconsider what happens if the Ityesi project in the United Kingdom imports some materials from the United States. In this case, the project's pound free cash flows will be correlated with exchange rates. Assuming the cost of the material in the United States remains stable, if the value of a dollar appreciates against the pound, the pound cost of these materials will increase, thereby reducing the pound free cash flows. The reverse is also true: If the dollar depreciates, then the pound free cash flows will increase. Hence, our working assumption that changes in the free cash flows are uncorrelated with changes in the exchange rate is violated, and it is no longer appropriate to calculate the expected dollar free cash flows by converting the expected pound free cash flows at the forward rate.

Whenever a project has cash flows that depend on the values of multiple currencies, the most convenient approach is to separate the cash flows by currency. For example, a fraction of Ityesi's manufacturing costs may be for inputs whose cost fluctuates with the value of the dollar. Specifically, suppose £5.625 million of the costs are denominated in pounds, and an additional $16 million (or £10 million at the current exchange rate of $1.60/£) is for inputs whose price fluctuates with the value of the dollar. Then we can calculate Ityesi's pound-denominated free cash flows excluding these dollar-based costs, as in Table 31.4.

If the revenues and costs in the spreadsheet in Table 31.4 are not affected by changes in the spot exchange rates, it makes sense to assume that changes in the free cash flows are uncorrelated with changes in the spot exchange rates. Hence, we can convert the pound-denominated free cash flows to equivalent dollar amounts using the forward exchange rate, as we did in Section 31.2. The spreadsheet in Table 31.5 performs this calculation, with the dollar value of the pound-denominated free cash flow shown in line 3.

Next, we add the dollar-based cash flows to determine the project's aggregate free cash flow in dollar terms. This calculation is done in lines 4 through 6 of Table 31.5. Note that

| TABLE 31.4 SPREADSHEET | **Ityesi's Pound Free Cash Flows** | | | | | |
|---|---|---|---|---|---|---|
| Year | | 0 | 1 | 2 | 3 | 4 |
| **Incremental Earnings Forecast (£ millions)** | | | | | | |
| 1 Sales | | — | 37.500 | 37.500 | 37.500 | 37.500 |
| 2 Cost of Goods Sold | | — | (5.625) | (5.625) | (5.625) | (5.625) |
| 3 **Gross Profit** | | — | 31.875 | 31.875 | 31.875 | 31.875 |
| 4 Operating Expenses | | (4.167) | (5.625) | (5.625) | (5.625) | (5.625) |
| 5 Depreciation | | — | (3.750) | (3.750) | (3.750) | (3.750) |
| 6 **EBIT** | | (4.167) | 22.500 | 22.500 | 22.500 | 22.500 |
| 7 Income tax at 40% | | 1.667 | (9.000) | (9.000) | (9.000) | (9.000) |
| 8 **Unlevered Net Income** | | (2.500) | 13.500 | 13.500 | 13.500 | 13.500 |
| **Free Cash Flow** | | | | | | |
| 9 Plus: Depreciation | | — | 3.750 | 3.750 | 3.750 | 3.750 |
| 10 Less: Capital Expenditures | | (15.000) | — | — | — | — |
| 11 Less: Increases in NWC | | — | — | — | — | — |
| 12 **Pound Free Cash Flow** | | (17.500) | 17.250 | 17.250 | 17.250 | 17.250 |

| | Year | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| **TABLE 31.5 SPREADSHEET** | **Expected Dollar Free Cash Flows from Ityesi's U.K. Project** | | | | | |
| **Dollar Free Cash Flow ($ millions)** | | | | | | |
| 1  Pound FCF (£ millions) | | (17.500) | 17.250 | 17.250 | 17.250 | 17.250 |
| 2  Forward Exchange Rate ($/£) | | 1.600 | 1.555 | 1.512 | 1.469 | 1.428 |
| 3  **Dollar Value of Pound FCF** (1 × 2) | | (28.000) | 26.825 | 26.073 | 25.344 | 24.633 |
| 4  Dollar Costs | | — | (16.000) | (16.000) | (16.000) | (16.000) |
| 5  Income tax at 40% | | — | 6.400 | 6.400 | 6.400 | 6.400 |
| 6  **Free Cash Flow** | | (28.000) | 17.225 | 16.473 | 15.744 | 15.033 |

we deduct Ityesi's dollar-denominated costs, and then add the tax shield associated with these costs. Even if the taxes will be paid in pounds in the U.K., they will fluctuate with the dollar cost of the inputs and so can be viewed as a dollar-denominated cash flow.

Given the dollar-denominated free cash flow in line 6 of Table 31.5, we can now compute the NPV of the investment using Ityesi's dollar WACC:[3]

$$\frac{17.225}{1.068} + \frac{16.473}{1.068^2} + \frac{15.744}{1.068^3} + \frac{15.033}{1.068^4} - 28.000 = \$27.05 \text{ million}$$

Notice that we would have gotten the same answer had we taken the dollar-based expected costs of $16 million and included them in Table 31.4 by first converting them to pounds at the forward exchange rate. But note that had we done so, these cash flows would no longer correspond to expected cash flows because the forward exchange rate is not an unbiased predictor of the future spot rate. Thus, another way to account for cash flows that are correlated with exchange rates is to convert the cash flows at the forward rate with the explicit understanding that the resulting numbers are not expectations.

The Ityesi example was simplified because we could easily isolate the cash flows that would vary perfectly with the dollar-pound exchange rate from those that would be uncorrelated with the exchange rate. In practice, determining these sensitivities may be difficult. If historical data is available, the tools of regression can be used to identify the exchange rate risk of project cash flows, in much the same way that we used regression to identify the market risk of security returns in Part 4.

In this chapter, we have endeavored to provide an introduction to international capital budgeting. This topic is sufficiently complicated that entire textbooks are devoted to it. Hence, it is difficult to do this issue justice in a single-chapter treatment. Although we have provided a basic framework for approaching the problem, a reader who is seriously considering undertaking a foreign venture should consult one of the books listed in the Further Readings section at the end of the chapter.

**CONCEPT CHECK**

1. What conditions cause the cash flows of a foreign project to be affected by exchange rate risk?

2. How do we make adjustments when a project has inputs and outputs in different currencies?

---

[3]Again, we use the domestic WACC to discount the cash flows because we continue to assume, as in footnote 2, that the overall market risk of the project is unchanged.

1040    **Chapter 31** International Corporate Finance



**INTERVIEW WITH**

# Bill Barrett

William (Bill) Barrett is Co-Chair of Barrett Corporation and CEO of Barrett Explorer. Barrett Corporation is a Canadian family business headquartered in Woodstock, New Brunswick, that distributes recreation and outdoor goods, consumer electronics, wireless broadband services, and other products.

QUESTION: *What are the benefits to being international?*

ANSWER: When a business seeks growth, sooner or later it must look at the international market. In today's world, you are usually involved in international business because so much production and manufacturing occurs in China. We have had long-standing relationships with Chinese companies and have been importing from China and Japan for 30 years. We have also invested and become partners in other businesses: one in India, another in Africa, in Europe, and in the United Kingdom.

QUESTION: *How have currency exchange rates affected your company?*

ANSWER: Currency fluctuations have huge implications. If the marketplace was used to buying something at $1 Canadian but now, due to an exchange rate change, it is $1.20 Canadian, that is a really tough situation to manage. Sometimes we hedge. We buy options on currency. We buy forwards on currency. We try to anticipate and protect ourselves by buying into the future. We never buy 100% into the future but we hedge 50 to 70% of our exposure.

QUESTION: *Are there any important international tax considerations you face?*

ANSWER: International tax rules affect where and how we do business. We are an Atlantic Canadian company. We form holding companies in various parts of the world depending upon the tax implications. In a specific instance in India, we determined that by manufacturing in China and exporting to India, we would face a huge import duty. The solution was to manufacture in India; by doing so, we saved about 27% in tax.

QUESTION: *Do you get involved in joint ventures, licensing agreements, etc., or do you access other countries directly?*

ANSWER: We do business in a variety of ways, including joint venture relationships, distribution relationships, and agency relationships. There are many countries that have such complex regulatory issues that a joint venture is the only practical way to go. In other situations, like the European Union, there is a common set of regulatory, tax, and deployment issues in terms of how people are hired, what your obligations are to them, and what their obligations are to you.

---

## MyFinanceLab

Here is what you should know after reading this chapter. MyFinanceLab will help you identify what you know and where to go when you need to practice.

### 31.1 Internationally Integrated Capital Markets

■ The condition necessary to ensure internationally integrated capital markets is that the value of a foreign investment does not depend on the currency (home or foreign) used in the analysis.

### 31.2 Valuation of Foreign Currency Cash Flows

■ Two methods are used to value foreign currency cash flows when markets are internationally integrated and uncertainty in spot exchange rates is uncorrelated with the foreign currency cash flows:
  ■ Calculate the foreign currency value of a foreign project as the NPV of the expected foreign currency future cash flows discounted at the foreign cost of capital, and then convert the foreign currency NPV into the home currency using the current spot exchange rate.

- Compute the expected value of the foreign currency cash flows in the home currency by multiplying the expected value in the foreign currency by the forward exchange rates, and then compute the NPV of these home currency cash flows using the domestic cost of capital.

- When markets are internationally integrated and uncertainty in spot exchange rates is uncorrelated with the foreign currency cash flows, the foreign and domestic risk premia are approximately the same so the foreign WACC can be approximated as the foreign risk-free interest rate plus the domestic risk premium:

$$r_\pounds^* = \frac{1 + r_\pounds}{1 + r_\$}(1 + r_\$^*) - 1 \approx r_\pounds + (r_\$^* - r_\$) \tag{31.7}$$

### 31.3 Valuation and International Taxation

- A U.S. corporation pays the higher of the foreign or domestic tax rate on its foreign project, so project valuation should use the higher of these two rates as well. The U.S. corporation may be able to reduce its tax liability by undertaking foreign projects in other countries whose earnings can be pooled with those of the new project, or by deferring the repatriation of earnings.

### 31.4 Internationally Segmented Capital Markets

- Capital markets might be internationally segmented. The implication is that one country or currency has a higher cost of capital than another country or currency, when the two are compared in the same currency. This segmentation may provide a firm with a comparative advantage based on its access to capital across markets.

### 31.5 Capital Budgeting with Exchange Risk

- When a project has inputs and outputs in different currencies, the foreign-denominated cash flows are likely to be correlated with changes in spot rates. To correctly value such projects, the foreign and domestic cash flows should be valued separately.

## Key Terms

currency swaps *p. 1034*
internationally integrated
   capital markets *p. 1028*

repatriated *p. 1033*
segmented capital markets *p. 1034*

## Further Reading

See the following textbooks devoted to international corporate finance: R. Click and J. Coval, *The Theory and Practice of International Financial Management* (Prentice Hall, 2001); M. Eaker, F. Fabozzi, and D. Grant, *International Corporate Finance* (The Dryden Press, 1996); D. Eiteman, A. Stonehill, and M. Moffett, *Multinational Business Finance* (Addison-Wesley, 2009); J. Grabbe, *International Financial Markets* (Prentice-Hall, 1995); M. Levi, *International Finance* (McGraw-Hill, 1996); J. Madura, *International Financial Management* (South-Western, 2003); P. Sercu and R. Uppal, *International Financial Markets and the Firm* (South-Western College Publishing, 1995); and A. Shapiro, *Multinational Financial Management* (John Wiley & Sons, 2009).

The effect that international operations have on the value of the firm and its cost of capital is studied in the following articles: V. Errunza and L. Senbet, "Market Segmentation and the Cost of Capital in International Equity Markets," *Journal of Financial and Quantitative Analysis* 35(4) (2000): 577–600; and R. Stulz, "Globalization, Corporate Finance, and the Cost of Capital," *Journal of Applied Corporate Finance* 12(3) (1999): 8–25.

1042      **Chapter 31** International Corporate Finance

# Problems

*All problems are available in MyFinanceLab. An asterisk (\*) indicates problems with a higher level of difficulty.*

## Internationally Integrated Capital Markets

1. You are a U.S. investor who is trying to calculate the present value of a €5 million cash inflow that will occur one year in the future. The spot exchange rate is $S = \$1.25/€$ and the forward rate is $F_1 = \$1.215/€$. You estimate that the appropriate dollar discount rate for this cash flow is 4% and the appropriate euro discount rate is 7%.
   a. What is the present value of the €5 million cash inflow computed by first discounting the euro and then converting it into dollars?
   b. What is the present value of the €5 million cash inflow computed by first converting the cash flow into dollars and then discounting?
   c. What can you conclude about whether these markets are internationally integrated, based on your answers to parts a and b?

2. Mia Caruso Enterprises, a U.S. manufacturer of children's toys, has made a sale in Cyprus and is expecting a C£ 4 million cash inflow in one year. The current spot rate is $S = \$1.80/C£$ and the one-year forward rate is $F_1 = \$1.8857/C£$.
   a. What is the present value of Mia Caruso's C£4 million inflow computed by first discounting the cash flow at the appropriate Cypriot pound discount rate of 5%, and then converting the result into dollars?
   b. What is the present value of Mia Caruso's C£4 million inflow computed by first converting the cash flow into dollars, and then discounting at the appropriate dollar discount rate of 10%?
   c. What can you conclude about whether these markets are internationally integrated, based on your answers to parts a and b?

## Valuation of Foreign Currency Cash Flows

 3. Etemadi Amalgamated, a U.S. manufacturing firm, is considering a new project in the euro area. You are in Etemadi's corporate finance department and are responsible for deciding whether to undertake the project. The expected free cash flows, in euros, are shown here:

| Year | Free Cash Flow (€ million) |
|------|----------------------------|
| 0 | −15 |
| 1 | 9 |
| 2 | 10 |
| 3 | 11 |
| 4 | 12 |

   You know that the spot exchange rate is $S = \$1.15/€$. In addition, the risk-free interest rate on dollars is 4% and the risk-free interest rate on euros is 6%.

   Assume that these markets are internationally integrated and the uncertainty in the free cash flows is not correlated with uncertainty in the exchange rate. You determine that the dollar WACC for these cash flows is 8.5%. What is the dollar present value of the project? Should Etemadi Amalgamated undertake the project?

 4. Etemadi Amalgamated, the U.S. manufacturing company in Problem 3, is still considering a new project in the euro area. All information presented in Problem 3 is still accurate, except the spot rate is now $S = \$0.85/€$, about 26% lower. What is the new present value of the project in dollars? Should Etemadi Amalgamated undertake the project?

5. You work for a U.S. firm, and your boss has asked you to estimate the cost of capital for countries using the euro. You know that $S = \$1.20/€$ and $F_1 = \$1.157/€$. Suppose the dollar

WACC for your company is known to be 8%. If these markets are internationally integrated, estimate the euro cost of capital for a project with free cash flows that are uncorrelated with spot exchange rates. Assume the firm pays the same tax rate no matter where the cash flows are earned.

6. Maryland Light, a U.S. light fixtures manufacturer, is considering an investment in Japan. The dollar cost of equity for Maryland Light is 11%. You are in the corporate treasury department, and you need to know the comparable cost of equity in Japanese yen for a project with free cash flows that are uncorrelated with spot exchange rates. The risk-free interest rates on dollars and yen are $r_\$ = 5\%$ and $r_¥ = 1\%$, respectively. Maryland Light is willing to assume that capital markets are internationally integrated. What is the yen cost of equity?

7. The dollar cost of debt for Coval Consulting, a U.S. research firm, is 7.5%. The firm faces a tax rate of 30% on all income, no matter where it is earned. Managers in the firm need to know its yen cost of debt because they are considering launching a new bond issue in Tokyo to raise money for a new investment there. The risk-free interest rates on dollars and yen are $r_\$ = 5\%$ and $r_¥ = 1\%$, respectively. Coval Consulting is willing to assume that capital markets are internationally integrated and that its free cash flows are uncorrelated with the yen-dollar spot rate. What is Coval Consulting's after-tax cost of debt in yen? (*Hint*: Start by finding the after-tax cost of debt in dollars and then find the yen equivalent.)



8. Manzetti Foods, a U.S. food processing and distribution company, is considering an investment in the euro area. You are in Manzetti's corporate finance department and are responsible for deciding whether to undertake the project. The expected free cash flows, in euros, are uncorrelated to the spot exchange rate and are shown here:

| Year | Free Cash Flow (€ million) |
|---|---|
| 0 | −25 |
| 1 | 12 |
| 2 | 14 |
| 3 | 15 |
| 4 | 15 |

The new project has similar dollar risk to Manzetti's other projects. The company knows that its overall dollar WACC is 9.5%, so it feels comfortable using this WACC for the project. The risk-free interest rate on dollars is 4.5% and the risk-free interest rate on euros is 7%.

a. Manzetti is willing to assume that capital markets in the United States and the euro area are internationally integrated. What is the company's euro WACC?

b. What is the present value of the project in euros?

### Valuation and International Taxation

9. Tailor Johnson, a U.S. maker of fine menswear, has a subsidiary in Ethiopia. This year, the subsidiary reported and repatriated earnings before interest and taxes (EBIT) of 100 million Ethiopian birrs. The current exchange rate is 8 birr/$ or $S_1 = \$0.125/\text{birr}$. The Ethiopian tax rate on this activity is 25%. U.S. tax law requires Tailor Johnson to pay taxes on the Ethiopian earnings at the same rate as profits earned in the United States, which is currently 45%. However, the United States gives a full tax credit for foreign taxes paid up to the amount of the U.S. tax liability. What is Tailor Johnson's U.S. tax liability on its Ethiopian subsidiary?

*10. Tailor Johnson, the menswear company with a subsidiary in Ethiopia described in Problem 9, is considering the tax benefits resulting from deferring repatriation of the earnings from the subsidiary. Under U.S. tax law, the U.S. tax liability is not incurred until the profits are brought back home. Tailor Johnson reasonably expects to defer repatriation for 10 years, at which point the birr earnings will be converted into dollars at the prevailing spot rate, $S_{10}$, and the tax credit

for Ethiopian taxes paid will still be converted at the exchange rate $S_1 = \$0.125/\text{birr}$. Tailor Johnson's after-tax cost of debt is 5%.

    a. Suppose the exchange rate in 10 years is identical to this year's exchange rate, so $S_{10} = \$0.125/\text{birr}$. What is the present value of deferring the U.S. tax liability on Tailor Johnson's Ethiopian earnings for 10 years?

    b. How will the exchange rate in 10 years affect the actual amount of the U.S. tax liability? Write an equation for the U.S. tax liability as a function of the exchange rate $S_{10}$.

**11.** Peripatetic Enterprises, a U.S. import-export trading firm, is considering its international tax situation. U.S. tax law requires U.S. corporations to pay taxes on their foreign earnings at the same rate as profits earned in the United States; this rate is currently 45%. However, a full tax credit is given for the foreign taxes paid up to the amount of the U.S. tax liability. Peripatetic has major operations in Poland, where the tax rate is 20%, and in Sweden, where the tax rate is 60%. The profits, which are fully and immediately repatriated, and foreign taxes paid for the current year are shown here:

|  | Poland | Sweden |
| --- | --- | --- |
| Earnings before interest and taxes (EBIT) | $80 million | $100 million |
| Host country taxes paid | $16 million | $60 million |
| Earnings before interest after taxes | $64 million | $40 million |

    a. What is the U.S. tax liability on the earnings from the Polish subsidiary assuming the Swedish subsidiary did not exist?

    b. What is the U.S. tax liability on the earnings from the Swedish subsidiary assuming the Polish subsidiary did not exist?

    c. Under U.S. tax law, Peripatetic is able to pool the earnings from its operations in Poland and Sweden when computing its U.S. tax liability on foreign earnings. Total EBIT is thus $180 million and the total host country taxes paid is $76 million. What is the total U.S. tax liability on foreign earnings? Show how this relates to the answers in parts a and b.

### Internationally Segmented Capital Markets

**\*12.** Suppose the interest on Russian government bonds is 7.5%, and the current exchange rate is 28 rubles per dollar. If the forward exchange rate is 28.5 rubles per dollar, and the current U.S. risk-free interest rate is 4.5%, what is the implied credit spread for Russian government bonds?

### Capital Budgeting with Exchange Risk

 **\*13.** Assume that in the original Ityesi example in Table 31.1, all sales actually occur in the United States and are projected to be $60 million per year for four years. Keeping the cost of sales, operating expenses, capital expenditures and depreciation expenses unchanged (and in pounds), and assuming the tax rate remains at 40%, calculate the NPV of the investment opportunity.

## Data Case

You are a senior financial analyst with IBM in their capital budgeting division. IBM is considering expanding in Australia due to its positive business atmosphere and cultural similarities to the U.S.

    The new facility would require an initial investment in fixed assets of $5 billion Australian and an additional capital investment of 3% would be required each year in years 1–4. All capital investments would be depreciated straight-line over the five years that the facility operates. First-year revenues from the facility are expected to be $6 billion Australian and grow at 10% per year. Cost of goods sold would be 40% of revenue; the other operating expenses would amount to 12% of revenue. Net working capital requirements would be 11% of sales and would be required the year prior to the actual revenues. All net working capital would be recovered at the end of the fifth year. Assume that the tax rates are the same in the two countries, that the two markets are internationally

integrated, and that the cash flow uncertainty of the project is uncorrelated with changes in the exchange rate. Your team manager wants you to determine the NPV of the project in U.S. dollars using a cost of capital of 12%.

1. Go to the Yahoo! Finance website (finance.yahoo.com).
   a. Enter the stock symbol for IBM (IBM) in the box and click "Get Quotes."
   b. Click "Income Statement" under "Company Financials." Copy and paste the data to Excel, or if you have Internet Explorer, place the cursor inside the statement and right-click. Select "Export to Microsoft Excel" from the menu.

2. Obtain exchange rates and comparable interest rates for Australia at Bloomberg's Web site (www.bloomberg.com).
   a. Place the cursor on "Market Data" and click "Currencies" from the drop-down menu. Export the currency table to Excel and paste it into the same spreadsheet as the IBM income statement.
   b. Go back to the Web page and click "Rates & Bonds" from the menu on the left. Then click "Australia" to get the interest rates for Australia. Right-click and export the table to Excel; paste it into the spreadsheet.
   c. Go back to the Web page and click "U.S." Download the Treasury data and paste it into the spreadsheet.

3. You may have noticed that the one-year and four-year rates are not available at Bloomberg.com for the U.S. Treasury. Go to the U.S. Treasury Web site (www.treas.gov).
   a. To find the one-year rate, type "daily yield curve" into the search box at the top of the page and select the link that appears that states "Historical Yield Data," then click on "View Text Version of Treasury Yield Curve." You can also go directly to the page by typing http://www.treas.gov/offices/domestic-finance/debt-management/interest-rate/yield.shtml. Be sure it is *not* the link for the "real" rates. Export the yields into Excel on the same spreadsheet as the other data. Add the one-year yield to the other Treasury rates.
   b. To find an estimate of the four-year yield, calculate the average of the three- and five-year yields from the Treasury yield curve.

4. In your Excel spreadsheet, create a new worksheet with a timeline for the project expected cash flows.
   a. Compute the tax rate as the three-year average of IBM's annual income tax divided by annual earnings before tax.
   b. Determine the expected free cash flows of the project.

5. Note that the free cash flows you calculated in Question 4 are in Australian dollars. Use Eq. 30.3 to determine the forward exchange rates for each of the five years of the project. Then, use the forward rates to convert the cash flows to U.S. dollars.

6. Compute the NPV of the project in U.S. dollars using the 12% required return given by your team manager.

# Glossary

**$1.00 out lease**   A type of lease, also known as a finance lease, in which ownership of the asset transfers to the lessee at the end of the lease for a nominal cost of $1.00.

**10-K**   The annual form that U.S. companies use to file their financial statements with the U.S. Securities and Exchange Commission (SEC).

**10-Q**   The quarterly reporting form that U.S. companies use to file their financial statements with the U.S. Securities and Exchange Commission (SEC).

**95% confidence interval**   A confidence interval gives a range of values which is likely to include an unknown parameter. If independent samples are taken repeatedly from the same population, then the true parameter will lie outside the 95% confidence interval 5% of the time. For a normal distribution, the interval corresponds to approximately 2 standard deviations on both sides of the mean.

**abandonment option**   An option for an investor to cease making investments in a project. Abandonment options can add value to a project because a firm can drop a project if it turns out to be unsuccessful.

**ABS**   *See* asset-backed security.

**absolute return**   *See* cash multiple.

**accounts payable**   The amounts owed to creditors for products or services purchased with credit.

**accounts payable days**   An expression of a firm's accounts payable in terms of the number of days' worth of cost of goods sold that the accounts payable represents.

**accounts payable turnover**   The ratio of annual cost of sales to accounts payable. A measure of how quickly the firm is paying its suppliers.

**accounts receivable**   Amounts owed to a firm by customers who have purchased goods or services on credit.

**accounts receivable days**   An expression of a firm's accounts receivable in terms of the number of days' worth of sales that the accounts receivable represents.

**accounts receivable turnover**   The ratio of annual sales to accounts receivable. A measure of how efficiently the firm is managing accounts receivable.

**accumulated depreciation**   The cumulative depreciation of an asset up to a given point in its life; equal to last period's accumulated depreciation plus the current period's depreciation expense.

**acquirer (or bidder)**   A firm that, in a takeover, buys another firm.

**acquisition premium**   Paid by an acquirer in a takeover, it is the percentage difference between the acquisition price and the premerger price of a target firm.

**actuarially fair**   When the NPV from selling insurance is zero because the price of insurance equals the present value of the expected payment.

**adjustable rate mortgages (ARMs)**   Mortgages with interest rates that are not constant over the life of the mortgage. These were the most common type of "subprime" loans.

**adjusted betas**   A beta that has been adjusted toward 1 to account for estimation error.

**adjusted present value (APV)**   A valuation method to determine the levered value of an investment by first calculating its unlevered value (its value without any leverage) and then adding the value of the interest tax shield and deducting any costs that arise from other market imperfections.

**adverse selection**   The idea that when the buyers and sellers have different information, the average quality of assets in the market will differ from the average quality overall.

**after-tax interest rate**   Reflects the amount of interest an investor can keep after taxes have been deducted.

**agency costs**   Costs that arise when there are conflicts of interest between a firm's stakeholders.

**agency problem**   When decision makers, despite being hired as the agents of other stakeholders, put their own self-interest ahead of the interests of the stakeholders.

**aggressive financing policy**   Financing part or all of a firm's permanent working capital with short-term debt.

**aging schedule**   Categorizes a firm's accounts by the number of days they have been on the firm's books. It can be prepared using either the number of accounts or the dollar amount of the accounts receivable outstanding.

**alpha**   The difference between a stock's expected return and its required return according to the security market line.

**American options**   The most common kind of option, they allow their holders to exercise the option on any date up to, and including, the expiration date.

**amortization**   A charge that captures the change in value of acquired assets. Like depreciation, amortization is not an actual cash expense.

**amortizing loan**   A loan on which the borrower makes monthly payments that include interest on the loan plus some part of the loan balance.

**angel investors**   Individual investors who buy equity in small private firms.

**annual percentage rate (APR)**   Indicates the amount of interest earned in one year without the effect of compounding.

**annual report**   The yearly summary of business sent by U.S. public companies to their shareholders that accompanies or includes the financial statement.

**annuity**   A stream of equal periodic cash flows over a specified time period. These cash flows can be inflows of returns earned on investments or outflows of funds invested to earn future returns.

**annuity spreadsheet**   An Excel spreadsheet that can compute any one of the five variables of *NPER, RATE, PV, PMT*, and *FV*. Given any four input variables the spreadsheet computes the fifth.

**APR**   *See* annual percentage rate.

**APT**   *See* Arbitrage Pricing Theory.

**APV**   *See* adjusted present value.

**arbitrage**   The practice of buying and selling equivalent goods or portfolios to take advantage of a price difference.

**arbitrage opportunity**   Any situation in which it is possible to make a profit without taking any risk or making any investment.

**Arbitrage Pricing Theory (APT)**   A model that uses more than one portfolio to capture systematic risk. The portfolios themselves can be thought of as either the risk factor itself or a portfolio of stocks correlated with an unobservable risk factor. Also referred to as a multifactor model.

**ARM**   *See* adjustable rate mortgages.

**ask price**   The price at which a market maker or specialist is willing to sell a security.

**asset beta**   *See* unlevered beta.

**asset cost of capital**   The expected return required by the firm's investors to hold the firm's underlying assets; the weighted average of the firm's equity and debt costs of capital.

**asset pool**   Security created by pooling together the cash flows from multiple underlying securities, such as mortgages.

**asset securitization**   The process of creating an asset-backed security by packaging a portfolio of financial securities and issuing an asset-backed security backed by this portfolio.

**asset substitution problem**   When a firm faces financial distress, shareholders can gain from decisions that increase the risk of the firm sufficiently, even if they have negative NPV.

**asset turnover**   The ratio of sales to assets, a measure of how efficiently the firm is utilizing its assets to generate sales.

**asset-backed bonds**   A type of secured corporate debt. Specific assets are pledged as collateral that bondholders have a direct claim to in the event of bankruptcy. Asset-backed bonds can be secured by any kind of asset.

**asset-backed security (ABS)**   A security whose cash flows come from an underlying pool of financial securities that "back" it.

**assets**   The cash, inventory, property, plant and equipment, and other investments a company has made.

**asymmetric information**   A situation in which parties have different information. It can arise when, for example, managers have superior information to investors regarding the firm's future cash flows.

**at-the-money**   Describes options whose exercise prices are equal to the current stock price.

**auction IPO**   A method for selling new issues directly to the public. Rather than setting a price itself and then allocating shares to buyers, the underwriter in an auction IPO takes bids from investors and then sets the price to clear the market.

**auditor**   A neutral third party that corporations are required to hire that checks the annual financial statements to ensure they are prepared according to GAAP, and to verify that the information is reliable.

**availability float**   How long it takes a bank to give a firm credit for customer payments the firm has deposited in the bank.

**average annual return**   The arithmetic average of an investment's realized returns for each year.

**backdating**   The practice of choosing the grant date of a stock option retroactively, so that the date of the grant would coincide with a date when the stock price was lower than its price at the time the grant was actually awarded. By backdating the option in this way, the executive receives a stock option that is already in-the-money.

**balance sheet**   A list of a firm's assets and liabilities that provides a snapshot of the firm's financial position at a given point in time.

**balance sheet identity**   Total assets equals total liabilities plus stockholders' equity.

**balloon payment**   A large payment that must be made on the maturity date of a bond.

**basis risk**   The risk that the value of a security used to hedge an exposure will not track that exposure perfectly.

**bearer bonds**   Similar to currency in that whoever physically holds this bond's certificate owns the bond. To receive a coupon payment, the holder of a bearer bond must provide explicit proof of ownership by literally clipping a coupon off the bond certificate and remitting it to the paying agent.

**best-efforts IPO**   For smaller initial public offerings (IPOs), a situation in which the underwriter does not guarantee that the stock will be sold, but instead tries to sell the stock for the best possible price. Often such deals have an all-or-none clause: either all of the shares are sold in the IPO, or the deal is called off.

**beta ($\beta$)**   The expected percent change in the excess return of a security for a 1% change in the excess return of the market (or other benchmark) portfolio.

**bid price**   The price at which a market maker or specialist is willing to buy a security.

**bid-ask spread**   The amount by which the ask price exceeds the bid price.

**bidder**  *See* acquirer.

**Binomial Option Pricing Model**  A technique for pricing options based on the assumption that each period, the stock's return can take on only two values.

**binomial tree**  A timeline with two branches at every date representing the possible events that could happen at those times.

**bird in the hand hypothesis**  The thesis that firms choosing to pay higher current dividends will enjoy higher stock prices because shareholders prefer current dividends to future ones (with the same present value).

**Black-Scholes Option Pricing Model**  A technique for pricing European-style options when the stock can be traded continuously. It can be derived from the Binomial Option Pricing Model by allowing the length of each period to shrink to zero.

**blanket lien**  *See* floating lien.

**board of directors**  A group elected by shareholders that has the ultimate decision-making authority in the corporation.

**bond**  A security sold by governments and corporations to raise money from investors today in exchange for the promised future payment.

**bond certificate**  States the terms of a bond as well as the amounts and dates of all payments to be made.

**book building**  A process used by underwriters for coming up with an offer price based on customers' expressions of interest.

**book value**  The acquisition cost of an asset less its accumulated depreciation.

**book value of equity**  The difference between the book value of a firm's assets and its liabilities; also called stockholders' equity, it represents the net worth of a firm from an accounting perspective.

**book-to-market ratio**  The ratio of the book value of equity to the market value of equity.

**break-even**  The level for which an investment has an NPV of zero.

**break-even analysis**  A calculation of the value of each parameter for which the NPV of the project is zero.

**bridge loan**  A type of short-term bank loan that is often used to "bridge the gap" until a firm can arrange for long-term financing.

**Bulldogs**  A term for foreign bonds in the United Kingdom.

**business interruption insurance**  A type of insurance that protects a firm against the loss of earnings if the business is interrupted due to fire, accident, or some other insured peril.

**business liability insurance**  A type of insurance that covers the costs that result if some aspect of a business causes harm to a third party or someone else's property.

**butterfly spread**  An option portfolio that is long two calls with differing strike prices, and short two calls with a strike price equal to the average strike price of the first two calls.

**buying stocks on margin (using leverage)**  Borrowing money to invest in stocks.

**"C" corporations**  Corporations that have no restrictions on who owns their shares or the number of shareholders, and therefore cannot qualify for subchapter S treatment and are subject to direct taxation.

**CAGR**  *See* compound annual growth rate.

**call date**  The right (but not the obligation) of a bond issuer to retire outstanding bonds on (or after) a specific date.

**call option**  A financial option that gives its owner the right to buy an asset.

**call price**  A price specified at the issuance of a bond at which the issuer can redeem the bond.

**callable annuity rate**  The rate on a risk-free annuity that can be repaid (or called) at any time.

**callable bonds**  Bonds that contain a call provision that allows the issuer to repurchase the bonds at a predetermined price.

**cannibalization**  When sales of a firm's new product displace sales of one of its existing products.

**Capital Asset Pricing Model (CAPM)**  An equilibrium model of the relationship between risk and return that characterizes a security's expected return based on its beta with the market portfolio.

**capital budget**  Lists all of the projects that a company plans to undertake during the next period.

**capital budgeting**  The process of analyzing investment opportunities and deciding which ones to accept.

**capital expenditures**  Purchases of new property, plant, and equipment.

**capital gain**  The amount by which the sale price of an asset exceeds its initial purchase price.

**capital gain rate**  An expression of a capital gain as a percentage of the initial price of the asset.

**capital lease**  A lease viewed as an acquisition for accounting purposes. The asset acquired is listed on the lessee's balance sheet, and the lessee incurs depreciation expenses for the asset. In addition, the present value of the future lease payment is listed as a liability, and the interest portion of the lease payments is deducted as an interest expense. Also known as a finance lease.

**capital market line (CML)**  When plotting expected returns versus volatility, the line from the risk-free investment through the efficient portfolio of risky stocks (the portfolio that has the highest possible Sharpe ratio). In the context of the CAPM, it is the line from the risk-free investment through the market portfolio. It shows the highest possible expected return that can be obtained for any given volatility.

**capital structure**  The relative proportions of debt, equity, and other securities that a firm has outstanding.

**CAPM**  *See* Capital Asset Pricing Model.

**captured**  Describes a board of directors whose monitoring duties have been compromised by connections or perceived loyalties to management.

**carried interest**  Fee representing general partners' share of any positive return generated by the fund.

**carryback or carryforward**  *See* tax loss carryforwards and carrybacks.

**cash conversion cycle (CCC)**  A measure of the cash cycle calculated as the sum of a firm's inventory days and accounts receivable days, less its accounts payable days.

**cash cycle**  The length of time between when a firm pays cash to purchase its initial inventory and when it receives cash from the sale of the output produced from that inventory.

**cash multiple (multiple of money, absolute return)**    The ratio of the total cash received to the total cash invested.

**cash offer**    A type of seasoned equity offering (SEO) in which a firm offers the new shares to investors at large.

**cash ratio**    The ratio of cash to current liabilities. It is the most stringent liquidity ratio.

**cash-and-carry strategy**    A strategy used to lock in the future cost of an asset by buying the asset for cash today, and storing (or "carrying") it until a future date.

**CCC**    *See* cash conversion cycle.

**CDO**    *See* collaterized debt obligation.

**CDS**    *See* credit default swap.

**Chapter 11 reorganization**    A common form of bankruptcy for large corporations in which all pending collection attempts are automatically suspended, and the firm's existing management is given the opportunity to propose a reorganization plan. While developing the plan, management continues to operate the business as usual. The creditors must vote to accept the plan, and it must be approved by the bankruptcy court. If an acceptable plan is not put forth, the court may ultimately force a Chapter 7 liquidation of the firm.

**Chapter 7 liquidation**    A provision of the U.S. bankruptcy code in which a trustee is appointed to oversee the liquidation of a firm's assets through an auction. The proceeds from the liquidation are used to pay the firm's creditors, and the firm ceases to exist.

**Check 21**    *See* Check Clearing for the 21st Century Act.

**Check Clearing for the 21st Century Act (Check 21)**    Eliminates the disbursement float due to the check-clearing process. Under the act, banks can process check information electronically, and, in most cases, the funds are deducted from a firm's checking account on the same day that the firm's supplier deposits the check in its bank.

**chief executive officer (CEO)**    The person charged with running the corporation by instituting the rules and policies set by the board of directors.

**chief financial officer (CFO)**    The most senior financial manager, who often reports directly to the CEO.

**classified board**    *See* staggered board.

**clean expenses**    Expenses that do not include non-cash charges such as depreciation or amortization. While it differs from some accounting treatment, using clean expenses is preferred in financial models.

**clean price**    A bond's cash price less an adjustment for accrued interest, the amount of the next coupon payment that has already accrued.

**clientele effects**    When the dividend policy of a firm reflects the tax preference of its investor clientele.

**CML**    *See* capital market line.

**CMO**    *See* collaterized mortgage obligation.

**collateralized debt obligation (CDO)**    The security that results when banks re-securitize other asset-backed securities.

**collateralized mortgage obligation (CMO)**    A debt security where the cash flows are derived from large mortgage pools, and the payouts are divided into different tranches that have different priority claims on the underlying cash flows.

**collection float**    The amount of time it takes for a firm to be able to use funds after a customer has paid for its goods.

**commercial paper**    Short-term, unsecured debt issued by large corporations that is usually a cheaper source of funds than a short-term bank loan. Most commercial paper has a face value of at least $100,000. Like long-term debt, commercial paper is rated by credit rating agencies.

**committed line of credit**    A legally binding agreement that obligates a bank to provide funds to a firm (up to a stated credit limit) as long as the firm satisfies any restrictions in the agreement.

**common risk**    Perfectly correlated risk.

**compensating balance**    An amount a firm's bank may require the firm to maintain in an account at the bank as compensation for services the bank may perform.

**competitive market**    A market in which goods can be bought and sold at the same price.

**compound annual growth rate (CAGR)**    Geometric average annual growth rate; year-over-year growth rate which, if applied to the initial value and compounded, will lead to the final value.

**compound interest**    The effect of earning "interest on interest."

**compounding**    The process of converting a cash flow to its future value, taking into to account the fact that interest is earned on prior interest payments.

**conglomerate merger**    The type of merger when the target and acquirer operate in unrelated industries.

**conservation of value principle**    With perfect capital markets, financial transactions neither add nor destroy value, but instead represent a repackaging of risk (and therefore return).

**conservative financing policy**    When a firm finances its short-term needs with long-term debt.

**consol**    A bond that promises its owner a fixed cash flow every year, forever.

**constant dividend growth model**    A model for valuing a stock by viewing its dividends as a constant growth perpetuity.

**constant interest coverage ratio**    When a firm keeps its interest payments equal to a target fraction of its free cash flows.

**continuation value**    The current value of all future free cash flow from continuing a project or investment. *See also* terminal value.

**continuous compounding**    The compounding of interest every instant (an infinite number of times per year).

**conversion price**    The face value of a convertible bond divided by the number of shares received if the bond is converted.

**conversion ratio**    The number of shares received upon conversion of a convertible bond, usually stated per $1000 face value.

**convertible bonds**    Corporate bonds with a provision that gives the bondholder an option to convert each bond owned into a fixed number of shares of common stock.

**convertible preferred stock**    A preferred stock that gives the owner an option to convert it into common stock on some future date.

**corporate bonds**    Bonds issued by a corporation.

**corporate governance**    The system of controls, regulations, and incentives designed to minimize agency costs between managers and investors and prevent corporate fraud.

**corporate investor, corporate partner, strategic partner, strategic investor**    A corporation that invests in private companies.

**corporate partner**    *See* corporate investor.

**corporation**    A legally defined, artificial being, separate from its owners.

**correlation**    The covariance of the returns divided by the standard deviation of each return; a measure of the common risk shared by stocks that does not depend on their volatility.

**cost of capital**    The expected return available on securities with equivalent risk and term to a particular investment.

**coupon bonds**    Bonds that pay regular coupon interest payments up to maturity, when the face value is also paid.

**coupon rate**    Determines the amount of each coupon payment of a bond. The coupon rate, expressed as an APR, is set by the issuer and stated on the bond certificate.

**coupon-paying yield curve**    A plot of the yield of coupon bonds of different maturities.

**coupons**    The promised interest payments of a bond.

**covariance**    The expected product of the deviation of each return from its mean.

**covenants**    Restrictive clauses in a bond contract that limit the issuers from undercutting their ability to repay bonds.

**covered interest parity equation**    States that the difference between the forward and spot exchange rates is related to the interest rate differential between the currencies.

**credibility principle**    The principle that claims in one's self-interest are credible only if they are supported by actions that would be too costly to take if the claims were untrue.

**credit default swap (CDS)**    When a buyer pays a premium to the seller (often in the form of periodic payments) and receives a payment from the seller to make up for the loss if the underlying bond defaults.

**credit rating**    A rating assigned by a rating agency that assesses the likelihood that a borrower will default.

**credit risk**    The risk of default by the issuer of any bond that is not default free; it is an indication that the bond's cash flows are not known with certainty.

**credit spread**    The difference between the risk-free interest rate on U.S. Treasury notes and the interest rates on all other loans. The magnitude of the credit spread will depend on investors' assessment of the likelihood that a particular firm will default.

**cum-dividend**    When a stock trades before the ex-dividend date, entitling anyone who buys the stock to the dividend.

**cumulative abnormal return**    Measure of a stock's cumulative return relative to that predicted based on its beta.

**cumulative normal distribution**    The probability that an outcome from a standard normal distribution will be below a certain value.

**currency forward contract**    A contract that sets a currency exchange rate, and an amount to exchange, in advance.

**currency swaps**    A contract in which parties agree to exchange coupon payments and a final face value payment that are in different currencies.

**currency timeline**    Indicates time horizontally by dates (as in a standard timeline) and currencies vertically (as in dollars and euros).

**current assets**    Cash or assets that could be converted into cash within one year. This category includes marketable securities, accounts receivable, inventories, and pre-paid expenses such as rent and insurance.

**current liabilities**    Liabilities that will be satisfied within one year. They include accounts payable, notes payable, short-term debt, current maturities of long-term debt, salary or taxes owed, and deferred or unearned revenue.

**current ratio**    The ratio of current assets to current liabilities.

**current yield**    Coupon amount expressed as a percentage of the current price of a bond.

**daily settlement**    A procedure in which the margin used to secure a position in a financial contract is adjusted at the end of each day according to the change in the contract's market value.

**data snooping bias**    The idea that given enough characteristics, it will always be possible to find some characteristic that by pure chance happens to be correlated with the estimation error of a regression.

**data table**    An Excel function that allows the user to perform sensitivity analysis by computing updated output values (for example, NPV or IRR) by changing one or two assumptions or input variables (such as the discount rate or growth rate).

**dealer paper**    Commercial paper that dealers sell to investors in exchange for a spread (or fee) for their services. The spread decreases the proceeds that the issuing firm receives, thereby increasing the effective cost of the paper.

**debentures**    A type of unsecured corporate debt. Debentures typically have longer maturities (more than ten years) than notes, another type of unsecured corporate debt.

**debt capacity**    The amount of debt at a particular date that is required to maintain the firm's target debt-to-value ratio.

**debt ceiling**    A constraint imposed by the U.S. Congress limiting the overall amount of debt the government can incur.

**debt cost of capital**    The cost of capital, or expected return, that a firm must pay on its debt.

**debt covenants**    Conditions of making a loan in which creditors place restrictions on actions that a firm can take.

**debt overhang**    When shareholders choose not to invest in a positive-NPV project because some of the gains from investment will accrue to debtholders.

**debt-equity ratio**    The ratio of a firm's total amount of short- and long-term debt (including current maturities) to the value of its equity, which may be calculated based on market or book values.

**debt-to-capital ratio**    The ratio of a firm's total amount of short- and long-term debt (including current maturities) to the sum of the value of its debt and the value of its equity, which may be calculated based on market or book values.

**debt-to-enterprise-value ratio**    The fraction of a firm's enterprise value that corresponds to net debt.

**debt-to-value ratio**    Ratio of debt to debt plus equity, in terms of market values. It is also common to use net debt in place of debt (the debt-to-enterprise value ratio).

**debtor-in-possession (DIP) financing**    New debt issued by a bankrupt firm; this debt is senior to all existing creditors,

providing renewed access to financing to allow a firm that has filed for bankruptcy to keep operating.

**decision node**   A node on a decision tree at which a decision is made, and so corresponds to a real option.

**decision tree**   A graphical representation of future decisions and uncertainty resolution.

**declaration date**   The date on which a public company's board of directors authorizes the payment of a dividend.

**deductible**   A provision of an insurance policy in which an initial amount of loss is not covered by the policy and must be paid by the insured.

**deep in-the-money**   Describes options that are in-the-money and for which the strike price and stock price are very far apart.

**deep out-of-the-money**   Describes options that are out-of-the-money and for which the strike price and the stock price are very far apart.

**default**   When a firm fails to make the required interest or principal payments on its debt, or violates a debt covenant.

**default spread**   *See* credit spread.

**deferred taxes**   An asset or liability that results from the difference between a firm's tax expenses as reported for accounting purposes, and the actual amount paid to the taxing authority.

**depreciation**   A yearly deduction a firm makes from the value of its fixed assets (other than land) over time according to a depreciation schedule that depends on an asset's life span.

**depreciation expense**   Amount deducted, for accounting purposes, from an asset's value to reflect wear and tear over a given period.

**depreciation tax shield**   The tax savings that result from the ability to deduct depreciation.

**derivative security**   A security whose cash flows depend solely on the prices of other marketed assets.

**diluted EPS**   A firm's disclosure of its potential for dilution from options it has awarded which shows the earnings per share the company would have if the stock options were exercised.

**dilution**   An increase in the total number of shares that will divide a fixed amount of earnings; often occurs when stock options are exercised or convertible bonds are converted.

**direct lease**   A type of lease in which the lessor is not the manufacturer, but is often an independent company that specializes in purchasing assets and leasing them to customers.

**direct paper**   Commercial paper that a firm sells directly to investors.

**dirty price (invoice price)**   A bond's actual cash price.

**disbursement float**   The amount of time it takes before a firm's payments to its suppliers actually result in a cash outflow for the firm.

**discount**   The amount by which a cash flow exceeds its present value. The process of converting a cash flow to its present value.

**discount factor**   The value today of a dollar received in the future.

**discount loan**   A type of bridge loan in which the borrower is required to pay the interest at the beginning of the loan period. The lender deducts interest from the loan proceeds when the loan is made.

**discount rate**   The rate used to discount a stream of cash flows; the cost of capital of a stream of cash flows.

**discounted free cash flow model**   A method for estimating a firm's enterprise value by discounting its future free cash flow.

**discounting**   The process of converting a cash flow to its present value.

**disposition effect**   The tendency to hold on to stocks that have lost value and sell stocks that have risen in value since the time of purchase.

**distribution date**   *See* payable date.

**diversifiable risk**   *See* firm-specific risk.

**diversification**   The averaging of independent risks in a large portfolio.

**dividend payments**   Payments made at the discretion of the corporation to its equity holders.

**dividend payout rate**   The fraction of a firm's earnings that the firm pays as dividends each year.

**dividend puzzle**   When firms continue to issue dividends despite their tax disadvantage.

**dividend signaling hypothesis**   The idea that dividend changes reflect managers' views about a firm's future earnings prospects.

**dividend smoothing**   The practice of maintaining relatively constant dividends.

**dividend yield**   The expected annual dividend of a stock divided by its current price. The dividend yield is the percentage return an investor expects to earn from the dividend paid by the stock.

**dividend-capture theory**   The theory that absent transaction costs, investors can trade shares at the time of the dividend so that non-taxed investors receive the dividend.

**dividend-discount model**   A model that values shares of a firm according to the present value of the future dividends the firm will pay.

**Dodd-Frank Act**   A 2010 Congressional act that sought to bring about financial stability by bringing about sweeping changes to the financial regulatory system in response to the 2008 financial crisis.

**domestic bonds**   Bonds issued by a local entity and traded in a local market, but purchased by foreigners. They are denominated in the local currency.

**double-barreled**   Describes municipal bonds for which the issuing local or state government has strengthened its promise to pay by committing itself to using general revenue to pay off the bonds.

**dual class shares**   When one class of a firm's shares has superior voting rights over the other class.

**DuPont Identity**   Expression of the ROE in terms of the firm's profitability, asset efficiency, and leverage.

**duration**   The sensitivity of a bond's price to changes in interest rates. The value-weighted average maturity of a bond's cash flows.

**duration mismatch**   When the durations of a firm's assets and liabilities are significantly different.

**duration-neutral portfolio**   A portfolio with a zero duration.

**Dutch auction**    A share repurchase method in which the firm lists different prices at which it is prepared to buy shares, and shareholders in turn indicate how many shares they are willing to sell at each price. The firm then pays the lowest price at which it can buy back its desired number of shares.

**dynamic trading strategy**    A replication strategy based on the idea that an option payoff can be replicated by dynamically trading in a portfolio of the underlying stock and a risk-free bond.

**EAB**    *See* equivalent annual benefit.

**EAR**    *See* effective annual rate.

**earnings per share (EPS)**    A firm's net income divided by the total number of shares outstanding.

**earnings yield**    Ratio of expected earnings to share price; reciprocal of the forward P/E multiple.

**EBIT**    A firm's earnings before interest and taxes are deducted.

**EBIT break-even**    The level of sales for which a project's EBIT is zero.

**EBIT margin**    The ratio of EBIT to sales.

**EBITDA**    A computation of a firm's earnings before interest, taxes, depreciation, and amortization are deducted.

**economic distress**    A significant decline in the value of a firm's assets, whether or not the firm experiences financial distress due to leverage.

**economies of scale**    The savings a large company can enjoy—that are not available to a small company—from producing goods in high volume.

**economies of scope**    Savings large companies can realize that come from combining the marketing and distribution of different types of related products.

**effective annual rate (EAR)**    The total amount of interest that will be earned at the end of one year.

**effective dividend tax rate**    The effective dividend tax rate measures the additional tax paid by the investor per dollar of after-tax capital gain income that is instead received as a dividend.

**efficient frontier**    The set of portfolios that can be formed from a given set of investments with the property that each portfolio has the highest possible expected return that can be attained without increasing its volatility.

**efficient market**    When the cost of capital of an investment depends only on its systematic risk, and not its diversifiable risk.

**efficient markets hypothesis**    The idea that competition among investors works to eliminate all positive-NPV trading opportunities. It implies that securities will be fairly priced, based on their future cash flows, given all information that is available to investors.

**efficient portfolio**    A portfolio that contains only systematic risk. An efficient portfolio cannot be diversified further; there is no way to reduce the volatility of the portfolio without lowering its expected return. The efficient portfolio is the tangent portfolio, the portfolio with the highest Sharpe ratio in the economy.

**empirical distribution**    A plot showing the frequency of outcomes based on historical data.

**enterprise value**    The total market value of a firm's equity and debt, less the value of its cash and marketable securities. It measures the value of the firm's underlying business.

**EPS**    *See* earnings per share.

**equal-ownership portfolio**    A portfolio containing an equal fraction of the total number of shares outstanding of each security in the portfolio. Equivalent to a value-weighted portfolio.

**equally weighted portfolio**    A portfolio in which the same dollar amount is invested in each stock.

**equity**    The collection of all the outstanding shares of a corporation.

**equity cost of capital**    The expected rate of return available in the market on other investments with equivalent risk to the firm's shares.

**equity holder (also shareholder or stockholder)**    An owner of a share of stock in a corporation.

**equity multiplier**    Measure of leverage that indicates the value of assets held per dollar of shareholder equity.

**equivalent annual benefit (EAB)**    The annual annuity payment over the life of an investment that has the same NPV as the investment.

**equivalent annual benefit method**    A method of choosing between projects with different lives by selecting the project with the higher equivalent annual benefit. It ignores the value of any real options because it assumes that both projects will be replaced on their original terms.

**error (or residual) term**    Represents the deviation from the best-fitting line in a regression. It is zero on average and uncorrelated with any regressors.

**ESO**    *See* executive stock option.

**ETF**    *See* exchange traded fund.

**Eurobonds**    International bonds that are not denominated in the local currency of the country in which they are issued.

**European options**    Options that allow their holders to exercise the option only on the expiration date; holders cannot exercise before the expiration date.

**evergreen credit**    A revolving line of credit with no fixed maturity.

**ex-dividend date**    A date, two days prior to a dividend's record date, on or after which anyone buying the stock will not be eligible for the dividend.

**excess return**    The difference between the average return for an investment and the average return for a risk-free investment.

**exchange ratio**    In a takeover, the number of bidder shares received in exchange for each target share.

**exchange-traded fund (ETF)**    A security that trades directly on an exchange, like a stock, but represents ownership in a portfolio of stocks.

**execution risk**    The risk that a misstep in the firm's execution may cause a project to fail to generate the forecasted cashflows.

**executive stock option (ESO)**    A common practice for compensating executives by granting them call options on their company's stock.

**exercise price**    *See* strike price.

**exercising (an option)**   When a holder of an option enforces the agreement and buys or sells a share of stock at the agreed-upon price

**exit strategy**   An important consideration for investors in private companies, it details how they will eventually realize the return from their investment.

**expected (mean) return**   A computation for the return of a security based on the average payoff expected.

**expiration date**   The last date on which an option holder has the right to exercise the option.

**face value**   The notional amount of a bond used to compute its interest payments. The face value of the bond is generally due at the bond's maturity. Also called par value or principal amount.

**factor betas**   The sensitivity of the stock's excess return to the excess return of a factor portfolio, as computed in a multifactor regression.

**factor portfolios**   Portfolios that can be combined to form an efficient portfolio.

**factoring of accounts receivable**   An arrangement in which a firm sells receivables to the lender (i.e., the factor), and the lender agrees to pay the firm the amount due from its customers at the end of the firm's payment period.

**factors**   Firms that purchase the receivables of other companies and are the most common sources for secured short-term loans.

**fair market value (FMV) cap lease**   A type of lease in which the lessee can purchase the asset at the minimum of its fair market value and a fixed price or "cap."

**fair market value (FMV) lease**   A type of lease that gives the lessee the option to purchase the asset at its fair market value at the termination of the lease.

**Fama-French-Carhart (FFC) factor specification**   A multifactor model of risk and return in which the factor portfolios are the market, small-minus-big, high-minus-low, and PR1YR portfolios identified by Fama, French, and Carhart.

**familiarity bias**   The tendency of investors to favor investments in companies with which they are familiar.

**FCFE**   *See* free cash flow to equity.

**federal funds rate**   The overnight loan rate charged by banks with excess reserves at a Federal Reserve bank (called federal funds) to banks that need additional funds to meet reserve requirements. The federal funds rate is influenced by the Federal Reserve's monetary policy, and itself influences other interest rates in the market.

**FFC factor specification**   *See* Fama-French-Carhart factor specification.

**field warehouse**   A warehouse arrangement that is operated by a third party, but is set up on the borrower's premises in a separate area. Inventory held in the field warehouse can be used as secure collateral for borrowing.

**final prospectus**   Part of the final registration statement prepared by a company prior to an IPO that contains all the details of the offering, including the number of shares offered and the offer price.

**finance lease**   *See* capital lease.

**inancial distress**   When a firm has difficulty meeting its debt obligations.

**financial option**   A contract that gives its owner the right (but not the obligation) to purchase or sell an asset at a fixed price at some future date.

**financial security**   An investment opportunity that trades in a financial market.

**financial statements**   Firm-issued (usually quarterly and annually) accounting reports with past performance information.

**firm commitment**   An agreement between an underwriter and an issuing firm in which the underwriter guarantees that it will sell all of the stock at the offer price.

**firm-specific, idiosyncratic, unique, or diversifiable risk**   Fluctuations of a stock's return that are due to firm-specific news and are independent risks unrelated across stocks.

**fixed price lease**   A type of lease in which the lessee has the option to purchase the asset at the end of the lease for a fixed price that is set upfront in the lease contract.

**floating lien**   A financial arrangement in which all of a firm's inventory is used to secure a loan.

**floating rate**   An interest rate or exchange rate that changes depending on supply and demand in the market.

**floor planning**   *See* trust receipts loan.

**flow to equity (FTE)**   A valuation method that calculates the free cash flow available to equity holders taking into account all payments to and from debt holders. The cash flows to equity holders are then discounted using the equity cost of capital.

**FMV lease**   *See* fair market value lease.

**foreign bonds**   Bonds issued by a foreign company in a local market and are intended for local investors. They are also denominated in the local currency.

**forward earnings**   A firm's anticipated earnings over the coming 12 months.

**forward exchange rate**   The exchange rate set in a currency forward contract, it applies to an exchange that will occur in the future.

**forward interest rate (forward rate)**   An interest rate guaranteed today for a loan or investment that will occur in the future.

**forward P/E**   A firm's price-earnings (P/E) ratio calculated using forward earnings.

**forward rate agreement**   *See* interest rate forward contract.

**free cash flow**   The incremental effect of a project on a firm's available cash.

**free cash flow hypothesis**   The view that wasteful spending is more likely to occur when firms have high levels of cash flow in excess of what is needed after making all positive-NPV investments and payments to debt holders.

**free cash flow to equity (FCFE)**   The free cash flow that remains after adjusting for interest payments, debt issuance, and debt repayment.

**free float**   The number of shares actually available for public trading. Since 2005, this has been used to compute the value weights of the S&P 500 Index.

1054    **Glossary**

**freezeout merger**    A situation in which the laws on tender offers allow an acquiring company to freeze existing shareholders out of the gains from merging by forcing non-tendering shareholders to sell their shares for the tender offer price.

**friendly takeover**    When a target's board of directors supports a merger, negotiates with potential acquirers, and agrees on a price that is ultimately put to a shareholder vote.

**FTE**    *See* flow to equity.

**funding risk**    The risk of incurring financial distress costs should a firm not be able to refinance its debt in a timely manner or at a reasonable rate.

**future value**    The value of a cash flow that is moved forward in time.

**futures contract**    A forward contract that is traded on an exchange.

**GAAP**    *See* Generally Accepted Accounting Principles.

**general lien**    *See* floating lien.

**general obligation bonds**    Bonds backed by the full faith and credit of a local government.

**Generally Accepted Accounting Principles (GAAP)**    A common set of rules and a standard format for public companies to use when they prepare their financial reports.

**global bonds**    Bonds that are offered for sale in several different markets simultaneously. Unlike Eurobonds, global bonds can be offered for sale in the same currency as the country of issuance.

**golden parachute**    An extremely lucrative severance package that is guaranteed to a firm's senior managers in the event that the firm is taken over and the managers are let go.

**goodwill**    The difference between the price paid for a company and the book value assigned to its assets.

**gray directors**    Members of a board of directors who are not as directly connected to the firm as insiders are, but who have existing or potential business relationships with the firm.

**greenmail**    When a firm avoids a threat of takeover and removal of its management by a major shareholder by buying out the shareholder, often at a large premium over the current market price.

**greenshoe provision**    *See* over-allotment allocation.

**gross margin**    The ratio of gross profit to revenues (sales).

**gross profit**    The third line of an income statement that represents the difference between a firm's sales revenues and its costs.

**growing annuity**    A stream of cash flows paid at regular intervals and growing at a constant rate, up to some final date.

**growing perpetuity**    A stream of cash flows that occurs at regular intervals and grows at a constant rate forever.

**growth option**    A real option to invest in the future. Because these options have value, they contribute to the value of any firm that has future possible investment opportunities.

**growth stocks**    Firms with high market-to-book ratios.

**hedge (or hedging)**    To reduce risk by holding contracts or securities whose payoffs are negatively correlated with some risk exposure.

**herd behavior**    The tendency of investors to make similar trading errors by actively imitating other investors' actions.

**high-minus-low (HML) portfolio**    An annually updated portfolio that is long stocks with high book-to-market ratios and short stocks with low book-to-market ratios.

**high-yield bonds**    Bonds below investment grade which trade with a high yield to maturity to compensate investors for their high risk of default.

**HML portfolio**    *See* high-minus-low portfolio.

**homemade dividend**    When an investor creates a cash payout from their holdings of a stock by simply selling some portion of their shares.

**homemade leverage**    When investors use leverage in their own portfolios to adjust the leverage choice made by a firm.

**homogeneous expectations**    A theoretical situation in which all investors have the same estimates concerning future investment returns.

**horizontal merger**    The type of merger when the target and acquirer are in the same industry.

**hostile takeover**    A situation in which an individual or organization, sometimes referred to as a corporate raider, purchases a large fraction of a target corporation's stock and in doing so gets enough votes to replace the target's board of directors and its CEO.

**hurdle rate**    A higher discount rate created by the hurdle rate rule. If a project can jump the hurdle with a positive NPV at this higher discount rate, then it should be undertaken.

**hurdle rate rule**    Raises the discount rate by using a higher discount rate than the cost of capital to compute the NPV, but then applies the regular NPV rule: Invest whenever the NPV calculated using this higher discount rate is positive.

**idiosyncratic risk**    *See* firm-specific risk.

**immunized portfolio**    *See* duration-neutral portfolio.

**immunizing**    Adjusting a portfolio to make it duration neutral.

**impairment charge**    Captures the change in value of the acquired assets; is not an actual cash expense.

**implied volatility**    The volatility of an asset's return that is consistent with the quoted price of an option on the asset.

**income statement**    A list of a firm's revenues and expenses over a period of time.

**incremental earnings**    The amount by which a firm's earnings are expected to change as a result of an investment decision.

**incremental IRR**    The IRR of the incremental cash flows associated with replacing one project with another, or changing from one decision to another.

**incremental IRR investment rule**    Applies the IRR rule to the difference between the cash flows of two mutually exclusive alternatives (the *increment* to the cash flows of one investment over the other).

**indenture**    Included in a prospectus, it is a formal contract between a bond issuer and a trust company. The trust company represents the bondholders and makes sure that the terms of the indenture are enforced. In the case of default, the trust company represents the bondholders' interests.

**independent (outside) directors**    *See* outside directors.

**independent risk**    Risks that bear no relation to each other. If risks are independent, then knowing the outcome of one provides no information about the other. Independent risks are always uncorrelated, but the reverse need not be true.

**index funds**    Mutual funds that invest in stocks in proportion to their representation in a published index, such as the S&P 500 or Wilshire 5000.

**inefficient portfolio**   Describes a portfolio for which it is possible to find another portfolio that has higher expected return and lower volatility.

**information node**   A type of node on a decision tree indicating uncertainty that is out of the control of the decision maker.

**informational cascade effect**   When traders ignore their own information hoping to profit from the information of others.

**initial public offering (IPO)**   The process of selling stock to the public for the first time.

**inside directors**   Members of a board of directors who are employees, former employees, or family members of employees.

**insider trading**   Occurs when a person makes a trade based on privileged information.

**insurance premium**   The fee a firm pays to an insurance company for the purchase of an insurance policy.

**intangible assets**   Non-physical assets, such as intellectual property, brand names, trademarks, and goodwill. Intangible assets appear on the balance sheet as the difference between the price paid for an acquisiton and the book value assigned to its tangible assets.

**interest coverage ratio**   An assessment by lenders of a firm's leverage. Common ratios consider operating income, EBIT, or EBITDA as a multiple of the firm's interest expenses.

**interest rate factor**   One plus the interest rate, it is the rate of exchange between dollars today and dollars in the future.

**interest rate forward contract**   A contract today that fixes the interest rate for a loan or investment in the future.

**interest rate swap**   A contract in which two parties agree to exchange the coupons from two different types of loans.

**interest tax shield**   The reduction in taxes paid due to the tax deductibility of interest payments.

**internal rate of return (IRR)**   The interest rate that sets the net present value of the cash flows equal to zero.

**internal rate of return (IRR) investment rule**   A decision rule that accepts any investment opportunity where IRR exceeds the opportunity cost of capital. This rule is only optimal in special circumstances, and often leads to errors if misapplied.

**internationally integrated capital markets**   When any investor can exchange currencies in any amount at the spot or forward rates and is free to purchase or sell any security in any amount in any country at its current market prices.

**in-the-money**   Describes an option whose value if immediately exercised would be positive.

**intrinsic value**   The amount by which an option is in-the-money, or zero if the option is out-of-the-money.

**inventories**   A firm's raw materials as well as its work-in-progress and finished goods.

**inventory days**   An expression of a firm's inventory in terms of the number of days' worth or cost of goods sold that the inventory represents.

**inventory turnover**   The ratio of the annual cost of sales to inventory. A measure of how efficiently a firm is managing its inventory.

**investment-grade bonds**   Bonds in the top four categories of creditworthiness with a low risk of default.

**invoice price**   *See* dirty price.

**IPO**   *See* initial public offering.

**IRR**   *See* internal rate of return.

**IRR investment rule**   *See* internal rate of return investment rule.

**Jensen's alpha**   The constant term in a regression of a security's excess returns against those of the market portfolio. It can be interpreted as a risk-adjusted measure of the security's past performance.

**JIT inventory management**   *See* "just-in-time" inventory management.

**junk bonds**   Bonds in one of the bottom five categories of creditworthiness (below investment grade) that have a high risk of default.

**"just-in-time" (JIT) inventory management**   When a firm acquires inventory precisely when needed so that its inventory balance is always zero, or very close to it.

**key personnel insurance**   A type of insurance that compensates a firm for the loss or unavoidable absence of crucial employees in the firm.

**Law of One Price**   In competitive markets, securities or portfolios with the same cash flows must have the same price.

**LBO**   *See* leveraged buyout.

**lead underwriter**   The primary banking firm responsible for managing a security issuance.

**lease-equivalent loan**   A loan that is required on the purchase of an asset that leaves the purchaser with the same net future obligations as a lease would entail.

**lemons principle**   When a seller has private information about the value of a good, buyers will discount the price they are willing to pay due to adverse selection.

**lessee**   The party in a lease liable for periodic payments in exchange for the right to use the asset.

**lessor**   The party in a lease who is entitled to the lease payments in exchange for lending the asset.

**leverage**   The amount of debt held in a portfolio or issued by a firm. *See also* buying stocks on margin.

**leverage ratchet effect**   Once existing debt is in place, shareholders may have an incentive to increase leverage even if it decreases the value of the firm, and shareholders may prefer not to decrease leverage by buying back debt even when it will increase the value of the firm.

**leverage ratio (of an option)**   A measure of leverage obtained by looking at debt as a proportion of value, or interest payments as a proportion of cash flows.

**leveraged buyout (LBO)**   When a group of private investors purchases all the equity of a public corporation and finances the purchase primarily with debt.

**leveraged lease**   A lease in which the lessor borrows from a bank or other lender to obtain the initial capital to purchase an asset, using the lease payments to pay interest and principal on the loan.

**leveraged recapitalization**   When a firm uses borrowed funds to pay a large special dividend or repurchase a significant amount of its outstanding shares.

**levered equity**   Equity in a firm with outstanding debt.

**liabilities**   A firm's obligations to its creditors.

**LIBOR**   *See* London Inter-Bank Offered Rate.

1056     **Glossary**

**limited liability**   When an investor's liability is limited to her initial investment.

**limited liability company (LLC)**   A limited partnership without a general partner.

**limited partnership**   A partnership with two kinds of owners, general partners and limited partners.

**line of credit**   A bank loan arrangement in which a bank agrees to lend a firm any amount up to a stated maximum. This flexible agreement allows the firm to draw upon the line of credit whenever it chooses.

**linear regression**   The statistical technique that identifies the best-fitting line through a set of points.

**liquid**   Describes an investment that can easily be turned into cash because it can be sold immediately at a competitive market price.

**liquidating dividend**   A return of capital to shareholders from a business operation that is being terminated.

**liquidation**   Closing down a business and selling off all its assets; often the result of the business declaring bankruptcy.

**liquidity risk**   The risk of being forced to liquidate an investment (at a loss) because the cash is required to satisfy another obligation (most often a margin requirement).

**LLC**   *See* limited liability company.

**loan origination fee**   A bank charge that a borrower must pay to initiate a loan.

**lockup**   A restriction that prevents existing shareholders from selling their shares for some period (usually 180 days) after an IPO.

**London Inter-Bank Offered Rate (LIBOR)**   The rate of interest at which banks borrow funds from each other in the London interbank market. It is quoted for maturities of one day to one year for ten major currencies.

**long bonds**   Bonds issued by the U.S. Treasury with the longest outstanding maturities (30 years).

**long position**   A positive investment in a security.

**long-term assets**   Net property, plant, and equipment, as well as property not used in business operations, start-up costs in connection with a new business, investments in long-term securities, and property held for sale.

**long-term debt**   Any loan or debt obligation with a maturity of more than a year.

**long-term liabilities**   Liabilities that extend beyond one year.

**MACRS depreciation**   The most accelerated cost recovery system allowed by the IRS. Based on the recovery period, MACRS depreciation tables assign a fraction of the purchase price that the firm can depreciate each year.

**mail float**   How long it takes a firm to receive a customer's payment check after the customer has mailed it.

**management buyout (MBO)**   A leveraged buyout in which the buyer is the firm's own management.

**management discussion and analysis (MD&A)**   A preface to the financial statements in which a company's management discusses the recent year (or quarter), providing a background on the company and any significant events that may have occurred.

**management entrenchment**   A situation arising as the result of the separation of ownership and control in which managers may make decisions that benefit themselves at investors' expense.

**management entrenchment theory**   A theory that suggests managers choose a capital structure to avoid the discipline of debt and maintain their own job security.

**margin**   Collateral that investors are required to post when buying or selling securities that could generate losses beyond the initial investment.

**marginal corporate tax rate**   The tax rate a firm will pay on an incremental dollar of pretax income.

**market capitalization**   The total market value of equity; equals the market price per share times the number of shares.

**market index**   The market value of a broad-based portfolio of securities.

**market makers**   Individuals on the trading floor of a stock exchange who match buyers with sellers.

**market portfolio**   A value-weighted portfolio of all shares of all stocks and securities in the market.

**market proxy**   A portfolio whose return is believed to closely track the true market portfolio.

**market risk**   *See* systematic risk.

**market timing**   The strategy of buy or selling securities (or an asset class) based on a forecast of future price movements.

**market timing view of capital structure**   The idea that capital structure decisions are made in part to exploit under or over-pricing of the stock in the market.

**market value balance sheet**   Similar to an accounting balance sheet, with two key distinctions: First, all assets and liabilities of the firm are included, even intangible assets such as reputation, brand name, or human capital that are missing from a standard accounting balance sheet; second, all values are current market values rather than historical costs.

**market-to-book ratio (price-to-book [PB] ratio)**   The ratio of a firm's market (equity) capitalization to the book value of its stockholders' equity.

**marketable securities**   Short-term, low-risk investments that can be easily sold and converted to cash (such as money market investments, like government debt, that mature within a year).

**marking to market**   Computing gains and losses each day based on the change in the market price of a futures contract.

**martingale prices**   *See* risk-neutral probabilities.

**matching principle**   States that a firm's short-term needs should be financed with short-term debt and long-term needs should be financed with long-term sources of funds.

**maturity date**   The final repayment date of a bond.

**MBO**   *See* management buyout.

**MBS**   *See* mortgage-backed security.

**MD&A**   *See* management discussion and analysis.

**merger waves**   Peaks of heavy activity followed by quiet troughs of few transactions in the takeover market.

**merger-arbitrage spread**   In a takeover, the difference between a target stock's price and the implied offer price.

**method of comparables**    An estimate of the value of a firm based on the value of other, comparable firms or other investments that are expected to generate very similar cash flows in the future.

**mid-year convention**    A method of discounting in which cash flows that arrive continuously throughout the year are treated as though they arrive at the middle of the year. This mid-year convention is a reasonable approximation to continuous discounting.

**momentum strategy**    Buying stocks that have had past high returns, and (short) selling stocks that have had past low returns.

**Monte Carlo simulation**    A common technique for pricing derivative assets in which the expected payoff of the derivative security is estimated by calculating its average payoff after simulating many random paths for the underlying stock price. In the randomization, the risk-neutral probabilities are used, so the average payoff can be discounted at the risk-free rate to estimate the derivative security's value.

**moral hazard**    When purchasing insurance reduces a firm's incentive to avoid risk.

**mortgage bonds**    A type of secured corporate debt. Real property is pledged as collateral that bondholders have a direct claim to in the event of bankruptcy.

**mortgage-backed security (MBS)**    An asset-backed security backed by home mortgages.

**multifactor model**    A model that uses more than one risk factor to capture risk. *See also* Arbitrage Pricing Theory (APT).

**multiple of money**    *See* cash multiple.

**multiple regression**    A regression with more than one independent variable.

**municipal bonds**    Bonds issued by state and local governments. They are not taxable at the federal level (and sometimes not at the state or local level either) and so are sometimes also referred to as tax-exempt bonds.

**mutually dependent investments**    Situation in which the value of one project depends upon the outcome of the others.

**naked short sale**    Short sale in which the seller fails to locate shares to borrow before executing the sale.

**natural hedge**    When a firm can pass on cost increases to its customers or revenue decreases to its suppliers.

**net debt**    Total debt outstanding minus any cash balances.

**net income or earnings**    The last or "bottom line" of a firm's income statement that is a measure of the firm's income over a given period of time.

**net investment**    The firm's capital expenditures in excess of depreciation.

**net operating profit after tax (NOPAT)**    *See* unlevered net income.

**net present value (NPV)**    The difference between the present value of a project's or investment's benefits and the present value of its costs.

**Net Present Value (NPV) Decision Rule**    When making an investment decision, take the alternative with the highest NPV. Choosing this alternative is equivalent to receiving its NPV in cash today. Also known as NPV Investment Rule.

**net profit margin**    The ratio of net income to revenues, it shows the fraction of each dollar in revenues that is available to equity holders after the firm pays interest and taxes.

**net working capital**    The difference between a firm's current assets and current liabilities that represents the capital available in the short-term to run the business.

**no-arbitrage price**    In a normal market, when the price of a security equals the present value of the cash flows paid by the security.

**nominal interest rates**    Interest rates quoted by banks and other financial institutions that indicate the rate at which money will grow if invested for a certain period of time.

**non-tax lease**    A type of lease in which the lessee receives the depreciation deductions for tax purposes, and can also deduct the interest portion of the lease payments as an interest expense. The interest portion of the lease payment is interest income for the lessor.

**NOPAT**    Net operating profit after tax; equivalent to unlevered net income.

**normal market**    A competitive market in which there are no arbitrage opportunities.

**notes**    A type of unsecured corporate debt. Notes typically are coupon bonds with maturities shorter than 10 years.

**notional principal**    Used to calculate the coupon payments in an interest rate swap.

**no-trade theorem**    The idea that when investors have rational expectations, prices will adjust to reflect new information before any trades can occur.

**NPV**    *See* net present value.

**NPV Decision Rule**    *See* Net Present Value (NPV) Decision Rule.

**NPV Investment Rule**    *See* Net Present Value (NPV) Decision Rule.

**NPV profile**    Graph that projects NPV over a range of discount rates.

**off-balance sheet transactions**    Transactions or arrangements that can have a material impact on a firm's future performance yet do not appear on the balance sheet.

**OID**    *See* original issue discount.

**on-the-run bonds**    The most recently issued treasury security of a particular original maturity.

**open interest**    The total number of contracts of a particular option that have been written.

**open market repurchase**    When a firm repurchases shares by buying its shares in the open market.

**operating cycle**    The average length of time between when a firm originally receives its inventory and when it receives the cash back from selling its product.

**operating income**    A firm's gross profit less its operating expenses.

**operating lease**    A type of lease, viewed as a rental for accounting purposes, in which the lessee reports the entire lease payment as an operating expense. The lessee does not deduct a depreciation expense for the asset and does not report the asset, or the lease payment liability, on its balance sheet.

**operating leverage**    Relative proportion of fixed versus variable costs.

**operating margin**    The ratio of operating income to revenues, it reveals how much a company has earned from each dollar of sales before interest and taxes are deducted.

**opportunity cost**    The value a resource could have provided in its best alternative use.

**opportunity cost of capital**    The best available expected return offered in the market on an investment of comparable risk and term to the cash flow being discounted; the return the investor forgoes on an alternative investment of equivalent riskiness and term when the investor takes on a new investment.

**option delta**    The change in the price of an option given a $1 change in the price of the stock; the number of shares in the replicating portfolio for the option.

**option premium**    The market price of the option.

**option writer**    The seller of an option contract.

**original issue discount (OID)**    Describes a coupon bond that is issued at a discount.

**out-of-the-money**    Describes an option that if exercised immediately results in a loss of money.

**outside (independent) directors**    Any member of a board of directors other than an inside or gray director.

**over-allotment allocation (greenshoe provision)**    On an IPO, an option that allows the underwriter to issue more stock, usually amounting to 15% of the original offer size, at the IPO offer price.

**overconfidence bias**    The tendency of individual investors to trade too much based on the mistaken belief that they can pick winners and losers better than investment professionals.

**overhead expenses**    Those expenses associated with activities that are not directly attributable to a single business activity but instead affect many different areas of a corporation.

**paid-in capital**    Capital contributed by stockholders through the purchase of stock from the corporation at a price in excess of its par value.

**par**    A price at which coupon bonds trade that is equal to their face value.

**partnership**    A sole proprietorship with more than one owner.

**pass-through**    Describes securities whose payments derive directly from other assets like mortgages.

**passive portfolio**    A portfolio that is not rebalanced in response to price changes.

**payable date (distribution date)**    A date, generally within a month after the record date, on which a firm mails dividend checks to its registered stockholders.

**payback investment rule**    The simplest investment rule. Only projects that pay back their initial investment within the payback period are undertaken.

**payback period**    A specified amount of time used in the payback investment rule. Only investments that pay back their initial investment within this amount of time are undertaken.

**payments pattern**    Information on the percentage of monthly sales that the firm collects in each month after the sale.

**payout policy**    The way a firm chooses between the alternative ways to pay cash out to equity holders.

**P/E**    *See* price-earnings ratio.

**pecking order hypothesis**    The idea that managers will prefer to fund investments by first using retained earnings, then debt and equity only as a last resort.

**perfect capital markets**    A set of conditions in which investors and firms can trade the same set of securities at competitive market prices with no frictions such as taxes, transaction costs, issuance costs, asymmetric information, or agency costs.

**permanent working capital**    The amount that a firm must keep invested in its short-term assets to support its continuing operations.

**perpetuity**    A stream of equal cash flows that occurs at regular intervals and lasts forever.

**pledging of accounts receivable**    An agreement in which a lender accepts accounts receivable as collateral for a loan. The lender typically lends a percentage of the value of the accepted invoices.

**poison pill**    A defense against a hostile takeover. It is a rights offering that gives the target shareholders the right to buy shares in either the target or an acquirer at a deeply discounted price.

**policy limits**    Those provisions of an insurance policy that limit the amount of loss that the policy covers regardless of the extent of the damage.

**pool (of assets)**    *See* asset pool.

**portfolio**    A collection of securities.

**portfolio insurance**    A protective put written on a portfolio rather than a single stock. When the put does not itself trade, it is synthetically created by constructing a replicating portfolio.

**portfolio weights**    The fraction of the total investment in a portfolio held in each individual investment in the portfolio.

**post-money valuation**    At the issue of new equity, the value of the whole firm (old plus new shares) at the price the new equity is sold at.

**PR1YR portfolio**    *See* prior one-year momentum portfolio.

**pre-money valuation**    At the issuance of new equity, the value of a firm's prior shares outstanding at the price in the funding round.

**precautionary balance**    The amount of cash a firm holds to counter the uncertainty surrounding its future cash needs.

**preferred stock**    Preferred stock issued by mature companies such as banks usually has a preferential dividend and seniority in any liquidation and sometimes special voting rights. Preferred stock issued by young companies has seniority in any liquidation but typically does not pay cash dividends and contains a right to convert to common stock.

**preliminary prospectus (red herring)**    Part of the registration statement prepared by a company prior to an IPO that is circulated to investors before the stock is offered.

**premium**    A price at which coupon bonds trade that is greater than their face value. Also, the price a firm pays to purchase insurance, allowing the firm to exchange a random future loss for a certain upfront expense.

**prepackaged bankruptcy**    A method for avoiding many of the legal and other direct costs of bankruptcy in which a firm first develops a reorganization plan with the agreement of its main creditors, and then files Chapter 11 to implement the plan.

**prepayment risk**    The risk faced by an investor in a callable bond or loan that the principal may be prepaid prior to maturity. This risk is the most important risk for holders of agency-backed mortgages.

**present value (PV)**    The value of a cost or benefit computed in terms of cash today.

**pretax WACC**  The weighted average cost of capital computed using the pretax cost of debt; it can be used to estimate the unlevered cost of capital for a firm that maintains a target leverage ratio.

**price-earnings ratio (P/E)**  The ratio of the market value of equity to the firm's earnings, or its share price to its earnings per share.

**price-to-book (PB) ratio**  *See* market-to-book ratio.

**price-weighted portfolio**  A portfolio that holds an equal number of shares of each stock, independent of their size.

**primary market**  Market used when a corporation itself issues new shares of stock and sells them to investors.

**primary offering**  New shares available in a public offering that raise new capital.

**primary shares**  New shares issued by a company in an equity offering.

**prime rate**  The rate banks charge their most creditworthy customers.

**prior one-year momentum (PR1YR) portfolio**  A self-financing portfolio that goes long on the top 30% of stocks with the highest prior year returns, and short on the 30% with the lowest prior year returns, each year.

**private company**  A company whose shares do not trade on a public market.

**private debt**  Debt that is not publicly traded.

**private equity firm**  A firm organized very similarly to venture capital firms that invests in the equity of existing privately held firms rather than startup companies.

**private placement**  A bond issue that is sold to a small group of investors rather to the general public. Because a private placement does not need to be registered, it is less costly to issue.

**pro forma**  Describes a statement that is not based on actual data but rather depicts a firm's financials under a given set of hypothetical assumptions.

**probability distribution**  A graph that provides the probability of every possible discrete state.

**processing float**  How long it takes a firm to process a customer's payment check and deposit it in the bank.

**profitability index**  Measures the NPV per unit of resource consumed.

**profitability index rule**  Recommends investment whenever the profitability index exceeds some predetermined number.

**project externalities**  Indirect effects of a project that may increase or decrease the profits of other business activities of a firm.

**promissory note**  A written statement that indicates the amount of a loan, the date payment is due, and the interest rate.

**property insurance**  A type of insurance companies purchase to compensate them for losses to their assets due to fire, storm damage, vandalism, earthquakes, and other natural and environmental risks.

**protective put**  A long position in a put option held on a stock you already own.

**proxy fight**  In a hostile takeover, when the acquirer attempts to convince the target's shareholders to unseat the target's board by using their proxy votes to support the acquirers' candidates for election to the target's board.

**public companies**  Those corporations whose stock is traded on a stock market or exchange, providing shareholders the ability to quickly and easily convert their investments into cash.

**public warehouse**  A business that exists for the sole purpose of storing and tracking the inflow and outflow of inventory. If a lender extends a loan to a borrowing firm, based on the value of the inventory, this arrangement provides the lender with the tightest control over the inventory.

**pure discount bonds**  *See* zero-coupon bonds.

**put option**  A financial option that gives its owner the right to sell an asset for a fixed price up to (and on) a fixed date.

**put-call parity**  The relationship that gives the price of call option in terms of the price of put option plus the price of the underlying stock minus the present value of the strike price and the present value of any dividend payments.

**PV**  *See* present value.

**pyramid structure**  A way for an investor to control a corporation without owning 50% of the equity whereby the investor first creates a company in which he has a controlling interest. This company then owns a controlling interest in another company. The investor controls both companies, but may own as little as 25% of the second company.

**quick ratio**  The ratio of current assets other than inventory to current liabilities.

**raider**  The acquirer in a hostile takeover.

**rational expectations**  The idea that investors may have different information regarding expected returns, correlations, and volatilities, but they correctly interpret that information and the information contained in market prices and adjust their estimates of expected returns in a rational way.

**real interest rate**  The rate of growth of purchasing power after adjusting for inflation.

**real option**  The right to make a particular business decision, such as a capital investment. A key distinction between real options and financial options is that real options, and the underlying assets on which they are based, are often not traded in competitive markets.

**realized return**  The return that actually occurs over a particular time period.

**record date**  When a firm pays a dividend, only shareholders of record on this date receive the dividend.

**red herring**  *See* preliminary prospectus.

**refinance**  Repaying an existing loan and then taking out a new loan at a lower rate.

**registered bonds**  The issuer of this type of bond maintains a list of all holders of its bonds. Coupon and principal payments are made only to people on this list.

**registration statement**  A legal document that provides financial and other information about a company to investors, prior to a security issuance.

**regression**  A statistical technique that estimates a linear relationship between two variables (the dependent and independent variable) by fitting a line that minimizes the squared distance between the data and the line.

1060      Glossary

**relative wealth concerns**   When investors are concerned about the performance of their portfolio relative to that of their peers, rather than its absolute performance.

**repatriated**   Refers to the profits from a foreign project that a firm brings back to its home country.

**replicating portfolio**   A portfolio consisting of a stock and a risk-free bond that has the same value and payoffs in one period as an option written on the same stock.

**repurchase yield**   Amount spent on repurchases during the year divided by the firm's equity market capitalization at the start of the year. The repurchase yield plus the dividend yield provides a measure of the firm's total payouts.

**required return**   The expected return of an investment that is necessary to compensate for the risk of undertaking the investment.

**residual income valuation method**   Valuation method based on discounting earnings net of changes in the book value of equity; equivalent to the flow to equity method.

**residual term**   *See* error term.

**residual value**   An asset's market value at the end of a lease.

**retained earnings**   The difference between a firm's net income and the amount it spends on dividends.

**retention rate**   The fraction of a firm's current earnings that the firm retains.

**return**   The difference between the selling price and purchasing price of an asset plus any cash distributions expressed as a percentage of the buying price.

**return of capital**   When a firm, instead of paying dividends out of current earnings (or accumulated retained earnings), pays dividends from other sources, such as paid-in capital or the liquidation of assets.

**return on assets (ROA)**   The ratio of net income plus interest expense to the total book value of the firm's assets. This measure of ROA includes the benefit of the interest tax shield associated with leverage. As a benchmark, ROA is most comparable to the firm's unlevered cost of capital.

**return on equity (ROE)**   The ratio of a firm's net income to the book value of its equity. As a benchmark, ROE is most comparable to the firm's required return on equity.

**return on invested capital (ROIC)**   The ratio of a firm's after-tax profit excluding any interest expense (or income) to the sum of the book value of its equity and net debt. As a benchmark, ROIC is most comparable to the firm's weighted average cost of capital.

**revenue bonds**   Municipal bonds for which the local or state government can pledge as repayment revenues generated by specific projects.

**reverse split**   When the price of a company's stock falls too low and the company reduces the number of outstanding shares.

**revolving line of credit**   A credit commitment for a specific time period, typically two to three years, which a company can use as needed.

**rights offer**   A type of seasoned equity offering (SEO) in which a firm offers the new shares only to existing shareholders.

**risk-arbitrageurs**   Traders who, once a takeover offer is announced, speculate on the outcome of the deal.

**risk aversion**   When investors prefer to have a safe future payment rather than an uncertain one of the same expected amount.

**risk premium**   Represents the additional return that investors expect to earn to compensate them for a security's risk.

**risk-free interest rate**   The interest rate at which money can be borrowed or lent without risk over a given period.

**risk-neutral probabilities**   The probability of future states that are consistent with current prices of securities assuming all investors are risk neutral. Also known as state-contingent prices, state prices, or martingale prices.

**ROA**   *See* return on assets.

**road show**   During an IPO, when a company's senior management and its underwriters travel around the country (and sometimes around the world) promoting the company and explaining their rationale for an offer price to the underwriters' largest customers, mainly institutional investors such as mutual funds and pension funds.

**ROE**   *See* return on equity.

**ROIC**   *See* return on invested capital.

**R-squared**   In the CAPM regression, the square of the correlation between the stock's and market's excess returns. More generally, the fraction of the variance of the independent variable that is explained in a regression.

**"S" corporations**   Those corporations that elect subchapter S tax treatment and are allowed, by the U.S. Internal Revenue Tax code, an exemption from double taxation.

**sale and leaseback**   Describes a type of lease in which a firm already owns an asset it would prefer to lease. The firm receives cash from the sale of the asset and then makes lease payments to retain the use of the asset.

**sales-type lease**   A type of lease in which the lessor is the manufacturer (or a primary dealer) of the asset.

**Samurai bonds**   A term for foreign bonds in Japan.

**Sarbanes-Oxley Act (SOX)**   A 2002 Congressional act intended to improve the accuracy of information given to both boards and to shareholders.

**scenario analysis**   An important capital budgeting tool that determines how the NPV varies as a number of the underlying assumptions are changed simultaneously.

**seasoned equity offering (SEO)**   When a public company offers new shares for sale.

**secondary market**   Market shares continue to trade on after the initial transaction between the corporation and investors.

**secondary offering**   An equity offering of secondary shares.

**secondary shares**   Shares sold by existing shareholders in an equity offering.

**secured debt (loan)**   A type of corporate loan or debt security in which specific assets are pledged as a firm's collateral.

**secured loan**   A loan collateralized with assets held by the firm, such as the firm's accounts receivables, inventory, or plant, property or equipment.

**security**   *See* financial security.

**security interest**   A classification of a lease in bankruptcy proceedings that assumes a firm has effective ownership of an asset and the asset is protected against seizure.

**security market line (SML)**  The pricing implication of the CAPM, it specifies a linear relation between the risk premium of a security and its beta with the market portfolio.

**segmented capital markets**  Capital markets that are not internationally integrated.

**self-financing portfolio**  A portfolio that costs nothing to construct.

**semi-strong form efficiency**  The theory that consistent profits should not be possible from trading on any public information, such as news announcements or analysts' recommendations.

**seniority**  A bondholder's priority in claiming assets not already securing other debt.

**sensation seeking**  The increase in trading activity due to an individual's desire for novel or intense risk-taking experiences.

**sensitivity analysis**  An important capital budgeting tool that determines how the NPV varies as a single underlying assumption is changed.

**SEO**  *See* seasoned equity offering.

**Separate Trading of Registered Interest and Principal Securities (STRIPS)**  *See* STRIPS.

**Separation Principle**  In a perfect market, the NPV of an investment decision can be evaluated separately from any financial transactions a firm is considering.

**serial bonds**  A single issue of municipal bonds that are scheduled to mature serially over a period of years.

**share repurchase**  A situation in which a firm uses cash to buy back its own stock.

**shareholder (also stockholder or equity holder)**  An owner of a share of stock in a corporation.

**Sharpe ratio**  The excess return of an asset divided by the volatility of the return of the asset; a measure of the reward per unit risk.

**short interest**  The number of shares sold short.

**short position**  A negative amount invested in a stock.

**short sale**  Selling a security you do not own.

**short-term debt**  Debt with a maturity of less than one year.

**signaling theory of debt**  The use of leverage as a way to signal information to investors.

**simple interest**  Interest earned without the effect of compounding.

**single-factor model**  A model using an efficient portfolio, capturing all systemic risk alone.

**sinking fund**  A method for repaying a bond in which a company makes regular payments into a fund administered by a trustee over the life of the bond. These payments are then used to repurchase bonds.

**size effect**  The observation that small stocks (or stocks with a high book-to-market ratio) have higher returns.

**small-minus-big (SMB) portfolio**  A portfolio resulting from a trading strategy that each year buys a small market value portfolio and finances that position by selling short a large market value portfolio.

**SMB portfolio**  *See* small-minus-big portfolio.

**SML**  *See* security market line.

**sole proprietorship**  A business owned and run by one person.

**sovereign bonds**  Bonds issued by national governments.

**sovereign debt**  Debt issued by a national government.

**SOX**  *See* Sarbanes-Oxley Act.

**SPE**  *See* special-purpose entity.

**special dividend**  A one-time dividend payment a firm makes that is usually much larger than a regular dividend.

**special-purpose entity (SPE)**  A separate business partnership created by a lessee for the sole purpose of obtaining a lease.

**specialists**  Individuals on the trading floor of the NYSE who match buyers with sellers; also called market makers.

**speculate**  When investors use securities to place a bet on the direction in which they believe the market is likely to move.

**speculative bonds**  Bonds in one of the bottom five categories of creditworthiness that have a high risk of default.

**spin-off**  When a firm sells a subsidiary by selling shares in the subsidiary alone.

**spot exchange rate**  The current foreign exchange rate.

**spot interest rates**  Default-free, zero-coupon yields.

**staggered (classified) board**  In many public companies, a board of directors whose three-year terms are staggered so that only one-third of the directors are up for election each year.

**stakeholder model**  The explicit consideration most countries (other than the United States) give to other stakeholders besides equity holders, in particular, rank-and-file employees.

**standard deviation**  A common method used to measure the risk of a probability distribution, it is the square root of the variance, the expected squared deviation from the mean.

**standard error**  The standard deviation of the estimated value of the mean of the actual distribution around its true value; that is, it is the standard deviation of the average return.

**state prices**  *See* risk-neutral probabilities.

**state-contingent prices**  *See* risk-neutral probabilities.

**statement of cash flows**  An accounting statement that shows how a firm has used the cash it earned during a set period.

**statement of financial performance**  Statement showing the firm's revenues and expenses over a period of time. *See also* income statement.

**statement of financial position**  List of the firm's assets and liabilities that provides a snapshot of the firm's financial position at a given point in time. *See also* balance sheet.

**statement of stockholders' equity**  An accounting statement that breaks down the stockholders' equity computed on the balance sheet into the amount that came from issuing new shares versus retained earnings.

**step up**  Refers to an increase in the book value of a target's assets to the purchase price when an acquirer purchases those assets directly instead of purchasing the target stock.

**stock**  The ownership or equity of a corporation divided into shares.

**stock dividend**  *See* stock split.

**stock exchanges**  *See* stock markets.

**stock markets (also stock exchanges)**  Organized markets on which the shares of many corporations are traded.

**stock options**  A form of compensation a firm gives to its employees that gives them the right to buy a certain number of shares of stock by a specific date at a specific price.

1062    **Glossary**

**stock split (stock dividend)**    When a company issues a dividend in shares of stock rather than cash to its shareholders.

**stock swap**    Merger deal when the target shareholders receive stock as payment for target shares.

**stock-outs**    When a firm runs out of inventory, leading to lost sales.

**stockholder (also shareholder or equity holder)**    An owner of a share of stock or equity in a corporation.

**stockholders' equity**    An accounting measure of a firm's net worth that represents the difference between the firm's assets and its liabilities.

**stop-out yield**    The highest yield competitive bid that will fund a particular U.S. Treasury security issue when all successful bidders (including the noncompetitive bidders) are awarded this yield.

**straddle**    A portfolio that is long a call and a put on the same stock with the same exercise date and the strike price.

**straight-line depreciation**    A method of depreciation in which an asset's cost is divided equally over its life.

**strangle**    A portfolio that is long a call and a put with the same exercise date, but the strike price of the call exceeds the strike price of the put.

**strategic investor**    *See* corporate investor.

**strategic partner**    *See* corporate investor.

**stream of cash flows**    A series of cash flows lasting several periods.

**stretching the accounts payable**    When a firm ignores a payment due period and pays later.

**strike (exercise) price**    The price at which an option holder buys or sells a share of stock when the option is exercised.

**STRIPS (Separate Trading of Registered Interest and Principal Securities)**    Zero-coupon Treasury securities with maturities longer than one year that trade in the bond market.

**strong form efficiency**    The theory that it should not be possible to consistently profit even by trading on private information.

**subordinated debenture**    Debt that, in the event of a default, has a lower priority claim to the firm's assets than other outstanding debt.

**subprime mortgages**    Mortgages for which borrowers do not meet typical credit standards, and thus have a high default probability.

**sunk cost**    Any unrecoverable cost for which a firm is already liable.

**sunk cost fallacy**    The idea that once a manager makes a large investment, he should not abandon a project.

**syndicate**    A group of underwriters who jointly underwrite and distribute a security issuance.

**syndicated bank loan**    A single loan that is funded by a group of banks rather than just a single bank.

**synthetic lease**    A lease that commonly uses a special-purpose entity (SPE) and is designed to obtain specific accounting and tax treatment.

**systematic, undiversifiable, or market risk**    Fluctuations of a stock's return that are due to market-wide news representing common risk.

**tailing the hedge**    Adjusting the hedge position in a futures contract to account for interest earned on marked-to-market profits.

**takeover**    Refers to two mechanisms, either a merger or an acquisition, by which ownership and control of a firm can change.

**takeover synergies**    Value obtained from an acquisition that could not be obtained if the target remained an independent firm; i.e., value in excess of the firm's standalone value.

**tangent portfolio**    A portfolio with the highest Sharpe ratio; the point of tangency to the efficient frontier of a line drawn from the risk-free asset; the market portfolio if the CAPM holds.

**target firm**    A firm that is acquired by another in a merger or acquisition.

**target leverage ratio**    When a firm adjusts its debt proportionally to a project's value or its cash flows (where the proportion need not remain constant). A constant market debt-equity ratio is a special case.

**targeted repurchase**    When a firm purchases shares directly from a specific shareholder.

**tax loss carryforwards and carrybacks**    Two features of the U.S. tax code that allow corporations to take losses during a current year and offset them against gains in nearby years. Since 1997, companies can "carry back" losses for two years and "carry forward" losses for 20 years.

**TED (Treasury-Eurodollar) spread**    Difference in interest rates between the three-month London Inter-Bank Offered Rate (LIBOR) and three-month U.S. Treasury bills.

**temporary working capital**    The difference between the actual level of short-term working capital needs and its permanent working capital requirements.

**tender offer**    A public announcement of an offer to all existing security holders to buy back a specified amount of outstanding securities at a prespecified price over a prespecified period of time.

**term**    Time remaining until the final repayment date of a bond.

**term loan**    A bank loan that lasts for a specific term.

**term sheet**    Summary of the structure of a merger transaction that includes details such as who will run the new company, the size and composition of the new board, the location of the headquarters, and the name of the new company.

**term structure**    The relationship between the investment term and the interest rate.

**terminal (continuation) value**    The value of a project's remaining free cash flows beyond the forecast horizon. This amount represents the market value (as of the last forecast period) of the free cash flow from the project at all future dates. *See also* continuation value.

**TEV (total enterprise value)**    *See* enterprise value.

**time value**    The difference between an option's price and its intrinsic value.

**time value of money**    The difference in value between money today and money in the future; also, the observation that two cash flows at two different points in time have different values.

**timeline**    A linear representation of the timing of (potential) cash flows.

**TIPS (Treasury Inflation-Protected Securities)**  An inflation-indexed bond issued by the U.S. Treasury with maturities of 5, 10, and 20 years. They are standard coupon bonds with one difference: The outstanding principle is adjusted for inflation.

**toehold**  An initial ownership stake in a firm that a corporate raider can use to initiate a takeover attempt.

**tombstone**  A newspaper advertisement in which an underwriter advertises a security issuance.

**total enterprise value (TEV)**  *See* enterprise value.

**total payout model**  A firm's total payouts to equity holders (i.e., all the cash distributed as dividends and stock repurchases) are discounted and then divided by the current number of shares outstanding to determine the share price.

**total return**  The sum of a stock's dividend yield and its capital gain rate.

**trade credit**  The difference between receivables and payables that is the net amount of a firm's capital consumed as a result of those credit transactions; the credit that a firm extends to its customers.

**trade-off theory**  The firm picks its capital structure by trading off the benefits of the tax shield from debt against the costs of financial distress and agency costs.

**trailing earnings**  A firm's earnings over the prior 12 months.

**trailing P/E**  The computation of a firm's P/E using its trailing earnings.

**tranches**  Different classes of securities that comprise a single bond issuance. All classes of securities are paid from the same cash flow source.

**transaction cost**  In most markets, an expense such as a broker commission and the bid-ask spread investors must pay in order to trade securities.

**transactions balance**  The amount of cash a firm needs to be able to pay its bills.

**Treasury bills**  Zero-coupon bonds, issued by the U.S. government, with a maturity of up to one year.

**Treasury bonds**  A type of U.S. Treasury coupon securities, currently traded in financial markets, with original maturities of more than ten years.

**Treasury Inflation-Protected Securities (TIPS)**  *See* TIPS.

**Treasury notes**  A type of U.S. Treasury coupon securities, currently traded in financial markets, with original maturities from one to ten years.

**treasury stock method**  Method of computing a firm's fully diluted share count by including the net new shares potentially created by unexercised in-the-money warrants and options. This method assumes any proceeds the company receives from the exercise are used to repurchase shares. It is equivalent to adding shares with the same market value as the intrinsic value of the options.

**true lease**  A classification of a lease in bankruptcy proceedings in which the lessor retains ownership rights over an asset.

**true tax lease**  A type of lease in which the lessor receives the depreciation deductions associated with the ownership of the asset. The lessee can deduct the full amount of the lease payments as an operating expense, and these lease payments are treated as revenue for the lessor.

**trust receipts loan**  A type of loan in which distinguishable inventory items are held in a trust as security for the loan. As these items are sold, the firm remits the proceeds from their sale to the lender in repayment of the loan.

**tunneling**  A conflict of interest that arises when a shareholder who has a controlling interest in multiple firms moves profits (and hence dividends) away from companies in which he has relatively less cash flow rights toward firms in which he has relatively more cash flow rights.

**turnover ratios**  Measures of working capital computed by expressing annual revenues or costs as a multiple of the corresponding working capital account (accounts receivable, accounts payable, and inventory)

**uncommitted line of credit**  A line of credit that does not legally bind a bank to provide the funds a borrower requests.

**under-investment problem**  A situation in which equity holders choose not to invest in a postive NPV project because the firm is in financial distress and the value of undertaking the investment opportunity will accrue to bondholders rather than themselves.

**underwriter**  An investment banking firm that manages a security issuance and designs its structure.

**underwriting spread**  Company-paid fee to underwriters based on the issue price.

**undiversifiable risk**  *See* systematic risk.

**unique risk**  *See* firm-specific risk.

**unlevered beta**  Measures the risk of a firm were it unlevered; beta of the firm's assets; measures the market risk of the firm's business activities, ignoring any additional risk due to leverage.

**unlevered cost of capital**  The cost of capital of a firm, were it unlevered; for a firm that maintains a target leverage ratio, it can be estimated as the weighted average cost of capital computed without taking into account taxes (pretax WACC).

**unlevered equity**  Equity in a firm with no debt.

**unlevered net income**  Net income plus after-tax interest expense; equivalently, after-tax EBIT. *See also* net operating profit after tax (NOPAT).

**unlevered P/E ratio**  The enterprise value of a firm divided by its unlevered net income in a particular year.

**unsecured debt**  A type of corporate debt that, in the event of a bankruptcy, gives bondholders a claim to only the assets of the firm that are not already pledged as collateral on other debt.

**unsystematic risk**  *See* firm-specific risk.

**valuation multiple**  A ratio of a firm's value to some measure of the firm's scale or cash flow.

**Valuation Principle**  The value of an asset to the firm or its investors is determined by its competitive market price: The benefits and costs of a decision should be evaluated using these market prices, and when the value of the benefits exceeds the value of the costs, the decision will increase the market value of the firm.

**value additivity**    A relationship determined by the Law of One Price, in which the price of an asset that consists of other assets must equal the sum of the prices of the other assets.

**value stocks**    Firms with low market-to-book ratios.

**value-weighted portfolio**    A portfolio in which each security is held in proportion to its market capitalization. Also called an equal-ownership portfolio, because it consists of the same fraction of the outstanding shares of each security.

**variance**    A method to measure the risk of a probability distribution, it is the expected squared deviation from the mean.

**venture capital firm**    A limited partnership that specializes in raising money to invest in the private equity of young firms.

**venture capitalist**    One of the general partners who work for and run a venture capital firm.

**vertical integration**    Refers to the merger of two companies in the same industry that make products required at different stages of the production cycle. Also, refers to the merger of a firm and its supplier or a firm and its customer.

**vertical merger**    The type of merger when the target's industry buys or sells to the acquirer's industry.

**VIX Index**    An index quoted in percent per annum that tracks the one-month implied volatility of options written on the S&P 500 Index. It is a popular measure of market volatility.

**volatility**    The standard deviation of a return.

**WACC**    *See* weighted average cost of capital.

**warehouse arrangement**    When the inventory that serves as collateral for a loan is stored in a warehouse.

**warrant**    A call option written by the company itself on new stock. When a holder of a warrant exercises it and thereby purchases stock, the company delivers this stock by issuing new stock.

**weak form efficiency**    The theory that it should not be possible to profit by trading on information in past prices by, for example, selling winners and hanging on to losers or, conversely, by trading on momentum.

**weighted average cost of capital (WACC)**    The average of a firm's equity and after-tax cost of capital, weighted by the fraction of the firm's enterprise value that corresponds to equity and debt, respectively. Discounting free cash flows using the WACC computes their value including the interest tax shield.

**white knight**    A target company's defense against a hostile takeover attempt, in which it looks for another, friendlier company to acquire it.

**white squire**    A variant of the white knight defense, in which a large, passive investor or firm agrees to purchase a substantial block of shares in a target with special voting rights.

**winner's curse**    Refers to a situation in competitive bidding when the high bidder, by virtue of being the high bidder, has very likely overestimated the value of the item being bid on.

**with recourse**    A loan or lease in which the lender can claim all the borrower's assets, not just explicitly pledged collateral, in the event of a default.

**without recourse**    A loan or lease in which the lender's claim on the borrower's assets in the event of a default is limited to only explicitly pledged collateral.

**workout**    A method for avoiding a declaration of bankruptcy in which a firm in financial distress negotiates directly with its creditors to reorganize.

**Yankee bonds**    A term for foreign bonds in the United States.

**yield curve**    A plot of bond yields as a function of the bonds' maturity date.

**yield to call (YTC)**    The yield of a callable bond calculated under the assumption that the bond will be called on the earliest call date.

**yield to maturity (YTM)**    The discount rate that sets the present value of the promised bond payments equal to the current market price of the bond. Equivalently, it is the IRR of an investment in a bond that is held to maturity and does not default.

**YTC**    *See* yield to call.

**YTM**    *See* yield to maturity.

**zero-coupon bond**    A bond that makes only one payment at maturity.

**zero-coupon yield curve**    A plot of the yield of risk-free zero-coupon bonds (STRIPS) as a function of the bond's maturity date.

# Index

*Note to reader*: **Bold** page number indicates a key topic, which appears bold on the referenced page. Page number followed by *b*, *e*, *f*, or *t* indicates that the reference is within a box (*b*), example (*e*), figure (*f*), or table (*t*). Page number preceded by n. indicates that the reference is within a footnote.

## Numbers

$1.00 out lease
  as capital lease, 867
  defined, **864**
10-K yearly financial statement, **22**
10-Q quarterly financial statement, **22**
95% confidence interval, for expected return, **325**

## A

*A. see* assets (*A*)
$\alpha$ (alpha). *see* alpha ($\alpha$)
AAA ratings, of collateralized debt obligation (CDO), 847
abandonment option
  defined, **783**
  overview of, 788–789
  review, 799
Abel, A., 161
ABS. *see* asset-backed security
absolute return. *see also* cash multiples, 698
accounting practices
  lease vs. borrow, 881–882
  for leasing, 866–867
  mergers and acquisitions and, 944–945
  for synthetic leases, 870*b*
  tax treatment of leases, 868–869
accounts payable
  adjusting for changes in working capital, 32
  cost of trade credit with stretched payables, 896*e*
  as current liability, **26**

managing, 895–896, 895*e*
review, 901
review problems, 904–905
accounts payable days
  cash conversion cycle (CCC), 887, 888*t*
  defined, **38**
  overview of, 895
accounts payable turnover, **38**
accounts receivable
  adjusting for changes in working capital, 32
  as collateral for secured loans, 921–922
  as current asset, **25**
  loss of receivables as indirect cost of bankruptcy, 545
  managing, 892–895
  review, 901
  review problems, 904
accounts receivable days, **38**
  cash conversion cycle (CCC), 887, 888*t*
  monitoring receivables, 893
accounts receivable turnover, **25**
accumulated depreciation, as long-term asset, **25**
Ackermann, J., n. 497
acquirer (bidder), in mergers and acquisition
  defined, **931**
  paying acquisition premium, 933–934
  stepping up book value of target assets, 945
  tender offer of, 941–942
acquisition costs, costs of holding inventory, 897
acquisition premium
  paid for merger, **933**
  stock price reaction to merger, 934*t*
acquisitions. *see also* mergers and acquisitions
  debt capacity for, 632*e*
  sources and uses of funds in Ideko example, 680*t*

valuing foreign acquisitions in segmented market, 1036–1037*e*
valuing using APV method, 636*e*
valuing using constant interest coverage ratio, 646*e*
valuing using FTE method, 640*e*
valuing using WACC method, 630–631*e*
actuarially fair, insurance premiums, **987**
adjustable rate mortgages (ARMs), **148***b*
adjusted betas, in beta forecasts, **433**–434
adjusted present value (APV), **633**
  with alternative leverage policies, 644
  comparing WACC, APV, and FTE, 647–648
  constant interest coverage ratio and, **645**
  cost of capital with fixed debt structure (Avco RFX project), 656*t*
  interest tax shield and, 634–635
  with other leverage policies, 664–666
  overview of, 633
  permanent debt and, 655*e*
  personal taxes and, 658*e*
  predetermined debt levels in APV method, 646–647
  review, 662–663
  solving for leverage and value simultaneously, 672–673
  summary of, 635–636
  unlevered value of projects, 633–634
  valuation of equity, 695–696
  valuing an acquisition using, 636*e*
Admati, A., n. 497, 501, n. 557, n. 562*b*
adverse selection
  defined, **567**
  in equity markets, 567*e*
  implications for capital structure, 570–571
  implications for equity issuance, 568–569
  insurance policy limits and, 991–992*e*
  insurance prices and, 990

1066    Index

adverse selection (*continued*)
  overview of, 566–568
  winner's curse and, 822
after-tax borrowing rate, leases and, 875–876
after-tax interest rates
  comparing, 158*e*
  overview of, **157**–158
  WACC method using, 627
agency benefits
  commitment and, 561–562
  concentration of ownership, 559–560
  overview of, 559
  reduction of wasteful investment, 560–561
  review, 574
  review problems, 580–581
agency costs
  capital budgeting and, 650–651
  corporate governance and, 962
  of debt, 766–767, 766–767*e*
  debt levels in practice and, 564
  debt maturity and covenants, 558
  debt overhang and under-investment as, 554–556
  defined, **553**
  excessive risk-taking and asset substitution, 553–554
  insurance prices and, 990
  of leverage, 556, 556–557*e*
  optimal debt levels, 563–564
  of retention of cash, 606–607
  review, 573–574
  review problems, 578–580
  stakeholder model and, 979–980
  trade-off theory and, 563
agency problem
  corporate ethics and, 11–12
  defined, **11**
  financial options and, 730–731
  managerial motives for mergers, 940
  managing conflicts due to, 968
Aggarwal, R., n. 819
aggressive financing policy, **915**
aging schedule
  defined, **893**
  monitoring receivables, 894–895, 894*e*, 894*t*
airlines
  bankruptcies in, 14*b*
  EBIT margins for four U.S. airlines, 36*f*
  government loan guarantees, 650*b*
  hedging commodity price risk, 994*f*
  leasing airplanes, 859
  leverage and risk of bankruptcy (United Airlines example), 539
  operating lease (Alaska Air Group), 867*b*
Aivazian, V., 534
Akerlof, G., 567*b*
Alchian, A., n. 878
Alexander, G., 194, 389

Allayannis, G., 1021
Allen, F., n. 599, n. 608, 619
all-equity comparables, in determining cost of capital, 414
Almeida, H., n. 551, 902, n. 979
alpha (α)
  estimating for mutual funds, 451*f*
  identifying for stocks, 438–439
  positive-alpha trading strategies, 458–460
  profiting from non-zero alpha stocks, 439–440
  of securities ($\alpha_s$), **410**, 439
Altinkilic, O., 831
Altman, E., n. 544, 800
American options
  arbitrage bounds on prices, 720–721
  arbitrage profits and, 720
  Black-Scholes formula applied to call option, 748
  defined, **707**
  dividend-paying stocks and, 724–726
  valuing put option (JetBlue example), 749*f*
American Recovery and Reinvestment Act (2009), 252*b*
American Stock Exchange (AMEX)
  investing in market indexes, 404
  as largest stock market, 15
Amihud, Y., n. 955
amortization
  computing loan payments, 146–147
  deductibility of, n. 29
  defined, **26**
  long-term assets and, 26
amortizing loan, **146**
Amran, M., 800
Anderson, C., 769
Ang, J., 881
angel investors, in equity financing, **807**
annual percentage rate (APR)
  converting to discount rate, 145–146*e*
  converting to effective annual rate (EAR), 144
  defined, **144**
  overview of, 144–146
annual reports, financial disclosure by firms, **22**
annuities
  computing internal rate of return (*IRR*), 128–129*e*
  defined, **112**
  determining payment amount, 124
  determining present value when discount rates vary by maturity, 152*b*
  evaluating annuity with monthly cash flows, 122*e*
  example problems, 134–135
  future value of, 114–115
  growing annuity, 118–119
  present value of, 112–113, 114*e*, 123

  in retirement savings plan, 115*e*
  using wrong discount rate, 143*b*
annuity due, n. 114
annuity spreadsheet
  computing loan payments, 147
  determining annuity payment amount, 125*e*
  overview of, **121***e*
Antikarov, V., 800
antitrust legislation, 949
APR. *see* annual percentage rate (APR)
APT (Arbitrage Pricing Theory), **462**
APV. *see* adjusted present value (APV)
arbitrage
  bond arbitrage, 181
  bounds on option prices, 720–721
  in currency markets during financial crisis, 1003*b*
  efficient markets hypothesis and, 300
  homemade leverage and, 485*e*
  merger-arbitrage spread, 942–943
  mergers and acquisitions and, 944*f*
  NASDAQ SOES bandits, 71*b*
  no-arbitrage pricing, 72–75
  overview of, 60, **70**–71
  risk premiums and, 334
  risky vs. risk-free cash flows and, 92–93
  stock index and, 77*b*
  stock index arbitrage, 77*b*
  transaction costs and, 93
arbitrage opportunities
  identifying in securities, 73–75
  joke illustrating, 72*b*
  overview of, **70**
Arbitrage Pricing Theory (APT), **462**
arithmetic average, vs. compound annual return, 326*b*
ARMs (adjustable rate mortgages), **148***b*
Arzac, E., 661, 701
ask price, stocks, **16**
Asquith, P., n. 569, 856
asset-backed bonds, **839**
asset-backed securities (ABS)
  defined, **844**
  overview of, 844–845
  review, 855
  review problems, 857
asset betas ($\beta_U$)
  capital structure and, 691*t*
  estimating, 418*e*
  industry asset betas, 417–419
  industry chart (2012), 419*f*
  in MM (Modigliani-Miller) proposition II, 491–494
  overview of, **416**
asset cost of capital
  defined, **415**
  determining project's cost of capital, 415–417
  unlevering cost of capital, 416*e*

asset pools, **846**–847*b*
assets (*A*)
　current, 25
　defined, **24**
　duration mismatch, 1012
　estimating industry asset betas, 418*e*
　fire sales, 545–546
　historical value of investment in,
　　314–315*f*
　industry asset betas (2012), 418*e*
　interest tax shield as, 518
　lease vs. buy, 859, 872–873
　long-term, **25–26**
　missing, 697*b*
　opportunity cost of idle, 238*b*
　return on (ROA), **43**
　valuing portfolio, 77–78
asset securitization, **844**
asset substitution problem, 553–**554**
assets under management (AUM), 451
asset turnover, in DuPont Identity, **44**
assumptions
　Capital Asset Pricing Model (CAPM),
　　379–380
　capital budgeting (best-and worst-case),
　　253*t*, 254*f*
　capital expenditures (Ideko business
　　plan), 678*t*
　model building, 757*b*
　operating costs (Ideko business plan),
　　677*t*
asymmetric information, capital structure
　　and
　adverse selection and lemons principle,
　　566–568
　implications of adverse selection for
　　capital structure, 570–571
　implications of adverse selection for
　　equity issuance, 568–569
　leverage as credible signal, 565–566
　overview of, 564–**565**
　review, 574
　review problems, 582–583
attention, trading biases and,
　　446–447
at-the-money, financial options, **708**
Atkins, A., 132
auction IPO
　defined, **814**
　pricing in, 814*e*
auditing
　financial model and, 688*b*
　financial statements, **22**
　monitoring corporate governance,
　　965
auditor, **22**
Auerbach, A. J., n. 605
AUM (assets under management), 451
availability float, **892**
Avant bond, 187*t*

average annual returns
　comparing stocks, bonds, and Treasury
　　Bills (1926–2011), 322*f*
　overview of, **321**–322
　vs. compound annual returns, 326*b*

**B**
*β*. *see* beta (*β*)
Bachelier, L., n. 710
backdating, stock options, **967**
Baginski, S., 51
Bagwell, L., 619
Bailey, J., 194, 389
bailouts, due to global financial crisis, 555*b*,
　　562*b*
Bain Capital, 528*b*
Baker, M., 469, n. 571
balance sheet identity, **25**
balance sheets
　assets, 25–26
　enterprise value, 28
　example problems, 52–55
　fictitious examples, 24*t*, 675*t*
　in financial models, 686–689
　leases and, 866–867*e*, n. 867
　liabilities, 26
　market value balance sheet compared
　　with, 486
　market value balance sheet (Savings and
　　Loan example), 1012*t*
　market vs. book value, 27–28
　overview of, **24**–25
　pro forma, 687*t*
　stockholders' equity, 27
　suspect arguments for leasing, 880
Ball, R., 303
balloon payments, in debt repayment, **852**
Balson, A., 528*b*
Bancel, F., 534
bank loans
　bridge loans, 917
　end-of-period payment loans, 916
　lines of credit, 916–917
　review, 924
　review problems, 926
　for short-term financing, 916
　stipulations and fees, 917–918
bankruptcy. *see also* financial distress
　in airlines, 14*b*
　capital structure and, 541–542
　corporate, 13–14
　direct costs of, 543–544
　indirect costs of, 544–547
　insurance and, 988
　leasing and, 869–870
　leverage and risk of (United Airlines),
　　539
　prepackaged (Chrysler), 547*b*
　risk impacting firm value, 542*e*
　valuing distress costs, 651*e*

bankruptcy code, 543
banks
　capital regulation and ROE fallacy, 497*b*
　supply and demand for currency and, 999
Banz, R., 456–457, n. 456
Barber, B., n. 443, 444*f*, n. 444, n. 445,
　　n. 446, n. 454, 469
Barberis, N., 469
Barca, F., 19
Barclay, M., 619
Barrett, William, 1040*b*
Bartter, B., n. 739
Basel III Accord, n. 497
basis risk, **997**
Baumol, W., 902
Bautista, A., n. 873
bearer bonds, **839**
Bebchuk, L., n. 979
Becht, M., 19, 983
behavioral biases. *see also* systematic
　　trading biases
　implications of, 447
　of investors, 460
Benartzi, S., n. 442, n. 609
Benninga, S., 701
Benveniste, L., 831
Beranek, W., n. 915
Berens, J., n. 530
Berk, J. B., n. 452, n. 453, n. 457, 469,
　　n. 546, n. 783, n. 797
Berkman, H., 1021
Berkman, H., 1021
Bernanke, B., 161
Bernardo, A., 619, n. 783, 800
Bernstein, P., 501
Bertrand, M., n. 979
best-efforts IPO, **813**
best-fitting line
　beta estimation for cost of capital,
　　408–409
　defined, n. 408
beta (*β*)
　cash and, 417*e*
　computing beta of debt, 765–766*e*
　cost of capital and, 340, 348–349
　of debt ($\beta_D$), 492–494, 555–556,
　　765–766*e*, 765*f*
　debt betas, 413–414
　of equity ($\beta_E$), 492–494, 555, 765*f*
　equity betas, 690–691
　estimating, 338*e*
　expected returns and, 341*e*
　factor betas, 461–462
　interpreting, 338
　leverage and, 420*e*, 493*e*
　levered and unlevered betas, 491–494
　of levered equity ($\beta_E$), 492–493
　market risk and, 381–384
　negative-beta stocks, 383*e*
　of a portfolio, 384–386
　required returns and, 375–377

1068    Index

beta ($\beta$) (*continued*)
    risk premium adjustment, 340–341
    risk premium determination, 378–379
    of risky debt, 763–765, 765–766*e*
    for S&P 500 stocks (2007–2012), 339*t*
    of security, 337–338, 382
    sensitivity to systematic risk, **337**
    of stock ($\beta_s$), 337–338
    of unlevered equity ($\beta_U$), 492–493
    unlevering, 690–691
    volatility and, 340*b*
beta estimation
    for Cisco Systems (1999–2012), 434*f*
    cost of capital based on historical
        returns, 407–408
    cost of capital by identifying best-fitting
        line, 409
    cost of capital by linear regression,
        410–411
    for industry asset betas, 418*e*
    practical considerations in, 433–436
    for project of single-product firm,
        414–415*e*
    review, 425–426
    review problems, 428–429
    with/without outliers, 435*f*
Betker, B., n. 544
Betts, John, 233
Bhattacharya, S., 501
Biais, B., n. 891
biases, investor. *see* systematic trading
        biases
bid price, stocks, **16**
bid-ask spread, stocks, **17**
bidder, in mergers and acquisitions.
        *see* acquirer (bidder), in mergers
        and acquisition
Bikhchandani, S., n. 447, 469
Billingsley, R., 856
binomial lattice, n. 743
Binomial Option Pricing Model
    defined, **739**
    deriving Black-Scholes formula from, 747
    making models realistic, 746
    multiperiod model, 742–744
    pricing formula, 741–742
    review, 767
    review problems, 769–770
    stock price path, 746*f*
    two-state, single period model, 739–740
    valuing put options, 742*e*, 745*e*
binomial trees
    in binomial pricing formula, 741
    decision trees compared with, 774
    defined, **739**
    making models realistic, 746
    in multiperiod model, 743–744
    option pricing with risk-neutral
        probabilities, 760

    in two-state, single period model,
        739–740
    valuing put options, 742*e*, 745*e*
bird in the hand hypothesis, **593***b*
Bizer, D., n. 557
Black, F., n. 399, n. 410, 427, n. 596,
        n. 601, n. 727, 738, n. 738, 747,
        754, 757*b*,769
BlackRock, 405*b*
Black-Scholes Option Pricing Model
    applied to real investment option,
        778–780, 778*t*
    Black-Scholes formula, 747–748
    computing implied volatility, 752, 753*e*
    defined, **747**
    limitations in applying to executive
        stock options, 756*b*
    for option quotes (JetBlue), 749*t*
    for replicating portfolio, 754–755, 754*e*
    review, 767–768
    review problems, 770–771
    valuing call options, 748*e*, 749*f*
    valuing options on dividend paying
        stocks, 750–751, 751–752*e*
    valuing put options, 749–750, 750*e*
    VIX index and, 753*b*
blanket liens, on inventory, **922**
Blaylock, B., n. 547
Blum, P., 271
Blume, M., n. 433, n. 456
board of directors
    approval of mergers and acquisitions,
        945–946
    in corporate organization chart, 10*f*
    Dodd-Frank Act and, 975
    independence of, 963–964
    other monitors complementing, 965
    review, 981–982
    review problems, 983–984
    role in corporate management, **9**
    size of, 964
    types of directors, 963
Bodie, Z., 194, 344
Bogle, J., 452, n. 452
Bolton, P., n. 562, 983
bond certificates, **170**
bond covenants, 845–848, 855, 857
bond markets, 841
bond prices
    call price, of bonds, 848
    clean and dirty prices of coupon
        bonds, 179*b*
    computing from YTM, 174*e*
    computing no-arbitrage price, **74***t*
    computing price of coupon bond,
        181–182
    computing price of coupon bond
        from zero-coupon bond prices,
        181–182

conversion price, **853**
    interest rate determined from, 74–75
    interest rate ($r$), 178–181, 179–180*e*
    price on call date, 849*f*
    price prior to call date, 850*f*
    time and, 176–178, 178*b*
bond ratings, 187–188, 187*t*
bonds
    average annual returns (1926–2011),
        322*f*
    bearer and registered bonds, 839
    call provisions, 848–851
    callable bonds, 848, 849*f*, 850*f*
    consol, 109
    converting into equity, 852–854, 853*f*
    coupon payments on inflation-indexed
        bonds, 843*e*
    defined, **72**
    excess return vs. volatility, 327*t*
    as financial security, **72**
    indenture, in public bond prospectus, **837**
    interest rate determination from bond
        prices, 74–75
    investment, value in (historical),
        314–315*f*
    issuance costs, 648*t*, 825*f*
    maturities of, 837–839
    municipal bonds (munis), 844, 850*b*
    net cash flows from buying vs.
        selling, 73*t*
    no-arbitrage price, 74
    private placement bonds, **842**
    returns on (historical), 313
    risk and return (historical), 345–346
    risky government bonds, 1035*e*
    sinking funds for repayment, 852
    sovereign debt and, 842–844
    time impact on bond prices, 178*b*
    types of corporate debt, 839–840
    volatility (1926–2011), 322*t*, 324*t*
    yield to call (YTC), **851**, 851–852*e*
bonds, valuing
    bond ratings and, 187–188, 187*t*
    computing price of coupon bond
        from zero-coupon bond prices,
        181–182
    computing yields from forward interest
        rates, 202
    corporate bond yields, 185–188
    coupon bonds, 173–175
    coupon bond yields, 182–184
    discounts and premiums, 175–176
    example problems, 195–199
    interest rates and, 178–181
    overview of, 169–170
    review, 193–194
    risk-free interest rate and, 171–172
    sovereign bonds, 188–191
    terminology, 170

time and bond prices, 176–178
treasury bond yields, 184
yield curve and bond arbitrage, 181
yield to maturity (YTM), 171, 172*e*
zero-coupon bonds, 170–171
book building, in pricing IPOs, **818**
book value
 of assets, **25**
 of equity, **27**
book-to-market ratio
 excess returns and, **456**, 456*f*
 strategy for portfolio selection, 463
Booth, L., 534
Borison, A., 800
borrowing
 after-tax lease borrowing rate, 875
 costs reduced by diversification and
  scale resulting from mergers, 938
 lease vs., 873–875, 874*t*
 trade-offs between long and short term,
  1017
borrowing, for investment
 buying stocks on margin, 372–373
 efficient frontier with differing savings
  and borrowing rates, 398
 money for investments, 371
 review, 388
 review problems, 393–394
Bowman, R., 882
Boyd, J., n. 600
Bradbury, M., 1021
Bradley, M., 534, 856, n. 933
Bradshaw, M., 51
Brander, J., n. 562
Brav, A., n. 611, 826, n. 828, 831
break-even, **252**
break-even analysis
 defined, **253**
 using Excel for, 257*b*
Brennan, M., n. 399, 534, n. 595, n. 795,
  800, 856
bridge loans, **917**
Brisley, N., 769
Brockman, P., 619
Brooks, R., 1020
Brown, K., 344,1021
Brown, S., 344
Bruner, R., n. 406
Brunnermeier, M., 469
budgets
 capital. *see* capital budgeting
 U.S. budget deficits and debt ceiling,
  185*b*
Buffett, W., 616*b*
Bühler, W., 856
Bulldogs, in bond market, **841**
Burns, N., n. 967
Burton, J., n. 383
Bush, President George W., 523*b*

business interruption insurance, **986**
business liability insurance, **986**
business plans
 capital expenditures and need for
  expansion, 678
 changing capital structures by levering
  up, 679–680
 operational improvements in,
  677–678
 overview of, 677
 review, 700
 review problems, 700
 working capital requirements, 679
butterfly spread, 716–**717**, 717*f*
buying on margin, stocks, **372**–373
buy vs. lease, 871*t*, 872–873, 873*t*
Byrd, J., n. 963

**C**

"C" corporations, taxation of, **7**
Cadbury, Sir Adrian, 974
Cadbury Commission, 974–975
CAGR. *see* compound annual growth rate
 (CAGR)
calculators, solving problems related to
 time value of money, 120–121
California Public Employees' Retirement
 System (CalPERS), 809, 968
callable annuity rate, **796**
callable bonds
 overview of, **848**
 price on call date, 849*f*
 price prior to call date, 850*f*
 yield to call (YTC), **851**, 851–852*e*
call date, of bonds
 defined, **848**
 prices on, 849*f*
 prices prior to, 850*f*
call options
 butterfly spread, 716–717, 717*f*
 defined, **707**
 equity as, 727, 727*f*
 long position, 710–711
 option quotes and implied debt yields
  (Google), 730*f*
 payoffs at expiration, 710*f*
 pricing currency options, 1008–1009
 profit at expiration, 713*f*
 put-call parity, 718–720, 719*e*
 replicating portfolio and, 754, 755*f*
 short position, 712*e*
 straddle combination, 715
 strangle combination, 716*e*
 two-year call and put options on S&P
  500 index, 726*t*
 valuing (JetBlue example), 749*f*
 valuing on dividend paying stocks,
  750–751, 751–752*e*
 valuing using Black-Scholes formula, 748*e*

valuing using two-state single period
 model, 739–740
viewing investments as, 777–780
call price, of bonds, **848**
call provisions, bond repayment, 848–851
CalPERS (California Public Employees'
 Retirement System), 809, 968
Campbell, J., n. 442
Campello, M., 902
cannibalization
 calculating free cash flow from, 241*t*
 indirect effects on incremental earnings,
  **238**t
capital
 allocating for investment, 205
 bank capital regulation and ROE fallacy,
  497*b*
 budgets. *see* capital budgeting
 equity cost of. *see* equity cost of capital
 opportunity cost of. *see* opportunity
  cost of capital
 working capital. *see* working capital
  management
Capital Asset Pricing Model (CAPM)
 applying to beta of a portfolio, 384–386
 assumptions, 379–380
 benefits and limits of, 423, 425
 capital market line (CML), 380–381
 describing competitive market, 440
 determining risk premiums, 381
 with differing interest rates, 398–399
 efficiency of market portfolio and, 437
 estimating opportunity cost of capital,
  689–690
 excessive trading and overconfidence of
  investors and, 443
 future investment options and, n. 782
 identifying investments of similar risk,
  401
 including investor taxes (extension for),
  n. 595
 individual behavior and market prices
  and, 445
 informed vs. uninformed investors and,
  440–441
 insurance prices and, 988*e*
 investor behavior and, 438–439
 market risk and beta, 381–384
 overview of, **342**
 rational expectations of investors and,
  441–442
 review, 388–389, 425
 review problems, 394–395
 security market line (SML), 384
 Sharpe on, 383*b*
 summary of, 386
 supply, demand, and efficiency of
  market portfolio, 380

1070    Index

capital budget, **234**
capital budgeting and valuation
  accounting for imperfections, 648
  advanced topics, 651
  APV method, 633
  APV method applied to acquisitions, 636*e*
  APV method with alternative leverage policies, 644
  APV method with predetermined debt levels, 646–647
  calculating FCFE, **637**–638
  comparing WACC, APV, and FTE methods, 647–648
  constant interest coverage ratio and, **645**
  debt capacity for acquisitions, 632*e*
  estimating unlevered cost of capital, 640–641
  financial distress and agency costs and, 650–651
  FTE method, 636–637
  FTE method applied to acquisitions, 640*e*
  FTE method applied to equity cash flows, 638
  FTE method with changing leverage, 655–657
  implementing constant debt-equity ratio, 631–632
  incremental leverage of projects and, 642–644
  interest tax shield and, 634–635
  issuance and financing costs and, 648
  leverage and the cost of capital, 654–655
  overview of, 626–628
  periodically adjusted debt, 651–654
  personal taxes and, 657–659
  project-based costs of capital, 640
  project leverage and equity cost of capital, 641–642
  review, 659–661
  review problems, 661–666
  security mispricing and, 649
  summary of APV method, 635–636
  summary of FTE method, 638–639
  summary of WACC method, 630
  unlevered value of projects, 633–634
  valuing loans, 649–650*e*
  WACC method, 628–629
  WACC method applied to acquisitions, 630–631*e*
  WACC method applied to projects, 629–630
  WACC method with changing leverage, 655–657
capital budgeting and valuation case study
  APV valuation of equity, 695–696
  balance sheet and statement of cash flows, 686–689

business plan and, 677
capital expenditures and need for expansion, 678
changing capital structures by levering up, 679–680
comparables approach to, 675–677
discounted cash flow approach to continuation value, 693–695
estimating cost of capital using CAPM, 689–690
forecasting earnings, 680–682
forecasting free cash flows, 683–685
IRR and cash multiples applied to, 697–698
multiples approach to continuation value, 692–693
multiples approach used to comparing valuation with closes competitors, 696–697
operational improvements in business plan, 677–678
overview of, 674
review, 700–701
review problems, 701–703
sensitivity analysis, 699
unlevered cost of capital, 691–692
unlevering beta based on firm capital structure, 690–691
working capital requirements, 679, 682–683
capital budgeting, with exchange risk
  overview of, 1037–1039
  review, 1041
  review problems, 1044
capital budgets
  adjustments to free cash flow, 248–251
  break-even analysis, 252–253
  calculating free cash flow directly, 243–244
  calculating free cash flow from earnings, 241–243
  calculating *NPV*, 244, 246
  comparing free cash flows for alternative approaches, 247
  defined, **234**
  discounted free cash flow model and, 286–287
  evaluating manufacturing alternatives, 246–247
  forecasting incremental earnings, 235–237
  indirect effects on incremental earnings, 237–239
  MACRS depreciation and, 269–270, 270*t*
  overview of, **234**
  project analysis with Excel, 257–258*b*
  real world complexities and, 240
  revenue and cost estimates, 234

review, 258–259
review problems, 259–267
scenario analysis, 256
sensitivity analysis, 253–254
with spreadsheet, 245*b*
sunk costs and incremental earnings, 239
WACC and, 489–491
capital expenditures (*CapEx*)
  assumptions (Ideko business plan), 678*t*
  calculating free cash flow from earnings, 241
  incremental earnings forecast and, 235
  investment activity related to, **32**
  need for expansion and, 678
  net external financing (1975–2011), 525*f*
  sources for U.S. corporations, 570*f*
  suspect arguments for leasing, 879–880
capital gain rate, **273**
capital gains
  investors, 519
  stock valuation, **273**
  taxes on, 594–595, 594*t*
  taxes on capital gains vs. dividends, n. 594
capital lease
  accounting practices for, n. 866
  criteria for, 867
  defined, **866**
  as long-term liability, **26**
  operating lease compared with, 868*e*
capital market line (CML)
  expected returns and, 381*f*
  overview of, 380–**381**
  Security Market Line and, 384*f*
capital markets, competition and, 438
capital preservation, suspect arguments for leasing, 880
capital structure
  adverse selection and, 570–571
  asymmetric information and. *see* asymmetric information, capital structure and
  bankruptcy and, 541–542
  bottom line in, 572
  conservation of value principle, 499
  debt financing. *see* debt financing
  equity financing. *see* equity financing
  leverage effect on risk and return, 481–482
  levering up creating changes in, 679–680
  management entrenchment theory, 564
  overview of, **479**
  review, 500–501
  review problems, 502–506
  taxes and, 524
  trade-off theory. *see* trade-off theory
  unlevered betas and, 690–691, 691*t*

capital structure, fallacies
  equity issuances and dilution, 498
  leverage and earnings per share, 495–497
  overview of, 495
  review, 501
  review problems, 505–506
capital structure, MM proposition I
  homemade leverage, 483–485
  leveraged recapitalization, 486–488
  market value balance sheet, 485–486
  overview of, 483
capital structure, MM proposition II
  capital budgeting and WACC, 489–491
  computing WACC with multiple securities, 491
  leverage and equity cost of capital, 488–489
  levered and unlevered betas, 491–494
  overview of, 488
CAPM. *see* Capital Asset Pricing Model (CAPM)
captured, boards, **964**
Carhart, M., n. 452, n. 465, 469
Carleton, W., n. 969
Carlson, M., n. 828
carried interest, fee to general partners, **808**
carrying costs, costs of holding inventory, 897
Carter, D., 1021
cash
  auditing financial model, 688*b*
  beta ($\beta$) and, 417*e*
  cash balances during global financial crisis, 899*b*
  cost of capital and, n. 493
  financial managers role in cash management, 10
  money market investments as alternative to holding, 900*t*
  net debt and, 417
  net present value (NPV) and cash needs, 68–70
  reasons for holding, 898–899
  reasons for holding excess, n. 683
cash-and-carry strategy
  advantages of forward contracts, 1005
  computing no-arbitrage forward exchange price, 1004*e*
  currency timeline showing, 1002*f*
  for eliminating exchange rate risk, 1005*e*
  Law of One Price and forward exchange rate, 1002–1004
  overview of, 1001
  simultaneous trades in, **1003**
  using, 1005*e*
cash conversion cycle (CCC)
  defined, **887**
  working capital in various industries (2012), 888*t*

cash cycle
  defined, **887**
  operating cycle and, 887*f*
  overview of, 887–889
cash flow (*C*)
  after-tax investor cash flows from EBIT, 520*f*
  annuities. *see* annuities
  comparing levered and unlevered firms, 511*f*
  at date *n*, (C$_n$), 104–105
  for debt and equity of levered firm, 480*t*
  debt financing and, 644
  determining from present or future values, 123–125, 135–137
  discounting risky, 157*e*
  free. *see* free cash flows (FCFs)
  future value of, 99
  lease vs. borrow, 874*t*
  lease vs. buy, 871*t*, 873*t*
  negative cash flow shocks, 911–912, 912*t*
  non-annual, 121
  perpetuities. *see* perpetuities
  positive cash flow shocks, 912–913, 913*t*
  present value of, 102*e*
  solving for number of periods, 139–140
  stream of. *see* stream of cash flows
  in strong and weak economies, 479*t*
  timeline for, 97–98
  for true tax lease, 871–872
  for unlevered equity, 480*t*
  valuing equity cash flows using FTE, 638
  valuing foreign currency cash flows. *see* valuation, of foreign currency cash flows
cash management
  alternative investments, 899–901
  motivation for holding cash, 898–899
  overview of, 898
  review, 901
  review problems, 905
cash multiples
  defined, **698**
  for investment in Ideko Corp., 698*t*
  valuing investments, 697–698
cash offer, SEOs, **826**
cash ratio, balance sheet analysis, 37
casualty insurance, 990
CBOE (Chicago Board Options Exchange)
  option quotes and, 707
  VIX index and, 753*b*
CDO (collateralized debt obligation)
  global financial crisis and, 846–847*b*
  overview of, **845–846**
CDS. *see* credit default swaps (CDS)
CEO. *see* chief executive officer (CEO)
CFO (chief financial officer)
  in corporate organization chart, 10*f*
  role in corporate management, **9**

chaebol, 981
Chakrabory, A., 856
Chance, D., 1020
Chapter 11 reorganization, **543**, 869
Chapter 7 liquidation, **543**
Check Clearing for the 21st Century Act (Check 21), **892**
Chen, Hsuan-Chi, 824, 825
Chevalier, J., n. 452, n. 562
Chew, D. H., n. 609, 619
Chicago Board Options Exchange (CBOE)
  option quotes and, 707
  VIX index and, 753*b*
chief executive officer (CEO)
  board of directors and, 964
  compensation of, 966–967, 966*f*
  in corporate organization chart, 10*f*
  managerial motives for mergers, 940
  ownership interest in firms and, 560
  performance of, 13
  role in corporate management, **9**
chief financial officer (CFO)
  in corporate organization chart, 10*f*
  role in corporate management, **9**
Choi, S., n. 915
Choudhry, M., 161, 902
Chowdhry, B., n. 783, 800
Chung, D., 619
*Citizens United v. Federal Election Commission*, 12*b*
Clarke, J., 831
clawback provisions, Dodd-Frank Act and, 975
Clayton Act (1914), 949
clean expenses, n. 235
clean price, coupon bonds, **179***b*
Clements, J., 450*b*
Click, R., 1041
clientele effects
  defined, **599**
  investor preferences and, 599–601
  review, 617
  review problems, 621–622
CMO (collateralized mortgage obligation), **846–847***b*
Cole, R., 902
Coles, J., n. 968
collateral, for secured loans
  accounts receivable, 921–922
  inventory, 922–924
collateral, margin, 996
collateralized debt obligation (CDO)
  global financial crisis and, 846–847*b*
  overview of, **845**–846
collateralized mortgage obligation (CMO), **846–847***b*
collection float, **892**
collection policy, 893

Collins, D., 51
Comment, R., n. 611, n. 947
commercial paper
  defined, **919**
  effective annual rate, 919–920*e*
  review, 924
  review problems, 926–927
  for short-term financing, 919–920
committed line of credit, **917**
commitment, agency benefits of leverage,
  561–562
commitment fees, loans, 917
commodities, options on, 709
commodity price risk
  commodity hedging strategies, 998*b*
  common mistakes to avoid in hedging,
    997*b*
  hedging decisions, 998
  hedging with futures contracts,
    995–998, 995*f*, 996*t*
  hedging with long-term contracts,
    993–995, 994–995*e*, 994*f*
  hedging with vertical integration and
    storage, 993
  overview of, 992–993
  review, 1019
  review problems, 1022–1023
common risk
  risk and return, 347
  types of risk, **330**
comparables, valuation using. *see also*
    method of comparables
  fictitious example (Ideko), 676*e*
  IPOs and, 818*e*
  overview of, 675–677
  review, 700
compensating balance, in cash management,
  **899**
compensating balance requirement
  in bank loans, 918
  effective annual rate (EAR) and, 919*e*
compensation
  of CEO, 966*f*
  Dodd-Frank Act and, 12*b*, 975
  golden parachutes, 948
  of management, 704
  pay and performance sensitivity, 966–967
  policies, 966
  review, 982
  review problems, 984
  stocks and options as, 966
competition
  capital markets and, 438
  efficient markets and, 295–297
  identifying stock's alpha, 438–439
  information and stock prices and, 308
  mergers and acquisitions, 955–956
  noncompetitive markets, n. 78
  profiting from non-zero alpha stocks,
    439–440

review, 466
review problems, 470
competitive markets
  determining cash value of decisions,
    61–62*e*
  liquidity and informational role of prices,
    78*b*
  no arbitrage opportunities, 71
  overview of, **61**
compound annual growth rate (CAGR), 305
compound annual returns, vs. average
    annual returns, 326*b*
compounding
  continuous, 144–145
  defined, **99**
  power of, 100*e*
  Rule of 72, 101*b*
compound interest, **99**
confidence intervals, equity betas with
    confidence intervals for comparable
    firms, 690*t*
conflict of interest. *see* agency problem
conglomerate mergers
  tax benefits of, 937
  types of mergers, **933**
Connors, J., 613*b*
conservation of value principle, **499**
conservative financing policy, **915**
consol, **109**
constant dividend growth model, 276–**277**,
    277*e*
Constantinides, G., 469, n. 599, 619, 983
constant interest coverage ratio
  defined, **645**
  valuing acquisitions using, 646*e*
continuation value
  discounted cash flow approach to,
    693–695, 694*e*
  estimating for Ideko, 693*t*
  long-run growth and, 695*b*
  multiples approach to, 692–693
continuous compounding, **144**–145
contracts, lease, 865
conversion price, of bonds, **853**
conversion ratio, in bond retirement, **852**
convertible bonds
  defined, **852**
  income statements and, **30**
  issuance costs, 825*f*
  value of, 853*f*
convertible preferred stock, as source of
    equity capital, **810**
convertible provisions, for bond
    repayment, 852–854
Cook, D., n. 610, 619
Cookson, R., 501
Cooper, M., n. 465
Cootner, P., n. 710
Copeland, T., 302, n. 614, 661, 800
Core, J., 19, n. 971

Cornelli, F., 831
Cornwell, C., n. 915
corporate bonds
  average annual returns (1926–2011),
    322*f*, 322*t*
  credit crisis and bond yields, 189*f*
  default prospect and, 185–187
  historical returns, 313
  maturities, 837–839
  overview of, **184**–185
  volatility (1926–2011), 322*t*, 324*t*
  yields, 188, 188*f*
corporate debt
  issued as part of Hertz LBO, 837*t*
  overview of, 837
  private debt and, 841–842
  public debt and, 837–841
  review, 854
  review problems, 856–857
  types of, 839–840, 839*t*
corporate finance, international. *see*
    international corporate finance
corporate governance
  agency costs and, 962, 981, 983
  board independence and, 963–964
  board size and, 964
  Cadbury Commission, 974–975
  compensation policies, 966
  defined, **962**
  Dodd-Frank Act, 12*b*, 975
  insider trading, 975–976
  management entrenchment, 970–971
  managing agency conflicts, 968,
    982, 984
  monitors complementing board, 965
  overview of, 961
  pay and performance sensitivity,
    966–967
  regulations, 971–972
  review, 981–983
  review problems, 983–984
  Sarbanes-Oxley Act (SOX), 972–974
  shareholder actions in, 968–970
  takeover threat, 971
  trade-offs between cost and benefits,
    981, 983
  types of directors, 963
corporate governance, international
  controlling owners and pyramids,
    977–979
  cross-holdings, 980–981
  employee participation in (OECD
    countries), 980*t*
  overview of, 976
  protection of shareholder rights,
    976–977
  review, 982–983
  review problems, 984
  stakeholder model and, 979–980
corporate investor, **810**

corporate management team, 9
corporate managers, 298
corporate partners, as source of equity
  capital, **810**
corporate tax rate ($\tau_c$), 421, 604–605
corporations
  bankruptcy, 13–14
  defined, **5**
  ethics. *see* ethics, within corporations
  excessive perks and scandals, 561*b*
  formation of, 5
  fraud and, 961
  goals of, 10
  investors as source of equity capital, 810
  overview of, 2–3
  ownership of, 5–6
  ownership vs. control, 9–10, 19–20
  sources for capital expenditures, 570*f*
  taxes on, 6–7, 7*e*
$Corr(R_i, R_j)$, correlation between two
  returns, 355
correlation
  affecting volatility and expected returns,
    365*f*
  computing generally, 356*e*
  covariance computed from, 357*e*
  defined, **355**
  Excel for computing, 356*b*
  of pair of stocks, 356*t*
  of portfolios, 354–357
  of returns, 355*f*
  for selected stocks (1996–2011), 357*t*
  of a stock with itself, 355*e*
  of two-stock portfolio, 365–366
Costa, L., n. 947
cost/benefit analysis, valuation of
    decisions, 60–61
cost of capital
  beta and, 340–341
  cash and, 494*e*
  equity cost. *see* equity cost of capital
  estimating, 324
  for an investment ($r_I$), 341
  opportunity cost. *see* opportunity cost
    of capital
costs, in capital budgets, 234
costs, of financial distress
  direct costs, 543–544
  globally, 555*b*
  impact on firm value, 547
  indirect costs, 544–547
  optimal leverage and, 551*f*
  overview of, 542
  stock prices and, 548–549*e*
  who pays, 547–548
Cotter, J., n. 963, n. 970
coupon bonds
  cash flows of, 173*e*
  clean and dirty prices, 179*b*
  discounts and premiums, 176*e*

duration of, 1010*e*, 1010*t*
original issue discount (OID) bond, 839
overview of, **173**–175
pricing, 175*t*
time impacting, 177*e*
valuing from zero-coupon bond,
  181–182
yields, 183–184
coupon-paying yield curve, **184**
coupon payment (CPN)
  cash flows, 173*e*
  formula for, 170
  on inflation-indexed bonds, 843*e*
  price of coupon bond and, 182
coupon rate, of bond, **170**
coupons, **170**
Coval, J., 1041
covariance
  between pairs of stocks, 356*t*
  computing, 356*e*
  computing from correlation, 357*e*
  computing in Excel, 356*b*
  defined, **354**
  of a stock with itself, 355*e*
covenants
  bond covenants. *see* bond covenants
  defined, **845**
covered interest parity equation, **1004**
$Cov(R_i, R_j)$, covariance between two
  returns, 354
Cox, J., n. 739
CPN. *see* coupon payment (CPN)
Cramer, J., 448
Crawford, R., n. 878
credibility principle, **565**
credit cards, transactions treated as cash
    sales, n. 888
credit crisis, bond yields and, 189*b*, 189*f*
credit default swaps (CDS)
  defined, **728**
  financial crisis (2008), 729*b*
  overview of, 728–729
creditors, indirect cost of bankruptcy
    impacting, 546
credit policies, in receivables management,
    892–893
credit rating
  agencies, n. 645, 919
  of bonds, 187*t*, 840*t*
  borrowing and, 1016–1017
  determinants of, n. 645
  interest rates and, 649, 1017
  poor, results of, 896
credit risk
  of bonds, **185**
  commodity price risk and, 996
credit spread, between Treasuries and
    corporate bonds, **188**
Crescenzi, A., 856
Crick, T., 225

criminal penalties, Sarbanes-Oxley Act
    (SOX) and, 972
cross-holdings, by global corporations,
    980–981
Crouhy, M., 1020
Croushore, D., 161
cum-dividend
  defined, **588**
  for Genron, 614*t*
cum-dividend stock price ($P_{cum}$), 588,
    591, 597
cumulative abnormal return, **448**
cumulative normal distribution
  Black-Scholes formula and, 747, 747*f*
  defined, **747**
Cuñat, V., n. 969, n. 970
Cuny, C., n. 530
currencies, options on, 709
currency
  dollars per Euro (1999–2012), 999*f*
  supply and demand for, 999
  valuing foreign currency cash flows. *see*
    valuation, of foreign currency cash
    flows
currency forward contracts
  advantages of, 1005
  compared with currency options or no
    hedge, 1006*f*
  currency timeline showing, 1002*f*
  defined, **1000**
  hedging exchange rate risk with,
    1000–1001, 1001*f*, 1002*f*
  locking in exchange rate with, 1001*e*
currency markets, during financial crisis,
    1003*b*
currency options
  compared with currency forward
    contracts or no hedge, 1006*f*
  cost of Euros, 1006*t*
  hedging conditional exposure with,
    1007–1008*e*
  hedging exchange rate risk with,
    1005–1009
  pricing, 1008–1009
currency swaps, **1034**–1035
currency timeline
  defined, **1002**
  showing forward contract and
    cash-and-carry strategy, 1002*f*
current assets, **25**
current liabilities, **26**
current ratio, balance sheet
    analysis, **37**
current yield, n. 422
customers, loss of due to bankruptcy,
    544–545
cyclicality, of IPOs, 823*f*

**D**
$\Delta NWC_t$, 242
*D. see* debt (D)

*d* (debt-to-value ratio)
  defined, **491**
  for selected industries, 526*f*
  for U.S. firms, 525*f*
Da, Z, 469, n. 782
Dahya, J., n. 975
daily settlement
  eliminating credit risk, **996**
  example (petroleum industry), 996–998
Dasgupta, S., n. 562
data snooping bias, **456**
Data Tables, Excel
  computing NPV profile, **232**
  sensitivity analysis with, 257*b*
DCF. *see* discounted cash flow (DCF)
dealer paper, **919**
Dean, J., 260
DeAngelo, H., n. 530, 534
debentures, types of corporate debt, **839**
debt (*D*). *see also* volatility
  agency costs of, 766–767, 766–767*e*
  agency costs of leverage and, 558
  betas, 413–414, 413*t*, 765–766*e*, 765*f*
  cash and net debt, 417
  cash flows for debt in levered firm, 480*t*
  comparing outcomes with different
    levels of risk, 553*t*
  comparing outcomes with/without new
    project, 554*t*
  corporate. *see* corporate debt
  cost of capital with fixed debt structure
    (Avco RFX project), 656–657*t*
  debt levels in practice, 564
  defaults by debt ratings (1983–2011),
    412*t*
  effective tax advantage of, 521*e*
  firm preferences for, 524–527
  growth and, 529–530
  interest tax shield and. *see* interest tax
    shield
  limitations of tax benefits of, 527–529
  net external financing (1975–2011) and,
    525*f*
  optimal level of, 552*e*, 563–564
  as option portfolio, 727–728, 728*f*
  option quotes and implied debt yields
    (Google), 730*f*
  as options, n. 764
  periodically adjusted, 651–654
  permanent, 655*e*
  planned debt and interest payments
    (Ideko example), 679*t*
  predetermined level in APV method,
    646–647
  restructuring by debtor countries
    (1800–2006), 190*f*
  risky debt, 729–730
  signals, 566*e*
  systematic risk and risk premiums for,
    482*t*

  tax advantage of, 522*f*, 523–524
  tax advantage of debt ($\tau^*$), 520–521
  what counts as debt, 639*b*
  with/without leverage, 549*t*
  yield on, 729–730*e*
debt betas ($\beta_D$)
  computing, 765–766*e*
  debt cost of capital, 413–414
  debt-equity ratio, 765*f*
  by ratings and maturity, 413*t*
debt capacity
  for acquisitions, 632*e*
  Avco example, 634*e*
  benefits of diversification following
    mergers, 938
  defined, **632**
  fixed debt structure (Avco RFX
    project), 646*t*
  insurance allowing firms to increase use
    of debt financing, 989–990
  leasing increasing, 878
  for project over time (Avco RFX), 632*t*
debt ceiling
  defined, **185**
  U.S. budget deficits and, 185*b*
debt cost of capital ($r_D$)
  debt betas, 413–414
  debt yields, 411–412
  estimating, 413*e*
  overview of, **411**
  review, 426
  review problems, 429
debt covenants, **558**
debt-equity ratio
  annual targets, 653–654*e*
  beta of debt and equity, 765*f*
  defined, **39**
  implementing constant ratio, 631–632
  interest tax shield and, 514–515, 515–516*e*
  leverage ratios, **39**
debt financing
  at Apple, 644*e*
  asset-backed securities (ABS), 844–845
  bond covenants, 845–848
  call provisions for bond repayment,
    848–851
  capital structure and, 480–481
  cash flows and, 644
  convertible provisions for bond
    repayment, 852–854
  corporate debt, 837
  fixed equity payout and, 643
  insurance allowing firms to increase use
    of debt financing, 989–990
  leasing compared with, 874
  low leverage puzzle, 530–531
  municipal bonds (munis), 844
  overview of, 836
  private debt and, 841–842
  public debt and, 837–841

  repayment provisions, 848
  review, 500, 854–855
  review problems, 502, 856–857
  risk of financial distress and, 550
  sinking funds for bond repayment, 852
  sovereign debt, 842–844
  vs. equity financing, 492*b*
debt holders
  agency conflicts and, 730–731
  agency costs of leverage and, 553
  who pays the costs of financial distress,
    548–549
debtor countries, restructuring debt
    (1800–2006), 190*f*
debtor-in-possession (DIP)
    financing, **545**
debt overhang
  defined, **554–555**
  estimating, 555–556, 556*e*
  global financial distress and, 555*b*
  leasing mitigating, 878–879
  leverage ratchet effect and, 557–558*e*
  under-investment and, 554–556
debt-to-capital ratio, **40**
debt-to-enterprise value ratio, **40**
debt-to-value ratio (*d*)
  defined, **491**
  for selected industries, 526*f*
  for U.S. firms, 525*f*
debt yields
  calculating on new corporate debt,
    729–730*e*
  debt cost of capital and, 411–412
  error in using as cost of capital, 412*b*
  European sovereign debt, 191*b*, 191*f*
  option quotes and implied debt yields
    (Google), 730*f*
decision-making, firms
  cost of capital in investing, 95
  market prices determining cash value
    of, 61–62*e*
  overview of, 59
  Valuation Principle in, 62–63*e*
  valuing decisions, 60–61
decision nodes, on decision trees, **775**
decision trees
  analysis of real options, 774–776,
    775–776*f*, 789*f*
  defined, **774**
  mapping uncertainties, 775–776
  review, 799
  review problems, 800–801
  staged investment opportunity, 786*f*
  start-up decision for investing in drug,
    784*f*
declaration date, dividends, **585**
deductibles, insurance, **991**
deductions (tax), for interest payments,
    509–511
deep in-the-money, **709**

deep out-of-the-money, **709**
default
  by debt ratings (1983–2011), 412*t*
  defined, **540**
  leverage and risk of (Armin Industries example), 540–541
default (credit) spread, between Treasuries and corporate bonds, **188**
deferred taxes, as long-term liability, 26
de Finetti, B., 344, n. 362, 369*b*, 389
Delaney, K., n. 815*b*
delaying investments, 777, 783*b*
demand, equaling supply in efficient portfolio, 380
DeMarzo, P., n. 441, n. 442, n. 447, n. 497, 501, n. 557, n. 562*b*, 1021
Demeulemeester, E., 225
Demirguq-Kunt, A., 534
Demsetz, H., 968, n. 968
Denis, D., 19
depreciation
  accelerating, 248*e*
  in calculation of free cash flow from earnings, 241
  impact on cash flow, 33*e*
  incremental earnings forecast and, 235
  MACRS depreciation, 269–270, 270*t*
depreciation expense, **25**
depreciation tax shield, **244**
derivative securities, **761**
Desai, A., n. 933
deviation, measuring risk and return, 317–319
Dewenter, K., 619
Dhar, R., n. 446, n. 614
Diamond, D., 469
differential access, to markets, 1034–1035
Dill, D., n. 873
diluted EPS, on income statements, **30**
dilution
  equity issuances and, 498
  of shares, **30**
Dimson, E., 344
DIP (debtor-in-possession) financing, **545**
direct leases, **860**
directors, types of, 963
direct paper, **919**
dirty price, coupon bonds, **179*b***
disbursement float, **892**
disclosure. *see* financial statements
discount
  determining for coupon bond, 176*e*
  premiums and, 175–176
  on zero-coupon bonds, **170**
discount factor, in interest rates, **65**
discount loans, **917**
discount rate (*r*)
  adjusting for different time periods, 142
  converting APR to, 145–146*e*

determining present value of annuity when discount rates vary by maturity, 152*b*
discounting continuous cash flows, 167–168
example problems, 162–164
general equation for period conversion, 142–143
present value of cash flow using term structure of discount rates, 151
for risk-free investment, **65**
state error in calculating pension funding, 159*b*
using wrong discount rate in annuity formula, 143*b*
yield curve for, 150–152
discounted cash flow (DCF)
  estimating continuation value, 693–695, 694*e*
  estimating continuation value with EBITDA multiple, 695*t*
  valuing investments, 692
discounted free cash flow model
  connection to capital budgeting, 286–287
  defined, **284**
  implementing, 285
  valuing enterprises with, 284–285, 286*e*
discounting
  defined, **101**
  interest tax shield with period adjustments, 653*f*
  perpetuities one time too many, 112*b*
  risky cash flows, 157*e*
  Rule of 72, 101*b*
disposition effect, systematic trading biases, **445**–446
distress, financial. *see* financial distress
distribution date (payable date), dividends, **585**
distributions to shareholders
  dividends, 585–587
  overview of, 585
  review, 617
  review problems, 619
  share repurchases, 587–588
Dittmar, A., n. 596, 619
Dittmar, R., n. 596
*Div. see* dividends (*Div*)
*Div$_t$*, dividends at date *t*, 278
diversifiable risk. *see* Firm-specific risk
diversification
  benefits during market crashes, 335*b*
  Clements on, 450*b*
  diversifiable vs. systematic risk, 336*e*
  of equally weighted portfolio, 360–361
  fallacy of long-run diversification, 336*b*
  gambling and, 331*e*
  of portfolio with arbitrary weights, 362
  reasons for mergers and acquisitions, 938

risk and return and, 336
role in averaging out risk, **330**–331
  in stock portfolios, 331, 347–348
  underdiversification and portfolio biases, 442–443
  using different types of stocks for, 361*e*
dividend-capture theory, **600**–601
dividend-discount model
  applying, **276**
  constant dividend growth, 276–277
  dividend yields, capital gains, and total returns, 273–275
  dividends vs. investment and growth, 277–280
  equation for, 276
  growth rates and, 280–281
  limitations of, 282
  multiyear investors and, 275–276
  one-year investors and, 272–273
  overview of, 272
  review problems, 303–304
  Theory of Investment Value (Burr) and, 278*b*
dividend paying stock, 724–726, 725*e*
dividend payment, **5**
dividend payout rate, **278**
dividend puzzle, **596**
dividend reinvestment program (DRIP), n. 590
dividends (*Div*)
  constant dividend growth, 276–277, 277*e*
  cut in (Royal & SonAlliance), 610*b*
  cutting dividend tax rate, 523*b*
  delaying payout in perfect capital markets, 602*e*
  dividend paying stock, 724–726, 725*e*
  dividend payout rate, 278
  earnings and dividends per share (GM 1985–2008), 608*f*
  effective dividend tax rate, 597–598
  equity issuance for paying, 595*e*
  factors in timing investments, 781
  high dividend (equity issue), 591–592
  investors paying taxes on, 519
  MM dividend policy irrelevance, 592–593
  optimal dividend policy with taxes, 595–596
  paying with excess cash, 588–589
  payments, 5
  payout policies, 585–587
  payout policies (Genron), 592*t*
  payout policy by investor groups, 600*t*
  payout policy with perfect capital markets, 593
  for profitable growth, 279*e*
  review, 617
  review problems, 619–621
  share repurchase compared with, 588

1076      Index

dividends (*Div*) (*continued*)
  signaling with payout policy, 609–610
  special dividend (Microsoft), 586*f*
  stock dividends and splits, 612,
    614–615
  stock history and (GM stock), 586*f*
  stock valuation and, 287*f*
  tax disadvantage of, 593–596
  taxes on, 594–595, 594*t*
  trends in, 595*f*
  valuing call options on dividend paying
    stocks, 750–751, 751–752*e*
  vs. investment and growth, 277–280
  yields, 273
dividend signaling hypothesis, **609**
dividend smoothing, **608**–609
dividend tax rate ($\tau_d$), 523*b*, 597, 598,
    598*e*
dividend yields, **273**
Dixit, A., 800
DJIA (Dow Jones Industrial Average)
  as price-weighted portfolio, 403–404
  stock index arbitrage and, 77*b*
Dodd, P., n. 970
Dodd-Frank Wall Street Reform and
    Consumer Protection Act (2010)
  corporate compensation and
    governance and, **12***b*
  exemptions for small firms, 48
  regulations designed to strengthen
    corporate governance, 975
  as response to 2008 financial crisis, 6*b*
Doherty, J., n. 544
Doidge, C., n. 979
Dolde, W., 1021
dollars
  per Euro (1999–2012), 999*f*
  spot exchange rate, 1002
domestic bonds, **841**
double-barreled bonds, **844**
double taxation, 523*b*
Dow Jones Industrial Average (DJIA)
  as price-weighted portfolio, 403–404
  stock index arbitrage and, 77*b*
Dow Jones Total Market Index, n. 403
downside risk, measuring, n. 318
DRIP (dividend reinvestment program),
    n. 590
dual class shares, controlling owners and
    pyramids, **977**
Duffie, D., 1021
Dun & Bradstreet, 893
Dunbar, C., 825, 831
DuPont Identity, return on equity (ROE)
    and, **44**
duration
  of bonds, **179**
  estimating interest rate sensitivity using,
    1011*e*

interest rate swaps for changing, 1018
  as measure of interest rate risk,
    1009–1011, 1010*e*
  of a security, 1010, 1010*e*, 1010*t*
duration-based hedging
  hedging interest rate risk, 1011–1014
  Savings and Loan example, 1012*t*,
    1014*t*
duration mismatch, interest rate risk,
    **1012**
duration-neutral portfolios, **1013**–1014
Dutch auction, for share repurchases, **587**
Dyckman, T., 51
Dyl, E., 132, 619
dynamic trading strategy, 744

**E**
*E. see* equity (*E*)
EAB (equivalent annual benefit), 792*b*
Eaker, M., 1041
EAR. *see* effective annual rate (EAR)
earnings
  calculating free cash flow from, 241–243
  retention rate, 278
earnings before interest and taxes. *see*
    EBIT (earnings before interest and
    taxes)
earnings per share (EPS)
  dividends and, 278
  earnings growth due to mergers,
    938–939, 938*e*
  GM earnings and dividends per share
    (1985–2008), 608*f*
  on income statements, **30**
  leverage and, 495–497
  MM propositions and, 496–497*e*
  with/without leverage, 496*f*
earnings yield, n. 495
earthquake insurance, 329
EBIT (earnings before interest and taxes)
  after-tax investor cash flows and, 520*f*
  break-even, **253**
  enterprise value multiples and, 289–290*e*
  evaluating manufacturing alternatives in
    capital budgeting, 246–247
  on income statements, **30**
  incremental earnings forecast and, 236
  interest coverage ratio and, 38
  interest payments as percentage of, 531*f*
  limits of tax benefits of debt and, 527
  tax saving by different levels of interest,
    529*f*
  valuation ratios, 41
EBIT break-even, **253**
EBIT margin
  for four U.S. airlines, 36*f*
  in income statement analysis, **35**
EBITDA
  enterprise value multiples and,
    289–290*e*

estimating continuation value with
    EBITDA multiple, 695*t*
  forecasting income for Ideko Corp., 682*e*
  free cash flows (FCFs) and, 871
  interest coverage ratio and, **39**
  mismatched ratios and, 41*b*
  multiples approach to continuation
    value, 692
  sensitivity analysis, 699
  valuation ratios, 41
  valuation using comparables and,
    675–676
EBITDA/Sales ratio, 676*t*
Eckbo, B. E., n. 828, 829, 831, n. 936
economic distress. *see also* financial distress,
    **541**
economies of scale, **935**
economies of scope, **935**
Edmans, A., n. 447
Edwards, A., n. 547
effective annual rate (EAR)
  compensating balance requirements and,
    919*e*
  compounding intervals and, 144*t*
  converting APR to, 144
  overview of, **142**–143
  of strategy paper, 919–920*e*
  valuing monthly cash flows, 143*e*
  of warehouse financing, 923*e*
effective dividend tax rate
  changes in, 598*e*
  defined, **597**
  tax differences across investors, 598
effective tax advantage of interest in excess
    of EBIT, 527
effective tax rate on retained cash, 605
efficiency
  of market portfolio, 448
  reasons for mergers and acquisitions,
    936–937
efficient frontier
  with differing savings and borrowing
    rates, 398
  overview of, **370**
  of portfolio with three stocks, 370*f*
  of portfolio with three stocks vs. ten
    stocks, 371
efficient markets, n. 71
  competition and, 295–297
  efficient markets hypothesis vs. no
    arbitrage, 300
efficient markets hypothesis
  overview of, **295**
  vs. no arbitrage, 300
efficient portfolios
  expected returns of, 377–379
  identifying, 364, 375*e*, 378*e*
  identifying systematic risk and, **337**
  improving returns with, 364–365*e*
  with many stocks, 368–371

market portfolio and, 459*b*
overview of, 368–371
relationship to market portfolio,
    379–380
required returns, 388, 394
risk and return, 387–388, 392–393
tangent portfolio as, 374
with two stocks, 363–364
Eisfeldt, A., **869**, n. 878
Eiteman, D., 1021
electronic check processing, float
    management and, 892
Ellison, G., n. 452
Elton, E., 598*e*, 344
empire building, 560
empirical distribution, of returns, **321**
employees
    executive/employee stock options
        (ESOs), 532*b*, 756*b*
    as inside directors, 963
    loss of employees as indirect cost of
        bankruptcy, 545
    as outside monitor of corporations, 965
    participation in corporate governance in
        OECD countries, 980*t*
end-of-period payment loans, 916
end-of-term options
    lease payments and, 864–865*e*
    leases, 863–865
endowing
    growing perpetuity, 117–118*e*
    perpetuities, 111*e*
enterprise value (EV)
    balance sheets and, **28**
    EV/EBITDA ratio, 676*e*, 676*t*, 697*t*
    EV/Sales ratio, 676*e*, 676*t*, 697*t*
    mismatched ratios and, 41*b*
    multiples, 289–290*e*
    valuation using comparables and, 675
*EPS. see* earnings per share (*EPS*)
*EPS$_t$*, earning per share at date *t*, 278
equally weighted portfolio
    diversification of, **360**–361
    volatility of, 360*f*
equal-ownership portfolio, **402**
equipment leases. *see also* leases, 859–860
equity (*E*)
    adverse selection in equity markets, 567*e*
    APV estimate of initial equity value,
        696*t*
    APV valuation of, 695–696, 696*t*
    beta of, 765*f*
    as call option, 727, 727*f*
    cash flows for debt and equity of
        levered firm, 480*t*
    cash flows for equity in levered firm, 480*t*
    cash flows for unlevered equity, 480*t*
    comparing outcomes with/without new
        project, 554*t*

comparing strategies with different
    levels of risk, 553*t*
converting bonds to, 852–854
corporate ownership and, **5**
expected free cash flows to equity for
    Avco's RFX project, 629*t*
high dividend (equity issue), 591–592
homemade leverage replicating levered
    equity, 484*t*
implications of adverse selection for
    equity issuance, 568–569
market value of equity and risk,
    457–458*e*
net external financing (1975–2011)
    and, 525*f*
as options, n. 764
paying dividends with, 595*e*
project financing and, 422
return on equity (ROE), **42**
returns to equity with/without leverage,
    481*t*
statement of stockholder's equity, **33–34**
stock returns before/after equity issue,
    569*f*
systematic risk and risk premiums
    for, 482*t*
value with/without leverage, 549*t*
valuing equity cash flows using FTE,
    638
valuing when there are multiple securities,
    486*e*
equity betas ($\beta_E$)
    with confidence intervals for
        comparable firms, 690*t*
    overview of, 690–691
    relationship to leverage (Hamada and
        Rubinstein), n. 493
equity capital, raising
    exit strategies, 812
    funding and ownership, 811*e*
    IPOs. *see* initial public offerings (IPOs)
    outside investors, 810–812
    overview of, 806
    for private companies, 807
    review, 829
    review problems, 831–832
    SEOs. *see* seasoned equity offerings
        (SEOs)
    sources of funding for private
        companies, 807–810
equity cost of capital ($r_E$)
    capital, 272
    computing, 401*e*, 489*e*
    defined, **272**
    leverage and, 482*e*
    overview of, 401–402
    project leverage and, 641–642
    reducing, 491*e*
    reducing leverage and cost of capital,
        491*e*

regression in estimating, 410*e*
review, 425
review problems, 427
equity financing
    capital structure and, 479–481
    corporations retaining cash for, 605
    overview of, 479–480
    review, 500
    review problems, 502
    vs. debt financing, 492*b*
equity holders
    agency conflicts and, 730–731
    corporate ownership and, **5**
    valuing projects based on cash flows to,
        636–637
    who pays the costs of financial distress,
        548–549
equity multiplier
    in DuPont Identity, 44
    as measure of firm leverage, **41**
equity offerings, issuance costs, 648*t*
equivalent annual benefit (EAB), 792*b*
equivalent annual benefit method, 792*b*
error (or residual) term, in linear
    regression, **410**
Errunza, V., 1041
ESOs (executive/employee stock options)
    as tax shield, 532*b*
    valuing, **756**
estimation
    accuracy of estimating expected (mean)
        returns, 325*e*
    of beta, 338*e*
    beta ($\beta$). *see* beta estimation
    of continuation value, 693
    debt overhang, 555–556, 556*e*
    limitations of estimating expected
        returns, 325
    methods used by various data providers,
        434*t*
    opportunity cost of capital using
        CAPM, 689–690
    of risk premium, 340–341
    unlevered cost of capital, 640–641
    unlevered cost of capital for Ideko
        Corp., 691–692, 691–692*e*
estimation error, in predicting future
    returns based on past, 324
ETFs (exchange-traded funds)
    investing in market indexes, **404**
    Latham on, 405*b*
ethics, within corporations
    agency problem, **11–12**
    CEO performance and, 13
    corporate bankruptcy and, 13–14
    moral hazard and, 562*b*
    overview of, 11
Eurobonds, **841**
Euronext, 15

**1078    Index**

European Commission, antitrust regulations, 949
European Currency Union, 191*f*
European options
  accuracy of estimates, 325
  arbitrage bounds on option prices, 720–721
  Black-Scholes formula applied to call option on non-dividend paying stock, 748
  defined, **707**
  dividend-paying stocks, 724–726
  exercise date, 721
  exercising options early, 722
  factors effecting prices of, 720
  non-dividend-paying stocks, 722–723
  portfolio insurance, 717–718, 718*f*
  put-call parity, 719, 719*e*
  realism in option pricing models, 746
  risk-neutral probabilities applied to, 760–761*e*
  value and volatility, 721–722*e*
  valuing call option using two-state single period model, 739–740
  valuing call options on dividend paying stocks with Black-Scholes formula, 751–752*e*
  valuing European put option using Black-Scholes formula, 749–750
  valuing on dividend paying stocks with Black-Scholes formula, 750–751
  valuing put option as function of JetBlue stock price, 749*f*
European sovereign debt yields, 191*b*, 191*f*
Euros
  dollars per Euro (1999–2012), 999*f*
  spot exchange rate, 1002
EV. *see* enterprise value (EV)
EV/EBITDA ratio
  discounted cash flow vs. purchase price estimates, 697*t*
  Ideko fictitious example, 676*t*
  valuation using comparables and, 676*e*
evergreen credit, for short-term financing, **917**
EV/Sales ratio
  discounted cash flow vs. purchase price estimates, 697*t*
  Ideko fictitious example, 676*t*
  valuation using comparables and, 676*e*
Excel
  best-fitting line in, n. 408
  capital budgets using Excel spreadsheet, 245*b*
  computing NPV profile using Data Table functions, 232
  INTERCEPT( ) function, n. 410
  IRR function in, 129*b*
  NORMSDIST( ) function, 747

NPV function in, 109*b*
project analysis with, 257–258*b*
regression data analysis tool, 410
SLOPE( ) function, n. 409
spreadsheet functions, 120
excessive risk-taking, agency costs of leverage, 553–554
excessive trading, investor behavior, 443–444
excess returns
  book-to-market ratio and, 456, 456*f*
  and market capitalization in trading strategies, 455–456
  overview of, **327**
  S&P 500 compared to 10-year Treasury securities, 406*t*
  S&P 500 compared to Cisco, 409*f*
  size effects and (1926–2011), 455*f*
  for stocks, bonds, and Treasury Bills, 327*t*
Exchange Acts (1933–1934)
  insider trading and, 975
  SEC established by, 972
exchange rate
  capital budgeting with exchange risk, 1037–1039
  computing no-arbitrage forward exchange price, 1004*e*
  defined, **1000**
  floating rates, 999
  fluctuations in, 999–1000
  forward exchange rate, 1000
  implied volatility of, 1009*e*
  Law of One Price and, 1002–1004
  locking in rate with forward contract, 1001*e*
  valuation of foreign currency cash flows and, 1030
exchange rate risk, 999*f*
  arbitrage in currency markets during financial crisis, 1003*b*
  cash-and-carry strategy for eliminating exchange rate risk, 1001–1005, 1005*e*
  computing no-arbitrage forward exchange price, 1004*e*
  hedging exchange rate risk with forward contracts, 1000–1001, 1001*e*, 1001*f*
  hedging exchange rate risk with options, 1005–1009, 1006*f*, 1006*t*, 1007–1008*e*
  implied volatility of exchange rates, 1009*e*
  overview of, 999–1000, 1000*e*
  review, 1019
  review problems, 1023–1024
exchange ratio, in stock takeover, **942**, 942–943*e*
exchange-traded funds (ETFs)
  investing in market indexes, **404**
  Latham on, 405*b*

ex-dividend
  ex-dividend date, **586***f*
  for Genron, 614*t*
  paying dividends with excess cash, 589
ex-dividend stock price ($P_{ex}$), 589
execution risk, adjusting for, **421***b*
executive/employee stock options (ESOs)
  as tax shield, 532*b*
  valuing, **756**
exercise price. *see* strike price
exercising options
  defined, **707**
  dividend-paying stocks, 724–726, 725*e*
  early, 722
  non-dividend-paying stocks, 722–724, 724*e*
  review problems, 735–736
exit strategies, leaving private companies, **812**
expected free cash flow growth ($g_{FCF}$), 285
expected return ($E[R]$)
  accuracy of estimates, 325, 325*e*
  on assets ($r_A$), 490
  beta and, 341*e*
  calculating for a portfolio, 353*e*
  Capital Market Line (CML), 381*f*
  CAPM equation for, 381
  computing for stocks, 382*e*
  of debt ($r_D$), 489–490, 628, 630, 633–635, 642
  for efficient portfolios, 352–353, 377–379
  impact of change correlation, 365*f*
  of levered equity ($r_E$), 489–490
  measuring risk and return, **316–318**
  of portfolios, 385–386*e*, 386, 390
  reasons for not estimating directly, 411*b*
  Security Market Line (SML) and, 385*f*
  short sale and, 366*e*
  standard error, 324–325
  for two-stock portfolios, 363*e*
  vs. volatility comparing three-stock and ten-stock portfolios, 371*f*
  vs. volatility for three-stock portfolio, 364*f*
  vs. volatility for two-stock portfolio, 364*f*
  vs. volatility in tangent portfolio, 374*f*
expected tail loss, in measuring downside risk, n. 318
experience, investor behavior and, 446–447
expertise, reasons for mergers and acquisitions, 935–936
expiration dates, options, **707**
Ezzell, J., n. 652, n. 655, 661

**F**

*F* (forward rate). *see* forward exchange rate ($F$)
Fabozzi, F., 856, 881, 902, n. 1014, 1041

face value, of bond, **170**
factor betas, **461**–462
factoring of accounts receivable
    defined, **921**
    with and without recourse, 921–922
factor models, 463–465
factor portfolios, **461**–462
factors, **921**
fair market value cap lease, **864**
fair market value (FMV) lease
    defined, **863**
    end-of-term options and, 864–865e
Fama, E., 303, n. 452, n. 455, 469, 575,
    n. 596
Fama-French-Carhart (FFC) factor
    specification
    calculating cost of capital, 464–465e
    cost of capital with, 463–465
    portfolio average monthly returns
        (1927–2012), 464t
    strategy for portfolio selection, **463**
familiarity bias, portfolio biases, **442**
Fan, J., n. 531, n. 572
Farma, E., n. 407
Farrell, M., n. 543
FASB (Financial Accounting Standards
    Board)
    lease accounting recommendations, 866
    new standards effecting leases, n. 867
FCFE. *see* free cash flow to equity (FCFE)
Federal Election *Commission, Citizens
    United v.*, 12b
federal funds rate, **152**
Federal Reserve
    monetary policy during 2008 financial
        crisis, 150
    role in determining interest rates, 152
Fenn, G., 619
Ferris, S., n. 544
Ferson, W., 427
FFC factor specification. *see*
    Fama-French-Carhart (FFC) factor
    specification
Fich, E., n. 964
field warehouse, inventory as collateral,
    **923**
final prospectus, of IPO offering, **816**
finance lease. *see* capital lease
Financial Accounting Standards Board
    (FASB)
    lease accounting recommendations, 866
    new standards affecting leases, n. 867
financial distress
    bankruptcy and capital structure and,
        541–542
    bankruptcy code, 543
    capital budgeting and, 650–651
    costs of, 542
    currency markets and, 1003b
    defined, **539**

direct costs of bankruptcy, 543–544
funding risk, 915
global costs of, 555b
government loan guarantees, 650b
impact of distress costs on firm value,
    547, 548e
indirect costs of bankruptcy, 544–547
insurance and, 988
insurance reducing costs of, 989e
leasing reducing costs of, 878
leverage and risk of default, 540–541
optimal leverage and, 551f, 563f
retaining cash for, 605–606
review, 573–574
review problems, 575–577
stock prices and, 548–549e
valuing costs of, 651e
who pay the costs of, 547–548
financial managers, 9–10
financial models
    auditing, 688b
    balance sheet and statement of cash
        flows, 686–689
    forecasting earnings, 680–682
    forecasting free cash flows, 683–685
    review, 700
    review problems, 700
    working capital requirements, 682–683
financial options
    agency conflicts and, 730–731
    butterfly spread combination, 716–717,
        717f
    calculating yield on new corporate debt,
        729–730e
    call option quotes and implied debt
        yields (Google), 730f
    as compensation, 966
    credit default swaps (CDS) and,
        728–729, 729b
    debt as option portfolio, 727–728,
        728f
    defined, **707**
    equity as call option, 727, 727f
    exercising early (dividend paying
        stocks), 724–726, 725e
    exercising early (non-dividend paying
        stocks), 722–724, 724e
    factors affecting prices of, 720–722
    hedging exchange rate risk with
        currency options, 1005–1009, 1006f,
        1006t, 1007–1008e
    interpreting stock option quotations,
        707–709
    long position in option contract,
        710–711
    option quotes (Amazon.com), 708t
    option quotes (GE), 726t
    option quotes (Google), 724t
    overview of, 706
    payoffs at expiration, 710, 710f

payoffs at maturity, 711e
portfolio insurance, 717–718, 718f
portfolio of, 715
pricing risky debt, 729–730
profits from holding options until
    expiration, 713, 713–714e, 713f
purchasing, 709e
put-call parity and, 718–720, 719e
real options compared with, 774
returns for holding options until
    expiration, 714, 715f
review, 731–732
review problems, 733–737
on securities other than stocks, 709
short position in option contract,
    711–712, 712f
straddle combination, 715–716, 715f
two-year call and put options on S&P
    500 index, 726t
understanding option contracts, 707
value and volatility, 721e
financial options, valuing
    agency costs of debt, 766–767,
        766–767e
    beta (β) of risky debt, 763–765,
        765–766e
    Binomial Option Pricing Model, 739
    binomial pricing formula, 741–742
    Black-Scholes Option Pricing Model,
        747–748
    corporate applications of option
        pricing, 763
    implied volatility and, 752, 753e
    making models realistic, 746
    multiperiod model, 742–744
    overview of, 738
    replicating portfolio in Black-Scholes
        Model, 754–755, 754e
    review, 767–769
    review problems, 769–772
    risk and return, 761–763
    risk-neutral probability models,
        758–761
    two-state single period model,
        739–740
    using Binomial model for valuing a put
        option, 745e
    using Black-Scholes model for valuing
        call options, 748e, 750–751,
        751–752e
    using Black-Scholes model for valuing
        put options, 749–750
    valuing executive stock options (ESOs),
        756
financial ratios
    discounted cash flow vs. purchase price
        estimates, 697t
    Ideko fictitious example, 676t
financial reporting standards, 57

1080     **Index**

financial securities
    expected returns, 377
    firm NPV decisions and, 75–76
    fraction of portfolio invested in security
      $i$ ($x_i$), 352
    identifying arbitrage opportunities,
      73–75
    investing in risk-free securities,
      371–372
    issuance costs, 648t, 825f
    long and short positions in, 366
    mispricing, 649
    option securities other than stocks, 709
    overview of, 72
    pricing derivative securities, 761
    required return of security $i$ ($r_i$), 376
    separating investment and financing, 76
    supply and demand for currency and,
      999
    valuing with Law of One Price, **72**
    WACC with multiple securities, 491,
      492e
financial statements
    balance sheet, 24–28
    cash flow statement, 30–33
    defined, **22**
    Dodd-Frank Act, 48
    example problems, 51–52
    income statement, 28–30
    management discussion and analysis
      (MD&A), 34
    Mydeco Corp example, 53t
    notes to, 34–35
    overview of, 21
    preparation of, 22
    projections (Springfield Snowboards
      2013), 910–913t
    reporting abuses (Enron and
      WorldCom), 46–47
    sales by product categories, 34–35e
    Sarbanes-Oxley Act (SOX) and, 47
    statement of stockholders' equity, 33–34
    types of, 24
financial statements, analysis of
    DuPont Identity, 44
    example problems, 56–57
    interest coverage ratio, 38–39
    leverage ratios, 39–41
    liquidity ratios, 36–37
    operating returns, 42–43
    overview of, 35
    profitability ratios, 35–36
    valuation ratios, 41–42
    working capital ratios, 37–38
financing
    with debt. *see* debt financing
    debtor-in-possession (DIP) financing,
      545
    with equity. *see* equity financing
    financial managers role in corporate
      financing decisions, 10

    issuance and financing costs, 648, 666
    net external financing (1975–2011),
      525f
    pecking order for alternatives in, 571e
    project financing and IRR, 221b
    separating investment and financing,
      76e
    statement of cash flows and, 32–33
financing, long-term
    debt financing. *see* debt financing
    leases. *see* leases
    leases in, 859–860
    raising equity capital. *see* equity capital,
      raising
fire sale of assets, as indirect cost of
    bankruptcy, 545–546
firm commitment IPO, **813**
firms
    annual report, **22**
    bankruptcy risk impacting firm value,
      542, 542e
    cash cycle of. *see* cash cycle
    corporations. *see* corporations
    cost of capital, 466f
    debt level by firm types, 564
    debt preferences of, 524–527
    debt-to-value ratio for U.S. firms
      (1975–2011), 525f
    distress costs impacting firm value, 547,
      548e
    free cash flow uses, 585f
    goals of, 10
    growth rates, 281e
    with large cash balances (September
      2012), 607t
    leverage policies, 652f
    limited liability companies (LLC), **5**
    liquidation of, **13**
    market value balance sheet, 487t
    market value of, 41–42
    net debt, **40**
    partnerships, **4–5**
    society and, 11
    sole proprietorship, **3–4**
    taxes and. *see* taxes, firm debt and
    types of, 3, 4f, 19
    working capital impacting value of, 889
firm-specific, idiosyncratic, unique,
    or diversifiable risk
    overview of, **332**
    vs. systematic risk, 336e
Fisher, A., 80, 260, n. 828
Fisher, I., 80, 260
fixed price lease, **864**
float management, 892
floating liens, inventory as collateral, **922**
floating rates, **999**
floor planning, inventory as collateral, **922**
flow-to-equity (FTE)
    calculating free cash flow to equity
      (FCFE), **637**–638

    with changing leverage, 655–657
    comparing WACC and APV with,
      647–648
    overview of, 636–637
    review, 663
    summary of, 638–639
    valuing acquisitions, 640e
    valuing equity cash flows, 638
FMV lease. *see* fair market value lease
forecasting
    beta. *see* beta estimation
    free cash flows (Ideko Corp.), 683–685,
      684t
    income (Ideko Corp.), 682e
    net working capital (Ideko Corp.), 683t
forecasting earnings
    complexities in real world and, 240
    in financial model, 680–682
    incremental earnings forecast, 235–237
    indirect effects on incremental earnings,
      237–239
    overview of, 234
    revenue and cost estimates, 234
    review problems, 260–261
    sunk costs and incremental earnings, 239
forecasting short-term financing
    negative cash flow shocks, 911–912
    overview of, 909
    positive cash flow shocks, 912–913
    projections for Springfield snowboards
      (2013), 910–913t
    review, 924
    review problems, 925
    seasonalities, 909–911
foreign bonds, **841**
foreign currency cash flows, valuing. *see*
    valuation, of foreign currency cash
    flows
foreign exchange rate. *see* exchange rate
forward contracts. *see* currency forward
    contracts
forward earnings, valuation multiples and,
    **289**
forward exchange rate ($F$)
    computing no-arbitrage forward
      exchange price, 1004e
    defined, **1000**
    Law of One Price and, 1002–1004
forward interest rates
    bond yields from, 202
    computing, 201–202e
    future interest rates and, 203
    overview of, **201**
forward P/E, **289**
forward rate agreement, **201**
framing effect, in Prospect Theory,
    446b
Francis, J., 344
Frank, M., 575
Franks, J., n. 977
free cash flow hypothesis, **561**

free cash flow to equity (FCFE)
  Avco RFX project example, 637*e*
  calculating, 637–638, 639*e*
  defined, **637**
free cash flows (FCFs)
  adjustments to, 248–251
  calculating directly, 243–244
  calculating from earnings, **241**–243
  calculating NPV, 244, 246
  comparing for alternatives, 247
  comparing methods of stock valuation, 287*f*
  converting using foreign exchange rates, 1030
  at date t ($FCF_t$), 244, 628, 632
  discounted free cash flow model, 284–288
  in dollars (Ityesi project), 1039*t*
  expected (Ityesi project), 1029–1030*t*
  expected free cash flow growth ($g_{FCF}$), 285
  expected free cash flows to equity for Avco's RFX project, 629*t*
  in financial model, 683–685
  forecasting, 683–685, 684*t*
  lease vs. borrow, 873*t*
  lease vs. buy, 871*t*
  leverage and, 686*e*
  in pounds (Ityesi project), 1038*t*
  review problems, 261–265, 305
  timing in adjustments to, 248
  uses of, 585*f*
  WACC and APV methods for valuing projects, 636
free float, n. **402**
free rider problem
  leveraged buyouts avoiding, 954
  mergers and acquisitions and, 950–951, n. 951
freezeout mergers, **955**
French, K., n. 407, n. 452, n. 455, 469, 575, n. 596
Frieden, Sue, 23*b*
friendly takeover, **945**
Froot, K., 1021
FTE. *see* flow-to-equity (FTE)
fund managers
  performance of, 451–454
  returns before and after hiring, 453*f*
funding risk, **915**
future interest rates, 203
future value (*FV*)
  of annuities, 114–115
  of cash flows, 99
  computing, 104*e*
  computing in Excel, 120*e*
  converting dollars today to gold, Euros, or dollars in the future, 66*f*
  at date *n* ($FV_n$), 99, 103, 107
  present value vs., **65**
  of stream of cash flows, 107

futures contracts
  defined, **995**
  hedging commodity price risk, 995–998, 995*f*, 996*t*
FV function, Excel, 120

**G**
*g. see* growth rates (*g*)
GAAP (Generally Accepted Accounting Principles), **22**
Galai, D., 1020
Gallinger, G., 925
gambling, diversification and, 331*e*
Garcia, D., n. 447
Garman, M., n. 1008
Garvey, G., n. 971
Gates, Bill, 981
Geczy, C., 826, n. 828, 831, 1021
general liens, **922**
general obligation bonds, **844**
Generally Accepted Accounting Principles (GAAP), **22**
general partners
  in limited partnerships, 4
  as venture capitalists, 808
Gentry, J., 902
Giammarino, R., n. 828
Gibbons, M., 427
Gilligan, T., n. 878
Gine, M., n. 969, n. 970
Ginnie Mae. *see* Government National Mortgage Association (GNMA)
Glaser, R., 810–811, 826
Glaser, Shelagh, 424*b*
global bonds, **841**
global financial crisis
  bailouts, 555*b*, 562*b*
  cash balances during, 899*b*
  diversification benefits during market crashes, 335*b*
  loan guarantees, 650*b*
  prepackaged bankruptcy (Chrysler), 547*b*
  short-term financing during global crisis of 2008, 920*b*
  subprime mortgages, 846–847*b*
global governance. *see* corporate governance, international
Glosten, L., 661
GNMA (Government National Mortgage Association)
  mortgage-backed security (MBS), 844–845
  restrictions on mortgage, 846*b*
goals, of firms, 10
Goedhart, M., 701
Goel, A., n. 936
Goetzmann, W., 132, 344, n. 614
golden parachutes
  defined, **948**
  Dodd-Frank Act and, 975
Goldreich, D., 831

Goldstein, R., 575
Gollier, C., n. 891
Gompers, P., 808, n. 808, 826, n. 828, 831, n. 971
goodwill, as long-term asset, **25**
Gordon, R., 19
governance. *see* corporate governance
government
  debt financing by, 836
  loan guarantees, 650*b*
  risky bonds, 1035*e*
  sovereign debt, 842–844
Government National Mortgage Association (GNMA)
  mortgage-backed security (MBS), 844–845
  restrictions on mortgage, 846*b*
Goyal, A., n. 406, 453*f*, n. 783, 800
Goyal, V., 575
Grabbe, J., 225, 534, 1021, 1041
Graham, J., n. 524, n. 529, 532*b*, n. 563, n. 611, n. 645
Graham, R., 216*b*, n. 406, 1021
Grannis, Dick, 209*b*
Grant, D., 1041
gray directors, **963**
Green, R., n. 452, n. 783, 856
Green Shoe Company, n. 819
greenmail, **588**
greenshoe provisions, managing IPO-related risk, **819**
Grenadier, S., n. 865, 882
Griffoli, T. M., 1003*b*
Grinblatt, M., n. 444, n. 465
Grossman, S., 469, n. 951
gross margin, in income statement analysis, **35**
gross profit, in earnings calculations, **29**
growing annuity
  overview of, **118**–119
  retirement savings plan, 118–119*e*
growing perpetuity, **116**
growth
  continuation value and long-run growth, 695*b*
  corporations retaining cash for, 607
  cutting negative-NPV growth, 606–607*e*
  debt and, 529–530
growth options
  defined, **783**
  option to expand, 785–788
  review, 799
  review problems, 802–803
  valuing with growth potential, 783–785
growth rates (*g*)
  changing, 280–281
  constant dividend growth model, 276–277, 277*e*
  discounted cash flow approach to continuation value, 693

**1082**    **Index**

growth rates (*g*) (*continued*)
  expected free cash flow growth (*g*$_{FCF}$), 285
  growing perpetuity, 116
  profitable, 279*e*
  unprofitable, 280*e*
  valuing firms, 281*e*
growth stocks, market-to-book ratio in, **28**
Gruber, M., 344, n. 452, 598*e*
Grullon, G., n. 446, n. 587, n. 596, n. 609, n. 611, 619
Guadalupe, M., n. 969, n. 970
Guay, W., 19, 619, n. 971, 1021
Guitierrez, Jr., R., n. 465
Guo, R. J., 469, n. 782
Guy, J., 427

**H**
Hall, B., n. 967
Hamada, R., n. 493, n. 655
Hanourna, P., n. 979
Hansen, R., 825, 831
Harford, J., 619, n. 932, n. 940
Harris, D., 478
Harris, L., 973*b*
Harris, M., 469, 561, n. 562, 575, n. 599, n. 608, 619, 831, 983
Harris, R., n. 642, n. 655, 661
Harrison, W., 51
Hart, O., 575, n. 951
Hart-Scott-Rodino (HSR) Act (1976), 949
Harvey, C., 216*b*, n. 225, 406, 427, 534, n. 611, n. 645
Haugen, R., n. 546
Hays, K., n. 545
Healey, R., 925
Healy, P., n. 609
Heaton, J., n. 560
hedging, using options to reduce risk, **709**
hedging commodity price risk
  decision making regarding, 998
  with futures contracts, 995–998, 995*f*, 996*t*
  with long-term contracts, 993–995, 994–995*e*, 994*f*
  mistakes to avoid, 997*b*
  strategies, 998*b*
  using vertical integration and storage, 993
hedging exchange rate risk
  cash-and-carry strategy, 1001–1005
  with forward contracts, 1000–1001, 1001*e*, 1001*f*
  with options, 1005–1009, 1006*f*, 1006*t*, 1007–1008*e*
hedging interest rate risk
  duration-based hedging, 1011–1014
  swap-based hedging, 1014–1018

Hellwig, M., 469, n. 497, 501, n. 557, n. 562*b*
Hendel, I., 882
Hendricks, D., n. 465
Hennessy, C., n. 562, 575, 856
Heron, R., n. 947, n. 967
Herroelen, W., 225
Herzel, L., 958
Hickman, K., n. 963
high dividend (equity issue), 591–592
high-minus-low (HML) portfolio, **463**
high-yield bonds, **188**
Hill, N., 925
Himmelberg, C., n. 968
Hirshleifer, D., n. 447
HML (high-minus-low) portfolio, **463**
Holland, David, 255*b*
homemade dividends, **590**, 591–592*e*
homemade leverage
  arbitrage and, 485*e*
  defined, **484**
  replicating levered equity with, 484*t*
Homer, S., 161
homogeneous expectations, in CAPM, **380**, 440
horizontal mergers, **933**
Horngren, C., 51
hostile takeovers, **13**, **945**
housing market, global financial crisis and (2008) and, 920*b*
Howton, S., 1021
Hubbard, R. G., 523*b*, n. 968
Huberman, G., n. 442, n. 991
hubris hypothesis, 940
Huddart, S., n. 756*b*
Hull, J., 733, 769
hurdle rate, **796**
hurdle rate rule
  applying to option to delay, 796–797*e*
  defined, **795**
  overview of, 795–796
hurricanes, insurance premiums and, n. 987
Husic, F., n. 456

**I**
*i* (inflation), 149*f*
*I* (investments). *see* investments (*I*)
idiosyncratic risk. *see* firm-specific risk
IID (independent and identically distributed) returns, n. 324
Ikenberry, D., n. 587, n. 596, n. 611
immunized portfolio, **1013**
immunizing the portfolio
  defined, **1013**
  with interest rate swaps, 1018*e*
  Savings and Loan example, 1014*t*
impairment charges, reducing value of assets, **26**

implied volatility
  Black-Scholes Option Pricing Model and, 752
  computing from option price, 753*e*
  defined, **752**
  of exchange rates, 1009*e*
  VIX index and, 753*b*
incentives, leases, 879
incentives, manager vs. shareholder, 607
income. *see also* earnings
  factors in effective dividend tax rate, 598
  forecasting (Ideko Corp.), 682*e*
income statements
  defined, **28**
  earnings calculations, 29–30
  example problems, 54–55
  fictitious examples, 29*t*, 675*t*
  overview of, 28
  pro forma, 681*t*
  projected income (Springfield snowboards), 910–913*t*
incremental earnings
  defined, **234**
  forecasting, 235–237
  indirect effects on, 237–239
  product adoption and price changes, 240*e*
  sunk costs and, 239
incremental financing, for projects, 642–644
incremental IRR
  applying to investment decisions, 218–221
  comparing alternatives with, 219–220*e*
  defined, **218**
  investment rule, 219
indenture, in public bond prospectus, **837**
independent and identically distributed (IID) returns, n. 324
independent outside directors. *see* outside directors
independent risk, **330**, 347
indexes
  market. *see* market indexes
  profitability. *see* profitability index
index funds, **404**, 405*b*
indirect costs, of financial distress, 544–547
industry asset betas
  chart of (2012), 419*f*
  estimating, 418*e*
  methods for determining project's cost of capital, 417–419
inefficient portfolios, **364**, 438*f*
inflation-indexed bonds, 843*e*
inflation rate (*i*), 149*f*
information, asymmetric information and capital structure. *see* asymmetric information, capital structure and
information, in stock pricing
  consequences for corporate managers, 298
  consequences for investors, 297–298
  overview of, 294–295