# EXHIBIT 77 (part 2)

investment to generate extra cash flow from access to these workers' skills. (Outlays for training could be lower, for example.) Does the additional investment generate additional NPV, compared to building the factory at a cheaper but remote site? How is the CFO to know? He or she can't afford the time to investigate every alternative that was considered but rejected by the project's sponsors.

Third, many capital investments don't appear in the capital budget. These include research and development, worker training, and marketing outlays designed to expand a market or lock in satisfied customers.

Fourth, *small decisions add up.* Operating managers make investment decisions every day. They may carry extra inventories of raw materials so they won't have to worry about being caught short. Managers at the confabulator plant in Quayle City, Kansas, may decide they need one more forklift. They may hold on to an idle machine tool or an empty warehouse that could have been sold. These are not big decisions ($25,000 here, $50,000 there) but thousands of such decisions add up to real money.

Fifth, the CFO may be subject to the same kinds of temptations that afflict lower layers of management.

We now consider incentives and agency problems in capital investment.

## Agency Problems in Capital Budgeting

As you have surely guessed, there is no perfect system of incentives. But it's easy to see what *won't* work. Suppose shareholders decide to pay the financial managers a fixed salary—no bonuses, no stock options, just $X per month. The manager, as the stockholders' agent, is instructed to find and invest in all positive-NPV projects open to the firm. The manager may sincerely try to do so, but will face various tempting alternatives:

**Reduced effort.** Finding and implementing investment in truly valuable projects is a high-effort, high-pressure activity. The financial manager will be tempted to slack off.

**Perks.** Our hypothetical financial manager gets no bonuses. Only $X per month. But he or she may take a bonus anyway, not in cash, but in tickets to sporting events, lavish office accommodations, planning meetings scheduled at luxury resorts, and so on. Economists refer to these nonpecuniary rewards as *private benefits.* Ordinary people call them *perks* (short for perquisites).[1]

**Empire building.** Other things equal, managers prefer to run large businesses rather than small ones. Getting from small to large may not be a positive-NPV undertaking. Managers are also reluctant to dismantle their empires. That is, they are reluctant to disinvest.

**Entrenching investment.** Suppose manager Q considers two expansion plans. One plan will require a manager with special skills that manager Q just happens to have. The other plan requires only a general-purpose manager. Guess which plan Q will favor. Projects designed to require or reward the skills of existing managers are called *entrenching investments.*[2]

Entrenching investments and empire building are typical symptoms of overinvestment, that is, investing beyond the point where NPV falls to zero. The temptation to

---

[1] But don't assume that all perks are unwarranted and inefficient. That corporate jet can be a good investment if it saves three or four hours a week that the CEO and CFO would otherwise waste in airports. Also, some large companies require the CEO to fly in the corporate jet for security reasons. Rajan and Wulf argue that it is *not* correct to treat all perks as managerial excess. See R. Rajan and J. Wulf, "Are Perks Purely Managerial Excess?" *Journal of Financial Economics* 79 (January 2006), pp. 1–33.

[2] A. Shleifer and R. W. Vishny, "Management Entrenchment: The Case of Manager-Specific Investments," *Journal of Financial Economics* 25 (November 1989), pp. 123–140.

overinvest is highest when the firm has plenty of cash but limited investment opportunities. Michael Jensen calls this the *free-cash-flow* problem.[3]

**Avoiding risk.** If the manager receives only a fixed salary, she cannot share in the upside of risky projects. But, if the risky project turns out to be a loser, her job may be on the line. In this case safe projects are from the manager's viewpoint better than risky ones.[4] But risky projects can sometimes have large, positive NPVs.

A manager on a fixed salary could hardly avoid all these temptations all of the time. The resulting loss in value is an agency cost.

### Monitoring

Agency costs can be reduced by monitoring a manager's efforts and actions and by intervening when the manager veers off course.

Monitoring can prevent the more obvious agency costs, such as blatant perks. It can confirm that the manager is putting sufficient time on the job. But monitoring requires time and money. Some monitoring is almost always worthwhile, but a limit is soon reached at which an extra dollar spent on monitoring would not return an extra dollar of value from reduced agency costs. Like all investments, monitoring encounters diminishing returns.

Some agency costs can't be prevented even with the most thorough monitoring. Suppose a shareholder undertakes to monitor capital investment decisions. How could he or she ever know for sure whether a capital budget approved by top management includes (1) *all* the positive-NPV opportunities open to the firm and (2) *no* projects with negative NPVs due to empire-building or entrenching investments? The managers obviously know more about the firm's prospects than outsiders ever can. If the shareholder could list all projects and their NPVs, then the managers would hardly be needed!

Who actually does the monitoring? Ultimately it is the shareholders' responsibility, but in large, public companies, monitoring is *delegated* to the board of directors, who are elected by shareholders and are supposed to represent their interests. The board meets regularly, both formally and informally, with top management. Attentive directors come to know a great deal about the firm's prospects and performance and the strengths and weaknesses of its top management.

The board also hires independent accountants to audit the firm's financial statements. If the audit uncovers no problems, the auditors issue an opinion that the financial statements fairly represent the company's financial condition and are consistent with Generally Accepted Accounting Principles (GAAP).

If problems are found, the auditors will negotiate changes in assumptions or procedures. Managers almost always agree, because if acceptable changes are not made, the auditors will issue a *qualified opinion,* which is bad news for the company and its shareholders. A qualified opinion suggests that managers are covering something up and undermines investors' confidence.

A qualified audit opinion may be bad news, but when investors learn of accounting irregularities that have escaped detection, there can be hell to pay. In January 2004 Adecco, the giant Swiss employment agency, announced that it had discovered material accounting irregularities in its North American operations. The next day Adecco's share price fell by 40%, wiping $5 billion off the market value of the company.

---

[3] M. C. Jensen, "Agency Costs of Free Cash Flow, Corporate Finance and Takeovers," *American Economic Review* 76 (May 1986), pp. 323–329.

[4] Sometimes managers can be tempted to take *too much risk.* Suppose that a regional office suffers unexpected losses. The regional manager's job is on the line, and in response he or she tries a risky strategy that offers a small probability of a big, quick payoff. If the strategy pays off, the manager's job is safe. If it fails, nothing is lost, because the manager would have been fired anyway.

Lenders also monitor. If a company takes out a large bank loan, the bank will track the company's assets, earnings, and cash flow. By monitoring to protect its loan, the bank protects shareholders' interests also.[5]

Delegated monitoring is especially important when ownership is widely dispersed. If there is a dominant shareholder, he or she will generally keep a close eye on top management. But when the number of stockholders is large, and each stockholding is small, individual investors cannot justify much time and expense for monitoring. Each is tempted to leave the task to others, taking a free ride on others' efforts. But if everybody prefers to let somebody else do it, then it will not get done; that is, monitoring by shareholders will not be strong or effective. Economists call this the *free-rider problem*.[6]

If the free-rider problem is severe, delegated monitoring may be the only solution. But delegation brings its own agency problems. For example, many board members may be long-standing friends of the CEO and may be indebted to the CEO for help or advice. Understandably, they may be reluctant to fire the CEO or enquire too deeply into his or her conduct. Auditing firms may also have conflicts of interest. For example, many believed that Enron's auditors, Arthur Andersen, might have been tougher on the company had it not also earned substantial fees from providing Enron with consulting services. If monitors are likely to have their own agenda, then we have Dr. Seuss's bee-watching problem:

> Oh, the jobs people work at!
> Out west, near Hawtch-Hawtch,
> there's a Hawtch-Hawtcher Bee Watcher.
> His job is to watch . . .
> is to keep both his eyes on the lazy town bee.
> A bee that is watched will work harder you see!
>
> Well . . . he watched and he watched
> But, in spite of his watch,
> that bee didn't work any harder. Not mawtch.
>
> So then somebody said,
> "Our bee-watching man
> just isn't bee-watching as hard as he can.
> He ought to be watched by another Hawtch-Hawtcher!!
> The thing that we need
> is a Bee-Watcher-Watcher!"[7]

In response to the Enron debacle, the Sarbanes-Oxley Act set up a bee-watcher-watcher, called the Public Company Oversight Board, to monitor the activities of auditors. It also prohibited an auditing firm from providing both auditing and consulting services to the same company.[8]

---

[5] Lenders' and shareholders' interests are not always aligned—see Chapter 18. But a company's ability to satisfy lenders is normally good news for stockholders, particularly when lenders are well placed to monitor. See C. James "Some Evidence on the Uniqueness of Bank Loans," *Journal of Financial Economics* 19 (December 1987), pp. 217–235.

[6] The free-rider problem might seem to drive out all monitoring by dispersed shareholders. But investors have another reason to investigate: They want to make money on their common stock portfolios by buying undervalued companies and selling overvalued ones. To do this they must investigate companies' performance.

[7] Dr. Seuss, *Did I Ever Tell You How Lucky You Are?* (New York: Random House, 1973), pp. 26–28.

[8] The Sarbanes-Oxley Act forbids auditing firms from providing their clients with fairness opinions, actuarial services, investment banking services, management functions, legal services, or any other services proscribed by the Public Company Accounting Oversight Board.

## Management Compensation

Because monitoring is necessarily imperfect, compensation plans must be designed to attract competent managers and to give them the right incentives.

Figure 12.1 compares the level of compensation in different countries and Figure 12.2 shows the growth of CEO compensation in the U.S. Three features stand out.

1. The U.S. has unusually high levels of executive pay. CEOs in the States receive over 3 times the pay of German CEOs and almost 10 times the pay of Japanese CEOs.
2. Although CEO compensation in the U.S. fell in 2001 after the end of the dot.com boom and probably again during the 2008–2009 credit crisis, there has for the most part been a strong upward trend.
3. A large and increasing fraction of CEO compensation in the U.S. comes from variable bonuses, stock options, and other long-term incentives.

We look first at the size of the pay package. Then we turn to its contents.

High levels of CEO pay undoubtedly encourage CEOs to work hard and (perhaps more important) offer an attractive carrot to lower-level managers who hope to become CEOs.

◗ **FIGURE 12.1**

Median CEO compensation in 2008 for large companies. Compensation in the U.S. is relatively high and is heavily dependent on performance. We are grateful to Towers Perrin for providing these data.

*Source:* Towers Perrin's proprietary data.



◗ **FIGURE 12.2**

Growth in CEO compensation in the U.S. The growth has come largely from grants of stock and options.

*Source:* Execucomp.



Visit us at www.mhhe.com/bma



But there has been widespread concern about "excessive" pay, especially pay for mediocre performance. For example, Robert Nardelli received a $210 million severance package on leaving The Home Depot and Henry McKinnell received almost $200 million on leaving Pfizer. Both CEOs left behind troubled and underperforming companies. You can imagine the newspaper headlines.

Those headlines got a lot bigger in 2008 when it was revealed that generous bonuses were to be paid to the senior management of banks that had been bailed out by the government. Merrill Lynch hurried through $3.6 billion in bonuses, including $121 million to just four executives, only days before Bank of America finalized its deal to buy the collapsing firm with the help of taxpayer money. "Bonuses for Boneheads" was the headline in *Forbes* magazine.

The widespread view that taxpayer money was being used to pay bonuses to bankers whose greed had brought about the credit crisis led to demands that governments curb bankers' compensation. In France President Sarkozy announced that there would be no bonuses in 2009 at banks that had received state aid. The German government set a €500,000 ($630,000) limit on executive pay at rescued banks. In the U.S., the Obama administration appointed a "pay czar" to oversee the salaries of top executives at companies receiving "exceptional assistance" from the government. The U.S. Congress also set restrictions on the pay of top executives in banks who accepted bail-out funds. Incentive compensation was limited to one-third of total pay, and was to be paid only in the form of stock that could not be cashed in as long as the company remained in receipt of government aid. The banks were also prohibited from giving big handouts to departing executives.

These restrictions ensured that banks taking government aid did not pay "excessive" compensation. Putting compensation in a Congressional straightjacket is dangerous, however. How can it make sense to require that two-thirds of executive pay *not* be related to performance? Why should all incentive compensation be in restricted stock?

It is easy to point to cases where poorly performing managers have received unjustifiably large payouts. But is there a more general problem? Perhaps high levels of pay simply reflect a shortage of talent. After all, CEOs are not alone in earning large sums. The earnings of top professional athletes are equally mouthwatering. In 2007 the New York Yankees' Jason Giambi, Derek Jeter, and Alex Rodriguez were each paid more than $20 million. The Yankees must have believed that it was worth paying up for stars that would win games and fill up the ballpark.

If star managers are as rare as star baseball players, corporations may need to pay up for CEO talent. Suppose that a superior CEO can add 1% to the value and stock price of a large corporation with a market capitalization of $10 billion. One percent on a stock-market value of $10 billion is $100 million. If the CEO can really deliver, then a pay package of, say, $20 million per year sounds like a bargain.[9]

There is also a less charitable explanation of managerial pay. This view stresses the close links between the CEO and the other members of the board of directors. If directors are too chummy with the CEO, they may find it difficult to get tough when it comes to setting compensation packages. Sometimes directors approve extra payments that provide shareholders with little or no prospective benefit. Take the example of the German company, Mannesmann, which was acquired in a $200 billion takeover. After the deal was finalized, Mannesmann's board of directors voted an ex gratia payment of $74 million to the company's executives. German Federal prosecutors charged six of the directors with breach of their fiduciary duty and failure to preserve the company's assets. Although the case was eventually settled out of court, it highlighted the danger that directors may be tempted to

---

[9] Gabaix and Landier argue that high CEO pay is a natural consequence of steadily increasing firm values and the competition for management talent. See X. Gabaix and A. Landier, "Why Has CEO Pay Increased So Much?" *Quarterly Journal of Economics* 123 (February 2008), pp. 49–100.

act as lords of the manor, rather than as stewards of the estate, when they set compensation levels.

In most firms executive pay is the responsibility of a compensation committee of the board of directors. This committee does not operate in a vacuum; it usually places significant weight on average compensation in peer companies. The problem is that few boards are prepared to approve a compensation package that is below average. But, if every firm wants its CEO to have above-average compensation, the average will ratchet upward.[10]

The danger that CEOs may have undue influence over their compensation has prompted some countries, such as the U.K., Sweden, Australia, and the Netherlands, to give shareholders a vote on executive pay. In most cases the vote is nonbinding,[11] but when shareholders of the pharmaceutical giant GlaxoSmithKline voted against a new compensation package for its chief executive, three members of the board's remuneration committee were replaced and the pay package was renegotiated. Shareholders voted against compensation packages at several other U.K. companies, including Royal Dutch Shell and the Royal Bank of Scotland Group.

So we have two views of the level of managerial pay. One is that it results from arms-length contracting in a tight market for managerial talent. The other is that poor governance and weak boards allow excessive pay. There is evidence for and against both views. For example, CEOs are not the only group to have seen their compensation increase rapidly in recent years. Corporate lawyers, sports stars, and celebrity entertainers have all increased their share of national income, even though their compensation is determined by arms-length negotiation.[12] However, the shortage-of-talent argument cannot account for wide disparities in pay. For example, compare the CEO of GM (compensation of $16 million in 2007, two years before GM's bankruptcy) to the CEO of Toyota (compensation about $1 million ) or to General Petraeus, the former U.S. military commander in Iraq (about $180,000). It is difficult to argue that GM's CEO delivered the most value or had the most difficult and important job.

## Incentive Compensation

The amount of compensation may be less important than how it is structured. The compensation package should encourage managers to maximize shareholder wealth.

Compensation could be based on input (for example, the manager's effort) or on output (income or value added as a result of the manager's decisions). But input is difficult to measure. How can outside investors observe effort? They can check that the manager clocks in on time, but hours worked does not measure true effort. (Is the manager facing up to difficult and stressful choices, or is he or she just burning time with routine meetings, travel, and paperwork?)

Because effort is not observable, compensation must be based on output, that is, on verifiable results. Trouble is, results depend not just on the manager's contribution, but also on events outside the manager's control. Unless you can separate out the manager's contribution, you face a difficult trade-off. You want to give the manager high-powered incentives, so that he or she does very well when the firm does very well and poorly when the firm underperforms. But suppose the firm is a cyclical business that always struggles in

---

[10] Bizjak, Lemmon, and Naveen found that most firms set pay levels at or above the median of the peer group, and some go much higher. For example, Coca-Cola and IBM consistently aim for pay levels in the upper quartile of their peers. See J. M. Bizjak, M. L. Lemmon, and L. Naveen, "Has the Use of Peer Groups Contributed to Higher Pay and Less Efficient Compensation?" *Journal of Financial Economics* 90 (November 2008), pp. 152–168.

[11] The Netherlands gives shareholders a binding vote.

[12] See S. N. Kaplan and J. D. Rauh, "Wall Street and Main Street: What Contributes to the Rise in the Highest Incomes?" *Review of Financial Studies,* forthcoming.

recessions. Then high-powered incentives will force the manager to bear business cycle risk that is not his or her fault.

There are limits to the risks that managers can be asked to bear. So the result is a compromise. Firms do link managers' pay to performance, but fluctuations in firm value are shared by managers and shareholders. Managers bear some of the risks that are beyond their control and shareholders bear some of the agency costs if managers fail to maximize firm value. Thus some agency costs are inevitable.

Most major companies around the world now link part of their executive pay to the stock-price performance.[13] This compensation is generally in one of three forms: stock options, restricted stock (stock that must be retained for several years), or performance shares (shares awarded only if the company meets an earnings or other target).

Stock options give managers the right (but not the obligation) to buy their company's shares in the future at a fixed exercise price. Usually the exercise price is set equal to the company's stock price on the day when the options are granted. If the company performs well and stock price increases, the manager can buy shares and cash in on the difference between the stock price and the exercise price. If the stock price falls, the manager leaves the options unexercised and hopes for a stock price recovery or compensation through another channel. (If the stock price doesn't recover, the manager may be granted a new batch of options or given a lower exercise price on the original options.)

The popularity of stock options was encouraged by U.S. accounting rules, which allowed companies to grant stock options without recognizing any immediate compensation expense. The rules allowed companies to value options at the excess of the stock price over the exercise price on the grant date. But the exercise price was almost always set equal to the stock price on that date. Thus the excess was zero and the stock options were valued at zero. (We show how to calculate the actual value of options in Chapters 20 and 21.) So companies could grant lots of options at no recorded cost and with no reduction in accounting earnings. Naturally accountants and investors were concerned, because earnings were more and more overstated as the volume of option grants increased. After years of controversy, the accounting rules were changed in 2006. U.S. corporations are now required to value executive stock options more realistically and to deduct these values as a compensation expense.

Options also have a tax advantage in the U.S. Compensation of more than $1 million has since 1994 been considered unreasonable and is not a tax-deductible expense. However, there is no restriction on compensation in the form of stock options.

You can see the advantages of tying compensation to stock price. When a manager works hard to maximize firm value, she helps both the stockholders and herself. But compensation via options or restricted stock also has at least four imperfections. First, the payoffs depend on the absolute change in stock price, not the change relative to the market or to stock prices of other firms in the same industry. Thus they force the manager to bear market or industry risks, which are outside the manager's control. Compensation based on relative stock-price performance makes logical sense but is rarely seen in practice.

Here is a second difficult issue. Because a company's stock price depends on investors' expectations of future earnings, rates of return depend on how well the company performs relative to expectations. Suppose a company announces the appointment of an outstanding new manager. The stock price leaps up in anticipation of improved performance. If the new manager then delivers exactly the good performance that investors expected, the stock will earn only a normal rate of return. In this case a compensation scheme linked to the stock return after the manager starts would fail to recognize the manager's special contribution.

---

[13] The major exceptions are in China, Japan, India, and South Korea, where such incentive schemes are still used by a minority of large firms. See Towers Perrin, *Equity Incentives Around the World,* 2008, **www.towersperrin.com**.

Third, incentive plans may tempt managers to withhold bad news or manipulate earnings to pump up stock prices. They may also be tempted to defer valuable investment projects if the projects would depress earnings in the short run. We return to this point at the end of the chapter.

Fourth, some compensation schemes encourage excessive risk-taking. Suppose a possible deal comes up that could make or lose $100 million. You are about to reject it, but then you think of your stock options and realize that you can't lose. If the deal comes off, the stock price will rise and your options will be worth a packet. If it doesn't, there is nothing lost; you just wait for the next deal to surface.

In Chapter 1 we suggested that the subprime crisis was largely an agency problem, where bank CEOs were encouraged by poorly designed incentive schemes to bet the shop. The solution is not to move away from incentive compensation but to ensure that managers bear more of the cost of poor decisions. For example, in 2008 the Swiss bank UBS adopted a new pay system to deal with this problem. Incentive payments are to be retained by the bank for up to five years. If, in the meantime, the manager or trader underperforms, the previously agreed payments will be forfeited.

## 12-2 Measuring and Rewarding Performance: Residual Income and EVA

Almost all top executives of firms with publicly traded shares have compensation packages that depend in part on their firms' stock price performance. But their compensation also includes a bonus that depends on increases in earnings or on other accounting measures of performance. For lower-level managers, compensation packages usually depend more on accounting measures and less on stock returns.

Accounting measures of performance have two advantages:

1. They are based on absolute performance, rather than on performance relative to investors' expectations.
2. They make it possible to measure the performance of junior managers whose responsibility extends to only a single division or plant.

Tying compensation to accounting profits also creates some obvious problems. First, accounting profits are partly within the control of management. For example, managers whose pay depends on near-term earnings may cut maintenance or staff training. This is not a recipe for adding value, but an ambitious manager hoping for a quick promotion will be tempted to pump up short-term profits, leaving longer-run problems to his or her successors.

Second, accounting earnings and rates of return can be severely biased measures of true profitability. We ignore this problem for now, but return to it in the next section.

Third, growth in earnings does not necessarily mean that shareholders are better off. Any investment with a positive rate of return (1% or 2% will do) will eventually increase earnings. Therefore, if managers are told to maximize growth in earnings, they will dutifully invest in projects offering 1% or 2% rates of return—projects that destroy value. But shareholders do not want growth in earnings for its own sake, and they are not content with 1% or 2% returns. They want positive-NPV investments, and *only* positive-NPV investments. They want the company to invest only if the expected rate of return exceeds the cost of capital.

Look at Table 12.1, which contains a simplified income statement and balance sheet for your company's Quayle City confabulator plant. There are two methods for judging whether the plant's returns are higher than the cost of capital.

| Income | | Assets | |
|---|---|---|---|
| Sales | $550 | Net working capital[†] | $80 |
| Cost of goods sold* | 275 | Property, plant, and equipment investment | 1,170 |
| Selling, general, and administrative expenses | 75 | *Less* cumulative depreciation | 360 |
| | 200 | Net investment | 810 |
| Taxes at 35% | 70 | Other assets | 110 |
| Net income | $130 | Total assets | $1,000 |

> ▶ **TABLE 12.1**
> Simplified statements of income and assets for the Quayle City confabulator plant (figures in millions).
>
> * Includes depreciation expense.
> † Current assets less current liabilities.

**Net Return on Investment**   Book return on investment (ROI) is just the ratio of after-tax operating income to the net (depreciated) book value of assets.[14] In Chapter 5 we rejected book ROI as a capital investment criterion, and in fact few companies now use it for that purpose. However, managers frequently assess the performance of a division or a plant by comparing its ROI with the cost of capital.

Suppose you need to assess the performance of the Quayle City plant. As you can see from Table 12.1, the corporation has $1,000 million invested in the plant, which is generating earnings of $130 million. Therefore the plant is earning an ROI of $130/1,000 = .13$, or 13%.[15] If the cost of capital is (say) 10%, then the plant's activities are adding to shareholder value. The *net* return is $13 - 10 = 3\%$. If the cost of capital is (say) 20%, then shareholders would have been better off investing $1 billion somewhere else. In this case the net return is negative, at $13 - 20 = -7\%$.

**Residual Income or Economic Value Added (EVA®)[16]**   The second method calculates a net dollar return to shareholders. It asks, What are earnings after deducting a charge for the cost of capital?

When firms calculate income, they start with revenues and then deduct costs, such as wages, raw material costs, overhead, and taxes. But there is one cost that they do not commonly deduct: the cost of capital. True, they allow for depreciation, but investors are not content with a return of their investment; they also demand a return *on* that investment. As we pointed out in Chapter 10, a business that breaks even in terms of accounting profits is really making a loss; it is failing to cover the cost of capital.

To judge the net contribution to value, we need to deduct the cost of capital contributed to the plant by the parent company and its stockholders. Suppose again that the cost of capital is 10%. Then the dollar cost of capital for the Quayle City plant is $.10 \times \$1,000 = \$100$ million. The net gain is therefore $\$130 - 100 = \$30$ million. This is the addition to shareholder wealth due to management's hard work (or good luck).

---

[14] Notice that investment includes the net working capital (current assets minus current liabilities) required to operate the plant. The investment shown is also called net assets or the net capital invested in the plant. We say "ROI," but you will also hear "return on capital" (ROC). "Return on assets" (ROA) sometimes refers to return on assets defined to include net working capital, as in Table 12.1, but sometimes to return on total assets, where current assets are included but current liabilities are not subtracted. It's prudent to check definitions when reviewing reported ROIs, ROCs, or ROAs.

[15] Notice that earnings are calculated after tax but with no deductions for interest paid. The plant is evaluated as if it were all-equity-financed. This is standard practice (see Chapter 6). It helps to separate investment and financing decisions. The tax advantages of debt financing supported by the plant are picked up not in the plant's earnings or cash flows but in the discount rate. The cost of capital is the after-tax weighted-average cost of capital, or WACC. WACC was briefly introduced in Chapter 9 and will be further explained in Chapters 17 and 19.

[16] EVA is the term used by the consulting firm Stern–Stewart, which has done much to popularize and implement this measure of residual income. With Stern–Stewart's permission, we omit the copyright symbol in what follows.

Net income after deducting the dollar return required by investors is called *residual income* or *economic value added (EVA)*. The formula is

$$\text{EVA} = \text{residual income} = \text{income earned} - \text{income required}$$
$$= \text{income earned} - \text{cost of capital} \times \text{investment}$$

For our example, the calculation is

$$\text{EVA} = \text{residual income} = 130 - (.10 \times 1{,}000) = +\$30 \text{ million}$$

But if the cost of capital were 20%, EVA would be negative by $70 million.

Net return on investment and EVA are focusing on the same question. When return on investment equals the cost of capital, net return and EVA are both zero. But the net return is a percentage and ignores the scale of the company. EVA recognizes the amount of capital employed and the number of dollars of additional wealth created.

The term *EVA* has been popularized by the consulting firm Stern–Stewart. But the concept of residual income has been around for some time,[17] and many companies that are not Stern–Stewart clients use this concept to measure and reward managers' performance.

Other consulting firms have their own versions of residual income. McKinsey & Company uses *economic profit (EP)*, defined as capital invested multiplied by the spread between return on investment and the cost of capital. This is another way to measure residual income. For the Quayle City plant, with a 10% cost of capital, economic profit is the same as EVA:

$$\text{Economic profit (EP)} = (\text{ROI} - r) \times \text{capital invested}$$
$$= (.13 - .10) \times 1{,}000 = \$30 \text{ million}$$

In Chapter 28 we take a look at EVAs calculated for some well-known companies. But EVA's most valuable contributions happen inside companies. EVA encourages managers and employees to concentrate on increasing value, not just on increasing earnings.

## Pros and Cons of EVA

Let us start with the pros. EVA, economic profit, and other residual income measures are clearly better than earnings or earnings growth for measuring performance. A plant that is generating lots of EVA should generate accolades for its managers as well as value for shareholders. EVA may also highlight parts of the business that are not performing up to scratch. If a division is failing to earn a positive EVA, its management is likely to face some pointed questions about whether the division's assets could be better employed elsewhere.

EVA sends a message to managers: Invest if and only if the increase in earnings is enough to cover the cost of capital. This is an easy message to grasp. Therefore EVA can be used down deep in the organization as an incentive compensation system. It is a substitute for explicit monitoring by top management. Instead of *telling* plant and divisional managers not to waste capital and then trying to figure out whether they are complying, EVA rewards them for careful investment decisions. Of course, if you tie junior managers' compensation to their economic value added, you must also give them power over those decisions that affect EVA. Thus the use of EVA implies delegated decision making.

EVA makes the cost of capital *visible* to operating managers. A plant manager can improve EVA by (a) increasing earnings or (b) *reducing* capital employed. Therefore underutilized assets tend to be flushed out and disposed of.

---

[17] EVA is conceptually the same as the residual income measure long advocated by some accounting scholars. See, for example, R. Anthony, "Accounting for the Cost of Equity," *Harvard Business Review* 51 (1973), pp. 88–102, and "Equity Interest—Its Time Has Come," *Journal of Accountancy* 154 (1982), pp. 76–93.

Introduction of residual income measures often leads to surprising reductions in assets employed—not from one or two big capital disinvestment decisions, but from many small ones. Ehrbar quotes a sewing machine operator at Herman Miller Corporation:

> [EVA] lets you realize that even assets have a cost. . . . we used to have these stacks of fabric sitting here on the tables until we needed them. . . . We were going to use the fabric anyway, so who cares that we're buying it and stacking it up there? Now no one has excess fabric. They only have the stuff we're working on today. And it's changed the way we connect with suppliers, and we're having [them] deliver fabric more often.[18]

If you propose to tie a manager's remuneration to her business's profitability, it is clearly better to use EVA than accounting income which takes no account of the cost of the capital employed. But what are the limitations of EVA? Here we return to the same question that bedevils stock-based measures of performance. How can you judge whether a low EVA is a consequence of bad management or of factors outside the manager's control? The deeper you go in the organization, the less independence that managers have and therefore the greater the problem in measuring their contribution.

The second limitation with any accounting measure of performance lies in the data on which it is based. We explore this issue in the next section.

## 12-3  Biases in Accounting Measures of Performance

Anyone using accounting measures of performance had better hope that the accounting numbers are accurate. Unfortunately, they are often not accurate, but biased. Applying EVA or any other accounting measure of performance therefore requires adjustments to the income statements and balance sheets.

For example, think of the difficulties in measuring the profitability of a pharmaceutical research program, where it typically takes 10 to 12 years to bring a new drug from discovery to final regulatory approval and the drug's first revenues. That means 10 to 12 years of guaranteed losses, even if the managers in charge do everything right. Similar problems occur in start-up ventures, where there may be heavy capital outlays but low or negative earnings in the first years of operation. This does not imply negative NPV, so long as operating earnings and cash flows are sufficiently high later on. But EVA and ROI would be negative in the start-up years, even if the project were on track to a strong positive NPV.

The problem in these cases is not with EVA or ROI, but with the accounting data. The pharmaceutical R&D program may be showing accounting losses, because generally accepted accounting principles require that outlays for R&D be written off as current expenses. But from an economic point of view, those outlays are an investment, not an expense. If a proposal for a new business predicts accounting losses during a start-up period, but the proposal nevertheless shows a positive NPV, then the start-up losses are really an investment—cash outlays made to generate larger cash inflows when the business hits its stride.

### Example: Measuring the Profitability of the Nodhead Supermarket

Supermarket chains invest heavily in building and equipping new stores. The regional manager of a chain is about to propose investing $1 million in a new store in Nodhead. Projected cash flows are

| | Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | **6** | **after 6** |
| Cash flow ($ thousands) | 100 | 200 | 250 | 298 | 298 | 297 | 0 |

---

[18] A. Ehrbar, *EVA: The Real Key to Creating Wealth* (New York: John Wiley & Sons, Inc., 1998), pp. 130–131.

Of course, real supermarkets last more than six years. But these numbers are realistic in one important sense: It may take two or three years for a new store to build up a substantial, habitual clientele. Thus cash flow is low for the first few years even in the best locations.

We will assume the opportunity cost of capital is 10%. The Nodhead store's NPV at 10% is zero. It is an acceptable project, but not an unusually good one:

$$\text{NPV} = -1,000 + \frac{100}{1.10} + \frac{200}{(1.10)^2} + \frac{250}{(1.10)^3} + \frac{298}{(1.10)^4} + \frac{298}{(1.10)^5} + \frac{297}{(1.10)^6} = 0$$

With NPV = 0, the true (internal) rate of return of this cash-flow stream is also 10%.

Table 12.2 shows the store's forecasted *book* profitability, assuming straight-line depreciation over its six-year life. The book ROI is lower than the true return for the first two years and higher afterward.[19] EVA also starts negative for the first two years, then turns positive and grows steadily to year 6. These are typical outcomes, because accounting income is too low when a project or business is young and too high as it matures.

At this point the regional manager steps up on stage for the following soliloquy:

The Nodhead store's a decent investment. But if we go ahead, I won't look very good at next year's performance review. And what if I also go ahead with the new stores in Russet, Gravenstein, and Sheepnose? Their cash-flow patterns are pretty much the same. I could actually appear to lose money next year. The stores I've got won't earn enough to cover the initial losses on four new ones.

Of course, everyone knows new supermarkets lose money at first. The loss would be in the budget. My boss will understand—I think. But what about her boss? What if the board of directors starts asking pointed questions about profitability in my region? I'm under a lot of pressure to generate better earnings. Pamela Quince, the upstate manager, got a bonus for generating a positive EVA. She didn't spend much on expansion.

The regional manager is getting conflicting signals. On the one hand, he is told to find and propose good investment projects. *Good* is defined by discounted cash flow. On the other hand, he is also urged to seek high book income. But the two goals conflict because book income does not measure true income. The greater the pressure for immediate book profits, the more the regional manager is tempted to forgo good investments or to favor quick-payback projects over longer-lived projects, even if the latter have higher NPVs.

▶ **TABLE 12.2**

Forecasted book income, ROI, and EVA for the proposed Nodhead store. Book ROI and EVA are underestimated for the first two years and overestimated thereafter.

*Note:* There are minor rounding errors in some annual figures.

| | | Year | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 |
| | Cash flow | 100 | 200 | 250 | 298 | 298 | 297 |
| | Book value at start of year | 1,000 | 834 | 667 | 500 | 333 | 167 |
| | Book value at end of year | 834 | 667 | 500 | 333 | 167 | 0 |
| | Book depreciation | 167 | 167 | 167 | 167 | 167 | 167 |
| | Book income | −67 | 33 | 83 | 131 | 131 | 130 |
| | Book ROI | −0.067 | 0.040 | 0.125 | 0.263 | 0.394 | 0.782 |
| | EVA | −167 | −50 | 17 | 81 | 98 | 114 |



Visit us at
www.mhhe.com/bma

---

[19] The errors in book ROI always catch up with you in the end. If the firm chooses a depreciation schedule that overstates a project's return in some years, it must also understate the return in other years. In fact, you can think of a project's IRR as a kind of average of the book returns. It is not a simple average, however. The weights are the project's book values discounted at the IRR. See J. A. Kay, "Accountants, Too, Could Be Happy in a Golden Age: The Accountant's Rate of Profit and the Internal Rate of Return," *Oxford Economic Papers* 28 (1976), pp. 447–460.

## Measuring Economic Profitability

Let us think for a moment about how profitability should be measured in principle. It is easy enough to compute the true, or economic, rate of return for a common stock that is continuously traded. We just record cash receipts (dividends) for the year, add the change in price over the year, and divide by the beginning price:

$$\text{Rate of return} = \frac{\text{cash receipts} + \text{change in price}}{\text{beginning price}}$$

$$= \frac{C_1 + (P_1 - P_0)}{P_0}$$

The numerator of the expression for rate of return (cash flow plus change in value) is called **economic income:**

$$\text{Economic income} = \text{cash flow} + \text{change in present value}$$

Any reduction in present value represents **economic depreciation;** any increase in present value represents *negative* economic depreciation. Therefore

$$\text{Economic income} = \text{cash flow} - \text{economic depreciation}$$

The concept works for any asset. Rate of return equals cash flow plus change in value divided by starting value:

$$\text{Rate of return} = \frac{C_1 + (\text{PV}_1 - \text{PV}_0)}{\text{PV}_0}$$

where $\text{PV}_0$ and $\text{PV}_1$ indicate the present values of the business at the ends of years 0 and 1.

The only hard part in measuring economic income is calculating present value. You can observe market value if the asset is actively traded, but few plants, divisions, or capital projects have shares traded in the stock market. You can observe the present market value of *all* the firm's assets but not of any one of them taken separately.

Accountants rarely even attempt to measure present value. Instead they give us net book value (BV), which is original cost less depreciation computed according to some arbitrary schedule. If book depreciation and economic depreciation are different (they are rarely the same), then book earnings will not measure true earnings. (In fact, it is not clear that accountants should even *try* to measure true profitability. They could not do so without heavy reliance on subjective estimates of value. Perhaps they should stick to supplying objective information and leave the estimation of value to managers and investors.)

It is not hard to *forecast* economic income and rate of return for the Nodhead store. Table 12.3 shows the calculations. From the cash-flow forecasts we can forecast present

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | **6** |
| Cash flow | 100 | 200 | 250 | 298 | 298 | 297 |
| PV at start of year | 1,000 | 1,000 | 900 | 740 | 516 | 270 |
| PV at end of year | 1,000 | 900 | 740 | 516 | 270 | 0 |
| Economic depreciation | 0 | 100 | 160 | 224 | 246 | 270 |
| Economic income | 100 | 100 | 90 | 74 | 52 | 27 |
| Rate of return | 0.10 | 0.10 | 0.10 | 0.10 | 0.10 | 0.10 |
| EVA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

▶ **TABLE 12.3**    Forecasted economic income, rate of return, and EVA for the proposed Nodhead store. Economic income equals cash flow minus economic depreciation. Rate of return equals economic income divided by value at start of year. EVA equals income minus cost of capital times value at start of year.

*Note:* There are minor rounding errors in some annual figures.



eXcel

Visit us at
www.mhhe.com/bma

value at the start of periods 1 to 6. Cash flow minus economic depreciation equals economic income. Rate of return equals economic income divided by start-of-period value.

Of course, these are forecasts. Actual future cash flows and values will be higher or lower. Table 12.3 shows that investors *expect* to earn 10% in each year of the store's six-year life. In other words, investors expect to earn the opportunity cost of capital each year from holding this asset.

Notice that EVA calculated using present value and economic income is zero in each year of the Nodhead project's life. For year 2, for example,

$$EVA = 100 - (.10 \times 1,000) = 0$$

EVA *should* be zero, because the project's true rate of return is only equal to the cost of capital. EVA will always give the right signal if book income equals economic income and asset values are measured accurately.

### Do the Biases Wash Out in the Long Run?

Even if the forecasts for the Nodhead store turn out to be correct, ROI and EVA will be biased. That might not be a serious problem if the errors wash out in the long run, when the region settles down to a steady state with an even mix of old and new stores.

It turns out that the errors do not wash out in the steady state. Table 12.4 shows steady-state book ROIs and forecasted EVAs for the supermarket chain if it opens one store a year. For simplicity we assume that the company starts from scratch and that each store's cash flows are carbon copies of the Nodhead store. The true rate of return on each store is, therefore, 10% and the true EVA is zero. But as Table 12.4 demonstrates, steady-state book ROI and estimated EVA *overstate* the true profitability.

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | **6** |
| Book income for store[a] | | | | | | |
| 1 | −67 | 33 | 83 | 131 | 131 | 130 |
| 2 | | −67 | 33 | 83 | 131 | 131 |
| 3 | | | −67 | 33 | 83 | 131 |
| 4 | | | | −67 | 33 | 83 |
| 5 | | | | | −67 | 33 |
| 6 | | | | | | −67 |
| Total book income | −67 | −33 | 50 | 181 | 312 | 443 |
| | | | | | | |
| Book value for store | | | | | | |
| 1 | 1,000 | 834 | 667 | 500 | 333 | 167 |
| 2 | | 1,000 | 834 | 667 | 500 | 333 |
| 3 | | | 1,000 | 834 | 667 | 500 |
| 4 | | | | 1,000 | 834 | 667 |
| 5 | | | | | 1,000 | 834 |
| 6 | | | | | | 1,000 |
| Total book value | 1,000 | 1,834 | 2,501 | 3,001 | 3,334 | 3,501 |
| | | | | | | |
| Book ROI for all stores | −0.067 | −0.018 | 0.020 | 0.060 | 0.094 | 0.126[b] |
| EVA | −166.73 | −216.79 | −200.19 | −118.91 | −20.96 | 92.66[c] |
| | | | | | | ▲ |
| | | | | | | Steady state |

 **TABLE 12.4**    Book ROI for a group of stores like the Nodhead store. The steady-state book ROI overstates the 10% *economic rate* of return. The steady-state EVA is also biased upward.

[a] Book income = cash flow − book depreciation.
[b] Steady-state book ROI.
[c] Steady-state EVA.
*Note:* There are minor rounding errors in some annual figures.



Visit us at
www.mhhe.com/bma

Thus we still have a problem even in the long run. The extent of the error depends on how fast the business grows. We have just considered one steady state with a zero growth rate. Think of another firm with a 5% steady-state growth rate. Such a firm would invest $1,000 the first year, $1,050 the second, $1,102.50 the third, and so on. Clearly the faster growth means more new projects relative to old ones. The greater weight given to young projects, which have low book ROIs and negative apparent EVAs, the lower the business's apparent profitability.[20]

## What Can We Do about Biases in Accounting Profitability Measures?

The dangers in judging profitability by accounting measures are clear from these examples. To be forewarned is to be forearmed. But we can say something beyond just "be careful."

It is natural for firms to set a standard of profitability for plants or divisions. Ideally that standard should be the opportunity cost of capital for investment in the plant or division. That is the whole point of EVA: to compare actual profits with the cost of capital. But if performance is measured by return on investment or EVA, then these measures need to recognize accounting biases. Ideally, the financial manager should identify and eliminate accounting biases before calculating EVA or net ROI. The managers and consultants that implement these measures work hard to adjust book income closer to economic income. For example, they may record R&D as an investment rather than an expense and construct alternative balance sheets showing R&D as an asset.

Accounting biases are notoriously hard to get rid of, however. Thus, many firms end up asking not "Did the widget division earn more than its cost of capital last year?" but "Was the widget division's book ROI typical of a successful firm in the widget industry?" The underlying assumptions are that (1) similar accounting procedures are used by other widget manufacturers and (2) successful widget companies earn their cost of capital.

There are some simple accounting changes that could reduce biases in performance measures. Remember that the biases all stem from *not* using economic depreciation. Therefore why not switch to economic depreciation? The main reason is that each asset's present value would have to be reestimated every year. Imagine the confusion if this were attempted. You can understand why accountants set up a depreciation schedule when an investment is made and then stick to it. But why restrict the choice of depreciation schedules to the old standbys, such as straight-line? Why not specify a depreciation pattern that at least matches *expected* economic depreciation? For example, the Nodhead store could be depreciated according to the expected economic depreciation schedule shown in Table 12.3. This would avoid any systematic biases. It would break no law or accounting standard. This step seems so simple and effective that we are at a loss to explain why firms have not adopted it.[21]

## Earnings and Earnings Targets

The biases that we have just described do not come from creative accounting. They are built into GAAP. Of course we should worry about creative accounting also. We have already noted how stock options have tempted managers to fiddle with accounting choices to make reported earnings look good and prop up stock price.

But perhaps there is a deeper problem. CEOs of public companies face constant scrutiny. Much of that scrutiny focuses on earnings. Security analysts forecast earnings per share (EPS) and investors, security analysts, and professional portfolio managers wait to see whether the company can meet or beat the forecasts. *Not* meeting the forecasts can be a big disappointment.

---

[20] We could repeat the steady-state analysis in Table 12.4 for different growth rates. It turns out that book income will overstate economic income if the growth rate is less than the internal rate of return and understate economic income if the growth rate exceeds the internal rate of return. Biases disappear if the growth rate and internal rate of return are exactly equal.

[21] This procedure has been suggested by several authors, for example by Zvi Bodie in "Compound Interest Depreciation in Capital Investment," *Harvard Business Review* 60 (May–June 1982), pp. 58–60.

Monitoring by security analysts and portfolio managers can help constrain agency problems. But CEOs complain about the "tyranny of EPS" and the apparent short-sightedness of the stock market. (The British call it *short-termism*.) Of course the stock market is not systematically short-sighted. If it were, growth companies would not sell at the high price–earnings ratios observed in practice.[22] Nevertheless, the pressure on CEOs to generate steady, predictable growth in earnings is real.

CEOs complain about this pressure, but do they do anything about it? Unfortunately the answer appears to be yes, according to Graham, Harvey, and Rajgopal, who surveyed about 400 senior managers.[23] Most of the managers said that accounting earnings were the single most important number reported to investors. Most admitted to adjusting their firms' operations and investments to manage earnings. For example, 80% were willing to decrease discretionary spending in R&D, advertising, or maintenance if necessary to meet earnings targets. Many managers were also prepared to defer or reject investment projects with positive NPVs. There is a good deal of evidence that firms do indeed manage their earnings. For example, DeGeorge, Patel, and Zeckhauser studied a large sample of earnings announcements.[24] With remarkable regularity, earnings per share either met or beat security analysts' forecasts, but only by a few cents. CFOs appeared to report conservatively in good times, building a stockpile of earnings that could be reported later. The rule, it seems, is *Make sure that you report sufficiently good results to keep analysts happy, and, if possible, keep something back for a rainy day.*[25]

How much value was lost because of such adjustments? For a healthy, profitable company, spending a little more on advertising or deferring a project start for a few months may cause no significant damage. But we cannot endorse any sacrifice of fundamental shareholder value done just to manage earnings.

We may condemn earnings management, but in practice it's hard for CEOs and CFOs to break away from the crowd. Graham and his coauthors explain it this way:[26]

> The common belief is that a well-run and stable firm should be able to "produce the numbers". . . even in a year that is somewhat down. Because the market expects firms to be able to hit or slightly exceed earnings targets, and on average firms do just this, problems can arise when a firm does not deliver. . . . The market might assume that not delivering [reveals] potentially serious problems (because the firm is apparently so near the edge that it cannot produce the dollars to hit earnings . . .). As one CFO put it, "if you see one cockroach, you immediately assume that there are hundreds behind the walls."

Thus we have a cockroach theory explaining why stock prices sometimes fall sharply when a company's earnings fall short, even if the shortfall is only a penny or two.

Of course private firms do not have to worry about earnings management—which could help explain the increasing number of firms that have been bought out and returned to private ownership. (We discuss "going private" in Chapters 32 and 33.) Firms in some other countries, where quarterly earnings reports are not required and governance is more relaxed, may find it easier to invest for the long run. But such firms will also accumulate more agency problems. We wish there were simple answers to these trade-offs.

---

[22] Recall from Chapter 4 that the price–earnings ratio equals $1/r_E$, where $r_E$ is the cost of equity, *unless* the firm has valuable growth opportunities (PVGO). The higher the PVGO, the lower the earnings–price ratio and the higher the price–earnings ratio. Thus the high price–earnings ratios observed for growth companies (much higher than plausible estimates of $1/r_E$) imply that investors forecast large PVGOs. But PVGO depends on investments made many years in the future. If investors see significant PVGOs, they can't be systematically short-sighted.

[23] J. R. Graham, C. R. Harvey, and S. Rajgopal, "The Economic Implications of Corporate Financial Reporting," *Journal of Accounting and Economics* 40 (2005), pp. 3–73.

[24] F. Degeorge, J. Patel, and R. Zeckhauser, "Earnings Management to Exceed Thresholds," *The Journal of Business* 72 (January 1999), pp. 1–33.

[25] Sometimes, instead of adjusting their operations, companies meet their target earnings by bending the accounting rules. For example, in August 2009 GE was fined $50 million for creative accounting in earlier years. The SEC said that GE had met or exceeded analysts' profit targets in every quarter from 1995 through 2004, but that its top accountants signed off on improper decisions to make its numbers look better and to avoid missing analysts' earnings expectations.

[26] Graham, Harvey, and Rajgopal, *op. cit.*, p. 29.

Capital investment decisions must be decentralized to a large extent. Consequently, agency problems are inevitable. Plant or divisional managers may be tempted to slack off, to avoid risk, or to propose empire-building or entrenching investments. Of course, top management is also exposed to similar temptations.

Agency problems are mitigated by a combination of monitoring and incentives. For example, shareholders delegate the task of monitoring top management to the board of directors and to the accountants who audit the company's books.

To encourage managers to maximize shareholder value, a large part of their compensation is usually tied to company performance. Typically, this performance-related pay consists of a mixture of stock or stock options and bonuses that depend on accounting measures of profitability. The U.S is unusual both in the high levels of compensation for top executives and the extent to which pay is performance-related.

If you want to align the interests of the manager and the shareholder, it makes sense to give the manager common stock or stock options. But this is not a complete solution, for at least three reasons. First, stock prices depend on market and industry developments, not just on firm-specific performance. Thus compensation by stock or options exposes managers to risks that are outside their control. Second, today's stock price already reflects managers' expected future performance. Therefore, superior performance if it is expected, will not be rewarded with a superior stock-market return. Third, tying too much of management compensation to stock prices tempts managers to pump up stock prices, for example, by manipulating reported earnings per share.

The further you go down in a company, the more tenuous the link between the stock price and a manager's effort and decisions. Therefore a higher fraction of pay depends on accounting income. Increasing accounting income is not the same thing as increasing value, because accountants do not recognize the cost of capital as an expense. Many companies therefore tie compensation to net return on investment (net ROI) or to Economic Value Added (EVA). Net ROI is the difference between ordinary ROI and the cost of capital. EVA and other residual income measures subtract a charge for capital employed. This charge pushes managers and employees to let go of unneeded assets and to acquire new ones only if the additional earnings exceed the cost of capital.

Of course, any accounting measure of profitability, such as EVA or the book return on investment (ROI), depends on accurate measures of earnings and capital employed. Unless adjustments are made to accounting data, these measures may underestimate the true profitability of new assets and overestimate that of old assets.

In principle, the solution is easy. EVA and ROI should be calculated using true or economic income. Economic income is equal to the cash flow less economic depreciation (that is, the decline in the present value of the asset). Unfortunately, we can't ask accountants to recalculate each asset's present value each time income is calculated. But it does seem fair to ask why they don't at least try to match book depreciation schedules to typical patterns of economic depreciation.

The more pressing problem is that CEOs and CFOs seem to pay too much attention to earnings, at least in the short run, to maintain smooth growth and to meet earnings targets. They manage earnings, not with improper accounting, but by tweaking operating and investment plans. For example, they may defer a positive-NPV project for a few months to move the project's up-front expenses into the next fiscal year. It's not clear how much value is lost by this kind of behavior, but any value loss is unfortunate.

**FURTHER READING**

*Current practices in management remuneration are discussed in:*

K. J. Murphy, "Executive Compensation," in O. Ashenfelter and D. Cards (eds.), *Handbook of Labor Economics* (North-Holland, 1999).

R.K. Aggarwal, "Executive Compensation and Incentives," in B. E Eckbo (ed.), *Handbook of Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007), Chapter 7.

B. J. Hall and K. J. Murphy, "The Trouble with Stock Options," *Journal of Economic Perspectives* 17 (Summer 2003), pp. 49–70.

*The following surveys argue that executive compensation has been excessive, owing partly to weaknesses in corporate governance:*

L. Bebchuk and J. Fried, *Pay without Performance: The Unfulfilled Promise of Executive Compensation* (Cambridge, MA: Harvard University Press, 2005).

M. C. Jensen, K. J. Murphy, and E. G. Wruck, "Remuneration: Where We've Been, How We Got to Here, What Are the Problems, and How to Fix Them," 2004, at **www.ssrn.com**, posted July 12, 2004.

*The Fall 2005 issue of the* Journal of Applied Corporate Finance *focuses on executive pay and corporate governance.*

*The following article is worth reading for survey evidence on earnings and corporate reporting:*

J. R. Graham, C. R. Harvey, and S. Rajgopal, "The Economic Implications of Corporate Financial Reporting," *Journal of Accounting and Economics* 40 (2005), pp. 3–73.

*For easy-to-read descriptions of EVA, see:*

A. Ehrbar, *EVA: The Real Key to Creating Wealth* (New York: John Wiley & Sons, 1998).

J. M. Stern and J. S. Shiely, *The EVA Challenge—Implementing Value-added Change in an Organization* (New York: John Wiley & Sons, 2001).



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

**PROBLEM SETS**

### BASIC

1. True or false?
    a. U.S. CEOs are paid much more than CEOs in other countries.
    b. A large fraction of compensation for U.S. CEOs comes from stock-option grants.
    c. Stock-option grants give the manager a certain number of shares delivered at annual intervals, usually over five years.
    d. U.S. accounting rules now require recognition of the value of stock-option grants as a compensation expense.

2. Define the following: (a) Agency costs in capital investment, (b) private benefits, (c) empire building, (d) free-rider problem, (e) entrenching investment, (f) delegated monitoring.

3. Monitoring alone can never completely eliminate agency costs in capital investment. Briefly explain why.

4. Here are several questions about economic value added or EVA.
    a. Is EVA expressed as a percentage or a dollar amount?
    b. Write down the formula for calculating EVA.
    c. What is the difference, if any, between EVA and residual income?
    d. What is the point of EVA? Why do firms use it?
    e. Does the effectiveness of EVA depend on accurate measures of accounting income and assets?

5. The Modern Language Corporation earned $1.6 million on net assets of $20 million. The cost of capital is 11.5%. Calculate the net ROI and EVA.

6. Fill in the blanks:

   "A project's economic income for a given year equals the project's _____ less its _____ depreciation. New projects may take several years to reach full profitability. In these cases book income is _____ than economic income early in the project's life and _____ than economic income later in its life."

7. How in practice do managers of public firms meet short-run earnings targets? By creative accounting?

**INTERMEDIATE**

8. Compare typical compensation and incentive arrangements for (a) top management, for example, the CEO or CFO, and (b) plant or division managers. What are the chief differences? Can you explain them?

9. Suppose all plant and division managers were paid only a fixed salary—no other incentives or bonuses.

   a. Describe the agency problems that would appear in capital investment decisions.

   b. How would tying the managers' compensation to EVA alleviate these problems?

10. Who monitors the top management of public U.S. corporations? (We have mentioned four types of monitoring in this chapter.)

11. We noted that management compensation must in practice rely on results rather than on effort. Why? What problems are introduced by not rewarding effort?

12. Here are a few questions about compensation schemes that tie top management's compensation to the rate of return earned on the company's common stock.

   a. Today's stock price depends on investors' expectations of future performance. What problems does this create?

   b. Stock returns depend on factors outside the managers' control, for example, changes in interest rates or prices of raw materials. Could this be a serious problem? If so, can you suggest a partial solution?

   c. Compensation schemes that depend on stock returns do *not* depend on accounting data. Is that an advantage? Why or why not?

13. You chair the compensation committee of the board of directors of Androscoggin Copper. A consultant suggests two stock-option packages for the CEO:

   a. A conventional stock-option plan, with the exercise price fixed at today's stock price.

   b. An alternative plan in which the exercise price depends on the future market value of a portfolio of the stocks of *other* copper-mining companies. This plan pays off for the CEO only if Androscoggin's stock price performs better than its competitors'.

   The second plan sets a higher hurdle for the CEO, so the number of shares should be higher than in the conventional plan. Assume that the number of shares granted under each plan has been calibrated so that the present values of the two plans are the same. Which plan would you vote for? Explain.

14. Table 12.5 shows a condensed income statement and balance sheet for Androscoggin Copper's Rumford smelting plant.

   a. Calculate the plant's EVA. Assume the cost of capital is 9%.

   b. As Table 12.5 shows, the plant is carried on Androscoggin's books at $48.32 million. However, it is a modern design, and could be sold to another copper company for $95 million. How should this fact change your calculation of EVA?

15. Herbal Resources is a small but profitable producer of dietary supplements for pets. This is not a high-tech business, but Herbal's earnings have averaged around $1.2 million after tax,

| Income Statement for 2011 | | Assets, December 31, 2011 | |
|---|---|---|---|
| Revenue | $56.66 | Net working capital | $ 7.08 |
| Raw materials cost | 18.72 | | |
| Operating cost | 21.09 | Investment in plant and equipment | 69.33 |
| Depreciation | 4.50 | *Less* accumulated depreciation | 21.01 |
| Pretax income | 12.35 | Net plant and equipment | 48.32 |
| Tax at 35% | 4.32 | | |
| Net income | $ 8.03 | Total assets | $55.40 |

▶ **TABLE 12.5**

Condensed financial statements for the Rumford smelting plant. See Problem 14 (figures in $ millions).

Visit us at www.mhhe.com/bma

largely on the strength of its patented enzyme for making cats nonallergenic. The patent has eight years to run, and Herbal has been offered $4 million for the patent rights.

Herbal's assets include $2 million of working capital and $8 million of property, plant, and equipment. The patent is not shown on Herbal's books. Suppose Herbal's cost of capital is 15%. What is its EVA?

**16.** True or false? Explain briefly.

a. Book profitability measures are biased measures of true profitability for individual assets. However, these biases "wash out" when firms hold a balanced mix of old and new assets.

b. Systematic biases in book profitability would be avoided if companies used depreciation schedules that matched expected economic depreciation. However, few, if any, firms have done this.

**17.** Consider the following project:

| | Period | | | |
|---|---|---|---|---|
| | **0** | **1** | **2** | **3** |
| Net cash flow | −100 | 0 | 78.55 | 78.55 |

The internal rate of return is 20%. The NPV, assuming a 20% opportunity cost of capital, is exactly zero. Calculate the expected *economic* income and economic depreciation in each year.



Visit us at
www.mhhe.com/bma

**18.** Calculate the year-by-year book and economic profitability for investment in polyzone production, as described in Chapter 11. Use the cash flows and competitive spreads shown in Table 11.2, and assume straight-line depreciation over 10 years.

What is the steady-state book rate of return (ROI) for a mature company producing polyzone? Assume no growth and competitive spreads.



Visit us at
www.mhhe.com/bma

**19.** The Web site **www.mhhe.com/bma** contains an Excel program for calculating the profitability of the Nodhead project. Now suppose that the cash flows from Nodhead's new supermarket are as follows:

| | Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | **0** | **1** | **2** | **3** | **4** | **5** | **6** |
| Cash flows ($ thousands) | −1,000 | +298 | +298 | +298 | +138 | +138 | +140 |

a. Recalculate economic depreciation. Is it accelerated or decelerated?

b. Rework Tables 12.2 and 12.3 to show the relationship between (i) the "true" rate of return and book ROI and (ii) true EVA and forecasted EVA in each year of the project's life.



Visit us at
www.mhhe.com/bma

**20.** The Web site **www.mhhe.com/bma** contains an Excel program for measuring the profitability of the Nodhead project. Reconstruct Table 12.4 assuming a steady-state growth rate of 10% per year. Your answer will illustrate a fascinating theorem, namely, that book rate of return equals the economic rate of return when the economic rate of return and the steady-state growth rate are the same.

### CHALLENGE

**21.** Consider an asset with the following cash flows:



Visit us at
www.mhhe.com/bma

| | Year | | | |
|---|---|---|---|---|
| | **0** | **1** | **2** | **3** |
| Cash flows ($ millions) | −12 | +5.20 | +4.80 | +4.40 |

Visit us at www.mhhe.com/bma

The firm uses straight-line depreciation. Thus, for this project, it writes off $4 million per year in years 1, 2, and 3. The discount rate is 10%.

a. Show that economic depreciation equals book depreciation.

b. Show that the book rate of return is the same in each year.

c. Show that the project's book profitability is its true profitability.

You've just illustrated another interesting theorem. If the book rate of return is the same in each year of a project's life, the book rate of return equals the IRR.

22. In our Nodhead example, true depreciation was decelerated. That is not always the case. For instance, Table 12.6 shows how on average the market value of a Boeing 737 has varied with its age[27] and the cash flow needed in each year to provide a 10% return. (For example, if you bought a 737 for $19.69 million at the start of year 1 and sold it a year later, your total profit would be $17.99 + 3.67 - 19.69 = \$1.97$ million , 10% of the purchase cost.)

Many airlines write off their aircraft straight-line over 15 years to a salvage value equal to 20% of the original cost.

a. Calculate economic and book depreciation for each year of the plane's life.

b. Compare the true and book rates of return in each year.

c. Suppose an airline invested in a fixed number of Boeing 737s each year. Would steady-state book return overstate or understate true return?



Visit us at
www.mhhe.com/bma

| Start of Year | Market Value | Cash Flow |
|---|---|---|
| 1 | 19.69 | |
| 2 | 17.99 | $3.67 |
| 3 | 16.79 | 3.00 |
| 4 | 15.78 | 2.69 |
| 5 | 14.89 | 2.47 |
| 6 | 14.09 | 2.29 |
| 7 | 13.36 | 2.14 |
| 8 | 12.68 | 2.02 |
| 9 | 12.05 | 1.90 |
| 10 | 11.46 | 1.80 |
| 11 | 10.91 | 1.70 |
| 12 | 10.39 | 1.61 |
| 13 | 9.91 | 1.52 |
| 14 | 9.44 | 1.46 |
| 15 | 9.01 | 1.37 |
| 16 | 8.59 | 1.32 |

▶ **TABLE 12.6**

Estimated market values of a Boeing 737 in January 1987 as a function of age, plus the cash flows needed to provide a 10% true rate of return (figures in $ millions).

---

[27] We are grateful to Mike Staunton for providing us with these estimates.

# Efficient Markets and Behavioral Finance

▶ **Up to this** point we have concentrated almost exclusively on the left-hand side of the balance sheet—the firm's capital investment decision. Now we move to the right-hand side and to the problems involved in financing the capital investments. To put it crudely, you've learned how to spend money, now learn how to raise it.

Of course we haven't totally ignored financing in earlier chapters. We introduced the weighted-average cost of capital, for example. But in most places we have looked past financing issues and used estimates of the opportunity cost of capital to discount future cash flows. We didn't ask how the cost of capital might be affected by financing.

Now we are turning the problem around. We take the firm's present portfolio of real assets and its future investment strategy as given, and then we determine the best financing strategy. For example,

- Should the firm reinvest most of its earnings in the business, or distribute the cash to shareholders?
- If the firm needs more money, should it issue more stock or should it borrow?
- Should it borrow short term or long term?
- Should it borrow by issuing a normal long-term bond or a convertible bond (a bond which can be exchanged for stock by the bondholders)?

There are countless other financing trade-offs, as you will see.

The purpose of holding the firm's capital investment decision constant is to separate that decision from the financing decision. Strictly speaking, this assumes that investment and financing decisions are *independent*. In many circumstances this is a reasonable assumption. The firm is generally free to change its capital structure by repurchasing one security and issuing another. In that case there is no need to associate a particular investment project with a particular source of cash. The firm can think, first, about which projects to accept and, second, about how they should be financed.

Sometimes decisions about capital structure depend on project choice or vice versa, and in those cases the investment and financing decisions have to be considered jointly. However, we defer discussion of such interactions of financing and investment decisions until Chapter 19.

We start this chapter by contrasting investment and financing decisions. The objective in each case is the same—to maximize NPV. However, it may be harder to find positive-NPV financing opportunities. The reason it is difficult to add value by clever financing decisions is that capital markets are usually efficient. By this we mean that fierce competition between investors eliminates profit opportunities and causes debt and equity issues to be fairly priced. If you think that sounds like a sweeping statement, you are right. That is why we have devoted this chapter to explaining and evaluating the efficient-market hypothesis.

You may ask why we start our discussion of financing issues with this conceptual point, before you have even the most basic knowledge about securities and issue procedures. We do it this way because financing decisions seem overwhelmingly complex if you don't learn to ask the right questions. We are afraid you might flee from confusion to the myths that often dominate popular discussion of corporate financing. You need to understand the efficient-market hypothesis not because it is *universally* true but because it leads you to ask the right questions.

We define the efficient-market hypothesis more carefully in Section 13-2. The hypothesis comes in

different strengths, depending on the information available to investors. Sections 13-2 through 13-4 review the evidence for and against efficient markets. The evidence "for" is considerable, but over the years a number of puzzling anomalies have accumulated.

Advocates for rational and efficient markets also have a hard time explaining *bubbles*. Every decade seems to find its own bubble: the 1980s real estate and stock market bubble in Japan, the 1990s technology stock bubble, and the recent real estate bubble that triggered the subprime crisis. Part of the blame for bubbles goes to the incentive and agency problems that can plague even the most rational people, particularly when they are investing other people's money. But bubbles may also reflect patterns of irrational behavior that have been well documented by behavioral psychologists. We describe the main features of *behavioral finance* and the challenge that it poses to the efficient-market hypothesis.

The chapter closes with the six lessons of market efficiency.

● ● ● ● ●

## 13-1 We Always Come Back to NPV

Although it is helpful to separate investment and financing decisions, there are basic similarities in the criteria for making them. The decisions to purchase a machine tool and to sell a bond each involve valuation of a risky asset. The fact that one asset is real and the other is financial doesn't matter. In both cases we end up computing net present value.

The phrase *net present value of borrowing* may seem odd to you. But the following example should help to explain what we mean: As part of its policy of encouraging small business, the government offers to lend your firm $100,000 for 10 years at 3%. This means that the firm is liable for interest payments of $3,000 in each of the years 1 through 10 and that it is responsible for repaying the $100,000 in the final year. Should you accept this offer?

We can compute the NPV of the loan agreement in the usual way. The one difference is that the first cash flow is *positive* and the subsequent flows are *negative:*

$$\text{NPV} = \text{amount borrowed} - \text{present value of interest payments}$$
$$- \text{present value of loan repayment}$$
$$= +100{,}000 - \sum_{t=1}^{10} \frac{3{,}000}{(1+r)^t} - \frac{100{,}000}{(1+r)^{10}}$$

The only missing variable is $r$, the opportunity cost of capital. You need that to value the liability created by the loan. We reason this way: The government's loan to you is a financial asset: a piece of paper representing your promise to pay $3,000 per year plus the final repayment of $100,000. How much would that paper sell for if freely traded in the capital market? It would sell for the present value of those cash flows, discounted at $r$, the rate of return offered by other securities issued by your firm. All you have to do to determine $r$ is to answer the question, What interest rate would my firm need to pay to borrow money directly from the capital markets rather than from the government?

Suppose that this rate is 10%. Then

$$\text{NPV} = +100{,}000 - \sum_{t=1}^{10} \frac{3{,}000}{(1.10)^t} - \frac{100{,}000}{(1.10)^{10}}$$
$$= +100{,}000 - 56{,}988 = +\$43{,}012$$

Of course, you don't need any arithmetic to tell you that borrowing at 3% is a good deal when the fair rate is 10%. But the NPV calculations tell you just how much that opportunity is worth ($43,012).[1] It also brings out the essential similarity between investment and financing decisions.

---
[1] We ignore here any tax consequences of borrowing. These are discussed in Chapter 18.

## Differences between Investment and Financing Decisions

In some ways investment decisions are simpler than financing decisions. The number of different securities and financing strategies is well into the hundreds (we have stopped counting). You will have to learn the major families, genera, and species. You will also need to become familiar with the vocabulary of financing. You will learn about such matters as red herrings, greenshoes, and bookrunners; behind each of these terms lies an interesting story.

There are also ways in which financing decisions are much easier than investment decisions. First, financing decisions do not have the same degree of finality as investment decisions. They are easier to reverse. That is, their abandonment value is higher. Second, it's harder to make money by smart financing strategies. The reason is that financial markets are more competitive than product markets. This means it is more difficult to find positive-NPV financing strategies than positive-NPV investment strategies.

When the firm looks at capital investment decisions, it does *not* assume that it is facing perfect, competitive markets. It may have only a few competitors that specialize in the same line of business in the same geographical area. And it may own some unique assets that give it an edge over its competitors. Often these assets are intangible, such as patents, expertise, or reputation. All this opens up the opportunity to make superior profits and find projects with positive NPVs.

In financial markets your competition is all other corporations seeking funds, to say nothing of the state, local, and federal governments that go to New York, London, and other financial centers to raise money. The investors who supply financing are comparably numerous, and they are smart: Money attracts brains. The financial amateur often views capital markets as *segmented,* that is, broken down into distinct sectors. But money moves between those sectors, and it usually moves fast. In general, as we shall see, firms should assume that the securities they issue are fairly priced. That takes us into the main topic of this chapter: efficient capital markets.

## 13-2 What Is an Efficient Market?

### A Startling Discovery: Price Changes Are Random

As is so often the case with important ideas, the concept of efficient capital markets stemmed from a chance discovery. In 1953 Maurice Kendall, a British statistician, presented a controversial paper to the Royal Statistical Society on the behavior of stock and commodity prices.[2] Kendall had expected to find regular price cycles, but to his surprise they did not seem to exist. Each series appeared to be "a 'wandering' one, almost as if once a week the Demon of Chance drew a random number . . . and added it to the current price to determine the next week's price." In other words, the prices of stocks and commodities seemed to follow a *random walk.*

If you are not sure what we mean by "random walk," you might like to think of the following example: You are given $100 to play a game. At the end of each week a coin is tossed. If it comes up heads, you win 3% of your investment; if it is tails, you lose 2.5%.

---

[2] See M. G. Kendall, "The Analysis of Economic Time Series, Part I. Prices," *Journal of the Royal Statistical Society* 96 (1953), pp. 11–25. Kendall's idea was not wholly new. It had been proposed in an almost forgotten thesis written 53 years earlier by a French doctoral student, Louis Bachelier. Bachelier's accompanying development of the mathematical theory of random processes anticipated by five years Einstein's famous work on the random Brownian motion of colliding gas molecules. See L. Bachelier, *Théorie de la Speculation* (Paris: Gauthiers-Villars, 1900). Reprinted in English (A. J. Boness, trans.) in P. H. Cootner (ed.), *The Random Character of Stock Market Prices* (Cambridge, MA: MIT Press, 1964), pp. 17–78.

Therefore, your capital at the end of the first week is either $103.00 or $97.50. At the end of the second week the coin is tossed again. Now the possible outcomes are:



This process is a random walk with a positive drift of .25% per week.[3] It is a random walk because successive changes in value are independent. That is, the odds each week are the same, regardless of the value at the start of the week or of the pattern of heads and tails in the previous weeks.

If you find it difficult to believe that there are no patterns in share price changes, look at the two charts in Figure 13.1. One of these charts shows the outcome from playing our game for five years; the other shows the actual performance of the Standard and Poor's Index for a five-year period. Can you tell which one is which?[4]

When Maurice Kendall suggested that stock prices follow a random walk, he was implying that the price changes are independent of one another just as the gains and losses in our coin-tossing game were independent. Figure 13.2 illustrates this for four stocks, Microsoft, BP, Philips, and Sony. Each panel shows the change in price of the stock on successive days. The circled dot in the southeast quadrant of the Microsoft panel refers to a pair of days in which a 3% increase was followed by a 3% decrease. If there were a systematic tendency for increases to be followed by decreases, there would be many dots in the southeast quadrant and few in the northeast quadrant. It is obvious from a glance that there is very little pattern in these price movements, but we can test this more precisely by calculating the coefficient of correlation between each day's price change and the next. If price movements persisted, the correlation would be positive; if there were no relationship, it would be 0. In our



◗ **FIGURE 13.1**

This chart show the Standard and Poor's Index for a five-year period and the results of playing our coin-tossing game for five years. Can you tell which line is which?

---

[3] The drift is equal to the expected outcome: $(1/2)(3) + (1/2)(-2.5) = .25\%$.

[4] The blue in Figure 13.1 shows the actual Standard and Poor's Index for February 2002 to February 2007; the red is a series of cumulated random numbers. Of course, 50% of you are likely to have guessed right, but we bet it was just a guess.



▶ **FIGURE 13.2**

Each dot shows a pair of returns for a stock on two successive days between January 1990 and May 2009. The circled dot for Microsoft records a daily return of +3% and then −3% on the next day. The scatter diagram shows no significant relationship between returns on successive days.

example, the correlation between successive price changes in Microsoft stock was −.019; there was a negligible tendency for price rises to be followed by price falls.[5] For Philips this correlation was also negative at −.030. However, for BP and Sony the correlations were positive at +.004 and +.026, respectively. In these cases there was a negligible tendency for price rises to be followed by further price rises.

Figure 13.2 suggests that successive price changes of all four stocks were effectively uncorrelated. Today's price change gave investors almost no clue as to the likely change

---

[5] The correlation coefficient between successive observations is known as the *autocorrelation coefficient*. An autocorrelation of −.019 implies that, if Microsoft's stock price rose by 1% more than the average yesterday, your best forecast of today's change would be .019% *less* than the average.



Cycles self-destruct as soon as they are recognized by investors. The stock price instantaneously jumps to the present value of the expected future price.

tomorrow. Does that surprise you? If so, imagine that it were not the case and that changes in Microsoft's stock price were expected to persist for several months. Figure 13.3 provides an example of such a predictable cycle. You can see that an upswing in Microsoft's stock price started last month, when the price was $20, and it is expected to carry the price to $40 next month. What will happen when investors perceive this bonanza? It will self-destruct. Since Microsoft stock is a bargain at $30, investors will rush to buy. They will stop buying only when the stock offers a normal rate of return. Therefore, as soon as a cycle becomes apparent to investors, they immediately eliminate it by their trading.

## Three Forms of Market Efficiency

You should see now why prices in competitive markets must follow a random walk. If past price changes could be used to predict future price changes, investors could make easy profits. But in competitive markets easy profits don't last. As investors try to take advantage of the information in past prices, prices adjust immediately until the superior profits from studying past price movements disappear. As a result, all the information in past prices will be reflected in *today's* stock price, not tomorrow's. Patterns in prices will no longer exist and price changes in one period will be independent of changes in the next. In other words, the share price will follow a random walk.

In competitive markets today's stock price must already reflect the information in past prices. But why stop there? If markets are competitive, shouldn't today's stock price reflect *all* the information that is available to investors? If so, securities will be fairly priced and security returns will be unpredictable. No one earns consistently superior returns in such a market. Collecting more information won't help, because all available information is already impounded in today's stock prices.

Economists define three levels of market efficiency, which are distinguished by the degree of information reflected in security prices. In the first level, prices reflect the information contained in the record of past prices. This is called *weak market efficiency*. If markets are efficient in the weak sense, then it is impossible to make consistently superior profits by studying past returns. Prices will follow a random walk.

The second level of efficiency requires that prices reflect not just past prices but all other public information, for example, from the Internet or the financial press. This is known as *semistrong market efficiency*. If markets are semistrong efficient, then prices will adjust

immediately to public information such as the announcement of the last quarter's earnings, a new issue of stock, or a proposal to merge two companies.

With *strong-market efficiency,* prices reflect *all* the information that can be acquired by painstaking analysis of the company and the economy. In such a market we would observe lucky and unlucky investors, but we wouldn't find any superior investment managers who can consistently beat the market.

## Efficient Markets: The Evidence

In the years that followed Maurice Kendall's discovery, financial journals were packed with tests of the efficient-market hypothesis. To test the weak form of the hypothesis, researchers measured the profitability of some of the trading rules used by those investors who claim to find patterns in security prices. They also employed statistical tests, including the test we used to look for patterns in the returns on Microsoft, BP, Philips, and Sony stock. It appears that throughout the world there are few patterns in day-to-day returns.

To analyze the semistrong form of the efficient-market hypothesis, researchers have measured how rapidly security prices respond to different items of news, such as earnings or dividend announcements, news of a takeover, or macroeconomic information.

Before we describe what they found, we should explain how to isolate the effect of an announcement on the price of a stock. Suppose, for example, that you need to understand how stock prices of takeover targets respond when the takeovers are first announced. As a first stab, you could simply calculate the average return on target-company stocks in the days leading up to the announcement and immediately after it. With daily returns on a large sample of targets, the average announcement effect should be clear. There won't be too much contamination from movements in the overall market around the announcement dates, because daily market returns average out to a very small number.[6] The potential contamination increases for weekly or monthly returns, however. Thus you will usually want to adjust for market movements. For example, you can simply subtract out the return on the market:

$$\text{Adjusted stock return} = \text{return on stock} - \text{return on market index}$$

Chapter 8 suggests a refined adjustment based on betas. (Just subtracting the market return assumes that target-firm betas equal 1.0.) This adjustment is called the *market model:*

$$\text{Expected stock return} = \alpha + \beta \times \text{return on market index}$$

Alpha ($\alpha$) states how much on average the stock price changed when the market index was unchanged. Beta ($\beta$) tells us how much *extra* the stock price moved for each 1% change in the market index.[7] Suppose that subsequently the stock price return is $\tilde{r}$ in a month when the market return is $\tilde{r}_m$. In that case we would conclude that the *abnormal return* for that month is

$$\text{Abnormal stock return} = \text{actual stock return} - \text{expected stock return}$$
$$= \tilde{r} - (\alpha + \beta \tilde{r}_m)$$

This abnormal return should reflect firm-specific news only.[8]

---

[6] Suppose, for example, that the market return is 12% per year. With 250 trading days in the year, the average daily return is $(1.12)^{1/250} - 1 = .00045$, or .045%.

[7] It is important when estimating $\alpha$ and $\beta$ that you choose a period in which you believe that the stock behaved normally. If its performance was abnormal, then estimates of $\alpha$ and $\beta$ cannot be used to measure the returns that investors expected. As a precaution, ask yourself whether your estimates of expected returns look sensible. Methods for estimating abnormal returns are analyzed in A. C. MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35 (1997), pp. 13–39; and also S. P. Kothari and J. B. Warner, "Econometrics of Event Studies," in B. E. Eckbo (ed.), *The Handbook of Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007), Chapter 1.

[8] Abnormal returns are also often calculated using the Fama-French three-factor model, which we discussed in Chapter 8. The stock return is adjusted for the market return, the difference between small- and large-stock returns, and the difference between returns on high and low book-to-market firms.



**FIGURE 13.4**

The performance of the stocks of target companies compared with that of the market. The prices of target stocks jump up on the announcement day, but from then on, there are no unusual price movements. The announcement of the takeover attempt seems to be fully reflected in the stock price on the announcement day.

*Source:* A. Keown and J. Pinkerton, "Merger Announcements and Insider Trading Activity," *Journal of Finance* 36 (September 1981), pp. 855–869. © 1981. Reprinted with permission of Blackwell Publishers Journal Rights. We are grateful to Jinghua Yan for updating the calculations to the period 1979–2004.

Figure 13.4 illustrates how the release of news affects abnormal returns. The graph shows the abnormal return on a sample of nearly 17,000 firms that were targets of takeover attempts. Acquiring firms usually have to pay a substantial *takeover premium* to get the deal done, so the target firm's stock price increases as soon as the takeover bid is announced. Figure 13.4 shows the average pattern of the target's stock returns before and after the announcement of a takeover (day 0 in the figure). Stock prices drift up before date zero, as investors gradually realize that a takeover may be coming. On the announcement day, prices jump up dramatically.[9] The stock-price adjustment is immediate and complete. After the big price move on the public announcement day, the run-up is over, and there is no significant further drift in the stock price, either upward or downward. Thus within the day, the new stock prices reflect (at least on average) the magnitude of the takeover premium.

Tests of the strong form of the hypothesis have examined the recommendations of professional security analysts and have looked for mutual funds or pension funds that could predictably outperform the market. Some researchers have found a slight persistent

---

[9] Big profits await if you can identify target firms before the takeover announcement. Purchases based on confidential inside information are illegal, however, and could land you in jail.



▶ **FIGURE 13.5**

Average annual returns on a large sample of U.S. mutual funds and the market index, 1962–2008. Notice that mutual funds underperform the market in approximately two-thirds of the years.

*Source:* M. M. Carhart, "On Persistence in Mutual Fund Performance," *Journal of Finance* 52 (March 1997), pp. 57–82. © 1997 Blackwell Publishers. We are grateful to Jinghua Yan for updating the calculations.

outperformance, but just as many have concluded that professionally managed funds fail to recoup the costs of management. Look, for example, at Figure 13.5, which is an updated version of a study by Mark Carhart of the average return on a large sample of U.S. mutual funds. You can see that in some years the mutual funds beat the market, but roughly two-thirds of the time it was the other way around. Figure 13.5 provides a fairly crude comparison, for mutual funds have tended to specialize in particular sectors of the market, such as low-beta stocks or large-firm stocks, that may have given below-average returns. To control for such differences, each fund needs to be compared with a benchmark portfolio of similar securities. The study by Mark Carhart did this, but the message was unchanged: The funds earned a lower return than the benchmark portfolios *after* expenses and roughly matched the benchmarks *before* expenses.

It would be surprising if some managers were not smarter than others and could earn superior returns. But it seems difficult to spot the smart ones, and the top-performing managers one year have about an average chance of falling on their faces the next year.[10]

The evidence on efficient markets has convinced many professional and individual investors to give up pursuit of superior performance. They simply "buy the index," which maximizes diversification and cuts costs to the bone. Individual investors can buy *index*

---

[10] See, for example, B. G. Malkiel, "Returns from Investing in Equity Mutual Funds 1971 to 1991," *Journal of Finance* 50 (June 1995), pp. 549–572. Some contrary evidence that good performance does persist is provided in R. Kosowski, A. Timmerman, R. Wermers, and H. White, "Can Mutual Fund 'Stars' Really Pick Stocks? New Evidence from a Bootstrap Analysis," *Journal of Finance* 61 (December 2006), pp. 2551–2595. See also M. J. Gruber, "Another Puzzle: The Growth in Actively Managed Mutual Funds," *Journal of Finance* 51 (July 1996), pp. 783–810.

*funds*, which are mutual funds that track stock market indexes. There is no active management, so costs are very low. For example, management fees for the Vanguard 500 Index Fund, which tracks the S&P 500 Index, were .18% per year in 2009 (.09% per year for investments over $100,000). The size of this fund was $73 billion.

How far could indexing go? Not to 100%: If all investors hold index funds then nobody will be collecting information and prices will not respond to new information when it arrives. An efficient market needs some smart investors who gather information and attempt to profit from it. To provide incentives to gather costly information, prices cannot reflect *all* information.[11] There must be some profits available to allow the costs of information to be recouped. But if the costs are small, relative to the total market value of traded securities, then the financial market can still be close to perfectly efficient.

## 13-3 The Evidence Against Market Efficiency

Almost without exception, early researchers concluded that the efficient-market hypothesis was a remarkably good description of reality. So powerful was the evidence that any dissenting research was regarded with suspicion. But eventually the readers of finance journals grew weary of hearing the same message. The interesting articles became those that turned up some puzzle. Soon the journals were packed with evidence of anomalies that investors have apparently failed to exploit.

What exactly is an anomaly? So far we have connected market efficiency to the absence of opportunities to make money. Let's be more precise: in an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows ($C_t$) and the opportunity cost of capital ($r$):

$$P = \sum_{t=1}^{\infty} \frac{C_t}{(1 + r)^t}$$

If price equals fundamental value, the expected rate of return is the opportunity cost of capital, no more and no less. If price differs from fundamental value, then investors can earn more than the cost of capital, by selling if the price is too high and buying when it is too low.

You will recall these principles from our discussion of common stock values in Chapter 4. Here the principles tell us that you can't identify a superior return unless you know what the normal expected return is. Therefore, if you try to determine whether a market is efficient, you usually have to adopt an asset pricing model that specifies the relationship between risk and expected return. Any test of market efficiency is then a combined test of efficiency and the asset pricing model. Any test of an asset pricing model is also a combined test of the model and market efficiency.

The most commonly used asset pricing model is the CAPM. Chapter 8 pointed to some apparent violations of the CAPM, including the abnormally high returns on the stocks of small firms. For example, look back at Figure 8.10, which shows the cumulative difference between the returns on small-firm stocks and large-firm stocks. You can see that since 1926 the stocks of the firms with the lowest market capitalizations have performed substantially better than those with the highest capitalizations.

Now this may mean one (or more) of several things. First, it could be that investors have demanded a higher expected return from small firms to compensate for some extra risk factor that is not captured in the simple capital asset pricing model.

---

[11] See S. J. Grossman and J. E. Stiglitz, "On the Impossibility of Informationally Efficient Markets," *American Economic Review* 70 (June 1980), pp. 393–408.

Second, the superior performance of small firms could simply be a coincidence, a finding that stems from the efforts of many researchers to find interesting patterns in the data. There is evidence for and against the coincidence theory. Those who believe that the small-firm effect is a pervasive phenomenon can point to the fact that small-firm stocks have provided a higher return in many other countries. On the other hand, you can see from Figure 8.10 that the small-firm effect seems to have disappeared as soon as it was first documented in 1981. Perhaps investors did underestimate the returns on small firms before 1981, but then bid up the firms' stock prices as soon as the mispricing was identified.

Third, the small-firm effect could be an important exception to the efficient-market theory, an exception that gave investors the opportunity for consistently superior returns over a period of several decades. If these anomalies offer easy pickings, you would expect to find a number of investors eager to take advantage of them. It turns out that, while many investors do try to exploit such anomalies, it is surprisingly difficult to get rich by doing so. For example, Professor Richard Roll, who probably knows as much as anyone about market anomalies, confesses

> Over the past decade, I have attempted to exploit many of the seemingly most promising "inefficiencies" by actually trading significant amounts of money according to a trading rule suggested by the "inefficiencies" . . . I have never yet found one that worked in practice, in the sense that it returned more after cost than a buy-and-hold strategy.[12]

### Do Investors Respond Slowly to New Information?

We have dwelt on the small-firm effect, but there is no shortage of other puzzles and anomalies. Some of them relate to the short-term behavior of stock prices. For example, returns appear to be higher in January than in other months, they seem to be lower on a Monday than on other days of the week, and most of the daily return comes at the beginning and end of the day.

To have any chance of making money from such short-term patterns, you need to be a professional trader, with one eye on the computer screen and the other on your annual bonus. If you are a corporate financial manager, these short-term patterns in stock prices may be intriguing conundrums, but they are unlikely to change the major financial decisions about which projects to invest in and how they should be financed.

Corporate financial managers should be more concerned about mispricing that lasts months or years. Here are two examples of possible longer-lasting inefficiency.

**The Earnings Announcement Puzzle** The earnings announcement puzzle is summarized in Figure 13.6, which shows stock performance following the announcement of unexpectedly good or bad earnings during the years 1972 to 2001. The 10% of the stocks of firms with the best earnings news outperform those with the worst news by about 1% per month over the six-month period following the announcement. It seems that investors underreact to the earnings announcement and become aware of the full significance only as further information arrives.

**The New-Issue Puzzle** When firms issue stock to the public, investors typically rush to buy. On average those lucky enough to receive stock receive an immediate capital gain. However, researchers have found that these early gains often turn into losses. For example, suppose that you bought stock immediately following each initial public offering (IPO) and then held that stock for five years. Over the period 1970–2007 your average annual return would have been 3.8% less than the return on a portfolio of similar-sized stocks.

---

[12] R. Roll, "What Every CFO Should Know about Scientific Progress in Financial Economics: What Is Known and What Remains to Be Resolved," *Financial Management* 23 (Summer 1994), pp. 69–75.



▶ **FIGURE 13.6**

The average return 1972–2001 on stocks of firms over the six months following an announcement of quarterly earnings. The 10% of stocks with the best earnings news (portfolio 10) outperformed those with the worst news (portfolio1) by about 1% per month.

*Source:* T. Chordia and L. Shivakumar, "Inflation Illusion and the Post-earnings Announcement Drift," *Journal of Accounting Research* 43 (2005), pp. 521–556.

The jury is still out on these studies of long-term anomalies. Take, for example, the new-issue puzzle. Most new issues during the past 30 years have involved growth stocks with high market values and limited book assets. When the long-run performance of new issues is compared with a portfolio that is matched in terms of both size and book-to-market ratios, the difference in performance almost halves.[13] So the new-issue puzzle could turn out to be just the book-to-market ratio puzzle in disguise.[14]

Anomalies such as the new-issue puzzle may be a sign of inadequate asset pricing models, and so for many people they are not convincing evidence against market efficiency. However, there are other anomalies that cannot be dismissed so easily. One example is that of "Siamese twins," two securities with claims on the same cash flows, which nevertheless trade separately. Before the two companies merged in July 2005, the Dutch company Royal Dutch Petroleum and the British company Shell Transport & Trading (T&T) were Siamese twins, each with a fixed share in the profits and dividends of the oil giant. Since both companies participated in the same underlying cash flows, you would expect the stock prices to have moved in exact lockstep. But, as you can see from Figure 13.7, the prices of the two shares sometimes diverged substantially.[15]

---

[13] The long-run underperformance of new issues was documented in R. Loughran and J. R. Ritter, "The New Issues Puzzle," *Journal of Finance* 50 (1995), pp. 23–51. The figures are updated on Jay Ritter's Web site, where IPO returns are compared with those of a portfolio that is matched in terms of size and book-to-market ratio. (See **bear.cba.ufl.edu/ritter**.)

[14] There may be still other reasons for the poor long-term performance of IPOs, including tax effects. Portfolios of IPOs generate many extreme winners and losers. Investors can sell the losers, deducting the losses against other capital gains, and hold the winners, thus deferring taxes. IPO stocks are a good venue for this tax strategy, so tax-savvy investors may have bid up IPO stock prices.

[15] For evidence on the pricing of Siamese twins see K. A. Froot and E. Dabora, "How Are Stock Prices Affected by the Location of Trade?" *Journal of Financial Economics* 53 (August 1999), pp. 189–216, and, for more recent data, A. De Jong, L. Rosenthal, and M. A. Van Dijk, "The Risk and Return of Arbitrage in Dual-Listed Companies," *Review of Finance* 13 (2009), pp. 495–520.



◗ **FIGURE 13.7**

Log deviations from Royal Dutch Shell/Shell T&T parity.

*Source:* Mathijs van Dijk Web site **www.mathijsavandijk.com/dual-listed-companies**. Used with permission.

## Bubbles and Market Efficiency

Cases such as the Siamese twins suggest that there are occasions when prices of individual stocks can get out of line. But are there also cases in which prices as a whole can no longer be justified by fundamentals? We will look at the evidence in a moment, but first we should note how difficult it is to value common stocks and to determine whether their prices are irrational.

For example, imagine that in May 2009 you wanted to check whether the stocks forming Standard & Poor's Composite Index were fairly valued. As a first stab you might use the constant-growth formula that we introduced in Chapter 4. In 2009 the annual dividends paid by the companies in the index came to about $217 billion. Suppose that these dividends were expected to grow at a steady rate of 4.1% and that investors required a return of 7.2%. Then the constant-growth formula gives a value for the common stocks of

$$\text{PV common stocks} = \frac{\text{DIV}}{r-g} = \frac{217}{.072-.041} = \$7{,}000 \text{ billion}$$

which was roughly their value in May 2009. But how confident could you be about these figures? Perhaps the likely dividend growth was only 3.6% per year. In that case your estimate of the value of the common stocks would decline to

$$\text{PV common stocks} = \frac{\text{DIV}}{r-g} = \frac{217}{.072-.036} = \$6{,}028 \text{ billion}$$

In other words, a reduction of just half a percentage point in the expected rate of dividend growth would reduce the value of common stocks by about 14%.

The extreme difficulty of valuing common stocks from scratch has two important consequences. First, investors find it easier to price a common stock relative to yesterday's price or relative to today's price of comparable securities. In other words, they generally take yesterday's price as correct, adjusting upward or downward on the basis of today's information. If information arrives smoothly, then, as time passes, investors become increasingly confident that today's price level is correct. But when investors lose confidence in the benchmark of yesterday's price, there may be a period of confused trading and volatile prices before a new benchmark is established.

Second, most of the tests of market efficiency are concerned with *relative* prices and focus on whether there are easy profits to be made. It is almost impossible to test whether stocks are *correctly valued*, because no one can measure true value with any precision. Take, for example, Hershey stock, which sold for $36 in April 2009. Could we prove that this was its true value? Of course not, but we could be more confident that the price of Hershey should not be very different from that of Smucker's ($39), because both companies had similar earnings and dividends per share and both had similar growth prospects.

It may be impossible to *prove* that market levels are, or are not, consistent with fundamentals. However, every now and again investors seem to be caught up in a speculative frenzy, and asset prices then reach levels that (at least with hindsight) cannot easily be justified by the outlook for profits and dividends. Investors refer to such occasions as *bubbles*. Bubbles can result when prices rise rapidly, and more and more investors join the game on the assumption that prices will *continue* to rise. These bubbles can be self-sustaining for a while. It can be rational to jump on the bandwagon as long as you are sure that there will be greater fools that you can sell out to. But remember that lots of money will be lost, perhaps by you, when the bubble bursts.[16]

The Japanese bubble is a good example. The Nikkei 225 Index rose about 300% between the start of 1985 and December 1989. After a sharp increase in interest rates at the beginning of 1990, stock prices began to fall. By October the Nikkei had sunk to about half its peak. In March 2009, the Nikkei was still down 80% from its peak 19 years before.

The boom in Japanese stock prices was matched by an even greater explosion in land prices. For example, Ziemba and Schwartz document that the few hundred acres of land under the Emperor's Palace in Tokyo, evaluated at neighborhood land prices, was worth as much as all the land in Canada or California.[17] But then the real estate bubble also burst. By 2005 land prices in the six major Japanese cities had slumped to just 13% of their peak.

Such bubbles are not confined to Japan. Toward the end of the twentieth century investors in technology stocks saw a remarkable run-up in the value of their holdings. The Nasdaq Composite Index, which has a heavy weighting in high-tech stocks, rose 580% from the start of 1995 to its high in March 2000. Then, as rapidly as it began, the boom ended, and by October 2002 the Nasdaq index had fallen 78% from its peak.

Some of the largest gains and losses were experienced by dot.com stocks. For example, Yahoo! shares, which began trading in April 1996, appreciated by 1,400% in four years. In these heady days some companies found that they could boost their stock price simply by adding "dot.com" to the company name.[18]

Looking back at the Japanese and dot.com bubbles, it seems difficult to believe that future cash flows could ever have been sufficient to provide investors with a reasonable return.[19] If that is the case, we have two important exceptions to the theory of efficient markets.

---

[16] Bubbles are not necessarily irrational. See M. Brunnermeier, *Asset Pricing under Asymmetric Information: Bubbles, Crashes, Technical Analysis and Herding* (Oxford: Oxford University Press, 2001).

[17] See W. T. Ziemba and S. L. Schwartz, *Invest Japan* (Chicago, IL: Probus Publishing Co., 1992), p. 109.

[18] P. R. Rau, O. Dimitrov, and M. Cooper, "A Rose.com by Any Other Name," *Journal of Finance* 56 (2001), pp. 2371–2388.

[19] For an analysis of Japanese stock prices, see K. French and J. M. Poterba, "Were Japanese Stock Prices Too High?" *Journal of Financial Economics* 29 (October 1991), pp. 337–364. For more on dot.com stock prices, see E. Ofek and M. Richardson, "The Valuation and Market Rationality of Internet Stock Prices," *Oxford Review of Economic Policy* 18 (Autumn 2002), pp. 265–287.

## 13-4 Behavioral Finance

Why might prices depart from fundamental values? Some believe that the answer lies in behavioral psychology. People are not 100% rational 100% of the time. This shows up in investors' attitudes to risk and the way they assess probabilities.

1. *Attitudes toward risk.* Psychologists have observed that, when making risky decisions, people are particularly loath to incur losses. It seems that investors do not focus solely on the current value of their holdings, but look back at whether their investments are showing a profit or a loss. For example, if I sell my holding of IBM stock for $10,000, I may feel on top of the world if the stock only cost me $5,000, but I will be much less happy if it had cost $11,000. This observation is the basis for *prospect theory.*[20] Prospect theory states that (a) the value investors place on a particular outcome is determined by the gains or losses that they have made since the asset was acquired or the holding last reviewed, and (b) investors are particularly averse to the possibility of even a very small loss and need a high return to compensate for it.

    The pain of loss seems also to depend on whether it comes on the heels of earlier losses. Once investors have suffered a loss, they may be even more concerned not to risk a further loss. Conversely, just as gamblers are known to be more willing to make large bets when they are ahead, so investors may be more prepared to run the risk of a stock market dip after they have enjoyed a run of unexpectedly high returns.[21] If they do then suffer a small loss, they at least have the consolation of still being ahead for the year.

    When we discussed portfolio theory in Chapters 7 and 8, we pictured investors as forward-looking only. Past gains or losses were not mentioned. All that mattered was the investor's current wealth and the expectation and risk of future wealth. We did not allow for the possibility that Nicholas would be elated because his investment is in the black, while Nicola with an equal amount of wealth would be despondent because hers is in the red.

2. *Beliefs about probabilities.* Most investors do not have a Ph.D. in probability theory and may make systematic errors in assessing the probability of uncertain events. Psychologists have found that, when judging possible future outcomes, individuals tend to look back at what happened in a few similar situations. As a result, they are led to place too much weight on a small number of recent events. For example, an investor might judge that an investment manager is particularly skilled because he has "beaten the market" for three years in a row, or that three years of rapidly rising prices are a good indication of future profits from investing in the stock market. The investor may not stop to reflect on how little one can learn about expected returns from three years' experience.

    Most individuals are also too *conservative,* that is, too slow to update their beliefs in the face of new evidence. People tend to update their beliefs in the correct direction but the magnitude of the change is less than rationality would require.

    Another systematic bias is *overconfidence.* Most of us believe that we are better-than-average drivers and most investors think they are better-than-average stock pickers. Two speculators who trade with each other cannot both make money, but may be prepared to continue trading because each is confident that the other is the patsy. Overconfidence also shows up in the certainty that people express about their judgments. They consistently overestimate the odds that the future will turn out as they say and underestimate the chances of unlikely events.

---

[20] Prospect theory was first set out in D. Kahneman and A. Tversky, "Prospect Theory: An Analysis of Decision under Risk," *Econometrica* 47 (1979), pp. 263–291.

[21] The effect is described in R. H. Thaler and E. J. Johnson, "Gambling with the House Money and Trying to Break Even: The Effects of Prior Outcomes on Risky Choice," *Management Science* 36 (1990), pp. 643–660. The implications of prospect theory for stock returns are explored in N. Barberis, M. Huang, and T. Santos, "Prospect Theory and Asset Prices," *Quarterly Journal of Economics* 116 (February 2001), pp. 1–53.

You can see how these behavioral characteristics may help to explain the Japanese and dot.com bubbles. As prices rose, they generated increased optimism about the future and stimulated additional demand. The more that investors racked up profits, the more confident they became in their views and the more willing they became to bear the risk that next month might not be so good.

## Limits to Arbitrage

It is not difficult to believe that amateur investors may sometimes be caught up in a scatty whirl of irrational exuberance.[22] But there are plenty of hard-headed professional investors managing huge sums of money. Why don't these investors bail out of overpriced stocks and force their prices down to fair value? One reason is that there are *limits to arbitrage,* that is, limits on the ability of the rational investors to exploit market inefficiencies.

Strictly speaking, *arbitrage* means an investment strategy that guarantees superior returns without any risk. In practice, arbitrage is defined more casually as a strategy that exploits market inefficiency and generates superior returns if and when prices return to fundamental values. Such strategies can be very rewarding, but they are rarely risk-free.

In an efficient market, if prices get out of line, then arbitrage forces them back. The arbitrageur buys the underpriced securities (pushing up their prices) and sells the overpriced securities (pushing down their prices). The arbitrageur earns a profit by buying low and selling high and waiting for prices to converge to fundamentals. Thus arbitrage trading is often called *convergence trading.*

In practice arbitrage is harder than it looks. Trading costs can be significant and some trades are difficult to execute. For example, suppose that you identify an overpriced security that is *not* in your existing portfolio. You want to "sell high," but how do you sell a stock that you don't own? It can be done, but you have to *sell short.*

To sell a stock short, you borrow shares from another investor's portfolio, sell them, and then wait hopefully until the price falls and you can buy the stock back for less than you sold it for. If you're wrong and the stock price increases, then sooner or later you will be forced to repurchase the stock at a higher price (therefore at a loss) to return the borrowed shares to the lender. But if you're right and the price does fall, you repurchase, pocket the difference between the sale and repurchase prices, and return the borrowed shares. Sounds easy, once you see how short selling works, but there are costs and fees to be paid, and in some cases you will not be able to find shares to borrow.[23]

The perils of selling short were dramatically illustrated in 2008. Given the gloomy outlook for the automobile industry, a number of hedge funds decided to sell Volkswagen (VW) shares short in the expectation of buying them back at a lower price. Then in a surprise announcement Porsche revealed that it had effectively gained control of 74% of VW's shares. Since a further 20% was held by the state of Lower Saxony, there was not enough stock available for the short sellers to buy back. As they scrambled to cover their positions, the price of VW stock rose in just two days from €209 to a high of €1005, making VW the most highly valued company in the world. Although the stock price drifted rapidly down, those short-sellers who were caught in the *short squeeze* suffered large losses.

The VW example illustrates that the most important limit to arbitrage is the risk that prices will diverge even further before they converge. Thus an arbitrageur has to have the guts and resources to hold on to a position that may get much worse before it gets better.

---

[22] The term "irrational exuberance" was coined by Alan Greenspan, former chairman of the Federal Reserve Board, to describe the dot.com boom. It was also the title of a book by Robert Shiller that examined the boom. See R. Shiller, *Irrational Exuberance* (New York: Broadway Books, 2001).

[23] Investment and brokerage firms identify shares eligible for lending and arrange to make them available to short-sellers. The supply of shares that can be borrowed is limited. You are charged a fee for borrowing the stock, and you are required to put up collateral to protect the lender in case the share price rises and the short-seller is unable to repurchase and return the shares. Putting up collateral is costless if the short-seller gets a market interest rate, but sometimes only lower interest rates are offered.

Take another look at the relative prices of Royal Dutch and Shell T&T in Figure 13.7. Suppose that you were a professional money manager in 1980, when Royal Dutch was about 12% below parity. You decided to buy Royal Dutch, sell Shell T&T short, and wait confidently for prices to converge to parity. It was a long wait. The first time you would have seen any profit on your position was in 1983. In the meantime the mispricing got worse, not better. Royal Dutch fell to more than 30% below parity in mid-1981. Therefore, you had to report a substantial loss on your "arbitrage" strategy in that year. You were fired and took up a new career as a used-car salesman.

The demise in 1998 of Long Term Capital Management (LTCM) provides another example of the problems with convergence trades. LTCM, one of the largest and most profitable hedge funds of the 1990s, believed that interest rates in the different euro zone countries would converge when the euro replaced the countries' previous currencies. LTCM had taken massive positions to profit from this convergence, as well as massive positions designed to exploit other pricing discrepancies. After the Russian government announced a moratorium on some of its debt payments in August 1998, there was great turbulence in the financial markets, and many of the discrepancies that LTCM was betting on suddenly got much larger.[24] LTCM was losing hundreds of millions of dollars daily. The fund's capital was nearly gone when the Federal Reserve Bank of New York arranged for a group of LTCM's creditor banks to take over LTCM's remaining assets and shut down what was left in an orderly fashion.

LTCM's sudden meltdown has not prevented rapid growth in the hedge fund industry in the 2000s. If hedge funds can push back the limits to arbitrage and avoid the kinds of problems that LTCM ran into, markets will be more efficient going forward. But asking for complete efficiency is probably asking too much. Prices can get out of line and stay out if the risks of an arbitrage strategy outweigh the expected returns.

## Incentive Problems and the Subprime Crisis

The limits to arbitrage open the door to individual investors with built-in biases and misconceptions that can push prices away from fundamental values. But there can also be incentive problems that get in the way of a rational focus on fundamentals. We illustrate with a brief look at the subprime crisis in the United States.

Few U.S. homeowners foresaw a collapse in the price of their home. After all, the average house price in the U.S. had not fallen since the Great Depression of the 1930s. But in 2005 *The Economist* surveyed the widespread increase in property prices and warned:

> [T]he total value of the residential property in developed economies rose by more than $30 trillion over the past five years to over $70 trillion, an increase equivalent to 100% of those countries' combined GDPs. Not only does this dwarf any previous house-price boom, it is larger than the global stock market bubble in the late 1920s (55% of GDP). In other words it looks like the biggest bubble in history.[25]

Shortly afterward the bubble burst. By March 2009, U.S. house prices had fallen by nearly a third from their peak in 2006.[26]

How could such a boom and crash arise? In part because banks, credit rating agencies, and other financial institutions all had distorted incentives. Purchases of real estate are generally financed with mortgage loans from banks. In most parts of the U.S., borrowers can default on their mortgages with relatively small penalties. If property prices fall, they can simply walk away. But, if prices rise, they make money. Thus borrowers may be willing to take large risks, especially if the fraction of the purchase price financed with their own money is small.

---

[24] The Russian debt moratorium was unexpected and unusual, because the debt had only recently been issued and was denominated in *roubles*. The government preferred to default rather than to print roubles to service the debt.

[25] "In come the waves," *The Economist,* June 16, 2005.

[26] Investors who did foresee that the fall in house prices would lead to the subprime debacle were able to earn high profits. For example, John Paulson, the hedge fund manager, earned $3.7 billion in 2007 as a result (*Financial Times,* January 15, 2008, and June 18, 2008).

Why, then, are banks willing to lend money to people who are bound to default if property prices fall significantly? Since the borrowers benefited most of the time, they were willing to pay attractive up-front fees to banks to get mortgage loans. But the banks could pass on the default risk to somebody else by packaging and reselling the mortgages as mortgage-backed securities (MBSs). Many MBS buyers assumed that they were safe investments, because the credit rating agencies said so. As it turned out, the credit ratings were a big mistake. (The rating agencies introduced another agency problem, because issuers paid the agencies to rate the MBS issues, and the agencies consulted with issuers over how MBS issues should be structured.)

The "somebody else" was also the government. Many subprime mortgages were sold to FNMA and FMAC ("Fannie Mae" and "Freddie Mac"). These were private corporations with a special advantage: government credit backup. (The backup was implicit, but quickly became explicit when Fannie and Freddie got into trouble in 2008. The U.S. Treasury had to take them over.) Thus these companies were able to borrow at artificially low rates, channeling money into the mortgage market.

The government was also on the hook because large banks that held subprime MBSs were "too big to fail" in a financial crisis. So the original incentive problem—the temptation of home buyers to take out a large mortgage and hope for higher real estate prices—was never corrected. The government could have cut its exposure by reining in Fannie and Freddie before the crisis but did not do so.

Agency and incentive problems do not arise just in real estate. They are widespread in the financial services industry. In the U.S. and many other countries, people engage financial institutions such as pension funds and mutual funds to invest their money. These institutions are the investors' agents, but the agents' incentives do not always match the investors' interests. Just as with real estate, these agency relationships can lead to mispricing, and potentially bubbles.[27]

## 13-5 The Six Lessons of Market Efficiency

The efficient-market hypothesis emphasizes that arbitrage will rapidly eliminate any profit opportunities and drive market prices back to fair value. Behavioral-finance specialists may concede that there are no easy profits, but argue that arbitrage is costly and sometimes slow-working, so that deviations from fair value may persist.

Sorting out the puzzles will take time, but we suggest that financial managers should assume, at least as a starting point, that there are no free lunches to be had on Wall Street.

The "no free lunch" principle gives us the following six lessons of market efficiency. After reviewing these lessons, we consider what market *in*efficiency can mean for the financial manager.

### Lesson 1: Markets Have No Memory

The weak form of the efficient-market hypothesis states that the sequence of past price changes contains no information about future changes. Economists express the same idea more concisely when they say that the market has no memory. Sometimes financial managers *seem* to act as if this were not the case. For example, after an abnormal market rise, managers prefer to issue equity rather than debt.[28] The idea is to catch the market while it is high. Similarly, they are often reluctant to issue stock after a fall in price. They are inclined

---

[27] See F. Allen, "Do Financial Institutions Matter?" *Journal of Finance* 56 (2001), pp. 1165–1175.

[28] See, for example, P. Asquith and D. W. Mullins, Jr., "Equity Issues and Offering Dilution," *Journal of Financial Economics* 15 (January–February 1986), pp. 16–89; and (for the U.K.) P. R. Marsh, "The Choice between Debt and Equity: An Empirical Study," *Journal of Finance* 37 (March 1982), pp. 121–144.

to wait for a rebound. But we know that the market has no memory and the cycles that financial managers seem to rely on do not exist.[29]

Sometimes a financial manager will have inside information indicating that the firm's stock is overpriced or underpriced. Suppose, for example, that there is some good news that the market does not know but you do. The stock price will rise sharply when the news is revealed. Therefore, if your company sells shares at the current price, it would offer a bargain to new investors at the expense of present stockholders.

Naturally, managers are reluctant to sell new shares when they have favorable inside information. But such information has nothing to do with the history of the stock price. Your firm's stock could be selling at half its price of a year ago, and yet you could have special information suggesting that it is *still* grossly overvalued. Or it may be undervalued at twice last year's price.

## Lesson 2: Trust Market Prices

In an efficient market you can trust prices, for they impound all available information about the value of each security. This means that in an efficient market, there is no way for most investors to achieve consistently superior rates of return. To do so, you not only need to know more than *anyone* else; you also need to know more than *everyone* else. This message is important for the financial manager who is responsible for the firm's exchange-rate policy or for its purchases and sales of debt. If you operate on the basis that you are smarter than others at predicting currency changes or interest-rate moves, you will trade a consistent financial policy for an elusive will-o'-the-wisp.

The company's assets may also be directly affected by management's faith in its investment skills. For example, one company may purchase another simply because its management thinks that the stock is undervalued. On approximately half the occasions the stock of the acquired firm will with hindsight turn out to be undervalued. But on the other half it will be overvalued. On average the value will be correct, so the acquiring company is playing a fair game except for the costs of the acquisition.

## Lesson 3: Read the Entrails

If the market is efficient, prices impound all available information. Therefore, if we can only learn to read the entrails, security prices can tell us a lot about the future. For example, in Chapter 23 we show how information in a company's financial statements can help the financial manager to estimate the probability of bankruptcy. But the market's assessment of the company's securities can also provide important information about the firm's prospects. Thus, if the company's bonds are trading at low prices, you can deduce that the firm is probably in trouble.

Here is another example: Suppose that investors are confident that interest rates are set to rise over the next year. In that case, they will prefer to wait before they make long-term loans, and any firm that wants to borrow long-term money today will have to offer the inducement of a higher rate of interest. In other words, the long-term rate of interest will have to be higher than the one-year rate. Differences between the long-term interest rate and the short-term rate tell you something about what investors expect to happen to short-term rates in the future.

The nearby box shows how market prices reveal opinions about issues as diverse as a presidential election, the weather, or the demand for a new product.

---

[29] If high stock prices signal expanded investment opportunities and the need to finance these new investments, we would expect to see firms raise more money *in total* when stock prices are historically high. But this does not explain why firms prefer to raise the extra cash at these times by an issue of equity rather than debt.

# Prediction Markets

▶ Stock markets allow investors to bet on their favorite stocks. Prediction markets allow them to bet on almost anything else. These markets reveal the collective guess of traders on issues as diverse as New York City snowfall, an avian flu outbreak, and the occurrence of a major earthquake.

Prediction markets are conducted on the major futures exchanges and on a number of smaller online exchanges such as Intrade (**www.intrade.com**) and the Iowa Electronic Markets (**www.biz.uiowa.edu/ iem**). Take the 2008 presidential race as an example. On the Iowa Electronic Markets you could bet that Barack Obama would win by buying one of his contracts. Each Obama contract paid $1 if he won the presidency and nothing if he lost. If you thought that the probability of an Obama victory was 55% (say), you would have been prepared to pay up to $.55 for his contract. Someone who was relatively pessimistic about Obama's chances would have been happy to *sell* you such a contract, for that sale would turn a profit if Obama were to lose. With many participants buying

and selling, the market price of a contract revealed the collective wisdom of the crowd.

Take a look at the accompanying figure from the Iowa Electronic Markets. It shows the contract prices for the two contenders for the White House between June and November 2008. Following the Republican convention at the start of September, the price of a McCain contract reached a maximum of $.47. From then on the market suggested a steady fall in the probability of a McCain victory.

Participants in prediction markets are putting their money where their mouth is. So the forecasting accuracy of these markets compares favorably with those of major polls. Some businesses have also formed internal prediction markets to survey the views of their staff. For example, Google operates an internal market to forecast product launch dates, the number of Gmail users, and other strategic questions.*

---

*Google's experience is analyzed in B. Cowgill, J. Wolfers, and E. Zitzewitz, "Using Prediction Markets to Track Information Flows: Evidence from Google," Working paper, Dartmouth College, January 2009.



## Lesson 4: There Are No Financial Illusions

In an efficient market there are no financial illusions. Investors are unromantically concerned with the firm's cash flows and the portion of those cash flows to which they are entitled. However, there are occasions on which managers seem to assume that investors suffer from financial illusion.

For example, some firms devote considerable ingenuity to the task of manipulating earnings reported to stockholders. This is done by "creative accounting," that is, by choosing accounting methods that stabilize and increase reported earnings. Presumably firms go to this trouble because management believes that stockholders take the figures at face value.[30]

One way that companies can affect their reported earnings is through the way that they cost the goods taken out of inventory. Companies can choose between two methods. Under the FIFO (first-in, first-out) method, the firm deducts the cost of the first goods to have been placed in inventory. Under the LIFO (last-in, first-out) method companies deduct the cost of the latest goods to arrive in the warehouse. When inflation is high, the cost of the goods that were bought first is likely to be lower than the cost of those that were bought last. So earnings calculated under FIFO appear higher than those calculated under LIFO.

Now, if it were just a matter of presentation, there would be no harm in switching from LIFO to FIFO. But the IRS insists that the same method that is used to report to shareholders also be used to calculate the firm's taxes. So the lower apparent earnings from using the LIFO method also bring lower immediate tax payments.

If markets are efficient, investors should welcome a change to LIFO accounting, even though it reduces earnings. Biddle and Lindahl, who studied the matter, concluded that this is exactly what happens, so that the move to LIFO is associated with an abnormal rise in the stock price.[31] It seems that shareholders look behind the figures and focus on the amount of the tax savings.

## Lesson 5: The Do-It-Yourself Alternative

In an efficient market investors will not pay others for what they can do equally well themselves. As we shall see, many of the controversies in corporate financing center on how well individuals can replicate corporate financial decisions. For example, companies often justify mergers on the grounds that they produce a more diversified and hence more stable firm. But if investors can hold the stocks of both companies why should they thank the companies for diversifying? It is much easier and cheaper for them to diversify than it is for the firm.

The financial manager needs to ask the same question when considering whether it is better to issue debt or common stock. If the firm issues debt, it will create financial leverage. As a result, the stock will be more risky and it will offer a higher expected return. But stockholders can obtain financial leverage without the firm's issuing debt; they can borrow on their own accounts. The problem for the financial manager is, therefore, to decide whether the company can issue debt more cheaply than the individual shareholder.

## Lesson 6: Seen One Stock, Seen Them All

The elasticity of demand for any article measures the percentage change in the quantity demanded for each percentage addition to the price. If the article has close substitutes, the elasticity will be strongly negative; if not, it will be near zero. For example, coffee, which is a staple commodity, has a demand elasticity of about $-.2$. This means that a 5% increase in the price of coffee changes sales by $-.2 \times .05 = -.01$; in other words, it reduces demand by only 1%. Consumers are likely to regard different *brands* of coffee as much closer substitutes for each other. Therefore, the demand elasticity for a particular brand could be in the region of, say, $-2.0$. A 5% increase in the price of Maxwell House relative to that of Folgers would in this case reduce demand by 10%.

---

[30] For a discussion of the evidence that investors are not fooled by earnings manipulation, see R. Watts, "Does It Pay to Manipulate EPS?" in J. M. Stern and D. H. Chew, Jr. (eds.), *The Revolution in Corporate Finance* (Oxford: Basil Blackwell, 1992).

[31] G. C. Biddle and F. W. Lindahl, "Stock Price Reactions to LIFO Adoptions: The Association between Excess Returns and LIFO Tax Savings," *Journal of Accounting Research* 20 (Autumn 1982, Part 2), pp. 551–588.

Investors don't buy a stock for its unique qualities; they buy it because it offers the prospect of a fair return for its risk. This means that stocks should be like *very* similar brands of coffee, almost perfect substitutes. Therefore, the demand for a company's stock should be highly elastic. If its prospective return is too low relative to its risk, *nobody* will want to hold that stock. If the reverse is true, *everybody* will scramble to buy.

Suppose that you want to sell a large block of stock. Since demand is elastic, you naturally conclude that you need to cut the offering price only very slightly to sell your stock. Unfortunately, that doesn't necessarily follow. When you come to sell your stock, other investors may suspect that you want to get rid of it because you know something they don't. Therefore, they will revise their assessment of the stock's value downward. Demand is still elastic, but the whole demand curve moves down. Elastic demand does not imply that stock prices never change when a large sale or purchase occurs; it *does* imply that you can sell large blocks of stock at close to the market price *as long as you can convince other investors that you have no private information.*

Here again we encounter an apparent contradiction with practice. State and federal regulatory commissions, which set the prices charged by local telephone companies, electric companies, and other utilities, have sometimes allowed significantly higher earnings to compensate the firm for price "pressure." This pressure is the decline in the firm's stock price that is supposed to occur when new shares are offered to investors. Yet Paul Asquith and David Mullins, who searched for evidence of pressure, found that new stock issues by utilities drove down their stock prices on average by only .9%.[32] We come back to the subject of pressure when we discuss stock issues in Chapter 15.

## What If Markets Are Not Efficient? Implications for the Financial Manager

Our six lessons depend on efficient markets. What should financial managers do when markets are *not* efficient? The answer depends on the nature of the inefficiency.

**Trading Opportunities—Are They Really There for Nonfinancial Corporations?**   Suppose that the treasurer's staff in your firm notices mispricing in fixed-income or commodities markets, the kind of mispricing that a hedge fund would attempt to exploit in a convergence trade. Should the treasurer authorize the staff to undertake a similar convergence trade? In most cases, the answer should be *no*. First, the corporation faces the same limits to arbitrage that afflict hedge funds and other investors. Second, the corporation probably has no competitive edge in the convergence-trade business.

Procter & Gamble (P&G) supplied a costly example of this point in early 1994, when it lost $102 million in short order. It seems that in 1993 P&G's treasury staff believed that interest rates would be stable and decided to act on this belief to reduce P&G's borrowing costs. They committed P&G to deals with Bankers Trust designed to do just that. Of course there was no free lunch. In exchange for a reduced interest rate, P&G agreed to compensate Bankers Trust if interest rates rose sharply. Rates did increase dramatically in early 1994, and P&G was on the hook.

Then P&G accused Bankers Trust of misrepresenting the transactions—an embarrassing allegation, since P&G was hardly investing as a widow or orphan—and sued Bankers Trust.

We take no stand on the merits of this litigation, which was eventually settled. But think of P&G's competition when it traded in the fixed-income markets. Its competition included the trading desks of all the major investment banks, hedge funds like LTCM, and fixed-income portfolio managers. P&G had no special insights or competitive advantages on the fixed-income playing field. There was no evident reason to expect positive NPV on

---

[32] See P. Asquith and D. W. Mullins, "Equity Issues and Offering Dilution," *Journal of Financial Economics* 15 (January–February 1986), pp. 61–89.

the trades it committed to. Why was it trading at all? P&G would never invest to enter a new consumer market if it had no competitive advantage in that market.

In Chapter 11 we argued that a corporation should not invest unless it can identify a competitive advantage and a source of economic rents. Market inefficiencies may offer economic rents from convergence trades, but few corporations have a competitive edge in pursuing these rents. As a general rule, nonfinancial corporations gain nothing, on average, by speculation in financial markets. They should not try to imitate hedge funds.[33]

**What If Your Company's Shares Are Mispriced?**    The financial manager may not have special information about future interest rates, but definitely has special information about the value of his or her own company's shares. The strong form of market efficiency does not always hold, so the financial manager will often have information that outside investors do not have. Or investors may have the same information as management, but be slow in reacting to that information or may be infected with behavioral biases.

Sometimes you hear managers thinking out loud like this:

> Great! Our stock is clearly overpriced. This means we can raise capital cheaply and invest in Project X. Our high stock price gives us a big advantage over our competitors who could not possibly justify investing in Project X.

But that doesn't make sense. If your stock is truly overpriced, you can help your current shareholders by selling additional stock and using the cash to invest in other capital market securities. But you should *never* issue stock to invest in a project that offers a lower rate of return than you could earn elsewhere in the capital market. Such a project would have a negative NPV. You can always do better than investing in a negative-NPV project: Your company can go out and buy common stocks. In an efficient market, such purchases are always *zero* NPV.

What about the reverse? Suppose you know that your stock is *underpriced.* In that case, it certainly would not help your current shareholders to sell additional "cheap" stock to invest in other fairly priced stocks. If your stock is sufficiently underpriced, it may even pay to forgo an opportunity to invest in a positive-NPV project rather than to allow new investors to buy into your firm at a low price. Financial managers who believe that their firm's stock is underpriced may be justifiably reluctant to issue more stock, but they may instead be able to finance their investment program by an issue of debt. In this case the market inefficiency would affect the firm's choice of financing but not its real investment decisions. In Chapter 15 we will have more to say about the financing choice when managers believe their stock is mispriced.

**What If Your Firm Is Caught in a Bubble?**    Once in a lifetime, your company's stock price may be swept up in a bubble like the dot.com boom of the late 1990s. Bubbles can be exhilarating. It's hard not to join in the enthusiasm of the crowds of investors bidding up your firm's stock price.[34] On the other hand, financial management *inside* a bubble poses difficult personal and ethical challenges. Managers don't want to "talk down" a high-flying stock price, especially when bonuses and stock-option payoffs depend on it. The temptation to cover up bad news or manufacture good news can be very strong. But the longer a bubble lasts, the greater the damage when it finally bursts. When it does burst, there will be lawsuits and possibly jail time for managers who have resorted to tricky accounting or misleading public statements in an attempt to sustain the inflated stock price.

---

[33] There are of course some likely exceptions. Hershey and Nestlé are credible traders in cocoa futures markets. The major oil companies probably have special skills and knowledge relevant to energy markets.

[34] See J. C. Stein, "Rational Capital Budgeting in an Irrational World," *Journal of Business* 69 (October 1996), pp. 429–455.

When a firm's stock price is swept upward in a bubble, CEOs and financial managers are tempted to acquire another firm using the stock as currency. One extreme example where this arguably happened is AOL's acquisition of Time Warner at the height of the dot.com bubble in 2000. AOL was a classic dot.com company. Its stock rose from $2.34 at the end of 1995 to $75.88 at the end of 1999. Time Warner's stock price also increased during this period, but only from $18.94 to $72.31. AOL's total market capitalization was a small fraction of Time Warner's in 1995, but overtook Time Warner's in 1998. By the end of 1999 AOL's outstanding shares were worth $173 billion, compared with Time Warner's $95 billion. AOL managed to complete the acquisition before the Internet bubble burst. AOL-Time Warner's stock then plummeted, but not by nearly as much as the stocks of dot.com companies that had not managed to find and acquire safer partners.[35]

---

[35] Pavel Savor and Qi Lu provide evidence that many other firms were able to benefit from stock acquisitions. See "Do Stock Mergers Create Value for Acquirers?" *Journal of Finance,* 64 (June 2009), pp. 1061–1097.



**SUMMARY**

The patron saint of the Bolsa (stock exchange) in Barcelona, Spain, is Nuestra Señora de la Esperanza—Our Lady of Hope. She is the perfect patroness, for we all hope for superior returns when we invest. But competition between investors will tend to produce an efficient market. In such a market, prices will rapidly impound any new information, and it will be difficult to make consistently superior returns. We may indeed hope, but all we can rationally *expect* in an efficient market is a return just sufficient to compensate us for the time value of money and for the risks we bear.

The efficient-market hypothesis comes in three different flavors. The weak form of the hypothesis states that prices efficiently reflect all the information in the past series of stock prices. In this case it is impossible to earn superior returns simply by looking for patterns in stock prices; in other words, price changes are random. The semistrong form of the hypothesis states that prices reflect all published information. That means it is impossible to make consistently superior returns just by reading the newspaper, looking at the company's annual accounts, and so on. The strong form of the hypothesis states that stock prices effectively impound all available information. It tells us that superior information is hard to find because in pursuing it you are in competition with thousands, perhaps millions, of active, intelligent, and greedy investors. The best you can do in this case is to assume that securities are fairly priced and to hope that one day Nuestra Señora will reward your humility.

During the 1960s and 1970s every article on the topic seemed to provide additional evidence that markets are efficient. But then readers became tired of hearing the same message and wanted to read about possible exceptions. During the 1980s and 1990s more and more anomalies and puzzles were uncovered. Bubbles, including the dot.com bubble of the 1990s and the real estate bubble of the 2000s, cast doubt on whether markets were always and everywhere efficient.

Limits to arbitrage can explain why asset prices may get out of line with fundamental values. Behavioral finance, which relies on psychological evidence to interpret investor behavior, is consistent with many of the deviations from market efficiency. Behavioral finance says that investors are averse to even small losses, especially when recent investment returns have been disappointing. Investors may rely too much on a few recent events in predicting the future. They may be overconfident in their predictions and may be sluggish in reacting to new information.

There are plenty of quirks and biases in human behavior, so behavioral finance has plenty of raw material. But if every puzzle or anomaly can be explained by some recipe of quirks, biases,

and hindsight, what have we learned? Research in behavioral finance literature is informative and intriguing, but not yet at the stage where a few parsimonious models can account for most of the deviations from market efficiency.

For the corporate treasurer who is concerned with issuing or purchasing securities, the efficient-market theory has obvious implications. In one sense, however, it raises more questions than it answers. The existence of efficient markets does not mean that the financial manager can let financing take care of itself. It provides only a starting point for analysis. It is time to get down to details about securities and issue procedures. We start in Chapter 14.

● ● ● ● ●

**FURTHER READING**

*Malkiel's book is an-easy-to-read book on market efficiency. Fama has written two classic review articles on the topic:*

B. G. Malkiel, *A Random Walk Down Wall Street,* 8th ed. (New York: W.W. Norton, 2004).

E. F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25 (May 1970), pp. 383–417.

E. F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46 (December 1991), pp. 1575–1617.

*There are several useful surveys of behavioral finance:*

N. Barberis and R. H. Thaler, "A Survey of Behavioral Finance," in G. M. Constantinides, M. Harris, and R. M. Stulz (eds.), *Handbook of the Economics of Finance* (Amsterdam: Elsevier Science, 2003).

M. Baker, R. S. Ruback, and J. Wurgler, "Behavioral Corporate Finance," in B. E. Eckbo (ed.), *The Handbook of Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007), Chapter 4.

R. J. Shiller, "Human Behavior and the Efficiency of the Financial System," in J. B. Taylor and M. Woodford (eds.), *Handbook of Macroeconomics* (Amsterdam: North-Holland, 1999).

A. Shleifer, *Inefficient Markets: An Introduction to Behavioral Finance* (Oxford: Oxford University Press, 2000).

R. H. Thaler (ed.), *Advances in Behavioral Finance* (New York: Russell Sage Foundation, 1993).

*Some conflicting views on market efficiency are provided by:*

G. W. Schwert, "Anomalies and Market Efficiency," in G. M. Constantinides, M. Harris, and R. M. Stulz (eds.), *Handbook of the Economics of Finance* (Amsterdam: Elsevier Science, 2003).

M. Rubinstein, "Rational Markets: Yes or No? The Affirmative Case?" *Financial Analysts Journal* 57 (May–June 2001), pp. 15–29.

B. G. Malkiel, "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives* 17 (Winter 2003), pp. 59–82.

R. J. Shiller, "From Efficient Markets Theory to Behavioral Finance," *Journal of Economic Perspectives* 17 (Winter 2003), pp. 83–104.

E. F. Fama and K. R. French, "Dissecting Anomalies," *Journal of Finance* 63 (August 2008), pp. 1653–1678.

*Bubbles are discussed in:*

M. Brunnermeier, *Asset Pricing under Asymmetric Information: Bubbles, Crashes, Technical Analysis, and Herding* (Oxford: Oxford University Press, 2001).

R. J. Shiller, *Irrational Exuberance,* 2nd ed. (Princeton, NJ: Princeton University Press, 2005).



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

## BASIC

1. Which (if any) of these statements are true? Stock prices appear to behave as though successive values (a) are random numbers, (b) follow regular cycles, (c) differ by a random number.

2. Supply the missing words:

   "There are three forms of the efficient-market hypothesis. Tests of randomness in stock returns provide evidence for the _____ form of the hypothesis. Tests of stock price reaction to well-publicized news provide evidence for the _____ form, and tests of the performance of professionally managed funds provide evidence for the _____ form. Market efficiency results from competition between investors. Many investors search for new information about the company's business that would help them to value the stock more accurately. Such research helps to ensure that prices reflect all available information; in other words, it helps to keep the market efficient in the _____ form. Other investors study past stock prices for recurrent patterns that would allow them to make superior profits. Such research helps to ensure that prices reflect all the information contained in past stock prices; in other words, it helps to keep the market efficient in the _____ form."

3. True or false? The efficient-market hypothesis assumes that

   a. There are no taxes.

   b. There is perfect foresight.

   c. Successive price changes are independent.

   d. Investors are irrational.

   e. There are no transaction costs.

   f. Forecasts are unbiased.

4. True or false?

   a. Financing decisions are less easily reversed than investment decisions.

   b. Tests have shown that there is almost perfect negative correlation between successive price changes.

   c. The semistrong form of the efficient-market hypothesis states that prices reflect all publicly available information.

   d. In efficient markets the expected return on each stock is the same.

5. Analysis of 60 monthly rates of return on United Futon common stock indicates a beta of 1.45 and an alpha of −.2% per month. A month later, the market is up by 5%, and United Futon is up by 6%. What is Futon's abnormal rate of return?

6. True or false?

   a. Analysis by security analysts and investors helps keep markets efficient.

   b. Psychologists have found that, once people have suffered a loss, they are more relaxed about the possibility of incurring further losses.

   c. Psychologists have observed that people tend to put too much weight on recent events when forecasting.

   d. If the efficient-market hypothesis is correct, managers will not be able to increase stock prices by creative accounting that boosts reported earnings.

7. Geothermal Corporation has just received good news: its earnings increased by 20% from last year's value. Most investors are anticipating an increase of 25%. Will Geothermal's stock price increase or decrease when the announcement is made?

Visit us at www.mhhe.com/bma

8. Here again are the six lessons of market efficiency. For each lesson give an example showing the lesson's relevance to financial managers.
   a. Markets have no memory.
   b. Trust market prices.
   c. Read the entrails.
   d. There are no financial illusions.
   e. The do-it-yourself alternative.
   f. Seen one stock, seen them all.

9. Give two or three examples of research results or events that raise doubts about market efficiency. Briefly explain why.

### INTERMEDIATE

10. How would you respond to the following comments?
    a. "Efficient market, my eye! I know lots of investors who do crazy things."
    b. "Efficient market? Balderdash! I know at least a dozen people who have made a bundle in the stock market."
    c. "The trouble with the efficient-market theory is that it ignores investors' psychology."
    d. "Despite all the limitations, the best guide to a company's value is its written-down book value. It is much more stable than market value, which depends on temporary fashions."

11. Respond to the following comments:
    a. "The random-walk theory, with its implication that investing in stocks is like playing roulette, is a powerful indictment of our capital markets."
    b. "If everyone believes you can make money by charting stock prices, then price changes won't be random."
    c. "The random-walk theory implies that events are random, but many events are not random. If it rains today, there's a fair bet that it will rain again tomorrow."

12. Which of the following observations *appear* to indicate market inefficiency? Explain whether the observation appears to contradict the weak, semistrong, or strong form of the efficient-market hypothesis.
    a. Tax-exempt municipal bonds offer lower pretax returns than taxable government bonds.
    b. Managers make superior returns on their purchases of their company's stock.
    c. There is a positive relationship between the return on the market in one quarter and the change in aggregate profits in the next quarter.
    d. There is disputed evidence that stocks that have appreciated unusually in the recent past continue to do so in the future.
    e. The stock of an acquired firm tends to appreciate in the period before the merger announcement.
    f. Stocks of companies with unexpectedly high earnings appear to offer high returns for several months after the earnings announcement.
    g. Very risky stocks on average give higher returns than safe stocks.

13. Here are alphas and betas for Intel and Conagra for the 60 months ending April 2009. Alpha is expressed as a percent per month.

    |         | Alpha | Beta |
    |---------|-------|------|
    | Intel   | −.57  | 1.08 |
    | Conagra | −.46  | .65  |

    Explain how these estimates would be used to calculate an abnormal return.

14. "If the efficient-market hypothesis is true, the pension fund manager might as well select a portfolio with a pin." Explain why this is not so.

15. Two financial managers, Alpha and Beta, are contemplating a chart showing the actual performance of the Standard and Poor's Composite Index over a five-year period. Each manager's company needs to issue new shares of common stock sometime in the next year.

    **Alpha:** My company's going to issue right away. The stock market cycle has obviously topped out, and the next move is almost surely down. Better to issue now and get a decent price for the shares.

    **Beta:** You're too nervous; we're waiting. It's true that the market's been going nowhere for the past year or so, but the figure clearly shows a basic upward trend. The market's on the way up to a new plateau.

    What would you say to Alpha and Beta?

16. What does the efficient-market hypothesis have to say about these two statements?

    a. "I notice that short-term interest rates are about 1% below long-term rates. We should borrow short-term."

    b. "I notice that interest rates in Japan are lower than rates in the United States. We would do better to borrow Japanese yen rather than U.S. dollars."

17. Fama and French show that average stock returns on firms with small market capitalizations have been significantly higher than average returns for "large-cap" firms. What are the possible explanations for this result? Does the result disprove market efficiency? Explain briefly.

18. Column (A) in Table 13.1 on the following page shows the monthly return on the British FTSE 100 index from May 2007 through February 2009. Columns (B) and (C) show returns on the stocks of two firms—Executive Cheese and Paddington Beer. Both firms announced their earnings in February 2009. Calculate the average abnormal return of the two stocks during the month of the earnings announcement.



Visit us at
www.mhhe.com/bma

19. On May 15, 1997, the government of Kuwait offered to sell 170 million BP shares, worth about $2 billion. Goldman Sachs was contacted after the stock market closed in London and given one hour to decide whether to bid on the stock. They decided to offer 710.5 pence ($11.59) per share, and Kuwait accepted. Then Goldman Sachs went looking for buyers. They lined up 500 institutional and individual investors worldwide, and resold all the shares at 716 pence ($11.70). The resale was complete before the London Stock Exchange opened the next morning. Goldman Sachs made $15 million overnight.[36]

    What does this deal say about market efficiency? Discuss.

20. Explain how incentive and agency problems can contribute to mispricing of securities or to bubbles. Give examples.

21. Many commentators have blamed the subprime crisis on "irrational exuberance." What is your view? Explain briefly.

## CHALLENGE

22. "The strong-form of the efficient-market hypothesis is nonsense. Look at mutual fund X; it has had superior performance for each of the last 10 years." Does the speaker have a point? Suppose that there is a 50% probability that X will obtain superior performance in any year simply by chance.

    a. If X is the only fund, calculate the probability that it will have achieved superior performance for each of the past 10 years.

    b. Now recognize that there are over 10,000 mutual funds in the United States. What is the probability that by chance there is at least 1 out of 10,000 funds that obtained 10 successive years of superior performance?

---

[36] "Goldman Sachs Earns a Quick $15 Million Sale of BP Shares," *The Wall Street Journal,* May 16, 1997, p. A4.

Visit us at www.mhhe.com/bma

▶ **TABLE 13.1**

See Problem 18. Rates of return in percent per month:

| Month | (A) Market Return | (B) Executive Cheese Return | (C) Paddington Beer Return |
|---|---|---|---|
| May 07 | 2.7 | −3 | 1.6 |
| Jun | −0.2 | 2.3 | −0.8 |
| Jul | −3.8 | −5.1 | 0.3 |
| Aug | −0.9 | −0.7 | −1.6 |
| Sep | 2.6 | 3.1 | 2.8 |
| Oct | 3.9 | 13 | 2.1 |
| Nov | −4.3 | −2.1 | −6 |
| Dec | 0.4 | 6.2 | −1.7 |
| Jan 08 | −8.9 | −4 | −5 |
| Feb | 0.1 | 0.4 | −0.4 |
| Mar | −3.1 | −2.1 | −2 |
| Apr | 6.8 | 4.6 | 3.2 |
| May | −0.6 | −0.3 | 0.4 |
| Jun | −7.1 | −12.7 | −7.3 |
| Jul | −3.8 | 1.1 | −4.1 |
| Aug | 4.2 | 7.2 | 2.3 |
| Sep | −13.0 | −18.1 | −8.7 |
| Oct | −10.7 | −6.2 | −12 |
| Nov | −2.0 | 0.5 | −4.2 |
| Dec | 3.4 | 4.7 | 2.7 |
| Jan 09 | −6.4 | −8.1 | −0.4 |
| Feb | −7.7 | −2.1 | −9.4 |

23. Some extreme bubbles are obvious with hindsight, *after* they burst. But how would you *define* a bubble? There are many examples of good news and rising stock prices, followed by bad news and falling stock prices. Can you set out rules and procedures to distinguish bubbles from the normal ups and downs of stock prices?

**REAL-TIME DATA ANALYSIS**



**Use either finance.yahoo.com or the Market Insight database (www.mhhe.com/edumarketinsight) to download daily prices for five U.S. stocks for a recent five-year period.**

For each stock, construct a scatter diagram of successive returns as in Figure 13.2. Calculate the correlation among the returns on successive days. Do you find any consistent patterns?

Visit us at www.mhhe.com/bma

# An Overview of Corporate Financing

▶ **We now begin** our analysis of long-term financing decisions—an undertaking we will not complete until Chapter 25. This chapter provides an introduction to corporate financing. It reviews with a broad brush several topics that will be explored more carefully later on.

We start the chapter by looking at aggregate data on the sources of financing. Much of the money for new investments comes from profits that companies retain and reinvest. The remainder comes from selling new debt or equity securities. These financing patterns raise several interesting questions. Do companies rely too heavily on internal financing rather than on new issues of debt or equity? Are debt ratios of U.S. corporations dangerously high? How do patterns of financing differ across the major industrialized countries?

Our second task in the chapter is to review some of the essential features of debt and equity. Lenders and stockholders have different *cash flow rights* and also different *control rights*. The lenders have first claim on cash flow, because they are promised definite cash payments for interest and principal. The stockholder receives whatever cash is left over after the lenders are paid. Stockholders, on the other hand, have complete control of the firm, providing that they keep their promises to lenders. As owners of the business, stockholders have the ultimate control over what assets the company buys, how the assets are financed, and how they are used. Of course, in large public corporations the stockholders delegate these decisions to the board of directors, who in turn appoint senior management. In these cases *effective* control often ends up with the company's management.

The simple division of cash flow among debt and equity glosses over the many different types of debt that companies issue. Therefore, we close our discussion of debt and equity with a brief canter through the main categories of debt. We also pause to describe certain less common forms of equity, particularly preferred stock.

The financial crisis that started in the summer of 2007 demonstrated the importance of healthy financial markets and institutions. We will review the crisis, introduce you to the major financial institutions, and look at the roles that financial institutions play in corporate financing and in the economy at large.

● ● ● ● ●

## 14-1 Patterns of Corporate Financing

Corporations invest in long-term assets (primarily property, plant, and equipment) and in net working capital (current assets minus current liabilities). Figure 14.1 shows where U.S. corporations get the cash to pay for these investments. Most of the cash is generated internally. That is, it comes from cash flow allocated to depreciation and from retained earnings (earnings not paid out as cash dividends).[1] Shareholders are happy to plow this

---

[1] In Figure 14.1, internally generated cash was calculated by adding depreciation to retained earnings. Depreciation is a noncash expense. Thus, retained earnings understate the cash flow available for reinvestment.



▶ **FIGURE 14.1**

Sources of funds for U.S. nonfinancial corporations expressed as a fraction of the total.

*Source:* Board of Governors of the Federal Reserve System, Division of Research and Statistics, Flow of Funds Accounts Table F.102 at **www.federalreserve.gov/releases/z1/current/data.htm**.

cash back into the firm, provided that investments are positive NPV. Every positive-NPV outlay increases shareholder value.

U.S. corporations are not alone in relying mostly on internally generated cash. For example, internal cash flow makes up more than two-thirds of corporate financing in Germany, Japan, and the U.K.

Sometimes internal cash flow more than covers investment. More often it does not, and the company faces a financial deficit. To cover the deficit, the company must cut back on dividends in order to increase retained earnings, or it must raise new debt or equity capital from outside investors. So there are two basic financing decisions. First, what fraction of profits should be plowed back into the business rather than paid out to shareholders? Second, what fraction of the financial deficit should be met with debt rather than equity? Thus the firm needs a payout policy (Chapter 16) and a debt policy (Chapters 17 and 18).

Take a look at U.S. equity issues in Figure 14.1. Net issues were *negative* in every year. This means that the cash raised by share issues was less than the cash paid out to shareholders by repurchase of previously outstanding shares. (Corporations can buy back their own shares, or they may purchase and retire other firms' shares in the course of mergers and acquisitions.) The choice between cash dividends and repurchases is another aspect of payout policy.

Stock repurchases in the U.S. were especially large in 2006 and 2007, which accounts for the large negative net equity issues in those years. Figure 14.1 shows that the negative equity issues were approximately offset by borrowing. In aggregate, U.S. corporations were switching from equity to debt financing.

## Do Firms Rely Too Much on Internal Funds?

We have seen that on average internal funds (retained earnings plus depreciation) cover most of the cash needed for investment. It seems that internal financing is more convenient than external financing by stock and debt issues. But some observers worry that managers have an irrational or self-serving aversion to external finance. A manager seeking comfortable employment could be tempted to forego a risky but positive-NPV project if it involved launching a new stock issue and facing awkward questions from potential

investors. Perhaps managers take the line of least resistance and dodge the "discipline of capital markets."

We do not mean to paint managers as loafers. There are also some good reasons for relying on internally generated funds. The cost of issuing new securities is avoided, for example. Moreover, the announcement of a new equity issue is usually bad news for investors, who worry that the decision signals lower future profits or higher risk.[2] If issues of shares are costly and send a bad-news signal to investors, companies may be justified in looking more carefully at those projects that would require a new stock issue.

## How Much Do Firms Borrow?

The mix of debt and equity financing varies widely from industry to industry and from firm to firm. Debt ratios also vary over time for particular firms. These variations are a fact of life: there is no constant, God-given debt ratio, and if there were, it would change. But a few aggregate statistics will do no harm.

Table 14.1 shows the aggregate balance sheet of all U.S. manufacturing corporations. If all these businesses were merged into a single gigantic firm, Table 14.1 would be its balance sheet. Assets and liabilities in the table are entered at book values, that is, accounting values. These do not generally equal market values. The numbers are nevertheless instructive. Notice that firms had long-term debt of \$1,385 billion and equity of \$2,775 billion. The ratio of long-term debt to long-term debt plus equity was, therefore, \$1,385/ (\$1,385 + \$2,775) = .33.[3]

Table 14.1 is of course only a snapshot. Is there a long-term trend to more debt and less equity? The answer depends partly on how you measure the debt ratio, as Figure 14.2 demonstrates. In book-value terms the debt ratio crept steadily upward until 1990, when it began to dip as firms opted to pay down debt. The picture is rather different in terms of market values. Booming stock prices until 1999 ensured that for many years the amount of long-term debt grew less rapidly than the market value of equity, but this trend reversed in the stock market declines of 2000–2003 and 2008.

| Assets | | $ Billions | Liabilities | | $ Billions |
|---|---|---|---|---|---|
| Current assets[a] | | $2,037 | Current liabilities[a] | | $1,578 |
| Fixed assets | $2,749 | | Long-term debt | $1,385 | |
| Less depreciation | 1,459 | | Other long-term liabilities[b] | 1,105 | |
| Net fixed assets | | 1,291 | Total long-term liabilities[b] | | 2,490 |
| Other long-term assets | | 3,515 | Stockholder's equity | | 2,775 |
| Total assets | | $6,843 | Total liabilities and stockholders' equity | | $6,843 |

▶ **TABLE 14.1**   Aggregate balance sheet for manufacturing corporations in the United States, fourth quarter, 2008 (figures in $ billions)

[a] See Table 30.1 for a breakdown of current assets and liabilities.
[b] Includes deferred taxes and several miscellaneous categories.
*Source:* U.S. Census Bureau, *Quarterly Report for Manufacturing, Mining and Trade Corporations,* 2008 (**www.census.gov/econ/qfr**).

---

[2] Managers do have insiders' insights and naturally are tempted to issue stock when the price looks good to them, that is, when they are less optimistic than outside investors. The outside investors realize this and will buy a new issue only at a discount from the pre-announcement price. More on stock issues in Chapter 15.

[3] This debt ratio may be understated, because "Other long-term liabilities" probably include some debt-equivalent claims. We will not pause to sort through these other liabilities, however.

Should we be concerned that book debt ratios are higher today than they were 50 years ago? It is true that higher debt ratios mean that more companies will fall into financial distress when a serious recession hits the economy. But all companies live with this risk to some degree, and it does not follow that less risk is better. Finding the optimal debt ratio is like finding the optimal speed limit. We can agree that accidents at 30 miles per hour are generally less dangerous than accidents at 60 miles per hour, but we do not therefore set the speed limit on all roads at 30. Speed has benefits as well as risks. So does debt, as we see in Chapter 18.

**International Comparisons**   Corporations in the U.S. are generally viewed as having less debt than many of their foreign counterparts. That was true in the 1950s and 1960s. Now it is not so clear.

International comparisons of corporate debt ratios are muddied by differences in accounting methods, but the European Union has constructed a database of harmonized accounts that provides at least a rough indication of where the U.S. ranks in the debt-ratio league. Figure 14.3 compares the average ratio of total liabilities to total liabilities plus equity for the manufacturing industry in a sample of countries. You can see that Germany and Italy have the highest ratios, while the U.S. is roughly in the middle of the pack.

◗ **FIGURE 14.2**

Ratio of debt to net worth for nonfinancial corporations, 1955–2008Q2.

*Source:* Board of Governors of the Federal Reserve System, Division of Research and Statistics, Flow of Funds Accounts Table B.102 at **www.federalreserve.gov/ releases/z1/current/data.htm**.



◗ **FIGURE 14.3**

Ratios of total liabilities to total liabilities plus equity for manufacturing industry, 2006.

*Source:* European Union *Bach* database of harmonized company accounts. © European Communities, 1995–2006.



## 14-2 Common Stock

Now we take a brief tour of the debt and equity securities issued by corporations. We start with Table 14.2, which shows how the common stock of Honeywell International is recorded on its books.

The maximum number of shares that can be issued is known as the *authorized share capital;* for Honeywell it was 2 billion shares. If management wishes to increase the number of authorized shares, it needs the agreement of shareholders. By December 2008 Honeywell had issued only 958 million shares, so it could issue over a billion more without further shareholder approval.

Most of the issued shares were held by investors. These shares are said to be *issued and outstanding.* But Honeywell has also bought back 223 million shares from investors. Repurchased shares are held in the company's treasury until they are either canceled or resold. Treasury shares are said to be *issued but not outstanding.*

The issued shares are entered into the company's books at their par value. Each Honeywell share had a par value of $1.00. Thus the total book value of the issued shares was 958 million × $1.00 = $958 million. Par value has little economic significance.[4] Some companies issue shares with no par value. In this case, the stock is listed in the accounts at an arbitrarily determined figure.

The price of new shares sold to the public almost always exceeds par value. The difference is entered in the company's accounts as additional paid-in capital or capital surplus. Thus, if Honeywell sold an additional 100,000 shares at $40 a share, the common stock account would increase by 100,000 × $1.00 = $100,000 and the capital surplus account would increase by 100,000 × $39.00 = $3,900,000.

Honeywell distributed part of its earnings as dividends. The remainder was retained in the business and used to finance new investments. The cumulative amount of retained earnings was $16,250 million.

The next entry in the common stock account shows the amount that the company has spent on repurchasing its common stock. The repurchases have reduced the stockholders' equity by $14,015 million.

Honeywell's net common equity had a book value in December 2008 of $7,187 million. That works out at 7,187/735 = $9.78 per share. But in December 2008, Honeywell's shares were priced at about $35 each. So the market value of the outstanding common stock was 735 million × $35 = $25,725 million, about $18 billion higher than book value.

| | |
|---|---:|
| Common shares ($1 par value per share) | $   958 |
| Additional paid-in capital | 3,994 |
| Retained earnings | 16,250 |
| Treasury shares | (14,015) |
| Net common equity | $ 7,187 |
| *Note:* | |
| Authorized shares | 2,000 |
| Issued shares, of which | 958 |
| Outstanding | 735 |
| Treasury shares | 223 |

▶ **TABLE 14.2**
Book value of common stockholders' equity of Honeywell International, Inc., December 31, 2008 (figures in millions).

*Source:* Honeywell International, *Annual Reports.*

---

[4] Some states do not allow companies to sell shares below par value. Also some states calculate an annual franchise tax based on the total par value of the company's shares. Therefore par value has traditionally been set at a low figure.

## Ownership of the Corporation

A corporation is owned by its common stockholders. Some of this common stock is held directly by individual investors, but the greater proportion belongs to **financial institutions** such as mutual funds, pension funds, and insurance companies. For example, look at Figure 14.4. You can see that in the U.S. about 50% of common stock is held by financial institutions, with pension funds and mutual funds each holding about 20%.

What do we mean when we say that these stockholders *own* the corporation? The answer is obvious if the company has issued no other securities. Consider the simplest possible case of a corporation financed solely by common stock, all of which is owned by the firm's chief executive officer (CEO). This lucky owner-manager receives all the cash flows and makes all investment and operating decisions. She has complete *cash-flow rights* and also complete *control rights*.

These rights are split up and reallocated as soon as the company borrows money. If it takes out a bank loan, it enters into a contract with the bank promising to pay interest and eventually repay the principal. The bank gets a privileged, but limited, right to cash flows; the residual cash-flow rights are left with the stockholder. Thus common stock is a *residual claim* on the firm's assets and cash flow.

The bank typically protects its claim by imposing restrictions on what the firm can or cannot do. For example, it may require the firm to limit future borrowing, and it may forbid the firm to sell off assets or to pay excessive dividends. The stockholders' control rights are thereby limited. However, the contract with the bank can never restrict or determine all the operating and investment decisions necessary to run the firm efficiently. (No team of lawyers, no matter how long they scribbled, could ever write a contract covering all possible contingencies.)[5] The owner of the common stock retains the residual rights of control over these decisions. For example, she may choose to increase the selling price of the firm's products, to hire temporary rather than permanent employees, or to construct a new plant in Miami Beach rather than Hollywood.[6]

Ownership of the firm can of course change. If the firm fails to make the promised payments to the bank, it may be forced into bankruptcy. Once the firm is under the "protection" of a bankruptcy court, shareholders' cash-flow and control rights are tightly restricted



▶ **FIGURE 14.4**

Holdings of corporate equities, fourth quarter, 2008.

*Source:* Board of Governors of the Federal Reserve System, Division of Research and Statistics, Flow of Funds Accounts Table L.213 at **www.federalreserve.gov/releases/z1/current/data.htm**.

---

[5] Theoretical economists therefore stress the importance of *incomplete contracts.* Their point is that contracts pertaining to the management of the firm *must* be incomplete and that someone must exercise residual rights of control. See O. Hart, *Firms, Contracts, and Financial Structure* (Oxford: Oxford University Press, 1995).

[6] Of course, the bank manager may suggest that a particular decision is unwise, or even threaten to cut off future lending, but the bank does not have any *right* to make these decisions.

and may be extinguished altogether. Unless some rescue or reorganization plan can be implemented, the bank will become the new owner of the firm and will acquire the cash-flow and control rights of ownership. (We discuss bankruptcy in Chapter 32.)

There is no law of nature that says residual cash-flow rights and residual control rights have to go together. For example, one could imagine a situation where the debtholder gets to make all the decisions. But this would be inefficient. Since the benefits of good decisions are felt mainly by the common stockholders, it makes sense to give them control over how the firm's assets are used.

We have focused so far on a firm that is owned by a single stockholder. Public corporations are owned by many stockholders. Ownership can be widely dispersed, with tens of thousands of stockholders, none owning a significant block of shares. It has been widely believed that ownership in the U.S. is more widely dispersed than in other countries. However, recent research by Clifford Holderness shows that this is not the case. He finds that 96% of a sample of U.S. public corporations have block holders with at least 5% of the outstanding shares. Some countries have more concentrated ownership than the U.S., some have less. The U.S. lies in the middle of the pack.[7]

The common stockholders in widely held corporations still have the residual rights over the cash flows and have the ultimate right of control over the company's affairs. In practice, however, their control is limited to an entitlement to vote, either in person or by proxy, on appointments to the *board of directors,* and on other crucial matters such as the decision to merge. Many shareholders do not bother to vote. They reason that, since they own so few shares, their vote will have little impact on the outcome. The problem is that, if all shareholders think in the same way, they cede effective control and management gets a free hand to look after its own interests.

## Voting Procedures

In most companies stockholders elect directors by a system of *majority voting.* In this case, each director is voted upon separately and stockholders can cast one vote for each share that they own. If a company's articles permit *cumulative voting,* the directors are voted upon jointly and stockholders can, if they wish, allot all their votes to just one candidate.[8] Cumulative voting makes it easier for a minority group among the stockholders to elect directors who will represent the group's interests. That is why some shareholder groups campaign for cumulative voting.

On many issues a simple majority of votes cast is sufficient to carry the day, but the company charter may specify some decisions that require a *supermajority* of, say, 75% of those eligible to vote. For example, a supermajority vote is sometimes needed to approve a merger.

The issues on which stockholders are asked to vote are rarely contested, particularly in the case of large, publicly traded firms. Occasionally, there are *proxy contests* in which the firm's existing management and directors compete with outsiders for effective control of the corporation. But the odds are stacked against the outsiders, for the insiders can get the firm to pay all the costs of presenting their case and obtaining votes.

## Dual-Class Shares and Private Benefits

Usually companies have one class of common stock and each share has one vote. Occasionally, however, a firm may have two classes of stock outstanding, which differ in their

---

[7] See R. La Porta, F. Lopez-de-Silanes, and A. Shleifer, "Corporate Ownership around the World," *Journal of Finance* 54 (1999), pp. 471–517; and C. Holderness, "The Myth of Diffuse Ownership in the United States," *Review of Financial Studies* 22 (April 2009), pp. 1377–1408.

[8] For example, suppose there are five directors to be elected and you own 100 shares. You therefore have a total of $5 \times 100 = 500$ votes. Under the majority voting system, you can cast a maximum of 100 votes for any one candidate. Under a cumulative voting system, you can cast all 500 votes for your favorite candidate.

# A Contest Over Voting Rights

◗ "Not so long ago," wrote *The Economist* magazine, "shareholder friendly companies in Switzerland were as rare as Swiss admirals. Safe behind anti-takeover defences, most managers treated their shareholders with disdain." However, *The Economist* perceived one encouraging sign that these attitudes were changing. This was a proposal by the Union Bank of Switzerland (UBS) to change the rights of its equity-holders.

UBS had two classes of shares—bearer shares, which are anonymous, and registered shares, which are not. In Switzerland, where anonymity is prized, bearer shares usually traded at a premium. UBS's bearer shares had sold at a premium for many years. However, there was another important distinction between the two share classes. The registered shares carried five times as many votes as an equivalent investment in the bearer shares. Presumably attracted by this feature, an investment company, BK Vision, began to accumulate a large position in the registered shares, and its price rose to a 38% premium over the bearer shares.

At this point UBS announced its plan to merge the two classes of shares, so that the registered shares would become bearer shares and would lose their superior voting rights. Since all UBS's shares would then sell for the same price, UBS's announcement led to a rise in the price of the bearer shares and a fall in the price of the registered.

Martin Ebner, the president of BK Vision, objected to the change, complaining that it stripped the registered shareholders of some of their voting rights without providing compensation. The dispute highlighted the question of the value of superior voting stock. If the votes are used to secure benefits for *all* shareholders, then the stock should not sell at a premium. However, a premium would arise if holders of the superior voting stock expected to secure benefits for themselves alone.

To many observers UBS's proposal was a welcome attempt to prevent one group of shareholders from profiting at the expense of others and to unite all shareholders in the common aim of maximizing firm value. To others it represented an attempt to take away their rights. In any event, the debate over the proposal was never fully resolved, for UBS shortly afterward agreed to merge with SBC, another Swiss bank.

---

right to vote. For example, when Google made its first issue of common stock, the founders were reluctant to give up control of the company. Therefore, the company created two classes of shares. The A shares, which were sold to the public, had 1 vote each, while the B shares, which were owned by the founders, had 10 votes each. Both classes of share had the same cash-flow rights, but they had different control rights.

When there are two classes of stock, shareholders with the extra voting power may sometimes use it to toss out bad management or to force management to adopt policies that enhance shareholder value. But, as long as both classes of share have identical cash-flow rights, all shareholders benefit equally from such changes. So here is the question: if everyone gains equally from better management, why do shares with superior voting power typically sell at a premium? The only plausible reason is that there are *private benefits* captured by the owners of these shares. For example, a holder of a block of voting shares might be able to obtain a seat on the board of directors or access to perquisites provided by the company. (How about a ride to Bermuda on the corporate jet?) The shares might have extra bargaining power in an acquisition. Or they might be held by another company, which could use its voting power and influence to secure a business advantage. These are some of the reasons why shares with more votes usually sell for a higher price.

These private benefits of control seem to be much larger in some countries than others. For example, Tatiana Nenova has looked at a number of countries in which firms may have

two classes of stock.[9] In the United States the premium that an investor needed to pay to gain voting control amounted to only 2% of firm value, but in Italy it was over 29% and in Mexico it was 36%. It appears that in these two countries majority investors are able to secure large private benefits. The Finance in the News box describes a major dispute in Switzerland over the value of superior voting rights.

Even when there is only one class of shares, minority stockholders may be at a disadvantage; the company's cash flow and potential value may be diverted to management or to one or a few dominant stockholders holding large blocks of shares. In the U.S., the law protects minority stockholders from exploitation, but minority stockholders in other countries do not always fare so well.[10]

Financial economists sometimes refer to the exploitation of minority shareholders as *tunneling;* the majority shareholder tunnels into the firm and acquires control of the assets for himself. Let us look at tunneling Russian-style.

---

**EXAMPLE 14.1** ● Raiding the Minority Shareholders

To grasp how the scam works, you first need to understand *reverse stock splits.* These are often used by companies with a large number of low-priced shares. The company making the reverse split simply combines its existing shares into a smaller, more convenient, number of new shares. For example, the shareholders might be given 2 new shares in place of the 3 shares that they currently own. As long as all shareholdings are reduced by the same proportion, nobody gains or loses by such a move.

However, the majority shareholder of one Russian company realized that the reverse stock split could be used to loot the company's assets. He therefore proposed that existing shareholders receive 1 new share in place of every 136,000 shares they currently held.[11]

Why did the majority shareholder pick the number "136,000"? Answer: because the two minority shareholders owned less than 136,000 shares and therefore did not have the right to *any* shares. Instead they were simply paid off with the par value of their shares and the majority shareholder was left owning the entire company. The majority shareholders of several other companies were so impressed with this device that they also proposed similar reverse stock splits to squeeze out their minority shareholders.

Such blatant exploitation would not be permitted in the U.S. or many other countries.

● ● ● ● ●

### Equity in Disguise

Common stocks are issued by corporations. But a few equity securities are issued not by corporations but by partnerships or trusts. We will give some brief examples.

**Partnerships**    Plains All American Pipeline LP is a *master limited partnership* that owns crude oil pipelines in the United States and Canada. You can buy "units" in this partnership on

---

[9] T. Nenova, "The Value of Corporate Voting Rights and Control: A Cross-Country Analysis," *Journal of Financial Economics* 68 (June 2003) pp. 325–352.

[10] International differences in the opportunities for dominant shareholders to exploit their position are discussed in S. Johnson et al., "Tunnelling," *American Economic Review* 90 (May 2000), pp. 22–27.

[11] Since a reverse stock split required only the approval of a simple majority of the shareholders, the proposal was voted through.

the New York Stock Exchange, thus becoming a *limited partner* in Plains All American. The most the limited partners can lose is their investment in the company.[12] In this and most other respects, the partnership units are just like the shares in an ordinary corporation. They share in the profits of the business and receive cash distributions (like dividends) from time to time.

Partnerships avoid corporate income tax; any profits or losses are passed straight through to the partners' tax returns. Offsetting this tax advantage are various limitations of partnerships. For example, the law regards a partnership merely as a voluntary association of individuals; like its partners, it is expected to have a limited life. A corporation, on the other hand, is an independent legal "person" that can, and often does, outlive all its original shareholders.

**Trusts and REITs**    Would you like to own a part of the oil in the Prudhoe Bay field on the north slope of Alaska? Just call your broker and buy a few units of the Prudhoe Bay Royalty Trust. BP set up this trust and gave it a royalty interest in production from BP's share of the Prudhoe Bay revenues. As the oil is produced, each trust unit gets its share of the revenues.

This trust is the passive owner of a single asset: the right to a share of the revenues from BP's Prudhoe Bay production. Operating businesses, which cannot be passive, are rarely organized as trusts, though there are exceptions, notably *real estate investment trusts,* or *REITs* (pronounced "reets").

REITs were created to facilitate public investment in commercial real estate; there are shopping center REITs, office building REITs, apartment REITs, and REITs that specialize in lending to real estate developers. REIT "shares" are traded just like common stocks. The REITs themselves are not taxed, so long as they distribute at least 95% of earnings to the REITs' owners, who must pay whatever taxes are due on the dividends. However, REITs are tightly restricted to real estate investment. You cannot set up a widget factory and avoid corporate taxes by calling it a REIT.

## Preferred Stock

Usually when investors talk about "stock" or "equity", they are referring to common stock. But Honeywell also has authorization to issue up to 40 million shares of **preferred stock,** and this too would form part of its equity. Despite its name, preferred stock provides only a small part of most companies' cash needs and it will occupy less time in later chapters. However, it can be a useful method of financing in mergers and certain other special situations.

Like debt, preferred stock offers a series of fixed payments to the investor. The company can choose *not* to pay a preferred dividend, but in that case it may not pay a dividend to its common stockholders. Most issues of preferred are known as *cumulative preferred stock.* This means that the firm must pay *all* past preferred dividends before common stockholders get a cent. If the company does miss a preferred dividend, the preferred stockholders generally gain some voting rights, so that the common stockholders are obliged to share control of the company with the preferred holders. Directors are also aware that failure to pay the preferred dividend earns the company a black mark with investors, so they do not take such a decision lightly.

---

[12] A partnership can offer limited liability *only* to its limited partners. The partnership must also have one or more general partners, who have unlimited liability. However, general partners can be corporations. This puts the corporation's shield of limited liability between the partnership and the human beings who ultimately own the general partner.

## 14-3 Debt

When companies borrow money, they promise to make regular interest payments and to repay the principal. However, this liability is limited. Stockholders have the right to default on the debt if they are willing to hand over the corporation's assets to the lenders. Clearly, they will choose to do this only if the value of the assets is less than the amount of the debt.[13]

Because lenders are not considered to be owners of the firm, they do not normally have any voting power. The company's payments of interest are regarded as a cost and are deducted from taxable income. Thus interest is paid from *before-tax* income, whereas dividends on common and preferred stock are paid from *after-tax* income. Therefore the government provides a tax subsidy for debt that it does not provide for equity. We discuss debt and taxes in detail in Chapter 18.

We have seen that financial institutions own the majority of corporate equity. Figure 14.5 shows that this is also true of the company's bonds. In this case it is the insurance companies that own the largest stake.[14]

### Debt Comes in Many Forms

The financial manager is faced with an almost bewildering choice of debt securities. For example, look at Table 14.3, which shows the many ways that Honeywell has borrowed money. Honeywell has also entered into a number of other arrangements that are not shown on the balance sheet. For example, it has arranged lines of credit that allow it to take out further short-term bank loans. Also it has entered into a swap that converts some of its fixed-rate debt into floating-rate debt.

You are probably wondering what a swap or floating-rate debt is. Relax—later in the book we explain the various features of corporate debt. For the moment, simply notice



▶ **FIGURE 14.5**

Holdings of bonds issued in the U.S. by U.S. and foreign corporations, fourth quarter, 2008.

*Source:* Board of Governors of the Federal Reserve System, Division of Research and Statistics, Flow of Funds Accounts Table L.212 at **www.federalreserve.gov/ releases/z1/current/data.htm**.

---

[13] In practice this handover of assets is far from straightforward. Sometimes there may be thousands of lenders with different claims on the firm. Administration of the handover is usually left to the bankruptcy court (see Chapter 32).

[14] Figure 14.5 does not include shorter-term debt such as bank loans. Almost all short-term debt issued by corporations is held by financial institutions.

▶ **TABLE 14.3**

Large firms issue many different securities. This table shows some of the debt securities on Honeywell's balance sheet in December 2008.

| |
|---|
| Bank loans |
| Commercial paper |
| Notes |
| Unsecured debentures |
| Floating-rate bonds |
| Zero-coupon bonds |
| Money multiplier notes |
| Industrial development bonds |

that the mixture of debt securities that each company issues reflects the financial manager's response to a number of questions:

1. *Should the company borrow short-term or long-term?* If your company simply needs to finance a temporary increase in inventories ahead of the holiday season, then it may make sense to take out a short-term bank loan. But suppose that the cash is needed to pay for expansion of an oil refinery. Refinery facilities can operate more or less continuously for 15 or 20 years. In that case it would be more appropriate to issue a long-term bond.[15]

    Some loans are repaid in a steady, regular way; in other cases the entire loan is repaid at maturity. Occasionally either the borrower or the lender has the option to terminate the loan early and to demand that it be repaid immediately.

2. *Should the debt be fixed or floating rate?* The interest payment, or coupon, on long-term bonds is commonly fixed at the time of issue. If a $1,000 bond is issued when long-term interest rates are 10%, the firm continues to pay $100 per year regardless of how interest rates fluctuate.

    Most bank loans and some bonds offer a variable, or *floating,* rate. For example, the interest rate in each period may be set at 1% above LIBOR (London Interbank Offered Rate), which is the interest rate at which major international banks lend dollars to each other. When LIBOR changes, the interest rate on your loan also changes.

3. *Should you borrow dollars or some other currency?* Many firms in the U.S. borrow abroad. Often they may borrow dollars abroad (foreign investors have large holdings of dollars), but firms with overseas operations may decide to issue debt in a foreign currency. After all, if you need to spend foreign currency, it probably makes sense to borrow foreign currency.

    Because these international bonds have usually been marketed by the London branches of international banks they have traditionally been known as **eurobonds** and the debt is called **eurocurrency** debt. A eurobond may be denominated in dollars, yen, or any other currency. Unfortunately, when the single European currency was established, it was called the *euro.* It is, therefore, easy to confuse a *eurobond* (a bond that is sold internationally) with a bond that is denominated in euros.

4. *What promises should you make to the lender?* Lenders want to make sure that their debt is as safe as possible. Therefore, they may demand that their debt is *senior* to other debt. If default occurs, senior debt is first in line to be repaid. The *junior,* or *subordinated,* debtholders are paid only after all senior debtholders are satisfied (though all debtholders rank ahead of the preferred and common stockholders).

---

[15] A company might choose to finance a long-term project with short-term debt if it wished to signal its confidence in the future. Investors would deduce that, if the company anticipated declining profits, it would not take the risk of being unable to take out a fresh loan when the first one matured. See D. Diamond, "Debt Maturity Structure and Liquidity Risk," *Quarterly Journal of Economics* 106 (1991), pp. 709–737.

The firm may also set aside some of its assets specifically for the protection of particular creditors. Such debt is said to be *secured* and the assets that are set aside are known as *collateral*. Thus a retailer might offer inventory or accounts receivable as collateral for a bank loan. If the retailer defaults on the loan, the bank can seize the collateral and use it to help pay off the debt.

Usually the firm also provides assurances to the lender that it will not take unreasonable risks. For example, a firm that borrows in moderation is less likely to get into difficulties than one that is up to its gunwales in debt. So the borrower may agree to limit the amount of extra debt that it can issue. Lenders are also concerned that, if trouble occurs, others will push ahead of them in the queue. Therefore, the firm may agree not to create new debt that is senior to existing debtholders or to put aside assets for other lenders.

5. *Should you issue straight or convertible bonds?* Companies often issue securities that give the owner an option to convert them into other securities. These options may have a substantial effect on value. The most dramatic example is provided by a **warrant,** which is *nothing but* an option. The owner of a warrant can purchase a set number of the company's shares at a set price before a set date. Warrants and bonds are often sold together as a package.

A **convertible bond** gives its owner the option to exchange the bond for a predetermined number of shares. The convertible bondholder hopes that the issuing company's share price will zoom up so that the bond can be converted at a big profit. But if the shares zoom down, there is no obligation to convert; the bondholder remains a bondholder.

## A Debt by Any Other Name

The word *debt* sounds straightforward, but companies make a number of promises that look suspiciously like debt but are treated differently in the accounts. Some of these disguised debts are easily spotted. For example, accounts payable are simply obligations to pay for goods that have already been delivered and are therefore like short-term debt.

Other arrangements are less obvious. For example, instead of borrowing to buy new equipment, the company may rent or **lease** it on a long-term basis. In this case, the firm promises to make a series of lease payments to the owner of the equipment. This is just like the obligation to make payments on an outstanding loan. If the firm gets into deep water, it can't choose to miss out on its debt interest, and it can't choose to skip those lease payments.

Here is another example of a disguised debt. At the end of 2008 Honeywell had promised its employees postretirement health care and life insurance benefits valued at $17 billion. However, Honeywell had set aside only $8.5 billion to help meet this obligation. The *unfunded* obligation amounted to $8.5 billion.

There is nothing underhand about any of these obligations. They are all clearly shown on the balance sheet or explained in the notes to the accounts. Sometimes, however, companies go to considerable lengths to ensure that investors do *not* know how much the companies have borrowed. For example, Enron was able to borrow $658 million by setting up *special-purpose entities (SPEs),* which raised cash by a mixture of equity and debt and then used these debts to help fund the parent company. None of this debt showed up on Enron's balance sheet.

## Variety's the Very Spice of Life

We have indicated several dimensions along which corporate securities can be classified. That gives the financial manager plenty of choice in designing securities. As long as you can convince investors of its attractions, you can issue a convertible, subordinated, floating-rate bond denominated in Swedish kronor. Rather than combining features of existing

securities, you may create an entirely new one. We can imagine a coal mining company issuing convertible bonds on which the payment fluctuates with coal prices. We know of no such security, but it is perfectly legal to issue it—and who knows?—it might generate considerable interest among investors.

Given the enormous variety of corporate securities, it's no surprise to find hybrids that incorporate features of both debt and equity. The dividing line between debt and equity is sometimes hard to locate. For example, monthly income preferred stock (MIPS) is subordinated debt that is repackaged as preferred stock. MIPS is treated as equity on the issuing company's balance sheet, but the Internal Revenue Service treats the preferred dividends as tax-deductible interest.[16] MIPS is debt for tax purposes, equity otherwise.

Financial managers don't care what a security is called; they care how it works. ("What's in a name? That which we call a rose by any other name would smell as sweet.")[17] But a security's classification as debt or equity does matter for accounting and tax purposes. Classification can sometimes be challenging. It doesn't help to say that "Debt is safe, equity is risky," because there are plenty of examples of safe equity (preferred stock issued by a blue-chip corporation, for example) and risky debt (junk bonds). It does help to remember that equity is a *residual claim* that participates in the upsides and downsides of the business after debt claims are satisfied. Equity has residual cash-flow rights and residual control rights. Debt has first claim on cash flows, but its claim is limited. It does not participate in the upsides of the business. Debt has no control rights unless the firm defaults or violates debt covenants.

## 14-4   Financial Markets and Institutions

That completes our tour of corporate securities. You may feel like the tourist who has just seen 12 cathedrals in five days. But there will be plenty of time in later chapters for reflection and analysis. It is now time to move on and to look briefly at the markets in which the firm's securities are traded and at the financial institutions that hold them.

We have explained that corporations raise money by selling financial assets such as stocks and bonds. This increases the amount of cash held by the company and the amount of stocks and bonds held by the public. These issues are known as *primary issues* that are sold in the **primary market.** But in addition to helping companies to raise cash, financial markets also allow investors to trade stocks or bonds among themselves. For example, Ms. Watanabe might decide to raise some cash by selling her Sony stock at the same time that Mr. Hashimoto invests his savings in Sony. So they make a trade. The result is simply a transfer of ownership from one person to another, which has no effect on the company's cash, assets, or operations. Such purchases and sales are known as *secondary transactions* and they take place in the **secondary market.**

Some financial assets have less active secondary markets than others. For example, when a company borrows money from a bank, the bank acquires a financial asset (the company's promise to repay the loan with interest). Banks do sometimes sell packages of loans to other banks, but generally they retain the loan until it is repaid by the borrower. Other financial assets are regularly traded. Some of these assets, such as shares of stock, are traded on organized exchanges like the New York, London, or Tokyo stock exchanges. In other cases there is no organized exchange, and the assets are traded by a network of dealers. Such markets are known as *over-the-counter (OTC)* markets. For example, most government and corporate bonds are traded OTC.

Some financial markets are not used to raise cash but instead help firms to manage their risks. In these markets firms can buy or sell derivatives, whose payoffs depend on the prices

---

[16] See P. Irvine and J. Rosenfeld, "Raising Capital Using Monthly Income Preferred Stock: Market Reaction and Implications for Capital Structure Theory," *Financial Management* 29 (Summer 2000), pp. 5–20.

[17] *Romeo and Juliet,* Act II, Scene 2.

of other securities or commodities. For example, if a chocolate producer is worried about rising cocoa prices, it can use the derivatives markets to fix the price at which it buys its future cocoa requirements.

## The Financial Crisis of 2007–2009

The financial crisis of 2007–2009[18] raised many questions, but it settled one question conclusively: Yes, financial markets and institutions are important. When financial markets and institutions ceased to operate properly, the world was pushed deeper into a global recession.

For the U.S., the recession was the worst since the Great Depression of the 1930s. But financial crises have hit many other countries. Carmen Reinhart and Kenneth Rogoff examined 18 postwar financial crises in the developed world, several crises in developing economies, and two earlier historical episodes.[19] They found that systemic banking crises are typically preceeded by credit booms and asset price bubbles. The crises result, on average, in a 35% real drop in housing prices spread over a period of six years. Stock prices fall 55% over three and a half years. Output falls by 9% over two years, and unemployment rises 7% over four years. Government debt rises 86% from its precrisis level.

Crises always come as nasty surprises. Perhaps managers, investors, and policymakers ignore the many prior crises. ("Those who cannot remember the past are condemned to repeat it.")[20] Perhaps they believe that their country is different or this time is different.

The crisis of 2007–2009 cannot be blamed on any short list of economic events. We can note a few of the many contributing factors, however. We start with easy-money policies adopted by the U.S. Federal Reserve and other central banks after the collapse of the technology stock bubble in 2000. At the same time, large balance-of-payments surpluses in Asian economies were invested back into U.S. Treasuries and other debt securities. This also contributed to lax credit.

Low interest rates and easy credit helped fuel a dramatic increase in housing prices in the U.S. and several other countries, including the U.K., Ireland, and Spain. Housing prices reached a peak in 2006, but then started to fall.

Many subprime mortgages had been packaged together and resold to banks. As house prices fell, investors became increasingly worried about the losses that these banks were suffering. By August banks had become wary about lending to each other for more than a few days, and central banks were forced to inject massive liquidity. Lenders demanded more and more collateral for what were ordinarily safe, routine transactions.

During the fall of 2007 prices of debt that was backed by subprime mortgages continued to decline. In March 2008, the Federal Reserve bailed out Bear Sterns through an arranged merger with J.P. Morgan. Public money and guarantees were required to induce J.P. Morgan to engage in the transaction.

Although the financial system, particularly banks, came under tremendous pressure during 2008, the real economy was not much affected. That changed in September 2008, when Lehman Brothers was *not* bailed out by the government. Lehman's bankruptcy meant major losses for investors and other financial institutions. More important, the investors and institutions now feared that new risks could be lurking in every balance sheet. Many of those fears were justified. For example, AIG, once an AAA-rated insurance company, turned out to have massive exposure from insuring bonds against default. Bailing out AIG cost the U.S. Treasury about $85 billion.

---

[18] We write this chapter in July 2009. We hope that "2007–2009" is not overly optimistic.

[19] C. Reinhart and K. Rogoff, "The Aftermath of Financial Crises," *American Economic Review* 99 (May 2009), pp. 466–472. Among the 18 postwar crises in developed countries, they put particular emphasis on "the big five" (Spain 1977, Norway 1987, Finland 1991, Sweden 1991, and Japan 1992). The emerging market episodes are the 1997–1998 Asian Crisis (Indonesia, Malaysia, and the Philippines), Colombia 1998, and Argentina 2001. The historical episodes are Norway 1899 and the U.S. 1929.

[20] This maxim appears in many versions. We have quoted the American philosopher George Santayana.

By first quarter of 2009, economic activity in the U.S. and many other countries was declining rapidly. Unemployment rose dramatically. As international trade fell away, export-based economies such as Japan and Germany were hit particularly badly. It was the worst worldwide crisis since the Great Depression.

## The Role of Financial Institutions

We have described some of the consequences when financial institutions don't work as designed. We should say more about how they should work. What functions are they supposed to serve?

Financial institutions act as *financial intermediaries* that gather the savings of many individuals and reinvest them in loans or in the financial markets. For example, banks raise money by taking deposits and by selling debt and common stock to investors. They then lend the money to companies and individuals. Of course banks must charge sufficient interest to cover their costs and to compensate depositors and other investors.

Banks and their immediate relatives, such as savings and loan companies, are the most familiar intermediaries. But there are many others, such as insurance companies and mutual funds. In the United States insurance companies are more important than banks for the *long-term* financing of business. They holds massive investments in corporate stocks and bonds, and they often make long-term loans directly to corporations. Most of the money for these loans comes from the sale of insurance policies. Say you buy a fire insurance policy on your home. You pay cash to the insurance company, which it invests in the financial markets. In exchange you get a financial asset (the insurance policy). You receive no interest on this asset, but if a fire does strike, the company is obliged to cover the damages up to the policy limit. This is the return on your investment. Of course, the company will issue not just one policy but thousands. Normally the incidence of fires averages out, leaving the company with a predictable obligation to its policyholders as a group.

Why are financial intermediaries different from a manufacturing corporation? First, the financial intermediary may raise money in special ways, for example, by taking deposits or by selling insurance policies. Second, the financial intermediary invests in *financial assets,* such as stocks, bonds, or loans to businesses or individuals. By contrast, the manufacturing company's main investments are in *real* assets, such as plant and equipment. Thus the intermediary receives cash flows from its investment in one set of financial assets (stocks, bonds, etc.) and repackages those flows as a different set of financial assets (bank deposits, insurance policies, etc.). The intermediary hopes that investors will find the cash flows on this new package more attractive than those provided by the original security.

Financial intermediaries contribute in many ways to our individual well-being and the smooth functioning of the economy. Here are some examples.

**The Payment Mechanism**    Think how inconvenient life would be if all payments had to be made in cash. Fortunately, checking accounts, credit cards, and electronic transfers allow individuals and firms to send and receive payments quickly and safely over long distances. Banks are the obvious providers of payments services, but they are not alone. For example, if you buy shares in a money-market mutual fund, your money is pooled with that of other investors and is used to buy safe, short-term securities. You can then write checks on this mutual fund investment, just as if you had a bank deposit.

**Borrowing and Lending**    Almost all financial institutions are involved in channeling savings toward those who can best use them. Thus, if Ms. Jones has more money now than she needs and wishes to save for a rainy day, she can put the money in a bank savings deposit. If Mr. Smith wants to buy a car now and pay for it later, he can borrow money from the bank. Both the lender and borrower are happier than if they were forced to spend cash as it arrived. Of course, individuals are not alone in needing to raise cash. Companies with

profitable investment opportunities may wish to borrow from the bank, or they may raise the finance by selling new shares or bonds. Governments also often run at a deficit, which they fund by issuing large quantities of debt.

In principle, individuals or firms with cash surpluses could take out newspaper advertisements or surf the Net looking for those with cash shortages. But it can be cheaper and more convenient to use a financial intermediary, such as a bank, to link up the borrower and lender. For example, banks are equipped to check out the would-be borrower's creditworthiness and to monitor the use of cash lent out. Would you lend money to a stranger contacted over the Internet? You would be safer lending the money to the bank and letting the bank decide what to do with it.

Notice that banks promise their checking account customers instant access to their money and at the same time make long-term loans to companies and individuals. This mismatch between the liquidity of the bank's liabilities (the deposits) and most of its assets (the loans) is possible only because the number of depositors is sufficiently large that the bank can be fairly sure that they will not all want to withdraw their money simultaneously.

**Pooling Risk**    Financial markets and institutions allow firms and individuals to pool their risks. For instance, insurance companies make it possible to share the risk of an automobile accident or a household fire. Here is another example. Suppose that you have only a small sum to invest. You could buy the stock of a single company, but then you would be wiped out if that company went belly-up. It is generally better to buy shares in a mutual fund that invests in a diversified portfolio of common stocks or other securities. In this case you are exposed only to the risk that security prices as a whole will fall.

The basic functions of financial markets are the same the world over. So it is not surprising that similar institutions have emerged to perform these functions. In almost every country you will find banks accepting deposits, making loans, and looking after the payments system. You will also encounter insurance companies offering life insurance and protection against accident. If the country is relatively prosperous, other institutions, such as pension funds and mutual funds, will also have been established to help manage people's savings.

Of course there are differences in institutional structure. Take banks, for example. In many countries where securities markets are relatively undeveloped, banks play a much more dominant role in financing industry. Often the banks undertake a wider range of activities than they do in the United States. For example, they may take large equity stakes in industrial companies; this would not generally be allowed in the United States.

● ● ● ● ●

Financial managers are faced with two broad financing decisions:                **SUMMARY**

1. How much of internally generated cash flow should be plowed back into the business? How much should be paid out to shareholders by cash dividends or share repurchases?
2. To what extent should the firm use debt rather than equity financing?

The answers to these questions depend on the firm's payout policy and debt policy.

Figure 14.1 summarizes how U.S. corporations raise and spend money. Have another look at it and try to get a feel for the numbers. Notice that internally generated cash is the major source of financing for investment. Borrowing is also significant. Net equity issues have been negative, however—that is, share repurchases have been larger than share issues.

Common stock is the simplest form of finance. The common stockholders own the corporation. They get all of the cash flow and assets that are left over after the firm's debts have been paid. Common stock is therefore a residual claim that participates in the upsides and downsides


Visit us at www.mhhe.com/bma

of the business. Debt has first claim on cash flows, but its claim is limited. Debt has no control rights unless the firm defaults or violates debt covenants.

Preferred stock is another form of equity financing. Preferreds promise a fixed dividend, but if the board of directors decides to skip the dividend, holders of the preferred have no recourse. The firm must pay the preferred dividends before it pays any dividends on common stock, however.

Debt is the most important source of external financing. Holders of bonds and other corporate debt are promised interest payments and return of principal. If the company cannot make these payments, the debt investors can sue for payment or force bankruptcy. Bankruptcy usually means that the debt holders take over and either sell the company's assets or continue to operate them under new management.

Note that the tax authorities treat interest payments as a cost and therefore the company can deduct interest when calculating its taxable income. Interest is paid from pretax income, whereas dividends and retained earnings come from after-tax income. That is one reason why preferred stock is a less important source of financing than debt. Preferred dividends are not tax-deductible.

Book debt ratios in the United States have generally increased over the post–World War II period. However, they are not appreciably higher than the ratios in the other major industrialized countries.

The variety of debt instruments is almost endless. The instruments differ by maturity, interest rate (fixed or floating), currency, seniority, security, and whether the debt can be converted into equity.

The majority of the firm's debt and equity is owned by financial institutions—notably banks, insurance companies, pension funds, and mutual funds. The crisis of 2007–2009 dramatized the crucial role that these institutions play. They finance much of corporate investment, as well as investment in real estate and other assets. They run the payments mechanism, help individuals diversify and manage their portfolios, and help companies manage risk.

● ● ● ● ●

**FURTHER READING**

*A useful article for comparing financial structure in the United States and other major industrial countries is:*

R. G. Rajan and L. Zingales, "What Do We Know about Capital Structure? Some Evidence from International Data," *Journal of Finance* 50 (December 1995), pp. 1421–1460.

*For a discussion of the allocation of control rights and cash-flow rights between stockholders and debt holders, see:*

O. Hart, *Firms, Contracts, and Financial Structure* (Oxford: Oxford University Press, 1995).

*Robert Merton gives an excellent overview of the functions of financial institutions in:*

R. Merton, "A Functional Perspective of Financial Intermediation," *Financial Management* 24 (Summer 1995), 23–41.

*The Winter 2009 issue of the* Journal of Financial Perspectives *contains several articles on the crisis of 2007–2009. See also:*

V. V. Acharya and M. W. Richardson, eds., *Restoring Financial Stability* (Hoboken, NJ: John Wiley & Sons, 2009).

*The following works cover financial crises more generally:*

F. Allen and D. Gale, *Understanding Financial Crises* (Oxford: Oxford University Press, 2007).

C. Reinhart and K. Rogoff, "The Aftermath of Financial Crises," *American Economic Review* 99 (May 2009), pp. 466–472.

C. M. Reinhart and K. Rogoff, *This Time Is Different: Eight Centuries of Financial Folly* (Princeton: Princeton University Press, 2009).

 **connect**™

Select problems are available in McGraw-Hill Connect.
Please see the preface for more information.

**BASIC**

1. *True* or *false?*

   a. Net stock issues by U.S. nonfinancial corporations are in most years small but positive.

   b. Most capital investment by U.S. companies is funded by retained earnings and reinvested depreciation.

   c. Debt ratios in the U.S. have generally increased over the past 50 years.

2. The authorized share capital of the Alfred Cake Company is 100,000 shares. The equity is currently shown in the company's books as follows:

   | | |
   |---|---:|
   | Common stock ($.50 par value) | $40,000 |
   | Additional paid-in capital | 10,000 |
   | Retained earnings | 30,000 |
   | Common equity | 80,000 |
   | Treasury stock (2,000 shares) | 5,000 |
   | Net common equity | $75,000 |

   a. How many shares are issued?

   b. How many are outstanding?

   c. Explain the difference between your answers to (a) and (b).

   d. How many more shares can be issued without the approval of shareholders?

   e. Suppose that Alfred Cake issues 10,000 shares at $2 a share. Which of the above figures would be changed?

   f. Suppose instead that the company bought back 5,000 shares at $5 a share. Which of the above figures would be changed?

3. There are 10 directors to be elected. A shareholder owns 80 shares. What is the maximum number of votes that he or she can cast for a favorite candidate under (a) majority voting? (b) cumulative voting?

4. Fill in the blanks, using the following terms: floating rate, common stock, convertible, subordinated, preferred stock, senior, warrant.

   a. If a lender ranks behind the firm's general creditors in the event of default, his or her loan is said to be _____.

   b. Interest on many bank loans is based on a _____ of interest.

   c. A(n) _____ bond can be exchanged for shares of the issuing corporation.

   d. A(n) _____ gives its owner the right to buy shares in the issuing company at a predetermined price.

   e. Dividends on _____ cannot be paid unless the firm has also paid any dividends on its _____.

5. True or false?

   a. In the United States, most common shares are owned by individual investors.

   b. An insurance company is a financial intermediary.

   c. Investments in partnerships cannot be publicly traded.

Visit us at www.mhhe.com/bma

## INTERMEDIATE

6. In 2008 Pfizer had 12,000 million shares of common stock authorized, 8,863 million in issue, and 6,746 million outstanding (figures rounded to the nearest million). Its equity account was as follows:

| | |
|---|---|
| Common stock | $ 443 |
| Additional paid-in capital | 70,283 |
| Retained earnings | 44,148 |
| Treasury shares | (57,391) |

  a. What was the par value of each share?

  b. What was the average price at which shares were sold?

  c. How many shares had been repurchased?

  d. What was the average price at which the shares were repurchased?

  e. What was the net book value of Pfizer's common equity?

7. Inbox Software was founded in 2007. Its founder put up $2 million for 500,000 shares of common stock. Each share had a par value of $.10.

  a. Construct an equity account (like the one in Table 14.2) for Inbox on the day after its founding. Ignore any legal or administrative costs of setting up the company.

  b. After two years of operation, Inbox generated earnings of $120,000 and paid no dividends. What was the equity account at this point?

  c. After three years the company sold 1 million additional shares for $5 per share. It earned $250,000 during the year and paid no dividends. What was the equity account?

8. Look back at Table 14.2.

  a. Suppose that Honeywell issued an additional 50 million shares at $30 a share. Rework Table 14.2 to show the company's equity after the issue.

  b. Suppose that Honeywell *subsequently* repurchased 20 million shares at $35 a share. Rework Table 14.2 to show the effect of this further change.

9. Suppose that East Corporation has issued voting and nonvoting stock. Investors hope that holders of the voting stock will use their power to vote out the company's incompetent management. Would you expect the voting stock to sell for a higher price? Explain.

10. In 2007 Beta Corporation earned gross profits of $760,000.

  a. Suppose that it is financed by a combination of common stock and $1 million of debt. The interest rate on the debt is 10%, and the corporate tax rate is 35%. How much profit is available for common stockholders after payment of interest and corporate taxes?

  b. Now suppose that instead of issuing debt Beta is financed by a combination of common stock and $1 million of preferred stock. The dividend yield on the preferred is 8% and the corporate tax rate is still 35%. How much profit is now available for common stockholders after payment of preferred dividends and corporate taxes?

11. Look up the financial statements for a U.S. corporation on the Internet and construct a table like Table 14.3 showing the types of debt that the company has issued. What arrangements has it made that would allow it to borrow more in the future? (*Hint:* You will need to look at the notes to the accounts to answer this.)

12. Which of the following features would increase the value of a corporate bond? Which would reduce its value?

  a. The borrower has the option to repay the loan before maturity.

  b. The bond is convertible into shares.

c. The bond is secured by a mortgage on real estate.

d. The bond is subordinated.

13. Construct a time line of the important events in the financial crisis that started in the summer of 2007. When do you think the crisis ended? You will probably want to review some of the entries under Further Reading before you answer.

14. We mention several causes of the financial crisis. What other causes can you identify? You will probably want to review some of the entries under Further Reading before you answer.

## CHALLENGE

15. The shareholders of the Pickwick Paper Company need to elect five directors. There are 200,000 shares outstanding. How many shares do you need to own to *ensure* that you can elect at least one director if (a) the company has majority voting? (b) it has cumulative voting?



**REAL-TIME
DATA ANALYSIS**



1. Use data from the Standard & Poor's market insight database at **www.mhhe.com/edumarketinsight** to work out the financing proportions given in Figure 14.1 for a particular industrial company for some recent year.

2. The Web site **www.federalreserve.gov/releases/z1/current/default.htm** provides data on sources of funds and an aggregate balance sheet for nonfarm nonfinancial corporations. Look at Table F.102 for the latest year. What proportion of the cash that companies needed was generated internally and how much had to be raised on the financial markets? Is this the usual pattern? Now look at "new equity issues." Were companies on average issuing new equity or buying their shares back?

3. An aggregate balance sheet for U.S. manufacturing corporations can be found on **www.census.gov/econ/qfr.** Find the balance sheet for the latest year. What was the ratio of long-term debt to long-term debt plus equity? What about the ratio of all long-term liabilities to long-term liabilities plus equity?

# How Corporations Issue Securities

▶ **In Chapter 11** we encountered Marvin Enterprises, one of the most remarkable growth companies of the twenty-first century. It was founded by George and Mildred Marvin, two high-school dropouts, together with their chum Charles P. (Chip) Norton. To get the company off the ground the three entrepreneurs relied on their own savings together with personal loans from a bank. However, the company's rapid growth meant that they had soon borrowed to the hilt and needed more equity capital. Equity investment in young private companies is generally known as *venture capital.* Such venture capital may be provided by investment institutions or by wealthy individuals who are prepared to back an untried company in return for a piece of the action. In the first part of this chapter we will explain how companies like Marvin go about raising venture capital.

Venture capital organizations aim to help growing firms over that awkward adolescent period before they are large enough to go public. For a successful firm such as Marvin, there is likely to come a time when it needs to tap a wider source of capital and therefore decides to make its first public issue of common stock. The next section of the chapter describes what is involved in such an issue in the United States. We explain the process for registering the offering with the Securities and Exchange Commission and we introduce you to the underwriters who buy the issue and resell it to the public. We also see that new issues are generally sold below the price at which they subsequently trade. To understand why that is so, we need to make a brief sortie into the field of auction procedures.

A company's first issue of stock is seldom its last. In Chapter 14 we saw that corporations face a persistent financial deficit that they meet by selling securities. We therefore look at how established corporations go about raising more capital. In the process we encounter another puzzle: When companies announce a new issue of stock, the stock price generally falls. We suggest that the explanation lies in the information that investors read into the announcement.

If a stock or bond is sold publicly, it can then be traded on the securities markets. But sometimes investors intend to hold on to their securities and are not concerned about whether they can sell them. In these cases there is little advantage to a public issue, and the firm may prefer to place the securities directly with one or two financial institutions. At the end of this chapter we explain how companies arrange a private placement.

● ● ● ● ●

## 15-1 Venture Capital

On April 1, 2022, George and Mildred Marvin met with Chip Norton in their research lab (which also doubled as a bicycle shed) to celebrate the incorporation of Marvin Enterprises. The three entrepreneurs had raised $100,000 from savings and personal bank loans and had purchased one million shares in the new company. At this *zero-stage* investment, the company's assets were $90,000 in the bank ($10,000 had been spent for legal and other expenses

of setting up the company), plus the *idea* for a new product, the household gargle blaster. George Marvin was the first to see that the gargle blaster, up to that point an expensive curiosity, could be commercially produced using microgenetic refenestrators.

Marvin Enterprises' bank account steadily drained away as design and testing proceeded. Local banks did not see Marvin's idea as adequate collateral, so a transfusion of equity capital was clearly needed. Preparation of a *business plan* was a necessary first step. The plan was a confidential document describing the proposed product, its potential market, the underlying technology, and the resources (time, money, employees, and plant and equipment) needed for success.

Most entrepreneurs are able to spin a plausible yarn about their company. But it is as hard to convince a venture capitalist that your business plan is sound as to get a first novel published. Marvin's managers were able to point to the fact that they were prepared to put their money where their mouths were. Not only had they staked all their savings in the company but they were mortgaged to the hilt. This *signaled* their faith in the business.

First Meriam Venture Partners was impressed with Marvin's presentation and agreed to buy one million new shares for $1 each. After this *first-stage* financing, the company's market-value balance sheet looked like this:

**Marvin Enterprises' First-Stage Balance Sheet (Market Values in $ Millions)**

| | | | |
|---|---|---|---|
| Cash from new equity | $1 | $1 | New equity from venture capital |
| Other assets, mostly intangible | 1 | 1 | Original equity held by entrepreneurs |
| Value | $2 | $2 | Value |

By agreeing to pay $1 a share for Marvin's stock, First Meriam placed a value of $1 million on the entrepreneurs' original shareholdings. This was First Meriam's estimate of the value of the entrepreneurs' original idea and their commitment to the enterprise. If the estimate was right, the entrepreneurs could congratulate themselves on a $900,000 paper gain over their original $100,000 investment. In exchange, the entrepreneurs gave up half their company and accepted First Meriam's representatives to the board of directors.[1]

The success of a new business depends critically on the effort put in by the managers. Therefore venture capital firms try to structure a deal so that management has a strong incentive to work hard. That takes us back to Chapters 1 and 12, where we showed how the shareholders of a firm (who are the principals) need to provide incentives for the managers (who are their agents) to work to maximize firm value.

If Marvin's management had demanded watertight employment contracts and fat salaries, they would not have found it easy to raise venture capital. Instead the Marvin team agreed to put up with modest salaries. They could cash in only from appreciation of their stock. If Marvin failed they would get nothing, because First Meriam actually bought *preferred* stock designed to convert automatically into common stock when and if Marvin Enterprises succeeded in an initial public offering or consistently generated more than a target level of earnings. But if Marvin Enterprises had failed, First Meriam would have been first in line to claim any salvageable assets. This raised even further the stakes for the company's management.[2]

Venture capitalists rarely give a young company up front all the money it will need. At each stage they give enough to reach the next major checkpoint. Thus in spring 2024,

---

[1] Venture capital investors do not necessarily demand a majority on the board of directors. Whether they do depends, for example, on how mature the business is and on what fraction they own. A common compromise gives an equal number of seats to the founders and to outside investors; the two parties then agree to one or more additional directors to serve as tie-breakers in case a conflict arises. Regardless of whether they have a majority of directors, venture capital companies are seldom silent partners; their judgment and contacts can often prove useful to a relatively inexperienced management team.

[2] Notice the trade-off here. Marvin's management is being asked to put all its eggs into one basket. That creates pressure for managers to work hard, but it also means that they take on risk that could have been diversified away.

having designed and tested a prototype, Marvin Enterprises was back asking for more money for pilot production and test marketing. Its *second-stage* financing was $4 million, of which $1.5 million came from First Meriam, its original backers, and $2.5 million came from two other venture capital partnerships and wealthy individual investors. The balance sheet just after the second stage was as follows:

**Marvin Enterprises' Second-Stage Balance Sheet (Market Values in $ Millions)**

| | | | |
|---|---|---|---|
| Cash from new equity | $4 | $4 | New equity, second stage |
| Fixed assets | 1 | 5 | Equity from first stage |
| Other assets, mostly intangible | 9 | 5 | Original equity held by entrepreneurs |
| Value | $14 | $14 | Value |

Now the after-the-money valuation was $14 million. First Meriam marked up its original investment to $5 million, and the founders noted an additional $4 million paper gain.

Does this begin to sound like a (paper) money machine? It was so only with hindsight. At stage 1 it wasn't clear whether Marvin would ever get to stage 2; if the prototype hadn't worked, First Meriam could have refused to put up more funds and effectively closed down the business.[3] Or it could have advanced stage 2 money in a smaller amount on less favorable terms. The board of directors could also have fired George, Mildred, and Chip and gotten someone else to try to develop the business.

In Chapter 14 we pointed out that stockholders and lenders differ in their cash-flow rights and control rights. The stockholders are entitled to whatever cash flows remain after paying off the other security holders. They also have control over how the company uses its money, and it is only if the company defaults that the lenders can step in and take control of the company. When a new business raises venture capital, these cash-flow rights and control rights are usually negotiated separately. The venture capital firm will want a say in how that business is run and will demand representation on the board and a significant number of votes. The venture capitalist may agree that it will relinquish some of these rights if the business subsequently performs well. However, if performance turns out to be poor, the venture capitalist may automatically get a greater say in how the business is run and whether the existing management should be replaced.

For Marvin, fortunately, everything went like clockwork. Third-stage *mezzanine financing* was arranged,[4] full-scale production began on schedule, and gargle blasters were acclaimed by music critics worldwide. Marvin Enterprises went public on February 3, 2028. Once its shares were traded, the paper gains earned by First Meriam and the company's founders turned into fungible wealth. Before we go on to this initial public offering, let us look briefly at the venture capital markets today.

## The Venture Capital Market

Most new companies rely initially on family funds and bank loans. Some of them continue to grow with the aid of equity investment provided by wealthy individuals known as *angel investors*. However, like Marvin, many adolescent companies raise capital from specialist venture-capital firms, which pool funds from a variety of investors, seek out fledgling companies to invest in, and then work with these companies as they try to grow. In addition, some large technology firms, such as Intel and Johnson & Johnson, act as *corporate venturers* by providing equity capital to new innovative companies.

---

[3] If First Meriam had refused to invest at stage 2, it would have been an exceptionally hard sell convincing another investor to step in in its place. The other outside investors knew they had less information about Marvin than First Meriam and would have read its refusal as a bad omen for Marvin's prospects.

[4] Mezzanine financing does not necessarily come in the third stage; there may be four or five stages. The point is that mezzanine investors come in late, in contrast to venture capitalists who get in on the ground floor.



▶ **FIGURE 15.1**

Venture capital invest-
ment in the United
States.

*Sources:* Pricewater-
houseCoopers/Venture
Economics/National
Venture Capital Association
Money Tree™. (See **www.
pwcmoneytree.com**). © 2009
PricewaterhouseCoopers. All
rights reserved.

Figure 15.1 shows the changing level of venture capital investment. During the giddy days of 2000 funds invested over $100 billion, but with the end of the dot.com boom, venture capital investment slumped.

Most venture capital funds are organized as limited private partnerships with a fixed life of about 10 years. Pension funds and other investors are the limited partners. The management company, which is the general partner, is responsible for making and overseeing the investments, and in return receives a fixed fee and a share of the profits, called the *carried interest.*[5] You will find that these venture capital partnerships are often lumped together with similar partnerships that provide funds for companies in distress or that buy out whole companies or divisions of public companies and then take them private. The general term for these activities is *private equity investing.*

Venture capital firms are not passive investors. They tend to specialize in young high-tech firms that are difficult to evaluate and they monitor these firms closely. They also provide ongoing advice to the firms that they invest in and often play a major role in recruiting the senior management team. Their judgment and contacts can be valuable to a business in its early years and can help the firm to bring its products more quickly to market.[6]

Venture capitalists may cash in on their investment in two ways. Generally, once the new business has established a track record, it may be sold out to a larger firm. However, many entrepreneurs do not fit easily into a corporate bureaucracy and would prefer instead to remain the boss. In this case, the company may decide, like Marvin, to go public and so provide the original backers with an opportunity to "cash out," selling their stock and leaving the original entrepreneurs in control. A thriving venture capital market therefore needs an active stock exchange, such as Nasdaq, that specializes in trading the shares of young, rapidly growing firms.[7]

During the late 1990s the venture capital market in Europe was helped by the formation of new European stock exchanges that modeled themselves on Nasdaq and specialized in trading the stocks of young fast-growing firms. In three years the Neuer Markt exchange in Frankfurt listed over 300 new companies, more than half of which were backed by venture

---

[5] A typical arrangement might be for the management company to receive a fee of 2% *plus* 20% of the profits.

[6] For evidence on the role of venture capitalists in assisting new businesses, see T. Hellman and M. Puri, "The Interaction between Product Market and Financial Strategy: The Role of Venture Capital," *Review of Financial Studies* 13 (2000), pp. 959–984; and S. N. Kaplan and P. Stromberg, "Contracts, Characteristics and Actions: Evidence from Venture Capitalist Analyses," *Journal of Finance* 59 (October 2004), pp. 2177–2210.

[7] This argument is developed in B. Black and R. Gilson, "Venture Capital and the Structure of Capital Markets: Banks versus Stock Markets," *Journal of Financial Economics* 47 (March 1998), pp. 243–277.

capital firms. But then the exchange was hit by scandal as one high-tech firm, Comroad, revealed that most of its claimed $94 million of revenue was fictitious. As the dot.com boom fizzled out, stock prices on the Neuer Markt fell by 95% and the exchange was finally closed down.

Very few new businesses make it big, but venture capitalists keep sane by forgetting about the many failures and reminding themselves of the success stories—the investors who got in on the ground floor of firms like Federal Express, Genentech, and Intel. For every 10 first-stage venture capital investments, only two or three may survive as successful, self-sufficient businesses. From these statistics come two rules for success in venture capital investment. First, don't shy away from uncertainty; accept a low probability of success. But don't buy into a business unless you can see the *chance* of a big, public company in a profitable market. There's no sense taking a long shot unless it pays off handsomely if you win. Second, cut your losses; identify losers early, and if you can't fix the problem—by replacing management, for example—throw no good money after bad.

How successful is venture capital investment? Since you can't look up the value of new start-up businesses in *The Wall Street Journal,* it is difficult to say with confidence. However, *Venture Economics,* which tracks the performance of a large sample of venture capital funds, calculated that in the 20 years to the end of 2008 investors in these funds would have earned an average annual return of 17% after expenses.[8] That is nearly 10% more a year than they would have earned from investing in the stocks of large public corporations. We do not know whether this compensates for the extra risks of investing in venture capital.

## 15-2   The Initial Public Offering

There comes a stage in the life of many young companies when they decide to make an **initial public offering** of stock, or **IPO.** This may be a *primary* offering, in which new shares are sold to raise additional cash for the company. Or it may be a *secondary* offering, where the existing shareholders decide to cash in by selling part of their holdings.

Secondary offerings are not confined to small, immature businesses. For example, in 1998 Du Pont sold off a large part of its holding in Conoco for $4.4 billion. The biggest secondary offerings occur when governments sell their shareholdings in companies. For example, the British government raised $9 billion from its sale of British Gas stock, while the 1985 initial offering by the Japanese government of a 12.5% stake in NTT brought in $15 billion. Even these two issues were dwarfed by the 2006 IPO of the state-owned Industrial and Commercial Bank of China, which raised $22 billion.

We have seen that companies may make an IPO to raise new capital or to enable shareholders to cash out, but, as you can see from Figure 15.2, there may be other benefits to going public. For example, the company's stock price provides a readily available yardstick of performance, and allows the firm to reward the management team with stock options. And, because information about the company becomes more widely available, the company can diversify its sources of finance and reduce its borrowing cost.

While there are advantages to having a market for your shares, we should not give the impression that firms everywhere aim to go public. In many countries it is common for large businesses to remain privately owned. For example, Italy has only about a tenth as many listed companies as the U.K. although the economies are roughly similar in size.

Even in the United States many businesses choose to remain as private, unlisted companies. They include some very large operations, such as Bechtel, Cargill, and Levi Strauss. Also you should not think of the issue process in the United States as a one-way street;

---

[8] Gompers and Lerner, who studied the period 1979–1997, found somewhat higher returns. P. A. Gompers and J. Lerner, "Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity,* Winter 1997, pp. 5–12.



**FIGURE 15.2**

Survey evidence on the motives for going public.

*Source:* J. C. Brau and S. E. Fawcett, "Evidence on What CFOs Think about the IPO Process: Practice, Theory and Managerial Implications," *Journal of Applied Corporate Finance* 18 (Summer 2006), pp. 107–117. © 2006 Blackwell Publishers.

public firms often go into reverse and return to being privately owned. For a somewhat extreme example, consider the food service company, Aramark. It began life in 1936 as a private company and went public in 1960. In 1984 a management buyout led to the company going private and it remained private until 2001, when it had its second public offering. But the experiment did not last long, for five years later Aramark was once again the object of a buyout that took the company private again.

Managers often chafe at the red tape involved in running a public company and at the costs of communicating with shareholders. These complaints have become more vocal since the passage of the Sarbanes-Oxley Act. This act sought to prevent a repeat of the corporate scandals that brought about the collapse of Enron and WorldCom, but, as the nearby box suggests, a consequence has been an increased reporting burden on small public companies and an apparent increase in their readiness to go private.[9]

## Arranging an Initial Public Offering

Let us now look at how Marvin arranged to go public. By 2028 the company had grown to the point at which it needed still more capital to implement its second-generation production technology. At the same time the company's founders were looking to sell some of their shares.[10] In the previous few months there had been a spate of IPOs by high-tech companies and the shares had generally sold like hotcakes. So Marvin's management hoped that investors would be equally keen to buy the company's stock.

---

[9] There has also been an increase in the number of firms that have reduced the regulatory and reporting burden by "going dark." In this case the company must have less than 300 shareholders and must not be listed on a public exchange.

[10] First Meriam also wanted to cash in on its investment, but venture capital companies usually believe that selling out at the time of the IPO would send a bad signal to investors. Therefore First Meriam planned to wait until well after the IPO and then either sell its holding or distribute its shares in Marvin to the investors in the First Meriam fund.

# FINANCE IN THE NEWS

## The Urge to Go Private

❧ Recent years have seen a boom in U.S. companies choosing to go private. The following passage from *The Wall Street Journal* argues that the boom was accentuated by more burdensome regulation of public companies:

At least part of the strength of private equity is a direct result of the problems besetting public markets. Public-to-private deals are in fact lengthy, costly and can lead to unpleasantness with shareholders—often via lawsuits. The fact that so many companies have nonetheless been willing to take the plunge speaks volumes about how eager they are to escape the increasing burdens of public-company regulation.

Sarbanes-Oxley has been the last straw for some, with its auditing and reporting requirements imposing major new costs, especially on smaller companies. The Securities and Exchange Commission is promising Sarbox reform, though its recent noises suggest it won't exempt smaller companies from the rules. It might want to consider International Strategy & Investment Group data showing that 191 public companies—worth $146 billion in deal value—have gone private since June 30, 2002, shortly before Sarbox went into effect. Daniel Clifton, executive director of the American Shareholders Association, notes that the big spike came right after Sarbox's implementation, yet the dollar amount of the deals didn't rise equivalently—suggesting it was mainly smaller firms doing the exiting.

Mr. Clifton has also been studying the surging costs of regulation for public companies and has found that, while in 1999 regulatory costs were about 4.8% of market capitalization, by 2002 the ratio was 9.9%. It has fallen some since. But these costs are a double whammy for smaller companies, which have fewer resources to devote to compliance costs and "it is also money that they can't use for the investments that they need make grow," says Mr. Clifton.

The relentless pressure of quarterly earnings is also a tyranny that some managers would prefer to avoid. Such targets have their uses in holding managers accountable. But even capable executives who fail to meet Wall Street expectations, or suffer an unexpected bump in the road, have to worry that they'll get hit with shareholder suits for even a temporary stock price dip. It may not be a coincidence that, according to a recent survey from Booz Allen Hamilton, 15.3% of CEOs at the world's 2,500 largest public companies left office in 2005, many of them fleeing to private companies that can afford the luxury of a longer-run view.*

*"Hot Topic: Going Private," *The Wall Street Journal*, June 3, 2006, p. A.7. © 2006 Dow Jones & Company, Inc.

Management's first task was to select the *underwriters*. Underwriters act as financial midwives to a new issue. Usually they play a triple role: First they provide the company with procedural and financial advice, then they buy the issue, and finally they resell it to the public.

After some discussion Marvin settled on Klein Merrick as the managing underwriter and Goldman Stanley as the comanager. Klein Merrick then formed a syndicate of underwriters who would buy the entire issue and reoffer it to the public.

In choosing Klein Merrick to manage its IPO, Marvin was influenced by Merrick's proposals for making an active market in the stock in the weeks after the issue.[11] Merrick also planned to generate continuing investor interest in the stock by distributing a major research report on Marvin's prospects.[12] Marvin hoped that this report would encourage investors to hold its stock.

---

[11] On average the managing underwriter accounts for 40% to 60% of trading volume in the stock during the first 60 days after an IPO. See K. Ellis, R. Michaely, and M. O'Hara, "When the Underwriter Is the Market Maker: An Examination of Trading in the IPO Aftermarket," *Journal of Finance* 55 (June 2000), pp. 1039–1074.

[12] The 40 days after the offer are designated as a *quiet period*. Merrick is obliged to wait until after this period before commenting on the valuation of the company. Survey evidence suggests that, in choosing an underwriter, firms place considerable importance on its ability to provide follow-up research reports. See L. Krigman, W. H. Shaw, and K. L. Womack, "Why Do Firms Switch Underwriters?" *Journal of Financial Economics* 60 (May–June 2001), pp. 245–284.

Together with Klein Merrick and firms of lawyers and accountants, Marvin prepared a **registration statement** for the approval of the Securities and Exchange Commission (SEC).[13] This statement is a detailed and somewhat cumbersome document that presents information about the proposed financing and the firm's history, existing business, and plans for the future.

The most important sections of the registration statement are distributed to investors in the form of a **prospectus.** In the appendix to this chapter we have reproduced the prospectus for Marvin's first public issue of stock. Real prospectuses would go into much more detail on each topic, but this example should give you some feel for the mixture of valuable information and redundant qualification that characterizes these documents. The Marvin prospectus also illustrates how the SEC insists that investors' eyes are opened to the dangers of purchase (see "Certain Considerations" of the prospectus). Some investors have joked that if they read each prospectus carefully, they would not dare buy any new issue.

In addition to registering the issue with the SEC, Marvin needed to check that the issue complied with the so-called *blue-sky laws* of each state that regulate sales of securities within the state.[14] It also arranged for its newly issued shares to be traded on the Nasdaq exchange.

## The Sale of Marvin Stock

While the registration statement was awaiting approval, Marvin and its underwriters began to firm up the issue price. First they looked at the price–earnings ratios of the shares of Marvin's principal competitors. Then they worked through a number of discounted-cash-flow calculations like the ones we described in Chapters 4 and 11. Most of the evidence pointed to a market price in the region of $74 to $76 a share and the company therefore included this provisional figure in the preliminary version of the prospectus.[15]

Marvin and Klein Merrick arranged a *road show* to talk to potential investors. Mostly these were institutional investors, such as managers of mutual funds and pension funds. The investors gave their reactions to the issue and indicated to the underwriters how much stock they wished to buy. Some stated the maximum price that they were prepared to pay, but others said that they just wanted to invest so many dollars in Marvin at whatever issue price was chosen. These discussions with fund managers allowed Klein Merrick to build up a book of potential orders.[16] Although the managers were not bound by their responses, they knew that, if they wanted to keep in the underwriters' good books, they should be careful not to go back on their expressions of interest. The underwriters also were not obliged to treat all investors equally. Some investors who were keen to buy Marvin stock were disappointed in the allotment that they subsequently received.

Immediately after it received clearance from the SEC, Marvin and the underwriters met to fix the issue price. Investors had been enthusiastic about the story that the company had to tell and it was clear that they were prepared to pay more than $76 for the stock. Marvin's managers were tempted to go for the highest possible price, but the underwriters were more cautious. Not only would they be left with any unsold stock if they overestimated investor demand but they also argued that some degree of underpricing was needed to tempt

---

[13] The rules governing the sale of securities derive principally from the Securities Act of 1933. The SEC is concerned solely with disclosure and it has no power to prevent an issue as long as there has been proper disclosure. Some public issues are exempt from registration. These include issues by small businesses and loans maturing within nine months.

[14] In 1980, when Apple Computer Inc. went public, the Massachusetts state government decided the offering was too risky and barred the sale of the shares to individual investors in the state. The state relented later after the issue was out and the price had risen. Needless to say, this action was not acclaimed by Massachusetts investors.

States do not usually reject security issues by honest firms through established underwriters. We cite the example to illustrate the potential power of state securities laws and to show why underwriters keep careful track of them.

[15] The company is allowed to circulate a preliminary version of the prospectus (known as a *red herring*) before the SEC has approved the registration statement.

[16] The managing underwriter is therefore often known as the *bookrunner.*

investors to buy the stock. Marvin and the underwriters therefore compromised on an issue price of $80. Potential investors were encouraged by the fact that the offer price was higher than the $74 to $76 proposed in the preliminary prospectus and decided that the underwriters must have encountered considerable enthusiasm for the issue.

Although Marvin's underwriters were committed to buy only 900,000 shares from the company, they chose to sell 1,035,000 shares to investors. This left the underwriters short of 135,000 shares or 15% of the issue. If Marvin's stock had proved unpopular with investors and traded below the issue price, the underwriters could have bought back these shares in the marketplace. This would have helped to stabilize the price and would have given the underwriters a profit on these extra shares that they sold. As it turned out, investors fell over themselves to buy Marvin stock and by the end of the first day the stock was trading at $105. The underwriters would have incurred a heavy loss if they had been obliged to buy back the shares at $105. However, Marvin had provided underwriters with a *greenshoe* option that allowed them to buy an additional 135,000 shares from the company. This ensured that the underwriters were able to sell the extra shares to investors without fear of loss.

### The Underwriters

Marvin's underwriters were prepared to enter into a firm commitment to buy the stock and then offer it to the public. Thus they took the risk that the issue might flop and they would be left with unwanted stock. Occasionally, where the sale of common stock is regarded as particularly risky, the underwriters may be prepared to handle the sale only on a best-efforts basis. In this case the underwriters promise to sell as much of the issue as possible but do not guarantee to sell the entire amount.[17]

Successful underwriting requires financial muscle and considerable experience. The names of Marvin's underwriters are of course fictitious, but Table 15.1 shows that underwriting is dominated by the major investment banks and large commercial banks. Foreign players are also heavily involved in underwriting securities that are sold internationally.

Underwriting is not always fun. In April 2008 the British bank, HBOS, offered its shareholders two new shares at a price of £2.75 for each five shares that they currently held.[18] The underwriters to the issue, Morgan Stanley and Dresdner Kleinwort, guaranteed that at the end of eight weeks they would buy any new shares that the stockholders did not want. At the time of the offer HBOS shares were priced at about £5, so the underwriters felt confident that they would not have to honor their pledge. Unfortunately, they reckoned without the turbulent market in bank shares that year. The bank's shareholders worried that the money they were asked to provide would largely go to bailing out the bondholders and depositors. By the end of the eight weeks the price of HBOS stock had slumped below the issue price, and the underwriters were left with 932 million unwanted shares worth £3.6 billion.

Companies get to make only one IPO, but underwriters are in the business all the time. Wise underwriters, therefore, realize that their reputation is on the line and will not handle an issue unless they believe the facts have been presented fairly to investors. So, when a new issue goes wrong, the underwriters may be blamed for overhyping the issue and failing in their "due diligence." For example, in December 1999 the software company Va Linux went public at $30 a share. The next day trading opened at $299 a share, but then the price began to sag. Within two years it had fallen below $2. Disgruntled Va Linux investors sued the underwriters, complaining that the prospectus was "materially false." These underwriters

---

[17] The alternative is to enter into an *all-or-none* arrangement. In this case, either the entire issue is sold at the offering price or the deal is called off and the issuing company receives nothing.

[18] This arrangement is known as a *rights issue*. We describe rights issues later in the chapter.

| | Value of Issues ($ billions) | Number of Issues |
|---|---|---|
| J.P. Morgan | $455 | 1,210 |
| Barclays Capital | 401 | 1,041 |
| Citigroup | 309 | 986 |
| Deutsche Bank | 309 | 807 |
| Merrill Lynch | 241 | 852 |
| Goldman Sachs | 228 | 584 |
| Morgan Stanley | 220 | 661 |
| RBS | 214 | 712 |
| Credit Suisse | 205 | 682 |
| UBS | 204 | 867 |

▶ **TABLE 15.1**

The top managing underwriters, January–December 2008. Values include global debt and equity issues.

*Source:* Thomson Reuters (**www.thomsonreuters.com**). © 2008 Thomson Reuters.

had plenty of company, for following the collapse of the dot.com stocks in 2000, investors in many other high-tech IPOs sued the underwriters. As the nearby box explains, there was further embarrassment when it emerged that several well-known underwriters had engaged in "spinning"—that is, allocating stock in popular new issues to managers of their important corporate clients. The underwriter's seal of approval for a new issue no longer seemed as valuable as it once had.

## Costs of a New Issue

We have described Marvin's underwriters as filling a triple role—providing advice, buying the new issue, and reselling it to the public. In return they received payment in the form of a *spread;* that is, they were allowed to buy the shares for less than the *offering price* at which the shares were sold to investors.[19] Klein Merrick as syndicate manager kept 20% of this spread. A further 25% of the spread was used to pay those underwriters who bought the issue. The remaining 55% went to the firms that provided the salesforce.

The underwriting spread on the Marvin issue amounted to 7% of the total sum raised from investors. Since many of the costs incurred by underwriters are fixed, you would expect that the percentage spread would decline with issue size. This in part is what we find. For example, a $5 million IPO might carry a spread of 10%, while the spread on a $300 million issue might be only 5%. However, Chen and Ritter found that for almost every IPO between $20 and $80 million the spread was exactly 7%.[20] Since it is difficult to believe that there are no scale economies, this clustering at 7% is a puzzle.[21]

In addition to the underwriting fee, Marvin's new issue entailed substantial administrative costs. Preparation of the registration statement and prospectus involved management, legal counsel, and accountants, as well as the underwriters and their advisers. In addition, the firm had to pay fees for registering the new securities, printing and mailing costs, and so on. You can see from the first page of the Marvin prospectus (see this chapter's appendix) that these administrative costs totaled $820,000 or just over 1% of the proceeds.

---

[19] In the more risky cases the underwriter usually receives some extra noncash compensation, such as warrants to buy additional common stock in the future.

[20] H. C. Chen and J. R. Ritter, "The Seven Percent Solution," *Journal of Finance* 55 (June 2000), pp. 1105–1132.

[21] Chen and Ritter argue that the fixed spread suggests the underwriting market is not competitive and the Justice Department was led to investigate whether the spread constituted evidence of price-fixing. Robert Hansen disagrees that the market is not competitive. Among other things, he provides evidence that the 7% spread is not abnormally profitable and argues that it is part of a competitive and efficient market. See R. Hansen, "Do Investment Banks Compete in IPOs?: The Advent of the 7% Plus Contract," *Journal of Financial Economics* 59 (2001) pp. 313–346.

# How Scandal Hit the Investment Banking Industry

Nineteen ninety-nine looked to be a wonderful year for investment banks. Not only did they underwrite a near-record number of IPOs, but the stocks that they sold leapt by an average of 72% on their first day of trading, earning the underwriters some very grateful clients. Just three years later the same investment banks were in disgrace. Probing by New York State Attorney General Eliot Spitzer uncovered a chronicle of unethical and shameful behavior during the boom years.

As the dot.com stock market boom developed, investment banking analysts had begun to take on the additional role of promoters of the shares that they analyzed, in the process becoming celebrities with salaries to match. The early run-up in the stock price of dot.com IPOs therefore owed much to hype by the underwriters' analysts, who strongly promoted stocks that they sometimes privately thought were overpriced. One superstar Internet analyst was revealed in internal e-mails to have believed that stocks he was peddling to investors were "junk" and "piece[s] of crap." In many cases the stocks were indeed junk, and the underwriters who had puffed the IPOs soon found themselves sued by disgruntled investors who had bought at the inflated prices.

The underwriters' troubles deepened further when it was disclosed that in a number of cases they had allocated stock in hot new issues to the personal brokerage accounts of the CEOs of major corporate clients. This stock could then be sold, or "spun," for quick profits. Five senior executives of leading telecom companies were disclosed to have received a total of $28 million in profits from their allocation of stocks in IPOs underwritten by one bank. Over the same period the bank was awarded over $100 million of business from these five companies. Eliot Spitzer argued that such lucrative perks were really attempts by the banks to buy future business and that the profits therefore belonged to the companies' shareholders rather than the executives. Soon top executives of several other companies were facing demands from disgruntled shareholders that they return to their companies the profits that they had pocketed from hot initial public offerings.

These scandals that engulfed the investment banking industry resulted in a $1.4 billion payout by the banks and an agreement to separate investment banking and research departments, hire independent consultants, and select independent research providers. But the revelations also raised troubling questions about ethical standards and the pressures that can lead employees to unscrupulous behavior.

### Underpricing of IPOs

Marvin's issue was costly in yet another way. Since the offering price was less than the true value of the issued securities, investors who bought the issue got a bargain at the expense of the firm's original shareholders.

These costs of *underpricing* are hidden but nevertheless real. For IPOs they generally exceed all other issue costs. Whenever any company goes public, it is very difficult to judge how much investors will be prepared to pay for the stock. Sometimes the underwriters misjudge dramatically. For example, when the prospectus for the IPO of eBay was first published, the underwriters indicated that the company would sell 3.5 million shares at a price between $14 and $16 each. However, the enthusiasm for eBay's Web-based auction system was such that the underwriters increased the issue price to $18. The next morning dealers were flooded with orders to buy eBay; over 4.5 million shares traded and the stock closed the day at a price of $47.375.

We admit that the eBay issue was unusual.[22] But researchers have found that investors who buy at the issue price on average realize very high returns over the following days. For

---

[22] It does not, however, hold the record. That honor goes to Va Linux.



**FIGURE 15.3**

Average initial returns from investing in IPOs in different countries.

*Source:* T. Loughran, J. R. Ritter, and K. Rydqvist, "Initial Public Offerings: International Insights," *Pacific Basin Finance Journal* 2 (1994), pp. 165–199, extended and updated on **bear.cba.ufl.edu/ritter**. © 1994 Elsevier Science. Reprinted with permission.

example, one study of nearly 12,000 U.S. IPOs from 1960 to 2008 found average underpricing of 16.9%.[23]

Figure 15.3 shows that the United States is not the only country in which IPOs are underpriced. In China the gains from buying IPOs have averaged 165%.[24]

You might think that shareholders would prefer not to sell stock in their company for less than its market price, but many investment bankers and institutional investors argue that underpricing is in the interests of the issuing firm. They say that a low offering price on an IPO raises the price when it is subsequently traded in the market and enhances the firm's ability to raise further capital.

There is another possible reason that it may make sense to underprice new issues. Suppose that you successfully bid for a painting at an art auction. Should you be pleased? It is true that you now own the painting, which was presumably what you wanted, but everybody else at the auction apparently thought that the painting was worth less than you did. In other words, your success suggests that you may have overpaid. This problem is known as the *winner's curse*. The highest bidder in an auction is most likely to have overestimated the object's value and, unless bidders recognize this in their bids, the buyer will on average overpay. If bidders are aware of the danger, they are likely to adjust their bids down correspondingly.

The same problem arises when you apply for a new issue of securities. For example, suppose that you decide to apply for every new issue of common stock. You will find that you have no difficulty in getting stock in the issues that no one else wants. But, when the issue

---

[23] Our figure is an equally weighted average of first-day returns and is calculated from data on **bear.cba.ufl.edu/ritter**. As we saw in Chapter 13, there is some evidence that these early gains are not maintained and in the five years following an IPO the shares underperform the market.

[24] The Chinese returns are for A shares, which are traded only domestically.

is attractive, the underwriters will not have enough stock to go around, and you will receive less stock than you wanted. The result is that your money-making strategy may turn out to be a loser. If you are smart, you will play the game only if there is substantial underpricing on average. Here then we have a possible rationale for the underpricing of new issues. Uninformed investors who cannot distinguish which issues are attractive are exposed to the winner's curse. Companies and their underwriters are aware of this and need to underprice on average to attract the uninformed investors.[25]

These arguments could well justify some degree of underpricing, but it is not clear that they can account for underpricing of 100% or more. Skeptics point out that such underpricing is largely in the interests of the underwriters, who want to reduce the risk that they will be left with unwanted stock and to court popularity by allotting stock to favored clients.

If the skeptics are right, you might expect issuing companies to rebel at being asked to sell stock for much less than it is worth. Think back to our example of eBay. If the company had sold 3.5 million shares at the market price of $47.375 rather than $18, it would have netted an additional $103 million. So why weren't eBay's existing shareholders hopping mad? Loughran and Ritter suggest that the explanation lies in behavioral psychology and argue that the cost of underpricing may be outweighed in shareholders' minds by the happy surprise of finding that they are wealthier than they thought. EBay's largest shareholder was Pierre Omidyar, the founder and chairman, who retained his entire holding of 15.2 million shares. The initial jump in the stock price from $18 to $47.375 added $447 million to Mr. Omidyar's wealth. This may well have pushed the cost of underpricing to the back of his mind.[26]

### Hot New-Issue Periods

Figure 15.4 shows that the degree of underpricing fluctuates sharply from year to year. In 1999, around the peak of the dot.com boom, new issues raised $65 billion and the average first-day return on IPOs was 72%. Nearly $37 billion was left on the table that year. But, as the number of new issues slumped, so did the amount of underpricing. The year 2008 saw just 21 IPOs and the average first-day return was a measly 6.4%.



> **FIGURE 15.4**

IPO proceeds in the United States and average first-day returns, 1990–2008.

*Source:* J. R. Ritter, "Some Factoids about the 2008 IPO Market," February 6, 2009, **bear.cba.ufl.edu/ritter**.

---

[25] Notice that the winner's curse would disappear if only investors knew what the market price was going to be. One response is to allow trading in a security before it has been issued. This is known as a *gray market* and in the U.S. is most common for debt issues. Investors can observe the price in the gray market and can be more confident that they are not overbidding when the actual issue takes place.

[26] T. Loughran and J. Ritter, "Why Don't Issuers Get Upset about Leaving Money on the Table in IPOs?" *Review of Financial Studies* 15 (2002), pp. 413–443.

Some observers believe that these hot new-issue periods arise because investors are prone to periods of excessive optimism and would-be issuers time their IPOs to coincide with these periods. Other observers stress the fact that a fall in the cost of capital or an improvement in the economic outlook may mean that a number of new or dormant projects suddenly become profitable. At such times, many entrepreneurs rush to raise new cash to invest in these projects.[27]

## 15-3   Alternative Issue Procedures for IPOs

Table 15.2 summarizes the main steps involved in making an initial public offering of stock in the United States. You can see that Marvin's new issue was a typical IPO in almost every respect. In particular most IPOs in the United States use the *bookbuilding* method in which the underwriter builds a book of likely orders and uses this information to set the issue price.

The bookbuilding method is in some ways like an auction, since potential buyers indicate how many shares they are prepared to buy at given prices. However, these indications are not binding, and are used only as a guide to fix the price of the issue. The advantage of the bookbuilding method is that it allows underwriters to give preference to those investors whose bids are most helpful in setting the issue price and to offer them a reward in the shape of underpricing.[28] Critics of bookbuilding point to the abuses of the 1990s, and emphasize the dangers of allowing the underwriter to decide who is allotted stock.

Bookbuilding has rapidly gained popularity throughout the world, but it is not the only way to sell new stock. One alternative is to conduct an open auction. In this case investors are invited to submit their bids, stating how many shares they wish to buy and the price. The securities are then sold to the highest bidders. Most governments, including the U.S. Treasury, sell their bonds by auction. In the United States auctions of common stock have accounted for only 1% of IPOs in the 10 years to 2009. However, in 2004, Google simultaneously raised eyebrows and $1.7 billion in the world's largest initial public offering to be sold by auction.[29]

Fans of auctions often point to countries such as France, Israel, and Japan, where auctions were once commonly used to sell new issues of stock. Japan is a particularly interesting case, for the bookbuilding method was widely used until it was revealed that investment banks had been allocating shares in hot IPOs to government officials. In 1989 the finance

| |
|---|
| 1. Company appoints managing underwriter (bookrunner) and comanager(s). Underwriting syndicate formed. |
| 2. Arrangement with underwriters includes agreement on spread (typically 7% for medium-sized IPOs) and on greenshoe option (typically allowing the underwriters to increase the number of shares bought by 15%). |
| 3. Issue registered with SEC and preliminary prospectus (red herring) issued. |
| 4. Roadshow arranged to market the issue to potential investors. Managing underwriter builds book of potential demand. |
| 5. SEC approves registration. Company and underwriters agree on issue price. |
| 6. Underwriters allot stock (typically with overallotment). |
| 7. Trading starts. Underwriters cover short position by buying stock in the market or by exercising greenshoe option. |
| 8. Managing underwriter makes liquid market in stock and provides research coverage. |

▶ **TABLE 15.2**

The main steps involved in making an initial public offering of stock in the United States.

---

[27] For examples of these explanations, see A. P. Ljungqvist, V. Nanda, and R. Singh, "Hot Markets, Investor Sentiment, and IPO Pricing," *Journal of Business* 79 (July 2006), pp. 1667–1702; and L. Pastor and P. Veronesi, "Rational IPO Waves," *Journal of Finance* 60 (2005), pp. 1713–1757.

[28] See L. M. Benveniste and P. A. Spindt, "How Investment Bankers Determine the Offer Price and Allocation of New Issues," *Journal of Financial Economics* 24 (1989), pp. 343–362; and F. Cornelli and D. Goldreich, "Bookbuilding and Strategic Allocation," *Journal of Finance* 56 (December 2001), pp. 2337–2369.

[29] Google's issue was followed in 2005 by a $140 million auction of stock by Morningstar.

ministry responded to this scandal by ruling that in the future all IPOs were to be auctioned. This resulted in a sharp fall in underpricing. However, in 1997 the restrictions were lifted, bookbuilding returned to favor, and the level of underpricing increased.[30]

### Types of Auction: A Digression

Suppose that a government wishes to auction four million bonds and three would-be buyers submit bids. Investor A bids $1,020 each for one million bonds, B bids $1,000 for three million bonds, and C bids $980 for two million bonds. The bids of the two highest bidders (A and B) absorb all the bonds on offer and C is left empty-handed. What price do the winning bidders, A and B, pay?

The answer depends on whether the sale is a *discriminatory auction* or a *uniform-price auction.* In a discriminatory auction every winner is required to pay the price that he or she bid. In this case A would pay $1,020 and B would pay $1,000. In a uniform-price auction both would pay $1,000, which is the price of the lowest winning bidder (investor B).

It might seem from our example that the proceeds from a uniform-price auction would be lower than from a discriminatory auction. But this ignores the fact that the uniform-price auction provides better protection against the winner's curse. Wise bidders know that there is little cost to overbidding in a uniform-price auction, but there is potentially a very high cost to doing so in a discriminatory auction.[31] Economists therefore often argue that the uniform-price auction should result in higher proceeds.[32]

Sales of bonds by the U.S. Treasury used to take the form of discriminatory auctions so that successful buyers paid their bid. However, in 1998 the government switched to a uniform-price auction.[33]

## 15-4 Security Sales by Public Companies

A company's first public issue of stock is seldom its last. As the firm grows, it is likely to make further issues of debt and equity. Public companies can issue securities either by offering them to investors at large or by making a rights issue that is limited to existing stockholders. We begin by describing general cash offers, which are now used for almost all debt and equity issues in the United States. We then describe rights issues, which are widely used in other countries for issues of common stock.

### General Cash Offers

When a corporation makes a general cash offer of debt or equity in the United States, it goes through much the same procedure as when it first went public. In other words, it registers the issue with the SEC[34] and then sells the securities to an underwriter (or a syndicate of underwriters), who in turn offers the securities to the public. Before the price of the issue is fixed the underwriter will build up a book of likely demand for the securities just as in the case of Marvin's IPO.

---

[30] T. Kaneko and R. Pettway, "Auctions versus Bookbuilding of Japanese IPOs," *Pacific Basin Journal* 11 (2003), pp. 439–462.

[31] In addition, the price in the uniform-price auction depends not only on the views of B but also on those of A (for example, if A had bid $990 rather than $1,020, then both A and B would have paid $990 for each bond). Since the uniform-price auction takes advantage of the views of both A and B, it reduces the winner's curse.

[32] Sometimes auctions reduce the winner's curse by allowing uninformed bidders to enter noncompetitive bids, whereby they submit a quantity but not a price. For example, in U.S. Treasury auctions investors may submit noncompetitive bids and receive their full allocation.

[33] Experience in the United States with uniform-price auctions suggests that they do indeed reduce the winner's curse problem and realize higher prices for the seller. See D. Goldreich, "Underpricing in Discriminatory and Uniform-Price Auctions, "*Journal of Financial and Quantitative Analysis* 42 (June 2007), pp. 443–466.

[34] In 2005 the SEC created a new category of firm termed "a well-known seasoned issuer" (or WKSI). These firms are exempt from certain filing requirements.

The SEC's Rule 415 allows large companies to file a single registration statement covering financing plans for up to three years into the future. The actual issues can then be done with scant additional paperwork, whenever the firm needs the cash or thinks it can issue securities at an attractive price. This is called *shelf registration*—the registration statement is "put on the shelf," to be taken down and used as needed.

Think of how you as a financial manager might use shelf registration. Suppose your company is likely to need up to $200 million of new long-term debt over the next year or so. It can file a registration statement for that amount. It then has prior approval to issue up to $200 million of debt, but it isn't obligated to issue a penny. Nor is it required to work through any particular underwriters; the registration statement may name one or more underwriters the firm thinks it may work with, but others can be substituted later.

Now you can sit back and issue debt as needed, in bits and pieces if you like. Suppose Merrill Lynch comes across an insurance company with $10 million ready to invest in corporate bonds. Your phone rings. It's Merrill Lynch offering to buy $10 million of your bonds, priced to yield, say, 8½%. If you think that's a good price, you say OK and the deal is done, subject only to a little additional paperwork. Merrill then resells the bonds to the insurance company, it hopes at a higher price than it paid for them, thus earning an intermediary's profit.

Here is another possible deal: Suppose that you perceive a window of opportunity in which interest rates are temporarily low. You invite bids for $100 million of bonds. Some bids may come from large investment banks acting alone; others may come from ad hoc syndicates. But that's not your problem; if the price is right, you just take the best deal offered.[35]

Not all companies eligible for shelf registration actually use it for all their public issues. Sometimes they believe they can get a better deal by making one large issue through traditional channels, especially when the security to be issued has some unusual feature or when the firm believes that it needs the investment banker's counsel or stamp of approval on the issue. Consequently, shelf registration is less often used for issues of common stock or convertible securities than for garden-variety corporate bonds.

## International Security Issues

Instead of borrowing in their local market, companies often issue bonds in another country's domestic market, in which case the issue will be governed by the rules of that country.

A second alternative is to make an issue of *eurobonds,* which is underwritten by a group of international banks and offered simultaneously to investors in a number of countries. The borrower must provide a prospectus or offering circular that sets out the detailed terms of the issue. The underwriters will then build up a book of potential orders, and finally the issue will be priced and sold. Very large debt issues may be sold as *global bonds,* with one part sold internationally in the eurobond market and the remainder sold in the company's domestic market.

Equity issues too may be sold overseas. In fact some companies' stocks do not trade at all in their home country. For example, in 2009 Changyou.com, the Chinese online game company, raised $120 million by an IPO in the United States. Its stock was not traded in China. Presumably, the company thought it could get a better price and more active follow-on trading by listing overseas.

Traditionally New York has been the natural home for such issues, but in recent years many companies have preferred to list in London or Hong Kong. This has led many U.S. observers to worry that New York may be losing its competitive edge to other financial centers that have more flexible regulatory systems and fewer corporate lawsuits.

---

[35] These two deals are examples of *accelerated underwritings.* For a good description of such issues, see B. Bortolotti, W. Megginson, and S. B. Smart, "The Rise of Accelerated Seasoned Equity Underwritings," *Journal of Applied Corporate Finance*, 20 (Summer 2008), pp. 35–57.

**TABLE 15.3**

Gross underwriting spreads of selected issues. Spreads are percentages of gross proceeds.

| Type | Company | Issue Amount, $ millions | Underwriter's Spread (%) |
|---|---|---|---|
| **Common Stock:** | | | |
| IPO | American Water Works | $1,250 | 7.0% |
| IPO | Rosetta Stone | 129.4 | 7.0 |
| IPO | Energy Recovery | 119.0 | 7.0 |
| IPO | Arc Sight | 61.2 | 7.0 |
| IPO | Heritage-Crystal Clean | 22.0 | 7.0 |
| Seasoned | Ford Motor | 1,425 | 3.00 |
| Seasoned | Express Scripts | 1,403 | 1.68 |
| Seasoned | Newmont Mining | 1,110 | 1.17 |
| Seasoned | American Express | 500 | 3.30 |
| Seasoned | Brookdale Senior Living | 143 | 4.75 |
| **Debt:** | | | |
| 2.25% global notes, 2011 | Hewlett-Packard | $1,000 | .15% |
| 3.2% global notes, 2014 | Wal-Mart Stores | 1,000 | .35 |
| 8% global notes, 2014 | Starwood Hotel & Resorts | 500 | 1.38 |
| 3% convertible senior notes, 2012 | Newmont Mining | 450 | 2.50 |
| 11.75% global notes, 2016 | Mariner Energy | 300 | 1.91 |

## The Costs of a General Cash Offer

Whenever a firm makes a cash offer of securities, it incurs substantial administrative costs. Also the firm needs to compensate the underwriters by selling them securities below the price that they expect to receive from investors. Table 15.3 lists underwriting spreads for a few issues in 2008–2009.

Notice that the underwriting spreads for debt securities are lower than for common stocks, less than 1% for many issues. Larger issues tend to have lower spreads than smaller issues. This may partly stem from the fact that there are fixed costs to selling securities, but large issues are generally made by large companies, which are better known and easier for the underwriter to monitor. So do not assume that a small company could make a jumbo issue at a negligible percentage spread.[36]

Figure 15.5 summarizes a study of total issue costs (spreads plus administrative costs) for several thousand issues between 2004 and 2008.

## Market Reaction to Stock Issues

Economists who have studied seasoned issues of common stock have generally found that announcement of the issue results in a decline in the stock price. For industrial issues in the United States this decline amounts to about 3%. While this may not sound overwhelming, the fall in market value is equivalent, on average, to nearly a third of the new money raised by the issue.

What's going on here? One view is that the price of the stock is simply depressed by the prospect of the additional supply. On the other hand, there is little sign that the extent of

---

[36] This point is emphasized in O. Altinkilic and R. S. Hansen, "Are There Economies of Scale in Underwriting Fees? Evidence of Rising External Financing Costs," *Review of Financial Studies* 13 (Spring 2000), pp. 191–218.



▶ **FIGURE 15.5**

Total direct costs as a percentage of gross proceeds. The total direct costs for initial public offerings (IPOs), seasoned equity offerings (SEOs), convertible bonds, and straight bonds are composed of underwriter spreads and other direct expenses.

*Source:* We are grateful to Nickolay Gantchev for undertaking these calculations, which update tables in I. Lee, S. Lochhead, J. R. Ritter, and Q. Zhao, "The Costs of Raising Capital," *Journal of Financial Research* 19 (Spring 1996), pp. 59–74.

the price fall increases with the size of the stock issue. There is an alternative explanation that seems to fit the facts better.

Suppose that the CFO of a restaurant chain is strongly optimistic about its prospects. From her point of view, the company's stock price is too low. Yet the company wants to issue shares to finance expansion into the new state of Northern California.[37] What is she to do? All the choices have drawbacks. If the chain sells common stock, it will favor new investors at the expense of old shareholders. When investors come to share the CFO's optimism, the share price will rise, and the bargain price to the new investors will be evident.

If the CFO could convince investors to accept her rosy view of the future, then new shares could be sold at a fair price. But this is not so easy. CEOs and CFOs always take care to *sound* upbeat, so just announcing "I'm optimistic" has little effect. But supplying detailed information about business plans and profit forecasts is costly and is also of great assistance to competitors.

The CFO could scale back or delay the expansion until the company's stock price recovers. That too is costly, but it may be rational if the stock price is severely undervalued and a stock issue is the only source of financing.

If a CFO knows that the company's stock is *over*valued, the position is reversed. If the firm sells new shares at the high price, it will help existing shareholders at the expense of the new ones. Managers might be prepared to issue stock even if the new cash was just put in the bank.

Of course, investors are not stupid. They can predict that managers are more likely to issue stock when they think it is overvalued and that optimistic managers may cancel or

---

[37] Northern California seceded from California and became the fifty-second state in 2016.

defer issues. Therefore, when an equity issue is announced, they mark down the price of the stock accordingly. Thus the decline in the price of the stock at the time of the new issue may have nothing to do with the increased supply but simply with the information that the issue provides.[38]

Cornett and Tehranian devised a natural experiment that pretty much proves this point.[39] They examined a sample of stock issues by commercial banks. Some of these issues were necessary to meet capital standards set by banking regulators. The rest were ordinary, voluntary stock issues designed to raise money for various corporate purposes. The necessary issues caused a much smaller drop in stock prices than the voluntary ones, which makes perfect sense. If the issue is outside the manager's discretion, announcement of the issue conveys no information about the manager's view of the company's prospects.[40]

Most financial economists now interpret the stock price drop on equity issue announcements as an information effect and not a result of the additional supply.[41] But what about an issue of preferred stock or debt? Are they equally likely to provide information to investors about company prospects? A pessimistic manager might be tempted to get a debt issue out before investors become aware of the bad news, but how much profit can you make for your shareholders by selling overpriced debt? Perhaps 1% or 2%. Investors know that a pessimistic manager has a much greater incentive to issue equity rather than preferred stock or debt. Therefore, when companies announce an issue of preferred or debt, there is a barely perceptible fall in the stock price.[42]

There is, however, at least one puzzle left. As we saw in Chapter 13, it appears that the long-run performance of companies that issue shares is substandard. Investors who bought these companies' shares *after* the stock issue earned lower returns than they would have if they had bought into similar companies. This result holds for both IPOs and seasoned issues.[43] It seems that investors fail to appreciate fully the issuing companies' information advantage. If so, we have an exception to the efficient-market theory.

### Rights Issues

Instead of making an issue of stock to investors at large, companies sometimes give their existing shareholders the right of first refusal. Such issues are known as *privileged subscription,* or *rights, issues.* In the United States rights issues are largely confined to closed-end investment companies. However, in Europe and Asia rights issues are common and in many countries obligatory.

We have already come across one example of a rights issue—the offer by the British bank HBOS, which ended up in the hands of its underwriters. Let us look more closely at another issue. In 2009 the European mining company, Xstrata, needed to raise £4.1 billion to finance the acquisition of Prodeco, a coal mining business. It did so by offering its existing shareholders the right to buy two new shares for every one that they currently held. The new shares were priced at £2.10 each, some 66% below the pre-announcement price of £6.23.

---

[38] This explanation was developed in S. C. Myers and N. S. Majluf, "Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have," *Journal of Financial Economics* 35 (1998), pp. 99–122.

[39] M. M. Cornett and H. Tehranian, "An Examination of Voluntary versus Involuntary Issuances by Commercial Banks," *Journal of Financial Economics* 35 (1994), pp. 99–122.

[40] The "involuntary issuers" did make a choice: they could have foregone the stock issue and run the risk of failing to meet the regulatory capital standards. The banks that were more concerned with this risk were more likely to issue. Thus it is no surprise that Cornett and Tehranian found some drop in stock price even for the involuntary issues.

[41] There is another possible information effect. Just as an unexpected increase in the dividend suggests to investors that the company is generating more cash than they thought, the announcement of a new issue may have the reverse implication. However, this effect cannot explain why the announcement of an issue of debt does not result in a similar fall in the stock price.

[42] See L. Shyam-Sunder, "The Stock Price Effect of Risky vs. Safe Debt," *Journal of Financial and Quantitative Analysis* 26 (December 1991), pp. 549–558.

[43] See, for example, T. Loughran and J. R. Ritter, "The New Issues Puzzle," *Journal of Finance* 50 (March 1995), pp. 23–51; and Jay Ritter's Web site: **bear.cba.ufl.edu/ritter**.

Imagine that you held one share of Xstrata valued at £6.23 just before the rights issue. Xstrata's offer would give you the right to buy two new shares for an additional outlay of 2 × £2.10 = £4.20. If you take up the offer, your holding increases to three shares and the value of your investment increases by the extra cash to £6.23 + £4.20 = £10.43. Therefore, after the issue the value of each share is no longer £6.23 but much lower at £10.43/3 = £3.48. This is termed the *ex-rights price*.

How much is the right to buy each new share for £2.10 worth? The answer is £3.48 − £2.10 = £1.38.[44] An investor who could buy a share worth £3.48 for £2.10 would be willing to pay £1.38 for the privilege.[45]

It should be clear on reflection that Xstrata could have raised the same amount of money on a variety of terms. For example, it could have offered half as many shares at twice the price. In this case, if you held one Xstrata share before the issue, you would have the right to subscribe for one new share at £4.20. This would give you two shares in total worth £6.23 + £4.20 = £10.43, and the value of each share would be £10.43/2 = £5.215. Under this new arrangement the *ex-rights* share price is higher, but you end up with just two shares rather than three. The total value of your holding remains the same. Suppose that you wanted to sell your right to buy one new share for £4.20. Investors would be prepared to pay you £1.015 for this right. They would then pay over £4.20 to Xstrata and receive a share worth £5.215.

Xstrata's shareholders were given six weeks to decide whether they wished to take up the offer of new shares. If the stock price in the meantime fell below the issue price, shareholders would have no incentive to buy the new shares. For this reason companies making a rights issue generally arrange for the underwriters to buy any unwanted stock. For example, Deutsche Bank and J.P. Morgan agreed to buy any unsold Xstrata stock at the issue price of £2.10. Underwriters are not often left holding the baby, but we saw earlier that in the case of the HBOS issue they were left with a very large (and bouncing) baby.

Our example illustrates that, as long as the company successfully sells the new shares, the issue price in a rights offering is irrelevant. That is not the case in a general cash offer. If the company sells stock to new shareholders for less than the market will bear, the buyer makes a profit at the expense of existing shareholders. General cash offers are typically sold at a small discount of about 3% on the previous day's closing price,[46] so underpricing is not a major worry. But, since this cost can be avoided completely by using a rights issue, we are puzzled by the apparent preference of companies for general cash offers.

## 15-5  Private Placements and Public Issues

Whenever a company makes a public offering, it is obliged to register the issue with the SEC. It could avoid this costly process by selling the securities privately. The rules on what constitutes a *private placement* are complicated but the SEC generally insists that the security be sold to no more than 35 knowledgeable investors.

One of the drawbacks of a private placement is that the investor cannot easily resell the security. However, institutions such as life insurance companies invest huge amounts

---

[44] In fact he should be prepared to pay slightly more, because he is not compelled to buy the stock and can choose not to do so. In practice, since the option is usually well in the money and its time to expiration is short, its value is usually negligible.

[45] There is a minor, but potentially confusing, difference between U.S. and European rights issues. In the Xstrata issue shareholders were offered two rights for each share held. Each right allowed them to buy one new share. A similar issue in the United States would provide the shareholder with four rights for each share held. However, the shareholder would need two rights to buy one new share and each right would therefore be worth correspondingly less. You may often encounter formulas for the value of a right. Remember to check whether it is referring to a U.S. or a European issue.

[46] See S. A. Corwin, "The Determinants of Underpricing for Seasoned Equity Offers," *Journal of Finance* 58 (October 1993), pp. 2249–2279; and S. Mola and T. Loughran, "Discounting and Clustering in Seasoned Equity Offering Price," *Journal of Financial and Quantitative Analysis* 39 (March 2004), pp. 1–23.

in corporate debt for the long haul and are less concerned about its marketability. Consequently, an active private placement market has evolved for corporate debt. Often this debt is negotiated directly between the company and the lender, but, if the issue is too large to be absorbed by one institution, the company will generally employ an investment bank to draw up a prospectus and identify possible buyers.

As you would expect, it costs less to arrange a private placement than to make a public issue. This is a particular advantage for companies making smaller issues.

In 1990 the SEC adopted Rule 144A, which relaxed its restrictions on who can buy and trade unregistered securities. The rule allows large financial institutions (known as *qualified institutional buyers*) to trade unregistered securities among themselves. Rule 144A was intended to increase liquidity and reduce interest rates and issue costs for private placements. It was aimed largely at foreign corporations deterred by registration requirements in the United States. The SEC argued that such firms would welcome the opportunity to issue unregistered stocks and bonds that could then be freely traded by large U.S. financial institutions.

Rule 144A issues have proved very popular, particularly with foreign issuers. There has also been an increasing volume of secondary trading in Rule 144A issues.

● ● ● ● ●

**SUMMARY**

In this chapter we have summarized the various procedures for issuing corporate securities. We first looked at how infant companies raise venture capital to carry them through to the point at which they can make their first public issue of stock. We then looked at how companies can make further public issues of securities by a general cash offer. Finally, we reviewed the procedures for a private placement.

It is always difficult to summarize a summary. Instead we will remind you of some of the most important implications for the financial manager who must decide how to raise financing.

- **Larger is cheaper.** There are economies of scale in issuing securities. It is cheaper to go to the market once for $100 million than to make two trips for $50 million each. Consequently firms bunch security issues. That may often mean relying on short-term financing until a large issue is justified. Or it may mean issuing more than is needed at the moment in order to avoid another issue later.

- **Watch out for underpricing.** Underpricing is often a serious hidden cost to the existing shareholders.

- **The winner's curse may be a serious problem with IPOs.** Would-be investors in an initial public offering (IPO) do not know how other investors will value the stock and they worry that they are likely to receive a larger allocation of the overpriced issues. Careful design of issue procedure may reduce the winner's curse.

- **New stock issues may depress the price.** The extent of this price pressure varies, but for industrial issues in the United States the fall in the value of the existing stock may amount to a significant proportion of the money raised. This pressure is due to the information that the market reads into the company's decision to issue stock.

- **Shelf registration often makes sense for debt issues by blue-chip firms.** Shelf registration reduces the time taken to arrange a new issue, it increases flexibility, and it may cut underwriting costs. It seems best suited for debt issues by large firms that are happy to switch between investment banks. It seems less suited for issues of unusually risky or complex securities or for issues by small companies that are likely to benefit from a close relationship with an investment bank.

*Metrick, Megginson, Gompers, and Gompers and Lerner provide an overview of the venture capital industry, while Sahlman looks at the form of the venture capital contract:*

A. Metrick, *Venture Capital and the Finance of Innovation* (New York: John Wiley & Sons, 2006).

W. L. Megginson, "Toward a Global Model of Venture Capital?" *Journal of Applied Corporate Finance* 16 (Winter 2004), pp. 89–107.

P. Gompers, "Venture Capital," in B. E. Eckbo (ed.), *Handbook of Corporate Finance: Empirical Corporate Finance* (Amsterdam: Elsevier/North Holland, 2007).

P. Gompers and J. Lerner, "The Venture Capital Revolution," *Journal of Economic Perspectives* 15 (Spring 2001), pp. 145–168.

W. A. Sahlman, "Aspects of Financial Contracting in Venture Capital," *Journal of Applied Corporate Finance* (Summer 1988), pp. 23–26.

*Here are four comprehensive surveys of the literature on new issues:*

B. E. Eckbo, R. W. Masulis, and Ø. Norli, "Security Offerings: A Survey," in B. E. Eckbo (ed.), *Handbook of Corporate Finance: Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007).

A. P. Ljungqvist, "IPO Underpricing," in B. E. Eckbo (ed.), *Handbook of Corporate Finance: Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007).

J. R. Ritter, "Investment Banking and Securities Issuance," in G. M. Constantinides, M. Harris, and R. Stulz (eds.), *Handbook of the Economics of Finance* (Amsterdam: Elsevier Science, 2003).

T. Jenkinson and A. P. Ljungqvist, *Going Public: The Theory and Evidence on How Companies Raise Equity Finance,* 2nd ed. (Oxford: Oxford University Press, 2001).

*Two useful articles on IPOs are:*

R. G. Ibbotson, J. L. Sindelar, and J. R. Ritter, "The Market's Problems with the Pricing of Initial Public Offerings," *Journal of Applied Corporate Finance* 7 (Spring 1994), pp. 66–74.

L. M. Benveniste and W. J. Wilhelm, Jr., "Initial Public Offerings: Going by the Book," *Journal of Applied Corporate Finance* 10 (Spring 1997) pp. 98–108.

*A useful introduction to the design of auctions is:*

P. Milgrom, "Auctions and Bidding: A Primer," *Journal of Economic Perspectives* 2 (1989), pp. 3–22.

**FURTHER READING**



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

## BASIC

**PROBLEM SETS**

1. After each of the following issue methods we have listed two types of issue. Choose the one more likely to employ that method.
   a. Rights issue (*initial public offer/further sale of an already publicly traded stock*)
   b. Rule 144A issue (*international bond issue/U.S. bond issue by a foreign corporation*)
   c. Private placement (*issue of existing stock/bond issue by an industrial company*)
   d. Shelf registration (*initial public offer/bond issue by a large industrial company*)

2. Each of the following terms is associated with one of the events beneath. Can you match them up?
   a. Best efforts
   b. Bookbuilding
   c. Shelf registration
   d. Rule 144A

Visit us at www.mhhe.com/bma

*Events:*

A.  Investors indicate to the underwriter how many shares they would like to buy in a new issue and these indications are used to help set the price.

B.  The underwriter accepts responsibility only to *try* to sell the issue.

C.  Some issues are not registered but can be traded freely among qualified institutional buyers.

D.  Several tranches of the same security may be sold under the same registration. (A "tranche" is a batch, a fraction of a larger issue.)

3.  Explain what each of the following terms or phrases means:
    a.  Venture capital
    b.  Book building
    c.  Underwriting spread
    d.  Registration statement
    e.  Winner's curse

4.  For each of the following pairs of issues, which is likely to involve the lower proportionate underwriting and administrative costs?
    a.  A large issue/a small issue.
    b.  A bond issue/a common stock issue.
    c.  Initial public offering/subsequent issue of stock.
    d.  A small private placement of bonds/a small general cash offer of bonds.

5.  True or false?
    a.  Venture capitalists typically provide first-stage financing sufficient to cover all development expenses. Second-stage financing is provided by stock issued in an IPO.
    b.  Underpricing in an IPO is only a problem when the original investors are selling part of their holdings.
    c.  Stock price generally falls when the company announces a new issue of shares. This is attributable to the information released by the decision to issue.

6.  You need to choose between making a public offering and arranging a private placement. In each case the issue involves $10 million face value of 10-year debt. You have the following data for each:

    •  *A public issue:* The interest rate on the debt would be 8.5%, and the debt would be issued at face value. The underwriting spread would be 1.5%, and other expenses would be $80,000.

    •  *A private placement:* The interest rate on the private placement would be 9%, but the total issuing expenses would be only $30,000.

    a.  What is the difference in the proceeds to the company net of expenses?
    b.  Other things being equal, which is the better deal?
    c.  What other factors beyond the interest rate and issue costs would you wish to consider before deciding between the two offers?

7.  Associated Breweries is planning to market unleaded beer. To finance the venture it proposes to make a rights issue at $10 of one new share for each two shares held. (The company currently has outstanding 100,000 shares priced at $40 a share.) Assuming that the new money is invested to earn a fair return, give values for the following:

    a.  Number of new shares.
    b.  Amount of new investment.
    c.  Total value of company after issue.

    d. Total number of shares after issue.

    e. Stock price after the issue.

    f. Price of the right to buy one new share.

## INTERMEDIATE

  **8.** Here is a further vocabulary quiz. Briefly explain each of the following:

    a. Zero-stage vs. first- or second-stage financing.

    b. Carried interest.

    c. Rights issue.

    d. Road show.

    e. Best-efforts offer.

    f. Qualified institutional buyer.

    g. Blue-sky laws.

    h. Greenshoe option.

  **9.** a. "A signal is credible only if it is costly." Explain why management's willingness to invest in Marvin's equity was a credible signal. Was its willingness to accept only part of the venture capital that would eventually be needed also a credible signal?

    b. "When managers take their reward in the form of increased leisure or executive jets, the cost is borne by the shareholders." Explain how First Meriam's financing package tackled this problem.

 **10.** In some U.K. IPOs any investor may be able to apply to buy shares. Mr. Bean has observed that on average these stocks are underpriced by about 9% and for some years has followed a policy of applying for a constant proportion of each issue. He is therefore disappointed and puzzled to find that this policy has not resulted in a profit. Explain to him why this is so.

 **11.** Why are the costs of debt issues less than those of equity issues? List the possible reasons.

 **12.** There are three reasons that a common stock issue might cause a fall in price: (a) the price fall is needed to absorb the extra supply, (b) the issue causes temporary price pressure until it has been digested, and (c) management has information that stockholders do not have. Explain these reasons more fully. Which do you find most plausible? Is there any way that you could seek to test whether you are right?

 **13.** Construct a simple example to show the following:

    a. Existing shareholders are made worse off when a company makes a cash offer of new stock below the market price.

    b. Existing shareholders are not made worse off when a company makes a rights issue of new stock below the market price even if the new stockholders do not wish to take up their rights.

 **14.** In 2001 the Pandora Box Company made a rights issue at €5 a share of one new share for every four shares held. Before the issue there were 10 million shares outstanding and the share price was €6.

    a. What was the total amount of new money raised?

    b. What was the value of the right to buy one new share?

    c. What was the prospective stock price after the issue?

    d. How far could the total value of the company fall before shareholders would be unwilling to take up their rights?

 **15.** Problem 14 contains details of a rights offering by Pandora Box. Suppose that the company had decided to issue new stock at €4. How many new shares would it have needed to sell to raise the same sum of money? Recalculate the answers to questions (b) to (d) in Problem 14. Show that the shareholders are just as well off if the company issues the shares at €4 rather than €5.

16. Suppose that instead of having a rights issue of new stock at €4 (see Problem 15), Pandora decided to make a general cash offer at €4. Would existing shareholders still be just as well off? Explain.

17. Refer to the Marvin Prospectus Appendix at the end of this chapter to answer the following questions.
    a. If there is unexpectedly heavy demand for the issue, how many extra shares can the underwriter buy?
    b. How many shares are to be sold in the primary offering? How many will be sold in the secondary offering?
    c. One day post-IPO, Marvin shares traded at $105. What was the degree of underpricing? How does that compare with the average degree of underpricing for IPOs in the United States?
    d. There are three kinds of cost to Marvin's new issue—underwriting expense, administrative costs, and underpricing. What was the *total* dollar cost of the Marvin issue?

18. Find the prospectus for a recent IPO. How do the issue costs compare with (a) those of the Marvin issue and (b) those shown in Table 15.3? Can you suggest reasons for the differences?

## CHALLENGE

19. a. Why do venture capital companies prefer to advance money in stages? If you were the management of Marvin Enterprises, would you have been happy with such an arrangement? With the benefit of hindsight did First Meriam gain or lose by advancing money in stages?
    b. The price at which First Meriam would invest more money in Marvin was not fixed in advance. But Marvin could have given First Meriam an *option* to buy more shares at a preset price. Would this have been better?
    c. At the second stage Marvin could have tried to raise money from another venture capital company in preference to First Meriam. To protect themselves against this, venture capital firms sometimes demand first refusal on new capital issues. Would you recommend this arrangement?

20. Explain the difference between a uniform-price auction and a discriminatory auction. Why might you prefer to sell securities by one method rather than another?

21. Here is recent financial data on Pisa Construction, Inc.

| Stock price | $40 | Market value of firm | $400,000 |
|---|---|---|---|
| Number of shares | 10,000 | Earnings per share | $4 |
| Book net worth | $500,000 | Return on investment | 8% |

Pisa has not performed spectacularly to date. However, it wishes to issue new shares to obtain $80,000 to finance expansion into a promising market. Pisa's financial advisers think a stock issue is a poor choice because, among other reasons, "sale of stock at a price below book value per share can only depress the stock price and decrease shareholders' wealth." To prove the point they construct the following example: "Suppose 2,000 new shares are issued at $40 and the proceeds are invested. (Neglect issue costs.) Suppose return on investment does not change. Then

Book net worth = $580,000

Total earnings = .08(580,000) = $46,400

$$\text{Earnings per share} = \frac{46,400}{12,000} = \$3.87$$

Thus, EPS declines, book value per share declines, and share price will decline proportionately to $38.70."

Evaluate this argument with particular attention to the assumptions implicit in the numerical example.

Visit us at www.mhhe.com/bma

Look up a recent IPO on **www.hoovers.com** or **biz.yahoo.com/ipo** and then use the Edgar database to find the prospectus. (You may find it easiest to look up the company on **finance.yahoo.com** and use the link to SEC filings. In any case finding the final prospectus can be a matter of trial and error.) Compare the IPO with that of Marvin. For example, Who were the existing shareholders? Was the company raising more capital or were existing shareholders selling? Were existing shareholders prevented by a lock-up agreement from selling more shares? How did the underwriting and other costs compare with those of Marvin? Did the underwriters have a greenshoe option? Did the issue turn out to be underpriced? (The Yahoo! Web site should help here.) If so, how much money was left on the table?

**REAL-TIME
DATA ANALYSIS**

# APPENDIX ●●●●●

## Marvin's New-Issue Prospectus[47]

**PROSPECTUS**
**900,000 Shares**
**Marvin Enterprises Inc.**
**Common Stock ($.10 par value)**

Of the 900,000 shares of Common Stock offered hereby, 500,000 shares are being sold by the Company and 400,000 shares are being sold by the Selling Stockholders. See "Principal and Selling Stockholders." The Company will not receive any of the proceeds from the sale of shares by the Selling Stockholders.

Before this offering there has been no public market for the Common Stock. **These securities involve a high degree of risk. See "Certain Considerations."**

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | Price to Public | Underwriting Discount | Proceeds to Company[1] | Proceeds to Selling Stockholders[1] |
|---|---|---|---|---|
| Per share | $80.00 | $5.60 | $74.40 | $74.40 |
| Total[2] | $72,000,000 | $5,040,000 | $37,200,000 | $29,760,000 |

[1] Before deducting expenses payable by the Company estimated at $820,000, of which $455,555 will be paid by the Company and $364,445 will be paid by the Selling Stockholders.

[2] The Company and the selling shareholders have granted to the Underwriters an option to purchase up to an additional 135,000 shares at the initial public offering price, less the underwriting discount, solely to cover overallotment.

The Common Stock is offered subject to receipt and acceptance by the Underwriters, to prior sale, and to the Underwriters' right to reject any order in whole or in part and to withdraw, cancel, or modify the offer without notice.

Klein Merrick Inc.                                                                February 3, 2028

No person has been authorized to give any information or to make any representations, other than as contained therein, in connection with the offer contained in this Prospectus, and, if given or made, such information or representations must not be relied upon. This Prospectus

[47] Most prospectuses have content similar to that of the Marvin prospectus but go into considerably more detail. Also we have omitted Marvin's financial statements.

Visit us at www.mhhe.com/bma

does not constitute an offer of any securities other than the registered securities to which it relates or an offer to any person in any jurisdiction where such an offer would be unlawful. The delivery of this Prospectus at any time does not imply that information herein is correct as of any time subsequent to its date.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE COMMON STOCK OF THE COMPANY AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

### Prospectus Summary

*The following summary information is qualified in its entirety by the detailed information and financial statements appearing elsewhere in this Prospectus.*

### The Offering

Common Stock offered by the Company ...............................................................500,000 shares
Common Stock offered by the Selling Stockholders .............................................400,000 shares
Common Stock to be outstanding after this offering .........................................4,100,000 shares

### Use of Proceeds

For the construction of new manufacturing facilities and to provide working capital.

### The Company

Marvin Enterprises Inc. designs, manufactures, and markets gargle blasters for domestic use. Its manufacturing facilities employ integrated nanocircuits to control the genetic engineering processes used to manufacture gargle blasters.

The Company was organized in Delaware in 2022.

### Use of Proceeds

The net proceeds of this offering are expected to be $36,744,445. Of the net proceeds, approximately $27.0 million will be used to finance expansion of the Company's principal manufacturing facilities. The balance will be used for working capital.

### Certain Considerations

Investment in the Common Stock involves a high degree of risk. The following factors should be carefully considered in evaluating the Company:

*Substantial Capital Needs* The Company will require additional financing to continue its expansion policy. The Company believes that its relations with its lenders are good, but there can be no assurance that additional financing will be available in the future.

*Licensing* The expanded manufacturing facilities are to be used for the production of a new imploding gargle blaster. An advisory panel to the U.S. Food and Drug Administration (FDA) has recommended approval of this product for the U.S. market but no decision has yet been reached by the full FDA committee.

### Dividend Policy

The company has not paid cash dividends on its Common Stock and does not anticipate that dividends will be paid on the Common Stock in the foreseeable future.

### Management

The following table sets forth information regarding the Company's directors, executive officers, and key employees.

| Name | Age | Position |
|------|-----|----------|
| George Marvin | 32 | President, Chief Executive Officer, & Director |
| Mildred Marvin | 28 | Treasurer & Director |
| Chip Norton | 30 | General Manager |

*George Marvin*—George Marvin established the Company in 2022 and has been its Chief Executive Officer since that date. He is a past president of the Institute of Gargle Blasters and has recently been inducted into the Confrérie des Gargarisateurs.

Visit us at www.mhhe.com/bma

*Mildred Marvin*—Mildred Marvin has been employed by the Company since 2022.

*Chip Norton*—Mr. Norton has been General Manager of the Company since 2022. He is a former vice-president of Amalgamated Blasters, Inc.

### Executive Compensation

The following table sets forth the cash compensation paid for services rendered for the year 2027 by the executive officers:

| Name | Capacity | Cash Compensation |
|---|---|---|
| George Marvin | President and Chief Executive Officer | $300,000 |
| Mildred Marvin | Treasurer | 220,000 |
| Chip Norton | General Manager | 220,000 |

### Certain Transactions

At various times between 2023 and 2026 First Meriam Venture Partners invested a total of $8.5 million in the Company. In connection with this investment, First Meriam Venture Partners was granted certain rights to registration under the Securities Act of 1933, including the right to have their shares of Common Stock registered at the Company's expense with the Securities and Exchange Commission.

### Principal and Selling Stockholders

The following table sets forth certain information regarding the beneficial ownership of the Company's voting Common Stock as of the date of this prospectus by (i) each person known by the Company to be the beneficial owner of more than 5 percent of its voting Common Stock, and (ii) each director of the Company who beneficially owns voting Common Stock. Unless otherwise indicated, each owner has sole voting and dispositive power over his or her shares.

| | Common Stock | | | | |
|---|---|---|---|---|---|
| | Shares Beneficially Owned Prior to Offering | | | Shares Beneficially Owned After Offer[1] | |
| Name of Beneficial Owner | Number | Percent | Shares to Be Sold | Number | Percent |
| George Marvin | 375,000 | 10.4 | 60,000 | 315,000 | 7.7 |
| Mildred Marvin | 375,000 | 10.4 | 60,000 | 315,000 | 7.7 |
| Chip Norton | 250,000 | 6.9 | 80,000 | 170,000 | 4.1 |
| First Meriam Venture Partners | 1,700,000 | 47.2 | — | 1,700,000 | 41.5 |
| TFS Investors Centri-Venture Partnership | 260,000 | 7.2 | — | 260,000 | 6.3 |
| Henry Pobble | 260,000 | 7.2 | — | 260,000 | 6.3 |
| | 180,000 | 5.0 | — | 180,000 | 4.4 |
| Georgina Sloberg | 200,000 | 5.6 | 200,000 | — | — |

[1] Assuming no exercise of the Underwriters' overallotment option.

### Lock-up Agreements

The holders of the common stock have agreed with the underwriters not to sell, pledge, or otherwise dispose of their shares, other than as specified in this prospectus, for a period of 180 days after the date of the prospectus without the prior consent of Klein Merrick.

Visit us at www.mhhe.com/bma

**Description of Capital Stock**

The Company's authorized capital stock consists of 10,000,000 shares of voting Common Stock.

As of the date of this Prospectus, there are 10 holders of record of the Common Stock.

Under the terms of one of the Company's loan agreements, the Company may not pay cash dividends on Common Stock except from net profits without the written consent of the lender.

**Underwriting**

Subject to the terms and conditions set forth in the Underwriting Agreement, the Company has agreed to sell to each of the Underwriters named below, and each of the Underwriters, for whom Klein Merrick Inc. are acting as Representatives, has severally agreed to purchase from the Company, the number of shares set forth opposite its name below.

| Underwriters | Number of Shares to Be Purchased |
|---|---|
| Klein Merrick, Inc. | 300,000 |
| Goldman Stanley | 300,000 |
| Medici Bank | 100,000 |
| Canary Wharf Securities | 100,000 |
| Bank of New England | 100,000 |

In the Underwriting Agreement, the several Underwriters have agreed, subject to the terms and conditions set forth therein, to purchase all shares offered hereby if any such shares are purchased. In the event of a default by any Underwriter, the Underwriting Agreement provides that, in certain circumstances, purchase commitments of the nondefaulting Underwriters may be increased or the Underwriting Agreement may be terminated.

There is no public market for the Common Stock. The price to the public for the Common Stock was determined by negotiation between the Company and the Underwriters and was based on, among other things, the Company's financial and operating history and condition, its prospects and the prospects for its industry in general, the management of the Company, and the market prices of securities for companies in businesses similar to that of the Company.

**Legal Matters**

The validity of the shares of Common Stock offered by the Prospectus is being passed on for the Company by Dodson and Fogg and for the Underwriters by Kenge and Carboy.

**Experts**

The consolidated financial statements of the Company have been so included in reliance on the reports of Hooper Firebrand, independent accountants, given on the authority of that firm as experts in auditing and accounting.

**Financial Statements**

[*Text and tables omitted.*]

Visit us at www.mhhe.com/bma

PAYOUT POLICY AND CAPITAL STRUCTURE

# Payout Policy

▶ **Corporations can return** cash to their shareholders by paying a dividend or by repurchasing shares. In this chapter we explain how financial managers decide on the amount and form of payout, and we discuss the controversial question of how payout policy affects shareholder value.

Suppose you own stock in a corporation that has $1 per share of unneeded cash. It can hold on to the cash or it can pay an extra cash dividend of $1 per share. Does the decision matter? Your first instinct should be to say no. The dividend puts $1 per share in your pocket but, at the same time, each share should be worth $1 less. Your wealth should be unaffected.

But corporations usually hold cash for a reason. What if that $1 per share is not redundant money? Suppose that it was set aside for capital investment. Then paying the extra dividend could mean cancelation of investment projects. The payout decision could also be an investment decision.

Suppose the firm pays out $1 per share, but replaces the cash by borrowing. Then the payout decision would also be a borrowing decision.

To fully understand payout policy, we must separate payout decisions from investment and borrowing decisions. If we hold investment and borrowing fixed, changes in cash dividends must be offset by issues or retirements of shares. For example, a company might pay generous cash dividends, knowing that it will have to schedule stock issues to raise cash for investment. Another company might pay no dividends, but instead use cash to repurchase shares.

Therefore we will take care to analyze the trade-off between higher or lower cash dividends and the issue or repurchase of common stock. The trade-off is more interesting than you might at first think, for at least three reasons. First, changes in dividends convey information about the firm's profitability to investors. Second, dividends are taxed at higher rates than capital gains. Third, investors worry that cash-cow corporations will run out of positive-NPV investments and waste cash on perks or poor projects. Generous cash payouts are one way of relieving such worries.

We start the chapter with facts about payout and a description of how dividends and repurchases happen.

●●●●●

## 16-1 Facts about Payout

Corporations can pay out cash to their shareholders in two ways. They can pay a dividend or they can buy back some of the outstanding shares. In recent years dividend payments and stock repurchases have amounted to a high proportion of earnings.

Although dividends remain the principal channel for returning cash to shareholders, many corporations pay no dividends at all. In the U.S., the percentage of dividend-paying



**FIGURE 16.1**

Dividends and stock repurchases in the United States, 1980–2008 (figures in $ billions).

*Source:* Standard & Poor's Compustat.

firms fell from 64% in 1980 to 52% in 2007.[1] Some of the non–dividend payers did pay a dividend in the past but then fell on hard times and were forced to conserve cash. Further, a large number of new growth companies have gone public in recent years and do not pay a dividend. In the U.S. these include such household names as Sun Microsystems, Cisco, Amazon, and Google, as well as many small, rapidly growing firms that have not yet reached full profitability.

Figure 16.1 shows that before 1983 stock repurchases were fairly rare, but since then they have become increasingly common. In 2007, a record year for stock repurchases, 28 U.S. companies each bought back more than $5 billion of stock. Exxon Mobil bought back $31 billion, Microsoft bought back $28 billion, IBM $19 billion, and GE $14 billion.

## 16-2 How Firms Pay Dividends and Repurchase Stock

Before we look at the choice between dividends and stock repurchases, we need to review how these payments to shareholders take place.

A company's dividend is set by the board of directors. The announcement of the dividend states that the payment will be made to all stockholders who are registered on a particular *record date*. Then a week or so later dividend checks are mailed to stockholders. Stocks are normally bought or sold *with dividend* (or *cum dividend*) until two business days before the record date, and then they trade *ex dividend*. If you buy stock on the ex-dividend date, your purchase will not be entered on the company's books before the record date and you will not be entitled to the dividend.

Figure 16.2 illustrates this sequence of events. On April 15, 2009, Exxon Mobil declared a quarterly dividend of $.42 per share. The dividend was paid on June 10 to all shareholders who were registered on the company's books on May 13. Two days earlier on May 11 the shares began to trade ex dividend. Any investor who bought shares on that date would not have had his purchase registered by the record date and would not have been entitled to the dividend.

---

[1] The proportion of dividend payers among U.S. industrial companies is even lower. See E. Fama and K. French, "Disappearing Dividends: Changing Firm Characteristics or Lower Propensity to Pay?" *Journal of Financial Economics* 60 (2001), pp. 3–43. In Europe the decline in the proportion of dividend payers has been particularly marked in Germany. See D. J. Denis and I. Osobov, "Why Do Firms Pay Dividends? International Evidence on the Determinants of Dividend Policy," *Journal of Financial Economics* 89 (July 2008), pp. 62–82.



April 15, 2009 — **Exxon Mobil declares regular quarterly dividend of $.42 per share.** — Declaration date

May 11, 2009 — **Shares start to trade ex dividend.** — Ex-dividend date

May 13, 2009 — **Dividend will be paid to shareholders registered on this date.** — Record date

June 10, 2009 — **Dividend checks are mailed to shareholders.** — Payment date

▶ **FIGURE 16.2**

An illustration of how dividends are paid.

The company is not free to declare whatever dividend it chooses. In some countries, such as Brazil and Chile, companies are obliged by law to pay out a *minimum* proportion of their earnings. Conversely, some restrictions may be imposed by lenders, who are concerned that excessive dividend payments would not leave enough in the kitty to repay their loans. In the U.S., state law also helps to protect the firm's creditors against excessive dividend payments. For example, companies are not allowed to pay a dividend out of legal capital, which is generally defined as the par value of outstanding shares.[2]

Most U.S. companies pay a *regular* cash dividend each quarter, but occasionally this is supplemented by a one-off *extra* or *special dividend*. Many companies offer shareholders automatic dividend reinvestment plans (DRIPs). Often the new shares are issued at a 5% discount from the market price. Sometimes 10% or more of total dividends will be reinvested under such plans.[3]

Dividends are not always in the form of cash. Frequently companies also declare *stock dividends*. For example, if the firm pays a stock dividend of 5%, it sends each shareholder 5 extra shares for every 100 shares currently owned. A stock dividend is essentially the same as a stock split. Both increase the number of shares but do not affect the company's assets, profits, or total value. So both reduce value *per share*.[4] In this chapter we focus on *cash* dividends.

## How Firms Repurchase Stock

Instead of paying a dividend to its stockholders, the firm can use the cash to repurchase stock. The reacquired shares are kept in the company's treasury and may be resold if the company needs money. There are four main ways to repurchase stock. By far the most common method is for the firm to announce that it plans to buy its stock in the open market, just like any other investor.[5] However, companies sometimes use a tender offer where they offer to buy back a stated number of shares at a fixed price, which is typically set at about 20% above the current market level. Shareholders can then choose whether to accept this offer. A third procedure is to employ a *Dutch auction*. In this case the firm states a series of

[2] Where there is no par value, legal capital is defined as part or all of the receipts from the issue of shares. Companies with wasting assets, such as mining companies, are sometimes permitted to pay out legal capital.

[3] Sometimes companies not only allow shareholders to reinvest dividends but also allow them to buy additional shares at a discount. For an amusing and true rags-to-riches story, see M. S. Scholes and M. A. Wolfson, "Decentralized Investment Banking: The Case of Dividend-Reinvestment and Stock-Purchase Plans," *Journal of Financial Economics* 24 (September 1989), pp. 7–36.

[4] The distinction between a stock dividend and a stock split is technical. A stock dividend is shown in the accounts as a transfer from retained earnings to equity capital. A split is shown as a reduction in the par value of each share.

[5] The U.S. Securities and Exchange Commission's rule 10b-18 protects repurchasing firms from accusations of share-price manipulation. Adoption of this rule was one reason why repurchases have grown so rapidly. Open-market repurchases are subject to several restrictions, however. For example, repurchases cannot exceed a small fraction of daily trading volume.

prices at which it is prepared to repurchase stock. Shareholders submit offers declaring how many shares they wish to sell at each price and the company calculates the lowest price at which it can buy the desired number of shares.[6] Finally, repurchase sometimes takes place by direct negotiation with a major shareholder.

## 16-3   How Do Companies Decide on Payouts?

In 2004 a survey of senior executives asked about their firms' dividend policies.[7] Figure 16.3 paraphrases the executives' responses. Three features stand out:

1. Managers are reluctant to make dividend changes that may have to be reversed. They are particularly worried about having to rescind a dividend increase and, if necessary, would choose to raise new funds to maintain the payout.
2. To avoid the risk of a reduction in payout, managers "smooth" dividends. Consequently, dividend changes follow shifts in long-run sustainable earnings. Transitory earnings changes are unlikely to affect dividend payouts.
3. Managers focus more on dividend changes than on absolute levels. Thus paying a $2.00 dividend is an important financial decision if last year's dividend was $1.00, but no big deal if last year's dividend was $2.00.



▶ **FIGURE 16.3**

A 2004 survey of financial executives suggested that their firms were reluctant to cut the dividend and tried to maintain a smooth series of payments.

*Source:* A. Brav, J. R. Graham, C. R. Harvey, and R. Michaely, "Payout Policy in the 21st Century," *Journal of Financial Economics* 77 (September 2005), pp. 483–527. © 2005 Elsevier Science, used with permission.

---

[6] This is another example of the uniform-price auction described in Section 15.3.

[7] See A. Brav, J. R. Graham, C. R. Harvey, and R. Michaely, "Payout Policy in the 21st Century," *Journal of Financial Economics* 77 (September 2005), pp. 483–527. This paper revisits an earlier classic series of interviews on dividend policy described in J. Lintner, "Distribution of Incomes of Corporations among Dividends, Retained Earnings, and Taxes," *American Economic Review* 46 (May 1956), pp. 97–113.

While stock repurchases are like bumper dividends, they do not typically *substitute* for dividends. Over two-thirds of the companies that paid a dividend in 2007 also repurchased stock. Firms are likely to buy back stock when they have accumulated a large amount of unwanted cash or wish to change their capital structure by replacing equity with debt.

Unlike a stock repurchase, dividends are not regarded as an appropriate way to pay out transitory earnings. Therefore, many firms that repurchase stock would not contemplate using the cash to raise the dividend and so incur a commitment to maintain the payout.[8]

Given these differences in the way that dividends and repurchases are used, it is not surprising to find that repurchases are much more volatile than dividends. Repurchases generally mushroom during boom times as firms accumulate excess cash but wither in recessions. You can see this from Figure 16.1, which shows that repurchases fell sharply during the early 1990s and then again between 2000 and 2002. In 2008, as the depth of the financial crisis became clear, repurchases were again cut back sharply. (Even Exxon Mobil, the all-time repurchase champion, announced in May 2009 that it was cutting back repurchases to $5 billion per quarter, down from $8 billion per quarter a year earlier.) Dividends were also reduced, but not by nearly as much.

Until recently many countries banned or severely restricted the use of stock repurchases. As a result, firms that had amassed large amounts of cash were tempted to invest it at very low rates of return rather than hand it back to shareholders, who could have reinvested it in firms that were short of cash. But many of these limitations have now been removed. For example, Japan permitted repurchases in 1995 and Sweden in 2000, while Germany relaxed its restrictions in 1998.[9] Many multinational giants now repurchase huge amounts of stock. For example, in 2007 the Spanish bank BBVA, BP, Royal Dutch Shell, and Glaxo Smith Kline all spent huge sums on buying back their stock.

## 16-4 The Information in Dividends and Stock Repurchases

In some countries you cannot rely on the information that companies provide. Passion for secrecy and a tendency to construct multilayered corporate organizations produce asset and earnings figures that are next to meaningless. Some people say that, thanks to creative accounting, the situation is little better for some companies in the U.S.

How does an investor in such a world separate marginally profitable firms from the real money makers? One clue is dividends. Investors can't read managers' minds, but they can learn from managers' actions. They know that a firm that reports good earnings and pays a generous dividend is putting its money where its mouth is. We can understand, therefore, why investors would value the *information content of dividends* and would refuse to believe a firm's reported earnings unless they were backed up by an appropriate dividend policy.

Of course, firms can cheat in the short run by overstating earnings and scraping up cash to pay a generous dividend. But it is hard to cheat in the long run, for a firm that is not making enough money will not have enough cash to pay out. If a firm chooses a high dividend payout without the cash flow to back it up, that firm will ultimately have to reduce its investment plans or turn to investors for additional debt or equity financing. All of these consequences are costly. Therefore, most managers don't increase dividends until they are confident that sufficient cash will flow in to pay them.

---

[8] See, for example, R. Dittmar and A. Dittmar, "Stock Repurchase Waves: An Examination of the Trends in Aggregate Corporate Payout Policy," working paper, University of Michigan at Ann Arbor, February 2004.

[9] For a survey of repurchase practices in different countries, see International Organization of Securities Commissions (IOSCO), "Report on Stock Repurchase Programs," February 2004, **www.iosco.org**.

Do dividend changes convey information about future as well as current profitability? The evidence is mixed. Several researchers find that dividend increases do not predict increased earnings growth. However, Healy and Palepu, who focus on companies that paid a dividend for the first time, find that on average earnings jumped 43% in the year a dividend was paid. If managers thought that this was a temporary windfall, they might have been cautious about committing themselves to paying out cash. But it looks as if these managers had good reason to be confident about prospects, for earnings continued to rise in the following years.[10]

Investors certainly appear to take comfort from an increase in dividends. When the increase is announced, analysts generally up their forecast of the current year's earnings.[11] It is no surprise, therefore, to find that a higher dividend prompts a rise in the stock price, whereas a dividend cut results in a fall in price. For example, in the case of the dividend initiations studied by Healy and Palepu, the dividend announcement resulted in a 4% stock-price increase on average.[12]

Notice that investors do not get excited about the *level* of a company's dividend; they worry about the *change,* which they view as an important indicator of the sustainability of earnings.

It seems that in some other countries investors are less preoccupied with dividend changes. For example, in Japan there is a much closer relationship between corporations and major stockholders, and therefore information may be more easily shared with investors. Consequently, Japanese corporations are more prone to cut their dividends when there is a drop in earnings, but investors do not mark the stocks down as sharply as in the U.S.[13]

Do not assume that all dividend cuts are bad news, however. The nearby box explains how investors endorsed a drastic dividend cut announced in 2009 by J.P. Morgan.

## The Information Content of Share Repurchases

Share repurchases, like dividends, are a way to hand cash back to shareholders. But unlike dividends, share repurchases are frequently a one-off event. So a company that announces a repurchase program is not making a long-term commitment to distribute more cash. The information in the announcement of a share repurchase program is therefore different from the information in a dividend payment.

Corporations repurchase shares when they have accumulated excess cash or when they want to substitute debt for equity. Shareholders applaud payout of excess cash when they worry that the firm would otherwise fritter the money away on perks or unprofitable empire building. Shareholders also know that firms with large quantities of debt to service are less likely to squander cash. A study by Comment and Jarrell, who looked at the announcements of open-market repurchase programs, found that on average they resulted in an abnormal price rise of 2%.[14]

[10] P. Healy and K. Palepu, "Earnings Information Conveyed by Dividend Initiations and Omissions," *Journal of Financial Economics* 21 (1988), pp. 149–175. For an example of a study that finds no information in dividend changes, see G. Grullon, R. Michaely, and B. Swaminathan, "Are Dividend Changes a Sign of Firm Maturity?" *Journal of Business* 75 (July 2002), pp. 387–424.

[11] A. R. Ofer and D. R. Siegel, "Corporate Financial Policy, Information, and Market Expectations: An Empirical Investigation of Dividends," *Journal of Finance* 42 (September 1987), pp. 889–911.

[12] The 4% average return was adjusted for market returns. Healy and Palepu also looked at companies that *stopped* paying a dividend. In this case the stock price on average declined by 9.5% on the announcement and earnings fell over the next four quarters.

[13] The dividend policies of Japanese *keiretsus* are analyzed in K. L. Dewenter and V. A. Warther, "Dividends, Asymmetric Information, and Agency Conflicts: Evidence from a Comparison of the Dividend Policies of Japanese and U.S. Firms," *Journal of Finance* 53 (June 1998), pp. 879–904.

[14] R. Comment and G. Jarrell, "The Relative Signalling Power of Dutch-Auction and Fixed Price Self-Tender Offers and Open-Market Share Repurchases," *Journal of Finance* 46 (September 1991), pp. 1243–1271. There is also evidence of continuing superior performance during the years following a repurchase announcement. See D. Ikenberry, J. Lakonishok, and T. Vermaelen, "Market Underreaction to Open Market Share Repurchases," *Journal of Financial Economics* 39 (October 1995), pp. 181–208.

# Good News: J.P. Morgan Cuts Its Dividend to a Nickel

❯ On February 23, 2009, J.P. Morgan cut its quarterly dividend from 38¢ to a nickel (5¢) per share. The cut was a surprise to investors, but the bank's share price *increased* by about 5%.

Usually dividend cuts or omissions are bad news, because investors infer trouble. Investors take the cut as a signal of a cash or earnings shortfall—and they are usually right. Managers know that cuts will be treated as bad news, so they usually put off cuts until enough bad news accumulates to force them to act. For example, General Motors, which lost $39 billion in 2007 and $31 billion in 2008, continued paying quarterly dividends of 25¢ per share until June 2008, when it cut its dividend to zero.

J.P. Morgan Chase, however, acted from a position of relative strength. It remained profitable when other large U.S. banks were announcing horrific losses. Its CEO James Dimon explained that the dividend cut would save $5 billion a year and pre- pare it for a worst-case recession. It would also "put the bank in a position to pay back more quickly the $25 billion that it took from the government under the Troubled Asset Relief Program." J.P. Morgan has said it was encouraged to take the money and didn't need it.

Thus investors interpreted the dividend cut as a signal of confidence, not of distress.

**Source:** R. Sidel and M. Rieker, "J.P. Morgan Makes 87% Cut in its Dividend to a Nickel," *The New York Times*, February 24, 2009, pp. C1, C3.

---

Stock repurchases may also be used to signal a manager's confidence in the future. Suppose that you, the manager, believe that your stock is substantially undervalued. You announce that the company is prepared to buy back a fifth of its stock at a price that is 20% above the current market price. But (you say) you are certainly not going to sell any of your own stock at that price. Investors jump to the obvious conclusion—you must believe that the stock is a good value even at 20% above the current price.

When companies offer to repurchase their stock at a premium, senior management and directors usually commit to hold on to their stock.[15] So it is not surprising that researchers have found that announcements of offers to buy back shares above the market price have prompted a larger rise in the stock price, averaging about 11%.[16]

## 16-5 The Payout Controversy

We have seen that a change in payout may provide information about management's con- fidence in the future and so affect the stock price. But eventually this change in the stock price would happen anyway as information seeps out through other channels. But does payout policy change the value of the firm's common stock, rather than just sending a signal about value?

One endearing feature of economics is its ability to accommodate not just two, but three, opposing points of view. And so it is with payout policy. On the right, a conservative

---

[15] Not only do managers hold on to their stock; on average they also add to their holdings *before* the announcement of a repurchase. See D. S. Lee, W. Mikkelson, and M. M. Partch, "Managers' Trading around Stock Repurchases," *Journal of Finance* 47 (December 1992), pp. 1947–1961.

[16] See R. Comment and G. Jarrell, *op. cit.*

group argues that investors prefer higher dividend payouts. On the left, another group argues that higher dividends decrease value, because dividends are taxed more heavily than capital gains. And in the center, there is a middle-of-the-road party that claims that payout policy makes no difference.

### Dividend Policy Is Irrelevant in Perfect Capital Markets

The middle-of-the-road party was founded in 1961 by Miller and Modigliani (always referred to as "MM"), when they published a proof that dividend policy is irrelevant in a world without taxes, transaction costs, or other market imperfections.[17] MM argued as follows. Suppose your firm has settled on its investment program. You have a plan to finance the investments with cash on hand, additional borrowing, and reinvestment of future earnings. Any surplus cash is to be paid out as dividends.

Now think what happens if you want to increase the total payout by upping the dividend without also changing the investment and financing policy. The extra money must come from somewhere. If the firm fixes its borrowing, the only way it can finance the extra dividend is to print some more shares and sell them. The new stockholders are going to part with their money only if you can offer them shares that are worth as much as they cost. But how can the firm sell more shares when its assets, earnings, investment opportunities, and, therefore, market value are all unchanged? The answer is that there must be a *transfer of value* from the old to the new stockholders. The new ones get the newly printed shares, each one worth less than before the dividend change was announced, and the old ones suffer a capital loss on their shares. The capital loss borne by the old shareholders just offsets the extra cash dividend they receive.

Figure 16.4 shows how this transfer of value occurs. Our hypothetical company pays out a third of its total value as a dividend and it raises the money to do so by selling new shares.



> ▶ **FIGURE 16.4**
>
> This firm pays out a third of its worth as a dividend and raises the money by selling new shares. The transfer of value to the new stockholders is equal to the dividend payment. The total value of the firm is unaffected.

[17] M. H. Miller and F. Modigliani, "Dividend Policy, Growth and the Valuation of Shares," *Journal of Business* 34 (October 1961), pp. 411–433. MM's arguments were anticipated in 1938 in J. B. Williams, *The Theory of Investment Value* (Cambridge, MA: Harvard University Press, 1938). Also, a proof similar to MM's was developed in J. Lintner, "Dividends, Earnings, Leverage and Stock Prices and the Supply of Capital to Corporations," *Review of Economics and Statistics* 44 (August 1962), pp. 243–269.

The capital loss suffered by the old stockholders is represented by the reduction in the size of the red boxes. But that capital loss is exactly offset by the fact that the new money raised (the black boxes) is paid over to them as dividends.

Does it make any difference to the old stockholders that they receive an extra dividend payment plus an offsetting capital loss? It might if that were the only way they could get their hands on cash. But as long as there are efficient capital markets, they can raise the cash by selling shares. Thus the old shareholders can cash in either by persuading the management to pay a higher dividend or by selling some of their shares. In either case there will be a transfer of value from old to new shareholders. The only difference is that in the former case this transfer is caused by a dilution in the value of each of the firm's shares, and in the latter case it is caused by a reduction in the number of shares held by the old shareholders. The two alternatives are compared in Figure 16.5.

Because investors do not need dividends to get their hands on cash, they will not pay higher prices for the shares of firms with high payouts. Therefore firms ought not to worry about dividend policy. They can let dividends fluctuate as a by-product of their investment and financing decisions.

## Dividend Irrelevance—An Illustration

Consider the case of Rational Demiconductor, which at this moment has the following balance sheet:

**Rational Demiconductor's Balance Sheet (Market Values)**

| | | | |
|---|---|---|---|
| Cash ($1,000 held for investment) | 1,000 | 0 | Debt |
| Fixed assets | 9,000 | 10,000 + NPV | Equity |
| Investment opportunity ($1,000 investment required) | NPV | | |
| Total asset value | $10,000 + NPV | $10,000 + NPV | Value of firm |

Rational Demiconductor has $1,000 cash earmarked for a project requiring a $1,000 investment. We do not know how attractive the project is, and so we enter it at NPV; after the project is undertaken it will be worth $1,000 + NPV. Note that the balance sheet is



▶ **FIGURE 16.5**

Two ways of raising cash for the firm's original shareholders. In each case the cash received is offset by a decline in the value of the old stockholders' claim on the firm. If the firm pays a dividend, each share is worth less because more shares have to be issued against the firm's assets. If the old stockholders sell some of their shares, each share is worth the same but the old stockholders have fewer shares.

constructed with market values; equity equals the market value of the firm's outstanding shares (price per share times number of shares outstanding). It is not necessarily equal to their book value.

Now Rational Demiconductor uses the cash to pay a $1,000 dividend to its stockholders. The benefit to them is obvious: $1,000 of spendable cash. It is also obvious that there must be a cost. The cash is not free.

Where does the money for the dividend come from? Of course, the immediate source of funds is Rational Demiconductor's cash account. But this cash was earmarked for the investment project. Since we want to isolate the effects of dividend policy on shareholders' wealth, we assume that the company *continues* with the investment project. That means that $1,000 in cash must be raised by new financing. This could consist of an issue of either debt or stock. Again, we just want to look at dividend policy for now, and we defer discussion of the debt-equity choice until Chapters 17 and 18. Thus Rational Demiconductor ends up financing the dividend with a $1,000 stock issue.

Now we examine the balance sheet after the dividend is paid, the new stock is sold, and the investment is undertaken. Because Rational Demiconductor's investment and borrowing policies are unaffected by the dividend payment, its *overall* market value must be unchanged at $10,000 + NPV.[18] We know also that if the new stockholders pay a fair price, their stock is worth $1,000. That leaves us with only one missing number—the value of the stock held by the original stockholders. It is easy to see that this must be

$$\text{Value of original stockholders' shares} = \text{value of company} - \text{value of new shares}$$
$$= (10{,}000 + \text{NPV}) - 1{,}000$$
$$= \$9{,}000 + \text{NPV}$$

The old shareholders have received a $1,000 cash dividend and incurred a $1,000 capital loss. Dividend policy doesn't matter.

By paying out $1,000 with one hand and taking it back with the other, Rational Demiconductor is recycling cash. To suggest that this makes shareholders better off is like advising a cook to cool the kitchen by leaving the refrigerator door open.

Of course, our proof ignores taxes, issue costs, and a variety of other complications. We turn to those items in a moment. The really crucial assumption in our proof is that the new shares are sold at a fair price. The shares sold to raise $1,000 must actually be *worth* $1,000.[19] In other words, we have assumed efficient capital markets.

## Calculating Share Price

We have assumed that Rational Demiconductor's new shares can be sold at a fair price, but what is that price and how many new shares are issued?

Suppose that before this dividend payout the company had 1,000 shares outstanding and that the project had an NPV of $2,000. Then the old stock was worth in total $10,000 + NPV = $12,000, which works out at $12,000/1,000 = $12 per share. After the company has paid the dividend and completed the financing, this old stock is worth $9,000 + NPV = $11,000. That works out at $11,000/1,000 = $11 per share. In other words, the price of the old stock falls by the amount of the $1 per share dividend payment.

Now let us look at the new stock. Clearly, after the issue this must sell at the same price as the rest of the stock. In other words, it must be valued at $11. If the new stockholders

---

[18] All other factors that might affect Rational Demiconductor's value are assumed constant. This is not a necessary assumption, but it simplifies the proof of MM's theory.

[19] The "old" shareholders get all the benefit of the positive-NPV project. The new shareholders require only a fair rate of return. They are making a zero-NPV investment.

get fair value, the company must issue $1,000/$11 or 91 new shares in order to raise the $1,000 that it needs.

## Stock Repurchase

We have seen that any increased cash dividend payment must be offset by a stock issue if the firm's investment and borrowing policies are held constant. In effect the stockholders finance the extra dividend by selling off part of their ownership of the firm. Consequently, the stock price falls by just enough to offset the extra dividend.

This process can also be run backward. With investment and borrowing policy given, any *reduction* in dividends must be balanced by a reduction in the number of shares issued or by repurchase of previously outstanding stock. But if the process has no effect on stockholders' wealth when run forward, it must likewise have no effect when run in reverse. We will confirm this by another numerical example.

Suppose that a technical discovery reveals that Rational Demiconductor's new project is not a positive-NPV venture but a sure loser. Management announces that the project is to be discarded and that the $1,000 earmarked for it will be paid out as an extra dividend of $1 per share. After the dividend payout, the balance sheet is

**Rational Demiconductor's Balance Sheet (Market Values)**

| | | | |
|---|---|---|---|
| Cash | $ 0 | $ 0 | Debt |
| Existing fixed assets | 9,000 | 9,000 | Equity |
| New project | 0 | | |
| Total asset value | $ 9,000 | $ 9,000 | Total firm value |

Since there are 1,000 shares outstanding, the stock price is $10,000/1,000 = $10 before the dividend payment and $9,000/1,000 = $9 *after* the payment.

What if Rational Demiconductor uses the $1,000 to repurchase stock instead? As long as the company pays a fair price for the stock, the $1,000 buys $1,000/$10 = 100 shares. That leaves 900 shares worth 900 × $10 = $9,000.

As expected, we find that switching from cash dividends to share repurchase has no effect on shareholders' wealth. They forgo a $1 cash dividend but end up holding shares worth $10 instead of $9.

Note that when shares are repurchased the transfer of value is in favor of those stockholders who do not sell. They forgo any cash dividend but end up owning a larger slice of the firm. In effect they are using their share of Rational Demiconductor's $1,000 distribution to buy out some of their fellow shareholders.

## Stock Repurchase and Valuation

Valuing the equity of a firm that repurchases its own stock can be confusing. Let's work through a simple example.

Company X has 100 shares outstanding. It earns $1,000 a year, all of which is paid out as a dividend. The dividend per share is, therefore, $1,000/100 = $10. Suppose that investors expect the dividend to be maintained indefinitely and that they require a return of 10%. In this case the value of each share is $PV_{share} = $10/.10 = $100$. Since there are 100 shares outstanding, the *total* market value of the equity is $PV_{equity} = 100 × $100 = $10,000$. Note that we could reach the same conclusion by discounting the *total* dividend payments to shareholders ($PV_{equity} = $1,000/.10 = $10,000$).[20]

---

[20] When valuing the entire equity, remember that if the company is expected to issue additional shares in the future, we should include the dividend payments on these shares only if we also include the amount that investors pay for them. See Chapter 19.

Now suppose the company announces that instead of paying a cash dividend in year 1, it will spend the same money repurchasing its shares in the open market. The total expected cash flows to shareholders (dividends and cash from stock repurchase) are unchanged at $1,000. So the total value of the equity also remains at $1,000/.10 = $10,000. This is made up of the value of the $1,000 received from the stock repurchase in year 1 ($PV_{repurchase}$ = $1,000/1.1 = $909.1) and the value of the $1,000-a-year dividend starting in year 2 [$PV_{dividends}$ = $1,000/(.10 \times 1.1) = $9,091]. Each share continues to be worth $10,000/100 = $100 just as before.

Think now about those shareholders who plan to sell their stock back to the company. They will demand a 10% return on their investment. So the expected price at which the firm buys back shares must be 10% higher than today's price, or $110. The company spends $1,000 buying back its stock, which is sufficient to buy $1,000/$110 = 9.09 shares.

The company starts with 100 shares, it buys back 9.09, and therefore 90.91 shares remain outstanding. Each of these shares can look forward to a dividend stream of $1,000/90.91 = $11 per share. So after the repurchase shareholders have 10% fewer shares, but earnings and dividends per share are 10% higher. An investor who owns one share today that is not repurchased will receive no dividends in year 1 but can look forward to $11 a year thereafter. The value of each share is therefore $11/(.1 \times 1.1) = $100.

Our example illustrates several points. First, other things equal, company value is unaffected by the decision to repurchase stock rather than to pay a cash dividend. Second, when valuing the entire equity you need to include both the cash that is paid out as dividends and the cash that is used to repurchase stock. Third, when calculating the cash flow *per share*, it is double counting to include both the forecasted dividends per share *and* the cash received from repurchase (if you sell back your share, you don't get any subsequent dividends). Fourth, a firm that repurchases stock instead of paying dividends reduces the number of shares outstanding but produces an offsetting increase in subsequent earnings and dividends per share.

## 16-6 The Rightists

MM said that dividend policy is irrelevant because it does not affect shareholder value. MM did not say that payout should be random or erratic; for example, it may change over the life cycle of the firm. A young growth firm pays out little or nothing, to maximize the cash flow available for investment. As the firm matures, positive-NPV investment opportunities are harder to come by and growth slows down. There is cash available for payout to shareholders. At some point the firm commits to pay a regular dividend. It may also repurchase shares. In old age, profitable growth opportunities disappear, and payout may become much more generous.

Of course MM assumed absolutely perfect and efficient capital markets. In MM's world, everyone is a rational optimizer. The right-wing payout party points to real-world imperfections that could make high dividend payout ratios better than low ones. There is a natural clientele for high-payout stocks, for example. Some financial institutions are legally restricted from holding stocks lacking established dividend records.[21] Trusts and endowment funds may prefer high-dividend stocks because dividends are regarded as spendable "income," whereas capital gains are "additions to principal."

There is also a natural clientele of investors, such as the elderly, who look to their stock portfolios for a steady source of cash to live on.[22] In principle, this cash could be easily

---

[21] Most colleges and universities are legally free to spend capital gains from their endowments, but they usually restrict spending to a moderate percentage that can be covered by dividends and interest receipts.

[22] See, for example, J. R. Graham and A. Kumar, "Do Dividend Clienteles Exist? Evidence on Dividend Preferences of Retail Investors," *Journal of Finance* 61 (June 2006), pp. 1305–1336; and M. Baker, S. Nagel and J. Wurgler, "The Effect of Dividends on Consumption," *Brookings Papers on Economic Activites* (2007), pg 277–291.

## Microsoft's Payout Bonanza

❯ There is a point at which hoarding money becomes embarrassing. . . . Microsoft, which grew into the world's largest software company . . . and which has been generating cash at the rate of $1 billion a month passed that point years ago. On July 20th, it finally addressed the issue.

Its solution was to give back to its shareholders, in various forms, an unprecedented $75 billion. One dollop, to the tune of $32 billion, will be a one-time dividend to be paid in December. Another will be share buybacks worth $30 billion over four years.

The third will be a doubling of Microsoft's ongoing dividend to 32 cents a share annually, payable in quarterly instalments. Not bad for a company that has not even turned 30 yet, and that only declared its first dividend in January 2003.

The decision is impressive for the mature analysis by Microsoft of its role in the industry and the prospects for the future that it implies.

**Source:** "An End to Growth?" *The Economist,* July 24, 2004, p. 61. © 2004 The Economist Newspaper Group, Inc. Reprinted with permission. Further reproduction prohibited (**www.economist.com**).

generated from stocks paying no dividends at all; the investor could just sell off a small fraction of his or her holdings from time to time. But it is simpler and cheaper for the company to send a quarterly check than for its shareholders to sell, say, one share every three months. Regular dividends relieve many of its shareholders of transaction costs and considerable inconvenience.[23]

Some observers have appealed to behavioral psychology to explain why we may prefer to receive those regular dividends rather than sell small amounts of stock.[24] We are all, they point out, liable to succumb to temptation. Some of us may hanker after fattening foods, while others may be dying for a drink. We could seek to control these cravings by willpower, but that can be a painful struggle. Instead, it may be easier to set simple rules for ourselves ("cut out chocolate," or "wine with meals only"). In just the same way, we may welcome the self-discipline that comes from spending only dividend income, and thereby sidestep the difficult decision of how much we should dip into capital.

### Payout Policy, Investment Policy, and Management Incentives

Perhaps the most persuasive argument in favor of the rightist position is that paying out funds to shareholders prevents managers from misusing or wasting funds.[25] Suppose a company has plenty of free cash flow but few profitable investment opportunities. Shareholders may not trust the managers to spend retained earnings wisely and may fear that the money will be plowed back into building a larger empire rather than a more profitable one. In such cases investors may demand higher dividends or a stock repurchase not because these are valuable in themselves, but because they encourage a more careful, value-oriented investment policy.

---

[23] Those advocating generous dividends might go on to argue that a regular cash dividend relieves stockholders of the risk of having to sell shares at "temporarily depressed" prices. Of course, the firm will have to issue shares eventually to finance the dividend, but (the argument goes) the firm can pick the *right time* to sell. If firms really try to do this and if they are successful—two big *ifs*—then stockholders of high-payout firms might indeed get something for nothing.

[24] See H. Shefrin and M. Statman, "Explaining Investor Preference for Cash Dividends," *Journal of Financial Economics* 13 (June 1984), pp. 253–282.

[25] See M. Rozeff, "Growth, Beta and Agency Costs as Determinants of Dividend Payout Ratios," *Journal of Financial Research* 5 (1982), pp. 249–259; F. Easterbrook, "Two Agency Cost Explanations of Dividends," *American Economic Review* 74 (1984), pp. 650–659; and especially M. Jensen, "Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers," *American Economic Review* 76 (May 1986), pp. 323–329.

The nearby box describes how Microsoft announced the largest cash distribution in corporate history. By 2004 the company's investment opportunities had diminished, and investors were, therefore, happy to see Microsoft distribute its cash mountain.

Microsoft paid out its gigantic special dividend willingly. Other cash-cow corporations may let go of cash grudgingly under pressure from investors. Stock price falls when investors sense excessive perks or empire building. The threat of a falling stock price is an excellent motivator, particularly for top managers holding valuable stock options.

The willingness of mature corporations to make generous payouts shows that corporate governance works in the U.S. and other developed economies. But governance is less effective in many emerging economies, and managers' and stockholders' interests are not as closely aligned. Payout ratios are smaller where governance is weak.[26]

## 16-7 Taxes and the Radical Left

The left-wing dividend creed is simple: Whenever dividends are taxed more heavily than capital gains, firms should pay the lowest cash dividend they can get away with. Available cash should be retained or used to repurchase shares.

By shifting their distribution policies in this way, corporations can transmute dividends into capital gains. If this financial alchemy results in lower taxes, it should be welcomed by any taxpaying investor. That is the basic point made by the leftist party when it argues for low-dividend payout.

If dividends are taxed more heavily than capital gains, investors should pay more for stocks with low dividend yields. In other words, they should accept a lower *pretax* rate of return from securities offering returns in the form of capital gains rather than dividends. Table 16.1 illustrates this. The stocks of firms A and B are equally risky. Investors expect A to be worth $112.50 per share next year. The share price of B is expected to be only $102.50, but a $10 dividend is also forecasted, and so the total pretax payoff is the same, $112.50.

| | Firm A (No Dividend) | Firm B (High Dividend) |
|---|---|---|
| Next year's price | $112.50 | $102.50 |
| Dividend | $0 | $10.00 |
| Total pretax payoff | $112.50 | $112.50 |
| Today's stock price | $100 | $97.78 |
| Capital gain | $12.50 | $4.72 |
| Before-tax rate of return | $100 \times \left(\dfrac{12.5}{100}\right) = 12.5\%$ | $100 \times \left(\dfrac{14.72}{97.78}\right) = 15.05\%$ |
| Tax on dividend at 40% | $0 | $.40 \times 10 = \$4.00$ |
| Tax on capital gains at 20% | $.20 \times 12.50 = \$2.50$ | $.20 \times 4.72 = \$.94$ |
| Total after-tax income (dividends plus capital gains less taxes) | $(0 + 12.50) - 2.50 = \$10.00$ | $(10.00 + 4.72) - (4.00 + .94) = \$9.78$ |
| After-tax rate of return | $100 \times \left(\dfrac{10}{100}\right) = 10.0\%$ | $100 \times \left(\dfrac{9.78}{97.78}\right) = 10.0\%$ |

▶ **TABLE 16.1** Effects of a shift in dividend policy when dividends are taxed more heavily than capital gains. The high-payout stock (firm B) must sell at a lower price to provide the same after-tax return.

---

[26] See R. La Porta, F. Lopez-de-Silanes, A. Shleifer, and R. W. Vishny, "Agency Problems and Dividend Policies around the World," *Journal of Finance* 55 (February 2000), pp. 1–34.

Yet we find B's stock selling for less than A's and therefore offering a higher pretax rate of return. The reason is obvious: Investors prefer A because its return comes in the form of capital gains. Table 16.1 shows that A and B are equally attractive to investors who, we assume, pay a 40% tax on dividends and a 20% tax on capital gains. Each offers a 10% return after all taxes. The difference between the stock prices of A and B is exactly the present value of the extra taxes the investors face if they buy B.[27]

The management of B could save these extra taxes by eliminating the $10 dividend and using the released funds to repurchase stock instead. Its stock price should rise to $100 as soon as the new policy is announced.

## Why Pay Any Dividends at All?

It is true that when companies make very large one-off distributions of cash to shareholders, they generally choose to do so by share repurchase rather than by a large temporary hike in dividends. But if dividends attract more tax than capital gains, why should any firm ever pay a cash dividend? If cash is to be distributed to stockholders, isn't share repurchase always the best channel for doing so? The leftist position seems to call not just for low payouts but for *zero* payouts whenever capital gains have a tax advantage.

Few leftists would go quite that far. A firm that eliminates dividends and starts repurchasing stock on a regular basis may find that the Internal Revenue Service recognizes the repurchase program for what it really is and taxes the payments accordingly. That is why financial managers do not usually announce that they are repurchasing shares to save stockholders taxes; they give some other reason.[28]

The low-payout party has nevertheless maintained that the market rewards firms that have low-payout policies. They have claimed that firms that paid dividends and as a result had to issue shares from time to time were making a serious mistake. Any such firm was essentially financing its dividends by issuing stock; it should have cut its dividends at least to the point at which stock issues were unnecessary. This would not only have saved taxes for shareholders but it would also have avoided the transaction costs of the stock issues.[29]

## Empirical Evidence on Dividends and Taxes

It is hard to deny that taxes are important to investors. You can see that in the bond market. Interest on municipal bonds is not taxed, and so municipals usually sell at low pretax yields. Interest on federal government bonds is taxed, and so these bonds sell at higher pretax yields. It does not seem likely that investors in bonds just forget about taxes when they enter the stock market.

There is some evidence that in the past taxes have affected U.S. investors' choice of stocks.[30] Lightly taxed institutional investors have tended to hold high-yield stocks and retail investors have preferred low-yield stocks. Moreover, this preference for low-yield stocks has been somewhat more marked for high-income individuals. Nevertheless, it seems that taxes have been only a secondary consideration with these investors, and have not deterred individuals in high-tax brackets from holding substantial amounts of dividend-paying stocks.

---

[27] Michael Brennan has modeled what happens when you introduce taxes into an otherwise perfect market. He found that the capital asset pricing model continues to hold, but on an *after-tax* basis. Thus, if A and B have the same beta, they should offer the same after-tax rate of return. The spread between pretax and post-tax returns is determined by a weighted average of investors' tax rates. See M. J. Brennan, "Taxes, Market Valuation and Corporate Financial Policy," *National Tax Journal* 23 (December 1970), pp. 417–427.

[28] They might say, "Our stock is a good investment," or, "We want to have the shares available to finance acquisitions of other companies." What do you think of these rationales?

[29] These costs can be substantial. Refer back to Chapter 15, especially Figure 15.5.

[30] See, for example, Y. Grinstein and R. Michaely, "Institutional Holdings and Payout Policy," *Journal of Finance* 60 (June 2005), pp. 1389–1426; and J. R. Graham and A. Kumar, "Do Dividend Clienteles Exist? Evidence on Dividend Preferences of Retail Investors," *Journal of Finance* 61 (June 2006), pp. 1305–1336.

If investors are concerned about taxes, we might also expect that, when the tax penalty on dividends is high, companies would think twice about increasing the payout. Only about a fifth of U.S. financial managers cite investor taxes as an important influence when the firm makes its dividend decision. On the other hand, firms have sometimes responded to major shifts in the way that investors are taxed. For example, when Australia introduced a tax change in 1987 that effectively eliminated the tax penalty on dividends for Australian investors, firms became more willing to increase their payout.[31]

If tax considerations are important, we would expect to find a historical tendency for high-dividend stocks to sell at lower prices and therefore to offer higher returns, just as in Table 16.1. Unfortunately, there are difficulties in measuring this effect. For example, suppose that stock A is priced at $100 and is expected to pay a $5 dividend. The *expected* yield is, therefore, 5/100 = .05, or 5%. The company now announces bumper earnings and a $10 dividend. Thus with the benefit of hindsight, A's *actual* dividend yield is 10/100 = .10, or 10%. If the unexpected increase in earnings causes a rise in A's stock price, we will observe that a high actual yield is accompanied by a high actual return. But that would not tell us anything about whether a high *expected* yield was accompanied by a high *expected* return. To measure the effect of dividend policy, we need to estimate the dividends that investors expected.

A second problem is that nobody is quite sure what is meant by high dividend yield. For example, utility stocks have generally offered high yields. But did they have a high yield all year, or only in months or on days that dividends were paid? Perhaps for most of the year, they had zero yields and were perfect holdings for the highly taxed individuals.[32] Of course, high-tax investors did not want to hold a stock on the days dividends were paid, but they could sell their stock temporarily to a security dealer. Dealers are taxed equally on dividends and capital gains and therefore should not have demanded any extra return for holding stocks over the dividend period.[33] If shareholders could pass stocks freely between each other at the time of the dividend payment, we should not observe any tax effects at all.

A number of researchers have attempted to tackle these problems and to measure whether investors demand a higher return from high-yielding stocks. Their findings offer some limited comfort to the dividends-are-bad school, for most of the researchers have suggested that high-yielding stocks have provided higher returns. However, the estimated tax rates differ substantially from one study to another. For example, while Litzenberger and Ramaswamy concluded that investors have priced stocks as if dividend income attracted an extra 14% to 23% rate of tax, Miller and Scholes used a different methodology and came up with a negligible 4% difference in the rate of tax.[34]

### The Taxation of Dividends and Capital Gains

Many of these attempts to measure the effect of dividends are of more historical than current interest, for they look back at the years before 1986 when there was a dramatic

---

[31] K. Pattenden and G. Twite, "Taxes and Dividend Policy under Alternative Tax Regimes," *Journal of Corporate Finance* 14 (2008), pp. 1–16.

[32] Suppose there are 250 trading days in a year. Think of a stock paying quarterly dividends. We could say that the stock offers a high dividend yield on 4 days but a zero dividend yield on the remaining 246 days.

[33] The stock could also be sold to a corporation, which could "capture" the dividend and then resell the shares. Corporations are natural buyers of dividends, because they pay tax only on 30% of dividends received from other corporations. (We say more on the taxation of intercorporate dividends later in this section.)

[34] See R. H. Litzenberger and K. Ramaswamy, "The Effects of Dividends on Common Stock Prices: Tax Effects or Information Effects," *Journal of Finance* 37 (May 1982), pp. 429–443; and M. H. Miller and M. Scholes, "Dividends and Taxes: Some Empirical Evidence," *Journal of Political Economy* 90 (1982), pp. 1118–1141. Merton Miller provides a broad review of the empirical literature in "Behavioral Rationality in Finance: The Case of Dividends," *Journal of Business* 59 (October 1986), pp. S451–S468.

difference between the taxation of dividends and capital gains.[35] As we write this in 2009, the top rate of tax on both dividends and capital gains is 15%.[36]

There is, however, one way that tax law continues to favor capital gains. Taxes on dividends have to be paid immediately, but taxes on capital gains can be deferred until shares are sold and the capital gains are realized. Stockholders can choose when to sell their shares and thus when to pay the capital gains tax. The longer they wait, the less the present value of the capital gains tax liability.[37]

The distinction between dividends and capital gains is not important for many financial institutions, which operate free of all taxes and therefore have no reason to prefer capital gains to dividends or vice versa. For example, pension funds are untaxed. These funds hold roughly $3 trillion in common stocks, so they have enormous clout in the U.S. stock market. Only corporations have a tax reason to *prefer* dividends. They pay corporate income tax on only 30% of any dividends received. Thus the effective tax rate on dividends received by large corporations is 30% of 35% (the marginal corporate tax rate), or 10.5%. But they have to pay a 35% tax on the full amount of any realized capital gain.

The implications of these tax rules for dividend policy are pretty simple. Capital gains have advantages to many investors, but they are far less advantageous than they were 20 or 30 years ago.[38] Thus, the leftist case for minimizing cash dividends is weaker than it used to be.

## Alternative Tax Systems

In the U.S. shareholders' returns are taxed twice. They are taxed at the corporate level (corporate tax) and in the hands of the shareholder (income tax or capital gains tax). These two tiers of tax are illustrated in Table 16.2, which shows the after-tax return to the shareholder if the company distributes all its income as dividends. We assume the company earns $100 a share before tax and therefore pays corporate tax of .35 × 100 = $35. This leaves $65



| | | |
|---|---|---|
| Operating income | 100 | |
| Corporate tax at 35% | 35 | ← Corporate tax |
| After-tax income (paid out as dividends) | 65 | |
| Income tax paid by investor at 15% | 9.75 | ← Second tax paid by investor |
| Net income to shareholder | 55.25 | |

▶ **TABLE 16.2**   In the United States returns to shareholders are taxed twice. This example assumes that all income after corporate taxes is paid out as cash dividends to an investor in the top income tax bracket (figures in dollars per share).

---

[35] The Tax Reform Act of 1986 equalized the tax rates on dividends and capital gains. A gap began to open up again in 1992.

[36] These rates were established by the *Jobs and Growth Tax Relief Reconciliation Act* of 2003 and have been extended to 2010. Note that capital gains realized within a year of purchase and dividends on stocks held for less than 61 days are taxed as ordinary income.

[37] When securities are sold, capital gains tax is paid on the difference between the selling price and the initial purchase price or *basis*. Thus, shares purchased in 2004 for $20 (the basis) and sold for $30 in 2009 would generate $10 per share in capital gains and a tax of $1.50 at a 15% tax rate.

Suppose the investor now decides to defer sale for one year. Then, if the interest rate is 5%, the present value of the tax, viewed from 2009, falls to 1.50/1.05 = $1.43. That is, the *effective* capital gains rate is 14.3%. The longer sale is deferred, the lower the effective rate will be.

The effective rate falls to zero if the investor dies before selling, because the investor's heirs get to "step up" the basis without recognizing any taxable gain. Suppose the price is still $30 when the investor dies. The heirs could sell for $30 and pay no tax, because they could claim a $30 basis. The $10 capital gain would escape tax entirely.

[38] We described above how Microsoft in 2004 declared a special dividend of $32 billion. Would the company have done so if there had still been a substantial tax disadvantage to dividend payments? We doubt it.

a share to be paid out as a dividend, which is then subject to a second layer of tax. For example, a shareholder who is taxed at 15% pays tax on this dividend of .15 × 65 = $9.75. Only a tax-exempt pension fund or charity would retain the full $65.

Of course, dividends are regularly paid by companies that operate under very different tax systems. For example, Germany partly compensates for the corporate layer of tax by levying income tax on only half an individual's dividend income.

In some other countries, such as Australia and New Zealand, shareholders' returns are not taxed twice. For example, in Australia shareholders are taxed on dividends, but they may deduct from this tax bill their share of the corporate tax that the company has paid. This is known as an *imputation tax system*. Table 16.3 shows how the imputation system works. Suppose that an Australian company earns pretax profits of A$100 a share. After it pays corporate tax at 30%, the profit is A$70 a share. The company now declares a net dividend of A$70 and sends each shareholder a check for this amount. This dividend is accompanied by a tax credit saying that the company has already paid A$30 of tax on the shareholder's behalf. Thus shareholders are treated as if each received a total, or gross, dividend of 70 + 30 = A$100 and paid tax of A$30. If the shareholder's tax rate is 30%, there is no more tax to pay and the shareholder retains the net dividend of A$70. If the shareholder pays tax at the top personal rate of 45%, then he or she is required to pay an additional $15 of tax; if the tax rate is 15% (the rate at which Australian pension funds are taxed), then the shareholder receives a *refund* of 30 − 15 = A$15.[39]

Under an imputation tax system, millionaires have to cough up the extra personal tax on dividends. If this is more than the tax that they would pay on capital gains, then millionaires would prefer that the company does not distribute earnings. If it is the other way around, they would prefer dividends.[40] Investors with low tax rates have no doubts about the matter. If the company pays a dividend, these investors receive a check from the revenue service for the excess tax that the company has paid, and therefore they prefer high payout rates.

|  | Rate of Income Tax | | |
|---|---|---|---|
|  | 15% | 30% | 45% |
| Operating income | 100 | 100 | 100 |
| Corporate tax ($T_c = .30$) | 30 | 30 | 30 |
| After-tax income | 70 | 70 | 70 |
| Grossed-up dividend | 100 | 100 | 100 |
| Income tax | 15 | 30 | 45 |
| Tax credit for corporate payment | −30 | −30 | −30 |
| Tax due from shareholder | −15 | 0 | 15 |
| Available to shareholder | 85 | 70 | 55 |

▶ **TABLE 16.3**     Under imputation tax systems, such as that in Australia, shareholders receive a tax credit for the corporate tax that the firm has paid (figures in Australian dollars per share).

[39] In Australia, shareholders receive a credit for the full amount of corporate tax that has been paid on their behalf. In other countries the tax credit is less than the corporate tax rate. You can think of the tax system in these countries as lying between the Australian and U.S. systems.

[40] In the case of Australia the tax rate on capital gains is the same as the tax rate on dividends. However, for securities that are held for more than 12 months only half of the gain is taxed.

Look once again at Table 16.3 and think what would happen if the corporate tax rate were zero. The shareholder with a 15% tax rate would still end up with A\$85, and the shareholder with the 45% rate would still receive A\$55. Thus, under an imputation tax system, when a company pays out all its earnings, there is effectively only one layer of tax—the tax on the shareholder. The revenue service collects this tax through the company and then sends a demand to the shareholder for any excess tax or makes a refund for any overpayment.[41]

## 16-8 The Middle-of-the-Roaders

The middle-of-the-road party, which is principally represented by Miller, Black, and Scholes,[42] maintains that a company's value is not affected by its dividend policy. Unlike the other two parties, they emphasize that the supply of dividends is free to adjust to the demand. Therefore, if companies could increase their stock price by changing their dividend payout, they would surely have done so. Presumably, dividends are where they are because no company believes that it could add value simply by upping or reducing its dividend payout.

This "supply argument" is not inconsistent with the existence of a clientele of investors who prefer low-payout stocks. If necessary, these investors would be prepared to pay a premium for low-payout stocks. But perhaps they do not have to. Enough firms may have already noticed the existence of this clientele and switched to low-payout policies. If so, there is no incentive for *additional* firms to switch to low-payout policies. Similarly, there may well be some investors who prefer high dividends, but these investors too already have a wide choice of suitable stocks. A third group of investors, such as pension funds and other tax-exempt institutions, may have no reason to prefer dividends to capital gains. These investors will be happy to hold both low- and high-payout stocks, and the value that they place on each stock will be unaffected by the company's dividend policy. In that case we are back in an MM world where dividend policy does not affect value.[43]

The middle-of-the-roaders stress that companies would not supply such a large quantity of dividends unless they believed that this was what investors wanted. But that still leaves a puzzle. Even in the days when there was a large tax disadvantage to dividends, many investors were apparently happy to hold high-payout stocks. Why? The response of the middle-of-the-roaders has been to argue that there are always plenty of wrinkles in the tax system that shareholders can use to avoid paying taxes on dividends. For example, instead of investing directly in common stocks, they can do so through a pension fund or insurance company, which receives more favorable tax treatment. However, it is not clear that this is the whole story, for a high proportion of dividends is regularly paid out to wealthy individuals and included in their taxable income.[44]

---

[41] This is only true for earnings that are paid out as dividends. Retained earnings are subject to corporate tax. Shareholders get the benefit of retained earnings in the form of capital gains.

[42] F. Black and M. S. Scholes, "The Effects of Dividend Yield and Dividend Policy on Common Stock Prices and Returns," *Journal of Financial Economics* 1 (May 1974), pp. 1–22; M. H. Miller and M. S. Scholes, "Dividends and Taxes," *Journal of Financial Economics* 6 (December 1978), pp. 333–364; and M. H. Miller, "Behavioral Rationality in Finance: The Case of Dividends," *Journal of Business* 59 (October 1986), pp. S451–S468.

[43] Baker and Wurgler argue that the demand for dividends may change. When this is reflected in stock prices, firms adjust their dividend policy to cater for the shift in demand. Thus a shift in clienteles shows up in a change in firms' propensity to pay dividends. See M. Baker and J. Wurgler, "A Catering Theory of Dividends," *Journal of Finance* 59 (June 2004), pp. 1125–1165.

[44] See, for example, F. Allen and R. Michaely, "Payout Policy," in *Handbook of the Economics of Finance: Corporate Finance,* G. Constantinides, M. Harris, and R. Stulz, (eds.), (Amsterdam: North-Holland, 2003).

There is another possible reason that U.S. companies may pay dividends even when these dividends result in higher tax bills. Companies that pay *low* dividends will be more attractive to highly taxed individuals; those that pay *high* dividends will have a greater proportion of pension funds or other tax-exempt institutions as their stockholders. These financial institutions are sophisticated investors; they monitor carefully the companies that they invest in and they bring pressure on poor managers to perform. Successful, well-managed companies are happy to have financial institutions as investors, but their poorly managed brethren would prefer unsophisticated and more docile stockholders.

You can probably see now where the argument is heading. Well-managed companies want to signal their worth. They can do so by having a high proportion of demanding institutions among their stockholders. How do they achieve this? By paying high dividends. Those shareholders who pay tax do not object to these high dividends as long as the effect is to encourage institutional investors who are prepared to put the time and effort into monitoring the management.[45]

## Payout Policy and the Life Cycle of the Firm

MM said that dividend policy does not affect shareholder value. Shareholder value is driven by the firm's investment policy, including its future growth opportunities. Financing policy, including the choice between debt and equity, can also affect value, as we will see in Chapter 18.

In MM's analysis, payout is a residual, a by-product of other financial policies. The firm should make investment and financing decisions, and then pay out whatever cash is left over. Therefore payout should change over the life cycle of the firm.

MM assumed a perfect and rational world, but many of the complications discussed in this chapter actually reinforce the life cycle of payout. Let's review the life-cycle story.[46]

Young growth firms have plenty of profitable investment opportunities. During this time it is efficient to retain and reinvest all operating cash flow. Why pay out cash to investors if the firm then has to replace the cash by borrowing or issuing more shares? Retaining cash avoids costs of issuing securities and minimizes shareholders' taxes. Investors are not worried about wasteful overinvestment, because investment opportunities are good, and managers' compensation is tied to stock price.

As the firm matures, positive-NPV projects become scarcer relative to cash flow. The firm begins to accumulate cash. Now investors begin to worry about overinvestment or excessive perks. The investors pressure management to start paying out cash. Sooner or later, managers comply—otherwise stock price stagnates. The payout may come as share repurchases, but initiating a regular cash dividend sends a stronger and more reassuring signal of financial discipline. The commitment to financial discipline can outweigh the tax costs of dividends. (The middle-of-the-road party argues that the tax costs of paying cash dividends may not be that large, particularly in recent years, when U.S. personal tax rates on dividends and capital gains have been low.) Regular dividends may also be attractive to some types of investors, for example, retirees who depend on dividends for living expenses.

As the firm ages, more and more payout is called for. The payout may come as higher dividends or large repurchases. Sometimes the payout comes as the result of a takeover. Shareholders are bought out, and the firm's new owners generate cash by selling assets and restructuring operations. We discuss takeovers in Chapter 32.

---

[45] This signaling argument is developed in F. Allen, A. E. Bernardo, and I. Welch, "A Theory of Dividends Based on Tax Clienteles," *Journal of Finance* 55 (December 2000), pp. 2499–2536.

[46] Here we are following a life-cycle theory set out in H. DeAngelo, L. DeAngelo, and D. Skinner, "Corporate Payout Policy," *Foundations and Trends in Finance* 3 (2008), pp. 95–287.



**SUMMARY**

When managers decide on the dividend, their primary concern seems to be to give shareholders a "fair" payment on their investment. However, most managers are very reluctant to reduce dividends and will not increase the payout unless they are confident it can be maintained.

As an alternative to dividend payments, the company can repurchase its own stock. In recent years companies have bought back their stock in large quantities, but repurchases do not generally substitute for dividends. Instead they are used to return unwanted cash to shareholders or to retire equity and replace it with debt.

If we hold the company's investment decision and capital structure constant, then payout policy is a trade-off between cash dividends and the issue or repurchase of common stock. Should firms retain whatever earnings are necessary to finance growth and pay out any residual as cash dividends? Or should they increase dividends and then (sooner or later) issue stock to make up the shortfall of equity capital? Or should they reduce dividends and use the released cash to repurchase stock?

If we lived in an ideally simple and perfect world, there would be no problem, for the choice would have no effect on market value. The controversy centers on the effects of dividend policy in our flawed world. Many investors believe that a high dividend payout enhances share price. Perhaps they welcome the self-discipline that comes from spending only dividend income rather than having to decide whether they should dip into capital. We suspect also that investors often pressure companies to increase dividends when they do not trust management to spend free cash flow wisely. In this case a dividend increase may lead to a rise in the stock price not because investors like dividends as such but because they want managers to run a tighter ship.

The most obvious and serious market imperfection has been the different tax treatment of dividends and capital gains. In the past, dividends in the United States have often been much more heavily taxed than capital gains. In 2003 the maximum tax rate was set at 15% on both dividends and gains, though capital gains continued to enjoy one advantage—the tax payment is not due until any gain was realized. If dividends are more heavily taxed, highly taxed investors should hold mostly low-payout stocks, and we would expect high-payout stocks to offer investors the compensation of greater pretax returns.

This view has a respectable theoretical basis. It is supported by some evidence that, when dividends were at a significant tax disadvantage in the U.S., gross returns did reflect the tax differential. The weak link is the theory's silence on the question of why companies continued to distribute such large dividends when they landed investors with such large tax bills.

The third view of dividend policy starts with the notion that the actions of companies do reflect investors' preferences; thus the fact that companies pay substantial dividends is the best evidence that investors want them. If the supply of dividends exactly meets the demand, no single company could improve its market value by changing its payout policy.

It is difficult to be dogmatic over these controversies. If investment policy and borrowing are held constant, then the arguments over payout policy are largely about shuffling money from one pocket to another. Unless there are substantial tax consequences to these shuffles, it is unlikely that firm value is greatly affected either by the total amount of the payout or the choice between dividends and repurchase. Investors' concern with payout decisions seems to stem mainly from the information that they read into managers' actions.

The bottom-line conclusion, if there is one, is that payout varies over the life cycle of the firm. Young growth firms pay no cash dividends and rarely repurchase stock. These firms have profitable investment opportunities. They finance these investments as much as possible from internally generated cash flow. As firms mature, profitable investment opportunities shrink relative to cash flow. The firm comes under pressure from investors, because investors worry that managers will overinvest if there is too much idle cash available. The threat of a lagging stock price pushes managers to distribute cash by repurchases or cash dividends. Committing to a regular cash dividend sends the more credible signal of financial discipline.

● ● ● ● ●

### FURTHER READING

*For comprehensive reviews of the literature on payout policy, see:*

F. Allen and R. Michaely, "Payout Policy," in G. Constantinides, M. Harris, and R. Stulz, (eds.), *Handbook of the Economics of Finance: Corporate Finance* (Amsterdam: North-Holland, 2003).

H. DeAngelo, L. DeAngelo, and D. Skinner, "Corporate Payout Policy," *Foundations and Trends in Finance* 3 (2008), pp. 95–287.

*For a recent survey of managers' attitudes to the payout decision, see:*

A. Kalay and M. Lemmon, "Payout Policy," in B. E. Eckbo (ed.), *Handbook of Empirical Corporate Finance* (Amsterdam: Elsevier/North-Holland, 2007), Chapter 10.

A. Brav, J. R. Graham, C. R. Harvey, and R. Michaely, "Payout Policy in the 21st Century," *Journal of Financial Economics* 77 (September 2005), pp. 483–527.

● ● ● ● ●

 **Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

### PROBLEM SETS

### BASIC

1. In 2009 J. M. Smucker paid a regular quarterly dividend of $.35 a share.
   a. Match each of the following sets of dates:

   | (A1) 17 July 2009 | (B1) Record date |
   |---|---|
   | (A2) 11 August 2009 | (B2) Payment date |
   | (A3) 12 August 2009 | (B3) Ex-dividend date |
   | (A4) 14 August 2009 | (B4) Last with-dividend date |
   | (A5)  1 September 2009 | (B5) Declaration date |

   b. On one of these dates the stock price is likely to fall by about the value of the dividend. Which date? Why?
   c. Smucker's stock price in August 2009 was $52. What was the dividend yield?
   d. If earnings per share for 2009 are $4.56, what is the percentage payout rate?
   e. Suppose that in 2009 the company paid a 10% stock dividend. What would be the expected fall in price?

2. Here are several "facts" about typical corporate dividend policies. Which are true and which false?
   a. Companies decide each year's dividend by looking at their capital expenditure requirements and then distributing whatever cash is left over.
   b. Managers and investors seem more concerned with dividend changes than with dividend levels.
   c. Managers often increase dividends temporarily when earnings are unexpectedly high for a year or two.
   d. Companies undertaking substantial share repurchases usually finance them with an offsetting reduction in cash dividends.

3. a. Wotan owns 1,000 shares of a firm that has just announced an increase in its dividend from $2.00 to $2.50 a share. The share price is currently $150. If Wotan does not wish to spend the extra cash, what should he do to offset the dividend increase?

**Visit us at www.mhhe.com/bma**


b.  Brunhilde owns 1,000 shares of a firm that has just announced a dividend cut from $8.00 a share to $5.00. The share price is currently $200. If Brunhilde wishes to maintain her consumption, what should she do to offset the dividend cut?

4.  Patriot Games has 5 million shares outstanding. The president has proposed that, given the firm's large cash holdings, the annual dividend should be increased from $6.00 a share to $8.00. If you agree with the president's plans for investment and capital structure, what else must the company do as a consequence of the dividend increase?

5.  House of Haddock has 5,000 shares outstanding and the stock price is $140. The company is expected to pay a dividend of $20 per share next year and thereafter the dividend is expected to grow indefinitely by 5% a year. The President, George Mullet, now makes a surprise announcement: He says that the company will henceforth distribute half the cash in the form of dividends and the remainder will be used to repurchase stock.

a.  What is the total value of the company before and after the announcement? What is the value of one share?

b.  What is the expected stream of dividends per share for an investor who plans to retain his shares rather than sell them back to the company? Check your estimate of share value by discounting this stream of dividends per share.

6.  Here are key financial data for House of Herring, Inc.:

| | |
|---|---|
| Earnings per share for 2015 | $5.50 |
| Number of shares outstanding | 40 million |
| Target payout ratio | 50% |
| Planned dividend per share | $2.75 |
| Stock price, year-end 2015 | $130 |

House of Herring plans to pay the entire dividend early in January 2016. All corporate and personal taxes were repealed in 2014.

a.  Other things equal, what will be House of Herring's stock price after the planned dividend payout?

b.  Suppose the company cancels the dividend and announces that it will use the money saved to repurchase shares. What happens to the stock price on the announcement date? Assume that investors learn nothing about the company's prospects from the announcement. How many shares will the company need to repurchase?

c.  Suppose the company increases dividends to $5.50 per share and then issues new shares to recoup the extra cash paid out as dividends. What happens to the with- and ex-dividend share prices? How many shares will need to be issued? Again, assume investors learn nothing from the announcement about House of Herring's prospects.

7.  Answer the following question twice, once assuming current tax law and once assuming zero tax on capital gains.

Suppose all investments offered the same expected return *before* tax. Consider two equally risky shares, Hi and Lo. Hi shares pay a generous dividend and offer low expected capital gains. Lo shares pay low dividends and offer high expected capital gains. Which of the following investors would prefer the Lo shares? Which would prefer the Hi shares? Which should not care? (Assume that any stock purchased will be sold after one year.)

a.  A pension fund.

b.  An individual.

c.  A corporation.

d.  A charitable endowment.

e.  A security dealer.

**Visit us at www.mhhe.com/bma**

### INTERMEDIATE

8. Look in a recent issue of *The Wall Street Journal* at "Dividend News" and choose a company reporting a regular dividend.
   a. How frequently does the company pay a regular dividend?
   b. What is the amount of the dividend?
   c. By what date must your stock be registered for you to receive the dividend?
   d. How much later is the dividend paid?
   e. Look up the stock price and calculate the annual yield on the stock.

9. Which types of companies would you expect to distribute a relatively high or low proportion of current earnings? Which would you expect to have a relatively high or low price–earnings ratio?
   a. High-risk companies.
   b. Companies that have experienced an unexpected decline in profits.
   c. Companies that *expect* to experience a decline in profits.
   d. Growth companies with valuable future investment opportunities.

10. Little Oil has outstanding 1 million shares with a total market value of $20 million. The firm is expected to pay $1 million of dividends next year, and thereafter the amount paid out is expected to grow by 5% a year in perpetuity. Thus the expected dividend is $1.05 million in year 2, $1.105 million in year 3, and so on. However, the company has heard that the value of a share depends on the flow of dividends, and therefore it announces that next year's dividend will be increased to $2 million and that the extra cash will be raised immediately by an issue of shares. After that, the total amount paid out each year will be as previously forecasted, that is, $1.105 million in year 2 and increasing by 5% in each subsequent year.
    a. At what price will the new shares be issued in year 1?
    b. How many shares will the firm need to issue?
    c. What will be the expected dividend payments on these new shares, and what therefore will be paid out to the *old* shareholders after year 1?
    d. Show that the present value of the cash flows to current shareholders remains $20 million.

11. We stated in Section 16-5 that MM's proof of dividend irrelevance assumes that new shares are sold at a fair price. Look back at problem 10. Assume that new shares are issued in year 1 at $10 a share. Show who gains and who loses. Is dividend policy still irrelevant? Why or why not?

12. Respond to the following comment: "It's all very well saying that I can sell shares to cover cash needs, but that may mean selling at the bottom of the market. If the company pays a regular cash dividend, investors avoid that risk."

13. Refer to the first balance sheet prepared for Rational Demiconductor in Section 16-5. Again it uses cash to pay a $1,000 cash dividend, planning to issue stock to recover the cash required for investment. But this time catastrophe hits before the stock can be issued. A new pollution control regulation increases manufacturing costs to the extent that the value of Rational Demiconductor's existing business is cut in half, to $4,500. The NPV of the new investment opportunity is unaffected, however. Show that dividend policy is still irrelevant.

14. "Many companies use stock repurchases to increase earnings per share. For example, suppose that a company is in the following position:

| | |
|---|---|
| Net profit | $10 million |
| Number of shares before repurchase | 1 million |
| Earnings per share | $10 |
| Price–earnings ratio | 20 |
| Share price | $200 |

Visit us at www.mhhe.com/bma

The company now repurchases 200,000 shares at $200 a share. The number of shares declines to 800,000 shares and earnings per share increase to $12.50. Assuming the price–earnings ratio stays at 20, the share price must rise to $250." Discuss.

15. Hors d'Age Cheeseworks has been paying a regular cash dividend of $4 per share each year for over a decade. The company is paying out all its earnings as dividends and is not expected to grow. There are 100,000 shares outstanding selling for $80 per share. The company has sufficient cash on hand to pay the next annual dividend.

Suppose that Hors d'Age decides to cut its cash dividend to zero and announces that it will repurchase shares instead.

a. What is the immediate stock price reaction? Ignore taxes, and assume that the repurchase program conveys no information about operating profitability or business risk.

b. How many shares will Hors d'Age purchase?

c. Project and compare future stock prices for the old and new policies. Do this for at least years 1, 2, and 3.

16. An article on stock repurchase in the *Los Angeles Times* noted: "An increasing number of companies are finding that the best investment they can make these days is in themselves." Discuss this view. How is the desirability of repurchase affected by company prospects and the price of its stock?

17. Comment briefly on each of the following statements:

a. "Unlike American firms, which are always being pressured by their shareholders to increase dividends, Japanese companies pay out a much smaller proportion of earnings and so enjoy a lower cost of capital."

b. "Unlike new capital, which needs a stream of new dividends to service it, retained earnings have zero cost."

c. "If a company repurchases stock instead of paying a dividend, the number of shares falls and earnings per share rise. Thus stock repurchase must always be preferred to paying dividends."

18. Formaggio Vecchio has just announced its regular quarterly cash dividend of $1 per share.

a. When will the stock price fall to reflect this dividend payment—on the record date, the ex-dividend date, or the payment date?

b. Assume that there are no taxes. By how much is the stock price likely to fall?

c. Now assume that *all* investors pay tax of 30% on dividends and nothing on capital gains. What is the likely fall in the stock price?

d. Suppose, finally, that everything is the same as in part (c), except that security dealers pay tax on *both* dividends and capital gains. How would you expect your answer to (c) to change? Explain.

19. Refer back to Problem 18. Assume no taxes and a stock price immediately after the dividend announcement of $100.

a. If you own 100 shares, what is the value of your investment? How does the dividend payment affect your wealth?

b. Now suppose that Formaggio Vecchio cancels the dividend payment and announces that it will repurchase 1% of its stock at $100. Do you rejoice or yawn? Explain.

20. The shares of A and B both sell for $100 and offer a pretax return of 10%. However, in the case of company A the return is entirely in the form of dividend yield (the company pays a regular annual dividend of $10 a share), while in the case of B the return comes entirely as capital gain (the shares appreciate by 10% a year). Suppose that dividends and capital gains are both taxed at 30%. What is the after-tax return on share A? What is the after-tax return on share B to an investor who sells after two years? What about an investor who sells after 10 years?

21. a. The Horner Pie Company pays a quarterly dividend of $1. Suppose that the stock price is expected to fall on the ex-dividend date by $.90. Would you prefer to buy on the with-dividend date or the ex-dividend date if you were (i) a tax-free investor, (ii) an investor with a marginal tax rate of 40% on income and 16% on capital gains?

    b. In a study of ex-dividend behavior, Elton and Gruber[47] estimated that the stock price fell on the average by 85% of the dividend. Assuming that the tax rate on capital gains was 40% of the rate on income tax, what did Elton and Gruber's result imply about investors' marginal rate of income tax?

    c. Elton and Gruber also observed that the ex-dividend price fall was different for high-payout stocks and for low-payout stocks. Which group would you expect to show the larger price fall as a proportion of the dividend?

    d. Would the fact that investors can trade stocks freely around the ex-dividend date alter your interpretation of Elton and Gruber's study?

    e. Suppose Elton and Gruber repeated their tests for 2009, when the tax rate was the same on dividends and capital gains. How would you expect their results to have changed?

22. The middle-of-the-road party holds that dividend policy doesn't matter because the *supply* of high-, medium-, and low-payout stocks has already adjusted to satisfy investors' demands. Investors who like generous dividends hold stocks that give them all the dividends that they want. Investors who want capital gains see ample low-payout stocks to choose from. Thus, high-payout firms cannot gain by transforming to low-payout firms, or vice versa.

    Suppose the government reduces the tax rate on dividends but not on capital gains. Suppose that before this change the supply of dividends matched investor needs. How would you expect the tax change to affect the total cash dividends paid by U.S. corporations and the proportion of high- versus low-payout companies? Would dividend policy still be irrelevant after any dividend supply adjustments are completed? Explain.

### CHALLENGE

23. Consider the following two statements: "Dividend policy is irrelevant," and "Stock price is the present value of expected future dividends." (See Chapter 4.) They *sound* contradictory. This question is designed to show that they are fully consistent.

    The current price of the shares of Charles River Mining Corporation is $50. Next year's earnings and dividends per share are $4 and $2, respectively. Investors expect perpetual growth at 8% per year. The expected rate of return demanded by investors is $r = 12\%$.

    We can use the perpetual-growth model to calculate stock price:

    $$P_0 = \frac{DIV}{r - g} = \frac{2}{.12 - .08} = 50$$

    Suppose that Charles River Mining announces that it will switch to a 100% payout policy, issuing shares as necessary to finance growth. Use the perpetual-growth model to show that current stock price is unchanged.

24. "If a company pays a dividend, the investor is liable for tax on the total value of the dividend. If instead the company distributes the cash by stock repurchase, the investor is liable for tax only on any capital gain rather than on the entire amount. Therefore, even if the tax rates on dividend income and capital gains are the same, stock repurchase is always preferable to a dividend payment." Explain with a simple example why this is not the case. (Ignore the fact that capital gains may be postponed.)

---

[47] E. J. Elton and M. J. Gruber, "Marginal Stockholders' Tax Rates and the Clientele Effect," *Review of Economics and Statistics* 52 (1970), pp. 68–74.

25. Adherents of the "dividends-are-good" school sometimes point to the fact that stocks with high yields tend to have above-average price–earnings multiples. Is this evidence convincing? Discuss.

26. Suppose that there are just three types of investors with the following tax rates:

|  | Individuals | Corporations | Institutions |
|---|---|---|---|
| Dividends | 50% | 5% | 0% |
| Capital gains | 15 | 35 | 0 |

Individuals invest a total of $80 billion in stock and corporations invest $10 billion. The remaining stock is held by the institutions. All three groups simply seek to maximize their after-tax income.

These investors can choose from three types of stock offering the following pretax payouts:

|  | Low Payout | Medium Payout | High Payout |
|---|---|---|---|
| Dividends | $5 | $5 | $30 |
| Capital gains | 15 | 5 | 0 |

These payoffs are expected to persist in perpetuity. The low-payout stocks have a total market value of $100 billion, the medium-payout stocks have a value of $50 billion, and the high-payout stocks have a value of $120 billion.

a. Who are the marginal investors that determine the prices of the stocks?

b. Suppose that this marginal group of investors requires a 12% after-tax return. What are the prices of the low-, medium-, and high-payout stocks?

c. Calculate the after-tax returns of the three types of stock for each investor group.

d. What are the dollar amounts of the three types of stock held by each investor group?

**Visit us at www.mhhe.com/bma**

# Does Debt Policy Matter?

◗ **A firm's basic** resource is the stream of cash flows produced by its assets. When the firm is financed entirely by common stock, all those cash flows belong to the stockholders. When it issues both debt and equity securities, it splits the cash flows into two streams, a relatively safe stream that goes to the debtholders and a riskier stream that goes to the stockholders.

The firm's mix of debt and equity financing is called its capital structure. Of course capital structure is not just "debt versus equity." There are many different flavors of debt, at least two flavors of equity (common versus preferred), plus hybrids such as convertible bonds. The firm can issue dozens of distinct securities in countless combinations. It attempts to find the particular combination that maximizes the overall market value of the firm.

Are such attempts worthwhile? We must consider the possibility that *no* combination has any greater appeal than any other. Perhaps the really important decisions concern the company's assets, and decisions about capital structure are mere details—matters to be attended to but not worried about.

Modigliani and Miller (MM), who showed that payout policy doesn't matter in perfect capital markets, also showed that financing decisions don't matter in perfect markets. Their famous "proposition 1" states that a firm cannot change the total value of its securities just by splitting its cash flows into different streams: The firm's value is determined by its real assets, not by the securities it issues. Thus capital structure is irrelevant as long as the firm's investment decisions are taken as given.

MM's proposition 1 allows complete separation of investment and financing decisions. It implies that any firm could use the capital budgeting procedures presented in Chapters 5 through 12 without worrying about where the money for capital expenditures comes from. In those chapters, we assumed all-equity financing without really thinking about it. If MM are right, that is exactly the right approach. If the firm uses a mix of debt and equity financing, its overall cost of capital will be exactly the same as its cost of equity with all-equity financing.

We believe that in practice capital structure does matter, but we nevertheless devote all of this chapter to MM's argument. If you don't fully understand the conditions under which MM's theory holds, you won't fully understand why one capital structure is better than another. The financial manager needs to know what kinds of market imperfection to look for.

For example, the firm may invent some new security that a particular clientele of investors is willing to buy at a premium price, thereby increasing the overall market value of the firm. (We argue, however, that such financial innovations are easily copied and that any gains in value will be confined to the first few issuers.)

In Chapter 18 we undertake a detailed analysis of the imperfections that are most likely to make a difference, including taxes, the costs of bankruptcy and financial distress, the costs of writing and enforcing complicated debt contracts, differences created by imperfect information, and the effects of debt on incentives for management. In Chapter 19 we show how such imperfections (especially taxes) affect the weighted-average cost of capital and the value of the firm.

● ● ● ● ●

## 17-1 The Effect of Financial Leverage in a Competitive Tax-free Economy

Financial managers try to find the combination of securities that has the greatest overall appeal to investors—the combination that maximizes the market value of the firm. Before tackling this problem, we should check whether a policy that maximizes the total value of the firm's securities also maximizes the wealth of the shareholders.

Let $D$ and $E$ denote the market values of the outstanding debt and equity of the Wapshot Mining Company. Wapshot's 1,000 shares sell for $50 apiece. Thus

$$E = 1,000 \times 50 = \$50,000$$

Wapshot has also borrowed $25,000, and so $V$, the aggregate market value of all Wapshot's outstanding securities, is

$$V = D + E = \$75,000$$

Wapshot's stock is known as *levered equity*. Its stockholders face the benefits and costs of **financial leverage,** or *gearing*. Suppose that Wapshot "levers up" still further by borrowing an additional $10,000 and paying the proceeds out to shareholders as a special dividend of $10 per share. This substitutes debt for equity capital with no impact on Wapshot's assets.

What will Wapshot's equity be worth after the special dividend is paid? We have two unknowns, $E$ and $V$:

| | | |
|---|---|---|
| Old debt | $25,000 | |
| New debt | $10,000 | $35,000 = D |
| Equity | | ? = E |
| Firm value | | ? = V |

If $V$ is $75,000 as before, then $E$ must be $V - D = 75,000 - 35,000 = \$40,000$. Stockholders have suffered a capital loss that exactly offsets the $10,000 special dividend. But if $V$ *increases* to, say, $80,000 as a result of the change in capital structure, then $E = \$45,000$ and the stockholders are $5,000 ahead. In general, any increase or decrease in $V$ caused by a shift in capital structure accrues to the firm's stockholders. We conclude that a policy that maximizes the market value of the firm is also best for the firm's stockholders.

This conclusion rests on two important assumptions: first, that Wapshot can ignore payout policy and, second, that after the change in capital structure the old and new debt are *worth* $35,000.

Payout policy may or may not be relevant, but there is no need to repeat the discussion of Chapter 16. We need only note that shifts in capital structure sometimes force important decisions about payout policy. Perhaps Wapshot's cash dividend has costs or benefits that should be considered in addition to any benefits achieved by its increased financial leverage.

Our second assumption that old and new debt ends up worth $35,000 seems innocuous. But it could be wrong. Perhaps the new borrowing has increased the risk of the old bonds. If the holders of old bonds cannot demand a higher rate of interest to compensate for the increased risk, the value of their investment is reduced. In this case Wapshot's stockholders gain at the expense of the holders of old bonds even though the overall value of the firm is unchanged.

But this anticipates issues better left to Chapter 18. In this chapter we assume that any new issue of debt has no effect on the market value of existing debt.

## Enter Modigliani and Miller

Let us accept that the financial manager would like to find the combination of securities that maximizes the value of the firm. How is this done? MM's answer is that the financial manager should stop worrying: In a perfect market any combination of securities is as good as another. The value of the firm is unaffected by its choice of capital structure.[1]

You can see this by imagining two firms that generate the same stream of operating income and differ only in their capital structure. Firm U is unlevered. Therefore the total value of its equity $E_U$ is the same as the total value of the firm $V_U$. Firm, L, on the other hand, is levered. The value of its stock is, therefore, equal to the value of the firm less the value of the debt: $E_L = V_L - D_L$.

Now think which of these firms you would prefer to invest in. If you don't want to take much risk, you can buy common stock in the unlevered firm U. For example, if you buy 1% of firm U's shares, your investment is $.01V_U$ and you are entitled to 1% of the gross profits:

| Dollar Investment | Dollar Return |
|---|---|
| $.01V_U$ | $.01 \times$ Profits |

Now compare this with an alternative strategy. This is to purchase the same fraction of *both* the debt and the equity of firm L. Your investment and return would then be as follows:

| | Dollar Investment | Dollar Return |
|---|---|---|
| Debt | $.01D_L$ | $.01 \times$ Interest |
| Equity | $.01E_L$ | $.01 \times$ (Profits $-$ interest) |
| Total | $.01(D_L + E_L)$ | $.01 \times$ Profits |
| | $= .01V_L$ | |

Both strategies offer the same payoff: 1% of the firm's profits. The law of one price tells us that in well-functioning markets two investments that offer the same payoff must have the same price. Therefore, $.01V_U$ must equal $.01V_L$: the value of the unlevered firm must equal the value of the levered firm.

Suppose that you are willing to run a little more risk. You decide to buy 1% of the outstanding shares in the *levered* firm. Your investment and return are now as follows:

| Dollar Investment | Dollar Return |
|---|---|
| $.01E_L$ | $.01 \times$ (Profits $-$ interest) |
| $= .01(V_L - D_L)$ | |

But there is an alternative strategy. This is to borrow $.01D_L$ on your own account and purchase 1% of the stock of the *unlevered* firm. In this case, your borrowing gives you an immediate cash *inflow* of $.01D_L$, but you have to pay interest on your loan equal to 1% of the interest that is paid by firm L. Your total investment and return are, therefore, as follows:

| | Dollar Investment | Dollar Return |
|---|---|---|
| Borrowing | $-.01D_L$ | $-.01 \times$ Interest |
| Equity | $.01V_U$ | $.01 \times$ Profits |
| Total | $.01(V_U - D_L)$ | $.01 \times$ (Profits $-$ interest) |

[1] F. Modigliani and M. H. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *American Economic Review* 48 (June 1958), pp. 261–297. MM's basic argument was anticipated in 1938 by J. B. Williams and to some extent by David Durand. See J. B. Williams, *The Theory of Investment Value* (Cambridge, MA: Harvard University Press, 1938) and D. Durand, "Cost of Debt and Equity Funds for Business: Trends and Problems of Measurement," *Conference on Research in Business Finance* (New York: National Bureau of Economic Research, 1952).

Again both strategies offer the same payoff: 1% of profits after interest. Therefore, both investments must have the same cost. The payoff $.01(V_U - D_L)$ must equal $.01(V_L - D_L)$ and $V_U$ must equal $V_L$.

It does not matter whether the world is full of risk-averse chickens or venturesome lions. All would agree that the value of the unlevered firm U must be equal to the value of the levered firm L. As long as investors can borrow or lend on their own account on the same terms as the firm, they can "undo" the effect of any changes in the firm's capital structure. This is the basis for MM's famous proposition 1: "The market value of any firm is independent of its capital structure."

## The Law of Conservation of Value

MM's argument that debt policy is irrelevant is an application of an astonishingly simple idea. If we have two streams of cash flow, *A* and *B,* then the present value of *A + B* is equal to the present value of *A* plus the present value of *B*. We met this principle of *value additivity* in our discussion of capital budgeting, where we saw that the present value of two assets combined is equal to the sum of their present values considered separately.

In the present context we are not combining assets but splitting them up. But value additivity works just as well in reverse. We can slice a cash flow into as many parts as we like; the values of the parts will always sum back to the value of the unsliced stream. (Of course, we have to make sure that none of the stream is lost in the slicing. We cannot say, "The value of a pie is independent of how it is sliced," if the slicer is also a nibbler.)

This is really a *law of conservation of value.* The value of an asset is preserved regardless of the nature of the claims against it. Thus proposition 1: Firm value is determined on the *left-hand* side of the balance sheet by real assets—not by the proportions of debt and equity securities issued to buy the assets.

The simplest ideas often have the widest application. For example, we could apply the law of conservation of value to the choice between issuing preferred stock, common stock, or some combination. The law implies that the choice is irrelevant, assuming perfect capital markets and providing that the choice does not affect the firm's investment and operating policies. If the total value of the equity "pie" (preferred and common combined) is fixed, the firm's owners (its common stockholders) do not care how this pie is sliced.

The law also applies to the *mix* of debt securities issued by the firm. The choices of long-term versus short-term, secured versus unsecured, senior versus subordinated, and convertible versus nonconvertible debt all should have no effect on the overall value of the firm.

Combining assets and splitting them up will not affect values as long as they do not affect an investor's choice. When we showed that capital structure does not affect choice, we implicitly assumed that both companies and individuals can borrow and lend at the same risk-free rate of interest. As long as this is so, individuals can undo the effect of any changes in the firm's capital structure.

In practice corporate debt is not risk-free and firms cannot escape with rates of interest appropriate to a government security. Some people's initial reaction is that this alone invalidates MM's proposition. It is a natural mistake, but capital structure can be irrelevant even when debt is risky.

If a company borrows money, it does not *guarantee* repayment: It repays the debt in full only if its assets are worth more than the debt obligation. The shareholders in the company, therefore, have limited liability.

Many individuals would like to borrow with limited liability. They might, therefore, be prepared to pay a small premium for levered shares *if the supply of levered shares were*

*insufficient to meet their needs.*[2] But there are literally thousands of common stocks of companies that borrow. Therefore it is unlikely that an issue of debt would induce them to pay a premium for *your* shares.[3]

### An Example of Proposition 1

Macbeth Spot Removers is reviewing its capital structure. Table 17.1 shows its current position. The company has no leverage and all the operating income is paid as dividends to the common stockholders (we assume still that there are no taxes). The expected earnings and dividends per share are $1.50, but this figure is by no means certain—it could turn out to be more or less than $1.50. The price of each share is $10. Since the firm expects to produce a level stream of earnings in perpetuity, the expected return on the share is equal to the earnings–price ratio, 1.50/10.00 = .15, or 15%.

Ms. Macbeth, the firm's president, has come to the conclusion that shareholders would be better off if the company had equal proportions of debt and equity. She therefore proposes to issue $5,000 of debt at an interest rate of 10% and use the proceeds to repurchase 500 shares. To support her proposal, Ms. Macbeth has analyzed the situation under different assumptions about operating income. The results of her calculations are shown in Table 17.2.

To see more clearly how leverage would affect earnings per share, Ms. Macbeth has also produced Figure 17.1. The brown line shows how earnings per share would vary with operating income under the firm's current all-equity financing. It is, therefore, simply a plot of the data in Table 17.1. The green line shows how earnings per share would vary given equal proportions of debt and equity. It is, therefore, a plot of the data in Table 17.2.

Ms. Macbeth reasons as follows: "It is clear that the effect of leverage depends on the company's income. If income is greater than $1,000, the return to the equityholder is *increased* by leverage. If it is less than $1,000, the return is *reduced* by leverage. The return is unaffected when operating income is exactly $1,000. At this point the return on the market value of the assets is 10%, which is exactly equal to the interest rate on the debt. Our capital structure decision, therefore, boils down to what we think about income prospects. Since we expect operating income to be above the $1,000 break-even point, I believe we can best help our shareholders by going ahead with the $5,000 debt issue."

▶ **TABLE 17.1**

Macbeth Spot Removers is entirely equity-financed. Although it expects to have an income of $1,500 a year in perpetuity, this income is not certain. This table shows the return to the stockholder under different assumptions about operating income. We assume no taxes.

| Data | | | | |
|---|---|---|---|---|
| Number of shares | 1,000 | | | |
| Price per share | $10 | | | |
| Market value of shares | $10,000 | | | |
| **Outcomes** | | | | |
| Operating income ($) | 500 | 1,000 | **1,500** | 2,000 |
| Earnings per share ($) | .50 | 1.00 | **1.50** | 2.00 |
| Return on shares (%) | 5 | 10 | **15** | 20 |
| | | | **Expected outcome** | |

---

[2] Of course, individuals could *create* limited liability if they chose. In other words, the lender could agree that borrowers need repay their debt in full only if the assets of company X are worth more than a certain amount. Presumably individuals don't enter into such arrangements because they can obtain limited liability more simply by investing in the stocks of levered companies.

[3] Capital structure is also irrelevant if each investor holds a fully diversified portfolio. In that case he or she owns *all* the risky securities offered by a company (both debt and equity). But anybody who owns *all* the risky securities doesn't care about how the cash flows are divided among different securities.

| Data | | | | |
|---|---|---|---|---|
| Number of shares | 500 | | | |
| Price per share | $10 | | | |
| Market value of shares | $5,000 | | | |
| Market value of debt | $5,000 | | | |
| Interest at 10% | $500 | | | |
| **Outcomes** | | | | |
| Operating income ($) | 500 | 1,000 | **1,500** | 2,000 |
| Interest ($) | 500 | 500 | **500** | 500 |
| Equity earnings ($) | 0 | 500 | **1,000** | 1,500 |
| Earnings per share ($) | 0 | 1 | **2** | 3 |
| Return on shares (%) | 0 | 10 | **20** | 30 |
| | | | **Expected outcome** | |

▶ **TABLE 17.2**
Macbeth Spot Removers is wondering whether to issue $5,000 of debt at an interest rate of 10% and repurchase 500 shares. This table shows the return to the shareholder under different assumptions about operating income.



▶ **FIGURE 17.1**
Borrowing increases Macbeth's EPS (earnings per share) when operating income is greater than $1,000 and reduces EPS when operating income is less than $1,000. Expected EPS rises from $1.50 to $2.

As financial manager of Macbeth Spot Removers, you reply as follows: "I agree that leverage will help the shareholder as long as our income is greater than $1,000. But your argument ignores the fact that Macbeth's shareholders have the alternative of borrowing on their own account. For example, suppose that an investor borrows $10 and then invests $20 in two unlevered Macbeth shares. This person has to put up only $10 of his or her own

▶ **TABLE 17.3**
Individual investors
can replicate Macbeth's
leverage.

| | Operating Income ($) | | | |
|---|---|---|---|---|
| | **500** | **1,000** | **1,500** | **2,000** |
| Earnings on two shares ($) | 1 | 2 | **3** | 4 |
| *Less* interest at 10% ($) | 1 | 1 | **1** | 1 |
| Net earnings on investment ($) | 0 | 1 | **2** | 3 |
| Return on $10 investment (%) | 0 | 10 | **20** | 30 |
| | | | **Expected outcome** | |

money. The payoff on the investment varies with Macbeth's operating income, as shown in Table 17.3. This is exactly the same set of payoffs as the investor would get by buying one share in the levered company. [Compare the last two lines of Tables 17.2 and 17.3.] Therefore, a share in the levered company must also sell for $10. If Macbeth goes ahead and borrows, it will not allow investors to do anything that they could not do already, and so it will not increase value."

The argument that you are using is exactly the same as the one MM used to prove proposition 1.

## 17-2  Financial Risk and Expected Returns

Consider now the implications of MM's proposition 1 for the expected returns on Macbeth stock:

| | Current Structure: All Equity | Proposed Structure: Equal Debt and Equity |
|---|---|---|
| Expected earnings per share ($) | 1.50 | 2.00 |
| Price per share ($) | 10 | 10 |
| Expected return on share (%) | 15 | 20 |

Leverage increases the expected stream of earnings per share but *not* the share price. The reason is that the change in the expected earnings stream is exactly offset by a change in the rate at which the earnings are discounted. The expected return on the share (which for a perpetuity is equal to the earnings–price ratio) increases from 15% to 20%. We now show how this comes about.

The expected return on Macbeth's assets $r_A$ is equal to the expected operating income divided by the total market value of the firm's securities:

$$\text{Expected return on assets} = r_A = \frac{\text{expected operating income}}{\text{market value of all securities}}$$

We have seen that in perfect capital markets the company's borrowing decision does not affect *either* the firm's operating income *or* the total market value of its securities. Therefore the borrowing decision also does not affect the expected return on the firm's assets $r_A$.

Suppose that an investor holds all of a company's debt and all of its equity. This investor is entitled to all the firm's operating income; therefore, the expected return on the portfolio is just $r_A$.

The expected return on a portfolio is equal to a weighted average of the expected returns on the individual holdings. Therefore the expected return on a portfolio consisting of *all* the firm's securities is

Expected return on assets = (proportion in debt × expected return on debt)

+ (proportion in equity × expected return on equity)

$$r_A = \left( \frac{D}{D + E} \times r_D \right) + \left( \frac{E}{D + E} \times r_E \right)$$

This formula is of course an old friend from Chapter 9. The overall expected return $r_A$ is called the *company cost of capital* or the *weighted-average cost of capital* (WACC).

We can turn the formula around to solve for $r_E$, the expected return to equity for a levered firm:

Expected return on equity = expected return on assets

+ (expected return on assets − expected return on debt)

× debt–equity ratio

$$r_E = r_A + (r_A - r_D)\frac{D}{E}$$

## Proposition 2

This is MM's proposition 2: The expected rate of return on the common stock of a levered firm increases in proportion to the debt–equity ratio ($D/E$), expressed in market values; the rate of increase depends on the spread between $r_A$, the expected rate of return on a portfolio of all the firm's securities, and $r_D$, the expected return on the debt. Note that $r_E = r_A$ if the firm has no debt.

We can check out this formula for Macbeth Spot Removers. Before the decision to borrow

$$r_E = r_A = \frac{\text{expected operating income}}{\text{market value of all securities}}$$

$$= \frac{1{,}500}{10{,}000} = .15, \text{ or } 15\%$$

If the firm goes ahead with its plan to borrow, the expected return on assets $r_A$ is still 15%. The expected return on equity is

$$r_E = r_A + (r_A - r_D)\frac{D}{E}$$

$$= .15 + (.15 - .10)\frac{5{,}000}{5{,}000} = .20, \text{ or } 20\%$$

When the firm was unlevered, equity investors demanded a return of $r_A$. When the firm is levered, they require a premium of $(r_A - r_D)D/E$ to compensate for the extra risk.

MM's proposition 1 says that financial leverage has no effect on shareholders' wealth. Proposition 2 says that the rate of return they can expect to receive on their shares increases as the firm's debt–equity ratio increases. How can shareholders be indifferent to increased leverage when it increases expected return? The answer is that any increase in expected return is exactly offset by an increase in risk and therefore in shareholders' *required* rate of return.

Look at what happens to the risk of Macbeth shares if it moves to equal debt–equity proportions. Table 17.4 shows how a shortfall in operating income affects the payoff to the shareholders.

| If operating income falls from | | $1,500 | to | $500 | Change |
|---|---|---|---|---|---|
| No debt: | Earnings per share | $1.50 | | $.50 | −$1.00 |
| | Return | 15% | | 5% | −10% |
| 50% debt: | Earnings per share | $2.00 | | 0 | −$2.00 |
| | Return | 20% | | 0 | −20% |

▶ **TABLE 17.4** Financial leverage increases the risk of Macbeth shares. A $1,000 drop in operating income reduces earnings per share by $1 with all-equity financing, but by $2 with 50% debt.

The debt–equity proportion does not affect the *dollar* risk borne by equityholders. Suppose operating income drops from $1,500 to $500. Under all-equity financing, equity earnings drop by $1 per share. There are 1,000 outstanding shares, and so *total* equity earnings fall by $1 × 1,000 = $1,000. With 50% debt, the same drop in operating income reduces earnings per share by $2. But there are only 500 shares outstanding, and so total equity income drops by $2 × 500 = $1,000, just as in the all-equity case.

However, the debt–equity choice does amplify the spread of *percentage* returns. If the firm is all-equity-financed, a decline of $1,000 in the operating income reduces the return on the shares by 10%. If the firm issues risk-free debt with a fixed interest payment of $500 a year, then a decline of $1,000 in the operating income reduces the return on the shares by 20%. In other words, the effect of the proposed leverage is to double the amplitude of the swings in Macbeth's shares. Whatever the beta of the firm's shares before the refinancing, it would be twice as high afterward.

Now you can see why investors require higher returns on levered equity. The required return simply rises to match the increased risk.

---

**EXAMPLE 17.1** ● Leverage and the Cost of Equity

Let us revisit a numerical example from Chapter 9. We looked at a company with the following market-value balance sheet:

| Asset value | 100 | Debt (*D*) | 30 | at $r_D = 7.5\%$ |
|---|---|---|---|---|
| | | Equity (*E*) | 70 | at $r_E = 15\%$ |
| Asset value | 100 | Firm value (*V*) | 100 | |

and an overall cost of capital of:

$$r_A = r_D \frac{D}{V} + r_E \frac{E}{V}$$

$$= \left(7.5 \times \frac{30}{100}\right) + \left(15 \times \frac{70}{100}\right) = 12.75\%$$

If the firm is contemplating investment in a project that has the same risk as the firm's existing business, the opportunity cost of capital for this project is the same as the firm's cost of capital; in other words, it is 12.75%.

What would happen if the firm issued an additional 10 of debt and used the cash to repurchase 10 of its equity? The revised market-value balance sheet is

| Asset value | 100 | Debt ($D$) | 40 |
|---|---|---|---|
| | | Equity ($E$) | 60 |
| Asset value | 100 | Firm value ($V$) | 100 |

The change in financial structure does not affect the amount or risk of the cash flows on the total package of debt and equity. Therefore, if investors required a return of 12.75% on the total package before the refinancing, they must require a 12.75% return on the firm's assets afterward.

Although the required return on the *package* of debt and equity is unaffected, the change in financial structure does affect the required return on the individual securities. Since the company has more debt than before, the debtholders are likely to demand a higher interest rate. Suppose that the expected return on the debt rises to 7.875%. Now you can write down the basic equation for the return on assets

$$r_A = r_D \frac{D}{V} + r_E \frac{E}{V}$$

$$= \left(7.875 \times \frac{40}{100}\right) + \left(r_E \times \frac{60}{100}\right) = 12.75\%$$

and solve for the return on equity $r_E = 16.0\%$.

Increasing the amount of debt increased debtholder risk and led to a rise in the return that debtholders required ($r_{debt}$ rose from 7.5 to 7.875%). The higher leverage also made the equity riskier and increased the return that shareholders required ($r_E$ rose from 15% to 16%). The weighted-average return on debt and equity remained at 12.75%:

$$r_A = (r_D \times .4) + (r_E \times .6)$$

$$= (7.875 \times .4) + (16 \times 6) = 12.75\%$$

Suppose that the company decided instead to repay all its debt and to replace it with equity. In that case all the cash flows would go to the equityholders. The company cost of capital, $r_A$, would stay at 12.75%, and $r_E$ would also be 12.75%.

● ● ● ● ●

## How Changing Capital Structure Affects Beta

We have looked at how changes in financial structure affect expected return. Let us now look at the effect on beta.

The stockholders and debtholders both receive a share of the firm's cash flows, and both bear part of the risk. For example, if the firm's assets turn out to be worthless, there will be no cash to pay stockholders or debtholders. But debtholders usually bear much less risk than stockholders. Debt betas of large firms are typically in the range of .1 to .3.

If you owned a portfolio of all the firm's securities, you wouldn't share the cash flows with anyone. You wouldn't share the risks with anyone either; you would bear them all. Thus the firm's asset beta is equal to the beta of a portfolio of all the firm's debt and its equity.

The beta of this hypothetical portfolio is just a weighted average of the debt and equity betas:

$$\beta_A = \beta_{portfolio} = \beta_D \frac{D}{V} + \beta_E \frac{E}{V}$$

Think back to our example. If the debt before the refinancing has a beta of .1 and the equity has a beta of 1.1, then

$$\beta_A = \left(.1 \times \frac{30}{100}\right) + \left(1.1 \times \frac{70}{100}\right) = .8$$

What happens after the refinancing? The risk of the total package is unaffected, but both the debt and the equity are now more risky. Suppose that the debt beta increases to .2. We can work out the new equity beta:

$$\beta_A = \beta_{\text{portfolio}} = \beta_D \frac{D}{V} + \beta_E \frac{E}{V}$$

$$.8 = \left(.2 \times \frac{40}{100}\right) + \left(\beta_E \times \frac{60}{100}\right)$$

$$\beta_E = 1.2$$

Our example shows how borrowing creates financial leverage or gearing. Financial leverage does not affect the risk or the expected return on the firm's assets, but it does push up the risk of the common stock. Shareholders demand a correspondingly higher return because of this *financial risk.*

Now you can see how to *unlever* betas, that is, how to go from an observed $\beta_E$ to $\beta_A$. You have the equity beta, say, 1.2. You also need the debt beta, say, .2, and the relative market values of debt $(D/V)$ and equity $(E/V)$. If debt accounts for 40% of overall value $V$, then the unlevered beta is

$$\beta_A = \left(.2 \times \frac{40}{100}\right) + \left(1.2 \times \frac{60}{100}\right) = .8$$

This runs the previous example in reverse. Just remember the basic relationship:

$$\beta_A = \beta_{\text{portfolio}} = \beta_D\left(\frac{D}{V}\right) + \beta_E\left(\frac{E}{V}\right)$$

MM's propositions warn us that higher leverage increases both expected equity returns and equity risk. It does *not* increase shareholder value. Having worked through the example of Macbeth, this much should now seem obvious. But watch out for hidden changes in leverage, such as a decision to lease new equipment or to underfund the pension scheme. Do not interpret any resultant increase in the expected equity return as creating additional shareholder value.

## 17-3 The Weighted-Average Cost of Capital

What did financial experts think about debt policy before MM? It is not easy to say because with hindsight we see that they did not think too clearly.[4] However, a "traditional" position emerged in response to MM. To understand it, we have to return to the weighted-average cost of capital.

Figure 17.2 sums up the implications of MM's propositions for the costs of debt and equity and the weighted-average cost of capital. The figure assumes that the firm's bonds are essentially risk-free at low debt levels. Thus $r_D$ is independent of $D/E$, and $r_E$ increases linearly as $D/E$ increases. As the firm borrows more, the risk of default increases and the firm is required to pay higher rates of interest. Proposition 2 predicts that when this occurs

---

[4] Financial economists in 20 years may remark on Brealey, Myers, and Allen's blind spots and clumsy reasoning. On the other hand, they may not remember us at all.



▶ **FIGURE 17.2**

MM's proposition 2. The expected return on equity $r_E$ increases linearly with the debt–equity ratio so long as debt is risk-free. But if leverage increases the risk of the debt, debtholders demand a higher return on the debt. This causes the rate of increase in $r_E$ to slow down.

the rate of increase in $r_E$ slows down. This is also shown in Figure 17.2. The more debt the firm has, the less sensitive $r_E$ is to further borrowing.

Why does the slope of the $r_E$ line in Figure 17.2 taper off as $D/E$ increases? Essentially because holders of risky debt bear some of the firm's business risk. As the firm borrows more, more of that risk is transferred from stockholders to bondholders.

## Two Warnings

Sometimes the objective in financing decisions is stated not as "maximize overall market value" but as "minimize the weighted-average cost of capital." If MM's proposition 1 holds, then these are equivalent objectives. If MM's proposition 1 does *not* hold, then the capital structure that maximizes the value of the firm also minimizes the weighted-average cost of capital, *provided* that operating income is independent of capital structure. Remember that the weighted-average cost of capital is the expected rate of return on the market value of all of the firm's securities. Anything that increases the value of the firm reduces the weighted-average cost of capital if operating income is constant. But if operating income is varying too, all bets are off.

In Chapter 18 we show that financial leverage can affect operating income in several ways. Therefore maximizing the value of the firm is *not* always equivalent to minimizing the weighted-average cost of capital.

**Warning 1**   Shareholders want management to increase the firm's value. They are more interested in being rich than in owning a firm with a low weighted-average cost of capital.

**Warning 2**   Trying to minimize the weighted-average cost of capital seems to encourage logical short circuits like the following. Suppose that someone says, "Shareholders demand—and deserve—higher expected rates of return than bondholders do. Therefore debt is the cheaper capital source. We can reduce the weighted-average cost of capital by borrowing more." But this doesn't follow if the extra borrowing leads stockholders to demand a still higher expected rate of return. According to MM's proposition 2 the cost of equity capital $r_E$ increases by just enough to keep the weighted-average cost of capital constant.

This is not the only logical short circuit you are likely to encounter. We have cited two more in Problem 15 at the end of this chapter.

## Rates of Return on Levered Equity—The Traditional Position

You may ask why we have even mentioned the aim of minimizing the weighted-average cost of capital if it is often wrong or confusing. We had to because the traditionalists accept this objective and argue their case in terms of it.

The logical short circuit we just described rested on the assumption that $r_E$, the expected rate of return demanded by stockholders, does not rise, or rises very slowly, as the firm borrows more. Suppose, just for the sake of argument, that this is true. Then $r_A$, the weighted-average cost of capital, must decline as the debt–equity ratio rises.

The traditionalists' position is shown in Figure 17.3. They say that a moderate degree of financial leverage may increase the expected equity return $r_E$, but not as much as predicted by MM's proposition 2. But irresponsible firms that borrow *excessively* find $r_E$ shooting up *faster* than MM predict. Therefore the weighted-average cost of capital declines at first, then rises. It reaches a minimum at some intermediate debt ratio. Remember that minimizing the weighted-average cost of capital is equivalent to maximizing firm value if operating income is not affected by borrowing.

Two arguments could be advanced in support of this position. First, perhaps investors do not notice or appreciate the financial risk created by moderate borrowing, although they wake up when debt is "excessive." If so, stockholders in moderately leveraged firms may accept a lower rate of return than they really should.

That seems naive.[5] The second argument is better. It accepts MM's reasoning as applied to perfect capital markets but holds that actual markets are imperfect. Because



> **FIGURE 17.3**
>
> The dashed lines show MM's view of the effect of leverage on the expected return on equity $r_E$ and the weighted-average cost of capital $r_A$. (See Figure 17.2.) The solid lines show the traditional view. Traditionalists say that borrowing at first increases $r_E$ more slowly than MM predict but that $r_E$ shoots up with excessive borrowing. If so, the weighted-average cost of capital can be minimized if you use just the right amount of debt.

Rates of return

$r_E$ (MM)

$r_E$ (traditional)

$r_A$ (MM)

$r_A$ (traditional)

$r_D$

$\dfrac{D}{E} = \dfrac{\text{debt}}{\text{equity}}$

Traditionalists believe there is an optimal debt–equity ratio that minimizes $r_A$.

---

[5] This first argument may reflect a confusion between financial risk and the risk of default. Default is not a serious threat when borrowing is moderate; stockholders worry about it only when the firm goes "too far." But stockholders bear financial risk—in the form of increased volatility of rates of return and a higher beta—even when the chance of default is nil.

of these imperfections, firms that borrow may provide a valuable service for investors. If so, levered shares might trade at premium prices compared to their theoretical values in perfect markets.

Suppose that corporations can borrow more cheaply than individuals. Then it would pay investors who want to borrow to do so indirectly by holding the stock of levered firms. They would be willing to live with expected rates of return that do not fully compensate them for the business and financial risk they bear.

Is corporate borrowing really cheaper? It's hard to say. Interest rates on home mortgages are not too different from rates on high-grade corporate bonds.[6] Rates on margin debt (borrowing from a stockbroker with the investor's shares tendered as security) are not too different from the rates firms pay banks for short-term loans.

There are some individuals who face relatively high interest rates, largely because of the costs lenders incur in making and servicing small loans. There are economies of scale in borrowing. A group of small investors could do better by borrowing via a corporation, in effect pooling their loans and saving transaction costs.[7]

Suppose that this class of investors is large, both in number and in the aggregate wealth it brings to capital markets. That creates a clientele for whom corporate borrowing is better than personal borrowing. That clientele would, in principle, be willing to pay a premium for the shares of a levered firm.

But maybe it doesn't *have* to pay a premium. Perhaps smart financial managers long ago recognized this clientele and shifted the capital structures of their firms to meet its needs. The shifts would not have been difficult or costly. But if the clientele is now satisfied, it no longer needs to pay a premium for levered shares. Only the financial managers who *first* recognized the clientele extracted any advantage from it.

Maybe the market for corporate leverage is like the market for automobiles. Americans need millions of automobiles and are willing to pay thousands of dollars apiece for them. But that doesn't mean that you could strike it rich by going into the automobile business. You're at least 80 years too late.

## Today's Unsatisfied Clienteles Are Probably Interested in Exotic Securities

So far we have made little progress in identifying cases where firm value might plausibly depend on financing. But our examples illustrate what smart financial managers look for. They look for an *unsatisfied* clientele, investors who want a particular kind of financial instrument but because of market imperfections can't get it or can't get it cheaply.

MM's proposition 1 is violated when the firm, by imaginative design of its capital structure, can offer some *financial service* that meets the needs of such a clientele. Either the service must be new and unique or the firm must find a way to provide some old service more cheaply than other firms or financial intermediaries can.

Now, is there an unsatisfied clientele for garden-variety debt or levered equity? We doubt it. But perhaps you can invent an exotic security and uncover a latent demand for it.

In the next several chapters we will encounter a number of new securities that have been invented by companies and advisers. These securities take the company's basic cash flows

---

[6] One of the authors once obtained a home mortgage at a rate 1/2 percentage point *less* than the contemporaneous yield on long-term AAA bonds.

[7] Even here there are alternatives to borrowing on personal account. Investors can draw down their savings accounts or sell a portion of their investment in bonds. The impact of reductions in lending on the investor's balance sheet and risk position is exactly the same as increases in borrowing.

and repackage them in ways that are thought to be more attractive to investors. However, while inventing these new securities is easy, it is more difficult to find investors who will rush to buy them.

## Imperfections and Opportunities

The most serious capital market imperfections are often those created by government. An imperfection that supports a violation of MM's proposition 1 *also* creates a money-making opportunity. Firms and intermediaries will find some way to reach the clientele of investors frustrated by the imperfection.

For many years the U.S. government imposed a limit on the rate of interest that could be paid on savings accounts. It did so to protect savings institutions by limiting competition for their depositors' money. The fear was that depositors would run off in search of higher yields, causing a cash drain that savings institutions would not be able to meet.

These regulations created an opportunity for firms and financial institutions to design new savings schemes that were not subject to the interest-rate ceilings. One invention was the *floating-rate note,* first issued in 1974 by Citicorp, and with terms designed to appeal to individual investors. Floating-rate notes are medium-term debt securities whose interest payments "float" with short-term interest rates. On the Citicorp issue, for example, the coupon rate used to calculate each semiannual interest payment was set at 1 percentage point above the contemporaneous yield on Treasury bills. The holder of the Citicorp note was therefore protected against fluctuating interest rates, because Citicorp sent a larger check when interest rates rose (and, of course, a smaller check when rates fell).

Citicorp evidently found an untapped clientele of investors, for it was able to raise $650 million in the first offering. The success of the issue suggests that Citicorp was able to add value by changing its capital structure. However, other companies were quick to jump on Citicorp's bandwagon, and within five months an additional $650 million of floating-rate notes were issued by other companies. By the mid-1980s about $43 billion of floating-rate securities were outstanding, and now floating-rate debt securities seem ubiquitous.

Interest-rate regulation also provided financial institutions with an opportunity to create value by offering money-market funds. These are mutual funds invested in Treasury bills, commercial paper, and other high-grade, short-term debt instruments. Any saver with a few thousand dollars to invest can gain access to these instruments through a money-market fund and can withdraw money at any time by writing a check against his or her fund balance. Thus the fund resembles a checking or savings account that pays close to market interest rates. These money-market funds have become enormously popular. By 2009 their assets had risen to $3.7 trillion.[8]

Long before interest-rate ceilings were finally removed, most of the gains had gone out of issuing the new securities to individual investors. Once the clientele was finally satisfied, MM's proposition 1 was restored (until the government creates a new imperfection). The moral of the story is this: If you ever find an unsatisfied clientele, do something right away, or capital markets will evolve and steal it from you.

This is actually an encouraging message for the economy as a whole. If MM are right, investors' demands for different types of securities are satisfied at minimal cost. The cost

---

[8] Money-market funds are not totally safe. In 2008 the Reserve Primary Fund incurred heavy losses on its holdings of Lehman Brothers debt and became only the second money-market fund in history to "break the buck" by paying investors 97 cents in the dollar.

of capital will reflect only business risk. Capital will flow to companies with positive-NPV investments, regardless of the companies' capital structures. This is the efficient outcome.

## 17-4 A Final Word on the After-Tax Weighted-Average Cost of Capital

MM left us a simple message. When the firm changes its mix of debt and equity securities, the risk and expected returns of these securities change, but the company's overall cost of capital does not change.

Now if you think that message is too neat and simple, you're right. The complications are spelled out in the next two chapters. But we must note one complication here: Interest paid on a firm's borrowing can be deducted from taxable income. Thus the *after-tax* cost of debt is $r_D(1 - T_c)$, where $T_c$ is the marginal corporate tax rate. So, when companies discount an average-risk project, they do not use the company cost of capital as we have just computed it. Instead they use the after-tax cost of debt to compute the after-tax weighted-average cost of capital or WACC:

$$\text{After-tax WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$

We briefly introduced this formula in Chapter 9, where we used it to estimate the weighted-average cost of capital for Union Pacific. In 2009 Union Pacific's long-term borrowing rate was $r_D = 7.8\%$, and its estimated cost of equity was $r_E = 9.9\%$. With a 35% corporate tax rate, the after-tax cost of debt was $r_D(1 - T_c) = 7.8(1 - .35) = 5.1\%$. The ratio of debt to overall company value was $D/V = 31.5\%$. Therefore

$$\text{After-tax WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$
$$= (1 - .35) \times 7.8 \times .315 + 9.9 \times .685 = 8.4\%$$

MM's proposition 2 states that *in the absence of taxes* the company cost of capital stays the same regardless of the amount of leverage. But, if companies receive a tax shield on their interest payments, then the after-tax WACC declines as debt increases. This is illustrated in Figure 17.4, which shows how Union Pacific's WACC changes as the debt–equity ratio changes.



**FIGURE 17.4**

Estimated after-tax WACC for Union Pacific at different debt–equity ratios. The figure assumes $r_E = 9.9\%$ at a 31.5% debt ratio (equivalent to a 46% debt–equity ratio) and a borrowing rate of $r_D = 7.8\%$. Notice that the debt interest rate is assumed to increase with the debt–equity ratio.

## SUMMARY

Think of the financial manager as taking all of the firm's real assets and selling them to investors as a package of securities. Some financial managers choose the simplest package possible: all-equity financing. Some end up issuing dozens of debt and equity securities. The problem is to find the particular combination that maximizes the market value of the firm.

Modigliani and Miller's (MM's) famous proposition 1 states that no combination is better than any other—that the firm's overall market value (the value of all its securities) is independent of capital structure. Firms that borrow do offer investors a more complex menu of securities, but investors yawn in response. The menu is redundant. Any shift in capital structure can be duplicated or "undone" by investors. Why should they pay extra for borrowing indirectly (by holding shares in a levered firm) when they can borrow just as easily and cheaply on their own accounts?

MM agree that borrowing raises the expected rate of return on shareholders' investments. But it also increases the risk of the firm's shares. MM show that the higher risk exactly offsets the increase in expected return, leaving stockholders no better or worse off.

Proposition 1 is an extremely general result. It applies not just to the debt–equity trade-off but to *any* choice of financing instruments. For example, MM would say that the choice between long-term and short-term debt has no effect on firm value.

The formal proofs of proposition 1 all depend on the assumption of perfect capital markets. MM's opponents, the "traditionalists," argue that market imperfections make personal borrowing excessively costly, risky, and inconvenient for some investors. This creates a natural clientele willing to pay a premium for shares of levered firms. The traditionalists say that firms should borrow to realize the premium.

But this argument is incomplete. There may be a clientele for levered equity, but that is not enough; the clientele has to be *unsatisfied*. There are already thousands of levered firms available for investment. Is there still an unsatiated clientele for garden-variety debt and equity? We doubt it.

Proposition 1 is violated when financial managers find an untapped demand and satisfy it by issuing something new and different. The argument between MM and the traditionalists finally boils down to whether this is difficult or easy. We lean toward MM's view: Finding unsatisfied clienteles and designing exotic securities to meet their needs is a game that's fun to play but hard to win.

If MM are right, the overall cost of capital—the expected rate of return on a portfolio of all the firm's outstanding securities—is the same regardless of the mix of securities issued to finance the firm. The overall cost of capital is usually called the company cost of capital or the weighted-average cost of capital (WACC). MM say that WACC doesn't depend on capital structure. But MM assume away lots of complications. The first complication is taxes. When we recognize that debt interest is tax-deductible, and compute WACC with the after-tax interest rate, WACC declines as the debt ratio increases. There is more—lots more—on taxes and other complications in the next two chapters.

## FURTHER READING

*The fall 1988 issue of the* Journal of Economic Perspectives *contains a collection of articles, including one by Modigliani and Miller, which review and assess the MM propositions. The summer 1989 issue of* Financial Management *contains three more articles under the heading "Reflections on the MM Propositions 30 Years Later."*

*Two surveys of financial innovation include:*

K. A. Karow, G. R. Erwin, and J. J. McConnell, "Survey of U.S. Corporate Financing Innovations: 1970–1997," *Journal of Applied Corporate Finance* 12 (Spring 1999), pp. 55–69.

P. Tufano, "Financial Innovation," in G. M. Constantinides, M. Harris, and R. Stulz (eds.), *Handbook of the Economics of Finance,* Vol 1A (Amsterdam: Elsevier/North-Holland, 2003).

*Miller reviews the MM propositions in:*

M. H. Miller, "The Modigliani-Miller Propositions after Thirty Years," *Journal of Applied Corporate Finance* 2 (Spring 1989), pp. 6–18.

*For a skeptic's view of MM's arguments see:*

S. Titman, "The Modigliani-Miller Theorem and the Integration of Financial Markets," *Financial Management* 31 (Spring 2002), pp. 101–115.



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

### BASIC

PROBLEM SETS

1. Ms. Kraft owns 50,000 shares of the common stock of Copperhead Corporation with a market value of $2 per share, or $100,000 overall. The company is currently financed as follows:

| | Book Value |
|---|---|
| Common stock (8 million shares) | $2 million |
| Short-term loans | $2 million |

   Copperhead now announces that it is replacing $1 million of short-term debt with an issue of common stock. What action can Ms. Kraft take to ensure that she is entitled to exactly the same proportion of profits as before?

2. Spam Corp. is financed entirely by common stock and has a beta of 1.0. The firm is expected to generate a level, perpetual stream of earnings and dividends. The stock has a price–earnings ratio of 8 and a cost of equity of 12.5%. The company's stock is selling for $50. Now the firm decides to repurchase half of its shares and substitute an equal value of debt. The debt is risk-free, with a 5% interest rate. The company is exempt from corporate income taxes. Assuming MM are correct, calculate the following items after the refinancing:

   a. The cost of equity.

   b. The overall cost of capital (WACC).

   c. The price–earnings ratio.

   d. The stock price.

   e. The stock's beta.

3. The common stock and debt of Northern Sludge are valued at $50 million and $30 million, respectively. Investors currently require a 16% return on the common stock and an 8% return on the debt. If Northern Sludge issues an additional $10 million of common stock and uses this money to retire debt, what happens to the expected return on the stock? Assume that the change in capital structure does not affect the risk of the debt and that there are no taxes.

4. Suppose that Macbeth Spot Removers issues only $2,500 of debt and uses the proceeds to repurchase 250 shares.

   a. Rework Table 17.2 to show how earnings per share and share return now vary with operating income.

   b. If the beta of Macbeth's assets is .8 and its debt is risk-free, what would be the beta of the equity after the debt issue?

Visit us at www.mhhe.com/bma

5. True or false?
   a. MM's propositions assume perfect financial markets, with no distorting taxes or other imperfections.
   b. MM's proposition 1 says that corporate borrowing increases earnings per share but reduces the price–earnings ratio.
   c. MM's proposition 2 says that the cost of equity increases with borrowing and that the increase is proportional to $D/V$, the ratio of debt to firm value.
   d. MM's proposition 2 assumes that increased borrowing does not affect the interest rate on the firm's debt.
   e. Borrowing does not increase financial risk and the cost of equity if there is no risk of bankruptcy.
   f. Borrowing increases firm value if there is a clientele of investors with a reason to prefer debt.

6. Look back to Section 17.1. Suppose that Ms. Macbeth's investment bankers have informed her that since the new issue of debt is risky, debtholders will demand a return of 12.5%, which is 2.5% above the risk-free interest rate.
   a. What are $r_A$ and $r_E$?
   b. Suppose that the beta of the unlevered stock was .6. What will $\beta_A$, $\beta_E$, and $\beta_D$ be after the change to the capital structure?

7. Note the two blank graphs in Figure 17.5 below. On graph (*a*), assume MM are right, and plot the relationship between financial leverage (debt-equity ratio) and (i) the rates of return on debt and equity and (ii) the weighted-average cost of capital. Then fill in graph (*b*), assuming the traditionalists are right.

8. Gaucho Services starts life with all-equity financing and a cost of equity of 14%. Suppose it refinances to the following market-value capital structure:

| | | |
|---|---|---|
| Debt (*D*) | 45% | at $r_D = 9.5\%$ |
| Equity (*E*) | 55% | |

   Use MM's proposition 2 to calculate the new cost of equity. Gaucho pays taxes at a marginal rate of $T_c = 40\%$. Calculate Gaucho's after-tax weighted-average cost of capital.

### INTERMEDIATE

9. Companies A and B differ only in their capital structure. A is financed 30% debt and 70% equity; B is financed 10% debt and 90% equity. The debt of both companies is risk-free.
   a. Rosencrantz owns 1% of the common stock of A. What other investment package would produce identical cash flows for Rosencrantz?
   b. Guildenstern owns 2% of the common stock of B. What other investment package would produce identical cash flows for Guildenstern?

▶ **FIGURE 17.5**

See Problem 7.



c. Show that neither Rosencrantz nor Guildenstern would invest in the common stock of B if the *total* value of company A were less than that of B.

**10.** Here is a limerick:

*There once was a man named Carruthers,*
*Who kept cows with miraculous udders.*
*He said, "Isn't this neat?*
*They give cream from one teat,*
*And skim milk from each of the others!"*

What is the analogy between Mr. Carruthers's cows and firms' financing decisions? What would MM's proposition 1, suitably adapted, say about the value of Mr. Carruthers's cows? Explain.

**11.** Executive Chalk is financed solely by common stock and has outstanding 25 million shares with a market price of $10 a share. It now announces that it intends to issue $160 million of debt and to use the proceeds to buy back common stock.

a. How is the market price of the stock affected by the announcement?

b. How many shares can the company buy back with the $160 million of new debt that it issues?

c. What is the market value of the firm (equity plus debt) after the change in capital structure?

d. What is the debt ratio after the change in structure?

e. Who (if anyone) gains or loses?

Now try the next question.

**12.** Executive Cheese has issued debt with a market value of $100 million and has outstanding 15 million shares with a market price of $10 a share. It now announces that it intends to issue a further $60 million of debt and to use the proceeds to buy back common stock. Debtholders, seeing the extra risk, mark the value of the existing debt down to $70 million.

a. How is the market price of the stock affected by the announcement?

b. How many shares can the company buy back with the $60 million of new debt that it issues?

c. What is the market value of the firm (equity plus debt) after the change in capital structure?

d. What is the debt ratio after the change in structure?

e. Who (if anyone) gains or loses?

**13.** Hubbard's Pet Foods is financed 80% by common stock and 20% by bonds. The expected return on the common stock is 12% and the rate of interest on the bonds is 6%. Assuming that the bonds are default-risk free, draw a graph that shows the expected return of Hubbard's common stock ($r_E$) and the expected return on the package of common stock and bonds ($r_A$) for different debt–equity ratios.

**14.** "MM totally ignore the fact that as you borrow more, you have to pay higher rates of interest." Explain carefully whether this is a valid objection.

**15.** Indicate what's wrong with the following arguments:

a. "As the firm borrows more and debt becomes risky, both stockholders and bondholders demand higher rates of return. Thus by *reducing* the debt ratio we can reduce *both* the cost of debt and the cost of equity, making everybody better off."

b. "Moderate borrowing doesn't significantly affect the probability of financial distress or bankruptcy. Consequently moderate borrowing won't increase the expected rate of return demanded by stockholders."

Visit us at www.mhhe.com/bma

16. Each of the following statements is false or at least misleading. Explain why in each case.

    a. "A capital investment opportunity offering a 10% DCF rate of return is an attractive project if it can be 100% debt-financed at an 8% interest rate."

    b. "The more debt the firm issues, the higher the interest rate it must pay. That is one important reason why firms should operate at conservative debt levels."

17. Can you invent any new kinds of debt that might be attractive to investors? Why do you think they have not been issued?

18. Imagine a firm that is expected to produce a level stream of operating profits. As leverage is increased, what happens to:

    a. The ratio of the market value of the equity to income after interest?

    b. The ratio of the market value of the *firm* to income before interest if (i) MM are right and (ii) the traditionalists are right?

19. Archimedes Levers is financed by a mixture of debt and equity. You have the following information about its cost of capital:

    | | | |
    |---|---|---|
    | $r_E = \_\_$ | $r_D = 12\%$ | $r_A = \_\_$ |
    | $\beta_E = 1.5$ | $\beta_D = \_\_$ | $\beta_A = \_\_$ |
    | $r_f = 10\%$ | $r_m = 18\%$ | $D/V = .5$ |

    Can you fill in the blanks?

20. Look back to Problem 19. Suppose now that Archimedes repurchases debt and issues equity so that $D/V = .3$. The reduced borrowing causes $r_D$ to fall to 11%. How do the other variables change?

21. Omega Corporation has 10 million shares outstanding, now trading at $55 per share. The firm has estimated the expected rate of return to shareholders at about 12%. It has also issued long-term bonds at an interest rate of 7%. It pays tax at a marginal rate of 35%.

    a. What is Omega's after-tax WACC?

    b. How much higher would WACC be if Omega used no debt at all? (*Hint:* For this problem you can assume that the firm's overall beta [$\beta_A$] is not affected by its capital structure or the taxes saved because debt interest is tax-deductible.)

22. Gamma Airlines has an asset beta of 1.5. The risk-free interest rate is 6%, and the market risk premium is 8%. Assume the capital asset pricing model is correct. Gamma pays taxes at a marginal rate of 35%. Draw a graph plotting Gamma's cost of equity and after-tax WACC as a function of its debt-to-equity ratio $D/E$, from no debt to $D/E = 1.0$. Assume that Gamma's debt is risk-free up to $D/E = .25$. Then the interest rate increases to 6.5% at $D/E = .5$, 7% at $D/E = .8$, and 8% at $D/E = 1.0$. As in Problem 21, you can assume that the firm's overall beta ($\beta_A$) is not affected by its capital structure or the taxes saved because debt interest is tax-deductible.

### CHALLENGE

23. Consider the following three tickets: ticket A pays $10 if _____ is elected as president, ticket B pays $10 if _____ is elected, and ticket C pays $10 if neither is elected. (Fill in the blanks yourself.) Could the three tickets sell for less than the present value of $10? Could they sell for more? Try auctioning off the tickets. What are the implications for MM's proposition 1?

24. People often convey the idea behind MM's proposition 1 by various supermarket analogies, for example, "The value of a pie should not depend on how it is sliced," or, "The cost of a whole chicken should equal the cost of assembling one by buying two drumsticks, two wings, two breasts, and so on."

Visit us at www.mhhe.com/bma

Actually proposition 1 doesn't work in the supermarket. You'll pay less for an uncut whole pie than for a pie assembled from pieces purchased separately. Supermarkets charge more for chickens after they are cut up. Why? What costs or imperfections cause proposition 1 to fail in the supermarket? Are these costs or imperfections likely to be important for corporations issuing securities on the U.S. or world capital markets? Explain.

25. Suppose that new security designs could be patented.[9] The patent holder could restrict use of the new design or charge other firms royalties for using it. What effect would such patents have on MM's capital-structure irrelevance theory?

---

[9] So far security designs cannot be patented, but other financial applications have received patent protection. See J. Lerner, "Where Does State Street Lead? A First Look at Finance Patents," *Journal of Finance* 57 (April 2002), pp. 901–930.

# 18

PAYOUT POLICY AND CAPITAL STRUCTURE

# How Much Should a Corporation Borrow?

◗ **In Chapter 17** we found that debt policy rarely matters in well-functioning capital markets with no frictions or imperfections. Few financial managers would accept that conclusion as a practical guideline. If debt policy doesn't matter, then they shouldn't worry about it—financing decisions could be routine or erratic—it wouldn't matter. Yet financial managers do worry about debt policy. This chapter explains why.

If debt policy were completely irrelevant, then actual debt ratios should vary randomly from firm to firm and industry to industry. Yet almost all airlines, utilities, banks, and real estate development companies rely heavily on debt. And so do many firms in capital-intensive industries such as steel, aluminum, chemicals, petroleum, and mining. On the other hand, it is rare to find a pharmaceutical company or advertising agency that is not predominantly equity-financed. Glamorous growth companies rarely use much debt despite rapid expansion and often heavy requirements for capital.

The explanation of these patterns lies partly in the things we left out of the last chapter. We mostly ignored taxes. We assumed bankruptcy was cheap, quick, and painless. It isn't, and there are costs associated with financial distress even if legal bankruptcy is ultimately avoided. We ignored potential conflicts of interest between the firm's security holders. For example, we did not consider what happens to the firm's "old" creditors when new debt is issued or when a shift in investment strategy takes the firm into a riskier business. We ignored the information problems that favor debt over equity when cash must be raised from new security issues. We ignored the incentive effects of financial leverage on management's investment and payout decisions.

Now we will put all these things back in: taxes first, then the costs of bankruptcy and financial distress. This will lead us to conflicts of interest and to information and incentive problems. In the end we will have to admit that debt policy does matter.

However, we will not throw away the MM theory we developed so carefully in Chapter 17. We're shooting for a theory combining MM's insights plus the effects of taxes, costs of bankruptcy and financial distress, and various other complications. We're not dropping back to a theory based on inefficiencies in the capital market. Instead, we want to see how well-functioning capital markets respond to taxes and the other things covered in this chapter.

● ● ● ● ●

## 18-1 Corporate Taxes

Debt financing has one important advantage under the corporate income tax system in the U.S. and many other countries. The interest that the company pays is a tax-deductible expense. Thus the return to bondholders escapes taxation at the corporate level.

Table 18.1 shows simple income statements for firm U, which has no debt, and firm L, which has borrowed $1,000 at 8%. L's tax bill is $28 less than U's. This is the *tax shield*

| | Income Statement of Firm U | Income Statement of Firm L |
|---|---|---|
| Earnings before interest and taxes | $1,000 | $1,000 |
| Interest paid to bondholders | 0 | 80 |
| Pretax income | 1,000 | 920 |
| Tax at 35% | 350 | 322 |
| Net income to stockholders | $ 650 | $ 598 |
| Total income to both bondholders and stockholders | $0 + 650 = $650 | $80 + 598 = $678 |
| Interest tax shield (.35 × interest) | $0 | $28 |

▶ **TABLE 18.1**   The tax deductibility of interest increases the total income that can be paid out to bondholders and stockholders.

provided by the debt of L. In effect the government pays 35% of the interest expense of L. The total income that L can pay out to its bondholders and stockholders increases by that amount.

Tax shields can be valuable assets. Suppose that the debt of L is fixed and permanent. (That is, the company commits to refinance its present debt obligations when they mature and to keep rolling over its debt obligations indefinitely.) Then L can look forward to a permanent stream of cash flows of $28 per year. The risk of these flows is likely to be less than the risk of the operating assets of L. The tax shields depend only on the corporate tax rate[1] and on the ability of L to earn enough to cover interest payments. The corporate tax rate has been pretty stable. And the ability of L to earn its interest payments must be reasonably sure; otherwise it could not have borrowed at 8%. Therefore we should discount the interest tax shields at a relatively low rate.

But what rate? One common assumption is that the risk of the tax shields is the same as that of the interest payments generating them. Thus we discount at 8%, the expected rate of return demanded by investors who are holding the firm's debt:

$$PV(\text{tax shield}) = \frac{28}{.08} = \$350$$

In effect the government assumes 35% of the $1,000 debt obligation of L.

Under these assumptions, the present value of the tax shield is independent of the return on the debt $r_D$. It equals the corporate tax rate $T_c$ times the amount borrowed $D$:

$$\text{Interest payment} = \text{return on debt} \times \text{amount borrowed}$$
$$= r_D \times D$$

$$PV(\text{tax shield}) = \frac{\text{corporate tax rate} \times \text{interest payment}}{\text{expected return on debt}}$$

$$= \frac{T_c r_D D}{r_D} = T_c D$$

---

[1] Always use the marginal corporate tax rate, not the average rate. Average rates are often much lower than marginal rates because of accelerated depreciation and other tax adjustments. For large corporations, the marginal rate is usually taken as the statutory rate, which was 35% when this chapter was written (2009). However, effective marginal rates can be less than the statutory rate, especially for smaller, riskier companies that cannot be sure that they will earn taxable income in the future.

Of course, PV(tax shield) is less if the firm does not plan to borrow a permanent fixed amount,[2] or if it may not have enough taxable income to use the interest tax shields.[3]

### How Do Interest Tax Shields Contribute to the Value of Stockholders' Equity?

MM's proposition 1 amounts to saying that the value of a pie does not depend on how it is sliced. The pie is the firm's assets, and the slices are the debt and equity claims. If we hold the pie constant, then a dollar more of debt means a dollar less of equity value.

But there is really a third slice, the government's. Look at Table 18.2. It shows an expanded balance sheet with *pretax* asset value on the left and the value of the government's tax claim recognized as a liability on the right. MM would still say that the value of the pie—in this case *pretax* asset value—is not changed by slicing. But anything the firm can do to reduce the size of the government's slice obviously makes stockholders better off. One thing it can do is borrow money, which reduces its tax bill and, as we saw in Table 18.1, increases the cash flows to debt and equity investors. The *after-tax* value of the firm (the sum of its debt and equity values as shown in a normal market value balance sheet) goes up by PV(tax shield).

### Recasting Merck's Capital Structure

Merck is a large, successful firm that uses relatively little long-term debt. Table 18.3(*a*) shows simplified book and market value balance sheets for Merck in December 2008.

Suppose that you were Merck's financial manager with complete responsibility for its capital structure. You decide to borrow an additional $1 billion on a permanent basis and use the proceeds to repurchase shares.

Table 18.3(*b*) shows the new balance sheets. The book version simply has $1,000 million more long-term debt and $1,000 million less equity. But we know that Merck's assets must be worth more because its tax bill has been reduced by 35% of the interest on the new

> **TABLE 18.2**
> Normal and expanded market value balance sheets. In a normal balance sheet, assets are valued after tax. In the expanded balance sheet, assets are valued pretax, and the value of the government's tax claim is recognized on the right-hand side. Interest tax shields are valuable because they reduce the government's claim.

**Normal Balance Sheet (Market Values)**

| Asset value of (present value of after-tax cash flows) | Debt |
| --- | --- |
| | Equity |
| Total assets | Total value |

**Expanded Balance Sheet (Market Values)**

| Pretax asset value (present value of pretax cash flows) | Debt |
| --- | --- |
| | Government's claim (present value of future taxes) |
| | Equity |
| Total pretax assets | Total pretax value |

---

[2] In this example, we assume that the amount of debt is fixed and stable over time. The natural alternative assumption is a fixed *ratio* of debt to firm value. If the ratio is fixed, then the level of debt and the amount of interest tax shields will fluctuate as firm value fluctuates. In that case projected interest tax shields can't be discounted at the cost of debt. We cover this point in detail in the next chapter.

[3] If the income of L does not cover interest in some future year, the tax shield is not necessarily lost. L can carry back the loss and receive a tax refund up to the amount of taxes paid in the previous two years. If L has a string of losses, and thus no prior tax payments that can be refunded, then losses can be carried forward and used to shield income in later years.

### Book Values

| Net working capital | $4,986.2 | $3,943.3 | Long-term debt |
| | | 10,175.4 | Other long-term liabilities |
| Long-term assets | 27,890.8 | 18,758.3 | Equity |
| Total assets | $32,877.0 | $32,877.0 | Total value |

### Market Values

| Net working capital | $4,986.2 | $3,943.3 | Long-term debt |
| PV interest tax shield | 1,380.2 | 10,175.4 | Other long-term liabilities |
| Long-term assets | 72,680.6 | 64,928.3 | Equity |
| Total assets | $79,047.0 | $79,047.0 | Total value |

**TABLE 18.3a**   Simplified balance sheets for Merck, December 2008 (figures in millions).

*Notes:*
1. Market value is equal to book value for net working capital, long-term debt, and other long-term liabilities. Market value of equity = number of shares times closing price for December 2008. The difference between the market and book values of long-term assets is equal to the difference between the market and book values of equity.
2. PV interest tax shield assumes fixed, perpetual debt, with a 35% tax rate.

### Book Values

| Net working capital | $4,986.2 | $4,943.3 | Long-term debt |
| | | 10,175.4 | Other long-term liabilities |
| Long-term assets | 27,890.8 | 17,758.3 | Equity |
| Total assets | $32,877.0 | $32,877.0 | Total value |

### Market Values

| Net working capital | $4,986.2 | $4,943.3 | Long-term debt |
| PV interest tax shield | 1,730.2 | 10,175.4 | Other long-term liabilities |
| Long-term assets | 72,680.6 | 64,278.3 | Equity |
| Total assets | $79,397.0 | $79,397.0 | Total value |

**TABLE 18.3b**   Balance sheets for Merck with additional $1 billion of long-term debt substituted for stockholders' equity (figures in millions).

debt. In other words, Merck has an increase in PV(interest tax shield), which is worth $T_cD = .35 \times \$1,000$ million = $350 million. If the MM theory holds *except* for taxes, firm value must increase by $350 million to $79,397 million. Merck's equity ends up worth $64,278 million.

Now you have repurchased $1,000 million worth of shares, but Merck's equity value has dropped by only $650 million. Therefore Merck's stockholders must be $350 million ahead. Not a bad day's work.[4]

## MM and Taxes

We have just developed a version of MM's proposition 1 as corrected by them to reflect corporate income taxes.[5] The new proposition is

$$\text{Value of firm} = \text{value if all-equity-financed} + \text{PV(tax shield)}$$

In the special case of permanent debt,

$$\text{Value of firm} = \text{value if all-equity-financed} + T_cD$$

---

[4] Notice that as long as the bonds are sold at a fair price, all the benefits from the tax shield must go to the shareholders.

[5] Interest tax shields are recognized in MM's original article, F. Modigliani and M. H. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *American Economic Review* 48 (June 1958), pp. 261–296. The valuation procedure used in Table 18.3(*b*) is presented in their 1963 article "Corporate Income Taxes and the Cost of Capital: A Correction," *American Economic Review* 53 (June 1963), pp. 433–443.

Our imaginary financial surgery on Merck provides the perfect illustration of the problems inherent in this "corrected" theory. That $350 million came too easily; it seems to violate the law that there is no such thing as a money machine. And if Merck's stockholders would be richer with $4,943 million of corporate debt, why not $5,943 or $15,943 million? At what debt level should Merck stop borrowing? Our formula implies that firm value and stockholders' wealth continue to go up as $D$ increases. The optimal debt policy appears to be embarrassingly extreme. All firms should be 100% debt-financed.

MM were not that fanatical about it. No one would expect the formula to apply at extreme debt ratios. There are several reasons why our calculations overstate the value of interest tax shields. First, it's wrong to think of debt as fixed and perpetual; a firm's ability to carry debt changes over time as profits and firm value fluctuate. Second, many firms face marginal tax rates less than 35%. Third, you can't use interest tax shields unless there will be future profits to shield—and no firm can be absolutely sure of that.

But none of these qualifications explains why companies like Merck survive and thrive at low debt ratios. It's hard to believe that Merck's financial managers are simply missing the boat.

A conservative debt policy can of course be great comfort when a company suffers a sudden adverse shock. For Merck, that shock came in September 2004, when it became clear that its blockbuster painkiller Vioxx increased the risk of heart attacks in some patients. When Merck withdrew Vioxx from the market, it lost billions of dollars in future revenues and had to spend or set aside nearly $5 billion for legal costs and settlements. Yet the company's credit rating was not harmed, and it retained ample cash flow to fund all its investments, including research and development, and to maintain its regular dividend. But if Merck was that strong financially *after* the loss of Vioxx, was its debt policy before the loss excessively conservative? Why did it pass up the opportunity to borrow a few billion more (as in Table 18.3[*b*]), thus substituting tax-deductible interest for taxable income to shareholders?

We seem to have argued ourselves into a blind alley. But there may be two ways out:

1. Perhaps a fuller examination of the U.S. system of corporate *and personal* taxation will uncover a tax disadvantage of corporate borrowing, offsetting the present value of the interest tax shield.
2. Perhaps firms that borrow incur other costs—bankruptcy costs, for example.

We now explore these two escape routes.

## 18-2 Corporate and Personal Taxes

When personal taxes are introduced, the firm's objective is no longer to minimize the *corporate* tax bill; the firm should try to minimize the present value of *all* taxes paid on corporate income. "All taxes" include *personal* taxes paid by bondholders and stockholders.

Figure 18.1 illustrates how corporate and personal taxes are affected by leverage. Depending on the firm's capital structure, a dollar of operating income will accrue to investors either as debt interest or equity income (dividends or capital gains). That is, the dollar can go down either branch of Figure 18.1.

Notice that Figure 18.1 distinguishes between $T_p$, the personal tax rate on interest, and $T_{pE}$, the effective personal tax rate on equity income. This rate can be well below $T_P$, depending on the mix of dividends and capital gains realized by shareholders. The top marginal rate on dividends and capital gains is now (2009) only 15% while the top rate on



▶ **FIGURE 18.1**

The firm's capital struc-ture determines whether operating income is paid out as interest or equity income. Interest is taxed only at the personal level. Equity income is taxed at both the cor-porate and the personal levels. However, $T_{pE}$, the personal tax rate on equity income, can be less than $T_p$, the per-sonal tax rate on interest income.

other income, including interest income, is 35%. Also capital gains taxes can be deferred until shares are sold, so the top *effective* capital gains rate is usually less than 15%.

The firm's objective should be to arrange its capital structure to maximize after-tax income. You can see from Figure 18.1 that corporate borrowing is better if $(1 - T_p)$ is more than $(1 - T_{pE}) \times (1 - T_c)$; otherwise it is worse. The *relative tax* advantage of debt over equity is

$$\text{Relative tax advantage of debt} = \frac{1 - T_p}{(1 - T_{pE})(1 - T_c)}$$

This suggests two special cases. First, suppose that debt and equity income were taxed at the same effective personal rate. But with $T_{pE} = T_p$, the relative advantage depends only on the *corporate rate:*

$$\text{Relative advantage} = \frac{1 - T_p}{(1 - T_{pE})(1 - T_c)} = \frac{1}{1 - T_c}$$

In this case, we can forget about personal taxes. The tax advantage of corporate bor-rowing is exactly as MM calculated it.[6] They do not have to assume away personal taxes. Their theory of debt and taxes requires only that debt and equity be taxed at the same rate.

---

[6] Personal taxes reduce the dollar amount of corporate interest tax shields, but the appropriate discount rate for cash flows after personal tax is also lower. If investors are willing to lend at a prospective return *before* personal taxes of $r_D$, then they must also be willing to accept a return *after* personal taxes of $r_D(1 - T_p)$, where $T_p$ is the marginal rate of personal tax. Thus we can compute the value after personal taxes of the tax shield on permanent debt:

$$\text{PV(tax shield)} = \frac{T_c \times r_D D \times (1 - T_p)}{r_D \times (1 - T_p)} = T_c D$$

This brings us back to our previous formula for firm value:

$$\text{Value of firm} = \text{value if all-equity-financed} + T_c D$$

The second special case occurs when corporate and personal taxes cancel to make debt policy irrelevant. This requires

$$1 - T_p = (1 - T_{pE})(1 - T_c)$$

This case can happen only if $T_c$, the corporate rate, is less than the personal rate $T_p$ *and* if $T_{pE}$, the effective rate on equity income, is small. Merton Miller explored this situation at a time when U.S. tax rates on interest and dividends were much higher than now, but we won't go into the details of his analysis here.[7]

In any event we seem to have a simple, practical decision rule. Arrange the firm's capital structure to shunt operating income down that branch of Figure 18.1 where the tax is least. Unfortunately that is not as simple as it sounds. What's $T_{pE}$, for example? The shareholder roster of any large corporation is likely to include tax-exempt investors (such as pension funds or university endowments) as well as millionaires. All possible tax brackets will be mixed together. And it's the same with $T_p$, the personal tax rate on interest. The large corporation's "typical" bondholder might be a tax-exempt pension fund, but many taxpaying investors also hold corporate debt.

Some investors may be much happier to buy your debt than others. For example, you should have no problems inducing pension funds to lend; they don't have to worry about personal tax. But taxpaying investors may be more reluctant to hold debt and will be prepared to do so only if they are compensated by a high rate of interest. Investors paying tax on interest at the top rate of 35% may be particularly reluctant to hold debt. They will prefer to hold common stock or tax-exempt bonds issued by states and municipalities.

To determine the net tax advantage of debt, companies would need to know the tax rates faced by the *marginal* investor—that is, an investor who is equally happy to hold debt or equity. This makes it hard to put a precise figure on the tax benefit, but we can nevertheless provide a back-of-the-envelope calculation. Let's consider a large, dividend-paying company like Merck. Merck's dividend payout ratio has averaged about 65%, so for each $1.00 of income, $.65 is received as dividends and $.35 as capital gains. Suppose the marginal investor is in the top tax bracket, paying 35% on interest and 15% on dividends and capital gains. Let's assume that deferred realization of capital gains cuts the effective capital gains rate in half, to $15/2 = 7.5\%$. Therefore, if the investor invests in Merck common stock, the tax on each $1.00 of equity income is $T_{pE} = (.65 \times 15) + (.35 \times 7.5) = 12.4\%$.

Now we can calculate the effect of shunting a dollar of income down each of the two branches in Figure 18.1:

|  | Interest | Equity Income |
|---|---|---|
| Income before tax | $1.00 | $1.00 |
| Less corporate tax at $T_c = .35$ | 0 | .35 |
| Income after corporate tax | 1.00 | .65 |
| Personal tax at $T_p = .35$ and $T_{pE} = .124$ | .35 | .081 |
| Income after all taxes | $ .65 | $ .569 |
| | | Advantage to debt = $.081 |

The advantage to debt financing appears to be about $.08 on the dollar.

We should emphasize that our back-of-the-envelope calculation is just that. But it's interesting to see how debt's tax advantage shrinks when we account for the relatively low personal tax rate on equity income.

[7] M. H. Miller, "Debt and Taxes," *Journal of Finance* 32 (May 1977), pp. 261–276.

Most financial managers believe that there is a moderate tax advantage to corporate borrowing, at least for companies that are reasonably sure they can use the corporate tax shields. For companies that cannot benefit from corporate tax shields there is probably a moderate tax disadvantage.

Do companies make full use of interest tax shields? John Graham argues that they don't. His estimates suggest that a typical tax-paying corporation could add 7.5% to firm value by levering up to a still-conservative debt ratio.[8] This is hardly spare change. Therefore it still appears that financial managers have passed by some easy tax savings. Perhaps they saw some offsetting disadvantage to increased borrowing. We now explore this second escape route.

## 18-3 Costs of Financial Distress

Financial distress occurs when promises to creditors are broken or honored with difficulty. Sometimes financial distress leads to bankruptcy. Sometimes it only means skating on thin ice.

As we will see, financial distress is costly. Investors know that levered firms may fall into financial distress, and they worry about it. That worry is reflected in the current market value of the levered firm's securities. Thus, the value of the firm can be broken down into three parts:

$$\begin{array}{c} \text{Value} \\ \text{of firm} \end{array} = \begin{array}{c} \text{value if} \\ \text{all-equity-finaced} \end{array} + \text{PV(tax shield)} - \begin{array}{c} \text{PV(costs of} \\ \text{financial distress)} \end{array}$$

The costs of financial distress depend on the probability of distress and the magnitude of costs encountered if distress occurs.

Figure 18.2 shows how the trade-off between the tax benefits and the costs of distress could determine optimal capital structure. PV(tax shield) initially increases as the firm



Market value

**FIGURE 18.2**

The value of the firm is equal to its value if all-equity-financed plus PV tax shield minus PV costs of financial distress. According to the trade-off theory of capital structure, the manager should choose the debt ratio that maximizes firm value.

borrows more. At moderate debt levels the probability of financial distress is trivial, and so PV(cost of financial distress) is small and tax advantages dominate. But at some point the probability of financial distress increases rapidly with additional borrowing; the costs of distress begin to take a substantial bite out of firm value. Also, if the firm can't be sure of profiting from the corporate tax shield, the tax advantage of additional debt is likely to dwindle and eventually disappear. The theoretical optimum is reached when the present value of tax savings due to further borrowing is just offset by increases in the present value of costs of distress. This is called the *trade-off theory* of capital structure.

   *Costs of financial distress* cover several specific items. Now we identify these costs and try to understand what causes them.

## Bankruptcy Costs

You rarely hear anything nice said about corporate bankruptcy. But there is some good in almost everything. Corporate bankruptcies occur when stockholders exercise their *right to default*. That right is valuable; when a firm gets into trouble, limited liability allows stockholders simply to walk away from it, leaving all its troubles to its creditors. The former creditors become the new stockholders, and the old stockholders are left with nothing.

   Stockholders in corporations automatically get *limited liability*. But suppose that this were not so. Suppose that there are two firms with identical assets and operations. Each firm has debt outstanding, and each has promised to repay $1,000 (principal and interest) next year. But only one of the firms, Ace Limited, enjoys limited liability. The other firm, Ace Unlimited, does not; its stockholders are personally liable for its debt.[9]

   Figure 18.3 compares next year's possible payoffs to the creditors and stockholders of these two firms. The only differences occur when next year's asset value turns out to be less than $1,000. Suppose that next year the assets of each company are worth only $500. In this case Ace Limited defaults. Its stockholders walk away; their payoff is zero. Bondholders get the assets worth $500. But Ace Unlimited's stockholders can't walk away. They have to cough up $500, the difference between asset value and the bondholders' claim. The debt is paid whatever happens.

   Suppose that Ace Limited does go bankrupt. Of course, its stockholders are disappointed that their firm is worth so little, but that is an operating problem having nothing to do with financing. Given poor operating performance, the right to go bankrupt—the right to default—is a valuable privilege. As Figure 18.3 shows, Ace Limited's stockholders are in better shape than Unlimited's are.

   The example illuminates a mistake people often make in thinking about the costs of bankruptcy. Bankruptcies are thought of as corporate funerals. The mourners (creditors and especially shareholders) look at their firm's present sad state. They think of how valuable their securities used to be and how little is left. But they may also think of the lost value as a cost of bankruptcy. That is the mistake. The decline in the value of assets is what the mourning is really about. That has no necessary connection with financing. The bankruptcy is merely a legal mechanism for allowing creditors to take over when the decline in the value of assets triggers a default. Bankruptcy is not the *cause* of the decline in value. It is the result.

   Be careful not to get cause and effect reversed. When a person dies, we do not cite the implementation of his or her will as the cause of death.

---

[9] Ace Unlimited could be a partnership or sole proprietorship, which do not provide limited liability.



▶ **FIGURE 18.3**

Comparison of limited and unlimited liability for two otherwise identical firms. If the two firms' asset values are less than $1,000, Ace Limited stockholders default and its bondholders take over the assets. Ace Unlimited stockholders keep the assets, but they must reach into their own pockets to pay off its bondholders. The total payoff to both stockholders and bondholders is the same for the two firms.

We said that bankruptcy is a legal mechanism allowing creditors to take over when a firm defaults. *Bankruptcy costs* are the costs of using this mechanism. There are no bankruptcy costs at all shown in Figure 18.3. Note that only Ace Limited can default and go bankrupt. But, regardless of what happens to asset value, the *combined* payoff to the bondholders and stockholders of Ace Limited is always the same as the *combined* payoff to the bondholders and stockholders of Ace Unlimited. Thus the overall market values of the two firms now (this year) must be identical. Of course, Ace Limited's stock is worth more than Ace Unlimited's stock because of Ace Limited's right to default. Ace Limited's debt is worth correspondingly less.

Our example was not intended to be strictly realistic. Anything involving courts and lawyers cannot be free. Suppose that court and legal fees are $200 if Ace Limited defaults.



> **FIGURE 18.4**
>
> Total payoff to Ace Limited security holders. There is a $200 bankruptcy cost in the event of default (shaded area).

The fees are paid out of the remaining value of Ace's assets. Thus if asset value turns out to be $500, creditors end up with only $300. Figure 18.4 shows next year's *total* payoff to bondholders and stockholders net of this bankruptcy cost. Ace Limited, by issuing risky debt, has given lawyers and the court system a claim on the firm if it defaults. The market value of the firm is reduced by the present value of this claim.

It is easy to see how increased leverage affects the present value of the costs of financial distress. If Ace Limited borrows more, it increases the probability of default and the value of the lawyers' claim. It increases PV (costs of financial distress) and reduces Ace's present market value.

The costs of bankruptcy come out of stockholders' pockets. Creditors foresee the costs and foresee that *they* will pay them if default occurs. For this they demand compensation in advance in the form of higher payoffs when the firm does *not* default; that is, they demand a higher promised interest rate. This reduces the possible payoffs to stockholders and reduces the present market value of their shares.

### Evidence on Bankruptcy Costs

Bankruptcy costs can add up fast. While United Airlines was in bankruptcy, it paid over $350 million to lawyers, accountants, and consultants.[10] Enron set a record with legal, accounting, and other professional costs of nearly $1 billion. Professional fees for another distressed energy company, Mirant Corp., were a bit more moderate. The "burn rate" of fees for the first year of Mirant's bankruptcy proceedings was $120 to $140 million.[11]

Daunting as such numbers may seem, they are not a large fraction of the companies' asset values. Lawrence Weiss, who studied 31 firms that went bankrupt between 1980 and 1986, found average costs of about 3% of total book assets and 20% of the market value of equity in the year prior to bankruptcy. A study by Andrade and Kaplan of a sample of troubled and highly leveraged firms estimated costs of financial distress amounting to 10% to 20% of predistress market value, although they found it hard to

---

[10] "Bankruptcy Lawyers Flying High; Airlines' Woes Mean Big Paydays for Consultants and Law Firms; Partner's $177,000 Bill for August," *The Wall Street Journal,* October 21, 2005, p. C.1.

[11] "Enron Bankruptcy Specialist to File for Additional Payment; On Top of $63.4 Million, 'Success Fee' to Be Sought of Additional $25 Million," *The Wall Street Journal,* September 3, 2004, p. A.2; and "Mirant Bankruptcy Legal Fees Seen Topping $120 Million," Reuters, January 20, 2004.

decide whether these costs were caused by financial distress or by the business setbacks that led to distress.[12]

Bankruptcy eats up a larger fraction of asset value for small companies than for large ones. There are significant economies of scale in going bankrupt. For example, a study of smaller U.K. bankruptcies by Franks and Sussman found that fees (legal and accounting) and other costs soaked up roughly 20% to 40% of the proceeds from liquidation of the companies.[13]

## Direct versus Indirect Costs of Bankruptcy

So far we have discussed the *direct* (that is, legal and administrative) costs of bankruptcy. There are indirect costs too, which are nearly impossible to measure. But we have circumstantial evidence indicating their importance.

Managing a bankrupt firm is not easy. Consent of the bankruptcy court is required for many routine business decisions, such as the sale of assets or investment in new equipment. At best this involves time and effort; at worst proposals to reform and revive the firm are thwarted by impatient creditors, who stand first in line for cash from asset sales or liquidation of the entire firm.

Sometimes the problem is reversed: The bankruptcy court is so anxious to maintain the firm as a going concern that it allows the firm to engage in negative-NPV activities. When Eastern Airlines entered the "protection" of the bankruptcy court in 1989, it still had some valuable, profit-making routes and salable assets such as planes and terminal facilities. The creditors would have been best served by a prompt liquidation, which probably would have generated enough cash to pay off all debt and preferred stockholders. But the bankruptcy judge was keen to keep Eastern's planes flying at all costs, so he allowed the company to sell many of its assets to fund hefty operating losses. When Eastern finally closed down after two years, it was not just bankrupt, but *administratively* insolvent: There was almost nothing for creditors, and the company was running out of cash to pay legal expenses.[14]

We do not know what the sum of direct and indirect costs of bankruptcy amounts to. We suspect it is a significant number, particularly for large firms for which proceedings would be lengthy and complex. Perhaps the best evidence is the reluctance of creditors to force bankruptcy. In principle, they would be better off to end the agony and seize the assets as soon as possible. Instead, creditors often overlook defaults in the hope of nursing the firm over a difficult period. They do this in part to avoid costs of bankruptcy. There is an old financial saying, "Borrow $1,000 and you've got a banker. Borrow $10,000,000 and you've got a partner."

Creditors may also shy away from bankruptcy because they worry about violations of absolute priority. *Absolute priority* means that creditors are paid in full before stockholders receive a penny. But sometimes reorganizations provide something for everyone, including consolation prizes for stockholders. Sometimes other claimants move up in the queue. For

---

[12] The pioneering study of bankruptcy costs is J. B. Warner, "Bankruptcy Costs: Some Evidence," *Journal of Finance* 26 (May 1977), pp. 337–348. See also L. A. Weiss, "Bankruptcy Resolution: Direct Costs and Violation of Priority of Claims," *Journal of Financial Economics* 27 (October 1990), pp. 285–314; E. I. Altman, "A Further Investigation of the Bankruptcy Cost Question," *Journal of Finance* 39 (September 1984), pp. 1067–1089; and G. Andrade and S. N. Kaplan, "How Costly Is Financial (not Economic) Distress? Evidence from Highly Leveraged Transactions That Became Distressed," *Journal of Finance* 53 (October 1998), pp. 1443–1493.

[13] J. Franks and O. Sussman, "Financial Distress and Bank Restructuring of Small to Medium Size UK Companies," *Review of Finance* 9 (2005), pp. 65–96. Karin Thornburg found that the Swedish bankruptcy system is reasonably efficient for smaller firms, however. See "Bankruptcy Auctions: Costs, Debt Recovery and Firm Survival," *Journal of Financial Economics* 58 (December 2000), pp. 337–368.

[14] See L. A. Weiss and K. H. Wruck, "Information Problems, Conflicts of Interest, and Asset Stripping: Chapter 11's Failure in the Case of Eastern Airlines," *Journal of Financial Economics* 48 (1998), pp. 55–97.

example, after the Chrysler bankruptcy in 2009, the State of Indiana sued (unsuccessfully) on behalf of local pension funds that had invested in Chrysler bonds. The funds complained bitterly about the terms of sale of the bankrupt company's assets to Fiat, arguing that they would get only $.29 on the dollar, while other, more junior claimants fared better. The Chrysler bankruptcy was a special case, however. One of the key players in the proceedings was the U.S. government which was anxious to protect tens of thousands of jobs in the middle of a severe recession.

We cover bankruptcy procedures in more detail in Chapter 32.

## Financial Distress without Bankruptcy

Not every firm that gets into trouble goes bankrupt. As long as the firm can scrape up enough cash to pay the interest on its debt, it may be able to postpone bankruptcy for many years. Eventually the firm may recover, pay off its debt, and escape bankruptcy altogether.

But the mere threat of financial distress can be costly to the threatened firm. Customers and suppliers are extra cautious about doing business with a firm that may not be around for long. Customers worry about resale value and the availability of service and replacement parts. (This was a serious drag on Chrysler's sales prebankruptcy, for example.) Suppliers are disinclined to put effort into servicing the distressed firm's account and may demand cash on the nail for their products. Potential employees are unwilling to sign on and existing staff keep slipping away from their desks for job interviews.

High debt, and thus high financial risk, also appear to reduce firms' appetites for business risk. For example, Luigi Zingales looked at the fortunes of U.S. trucking companies after the trucking industry was deregulated in the late 1970s.[15] The deregulation sparked a wave of competition and restructuring. Survival required new investment and improvements in operating efficiency. Zingales found that conservatively financed trucking companies were more likely to survive in the new competitive environment. High-debt firms were more likely to drop out of the game.

## Debt and Incentives

When a firm is in trouble, both bondholders and stockholders want it to recover, but in other respects their interests may be in conflict. In times of financial distress the security holders are like many political parties—united on generalities but threatened by squabbling on any specific issue.

Financial distress is costly when these conflicts of interest get in the way of proper operating, investment, and financing decisions. Stockholders are tempted to forsake the usual objective of maximizing the overall market value of the firm and to pursue narrower self-interest instead. They are tempted to play games at the expense of their creditors. We now illustrate how such games can lead to costs of financial distress.

Here is the Circular File Company's book balance sheet:

**Circular File Company (Book Values)**

| | | | |
|---|---|---|---|
| Net working capital | $ 20 | $ 50 | Bonds outstanding |
| Fixed assets | 80 | 50 | Common stock |
| Total assets | $100 | $100 | Total value |

We will assume there is only one share and one bond outstanding. The stockholder is also the manager. The bondholder is somebody else.

---

[15] L. Zingales, "Survival of the Fittest or the Fattest? Exit and Financing in the Trucking Industry," *Journal of Finance* 53 (June 1998), pp. 905–938.

Here is its balance sheet in market values—a clear case of financial distress, since the face value of Circular's debt ($50) exceeds the firm's total market value ($30):

**Circular File Company (Market Values)**

| | | | |
|---|---|---|---|
| Net working capital | $20 | $25 | Bonds outstanding |
| Fixed assets | 10 | 5 | Common stock |
| Total assets | $30 | $30 | Total value |

If the debt matured today, Circular's owner would default, leaving the firm bankrupt. But suppose that the bond actually matures one year hence, that there is enough cash for Circular to limp along for one year, and that the bondholder cannot "call the question" and force bankruptcy before then.

The one-year grace period explains why the Circular share still has value. Its owner is betting on a stroke of luck that will rescue the firm, allowing it to pay off the debt with something left over. The bet is a long shot—the owner wins only if firm value increases from $30 to more than $50.[16] But the owner has a secret weapon: He controls investment and operating strategy.

## Risk Shifting: The First Game

Suppose that Circular has $10 cash. The following investment opportunity comes up:



This is a wild gamble and probably a lousy project. But you can see why the owner would be tempted to take it anyway. Why not go for broke? Circular will probably go under anyway, so the owner is essentially betting with the bondholder's money. But the owner gets most of the loot if the project pays off.

Suppose that the project's NPV is −$2 but that it is undertaken anyway, thus depressing firm value by $2. Circular's new balance sheet might look like this:

**Circular File Company (Market Values)**

| | | | |
|---|---|---|---|
| Net working capital | $10 | $20 | Bonds outstanding |
| Fixed assets | 18 | 8 | Common stock |
| Total assets | $28 | $28 | Total value |

Firm value falls by $2, but the owner is $3 ahead because the bond's value has fallen by $5.[17] The $10 cash that used to stand behind the bond has been replaced by a very risky asset worth only $8.

Thus a game has been played at the expense of Circular's bondholder. The game illustrates the following general point: Stockholders of levered firms gain when business risk increases. Financial managers who act strictly in their shareholders' interests (and *against* the interests of creditors) will favor risky projects over safe ones. They may even take risky projects with negative NPVs.

---

[16] We are not concerned here with how to work out whether $5 is a fair price for stockholders to pay for the bet. We will come to that in Chapter 23 when we discuss risky debt.

[17] We are not calculating this $5 drop. We are simply using it as a plausible assumption. The tools necessary for a calculation come in Chapters 21 and 23.

This warped strategy for capital budgeting clearly is costly to the firm and to the economy as a whole. Why do we associate the costs with financial distress? Because the temptation to play is strongest when the odds of default are high. A blue-chip company like Exxon Mobil would never invest in our negative-NPV gamble. Its creditors are not vulnerable to one risky project.

## Refusing to Contribute Equity Capital: The Second Game

We have seen how stockholders, acting in their immediate, narrow self-interest, may take projects that reduce the overall market value of their firm. These are errors of commission. Conflicts of interest may also lead to errors of omission.

Assume that Circular cannot scrape up any cash, and therefore cannot take that wild gamble. Instead a *good* opportunity comes up: a relatively safe asset costing $10 with a present value of $15 and NPV = +$5.

This project will not in itself rescue Circular, but it is a step in the right direction. We might therefore expect Circular to issue $10 of new stock and to go ahead with the investment. Suppose that two new shares are issued to the original owner for $10 cash. The project is taken. The new balance sheet might look like this:

**Circular File Company (Market Values)**

| | | | |
|---|---|---|---|
| Net working capital | $20 | $33 | Bonds outstanding |
| Fixed assets | 25 | 12 | Common stock |
| Total assets | $45 | $45 | Total value |

The total value of the firm goes up by $15 ($10 of new capital and $5 NPV). Notice that the Circular bond is no longer worth $25, but $33. The bondholder receives a capital gain of $8 because the firm's assets include a new, safe asset worth $15. The probability of default is less, and the payoff to the bondholder if default occurs is larger.

The stockholder loses what the bondholder gains. Equity value goes up not by $15 but by $15 − $8 = $7. The owner puts in $10 of fresh equity capital but gains only $7 in market value. Going ahead is in the firm's interest but not the owner's.

Again, our example illustrates a general point. If we hold business risk constant, any increase in firm value is shared among bondholders and stockholders. The value of any investment opportunity to the firm's *stockholders* is reduced because project benefits must be shared with bondholders. Thus it may not be in the stockholders' self-interest to contribute fresh equity capital even if that means forgoing positive-NPV investment opportunities.

This problem theoretically affects all levered firms, but it is most serious when firms land in financial distress. The greater the probability of default, the more bondholders have to gain from investments that increase firm value.

## And Three More Games, Briefly

As with other games, the temptation to play the next three games is particularly strong in financial distress.

**Cash In and Run**  Stockholders may be reluctant to put money into a firm in financial distress, but they are happy to take the money out—in the form of a cash dividend, for example. The market value of the firm's stock goes down by less than the amount of the dividend paid, because the decline in *firm* value is shared with creditors. This game is just "refusing to contribute equity capital" run in reverse.[18]

---

[18] If stockholders or managers take money out of the firm in anticipation of financial distress or bankruptcy, the bankruptcy court can treat the payout as *fraudulent conveyance* and claw back the money to the firm and its creditors.

**Playing for Time**   When the firm is in financial distress, creditors would like to salvage what they can by forcing the firm to settle up. Naturally, stockholders want to delay this as long as they can. There are various devious ways of doing this, for example, through accounting changes designed to conceal the true extent of trouble, by encouraging false hopes of spontaneous recovery, or by cutting corners on maintenance, research and development, and so on, in order to make this year's operating performance look better.

**Bait and Switch**   This game is not always played in financial distress, but it is a quick way to get *into* distress. You start with a conservative policy, issuing a limited amount of relatively safe debt. Then you suddenly switch and issue a lot more. That makes all your debt risky, imposing a capital loss on the "old" bondholders. Their capital loss is the stockholders' gain.

A dramatic example of bait and switch occurred in October 1988, when the management of RJR Nabisco announced its intention to acquire the company in a *leveraged buy-out* (LBO). This put the company "in play" for a transaction in which existing shareholders would be bought out and the company would be "taken private." The cost of the buy-out would be almost entirely debt-financed. The new private company would start life with an extremely high debt ratio.

RJR Nabisco had debt outstanding with a market value of about $2.4 billion. The announcement of the coming LBO drove down this market value by $298 million.[19]

## What the Games Cost

Why should anyone object to these games so long as they are played by consenting adults? Because playing them means poor decisions about investments and operations. These poor decisions are *agency costs* of borrowing.

The more the firm borrows, the greater is the temptation to play the games (assuming the financial manager acts in the stockholders' interest). The increased odds of poor decisions in the future prompt investors to mark down the present market value of the firm. The fall in value comes out of the shareholders' pockets. Therefore it is ultimately in their interest to avoid temptation. The easiest way to do this is to limit borrowing to levels at which the firm's debt is safe or close to it.

Banks and other corporate lenders are also not financial innocents. They realize that games may be played at their expense and so protect themselves by rationing the amount that they will lend or by imposing restrictions on the company's actions.

---

**EXAMPLE 18.1**   ● Ms. Ketchup Faces Credit Rationing

Consider the case of Henrietta Ketchup, a budding entrepreneur with two possible investment projects that offer the following payoffs:

| | Investment | Payoff | Probability of Payoff |
|---|---|---|---|
| Project 1 | −12 | +15 | 1.0 |
| Project 2 | −12 | +24 | .5 |
| | | 0 | .5 |

---

[19] We thank Paul Asquith for these figures. RJR Nabisco was finally taken private not by its management but by another LBO partnership. We discuss this LBO in Chapter 32.

Project 1 is surefire and very profitable; project 2 is risky and a rotten project. Ms. Ketchup now approaches her bank and asks to borrow the present value of $10 (she will find the remaining money out of her own purse). The bank calculates that the payoff will be split as follows:

| | Expected Payoff to Bank | Expected Payoff to Ms. Ketchup |
|---|---|---|
| Project 1 | +10 | +5 |
| Project 2 | $(.5 \times 10) + (.5 \times 0) = +5$ | $.5 \times (24 - 10) = +7$ |

If Ms. Ketchup accepts project 1, the bank's debt is certain to be paid in full; if she accepts project 2, there is only a 50% chance of payment and the expected payoff to the bank is only $5. Unfortunately, Ms. Ketchup will prefer to take project 2, for if things go well, she gets most of the profit, and if they go badly, the bank bears most of the loss. Unless Ms. Ketchup can convince the bank that she will not gamble with its money, the bank will limit the amount that it is prepared to lend.[20]

· · · · ·

How can Ms. Ketchup in Example 18.1 reassure the bank of her intentions? The obvious answer is to give it veto power over potentially dangerous decisions. There we have the ultimate economic rationale for all that fine print backing up corporate debt. Debt contracts frequently limit dividends or equivalent transfers of wealth to stockholders; the firm may not be allowed to pay out more than it earns, for example. Additional borrowing is almost always limited. For example, many companies are prevented by existing bond indentures from issuing any additional long-term debt unless their ratio of earnings to interest charges exceeds 2.0.

Sometimes firms are restricted from selling assets or making major investment outlays except with the lenders' consent. The risks of playing for time are reduced by specifying accounting procedures and by giving lenders access to the firm's books and its financial forecasts.

Of course, fine print cannot be a complete solution for firms that insist on issuing risky debt. The fine print has its own costs; you have to spend money to save money. Obviously a complex debt contract costs more to negotiate than a simple one. Afterward it costs the lender more to monitor the firm's performance. Lenders anticipate monitoring costs and demand compensation in the form of higher interest rates; thus the monitoring costs— another agency cost of debt—are ultimately paid by stockholders.

Perhaps the most severe costs of the fine print stem from the constraints it places on operating and investment decisions. For example, an attempt to prevent the risk-shifting game may also prevent the firm from pursuing *good* investment opportunities. At the minimum there are delays in clearing major investments with lenders. In some cases lenders may veto high-risk investments even if net present value is positive. The lenders are tempted to play a game of their own, forcing the firm to stay in cash or low-risk assets even if good projects are forgone.

Debt contracts cannot cover every possible manifestation of the games we have just discussed. Any attempt to do so would be hopelessly expensive and doomed to failure in any event. Human imagination is insufficient to conceive of all the possible things that could go wrong. Therefore contracts are always *incomplete*. We will always find surprises coming at us on dimensions we never thought to think about.

---

[20] You might think that, if the bank suspects Ms. Ketchup will undertake project 2, it should just raise the interest rate on its loan. In this case Ms. Ketchup will not want to take on project 2 (they can't both be happy with a lousy project). But Ms. Ketchup also would not want to pay a high rate of interest if she is going to take on project 1 (she would do better to borrow less money at the risk-free rate). So simply raising the interest rate is not the answer.

We hope we have not left the impression that managers and stockholders always succumb to temptation unless restrained. Usually they refrain voluntarily, not only from a sense of fair play but also on pragmatic grounds: A firm or individual that makes a killing today at the expense of a creditor will be coldly received when the time comes to borrow again. Aggressive game playing is done only by out-and-out crooks and by firms in extreme financial distress. Firms limit borrowing precisely because they don't wish to land in distress and be exposed to the temptation to play.

### Costs of Distress Vary with Type of Asset

Suppose your firm's only asset is a large downtown hotel, mortgaged to the hilt. The recession hits, occupancy rates fall, and the mortgage payments cannot be met. The lender takes over and sells the hotel to a new owner and operator. You use your firm's stock certificates for wallpaper.

What is the cost of bankruptcy? In this example, probably very little. The value of the hotel is, of course, much less than you hoped, but that is due to the lack of guests, not to the bankruptcy. Bankruptcy doesn't damage the hotel itself. The direct bankruptcy costs are restricted to items such as legal and court fees, real estate commissions, and the time the lender spends sorting things out.

Suppose we repeat the story of Heartbreak Hotel for Fledgling Electronics. Everything is the same, except for the underlying real assets—not real estate but a high-tech going concern, a growth company whose most valuable assets are technology, investment opportunities, and its employees' human capital.

If Fledgling gets into trouble, the stockholders may be reluctant to put up money to cash in on its growth opportunities. Failure to invest is likely to be much more serious for Fledgling than for the Heartbreak Hotel.

If Fledgling finally defaults on its debt, the lender will find it much more difficult to cash in by selling off the assets. Many of them are intangibles that have value only as a part of a going concern.

Could Fledgling be kept as a going concern through default and reorganization? It may not be as hopeless as putting a wedding cake through a car wash, but there are a number of serious difficulties. First, the odds of defections by key employees are higher than they would be if the firm had never gotten into financial trouble. Special guarantees may have to be given to customers who have doubts about whether the firm will be around to service its products. Aggressive investment in new products and technology will be difficult; each class of creditors will have to be convinced that it is in its interest for the firm to invest new money in risky ventures.

Some assets, like good commercial real estate, can pass through bankruptcy and reorganization largely unscathed;[21] the values of other assets are likely to be considerably diminished. The losses are greatest for the intangible assets that are linked to the health of the firm as a going concern—for example, technology, human capital, and brand image. That may be why debt ratios are low in the pharmaceutical industry, where value depends on continued success in research and development, and in many service industries where value depends on human capital. We can also understand why highly profitable growth companies, such as Microsoft or Google, use mostly equity finance.

---

[21] In 1989 the Rockefeller family sold 80% of Rockefeller Center—several acres of extremely valuable Manhattan real estate—to Mitsubishi Estate Company for $1.4 billion. A REIT, Rockefeller Center Properties, held a $1.3 billion mortgage loan (the REIT's only asset) secured by this real estate. But rents and occupancy rates did not meet forecasts, and by 1995 Mitsubishi had incurred losses of about $600 million. Then Mitsubishi quit, and Rockefeller Center was bankrupt. That triggered a complicated series of maneuvers and negotiations. But did this damage the value of the Rockefeller Center properties? Was Radio City Music Hall, one of the properties, any less valuable because of the bankruptcy? We doubt it.

The moral of these examples is this: *Do not think only about the probability that borrowing will bring trouble. Think also of the value that may be lost if trouble comes.*

**Heartbreak Hotel for Enron?**    Enron was one of the most glamorous, fast-growing, and (apparently) profitable companies of the 1990s. It played a lead role in the deregulation of electric power markets, both in the United States and internationally. It invested in electric power generation and distribution, gas pipelines, telecommunications networks, and various other ventures. It also built up an active energy trading business. At its peak the aggregate market value of Enron's common stock exceeded $60 billion. By the end of 2001, Enron was in bankruptcy and its shares were worthless.

With hindsight we see that Enron was playing many of the games that we described earlier in this section. It was borrowing aggressively and hiding the debt in "special purpose entities" (SPEs). The SPEs also allowed it to pump up its reported earnings, playing for time while making more and more risky investments. When the bubble burst, there was hardly any value left.

The collapse of Enron didn't really destroy $60 billion in value, because that $60 billion wasn't there in the first place. But there were genuine costs of financial distress. Let's focus on Enron's energy trading business. That business was not as profitable as it appeared, but it was nevertheless a valuable asset. It provided an important service for wholesale energy customers and suppliers who wanted to buy or sell contracts that locked in the future prices and quantities of electricity, natural gas, and other commodities.

What happened to this business when it became clear that Enron was in financial distress and probably headed for bankruptcy? It disappeared. Trading volume went to zero immediately. None of its customers were willing to make a new trade with Enron, because it was far from clear that Enron would be around to honor its side of the bargain. With no trading volume, there was no trading business. As it turned out, Enron's trading business more resembled Fledgling Electronics than a tangible asset like Heartbreak Hotel.

The value of Enron's trading business depended on Enron's creditworthiness. The value should have been protected by conservative financing. Most of the lost value can be traced back to Enron's aggressive borrowing. This loss of value was therefore a cost of financial distress.

## The Trade-off Theory of Capital Structure

Financial managers often think of the firm's debt–equity decision as a trade-off between interest tax shields and the costs of financial distress. Of course, there is controversy about how valuable interest tax shields are and what kinds of financial trouble are most threatening, but these disagreements are only variations on a theme. Thus, Figure 18.2 illustrates the debt–equity trade-off.

This *trade-off theory* of capital structure recognizes that target debt ratios may vary from firm to firm. Companies with safe, tangible assets and plenty of taxable income to shield ought to have high target ratios. Unprofitable companies with risky, intangible assets ought to rely primarily on equity financing.

If there were no costs of adjusting capital structure, then each firm should always be at its target debt ratio. However, there are costs, and therefore delays, in adjusting to the optimum. Firms cannot immediately offset the random events that bump them away from their capital structure targets, so we should see random differences in actual debt ratios among firms having the same target debt ratio.

All in all, this trade-off theory of capital structure choice tells a comforting story. Unlike MM's theory, which seemed to say that firms should take on as much debt as possible, it avoids extreme predictions and rationalizes moderate debt ratios. Also, if you ask financial managers whether their firms have target debt ratios, they will usually say yes—although the target is often specified not as a debt ratio but as a debt rating. For example, the firm might

manage its capital structure to maintain a single-A bond rating. Ratio or rating, a target is consistent with the trade-off theory.[22]

But what are the facts? Can the trade-off theory of capital structure explain how companies actually behave?

The answer is "yes and no." On the "yes" side, the trade-off theory successfully explains many industry differences in capital structure. High-tech growth companies, whose assets are risky and mostly intangible, normally use relatively little debt. Airlines can and do borrow heavily because their assets are tangible and relatively safe.[23]

On the "no" side, there are some things the trade-off theory cannot explain. It cannot explain why some of the most successful companies thrive with little debt. Think of Merck, which as Table 18.3 (*a*) shows is basically all-equity-financed. Granted, Merck's most valuable assets are intangible, the fruits of its pharmaceutical research and development. We know that intangible assets and conservative capital structures go together. But Merck also has a very large corporate income tax bill (about $2 billion in 2008) and the highest possible credit rating. It could borrow enough to save tens of millions of dollars without raising a whisker of concern about possible financial distress.

Merck illustrates an odd fact about real-life capital structures: The most profitable companies commonly borrow the least.[24] Here the trade-off theory fails, for it predicts exactly the reverse. Under the trade-off theory, high profits should mean more debt-servicing capacity and more taxable income to shield and so should give a *higher* target debt ratio.[25]

In general it appears that public companies rarely make major shifts in capital structure just because of taxes,[26] and it is hard to detect the present value of interest tax shields in firms' market values.[27] Also, there are large, long-lived differences between debt ratios of firms in the same industry, even after controlling for attributes that the trade-off theory says should be important.[28]

A final point on the "no" side for the trade-off theory: Debt ratios today are no higher than they were in the early 1900s, when income tax rates were low (or zero). Debt ratios in other industrialized countries are equal to or higher than those in the U.S. Many of these countries have imputation tax systems, which should eliminate the value of the interest tax shields.[29]

---

[22] See J. Graham and C. Harvey, "The Theory and Practice of Corporate Finance: Evidence from the Field," *Journal of Financial Economics* 60 (May/June 2001), pp. 187–244.

[23] We are not suggesting that all airline companies are safe; many are not. But air*craft* can support debt where air*lines* cannot. If Fly-by-Night Airlines fails, its planes retain their value in another airline's operations. There's a good secondary market in used aircraft, so a loan secured by aircraft can be well protected even if made to an airline flying on thin ice (and in the dark).

[24] For example, in an international comparison Wald found that profitability was the single largest determinant of firm capital structure. See J. K. Wald, "How Firm Characteristics Affect Capital Structure: An International Comparison," *Journal of Financial Research* 22 (Summer 1999), pp. 161–187.

[25] Here we mean debt as a fraction of the book or replacement value of the company's assets. Profitable companies might not borrow a greater fraction of their market value. Higher profits imply higher market value as well as stronger incentives to borrow.

[26] Mackie-Mason found that taxpaying companies are more likely to issue debt (vs. equity) than nontaxpaying companies. This shows that taxes do affect financing choices. However, it is not necessarily evidence for the trade-off theory. Look back to Section 18.2, and note the special case where corporate and personal taxes cancel to make debt policy irrelevant. In that case, taxpaying firms would see no net tax advantage to debt: corporate interest tax shields would be offset by the taxes paid by investors in the firm's debt. But the balance would tip in favor of equity for a firm that was losing money and reaping no benefits from interest tax shields. See J. Mackie-Mason, "Do Taxes Affect Corporate Financing Decisions?" *Journal of Finance* 45 (December 1990), pp. 1471–1493.

[27] A study by E. F. Fama and K. R. French, covering over 2,000 firms from 1965 to 1992, failed to find any evidence that interest tax shields contributed to firm value. See "Taxes, Financing Decisions and Firm Value," *Journal of Finance* 53 (June 1998), pp. 819–843.

[28] M. L. Lemmon, M. R. Roberts, and J. F. Zender, "Back to the Beginning: Persistence and the Cross-Section of Corporate Capital Structure," *Journal of Finance* 63 (August 2008), pp. 1575–1608.

[29] We described the Australian imputation tax system in Section 16.7. Look again at Table 16.3, supposing that an Australian corporation pays A$10 of interest. This reduces the corporate tax by A$3.00; it also reduces the tax credit taken by the shareholders by A$3.00. The final tax does not depend on whether the corporation or the shareholder borrows.

You can check this by redrawing Figure 18.1 for the Australian system. The corporate tax rate $T_c$ will cancel out. Since income after all taxes depends only on investors' tax rates, there is no special advantage to corporate borrowing.

None of this disproves the trade-off theory. As George Stigler emphasized, theories are not rejected by circumstantial evidence; it takes a theory to beat a theory. So we now turn to a completely different theory of financing.

## 18-4    The Pecking Order of Financing Choices

The pecking-order theory starts with *asymmetric information*—a fancy term indicating that managers know more about their companies' prospects, risks, and values than do outside investors.

Managers obviously know more than investors. We can prove that by observing stock price changes caused by announcements by managers. For example, when a company announces an increased regular dividend, stock price typically rises, because investors interpret the increase as a sign of management's confidence in future earnings. In other words, the dividend increase transfers information from managers to investors. This can happen only if managers know more in the first place.

Asymmetric information affects the choice between internal and external financing and between new issues of debt and equity securities. This leads to a *pecking order,* in which investment is financed first with internal funds, reinvested earnings primarily; then by new issues of debt; and finally with new issues of equity. New equity issues are a last resort when the company runs out of debt capacity, that is, when the threat of costs of financial distress brings regular insomnia to existing creditors and to the financial manager.

We will take a closer look at the pecking order in a moment. First, you must appreciate how asymmetric information can force the financial manager to issue debt rather than common stock.

### Debt and Equity Issues with Asymmetric Information

To the outside world Smith & Company and Jones, Inc., our two example companies, are identical. Each runs a successful business with good growth opportunities. The two businesses are risky, however, and investors have learned from experience that current expectations are frequently bettered or disappointed. Current expectations price each company's stock at $100 per share, but the true values could be higher or lower:

|                              | Smith & Co. | Jones, Inc. |
| ---------------------------- | :---------: | :---------: |
| True value could be higher, say | $120     | $120        |
| Best current estimate        | 100         | 100         |
| True value could be lower, say | 80        | 80          |

Now suppose that both companies need to raise new money from investors to fund capital investment. They can do this either by issuing bonds or by issuing new shares of common stock. How would the choice be made? One financial manager—we will not tell you which one—might reason as follows:

> Sell stock for $100 per share? Ridiculous! It's worth at least $120. A stock issue now would hand a free gift to new investors. I just wish those skeptical shareholders would appreciate the true value of this company. Our new factories will make us the world's lowest-cost producer. We've painted a rosy picture for the press and security analysts, but it just doesn't seem to be working. Oh well, the decision is obvious: we'll issue debt, not underpriced equity. A debt issue will save underwriting fees too.

The other financial manager is in a different mood:

> Beefalo burgers were a hit for a while, but it looks like the fad is fading. The fast-food division's gotta find some good new products or it's all downhill from here. Export markets are OK for now, but how are we going to compete with those new Siberian ranches? Fortunately the stock price has held up pretty well—we've had some good short-run news

for the press and security analysts. Now's the time to issue stock. We have major investments underway, and why add increased debt service to my other worries?

Of course, outside investors can't read the financial managers' minds. If they could, one stock might trade at $120 and the other at $80.

Why doesn't the optimistic financial manager simply educate investors? Then the company could sell stock on fair terms, and there would be no reason to favor debt over equity or vice versa.

This is not so easy. (Note that both companies are issuing upbeat press releases.) Investors can't be told what to think; they have to be convinced. That takes a detailed layout of the company's plans and prospects, including the inside scoop on new technology, product design, marketing plans, and so on. Getting this across is expensive for the company and also valuable to its competitors. Why go to the trouble? Investors will learn soon enough, as revenues and earnings evolve. In the meantime the optimistic financial manager can finance growth by issuing debt.

Now suppose there are two press releases:

Jones, Inc., will issue $120 million of five-year senior notes.

Smith & Co. announced plans today to issue 1.2 million new shares of common stock. The company expects to raise $120 million.

As a rational investor, you immediately learn two things. First, Jones's financial manager is optimistic and Smith's is pessimistic. Second, Smith's financial manager is also naive to think that investors would pay $100 per share. The *attempt* to sell stock shows that it must be worth less. Smith might sell stock at $80 per share, but certainly not at $100.[30]

Smart financial managers think this through ahead of time. The end result? Both Smith and Jones end up issuing debt. Jones, Inc., issues debt because its financial manager is optimistic and doesn't want to issue undervalued equity. A smart, but pessimistic, financial manager at Smith issues debt because an attempt to issue equity would force the stock price down and eliminate any advantage from doing so. (Issuing equity also reveals the manager's pessimism immediately. Most managers prefer to wait. A debt issue lets bad news come out later through other channels.)

The story of Smith and Jones illustrates how asymmetric information favors debt issues over equity issues. If managers are better informed than investors and both groups are rational, then any company that can borrow will do so rather than issuing fresh equity. In other words, debt issues will be higher in the pecking order.

Taken literally this reasoning seems to rule out any issue of equity. That's not right, because asymmetric information is not always important and there are other forces at work. For example, if Smith had already borrowed heavily, and would risk financial distress by borrowing more, then it would have a good reason to issue common stock. In this case announcement of a stock issue would not be entirely bad news. The announcement would still depress the stock price—it would highlight managers' concerns about financial distress— but the fall in price would not necessarily make the issue unwise or infeasible.

High-tech, high-growth companies can also be credible issuers of common stock. Such companies' assets are mostly intangible, and bankruptcy or financial distress would be especially costly. This calls for conservative financing. The only way to grow rapidly and keep a conservative debt ratio is to issue equity. If investors see equity issued for these reasons, problems of the sort encountered by Smith's financial manager become much less serious.

With such exceptions noted, asymmetric information can explain the dominance of debt financing over new equity issues, at least for mature public corporations. Debt issues are frequent; equity issues, rare. The bulk of external financing comes from debt, even in

---

[30] A Smith stock issue might not succeed even at $80. Persistence in trying to sell at $80 could convince investors that the stock is worth even less!

the United States, where equity markets are highly information-efficient. Equity issues are even more difficult in countries with less well developed stock markets.

None of this says that firms ought to strive for high debt ratios—just that it's better to raise equity by plowing back earnings than issuing stock. In fact, a firm with ample internally generated funds doesn't have to sell any kind of security and thus avoids issue costs and information problems completely.

## Implications of the Pecking Order

The *pecking-order theory* of corporate financing goes like this.

1.  Firms prefer internal finance.
2.  They adapt their target dividend payout ratios to their investment opportunities, while trying to avoid sudden changes in dividends.
3.  Sticky dividend policies, plus unpredictable fluctuations in profitability and investment opportunities, mean that internally generated cash flow is sometimes more than capital expenditures and other times less. If it is more, the firm pays off debt or invests in marketable securities. If it is less, the firm first draws down its cash balance or sells its marketable securities.
4.  If external finance is required, firms issue the safest security first. That is, they start with debt, then possibly hybrid securities such as convertible bonds, then perhaps equity as a last resort.

In this theory, there is no well-defined target debt–equity mix, because there are two kinds of equity, internal and external, one at the top of the pecking order and one at the bottom. Each firm's observed debt ratio reflects its cumulative requirements for external finance.

The pecking order explains why the most profitable firms generally borrow less—not because they have low target debt ratios but because they don't need outside money. Less profitable firms issue debt because they do not have internal funds sufficient for their capital investment programs and because debt financing is first on the pecking order of *external* financing.

In the pecking-order theory, the attraction of interest tax shields is assumed to be second-order. Debt ratios change when there is an imbalance of internal cash flow, net of dividends, and real investment opportunities. Highly profitable firms with limited investment opportunities work down to low debt ratios. Firms whose investment opportunities outrun internally generated funds are driven to borrow more and more.

This theory explains the inverse intraindustry relationship between profitability and financial leverage. Suppose firms generally invest to keep up with the growth of their industries. Then rates of investment will be similar within an industry. Given sticky dividend payouts, the least profitable firms will have less internal funds and will end up borrowing more.

## The Trade-off Theory vs. the Pecking-Order Theory—Some Recent Tests

In 1995 Rajan and Zingales published a study of debt versus equity choices by large firms in Canada, France, Germany, Italy, Japan, the U.K., and the U.S. Rajan and Zingales found that the debt ratios of individual companies seemed to depend on four main factors:[31]

1.  *Size.* Large firms tend to have higher debt ratios.
2.  *Tangible assets.* Firms with high ratios of fixed assets to total assets have higher debt ratios.
3.  *Profitability.* More profitable firms have lower debt ratios.
4.  *Market to book.* Firms with higher ratios of market-to-book value have lower debt ratios.

---

[31] R. G. Rajan and L. Zingales, "What Do We Know about Capital Structure? Some Evidence from International Data," *Journal of Finance* 50 (December 1995), pp. 1421–1460. The same four factors seem to work in developing economies. See L. Booth, V. Aivazian, A. Demirguc-Kunt, and V. Maksimovic, "Capital Structure in Developing Countries," *Journal of Finance* 56 (February 2001), pp. 87–130.

These results convey good news for both the trade-off and pecking-order theories. Trade-off enthusiasts note that large companies with tangible assets are less exposed to costs of financial distress and would be expected to borrow more. They interpret the market-to-book ratio as a measure of growth opportunities and argue that growth companies could face high costs of financial distress and would be expected to borrow less. Pecking-order advocates stress the importance of profitability, arguing that profitable firms use less debt because they can rely on internal financing. They interpret the market-to-book ratio as just another measure of profitability.

It seems that we have two competing theories, and they're both right! That's not a comfortable conclusion. So recent research has tried to run horse races between the two theories in order to find the circumstances in which one or the other wins. It seems that the pecking order works best for large, mature firms that have access to public bond markets. These firms rarely issue equity. They prefer internal financing, but turn to debt markets if needed to finance investment. Smaller, younger, growth firms are more likely to rely on equity issues when external financing is required.[32]

There is also some evidence that debt ratios incorporate the cumulative effects of *market timing*.[33] Market timing is an example of behavioral corporate finance. Suppose that investors are sometimes irrationally exuberant (as in the late 1990s) and sometimes irrationally despondent. If the financial manager's views are more stable than investors', then he or she can take advantage by issuing shares when the stock price is too high and switching to debt when the price is too low. Thus lucky companies with a history of buoyant stock prices will issue less debt and more shares, ending up with low debt ratios. Unfortunate and unpopular companies will avoid share issues and end up with high debt ratios.

Market timing could explain why companies tend to issue shares after run-ups in stock prices and also why aggregate stock issues are concentrated in bull markets and fall sharply in bear markets.

There are other behavioral explanations for corporate financing policies. For example, Bertrand and Schoar tracked the careers of individual CEOs, CFOs, and other top managers. Their individual "styles" persisted as they moved from firm to firm.[34] For example, older CEOs tended to be more conservative and pushed their firms to lower debt. CEOs with MBA degrees tended to be more aggressive. In general, financial decisions depended not just on the nature of the firm and its economic environment, but also on the personalities of the firm's top management.

## The Bright Side and the Dark Side of Financial Slack

Other things equal, it's better to be at the top of the pecking order than at the bottom. Firms that have worked down the pecking order and need external equity may end up living with excessive debt or passing by good investments because shares can't be sold at what managers consider a fair price.

In other words, *financial slack* is valuable. Having financial slack means having cash, marketable securities, readily salable real assets, and ready access to debt markets or to bank financing. Ready access basically requires conservative financing so that potential lenders see the company's debt as a safe investment.

[32] L. Shyam-Sunder and S. C. Myers found that the pecking-order hypothesis outperformed the trade-off hypothesis for a sample of large companies in the 1980s. See "Testing Static Trade-off against Pecking-Order Theories of Capital Structure," *Journal of Financial Economics* 51 (February 1999), pp. 219–244. M. Frank and V. Goyal found that the performance of the pecking-order hypothesis deteriorated in the 1990s, especially for small growth firms. See "Testing the Pecking Order Theory of Capital Structure," *Journal of Financial Economics* 67 (February 2003), pp. 217–248. See also E. Fama and K. French, "Testing Trade-off and Pecking Order Predictions about Dividends and Debt," *Review of Financial Studies* 15 (Spring 2002), pp. 1–33; and M. L. Lemmon and J. F. Zender, "Debt Capacity and Tests of Capital Structure Theories," *Journal of Financial and Quantitative Analysis,* forthcoming.

[33] M. Baker and J. Wurgler, "Market Timing and Capital Structure," *Journal of Finance* 57 (February 2002), pp. 1–32.

[34] M. Bertrand and A. Schoar, "Managing with Style: The Effect of Managers on Firm Policies," *Quarterly Journal of Economics* 118 (November 2003), pp. 1169–1208.

# Ford Cashes in All of its Financial Slack

In 2006, Ford Motor Company brought in a new CEO, Alan Mulally, who launched a thorough restructuring of the company. The company had to cut costs, improve efficiency, and renew its products. This was a massive investment, but debt financing was available. The company decided to borrow as much as it could, to maximize the amount of cash on hand to pay for the restructuring.

In December 2006, Ford issued $5 billion of senior convertible notes. It also arranged a $7 billion, seven-year term loan and an $11.5 billion, five-year revolving credit facility. The total was $23.5 billion.

Ford was able to get this money by pledging almost all of its assets as collateral, including its U.S. property, plant, and equipment; its equity investments in Ford Credit and Ford's foreign subsidiaries; and its trademarks, including the Ford brand name and logo.

Why did Ford decide to use up all of its financial slack in one gigantic gulp? First, debt financing was available on relatively easy terms in 2006. Second, Mulally must have been aware of the history of restructuring programs in the U.S. auto industry. Some of these initiatives were failures, some partial successes, but none solved Ford, GM, or Chrysler's competitive problems. The companies shrank but did not improve significantly.

So Mulally was in effect sending a wake-up call to Ford's managers and employees: "We've raised all the cash that we can get. This is our last chance to reform the company. If we don't make it, Ford is gone."

As we write in 2009 Ford has *not* followed GM and Chrysler into bankruptcy. It's losing money in a severe recession, but still launching new models. It looks like Ford is a survivor.

---

In the long run, a company's value rests more on its capital investment and operating decisions than on financing. Therefore, you want to make sure your firm has sufficient financial slack so that financing is quickly available for good investments. Financial slack is most valuable to firms with plenty of positive-NPV growth opportunities. That is another reason why growth companies usually aspire to conservative capital structures.

Of course financial slack is only valuable if you're willing to use it. Take a look at the nearby box, which describes how Ford used up all of its financial slack in one enormous debt issue.

There is also a dark side to financial slack. Too much of it may encourage managers to take it easy, expand their perks, or empire-build with cash that should be paid back to stockholders. In other words, slack can make agency problems worse.

Michael Jensen has stressed the tendency of managers with ample free cash flow (or unnecessary financial slack) to plow too much cash into mature businesses or ill-advised acquisitions. "The problem," Jensen says, "is how to motivate managers to disgorge the cash rather than investing it below the cost of capital or wasting it in organizational inefficiencies."[35]

If that's the problem, then maybe debt is an answer. Scheduled interest and principal payments are contractual obligations of the firm. Debt forces the firm to pay out cash. Perhaps the best debt level would leave just enough cash in the bank, after debt service, to finance all positive-NPV projects, with not a penny left over.

We do not recommend this degree of fine-tuning, but the idea is valid and important. Debt can discipline managers who are tempted to invest too much. It can also provide the pressure to force improvements in operating efficiency. We pick up this theme again in Chapter 32.

---

[35] M. C. Jensen, "Agency Costs of Free Cash Flow, Corporate Finance and Takeovers," *American Economic Review* 26 (May 1986), pp. 323–329.

## Is There a Theory of Optimal Capital Structure?

No. That is, there is no *one* theory that can capture everything that drives thousands of corporations' debt vs. equity choices. Instead there are several theories, each more or less helpful, depending on each particular corporation's assets, operations, and circumstances.

In other words, *relax:* Don't waste time searching for a magic formula for the optimal debt ratio. Remember too that most value comes from the left side of the balance sheet, that is, from the firm's operations, assets, and growth opportunities. Financing is less important. Of course, financing can subtract value rapidly if you screw it up, but you won't do that.

In practice, financing choices depend on the relative importance of the factors discussed in this chapter. In some cases, reducing taxes will be the primary objective. Thus high debt ratios are found in the lease-financing business (see Chapter 25). Long-term leases are often tax-driven transactions. High debt ratios are also found in developed commercial real estate. For example, modern downtown office buildings can be safe, cash-cow assets if the office space is rented to creditworthy tenants. Bankruptcy costs are small, so it makes sense to lever up and save taxes.

For smaller growth companies, interest tax shields are less important than preserving financial slack. Profitable growth opportunities are valuable only if financing is available when it comes time to invest. Costs of financial distress are high, so it's no surprise that growth companies try to use mostly equity financing.

Mature public corporations often end up following the pecking order. Information problems deter large equity issues, so such firms prefer to finance investment with retained earnings. They issue more debt when investments outrun retained earnings, and pay down debt when earnings outpace investment.

Sooner or later a corporation's operations age to the point where growth opportunities evaporate. In that case, the firm may issue large amounts of debt and retire equity, to constrain investment and force payout of cash to investors. The higher debt ratio may come voluntarily or be forced by a takeover.

These examples are not exhaustive, but they give some flavor of how a thoughtful CEO can set financing strategy.

● ● ● ● ●

## SUMMARY

Our task in this chapter was to show why capital structure matters. We did not throw away MM's proposition that capital structure is irrelevant; we added to it. However, we did not arrive at any simple, universal theory of optimal capital structure.

The trade-off theory emphasizes interest tax shields and the costs of financial distress. The value of the firm is broken down as

Value if all-equity-financed + PV(tax shield) − PV(costs of financial distress)

According to this theory, the firm should increase debt until the value from PV(tax shield) is just offset, at the margin, by increases in PV(costs of financial distress).

The costs of financial distress are:

1. Bankruptcy costs
    a. Direct costs such as legal and accounting fees.
    b. Indirect costs reflecting the difficulty of managing a company undergoing liquidation or reorganization.

2. Costs of financial distress short of bankruptcy
    a. Doubts about a firm's creditworthiness can hobble its operations. Customers and suppliers will be reluctant to deal with a firm that may not be around next year. Key employees will be tempted to leave. Highly leveraged firms seem to be less vigorous product-market competitors.


Visit us at www.mhhe.com/bma

b. Conflicts of interest between bondholders and stockholders of firms in financial distress may lead to poor operating and investment decisions. Stockholders acting in their narrow self-interest can gain at the expense of creditors by playing "games" that reduce the overall value of the firm.

c. The fine print in debt contracts is designed to prevent these games. But fine print increases the costs of writing, monitoring, and enforcing the debt contract.

The value of the interest tax shield would be easy to compute if we had only corporate taxes to worry about. In that case the net tax saving from borrowing would be just the marginal corporate tax rate $T_c$ times $r_D D$, the interest payment. If debt is fixed, the tax shield can be valued by discounting at the borrowing rate $r_D$. In the special case of fixed, permanent debt

$$\text{PV(tax shield)} = \frac{T_c r_D D}{r_D} = T_c D$$

However, corporate taxes are only part of the story. If investors pay higher taxes on interest income than on equity income (dividends and capital gains), then interest tax shields to the corporation will be partly offset by higher taxes paid by investors. The low (15% maximum) U.S. tax rates on dividends and capital gains have reduced the tax advantage to corporate borrowing.

The trade-off theory balances the tax advantages of borrowing against the costs of financial distress. Corporations are supposed to pick a target capital structure that maximizes firm value. Firms with safe, tangible assets and plenty of taxable income to shield ought to have high targets. Unprofitable companies with risky, intangible assets ought to rely more on equity financing.

This theory of capital structure successfully explains many industry differences in capital structure, but it does not explain why the most profitable firms *within* an industry generally have the most conservative capital structures. Under the trade-off theory, high profitability should mean high debt capacity *and* a strong tax incentive to use that capacity.

There is a competing, pecking-order theory, which states that firms use internal financing when available and choose debt over equity when external financing is required. This explains why the less profitable firms in an industry borrow more—not because they have higher target debt ratios but because they need more external financing and because debt is next on the pecking order when internal funds are exhausted.

The pecking order is a consequence of asymmetric information. Managers know more about their firms than outside investors do, and they are reluctant to issue stock when they believe the price is too low. They try to time issues when shares are fairly priced or overpriced. Investors understand this, and interpret a decision to issue shares as bad news. That explains why stock price usually falls when a stock issue is announced.

Debt is better than equity when these information problems are important. Optimistic managers will prefer debt to undervalued equity, and pessimistic managers will be pressed to follow suit. The pecking-order theory says that equity will be issued only when debt capacity is running out and financial distress threatens.

The pecking-order theory stresses the value of financial slack. Without sufficient slack, the firm may be caught at the bottom of the pecking order and be forced to choose between issuing undervalued shares, borrowing and risking financial distress, or passing up positive-NPV investment opportunities.

There is, however, a dark side to financial slack. Surplus cash or credit tempts managers to overinvest or to indulge an easy and glamorous corporate lifestyle. When temptation wins, or threatens to win, a high debt ratio can help: It forces the company to disgorge cash and prods managers and organizations to try harder to be more efficient.

Visit us at www.mhhe.com/bma



**FURTHER READING**

*The research literature on capital structure is enormous. We cite only a few of the most important and interesting articles. The following review articles give broader surveys.*

M. Harris and A. Raviv, "The Theory of Capital Structure," *Journal of Finance* 46 (March 1991), pp. 297–355.

S. C. Myers, "Financing of Corporations," in G. M. Constantinides, M. Harris, and R. Stulz (eds.), *Handbook of the Economics of Finance* (Amsterdam: Elsevier North-Holland, 2003).

*The Winter 2005 issue of the* Journal of Applied Corporate Finance *contains several articles on capital structure decisions in practice.*

The following paper surveys chief financial officers' views about capital structure:

J. Graham and C. Harvey, "How Do CFOs Make Capital Budgeting and Capital Structure Decisions?" *Journal of Applied Corporate Finance* 15 (Spring 2002), pp. 8–23.

● ● ● ● ●

   **Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

## BASIC

**PROBLEM SETS**

1. The present value of interest tax shields is often written as $T_c D$, where $D$ is the amount of debt and $T_c$ is the marginal corporate tax rate. Under what assumptions is this present value correct?

2. Here are book and market value balance sheets of the United Frypan Company (UF):

| **Book** | | | | **Market** | | | |
|---|---|---|---|---|---|---|---|
| Net working capital | $ 20 | $ 40 | Debt | Net working capital | $ 20 | $ 40 | Debt |
| Long-term assets | 80 | 60 | Equity | Long-term assets | 140 | 120 | Equity |
| | $100 | $100 | | | $160 | $160 | |

   Assume that MM's theory holds with taxes. There is no growth, and the $40 of debt is expected to be permanent. Assume a 40% corporate tax rate.

   a. How much of the firm's value is accounted for by the debt-generated tax shield?

   b. How much better off will UF's shareholders be if the firm borrows $20 more and uses it to repurchase stock?

3. What is the relative tax advantage of corporate debt if the corporate tax rate is $T_c = .35$, the personal tax rate is $T_p = .35$, but all equity income is received as capital gains and escapes tax entirely ($T_{pE} = 0$)? How does the relative tax advantage change if the company decides to pay out all equity income as cash dividends that are taxed at 15%?

4. "The firm can't use interest tax shields unless it has (taxable) income to shield." What does this statement imply for debt policy? Explain briefly.

5. This question tests your understanding of financial distress.

   a. What are the costs of going bankrupt? Define these costs carefully.

   b. "A company can incur costs of financial distress without ever going bankrupt." Explain how this can happen.

   c. Explain how conflicts of interest between bondholders and stockholders can lead to costs of financial distress.

6. On February 29, 2009, when PDQ Computers announced bankruptcy, its share price fell from $3.00 to $.50 per share. There were 10 million shares outstanding. Does that imply bankruptcy costs of $10 \times (3.00 - .50) = \$25$ million? Explain.

7. The traditional theory of optimal capital structure states that firms trade off corporate interest tax shields against the possible costs of financial distress due to borrowing. What does this theory predict about the relationship between book profitability and target book debt ratios? Is the theory's prediction consistent with the facts?

Visit us at www.mhhe.com/bma

8. Rajan and Zingales identified four variables that seemed to explain differences in debt ratios in several countries. What are the four variables?

9. Why does asymmetric information push companies to raise external funds by borrowing rather than by issuing common stock?

10. Fill in the blanks: According to the pecking-order theory,
    a. The firm's debt ratio is determined by _____.
    b. Debt ratios depend on past profitability, because _____.

11. For what kinds of companies is financial slack most valuable? Are there situations in which financial slack should be reduced by borrowing and paying out the proceeds to the stockholders? Explain.

## INTERMEDIATE

12. Compute the present value of interest tax shields generated by these three debt issues. Consider corporate taxes only. The marginal tax rate is $T_c = .35$.
    a. A $1,000, one-year loan at 8%.
    b. A five-year loan of $1,000 at 8%. Assume no principal is repaid until maturity.
    c. A $1,000 perpetuity at 7%.

13. Suppose that, in an effort to reduce the federal deficit, Congress increases the top personal tax rate on interest and dividends to 35% but retains a 15% tax rate on realized capital gains. The corporate tax rate stays at 35%. Compute the total corporate plus personal taxes paid on debt versus equity income if (a) all capital gains are realized immediately and (b) capital gains are deferred forever. Assume capital gains are half of equity income.

14. "The trouble with MM's argument is that it ignores the fact that individuals can deduct interest for personal income tax." Show why this is not an objection if personal tax rates on interest and equity income are the same.

15. Look back at the Merck example in Section 18-1. Suppose Merck increases its long-term debt to $10 billion. It uses the additional debt to repurchase shares. Reconstruct Table 18.3(*b*) with the new capital structure. How much additional value is added for Merck shareholders if the table's assumptions are correct?

16. In Section 18-3, we briefly referred to three games: Playing for time, cash in and run, and bait and switch.

    For each game, construct a simple numerical example (like the example for the risk-shifting game) showing how shareholders can gain at the expense of creditors. Then explain how the temptation to play these games could lead to costs of financial distress.

17. Look at some real companies with different types of assets. What operating problems would each encounter in the event of financial distress? How well would the assets keep their value?

18. Let us go back to Circular File's market value balance sheet:

| Net working capital | $20 | $25 | Bonds outstanding |
|---|---|---|---|
| Fixed assets | 10 | 5 | Common stock |
| Total assets | $30 | $30 | Total value |

Who gains and who loses from the following maneuvers?
    a. Circular scrapes up $5 in cash and pays a cash dividend.
    b. Circular halts operations, sells its fixed assets, and converts net working capital into $20 cash. Unfortunately the fixed assets fetch only $6 on the secondhand market. The $26 cash is invested in Treasury bills.

Visit us at www.mhhe.com/bma

c. Circular encounters an acceptable investment opportunity, NPV = 0, requiring an investment of $10. The firm borrows to finance the project. The new debt has the same security, seniority, etc., as the old.

d. Suppose that the new project has NPV = +$2 and is financed by an issue of preferred stock.

e. The lenders agree to extend the maturity of their loan from one year to two in order to give Circular a chance to recover.

19. The Salad Oil Storage (SOS) Company has financed a large part of its facilities with long-term debt. There is a significant risk of default, but the company is not on the ropes yet. Explain:

a. Why SOS stockholders could lose by investing in a positive-NPV project financed by an equity issue.

b. Why SOS stockholders could gain by investing in a negative-NPV project financed by cash.

c. Why SOS stockholders could gain from paying out a large cash dividend.

20. a. Who benefits from the fine print in bond contracts when the firm gets into financial trouble? Give a one-sentence answer.

b. Who benefits from the fine print when the bonds are issued? Suppose the firm is offered the choice of issuing (i) a bond with standard restrictions on dividend payout, additional borrowing, etc., and (ii) a bond with minimal restrictions but a much higher interest rate? Suppose the interest rates on both (i) and (ii) are fair from the viewpoint of lenders. Which bond would you expect the firm to issue? Why?

21. "I was amazed to find that the announcement of a stock issue drives down the value of the issuing firm by 30%, on average, of the proceeds of the issue. That issue cost dwarfs the underwriter's spread and the administrative costs of the issue. It makes common stock issues prohibitively expensive."

a. You are contemplating a $100 million stock issue. On past evidence, you anticipate that announcement of this issue will drive down stock price by 3% and that the market value of your firm will fall by 30% of the amount to be raised. On the other hand, additional equity financing is required to fund an investment project that you believe has a positive NPV of $40 million. Should you proceed with the issue?

b. Is the fall in market value on announcement of a stock issue an *issue cost* in the same sense as an underwriter's spread? Respond to the quote that begins this question.

Use your answer to (a) as a numerical example to explain your response to (b).

22. Ronald Masulis analyzed the stock price impact of *exchange offers* of debt for equity or vice versa.[36] In an exchange offer, the firm offers to trade freshly issued securities for seasoned securities in the hands of investors. Thus, a firm that wanted to move to a higher debt ratio could offer to trade new debt for outstanding shares. A firm that wanted to move to a more conservative capital structure could offer to trade new shares for outstanding debt securities.

Masulis found that debt for equity exchanges were good news (stock price increased on announcement) and equity for debt exchanges were bad news.

a. Are these results consistent with the trade-off theory of capital structure?

b. Are the results consistent with the evidence that investors regard announcements of (i) stock issues as bad news, (ii) stock repurchases as good news, and (iii) debt issues as no news, or at most trifling disappointments?

c. How could Masulis's results be explained?

---

[36] R. W. Masulis, "The Effects of Capital Structure Change on Security Prices: A Study of Exchange Offers," *Journal of Financial Economics* 8 (June 1980), pp. 139–177, and "The Impact of Capital Structure Change on Firm Value," *Journal of Finance* 38 (March 1983), pp. 107–126.

**23.** The possible payoffs from Ms. Ketchup's projects (see Example 18.1, pages 455 & 456) have not changed but there is now a 40% chance that Project 2 will pay off $24 and a 60% chance that it will pay off $0.

a. Recalculate the expected payoffs to the bank and Ms. Ketchup if the bank lends the present value of $10. Which project would Ms. Ketchup undertake?

b. What is the maximum amount the bank could lend that would induce Ms. Ketchup to take Project 1?

**24.** Some corporations' debt–equity targets are expressed not as a debt ratio but as a target debt rating on the firm's outstanding bonds. What are the pros and cons of setting a target rating rather than a target ratio?

### CHALLENGE

**25.** Most financial managers measure debt ratios from their companies' book balance sheets. Many financial economists emphasize ratios from market-value balance sheets. Which is the right measure in principle? Does the trade-off theory propose to explain book or market leverage? How about the pecking-order theory?

**26.** The trade-off theory relies on the threat of financial distress. But why should a public corporation ever have to land in financial distress? According to the theory, the firm should operate at the top of the curve in Figure 18.2. Of course market movements or business setbacks could bump it up to a higher debt ratio and put it on the declining, right-hand side of the curve. But in that case, why doesn't the firm just issue equity, retire debt, and move to back up to the optimal debt ratio?

What are the reasons why companies don't issue stock—or enough stock—quickly enough to avoid financial distress?

**You can download data for the following questions from Standard & Poor's Market Insight Web site (www.mhhe.com/edumarketinsight).**

**REAL-TIME DATA ANALYSIS**

**1.** Look up Merck on the Market Insight database.

a. Recalculate book- and market-value balance sheets using the most recent available financial information. Use the same format as for Table 18.3.

b. Track Merck's long-term debt and debt ratio over the last five years. How have they changed? Does it appear that Merck has a stable target debt ratio? Do you see any evidence of pecking-order financing?

c. How much has Merck spent to repurchase its own shares? Would the trade-off theory predict share repurchases for a conservatively financed company like Merck?



**2.** Select three or four companies from the Market Insight database. Estimate how much more these companies could borrow before they would exhaust taxable profits.



**3.** The Market Insight database gives access to dozens of industry surveys. Check out the financial tables at the end of these surveys for several different industries. We suggest that you start with Autos and Auto Parts, Broadcasting and Cable TV, Department Stores and Trucking, plus a couple more industries that interest you. Write down the debt-to-capital ratios for a few of the largest companies in each industry, and average within the industry. Can you explain the differences between these industry-average ratios?



Visit us at www.mhhe.com/bma

PAYOUT POLICY AND CAPITAL STRUCTURE

# Financing and Valuation

▶ **In Chapters 5** and 6 we showed how to value a capital investment project by a four-step procedure:

1. Forecast after-tax cash flows, assuming all-equity financing.
2. Assess the project's risk.
3. Estimate the opportunity cost of capital.
4. Calculate NPV, using the opportunity cost of capital as the discount rate.

There's nothing wrong with this procedure, but now we're going to extend it to include value contributed by financing decisions. There are two ways to do this:

1. *Adjust the discount rate.* The adjustment is typically downward, to account for the value of interest tax shields. This is the most common approach, which is usually implemented via the after-tax weighted-average cost of capital (WACC). We introduced the after-tax WACC in Chapters 9 and 17, but here we provide a lot more guidance on how it is calculated and used.
2. *Adjust the present value.* That is, start by estimating the firm or project's base-case value, assuming it is all-equity-financed, and then adjust this base-case value to account for financing.

Adjusted present value (APV)

= base-case value + value of financing side effects

Once you identify and value the financing side effects, calculating APV is no more than addition or subtraction.

This is a how-to-do-it chapter. In the first section, we explain and derive the after-tax WACC and use it to value a project and business. Then in Section 19-2 we work through a more complex and realistic valuation problem. Section 19-3 covers some tricks of the trade: helpful hints on how to estimate inputs and on how to adjust WACC when business risk or capital structure changes. Section 19-4 turns to the APV method. The idea behind APV is simple enough, but tracing through all the financing side effects can be tricky. We conclude the chapter with a question-and-answer section designed to clarify points that managers and students often find confusing. The Appendix covers an important special case, namely, the after-tax valuation of safe cash flows.

• • • • • •

## 19-1 The After-Tax Weighted-Average Cost of Capital

We first addressed problems of valuation and capital budgeting in Chapters 2 to 6. In those early chapters we said hardly a word about financing decisions. In fact we proceeded under the simplest possible financing assumption, namely, all-equity financing. We were really assuming a Modigliani–Miller (MM) world in which all financing decisions are irrelevant. In a strict MM world, firms can analyze real investments as if they are all-equity-financed; the actual financing plan is a mere detail to be worked out later.

Under MM assumptions, decisions to spend money can be separated from decisions to raise money. Now we reconsider the capital budgeting decision when investment and financing decisions interact and cannot be wholly separated.

One reason that financing and investment decisions interact is taxes. Interest is a tax-deductible expense. Think back to Chapters 9 and 17 where we introduced the *after-tax* weighted-average cost of capital:

$$\text{WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$

Here $D$ and $E$ are the market values of the firm's debt and equity, $V = D + E$ is the total market value of the firm, $r_D$ and $r_E$ are the costs of debt and equity, and $T_c$ is the marginal corporate tax rate.

Notice that the WACC formula uses the *after-tax* cost of debt $r_D (1 - T_c)$. That is how the after-tax WACC captures the value of interest tax shields. Notice too that all the variables in the WACC formula refer to the firm as a whole. As a result, the formula gives the right discount rate only for projects that are just like the firm undertaking them. The formula works for the "average" project. It is incorrect for projects that are safer or riskier than the average of the firm's existing assets. It is incorrect for projects whose acceptance would lead to an increase or decrease in the firm's target debt ratio.

The WACC is based on the firm's *current* characteristics, but managers use it to discount *future* cash flows. That's fine as long as the firm's business risk and debt ratio are expected to remain constant, but when the business risk and debt ratio are expected to change, discounting cash flows by the WACC is only approximately correct.

---

**EXAMPLE 19.1**   ● Calculating Sangria's WACC

Sangria is a U.S.-based company whose products aim to promote happy, low-stress lifestyles. Let's calculate Sangria's WACC. Its book and market-value balance sheets are:

**Sangria Corporation (Book Values, $ millions)**

| | | | |
|---|---|---|---|
| Asset value | $1,000 | $ 500 | Debt |
| | | 500 | Equity |
| | $1,000 | $1,000 | |

**Sangria Corporation (Market Values, $ millions)**

| | | | |
|---|---|---|---|
| Asset value | $1,250 | $ 500 | Debt |
| | | 750 | Equity |
| | $1,250 | $1,250 | |

We calculated the market value of equity on Sangria's balance sheet by multiplying its current stock price ($7.50) by 100 million, the number of its outstanding shares. The company's future prospects are good, so the stock is trading above book value ($7.50 vs. $5.00 per share). However, interest rates have been stable since the firm's debt was issued and the book and market values of debt are in this case equal.

Sangria's cost of debt (the market interest rate on its existing debt and on any new borrowing[1]) is 6%. Its cost of equity (the expected rate of return demanded by investors in Sangria's stock) is 12.4%.

---

[1] Always use an up-to-date interest rate (yield to maturity), not the interest rate when the firm's debt was first issued and not the coupon rate on the debt's book value.

The market-value balance sheet shows assets worth $1,250 million. Of course we can't observe this value directly, because the assets themselves are not traded. But we know what they are worth to debt and equity investors ($500 + 750 = $1,250 million). This value is entered on the left of the market-value balance sheet.

Why did we show the book balance sheet? Only so you could draw a big X through it. Do so now.

When estimating the weighted-average cost of capital, you are not interested in past investments but in current values and expectations for the future. Sangria's true debt ratio is not 50%, the book ratio, but 40%, because its assets are worth $1,250 million. The cost of equity, $r_E = .124$, is the expected rate of return from purchase of stock at $7.50 per share, the current market price. It is not the return on book value per share. You can't buy shares in Sangria for $5 anymore.

Sangria is consistently profitable and pays taxes at the marginal rate of 35%. This tax rate is the final input for Sangria's WACC. The inputs are summarized here:

| | |
|---|---|
| Cost of debt ($r_D$) | .06 |
| Cost of equity ($r_E$) | .124 |
| Marginal tax rate ($T_c$) | .35 |
| Debt ratio ($D/V$) | 500/1,250 = .4 |
| Equity ratio ($E/V$) | 750/1,250 = .6 |

The company's after-tax WACC is:

$$\text{WACC} = .06 \times (1 - .35) \times .4 + .124 \times .6 = .090, \text{ or } 9.0\%$$

● ● ● ● ●

That's how you calculate the weighted-average cost of capital. Now let's see how Sangria would *use* it.

**EXAMPLE 19.2**   ●   Using Sangria's WACC to value a project

Sangria's enologists have proposed investing $12.5 million in the construction of a perpetual crushing machine, which (conveniently for us) never depreciates and generates a perpetual stream of earnings and cash flow of $1.731 million per year pretax. The project is average risk, so we can use WACC. The after-tax cash flow is:

| | |
|---|---|
| Pretax cash flow | $1.731 million |
| Tax at 35% | .606 |
| After-tax cash flow | $C$ = $1.125 million |

*Notice:* This after-tax cash flow takes no account of interest tax shields on debt supported by the perpetual crusher project. As we explained in Chapter 6, standard capital budgeting practice calculates after-tax cash flows as if the project were all-equity-financed. However, the interest tax shields will not be ignored: We are about to discount the project's cash flows by Sangria's WACC, in which the cost of debt is entered after tax. The value of interest tax shields is picked up not as higher after-tax cash flows, but in a lower discount rate.

The crusher generates a perpetual after-tax cash flow of $C$ = $1.125 million, so NPV is:

$$\text{NPV} = -12.5 + \frac{1.125}{0.09} = 0$$

NPV = 0 means a barely acceptable investment. The annual cash flow of $1.125 million per year amounts to a 9% rate of return on investment (1.125/12.5 = .09), exactly equal to Sangria's WACC.

If project NPV is exactly zero, the return to equity investors must exactly equal the cost of equity, 12.4%. Let's confirm that Sangria shareholders can actually look forward to a 12.4% return on their investment in the perpetual crusher project.

Suppose Sangria sets up this project as a mini-firm. Its market-value balance sheet looks like this:

**Perpetual Crusher (Market Values, $ millions)**

| Asset value | $ 12.5 | $ 5.0 | Debt |
|---|---|---|---|
| | | 7.5 | Equity |
| | $ 12.5 | $ 12.5 | |

Calculate the expected dollar return to shareholders:

$$\text{After-tax interest} = r_D(1 - T_c)D = .06 \times (1 - .35) \times 5 = .195$$
$$\text{Expected equity income} = C - r_D(1 - T_c)D = 1.125 - .195 = .93$$

The project's earnings are level and perpetual, so the expected rate of return on equity is equal to the expected equity income divided by the equity value:

$$\text{Expected equity return} = r_E = \frac{\text{expected equity income}}{\text{equity value}}$$

$$= \frac{.93}{7.5} = .124, \text{ or } 12.4\%$$

The expected return on equity equals the cost of equity, so it makes sense that the project's NPV is zero.

● ● ● ● ●

## Review of Assumptions

When discounting the perpetual crusher's cash flows at Sangria's WACC, we assume that:

- The project's business risks are the same as those of Sangria's other assets and remain so for the life of the project.
- The project supports the same fraction of debt to value as in Sangria's overall capital structure, which remains constant for the life of the project.

You can see the importance of these two assumptions: If the perpetual crusher had greater business risk than Sangria's other assets, or if the acceptance of the project would lead to a permanent, material change in Sangria's debt ratio,[2] then Sangria's shareholders would not be content with a 12.4% expected return on their equity investment in the project.

We have illustrated the WACC formula only for a project offering perpetual cash flows. But the formula works for any cash-flow pattern if the firm adjusts its borrowing

---

[2] Users of WACC need not worry about small or temporary fluctuations in debt-to-value ratios. Suppose that Sangria management decides for convenience to borrow $12.5 million to allow immediate construction of the crusher. This does not necessarily change Sangria's long-term financing policy. If the crusher supports only $5.0 million of debt, Sangria would have to pay down debt to restore its overall debt ratio to 40%. For example, it could fund later projects with less debt and more equity.

to maintain a constant debt ratio over time.[3] When the firm departs from this borrowing policy, WACC is only approximately correct.

## 19-2 Valuing Businesses

On most workdays the financial manager concentrates on valuing projects, arranging financing, and helping run the firm more effectively. The valuation of the business as a whole is left to investors and financial markets. But on some days the financial manager has to take a stand on what an entire business is worth. When this happens, a *big* decision is typically in the offing. For example:

- If firm A is about to make a takeover offer for firm B, then A's financial managers have to decide how much the combined business A + B is worth under A's management. This task is particularly difficult if B is a private company with no observable share price.
- If firm C is considering the sale of one of its divisions, it has to decide what the division is worth in order to negotiate with potential buyers.
- When a firm goes public, the investment bank must evaluate how much the firm is worth in order to set the issue price.

In addition, thousands of analysts in stockbrokers' offices and investment firms spend every workday burrowing away in the hope of finding undervalued firms. Many of these analysts use the valuation tools we are about to cover.

In Chapter 4 we took a first pass at valuing an entire business. We assumed then that the business was financed solely by equity. Now we will show how WACC can be used to value a company that is financed by a mixture of debt and equity as long as the debt ratio is expected to remain approximately constant. You just treat the company as if it were one big project. You forecast the company's cash flows (the hardest part of the

---

[3] We can prove this statement as follows. Denote expected after-tax cash flows (assuming all-equity financing) as $C_1, C_2, \ldots, C_T$. With all-equity financing, these flows would be discounted at the opportunity cost of capital $r$. But we need to value the cash flows for a firm that is financed partly with debt.

Start with value in the next to last period: $V_{T-1} = D_{T-1} + E_{T-1}$. The total cash payoff to debt and equity investors is the cash flow plus the interest tax shield. The expected total return to debt and equity investors is:

$$\text{Expected cash payoff in } T = C_T + T_c r_D D_{T-1} \tag{1}$$

$$= V_{T-1}\left(1 + r_D\frac{D_{T-1}}{V_{T-1}} + r_E\frac{E_{T-1}}{V_{T-1}}\right) \tag{2}$$

Assume the debt ratio is constant at $L = D/V$. Equate (1) and (2) and solve for $V_{T-1}$:

$$V_{T-1} = \frac{C_T}{1 + (1 - T_c)r_D L + r_E(1 - L)} = \frac{C_T}{1 + \text{WACC}}$$

The logic repeats for $V_{T-2}$. Note that the next period's payoff includes $V_{T-1}$:

$$\text{Expected cash payoff in T} - 1 = C_{T-1} + T_c r_D D_{T-2} + V_{T-1}$$

$$= V_{T-2}\left(1 + r_D\frac{D_{T-2}}{V_{T-2}} + r_E\frac{E_{T-2}}{V_{T-2}}\right)$$

$$V_{T-2} = \frac{C_{T-1} + V_{T-1}}{1 + (1 - T_c)r_D L + r_E(1 - L)} = \frac{C_{T-1} + V_{T-1}}{1 + \text{WACC}} = \frac{C_{T-1}}{1 + \text{WACC}} + \frac{C_T}{(1 + \text{WACC})^2}$$

We can continue all the way back to date 0:

$$V_0 = \sum_{t=1}^{T} \frac{C_t}{(1 + \text{WACC})^t}$$

exercise) and discount back to present value. But be sure to remember three important points:

1. If you discount at WACC, cash flows have to be projected just as you would for a capital investment project. Do not deduct interest. Calculate taxes as if the company were all-equity-financed. (The value of interest tax shields is not ignored, because the after-tax cost of debt is used in the WACC formula.)

2. Unlike most projects, companies are potentially immortal. But that does not mean that you need to forecast every year's cash flow from now to eternity. Financial managers usually forecast to a medium-term horizon and add a terminal value to the cash flows in the horizon year. The terminal value is the present value at the horizon of all subsequent cash flows. Estimating the terminal value requires careful attention because it often accounts for the majority of the company's value.

3. Discounting at WACC values the assets and operations of the company. If the object is to value the company's equity, that is, its common stock, don't forget to subtract the value of the company's outstanding debt.

Here's an example.

## Valuing Rio Corporation

Sangria is tempted to acquire the Rio Corporation, which is also in the business of promoting relaxed, happy lifestyles. Rio has developed a special weight-loss program called the Brazil Diet, based on barbecues, red wine, and sunshine. The firm guarantees that within three months you will have a figure that will allow you to fit right in at Ipanema or Copacabana beach in Rio de Janeiro. But before you head for the beach, you've got the job of working out how much Sangria should pay for Rio.

Rio is a U.S. company. It is privately held, so Sangria has no stock-market price to rely on. Rio has 1.5 million shares outstanding and debt with a market and book value of $36 million. Rio is in the same line of business as Sangria, so we will assume that it has the same business risk as Sangria and can support the same proportion of debt. Therefore we can use Sangria's WACC.

Your first task is to forecast Rio's *free cash flow* (FCF). Free cash flow is the amount of cash that the firm can pay out to investors after making all investments necessary for growth. Free cash flow is calculated assuming the firm is all-equity-financed. Discounting the free cash flows at the after-tax WACC gives the total value of Rio (debt *plus* equity). To find the value of its equity, you will need to subtract the $36 million of debt.

We will forecast each year's free cash flow out to a *valuation horizon* ($H$) and predict the business's value at that horizon ($PV_H$). The cash flows and horizon value are then discounted back to the present:

$$PV = \underbrace{\frac{FCF_1}{1 + WACC} + \frac{FCF_2}{(1 + WACC)^2} + \cdots + \frac{FCF_H}{(1 + WACC)^H}}_{PV \text{ (free cash flow)}} + \underbrace{\frac{PV_H}{(1 + WACC)^H}}_{PV \text{ (horizon value)}}$$

Of course, the business will continue after the horizon, but it's not practical to forecast free cash flow year by year to infinity. $PV_H$ stands in for the value in year $H$ of free cash flow in periods $H + 1$, $H + 2$, etc.

Free cash flow and net income are not the same. They differ in several important ways:

- Income is the return to shareholders, calculated after interest expense. Free cash flow is calculated before interest.

- Income is calculated after various noncash expenses, including depreciation. Therefore we will add back depreciation when we calculate free cash flow.

- Capital expenditures and investments in working capital do not appear as expenses on the income statement, but they do reduce free cash flow.

Free cash flow can be negative for rapidly growing firms, even if the firms are profitable, because investment exceeds cash flow from operations. Negative free cash flow is normally temporary, fortunately for the firm and its stockholders. Free cash flow turns positive as growth slows down and the payoffs from prior investments start to roll in.

Table 19.1 sets out the information that you need to forecast Rio's free cash flows. We will follow common practice and start with a projection of sales. In the year just ended Rio had sales of $83.6 million. In recent years sales have grown by between 5% and 8% a year. You forecast that sales will grow by about 7% a year for the next three years. Growth will then slow to 4% for years 4 to 6 and to 3% starting in year 7.

The other components of cash flow in Table 19.1 are driven by these sales forecasts. For example, you can see that costs are forecasted at 74% of sales in the first year with a gradual increase to 76% of sales in later years, reflecting increased marketing costs as Rio's competitors gradually catch up.

Increasing sales are likely to require further investment in fixed assets and working capital. Rio's net fixed assets are currently about $.79 for each dollar of sales. Unless Rio has surplus capacity or can squeeze more output from its existing plant and equipment, its investment in fixed assets will need to grow along with sales. Therefore we assume that

| | | Latest | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | **Year** | **Forecast** | | | | | | |
| | | **0** | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| | | | | | | | | | |
| 1 | Sales | 83.6 | 89.5 | 95.8 | 102.5 | 106.6 | 110.8 | 115.2 | 118.7 |
| 2 | Cost of goods sold | 63.1 | 66.2 | 71.3 | 76.3 | 79.9 | 83.1 | 87.0 | 90.2 |
| 3 | EBITDA (1−2) | 20.5 | 23.3 | 24.4 | 26.1 | 26.6 | 27.7 | 28.2 | 28.5 |
| 4 | Depreciation | 3.3 | 9.9 | 10.6 | 11.3 | 11.8 | 12.3 | 12.7 | 13.1 |
| 5 | Profit before tax (EBIT) (3−4) | 17.2 | 13.4 | 13.8 | 14.8 | 14.9 | 15.4 | 15.5 | 15.4 |
| 6 | Tax | 6.0 | 4.7 | 4.8 | 5.2 | 5.2 | 5.4 | 5.4 | 5.4 |
| 7 | Profit after tax (5−6) | 11.2 | 8.7 | 9.0 | 9.6 | 9.7 | 10.0 | 10.1 | 10.0 |
| | | | | | | | | | |
| 8 | Investment in fixed assets | 11.0 | 14.6 | 15.5 | 16.6 | 15.0 | 15.6 | 16.2 | 15.9 |
| 9 | Investment in working capital | 1.0 | 0.5 | 0.8 | 0.9 | 0.5 | 0.6 | 0.6 | 0.4 |
| 10 | Free cash flow (7 + 4 − 8 − 9) | 2.5 | 3.5 | 3.2 | 3.4 | 5.9 | 6.1 | 6.0 | 6.8 |
| | | | | | | | | | |
| | **PV free cash flow, years 1–6** | 20.3 | | | | | | | |
| | **PV horizon value** | 67.6 | | | (Horizon value in year 6) | | | 113.4 | |
| | **PV of company** | 87.9 | | | | | | | |
| | | | | | | | | | |
| | **Assumptions:** | | | | | | | | |
| | Sales growth, % | 6.7 | 7.0 | 7.0 | 7.0 | 4.0 | 4.0 | 4.0 | 3.0 |
| | Costs (percent of sales) | 75.5 | 74.0 | 74.5 | 74.5 | 75.0 | 75.0 | 75.5 | 76.0 |
| | Working capital (percent of sales) | 13.3 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 | 13.0 |
| | Net fixed assets (percent of sales) | 79.2 | 79.0 | 79.0 | 79.0 | 79.0 | 79.0 | 79.0 | 79.0 |
| | Depreciation (percent of net fixed assets) | 5.0 | 14.0 | 14.0 | 14.0 | 14.0 | 14.0 | 14.0 | 14.0 |
| | | | | | | | | | |
| | Tax rate, % | 35.0 | | | | | | | |
| | WACC, % | 9.0 | | | | | | | |
| | Long-term growth forecast, % | 3.0 | | | | | | | |
| | | | | | | | | | |
| | **Fixed assets and working capital** | | | | | | | | |
| | Gross fixed assets | 95.0 | 109.6 | 125.1 | 141.8 | 156.8 | 172.4 | 188.6 | 204.5 |
| | Less accumulated depreciation | 29.0 | 38.9 | 49.5 | 60.8 | 72.6 | 84.9 | 97.6 | 110.7 |
| | Net fixed assets | 66.0 | 70.7 | 75.6 | 80.9 | 84.2 | 87.5 | 91.0 | 93.8 |
| | Net working capital | 11.1 | 11.6 | 12.4 | 13.3 | 13.9 | 14.4 | 15.0 | 15.4 |

▶ **TABLE 19.1**    Free-cash-flow projections and company value for Rio Corporation ($ millions).

eXcel

Visit us at
www.mhhe.com/bma

every dollar of sales growth requires an increase of $.79 in net fixed assets. We also assume that working capital grows in proportion to sales.

Rio's free cash flow is calculated in Table 19.1 as profit after tax, plus depreciation, minus investment. Investment is the change in the stock of (gross) fixed assets and working capital from the previous year. For example, in year 1:

$$\text{Free cash flow} = \text{Profit after tax} + \text{depreciation} - \text{investment in fixed assets}$$
$$- \text{investment in working capital}$$
$$= 8.7 + 9.9 - (109.6 - 95.0) - (11.6 - 11.1) = \$3.5 \text{ million}$$

### Estimating Horizon Value

We will forecast cash flows for each of the first six years. After that, Rio's sales are expected to settle down to stable, long-term growth starting in year 7. To find the present value of the cash flows in years 1 to 6, we discount at the 9% WACC:

$$\text{PV} = \frac{3.5}{1.09} + \frac{3.2}{1.09^2} + \frac{3.4}{1.09^3} + \frac{5.9}{1.09^4} + \frac{6.1}{1.09^5} + \frac{6.0}{1.09^6} = \$20.3 \text{ million}$$

Now we need to find the value of the cash flows from year 7 onward. In Chapter 4 we looked at several ways to estimate horizon value. Here we will use the constant-growth DCF formula. This requires a forecast of the free cash flow for year 7, which we have worked out in the final column of Table 19.1, assuming a long-run growth rate of 3% per year.[4] The free cash flow is $6.8 million, so

$$\text{PV}_H = \frac{\text{FCF}_{H+1}}{\text{WACC} - g} = \frac{6.8}{.09 - .03} = \$113.4 \text{ million}$$

$$\text{PV at year } 0 = \frac{1}{1.09^6} \times 113.4 = \$67.6 \text{ million}$$

We now have all we need to value the business:

$$\text{PV(company)} = \text{PV(cash flow years 1–6)} + \text{PV(horizon value)}$$
$$= \$20.3 + 67.6 = \$87.9 \text{ million}$$

This is the total value of Rio. To find the value of the equity, we simply subtract the value of the debt:

$$\text{Total value of equity} = \$87.9 - 36.0 = \$51.9 \text{ million}$$

And to find the value per share, we divide by the total number of shares outstanding:

$$\text{Value per share} = 51.9/1.5 = \$34.60$$

Thus Sangria could afford to pay up to $34.60 per share for Rio.

You now have an estimate of the value of Rio Corporation. But how confident can you be in this figure? Notice that less than a quarter of Rio's value comes from cash flows in the first six years. The rest comes from the horizon value. Moreover, this horizon value can change in response to only minor changes in assumptions. For example, if the long-run growth rate is 4% rather than 3%, Rio needs to invest more to support this higher growth, but firm value increases from $87.9 million to $89.9 million.

In Chapter 4 we stressed that wise managers won't stop at this point. They will check their calculations by identifying comparable companies and comparing their price–earnings multiples and ratios of market to book value.[5]

---

[4] Notice that expected free cash flow increases by about 14% from year 6 to year 7 because the transition from 4% to 3% sales growth reduces required investment. But sales, investment, and free cash flow will all increase at 3% once the company settles into stable growth. Recall that the first cash flow in the constant-growth DCF formula occurs in the next year, year 7 in this case. Growth progresses at a steady-state 3% from year 7 onward. Therefore it's OK to use the 3% growth rate in the horizon-value formula.

[5] See Section 4-5.

When you forecast cash flows, it is easy to become mesmerized by the numbers and just do it mechanically. As we pointed out in Chapter 11, it is important to take a strategic view. Are the revenue figures consistent with what you expect your competitors to do? Are the costs you have predicted realistic? Probe the assumptions behind the numbers to make sure they are sensible. Be particularly careful about the growth rates and profitability assumptions that drive horizon values. Don't assume that the business you are valuing will grow and earn more than the cost of capital in perpetuity.[6] This would be a nice outcome for the business, but not an outcome that competition will tolerate.

You should also check whether the business is worth more dead than alive. Sometimes a company's *liquidation value* exceeds its value as a going concern. Smart financial analysts sometimes ferret out idle or underexploited assets that would be worth much more if sold to someone else. You may end up counting these assets at their likely sale price and valuing the rest of the business without them.

### WACC vs. the Flow-to-Equity Method

When valuing Rio we forecast the cash flows assuming all-equity financing and we used the WACC to discount these cash flows. The WACC formula picked up the value of the interest tax shields. Then to find equity value, we subtracted the value of debt from the total value of the firm.

If our task is to value a firm's equity, there's an obvious alternative to discounting company cash flows at the firm's WACC: Discount cash flows to *equity,* after interest and after taxes, at the cost of equity capital. This is called the *flow-to-equity* method. If the company's debt ratio is constant over time, the flow-to equity method should give the same answer as discounting cash flows at the WACC and then subtracting debt.

The flow-to-equity method seems simple, and it is simple if the proportions of debt and equity financing stay reasonably close to constant for the life of the company. But the cost of equity depends on financial leverage; in other words, it depends on financial risk as well as business risk. If financial leverage is expected to change significantly, discounting flows to equity at today's cost of equity will not give the right answer.

## 19-3 Using WACC In Practice

### Some Tricks of the Trade

Sangria had just one asset and two sources of financing. A real company's market-value balance sheet has many more entries, for example:[7]

---

[6] Table 19.1 is too optimistic in this respect, because the horizon value increases with the assumed long-run growth rate. This implies that Rio has valuable growth opportunities (PVGO) even after the horizon in year 6. A more sophisticated spreadsheet would add an intermediate growth stage, say from years 7 through 10, and gradually reduce profitability to competitive levels. See Problem 26 at the end of this chapter.

[7] This balance sheet is for exposition and should not be confused with a real company's books. It includes the value of growth opportunities, which accountants do not recognize, though investors do. It excludes certain accounting entries, for example, deferred taxes.

Deferred taxes arise when a company uses faster depreciation for tax purposes than it uses in reports to investors. That means the company reports more in taxes than it pays. The difference is accumulated as a liability for deferred taxes. In a sense there is a liability, because the Internal Revenue Service "catches up," collecting extra taxes, as assets age. But this is irrelevant in capital investment analysis, which focuses on actual after-tax cash flows and uses accelerated tax depreciation.

Deferred taxes should not be regarded as a source of financing or an element of the weighted-average cost of capital formula. The liability for deferred taxes is not a security held by investors. It is a balance sheet entry created for accounting purposes.

Deferred taxes can be important in regulated industries, however. Regulators take deferred taxes into account in calculating allowed rates of return and the time patterns of revenues and consumer prices.

| | |
|---|---|
| Current assets, including cash, inventory, and accounts receivable | Current liabilities, including accounts payable and short-term debt |
| Property, plant, and equipment | Long-term debt ($D$) |
| | Preferred stock ($P$) |
| Growth opportunities | Equity ($E$) |
| Total assets | Total liabilities plus equity |

Several questions immediately arise:

**How does the formula change when there are more than two sources of financing?** Easy: There is one cost for each element. The weight for each element is proportional to its market value. For example, if the capital structure includes both preferred and common shares,

$$\text{WACC} = r_D(1 - T_c)\frac{D}{V} + r_P\frac{P}{V} + r_E\frac{E}{V}$$

where $r_P$ is investors' expected rate of return on the preferred stock, $P$ is the amount of preferred stock outstanding, and $V = D + P + E$.

**What about short-term debt?** Many companies consider only long-term financing when calculating WACC. They leave out the cost of short-term debt. In principle this is incorrect. The lenders who hold short-term debt are investors who can claim their share of operating earnings. A company that ignores this claim will misstate the required return on capital investments.

But "zeroing out" short-term debt is not a serious error if the debt is only temporary, seasonal, or incidental financing or if it is offset by holdings of cash and marketable securities. Suppose, for example, that one of your foreign subsidiaries takes out a six-month loan to finance its inventory and accounts receivable. The dollar equivalent of this loan will show up as a short-term debt. At the same time headquarters may be lending money by investing surplus dollars in short-term securities. If this lending and borrowing offset, there is no point in including the cost of short-term debt in the weighted-average cost of capital, because the company is not a *net* short-term borrower.

**What about other current liabilities?** Current liabilities are usually "netted out" by subtracting them from current assets. The difference is entered as net working capital on the left-hand side of the balance sheet. The sum of long-term financing on the right is called *total capitalization*.



| | |
|---|---|
| Net working capital = current assets − current liabilities | Long-term debt ($D$) |
| Property, plant, and equipment | Preferred stock ($P$) |
| Growth opportunities | Equity ($E$) |
| | Total capitalization ($V$) |

When net working capital is treated as an asset, forecasts of cash flows for capital investment projects must treat increases in net working capital as a cash outflow and decreases as an inflow. This is standard practice, which we followed in Section 6-2. We also did so when we estimated the future investments that Rio would need to make in working capital.

Since current liabilities include short-term debt, netting them out against current assets excludes the cost of short-term debt from the weighted-average cost of capital. We have just explained why this can be an acceptable approximation. But when short-term debt is an important, permanent source of financing—as is common for small firms and firms outside the United States—it should be shown explicitly on the right-hand side of the balance sheet,

not netted out against current assets.[8] The interest cost of short-term debt is then one element of the weighted-average cost of capital.

**How are the costs of financing calculated?** You can often use stock market data to get an estimate of $r_E$, the expected rate of return demanded by investors in the company's stock. With that estimate, WACC is not too hard to calculate, because the borrowing rate $r_D$ and the debt and equity ratios $D/V$ and $E/V$ can be directly observed or estimated without too much trouble.[9] Estimating the value and required return for preferred shares is likewise usually not too complicated.

Estimating the required return on other security types can be troublesome. Convertible debt, where the investors' return comes partly from an option to exchange the debt for the company's stock, is one example. We leave convertibles to Chapter 24.

Junk debt, where the risk of default is high, is likewise difficult. The higher the odds of default, the lower the market price of the debt, and the higher is the *promised* rate of interest. But the weighted-average cost of capital is an *expected,* that is average, rate of return, not a promised one. For example, in July 2009, MGM Mirage bonds maturing in 2015 sold at only 66% of face value and offered a 15% promised yield, nearly 13 percentage points above yields on the highest-quality debt issues maturing at the same time. The price and yield on the MGM bond demonstrated investors' concern about the company's chronic financial ill-health. But the 15% yield was not an expected return, because it did not average in the losses to be incurred if MGM were to default. Including 15% as a "cost of debt" in a calculation of WACC would therefore have overstated MGM's true cost of capital.

This is bad news: There is no easy or tractable way of estimating the expected rate of return on most junk debt issues.[10] The good news is that for most debt the odds of default are small. That means the promised and expected rates of return are close, and the promised rate can be used as an approximation in the weighted-average cost of capital.

**Company vs. Industry WACCs**   Of course you want to know what your company's WACC is. Yet industry WACCs are sometimes more useful. Here's an example. Kansas City Southern used to be a portfolio of (1) the Kansas City Southern Railroad, with operations running from the U.S. Midwest south to Texas and Mexico, and (2) Stillwell Financial, an investment-management business that included the Janus mutual funds. It's hard to think of two more dissimilar businesses. Kansas City Southern's overall WACC was not right for either of them. The company would have been well advised to use a railroad industry WACC for its railroad operations and an investment management WACC for Stillwell.

KCS spun off Stillwell in 2000 and is now a pure-play railroad. But even now the company would be wise to check its WACC against a railroad industry WACC. Industry WACCs are less exposed to random noise and estimation errors. Fortunately for Kansas City Southern, there are several large, pure-play U.S. railroads from which a railroad industry WACC can be estimated.[11] Of course, use of an industry WACC for a particular company's investments assumes that the company and industry have approximately the same business risk and financing.

---

[8] Financial practitioners have rules of thumb for deciding whether short-term debt is worth including in WACC. One rule checks whether short-term debt is at least 10% of total liabilities and net working capital is negative. If so, then short-term debt is almost surely being used to finance long-term assets and is explicitly included in WACC.

[9] Most corporate debt is not actively traded, so its market value cannot be observed directly. But you can usually value a nontraded debt security by looking to securities that *are* traded and that have approximately the same default risk and maturity. See Chapter 23.

For healthy firms the market value of debt is usually not too far from book value, so many managers and analysts use book value for $D$ in the weighted-average cost of capital formula. However, be sure to use *market,* not book, values for *E*.

[10] When betas can be estimated for the junk issue or for a sample of similar issues, the expected return can be calculated from the capital asset pricing model. Otherwise the yield should be adjusted for the probability of default. Evidence on historical default rates on junk bonds is described in Chapter 23.

[11] See Tables 4.4 and 9.1.

## Mistakes People Make in Using the Weighted-Average Formula

The weighted-average formula is very useful but also dangerous. It tempts people to make logical errors. For example, manager Q, who is campaigning for a pet project, might look at the formula

$$\text{WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$

and think, "Aha! My firm has a good credit rating. It could borrow, say, 90% of the project's cost if it likes. That means $D/V = .9$ and $E/V = .1$. My firm's borrowing rate $r_D$ is 8%, and the required return on equity, $r_E$, is 15%. Therefore

$$\text{WACC} = .08(1 - .35)(.9) + .15(.1) = .062$$

or 6.2%. When I discount at that rate, my project looks great."

Manager Q is wrong on several counts. First, the weighted-average formula works only for projects that are carbon copies of the firm. The firm isn't 90% debt-financed.

Second, the immediate source of funds for a project has no necessary connection with the hurdle rate for the project. What matters is the project's overall contribution to the firm's borrowing power. A dollar invested in Q's pet project will not increase the firm's debt capacity by $.90. If the firm borrows 90% of the project's cost, it is really borrowing in part against its *existing* assets. Any advantage from financing the new project with more debt than normal should be attributed to the old projects, not to the new one.

Third, even if the firm were willing and able to lever up to 90% debt, its cost of capital would not decline to 6.2% (as Q's naive calculation predicts). You cannot increase the debt ratio without creating financial risk for stockholders and thereby increasing $r_E$, the expected rate of return they demand from the firm's common stock. Going to 90% debt would certainly increase the borrowing rate, too.

## Adjusting WACC when Debt Ratios and Business Risks Differ

The WACC formula assumes that the project or business to be valued will be financed in the same debt–equity proportions as the company (or industry) as a whole. What if that is not true? For example, what if Sangria's perpetual crusher project supports only 20% debt, versus 40% for Sangria overall?

Moving from 40% to 20% debt may change all the inputs to the WACC formula.[12] Obviously the financing weights change. But the cost of equity $r_E$ is less, because financial risk is reduced. The cost of debt may be lower too.

Take another look at Figure 17.4 on page 433, which plots WACC and the costs of debt and equity as a function of the debt–equity ratio. The flat line is $r$, the opportunity cost of capital. Remember, this is the expected rate of return that investors would want from the project if it were all-equity-financed. The opportunity cost of capital depends only on business risk and is the natural reference point.

Suppose Sangria or the perpetual crusher project were all-equity-financed ($D/V = 0$). At that point WACC equals cost of equity, and both equal the opportunity cost of capital. Start from that point in Figure 19.1. As the debt ratio increases, the cost of equity increases, because of financial risk, but notice that WACC declines. The decline is *not* caused by use of "cheap" debt in place of "expensive" equity. It falls because of the tax shields on debt interest payments. If there were no corporate income taxes, the weighted-average cost of

---

[12] Even the tax rate could change. For example, Sangria might have enough taxable income to cover interest payments at 20% debt but not at 40% debt. In that case the effective marginal tax rate would be higher at 20% than 40% debt.



▶ **FIGURE 19.1**

This plot shows WACC for the Sangria Corporation at debt-to-equity ratios of 25% and 67%. The corresponding debt-to-value ratios are 20% and 40%.

e**X**cel

Visit us at
www.mhhe.com/bma

capital would be constant, and equal to the opportunity cost of capital, at all debt ratios. We showed this in Chapter 17.

Figure 19.1 shows the *shape* of the relationship between financing and WACC, but initially we have numbers only for Sangria's current 40% debt ratio. We want to recalculate WACC at a 20% ratio.

Here is the simplest way to do it. There are three steps.

**Step 1**  Calculate the opportunity cost of capital. In other words, calculate WACC and the cost of equity at zero debt. This step is called *unlevering* the WACC. The simplest unlevering formula is

$$\text{Opportunity cost of capital} = r = r_D D/V + r_E E/V$$

This formula comes directly from Modigliani and Miller's proposition 1 (see Section 17-1). If taxes are left out, the weighted-average cost of capital equals the opportunity cost of capital and is independent of leverage.

**Step 2**  Estimate the cost of debt, $r_D$, at the new debt ratio, and calculate the new cost of equity.

$$r_E = r + (r - r_D)D/E$$

This formula is Modigliani and Miller's proposition 2 (see Section 17-2). It calls for $D/E$, the ratio of debt to *equity*, not debt to value.

**Step 3**  Recalculate the weighted-average cost of capital at the new financing weights.
   Let's do the numbers for Sangria at $D/V = .20$, or 20%.
   *Step 1.* Sangria's current debt ratio is $D/V = .4$. So

$$r = .06(.4) + .124(.6) = .0984, \text{ or } 9.84\%$$

*Step 2.* We will assume that the debt cost stays at 6% when the debt ratio is 20%. Then

$$r_E = .0984 + (.0984 - .06)(.25) = .108, \text{ or } 10.8\%$$

Note that the debt–*equity* ratio is .2/.8 = .25.

*Step 3.* Recalculate WACC.

$$\text{WACC} = .06(1 - .35)(.2) + .108(.8) = .0942, \text{ or } 9.42\%$$

Figure 19.1 enters these numbers on the plot of WACC versus the debt–equity ratio.

### Unlevering and Relevering Betas

Our three-step procedure (1) unlevers and then (2) relevers the cost of equity. Some financial managers find it convenient to (1) unlever and then (2) relever the equity beta. Given the beta of equity at the new debt ratio, the cost of equity is determined from the capital asset pricing model. Then WACC is recalculated.

The formula for unlevering beta was given in Section 17-2.

$$\beta_A = \beta_D\,(D/V) + \beta_E\,(E/V)$$

This equation says that the beta of a firm's assets is revealed by the beta of a portfolio of all of the firm's outstanding debt and equity securities. An investor who bought such a portfolio would own the assets free and clear and absorb only business risks.

The formula for relevering beta closely resembles MM's proposition 2, except that betas are substituted for rates of return:

$$\beta_E = \beta_A + (\beta_A - \beta_D)D/E$$

Use this formula to recalculate $\beta_E$ when $D/E$ changes.

### The Importance of Rebalancing

The formulas for WACC and for unlevering and relevering expected returns are simple, but we must be careful to remember underlying assumptions. The most important point is *rebalancing*.

Calculating WACC for a company at its existing capital structure requires that the capital structure *not* change; in other words, the company must rebalance its capital structure to maintain the same market-value debt ratio for the relevant future. Take Sangria Corporation as an example. It starts with a debt-to-value ratio of 40% and a market value of $1,250 million. Suppose that Sangria's products do unexpectedly well in the marketplace and that market value increases to $1,500 million. Rebalancing means that it will then increase debt to .4 × 1,500 = $600 million,[13] thus regaining a 40% ratio. If market value instead falls, Sangria would have to pay down debt proportionally.

Of course real companies do not rebalance capital structure in such a mechanical and compulsive way. For practical purposes, it's sufficient to assume gradual but steady adjustment toward a long-run target. But if the firm plans significant changes in capital structure (for example, if it plans to pay off its debt), the WACC formula won't work. In such cases, you should turn to the APV method, which we describe in the next section.

---

[13] The proceeds of the additional borrowing would be paid out to shareholders or used, along with additional equity investment, to finance Sangria's growth.

Our three-step procedure for recalculating WACC makes a similar rebalancing assumption.[14] Whatever the starting debt ratio, the firm is assumed to rebalance to maintain that ratio in the future.[15]

## The Modigliani–Miller Formula, Plus Some Final Advice

What if the firm does not rebalance to keep its debt ratio constant? In this case the only general approach is adjusted present value, which we cover in the next section. But sometimes financial managers turn to other discount-rate formulas, including one derived by Modigliani and Miller (MM). MM considered a company or project generating a level, perpetual stream of cash flows financed with fixed, perpetual debt, and derived a simple after-tax discount rate:[16]

$$r_{MM} = r(1 - T_c D/V)$$

---

[14] Similar, but not identical. The basic WACC formula is correct whether rebalancing occurs at the end of each period or continuously. The unlevering and relevering formulas used in steps 1 and 2 of our three-step procedure are exact only if rebalancing is continuous so that the debt ratio stays constant day-to-day and week-to-week. However, the errors introduced from annual rebalancing are very small and can be ignored for practical purposes.

[15] Here's why the formulas work with continuous rebalancing. Think of a market-value balance sheet with assets and interest tax shields on the left and debt and equity on the right, with $D + E = PV(\text{assets}) + PV(\text{tax shield})$. The total risk (beta) of the firm's debt and equity equals the blended risk of PV(assets) and PV(tax shield)

$$\beta_D \frac{D}{V} + \beta_E \frac{E}{V} = \alpha\beta_A + (1-\alpha)\beta_{tax\ shield} \tag{1}$$

where $\alpha$ is the proportion of the total firm value from its assets and $1 - \alpha$ is the proportion from interest tax shields. If the firm readjusts its capital structure to keep $D/V$ constant, then the beta of the tax shield must be the same as the beta of the assets. With rebalancing, an $x\%$ change in firm value $V$ changes debt $D$ by $x\%$. So the interest tax shield $T_c\ r_D\ D$ will change by $x\%$ as well. Thus the risk of the tax shield must be the same as the risk of the firm as a whole:

$$\beta_{tax\ shield} = \beta_A = \beta_D \frac{D}{V} + \beta_E \frac{E}{V} \tag{2}$$

This is our unlevering formula expressed in terms of beta. Since expected returns depend on beta:

$$r_A = r_D \frac{D}{V} + r_E \frac{E}{V} \tag{3}$$

Rearrange formulas (2) and (3) to get the relevering formulas for $\beta_E$ and $r_E$.

$$\beta_E = \beta_A + (\beta_A - \beta_D)D/E$$
$$r_E = r_A + (r_A - r_D)D/E$$

All this assumes continuous rebalancing. Suppose instead that the firm rebalances once a year, so that the next year's interest tax shield, which depends on this year's debt, is known. Then you can use a formula developed by Miles and Ezzell:

$$r_{Miles\text{-}Ezzell} = r_A - (D/V)r_D T_c \left(\frac{1 + r_A}{1 + r_D}\right)$$

See J. Miles and J. Ezzell, "The Weighted Average Cost of Capital, Perfect Capital Markets, and Project Life: A Clarification," *Journal of Financial and Quantitative Analysis* 15 (September 1980), pp. 719–730.

[16] The formula first appeared in F. Modigliani and M. H. Miller, "Corporate Income Taxes and the Cost of Capital: A Correction," *American Economic Review* 53 (June 1963) pp. 433–443. It is explained more fully in M. H. Miller and F. Modigliani: "Some Estimates of the Cost of Capital to the Electric Utility Industry: 1954–1957," *American Economic Review* 56 (June 1966), pp. 333–391.

Given perpetual fixed debt,

$$V = \frac{C}{r} + T_c D$$

$$V = \frac{C}{r(1 - T_c D/V)} = \frac{C}{r_{MM}}$$

Here it's easy to unlever: just set the debt-capacity parameter ($D/V$) equal to zero.[17]

MM's formula is still used in practice, but the formula is exact only in the special case where there is a level, perpetual stream of cash flows and fixed, perpetual debt. However, the formula is not a bad approximation for shorter-lived projects when debt is issued in a fixed amount.[18]

So which team do you want to play with, the fixed-debt team or the rebalancers? If you join the fixed-debt team you will be outnumbered. Most financial managers use the plain, after-tax WACC, which assumes constant market-value debt ratios and therefore assumes rebalancing. That makes sense, because the debt *capacity* of a firm or project must depend on its future value, which will fluctuate.

At the same time, we must admit that the typical financial manager doesn't care much if his or her firm's debt ratio drifts up or down within a reasonable range of moderate financial leverage. The typical financial manager acts as if a plot of WACC against the debt ratio is "flat" (constant) over this range. This too makes sense, if we just remember that interest tax shields are the *only* reason why the after-tax WACC declines in Figure 17.4 or 19.1. The WACC formula doesn't explicitly capture costs of financial distress or any of the other nontax complications discussed in Chapter 18.[19] All these complications may roughly cancel the value added by interest tax shields (within a range of moderate leverage). If so, the financial manager is wise to focus on the firm's operating and investment decisions, rather than on fine-tuning its debt ratio.

## 19-4 Adjusted Present Value

The idea behind **adjusted present value (APV)** is to divide and conquer. APV does not attempt to capture taxes or other effects of financing in a WACC or adjusted discount rate. A series of present value calculations is made instead. The first establishes a base-case value for the project or firm: its value as a separate, all-equity-financed venture. The discount rate for the base-case value is just the opportunity cost of capital. Once the base-case value is set, then each financing side effect is traced out, and the present value of its cost or benefit to the firm is calculated. Finally, all the present values are added together to estimate the project's total contribution to the value of the firm:

$$\text{APV} = \text{base-case NPV} + \text{sum of PVs of financing side effects}^{20}$$

---

[17] In this case the relevering formula for the cost of equity is:

$$r_E = r_A + (1 - T_c)(r_A - r_D)D/E$$

The unlevering and relevering formulas for betas are

$$\beta_A = \frac{\beta_D(1 - T_c)D/E + \beta_E}{1 + (1 - T_c)D/E}$$

and

$$\beta_E = \beta_A + (1 - T_c)(\beta_A - \beta_D)D/E$$

See R. Hamada: "The Effect of a Firm's Capital Structure on the Systematic Risk of Common Stocks," *Journal of Finance* 27 (May 1972), pp. 435–452.

[18] See S. C. Myers, "Interactions of Corporate Financing and Investment Decisions—Implications for Capital Budgeting," *Journal of Finance* 29 (March 1974), pp. 1–25.

[19] Costs of financial distress can show up as rapidly increasing costs of debt and equity, especially at high debt ratios. The costs of financial distress could "flatten out" the WACC curve in Figures 17.4 and 19.1, and finally increase WACC as leverage climbs. Thus some practitioners calculate an industry WACC and take it as constant, at least within the range of debt ratios observed for healthy companies in the industry.

Personal taxes could also generate a flatter curve for after-tax WACC as a function of leverage. See Section 18-2.

[20] "The adjusted-present-value rule was developed in S. C. Myers, "Interactions of Corporate Financing and Investment Decisions—Implications for Capital Budgeting," *Journal of Finance* 29 (March 1974), pp. 1–25.

The most important financing side effect is the interest tax shield on the debt supported by the project (a plus). Other possible side effects are the issue costs of securities (a minus) or financing packages subsidized by a supplier or government (a plus).

APV gives the financial manager an explicit view of the factors that are adding or subtracting value. APV can prompt the manager to ask the right follow-up questions. For example, suppose that base-case NPV is positive but less than the costs of issuing shares to finance the project. That should prompt the manager to look around to see if the project can be rescued by an alternative financing plan.

## APV for the Perpetual Crusher

APV is easiest to understand in simple numerical examples. Let's apply it to Sangria's perpetual crusher project. We start by showing that APV is equivalent to discounting at WACC if we make the same assumptions about debt policy.

We used Sangria's WACC (9%) as the discount rate for the crusher's projected cash flows. The WACC calculation assumed that debt will be maintained at a constant 40% of the future value of the project or firm. In this case, the risk of interest tax shields is the same as the risk of the project.[21] Therefore we will discount the tax shields at the opportunity cost of capital ($r$). We calculated the opportunity cost of capital in the last section by unlevering Sangria's WACC to obtain $r = 9.84\%$.

The first step is to calculate base-case NPV. We discount after-tax project cash flows of $1.125 million at the opportunity cost of capital of 9.84% and subtract the $12.5 million outlay. The cash flows are perpetual, so:

$$\text{Base-case NPV} = -12.5 + \frac{1.125}{.0984} = -\$1.067 \text{ million}$$

Thus the project would not be worthwhile with all-equity financing. But it actually supports debt of $5 million. At a 6% borrowing rate ($r_D = .06$) and a 35% tax rate ($T_c = .35$), annual tax shields are $.35 \times .06 \times 5 = .105$, or $105,000.

What are those tax shields worth? If the firm is constantly rebalancing its debt, we discount at $r = 9.84\%$:

$$\text{PV(interest tax shields, debt rebalanced)} = \frac{105,000}{.0984} = \$1.067 \text{ million}$$

APV is the sum of base-case value and PV(interest tax shields)

$$\text{APV} = -1.067 \text{ million} + 1.067 \text{ million} = 0$$

This is exactly the same as we obtained by one-step discounting with WACC. The perpetual crusher is a break-even project by either valuation method.

But with APV, we don't have to hold debt at a constant proportion of value. Suppose Sangria plans to keep project debt fixed at $5 million. In this case we assume the risk of the tax shields is the same as the risk of the debt and we discount at the 6% rate on debt:

$$\text{PV(tax shields, debt fixed)} = \frac{105,000}{.06} = \$1.75 \text{ million}$$

$$\text{APV} = -1.067 + 1.75 = \$.683 \text{ million}$$

Now the project is more attractive. With fixed debt, the interest tax shields are safe and therefore worth more. (Whether the fixed debt is safer for Sangria is another matter. If the perpetual crusher project fails, the $5 million of fixed debt may end up as a burden on Sangria's other assets.)

---

[21] That is, $\beta_A = \beta_{\text{tax shields}}$. See footnote 15 above.

## Other Financing Side Effects

Suppose Sangria has to finance the perpetual crusher by issuing debt and equity. It issues $7.5 million of equity with issue costs of 7% ($525,000) and $5 million of debt with issue costs of 2% ($100,000). Assume the debt is fixed once issued, so that interest tax shields are worth $1.75 million. Now we can recalculate APV, taking care to subtract the issue costs:

$$\text{APV} = -1.067 + 1.75 - .525 - .100 = .058 \text{ million, or } \$58,000$$

The issue costs would reduce APV to nearly zero.

Sometimes there are favorable financing side effects that have nothing to do with taxes. For example, suppose that a potential manufacturer of crusher machinery offers to sweeten the deal by leasing it to Sangria on favorable terms. Then you could calculate APV as the sum of base-case NPV plus the NPV of the lease. Or suppose that a local government offers to lend Sangria $5 million at a very low interest rate if the crusher is built and operated locally. The NPV of the subsidized loan could be added in to APV. (We cover leases in Chapter 25 and subsidized loans in the Appendix to this chapter.)

## APV for Businesses

APV can also be used to value businesses. Let's take another look at the valuation of Rio. In Table 19.1, we assumed a constant 40% debt ratio and discounted free cash flow at Sangria's WACC. Table 19.2 runs the same analysis, but with a fixed debt schedule.

We'll suppose that Sangria has decided to make an offer for Rio. If successful, it plans to finance the purchase with $51 million of debt. It intends to pay down the debt to $45 million in year 6. Recall Rio's horizon value of $113.4 million, which is calculated in Table 19.1 and shown again in Table 19.2. The debt ratio at the horizon is therefore projected at 45/113.4 = .397, about 40%. Thus Sangria plans to take Rio back to a normal 40% debt ratio at the horizon.[22] But Rio will be carrying a heavier debt load before the horizon. For example, the $51 million of initial debt is about 58% of company value as calculated in Table 19.1.

Let's see how Rio's APV is affected by this more aggressive borrowing schedule. Table 19.2 shows projections of free cash flows from Table 19.1.[23] Now we need Rio's base-case value, so we discount these flows at the opportunity cost of capital (9.84%), not at WACC. The resulting base-case value for Rio is $84.3 million. Table 19.2 also projects debt levels, interest, and interest tax shields. If the debt levels are taken as fixed, then the tax shields should be discounted back at the 6% borrowing rate. The resulting PV of interest tax shields is $5.0 million. Thus,

$$\text{APV} = \text{base-case NPV} + \text{PV(interest tax shields)}$$
$$= \$84.3 + 5.0 = \$89.3 \text{ million}$$

an increase of $1.4 million from NPV in Table 19.1. The increase can be traced to the higher early debt levels and to the assumption that the debt levels and interest tax shields are fixed and relatively safe.[24]

Now a difference of $1.4 million is not a big deal, considering all the lurking risks and pitfalls in forecasting Rio's free cash flows. But you can see the advantage of the flexibility that APV provides. The APV spreadsheet allows you to explore the implications of different

---

[22] Therefore we still calculate the horizon value in year 6 by discounting subsequent free cash flows at WACC. The horizon value in year 6 is discounted back to year 0 at the opportunity cost of capital, however.

[23] Many of the assumptions and calculations in Table 19.1 have been hidden in Table 19.2. The hidden rows can be recalled in the "live" version of Table 19.2, which is available on this book's Web site **(www.mhhe.com/bma)**.

[24] But will Rio really *support* debt at the levels shown in Table 19.2? If not, then the debt must be partly supported by Sangria's other assets, and only part of the $5 million in PV(interest tax shields) can be attributed to Rio itself.

| | Latest | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year | Forecast | | | | | | |
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | | | | | | | | |
| Free cash flow | 2.5 | 3.5 | 3.2 | 3.4 | 5.9 | 6.1 | 6.0 | 6.8 |
| | | | | | | | | |
| **PV free cash flow, years 1–6** | **19.7** | | | | | | | |
| **PV horizon value** | **64.6** | | | (Horizon value in year 6) | | | 113.4 | |
| **Base-case PV of company** | **84.3** | | | | | | | |
| | | | | | | | | |
| Debt | 51.0 | 50.0 | 49.0 | 48.0 | 47.0 | 46.0 | 45.0 | |
| Interest | | 3.06 | 3.00 | 2.94 | 2.88 | 2.82 | 2.76 | |
| Interest tax shield | | 1.07 | 1.05 | 1.03 | 1.01 | 0.99 | 0.97 | |
| **PV Interest tax shields** | **5.0** | | | | | | | |
| | | | | | | | | |
| **APV** | **89.3** | | | | | | | |
| | | | | | | | | |
| Tax rate, % | 35.0 | | | | | | | |
| Opportunity cost of capital, % | 9.84 | | | | | | | |
| WACC, % (to discount horizon value to year 6) | 9.0 | | | | | | | |
| Long-term growth forecast, % | 3.0 | | | | | | | |
| Interest rate, % (years 1–6) | 6.0 | | | | | | | |
| | | | | | | | | |
| After-tax debt service | | 2.99 | 2.95 | 2.91 | 2.87 | 2.83 | 2.79 | |

▶ **TABLE 19.2** APV valuation of Rio Corporation ($ millions).



eXcel

Visit us at
www.mhhe.com/bma

financing strategies without locking into a fixed debt ratio or having to calculate a new WACC for every scenario.

APV is particularly useful when the debt for a project or business is tied to book value or has to be repaid on a fixed schedule. For example, Kaplan and Ruback used APV to analyze the prices paid for a sample of leveraged buyouts (LBOs). LBOs are takeovers, typically of mature companies, financed almost entirely with debt. However, the new debt is not intended to be permanent. LBO business plans call for generating extra cash by selling assets, shaving costs, and improving profit margins. The extra cash is used to pay down the LBO debt. Therefore you can't use WACC as a discount rate to evaluate an LBO because its debt ratio will not be constant.

APV works fine for LBOs. The company is first evaluated as if it were all-equity-financed. That means that cash flows are projected after tax, but without any interest tax shields generated by the LBO's debt. The tax shields are then valued separately and added to the all-equity value. Any other financing side effects are added also. The result is an APV valuation for the company.[25] Kaplan and Ruback found that APV did a pretty good job explaining prices paid in these hotly contested takeovers, considering that not all the information available to bidders had percolated into the public domain. Kaplan and Ruback were restricted to publicly available data.

### APV for International Investments

APV is most useful when financing side effects are numerous and important. This is frequently the case for large international investments, which may have custom-tailored *project*

---

[25] Kaplan and Ruback actually used "compressed" APV, in which all cash flows, including interest tax shields, are discounted at the opportunity cost of capital. S. N. Kaplan and R. S. Ruback, "The Valuation of Cash Flow Forecasts: An Empirical Analysis," *Journal of Finance* 50 (September 1995), pp. 1059–1093.

*financing* and special contracts with suppliers, customers, and governments. Here are a few examples of financing side effects encountered in international finance.

We explain project finance in Chapter 24. It typically means very high debt ratios to start, with most or all of a project's early cash flows committed to debt service. Equity investors have to wait. Since the debt ratio will not be constant, you have to turn to APV.

Project financing may include debt available at favorable interest rates. Most governments subsidize exports by making special financing packages available, and manufacturers of industrial equipment may stand ready to lend money to help close a sale. Suppose, for example, that your project requires construction of an on-site electricity generating plant. You solicit bids from suppliers in various countries. Don't be surprised if the competing suppliers sweeten their bids with offers of low interest rate project loans or if they offer to lease the plant on favorable terms. You should then calculate the NPVs of these loans or leases and include them in your project analysis.

Sometimes international projects are supported by contracts with suppliers or customers. Suppose a manufacturer wants to line up a reliable supply of a crucial raw material—powdered magnoosium, say. The manufacturer could subsidize a new magnoosium smelter by agreeing to buy 75% of production and guaranteeing a minimum purchase price. The guarantee is clearly a valuable addition to project APV: if the world price of powdered magnoosium falls below the minimum, the project doesn't suffer. You would calculate the value of this guarantee (by the methods explained in Chapters 20 to 22) and add it to APV.

Sometimes local governments impose costs or restrictions on investment or disinvestment. For example, Chile, in an attempt to slow down a flood of short-term capital inflows in the 1990s, required investors to "park" part of their incoming money in non-interest-bearing accounts for a period of two years. An investor in Chile during this period would calculate the cost of this requirement and subtract it from APV.

## 19-5 Your Questions Answered

*Question:* All these cost of capital formulas—which ones do financial managers actually use?

*Answer:* The after-tax weighted-average cost of capital, most of the time. WACC is estimated for the company, or sometimes for an industry. We recommend industry WACCs when data are available for firms with similar assets, operations, business risks, and growth opportunities.

Of course, conglomerate companies, with divisions operating in two or more unrelated industries, should not use a single company or industry WACC. Such firms should try to estimate a different industry WACC for each operating division.

*Question:* But WACC is the correct discount rate only for "average" projects. What if the project's financing differs from the company's or industry's?

*Answer:* Remember, investment projects are usually not separately financed. Even when they are, you should focus on the project's contribution to the firm's overall debt capacity, not on its immediate financing. (Suppose it's convenient to raise all the money for a particular project with a bank loan. That doesn't mean the project itself supports 100% debt financing. The company is borrowing against its existing assets as well as the project.)

But if the project's debt capacity is materially different from the company's existing assets, or if the company's overall debt policy changes, WACC should be adjusted. The adjustment can be done by the three-step procedure explained in Section 19-3.

*Question:* Could we do one more numerical example?

*Answer:* Sure. Suppose that WACC has been estimated as follows at a 30% debt ratio:

$$\text{WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$

$$= .09(1 - .35)(.3) + .15(.7) = .1226, \text{ or } 12.26\%$$

What is the correct discount rate at a 50% debt ratio?

*Step 1.* Calculate the opportunity cost of capital.

$$r = r_D D/V + r_E E/V$$
$$= .09(.3) + .15(.7) = .132, \text{ or } 13.2\%$$

*Step 2.* Calculate the new costs of debt and equity. The cost of debt will be higher at 50% debt than 30%. Say it is $r_D = .095$. The new cost of equity is:

$$r_E = r + (r - r_D)D/E$$
$$= .132 + (.132 - .095)50/50$$
$$= .169, \text{ or } 16.9\%$$

*Step 3.* Recalculate WACC.

$$\text{WACC} = r_D(1 - T_c)D/V + r_E E/V$$
$$= .095(1 - .35)(.5) + .169(.5) = .1154, \text{ or about } 11.5\%$$

*Question:* How do I use the capital asset pricing model to calculate the after-tax weighted-average cost of capital?

*Answer:* First plug the equity beta into the capital asset pricing formula to calculate $r_E$, the expected return to equity. Then use this figure, along with the after-tax cost of debt and the debt-to-value and equity-to-value ratios, in the WACC formula.

Of course the CAPM is not the only way to estimate the cost of equity. For example, you might be able to use the dividend-discount model (see Section 4-3).

*Question:* But suppose I do use the CAPM? What if I have to recalculate the equity beta for a different debt ratio?

*Answer:* The formula for the equity beta is:

$$\beta_E = \beta_A + (\beta_A - \beta_D)D/E$$

where $\beta_E$ is the equity beta, $\beta_A$ is the asset beta, and $\beta_D$ is the beta of the company's debt. The asset beta is a weighted average of the debt and equity betas:

$$\beta_A = \beta_D (D/V) + \beta_E (E/V)$$

Suppose you needed the opportunity cost of capital $r$. You could calculate $\beta_A$ and then $r$ from the capital asset pricing model.

*Question:* I think I understand how to adjust for differences in debt capacity or debt policy. How about differences in business risk?

*Answer:* If business risk is different, then $r$, the opportunity cost of capital, is different.

Figuring out the right $r$ for an unusually safe or risky project is never easy. Sometimes the financial manager can use estimates of risk and expected return for companies similar to the project. Suppose, for example, that a traditional pharmaceutical company is considering a major commitment to biotech research. The financial manager could pick a sample of biotech companies, estimate their average beta and cost of capital, and use these estimates as benchmarks for the biotech investment.

But in many cases it's difficult to find a good sample of matching companies for an unusually safe or risky project. Then the financial manager has to adjust the opportunity cost of capital by judgment. Section 9-3 may be helpful in such cases.

*Question:* When do I need adjusted present value (APV)?

*Answer:* The WACC formula picks up only one financing side effect: the value of interest tax shields on debt supported by a project. If there are other side effects—subsidized financing tied to a project, for example—you should use APV.

You can also use APV to break out the value of interest tax shields:

$$\text{APV} = \text{base-case NPV} + \text{PV(tax shield)}$$

Suppose, for example, that you are analyzing a company just after a leveraged buyout. The company has a very high initial debt level but plans to pay down the debt as rapidly as possible. APV could be used to obtain an accurate valuation.

*Question:* When should personal taxes be incorporated into the analysis?

*Answer:* Always use $T_c$, the marginal corporate tax rate, when calculating WACC as a weighted average of the costs of debt and equity. The discount rate is adjusted *only* for corporate taxes.

In principle, APV can be adjusted for personal taxes by replacing the marginal corporate rate $T_c$ with an effective tax rate that combines corporate and personal taxes and reflects the net tax advantage per dollar of interest paid by the firm. We provided back-of-the-envelope calculations of this advantage in Section 18-2. The effective tax rate is almost surely less than $T_c$, but it is very difficult to pin down the numerical difference. Therefore, in practice $T_c$ is almost always used as an approximation.

*Question:* Are taxes really that important? Do financial managers really fine-tune the debt ratio to minimize WACC?

*Answer:* As we saw in Chapter 18, financing decisions reflect many forces beyond taxes, including costs of financial distress, differences in information, and incentives for managers. There may not be a sharply defined optimal capital structure. Therefore most financial managers don't fine-tune their companies' debt ratios, and they don't rebalance financing to keep debt ratios strictly constant. In effect they assume that a plot of WACC for different debt ratios is "flat" over a reasonable range of moderate leverage.

● ● ● ● ●

**SUMMARY**

In this chapter we considered how financing can be incorporated into the valuation of projects and ongoing businesses. There are two ways to take financing into account. The first is to calculate NPV by discounting at an adjusted discount rate, usually the after-tax weighted-average cost of capital (WACC). The second approach discounts at the opportunity cost of capital and then adds or subtracts the present values of financing side effects. The second approach is called adjusted present value, or APV.

The formula for the after-tax WACC is:

$$\text{WACC} = r_D(1 - T_c)\frac{D}{V} + r_E\frac{E}{V}$$

where $r_D$ and $r_E$ are the expected rates of return demanded by investors in the firm's debt and equity securities, $D$ and $E$ are the current *market values* of debt and equity, and $V$ is the total market value of the firm ($V = D + E$). Of course, the WACC formula expands if there are other sources of financing, for example, preferred stock.

Strictly speaking, discounting at WACC works only for projects that are carbon copies of the existing firm—projects with the same business risk that will be financed to maintain the firm's current market debt ratio. But firms can use WACC as a benchmark rate to be adjusted for differences in business risk or financing. We gave a three-step procedure for adjusting WACC for different debt ratios.

Discounting cash flows at the WACC assumes that debt is rebalanced to keep a constant ratio of debt to market value. The amount of debt supported by a project is assumed to rise or fall with the project's after-the-fact success or failure. The WACC formula also assumes that financing matters *only* because of interest tax shields. When this or other assumptions are violated, only APV will give an absolutely correct answer.

APV is, in concept at least, simple. First calculate the base-case NPV of the project or business on the assumption that financing *doesn't* matter. (The discount rate is not WACC, but the opportunity cost of capital.) Then calculate the present values of any relevant financing side effects and add or subtract from base-case value. A capital investment project is worthwhile if

$$\text{APV} = \text{base-case NPV} + \text{PV(financing side effects)}$$

**Visit us at www.mhhe.com/bma**

is positive. Common financing side effects include interest tax shields, issue costs, and special financing packages offered by suppliers or governments.

For firms or going-concern businesses, value depends on free cash flow. Free cash flow is the amount of cash that can be paid out to all investors, debt as well as equity, after deducting cash needed for new investment or increases in working capital. Free cash flow does not include the value of interest tax shields, however. The WACC formula accounts for interest tax shields by using the after-tax cost of debt. APV adds PV(interest tax shields) to base-case value.

Businesses are usually valued in two steps. First free cash flow is forecasted out to a valuation horizon and discounted back to present value. Then a horizon value is calculated and also discounted back. The horizon value is usually estimated by using the perpetual-growth DCF formula or by multiplying forecasted EBIT or EBITDA[26] by multiples observed for similar firms. Be particularly careful to avoid unrealistically high horizon values. By the time the horizon arrives, competitors will have had several years to catch up. Also, when you are done valuing the business, don't forget to subtract its debt to get the value of the firm's equity.

All of this chapter's examples reflect assumptions about the amount of debt supported by a project or business. Remember not to confuse "supported by" with the immediate source of funds for investment. For example, a firm might, as a matter of convenience, borrow $1 million for a $1 million research program. But the research is unlikely to contribute $1 million in debt capacity; a large part of the $1 million new debt would be supported by the firm's other assets.

Also remember that *debt capacity* is not meant to imply an absolute limit on how much the firm *can* borrow. The phrase refers to how much it *chooses* to borrow against a project or ongoing business.

**FURTHER READING**

The Harvard Business Review *has published a popular account of APV:*

T. A. Luehrman, "Using APV: A Better Tool for Valuing Operations," *Harvard Business Review* 75 (May–June 1997), pp. 145–154.

*There have been dozens of articles on the weighted-average cost of capital and other issues discussed in this chapter. Here are three:*

J. Miles and R. Ezzell, "The Weighted Average Cost of Capital, Perfect Capital Markets, and Project Life: A Clarification," *Journal of Financial and Quantitative Analysis* 15 (September 1980), pp. 719–730.

R. A. Taggart, Jr., "Consistent Valuation and Cost of Capital Expressions with Corporate and Personal Taxes," *Financial Management* 20 (Autumn 1991), pp. 8–20.

R. S. Ruback, "Capital Cash Flows: A Simple Approach to Valuing Risky Cash Flows," *Financial Management* 31 (Summer 2002), pp. 85–103.

*Two books that provide detailed explanations of how to value companies are:*

T. Koller, M. Goedhart, and D. Wessels, *Valuation: Measuring and Managing the Value of Companies,* 4th ed. (New York: Wiley, 2005).

S. P. Pratt and A.V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* 5th ed. (New York: McGraw-Hill, 2007).

*The valuation rule for safe, nominal cash flows is developed in:*

R. S. Ruback, "Calculating the Market Value of Risk-Free Cash Flows," *Journal of Financial Economics* 15 (March 1986), pp. 323–339.

---

[26] Recall that EBIT = earnings before interest and taxes and EBITDA = EBIT plus depreciation and amortization.



**Select problems are available in McGraw-Hill Connect.
Please see the preface for more information.**

**PROBLEM SETS**    **BASIC**

1. Calculate the weighted-average cost of capital (WACC) for Federated Junkyards of America, using the following information:
   - Debt: $75,000,000 book value outstanding. The debt is trading at 90% of book value. The yield to maturity is 9%.
   - Equity: 2,500,000 shares selling at $42 per share. Assume the expected rate of return on Federated's stock is 18%.
   - Taxes: Federated's marginal tax rate is $T_c = .35$.

2. Suppose Federated Junkyards decides to move to a more conservative debt policy. A year later its debt ratio is down to 15% ($D/V = .15$). The interest rate has dropped to 8.6%. Recalculate Federated's WACC under these new assumptions. The company's business risk, opportunity cost of capital, and tax rate have not changed. Use the three-step procedure explained in Section 19-3.

3. True or false? Use of the WACC formula assumes
   a. A project supports a fixed amount of debt over the project's economic life.
   b. The *ratio* of the debt supported by a project to project value is constant over the project's economic life.
   c. The firm rebalances debt each period, keeping the debt-to-value ratio constant.

4. What is meant by the flow-to-equity valuation method? What discount rate is used in this method? What assumptions are necessary for this method to give an accurate valuation?

5. True or false? The APV method
   a. Starts with a base-case value for the project.
   b. Calculates the base-case value by discounting project cash flows, forecasted assuming all-equity financing, at the WACC for the project.
   c. Is especially useful when debt is to be paid down on a fixed schedule.

6. A project costs $1 million and has a base-case NPV of exactly zero (NPV = 0). What is the project's APV in the following cases?
   a. If the firm invests, it has to raise $500,000 by a stock issue. Issue costs are 15% of *net* proceeds.
   b. If the firm invests, its debt capacity increases by $500,000. The present value of interest tax shields on this debt is $76,000.

7. Whispering Pines, Inc., is all-equity-financed. The expected rate of return on the company's shares is 12%.
   a. What is the opportunity cost of capital for an average-risk Whispering Pines investment?
   b. Suppose the company issues debt, repurchases shares, and moves to a 30% debt-to-value ratio ($D/V = .30$). What will the company's weighted-average cost of capital be at the new capital structure? The borrowing rate is 7.5% and the tax rate is 35%.

8. Consider a project lasting one year only. The initial outlay is $1,000 and the expected inflow is $1,200. The opportunity cost of capital is $r = .20$. The borrowing rate is $r_D = .10$, and the tax shield per dollar of interest is $T_c = .35$.
   a. What is the project's base-case NPV?
   b. What is its APV if the firm borrows 30% of the project's required investment?

9. The WACC formula seems to imply that debt is "cheaper" than equity—that is, that a firm with more debt could use a lower discount rate. Does this make sense? Explain briefly.

**Visit us at www.mhhe.com/bma**

10. Suppose KCS Corp. buys out Patagonia Trucking, a privately owned business, for $50 million. KCS has only $5 million cash in hand, so it arranges a $45 million bank loan. A normal debt-to-value ratio for a trucking company would be 50% at most, but the bank is satisfied with KCS's credit rating.

    Suppose you were valuing Patagonia by APV in the same format as Table 19.2. How much debt would you include? Explain briefly.

## INTERMEDIATE

11. Table 19.3 shows a *book* balance sheet for the Wishing Well Motel chain. The company's long-term debt is secured by its real estate assets, but it also uses short-term bank financing. It pays 10% interest on the bank debt and 9% interest on the secured debt. Wishing Well has 10 million shares of stock outstanding, trading at $90 per share. The expected return on Wishing Well's common stock is 18%.

    Calculate Wishing Well's WACC. Assume that the book and market values of Wishing Well's debt are the same. The marginal tax rate is 35%.

12. Suppose Wishing Well is evaluating a new motel and resort on a romantic site in Madison County, Wisconsin. Explain how you would forecast the after-tax cash flows for this project. (*Hints:* How would you treat taxes? Interest expense? Changes in working capital?)

13. To finance the Madison County project, Wishing Well will have to arrange an additional $80 million of long-term debt and make a $20 million equity issue. Underwriting fees, spreads, and other costs of this financing will total $4 million. How would you take this into account in valuing the proposed investment?

14. Table 19.4 shows a simplified balance sheet for Rensselaer Felt. Calculate this company's weighted-average cost of capital. The debt has just been refinanced at an interest rate of 6% (short term) and 8% (long term). The expected rate of return on the company's shares is 15%. There are 7.46 million shares outstanding, and the shares are trading at $46. The tax rate is 35%.

15. How will Rensselaer Felt's WACC and cost of equity change if it issues $50 million in new equity and uses the proceeds to retire long-term debt? Assume the company's borrowing rates are unchanged. Use the three-step procedure from Section 19-3.

16. Digital Organics (DO) has the opportunity to invest $1 million now ($t = 0$) and expects after-tax returns of $600,000 in $t = 1$ and $700,000 in $t = 2$. The project will last for two years only. The appropriate cost of capital is 12% with all-equity financing, the

| Cash and marketable securities | 100 | Bank loan | 280 |
|---|---|---|---|
| Accounts receivable | 200 | Accounts payable | 120 |
| Inventory | 50 | Current liabilities | 400 |
| Current assets | 350 | | |
| Real estate | 2,100 | Long-term debt | 1,800 |
| Other assets | 150 | Equity | 400 |
| Total | 2,600 | Total | 2,600 |

> **TABLE 19.3**
> Balance sheet for Wishing Well, Inc. (figures in $ millions).

| Cash and marketable securities | 1,500 | Short-term debt | 75,600 |
|---|---|---|---|
| Accounts receivable | 120,000 | Accounts payable | 62,000 |
| Inventories | 125,000 | Current liabilities | 137,600 |
| Current assets | 246,500 | | |
| Property, plant, and equipment | 302,000 | Long-term debt | 208,600 |
| Other assets | 89,000 | Deferred taxes | 45,000 |
| Total | 637,500 | Shareholders' equity | 246,300 |
| | | Total | 637,500 |

> **TABLE 19.4**
> Simplified book balance sheet for Rensselaer Felt (figures in $ thousands).

Visit us at www.mhhe.com/bma

borrowing rate is 8%, and DO will borrow $300,000 against the project. This debt must be repaid in two equal installments. Assume debt tax shields have a net value of $.30 per dollar of interest paid. Calculate the project's APV using the procedure followed in Table 19.2.

17. Consider another perpetual project like the crusher described in Section 19-1. Its initial investment is $1,000,000, and the expected cash inflow is $95,000 a year in perpetuity. The opportunity cost of capital with all-equity financing is 10%, and the project allows the firm to borrow at 7%. The tax rate is 35%.

    Use APV to calculate this project's value.

    a. Assume first that the project will be partly financed with $400,000 of debt and that the debt amount is to be fixed and perpetual.

    b. Then assume that the initial borrowing will be increased or reduced in proportion to changes in the market value of this project.

    Explain the difference between your answers to (a) and (b).

18. Suppose the project described in Problem 17 is to be undertaken by a university. Funds for the project will be withdrawn from the university's endowment, which is invested in a widely diversified portfolio of stocks and bonds. However, the university can also borrow at 7%. The university is tax exempt.

    The university treasurer proposes to finance the project by issuing $400,000 of perpetual bonds at 7% and by selling $600,000 worth of common stocks from the endowment. The expected return on the common stocks is 10%. He therefore proposes to evaluate the project by discounting at a weighted-average cost of capital, calculated as:

$$r = r_D \frac{D}{V} + r_E \frac{E}{V}$$

$$= .07 \left( \frac{400,000}{1,000,000} \right) + .10 \left( \frac{600,000}{1,000,000} \right)$$

$$= .088, \text{ or } 8.8$$

    What's right or wrong with the treasurer's approach? Should the university invest? Should it borrow? Would the project's value to the university change if the treasurer financed the project entirely by selling common stocks from the endowment?

19. Consider a project to produce solar water heaters. It requires a $10 million investment and offers a level after-tax cash flow of $1.75 million per year for 10 years. The opportunity cost of capital is 12%, which reflects the project's business risk.

    a. Suppose the project is financed with $5 million of debt and $5 million of equity. The interest rate is 8% and the marginal tax rate is 35%. The debt will be paid off in equal annual installments over the project's 10-year life. Calculate APV.

    b. How does APV change if the firm incurs issue costs of $400,000 to raise the $5 million of required equity?

20. Take another look at the valuations of Rio in Tables 19.1 and 19.2. Now use the live spreadsheets on this book's Web site (**www.mhhe.com/bma**) to show how the valuations depend on:

    a. The forecasted long-term growth rate.

    b. The required amounts of investment in fixed assets and working capital.

    c. The opportunity cost of capital. Note you can also vary the opportunity cost of capital in Table 19.1.

    d. Profitability, that is, cost of goods sold as a percentage of sales.

    e. The assumed amount of debt financing.


Visit us at
www.mhhe.com/bma

Visit us at www.mhhe.com/bma

**21.** The Bunsen Chemical Company is currently at its target debt ratio of 40%. It is contemplating a $1 million expansion of its existing business. This expansion is expected to produce a cash inflow of $130,000 a year in perpetuity.

The company is uncertain whether to undertake this expansion and how to finance it. The two options are a $1 million issue of common stock or a $1 million issue of 20-year debt. The flotation costs of a stock issue would be around 5% of the amount raised, and the flotation costs of a debt issue would be around 1½%.

Bunsen's financial manager, Ms. Polly Ethylene, estimates that the required return on the company's equity is 14%, but she argues that the flotation costs increase the cost of new equity to 19%. On this basis, the project does not appear viable.

On the other hand, she points out that the company can raise new debt on a 7% yield, which would make the cost of new debt 8½%. She therefore recommends that Bunsen should go ahead with the project and finance it with an issue of long-term debt.

Is Ms. Ethylene right? How would you evaluate the project?

**22.** Nevada Hydro is 40% debt-financed and has a weighted-average cost of capital of 9.7%:

$$\text{WACC} = (1 - T_c)r_D\frac{D}{V} + r_E\frac{E}{V}$$

$$= (1 - .35)(.085)(.40) + .125(.60) = .097$$

Goldensacks Company is advising Nevada Hydro to issue $75 million of preferred stock at a dividend yield of 9%. The proceeds would be used to repurchase and retire common stock. The preferred issue would account for 10% of the preissue market value of the firm.

Goldensacks argues that these transactions would reduce Nevada Hydro's WACC to 9.4%:

$$\text{WACC} = (1 - .35)(.085)(.40) + .09(.10) + .125(.50)$$
$$= .094, \text{ or } 9.4\%$$

Do you agree with this calculation? Explain..

**23.** Chiara Company's management has made the projections shown in Table 19.5. Use this Excel spreadsheet as a starting point to value the company as a whole. The WACC for



eXcel

Visit us at
www.mhhe.com/bma

| | | Historical | | | Forecast | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Year:** | | **−2** | **−1** | **0** | **1** | **2** | **3** | **4** | **5** |
| 1. Sales | | 35,348 | 39,357 | 40,123 | 36,351 | 30,155 | 28,345 | 29,982 | 30,450 |
| 2. Cost of goods sold | | 17,834 | 18,564 | 22,879 | 21,678 | 17,560 | 16,459 | 15,631 | 14,987 |
| 3. Other costs | | 6,968 | 7,645 | 8,025 | 6,797 | 5,078 | 4,678 | 4,987 | 5,134 |
| 4. EBITDA (1–2–3) | | 10,546 | 13,148 | 9,219 | 7,876 | 7,517 | 7,208 | 9,364 | 10,329 |
| 5. Depreciation | | 5,671 | 5,745 | 5,678 | 5,890 | 5,670 | 5,908 | 6,107 | 5,908 |
| 6. EBIT (Pretax profit) (4–5) | | 4,875 | 7,403 | 3,541 | 1,986 | 1,847 | 1,300 | 3,257 | 4,421 |
| 7. Tax at 35% | | 1,706 | 2,591 | 1,239 | 695 | 646 | 455 | 1,140 | 1,547 |
| 8. Profit after tax (6–7) | | 3,169 | 4,812 | 2,302 | 1,291 | 1,201 | 845 | 2,117 | 2,874 |
| 9. Change in working capital | | 325 | 566 | 784 | −54 | −342 | −245 | 127 | 235 |
| 10. Investment (change in gross fixed assets) | | 5,235 | 6,467 | 6,547 | 7,345 | 5,398 | 5,470 | 6,420 | 6,598 |

▶ **TABLE 19.5**  Cash flow projections for Chiara Corp. ($ thousands).

Visit us at www.mhhe.com/bma

Chiara is 12% and the long-run growth rate after year 5 is 4%. The company has $5 million debt and 865,000 shares outstanding. What is the value per share?

### CHALLENGE

**24.** In Footnote 15 we referred to the Miles–Ezzell discount rate formula, which assumes that debt is not rebalanced continuously, but at one-year intervals. Derive this formula. Then use it to unlever Sangria's WACC and calculate Sangria's opportunity cost of capital. Your answer will be slightly different from the opportunity cost that we calculated in Section 19-3. Can you explain why?

**25.** The WACC formula assumes that debt is rebalanced to maintain a constant debt ratio $D/V$. Rebalancing ties the level of future interest tax shields to the future value of the company. This makes the tax shields risky. Does that mean that fixed debt levels (no rebalancing) are better for stockholders?

**26.** Modify Table 19.1 on the assumption that competition eliminates any opportunities to earn more than WACC on new investment after year 7 (PVGO = 0). How does the valuation of Rio change?

---

**REAL-TIME DATA ANALYSIS**

Table 19.6 is a simplified book balance sheet for Apache Corp. at year-end 2008. Here is some further information:

| | |
|---|---|
| Number of outstanding shares ($N$) | 335.75 million |
| Price per share ($P$) | $74.0 |
| Beta | 1.21 |
| Treasury bill rate | .11% |
| 20-year Treasury bond rate | 2.25% |
| Cost of debt ($r_D$) | 7.50 |
| Marginal tax rate | 35% |

a. Calculate Apache's WACC. Use the capital asset pricing model and the additional information given above. Make additional assumptions and approximations as necessary.

b. What is Apache's opportunity cost of capital?

c. Finally, go to the Standard & Poor's Market Insight Web site (**www.mhhe.com/edumarketinsight**) and update your answers to questions (a) and (b).


STANDARD &POOR'S

▶ **TABLE 19.6**
Simplified book balance sheet for Apache, year–end 2008 (figures in $ millions).

| | | | | |
|---|---|---|---|---|
| Current assets | 4,451 | Current liabilities | 2,615 |
| Net property, plant, and equipment | 23,959 | Long-term debt | 4,816 |
| Investments and other assets | 7,776 | Other liabilities | 5,246 |
| | | Shareholders' equity | 16,509 |
| Total | 29,186 | Total | 29,186 |

---

# APPENDIX ● ● ● ● ●

## Discounting Safe, Nominal Cash Flows

Suppose you're considering purchase of a $100,000 machine. The manufacturer sweetens the deal by offering to finance the purchase by lending you $100,000 for five years, with annual interest payments of 5%. You would have to pay 13% to borrow from a bank. Your marginal tax rate is 35% ($T_c = .35$).

How much is this loan worth? If you take it, the cash flows, in thousands of dollars, are:

| | Period | | | | | |
|---|---|---|---|---|---|---|
| | **0** | **1** | **2** | **3** | **4** | **5** |
| Cash flow | 100 | −5 | −5 | −5 | −5 | −105 |
| Tax shield | | +1.75 | +1.75 | +1.75 | +1.75 | +1.75 |
| After-tax cash flow | 100 | −3.25 | −3.25 | −3.25 | −3.25 | −103.25 |

What is the right discount rate?

Here you are discounting *safe, nominal* cash flows—safe because your company must commit to pay if it takes the loan,[27] and nominal because the payments would be fixed regardless of future inflation. Now, the correct discount rate for safe, nominal cash flows is your company's *after-tax,* unsubsidized borrowing rate,[28] which is $r_D(1 - T_c) = .13(1 - .35) = .0845$. Therefore,

$$\text{NPV} = +100 - \frac{3.25}{1.0845} - \frac{3.25}{(1.0845)^2} - \frac{3.25}{(1.0845)^3} - \frac{3.25}{(1.0845)^4} - \frac{103.25}{(1.0845)^5}$$

$$= +20.52, \text{ or } \$20,520$$

The manufacturer has effectively cut the machine's purchase price from $100,000 to $100,000 − $20,520 = $79,480. You can now go back and recalculate the machine's NPV using this fire-sale price, or you can use the NPV of the subsidized loan as one element of the machine's adjusted present value.

**A General Rule**   Clearly, we owe an explanation of why $r_D(1 - T_c)$ is the right discount rate for safe, nominal cash flows. It's no surprise that the rate depends on $r_D$, the unsubsidized borrowing rate, for that is investors' opportunity cost of capital, the rate they would demand from your company's debt. But why should $r_D$ be converted to an *after-tax* figure?

Let's simplify by taking a *one-year* subsidized loan of $100,000 at 5%. The cash flows, in thousands of dollars, are:

| | Period 0 | Period 1 |
|---|---|---|
| Cash flow | 100 | −105 |
| Tax shield | | +1.75 |
| After-tax cash flow | 100 | −103.25 |

Now ask, What is the maximum amount $X$ that could be borrowed for one year through regular channels if $103,250 is set aside to service the loan?

"Regular channels" means borrowing at 13% pretax and 8.45% after tax. Therefore you will need 108.45% of the amount borrowed to pay back principal plus after-tax interest charges. If $1.0845X = 103,250$, then $X = 95,205$. Now if you can borrow $100,000 by a subsidized loan, but only $95,205 through normal channels, the difference ($4,795) is money in the bank. Therefore, it must also be the NPV of this one-period subsidized loan.

When you discount a safe, nominal cash flow at an after-tax borrowing rate, you are implicitly calculating the *equivalent loan,* the amount you could borrow through normal channels, using the cash flow as debt service. Note that:

$$\text{Equivalent loan} = \text{PV(cash flow available for debt service)} = \frac{103,250}{1.0845} = 95,205$$

---

[27] In theory, *safe* means literally "risk-free," like the cash returns on a Treasury bond. In practice, it means that the risk of not paying or receiving a cash flow is small.

[28] In Section 13-1 we calculated the NPV of subsidized financing using the *pretax* borrowing rate. Now you can see that was a mistake. Using the pretax rate implicitly defines the loan in terms of its pretax cash flows, violating a rule promulgated way back in Section 6-1: *Always* estimate cash flows on an after-tax basis.

Visit us at www.mhhe.com/bma

In some cases, it may be easier to think of taking the lender's side of the equivalent loan rather than the borrower's. For example, you could ask, How much would my company have to invest today to cover next year's debt service on the subsidized loan? The answer is $95,205: If you lend that amount at 13%, you will earn 8.45% after tax, and therefore have 95,205(1.0845) = $103,250. By this transaction, you can in effect cancel, or "zero out," the future obligation. If you can borrow $100,000 and then set aside only $95,205 to cover all the required debt service, you clearly have $4,795 to spend as you please. That amount is the NPV of the subsidized loan.

Therefore, regardless of whether it's easier to think of borrowing or lending, the correct discount rate for safe, nominal cash flows is an after-tax interest rate.[29]

In some ways, this is an obvious result once you think about it. Companies are free to borrow or lend money. If they *lend,* they receive the after-tax interest rate on their investment; if they *borrow* in the capital market, they pay the after-tax interest rate. Thus, the opportunity cost to companies of investing in debt-equivalent cash flows is the after-tax interest rate. This is the adjusted cost of capital for debt-equivalent cash flows.[30]

**Some Further Examples**   Here are some further examples of debt-equivalent cash flows.

**Payout Fixed by Contract**   Suppose you sign a maintenance contract with a truck leasing firm, which agrees to keep your leased trucks in good working order for the next two years in exchange for 24 fixed monthly payments. These payments are debt-equivalent flows.

**Depreciation Tax Shields**   Capital projects are normally valued by discounting the total after-tax cash flows they are expected to generate. Depreciation tax shields contribute to project cash flow, but they are not valued separately; they are just folded into project cash flows along with dozens, or hundreds, of other specific inflows and outflows. The project's opportunity cost of capital reflects the average risk of the resulting aggregate.

However, suppose we ask what depreciation tax shields are worth *by themselves*. For a firm that's sure to pay taxes, depreciation tax shields are a safe, nominal flow. Therefore, they should be discounted at the firm's after-tax borrowing rate.

Suppose we buy an asset with a depreciable basis of $200,000, which can be depreciated by the five-year tax depreciation schedule (see Table 6.4). The resulting tax shields are:

| | **Period** | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Percentage deductions | 20 | 32 | 19.2 | 11.5 | 11.5 | 5.8 |
| Dollar deductions (thousands) | $40 | $64 | $38.4 | $23 | $23 | $11.6 |
| Tax shields at $T_c = .35$ (thousands) | $14 | $22.4 | $13.4 | $8.1 | $8.1 | $4.0 |

The after-tax discount rate is $r_D(1 - T_c) = .13(1 - .35) = .0845$. (We continue to assume a 13% pretax borrowing rate and a 35% marginal tax rate.) The present value of these shields is:

$$PV = \frac{14}{1.0845} + \frac{22.4}{(1.0845)^2} + \frac{13.4}{(1.0845)^3} + \frac{8.1}{(1.0845)^4} + \frac{8.1}{(1.0845)^5} + \frac{4.0}{(1.0845)^6}$$

$$= +56.2, \text{ or } \$56,200$$

[29] Borrowing and lending rates should not differ by much if the cash flows are truly safe, that is, if the chance of default is small. Usually your decision will not hinge on the rate used. If it does, ask which offsetting transaction—borrowing or lending—seems most natural and reasonable for the problem at hand. Then use the corresponding interest rate.

[30] All the examples in this section are forward-looking; they call for the value today of a stream of future debt-equivalent cash flows. But similar issues arise in legal and contractual disputes when a *past* cash flow has to be brought forward in time to a present value today. Suppose it's determined that company A should have paid B $1 million 10 years ago. B clearly deserves more than $1 million today, because it has lost the time value of money. The time value of money should be expressed as an after-tax borrowing or lending rate, or if no risk enters, as the after-tax risk-free rate. The time value of money is *not* equal to B's overall cost of capital. Allowing B to "earn" its overall cost of capital on the payment allows it to earn a risk premium without bearing risk. For a broader discussion of these issues, see F. Fisher and C. Romaine, "Janis Joplin's Yearbook and Theory of Damages," *Journal of Accounting, Auditing & Finance* 5 (Winter/Spring 1990), pp. 145–157.

Visit us at www.mhhe.com/bma

**A Consistency Check** You may have wondered whether our procedure for valuing debt-equivalent cash flows is consistent with the WACC and APV approaches presented earlier in this chapter. Yes, it is consistent, as we will now illustrate.

Let's look at another very simple numerical example. You are asked to value a $1 million payment to be received from a blue-chip company one year hence. After taxes at 35%, the cash inflow is $650,000. The payment is fixed by contract.

Since the contract generates a debt-equivalent flow, the opportunity cost of capital is the rate investors would demand on a one-year note issued by the blue-chip company, which happens to be 8%. For simplicity, we'll assume this is your company's borrowing rate too. Our valuation rule for debt-equivalent flows is therefore to discount at $r_D(1 - T_c) = .08(1 - .35) = .052$:

$$PV = \frac{650,000}{1.052} = \$617,900$$

What is the *debt capacity* of this $650,000 payment? Exactly $617,900. Your company could borrow that amount and pay off the loan completely—principal and after-tax interest—with the $650,000 cash inflow. The debt capacity is 100% of the PV of the debt-equivalent cash flow.

If you think of it that way, our discount rate $r_D(1 - T_c)$ is just a special case of WACC with a 100% debt ratio ($D/V = 1$).

$$WACC = r_D(1 - T_c)D/V + r_E E/V$$
$$= r_D(1 - T_c) \text{ if } D/V = 1 \text{ and } E/V = 0$$

Now let's try an APV calculation. This is a two-part valuation. First, the $650,000 inflow is discounted at the opportunity cost of capital, 8%. Second, we add the present value of interest tax shields on debt supported by the project. Since the firm can borrow 100% of the cash flow's value, the tax shield is $r_D T_c$ APV, and APV is:

$$APV = \frac{650,000}{1.08} + \frac{.08(.35)APV}{1.08}$$

Solving for APV, we get $617,900, the same answer we obtained by discounting at the after-tax borrowing rate. Thus our valuation rule for debt-equivalent flows is a special case of APV.

## QUESTIONS

1. The U.S. government has settled a dispute with your company for $16 million. It is committed to pay this amount in exactly 12 months. However, your company will have to pay tax on the award at a marginal tax rate of 35%. What is the award worth? The one-year Treasury rate is 5.5%.

2. You are considering a five-year lease of office space for R&D personnel. Once signed, the lease cannot be canceled. It would commit your firm to six annual $100,000 payments, with the first payment due immediately. What is the present value of the lease if your company's borrowing rate is 9% and its tax rate is 35%? (*Note:* The lease payments would be tax-deductible.)

# Understanding Options

▶ **Pop quiz: What** do the following events have in common?

- The coffee roaster, Green Mountain, buys options that put a ceiling on the price that it will pay for its future purchases of beans.
- Flatiron offers its president a bonus if the company's stock price exceeds $120.
- Blitzen Computer dips a toe in the water and enters a new market.
- Malted Herring postpones investment in a positive-NPV plant.
- Hewlett-Packard exports partially assembled printers even though it would be cheaper to ship the finished product.
- Dominion installs a dual-fired unit at its Possum Point power station that can use either fuel oil or natural gas.
- In 2004 Air France acquires the Dutch airline, KLM, in exchange for a package of Air France shares and warrants. The warrants entitle KLM's shareholders to buy additional Air France shares for €20 each within then next 3.5 years.
- In February 2008 Chiquita Brands issues $200 million of 4.25% convertible bonds maturing in 2016. Each bond can be exchanged for 44.55 shares at any time before maturity.

Answers: (1) Each of these events involves an option, and (2) they illustrate why the financial manager of an industrial company needs to understand options.

Companies regularly use commodity, currency, and interest-rate options to reduce risk. For example, a meatpacking company that wishes to put a ceiling on the cost of beef might take out an option to buy live cattle at a fixed price. A company that wishes to limit its future borrowing costs might take out an option to sell long-term bonds at a fixed price. And so on. In Chapter 26 we explain how firms employ options to limit their risk.

Many capital investments include an embedded option to expand in the future. For instance, the company may invest in a patent that allows it to exploit a new technology or it may purchase adjoining land that gives it the option in the future to increase capacity. In each case the company is paying money today for the opportunity to make a further investment. To put it another way, the company is acquiring *growth opportunities.*

Here is another disguised option to invest: You are considering the purchase of a tract of desert land that is known to contain gold deposits. Unfortunately, the cost of extraction is higher than the current price of gold. Does this mean the land is almost worthless? Not at all. You are not obliged to mine the gold, but ownership of the land gives you the option to do so. Of course, if you know that the gold price will remain below the extraction cost, then the option is worthless. But if there is uncertainty about future gold prices, you could be lucky and make a killing.[1]

If the option to expand has value, what about the option to bail out? Projects don't usually go on until the equipment disintegrates. The decision to terminate a project is usually taken by management, not by nature.

---

[1] In Chapter 11 we valued Kingsley Solomon's gold mine by calculating the value of the gold in the ground and then subtracting the value of the extraction costs. That is correct only if we *know* that the gold will be mined. Otherwise, the value of the mine is increased by the value of the option to leave the gold in the ground if its price is less than the extraction cost.

Once the project is no longer profitable, the company will cut its losses and exercise its option to abandon the project. Some projects have higher abandonment value than others. Those that use standardized equipment may offer a valuable abandonment option. Others may actually cost money to discontinue. For example, it is very costly to decommission an offshore oil platform.

We took a peek at investment options in Chapter 10, and we showed there how to use decision trees to analyze a pharmaceutical company's options to discontinue trials of a new drug. In Chapter 22 we take a more thorough look at these *real* options.

The other important reason why financial managers need to understand options is that they are often tacked on to an issue of corporate securities and so provide the investor or the company with the flexibility to change the terms of the issue. For example, in Chapter 24 we show how warrants or convertibles give their holders an option to buy common stock in exchange for cash or bonds.

In fact, we see in Chapter 23 that whenever a company borrows, it gains an option to walk away from its debts and surrender its assets to the bondholders. If the value of the company's assets is less than the amount of the debt, the company will choose to default on the payment and the bondholders will get to keep the company's assets. Thus, when the firm borrows, the lender effectively acquires the company and the shareholders obtain the option to buy it back by paying off the debt. This is an extremely important insight. It means that anything that we can learn about traded options applies equally to corporate liabilities.

In this chapter we use traded stock options to explain how options work, but we hope that our brief survey has convinced you that the interest of financial managers in options goes far beyond traded stock options. That is why we are asking you to invest here to acquire several important ideas for use later.

If you are unfamiliar with the wonderful world of options, it may seem baffling on first encounter. We therefore divide this chapter into three bite-sized pieces. Our first task is to introduce you to call and put options and to show you how the payoff on these options depends on the price of the underlying asset. We then show how financial alchemists can combine options to produce a variety of interesting strategies.

We conclude the chapter by identifying the variables that determine option values. There you encounter some surprising and counterintuitive effects. For example, investors are used to thinking that increased risk reduces present value. But for options it is the other way around.

● ● ● ● ●

## 20-1 Calls, Puts, and Shares

Investors regularly trade options on common stocks.[2] For example, Table 20.1 reproduces quotes for options on the stock of Google. You can see that there are two types of option— calls and puts. We explain each in turn.

### Call Options and Position Diagrams

A **call option** gives its owner the right to buy stock at a specified *exercise* or *strike price* on or before a specified maturity date. If the option can be exercised only at maturity, it is conventionally known as a *European call;* in other cases (such as the Google options shown in Table 20.1), the option can be exercised on or at any time before maturity, and it is then known as an *American call.*

The third column of Table 20.1 sets out the prices of Google call options with different exercise prices and exercise dates. Look at the quotes for options maturing in

---

[2] The two principal options exchanges in the United States are the International Securities Exchange (ISE) and the Chicago Board Options Exchange (CBOE).

◗ **TABLE 20.1**
Selected prices of
put and call options
on Google stock in
September 2008, when
the closing stock price
was $430.

*Long-term options are
called "LEAPS."
*Source:* Yahoo! Finance,
**http://finance.yahoo.com**.
Reproduced with permission
of Yahoo! Inc. © 2008 by
Yahoo! Inc. Yahoo! and
the Yahoo! logo are
trademarks of Yahoo! Inc.

| Maturity Date | Exercise Price | Price of Call Option | Price of Put Option |
|---|---|---|---|
| December 2008 | $370 | $ 78.90 | $16.45 |
|  | 400 | 58.65 | 26.10 |
|  | 430 | 41.75 | 38.90 |
|  | 460 | 28.05 | 55.45 |
|  | 490 | 17.85 | 75.45 |
| March 2009 | $370 | $ 90.20 | $25.05 |
|  | 400 | 70.80 | 35.65 |
|  | **430** | **54.35** | **48.55** |
|  | 460 | 39.85 | 64.10 |
|  | 490 | 28.75 | 83.20 |
| January 2010* | $370 | $116.90 | $42.55 |
|  | 400 | 100.00 | 54.75 |
|  | 430 | 85.05 | 69.85 |
|  | 460 | 71.60 | 86.00 |
|  | 490 | 59.90 | 103.70 |

December 2008. The first entry says that for $78.90 you could acquire an option to buy one share[3] of Google stock for $370 on or before December 2008. Moving down to the next row, you can see that an option to buy for $30 more ($400 vs. $370) costs $20.25 less, that is $58.65. In general, the value of a call option goes down as the exercise price goes up.

Now look at the quotes for options maturing in March 2009 and January 2010. Notice how the option price increases as option maturity is extended. For example, at an exercise price of $430, the December 2008 call option costs $41.75, the March 2009 option costs $54.35, and the January 2010 option costs $85.05.

In Chapter 13 we met Louis Bachelier, who in 1900 first suggested that security prices follow a random walk. Bachelier also devised a very convenient shorthand to illustrate the effects of investing in different options. We use this shorthand to compare a call option and a put option on Google stock.

The *position diagram* in Figure 20.1(*a*) shows the possible consequences of investing in Google March 2009 call options with an exercise price of $430 (boldfaced in Table 20.1). The outcome from investing in Google calls depends on what happens to the stock price. If the stock price at the end of this six-month period turns out to be less than the $430 exercise price, nobody will pay $430 to obtain the share via the call option. Your call will in that case be valueless, and you will throw it away. On the other hand, if the stock price turns out to be greater than $430, it will pay to exercise your option to buy the share. In this case, when the call expires, it will be worth the market price of the share minus the $430 that you must pay to acquire it. For example, suppose that the price of Google stock rises to $500. Your call will then be worth $500 − $430 = $70. That is your payoff, but of course it is not all profit. Table 20.1 shows that you had to pay $54.35 to buy the call.

---

[3] You can't actually buy an option on a single share. Trades are in multiples of 100. The minimum order would be for 100 options on 100 Google shares.



▶ **FIGURE 20.1**

Position diagrams show how payoffs to owners of Google calls and puts (shown by the colored lines) depend on the share price. (*a*) Result of buying Google call exercisable at $430. (*b*) Result of buying Google put exercisable at $430.

## Put Options

Now let us look at the Google **put options** in the right-hand column of Table 20.1. Whereas a call option gives you the right to *buy* a share for a specified exercise price, a put gives you the right to *sell* the share. For example, the boldfaced entry in the right-hand column of Table 20.1 shows that for $48.55 you could acquire an option to sell Google stock for a price of $430 anytime before March 2009. The circumstances in which the put turns out to be profitable are just the opposite of those in which the call is profitable. You can see this from the position diagram in Figure 20.1(*b*). If Google's share price immediately before expiration turns out to be *greater* than $430, you won't want to sell stock at that price. You would do better to sell the share in the market, and your put option will be worthless. Conversely, if the share price turns out to be *less* than $430, it will pay to buy stock at the low price and then take advantage of the option to sell it for $430. In this case, the value of the put option on the exercise date is the difference between the $430 proceeds of the sale and the market price of the share. For example, if the share is worth $340, the put is worth $90:

$$\text{Value of put option at expiration} = \text{exercise price} - \text{market price of the share}$$
$$= \$430 - \$340 = \$90$$

## Selling Calls, Puts, and Shares

Let us now look at the position of an investor who *sells* these investments. If you sell, or "write," a call, you promise to deliver shares if asked to do so by the call buyer. In other words, the buyer's asset is the seller's liability. If the share price is below the exercise price when the option matures, the buyer will not exercise the call and the seller's liability will be zero. If it rises above the exercise price, the buyer will exercise and the seller must give up the shares. The seller loses the difference between the share price and the exercise price received from the buyer. Notice that it is the buyer who always has the option to exercise; option sellers simply do as they are told.



> ▶ **FIGURE 20.2**
>
> Payoffs to *sellers* of Google calls and puts (shown by the colored lines) depend on the share price. (*a*) Result of selling Google call exercisable at $430. (*b*) Result of selling Google put exercisable at $430.

Suppose that the price of Google stock turns out to be $500, which is above the option's exercise price of $430. In this case the buyer will exercise the call. The seller is forced to sell stock worth $500 for only $430 and so has a payoff of −$70.[4] Of course, that $70 loss is the buyer's gain. Figure 20.2(*a*) shows how the payoffs to the seller of the Google call option vary with the stock price. Notice that for every dollar the buyer makes, the seller loses a dollar. Figure 20.2(*a*) is just Figure 20.1(*a*) drawn upside down.

In just the same way we can depict the position of an investor who sells, or writes, a put by standing Figure 20.1(*b*) on its head. The seller of the put has agreed to pay $430 for the share if the buyer of the put should request it. Clearly the seller will be safe as long as the share price remains above $430 but will lose money if the share price falls below this figure. The worst thing that can happen is that the stock becomes worthless. The seller would then be obliged to pay $430 for a stock worth $0. The payoff to the option position would be −$430.

### Position Diagrams Are Not Profit Diagrams

Position diagrams show *only* the payoffs at option exercise; they do not account for the initial cost of buying the option or the initial proceeds from selling it.

This is a common point of confusion. For example, the position diagram in Figure 20.1(*a*) makes purchase of a call *look* like a sure thing—the payoff is at worst zero, with plenty of upside if Google's stock price goes above $430 by March 2009. But compare the *profit diagram* in Figure 20.3(*a*), which subtracts the $54.35 *cost* of the call in September 2008 from the payoff at maturity. The call buyer loses money at all share prices less than $430 + 54.35 = $484.35. Take another example: The position diagram in Figure 20.2(*b*) makes selling a put *look* like a sure loss—the *best* payoff is zero. But the profit diagram in Figure 20.3(*b*), which recognizes the $48.55 received by the seller, shows that the seller gains at all prices above $430 − 48.55 = $381.45.[5]

---

[4] The seller has some consolation, for he or she was paid $54.35 in September for selling the call.

[5] The fact that you have made a profit on your position is not necessarily a cause for rejoicing. The profit needs to compensate you for the time value of money and the risk that you took.



**FIGURE 20.3**

Profit diagrams incorporate the costs of buying an option or the proceeds from selling one. In panel (*a*), we subtract the $54.35 cost of the Google call from the payoffs plotted in Figure 20.1(*a*). In panel (*b*), we add the $48.55 proceeds from selling the Google put to the payoffs in Figure 20.2(*b*).

Profit diagrams like those in Figure 20.3 may be helpful to the options beginner, but options experts rarely draw them.[6] Now that you've graduated from the first options class we won't draw them either. We stick to position diagrams, because you have to focus on payoffs at exercise to understand options and to value them properly.

## 20-2 Financial Alchemy with Options

Look now at Figure 20.4(*a*), which shows the payoff if you buy Google stock at $430. You gain dollar-for-dollar if the stock price goes up and you lose dollar-for-dollar if it falls. That's trite; it doesn't take a genius to draw a 45-degree line.

Look now at panel (*b*), which shows the payoffs from an investment strategy that retains the upside potential of Google stock but gives complete downside protection. In this case your payoff stays at $430 even if the Google stock price falls to $400, $100, or zero. Panel (*b*)'s payoffs are clearly better than panel (*a*)'s. If a financial alchemist could turn panel (*a*) into panel (*b*), you'd be willing to pay for the service.

Of course alchemy has its dark side. Panel (*c*) shows an investment strategy for masochists. You lose if the stock price falls, but you give up any chance of profiting from a rise in the stock price. If you *like* to lose, or if someone pays you enough to take the strategy on, this is the investment for you.

Now, as you have probably suspected, all this financial alchemy is for real. You can do both the transmutations shown in Figure 20.4. You do them with options, and we will show you how.

Consider first the strategy for masochists. The first diagram in Figure 20.5 shows the payoffs from buying a share of Google stock, while the second shows the payoffs from *selling* a call option with a $430 exercise price. The third diagram shows what happens if you combine these two positions. The result is the no-win strategy that we depicted in panel

---

[6] Profit diagrams such as Figure 20.3 deduct the initial cost of the option from the final payoff. They therefore ignore the first lesson of finance—"A dollar today is worth more than a dollar in the future."



> **FIGURE 20.4**

Payoffs at the end of six months to three investment strategies for Google stock. (*a*) You buy one share for $430. (*b*) No downside. If stock price falls, your payoff stays at $430. (*c*) A strategy for masochists? You lose if stock price falls, but you don't gain if it rises.

(*c*) of Figure 20.4. You lose if the stock price declines below $430, but, if the stock price rises above $430, the owner of the call will demand that you hand over your stock for the $430 exercise price. So you lose on the downside and give up any chance of a profit. That's the bad news. The good news is that you get paid for taking on this liability. In September 2009 you would have been paid $54.35, the price of a six-month call option.

Now, we'll create the downside protection shown in Figure 20.4(*b*). Look at row 1 of Figure 20.6. The first diagram again shows the payoff from buying a share of Google stock, while the next diagram in row 1 shows the payoffs from buying a Google put option with an exercise price of $430. The third diagram shows the effect of combining these two positions. You can see that, if Google's stock price rises above $430, your put option is valueless, so you simply receive the gains from your investment in the share. However, if the stock price falls below $430, you can exercise your put option and sell your stock for $430. Thus, by adding a put option to your investment in the stock, you have protected yourself against loss.[7] This is the strategy that we depicted in panel (*b*) of Figure 20.4. Of course,

---

[7] This combination of a stock and a put option is known as a *protective put*.



▶ **FIGURE 20.5**

You can use options to create a strategy where you lose if the stock price falls but do not gain if it rises (strategy [*c*] in Figure 20.4).

there is no gain without pain. The *cost* of insuring yourself against loss is the amount that you pay for a put option on Google stock with an exercise price of $430. In September 2008 the price of this put was $48.55. This was the going rate for financial alchemists.

We have just seen how put options can be used to provide downside protection. We now show you how call options can be used to get the same result. This is illustrated in row 2 of Figure 20.6. The first diagram shows the payoff from placing the present value of $430 in a bank deposit. Regardless of what happens to the price of Google stock, your bank deposit will pay off $430. The second diagram in row 2 shows the payoff from a call option on Google stock with an exercise price of $430, and the third diagram shows the effect of combining these two positions. Notice that, if the price of Google stock falls, your call is worthless, but you still have your $430 in the bank. For every dollar that Google stock price rises above $430, your investment in the call option pays off an extra dollar. For example, if the stock price rises to $500, you will have $430 in the bank and a call worth $70. Thus you participate fully in any rise in the price of the stock, while being fully protected against any fall. So we have just found another way to provide the downside protection depicted in panel (*b*) of Figure 20.4.

These two rows of Figure 20.6 tell us something about the relationship between a call option and a put option. Regardless of the future stock price, both investment strategies provide identical payoffs. In other words, if you buy the share and a put option to sell it for $430, you receive the same payoff as from buying a call option and setting enough money aside to pay the $430 exercise price. Therefore, if you are committed to holding the two packages until the options expire, the two packages should sell for the same price today. This gives us a fundamental relationship for European options:

Value of call + present value of exercise price = value of put + share price

To repeat, this relationship holds because the payoff of

Buy call, invest present value of exercise price in safe asset[8]

is identical to the payoff from

Buy put, buy share

---

[8] The present value is calculated at the *risk-free* rate of interest. It is the amount that you would have to invest today in a bank deposit or Treasury bills to realize the exercise price on the option's expiration date.



▶ **FIGURE 20.6**
Each row in the figure shows a different way to create a strategy where you gain if the stock price rises but are protected on the downside (strategy [b] in Figure 20.4).

This basic relationship among share price, call and put values, and the present value of the exercise price is called **put–call parity.**[9]

Put–call parity can be expressed in several ways. Each expression implies two investment strategies that give identical results. For example, suppose that you want to solve for the value of a put. You simply need to twist the put–call parity formula around to give

Value of put = value of call + present value of exercise price − share price

From this expression you can deduce that

Buy put

is identical to

Buy call, invest present value of exercise price in safe asset, sell share

In other words, if puts are not available, you can get exactly the same payoff by buying calls, putting cash in the bank, and selling shares.

---

[9] Put–call parity holds only if you are committed to holding the options until the final exercise date. It therefore does not hold for American options, which you can exercise *before* the final date. We discuss possible reasons for early exercise in Chapter 21. Also if the stock makes a dividend payment before the final exercise date, you need to recognize that the investor who buys the call misses out on this dividend. In this case the relationship is

Value of call + present value of exercise price = value of put + share price − present value of dividend



▶ **FIGURE 20.7**

A strategy of buying a call, depositing the present value of the exercise price in the bank, and selling the stock is equivalent to buying a put.

If you find this difficult to believe, look at Figure 20.7, which shows the possible payoffs from each position. The diagram on the left shows the payoffs from a call option on Google stock with an exercise price of $430. The second diagram shows the payoffs from placing the present value of $430 in the bank. Regardless of what happens to the share price, this investment will pay off $430. The third diagram shows the payoffs from selling Google stock. When you sell a share that you don't own, you have a liability—you must sometime buy it back. As they say on Wall Street:

He who sells what isn't his'n

Buys it back or goes to pris'n

Therefore the best that can happen to you is that the share price falls to zero. In that case it costs you nothing to buy the share back. But for every extra dollar on the future share price, you will need to spend an extra dollar to buy the share. The final diagram in Figure 20.7 shows that the *total* payoff from these three positions is the same as if you had bought a put option. For example, suppose that when the option matures the stock price is $400. Your call will be worthless, your bank deposit will be worth $430, and it will cost you $400 to repurchase the share. Your total payoff is $0 + 430 − 400 = $30$, exactly the same as the payoff from the put.

If two investments offer identical payoffs, then they should sell for the same price today. If the law of one price is violated, you have a potential arbitrage opportunity. So let's check whether there are any arbitrage profits to be made from our Google calls and puts. In September 2008 the price of a six-month call with a $430 exercise price was $54.35, the interest rate was about 3%, and the price of Google stock was $430. Therefore the cost of a homemade put was:

Buy call + present value of exercise price − share price = cost of homemade put

$$54.35 \quad + \quad 430/1.03^{.5} \quad - \quad 430 \quad = \quad 48.04$$

This is almost exactly the same as it would have cost you to buy a put directly.

◗ **FIGURE 20.8**

The payoff from one of
Ms. Higden's "tickets"
depends on Flatiron's
stock price.



◗ **FIGURE 20.9**

The solid black line shows
the payoff from buying a
call with an exercise price
of $120. The dotted line
shows the sale of a call
with an exercise price of
$160. The combined pur-
chase and sale (shown by
the colored line) is identi-
cal to one of Ms. Higden's
"tickets."



### Spotting the Option

Options rarely come with a large label attached. Often the trickiest part of the problem is
to identify the option. When you are not sure whether you are dealing with a put or a call
or a complicated blend of the two, it is a good precaution to draw a position diagram. Here
is an example.

The Flatiron and Mangle Corporation has offered its president, Ms. Higden, the follow-
ing incentive scheme: At the end of the year Ms. Higden will be paid a bonus of $50,000
for every dollar that the price of Flatiron stock exceeds its current figure of $120. However,
the maximum bonus that she can receive is set at $2 million.

You can think of Ms. Higden as owning 50,000 tickets, each of which pays nothing if
the stock price fails to beat $120. The value of each ticket then rises by $1 for each dollar
rise in the stock price up to the maximum of $2,000,000/50,000 = $40. Figure 20.8 shows
the payoffs from just one of these tickets. The payoffs are not the same as those of the
simple put and call options that we drew in Figure 20.1, but it is possible to find a combi-
nation of options that exactly replicates Figure 20.8. Before going on to read the answer,
see if you can spot it yourself. (If you are someone who enjoys puzzles of the make-a-
triangle-from-just-two-matchsticks type, this one should be a walkover.)

The answer is in Figure 20.9. The solid black line represents the purchase of a call option
with an exercise price of $120, and the dotted line shows the sale of another call option with

an exercise price of $160. The colored line shows the payoffs from a combination of the purchase and the sale—exactly the same as the payoffs from one of Ms. Higden's tickets.

Thus, if we wish to know how much the incentive scheme is costing the company, we need to calculate the difference between the value of 50,000 call options with an exercise price of $120 and the value of 50,000 calls with an exercise price of $160.

We could have made the incentive scheme depend in a much more complicated way on the stock price. For example, the bonus could peak at $2 million and then fall steadily back to zero as the stock price climbs above $160.[10] You could still have represented this scheme as a combination of options. In fact, we can state a general theorem:

> Any set of contingent payoffs—that is, payoffs that depend on the value of some other asset—can be constructed with a mixture of simple options on that asset.

In other words, you can create any position diagram—with as many ups and downs or peaks and valleys as your imagination allows—by buying or selling the right combinations of puts and calls with different exercise prices.[11]

Finance pros often talk about **financial engineering,** which is the practice of packaging different investments to create new tailor-made instruments. Perhaps a German company would like to set a minimum and maximum cost at which it can buy dollars in six-months' time. Or perhaps an oil company would like to pay a lower rate of interest on its debt if the price of oil falls. Options provide the building blocks that financial engineers use to create these interesting payoff structures.

## 20-3 What Determines Option Values?

So far we have said nothing about how the market value of an option is determined. We do know what an option is worth when it matures, however. Consider, for instance, our earlier example of an option to buy Google stock at $430. If Google's stock price is below $430 on the exercise date, the call will be worthless; if the stock price is above $430, the call will be worth $430 less than the value of the stock. This relationship is depicted by the heavy, lower line in Figure 20.10.

Even before maturity the price of the option can never remain *below* the heavy, lower-bound line in Figure 20.10. For example, if our option were priced at $10 and the stock were priced at $460, it would pay any investor to sell the stock and then buy it back by purchasing the option and exercising it for an additional $430. That would give an arbitrage opportunity with a profit of $20. The demand for options from investors seeking to exploit this opportunity would quickly force the option price up, at least to the heavy line in the figure. For options that still have some time to run, the heavy line is therefore a *lower bound* on the market price of the option. Option geeks express the same idea more concisely when they write Lower Bound = Max(stock price − exercise price, 0).

The diagonal line in Figure 20.10 is the *upper bound* to the option price. Why? Because the option cannot give a higher ultimate payoff than the stock. If at the option's expiration the stock price ends up *above* the exercise price, the option is worth the stock price *less* the exercise price.

---

[10] This is not as nutty a bonus scheme as it may sound. Maybe Ms. Higden's hard work can lift the value of the stock by so much and the only way she can hope to increase it further is by taking on extra risk. You can deter her from doing this by making her bonus start to decline beyond some point. Too bad that the bonus schemes for some bank CEOs did not contain this feature.

[11] In some cases you may also have to borrow or lend money to generate a position diagram with your desired pattern. Lending raises the payoff line in position diagrams, as in the bottom row of Figure 20.6. Borrowing lowers the payoff line.

**FIGURE 20.10**

Value of a call before its expiration date (dashed line). The value depends on the stock price. It is always worth more than its value if exercised now (heavy line). It is never worth more than the stock price itself.



If the stock price ends up *below* the exercise price, the option is worthless, but the stock's owner still has a valuable security. For example, if the option's exercise price is $430, then the extra dollar returns realized by stockholders are shown in the following table:

|  | Stock Payoff | Option Payoff | Extra Payoff from Holding Stock Instead of Option |
|---|---|---|---|
| Option exercised (stock price greater than $430) | Stock price | Stock price −430 | $430 |
| Option expires unexercised (stock price less than or equal to $430) | Stock price | 0 | Stock price |

If the stock and the option have the same price, everyone will rush to sell the option and buy the stock. Therefore, the option price must be somewhere in the shaded region of Figure 20.10. In fact, it will lie on a curved, upward-sloping line like the dashed curve shown in the figure. This line begins its travels where the upper and lower bounds meet (at zero). Then it rises, gradually becoming parallel to the upward-sloping part of the lower bound.

But let us look more carefully at the shape and location of the dashed line. Three points, *A, B,* and *C,* are marked on the dashed line. As we explain each point you will see why the option price has to behave as the dashed line predicts.

**Point *A*** *When the stock is worthless, the option is worthless.* A stock price of zero means that there is no possibility the stock will ever have any future value.[12] If so, the option is sure to expire unexercised and worthless, and it is worthless today.

That brings us to our first important point about option value:

*The value of an option increases as stock price increases, if the exercise price is held constant.*

That should be no surprise. Owners of call options clearly hope for the stock price to rise and are happy when it does.

**Point *B*** *When the stock price becomes large, the option price approaches the stock price less the present value of the exercise price.* Notice that the dashed line representing the option price

---

[12] If a stock *can* be worth something in the future, then investors will pay *something* for it today, although possibly a very small amount.

in Figure 20.10 eventually becomes parallel to the ascending heavy line representing the lower bound on the option price. The reason is as follows: The higher the stock price, the higher is the probability that the option will eventually be exercised. If the stock price is high enough, exercise becomes a virtual certainty; the probability that the stock price will fall below the exercise price before the option expires becomes trivially small.

If you own an option that you *know* will be exchanged for a share of stock, you effectively own the stock now. The only difference is that you don't have to pay for the stock (by handing over the exercise price) until later, when formal exercise occurs. In these circumstances, buying the call is equivalent to buying the stock but financing part of the purchase by borrowing. The amount implicitly borrowed is the present value of the exercise price. The value of the call is therefore equal to the stock price less the present value of the exercise price.

This brings us to another important point about options. Investors who acquire stock by way of a call option are buying on credit. They pay the purchase price of the option today, but they do not pay the exercise price until they actually take up the option. The delay in payment is particularly valuable if interest rates are high and the option has a long maturity.

*Thus, the value of an option increases with both the rate of interest and the time to maturity.*

**Point C** *The option price always exceeds its minimum value* (except when stock price is zero). We have seen that the dashed and heavy lines in Figure 20.10 coincide when stock price is zero (point *A*), but elsewhere the lines diverge; that is, the option price must exceed the minimum value given by the heavy line. The reason for this can be understood by examining point *C*.

At point *C,* the stock price exactly equals the exercise price. The option is therefore worthless if exercised today. However, suppose that the option will not expire until three months hence. Of course we do not know what the stock price will be at the expiration date. There is roughly a 50% chance that it will be higher than the exercise price and a 50% chance that it will be lower. The possible payoffs to the option are therefore:

| Outcome | Payoff |
| --- | --- |
| Stock price rises (50% probability) | Stock price less exercise price (option is exercised) |
| Stock price falls (50% probability) | Zero (option expires worthless) |

If there is a positive probability of a positive payoff, and if the worst payoff is zero, then the option must be valuable. That means the option price at point *C* exceeds its lower bound, which at point *C* is zero. In general, the option prices will exceed their lower-bound values as long as there is time left before expiration.

One of the most important determinants of the *height* of the dashed curve (i.e., of the difference between actual and lower-bound value) is the likelihood of substantial movements in the stock price. An option on a stock whose price is unlikely to change by more than 1% or 2% is not worth much; an option on a stock whose price may halve or double is very valuable.

As an option holder, you gain from volatility because the payoffs are not symmetric. If the stock price falls *below* the exercise price, your call option will be worthless, regardless of whether the shortfall is a few cents or many dollars. On the other hand, for every dollar that the stock price rises *above* the exercise price, your call will be worth an extra dollar. Therefore, the option holder gains from the increased volatility on the upside, but does not lose on the downside.

A simple example may help to illustrate the point. Consider two stocks, X and Y, each of which is priced at $100. The only difference is that the outlook for Y is much less easy



◗ **FIGURE 20.11**

Call options on the shares of (*a*) firm X and (*b*) firm Y. In each case, the current share price equals the exercise price, so each option has a 50% chance of ending up worthless (if the share price falls) and a 50% chance of ending up "in the money" (if the share price rises). However, the chance of a large payoff is greater for the option on firm Y's shares because Y's stock price is more volatile and therefore has more upside potential.

to predict. There is a 50% chance that the price of Y will rise to $150 and a similar chance that it will fall to $70. By contrast, there is a 50-50 chance that the price of X will either rise to $130 or fall to $90.

Suppose that you are offered a call option on each of these stocks with an exercise price of $100. The following table compares the possible payoffs from these options:

|  | Stock Price Falls | Stock Price Rises |
| --- | --- | --- |
| Payoff from option on X | $0 | $130 − $100 = $30 |
| Payoff from option on Y | $0 | $150 − $100 = $50 |

In both cases there is a 50% chance that the stock price will decline and make the option worthless but, if the stock price rises, the option on Y will give the larger payoff. Since the chance of a zero payoff is the same, the option on Y is worth more than the option on X.

Of course, in practice future stock prices may take on a range of different values. We have recognized this in Figure 20.11, where the uncertain outlook for Y's stock price shows up in the wider probability distribution of future prices.[13] The greater spread of outcomes

---

[13] Figure 20.11 continues to assume that the exercise price on both options is equal to the current stock price. This is not a necessary assumption. Also in drawing Figure 20.11 we have assumed that the distribution of stock prices is symmetric. This also is not a necessary assumption, and we will look more carefully at the distribution of stock prices in the next chapter.



**FIGURE 20.12**

How the value of the Google call option increases with the volatility of the stock price. Each of the curved lines shows the value of the option for different initial stock prices. The only difference is that the upper line assumes a much higher level of uncertainty about Google's future stock price.



Visit us at
www.mhhe.com/bma

for stock Y again provides more upside potential and therefore increases the chance of a large payoff on the option.

Figure 20.12 shows how volatility affects the value of an option. The upper curved line depicts the value of the Google call option assuming that Google's stock price, like that of stock Y, is highly variable. The lower curved line assumes a lower (and more realistic) degree of volatility.[14]

The probability of large stock price changes during the remaining life of an option depends on two things: (1) the variance (i.e., volatility) of the stock price *per period* and (2) the number of periods until the option expires. If there are $t$ remaining periods, and the variance per period is $\sigma^2$, the value of the option should depend on cumulative variability $\sigma^2 t$.[15] Other things equal, you would like to hold an option on a volatile stock (high $\sigma^2$). Given volatility, you would like to hold an option with a long life ahead of it (large $t$).

***Thus the value of an option increases with both the volatility of the share price and the time to maturity.***

It's a rare person who can keep all these properties straight at first reading. Therefore, we have summed them up in Table 20.2.

## Risk and Option Values

In most financial settings, risk is a bad thing; you have to be paid to bear it. Investors in risky (high-beta) stocks demand higher expected rates of return. High-risk capital investment projects have correspondingly high costs of capital and have to beat higher hurdle rates to achieve positive NPV.

---

[14] The option values shown in Figure 20.12 were calculated by using the Black-Scholes option-valuation model. We explain this model in Chapter 21 and use it to value the Google option.

[15] Here is an intuitive explanation: If the stock price follows a random walk (see Section 13-2), successive price changes are statistically independent. The cumulative price change before expiration is the sum of $t$ random variables. The variance of a sum of independent random variables is the sum of the variances of those variables. Thus, if $\sigma^2$ is the variance of the daily price change, and there are $t$ days until expiration, the variance of the cumulative price change is $\sigma^2 t$.

◗ **TABLE 20.2**

What the price of a call option depends on.

*The direct effect of increases in $r_f$ or $\sigma$ on option price, *given* the stock price. There may also be *indirect* effects. For example, an increase in $r_f$ could reduce stock price *P*. This in turn could affect option price.

1. If there is an *increase* in:      The change in the call option price is:

     Stock price ($P$)            Positive

     Exercise price (EX)        Negative

     Interest rate ($r_f$)          Positive*

     Time to expiration ($t$)      Positive

     Volatility of stock price ($\sigma$)      Positive*

2. Other properties of call options:

     a. *Upper bound.* The option price is always less than the stock price.

     b. *Lower bound.* The call price never falls below the payoff to immediate exercise ($P - EX$ or zero, whichever is larger).

     c. If the stock is worthless, the call is worthless.

     d. As the stock price becomes very large, the call price approaches the stock price less the present value of the exercise price.

◗ **TABLE 20.3**

Which package of executive stock options would you choose? The package offered by Digital Organics is more valuable, because the volatility of that company's stock is higher.

|  | Establishment Industries | Digital Organics |
|---|---|---|
| Number of options | 100,000 | 100,000 |
| Exercise price | $25 | $25 |
| Maturity | 5 years | 5 years |
| Current stock price | $22 | $22 |
| Stock price volatility (standard deviation of return) | 24% | 36% |

For options it's the other way around. As we have just seen, options written on volatile assets are worth *more* than options written on safe assets. If you can understand and remember that one fact about options, you've come a long way.

**EXAMPLE 20.1** ● Volatility and Executive Stock Options

Suppose you have to choose between two job offers, as CFO of either Establishment Industries or Digital Organics. Establishment Industries' compensation package includes a grant of the stock options described on the left side of Table 20.3. You demand a similar package from Digital Organics, and they comply. In fact they match the Establishment Industries options in every respect, as you can see on the right side of Table 20.3. (The two companies' current stock prices just happen to be the same.) The only difference is that Digital Organics' stock is 50% more volatile than Establishment Industries' stock (36% annual standard deviation vs. 24% for Establishment Industries).

If your job choice hinges on the value of the executive stock options, you should take the Digital Organics offer. The Digital Organics options are written on the more volatile asset and therefore are worth more.

We value the two stock-option packages in the next chapter.

If you have managed to reach this point, you are probably in need of a rest and a stiff gin and tonic. So we will summarize what we have learned so far and take up the subject of options again in the next chapter when you are rested (or drunk).

There are two types of option. An American call is an option to buy an asset at a specified exercise price on or before a specified maturity date. Similarly, an American put is an option to sell the asset at a specified price on or before a specified date. European calls and puts are exactly the same except that they cannot be exercised before the specified maturity date. Calls and puts are the basic building blocks that can be combined to give any pattern of payoffs.

What determines the value of a call option? Common sense tells us that it ought to depend on three things:

1. To exercise an option you have to pay the exercise price. Other things being equal, the less you are obliged to pay, the better. Therefore, the value of a call option increases with the ratio of the asset price to the exercise price.

2. You do not have to pay the exercise price until you decide to exercise the option. Therefore, a call option gives you a free loan. The higher the rate of interest and the longer the time to maturity, the more this free loan is worth. So the value of a call option increases with the interest rate and time to maturity.

3. If the price of the asset falls short of the exercise price, you won't exercise the call option. You will, therefore, lose 100% of your investment in the option no matter how far the asset depreciates below the exercise price. On the other hand, the more the price rises *above* the exercise price, the more profit you will make. Therefore the option holder does not lose from increased volatility if things go wrong, but gains if they go right. The value of an option increases with the variance per period of the stock return multiplied by the number of periods to maturity.

Always remember that an option written on a risky (high-variance) asset is worth more than an option on a safe asset. It's easy to forget, because in most other financial contexts increases in risk reduce present value.

See Further Readings for Chapter 21.



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

**BASIC**

1. Complete the following passage:

   A _____ option gives its owner the opportunity to buy a stock at a specified price that is generally called the _____ price. A _____ option gives its owner the opportunity to sell stock at a specified price. Options that can be exercised only at maturity are called _____ options.

2. Note Figure 20.13 on the next page. Match each diagram, (*a*) and (*b*), with one of the following positions:

   • Call buyer
   • Call seller
   • Put buyer
   • Put seller

Visit us at www.mhhe.com/bma

3. Suppose that you hold a share of stock and a put option on that share. What is the payoff when the option expires if (a) the stock price is below the exercise price? (b) the stock price is above the exercise price?

4. What is put–call parity and why does it hold? Could you apply the parity formula to a call and put with different exercise prices?

5. There is another strategy involving calls and borrowing or lending that gives the same payoffs as the strategy described in Problem 3. What is the alternative strategy?

6. Dr. Livingstone I. Presume holds £600,000 in East African gold stocks. Bullish as he is on gold mining, he requires absolute assurance that at least £500,000 will be available in six months to fund an expedition. Describe two ways for Dr. Presume to achieve this goal. There is an active market for puts and calls on East African gold stocks, and the rate of interest is 6% per year.

7. Suppose you buy a one-year European call option on Wombat stock with an exercise price of $100 and sell a one-year European put option with the same exercise price. The current stock price is $100, and the interest rate is 10%.
   a. Draw a position diagram showing the payoffs from your investments.
   b. How much will the combined position cost you? Explain.

8. Look again at Figure 20.13. It appears that the investor in panel (*b*) can't lose and the investor in panel (*a*) can't win. Is that correct? Explain. (*Hint:* Draw a profit diagram for each panel.)

9. What is a call option worth if (a) the stock price is zero? (b) the stock price is extremely high relative to the exercise price?

10. How does the price of a call option respond to the following changes, other things equal? Does the call price go up or down?
    a. Stock price increases.
    b. Exercise price is increased.
    c. Risk-free rate increases.
    d. Expiration date of the option is extended.
    e. Volatility of the stock price falls.
    f. Time passes, so the option's expiration date comes closer.

11. Respond to the following statements.
    a. "I'm a conservative investor. I'd much rather hold a call option on a safe stock like Exxon Mobil than a volatile stock like Google."

Visit us at www.mhhe.com/bma

▶ **FIGURE 20.13**

See Problem 2.



b. "I bought an American call option on Fava Farms stock, with an exercise price of $45 per share and three more months to maturity. Fava Farms' stock has skyrocketed from $35 to $55 per share, but I'm afraid it will fall back below $45. I'm going to lock in my gain and exercise my call right now."

## INTERMEDIATE

12. Discuss briefly the risks and payoffs of the following positions:
    a. Buy stock and a put option on the stock.
    b. Buy stock.
    c. Buy call.
    d. Buy stock and sell call option on the stock.
    e. Buy bond.
    f. Buy stock, buy put, and sell call.
    g. Sell put.

13. "The buyer of the call and the seller of the put both hope that the stock price will rise. Therefore the two positions are identical." Is the speaker correct? Illustrate with a position diagram.

14. Pintail's stock price is currently $200. A one-year *American* call option has an exercise price of $50 and is priced at $75. How would you take advantage of this great opportunity? Now suppose the option is a *European* call. What would you do?

15. It is possible to buy three-month call options and three-month puts on stock Q. Both options have an exercise price of $60 and both are worth $10. If the interest rate is 5% a year, what is the stock price? (*Hint:* Use put–call parity.)

16. In January 2009, a one-year call on the stock of Amazon.com, with an exercise price of $45.00, sold for $19.55. The stock price was $55. The risk-free interest rate was 2.5%. How much would you be willing to pay for a put on Amazon stock with the same maturity and exercise price? Assume that the Amazon options are European options. (*Note:* Amazon does not pay a dividend.)

17. FX Bank has succeeded in hiring ace foreign exchange trader Lucinda Cable. Her remuneration package reportedly includes an annual bonus of 20% of the profits that she generates in excess of $100 million. Does Ms. Cable have an option? Does it provide her with the appropriate incentives?

18. Suppose that Mr. Colleoni borrows the present value of $100, buys a six-month put option on stock Y with an exercise price of $150, and sells a six-month put option on Y with an exercise price of $50.
    a. Draw a position diagram showing the payoffs when the options expire.
    b. Suggest two other combinations of loans, options, and the underlying stock that would give Mr. Colleoni the same payoffs.

19. Which *one* of the following statements is correct?
    a. Value of put + present value of exercise price = value of call + share price.
    b. Value of put + share price = value of call + present value of exercise price.
    c. Value of put − share price = present value of exercise price − value of call.
    d. Value of put + value of call = share price − present value of exercise price.

    The correct statement equates the value of two investment strategies. Plot the payoffs to each strategy as a function of the stock price. Show that the two strategies give identical payoffs.

20. Test the formula linking put and call prices by using it to explain the relative prices of actual traded puts and calls. (*Note:* The formula is exact only for European options. Most traded puts and calls are American.)

Visit us at www.mhhe.com/bma

21. a. If you can't sell a share short, you can achieve exactly the same final payoff by a combination of options and borrowing or lending. What is this combination?

    b. Now work out the mixture of stock and options that gives the same final payoff as investment in a risk-free loan.

22. The common stock of Triangular File Company is selling at $90. A 26-week call option written on Triangular File's stock is selling for $8. The call's exercise price is $100. The risk-free interest rate is 10% per year.

    a. Suppose that puts on Triangular stock are not traded, but you want to buy one. How would you do it?

    b. Suppose that puts *are* traded. What should a 26-week put with an exercise price of $100 sell for?

23. Ms. Higden has been offered yet another incentive scheme (see Section 20-2). She will receive a bonus of $500,000 if the stock price at the end of the year is $120 or more; otherwise she will receive nothing. (Don't ask why anyone should want to offer such an arrangement. Maybe there's some tax angle.)

    a. Draw a position diagram illustrating the payoffs from such a scheme.

    b. What combination of options would provide these payoffs? (*Hint:* You need to buy a large number of options with one exercise price and sell a similar number with a different exercise price.)

24. Option traders often refer to "straddles" and "butterflies." Here is an example of each:

    • *Straddle:* Buy call with exercise price of $100 and simultaneously buy put with exercise price of $100.

    • *Butterfly:* Simultaneously buy one call with exercise price of $100, sell two calls with exercise price of $110, and buy one call with exercise price of $120.

    Draw position diagrams for the straddle and butterfly, showing the payoffs from the investor's net position. Each strategy is a bet on variability. Explain briefly the nature of each bet.

25. Look at actual trading prices of call options on stocks to check whether they behave as the theory presented in this chapter predicts. For example,

    a. Follow several options as they approach maturity. How would you expect their prices to behave? Do they actually behave that way?

    b. Compare two call options written on the same stock with the same maturity but different exercise prices.

    c. Compare two call options written on the same stock with the same exercise price but different maturities.

26. Is it more valuable to own an option to buy a portfolio of stocks or to own a portfolio of options to buy each of the individual stocks? Say briefly why.

27. Table 20.4 lists some prices of options on common stocks (prices are quoted to the nearest dollar). The interest rate is 10% a year. Can you spot any mispricing? What would you do to take advantage of it?

▶ **TABLE 20.4**

Prices of options on common stocks (in dollars). See Problem 27.

| Stock | Time to Exercise (months) | Exercise Price | Stock Price | Put Price | Call Price |
|-------|---------------------------|----------------|-------------|-----------|------------|
| Drongo Corp. | 6 | $ 50 | $80 | $20 | $52 |
| Ragwort, Inc. | 6 | 100 | 80 | 10 | 15 |
| Wombat Corp. | 3 | 40 | 50 | 7 | 18 |
| | 6 | 40 | 50 | 5 | 17 |
| | 6 | 50 | 50 | 8 | 10 |

Visit us at www.mhhe.com/bma

**28.** You've just completed a month-long study of energy markets and conclude that energy prices will be *much* more volatile in the next year than historically. Assuming you're right, what types of option strategies should you undertake? (*Note:* You can buy or sell options on oil-company stocks or on the price of future deliveries of crude oil, natural gas, fuel oil, etc.)

### CHALLENGE

**29.** Figure 20.14 below shows some complicated position diagrams. Work out the combination of stocks, bonds, and options that produces each of these positions.

**30.** Some years ago the Australian firm Bond Corporation sold a share in some land that it owned near Rome for $110 million and as a result boosted its annual earnings by $74 million. A television program subsequently revealed that the buyer was given a put option to sell its share in the land back to Bond for $110 million and that Bond had paid $20 million for a call option to repurchase the share in the land for the same price.

  a. What happens if the land is worth more than $110 million when the options expire? What if it is worth less than $110 million?

  b. Use position diagrams to show the net effect of the land sale and the option transactions.

  c. Assume a one-year maturity on the options. Can you deduce the interest rate?

  d. The television program argued that it was misleading to record a profit on the sale of land. What do you think?

**31.** Three six-month call options are traded on Hogswill stock:

| Exercise Price | Call Option Price |
|---|---|
| $ 90 | $ 5 |
| 100 | 11 |
| 110 | 15 |

How would you make money by trading in Hogswill options? (*Hint:* Draw a graph with the option price on the vertical axis and the ratio of stock price to exercise price on the horizontal axis. Plot the three Hogswill options on your graph. Does this fit with what you know about how option prices should vary with the ratio of stock price to exercise price?) Now look in the newspaper at options with the same maturity but different exercise prices. Can you find any money-making opportunities?



▶ **FIGURE 20.14**

Some complicated position diagrams. See Problem 29.

Visit us at www.mhhe.com/bma

**32.** Digital Organics has 10 million outstanding shares trading at $25 per share. It also has a large amount of debt outstanding, all coming due in one year. The debt pays interest at 8%. It has a par (face) value of $350 million, but is trading at a market value of only $280 million. The one-year risk-free interest rate is 6%.

   a.  Write out the put–call parity formula for Digital Organics' stock, debt, and assets.
   b.  What is the value of the company's option to default on its debt?

**REAL-TIME DATA ANALYSIS**

Go to **finance.yahoo.com**. Check out the delayed quotes for Google for different exercise prices and maturities.

   a.  Confirm that higher exercise prices mean lower call prices and higher put prices.
   b.  Confirm that longer maturity means higher prices for both puts and calls.
   c.  Choose a Google put and call with the same exercise price and maturity. Confirm that put–call parity holds (approximately). (*Note:* You will have to use an up-to-date risk-free interest rate.)

Visit us at www.mhhe.com/bma

# Valuing Options

▶ **In the last** chapter we introduced you to call and put options. Call options give the owner the right to buy an asset at a specified exercise price; put options give the right to sell. We also took the first step toward understanding how options are valued. The value of a call option depends on five variables:

1. The higher the price of the asset, the more valuable an option to buy it.

2. The lower the price that you must pay to exercise the call, the more valuable the option.

3. You do not need to pay the exercise price until the option expires. This delay is most valuable when the interest rate is high.

4. If the stock price is below the exercise price at maturity, the call is valueless regardless of whether the price is $1 below or $100 below. However, for every dollar that the stock price rises above the exercise price, the option holder gains an additional dollar. Thus, the value of the call option increases with the volatility of the stock price.

5. Finally, a long-term option is more valuable than a short-term option. A distant maturity delays the point at which the holder needs to pay the exercise price and increases the chance of a large jump in the stock price before the option matures.

In this chapter we show how these variables can be combined into an exact option-valuation model—a formula we can plug numbers into to get a definite answer. We first describe a simple way to value options, known as the binomial model. We then introduce the Black–Scholes formula for valuing options. Finally, we provide a checklist showing how these two methods can be used to solve a number of practical option problems.

The most efficient way to value most options is to use a computer. But in this chapter we will work through some simple examples by hand. We do so because unless you understand the basic principles behind option valuation, you are likely to make mistakes in setting up an option problem and you won't know how to interpret the computer's answer and explain it to others.

In the last chapter we looked at the put and call options on Google stock. In this chapter we stick with that example and show you how to value the Google options. But remember *why* you need to understand option valuation. It is not to make a quick buck trading on an options exchange. It is because many capital budgeting and financing decisions have options embedded in them. We discuss a variety of these options in subsequent chapters.

●●●●●

## 21-1 A Simple Option-Valuation Model

### Why Discounted Cash Flow Won't Work for Options

For many years economists searched for a practical formula to value options until Fischer Black and Myron Scholes finally hit upon the solution. Later we will show you what they found, but first we should explain why the search was so difficult.

**525**

Our standard procedure for valuing an asset is to (1) figure out expected cash flows and (2) discount them at the opportunity cost of capital. Unfortunately, this is not practical for options. The first step is messy but feasible, but finding *the* opportunity cost of capital is impossible, because the risk of an option changes every time the stock price moves.

When you buy a call, you are taking a position in the stock but putting up less of your own money than if you had bought the stock directly. Thus, an option is always riskier than the underlying stock. It has a higher beta and a higher standard deviation of return.

How much riskier the option is depends on the stock price relative to the exercise price. A call option that is in the money (stock price greater than exercise price) is safer than one that is out of the money (stock price less than exercise price). Thus a stock price increase raises the option's price *and* reduces its risk. When the stock price falls, the option's price falls *and* its risk increases. That is why the expected rate of return investors demand from an option changes day by day, or hour by hour, every time the stock price moves.

We repeat the general rule: The higher the stock price is relative to the exercise price, the safer is the call option, although the option is always riskier than the stock. The option's risk changes every time the stock price changes.

## Constructing Option Equivalents from Common Stocks and Borrowing

If you've digested what we've said so far, you can appreciate why options are hard to value by standard discounted-cash-flow formulas and why a rigorous option-valuation technique eluded economists for many years. The breakthrough came when Black and Scholes exclaimed, "Eureka! We have found it![1] The trick is to set up an *option equivalent* by combining common stock investment and borrowing. The net cost of buying the option equivalent must equal the value of the option."

We'll show you how this works with a simple numerical example. We'll travel back to September 2008 and consider a six-month call option on Google stock with an exercise price of $430. We'll pick a day when Google stock was also trading at $430, so that this option is *at the money*. The short-term, risk-free interest rate was 3% per year, or about 1.5% for six months.

To keep the example as simple as possible, we assume that Google stock can do only two things over the option's six-month life: either the price will fall by a quarter to $322.5 or rise by one-third to $573.33.

If Google's stock price falls to $322.50, the call option will be worthless, but if the price rises to $573.33, the option will be worth $573.33 - 430 = $143.33$. The possible payoffs to the option are therefore:

| | Stock Price = $322.50 | Stock Price = $573.33 |
|---|---|---|
| 1 call option | $0 | $143.33 |

Now compare these payoffs with what you would get if you bought 4/7 Google shares and borrowed $181.56 from the bank:[2]

| | Stock Price = $322.50 | Stock Price = $573.33 |
|---|---|---|
| 4/7 shares | $184.29 | $327.62 |
| Repayment of loan + interest | −184.29 | −184.29 |
| Total payoff | $ 0 | $143.33 |

---

[1] We do not know whether Black and Scholes, like Archimedes, were sitting in bathtubs at the time.

[2] The amount that you need to borrow from the bank is simply the present value of the difference between the payoffs from the option and the payoffs from 4/7 shares. In our example, amount borrowed = $((4/7) \times 322.50 - 0)/1.015 = ((4/7) \times 573.33 - 143.33)/1.015 = \$181.56$.

Notice that the payoffs from the levered investment in the stock are identical to the payoffs from the call option. Therefore, the law of one price tells us that both investments must have the same value:

$$\text{Value of call} = \text{value of } (4/7) \text{ shares} - \$181.56 \text{ bank loan}$$
$$= 430 \times (4/7) - 181.56 = 64.15$$

Presto! You've valued a call option.

To value the Google option, we borrowed money and bought stock in such a way that we exactly replicated the payoff from a call option. This is called a **replicating portfolio.** The number of shares needed to replicate one call is called the **hedge ratio** or **option delta.** In our Google example one call is replicated by a levered position in 4/7 shares. The option delta is, therefore, 4/7, or about .571.

How did we know that Google's call option was equivalent to a levered position in 4/7 shares? We used a simple formula that says:

$$\text{Option delta} = \frac{\text{spread of possible option prices}}{\text{spread of possible share prices}} = \frac{143.33 - 0}{573.33 - 322.50} = \frac{143.33}{250.83} = \frac{4}{7}$$

You have learned not only to value a simple option but also that you can replicate an investment in the option by a levered investment in the underlying asset. Thus, if you can't buy or sell a call option on an asset, you can create a homemade option by a replicating strategy—that is, you buy or sell delta shares and borrow or lend the balance.

**Risk-Neutral Valuation**    Notice why the Google call option should sell for $64.15. If the option price is higher than $64.15, you could make a certain profit by buying 4/7 shares of stock, selling a call option, and borrowing $181.56. Similarly, if the option price is less than $64.15, you could make an equally certain profit by selling 4/7 shares, buying a call, and lending the balance. In either case there would be an arbitrage opportunity.[3]

If there's a possible arbitrage profit, everyone scurries to take advantage of it. So when we said that the option price had to be $64.15 or there would be an arbitrage opportunity, we did not have to know anything about investor attitudes to risk. The option price cannot depend on whether investors detest risk or do not care a jot.

This suggests an alternative way to value the option. We can *pretend* that all investors are *indifferent* about risk, work out the expected future value of the option in such a world, and discount it back at the risk-free interest rate to give the current value. Let us check that this method gives the same answer.

If investors are indifferent to risk, the expected return on the stock must be equal to the risk-free rate of interest:

$$\text{Expected return on Google stock} = 1.5\% \text{ per six months}$$

We know that Google stock can either rise by 33.3% to $573.33 or fall by 25% to $322.50. We can, therefore, calculate the probability of a price rise in our hypothetical risk-neutral world:

$$\text{Expected return} = [\text{probability of rise} \times 33.3]$$
$$+ [(1 - \text{probability of rise}) \times (-25)]$$
$$= 1.5\%$$

Therefore,

$$\text{Probability of rise} = .4543, \text{ or } 45.43\%$$

---

[3] Of course, you don't get seriously rich by dealing in 4/7 shares. But if you multiply each of our transactions by a million, it begins to look like real money.

Notice that this is *not* the *true* probability that Google stock will rise. Since investors dislike risk, they will almost surely require a higher expected return than the risk-free interest rate from Google stock. Therefore the true probability is greater than .4543.

The general formula for calculating the risk-neutral probability of a rise in value is:

$$p = \frac{\text{interest rate} - \text{downside change}}{\text{upside change} - \text{downside change}}$$

In the case of Google stock:

$$p = \frac{.015 - (-.25)}{.333 - (-.25)} = .4543$$

We know that if the stock price rises, the call option will be worth $143.33; if it falls, the call will be worth nothing. Therefore, if investors are risk-neutral, the expected value of the call option is:

$$[\text{Probability of rise} \times 143.33] + [(1 - \text{probability of rise}) \times 0]$$
$$= (.4543 \times 143.33) + (.5457 \times 0)$$
$$= \$65.11$$

And the *current* value of the call is:

$$\frac{\text{Expected future value}}{1 + \text{interest rate}} = \frac{65.11}{1.015} = \$64.15$$

Exactly the same answer that we got earlier!

We now have two ways to calculate the value of an option:

1.  Find the combination of stock and loan that replicates an investment in the option. Since the two strategies give identical payoffs in the future, they must sell for the same price today.
2.  Pretend that investors do not care about risk, so that the expected return on the stock is equal to the interest rate. Calculate the expected future value of the option in this hypothetical *risk-neutral* world and discount it at the risk-free interest rate. This idea may seem familiar to you. In Chapter 9 we showed how you can value an investment either by discounting the expected cash flows at a risk-adjusted discount rate or by adjusting the expected cash flows for risk and then discounting these *certainty-equivalent* flows at the risk-free interest rate. We have just used this second method to value the Google option. The certainty-equivalent cash flows on the stock and option are the cash flows that would be expected in a risk-neutral world.

### Valuing the Google Put Option

Valuing the Google call option may well have seemed like pulling a rabbit out of a hat. To give you a second chance to watch how it is done, we will use the same method to value another option—this time, the six-month Google put option with a $430 exercise price.[4] We continue to assume that the stock price will either rise to $573.33 or fall to $322.50.

If Google's stock price rises to $573.33, the option to sell for $430 will be worthless. If the price falls to $322.50, the put option will be worth $430 − 322.50 = $107.50. Thus the payoffs to the put are:

|  | Stock Price = $322.50 | Stock Price = $573.33 |
|---|---|---|
| 1 put option | $107.50 | $0 |

---

[4] When valuing *American* put options, you need to recognize the possibility that it will pay to exercise early. We discuss this complication later in the chapter, but it is unimportant for valuing the Google put and we ignore it here.

We start by calculating the option delta using the formula that we presented above:[5]

$$\text{Option delta} = \frac{\text{spread of possible option prices}}{\text{spread of possible stock prices}} = \frac{0 - 107.50}{573.33 - 322.50}$$

$$= -\frac{3}{7} \text{ or about } -.429$$

Notice that the delta of a put option is always negative; that is, you need to *sell* delta shares of stock to replicate the put. In the case of the Google put you can replicate the option payoffs by *selling* 3/7 Google shares and *lending* $242.09. Since you have sold the share short, you will need to lay out money at the end of six months to buy it back, but you will have money coming in from the loan. Your net payoffs are exactly same as the payoffs you would get if you bought the put option:

|  | Stock Price = $322.50 | Stock Price = $573.33 |
|---|---|---|
| Sale of 3/7 shares | − $138.22 | − $245.72 |
| Repayment of loan + interest | +245.72 | +245.72 |
| Total payoff | $107.50 | $ 0 |

Since the two investments have the same payoffs, they must have the same value:

$$\text{Value of put} = -(3/7) \text{ shares} + \$242.09 \text{ bank loan}$$
$$= -(3/7) \times 430 + \$242.09 = \$57.82$$

**Valuing the Put Option by the Risk-Neutral Method**   Valuing the Google put option with the risk-neutral method is a cinch. We already know that the probability of a rise in the stock price is .4543. Therefore the expected value of the put option in a risk-neutral world is:

$$[\text{Probability of rise} \times 0] + [(1 - \text{probability of rise}) \times 107.50]$$
$$= (.4543 \times 0) + (.5457 \times 107.50)$$
$$= \$58.66$$

And therefore the *current* value of the put is:

$$\frac{\text{Expected future value}}{1 + \text{interest rate}} = \frac{58.66}{1.015} = \$57.80$$

**The Relationship between Call and Put Prices**   We pointed out earlier that for European options there is a simple relationship between the value of the call and that of the put.[6]

$$\text{Value of put} = \text{value of call} + \text{present value of exercise price} - \text{share price}$$

Since we had already calculated the value of the Google call, we could also have used this relationship to find the value of the put:

$$\text{Value of put} = 64.15 + \frac{430}{1.015} - 430 = \$57.80$$

Everything checks.

---

[5] The delta of a put option is always equal to the delta of a call option with the same exercise price minus one. In our example, delta of put = (4/7) − 1 = − 3/7.

[6] *Reminder:* This formula applies only when the two options have the same exercise price and exercise date.

## 21-2 The Binomial Method for Valuing Options

The essential trick in pricing any option is to set up a package of investments in the stock and the loan that will exactly replicate the payoffs from the option. If we can price the stock and the loan, then we can also price the option. Equivalently, we can pretend that investors are risk-neutral, calculate the expected payoff on the option in this fictitious risk-neutral world, and discount by the rate of interest to find the option's present value.

These *concepts* are completely general, but there are several ways to find the replicating package of investments. The example in the last section used a simplified version of what is known as the **binomial method.** The method starts by reducing the possible changes in next period's stock price to two, an "up" move and a "down" move. This assumption that there are just two possible prices for Google stock at the end of six months is clearly fanciful.

We could make the Google problem a trifle more realistic by assuming that there are two possible price changes in each three-month period. This would give a wider variety of six-month prices. And there is no reason to stop at three-month periods. We could go on to take shorter and shorter intervals, with each interval showing two possible changes in Google's stock price and giving an even wider selection of six-month prices.

This is illustrated in Figure 21.1. The top diagram shows our starting assumption: just two possible prices at the end of six months. Moving down, you can see what happens when there are two possible price changes every three months. This gives three possible stock prices when the option matures. In Figure 21.1(*c*) we have gone on to divide the six-month period into 26 weekly periods, in each of which the price can make one of two small moves. The distribution of prices at the end of six months is now looking much more realistic.

We could continue in this way to chop the period into shorter and shorter intervals, until eventually we would reach a situation in which the stock price is changing continuously and there is a continuum of possible future stock prices.

### Example: The Two-Stage Binomial Method

Dividing the period into shorter intervals doesn't alter the basic method for valuing a call option. We can still replicate the call by a levered investment in the stock, but we need to adjust the degree of leverage at each stage. We demonstrate first with our simple two-stage case in Figure 21.1(*b*). Then we work up to the situation where the stock price is changing continuously.

Figure 21.2 is taken from Figure 21.1(*b*) and shows the possible prices of Google stock, assuming that in each three-month period the price will either rise by 22.56% or fall by 18.41%.[7] We show in parentheses the possible values at maturity of a six-month call option with an exercise price of $430. For example, if Google's stock price turns out to be $286.27 in month 6, the call option will be worthless; at the other extreme, if the stock value is $645.90, the call will be worth $645.90 − $430 = $215.90. We haven't worked out yet what the option will be worth *before* maturity, so we just put question marks there for now.

**Option Value in Month 3**     To find the value of Google's option today, we start by working out its possible values in month 3 and then work back to the present. Suppose that at the end of three months the stock price is $527.00. In this case investors know that, when the option finally matures in month 6, the stock price will be either $430 or

---

[7] We explain shortly why we picked these figures.



▶ **FIGURE 21.1**

This figure shows the possible six-month price changes for Google stock assuming that the stock makes a single up or down move each six months (Fig. 21.1[a]), 2 moves, one every three months (Fig. 21.1[b]), or 26 moves, one every week (Fig. 21.1[c]). Beside each tree we show a histogram of the possible six-month price changes, assuming investors are risk-neutral.

$645.89, and the corresponding option price will be $0 or $215.89. We can therefore use our simple formula to find how many shares we need to buy in month 3 to replicate the option:

$$\text{Option delta} = \frac{\text{spread of possible option prices}}{\text{spread of possible stock prices}} = \frac{215.89 - 0}{645.89 - 430} = 1.0$$

▶ **FIGURE 21.2**

Present and possible future prices of Google stock assuming that in each three-month period the price will either rise by 22.6% or fall by 18.4%. Figures in parentheses show the corresponding values of a six-month call option with an exercise price of $430.



Now we can construct a leveraged position in delta shares that would give identical payoffs to the option:

| | Month 6 Stock Price = $430 | Month 6 Stock Price = $645.90 |
|---|---|---|
| Buy 1.0 shares | $430 | $645.90 |
| Borrow PV(430) | −430 | −430 |
| Total payoff | $ 0 | $215.90 |

Since this portfolio provides identical payoffs to the option, we know that the value of the option in month 3 must be equal to the price of one share less the $430 loan discounted for three months at 3% per year, about .75% for three months:

$$\text{Value of call in month 3} = \$527.00 - \$430/1.0075 = \$100.20$$

Therefore, if the share price rises in the first three months, the option will be worth $100.20. But what if the share price falls to $350.85? In that case the most that you can hope for is that the share price will recover to $430. Therefore the option is bound to be worthless when it matures and must be worthless at month 3.

**Option Value Today**   We can now get rid of two of the question marks in Figure 21.2. Figure 21.3 shows that if the stock price in month 3 is $527.00, the option value is $100.20 and, if the stock price is $350.85, the option value is zero. It only remains to work back to the option value today.

We again begin by calculating the option delta:

$$\text{Option delta} = \frac{\text{spread of possible option prices}}{\text{spread of possible stock prices}} = \frac{100.20 - 0}{527.00 - 350.85} = .5688$$

We can now find the leveraged position in delta shares that would give identical payoffs to the option:

| | Month 3 Stock Price = $350.85 | Month 3 Stock Price = $527.00 |
|---|---|---|
| Buy .5688 shares | $199.56 | $299.76 |
| Borrow PV(199.56) | −199.56 | −199.56 |
| Total payoff | $ 0 | $100.20 |

The value of the Google option today is equal to the value of this leveraged position:

$$\text{PV option} = .5688 \times \text{Share price} - \text{PV}(\$199.56)$$
$$= .5688 \times \$430 - \$199.56/1.0075 = \$46.51$$



**FIGURE 21.3**

Present and possible future prices of Google stock. Figures in parentheses show the corresponding values of a six-month call option with an exercise price of $430.

## The General Binomial Method

Moving to two steps when valuing the Google call probably added extra realism. But there is no reason to stop there. We could go on, as in Figure 21.1, to chop the period into smaller and smaller intervals. We could still use the binomial method to work back from the final date to the present. Of course, it would be tedious to do the calculations by hand, but simple to do so with a computer.

Since a stock can usually take on an almost limitless number of future values, the binomial method gives a more realistic and accurate measure of the option's value if we work with a large number of subperiods. But that raises an important question. How do we pick sensible figures for the up and down changes in value? For example, why did we pick figures of +22.6% and −18.4% when we revalued Google's option with two subperiods? Fortunately, there is a neat little formula that relates the up and down changes to the standard deviation of stock returns:

$$1 + \text{upside change} = u = e^{\sigma\sqrt{h}}$$
$$1 + \text{downside change} = d = 1/u$$

where,

$e$ = base for natural logarithms = 2.718
$\sigma$ = standard deviation of (continuously compounded) stock returns
$h$ = interval as fraction of a year

When we said that Google's stock price could either rise by 33.3% or fall by 25% over six months ($h$ = .5), our figures were consistent with a figure of 40.68% for the standard deviation of annual returns:[8]

$$1 + \text{upside change}(\text{6-month interval}) = u = e^{.4068\sqrt{.5}} = 1.333$$
$$1 + \text{downside change} = d = 1/u = 1/1.333 = .75$$

To work out the equivalent upside and downside changes when we divide the period into two three-month intervals ($h$ = .25), we use the same formula:

$$1 + \text{upside change}(\text{3-month interval}) = u = e^{.4068\sqrt{.25}} = 1.226$$
$$1 + \text{downside change} = d = 1/u = 1/1.226 = .816$$

---

[8] To find the standard deviation given $u$, we turn the formula around:

$$\sigma = \log(u)/\sqrt{h}$$

where log = natural logarithm. In our example:

$$\sigma = \log(1.333)/\sqrt{.5} = .2877/\sqrt{.5} = .4068$$

▶ **TABLE 21.1**    As the number of steps is increased, you must adjust the range of possible changes in the value of the asset to keep the same standard deviation. But you will get increasingly close to the Black–Scholes value of the Google call option.

(*Note:* The standard deviation is $\sigma = .4068$)

| Change per Interval (%) | | | |
|---|---|---|---|
| **Number of Steps** | **Upside** | **Downside** | **Estimated Option Value** |
| 1 | +33.3 | −25.0 | $64.15 |
| 2 | +22.6 | −18.4 | 46.49 |
| 6 | +12.5 | −11.1 | 50.05 |
| 26 | +5.8 | −5.5 | 51.57 |
| | | Black–Scholes value = | 52.04 |

The center columns in Table 21.1 show the equivalent up and down moves in the value of the firm if we chop the period into six monthly or 26 weekly periods, and the final column shows the effect on the estimated option value. (We explain the Black–Scholes value shortly.)

### The Binomial Method and Decision Trees

Calculating option values by the binomial method is basically a process of solving decision trees. You start at some future date and work back through the tree to the present. Eventually the possible cash flows generated by future events and actions are folded back to a present value.

Is the binomial method *merely* another application of decision trees, a tool of analysis that you learned about in Chapter 10? The answer is no, for at least two reasons. First, option pricing theory is absolutely essential for discounting within decision trees. Discounting expected cash flows doesn't work within decision trees for the same reason that it doesn't work for puts and calls. As we pointed out in Section 21-1, there is no single, constant discount rate for options because the risk of the option changes as time and the price of the underlying asset change. There is no single discount rate inside a decision tree, because if the tree contains meaningful future decisions, it also contains options. The market value of the future cash flows described by the decision tree has to be calculated by option pricing methods.

Second, option theory gives a simple, powerful framework for describing complex decision trees. For example, suppose that you have the option to abandon an investment. The complete decision tree would overflow the largest classroom chalkboard. But now that you know about options, the opportunity to abandon can be summarized as "an American put." Of course, not all real problems have such easy option analogies, but we can often approximate complex decision trees by some simple package of assets and options. A custom decision tree may get closer to reality, but the time and expense may not be worth it. Most men buy their suits off the rack even though a custom-made Armani suit would fit better and look nicer.

## 21-3 The Black–Scholes Formula

Look back at Figure 21.1, which showed what happens to the distribution of possible Google stock price changes as we divide the option's life into a larger and larger number of increasingly small subperiods. You can see that the distribution of price changes becomes increasingly smooth.



▶ **FIGURE 21.4**

As the option's life is divided into more and more subperiods, the distribution of possible stock price changes approaches a lognormal distribution.

If we continued to chop up the option's life in this way, we would eventually reach the situation shown in Figure 21.4, where there is a continuum of possible stock price changes at maturity. Figure 21.4 is an example of a lognormal distribution. The lognormal distribution is often used to summarize the probability of different stock price changes.[9] It has a number of good commonsense features. For example, it recognizes the fact that the stock price can never fall by more than 100%, but that there is some, perhaps small, chance that it could rise by much more than 100%.

Subdividing the option life into indefinitely small slices does not affect the principle of option valuation. We could still replicate the call option by a levered investment in the stock, but we would need to adjust the degree of leverage continuously as time went by. Calculating option value when there is an infinite number of subperiods may sound a hopeless task. Fortunately, Black and Scholes derived a formula that does the trick.[10] It is an unpleasant-looking formula, but on closer acquaintance you will find it exceptionally elegant and useful. The formula is:

$$\text{Value of call option} = [\text{delta} \times \text{share price}] - [\text{bank loan}]$$
$$\uparrow \qquad\qquad \uparrow \qquad\qquad \uparrow$$
$$[N(d_1) \quad \times \quad P] \;-\; [N(d_2) \times \text{PV(EX)}]$$

where,

$$d_1 = \frac{\log[P/\text{PV(EX)}]}{\sigma\sqrt{t}} + \frac{\sigma\sqrt{t}}{2}$$
$$d_2 = d_1 - \sigma\sqrt{t}$$

$N(d)$ = cumulative normal probability density function[11]

EX = exercise price of option; PV(EX) is calculated by discounting at the risk-free interest rate $r_f$

[9] When we first looked at the distribution of stock price changes in Chapter 8, we depicted these changes as normally distributed. We pointed out at the time that this is an acceptable approximation for very short intervals, but the distribution of changes over longer intervals is better approximated by the lognormal.

[10] The pioneering articles on options are F. Black and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81 (May–June 1973), pp. 637–654; and R. C. Merton, "Theory of Rational Option Pricing," *Bell Journal of Economics and Management Science* 4 (Spring 1973), pp. 141–183.

[11] That is, $N(d)$ is the probability that a normally distributed random variable $\tilde{x}$ will be less than or equal to $d$. $N(d_1)$ in the Black–Scholes formula is the option delta. Thus the formula tells us that the value of a call is equal to an investment of $N(d_1)$ in the common stock less borrowing of $N(d_2) \times$ PV(EX).

$t$ = number of periods to exercise date

$P$ = price of stock now

$\sigma$ = standard deviation per period of (continuously compounded) rate of return on stock

Notice that the value of the call in the Black–Scholes formula has the same properties that we identified earlier. It increases with the level of the stock price $P$ and decreases with the present value of the exercise price PV(EX), which in turn depends on the interest rate and time to maturity. It also increases with the time to maturity and the stock's variability $(\sigma \sqrt{t})$.

To derive their formula Black and Scholes assumed that there is a continuum of stock prices, and therefore to replicate an option investors must continuously adjust their holding in the stock.[12] Of course this is not literally possible, but even so the formula performs remarkably well in the real world, where stocks trade only intermittently and prices jump from one level to another. The Black–Scholes model has also proved very flexible; it can be adapted to value options on a variety of assets such as foreign currencies, bonds, and commodities. It is not surprising, therefore, that it has been extremely influential and has become the standard model for valuing options. Every day dealers on the options exchanges use this formula to make huge trades. These dealers are not for the most part trained in the formula's mathematical derivation; they just use a computer or a specially programmed calculator to find the value of the option.

### Using the Black–Scholes Formula

The Black–Scholes formula may look difficult, but it is very straightforward to apply. Let us practice using it to value the Google call.

Here are the data that you need:

- Price of stock now = $P$ = 430
- Exercise price = EX = 430
- Standard deviation of continuously compounded annual returns = $\sigma$ = .4068
- Years to maturity = $t$ = .5
- Interest rate per annum = $r_f$ = 3% (or about 1.5% for six months).[13]

Remember that the Black–Scholes formula for the value of a call is

$$[N(d_1) \times P] - [N(d_2) \times \text{PV(EX)}]$$

where,

$d_1 = \log[P/\text{PV(EX)}]/\sigma \sqrt{t} + \sigma \sqrt{t}/2$

$d_2 = d_1 - \sigma \sqrt{t}$

$N(d)$ = cumulative normal probability function

There are three steps to using the formula to value the Google call:

---

[12] The important assumptions of the Black-Scholes formula are that (a) the price of the underlying asset follows a lognormal random walk, (b) investors can adjust their hedge continuously and costlessly, (c) the risk-free rate is known, and (d) the underlying asset does not pay dividends.

[13] More precisely, an annually compounded interest rate of 3% is equivalent to a six-month rate of $1.03^{.5} - 1 = .014889$, or 1.4889%. Thus PV(EX) = 430/1.014889 = \$423.69.

When valuing options, it is more common to use continuously compounded rates (see Section 2-4). If the annually compounded rate is 3%, the equivalent continuously compounded rate is 2.956%. (The natural log of 1.03 is .02956 and $e^{.02956} = 1.03$.) Using continuous compounding, PV(EX) = $430 \times e^{-.5 \times .02956}$ = \$423.69.

If both methods give the same answer, why do we bother to mention the subject here? It is simply because most computer programs for valuing options call for a continuously compounded rate. If you enter an annually compounded rate by mistake, the error will usually be small, but you can waste a lot of time trying to trace it.

**Step 1**   Calculate $d_1$ and $d_2$. This is just a matter of plugging numbers into the formula (noting that "log" means *natural* log):

$$d_1 = \log[P/\mathrm{PV(EX)}]/\sigma\sqrt{t} + \sigma\sqrt{t}/2$$
$$= \log[430/(430/1.015)]/(.4068 \times \sqrt{.5}) + .4068 \times \sqrt{.5}/2$$
$$= .1956$$
$$d_2 = d_1 - \sigma\sqrt{t} = .1956 - .4068 \times \sqrt{.5} = -.0921$$

**Step 2**   Find $N(d_1)$ and $N(d_2)$. $N(d_1)$ is the probability that a normally distributed variable will be less than $d_1$ standard deviations above the mean. If $d_1$ is large, $N(d_1)$ is close to 1.0 (i.e., you can be almost certain that the variable will be less than $d_1$ standard deviations above the mean). If $d_1$ is zero, $N(d_1)$ is .5 (i.e., there is a 50% chance that a normally distributed variable will be below the average).

The simplest way to find $N(d_1)$ is to use the Excel function NORMSDIST. For example, if you enter NORMSDIST(.1956) into an Excel spreadsheet, you will see that there is a .5775 probability that a normally distributed variable will be less than .1956 standard deviations above the mean. Alternatively, you can use a set of normal probability tables such as the present value tables (Appendix Table 6) located on the book Web site at **www.mhhe. com/bma**.

Again you can use the Excel function to find $N(d_2)$. If you enter NORMSDIST($-.0921$) into an Excel spreadsheet, you should get the answer .4633. In other words, there is a probability of .4633 that a normally distributed variable will be less than .0921 standard deviations *below* the mean. Alternatively, if you use Appendix Table 6 (again located at **www. mhhe.com/bma** under the Present Value Tables heading), you need to look up the value for $+.0921$ and subtract it from 1.0:

$$N(d_2) = N(-.0921) = 1 - N(+.0921)$$
$$= 1 - .5367 = .4633$$

**Step 3**   Plug these numbers into the Black–Scholes formula. You can now calculate the value of the Google call:

$$[\text{Delta} \times \text{price}] - [\text{bank loan}]$$
$$= [N(d_1) \times P] - [N(d_2) \times \mathrm{PV(EX)}]$$
$$= [.5775 \times 430] - [.4633 \times 430/1.015] = 248.32 - 196.29 = 52.04$$

In other words, you can replicate the Google call option by investing \$248.32 in the company's stock and borrowing \$196.29. Subsequently, as time passes and the stock price changes, you may need to borrow a little more to invest in the stock or you may need to sell some of your stock to reduce your borrowing.

### The Risk of an Option

How risky is the Google call option? We have seen that you can exactly replicate a call by a combination of risk-free borrowing and an investment in the stock. So the risk of the option must be the same as the risk of this replicating portfolio. We know that the beta of any portfolio is simply a weighted average of the betas of the separate holdings. So the risk of the option is just a weighted average of the betas of the investments in the loan and the stock.

On past evidence the beta of Google stock is $\beta_{\text{stock}} = 1.27$; the beta of a risk-free loan is $\beta_{\text{loan}} = 0$. You are investing \$248.32 in the stock and $-\$196.29$ in the loan. (Notice that the investment in the loan is negative—you are *borrowing* money.) Therefore the beta of the option is $\beta_{\text{option}} = (-196.29 \times 0 + 248.32 \times 1.27)/(-196.29 + 248.32) = 6.07$. Notice that, because a call option is equivalent to a levered position in the stock, it is always riskier



**FIGURE 21.5**

The curved line shows how the value of the Google call option changes as the price of Google stock changes.

Visit us at
www.mhhe.com/bma



Values of Google call option, dollars

Exercise price = $430

than the stock itself. In Google's case the option is nearly five times as risky as the stock. As time passes and the price of Google stock changes, the risk of the option will also change.

**Some More Practice**   Suppose you repeat the calculations for the Google call for a wide range of stock prices. The result is shown in Figure 21.5. You can see that the option values lie along an upward-sloping curve that starts its travels in the bottom left-hand corner of the diagram. As the stock price increases, the option value rises and gradually becomes parallel to the lower bound for the option value. This is exactly the shape we deduced in Chapter 20 (see Figure 20.10).

The height of this curve of course depends on risk and time to maturity. For example, if the risk of Google stock had suddenly decreased, the curve shown in Figure 21.5 would drop at every possible stock price.

### The Black–Scholes Formula and the Binomial Method

Look back at Table 21.1 where we used the binomial method to calculate the value of the Google call. Notice that, as the number of intervals is increased, the values that you obtain from the binomial method begin to snuggle up to the Black–Scholes value of $52.04.

The Black–Scholes formula recognizes a continuum of possible outcomes. This is usually more realistic than the limited number of outcomes assumed in the binomial method. The formula is also more accurate and quicker to use than the binomial method. So why use the binomial method at all? The answer is that there are many circumstances in which you cannot use the Black–Scholes formula but the binomial method will still give you a good measure of the option's value. We will look at several such cases in Section 21-5.

## 21-4 Black–Scholes in Action

To illustrate the principles of option valuation, we focused on the example of Google's options. But financial managers turn to the Black–Scholes model to estimate the value of a variety of different options. Here are four examples.

## Executive Stock Options

The 2007 winner in *Forbes*'s annual list of the most highly paid executives was Larry Ellison, the CEO of Oracle Corporation. His salary was just $1 million, but he also pocketed another $182 million from the exercise of stock options.

The example highlights that executive stock options are often an important part of compensation. For many years companies were able to avoid reporting the cost of these options in their annual statements. However, they must now treat options as an expense just like salaries and wages, so they need to estimate the value of all new options that they have granted. For example, Oracle's financial statements show that in fiscal 2008 the company issued a total of 69 million options with an average life of five years and an exercise price of $20.49. Oracle calculated that the average value of these options was $7.53. How did it come up with this figure? It just used the Black–Scholes model assuming a standard deviation of 29% and an interest rate of 4.6%.[14]

Some companies have disguised how much their management is paid by backdating the grant of an option. Suppose, for example, that a firm's stock price has risen from $20 to $40. At that point the firm awards its CEO options exercisable at $20. That is generous but not illegal. However, if the firm pretends that the options were *actually* awarded when the stock price was $20 and values them on that basis, it will substantially understate the CEO's compensation.[15] The nearby box discusses the backdating scandal.

Speaking of executive stock options, we can now use the Black–Scholes formula to value the option packages you were offered in Section 20-3 (see Table 20.3). Table 21.2 calculates the value of the options from the safe-and-stodgy Establishment Industries at $5.26 each. The options from risky-and-glamorous Digital Organics are worth $7.40 each. Congratulations.

## Warrants

When Owens Corning emerged from bankruptcy in 2006, the debtholders became the sole owners of the company. But the old stockholders were not left entirely empty handed. They were given warrants to buy the new common stock at any point in the next seven

|  | Establishment Industries | Digital Organics |
|---|---|---|
| Stock price (P) | $22 | $22 |
| Exercise price (EX) | $25 | $25 |
| Interest rate ($r_f$) | .04 | .04 |
| Maturity in years (t) | 5 | 5 |
| Standard deviation ($\sigma$) | .24 | .36 |
| $d_1 = \log[P/PV(EX)]/\sigma\sqrt{t} + \sigma\sqrt{t}/2$ | 0.3955 | 0.4873 |
| $d_2 = d_1 - \sigma\sqrt{t}$ | −0.1411 | −0.3177 |
| Call value $= [N(d_1) \times P] - [N(d_2) \times PV(EX)]$ | $5.26 | $7.40 |

▶ **TABLE 21.2**

Using the Black–Scholes formula to value the executive stock options for Establishment Industries and Digital Organics (see Table 20.3).



Visit us at
www.mhhe.com/bma

---

[14] Many of the recipients of these options may not have agreed with Oracle's valuation. First, the options were less valuable to their owners if they created substantial undiversifiable risk. Second, if the holders planned to quit the company in the next few years, they were liable to forfeit the options. For a discussion of these issues see J. I. Bulow and J. B. Shoven, "Accounting for Stock Options," *Journal of Economic Perspectives* 19 (Fall 2005), pp. 115–134.

[15] Until 2005 companies were obliged to record as an expense any difference between the stock price when the options were granted and the exercise price. Thus, as long as the options were granted at-the-money (exercise price equals stock price), the company was not obliged to show any expense.

# The Perfect Payday[*]

On an October day in 1999 the shares of the giant insurer United Health Group sank to their lowest level of the year. That may have been bad news for investors but it was good news for William McGuire, the chief executive, for the company granted him options to buy the stock in the future at that low price. If the options had been dated a month later when the stock price was 40% higher, those options would have been far less valuable. Lucky coincidence? Possibly, but the following year also Mr. McGuire was granted options on the day that the stock price hit the year's low. And in 2001 the grant came near the bottom of a sharp dip in the stock price.

Over the following years evidence began to accumulate that in other companies too executives were being granted options at unusually favorable prices. It seemed that these firms were using hindsight to choose the date on which the options were granted. Such backdating is not necessarily illegal, but most options are granted under a shareholder-approved plan that typically requires the exercise price to be equal to the fair market value of the company's stock at the time of the grant. Also backdating may result in an underestimate of the amount of compensation paid and therefore to a misstatement of earnings and an underpayment of taxes.

Investigations by the SEC and prosecutions by disgruntled shareholders led to the resignation of a number of directors and officers of major corporations that were found to have backdated options. William McGuire was among those who fell on their sword. He subsequently agreed to pay $39 million and forfeit another 3.7 million compensatory stock options to settle a class-action suit headed by the California Public Employee Retirement System (Calpers).

---

[*]"The Perfect Payday" is the title of an article in *The Wall Street Journal* that drew attention to the practice of backdating. See C. Forelle and J. Bandler, "The Perfect Payday; Some CEOs Reap Millions by Landing Stock Options When They Are Most Valuable; Luck—or Something Else?" *The Wall Street Journal*, March 18, 2006, p. A1. Earlier evidence of backdating appeared in D. Yermack, "Good Timing: CEO Stock Option Awards and Company News Announcements," *Journal of Finance* 52 (1997), pp. 449–476, and in E. Lie, "On the Timing of CEO Stock Option Awards," *Management Science* 51 (2005), pp. 802–812.

---

years for $45.25 a share. Because the stock in the restructured firm was worth about $30 a share, the stock needed to appreciate by 50% before the warrants would be worth exercising. However, this option to buy Owens Corning stock was clearly valuable and shortly after the warrants started trading they were selling for $6 each. You can be sure that before shareholders were handed this bone, all the parties calculated the value of the warrants under different assumptions about the stock's volatility. The Black–Scholes model is tailor-made for this purpose.

### Portfolio Insurance

Your company's pension fund owns an $800 million diversified portfolio of common stocks that moves closely in line with the market index. The pension fund is currently fully funded, but you are concerned that if it falls by more than 20% it will start to be underfunded. Suppose that your bank offers to insure you for one year against this possibility. What would you be prepared to pay for this insurance? Think back to Section 20-2 (Figure 20.6), where we showed that you can shield against a fall in asset prices by buying a protective put option. In the present case the bank would be selling you a one-year put option on U.S. stock prices with an exercise price 20% below their current level. You can get the value of that option in two steps. First use the Black–Scholes formula to value a call with the same exercise price and maturity. Then back out the put value from put–call parity. (You will have to adjust for dividends, but we'll leave that to the next section.)

# The Fear Index*

The Market Volatility Index or VIX measures the volatility that is implied by near-term Standard & Poor's 500 Index options and is therefore an estimate of expected *future* market volatility over the next 30 calendar days. Implied market volatilities have been calculated by the Chicago Board Options Exchange (CBOE) since January 1986, though in its current form the VIX dates back only to 2003.

Investors regularly trade volatility. They do so by buying or selling VIX futures and options contracts. Since these were introduced by the Chicago Board Options Exchange (CBOE), combined trading activity in the two contracts has grown to more than 100,000 contracts per day, making them two of the most successful innovations ever introduced by the exchange.

Because VIX measures investor uncertainty, it has been dubbed the "fear index." The market for index options tends to be dominated by equity investors who buy index puts when they are concerned about a potential drop in the stock market. Any subsequent decline in the value of their portfolio is then offset by the increase in the value of the put option. The more that investors demand such insurance, the higher the price of index put options. Thus VIX is an indicator that reflects the price of portfolio insurance.

Between January 1986 and April 2009 the VIX has averaged 20.5%, almost identical to the long-term level of market volatility that we cited in Chapter 7. The high point for the index was in October 1987 when the VIX closed the month at 61%,** but there have been several other short-lived spikes, for example, at the time of Iraq's invasion of Kuwait and the subsequent response by U.N. forces.

Although the VIX is the most widely quoted measure of volatility, volatility measures are also available for several other U.S. and overseas stock market indexes (such as the FTSE 100 Index in the U.K. and the CAC 40 in France), as well as for gold, oil, and the euro.

*For a review of the VIX index see R. E. Whaley, "Understanding the VIX," *Journal of Portfolio Management* 35 (Spring 2009), pp. 98–105.

**On October 19, 1987 (Black Monday), the VIX closed at 150. Fortunately, the market volatility returned fairly rapidly to less exciting levels.

## Calculating Implied Volatilities

So far we have used our option pricing model to calculate the value of an option given the standard deviation of the asset's returns. Sometimes it is useful to turn the problem around and ask what the option price is telling us about the asset's volatility. For example, the Chicago Board Options Exchange trades options on several market indexes. As we write this, the Standard and Poor's 500 index is 890, while a nine-month at-the-money call on the index is priced at 120. If the Black–Scholes formula is correct, then an option value of 120 makes sense only if investors believe that the standard deviation of index returns is about 40% a year.[16]

The Chicago Board Options Exchange regularly publishes the implied volatility on the Standard and Poor's index, which it terms the VIX (see the nearby box). There is an active market in the VIX. For example, suppose you feel that the implied volatility is implausibly low. Then you can "buy" the VIX at the current low price and hope to "sell" it at a profit when implied volatility has increased.

You may be interested to compare the current implied volatility that we calculated earlier with Figure 21.6, which shows past measures of implied volatility for the Standard and Poor's index and for the Nasdaq index (VXN). Notice the sharp increase in investor uncertainty at the height of the credit crunch in 2008. This uncertainty showed up in the price that investors were prepared to pay for options.

[16] In calculating the implied volatility we need to allow for the dividends paid on the shares. We explain how to take these into account in the next section.



▶ **FIGURE 21.6**

Standard deviations of market returns implied by prices of options on stock indexes.

*Source:* Data from the Chicago Board Options Exchange **www.cboe.com**.

## 21-5  Option Values at a Glance

So far our discussion of option values has assumed that investors hold the option until maturity. That is certainly the case with European options that *cannot* be exercised before maturity but may not be the case with American options that can be exercised at any time. Also, when we valued the Google call, we could ignore dividends, because Google did not pay any. Can the same valuation methods be extended to American options and to stocks that pay dividends?

Another question concerns dilution. When investors buy and then exercise traded options, there is no effect on the number of shares issued by the company. But sometimes the company itself may give options to key employees or sell them to investors. When these options are exercised, the number of outstanding shares *does* increase, and therefore the stake of existing stockholders is diluted. Can standard option-valuation models cope with the effect of dilution?

In this section we look at how the possibility of early exercise and dividends affect option value. We hold over the problem of dilution to the Appendix to this chapter.

**American Calls—No Dividends**   Unlike European options, American options can be exercised anytime. However, we know that in the absence of dividends the value of a call option increases with time to maturity. So, if you exercised an American call option early, you would needlessly reduce its value. Since an American call should not be exercised before maturity, its value is the same as that of a European call, and the Black–Scholes model applies to both options.

**European Puts—No Dividends**   If we wish to value a European put, we can use the put–call parity formula from Chapter 20:

$$\text{Value of put} = \text{value of call} - \text{value of stock} + \text{PV}(\text{exercise price})$$

**American Puts—No Dividends**   It can sometimes pay to exercise an American put before maturity in order to reinvest the exercise price. For example, suppose that immediately after you buy an American put, the stock price falls to zero. In this case there is no advantage to holding onto the option since it *cannot* become more valuable. It is better to exercise the put and invest the exercise money. Thus an American put is always more valuable than a European put. In our extreme example, the difference is equal to the present value of the interest that you could earn on the exercise price. In all other cases the difference is less.

Because the Black–Scholes formula does not allow for early exercise, it cannot be used to value an American put exactly. But you can use the step-by-step binomial method as long as you check at each point whether the option is worth more dead than alive and then use the higher of the two values.

**European Calls and Puts on Dividend-Paying Stocks**   Part of the share value comprises the present value of dividends. The option holder is not entitled to dividends. Therefore, when using the Black–Scholes model to value a European option on a dividend-paying stock, you should reduce the price of the stock by the present value of the dividends to be paid before the option's maturity.

Dividends don't always come with a big label attached, so look out for instances where the asset holder gets a benefit and the option holder does not. For example, when you buy foreign currency, you can invest it to earn interest; but if you own an option to buy foreign currency, you miss out on this income. Therefore, when valuing an option to buy foreign currency, you need to deduct the present value of this foreign interest from the current price of the currency.[17]

**American Calls on Dividend-Paying Stocks**   We have seen that when the stock does not pay dividends, an American call option is *always* worth more alive than dead. By holding onto the option, you not only keep your option open but also earn interest on the exercise money. Even when there are dividends, you should never exercise early if the dividend you gain is less than the interest you lose by having to pay the exercise price early. However, if the dividend is sufficiently large, you might want to capture it by exercising the option just before the ex-dividend date.

The only general method for valuing an American call on a dividend-paying stock is to use the step-by-step binomial method. In this case you must check at each stage to see whether the option is more valuable if exercised just before the ex-dividend date than if held for at least one more period.

## 21-6  The Option Menagerie

Our focus in the past two chapters has been on plain-vanilla puts and calls or combinations of them. An understanding of these options and how they are valued will allow you to handle most of the option problems that you are likely to encounter in corporate finance. However, you may occasionally encounter some more unusual options. We are not going to be looking at them in this book, but just for fun and to help you hold your own in

---

[17] For example, suppose that it currently costs $2 to buy £1 and that this pound can be invested to earn interest of 5%. The option holder misses out on interest of $.05 \times \$2 = \$.10$. So, before using the Black–Scholes formula to value an option to buy sterling, you must adjust the current price of sterling:

$$\text{Adjusted price of sterling} = \text{current price} - \text{PV(interest)}$$
$$= \$2 - .10/1.05 = \$1.905$$

conversations with your investment banker friends, here is a crib sheet that summarizes a few of these exotic options:

| | |
|---|---|
| Asian (or average) option | The exercise price is equal to the *average* of the asset's price during the life of the option. |
| Barrier option | Option where the payoff depends on whether the asset price reaches a specified level. A knock-in option (up-and-in call or down-and-in put) comes into existence only when the underlying asset reaches the barrier. Knock-out options (down-and-out call or up-and-out put) *cease* to exist if the asset price reaches the barrier. |
| Bermuda option | The option is exercisable on discrete dates before maturity. |
| Caput option | Call option on a put option. |
| Chooser (as-you-like-it) option | The holder must decide before maturity whether the option is a call or a put. |
| Compound option | An option on an option. |
| Digital (binary or cash-or-nothing) option | The option payoff is zero if the asset price is the wrong side of the exercise price and otherwise is a fixed sum. |
| Lookback option | The option holder chooses as the exercise price any of the asset prices that occurred before the final date. |
| Rainbow option | Call (put) option on the best (worst) of a basket of assets. |

● ● ● ● ●

**SUMMARY**

In this chapter we introduced the basic principles of option valuation by considering a call option on a stock that could take on one of two possible values at the option's maturity. We showed that it is possible to construct a package of the stock and a loan that would provide exactly the same payoff as the option *regardless* of whether the stock price rises or falls. Therefore the value of the option must be the same as the value of this replicating portfolio.

We arrived at the same answer by pretending that investors are risk-neutral, so that the expected return on every asset is equal to the interest rate. We calculated the expected future value of the option in this imaginary risk-neutral world and then discounted this figure at the interest rate to find the option's present value.

The general binomial method adds realism by dividing the option's life into a number of subperiods in each of which the stock price can make one of two possible moves. Chopping the period into these shorter intervals doesn't alter the basic method for valuing a call option. We can still replicate the call by a package of the stock and a loan, but the package changes at each stage.

Finally, we introduced the Black–Scholes formula. This calculates the option's value when the stock price is constantly changing and takes on a continuum of possible future values.

An option can be replicated by a package of the underlying asset and a risk-free loan. Therefore, we can measure the risk of any option by calculating the risk of this portfolio. Naked options are often substantially more risky than the asset itself.

When valuing options in practical situations there are a number of features to look out for. For example, you may need to recognize that the option value is reduced by the fact that the holder is not entitled to any dividends.

● ● ● ● ●

**FURTHER READING**

*Three readable articles about the Black–Scholes model are:*

F. Black, "How We Came up with the Option Formula," *Journal of Portfolio Management* 15 (1989), pp. 4–8.

F. Black, "The Holes in Black–Scholes," *RISK Magazine* 1 (1988), pp. 27–29.

F. Black, "How to use the Holes in Black–Scholes," *Journal of Applied Corporate Finance* 1 (Winter 1989), pp. 67–73.

*There are a number of good books on option valuation. They include:*

J. Hull, *Options, Futures and Other Derivatives,* 7th ed. (Englewood Cliffs, NJ: Prentice-Hall, Inc., 2008).

R. L. McDonald, *Derivatives Markets,* 2nd ed. (Reading, MA: Pearson Addison Wesley, 2005).

P. Wilmott, *Paul Wilmott on Quantitative Finance,* 2nd ed. (New York: John Wiley & Sons, 2006).



**Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

## BASIC

PROBLEM SETS

1. The stock price of Heavy Metal (HM) changes only once a month: either it goes up by 20% or it falls by 16.7%. Its price now is $40. The interest rate is 12.7% per year, or about 1% per month.

   a. What is the value of a one-month call option with an exercise price of $40?

   b. What is the option delta?

   c. Show how the payoffs of this call option can be replicated by buying HM's stock and borrowing.

   d. What is the value of a two-month call option with an exercise price of $40?

   e. What is the option delta of the two-month call over the first one-month period?

2. a. Can the delta of a call option be greater than 1.0? Explain.

   b. Can it be less than zero?

   c. How does the delta of a call change if the stock price rises?

   d. How does it change if the risk of the stock increases?

3. Take another look at our two-step binomial trees for Google, for example, in Figure 21.2. Use the replicating-portfolio or risk-neutral method to value six-month call and put options with an exercise price of $400. Assume the Google stock price is $430.

4. Imagine that Google's stock price will either rise by 25% or fall by 20% over the next six months (see Section 21-1). Recalculate the value of the call option (exercise price = $430) using (a) the replicating portfolio method and (b) the risk-neutral method. Explain intuitively why the option value falls from the value computed in Section 21-1.

5. Over the coming year Ragwort's stock price will halve to $50 from its current level of $100 or it will rise to $200. The one-year interest rate is 10%.

   a. What is the delta of a one-year call option on Ragwort stock with an exercise price of $100?

   b. Use the replicating-portfolio method to value this call.

   c. In a risk-neutral world what is the probability that Ragwort stock will rise in price?

   d. Use the risk-neutral method to check your valuation of the Ragwort option.

   e. If someone told you that in reality there is a 60% chance that Ragwort's stock price will rise to $200, would you change your view about the value of the option? Explain.

6. Use the Black–Scholes formula to value the following options:

   a. A call option written on a stock selling for $60 per share with a $60 exercise price. The stock's standard deviation is 6% per month. The option matures in three months. The risk-free interest rate is 1% per month.

   b. A put option written on the same stock at the same time, with the same exercise price and expiration date.

Visit us at www.mhhe.com/bma

Now for each of these options find the combination of stock and risk-free asset that would replicate the option.

7. "An option is always riskier than the stock it is written on." True or false? How does the risk of an option change when the stock price changes?

8. For which of the following options *might* it be rational to exercise before maturity? Explain briefly why or why not.

   a. American put on a non-dividend-paying stock.

   b. American call—the dividend payment is $5 per annum, the exercise price is $100, and the interest rate is 10%.

   c. American call—the interest rate is 10%, and the dividend payment is 5% of future stock price. (*Hint:* The dividend depends on the stock price, which could either rise or fall.)

### INTERMEDIATE

9. Johnny Jones's high school derivatives homework asks for a binomial valuation of a 12-month call option on the common stock of the Overland Railroad. The stock is now selling for $45 per share and has an annual standard deviation of 24%. Johnny first constructs a binomial tree like Figure 21.2, in which stock price moves up or down every six months. Then he constructs a more realistic tree, assuming that the stock price moves up or down once every three months, or four times per year.

   a. Construct these two binomial trees.

   b. How would these trees change if Overland's standard deviation were 30%? (*Hint:* Make sure to specify the right up and down percentage changes.)

10. Suppose a stock price can go up by 15% or down by 13% over the next year. You own a one-year put on the stock. The interest rate is 10%, and the current stock price is $60.

    a. What exercise price leaves you indifferent between holding the put or exercising it now?

    b. How does this break-even exercise price change if the interest rate is increased?

11. The price of Moria Mining stock is $100. During each of the next two six-month periods the price may either rise by 25% or fall by 20% (equivalent to a standard deviation of 31.5% a year). At month 6 the company will pay a dividend of $20. The interest rate is 10% per six-month period. What is the value of a one-year American call option with an exercise price of $80? Now recalculate the option value, assuming that the dividend is equal to 20% of the with-dividend stock price.

12. Buffelhead's stock price is $220 and could halve or double in each six-month period (equivalent to a standard deviation of 98%). A one-year call option on Buffelhead has an exercise price of $165. The interest rate is 21% a year.

    a. What is the value of the Buffelhead call?

    b. Now calculate the option delta for the second six months if (i) the stock price rises to $440 and (ii) the stock price falls to $110.

    c. How does the call option delta vary with the level of the stock price? Explain intuitively why.

    d. Suppose that in month 6 the Buffelhead stock price is $110. How at that point could you replicate an investment in the stock by a combination of call options and risk-free lending? Show that your strategy does indeed produce the same returns as those from an investment in the stock.

13. Suppose that you own an American put option on Buffelhead stock (see Problem 12) with an exercise price of $220.

    a. Would you ever want to exercise the put early?

    b. Calculate the value of the put.

    c. Now compare the value with that of an equivalent European put option.

14. Recalculate the value of the Buffelhead call option (see Problem 12), assuming that the option is American and that at the end of the first six months the company pays a dividend of $25. (Thus the price at the end of the year is either double or half the *ex*-dividend price in month 6.) How would your answer change if the option were European?

15. Suppose that you have an option that allows you to sell Buffelhead stock (see Problem 12) in month 6 for $165 *or* to buy it in month 12 for $165. What is the value of this unusual option?

16. The current price of the stock of Mont Tremblant Air is C$100. During each six-month period it will either rise by 11.1% or fall by 10% (equivalent to an annual standard deviation of 14.9%). The interest rate is 5% per six-month period.

    a. Calculate the value of a one-year European put option on Mont Tremblant's stock with an exercise price of C$102.

    b. Recalculate the value of the Mont Tremblant put option, assuming that it is an American option.

17. The current price of United Carbon (UC) stock is $200. The standard deviation is 22.3% a year, and the interest rate is 21% a year. A one-year call option on UC has an exercise price of $180.



Visit us at
www.mhhe.com/bma

    a. Use the Black–Scholes model to value the call option on UC. You may find it helpful to use the "live" spreadsheet in Table 21.2 on the book's Web site, **www.mhhe.com/bma**.

    b. Use the formula given in Section 21-2 to calculate the up and down moves that you would use if you valued the UC option with the one-period binomial method. Now value the option by using that method.

    c. Recalculate the up and down moves and revalue the option by using the two-period binomial method.

    d. Use your answer to part (c) to calculate the option delta (i) today; (ii) next period if the stock price rises; and (iii) next period if the stock price falls. Show at each point how you would replicate a call option with a levered investment in the company's stock.

18. Suppose you construct an option hedge by buying a levered position in delta shares of stock and selling one call option. As the share price changes, the option delta changes, and you will need to adjust your hedge. You can minimize the cost of adjustments if changes in the stock price have only a small effect on the option delta. Construct an example to show whether the option delta is likely to vary more if you hedge with an in-the-money option, an at-the-money option, or an out-of-the-money option.

19. a. In Section 21-3 we calculated the risk (beta) of a six-month call option on Google stock with an exercise price of $430. Now repeat the exercise for a similar option with an exercise price of $400. Does the risk rise or fall as the exercise price is reduced?

    b. Now calculate the risk of a one-year call on Google stock with an exercise price of $430. Does the risk rise or fall as the maturity of the option lengthens?

20. Other things equal, which of these American options are you most likely to want to exercise early?

    a. A put option on a stock with a large dividend or a call on the same stock.

    b. A put option on a stock that is selling below exercise price or a call on the same stock.

    c. A put option when the interest rate is high or the same put option when the interest rate is low.

    Illustrate your answer with examples.

21. Is it better to exercise a call option on the with-dividend date or on the ex-dividend date? How about a put option? Explain.

22. Use the "live" Black–Scholes program on this book's Web site, **www.mhhe.com/bma,** to value the Owens Corning warrants described in Section 21-4. The standard deviation of



Visit us at
www.mhhe.com/bma



Visit us at
www.mhhe.com/bma

Owens Corning stock was 41% a year and the interest rate when the warrants were issued was 5%. Owens Corning did not pay a dividend. Ignore the problem of dilution.

23. Use the "live" Black–Scholes program at **www.mhhe.com/bma** to estimate how much you should be prepared to pay to insure the value of your pension fund portfolio for the coming year. Make reasonable assumptions about the volatility of the market and use current interest rates. Remember to subtract the present value of likely dividend payments from the current level of the market index.

### CHALLENGE

24. Use the formula that relates the value of the call and the put (see Section 20-2) and the one-period binomial model to show that the option delta for a put option is equal to the option delta for a call option minus 1.

25. Show how the option delta changes as the stock price rises relative to the exercise price. Explain intuitively why this is the case. (What happens to the option delta if the exercise price of an option is zero? What happens if the exercise price becomes indefinitely large?)

26. Your company has just awarded you a generous stock option scheme. You suspect that the board will either decide to increase the dividend or announce a stock repurchase program. Which do you secretly hope they will decide? Explain. (You may find it helpful to refer back to Chapter 16.)

27. Calculate and compare the risk (betas) of the following investments: (a) a share of Google stock; (b) a one-year call option on Google; (c) a one-year put option; (d) a portfolio consisting of a share of Google stock and a one-year put option; (e) a portfolio consisting of a share of Google stock, a one-year put option, and the sale of a one-year call. In each case assume that the exercise price of the option is $430, which is also the current price of Google stock.

28. Some corporations have issued *perpetual* warrants. Warrants are call options issued by a firm, allowing the warrant holder to buy the firm's stock.

   a. What does the Black–Scholes formula predict for the value of an infinite-lived call option on a non-dividend-paying stock? Explain the value you obtain. (*Hint:* What happens to the present value of the exercise price of a long-maturity option?)

   b. Do you think this prediction is realistic? If not, explain carefully why. (*Hints:* What about dividends? What about bankruptcy?)

● ● ● ● ●

**REAL-TIME DATA ANALYSIS**

Look back at the stocks listed in Table 7.3. Pick at least three stocks and find call option prices for each of them on **finance.yahoo.com**. Now find monthly adjusted prices and calculate the standard deviation from the monthly returns using the Excel function STDEV. Convert the standard deviation from monthly to annual units by multiplying by the square root of 12.

   a. For each stock pick a traded option with a maturity of about six months and an exercise price equal to the current stock price. Use the Black–Scholes formula and your estimate of standard deviation to value each option. If the stock pays dividends, remember to subtract from the stock price the present value of any dividends that the option holder will miss out on. How close is your calculated value to the traded price of the option?

   b. Your answer to part (a) will not exactly match the traded price. Experiment with different values for the standard deviation until your calculated values match the prices of the traded options as closely as possible. What are these implied volatilities? What do the implied volatilities say about investors' forecasts of future volatility?

Visit us at www.mhhe.com/bma

## MINI-CASE • • • • •

### Bruce Honiball's Invention

It was another disappointing year for Bruce Honiball, the manager of retail services at the Gibb River Bank. Sure, the retail side of Gibb River was making money, but it didn't grow at all in 2009. Gibb River had plenty of loyal depositors, but few new ones. Bruce had to figure out some new product or financial service—something that would generate some excitement and attention.

Bruce had been musing on one idea for some time. How about making it easy *and safe* for Gibb River's customers to put money in the stock market? How about giving them the upside of investing in equities—at least *some* of the upside—but none of the downside?

Bruce could see the advertisements now:

> How would you like to invest in Australian stocks completely risk-free? You can with the new Gibb River Bank *Equity-Linked Deposit.* You share in the good years; we take care of the bad ones.
>
> Here's how it works. Deposit A$100 with us for one year. At the end of that period you get back your A$100 *plus* A$5 for every 10% rise in the value of the Australian All Ordinaries stock index. But, if the market index falls during this period, the Bank will still refund your A$100 deposit in full.
>
> There's no risk of loss. Gibb River Bank is your safety net.

Bruce had floated the idea before and encountered immediate skepticism, even derision: "Heads they win, tails we lose—is that what you're proposing, Mr. Honiball?" Bruce had no ready answer. Could the bank really afford to make such an attractive offer? How should it invest the money that would come in from customers? The bank had no appetite for major new risks.

Bruce has puzzled over these questions for the past two weeks but has been unable to come up with a satisfactory answer. He believes that the Australian equity market is currently fully valued, but he realizes that some of his colleagues are more bullish than he is about equity prices.

Fortunately, the bank had just recruited a smart new MBA graduate, Sheila Liu. Sheila was sure that she could find the answers to Bruce Honiball's questions. First she collected data on the Australian market to get a preliminary idea of whether equity-linked deposits could work. These data are shown in Table 21.3. She was just about to undertake some quick calculations when she received the following further memo from Bruce:

> Sheila, I've got another idea. A lot of our customers probably share my view that the market is overvalued. Why don't we also give them a chance to make some money by offering a "bear

| Year | Interest Rate | Market Return | End-Year Dividend Yield | Year | Interest Rate | Market Return | End-Year Dividend Yield |
|------|------|------|------|------|------|------|------|
| 1989 | 17.3% | 17.4% | 5.7% | 1999 | 4.9% | 16.1% | 3.2% |
| 1990 | 15.9 | −17.5 | 6.8 | 2000 | 4.9 | 5.2 | 3.4 |
| 1991 | 11.1 | 34.2 | 3.8 | 2001 | 4.8 | 10.4 | 3.3 |
| 1992 | 6.8 | −2.3 | 3.8 | 2002 | 4.8 | −8.8 | 4.0 |
| 1993 | 5.3 | 45.4 | 3.0 | 2003 | 4.8 | 14.6 | 3.9 |
| 1994 | 5.4 | −8.7 | 4.0 | 2004 | 5.4 | 28.0 | 3.5 |
| 1995 | 8.0 | 20.2 | 4.0 | 2005 | 5.6 | 22.8 | 3.7 |
| 1996 | 7.4 | 14.6 | 3.6 | 2006 | 5.9 | 24.2 | 3.7 |
| 1997 | 5.5 | 12.2 | 3.9 | 2007 | 6.4 | 11.8 | 3.7 |
| 1998 | 5.0 | 11.6 | 3.5 | 2008 | 7.16 | −40.38 | 6.8 |

▶ **TABLE 21.3**
Australian interest rates and equity returns, 1989–2008.

Visit us at www.mhhe.com/bma

market deposit"? If the market goes up, they would just get back their A\$100 deposit. If it goes down, they get their A\$100 back plus \$5 for each 10% that the market falls. Can you figure out whether we could do something like this? Bruce.

### QUESTION

1. What kinds of options is Bruce proposing? How much would the options be worth? Would the equity-linked and bear-market deposits generate positive NPV for Gibb River Bank?

## APPENDIX ● ● ● ● ●

### How Dilution Affects Option Value

If you buy a call option on an options exchange and then exercise it, you have no effect on the number of outstanding shares. The investor who sold the call simply hands over to you his or her shares. However, sometimes the company itself may issue options to buy its own shares. For example, we saw in Section 21-4 that in 2008 Oracle Corporation issued a total of 69 million executive stock options.

Companies also issue convertible bonds, which give investors the option to exchange their bonds in the future for common stock. Therefore, a convertible bond resembles a package of a straight bond and an option to buy the stock. Alternatively, the company may sell a package of bonds and warrants. These warrants are long-term call options to buy the company's stock. Presumably the company hopes that the warrants will serve as a "sweetener," so that by including options in the package investors will be induced to pay a much higher price. If the holders of the convertible bonds or the warrants decide to exercise their option, the company must issue the additional shares to them.

Options that are issued by the company are somewhat trickier to value than exchange-traded options. When these options are exercised, the firm's assets and profits are spread over a larger number of shares. Sometimes this dilution is negligible and can safely be ignored. But, if the number of shares can increase substantially, you need to take it into account when valuing the options. To illustrate how you can do so, we will work through the example of United Glue's warrants.

**Example: Valuing United Glue's Warrants**   United Glue has just issued a \$2 million package of debt and warrants. Here are some basic data that we can use to value the warrants:

| | |
|---|---|
| Number of shares outstanding ($N$) | 1 million |
| Current stock price ($P$) | \$12 |
| Number of warrants issued per share outstanding ($q$) | .10 |
| Total number of warrants issued ($Nq$) | 100,000 |
| Exercise price of warrants (EX) | \$10 |
| Time to expiration of warrants ($t$) | 4 years |
| Annual standard deviation of stock price changes ($\sigma$) | .40 |
| Rate of interest ($r$) | 10% |
| United stock pays no dividends | |

Visit us at www.mhhe.com/bma

**TABLE 21A.1**
United Glue's market value balance sheet (in $ millions).

| Before the Issue | | | |
|---|---|---|---|
| Existing assets | $16 | $ 4 | Existing loans |
| | | 12 | Common stock |
| | | | (1 million shares at |
| | | | $12 a share) |
| Total | $16 | $16 | Total |

| After the Issue | | | |
|---|---|---|---|
| Existing assets | $16 | $ 4 | Existing loans |
| New assets financed | | 1.5 | New loan without warrants |
| by debt and warrants | 2 | 5.5 | Total debt |
| | | .5 | Warrants |
| | | 12 | Common stock |
| | | 12.5 | Total equity |
| Total | $18 | $18.0 | Total |

Suppose that without the warrants the debt is worth $1.5 million. Then investors must be paying $.5 million for the warrants:

Cost of warrants = total amount of financing − value of loan without warrants

$500,000 = $2,000,000 − $1,500,000

$$\text{Each warrant costs investors } \frac{500{,}000}{100{,}000} = \$5$$

Table 21A.1 shows the market value of United's assets and liabilities both before and after the issue.

Now let us take a stab at checking whether the warrants are really worth the $500,000 that investors are paying for them. Since the warrant is a call option to buy the United stock, we can use the Black–Scholes formula to value the warrant. It turns out that a four-year call to buy United stock at $10 is worth $6.15.[18] Thus the warrant issue looks like a good deal for investors and a bad deal for United. Investors are paying $5 a share for warrants that are worth $6.15.

**How the Value of United Warrants Is Affected by Dilution**   Unfortunately, our calculations for United warrants do not tell the whole story. Remember that when investors exercise a traded call or put option, there is no change in either the company's assets or the number of shares outstanding. But, if United's warrants are exercised, the number of shares outstanding will increase by $Nq = 100{,}000$. Also the assets will increase by the amount of the exercise money ($Nq \times EX = 100{,}000 \times \$10 = \$1$ million). In other words, there will be dilution. We need to allow for this dilution when we value the warrants.

Let us call the value of United's equity $V$:

Value of equity = $V$ = value of United's total assets − value of debt

If the warrants are exercised, equity value will increase by the amount of the exercise money to $V + NqEX$. At the same time the number of shares will increase to $N + Nq$. So the share price after the warrants are exercised will be:

$$\text{Share price after exercise} = \frac{V + NqEX}{N + Nq}$$

---

[18] Plugging the data for United into the Black–Scholes formula gives

$$d_1 = \log[12/(10/1.1^4)]/(.40 \times \sqrt{4}) + .40 \times \sqrt{4}/2 = 1.104 \text{ and } d_2 = 1.104 - .40 \times \sqrt{4} = .304$$

The Excel NORMSDIST function tells us that $N(d_1) = .865$, and $N(d_2) = .620$. Therefore, estimated warrant value = $.865 \times 12 - .620 \times (10/1.1^4) = \$6.15$.

Visit us at www.mhhe.com/bma

At maturity the warrant holder can choose to let the warrants lapse or to exercise them and receive the share price less the exercise price. Thus the value of the warrants will be the share price minus the exercise price or zero, whichever is the higher. Another way to write this is:

$$\text{Warrant value at maturity} = \text{maximum}(\text{share price} - \text{exercise price}, \text{zero})$$

$$= \text{maximum}\left(\frac{V + Nq\text{EX}}{N + Nq} - \text{EX}, 0\right)$$

$$= \text{maximum}\left(\frac{V/N - \text{EX}}{1 + q}, 0\right)$$

$$= \frac{1}{1 + q}\text{maximum}\left(\frac{V}{N} - \text{EX}, 0\right)$$

This tells us the effect of dilution on the value of United's warrants. The warrant value is the value of $1/(1 + q)$ call options written on the stock of an alternative firm with the same total equity value $V$, *but with no outstanding warrants*. The alternative firm's stock price would be equal to $V/N$—that is, the total value of United's equity ($V$) divided by the number of shares outstanding ($N$). The stock price of this alternative firm is more variable than United's stock price. So when we value the call option on the alternative firm, we must remember to use the standard deviation of the changes in $V/N$.

Now we can recalculate the value of United's warrants allowing for dilution. First we find the stock price of the alternative firm:

$$\text{Current equity value of alternative firm} = V = \text{value of United's total assets} - \text{value of loans}$$

$$= 18 - 5.5 = \$12.5 \text{ millon}$$

$$\text{Current share price of alternative firm} = \frac{V}{N} = \frac{12.5 \text{ millon}}{1 \text{ millon}} = \$12.50$$

Also, suppose the standard deviation of the share price changes of this alternative firm is $\sigma^* = .41$.[19]

The Black–Scholes formula gives a value of $6.64 for a call option on a stock with a price of $12.50 and a standard deviation of .41. The value of United warrants is equal to the value of $1/(1 + q)$ call options on the stock of this alternative firm. Thus warrant value is:

$$\frac{1}{1 + q} \times \text{value of call on alternative firm} = \frac{1}{1.1} \times 6.64 = \$6.04$$

---

[19] How in practice could we compute $\sigma^*$? It would be easy if we could wait until the warrants had been trading for some time. In that case $\sigma^*$ could be computed from the returns on a package of *all* the company's shares and warrants. In the present case we need to value the warrants *before* they start trading. We argue as follows: The standard deviation of the *assets* before the issue is equal to the standard deviation of a package of the common stock and the existing loans. For example, suppose that the company's debt is risk-free and that the standard deviation of stock returns *before* the bond-warrant issue is 38%. Then we calculate the standard deviation of the initial assets as follows:

$$\begin{array}{c}\text{Standard deviation}\\\text{of initial assets}\end{array} = \begin{array}{c}\text{proportion in}\\\text{common stock}\end{array} \times \begin{array}{c}\text{standard deviation}\\\text{of common stock}\end{array}$$

$$= \frac{12}{16} \times 38 = 28.5\%$$

Now suppose that the assets after the issue are equally risky. Then,

$$\begin{array}{c}\text{Standard deviation}\\\text{of assets after issue}\end{array} = \begin{array}{c}\text{proportion of equity}\\\text{after issue}\end{array} \times \begin{array}{c}\text{standard deviation}\\\text{of equity}(\sigma^*)\end{array}$$

$$28.5 = \frac{12.5}{18} \times \text{standard deviation of equity}(\sigma^*)$$

$$\text{Standard deviation of equity }(\sigma^*) = 41\%$$

Notice that in our example the standard deviation of the stock returns *before* the warrant issue was slightly lower than the standard deviation of the package of stock and warrants. However, the warrant holders bear proportionately more of this risk than do the stockholders; so the bond-warrant package could either increase or reduce the risk of the stock.

Visit us at www.mhhe.com/bma

This is a somewhat lower value than the one we computed when we ignored dilution but still a bad deal for United.

It may sound from all this as if you need to know the value of United warrants to compute their value. This is not so. The formula does not call for warrant value but for $V$, the value of United's equity (that is, the shares *plus* warrants). Given equity value, the formula calculates how the overall value of equity should be split up between stock and warrants. Thus, suppose that United's underwriter advises that $500,000 extra can be raised by issuing a package of bonds and warrants rather than bonds alone. Is this a fair price? You can check using the Black–Scholes formula with the adjustment for dilution.

Finally, notice that these modifications are necessary to apply the Black–Scholes formula to value a warrant. They are not needed by the warrant holder, who must decide whether to exercise at maturity. If at maturity the price of the stock exceeds the exercise price of the warrant, the warrant holder will of course exercise.

## QUESTION

1. Here is a question about dilution. The Electric Bassoon Company has outstanding 2,000 shares with a total market value of $20,000 *plus* 1,000 warrants with a total market value of $5,000. Each warrant gives its holder the option to buy one share at $20.

   a. To value the warrants, you first need to value a call option on an alternative share. How might you calculate its standard deviation?

   b. Suppose that the value of a call option on this alternative share was $6. Calculate whether the Electric Bassoon warrants were undervalued or overvalued.

# Real Options

▶ **When you use** discounted cash flow (DCF) to value a project, you implicitly assume that your firm will hold the project passively. In other words, you are ignoring the *real options* attached to the project—options that sophisticated managers can take advantage of. You could say that DCF does not reflect the value of management. Managers who hold real options do not have to be passive; they can make decisions to capitalize on good fortune or to mitigate loss. The opportunity to make such decisions clearly adds value whenever project outcomes are uncertain.

Chapter 10 introduced the four main types of real options:

- The option to expand if the immediate investment project succeeds.
- The option to wait (and learn) before investing.
- The option to shrink or abandon a project.
- The option to vary the mix of output or the firm's production methods.

Chapter 10 gave several simple examples of real options. We also showed you how to use decision trees to set out possible future outcomes and decisions. But we did not show you how to value real options. That is our task in this chapter. We apply the concepts and valuation principles you learned in Chapter 21.

For the most part we work with simple numerical examples. The art and science of valuing real options are illustrated just as well with simple calculations as complex ones. But we also describe several more realistic examples, including:

- A strategic investment in the computer business.
- The valuation of an aircraft purchase option.
- The option to develop commercial real estate.
- The decision to operate or mothball an oil tanker.

These examples show how financial managers can value real options in real life. We also show how managers can *create* real options, adding value by adding flexibility to the firm's investments and operations.

We should start with a warning. Setting out the possible future choices that the firm may encounter usually calls for a strong dose of judgment. Therefore, do not expect precision when valuing real options. Often managers do not even try to put a figure on the value of the option, but simply draw on their experience to decide whether it is worth paying for additional flexibility. Thus they might say, "We just don't know whether gargle blasters will catch on, but it probably makes sense to spend an extra $200,000 now to allow for an extra production line in the future."

● ● ● ● ●

## 22-1 The Value of Follow-on Investment Opportunities

It is 1982. You are assistant to the chief financial officer (CFO) of Blitzen Computers, an established computer manufacturer casting a profit-hungry eye on the rapidly developing personal computer market. You are helping the CFO evaluate the proposed introduction of the Blitzen Mark I Micro.

The Mark I's forecasted cash flows and NPV are shown in Table 22.1. Unfortunately the Mark I can't meet Blitzen's customary 20% hurdle rate and has a $46 million negative NPV, contrary to top management's strong gut feeling that Blitzen ought to be in the personal computer market.

The CFO has called you in to discuss the project:

"The Mark I just can't make it on financial grounds," the CFO says. "But we've got to do it for strategic reasons. I'm recommending we go ahead."

"But you're missing the all-important financial advantage, Chief," you reply.

"Don't call me 'Chief.' What financial advantage?"

"If we don't launch the Mark I, it will probably be too expensive to enter the micro market later, when Apple, IBM, and others are firmly established. If we go ahead, we have the opportunity to make follow-on investments that could be extremely profitable. The Mark I gives not only its own cash flows but also a call option to go on with a Mark II micro. That call option is the real source of strategic value."

"So it's strategic value by another name. That doesn't tell me what the Mark II investment's worth. The Mark II could be a great investment or a lousy one—we haven't got a clue."

"That's exactly when a call option is worth the most," you point out perceptively. "The call lets us invest in the Mark II if it's great and walk away from it if it's lousy."

"So what's it worth?"

"Hard to say precisely, but I've done a back-of-the-envelope calculation, which suggests that the value of the option to invest in the Mark II could more than offset the Mark I's $46 million negative NPV. [The calculations are shown in Table 22.2.] If the option to invest is worth $55 million, the total value of the Mark I is its own NPV, −$46 million, plus the $55 million option attached to it, or +$9 million."

"You're just overestimating the Mark II," the CFO says gruffly. "It's easy to be optimistic when an investment is three years away."

"No, no," you reply patiently. "The Mark II is expected to be no more profitable than the Mark I—just twice as big and therefore twice as bad in terms of discounted cash flow. I'm forecasting it to have a negative NPV of about $100 million. But there's a chance the Mark II could be extremely valuable. The call option allows Blitzen to cash in on those upside outcomes. The chance to cash in could be worth $55 million.

"Of course, the $55 million is only a trial calculation, but it illustrates how valuable follow-on investment opportunities can be, especially when uncertainty is high and the product market is growing rapidly. Moreover, the Mark II will give us a call on the Mark III, the Mark III on the Mark IV, and so on. My calculations don't take subsequent calls into account."

"I think I'm beginning to understand a little bit of corporate strategy," mumbles the CFO.

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | **1982** | **1983** | **1984** | **1985** | **1986** | **1987** |
| After-tax operating cash flow (1) | | +110 | +159 | +295 | +185 | 0 |
| Capital investment (2) | 450 | 0 | 0 | 0 | 0 | 0 |
| Increase in working capital (3) | 0 | 50 | 100 | 100 | −125 | −125 |
| Net cash flow (1) − (2) − (3) | −450 | + 60 | + 59 | +195 | +310 | +125 |
| NPV at 20% = − $46.45, or about − $46 million | | | | | | |

▶ **TABLE 22.1**

Summary of cash flows and financial analysis of the Mark I microcomputer ($ millions).

> **TABLE 22.2**

Valuing the option to invest in the Mark II microcomputer.

**Assumptions**

1. The decision to invest in the Mark II must be made after three years, in 1985.

2. The Mark II investment is double the scale of the Mark I (note the expected rapid growth of the industry). Investment required is $900 million (the exercise price), which is taken as fixed.

3. Forecasted cash inflows of the Mark II are also double those of the Mark I, with present value of $807 million in 1985 and $807/(1.2)^3 = $467 million in 1982.

4. The future value of the Mark II cash flows is highly uncertain. This value evolves as a stock price does with a standard deviation of 35% per year. (Many high-technology stocks have standard deviations higher than 35%.)

5. The annual interest rate is 10%.

**Interpretation**

The opportunity to invest in the Mark II is a three-year call option on an asset worth $467 million with a $900 million exercise price.

**Valuation**

$$\text{PV(exercise price)} = \frac{900}{(1.1)^3} = 676$$

$$\text{Call value} = [N(d_1) \times P] - [N(d_2) \times \text{PV(EX)}]$$

$$d_1 = \log[P/\text{PV(EX)}]/\sigma\sqrt{t} + \sigma\sqrt{t}/2$$

$$= \log[.691]/.606 + .606/2 = -.3072$$

$$d_2 = d_1 - \sigma\sqrt{t} = -.3072 - .606 = -.9134$$

$$N(d_1) = .3793, \ N(d_2) = .1805$$

$$\text{Call value} = [.3793 \times 467] - [.1805 \times 676] = \$55.1 \text{ million}$$

## Questions and Answers about Blitzen's Mark II

*Question:* I know how to use the Black–Scholes formula to value traded call options, but this case seems harder. What number do I use for the stock price? I don't see any traded shares.

*Answer:* With traded call options, you can see the value of the *underlying asset* that the call is written on. Here the option is to buy a nontraded real asset, the Mark II. We can't observe the Mark II's value; we have to compute it.

The Mark II's forecasted cash flows are set out in Table 22.3. The project involves an initial outlay of $900 million in 1985. The cash inflows start in the following year and have a present value of $807 million in 1985, equivalent to $467 million in 1982 as shown in Table 22.3. So the real option to invest in the Mark II amounts to a three-year call on an underlying asset worth $467 million, with a $900 million exercise price.

> **TABLE 22.3**

Cash flows of the Mark II microcomputer, as forecasted from 1982 ($ millions).

| | Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | **1982** | **1985** | **1986** | **1987** | **1988** | **1989** | **1990** |
| After-tax operating cash flow | | | +220 | +318 | +590 | +370 | 0 |
| Increase in working capital | | | 100 | 200 | 200 | −250 | −250 |
| Net cash flow | | | +120 | +118 | +390 | +620 | +250 |
| Present value at 20% | +467 | ⬅ +807 | | | | | |
| Investment, PV at 10% | 676 | ⬅ 900 | | | | | |
| | (PV in 1982) | | | | | | |
| Forecasted NPV in 1985 | | − 93 | | | | | |

Notice that real options analysis does *not* replace DCF. You typically need DCF to value the underlying asset.

*Question:* Table 22.2 uses a standard deviation of 35% per year. Where does that number come from?

*Answer:* We recommend you look for *comparables,* that is, traded stocks with business risks similar to the investment opportunity.[1] For the Mark II, the ideal comparables would be growth stocks in the personal computer business, or perhaps a broader sample of high-tech growth stocks. Use the average standard deviation of the comparable companies' returns as the benchmark for judging the risk of the investment opportunity.[2]

*Question:* Table 22.3 discounts the Mark II's cash flows at 20%. I understand the high discount rate, because the Mark II is risky. But why is the $900 million investment discounted at the risk-free interest rate of 10%? Table 22.3 shows the present value of the investment in 1982 of $676 million.

*Answer:* Black and Scholes assumed that the exercise price is a fixed, certain amount. We wanted to stick with their basic formula. If the exercise price is uncertain, you can switch to a slightly more complicated valuation formula.[3]

*Question:* Nevertheless, if I had to decide in 1982, once and for all, whether to invest in the Mark II, I wouldn't do it. Right?

*Answer:* Right. The NPV of a commitment to invest in the Mark II is negative:

$$NPV(1982) = PV(\text{cash inflows}) - PV(\text{investment}) = \$467 - 676 = -\$209 \text{ million}$$

The option to invest in the Mark II is "out of the money" because the Mark II's value is far less than the required investment. Nevertheless, the option is worth +$55 million. It is especially valuable because the Mark II is a risky project with lots of upside potential. Figure 22.1 shows the probability distribution of the possible present values of the Mark II in 1985. The expected (mean or average) outcome is our forecast of $807,[4] but the actual value could exceed $2 billion.

*Question:* Could it also be far below $807 million—$500 million or less?

*Answer:* The downside is irrelevant, because Blitzen won't invest unless the Mark II's actual value turns out higher than $900 million. The net option payoffs for all values less than $900 million are zero.

In a DCF analysis, you discount the expected outcome ($807 million), which averages the downside against the upside, the bad outcomes against the good. The value of a call option depends only on the upside. You can see the danger of trying to value a future investment option with DCF.

---

[1] You could also use scenario analysis, which we described in Chapter 10. Work out "best" and "worst" scenarios to establish a range of possible future values. Then find the annual standard deviation that would generate this range over the life of the option. For the Mark II, a range from $300 million to $2 billion would cover about 90% of the possible outcomes. This range, shown in Figure 22.1, is consistent with an annual standard deviation of 35%.

[2] Be sure to "unlever" the standard deviations, thereby eliminating volatility created by debt financing. Chapter 17 covered unlevering procedures for beta. The same principles apply for standard deviation: You want the standard deviation of a portfolio of all the debt and equity securities issued by the comparable firm.

[3] If the required investment is uncertain, you have, in effect, an option to exchange one risky asset (the future value of the exercise price) for another (the future value of the Mark II's cash inflows). See W. Margrabe, "The Value of an Option to Exchange One Asset for Another," *Journal of Finance* 33 (March 1978), pp. 177–186.

[4] We have drawn the future values of the Mark II as a lognormal distribution, consistent with the assumptions of the Black–Scholes formula. Lognormal distributions are skewed to the right, so the average outcome is greater than the most likely outcome. The most likely outcome is the highest point on the probability distribution.



Probability

Expected value ($807)   Required investment ($900)

500    1500    2000    2500    Present value in 1985

▶ **FIGURE 22.1**

This distribution shows the range of possible present values for the Mark II project in 1985. The expected value is about $800 million, less than the required investment of $900 million. The option to invest pays off in the shaded area above $900 million.

*Question:* What's the decision rule?

*Answer:* Adjusted present value. The Mark I project costs $46 million (NPV = − $46 million), but accepting it creates the expansion option for the Mark II. The expansion option is worth $55 million, so:

$$APV = -46 + 55 = +\$9 \text{ million}$$

Of course we haven't counted other follow-on opportunities. If the Mark I and Mark II are successes, there will be an option to invest in the Mark III, possibly the Mark IV, and so on.

### Other Expansion Options

You can probably think of many other cases where companies spend money today to create opportunities to expand in the future. A mining company may acquire rights to an ore body that is not worth developing today but could be very profitable if product prices increase. A real estate developer may invest in worn-out farmland that could be turned into a shopping mall if a new highway is built. A pharmaceutical company may acquire a patent that gives the right but not the obligation to market a new drug. In each case the company is acquiring a real option to expand.

## 22-2 The Timing Option

The fact that a project has a positive NPV does not mean that you should go ahead today. It may be better to wait and see how the market develops.

Suppose that you are contemplating a now-or-never opportunity to build a malted herring factory. In this case you have an about-to-expire call option on the present value of the factory's future cash flows. If the present value exceeds the cost of the factory, the call option's payoff is the project's NPV. But if NPV is negative, the call option's payoff is zero, because in that case the firm will not make the investment.

Now suppose that you can delay construction of the plant. You still have the call option, but you face a trade-off. If the outlook is highly uncertain, it is tempting to wait and see whether the malted herring market takes off or decays. On the other hand, if the project is truly profitable, the sooner you can capture the project's cash flows, the better. If the cash flows are high enough, you will want to exercise your option right away.

The cash flows from an investment project play the same role as dividend payments on a stock. When a stock pays no dividends, an American call is always worth more alive than dead and should never be exercised early. But payment of a dividend before the option matures reduces the ex-dividend price and the possible payoffs to the call option at maturity. Think of the extreme case: If a company pays out all its assets in one bumper dividend, the stock price must be zero and the call worthless. Therefore, any in-the-money call would be exercised just before this liquidating dividend.

Dividends do not always prompt early exercise, but if they are sufficiently large, call option holders capture them by exercising just before the ex-dividend date. We see managers acting in the same way: When a project's forecasted cash flows are sufficiently large, managers capture the cash flows by investing right away. But when forecasted cash flows are small, managers are inclined to hold on to their call rather than to invest, even when project NPV is positive.[5] This explains why managers are sometimes reluctant to commit to positive-NPV projects. This caution is rational as long as the option to wait is open and sufficiently valuable.

## Valuing the Malted Herring Option

Figure 22.2 shows the possible cash flows and end-of-year values for the malted herring project. If you commit and invest $180 million, you have a project worth $200 million. If demand turns out to be low in year 1, the cash flow is only $16 million and the value of the project falls to $160 million. But if demand is high in year 1, the cash flow is $25 million and value rises to $250 million. Although the project lasts indefinitely, we assume that investment cannot be postponed beyond the end of the first year, and therefore we show only the cash flows for the first year and the possible values at the end of the year. Notice that if you undertake the investment right away, you capture the first year's cash flow ($16 million or $25 million); if you delay, you miss out on this cash flow, but you will have more information on how the project is likely to work out.

We can use the binomial method to value this option. The first step is to pretend that investors are risk neutral and to calculate the probabilities of high and low demand in this risk-neutral world. If demand is high in the first year, the malted herring plant



| Now | 200  (NPV = 200 − 180 = 20) |
| | (?) |
| | Cash flow   Cash flow |
| | = 16   = 25 |
| Year 1 | 160    250 |
| | (0)    (250 − 180 = 70) |

> ▶ **FIGURE 22.2**
>
> Possible cash flows and end-of-period values for the malted herring project are shown in black. The project costs $180 million, either now or later. The red figures in parentheses show payoffs from the option to wait and to invest later if the project is positive-NPV at year 1. Waiting means loss of the first year's cash flows. The problem is to figure out the current value of the option.

[5] We have been a bit vague about forecasted project cash flows. If competitors can enter and take away cash that you could have earned, the meaning is clear. But what about the decision to, say, develop an oil well? Here delay doesn't waste barrels of oil in the ground; it simply postpones production and the associated cash flow. The cost of waiting is the decline in today's *present value* of revenues from production. Present value declines if the cash flow from production increases more slowly than the cost of capital.

has a cash flow of $25 million and a year-end value of $250 million. The total return is $(25 + 250)/200 - 1 = .375$, or 37.5%. If demand is low, the plant has a cash flow of $16 million and a year-end value of $160 million. Total return is $(16 + 160)/200 - 1 = - .12$, or −12%. In a *risk-neutral* world, the expected return would be equal to the interest rate, which we assume is 5%:

$$\text{Expected} \atop \text{return} = \begin{pmatrix} \text{Probability of} \\ \text{high demand} \end{pmatrix} \times 37.5 + \begin{pmatrix} 1 - \text{probability of} \\ \text{high demand} \end{pmatrix} \times (-12) = 5\%$$

Therefore the (pretend) probability of high demand is 34.3%.

We want to value a call option on the malted herring project with an exercise price of $180 million. We begin as usual at the end and work backward. The bottom row of Figure 22.2 shows the possible values of this option at the end of the year. If project value is $160 million, the option to invest is worthless. At the other extreme, if project value is $250 million, option value is $250 − 180 = $70 million.

To calculate the value of the option today, we work out the expected payoffs in a risk-neutral world and discount at the interest rate of 5%. Thus, the value of your option to invest in the malted herring plant is:

$$\frac{(.343 \times 70) + (.657 \times 0)}{1.05} = \$22.9 \text{ million}$$

But here is where we need to recognize the opportunity to exercise the option immediately. The option is worth $22.9 million if you keep it open, and it is worth the project's immediate NPV (200 − 180 = $20 million) if exercised now. Therefore we decide to wait, and then to invest next year only if demand turns out high.

We have of course simplified the malted herring calculations. You won't find many actual investment-timing problems that fit into a one-step binomial tree. (We work through a more realistic, 8-step tree in the next section.) But the example delivers an important practical point: A positive NPV is not a sufficient reason for investing. It may be better to wait and see.

### Optimal Timing for Real Estate Development

Sometimes it pays to wait for a long time, even for projects with large positive NPVs. Suppose you own a plot of vacant land in the suburbs.[6] The land can be used for a hotel or an office building, but not for both. A hotel could be later converted to an office building, or an office building to a hotel, but only at significant cost. You are therefore reluctant to invest, even if both investments have positive NPVs.

In this case you have two options to invest, but only one can be exercised. You therefore learn two things by waiting. First, you learn about the general *level* of cash flows from development, for example, by observing changes in the value of developed properties near your land. Second, you can update your estimates of the *relative* size of the hotel's future cash flows versus the office building's.

Figure 22.3 shows the conditions in which you would finally commit to build either the hotel or the office building. The horizontal axis shows the current cash flows that a hotel would generate. The vertical axis shows current cash flows for an office building. For simplicity, we assume that each investment would have an NPV of exactly zero at a current cash flow of 100. Thus, if you were forced to invest today, you would choose the building with the higher cash flow, assuming the cash flow is greater than 100. (What if you were forced to decide today and each building could generate the same cash flow, say, 150? You would flip a coin.)

---

[6] The following example is based on P. D. Childs, T. J. Riddiough, and A. J. Triantis, "Mixed Uses and the Redevelopment Option," *Real Estate Economics* 24 (Fall 1996), pp. 317–339.



▶ **FIGURE 22.3**

Development option for vacant land, assuming two mutually exclusive uses, either hotel or office building. The developer should "wait and see" unless the hotel's and office building's cash flows end up in one of the shaded areas.

*Source:* Adapted from Figure 1 in P. D. Childs, T. J. Riddiough, and A. J. Triantis, "Mixed Uses and the Redevelopment Option," *Real Estate Economics* 24 (Fall 1996), pp. 317–339. © 1996 Blackwell Publishers.

If the two buildings' cash flows plot in the colored area at the lower right of Figure 22.3, you build the hotel. To fall in this area, the hotel's cash flows have to beat two hurdles. First, they must exceed a minimum level of about 240. Second, they must exceed the office building's cash flows by a sufficient amount. If the situation is reversed, with office building cash flows above the minimum level of 240, and also sufficiently above the hotel's, then you build the office building. In this case, the cash flows plot in the colored area at the top left of the figure.

Notice how the "Wait and see" region extends upward along the 45-degree line in Figure 22.3. When the cash flows from the hotel and office building are nearly the same, you become *very* cautious before choosing one over the other.

You may be surprised at how high cash flows have to be in Figure 22.3 to justify investment. There are three reasons. First, building the office building means not building the hotel, and vice versa. Second, the calculations underlying Figure 22.3 assumed cash flows that were small, but growing; therefore, the costs of waiting to invest were small. Third, the calculations did not consider the threat that someone might build a competing hotel or office building right next door. In that case the "relax and wait" area of Figure 22.3 would shrink dramatically.

## 22-3   The Abandonment Option

Expansion value is important. When investments turn out well, the quicker and easier the business can be expanded, the better. But suppose bad news arrives, and cash flows are far below expectations. In that case it is useful to have the option to bail out and recover the value of the project's plant, equipment, or other assets. The option to abandon is equivalent to a put option. You exercise that abandonment option if the value recovered from the project's assets is greater than the present value of continuing the project for at least one more period.

The binomial method is tailor-made for most abandonment options. Here is an example.

### The Zircon Subductor Project

Dawn East, the chief financial officer of Maine Subductor Corp., has to decide whether to start production of zircon subductors. The investment required is $12 million—$2 million for roads and site preparation and $10 million for equipment. The equipment costs $700,000 per year ($.7 million) to operate (a fixed cost). For simplicity, we ignore other costs and taxes.



▶ **FIGURE 22.4**

Binomial tree for the Subductor project. Cash flow (top number) and end-of-period present value are shown for each node in millions of dollars. Abandonment occurs if cash flows drop into the shaded boxes. Beginning present value is about $14 million.

Visit us at
www.mhhe.com/bma



At today's prices, the project would generate revenues of $2.5 million per year. Annual output will be constant, so revenue is proportional to price. If the mine were operating today, cash flow would be $2.5 − .7 = $1.8 million.

**Calculate the Present Value of the Project**    The first step in a real options analysis is to value the underlying asset, that is, the project if it had no options attached. Usually this is done by discounted cash flow (DCF). In this case the chief source of uncertainty is the future selling price of zircon subductors. Therefore Ms. East starts by calculating the present value of future revenues. She perceives no upward trend in subductor prices, and ends up forecasting stable prices for the next 8 years. Fixed costs are constant at $.7 million. The top panel of Figure 22.4 shows these cash-flow forecasts and calculates present values: about $13.8 million for revenues, after discounting at a risk-adjusted rate of 9%, and $4.3 million for fixed costs, after discounting at a risk-free rate of 6%.[7] The NPV of the project, assuming no salvage value or abandonment over its 10-year life, is:

$$NPV = PV(revenues) − PV(fixed\ costs) − investment\ required$$
$$= \$13.84 − 4.35 − 12.00 = −\$2.51\ million$$

This NPV is slightly negative, but Ms. East has so far made no provision for abandonment.

**Build a Binomial Tree**    Now Ms. East constructs a binomial tree for revenues and PV(revenues). She notes that subductor prices have followed a random walk with an annual standard deviation of about 20%. She constructs a binomial tree with one step per year. The "up" values for revenues are 122% of the prior year's revenues. The "down" values are 82%

---

[7] Why calculate present values for revenues and fixed costs separately? Because it's easier to construct a binomial tree for revenues, which can be assumed to follow a random walk with constant standard deviation. We will subtract fixed costs after the binomial tree is constructed.

of prior revenues.[8] Thus, the up and down revenues for year 1 are $2.5 \times 1.22 = $3.05 and $2.5 \times .82 = $2.05 million, respectively. After deduction of fixed costs, the up and down cash flows are $2.35 and $1.35 million, respectively. The first two years of the resulting tree are shown below (figures in millions of dollars).



Figure 22.4 shows the whole tree, starting with cash flows in year 1. (Maine Subductor can't generate any revenues in year 0 because it hasn't started production yet.) The top number at each node is cash flow. The bottom number is the *end*-of-year present value of *all* subsequent cash flows, including the value of the production equipment when the project ends or is abandoned. We will see in a moment how these present values are calculated.

Finally, Ms. East calculates the risk-neutral probabilities of up and down changes in revenues, $p$ and $1 - p$, respectively. Here she must pause to make sure that each year's revenue is valued properly. Remember that we have discounted revenues at a risk-adjusted rate of 9%. Thus the present value of year 1 revenues is not $2.5 million, but only

$$PV = \frac{2.5}{1.09} = $2.29 \text{ million}$$

Therefore, Ms. East needs to calculate the risk-neutral probabilities that generate an expected return equal to the 6% risk-free rate.[9]

$$\text{Expected return} = \frac{[3.05p + 2.05(1 - p)]}{2.29} - 1 = .06$$

$$\text{Probability of up change} = .382$$
$$\text{Probability of down change} = .618$$

Ms. East can use these probabilities at every node of the binomial tree, because the proportional up and down moves are the same at each node.

**Solve for Optimal Abandonment and Project Value** Ms. East has assumed a project life of 8 years. At that time the production equipment, which normally depreciates by about 5% per year, should be worth $6.63 million. This salvage value represents what the equipment could be sold for, or its value to Maine Subductor if shifted to another use.

Now let's calculate this project's value in the binomial tree. We start at the far right of Figure 22.4 (year 8) and work back to the present. The company will abandon for sure in year 8, when the ore body is exhausted. Thus we enter the ending salvage value ($6.63 million) as the end-of-year value in year 8. Then we step back to year 7.

Suppose that Maine Subductor ends up in the best possible place in that year, where cash flow is $9.44 million. The upside payoff if the company does not abandon is the "up" node

---

[8] The formula (given in Section 21-2) for the up percentage is $u = e^{\sigma\sqrt{h}}$ where $\sigma$ is the standard deviation per year and $h$ is the interval as a fraction of a year. In this case, $h = 1$ and $e^{\sigma} = e^{.2} = 1.22$. The down value is $d = 1/u = .82$.

[9] Notice that the "up" revenues are 122% of today's revenue level, but 133% of the present value of next year's forecasted revenues. Thus the "up" probability required to generate a 6% average return is relatively small.

in year 8: 11.68 + 6.63 = \$18.31 million. The downside payoff is 7.60 + 6.63 = \$14.23 million. The present value, using the risk-neutral probabilities, is:

$$PV = \frac{(.382 \times 18.31) + (.618 \times 14.23)}{1.06} = \$14.90 \text{ million}$$

The company could abandon at the end of year 7, realizing salvage value of \$6.98 million, but continuing is better. We therefore enter \$14.90 million as the end-of-year value at the top node for year 7 in Figure 22.4.

We can fill in the end-of-period values for the other nodes in year 7 by the same procedure. But at some point, as we step down to lower and lower cash flows, there will come a node where it's better to bail out than continue. This occurs when cash flow is \$.67 million. The present value of continuing is only:

$$PV = \frac{.382 \times (.98 + 6.63) + .618 \times (.42 + 6.63)}{1.06} = \$6.85 \text{ million}$$

The payoff to abandonment is \$6.98 million, so that payoff is entered as the value in year 7 at all nodes with cash flows equal to or less than \$.67 million.

The cash flows and end-of-year values for year 7 are the payoffs to continuing from year 6. We then calculate values in year 6, checking at each node whether to abandon. Repeat this drill for year 5, then year 4, and so on back to year 0. In this example, Maine Subductor should abandon the project if cash flows drop to \$.67 million or less in each year. We have colored the nodes in Figure 22.4 where abandonment occurs.

Solving back through the binomial tree, we get a present value of \$13.977 million at year 0, and net present value of \$13.977 − 12.0 = \$1.977 million.[10] If there were no option to abandon, the DCF valuation would be − \$2.51 million. Therefore the option to abandon is worth \$1.977 + 2.510 = \$4.487 million.[11] In an APV format,

$$APV = NPV \text{ with no abandonment} + \text{abandonment option value}$$
$$= -2.51 + 4.487 = +\$1.977 \text{ million}$$

The project looks good, although Ms. East may wish to check out the timing option. She could decide to wait.

### Abandonment Value and Project Life

Ms. East assumed that the zircon subductor project had a definite 8-year life. But most projects' economic lives are not known at the start. Cash flows from a new product may last only a year or so if the product fails in the marketplace. But if it succeeds, that product, or variations or improvements of it, could be produced for decades.

A project's economic life can be just as hard to predict as the project's cash flows. Yet in standard DCF capital-budgeting analysis, that life is assumed to end at a fixed future date. Real options analysis allows us to relax that assumption. Here is the procedure.[12]

1. Forecast the range of possible cash flows well beyond your best guess of the project's economic life. Suppose, for example, that your guess is 8 years. You could prepare a binomial tree like Figure 22.4 stretching out 20 years into the future.

---

[10] We will spare you the calculations. You can check them, however. The "live" spreadsheet for Figure 22.4 is on this book's Web site (**www.mhhe.com/bma**).

[11] It turns out, however, that the value of *early* abandonment in this example is relatively small. Suppose that Maine Subductor could recover salvage value of \$6.63 million in year 8, but not before. The present value of this recovery in year 0, using a 6% discount rate, is \$4.16 million. APV in this case is −2.51 + 4.16 = \$1.65 million, a little less than the APV of \$1.977 million if early abandonment is allowed.

[12] See S. C. Myers and S. Majd, "Abandonment Value and Project Life," in *Advances in Futures and Options Research,* ed. F. J. Fabozzi (Greenwich, CT: JAI Press, 1990).

2.  Then value the project, including its abandonment value. In the best upside scenarios, project life will be 20 years—it will never make sense to abandon before year 20. In the worst downside scenarios, project life will be much shorter, because the project will be more valuable dead than alive. If your original guess about project life is right, then in intermediate scenarios, where actual cash flows match expectations, abandonment will occur around year 8.

This procedure links project life to the performance of the project. It does not impose an arbitrary ending date, except in the far distant future.

## Temporary Abandonment

Companies are often faced with complex options that allow them to abandon a project *temporarily*, that is, to mothball it until conditions improve. Suppose you own an oil tanker operating in the short-term spot market. (In other words, you charter the tanker voyage by voyage, at whatever short-term charter rates prevail at the start of the voyage.) The tanker costs $50 million a year to operate and at current tanker rates it produces charter revenues of $52.5 million per year. The tanker is therefore profitable but scarcely cause for celebration. Now tanker rates dip by about 10%, forcing revenues down to $47 million. Do you immediately lay off the crew and mothball the tanker until prices recover? The answer is clearly yes if the tanker business can be turned on and off like a faucet. But that is unrealistic. There is a fixed cost to mothballing the tanker. You don't want to incur this cost only to regret your decision next month if rates rebound to their earlier level. The higher the costs of mothballing and the more variable the level of charter rates, the greater the loss that you will be prepared to bear before you call it quits and lay up the boat.

Suppose that eventually you do decide to take the boat off the market. You lay up the tanker temporarily.[13] Two years later your faith is rewarded; charter rates rise, and the revenues from operating the tanker creep above the operating cost of $50 million. Do you reactivate immediately? Not if there are costs to doing so. It makes more sense to wait until the project is well in the black and you can be fairly confident that you will not regret the cost of bringing the tanker back into operation.

These choices are illustrated in Figure 22.5. The blue line shows how the value of an operating tanker varies with the level of charter rates. The black line shows the value of the



▶ **FIGURE 22.5**

An oil tanker should be mothballed when tanker rates fall to M, where the tanker's value if mothballed is enough above its value in operation to cover mothballing costs. The tanker is reactivated when rates recover to R.

---

[13] We assume it makes sense to keep the tanker in mothballs. If rates fall sufficiently, it will pay to scrap the tanker.

tanker when mothballed.[14] The level of rates at which it pays to mothball is given by M and the level at which it pays to reactivate is given by R. The higher the costs of mothballing and reactivating and the greater the variability in tanker rates, the further apart these points will be. You can see that it will pay for you to mothball as soon as the value of a mothballed tanker reaches the value of an operating tanker plus the costs of mothballing. It will pay to reactivate as soon as the value of a tanker that is operating in the spot market reaches the value of a mothballed tanker plus the costs of reactivating. If the level of rates falls below M, the value of the tanker is given by the black line; if the level is greater than R, value is given by the blue line. If rates lie between M and R, the tanker's value depends on whether it happens to be mothballed or operating.

## 22-4 Flexible Production

Flexible production means the ability to vary production inputs or outputs in response to fluctuating demand or prices. Take the case of CT (combustion-turbine) generating plants, which are designed to deliver short bursts of peak-load electrical power. CTs can't match the thermal efficiency of coal or nuclear power plants, but CTs can be turned on or off on short notice. The coal plants and "nukes" are efficient only if operated on "base load" for long periods.

The profits from operating a CT depend on the *spark spread,* that is, on the difference between the price of electricity and the cost of the natural gas used as fuel. CTs are money-losers at average spark spreads, but the spreads are volatile and can spike to very high levels when demand is high and generating capacity tight. Thus a CT delivers a series of call options that can be exercised day by day (even hour by hour) when spark spreads are sufficiently high. The call options are normally out-of-the-money (CTs typically operate only about 5% of the time), but the money made at peak prices makes investment in the CTs worthwhile.

The volatility of spark spreads depends on the correlation between the price of electricity and the price of natural gas used as fuel. If the correlation were 1.0, so that electricity and natural gas prices moved together dollar for dollar, the spark spread would barely move from its average value, and the options to operate the gas turbine would be worthless. But in fact the correlation is less than 1.0, so the options are valuable. In addition, some CTs are set up to give a further option, because they can be run on oil as well as natural gas.[15]

In this example, the output is the same (electricity); option value comes from the ability to vary the amount produced and the raw materials used (natural gas or oil). In other cases, option value comes from the flexibility to switch from product to product using the same production facilities. For example, textile firms have invested heavily in computer-controlled knitting machines, which allow production to shift from product to product, or from design to design, as demand and fashion dictate.

Flexibility in *procurement* can also have option value. For example, a computer manufacturer planning next year's production must also plan to buy components, such as disk drives and microprocessors, in large quantities. Should it strike a deal today with the component manufacturer? This locks in the quantity, price, and delivery dates. But it also gives

---

[14] Dixit and Pindyck estimate these thresholds for a medium-sized tanker and show how they depend on costs and the volatility of freight rates. See A. K. Dixit and R. S. Pindyck, *Investment under Uncertainty* (Princeton, NJ: Princeton University Press, 1994), Chapter 7. Brennan and Schwartz provide an analysis of a mining investment that also includes an option to shut down temporarily. See M. Brennan and E. Schwartz, "Evaluating Natural Resource Investments," *Journal of Business* 58 (April 1985), pp. 135–157.

[15] Industrial steam and heating systems can also be designed to switch between fuels, depending on relative fuel costs. See N. Kulatilaka, "The Value of Flexibility: The Case of a Dual-Fuel Industrial Steam Boiler," *Financial Management* 22 (Autumn 1993), pp. 271–280.

# FINANCE IN PRACTICE

## Valuing Flexibility

▶ With the help of faculty from Stanford University, Hewlett-Packard has experimented with real options since the beginning of the 1990s. Example: In the '80s, HP customized inkjet printers for foreign markets at the factory, then shipped them in finished form to warehouses. Customizing at the factory is cheaper than customizing in the field. But HP kept guessing wrong on demand and ending up with, say, too many printers configured for French customers but not enough for Germans.

Executives realized that it would be smarter to ship partially assembled printers and then customize them at the warehouse, once it had firm orders. True, local customization costs more. But even though production costs rose, HP saved $3 million a month by more effectively matching supply to demand, says Corey A. Billington, a former Stanford professor who directs HP's Strategic Planning & Modeling group.

Common sense? Sure. But you can also view it as a neat solution of a real-options problem. Increasing the cost of production—anathema to your average engineer—was in effect the price HP paid for the option to delay configuration choices until the optimal time.

**Source:** P. Coy, "Exploiting Uncertainty." Reprinted from June 7, 1999 issue of *Business Week* by special premission, © 1999 by The McGraw-Hill Companies, Inc.

up flexibility, for example, the ability to switch suppliers next year or buy at a "spot" price if next year's prices are lower.

The Finance in Practice box features another example of the value of flexibility in production or procurement.

## 22-5 Aircraft Purchase Options

For our final example, we turn to the problem confronting airlines that order new airplanes for future use. In this industry lead times between an order and delivery can extend to several years. Long lead times mean that airlines that order planes today may end up not needing them. You can see why an airline might negotiate for an aircraft purchase *option.*

In Section 10-3, we used aircraft purchase options to illustrate the option to expand. What we said there was the truth, but not the whole truth. Let's take another look. Suppose an airline forecasts a need for a new Airbus A320 four years hence.[16] It has at least three choices.

- *Commit now.* It can commit now to buy the plane, in exchange for Airbus's offer of locked-in price and delivery date.
- *Acquire option.* It can seek a purchase option from Airbus, allowing the airline to decide later whether to buy. A purchase option fixes the price and delivery date if the option is exercised.
- *Wait and decide later.* Airbus will be happy to sell another A320 at any time in the future if the airline wants to buy one. However, the airline may have to pay a higher price and wait longer for delivery, especially if the airline industry is flying high and many planes are on order.

---

[16] The following example is based on J. E. Stonier, "What Is an Aircraft Purchase Option Worth? Quantifying Asset Flexibility Created through Manufacturer Lead-Time Reductions and Product Commonality," in *Handbook of Airline Finance,* ed. G. F. Butler and M. R. Keller. © 1999 Aviation Week Books.

|  | Year 0 | Year 3 | Year 4 | Year 5 or later |
|---|---|---|---|---|
| Buy option | Airline and manufacturer set price and delivery date | Exercise? (Yes or no) | Aircraft delivered if option exercised | |
| Wait | Wait and decide later | Buy now? If yes, negotiate price and wait for delivery. | | Aircraft delivered if purchased at year 3. |

▶ **FIGURE 22.6**

This aircraft purchase option, if exercised at year 3, guarantees delivery at year 4 at a fixed price. Without the option, the airline can still order the plane at year 3, but the price is uncertain and the wait for delivery longer.

*Source:* Adapted from Figure 17–17 in J. Stonier, "What Is an Aircraft Purchase Option Worth? Quantifying Asset Flexibility Created through Manufacturer Lead-Time Reductions and Product Commonality," *Handbook of Airline Finance,* ed. G.F. Butler and M.R. Keller. Copyright 1999 Aviation Week Books; Reprinted with permission from The McGraw-Hill Companies, Inc.

The top half of Figure 22.6 shows the terms of a typical purchase option for an Airbus A320. The option must be exercised at year 3, when final assembly of the plane will begin. The option fixes the purchase price and the delivery date in year 4. The bottom half of the figure shows the consequences of "wait and decide later." We assume that the decision will come at year 3. If the decision is "buy," the airline pays the year-3 price and joins the queue for delivery in year 5 or later.

The payoffs from "wait and decide later" can never be better than the payoffs from an aircraft purchase option, since the airline can discard the option and negotiate afresh with Airbus if it wishes. In most cases, however, the airline will be better off in the future with the option than without it; the airline is at least guaranteed a place in the production line, and it may have locked in a favorable purchase price. But how much are these advantages worth today, compared to the wait-and-see strategy?

Figure 22.7 illustrates Airbus's answers to this problem. It assumes a three-year purchase option with an exercise price equal to the current A320 price of $45 million. The present value of the purchase option depends on both the NPV of purchasing an A320 at that price and on the forecasted wait for delivery if the airline does *not* have a purchase option but nevertheless decides to place an order in year 3. The longer the wait in year 3, the more valuable it is to have the purchase option today. (Remember that the purchase option holds a place in the A320 production line and guarantees delivery in year 4.)

If the NPV of buying an A320 today is very high (the right-hand side of Figure 22.7), future NPV will probably be high as well, and the airline will want to buy regardless of whether it has a purchase option. In this case the value of the purchase option comes mostly from the value of guaranteed delivery in year 4.[17] If the NPV is very low, then the option has low value because the airline is unlikely to exercise it. (Low NPV today probably means low NPV in year 3.) The purchase option is worth the most, compared to the wait-and-decide-later strategy, when NPV is around zero. In this case the airline can exercise the option, getting a good price and early delivery, if future NPV is higher than expected; alternatively, it can walk away from the option if NPV disappoints. Of course,

---

[17] The Airbus real-options model assumes that future A320 prices will be increased when demand is high, but only to an upper bound. Thus the airline that waits and decides later may still have a positive-NPV investment opportunity if future demand and NPV are high. Figure 22.7 plots the *difference* between the value of the purchase option and this wait-and-see opportunity. This difference can shrink when NPV is high, especially if forecasted waiting times are short.



▶ **FIGURE 22.7**

Value of aircraft purchase option—the extra value of the option versus waiting and possibly negotiating a purchase later. (See Figure 22.6.) The purchase option is worth most when NPV of purchase now is about zero and the forecasted wait for delivery is long.

*Source:* Adapted from Fig. 17–20 in J. Stonier, "What Is an Aircraft Purchase Option Worth? Quantifying Asset Flexibility Created Through Manufacturer Lead-Time Reductions and Product Commonality," in *Handbook of Aviation Finance.,* ed. G. F. Butler and M. R. Keller. © 1999 Aviation Week Books; Reprinted with permission from The McGraw-Hill Companies, Inc.

if it walks away, it may still wish to negotiate with Airbus for delivery at a price lower than the option's exercise price.

We have cruised by many of the technical details of Airbus's valuation model for purchase options. But the example does illustrate how real-options models are being built and used. By the way, Airbus offers more than just plain-vanilla purchase options. Airlines can negotiate "rolling options," which lock in price but do not guarantee a place on the production line. (Exercise of the rolling option means that the airline joins the end of the queue.) Airbus also offers a purchase option that includes the right to switch from delivery of an A320 to an A319, a somewhat smaller plane.

## 22-6  A Conceptual Problem?

In this chapter we have suggested that option pricing models can help to value the real options in capital investment decisions. But that raises a question.

When we introduced option pricing models in Chapter 21, we suggested that the trick is to construct a package of the underlying asset and a loan that would give exactly the same payoffs as the option. If the two investments do not sell for the same price, then there are arbitrage possibilities. But many assets are not freely traded. This means that we can no longer rely on arbitrage arguments to justify the use of option models.

The risk-neutral method still makes practical sense, however. It's really just an application of the *certainty-equivalent* method introduced in Chapter 9.[18] The key assumption—implicit till now—is that the company's *shareholders* have access to assets with the same risk characteristics (e.g., the same beta) as the capital investments being evaluated by the firm.

Think of each real investment opportunity as having a "double," a security or portfolio with identical risk. Then the expected rate of return offered by the double is also the cost of capital for the real investment and the discount rate for a DCF valuation of the investment project. Now what would investors pay for a real *option* based on the project? The same as for an identical traded option written on the double. This traded option does not

---

[18] Use of risk-neutral probabilities converts future cash flows to certainty equivalents, which are then discounted to present value at a risk-free rate.

have to exist; it is enough to know how it would be valued by investors, who could employ either the arbitrage or the risk-neutral method. The two methods give the same answer, of course.

When we value a real option by the risk-neutral method, we are calculating the option's value if it could be traded. This exactly parallels standard capital budgeting. Shareholders would vote unanimously to accept any capital investment whose market value *if traded* exceeds its cost, as long as they can buy traded securities with the same risk characteristics as the project. This key assumption supports the use of both DCF and real-option valuation methods.

### Practical Challenges

The challenges in applying real-options analysis are not conceptual but practical. It isn't always easy. We can tick off some of the reasons why.

First, real options can be complex, and valuing them can absorb a lot of analytical and computational horsepower. Whether you want to invest in that horsepower is a matter for business judgment. Sometimes an approximate answer now is more useful than a "perfect" answer later, particularly if the perfect answer comes from a complicated model that other managers will regard as a black box. One advantage of real options analysis, if you keep it simple, is that it's relatively easy to explain. Complex decision trees can often be described as the payoffs to one or two simple call or put options.

The second problem is lack of *structure.* To quantify the value of a real option, you have to specify its possible payoffs, which depend on the range of possible values of the underlying asset, exercise prices, timing of exercise, etc. In this chapter we have taken well-structured examples where it is easy to see the road map of possible outcomes. In other cases you may not have a road map. For example, reading this book can enhance your personal call option to work in financial management, yet we suspect that you would find it hard to write down how that option would change the binomial tree of your entire future career.

A third problem can arise when your *competitors* have real options. This is not a problem in industries where products are standardized and no single competitor can shift demand and prices. But when you face just a few key competitors, all with real options, then the options can interact. If so, you can't value your options without thinking of your competitors' moves. Your competitors will be thinking in the same fashion.

An analysis of competitive interactions would take us into other branches of economics, including game theory. But you can see the danger of assuming passive competitors. Think of the timing option. A simple real-options analysis will often tell you to wait and learn before investing in a new market. Be careful that you don't wait and learn that a competitor has moved first.[19]

Given these hurdles, you can understand why systematic, quantitative valuation of real options is restricted mostly to well-structured problems like the examples in this chapter. The qualitative implications of real options are widely appreciated, however. Real options give the financial manager a conceptual framework for strategic planning and thinking about capital investments. If you can identify and understand real options, you will be a more sophisticated consumer of DCF analysis and better equipped to invest your company's money wisely.

Understanding real options also pays off when you can *create* real options, adding value by adding flexibility to the company's investments and operations. For example, it may be better to design and build a series of modular production plants, each with capacity of 50,000 tons per year of magnoosium alloy, than to commit to one large plant with

---

[19] Being the first mover into a new market is not always the best strategy, of course. Sometimes later movers win. For a survey of real options and product-market competition, see H. Smit and L. Trigeorgis, *Strategic Investment, Real Options and Games* (Princeton, NJ: Princeton University Press, 2004).

capacity of 150,000 tons per year. The larger plant will probably be more efficient because of economies of scale. But with the smaller plants, you retain the flexibility to expand in step with demand and to defer investment when demand growth is disappointing.

Sometimes valuable options can be created simply by "overbuilding" in the initial round of investment. For example, oil-production platforms are typically built with vacant deck space to reduce the cost of adding equipment later. Undersea oil pipelines from the platforms to shore are often built with larger diameters and capacity than production from the platform will require. The additional capacity is then available at low cost if additional oil is found nearby. The extra cost of a larger-diameter pipeline is much less than the cost of building a second pipeline later.



**SUMMARY**

In Chapter 21 you learned the basics of option valuation. In this chapter we described four important real options:

1. *The option to make follow-on investments.* Companies often cite "strategic" value when taking on negative-NPV projects. A close look at the projects' payoffs reveals call options on follow-on projects in addition to the immediate projects' cash flows. Today's investments can generate tomorrow's opportunities.

2. *The option to wait (and learn) before investing.* This is equivalent to owning a call option on the investment project. The call is exercised when the firm commits to the project. But rather than exercising the call immediately, it's often better to defer a positive-NPV project in order to keep the call alive. Deferral is most attractive when uncertainty is great and immediate project cash flows—which are lost or postponed by waiting—are small.

3. *The option to abandon.* The option to abandon a project provides partial insurance against failure. This is a put option; the put's exercise price is the value of the project's assets if sold or shifted to a more valuable use.

4. *The option to vary the firm's output or its production methods.* Firms often build flexibility into their production facilities so that they can use the cheapest raw materials or produce the most valuable set of outputs. In this case they effectively acquire the option to exchange one asset for another.

We should offer here a healthy warning: The real options encountered in practice are often complex. Each real option brings its own issues and trade-offs. Nevertheless the tools that you have learned in this and previous chapters can be used in practice. The Black–Scholes formula often suffices to value expansion options. Problems of investment timing and optimal abandonment can be tackled with binomial trees.

Binomial trees are cousins of decision trees. You work back through binomial trees from future payoffs to present value. Whenever a future decision needs to be made, you figure out the value-maximizing choice, using the principles of option pricing theory, and record the resulting value at the appropriate node of the tree.

Don't jump to the conclusion that real-option-valuation methods can replace discounted cash flow (DCF). First, DCF works fine for safe cash flows. It also works for "cash cow" assets—that is, for assets or businesses whose value depends primarily on forecasted cash flows, not on real options. Second, the starting point in most real-option analyses is the present value of an underlying asset. To value the underlying asset, you typically have to use DCF.

Real options are rarely traded assets. When we value a real option, we are estimating its value if it could be traded. This is the standard approach in corporate finance, the same approach taken in DCF valuations. The key assumption is that shareholders can buy traded securities or

Visit us at www.mhhe.com/bma

portfolios with the same risk characteristics as the real investments being evaluated by the firm. If so, they would vote unanimously for any real investment whose market value if traded would exceed the investment required. This key assumption supports the use of both DCF and real-option valuation methods.

### FURTHER READING

*The Further Reading for Chapter 10 lists several introductory articles on real options. The Spring 2005 and 2007 issues of the* Journal of Applied Corporate Finance *contain additional articles.*

*The Spring 2006 issue contains two further articles:*

R. L. McDonald, "The Role of Real Options in Capital Budgeting: Theory and Practice," *Journal of Applied Corporate Finance* 18 (Spring 2006), pp. 28–39.

M. Amram, F. Li, and C. A. Perkins, "How Kimberly-Clark Uses Real Options," *Journal of Applied Corporate Finance* 18 (Spring 2006), pp. 40–47.

*The standard texts on real options include:*

M. Amran and N. Kulatilaka, *Real Options: Managing Strategic Investments in an Uncertain World* (Boston: Harvard Business School Press, 1999).

T. Copeland and V. Antikarov, *Real Options: A Practitioner's Guide* (New York: Texere, 2001).

A. K. Dixit and R. S. Pindyck, *Investment under Uncertainty* (Princeton, NJ: Princeton University Press, 1994).

H. Smit and L. Trigeorgis, *Strategic Investment, Real Options and Games* (Princeton, NJ: Princeton University Press, 2004).

L. Trigeorgis, *Real Options* (Cambridge, MA: MIT Press, 1996).

*Mason and Merton review a range of option applications to corporate finance:*

S. P. Mason and R. C. Merton, "The Role of Contingent Claims Analysis in Corporate Finance," in E. I. Altman and M. G. Subrahmanyan (eds.), *Recent Advances in Corporate Finance* (Homewood, IL: Richard D. Irwin, Inc., 1985).

*Brennan and Schwartz have worked out an interesting application to natural resource investments:*

M. J. Brennan and E. S. Schwartz, "Evaluating Natural Resource Investments," *Journal of Business* 58 (April 1985), pp. 135–157.

 **connect™**  **Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

### PROBLEM SETS

#### BASIC

1. Look again at the valuation in Table 22.2 of the option to invest in the Mark II project. Consider a change in each of the following inputs. Would the change increase or decrease the value of the expansion option?
   a. Increased uncertainty (higher standard deviation).
   b. More optimistic forecast (higher expected value) of the Mark II in 1985.
   c. Increase in the required investment in 1985.

2. A start-up company is moving into its first offices and needs desks, chairs, filing cabinets, and other furniture. It can buy the furniture for $25,000 or rent it for $1,500 per month. The founders are of course confident in their new venture, but nevertheless they rent. Why? What's the option?

Visit us at www.mhhe.com/bma

**3.** Flip back to Tables 6.2 and 6.6, where we assumed an economic life of seven years for IM&C's guano plant. What's wrong with that assumption? How would you undertake a more complete analysis?

**4.** You own a parcel of vacant land. You can develop it now, or wait.

a. What is the advantage of waiting?

b. Why might you decide to develop the property immediately?

**5.** Gas turbines are among the least efficient ways to produce electricity, much less thermally efficient than coal or nuclear plants. Why do gas-turbine generating stations exist? What's the option?

**6.** Why is quantitative valuation of real options often difficult in practice? List the reasons briefly.

**7.** True or false?

a. Real-options analysis sometimes tells firms to make negative-NPV investments to secure future growth opportunities.

b. Using the Black–Scholes formula to value options to invest is dangerous when the investment project would generate significant immediate cash flows.

c. Binomial trees can be used to evaluate options to acquire or abandon an asset. It's OK to use risk-neutral probabilities in the trees even when the asset beta is 1.0 or higher.

d. It's OK to use the Black–Scholes formula or binomial trees to value real options, even though the options are not traded.

e. A real-options valuation will sometimes reveal that it's better to invest in a single large plant than a series of smaller plants.

**8.** Alert financial managers can *create* real options. Give three or four possible examples.

### INTERMEDIATE

**9.** Describe each of the following situations in the language of options:

a. Drilling rights to undeveloped heavy crude oil in Northern Alberta. Development and production of the oil is a negative-NPV endeavor. (The break-even oil price is C$70 per barrel, versus a spot price of C$60.) However, the decision to develop can be put off for up to five years. Development costs are expected to increase by 5% per year.

b. A restaurant is producing net cash flows, after all out-of-pocket expenses, of $700,000 per year. There is no upward or downward trend in the cash flows, but they fluctuate as a random walk, with an annual standard deviation of 15%. The real estate occupied by the restaurant is owned, not leased, and could be sold for $5 million. Ignore taxes.

c. A variation on part (b): Assume the restaurant faces known fixed costs of $300,000 per year, incurred as long as the restaurant is operating. Thus,

$$\text{Net cash flow} = \text{revenue less variable costs} - \text{fixed costs}$$
$$\$700,000 = 1,000,000 - 300,000$$

The annual standard deviation of the forecast error of revenue less variable costs is 10.5%. The interest rate is 10%. Ignore taxes.

d. A paper mill can be shut down in periods of low demand and restarted if demand improves sufficiently. The costs of closing and reopening the mill are fixed.

e. A real estate developer uses a parcel of urban land as a parking lot, although construction of either a hotel or an apartment building on the land would be a positive-NPV investment.

f. Air France negotiates a purchase option for 10 Boeing 787s. Air France must confirm the order by 2010. Otherwise Boeing will be free to sell the aircraft to other airlines.



Visit us at
www.mhhe.com/bma

**10.** Look again at Table 22.2. How does the value in 1982 of the option to invest in the Mark II change if:

a. The investment required for the Mark II is $800 million (vs. $900 million)?

b. The present value of the Mark II in 1982 is $500 million (vs. $467 million)?

c. The standard deviation of the Mark II's present value is only 20% (vs. 35%)?



Visit us at
www.mhhe.com/bma

**11.** You own a one-year call option on one acre of Los Angeles real estate. The exercise price is $2 million, and the current, appraised market value of the land is $1.7 million. The land is currently used as a parking lot, generating just enough money to cover real estate taxes. The annual standard deviation is 15% and the interest rate 12%. How much is your call worth? Use the Black–Scholes formula. You may find it helpful to go to the "live" spreadsheet for Chapter 21, which calculates Black-Scholes values (visit this book's Web site, **www.mhhe. com/bma**).



Visit us at
www.mhhe.com/bma

**12.** A variation on Problem 11: Suppose the land is occupied by a warehouse generating rents of $150,000 after real estate taxes and all other out-of-pocket costs. The present value of the land plus warehouse is again $1.7 million. Other facts are as in Problem 11. You have a European call option. What is it worth?



Visit us at
www.mhhe.com/bma

**13.** You have an option to purchase all of the assets of the Overland Railroad for $2.5 billion. The option expires in nine months. You estimate Overland's current (month 0) present value (PV) as $2.7 billion. Overland generates after-tax free cash flow (FCF) of $50 million at the end of each quarter (i.e., at the end of each three-month period). If you exercise your option at the start of the quarter, that quarter's cash flow is paid out to you. If you do not exercise, the cash flow goes to Overland's current owners.

In each quarter, Overland's PV either increases by 10% or decreases by 9.09%. This PV includes the quarterly FCF of $50 million. After the $50 million is paid out, PV drops by $50 million. Thus the binomial tree for the first quarter is (figures in millions):



The risk-free interest rate is 2% per quarter.

a. Build a binomial tree for Overland, with one up or down change for each three-month period (three steps to cover your nine-month option).

b. Suppose you can only exercise your option now, or after nine months (not at month 3 or 6). Would you exercise now?

c. Suppose you can exercise now, or at month 3, 6, or 9. What is your option worth today? Should you exercise today, or wait?



Visit us at
www.mhhe.com/bma

**14.** In Section 10-4 we considered two production technologies for a new Wankel-engined outboard motor. Technology A was the most efficient but had no salvage value if the new outboards failed to sell. Technology B was less efficient but offered a salvage value of $17 million.

Visit us at www.mhhe.com/bma

Figure 10.5 shows the present value of the project as either $24 or $16 million in year 1 if Technology A is used. Assume that the present value of these payoffs is $18 million at year 0.

a. With Technology B, the payoffs at year 1 are $22.5 or $15 million. What is the present value of these payoffs in year 0 if Technology B is used? (*Hint:* The payoffs with Technology B are 93.75% of the payoffs from Technology A.)

b. Technology B allows abandonment in year 1 for $17 million salvage value. You also get cash flow of $1.5 million, for a total of $18.5 million. Calculate abandonment value, assuming a risk-free rate of 7%.

15. Respond to the following comments.

a. "You don't need option pricing theories to value flexibility. Just use a decision tree. Discount the cash flows in the tree at the company cost of capital."

b. "These option pricing methods are just plain nutty. They say that real options on risky assets are worth more than options on safe assets."

c. " Real-options methods eliminate the need for DCF valuation of investment projects."

16. We mentioned that combustion-turbine (CT) generators can be set up to burn either oil or natural gas. How will the value of this option be affected by the correlation between oil and natural gas prices? Explain briefly.

17. Josh Kidding, who has only read part of Chapter 10, decides to value a real option by (1) setting out a decision tree, with cash flows and probabilities forecasted for each future outcome; (2) deciding what to do at each decision point in the tree; and (3) discounting the resulting expected cash flows at the company cost of capital. Will this procedure give the right answer? Why or why not?

18. Go to this book's Web site (**www.mhhe.com/bma**) and find the "live" spreadsheet for the Subductor project. Show how the value of the option to abandon changes as you change different input variables. Can you relate your findings to what you know about the value of a put option? (*Hint:* If you are stuck, you may find it useful to refer back to Section 20-3.)



Visit us at
www.mhhe.com/bma

19. In binomial trees, risk-neutral probabilities are set to generate an expected rate of return equal to the risk-free interest rate in each branch of the tree. What do you think of the following statement: "The value of an option to acquire an asset increases with the difference between the risk-free rate of interest and the weighted-average cost of capital for the asset"?

## CHALLENGE

20. Suppose you expect to need a new plant that will be ready to produce turbo-encabulators in 36 months. If design A is chosen, construction must begin immediately. Design B is more expensive, but you can wait 12 months before breaking ground. Figure 22.8 on the next page shows the cumulative present value of construction costs for the two designs up to the 36-month deadline. Assume that the designs, once built, will be equally efficient and have equal production capacity.

A standard DCF analysis ranks design A ahead of design B. But suppose the demand for turbo-encabulators falls and the new factory is not needed; then, as Figure 22.8 shows, the firm is better off with design B, provided the project is abandoned before month 24.

Describe this situation as the choice between two (complex) call options. Then describe the same situation in terms of (complex) abandonment options. The two descriptions should imply identical payoffs, given optimal exercise strategies.

21. In Chapter 4, we expressed the value of a share of stock as:

$$P_0 = \frac{\text{EPS}_1}{r} + \text{PVGO}$$

▶ **FIGURE 22.8**

Cumulative construction cost of the two plant designs. Plant A takes 36 months to build; plant B, only 24. But plant B costs more.



Cumulative construction cost

Total cost of design B

Total cost of design A

Time, months

0    12    24    36

Start A    Start B    Both plants would be ready at this time

where $EPS_1$ is earnings per share from existing assets, $r$ is the expected rate of return required by investors, and PVGO is the present value of growth opportunities. PVGO really consists of a portfolio of expansion options.[20]

a. What is the effect of an increase in PVGO on the standard deviation or beta of the stock's rate of return?

b. Suppose the CAPM is used to calculate the cost of capital for a growth (high-PVGO) firm. Assume all-equity financing. Will this cost of capital be the correct hurdle rate for investments to expand the firm's plant and equipment, or to introduce new products?

---

[20] If this challenge problem intrigues you, check out two articles by Eduardo Schwartz and Mark Moon, who attempt to use real-options theory to value Internet companies: "Rational Valuation of Internet Companies," *Financial Analysts Journal* 56 (May/June 2000), pp. 62–65, and "Rational Pricing of Internet Companies Revisited," *The Financial Review* 36 (November 2001), pp. 7–25.

# Credit Risk and the Value of Corporate Debt

▶ **We first looked** at how to value bonds way back in Chapter 3. We explained in that chapter what bond dealers mean when they refer to spot rates of interest and yields to maturity. We discussed why long-term and short-term bonds may offer different rates of interest and why prices of long-term bonds are affected more by a change in rates. We looked at the difference between nominal and real (inflation-adjusted) interest rates, and we saw how interest rates respond to changes in the prospects for inflation.

All the lessons of Chapter 3 hold good for both government and corporate bonds, but there is also a fundamental distinction between government and corporate issues. When the U.S. Treasury borrows money, you can be confident that the debt will be repaid in full and on time. This is not true of corporate borrowing. Look, for example, at Figure 23.1. You can see that in 2008 companies defaulted on a record $430 billion of debt. Bondholders are aware of the danger that they will not get their money back and so demand a higher rate of interest.

The extra yield on corporate bonds is the annual payment that investors demand for taking on the possibility of default. We begin our review of corporate bonds by looking at how this yield spread varies with the likelihood of default. Then in Section 23-2 we look more carefully at the company's decision to default. We show that default is an *option;* if the going becomes too tough, the company has the option to stop payments on its bonds and hand over the business to the debtholders. We know what determines the value of options; therefore, we know the basic variables that must enter into the valuation of corporate bonds.

Our next step is to look at bond ratings and some of the techniques that are used by banks and bond investors to estimate the probability that the borrower will not be able to repay its debts. As a company's prospects deteriorate, bondholders worry increasingly about this risk, and their worries are reflected in lower bond prices. Therefore, in the final section we describe some of the ways that financial managers measure the risk of loss from investment in corporate bonds.

•••••

## 23-1 Yields on Corporate Debt

Six Flags is known for the roller-coaster rides at its theme parks, but the company itself has also experienced a white-knuckle ride of its own. By early 2009 the price of its 9.625% bonds of 2014 had fallen to 19.5% of face value and offered a yield to maturity of 64%. A naïve investor who compared this yield with the 2% yield on Treasury bonds might have concluded that the Six Flags debt was a wonderful investment. But the owner would earn a return of 64% on the debt only if the company repaid the bonds in full. That was looking increasingly doubtful. Over the previous decade the company had recorded a series of losses, and it entered 2009 with over $2 billion of debt and negative book equity. Because there was a considerable risk that the company would default on its bonds, the *expected* return was much less than 64%.



▶ **FIGURE 23.1**

Global face value of defaulting debt, 1989–2008, in billions of dollars.

*Source:* Standard & Poor's, *Default, Transition and Recovery: 2008 Annual Global Corporate Default Study and Rating Transitions,* April 2, 2009.

Corporate bonds, such as the Six Flags bond, offer a higher *promised* yield than government bonds, but do they necessarily offer a higher *expected* yield? We can answer this question with a simple numerical example. Suppose that the interest rate on one-year *risk-free* bonds is 5%. Backwoods Chemical Company has issued 5% notes with a face value of $1,000, maturing in one year. What will the Backwoods notes sell for?

If the notes are risk-free, the answer is easy—just discount principal ($1,000) and interest ($50) at 5%:

$$\text{PV of notes} = \frac{\$1,000 + 50}{1.05} = \$1,000$$

Suppose, however, that there is a 20% chance that Backwoods will default and that, if default does occur, holders of its notes receive half the face value of the notes, or $500. In this case, the possible payoffs to the noteholders are:

|  | Payoff | Probability |
|---|---|---|
| No default | $1,050 | .8 |
| Default | 500 | .2 |

The expected payment is .8($1,050) + .2($500) = $940.

We can value the Backwoods notes like any other risky asset, by discounting their expected payoff ($940) at the appropriate opportunity cost of capital. We might discount at the risk-free interest rate (5%) if Backwoods's possible default is totally unrelated to other events in the economy. In this case default risk is wholly diversifiable, and the beta of the notes is zero. The notes would sell for:

$$\text{PV of notes} = \frac{\$940}{1.05} = \$895$$

An investor who purchased the notes for $895 would receive a *promised* yield of 17.3%:

$$\text{Promised yield} = \frac{\$1050}{\$895} - 1 = .173$$

That is, an investor who purchased the notes for $895 would earn a return of 17.3% if Backwoods does not default. Bond traders therefore might say that the Backwoods notes "yield 17.3%." But the smart investor would realize that the notes' *expected* yield is only 5%, the same as on risk-free bonds.

This of course assumes that the risk of default with these notes is wholly diversifiable, so that they have no market risk. In general, risky bonds do have market risk (that is, positive betas) because default is more likely to occur in recessions when all businesses are doing poorly. Suppose that investors demand a 3% risk premium and an 8% expected rate of return. Then the Backwoods notes will sell for 940/1.08 = $870 and offer a promised yield of (1,050/870) − 1 = .207, or 20.7%.

## What Determines the Yield Spread?

Figure 23.2 shows how the yield spread on U.S. corporate bonds varies with the bond's risk. Bonds rated Aaa by Moody's are the highest-grade bonds and are issued only by blue-chip companies. The promised yield on these bonds has on average been 1% higher than the yield on Treasuries. Baa bonds are rated three notches lower; the yield spread on these bonds has averaged over 2%. At the bottom of the heap are high-yield or "junk" bonds. There is considerable variation in the yield spreads on junk bonds; a typical spread might be about 5% over Treasuries, but, as we saw in the case of the Six Flags bond, spreads can go skyward as companies approach distress.

Remember these are promised yields and companies don't always keep their promises. Many high-yielding bonds have defaulted, while some of the more successful issuers have called their debt, thus depriving their holders of the prospect of a continuing stream of high coupon payments. So while the *promised yield* on junk bonds has averaged 5% more than yields on Treasuries, the annual *return* since 1980 has been less than 2% higher.

Figure 23.2 also shows that yield spreads can vary quite sharply from one year to the next. For example, they were unusually high in 1990–1991, 2000–2002, and 2008. Why is this? The main reason is that these were periods when profits were poor and defaults more likely. (Figure 23.1 shows how default rates jumped in these years.) However, the fluctuations in spreads appear to be too large to be due simply to changing probabilities of default. It seems that there are occasions when investors are particularly reluctant to bear the risk of low-grade bonds and so scurry to the safe haven of government debt.[1]



▶ **FIGURE 23.2**

End-year yield spreads between corporate and 10-year Treasury bonds, 1980–2008.

*Source:* The Federal Reserve, **www.federalreserve.gov**, and Datastream.

---

[1] For evidence on the effect of changing risk aversion on bond spreads, see A. Berndt, R. Douglas, D. Duffie, M. Ferguson, and D. Schranzk, "Measuring Default Risk Premia from Default Swap Rates and EDFs," unpublished paper, Graduate School of Business, Stanford University, November 2005.

To understand more precisely what the yield spread measures, compare these two strategies:

*Strategy 1:* Invest $1,000 in a floating-rate default-free bond yielding 9%.[2]

*Strategy 2:* Invest $1,000 in a comparable floating-rate corporate bond yielding 10%. At the same time take out an insurance policy to protect yourself against the possibility of default. You pay an insurance premium of 1% a year, but in the event of default you are compensated for any loss in the bond's value.

Both strategies provide exactly the same payoff. In the case of Strategy 2 you gain a 1% higher yield but this is exactly offset by the 1% annual premium on the insurance policy. Why does the insurance premium have to be equal to the spread? Because, if it weren't, one strategy would dominate the other and there would be an arbitrage opportunity. The law of one price tells us that two equivalent risk-free investments must cost the same.

Our example tells us how to interpret the spread on corporate bonds. It is equal to the annual premium that would be needed to insure the bond against default.[3]

By the way, you *can* insure corporate bonds; you do so with an arrangement called a *credit default swap* (CDS). If you buy a default swap, you commit to pay a regular insurance premium (or *spread*).[4] In return, if the company subsequently defaults on its debt, the seller of the swap pays you the difference between the face value of the debt and its market value. For example, when General Motors defaulted in 2009, its unsecured bonds were auctioned for 12.5% of face value. Thus sellers of default swaps had to pay out 87.5 cents on each dollar of GM debt that they had insured.

CDSs have proved very popular, particularly with banks that need to reduce the risk of their loan books. From almost nothing in 2000, the notional value of default swaps and related products had mushroomed to $55 trillion in 2008.[5]

Figure 23.3 shows the annual cost of insuring the 10-year bonds of a sample of well-known firms. Notice the sharp increase in the cost of the default swaps in the second half of 2008. By the end of September it cost $5.50 a year to insure $100 of General Electric debt.

 **FIGURE 23.3**

Credit default swaps insure the holders of corporate bonds against default. This figure shows the cost of default swaps on the 10-year senior debt of four companies.

*Source:* Datastream



[2] The interest payment on floating-rate bonds goes up and down as the general level of interest rates changes. Thus a floating-rate default-free bond will sell at close to face value on each coupon date. Many governments issue "floaters." The U.S. Treasury does not do so, though some U.S. government agencies do.

[3] For illustration, we have used the example of a floating-rate bond to demonstrate the equivalence between the yield spread and the cost of default insurance. But the spread on a fixed-rate corporate bond should be effectively identical to that on a floater.

[4] In the case of low-grade bonds, when the regular spread does not sufficiently protect the seller against the possibility of an early default, the buyer of the default swap may also be asked to pay an up-front fee.

[5] Related credit derivatives include credit-linked notes, total return swaps, and credit options. For a useful survey of the credit-derivative market, see J. P. Morgan, "The J. P. Morgan Guide to Credit Derivatives," at **www.investinginbonds.com/assets/files/intro_to_credit_derivatives.pdf**.

Many of these default swaps were sold by *monoline insurers*, which specialize in providing services to the capital markets. The monolines had traditionally concentrated on insuring relatively safe municipal debt but had been increasingly prepared to underwrite corporate debt, as well as many securities that were backed by subprime mortgages. By 2008 insurance companies had sold protection on $2.4 trillion of bonds. As the outlook for many of these bonds deteriorated, investors began to question whether the insurance companies had sufficient capital to make good on their guarantees.

One of the largest providers of credit protection was AIG Financial Products, part of the giant insurance group, AIG, with a portfolio of over $440 billion of credit guarantees. AIG's clients never dreamt that the company would be unable to pay up: not only was AIG triple-A rated, but it had promised to post generous collateral if the value of the insured securities dropped or if its own credit rating fell. So confident was AIG of its strategy that the head of its financial products group claimed that it was hard "to even see a scenario within any kind of realm of reason that would see us losing one dollar in any of these transactions." But in September 2008 this unthinkable scenario occurred, when the credit rating agencies downgraded AIG's debt, and the company found itself obliged to provide $32 billion of additional collateral within the next 15 days. Had AIG defaulted, everyone who had bought a CDS contract from the company would have suffered large losses on these contracts. To save AIG from imminent collapse, the Federal Reserve stepped in with an $85 billion rescue package.

## 23-2 The Option to Default

The difference between a corporate bond and a comparable Treasury bond is that the company has the option to default whereas the government supposedly doesn't.[6] That is a valuable option. If you don't believe us think about whether (other things equal) you would prefer to be a shareholder in a company with limited liability or in a company with unlimited liability. Of course, you would prefer to have the option to walk away from your company's debts. Unfortunately, every silver lining has its cloud, and the drawback to having a default option is that corporate bondholders expect to be compensated for giving it to you. That is why corporate bonds sell at lower prices and offer higher yields than government bonds.

We can illustrate the nature of the default option by returning to the plight of Circular File Company, which we discussed in Chapter 18. Circular File borrowed $50 per share, but then the firm fell on hard times and the market value of its assets fell to $30. Circular's bond and stock prices fell to $25 and $5, respectively. Thus Circular's *market-value* balance sheet is:

### Circular File Company (Market Values)

| | | | |
|---|---|---|---|
| Asset value | $30 | $25 | Bonds |
| | | 5 | Stock |
| | $30 | $30 | Firm value |

If Circular's debt were due and payable now, the firm could not repay the $50 it originally borrowed. It would default, leaving bondholders with assets worth $30 and shareholders with nothing. The reason that Circular stock has a market value of $5 is that the debt is *not* due now, but rather a year from now. A stroke of good fortune could increase

---

[6] But governments cannot print the currencies of other countries. Therefore, they may be forced into default on their foreign currency debt. For example, in 2008 Ecuador defaulted on $3.9 billion of foreign currency debt. Very occasionally governments have even defaulted on their own currency's debt. For example, in 1998 the Russian government defaulted on $36 billion of ruble debt.

firm value enough to pay off the bondholders in full, with something left over for the stockholders.

When Circular File borrowed, it acquired an option to default. In other words, it is not compelled to repay the debt at maturity. If the value of its assets is less than the $50 that it owes, it will choose to default on the debt and the bondholders will get to keep the assets. To put it another way, when Circular borrowed, the bondholders effectively acquired the company's assets and the shareholders gained an option to buy them back by paying off the debt. In effect, the stockholders purchased a call option on the assets of the firm. Thus the balance sheet of Circular File can be expressed as follows:

### Circular File Company (Market Values)

| | | | |
|---|---|---|---|
| Asset value | $30 | $25 | Bond value = asset value − value of call |
| | | 5 | Stock value = value of call |
| | $30 | $30 | Firm value = asset value |

Figure 23.4 shows the possible payoffs to Circular File's shareholders when the bonds mature at the end of the year. If the future value of the assets is less than $50, Circular will default and the stock will be worthless. If the value of the assets exceeds $50, the stockholders will receive asset value *less* the $50 paid over to the bondholders. Does Figure 23.4 look familiar to you? It should if you have read Chapter 20 on options. The payoffs in Figure 23.4 are identical to those of a call option on the firm's assets with an exercise price of $50.

In Chapter 20 we also set out the basic relationship between calls and puts:

Value of call + present value of exercise price = value of put + value of share

To apply this to Circular File, we need to interpret "value of share" as "asset value," because the common stock is a call option on the firm's assets. Also "present value of exercise price" is the present value of receiving the promised payment of $50 to bondholders *for sure* next year. Thus,

Value of call + present value of promised payment to bondholders
= value of put + asset value

Now we can solve for the value of Circular's bonds. This is equal to the firm's asset value less the value of the shareholders' call option on these assets:

Bond value = asset value − value of call
= present value of promised payment to bondholders − value of put

Circular's bondholders have in effect bought a safe bond, but at the same time given the shareholders a put option to sell them the firm's assets for the amount of the debt.



▶ **FIGURE 23.4**

The value of Circular's common stock is the value of a call option on the firm's assets with an exercise price of $50.

Now you can see why bond traders, investors, and financial managers refer to *default puts*. When a firm defaults, its stockholders are in effect exercising their default put. The put's value is the value of limited liability—the value of the stockholders' right to walk away from their firm's debts in exchange for handing over the firm's assets to its creditors. In the case of Circular File this option to default is extremely valuable because default is likely to occur. At the other extreme, the value of IBM's option to default is trivial compared with the value of IBM's assets. Default on IBM bonds is possible but extremely unlikely. Option traders would say that for Circular File the put option is "deep in the money" because today's asset value ($30) is well below the exercise price ($50). For IBM the put option is far "out of the money" because the value of IBM's assets substantially exceeds the amount of IBM's debt.

Valuing corporate bonds should be a two-step process:

$$\text{Bond value} = \frac{\text{bond value assuming}}{\text{no chance of default}} - \frac{\text{value of put}}{\text{option on assets}}$$

The first step is easy: Calculate the bond's value assuming no default risk. (Discount promised interest and principal payments at the rates offered by Treasury issues.) Second, calculate the value of a put written on the firm's assets, where the maturity of the put equals the maturity of the bond and the exercise price of the put equals the promised payment to bondholders.

Owning a corporate bond is also equivalent to owning the firm's assets but giving a call option on these assets to the firm's stockholders:

$$\text{Bond value} = \text{asset value} - \text{value of call option on assets}$$

Thus you can also calculate a bond's value, given the value of the firm's assets, by valuing a call option on these assets and subtracting the value of this call from that of the assets. (Remember: The call value is just the value of the firm's common stock.) Therefore, if you can value puts and calls on the firm's assets, you can value its debt.[7]

## How the Default Option Affects a Bond's Risk and Yield

If the firm's debt is risk-free, the equityholders bear all the risk of the underlying assets. But when the firm has limited liability, the debtholders share this risk with the equityholders. We have seen that the equity of a firm with limited liability is equivalent to a call option on the firm's assets. So, if we can calculate the risk of this call, we can find how the firm's risk is shared between the equityholders and the debtholders.[8]

Think back to Chapter 21 where you learned how to calculate the risk of a call option. This involved two steps:

*Step 1:* Find the combination of the underlying asset and risk-free borrowing that provides the same payoffs as the call option (in the present case, the call option is the leveraged equity).

*Step 2:* Calculate the beta of this replicating portfolio.

Figure 23.5 takes a hypothetical company whose underlying assets have a beta of 1.0 and shows how the beta of these assets is shared between the equityholders and the debtholders. If the company had unlimited liability, the equityholders would bear all the risk of the assets and the debt would be risk-free. But with *limited* liability, the debtholders bear part

---

[7] However, option-valuation procedures cannot value the *assets* of the firm. Puts and calls must be valued as a proportion of asset value. For example, note that the Black–Scholes formula (Section 21-3) requires stock price to compute the value of a call option.

[8] The classic paper on the valuation of the option to default is R. Merton, "On the Pricing of Corporate Debt: The Risk Structure of Interest Rates," *Journal of Finance* 29 (May 1974), pp. 449–470.





Visit us at
www.mhhe.com/bma

▶ **FIGURE 23.5**

How the betas of the debt and equity vary with the degree of leverage and the maturity of the debt. These curves are calculated using option pricing theory under the following simplified assumptions: (1) the risk-free interest rate is constant for all maturities; (2) the standard deviation of the returns on the company's assets is 25% per annum; (3) the asset beta is 1.0; (4) debt is in the form of zero-coupon bonds; and (5) leverage is the ratio *D/V*, where *D* is the face value of the debt discounted at the risk-free interest rate and *V* is the market value of the assets.

of the risk. The higher the leverage and the longer the maturity of the debt, the greater the proportion of the risk that is assumed by the debtholders. For example, suppose that our hypothetical company is financed 60% by 25-year debt. With *unlimited* liability the debt would have a beta of zero and the equity would have a beta of 2.5.[9] But, when the risk of the assets is shared, the debt has a beta of .7 and the equity a beta of 1.4.

Figure 23.6 stays with the same hypothetical company and shows how the promised yield on its debt varies with leverage and bond maturity. For example, you can see that if a company has a 20% debt ratio and all its debt matures in 25 years, then it should pay about .50 percentage point above the government rate to compensate for default risk. Notice that just as risk increases with maturity, so generally does the promised yield. This makes sense, for the longer you have to wait for repayment, the greater the chance that things will go wrong.[10]

Notice that in constructing Figure 23.6 we made several artificial assumptions. One assumption is that the company does not pay dividends or repurchase stock. If it does regularly pay out part of its assets to stockholders, there will be fewer assets to protect the bondholder in the event of trouble. In this case, the market will justifiably require a higher yield on the company's bonds.

There are other complications that make the valuation of corporate debt a good bit more difficult than it sounds. For example, Figure 23.6 assumes that the company makes only a single issue of zero-coupon debt. But suppose instead that it issues a 10-year bond

---

[9] Remember that the beta of the assets is a weighted average of the beta of the debt and that of the equity:

$$\beta_{assets} = (D/V)\beta_{debt} + (E/V)\beta_{equity}$$

If $\beta_{assets} = 1.0$ and $\beta_{debt} = 0$, then with 60% leverage:

$$1.0 = (.6 \times 0) + (.4 \times \beta_{equity})$$
$$\beta_{equity} = 2.5$$

[10] The *price* of the bond always declines with maturity and leverage. (Remember the value of a put option increases with maturity and with the exercise price.) However, with very long maturities and high leverage the bond's *yield per annum* will start to decline.



**FIGURE 23.6**

How the interest rate on risky corporate debt changes with leverage and maturity.

e**X**cel

Visit us at
www.mhhe.com/bma

that pays interest annually. We can still think of the company's stock as a call option that can be exercised by making the promised payments. But in this case there are 10 payments rather than just one. To value the stock, we would need to value 10 sequential call options. The first option can be exercised by making the first interest payment when it comes due. By exercising, the stockholders obtain a second call option, which can be exercised by making the second interest payment. The reward to exercising is that the stockholders get a third call option, and so on. Finally, in year 10 the stockholders can exercise the tenth option. By paying off both the principal and the last year's interest, the stockholders regain unencumbered ownership of the company's assets.

Of course, if the firm does not make any of these payments when due, bondholders take over and stockholders are left with nothing. In other words, by not exercising one call option, stockholders give up all subsequent call options.

Valuing the equity when the 10-year bond is issued is equivalent to valuing the first of the 10 call options. But you cannot value the first option without valuing the nine that follow.[11] Even this example understates the practical difficulties, because large firms may have dozens of outstanding debt issues with different interest rates and maturities, and before the current debt matures they may make further issues. Consequently, when bond traders evaluate a corporate bond, they do not immediately reach for their option calculator. They are more likely to start by identifying bonds with a similar risk of default and look at the yield spreads offered by these bonds.

In practice, interest rate differentials tend to be much greater than those shown in Figure 23.6. The highest-grade corporate bonds typically offer promised yields about 1 percentage point higher than U.S. Treasury bonds. It is very difficult to justify differentials of this magnitude simply in terms of default risk.[12] So what is going on? It could be that companies are paying too much for their debt, but it seems likely that the high yields on corporate bonds stem in part from some other drawback. One possibility is that investors demand the additional yield to compensate for the lack of liquidity in corporate debt markets.[13] There is little doubt that investors prefer bonds that are easily bought and sold. We

---

[11] The other approach to valuing the company's debt (subtracting the value of a put option from risk-free bond value) is no easier. The analyst would be confronted by not one simple put option but a package of 10 sequential puts.

[12] See, for example, J. Huang and M. Huang, "How Much of the Corporate-Treasury Yield Spread Is Due to Credit Risk? Results from a New Calibration Approach," working paper, Pennsylvania State University, May 2003.

[13] For evidence that the more liquid corporate bonds have lower yields than less liquid bonds, see E. J. Elton, M. J. Gruber, D. Agrawal, and C. Mann, "Factors Affecting the Valuation of Corporate Bonds," *Journal of Banking and Finance* 28 (November 2006), pp. 2747–2767.

can even see small yield differences in the Treasury bond market, where the latest bonds issued (known as "on-the-run" bonds) are traded much more heavily and typically yield a little less than more seasoned issues.

Another reason that corporate bond investors in the United States may require a higher yield is that interest payments are subject to both federal and state tax. Interest on Treasury bonds is exempt from state tax. Suppose, for example, that you hold a corporate bond with a 6% coupon and pay state tax of 5%. Then you would need an additional yield of about $.05 \times 6 = .3\%$ simply to compensate for the additional tax.[14]

## A Digression: Valuing Government Financial Guarantees

When Bethlehem Steel declared bankruptcy in 2003, its pension plan had liabilities of $7 billion and assets of just $3 billion. But the 97,000 workers and retirees did not face a destitute old age. Their pensions were largely guaranteed by the Pension Benefit Guaranty Corporation (PBGC).[15]

Pension promises don't always appear on the company's balance sheet, but they are a long-term liability just like the promises to bondholders. The guarantee by the PBGC changes the pension promises from a risky liability to a safe one. If the company goes belly-up and there are insufficient assets to cover the pensions, the PBGC makes up the difference.

The government recognizes that the guarantee provided by the PBGC is costly. Thus shortly after assuming the liability for the Bethlehem Steel plan, the PBGC calculated that the discounted value of payments on defaulted plans and those close to default amounted to $23 billion.

Unfortunately, these calculations ignore the risk that other firms in the future may fail and hand over their pension liability to the PBGC. To calculate the cost of the guarantee, we need to think about what the value of company pension promises would be without any guarantee:

$$\text{Value of guarantee} = \text{value of guaranteed pensions} \\ - \text{value of pension promises without a guarantee}$$

*With* the guarantee the pensions are as safe as a promise by the U.S. government;[16] *without* the guarantee the pensions are like an ordinary debt obligation of the firm. We already know what the difference is between the value of safe government debt and risky corporate debt. It is the value of the firm's right to hand over the assets of the firm and to walk away from its obligations. Thus the value of the pension guarantee is the value of this put option.

In a paper prepared for the Congressional Budget Office, Wendy Kiska, Deborah Lucas, and Marvin Phaup show how option pricing models can help to give a better measure of the cost to the PBGC of pension guarantees.[17] Their estimates suggest that the true cost is in excess of $87 billion, or $64 billion more than the published figure.

The PBGC is not the only government body to provide financial guarantees. For example, the Federal Deposit Insurance Corporation (FDIC) guarantees bank deposit accounts; the Federal Family Education Loan (FFEL) program guarantees loans to students; the Small Business Administration (SBA) provides partial guarantees for loans to small businesses, and so on. The government's liability under these programs is enormous. Fortunately, option pricing is leading to a better way to calculate their cost.

---

[14] See E. J. Elton, M. J. Gruber, D. Agrawal, and C. Mann, "Explaining the Rate Spread on Corporate Bonds," *Journal of Finance* 56 (February 2001), pp. 247–277. Since state taxes are deductible when calculating federal taxes, our calculation slightly overstates the effect of state tax.

[15] An even more costly failure occurred when United Airlines declared bankruptcy, leaving the PBGC with a liability of $6.6 billion.

[16] The pension guarantee is not ironclad. If the PBGC cannot meet its obligations, the government is not committed to providing the extra cash. But few doubt that it would do so.

[17] Congressional Budget Office, "The Risk Exposure of the Pension Benefit Guaranty Corporation," Washington, DC, September 2005.

## 23-3 Bond Ratings and the Probability of Default

Banks and other financial institutions not only want to know the value of the loans that they have made. They also need to know the risk that they are incurring. Some rely on the judgments of specialized bond rating services. Others have developed their own models for measuring the probability that the borrower will default. We describe bond ratings first, and then discuss two models for predicting default.

The relative quality of most traded bonds can be judged by bond ratings. There are three principal rating services—Moody's, Standard & Poor's, and Fitch.[18] Table 23.1 summarizes these ratings. For example, the highest-quality bonds are rated triple-A (Aaa) by Moody's, then come double-A (Aa) bonds, and so on. Bonds rated Baa or above are known as *investment-grade* bonds.[19] Commercial banks, many pension funds, and other financial institutions are not allowed to invest in bonds unless they are investment-grade.[20]

Bonds rated below Baa are termed **high-yield,** or **junk, bonds.** Most junk bonds used to be *fallen angels,* that is, bonds of companies that had fallen on hard times. But during the 1980s new issues of junk bonds multiplied tenfold as more and more companies issued large quantities of low-grade debt to finance takeovers. The result was that for the first time corporate midgets were able to take control of corporate giants.

Issuers of these junk bonds often had debt ratios of 90% to 95%. Many worried that this threatened the health of corporate America and, as default rates rose in the early 1990s, the market for new issues of junk bonds dried up. Later in the decade, with increasing economic prosperity, the annual default rate fell to below 2% and junk bonds returned to fashion. Once more the boom years did not last. In 2001, 11% of U.S. junk bond issues defaulted, and companies for a second time found it difficult for a while to market their junk bonds.

Bond ratings are judgments about firms' financial and business prospects. There is no fixed formula by which ratings are calculated. Nevertheless, investment bankers, bond portfolio managers, and others who follow the bond market closely can get a fairly good

| Moody's | Standard & Poor's and Fitch |
|---|---|
| Investment-grade bonds: | |
| Aaa | AAA |
| Aa | AA |
| A | A |
| Baa | BBB |
| Junk bonds: | |
| Ba | BB |
| B | B |
| Caa | CCC |
| Ca | CC |
| C | C |

▶ **TABLE 23.1** Key to bond ratings. The highest-quality bonds are rated triple-A. Investment-grade bonds have to be the equivalent of Baa or higher. Bonds that don't make this cut are called " high-yield" or "junk" bonds.

---

[18] The SEC has been concerned about the power wielded by the three bond-rating agencies. It has therefore approved five new services: Dominion Bond (2003), A.M. Best (2005), Egan-Jones Rating (2007), Japan Credit Rating Agency (2007), and Ratings and Investment Information (2007).

[19] Rating services also provide a finer breakdown. Thus a bond might be rated A-1, A-2, or A-3 (the lowest A rating). In addition, the rating service may announce that it has put an issue on its watch list for a possible upgrade or downgrade.

[20] Investment-grade bonds can usually be entered at face value on the books of banks and life insurance companies.

| Ratio | AAA | AA | A | BBB | BB | B | CCC |
|---|---|---|---|---|---|---|---|
| EBIT/interest* | 23.8 | 19.5 | 8.0 | 4.7 | 2.5 | 1.2 | 0.4 |
| Return on capital, % | 27.6 | 27.0 | 17.5 | 13.4 | 11.3 | 8.7 | 3.2 |
| Total debt/(total debt + equity), % | 12.4 | 28.3 | 37.5 | 42.5 | 53.7 | 75.9 | 113.5† |

▶ **TABLE 23.2**    How financial ratios differ according to a firm's bond rating. Three-year (2002–2004) median ratios for industrial firms by bond rating.

\* EBIT = earnings before interest and taxes.
† A debt ratio greater than 100% means that book equity is negative.
*Source:* Standard & Poor's, *Corporate Bond Rating Criteria,* 2006, **www.standardandpoors.com**.

▶ **FIGURE 23.7**

Default rates of corporate bonds 1981–2008, by Standard & Poor's rating at time of issue.

*Source:* Standard & Poor's, *"Default, Transition, and Recovery: 2008 Global Annual Corporate Default Study and Rating Transitions,"* February 2009. **www.standardandpoors.com**.



idea of how a bond will be rated by looking at a few key numbers such as the firm's debt ratio, the ratio of earnings to interest, and the return on assets. Table 23.2 shows how these ratios vary with the firm's bond rating.

Figure 23.7 shows that bond ratings do reflect the probability of default. Since 1981 only 3 in 10,000 bonds that were initially rated triple-A by Standard & Poor's have defaulted in the year after issue and only 55 in 10,000 have defaulted within 10 years of issue. (The AAA default rate is not plotted in Figure 23.7. It would be invisible.) At the other extreme, half of CCC bonds have defaulted by year 10. Of course, bonds do not usually fall suddenly from grace. As time passes and the company becomes progressively more shaky, the agencies revise downward the bond's rating to reflect the increasing probability of default.

Rating agencies don't always get it right. When Enron went belly-up in 2001, investors protested that only two months earlier the company's debt had an investment-grade rating. And when agencies *do* downgrade a company's debt, they are often accused of precipitate action that increases the cost of borrowing.

## 23-4    Predicting the Probability of Default

### Credit Scoring

If you apply for a credit card or a bank loan, you will probably be asked to complete a questionnaire that provides details about your job, home, and financial health. This information is then used to calculate an overall credit score.[21] If you do not make the grade on

---

[21] The most commonly used consumer credit score is the FICO score developed by Fair Isaac & Co., which uses data provided by any one of three credit bureaus—Experian, TransUnion, or Equifax.

the score, you are likely to be refused credit or subjected to a more detailed analysis. In a similar way, mechanical credit scoring systems are used by banks to assess the risk of their corporate loans and by firms when they extend credit to customers.

Suppose that you are given the task of developing a credit scoring system that will help to decide whether to extend credit to businesses. You start by comparing the financial statements of companies that went bankrupt over a 40-year period with those of surviving firms. Figure 23.8 shows what you find. Panel (*a*) illustrates that, as early as four years before



▶ **FIGURE 23.8**

Financial ratios of 544 failing and nonfailing firms.

*Source:* W. H. Beaver, M. F. McNichols, and J-W. Rhie, "Have Financial Statements Become Less Informative? Evidence from the Ability of Financial Ratios to Predict Bankruptcy," *Review of Accounting Studies* 10 (2005), pp. 93–122. © 2005 Springer Verlag.

they went bankrupt, failing firms were earning a much lower return on assets (ROA) than firms that survived. Panel (*b*) shows that on average they also had a high ratio of liabilities to assets, and Panel (*c*) shows that EBITDA (earnings before interest, taxes, and depreciation) was low relative to the firms' total liabilities. Thus bankrupt firms were less profitable (low ROA), were more highly leveraged (high ratio of liabilities to assets), and generated relatively little cash (low ratio of EBITDA to liabilities). In each case these indicators of the firms' financial health steadily deteriorated as bankruptcy approached.

William Beaver, Maureen McNichols, and Jung-Wu Rhie, who studied these firms, concluded that the chance of failing during the next year relative to the chance of not failing was best estimated by the following equation:[22]

$$\text{Log(relative chance of failure)}$$
$$= -6.445 - 1.192\,\text{ROA} + 2.307\,\text{liabilities/assets} - .346\,\text{EBITDA/liabilities}$$

As we write this in early 2009, Eastman Kodak is struggling with declining sales and huge debts. Its bonds are rated B. But what are the odds that Kodak will fail over the coming year? Let's use the above equation to check. Based on the latest annual statements, Kodak's return on assets was −4.5%, its total liabilities were 89.5% of its assets, and its EBITDA was −2.5% of liabilities. Plugging these figures into the equation gives Kodak's relative odds of failing as:

$$\text{Log(relative chance of failure)}$$
$$= -6.445 - 1.192(-.045) + 2.307(.895) - .346(-.025) = -4.32$$
$$\text{Relative chance of failure} = e^{(-4.32)} = .013, \text{ or } 1.3\%$$

A variety of techniques have been used to develop credit scoring systems. The model that we described just above uses the technique of *hazard analysis*. An early, and still widely used model, the famous *Z*-score model developed by Edward Altman, uses *multiple discriminant analysis* to separate the creditworthy sheep from the impecunious goats.[23]

Credit scoring systems should carry a health warning. When you construct a risk index, it is tempting to experiment with many different combinations of variables until you find the equation that would have worked best in the past. Unfortunately, if you "mine" the data in this way, you are likely to find that the system works less well in the future than it did previously. If you are misled by the past successes into placing too much faith in your model, you may refuse credit to a number of potentially good customers. The profits that you lose by turning away these customers could more than offset the gains that you make by avoiding a few bad eggs. As a result, you could be worse off than if you had pretended that you could not tell one would-be borrower from another and extended credit to all of them.

Does this mean that firms should not use credit scoring systems? Not a bit. It merely implies that it is not sufficient to have a good system; you also need to know how much to rely on it.

### Market-Based Risk Models

Credit scoring systems rely primarily on the companies' financial statements to estimate which firms are most likely to become bankrupt and default on their debts. For small

[22] See W. H. Beaver, M. F. McNichols, and J-W. Rhie, "Have Financial Statements Become Less Informative? Evidence from the Ability of Financial Ratios to Predict Bankruptcy," *Review of Accounting Studies* 10 (2005), pp. 93–122.

[23] For a description of the *Z*-score model, see E. I. Altman, *Corporate Financial Distress and Bankruptcy,* 3rd ed. (New York: John Wiley, 2005).



▶ **FIGURE 23.9**

Phlogiston Chemical has issued five-year debt with a face value of $60. The shaded area shows that there is a 20% probability that the value of the company's assets in year 5 will be less than $60, in which case the company will choose to default.

businesses there may be little alternative to the use of accounting data, but for large, publicly traded firms it is also possible to take advantage of the information in security prices. These techniques build on the idea that stockholders will exercise their option to default if the market value of the assets falls below the payments that must be made on the debt.

Suppose that the assets of Phlogiston Chemical have a current market value of $100 and its debt has a face value of $60 (i.e., 60% leverage), all of which is due to be repaid at the end of five years. Figure 23.9 shows the range of possible values of Phlogiston's assets when the loan becomes due. The expected value of the assets is $120, but this value is by no means certain. There is a probability of 20% that the asset value could fall below $60, in which case the company will default on its debt. This probability is shown by the shaded area in Figure 23.9.

To calculate the probability that Phlogiston will default, we need to know the expected growth in the market value of its assets, the face value and maturity of the debt, and the variability of future asset values. Real-world cases are likely to be more complex than our Phlogiston example. For example, firms may have several classes of debt maturing on different dates. If so, it may pay the stockholders to put up more money to pay off the short-term debt and thus keep alive the chance that the firm's fortunes will recover before the rest of the debt becomes due.

However, banks and consulting firms are now finding that they can use these ideas to measure the risk of actual loans. For example, in Section 23-1 we encountered the troubled theme-park operator, Six Flags. In June 2009, Six Flags finally succumbed and filed for bankruptcy.

The black line in Figure 23.10 shows the market value that investors placed on Six Flags's assets, and the red line shows the asset value at which the company would choose to default on its debts. You can see how the value of the company's assets crept closer and closer to the default point before finally hitting it.

Of course, nobody had a crystal ball that foretold the eventual outcome, but Moody's KMV, which specializes in credit models, regularly estimates the probability that companies will default on their debts during the next year. Figure 23.11 shows how KMV progressively increased its estimate of the chances that the value of Six Flags's assets would hit the

**FIGURE 23.10**

The market value of the assets of Six Flags crept closer and closer to the point at which the firm would choose to default.

*Source:* Moody's KMV.



**FIGURE 23.11**

Estimates by Moody's KMV of the probability that Six Flags would default on its debt within a year.

*Note:* The probabilities reported by Moody's KMV are limited to a range from .01% to 35%.



default point. As the value of the company's assets started to collapse, KMV's assessment of the probability of default progressively increased. By July 2008 it had reached the maximum figure of 35%.[24]

## 23-5 Value at Risk

It is March 2009 and you own Starbucks 6.25% bonds maturing in 2017. The bonds are rated BBB by Standard & Poor's and are currently priced at 94.25% to offer a *promised* yield to maturity of 7.2%. If you plan to hold the bonds for the next 12 months, how much risk are you taking?

You may be tempted to look back at past default rates for BBB-rated bonds and conclude that there is only a negligible chance that the bonds will default during the next year and therefore your investment is almost as safe as U.S. Treasuries. But of course this ignores

---

[24] The probabilities provided by Moody's KMV are kept within the range of .01% to 35%.

| | Rating at Year-end | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rating at Start of Year | AAA | AA | A | BBB | BB | B | CCC to C | Default | Not Rated |
| AAA | 88.39 | 7.63 | 0.53 | 0.06 | 0.08 | 0.03 | 0.06 | 0 | 3.23 |
| AA | 0.58 | 87.02 | 7.79 | 0.54 | 0.06 | 0.09 | 0.03 | 0.03 | 3.86 |
| A | 0.04 | 2.04 | 87.19 | 5.35 | 0.4 | 0.16 | 0.03 | 0.08 | 4.72 |
| BBB | 0.01 | 0.15 | 3.87 | 84.28 | 4 | 0.69 | 0.16 | 0.24 | 6.6 |
| BB | 0.02 | 0.05 | 0.19 | 5.3 | 75.74 | 7.22 | 0.8 | 0.99 | 9.68 |
| B | 0 | 0.05 | 0.15 | 0.26 | 5.68 | 73.02 | 4.34 | 4.51 | 12 |
| CCC to C | 0 | 0 | 0.23 | 0.34 | 0.97 | 11.84 | 46.96 | 25.67 | 14 |

▶ **TABLE 23.3** Global Average One-Year Transition Rates, 1981–2008, showing the percentage of bonds changing from one rating to another.

*Source:* Standard & Poor's, "Default, Transition, and Recovery: 2008 Annual Global Default Study and Rating Transitions," February 2009.

the possibility that, although default is unlikely in the short term, Starbucks's prospects may not be as good at the end of the year as they are now. If so, the bonds could be down-rated and their value would fall.

Banks and consulting firms have developed a variety of ways to measure the risk of a deterioration in credit quality. For example, one of the most popular, the *CreditMetrics* system, looks at the possible impact of changes in the bond rating.[25] Table 23.3 shows how frequently bonds were rerated in the years 1981–2008. Since your Starbucks bonds are BBB-rated, we will focus on the fourth row of the table. You can see that in the past 84.28% of BBB bonds were still rated triple-B after one year and a few were even upgraded to A or better. However, the bad news is that after one year over 5% of BBB-rated bonds had moved into the junk bond category of BB or below.

If Starbucks debt were to be downgraded to BB, investors would undoubtedly demand a higher yield. For example, in 2009 the yield on BB bonds was about 1.1% higher than that on triple-Bs. If the yield on your Starbucks bonds rose by this amount, the price would fall by about 6%. In other words, there is more than a 5% chance that the value of your invest-ment will fall by 6% or more over the coming year. Bankers refer to this as the **value at risk** (or **VAR**) on the Starbucks bonds.

There are a number of ways to improve this back-of-the-envelope estimate of the value at risk. For example, we assumed that the yield spreads on corporate bonds are constant. But, if investors become more reluctant to take on credit risk, you could lose much more than 6% on your investment. Notice also that when we calculated the risk from investing in Starbucks debt, we looked only at how the price of the bonds would be affected by a change in credit rating. If we wanted a comprehensive measure of value at risk, we would need to recognize that risk-free interest rates, too, may change over the year.

Banks and bond investors are not just interested in the risk of individual loans; they would also like to know the risk of their entire portfolio. Therefore, specialists in credit risk need to worry about the correlation between the outcomes. A portfolio of loans, all of which are to factory outlets in suburban Hicksville, is likely to be more risky than a portfo-lio with a variety of different borrowers.

---

[25] *CreditMetrics* was originally developed by J.P. Morgan. For a description of *CreditMetrics*, see the manuals provided by **www.riskmetrics.com**.

• • • • •

**SUMMARY**

Corporations have limited liability. If companies are unable to pay their debts, they can file for bankruptcy. Lenders are aware that they may receive less than they are owed, and that the *expected* yield on a corporate bond is less than the *promised yield*.

Because of the possibility of default, the promised yield on a corporate bond is higher than on a government bond. You can think of this extra yield as the amount that you would need to pay to insure the bond against default. There is an active market for insurance policies that protect the debtholder against default. These policies are called credit default swaps. There are no free lunches in financial markets. So the extra yield you get for buying a corporate bond is eaten up by the cost of insuring against default.

The company's option to default is equivalent to a put option. If the value of the firm's assets is less than the amount of the debt, it will pay for the company to default and to allow the lenders to take over the assets in settlement of the debt. This insight tells us what we need to think about when valuing corporate debt—the current value of the firm relative to the point at which it would default, the volatility of the assets, the maturity of the debt payments, and the risk-free interest rate. Unfortunately, most companies have several loans outstanding with payments due at different times. This considerably complicates the task of valuing the put option.

Because of these complications, bond investors do not regularly use option models to value the default option that is attached to a corporate bond. More commonly, they rely on their experience to judge whether the spread between the yield on a corporate bond and the yield on a comparable government issue compensates for the possibility of default. Spreads can change rapidly as investors reassess the chances of default or become more or less risk-averse.

When investors want a measure of the risk of a company's bonds, they usually look at the rating that has been assigned by Moody's, Standard & Poor's, or Fitch. They know that bonds with a triple-A rating are much less likely to default than bonds with a junk rating.

Banks, rating services, and consulting firms have also developed a number of models for estimating the likelihood of default. Credit scoring systems take accounting ratios or other indicators of corporate health and weight them to produce a single measure of default. Moody's KMV takes a different tack and seeks to measure the probability that the market value of the firm's assets will fall to the point at which the firm will choose to default rather than try to keep up with its debt payments.

Don't assume that there is no risk just because there is no immediate prospect of default. If the quality of the bonds deteriorates, investors will demand a higher yield and the bond price will fall. One way to calculate the value at risk is to look at the probability of possible ratings changes and to estimate the likely effect of these changes for the bond's price.

• • • • •

**FURTHER READING**

*The Web sites of the main credit rating agencies and of Moody's KMV contain a variety of useful reports on credit risk.* (See in particular **www.moodys.com**, **www.standardandpoors.com**, **www.fitch.com**, and **www.moodyskmv.com**.)

*Altman provides a review of credit scoring models in:*

E. I. Altman, *Corporate Financial Distress and Bankruptcy,* 3rd ed. (New York: John Wiley, 2005).

*There are a number of books that discuss corporate bonds and credit risk. Look, for example, at:*

A. Saunders and L. Allen, *Credit Risk Measurement,* 2nd ed. (New York: John Wiley, 2002).

J. B. Caouette, E. I. Altman, P. Narayanan, and R. Nimmo, *Managing Credit Risk* (New York: John Wiley, 2008).

D. Duffie and K. J. Singleton, *Credit Risk: Pricing, Measurement and Management* (Princeton, NJ: Princeton University Press, 2003).

Visit us at www.mhhe.com/bma

 **Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

## BASIC

**PROBLEM SETS**

1. You own a 5% bond maturing in two years and priced at 87%. Suppose that there is a 10% chance that at maturity the bond will default and you will receive only 40% of the promised payment. What is the bond's promised yield to maturity? What is its expected yield?

2. Other things equal, would you expect the difference between the price of a Treasury bond and a corporate bond to increase or decrease with

   a. The company's business risk?

   b. The degree of leverage?

3. The difference between the value of a government bond and a simple corporate bond is equal to the value of an option. What is this option and what is its exercise price?

4. The following table shows some financial data for two companies:

   | | A | B |
   | --- | --- | --- |
   | Total assets | $1,552.1 | $1,565.7 |
   | EBITDA | −60 | 70 |
   | Net income + interest | −80 | 24 |
   | Total liabilities | 814.0 | 1,537.1 |

   Use the formula shown in Section 23-4 to calculate which has the higher probability of default.

5. What variables are required to use a market-based approach to calculate the probability that a company will default on its debt?

6. You have a B-rated bond. On past evidence, what is the probability that it will continue to be rated B in one year's time? What is the probability that it will have a lower rating?

7. You have an A-rated bond. Is a rise in rating more likely than a fall? Would your answer be the same if the bond were B-rated?

8. Why is it more difficult to estimate the value at risk for a portfolio of loans rather than for a single loan?

## INTERMEDIATE

9. Company A has issued a single zero-coupon bond maturing in 10 years. Company B has issued a coupon bond maturing in 10 years. Explain why it is more complicated to value B's debt than A's.

10. Company X has borrowed $150 maturing this year and $50 maturing in 10 years. Company Y has borrowed $200 maturing in five years. In both cases asset value is $140. Sketch a scenario in which X does not default but Y does.

11. Discuss the problems with developing a numerical credit scoring system for evaluating personal loans. You can only test your system using data for applicants who have in the past been granted credit. Is this a potential problem?

12. What problems are you likely to encounter when using a market-based approach for estimating the probability that a company will default?

13. How much would it cost you to insure the bonds of Backwoods Chemical against default? (See Section 23-1.)

Visit us at www.mhhe.com/bma

## CHALLENGE

14. Look back to the first Backwoods Chemical example at the start of Section 23-1. Suppose that the firm's book balance sheet is:

**Backwoods Chemical Company (Book Values)**

| | | | |
|---|---|---|---|
| Net working capital | $ 400 | $1,000 | Debt |
| Net fixed assets | 1,600 | 1,000 | Equity (net worth) |
| Total assets | $2,000 | $2,000 | Total value |

The debt has a one-year maturity and a promised interest payment of 9%. Thus, the promised payment to Backwoods's creditors is $1,090. The market value of the assets is $1,200 and the standard deviation of asset value is 45% per year. The risk-free interest rate is 9%. Calculate the value of Backwoods debt and equity.



Visit us at
www.mhhe.com/bma

15. Use the Black–Scholes model and redraw Figures 23.5 and 23.6 assuming that the standard deviation of the return on the firm's assets is 40% a year. Do the calculations for 60% leverage only. (*Hint:* It is simplest to assume that the risk-free interest rate is zero.) What does this tell you about the effect of changing risk on the spread between high-grade and low-grade corporate bonds? (You may find it helpful to use the Black–Scholes program on the "live" spreadsheet for Chapter 21 at **www.mhhe.com/bma**.)

● ● ● ● ●

**REAL-TIME
DATA ANALYSIS**





**Use data from the Standard & Poor's Market Insight Database at www.mhhe.com/edumarketinsight to answer the following question.**

1. Select three industrial companies that have been experiencing difficult times.

   a. For each of them draw a figure similar to Figure 23.8. Are the companies' troubles reflected in their financial ratios?

   b. Calculate a default probability for each using the formula shown in Section 23-4.

   c. Now look at the company's bond rating. Do the two measures provide consistent messages?

2. Log in to the Moody's KMV Web site at **www.moodyskmv.com**. This site contains a number of case studies showing how the probability of default (termed the *expected default frequency* or *EDF*) changes as default comes closer. Compare the information provided by the EDFs with that provided by the credit ratings.

# The Many Different Kinds of Debt

▶ **In Chapters 17** and 18 we discussed how much a company should borrow. But companies also need to think about what *type* of debt to issue. They can choose to issue short- or long-term debt, straight or convertible bonds; they can issue in the United States or in the international debt market; and they can sell the debt publicly or place it privately with a few large investors.

As a financial manager, you need to choose the type of debt that makes sense for your company. For example, if a firm has only a temporary need for funds, it should generally issue short-term debt. Firms with a substantial overseas business may prefer to issue foreign currency debt. Sometimes competition between lenders opens a window of opportunity in a particular sector of the debt market. The effect may be only a few basis points reduction in yield, but on a large issue that can translate into savings of several million dollars. Remember the saying, "A million dollars here and a million there—pretty soon it begins to add up to real money."[1]

Our focus in this chapter is on long-term debt.[2] We begin our discussion by looking at different types of bonds. We examine the differences between senior and junior bonds and between secured and unsecured bonds. Then we describe how bonds may be repaid by means of a sinking fund and how the borrower or the lender may have an option for early repayment. In Section 24-6 we look at convertible bonds and at their close relative, the package of bonds and warrants.

Debt may be sold to the public or placed privately with large financial institutions. Because privately placed bonds are broadly similar to public issues, we do not discuss them at length. However, we do discuss another form of private placement known as project finance. This is the glamorous part of the debt market. The words *project finance* conjure up images of multi-million-dollar loans to finance huge ventures in exotic parts of the world. You'll find there's something to the popular image, but it's not the whole story.

We conclude with a look at a few unusual bonds and consider the reasons for innovation in the debt market.

As we look at these different features of corporate debt, we try to explain why sinking funds, repayment options, convertible securities, and the like exist. They are not simply matters of custom or neutral mutations; there are generally good reasons for their use.

We should point out that many debts are not shown on the company's balance sheet. For example, companies may be able to disguise the debt by establishing *special purpose entities (SPEs),* which raise cash by a mixture of equity and debt and then use that cash to help fund the parent company. By making use of SPEs, Enron kept a large amount of its debt off-balance-sheet, but that did not stop the company from going bankrupt. Since the Enron scandal accountants have moved to tighten up the rules on disclosing SPE debt.

Companies have other important long-term liabilities that we do *not* discuss in this chapter. For instance, long-term leases are very similar to debt. The user of the equipment agrees to make a series of lease payments and, if it defaults, it may be forced into bankruptcy. We discuss leases in Chapter 25.

Postretirement health benefits and pension promises can also be huge liabilities. For example, in 2003 General Motors had a pension deficit of $19 billion. To reduce this deficit, GM made a large issue of bonds

---

[1] The remark was made by the late Senator Everett Dirksen. However, he was talking billions.

[2] Short-term debt is discussed in Chapter 30.

and invested the majority of the proceeds in its pension fund. You could say that the effect was to increase the company's debt, but the economic reality was that it substituted one long-term obligation (the new debt) for another (its pension obligation). Management of pension plans is outside the scope of this book, but financial managers spend a good deal of time worrying about the pension "debt."

● ● ● ● ●

## 24-1 Domestic Bonds, Foreign Bonds, and Eurobonds

A firm can issue a bond either in its home country or in another country. Bonds that are sold to local investors in another country's bond market are known as *foreign bonds.* The United States is by far the largest market for foreign bonds, but Japan and Switzerland are also substantial markets. Foreign bonds have a variety of nicknames: A bond sold by a foreign company in the United States is known as a *yankee bond;* a bond sold by a foreign firm in Japan is a *samurai.*

Of course, any firm that raises money in a foreign country is subject to the rules of that country. For example, any issue in the United States of publicly traded bonds needs to be registered with the SEC. However, foreign firms commonly avoid registration by complying with the SEC's Rule 144A for bond issues in the United States. Rule 144A bonds can be bought and sold only by large financial institutions.[3]

We have seen that a firm may issue a bond in its home country or in another country. In each case the offer is subject to local laws governing the sale and is overseen by the country's financial regulator. Instead of issuing a bond in a particular country's market, a bond issue may also be sold internationally. For example, IBM could issue a dollar bond to investors outside the United States. Because the issue is not marketed to U.S. investors, it does not need to be registered with the SEC.

International issues that are marketed outside any domestic jurisdiction are known as *eurobonds,* and are usually made in one of the major currencies, such as the U.S. dollar, the euro, or the yen. Eurobond issues are marketed by international syndicates of underwriters, such as the London branches of large U.S., European, and Japanese banks and security dealers. Be careful not to confuse a eurobond (which is outside the jurisdiction of any domestic market and may be in any currency) with a bond that is marketed in a European country and denominated in euros.

The eurobond market arose during the 1960s because the U.S. government imposed a tax on the purchase of foreign securities and discouraged American corporations from exporting capital. Therefore both European and American multinationals were forced to tap an international market for capital.

The tax was removed in 1974. Since firms can now choose whether to borrow in New York or London, the interest rates in the two markets are usually similar. However, the eurobond market is not directly subject to regulation by the U.S. authorities, and therefore the financial manager needs to be alert to small differences in the cost of borrowing in one market rather than another.

These days very large bond issues are often marketed both internationally (that is, in the eurobond market) and in individual domestic markets. For example, IBM could sell its dollar bonds internationally and also register the issue for sale in the United States. Such bonds are called *global bonds.*

---

[3] We described Rule 144A in Section 15-5.

## 24-2   The Bond Contract

To give you some feel for the bond contract (and for some of the language in which it is couched), we have summarized in Table 24.1 the terms of an issue of 30-year bonds by J.C. Penney. We will look at the principal items in turn.

### Indenture, or Trust Deed

The J.C. Penney bond offering was a public issue of bonds, which was registered with the SEC. In the case of a public issue, the bond agreement is in the form of an **indenture,** or **trust deed,** between the bondholder and a trust company.[4] Bank of America National Trust and Savings Association, which is the trust company for the issue, represents the bondholders. It must see that the terms of the indenture are observed and look after the bondholders in the event of default. The bond indenture is a turgid legal document.[5] A copy of it is included in the registration statement and the main provisions are summarized in the prospectus to the issue.

▶ **TABLE 24.1**
Summary of terms of 8.25% sinking fund debenture 2022 issued by J.C. Penney.

| | |
|---|---|
| Trustee | Bank of America National Trust and Savings Association |
| Rights on default | The trustee or 25% of debenture holders may declare the principal due and payable. |
| Registered | Fully registered |
| Denomination | $1,000 |
| Amount issued | $250 million |
| Issue date | August 26, 1992 |
| Offered | Issued at a price of 99.489% plus accrued interest (proceeds to company 98.614%) through First Boston Corporation |
| Interest | At a rate of 8.25% per annum, payable February 15 and August 15 |
| Seniority | Ranks pari passu with other unsecured unsubordinated debt |
| Security | Not secured. Company will not permit to have any lien on its property or assets without equally and ratably securing the debt securities |
| Maturity | August 15, 2022 |
| Sinking fund | Annually from August 15, 2003, sufficient to redeem $12.5 million principal amount, plus an optional sinking fund of up to $25 million |
| Callable | At whole or in part on or after August 15, 2002, at the option of the Company with at least 30 days, but not more than 60 days notice to each August 14 as follows: |

| | | | | | |
|---|---|---|---|---|---|
| 2003 | 103.870% | 2004 | 103.485 | 2005 | 103.000 |
| 2006 | 102.709 | 2007 | 102.322 | 2008 | 101.955 |
| 2009 | 101.548 | 2010 | 101.161 | 2011 | 100.774 |
| 2012 | 100.387 | | | | |

and thereafter at 100% plus accrued interest

Also callable for the mandatory and optional sinking funds on August 15, 2003, and thereafter.

| | |
|---|---|
| Moody's rating | B |

---

[4] In the case of a eurobond issue, there is a *fiscal agent,* who carries out some of the same functions as the bond trustee.

[5] For example, the indenture for an earlier J.C. Penney bond stated: "In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all matters be certified by, or covered by the opinion of, only one such Person, or that they be certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more such other Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents." Try saying that three times fast.

Moving down Table 24.1, you see that the J.C. Penney bonds are *registered.* This means that the company's registrar records the ownership of each bond and the company pays the interest and final principal amount directly to each owner.[6]

Almost all bonds in the United States are issued in registered form, but in many countries bonds may be issued in *bearer* form. In this case the certificate constitutes the primary evidence of ownership, so the bondholder must send the certificate itself to claim the final repayment of principal. Eurobonds almost invariably allow the owner to hold them in bearer form. However, because the ownership of bearer bonds cannot be traced, the IRS has made it difficult for U.S. residents to hold them.

### The Bond Terms

Like most dollar bonds, the J.C. Penney bonds have a face value of $1,000. Notice, however, that the bond price is shown as a percentage of face value. Also the price is stated before adding *accrued interest.* This means that the bond buyer must pay not only the quoted price but also the amount of any future interest that has accumulated. For example, investors who bought bonds for delivery on (say) December 15, would have only two months to wait before receiving their first interest payment. Therefore, the four months of accrued interest would be $120/360 \times 8.25 = 2.75\%$, and the investor would pay the purchase price of the bond plus 2.75%.[7]

The J.C. Penney bonds were offered to the public at a price of 99.489%, but the company received only 98.614%. The difference represents the underwriters' spread. Of the $248.7 million raised, about $246.5 million went to the company and $2.2 million (or .9%) went to the underwriters.

The annual interest or *coupon* payment on each bond is 8.25% of $1,000, or $82.50. This interest is payable semiannually, so every six months investors receive interest of $82.50/2 = \$41.25$. Most U.S. bonds pay interest semiannually, but in many other countries it is common to pay interest annually.[8]

The regular interest payment on a bond is a hurdle that the company must keep jumping. If the company ever fails to make the payment, lenders can demand their money back instead of waiting until matters may deteriorate further.[9] Thus, coupon payments provide added protection for lenders.[10]

Sometimes bonds are sold with a lower coupon payment but at a larger discount on their face value, so investors receive a significant part of their return in the form of capital appreciation.[11] The ultimate is the zero-coupon bond, which pays no interest at all; in this case the entire return consists of capital appreciation.[12]

---

[6] Generally, investors do not physically hold the security; instead their ownership is represented by a book entry. The "book" is in practice a computer.

[7] In the U.S. corporate bond market accrued interest is calculated on the assumption that a year is composed of twelve 30-day months; in some other markets (such as the U.S. Treasury bond market) calculations recognize the actual number of days in each calendar month.

[8] If a bond pays interest semiannually, investors usually calculate a *semiannually* compounded yield to maturity on the bond. In other words, the yield is quoted as twice the six-month yield. When bonds pay interest annually, it is conventional to quote their yields to maturity on an *annually* compounded basis. Remember this when comparing yields.

[9] There is one type of bond on which the borrower is obliged to pay interest only if it is covered by the year's earnings. These so-called income bonds are rare and have largely been issued as part of railroad reorganizations. For a discussion of income bonds, see J. J. McConnell and G. G. Schlarbaum, "Returns, Risks, and Pricing of Income Bonds, 1956–1976 (Does Money Have an Odor?)," *Journal of Business* 54 (January 1981), pp. 33–64.

[10] Interest payments would be a trivial hurdle if the company could sell assets to make the payment. Such sales are therefore restricted.

[11] Any bond that is issued at a discount is known as an *original issue discount bond.* A zero-coupon bond is often called a "pure discount bond." The capital appreciation on a discount bond is not taxed as income as long as it amounts to less than .25% a year (IRS Code Section 1272).

[12] The ultimate of ultimates was an issue of a perpetual zero-coupon bond on behalf of a charity.

The J.C. Penney interest payment is fixed for the life of the bond, but in some issues the payment varies with the general level of interest rates. For example, the payment may be set at 1% over the U.S. Treasury bill rate or (more commonly) over the **London interbank offered rate (LIBOR),** which is the rate at which international banks lend to one another. Sometimes these *floating-rate notes* specify a minimum (or floor) interest rate or they may specify a maximum (or cap) on the rate.[13] You may also come across "collars," which stipulate both a maximum and a minimum payment.

## 24-3 Security and Seniority

Almost all debt issues by industrial and financial companies are general unsecured obligations. Short-term unsecured issues are usually called **notes;** longer-term issues like the J.C. Penney bond are called **debentures** (though in some countries, such as the U.K. and Australia, "debenture" means a *secured* bond).

Utility company bonds are more often secured. This means that if the company defaults on its debt, the trustee or lender may take possession of the relevant assets. If these are insufficient to satisfy the claim, the remaining debt will have a general claim, alongside any unsecured debt, on the other assets of the firm.

The majority of secured bonds are **mortgage bonds.** These sometimes provide a claim against a specific building, but they are more often secured on all the firm's property.[14] Of course, the value of any mortgage depends on the extent of alternative uses of the property. A custom-built machine for producing buggy whips will not be worth much when the market for buggy whips dries up.

Companies that own securities may use them as collateral for a loan. For example, holding companies are firms whose main assets consist of common stock in a number of subsidiaries. So, when holding companies wish to borrow, they generally use these investments as collateral. The problem for the lender is that the stock is junior to all other claims on the assets of the subsidiaries, and so these *collateral trust bonds* usually include detailed restrictions on the freedom of the subsidiaries to issue debt or preferred stock.

A third form of secured debt is the **equipment trust certificate.** This is most frequently used to finance new railroad rolling stock but may also be used to finance trucks, aircraft, and ships. Under this arrangement a trustee obtains formal ownership of the equipment. The company makes a down payment on the cost of the equipment, and the balance is provided by a package of equipment trust certificates with different maturities that might typically run from 1 to 15 years. Only when all these debts have finally been paid off does the company become the formal owner of the equipment. Bond rating agencies such as Moody's or Standard & Poor's usually rate equipment trust certificates one grade higher than the company's regular debt.

Bonds may be senior claims or they may be subordinated to the senior bonds or to *all* other creditors.[15] If the firm defaults, the senior bonds come first in the pecking order. The subordinated lender gets in line behind the general creditors but ahead of the preferred stockholders and the common stockholders.

---

[13] Instead of issuing a capped floating-rate loan, a company sometimes issues an uncapped loan and at the same time buys a cap from a bank. The bank pays the interest in excess of the specified level.

[14] If a mortgage is *closed,* no more bonds may be issued against the mortgage. However, usually there is no specific limit to the amount of bonds that may be secured (in which case the mortgage is said to be *open*). Many mortgages are secured not only by existing property but also by "after-acquired" property. However, if the company buys only property that is already mortgaged, the bondholder would have only a junior claim on the new property. Therefore, mortgage bonds with after-acquired property clauses also limit the extent to which the company can purchase additional mortgaged property.

[15] If a bond does not specifically state that it is junior, you can assume that it is senior.



▶ **FIGURE 24.1**

Ultimate percentage recovery rates on defaulting debt by seniority and security, 1987–2006.

*Source:* Moody's, "Moody's Ultimate Recovery Database."

As you can see from Figure 24.1, if default does occur, it pays to hold senior secured bonds. On average, investors in these bonds can expect to recover nearly two-thirds of the amount of the loan. At the other extreme, recovery rates for junior unsecured bondholders are only 15% of the face value of the debt.

### Asset-Backed Securities

Instead of borrowing money directly, companies sometimes bundle up a group of assets and then sell the cash flows from these assets. This issue is known as an *asset-backed security,* or *ABS.*

Suppose your company has made a large number of mortgage loans to buyers of homes or commercial real estate. However, you don't want to wait until the loans are paid off; you would like to get your hands on the money now. Here is what you do. You establish a separate company that buys a package of the mortgage loans. To finance this purchase, the company sells *mortgage pass-through certificates.* The holders of these certificates simply receive a share of the mortgage payments. For example, if interest rates fall and the mortgages are repaid early, holders of the pass-through certificates are also repaid early. That is not generally popular with these holders, for they get their money back just when they don't want it—when interest rates are low.

Sometimes, instead of issuing one class of pass-through certificates, the company will issue several different classes of security, known as *collateralized mortgage obligations* or *CMOs.* For example, any mortgage payments might be used first to pay off one class of security holders and only then will other classes start to be repaid. As we will see in Chapter 30, these CMOs ran into heavy weather during the credit crisis of 2007–2009.

Real estate companies are not unique in wanting to turn future cash receipts into up-front cash. Automobile loans, student loans, and credit card receivables are also often bundled and remarketed as an asset-backed security. Indeed, investment bankers seem able to repackage any set of cash flows into a loan. In 1997 David Bowie, the British rock star, established a company that then purchased the royalties from his current albums.

The company financed the purchase by selling $55 million of 10-year notes. The royalty receipts were used to make the principal and interest payments on the notes. When asked about the singer's reaction to the idea, his manager replied, "He kind of looked at me cross-eyed and said 'What?' "[16]

## 24-4 Repayment Provisions

### Sinking Funds

Back to our J.C. Penney bond. Its maturity date is 2022, but the issue is repaid on a regular basis before maturity. To do this, the company makes a series of payments into a *sinking fund*.[17] If the payment is in the form of cash, the trustee selects bonds by lottery and uses the cash to redeem them at their face value.[18] Alternatively, the company can choose to buy bonds in the marketplace and pay these into the fund.[19] This is a valuable option for the company. If the bond price is low, the firm will buy the bonds in the market and hand them to the sinking fund; if the price is high, it will call the bonds by lottery.

Generally, there is a mandatory fund that *must* be satisfied and an optional fund that can be satisfied if the borrower chooses. For example, J.C. Penney *must* contribute at least $12.5 million each year to the sinking fund but has the option to contribute a further $25 million.

The J.C. Penney "sinker" begins to operate after about 10 years, and the payments on the fund are sufficient to redeem the entire issue over the bond's life. We saw earlier that interest payments provide a regular test of solvency. A sinking fund provides an additional hurdle that the firm must keep jumping. If it cannot pay the cash into the sinking fund, the lenders can demand their money back. That is why long-dated, lower-quality issues involve larger sinking funds. Higher-quality bonds generally have a lighter sinking fund requirement if they have one at all.

Unfortunately, a sinking fund is a weak test of solvency if the firm is allowed to repurchase bonds in the market. Since the *market* value of the debt declines as the firm approaches financial distress, the sinking fund becomes a hurdle that gets progressively lower as the hurdler gets weaker.

### Call Provisions

The J.C. Penney bond includes a call option that allows the company to repay the debt early. Sometimes you come across bonds that give the *investor* the repayment option. Retractable (or puttable) bonds give investors the right to demand early repayment; extendible bonds give them the option to extend the bond's life.

For some companies callable bonds offer a natural form of insurance. For example, Fannie Mae and Freddie Mac offer fixed-rate mortgages to home buyers. When interest rates fall, home owners are likely to repay their fixed-rate mortgage and take out a new mortgage at the lower interest rate. This can severely dent the income of the two agencies. Therefore, to protect themselves against the effect of falling interest rates, they have traditionally issued large quantities of long-term callable debt. When interest rates fall, the agencies can reduce their funding costs by calling their bonds and replacing them with new

---

[16] See J. Matthews, "David Bowie Reinvents Himself, This Time as a Bond Issue," *Washington Post,* February 7, 1997.

[17] A number of private placements (particularly those in extractive industries) require a payment only when net income exceeds some specified level.

[18] Every investor dreams of buying up the entire supply of a sinking-fund bond that is selling way below face value and then forcing the company to buy the bonds back at face value. Cornering the market in this way is fun to dream about but difficult to do.

[19] If the bonds are privately placed, the company cannot repurchase them in the marketplace; it must call them at their face value.

bonds at a lower rate. Ideally, the fall in bond interest payments should exactly offset the reduction in mortgage income.

J.C. Penney's bonds provide investors with 10 years of *call protection*. During this period the company is not permitted to call the bonds at all. Sometimes a company may not be allowed to call the bonds in the first few years if it then replaces the bonds with new debt at a lower interest rate. In some bond issues the call provision is combined with an increasing coupon payment. For example, Bank of America has issued a 10-year step-up bond. The bond's coupon starts out at 4.5% in the first year and then climbs progressively to 6.5% by the tenth year. Those higher interest rates may sound mouthwatering. The catch is that the company can call the bonds whenever the coupon is about to step up.

How does a company know when to call its bonds? The answer is simple: Other things equal, if it wishes to maximize the value of its stock, it must minimize the value of its bonds. Therefore, a company should never call the bonds if their market value is less than the call price, for that would just be giving a present to the bondholders. Equally, a company *should* call the bond if it is worth *more* than the call price.

Of course, investors take the call option into account when they buy or sell the bond. They know that the company will call the bond as soon as it is worth more than the call price, so no investor will be willing to pay more than the call price for the bond. The market price of the bond may, therefore, reach the call price, but it will not rise above it. This gives the company the following rule for calling its bonds: *Call the bond when, and only when, the market price reaches the call price.*[20]

If we know how bond prices behave over time, we can modify the basic option-valuation model of Chapter 21 to find the value of the callable bond, *given* that investors know that the company will call the issue as soon as the market price reaches the call price. For example, look at Figure 24.2. It illustrates the relationship between the value of a straight 8% five-year bond and the value of a comparable callable bond. Suppose that the value of the straight bond is very low. In this case there is little likelihood that



**▶ FIGURE 24.2**

Relationship between the value of a callable bond and that of a straight (noncallable) bond. Assumptions: (1) Both bonds have an 8% coupon and a five-year maturity; (2) the callable bond may be called at face value any time before maturity; (3) the short-term interest rate follows a random walk, and the expected returns on bonds of all maturities are equal.

*Source:* M. J. Brennan and E. S. Schwartz, "Savings Bonds, Retractable Bonds, and Callable Bonds," *Journal of Financial Economics* 5 (1977), pp. 67–88. © 1977 Elsevier Science, with permission.

[20] Of course, this assumes that the bond is correctly priced, that investors are behaving rationally, and that investors expect the *firm* to behave rationally. Also we ignore some complications. First, you may not wish to call a bond if you are prevented by a nonrefunding clause from issuing new debt. Second, the call premium is a tax-deductible expense for the company but is taxed as a capital gain to the bondholder. Third, there are other possible tax consequences to both the company and the investor from replacing a high-coupon bond with a lower-coupon bond. Fourth, there are costs and delays to calling and reissuing debt.

the company will ever wish to call its bonds. (Remember that it will call the bonds only when their price equals the call price.) Therefore the value of the callable bond will be almost identical to the value of the straight bond. Now suppose that the straight bond is worth exactly 100. In this case there is a good chance that at some time the company will wish to call its bonds. Therefore the value of our callable bond will be slightly less than that of the straight bond. If interest rates decline further, the price of the straight bond will continue to rise, but nobody will ever pay more than the call price for the callable bond.

A call provision is not a free lunch. It provides the issuer with a valuable option, but that is recognized in a lower issue price. So why do companies bother with a call provision? One reason is that bond indentures often place a number of restrictions on what the company can do. Companies are happy to agree to these restrictions as long as they know that they can escape from them if the restrictions prove too inhibiting. The call provision provides the escape route.

We mentioned earlier that some bonds also provide the *investor* with an option to demand early repayment. *Puttable* bonds exist largely because bond indentures cannot anticipate every action the company may take that could harm the bondholder. If the value of the bonds is reduced, the put option allows the bondholders to demand repayment.

Puttable loans can sometimes get their issuers into BIG trouble. During the 1990s many loans to Asian companies gave their lenders a repayment option. Consequently, when the Asian crisis struck in 1997, these companies were faced by a flood of lenders demanding their money back.

## 24-5 Debt Covenants

Investors in corporate bonds know that there is a risk of default. But they still want to make sure that the company plays fair. They don't want it to gamble with their money. Therefore, the loan agreement usually includes a number of *debt covenants* that prevent the company from purposely increasing the value of its default option.[21]

Lenders worry that after they have made the loan, the company may pile up more debt and so increase the chance of default. They protect themselves against this risk by prohibiting the company from making further debt issues unless the ratio of debt to equity is below a specified limit.

Not all debts are created equal. If the firm defaults, the senior debt comes first in the pecking order and must be paid off in full before the junior debtholders get a cent. Therefore, when a company issues senior debt, the lenders will place limits on further issues of senior debt. But they won't restrict the amount of *junior* debt that the company can issue. Because the senior lenders are at the front of the queue, they view the junior debt in the same way that they view equity: They would be happy to see an issue of either. Of course, the converse is not true. Holders of the junior debt *do* care both about the total amount of debt and the proportion that is senior to their claim. As a result, an issue of junior debt generally includes a restriction on both total debt and senior debt.

*All* bondholders worry that the company may issue more secured debt. An issue of mortgage bonds often imposes a limit on the amount of secured debt. This is not necessary when you are issuing unsecured debentures. As long as the debenture holders are given an equal claim, they don't care how much you mortgage your assets. Therefore, unsecured

---

[21] We described in Section 18-3 some of the games that managers can play at the expense of bondholders.

bonds usually include a so-called negative-pledge clause, in which the unsecured holders simply say, "Me too."[22]

Instead of borrowing money to buy an asset, companies may enter into a long-term agreement to rent or lease it. For the debtholder this is very similar to secured borrowing. Therefore debt agreements also include limitations on leasing.

We have talked about how an unscrupulous borrower can try to increase the value of the default option by issuing more debt. But this is not the only way that such a company can exploit its existing bondholders. For example, we know that the value of an option is reduced when the company pays out some of its assets to stockholders. In the extreme case a company could sell all its assets and distribute the proceeds to shareholders as a bumper dividend. That would leave nothing for the lenders. To guard against such dangers, debt issues may restrict the amount that the company may pay out in the form of dividends or repurchases of stock.[23]

Take a look at Table 24.2, which summarizes the principal covenants in a large sample of senior bond issues. Notice that investment-grade bonds tend to have fewer restrictions than high-yield bonds. For example, restrictions on the amount of any dividends or repurchases are less common in the case of investment-grade bonds.

These debt covenants *do* matter. Asquith and Wizman, who studied the effect of leveraged buyouts on the value of the company's debt, found that when there were no restrictions on further debt issues, dividend payments, or mergers, the buyout led to a 5.2% fall in the value of existing bonds.[24] Those bonds that were protected by strong covenants against excessive borrowing increased in price by 2.6%.

Unfortunately, it is not always easy to cover all loopholes, as the bondholders of Marriott Corporation discovered in 1992. They hit the roof when the company announced plans to divide its operations into two separate businesses. One business, Marriott International, would manage Marriott's hotel chain and receive most of the revenues, while the other, Host Marriott, would own all the company's real estate and be responsible for servicing essentially all of the old company's $3 billion of debt. As a result the price of Marriott's bonds plunged nearly 30%, and investors began to think about how they could protect themselves against such *event risks*. As you can see from Table 24.2 it is now more common for bondholders to insist on *poison-put* clauses that oblige the borrower to repay the debt if there is a change of control and the bonds are downrated.

▶ **TABLE 24.2** Percentage of sample of bonds with covenant restrictions. Sample consists of 4,478 senior bonds issued between 1993 and 2007.

[a] For example, default on other loans, rating changes, or declining net worth.
*Source:* S. Chava, P. Kumar, and A. Warga, "Managerial Agency and Bond Covenants," *Review of Financial Studies,* forthcoming.

| Type of Covenant | Percentage of Bonds with Covenants | |
|---|---|---|
| | Investment-Grade Bonds | Other Bonds |
| Merger restrictions | 92% | 93% |
| Dividends or other payment restrictions | 6 | 44 |
| Debt covenants | 74 | 67 |
| Default-related events[a] | 52 | 71 |
| Change in control | 24 | 74 |

[22] "Me too" is not acceptable legal jargon. Instead the bond agreement may state that the company "will not consent to any lien on its assets without securing the existing bonds equally and ratably."

[23] A dividend restriction might typically prohibit the company from paying dividends if their cumulative amount would exceed the sum of (1) cumulative net income, (2) the proceeds from the sale of stock or conversion of debt, and (3) a dollar amount equal to one year's dividend.

[24] P. Asquith and T. Wizman "Event Risk, Covenants, and Bondholder Returns in Leveraged Buyouts," *Journal of Financial Economics* 27 (September 1990), pp. 195–213. Leveraged buyouts (LBOs) are company acquisitions that are financed by large issues of (usually unsecured) debt. We describe LBOs in Chapter 32.

## U.S. Shoe's Owner Riles Bondholders with Its Debt Moves

▶ Imagine a company trying to push its bonds into technical default just so it can redeem them before maturity. Some bond analysts assert that this is exactly what Luxottica Group SpA of Italy—the new owner of U.S. Shoe Corp.—is doing with U.S. Shoe's 8 5/8% note issue.

Luxottica's strategy, which the company asserts wasn't deliberately designed to hurt bondholders, is shaping to be the newest wrinkle in corporate America's scramble to pry high-interest-bearing bonds from the hands of investors before they mature, some analysts say. As interest rates have fallen, a host of corporate issuers—from stodgy utilities to fleet-footed finance companies—have rushed to redeem their high-interest bonds with lower coupon issues. As long as the bonds are "callable," or redeemable, there is usually no problem. Increasingly, however, corporate issuers are trying to redeem noncallable bonds—securities that can't be wrested from investors before maturity—using unusual tactics.

Bond analysts say Luxottica has been trying to put U.S. Shoe's 8 5/8% note issue, maturing in 2002, in technical default by piling $1.4 billion of secured debt onto the company earlier this year. That's because a little-noticed covenant in U.S. Shoe's bond indenture says its bonds are in technical default if it adds secured debt to its financial ledger without simultaneously adding collateral to back the 8 5/8% securities so they're on the same level as the bank debt.

What's riling bondholders is that Luxottica hasn't been willing to secure its 8 5/8% notes even though it took on a load of secured debt earlier this year. Now Luxottica is trying to redeem its bonds early, which the company says it can do under the covenants when the issue is in technical default.

"This action is 10 times worse than Marriott on its worst day, because Marriott never violated an explicit covenant," contends Max Holmes, a securities analyst.

**Source:** Extracted from Anita Raghaven, "U.S. Shoe's Owner Riles Bondholders with Its Debt Moves," *The Wall Street Journal,* October 18, 1995, p. C1. Eastern Edition (Staff-produced copy only). Reprinted by permission of the *The Wall Street Journal,* copyright © 1995 Dow Jones & Company, Inc. All Rights Reserved Worldwide.

However, there are always nasty surprises round the next corner. The above box describes one such surprise for bond investors of U.S. Shoe.

### 24-6 Convertible Bonds and Warrants

Unlike the common or garden bond, a convertible security can change its spots. It starts life as a bond (or preferred stock), but subsequently may turn into common stock. For example, in Febuary 2008 Chiquita Brands issued $200 million of 4.25% unsecured senior convertible notes due in 2016. Each bond can be converted at any time into 44.5524 shares of common stock. Thus the owner has an eight-year option to return the bond to the company and receive 44.5524 shares of common stock in exchange. The number of shares into which each bond can be converted is called the bond's **conversion ratio.** The conversion ratio of the Chiquita bond is 44.5524.

To receive these shares, the owner of the convertible must surrender bonds with a face value of $1,000. This means that to receive *one* share, the owner needs to surrender a face amount of $1,000/44.5524 = $22.45. This is the bond's **conversion price.** Anybody who bought the bond at $1,000 to convert it into stock paid the equivalent of $22.45 a share, nearly 33% above the stock price at the time of the convertible issue.

**607**

You can think of a convertible bond as equivalent to a straight bond plus an option to acquire common stock. When convertible bondholders exercise this option, they do not pay cash; instead they give up their bonds in exchange for shares. If Chiquita's bonds had not been convertible, they would probably have been worth about $670 at the time of issue. The difference between the price of a convertible bond and the price of an equivalent straight bond represents the value that investors place on the conversion option. For example, an investor who paid $1,000 in 2008 for the Chiquita convertible would have paid about $1,000 − $670 = $330 for the option to acquire 44.5524 shares.

### The Value of a Convertible at Maturity

By the time that the Chiquita convertible matures, investors need to choose whether to stay with the bond or convert to common stock. Figure 24.3(*a*) shows the possible bond values at maturity.[25] Notice that the bond value is simply the face value as long as Chiquita does not default. However, if the value of Chiquita's assets is sufficiently low, the bondholders will receive *less* than the face value and, in the extreme case that the assets are worthless, they will receive nothing. You can think of the bond value as a lower bound, or "floor," to the price of the convertible. But that floor has a nasty slope and, when the company falls on hard times, the bond may not be worth much.

Figure 24.3(*b*) shows the value of the shares that investors receive if they choose to convert. If Chiquita's assets at that point are worthless, the shares into which the convertible



**FIGURE 24.3**

(*a*) The bond value when Chiquita's convertible bond matures. If firm value is at least equal to the face value of Chiquita's debt, the bond is paid off at face value.

(*b*) The conversion value at maturity. If converted, the value of the convertible rises in proportion to firm value.

(*c*) At maturity the convertible bondholder can choose to receive the payment on the bond or convert to common stock. The value of the convertible bond is therefore the higher of its bond value and its conversion value.

[25] You may recognize this as the position diagram for a default-free bond *minus* a put option on the assets with an exercise price equal to the face value of the bonds. See Section 23-2.

can be exchanged are also worthless. But, as the value of the assets rises, so does the conversion value.

Chiquita's convertible cannot sell for less than its conversion value. If it did, investors would buy the convertible, exchange it rapidly for stock, and sell the stock. Their profit would be equal to the difference between the conversion value and the price of the convertible. Therefore, there are two lower bounds to the price of the convertible: its bond value and its conversion value. Investors will not convert if the convertible is worth more as a bond; they *will* do so if the conversion value at maturity exceeds the bond value. In other words, the price of the convertible at maturity is represented by the higher of the two lines in Figures 24.3(*a*) and (*b*). This is shown in Figure 24.3(*c*).

### Forcing Conversion

Beginning in 2014 Chiquita has an option to buy back (or *call*) its convertible bonds at their face value whenever its stock price is at least 30% above the bond's conversion price. If Chiquita does announce that it will call the bonds, it makes sense for investors to convert immediately. Thus a call can *force conversion*.

As we saw earlier, calling a bond does not affect the total size of the company pie, but it can affect the size of the individual slices. Chiquita can minimize the value of the bondholder's slice by forcing conversion and terminating the bondholder's option.[26]

### Why Do Companies Issue Convertibles?

You are approached by an investment banker who is anxious to persuade your company to issue a convertible bond with a conversion price set somewhat above the current stock price. She points out that investors would be prepared to accept a lower yield on the convertible, so that it is "cheaper" debt than a straight bond.[27] You observe that if your company's stock performs as well as you expect, investors will convert the bond. "Great," she replies, "in that case you will have sold shares at a much better price than you could sell them for today. It's a win-win opportunity."

Is the investment banker right? Are convertibles "cheap debt"? Of course not. They are a package of a straight bond and an option. The higher price that investors are prepared to pay for the convertible represents the value that they place on the option. The convertible is "cheap" only if this price overvalues the option.

What then of the other argument, that the issue represents a deferred sale of common stock at an attractive price? The convertible gives investors the right to buy stock by giving up a bond.[28] Bondholders may decide to do this, but then again they may not. Thus issue of a convertible bond *may* amount to a deferred stock issue. But if the firm needs equity capital, a convertible issue is an unreliable way of getting it.

John Graham and Campbell Harvey surveyed companies that had seriously considered issuing convertibles. In 58% of the cases management considered convertibles an inexpensive way to issue "delayed" common stock. Forty-two percent of the firms viewed convertibles as less expensive than straight debt.[29] Taken at their face value, these arguments don't

---

[26] The financial manager might delay calling if interest payments on the convertible are less than the extra dividends that would be paid after conversion. This delay would reduce cash payments to bondholders. Nothing is lost if the financial manager calls on the way down. Note that investors may convert voluntarily if they would thereby increase their income.

[27] She might even point out to you that in 2002 several Japanese companies issued convertible bonds at a negative yield. Investors actually *paid* the companies to hold their debt.

[28] That is much the same as already having the stock together with the right to sell it for the convertible's bond value. In other words, instead of thinking of a convertible as a bond plus a call option, you could think of it as the stock plus a put option. Now you can see why it is wrong to think of a convertible as equivalent to the sale of stock; it is equivalent to the sale of both stock and a put option. If there is any possibility that investors will want to hold onto their bond, that put option has value.

[29] See J. R. Graham and C. R. Harvey, "The Theory and Practice of Finance: Evidence from the Field," *Journal of Financial Economics* 61 (2001), pp. 187–243.

make sense. But we suspect that these phrases encapsulate some more complex and rational motives.

Notice that convertibles tend to be issued by the smaller and more speculative firms. They are almost invariably unsecured and generally subordinated. Now put yourself in the position of a potential investor. You are approached by a firm with an untried product line that wants to issue some junior unsecured debt. You know that if things go well, you will get your money back, but if they do not, you could easily be left with nothing. Since the firm is in a new line of business, it is difficult to assess the chances of trouble. Therefore you don't know what the fair rate of interest is. Also, you may be worried that once you have made the loan, management will be tempted to run extra risks. It may take on additional senior debt, or it may decide to expand its operations and go for broke on your money. In fact, if you charge a very high rate of interest, you could be encouraging this to happen.

What can management do to protect you against a wrong estimate of the risk and to assure you that its intentions are honorable? In crude terms, it can give you a piece of the action. You don't mind the company running unanticipated risks as long as you share in the gains as well as the losses.[30] Convertible securities make sense whenever it is unusually costly to assess the risk of debt or whenever investors are worried that management may not act in the bondholders' interest.[31]

The relatively low coupon rate on convertible bonds may also be a convenience for rapidly growing firms facing heavy capital expenditures.[32] They may be willing to provide the conversion option to reduce immediate cash requirements for debt service. Without that option, lenders might demand extremely high (promised) interest rates to compensate for the probability of default. This would not only force the firm to raise still more capital for debt service but also increase the risk of financial distress. Paradoxically, lenders' attempts to protect themselves against default may actually increase the probability of financial distress by increasing the burden of debt service on the firm.

## Valuing Convertible Bonds

We have seen that a convertible bond is equivalent to a package of a bond and an option to buy stock. This means that the option-valuation models that we described in Chapter 21 can also be used to value the option to convert. We don't want to repeat that material here, but we should note three wrinkles that you need to look out for when valuing a convertible:

1. *Dividends*. If you hold the common stock, you may receive dividends. The investor who holds an option to convert into common stock misses out on these dividends. In fact the convertible holder loses out every time a cash dividend is paid because the dividend reduces the stock price and thus reduces the value of the conversion option. If the dividends are high enough, it may even pay to convert before maturity to capture the extra income. We showed how dividend payments affect option value in Section 21-5.

---

[30] In the survey referred to above a further 44% of the respondents reported that an important factor in their decision was the fact that convertibles were attractive to investors who were unsure about the riskiness of the company.

[31] Changes in risk are more likely when the firm is small and its debt is low-grade. Therefore, we should find that convertible bonds of such firms offer their holders a larger potential ownership share. This is indeed the case. See C. M. Lewis, R. J. Rogalski, and J. K. Seward, "Understanding the Design of Convertible Debt," *Journal of Applied Corporate Finance* 11 (Spring 1998), pp. 45–53.

[32] Of course, the firm could also make an equity issue rather than an issue of straight debt or convertibles. However, a convertible issue sends a better signal to investors than an issue of common stock. As we explained in Chapter 15, announcement of a stock issue prompts worries of overvaluation and usually depresses the stock price. Convertibles are hybrids of debt and equity and send a less negative signal. If the company is likely to need equity, its willingness to issue a convertible and take the chance that the stock price will rise enough to lead to conversion also signals management's confidence in the future. See J. Stein, "Convertible Bonds as Backdoor Equity Financing," *Journal of Financial Economics* 32 (1992), pp. 3–21.

2. *Dilution.* The second complication arises because conversion increases the number of outstanding shares. Therefore, exercise means that each shareholder is entitled to a smaller proportion of the firm's assets and profits.[33] This problem of *dilution* never arises with traded options. If you buy an option through an option exchange and subsequently exercise it, you have no effect on the number of shares outstanding. We showed how dilution affects option value in the Appendix to Chapter 21.

3. *Changing bond value.* When investors convert to shares, they give up their bond. The exercise price of the option is therefore the value of the bond that they are relinquishing. But this bond value is not constant. If the bond value at issue is less than the face value (and it usually is less), it is likely to change as maturity approaches. Also the bond value varies as interest rates change and as the company's credit standing changes. If there is some possibility of default, investors cannot even be certain of what the bond will be worth at maturity. In Chapter 21 we did not get into the complication of uncertain exercise prices.

## A Variation on Convertible Bonds: The Bond–Warrant Package

Instead of issuing a convertible bond, companies sometimes sell a package of straight bonds and warrants. Warrants are simply long-term call options that give the investor the right to buy the firm's common stock. For example, each warrant might allow the holder to buy a share of stock for $50 at any time during the next five years. Obviously, the warrant holders hope that the company's stock will zoom up, so that they can exercise their warrants at a profit. But, if the company's stock price remains below $50, holders will choose not to exercise, and the warrants will expire worthless.

Convertible bonds consist of a package of a straight bond and an option. An issue of bonds and warrants also contains a straight bond and an option. But there are some differences:

1. *Warrants are usually issued privately.* Packages of bonds with warrants tend to be more common in private placements. By contrast, most convertible bonds are issued publicly.

2. *Warrants can be detached.* When you buy a convertible, the bond and the option are bundled together. You cannot sell them separately. This may be inconvenient. If your tax position or attitude to risk inclines you to bonds, you may not want to hold options as well. Warrants are sometimes also "nondetachable," but usually you can keep the bond and sell the warrant.

3. *Warrants are exercised for cash.* When you convert a bond, you simply exchange your bond for common stock. When you exercise warrants, you generally put up extra cash, though occasionally you have to surrender the bond or can choose to do so. This means that the bond-warrant package and the convertible bond have different effects on the company's cash flow and on its capital structure.

4. *A package of bonds and warrants may be taxed differently.* There are some tax differences between warrants and convertibles. Suppose that you are wondering whether to issue a convertible bond at 100. You can think of this convertible as a package of a straight bond worth, say, 90 and an option worth 10. If you issue the bond and option separately, the IRS will note that the bond is issued at a discount and that its price will rise by 10 points over its life. The IRS will allow you, the issuer, to spread this prospective price appreciation over the life of the bond and deduct it from your taxable profits. The IRS will also allocate the prospective price appreciation to the

---

[33] In their financial statements companies recognize the possibility of dilution by showing how earnings would be affected by the issue of the extra shares.

taxable income of the bondholder. Thus, by issuing a package of bonds and warrants rather than a convertible, you may reduce the tax paid by the issuing company and increase the tax paid by the investor.

5. *Warrants may be issued on their own.* Warrants do not have to be issued in conjunction with other securities. Often they are used to compensate investment bankers for underwriting services. Many companies also give their executives long-term options to buy stock. These executive stock options are not usually called warrants, but that is exactly what they are. Companies can also sell warrants on their own directly to investors, though they rarely do so.

## 24-7 Private Placements and Project Finance

The J.C. Penney debentures were registered with the SEC and sold to the public. However, debt is often placed privately with a small number of financial institutions. As we saw in Section 15-5, it costs less to arrange a private placement than to make a public debt issue. But there are three other differences between a privately placed bond and its public counterpart.

First, if you place an issue privately with one or two financial institutions, it may be necessary to sign only a simple promissory note. This is just an IOU that lays down certain conditions that the borrower must observe. However, when you make a public issue of debt, you must worry about who is supposed to represent the bondholders in any subsequent negotiations and what procedures are needed for paying interest and principal. Therefore, the contract has to be somewhat more complicated.

The second characteristic of publicly issued bonds is that they are somewhat standardized products. They *have* to be—investors are constantly buying and selling without checking the fine print in the agreement. This is not so necessary in private placements and so the debt can be custom-tailored for firms with special problems or opportunities. The relationship between borrower and lender is much more intimate. Imagine a $200 million debt issue privately placed with an insurance company, and compare it with an equivalent public issue held by 200 anonymous investors. The insurance company can justify a more thorough investigation of the company's prospects and therefore may be more willing to accept unusual terms or conditions.[34]

As we saw earlier, all bond agreements seek to protect the lender by imposing conditions on the borrower. Because covenants are more easily renegotiated in the case of privately placed debt, the conditions tend to be more severe. For example, the loan agreement may state that the borrower will be in default if interest payments ever exceed a certain multiple of earnings or if the company fails to maintain a minimum level of liquid assets. In many cases the loan contains restrictions on the firm's capital expenditures. Since privately placed debt keeps the borrower on a fairly short leash, it is quite common for a covenant to be breached.[35] This is not as calamitous as it may sound. As long as the borrower is in good financial health, the bank may simply readjust the terms of the covenant. Only if covenants continue to be violated will the lender choose to take more drastic action.

These features of private placements give them a particular niche in the corporate debt market, namely, loans to small- and medium-sized firms. These are the firms that face the

---

[34] Of course debt with the same terms could be offered publicly, but then 200 separate investigations would be required—a much more expensive proposition.

[35] In a study of large, private placements, Dichev and Skinner found that 30% of the loans resulted in covenant violations. See I. D. Dichev and D. J. Skinner, "Large-Sample Evidence on the Debt Covenant Hypothesis," *Journal of Accounting Research* 40 (2002), pp. 1091–1123.

highest costs in public issues, that require the most detailed investigation, and that may require specialized, flexible loan arrangements. However, many large companies also use private placements.

Of course, the advantages of private placements are not free, for the lenders demand a higher rate of interest to compensate them for holding an illiquid asset. It is difficult to generalize about the difference in interest rates between private placements and public issues, but a typical differential is 50 basis points, or .50 percentage points.

## Project Finance

We are not going to dwell further on the topic of private placement bonds, because the greater part of what we have had to say about public issues is also true of private placements. However, we do need to discuss a different form of private loan, one that is tied as closely as possible to the fortunes of a particular project and that minimizes the exposure of the parent. Such a loan is usually referred to as **project finance** and is a specialty of large international banks.

Project finance means debt supported by the project, not by the project's sponsoring companies. Debt ratios are nevertheless very high for most project financings. They can be high because the debt is supported not just by the project's assets but also by a variety of contracts and guarantees provided by customers, suppliers, and local governments as well as by the project's owners.

---

**EXAMPLE 24.1**   ● Project Finance for a Power Station

---

Here is how project finance was used to construct a $1.8 billion oil-fired power plant in Pakistan. First, a separate firm, the Hub Power Company (Hubco) was established to own the power station. Hubco then engaged a consortium of companies, headed by the Japanese company Mitsui & Co., to build the power station, while the British company International Power became responsible for managing and running it for an initial period of 12 years. Hubco agreed to buy the fuel from the Pakistan State Oil Company and to sell the power station's output to another government body, the Water and Power Development Authority (WAPDA).

Hubco's lawyers drew up a complex series of contracts to make certain that each of these parties came up to scratch. For example, the contractors agreed to deliver the plant on time and to ensure that it would operate to specifications. International Power, the plant manager, agreed to maintain the plant and operate it efficiently. Pakistan State Oil Company entered into a long-term contract to supply oil to Hubco, and WAPDA agreed to buy Hubco's output for the next 30 years.[36] Since WAPDA would pay for the electricity with rupees, Hubco was concerned about the possibility of a fall in the value of the rupee. The State Bank of Pakistan therefore arranged to provide Hubco with foreign exchange for debt service at guaranteed exchange rates. The Pakistan government guaranteed that WAPDA, Pakistan State Oil, and the State Bank would honor their agreements.

The effect of these contracts was to ensure that each risk was borne by the party that was best able to measure and control it. For example, the contractors were best placed to ensure that the plant was completed on time, so it made sense to ask them to bear the risk

---

[36] WAPDA entered into a *take-or-pay* agreement with Hubco; if it did not take the electricity, it still had to pay for it. In the case of pipeline projects the contract with the customer is often in the form of a *throughput* agreement, whereby the customer agrees to make a minimum use of the pipeline. Another arrangement for transferring revenue risk to a customer is the *tolling contract,* whereby the customer agrees to deliver to the project company materials that the company is to process and return to the customer. One purpose of transferring revenue risk to customers is to encourage them to estimate their demand for the project's output thoroughly.

of construction delays. Similarly, the plant operator was best placed to operate the plant efficiently and would be penalized if it failed to do so. The contractors and the plant manager were prepared to take on these risks because the project involved an established technology and there was relatively little chance of unpleasant surprises.

While these contracts sought to be as precise as possible about each party's responsibilities, they could not cover every eventuality; inevitably the contracts were incomplete. Therefore, to buttress the formal legal agreements, the contractors and the plant manager became major shareholders in Hubco. This meant that if they cut corners in building and running the plant, they would share in the losses.

The equity in Hubco was highly levered. Over 75% of the $1.8 billion investment in the project was financed by debt. Just under $600 million was junior debt provided by a fund that was set up by the World Bank and the export credit agencies of France, Italy, and Japan. The remainder was senior debt provided in seven different currencies by 58 local and international banks.[37] The banks were encouraged to invest because they knew that the World Bank and several governments were in the front line and would take a hit if the project were to fail. But they were still concerned that the government of Pakistan might prevent Hubco from paying out foreign currency or it might impose a special tax or prevent the company from bringing in the specialist staff it needed. Therefore, to protect Hubco against these political risks, the government promised to pay compensation if it interfered in such ways with the operation of the project. Of course, the government could not be prevented from tearing up that agreement, but, if it did, Hubco could call on a $360 million guarantee by the World Bank and the Japan Bank for International Cooperation. This was supposed to keep the Pakistan government honest once the plant was built and operating. Governments can be surprisingly relaxed when faced with the wrath of a private corporation but are usually reluctant to break an agreement that lands the World Bank with a large bill.

The arrangements for the Hubco project were complex, costly, and time-consuming. Over 200 person-years were spent in setting up the project. Not everything was plain sailing. The project was suspended for over a year by a Pakistani court ruling that the interest on the loans contravened Islamic law. Ten years after the start of the discussions the final agreement on financing the project was signed and within a short time Hubco was producing a fifth of all Pakistan's electricity.

That was not the end of the Hubco story. WAPDA was obliged by its contract to make regular payments to Hubco regardless of whether it took the electricity, and as a result found itself on the brink of collapse. After the fall of Benazir Bhutto's government in Pakistan, the new government terminated the contract with Hubco and announced a 30% cut in electricity tariffs. After three years of painful dispute, which threatened Pakistan's relationships with the World Bank, Hubco finally agreed to a new tariff. The feud with the government was finally over, and by 2006 Hubco had fully repaid its senior debts.

● ● ● ● ●

## Project Finance—Some Common Features

No two project financings are alike, but they have some common features:

- The project is established as a separate company.
- Equity ownership is privately held by a small group of investors. These usually include the contractors and the plant manager, who therefore share in the risk of the project's failure.

---

[37] Notice that, although most of Hubco's debt had a maturity of about 12 years, the project was not financed by a public bond issue. The concentrated ownership of bank debt induces the lenders to evaluate the project carefully and to monitor its subsequent progress. It also facilitates the renegotiation of the debt if the project company runs into difficulties.

- The project company enters into a complex series of contracts that distribute risk among the contractors, the plant manager, the suppliers, and the customers.
- The government may guarantee that it will provide the necessary permits, allow the purchase of foreign exchange, and so on.
- The detailed contractual arrangements and the government guarantees typically allow about 70% of the capital for the project to be provided in the form of bank debt or other privately placed borrowing. This debt is supported by the project cash flows; if these flows are insufficient, the lenders do not have any recourse against the parent companies.

### The Role of Project Finance

Project finance is widely used in developing countries to fund power, telecommunications, and transportation projects, but it is also used in the major industrialized countries. In the United States project finance has been most commonly used to fund power plants. For example, an electric utility company may get together with an industrial company to construct a cogeneration plant that provides electricity to the utility and waste heat to a nearby industrial plant. The utility stands behind the cogeneration project and guarantees its revenue stream. Banks are happy to lend a high proportion of the cost of the project because they know that once the project is up and running, the cash flow is insulated from most of the risks facing normal businesses.[38]

Project financing is costly to arrange[39] and the project debt usually carries a relatively high interest rate. So why don't companies simply finance the projects by borrowing against their existing assets? Notice that most of the projects have limited lives and employ established technologies. They generate substantial free cash flow, and there are few options to make profitable follow-on investments. If such investments are funded with project finance, management has little discretion over how the cash flows are used. Instead, the debt-service requirements ensure that the cash must be returned to investors rather than frittered away on unprofitable future ventures.[40]

Our example of the Hubco power station illustrates another important motivation for project finance. The success of the project depends on the performance of a number of different parties. For example, Hubco had only one source of fuel and one customer. To prevent any of the parties from changing the rules of the game after the project has begun, all of them need to enter into a complex set of contracts that are designed to ensure that risks are borne by those best able to control them. And because project viability is often dependent on the goodwill of the government, the government is also often a party to these contracts and the financing is structured to reduce the chance of punitive government action.

## 24-8   Innovation in the Bond Market

Domestic bonds and eurobonds, fixed- and floating-rate bonds, coupon bonds and zeros, callable and puttable bonds, privately placed bonds and project finance—you might think that this would give you as much choice as you need. Yet almost every day some new type of bond seems to be issued.

---

[38] There are some interesting regulatory implications to this arrangement. When a utility builds a power plant, it is entitled to a fair return on its investment: Regulators are supposed to set customer charges that will allow the utility to earn its cost of capital. Unfortunately, the cost of capital is not easily measured and is a natural focus for argument in regulatory hearings. But when a utility buys electric power, the cost of capital is rolled into the contract price and treated as an operating cost. In this case the pass-through to the customer may be less controversial.

[39] Total transaction costs for infrastructure projects average 3% to 5% of the amount invested. See M. Klein, J. So, and B. Shin, "Transaction Costs in Private Infrastructure Projects—Are They Too High?" The World Bank Group, October 1996.

[40] Because the project is an independent company, it cannot drag down the parent company if something does go badly wrong with the project.

**TABLE 24.3**
Some examples of innovation in bond design.

| | |
|---|---|
| Liquid yield option notes (LYONs) | Puttable, callable, convertible, zero-coupon debt. |
| Floating-price (death-spiral) convertibles | Convertible debt where the bondholder can convert into a fixed *value* of shares. |
| Asset-backed securities | Many small loans are packaged together and resold as a bond. |
| Catastrophe (CAT) bonds | Payments are reduced in the event of a specified natural disaster. |
| Reverse floaters (yield-curve notes) | Floating-rate bonds that pay a higher rate of interest when other interest rates fall and a lower rate when other rates rise. |
| Equity-linked bonds | Payments are linked to the performance of a stock market index. |
| Pay-in-kind bonds (PIKs) | Issuer can choose to make interest payments either in cash or in more bonds with an equivalent face value. |
| Rate-sensitive bonds | Coupon rate changes as company's credit rating changes. |
| Mortality bonds | Bonds whose payments are reduced or eliminated if there is a jump in mortality rates. |

Table 24.3 lists some of the more interesting bonds that have been invented in recent years.[41] Earlier in the chapter we cited the "Bowie bonds" as an example of asset-backed securities, and in Chapter 26 we discuss catastrophe bonds whose payoffs are linked to the occurrence of natural disasters.

Some financial innovations appear to serve little or no economic purpose; they may flower briefly but then wither. For example, toward the end of the 1990s in the United States there was a bout of new issues of *floating-price convertibles,* or, as they were more commonly called, death-spiral, or toxic, convertibles. When death-spiral convertibles are issued, the conversion price is set below the current stock price. Moreover, each bond is convertible not into a fixed *number* of shares but into shares with a fixed *value.* Therefore, the more the share price falls, the more shares that the convertible bondholder is entitled to. With a normal convertible, the value of the conversion option falls whenever the value of the firm's assets falls; so the convertible holder shares some of the pain with the stockholders. With a death-spiral convertible, the holder is entitled to shares with a fixed value, so the entire effect of the decrease in the asset price falls on the common stockholders. Death-spiral convertibles were issued largely by companies that were already in desperate straits, and, when the issuers failed to recover, the toxic chicken came home to roost. After the initial flurry of issues in the United States, death-spiral convertibles seem now to have been consigned to the garbage heap of unsuccessful innovations.

Many other innovations seem to have a more obvious purpose. Here are some important motives for creating new securities:

1. *Investor choice.* Sometimes new financial instruments are created to widen investor choice. Economists refer to such securities as helping to "complete the market." This was the idea behind the 2006 issue of nearly €350 million of *mortality bonds* by the French insurance company Axa. One of the big risks for a life insurance company is a pandemic or other disaster that results in a sharp increase in the death rate. Axa's bond, therefore, offers investors a higher interest rate for taking on some of that risk. Holders of the bond will lose their entire investment if death rates for two consecutive years are 10% or more above expectations.

   Pension funds are in the opposite position to insurance companies. Their worry is that the scheme's members will continue to draw their pensions into a ripe old age.

---

[41] For a more comprehensive list of innovations, see K. A. Carrow and J. J. McConnell, "A Survey of U.S. Corporate Financing Innovations: 1970–1997," *Journal of Applied Corporate Finance* 12 (Spring 1999), pp. 55–69.

Investment bankers have therefore been working to design *longevity bonds* that pay a higher rate of interest if an unusually high proportion of the population survives to a particular age. A pension fund that held these bonds would be protected against an unexpected increase in longevity.[42]

Both mortality and longevity bonds widen investor choice. They allow insurance companies and pension funds to protect themselves against adverse changes in mortality and they spread the risk widely around the market.

2. *Government regulation and tax.* Merton Miller has described new government regulations and taxes as the sand in the oyster that stimulates the design of new types of security. For example, we have already seen how the eurobond market was a response to the U.S. government's imposition of a tax on purchases of foreign securities.

   Asset-backed securities provide another instance of a market that has been encouraged by regulation. To reduce the likelihood of failure, banks are obliged to finance part of their loan portfolio with equity capital. Many banks have sought to reduce the amount of capital that they need to hold by packaging up their loans or credit card receivables and selling them off as bonds. Bank regulators worry about this. They think that banks may be tempted to sell off their riskiest loans and to keep their safest ones. They have therefore introduced new regulations that will link the capital requirement to the riskiness of the loans.

3. *Reducing agency costs.* At the turn of the century investors were worried by the huge spending plans of telecom companies. So when BT, the British telecom giant, decided to sell $10 billion of bonds in 2000, it offered a *step-up* provision to reassure investors. Under this arrangement, BT was required to increase the coupon rate on the bonds by 25 basis points if ever its bonds were downgraded a notch by Moody's or Standard & Poor's. BT's rate-sensitive bonds protected investors against possible future attempts by the company to exploit existing bondholders by loading on more debt.

Dreaming up new financial instruments is only half the battle. The other problem is to produce them efficiently. Think, for example, of the problems of packaging together several hundred million dollars' worth of credit card receivables and allocating the cash flows to a diverse group of investors. That requires good computer systems. The deal also needs to be structured so that, if the issuer goes bankrupt, the receivables will not be part of the bankruptcy estate. That depends on the development of legal structures that will stand up in the event of a dispute.

---

[42] The French bank BNP Paribas attempted to launch a $1 billion issue of longevity bonds in 2004, but had difficulty attracting buyers.

● ● ● ● ●

**SUMMARY**

You should now have a fair idea of what you are letting yourself in for when you make an issue of bonds. You can issue bonds in the domestic U.S. market, in a foreign bond market, or in the eurobond market. Eurobonds are marketed simultaneously in a number of foreign countries, usually by the London branches of international banks and security dealers.

The detailed bond agreement is set out in the indenture between your company and a trustee, but the main provisions are summarized in the prospectus to the issue. The indenture states whether the bonds are senior or subordinated, and whether they are secured or unsecured. Most bonds are unsecured debentures or notes. This means that they are general claims on the corporation. The principal exceptions are utility mortgage bonds, collateral trust bonds, and equipment trust certificates. In the event of default, the trustee to these issues can repossess the company's assets to pay off the debt.



Some long-term bond issues have a sinking fund. This means that the company must set aside enough money each year to retire a specified number of bonds. A sinking fund reduces the average life of the bond, and it provides a yearly test of the company's ability to service its debt. It therefore helps to protect the bondholders against the risk of default.

Long-dated bonds may be callable before maturity. The option to call the bond may be very valuable. If interest rates decline and bond value rises, you may be able to call a bond that would be worth substantially more than the call price. Of course, if investors know that you may call the bond, the call price will act as a ceiling on the market price. Your best strategy, therefore, is to call the bond as soon as the market price hits the call price. You are unlikely to do better than that.

Lenders usually seek to prevent the borrower from taking actions that would damage the value of their loans. Here are some examples of debt covenants:

1. The loan agreement may limit the amount of additional borrowing by the company.
2. Unsecured loans may incorporate a negative pledge clause, which prohibits the company from securing additional debt without giving equal treatment to the existing unsecured bonds.
3. Lenders may place a limit on the company's dividend payments or repurchases of stock.

Bank loans and other privately placed debt tend to impose more restrictive conditions, but these conditions are more easily changed if it makes sense to do so.

Most bonds start and finish their lives as bonds, but convertible bonds give their owner the option to exchange the bond for common stock. The *conversion ratio* measures the number of shares into which each bond can be exchanged. You can think of a convertible bond as equivalent to a straight bond plus a call option on the stock. Sometimes, instead of issuing a convertible, companies may decide to issue a package of bonds and options (or *warrants*) to buy the stock. If the stock price rises above the exercise price, the investor may then keep the bond and exercise the warrants for cash.

Private placements are less standardized than public issues, but otherwise they are generally close counterparts of publicly issued bonds. Sometimes private debt takes the form of project finance. In this case the loan is tied to the fortunes of a particular project.

There is an enormous variety of bond issues and new forms of bonds are spawned almost daily. By a process of natural selection, some of these new instruments become popular and may even replace existing species. Others are ephemeral curiosities. Some innovations succeed because they widen investor choice or reduce agency costs. Others owe their origin to tax rules and government regulation.

● ● ● ● ●

**FURTHER READING**

*A useful general work on debt securities is:*

F. J. Fabozzi (ed.), *The Handbook of Fixed Income Securities,* 6th ed. (New York: McGraw-Hill, 2005).

*For nontechnical discussions of the pricing of convertible bonds and the reasons for their use, see:*

M. J. Brennan and E. S. Schwartz, "The Case for Convertibles," *Journal of Applied Corporate Finance* 1 (Summer 1988), pp. 55–64.

C. M. Lewis, R. J. Rogalski, and J. K. Seward, "Understanding the Design of Convertible Debt," *Journal of Applied Corporate Finance* 11 (Spring 1998), pp. 45–53.

*Discussions of project finance include:*

B. C. Esty, *Modern Project Finance: A Casebook* (New York: John Wiley, 2003).

B. C. Esty, "Returns on Project-Financed Investments: Evolution and Managerial Implications," *Journal of Applied Corporate Finance* 15 (Spring 2002), pp. 71–86.

R. A. Brealey, I. A. Cooper, and M. Habib, "Using Project Finance to Fund Infrastructure Investments," *Journal of Applied Corporate Finance* 9 (Fall 1996), pp. 25–38.

   *The readings listed at the end of Chapter 17 include several articles on financial innovation.*

 **Select problems are available in McGraw-Hill Connect. Please see the preface for more information.**

**BASIC**                                                                          **PROBLEM SETS**

1. Select the most appropriate term from within the parentheses:
   a. (High-grade utility bonds/Low-grade industrial bonds) generally have only light sinking-fund requirements.
   b. Collateral trust bonds are often issued by (utilities/industrial holding companies).
   c. (Utility bonds/Industrial bonds) are usually unsecured.
   d. Equipment trust certificates are usually issued by (railroads/financial companies).
   e. Mortgage pass-through certificates are an example of (an asset-backed security/project finance).

2. For each of the following sinking funds, state whether the fund increases or decreases the value of the bond at the time of issue (or whether it is impossible to say):
   a. An optional sinking fund operating by drawings at par.
   b. A mandatory sinking fund operating by drawings at par *or* by purchases in the market.
   c. A mandatory sinking fund operating by drawings at par.

3. a. As a senior bondholder, would you like the company to issue more junior debt to finance its investment program, would you prefer it not to do so, or would you not care?
   b. You hold debt secured on the company's existing property. Would you like the company to issue more unsecured debt to finance its investments, would you prefer it not to do so, or would you not care?

4. Use Table 24.1 (but not the text) to answer the following questions:
   a. Who are the principal underwriters for the J.C. Penney bond issue?
   b. Who is the trustee for the issue?
   c. How many dollars does the company receive for each debenture after deduction of the underwriters' spread?
   d. Is the debenture "bearer" or "registered"?
   e. At what price was the issue callable in 2005?

5. Look at Table 24.1:
   a. Suppose the debenture was issued on September 1, 1992, at 99.489%. How much would you have to pay to buy one bond delivered on September 15? Don't forget to include accrued interest.
   b. When is the first interest payment on the bond, and what is the amount of the payment?
   c. On what date do the bonds finally mature, and what is the principal amount of the bonds that is due to be repaid on that date?
   d. Suppose that the market price of the bonds rises to 102 and thereafter does not change. When should the company call the issue?

**Visit us at www.mhhe.com/bma**

6.  Explain the three principal ways in which the terms of private placement bonds commonly differ from those of public issues.

7.  True or false? Briefly explain in each case.

    a.  Lenders in project financings rarely have any recourse against the project's owners if the project fails.

    b.  Many new and exotic debt securities are triggered by government policies or regulations.

    c.  Call provisions give a valuable option to debt investors.

    d.  Restrictive covenants have been shown to protect debt investors when takeovers are financed with large amounts of debt.

    e.  Privately placed debt issues often include stricter covenants than public debt. However, public debt covenants are more difficult and expensive to renegotiate.

8.  Maple Aircraft has issued a 4 ¾% convertible subordinated debenture due 2014. The conversion price is $47.00 and the debenture is callable at 102.75% of face value. The market price of the convertible is 91% of face value, and the price of the common is $41.50. Assume that the value of the bond in the absence of a conversion feature is about 65% of face value.

    a.  What is the conversion ratio of the debenture?

    b.  If the conversion ratio were 50, what would be the conversion price?

    c.  What is the conversion value?

    d.  At what stock price is the conversion value equal to the bond value?

    e.  Can the market price be less than the conversion value?

    f.  How much is the convertible holder paying for the option to buy one share of common stock?

    g.  By how much does the common have to rise by 2014 to justify conversion?

    h.  When should Maple call the debenture?

9.  True or false?

    a.  Convertible bonds are usually senior claims on the firm.

    b.  The higher the conversion ratio, the more valuable the convertible.

    c.  The higher the conversion price, the more valuable the convertible.

    d.  Convertible bonds do not share fully in the price of the common stock, but they provide some protection against a decline.

### INTERMEDIATE

10. Suppose that the J.C. Penney bond was issued at face value and that investors continue to demand a yield of 8.25%. Sketch what you think would happen to the bond price as the first interest payment date approaches and then passes. What about the price of the bond plus accrued interest?

11. Find the terms and conditions of a recent bond issue and compare them with those of the J.C. Penney issue.

12. Bond prices can fall either because of a change in the general level of interest rates or because of an increased risk of default. To what extent do floating-rate bonds and puttable bonds protect the investor against each of these risks?

13. Proctor Power has fixed assets worth $200 million and net working capital worth $100 million. It is financed partly by equity and partly by three issues of debt. These consist of $250 million of First Mortgage Bonds secured only on the company's fixed assets, $100 million of senior debentures, and $120 million of subordinated debentures. If the debt were due today, how much would each debtholder be entitled to receive?

14. Elixir Corporation has just filed for bankruptcy. Elixir is a holding company whose assets consist of real estate worth $80 million and 100% of the equity of its two operating subsidiaries. It is financed partly by equity and partly by an issue of $400 million of senior collateral trust bonds that are just about to mature. Subsidiary A has issued directly $320 million of debentures and $15 million of preferred stock. Subsidiary B has issued $180 million of senior debentures and $60 million of subordinated debentures. A's assets have a market value of $500 million and B's have a value of $220 million. How much will each security holder receive if the assets are sold and distributed strictly according to precedence?

15. a. Residential mortgages may stipulate either a fixed rate or a variable rate. As a *borrower*, what considerations might cause you to prefer one rather than the other?

    b. Why might holders of mortgage pass-through certificates wish the mortgages to have a floating rate?

16. After a sharp change in interest rates, newly issued bonds generally sell at yields different from those of outstanding bonds of the same quality. One suggested explanation is that there is a difference in the value of the call provisions. Explain how this could arise.

17. Suppose that a company simultaneously issues a zero-coupon bond and a coupon bond with identical maturities. Both are callable at any time at their face values. Other things equal, which is likely to offer the higher yield? Why?

18. a. If interest rates rise, will callable or noncallable bonds fall more in price?

    b. Sometimes you encounter bonds that can be repaid after a fixed interval at the option of *either* the issuer or the bondholder. If the exercise price of each option is the same and both the issuer and bondholder act rationally, what will happen when the options can be exercised? (Ignore refinements such as transactions or issue costs.)

19. A puttable bond is a bond that may be repaid before maturity at the investor's option. Sketch a diagram similar to Figure 24.2 showing the relationship between the value of a straight bond and that of a puttable bond.

20. Alpha Corp. is prohibited from issuing more senior debt unless net tangible assets exceed 200% of senior debt. Currently the company has outstanding $100 million of senior debt and has net tangible assets of $250 million. How much more senior debt can Alpha Corp. issue?

21. Explain carefully why bond indentures may place limitations on the following actions:

    a. Sale of the company's assets.

    b. Payment of dividends to shareholders.

    c. Issue of additional senior debt.

22. Explain when it makes sense to use project finance rather than a direct debt issue by the parent company.

23. The Surplus Value Company had $10 million (face value) of convertible bonds outstanding in 2010. Each bond has the following features.

| | |
|---|---|
| Face value | $1000 |
| Conversion price | $25 |
| Current call price | 105 (percent of face value) |
| Current trading price | 130 (percent of face value) |
| Maturity | 2017 |
| Current stock price | $30 (per share) |
| Interest rate | 10% (coupon as percent of face value) |

**Visit us at www.mhhe.com/bma**

a. What is the bond's conversion value?

b. Can you explain why the bond is selling above conversion value?

c. Should Surplus call? What will happen if it does so?

24. Piglet Pies has issued a zero-coupon 10-year bond that can be converted into 10 Piglet shares. Comparable straight bonds are yielding 8%. Piglet stock is priced at $50 a share.

   a. Suppose that you had to make a now-or-never decision on whether to convert or to stay with the bond. Which would you do?

   b. If the convertible bond is priced at $550, how much are investors paying for the option to buy Piglet shares?

   c. If after one year the value of the conversion option is unchanged, what is the value of the convertible bond?

25. Iota Microsystems' 10% convertible is about to mature. The conversion ratio is 27.

   a. What is the conversion price?

   b. The stock price is $47. What is the conversion value?

   c. Should you convert?

26. In 1996 Marriott International made an issue of unusual bonds called Liquid Yield Option Notes, or LYONS. The bond matures in 2011, has a zero coupon, and was issued at $532.15. It could be converted into 8.76 shares. Beginning in 1999 the bonds could be called by Marriott. The call price was $603.71 in 1999 and increased by 4.3% a year thereafter. Holders had an option to put the bond back to Marriott in 1999 at $603.71 and in 2006 at $810.36. At the time of issue the price of the common stock was about $50.50.

   a. What was the yield to maturity on the bond?

   b. Assuming that comparable nonconvertible bonds yielded 10%, how much were investors paying for the conversion option?

   c. What was the conversion value of the bonds at the time of issue?

   d. What was the initial conversion price of the bonds?

   e. What was the conversion price in 2005? Why did it change?

   f. If the price of the bond in 2006 was less than $810.36, would you have put the bond back to Marriott?

   g. At what price could Marriott have called the bonds in 2006? If the price of the bond in 2006 was more than this, should Marriott have called them?

## CHALLENGE

27. Dorlcote Milling has outstanding a $1 million 3% mortgage bond maturing in 10 years. The coupon on any new debt issued by the company is 10%. The finance director, Mr. Tulliver, cannot decide whether there is a tax benefit to repurchasing the existing bonds in the marketplace and replacing them with new 10% bonds. What do you think? Does it matter whether bond investors are taxed?

28. Refer back to the Hub Power project in Section 24-7. There were many other ways that the Hubco project could have been financed. For example, a government agency could have invested in the power plant and hired National Power to run it. Alternatively, National Power could have owned the power plant directly and funded its cost by a mixture of new borrowing and the sale of shares. What do you think were the advantages of setting up a separately financed company to undertake the project?

29. This question illustrates that when there is scope for the firm to vary its risk, lenders may be more prepared to lend if they are offered a piece of the action through the issue of a convertible bond. Ms. Blavatsky is proposing to form a new start-up firm with initial assets of $10 million. She can invest this money in one of two projects. Each has the same

expected payoff, but one has more risk than the other. The relatively safe project offers a 40% chance of a $12.5 million payoff and a 60% chance of an $8 million payoff. The risky project offers a 40% chance of a $20 million payoff and a 60% chance of a $5 million payoff.

Ms. Blavatsky initially proposes to finance the firm by an issue of straight debt with a promised payoff of $7 million. Ms. Blavatsky will receive any remaining payoff. Show the possible payoffs to the lender and to Ms. Blavatsky if (a) she chooses the safe project and (b) she chooses the risky project. Which project is Ms. Blavatsky likely to choose? Which will the lender want her to choose?

Suppose now that Ms. Blavatsky offers to make the debt convertible into 50% of the value of the firm. Show that in this case the lender receives the same expected payoff from the two projects.

30. Occasionally it is said that issuing convertible bonds is better than issuing stock when the firm's shares are undervalued. Suppose that the financial manager of the Butternut Furniture Company does have inside information indicating that the Butternut stock price is too low. Butternut's future earnings will in fact be higher than investors expect. Suppose further that the inside information cannot be released without giving away a valuable competitive secret. Clearly, selling shares at the present low price would harm Butternut's existing shareholders. Will they also lose if convertible bonds are issued? If they do lose in this case, is the loss more or less than it would be if common stock were issued?

Now suppose that investors forecast earnings accurately, but still undervalue the stock because they overestimate Butternut's actual business risk. Does this change your answers to the questions posed in the preceding paragraph? Explain.

# MINI-CASE ● ● ● ● ●

## The Shocking Demise of Mr. Thorndike

It was one of Morse's most puzzling cases. That morning Rupert Thorndike, the autocratic CEO of Thorndike Oil, was found dead in a pool of blood on his bedroom floor. He had been shot through the head, but the door and windows were bolted on the inside and there was no sign of the murder weapon.

Morse looked in vain for clues in Thorndike's bedroom and office. He had to take another tack. He decided to investigate the financial circumstances surrounding Thorndike's demise. The company's capital structure was as follows:

- 5% debentures: $250 million face value. The bonds mature in 10 years and offer a yield of 12%.
- Stock: 30 million shares, which closed at $9 a share the day before the murder.
- 10% subordinated convertible notes: The notes mature in one year and are convertible at any time at a conversion ratio of 110. The day before the murder these notes were priced at 5% more than their conversion value.

Yesterday Thorndike had flatly rejected an offer by T. Spoone Dickens to buy all of the common stock for $10 a share. With Thorndike out of the way, it appeared that Dickens's offer would be accepted, much to the profit of Thorndike Oil's other shareholders.[43]

---

[43] Rupert Thorndike's shares would go to a charitable foundation formed to advance the study of financial engineering and its crucial role in world peace and progress. The managers of the foundation's endowment were not expected to oppose the takeover.

Thorndike's two nieces, Doris and Patsy, and his nephew John all had substantial investments in Thorndike Oil and had bitterly disagreed with Thorndike's dismissal of Dickens's offer. Their stakes are shown in the following table:

|  | 5% Debentures (Face Value) | Shares of Stock | 10% Convertible Notes (Face Value) |
|---|---|---|---|
| Doris | $4 million | 1.2 million | $0 million |
| John | 0 | .5 | 5 |
| Patsy | 0 | 1.5 | 3 |

All debt issued by Thorndike Oil would be paid off at face value if Dickens's offer went through. Holders of the convertible notes could choose to convert and tender their shares to Dickens.

Morse kept coming back to the problem of motive. Which niece or nephew, he wondered, stood to gain most by eliminating Thorndike and allowing Dickens's offer to succeed?

### QUESTION

1. Help Morse solve the case. Which of Thorndike's relatives stood to gain most from his death?

# Leasing

▶ **Most of us** occasionally rent a car, bicycle, or boat. Usually such personal rentals are short-lived; we may rent a car for a day or week. But in corporate finance longer-term rentals are common. A rental agreement that extends for a year or more and involves a series of fixed payments is called a lease.

Firms lease as an alternative to buying capital equipment. In the U.S., about 30% of new capital equipment is leased. Trucks and farm machinery are often leased; so are railroad cars, aircraft, and ships. Just about every kind of asset can be leased. Many of the pandas in American zoos are leased, with the proceeds going to panda conservation.

Every lease involves two parties. The *user* of the asset is called the *lessee.* The lessee makes periodic payments to the *owner* of the asset, who is called the *lessor.* For example, if you sign an agreement to rent an apartment for a year, you are the lessee and the owner is the lessor.

You often see references to the *leasing industry*. This refers to lessors. (Almost all firms are lessees to at least a minor extent.) Who are the lessors?

Some of the largest lessors are equipment manufacturers. For example, IBM is a large lessor of computers, and Deere is a large lessor of agricultural and construction equipment.

The other two major groups of lessors are banks and independent leasing companies. Leasing companies play an enormous role in the airline business. For example, in 2008 GE Capital Aviation Services, a subsidiary of GE Capital, owned and leased out nearly 1,500 commercial aircraft. The world's airlines rely largely on leasing to finance their fleets.

Leasing companies offer a variety of services. Some act as lease brokers (arranging lease deals) as well as being lessors. Others specialize in leasing automobiles, trucks, and standardized industrial equipment; they succeed because they can buy equipment in quantity, service it efficiently, and if necessary resell it at a good price.

We begin this chapter by cataloging the different kinds of leases and some of the reasons for their use. Then we show how short-term, or cancelable, lease payments can be interpreted as equivalent annual costs. The remainder of the chapter analyzes long-term leases used as alternatives to debt financing.

● ● ● ● ●

## 25-1 What Is a Lease?

Leases come in many forms, but in all cases the lessee (user) promises to make a series of payments to the lessor (owner). The lease contract specifies the monthly or semiannual payments, with the first payment usually due as soon as the contract is signed. The payments are usually level, but their time pattern can be tailored to the user's needs. For example, suppose that a manufacturer leases a machine to produce a complex new product. There will be a year's "shakedown" period before volume production starts. In this case, it might be possible to arrange for lower payments during the first year of the lease.

**625**

When a lease is terminated, the leased equipment reverts to the lessor. However, the lease agreement often gives the user the option to purchase the equipment or take out a new lease.

Some leases are short-term or cancelable during the contract period at the option of the lessee. These are generally known as *operating leases.* Others extend over most of the estimated economic life of the asset and cannot be canceled or can be canceled only if the lessor is reimbursed for any losses. These are called *capital, financial,* or *full-payout leases.*

Financial leases are a *source of financing.* Signing a financial lease contract is like borrowing money. There is an immediate cash inflow because the lessee is relieved of having to pay for the asset. But the lessee also assumes a binding obligation to make the payments specified in the lease contract. The user could have borrowed the full purchase price of the asset by accepting a binding obligation to make interest and principal payments to the lender. Thus the cash-flow consequences of leasing and borrowing are similar. In either case, the firm raises cash now and pays it back later. Later in this chapter we compare leasing and borrowing as financing alternatives.

Leases also differ in the services provided by the lessor. Under a *full-service,* or *rental,* lease, the lessor promises to maintain and insure the equipment and to pay any property taxes due on it. In a *net* lease, the lessee agrees to maintain the asset, insure it, and pay any property taxes. Financial leases are usually net leases.

Most financial leases are arranged for brand new assets. The lessee identifies the equipment, arranges for the leasing company to buy it from the manufacturer, and signs a contract with the leasing company. This is called a *direct* lease. In other cases, the firm sells an asset it already owns and leases it back from the buyer. These *sale and lease-back* arrangements are common in real estate. For example, firm X may wish to raise cash by selling an office or factory but still retain use of the building. It could do this by selling the building for cash to a leasing company and simultaneously signing a long-term lease contract. For example, in 2007 HSBC sold its head office building in London for £1.09 billion, or about $2 billion. HSBC then leased the building back at an annual rent of £43.5 million. Thus legal ownership of the building passed to the new owner, but the right to use it remained with HSBC.

You may also encounter *leveraged* leases. These are financial leases in which the lessor borrows part of the purchase price of the leased asset, using the lease contract as security for the loan. This does not change the lessee's obligations, but it can complicate the lessor's analysis considerably.

## 25-2 Why Lease?

You hear many suggestions about why companies should lease equipment rather than buy it. Let us look at some sensible reasons and then at four more dubious ones.

### Sensible Reasons for Leasing

**Short-Term Leases Are Convenient**   Suppose you want the use of a car for a week. You could buy one and sell it seven days later, but that would be silly. Quite apart from the fact that registering ownership is a nuisance, you would spend some time selecting a car, negotiating purchase, and arranging insurance. Then at the end of the week you would negotiate resale and cancel the registration and insurance. When you need a car only for a short time, it clearly makes sense to rent it. You save the trouble of registering ownership, and you know the effective cost. In the same way, it pays a company to lease equipment that it needs for only a year or two. Of course, this kind of lease is always an operating lease.

Sometimes the cost of short-term rentals may seem prohibitively high, or you may find it difficult to rent at any price. This can happen for equipment that is easily damaged by

careless use. The owner knows that short-term users are unlikely to take the same care they would with their own equipment. When the danger of abuse becomes too high, short-term rental markets do not survive. Thus, it is easy enough to buy a Lamborghini Gallardo, provided your pockets are deep enough, but nearly impossible to rent one.

**Cancellation Options Are Valuable**   Some leases that *appear* expensive really are fairly priced once the option to cancel is recognized. We return to this point in the next section.

**Maintenance Is Provided**   Under a full-service lease, the user receives maintenance and other services. Many lessors are well equipped to provide efficient maintenance. However, bear in mind that these benefits will be reflected in higher lease payments.

**Standardization Leads to Low Administrative and Transaction Costs**   Suppose that you operate a leasing company that specializes in financial leases for trucks. You are effectively lending money to a large number of firms (the lessees) that may differ considerably in size and risk. But, because the underlying asset is in each case the same salable item (a truck), you can safely "lend" the money (lease the truck) without conducting a detailed analysis of each firm's business. You can also use a simple, standard lease contract. This standardization makes it possible to "lend" small sums of money without incurring large investigative, administrative, or legal costs.

For these reasons leasing is often a relatively cheap source of cash for the small company. It offers secure financing on a flexible, piecemeal basis, with lower transaction costs than in a bond or stock issue.

**Tax Shields Can Be Used**   The lessor owns the leased asset and deducts its depreciation from taxable income. If the lessor can make better use of depreciation tax shields than an asset's user can, it may make sense for the leasing company to own the equipment and pass on some of the tax benefits to the lessee in the form of low lease payments.

**Leasing and Financial Distress**   Lessors in financial leases are in many ways similar to secured lenders, but lessors may fare better in bankruptcy. If a lessee defaults on a lease payment, you might think that the lessor could pick up the leased asset and take it home. But if the bankruptcy court decides that the asset is "essential" to the lessee's business, it *affirms* the lease. Then the bankrupt firm can continue to use the asset. It must continue to make the lease payments, however. This can be good news for the lessor, who is paid while other creditors cool their heels. Even secured creditors are not paid until the bankruptcy process works itself out.

If the lease is not affirmed but *rejected,* the lessor can recover the leased asset. If it is worth less than the present value of the remaining lease payments, the lessor can try to recoup this loss. But in this case the lender must get in line with unsecured creditors.

Unfortunately for lessors, there is a third possibility. A lessee in financial distress may be able to renegotiate the lease, forcing the lessor to accept lower lease payments. For example, in 2001 American Airlines (AA) acquired most of the assets of Trans World Airlines (TWA). TWA was bankrupt, and AA's purchase contract was structured so that AA could decide whether to affirm or reject TWA's aircraft leases. AA contacted the lessors and threatened to reject. The lessors realized that rejection would put about 100 leased aircraft back in their laps to sell or re-lease, probably at fire-sale prices. (The market for used aircraft was not strong at the time.) The lessors ended up accepting renegotiated lease rates that were about half what TWA had been paying.[1]

---

[1] If the leases had been rejected, the lessors would have had a claim only on TWA's assets and cash flows, not AA's. The renegotiation of the TWA leases is described in E. Benmelech and N. K. Bergman, "Liquidation Values and the Credibility of Financial Contract Renegotiation: Evidence from U.S. Airlines," *Quarterly Journal of Economics* 123 (2008), pp. 1635–1677.

**Avoiding the Alternative Minimum Tax** Red-blooded financial managers want to earn lots of money for their shareholders but *report* low profits to the tax authorities. Tax law in the United States allows this. A firm may use straight-line depreciation in its annual report but choose accelerated depreciation (and the shortest possible asset life) for its tax books. By this and other perfectly legal and ethical devices, profitable companies have occasionally managed to escape tax entirely. Almost all companies pay less tax than their public income statements suggest.[2]

But there is a trap for U.S. companies that shield too much income: the alternative minimum tax (*AMT*). Corporations must pay the AMT whenever it is higher than their tax computed in the regular way.

Here is how the AMT works: It requires a second calculation of taxable income, in which part of the benefit of accelerated depreciation and other tax-reducing items[3] is added back. The AMT is 20% of the result.

Suppose Yuppytech Services would have $10 million in taxable income but for the AMT, which forces it to add back $9 million of tax privileges:

|  | Regular Tax | Alternative Minimum Tax |
|---|---|---|
| Income | $10 | $10 + 9 = 19$ |
| Tax rate | .35 | .20 |
| Tax | $ 3.5 | $3.8 |

Yuppytech must pay $3.8 million, not $3.5.[4]

How can this painful payment be avoided? How about leasing? Lease payments are *not* on the list of items added back in calculating the AMT. If you lease rather than buy, tax depreciation is less and the AMT is less. There is a net gain if the *lessor* is not subject to the AMT and can pass back depreciation tax shields in the form of lower lease payments.

## Some Dubious Reasons for Leasing

**Leasing Avoids Capital Expenditure Controls** In many companies lease proposals are scrutinized as carefully as capital expenditure proposals, but in others leasing may enable an operating manager to avoid the approval procedures needed to buy an asset. Although this is a dubious reason for leasing, it may be influential, particularly in the public sector. For example, city hospitals have sometimes found it politically more convenient to lease their medical equipment than to ask the city government to provide funds for purchase.

**Leasing Preserves Capital** Leasing companies provide "100% financing"; they advance the full cost of the leased asset. Consequently, they often claim that leasing preserves capital, allowing the firm to save its cash for other things.

But the firm can also "preserve capital" by borrowing money. If Greymare Bus Lines leases a $100,000 bus rather than buying it, it does conserve $100,000 cash. It could also (1) buy the bus for cash and (2) borrow $100,000, using the bus as security. Its bank balance

---

[2] Year-by-year differences between reported tax expense and taxes actually paid are explained in footnotes to the financial statements. The cumulative difference is shown on the balance sheet as a deferred tax liability. (Note that accelerated depreciation *postpones* taxes; it does not eliminate taxes.)

[3] Other items include some interest receipts from tax-exempt municipal securities and taxes deferred by use of completed contract accounting. (The completed contract method allows a manufacturer to postpone reporting taxable profits until a production contract is completed. Since contracts may span several years, this deferral can have a substantial positive NPV.)

[4] But Yuppytech can carry forward the $.3 million difference. If later years' AMTs are *lower* than regular taxes, the difference can be used as a tax credit. Suppose the AMT next year is $4 million and the regular tax is $5 million. Then Yuppytech pays only $5 - .3 = $4.7$ million.

ends up the same whether it leases or buys and borrows. It has the bus in either case, and it incurs a $100,000 liability in either case. What's so special about leasing?

**Leases May Be Off-Balance-Sheet Financing**  In some countries financial leases are off-balance-sheet financing; that is, a firm can acquire an asset, finance it through a financial lease, and show neither the asset nor the lease contract on its balance sheet.

In the United States, the Financial Accounting Standards Board (FASB) requires that all *capital* (i.e., financial) leases be capitalized. This means that the present value of the lease payments must be calculated and shown alongside debt on the right-hand side of the balance sheet. The same amount must be shown as an asset on the left-hand side and written off over the life of the lease.

The FASB defines capital leases as leases that meet *any one* of the following requirements:

1.  The lease agreement transfers ownership to the lessee before the lease expires.
2.  The lessee can purchase the asset for a bargain price when the lease expires.
3.  The lease lasts for at least 75% of the asset's estimated economic life.
4.  The present value of the lease payments is at least 90% of the asset's value.

All other leases are operating leases as far as the accountants are concerned.[5]

Many financial managers have tried to take advantage of this arbitrary boundary between operating and financial leases. Suppose that you want to finance a computer-controlled machine tool costing $1 million. The machine tool's life is expected to be 12 years. You could sign a lease contract for 8 years 11 months (just missing requirement 3), with lease payments having a present value of $899,000 (just missing requirement 4). You could also make sure the lease contract avoids requirements 1 and 2. Result? You have off-balance-sheet financing. This lease would not have to be capitalized, although it is clearly a long-term, fixed obligation.

Now we come to the $64,000 question: Why should anyone *care* whether financing is off balance sheet or on balance sheet? Shouldn't the financial manager worry about substance rather than appearance?

When a firm obtains off-balance-sheet financing, the conventional measures of financial leverage, such as the debt–equity ratio, understate the true degree of financial leverage. Some believe that financial analysts do not always notice off-balance-sheet lease obligations (which are still referred to in footnotes) or the greater volatility of earnings that results from the fixed lease payments. They may be right if off-balance-sheet lease obligations are moderate and "lost in the noise" of all the firm's other activities. But we would not expect investors, security analysts, and debt-rating agencies to miss large hidden obligations unless they were systematically misled by management.

**Leasing Affects Book Income**  Leasing can make the firm's balance sheet and income statement *look* better by increasing book income or decreasing book asset value, or both.

A lease that qualifies as off-balance-sheet financing affects book income in only one way: The lease payments are an expense. If the firm buys the asset instead and borrows to finance it, both depreciation and interest expense are deducted. Leases are usually set up so that payments in the early years are less than depreciation plus interest under the buy-and-borrow alternative. Consequently, leasing increases book income in the early years of an asset's life. The book rate of return can increase even more dramatically, because the book

---

[5] In March 2009 the FASB and the International Accounting Standards Board (IASB) published a discussion paper entitled *Leases: Preliminary Views*. This set out some possible changes to accounting rules that would lead to more leasing activity being shown on the balance sheet.