Case 4:21-cv-02473   Document 120   Filed on 04/07/25 in TXSD   Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
April 07, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE CONCHO RESOURCES, INC. SECURITIES LITIGATION | § § § § § § § § § § | CIVIL ACTION NO. 4:21-cv-2473 |

## ORDER

Pending before the Court is Lead Plaintiffs' Motion to Exclude Opinions and Testimony of Defendants' Expert Lucy P. Allen. (Doc. No. 85). Defendants responded in opposition (Doc. No. 89) and Plaintiffs replied. (Doc. No. 91). Having heard the parties' oral arguments and considered the parties' submissions, and the law, the Court GRANTS in part and DENIES in part Lead Plaintiffs' Motion to Exclude Defendants' Expert. (Doc. No. 85).

### I.     Background

**A.     Procedural History**

The Utah Retirement System and the Construction Laborer's Pension Trust for Southern California (collectively, the "Lead Plaintiffs") purchased common stock in Concho Resources, Inc. ("Concho") between February 21, 2018 and July 31, 2019. At this time, Concho was a publicly traded company. It has subsequently been acquired by ConocoPhillips.

The Lead Plaintiffs brought this action alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 by Defendants. (Doc. No. 25 at 184–86). In addition to suing Concho, Lead Plaintiffs alleged violations of Section 20(a) of the Exchange Act against Defendants Timothy Leach, Jack Harper, C. William Giraud, E. Joseph Wright, and Brenda

Schroer. (*Id.* at 187–88). This Court previously dismissed Defendants Schroer and Wright. (Doc. No. 43).

Lead Plaintiffs have now filed a Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel. (Doc. No. 54). Lead Plaintiffs seek to certify a class composed of:

> themselves and all other persons and entities who purchased or otherwise acquired Concho publicly traded common stock during the period from February 21, 2018 through July 31, 2019 inclusive, and were damaged thereby.

(the "Proposed Class") (*Id.* at 1). Lead Plaintiffs also seek to exclude Defendants, present or former executives of Defendants, and all related parties of Defendants from the Proposed Class. (*Id.*). Lead Plaintiffs argue that class certification is appropriate because the Proposed Class and its counsel readily satisfy the four requirements of Rule 23(a), as well as the two requirements of Rule 23(b)(3)—that common questions of law or fact predominate over individual questions and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. *See* (*id.*).

### B. Factual History

At all relevant times, Concho engaged in the acquisition, development, exploration, and production of oil and natural gas. (*Id.* at 9). During the Proposed Class period, Concho began construction on development projects where multiple wells were drilled in close proximity to each other. These projects were described using terms such as "large-scale development" or "manufacturing mode." (*Id.*). Decreasing the space between wells is often used to attempt to "reduce[ ] drilling cycle time and overall operation cost." (*Id.* at 19, 23). As part of its large-scale development plan, Concho built out a multi-well pad that they named "Dominator," its largest project to date. (Doc. No. 54 at 9). Concho informed investors that they had "valuable data" that they used to "optimize" well design (including spacing) and well completion. (Doc. No. 25 at 7).

Specifically, Defendant Leach assured investors at the start of the Proposed Class period that "well spacing, lateral placement and completion design" for its manufacturing mode had been "validated." (*Id.*). Defendant Harper also told investors that Concho had "successfully made [the] transition" to large-scale development. (*Id.*).

During this same time period, Concho announced that it had reached a definitive agreement with RSP Permian, Inc. ("RSP"), under which Concho would acquire RSP in an "all-stock" transaction (the "RSP Acquisition"). (Doc. No. 25 at 74). Under the terms of the agreement, shareholders of RSP would receive 0.320 shares of Concho common stock in exchange for each share of RSP common stock, representing consideration to each RSP shareholder of $50.24 per share based on the closing price of Concho common stock on March 27, 2018. (*Id.*). The consideration given to RSP shareholders in connection with the RSP Acquisition represented an approximate 29% premium when valued by RSP's closing price of $38.92 on March 27, 2018. (*Id.*). Upon the closing of the transaction, Concho shareholders owned approximately 74.5% of the combined company, and RSP shareholders owned approximately 25.5%. (*Id.*).

Lead Plaintiffs allege that, instead of basing its large-scale development on accumulated data and knowledge, Concho's manufacturing mode "consisted of experimental and highly risky production methodologies involving tightly spaced wells which exposed [Concho] to potentially ruinous risk." (Doc. No. 54 at 9). Plaintiffs assert that, during the Proposed Class period, instead of disclosing the truth, Defendants: "(i) touted the transition to large-scale development as a success as well as its benefits with zero basis to do so; (ii) stated it was the product of gradual learning and verified techniques despite being experimental; (iii) issued non-risk adjusted production forecasts despite knowing such forecasts were overstated; and (iv) cast certain 'aggressive' projects as 'tests' despite having employed such 'tests' Company-wide." (*Id.*). Thus,

Lead Plaintiffs contend that, though they were aware there was a general risk involved when investing in an oil exploration business, Concho misled investors to believe that it had the ability to effectuate a manufacturing mode production system that would maximize production and reduce costs. In reality, however, this mode was not proven. (Doc. No. 109 at 273). Ultimately, they contend that Concho had to admit that its project was not working and that it was being forced to go "back to the drawing board on well spacing." (*Id.*).

The fact that these projects were not as established as previously conveyed allegedly became apparent after the close of trading on July 31, 2019. After the close of trading, Concho reported substandard second quarter 2019 financial results and "materially lowered current and forecasted production guidance." (Doc. No. 54 at 9). Specifically, in its earnings release for the second quarter of 2019, Concho stated "[w]hile the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates that well spacing was too tight." The next morning, prior to the start of trading, Concho held its second quarter 2019 earnings call. In that call, Defendants stated that while the Dominator was the most extreme spacing example, other "modestly more dense" projects had been constructed with tighter spacing as well. (*Id.*). Concho's second quarter 2019 financial results and subsequent earnings call are collectively referred to herein as the "Corrective Disclosure." On July 31, 2019, Concho stock's closing price was $97.68 per share. (Doc. No. 25 at 139). After the release of the Corrective Disclosure, Concho shares dropped 22%, closing at $75.97 on August 1, 2019. (Doc. No. 54 at 9).

Lead Plaintiffs filed this securities-fraud action alleging that Defendants violated securities laws and regulations when they made false or misleading statements on various dates throughout

4

the Proposed Class period. *See* (Doc. No. 25). Plaintiffs claim that these allegedly false and misleading statements were then corrected when Concho released the Corrective Disclosure. (*Id.*).

The Court addresses these alleged misrepresentations and the Corrective Disclosure in depth in a separate order on Lead Plaintiffs' Motion for Class Certification. Nevertheless, a brief overview of the parties' arguments is necessary to contextualize the *Daubert* issues. Defendants contend that Lead Plaintiffs' Motion for Class Certification must be denied because Plaintiffs cannot satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3). Under Rule 23, among other requirements, Plaintiffs must show that common issues of law and fact predominate— meaning individual issues of Proposed Class members must not outweigh the issues of the class as a whole. *See* FED. R. CIV. P. 23(b)(3). Defendants argue that the predominance requirement is not met for two reasons: 1) Plaintiffs cannot demonstrate that individual issues of reliance on the alleged misrepresentations (an element of their § 10b claim) will not predominate; and 2) Plaintiffs' damages cannot be measured on a class-wide basis consistent with Plaintiffs' theory of liability.

Regarding the first issue, Lead Plaintiffs must demonstrate that each shareholder relied on the alleged misrepresentations as part of their *prima facie* case. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*"). While Plaintiffs may rely on a presumption to satisfy this requirement, Defendants contend that they have rebutted this presumption. *See Basic v. Levinson*, 485 U.S. 224, 241–47 (1988). The Court must look at each alleged misrepresentation individually. *See id.* (suggesting that the Court must look at each statement individually because the "reliance element ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."). Defendants assert that they have rebutted the presumption with respect to all but 15 alleged misstatements because the

5

majority of the alleged misrepresentations had no impact on the price of the stock. If the Court finds that Defendants have severed the link between price impact and the alleged misrepresentation, they have successfully rebutted the presumption of reliance, and the Court cannot certify the Proposed Class. *See id.* at 241–47.

Though the Court must look at each statement independently, Defendants have organized the alleged misrepresentations into four categories that they labeled based on their concern with each statement:

   i. Category A: "Generic Statements," which Defendants contend simply express "vaguely positive sentiments about Defendants' faith in one aspect of Concho's business plan." (Doc. No. 68 at 21). Thus, Defendants conclude, these statements are too generic to have been actually corrected by the alleged corrective disclosures. (*Id.* at 22).

   ii. Category B: "Results and Observations from 2017 & 2018," which Defendants contend cannot be corrected by the corrective disclosures because "Concho's second quarter 2019 results cannot be attributed to factual observations about periods from months before." (*Id.* at 24).

   iii. Category C: "Pre-2019 Projections," which Defendants contend cannot be corrected by the alleged corrective disclosures because these Category C statements involved financial projections for 2018, whereas the alleged corrective disclosures concerned results for the second quarter of 2019. (*Id.* at 25).

   iv. Category D: "Other Statements," which Defendants do not challenge class certification on lack of price impact grounds. (*Id.* at 13).

While Defendants concede that, at least at this stage, Plaintiffs have established reliance on the Category D statements, Defendants contend that Plaintiffs have failed to satisfy the predominance requirement for a separate, second reason. Defendants also allege that Lead Plaintiffs cannot meet Rule 23's predominance requirement because Lead Plaintiffs have not conducted a study that translates the "legal theory of the harmful event into an analysis of the economic impact of that event." Thus, Defendants maintain that Lead Plaintiffs' damages cannot be measured on a class-wide basis consistent with Plaintiffs' theory of liability. Further,

6

Defendants argue that Plaintiffs proposed damage model cannot differentiate between damages allegedly incurred by Concho shareholders who acquired their shares on the open market prior to the RSP Acquisition and former RSP shareholders who acquired their shares via the RSP Acquisition. To support their position, Defendants have brought forth the expert report and testimony of Lucy P. Allen ("Allen"). Lead Plaintiffs have moved to exclude Allen's opinions. (Doc. No. 85).

## II.     Legal Standard

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify about their opinions as experts at trial. FED. R. EVID. 702. Admitting expert testimony is not a decision a court takes lightly, as factfinders tend to place extra weight on expert opinions. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993).[1] Accordingly, courts serve an important gatekeeping role when assessing proffered expert testimony, striving to admit qualified, reliable, and relevant opinions but exclude unreliable and misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

In *Daubert*, the Supreme Court announced several factors courts should consider when exercising their gate-keeping function under Federal Rule of Evidence 702, and in making a preliminary assessments of whether the reasoning underlying expert testimony is scientifically valid and can properly be applied to the facts in issue. *Daubert*, 509 U.S. at 593–98. These factors include: (1) whether the technique in question has been tested; (2) whether the technique has been subject to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community. *Id.* "[W]hether *Daubert*'s specific factors are,

---

[1] The Fifth Circuit recently held that the "*Daubert* hurdle must be cleared" at the class certification stage when expert testimony is relevant to the decision to certify a class. *Prantil v. Arkema Inc.*, 986 F.3d 570, 575 (5th Cir. 2021).

or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 153. Though the proponent of the expert testimony (here, Defendants) "need not satisfy each *Daubert* factor," it has the burden of showing that the testimony is reliable. *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).

### III.   Analysis

Plaintiffs move to exclude the opinions of economist Allen, who opines that: 1) there was no statistically significant price increase of Concho's stock due to the alleged misstatements in Category A; 2) the price decline following the Corrective Disclosure cannot serve as any basis to infer that the alleged misrepresentations impacted Concho's stock price when made; 3) the Category A statements are generic; and 4) Plaintiffs' expert's methodology is insufficient. *See* (Doc. No. 85-4). According to Allen, Concho's stock price did not move in response to the alleged misrepresentations. She avers that this lack of price movement demonstrates that the misstatements had no front-end price impact. Lead Plaintiffs' concede that the misstatements had no front-end price impact, hence their decision to pursue an inflation-maintenance theory of price impact (discussed in detail in the Court's order regarding class certification) rather than contending that the statements resulted in a statistically significant front-end stock price movement. Thus, Allen's first opinion—that the alleged misstatements had no front-end price impact—is not particularly relevant.

Allen's other opinions are, however, more relevant. Allen opines that if the alleged misrepresentations had the price impact that Plaintiffs allege, these statements would, at the very least, have been at least referenced in the relevant analyst reports.[2] She maintains that if no analyst

---

[2] Allen defines "analyst reports" as "periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor

8

referred to any of the alleged misstatements after the Corrective Disclosure, the analysts did not consider the Corrective Disclosure to be actually corrective of the alleged misstatements. Since the alleged Corrective Disclosure was not considered corrective of the alleged misstatements by the analysts, she ultimately concludes that the price decline following the alleged Corrective Disclosure does not provide any evidence regarding the price impact of the alleged misstatements. Moreover, with respect to the Category A statements specifically, she opines that information that does not change an analysist's price target must be considered "generic" by the analyst.

Plaintiffs dispute the methodology that that Allen used in reaching her conclusions. Plaintiffs argue that Allen's report and testimony should be wholly excluded for three reasons. First, they contend that the "content analysis" Allen performed contains fundamental flaws in both method and application. Second, they assert that her opinion regarding damages calculations are impermissible, unsupported legal conclusions. Third, they allege that she failed to disclose critical information in the materials considered in her report, rendering her opinions incomplete and unreliable.

Allen conducted a "content analysis" using stock analyst reports. A content analysis, as described by Allen, is a "systematic, objective, and replicable method of analyzing text to assess the relative importance of information." (Doc. No. 68 at 9). Defendants asked Allen to "conduct a systematic content analysis of all analyst reports following certain alleged misstatements and the alleged corrective disclosure with regard to specific questions." (Doc. No. 68-5 at 7). Specifically, she was asked "to code answers to the specific questions . . . based on a content analysis of the analyst reports on Concho following certain of the alleged misstatements and the alleged corrective disclosure." (*Id.*). Allen looked at 54 of the alleged misstatements set out in the Consolidated

---

conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries . . . ." (Doc. No. 68 at 11).

9

Complaint that Defendants then grouped into Categories A, B, and C. (*Id.*). She and her employees then reviewed "all available analyst reports on Concho" issued between July 31, 2019 and August 5, 2019, which amounted to 38 analyst reports by 26 different companies (*Id.* at 11). They also reviewed all analyst reports after each Category A alleged misstatement that were issued between the alleged misstatement date and the following three trading days, which amounted to 209 analyst reports. (*Id.*). They then compared each analyst report to each alleged misstatement and performed the content analysis by coding answers to the following questions:

Category A:

1. For each of the analyst report issued after each alleged misstatement, the following was coded:

    a. Is there any indication in the report that the alleged misstatement caused the analyst to change its valuation of Concho and/or its stock?

    b. Is there any indication in the report that the alleged misstatement caused the analyst to change its price target for Concho?

    c. Does the report reference the alleged misstatement?

    d. For events other than earnings releases, does the report reference the event (earnings/investor call, analyst conference, or SEC filing) that contains the alleged misstatement?

2. For each analyst report issued after the July 31, 2019 alleged corrective disclosure, the following was coded for each alleged misstatement:

    a. Is there any indication in the report that the analyst learned the prior misstatement was inaccurate or misleading?

    b. Is there any indication in the report that the analyst made a connection between the alleged misstatement and the alleged corrective disclosure?

    c. Does the report reference the alleged misstatement?

    d. Does the report reference the event (earnings/investor call, analyst conference, or SEC filing) that contains the alleged misstatement other than in tables showing prior results?

10

Category B:

3. For each analyst report issued after the July 31, 2019 alleged corrective disclosure, the following was coded for each alleged misstatement:

    a. Is there any indication in the report that the analyst learned the prior misstatement was inaccurate or misleading?

    b. Is there any indication in the report that the analyst made a connection between the alleged misstatement and the alleged corrective disclosure?

    c. Does the report reference the alleged misstatement other than in tables showing prior results?

    d. Does the report reference the event (earnings/investor call, analyst conference, or SEC filing) that contains the alleged misstatement other than in tables showing prior results?

Category C:

4. For each analyst report issued after the July 31, 2019 alleged corrective disclosure, the following was coded for each alleged misstatement:

    a. Is there any indication in the report that the analyst learned the prior misstatement was inaccurate or misleading?

    b. Is there any indication in the report that the analyst made a connection between the alleged misstatement and the alleged corrective disclosure?

    c. Does the report reference the alleged misstatement other than in tables showing prior results?

    d. Does the report reference the forecasted item (e.g. "2018 budget," "2018 crude oil growth," "2018 capital investment") that contains the alleged misstatement other than in tables showing prior results?

(*Id.* at 8–9).[3]

Allen's content analysis yielded the following results:

Category A:

1. For each alleged misstatement, there was no indication in any of the analyst reports issued after each alleged misstatement that the alleged misstatement either caused the analyst to change its valuation of Concho and/or its stock nor caused the analysts to

---

[3] Allen gave conflicting testimony whether Defendants' counsel alone created the questions for her content analysis or whether she aided Defendants' counsel in their creation.

       change its price targets for Concho. Additionally, only four analyst reports mention any of the alleged Category A misstatements, but those four analysts "appear to be referencing the alleged misstatement in a different context than what is alleged to be misstated in the Complaint." (*Id.* at 13).

2. For each alleged misstatement, there was no indication in any analyst report issued after the Corrective Disclosure that: 1) the analyst learned the prior misstatement was inaccurate or misleading; or 2) the analyst made a connection between the alleged misstatement and the alleged corrective disclosure. Moreover, no analyst report referenced the alleged misstatement. Of the 17 events (including earnings/investor calls, analyst conferences, or SEC filings) in which the alleged misstatements were made, three events were mentioned by analyst reports. Of those three events, none mentioned the alleged misstatements. (*Id.* at 14–15).

Category B:

3. For each alleged misstatement, there was no indication in any of the analyst reports that: 1) the analyst learned the prior misstatement was inaccurate or misleading; or 2) the analyst made a connection between the alleged misstatement and the alleged corrective disclosure. Additionally, no analyst referenced the alleged misstatement, other than in tables showing prior results. Of the nine events (including earnings/investor calls, analyst conferences, or SEC filings) in which the alleged misstatements were made, two events were mentioned in analyst reports. Of those two, both were mentioned in fewer than 10% of the reports and none mentioned the alleged misstatements. (*Id.* at 16).

Category C:

4. For each alleged misstatement, there was no indication in any of the analyst reports that: 1) the analyst learned the prior misstatement was inaccurate or misleading; or 2) the analyst made a connection between the alleged misstatement and the alleged corrective disclosure. Further, no analyst report referenced the alleged misstatement, other than in tables showing prior results. Of the five events in which the alleged misstatements were made, none were referenced in any of the analyst reports. (*Id.* at 17–18).

Allen concluded that there is no basis to infer that any Category A, B, or C statement had a price impact on Concho's stock.

       Plaintiffs first argue that Allen's opinion should be excluded because it is based exclusively on her subjective analysis of analyst reports rather than any scientific principles. The Court disagrees. Allen employed qualitative content analysis when she synthesized all relevant Concho analyst reports, and drew conclusions from these reports based on her education and experience.

12

Although Plaintiffs describe this methodology as nothing more than an irreplicable judgment call, this Court recognizes that content analysis is "not junk science" and is "generally reliable" despite the fact that it includes some subjectivity. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (rejecting *Daubert* challenge that expert's review of analyst reports was "entirely subjective" concluding that, although such analysis is "necessarily subjective, that does not mean [the] opinion is speculative or without methodological constraints").[4] Moreover, *Daubert* recognizes that a "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018) (citing *Daubert*, 509 U.S. at 596). While subjectivity may detract from the weight one might place on the results, in this instance it does not affect admissibility.

Second, Plaintiffs argue Allen's opinion is unreliable because her technique is not testable, has not been peer-reviewed, has no known error rate, and is not generally accepted in the economic community. Obviously, these are inherent limitations for studies like that conducted by Allen. It is well-established that the *Daubert* factors are not a "definitive checklist or test" and should only be applied when they would reasonably measure reliability. *See Daubert*, 509 U.S. at 593; *see also Kumho Tire Co.*, 526 U.S. at 150 (noting the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the issue, the expert's particular expertise, and the subject of his testimony"). Since experts may work within "areas of expertise, such as the 'social sciences in which the research, theories and opinions cannot have the exactness of hard science

---

[4] Importantly, the Court notes that Plaintiffs' expert, Chad Coffman, has performed a similar analysis in other cases to that used by Allen. *See, e.g., Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 4349171, at *28 n.18 (E.D. Mich. Sept. 30, 2024).

13

methodologies,'" trial judges are given broad discretion to determine "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006). In this case, peer-review, error rate, and scientific acceptance are inconsequential to assess the reliability of Allen's review of sell-side analyst reports. This conclusion is bolstered by the Supreme Court's decision in *Goldman I* that courts "should be open to all probative evidence on [the question of price impact at class certification]—qualitative as well as quantitative." *Goldman I*, 594 U.S. at 122. The Supreme Court went further, stating that, "under *Halliburton II*, a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Id.* (emphasis in original). This Court is satisfied that Allen's opinions are reliable and replicable.[5] Allen's methodology for the content analysis is sufficiently fleshed out to allow another to replicate the analysis. Plaintiffs' argument regarding the coding performed by Allen and her team goes to the weight of Allen's opinions, not to their admissibility.

Third, Lead Plaintiffs contend that Allen failed to disclose critical information in the materials considered in her report, rendering her opinions incomplete and unreliable. (Doc. No. 85 at 23). Such a complaint is not controlled by *Daubert* and its progeny, but rather by the Federal Rules of Civil Procedure. Rule 26 requires Allen's report to contain the facts and data she considered in forming her opinion. Allen testified that she may have reviewed news articles, but "nothing in [her] price impact analysis depended on anything that was in a news article." (Doc. No. 109 at 212). Rule 26 notably requires the expert to disclose the facts and data *considered*, rather than actually relied upon. Thus, the Court finds that Allen's failure to include the news articles she considered arguably violates Rule 26.

---

[5] Clearly, the fact that certain statements are mentioned or not mentioned in an analyst's report is easily verifiable.

When a party fails to provide information as required by Rule 26(a), courts turn to remedies found in Federal Rule of Civil Procedure 37(c). Rule 37(c) allows a court, in such circumstances, to exclude the evidence, unless the failure was substantially justified or is harmless. FED. R. CIV. P. 37(c)(1). Plaintiffs argue that the omission is not harmless because "Allen's failure to disclose media reactions to the corrective disclosure prevents Lead Plaintiffs and this Court from determining whether the mix of news coverage would have impacted her analyst-based content analysis considering that there are approximately 2,000 news articles covering the relevant time period." (Doc. No. 85 at 24).

It is true that "[i]nformation that an expert considered, but did not rely on, can be important to understanding and testing the validity of the expert's opinion. Any ambiguity as to the scope of the expert's role should be resolved in favor of the party seeking discovery." *Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2020 WL 1321521, at *2 (S.D. Tex. Mar. 17, 2020). Here, however, the scope of Allen's role and opinions are unambiguous. Defense counsel requested that Allen "conduct a systematic content analysis of all analyst reports." She was not asked to analyze all information that could have impacted Concho's stock price. Allen focused solely on coding answers regarding analyst reports, and her opinion regarding price impact stems from the results of that analysis. Plaintiffs' objection that she did not consider news articles does not prevent the Court from considering her analysis. Again, while this may be fodder for cross examination, it hardly constitutes grounds for finding her unqualified to testify. *See Bear Ranch*, 885 F.3d at 802. Though the Court agrees with Plaintiffs that Allen failed to include all data considered since she failed to include any news article that she reviewed, it finds that such omission was harmless. As such, it will not exclude Allen's testimony under Rule 37. Counsel are instructed to advise all of their experts to fully comply with Rule 26 because it is a rare incident

where failure to comply is clearly harmless. Here, the error is clearly harmless since her opinions were based solely on analyst reports; thus, the news reports play no role in her ultimate opinions.

Plaintiffs also contend that Allen's opinion regarding damages calculations are impermissible, unsupported, legal conclusions that are based on the wrong legal standard. (Doc. No. 85 at 21). Thus, Plaintiffs conclude that her opinion regarding damages must be excluded. Plaintiffs state that Allen "merely parrots" defense counsel's legal conclusion that Plaintiffs rely on materialization of the risk theory of loss causation and is not able to articulate what the theory entails. (*Id.* at 21–22). Plaintiffs allege that this deficiency demonstrates that her opinions regarding damages are legal conclusions, and therefore must be excluded. The Court agrees that some of her opinions do indeed invade the Court's bailiwick. The Court will not allow any economist to testify as to legal conclusions. Consequently, it does not consider any such legal conclusion in its *Daubert* or class certification analysis. Moreover, to the extent her opinion attacks a theory upon which Plaintiffs are not proceeding, her opinions may not be relevant and, to that extent, are not being considered here.

Finally, Lead Plaintiffs argue that Allen's opinion regarding Concho's acquisition of RSP is unsupported. (*Id.* at 22). Allen opines that Plaintiffs' damages methodology, as explained by Coffman, yields "economically nonsensical results" and does not fit Plaintiffs' liability theory regarding the RSP acquisition. In turn, Defendants contend that Coffman's methodology faces two glaring problems under *Comcast*, with respect to (1) pre-acquisition Concho shareholders; and (2) former RSP shareholders who obtained their stock in the merger. (Doc. No. 68 at 34). With respect to the pre-acquisition Concho shareholders, Allen opines that, if Plaintiffs' inflation-maintenance theory is correct, then Concho necessarily used those purportedly inflated shares as merger consideration in acquiring RSP. She opines that Coffman's methodology does not make economic

sense because it would award more damages to pre-acquisition Concho shareholders even though they concretely benefited. Allen maintains that the pre-acquisition Concho shareholders benefited because the inflated Concho stock was the consideration for the RSP stock; thus, pre-acquisition Concho shareholders were able to use less Concho stock as consideration for the RSP stock. As for the former RSP shareholders who converted their RSP stock to Concho stock, Allen opines that the former RSP shareholders received a net benefit, not an injury because they were paid a premium in the stock swap. As such, Defendants argue that the former RSP shareholders should not get to benefit again if this suit results in a payout of monetary damages.

An economist coming to a different economic conclusion than another economist does not automatically mean that one opinion or the other warrants exclusion. While the Court may or may not agree with Allen's opinions (or Coffman's for that matter), in whole or in part, that does not mean her opinions criticizing Coffman's methodology should be excluded. Instead, Plaintiffs' argument that her opinions make no "economic, logical, or legal sense," for the most part, goes to the weight of Allen's opinions, not to their admissibility on this issue.

## IV.   Conclusion

For the reasons above, the Court DENIES in part Lead Plaintiffs' Motion to Exclude Opinions and Testimony of Defendants' Expert Lucy P. Allen, at least as far as it may be considered at the class certification stage. (Doc. No. 85). The Court GRANTS in part the motion insofar as any opinion of Allen's amounts to a legal conclusion that invades the province assigned to the Court in the certification process.

SIGNED this 7th day of April, 2025.

Andrew S. Hanen
United States District Judge