United States District Court
Southern District of Texas
**ENTERED**
April 07, 2025
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE CONCHO RESOURCES, INC. SECURITIES LITIGATION | § § § § § § § § § | CIVIL ACTION NO. 4:21-cv-2473 |

## ORDER ON CLASS CERTIFICATION

Pending before the Court is Lead Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Doc. No. 54). Defendants responded (Doc. No. 68) and Plaintiffs replied (Doc. No. 80). Having heard the parties' oral arguments and considered the parties' submissions, and the applicable law, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Class Certification. (Doc. No. 54).

## I.      Background

### A.  Procedural History

The Utah Retirement System and the Construction Laborer's Pension Trust for Southern California (collectively, the "Lead Plaintiffs") purchased common stock in Concho Resources, Inc. ("Concho") between February 21, 2018 and July 31, 2019. At this time, Concho was a publicly traded company. It has subsequently been acquired by ConocoPhillips.

The Lead Plaintiffs brought this action alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 by Defendants. (Doc. No. 25 at 184–86). In addition to suing Concho, Lead Plaintiffs alleged violations of Section 20(a) of the Exchange Act against Defendants Timothy Leach, Jack Harper, C. William Giraud, E. Joseph Wright, and Brenda

Schroer. (*Id.* at 187–88). This Court previously dismissed Defendants Schroer and Wright. (Doc. No. 43). Leach, Harper, and Giraud are collectively referred to as the "Individual Defendants."

Lead Plaintiffs have now filed a Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel. (Doc. No. 54). Lead Plaintiffs seek to certify a class composed of:

> themselves and all other persons and entities who purchased or otherwise acquired Concho publicly traded common stock during the period from February 21, 2018 through July 31, 2019 inclusive, and were damaged thereby.

(the "Proposed Class") (*Id.* at 1). Lead Plaintiffs also seek to exclude Defendants, present or former executives of Defendants, and all related parties of Defendants from the Proposed Class. (*Id.*). Lead Plaintiffs argue that class certification is appropriate because the Proposed Class and its counsel readily satisfy the four requirements of Rule 23(a), as well as the two requirements of Rule 23(b)(3)—that common questions of law or fact predominate over individual questions and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy. *See* (*id.*).

## B. Factual History

At all relevant times, Concho engaged in the acquisition, development, exploration, and production of oil and natural gas. (*Id.* at 9). During the Proposed Class period, Concho began construction on development projects where multiple wells were drilled in close proximity to each other. These projects were described using terms such as "large-scale development" or "manufacturing mode." (*Id.*). Decreasing the space between wells is often used to attempt to "reduce[ ] drilling cycle time and overall operation cost." (*Id.* at 19, 23). As part of its large-scale development plan, Concho built out a multi-well pad that they named "Dominator," its largest project to date. (Doc. No. 54 at 9). Concho informed investors that they had "valuable data" that they used to "optimize" well design (including spacing) and well completion. (Doc. No. 25 at 7).

2

Specifically, Defendant Leach assured investors at the start of the Proposed Class period that "well spacing, lateral placement and completion design" for its manufacturing mode had been "validated." (*Id.*). Defendant Harper also told investors that Concho had "successfully made [the] transition" to large-scale development. (*Id.*).

During this same time period, Concho announced that it had reached a definitive agreement with RSP Permian, Inc. ("RSP"), under which Concho would acquire RSP in an "all-stock" transaction (the "RSP Acquisition"). (Doc. No. 25 at 74). Under the terms of the agreement, shareholders of RSP would receive 0.320 shares of Concho common stock in exchange for each share of RSP common stock, representing consideration to each RSP shareholder of $50.24 per share based on the closing price of Concho common stock on March 27, 2018. (*Id.*). The consideration given to RSP shareholders in connection with the RSP Acquisition represented an approximate 29% premium when valued by RSP's closing price of $38.92 on March 27, 2018. (*Id.*). Upon the closing of the transaction, Concho shareholders owned approximately 74.5% of the combined company, and RSP shareholders owned approximately 25.5%. (*Id.*).

Lead Plaintiffs allege that, instead of basing its large-scale development on accumulated data and knowledge, Concho's manufacturing mode "consisted of experimental and highly risky production methodologies involving tightly spaced wells which exposed [Concho] to potentially ruinous risk." (Doc. No. 54 at 9). Plaintiffs assert that, during the Proposed Class period, instead of disclosing the truth, Defendants: "(i) touted the transition to large-scale development as a success as well as its benefits with zero basis to do so;  (ii) stated it was the product of gradual learning and verified techniques despite being experimental; (iii) issued non-risk adjusted production forecasts despite knowing such forecasts were overstated; and (iv) cast certain

3

'aggressive' projects as 'tests' despite having employed such 'tests' Company-wide." (*Id.*). Thus, Lead Plaintiffs contend that, though they were aware there was a general risk involved when investing in an oil exploration business, Concho misled investors to believe that, based upon its accumulation of data and production history, it had the knowledge and ability to effectuate a manufacturing mode production system that would maximize production and reduce costs. In reality, however, this mode was not proven as represented. (Doc. No. 109 at 273). Ultimately, they contend that Concho was forced to go "back to the drawing board on well spacing." (*Id.*).

The fact that these projects were not as established as previously conveyed allegedly became apparent after the close of trading on July 31, 2019. After the close of trading, Concho reported substandard second quarter 2019 financial results and "materially lowered current and forecasted production guidance." (Doc. No. 54 at 9). Specifically, in its earnings release for the second quarter of 2019, Concho stated "[w]hile the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates that well spacing was too tight." The next morning, prior to the start of trading, Concho held its second quarter 2019 earnings call. In that call, Defendants stated that while the Dominator was the most extreme spacing example, other "modestly more dense" projects had been constructed with tight spacing as well. (*Id.*). Concho's second quarter 2019 financial results and subsequent earnings call are collectively referred to herein as the "Corrective Disclosure." On July 31, 2019, Concho stock's closing price was $97.68 per share. (Doc. No. 25 at 139). After the release of the Corrective Disclosure, Concho shares dropped 22%, closing at $75.97 on August 1, 2019. (Doc. No. 54 at 9). This sharp loss of value precipitated this lawsuit.

4

Lead Plaintiffs filed this securities-fraud action alleging that Defendants violated securities laws and regulations when they made false or misleading statements on various dates throughout the Proposed Class period. *See* (Doc. No. 25). Plaintiffs claim that these allegedly false and misleading statements were then corrected when Concho released the Corrective Disclosure. (*Id.*). Plaintiffs' Consolidated Complaint and subsequent letter to this Court explicitly lay out the sections of the Corrective Disclosure that Plaintiffs contend correct the alleged misstatements. Plaintiffs describe these passages as follows: [1]

    a. After the close of trading on July 31, 2019, Concho released its financial results for the second quarter 2019 (the "2Q2019 Earnings Release"). Concho reported a disappointing a net loss of $97 million, or $0.48 per share. The Company reported adjusted net income of $139 million, or $0.69 per share, which was below consensus estimates of $0.72 per share, down from the previous quarter's results of $0.72 per share and down 45% year-over-year. Concho also reported $717 million of adjusted EBITDAX, below consensus estimates of $736 million and down from the previous quarter's results of $755 million.

    b. Concho also announced that it would be forced to scale back production targets for the rest of this year—without lowering its current budget—giving bearish production forecasts for the upcoming quarter of 316 MBoepd to 322 MBoepd, below consensus forecasts of 336 MBoepd. Concho also revealed that it had slashed its active rig count to 18, down from 33 in the first quarter 2019, and lower than that projected in the Company's first quarter 2019 earnings call commentary of low 20s by the summer and original guidance of 24 rigs by the second half of 2019.

        Costs incurred for exploration and development activities for second-quarter 2019 totaled $785 million. During the quarter, Concho averaged 26 rigs, compared with 33 rigs in first-quarter 2019. The Company is currently running 18 rigs, including 11 rigs in the Delaware Basin and seven rigs in the Midland Basin. Additionally, the Company is currently utilizing seven completion crews.

    c. Dovetailing on the reduced rig count, Concho also disclosed for the first time that Dominator's 23 wells were spaced "too tight," and that Concho had "incorporated learnings from [Dominator] into its second half of 2019 program and future Delaware Basin projects."

---

[1] Plaintiffs submitted this letter in response to an order by the Court. The letter summarized and clarified the portions of the Corrective Disclosure that Plaintiffs contend correct the alleged misstatements, as set forth in the Complaint. The language set forth herein is taken directly from the letter received by the Court, but is an accurate reflection of what Plaintiffs pleaded in their Complaint. The Court is utilizing that summary here as it is more concise—especially when compared to the 190 page Consolidated Complaint.

In the Delaware Basin, Concho completed the 23-well Dominator project, a well-spacing test targeting multiple landings within the Upper Wolfcamp. The average lateral length for the project was approximately 4,400 feet, and all 23 wells were drilled, completed and put on production safely and ahead of schedule. While the Dominator project accelerated the Company's understanding across the project lifecycle (logistics, lateral placement, well spacing and facilities design), performance from the project indicates the well spacing was too tight. The Company has already incorporated learnings from this project into its second half of 2019 program and future Delaware Basin projects.

d. Concho held is second quarter 2019 earnings call on August 1, 2019. On the call Defendant Leach [Concho's Chief Executive Officer] stated that following Dominator's failure, Concho would be forced to retreat back to a more conservative approach to well spacing. Defendant Leach also attributed Concho's below-expected active rig count as a measure to avoid overshooting budgets.

Thanks, Megan, and good morning. Yesterday's results and updated 2019 outlook reflect our continued move to a lower capital budget than originally planned this year and our desire to enter 2020 in the best position to deliver competitive production growth and increasing free cash flow.

* * *

In the Delaware Basin, the 23 well Dominator project was designed to test logistical capabilities and well spacing that was approximately 50% tighter than our current resource assessment. While initial rates were solid, current performance data indicates that we developed the Upper Wolfcamp too densely.

We are incorporating the data into our development model to adjust spacing on future projects including those projects set to spud in the second half of '19.

* * *

Turning to our capital program; we averaged 26 rigs in the second quarter and capital totaled $785 million, which was down 15% compared to the first quarter. Year-to-date production volumes are ahead of schedule and today we're running 18 rigs, which is below our previous plan of 24. We've made the decision to adjust our drilling and completion schedule in the second half of the year to slow down and not chase incremental production at the expense of capital discipline.

e. On the call Defendant Giraud [Concho's Executive Vice President at all revanant times and Chief Operating Officer starting January 2019] stated that at maximum there should be 12 wells per project in the Permian:

6

> Yes, I mean, in terms of the project spacing, I don't know that it has taught us anything in terms of the optimal project size. The team has executed extremely well from a logistical standpoint, getting that much work done on time, actually ahead of schedule. So I do think, as we've talked about in previous calls, the optimal project size for us is probably in the 8 to 10 to 12 depending upon where you are in the Permian. But I'm not sure that Dominator gave us confidence that we can continue to push that up over time and find incremental efficiencies and how we do it.

    f.   Additionally on the call, Defendant Giraud attempted to downplay that existing and upcoming 2019 projects had "modestly more dense" spacing, by stating the well spacing was not "anywhere close to Dominator."

> You know, I don't know the number off the top of my head. Typically, I would characterize '19 as the year that we were advancing our understanding of optimal lateral length, plcaement [sic] design and well-spacing being one of the critical variables there. Typically, where we've done that, we have added kind of one more well into a project. Dominator is the most extreme example where we went 50% beyond kind of our traditional resource spacing. So I would say that in a number of the projects we have this year and including a couple more coming on in the back half of this year, you're going to see them developed at a modestly more dense than our resource spacing, but nothing anywhere close to Dominator

(Doc. No. 25 at 134–39).

## II.    Legal Standard

Plaintiffs bear the burden of proof on class certification. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). For purposes of a class certification motion, the substantive allegations contained in the complaint must be accepted as true. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974); *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988). The district court may certify a class only if a "rigorous analysis" convinces it that all conditions set out in Rule 23 are met. *Castano*, 84 F.3d at 740. In so doing, the Court must consider "how a trial on the merits would be conducted" if a class were certified. *Id.* A district court may look past the pleadings to determine if Rule 23's requirements have been met. *Id.* at 744. This necessitates looking "beyond the pleadings . . . [to] understand the claims, defenses, relevant facts, and applicable substantive

law in order to make a meaningful determination of the certification issues." *Id.* Nevertheless, for

certification purposes, a plaintiff is not required to prove that it will prevail on its claims. *Id.*

(indicating the strength of a plaintiff's claims should not affect the certification decision).

To obtain certification of the Proposed Class, Plaintiffs must satisfy Rule 23(a)'s four

threshold requirements, as well as the requirements of either Rule 23(b)(1), (b)(2), or (b)(3). FED.

R. CIV. P. 23. To satisfy the requirements of Rule 23(a), Plaintiffs must demonstrate that (1) the

class is so numerous that joinder is impracticable; (2) common questions of law or fact exist

among the class members; (3) the class representatives' claims or defenses are typical of the

claims or defenses of the class; and (4) the class representatives will fairly and adequately

represent the interests of the class members. FED. R. CIV. P. 23(a); *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 345 (2011).

With respect to Rule 23(b), Plaintiffs have moved for certification of the Proposed Class

under Rule 23(b)(3), which requires that questions of law or fact common to the Proposed Class

members predominate over any questions affecting only the individual members, and that a class

action is superior to any other available method for fairly and efficiently resolving the

controversy. FED. R. CIV. P. 23(b)(3). This requirement is more demanding than the commonality

prong of Rule 23(a) because it "tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir.

2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

### III.     Rule 23(a) Requirements

As noted above, Plaintiffs must meet each of the four requirements of Rule 23(a) to attain

certification of the proposed class: numerosity, commonality, typicality, and adequacy. *Vizena v.*

*Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004); *Stirman v. Exxon Corp.*, 280 F.3d 554,

8

558–59 (5th Cir. 2002); FED. R. CIV. P. 23 (a)(1)–(4). Defendants do not argue that Plaintiffs have not satisfied the four Rule 23(a) requirements. *See* (Doc. No. 68) ("[E]ven where a proposed class satisfies the prerequisites listed in Rule 23(a), a plaintiff must show that 'questions of law or fact common to class members predominate' over individualized issues."). Since Defendants do not contest Plaintiffs' compliance with Rule 23(a), the Court will only briefly examine whether Plaintiffs have fairly demonstrated that each requirement is met.

### A. Numerosity

To satisfy the numerosity requirement, the court must inquire whether the class is so numerous that joinder of all members is impracticable. *See Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992); *see also* FED. R. CIV. P. 23(a)(1). A plaintiff need not, however, demonstrate with precision the number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000); *see also Zeidman v. J. Ray McDermott Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). The Fifth Circuit favors the presumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Zeidman*, 651 F.2d at 1039.

Throughout the Proposed Class period, Concho common stock was listed on the New York Stock Exchange. (Doc. No. 54-3 at 13). During the Proposed Class period, the average weekly trading volume for Concho common stock was 10.04 million shares. (*Id.*). Based on the number of shares traded weekly on the New York Stock Exchange, the Court can reasonably assume that the Proposed Class members are sufficiently numerous to make joinder of all

members impracticable. *See Zeidman*, 651 F.2d at 1039. As such, Plaintiffs have satisfied the first requirement.

### B. Commonality

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Commonality requires that Lead Plaintiffs' and the Proposed Class members' claims depend on a common contention that is capable of class-wide resolution, meaning determination of its truth or falsity will resolve an issue central to each Proposed Class members' claim in "one stroke." *Wal-Mart Stores*, 564 U.S. at 350. Furthermore, Lead Plaintiffs must demonstrate, not only that the Class Representatives and the Proposed Class suffered a violation of the same provision of law, but that they all allegedly suffered the same injury as a result. *Id.* at 349–50.

The claims of all Proposed Class members hinge on common contentions that are capable of being resolved class wide. For example, Lead Plaintiffs allege that Concho made various misrepresentations and omissions via public press releases, earnings calls, and SEC filings. The materiality and veracity of those statements will be proven class wide and are contentions common to the entire Proposed Class. Lead Plaintiffs further allege that those uniform misrepresentations and omissions resulted in inflated prices of Concho securities, an injury affecting the entire Proposed Class. Like the issue of whether Concho's statements were material and misleading in violation of the Exchange Act, whether the statements artificially inflated the stock price is a question common to all Proposed Class members. Furthermore, whether Concho possessed the scienter required to impose liability under § 10(b) of the Exchange Act is an issue common to all members of the Proposed Class, which will be resolved as to each Proposed Class member "in one stroke." *See id.* at 350. Due to the fact that resolution of these common issues

applies to the claims of each Proposed Class member, the Court finds that Lead Plaintiffs have satisfied the commonality prerequisite for class certification.[2]

### C. Typicality

Plaintiffs must also demonstrate that the claims or defenses of the representative parties are typical of the claims or defenses of the class. *See* FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories. *Id.* Typicality does not mean that the claims of the representative parties be identical to those of the absent members. *See Phillips v. Joint Leg. Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981). Rather, typicality may be satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory. *See Ligon v. Frito–Lay, Inc.*, 82 F.R.D. 42, 47 (N.D. Tex. 1979) (finding "a class representative and a class member must be similarly, not identically, situated"). Factual differences do not defeat typicality. *Stirman*, 280 F.3d at 562.

Here, Lead Plaintiffs' claims and the Proposed Class members' claims arise from the same events and are based on the same legal theories. First, Lead Plaintiffs and the Proposed Class members complain of the exact same misrepresentations, omissions, and course of conduct by Concho. Lead Plaintiffs and the Proposed Class members both allegedly relied upon Concho's representations and omissions. They also contend that those same statements artificially inflated the value of Concho securities during the Class Period. Second, the claims alleged by Lead Plaintiffs, that would include the Proposed Class, are based on the same legal

---

[2] The Court will later address the issue of those who acquired their stock by virtue of the RSP Acquisition versus those who acquired their stock on the open market.

theories—violations of Sections 10(b) and 20(a) of the Exchange Act. The Court finds that Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

### D. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The class representatives' interests must be aligned with, and not antagonistic to, unnamed class members. *Mullen*, 186 F.3d at 625–26. A sufficient alignment of interests exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981).

Courts in the Fifth Circuit assess three factors when considering whether the class representatives will fairly and adequately protect the interests of the Proposed Class: (a) "the zeal and competence of the representative[s'] counsel"; (b) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (c) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)).

There is no evidence of any conflict between the interests of Lead Plaintiffs and those of the Proposed Class. The definition of the Proposed Class excludes potential members whose interests could be antagonistic to Plaintiffs' interests; specifically, Defendants, present or former executives of Defendants, and all related parties of Defendants. There has been no evidence or argument that Lead Plaintiffs are subject to legal defenses that are different from, or inapplicable to, the Proposed Class. The Court finds that Lead Plaintiffs' counsel is experienced in securities fraud disputes and have vigorously pursued the action to date. (Doc. No. 54-4). Nevertheless, for

the reasons below, the Lead Plaintiffs do not adequately represent the class as a whole. Instead, the named Lead Plaintiffs may be named as the class representatives for the Open Market Subclass. Since the Court finds that subclasses are necessary, Plaintiffs' counsel must propose an additional plaintiff or plaintiffs to act as the class representative for the RSP Acquisition Subclass.

Except for the issue noted above that will be remedied, Plaintiffs have satisfied their burden of showing that the Proposed Class meets each of the Rule 23(a) requirements for class certification. Having satisfied the threshold requirements of Rule 23(a), Plaintiffs must also satisfy the requirements under Rule 23(b)(3).

## IV.    Rule 23(b)(3) Requirements

Plaintiffs moving for certification under Rule 23(b)(3), like Lead Plaintiffs here, must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Requiring that common issues predominate over individual issues "prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). The issues to be considered under Rule 23(b)(3) are referred to as "predominance" and "superiority." *See Henry*, 199 F.R.D. at 570. Defendants argue that the Court should not certify the Proposed Class because Plaintiffs have not satisfied the predominance requirement.

### A.    Predominance

The predominance and superiority requirements are "far more demanding" than is Rule 23(a)(2)'s commonality requirement. *Amchem*, 521 U.S. at 624. Rule 23(b)(3) does not require

13

all questions of law or fact be common; it only requires that the common questions predominate over individual questions. *Longden*, 123 F.R.D. at 556. In deciding whether this requirement is met, courts focus on issues relating to the defendants' liability. *See id.* If the liabilities are common to the class, common questions are held to predominate over individual questions. *See Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981); *see also Longden*, 123 F.R.D. at 556.

In determining whether legal issues common to the class predominate over individual issues, the Court must inquire how the case will be tried. *Castano*, 84 F.3d at 740. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. *O'Sullivan*, 319 F.3d at 738.

The substantive issues that will control the outcome at trial arise from Plaintiffs' claims that Defendants violated § 10(b) and the Individual Defendants violated § 20(a) of the Securities and Exchange Act of 1934, and thereby injured the Proposed Class members. To recover for violations of § 10(b) and Rule 10b-5, which prohibit material misstatements or omissions in connection with the purchase or sale of any security, Plaintiffs must prove: (1) a material misrepresentation or omission by Defendants; (2) made with scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*").

To recover for a violation of § 20(a), which imposes joint and several liability for an underlying securities fraud violation, Plaintiffs must prove the Individual Defendants had actual power over Concho and induced or participated in the alleged violations. 15 U.S.C.A. § 78t(a);

*In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 749–50 (S.D. Tex. 2012). Since § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof. *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 699 (S.D. Tex. 2006). The additional substantive issue of whether the Individual Defendants had actual power over Concho and participated in or induced the fraud will be proven by the Individual Defendants' conduct, not by the conduct of any Proposed Class members. Therefore, individual issues will not predominate with respect to the § 20(a) claims. *Id.* at 700. Accordingly, the discussion of predominance is limited to the elements of § 10(b).

The issues as to whether Defendants made material misrepresentations and omissions, and whether those misrepresentations and omissions were made with the required scienter, are issues capable of class-wide proof. The same alleged misrepresentations and omissions that form the basis of each Proposed Class members' § 10(b) claims were made in press releases and earnings calls on thirteen dates through the Proposed Class period. The jury will make a single decision regarding the materiality and truthfulness of the alleged misrepresentations and whether Defendants acted with the requisite scienter based on common proof. That decision will apply to all Proposed Class members' claims. The entire Class will be cohesive with respect to its success or failure in proving the materiality of Defendants' misrepresentations and whether Defendants acted with the requisite scienter. *See Amgen, Inc. v. Conn. Ret. Plans & Tr.*, 568 U.S. 455, 460 (2013).

Nevertheless, Defendants argue that the predominance requirement is not met for two reasons: 1) Plaintiffs cannot demonstrate that individual issues of reliance on the alleged misrepresentations, an element of Plaintiffs § 10(b) claim, will not predominate; and 2)

Plaintiffs' damages cannot be measured on a class-wide basis consistent with Plaintiffs' theory of liability.

### 1. Reliance

As in many securities class actions, one critical issue lies at the intersection between the reliance element of a § 10(b) claim and the predominance requirement of Rule 23(b)(3). In securities fraud litigation concerning § 10(b)/Rule 10b–5 and § 20(a), Plaintiffs must demonstrate that individual issues of reliance will not predominate. *See, e.g., See Basic v. Levinson*, 485 U.S. 224, 241–47 (1988) (discussing, in detail, a rebuttable presumption of reliance in a Rule 10b–5 setting); *Affiliated Ute*, 406 U.S. at 153–54 (presuming reliance in fraud action where defendants failed to disclose material information). Nevertheless, predominance is a test readily met in certain cases alleging securities fraud. *See Amchem*, 521 U.S. at 625. This is largely due to the *Basic* presumption, which excuses securities fraud plaintiffs from establishing individual reliance on an alleged misrepresentation in certain circumstances. *See Basic*, 485 U.S. at 241–47.

Here, Lead Plaintiffs seek to certify a class of Concho shareholders by invoking the *Basic* presumption endorsed by the Supreme Court in *Basic v. Levinson*. In *Basic*, the Supreme Court recognized that "requiring proof of the Class Members' individual reliance on Defendants' misrepresentations or omissions in a securities fraud case would overwhelm issues common to the Class and, therefore, preclude class certification under Rule 23(b)(3)." *Id.* at 245. To address this problem, the Supreme Court held that securities fraud plaintiffs can, in certain circumstances, satisfy the reliance element "by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Id.* at 247. This rebuttable presumption of reliance is based on the fraud-on-the-market theory. *Id.*

16

The fundamental premise of the fraud-on-the-market theory underlying the *Basic* presumption is "that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Halliburton II*, 573 U.S. at 268. If the investor did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, the investor could not have relied on the distorted price. *Id.* Still, the *Basic* presumption may be rebutted. The defendant may rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248.

Defendants do not contest that Lead Plaintiffs' pleadings invoke the *Basic* presumption.[3] Instead, Defendants seek to defeat class certification by rebutting the *Basic* presumption through

---

[3] The Court finds it prudent to briefly discuss whether the shareholders who acquired Concho stock as a result of the RSP Acquisition are entitled to utilize the *Basic* presumption. Since neither side briefed the issue, the Court attempted to gain insight at the evidentiary hearing. Nevertheless, neither side provided a satisfactory path to resolving what the Court sees as, at least, a legal speed bump to class certification. Still, the Court notes that the presumption requires that the plaintiff *trade* the stock between the time the time the misrepresentation was made and when the truth was revealed. *Halliburton II*, 573 U.S. at 268. The Court finds that the "forced seller" doctrine/"fundamental change in investment" test adds insight as to how one may perceive that the former RSP shareholders having "traded" the stock. The forced seller doctrine originally recognized standing for the shareholder under section 10(b) and Rule 10b-5 when the "nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 307 (5th Cir. 1971). The doctrine has since evolved into the "fundamental change in investment" test. "[W]here a securities transaction results in a fundamental change in the nature of a shareholder's investment, leaving the plaintiff with shares that represent a participation in a wholly new and different enterprise, the plaintiff may be considered to be a purchaser or seller." *Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982). The Court finds that this test allows the former RSP shareholders who acquired Concho stock during the Proposed Class period to utilize the *Basic* presumption. Nevertheless, as seen below, the Court has concerns about whether the requirements of Rule 23(b)(3) broadly apply to both individuals that acquired their stock on the open market as well as those who acquired Concho stock via the RSP Acquisition.

evidence that its alleged misrepresentations actually had no impact on its stock price. The Court, therefore, must determine whether Defendants have successfully rebutted the presumption of reliance. To carry its burden, Defendants "must in fact sever the link between a misrepresentation and the price paid by the plaintiff." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 125–26 (2021) (quotations omitted) ("*Goldman I*"). Thus, the Court is required to look at each misstatement separately to determine whether Defendants carried their burden.

Though the Court must look at each statement independently, Defendants have organized the alleged misrepresentations into four categories that they labeled based on their analysis of each statement:

    i.    Category A: "Generic Statements," which Defendants contend simply express "vaguely positive sentiments about Defendants' faith in one aspect of Concho's business plan." (Doc. No. 68 at 21). Thus, Defendants conclude, these statements are too generic to have been actually corrected by the alleged corrective disclosures. (*Id.* at 22).

    ii.    Category B: "Results and Observations from 2017 & 2018," which Defendants contend cannot be corrected by the corrective disclosures because "Concho's second quarter 2019 results cannot be attributed to factual observations about periods from months before." (*Id.* at 24).

    iii.    Category C: "Pre-2019 Projections," which Defendants contend cannot be corrected by the alleged corrective disclosures because these Category C statements involved financial projections for 2018, whereas the alleged corrective disclosures concerned results for the second quarter of 2019. (*Id.* at 25).

    iv.    Category D: "Other Statements," upon which Defendants do not challenge class certification on lack of price impact grounds. (*Id.* at 13).

18

While the Court is not bound by the grouping or categorization proposed by either party, it finds that Defendants' grouping of the statements provides a good starting place.[4] By using this approach, the Court is not commenting on the accuracy of any individual statement.[5]

Initially, the Court notes that the parties agree that the Category D statements can support class certification, at least insofar as Defendants have not attempted to rebut the presumption of reliance as to these statements. Thus, the Court finds that Lead Plaintiffs have satisfied their burden under Rule 23(b)(3) to demonstrate that individual issues of reliance on the Category D alleged misrepresentations will not predominate. The Category D statements are as follows:

| Number[6] | Source[7] | Statement[8] |
|---|---|---|
| D-1 | Q1 2019 Earnings Release | Production for first-quarter 2019 was 29.6 million barrels of oil equivalent (MMBoe), or an average of 328 thousand Boe per day (MBoepd), an increase of 44% from first-quarter 2018 and 7% from fourth-quarter 2018…. Net loss for first-quarter 2019 was $695 million, or ($3.49) per share, compared with net income of $835 million, or $5.58 per share, for first-quarter 2018. Excluding certain non-cash and special items, first-quarter 2019 adjusted net income was $144 million, or $0.72 per share, compared with adjusted net income of $149 million, or $1.00 per share, for first-quarter 2018. During the quarter, Concho generated adjusted EBITDAX of $755 million, compared with $570 million for first-quarter 2018. |
| D-2 | Q1 2019 Earnings Release | The Company successfully started production on nine projects during first-quarter 2019, including the Dominator, Eider and Jack projects in the Delaware Basin as well as the Mabee project in the Midland Basin. |

---

[4] Defendant has divided certain alleged misstatements, as pleaded by Plaintiffs, into separate categories based on their objection to specific sentences. The Court is hesitant to address a pleaded "misstatement" line by line, as it could affect the genericness or substance of the statement. As such, the Court has consolidated certain statements that had been separated by Defendants back to the format in which they were pleaded. Where the Court has done so, it has included a separate footnote to explain which statements were consolidated. Otherwise, the Court has adopted the numbers assigned to the misstatements by Defendants. Where Defendants did not number the statements, like in Category D, the Court has assigned each statement a number.

[5] At this stage, the Court must accept the substantive allegations contained in the complaint as true. *Eisen*, 417 U.S. at 177–78. Moreover, at the class certification stage, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178. Thus, the Court does not opine and has not considered whether the alleged misrepresentations are, in fact, truthful.

[6] The column refers to the number assigned by Defendants to the alleged misrepresentation for ease of later reference, but, as noted above, the Court has renumbered some of the alleged misstatements from Defendants' original numbering.

[7] This column refers to the source of the alleged misstatement.

[8] This column refers to the alleged misrepresentation, as provided in Plaintiffs' Consolidated Complaint. (Doc. No. 25).

19

| D-3 | Q1 2019 Earnings Release | During first-quarter 2019, Concho averaged 33 rigs, compared to 34 rigs in fourth-quarter 2018. The Company is currently running 29 rigs, including 20 rigs in the Delaware Basin and nine rigs in the Midland Basin. Additionally, the Company is currently utilizing eight completion crews. |
|---|---|---|
| D-4 | Q1 2019 Earnings Call | Our focus paid off for us last quarter. We exceeded the high-end of our production guidance with strong oil volumes. Production for the quarter also benefited from strong early production out of our latest projects, including the Dominator, Eider and Mabee, as well as outside operated volumes. With solid cost control and production ahead of expectations, we also delivered strong financial performance. As expected, our capital investments, which are front-end loaded this year, exceeded operating cash flow during the quarter. Importantly, we're on track to deliver on the $2.8 billion to $3 billion capital program we laid out last quarter, and we have increased our estimates for oil production in 2019. |
| D-5 | Q1 2019 Earnings Call | We continue to learn from all these projects. And so using the Dominator one, just because it's a good example, that is our most extreme version of activity in a single square mile and also some of the more dense spacing we've tested. And so, yeah, the teams did a fantastic job on that, bringing that project and a couple of these other large ones this quarter and putting them on production actually ahead of schedule.<br><br>So we're continuing to figure out how to concentrate that much activity in one spot in the most efficient manner possible. We're continuing to play with spacing and also landing zones, and we're still continuing to tinker with combinations of different landing zones and to our whole completion design in them. So there is a lot to learn, but I think, at the same time, you've got a really competitive business that competes for investor capital. |
| D-6 | Q1 2019 Earnings Call | It's going to range depending on where you are in the basin and also the zone you're drilling. On that one, we drilled at almost 50% more densely than kind of our - where we typically look at resource booking in that zone. So we will watch - we haven't hit for a, kind of, critical 60 days of production where we included that'll be next quarter's batch of wells to talk about, but certainly returns look pretty good for us. |
| D-7 | Q3 2018 Earnings Release | Oil production is expected to grow more than 25% from fourth-quarter 2018 to fourth-quarter 2019. Further, Concho's planned activity level is expected to drive two-year crude oil and total production compound annual growth rates of 30% and 25%, respectively, from 2018 to 2020. Importantly, disciplined capital allocation and high-margin oil growth is expected to drive strong free cash flow generation and improving ROCE in 2019 and 2020. |
| D-8 | Q4 & FY 2018 Earnings Release | Capital spending for 2019 is expected to be between $2.8 billion and $3.0 billion, representing a 17% reduction at the midpoint compared with the Company's prior capital guidance . . . . Approximately 94% of the 2019 capital program will be allocated to drilling and completion operations. The Company's activity will be primarily focused on large-scale manufacturing projects across Concho's portfolio and will keep the Company on track to deliver the value creation benefits of the RSP Permian, Inc. ("RSP") acquisition. Concho's planned activity for 2019 is expected to deliver oil growth of 26% to 30%, and the base plan for 2020 is expected to drive a two-year oil compound annual growth rate of 23% (from 2018 to 2020). For first-quarter 2019, Concho expects production to average between 300 MBoepd and |

| | | |
|---|---|---|
| | | 306 MBoepd, and lease operating expense per Boe to average between $6.30 and $6.50. Additionally, Concho expects capital expenditures to total between $825 million and $875 million. Detailed guidance for 2019 is provided under "2019 Guidance" below. The Company's outlook for 2019 and 2020 excludes acquisitions and is subject to change without notice depending upon a number of factors, including commodity prices, industry conditions and other risks described under "Forward-Looking Statements and Cautionary Statements." |
| D-9 | Q1 2019 Earnings Release | Second-quarter 2019 production is expected to be 316 MBoepd to 322 MBoepd. The Company increased full-year 2019 total production growth guidance to 23% to 27%, reflecting first-quarter 2019 outperformance and strong execution of a disciplined capital program. Additionally, the Company increased full-year 2019 oil production growth guidance to 27% to 31%. |
| D-10 | Q1 2019 Earnings Release | We are delivering exceptional performance across our portfolio as we execute on our clear strategy to drive sustained, differentiated oil growth, free cash flow and corporate returns. Results for the first quarter of 2019 reflect our focus on large-scale development, controlling costs and generating solid returns on strategic investments, as demonstrated by the Oryx sale. During the quarter, we completed several important projects ahead of schedule, driving increased production that exceeded the high end of our guidance range. Given our strong start to the year, we are raising our full-year production growth outlook while maintaining our capital expenditure guidance. Our high-quality assets and returns-driven approach position us to extend our track record of enhancing value for shareholders. |
| D-11 | Q1 2019 Earnings Release | In the Delaware Basin, excluding the New Mexico Shelf, Concho added 23 wells with at least 60 days of production as of the end of first-quarter 2019. The average 30-day and 60-day peak rates for these wells were 1,817 Boepd (73% oil) and 1,647 Boepd (72% oil), respectively. These wells were drilled to an average lateral length of 9,125 feet. |
| D-12 | Q1 2019 Earnings Call | We raised our annual production growth outlook to account for the outperformance in 1Q as well as continued strong performance across the portfolio. At the midpoint, we increased our full-year oil production guidance to 29%. Relative to the 2-year outlook provided in February, we've clearly made a lot of progress and have a great deal of confidence in that plan. Full-field development is an important contributor to our momentum. This approach is all about optimizing spacing, timing and drilling and completion techniques to maximize program economics and recoveries. |
| D-13 | Q4 & FY 2018 Earnings Release | At December 31, 2018, Concho's estimated proved reserves totaled 1.2 billion Boe, compared to 840 million Boe at year-end 2017. The Company's proved reserves are approximately 63% oil and 37% natural gas. Proved developed reserves totaled 824 MMBoe, or 69% of total proved reserves. |
| D-14 | 2018 Form 10-K | At December 31, 2018, our 1,187 MMBoe total estimated proved reserves consisted of approximately 63 percent oil and 37 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our operating areas.<br><br>***<br><br>Delaware Basin. At December 31, 2018, we had estimated proved reserves in this area of 674 MMBoe, representing 57 percent of our total proved reserves. During the year ended December 31, 2018, we commenced drilling or |

| | | |
|---|---|---|
| | | participated in the drilling of 281 (171 net) wells in this area, and we completed 239 (136 net) wells that are producing. |
| D-15 | Q1 2019 Earnings Call | Sure. I'd say the beat in the first quarter, which was pretty significant, was a combination of a couple of things, the non-op that we've highlighted, also getting a couple of these very sizable projects on ahead of schedule. And so, there was something a little unique to the quarter maybe in that. But, I mean, underlying all of that is, we continue to see really strong results across our portfolio. And so, I think, that's what gave us the confidence to raise the overall annual guidance. |

Defendants do, however, attempt to sever the link between the alleged misrepresentations and the stock price by alleging that there is a "mismatch" between the remaining alleged misrepresentations (the statements in Categories A, B, and C) and the Corrective Disclosure. Lead Plaintiffs, of course, disagree that there is any such mismatch. Defendants present two primary theories of "mismatch:" 1) that there is a "genericness" mismatch (meaning the misrepresentation is too generic to be corrected by the specific Corrective Disclosure); and 2) that there is a substantive mismatch (meaning the information contained in the Corrective Disclosure did not actually correct the information found in the misrepresentation). Defendant contends that the Category A statements fall into the former theory, while Categories B and C primarily fall into the latter.

     *i.*      *Category A – Generic Mismatch*

As for the Category A statements, Defendants contend that the mismatch occurs due to the generic nature of a misrepresentations. The *Goldman I* Court explained:

> *The generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory.* Under that theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.' Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. *But that final inference—that the back-end price drop equals*

> *front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.*

*Goldman I*, 594 U.S. at 123 (citations omitted) (emphasis added).

Plaintiffs have represented to the Court that they are proceeding solely under an inflation-maintenance theory of price impact. Under this theory, "a misrepresentation causes a stock price to *remain* inflated by preventing preexisting inflation from dissipating from the stock price." *Id.* at 119–20 (citation omitted) (emphasis in original). Plaintiffs concede that there was no statistically significant front-end price impact to Concho's stock after most, if not all, of the alleged misstatements. Front-end price impact is a statistically significant price movement of the stock that occurs contemporaneously or shortly after an alleged misstatement. Back-end price impact, on the other hand, is a statistically significant price movement of the stock that occurs after the issuance of a corrective disclosure. Nevertheless, front-end price impact may be inferred from a back-end price drop when a corrective disclosure shows that the defendant's previous statements were untrue or that the defendant failed to disclose the truth, and when the stock price falls after the truth is revealed.[9] *See id.* at 123. A back-end price drop supports this inference only when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See id.* If there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See id.*

As an initial note, Defendants request that the Court look at the broader context of the alleged misrepresentations. During the evidentiary hearing, Defendants walked the Court through examples of Concho stating that it was continuously learning as they went into various projects and that the projects under scrutiny now were in the "early phases." While the "totality of the

---

[9] "Corrective disclosures" are often important in securities class actions to demonstrate that a company's misrepresentation kept its stock artificially high. If the stock price falls after the corrective disclosure, it can often be inferred that the misrepresentations had a price impact. *See Pub. Emps. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–21 (5th Cir. 2014).

circumstances" or "context" may be important eventually, this approach at the class certification stage would conflict with the Supreme Court's decision in *Amgen*, 568 U.S. at 480–81. There, the defendants put forth a similar argument; yet, the Court found that this evidence was not appropriate for a court to consider in deciding whether a plaintiff's proposed class satisfies Rule 23(b)(3)'s predominance requirement. *Id.* at 481. Instead, that evidence is pertinent to the issue of materiality. *Id.* Since it is inappropriate to assess materiality at the class certification stage, the Court cannot consider the additional information that was available to an investor at the time the alleged misstatement was made.[10] *Id.*

The Court will first address Defendants "generic mismatch" contention. Defendants, citing *Halliburton II*, contend that, if the "alleged misrepresentation did not, for whatever reason, actually affect the market price . . . then the presumption of reliance would not apply." (Doc. No. 68 at 2). A price impact analysis must be conducted, where (1) there is a considerable gap in front-end–back-end genericness, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims, as Lead Plaintiffs claim here, that a company's generic risk-disclosure was misleading by omission. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*").

As noted, Plaintiffs acknowledge that they are proceeding under an inflation-maintenance theory. "Under that theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman I*, 594 U.S. at 123 (citation and quotations omitted). When, as here, Lead Plaintiffs proceed under an inflation-maintenance theory, "the generic nature of a

---

[10] The Supreme Court noted in *Goldman I* that, while *Amgen* directs courts to refrain from using evidence on materiality until consideration on the merits, there may be some overlap of evidence that bears on reliance and that which goes towards materiality. *Goldman I*, 594 U.S. at 122. Nevertheless, the *Amgen* Court specified that the context of each alleged misrepresentations is not an appropriate inquiry at the class certification stage. *Amgen*, 568 U.S. at 481.

misrepresentation often will be important evidence of a lack of price impact." *Goldman I*, 594

U.S. at 123.

Defendants contend that the following thirty-three alleged misstatements are too generic

to have been corrected by the Corrective Disclosure:

| Number | Source | Statement |
|--------|--------|-----------|
| A-1 | Q4 & FY 2017 Earnings Release | The fourth quarter was an excellent end to a great year for Concho. Our operational and financial performance demonstrated our ability to consistently execute, control costs and capitalize on opportunities that strengthen our competitive position. |
| A-2 | Q4 & FY 2017 Earnings Release | High-quality acreage and scale within the Permian Basin enables Concho to efficiently allocate capital while continuing to advance manufacturing style development with leading-edge drilling and completion techniques. |
| A-3 | Q4 & FY 2017 Earnings Release | From these projects, Concho is collecting valuable data that helps the Company optimize lateral placement, completion design and facilitates planning. |
| A-4 | Q4 & FY 2017 Earnings Release | Concho is utilizing leading-edge technologies, including fiber optic monitoring, to collect valuable proprietary data with real-time and long-term implications for full-field optimization. |
| A-5 | 2017 Form 10-K | Multi-well pad drilling and project development may result in volatility in our operating results.<br><br>We utilize multi-well pad drilling and project development where practical. Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area. Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed. Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations.<br><br>Additionally, infrastructure expansion, including more complex facilities and takeaway capacity, could become challenging in project development areas. Managing capital expenditures for infrastructure expansion could cause economic constraints when considering design capacity. |
| A-6 | Q4 2017 Earnings Call | This industry is exciting: commodity prices change, new plays emerge, technology advance. Our strategy allows us to adapt quickly. And our history in the Permian, which is the best value-creating engine in our industry, |

| | | enables us to be a leader in the development here. Developing large-scale projects, manufacturing mode, whatever you call it, is one way that we're doing that. While our strategy is the same, the development of our inventory is more sophisticated and creates an opportunity to extend our competitive edge. |
|---|---|---|
| A-7 | Q4 2017 Earnings Call | Over the last few years, our transition to large-scale, multi-well projects has been an important development that will continue to drive growth, innovation and efficiencies. |
| A-8 | Q4 2017 Earnings Call | Our accomplishments last year paved the way for continued operational and financial performance for the next decade. Our development activities validated well spacing, lateral placement and completion design, and our strategic acquisitions and asset exchanges added complementary leasehold for long lateral development. The result is more high-quality reinvestment opportunities to fuel our growth. |
| A-9 | Q4 2017 Earnings Call | Analyst: Jack, most of your development to date, the tremendous growth over the last several years has, I guess, been single well pads as you've locked up your acreage and moved to an efficient mode of operation. How should we think about moving to field development as it relates to child wells versus parent, and how do you factor that into your thoughts in terms of guidance and so on?<br><br>Harper: Sure. And that is one of the reasons to move to the large-scale development as we have. And I think we've successfully made that transition. And so you will see more of that in the future to attempt to avoid creating child wells. Where there are child wells, which is a smaller percentage of our opportunities, we will continue to test that and make sure that we try not to leave any behind. |
| A-10 | March 2018 Raymond James Institutional Investors Conference | So manufacturing mode is a term we use. Other people call it cube development and there's other names as well. What we're trying to do is maximize the rate of return and the resource at the same time. And it's a work in progress, as you might guess. But some of the things that we're using as part of that is, clearly, technology. I said before, taking this empirical data combining it with modern technology helps us get to, we think, a better answer faster.<br><br>I think the drilling synergies are well documented. Walking rigs and drilling in nearby proximity. Certainly on the completion side, not only are our zipper-style completions efficient and may be a more effective way to complete the wells, they're increasingly being priced in a preferential manner as well.<br><br>And then production optimization is speaking to this sizing out facilities not for maximum – not necessarily for maximum production, but for a maximum return over a long period of time. |
| A-11 | March 2018 Investor Call | Analyst: Sure, understood. And then, I guess, second, the synergies you talked about and the advantages to quote-unquote manufacturing, can you just give a little bit of additional color detailing around what exactly it is that allows manufacturing mode on these assets to drive those synergies?<br><br>Leach: Yes. As Steve mentioned, I mean, the balance sheet to be able to do |

| | | |
|---|---|---|
| | | this intense development, instead of 1 or 2 well pads, to go to 8 well multi-well pads is one of the drivers. But it's also long laterals and all the infrastructure that we're going to be able to use together. Infrastructure, such as salt water disposal systems, water handling system that we built over time. All those things will be very additive. |
| A-12 | Q1   2018 Earnings Release | Our team achieved another outstanding quarter of operational and financial results, driving significant production growth while maintaining a disciplined capital program. Our results reflect our focus on large-scale project development, which enables us to maximize ultimate recovery, efficiencies and returns. Looking ahead, we intend to build on our strong momentum and capitalize on our execution strength, cost control and strong balance sheet to extend our track record of delivering growth and returns. |
| A-13 | Q1   2018 Earnings Call | I want to focus on the value-creating opportunities driven by large-scale development. We believe this type of development is important to maximize recoveries, drive economies of scale and deliver attractive economic returns predictably and consistently over the long term. |
| A-14 | Q1   2018 Earnings Call | Analyst: You kind of talked about moving from the 2 to 4 well pads to 8 to 10, but you guys are testing upwards of 20 wells at 1 of these pads. Can you talk about maybe what the sweet spot may be? Is it 8 to 10? Does 20 make sense just for cash sources and uses?<br><br>Leach: Well, I mean, when you talk about pads, it's a little bit more complicated than that. I think it's better to think about it as a project, a drilling project. Sometimes, we'll have 4 actual pads on the same project just so we can have rigs working at the same time. So we've been talking in terms mainly of half-section development, and we will have up to 5 landing zones in some of these areas. And if you're going 8 across on a section, so that's 4 wells in each landing times 5. So in a drilling project, you may have 20 wells in a half section. But then when we go to full-section development, it's twice that. So I think the answer to your question is these kind of drilling projects are going to grow in wells in the project over time and grow dramatically. And that's - - it drives a lot of value creation, as you can see on that Slide 16. |
| A-15[11] | May   2018 Citi Global Energy and Utilities Conference | The big thing that's going on in the business is this transition to development mode, and we've talked a lot about that. There's a lot of· industry conversation around what that means, what that looks like. There's different terms, tanks, cubes, everybody has a little bit different definition. But for us, it means getting to what we think is the optimal development plan, recognizing that you're learning all the time, but trying to decide what the right spacing is, which is generally 8 across in the different zones, and really getting in, and both big multi-well pads and stringing together multiple multi-well pads into even larger projects, simultaneously developing a square mile. Simultaneously both from a - in the same horizontal zone, but also vertically. |

---

[11] Defendants separated the last three sentences into Category B ("And I think we're fortunate to have kind of learned along the way and evolved from first drilling a 2-well pad and then a 3-well pad and then 2 2- well pads together. So we've been building up to this kind of larger-scale development mode, and we're very excited about what we're seeing. And I think that's the power of what are causing things like the first quarter and the results we had there."). These sentences affect the genericness of the statement as pleaded by Plaintiffs and, thus, should be considered with the preceding sentences. The Court still considered Defendants' Category B objection, that there is a substantive mismatch between the Category B statements and the Corrective Disclosure. For the same reasons articulated below, there is no substantive mismatch between the Corrective Disclosure and this statement.

| | | |
|---|---|---|
| | | And so we've talked a lot about these big multi-well pad projects. We've highlighted how we're doing them, both in the Midland Basin and in the Southern Delaware and also in the Northern Delaware. The projects that we've talked the most about, that have the most kind of age on them are the Mabee project up in the Northern Delaware - sorry, the Northern Midland, where we drilled 13 wells on a single half-mile section to 5 different zones, and we've talked a lot about the challenges of that. I think industry generally agrees that's a better way to do it, but you have to have a very sizable balance sheet and technical team, a big enough productive base to work through those challenges. The challenges of - that's the best way to do it, but it can be challenging getting up the learning curve. And I think we're fortunate to have kind of learned along the way and evolved from first drilling a 2-well pad and then a 3-well pad and then 2 2- well pads together. So we've been building up to this kind of larger-scale development mode, and we're very excited about what we're seeing. And I think that's the power of what are causing things like the first quarter and the results we had there. |
| A-16 | May 2018 Citi Global Energy and Utilities Conference | But I don't really view it as a dramatic change to development mode. Like I said, it's kind of an evolution going from 2-well pads to 3-well pads to 6-well projects to 8-well. So I think there's been an evolutionary - I don't think you can kind of see a switch get flipped. It's been a long time coming. We give quarterly guidance because of the - trying to give visibility into our business. And so I think that, plus the annual guidance, is a good way. We try to be very thoughtful in kind of showing you how we get there on an annual basis. But I don't expect there to be some big step change and all that. |
| A-17 | May 2018 Citi Global Energy and Utilities Conference | Giraud: I think, we're -- from the areas that we're focused on, I'll turn to this slide where we've kind of highlighted the different major pad projects that we're doing in '18 and '19. And the takeaway, I hope, from that map is, we're doing that everywhere. We're doing it in the Midland Basin, the Southern Delaware and the Northern Delaware. And what's nice about the RSP assets and what really attracted us to them is, they are already assembled and ready for this style of development. I think you can look at this map and see that while we have big blocks in Northern Delaware, there's work to be done still up there consolidating the overall position. But we're in a relative light [sic] stage in terms of under – we've kind of come through discovery, we've gone through delineation and now we're into development mode. And so in those different 3 main assets [Midland Basin, Southern Delaware, and Northern Delaware], we're there. But what I don't want to leave you with the impression is that we're not still learning. We did that fiber-optics project up on the Mabee Ranch, 13 well pad. And from that, we've learned some things that have caused us to tweak our completion design, actually make a little bit lower costs. So we continue to learn and then can move those learnings around to the other basins quickly. And so there's still work being done, but I think what we're seeing is, we think we know. And so we think we know in the Midland Basin how you need to match up the optimal spacing development of the Middle Spraberry, the Lower Spraberry, the Wolfcamp A and the Wolfcamp B. And we think we know what the spacing needs to be in all those and how you ought to develop it. But – so that specific example, I think, we're farther down the line. We're in a later stage of innings. But I think it's worth noting that there's still discovery and delineation work happening on our assets and around the Permian. I mean, just this last quarter, you saw RSP talk about the Jo Mill on their assets, and that's not a |

| | | zone we've historically targeted, that's not part of that stack that I just talked about. So there's still discovery and delineation work happening. I think there's still opportunity. We've tried to kind of highlight a little bit how we're thinking about that. This last quarter we talked about multiple landings in the Bone Spring over in Eddy County. We've talked about multiple landings in the Bone Spring and Lea County before. So there's still discovery and delineation of additional resource and still at figuring out what the optimal kind of development stack is. I've never been very good at predicting the innings. I think we've historically been more conservative, and we're not very good at predicting additional operational efficiencies that we can gain out into the future. So... |
|---|---|---|
| A-18 | Q2    2018 Earnings Call | We talked about reaching inflection points in the past. The shift to horizontal development in 2011 is one example. Establishing a position in the Northern Delaware is another. And it was about a year ago that we described another inflection point, our progression to large-scale development. Horizontal drilling in the Northern Delaware turned out to be huge value drivers for the company. And we believe manufacturing mode will do the same thing. This transition has been one of our most important operational and strategic priorities. |
| A-19 | Q2    2018 Earnings Call Deck | "Concho provided investor with a presentation to accompany the 2Q 2018 Earnings Call" which "claimed that 'manufacturing mode' 'unlocks signficant [sic] value' and 'optimizes well performance and increases resource reovery [sic].'" (Presentation slides not included in the Complaint). |
| A-20 | September 2018 Barclays CEO Energy Power Conference | And those things I talked about that we are focused on that have created strategic advantages for us, I want to touch on those. The execution of my team, that's what allows us to run this large capital program and run these rigs. The asset base that we have built over the last decade provides balance both in the Midland Basin and in the Delaware Basin and it also gives us an inventory of premium locations that we have multiple decades of this type of drilling to do. Capital efficiency, we have focused on both sides of the efficiency equation. Our wells are continuing to get better and the costs continue to become more efficient, and we manage the cost side of the equation as well. That's what allows us to generate growth and free cash flow. And growth and free cash flow are going to be the name of the game for the next decade. We'll spend some time talking about that. |
| A-21 | September 2018 Barclays CEO Energy Power Conference | So what I really want to focus on today in my remarks are the execution, strength and scale that our company has and that our team has built. And I want to talk about it in the terms of what it means to us and why does it matter. And the - it really falls into three different buckets. There's the operational bucket, there's also the building for the future and how do you manage risk. And so the allocation of capital is probably the most important thing that our team does and the most important thing that we do that creates success for the company. That's what drives our production growth and free cash flow. Also, we run a very large and stable ship. This allows us to balance risk and kind of plow through the volatility of our business. As we're drilling these wells, we try to create a virtuous learning cycle, where we are continuing to learn as we drill. And, yes, I know that you probably heard it in this conference that maybe that we are at the end of gains and efficiency and improvements. And I would tell you, I think, we're at an inflection point. And the inflection point is probably just as important as when I stood up here |

| | | and described an inflection point of going from vertical drilling to horizontal drilling in Permian several years ago, there's also an inflection point in our business, where we went from -- into the Delaware Basin and our team described why we thought the rock in the Delaware Basin were some of the best rock we've seen anywhere and why we were accumulating assets in the Delaware. Well, that type of efficiency and technology comes out of the wells that we're drilling and I'm telling you, I think, we are at a new inflection point. We also in execution and scale, focus on building for the future, and the assets that we've accumulated and the size and scale of those assets, and finally, the management of risk is, basically goes into the category, it's always something. We've had periods in the past, where whether it's weather or sand or frac spreads, this is a volatile business. The size and scale helps us manage the risk of those business. I'll spend some time talking about that. |
|---|---|---|
| A-22 | September 2018 Barclays CEO Energy Power Conference | At the same time, I will tell you, as the company has grown, our philosophy of having a portfolio approach to mitigate risk is going to apply to this as well. |
| A-23 | September 2018 Barclays CEO Energy Power Conference | So this inflection point that I was talking about is driven by manufacturing mode. And we increasingly are approaching developing our properties, not only from four different dimensions basically, there's a horizontal dimension, the vertical dimension, the sequencing between zones and the timing of what some in the industry call mowing the grass. So you do this to minimize the pressure syncs that create parent/child relationships between wells. This is the future of our business. And this transition to this style of development is just as important, I believe, as the transition we went through for horizontal drilling.<br><br>This is going to be a value creator and it optimizes recoveries, optimizes economics and reduces stranded wells. |
| A-24 | Q3   2018 Earnings Release | We have been disciplined over the last several years - generating free cash flow, prudently growing oil production, reducing our cost structure and building for the future with accretive acquisitions and strategic portfolio management. These efforts position us well for the next stage of our company, which includes delivering high-margin oil growth and initiating a return-of- capital strategy to our shareholders. We are a growth company, and our platform for delivering growth, demonstrating the benefits of scale and enhancing shareholder value, has never been better." |
| A-25 | Q3   2018 Earnings Call | I think the drilling side of our business is one of the best parts of our business. And I think the way we have approached that in the past will continue. I mean, you can see that it doesn't require that much of a growth in rigs to accomplish all the future, not just for '19 and '20, but beyond. So, by drilling longer laterals and the spacing we're using, the efficiency and all that, you can get a whole lot more done. And we do have rigs that now are on 6-months contracts or 1-year contracts but we do have kind of a portfolio approach on that. But I don't think you should expect us to - any change in strategy based on what we're seeing today. |

| A-26 | Q3    2018 Earnings Call | Analyst: I want to kind of take another run at that theme that Derrick had on his last question. So, as you guys are transitioning to these larger-scale pads, are there - the efficiencies, I think you guys have done a good job explaining, and I think the market's on top of that. But are there any challenges that are emerging, either ones that you anticipated or ones that you didn't anticipate that could lead to some nonobvious outcomes either in your CapEx profile quarter-to-quarter or your production ramp?<br><br>Harper: Sure. Yes, these large- scale projects, they really emphasize planning and planning ahead. And our team has done a good job of that. I think we're out in front, out here in the industry on this. So, yeah, there are midstream considerations, there's water delivery, there's water disposal, there's a lot of considerations, but - which typically can require up to a year of planning. And again, our team's doing a great job in managing that. And so, while there are challenges, we're up to it. And that is why we're increasing the percentage of capital towards this kind of projects. |
| A-27[12] | Q3    2018 Earnings Call | Analyst: Thanks. Appreciate the time. Yeah. There continues to be a lot of discussion about impacts of bounded versus unbounded well productivity on these pads in the Permian. What are you guys seeing on that front? And I guess how are you contemplating kind of parent-child relationships in the plan you've laid out? And how might that evolve as you think about moving more and more to these larger-scale projects?<br><br>Giraud: Sure. Big driver on going to these large-scale projects are; one, we think maximizing the resource by minimizing the impact of the parent-child effect; and then also getting the benefits on the capital side from efficiency. So those are kind of the two big drivers behind going to project development. As it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling based upon the results we have seen here. So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that we're talking about for 2019 and 2020.<br><br>Analyst: Okay. And do you have a kind of estimate of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship?<br><br>Giraud: Yes. We definitely baked that into all of our plans and our forecast.<br><br>Analyst: Is that something you'd be willing to share. |

---

[12] Defendants separated certain sentences into Category D. Those sentences included "[a]s it relates to kind of what we're seeing compared to what we're expecting, we have built our type curves and our internal modeling based upon the results we have seen here. So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that we're talking about for '19 and '20," as well as "Analyst: Okay. And do you have a kind of estimate of how you think about or how your programming in the relationship between single-well pad development versus multi-well pad development in that parent-child relationship? Giraud: Yes. We definitely bake that into all of our plans and our forecast." The Court believes removing these sentences affects the alleged genericness of the statement. Thus, the Court has reintegrated the sentences into A-27, as originally pleaded by Plaintiffs.

|  |  | Leach: It's different by zone and different by area. And it's extremely complicated. And we're developing a program to minimize it. I'm not sure that any company in any location can completely eliminate that because you always have edges of your leases and things like that. But I think with our asset base and the big blocky nature of our assets and the way we're prosecuting our development program, we're in the best position to kind of minimize that effect. And we think we have it estimated very well. |
|---|---|---|
| A-28 | 2018 Form 10-K | Multi-well pad drilling and project development may result in volatility in our operating results. We utilize multi-well pad drilling and project development where practical. Project development may involve more than one multi-well pad being drilled and completed at one time in a relatively confined area. Wells drilled on a pad or in a project may not be brought into production until all wells on the pad or project are drilled and completed. Problems affecting one pad or a single well could adversely affect production from all of the wells on the pad or in the entire project. As a result, multi-well pad drilling and project development can cause delays in the scheduled commencement of production, or interruptions in ongoing production. These delays or interruptions may cause declines or volatility in our operating results due to timing as well as declines in oil and natural gas prices. Further, any delay, reduction or curtailment of our development and producing operations, due to operational delays caused by multi-well pad drilling or project development, or otherwise, could result in the loss of acreage through lease expirations. |
| A-29[13] | Q4 & FY 2018 Earnings Call | Operationally, things are proceeding as planned. During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin. We continued to advance our style of returns-centric development, which focuses on large-scale and multi-well projects across our asset base. Our project results continued to demonstrate the prudence of this approach, which mitigates parent-child impacts, drives operational efficiencies and maximizes the long-term value of our investments. |
| A-30[14] | Q4 & FY 2018 Earnings Call | Analyst: Great, thanks. Maybe just a question on the large scale projects, you've seen strong results to-date on the various projects that you've developed. Can you provide any additional color on takeaways that you're seeing from these projects whether regarding proper development of multiple horizons, efficiency gains, potential impact to parent-child dynamics and well productivity things like this? |

[13] Defendants separated the first sentence into Category B ("Operationally, things are proceeding as planned. During the fourth quarter, we ran 34 rigs, one of the largest programs in the basin. We continued to advance our style of returns-centric development, which focuses on large-scale and multi-well projects across our asset base."). While the addition of this sentence does not affect the genericness of the statement as separated by Defendant, the Court still considers Defendants' Category B objection—that there is a substantive mismatch between the Category B statements and the Corrective Disclosure. For the same reasons articulated below, there is no substantive mismatch between the Corrective Disclosure and this statement.

[14] Defendants separated a fragment of one sentence into Category B. With respect to part of the sentence ("I'll just say we're obviously very pleased with what we're seeing and in terms of what we're expecting to see,"), Defendants contend that they have severed price impact between there is a substantive mismatch between the Category B statements and the Corrective Disclosure. As for the rest of the statement, Defendants contend it is too generic to support an inference of reliance. The Court again notes that Defendants' cherry-picking of certain statements is impermissible. It also disagrees with both contentions for the reasons outlined below.

| | | |
|---|---|---|
| | | Leach: Sure, I mean, while it's still early it's been a slow evolution for us into these larger and larger project sizes. I'll just say we're obviously very pleased with what we're seeing and in terms of what we're expecting to see, and I think we also double downed on the necessity of doing it this way and that this is the better way to do it. I'm modestly optimistic with over measured in periods and years, we will continue to find more efficiencies out of doing it that way, in addition to just the base reasons to do it around mitigating parent-child impacts, things like that. |
| A-31 | Q4 & FY 2018 Earnings Call | Analyst: Okay. And – but I guess what I'm asking is what is it about 2020 that's going to make that performance even if the commodity assumption is lower? Is it just this continued push towards bigger and bigger projects and longer laterals, sort of what are some of the variables there?<br><br>Harper: Sure, I mean, our focus will be on the most efficient deployment of our capital under any circumstance, and that is further highlighted the lower the commodity prices, and I think it's actually an opportunity for us to differentiate ourselves. But you're right, it's making our investment better through large project development, lateral placement within the zones, well spacing all of the small knobs that can now be turned to increased efficiency |
| A-32 | March 2019 Raymond James Institutional Investors Conference | Harper: Sure. So the question was, what do we not know about well spacing and sand loading, and there's always a lot to learn. I think we're at an advantage because we've drilled more wells than anybody else and have empirical data to look at. And also, we study what our peers do. I'll tell you what we do know about sand loading is we have reached diminishing returns in some of our areas and even seen sand loading come down. So economically, when you can spend less and get a similar result, it increases the rate of return, so that's positive. Our well spacing, it's an extremely complicated multivariable equation that does take a lot of time to fully understand. I would remind people that we have historically been pretty conservative on the way we've accounted for inventory and well spacing, and I'm thankful that, that's been our view up till now. |
| A-33[15] | Q1 2019 Earnings Call | And so I think that's the exciting thing about what we've been able to do and are going to continue to do as - deliver really compelling returns while continuing to learn. |

In their attempt to sever the link between each alleged misstatement and the price impact, Defendants rely heavily on an ongoing analogy between the alleged misstatements in *Goldman I* and the alleged misstatements in the case at bar. (Doc. No. 68 at 14). In *Goldman I*, the Supreme Court explained that a gap between misrepresentation and corrective disclosure reduces the likelihood that investors would understand the "specific disclosure [to have] actually corrected

---

[15] Defendants categorized the rest of this statement into Category D. As Defendants do not contest reliance on any part of the statement except the sentence listed as A-33 above, the Court will focus solely on that sentence.

the generic misrepresentation," and, in such a scenario, the back-end-front-end inference starts to break down. *Goldman I*, 594 U.S. at 123.

The *Goldman I* Court provided an example of such a "mismatch." The Court explained that a "mismatch" occurs "when the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')." *Id.* "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* Courts must perform this analysis at the class certification stage. *Id.* at 122.

In cases based on an inflation-maintenance theory, "a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place." *Goldman II*, 77 F.4th at 102. The central focus, in other words, is to ensure that the front-end disclosure and back-end event stand on equal footing; a mismatch in specificity between the two undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure. *Id.*

To demonstrate a lack of price impact, Defendants rely, in part, on their expert, Lucy P Allen ("Allen"), who testified live at the evidentiary hearing. Plaintiffs moved to exclude Allen's opinions (Doc. No. 85), and this motion was denied, for the most part, in a separate order. As such, the Court will consider, but not necessarily adopt, the majority of Allen's opinions in assessing the issues regarding Rule 23's predominance requirement.[16]

---

[16] The Court also considers, but does not necessarily adopt, portions of the testimony and opinions of Plaintiffs' expert, Chad Coffman.

As noted above, the parties adamantly dispute whether the Category A statements are generic. The Court may consider expert testimony regarding the generic nature of a statement, such as Allen's testimony, but may also use its "common sense in assessing whether a generic misrepresentation had a price impact." *Goldman I*, 141 S. Ct. at 1960. Attempting to sever the link between the back-end price impact and the misstatements, Allen analyzed the alleged misrepresentations in Category A and determined that they are "generic." As detailed above, her content analysis determined that none of the analysts referenced the alleged misstatements, nor did any analyst make a connection between the alleged misstatement and the corrective disclosure.

Defendants invite the Court to follow the Eastern District of Michigan's decision in *Shupe v. Rocket Companies, Inc.*, No. 1:21-CV-11528, 2024 WL 4349172 (E.D. Mich. Sept. 30, 2024).[17] In *Shupe*, the court found that the defendants successfully rebutted the *Basic* presumption by demonstrating that the alleged misrepresentations did not have an impact on the price of the company's stock. *Id.* at *26. The expert in *Shupe* opined, like Allen, that if the defendants' alleged misrepresentations had a price impact, those statements "would have been at least referenced in relevant sell-side analyst reports." *Id.* at *25. That court agreed with defendants' expert, calling the lack of reference to the alleged misrepresentations in reports issued throughout the class period "fatal" to plaintiff's class action hopes. *Id.* at *26.

Here, Lead Plaintiff's expert, Coffman, submitted a rebuttal report to Allen's conclusions and also testified live at the evidentiary hearing. He contends that Allen's "genericness" approach to the Category A statements (when assessing the analyst reports from the days after the alleged misrepresentation) "conflates a lack of change in price target from analyst coverage

---

[17] Notably, *Shupe* involved one of the Lead Plaintiffs, Construction Laborer's Pension Trust for Southern California, and the same Lead Plaintiffs' counsel as in this case.

with lack of relevance of the value of the information to the company's stock price." (Doc. No. 103-1 at 75). The Court agrees, as a general proposition, that there is little incentive for an analyst to reference an alleged misrepresentation if the alleged misrepresentations were supposedly intended to maintain the status quo. Significantly, on cross examination, Allen agreed that "in an efficient market, only new news should affect the stock price." (Doc. No. 109 at 202). After all, why would old news be newsworthy? While a lack of reference to the alleged misrepresentations may be some evidence that the misstatements are generic, it is not dispositive. Thus, the Court declines Defendants' invitation to blindly follow the reasoning in *Shupe*.

Nevertheless, the Court agrees with Defendants that they have successfully severed the link between some, but not all, of the Category A statements and the price of the stock. *See Basic*, 485 U.S. at 248. As discussed above, the Supreme Court in *Goldman I* found that the front-end-back-end price impact inference starts to break down then there is a mismatch between the generic alleged misrepresentations and the specific alleged corrective disclosure. *Goldman I*, 594 U.S. at 123. The statements at issue in *Goldman I* included:

- "We have extensive procedures and controls that are designed to identify and address conflicts of interest."

- "Our clients' interests always come first."

- "Integrity and honesty are at the heart of our business."

*Id.* at 120. The *Goldman I* defendants argued that these statements were "business principles" that equated to mere puffery, rather than statements that could be false and misleading to support a securities fraud action. Some, but not all, of the Category A statements similarly fall into the category of being general business principles and/or puffery.[18] The Court finds the following

---

[18] Plaintiffs argue that Defendants' reliance on *Goldman I* to support its "puffery" argument is irrelevant because "Defendants already raised this argument within their motion to dismiss and the Court rejected those very arguments." (Doc. No. 80 at 15). This Court previously adopted the majority of Magistrate Judge Sheldon's Report

Category A statements fall into that category: A-1, A-2, A-3, A-4, A-5, A-6, A-10, A-11, A-13, A-18, A-21, A-22, A-24, A-25, A-26, and A-31. Thus, Defendants have successfully "sever[ed] the link between back-end price drop and front-end misrepresentation" as to those statements. The remaining Category A statements are not so generic as to cause a mismatch; and, as to those statements, Defendants have failed to sever the link, at least at this stage. Therefore, the Court finds that individual issues of reliance will not predominate as to the remaining Category A statements.

     *ii.*   *Categories B and C – Substantive mismatch*

Defendants also contend that there is a mismatch between the representations in Category B and C and the Corrective Disclosure such that the Corrective Disclosure cannot substantively correct the alleged misstatement. Defendants contend the Category B cannot be corrected by the corrective disclosures because "Concho's second quarter 2019 results cannot be attributed to factual observations about periods from months before." (Doc. No. 68 at 24). The Category B statements are as follows:

| Number | Source | Statement |
|---|---|---|
| B-1 | Q4 & FY 2017 Earnings Release | Delivered outstanding results from the Company's large-scale development projects in the Northern and Southern Delaware Basin and in the Midland Basin. |
| B-2 | Q4 2017 Earnings Call | Analyst: So in terms of -- I guess you don't give a type curve as such, but as we look at the sort of productivity per lateral foot, I guess the best to think about your business, you don't see any degradation there at all.<br><br>Harper: Well, we've modeled the outcome as we see it based on the spacing that has either already happened or will happen in the future. |

---

and Recommendation. (Doc. No. 43). In his Report and Recommendation addressing Defendants motion to dismiss, Magistrate Judge Sheldon stated that "Defendants' puffery argument is without merit." (Doc. No. 38 at 31). This Court writes to reiterate that Plaintiffs pleading burden under Federal Rule of Civil Procedure 8 is independent from its burden under Federal Rule of Civil Procedure 23. Thus, while Defendants' puffery argument may have failed at the motion to dismiss stage, it does not necessarily follow that it must fail at the class certification stage.

| B-3 | March 2018 Raymond James Institutional Investors Conference | We've highlighted here on the left side of the page a couple of the upcoming large-scale projects and really just to show you that where some of them are. They're very dispersed amongst our asset base. And they are, in some cases, getting larger. We have a 20- plus well pad or project on here that we'll begin this year, but don't plan to see production until next year on that.<br><br> |
| --- | --- | --- |
| B-4 | Q1   2018 Earnings Call Deck | "The accompanying presentation to the May 2, 2018 earnings call incorporated an infographic map depicting Concho's 'Key Projects' for 2018 and 2019, all of which were multi-well and multi-zone projects, including the Dominator, a '20+ well multi-zone project' in the Northern Delaware Basin |
| B-5 | Q2   2018 Earnings Call | I think we've been one of the leaders in moving to these larger-scale development projects. And that's been a steady evolution over the last couple of years as we've tested different spacing between -- within a zone and between zones. And so these bigger and bigger projects, I think, are just the further evolution of that trend. Where you see some of the smaller projects, that's us continuing to test tighter spacing or different spacing within a zone or between zones, again. And so I think you're right. Longer term, you'll see an evolution to the bigger and bigger projects. However, we're still learning as we go. And so I think you'll see a blend of different sizes. |
| B-6 | September 2018 Barclays CEO Energy Power Conference | So as we drill these wells, we don't – we're not stamping out wells. Every one of these areas is – the rock is different and what we're going for is precision. And we are collecting a lot of information. This is just one example of – when you look over the past several years and you look at lateral length, what the average lateral length for the company has done, the stages per well for the company, what that's done, but then you look at the productivity. And you can see that we've been increasing the lateral length, we've been increasing the stages, but you can also notice that they kind of plateaued out in 2018. We have found the length that, we think, is optimal for these projects that we're drilling today. But look what's happening to the productivity of our wells. And this is an example of why that productivity continues to go up. This is the geo model for the Mabee area. That was driven a lot by fiber optics and by seismic. But I'm telling you, we've got a geo model like this for every area that we're drilling and it allows us, you probably can't see it on the screen, but the package is out there. You can see what the predrill well plan was. And then as we had this information, and we were using real-time information to |

| | | steer the well, how it helped us guide the well into the best rock, it allowed us to drill a 13,000-foot well with 1 drill bit. And so this kind of geo model is what we're using in every one of our areas to continue to increase the productivity and efficiency of the wells. So I really think, I mean, if you heard at this conference that the shale in the Permian is kind of reaching the end of the efficiency gain cycle, I completely disagree with that. I think that this transition to this type of development mode for the companies that can do it will continue to drive better and better productivity. |
|------|-----------|-----------------------------------------------------------------|
| B-7 | September 2018 Barclays CEO Energy Power Conference | And I can tell you more and more those projects are going to be multi-well pads. We started out a few years ago that it was 2, 3, 4 wells a pad. We're right now – this is probably the extreme example, but the Dominator project in Lea County, New Mexico, is 23 wells being drilled by 7 rigs all at the same time on 1 section of land. That's probably going to be the most aggressive multi-well pad that we drill. Probably going forward, a normal development will be 8 to 12 wells per pad. So that kind of capital efficiency would generate free cash flow for us. |
| B-8 | Q3 2018 Earnings Call | Analyst: Got it. And perhaps for Will, with the understanding that you guys are still in the relatively early stages of large-scale development, are there any generalizations you can make regarding efficiencies, gain or challenges experienced? I know that you guys recently talked about sequencing and timing in your Barclays presentation.<br><br>Giraud: Sure. I mean, we continue to experiment with different completion designs, timings, spacing. There's still a lot of learning to be done there. But I mean, early benefits, I think you see it in 2019 and 2020 program and you see it in the confidence of making these average projects sizes bigger over time. We like what we're seeing. We like the benefits we get of efficiency with our vendors of concentrating that much activity in one spot. And we like the results we're getting out of them. So more to come. |
| B-9 | Q4 & FY 2018 Earnings Call | Analyst: Good morning, everyone. Just wanted to follow up on the last question on well performance improvements, can you speak to how much you think the well performance improvements have come from optimizing spacing and well design aside from -- and things targeting on the reservoir, as opposed to just completion design modifications?<br><br>Leach: That's a little hard to describe in a brief way. But certainly what -- I think what we're pleased by is that as we moved into this large-scale project development. We're seeing the results we expect and it's enabling us to do some pretty interesting things from testing and continuing to understand the best way to do it. |

Likewise, Defendants contend that there is a substantive mismatch between the representations in Category C and the Corrective Disclosure. Defendants argue that the Category C statements cannot be corrected by the alleged Corrective Disclosure because the Category C statements involved financial projections for 2018, whereas the alleged Corrective Disclosure

concerned results for the second quarter of 2019. (Doc. No. 68 at 25). The Category C statements are as follows:

| Number | Source | Statement |
|---|---|---|
| C-1 | March 2018 Raymond James Institutional Investors Conference | Here, let's talk about the 2018 budget for just a moment.... Well, first of all, before we go there, let me say you should expect more of the same in '18 as you saw in previous years from Concho. It's going to be a budget focused on reinvesting our cash flow and an increased percentage of capital going towards these larger-scale projects that we've been describing to you. |
| C-2 | Q4 & FY 2017 Earnings Release | Concho expects 2018 capital spending to be at the midpoint of its capital guidance range of $1.9 billion to $2.1 billion, which reflects the Company's current outlook for service cost inflation. The 2018 capital program is expected to be funded with cash flows from operations and generate 20% crude oil growth and 16% to 20% total production growth year-over-year. Approximately 93% of the capital program is allocated to drilling and completion activities, with approximately 65% of that capital directed towards large-scale manufacturing projects. The Company's 2018 capital program is allocated among the following areas: Northern Delaware Basin (40%), Southern Delaware Basin (25%), Midland Basin (30%) and the New Mexico Shelf (5%). |
| C-3 | Q4 2017 Earnings Call | As we look to 2018, our total capital investment is expected to be $2 billion, with 93% allocated for drilling and completion activity. This level of investment is expected to grow oil approximately 20%. Importantly, approximately two-thirds of our development capital will be directed to large-scale, multi-zone projects.<br><br>In general, when we give guidance, we try to forecast the things that we're aware of at the time we give the guidance. |
| C-4 | Q4 & FY 2017 Earnings Release | The Company provided a new three-year production growth outlook. Concho expects to grow total production at a compound annual growth rate of 20% from 2017 to 2020. The outlook reflects the Company's high-quality production base and strong operating momentum. Additionally, the Company expects to deliver this growth within cash flows from operations at an average crude oil price (WTI) in the low-to-mid $50 per barrel range over the duration of the outlook.<br><br>As with the Company's 2018 outlook, growth over the three-year period from 2017 to 2020 is the output of reinvesting high-margin cash flow into its drilling program. |
| C-5 | Q4 & FY 2017 Earnings Release | At December 31, 2017, Concho's estimated proved reserves totaled 840 MMBoe, an increase of 17% from year-end 2016. The Company's proved reserves are approximately 60% crude oil and 40% natural gas. Proved developed reserves totaled 588 MMBoe, an increase of 26% from year-end 2016. The Company's proved developed reserves represent approximately 70% of total proved reserves. |

|  |  | During 2017, Concho added 194 MMBoe of proved reserves primarily from drilling and completion operations, resulting in a reserve replacement ratio of 275%. The Company's proved developed finding and development cost was $8.68 per Boe for 2017. |
| C-6 | 2017 Form 10-K | At December 31, 2017, substantially all of our 840 MMBoe total estimated proved reserves were located in our core operating areas and consisted of approximately 60 percent oil and 40 percent natural gas. We have assembled a multi-year inventory of horizontal development and exploration projects across our four core operating areas.<br><br>***<br><br>Northern Delaware Basin. At December 31, 2017, we had estimated proved reserves in this area of 295 MMBoe, representing 35 percent of our total proved reserves.<br><br>***<br><br>Southern Delaware Basin. At December 31, 2017, we had estimated proved reserves in this area of 128 MMBoe, representing 15 percent of our total proved reserves |
| C-7 | March 2018 Investor Call | We will run the largest development program in the Permian and our combined position will be more than 640,000 net acres... I expect Concho to capture both operational synergies and corporate level savings. These synergies, which are estimated to have a present value exceeding $2 billion derive from the highly complementary and blocky nature of these assets.... In addition to operational synergies, there are financial benefits we expect from corporate level savings. And those come from the areas you would expect, including the overlapping public company cost and financing cost. In all, we estimate annual corporate cost savings of $60 million. |
| C-8 | March 2018 Investor Call | In addition to our size, scale and execution strength provide us with the unique ability to capitalize on these new complementary assets. This ability includes moving these assets into manufacturing mode, which generates cost savings and minimizes parent-child locations. |
| C-9 | March 2018 Investor Call | Yes. We've said in total, Scott, that it's in excess of $2 billion, and Tim really hit on the keys. It's long lateral, it's large-scale development, it's preventing the parent-child relationship with larger-scale development, it's that shared infrastructure. So those are the key drivers. And there's good value in each one of those. |

Again, the "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 594 U.S. at 123. Rather than a mismatch due to the generic nature of the statement, Defendants contend there is a substantive mismatch between the Corrective Disclosure and the alleged misrepresentation in Categories B and C.

41

As for the Category B statements, Defendants contend that the statements "describe operation facts and financial results from the fourth quarter of 2017 through the end of 2018." (Doc. No. 68 at 24). As such, the Corrective Disclosure could not have corrected any of the Category B statements because the Corrective Disclosure stated Concho's financial results for the second quarter of 2019. (*Id.*). The price movement following the Corrective Disclosure, therefore, cannot be attributed to the Category B statements regarding quarters from months earlier. (*Id.*). Thus, Defendants conclude that, because there is a mismatch between the contents of the misrepresentation and the Corrective Disclosure, they have successfully rebutted the *Basic* presumption by severing the link between price impact and the alleged misrepresentation in Category B.

Conversely, Plaintiffs contend that Defendants' argument misconstrues and misinterprets Plaintiffs' allegations. (Doc. No. 80 at 18). As stated above, Plaintiffs argue that the Corrective Disclosure corrects the Category B misstatements by revealing the omitted/concealed truth: that Concho continued to claim it had proven manufacturing mode methodologies when in reality they did not and needed to go "back to the drawing board on well spacing." (Doc. No. 109 at 273). Plaintiffs state that Defendants' repeatedly and baselessly "touted the benefits of the 'large-scale project development." (Doc. No. 80 at 19). Since Defendants had no evidence to support, or misrepresented, the evidence of the benefits of the large-scale project development, Lead Plaintiffs conclude that the Category B statements were subsequently corrected "upon revelation of Concho's well-spacing woes." (*Id.*). Specifically, the Corrective Disclosure revealed that Concho had to halve its active rig count while keeping its budget the same, which Lead Plaintiffs argue corrects the earlier statements that the large-scale project developments were generating cost savings for the company. (*Id.* at 18).

The Court agrees with Plaintiffs with respect to a some of the Category B statements. If Plaintiffs relied solely on Concho's financial results for the second quarter 2019 as its corrective disclosure, the Court would be more persuaded by Defendants' argument that 2019 results cannot correct any of the 2017 and 2018 statements. Importantly, Plaintiffs rely on more than just the 2019 second quarter results. Plaintiffs also rely on the statements in the Corrective Disclosure that suggest that the manufacturing mode was not as efficient or proven as previously publicized. Therefore, there is not a substantive mismatch between the Corrective Disclosure and statements B-2, B-6, B-7, B-8, and B-9 above.

Nevertheless, the Court agrees with Defendants that there is a mismatch between the contents of the remaining Category B statements and the Corrective Disclosure. The remaining statements involve the actual results from 2017 and/or 2018 or otherwise discuss the switch to manufacturing mode generally. The Corrective Disclosure, therefore, does not actually correct these statements by disclosing the 2019 second quarter results, the decline in the number of active rigs, or that the Dominator's well spacing was too tight. Thus, Defendants have successfully "sever[ed] the link between back-end price drop and front-end misrepresentation" as to statements B-1, B-3, B-4, and B-5.

With respect to Category C, Defendants suggest there is a substantive mismatch between the statements and the Corrective Disclosure because: 1) statements C-1, C-2, and C-3 are financial projections of what Defendants expected to occur during the year 2018 and the alleged corrective disclosures pertain to results for the second quarter of 2019; 2) Statements C-4, C-5, and C-6 are projections for 2017 through 2020 that Concho met and therefore could not be corrected by the Corrective Disclosure; and 3) Statements C-7, C-8, and C-9 concern synergies

43

that Concho expected to obtain from its merger with RSP in early 2018 and the Corrective
Disclosure makes no mention of the merger. (Doc. No. 68 at 25–26).

On the other hand, Plaintiffs again argue that Defendants misinterpret its pleading.
Plaintiffs allege "that Defendants' statements with respect to Concho's forecasts were misleading
because they repeatedly represented that they were conservative and followed historical norms
(untrue on both fronts, among others)." (Doc. No. 80 at 20). Plaintiffs state that these
misrepresentations were subsequently corrected by the Corrective Disclosure, which "informed
investors of a financial condition dramatically different than what investors were led to expect."
(*Id.*).

Even assuming the Category C statements are misrepresentations, there is a substantive
mismatch between the Category C misstatements and the Corrective Disclosure. As noted above,
the Corrective Disclosure discusses, *inter alia*, 2019 second quarter results, the decline in the
number of active rigs, and that the Dominator's well spacing was too tight. Plaintiffs contend
that investors were led to expect "more of the same," and the Corrective Disclosure corrects that
statement because Concho reported "disappointing" results. In drawing this conclusion, Plaintiffs
reference statement C-1, in which investors were told to "expect more of the same in '18." The
Corrective Disclosure, however, only relays the financial results for the second quarter of 2019.
A statement to expect "more of the same" in one year cannot be corrected by a statement
regarding the results in a different year.

Moreover, the remaining Category C statements are not corrected by the Corrective
Disclosure. The statements do not pertain to the financial results for the second quarter of 2019.
The Corrective Disclosure does not even implicitly mention the RSP Acquisition referenced in
the remaining Category C statements. As such, Defendants have successfully "sever[ed] the link

44

between back-end price drop and front-end misrepresentation" as to statements C-1, C-2, C-3, C-4, C-5, C-6, C-7, C-8, and C-9.

In conclusion, Defendants have failed to rebut the *Basic* presumption for certain Category A and B statements, and all Category D statements.[19] Thus, with respect to those remaining statements, Plaintiffs have met their burden under Rule 23(b)(3) to show that questions of reliance common to class members predominate over any questions affecting only individual members.

### 2. Plaintiff's damages model

#### i. *In general*

Now, moving away from reliance and the issue of front-end impact via the inflation-maintenance theory, the Court addresses Defendants' second issue regarding predominance—damages. Defendants argue that Plaintiffs have not demonstrated that damages can be calculated on a class-wide basis. As such, Defendants conclude that Rule 23(b)(3)'s predominance requirement is not satisfied, and the Court should not certify the class.

Defendants contend that, with respect to Lead Plaintiffs' damages model, Lead Plaintiffs are proceeding on a "materialization-of-the-risk theory" of loss causation.[20] For avoidance of doubt, inflation-maintenance theory, discussed above, is considered as part of the element of reliance, which is sometimes referred to as "transaction causation." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015). Materialization of the risk (and the later discussed corrective disclosure theory), on the other hand, are considered as theories of the loss causation element of

---

[19] The following alleged misrepresentations, as numbered above, remain: A-7, A-8, A-9, A-12, A-14, A-15, A-16, A-17, A-19, A-20, A-23, A-27, A-28, A-29, A-30, A-32, A-33, B-2, B-6, B-7, B-8, B-9, D-1, D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9, D-10, D-11, D-12, D-13, D-14, and D-15.

[20] Plaintiffs need not prove loss causation at the class certification stage. *Halliburton I*, 563 U.S. at 813. Plaintiffs are required, however, to demonstrate that their proposed damages model is consistent with their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

a § 10b cause of action. *Id.* "Loss causation is a legal requirement distinct from reliance that demands a causal connection between the misstatement and claimed economic loss." *Id.* at 681–82. Though easy to conflate the two theories (inflation-maintenance versus materialization of the risk), the Fifth Circuit has explained that "[i]t is helpful to focus on three 'occurrences'—the misrepresentation, security transaction, and economic loss—and two 'relationships,' transaction causation, which links the misrepresentation and security transaction, and loss causation, which connects the misrepresentation to the economic loss." *Id.* at 681. The Supreme Court has further explained that transaction causation (*i.e.* reliance) focuses on the "facts surrounding the investor's decision to engage in the transaction," whereas loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 563 U.S. at 812 (emphasis in original). Thus, our focus now shifts from the time an investor purchased Concho stock at an allegedly inflated price to the drop in the stock's price after the Corrective Disclosure that allegedly caused the damage.

As noted above, Plaintiffs are required to demonstrate that their proposed damages model is consistent with their theory of liability. *Comcast*, 569 U.S. at 35. Defendants contend that Plaintiffs have failed to meet their burden in this respect, relying heavily on a case from this District involving the BP securities litigation. *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6388408, at *16 (S.D. Tex. Dec. 6, 2013) ("*BP I*"). The *BP I* court held that plaintiffs proceeding with a materialization of the risk theory of loss causation must provide the specifics of their proposed methodology in order for the court to determine that that methodology will track the plaintiff's theory of liability, as required by *Comcast*. *Id.* at *17.

Defendants assert that Plaintiffs are proceeding on a "materialization-of-the-risk theory" of loss causation (as defined below)—and since Plaintiffs are relying on that theory, they must

have more evidence at the class certification stage than just a plan to do an event study sometime in the future. (Doc. No. 68 at 5).[21] On the other hand, Plaintiffs explicitly state that they do not rely on a materialization-of-the-risk theory, as Defendants contend. (Doc. No. 80 at 26). Instead, Plaintiffs assert, and Plaintiffs' expert supports the claim, that Plaintiffs are proceeding solely on a "corrective disclosure" theory. (*Id.*); (Doc. No. 103-1 at 84–85). Defendants argue that Plaintiffs cannot disclaim a theory of liability pleaded in the Complaint. Plaintiffs contend that they pleaded the materialization-of-the-risk theory only in the alternative and that they have since abandoned that theory. *See* (Doc. No. 109 at 108).

The parties apparently disagree, at least to a certain extent, as to what the "materialization-of-the-risk" and "corrective disclosure" theories entail. Nevertheless, the Fifth Circuit has defined each theory. The "materialization-of-the-risk theory" is used where the "investors are harmed by [ ] corrective events that represent materializations of the risk that was improperly disclosed." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689 (5th Cir. 2015). On the other hand, the "corrective disclosure theory" is used when "a release of information [ ] reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321.

Defendants contend that Plaintiffs' Consolidated Complaint alleges only that Defendants "understated the risk," which is consistent with the definition of materialization-of-the-risk theory. While it is true that Plaintiffs use the words "materialization" and "risk" in their Complaint, Plaintiffs argue that their allegations are not based upon a risk that eventually materialized. Plaintiffs concede that the investors were aware that some risk was involved in the large-scale development projects. Indeed, risk comes with any form of investing, and perhaps

---

[21] "'Event studies' [are] regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280.

especially in the oil business—sometimes a well produces, sometimes it does not. Rather,

Plaintiffs contend that Concho misled investors into believing that it had accounted for the risk

and acted according. Specifically, Plaintiffs aver that Defendants misrepresented that Concho

had the capability to effectuate the large-scale development project when, in reality, they did not

have the requisite knowledge and experience and were forced to go "back to the drawing board

on well spacing." (Doc. No. 109 at 273). Moreover, Plaintiffs claim that Concho continued to

mislead investors throughout the Proposed Class period that it had the ability to, and was, in fact,

effectuating its large-scale development projects until it revealed the truth in the Corrective

Disclosure. These allegations are consistent with a corrective disclosure theory, which applies

when "a release of information [ ] reveals to the market the pertinent truth that was previously

concealed or obscured by the company's fraud." *Amedisys*, 769 F.3d at 321.

Several courts have already addressed and rejected similar arguments regarding

materialization of the risk theory by other defendants opposing class certification under Rule

23(b)(3). *See Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at \*15 (S.D. Tex.

Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20,

2019); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc. HQ*, 322

F. Supp. 3d 676, 692 (D. Md. 2018) ("A number of courts have rejected similar attempts by

defendants to reframe plaintiffs' theory of liability in order to prevent class certification in Rule

10(b)-5 securities fraud cases relying on the fraud-on-the-market theory of liability."); *see also

Baker v. SeaWorld Ent., Inc.*, Case. No. 14-cv-2129, 2017 WL 5885542, at \*14 (S.D. Cal. Nov.

29, 2017) (rejecting defendants' argument that plaintiffs' out-of-pocket damages calculation was

not properly tied to their theory of liability); *see also Schleicher v. Wendt*, 618 F.3d 679, 683–84

(7th Cir. 2010). For example, in *Schleicher v. Wendt*, the Seventh Circuit rejected the

48

defendants' attempt to recast the plaintiffs' fraud on the market case as a materialization of risk case, explaining that:

> Although "materialization of risk" runs like a mantra through the parties' briefs, we do not think that it has any significance . . . If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust . . . The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million . . . [but] [t]he phrase adds nothing to the analysis . . . [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.

*Schleicher*, 618 F.3d at 683–84. Here, Defendants' attempt to recast Plaintiffs' theory of loss causation does not preclude certification.[22] Based upon the pleadings, Plaintiffs' concessions, the briefing, and for the reasons above, the Court finds that Plaintiffs are proceeding on a corrective disclosure theory, rather than a materialization of the risk theory.

More importantly, the Court finds that the corrective disclosure theory is consistent with Plaintiffs' proposed theory of damages as required by *Comcast*. *See Comcast*, 569 U.S. at 35. In *Comcast*, the Supreme Court held that Rule 23(b)(3) requires that the method for calculating class damages be consistent with the theory of liability asserted in the case. *Id.* "The *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15. It is illogical that, at the class-certification stage, any method of measuring damages is acceptable so long as it can be applied class wide, no matter how arbitrary the measurements may be. *Comcast*, 569 U.S. at 36. Instead, a "plaintiff's damages case must be consistent with its liability

---

[22] The Court again notes that Plaintiff's concede that they pleaded both theories, though materialization of the risk theory was pleaded in the alternative. Whether one describes the pleading history as a switch in horses or merely the Plaintiffs finally choosing which horse to ride, they have clearly made their choice now. Plaintiffs may now proceed using *only* the corrective disclosure theory.

case," and must measure only those damages attributable to the theory of damages, though "calculations need not be exact." *Id.* at 35.

Coffman testified that if the class succeeds on the merits, damages can be calculated on a class-wide basis under the "well-accepted" "out-of-pocket" method. (Doc. No. 103-1 at 38–39). Out-of-pocket losses are the difference between the price paid for the stock and the "but for" value of the stock, or what its value would have been absent the misrepresentations and omissions. *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) ([T]he out-of-pocket measure . . . allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud . . . .") (quotations omitted). Coffman further testified that this methodology "aligns perfectly" with Plaintiffs' corrective disclosure theory of loss causation by "isolating the per share artificial inflation caused by the alleged misstatements and measuring the removal of this per share artificial inflation after corrective disclosures of the relevant truth concealed by the alleged misstatements." (Doc. No. 103-1 at 39). "Since this methodology ultimately identifies the inflation per share present on each day during the Class Period, the damages for any investor can be calculated formulaically based upon their specific trading." (*Id.* at 41). Thus, Coffman, or some other expert, can calculate the damages for each class member in a methodical manner.

While Plaintiffs may face a number of hurdles in actually proving loss causation, they are not required to make this showing until the merits stage. Moreover, Plaintiffs are not required to provide exact calculations to satisfy *Comcast*. *Comcast*, 569 U.S. at 35. Plaintiffs' burden at this stage is simply to propose a methodology for calculating damages that corresponds to their theory of liability and can be applied class-wide. They have done so here.[23] Plaintiffs proposed

---

[23] In a case involving the same Plaintiffs' counsel and expert, the defendants there lodged the same objection regarding the materialization of the risk theory. (*In re The Boeing Co. Sec. Lit.*, case No. 1:24-cv-151, Doc. No. 143

methodology, which applies on a class wide basis, is capable of measuring the out-of-pocket losses suffered by the Proposed Class.

### ii. RSP Acquisition

As noted above, Defendants complain that Coffman's methodology faces two glaring problems under *Comcast*, with respect to (1) pre-acquisition Concho shareholders; and (2) former RSP shareholders who converted their RSP stock. (Doc. No. 68 at 34). With respect to the pre-acquisition Concho shareholders, Defendants argue that, if it is true that the alleged fraud inflated the price of Concho's stock prior to the RSP Acquisition, then Concho necessarily used the inflated shares as merger consideration. (*Id.*). The pre-acquisition Concho shareholders thus received an economic benefit that Coffman's proposed damages methodology "makes no effort" to correct. (*Id.* at 35).

Defendants also argue that the premium a former RSP shareholders received in the RSP Acquisition (29% above the market price for their RSP stock) should "offset" any alleged loss suffered by a former RSP shareholder. (*Id.*). As such, Defendants contend that the former RSP shareholders cannot be included as members of the Proposed Class because the net benefit they received via the stock swap creates a fundamental conflict between the former RSP shareholders and the remaining Proposed Class members.

For their part, Plaintiffs argue that their proposed damages methodology can address any issues that arise as a result of the RSP Acquisition. (Doc. No. 80 at 32). With respect to the pre-

---

at 3). Perhaps more interesting is the *amicus* brief filed by various law professors in the appeal now pending before the Fourth Circuit. *See* Brief for Former SEC Officials and Law Professors as Amici Curiae Supporting Petitioners, In re The Boeing Co. Sec. Lit., No. 25-135 (4th Cir. Mar. 28, 2025). In their brief, *amici* claim, like Defendants here, that Coffman's "promise to do it later" approach does not comply with *Comcast,* and therefore the District Court erred in certifying a class. *Amici*, however, opine that in a case "premised on a financial statement subsequently revealed to be false by a 'corrective disclosure,'" Coffman's approach may be correct. *Id.* at 7. Thus, in a case like the case at bar involving an alleged correction of statements via a corrective disclosure, these professors (one of whom is a former Commissioner of the Securities and Exchange Commission) seemingly agree that the approach taken by this Court is both feasible and *Comcast* compliant.

acquisition Concho shareholders, Plaintiffs specify that the out-of-pocket methodology "would perform a simple adjustment to the inflation per share analysis based upon how the number of shares outstanding changed after the merger." (*Id.* at 33). Moreover, "[s]ince this methodology ultimately identifies the inflation per share present on each day during the Class Period, the damages for any investor can be calculated formulaically based upon their specific trading." (Doc. No. 103-1 at 41). The Court has no reason to conclude that Coffman's methodology cannot account for any issue that may arise in calculating the alleged damages of the pre-acquisition Concho shareholders.

As for the former RSP shareholders, Plaintiffs state that the 29% premium paid to the former RSP shareholders was not related to the alleged fraud. (*Id.* at 34). Instead, they contend that premiums are typically paid to the shareholders of the acquired company "for control." (*Id.*). Additionally, in this case, the higher amounts were paid due to the favorable acreage that Concho wished to acquire from RSP. (*Id.*). Thus, Plaintiffs' conclude that the premium paid to the former RSP shareholders should not affect the damages they may eventually be awarded due to the alleged fraud. Coffman's report explicitly addresses that the parties involved in a merger "negotiate a price that allows the target to share in the economic benefits of the business combination," and the damages model need not "treat this premium as a windfall by netting it from the RSP shareholders' losses suffered as a result of Defendants' fraud." Moreover, Plaintiffs contend that Defendants' "conflict of interest" argument is moot because the premium itself was not a product of the fraud and therefore should not affect the former RSP shareholders' damages.

The Court agrees, at least in part, with Plaintiffs. Defendants cite no precedent to support their contention that a premium paid to the shareholders of an acquired company should prevent

52

that shareholder from recovering any damages allegedly incurred by fraud. Moreover, premiums are frequently paid to the shareholders of an acquired company. To hold that former RSP shareholders cannot recover damages allegedly incurred from Defendants' alleged fraudulent conduct would be to punish those individuals who rightfully acquired Concho stock, albeit in a different manner than the remaining Proposed Class members. The Court declines to do so.

Nevertheless, the Court finds that former RSP shareholders should be separated into their own subclass. The Court finds that there could be issues involving both the merits and potential damages which might be unique to these shareholders. As such, it must consider "how a trial on the merits would be conducted" if a class were certified. *Castano*, 84 F.3d at 740. While the Court may disagree that the damages issues presented by Defendants preclude certification, it agrees that any grouping that includes open market purchasers and the former RSP shareholders may pose difficulties in managing the class action, particularly in trying the case. There are too many factors that may affect the former RSP shareholders damages that will not be factors for the open market purchasers, such as the premium discussed above. To group the two together would be to muddle a trial that will no doubt be complicated even if all the issues were the same. As such, the Court will certify two subclasses—one consisting of those who purchased Concho stock on the open market, and the second consisting of former RSP shareholders who acquired Concho stock via the RSP Acquisition. The subclasses are defined below. Since the Court is subdividing the Proposed Class, there is no fundamental conflict between the former RSP shareholders and those who obtained their stock on the open market that would require the Court to deny class certification.

For the reasons above, Plaintiffs have demonstrated that individual issues of reliance on the alleged misrepresentations, an element of Plaintiffs § 10(b) claim, will not predominate and

Plaintiffs' damages can be measured on a class-wide basis consistent with Plaintiffs' theory of liability. As such, Plaintiffs have satisfied their burden to show that questions of law or fact common to the Proposed Class members predominate over any questions affecting only the individual members. FED. R. CIV. P. 23(b)(3).

### B. Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). This requirement is easily met in this case. Typically, class actions are appropriate vehicles for adjudicating securities fraud cases because they "avoid the time and expense of requiring all class members to litigate individually." *BP I*, 2013 WL 6388408, at *18. The Court can assume, based on the number of outstanding shares that traded on a national exchange and the volume of put and call option contracts, that the Class will be so large and geographically dispersed as to make a class action superior to other methods for fairly and efficiently adjudicating the controversy. *See id.* (class action was vastly superior method for resolving the right to damages of approximately 900,000 securities purchasers). Further, the commonality of the subclass members' claims suggests that fairness and efficiency would be better served by certifying the two subclasses. *See id.* ("Given the large number of potential plaintiffs and the commonality of their claims, certifying the class will permit a fairer and more efficient adjudication of the controversy than requiring individual adjudications would."). As such, a class action is clearly "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

That being said, among the factors to be considered in determining whether Rule 23(b)(3)'s superiority requirement is satisfied are "the difficulties likely to be encountered in the

management of a class action." FED. R. CIV. P. 23(b)(3). In addition to the reasons discussed above, addressing a class of shareholders that purchased Concho stock on the open market versus those that received stock via the RSP Acquisition poses complications that also undermine the concept of superiority—at least between these two groups of Plaintiffs. Accordingly, as noted above, the Court is hereby certifying the subclasses listed below.

## C.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification in GRANTED IN

PART and DENIED IN PART. (Doc. No. 54).

It is further ORDERED that the Court certifies the following Class that are further

divided into two subclasses:

> All persons and entities who are a member of at least one subclass, as defined below. Excluded from either subclass are: (i) Defendants; (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, and any affiliate of any Defendant. For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Concho employees.

The subclasses are defined as follows:

1. Open Market Subclass: All persons and entities who purchased Concho publicly traded common stock, or otherwise acquired Concho publicly traded common stock from someone who purchased said stock, during the period from February 21, 2018 through July 31, 2019 inclusive.

2. RSP Acquisition Subclass: All persons and entities who acquired Concho publicly traded common stock via Concho's acquisition of RSP Permian, Inc.

It is further ORDERED that Plaintiffs Utah Retirement Systems and Construction

Laborers Pension Trust for Southern California are appointed as the Open Market Subclass

Representatives.

55

It is further ORDERED that Labaton Keller Sucharow LLP is appointed as class counsel for both the Open Market Subclass and RSP Acquisition Subclass.

It is further ORDERED that, within sixty days of the date this Order is filed, Plaintiff submit the names of the proposed RSP Acquisition Subclass representatives via a motion to which Defendants may respond according to the Rules.

SIGNED this 7ᵗʰ day of April, 2025.

Andrew S. Hanen
United States District Judge