IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____
CITY OF WARWICK RETIREMENT SYSTEM,   )
Individually and on Behalf of All    )
Others Similarly Situated,           )        CIVIL ACTION NO.
                                     )        4:21-CV-02473
              Plaintiffs,            )
                                     )
VS.                                  )
                                     )
CONCHO RESOURCES INC., CONOCOPHILLIPS )
(SUCCESSOR-IN-INTEREST TO CONCHO      )
RESOURCES INC.), TIMOTHY A. LEACH,   )
JACK F. HARPER, C. WILLIAM GIRAUD,   )
BRENDA R. SCHROER, and E. JOSEPH     )
WRIGHT,                              )        2:00 P.M.
                                     )
              Defendants.            )
_____)


MOTION HEARING
BEFORE THE HONORABLE ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE
MAY 12, 2025


**APPEARANCES**:


**FOR PLAINTIFFS:**
JOSEPH COTILLETTA
Labaton Keller Sucharow, LLP
140 Broadway
34th Floor
New York, New York 10005
(212)907-0631

ALFRED L. FATALE, III
Labaton Keller Sucharow, LLP
140 Broadway
34th Floor
New York, New York 10005
(212)907-0700

Appearances Continued:

**FOR THE DEFENDANTS CONCHO RESOURCES AND CONOCOPHILLIPS:**
AMY P. HEFLEY
Baker Botts, LLP
910 Louisiana Street
Houston, Texas 77002
(713)229-1270

ANTHONY J. LUCISANO
Baker Botts, LLP
910 Louisiana Street
Houston, Texas 77002
(713)229-1957

**FOR THE DEFENDANTS TIMOTHY LEACH AND C. WILLIAM GIRAUD:**
ROBERT P. RITCHIE
Vinson & Elkins, LLP
Trammell Crow Center
2001 Ross Avenue
Suite 3700
Dallas, Texas 75201
(214)220-7823

**COURT REPORTER:**
Monica Walker-Bailey, MS, FCRR, RPR, CSR-CA, GA, NJ, TX
Official Court Reporter
515 Rusk Street
Suite 8004
Houston, Texas 77002
(713)250-5087

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

**PROCEEDINGS**

**THE COURT:**  This is Judge Hanen, and we're on the record in *City of Warwick v. Concho*, 21-cv-2473.

Who do I have on the line for the Plaintiffs?

**MR. COTILLETTA:**  Good afternoon, Your Honor.  For the Plaintiffs, you have Joseph Cotilletta with Labaton Keller Sucharow.  And I'm joined by my colleague Alfred Fatale.

**THE COURT:**  Okay.

And for the Defendants?

**MS. HEFLEY:**  Good afternoon, Your Honor.  This is Amy Hefley with Baker Botts, and with me is Tony Lucisano.

**THE COURT:**  Okay.

**MR. RITCHIE:**  And good afternoon, Your Honor.  This is Robert Ritchie, from Vinson and Elkins, on behalf of Defendants Timothy Leach and William Giraud.

**THE COURT:**  Okay.

All right.  Mr. Cotilletta started this by sending me a letter at the end of March.  And why don't you lead off and tell me where we are discovery-wise and what issues there are that we need to resolve.

**MR. COTILLETTA:**  Absolutely, Your Honor.  So on that last point first, we are making significant progress in the case.  We are down to our last fact deposition, which is next Tuesday.  As you know, we have expert reports.  The first deadline for that will be June 9th.  And in terms of narrowing the disputes, we thought about it this morning, about ways we

PROCEEDINGS

can make the Court's life a little easier today, and so I'm prepared to lead off the hearing today with some concessions from the Plaintiffs.  There's a number of different discovery devices before the Court.  And so I'll just read into the record a narrowing of those different disputes, and then we can go into each of them of what remains.  So the first one is the 30(b)(6) notice that was directed at Concho.  And there were about 22 topics that were -- that remained in dispute.  So of those 22, we are going to withdraw three -- 13 of them, and that will be Topics 4, 5, 7 to 15, 27 and 30.  So that only leaves Topics 18, 20 to 21, 25, 35, 37, 49, and 61 left.  Another discovery device that is scheduled for today's agenda is Plaintiffs' third set of request for production of documents directed at Concho Resources.  That would be Exhibit B of Plaintiffs' March 25th letter.  And we are withdrawing Request for Production Nos. 4, 5, and 6, leaving the only remaining disputes there as 1 through 3, 7, and 8.  We are withdrawing in full Plaintiffs' first interrogatories directed at Concho, which is Exhibit C of Plaintiffs' March 25th letter.  We are withdrawing in full the first set of interrogatories directed at individual defendants, Exhibit D, which is of Plaintiffs' March 25th letter.  Your Honor, we still have the RFAs for both the company and the individual defendants on the table today.  We'll get to that in a little bit.  And there's -- there was an email we sent Ms. Hawkins at the end of last week, on May 5th, related to

## PROCEEDINGS

Plaintiffs' second set of interrogatories to Concho, and for that we're withdrawing Interrogatory 6, 12, and 15, leaving the only remaining dispute for that as 5, 8, 10, and 11.

So with that said, Your Honor, I'd like to go first into the dispute over the 30(b)(6).

**THE COURT:** Hold on.

**MR. COTILLETTA:** Go ahead.

**THE COURT:** Okay. Go ahead now. I'm ready.

**MR. COTILLETTA:** Okay. Yep. And that would be Exhibit A of the Plaintiffs' March 25th letter. And so the first topic in dispute is Topic No. 18, which is on page five of the Notice. And, Your Honor, essentially, we tried multiple ways to kind of cut this topic down, both by the number of large-scale development projects that we're seeking information about as well as the details of that information. And, essentially, through attempts to negotiate with Defendants, which included a Rule 31 written deposition on this topic, a significant narrowing of the subtopics, we are essentially trying to get an understanding of what kind of testing existed for projects, other than the Dominator, when those occurred, and what were the results of those tests. And without getting into -- I believe this is a public hearing, so I have to be careful. Without getting into confidential information, we will say that we feel very confident about our case, and where we're at right now, and the merits. And I will say that we made

PROCEEDINGS

significant progress on this issue, and we do believe that there are other large-scale projects that are at issue, other than Dominator.  And we have some information; we have good information; and our experts are working diligently on that information, but I don't think we're in a position where we have all of the information we need for full and complete expert reports on this issue, and that includes testimony from the company.

Now throughout depositions in this case, we deposed both the company itself and individuals on a fact witness basis or based on their personal knowledge, and I could just say, just generally speaking, directionally, folks had some information about other projects; there were some admissions on things that we cared about as it relates to this topic, but, again, it's not the full scope and coverage that we think we need to successfully try the case.  So we're looking well beyond just, you know, do we have some documents, where this is a fishing expedition, this is beyond even looking at summary judgment; this is do we have what we need to try this case.  And we certainly need someone from the company to stand in and testify under oath as to these other large-scale development projects. I am -- I could do it on the record or I could do it separately in writing to defense counsel.  I have a list of narrowed down topics and certainly narrowed down project areas -- excuse me, project names that I think would narrow this down from 50 down

## PROCEEDINGS

to about 20 or 25 projects.  And, like I said, I only think I need about three or four general directional categories that they need to prep the witness on, and I think that we would be -- that we would resolve this particular topic.  So -- and as you can see, Your Honor, I know we're going to cover a lot of other discovery devices today, for example, the RFAs, it's probably clear now, based on what we're trying to do with all these different devices, that we're really trying to get this information, and we feel like we're getting, for lack of a better word, stonewalled in each avenue that we try to go down.  And so this is a part of a bigger picture to get at this information.  So this would be a witness for this -- so it's obviously for this topic.  And as we'll talk later, there's some documents that correspond to this issue.  We're not asking to reinvent the wheel with, you know, ten more custodians or, you know, additional fact witnesses.  Right now, we're just looking for them to produce a 30(b)(6) on this topic and others.  So, Your Honor, I can pause at this topic, if you'd like, or I can keep going to the next topic.

**THE COURT:**  Let's pause and let Ms. Hefley respond.

**MS. HEFLEY:**  And, actually, Your Honor, Mr. Lucisano will take this one.

**THE COURT:**  Okay.

**MR. LUCISANO:**  This is Tony Luciano with Baker Botts.  So I think first, Your Honor, with respect to Topic No. 18, I

## PROCEEDINGS

think as we read it there's 27 some-odd subparts.  And, you know, I hear Mr. Cotilletta narrowing it down to sort of unspecified categories of information.  Our problem with this is in preparing a corporate representative to be able to testify with knowledge as to these 20 to 50, you know, unspecified projects.  The problem we run into is if these sort levels of generality is just sort of testing categories of information, whatever questions might arise out of that, that's an impossibly overbroad task to put on a corporate representative.

Further, the types of testing that Mr. Cotilletta referenced, Mr. Angelos has already testified, the corporate representative that we have in the case, that there's sort of -- there's no compendium of tests performed that each individual large-scale project, such that you effectively have to create sort of -- you know, you'd have to research and go back six, seven, eight years to determine on asset team by asset team whether any of these tests were performed on any projects.  And so the level at which we're sort of structuring these topics to open up any unspecified questions as to any number of projects, we don't think is an appropriate discovery device, especially when it's not true that we've stonewalled discovery into anything, you know, besides the Dominator.  We've presented substantial corporate representative testimony on well spacing, on project development, on many numerous projects, besides just the Dominator.  So that is -- that's just the problem we run

PROCEEDINGS

into with a topic structured as broadly as this one.

THE COURT:  Well, let me ask you, how many large-scale or, you know, manufacturing production sites were there, other than Dominator?  Are we talking five, ten, twenty?

MR. LUCISANO:  No, Your Honor.  So the company publicly defined that style of development in its projects with four or more wells.  That's what it took to qualify as a large-scale project.  And so I think in -- I know Mr. Cotilletta has taken it off the table, but in our interrogatories responses, our first answer to the first of the interrogatory responses have an appendix, Appendix A that catalogs all those projects that began producing between August 1st, 2017, and February 2020, and I believe it's upwards of 50 projects just within that time frame.  So it's a large number.  The company publicly disclosed in 2018, and 2019, that it was dedicating a majority of its capital to these projects.  So that's -- it's not the limited, sort of, discrete number.

MR. COTILLETTA:  Your Honor, if I may on that point.

THE COURT:  Go ahead.

MR. COTILLETTA:  This is Joe Cotilletta with Labaton again.  Yeah.  So, Your Honor, there were a large number of projects.  There's no doubt about that.  What we're looking to do, though, is reduce it down.  I have about 17 projects that -- actually, 16, if you exclude Dominator in the 2018/2019 time frame, that I would want just basic sort of high-level

## PROCEEDINGS

information from.  There's, in addition to that, about eight projects from 2017 that recently in discovery have become more relevant to certain allegations from earlier class period misstatements about the company's successful transition, and things of that nature, occurring in the beginning of the class period.  So at most, at most, you're looking at about 25 projects, so less than -- about half of what was disclosed to us in interrogatory responses, and we can probably come to an agreement in the next couple of days to narrow that down even further.

THE COURT:  I think one of the problems I'm hearing is that -- and I'm looking at -- I'm sitting here, it's in my lap, your Notice No. 18, is all the different subparts you have.  I mean, you know, there's no -- there's no one witness that would know, you know, half of it, is what I'm hearing the Defendant say.  I mean, we have, you know, A through double A, so we have a number of subparts there.  And if you're talking 25 projects, let's say you have two witnesses to a project, you're talking about 50 depositions.

MR. COTILLETTA:  Well, one way we can narrow it down further, Your Honor, is not just by the number of -- again, this is Joe Cotilletta with Labaton.  We can narrow it down further by the subparts specific to -- you know, and the problem is, a lot of this the information is with them, and the way that the documents were produced and, you know, there were other non

**PROCEEDINGS**

Dominator projects -- information that was produced in the 200-plus thousand documents. But there's -- we're kind of a little in the dark on certain issues because the information is best with Defendants. So let me give you an example. I don't think I need all these subparts. If I gave them a list of 17 projects or so and said, okay, out of these ones, ones that were considered density tests, if you will, or projects where the drilling was tighter than what they call resource booking or resource spacing, if we narrowed -- that would narrow it down further. So that would be number one. Number two, that would then lead to us only having to do about two or three subparts, which is, essentially, what tests were run on this project; when, and generally speaking, you know, what did that data show? And so one thing I found fascinating through discovery in this case was that the company actually was fairly organized. They had certain -- you know, they had --

THE COURT: I'm sure the Defendants would be glad to hear that.

MR. COTILLETTA: Yeah, it's one of the few times I give them credit, okay. But they're fairly organized within the company in terms, they have these -- on the operational side of things, they have these asset teams. So they have the Permian Basin split between Delaware and Midland, and then within there north and south, and then in some cases east and west. And in there, they had certain project heads or asset managers that ran

**PROCEEDINGS**

it.  And what we're seeing, at least the way the documents have been produced in some regard, is that they appear -- like when they have a project testing for, let's say, the Dominator, if you will, they will have that all nice and neat in one little place.  So the way I see this is, in terms of getting someone educated because, yes, time has passed, and that is just the nature of the case, they still have that duty to educate.  And, you know, they're going to have to likely take, and they've done this with other folks in this case to some degree, educate that individual on projects maybe they didn't necessarily work on, but that information is centrally located in a place where it's all kind of in a nice, neat bundle, if you will.  I understand that I'm not a hundred percent certain on that; I don't work for the company, and I'm definitely not defense counsel, but that's what I've seen at least.  And just as a high-level observation in terms of what we've been reviewing and how these depositions have been going is, I do think that when you start looking at these projects, and you put them in by different basins and sub-basins, it all of a sudden becomes very neat and organized. And I do think they could educate somebody, again, if we kept the topics fairly narrow.

           **THE COURT:**  Mr. Lucisano, what would happen if we did, not to be flippant about it, but a test run, have Mr. Cotilletta pick a project, and depose the witness that knows the most about that project, and let's see how that deposition goes to see how,

**PROCEEDINGS**

you know -- if one person can handle it or if we really got a thousand rabbit trails.

MR. LUCISANO: So I'm thinking -- this is Tony Lucisano. I think, Your Honor, we already tried that insofar as they asked our corporate representative, sort of, what testing data -- you know, how -- what do we know about X number of projects and these X number of tests, and the answer was, we could not find that out by way of some sort of centralized located -- centrally-located resource. And so --

THE COURT: Is there something like a file on each well?

MR. LUCISANO: Well, we have thousands of files on each well. If you recall, Your Honor, when we had our first, sort of, discovery hearing in the case, on the Dominator project in particular, the charge was to produce everything -- you know, virtually everything related to the project, and it resulted in tens of thousands of documents produced. So what would effectively result in sort of this forensic examination on -- or, you know, redocumentation of every well file for these projects to discern what tests were performed and what weren't for individuals who have long left the company who were actually involved in those projects. So this sort of test case that Your Honor is positing, we don't think would be feasible. And certainly when you extrapolate it across the 17 projects, times however many sorts of broad topics, would result in a 30(b)(6)

PROCEEDINGS

deposition that's far beyond the scope of what we can feasibly do in seven hours with one witness. Because that -- what we want to stress is that there's one particular witness, who we already put on for corporate representative testimony, who is in the best position to speak on reservoir hearing topics generally, and so we have to facilitate his testimony with respect to all of these projects and all of these tests. So we don't think it's as doable as Mr. Cotilletta is insinuating.

MR. COTILLETTA: Your Honor --

MS. HEFLEY: And, Your Honor, this is Amy Hefley.

Oh, I'm sorry.

THE COURT: Go ahead, Ms. Hefley.

MS. HEFLEY: I just wanted to add one point. It ties into the request for admissions, actually, that we'll be getting into later. So, for example, there's a request for admission that on a particular project some 40 tests were run. And I can tell you that our team spent hours trying to figure out the answers to those kinds of request for admissions by going through the document production, and the like, and we just aren't able to quickly -- or not quickly -- identify the answers to those questions. I think that kind of lines up with what Mr. Lucisano was saying about trying to answer these questions. Even for one project is a Herculean attack.

MR. COTILLETTA: Your Honor, if I may. Again, this is Joe from Labaton. You know, one of the proposals we had was the

**PROCEEDINGS**

written deposition under Rule 31, and maybe that kind of procedure would work here.  I don't claim to have a tremendous amount of experience using it.  I have used it before.  It allows us to just write out the questions that we would ask the witness normally.  We could probably work out a time frame for defendants to respond to that, a reasonable time frame, and it would save their client a tremendous amount of time and costs. I understand their concerns about burden and their argument. While I disagree with it, I do think that the -- that if maybe we could take that approach, that might be a good way to do it. Maybe we do it in some sort of hybrid approach, where we take Your Honor's suggestion about a test run, but run it through a Rule 31 written deposition.

**THE COURT:**  And how many questions do you think you can boil it down to?

**MR. COTILLETTA:**  That's a great question.

**THE COURT:**  Well, I mean, you know what you're trying to find out.  You want to know, how many tests did you run; what kind of tests were there, you know; what were the results, if you don't already have them through document production.

**MR. COTILLETTA:**  Yeah.  I think that's a fair question, Your Honor.  I -- don't hold me to it.  I need to think about it.  I also would like to talk to a few folks internally about it, but I would think -- my guess is, to be safe, probably somewhere between 100 to 200 questions.  I mean,

PROCEEDINGS

in a given seven-hour deposition, I ask probably a lot more than 200 questions. I would think it would be less than that, but I'm hesitant to give a small number because I don't know until I start putting pen to paper. But I don't think it would be more than that. I think probably approaching, you know, a hundred questions, at most. And it would be just to make sure foundationally the questions are sound, et cetera, et cetera, because I don't have the ability as I would in a regular deposition where if there's an objection to form, I can adjust. So I'm going to have to -- there's going to be some foundation there as well.

MS. HEFLEY: And, Your Honor, if I may. Amy Hefley again. That's exactly the kind of burden that we're talking about. If one of the questions is what tests were performed on X project, that's essentially rewriting the request for admission with the 40-test listed that they want to know about, that with a reasonable, diligent review we cannot answer for one project, let alone 25 projects. And if we get back --

THE COURT: They don't know what tests they ran on their own well?

MS. HEFLEY: Well, it's not that simple, Your Honor. So the kind of things they're asking about and calling tests -- for example, if you look at Request for Admission 40, I think is a pretty good list of what they're describing. As Mr. Angelos described in his deposition, we don't have -- excuse me. It's

**PROCEEDINGS**

Request for Admission No. 1. It has 40 things that they're asking about, was coring done, well logging, measurement-while-drilling, mud logging, time of hole, directional surveys. The list goes on and on and on. There's no one repository of that information. The only way to kind of piece together information like that would be to go through the document production in the case, which even doing that takes an extraordinary amount of time trying to search for terms to see if you can find a report that happens to mention one of those things. It's just not the kind of testing that was done on every single project, as Mr. Angelos described, and we don't have a central repository the way Mr. Cotilletta is envisioning.

THE COURT: Or maybe you'll have -- the way I'm envisioning it, you'll have a -- and this is a question, not a statement. I mean, it's not kept -- you don't have a file kept on each well?

MS. HEFLEY: As Mr. Lucisano explained, there are, you know, thousands of files for each well, with different kinds of information. It's not necessarily a list of all of the testing that might have been done going into one project or another.

And we keep kind of going back to the big picture, which is there aren't challenged statements about these 25 projects, and that's the nature that would require, sort of, detailed, granular data in the way that plaintiffs are seeming to want with their -- all of these discovery devices we're here

PROCEEDINGS

talking about today.  It just seems like this is really disproportionate to the needs of this case when you look at what challenge statements are remaining in the case.

        **MR. COTILLETTA:**  Your Honor, if I may on that point. I mean, we keep -- the parties keep going back and forth.  It's been years we've been litigating this particular issue.  There's no doubt now -- this isn't -- I would go as far as saying we're in a much different place than we were even in January when we were arguing before Your Honor at class certification. Discovery -- fact discovery is almost complete with what was presented to us though these witnesses.  And we've had a chance to review the documents, and our experts are knee-deep in it. And I can tell you that it's not solely the Dominator.  And the challenge statements -- the criteria of disclosure talks about other projects being done to the resource booking.  You know, I think, now, more than ever, we understand the real power of that statement than we did even four months ago.  And it's just -- I'll just address it at that and move on from that point.

        I think on -- on burden, I think we have a real issue here.  I mean, the reality is, I think internally -- again, I know we're at a public hearing, but I think we have laid out a prima facie case here.  We have a lot of good evidence on projects other than Dominator, and we feel the need to be able to substantiate that.  I think we -- you know, it's their burden, which, by the way, they never really submitted any sort

**PROCEEDINGS**

of evidence to us during the meet and confer process. They haven't submitted any declarations. They haven't talked extensively as they have now in front of Your Honor. But there hasn't been -- we need to be able to prove our case. You know, we need to be able to have the evidence that we need for experts to review and opine in a full complete report, so the jurors are aided in the right way. And it can't be -- their argument can't be, well, it's just, you know, based on a production of our documents, that we looked at ourselves as lawyers, we can't seem to find it, when they haven't -- I haven't heard whether or not they've done custodial interviews with their client. You know, part of me thinks a lot of this can just be, get an engineer in a meeting, that engineer so and so worked on a particular project at issue, and ask that engineer, when you were there, did they do, you know, microseismic testing? Yes, they did. Did they contract that out? Maybe to so and so. Or, no, we did it in-house. About when did you do it? During the completion phase of the project. Okay. Do we know when the completion date of the project was? It was on this date and this day of this year. All right. Let's go pull that information. I do feel there is a sense here where they need to go beyond just looking at the documents they produced. As Your Honor remembers from our search term dispute, I think about a year now at least since we had that dispute, the terms that ultimately the parties agreed on, and the Court had ruled on, did not include a vast

**PROCEEDINGS**

majority of these other large-scale projects.  So there have been other projects that are in this production.  There has been data, like microseismic data that has been produced, but it hasn't -- I think that's more of by virtue of certain terms hidden, and it being happened to be produced, versus this idea that everything was produced to us, and the whole universe is in these 200,000 documents.  I think that is the bigger issue.  And I think as our experts, as our team digs in deeper and says, hey, we looked at this project, and it has this data.  Oh, by the way, it references, you know -- its interference testing will say -- this is a hypothetical, but, you know, representing this and testing on this date on this other project, and we go run that down, and it wasn't produced, and it presents a problem.  And so, okay, we need a data for this project.  I mean, it's very clear there was something else going wrong with this project as well.  And so, you know, I guess what I'm trying to say in a long-winded way is they're always going to be able to argue some level of burden, but, you know, at the same time you look at the size of this case, multi-billion dollar, you know, securities class action; you look at the other factors of proportionality, you know, it's largely in favor of us being able to seek this information.  In fact, there was a case in this district, **Edwards v. McDermott**, which is a securities case, where the Court went into the various different factors.  And, you know, it was a 10(b) case like this too.  And, you know, you

**PROCEEDINGS**

look at things of ordinary nature in a 10(b) case.  So, for example, in the Edwards case, the Court there said, "One of the factors for proportionality is the importance of the issues at stake in the action."  And said, "Generally speaking, 10(b) actions are about protecting investors."  And so, you know, there's little debate that the stakes are meaningful.  And they're not in controversy.  I think in the Edwards case it was a billion dollars.  Here, it's, you know, much more than that.  You know, you have the party's relative active information.  The defendants have complete, exclusive control over the testing and reports for the large-scale projects at issue.  The party's resources, and this is ConocoPhillips owns Concho's -- Concho's assets.  This is ConocoPhillips' resources.  They're, you know, one of the largest companies in the world.  You know, you look at the importance of resolving the dispute.  This is dealing with large-scale projects.  This is dealing with spacing issues.  This is dealing with all the sorts of issues that are absolutely central to Dominator.  Dominator is still important, and there'll be plenty of discussion about Dominator at trial, but there are these other issues too.  I think we've done our homework.  We've worked awfully hard over the last few months, and we were able to show that there are other issues.  And we want to be able to round that out in a fair way for us, so that we can effectively litigate the case, and we can effectively present the case to a jury, so that we can get that verdict that

PROCEEDINGS

the investors really need.  So I think, you know, if you look at all these different factors, I just think they all point in favor of the Plaintiff.  And, you know, we've offered alternatives.  You know, we could do written depositions.  We could do a test run.

THE COURT:  Well, here's what I want to do, Mr. Cotilletta, I want you to pick two projects and do written depositions on those two projects.  Limit it to 60 questions each, and let's see where we get and let's see what the burden is and let's see what kind of information we get from the deposition.

And Mr. Lucisano, let's don't answer these questions with a bunch of objections because I'm already given him this route to go.  I mean, do your best to answer them and let's see what kind of burden this actually places on you.  Because right now, as far as burdensome, I hear what you're saying, but I have no way to gauge it.  And I hear what Mr. Cotilletta is saying as to relevance, and I understand that as well.  But let's see -- so, Mr. Cotilletta, pick two, maybe your two most important ones, and let's see what -- how this works.  And I understand, sort of having said this, it's an interim step.

Okay.

MR. COTILLETTA:  Your Honor, this is Joe Cotilletta with Labaton.  We will comply.

MS. HEFLEY:  Your Honor, Amy Hefley here.  Can you --

**PROCEEDINGS**

so fact discovery closed on April 23rd. Can we talk about timing and your expectation on when they would get us the 60 questions, and how long we would have to try to respond to them?

THE COURT: Well, I think we're just going to have to reschedule a lot of these deadlines, you know, because even -- I mean, if his approach doesn't work, or proves to be overly burdensome, then we're going to have to try something else. Even if it doesn't work, this is only two out of 17 or 18 that Mr. Cotilletta mentioned that he'd cut it down to. And so I think we're going to have to, you know, institute new deadlines. Because I realize it's going to take y'all time to answer these, depending on, you know -- obviously, after the guy states his name, everything else is going to be hard.

Is that something, Ms. Hefley, that you would want me to do or do you want to get together with Mr. Cotilletta and try to agree on deadlines?

MS. HEFLEY: We should probably try to confer and agree. I know the Plaintiffs have already had as many -- five-month extension, I believe, of the fact discovery deadline, and so we would want to keep it tight because, you know, this request is coming from them kind of later in the fact discovery period, and that's fine, but we need to keep tight deadlines, in our view, to get to summary judgment.

THE COURT: Okay. Well, why don't y'all get together and propose deadlines. I think you'll probably have to shift

PROCEEDINGS

the expert cutoffs and the dispositive motion cutoffs as well, but I'll leave that up to y'all when y'all meet and confer.

All right.  Mr. Cotilletta, let's go to our next topic.

MR. COTILLETTA:  Yes, Your Honor.  The next topic, if you don't mind, I'm going to bundle them together.  It's topics 20 and 21, because they're very similar.  And, in fact, we can probably also address 35 as well, which is further down the page.  I'll get there in a minute.  But 20 and 21 are on page seven.  And so, for the record, 20 is spacing tests and simulations Concho conducted prior to and during the class period and the results thereof.  And 21 is spacing tests conducted by Concho's competitors and the results thereof.  So, you know, as Your Honor knows, some of the misstatements in this case are in regards -- in particularly I believe it's Mr. Harper who makes them, are in regards to the company's ability to model and forecast and predict how well they think they can do, and also having the ability at large scale.  And I think some of the statements they made, and I don't have it quoted here, Your Honor, but something along the lines of, we study what our peers do; and we look to our peers, and we look to the industry data, et cetera, to make informed judgments and decisions.  So, clearly, a lot of that is really important.  There's been -- again, I can't get into it, but there's been testimony about competitor data generally speaking.  And I think any oil and gas

**PROCEEDINGS**

company, including during this time period, would agree that they would look at their competitors. There's a concept of this thing in the industry called "analog wells," which is essentially certain companies will look either at their own prior projects or projects of their competitors to try to gauge an understanding -- gauge an understanding of how much resource they can extract from land, from prior projects with similar characteristics, whether they're, you know, drilling in the same reservoir zone, or if they have the same amount of wellbores, or spacing vertically or horizontally between those wellbores. So -- and a variety of other different factors. And so this has become critically important to the Dominator and for other projects. And so we haven't had anybody really talk about that. We had -- you know, we've been able to try to touch and broach the topic directionally with certain witnesses who gave their best collection, but we don't have somebody who was prepared under a duty to educate, you know, from Defendants, somebody who is prepared who can talk on those points. So that's 20 and 21.

Let me just look at 35, which is on page eight. And generally the same thing, I look at it as the same thing, which is essentially spacing tests and looking at what, you know, internally and externally. And so my proposal would be to wrap all three of these topics just together, narrow it down to that, and have somebody be able to discuss that issue.

**THE COURT:** Ms. Hefley, what about well spacing? I

**PROCEEDINGS**

mean, that usually is a key issue in the case.  Is there an individual who could talk to that, or Mr. Lucisano, either one of you?

**MR. LUCISANO:**  This is Joe Lucisano.  And just to be clear, Your Honor, our corporate representative, who testified on April 10th, testified to many topics on well spacing, what constituted a well spacing test, Concho's process for making well spacing decisions, up spacing, the creation of tight curves, including in so far as they related to spacing.  It was a seven-hour deposition on well spacing.  So I think what you're -- what you keep seeing in these topics is the broad category of well spacing beyond that.  It's just this level of extraction that gives no reasonable certainty to us on what to prepare the witness to talk about.  The topic of well spacing, I just want to be very clear, was robustly discussed at the deposition.  The witness was extremely well prepared to talk about it.  And so the problem with these topics is that they give no indication or clarity on what precisely the witness needs to be educated to talk about that would make for a productive deposition.  So it's sort of a combination of the level of generality and the fact that it's duplicative and overbroad in relation to the other topics on which we already provided testimony.

**THE COURT:**  Mr. Cotilletta, what about that?  I mean, clearly the 30(b)(6) witness talked at a -- a 20,000-foot level,

PROCEEDINGS

I would guess.  I mean, obviously, I wasn't there, but usually that's how those depositions go.

Are there specific items where you can narrow this focus to?

MR. COTILLETTA:  Your Honor, there is.  And I think one way we can do this is it would technically be withdrawing No. 20 to a certain degree, but I think I'll just kind of merge it into 21.  I think really what we're trying to get at -- and the individual he's talking about generally discussed well spacing to some degree in a very specific nuanced way.  It wasn't the way that we envisioned some of these broader topics that we're discussing right now.  But having said that, I do think that we are lacking testimony from the company with respect to how they went about analyzing what they call "analog wells" and spacing tests by their competitors.  But the whole notion of that misstatement about "we study what our peers do," and what that really was all about, and how they get into that, I don't think that's ever really been fleshed out in any meaningful way until now.  And so I think that would significantly reduce any purported burden, although we disagree that there is one, associated with 20.  So that would be 21.

And then if you look at 35, it kind of flows into that.  I will say that, you know, if the -- and, you know, we've had so many meet and confers at this point and discussions, I don't remember this ever even -- because we rolled a lot of

**PROCEEDINGS**

topics into the gentleman who they're talking about deposition as part of the negotiation process.  If they were so similar, these would have gotten rolled in, Your Honor.  There was a reason that these were not rolled in.  I think they felt, for example, like competitor analysis was either burdensome to produce someone that way or not highly relevant, despite, you know, we have direct misstatements on that issue.  So, you know, I just want to throw that out there too, that had these been so similar, they just would have been rolled into the gentleman's topics -- designated topics.  But I think that's the way we can shorten that.  I think that's a fair balance between the parties' interests.

THE COURT:  Well, let's narrow down the topics to more specific headings, get with Mr. Lucisano, and I'm going to allow a deposition to go forward, a real deposition on this topic, but let's -- Mr. Cotilletta, you got to give him, you know, more specifically what you need and what you are looking for in terms of knowledge area wise.  Because if you give him these broad topics, he might as well put up the same witness again.

MR. COTILLETTA:  Yeah.  I'm trying to think if there's a way we can do it now on the call.

THE COURT:  Well, you don't have to do it now.  Give it some thought, call Mr. Lucisano and -- or email him and say, this is what we want, somebody that knows about A, B, and C and --

## PROCEEDINGS

**MR. LUCISANO:** And, Your Honor.

**THE COURT:** Hello.  Mr. Lucisano.

**MR. LUCISANO:** I just wanted to clarify one point on No. 20.  I'm looking back at our sort of final version of topics as we submitted them to Plaintiffs before the deposition.  We put up Mr. Angelos on Topic No. 20.  And so that the reason that I'm saying that we designated him on these sorts of topics is because we did.  And so --

**THE COURT:** No, I expected that.  That's why I just made the statement that, you know, if we didn't get more specific, you'd get the same guy saying the same stuff.

**MR. LUCISANO:** And I think that's what would happen if we're talking about this level of generality because that's what we endeavored to do, was to prepare a witness who is extremely well-versed in the processes and decision-making with respect to well spacing and creation of analog wells, all these things Mr. Cotilletta is talking about.  And he would be our corporate representative again on those topics if we were required to re-present him.

**THE COURT:** Well, I'm not requiring you to re-present him, but I am -- I want Mr. Cotilletta to be very specific.  And, you know, you had the broad general depo.  You don't want that or you're going to get the same info.  Let's, you know, burrow down and get the specific topics that maybe, you know, instead of a 20,000-foot level, you're talking about a

PROCEEDINGS

1,000-foot level, and somebody that was either there or actually doing the work that's being talked about can answer.

MR. COTILLETTA:  We can do that, Your Honor.  This is Joe from Labaton again.  And I will certainly endeavor to do that, Your Honor.

THE COURT:  All right.

Mr. Cotilletta, what's next?

MR. COTILLETTA:  Okay.  The next topic is 25, which is on page seven.  And so this one, you know, I suspect the Defendants are going to say that the same individual who testified on the spacing, testified on this topic.  We would actually disagree with that.  There was another individual who was produced for a deposition recently who had some information about this, but it wasn't to the degree that we were looking for.  That individual also was not in the capacity of a 30(b)(6) witness.  But 25 is in regards to technical support for well spacing.  Essentially, we want to narrow this down significantly to this issue of resource spacing, resource booking that keeps coming up.  And we just really need someone to -- let me give you an example, and it's an issue that we're going to have later on in the hearing about definitions with one of the interrogatory responses.  We can't seem to get a straight answer.  Some folks use the word interchangeably.  We see it as, you know, the perceived space in the company -- one witness, I think -- I can't get into it -- but described it in a way that

PROCEEDINGS

was essentially like the base spacing assumption, or something like that, for one of the -- you know, one or more reservoir zones, and allows the company to be able to kind of say what they expect their resource would be or return would be extracting certain resources from certain areas, generally speaking, right.  So -- but we need someone who can really talk about that and actually specialized in it, worked on it, maybe still works for the company and does it.  And, you know, it's a companywide kind of issue on this point, you know, how they exactly went about doing it.  I think, you know -- again, I suspect Mr. Lucisano is going to get up here and say that the gentleman who he's talking about testified to this to some degree, but that individual was not in that position at the company.  That individual was at the time a very specific engineer, in a very specific part of the Permian Basin.  And what we're looking for is the folks who -- and I have someone in mind who I can talk to Mr. Lucisano off line about that would be a good representative, but if the person is obviously willing to do it.  There are folks at the company who specialize in this, and it would be nice to have someone like that sitting in the chair who we can talk to about this issue.

THE COURT:  Okay.  Why don't you get with Mr. Lucisano about that, and especially if you have --

MR. LUCISANO:  Your Honor.

THE COURT:  Go ahead, Mr. Lucisano.

**PROCEEDINGS**

**MR. LUCISANO:**  I was going to say, if you look at Topic No. 31, and I think Mr. Cotilletta all but admits this, is that we did provide corporate representative testimony on Concho's resource booking, spacing.  The terms were not terms of art, but we gave the company's testimony on the best definitions of what they meant.  And the notion that the individual who was our corporate representative, who would be our corporate representative again, wasn't educated on what those terms meant, he was a reservoir engineer dealing with those terms, interfacing with the corporate engineering department that was considering them as well.  So it sounds to me like what Mr. Cotilletta is asking is, you know, to dictate the identity of our corporate representative, and that's, obviously, improper.  So we strongly dispute the notion that they didn't already have corporate representative testimony, and plenty of fact witness testimony on top of that, about these topics.

**THE COURT:**  Well, Mr. Lucisano, why if he's -- if I'm deposing someone, or if I have a corporate defendant and I'm the other side, and say I don't want a 30(b)(6) deposition, I just want to depose Joe Blow, can't I do that?

**MR. LUCISANO:**  You certainly can identify the fact witnesses that you'd like to depose, and they've done that, and they've exhausted the 15 that Your Honor ordered last year was the maximum fact witnesses that they were entitled to.  They've deposed folks from, you know, all aspects of the company, all

PROCEEDINGS

different departments, and then had three corporate

representative depositions in addition to that.  So that's the

problem, is to the extent they're seeking to add additional fact

witnesses in the backdoor, that would be in excess of the limits

on discovery.

**THE COURT:**  Okay.  Let's go to the next topic.  I'm

going to mull that one, Mr. Cotilletta.

**MR. COTILLETTA:**  Okay.  The next topic is Topic 37,

which is on page eight, and it's in regards to Concho's

acquisition of RSP.  And so what we would do there, Your Honor,

and I think we've previously made this representation to defense

counsel, is that we would significantly narrow this topic.  And

I should be a little more specific in saying that Topic 49,

which is also in dispute, that's on page ten, would also be

encompassed by this.  So we would kill two birds with one stone.

And what we're really looking at, and what we're really after,

is just the knowledge-share that occurred between Concho and

RSP, without kind of getting into things that have developed.

So, you know, the issue of the company's and the executive's

knowledge -- and what I mean by "executive," that includes the

individual defendants -- direct knowledge of spacing issues at

certain dimensions has become highly relevant and central to the

case.  And discovery has kind of led us directionally to the

knowledge-share that has occurred between Concho, on one hand,

and the target company, which was RSP, because RSP was drilling

PROCEEDINGS

tightly in the region before the acquisition. And the CEO of the company at the time, a gentleman by the name of Steven Gray, had given a public statement -- it's in a Wall Street Journal article as well; it's a public statement -- back in February of 2018, that, you know, spacing below a certain amount is too tight. And issues have come up about that kind of spacing dimension, and others, with respect to the executives and the company itself, RSP, and that acquisition and transfer of knowledge over to Concho. So it's no longer our original request -- and we have a document request on this later on, Your Honor. But it's no longer kind of when we looked at it broadly or earlier in the case where we wanted a bunch of different things from the acquisition or the merger. We are looking now for something extremely narrow, which is essentially the spacing assumptions and technical information that transferred over from Company A to Company B. And so that would be the witness on that as well as the documents, which, like I said, we'll get into in a little bit.

THE COURT: Mr. Lucisano, you want to respond to that?

MR. LUCISANO: Sure. So with respect to obviously what the individual defendants knew, which is sort of the prime relevance in a case like this, they deposed the individual defendants, and, you know, that's a fact witness question. With respect to the knowledge-share documents related to RSP and spacing -- and, you know, we could speak more to this with

PROCEEDINGS

respect to the request for production -- we had produced, and they've, you know, referenced with witnesses, documents, plenty of documents, related to RSP and spacing assumptions.  I think what he's talking about is trying to extrapolate spacing in one basin to another basin, which is a whole different problem.  But with respect to the general topic and use of spacing from RSP, that's not something that's been closed off to discovery in any stretch.  If what he's talking about with respect to this topic, which now, you know, is being narrowed or reproposed today, is what any individual Concho employees learned at any given time from an RSP employee with respect to spacing, that doesn't strike us as particularly fruitful 30(b)(6) topic on which you could provide corporate representative testimony.  They've, of course, deposed the asset manager of the Midland Basin who would have been overseeing the sort of technical learnings on any acquisition in which they were able to ask him whatever they wanted.  But, you know, again, we're just speaking to this sort of general category of information, with no real direction on how we can feasibly prepare someone to testify on behalf of the company.  So it's sort of similar to the earlier topics in that respect.

**MR. COTILLETTA:**  Your Honor, if I may.  This is Joe again.  Let me just pose a hypothetical without completely showing my hand.  But one way to easily kind of cut through this topic would be to get someone there and talk about the process

**PROCEEDINGS**

in which engineers, and the like, exchanged information.

There's a due diligence in every merger and acquisition, and no different in oil and gas. And certainly RSP was engaged in large-scale development prior to the acquisition in the same basins that the company Concho was operating in at the time and post-acquisition. So there was certainly knowledge here. Again, there's evidence that there is shared knowledge through, like, virtue data rooms, and things like that you would normally see. We're looking for someone who can talk more about it. And their issue about scienter, and all of that, there's many different ways to prove that, and it has been proven already in this case based on testimony and evidence. But, you know, there are folks who -- again, through the documents that were produced. We know, we're on the Teams. They created Teams for this transition and due diligence, and we know those folks were associated with those Teams, and those folks are very high up in the company, and those folks are the same kind of folks that would, you know, share information with executives and pass on their knowledge, if you will.

So, you know, there's -- it's not as easy as Mr. Lucisano says in terms of being able to swat down this topic. I think it's highly relevant. He's right, there's been a bunch of testimony about knowledge-share, and the kind of implications of that. And I think the Plaintiffs have done a good job of proving up this issue as best they can with the

**PROCEEDINGS**

limited information they have.  But up until to date, we haven't received any document from the RSP acquisition.  We don't know the full extent of the knowledge-share.  We see references of it in certain investor dec- -- in PowerPoints, and things that are very high level, 20-, 25,000-feet high, but nothing on the ground.  And we have been prevented from being able to ask questions about this.  There hasn't been a prior 30(b)(6) to talk extensively about the RSP acquisition in any meaningful way, and none of their other fact witnesses have been prepped in any real meaningful way on this topic.  So we do think it's a fair angle.  We think it's an angle that we are hot on the trail on.  And I think there's going to be more good things to come if we can get more information on this.

THE COURT:  Tell me what's the request for production dispute about that relates to this topic?

MR. COTILLETTA:  It is -- Your Honor, if I -- let me just pull that up really quick.  But it's essentially -- it is Request No. 2 and it's Exhibit B of Plaintiff's March 25th letter, so it's the third set of request for production on Defendants.  And it's the second request.  And we essentially, in the negotiation process -- and, Your Honor, if you'd like me to wait, I could wait until you get to it.

THE COURT:  I'm at it.  Go ahead.

MR. COTILLETTA:  Okay.  Great.  Yep.  So on that request, during the meet and confer process, we tried to

PROCEEDINGS

extremely narrow this request from what it originally was to documents, communications, in connection with two meetings, I believe we found, where there was an exchange of information, I believe, between the executives -- I don't have that readily in front of me -- as well as knowledge-share and well spacing, which is the earlier point I made with respect to the 30(b)(6) topic. And, again, some of this has been talked about a ton in depositions, without any great depth, but acknowledgement that this issue existed and that these processes took place. But we need to get down and deeper, and figure out really what was transferred over, and who knew what, when. And we don't have access to that right now, as it currently stands, both from the production and from the testimony.

THE COURT: Well, what is it you specifically want? I mean, because you got a very limited time period in the request No. 2? So you got, you know, a nine-day time period.

MR. COTILLETTA: Oh, well -- so it's a little -- so when you look at the language the comma -- that it's the comma including, so the front half of the RFP is meant for the usual agreed upon relevant time period, which, in this case, for all purposes, would be when -- around the same time that the due diligence process and the merger was fully effectuated, some time in early or part of 2018. But the comma -- and then the extra language was an example of what else that request would include, and it includes these two meetings that we reference in

**PROCEEDINGS**

May.  So it's those May meetings as well as the information and the data that was transferred over about well spacing assumption, so, you know, the 400 feet or less in the Midland Basin.  And, by the way, you know, I can't -- without Defendants allowing me to, I can't really comment on Mr. Lucisano's comments because there's confidential information that contradicts what he's saying.  It's not just limited to a particular basin, but I will say that the issue of, you know, 400 or less, or 450 or less, across the board in any direction has become very relevant in this case.  And, you know, it seems to be coming out of, you know -- out of the RSP angle and the executives over there.  So I -- what we -- we need something to tie up that loose end because right now we don't have that.

THE COURT:  Okay.  But what did you get in response to this request?

MR. COTILLETTA:  We were -- I have to pull up the -- but I believe they did not give us any documents.  They -- on the second -- on this third request for RFPs, we were in complete impasse on every RFP.  So we haven't -- it's been a complete standstill on this set of RFPs.

MR. LUCISANO:  Your Honor, if I may.

THE COURT:  Go ahead, Mr. Lucisano.

MR. LUCISANO:  The response was, we already searched for and produced documents related to RSP and spacing.  You know, if you look at our search terms, I think it was a

PROCEEDINGS

demonstrative we handed you long, long ago at the -- last year's discovery hearing, but, you know, we had RSP and spacing, density, large-scale, RSP and synergies, wells and spacing. The reason they have documents related to these meetings is because we've produced them. We did not deprive, you know, RSP spacing-related documents.

I think what Mr. Cotilletta is sort of, you know, making out to sort of generally is this notion of a premerger due diligence data room on spacing. They've asked multiple witnesses did such a data room exist. And no surprise, you know, these are competitor companies engaging in premerger diligence; you don't give your, sort of, company secrets before closing. So the reason that this request, the 30(b)(6) requests, are not as simple as sort of, you know, here's your discrete set of data room documents now, identify them or explain them, is because it didn't happen that way. So that's the response to the request for production, is that we've already engaged in, you know, voluminous productions and searches, whether RSP or not, relevant to spacing information.

**MR. COTILLETTA:** Yeah. Your Honor, it's been a while since I looked through those search terms, but I don't remember it being a significant amount of search terms on this issue and on this particular issue of knowledge-share on tight spacing. There's just not many documents. If they're going to make representations on the record that what they produced is

PROCEEDINGS

everything they have, and there's nothing else, that's one thing.  I haven't heard that yet, and I'm not sure if that's what Mr. Lucisano is suggesting.

But his point about the virtue data room and sharing information and competitor data, in these acquisitions, that's why there's always clean teams and clean rooms.  And so information needs to be shared in order to conduct due diligence, but they have a process in place to avoid situations in which the deal does not get consummated, and then at a certain point the parties break off and, you know, only certain very limited walled-off individuals have certain key information.  So I don't necessarily buy the fact that, like, you know, this information doesn't exist.  Or if it existed, you know, it's long gone because it would not have been transferred through the "VDRs," is what they call it.  There's a whole process for it to cleanse it and avoid, you know, exchange trade secrets or information.  So if, you know -- I haven't heard them say it.  If they want to go back and get back to us in a couple of days and say, we've looked everywhere; there's no other documents to produce, that's one thing.  If they're going to, you know, hang their hat on the search terms, which we did, you know, a year and half ago before having the benefit of looking at the discovery that was produced and digging deeper and asking witnesses questions, that's a different story.  Because that doesn't sound to me like we don't have the documents, and under

**PROCEEDINGS**

the circumstances we've reached these very narrow terms a long time ago, and based on those terms, that's all you're going to get, and we don't have anything for you based on those very limited circumstances.  So I don't know which one it is, and I don't know if counsel can make the representation on the record today, but maybe that's the path forward on this particular issue.

**THE COURT:**  Well, I guess I'm kind of confused, Counsel, between -- Mr. Cotilletta -- between what your 30(b)(6) request is and this request for production.

**MR. COTILLETTA:**  Yeah.  So, Your Honor, so the -- and this is why we narrowed Topic No. 37, is it originally -- it does contain a lot of potential subtopics.  The first three, four words say, "Counsel's acquisition of RSP."  That could theoretically include anything related to the acquisition.  We then add a comment saying, "including," and we list out several different things by way of examples to help, you know, set the focus of what it could be.  In the process of negotiating with them, we said, you know, "We'll cut back all this other stuff, the synergies, expenditure forecast, all of that.  Let's just forget that, set that all aside, and focus solely on the limited issue of knowledge-share, on well spacing through this acquisition."  So through that process, we've narrowed it now.  Let me just go to -- I think it's Topic 49.  Yeah.  And that's why we're also merging in 49 together.  And so that was a part

PROCEEDINGS

of the negotiation process.  The original topic, as you see, is right, you're right, Your Honor, it's very broad; it contains a lot of different things.  But over the process in negotiations, we told them, we'll crap all of it; we'll narrow it to this issue because it's become very relevant to our case, and we'll blend it in with Topic 49, which seems to cover a lot of it too.  It's a little bit different, 49.  Forty-nine is focusing on what RSP did, you know, technically before the acquisition, that they would have acquired that information through the acquisition and have possession of those documents.  That's a little bit different than what the company acquired on -- you know, on its due diligence of the -- of RSP itself, so...  But they are related and that's what we're looking at.  So we literally scrapped everything, Your Honor, in terms of other avenues we were seeking for RSP and focusing on this one issue.

**THE COURT:**  Okay.  But your Request No. 2 is prior to the acquisition, even though the date -- that nine-day period is actually after the acquisition.

**MR. COTILLETTA:**  Right.  That goes back to my --

**THE COURT:**  Your 30(b)(6) is, what did you gain -- at least this is what I'm hearing you say, "What knowledge did you gain from RSP by virtue of the merger?"

**MR. COTILLETTA:**  Merger, and what they also did.  Because if you add 49, it's what they did.  So as a part of the merger, you're gaining information.  And part of that

**PROCEEDINGS**

information is information that's in real time, part of that information is what RSP did themselves prior to that. So it's meant to cover all of that.

On your point about RFP No. 2, I agree with you; it says, "Prior," and there's an inconsistency there. That was not the intention. The intention of the request was to cover a very broader sense before the comma, and then the comma including was meant to suggest -- well, there's these two other meetings -- there's two very significant meetings that we would want included in this request. And so to the extent there's an inconsistency there, that's an error on our part, and willing to own up on it, but that was not the intention.

**THE COURT:** Okay. All right. Mr. Lucisano, I'm going to order you to produce, pursuant to Request No. 2, any documents that were exchanged or relating to the issues here on the May 15th and May 24th meetings.

And then let's shift back to the depo information. I'm going to allow 30(b)(6) deposition on what knowledge vis-à-vis well spacing was acquired by virtue of the RSP merger.

**MS. HEFLEY:** Are you -- sorry, Your Honor, Amy Hefley. Are you saying by virtue of the merger, meaning when it closed?

**THE COURT:** Well, when you acquired it, you basically acquired their knowledge. And the best -- I mean, I don't know who the best witness on this may be. It may be an RSP person, who then is now a Concho person by virtue of the merger, because

PROCEEDINGS

somebody from RSP knew what they knew about well spacing.

**MS. HEFLEY:**  And, Your Honor, I think, as Mr. Lucisano tried to clarify, the likely candidate for any and all of the topics we talked about is Mr. Angelos, who will have to be educated, you know, however we can educate him on these topics.

**THE COURT:**  Okay.  Well, if he's the one that knows what RSVP -- I keep saying, 'RSVP," I'm sorry -- RSP means, then I'm going to allow him to be deposed on that.  But to me -- seemingly, if there's anybody left.  Now, I know how these mergers go, people leave, you know, especially if you're the acquired, as opposed to the acquirer, and then you had financial difficulties on top of that, so...

**MS. HEFLEY:**  And the subsequent acquisition of ConocoPhillips.  Right, so there, yeah, lots of departures.  Most of the depositions have been former employees.  So Mr. Angelos is an ex-employee, so...

**THE COURT:**  Well, I'm going to allow the Plaintiffs to take that 30(b)(6) to find out the state of RSP's knowledge at the time it was acquired, and what kind of well spacing information that Concho got by virtue of the acquisition.

All right.  Mr. Cotilletta, what's the next?

**MR. COTILLETTA:**  The very last topic, Your Honor, and we're free and clear of the 30(b)(6) issue.  It's Topic No. 61, on page 11.

**THE COURT:**  Okay.  I'm there.

**PROCEEDINGS**

**MR. COTILLETTA:** All right. And this is relating to Concho's planned drilling schedule. So Your Honor may recall the issue of the rigged release issue, which is in the second half of 2019 the company had reduced activity and as a result had released a bunch of different rigs. We're arguing that's related to, you know, well spacing and decreased activity as a result of well spacing and well underperformance. Defendants -- you know, I'm not going to speak for them, but if they're, of course, going to argue that there are non-fraudulent reasons for the release of rigs, there's been some -- this kind of ties into one of the requests we have later, which is an exhibit we sent to the Court on April 8th, which is the fourth set of RFPs; it's one RFP in that set that is at dispute. But it's all related to drilling schedules, the contract for the rigs. Because what happened was throughout the course of this case, there's been some testimony about the rigs. Defendants have produced the rig schedules. We've looked at them. We -- extensively. And they have kind of created more questions than answers they were supposed to provide for. So they kind of -- it kind of snowballed, and now the question of what -- you know, what the contractual terms were and how the -- what the drilling schedule was for the rigs were is really important because, of course, they're going to say that the rigs were all scheduled to get off the time; it wasn't just a coincidence. And, you know, we have a reason to believe, at least for some of those, that's not

**PROCEEDINGS**

true, and that it is tied to certain projects that were up-spaced. And up spacing, meaning the spacing just becomes wider than originally intended because of, you know, risks with well interference or versions or variations of well interference. So the rig schedule is really important. I think it's a short and sweet topic. We know what rigs were released; there's a handful. I think it's a half dozen. Defendants can correct me if I'm wrong. They've disclosed, I think, what those rigs are. There might be one that's missing. So it would be a discussion about those schedules. I think we would also need the RFP to be responded to and have those contracts, which I think are very limited documents. I can't imagine them longer than a few pages of documents showing what the contract was for the rig. And taken together, we can then have, you know, fruitful testimony on this issue and close it out.

THE COURT: Mr. Lucisano.

MR. LUCISANO: Sure, Your Honor. So this one, I guess, is a little confusing or frustrating. I mean, we designated Mr. Angelos on Topic 61. I'm looking at an email that we sent to Mr. Cotilletta on March 31st identifying that topic. They didn't ask him a single question on the rig schedules, you know, what they perceived to be confusing about them, or what clarification they needed. And so, you know, we had a seven-hour deposition on, you know, extensively that topic, and 24 others, and they just didn't ask him about it.

## PROCEEDINGS

The contract terms of the rigs, I mean, we're really, really devolving from what's relevant to the challenged statements in the case. It's hard for us to comprehend how that can bear on the truth or falsity or scienter of the challenged statements made in 2018 and 2019. But, nevertheless, we designated someone to put up -- or to give this testimony, and they spent seven hours asking about everything but that. So we're -- we think reproposing the same witness for a topic he's already been designated for would be entirely inappropriate.

MR. COTILLETTA: Your Honor, just a quick response to that. I would need to look at where we stood on that, but I believe 61 was not entirely resolved, and then they unilaterally put someone in place for that topic. I don't think we had a complete resolution. But, you know, to avoid wasting further resources on this, Your Honor, why don't I -- why don't I just go back and look at this, Your Honor, and make sure that I'm absolutely certain of that. I don't want to take up too much of the Court's time on this issue. And if it's okay with the Court, I can respond to Mr. Lucisano in writing in the next couple of days on this particular topic just to confirm whether we would withdraw it or not. It's my understanding that if they did produce someone on 61, it was not pursuant to the terms that we agreed to, but I want to make sure I'm absolutely certain of that. And I'd rather move on to other matters.

THE COURT: All right. Let's move on then.

**PROCEEDINGS**

What's next, Mr. Cotilletta?

**MR. COTILLETTA:** Okay. Third set of RFPs, Exhibit B, Plaintiffs' letter of March 25th. And so we covered No. 2 already. And No. 1 is the text message production. So it's a little complicated in this case. Defendants did produce text messages earlier in the case for certain individual defendants. They did it in a more traditional way. What I mean by that is that they did it with, you know, certain metadata overlays, and certain information that is customary when producing text messages and ESI in these large security cases. What ended up happening was there were a lot of individuals who testified in this case, current or former employees, whose text messages were produced for that there -- first off, there wasn't any discussion prior to the production of the text messages that in fact they were going to produce text messages. Two, there was no discussion pursuant to the protocol we entered into with Baker Botts that there would be discussion about what the metadata would look like, or how these would be produced, or whether search terms would be needed. And three, upon questioning some of these witnesses -- or most of these witnesses who have produced text messages, the methodology in which they used to produce text messages wasn't anything we ever would agree on. And I could give one example. I think someone might have searched something like -- just the word "Dominator" in their iPhone. And then I believe that iPhone was then -- and

PROCEEDINGS

grouped with other text messages -- were all -- I don't know if Your Honor heard of a screenshot, where you press certain buttons on your iPhone, and you can take a picture of your screen.

THE COURT:  I'm a Luddite, but I know what a screenshot is.

MR. COTILLETTA:  So, you know, screenshots were taken. It wasn't produced like the way they produce other text messages in the case, not in 24-hour windows, not pursuant to some sort of protocol with other search terms that we would constitute as relevant in the case.  And so it kind of was just, you know, take it -- you know, take it or leave it.  These are the text messages.  Here they are.  And, you know, we didn't present any of them in the letter, but we could, if necessary.  There are certain text messages where it's very clear their conversation continues or there's a conversation above.  And we don't know because the period has been cut off.  And so we don't know if it's relevant or if it isn't relevant, and we don't know if it could be relevant to something outside the word "Dominator," you know.  So it ranges, not everybody did it the same way.  You know, we tried to do a decent job of asking the witnesses at the deposition who produced the text messages, if time permitted, "Hey, how were these produced?  Like, how did you look at them? You know, did you run terms," et cetera, et cetera.  Some cases we were blocked for attorney work-product protection,

PROCEEDINGS

attorney-client privilege. In other cases, we got a little more information. But, generally speaking, it was not done the way that it's traditionally done in these cases, which is we sit down with the other side; we discuss what terms would be used -- which, by the way, you know, text messages, people nowadays, they text things a lot differently than they would, had they typed it into an email. You know, so you're looking for different words. What you agreed to in search terms, even if they used the different search terms we agreed to a year ago, which they didn't, would not necessarily result in any hits if you're not contemplating for the informal nature of text messaging. So none of the standard protocol and meet and confer process ever happened, and all we're asking for now -- we originally asked for more than that, and for folks who hadn't produced text messages to produce text messages, and we have now since scaled back on this and are willing to agree to, hey, for all folks that you produced text messages with, can you please come to the table with us, meet/confer, let's discuss an appropriate protocol, for example, 24-hour windows, the use of certain terms, searching certain messages between certain employees, you know, certain folks, for example, if they didn't type in the word "Dominator," if they only looked at conversations between them and Jane doe. Meanwhile, there is 15, 20 other people we deposed who are all relevant and high up in the company who we think have relevant knowledge for

## PROCEEDINGS

different reasons.  So there's scope and depth issues and methodology issues with how the production was done, and we're looking for an opportunity to get to the table with them and correct that.

THE COURT:  How many witnesses are we talking about?  Or how many phones?

MR. COTILLETTA:  Off the top -- many witnesses produced text messages?

THE COURT:  Yes.

MR. COTILLETTA:  I would say it's approximately ten to 12, if I'm correct.  Counsel would probably know better than me.  But the three individual Defendants, and I would guess to say about seven or eight fact witnesses.

THE COURT:  Are we talking about 20?  Probably?

MR. COTILLETTA:  At most.  At most.

THE COURT:  Mr. Lucisano, what about these texts?

MS. HEFLEY:  Your Honor, Amy Hefley.  I'll take this one.  So backing up, we had a different experience than Mr. Cotilletta describes as what's standard in these cases.  In the McDermott case that he mentioned earlier, Judge Edison said, "You need to go look for the text messages of the individual Defendants and produce them, if they have any."  And so that's what we did in this case very early on in the discovery period.  Those were produced, and we didn't hear any requests for further text message productions, or the like, until we got subpoenas

PROCEEDINGS

for the individuals who are being deposed.  And when each individual, many of whom-- or most of whom are former employees, received the subpoena, we worked with that individual to have that individual search their phone.  They did not just search for the Dominator search term.  They searched chains.  In some cases, they read the entire chain that was available with a particular witness.  And we worked with them to make sure that we were taking screenshots with the date of the full conversation, on whatever date it was, about something that was relevant to the case, and that is what we've produced.  What they're asking us to do now is go back and take each of those individual, again, many of them are former employees, phones and have some vendor do some kind of extensive collection to essentially provide what will be the exact same information because we have already looked at the text messages with these individuals and produced the responsive ones.  And they have indicated that they believe that there will be, you know, additional messages in the chain.  We have confirmed with them in the deposition that that's just not the case.  If there was a discussion about a topic, we've produced it to them.  And so in our minds this is something that would be extremely invasive for former employees to have to turn over a phone.  Some of these employees have other jobs at other companies at this point.  And there is no way to do an image of a phone without collecting all of that sensitive information related to their other employment.

**PROCEEDINGS**

So, in our minds, this is kind of much to do about nothing because they have the responsive text messages.  We did our jobs as counsel working with our clients, who are the former employee deponents, current employee deponents, and making sure that if there were text messages, they were produced.  So we object to having to force these people to turn over phones and forcing us to go hire a vendor to do that collection when we just don't think it will net anything different than what we've already produced.

**MR. COTILLETTA:**  Your Honor, if I may just respond briefly to that.

**THE COURT:**  Yeah.

**MR. COTILLETTA:**  So the first most important distinction is the fact that, you know, Baker Botts has entered into an ESI protocol stipulation with us.  I know they're going to come back and say, "Well, that was with respect to our capacity as counsel for the company, not with respect to our capacity as counsel for the individual former employees," which, by the way, they represent each of them, and my understanding is they have written retainer agreements with each of them.  So that's number one.  And I think that's important because I look at this having three distinct categories of recipients of information.  You have the party Defendants, who aren't really at issue here, although we would want confirmation from defendants that they ran targeted search terms that we agreed

PROCEEDINGS

to, and things of that nature.  The second is the current employees, who, based on policies and procedures that Defendants produced earlier in this case, the company has custody, possession, and control over their information.  It's a bring-your-own-device-to-work policy.  And so the way we've dealt with these is when you bring your own device, and you're subject to an employer agreement, the employer has the right to come in and access the information at any time.  And then the employee agrees to cooperate in certain settings, like litigation, and to have their phone extracted.  Former employees.  Well, like I said earlier, Baker Botts represents all of these former employees.  These employees were subject to those agreements in a relevant time period.  I believe those agreements, I don't have them in front of me, but I believe those agreements say that the ability to access information would go beyond the employment terms.  There's a case outside of this District, unfortunately, and I think outside of this Circuit, a case that is called *In re Pork Antitrust*, and it's 2022 WL 972401.  The District in Minnesota in 2022 dealt with this very same issue, where you had this distinction between the party Defendants, and you had the current employees, and you had the former employees, and essentially what the Court did there, is they said -- they ordered text messages be produced for everyone but one custodian.  That custodian produced a declaration saying they never texted about work, ever.  And,

PROCEEDINGS

two, ordered forensic imaging with targeted searches while noting that the protocols that the vendors put in place protected the confidential information. It's 2025, back then it was 2022, only three years ago, and the Court acknowledged technology has changed and there's ways that this is done quickly and efficiently, and with the privacy interests of the holder of the phone at top priority. And the Court also then created certain parameters. In that case, I think the parameters were that it had to be a specific time period; the parties had a meet and confer about exactly what subjects were going to be pulled; they had to do it both on a recipient-to-recipient basis depending on who it is. So, for example, you know, communication between Mr. Harper and Mr. Giraud, the two individual Defendants, is highly relevant. In that situation, the Court said, "Well, those two folks, I want defense to look at the relevant time period, to the extent those texts still exist in those individual phones, and look at all of them. And if they're over a certain amount of text messages, then you can apply search terms that you have to agree with Plaintiffs' counsel on what those are," where with certain folks I believe the Court changed a little bit and said, "Okay, for those other folks, you run search terms." So there is a whole protocol set in place. None of that took place here. None of it. It's just all done unilaterally. We received the text messages I think almost every single time the night before

PROCEEDINGS

the deposition.  I mean, when I say "night before," I'm talking like, you know, past business hours.  You know, very late at night getting text messages, sometimes dozens for these individuals, all kind of out of order, cutoff screenshots, with no metadata, and, you know, we just think it's unfair.  And we don't think it's that burdensome.  Again, if you look at the five or six or seven factors of proportionality, and this case, those factors all weigh heavily in favor of the Plaintiffs.  So I don't think it's burdensome to go back to these people, who are their clients, and say, "Hey, we need to image your phone for an hour."  It's 2025; it takes about an hour, hour and a half to image a phone.  And that minor inconvenience will allow us all to be able to analyze the situation and test the veracity of these witnesses' statements on the text messages as well as the collection process.

MS. HEFLEY:  Your Honor --

MR. COTILLETTA:  And Your Honor, one other point.

I'm sorry, Amy, just one other point, if you don't mind.

There have been some very significant text messages that were produced in this case, very significant.  It wasn't like this idea like it's all going to be fruitful -- fruitless, as Defendants argue.  Like, there is a half dozen pretty good text messages in this case.  And it's concerning to me that, you know, we don't know the full scope of who was -- you know, the

**PROCEEDINGS**

collection, and who was pulling text messages from what, and the exact nature of the terms, or in some cases the terms are too narrow.  Extremely prejudicial to us.  We had no opportunity to participate in this process, even though we had an agreement in place, and the agreement is being ignored as if it doesn't exist or it doesn't apply, and I don't think it's fair to say it doesn't apply, and they know it should be in place.  So, you know, with that said, you know, I'll turn it over to Amy now, Your Honor.

THE COURT:  Well, wait.

Mr. Ritchie, if you're still alive and there, do you have a dog in this fight?

MR. RITCHIE:  Well, I think, as Mr. Cotilletta said, the individual Defendants are differently situated because, as Ms. Hefley said, very earlier in this case we did exactly what the Plaintiffs wanted us to do.  We took a complete forensic collection of their phones; we ran the search terms on them; we produced any responsive text messages; gave everything they want from our clients.  And so I think what they're looking at is really from the former employees, and the like, who are differently situated, as Ms. Hefley pointed out.

THE COURT:  All right.  Here's what I want --

MS. HEFLEY:  And, Your Honor --

THE COURT:  Ms. Hefley.

MS. HEFLEY:  -- can I reply briefly on the ESI

PROCEEDINGS

protocol because it's just not the case that we agreed that there would be an ESI protocol that we would be inclined to former employees.  I can't emphasize enough that we are talking about people who one of them is a CFO of another publicly traded company, another one lives in Denver.  These people are not people whose phone Concho, much less ConocoPhillips, had possession, custody, or control of, or does 'till this day.  And I am representing to the Court that each of these people worked with us, with Baker Botts, with Vinson & Elkins, to review text chains as they were going through them in real time, which is the reason the Plaintiffs got them the day before the deposition.  We worked with those people to make sure we had screenshots of the relevant messages in real time.  So they have the information.  It will be extremely expensive, burdensome, invasive to go out and do a forensic collection that will just net the same documents and text messages we've already produced. As Mr. Cotilletta also said, he thinks that there are some very interesting text messages that have been produced.  So it's not like we have hidden or withheld anything from them.  They have the information they need, and anything else would be unfair and unduly burdensome and expensive and invasive.

THE COURT:  All right.  Here's what I -- Ms. Hefley, here's what I want.  I want you to sit down and you and Mr. Cotilletta figure out the search terms, and I want you to search, or have a service search, the defendants -- the

PROCEEDINGS

individual Defendants' and the current employees' phones.  And I'm denying his request as to the former employees.

All right.  Mr. Cotilletta, what's next?

**MR. COTILLETTA:**  Okay.  Your Honor, we're on to Request No. 3.  And if I had to rank this request, Your Honor, this is probably my most important issue I'm bringing to the Court today.  This is the Aris database.  This is the Aris database we referenced in the complaint.  This is the Aris database that's been referenced in testimony numerous times as kind of where all the skeletons are hidden, and where all the information related to production forecasts, negative revisions or reforecasting of projects during the class period, et cetera, et cetera.  There is a lot of very, very important information in these databases.  This is where our reservoir engineers, and other folks at the company, and in the industry generally, use this data to plot tight curves, and other charts, and to analyze data in real time.  I can't even begin to tell you, Your Honor, how many times witnesses talk about the importance of this database; what's contained in there.  We don't have it.  And I think Defendants are going to come up and say, well, we produced, you know -- I forget the exact number, but it's a large number of Excel files all kind of chopped and thrown into a database, where numerous witnesses have now been deposed and have agreed that this information -- and this is industry information, by the way.  Like, any expert will tell you -- any

PROCEEDINGS

expert -- I don't know how many you'll see walking down the street in Houston that do oil and gas, but, you know, I'd say nine out of ten, you know, oil and gas experts will tell you the Aris database is as simple as downloading the entire database into a thumb drive and handing it to another engineer so they can plug it in and upload it into their software program.  It's that simple.  We've made our case to them in a good-faith letter, which, unfortunately now, I wish I kind of, in hindsight, would have submitted to the Court so you could see kind of how experts in the field view the ease in which it is to produce the Aris database, but it is extremely simple to extract this information and to give it to us.  It would contain the entire life during the relevant time period of each of the particular projects at issue, including the ones we were fighting about earlier today, and would show all the revisions, changes, you know, everything you could think of that would provide qualitative data that should tell the company in real time when there's a problem.  And so it's extremely important.  And on the flip side, there's absolutely no burden to producing it.  And we tried to negotiate with defense counsel on it.  You know, in full disclosure to Your Honor, because I'm assuming they're, you know, probably going to argue this too, we have been in touch with third-party engineers in this case.  They produced their reserve reports.  They produced exported files from Aris database that was Concho's.  It's not the full thing.

PROCEEDINGS

It doesn't tie in correctly every single time into the reserve reports for each year.  I've gone back and forth with the third parties to try to get good tie-ins.  Experts call it a tie-in, something where you have the reserve report and there's numbers or figures and you run the calculations through Aris and it's supposed to work perfectly, and sometimes it doesn't.  And so I've tried my best to shore up those issues.  My understanding is, it's not the entire Aris database, and that Defendants have the ones that actually have lockstep changes that happened over the course of the class period.  So it is the smoking gun, from a technical standpoint.  Extremely easy to produce, not burdensome, not expensive, and I think it should be produced in this case.

THE COURT:  What do you want off of it?

MR. COTILLETTA:  I want my experts to be able to run it into their database so that they can see exactly --

THE COURT:  No, no, I know why you want it.  What do you want, production data?  Expense data?

MR. COTILLETTA:  It contains it all in an export file, is my understanding.  I don't claim to be an expert on this issue, Your Honor, but I believe it's as simple as you can -- each project is logged within the relevant basin.  But there's different ways, I think, you can format Aris and you could have the project set up.  But my understanding at a very high level is as simple as you go into the software, and let's say I want

**PROCEEDINGS**

to look at a Dominator, I go and find a Dominator.  It will show all the well data; it will show all the data over a course of time; it will show how it plotted; it will show how it was doing relative to what it was expected to do.  It's real relative expectations too.  So there's none of this nonsense that we've been seeing in depositions arguing, well, it's not a perfect rate of return because you need to do this, this and that; you need to back that out or back that out to get it perfect.  There's no wiggle room.  There's no wiggle room from -- there's no escape hatch with the access to the Aris database.  It gives you the full information you need.  It's minimally invasive.  It's just you literally pop it into a thumb drive, or something similar to that.  I'm sure defense counsel is going to do something a little more secure, which is fine.  And then you go and you give it to whoever is in the field that knows how to use it.  They plug it into their system.  It's a self-contained unit.  You can look at any project at any point in time during that relevant time period, and you can pull up real live data.

THE COURT:  Okay.  Ms. Hefley, you or Mr. Lucisano.

MR. LUCISANO:  Sure.  This is Mr. Lucisano.  So I think, first of all, it's important to keep in mind this is a structured database.  I mean, you can kind of think about it like FAP, or some sort of accounting program, that covers an entire company.  I think as their request is written, and Mr. Cotilletta is making it seem as though, you can kind of go

PROCEEDINGS

into the software and take a snapshot of a particular project, or a particular set of projects, or a particular time period, and that's just not true.  It is not set up to -- for us to extract some subset of information and provide it securely.  So what they're actually asking for and -- what they're actually asking for is turning over the keys to the entire company's database.  What Mr. Cotilletta didn't say is that the depositions in this case have explained that Aris was a reservoir engineering level software that the, sort of, staff-level engineers were working in.  Any time that it was used to generate information for the company's plans, financials given to upper management, it was done so in the form of an Excel spreadsheet that was much easier to digest.  And, as Mr. Cotilletta admitted, we've produced many, many hundreds of those spreadsheets.  So it's hard for us to understand how something that is definitionally not in the information that was transmitted to the speakers in this case, and that was summarized in numerous files that were transmitted among management, could be relevant --

**THE COURT:**  Mr. Lucisano.  Mr. Lucisano.

**MR. LUCISANO:**  Yes.

**THE COURT:**  I need to take a break for a minute.

Everybody, let's take about five minutes and come back.

**MR. LUCISANO:**  Sure thing.

**PROCEEDINGS**

**MR. COTILLETTA:**  Will do, Your Honor.

(A pause was held in the proceedings at 3:40 p.m.)

(Back on the record at 3:47 p.m.)

**THE COURT:**  All right.  This is Judge Hanen.

Mr. Lucisano, I'm sorry to have interrupted you.  I had a personal emergency I had to take care of.  If you would continue, you were describing the Aris system to me.

**MR. LUCISANO:**  No problem at all, Your Honor.  And I think I was just about wrapped up, but the point was that the useable, digestible form of this data that could have any conceivable relevance to what the actual speakers were saying, vis-a-vis the information in the company, was transmitted in Excel format, and we have produced voluminous number of those. I think it's telling to the extent that the Plaintiffs have subpoenaed third-party reserve engineers who prepared the reports and have received Aris files.  You know, I hear Mr. Cotilletta saying that there's all these skeletons buried in them, and they're extremely important, and all the rest.  They ought to be able to identify, you know, what it is that is in there that is not otherwise available in the Excel sheets, and they haven't done so.  So we think that the notion of turning over the keys to the entire database for the company, operated/not operated projects, large-scale, or otherwise, which is the only way in which it could be done, is vastly disproportionate to the actual issues in the case, when you take

PROCEEDINGS

into account the technical reality of how this information was actually used in the company.

MR. COTILLETTA:  Your Honor, if I may just respond to that?  This is Joe Cotilletta from Labaton.

THE COURT:  Yes.

MR. COTILLETTA:  So on the issue about the Excels, first off, they never -- and we've tried to negotiate with them. I don't have any idea the full extent of the Excels.  I know there's a bunch of them.  I know some of them have metadata on them, but it's hundreds, if not thousands, of Excel sheets that I guess they just want our experts to spend 2, $3M to go through in piecemeal versus a fully functional interactive database that's easily transferable with a USB drive, as one of their witnesses had testified to.  And the Excel sheets also are self-limiting.  The lawyers have decided what they're going to put in that production, I'm assuming based on search terms. Because we never agreed that the entire database would be part of the production.  Everything that the lawyers have done up to this point is argued that it has to be within the narrow confines of specific search terms.  So we don't even know if the Excel sheets cover all the relevant projects.  If there is a way to do it, and I don't think there is a way to do it by specific project, I'm happy to go back and ask my experts, but I don't know, we could say, hey, for these 17, or whatever projects we really care about, we want it during the relevant time period.

**PROCEEDINGS**

I don't think it works that way, otherwise, I would have said, let's do it that way. I did have in my Request No. 3 specific projects; it would be a narrowing of those projects currently there. We don't need all of them. But I don't know if it could be done that way.

On the issue of the reserve reports, those are year-end tailored final reports that are reviewed for year-end proved reserves. That isn't the change that happened in real time. Now, Mr. Lucisano is saying it doesn't show you anything that can happen over time. You could always look back at those and see what's going on. Again, I'm not an expert, neither is Mr. Lucisano, quite frankly. And I wish -- our experts aren't disclosed yet. I wish all of our experts can be disclosed and have a conversation with the Court about it. But I -- again, my understanding is, and from people who are in this field that's been doing this for decades, it's a simple process. You literally take it out and you use it. I think the proportionality argument that Mr. Lucisano is talking about, it's not apples to apples here. You know, those are situations where you have to comb through thousands of documents and sift through without means of search terms, and the case law associated with that. This isn't this. This is an exportable database, where you click a few buttons; it downloads into a zip drive or into a -- not a floppy disk, but a USB drive, and you give it to the other side. So to the extent we can narrow my

PROCEEDINGS

projects, I'm happy to confer with them and see if that's possible. Mr. Lucisano says it isn't. I don't think it is, but I'm happy to try to do that. But I think that's the only way to do it. It's a perfect chain of custody. It allows -- there's no nonsense about metadata, and what was excluded, and what wasn't, and lawyers had their hands on what. It's a clean transfer from one engineering group to another, and it's walled-off, and allowed to be able to look at forensically. And this idea -- they always point to scienter, but there's other elements in the case. You have to prove falsity, right. You have to prove that there were problems with the company to begin with. And so this is the best evidence for that, and multiple witnesses have said this is the best evidence for that. And the idea -- by the way, really, it bothers me to even say it has nothing to do with scienter; it has 100 percent to do with scienter. Plenty of witnesses, including the individual Defendants, said they were involved in the reserve process. They were involved in the corporate risking process. They would receive rolled up data from the Aris database. But none of those documents have been produced in a way that you could show a witness where you can look at it. So there needs to be a way on a case like this, a very highly technical case, there needs to be a way to look at it forensically. This is the smoothest, easiest, most cost-effective way to do it. They don't really have, Your Honor -- and this is with all due respect. They

PROCEEDINGS

don't really have an argument for not producing it.  They don't.  I'm at a loss.  I don't know what else really to do to put forth evidence that, you know, this is an easy process and the relevancy of the data.  But, you know, I do think if the Court is on the fence, I would be willing to submit, you know, a redacted expert declaration.  It -- you know, it would be unredacted to Your Honor's chambers, but it would be redacted to defense counsel so they could -- I could show proof of what information we're submitting to support our argument.  But I'm almost certain I can get a declaration saying that, you know, this stuff is easy to produce; it's manageable, and it should be fairly easy, you know, and inexpensive to do.

THE COURT:  Mr. Lucisano, can you search the Aris database for specific information?

MR. LUCISANO:  See, now, that's what I was saying before, is that it's not -- you can't sort of take a snapshot back in time or with respect to some subset of the information.  And I think I just heard Mr. Cotilletta agree with that, which is why they're asking for the entire proprietary database.  And just one -- I mean, I think we've made our point, but this one last one is that, you know, in saying that the individual Defendants have the information rolled up.  That's precisely the point.  It was rolled up in an Excel viewable format that we've produced to the extent it was, you know, within the scope of discovery in the case.  And it's been many, many, many, many of

**PROCEEDINGS**

those produced.  So what we're talking about definitionally is something that was not rolled up.  And when you compare that to the sort of hyper-broad request for the entire database, we think it's a fairly straightforward call of a disproportionate request.

THE COURT:  Let me ask you.  If I want --

MR. COTILLETTA:  Your Honor --

THE COURT:  Wait.  Wait.

If I wanted, let's say, production rates on a certain well, would that be in the Excel files you've already produced?

MR. LUCISANO:  Absolutely.  It would be in the Excel files.  It would be in the -- you know, Mr. Cotilletta is right.  This was an organized company.  They had many recurring -- I think Your Honor referenced this at the last discovery hearing -- many high-level recurring reports on production from various projects, voluminous productions in this case, that have charted those production rates.  But, yeah, there's --

THE COURT:  You might have misunderstood my question.  Would it be the information on the Aris database?

MR. LUCISANO:  So the Aris database was the underlying software in which production data and the rest was housed.  All of the Excels would roll up that information as it exists in the Aris database.  And then further from that, there would be presentations and other documents that would also, you know, report the same information, underlying information.  So there's

**PROCEEDINGS**

many different forms in which underlying database was then used to run the company.

THE COURT:  But you couldn't roll up just the raw data that's contained in the database?

MR. LUCISANO:  The individual Defendants, the executives, could not.  And so the way it was --

THE COURT:  No, no, no, I'm talking about you, Baker Botts.  I mean if I said I want all the production data that's contained on the Aris database, can you do that?

MR. LUCISANO:  We could not.  The only -- and certainly not some sort of subset of it.  It would be -- it's just a matter of the database -- the structure database as it exists.

MR. COTILLETTA:  Your Honor, if I may just add a little more.

THE COURT:  Go ahead.

MR. COTILLETTA:  So, you know, one thing we referenced to Defendants in the meet and confer process was the fact that, you know, one of our allegations -- several allegations, but specifically in paragraph 361, 386, 389 of the complaint, we talk about risking and finance projections and the Aris database.  And, you know, the Aris data will most likely be the best source for information on reserves and cash flows in a company that focuses on production and economic performance, which has been talked about at length.  You know, the company

PROCEEDINGS

touted itself as a return-centric development approach, which relied on greater returns. And so the fact that things were declining internally to the extent that that exists in the database, or if we're able to show that, is evidence of falsity. Could you imagine what this case would be like if every securities case in the country, if the only documents that matter in proving scienter were the ones that directly hit the Defendants' table? It's not like that in every case. You know, you think of, like, homicide cases, and other cases across the country, where you need to prove beyond a reasonable doubt that someone committed a murder, do you always need the body? Does he always need the gun in the hand to shoot the individual, the victim? No, there's circumstantial evidence. So this idea that -- and I think Your Honor was getting to that through the questions you were asking Mr. Lucisano, is that it doesn't need to exactly hit the Defendants' table, individual Defendants' table. He has to read it in full in order to be able to prove he had knowledge of this issue. A lot of this is going to turn on expert -- battle of the experts. And what was, you know, a scienter and a severe recklessness standard in the Fifth Circuit is, it's all about, you know, what was obvious. What was the obvious nature of the issue? When you were saying, you know, the apples are $5. Was it obvious internally that they weren't? Or that what you're selling was not apples? So, you know, this idea that you need to have direct, absolute proof in the

PROCEEDINGS

person's lap, even though I'll say, Your Honor, very cautiously, optimistically, you know, that we have stuff like that in this case.  On this issue, I don't think it matters that it has to fall directly on the Defendants' lap.  That's focusing on one element of the case.  Certainly, at minimum, it proves falsity.  Two, it is circumstantial evidence.  We have tons of testimony about knowledge-share between executives and operations team and meetings and conversations that would be had, where the good, bad, and the ugly was discussed, where everything was discussed.  So, I mean, you know, this idea that you have to have a specific Excel report, and only that Excel report matters, and only that report with bad data, if it had bad data, is the only way that so and so is going to know if something is wrong with the company, is utterly ridiculous.  It's not -- it doesn't comport with testimony that's been had in this case.  It doesn't comport with business realties of oil and gas in the business.  And we're going to be able to prove, through the use of the Aris database, that it was obvious from an industry custom perspective and practice that there were major, major problems at the company across the board, not just the Dominator, across the board.  And so they know that, that's why they're fighting so hard on this.  They know it's easy to produce.  They know the data is there.  They know it could be walled-off, and it's not a big issue.  And they do it all the time, again, every year, when they pull databases for the reserve engineers.  They don't want

**PROCEEDINGS**

to do it here because they know it's the clean path to the truth, and it allows the experts perfect chain of custody for their expert analysis.  And that's the reality of it.  That's the reality of it.  And I can't figure out for the life of me why they don't want to produce it.  They could literally export it and give it in a USB.  This case is subject to confidentiality.  Everybody in this case, including the experts, take that -- the Court's order on confidentiality seriously. There's just nothing that hits in the other way.  There's not a burden argument.  There's not, you know, an issue related to confidence.  I just don't -- I don't -- I don't see anything pointing in their direction.

            **THE COURT:**  Mr. Lucisano, anything you want to add?

            **MR. LUCISANO:**  The only thing, Your Honor, I think the example citing to the allegations in the complaint is awfully telling because we deposed the confidential witness, who, you know, was the genesis of those allegations, about what this purported, you know, internal Aris analysis was that supposedly was so revealing.  And it turns out it's, you know, the reserve categorization of proved possible contingent, the very sorts of things that are identifiable on the face of these Excel spreadsheets, and the reserves roll forward that, you know -- that we've produced.  So we have yet to hear -- I mean, it's a lot of, sort of, bravado about how important this is, but yet to understand why or how it would contain information that's not --

PROCEEDINGS

or that's relevant in a way that demands turning over the entire proprietary database.  You know, that's sort of the disconnect we have.  So I think we've spoken our peace about that.

THE COURT:  I think here's what I want. Mr. Cotilletta, I want you to file on this one a formal motion; and then, Mr. Lucisano, you can file a formal response, and I'll rule.

MR. LUCISANO:  Understood.

THE COURT:  All right.

MR. COTILLETTA:  Understood, Your Honor.  Thank you.

THE COURT:  Mr. Cotilletta, any other thing?  Are we done or is there something else?

MR. COTILLETTA:  There are two requests left in this set.  And then after that --

THE COURT:  Let's go ahead and do it.

MR. COTILLETTA:  Yeah.  So Requests 7 and 8 are essentially -- and Ms. Hefley might have mentioned this earlier in relation to other discussions -- but this essentially is requests for projects, other than the Dominator, where we're looking for testing data and results.  This is the reason why we served RFAs, in a large part.  We need to understand what is out there because Defendants were making a burden argument and arguing that it's too burdensome, and, you know, it's too many, and we don't know what's what.  And I'm at a loss again, like the other issues we talked about earlier today, because I think

PROCEEDINGS

it's all relevant to our case; it's all various different indicators of well interference that the industry would look at, and an expert would look at; it's all highly relevant.  It's limited to large scales during the relevant time period, also highly relevant.  We've got a good prima facie evidence at this point showing that there's other large scales at issue.  And so I just -- I, you know, I don't know what to make of Defendants' argument that, you know, it's just going to be really hard.  We don't know, you know, what to do with this kind of request, when I haven't heard anybody sit down with any engineers on any of the relevant projects and ask, simply put, what were the tests that were performed?  And of those tests, do you have any reports left that are -- that you still have that weren't destroyed and that can be turned over?  So I'm willing to narrow this down.  I'm willing to narrow down the subparts.  I'm obviously willing to narrow down the amount of large scales.  I just don't know what exists in terms of the testing for some of these projects.  I mean, I could say for sure a lot of their projects had microseismic data.  We certainly want that.  Certain projects are extensive, but they used fiber optics.  Want that.  Certain projects they used acoustical data.  Want that.  But I don't know how far their testing goes because no one's been able to say, generally speaking, all the tests that were used.  So -- and, as Mr. Lucisano said, apparently it varied so much between project or basin that, you know -- you

**PROCEEDINGS**

know, I'm at a loss.  I'm at a loss, Your Honor.  But these are all relevant, relevant different tests that any expert in the field will tell you could point to well interfering.

**THE COURT:**  Mr. Lucisano.

**MR. LUCISANO:**  Sure.  So Requests 7 and 8, as Your Honor will recall, we structured the discovery production for the document production in this case last -- I guess a year ago. We produced -- I think we said 18,000 in one of our letters. Actually, we went back and looked.  It was 26,000 Dominator documents, sort of gathered from those voluminous well files. We produced those in May, basically everything under the sun with respect to the Dominator.  You know, we got these requests in February of this year, basically saying everything we want -- everything from the Dominator, every conceivable testing data -- if you look at Request No. 8, every conceivable, at least as far as we could tell, operational report or analysis.  So when you aggregate those two, it's all documents related to these projects.  And then you extrapolate this across 50 plus projects, you can sort of do the math and see the burden that that would entail.  So we think it's just, as we've discussed before, obviously, disproportionate to the actual challenge statements in the case, but then especially with respect to when you aggregate the burden of this sort of data-dump type request. It would be another thing entirely if -- you know, we've obviously produced, you know, plenty of non Dominator

**PROCEEDINGS**

spacing-related documents.  You know, we can go through our search terms and the first set of RFPs, where we responded to dozens that were beyond just the Dominator.  And so to produce testing data, where it exists with respect to plenty of other projects, this is just sort of the entire universe of Concho's large-scale production portfolio and basically every document that we haven't already produced.  So that's the problem that we have.

THE COURT:  Mr. Cotilletta, why don't you work on narrowing these down?

MR. COTILLETTA:  Will do, Your Honor.

THE COURT:  And, you know, I'm going to allow the Plaintiffs to get pertinent documents to the non Dominator large-scale projects, but I don't think we need to make the Defendants produce everything in the kitchen sink at the same time.  And I understand, you know, it's not just admissible evidence or key evidence that you're entitled to.  At the same time, I'm looking at some of this -- I just got out of a five-week trial, and I'm sitting here looking at this going, "Man, the jury is never going to look at this, ever."  And if they look at it, they wouldn't understand it.  Let's try to narrow this down to make it feasible.  And if you can't come to some agreement, I'll resolve it.  But, I mean, I do think the Plaintiffs get, you know, a reasonable look at these other large-scale projects, on the one hand.  On the other hand, I

PROCEEDINGS

don't think you need everything that you've listed here.  So let's narrow it down.  Let's narrow down the projects, and let's narrow down what you're requesting so that it's not overly burdensome on the Defendants.  And get with Mr. Lucisano, and let's see if y'all can resolve these two with that little bit of guidance that I've given you.

MR. COTILLETTA:  Absolutely, Your Honor.  We can certainly do that.

So, Your Honor, I know --

MR. LUCISANO:  And, Your Honor --

THE COURT:  Go ahead, Mr. Lucisano.

MR. LUCISANO:  To Ms. Hefley's point earlier, if we can just request that, you know, this narrow-down list, that we get it reasonably promptly, say two weeks from now, so that we can keep things moving.  That would be our request.

THE COURT:  If you can, please comply with that, Mr. Cotilletta.

MR. COTILLETTA:  Yes, Your Honor.

THE COURT:  I've been mispronouncing your name.  I apologize.

MR. COTILLETTA:  It's okay.  That happened my whole life.  It's not a big deal.

THE COURT:  I keep putting an "i" at the end.

MR. COTILLETTA:  Your Honor, there is more here.  I know it's getting late in the day for everybody.  There is that

PROCEEDINGS

one RFP, and the fourth set of RFPs, and then there's four interrogatories that we would need to discuss.  And then after that, the only thing that remains are broader -- I mean, it's a large amount of material; it's the RFAs, but they're like broader categories of issues.  So I don't know how Your Honor wants to best address that.

Do you want me to keep going?

THE COURT:  Yes.

MR. COTILLETTA:  Okay.  So I'm going to skip the RFAs for a minute.  I'm going to just get through the other kind of smaller items.  There is the fourth set of RFPs; it was an exhibit to an email we sent to Ms. Hawkins on April 8th.

THE COURT:  I don't know that I have it.  Okay.  She's going to look for that because I have not seen that.

MR. COTILLETTA:  Your Honor, I could read the request into the record, if that would make it a little easier.

THE COURT:  Okay.

MR. COTILLETTA:  Yeah.  So there's only two RFPs in this set, and the first one was HR files.  Defendants have produced those documents.  They're not an issue.  The second RFP, it goes:

Documents and communications sufficient to identify the contract terms for each of the rigs Concho released during the second quarter of 2019, including, but not limited to, the rigs identified in Defendant Concho's supplemental answers and

**PROCEEDINGS**

objections to Interrogatory No. 6 of lead Plaintiffs first set of interrogatories directed to Defendant Concho.

So that -- that was -- we talked earlier about the rig contracts with the deposition testimony. And I think for 61 I said I'd go back and talk with Mr. Lucisano about it in terms of the topics. This is a little bit different. This request was directly a result of prior discovery requests that came in the case. But it's the same thing, we're not looking for anything more than just the contract terms for the, you know -- the few rigs that were released. I forget exactly the number, but I imagine it's a very small production. And it's relevant because the idea of the rigs being released was related to production of activity, production of activities associated with well spacing, well underperformance, and risks associated with it. The company had to up-space their projects. And we're arguing that they had to release rigs by having to move projects because they had to change those projects and those designs, and there's a whole bunch of different things that happened. They're saying that that's not true. These were always planned. And we're saying, "Okay. Let's see the terms of the contract. That will tell us if it was planned or not." And I think there are limited documents, maybe a couple of pages for each rig, and I don't see why they cannot produce it.

THE COURT: Mr. Lucisano.

MR. LUCISANO: Yes. So -- I mean, I guess we're kind

PROCEEDINGS

of back to where we were in terms of the rig schedules.  And those were produced with respect to where the rigs were planned, where they ended up going.  None of that's been withheld.  I guess we're sort of scratching our heads on what the contract terms have to do with it beyond separate and apart from the schedule.  So it's just -- for us, it's sort of a pure relevance disconnect on this one.

THE COURT:  Okay.  I'm going to order you to produce them for the rigs that were let go.

All right.  Mr. Cotilletta, what's next?

MR. COTILLETTA:  Your Honor, what's next is second set of interrogatories directed at Defendant Concho.  This was sent this past Friday to Ms. Hawkins in an email.  I don't know if --

THE COURT:  Yes, that one I have.

MR. COTILLETTA:  Okay.  Great.  And you may recall, Your Honor, we withdrew 6, 12, and 15.  So the first one off the bat is Interrogatory No. 5.

THE COURT:  Okay.  I'm looking at it.

MR. COTILLETTA:  Okay.  Oh, bear with me just one second, Your Honor, while I get them.  I'm having a problem loading it.  Yep.  So as Your Honor can see, on No. 5, they said subject to without waiving.  They don't understand what we mean by, "Explain the public disclosures."  So, you know, it's us. We're saying, like, they're being evasive.  They know exactly what we mean.  We mean public disclosures and disclosures of SEC

PROCEEDINGS

filings and investor presentations and conferences.  And how I know that is based on all their answers they gave in interrogatories, where they were very clearly willing and able to say they never disclosed or disclosed something in public disclosures.  So I don't know why they can't do the same for No. 5.  And so we took issue with that because they didn't even make an attempt to respond to it.  They just said -- they just said, "We don't understand what that means," even though they do in other interrogatories.

THE COURT:  Mr. Lucisano.

MR. LUCISANO:  This is Mr. Lucisano.  So I think the confusion is because we quoted the words "explain" and "public disclosures."  Our confusion wasn't over those terms; it was the purported information to which Plaintiffs intend to refer.  If you look just above, our objection was to vagueness of, quote, statistical nature of well results for each resource spacing area.  That combination of words doesn't mean anything to us.  And so that's our problem, is that we can't answer whether that was disclosed when we don't understand what it is.  So that's consistent with the other approach to similar interrogatories.

THE COURT:  Statistical approach, Mr. Cotilletta, what do you mean?

MR. COTILLETTA:  Your Honor, it's essentially multiple different ways.  It could be greater return; it could be EUR, sometimes it's referenced as "EUR."  Statistical nature of the

## PROCEEDINGS

well results is essentially meaning, you know, have you described how those wells have been producing in some way through some number, whether it be percentage, volume rates, et cetera, for any particular given well, between the time period. I think their answer is going to be no.  But, you know, to Mr. Lucisano's point, they have the objection in the front to wording about, you know, resource spacing area, but when they actually went to go answer the question that wasn't the basis for the non-responsive answer.  Their basis was, "We don't understand what you mean to explain in public disclosures."

THE COURT:  So let's set that aside.  I mean, that's water under the bridge.

Okay.  Mr. Lucisano, I'm going to order you to answer No. 5 for either SEC disclosures or investor earnings call.

MS. HEFLEY:  And, Your Honor, Amy Hefley here.  I'm genuinely unsure what it is they're being asked when we're asked about, "Did we ever explain the statistical nature of well results?"  I still don't understand what that question asks.

THE COURT:  The way I understood it, and Mr. Cotilletta, if I'm wrong, you need to -- like these large-production manufacturing loads produce, you know, 45 percent better than the other oil.

Is that what you're talking about, Mr. Cotilletta?

MR. COTILLETTA:  Your Honor, that and also -- the reason why we use "statistical nature" is because it's even

PROCEEDINGS

broader than that.  It's the rate of return; it's the actual production; it's what was expected to be derived from -- the resource spacing has a particular term.  If you notice, it's capitalized there.  It's the way the company perceived how much resource it could get from a given area.  So it's all of those things.  It's the actual results that are happening in that area along with -- yeah, along with what was expected in that reservoir area.  And I think the answer is going to be no.  We expect the answer is going to be no, but that's what we meant by that question.

THE COURT:  Okay.  With that understanding, I want the Defendants to answer it for those two categories, SEC disclosures and investor earnings calls.

All right.  Mr. Cotilletta, what else?

MR. COTILLETTA:  No. 8, on page seven, it says, "Did you apply additional risk factors, projects drilled more or less densely than resource booking?"  So those are -- what we're getting at is there -- for projects -- so if they said, okay, look, in Wolfcamp A, and generally speaking, you know, we book six wells across, 660 feet apart.  Well, for projects where they were -- let's say that they call them "density tests."  These are projects that are booked tighter than that spacing, so less than 660 feet between wellbores.  "Did you apply additional risk factors for that?"  Now, they give an answer, some of it is responsive.  But the two biggest issues are, one, they gave one

**PROCEEDINGS**

example of a document.  We asked them to identify all of the documents because this is a contentious issue that's come up in these depositions, is, everyone says that this risk happened, that risk happened.  There's been no real hard evidence that's been produced, according to Defendants' theory or defense, on this issue.  And so they've produced one document for the -- I think this is the first time, I could be wrong, but they did produce documents -- new documents off of this Rog set, and I can't tell if this one is new or old.  But they only cite to one, and we're asking for a more inclusive nature of the Bates that are being referenced because we want to get a full picture and understanding of what defense they actually have on this issue.  They cite to a couple of pieces of testimony from a well-prepped corporate representative, who is covering a hundred other topics that day, but they don't -- and they reference one document, and we asked them to produce more than one document.  And so that's really where the issue is, sufficiency of the response.

THE COURT:  Mr. Lucisano.

MR. LUCISANO:  So, as we set out in the general objection, there's, you know, clearly no obligation to identify every document in the production that fits the category.  That's not a proper interrogatory request.  What we've identified, it's a process-based question.  You know, how do you go about doing this?  And we've provided, again, corporate representative

**PROCEEDINGS**

testimony on this topic, explaining how tight curves were built, explaining how projects were reforecast. Obviously, they disagree with us on the propriety of these processes and, you know, they'll be second-guessing it, but that doesn't mean that our answer wasn't responsive to their question. And so that's sort of our disconnect.

THE COURT: Okay. I think it's answered, so I'm not going to order any action on that one.

All right. Mr. Cotilletta, what's next?

MR. COTILLETTA: Okay. Your Honor, No. 10. What is your definition of RoR, rate of return? And, you know, they say there's no term, official term or companywide definition for ROR, and they cite testimony, and I just -- there's like 10,000 documents, Your Honor, produced in this case with the words "RoR." It's very clear what it directionally means. And I just -- you know, and part of this is moving to compel them to, you know, provide a fuller response; it's not an accurate response. And I guess Your Honor could say, you know, well, look, if they want to -- that's how they want to move forward and claim that there's no official response, you know, official definition, and hang their hat on it, I guess they could do that. I don't know if that's appropriate. I do have concerns with that response. I don't think it's consistent with the thousands of documents they've produced.

THE COURT: Okay. What say the Defense?

PROCEEDINGS

**MR. LUCISANO:**  So the question asked what was the definition of the acronym.  And as Concho's answer is, that acronym refers to rate of return.  Of course there are thousands of instances of calculations of rate of return giving various assumptions and -- depending on the context, and so there's no way to sort of -- nor would it be responsive to the question I hypothesized all the different ways in which rate of return could have appeared in any number of documents.  But they asked for the general definition of an acronym, and we gave it.  So it's hard for us to understand why or how we could have answered this question any differently.  And, by the way, you know, this question, "What is RoR," has been asked to plenty of witnesses, and their answers have been, "that refers to rate of return." So there's complete consistency across the board in terms of what that general term means.  Of course there's going to be questions on specific documents, and you have to go into the backup of how the calculations are performed, what have you, but, again, we answered the interrogatory that was asked.

**THE COURT:**  Okay.  I think it's answered sufficiently.

What's the next one, Mr. Cotilletta?

**MR. COTILLETTA:**  Okay.  The last one is No. 11, Your Honor.  The question asks if the company had an internal hurdle rate for production for a past or tight curve model, and then what that internal rate was.  And if it was different between projects of basins, which I believe it was, to provide that for

PROCEEDINGS

us.  And they came back and basically said -- I don't even know if the answer is really responsive.  They just say that they try to do a certain value, and then they don't have a categorical number, and it varied by project, and that supports -- the interrogatory contemplates that.  So it kind of states the obvious that it might not be the same across the board, which we already knew, but then it doesn't answer the actual question of what were the differences between the regions of the projects, which they have that data.  So it has come out in depositions; it just hasn't come out fully, and it's not all in one place. And so we were seeking to get the information so that we could provide a narrative of exactly what that looked like during the relevant time period.  They should be able to answer that instead of what I think is an evasive answer.

THE COURT:  Okay.  Mr. Lucisano.

MR. LUCISANO:  So, again, I think they're asking some sort of categorical question that they expect there to be some way to articulate it beyond what we've answered.  And what we have answered is generally projects were intended to be targeted at a 20 percent or greater rate of return, but, of course, with respect to specific projects, you're going to have a focused analysis on, okay, is this an expiration project?  Are you going -- could this be a dry hole?  Of course you're going to factor in a different rate of return based on those learnings, basin tests similarly.  And so the ask that there's some sort of

**PROCEEDINGS**

finite number that you can ascribe to any particular project, much less all of them, is just not how the witnesses in this case have talked about rates of return.  We've answered it to the best extent we can, based on information available to the company, and, again, consistent with what this question has actually been asked to witnesses.  So, you know, it's frustrating here, as he described as evasive, our best effort to track what the company actually knew at the time, and what the witnesses actually said.

THE COURT:  Help me, Mr. Lucisano.  The question actually asked about internal hurdle rate, and your answer talks about rates of return.  So I'm trying to see -- do we have a disconnect here?

MR. LUCISANO:  No.  So hurdle rate is a concept that they've asked witnesses about, basically, what was the rate at which the projected rate of return had to be above, or to meet that, in order to be proposed?  That's how the witnesses have described the hurdle rate.  And the testimony has been, "Well, there wasn't an official hurdle rate, but, generally speaking, we tried to propose projects 20 percent or greater."  So I think we're on the same page with respect to what a hurdle rate means. It is a returned-based metric.

THE COURT:  And the PV-20, "PV" stands for?

MR. LUCISANO:  Present value.

THE COURT:  Okay.

**PROCEEDINGS**

**MR. COTILLETTA:**  Your Honor, this is extremely important because what the company perceived as what they -- like they're expected rate of return versus what they actually were achieving, you know, from time to time could be different. And certainly certain witnesses, including more recently would probably agree with me and say that could be evidence of something wrong within the company and wrong within particular projects, something going bad, a particular project would need to be further investigated.  So this is extremely critical because, you know, one of the defenses, I think, that is wholly developing here is even in instances where a project is going below what was expected, "Well, it was still economical, so no harm no foul," which, you know, I don't know if people in the industry, generally speaking, would agree with that.  But, you know, finding out what the internal hurdle rate is is extremely important.  And they had it.  They had an understanding. There's no way a business of this size did not have an understanding of what that looked like from project to project. It sounds like, from his answer, that they know what the answer is.  This thing goes generally from -- generally, you know, PV-20 or more, they know what it is project by project.  I don't know why they won't tell us.  If they need us to narrow it, I'm happy to provide them the 17 or so projects and then maybe they can tell me, you know, what it looks like from there, if it's a burden argument.  But they haven't even made a burden argument

**PROCEEDINGS**

in their objection in their answer, so...

**THE COURT:**  Here's what I want you to do.  I want you to provide the 17 projects.

And, Mr. Lucisano, I want you to answer the interrogatories for those 17 projects with respect to -- I mean, I think you've already answered the general question, but answer, "Was there a specific rate for either a region or a project for those 17?"  And your answer may be no.

**MR. LUCISANO:**  Yeah.  I mean, I think Your Honor might be kind of getting at the disconnect between extrapolating some general hurdle rates to specific projects.  I mean, it's asking two different things.

**MS. HEFLEY:**  And, Your Honor, Amy Hefley jumping in here.  A hurdle rate, as we understood it, is when projects are being proposed at the company, is there some kind of threshold.  You have to have a return of at least this much for your project to get funds.  And that's what we answered.  The hurdle rate -- you know, there wasn't a specified hurdle rate, but generally 20 percent was what some of the testimony was.  You propose projects thinking it's going to get a 20 percent return.  And then as the project is drilled and producing, you see what the actual rate of return is, and that may or may not, you know, hit the rate of return.  It may be higher; it may be lower.  That's a totally different issue than what the general hurdle rate is.

**THE COURT:**  No, I understand.  You guys have answered

PROCEEDINGS

the general hurdle rate.  I just -- I want to -- I'm going to allow him to ask for those 17 areas whether there was a specific hurdle rate.  For instance, was there a different hurdle rate in the Delaware Basin.  You know, the answer may be, no, there wasn't.  You know, this general rule applied companywide.  Or if there was, yeah, you know, we have so much infrastructure in the Delaware Basin that we're okay with 15 percent because we still make money on it.

All right.  Mr. Cotilletta, what's next?

**MR. COTILLETTA:**  Okay.  Your Honor, that's all the smaller matters.  The elephant in the room is the RFAs because there's a bunch of them.  So, as Your Honor may recall, there were four sets, one to the company, and then three sets, one for each individual Defendant.  You know, I think it's important to kind of, just as a background, why we serve these RFAs.  We spent a lot of time preparing them.  We do believe they comport with case law.  We don't think they're compound.  And even if they are compound, case law is clear that if they're capable of separation and components and follow logical or chronological order, then they should be allowed.  The RFAs are a product of our attempt to get just simple information and narrow down issues.  We haven't been able up until this point in time, until today, to be able to get into some of these other large-scale development projects and other detailed information.  The RFAs sought to obtain that information, sought to narrow down the

PROCEEDINGS

number of tests that were being used by a project, et cetera, et cetera. And so that was a big part of the reason why we served these RFAs.

We also have a document destruction issue in this case. And in fairness to the Defendants, they have an argument. That argument is that there was destruction of documents pursuant to a -- I believe a six-month automatic deletion policy concerning emails; and then that there was an acquisition thereafter with ConocoPhillips; and it was subsequent deletion from that as well, and some carryover, where there was a stay of the deletion policy. We sought litigation holds. Some information regarding litigation holds have come out in response to RFAs from the individual Defendants. So we have a little more information now than we did, you know, two or three weeks ago. And so the RFAs, while there might be, you know, let's say 200 and -- about 250 directed at Concho, the first 170 are by project. We have ten RFAs per project, 17 projects. And they essentially ask the following:

Number one, whether certain testing existed; two, whether there was evidence of well interference from that testing; three, did the individual Defendants receive the testing of that project; four, you know, whether there were certain reports. And then it narrows it farther. It says, if there actual -- if certain reports -- and it lists them out -- if certain reports existed for project X. Then for those

**PROCEEDINGS**

reports that existed, did any of them show well interference. And if those ones showed it, did any of those -- for those projects, did those projects have forecasts. So there's a tapering. It's not as simple as they're ten subparts. They're all -- they're not logically ordered. They're not, you know -- and you're not capable of being able to simply go through them. So we made it in a way that it's broken out by project, very fluid; you can sit there and go through and say, admit, deny, admit, deny, admit, deny. Fairly straightforward. Fairly easy to comprehend. There are a large number of them. The case is large. There are a large number of large-scale projects. You know, that's unavoidable in a case like. You know, to balance our interests in getting to relevant information that we think that the investors are entitled to, the class is entitled to. We believe we're entitled to get to the truth, and these RFAs are a way to do that. And this is also a way to cut effectively from the issues. I mean, we talked earlier today how hard it would be to depose everybody on this stuff. Talked about how hard it is to produce evidence of all this stuff. I think the first step should be is they should be going through these and saying, look, we sat down with our engineer -- you know, I'll reference a project -- the Grissom Project -- or Brass Monkey is the first one. Brass Monkey. You know, none of these tests exist. The only one that exists is microseismic. Boom. Okay. Now, we've narrowed that down completely; it changes the effect

PROCEEDINGS

of the answers to the remaining RFAs.  So everything is triggered by the existence or non-existence of something.  This isn't, you know, a situation you see in the case law where people are -- litigators are trying to push RFAs on like highly contentious ultimate issues, you know, where, you know, it's subject to interpretation.  These are issues:  Does this report exist?  Does it not exist?  Does this testing exist?  Does this testing not exist?  Did so and so receive the test?  Did so and so receive the report?  Very straightforward, yes or no.  Was the sky blue?  Was it cloudy that day?  So that's the first 170.

There are a small number of up spacing.  RFAs 171 to 176, concern up spacing.  And that's -- again, that's the remedial measure the company put in place to address many different tightly spaced large-scale development projects.  And this happened in -- it started happening in early 2019, and was fully effectuated by the end of 2019.  So there's ones there. And for those, Your Honor, those projects are very straightforward.  Again, Project X, was Project X up spaced?  If it was up spaced, when?  You know, was it up spaced before this month?  Before that month?  Before that month?  Again, chronological order, easy to answer, admit, deny, admit, deny.

RFAs 177 and 196, concern risking.  This is obviously a really important part of the case.  Did the company apply mitigating factors to production forecast to lower the expected productivity of the project or well or certain aspects of the

**PROCEEDINGS**

project? And so it simply asks were -- was that applied on these specific projects? Admit, deny, admit, deny.

197 to 200, is analog wells. Again, this idea of prior projects either Concho operated or outside operated that have similar characteristics to what's being worked on in present time, you know. And so there's RFAs on that issue.

And then 201 to 210, those RFAs concern certain assumptions for spacing and production guidance. And these are relevant. These all seek to show that certain challenge statements had no basis, and Defendants knew that they had no basis, you know, by saying that, you know, production -- certain things were done or things were tightly spaced at a certain point in time. Everything is tied to either a logical or chronological order.

And then the final set -- and this is important because if the Court says -- if Your Honor says, you know, I hear you on the destruction stuff; we're not going go down there, and you were to cut the litigation hold questions, that's the last 50 or so questions in the RFA set. And those are simply asking the company if they issued a lit hold by a certain date and time. So -- because it's become very relevant. There's a ton of witnesses who don't have any documents, including one of the individual Defendants. We don't have any emails for that Defendant. We have a couple of -- you know, we have, I think, four or 500 documents they printed out with his

**PROCEEDINGS**

handwritten notes that he circled PowerPoint stuff, which happened to be really relevant and important and damming, but we don't -- we don't have -- like, aside from that, we have -- you know, it's not as simple as like one or two people in this case are missioning documents.  There are dozens of people who are missing documents, some are really important to the case.  And so I understand their argument, but I'm entitled, I think, at this stage, under these circumstances, to ask for a little more.  I'm not asking for attorney-client work product. I'm asking for when litigation holds were issued, and who were they issued to.  You know, and there's admits and denies for all of that.  So it's all in a chronological -- and, again, large number.  We're not denying it's a large number, but it's in a logical, chronological order that can be easily answered.  They answered those questions, Your Honor.  They answered them.  And Concho, for the most part, has objected to all the answers -- all the questions -- all the requests, rather.  So we're here now.  I'm happy to go through any specific RFAs.  Again, there's a lot, but they're by category, and I can address them that way too.

THE COURT:  Mr. Lucisano.

MS. HEFLEY:  It's Amy Hefley.  I'll take this one, Your Honor.

THE COURT:  Okay.

MS. HEFLEY:  I personally worked -- I personally worked on responding to the 246 RFAs that amount to 3,000 plus

PROCEEDINGS

RFAs, and so I can assure the Court that it is not as easy as is the sky blue or are oranges orange and apples red, and you could see that from the requests themselves.  So the first 170 written requests all have subparts.  And as I mentioned at the beginning of this hearing, it's not as simple as, can we go look at some repository and say, on question one, were these specific things done during a specific time period?  That would require digging to try to find the answer on each and every one of the specific subparts.  And so that's why we included in our objection for the reference back to what the Fifth Circuit, and others, including the commentary to the RJ rule, have said, which is, that these are not supposed to be discovery devices.  These are supposed to be things that can very easily be agreed, taken off the table, and that's how I've typically seen them used in my practice.  You know, admit that this document is authentic, or something else that's very discrete, and the parties are able to agree on, which is not what these are.

If you then go on to the next question -- you know, I think two is a great example of just how -- how subjective and not discrete these are, and this -- the data collected from a project indicated that at some point during a period there was more likely than not some indication of well interference.  All of that is going to be in the eye of the beholder and the question that it has in it, whether something was more likely than not, is really something you would ask a jury, not

## PROCEEDINGS

something you would put in an RFA.

So that is the problem with the first ten requests. So each of the first ten requests go to one project, and then they repeat that for another 17 projects, which is how you get the 107. And so to the extent we were able to, when their request asks about a specific report, you know, admit that there was or wasn't that report, we did; otherwise, these are so subjective and so broad that we were not able to do more than what we did. And I know that because I'm the one who was trying to work really hard with our team internal and external to try to find the answer to those.

When you move to the next chunk, those start at 171, you get into another set of requests that we really weren't able to answer. And to the extent we could, we denied many of them. But 171, for example, says, "Admit that you contemplated up spacing on at least one project before a different date?" Well, by the end of 2018, Concho was a 1500 employee company. There is no way that we could accurately admit that any one person contemplated up spacing before any of these dates. Up spacing itself is a vague term that we have heard from definition -- from depositions that people define differently. Some people say up spacing is just spreading out wells on a project. Our corporate representative testified that up spacing is actually drilling wells further apart from what the, quote, unquote resource spacing might have been. So there are different

101

PROCEEDINGS

definitions to begin with.  And those are just the kinds of questions, again, they do go to the ultimate issue.  I completely disagree with Mr. Cotilletta on that one.  All of these really, at the end of the day, go to ultimate issues, like well spacing, well interference, things like that.

172, admit that you up-spaced plan development between a certain period of time.  And then they list dozens and dozens of wells.  They clearly aren't on the same page as to what up spacing means because some of those wells have already been drilled and so it's unclear to me what they are asking us.  A bunch of wells that are already drilled and in the ground, I don't understand how one can spread them out further or up space them.  And that was something that also came out in the testimony.  So these are the issues that we're dealing with on those.

Now, when you get past these, you know, project questions into the litigation hold and text message requests, you'll see that, for the most part, we did answer those.  We admitted if we had a mobile device policy in place during the time.  We had denied if a litigation hold wasn't issued.  But the reality is the litigation hold for this case was issued after this case was filed in July of 2021, and that is -- when you piece together both the verification, which we independently provided to the Plaintiff, a declaration outlining Concho's document retention policy, ConocoPhillips' document retention

PROCEEDINGS

policy, when the documents were transferred from the Concho to ConocoPhillips after the January 2021 acquisition, when you piece all of that together, it makes perfect sense which custodians have documents and which ones don't, which is something else we put in that declaration many months ago.  So this notion that there was somehow improper destruction of documents is baseless.  And if you get to some of the requests asking about litigation of hold notices, and kind of what the contents of those litigation holds notices were, so admit that your litigation hold notice said X, that is specifically out of bound.  We have a case from -- again, it's another opinion from Judge Edison in the McDermott case, where he followed the weight of authority in saying that litigation hold notices and instructions are privileged.  They're attorney-client privilege communications, and they're thus not discoverable, which is why we did not answer those about the specific contents.  And then they've asked a bunch of questions about litigation hold notices unrelated to this action, unrelated to the allegations of this case, which are also completely out of bound.  They haven't made the threshold discovery showing you would need to make to discover into litigation hold notices on discovery matters to begin with, and certainly not in a way that requires us to answer more of these interrogatories -- more of these admissions -- requests for admissions than we did.  And so we would ask that we get protection from these requests for

**PROCEEDINGS**

admissions.  We've done the best we can using reasonably diligent searches, and we should not be required to do anything more.  They have many, many months, many hundreds of thousands of documents, pages, 15 depositions.  They're getting more corporate representative depositions on things like testing.  So this -- we think this is far out of bounds.  They have what they need from all the discovery they've already gotten in the case.

MR. COTILLETTA:  Your Honor.

THE COURT:  Mr. Cotilletta.

MR. COTILLETTA:  Oh, sorry, Your Honor.  I thought you said, "Hello."  I thought you were losing service or you were disconnecting.

Your Honor, if I may, just two counter points.

THE COURT:  Go ahead.

MR. COTILLETTA:  So starting with the litigation hold issue.  I think we have made a case out for it.  They've admitted that there's been destruction.  Now, when I mean destruction, I'm not insinuating that it was intentional to hide facts and information from the case.  I mean literally there was destruction of documents.  They've come forth with an explanation, an explanation they think that exonerates them, but I don't think that all of a sudden stops and we have to take their word for it.  I think we're entitled to test the veracity of that.  I haven't even gone -- we haven't even gone that far in, in terms of trying to figure out specific language and lit

104

PROCEEDINGS

holds. We're just -- I mean, there's some instance towards the end of the RFAs that says -- they don't say the language and the lit holds, but they say, you know, they would require preservation of text messages and emails. But even if they did, I think we are entitled to ask, "Hey, where are the lit holds?" And say, "When were they issued and who they were issued to," because there's rampant destruction. So I think that's the first point.

The second point on litigation about it being unrelated to the matter, the litigation is under a litigation hold. And the case law is clear, when a litigation hold is issued, even outside of this case, it causes a freeze or a stay on deletion power. They have this very tight deletion policy, I think of six months or so. If they had another case -- another issue, say, for example, there was a challenge to the RSP/Concho acquisition, or a large number of the custodians are targets in this case, were also sued in that case in Delaware Chancery or in Texas, under the corporate laws in Texas, and they -- there was a litigation hold issue, that would freeze those respective email policies. It doesn't not matter if there is -- you know, those would stay indefinite until the conclusion of that case. So it's very likely that there could be -- I mean, it's a big company, and they haven't answered the question, so I don't know, but there could have been other litigation holds that would have put a freeze on it. I explained to Ms. Hefley

PROCEEDINGS

recently at meet and confer, look, I've been in cases where this issue has come up and defense counsel has pushed really hard back and said, "No, we're not going to give it to you." And then they go back and they talk to their client and then they find out there was in fact a litigation hold from another case. And, in fact, they have the executive's text messages collected through another defense firm in another case and then they're going to produce it. It's happened. So I just -- you know, it was more of, "Hey, you know, can you make a representation that there wasn't? Or have you even talked to the client about it to see if that's a possibility? Have you exhausted all the possibilities for collection?" Because, you know, a case of this size and this magnitude with the damages it's, you know -- it's shocking to see that these many witnesses or custodians that don't have documents. And obviously it prejudices us because we can't effectively get all the information that we think we need on some of these issues. So I think the litigation hold stuff is totally appropriate. There's not many of them. There's 40 requests for admission. They're straightforward: Did it happen? Did it not happen? Did it happen on this day? Did it not happen on this day? And I think they should be answered.

I want to bring us back to the project --

**MS. HEFLEY:** While we're talking about the litigation hold ones, I think maybe there's a disconnect, and perhaps

106

**PROCEEDINGS**

Mr. Cotilletta didn't actually read our answers, because we answered the vast majority of the litigation hold RFAs, and those are the individual Defendants.  And they made clear that the first litigation hold related to the merger was issued December 1, 2020, which was -- and then updated following the lawsuit September 29th of 2021, that has already been answered. And, again, if you look back six months from the December of 2020, which is the retention policy that Concho had at the time, you would understand why there wouldn't -- if anything had been deleted prior to six months before 2020, i.e., before the discovery period in this case, and two years -- a year before this -- over a year before this lawsuit was filed, that's why there would be documents missing, to the extent there are any documents missing.  It was just a normal operation, you know, of the company's retention policy.  So I think perhaps on those RFAs we just have a disconnect, where Mr. Cotilletta hasn't seen that they answered them.

        **MR. COTILLETTA:**  No, I -- Your Honor, if I may.  I wasn't even done arguing my position on the issue.  I was providing a mere example.  The RFA doesn't say, specific to RSP. It says, "Was there any other litigation hold issued at this time period unrelated to this action?"  It's not related to just the RSP merger, or anything like that.  I'm not saying you didn't answer something when you did.  That's not what I'm getting at.  What I'm getting at is your general argument that

PROCEEDINGS

this is not relevant, and there's never an instance, I think, is what you were arguing, in which a litigation hold outside of the ones that when you related to the Concho's securities matter would be irrelevant, is just not true.  It doesn't comport with case law.  I mean, the litigation hold is a litigation hold.  It freezes the policies.  And it depends on who the target of those litigation holds were.  And that's what this is seeking.  It's not limited to the merger with RSP.  It's not limited to any litigation.  And so that's the purpose of it.  Because there might be other windows in this collection process that weren't chased down that might have more information for us.  Or, worse, because some of these folks have testified that they had no auto-delete policy on their phone.  Now, there's a way to do it, Your Honor, with your iPhone, where you can set it to delete 30 or indefinitely, et cetera.  Well, that would be bizarre.  It means we have it indefinite; you have the litigation hold, and somehow the emails got deleted or the information got deleted.  That means there must have been some sort of act of deleting, maybe, maybe not.  I'm entitled to go into that a little bit.  I can't even get there if I'm not allowed to figure out about other litigation holds and other potential cases during the same window of time regarding the same target.  So that was my point on the litigation hold.

Now, going back to the project-based RFAs, and that's the first 170, or so, they said they tried their best.  And I'm

PROCEEDINGS

looking at the response to Brass Monkey.  And let me just go up to the top.  It might be RFA No. 1.  They say in response to it, "Did a reasonable inquiry insufficient -- you know, "Reasonable inquiry is insufficient to allow Concho to determine the answer with respect to the undefined 40 subparts."  And so they can't admit or deny it.  I know for sure there's at least one or two documents that were produced for the Brass Monkey on some of these topics that clearly existed.  Like, this answer should not be, can't admit or deny.  So I'm concerned.  Like, they sit here and they say, "We went through and we did a reasonable search.  We looked at everything.  We can't admit or deny."  The first answer, right out the gate, is wrong.  They have.  They have documentation on the Brass Monkey, for example, on some of these projects.  So I don't understand how that can be the case.  I don't know how that answer could be what it is.  And that also gives me huge concern about these responses that were, you know -- were put together.  They were served within the time period, so they did it, but, you know, I do have concerns about the veracity of these responses.  So, you know, that's where I stand on the issue, Your Honor.  Again, I understand it's a large number, but it was done in a way that's logical.  It was done in a way that was chronological, in some instances, and I do think that the nature of the requests are such that they could be easily answered, if, if defense counsel sits within house or sits in corporate headquarters and asks some of these

**PROCEEDINGS**

engineers that worked on these projects what they know and they don't know.  I don't even think they've done that yet.

THE COURT:  Okay.  Here's what I'm going to do.  I'm going to look at the ones concerning the litigation hold.  With respect to the request for admissions concerning the various testing, which is, in effect, about 3,000 of them, I'm going to put that off until we actually -- we, the royal we, meaning you guys -- take the deposition on testing.  And then let's go back and visit it after that deposition.

Now, having said that, Mr. Cotilletta, if you have information that says, A, you guys know there's testing, why don't you go ahead and show opposing counsel and say, look, you know, all we're asking is yes or no on these.  Your own documents show yes on at least two things.  And, you know, they can follow up on that.  But as far as court action, I'm going to wait until after the depo -- the 30(b) depo on testing.

MR. COTILLETTA:  Okay, Your Honor.

THE COURT:  And I'll -- with respect to the ones on the litigation hold, I will look at those on my own now before then.

MR. COTILLETTA:  Okay.

MS. HEFLEY:  And, Your Honor, one last thing on the lit holds RFAs.  To the extent Your Honor looks at the ones that we did not answer with respect to other litigations unrelated to this one, if the Court thinks that further information is

**PROCEEDINGS**

required on those -- I disagree with Mr. Cotilletta's view.

There are plenty of cases that say one lit hold doesn't apply to another case or impose a duty in another case.  So if the Court gets to the point where it thinks perhaps additional information is required, we would love the opportunity to brief that for Your Honor.

THE COURT:  Okay.  If I think I need that, I will contact both sides.

MS. HEFLEY:  Okay.  Thank you.

THE COURT:  All right.  Mr. Cotilletta, are we done?

MR. COTILLETTA:  We have the individual Defendants -- we have, Your Honor, the individual Defendants' RFAs.  They're much shorter, and we can go through them much quicker.  I can deduce it very quickly for Your Honor.

THE COURT:  Okay.  Go ahead.

MR. COTILLETTA:  There are approximately -- and I'll use Defendant Giraud's, which is -- it was Exhibit B of Defendants' March 26th letter.  And his responses are Exhibit B of Plaintiffs' April 23rd letter.  It's a little tricky because the way the individual Defendants answered the RFAs, they didn't have the RFA in front.  You only see their answers; you don't see what the request was.  So you have to look at those, unfortunately, side-by-side.  So, Your Honor, the individual Defendant RFAs, there's about 40 of them for each Defendant, and the first nine are litigation holds.  So I would ask the Court

**PROCEEDINGS**

if they could look at those the same way they looked at -- they're going to look at Defendants -- the Court is going to look at Defendant Concho's lit hold answers. But, generally, I think the same language that tracks -- it's a little bit different because you're dealing with an individual, but the language tracks generally the same. The second subset of RFAs for Mr. Giraud to be 10 to 19. And those are essentially asking, "Did the individual defendant look at documents before he made the statement that we're alleging are false in pleading." Of course it's highly relevant to our case. And so, you know, those -- they generally said for those, "We can't sit here and tell you what we did day by day leading up to the statement." And our argument there is then the answer should be you can't admit or deny, not an objection. So it's more of a technical issue that we have with those responses.

THE COURT: Mr. Cotilletta.

MR. COTILLETTA: Yes.

THE COURT: Mr. Cotilletta, let me interrupt you for a minute. I can't find anything that has the request on it. I have a lot of responses and objections, but nothing that says, please admit X.

MR. COTILLETTA: Yeah. So, Your Honor, the way it was -- it was served underneath the Defendants' exhibits, the Defendant's letter dated March -- March 26th would be the exemplar we're using for Mr. Giraud.

**PROCEEDINGS**

**THE COURT:** Hold on. We're looking for it.

**MR. COTILLETTA:** Okay.

**THE COURT:** I got Mr. Giraud's responses. They're -- never mind. Be patient, Counsel. We're trying to pull up a copy. I don't know why the request did not go above each response, but it's not.

**MR. COTILLETTA:** I noticed the same thing, Your Honor. Sorry. Makes it harder to read it to the jurors.

**THE COURT:** Mr. Cotilletta, is there an attachment too?

**MR. COTILLETTA:** Yeah. So the RFAs directed at Mr. Giraud would have been attached as Defendants' Exhibit B, so Ms. Hefley's letter dated --

**THE COURT:** To what?

**MR. COTILLETTA:** It's Exhibit B to her letter to the Court. It was dated March 26th. She sent an email -- she sent an email, with that a letter and attachment A through -- Ms. Hefley can probably better speak it than me. I think it's A through D -- or A through E. And Exhibit B was --

**THE COURT:** And you think it's March 26th?

**MR. COTILLETTA:** Yeah, that's what I have. Let me double check that. That's what I have.

**THE COURT:** Because your letter was March 26th.

**MR. COTILLETTA:** Mine was March 25th. Hers is the next day.

**PROCEEDINGS**

**THE COURT:** Well, the March 26th one we have is from you.

**MS. HEFLEY:** Your Honor, we submitted a March 27th letter seeking protection from the RFAs. I think it's attached to the March 27th letter.

**THE COURT:** Okay. We're looking.

**MS. HEFLEY:** And the email was from Mr. Lucisano.

**THE COURT:** That might help. Okay. We found it. We're printing it right now.

Okay. Mr. Cotilletta, I now have it.

**MR. COTILLETTA:** All right. Your Honor, so the first RFAs are generally related to -- I say "generally" because there's one or two at the beginning that are more foundational or associated with fact witness texts --

**THE COURT REPORTER:** Mr. Cotilletta, this is the Court Reporter. You are going in and out for some reason.

**MR. COTILLETTA:** Oh, okay. Can you hear me better?

**THE COURT REPORTER:** Yes.

**MR. COTILLETTA:** How about now, sounds better?

**THE COURT REPORTER:** Yes, you do.

**MR. COTILLETTA:** Great.

**THE COURT:** Counsel, I promise you, we're going to find this thing.

**MR. COTILLETTA:** Okay. Your Honor, what I can do, I can email Rhonda real quick.

**PROCEEDINGS**

Does that work?

**MS. HEFLEY:**  I can forward the email.

**MR. COTILLETTA:**  Okay.  Your Honor, I sent the exhibit to Ms. Hawkins.  I cc'd defense counsel.

**THE COURT:**  Mr. Cotilletta, go ahead with the ones -- start with the ones that aren't litigation holds.

**MR. COTILLETTA:**  Okay.  So the -- yep.  So, Your Honor, so there are a number of them.  So there are three -- there are four subsets.  The first lit hold, we'll go back to that later.  The second subset is essentially what did the defendant look at to look at certain documents before -- or did he not look at any documents at all in the days leading up to the statements that we're saying were made with severe recklessness.  So that's -- that's the second set.  And for that, using Defendant Giraud, for example, he provides a brief discussion of regular meetings he had with the investor relations team, and then objects to the subparts vis-a-vis as improper recital of day-to-day, and says, basically, go take a deposition, which it's just -- on a technicality, it's just not how you answer an RFA.  You admit portions and you can deny or say that you can't admit or deny the rest, but you're supposed to provide a full response on the admission denial or the failure to admit or deny based on the information present.  So that alone, I think, requires an amendment on those responses.  So that would be Giraud responses, generally speaking, 10 to 19.

**PROCEEDINGS**

Then there's a third subset --

**THE COURT:**  Let me ask you.  Have you deposed him?

**MR. COTILLETTA:**  Yes, I have.  Yep.

**THE COURT:**  And you didn't ask him any of this stuff?

**MR. COTILLETTA:**  We did.  We asked him things he did leading up to the statements.  You know, Your Honor, point taken.  That is, yes, we did to a certain extent, not entirely on everything.  But I do think that -- at the minimum, I think, it should require an amendment.  And the RFAs don't -- generally speaking, we have the RFAs.  And, like you said earlier, you have them; you have the request; you have the answer.  If you're going to use them, you could use them almost like documentary evidence.  You put them right in front of a jury on an ELMO or something; you have the admission; you have the request, and you have the admission or denial, whatever it is that's pertinent to the point you're trying to make.  The way it's currently written, you can't do anything with it because it's not a responsive answer.  And, as Your Honor just mentioned, I don't even think it comports to the testimony at this point.  So I think it needs an amendment no matter what.  I guess, on the latter point, it's really up to the Defendants whether they want to tactically do that or not.  I do think at minimum I have a basis on technicalities that I think that -- you're supposed to answer an RFA with not just an objection left hanging, it should be, you know, with an admission or denial or a fail to admit or

**PROCEEDINGS**

deny because of some reason.  So that's all.  That's my general point on those issues.  I mean, I don't know if Your Honor already has a -- has already reached a conclusion on that, and that's fine.  We could go to the next subset.

THE COURT:  Ms. Hefley, you want to respond?

MR. RITCHIE:  Your Honor, Ritchie.  Your Honor, I'll respond to that.  I mean, I think we can, you know, talk about, in general, how we got these RFAs, in that, if you look through all these subparts that they sent us, and the ones he's going to go through in a second, relate to a whole series of documents.  You add it all up, it's over 700 things to respond to.  And they're seeking substantive discovery, not just clearing things that are not in dispute.  So we responded when we got this.  We reached out to them, and we pointed out case law saying that, you know, RFAs are not intended for factual discovery; they can be done through other mechanisms, and that, you know, Courts routinely disallow requests for admissions that run into the hundreds.  They may have brought those quotes in the **Penn Eng'g v. Peninsula Components** case that we sent them right away.  We pointed out these issues, and we said, "If you disagree with those, why don't you give us an extension so we can talk to the Court about these issues?"  They said, "No."  They said, "It's going to take a Court a while, and your deadline is going to come up, answer them anyway."  So we did because we had to.  We substantively went through meticulously answering them one by

PROCEEDINGS

one.  They never said what was wrong with our answers; they just told us they didn't like them.  And so here we are.  They've never given us these kinds of substantive points.  But we think our answers on these points are all sufficient.  And even though it's going way beyond what RFAs are intended for, we substantively engaged with this.  On these requests that he's talking about right now, he just told you he got the information he needed.  We just objected to these RFAs that are asking for a day-by-day itinerary of something six years ago of something that's not feasible for us to do and that's better approached by deposition testimony, which he was able to do shortly thereafter.  So it's a completely reasonable approach.  And he was then able to take depositions of all these witnesses, which he did for seven hours, inquiring to their memory about any of these issues, if he wanted more.  So we fully answered this.  He's got the answer he wants.  I don't know what else there is to do.  And we think, you know, he simply has not articulated anything that's reasonable.  And I don't know why he's still complaining about something, when he admittedly has the information he's waiting for, and has a second opportunity to get it through the deposition.

          **MR. COTILLETTA:**  Your Honor, if I could just respond that briefly.

          **THE COURT:**  Well, let's go to the next set.  I'm thinking about it.

**PROCEEDINGS**

**MR. COTILLETTA:** So the next ones are a little frustrating. So RFAs 20 to 22, it simply asks the witness if they regularly meet with certain people. Now, again, yes, Mr. Giraud did answer some of those questions at his deposition, but I don't think that excuses the fact that the responses are not sufficient. Actually, No. 21, they do answer, so we'll withdraw 21.

Twenty-two, I don't know if we -- let me just double check that, Your Honor. I want to make sure I'm precise here. They -- I don't know. They said they're not able to deny the request. I guess they could hang their hat on that. I mean, there are certain documents that the witness received, and I guess that goes more to the sufficiency. And if they want to -- I guess it's a tactical issue at this point. If they want to leave that there, they can leave that there. If they want to amend it, they should technically amend it. I think they have a duty to amend at this point, but it's not, you know -- predeposition, which is one of the reasons why we didn't grant an extension is because the whole purpose was to cut down the number of questions we were going to waste on the witness on things like this to establish what the witness has reviewed and move that and table that aside, was to have these interrogatories beforehand. So some of these were asked a second time, unfortunately, needlessly, because we didn't get the answer we needed. So I think 20 and 21, generally speaking,

**PROCEEDINGS**

we can withdraw.  Twenty-one, they say they weren't aware of an emergency meeting.  That's fine.  But, you know, avoiding No. 20, especially when it doesn't support testimony anymore.  And No. 22 is just not accurate or right, and so we would ask them to go back and amend that response.

**THE COURT:**  Why is it just not accurate or right?  Is there something called an "operating plan"?

**MR. COTILLETTA:**  Yeah.  He reviewed all of those, so I don't understand how he could say --

**THE COURT:**  Well, how do you know that?  Did you ask him in the deposition?

**MR. COTILLETTA:**  Yes.

**THE COURT:**  Okay.

**MR. COTILLETTA:**  A lot of this is to cut stuff down. You know, it's all about how you want to present it, right. We're far away from that.  But I do think that it's not technically right, and they should have a duty to amend it.  But I guess he can opt not to do that.  You know, I'm not really sure.  It's not right.

**MR. RITCHIE:**  I think the problem is he's referring to something called an "operating plan."  It's not signed.  He doesn't provide a Bates number of the document he's talking about.  This is exactly the problem with doing this through a RFA and trying to get discovery.  It's not what they're intending to comport; they're intended for some things that are

**PROCEEDINGS**

extremely precise, that aren't in dispute, and that you could admit or deny.  We couldn't do that because the vague way he defined it, we didn't know exactly what he was talking about. Now, he could have cleared that up in a deposition putting that in front of him or by amending his request.  He didn't do either of those things, so we gave a proper objection saying, "Look, you haven't been specific enough as to what you're talking about, so we can't admit or deny something that's vague and nebulous, and we don't know how you're going to use it."  And so we'll leave it at that.  But if he wanted to clear that up in a deposition two weeks later, he certainly could have done it. And he asked questions around these issues, so I don't think there's any actual issue of discovery here that he's lacking or has been unable to get information.

THE COURT:  Okay.  And does that -- Counsel, does your arguments for each side carry through the end of these or is there --

MR. COTILLETTA:  Well, the last set -- so for Mr. Giraud, and most of the individual Defendants, the last subset of information essentially asks, were they in receipt of certain periodic documents, and whether they ever asked any questions or any concerns about it.  You know, for this -- generally for these RFA responses, what they do is they say, we received -- they'll admit whether they received that particular document, and how often they received, but deny the rest as

121

**PROCEEDINGS**

saying it's too vague about whether questions were asked or whether it was discussed with others or raised concerns.

Now with Mr. Giraud, depending on some of these, I covered them.  Depending on others, I didn't, for sake of time.  There were other issues we had to handle.  Again, the idea was that this was supposed to be a way of cutting out that questioning to save time.  But we ended up having to go through it because of the way that they objected through it.  So it ended up not being able to serve the purpose that we wanted it to serve, which was to narrow down the issues, which is an appropriate purpose for an RFA.  So, you know, at this point, it's one of those things where they would need to amend to conform to the evidence.  It doesn't -- you know, I think they should answer it and say whether they had concerns or not had concerns.  I don't think that's a vague term.  I think that's a -- I think, you know, concerns in ordinary English means you had a concern.  You know, if you asked a question, you asked a question.  I don't think asking a question or discussing it with others is a vague request.  I think it could be easily answered.

**MR. RITCHIE:**  And so, yeah, I'll respond to that.  And I think the answer to your question, Your Honor, is, yes, our discussion that we just had does carry through.  It's the same issue here, with the added wrinkle that a lot of these requests are talking of documents that we received on a daily or weekly basis and asking about all of them.  So you add up how

## PROCEEDINGS

iterations of these documents we got, times whatever letter J is in the alphabet. You know, we're talking hundreds of requests about these documents. It's an unreasonable burden to try to respond to that. And, in any event, it's an impossible burden, given that we're talking about issues that happened more than five years ago and asking specific questions like, did you ask questions about it before a specific date. This is not something that is within the recollection. And he's asking it in a vague way that doesn't admit to a clear admission or denial; it's better explored through other discovery avenues. And he had the opportunity to do it, to the extent it was important to him, at the deposition. And he got the information he needed to the extent it's relevant, and anything more would just be unduly burdensome. We answered it to the extent we can. Even if they receive these documents, I don't think we can give him this clean RFA response that he's looking at for each and every iteration on each of these vague issues. And so I think our response and objection is appropriate on all of these.

THE COURT: Okay. I'm going to sustain the objections to the individual request for admissions. And I think there are better means for getting that testimony.

All right. I'm taking it under consideration -- after the depositions of the testing individual, I'll reconsider the ones to the company. And then the ones on the litigation hold, I'm going to look at those specifically.

**PROCEEDINGS**

MR. COTILLETTA: Okay, Your Honor.

THE COURT: All right. Mr. Cotilletta, are we done?

MR. COTILLETTA: Yeah. I'm happy to say, Your Honor, we're done. I just want to make one point really clear. I want to be very quick on this. You know, earlier -- I just don't want there to be a misunderstanding with defense counsel when I said that, you know, we're withdrawing certain issues today. That meant the dispute, not the actual fact that there was a request or a response, not that it would be deleted from the record permanently. And I think I was obvious when I said that, but it was more of the fact that those disputes -- we withdraw the fact that there were those disputes or that those disputes were initiated by us. So those are off the table now, and I made them clear on the record earlier at the deposition. So that's it. With that said, Your Honor, I am done. And I really appreciate your time this afternoon.

THE COURT: All right. Well, I'm sorry it took us a while to get to it, but I was in a five-week trial. You know, we were going from 8:30 in the morning 'til 6:00, 6:30 at night, and we just couldn't squeeze anything else in.

All right. Thank you.

MS. HEFLEY: One last follow-up from Defendant. There was one specific request where we had asked that information be provided in 14 days. We would just request that for all these requests to the extent Plaintiffs are going to get us a narrowed

124

**PROCEEDINGS**

list or talking of topics for a deposition, that kind of thing.

We really want to keep it moving, so we request that that

applies to everything.

**THE COURT:** Mr. Cotilletta, can you do that? There

were that many things.

**MR. COTILLETTA:** Well, Your Honor, if I can, I was

just going to say Mr. Fatale was going to reach out to

Ms. Hefley about just scheduling all these different things. If

we could have that opportunity to confer with counsel. I don't

think it would be much longer than 14 days, but we'd just like

to be able to -- Mr. Fatale would like to speak to Ms. Hefley on

that issue offline, if that's okay, and we can report back to

Ms. Rhonda with a date certain for all these things.

**THE COURT:** That works for me. But you can also --

you don't have to do it all at once. You could have a rolling

production, so to speak.

**MR. COTILLETTA:** Okay. And, then, Your Honor, just to

be clear about the expert deadline because that's coming up on

June 9th. So there's a lot here, so it sounds like as part of

that meet and confer process, we should also discuss, I think,

as you said earlier today, kind of what that -- the new schedule

is going to do look like.

**THE COURT:** And the reason I say that is because,

number one, we're thumping up against it, you know, in the next

couple of weeks. Number two, if we just extend it -- you know,

PROCEEDINGS

bump it 20 days, 30 days, we're going to be in somebody's vacation.  So -- I mean, it would be my recommendation that you talk, you know, four, five months backing it up.  I don't want to put either the Defendants or the Plaintiffs in a bind.  I'm just throwing that out there, and that's why I thought y'all could probably do better talking to each other, than having me just arbitrarily set something.

MR. COTILLETTA:  Okay.

MS. HEFLEY:  Your Honor, we're happy to talk to Plaintiffs.  We want to get to summary judgment, so we appreciate the consideration of summer schedules, but we want to keep this moving, especially since the discovery cutoff already was over April 23rd.

THE COURT:  And I understand that too, but, you know, if there's clearly an area where the Plaintiffs are entitled to something and they haven't got to it, maybe because I was in the middle of a case and couldn't rule on something, I mean, I'm going to give them that consideration, so there's, you know -- don't be unreasonable about it, is what I'm telling you.

MS. HEFLEY:  We certainly understand.

THE COURT:  All right.  Thank y'all.

MR. COTILLETTA:  Thank you, Your Honor.

MS. HEFLEY:  Thank you.

(Whereupon, the Court adjourned at 5:30 p.m.)

**PROCEEDINGS**
**\* \* \* \***

I certify that the foregoing is a correct transcript

from the record of proceedings in the above matter.

Date:  May 31, 2025

/S/ Monica Walker-Bailey, MS, FCRR, RPR, CSR
Signature of Court Reporter

**MR. COTILLETTA: [107]**
3/4 3/20 5/7 5/9 9/18 9/20 10/20 11/19 14/9 14/24 15/16 15/21 18/4 22/23 24/5 27/5 28/20 30/3 30/8 33/8 35/22 37/16 37/24 38/17 39/16 40/20 42/11 43/19 43/23 45/22 46/1 48/10 49/2 50/7 52/7 52/10 52/15 54/10 54/13 57/17 60/4 62/15 62/19 65/1 66/3 66/6 70/7 71/14 71/17 75/10 75/13 75/16 78/11 79/7 79/18 79/21 79/24 80/9 80/15 80/18 82/11 82/15 82/19 83/23 84/24 85/15 87/10 88/21 91/1 93/10 103/8 103/10 103/15 106/18 109/17 109/21 110/11 110/16 111/17 111/22 112/2 112/7 112/11 112/15 112/21 112/24 113/11 113/17 113/19 113/21 113/24 114/3 114/7 115/3 115/5 117/22 118/1 119/8 119/12 119/14 120/18 123/1 123/3 124/6 124/17 125/8 125/22

**MR. LUCISANO: [37]**
7/24 9/5 13/3 13/12 26/4 29/1 29/3 29/12 31/24 32/1 32/21 34/20 39/21 39/23 47/17 63/20 64/21 64/25 65/8 69/15 70/11 70/20 71/5 71/10 74/14 75/8 77/5 79/10 79/12 81/25 83/11 86/20 88/1 89/16 90/14 90/24 92/9

**MR. RITCHIE: [5]** 3/12 58/13 116/6 119/20 121/20

**MS. HEFLEY: [30]** 3/9 7/21 14/10 14/13 16/12 16/21 17/17 22/25 23/17 44/20 45/2 45/13 52/17 57/16 58/23 58/25 84/15

92/13 98/21 98/24 105/24 109/22 110/9 113/3 113/7 114/2 123/22 125/9 125/20 125/23

**THE COURT REPORTER: [3]** 113/15 113/18 113/20

**THE COURT: [146]**

**$**

**$3M [1]** 66/11
**$5 [1]** 72/23

**'**

**'RSVP [1]** 45/7
**'til [1]** 123/19
**'till [1]** 59/7

**/**

**/S [1]** 126/5

**0**

**02473 [1]** 1/5
**0631 [1]** 1/20
**0700 [1]** 1/24

**1**

**1,000-foot [1]** 30/1
**10 [7]** 5/3 20/25 21/1 21/4 87/10 111/7 114/25
**10,000 [1]** 87/13
**100 [2]** 15/25 68/15
**10005 [2]** 1/20 1/23
**107 [1]** 100/5
**10th [1]** 26/6
**11 [3]** 5/3 45/24 88/21
**12 [4]** 1/14 5/2 52/11 82/16
**1270 [1]** 2/4
**13 [1]** 4/9
**14 [2]** 123/24 124/10
**140 [2]** 1/19 1/22
**15 [6]** 4/10 5/2 32/23 51/24 82/16 103/4
**15 percent [1]** 93/7
**1500 [1]** 100/17
**15th [1]** 44/16

**16 [1]** 9/24
**17 [12]** 9/23 11/5 13/24 23/8 66/24 91/23 92/3 92/5 92/8 93/2 94/17 100/4
**170 [4]** 94/16 96/10 99/3 107/25
**171 [3]** 96/11 100/12 100/15
**172 [1]** 101/6
**176 [1]** 96/12
**177 [1]** 96/22
**18 [5]** 4/10 5/11 7/25 10/13 23/8
**18,000 [1]** 77/8
**19 [2]** 111/7 114/25
**1957 [1]** 2/7
**196 [1]** 96/22
**197 [1]** 97/3
**1st [1]** 9/12

**2**

**20 [20]** 4/11 7/1 8/5 24/7 24/9 24/10 25/18 27/7 27/21 29/4 29/6 37/5 51/24 52/14 90/23 91/21 118/2 118/25 119/3 125/1
**20 percent [4]** 89/20 90/20 92/19 92/20
**20,000-foot [2]** 26/25 29/25
**200 [4]** 15/25 16/2 94/16 97/3
**200,000 [1]** 20/7
**200-plus [1]** 11/2
**2001 [1]** 2/10
**201 [1]** 97/7
**2017 [2]** 9/12 10/2
**2018 [5]** 9/15 34/5 38/23 48/5 100/17
**2018/2019 [1]** 9/24
**2019 [7]** 9/15 9/24 46/4 48/5 80/24 96/15 96/16
**2020 [4]** 9/13 106/5 106/8 106/10
**2021 [3]** 101/22 102/2 106/6
**2022 [3]** 55/19 55/19 56/4
**2025 [4]** 1/14 56/3 57/11

**2025... [1]** 126/4
**21 [10]** 4/11 24/7 24/9 24/12 25/18 27/8 27/21 118/6 118/7 118/25
**21-cv-2473 [1]** 3/2
**210 [1]** 97/7
**212 [2]** 1/20 1/24
**214 [1]** 2/12
**22 [4]** 4/7 4/8 118/2 119/4
**220-7823 [1]** 2/12
**229-1270 [1]** 2/4
**229-1957 [1]** 2/7
**23rd [3]** 23/1 110/19 125/13
**24 [1]** 47/25
**24-hour [2]** 50/9 51/19
**246 [1]** 98/25
**2473 [1]** 3/2
**24th [1]** 44/16
**25 [8]** 4/11 7/1 10/6 10/17 16/18 17/22 30/8 30/16
**25,000-feet [1]** 37/5
**250 [1]** 94/16
**250-5087 [1]** 2/16
**25th [7]** 4/14 4/19 4/21 5/10 37/18 49/3 112/24
**26,000 [1]** 77/9
**26th [6]** 110/18 111/24 112/16 112/20 112/23 113/1
**27 [2]** 4/10 8/1
**27th [2]** 113/3 113/5
**29th [1]** 106/6
**2:00 [1]** 1/10

### 3

**3,000 [2]** 98/25 109/6
**30 [20]** 4/6 4/10 5/5 7/17 13/25 26/25 30/15 32/19 35/12 37/7 38/6 40/13 42/9 43/20 44/18 45/18 45/23 107/14 109/16 125/1
**31 [5]** 5/17 15/1 15/13 32/2 126/4
**31st [1]** 47/20

**34th [2]** 1/19 1/23
**35 [4]** 4/11 24/8 25/19 27/22
**361 [1]** 71/20
**37 [3]** 4/11 33/8 42/12
**3700 [1]** 2/11
**386 [1]** 71/20
**389 [1]** 71/20
**3:40 [1]** 65/2
**3:47 [1]** 65/3

### 4

**40 [6]** 14/16 16/23 17/1 105/19 108/5 110/24
**40-test [1]** 16/16
**400 [1]** 39/9
**400 feet [1]** 39/3
**45 percent [1]** 84/22
**450 [1]** 39/9
**49 [7]** 4/11 33/13 42/24 42/25 43/6 43/7 43/24
**4:21-CV-02473 [1]** 1/5

### 5

**50 [6]** 6/25 8/5 9/13 10/19 77/18 97/19
**500 [1]** 97/25
**5087 [1]** 2/16
**515 [1]** 2/14
**5:30 p.m [1]** 125/24
**5th [1]** 4/25

### 6

**60 [2]** 22/8 23/2
**61 [6]** 4/11 45/23 47/19 48/12 48/22 81/4
**660 feet [2]** 85/20 85/23
**6:00 [1]** 123/19
**6:30 at [1]** 123/19

### 7

**700 [1]** 116/11
**713 [3]** 2/4 2/7 2/16
**75201 [1]** 2/11
**77002 [3]** 2/4 2/7 2/15
**7823 [1]** 2/12

**8004 [1]** 2/15
**8:30 in [1]** 123/19
**8th [2]** 46/12 80/12

### 9

**907-0631 [1]** 1/20
**907-0700 [1]** 1/24
**910 [2]** 2/3 2/6
**972401 [1]** 55/19
**9th [2]** 3/24 124/19

### A

**ability [4]** 16/8 24/16 24/18 55/15
**able [37]** 8/4 14/20 18/23 19/4 19/5 20/17 20/22 21/22 21/23 25/14 25/24 31/3 35/16 36/21 37/6 57/13 62/15 65/19 68/8 72/4 72/17 73/17 76/23 83/3 89/13 93/22 93/23 95/6 99/16 100/5 100/8 100/13 117/11 117/13 118/10 121/9 124/11
**above [5]** 50/16 83/15 90/16 112/5 126/3
**absolute [1]** 72/25
**absolutely [7]** 3/20 21/17 48/17 48/23 61/19 70/11 79/7
**access [4]** 38/12 55/8 55/15 63/10
**according [1]** 86/5
**account [1]** 66/1
**accounting [1]** 63/23
**accurate [3]** 87/17 119/4 119/6
**accurately [1]** 100/18
**achieving [1]** 91/4
**acknowledged [1]** 56/4
**acknowledgement [1]** 38/8
**acoustical [1]** 76/21
**acquired [7]** 43/9 43/11 44/19 44/22 44/23 45/11 45/19

**acquirer [1]** 45/11
**acquisition [22]** 33/10 34/1 34/8 34/13 35/16 36/2 36/4 36/6 37/2 37/8 42/14 42/15 42/23 43/8 43/9 43/17 43/18 45/13 45/20 94/8 102/2 104/16
**acquisitions [1]** 41/5
**acronym [3]** 88/2 88/3 88/9
**across [9]** 13/24 39/9 72/9 73/20 73/20 77/18 85/20 88/14 89/6
**act [1]** 107/18
**action [7]** 1/4 20/20 21/4 87/8 102/18 106/22 109/15
**actions [1]** 21/5
**active [1]** 21/9
**activities [1]** 81/13
**activity [3]** 46/4 46/6 81/13
**actual [10]** 65/11 65/25 77/21 85/1 85/6 89/7 92/22 94/24 120/13 123/8
**actually [26]** 7/21 9/24 11/15 13/21 14/14 22/15 30/1 30/12 31/7 43/18 62/9 64/5 64/5 66/2 77/9 84/8 86/12 90/6 90/8 90/9 90/11 91/3 100/23 106/1 109/7 118/6
**add [8]** 14/13 33/3 42/16 43/24 71/14 74/13 116/11 121/25
**added [1]** 121/23
**addition [2]** 10/1 33/2
**additional [6]** 7/16 33/3 53/18 85/16 85/23 110/4
**address [5]** 18/18 24/8 80/6 96/13 98/19
**adjourned [1]** 125/24
**adjust [1]** 16/9
**admissible [1]** 78/16
**admission [10]** 14/15 16/16 16/23 17/1 105/19 114/22

**admissions [9]** 6/13 14/14 14/18 102/24 102/24 103/1 109/5 116/17 122/20
**admit [26]** 95/8 95/9 95/9 96/21 96/21 97/2 97/2 99/15 100/6 100/15 100/18 101/6 102/9 108/6 108/9 108/11 111/14 111/21 114/20 114/21 114/23 115/25 120/2 120/8 120/24 122/9
**admits [2]** 32/2 98/11
**admitted [3]** 64/14 101/19 103/17
**admittedly [1]** 117/19
**after [10]** 23/12 33/16 43/18 75/14 80/2 101/22 102/2 109/9 109/16 122/22
**afternoon [4]** 3/4 3/9 3/12 123/16
**again [40]** 6/14 9/21 10/21 12/20 14/24 16/13 18/20 24/24 28/19 29/18 30/4 31/10 32/8 35/17 35/23 36/7 36/13 38/7 53/12 57/6 67/11 67/14 73/24 75/24 86/25 88/18 89/16 90/5 96/12 96/18 96/20 97/3 98/12 98/18 101/2 102/11 106/7 108/20 118/3 121/5
**against [1]** 124/24
**agenda [1]** 4/12
**aggregate [2]** 77/17 77/23
**ago [11]** 18/17 40/1 41/22 42/2 51/9 56/4 77/7 94/15 102/5 117/9 122/6
**agree [11]** 23/16 23/18 25/1 44/4 49/23 51/16 56/19 69/18 91/6 91/14 99/17
**agreed [10]** 19/25 38/20 48/23 51/8 51/9 54/25 59/1 60/24 66/17 99/13
**agreement [5]** 10/9 55/7 58/4 58/5 78/23

**agreements [4]** 54/20 55/13 55/14 55/15
**agrees [1]** 55/9
**ahead [14]** 5/7 5/8 9/19 14/12 31/25 37/23 39/22 71/16 75/15 79/11 103/14 109/12 110/15 114/5
**aided [2]** 2/17 19/7
**ALFRED [2]** 1/21 3/6
**alive [1]** 58/11
**allegations [6]** 10/3 71/19 71/19 74/15 74/17 102/18
**alleging [1]** 111/9
**allow [8]** 28/14 44/18 45/8 45/17 57/12 78/12 93/2 108/4
**allowed [3]** 68/8 93/20 107/20
**allowing [1]** 39/5
**allows [4]** 15/4 31/3 68/4 74/2
**alone [2]** 16/18 114/24
**along [3]** 24/20 85/7 85/7
**alphabet [1]** 122/2
**already [27]** 8/11 13/4 14/4 15/20 22/13 23/18 26/22 32/15 36/11 39/23 40/18 48/8 49/4 53/15 54/8 59/16 70/10 78/7 89/7 92/6 101/9 101/11 103/7 106/6 116/3 116/3 125/12
**alternatives [1]** 22/4
**although [2]** 27/20 54/24
**always [7]** 20/17 41/6 67/10 68/9 72/11 72/12 81/19
**amend [6]** 118/16 118/16 118/17 119/5 119/17 121/12
**amending [1]** 120/5
**amendment [3]** 114/24 115/9 115/20
**among [1]** 64/18
**amount [10]** 15/3 15/7 17/8 25/9 34/5 40/22 56/18 76/16 80/4 98/25

**A**

**AMY [12]** 2/2 3/9 14/10 16/12 22/25 44/20 52/17 57/18 58/8 84/15 92/13 98/21

**analog [4]** 25/3 27/14 29/16 97/3

**analysis [5]** 28/5 74/3 74/18 77/16 89/22

**analyze [2]** 57/13 60/16

**analyzing [1]** 27/14

**ANDREW [1]** 1/13

**Angelos [7]** 8/11 16/24 17/11 29/6 45/4 45/16 47/19

**angle [3]** 37/11 37/11 39/11

**another [19]** 4/11 17/20 30/12 35/5 59/4 59/5 61/5 68/7 77/24 100/4 100/13 102/11 104/14 104/14 105/5 105/7 105/7 110/3 110/3

**answer [57]** 9/10 13/7 14/22 16/17 22/12 22/14 23/11 30/2 30/23 83/18 84/5 84/8 84/9 84/13 85/8 85/9 85/12 85/24 87/5 88/2 89/2 89/7 89/13 89/14 90/11 91/19 91/19 92/1 92/4 92/7 92/8 93/4 96/21 99/8 100/11 100/14 101/18 102/16 102/23 106/24 108/4 108/8 108/12 108/15 109/24 111/13 114/20 115/11 115/18 115/24 116/24 117/16 118/4 118/6 118/25 121/14 121/21

**answered [23]** 87/7 88/10 88/18 88/19 89/18 89/19 90/3 92/6 92/17 92/25 98/14 98/14 98/15 104/23 105/22 106/2 106/6 106/17 108/24 110/20 117/15 121/19 122/14

**answering [1]** 116/25

**answers [13]** 14/18 14/20

46/18 80/25 83/2 88/13 96/1 98/16 106/1 110/21 111/3 117/1 117/4

**ANTHONY [1]** 2/5

**Antitrust [1]** 55/18

**anybody [3]** 25/13 45/9 76/10

**anymore [1]** 119/3

**anything [20]** 8/22 42/3 42/15 49/22 54/8 59/19 59/20 67/9 74/11 74/13 81/8 83/17 103/2 106/9 106/23 111/19 115/17 117/18 122/13 123/20

**anyway [1]** 116/24

**apart [3]** 82/5 85/20 100/24

**apologize [1]** 79/20

**apparently [1]** 76/24

**appear [1]** 12/2

**APPEARANCES [2]** 1/16 1/25

**appeared [1]** 88/8

**appendix [2]** 9/11 9/11

**apples [5]** 67/19 67/19 72/23 72/24 99/2

**applied [2]** 93/5 97/1

**applies [1]** 124/3

**apply [7]** 56/19 58/6 58/7 85/16 85/23 96/23 110/2

**appreciate [2]** 123/16 125/11

**approach [7]** 15/10 15/11 23/6 72/1 83/20 83/21 117/12

**approached [1]** 117/10

**approaching [1]** 16/5

**appropriate [6]** 8/20 51/19 87/22 105/18 121/11 122/18

**approximately [2]** 52/10 110/16

**April [6]** 23/1 26/6 46/12 80/12 110/19 125/13

**April 10th [1]** 26/6

**April 23rd [3]** 23/1 110/19

125/13

**April 8th [2]** 46/12 80/12

**arbitrarily [1]** 125/7

**area [7]** 28/18 83/17 84/7 85/5 85/6 85/8 125/15

**areas [3]** 6/24 31/5 93/2

**aren't [7]** 14/20 17/22 54/23 67/12 101/8 114/6 120/1

**argue [4]** 20/18 46/9 57/23 61/22

**argued [1]** 66/19

**arguing [7]** 18/9 46/5 63/6 75/23 81/15 106/19 107/2

**argument [15]** 15/8 19/7 67/18 69/1 69/9 74/10 75/22 76/8 91/25 91/25 94/5 94/6 98/7 106/25 111/13

**arguments [1]** 120/16

**Aris [23]** 60/7 60/7 60/8 61/4 61/11 61/25 62/5 62/8 62/23 63/10 64/8 65/7 65/16 68/19 69/13 70/19 70/20 70/23 71/9 71/21 71/22 73/17 74/18

**arise [1]** 8/8

**around [2]** 38/21 120/12

**art [1]** 32/5

**article [1]** 34/4

**articulate [1]** 89/18

**articulated [1]** 117/17

**ascribe [1]** 90/1

**aside [4]** 42/21 84/11 98/3 118/22

**ask [24]** 9/2 15/4 16/1 19/14 35/16 37/6 47/21 47/25 66/23 70/6 76/11 89/25 93/2 94/18 98/8 99/25 102/25 104/5 110/25 115/2 115/4 119/4 119/10 122/6

**asked [23]** 13/5 40/9 51/14 84/16 84/16 86/1 86/16 88/1 88/8 88/12 88/18 90/6 90/11 90/15 102/17 115/5 118/23 120/12 120/21 121/1 121/17

**A**

**asked... [2]** 121/17 123/23
**asking [28]** 7/14 16/22 17/2 32/12 41/23 48/7 50/21 51/13 53/11 64/5 64/6 69/19 72/15 86/10 89/16 92/11 97/20 98/9 98/9 101/10 102/8 109/13 111/8 117/8 121/18 121/25 122/6 122/8
**asks [7]** 84/18 88/22 97/1 100/6 108/25 118/2 120/20
**aspects [2]** 32/25 96/25
**asset [5]** 8/16 8/16 11/22 11/25 35/14
**assets [1]** 21/13
**associated [6]** 27/21 36/16 67/22 81/13 81/14 113/14
**assuming [2]** 61/21 66/16
**assumption [2]** 31/1 39/3
**assumptions [4]** 34/15 35/3 88/5 97/8
**assure [1]** 99/1
**attached [2]** 112/12 113/4
**attachment [2]** 112/9 112/17
**attack [1]** 14/23
**attempt [2]** 83/7 93/21
**attempts [1]** 5/16
**attorney [4]** 50/25 51/1 98/9 102/14
**attorney-client [3]** 51/1 98/9 102/14
**August [1]** 9/12
**August 1st [1]** 9/12
**authentic [1]** 99/15
**authority [1]** 102/13
**auto [1]** 107/13
**auto-delete [1]** 107/13
**automatic [1]** 94/7
**available [3]** 53/6 65/20 90/4
**avenue [2]** 2/10 7/10
**avenues [2]** 43/14 122/10
**avoid [3]** 41/8 41/16 48/14
**avoiding [1]** 119/2
**aware [1]** 119/1
**away [2]** 116/19 119/16
**awfully [2]** 21/21 74/15

**B**

**back [39]** 8/15 16/18 17/21 18/5 29/4 34/4 41/18 41/18 42/19 43/19 44/17 48/16 51/16 53/11 54/16 56/3 57/9 62/2 63/8 63/8 64/24 65/3 66/23 67/10 69/17 77/9 81/5 82/1 89/1 99/10 105/3 105/4 105/23 106/7 107/24 109/8 114/9 119/5 124/12
**backdoor [1]** 33/4
**background [1]** 93/15
**backing [2]** 52/18 125/3
**backup [1]** 88/17
**bad [4]** 73/9 73/12 73/12 91/8
**Bailey [2]** 2/13 126/5
**Baker [9]** 2/3 2/6 3/10 7/24 49/17 54/14 55/11 59/9 71/7
**balance [2]** 28/11 95/12
**base [1]** 31/1
**based [15]** 6/11 7/7 19/8 36/12 42/2 42/3 55/2 66/16 83/2 86/24 89/24 90/4 90/22 107/24 114/23
**baseless [1]** 102/7
**basic [1]** 9/25
**basically [7]** 44/22 77/11 77/13 78/6 89/1 90/15 114/18
**basin [12]** 11/23 31/15 35/5 35/5 35/14 39/4 39/8 62/22 76/25 89/25 93/4 93/7
**basins [4]** 12/18 12/19 36/5 88/25
**basis [8]** 6/10 56/12 84/8 84/9 97/10 97/11 115/23 121/25
**bat [1]** 82/17
**Bates [2]** 86/10 119/22

**battle [1]** 72/19
**bear [2]** 48/3 82/19
**become [6]** 10/2 25/12 33/22 39/10 43/5 97/21
**becomes [2]** 12/19 47/2
**been [65]** 12/2 12/16 12/17 17/20 18/6 18/6 19/4 20/2 20/2 20/3 24/23 24/24 25/14 27/18 28/8 28/9 35/7 35/15 36/11 36/22 37/6 37/7 37/9 38/7 39/19 40/20 41/14 45/15 46/10 46/15 48/8 50/17 57/20 59/18 60/9 60/23 61/23 63/6 67/16 68/20 69/25 71/25 73/15 76/23 79/19 82/3 84/2 86/4 86/5 88/12 88/13 90/6 90/18 93/22 100/25 101/9 103/17 104/24 105/1 106/6 106/9 107/18 112/12 120/7 120/14
**before [28]** 1/13 4/4 15/3 18/9 29/5 34/1 40/12 41/22 43/8 44/7 56/25 57/1 59/11 69/16 77/21 96/19 96/20 96/20 100/16 100/19 106/10 106/10 106/11 106/12 109/19 111/8 114/11 122/7
**beforehand [1]** 118/23
**began [1]** 9/12
**begin [4]** 60/17 68/11 101/1 102/22
**beginning [3]** 10/5 99/4 113/13
**behalf [3]** 1/4 3/13 35/19
**beholder [1]** 99/23
**being [20]** 18/15 20/5 20/21 30/2 35/9 36/21 37/6 40/22 53/1 58/5 81/12 82/24 84/16 86/11 92/15 94/1 95/6 97/5 104/9 121/9
**believe [20]** 5/22 6/1 9/13 23/19 24/15 38/3 38/4 39/17 46/25 48/12 49/25 53/17 55/13 55/14 56/21 62/21

**believe... [4]**  88/25 93/16 94/7 95/15
**below [2]**  34/5 91/12
**benefit [1]**  41/22
**besides [2]**  8/22 8/24
**best [17]**  11/4 14/5 22/14 25/16 32/5 36/25 44/23 44/24 62/7 68/12 68/13 71/23 80/6 90/4 90/7 103/1 107/25
**better [10]**  7/10 52/11 84/22 112/18 113/17 113/19 117/10 122/10 122/21 125/6
**between [22]**  9/12 11/23 15/25 25/10 28/11 33/17 33/24 38/4 42/9 42/9 51/20 51/23 55/20 56/13 73/7 76/25 84/4 85/23 88/24 89/8 92/10 101/6
**beyond [11]**  6/16 6/18 14/1 19/21 26/12 55/16 72/10 78/3 82/5 89/18 117/5
**big [5]**  17/21 73/24 79/22 94/2 104/22
**bigger [2]**  7/11 20/7
**biggest [1]**  85/25
**billion [2]**  20/19 21/8
**bind [1]**  125/4
**birds [1]**  33/15
**bit [9]**  4/24 34/18 43/7 43/10 56/21 79/5 81/6 107/19 111/4
**bizarre [1]**  107/15
**blend [1]**  43/6
**blocked [1]**  50/25
**Blow [1]**  32/20
**blue [2]**  96/10 99/2
**board [5]**  39/9 73/20 73/21 88/14 89/6
**body [1]**  72/11
**boil [1]**  15/15
**book [1]**  85/19
**booked [1]**  85/22

**booking [5]**  11/8 18/15 30/18 32/4 85/17
**Boom [1]**  95/24
**both [7]**  4/22 5/13 6/10 38/12 56/11 101/23 110/8
**bothers [1]**  68/14
**Botts [9]**  2/3 2/6 3/10 7/24 49/17 54/14 55/11 59/9 71/8
**bound [2]**  102/11 102/19
**bounds [1]**  103/6
**Brass [5]**  95/22 95/23 108/1 108/7 108/13
**bravado [1]**  74/24
**break [2]**  41/10 64/22
**BRENDA [1]**  1/9
**bridge [1]**  84/12
**brief [2]**  110/5 114/15
**briefly [3]**  54/11 58/25 117/23
**bring [3]**  55/5 55/6 105/23
**bringing [1]**  60/6
**broach [1]**  25/14
**broad [7]**  13/25 26/11 28/18 29/22 43/2 70/3 100/8
**broader [5]**  27/11 44/7 80/3 80/5 85/1
**broadly [2]**  9/1 34/11
**Broadway [2]**  1/19 1/22
**broken [1]**  95/7
**brought [1]**  116/18
**built [1]**  87/1
**bump [1]**  125/1
**bunch [9]**  22/13 34/12 36/23 46/5 66/9 81/18 93/12 101/11 102/17
**bundle [2]**  12/12 24/6
**burden [17]**  15/8 16/13 18/19 18/25 20/18 22/9 22/15 27/20 61/19 74/10 75/22 77/19 77/23 91/25 91/25 122/3 122/4
**burdensome [11]**  22/16 23/7 28/5 57/6 57/9 59/14 59/21 62/12 75/23 79/4

122/14
**buried [1]**  65/17
**burrow [1]**  29/24
**business [4]**  57/2 73/16 73/16 91/17
**buttons [2]**  50/3 67/23
**buy [1]**  41/12

## C

**CA [1]**  2/13
**calculations [3]**  62/5 88/4 88/17
**call [9]**  11/8 27/14 28/21 28/23 41/15 62/3 70/4 84/14 85/21
**called [4]**  25/3 55/18 119/7 119/21
**calling [1]**  16/22
**calls [1]**  85/13
**came [3]**  81/7 89/1 101/13
**can't [29]**  19/7 19/7 19/9 24/24 30/22 30/25 32/20 39/4 39/5 47/12 59/3 60/17 69/16 74/4 78/22 83/5 83/18 86/9 105/16 107/20 108/5 108/9 108/11 111/11 111/14 111/19 114/21 115/17 120/8
**candidate [1]**  45/3
**cannot [2]**  16/17 81/23
**capable [2]**  93/18 95/6
**capacity [3]**  30/15 54/17 54/18
**capital [1]**  9/16
**capitalized [1]**  85/4
**care [2]**  65/6 66/25
**cared [1]**  6/14
**careful [1]**  5/23
**carry [2]**  120/16 121/22
**carryover [1]**  94/10
**case [115]**  3/22 5/24 6/9 6/16 6/19 8/12 11/15 12/7 12/9 13/14 13/22 17/7 18/2 18/3 18/22 19/4 20/19 20/22 20/23 20/25 21/1 21/2 21/7 21/24 21/25 24/15 26/1

**case... [88]** 33/23 34/12 34/22 36/12 38/20 39/10 43/5 46/15 48/3 49/5 49/6 49/12 50/9 50/11 52/20 52/23 53/10 53/19 55/3 55/16 55/18 56/8 57/7 57/21 57/24 58/15 59/1 61/7 61/23 62/13 64/8 64/17 65/25 67/21 68/10 68/22 68/22 69/25 70/16 72/5 72/6 72/8 73/3 73/5 73/15 74/6 74/7 76/1 77/7 77/22 81/8 87/14 90/3 93/17 93/18 94/5 95/10 95/12 96/3 96/23 98/4 98/6 101/21 101/22 102/11 102/12 102/19 103/7 103/16 103/19 104/11 104/12 104/14 104/17 104/17 104/21 105/5 105/7 105/12 106/11 107/5 108/14 110/3 110/3 111/10 116/14 116/19 125/17

**cases [13]** 11/24 49/10 50/24 51/1 51/3 52/19 53/6 58/2 72/9 72/9 105/1 107/21 110/2

**cash [1]** 71/23

**catalogs [1]** 9/11

**categorical [2]** 89/3 89/17

**categories [6]** 7/2 8/3 8/7 54/22 80/5 85/12

**categorization [1]** 74/20

**category [4]** 26/12 35/18 86/22 98/19

**causes [1]** 104/12

**cautiously [1]** 73/1

**cc'd [1]** 114/4

**Center [1]** 2/10

**central [3]** 17/12 21/18 33/22

**centralized [1]** 13/8

**centrally [2]** 12/11 13/9

**centrally-located [1]** 13/9

**centric [1]** 72/1

**CEO [1]** 34/1

**certain [57]** 10/3 11/3 11/16 11/25 12/13 20/4 25/4 25/15 27/7 31/5 31/5 33/22 34/5 37/4 41/10 41/10 41/11 47/1 48/17 48/23 49/6 49/8 49/9 50/2 50/15 51/20 51/20 51/20 51/21 55/9 56/8 56/18 56/20 69/10 70/9 76/20 76/21 89/3 91/5 94/19 94/23 94/24 94/25 96/25 97/7 97/9 97/11 97/12 97/20 101/7 114/11 115/7 118/3 118/12 120/21 123/7 124/13

**certainly [15]** 6/20 6/24 13/24 30/4 32/21 36/3 36/6 71/11 73/5 76/19 79/8 91/5 102/22 120/11 125/20

**certainty [1]** 26/13

**certification [1]** 18/9

**certify [1]** 126/2

**cetera [11]** 16/7 16/7 24/22 50/24 50/24 60/12 60/13 84/4 94/1 94/2 107/15

**CFO [1]** 59/4

**chain [4]** 53/6 53/18 68/4 74/2

**chains [2]** 53/5 59/10

**chair [1]** 31/21

**challenge [5]** 18/3 18/14 77/21 97/9 104/15

**challenged [3]** 17/22 48/2 48/4

**chambers [1]** 69/7

**chance [1]** 18/11

**Chancery [1]** 104/17

**change [2]** 67/8 81/17

**changed [2]** 56/5 56/21

**changes [3]** 61/16 62/9 95/25

**characteristics [2]** 25/8 97/5

**charge [1]** 13/15

**charted [1]** 70/17

**charts [1]** 60/16

**chased [1]** 107/11

**check [2]** 112/22 118/9

**chopped [1]** 60/22

**chronological [6]** 93/19 96/21 97/14 98/12 98/14 108/22

**chunk [1]** 100/12

**circled [1]** 98/1

**Circuit [3]** 55/18 72/20 99/10

**circumstances [3]** 42/1 42/4 98/8

**circumstantial [2]** 72/13 73/6

**cite [3]** 86/9 86/13 87/13

**citing [1]** 74/15

**CITY [2]** 1/3 3/2

**CIVIL [1]** 1/4

**claim [3]** 15/2 62/20 87/20

**clarification [1]** 47/23

**clarify [2]** 29/3 45/3

**clarity [1]** 26/18

**class [8]** 10/3 10/5 18/9 20/20 24/11 60/12 62/10 95/14

**clean [5]** 41/6 41/6 68/6 74/1 122/16

**cleanse [1]** 41/16

**clear [15]** 7/7 20/15 26/5 26/15 45/23 50/15 87/15 93/18 104/11 106/3 120/10 122/9 123/4 123/14 124/18

**cleared [1]** 120/4

**clearing [1]** 116/12

**clearly [7]** 24/23 26/25 83/3 86/21 101/8 108/8 125/15

**click [1]** 67/23

**client [7]** 15/7 19/11 51/1 98/9 102/14 105/4 105/10

**clients [3]** 54/3 57/10 58/19

**close [1]** 47/15

**closed [3]** 23/1 35/7 44/21

closing [1] 40/13
cloudy [1] 96/10
coincidence [1] 46/24
colleague [1] 3/6
collected [2] 99/20 105/6
collecting [1] 53/24
collection [9] 25/16 53/13 54/7 57/15 58/1 58/17 59/15 105/12 107/10
comb [1] 67/20
combination [2] 26/20 83/17
come [16] 10/8 34/6 37/12 51/18 54/16 55/8 60/20 64/23 78/22 86/2 89/9 89/10 94/12 103/20 105/2 116/24
coming [4] 23/21 30/19 39/11 124/18
comma [5] 38/18 38/18 38/23 44/7 44/7
comment [2] 39/5 42/16
commentary [1] 99/11
comments [1] 39/6
committed [1] 72/11
communication [1] 56/13
communications [3] 38/2 80/22 102/15
companies [4] 21/14 25/4 40/11 53/23
company [61] 4/22 6/8 6/10 6/20 9/5 9/14 11/15 11/21 12/14 13/21 25/1 27/13 30/24 31/3 31/8 31/14 31/19 32/25 33/25 34/2 34/8 34/16 34/16 35/20 36/5 36/17 40/12 43/11 46/4 51/25 54/17 55/3 59/5 60/15 61/17 63/24 65/12 65/22 66/2 68/11 70/13 71/2 71/24 71/25 73/14 73/20 81/15 85/4 88/22 90/5 90/8 91/2 91/7 92/15 93/13 96/13 96/23 97/20 100/17 104/23

122/24
company's [7] 10/4 24/16 32/5 33/19 64/6 64/11 106/15
companywide [3] 31/9 87/12 93/5
compare [1] 70/2
compel [1] 87/16
compendium [1] 8/13
competitor [4] 24/25 28/5 40/11 41/5
competitors [4] 24/13 25/2 25/5 27/15
complaining [1] 117/19
complaint [3] 60/8 71/20 74/15
complete [9] 6/6 18/10 19/6 21/10 39/19 39/20 48/14 58/16 88/14
completely [5] 35/23 95/25 101/3 102/19 117/12
completion [2] 19/17 19/18
complicated [1] 49/5
comply [2] 22/24 79/16
components [2] 93/19 116/19
comport [5] 73/14 73/15 93/16 107/4 119/25
comports [1] 115/19
compound [2] 93/17 93/18
comprehend [2] 48/3 95/10
computer [1] 2/17
computer-aided [1] 2/17
conceivable [3] 65/11 77/14 77/15
concept [2] 25/2 90/14
concern [5] 96/12 96/22 97/7 108/16 121/17
concerned [1] 108/9
concerning [4] 57/24 94/8 109/4 109/5
concerns [8] 15/8 87/22 108/18 120/22 121/2 121/14 121/15 121/16

concessions [1] 4/2
CONCHO [28] 1/7 1/8 2/2 3/2 4/7 4/13 4/18 5/1 24/11 33/17 33/24 34/9 35/10 36/5 44/25 45/20 59/6 80/23 81/2 82/12 94/16 97/4 98/15 100/17 102/1 104/15 106/8 108/4
Concho's [14] 21/12 21/12 24/13 26/7 32/4 33/9 46/2 61/25 78/5 80/25 88/2 101/24 107/3 111/3
conclusion [2] 104/21 116/3
conduct [1] 41/7
conducted [2] 24/11 24/13
confer [12] 19/1 23/17 24/2 37/25 51/12 51/18 56/10 68/1 71/18 105/1 124/9 124/20
conferences [1] 83/1
confers [1] 27/24
confidence [1] 74/11
confident [1] 5/24
confidential [4] 5/23 39/6 56/3 74/16
confidentiality [2] 74/7 74/8
confines [1] 66/20
confirm [1] 48/20
confirmation [1] 54/24
confirmed [1] 53/18
conform [1] 121/13
confused [1] 42/8
confusing [2] 47/18 47/22
confusion [2] 83/12 83/13
connection [1] 38/2
CONOCOPHILLIPS [7] 1/7 2/2 21/12 45/14 59/6 94/9 102/2
ConocoPhillips' [2] 21/13 101/25
consideration [3] 122/22 125/11 125/18
considered [1] 11/7

**considering [1]** 32/11
**consistency [1]** 88/14
**consistent [3]** 83/20 87/23 90/5
**constitute [1]** 50/10
**constituted [1]** 26/7
**consummated [1]** 41/9
**contact [1]** 110/8
**contain [3]** 42/13 61/12 74/25
**contained [4]** 60/19 63/16 71/4 71/9
**contains [2]** 43/2 62/19
**contemplated [2]** 100/15 100/19
**contemplates [1]** 89/5
**contemplating [1]** 51/11
**contentious [2]** 86/2 96/5
**contents [2]** 102/9 102/16
**context [1]** 88/5
**contingent [1]** 74/20
**continue [1]** 65/7
**Continued [1]** 2/1
**continues [1]** 50/16
**contract [8]** 19/16 46/14 47/13 48/1 80/23 81/9 81/20 82/4
**contracts [2]** 47/11 81/4
**contractual [1]** 46/21
**contradicts [1]** 39/7
**control [3]** 21/10 55/4 59/7
**controversy [1]** 21/7
**conversation [4]** 50/15 50/16 53/9 67/14
**conversations [2]** 51/23 73/8
**cooperate [1]** 55/9
**copy [1]** 112/5
**coring [1]** 17/2
**corporate [24]** 8/4 8/9 8/11 8/23 13/5 14/4 26/5 29/17 32/3 32/7 32/7 32/10 32/13 32/15 32/18 33/1 35/13

68/18 86/14 86/25 100/23 103/5 104/18 108/25
**correct [4]** 47/8 52/4 52/11 126/2
**correctly [1]** 62/1
**correspond [1]** 7/14
**cost [1]** 68/24
**cost-effective [1]** 68/24
**costs [1]** 15/7
**COTILLETTA [69]** 1/18 3/5 3/16 8/2 8/10 9/8 9/20 10/22 12/23 14/8 17/12 22/7 22/17 22/19 22/23 23/9 23/15 24/3 26/24 28/16 29/17 29/21 30/7 32/2 32/12 33/7 40/7 42/9 45/21 47/20 49/1 52/19 58/13 59/17 59/24 60/3 63/25 64/7 64/14 65/17 66/4 69/18 70/12 75/5 75/11 78/9 79/17 82/10 83/21 84/20 84/23 85/14 87/9 88/20 93/9 101/3 103/9 106/1 106/16 109/10 110/10 111/16 111/18 112/9 113/10 113/15 114/5 123/2 124/4
**Cotilletta's [1]** 110/1
**could [71]** 6/11 6/22 6/22 12/20 13/8 15/5 15/10 22/4 22/5 26/2 34/25 35/13 37/22 42/14 42/18 49/23 50/14 50/19 61/9 61/16 62/23 64/19 65/10 65/24 66/24 67/4 67/10 68/20 69/8 69/8 71/6 71/10 72/5 73/23 74/5 76/18 77/3 77/16 80/15 83/24 83/24 85/5 86/7 87/18 87/21 88/8 88/10 89/11 89/23 91/4 91/6 99/2 100/14 100/18 104/22 104/24 108/15 108/24 111/1 115/12 116/4 117/22 118/11 119/9 120/1 120/4 120/11 121/19 124/9 124/15 125/6
**couldn't [4]** 71/3 120/2

**counsel [22]** 6/23 12/14 33/12 42/5 42/9 52/11 54/3 54/17 54/18 56/20 61/20 63/13 69/8 105/2 108/24 109/12 112/4 113/22 114/4 120/15 123/6 124/9
**Counsel's [1]** 42/14
**counter [1]** 103/13
**country [2]** 72/6 72/10
**couple [7]** 10/9 41/18 48/20 81/22 86/13 97/24 124/25
**course [11]** 35/14 46/9 46/15 46/22 62/10 63/2 88/3 88/15 89/20 89/23 111/10
**court [32]** 1/1 2/13 2/14 4/4 19/25 20/24 21/2 46/12 48/19 55/22 56/4 56/7 56/15 56/21 59/8 60/7 61/9 67/14 69/4 97/16 99/1 109/15 109/25 110/3 110/25 111/2 112/16 113/15 116/22 116/23 125/24 126/5
**Court's [3]** 4/1 48/18 74/8
**Courts [1]** 116/16
**cover [5]** 7/5 43/6 44/3 44/6 66/21
**coverage [1]** 6/15
**covered [2]** 49/3 121/4
**covering [1]** 86/14
**covers [1]** 63/23
**crap [1]** 43/4
**create [1]** 8/14
**created [3]** 36/14 46/18 56/8
**creation [2]** 26/8 29/16
**credit [1]** 11/20
**criteria [1]** 18/14
**critical [1]** 91/9
**critically [1]** 25/12
**Crow [1]** 2/10
**CSR [2]** 2/13 126/5
**CSR-CA [1]** 2/13
**current [5]** 49/12 54/4 55/1

**current...** [2]  55/21 60/1
**currently** [3]  38/12 67/3
 115/16
**curve** [1]  88/23
**curves** [3]  26/9 60/16 87/1
**custodial** [1]  19/11
**custodian** [2]  55/24 55/24
**custodians** [4]  7/15 102/4
 104/16 105/14
**custody** [4]  55/3 59/7 68/4
 74/2
**custom** [1]  73/18
**customary** [1]  49/9
**cut** [9]  5/13 23/9 35/24
 42/19 50/17 95/16 97/18
 118/19 119/14
**cutoff** [2]  57/4 125/12
**cutoffs** [2]  24/1 24/1
**cutting** [1]  121/6
**cv** [2]  1/5 3/2

**D**

**daily** [1]  121/24
**Dallas** [1]  2/11
**damages** [1]  105/13
**damming** [1]  98/2
**dark** [1]  11/3
**data** [42]  11/13 13/6 17/24
 20/3 20/3 20/9 20/14 24/21
 24/25 36/8 39/2 40/9 40/10
 40/15 41/4 41/5 60/16 60/17
 61/17 62/18 62/18 63/2 63/2
 63/18 65/10 68/19 69/4
 70/21 71/3 71/8 71/22 73/12
 73/12 73/23 75/20 76/19
 76/21 77/14 77/23 78/4 89/9
 99/20
**data-dump** [1]  77/23
**database** [34]  60/7 60/8
 60/9 60/19 60/23 61/4 61/4
 61/11 61/25 62/8 62/16
 63/10 63/22 64/7 65/22
 66/12 66/17 67/23 68/19

69/14 69/19 70/3 70/19
 70/20 70/23 71/1 71/4 71/9
 71/12 71/12 71/22 72/4
 73/18 75/2
**databases** [2]  60/14 73/25
**date** [12]  19/19 19/19 20/12
 37/1 43/17 53/8 53/9 97/21
 100/16 122/7 124/13 126/4
**dated** [3]  111/24 112/13
 112/16
**dates** [1]  100/19
**day** [18]  19/19 38/16 43/17
 59/7 59/11 79/25 86/15
 96/10 101/4 105/21 105/21
 111/12 111/12 112/25
 114/18 114/18 117/9 117/9
**days** [8]  10/9 41/19 48/20
 114/12 123/24 124/10 125/1
 125/1
**deadline** [4]  3/24 23/19
 116/23 124/18
**deadlines** [5]  23/5 23/10
 23/16 23/22 23/25
**deal** [2]  41/9 79/22
**dealing** [6]  21/15 21/16
 21/17 32/9 101/14 111/5
**dealt** [2]  55/6 55/19
**debate** [1]  21/6
**dec** [1]  37/4
**decades** [1]  67/16
**December** [2]  106/5 106/7
**December 1** [1]  106/5
**decent** [1]  50/21
**decided** [1]  66/15
**decision** [1]  29/15
**decision-making** [1]  29/15
**decisions** [2]  24/22 26/8
**declaration** [5]  55/25 69/6
 69/10 101/24 102/5
**declarations** [1]  19/2
**declining** [1]  72/3
**decreased** [1]  46/6
**dedicating** [1]  9/15
**deduce** [1]  110/14

**keep** [1]  18/12
**deeper** [3]  20/8 38/10 41/23
**defendant** [15]  10/15 32/18
 80/25 81/2 82/12 93/14
 97/24 110/17 110/24 110/24
 111/3 111/8 114/11 114/15
 123/22
**Defendant's** [1]  111/24
**defendants** [57]  1/11 2/2
 2/8 3/8 3/13 4/20 4/23 5/16
 11/4 11/17 15/6 21/10 25/17
 30/10 33/21 34/21 34/23
 37/20 39/4 46/7 46/16 47/7
 49/5 49/6 52/12 52/22 54/23
 54/25 55/2 55/21 56/14
 57/23 58/14 59/25 60/20
 62/8 68/17 69/22 71/5 71/18
 75/22 78/15 79/4 80/19
 85/12 94/5 94/13 94/21
 97/10 97/23 106/3 110/11
 110/20 111/2 115/21 120/19
 125/4
**Defendants'** [11]  60/1 72/8
 72/16 72/16 73/4 76/7 86/5
 110/12 110/18 111/23
 112/12
**defense** [15]  6/23 12/14
 33/11 56/16 61/20 63/13
 69/8 86/5 86/12 87/25 105/2
 105/7 108/24 114/4 123/6
**defenses** [1]  91/10
**define** [1]  100/21
**defined** [2]  9/6 120/3
**definitely** [1]  12/14
**definition** [6]  87/11 87/12
 87/21 88/2 88/9 100/20
**definitionally** [2]  64/16
 70/1
**definitions** [3]  30/21 32/5
 101/1
**degree** [5]  12/9 27/7 27/10
 30/14 31/13
**Delaware** [4]  11/23 93/4
 93/7 104/17

**delete [2]** 107/13 107/14
**deleted [4]** 106/10 107/17 107/17 123/9
**deleting [1]** 107/18
**deletion [5]** 94/7 94/9 94/11 104/13 104/13
**demands [1]** 75/1
**demonstrative [1]** 40/1
**denial [4]** 114/22 115/15 115/25 122/10
**denied [2]** 100/14 101/20
**denies [1]** 98/11
**densely [1]** 85/17
**density [3]** 11/7 40/3 85/21
**Denver [1]** 59/5
**deny [19]** 95/8 95/9 95/9 96/21 96/21 97/2 97/2 108/6 108/9 108/11 111/14 114/20 114/21 114/23 116/1 118/10 120/2 120/8 120/25
**denying [2]** 60/2 98/13
**department [1]** 32/10
**departments [1]** 33/1
**departures [1]** 45/14
**depending [5]** 23/12 56/12 88/5 121/3 121/4
**depends [1]** 107/6
**depo [4]** 29/22 44/17 109/16 109/16
**deponents [2]** 54/4 54/4
**depose [4]** 12/24 32/20 32/22 95/18
**deposed [10]** 6/9 32/25 34/22 35/14 45/8 51/24 53/1 60/23 74/16 115/2
**deposing [1]** 32/18
**deposition [38]** 3/22 5/17 12/25 14/1 15/1 15/13 16/1 16/9 16/25 22/11 26/10 26/16 26/20 28/1 28/15 28/15 29/5 30/13 32/19 44/18 47/24 50/22 53/19 57/1 59/12 81/4 109/8 109/9

114/19 117/11 117/21 118/4 119/11 120/4 120/11 122/12 123/14 124/1
**depositions [18]** 6/9 10/19 12/16 22/4 22/8 27/2 33/2 38/8 45/15 63/6 64/8 86/3 89/9 100/21 103/4 103/5 117/13 122/23
**deprive [1]** 40/5
**depth [2]** 38/8 52/1
**derived [1]** 85/2
**described [6]** 16/25 17/11 30/25 84/2 90/7 90/18
**describes [1]** 52/19
**describing [2]** 16/24 65/7
**designated [5]** 28/10 29/7 47/19 48/5 48/9
**designs [1]** 81/17
**despite [1]** 28/6
**destroyed [1]** 76/14
**destruction [8]** 94/4 94/6 97/17 102/6 103/17 103/18 103/20 104/7
**detailed [2]** 17/24 93/24
**details [1]** 5/15
**determine [2]** 8/16 108/4
**developed [1]** 33/18
**developing [1]** 91/11
**development [9]** 5/14 6/21 8/24 9/6 36/4 72/1 93/24 96/14 101/6
**device [5]** 4/11 8/20 55/5 55/6 101/19
**devices [5]** 4/4 7/6 7/8 17/25 99/12
**devolving [1]** 48/2
**dictate [1]** 32/12
**didn't [22]** 12/10 29/10 32/14 40/16 47/21 47/25 50/13 51/10 51/21 52/24 64/7 83/6 106/1 106/24 110/20 115/4 117/2 118/18 118/24 120/3 120/5 121/4
**differences [1]** 89/8

**different [45]** 4/3 4/5 7/8 10/13 12/18 17/18 18/8 20/24 22/2 25/11 33/1 34/12 35/5 36/3 36/11 41/24 42/17 43/3 43/7 43/11 46/5 51/8 51/9 52/1 52/18 54/8 62/23 71/1 76/1 77/2 81/6 81/18 83/24 88/7 88/24 89/24 91/4 92/12 92/24 93/3 96/14 100/16 100/25 111/5 124/8
**differently [5]** 51/6 58/14 58/21 88/11 100/21
**difficulties [1]** 45/12
**digest [1]** 64/13
**digestible [1]** 65/10
**digging [2]** 41/23 99/7
**digs [1]** 20/8
**diligence [7]** 36/2 36/15 38/22 40/9 40/12 41/8 43/12
**diligent [2]** 16/17 103/2
**diligently [1]** 6/4
**dimension [1]** 34/7
**dimensions [1]** 33/22
**direct [3]** 28/7 33/21 72/25
**directed [8]** 4/7 4/13 4/18 4/20 81/2 82/12 94/16 112/11
**direction [3]** 35/18 39/9 74/12
**directional [2]** 7/2 17/4
**directionally [4]** 6/12 25/15 33/23 87/15
**directly [3]** 72/7 73/4 81/7
**disagree [7]** 15/9 27/20 30/12 87/3 101/3 110/1 116/20
**disallow [1]** 116/17
**discern [1]** 13/20
**disclosed [8]** 9/15 10/7 47/8 67/13 67/13 83/4 83/4 83/19
**disclosure [2]** 18/14 61/21
**disclosures [8]** 82/23 82/25 82/25 83/5 83/13 84/10 84/14 85/13

**disconnect [7]** 75/2 82/7 87/6 90/13 92/10 105/25 106/16

**disconnecting [1]** 103/12

**discover [1]** 102/21

**discoverable [1]** 102/15

**discovery [36]** 3/18 4/3 4/11 7/6 8/20 8/21 10/2 11/14 13/14 17/25 18/10 18/10 23/1 23/19 23/21 33/5 33/23 35/7 40/2 41/23 52/23 69/25 70/14 77/6 81/7 99/12 102/20 102/21 103/7 106/11 116/12 116/15 119/24 120/13 122/10 125/12

**discovery-wise [1]** 3/18

**discrete [4]** 9/17 40/15 99/16 99/20

**discuss [5]** 25/24 51/4 51/18 80/2 124/20

**discussed [6]** 26/15 27/9 73/9 73/9 77/20 121/2

**discussing [2]** 27/12 121/18

**discussion [8]** 21/19 47/10 49/14 49/16 49/17 53/20 114/16 121/22

**discussions [2]** 27/24 75/18

**disk [1]** 67/24

**dispositive [1]** 24/1

**disproportionate [4]** 18/2 65/25 70/4 77/21

**dispute [14]** 4/8 5/3 5/5 5/11 19/23 19/24 21/15 32/14 33/14 37/15 46/13 116/13 120/1 123/8

**disputes [6]** 3/25 4/5 4/16 123/11 123/12 123/12

**distinct [1]** 54/22

**distinction [2]** 54/14 55/20

**district [6]** 1/1 1/1 1/14 20/23 55/17 55/19

**DIVISION [1]** 1/2

**doable [1]** 14/8

**document [18]** 14/19 15/20 17/7 34/10 37/2 77/7 78/6 86/1 86/6 86/16 86/16 86/22 94/4 99/15 101/25 101/25 119/22 120/25

**documentary [1]** 115/12

**documentation [1]** 108/13

**documents [73]** 4/13 6/17 7/14 10/25 11/2 12/1 13/17 18/12 19/9 19/22 20/7 34/17 34/24 35/2 35/3 36/13 38/2 39/17 39/24 40/4 40/6 40/15 40/24 41/20 41/25 43/10 44/15 47/12 47/13 59/16 67/20 68/20 70/24 72/6 77/10 77/17 78/1 78/13 80/20 80/22 81/22 86/2 86/8 86/8 87/14 87/24 88/8 88/16 94/6 97/22 97/25 98/5 98/6 102/1 102/4 102/7 103/4 103/20 105/15 106/13 106/14 108/7 109/14 111/8 114/11 114/12 116/10 118/12 120/21 121/24 122/1 122/3 122/15

**doe [1]** 51/23

**does [13]** 31/8 41/9 42/13 59/7 72/11 96/6 96/7 96/7 96/7 114/1 120/15 120/15 121/22

**doesn't [25]** 23/6 23/8 35/11 41/13 41/25 58/5 58/6 58/7 62/1 62/6 67/9 72/15 73/14 73/15 83/17 87/4 89/7 104/20 106/20 107/4 110/2 119/3 119/22 121/13 122/9

**dog [1]** 58/12

**doing [7]** 17/7 30/2 31/10 63/3 67/16 86/24 119/23

**dollar [1]** 20/19

**dollars [1]** 21/8

**Dominator [29]** 5/20 6/3 8/22 8/25 9/4 9/24 11/1 12/3 13/14 18/13 18/23 21/18

**document [18]** 14/19 15/20 21/18 21/19 25/12 49/24 50/19 51/22 53/5 63/1 63/1 73/20 75/19 77/9 77/12 77/14 77/25 78/3 78/13

**done [33]** 12/8 17/2 17/10 17/20 18/15 19/11 21/20 32/22 36/24 51/2 51/3 52/2 56/5 56/24 64/12 65/21 65/24 66/18 67/5 75/12 97/12 99/7 103/1 106/19 108/21 108/22 109/2 110/10 116/16 120/11 123/2 123/4 123/15

**double [3]** 10/16 112/22 118/8

**doubt [3]** 9/22 18/7 72/10

**down [45]** 3/22 5/13 6/23 6/24 6/25 6/25 7/10 8/2 9/23 10/9 10/20 10/22 11/9 15/15 20/13 23/9 24/8 25/23 28/13 29/24 30/17 36/21 38/10 51/4 59/23 61/1 76/10 76/15 76/15 76/16 78/10 78/22 79/2 79/2 79/3 79/13 93/21 93/25 95/21 95/25 97/17 107/11 118/19 119/14 121/10

**downloading [1]** 61/4

**downloads [1]** 67/23

**dozen [2]** 47/7 57/23

**dozens [5]** 57/3 78/3 98/5 101/7 101/7

**drilled [4]** 85/16 92/21 101/10 101/11

**drilling [8]** 11/8 17/3 25/8 33/25 46/2 46/14 46/21 100/24

**drive [5]** 61/5 63/12 66/13 67/24 67/24

**dry [1]** 89/23

**due [7]** 36/2 36/15 38/21 40/9 41/7 43/12 68/25

**dump [1]** 77/23

**duplicative [1]** 26/21

**during [16]** 19/1 19/17 24/11 25/1 37/25 60/12 61/13 63/17 66/25 76/4 80/23 89/12 99/7 99/21 101/19 107/21
**duty [5]** 12/7 25/17 110/3 118/17 119/17

**E**

**each [28]** 4/6 7/10 8/13 13/10 13/13 17/16 17/18 22/9 53/1 53/11 54/19 54/20 59/8 61/13 62/2 62/22 80/23 81/22 83/16 93/14 99/8 100/3 110/24 112/5 120/16 122/16 122/17 125/6
**earlier [19]** 10/3 34/12 35/20 38/6 49/6 52/20 55/3 55/11 58/15 61/15 75/17 75/25 79/12 81/3 95/17 115/10 123/5 123/14 124/21
**early [3]** 38/23 52/23 96/15
**earnings [2]** 84/14 85/13
**ease [1]** 61/10
**easier [3]** 4/1 64/13 80/16
**easiest [1]** 68/24
**easily [6]** 35/24 66/13 98/14 99/13 108/24 121/19
**east [1]** 11/24
**easy [9]** 36/20 62/11 69/3 69/11 69/12 73/22 95/9 96/21 99/1
**economic [1]** 71/24
**economical [1]** 91/12
**Edison [2]** 52/20 102/12
**educate [5]** 12/7 12/9 12/20 25/17 45/5
**educated [4]** 12/6 26/19 32/8 45/5
**Edwards [3]** 20/23 21/2 21/7
**effect [2]** 95/25 109/6
**effective [1]** 68/24

**effectively [6]** 8/14 13/18 21/24 21/24 95/16 105/16
**effectuated [2]** 38/22 96/16
**efficiently [1]** 56/6
**effort [1]** 90/7
**eight [5]** 8/16 10/1 25/19 33/9 52/13
**either [10]** 25/4 26/2 28/5 30/1 84/14 92/7 97/4 97/13 120/5 125/4
**element [1]** 73/5
**elements [1]** 68/10
**elephant [1]** 93/11
**Elkins [3]** 2/9 3/13 59/9
**ELMO [1]** 115/13
**else [13]** 20/15 23/7 23/13 38/24 41/1 59/20 69/2 75/12 85/14 99/16 102/5 117/16 123/20
**email [12]** 4/24 28/23 47/19 51/7 80/12 82/13 104/20 112/16 112/17 113/7 113/25 114/2
**emails [4]** 94/8 97/24 104/4 107/17
**emergency [2]** 65/6 119/2
**emphasize [1]** 59/3
**employee [6]** 35/11 45/16 54/3 54/4 55/9 100/17
**employees [18]** 35/10 45/15 49/12 51/21 53/2 53/12 53/22 53/23 54/18 55/2 55/11 55/12 55/12 55/21 55/22 58/20 59/3 60/2
**employees' [1]** 60/1
**employer [2]** 55/7 55/7
**employment [2]** 53/25 55/16
**encompassed [1]** 33/15
**end [11]** 3/17 4/25 39/13 67/7 67/7 79/23 96/16 100/17 101/4 104/2 120/16
**endeavor [1]** 30/4
**endeavored [1]** 29/14

**ended [4]** 49/10 82/3 121/7 121/9
**Eng'g [1]** 116/18
**engaged [3]** 36/3 40/18 117/6
**engaging [1]** 40/11
**engineer [7]** 19/12 19/13 19/14 31/15 32/9 61/5 95/21
**engineering [3]** 32/10 64/9 68/7
**engineers [8]** 36/1 60/14 61/23 64/10 65/15 73/25 76/10 109/1
**English [1]** 121/16
**enough [2]** 59/3 120/7
**entail [1]** 77/20
**entered [2]** 49/16 54/14
**entire [12]** 53/6 61/4 61/13 62/8 63/24 64/6 65/22 66/17 69/19 70/3 75/1 78/5
**entirely [4]** 48/9 48/12 77/24 115/7
**entitled [10]** 32/24 78/17 95/14 95/14 95/15 98/7 103/23 104/5 107/19 125/15
**envisioned [1]** 27/11
**envisioning [2]** 17/12 17/14
**error [1]** 44/11
**escape [1]** 63/10
**ESI [4]** 49/10 54/15 58/25 59/2
**especially [6]** 8/20 31/23 45/10 77/22 119/3 125/12
**essentially [22]** 5/12 5/16 5/18 11/12 16/15 25/4 25/21 30/17 31/1 34/14 37/17 37/20 53/14 55/22 75/17 75/18 83/23 84/1 94/18 111/7 114/10 120/20
**establish [1]** 118/21
**et [11]** 16/7 16/7 24/22 50/24 50/24 60/12 60/13 84/3 94/1 94/1 107/15
**EUR [2]** 83/24 83/25

**evasive [3]** 82/24 89/14 90/7
**even [34]** 6/18 10/9 14/23 17/7 18/8 18/17 23/5 23/8 27/25 43/17 51/8 58/4 60/17 66/20 68/14 73/1 83/6 83/8 84/25 89/1 91/11 91/25 93/17 103/24 103/24 104/4 104/12 105/10 106/19 107/20 109/2 115/19 117/4 122/15
**event [1]** 122/4
**ever [9]** 18/16 27/18 27/25 49/22 51/13 55/25 78/20 84/17 120/21
**every [15]** 13/19 17/11 36/2 39/19 56/25 62/1 72/5 72/8 73/24 77/14 77/15 78/6 86/22 99/8 122/17
**everybody [5]** 50/20 64/23 74/7 79/25 95/18
**everyone [2]** 55/24 86/3
**everything [21]** 13/15 13/16 20/6 23/13 41/1 43/14 48/7 58/18 61/16 66/18 73/9 77/11 77/13 77/14 78/15 79/1 96/1 97/13 108/11 115/8 124/3
**everywhere [1]** 41/19
**evidence [20]** 18/22 19/1 19/5 36/7 36/12 68/12 68/13 69/3 72/4 72/13 73/6 76/5 78/17 78/17 86/4 91/6 94/20 95/19 115/13 121/13
**ex [1]** 45/16
**ex-employee [1]** 45/16
**exact [3]** 53/14 58/2 60/21
**exactly [11]** 16/13 31/10 56/10 58/15 62/16 72/16 81/10 82/24 89/12 119/23 120/3
**examination [1]** 13/18
**example [20]** 7/6 11/4 14/15 16/23 21/2 28/5 30/20 38/24

**49/23 51/19 51/21 56/13** 74/15 86/1 99/19 100/15 104/15 106/20 108/13 114/15
**examples [1]** 42/17
**Excel [13]** 60/22 64/13 65/13 65/20 66/10 66/14 66/21 69/23 70/10 70/11 73/11 73/11 74/21
**Excels [3]** 66/6 66/8 70/22
**excess [1]** 33/4
**exchange [2]** 38/3 41/16
**exchanged [2]** 36/1 44/15
**exclude [1]** 9/24
**excluded [1]** 68/5
**exclusive [1]** 21/10
**excuse [2]** 6/24 16/25
**excuses [1]** 118/5
**executive [1]** 33/20
**executive's [2]** 33/19 105/6
**executives [6]** 34/7 36/18 38/4 39/12 71/6 73/7
**exemplar [1]** 111/25
**exhausted [2]** 32/23 105/11
**exhibit [14]** 4/14 4/18 4/21 5/10 37/18 46/11 49/2 80/12 110/17 110/18 112/12 112/15 112/19 114/3
**exhibits [1]** 111/23
**exist [9]** 40/10 41/13 56/17 58/5 95/24 96/7 96/7 96/7 96/8
**existed [7]** 5/19 38/9 41/13 94/19 94/25 95/1 108/8
**existence [2]** 96/2 96/2
**exists [6]** 70/22 71/13 72/3 76/17 78/4 95/24
**exonerates [1]** 103/21
**expect [3]** 31/4 85/9 89/17
**expectation [1]** 23/2
**expectations [1]** 63/5
**expected [7]** 29/9 63/4 85/2 85/7 91/3 91/12 96/24
**expedition [1]** 6/18

**expenditure [1]** 42/20
**Expense [1]** 62/18
**expensive [3]** 59/14 59/21 62/12
**experience [2]** 15/3 52/18
**expert [13]** 3/23 6/6 24/1 60/25 61/1 62/20 67/11 69/6 72/19 74/3 76/3 77/2 124/18
**experts [15]** 6/4 18/12 19/5 20/8 61/3 61/10 62/3 62/15 66/11 66/23 67/12 67/13 72/19 74/2 74/7
**expiration [1]** 89/22
**explain [5]** 40/16 82/23 83/12 84/10 84/17
**explained [3]** 17/17 64/8 104/25
**explaining [2]** 87/1 87/2
**explanation [2]** 103/21 103/21
**explored [1]** 122/10
**export [2]** 62/19 74/5
**exportable [1]** 67/22
**exported [1]** 61/24
**extend [1]** 124/25
**extension [3]** 23/19 116/21 118/19
**extensive [2]** 53/13 76/20
**extensively [4]** 19/3 37/8 46/17 47/24
**extent [19]** 33/3 37/3 44/10 56/16 65/14 66/8 67/25 69/24 72/3 90/4 100/5 100/14 106/13 109/23 115/7 122/11 122/13 122/14 123/25
**external [1]** 100/10
**externally [1]** 25/22
**extra [1]** 38/24
**extract [3]** 25/7 61/11 64/4
**extracted [1]** 55/10
**extracting [1]** 31/5
**extraction [1]** 26/13
**extraordinary [1]** 17/8

**E**

**extrapolate [3]** 13/24 35/4 77/18
**extrapolating [1]** 92/10
**extremely [15]** 26/16 29/14 34/14 38/1 53/21 58/3 59/14 61/11 61/18 62/11 65/18 91/1 91/9 91/15 120/1
**eye [1]** 99/23

**F**

**face [1]** 74/21
**facie [2]** 18/22 76/5
**facilitate [1]** 14/6
**fact [29]** 3/22 6/10 7/16 18/10 20/22 23/1 23/19 23/21 24/7 26/21 32/16 32/21 32/24 33/3 34/23 37/9 41/12 49/15 52/13 54/14 71/18 72/2 105/5 105/6 113/14 118/5 123/8 123/11 123/12
**factor [1]** 89/24
**factors [10]** 20/20 20/24 21/3 22/2 25/11 57/7 57/8 85/16 85/24 96/24
**facts [1]** 103/19
**factual [1]** 116/15
**fail [1]** 115/25
**failure [1]** 114/23
**fair [5]** 15/21 21/23 28/11 37/11 58/6
**fairly [7]** 11/15 11/20 12/21 69/12 70/4 95/9 95/9
**fairness [1]** 94/5
**faith [1]** 61/7
**fall [1]** 73/4
**false [1]** 111/9
**falsity [4]** 48/4 68/10 72/4 73/5
**FAP [1]** 63/23
**far [10]** 14/1 18/7 22/16 26/9 76/22 77/15 103/6 103/24 109/15 119/16

**farther [1]** 94/23
**fascinating [1]** 11/14
**FATALE [4]** 1/21 3/6 124/7 124/11
**favor [3]** 20/21 22/3 57/8
**FCRR [2]** 2/13 126/5
**feasible [3]** 13/23 78/22 117/10
**feasibly [2]** 14/1 35/19
**February [3]** 9/13 34/4 77/13
**February 2020 [1]** 9/13
**feel [4]** 5/24 7/9 18/23 19/21
**feet [4]** 37/5 39/3 85/20 85/23
**felt [1]** 28/4
**fence [1]** 69/5
**few [6]** 11/19 15/23 21/21 47/13 67/23 81/9
**fiber [1]** 76/20
**field [4]** 61/10 63/15 67/15 77/3
**Fifth [2]** 72/20 99/10
**fight [1]** 58/12
**fighting [2]** 61/15 73/21
**figure [6]** 14/17 38/10 59/24 74/4 103/25 107/20
**figures [1]** 62/5
**file [6]** 13/10 13/19 17/15 62/19 75/5 75/6
**filed [2]** 101/22 106/12
**files [10]** 13/12 17/18 60/22 61/24 64/18 65/16 70/10 70/12 77/10 80/19
**filings [1]** 83/1
**final [3]** 29/4 67/7 97/15
**finance [1]** 71/21
**financial [1]** 45/11
**financials [1]** 64/11
**find [11]** 13/8 15/18 17/9 19/10 45/18 63/1 99/8 100/11 105/5 111/19 113/23
**finding [1]** 91/15
**fine [4]** 23/22 63/14 116/4

**finite [1]** 90/1
**firm [1]** 105/7
**first [35]** 3/21 3/23 4/6 4/17 4/20 5/4 5/11 7/25 9/10 9/10 13/13 42/13 49/13 54/13 63/21 66/7 78/2 80/19 81/1 82/16 86/7 94/16 95/20 95/23 96/10 99/3 100/2 100/3 104/8 106/4 107/25 108/11 110/25 113/11 114/9
**fishing [1]** 6/17
**fits [1]** 86/22
**five [9]** 5/11 9/4 23/19 57/7 64/23 78/19 122/6 123/18 125/3
**five-month [1]** 23/19
**five-week [2]** 78/19 123/18
**fleshed [1]** 27/18
**flip [1]** 61/19
**flippant [1]** 12/23
**Floor [2]** 1/19 1/23
**floppy [1]** 67/24
**flows [2]** 27/22 71/23
**fluid [1]** 95/8
**focus [3]** 27/4 42/18 42/21
**focused [1]** 89/21
**focuses [1]** 71/24
**focusing [3]** 43/7 43/15 73/4
**folks [20]** 6/12 12/9 15/23 30/23 31/16 31/19 32/25 36/13 36/15 36/16 36/17 36/17 51/14 51/17 51/21 56/15 56/21 56/22 60/15 107/12
**follow [3]** 93/19 109/15 123/22
**follow-up [1]** 123/22
**followed [1]** 102/12
**following [2]** 94/18 106/5
**foot [3]** 26/25 29/25 30/1
**force [1]** 54/6
**forcing [1]** 54/6
**forecast [3]** 24/17 42/20

**F**

**forecast... [1]**  96/24
**forecasts [2]**  60/11 95/3
**foregoing [1]**  126/2
**forensic [4]**  13/18 56/1 58/16 59/15
**forensically [2]**  68/8 68/23
**forget [3]**  42/21 60/21 81/10
**form [3]**  16/9 64/12 65/10
**formal [2]**  75/5 75/6
**format [3]**  62/23 65/13 69/23
**former [13]**  45/15 49/12 53/2 53/12 53/22 54/3 54/18 55/10 55/12 55/22 58/20 59/3 60/2
**forms [1]**  71/1
**forth [4]**  18/5 62/2 69/2 103/20
**Forty [1]**  43/7
**Forty-nine [1]**  43/7
**forward [5]**  28/15 42/6 74/22 87/19 114/2
**foul [1]**  91/13
**found [3]**  11/14 38/3 113/8
**foundation [1]**  16/10
**foundational [1]**  113/13
**foundationally [1]**  16/7
**four [10]**  7/2 9/7 18/17 42/14 80/1 93/13 94/22 97/25 114/9 125/3
**fourth [3]**  46/12 80/1 80/11
**frame [4]**  9/14 9/25 15/5 15/6
**frankly [1]**  67/12
**fraudulent [1]**  46/9
**free [1]**  45/23
**freeze [3]**  104/12 104/19 104/25
**freezes [1]**  107/6
**Friday [1]**  82/13
**front [8]**  19/3 38/5 38/19 55/14 84/6 110/21 115/13 120/5

**fruitful [3]**  35/12 47/15 57/22
**fruitless [1]**  57/22
**frustrating [3]**  47/18 90/7 118/2
**full [15]**  4/17 4/19 6/6 6/15 19/6 37/3 53/8 57/25 61/21 61/25 63/11 66/8 72/17 86/11 114/22
**fuller [1]**  87/17
**fully [5]**  38/22 66/12 89/10 96/16 117/15
**functional [1]**  66/12
**funds [1]**  92/17
**further [13]**  8/10 10/10 10/21 10/22 11/10 24/8 48/14 52/24 70/23 91/9 100/24 101/12 109/25

**G**

**GA [1]**  2/13
**gain [2]**  43/20 43/22
**gaining [1]**  43/25
**gas [5]**  24/25 36/3 61/2 61/3 73/16
**gate [1]**  108/12
**gathered [1]**  77/10
**gauge [3]**  22/17 25/5 25/6
**gave [8]**  11/5 25/15 32/5 58/18 83/2 85/25 88/9 120/6
**general [15]**  7/2 29/22 35/6 35/18 86/20 88/9 88/15 92/6 92/11 92/24 93/1 93/5 106/25 116/1 116/8
**generality [3]**  8/7 26/21 29/13
**generally [28]**  6/12 11/13 14/6 21/4 24/25 25/20 27/9 31/5 40/8 51/2 60/15 76/23 85/19 89/19 90/19 91/14 91/20 91/20 92/18 111/3 111/6 111/11 113/12 113/12 114/25 115/9 118/25 120/23
**generate [1]**  64/11
**genesis [1]**  74/17

**gentleman [3]**  28/1 31/12 34/2
**gentleman's [1]**  28/9
**genuinely [1]**  84/16
**gets [1]**  110/4
**getting [16]**  5/21 5/23 7/9 12/5 14/14 33/18 57/3 72/14 79/25 85/18 92/10 95/13 103/4 106/25 106/25 122/21
**GIRAUD [12]**  1/9 2/8 3/14 56/14 111/7 111/25 112/12 114/15 114/25 118/4 120/19 121/3
**Giraud's [2]**  110/17 112/3
**give [21]**  11/4 11/20 16/3 26/18 28/16 28/18 28/22 30/19 39/17 40/12 48/6 49/23 61/12 63/15 67/25 74/6 85/24 105/3 116/21 122/15 125/18
**given [10]**  16/1 22/13 34/3 35/10 64/12 79/6 84/4 85/5 117/3 122/5
**gives [3]**  26/13 63/10 108/16
**giving [1]**  88/4
**glad [1]**  11/17
**goes [7]**  12/25 17/4 43/19 76/22 80/21 91/20 118/13
**going [103]**  4/9 7/5 7/19 12/8 12/17 14/18 16/10 16/10 17/20 17/21 18/5 20/15 20/17 23/4 23/7 23/10 23/11 23/13 24/6 28/14 29/23 30/10 30/20 31/11 32/1 33/7 37/12 40/24 41/20 42/2 44/13 44/18 45/8 45/17 46/8 46/9 46/23 49/15 54/15 56/11 57/22 59/10 60/20 61/22 63/13 66/15 67/11 72/18 73/13 73/17 76/8 78/12 78/19 78/20 80/7 80/9 80/10 80/14 82/3 82/8 84/5 84/13 85/8 85/9 87/8 88/15

**going... [37]** 89/21 89/23 89/23 91/8 91/11 92/20 93/1 95/20 97/17 99/23 105/3 105/8 107/24 109/3 109/4 109/6 109/15 111/2 111/2 113/16 113/22 115/12 116/9 116/23 116/23 117/5 118/20 120/9 122/19 122/25 123/19 123/25 124/7 124/7 124/22 125/1 125/18

**gone [4]** 41/14 62/2 103/24 103/24

**good [15]** 3/4 3/9 3/12 6/3 15/10 16/24 18/22 31/18 36/25 37/12 57/23 61/7 62/3 73/8 76/5

**good-faith [1]** 61/7

**got [21]** 13/1 28/16 38/15 38/16 45/20 51/1 52/25 59/11 76/5 77/12 78/18 107/17 107/17 112/3 116/8 116/13 117/7 117/16 122/1 122/12 125/16

**gotten [2]** 28/3 103/7

**grant [1]** 118/18

**granular [1]** 17/24

**Gray [1]** 34/2

**great [6]** 15/16 37/24 38/8 82/15 99/19 113/21

**greater [4]** 72/2 83/24 89/20 90/20

**Grissom [1]** 95/22

**ground [2]** 37/6 101/11

**group [1]** 68/7

**grouped [1]** 50/1

**guess [17]** 15/24 20/16 27/1 42/8 47/18 52/12 66/11 77/7 81/25 82/4 87/18 87/21 115/20 118/11 118/13 118/14 119/18

**guessing [1]** 87/4

**guidance [2]** 79/6 97/8

**gun [2]** 62/10 72/12

**guy [2]** 23/12 29/11

**guys [3]** 92/25 109/8 109/11

# H

**hadn't [1]** 51/14

**half [8]** 10/7 10/15 38/19 41/22 46/4 47/7 57/12 57/23

**hand [5]** 33/24 35/24 72/12 78/25 78/25

**handed [1]** 40/1

**handful [1]** 47/7

**handing [1]** 61/5

**handle [2]** 13/1 121/5

**hands [1]** 68/6

**handwritten [1]** 98/1

**HANEN [3]** 1/13 3/1 65/4

**hang [3]** 41/21 87/21 118/11

**hanging [1]** 115/24

**happen [8]** 12/22 29/12 40/16 67/10 105/20 105/20 105/21 105/21

**happened [13]** 20/5 46/15 51/13 62/9 67/8 79/21 81/18 86/3 86/4 96/15 98/2 105/8 122/5

**happening [3]** 49/11 85/6 96/15

**happens [1]** 17/9

**happy [7]** 66/23 68/1 68/3 91/23 98/18 123/3 125/9

**hard [12]** 21/21 23/13 48/3 64/15 73/22 76/8 86/4 88/10 95/17 95/19 100/10 105/2

**harder [1]** 112/8

**harm [1]** 91/13

**HARPER [3]** 1/9 24/15 56/13

**hasn't [5]** 19/4 20/4 37/7 89/10 106/16

**hat [3]** 41/21 87/21 118/11

**hatch [1]** 63/10

**have [269]**

**haven't [20]** 19/2 19/2 19/10 19/10 25/13 37/1

39/19 41/2 41/17 65/21 76/10 78/7 91/25 93/22 102/19 103/24 103/24 104/23 120/7 125/16

**having [12]** 11/11 22/21 24/18 27/12 41/22 54/6 54/22 81/16 82/20 109/10 121/7 125/6

**Hawkins [4]** 4/25 80/12 82/13 114/4

**he [40]** 28/19 29/17 32/9 52/20 59/17 72/12 72/17 72/18 90/7 98/1 102/12 111/9 114/12 114/15 114/16 115/5 117/7 117/7 117/8 117/11 117/12 117/14 117/15 117/16 117/17 117/19 119/8 119/9 119/18 119/21 120/2 120/3 120/4 120/5 120/10 120/11 120/12 122/11 122/12 122/13

**he'd [1]** 23/9

**he's [19]** 27/9 31/12 32/17 35/4 35/8 36/22 39/7 45/6 48/8 116/9 117/6 117/16 117/18 117/20 119/20 119/22 120/13 122/8 122/16

**headings [1]** 28/14

**headquarters [1]** 108/25

**heads [2]** 11/25 82/4

**hear [9]** 8/2 11/18 22/16 22/17 52/24 65/16 74/23 97/17 113/17

**heard [7]** 19/10 41/2 41/17 50/2 69/18 76/10 100/20

**hearing [13]** 1/13 4/2 5/22 10/11 10/15 13/14 14/5 18/21 30/21 40/2 43/21 70/15 99/5

**heavily [1]** 57/8

**HEFLEY [25]** 2/2 3/10 7/20 14/10 14/12 16/12 22/25 23/14 25/25 44/20 52/17 58/15 58/21 58/24

**HEFLEY... [11]**  59/22 63/19 75/17 84/15 92/13 98/21 104/25 112/18 116/5 124/8 124/11

**Hefley's [2]**  79/12 112/13

**held [1]**  65/2

**Hello [2]**  29/2 103/11

**help [3]**  42/17 90/10 113/8

**her [1]**  112/15

**Herculean [1]**  14/23

**here [33]**  10/12 15/2 17/25 18/20 18/22 19/21 21/8 22/25 24/19 31/11 36/6 44/15 50/13 54/24 56/23 67/19 74/1 78/19 79/1 79/24 84/15 90/7 90/13 91/11 92/14 98/17 108/9 111/12 117/2 118/9 120/13 121/23 124/19

**here's [8]**  22/6 40/14 58/22 59/22 59/23 75/4 92/2 109/3

**Hers [1]**  112/24

**hesitant [1]**  16/3

**hey [7]**  20/9 50/23 51/16 57/10 66/24 104/5 105/9

**hidden [3]**  20/5 59/19 60/10

**hide [1]**  103/18

**high [8]**  9/25 12/15 36/16 37/5 37/5 51/24 62/24 70/15

**high-level [3]**  9/25 12/15 70/15

**higher [1]**  92/23

**highly [9]**  28/6 33/22 36/22 56/14 68/22 76/3 76/5 96/4 111/10

**him [20]**  22/13 28/16 28/18 28/23 29/7 29/19 29/21 35/16 45/5 45/8 47/21 47/25 93/2 115/2 115/4 115/5 119/11 120/5 122/12 122/16

**hindsight [1]**  61/9

**hire [1]**  54/7

**his [11]**  14/6 16/25 23/6

23/12 41/4 60/2 91/19 97/25 110/18 118/4 120/5

**hit [3]**  72/7 72/16 92/22

**hits [2]**  51/10 74/9

**hold [34]**  5/6 15/22 97/18 97/20 101/17 101/20 101/21 102/8 102/10 102/13 102/17 102/21 103/15 104/11 104/11 104/19 105/5 105/18 105/25 106/2 106/4 106/21 107/2 107/5 107/5 107/16 107/23 109/4 109/19 110/2 111/3 112/1 114/9 122/24

**holder [1]**  56/7

**holds [13]**  94/11 94/12 98/10 102/9 104/1 104/3 104/5 104/24 107/7 107/21 109/23 110/25 114/6

**hole [2]**  17/3 89/23

**homework [1]**  21/21

**homicide [1]**  72/9

**Honor [147]**

**Honor's [2]**  15/12 69/7

**HONORABLE [1]**  1/13

**horizontally [1]**  25/10

**hot [1]**  37/11

**hour [8]**  16/1 26/10 47/24 50/9 51/19 57/11 57/11 57/11

**hours [5]**  14/2 14/17 48/7 57/2 117/14

**house [2]**  19/17 108/25

**housed [1]**  70/21

**HOUSTON [5]**  1/2 2/4 2/7 2/15 61/2

**however [2]**  13/25 45/5

**HR [1]**  80/19

**huge [1]**  108/16

**hundred [3]**  12/13 16/5 86/14

**hundreds [5]**  64/14 66/10 103/3 116/18 122/2

**hurdle [15]**  88/22 90/11 90/14 90/18 90/19 90/21

91/15 92/11 92/14 92/17 92/18 92/24 93/1 93/3 93/3

**hybrid [1]**  15/11

**hyper [1]**  70/3

**hyper-broad [1]**  70/3

**hypothesized [1]**  88/7

**hypothetical [2]**  20/11 35/23

**I**

**I'd [4]**  5/4 48/24 61/2 81/5

**I'll [17]**  4/4 18/18 24/2 24/9 27/7 52/17 58/8 73/1 75/6 78/23 95/21 98/21 109/18 110/16 116/6 121/20 122/23

**I'm [107]**  3/6 4/1 5/8 10/11 10/12 10/12 10/15 11/17 12/13 12/14 13/3 14/11 16/3 16/10 17/13 20/16 22/13 24/6 28/14 28/20 29/4 29/7 29/20 32/17 32/18 33/6 37/23 41/2 42/8 43/21 44/13 44/18 45/7 45/8 45/17 45/25 46/8 47/8 47/19 48/16 48/23 50/5 52/11 57/1 57/18 60/2 60/6 61/21 63/13 65/5 66/16 66/23 67/11 68/1 68/3 69/2 69/9 71/7 75/24 76/14 76/15 76/15 77/1 77/1 78/12 78/18 78/19 80/9 80/10 82/8 82/18 82/20 84/13 84/15 84/20 87/7 90/12 91/22 93/1 98/7 98/9 98/9 98/17 100/9 103/18 106/23 106/24 106/25 107/19 107/20 107/25 108/9 109/3 109/3 109/6 109/15 117/24 118/9 119/18 122/19 122/22 122/25 123/3 123/17 125/4 125/17 125/19

**I've [7]**  12/15 62/2 62/7 79/6 79/19 99/14 105/1

**i.e [1]**  106/10

**idea [11]**  20/5 57/22 66/8 68/9 68/14 72/13 72/25

**idea... [4]** 73/10 81/12 97/3 121/5

**identifiable [1]** 74/21

**identified [2]** 80/25 86/23

**identify [7]** 14/20 32/21 40/15 65/19 80/22 86/1 86/21

**identifying [1]** 47/20

**identity [1]** 32/12

**ignored [1]** 58/5

**III [1]** 1/21

**image [3]** 53/24 57/10 57/12

**imagine [3]** 47/12 72/5 81/11

**imaging [1]** 56/1

**impasse [1]** 39/19

**implications [1]** 36/24

**importance [3]** 21/3 21/15 60/18

**important [22]** 21/18 22/19 24/23 25/12 46/22 47/5 54/13 54/21 60/6 60/13 61/18 63/21 65/18 74/24 91/2 91/16 93/14 96/23 97/15 98/2 98/6 122/12

**impose [1]** 110/3

**impossible [1]** 122/4

**impossibly [1]** 8/8

**improper [3]** 32/14 102/6 114/18

**inappropriate [1]** 48/9

**INC [2]** 1/7 1/8

**inclined [1]** 59/2

**include [3]** 19/25 38/25 42/15

**included [3]** 5/17 44/10 99/9

**includes [3]** 6/7 33/20 38/25

**including [12]** 25/1 26/9 38/19 42/16 44/7 61/14 68/16 74/7 80/24 91/5 97/23 99/11

**inclusive [1]** 86/10

**inconsistency [2]** 44/5 44/11

**inconvenience [1]** 57/12

**indefinite [2]** 104/21 107/16

**indefinitely [1]** 107/15

**independently [1]** 101/23

**indicated [2]** 53/17 99/21

**indication [2]** 26/18 99/22

**indicators [1]** 76/2

**individual [47]** 4/20 4/23 8/13 12/10 26/2 27/9 30/10 30/12 30/15 31/13 31/14 32/6 33/21 34/21 34/22 35/10 49/6 52/12 52/21 53/2 53/3 53/4 53/12 54/18 56/14 56/17 58/14 60/1 68/16 69/21 71/5 72/12 72/16 93/14 94/13 94/21 97/23 106/3 110/11 110/12 110/20 110/23 111/5 111/8 120/19 122/20 122/23

**Individually [1]** 1/4

**individuals [7]** 6/10 13/21 41/11 49/11 53/1 53/16 57/4

**industry [7]** 24/21 25/3 60/15 60/24 73/18 76/2 91/14

**inexpensive [1]** 69/12

**info [1]** 29/23

**informal [1]** 51/11

**information [102]** 5/14 5/15 5/23 6/3 6/4 6/5 6/6 6/12 7/9 7/12 8/3 8/7 10/1 10/24 11/1 11/3 12/11 17/5 17/6 17/19 19/20 20/22 21/9 22/10 30/13 34/15 35/18 36/1 36/18 37/1 37/13 38/3 39/1 39/6 40/19 41/5 41/7 41/12 41/13 41/17 43/9 43/25 44/1 44/1 44/2 44/17 45/20 49/9 51/2 53/14 53/25 54/23 55/4 55/8 55/15 56/3 59/14 59/20 60/11 60/13 60/24 60/25 61/12 63/11 64/4 64/11 64/16 65/12 66/1 69/9 69/14 69/17 69/22 70/19 70/22 70/25 70/25 71/23 74/25 83/14 89/11 90/4 93/21 93/24 93/25 94/12 94/14 95/13 103/19 105/16 107/11 107/17 109/11 109/25 110/4 114/23 117/7 117/20 120/14 120/20 122/12 123/23

**informed [1]** 24/22

**infrastructure [1]** 93/6

**initiated [1]** 123/13

**inquiring [1]** 117/14

**inquiry [2]** 108/3 108/4

**ins [1]** 62/3

**insinuating [2]** 14/8 103/18

**insofar [1]** 13/4

**instance [3]** 93/3 104/1 107/1

**instances [3]** 88/4 91/11 108/22

**instead [2]** 29/25 89/14

**institute [1]** 23/10

**instructions [1]** 102/14

**insufficient [2]** 108/3 108/4

**intend [1]** 83/14

**intended [5]** 47/3 89/19 116/15 117/5 119/25

**intending [1]** 119/25

**intention [3]** 44/6 44/6 44/12

**intentional [1]** 103/18

**interactive [1]** 66/12

**interchangeably [1]** 30/23

**INTEREST [1]** 1/8

**interesting [1]** 59/18

**interests [3]** 28/12 56/6 95/13

**interfacing [1]** 32/10

**interference [8]** 20/10 47/4 47/5 76/2 94/20 95/1 99/22 101/5

**interfering [1]** 77/3

**interim [1]** 22/21
**internal [6]** 74/18 88/22 88/24 90/11 91/15 100/10
**internally [5]** 15/24 18/20 25/22 72/3 72/23
**interpretation [1]** 96/6
**interrogatories [13]** 4/18 4/20 5/1 9/9 80/2 81/2 82/12 83/3 83/9 83/20 92/5 102/23 118/23
**interrogatory [9]** 5/2 9/10 10/8 30/22 81/1 82/17 86/23 88/18 89/5
**interrupt [1]** 111/18
**interrupted [1]** 65/5
**interviews [1]** 19/11
**invasive [4]** 53/21 59/15 59/21 63/11
**investigated [1]** 91/9
**investor [5]** 37/4 83/1 84/14 85/13 114/16
**investors [3]** 21/5 22/1 95/14
**involved [3]** 13/22 68/17 68/18
**iPhone [4]** 49/25 49/25 50/3 107/14
**irrelevant [1]** 107/4
**isn't [6]** 18/7 50/18 67/8 67/22 68/2 96/3
**issue [66]** 6/1 6/2 6/7 7/14 18/6 18/19 19/14 20/7 21/11 25/24 26/1 28/7 30/18 30/20 31/9 31/21 33/19 36/10 36/25 38/9 39/8 40/22 40/23 42/7 42/22 43/5 43/15 45/23 46/3 46/3 47/15 48/18 54/24 55/20 60/6 61/14 62/21 66/6 67/6 72/18 72/22 73/3 73/24 74/10 76/6 80/20 83/6 86/2 86/6 86/13 86/17 92/24 94/4 97/6 101/2 103/16 104/15 104/19 105/2 106/19 108/20

**issued [10]** 97/20 98/10 98/10 101/20 101/21 104/6 104/6 104/12 106/4 106/21
**issues [34]** 3/18 11/3 21/3 21/16 21/17 21/20 21/22 33/21 34/6 44/15 52/1 52/2 62/7 65/25 75/25 80/5 85/25 93/22 95/17 96/5 96/6 101/4 101/14 105/17 116/2 116/20 116/22 117/15 120/12 121/5 121/10 122/5 122/17 123/7
**items [2]** 27/3 80/11
**iteration [1]** 122/17
**iterations [1]** 122/1
**itinerary [1]** 117/9
**its [4]** 9/6 9/16 20/10 43/11
**itself [5]** 6/10 34/8 43/12 72/1 100/20

**J**

**JACK [1]** 1/9
**Jane [1]** 51/23
**January [2]** 18/8 102/2
**January 2021 [1]** 102/2
**job [2]** 36/25 50/21
**jobs [2]** 53/23 54/2
**Joe [9]** 9/20 10/22 14/25 22/23 26/4 30/4 32/20 35/22 66/4
**joined [1]** 3/6
**JOSEPH [3]** 1/9 1/18 3/5
**Journal [1]** 34/3
**JUDGE [5]** 1/14 3/1 52/20 65/4 102/12
**judgment [3]** 6/18 23/23 125/10
**judgments [1]** 24/22
**July [1]** 101/22
**jumping [1]** 92/13
**June [2]** 3/24 124/19
**June 9th [2]** 3/24 124/19
**jurors [2]** 19/6 112/8
**jury [4]** 21/25 78/20 99/25

**just [136]**

**K**

**keep [14]** 7/19 17/21 18/5 18/5 23/20 23/22 26/11 45/7 63/21 79/15 79/23 80/7 124/2 125/12
**keeps [1]** 30/18
**Keller [3]** 1/18 1/22 3/5
**kept [3]** 12/20 17/15 17/15
**key [3]** 26/1 41/11 78/17
**keys [2]** 64/6 65/22
**kill [1]** 33/15
**kind [52]** 5/13 5/19 11/2 12/12 14/21 15/1 15/19 16/13 16/22 17/5 17/10 17/21 22/10 22/15 23/21 27/7 27/22 31/3 31/9 33/18 33/23 34/6 34/11 35/24 36/17 36/23 42/8 45/19 46/10 46/18 46/19 46/19 50/11 53/13 54/1 57/4 60/10 60/22 61/8 61/10 63/22 63/25 76/9 80/10 81/25 89/5 92/10 92/15 93/15 102/8 124/1 124/21
**kinds [4]** 14/18 17/18 101/1 117/3
**kitchen [1]** 78/15
**knee [1]** 18/12
**knee-deep [1]** 18/12
**knew [7]** 34/21 38/11 45/1 45/1 89/7 90/8 97/10
**know [358]**
**knowledge [24]** 6/11 8/5 28/18 33/17 33/20 33/21 33/24 34/9 34/24 36/6 36/7 36/19 36/23 37/3 38/5 40/23 42/22 43/21 44/18 44/23 45/18 51/25 72/18 73/7
**knowledge-share [9]** 33/17 33/24 34/24 36/23 37/3 38/5 40/23 42/22 73/7
**knows [5]** 12/24 24/14

**K**

**knows... [3]** 28/24 45/6 63/15

**L**

**Labaton [9]** 1/18 1/22 3/5 9/20 10/22 14/25 22/24 30/4 66/4
**lack [1]** 7/9
**lacking [2]** 27/13 120/13
**laid [1]** 18/21
**land [1]** 25/7
**language [6]** 38/18 38/24 103/25 104/2 111/4 111/6
**lap [3]** 10/12 73/1 73/4
**large [36]** 5/14 6/2 6/21 8/14 9/2 9/8 9/14 9/21 20/1 21/11 21/16 24/18 36/4 40/3 49/10 60/22 65/23 75/21 76/4 76/6 76/16 78/6 78/14 78/25 80/4 84/21 93/23 95/10 95/11 95/11 95/11 96/14 98/12 98/13 104/16 108/21
**large-production [1]** 84/21
**large-scale [18]** 5/14 6/2 6/21 8/14 9/2 9/8 20/1 21/11 21/16 36/4 40/3 65/23 78/6 78/14 78/25 93/23 95/11 96/14
**largely [1]** 20/21
**largest [1]** 21/14
**last [16]** 3/21 3/22 4/25 21/21 32/23 40/1 45/22 69/21 70/14 77/7 88/21 97/19 109/22 120/18 120/19 123/22
**late [2]** 57/2 79/25
**later [8]** 7/13 14/15 23/21 30/20 34/10 46/11 114/10 120/11
**latter [1]** 115/21
**law [7]** 67/21 93/17 93/18 96/3 104/11 107/5 116/14

**laws [1]** 104/18
**lawsuit [2]** 106/6 106/12
**lawyers [4]** 19/9 66/15 66/18 68/6
**LEACH [3]** 1/8 2/8 3/14
**lead [4]** 3/17 4/2 11/11 81/1
**leading [3]** 111/12 114/12 115/6
**learned [1]** 35/10
**learnings [2]** 35/15 89/24
**least [10]** 12/1 12/15 19/23 43/21 46/25 77/15 92/16 100/16 108/6 109/14
**leave [6]** 24/2 45/10 50/12 118/15 118/15 120/10
**leaves [1]** 4/10
**leaving [2]** 4/16 5/2
**led [1]** 33/23
**left [6]** 4/11 13/21 45/9 75/13 76/13 115/24
**length [1]** 71/25
**less [9]** 10/7 16/2 39/3 39/9 39/9 59/6 85/16 85/22 90/2
**let [16]** 7/20 9/2 11/4 16/18 25/19 30/19 35/23 37/16 42/24 70/6 82/9 108/1 111/18 112/21 115/2 118/8
**let's [37]** 7/20 10/18 12/3 12/25 19/20 22/9 22/9 22/10 22/12 22/14 22/18 22/20 24/3 28/13 28/16 29/23 33/6 42/20 44/17 48/25 51/18 62/25 64/23 67/2 70/9 75/15 78/21 79/2 79/2 79/2 79/5 81/20 84/11 85/21 94/15 109/8 117/24
**letter [19]** 3/17 4/15 4/19 4/21 5/10 37/19 49/3 50/14 61/8 110/18 110/19 111/24 112/13 112/15 112/17 112/23 113/4 113/5 122/1
**letters [1]** 77/8
**level [15]** 8/18 9/25 12/15 20/18 26/12 26/21 26/25

29/13 29/25 30/1 37/5 62/24 64/9 64/10 70/15
**levels [1]** 8/6
**life [4]** 4/1 61/13 74/4 79/22
**like [75]** 5/4 7/1 7/9 7/18 12/2 13/10 14/19 15/23 17/6 18/1 20/3 20/25 28/5 31/1 31/2 31/20 32/11 32/22 34/17 34/22 36/1 36/8 36/8 37/21 41/12 41/25 49/18 49/24 50/8 50/23 52/25 55/9 55/11 57/2 57/22 57/22 57/23 58/20 59/19 60/25 63/23 68/22 72/5 72/8 72/9 73/2 75/24 80/4 82/24 84/20 87/13 89/12 91/3 91/18 91/19 91/24 95/12 96/4 98/3 98/4 101/4 101/5 103/5 106/23 108/8 108/9 115/10 115/12 117/2 118/21 122/6 124/10 124/11 124/19 124/22
**likely [6]** 12/8 45/3 71/22 99/22 99/24 104/22
**Limit [1]** 22/8
**limited [13]** 9/17 37/1 38/15 39/7 41/11 42/4 42/21 47/12 76/4 80/24 81/22 107/8 107/8
**limiting [1]** 66/15
**limits [1]** 33/4
**line [2]** 3/3 31/17
**lines [2]** 14/21 24/20
**list [9]** 6/23 11/5 16/24 17/4 17/19 42/16 79/13 101/7 124/1
**listed [2]** 16/16 79/1
**lists [1]** 94/24
**lit [8]** 97/20 103/25 104/3 104/5 109/23 110/2 111/3 114/9
**literally [5]** 43/13 63/12 67/17 74/5 103/19
**litigate [1]** 21/24

**litigating [1]** 18/6
**litigation [40]** 55/10 94/11 94/12 97/18 98/10 101/17 101/20 101/21 102/8 102/9 102/10 102/13 102/17 102/21 103/15 104/9 104/10 104/10 104/11 104/19 104/24 105/5 105/18 105/24 106/2 106/4 106/21 107/2 107/5 107/5 107/7 107/9 107/16 107/21 107/23 109/4 109/19 110/25 114/6 122/24
**litigations [1]** 109/24
**litigators [1]** 96/4
**little [25]** 4/1 4/24 11/3 12/4 21/6 33/13 34/18 38/17 43/7 43/10 47/18 49/5 51/1 56/21 63/14 71/15 79/5 80/16 81/6 94/13 98/8 107/19 110/19 111/4 118/1
**live [1]** 63/18
**lives [1]** 59/5
**LLP [5]** 1/18 1/22 2/3 2/6 2/9
**loading [1]** 82/21
**loads [1]** 84/21
**located [3]** 12/11 13/9 13/9
**lockstep [1]** 62/9
**logged [1]** 62/22
**logging [2]** 17/2 17/3
**logical [4]** 93/19 97/13 98/13 108/21
**logically [1]** 95/5
**long [7]** 13/21 20/17 23/3 40/1 40/1 41/14 42/1
**long-winded [1]** 20/17
**longer [4]** 34/9 34/11 47/12 124/10
**look [61]** 16/23 18/2 20/19 20/20 21/1 21/14 22/1 24/21 24/21 25/2 25/4 25/19 25/20 27/22 32/1 38/18 39/25 48/11 48/16 49/18 50/23

52/21 54/21 56/16 56/17 57/6 63/1 63/17 67/10 68/8 68/21 68/23 76/2 76/3 77/15 78/20 78/21 78/24 80/14 83/15 85/19 87/19 95/21 99/5 105/1 106/7 109/4 109/12 109/19 110/22 111/1 111/2 111/3 111/8 114/11 114/11 114/12 116/8 120/6 122/25 124/22
**looked [13]** 19/9 20/9 34/11 40/21 41/19 46/17 51/22 53/15 77/9 89/12 91/18 108/11 111/1
**looking [31]** 6/16 6/18 7/16 9/22 10/6 10/12 12/17 19/22 25/21 28/17 29/4 30/14 31/16 33/16 34/13 36/9 41/22 43/13 47/19 51/7 52/3 58/19 75/20 78/18 78/19 81/8 82/18 108/1 112/1 113/6 122/16
**looks [2]** 91/24 109/23
**loose [1]** 39/13
**losing [1]** 103/11
**loss [4]** 69/2 75/24 77/1 77/1
**lot [23]** 7/5 10/24 16/1 18/22 19/12 23/5 24/23 27/25 42/13 43/3 43/6 49/11 51/6 60/13 72/18 74/24 76/18 93/16 98/18 111/20 119/14 121/23 124/19
**lots [1]** 45/14
**Louisiana [2]** 2/3 2/6
**love [1]** 110/5
**lower [2]** 92/23 96/24
**Luciano [1]** 7/24
**LUCISANO [55]** 2/5 3/10 7/21 12/22 13/4 14/22 17/17 22/12 26/2 26/4 28/14 28/23 29/2 31/11 31/17 31/22 31/25 32/17 34/19 36/21 39/22 41/3 44/13 45/2 47/16 48/19 52/16 63/19 63/20

64/20 64/20 65/5 67/9 67/12 67/18 68/2 69/13 72/15 74/13 75/6 76/24 77/4 79/4 79/11 81/5 81/24 83/10 83/11 84/13 86/19 89/15 90/10 92/4 98/20 113/7
**Lucisano's [2]** 39/5 84/6
**Luddite [1]** 50/5

## M

**made [16]** 5/25 24/19 29/10 33/11 38/6 48/5 61/7 69/20 91/25 95/7 102/19 103/16 106/3 111/9 114/13 123/14
**magnitude [1]** 105/13
**major [2]** 73/19 73/19
**majority [3]** 9/16 20/1 106/2
**make [21]** 4/1 16/6 24/22 26/19 40/24 42/5 48/16 48/23 53/7 59/12 76/7 78/14 78/22 80/16 83/6 93/8 102/20 105/9 115/16 118/9 123/4
**makes [3]** 24/16 102/3 112/8
**making [7]** 3/21 26/7 29/15 40/8 54/4 63/25 75/22
**Man [1]** 78/20
**manageable [1]** 69/11
**management [2]** 64/12 64/19
**manager [1]** 35/14
**managers [1]** 11/25
**manufacturing [2]** 9/3 84/21
**many [36]** 8/24 9/2 13/25 15/14 15/18 23/18 26/6 27/24 36/10 40/24 52/5 52/6 52/7 53/2 53/12 60/18 61/1 64/14 64/14 69/25 69/25 69/25 69/25 70/13 70/15 71/1 75/23 96/13 100/14 102/5 103/3 103/3 103/3 105/14 105/18 124/5

**March [18]** 3/17 4/14 4/19 4/21 5/10 37/18 47/20 49/3 110/18 111/24 111/24 112/16 112/20 112/23 112/24 113/1 113/3 113/5

**March 25th [6]** 4/14 4/19 4/21 37/18 49/3 112/24

**March 26th [6]** 110/18 111/24 112/16 112/20 112/23 113/1

**March 27th [2]** 113/3 113/5

**March 31st [1]** 47/20

**material [1]** 80/4

**math [1]** 77/19

**matter [7]** 71/12 72/7 104/10 104/20 107/3 115/20 126/3

**matters [5]** 48/24 73/3 73/11 93/11 102/21

**maximum [1]** 32/24

**may [31]** 1/14 4/25 9/18 14/24 16/12 18/4 35/22 39/1 39/1 39/21 44/16 44/16 44/24 44/24 46/2 54/10 66/3 71/14 77/11 82/15 92/8 92/22 92/22 92/23 92/23 93/4 93/12 103/13 106/18 116/18 126/4

**May 5th [1]** 4/25

**maybe [16]** 12/10 15/1 15/9 15/11 17/13 19/16 22/19 29/24 31/7 42/6 81/22 91/23 105/25 107/19 107/19 125/16

**McDermott [3]** 20/23 52/20 102/12

**mean [51]** 10/14 10/16 15/17 15/25 17/15 18/5 18/20 20/15 22/14 23/6 26/1 26/24 27/1 33/20 38/15 44/23 47/18 48/1 49/7 57/1 63/22 69/20 71/8 73/10 74/23 76/18 78/23 80/3

81/25 82/22 82/25 83/25 83/17 83/22 84/10 84/11 87/4 92/5 92/9 92/11 95/17 103/17 103/19 104/1 104/22 107/5 116/2 116/7 118/11 125/2 125/17

**meaning [4]** 44/21 47/2 84/1 109/7

**meaningful [4]** 21/6 27/19 37/8 37/10

**means [11]** 45/7 67/21 83/8 87/15 88/15 90/21 101/9 107/16 107/18 121/16 122/21

**meant [7]** 32/6 32/8 38/19 44/3 44/8 85/9 123/8

**Meanwhile [1]** 51/23

**measure [1]** 96/13

**measurement [1]** 17/3

**measurement-while-drillin g [1]** 17/3

**mechanical [1]** 2/17

**mechanisms [1]** 116/16

**meet [12]** 19/1 24/2 27/24 37/25 51/12 51/18 56/10 71/18 90/16 105/1 118/3 124/20

**meet/confer [1]** 51/18

**meeting [2]** 19/13 119/2

**meetings [9]** 38/2 38/25 39/1 40/4 44/8 44/9 44/16 73/8 114/16

**memory [1]** 117/14

**mention [1]** 17/9

**mentioned [5]** 23/9 52/20 75/17 99/4 115/18

**mere [1]** 106/20

**merge [1]** 27/7

**merger [12]** 34/13 36/2 38/22 43/22 43/23 43/25 44/19 44/21 44/25 106/4 106/23 107/8

**mergers [1]** 45/10

**merging [1]** 42/25

**message [3]** 49/4 52/25 101/17

**messages [37]** 49/6 49/10 49/12 49/14 49/15 49/21 49/22 50/1 50/8 50/13 50/15 50/22 51/5 51/15 51/15 51/17 51/20 52/8 52/21 53/15 53/18 54/2 54/5 55/23 56/19 56/25 57/3 57/14 57/20 57/24 58/1 58/18 59/13 59/16 59/18 104/4 105/6

**messaging [1]** 51/12

**metadata [5]** 49/8 49/18 57/5 66/9 68/5

**methodology [2]** 49/21 52/2

**meticulously [1]** 116/25

**metric [1]** 90/22

**microseismic [4]** 19/15 20/3 76/19 95/24

**middle [1]** 125/17

**Midland [3]** 11/23 35/14 39/3

**might [16]** 8/8 15/10 17/20 28/19 47/9 49/24 70/18 75/17 89/6 92/9 94/15 100/25 107/10 107/11 108/2 113/8

**mind [5]** 24/6 31/17 57/19 63/21 112/4

**minds [2]** 53/21 54/1

**Mine [1]** 112/24

**minimally [1]** 63/11

**minimum [3]** 73/5 115/8 115/22

**Minnesota [1]** 55/19

**minor [1]** 57/12

**minute [4]** 24/9 64/22 80/10 111/19

**minutes [1]** 64/23

**mispronouncing [1]** 79/19

**missing [4]** 47/9 98/6 106/13 106/14

**missioning [1]**  98/5
**misstatement [1]**  27/16
**misstatements [3]**  10/4
 24/14 28/7
**misunderstanding [1]**
 123/6
**misunderstood [1]**  70/18
**mitigating [1]**  96/24
**mobile [1]**  101/19
**model [2]**  24/16 88/23
**money [1]**  93/8
**Monica [2]**  2/13 126/5
**Monkey [5]**  95/22 95/23
 108/1 108/7 108/13
**month [5]**  23/19 94/7 96/20
 96/20 96/20
**months [8]**  18/17 21/21
 102/5 103/3 104/14 106/7
 106/10 125/3
**more [48]**  7/15 9/7 10/2
 16/1 16/4 18/16 20/4 21/8
 28/13 28/16 29/10 31/2
 33/13 34/25 36/9 37/12
 37/13 46/18 49/7 51/1 51/14
 63/14 71/15 79/24 81/9
 85/16 86/10 86/16 91/5
 91/21 94/14 98/8 99/22
 99/24 100/8 102/23 102/23
 103/3 103/4 105/9 107/11
 111/14 113/13 117/15
 118/13 122/5 122/13 123/11
**morning [2]**  3/25 123/19
**most [17]**  10/6 10/6 12/24
 16/6 22/19 45/15 49/20
 52/15 52/15 53/2 54/13 60/6
 68/24 71/22 98/16 101/18
 120/19
**motion [3]**  1/13 24/1 75/5
**move [7]**  18/18 48/24 48/25
 81/16 87/19 100/12 118/22
**moving [4]**  79/15 87/16
 124/2 125/12
**Mr [33]**  7/21 8/10 12/22

17/11 29/2 34/19 44/13
 59/17 63/19 64/20 64/20
 67/12 69/13 74/13 77/4 79/4
 79/11 81/24 83/10 84/13
 86/19 87/9 90/10 98/20
 103/9 110/10 111/18 112/9
 113/7 113/15 114/5 118/3
 123/2
**Mr. [104]**  3/16 8/2 8/11 9/8
 12/23 14/8 14/22 16/24
 17/12 17/17 22/7 22/12
 22/17 22/19 23/9 23/15 24/3
 24/15 26/2 26/24 28/14
 28/16 28/23 29/6 29/17
 29/21 30/7 31/11 31/17
 31/22 31/25 32/2 32/12
 32/17 33/7 36/21 39/5 39/22
 40/7 41/3 42/9 45/2 45/4
 45/16 45/21 47/16 47/19
 47/20 48/19 49/1 52/16
 52/19 56/13 56/14 58/11
 58/13 59/24 60/3 63/20
 63/25 64/7 64/14 65/5 65/17
 67/9 67/18 68/2 69/18 70/12
 72/15 75/5 75/6 75/11 76/24
 78/9 79/17 81/5 82/10 83/11
 83/21 84/6 84/20 84/23
 85/14 88/20 89/15 92/4 93/9
 101/3 106/1 106/16 109/10
 110/1 111/7 111/16 111/25
 112/3 112/12 113/10 120/19
 121/3 124/4 124/7 124/11
**Mr. Angelos [6]**  8/11 16/24
 29/6 45/4 45/16 47/19
**Mr. Cotilletta [53]**  3/16 8/2
 9/8 12/23 14/8 17/12 22/7
 22/17 22/19 23/9 23/15 24/3
 26/24 28/16 29/17 29/21
 30/7 32/2 32/12 33/7 40/7
 42/9 45/21 47/20 49/1 52/19
 58/13 59/24 60/3 63/25 64/7
 64/14 65/17 69/18 70/12
 75/5 75/11 78/9 79/17 82/10
 83/21 84/20 84/23 85/14

88/20 93/9 101/3 106/1
 106/16 109/10 111/16
 113/10 124/4
**Mr. Cotilletta's [1]**  110/1
**Mr. Fatale [2]**  124/7 124/11
**Mr. Giraud [6]**  56/14 111/7
 111/25 112/12 120/19 121/3
**Mr. Giraud's [1]**  112/3
**Mr. Harper [2]**  24/15 56/13
**Mr. Lucisano [30]**  14/22
 17/17 22/12 26/2 28/14
 28/23 31/11 31/17 31/22
 31/25 32/17 36/21 39/22
 41/3 45/2 47/16 48/19 52/16
 63/20 65/5 67/9 67/18 68/2
 72/15 75/6 76/24 81/5 83/11
 89/15 92/4
**Mr. Lucisano's [2]**  39/5
 84/6
**Mr. Ritchie [1]**  58/11
**MS [8]**  2/13 58/24 59/22
 75/17 104/25 116/5 124/11
 126/5
**Ms. [16]**  4/25 7/20 14/12
 23/14 25/25 58/15 58/21
 63/19 79/12 80/12 82/13
 112/13 112/18 114/4 124/8
 124/13
**Ms. Hawkins [4]**  4/25
 80/12 82/13 114/4
**Ms. Hefley [9]**  7/20 14/12
 23/14 25/25 58/15 58/21
 63/19 112/18 124/8
**Ms. Hefley's [2]**  79/12
 112/13
**Ms. Rhonda [1]**  124/13
**much [15]**  18/8 21/8 25/6
 48/17 54/1 59/6 64/13 76/25
 85/4 90/2 92/16 93/6 110/13
 110/13 124/10
**mud [1]**  17/3
**mull [1]**  33/7
**multi [1]**  20/19
**multi-billion [1]** 20/19

**M**

**multiple [4]** 5/12 40/9 68/12 83/23

**murder [1]** 72/11

**must [1]** 107/18

**my [26]** 3/6 10/12 15/24 25/22 35/24 43/19 48/21 54/19 60/6 62/7 62/7 62/15 62/20 62/24 66/23 67/2 67/14 67/25 70/18 79/21 99/14 106/19 107/22 109/19 116/1 125/2

**N**

**name [3]** 23/13 34/2 79/19

**names [1]** 6/25

**narrative [1]** 89/12

**narrow [30]** 6/25 10/9 10/20 10/22 11/9 12/21 25/23 27/3 28/13 30/17 33/12 34/14 38/1 42/1 43/4 58/3 66/19 67/25 76/14 76/15 76/16 78/22 79/2 79/2 79/3 79/13 91/22 93/21 93/25 121/10

**narrow-down [1]** 79/13

**narrowed [8]** 6/23 6/24 11/9 35/9 42/12 42/23 95/25 123/25

**narrowing [6]** 3/24 4/5 5/18 8/2 67/3 78/10

**narrows [1]** 94/23

**nature [14]** 10/5 12/7 17/23 21/1 51/11 55/1 58/2 72/22 83/16 83/25 84/17 84/25 86/10 108/23

**neat [3]** 12/4 12/12 12/19

**nebulous [1]** 120/9

**necessarily [4]** 12/10 17/19 41/12 51/10

**necessary [1]** 50/14

**need [49]** 3/19 6/6 6/15 6/19 6/20 7/2 7/3 11/5 15/22 18/23 19/4 19/5 19/5 19/21 20/14 22/1 23/22 28/17 30/19 31/6 38/10 39/12 47/10 48/11 52/21 57/10 59/20 63/7 63/8 63/11 64/22 67/4 72/10 72/11 72/12 72/15 72/25 75/21 78/14 79/1 80/2 84/20 91/8 91/22 102/20 103/7 105/17 110/7 121/12

**needed [5]** 47/23 49/19 117/8 118/25 122/13

**needlessly [1]** 118/24

**needs [6]** 18/2 26/19 41/7 68/21 68/22 115/20

**negative [1]** 60/11

**negotiate [3]** 5/16 61/20 66/7

**negotiating [1]** 42/18

**negotiation [3]** 28/2 37/21 43/1

**negotiations [1]** 43/3

**neither [1]** 67/11

**net [2]** 54/8 59/16

**never [10]** 18/25 55/25 66/7 66/17 78/20 83/4 107/1 112/4 117/1 117/3

**nevertheless [1]** 48/5

**new [8]** 1/20 1/20 1/23 1/23 23/10 86/8 86/9 124/21

**next [25]** 3/22 7/19 10/9 24/3 24/5 30/7 30/8 33/6 33/8 45/21 48/19 49/1 60/3 82/10 82/11 87/9 88/20 93/9 99/18 100/12 112/25 116/4 117/24 118/1 124/24

**nice [3]** 12/4 12/12 31/20

**night [4]** 56/25 57/1 57/3 123/19

**nine [5]** 38/16 43/7 43/17 61/3 110/25

**nine-day [2]** 38/16 43/17

**NJ [1]** 2/13

**no [93]** 1/4 5/11 7/25 8/13 9/5 9/22 10/13 10/14 10/14 17/1 17/5 18/7 19/16 22/17 26/13 26/18 27/7 29/4 29/6 29/9 32/2 34/9 34/11 35/18 36/2 37/18 38/16 40/10 41/19 42/12 43/16 44/4 44/14 45/23 49/3 49/4 49/16 53/24 57/5 58/3 60/5 61/19 62/17 62/17 63/9 63/9 63/10 65/8 67/2 68/5 71/7 71/7 71/7 72/13 76/22 77/15 81/1 82/17 82/21 83/5 84/5 84/14 85/8 85/9 85/15 86/4 86/21 87/10 87/12 87/20 88/5 88/21 90/14 91/12 91/13 91/17 92/8 92/25 93/4 96/9 97/10 97/10 100/18 105/3 106/18 107/12 108/2 109/13 115/20 116/22 118/6 119/2 119/4

**non [6]** 10/25 46/9 77/25 78/13 84/9 96/2

**non-existence [1]** 96/2

**non-fraudulent [1]** 46/9

**non-responsive [1]** 84/9

**none [8]** 37/9 51/12 56/23 56/24 63/5 68/19 82/3 95/23

**nonsense [2]** 63/5 68/5

**normal [1]** 106/14

**normally [2]** 15/5 36/8

**north [1]** 11/24

**Nos [1]** 4/15

**not [170]**

**notes [1]** 98/1

**nothing [6]** 37/5 41/1 54/1 68/15 74/9 111/20

**notice [5]** 4/7 5/12 10/13 85/3 102/10

**noticed [1]** 112/7

**notices [5]** 102/8 102/9 102/13 102/17 102/21

**noting [1]** 56/2

**notion [6]** 27/16 32/6 32/14 40/8 65/21 102/6

**now [50]** 5/8 5/25 6/9 7/7

**now... [46]** 7/16 18/7 18/16 19/3 19/23 22/16 27/12 27/19 28/21 28/22 34/13 35/9 38/12 39/13 40/15 42/23 44/25 45/9 46/20 51/13 51/15 53/11 58/8 60/23 61/8 67/9 69/15 79/14 85/24 94/14 95/25 98/17 101/16 103/17 107/13 107/24 109/10 109/19 113/9 113/10 113/19 117/7 118/3 120/4 121/3 123/13
**nowadays [1]** 51/5
**nuanced [1]** 27/10
**number [36]** 4/3 5/13 8/19 9/14 9/17 9/21 10/17 10/21 11/10 11/10 13/6 13/7 16/3 54/21 60/21 60/22 65/13 81/10 84/3 88/8 89/4 90/1 94/1 94/19 95/10 95/11 96/11 98/12 98/13 104/16 108/21 114/8 118/20 119/22 124/24 124/25
**numbers [1]** 62/4
**numerous [4]** 8/24 60/9 60/23 64/18

# O

**oath [1]** 6/21
**object [1]** 54/5
**objected [3]** 98/16 117/8 121/8
**objection [10]** 16/9 83/15 84/6 86/21 92/1 99/9 111/14 115/24 120/6 122/18
**objections [4]** 22/13 81/1 111/20 122/19
**objects [1]** 114/17
**obligation [1]** 86/21
**observation [1]** 12/15
**obtain [1]** 93/25
**obvious [6]** 72/21 72/22 72/23 73/18 89/6 123/10

**obviously [12]** 7/13 23/13 27/1 31/18 32/13 34/20 76/16 77/21 77/25 87/2 96/22 105/15
**occurred [3]** 5/20 33/17 33/24
**occurring [1]** 10/5
**odd [1]** 8/1
**off [20]** 3/17 4/2 9/9 31/17 35/7 41/10 41/11 46/23 49/13 50/17 52/7 62/14 66/7 68/8 73/23 82/16 86/8 99/13 109/7 123/13
**offered [1]** 22/3
**official [5]** 2/14 87/12 87/20 87/20 90/19
**offline [1]** 124/12
**often [1]** 120/25
**Oh [6]** 14/11 20/9 38/17 82/19 103/10 113/17
**oil [6]** 24/25 36/3 61/2 61/3 73/16 84/22
**old [1]** 86/9
**once [1]** 124/15
**one [114]** 4/6 7/22 9/1 10/11 10/14 10/20 11/10 11/14 11/19 12/4 13/1 14/2 14/3 14/13 14/23 14/25 16/14 16/17 17/5 17/9 17/20 21/2 21/14 26/2 27/6 27/21 29/3 30/9 30/21 30/24 31/2 31/2 33/7 33/15 33/24 35/4 35/24 41/1 41/20 42/4 43/15 45/6 46/11 46/13 47/9 47/17 49/23 52/18 54/21 55/24 57/17 57/18 59/4 59/5 66/13 68/7 69/20 69/20 69/21 71/17 71/19 73/4 75/5 77/8 78/25 80/1 80/19 82/7 82/14 82/16 82/19 85/25 85/25 86/6 86/9 86/10 86/15 86/16 87/8 88/20 88/21 89/10 91/10 93/13 93/13 94/19 95/23 95/24 97/23 98/4

98/21 99/6 99/8 100/3 100/9 100/16 100/18 101/3 101/12 108/6 109/22 109/25 110/2 113/1 113/13 116/25 117/1 118/18 119/1 121/12 123/4 123/22 123/23 124/24
**one's [1]** 76/23
**ones [21]** 11/6 11/6 22/20 53/16 61/14 62/9 72/7 95/2 96/16 102/4 105/25 107/3 109/4 109/18 109/23 114/5 114/6 116/9 118/1 122/24 122/24
**only [23]** 4/10 4/16 5/3 7/1 11/11 17/5 23/8 41/10 51/22 56/4 65/24 68/3 71/10 72/6 73/11 73/11 73/12 74/14 80/3 80/18 86/9 95/24 110/21
**open [1]** 8/19
**operated [4]** 65/23 65/23 97/4 97/4
**operated/not [1]** 65/23
**operating [3]** 36/5 119/7 119/21
**operation [1]** 106/14
**operational [2]** 11/21 77/16
**operations [1]** 73/7
**opine [1]** 19/6
**opinion [1]** 102/11
**opportunity [6]** 52/3 58/3 110/5 117/20 122/11 124/9
**opposed [1]** 45/11
**opposing [1]** 109/12
**opt [1]** 119/18
**optics [1]** 76/20
**optimistically [1]** 73/2
**orange [1]** 99/2
**oranges [1]** 99/2
**order [13]** 41/7 44/14 57/4 72/17 74/8 82/8 84/13 87/8 90/17 93/20 96/21 97/14 98/14
**ordered [4]** 32/23 55/23

**ordered... [2]**  56/1 95/5
**ordinary [2]**  21/1 121/16
**organized [4]**  11/15 11/20 12/19 70/13
**original [2]**  34/9 43/1
**originally [4]**  38/1 42/12 47/3 51/14
**other [71]**  5/20 6/2 6/2 6/13 6/21 7/6 9/3 10/25 12/9 18/15 18/23 20/1 20/2 20/12 20/20 21/20 21/22 25/11 25/12 26/22 32/19 37/9 41/19 42/19 43/14 44/8 48/24 50/1 50/8 50/10 51/1 51/4 51/24 53/23 53/23 53/25 56/22 57/17 57/18 60/15 60/16 67/25 68/9 70/24 72/9 74/9 75/11 75/18 75/19 75/25 76/6 78/4 78/24 78/25 80/10 83/9 83/20 84/22 86/15 93/23 93/24 104/24 106/21 107/10 107/21 107/21 109/24 116/16 121/5 122/10 125/6
**others [8]**  1/4 7/17 34/7 47/25 99/10 121/2 121/4 121/19
**otherwise [4]**  65/20 65/23 67/1 100/7
**ought [1]**  65/19
**our [71]**  3/22 5/24 6/4 8/3 9/9 9/10 13/5 13/13 14/17 18/12 19/4 19/8 19/23 20/8 20/8 21/20 23/23 24/3 24/20 24/21 26/5 27/16 29/4 29/17 32/7 32/7 32/13 34/9 39/25 43/5 44/11 53/21 54/1 54/2 54/3 54/16 54/17 58/19 60/14 61/7 66/11 67/12 67/13 69/9 69/20 71/19 75/3 76/1 77/8 78/1 79/15 82/4 83/13 83/15 83/18 87/5 87/6 90/7 93/21 95/13 95/21 99/9

100/10 100/22 106/1 111/10 111/13 117/1 117/4 121/21 122/18
**ourselves [1]**  19/9
**out [58]**  8/8 11/6 13/8 14/17 15/4 15/5 15/18 18/21 19/16 21/23 23/8 27/18 28/8 38/10 39/11 39/11 40/8 42/16 45/18 47/15 57/4 58/21 59/15 59/24 61/3 63/8 63/8 67/17 74/4 74/19 75/21 78/18 86/20 89/9 89/10 91/15 94/12 94/24 95/7 97/25 100/22 101/12 101/13 102/10 102/19 103/6 103/16 103/25 105/5 107/20 108/12 113/16 116/14 116/14 116/20 121/6 124/7 125/5
**outlining [1]**  101/24
**outside [6]**  50/19 55/16 55/17 97/4 104/12 107/2
**over [25]**  5/5 21/10 21/21 34/9 34/15 38/11 39/2 39/12 43/3 53/22 54/6 55/4 56/18 58/8 62/9 63/2 64/6 65/22 67/10 75/1 76/14 83/13 106/12 116/11 125/13
**overbroad [2]**  8/9 26/22
**overlays [1]**  49/8
**overly [2]**  23/6 79/3
**overseeing [1]**  35/15
**own [7]**  16/20 25/4 44/12 55/5 55/6 109/13 109/19
**owns [1]**  21/12

## P

**p.m [4]**  1/10 65/2 65/3 125/24
**page [11]**  5/11 24/9 24/9 25/19 30/9 33/9 33/14 45/24 85/15 90/21 101/8
**pages [3]**  47/13 81/22 103/4
**paper [1]**  16/4
**paragraph [1]**  71/20
**parameters [2]**  56/8 56/9

**part [18]**  7/11 19/12 28/2 31/15 38/23 42/25 43/24 43/25 44/1 44/11 66/17 75/21 87/16 94/2 96/23 98/16 101/18 124/19
**participate [1]**  58/4
**particular [21]**  7/4 13/15 14/3 14/16 18/6 19/13 39/8 40/23 42/6 48/20 53/7 61/14 64/1 64/2 64/2 84/4 85/3 90/1 91/7 91/8 120/24
**particularly [2]**  24/15 35/12
**parties [6]**  18/5 19/24 41/10 56/10 62/3 99/16
**parties' [1]**  28/12
**party [4]**  54/23 55/21 61/23 65/15
**party's [2]**  21/9 21/11
**pass [1]**  36/18
**passed [1]**  12/6
**past [4]**  57/2 82/13 88/23 101/16
**path [2]**  42/6 74/1
**patient [1]**  112/4
**pause [3]**  7/18 7/20 65/2
**peace [1]**  75/3
**peers [3]**  24/20 24/21 27/16
**pen [1]**  16/4
**Peninsula [1]**  116/19
**Penn [1]**  116/18
**people [18]**  45/10 51/5 51/24 54/6 57/9 59/4 59/5 59/6 59/8 59/12 67/15 91/13 96/4 98/4 98/5 100/21 100/21 118/3
**per [1]**  94/17
**perceived [4]**  30/24 47/22 85/4 91/2
**percent [8]**  12/13 68/15 84/22 89/20 90/20 92/19 92/20 93/7
**percentage [1]**  84/3
**perfect [5]**  63/6 63/8 68/4 74/2 102/3

**perfectly [1]** 62/6
**performance [1]** 71/24
**performed [6]** 8/13 8/17 13/20 16/14 76/12 88/17
**perhaps [3]** 105/25 106/15 110/4
**period [29]** 10/3 10/6 23/22 24/12 25/1 38/15 38/16 38/20 43/17 50/17 52/23 55/13 56/9 56/16 60/12 61/13 62/10 63/18 64/2 66/25 76/4 84/4 89/13 99/7 99/21 101/7 106/11 106/22 108/18
**periodic [1]** 120/21
**permanently [1]** 123/10
**Permian [2]** 11/22 31/15
**permitted [1]** 50/22
**person [5]** 13/1 31/18 44/24 44/25 100/18
**person's [1]** 73/1
**personal [2]** 6/11 65/6
**personally [2]** 98/24 98/24
**perspective [1]** 73/19
**pertinent [2]** 78/13 115/15
**phase [1]** 19/18
**phone [9]** 53/4 53/22 53/24 55/10 56/7 57/10 57/12 59/6 107/13
**phones [6]** 52/6 53/12 54/6 56/17 58/17 60/1
**pick [3]** 12/24 22/7 22/19
**picture [4]** 7/11 17/21 50/3 86/11
**piece [3]** 17/6 101/23 102/3
**piecemeal [1]** 66/12
**pieces [1]** 86/13
**place [14]** 12/5 12/11 18/8 38/9 41/8 48/13 56/2 56/23 56/23 58/5 58/7 89/10 96/13 101/19
**places [1]** 22/15
**Plaintiff [2]** 22/3 101/24

**Plaintiff's [1]** 27/18
**plaintiffs [22]** 1/5 1/17 3/3 3/5 4/3 17/24 23/18 29/5 36/24 45/17 57/8 58/16 59/11 65/14 78/13 78/24 81/1 83/14 123/25 125/4 125/10 125/15
**Plaintiffs' [10]** 4/12 4/14 4/17 4/19 4/21 5/1 5/10 49/3 56/20 110/19
**plan [3]** 101/6 119/7 119/21
**planned [4]** 46/2 81/19 81/21 82/2
**plans [1]** 64/11
**pleading [1]** 111/10
**please [3]** 51/17 79/16 111/21
**plenty [8]** 21/19 32/15 35/2 68/16 77/25 78/4 88/12 110/2
**plot [1]** 60/16
**plotted [1]** 63/3
**plug [2]** 61/6 63/16
**plus [3]** 11/2 77/18 98/25
**point [42]** 3/21 9/18 14/13 18/4 18/18 22/2 27/24 29/3 31/9 38/6 41/4 41/10 44/4 53/23 57/17 57/18 63/17 65/9 66/19 68/9 69/20 69/23 76/6 77/3 79/12 84/6 93/22 97/13 99/21 104/8 104/9 107/22 110/4 115/6 115/16 115/19 115/21 116/2 118/14 118/17 121/11 123/4
**pointed [3]** 58/21 116/14 116/20
**pointing [1]** 74/12
**points [4]** 25/18 103/13 117/3 117/4
**policies [3]** 55/2 104/20 107/6
**policy [10]** 55/5 94/7 94/11 101/19 101/25 102/1 104/13 106/8 106/15 107/13

**prep [1]** 62/12
**Pork [1]** 55/18
**portfolio [1]** 78/6
**portions [1]** 114/20
**pose [1]** 35/23
**positing [1]** 13/23
**position [4]** 6/5 14/5 31/13 106/19
**possession [3]** 43/10 55/4 59/7
**possibilities [1]** 105/12
**possibility [1]** 105/11
**possible [2]** 68/2 74/20
**post [1]** 36/6
**post-acquisition [1]** 36/6
**potential [2]** 42/13 107/21
**power [2]** 18/16 104/13
**PowerPoint [1]** 98/1
**PowerPoints [1]** 37/4
**practice [2]** 73/19 99/15
**precise [2]** 118/9 120/1
**precisely [2]** 26/18 69/22
**predeposition [1]** 118/18
**predict [1]** 24/17
**prejudices [1]** 105/15
**prejudicial [1]** 58/3
**premerger [2]** 40/8 40/11
**prep [1]** 7/3
**prepare [3]** 26/14 29/14 35/19
**prepared [5]** 4/2 25/16 25/18 26/16 65/15
**preparing [2]** 8/4 93/16
**prepped [2]** 37/9 86/14
**present [8]** 21/25 29/19 29/20 50/13 90/24 97/6 114/23 119/15
**presentations [2]** 70/24 83/1
**presented [2]** 8/22 18/11
**presents [1]** 20/13
**preservation [1]** 104/4
**press [1]** 50/2
**pretty [2]** 16/24 57/23

**prevented [1]** 37/6
**previously [1]** 33/11
**prima [2]** 18/22 76/5
**prime [1]** 34/21
**printed [1]** 97/25
**printing [1]** 113/9
**prior [12]** 24/11 25/5 25/7 36/4 37/7 43/16 44/2 44/5 49/14 81/7 97/4 106/10
**priority [1]** 56/7
**privacy [1]** 56/6
**privilege [2]** 51/1 102/14
**privileged [1]** 102/14
**probably [16]** 7/7 10/8 15/5 15/25 16/1 16/5 23/17 23/25 24/8 52/11 52/14 60/6 61/22 91/6 112/18 125/6
**problem [16]** 8/3 8/6 8/25 10/23 20/14 26/17 33/3 35/5 61/18 65/8 78/7 82/20 83/18 100/2 119/20 119/23
**problems [3]** 10/11 68/11 73/19
**procedure [1]** 15/2
**procedures [1]** 55/2
**proceedings [3]** 2/17 65/2 126/3
**process [24]** 19/1 26/7 28/2 35/25 37/21 37/25 38/22 41/8 41/16 42/18 42/23 43/1 43/3 51/13 57/15 58/4 67/16 68/17 68/18 69/3 71/18 86/24 107/10 124/20
**process-based [1]** 86/24
**processes [3]** 29/15 38/9 87/3
**produce [26]** 7/17 13/15 28/6 41/20 44/14 48/22 49/5 49/15 49/22 50/8 51/15 52/22 61/11 62/11 69/11 73/22 74/5 78/3 78/15 81/23 82/8 84/21 86/8 86/16 95/19 105/8

**produced [62]** 2/17 10/25 11/1 12/2 13/17 19/22 20/3 20/5 20/6 20/13 30/13 35/1 36/14 39/24 40/5 40/25 41/23 46/16 49/13 49/18 49/21 50/8 50/22 50/23 51/15 51/17 52/8 52/24 53/10 53/16 53/20 54/5 54/9 55/3 55/23 55/24 57/21 58/18 59/16 59/18 60/21 61/24 61/24 62/12 64/14 65/13 68/20 69/24 70/1 70/10 74/23 77/8 77/11 77/25 78/7 80/20 82/2 86/5 86/6 87/14 87/24 108/7
**producing [6]** 9/12 49/9 61/19 69/1 84/2 92/21
**product [3]** 50/25 93/20 98/9
**production [41]** 4/13 4/15 9/3 14/19 15/20 17/7 19/8 20/2 35/1 37/14 37/19 38/13 40/17 42/10 49/4 49/14 52/2 60/11 62/18 66/16 66/18 70/9 70/15 70/17 70/21 71/8 71/24 77/6 77/7 78/6 81/11 81/12 81/13 84/21 85/2 86/22 88/23 96/24 97/8 97/11 124/16
**productions [3]** 40/18 52/25 70/16
**productive [1]** 26/20
**productivity [1]** 96/25
**program [2]** 61/6 63/23
**progress [2]** 3/21 6/1
**project [63]** 6/24 6/25 8/14 8/24 9/8 10/18 11/12 11/25 12/3 12/24 12/25 13/14 13/16 14/16 14/23 16/15 16/18 17/11 17/20 19/14 19/18 19/19 20/9 20/12 20/14 20/16 62/22 62/24 63/17 64/1 66/23 76/25 89/4 89/22 90/1 91/8 91/11 91/18

91/18 91/21 91/21 92/8 92/16 92/21 94/1 94/17 94/17 94/22 94/25 95/7 95/22 95/22 96/18 96/18 96/25 97/1 99/21 100/3 100/16 100/22 101/16 105/23 107/24
**project-based [1]** 107/24
**projected [1]** 90/16
**projections [1]** 71/21
**projects [98]** 5/14 5/20 6/2 6/13 6/21 7/1 8/6 8/17 8/19 8/24 9/6 9/12 9/13 9/16 9/22 9/23 10/2 10/7 10/17 11/1 11/6 11/7 12/10 12/18 13/7 13/20 13/22 13/24 14/7 16/18 17/23 18/15 18/23 20/1 20/2 21/11 21/16 22/7 22/8 25/5 25/5 25/7 25/13 47/1 60/12 61/14 64/2 65/23 66/21 66/24 67/3 67/3 68/1 70/16 75/19 76/11 76/18 76/19 76/20 76/21 77/18 77/19 78/5 78/14 78/25 79/2 81/15 81/16 81/17 85/16 85/18 85/20 85/22 87/2 88/25 89/8 89/19 89/21 90/20 91/8 91/23 92/3 92/5 92/11 92/14 92/20 93/24 94/17 95/3 95/3 95/11 96/14 96/17 97/2 97/4 100/4 108/14 109/1
**promise [1]** 113/22
**promptly [1]** 79/14
**proof [2]** 69/8 72/25
**proper [2]** 86/23 120/6
**proportionality [4]** 20/21 21/3 57/7 67/18
**proposal [1]** 25/22
**proposals [1]** 14/25
**propose [3]** 23/25 90/20 92/19
**proposed [2]** 90/17 92/15
**proprietary [2]** 69/19 75/2

**propriety [1]** 87/3
**protected [1]** 56/3
**protecting [1]** 21/5
**protection [3]** 50/25 102/25 113/4
**protocol [8]** 49/16 50/10 51/12 51/19 54/15 56/23 59/1 59/2
**protocols [1]** 56/2
**prove [7]** 19/4 36/11 68/10 68/11 72/10 72/17 73/17
**proved [2]** 67/8 74/20
**proven [1]** 36/11
**proves [2]** 23/6 73/5
**provide [13]** 32/3 35/13 46/19 53/14 61/17 64/4 87/17 88/25 89/12 91/23 92/3 114/22 119/22
**provided [4]** 26/23 86/25 101/24 123/24
**provides [1]** 114/15
**providing [1]** 106/20
**proving [2]** 36/25 72/7
**public [9]** 5/22 18/21 34/3 34/4 82/23 82/25 83/4 83/12 84/10
**publicly [3]** 9/6 9/15 59/4
**pull [6]** 19/20 37/17 39/16 63/18 73/25 112/4
**pulled [1]** 56/11
**pulling [1]** 58/1
**pure [1]** 82/6
**purported [3]** 27/20 74/18 83/14
**purpose [4]** 107/9 118/19 121/9 121/11
**purposes [1]** 38/21
**pursuant [5]** 44/14 48/22 49/16 50/9 94/7
**push [1]** 96/4
**pushed [1]** 105/2
**put [19]** 8/9 12/18 14/4 28/19 29/6 48/6 48/13 56/2

66/16 69/2 76/11 96/13 100/1 102/5 104/25 108/17 109/7 115/13 125/4
**putting [3]** 16/4 79/23 120/4
**PV [3]** 90/23 90/23 91/21
**PV-20 [2]** 90/23 91/21

**Q**

**qualify [1]** 9/7
**qualitative [1]** 61/17
**quarter [1]** 80/24
**question [30]** 15/16 15/22 17/14 34/23 46/20 47/21 70/18 84/8 84/18 85/10 86/24 87/5 88/1 88/6 88/11 88/12 88/22 89/7 89/17 90/5 90/10 92/6 99/6 99/18 99/24 104/23 121/17 121/18 121/18 121/21
**questioning [2]** 49/20 121/7
**questions [33]** 8/8 8/19 14/21 14/22 15/4 15/14 15/25 16/2 16/6 16/7 16/14 22/8 22/12 23/3 37/7 41/24 46/18 72/15 88/16 97/18 97/19 98/15 98/17 101/2 101/17 102/17 118/4 118/20 120/12 120/22 121/1 122/6 122/7
**quick [4]** 37/17 48/10 113/25 123/5
**quicker [1]** 110/13
**quickly [4]** 14/20 14/20 56/6 110/14
**quite [1]** 67/12
**quote [2]** 83/15 100/24
**quoted [2]** 24/19 83/12
**quotes [1]** 116/18

**R**

**rabbit [1]** 13/2
**raised [1]** 121/2
**rampant [1]** 104/7
**ran [4]** 11/25 16/19 54/25

58/17
**ranges [1]** 50/20
**rank [1]** 60/5
**rate [30]** 63/7 85/1 87/11 88/3 88/4 88/7 88/13 88/23 88/24 89/20 89/24 90/11 90/14 90/15 90/16 90/18 90/19 90/21 91/3 91/15 92/7 92/14 92/17 92/18 92/22 92/23 92/24 93/1 93/3 93/3
**rates [6]** 70/9 70/17 84/3 90/3 90/12 92/11
**rather [2]** 48/24 98/17
**raw [1]** 71/3
**re [3]** 29/19 29/20 55/18
**re-present [2]** 29/19 29/20
**reach [1]** 124/7
**reached [3]** 42/1 116/3 116/14
**read [7]** 4/4 8/1 53/6 72/17 80/15 106/1 112/8
**readily [1]** 38/4
**ready [1]** 5/8
**real [15]** 18/16 18/19 28/15 35/18 37/10 44/1 59/10 59/13 60/17 61/17 63/4 63/18 67/8 86/4 113/25
**reality [5]** 18/20 66/1 74/3 74/4 101/21
**realize [1]** 23/11
**really [44]** 7/8 13/1 18/1 18/25 22/1 24/23 25/13 27/8 27/17 27/18 30/19 31/6 33/16 33/16 37/17 38/10 39/5 46/22 47/5 48/1 48/1 54/23 58/20 66/25 68/14 68/24 69/1 69/2 76/8 86/17 89/2 96/23 98/2 98/6 99/25 100/10 100/13 101/4 105/2 115/21 119/18 123/4 123/15 124/2
**realties [1]** 73/16
**reason [12]** 28/4 29/6 40/4 40/13 46/25 59/11 75/20

**reason... [5]** 84/25 94/2 113/16 116/1 124/23
**reasonable [10]** 15/6 16/17 26/13 72/10 78/24 108/3 108/3 108/10 117/12 117/18
**reasonably [2]** 79/14 103/1
**reasons [3]** 46/9 52/1 118/18
**recall [5]** 13/13 46/2 77/6 82/15 93/12
**receipt [1]** 120/20
**receive [5]** 68/19 94/21 96/8 96/9 122/15
**received [9]** 37/2 53/3 56/24 65/16 118/12 120/24 120/24 120/25 121/24
**recently [4]** 10/2 30/13 91/5 105/1
**recipient [2]** 56/12 56/12
**recipients [1]** 54/22
**recital [1]** 114/18
**recklessness [2]** 72/20 114/14
**recollection [1]** 122/8
**recommendation [1]** 125/2
**reconsider [1]** 122/23
**record [11]** 3/2 4/4 6/22 24/10 40/25 42/5 65/3 80/16 123/10 123/14 126/3
**recorded [1]** 2/17
**recurring [2]** 70/13 70/15
**red [1]** 99/2
**redacted [2]** 69/6 69/7
**redocumentation [1]** 13/19
**reduce [2]** 9/23 27/20
**reduced [1]** 46/4
**refer [1]** 83/14
**reference [4]** 38/25 86/15 95/22 99/10
**referenced [8]** 8/11 35/2 60/8 60/9 70/14 71/17 83/25 86/11
**references [2]** 20/10 37/3

**referring [1]** 119/20
**refers [2]** 88/3 88/13
**reforecast [1]** 87/2
**reforecasting [1]** 60/12
**regard [1]** 12/2
**regarding [2]** 94/12 107/22
**regards [4]** 24/15 24/16 30/16 33/9
**region [2]** 34/1 92/7
**regions [1]** 89/8
**regular [2]** 16/8 114/16
**regularly [1]** 118/3
**reinvent [1]** 7/15
**relate [1]** 116/10
**related [22]** 4/25 13/16 26/9 34/24 35/3 39/24 40/4 40/6 42/15 43/13 46/6 46/13 53/25 60/11 74/10 77/17 78/1 81/12 106/4 106/22 107/3 113/12
**relates [2]** 6/14 37/15
**relating [2]** 44/15 46/1
**relation [2]** 26/22 75/18
**relations [1]** 114/17
**relative [3]** 21/9 63/4 63/4
**release [3]** 46/3 46/10 81/16
**released [5]** 46/5 47/6 80/23 81/10 81/12
**relevance [4]** 22/18 34/22 65/11 82/6
**relevancy [1]** 69/4
**relevant [43]** 10/3 28/6 33/22 36/22 38/20 39/10 40/19 43/5 48/2 50/11 50/18 50/18 50/19 51/24 51/25 53/10 55/13 56/14 56/16 59/13 61/13 62/22 63/18 64/19 66/21 66/25 75/1 76/1 76/3 76/4 76/5 76/11 77/2 77/2 81/11 89/13 95/13 97/9 97/21 98/2 107/1 111/10 122/13
**relied [1]** 72/2
**remained [1]** 4/8

**remaining [4]** 4/16 5/3 18/3 96/1
**remains [2]** 4/6 80/3
**remedial [1]** 96/13
**remember [2]** 27/25 40/21
**remembers [1]** 19/22
**repeat [1]** 100/4
**reply [1]** 58/25
**report [13]** 17/9 19/6 62/4 70/25 73/11 73/11 73/12 77/16 96/6 96/9 100/6 100/7 124/12
**REPORTER [4]** 2/13 2/14 113/16 126/5
**reports [14]** 3/23 6/7 21/11 61/24 62/2 65/16 67/6 67/7 70/15 76/13 94/23 94/24 94/25 95/1
**repository [3]** 17/5 17/12 99/6
**represent [1]** 54/19
**representation [3]** 33/11 42/5 105/9
**representations [1]** 40/25
**representative [20]** 8/4 8/9 8/12 8/23 13/5 14/4 26/5 29/18 31/18 32/3 32/7 32/8 32/13 32/15 33/2 35/13 86/14 86/25 100/23 103/5
**representing [2]** 20/11 59/8
**represents [1]** 55/11
**reproposed [1]** 35/9
**reproposing [1]** 48/8
**request [60]** 4/13 4/15 14/14 14/15 14/18 16/15 16/23 17/1 23/21 34/10 34/10 35/1 37/14 37/18 37/19 37/20 37/25 38/1 38/15 38/24 39/15 39/18 40/13 40/17 42/10 42/10 43/16 44/6 44/10 44/14 60/2 60/5 60/5 63/24 67/2 70/3 70/5 76/9 77/15 77/23 79/13 79/15 80/15 81/6 86/23

**R**

**request... [15]** 100/6 109/5 110/22 111/19 112/5 115/11 115/14 118/11 120/5 121/19 122/20 123/9 123/23 123/24 124/2

**requesting [1]** 79/3

**requests [26]** 40/14 46/11 52/24 75/13 75/16 75/19 77/5 77/12 81/7 98/17 99/3 99/4 100/2 100/3 100/13 101/17 102/7 102/24 102/25 105/19 108/23 116/17 117/6 121/23 122/2 123/25

**require [4]** 17/23 99/7 104/3 115/9

**required [4]** 29/18 103/2 110/1 110/5

**requires [2]** 102/22 114/24

**requiring [1]** 29/20

**reschedule [1]** 23/5

**research [1]** 8/15

**reserve [8]** 61/24 62/1 62/4 65/15 67/6 68/17 73/25 74/19

**reserves [3]** 67/8 71/23 74/22

**reservoir [7]** 14/5 25/9 31/2 32/9 60/14 64/9 85/8

**resolution [1]** 48/14

**resolve [4]** 3/19 7/4 78/23 79/5

**resolved [1]** 48/12

**resolving [1]** 21/15

**resource [15]** 11/8 11/9 13/9 18/15 25/6 30/18 30/18 31/4 32/4 83/16 84/7 85/3 85/5 85/17 100/25

**resources [8]** 1/7 1/8 2/2 4/14 21/12 21/13 31/5 48/15

**respect [28]** 7/25 14/7 27/14 29/15 34/7 34/20 34/24 35/1 35/6 35/8 35/11 35/21 38/6 54/16 54/17 68/25 69/17

77/12 77/22 78/4 82/2 89/21 90/21 92/5 108/5 109/5 109/18 109/24

**respective [1]** 104/19

**respond [14]** 7/20 15/6 23/3 34/19 48/19 54/10 66/3 83/7 116/5 116/7 116/11 117/22 121/20 122/4

**responded [3]** 47/11 78/2 116/13

**responding [1]** 98/25

**response [19]** 39/14 39/23 40/17 48/10 75/6 86/18 87/17 87/18 87/20 87/23 94/12 108/1 108/2 112/6 114/22 119/5 122/16 122/18 123/9

**responses [14]** 9/10 9/11 10/8 30/22 108/16 108/19 110/18 111/15 111/20 112/3 114/24 114/25 118/5 120/23

**responsive [9]** 53/16 54/2 58/18 84/9 85/25 87/5 88/6 89/2 115/18

**rest [4]** 65/18 70/21 114/21 120/25

**result [6]** 13/18 13/25 46/4 46/7 51/10 81/7

**resulted [1]** 13/16

**results [9]** 5/21 15/19 24/12 24/13 75/20 83/16 84/1 84/18 85/6

**retainer [1]** 54/20

**retention [4]** 101/25 101/25 106/8 106/15

**RETIREMENT [1]** 1/3

**return [20]** 31/4 63/7 72/1 83/24 85/1 87/11 88/3 88/4 88/7 88/13 89/20 89/24 90/3 90/12 90/16 91/3 92/16 92/20 92/22 92/23

**return-centric [1]** 72/1

**returned [1]** 90/22

**returned-based [1]** 90/22

returns [1] 72/2

**revealing [1]** 74/19

**review [4]** 16/17 18/12 19/6 59/9

**reviewed [3]** 67/7 118/21 119/8

**reviewing [1]** 12/16

**revisions [2]** 60/11 61/15

**rewriting [1]** 16/15

**RFA [11]** 97/19 100/1 106/20 108/2 110/21 114/20 115/24 119/24 120/23 121/11 122/16

**RFAs [42]** 4/22 7/6 75/21 80/4 80/9 93/11 93/15 93/20 93/24 94/3 94/13 94/15 94/17 95/15 96/1 96/4 96/11 96/22 97/6 97/7 98/18 98/25 99/1 104/2 106/2 106/16 107/24 109/23 110/12 110/20 110/24 111/6 112/11 113/4 113/12 115/9 115/10 116/8 116/15 117/5 117/8 118/2

**RFP [7]** 38/19 39/19 44/4 46/13 47/11 80/1 80/21

**RFPs [8]** 39/18 39/20 46/12 49/2 78/2 80/1 80/11 80/18

**Rhonda [2]** 113/25 124/13

**ridiculous [1]** 73/14

**rig [7]** 46/16 47/5 47/14 47/21 81/3 81/22 82/1

**rigged [1]** 46/3

**right [50]** 3/16 5/25 7/16 19/7 19/20 22/15 24/3 27/12 30/6 31/6 36/22 38/12 39/13 43/2 43/2 43/19 44/13 45/14 45/21 46/1 48/25 55/7 58/22 59/22 60/3 65/4 68/10 70/12 75/9 82/10 85/14 87/9 93/9 108/12 110/10 113/9 113/11 115/13 116/19 117/7 119/4 119/6 119/15 119/17 119/19 122/22 123/2 123/17 123/21

**right...** [1]  125/21
**rigs** [16]  46/5 46/10 46/14 46/16 46/22 46/23 47/6 47/9 48/1 80/23 80/25 81/10 81/12 81/16 82/2 82/9
**risk** [4]  85/16 85/23 86/3 86/4
**risking** [3]  68/18 71/21 96/22
**risks** [2]  47/3 81/14
**RITCHIE** [4]  2/9 3/13 58/11 116/6
**RJ** [1]  99/11
**ROBERT** [2]  2/9 3/13
**robustly** [1]  26/15
**Rog** [1]  86/8
**roll** [3]  70/22 71/3 74/22
**rolled** [8]  27/25 28/3 28/4 28/9 68/19 69/22 69/23 70/2
**rolling** [1]  124/15
**room** [7]  40/9 40/10 40/15 41/4 63/9 63/9 93/11
**rooms** [2]  36/8 41/6
**RoR** [4]  87/11 87/13 87/15 88/12
**Ross** [1]  2/10
**round** [1]  21/23
**route** [1]  22/14
**routinely** [1]  116/17
**royal** [1]  109/7
**RPR** [2]  2/13 126/5
**RSP** [32]  33/10 33/18 33/25 33/25 34/8 34/24 35/3 35/6 35/11 36/3 37/2 37/8 39/11 39/24 40/2 40/3 40/5 40/19 42/14 43/8 43/12 43/15 43/22 44/2 44/19 44/24 45/1 45/7 104/15 106/20 106/23 107/8
**RSP's** [1]  45/18
**RSP/Concho** [1]  104/15
**RSVP** [1]  45/7
**rule** [7]  5/17 15/1 15/13

75/7 93/5 99/11 125/17
**ruled** [1]  19/25
**run** [16]  8/6 8/25 11/12 12/23 14/16 15/12 15/12 15/18 20/13 22/5 50/24 56/22 62/5 62/15 71/2 116/17
**Rusk** [1]  2/14

## S

**safe** [1]  15/25
**said** [48]  5/4 7/1 11/6 21/2 21/4 22/21 27/12 34/17 42/19 52/20 55/11 55/23 56/15 56/21 58/8 58/13 58/15 59/17 67/1 68/13 68/17 71/8 76/24 77/8 81/5 82/21 83/7 83/7 85/18 89/1 90/9 99/11 102/10 103/11 105/3 107/25 109/10 111/11 115/10 116/20 116/22 116/22 117/1 118/10 123/7 123/10 123/15 124/21
**sake** [1]  121/4
**same** [33]  20/18 25/8 25/9 25/20 25/20 28/19 29/11 29/11 29/23 30/10 36/4 36/17 38/21 48/8 50/20 53/14 55/20 59/16 70/25 78/15 78/17 81/8 83/5 89/6 90/21 101/8 107/21 107/22 111/1 111/4 111/6 112/7 121/22
**sat** [1]  95/21
**save** [2]  15/7 121/7
**say** [68]  5/24 5/25 6/11 10/16 10/18 12/3 20/11 20/17 27/23 28/23 30/10 31/3 31/11 32/1 32/19 39/8 41/18 41/19 42/14 43/21 46/23 52/10 52/12 54/16 55/15 57/1 57/10 58/6 60/20 61/2 62/25 64/7 66/24 68/14 70/9 73/1 76/18 76/23 79/14 83/4 85/21 87/11 87/18

87/25 89/2 91/6 94/15 95/8 99/6 100/22 104/2 104/3 104/6 104/15 106/20 108/2 108/10 109/12 110/2 113/12 114/21 119/1 119/9 120/23 121/14 123/3 124/7 124/23
**saying** [31]  14/22 18/7 22/16 22/17 29/7 29/11 33/13 39/7 42/16 44/21 45/7 55/25 65/11 65/17 67/9 69/10 69/15 69/21 72/22 77/13 81/18 81/20 82/24 95/21 97/11 102/13 106/23 114/13 116/14 120/6 121/1
**says** [15]  20/8 36/21 44/5 68/2 85/15 86/3 94/23 97/16 97/16 100/15 104/2 106/21 109/11 111/20 114/18
**scale** [19]  5/14 6/2 6/21 8/14 9/2 9/8 20/1 21/11 21/16 24/18 36/4 40/3 65/23 78/6 78/14 78/25 93/23 95/11 96/14
**scaled** [1]  51/16
**scales** [3]  76/4 76/6 76/16
**schedule** [5]  46/2 46/21 47/5 82/6 124/21
**scheduled** [2]  4/12 46/23
**schedules** [6]  46/14 46/17 47/10 47/22 82/1 125/11
**scheduling** [1]  124/8
**SCHROER** [1]  1/9
**scienter** [7]  36/10 48/4 68/9 68/15 68/16 72/7 72/20
**scope** [5]  6/15 14/1 52/1 57/25 69/24
**scrapped** [1]  43/14
**scratching** [1]  82/4
**screen** [1]  50/4
**screenshot** [2]  50/2 50/6
**screenshots** [4]  50/7 53/8 57/4 59/13
**search** [26]  17/8 19/23 39/25 40/21 40/22 41/21

**search... [20]**  49/19 50/10 51/8 51/9 53/4 53/4 53/5 54/25 56/19 56/22 58/17 59/24 59/25 59/25 66/16 66/20 67/21 69/13 78/2 108/10
**searched [3]**  39/23 49/24 53/5
**searches [3]**  40/19 56/1 103/2
**searching [1]**  51/20
**SEC [3]**  82/25 84/14 85/12
**second [17]**  5/1 37/20 39/18 46/3 55/1 80/20 80/24 82/11 82/20 87/4 104/9 111/6 114/10 114/14 116/10 117/20 118/24
**second-guessing [1]**  87/4
**secrets [2]**  40/12 41/17
**secure [1]**  63/14
**securely [1]**  64/4
**securities [4]**  20/20 20/23 72/6 107/3
**security [1]**  49/10
**see [36]**  7/5 12/5 12/25 12/25 17/8 22/9 22/9 22/10 22/14 22/18 22/20 30/23 36/9 37/3 43/1 61/1 61/9 62/16 67/11 68/1 69/15 74/11 77/19 79/5 81/20 81/23 82/21 90/12 92/21 96/3 99/3 101/18 105/11 105/14 110/21 110/22
**seeing [3]**  12/1 26/11 63/6
**seek [2]**  20/22 97/9
**seeking [7]**  5/14 33/3 43/15 89/11 107/7 113/4 116/12
**seem [3]**  19/9 30/22 63/25
**seeming [1]**  17/24
**seemingly [1]**  45/9
**seems [3]**  18/1 39/10 43/6
**seen [4]**  12/15 80/14 99/14 106/16

**self [2]**  63/16 66/15
**self-contained [1]**  63/16
**self-limiting [1]**  66/15
**selling [1]**  72/24
**sending [1]**  3/16
**sense [3]**  19/21 44/7 102/3
**sensitive [1]**  53/25
**sent [10]**  4/24 46/11 47/20 80/12 82/12 112/16 112/16 114/3 116/9 116/19
**separate [1]**  82/5
**separately [1]**  6/22
**separation [1]**  93/19
**September [1]**  106/6
**September 29th [1]**  106/6
**series [1]**  116/10
**seriously [1]**  74/8
**serve [3]**  93/15 121/9 121/10
**served [4]**  75/21 94/2 108/17 111/23
**service [2]**  59/25 103/11
**set [33]**  4/12 4/20 5/1 37/19 39/20 40/15 42/17 42/21 46/12 46/13 49/2 56/23 62/24 64/2 64/3 75/14 78/2 80/1 80/11 80/19 81/1 82/11 84/11 86/8 86/20 97/15 97/19 100/13 107/14 114/14 117/24 120/18 125/7
**sets [2]**  93/13 93/13
**settings [1]**  55/9
**seven [12]**  8/16 14/2 16/1 24/10 26/10 30/9 47/24 48/6 52/13 57/7 85/15 117/14
**seven-hour [3]**  16/1 26/10 47/24
**several [2]**  42/16 71/19
**severe [2]**  72/20 114/13
**share [10]**  33/17 33/24 34/24 36/18 36/23 37/3 38/5 40/23 42/22 73/7
**shared [2]**  36/7 41/7
**sharing [1]**  41/4

**she [2]**  112/16 112/16
**She's [1]**  80/13
**sheets [4]**  65/20 66/10 66/14 66/21
**shift [2]**  23/25 44/17
**shocking [1]**  105/14
**shoot [1]**  72/12
**shore [1]**  62/7
**short [1]**  47/6
**shorten [1]**  28/11
**shorter [1]**  110/13
**shortly [1]**  117/11
**should [20]**  23/17 33/13 58/7 61/17 62/12 69/11 89/13 93/20 95/20 95/20 103/2 105/22 108/8 111/13 115/9 115/24 118/16 119/17 121/14 124/20
**show [15]**  11/13 21/22 61/15 63/1 63/2 63/3 63/3 67/9 68/20 69/8 72/4 95/1 97/9 109/12 109/14
**showed [1]**  95/2
**showing [4]**  35/24 47/13 76/6 102/20
**side [8]**  11/21 32/19 51/4 61/19 67/25 110/23 110/23 120/16
**sides [1]**  110/8
**sift [1]**  67/20
**Signature [1]**  126/5
**signed [1]**  119/21
**significant [7]**  3/21 5/18 6/1 40/22 44/9 57/20 57/21
**significantly [3]**  27/20 30/17 33/12
**similar [8]**  24/7 25/7 28/2 28/9 35/20 63/13 83/20 97/5
**similarly [2]**  1/4 89/25
**simple [12]**  16/21 40/14 61/4 61/7 61/11 62/21 62/25 67/16 93/21 95/4 98/4 99/5
**simply [6]**  76/11 95/6 97/1 97/20 117/17 118/2

**simulations [1]** 24/11
**since [4]** 19/24 40/21 51/16 125/12
**single [4]** 17/11 47/21 56/25 62/1
**sink [1]** 78/15
**sit [6]** 51/3 59/23 76/10 95/8 108/9 111/11
**sites [1]** 9/3
**sits [2]** 108/24 108/25
**sitting [3]** 10/12 31/20 78/19
**situated [3]** 1/4 58/14 58/21
**situation [3]** 56/15 57/13 96/3
**situations [2]** 41/8 67/19
**six [8]** 8/15 57/7 85/20 94/7 104/14 106/7 106/10 117/9
**six-month [1]** 94/7
**size [3]** 20/19 91/17 105/13
**skeletons [2]** 60/10 65/17
**skip [1]** 80/9
**sky [2]** 96/10 99/2
**small [3]** 16/3 81/11 96/11
**smaller [2]** 80/11 93/11
**smoking [1]** 62/10
**smoothest [1]** 68/23
**snapshot [2]** 64/1 69/16
**snowballed [1]** 46/20
**software [5]** 61/6 62/25 64/1 64/9 70/21
**solely [2]** 18/13 42/21
**some [79]** 4/2 6/3 6/12 6/13 6/17 7/13 8/1 11/24 12/2 12/9 13/8 14/16 15/11 16/10 20/18 24/14 24/18 27/10 27/11 28/23 30/13 30/23 31/12 38/7 38/22 46/10 46/16 46/25 49/20 50/9 50/24 53/5 53/13 53/13 53/22 57/20 58/2 59/17 63/23 64/4 66/9 69/17 71/11 76/17 78/18 78/23 84/2 84/3

85/24 89/16 89/17 89/25 92/10 92/15 92/19 93/23 94/10 94/11 98/6 99/5 99/21 99/22 100/21 101/9 102/7 104/1 105/17 107/12 107/18 108/7 108/13 108/22 108/25 113/16 116/1 118/4 118/23 119/25 121/3
**some-odd [1]** 8/1
**somebody [7]** 12/20 25/16 25/17 25/24 28/24 30/1 45/1
**somebody's [1]** 125/1
**somehow [2]** 102/6 107/17
**someone [16]** 6/20 12/5 28/6 30/19 31/6 31/16 31/20 32/18 35/19 35/25 36/9 48/5 48/13 48/22 49/23 72/11
**something [42]** 13/10 20/15 23/7 23/14 24/20 31/1 34/14 35/7 39/12 49/24 50/19 53/9 53/21 62/4 63/12 63/14 64/16 70/2 73/13 75/12 83/4 91/7 91/8 96/2 99/16 99/24 99/25 100/1 101/13 102/5 106/24 115/14 117/9 117/9 117/19 119/7 119/21 120/8 122/8 125/7 125/16 125/17
**sometimes [3]** 57/3 62/6 83/25
**somewhere [1]** 15/25
**sorry [8]** 14/11 44/20 45/7 57/18 65/5 103/10 112/8 123/17
**sort [46]** 8/2 8/6 8/7 8/12 8/15 8/18 9/17 9/25 13/5 13/8 13/14 13/18 13/22 15/11 17/23 18/25 22/21 26/20 29/4 34/21 35/15 35/17 35/20 40/7 40/8 40/12 40/14 50/9 63/23 64/9 69/16 70/3 71/11 74/24 75/2 77/10 77/19 77/23 78/5 82/4 82/6 87/6 88/6 89/17 89/25 107/18

**sorts [4]** 13/25 21/17 29/7 74/20
**sought [3]** 93/25 93/25 94/11
**sound [2]** 16/7 41/25
**sounds [4]** 32/11 91/19 113/19 124/19
**source [1]** 71/23
**south [1]** 11/24
**SOUTHERN [1]** 1/1
**space [3]** 30/24 81/15 101/12
**spaced [7]** 47/2 96/14 96/18 96/19 96/19 97/12 101/6
**spacing [67]** 8/23 11/9 21/16 24/10 24/12 25/10 25/21 25/25 26/6 26/7 26/8 26/8 26/9 26/10 26/12 26/14 27/10 27/15 29/16 30/11 30/17 30/18 31/1 32/4 33/21 34/5 34/6 34/14 34/25 35/3 35/4 35/6 35/11 38/5 39/2 39/24 40/2 40/3 40/6 40/9 40/19 40/23 42/22 44/19 45/1 45/19 46/6 46/7 47/2 47/2 78/1 81/13 83/16 84/7 85/3 85/22 96/11 96/12 97/8 100/16 100/19 100/19 100/22 100/23 100/25 101/5 101/9
**spacing-related [2]** 40/6 78/1
**speak [6]** 14/5 34/25 46/8 112/18 124/11 124/16
**speakers [2]** 64/17 65/11
**speaking [14]** 6/12 11/13 21/4 24/25 31/6 35/17 51/2 76/23 85/19 90/19 91/14 114/25 115/10 118/25
**specialize [1]** 31/19
**specialized [1]** 31/7
**specific [34]** 10/23 27/3 27/10 28/14 29/11 29/21 29/24 31/14 31/15 33/13

specific... [24]  56/9 66/20 66/22 67/2 69/14 73/10 88/16 89/21 92/7 92/11 93/2 97/2 98/18 99/6 99/7 99/8 100/6 102/16 103/25 106/20 120/7 122/6 122/7 123/23
specifically [5]  28/17 38/14 71/20 102/10 122/25
specified [1]  92/18
spend [1]  66/11
spent [3]  14/17 48/6 93/16
split [1]  11/23
spoken [1]  75/3
spread [1]  101/12
spreading [1]  100/22
spreadsheet [1]  64/13
spreadsheets [2]  64/15 74/22
squeeze [1]  123/20
staff [1]  64/10
staff-level [1]  64/10
stage [1]  98/8
stake [1]  21/4
stakes [1]  21/6
stand [2]  6/20 108/20
standard [3]  51/12 52/19 72/20
standpoint [1]  62/11
stands [2]  38/12 90/23
standstill [1]  39/20
start [4]  12/17 16/4 100/12 114/6
started [2]  3/16 96/15
starting [1]  103/15
state [1]  45/18
statement [7]  17/15 18/17 29/10 34/3 34/4 111/9 111/13
statements [11]  17/22 18/3 18/14 24/19 48/2 48/4 57/14 77/22 97/10 114/13 115/6
states [4]  1/1 1/14 23/12 89/5

statistical [5]  83/16 83/21 83/25 84/17 84/25
stay [3]  94/10 104/12 104/21
stenography [1]  2/17
step [2]  22/21 95/20
Steven [1]  34/2
still [11]  4/22 12/7 21/18 31/8 56/17 58/11 76/13 84/18 91/12 93/7 117/18
stipulation [1]  54/15
stone [1]  33/15
stonewalled [2]  7/10 8/21
stood [1]  48/11
stops [1]  103/22
story [1]  41/24
straight [1]  30/22
straightforward [5]  70/4 95/9 96/9 96/18 105/20
street [5]  2/3 2/6 2/14 34/3 61/2
stress [1]  14/3
stretch [1]  35/8
strike [1]  35/12
strongly [1]  32/14
structure [1]  71/12
structured [3]  9/1 63/22 77/6
structuring [1]  8/18
study [2]  24/20 27/16
stuff [11]  29/11 42/19 69/11 73/2 95/18 95/19 97/17 98/1 105/18 115/4 119/14
style [1]  9/6
sub [1]  12/19
sub-basins [1]  12/19
subject [5]  55/7 55/12 74/6 82/22 96/6
subjective [2]  99/19 100/8
subjects [1]  56/10
submit [1]  69/5
submitted [5]  18/25 19/2 29/5 61/9 113/3
submitting [1]  69/9

subparts [13]  8/1 10/13 10/17 10/23 11/5 11/11 76/15 95/4 99/4 99/9 108/5 114/17 116/9
subpoena [1]  53/3
subpoenaed [1]  65/15
subpoenas [1]  52/25
subsequent [2]  45/13 94/9
subset [8]  64/4 69/17 71/11 111/6 114/10 115/1 116/4 120/20
subsets [1]  114/9
substantial [1]  8/23
substantiate [1]  18/24
substantive [2]  116/12 117/3
substantively [2]  116/25 117/6
subtopics [2]  5/18 42/13
successful [1]  10/4
successfully [1]  6/16
SUCCESSOR [1]  1/8
such [3]  8/14 40/10 108/23
Sucharow [3]  1/18 1/22 3/6
sudden [2]  12/19 103/22
sued [1]  104/17
sufficiency [2]  86/17 118/13
sufficient [3]  80/22 117/4 118/6
sufficiently [1]  88/19
suggest [1]  44/8
suggesting [1]  41/3
suggestion [1]  15/12
Suite [2]  2/11 2/15
summarized [1]  64/18
summary [3]  6/18 23/23 125/10
summer [1]  125/11
sun [1]  77/11
supplemental [1]  80/25
support [3]  30/16 69/9 119/3
supports [1]  89/4
supposed [7]  46/19 62/6

**S**

**supposed... [5]**  99/12 99/13 114/21 115/23 121/6
**supposedly [1]**  74/18
**sure [18]**  11/17 16/6 34/20 41/2 47/17 48/16 48/23 53/7 54/4 59/12 63/13 63/20 64/25 76/18 77/5 108/6 118/9 119/19
**surprise [1]**  40/10
**surveys [1]**  17/4
**suspect [2]**  30/9 31/11
**sustain [1]**  122/19
**swat [1]**  36/21
**sweet [1]**  47/6
**synergies [2]**  40/3 42/20
**system [3]**  1/3 63/16 65/7

**T**

**table [10]**  4/23 9/9 51/18 52/3 72/8 72/16 72/17 99/14 118/22 123/13
**tactical [1]**  118/14
**tactically [1]**  115/22
**tailored [1]**  67/7
**take [26]**  7/22 12/8 15/10 15/11 23/11 45/18 48/17 50/3 50/12 50/12 52/17 53/11 64/1 64/22 64/23 65/6 65/25 67/17 69/16 74/8 98/21 103/22 109/8 114/18 116/23 117/13
**taken [5]**  9/9 47/14 50/7 99/13 115/7
**takes [2]**  17/7 57/11
**taking [2]**  53/8 122/22
**talk [23]**  7/13 15/23 23/1 25/13 25/18 26/2 26/14 26/16 26/19 31/6 31/17 31/21 35/25 36/9 37/8 60/18 71/21 81/5 105/4 116/7 116/21 125/3 125/9
**talked [12]**  19/2 26/25 30/2 38/7 45/4 71/25 75/25 81/3

**talking [31]**  9/4 10/17 10/18 16/13 18/1 27/9 28/1 29/13 29/17 29/25 31/12 35/4 35/8 52/5 52/14 57/1 59/3 67/18 70/1 71/7 84/23 105/24 117/7 119/22 120/3 120/7 121/24 122/2 122/5 124/1 125/6
**talks [2]**  18/14 90/11
**tapering [1]**  95/4
**target [3]**  33/25 107/6 107/22
**targeted [3]**  54/25 56/1 89/19
**targets [1]**  104/16
**task [1]**  8/9
**team [7]**  8/16 8/16 14/17 20/8 73/7 100/10 114/17
**teams [5]**  11/22 36/14 36/14 36/16 41/6
**technical [7]**  30/16 34/15 35/15 62/11 66/1 68/22 111/15
**technicalities [1]**  115/23
**technicality [1]**  114/19
**technically [4]**  27/6 43/8 118/16 119/17
**technology [1]**  56/5
**tell [15]**  3/18 14/17 18/13 37/14 60/17 60/25 61/3 61/17 77/3 77/16 81/21 86/9 91/22 91/24 111/12
**telling [3]**  65/14 74/16 125/19
**ten [9]**  7/15 9/4 33/14 52/10 61/3 94/17 95/4 100/2 100/3
**tens [1]**  13/17
**term [8]**  19/23 53/5 85/3 87/12 87/12 88/15 100/20 121/15
**terms [52]**  3/24 11/21 12/5 12/16 17/8 19/24 20/4 28/17 32/4 32/4 32/8 32/9 36/21

39/25 40/21 40/22 41/21 42/1 42/2 43/14 46/21 48/1 48/22 49/19 50/10 50/24 51/4 51/8 51/9 51/20 54/25 55/16 56/19 56/22 58/2 58/2 58/17 59/24 66/16 66/20 67/21 76/17 78/2 80/23 81/5 81/9 81/20 82/1 82/5 83/13 88/14 103/25
**test [9]**  12/23 13/22 15/12 16/16 22/5 26/7 57/13 96/8 103/23
**testified [10]**  8/11 26/5 26/6 30/11 30/11 31/12 49/11 66/14 100/23 107/12
**testify [3]**  6/20 8/4 35/19
**testimony [32]**  6/7 8/23 14/4 14/6 24/24 26/23 27/13 32/3 32/5 32/15 32/16 35/13 36/12 36/23 38/13 46/16 47/15 48/6 60/9 73/6 73/15 81/4 86/13 87/1 87/13 90/18 92/19 101/14 115/19 117/11 119/3 122/21
**testing [27]**  5/19 8/7 8/10 12/3 13/5 17/10 17/19 19/15 20/10 20/12 21/10 75/20 76/17 76/22 77/14 78/4 94/19 94/21 94/22 96/7 96/8 103/5 109/6 109/8 109/11 109/16 122/23
**tests [26]**  5/21 8/13 8/17 11/7 11/12 13/7 13/20 14/7 14/16 15/18 15/19 16/14 16/19 16/22 24/10 24/12 25/21 27/15 76/11 76/12 76/23 77/2 85/21 89/25 94/1 95/23
**TEXAS [7]**  1/1 2/4 2/7 2/11 2/15 104/18 104/18
**text [40]**  49/4 49/5 49/9 49/12 49/14 49/15 49/21 49/22 50/1 50/8 50/12 50/15 50/22 51/5 51/6 51/11 51/15

**text... [23]** 51/15 51/17 52/8 52/21 52/25 53/15 54/2 54/5 55/23 56/18 56/25 57/3 57/14 57/20 57/24 58/1 58/18 59/9 59/16 59/18 101/17 104/4 105/6

**texted [1]** 55/25

**texts [3]** 52/16 56/17 113/14

**than [40]** 5/20 6/2 9/4 10/7 11/8 16/1 16/2 16/5 18/8 18/16 18/17 18/23 21/8 43/11 46/18 47/3 47/13 51/6 51/14 52/11 52/18 54/8 75/19 81/9 84/22 85/1 85/17 85/22 85/23 86/16 92/24 94/14 99/22 99/25 100/8 102/24 112/18 122/5 124/10 125/6

**Thank [6]** 75/10 110/9 123/21 125/21 125/22 125/23

**that [800]**

**that's [120]** 8/8 8/25 9/7 9/16 12/14 14/1 15/16 15/21 16/13 16/15 17/23 20/4 23/22 25/18 27/2 27/18 28/10 28/11 29/9 29/12 29/13 30/2 32/13 33/2 33/14 34/23 35/7 35/7 40/16 41/1 41/2 41/5 41/20 41/24 42/2 42/6 42/24 43/10 43/13 44/1 44/11 46/5 46/25 47/9 52/22 53/19 54/21 54/21 60/9 64/3 66/13 67/15 68/1 68/3 69/15 69/22 71/4 71/8 73/4 73/15 73/21 74/3 74/3 74/25 75/1 75/2 78/7 81/19 82/3 83/18 83/19 84/11 85/9 86/2 86/4 86/17 86/22 87/5 87/19 87/22 90/17 92/17 92/23 93/10 95/12 96/10 96/12 96/12 97/18 99/9 99/14 99/16 104/7 105/11 106/12

106/24 107/7 107/9 107/24 108/19 108/21 112/21 112/22 114/14 114/14 115/15 116/1 116/1 116/4 117/10 117/10 117/18 119/2 120/8 121/15 121/15 123/15 124/12 124/18 125/5

**their [57]** 6/11 15/7 15/8 15/8 16/20 17/25 18/24 19/7 19/11 25/2 25/4 25/5 25/15 27/15 31/4 36/10 36/19 37/9 41/21 44/23 49/25 50/15 53/4 53/25 55/4 55/10 57/10 58/17 61/6 61/24 62/16 63/16 63/24 66/13 68/6 74/3 74/12 76/18 76/22 81/15 83/2 84/5 84/9 87/5 87/21 88/13 92/1 92/1 98/7 100/5 103/23 105/4 107/13 107/25 110/21 117/14 118/11

**them [92]** 4/6 4/9 7/17 10/24 11/5 11/20 12/18 15/20 22/14 23/3 23/21 24/6 24/16 29/5 32/11 40/5 40/15 40/16 41/17 42/19 43/4 46/8 46/17 47/12 47/23 50/14 50/23 51/23 52/3 52/22 53/7 53/12 53/18 53/20 54/19 54/20 55/14 56/18 58/17 59/4 59/10 59/11 59/19 61/7 65/18 66/7 66/9 66/9 66/10 67/4 68/1 82/9 82/20 85/21 86/1 86/16 87/16 90/2 91/23 93/12 93/16 94/24 95/1 95/6 95/10 98/15 98/19 99/14 100/14 101/12 101/13 103/21 105/19 106/17 109/6 110/13 110/24 114/8 115/11 115/12 115/12 115/13 116/14 116/19 116/24 116/25 117/2 119/4 121/4 121/25 123/14 125/18

**themselves [2]** 44/2 99/3

**then [61]** 4/5 11/11 11/23

11/24 23/7 27/22 33/1 38/23 41/9 42/16 44/7 44/17 44/25 45/7 45/11 47/14 48/12 48/25 49/25 49/25 55/8 56/3 56/7 56/19 63/14 70/23 71/1 75/6 75/14 77/18 77/22 80/1 80/2 88/23 89/3 89/7 91/23 92/21 93/13 93/20 94/8 94/23 94/25 97/7 97/15 99/18 100/3 101/7 102/16 105/4 105/4 105/7 106/5 109/8 109/20 111/13 114/17 115/1 117/13 122/24 124/17

**theoretically [1]** 42/15

**theory [1]** 86/5

**there'll [1]** 21/19

**there's [102]** 4/3 4/24 7/13 8/1 8/12 8/13 9/22 10/1 10/14 10/14 11/2 14/3 14/15 16/9 16/10 17/4 18/6 21/6 24/23 24/24 25/2 28/20 36/2 36/7 36/10 36/20 36/22 37/12 39/6 40/24 41/1 41/6 41/15 41/19 44/5 44/8 44/9 44/10 45/9 46/10 46/15 47/7 50/16 52/1 55/16 56/5 61/18 61/19 62/4 62/22 63/5 63/9 63/9 63/9 65/17 66/9 68/4 68/9 70/17 70/25 72/13 74/9 74/9 74/10 76/6 80/1 80/18 81/17 86/4 86/21 87/12 87/13 87/20 88/5 88/14 88/15 89/25 91/17 93/12 95/3 96/16 97/6 97/22 98/11 98/18 103/17 104/1 104/7 105/18 105/19 105/25 107/1 107/13 108/6 109/11 110/24 113/13 115/1 120/13 124/19 125/15 125/18

**thereafter [2]** 94/9 117/12

**thereof [2]** 24/12 24/13

**these [143]**

**they [290]**

**they'll [2]** 87/4 120/24

**they're [53]**  11/20 12/8 16/22 16/24 17/1 20/17 21/7 21/13 24/7 25/8 28/1 33/3 40/24 41/20 46/8 46/23 53/11 54/15 56/18 58/19 61/22 64/5 64/5 65/18 66/15 69/19 73/21 80/4 80/20 81/18 82/24 84/16 89/16 91/3 93/17 93/18 95/4 95/4 95/5 95/5 98/19 102/14 102/15 103/4 105/7 105/19 110/12 111/2 112/3 116/12 118/10 119/24 119/25

**they've [18]**  12/8 19/11 32/22 32/23 32/24 35/2 35/13 40/9 47/8 86/6 87/24 90/15 102/17 103/7 103/16 103/20 109/2 117/2

**thing [19]**  11/14 25/3 25/20 25/20 41/2 41/20 61/25 64/25 71/17 74/14 75/11 77/24 80/3 81/8 91/20 109/22 112/7 113/23 124/1

**things [40]**  6/13 10/5 11/22 16/22 17/1 17/10 21/1 29/16 33/18 34/13 36/8 37/4 37/12 42/17 43/3 51/6 55/1 72/2 74/21 79/15 81/18 85/6 92/12 97/12 97/12 99/6 99/13 101/5 103/5 109/14 115/5 116/11 116/12 118/21 119/25 120/6 121/12 124/5 124/8 124/13

**think [196]**

**thinking [3]**  13/3 92/20 117/25

**thinks [4]**  19/12 59/17 109/25 110/4

**third [8]**  4/12 37/19 39/18 49/2 61/23 62/2 65/15 115/1

**third-party [2]**  61/23 65/15

**this [349]**

**those [113]**  4/5 4/8 5/20

5/21 9/11 13/22 14/18 14/21 17/9 22/8 25/10 25/18 27/2 29/18 32/8 32/9 36/15 36/16 36/16 36/17 39/1 40/21 42/2 42/3 43/10 46/25 47/8 47/10 47/11 52/24 53/11 55/13 55/13 55/15 56/15 56/17 56/17 56/20 56/22 57/8 59/12 62/7 64/15 65/13 67/3 67/6 67/10 67/19 68/20 70/1 70/17 74/17 76/12 77/10 77/11 77/17 80/20 81/17 81/17 82/2 83/13 84/2 85/5 85/12 85/17 89/24 92/5 92/8 93/2 94/25 95/2 95/2 95/2 95/3 96/17 96/17 97/7 97/19 98/15 100/11 100/12 101/1 101/9 101/15 101/18 102/9 102/16 104/19 104/21 106/3 106/15 107/6 109/19 110/1 110/22 111/1 111/7 111/11 111/11 111/15 114/24 116/2 116/18 116/21 118/4 119/8 120/6 121/12 122/25 123/11 123/12 123/12 123/13

**though [8]**  9/23 18/11 43/17 58/4 63/25 73/1 83/8 117/4

**thought [5]**  3/25 28/23 103/10 103/11 125/5

**thousand [2]**  11/2 13/2

**thousands [8]**  13/12 13/17 17/18 66/10 67/20 87/24 88/3 103/3

**three [14]**  4/9 7/2 11/11 25/23 33/1 42/13 49/19 52/12 54/22 56/4 93/13 94/14 94/21 114/8

**threshold [2]**  92/15 102/20

**through [47]**  4/16 5/16 10/16 11/14 14/19 15/12 15/20 17/6 35/24 36/7 36/13 40/21 41/15 42/22 42/23 43/9 59/10 62/5 66/11 67/20 67/21 72/14 73/17 78/1

80/10 84/3 95/6 95/8 95/20 98/18 105/7 108/10 110/13 112/17 112/19 112/19 116/8 116/10 116/16 116/25 117/21 119/23 120/16 121/7 121/8 121/22 122/10

**throughout [2]**  6/9 46/15

**throw [1]**  28/8

**throwing [1]**  125/5

**thrown [1]**  60/22

**thumb [2]**  61/5 63/12

**thumping [1]**  124/24

**thus [1]**  102/15

**tie [4]**  39/13 62/1 62/3 62/3

**tie-in [1]**  62/3

**tie-ins [1]**  62/3

**tied [2]**  47/1 97/13

**ties [2]**  14/13 46/10

**tight [9]**  23/20 23/22 26/8 34/6 40/23 60/16 87/1 88/23 104/13

**tighter [2]**  11/8 85/22

**tightly [3]**  34/1 96/14 97/12

**time [72]**  9/14 9/24 12/6 15/5 15/6 15/7 17/3 17/8 20/18 23/11 25/1 31/14 34/2 35/10 36/5 38/15 38/16 38/20 38/21 38/23 42/2 44/1 45/19 46/24 48/18 50/22 55/8 55/13 56/9 56/16 56/25 59/10 59/13 60/17 61/13 61/18 62/1 63/3 63/17 63/18 64/2 64/10 66/25 67/9 67/10 69/17 73/24 76/4 78/16 78/18 84/4 86/7 89/13 90/8 91/4 91/4 93/16 93/22 97/6 97/13 97/21 99/7 101/7 101/20 106/8 106/22 107/22 108/17 118/24 121/4 121/7 123/16

**times [5]**  11/19 13/24 60/9 60/18 122/1

**timing [1]**  23/2

**TIMOTHY [3]**  1/8 2/8 3/14

**today [14]** 4/1 4/2 4/23 7/6 18/1 35/9 42/6 60/7 61/15 75/25 93/23 95/17 123/7 124/21

**today's [1]** 4/12

**together [10]** 17/6 23/15 23/24 24/6 25/23 42/25 47/14 101/23 102/3 108/17

**told [3]** 43/4 117/2 117/7

**ton [2]** 38/7 97/22

**tons [1]** 73/6

**Tony [3]** 3/10 7/24 13/3

**too [15]** 20/25 21/20 28/8 34/5 43/6 48/17 58/2 61/22 63/5 75/23 75/23 98/19 112/10 121/1 125/14

**took [6]** 9/7 38/9 56/23 58/16 83/6 123/17

**top [5]** 32/16 45/12 52/7 56/7 108/2

**topic [49]** 5/11 5/11 5/13 5/17 6/14 7/4 7/13 7/17 7/18 7/19 7/25 9/1 24/4 24/5 25/15 26/14 28/15 29/6 30/8 30/11 32/2 33/6 33/8 33/8 33/12 33/13 35/6 35/8 35/12 35/25 36/22 37/10 37/15 38/7 42/12 42/24 43/1 43/6 45/22 45/23 47/6 47/19 47/21 47/25 48/8 48/13 48/20 53/20 87/1

**topics [32]** 4/8 4/10 4/10 6/24 8/18 12/21 13/25 14/5 24/6 25/23 26/6 26/11 26/17 26/22 27/11 28/1 28/10 28/10 28/13 28/19 29/4 29/7 29/18 29/24 32/16 35/20 45/4 45/5 81/6 86/15 108/8 124/1

**totally [2]** 92/24 105/18

**touch [2]** 25/14 61/23

**touted [1]** 72/1

**towards [1]** 104/1

**track [1]** 90/8

**tracks [2]** 111/4 111/6

**trade [1]** 41/16

**traded [1]** 59/4

**traditional [1]** 49/7

**traditionally [1]** 51/3

**trail [1]** 37/11

**trails [1]** 13/2

**Trammell [1]** 2/10

**transcript [2]** 2/17 126/2

**transcription [1]** 2/17

**transfer [2]** 34/8 68/7

**transferable [1]** 66/13

**transferred [5]** 34/15 38/11 39/2 41/14 102/1

**transition [2]** 10/4 36/15

**transmitted [3]** 64/17 64/18 65/12

**tremendous [2]** 15/2 15/7

**trial [3]** 21/19 78/19 123/18

**tricky [1]** 110/19

**tried [10]** 5/12 13/4 37/25 45/3 50/21 61/20 62/7 66/7 90/20 107/25

**triggered [1]** 96/2

**true [5]** 8/21 47/1 64/3 81/19 107/4

**truth [3]** 48/4 74/2 95/15

**try [16]** 6/16 6/19 7/10 23/3 23/7 23/15 23/17 25/5 25/14 62/3 68/3 78/21 89/2 99/8 100/10 122/3

**trying [18]** 5/19 7/7 7/8 14/17 14/22 15/17 17/8 20/16 27/8 28/20 35/4 90/12 96/4 100/9 103/25 112/4 115/16 119/24

**Tuesday [1]** 3/23

**turn [4]** 53/22 54/6 58/8 72/18

**turned [1]** 76/14

**turning [3]** 64/6 65/21 75/1

**turns [1]** 74/19

**twenty [3]** 9/4 118/8 119/1

**Twenty-one [1]** 119/1

**Twenty-two [1]** 118/8

**two [38]** 10/18 11/10 11/11 22/7 22/8 22/19 22/19 23/8 33/15 38/2 38/25 44/8 44/9 49/15 56/1 56/14 56/15 73/6 75/13 77/17 79/5 79/14 80/18 85/12 85/25 92/12 94/14 94/19 98/4 99/19 103/13 106/11 108/6 109/14 113/13 118/8 120/11 124/25

**TX [1]** 2/13

**type [2]** 51/22 77/23

**typed [1]** 51/7

**types [1]** 8/10

**typically [1]** 99/14

## U

**ugly [1]** 73/9

**ultimate [3]** 96/5 101/2 101/4

**ultimately [1]** 19/24

**unable [1]** 120/14

**unavoidable [1]** 95/12

**unclear [1]** 101/10

**undefined [1]** 108/5

**under [10]** 6/21 15/1 25/17 41/25 77/11 84/12 98/8 104/10 104/18 122/22

**underlying [3]** 70/20 70/25 71/1

**underneath [1]** 111/23

**underperformance [2]** 46/7 81/14

**understand [25]** 12/12 15/8 18/16 22/18 22/20 64/15 74/25 75/21 78/16 78/21 82/22 83/8 83/19 84/10 84/18 88/10 92/25 98/7 101/12 106/9 108/14 108/20 119/9 125/14 125/20

**understanding [13]** 5/19 25/6 25/6 48/21 54/19 62/7 62/20 62/24 67/15 85/11 86/12 91/16 91/18

**U**

**understood [4]** 75/8 75/10 84/19 92/14
**unduly [2]** 59/21 122/14
**unfair [2]** 57/5 59/20
**unfortunately [4]** 55/17 61/8 110/23 118/24
**unilaterally [2]** 48/12 56/24
**unit [1]** 63/17
**UNITED [2]** 1/1 1/14
**universe [2]** 20/6 78/5
**unquote [1]** 100/24
**unreasonable [2]** 122/3 125/19
**unredacted [1]** 69/7
**unrelated [5]** 102/18 102/18 104/10 106/22 109/24
**unspecified [3]** 8/3 8/5 8/19
**unsure [1]** 84/16
**until [10]** 16/3 27/19 37/1 37/22 52/25 93/22 93/22 104/21 109/7 109/16
**up [72]** 8/19 14/21 24/2 26/8 28/19 29/6 30/19 31/11 34/6 36/16 36/25 37/1 37/17 39/13 39/16 44/12 47/2 47/2 48/6 48/17 49/10 51/24 52/18 60/20 62/7 62/24 63/18 64/3 65/9 66/18 68/19 69/22 69/23 70/2 70/22 71/3 81/15 82/3 86/2 93/22 96/11 96/12 96/18 96/19 96/19 100/15 100/19 100/19 100/22 100/23 101/6 101/8 101/12 105/2 108/1 109/15 111/12 112/4 114/12 115/6 115/21 116/11 116/24 120/4 120/10 121/7 121/9 121/25 123/22 124/18 124/24 125/3
**up-space [1]** 81/15
**up-spaced [2]** 47/2 101/6
**updated [1]** 106/5
**upload [1]** 61/6
**upon [2]** 38/20 49/19

**upper [1]** 64/12
**upwards [1]** 9/13
**us [48]** 10/7 11/11 15/4 18/11 19/1 20/6 20/21 21/23 23/2 26/13 33/23 35/12 39/17 41/18 48/3 51/18 53/11 54/6 54/15 57/13 58/3 58/16 59/9 61/12 64/3 64/15 81/21 82/6 82/23 83/17 87/3 88/10 89/1 91/22 91/22 101/10 102/22 105/15 105/23 107/11 116/9 116/21 117/2 117/3 117/10 123/13 123/17 123/25
**USB [3]** 66/13 67/24 74/6
**use [12]** 30/23 35/6 51/19 60/15 63/15 67/17 73/17 84/25 110/17 115/12 115/12 120/9
**useable [1]** 65/10
**used [12]** 15/3 49/22 51/4 51/9 64/11 66/2 71/1 76/20 76/21 76/24 94/1 99/14
**using [4]** 15/3 103/1 111/25 114/15
**usual [1]** 38/19
**usually [2]** 26/1 27/1
**utterly [1]** 73/14

**V**

**vacation [1]** 125/2
**vague [8]** 100/20 120/2 120/8 121/1 121/15 121/19 122/9 122/17
**vagueness [1]** 83/15
**value [2]** 89/3 90/24
**variations [1]** 47/4
**varied [2]** 76/25 89/4
**variety [1]** 25/11
**various [5]** 20/24 70/16 76/1 88/4 109/5
**vast [2]** 19/25 106/2
**vastly [1]** 65/24
**VDRs [1]** 41/15
**vendor [2]** 53/13 54/7

**vendors [1]** 56/2
**veracity [3]** 57/13 103/23 108/19
**verdict [1]** 21/25
**verification [1]** 101/23
**versed [1]** 29/15
**version [1]** 29/4
**versions [1]** 47/4
**versus [3]** 20/5 66/12 91/3
**vertically [1]** 25/10
**very [49]** 5/24 12/19 20/15 24/7 26/15 27/10 29/21 31/14 31/15 36/16 37/5 38/15 39/10 41/11 42/1 42/3 43/2 43/5 44/6 44/9 45/22 47/12 50/15 52/23 55/20 57/2 57/20 57/21 58/15 59/17 60/13 60/13 62/24 68/22 73/1 74/20 81/11 83/3 87/15 95/7 96/9 96/17 97/21 99/13 99/16 104/13 104/22 110/14 123/5
**victim [1]** 72/13
**view [3]** 23/23 61/10 110/1
**viewable [1]** 69/23
**Vinson [3]** 2/9 3/13 59/9
**virtually [1]** 13/16
**virtue [8]** 20/4 36/8 41/4 43/22 44/19 44/21 44/25 45/20
**vis [6]** 44/19 44/19 65/12 65/12 114/17 114/17
**vis-à-vis [1]** 44/19
**visit [1]** 109/9
**volume [1]** 84/3
**voluminous [4]** 40/18 65/13 70/16 77/10
**VS [1]** 1/6

**W**

**wait [6]** 37/22 37/22 58/10 70/8 70/8 109/16
**waiting [1]** 117/20
**waiving [1]** 82/22
**Walker [2]** 2/13 126/5

**Walker-Bailey [2]** 2/13 126/5

**walking [1]** 61/1

**Wall [1]** 34/3

**walled [3]** 41/11 68/8 73/23

**walled-off [3]** 41/11 68/8 73/23

**want [74]** 9/25 14/3 15/18 16/16 17/25 21/23 22/6 22/7 23/14 23/15 23/20 26/15 28/8 28/24 29/21 29/22 30/17 32/19 32/20 34/19 38/14 41/18 44/9 48/17 48/23 54/24 56/16 58/18 58/22 59/23 59/23 59/24 62/14 62/15 62/17 62/18 62/25 66/11 66/25 70/6 71/8 73/25 74/5 74/13 75/4 75/5 76/19 76/21 76/21 77/13 80/7 85/11 86/11 87/19 87/19 92/2 92/2 92/4 93/1 105/23 115/21 116/5 118/9 118/13 118/14 118/15 119/15 123/4 123/4 123/6 124/2 125/3 125/10 125/11

**wanted [9]** 14/13 29/3 34/12 35/17 58/16 70/9 117/15 120/10 121/9

**wants [2]** 80/6 117/16

**WARWICK [2]** 1/3 3/2

**wasn't [21]** 20/13 27/1 27/11 30/14 32/8 46/24 49/13 49/22 50/8 57/21 68/6 83/13 84/8 87/5 90/19 92/18 93/5 100/7 101/20 105/10 106/19

**waste [1]** 118/20

**wasting [1]** 48/14

**water [1]** 84/12

**way [80]** 10/20 10/24 12/1 12/5 13/8 15/10 17/5 17/12 17/13 17/24 18/25 19/7 20/10 20/17 21/23 22/17 27/6 27/10 27/11 27/19 28/6 28/10 28/21 30/25 35/24 37/9 37/10 39/4 40/16 42/17 49/7 50/8 50/20 51/2 51/5 53/24 54/19 55/5 60/25 65/24 66/21 66/22 67/1 67/2 67/5 68/3 68/14 68/20 68/21 68/23 68/24 71/6 73/12 74/9 75/1 84/2 84/19 85/4 88/6 88/11 89/18 91/17 95/7 95/16 95/16 98/19 100/18 102/22 107/13 108/21 108/22 110/20 111/1 111/22 115/16 117/5 120/2 121/6 121/8 122/9

**ways [7]** 3/25 5/13 36/11 56/5 62/23 83/24 88/7

**we [488]**

**we'd [1]** 124/10

**we'll [11]** 4/23 7/13 14/14 34/17 42/19 43/4 43/4 43/5 114/9 118/6 120/10

**we're [84]** 3/1 5/2 5/14 5/24 6/5 6/16 7/5 7/7 7/8 7/9 7/14 7/16 8/18 9/22 11/2 12/1 16/13 17/25 18/7 18/21 23/4 23/7 23/10 27/8 27/12 29/13 30/20 31/16 33/16 33/16 35/17 36/9 36/14 42/25 43/13 45/23 46/5 48/1 48/7 51/13 52/2 60/4 69/9 70/1 72/4 73/17 75/19 81/8 81/15 81/19 81/25 82/4 82/24 84/16 85/17 86/10 90/21 93/7 95/15 97/17 98/12 98/17 101/14 103/23 104/1 105/3 105/24 109/13 111/9 111/25 112/1 112/4 113/6 113/9 113/22 114/13 119/16 122/2 122/5 123/4 123/7 124/24 125/1 125/9

**we've [39]** 8/21 8/22 12/16 18/6 18/11 21/20 21/21 22/3 25/14 27/23 33/11 40/5 40/17 41/19 42/1 42/23 46/17 53/10 53/20 54/8 55/5 59/16 61/7 63/5 64/14 66/7 69/20 69/23 74/23 75/3 76/5 77/20 77/24 86/23 86/25 89/18 90/3 95/25 103/1

**week [3]** 4/25 78/19 123/18

**weekly [1]** 121/24

**weeks [4]** 79/14 94/14 120/11 124/25

**weigh [1]** 57/8

**weight [1]** 102/12

**well [104]** 5/15 6/16 8/23 9/2 10/20 13/11 13/12 13/13 13/19 15/17 16/11 16/20 16/21 17/2 17/16 17/18 19/8 20/16 22/6 22/18 23/4 23/24 24/1 24/8 24/17 25/25 26/6 26/7 26/8 26/10 26/12 26/14 26/16 27/9 28/13 28/19 28/22 29/15 29/16 29/20 30/16 32/11 32/17 34/4 34/17 38/5 38/5 38/14 38/17 39/1 39/2 42/8 42/22 44/8 44/19 44/22 45/1 45/6 45/17 45/19 46/6 46/7 46/7 47/4 47/4 54/16 55/11 56/15 57/14 58/10 58/13 60/20 63/2 63/6 70/10 76/2 77/3 77/10 81/13 81/14 83/16 84/1 84/4 84/17 85/20 86/14 87/18 90/18 91/12 94/10 94/20 95/1 96/25 99/22 100/16 101/5 101/5 107/15 113/1 117/24 119/10 120/18 123/17 124/6

**well-prepped [1]** 86/14

**well-versed [1]** 29/15

**wellbores [3]** 25/9 25/10 85/23

**wells [13]** 9/7 25/3 27/15 29/16 40/3 84/2 85/20 97/3 100/22 100/24 101/8 101/9 101/11

**went [7]**  20/24 27/14 31/10 77/9 84/8 108/10 116/25

**were [123]**  4/7 4/8 5/21 6/13 8/17 9/3 9/21 10/25 10/25 11/6 11/12 13/20 13/21 14/16 15/19 15/19 16/14 18/8 18/9 19/14 21/22 28/2 28/4 29/18 30/14 32/4 32/24 35/16 36/13 36/15 39/16 39/18 43/15 44/15 46/18 46/21 46/22 46/23 47/1 47/6 49/11 49/12 49/15 50/1 50/7 50/23 50/25 52/24 53/8 54/5 54/5 55/12 56/9 56/10 57/21 59/10 61/14 64/10 64/18 65/7 65/11 68/11 68/17 68/18 72/2 72/7 72/15 72/22 73/19 75/22 76/11 76/12 76/24 78/3 81/10 81/19 82/1 82/2 82/2 82/9 83/3 85/21 87/1 87/2 89/8 89/11 89/19 91/4 93/13 94/1 94/22 97/1 97/12 97/12 97/18 98/10 98/10 99/6 100/5 100/8 102/1 102/9 103/11 103/11 104/6 104/6 104/17 107/2 107/7 108/7 108/16 108/17 108/17 114/13 118/20 118/23 120/20 121/1 121/5 123/12 123/13 123/19 124/5

**weren't [6]**  13/20 72/23 76/13 100/13 107/10 119/1

**west [1]**  11/24

**what's [16]**  30/7 37/14 45/21 48/2 49/1 52/19 60/3 60/19 67/11 75/24 82/10 82/11 87/9 88/20 93/9 97/5

**whatever [6]**  8/8 35/16 53/9 66/24 115/15 122/1

**wheel [1]**  7/15

**Whereupon [1]**  125/24

**whether [19]**  8/17 19/10 25/8 40/19 48/20 49/1 83/18 84/3 93/2 94/19 94/20 94/22 99/24 115/21 120/21 120/24 121/1 121/2 121/14

**which [82]**  3/22 4/18 4/21 5/11 5/17 8/18 11/12 17/7 17/22 18/25 20/23 24/8 25/3 25/19 25/20 26/22 30/8 33/9 33/14 33/25 34/14 34/17 34/21 35/5 35/9 35/12 35/16 36/1 38/6 38/20 41/9 41/21 42/4 43/6 46/3 46/11 46/12 47/11 49/22 51/3 51/5 51/10 54/18 59/10 61/8 61/10 63/14 65/23 65/24 69/18 70/21 71/1 71/25 72/1 83/14 88/7 88/25 89/6 89/9 90/16 91/13 98/1 99/11 99/17 100/4 101/23 102/3 102/4 102/4 102/15 102/19 106/5 106/8 107/2 109/6 110/17 114/19 117/11 117/13 118/18 121/10 121/10

**while [9]**  15/9 17/3 40/20 56/1 82/20 94/15 105/24 116/23 123/18

**who [58]**  3/3 13/21 13/21 14/3 14/4 24/16 25/15 25/16 25/17 25/18 26/2 26/5 28/1 29/14 30/10 30/12 30/13 31/6 31/12 31/16 31/17 31/19 31/21 32/6 32/7 35/14 36/9 36/13 38/11 44/24 44/25 45/4 49/11 49/21 50/22 51/14 51/24 51/25 53/1 54/3 54/23 55/2 56/12 57/9 57/25 58/1 58/20 59/4 65/15 67/15 74/16 86/14 97/22 98/5 98/10 100/9 104/6 107/6

**whoever [1]**  63/15

**whole [9]**  20/6 27/15 35/5 41/15 56/23 79/21 81/18 116/10 118/19

**wholly [1]**  91/10

**whom [2]**  53/2 53/2

**whose [2]**  49/12 59/6

**why [35]**  3/17 23/24 29/9 31/22 32/17 41/6 42/12 42/25 48/15 48/15 62/17 69/19 73/21 74/5 74/25 75/20 78/9 81/23 83/5 84/25 88/10 91/22 93/15 94/2 99/9 102/15 106/9 106/12 109/11 112/5 116/21 117/18 118/18 119/6 125/5

**wider [1]**  47/3

**wiggle [2]**  63/9 63/9

**will [37]**  3/24 4/9 5/23 5/25 7/22 11/7 12/4 12/4 12/12 20/11 22/24 25/4 27/23 30/4 36/19 39/8 45/4 53/14 53/17 54/8 57/12 59/14 59/15 60/25 61/3 63/1 63/2 63/3 63/3 65/1 71/22 77/3 77/6 78/11 81/20 109/19 110/7

**WILLIAM [3]**  1/9 2/8 3/14

**willing [8]**  31/18 44/11 51/16 69/5 76/14 76/15 76/16 83/3

**winded [1]**  20/17

**window [1]**  107/22

**windows [3]**  50/9 51/19 107/10

**wise [2]**  3/18 28/18

**wish [3]**  61/8 67/12 67/13

**withdraw [5]**  4/9 48/21 118/6 119/1 123/11

**withdrawing [6]**  4/15 4/17 4/19 5/2 27/6 123/7

**withdrew [1]**  82/16

**withheld [2]**  59/19 82/3

**within [11]**  9/14 11/20 11/23 62/22 66/19 69/24 91/7 91/7 108/17 108/24 122/8

**without [9]**  5/21 5/23 33/18 35/23 38/8 39/4 53/24 67/21

**W**

**without... [1]** 82/22
**witness [29]** 6/10 7/3 7/12 10/14 12/24 14/2 14/3 15/5 26/14 26/16 26/18 26/25 28/19 29/14 30/16 30/24 32/16 34/16 34/23 44/24 48/8 53/7 68/21 74/16 113/14 118/2 118/12 118/20 118/21
**witnesses [32]** 7/16 10/18 18/11 25/15 32/22 32/24 33/4 35/2 37/9 40/10 41/24 49/20 49/21 50/21 52/5 52/7 52/13 60/18 60/23 66/14 68/13 68/16 88/12 90/2 90/6 90/9 90/15 90/17 91/5 97/22 105/14 117/13
**witnesses' [1]** 57/14
**WL [1]** 55/19
**WL 972401 [1]** 55/19
**Wolfcamp [1]** 85/19
**won't [1]** 91/22
**word [6]** 7/10 30/23 49/24 50/19 51/22 103/23
**wording [1]** 84/7
**words [5]** 42/14 51/8 83/12 83/17 87/14
**work [15]** 12/10 12/13 15/2 15/5 23/6 23/8 30/2 50/25 55/5 55/25 62/6 78/9 98/9 100/10 114/1
**work-product [1]** 50/25
**worked [11]** 19/13 21/21 31/7 53/3 53/7 59/8 59/12 97/5 98/24 98/25 109/1
**working [3]** 6/4 54/3 64/10
**works [4]** 22/20 31/8 67/1 124/14
**world [1]** 21/14
**worse [1]** 107/11
**would [150]**
**wouldn't [2]** 78/21 106/9
**wrap [1]** 25/22

**wrapped [1]** 65/9
**WRIGHT [1]** 1/10
**wrinkle [1]** 121/23
**write [1]** 15/4
**writing [2]** 6/23 48/19
**written [9]** 5/17 15/1 15/13 22/4 22/7 54/20 63/24 99/3 115/17
**wrong [9]** 20/15 47/8 73/13 84/20 86/7 91/7 91/7 108/12 117/1

**Y**

**y'all [7]** 23/11 23/24 24/2 24/2 79/5 125/5 125/21
**yeah [21]** 9/21 11/19 15/21 28/20 40/20 42/11 42/24 45/14 54/12 70/17 75/16 80/18 85/7 92/9 93/6 111/22 112/11 112/21 119/8 121/20 123/3
**year [13]** 19/20 19/23 32/23 41/22 51/9 62/2 67/7 67/7 73/24 77/7 77/13 106/11 106/12
**year's [1]** 40/1
**year-end [2]** 67/7 67/7
**years [6]** 8/16 18/6 56/4 106/11 117/9 122/6
**yep [5]** 5/9 37/24 82/21 114/7 115/3
**yes [21]** 12/6 19/15 24/5 52/9 64/21 66/5 79/18 80/8 81/25 82/14 96/9 109/13 109/14 111/17 113/18 113/20 115/3 115/7 118/3 119/12 121/21
**yet [5]** 41/2 67/13 74/23 74/24 109/2
**York [4]** 1/20 1/20 1/23 1/23
**you [578]**
**you'd [5]** 7/18 8/15 29/11 32/22 37/21
**you'll [5]** 17/13 17/14 23/25

61/1 101/18

**you're [30]** 10/6 10/17 10/18 15/17 22/16 26/11 29/23 29/25 42/2 43/2 43/25 45/10 51/7 51/11 55/6 58/11 72/24 78/17 79/3 84/23 89/21 89/23 95/6 111/5 114/21 115/11 115/16 115/23 120/7 120/9
**you've [3]** 70/10 79/1 92/6
**your [178]**

**Z**

**zip [1]** 67/23
**zone [1]** 25/9
**zones [1]** 31/3