United States Courts
Southern District of Texas
FILED

*June 23, 2025*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Civil Action No. 4:21-cv-02473 <br><br> <u>CLASS ACTION</u> |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>SUPPLEMENTAL BRIEFING ON LITIGATION HOLD OBJECTIONS</u>**

Pursuant to the Court's May 12, 2025 order (Dkt. 131), the parties have offered their competing positions and authorities on the validity of Defendants' targeted objections to a handful of Requests for Admission (RFAs) seeking to pry into the privileged substance of litigation holds and the existence and timing of holds that Plaintiffs readily admit are entirely unrelated to the allegations in this case. *See* Defs.' Br. (Dkt. 132); Pls. Br. (Dkts. 134 & 35). But Plaintiffs' Brief also takes a winding detour from that narrow issue, raising new, extraneous issues; presenting an apparent privilege log dispute that the parties never even discussed (much less submitted to the Court); veering into an uninvited and misleading tangent on the supposed strength of their "evidence"; and otherwise making blatant legal and factual misstatements that demand correction. Defendants submit this reply brief to provide a concise response to Plaintiffs' newly raised issues.

***Plaintiffs' argument about when Defendants' duty to preserve arose is irrelevant to the question at issue, not to mention both factually and legally incorrect.*** Plaintiffs first argue that they should be allowed more discovery into Defendants' pre-Complaint litigation holds because ███████████████████████████████████████████████████ ███████████████████████████████████ Pls. Br. 1-2. This is a non sequitur. Even if it were true (and it isn't, as explained below) that Defendants anticipated this litigation before the Complaint in this action was filed, Plaintiffs point to nothing to suggest that this would

1

somehow entitle them to discovery about Concho's pre-Complaint litigation holds, all of which concern *unrelated* matters. Accordingly, the question of when Concho anticipated this litigation has no bearing on the limited issue currently before the Court—whether Plaintiffs are entitled to additional discovery into Concho's litigation holds.

Moreover, even if it were relevant, Plaintiffs' argument that Defendants anticipated this litigation (and thus had a duty to preserve documents related to it) from the time of the alleged corrective disclosure is simply incorrect. A party's duty to preserve evidence does not arise from "a generalized, hypothetical threat of litigation." *Barnett v. Deere & Co.*, 2016 WL 4544052, at *3 (S.D. Miss. Aug. 31, 2016). Instead, the duty to preserve evidence arises only from "'reasonably foreseeable' *specific* litigation." *Design Basics, LLC v. Mitch Harris Bldg. Co., Inc.*, 2021 WL 5563981, at *4 (E.D. Mich. Nov. 29, 2021) (collecting cases); *see also Barnett*, 2016 WL 4544052, at *3 n.3 (similar, collecting cases). "Stated differently, the 'duty to preserve relevant evidence arises [only] when the party in possession of the evidence knows that litigation *by the party seeking the evidence* is pending or probable….'" *Design Basics*, 2021 WL 5563981, at *4 (quoting *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008)). Here, Plaintiffs have not—and cannot—show that Concho possessed such knowledge about this action prior to the filing of the Complaint on July 30, 2021.

In an attempt to urge otherwise, Plaintiffs' Brief claims (for the first time) that Concho anticipated this litigation ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████. Pls. Br. 5-6. But the documents Plaintiffs cite merely show ████ ████████████████████████████



—none of which has anything to do with anticipating the specific securities-fraud claims Plaintiffs have brought in this case.

In short, Defendants did not—and had no reason to—anticipate this litigation prior to Plaintiffs filing the Complaint on the eve of the limitations period, nearly two years later. Plaintiffs have only themselves to blame for this. It surely came as no surprise to Plaintiffs and their counsel

to learn that Concho—like all large corporations—had a rolling retention policy in place in order to avoid the enormous cost that perpetual document retention would require. Had Plaintiffs wanted Concho to suspend this policy and retain documents related to Plaintiffs' forthcoming claims, all they had to do was to send Concho "a document preservation letter, or any other correspondence threatening litigation." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). Having declined to provide such a "warning of future litigation," Plaintiffs cannot now complain that Defendants continued their "standard routine" regarding document retention. *Id.*

Indeed, this is particularly so here, since Plaintiffs' "discontent d[id] not crystalize into litigation for nearly two years." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007). Even if Plaintiffs had established that litigation should have been anticipated in the immediate aftermath of Concho's August 1, 2019 stock drop, they certainly have not established that Concho should have anticipated litigation through the entire two-year period after that in which Plaintiffs sat on their hands, declining to either file suit or even send a document preservation notice. Defendants thus had no obligation to preserve documents related to this case until Plaintiffs belatedly notified them of their claims by filing suit. "Any other conclusion would confront a putative litigant with an intractable dilemma: either preserve voluminous records for a indefinite period at potentially great expense, or continue routine document management practices and risk a spoliation claim at some point in the future." *Id.*; *see also Price v. Peerson*, 2014 WL 12558253, at *8 (C.D. Cal. Apr. 23, 2014) (same), *aff'd*, 643 F. App'x 637 (9th Cir. 2016).

***Plaintiffs' newly raised complaints about Defendants' privilege log do not support their contentions.*** Because the discovery record does not support Plaintiffs' preferred narrative, they theorize that withheld or redacted documents on Defendants' privilege log *must* contain the missing evidence that Concho anticipated this litigation in August 2019 (▆▆▆▆▆▆▆▆▆▆▆

██████████████ ) or October 2019 (████████████████████████

██████████████████ ). Pls. Br. 6 (citing privilege log entries "regarding legal risk"). Thus, they ask this Court to order an *in camera* review of 53 of those documents so that it can see the supposed evidence that Concho anticipated this litigation as of those dates.

Plaintiffs' request is both procedurally improper and factually fruitless. During the discovery process, Defendants addressed—and resolved—every one of Plaintiffs' requests or complaints regarding Defendants' privilege log, making various good-faith compromises to produce, redact, or un-redact documents from that log. After Defendants' compromises resolved any challenges to the privilege log, Plaintiffs *never* pursued a dispute with respect to the 53 withheld or redacted documents listed on Plaintiffs' Exhibit J[2]; had they done so, Defendants would have continued to engage in that same good-faith process. Plaintiffs' decision to unilaterally manufacture and submit the dispute to the Court (in an apparent attempt to prejudice the Court's analysis of the actual matter at issue in the supplemental briefing—whether Concho must answer RFAs about unrelated litigation holds) violates this Court's Rule 8.A.

Regardless, to avoid burdening the Court with resolving an unnecessary dispute, and to definitively put to rest any suggestion that these documents support Plaintiffs' duty-to-preserve narrative, Defendants have now produced to Plaintiffs in full 46 of the 53 previously withheld or redacted documents, which similarly say nothing about Concho reasonably anticipating a securities fraud lawsuit. Additionally, Defendants are transmitting unredacted versions of the remaining 7 documents to this Court for *in camera* review, so that it may see that the inarguably

---

[2] In addition to these 53 documents, as Plaintiffs' Exhibit J reflects through struck-out entries, Defendants had already removed from their privilege log and produced in full three documents bates labeled: WARCOP02569434, WARCOP02569785, and WARCOP02629286.

privileged material has nothing to do with Concho reasonably anticipating a securities fraud lawsuit.

*Unrelated litigation holds.* Although nearly all of the discovery Plaintiffs seek subject to the objections at issue concerns litigation holds in unrelated matters, Plaintiffs' Brief has remarkably little to say in response to Defendants' arguments on this issue. *See* Pls. Br. 9-10. Indeed, Plaintiffs appear to concede Defendants' principal point—that Plaintiffs would have no standing under such a hold. *See id.*

Nonetheless, Plaintiffs point to the unremarkable fact that a ████████████████████ ███████████████████████████████ Pls Br. 2, as if to suggest that Concho has somehow withheld emails preserved by an unrelated litigation hold. To set the record straight, if an unrelated hold existed and applied to preserve email data for a particular agreed custodian, then that email data was in fact *collected, reviewed, and (if responsive) produced*. Hence, discovery into such holds is entirely irrelevant, especially since Plaintiffs have now conceded that they would lack standing to enforce an unrelated litigation hold in the (purely hypothetical) event one were not properly followed. Pls. Br. 9.

*Defendant Jack Harper's Concho tenure vis-à-vis retention policy.* Plaintiffs also feign confusion at how Harper could have been subject to Concho's default, six-month retention policy—rather than its longer retention policy for certain "grandfathered in" employees—if he "joined Concho in 2006," before Defendant Will Giraud began his Concho tenure "in 2008 or 2009." Pls. Br. 4. Had Plaintiffs asked Defendants' counsel, inquired with Harper at his deposition, or run a quick Google search, they would have learned that Harper *left* Concho in early 2013 and returned in 2014—*after* Giraud (and plenty of other custodians) began their tenure at Concho.[3]

---

[3] *Harper Returns to Concho as Executive Vice President*, https://www.sfgate.com/business/article/Harper-returns-to-Concho-as-executive-vice-7407238.php (Mar. 23, 2014); *see also*, 1/2/13 Form 8-K

Once again, the actual facts completely accord with Defendants' explanation for the lack of email data for Harper (and certain other custodians), no matter how repeatedly and baselessly Plaintiffs claim "particularly disturbing" document "destruction." Pls. Br. 1.[4]

**Plaintiffs' misleading characterization of post-Class Period correspondence.** In a footnote, Plaintiffs also contend that  As such, this email is irrelevant to Plaintiffs' attempt to establish that Defendants committed securities fraud under the law of this Circuit, which rejects § 10(b) claims based on "fraud by hindsight," alleged "mismanagement," or "simple or even inexcusable negligence."[5] That this is apparently some of Plaintiffs' best "evidence" speaks volumes.

---

https://www.sec.gov/Archives/edgar/data/1358071/000119312513003950/d461136d8k.htm (announcing Harper's retirement from Concho); 3/19/14 Form 8-K httpsec.gov/Archives/edgar/data/1358071/000135807114000007/Form_8_K.htm (announcing Harper's return).

[4] Nor is it the least bit "suspicious" that the document production reflects that Tim Leach—the CEO of a publicly traded company—was not a frequent email user. *Contra* Pls. Br. 4. Plaintiffs have more than 47,000 emails produced from 33 custodians, many of whom were Concho executives. If emails between those custodians and Leach were "suspicious[ly]" missing from *just* Leach's custodial files, Plaintiffs ought to be able to identify them. Their refusal to do so speaks for itself.

[5] *See, e.g.*, *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 821 n.5 (S.D. Tex. 2013) ("fraud-by-hindsight is not a valid theory under Rule 10b"); *Burback v. Brock*, No. 22-40609, 2023 WL 4532803, at *6 (5th Cir. July 13, 2023) (scienter requires more than "merely simple or even inexcusable negligence"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (noting that failure to follow GAAP "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action");

*Plaintiffs' misdirection about* ▮▮▮▮▮▮▮▮ In the same footnote, Plaintiffs suggest that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pls. Br. 3 n.3. But what Plaintiffs neglect to mention

is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is entirely irrelevant to this case,

for several reasons. First, Concho did not disclose—and Plaintiffs thus did not and could not have

challenged in their Complaint—*any* project-specific forecast, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. Second, the *only* disclosed, company-wide forecast that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ was Concho's 1Q 2019 production forecast—which Concho undisputedly

*exceeded*. After beating that forecast, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮. The Company then provided new, public, Company-wide forecasts

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Here, as elsewhere, Plaintiffs' efforts to

prove fraud-by-soundbite will not hold up against the facts.

### CONCLUSION

For the foregoing reasons, and for those stated in Defendants' Brief (Dkt. 132), Defendants

respectfully request that the Court sustain Defendants' objections to Lead Plaintiffs' RFAs.

---

*Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) ("Insofar as Krim complains that BTX 'should have known' that its assets would become less profitable and its loan losses would increase, he is claiming negligence in predicting the future economic climate, which is not actionable under the federal securities laws.").

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*
    David D. Sterling
      Attorney-In-Charge
    State Bar No. 19170000
    Federal I.D. No. 07079
    Amy Pharr Hefley
    State Bar No. 24046046
    Anthony J. Lucisano
    State Bar No. 24102118
    Federal I.D. No. 3369146
    C. Frank Mace
    State Bar No. 24110609
    Federal I.D. No. 3385915
    910 Louisiana Street
    Houston, Texas 77002
    (713) 229-1946
    (713) 229-7946 (Fax)
    david.sterling@bakerbotts.com
    amy.hefley@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    frank.mace@bakerbotts.com

    ATTORNEYS FOR DEFENDANTS CONCHO
    RESOURCES INC., CONOCOPHILLIPS, AS
    SUCCESSOR IN INTEREST TO CONCHO
    RESOURCES INC., TIMOTHY LEACH, JACK F.
    HARPER, AND C. WILLIAM GIRAUD

By: */s/ Robert Ritchie (w/ permission)*
 Michael C. Holmes
 Texas Bar No. 24002307
 Southern District Bar No. 23716
 Robert Ritchie
 Texas Bar No. 24079213
 Southern District Bar No. 3089959
 K. Virginia Burke DeBeer
 Texas Bar No. 24097437
 Southern District Bar No. 3472047
 VINSON & ELKINS LLP
 2001 Ross Ave., Suite 3900
 Dallas, TX 75201
 Tel: (214) 220-7700
 Fax: (214) 999-7923
 mholmes@velaw.com
 rritchie@velaw.com
 vdebeer@velaw.com

 CO-COUNSEL FOR DEFENDANTS TIMOTHY
 LEACH, AND C. WILLIAM GIRAUD

## CERTIFICATE OF SERVICE

I hereby certify that, on June 17, 2025, a true and correct copy of the public, redacted version of the foregoing document was served on all counsel of record via the Court's ECF system. The sealed, unredacted version of this document will be served via email.

/s/ *Anthony J. Lucisano*
Anthony J. Lucisano

# APPENDIX I

# &

# Exhibits 1-6

# (filed under Seal)

ACTIVE 509850550.1

1

**APPENDIX II**

**DEFENDANTS' UNPUBLISHED AUTHORITIES FOR
DEFENDANTS' REPLY IN SUPPORT OF THEIR SUPPLEMENTAL BRIEFING ON
<u>LITIGATION HOLD OBJECTIONS</u>**

| CASE NO. | CASE NAME |
|---|---|
| 1. | *Barnett v. Deere & Co.*, 2016 WL 4544052, (S.D. Miss. Aug. 31, 2016) |
| 2. | *Design Basics, LLC v. Mitch Harris Bldg. Co., Inc.*, 2021 WL 5563981 (E.D. Mich. Nov. 29, 2021) |
| 3. | *Price v. Peerson*, 2014 WL 12558253, (C.D. Cal. Apr. 23, 2014) |
| 4. | *Burback v. Brock*, No. 22-40609, 2023 WL 4532803, (5th Cir. July 13, 2023) |
| 5. | *Is Shareholder Activism Effective In Influencing Corporate Action, Corp. Fin. Rev.*, 2011 WL 11562092 (Nov./Dec. 2011) |

Case No. 1

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 15 of 59

Barnett v. Deere & Company, Not Reported in Fed. Supp. (2016)

2016 WL 4544052

KeyCite Yellow Flag

Distinguished by   Steves and Sons, Inc. v. JELD-WEN, Inc.,   E.D.Va., May 1, 2018

2016 WL 4544052
Only the Westlaw citation is currently available.
United States District Court, S.D.
Mississippi, Eastern Division.

Ricky BARNETT, Plaintiff
v.
DEERE & COMPANY, Defendant.

CIVIL ACTION NO. 2:15-CV-2-KS-MTP
|
Signed 08/31/2016

**Attorneys and Law Firms**

Larry Stamps, Anita M. Stamps, Stamps & Stamps, Jackson, MS, John Gehlhausen - PHV, Robert J. Ingraham - PHV, John Gehlhausen, PC, Aurora, CO, Marc P. Weingarten - PHV, Locks Law Firm, Philadelphia, PA, for Plaintiff.

William Polk Thomas, Jonathan H. Still, Butler Snow LLP, Ridgeland, MS, Christen E. Luikart - PHV, Niels P. Murphy - PHV, Murphy & Anderson, PA, Jacksonville, FL, Frank M. Holbrook, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Keith Starrett, UNITED STATES DISTRICT JUDGE

**\*1**  For the reasons below, the Court **denies** Plaintiff's Motion for Sanctions [117] for Defendant's alleged spoliation of evidence.

*A. Background*

This is a product liability case. The Court discussed its factual background in a previous opinion. *See* Memorandum Opinion and Order at 1-2, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 15, 2015), ECF No. 26. Plaintiff claims that he was paralyzed when a lawn mower designed and manufactured by Defendant, the EZtrak Z425, rolled over on top of him, and that a defect in the lawn mower's design caused the accident and his injuries. The Court now considers Plaintiff's Motion for Sanctions [117] for Defendant's alleged spoliation

of evidence. Plaintiff contends that Defendant destroyed documents relevant to this litigation to deny access to them. Plaintiff seeks the following sanctions: a default judgment, striking Defendant's pleadings, and/or an adverse inference instruction at trial.

*B. Applicable Law*

"Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence." *Guzman v. Jones,* 804 F.3d 707, 713 (5th Cir. 2015). A party seeking sanctions "based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Rimkus Consulting Group, Inc. v. Cammarata,* 688 F. Supp. 2d 598, 615-16 (S.D. Tex. 2010), *cited with approval in Guzman,* 804 F.3d at 713.

With respect to the first element, "[a] party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Guzman,* 804 F.3d at 713. "Generally, the duty to preserve extends to documents or tangible things ... by or to individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses." *Rimkus,* 688 F. Supp. 2d at 612-13. Determining "when a duty to preserve arises in a particular case and the extent of that duty requires careful analysis of the specific facts and circumstances." *Id.* at 613.

As for the second element, the Fifth Circuit permits "an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of bad faith or bad conduct." *Guzman,* 804 F.3d at 713. Bad faith "generally means destruction for the purpose of hiding adverse evidence." *Id.* "Mere negligence is not enough" to sustain a finding of spoliation, *Vick v. Tex. Employment Comm.,* 514 F.2d 734, 737 (5th Cir. 1975), and if one may "just as reasonably infer from the facts" that the alleged spoliator was negligent, a finding of bad faith is inappropriate. *Stahl v. Wal-Mart Stores, Inc.,* 47 F. Supp. 2d 783, 787 (S.D. Miss. 1998).

Finally, the Fifth Circuit does not permit sanctions for spoliation unless the party seeking sanctions proves that "the spoliated evidence would have been relevant." *Rimkus,* 688 F. Supp. 2d at 617 (citing *Condrey v. SunTrust Bank of Ga.,* 431 F.3d 191, 203 (5th Cir. 2005)).

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 16 of 59
Barnett v. Deere & Company, Not Reported in Fed. Supp. (2016)
2016 WL 4544052

**\*2** The party seeking a spoliation finding and sanctions bears the burden of proof. *Id.* at 615. "Spoliation is a serious offense and a party's intentional destruction of relevant evidence threatens the sanctity and spirit of the judicial process. However, the imposition of sanctions under the court's inherent power is powerful medicine that should be administered with great restraint." *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 Fed.Appx. 899, 906 (5th Cir. 2010). The Court's determination depends "heavily on the facts and circumstances of each case and cannot be reduced to a generalized checklist of what is acceptable or unacceptable." *Rimkus*, 688 F. Supp. 2d at 613. [1]

[1]    Rule 37(e) addresses the available discovery sanctions for a party's failure to preserve electronically stored information. *See* FED. R. CIV. P. 37(e). Plaintiffs did not address Rule 37(e) in their initial brief, and the Court declines to consider arguments raised for the first time in reply. *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 492 (5th Cir. 2014) (court does not generally consider arguments raised for the first time in reply). Furthermore, the Fifth Circuit has not clarified whether its prior spoliation jurisprudence has been abrogated or otherwise amended pursuant to the latest amendment of Rule 37(e).
Regardless, the result of this motion would not change, as Rule 37(e) requires a "finding that the party acted with intent to deprive another party of the information's use in the litigation ...." FED. R. CIV. P. 37(e)(2). To the extent that Rule 37(e) permits less severe sanctions in cases where bad faith has not been shown, Plaintiff has only proposed that the Court bar Defendant and its experts from relying on or presenting evidence of the disputed information – including any testimony or other evidence that Defendant performed any testing on the lawn mower's design. In the Court's opinion, such a sanction would be "greater than necessary to cure the alleged prejudice ...," even if Plaintiff could prove the other elements of spoliation. FED. R. CIV. P. 37(e)(1). Indeed, Plaintiff will already have the opportunity to cross-examine Defendant's witnesses with regard to the alleged testing.

**C. Discussion**

*1. The Documents*

Plaintiff contends that Defendant breached its duty to preserve three different categories of documents. First, he contends that Defendant had an obligation to preserve documents generated as a result of its Hazard Discovery and Rating System, one of the tools it employs to insure that "products are safe and acceptable for their intended use." Exhibit H to Motion for Sanctions at 3, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 18, 2016), ECF No. 117-8. In discovery responses, Defendant described the HDRS documents as "a guide for John Deere design engineers to help them evaluate potential areas of safety concern when they are designing products." Exhibit A to Motion for Sanctions at 6, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 18, 2016), ECF No. 117-1. According to Defendant's counsel, the "HDRS work sheets no longer exist for this mower ...." Exhibit B to Motion for Sanctions at 1, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 18, 2016), ECF No. 117-2. Defendant's document retention policy provides that all HDRS records are retained until the product is shipped, at which point they are electronically destroyed. Exhibit D to Motion for Sanctions at 2, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 18, 2016), ECF No. 117-4.

Next, Plaintiff argues that Defendant had an obligation to preserve the minutes from Defendant's Product Safety Committee meetings. The Product Safety Committee "is charged with determining that a product is safe and ready for customer use before it authorizes production." Exhibit H [117-8], at 3. Defendant's document retention policy provides that the minutes from its Product Safety Committee meetings are retained for five years, and then they are electronically destroyed. Exhibit D [117-4], at 2.

**\*3** Finally, Plaintiff argues that Defendant should have preserved all documents related to product testing performed between 2002 and 2006 on the subject lawn mower design, including field tests related to the slope the lawn mower could traverse without rolling over. Deere represented in its discovery responses that "it reviews and tests all of its products for safety, including the [subject lawn mower], and at every stage of development, including during research, engineering, manufacture and field testing, to develop the specifications to which the deliverable products are manufactured." Exhibit A [117-1], at 23. The lawn mower in this case allegedly "underwent such testing and passed." *Id.*

Barnett v. Deere & Company, Not Reported in Fed. Supp. (2016)
2016 WL 4544052

According to Defendant's engineering expert, Kyle Ressler, [2] and Defendant's responses to Plaintiffs' interrogatories, the lawn mower "was ... tested in accordance with the state of the art at the time of its manufacture, design and testing." Exhibit H [117-8], at 5; Exhibit I to Motion for Sanctions at 3, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. May 18, 2016), ECF No. 117-9. According to Ressler, "literally thousands of tests" were performed on the design, and "it's common for [Defendant] to run and rerun and re-evaluate certification and safety tests multiple times throughout the year ... over the life of these vehicles ...." Exhibit B to Reply at 9, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. August 1, 2016), ECF No. 183-2. Ressler said that he performed "literally thousands of tests" on the EZtrak Z425, including a "tilt test." *Id.*

[2] Ressler worked as a design engineer and senior engineer on the lawn mower model at issue in this case. Exhibit B to Reply at 9, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. August 1, 2016), ECF No. 183-2. He "designed and engineered components and subsystems, [and] performed tests, reviews, [and] performance evaluations ...." *Id.*

Defendant's counsel represented to Plaintiff's counsel that documents generated pursuant to field tests of the subject lawn mower no longer exist. Exhibit B [117-2], at 1. Defendant's document retention policy provides that all "Analysis, Lab Test, and Field Performance" documents are retained for ten years, and then they are electronically destroyed. Exhibit D [117-4], at 2.

### 2. Duty to Preserve

Plaintiff argues that Defendant had a duty to preserve the documents because it knew or should have known that they may be relevant to future litigation. Plaintiff reasons that Defendant "has a long history of litigating rollover claims," and that it should have foreseen that it would be sued over similar claims pertaining to the EZtrak Z425. However, Plaintiff has not cited any legal authority providing that the duty to preserve can arise from such a generalized, hypothetical threat of litigation. "The undeniable reality is that litigation is an ever-present possibility in our society. While a party should not be permitted to destroy potential evidence after receiving unequivocal notice of impending litigation, the duty to preserve relevant documents should require more than a mere possibility of litigation." *Cache La*

*Poudre Feeds, LLC v. Land O'Lakes Farmland Feed, LLC*, 244 F.R.D. 614, 621 (D. Colo. 2007). [3]

[3] Numerous federal courts have implicitly assumed that the duty to preserve is determined by reference to the specific claims asserted in each case. *See, e.g. King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (where defendant was unaware at the time it destroyed malfunctioning equipment that the plaintiff intended to seek recovery based on the malfunction, defendant had no duty preserve the equipment); *Hill v. Cundiff*, 797 F.3d 948, 967 n. 10 (11th Cir. 2015) (no duty to preserve certain documents until plaintiff filed complaint because earlier preservation letter did not address them); *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (no duty to preserve evidence where party had no warning of future litigation); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003) (court referred to specific emails pertaining to specific plaintiff when determining whether duty to preserve had arisen, and testimony from defendant as to when he first anticipated litigation with the plaintiff).

*4 Plaintiff provided evidence that Defendant received four reports of rollover incidents involving the EZtrak Z425 between April 2011 and March 2013. Plaintiff did not direct the Court to evidence showing how many total units shipped, and the Court has no way of judging whether four incidents over three years is a significant rate of occurrence. Regardless, Plaintiff did not file suit until April 2, 2014, and Defendant was not served until April 14, 2014. Exhibit F to Notice of Removal at 4, 13, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. Jan. 15, 2015), ECF No. 1-7. Therefore, at the earliest, Defendant's duty to preserve attached on April 14, 2014 – when it received notice of Plaintiff's claims.

The subject lawn mower was manufactured in 2007. Exhibit A to Motion for Summary Judgment at 1, *Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP (S.D. Miss. June 15, 2016), ECF No. 137. Defendant's document retention policy provides that all HDRS records are retained until the product is shipped, at which point they are electronically destroyed. Exhibit D [117-4], at 2. It appears to be undisputed that the HDRS documents were destroyed in accordance with the document retention policy, several years prior to April 14, 2014. Accordingly, Defendant had no duty to preserve the HDRS documents at the time they were destroyed.

Case 4:21-cv-02473 Document 143 Filed 06/23/25 in TXSD Page 18 of 59

Barnett v. Deere & Company, Not Reported in Fed. Supp. (2016)
2016 WL 4544052

Defendant's document retention policy provides that the minutes from its Product Safety Committee meetings are retained for five years, and then they are electronically destroyed. *Id.* It appears to be undisputed that the Product Safety Committee minutes were destroyed in accordance with the document retention policy. The record is unclear as to when the Product Safety Committee meetings occurred, but it appears to be undisputed that they occurred prior to the date the unit was manufactured. Therefore, they had to have been destroyed at least two years before Defendant received notice of Plaintiff's claims. Accordingly, Defendant had no duty to preserve the Product Safety Committee minutes at the time they were destroyed.

### 3. Bad Faith

As noted above, the Fifth Circuit permits "sanctions against the spoliator only upon a showing of bad faith or bad conduct." *Guzman*, 804 F.3d at 713. In this context, bad faith "generally means destruction for the purpose of hiding adverse evidence." *Id.* "[T]he circumstances of the act must manifest bad faith." *Vick*, 514 F.2d at 737. If one may "just as reasonably infer from the facts" that the alleged spoliator was negligent, a finding of bad faith is inappropriate. *Stahl*, 47 F. Supp. 2d at 787.

Plaintiffs have not presented sufficient evidence of bad faith to merit the sanctions they have demanded – a default judgment in Plaintiff's favor, striking Defendant's pleadings, and/or an adverse inference instruction at trial.[4] Defendant presented undisputed evidence that it observes a document retention policy. *See, e.g.* Exhibit B [183-2], at 12; Exhibit D [117-4], at 2. It contends that the subject documents were destroyed pursuant to that policy.

[4]  In reply, Plaintiffs demanded for the first time that the Court bar Defendant and its experts from relying on or presenting evidence of the destroyed information. As stated above, the Court declines to consider this argument as it was presented for the first time in reply, *Transocean*, 767 F.3d at 492, and the Court believes that such a sanction would be "greater than necessary to cure the [purported] prejudice ...." FED. R. CIV. P. 37(e)(1).

The Court does "not draw an inference of bad faith when documents are destroyed under a routine policy." *Russell v. Univ. of Tex.*, 234 Fed.Appx. 195, 208 (5th Cir. 2007).[5]

Numerous federal courts have recognized that the routine destruction of information pursuant to a reasonable data retention policy is not grounds for sanctions. *See, e.g. FTC v. Lights of Am. Inc.*, 2012 U.S. Dist. LEXIS 17212, at \*19-\*20, 2012 WL 695008 (C.D. Cal. Jan. 20, 2012); *Viramontes v. United States Bancorp*, 2011 U.S. Dist. LEXIS 7850, at \*12, 2011 WL 291077 (N.D. Ill. Jan. 27, 2011); *Cache La Pudre*, 244 F.R.D. at 623-24; *Broccoli v. Echostar Communs. Corp.*, 229 F.R.D. 506, 510 (D. Md. 2005). Defendants have presented undisputed evidence of a reasonable data retention policy, and it appears to be undisputed that the HDRS documents and Product Safety Committee minutes were destroyed pursuant to that policy. Therefore, absent other factors, the Court declines to draw an inference of bad faith.

[5]  *See also Arthur Anderson LLP v. United States*, 544 U.S. 696, 704, 125 S. Ct. 2129, 161 L.Ed. 2d 1008 (2005) ("Document retention policies ... are common in business. It is, of course, not wrongful ... to comply with a valid document retention policy under ordinary circumstances."); *Vick*, 514 F.2d at 737 (no spoliation where documents were destroyed under routine procedures); *King*, 337 F.3d at 556 (routine document retention policy constituted an "innocuous" reason for destruction of evidence); *Kermode v. Univ. of Miss. Med. Ctr.*, 2011 U.S. Dist. LEXIS 71624, at \*13-\*15, 2011 WL 2619096 (S.D. Miss. July 1, 2011) (where documents were destroyed pursuant to automatic system prior to date that defendant would have had notice of the plaintiff's potential claim, there was no bad faith).

**\*5** Plaintiffs argue that Defendant's data retention policy is unreasonable because some categories of documents have shorter retention periods than others, and the retention periods for some categories of documents are purportedly too short. The Court disagrees. First, Plaintiff has not cited any legal authority providing that a court should infer bad faith because a document retention policy imposes different retention periods on different categories of documents. Moreover, the Court disagrees with Plaintiff's implicit argument that some of the broad categories of documents included in Defendant's policy will always be more relevant to potential litigation than others. Relevance can not be assumed; it must be determined by reference to the nature of the plaintiff's claims and the content of the disputed documents. Finally, the Court notes that other courts have found that retention periods shorter than those at issue here were reasonable. *See, e.g. Lights of*

2016 WL 4544052

*Am.*, 2012 U.S. Dist. LEXIS 17212 at *19, 2012 WL 695008 (45-day retention period was reasonable); *Cache La Poudre*, 244 F.R.D. at 621 (90-day retention period was reasonable); *Broccoli*, 229 F.R.D. at 510 (absent other factors, a 21-day retention period was "a risky but arguably defensible business practice undeserving of sanctions").

*4. Testing Documents*

Finally, Plaintiff alleges that Defendant destroyed all documents related to testing performed on the subject lawn mower design between 2002 and 2006. However, while Defendant's expert, Kyle Ressler, testified that he conducted extensive testing on the design, Plaintiff has not provided the Court with any evidence that Defendant generated any documents as a result of this testing. Likewise, the record contains no evidence regarding the nature or contents of these alleged documents, the dates on which they were created, the dates on which they were destroyed, or even the dates on which the tests were performed. Therefore, the Court is unable to determine whether there actually were any testing documents, whether Defendant destroyed them, when they were destroyed, whether there was a duty to preserve them at the time they were destroyed, and whether Defendant complied with its document retention policy.

As the party seeking a spoliation finding and sanctions, Plaintiff bears the burden of proof. *Rimkus*, 688 F. Supp. 2d at 615. As noted above, he has not provided the Court with evidence demonstrating that Defendant had a duty to preserve the alleged testing documents, or that they were destroyed in bad faith. Accordingly, he has not carried his burden.

*D. Conclusion*

For the reasons provided above, the Court **denies** Plaintiff's Motion for Sanctions [117] for Defendant's alleged spoliation of evidence.

SO ORDERED AND ADJUDGED this 31st day of August, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4544052

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 2

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 21 of 59

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)
2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

🚩 KeyCite Yellow Flag

Declined to Extend by   SnagPod, LLC v. Precision Kiosk Technologies, Inc., E.D.Mich.,   December 6, 2023

2021 WL 5563981
United States District Court, E.D.
Michigan, Southern Division.

DESIGN BASICS, LLC, Plaintiff,
v.
MITCH HARRIS BUILDING CO., INC., Blank-Ham Development, LLC, Minden Investments, LLC, and Mitchell L. Harris, Defendants.

Civil Case No. 16-14019
|
Signed 11/29/2021

### Attorneys and Law Firms

Dana Lejune, Dana Lejune Attorney at Law, Houston, TX, Aaron M. Halvas, Halvas Law Firm, PLLC, East Grand Rapids, MI, for Plaintiff.

Anthony A. Randazzo, Secrest, Wardle, Troy, MI, for Defendant Mitch Harris Building Company, Incorporated.

Anthony A. Randazzo, Robert B. Holt, Jr., Secrest, Wardle, Troy, MI, for Defendant Mitchell L. Harris.

### OPINION AND ORDER

LINDA V. PARKER, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Design Basics, LLC filed this lawsuit against Defendants on November 11, 2016, alleging violations of the federal Copyright Act and the Digital Millennium Copyright Act ("DMCA"). Defendant Blank-Ham Development LLC and Minden-Investments, LLC have been terminated as parties. The matter is presently before the Court on the following three [1] motions filed by the remaining defendants, Mitch Harris Building Co., Inc. and Mitchell L. Harris (hereafter collectively "Defendants"):

- Motion to Dismiss for Spoliation Evidence (ECF Nos. 57, 58);

- Motion to Strike Plaintiff's Expert & Expert Report (ECF No. 60); and

- Motion for Summary Judgment (ECF Nos. 62, 63).

The motions have been fully briefed. Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

1    The docket suggests that there are six motions pending; however, Defendants filed two versions of their motion to dismiss and motion for summary judgment, with one copy redacting confidential information and the second copy filed under seal. Further, when filing their reply brief in support of their summary judgment motion, Defendants inadvertently designated it as a separate motion (*See* ECF No. 74.)

The Court begins with Defendants' motion for sanctions and motion to strike Design Basics' expert and expert report, as the outcome of those motions heavily influences the Court's analysis of Defendants' summary judgment motion. First, the Court provides a general overview of the facts and procedural background relevant to Defendants' motions for sanctions and to strike.

### Brief Factual and Procedural Background

Design Basics is a Nebraska corporation engaged in the business of creating, publishing, and licensing original architectural plans and designs. Dennis Brozak founded Design Basics and ran the company until it was purchased by Patrick Carmichael, a Texas home builder and contractor, and Myles Sherman in 2009.

Since the mid-1980's, Design Basics has published home plan catalogs and, since the advent of the internet, has published its designs on its website and through its marketing partners. It owns copyrights in numerous architectural works for which the United States Copyright Office has issued certificates of registration, including the plans at issue in this lawsuit: 2761 Mayberry, 1748 Sinclair, 2100 Fenton, 1752 Lancaster, 2656 Castlar, 8037 Carriage Hills, 3484 MacCready, and 2245 Tyndale (collectively "Copyrighted Works").

Between 1998 and 2005, Design Basics received average annual revenue of $4 million from the licensing of its original home designs. Defendants—long-time residential home builders located in Brighton, Michigan—were among

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 22 of 59
Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)
2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

Design Basics' customers. From approximately 1998 to 2006, Defendants purchased and/or received over a 100 of Design Basic's design plan catalogs and paid approximately $20,000 to purchase at least 40 construction licenses from Design Basics, including the Copyrighted Works. Design Basics' licenses authorized Defendants to construct homes based on the Copyrighted Works, advertise the Copyrighted Works, and modify the Copyrighted Works to fit the needs of Defendants' customers.

**\*2** Beginning in 2009, Design Basics' revenue fell well below $1 million annually. Design Basics attributes the decline to widespread theft of its copyrighted plans by home builders and lumber yards, which it believes increased dramatically between 2004 and 2009. Carmichael, who met Brozak in the mid-1990's, encouraged Design Basics to pursue copyright infringement lawsuits against these home builders and lumber yards. Carmichael pledged to pay for the litigation costs and expenses of these lawsuits and to "quarterback" the litigation with attorney Dana Lejune (Design Basics' counsel in this case), in exchange for a 50% interest in any amount recovered in the litigation. Eventually Brozak agreed to this plan and Design Basics filed its first copyright infringement lawsuit in March 2006: *Design Basics, Inc. v. Granite Ridge Builders, Inc.*, No. 1:2006cv0072 (N.D. Ind. filed Mar. 10, 2006) ("*Granite Ridge* Litigation").

Carl Cuozzo had been an employee at Design Basics since the late 1980's and Carmichael enlisted him to assist in the *Granite Ridge* Litigation, which eventually settled for approximately $3.6 million. Cuozzo thereafter quit Design Basics and began working for Carmichael, finding additional infringement matters to pursue on behalf of Design Basics. Additional employees of Design Basics were enlisted to assist Cuozzo in this endeavor: Paul Foresman (former President and current Vice President of Design Basics); Greg Dodge (current Vice President and Chief Technology Officer of Design Basics); and Trish Baker.[2]

[2]    Design Basics LLC was formed in May 2009, after Carmichael purchased Design Basics, Inc. The restructuring of the company and their distinctions are not relevant for purposes of the pending motions. Thus, the Court refers to the pre- and post-2009 entities singularly as "Design Basics."

In May 2009, Carmichael, along with Sherman, purchased Design Basics, including its intellectual property. By that time, approximately 40 possible infringement matters had been identified; however, by 2010, Design Basics had filed only four lawsuits against alleged copyright violators. In subsequent years, it filed more than 100 copyright infringement matters.

In the meantime, in January 2010, Design Basics experienced a massive roof leak at its offices, causing water damage to the contents of cardboard banker boxes. The boxes were marked "CC" and were believed to contain customer change orders. They in fact contained, at least in part, important documents relating to the authorship of Design Basics' copyrighted designs. The documents were destroyed. According to Defendants, Design Basics destroyed other sources of information relevant to this matter. Specifically, between 2009 and 2013, Design Basics allegedly destroyed 15 computers and a server used in its business. This included a desktop computer used by Cuozzo and a laptop computer used by Foresman—two individuals tasked with researching entities allegedly infringing Design Basics' copyrights.

Design Basics alleges that it discovered Defendants' infringing activity on November 13, 2013. According to Design Basics, Defendants are displaying and marketing architectural works that copy Design Basics' 2761 Mayberry and 1748 Sinclair plans (also referred to collectively as the "Alleged Copied Works"). Additionally, Design Basics alleges that Defendants are displaying and marketing Copyrighted Works without attaching the required copyright management information ("CMI").[3] Design Basics therefore filed this lawsuit on November 11, 2016, two days before the applicable three-year limitations period expired.

[3]    Specifically, Design Basics alleges that Defendants display and market the following Design Basics' plans without attaching CMI: 2100 Fenton, 1752 Lancaster, 2656 Castlar, 8037 Carriage Hills, 3484 MacCready, and 2245 Tyndale.

**\*3** On June 1, 2017, the Court entered its first scheduling order in this matter. Between that date and July 20, 2020, the parties submitted eight stipulated orders extending the deadlines in that order, which the Court signed. The Eighth Amended Scheduling Order—which the Court warned would be the last—set a July 29, 2020 deadline for Rule 26(a)(2) expert disclosures, an August 31, 2020 deadline for expert rebuttal disclosures, an October 1, 2020 deadline for fact and expert discovery, and a November 2, 2020 deadline for the filing of dispositive motions and motions challenging experts.

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 23 of 59

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)
2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

Design Basics provided Defendants with a copy of a report from its architectural expert, Matthew McNicholas, on September 30, 2020. The report was authored on October 24, 2019. When first served with Defendants' interrogatories on September 9, 2017, Design Basics did not identify McNicholas as an expert witness; rather, Design Basics responded that it had not yet retained an expert. Design Basics never supplemented its answer. However, Design Basics identified McNicholas as a possible expert in its witness list filed September 29, 2017. According to Defendants, they produced an "Expert Rebuttal Report" from their expert, Dr. Robert Greenstreet, on August 31, 2020, despite not knowing who was going to testify as an expert for Design Basics or what that expert was going to say.

### Motion to Dismiss

In their motion to dismiss, Defendants ask the Court to dismiss Design Basics' claims against them or, alternatively, for an adverse inference instruction due to Design Basics' destruction of relevant evidence and failure to adequately respond to Defendants' discovery requests. Specifically as to the former, Defendants refer to the documents relevant to the authorship of the Alleged Copied Works which were destroyed after the 2010 flood and the computers and server destroyed between 2009 and 2014, which Defendants maintain may have contained evidence showing that Design Basics discovered Defendants' alleged infringement before November 13, 2013 and that, therefore, this lawsuit was filed beyond the relevant limitations period. Defendants also assert that, in response to their discovery requests, Design Basics has not adequately searched its electronic assets, inquired of key employees or asked them to collect information responsive to Defendants' discovery requests, searched the files of key employees, or produced documents that Carmichael and/or Design Basics' employees testified exist. Defendants maintain that Design Basics' destruction of evidence and similar discovery abuses led a magistrate judge in this district to recommend sanctions against it in another copyright infringement action: *Design Basics, LLC v. Marhofer*, No. 12-14894, 2015 U.S. Dist. LEXIS 178465 (E.D. Mich. June 15, 2015) (M.J. Hluchaniuk).

Rule 37 of the Federal Rules of Civil Procedure allows a court to issue sanctions against a party that fails to comply with a court order compelling discovery. The rule identifies the available sanctions, including an adverse inference instruction, "prohibiting the disobedient party from supporting or opposing designated claims or defenses," or dismissing the action in whole or in part. Fed. R. Civ. P. 37(b)(2). Rule 37 requires sanctions even without a court order where a party fails to provide information or identify a witness as required under the rule, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). However, absent a motion, such sanctions are limited to the exclusion of that information or witness at a hearing or trial. *Id.* Upon motion, the court *may* impose additional sanctions, including those available under Rule 37(b)(2).

**\*4** A court may also "impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (6th Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)). Prior to sanctioning a party for bad faith conduct in litigation under its inherent authority, however, the court must comply with the mandates of due process and find that the requisite bad faith exists. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511 (6th Cir. 2002) (citing *Chambers v. Nasco, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Moreover, while a federal court is not precluded from using its inherent authority to sanction bad faith conduct simply because that conduct could also be sanctioned under a statute or federal rule, the Supreme Court has advised courts to "ordinarily ... rely on the Rules rather than the inherent power." *Id.* (emphasis removed) (quoting *Nasco*, 501 U.S. at 50, 111 S.Ct. 2123).

### Spoliation

The Court begins with the evidence Design Basics irrefutably destroyed: authorship records, computers, and a server. Pursuant to its inherent powers, a court may "impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) (quoting *Adkins v. Wolever*, 554 F.3d 650, 652-53 (6th Cir. 2009)). "Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) (citing *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999)). To warrant sanctions for the spoliation of evidence, the movant must show: "(1) that

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

the party having control over the evidence had an obligation to preserve it *at the time it was destroyed*; (2) that the records were destroyed with a culpable state of mind [4] ; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dept. of Justice,* 622 F.3d 540, 553 (6th Cir. 2010) (emphasis added) (quoting *Residential Funding,* 306 F.3d at 107).

[4]    As discussed *infra* at pages 12-13, the 2015 amendments to the Federal Rules of Civil Procedure impacted this second element.

**Duty to Preserve**

The Sixth Circuit has stated that the duty to preserve attaches when the party "has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *John B. v. Goetz,* 531 F.3d 448, 459 (2008) (citing *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir. 2001); *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003)). According to Defendants, because by 2009 Design Basics had a business strategy of identifying and suing builders for copyright infringement, "future litigation" means any potential lawsuit Design Basics might file against any defendant to protect its intellectual property. Defendants do not cite a single case in which a court found the duty to preserve information to have existed indefinitely due to the possibility of future copyright litigation. Nor do Defendants cite any case interpreting future litigation so expansively in any context.

The term "future litigation" does not mean any possible or hypothetical lawsuit. Instead, it means "reasonably foreseeable" *specific* litigation. *Zubulake,* 220 F.R.D. at 216 (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999)); *see also United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1001 (9th Cir. 2002) (finding no spoliation because the defendant was not on notice of a "future specific" lawsuit). The duty to preserve evidence runs to an identifiable opposing party. *Town of Westport v. Monsanto Co.,* No. 14-12041, 2015 WL 13685105, at *4 (D. Mass. Nov. 5, 2015) (citing *In re Ethicon, Inc. v. Pelvic Repair Sys. Prod. Antitrust Litig.,* 299 F.R.D. 502, 516 (S.D. W. Va. 2014)); (*Delta-AirTran Baggage Fee Antitrust Litig.,* 770 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011); *Point Blank Solutions, Inc. v. Toyobo Am., Inc.,* No. 09-61166, 2011 WL 1456029, *26 (S.D. Fla. Apr. 5, 2011); *Brigham Young Univ.*

*v. Pfizer, Inc.,* 282 F.R.D. 566, 572 (D. Utah 2012)). Stated differently, the "duty to preserve relevant evidence arises when the party in possession of the evidence knows that litigation *by the party seeking the evidence* is pending or probable ...." *Kounelis v. Sherrer,* 529 F. Supp. 2d 503, 518 (D.N.J. 2008) (emphasis added) (citing *Joe Hand Promotions v. Sports Page Cafe,* 940 F. Supp. 102, 104 n.13 (D.N.J. 1996); *Baliotis v. McNeil,* 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); *see also Point Blank Solutions,* 2011 WL 1456029, at *25 (quoting *Kounelis*); *Realnetworks, Inc. v. DVD Copy Control Ass'n,* 264 F.R.D. 517, 526-27 (N.D. Cal. 2009) (holding that a "general concern over litigation" regarding the product RealDVD did not "create a duty to preserve all documentation related to RealDVD" and that a duty to preserve only arose when "a potential claim was identified or future litigation was probable" with the parties in question). The party asserting spoliation "must first show that [the spoliating party] owed *them* a duty to preserve documents." *In re Delta/Air Tran,* 2011 WL 915322, at *5, 770 F.Supp.2d 1299.

**\*5** Design Basics destroyed the authorship documents, server, and most of the computers before November 13, 2013, when it claims to have discovered Defendants' infringing activity. The authorship documents were destroyed in early 2010 and the computers and server were discarded sometime between 2009 and 2013. Defendants present no evidence to show that Design Basics had notice that the subject documents, server, and computers were relevant to the instant litigation or should have known that the evidence may be relevant to specific future litigation when they were destroyed. This distinguishes the present matter from *Marhofer*, the case on which Defendants primarily rely to support their spoliation motion. In *Marhofer*, the magistrate judge concluded that Design Basics had a duty to preserve as early as November 2009, when it claimed to have discovered evidence of its claims against the defendants. 2015 U.S. Dist. LEXIS 178465, at *4. However, the one exception in the instant matter is the laptop computer Cuozzo used from approximately 2012 to 2014, which was recycled in or around April 2014, several months after Design Basics purportedly discovered Defendants' infringing activity. (Cuozzo 3/5/20 Dep. at 9-10, ECF No. 58-3 at Pg ID 2236.) As of April 2014, Design Basics did have a duty to preserve relevant information. However, for the reasons stated below, satisfaction of this element alone is not enough to impose the requested spoliation sanctions.

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

**Culpable State of Mind**

Effective December 1, 2015, Federal Rule of Civil Procedure 37 was amended to include the following:

(e) **Failure to Preserve Electronically Stored Information**. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). As a result of this amendment, a party seeking the more severe sanction of dismissal or an adverse inference instruction must show that evidence was destroyed with the " 'intent' to deprive [the moving party] of the information's use." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (quoting Fed. R. Civ. P. 37(e)). "A showing of negligence or even gross negligence will not do the trick." *Id.* (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note).

**\*6** The Court is not able to conclude that Cuozzo's laptop was recycled with the intent to deprive Defendants of information contained therein.[5] First, according to Cuozzo, the laptop's hard drive was backed up before it was destroyed. (Cuozzo 3/5/20 Dep. at 9-11, ECF No. 58-3 at Pg ID 2235-35; *see also* Dodge 2//27/20 Dep. at 108-113, ECF No. 64-19 (indicating that hard drives were preserved before laptops were destroyed).) While Defendants point out that relevant information on the laptop could have been deleted before the backup, there is no evidence that it was.

[5]    Defendants believe Design Basics' actions are nefarious—consistent with the business model Defendants believe Design Basics adopted in 2009 to earn its revenue primarily through intellectual property shakedowns rather than the licensing of its architectural works. Whether Design Basics is a copyright troll or simply a copyright owner vigorously protecting its intellectual property is something the Court cannot know for sure. However, as the latter is a legitimate endeavor, Design Basics' aggressive pursuit of claimed infringers is not sufficient on its own to confer bad faith in its litigation tactics.

Second, Defendants offer nothing but supposition that Cuozzo had any information on the laptop relating to them. Defendants maintain that there must have been information about them on Cuozzo's laptop because he was heavily involved in researching potential infringers and researched Defendants in 2014. But Design Basics has indicated that Paul Foresman and Rick Molnar discovered Defendants' allegedly infringing activity (*see* Dodge 2/27/20 Dep. at 139, ECF No. 64-19; Answer No. 3 to Defs' Interrogatories, ECF No. 66-9 at Pg ID 3477), and Cuozzo testified that the research he did in April 2014 involved reviewing some documents (i.e., "papers") that Foresman gave him (Cuozzo 3/5/20 Dep. at 50-53, ECF No. 58-3 at Pg ID 2245). Cuozzo testified that Foresman gave him these physical documents, Cuozzo never scanned them into his computer, and that Cuozzo returned them to Foresman afterward. (*Id.*) Defendants also assert that Cuozzo admittedly had folders related to Defendants on prior laptops. However, the deposition testimony cited by Defendants does not support this assertion.[6] (*See* Mot. at 30 n. 18, ECF No. 57 at Pg ID 1370 (citing Cuozzo 3/6/20 Dep. at 50, ECF No. 58-3 at Pg ID 2245).)

[6]    For these reasons, the Court also cannot conclude that the destruction of Cuozzo's laptop resulted in the spoliation of information relevant to Defendants' defenses. The Court finds it unnecessary to discuss the relevance element in depth, however, as a movant's inability to show any one element precludes a spoliation sanction. *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 20012) (explaining that the test prescribed in *Beaven* is conjunctive and thus if at least one of the prongs is not satisfied, a spoliation sanction is unwarranted).

For these reasons, the Court concludes that spoliation sanctions are not warranted.

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 26 of 59

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

**Other Alleged Discovery Abuses**

Defendants argue that sanctions are further warranted due to other discovery abuses by Design Basics. More specifically, Defendants maintain that Design Basics did not adequately search its electronic assets or inquire of key employees to uncover information that should have been produced in response to Defendants' discovery requests. For example, Defendants believe that if Design Basics had more diligently searched, it would have located and been required to produce pre-2014 infringement research concerning Defendants, information related to Defendants in its Chelsea Lumber files, information concerning Defendants in Rick Molnar's files, and a "Suspected Infringement Form" for Defendants dated earlier than the one produced.

**\*7** Defendants, however, never filed a motion to compel in this matter to bring to the Court's attention the now purported insufficiencies in Design Basics' responses to Defendants' discovery requests. As a result, the Court has never been able to question Design Basics as to how they searched for information to respond to Defendants' discovery requests. Nor, as a result, has the Court ordered Design Basics to search differently or more diligently for the information Defendants believe exists but has not been produced. Rule 37 does not contemplate the sanctions Defendants seek absent such a motion or order. *See* Fed. R. Civ. P. 37(b), (c). Without this process, the Court cannot conclude with certainty that Design Basics has in fact failed to produce documents or provided insufficient answers in response to Defendants' discovery requests. [7]

[7]    Defendants merely speculate and are suspicious that additional relevant evidence has been withheld. The Court cannot sanction a party for failing to produce evidence where there is no clear indication the evidence even exists.

Defendants also assert that Design Basics submitted a false declaration from Janie Murnane concerning the destruction of authorship records due to water damage. The Court finds it unnecessary to consider this assertion, however, in light of its finding that the destruction occurred before Design Basics had a duty to preserve this evidence in connection with the present lawsuit.

While the Court retains the inherent authority to sanction a party for bad-faith conduct, Rule 37 offered Defendants an adequate mechanism to address Design Basics' purported discovery abuses. As the Supreme Court and Sixth Circuit have advised, a court should be reluctant to use its inherent power where an available rule or statute is "up to the task[.]" *First Bank of Marietta*, 307 F.3d at 511 (quoting *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123).

For these reasons, the Court is denying Defendants' request for sanctions based on Design Basics' purported discovery abuses.

**Motion to Strike Expert**

Defendants move to strike the testimony and report of Design Basics' expert, Matthew McNicholas, because Design Basics served Defendants with the report on September 30, 2020, after the July 29, 2020 deadline in the Court's scheduling order. Defendants claim prejudice due to the untimely filing because discovery closed the day after the report was produced.

Design Basics maintains in response that counsel for the parties repeatedly agreed to extend the deadlines in this case—as reflective of their eight stipulations to do so—and that Design Basics' counsel was in good faith acting under an agreement with Defendants' counsel to produce expert reports beyond the date set forth in the final scheduling order when it produced the report on September 30. As evidence of such an agreement, Design Basics points out that neither party filed an expert report by the July 29 deadline and that defense counsel never asked about Design Basics' absent expert report. Further, Design Basics maintains that the expert report produced by Defendants on August 31, 2020—also beyond the scheduling order's deadline— is in fact not a rebuttal report—despite its label—but the expert's *initial* report. According to Design Basics, its counsel repeatedly communicated to Defendants' counsel that the report of Design Basics' expert was already prepared but would not be produced until Defendants' report was ready, as the scheduling order required simultaneous production of initial expert reports. Design Basics counters Defendants' claim of prejudice, asserting that counsel discussed continued discovery, despite the passing of the discovery deadline, including depositions of the parties' experts.

Notably, in reply, Defendants do not refute Design Basics' assertions regarding the parties' communications concerning expert reports and discovery. (*See* ECF No. 72.)

**\*8** Under Rule 26 of the Federal Rules of Civil Procedure, parties must disclose *inter alia* the identity of trial witnesses and a written report of expert witnesses. Fed. R. Civ. P. 26(a)(2). A party using a retained expert must furnish a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(C).

Federal Rule of Civil Procedure 37(c)(1) "mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98-5488, 182 F.3d 920, 1999 WL 455435, at \*3 (6th Cir. June 25, 1999)). The burden falls on the potentially sanctioned party to prove harmlessness and/or substantial justification. *Id.* Here, Design Basics provides a substantial justification: an agreement between the parties to delay the exchange of expert reports. Defendants do not dispute Design Basics' assertion that counsel had such an agreement, focusing instead on the unrelated discovery abuses of which they accuse Design Basics. Further, despite Defendants' label, their expert's report—also submitted past the deadline for doing so in the Court's scheduling order—clearly is not a rebuttal report. (*See* ECF No. 60-4.)

Moreover, in light of the parties' agreement to conduct the depositions of their experts beyond the discovery deadline, the "late" disclosure of McNicholas' report is harmless. Adding to this finding is the fact that Design Basics had informed Defendants well before the expert deadlines that its expert's report was complete and ready for production but was not produced because of the parties' agreement to exchange their reports simultaneously.

For these reasons, the Court is denying Defendants' motion to strike.

### Summary Judgment

Defendants seek summary judgment with respect to Design Basics' claims against them. Defendants first argue that Design Basics cannot prove its claims because it lacks proof of ownership. Next Defendants argue that Design Basics' claims are barred by the applicable three-year limitations period. Lastly, Defendants maintain that Design Basics cannot prove infringement or the necessary removal of CMI.

The standard for evaluating Defendants' summary judgment motion is well established and need not be elaborately restated. Pursuant to Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Ownership

To prove its claims, Design Basics must show that it is the owner of the copyrights at issue. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003)) (stating elements of a copyright infringement claim); 17 U.S.C. § 1202(b)(1) ("No person shall, *without the authority of the copyright owner* or the law ... intentionally remove or alter any copyright management information") (emphasis added). Defendants maintain that Design Basics cannot prove that it is the owner of the Copyrighted Works.

**\*9** There is no dispute that Design Basics registered the Copyrighted Works with the United States Copyright Office. (*See* Compl. Exs. 1-8, ECF Nos. 1-2 to 1-9.) In judicial proceedings, "the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and the facts stated in the certificate." 17 U.S.C. § 410(c); *see also Lexmark*, 387 F.3d at 533-34. Defendants have the burden to rebut this presumption. *Id.* (citing *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995)). To rebut the presumption of validity, the defendant "must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (citations omitted).

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 28 of 59

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

Design Basics' copyright registrations list it as the author of the works. (*See* Compl. Exs. 1-8, ECF Nos. 1-2 to 1-9.) Copyright ownership vests in the work's author. 17 U.S.C. § 201(a). Usually, the author is the creator of the work. *Id.* § 102. However, there is an exception for "works made for hire." *Id.* § 201(b).

If the work is made for hire, the owner is the person for whom the work was prepared. *Id.* The Copyright Act defines a "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

*Id.* § 101. Architectural works do not fit into any of the categories of "specially ordered or commissioned" work. *Warren Freedenfeld Assoc. v. McTigue*, 531 F.3d 38, 48 (1st Cir. 2008) (citing *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1492 (11th Cir. 1990); *Meltzer v. Zoller*, 520 F. Supp. 847, 855 (D.N.J. 1981)); *Richard J. Zitz, Inc. v. Pereira*, No. 99-9399, 225 F.3d 646, 2000 WL 1239830, at *4 (2d Cir. Aug. 31, 2000).

Defendants rely in part on the destruction of the authorship documents and the sanctions requested for that destruction to rebut the presumption that Design Basics is the owner of the Copyrighted Works. However, for the reasons discussed earlier, Defendants are not entitled to an adverse inference based on spoliation.[8] Defendants also rely on deposition testimony reflecting that individuals identified as the creators of Design Basics' Copyrighted Works were not employees of Design Basics when the works were created. (Cuozzo 3/5/20 Dep. at 202-09, ECF No. 58-3 at Pg ID 2274-75.) Even if such evidence "casts doubt" on the validity of the copyrights, Design Basics responds with executed assignments from several individuals identified as designers of the Copyrighted Works, pursuant to which the individuals assigned their right, title, and interest in the works to Design Basics. (ECF Nos. 64-6 to 64-8.) Ownership of a copyright can arise through assignment, also. *See In re Napster, Inc. v. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002).

[8]    Defendants cannot overcome the presumption that Design Basics owns the Copyrighted Works simply by pointing out that Design Basics lacks evidence to demonstrate who authored those works. Design Basics' obligation to present such evidence does not arise unless and until Defendants present evidence casting doubt on the validity of the copyright. In other words, Design Basics does not have to offer *any* proof other than the certificates of registration unless and until Defendants present evidence to rebut the prima facie presumption of copyright validity that accompanies a registration certificate.

**\*10** For these reasons, Defendants fail to show that there is no genuine issue of material fact as to Design Basics' ownership (or lack thereof) of the Copyrighted Works.

### Statute of Limitations

A three-year limitations period applies to claims under the Copyright Act and the DMCA. 17 U.S.C. § 507(b). Such claims "accrue[ ] when a plaintiff knows of the potential violation or is chargeable with such knowledge." *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007) (quoting *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004)). "Because each act of infringement is a distinct harm, the statute of limitations bars infringement claims that accrued more than three years before suit was filed, but does not preclude infringement claims that accrued within the statutory period." *Bridgeport Music*, 376 F.3d at 621 (citing *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)); *Roger Miller Music*, 477 F.3d at 390 (explaining that "a claim for copyright infringement can accrue more than once because each infringement is a distinct harm"). "[E]ach new infringing act causes a new three year statutory period to begin." *Roger Miller Music*, 477 F.3d at 390 (quoting *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005)).

To support their statute of limitations defense, Defendants once again point to Design Basics' purported spoliation and destruction of evidence. Defendants argue that Design Basics concealed and destroyed the evidence demonstrating that its claims are stale. As discussed above, however, the Court declines to issue spoliation sanctions. Therefore, Defendants

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 29 of 59

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

have not met their burden of showing that the statute of limitations bars Design Basics' claims.

**Proof of Copyright Infringement**

Defendants maintain that Design Basics lacks evidence to prove that Defendants copied its architectural works.

A plaintiff asserting copyright infringement must show "(1) ownership of a valid copyright [in the work] at issue ... and (2) that the defendant copied protectable elements of the work." *Lexmark Int'l*, 387 F.3d at 534 (citing *Feist Publ'ns*, 499 U.S. at 361, 111 S.Ct. 1282; *Kohus*, 328 F.3d at 853). "The first prong tests the originality and non-functionality of the work, both of which are presumptively established by the copyright registration. *Id.* (internal citation omitted). "The second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)."

As an initial matter, Defendants point out that they were authorized to construct homes based on Design Basics' plans, redraw/modify the plans, and advertise the plans in their business operations. (Carmichael 3/4/20 Dep. at 149, ECF No. 57-14 at Pg ID 1628; Cuozzo 3/6/20 Dep. at 292-295, ECF No. 62-3 at Pg ID 2545-46.) "Anyone who is authorized by the copyright owner to use the copyrighted work ... is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios Inc.*, 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). Authorized use may be granted in writing, orally, or implied from conduct. *Johnson*, 149 F.3d at 500; *see also Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998).

 **\*11**  Design Basics is not required to show that Defendants' use of Design Basics' copyrighted works was unauthorized; rather, Defendants bear the burden of proving that their use of Design Basics' plans was authorized. *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760-61 (7th Cir. 2016); *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). Defendants do not satisfy this burden. This is because Defendants offer no evidence to show that the alleged infringing plans originated from Design Basics' 2761 Mayberry or 1748 Sinclair plan. In other words, Defendants fail to show that they modified licensed plans to develop the plans that Design Basics alleges are substantially similar to the Alleged Copied Works.

Defendants alternatively argue that Design Basics cannot demonstrate that they copied the 2761 Mayberry or 1748 Sinclair plan. Where direct evidence of copying is absent—which appears to be conceded in this case (*see* ECF No. 69 at Pg ID 3717)—a plaintiff alleging copyright infringement must show that the defendant had access to the allegedly infringed work and that there is a "substantial similarity between the two works at issue." *Kohus*, 328 F.3d at 853-54 (quoting *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999)). Access is not at issue here, as Defendants admittedly licensed the Alleged Copied Works.

In *Kohus*, the Sixth Circuit adopted the following two-step test for substantial similarity:

> [T]he first step "requires identifying which aspects of the artist's work, if any, are protectible by copyright," ... the second "involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work,

*Id.* at 855 (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296 (D.C. Cir. 2002)). Expert testimony "will almost certainly [be] required" at the first step. *Id.* at 856. For example, where the work at issue involves technical drawings, a lay person may not "understand what constitutes creativity in th[e] area, which elements are standard for the industry, and which elements are dictated by efficiency or by external standards." *Id.* at 858. Whether expert testimony is required at the second step will depend on who the "intended" or "target" audience is. *Id.* at 857 (emphasis removed).

As relevant to the first step, "[n]ot all 'copying' is actionable[.]" *Id.* at 853. A plaintiff alleging copyright infringement "must prove 'copying of constituent elements of the work *that are original*." *Id.* (alteration in *Kohus*) (quoting *Feist Publ'ns*, 499 U.S. at 361, 111 S.Ct. 1282). Therefore, "[t]he essence of the first step is to filter out the unoriginal, unprotectible elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity—through a variety of analyses." *Id.* at 855 (internal citation omitted). In cases involving a functional object, it also "is necessary to eliminate those elements dictated by efficiency." *Id.* at 856 "It also is important to filter out *scenes a faire*: those elements that follow naturally from the work's theme, rather than from the author's creativity, or elements that are dictated by external factors such as particular business practices." [9] *Id.* (internal quotation marks and citations omitted); *see*

also *Design Basics, LLC v. Forrester Wehrle Homes, Inc.,* 302 F. Supp. 3d 933, 942 (N.D. Ohio 2018) (explaining that "external considerations—that is, industry standards, consumer expectations, zoning requirements, and the like —can limit the amount of protected expression within architectural works.").

9    As one district court alternatively explained: "a scene that must be included in a work[.]" *Design Basics, LLC v. Forrester Wehrle Homes, Inc.,* No. 3:15cv666, 2017 WL 5444569, at *4 (N.D. Ohio 2017).

**\*12** "Once the unprotectible elements have been filtered out, the second step is to determine whether the allegedly infringing work is substantially similar to the protectible elements of the original." *Id.* at 856. In *Kohus*, the Sixth Circuit modified the standard employed at this step, providing for different approaches depending on the "*intended audience.*" *Id.* at 857. As the court explained:

> This will ordinarily be the lay public, in which case the finder of fact's judgment should be from the perspective of the lay observer or ... the ordinary reasonable person. But in cases where the audience for the work possesses specialized expertise that is relevant to the purchasing decision and lacking in the lay observer, the trier of fact should make the substantial similarity determination from the perspective of the intended audience. Expert testimony will usually be necessary to educate the trier of fact in those elements for which the specialist will look.

*Id.* The Sixth Circuit has warned, however, that "a court should be hesitant to find that the lay public does not fairly represent a work's intended audience." *Id.* (quoting *Dawson v. Hinshaw Music, Inc.*, 905 F.3d 731, 733 (4th Cir. 1990)).

Defendants assert that Design Basics lacks evidence to show that the alleged infringing plans are substantially similar to Design Basics' Alleged Copied Works. First, Defendants maintain that Design Basics' expert on copying should not be allowed to testify because his expert report was produced beyond the deadline in the Court's scheduling order. Second, according to Defendants, Design Basics' corporate designee, Cuozzo, is unqualified to opine on "substantial similarity" as he was unable to provide a definition of "infringement" during his deposition. Lastly, Defendants argue that Design Basics cannot demonstrate substantial similarity because the Alleged Copied Works contain only unprotected elements.

As discussed above, the Court is not striking the testimony of Design Basics' expert. With respect to Cuozzo, he is not called as a legal expert and thus his inability to define the term "infringement" is immaterial. It appears that he has sufficient experience in home design plans (*see* Cuozzo Decl. ¶¶ 2, 4, ECF No. 69-2 at Pg ID 3756-57) to testify regarding the components of architectural works and to opine on the similarities between the relevant plans. With this evidence (i.e., the testimony of Design Basics' expert, Matthew McNicholas, and Cuozzo), there is a genuine issue of material fact with respect to substantial similarity and whether the Copyrighted Works contain protectable elements. Further, after conducting a side-by-side comparison of the plans and examining the purported differences, the Court believes the issue of substantial similarity is best left for the trier of fact. *See Kohus*, 328 F.3d at 853 (quoting *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984)) (explaining that "[i]n copyright infringement cases 'granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly[.]'"); *see also Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) ("Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation[.]").

For these reasons, the Court concludes that Defendants are not entitled to summary judgment on Design Basics' copyright infringement claims.

### Digital Millennium Copyright Act

**\*13** Design Basics alleges that Defendants distributed architectural plans that were copies and/or derivatives of Design Basics' plans for which the CMI had been removed and/or omitted. (*See* Compl. ¶¶ 42-44, ECF No. 1 at Pg ID 10.)

As relevant to Design Basics' claim, the DMCA provides:

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 31 of 59

Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

**Removal or alteration of copyright management information.** No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b). [10] The statute defines CMI as the information conveyed in connection with copies of a work, such as its title, author, copyright owner, the terms and conditions for use of the work, and identifying numbers or symbols referring to the work's copyright information. *Id.* § 1202(c)(3). A plaintiff alleging a violation of § 1202(b) must show: (1) the existence of CMI on the infringed work; (2) removal and/or alteration of that information; (3) that the removal and/or alteration was done intentionally; and (4) that the removal was done with knowledge or reason to know that it will induce, enable, facilitate, or conceal an infringement. *See Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 376-77 (S.D.N.Y. 2019); *Janik v. SMG Media, Inc.*, No. 16 Civ. 7308, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018).

[10]    In response to Defendants' summary judgment motion, Design Basics argues that it also alleges a violation of subsection (a) of the statute, which prohibits providing CMI that is false or distributing or importing for distribution CMI that is false. 17 U.S.C. § 1202(a). Based on the allegations in the Complaint, the Court fails to see how Design Basics alleges conduct falling within this section. Nowhere does Design Basics assert that Defendants displayed or distributed architectural plans with false CMI. Design Basics does not elaborate on the substance of its purported §

1202(a) claim in its brief. (ECF No. 69 at Pg ID 3732.)

Defendants maintain that Design Basics' DMCA claim fails because it lacks evidence that Defendants removed CMI from Design Basics' "product or *original* work." (ECF No. 63 at Pg ID 2916 (emphasis added by Defendants) (quoting *Design Basics, LLC v. WK Olson*, No. 1:17-cv-7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019)) ("An action for removal of copyright management information requires the information to be removed from a plaintiff's product or original work.").) In *WK Olson*, the court explained that "basing a drawing on another's work is not the same as removing copyright management information[.]" 2019 WL 527535, at *5 (quoting *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-00496, 2014 WL 5798282, at *5 (D. Haw. Nov. 7, 2014)). As the district court explained in *Frost-Tsuji Architects*: " 'Virtually identical' plans could have been created by redrawing [the plaintiff]'s plans and not including [the plaintiff]'s copyright management information, but that would not involve any removal or alteration of copyright management information from [the plaintiff]'s original work." 2014 WL 5798282, at *5; *see also Kirk Kara Corp. v. W. Stone & Metal Corp.*, No. cv-20-1931, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) (dismissing the plaintiff's DMCA claim even though "the works may be substantially similar," because the "[d]efendant did not make identical copies of [the p]laintiff's works and then remove the engraved CMI"). As Design Basics alleges only that Defendants "removed and/or omitted [CMI] from *copies* of [Design Basics'] works" (Compl. ¶¶ 42, 44, ECF No. 1 at Pg ID 10), Defendants argue that they are entitled to summary judgment on Design Basics' DMCA claim.

**\*14** Design Basics responds that this interpretation of the statute is contrary to its intent and case law interpreting it, which hold that liability attaches where a party intentionally omits CMI or facilitates the omission of CMI. (ECF No. 69 at Pg ID 3731 (citing *GC2 Inc. v. Int'l Game Tech, PLC*, 255 F. Supp. 3d 812, 822 (N.D. Ill. 2017); *Agence France Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011)).) In *GC2 Inc.*, however, the defendant was alleged to have removed CMI from electronic copies of the plaintiff's original artwork. 255 F. Supp. 3d at 816-17, 821. Similarly, in *Agence France Presse*, the plaintiff posted the defendant's photographs on its online database, designating the plaintiff and an image licensing company as licensing agents and a third party as the photographer. 769 F. Supp. 2d at 299-300. As such, neither case suggests that the statute applies when CMI is removed or omitted from non-original work.

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 32 of 59

**Design Basics, LLC v. Mitch Harris Building Co., Inc., Not Reported in Fed. Supp. (2021)**
2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

As Design Basics does not allege that Defendants removed or omitted CMI from Design Basics' original works, the Court is granting summary judgment to Defendants with respect to Count IX of the Complaint.

### Conclusion

In summary, the Court finds spoliation sanctions unwarranted in this matter. Design Basics shows that its "late" disclosure of its expert and his report was substantially justified as it was in accordance with the parties' agreement. Thus, the Court declines to strike the expert's testimony or his report. Finally, Defendants fail to show that they are entitled to summary judgment based on their statute of limitations and ownership defenses. The Court finds a genuine issue of material fact with respect to whether Defendants copied Design Basics' 2761 Mayberry or 1748 Sinclair plans. Defendants are entitled to summary judgment, however, with respect to Design Basics' DMCA claim.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss for Spoliation of Evidence (ECF Nos. 57, 58) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Expert and Expert Report (ECF No. 60) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF Nos. 62, 63) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2021 WL 5563981, 2021 Copr.L.Dec. P 31,924

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 3

2014 WL 12558253
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

PRICE

v.

PEERSON, et al.

Case No. CV 13-3390 PSG (JEMx)
|
Filed 04/23/2014

**Attorneys and Law Firms**

Norwood Price, Burbank, CA, pro se.

Chung Hae Han, Terrence Matthew Jones, AUSA—Office of U.S. Attorney, Los Angeles, CA, Jonathan R. Babione, Michelle R. Ferber, Frankel Goldware Ferber LLP, San Ramon, CA, for Peerson, et al.

**Proceedings: (In Chambers) Order
GRANTING Defendant's Motion for Summary
Judgment and DENYING Plaintiff's Motion
for Sanctions for Spoliation of Evidence**

The Honorable Philip S. Gutierrez, United States District Judge

 **\*1** Pending before the Court is Defendant Michael Peerson's motion for summary judgment, *see* Dkt. # 73, and Plaintiff Norwood Price's motion for sanctions for spoliation of evidence against the United States Marshals Service and the United States Department of Justice, *see* Dkt. # 79. The Court finds the matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); L.R. 7-15. After considering the supporting, opposing, and reply papers, the Court GRANTS the motion for summary judgment and DENIES the motion for sanctions for spoliation of evidence.

I. Introduction
This case arises out of an interaction between Plaintiff Norwood Price ("Plaintiff"), appearing *pro se*, Defendant Michael Peerson ("Defendant" or "Deputy Peerson") at the federal courthouse located at 312 N. Spring Street, Los Angeles, California ("Spring Street Courthouse" or "Courthouse"). In short, Plaintiff contends that after he asked Deputy Peerson about a security policy that required Plaintiff

to remove his shoes when entering the Courthouse, Deputy Peerson directed three Court Security Officers ("CSOs") to seize and remove Plaintiff from the Courthouse. Dkt. # 87.

Based on these alleged events, Plaintiff filed this action against Deputy Peerson, the CSOs who allegedly seized and removed Plaintiff from the Courthouse, Akal Security, Inc. ("Akal") as the CSOs' employer, and the Government, asserting claims for: (1) a *Bivens* [1] violation of the First Amendment right to redress grievances to government without retaliation; (2) a *Bivens* violation of the Fourth Amendment right to be free from unreasonable seizure; (3) supervisor liability pursuant to *Bivens*; (4) false imprisonment; (5) negligence; and (6) violations of the Bane Act, Cal. Civ. Code § 52.1. Dkt. # 1.

[1]  The term "*Bivens*" refers to the United States Supreme Court's decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

A. Procedural Background
On July 12, 2013, Deputy Peerson and the Government moved to dismiss Plaintiff's Complaint. Dkt. # 13. The Court granted the motion on August 28, 2013. Dkt. # 19. As to Plaintiff's claims against the Government for false imprisonment and negligence, the Court held that it lacked jurisdiction because the Government could not be held responsible under the Federal Tort Claims Act ("FTCA") for acts of the CSOs because they were employees of Akal, an independent contractor to the United States Marshal Service. *Id.* The Court dismissed these claims without leave to amend. *Id.* As to Plaintiff's claims against Deputy Peerson for violations of the First and Fourth Amendments, supervisory liability, and violations of the Bane Act, the Court dismissed these claims as well. *Id.* However, the Court granted Plaintiff leave to amend. *Id.*

Plaintiff then filed a First Amended Complaint ("FAC") reasserting claims against Deputy Peerson for violations of the First and Fourth Amendments, supervisory liability, and violations of the Bane Act. Dkt. # 22. Plaintiff also moved for reconsideration of the Court's August 28, 2013 Order. Dkt. # 29. Plaintiff's motion challenged the Court's prior dismissal of his FTCA claims against the Government for lack of subject matter jurisdiction, along with his Fourth Amendment claim against Deputy Peerson. *Id.*

**\*2** On November 20, 2013, the Court denied in part and granted in part the motion for reconsideration. Dkt. # 43. The Court denied the motion as to Plaintiff's FTCA claims against the Government, but granted the motion in order to correct the erroneous legal standard applied to Plaintiff's Fourth Amendment claim against Deputy Peerson. *Id.*

Two days later, the Court granted in part and denied in part Deputy Peerson's motion to dismiss the FAC. Dkt. # 45. The Court denied the motion as to Plaintiff's First Amendment, Fourth Amendment, and supervisory liability claims against Deputy Peerson. *See id.* However, the Court granted the motion to dismiss, without prejudice, as to Plaintiff's Bane Act claims against Deputy Peerson. *Id.* at 17-18. With respect to those claims, the Court found that Plaintiff had failed to adequately plead any of the required elements of a Bane Act claim against Deputy Peerson. *Id.*

Plaintiff then filed a Second Amended Complaint ("SAC"), attempting to further specify his Bane Act claims against Deputy Peerson. Dkt. # 47. However, because Plaintiff failed to make any material corrections to those claims, the Court granted Defendant's motion to dismiss the Bane Act claims with prejudice. Dkt. # 63.

Deputy Peerson ("Defendant") now moves for summary judgment as to Plaintiff's remaining claims against him for *Bivens* violations under the First and Fourth Amendments, and supervisory liability as to those purported violations. Dkt. # 73. In addition to Defendant's motion, Plaintiff moves for sanctions against Defendant and the United States Marshals Service for spoliation of evidence. Dkt. # 79. Before turning to the merits of the motions, the Court reviews the factual background of both motions.

### B. Factual Background

Except for one extremely material fact, the facts of this case are largely undisputed. On September 20, 2011, Plaintiff entered the Spring Street Courthouse. *See Defendant's Statement of Uncontroverted Facts* ("*DSUF*") # 1. After a magnetometer search of Plaintiff's person, and an x-ray search of the various accoutrements Plaintiff carried with him that day, Plaintiff walked down a hallway leading to the United States Marshals Service ("USMS") office. *Id.* # 3. At the USMS office window, Plaintiff pressed a buzzer in order to alert the USMS of his presence, *id.* # 4, causing Defendant to approach the window, *id.* # 8. Plaintiff asked Defendant whether he knew "the name of the person who sets the shoe-removal policy for [the Spring Street Courthouse]." *See*

*Price Depo.* 51:3-6. Defendant answered Plaintiff by referring him to a placard posted at the entrance to the Courthouse that detailed information relevant to Plaintiff's question. *See DSUF* # 11. Defendant also motioned with his arm toward the entrance of the Courthouse in order to specifically direct Plaintiff to the location of the placard. *Id.*

At the same time, CSO Mike Soffarelli ("CSO Soffarelli"), who was stationed in the CSO communication center inside the Spring Street Courthouse, watched these events unfold on a camera monitor located inside the communication center. *Id.* ## 15-16. As CSO Soffarelli viewed the interaction between Plaintiff and Defendant, he saw Defendant "motion[ing] [with] his arm" in response to Plaintiff's question about the shoe-removal policy, which CSO Soffarelli interpreted as a signal to "tell [Plaintiff] to leave the lobby of the [USMS] office [area]." *Id.* # 18 (citing *Soffarelli Depo.* 19:11-19).

**\*3** CSO Soffarelli then radioed a CSO to immediately respond to the USMS office in order to "assist [Plaintiff] who appear[ed] to be disruptive." *DSUF* # 19 (citing *Soffarelli Depo.* 24:7-15). Three CSOs responded to CSO Soffarelli's radio call: Lead CSO William Wallace ("CSO Wallace"), CSO Steven McGrath, and CSO Pote Pigulsawas. *Id.* # 20. All three of these CSOs allegedly stopped Plaintiff outside the USMS office, asked him for his driver's license, and eventually escorted him out of the Courthouse. *See Plaintiff's Statement of Undisputed Facts* ("*PSUF*") ## 35, 39, 43; *see also* Dkt. # 92, Ex. A. And this is where the parties' agreement as to the facts of this case ends.

On the one hand, Defendant claims that the sole reason the CSOs stopped Plaintiff outside the USMS office was in response to CSO Soffarelli's radio call. *See DSUF* # 21 (citing *Wallace Decl.* ¶ 3; *McGrath Decl.* ¶ 3; *Pigulsawas Decl.* ¶ 3). In support of this conclusion, Defendant avers that he did not speak to the CSOs about Plaintiff, or ask the CSOs to stop Plaintiff outside the USMS office. *See DSUF* ## 22-23 (citing *Peerson Decl.* ¶ 5). Defendant even claims that he had no independent knowledge of any contact between Plaintiff and the CSOs. *See DSUF* # 24 (citing *Peerson Decl.* ¶ 8).

On the other hand, Plaintiff claims that the sole reason the CSOs stopped him outside the USMS office was because Defendant informed CSO Wallace that Plaintiff had "caused a disturbance" and then ordered CSO Wallace to seize Plaintiff. *See PSUF* # 36. In support of this factual conclusion, Plaintiff refers the Court to four sources of "evidence": (1) allegations contained in the SAC; (2) his

Price v. Peerson, Not Reported in Fed. Supp. (2014)

2014 WL 12558253

own deposition transcript recounting certain statements CSO Wallace allegedly made to him; (3) his own declaration recounting CSO Wallace's alleged statements; and (4) letters of "administrative complaint" that Plaintiff filed with the USMS. *See id.* ## 20, 36. Plaintiff further claims that Defendant watched the CSOs encircle him, demand his driver's license, and escort him out of the Courthouse. *See id.* ## 35, 38, 43.

With the factual and procedural background of this action well set, the Court proceeds to the merits of Defendant's motion for summary judgment and Plaintiff's motion for sanctions for spoliation of evidence. *See* Dkts. ## 73, 79. The Court first considers Defendant's motion, and then turns to Plaintiff's motion.

## II. Defendant's Motion for Summary Judgment

### A. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden to demonstrate the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the nonmovant must set forth specific evidence showing that there remains a genuine issue for trial, and "may not rest upon mere allegation or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The showing each party must make at the summary judgment stage depends on which party bears the burden of proof at trial on a particular issue. *See Celotex*, 477 U.S. at 325; *In re Brazier Forest Prods., Inc.*, 921 F.2d 221, 223 (1990). The moving party always bears the initial burden of informing the court of the basis for its motion and identifying the evidence on the record that it believes shows an absence of a genuine issue of fact. *Celotex*, 477 U.S. at 323. However, "if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden." *Brazier*, 921 F.2d at 223 (citing *Celotex*, 921 F.2d at 323). When the nonmoving party has the burden at trial, "the burden on the moving party may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

**\*4** If the moving party points to an absence of evidence on an issue for which the nonmoving party bears the burden at trial, the nonmoving party must then respond with evidence to support all essential elements. Thus, to survive a motion for summary judgment, "[t]he nonmoving party must [ ] make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial." *Brazier*, 921 F.2d at 223 (citing *Celotex*, 477 U.S. at 322-23). If the nonmoving party fails to make such a showing, summary judgment must be granted. *Celotex*, 477 U.S. at 325. In short, a moving party may prevail on a motion for summary judgment on an issue on which the nonmoving party bears the burden by establishing that the nonmoving party does not have evidence to support its claim. *Id.*

An issue of fact is a genuine and material issue if it cannot be reasonably resolved in favor of either party and may affect the outcome of the suit. *See Anderson*, 477 U.S. at 249-50. A party asserting that a fact cannot be genuinely disputed must support that assertion by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [ ] admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A party may object that material cited would not be admissible in evidence. *See id.* 56(c)(2). Admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible in evidence, and must show that the declarant or affiant is competent to testify on the matters stated. *See id.* 56(c)(4).

### B. Discussion

Defendant offers a straightforward theory in support of his motion for summary judgment: Under *Bivens*, Plaintiff must show that Defendant violated his First and Fourth Amendment rights by ordering the CSOs to seize and remove Plaintiff from the Spring Street Courthouse; however, because Plaintiff cannot show, pursuant to his burden on summary judgment, that Defendant directed the CSOs to seize and remove Plaintiff from the Courthouse, Defendant is entitled to judgment as a matter of law. *See* Dkt. # 73. For the reasons explained *infra*, the Court agrees with Defendant —Plaintiff fails to create a triable issue as to Defendant's purported involvement in Plaintiff's alleged seizure and removal from the Courthouse, so Defendant's motion for summary judgment must be granted. *See Brazier*, 921 F.2d at 223; *see also Celotex*, 477 U.S. at 322-23.

Case 4:21-cv-02473 Document 143 Filed 06/23/25 in TXSD Page 37 of 59

Price v. Peerson, Not Reported in Fed. Supp. (2014)
2014 WL 12558253

### i. Plaintiff's Bivens *Claims Fail on Summary Judgment*

Plaintiff brings three causes of action against Defendant. Plaintiff not only claims that Defendant violated his First and Fourth Amendment rights pursuant to *Bivens*, *see FAC* ¶¶ 24-38, but he also brings a supervisory liability claim under *Bivens* as well, *see id.* ¶¶ 39-41. As a general matter, *Bivens* establishes that victims of a constitutional violation by a federal officer have a right to recover damages against the official despite the absence of a statute conferring such a right. *Bivens*, 403 U.S. at 396. A cause of action under *Bivens* is thus a judicially created counterpart to a civil rights action under 42 U.S.C. § 1983 for claims against federal officers, who ordinarily do not act under color of state law. *Gibson v. United States*, 781 F.2d 1334, 1341 (9th Cir. 1986).

*Bivens* itself provides for a private right of action for violations of the Fourth Amendment. *Bivens*, 403 U.S. at 392-97. The *Bivens* right of action has also been extended to address violations of the First Amendment, *see Gibson*, 781 F.2d at 1342, and for supervisory liability claims, *see Hansen v. Black*, 885 F.3d 642, 646 (9th Cir. 1989). In all of these cases—whether under the First Amendment, the Fourth Amendment, or for a supervisory liability claim—a plaintiff must show that a federal officer participated, in some meaningful way, in the constitutional deprivation. So, under the Fourth Amendment, a plaintiff must show that a federal officer, by means of physical force or show of authority, restrained his or her liberty. *United States v. Orman*, 486 F.3d 1170, 1175 (9th Cir. 2007). Similarly, under the First Amendment, a plaintiff must show that a federal officer took some action that would chill or silence a person of ordinary firmness from future First Amendment activities. *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1231-232 (9th Cir. 2006). And, in the same vein, for a supervisory liability claim under either constitutional claim, a plaintiff must show that the federal officer personally participated in the deprivation. *Taylor v. List*, 880 F.2d 1040, 1045. In other words, a federal officer is liable only for his own misconduct—the term "supervisory liability" is merely a misnomer. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

**\*5** Applying these principles to the instant case, Plaintiff must therefore make some showing that Defendant specifically, rather than the CSOs more generally, deprived him of his First and Fourth Amendment rights. Indeed, based on the factual averments discussed *supra*, Defendant has already discharged his initial burden on summary judgment to

suggest an absence of evidence to support Plaintiff's case. *See Celotex*, 477 U.S. at 325. Defendant shows through various forms of admissible evidence that the sole reason the CSOs contacted Plaintiff was in response to CSO Soffarelli's radio call, rather than any directive he personally issued. *See Mot.* 1:23-2:4; *see also DSUF* ## 21-23. For example, Defendant and the CSOs have all declared under penalty of perjury that Defendant did not participate in Plaintiff's alleged seizure by summoning or directing the CSOs to contact Plaintiff outside of the USMS office. *See Peerson Decl.* ¶¶ 5-8; *Wallace Decl.* ¶ 3; *McGrath Decl.* ¶ 3; *Pigulsawas Decl.* ¶ 3. Rather, CSO Soffarelli alerted the CSOs to Plaintiff's "disruption" outside the USMS office. *See DSUF* ## 18-20.

Without question, though, Plaintiff has not met his burden to create a triable issue of fact as to Defendant's participation in the alleged constitutional deprivations. *See* Dkts. ## 87-88. More than any other purported fact, Plaintiff attempts to create a dispute of material fact as to all claims raised against Defendant through a single statement allegedly made by CSO Williams. *See Opp.* 9:25-28, 12:18-23, 13:8-13, 15:14-16, 18:16-19, 25:13-15. Plaintiff avers that when the CSOs stopped him outside the USMS office, CSO Williams told him that Defendant had summoned and ordered the CSOs to seize him because he had created a "disturbance." *Id.* 12:18-23 (citing *Price Depo.* 56:24-73:17; *Price Decl.*; *SAC* ¶¶ 13-18; *Reply*, Ex. A); *see also DSUF* ## 20-24. In Plaintiff's declaration, for instance, he states: "I ask [CSO Wallace] who is the person who claims that there was a disturbance? I am told by [him] that it was the person I just spoke to—[Deputy] Peerson." *See Price Decl.* at 2; *see also Plaintiff's Statement of Genuine Issues* 2:20-22 ("Plaintiff *states* [CSO] Wallace *stated* that [Deputy] Peerson *claims* Plaintiff has caused a 'disturbance.' ") (emphasis added).

But as the Federal Rules of Civil Procedure clearly explain, along with longstanding Supreme Court precedent, hearsay statements such as this will not do at the summary judgment phase. *See* Fed. R. Civ. P. 56(c)(2); *see also Celotex*, 477 U.S. at 324. CSO Wallace's alleged statement was not only made out of court, but Plaintiff now uses it to prove the truth of the matter asserted, *to wit*, to show that Defendant did in fact order the CSOs to seize him outside the USMS office. [2] *See* Fed. R. Evid. 801(c).

[2] The Court has also considered whether CSO Wallace's alleged statement contains independent legal significance and therefore constitutes a "verbal act." However, the Court finds that it does

Case 4:21-cv-02473 Document 143 Filed 06/23/25 in TXSD Page 38 of 59

Price v. Peerson, Not Reported in Fed. Supp. (2014)

2014 WL 12558253

not. Unlike a statement authorizing consent to a Fourth Amendment seizure, CSO Wallace's alleged statement that Plaintiff had caused a "disturbance" does not have inherent legal significance. *Cf. United States v. Moreno*, 233 F.3d 937, 940 (7th Cir. 2000) (finding that defendant's statements giving consent to search and then retracting the consent were verbal acts admissible as nonhearsay).

Furthermore, Plaintiff is not saved by any exception to the hearsay rule. While the Court recognizes that CSO Wallace is also a named defendant in this action, his "admission" may not be used against Defendant as a co-party in this action. *See* Fed. R. Evid. 801(d)(2); *see also United States v. Sauza-Martinez*, 217 F.3d 754, 758 (9th Cir. 2000); *Lundquist v. United States*, No. 96-35219, 1997 U.S. App. LEXIS 16204, at *9 (9th Cir. 1997) ("We agree with the general rule that one party's admissions ordinarily may not be used against a co-party."). As such, Plaintiff may not rely on this hearsay statement, or any other similar statement raised in Plaintiff's deposition transcript, declarations, pleadings, or letters of administrative complaint, *see Opp.* 9:26-28, in order to create a triable issue as to Defendant's alleged role in violating Plaintiff's constitutional rights, *see* Fed. R. Civ. P. 56(c)(2); *Kim v. United States*, 121 F.3d 1269, 1276-77 (9th Cir. 1997) (finding that plaintiff relied on "inadmissible hearsay testimony" that could not be considered in opposing summary judgment); *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 345 n.4 (9th Cir. 1995) ("[I]nadmissible hearsay evidence may not be considered on ... summary judgment.").

**\*6** To the extent Plaintiff relies on additional "evidence" to defeat Defendant's summary judgment motion, these attempts fail too. Plaintiff mentions that Defendant should be subject to liability under the Fourth Amendment specifically because he allegedly watched the interaction between Plaintiff and the CSOs on his video monitor. *See PSUF* # 38. However, Plaintiff offers only his own testimony in support of this contention, despite his lack of personal knowledge as to whether Defendant watched the interaction, or even whether Defendant has a monitor to do so. *See* Fed. R. Evid. 602 (lack of personal knowledge); *see also* Fed. R. Evid. 702 (improper opinion testimony).

Plaintiff also raises a plethora of nonmaterial facts, including "contradictions" and "conflicting statements" in the unauthenticated court facility incident report authored by CSO Williams. *See Opp.* 6:8-9:21. For example, Plaintiff avers that the court facility incident report creates a dispute

of material fact regarding Defendant's involvement in the seizure because it shows that Defendant "was about to ask [Plaintiff] to leave" and "was pleased to see the CSOs respond." *See Opp.*, Ex. B. But these statements do not fairly suggest, even when read in the light most favorable to Plaintiff, that Defendant directed the CSOs to seize Plaintiff, or even summoned the CSOs in order to speak with Plaintiff. In fact, just as Defendant's deposition testimony suggests, Defendant might have been "pleased" simply because the CSOs responded to Plaintiff on their own accord. *See Peerson Depo.* 56:6-11. Any other interpretation, such as Plaintiff's hypotheses here, amount to nothing more than allegation and speculation. *See* Fed. R. Evid. 602; *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

So while the list could go on-and-on, as Plaintiff fills many pages of his opposition brief with additional disputes of nonmaterial facts, *see Opp.* 7:21-9:10, the Court proceeds no further. *See also Plaintiff's Statement of Genuine Issues* 3:12-5:23. The Court has reviewed the entire record before it and cannot find even a scintilla of admissible evidence suggesting that Defendant instructed the CSOs to seize or remove Plaintiff from the Spring Street Courthouse. Without such evidence, Plaintiff has failed to create a triable issue as to any of his claims under *Bivens* for violations of the First and Fourth Amendments, and for supervisory liability based on those purported violations. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (party opposing summary judgment must present "significant probative evidence tending to support its claim that material, triable issues of fact remain"); *see also Brazier*, 921 F.2d at 223 ("The nonmoving party must [ ] make a sufficient showing to establish the existence of all elements ... on which they will bear the burden of proof at trial."). The Court therefore GRANTS Defendant's motion for summary judgment, and proceeds to Plaintiff's sanctions motion.

III. Plaintiff's Motion for Sanctions for Spoliation of Evidence

A. Legal Standard

A party's destruction of evidence qualifies as spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotations omitted). The court has two inherent bases of authority to impose sanctions for the

Price v. Peerson, Not Reported in Fed. Supp. (2014)

2014 WL 12558253

spoliation of evidence. The Court has the inherent power to levy sanctions in response to abusive litigation practices. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980). The Court can also sanction a party for failure to comply with court-ordered discovery pursuant to Rule 37(b) of the Federal Rules of Civil Procedure.

**\*7** Among the sanctions the Court may impose for spoliation of evidence are attorneys' fees and an adverse inference jury instruction. *See Chambers v. NASCO*, 501 U.S. 32, 44-45 (1991); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). A number of California district courts have adopted the Second Circuit's three-part test for determining whether the court should issue such a sanction. This test requires the party seeking the sanction to establish that (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed, (2) the records were destroyed with a culpable state of mind, and (3) the destroyed evidence was relevant to the action. *See id.* at 107; *In re Napster*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006); *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490, 2005 U.S. Dist. LEXIS 40088, at \*3, 9-10 (N.D. Cal. Dec. 20, 2005).

### B. Discussion

Plaintiff here seeks attorneys' fees, among other remedies, on the ground that Defendant, the Department of Justice, and the USMS more generally, "destroyed"[3] the video recordings of his interactions with Defendant and the CSOs during his visit to the Spring Street Courthouse on September 20, 2011. *See* Dkt. # 79. But even assuming, *arguendo*, that the video recordings are relevant to Plaintiff's constitutional claims, Plaintiff has failed to establish that Defendant, the USMS, or the Department of Justice did in fact commit spoliation, *i.e.*, that they destroyed the video recordings at a time when they were obligated to preserve them. *See Kitsap Physicians Serv.*, 314 F.3d at 1001; *Residential Funding Corp.*, 306 F.3d at 107.

[3]  As Magistrate Judge McDermott found in denying Plaintiff's motion to compel Department of Justice employees to testify regarding the recordings, *see* Dkt. # 76, the video footage was <u>not "destroyed," but merely recorded over,</u> *see* Dkt. # 86.

A party's obligation to preserve evidence may be triggered by prospective litigation. *See In re Napster*, 462 F. Supp. 2d at 1067 ("As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the

action."); *see also Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (defining inquiry as whether party that destroyed documents "was on notice that the [documents] had potential relevance to litigation"). However, courts have routinely held that to trigger such an obligation, the future litigation must be "probable," meaning "more than a possibility." *See In re Napster*, 462 F. Supp. 2d at 1068 (finding that defendant's duty to preserve evidence attached when plaintiff informed defendant that plaintiff would file suit if defendant did not "instantaneously comply" with the terms of the injunction); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1061 (N.D. Cal. 2006) (suggesting that the prospective litigation must be "more than a possibility" because "[l]itigation 'is an ever-present possibility in American life' ").

Although Plaintiff's argument here is far from clear, he appears to argue that prior to the filing of this action in May 2013, Defendant, the Department of Justice, and the USMS were aware of the potential for litigation, thus triggering their duty to preserve the video recordings. Dkt. # 79. To demonstrate their awareness of the litigation, Plaintiff points to multiple letters of "administrative complaint" that he filed with the USMS, all of which detail Plaintiff's allegations of the incident and request that the video recordings be retained and preserved. *See id.* 1:5-2:4; *see also id.*, Ex. A. Plaintiff's September 21, 2011 letter, for example, states that "[t]his a formal complaint against one your employees—[Deputy] Peerson" and further notes that in order "[t]o settle this matter, I wish that [the USMS] investigate and 'pull' the video/audio of this incident." *Id.*

**\*8** Notably, however, none of Plaintiff's letters, ranging from September 21, 2011 to March 20, 2012, threaten the USMS with litigation. *Cf. Washington Alder LLC v. Weyerhaeuser Co.*, No. CV 03-753-PA, 2004 WL 4076674, at \*1 (D. Or. 2004) (finding letter from plaintiff threatening to sue for antitrust violations put defendant on notice of possible litigation and triggered duty to preserve). Plaintiff's letters do not even mention the possibility of litigation. *See generally Mot.*, Ex. A; *cf. In re Napster*, 462 F. Supp. 2d at 1068. In fact, the letters read the opposite way, as Plaintiff clearly states in the September 21, 2011 letter his willingness to "settle" his administrative complaints with the USMS. *See Mot.*, Ex. A at 11; *id.*, Ex. A. at 14 (stating in October 4, 2011 letter that "I hope this matter can be resolved to everyone's satisfaction and [USMS] can learn from the mistakes of others[.]"). Non-litigious statements like these did not notify Defendant, the Department of Justice, or the USMS of the potential for future

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 40 of 59

Price v. Peerson, Not Reported in Fed. Supp. (2014)
2014 WL 12558253

litigation. *See Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007) (holding that a letter that did not threaten litigation and instead suggested a non-litigious solution did not trigger duty to preserve); *accord Indiana Mills & Mfg., Inc. v. Dorel Indus., Inc.*, No. 1:04-CV-01102-LJM-WTL, 2006 WL 1749410, at *4 (S.D. Ind. 2006); *Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co.*, No. Civ. 96-1041 WGB, 1997 WL 33768546, at *3 (D. N.J. 1997).

What's more, Plaintiff waited nearly two years after filing his September 21, 2011 letter of administrative complaint to bring the instant lawsuit. *Compare Mot.*, Ex. A *with* Dkt. # 1. That delay, paired with the nebulous nature of Plaintiff's letters of administrative complaint, deracinates Plaintiff's contention that Defendant, the Department of Justice, or the USMS should have anticipated litigation as early as September 2011, and thus had a duty to preserve the video recordings as of that date. *See, e.g., Land O'Lakes, Inc.*, 244 F.R.D. at 623 (noting that a two year delay between lawsuit and first purported threat of litigation undermined defendant's alleged awareness of litigation and duty to preserve evidence).

Indeed, to reach any other conclusion would subject all putative defendants to an evidentiary Catch-22, as the *Land O'Lakes* Court explained:

> [A] party's duty to preserve evidence in advance of litigation must be predicated on something more than an equivocal statement of discontent, particularly when that discontent does not crystalize into litigation for nearly two years. Any other conclusion would confront a putative litigant with an intractable dilemma: either preserve voluminous records for an indefinite period at potentially great expense, or continue routine document management practices and risk a spoliation claim ... in the future.

*Id.* Therefore, under the particular facts of this case, the Court cannot find that Plaintiff's letters of administrative complaint triggered a duty to preserve the video recordings at issue here. *See id.*; *Indiana Mills*, 2006 WL 1749410, at *4; *Claude P. Bamberger Int'l, Inc.*, 1997 WL 33768546, at *3; *see also*

*Tidenberg v. Bidz.com, Inc.*, No. CV 08-5553 PSG FMOx, at *6-11 (C.D. Cal. Dec. 1, 2009). The duty to preserve evidence requires more than a mere possibility of litigation.

The only remaining question, then, is when Defendant, the Department of Justice, and the USMS were actually put on notice of more than a possibility of litigation, thus triggering their duty to preserve the video recordings. At best, it appears that Defendant and the USMS were notified of the potential for future litigation when Plaintiff filed a follow-up letter with the USMS on May 25, 2012. *See Mot.*, Ex. A at 17. In this letter, unlike Plaintiff's prior letters, Plaintiff lucidly threatens future litigation, stating: "It is best for your agency to limit the possibility of a *civil complaint* by acknowledging the existence of any and all damages. If I cannot get a response from your agency, I will be forced to seek *judicial authority.*" *Id.* (emphases added); *see Washington Alder LLC*, 2004 WL 4076674, at *1 (holding that letter from plaintiff threatening to sue triggered duty to preserve evidence).

**\*9** Nonetheless, by the time Plaintiff sent the May 25, 2012 letter there was nothing that Defendant or the USMS could do to preserve the video recordings. As Judge McDermott recently declared in denying Plaintiff's motion to compel, the security cameras located in the Spring Street Courthouse are maintained on a "30 day loop," meaning that the cameras continually record, and any footage not recovered after 30 days cannot be retained thereafter. *See* Dkt. # 86 at 1. So even if Defendant or the USMS had acted on Plaintiff's May 25, 2012 request to preserve the video recordings, they would not have been able to preserve, or even retrieve, such evidence after October 20, 2011.

For these reasons, Plaintiff cannot establish that Defendant, the USMS, or the Department of Justice committed spoliation of evidence. *See, e.g., Tidenberg*, No. CV 08-5553 PSG FMOx, at *12 (finding no spoliation because defendant disposed of the evidence pursuant to routine disposal protocol prior to learning of impending litigation). Plaintiff's motion for sanctions for spoliation of evidence is therefore DENIED.

IV. Conclusion

Accordingly, the Court GRANTS Defendant Michael Peerson's motion for summary judgment and DENIES Plaintiff's motion for sanctions for spoliation of evidence.

**IT IS SO ORDERED.**

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 41 of 59

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12558253

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 4

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

2023 WL 4532803
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Dennis BURBACK; Ken Eddy; Mark
Andersen, Plaintiffs—Appellants,

v.

Jordan BROCK; Four Oceans Holding, Incorporated;
Elepreneurs U.S., L.L.C.; Elevacity U.S., L.L.C.;
Sharing Services Global Corporation, formerly known as
Sharing Services, Incorporated, Defendants—Appellees.

No. 22-40609
|
FILED July 13, 2023

Appeal from the United States District Court for the Eastern
District of Texas, USDC No. 4:20-CV-946

**Attorneys and Law Firms**

Stephen W. Abbott, Attorney, Brent Taylor Caldwell, Bayko,
Prebeg, Faucett & Abbott, P.L.L.C., Houston, TX, for
Plaintiffs—Appellants.

John Whitney Bowdich, Esq., Bowdich & Associates,
P.L.L.C., Dallas, TX, Andrew Paul Speicher, Figari &
Davenport, L.L.P., Dallas, TX, for Defendant—Appellee
Jordan Brock.

Janet Douvas Chafin, Jackson Walker, L.L.P., Houston, TX,
Blake Dietrich, Jackson Walker, L.L.P., Dallas, TX, for
Defendants—Appellees Four Oceans Holding, Incorporated,
Elepreneurs U.S., L.L.C., Elevacity U.S., L.L.C., Sharing
Services Global Corporation.

Before King, Smith, and Elrod, Circuit Judges.

**Opinion**

Per Curiam:[*]

[*]    This opinion is not designated for publication. See
       5th Cir. R. 47.5.

 **\*1** Plaintiffs appeal the dismissal of their claims alleging
securities fraud in connection with two investment schemes.
For the following reasons, we AFFIRM.

**I. Factual Background**

Plaintiffs-Appellants Dennis Burback, Ken Eddy, and
Mark Andersen ("Plaintiffs") are individual investors who
participated in two securities-related transactions that they
allege were actually part of two fraudulent schemes. The
first scheme involved the use of promissory notes (the "Note
Scheme"), while the second scheme is alleged to have been
related to the first and involved the purchase of stock (the
"Stock Scheme").

The Note Scheme was carried out by Robert Oblon and
Defendant-Appellee Jordan Brock, who are both alleged
to have convinced Plaintiffs to purchase promissory notes
based on false representations and insufficient disclosures.
Specifically, Oblon represented to Plaintiffs that FourOceans
Global, LLC ("Global"), a multilevel marketing travel
company that he founded, was insolvent and on the brink of
collapse and that Plaintiffs' investments were critical to its
survival. In September 2015, Plaintiffs each entered into a
note purchase agreement promising various forms of payment
from and equity ownership in Global in exchange for $33,333.
Plaintiffs allege that they were misled by Oblon and Brock as
to the legitimacy of Global's business in the months leading
up to their signing the note purchase agreements. By March
2016, it "became apparent to Plaintiffs" that Global "would be
a failure." Around this time, Oblon transferred Global's assets
to Defendants-Appellees Elevacity U.S., L.L.C. ("Elevacity")
and Elepreneurs U.S., L.L.C. ("Elepreneurs"), two other
multilevel marketing companies that he founded, without
first informing Plaintiffs. Plaintiffs never received any return
on their investment, nor the return of their principal, in
connection with the Note Scheme. According to Plaintiffs,
Oblon, Brock, and others instead used this money for their
own personal gain and to make Ponzi-like payments to
investors that were similarly situated as Plaintiffs in order to
perpetuate the Note Scheme.

The Stock Scheme is alleged to have begun in about February
or March 2018. Plaintiffs had made repeated requests for
updates regarding the status of the Note Scheme, expressing
concern as to "irregularities" surrounding their investments.
In March and April 2018, Brock spoke with Eddy over the
phone, stating that no irregularities existed and that he, Oblon,
and John "JT" Thatch had a "plan" to convert Plaintiffs'
ownership and equity interests in Global into stock in a
new company, Sharing Services, Inc., founded by Oblon.
Sharing Services, Inc., which would later become Defendant-

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 44 of 59

Burback v. Brock, Not Reported in Fed. Rptr. (2023)
2023 WL 4532803

Appellee Sharing Services Global Corporation ("Sharing Services"), had already acquired Four Oceans Holding, Inc. ("Holding"), Global's successor in interest; Elevacity; and Elepreneurs in October 2017.

In June 2018, Plaintiffs attended a conference call with Brock and Jeff Bollinger. During the call, Brock explained that he and Bollinger would be taking over for Oblon as Plaintiffs' point of contact. Bollinger then told Plaintiffs that Global had since been dissolved but that Plaintiffs would receive new stock in Sharing Services. Bollinger explained, though, that Plaintiffs could not directly receive Sharing Services stock and would instead need to complete their transaction with an intermediary company so as not to raise any concerns with the SEC. According to Bollinger, as a part of this plan, Plaintiffs would have to assign their interests in Global over to Custom Travel Holdings, Inc. ("Custom Travel") if they ever wanted to recover their initial investments in the Note Scheme.

**\*2** Each Plaintiff subsequently entered into a subscription agreement in which additional consideration (apart from that already expended in the Note Scheme) was exchanged for stock in Custom Travel. Plaintiffs never received Custom Travel stock certificates. At some point prior to the subscription agreements' execution, Brock and Bollinger "made clear" to Plaintiffs that they knew that Custom Travel would soon be acquired by Sharing Services, explaining that this was not public knowledge, Plaintiffs were not supposed to know about the acquisition, but that Plaintiffs would not be in violation of SEC rules. In a June 2019 conference call, Brock informed Plaintiffs that Sharing Services would not be acquiring Custom Travel and that all of Plaintiffs' investments in connection with both the Note and Stock Schemes were lost.

In December 2020, Plaintiffs filed an 11-count complaint (the "Complaint") in the United States District Court for the Eastern District of Texas naming, *inter alia*, Holding, Elepreneurs, Elevacity, Sharing Services (collectively, the "Entity Defendants"), Brock (collectively, with the Entity Defendants, the "Defendants"), Oblon, Bollinger, Thatch, Custom Travel, and Global as defendants. The Complaint asserts claims for federal securities fraud in violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, and claims for statutory fraud, common law fraud, fraud by nondisclosure, unjust enrichment, civil conspiracy, aiding and abetting, accounting, constructive trust, and breach of fiduciary duty under Texas law. Brock and Thatch subsequently moved to dismiss the Complaint.

The district court partially granted the motions in September 2021 (the "First Dismissal Order"). The court first dismissed the federal securities fraud claim against Brock relating to the Note Scheme, holding that the claim was filed past the applicable five-year statute of repose. The court next dismissed the federal securities fraud claims against both Brock and Thatch relating to the Stock scheme, explaining that neither claim was sufficiently pleaded in accordance with the heightened pleading standards for fraud. The court then determined that the state law fraud claims were similarly not well pleaded and dismissed these claims against both defendants. The remaining claims brought against the movants were dismissed as well. Each claim that the court dismissed was dismissed without prejudice, save for the federal securities claim brought against Brock relating to the Note Scheme.

Plaintiffs filed an eight-count amended complaint in October 2021 (the "Amended Complaint") with factual allegations that, for the purpose of this appeal, mostly hew to those in the Complaint. Notably, though, Thatch is no longer named as a defendant in the Amended Complaint. Like the Complaint, the Amended Complaint contains claims for federal securities fraud, and state claims for statutory fraud, common law fraud, fraud by nondisclosure, unjust enrichment, civil conspiracy, and breach of fiduciary duty; the remaining claims from the Complaint have been eliminated. Plaintiffs bring a new claim for "joint and several liability for knowing participation and assisting in Brock's and Oblon's fraudulent conduct and breaches of fiduciary duties" in the amended complaint as well. Brock and the Entity Defendants subsequently moved to dismiss the Amended Complaint.

The court fully granted both motions in July 2022 with prejudice (the "Second Dismissal Order"). The court first addressed the claims brought against Brock, beginning by dismissing the lone federal securities fraud claim against him for the same reason it did in the First Dismissal Order, explaining that Plaintiffs again failed to meet the heightened pleading standards for fraud. The court likewise dismissed Plaintiffs' state fraud claims as it did in the First Dismissal Order. Turning to the Entity Defendants' motion, the court ruled that all claims pertaining to Brock's actions must be dismissed because it had already held that the Amended Complaint did not adequately plead the underlying claims against Brock. The court then dismissed the claims against the Entity Defendants as they pertained to Oblon, holding that the Amended Complaint failed to sufficiently link Oblon's

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

actions to the Entity Defendants. The court dismissed the remaining claims against the Defendants as well.

**\*3** Following the Second Dismissal Order, the parties filed a joint stipulation dismissing the remainder of the claims with prejudice. Plaintiffs now appeal the dismissal of their federal securities fraud claim relating to the Note Scheme against Brock in the First Dismissal Order and raise various points of error in the Second Dismissal Order.

## II. Discussion

We review a district court's grant or denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6) *de novo. Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016). To survive such a motion, a complaint must allege enough facts, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, the complaint must include "factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Conclusory statements or " 'naked assertion[s]' devoid of 'further factual enhancement' " are insufficient. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint pleading facts "that are 'merely consistent with' a defendant's liability ... 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Whether the plausibility standard has been met is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Fraud claims are subject to heightened pleading requirements. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "This Court interprets Rule 9(b) strictly, requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the

statements were made, and explain why the statements were fraudulent." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)). "Although Rule 9(b) expressly allows scienter to be 'averred generally', simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Id.* (quoting *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). "The plaintiffs must set forth specific facts supporting an inference of fraud." *Id.* (quoting *Melder*, 27 F.3d at 1102). "Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Id.* (quoting *Herrmann Holdings*, 302 F.3d at 565). "If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief. However, this luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

**\*4** Federal securities fraud claims are subject to additional pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which "enhances the particularity requirements of Rule 9(b)." *Id.*; *see* 15 U.S.C. § 78u-4(b). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, under the PSLRA,

> in any private action ... in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. [1]

*Id.* § 78u-4(b)(2)(A).

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

1       Subject to exceptions inapplicable to the case at bar. *See* 15 U.S.C. § 78u-4(b)(2)(A) & (B).

### A. The Contours of the Appeal

As an initial matter, the parties disagree as to whether Plaintiffs may challenge any of the district court's holdings in the First Dismissal Order. "If [a] district court dismisse[s] [a] claim on the merits or with prejudice, [a] plaintiff may appeal that ruling without needing to include the claim in a later amended complaint." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 724 (5th Cir. 2015) (citing *Williams v. Wynne*, 533 F.3d 360, 365 (5th Cir. 2008)); *see also* 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1476 (3d ed. 2023) ("A rule that a party waives all objections to the court's dismissal if the party elects to amend is too mechanical and seems to be a rigid application of the concept that a Rule 15(a) amendment completely replaces the pleading it amends. Without more, the action of the amending party should not result in completely denying the right to appeal the court's ruling."). But if a claim is dismissed without prejudice due to a "technical defect or voluntary withdrawal, [a] plaintiff forfeits the right to appeal if it files an amended complaint omitting that claim." *Lincoln Gen. Ins.*, 787 F.3d at 724 (citing *Wilson v. First Hous. Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978), *vacated on other grounds*, 444 U.S. 959 (1979)). Here, the First Dismissal Order dismissed the federal securities fraud claim relating to the Note Scheme against Brock with prejudice. Therefore, Plaintiffs were not required to replead that claim in order to preserve the issue of its dismissal for appeal. Accordingly, we begin by addressing the district court's dismissal of that claim, *i.e.*, Plaintiffs' only challenge to the First Dismissal Order, and then turn to Plaintiffs' appeal of the Second Dismissal Order.

### B. The First Dismissal Order

In its First Dismissal Order, the district court dismissed the federal securities fraud claim relating to the Note Scheme against Brock because it was filed outside of the time prescribed by the applicable statute of repose.

Claims arising under the Exchange Act involving "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ... may be brought not later than the earlier of ... (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). The outer, five-year bound in § 1658 is a statute of repose, which "begin[s] to run on the date of the last culpable act or omission of the defendant." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 & n.1 (2018) (alteration in original) (quoting *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017)); *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 375 n.4 (5th Cir. 2013). Any prohibited conduct or omission under § 10(b) of the Exchange Act and its attendant regulation, SEC Rule 10b-5, must occur "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Prohibited conduct or omissions are " 'in connection with' the purchase or sale of securities if there is a relationship in which the fraud and the stock sale coincide or are more than tangentially related." *Roland v. Green*, 675 F.3d 503, 520 (5th Cir. 2012) (quoting *Madden v. Cowen & Co.*, 576 F.3d 957, 965–66 (9th Cir. 2009)), *aff'd sub nom. Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014).

**\*5** The Complaint alleges that Plaintiffs executed the note purchase agreements for the Note Scheme in September 2015, more than five years before they filed the Complaint in December 2020. Plaintiffs counter that Brock engaged in post-sale "lulling activities" to cover up the fraudulent nature of the Note Scheme, becoming the latest conduct relevant to the statute of repose and occurring within five years of the Complaint's filing. Specifically, Plaintiffs point to the transfer of Global's assets to Elevacity and Elepreneurs and the later transaction where those three entities were acquired by Sharing Services. But we fail to see how those actions (and other post-September 2015 statements or conduct) were connected to the execution of the note purchase agreements. Importantly, the pleadings do not sufficiently allege a connection between these post-sale actions and the original sale, *i.e.*, that these events were all linked as parts of a fraudulent scheme. Plaintiffs rely on allegations that are either conclusory or that the heightened pleading standards of Rule 9(b) and the PSLRA deem inadequate to establish such a connection. [2]

2       Representative allegations include:
[T]he statements (and omissions) made by these defendants ... propagated the impression that Plaintiffs were investing in a legal and legitimate enterprise and not ... a scheme to take their investments and transfer

[Global's] assets, secretly or otherwise ..., to Elepreneurs, Elevacity, and/or [Holding], which were ultimately sold to [Sharing Services], with no remuneration to Plaintiffs as equity owners in [Global].

...

Each Plaintiff was presented with a unified, consistent set of exaggerations, misrepresentations and omissions about their investment, how their investments would be spent, that [Global] was an ongoing, legitimate business, and there was no mention that the assets of [Global] would be secretly transferred to one or more entities (secret or otherwise), ... which would be sold to [Sharing Services] with no remuneration as equity owners in [Global].

Plaintiffs also contend that the district court erred in considering Brock's argument that the Complaint's allegations relating to the Note Scheme and not implicated by the statute of repose were not in connection with the purchase or sale of any security. According to Plaintiffs, Brock forfeited this argument because he raised it for the first time on reply below. But this mischaracterizes the nature of Brock's argument, which was consistent throughout his briefing: that the Complaint was devoid of well-pleaded allegations concerning the Note Scheme occurring within five years of its filing. In the opening brief on his first motion to dismiss, Brock argued that Plaintiffs' claim was "barred by the 5-year statute of repose" because it was "entirely based on an alleged fraudulent scheme to induce Plaintiffs to invest $33,333 in [Global] by executing separate Note Purchase Agreements ... on or about September 10, 2015." He contended that *all* relevant allegations regarding the fraudulent scheme "occurred *before* the September 2015 transaction." Implicit in this argument is that the Complaint's remaining allegations do not relate to the Note Scheme or invoke § 10(b) and Rule 10b-5. Brock only explicitly referred to the language "in connection with the purchase or sale of any security" in his reply brief because Plaintiffs' opposition brief relied on allegations that were wholly divorced from that requirement but would otherwise fall within the five-year window. Plaintiffs' briefing on the motion is further proof that they were on notice of Brock's argument and were not prejudiced. In their initial opposition to Brock's motion, they explicitly addressed his argument regarding which culpable acts or omissions triggered the statute of repose. And Plaintiffs restated their arguments in a sur-reply where they incorrectly averred (as they do here) that Brock's argument had been forfeited.

The Complaint's federal securities fraud claim against Brock was correctly dismissed for being filed outside the five-year statute of repose.

### C. The Second Dismissal Order

#### 1. Federal Securities Fraud Claims Relating to the Stock Scheme

**\*6** The district court dismissed the federal securities fraud claim relating to the Stock Scheme against Brock, holding that the allegations in the Amended Complaint failed to meet the heightened pleading standards for fraud. Because the Entity Defendants were alleged to be implicated in this scheme through Brock under an alter ego theory of liability, the court dismissed the parallel claims brought against them as well. Plaintiffs raise two points of error in the court's analysis. First, they argue that that court inadequately addressed their theories of Defendants' "scheme liability" and "lulling activities." Second, they contend that the court did not consider an SEC filing that they assert bolstered their claims.

#### a. Theories of "Scheme Liability" and "Lulling Activities"

Section 10(b) prohibits using or employing "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). The SEC's implementing regulation, Rule 10b-5, provides three general means of liability under § 10(b):

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

"To state a securities-fraud claim under section 10(b), and Rule 10b–5, plaintiffs must plead (1) a misstatement or

Burback v. Brock, Not Reported in Fed. Rptr. (2023)

2023 WL 4532803

omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). "A fact is material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.' " *Id.* (quoting *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir. 1985)). "Materiality 'depends on the significance the reasonable investor would place on the withheld or misrepresented information.' " *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). "[T]he required state of mind [for scienter] is an intent to deceive, manipulate, defraud or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (second alteration in original) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009)).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 536 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)). "To withstand a 12(b)(6) motion to dismiss, the required 'strong inference' of severe recklessness must be 'more than merely "reasonable" or "permissible"— it must be cogent and compelling, thus strong in light of other explanations.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "A reviewing court therefore must 'take into account plausible inferences opposing as well as supporting a strong inference of scienter.' " *Id.* (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)). "A complaint will survive only if the inference of scienter is 'at least as compelling as any opposing inference one could draw from the facts alleged.' '[A] tie favors the plaintiff.' " *Id.* (citation omitted) (alteration in original) (first quoting *Tellabs*, 551 U.S. at 324; and then quoting *Lormand*, 565 F.3d at 254).

**\*7** In its Second Dismissal Order, the district court held that the Amended Complaint did not contain non-conclusory allegations demonstrating that any of Brock's statements were false when made or that he otherwise had knowledge of those statements' falsity. The court similarly held that Plaintiffs could not establish Brock's scienter, ruling that the Amended Complaint's allegations concerning Brock's roles with Global and Sharing Services; receipt of shares in Sharing Services, Inc. that were later converted into Sharing Services shares; "knowledge of the fraudulent schemes"; and the benefits Sharing Services received because of those schemes did not meet Rule 9(b) or the PSLRA's heightened pleading requirements. Specifically, the court correctly determined that this collection of allegations was rooted in Brock's roles with Global and Sharing Services, and that "[s]cienter in a particular case may not be footed solely on motives universal to corporate executives." *Ind. Elec.*, 537 F.3d at 544. The court also correctly ruled that the allegations pertaining to the various forms of compensation Brock received, including his shares in Sharing Services, could not create a strong inference of scienter because the Amended Complaint did not allege the value of this compensation nor how it was connected to the Stock Scheme. *See id.* ("Incentive compensation packages may be considered in conjunction with other scienter allegations but only in an extraordinary case is it probative." (citation omitted)).

Plaintiffs contend that the district court neglected to consider extra-circuit caselaw that they argue supports the proposition that "lulling activities" may constitute evidence of scienter. In *United States v. Kelley*, 551 F.3d 171 (2d Cir. 2009) (per curiam), the defendant orchestrated a scheme in which he misled clients regarding their investments and subsequently produced fallacious account statements to lull them into believing that their investments were safer than they were. *Id.* at 172–73. The Second Circuit held that the district court did not abuse its discretion in admitting into evidence the account statements that had been produced two-to-four years following the purchase of securities, reasoning that although the dissemination of those statements alone could not establish a securities violation, they were relevant evidence because they "tended to demonstrate [the defendant's] intent to defraud his clients and the scope of the schemes he employed." *Id.* at 172, 175–76.

*Kelley* is inapposite, mainly because it is an evidentiary holding. It also lacks facts that are analogous to those in our case: there, the government had established a scheme to defraud that the district court determined involved post-sale

Case 4:21-cv-02473   Document 143   Filed 06/23/25 in TXSD   Page 49 of 59

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

account statements, whereas here, Plaintiffs have failed to adequately plead a fraudulent scheme (at all) to which post-sale lulling activities would attach. The other caselaw cited by Plaintiffs is similarly inapt because the court in each case was convinced of a scheme to defraud in which lulling activities were based. *See, e.g., SEC v. Holschuh*, 694 F.2d 130, 143–44 (7th Cir. 1982) (district court properly considered post-sale lulling activities that were "part of a single scheme or plan ... relat[ing] back to ... earlier fraudulent conduct"); *United States v. Riedel*, 126 F.2d 81, 82–83 (7th Cir. 1942) ("We are satisfied, however, that the evidence shows, and rather clearly, that the scheme was not over.... Avoidance of detection and prevention of recovery of money lost by the victims are within, and often a material part of, the illegal scheme."); *United States v. Jones*, 712 F.2d 1316, 1320–21 (9th Cir. 1983) ("Several investors testified that they relied on the mailings as demonstrating that [their investment] was doing well and that they had made a good investment.... [T]he defendants here had an interest in the bank mailings which lulled investors into complacency regarding [their investment]. The mailings furthered the fraud ....").

Plaintiffs do not otherwise meaningfully refute the district court's analysis; instead, they assert that it failed to account for their allegations pertaining to sections (a) and (c) of Rule 10b-5, which they refer to as "scheme liability." But the allegations that the district court deemed insufficient are the same that underpin Plaintiffs' theory of "scheme liability." Accordingly, Plaintiffs' legal theories do not disturb the district court's analysis.

### b. Consideration of the SEC Filing

**\*8** Plaintiffs assert that the district court erroneously failed to consider an SEC filing that was attached to their Amended Complaint ("Exhibit M").

"[A] district court 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 322).

Exhibit M is a Form 10-Q that Sharing Services filed with the SEC in December 2019 summarizing the firm's performance for the third quarter of that year. Plaintiffs point to two passages from Exhibit M that were quoted in the Amended Complaint and which they argue were overlooked by the district court. The first passage states that, in January 2019, Sharing Services "became aware of an unliquidated amount of potential liability arising from a series of cash advance loan transactions ... entered into by eight different lending sources and a Related Party entity ... owned and/or controlled by a former Company officer." The Amended Complaint alleges that, upon information and belief, this former company officer was either Brock or Oblon. The second passage states that, in June 2019, Sharing Services

> became aware of a potential liability arising out of certain previous transactions involving the formation and capitalization of two legal entities affiliated with a Company consultant who was, at the time, considered the Company spokesperson. Without the knowledge of the Company and in contravention of the express provisions of both the Company's Bylaws and the controlling Nevada Revised Statutes, this Company consultant purportedly solicited investment funds from various persons, who at the time, were independent contractors of the Company.... The Company believes that it is probable that these actions have resulted in a material loss to the investing parties and is evaluating the potential exposure of these events to the Company.

The Amended Complaint alleges that, upon information and belief, this company consultant was Oblon. According to Plaintiffs, both of these passages sufficiently allege Defendants' scienter and amount to a "public acknowledgment of fraud."

We disagree. The cited passages from Exhibit M contain no ostensible fraudulent activity. And even assuming that they do, it is not apparent that they are in any way related to the Note or Stock Schemes. The Amended Complaint is likewise devoid of any well-pleaded allegations connecting these events to the Note or Stock Schemes. There was thus

**Burback v. Brock, Not Reported in Fed. Rptr. (2023)**

2023 WL 4532803

no need for the district court to discuss Exhibit M or its citations in the Amended Complaint because, without more, it is wholly irrelevant to Plaintiffs' claims. [3]

[3]    Plaintiffs argue that the district court was also required to take judicial notice of Exhibit M due to it being an SEC filing. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (approving of a district court taking judicial notice of a Form 10-K filed with the SEC on a motion to dismiss). A full analysis of this issue would be redundant considering that Exhibit M was both explicitly cited in and incorporated by reference into the Amended Complaint, and our reasoning above would be equally applicable regardless.

**\*9**  Accordingly, the district court did not err in dismissing the federal securities fraud claims in the Second Dismissal Order.

### 2. State Fraud Claims Relating to the Note Scheme

Plaintiffs dispute the district court's dismissal of their state fraud claims relating to the Note Scheme due to the applicable statute of limitations.

The statute of limitations for fraud claims in Texas is four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4). Under the discovery rule exception to the statute of limitations, accrual of a cause of action is deferred "until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Berry v. Berry*, 646 S.W.3d 516, 524 (Tex. 2022) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).

The note purchase agreements were signed more than four years before filing the Complaint, which was thus filed after the statute of limitations had already run. Plaintiffs argue, however, that the discovery rule tolled the statute of limitations because they "learned of previously unknown ... facts" just "days before filing suit." Specifically, they point to a demand letter attached to the Amended Complaint that was sent to Brock in December 2020 shortly before the Complaint was filed. But Plaintiffs fail to identify which relevant facts they became aware of within four years of filing the Complaint, including those facts they first learned upon receipt of the demand letter. Plaintiffs must provide well-pleaded facts in support of their claims, including an invocation of the discovery rule; a failure to do so deprives the defense of fair notice and, relatedly, an opportunity to respond. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988) ("A defendant who has established that the suit is barred cannot be expected to anticipate the plaintiff's defenses to that bar."). Furthermore, it is not apparent that any of the facts discussed in the demand letter are related to the Note Scheme. Therefore, the district court did not err in dismissing the state fraud claims regarding the Note Scheme pursuant to the applicable statute of limitations.

### III. Conclusion

Having found no error in the district court's rulings, the judgments are AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 4532803

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 5

2011 WL 11562092

Corporate Finance Review

Copyright (c) 2025 Thomson Reuters Tax and Accounting

**\*1  IS SHAREHOLDER ACTIVISM EFFECTIVE IN INFLUENCING CORPORATION ACTION?**

November/December 2011

STANLEY BLOCK

**All forms of shareholder activism are not created equal.**

Shareholder activism can take many forms including proxy fights, threatened takeover attempts, 13D filings with the SEC indicating an intent to influence corporate management, private negotiations, public relations campaigns through the financial press, and so on.

In examining over 50 studies, it can be said the results of shareholder activism are mixed. This maybe due to the methods used, the time period examined, or the sample involved. Nevertheless there are some important observations to be made that may be of value to the investor or researcher when he or she sees a given company first being involved in an activist campaign.

Because of the mixed nature of the empirical research, the author has done a survey study of financial analysts as listed under Institutional Research Firms in the *Nelson's Directory of Investment Research.*  [FN1] It is the author's intent to tie together the results of the academic literature with the opinions of the practicing financial analysts.

**Historical background**

As described by Gillian and Starks, [FN2] in the early 1900's there was a great deal of shareholder activism as financial institutions tried to influence the actions of corporate management.

However, after the market crash of 1929, the enactment of securities legislation limited the power of financial institutions, and this diluted their ability for involvement in corporate governance activity. The gap between corporate management and investors continued to increase.

Fortunately, in 1942, the SEC enacted rule changes allowing investors to submit proposals to be considered on corporate ballots. Shareholder activism was born again. However, it did not become a major force until the late 1970's–early 1980's when institutional investors replaced individual investors as the key participants in the market. Since then, every decade has seen increased activities. Pension funds, mutual funds, corporate raiders, and others have all increased their participation. Leaders among the movement have been CalPERS, TIAA-CREF, Carl Icahn, and other corporate raiders. Another major movement began in the mid-1990's and continues until today—the strong presence that hedge funds have brought to the activist movement.

The author used the *Nelson's Directory of Investment Research's* listing of "Institutional Research Firms" as the database for the study. One thousand and four firms were listed in the 2009 edition. Following a pilot study, a three page questionnaire was mailed to the firms. The questionnaire covered various issues related to stockholder activism. Two hundred and seventy two responses were received from financial analysts at the 1,004 firms (27.1 percent response). Characteristics of the 272 respondents are shown in EXH 1 and EXH 2.

Exhibit 1

Classification of Respondents

| **Industry Classification** | **Number** | **Percent** |
|---|---|---|

| | | |
|---|---|---|
| Private Money Management Group | 58 | 21.5 |
| Brokerage | 52 | 19.1 |
| Hedge fund | 48 | 17.5 |
| Pension fund | 30 | 11.2 |
| Mutual fund | 27 | 9.8 |
| Pension fund | 15 | 5.4 |
| Investment Management Consulting | 13 | 4.9 |
| Bank Trust Department | 12 | 4.5 |
| Investment Banking | 10 | 3.6 |
| Other | 7 | 2.5 |
| | 272 | 100.0 |

Exhibit 2

Years of Experience of Respondents

| Experience | Number | Percent |
|---|---|---|
| 0-5 Years | 24 | 8.7 |
| 6-10 | 84 | 31.0 |
| 11-15 | 69 | 25.4 |
| 16-20 | 50 | 18.4 |
| 21-25 | 18 | 6.6 |
| 26-30 | 17 | 6.2 |
| Over 30 | 10 | 3.7 |
| | 272 | 100.0 |

 **\*2**  A follow-up telephone survey of 40 randomly selected non-respondents indicated no statistically significant difference between those who initially answered the questionnaire and those who elected not to participate.

As previously indicated, the responses of the survey participants were compared to the academic literature on shareholder activism. This study is an attempt to integrate the opinions of practicing financial analysts with the academic literature.

**Goals of shareholder activism**

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 54 of 59

The goals of shareholder activism are many and varied. Looking particularly at the studies of Strickland, Wiles, and Zenner, Karpoff, and Klein and Zur, [FN3] the primary goals of shareholder activism are shown in EXH 3.

Exhibit 3

Primary Goals of Shareholder Activism

**Rank**

1. Seeking a board seat

2. Changing corporate governance

3. Restructuring and divestiture

4. Changing profitability

5. Opposing or favoring a merger

6. Changing management compensation

7. Amending a poison pill

8. Increasing dividends

9. Increasing stock buybacks

10. Increasing/decreasing R&D

11. Increasing/decreasing capital expenditures

The first three goals have the strongest support. Seeking a board seat is viewed as the most important tool in influencing the corporate target. Whether there is success or failure, it is a threat to the status quo. Also, one or more new outside board members can clearly influence the corporation. Even if motions by the new board member(s) are voted down, they are placed on public record for all to see.

The second item in EXH 3 is changing corporate governance; which reflects back to Jensen's 1986 article [FN4] in which he suggests top corporate managers act as poor agents for stockholders. He suggests, in many cases, management is more interested in empire building than stockholder wealth maximization. This is evidenced by questionable acquisitions and high cash balances and low debt ratios.

Furthermore, because of insensitivity to shareholders, the firm may pay low cash dividends and not engage in stock buybacks.

As changing corporate governance is viewed in the study by the respondents, it encompasses such items as splitting up the position of chairman of the board and CEO, increasing the number of outside directors on the board, allowing cumulative voting for directors, and closely monitoring the compensation and activities of top management.

 **\*3**  The third most cited objective in EXH 3 for shareholder activism is corporate restructuring. This often relates to the divestiture of unprofitable divisions or the spinoff of profitable divisions in which the original firm maintains majority control.

**The effect of shareholder activism on stock market value**

This is where the true battleground lies. There is strong evidence both ways. We will begin with the non-believers. In a survey of research studies on the effect of activism on stock values Karpoff [FN5] found nine studies with negative returns and only five

Case 4:21-cv-02473    Document 143    Filed 06/23/25 in TXSD    Page 55 of 59

with positive returns. Shareholder activism was defined as submitting proposals at a company's annual meeting (and private negotiations).

Karpoff went on to state, "Shareholder proposals are not associated with short-term changes in firm value or with earnings improvements although both proposals and private negotiations sometime prompt organization changes." Karpoff did not stand alone in his dubious view of the impact of shareholder activism on stockholder value.

Gillian and Starks, [FN6] after an exhaustive historical study of stockholder activism on value, state, "Empirical evidence suggests that efforts of such activism are mixed. While some studies have found positive short-term reaction to certain types of activism, there is little evidence of improvement in the long-term operating or stock market performance of the targeted funds."

Then came the hedge funds to provide a whole new perspective. Basically hedge fund activism is conducted through 13D filings with the SEC, a mandated action when a firm acquires five percent or more of the equity holding of another firm. The 13D filings maybe friendly or unfriendly. To be included in the hedge funds activism studies, the 13D filing must indicate an unfriendly intent. The hedge fund may indicate an intent to obtain a board seat, a change in corporate governance, opposition to a merger, or even liquidation of the firm.

The filing of an unfriendly 13D form is the trigger point for the event study. If there is prior knowledge of the intent to file a 13D form, it is excluded from the studies.

In a recent article covering many more firms than earlier studies, Klein and Zur [FN7] found in the time period of 2003 to 2005 that hedge funds generate a 10.2 percent positive abnormal return for the target firms around the filing of the 13D document with the SEC. The Klein and Zur study covered 101 hedge funds and 151 target firms and the results were statistically significant. Of equal importance for one year after the filing, the positive abnormal returns were even higher at 11.4 percent. Based on the results, Klein and Zur state, "These findings suggest, that on average, the market believes activism creates shareholder value."

Brav, Jiang, Partnoy, and Thomas [FN8] also found similar results with hedge funds. Using 13D filings by activist hedge funds between 2001 and 2006, their sample of 236 activist funds produced seven percent positive abnormal returns by the target firms around the announcement of the 13D filings, with no reversal during subsequent years.

**Limitations to the latter studies**

 **\*4**  Not only do the hedge fund studies produce positive results, but there are no hedge fund studies which produce inconclusive or negative results.

However, this still does not answer the question about whether shareholder activism, in general, produces uniformly positive results. Almost all the recent studies use 13D hedge fund filings for event studies. Keep in mind, this only takes place when the hedge fund acquires a five percent or greater position in the target company. This five percent metric eliminates many other forms of activists from the sample pool.

For example, for a target company with a $10 billion market cap, the shareholder must own $500 million of the firm's equity. Few pension funds or mutual funds are likely to hold such a position. They are mandated by law to diversify their holdings, while a hedge fund is free to concentrate on a limited number of holdings.

To take this to an extreme, Exxon-Mobil, which has come under a large amount of criticism for failing to separate the positions of Chairman of the Board and CEO as well as for failure to aggressively pursue alternate forms of energy, had a market cap of $360 billion in August of 2010. A five percent position would require an ownership interest of $18 billion. Few could qualify for such a lofty amount.

**Response by survey participants to value creation by shareholder activists**

When the 272 respondents to this study were asked whether shareholder activism created value, they provided the results reported in EXH 4. Only 52 percent thought the announcement of a challenge would generate significant positive results.

Exhibit 4

Does Shareholder Activism Create Value?

| Response | Percent |
|---|---|
| Large Increase in Value | 20.2 |
| Moderate Increase in Value | 31.8 |
| Insignificant increase in Value | 24.1 |
| No Increase in Value | 23.9 |
| | 100.0 |

When further asked whether there was a difference in the impact of different types of shareholder activists such as hedge funds, pension funds, mutual funds, venture capital funds, private equity funds, and wealthy individuals, the answer was positive. A chi-square independence of classification test with a null hypothesis that there is no difference between the type of shareholder activism and value creation could be rejected at an .05 level of significance. That is to say, the type of activist matters. A further question asked the respondents to list the activists by level of influence and the results are shown in EXH 5.

Exhibit 5

Ranking of the Most Important Types of Shareholder Activities

| Types of Activist | Percent |
|---|---|
| Hedge fund | 39.8 |
| Pension fund | 27.9 |
| Mutual Fund | 11.4 |
| Venture Capital fund | 10.8 |
| Wealthy individual | 9.2 |
| Private equity fund | 0.9 |
| | 100.0 |

**\*5** The answers by the respondents are consistent with the results in the marketplace. Hedge fund activism, via 13D filings, tend to have the greatest effect on market value and should be the circumstance most likely to produce a positive return. All other forms of activism are subject to uncertainty in terms of change in value.

**Activism and corporate policy**

In addition to stock market results, there were interesting results for changes in corporate policy. Klein and Zur [FN9] found a significant change in policy for corporate directors and dividend policy.

Others found an increase in divestitures announcements for firms placed on the Council on Institutional Investors focus list for possible targeting. As another example, Sears, Roebuck and Company announced the breakup of its financial services division after it received pressure to make changes from several institutional investors, including CalPERS. Bizjak and Marquette [FN10] concluded that firms receiving proposals to amend their poison pills were more likely to change their poison pill provisions than a control group that did not receive such a proposal. Even TIAA-CREF got its say on firms adding women as board members. A majority of firms contacted and pressured by TIAA-CREF made such a change or indicated an intention to do so in the future.

**Respondents views of areas of influence**

When the 272 respondents to the study were asked to identify primary areas of influence on corporate policy, the results are consistent with the research in EXH 3. Shareholder activism has been generally successful seeking board seats, changing corporate governance, and initiating restructuring and divestitures. However, the relatively high ranking of changing profitability in EXH 3 is not supported by the survey. The respondents indicated a change in corporate profitability is not likely to take place three/fourths of the time.

**Industry of the target**

A question of possible interest is whether the targets tend to originate from different industries. It is well known that targeted firms are smaller and less profitable than other public firms. The question remains; are they more likely to originate from one industry than another? In EXH 6, 150 targeted firms were screened for industry classification between 2006–2010 and reported in percentages. The Standard and Poor's 10 basic industries were used as the basis for classification.

Exhibit 6

Industry of Origin of Target Firms

| Industry | Percent |
| --- | --- |
| 1. Technology | 15.8 |
| 2. Energy | 13.7 |
| 3. Financial | 11.8 |
| 4. Health Care | 10.8 |
| 5. Communication Services | 10.5 |
| 6. Consumer Discretionary | 8.7 |
| 7. Consumer Staple | 8.6 |
| 8. Industrials | 8.5 |
| 9. Materials | 7.4 |
| 10. Utility | 4.2 |
| | 100.0 |

**\*6** The table indicates that a higher percentage of firms fell in the technology sector (15.8 percent). This may be due to the lack of a well-defined business model and clear governance in rapidly growing technology companies. At the other extreme are utilities (4.2 percent), where the maturity of the industry may indicate strong corporate governance.

**The Klein and Zur study**

One of the most significant activism studies to date is by Klein and Zur. [FN11] The authors divide the activists into two distinct groups: hedge funds and entrepreneurial activists. The latter group is composed of non-hedge fund activists and includes venture capital funds, private equity funds, and asset management groups for wealthy individuals. It specifically excludes asset managers that are subject to government controls such as mutual funds and pension funds. Because the latter are regulated, they must maintain a high degree of diversification which inhibits their ability to take a large (threatening position) in any one target.

There are 101 hedge funds (with 151 targets) and 134 entrepreneurial activists (with 154 targets) in the study. They both create positive abnormal returns, around 13D filings, but the hedge funds positive abnormal returns are larger in the event study surrounding the 13D filing (10.2 percent versus 5.1 percent). However, they both are statistically significant. One year after the filing, both groups also have strong statistically significant returns, indicating the importance of 13D filings.

Of equal or greater importance is what the two divergent groups try to accomplish. The hedge funds target larger, healthier companies with an intent to change corporate governance (rather than actual operations). They are strongly influenced by the Jensen [FN12] literature and try to improve the agency function. The hedge funds try to discourage empire building through acquisitions and high cash balances that tend to facilitate unnecessary growth. They also discourage low debt levels, which indicate target companies are not minimizing cost of capital and maximizing stockholder wealth. Klein and Zur say hedge funds achieve all or part of their goals 60 percent of the time.

Entrepreneurial activists have an entirely different focus. They deal with smaller, less profitable targets and their interest is generally not in corporate governance, but on actual operating issues such as capital expenditures, research and development, and other similar topics. They achieve their goals 65 percent of the time. Interestingly enough, neither group is able to force an increase in earnings, profit margin, or EBITDA.

**Summary and conclusion**

The results of the effect of shareholder activism are mixed, with later studies offering some promise for firms filing 13D documents with the SEC. Hedge funds were able to generate positive returns.

A sample survey by the author of 272 financial analysts indicates only 52 percent believe that shareholder activism creates increased value for the targeted firm. The respondents viewed hedge funds as being the most effective activists followed by pension funds and mutual funds. Although technology was the most challenged industry for shareholder activism, a chi-square independence of classification test showed no statistically significant difference for the 10 industries under study.

**\*7** Activism may focus on operations of the firm or corporate governance. The latter addresses many of the issues related to the Jensen paper on agency theory. Activists appear to achieve some success in suppressing empire building, increasing cash dividends or share buybacks for the benefit of shareholders, and increasing debt to minimize the cost of capital and maximize shareholder wealth. Achieving a seat on the board of directors is considered the most significant achievement.

FN1. *Nelson's Directory of Investment Research*, 2008 Vol.1, New York: Thompson Financial/Nelson, Publisher.

FN2. S.L. Gillian and L.T. Starks, "Corporate Governance Proposals and Shareholder Activism: The Role of Institutional Investors," *Journal of Finance* (Vol. 57, 2000): 275–305.

FN3. D. Strickland, K. W. Wiles, and M. Zenner, "A Requiem for the U.S.A. Is Small Shareholder Monitoring Effective?" *Journal of Financial Economics* (Vol. 40, 1996): 319–338; J.M. Karpoff, "The Impact of Shareholder Activism on Target Companies: A Survey of Empirical Findings," University of Washington Working Paper, 2001; A. Klein, and E. Zur,

"Entrepreneurial Shareholder Activism: Hedge Funds and Other Private Investors," *Journal of Finance* (Vol. 64, 2009): 187–229.

FN4. M. Jensen, "Agency Costs of Free Cash Flow: Corporate Finance, and Takeovers", *American Economic Review* (Vol. 76, 1986): 323–329.

FN5. *Op. cit.* Note 3, Karpoff.

FN6. S.L. Gillian, and L.T. Starks, "The Evolution of Stockholder Activism in the United States," *Journal of Applied Corporate Finance* (Vol. 19, 2007): 55–73.

FN7. *Op. cit. Note 3, Klein and Zir.*

FN8. A. Brav, W. Jaing, F. Partnoy and R. Thomas, "Hedge Fund Activism, Corporate Governance, and Firm Performance," *Journal of Finance* (Vol. 63, 2008), 1729–1775.

FN9. Op. cit. Note 3, Klein and Zur.

FN10. J. Bizjak, and C. Marquette, "Are Shareholders all Bark and No Bite? Evidence from Shareholder Resolutions to Rescind Poison Pills." *Journal of Financial and Quantitative Analysis* (Vol. 33, 1998): 499–521.

FN11. *Op. cit.* Note 3, Klein and Zur.

FN12. *Op. cit.* Note 4.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.