**APPENDIX C**


**DEFENDANTS' UNPUBLISHED AUTHORITIES FOR
DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION
OF DEFENDANT CONCHO RESOURCES INC.'S ARIES DATABASE**


| CASE NO. | CASE NAME |
|:---:|---|
| 1. | *Balcacer v. Sam's E. Club Inc*, 2020 WL 1934851 (S.D. Tex. Apr. 22, 2020) |
| 2. | *Edwards v. McDermott Int'l, Inc.*, 2022 WL 1568279 (S.D. Tex. May 18, 2022) |
| 3. | *In re Apache Corp. Sec. Litig.*, 2023 WL 5322444 (S.D. Tex. Apr. 10, 2023) |
| 4. | *Jones v. Goord*, 2002 WL 1007614 (S.D.N.Y. May 16, 2002) |
| 5. | *Kerr v. Exobox Techs. Corp.*, 2012 WL 201872 (S.D. Tex. Jan. 23, 2012) |
| 6. | *Killick v. Harbor Freight Tools USA Inc.*, 2022 WL 22586525 (N.D. Fla. Aug. 23, 2022) |
| 7. | *Miller v. Univ. of Houston Sys.*, 2022 WL 22879671 (S.D. Tex. Oct. 20, 2022) |
| 8. | *Mir v. L-3 Comm'cns Integrated Sys., L.P.*, 2016 WL 4427488 (N.D. Tex. 2016) |
| 9. | *Nicholas J. Murlas Living Tr. v. Mobil Oil Corp.*, 1995 WL 124186 (N.D. Ill. Mar. 20, 1995) |
| 10. | *Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.*, 2022 WL 2316228 (N.D. Ill. June 28, 2022) |
| 11. | *Yoshikawa v. Exxon Mobil Corp.*, 2024 WL 3802997 (N.D. Tex. Aug. 12, 2024) |
| 12. | *The Sedona Conference, The Sedona Conference Database Principles Addressing the Preservation and Production of Databases and Database Information in Civil Litigation A Project of the Sedona Conference Working Group on Electronic Document Retention & Production,* 15 SEDONA CONF. J. 171 (2014). |

# Case No. 1

Balcacer v. Sam's East Club Inc, Not Reported in Fed. Supp. (2020)

2020 WL 1934851

2020 WL 1934851
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Hector BALCACER, Plaintiff,
v.
SAM'S EAST CLUB INC dba Sam's Club, Defendant.

Civil Action No. 4:19-CV-03840
|
Signed 04/22/2020

**Attorneys and Law Firms**

Joe House, Benjamin Graham House, House Perron and House PLLC, Katy, TX, Gordon Mark Wham, Rene S. Rogers, Wham and Rogers LLC, The Woodlands, TX, for Plaintiff.

John A. Ramirez, Stephanie Briggs Donaho, Bush Ramirez, Houston, TX, for Defendant.

**ORDER**

Charles Eskridge, United States District Judge

 **\*1** Before the Court is a letter request from Plaintiff Hector Balcacer for permission to file a motion to quash and for protection from Defendant Sam's Club's discovery requests. Dkt 18. Sam's Club filed a response letter. Dkt 20.

Balcacer's request is granted in part and denied in part.

 1. Background
This case results from injuries Balcacer allegedly suffered following the collapse of a display chair at one of Sam's Club's stores. The parties are in the midst of discovery.

Sam's Club has requested that Balcacer produce medical records from fifteen of his healthcare providers and served thirty-five depositions by written questions on them comprised of approximately ten short answer or yes/no questions. Sam's Club has also served a subpoena to Balcacer's employer Home Depot for payroll and personnel records.

Balcacer seeks protection from each of these. The Court held a telephonic hearing on this dispute on March 11, 2020.

 2. Legal standard
Federal Rule of Civil Procedure 26(b)(1) provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The Fifth Circuit holds that discovery requests are *relevant* when they "seek admissible evidence or evidence that is reasonably calculated to lead to the discovery of admissible evidence." *Wiwa v Royal Dutch Petroleum Co*, 392 F3d 812, 820 (5th Cir 2004) (citations and quotation marks omitted).

Rule 26(b)(2)(C) dictates that the district court must limit the frequency or extent of discovery in three circumstances:

- When the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

- When the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

- When the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Rule 26(c) allows the Court to grant protective orders that limit the extent and manner of discovery in order to "protect a party or person from annoyance, embarrassment,

Balcacer v. Sam's East Club Inc, Not Reported in Fed. Supp. (2020)
2020 WL 1934851

oppression, or undue burden or expense." The party seeking a protective order must show good cause and a specific need for protection. *In re Terra International Inc*, 134 F3d 302, 306 (5th Cir 1998). In analyzing a request for a protective order, the court must compare burden and benefit—the hardship borne by the party complying with the discovery versus the probative value gained by the opponent obtaining the information. *Cazorla v Koch Foods of Mississippi LLC*, 838 F3d 540, 555 (5th Cir 2016).

**\*2** District courts have broad discretion in determining whether to grant a protective order. *In re LeBlanc*, 559 F App'x 389, 392– 93 (5th Cir 2014).

3. Analysis

*As to Sam's Club's request for medical records*. Balcacer seeks protection from Sam's Club's request for medical records from fifteen of his healthcare providers. Balcacer has already produced medical records from twelve of the fifteen designated healthcare providers. And he notes that he is still receiving records from the last three providers, "which shall be produced upon receipt." Dkt 18 at 2.

The Court finds this request to be largely moot. Balcacer has either already produced or agreed to produce the records. To the extent Balcacer has not yet produced the medical records from the three remaining healthcare providers, the Court orders him to do so once received.

*As to Sam's Club's depositions by written questions*. Sam's Club has issued thirty-five depositions by written questions on fifteen healthcare providers. It asserts that Balcacer has placed his medical condition at issue in this case, and so it is entitled to determine the extent of any previous injuries, surgeries, and medical claims he received and filed prior to the subject incident. As to the overall number, Sam's Club explained at hearing that it must issue separate deposition notices to different departments of the same healthcare provider. It also argues that each notice is of marginal burden, comprised of only ten questions requiring either a yes/no or short answer.

Balcacer asserts that these depositions are burdensome and violate the ten-deposition limit set out in Federal Rule of Civil Procedure 31. It also argues that the depositions are not limited to a specific time period and thus are overbroad.

The Court finds Balcacer has squarely put his medical condition at issue in this lawsuit. Sam's Club is entitled to

seek medical information relating to his recent and any past injuries. The number of depositions is reasonably explained, and the burden as to each notice is minimal. The Court grants Sam's Club leave to exceed the ten-deposition limit in this circumstance.

But the Court also finds that Sam's Club's notices are overbroad to the extent they are not limited by time. Balcacer indicated agreement at hearing to a limitation of these depositions to the seven-year time period immediately preceding the subject injury. This is a reasonable limitation. Sam's Club can sufficiently evaluate any preexisting causes to Balcacer's health issues by an examination of his medical records from seven years prior to the date of the alleged injuries he incurred in the subject incident. See *Cummins v Lollar*, 2015 WL 12731746, \*2 (ND Tex).

*As to Sam's Club's subpoena to Home Depot*. Home Depot is Balcacer's current employer. Sam's Club issued a subpoena to Home Depot seeking Balcacer's payroll and personnel records. It has since withdrawn its request for payroll records.

Balcacer asserts that the subpoena is unrelated to the events and circumstances at issue and has no "justifiable legal basis." Dkt 18 at 2. Sam's Club responds that his personnel records will address the severity of his physical impairment, any limitations on his physical ability to work, and whether he missed any time from work. Dkt 20 at 1. Sam's Club also describes an incident where Balcacer was hit in the eye at Home Depot. It seeks the personnel records from Home Depot to further examine this incident and to discover whether this incident could have caused Balcacer's memory issues.

**\*3** Good cause exists to enter a protective order with respect to Sam's Club's subpoena on Home Depot. At the hearing, Balcacer stipulated that he would not seek lost wages or loss of earning capacity in this case. And the Court ordered that no such claim for relief will be hereafter permitted. Given this stipulation, discovery regarding lost wages or loss of earning capacity is outside the scope permitted by Rule 26(b)(1).

The comparative burden on Balcacer and Home Depot against the probative value of the information to Sam's Club also warrants a protective order. To the extent Sam's Club seeks the personnel records to further examine the incident that caused Balcacer's eye injury, medical records are sufficient and more appropriate. Balcacer has already agreed to produce these, and these medical records will disclose information regarding this injury, including the severity of his physical impairment.

**Balcacer v. Sam's East Club Inc, Not Reported in Fed. Supp. (2020)**

2020 WL 1934851

4. Conclusion

Balcacer's request is GRANTED IN PART and DENIED IN PART.

Balcacer's request for protection from Sam's Club's request for medical records is DENIED. The Court ORDERS that Balcacer must produce his medical records from the three remaining healthcare providers.

Balcacers's request for protection from Sam's Club's depositions by written questions is GRANTED IN PART and DENIED IN PART. The Court ORDERS that the pending depositions by written questions on the fifteen healthcare providers are limited to medical records that are dated not more than seven years prior to the date of the subject incident on October 30, 2017.

Balcacer's request for protection from Sam's Club's subpoena to Home Depot is GRANTED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1934851

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (6)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. (Report or Affidavit of Dr. William C. Watters III, M.D.)** <br> Re: Hector BALCACER, v. WAL-MART STORES TEXAS, LLC. <br> 2020 WL 8386646 | — | S.D.Tex. | Oct. 14, 2020 | Expert Materials |
| **2. (Report or Affidavit of Katrina E. Belen, PsyD)** <br> Re: Hector BALCACER, v. WAL-MART STORES TEXAS, LLC. <br> 2020 WL 8386647 | — | S.D.Tex. | Oct. 14, 2020 | Expert Materials |
| **3. (Report or Affidavit of Dr. Leonard Hershkowitz, M.D., F.A.A.N.)** <br> Hecter BALCACER, v. SAM'S EAST, INC. <br> 2020 WL 8386648 | — | S.D.Tex. | Oct. 10, 2020 | Expert Materials |
| **4. Docket 4:19-CV-03840** <br> Balcacer v. Sam's East, Inc. | — | S.D.Tex. | Oct. 04, 2019 | Docket |
| **5. Expert Resume of Katrina Esherick Belen** <br> Katrina Esherick Belen <br> 2020 WL 8770972 | — | S.D.Tex. | Oct. 14, 2020 | Expert Resume |
| **6. Expert Resume of William Charles Watters III** <br> Dr. William Charles Watters III, MD <br> 2020 WL 8815824 | — | S.D.Tex. | Oct. 14, 2020 | Expert Resume |

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

**History**

There are no History results for this citation.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 2

2022 WL 1568279
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Miriam EDWARDS, et al., Plaintiffs.

v.

MCDERMOTT INTERNATIONAL,
INC., et al., Defendants.

Civil Action No. 4:18-cv-04330
|
Signed 05/18/2022

**Attorneys and Law Firms**

Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Plaintiffs Miriam Edwards, Public Employees' Retirement System of Mississippi, Wah Kee Ho, John Arden Ahnefeldt, Robert Brower, Jr., Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, Alexandre Tazi.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Elizabeth Pennington Furlow, Baker Botts LLP, Houston, TX, for Defendants McDermott International, Inc., David Dickson, Stuart Spence, Chicago Bridge & Iron Co., Patrick K. Mullen.

**ORDER AND OPINION**

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

 **\*1** In this purported class action securities fraud case, I am faced with a good old-fashioned discovery dispute: I must decide the appropriate scope of discovery. The parties have submitted informative letter briefs outlining their respective positions, *see* Dkts. 255–258, and I heard oral argument. After carefully thinking about the issues involved, I have to admit that I am torn. I fully understand, appreciate, and sympathize with the arguments advanced by both sides. This is not an easy decision. On the one hand, Plaintiffs are entitled to conduct the discovery necessary to vigorously pursue their claims

for relief. On the other hand, I recognize that if I order the discovery Plaintiffs seek, Defendants will be forced to incur large sums of money, possibly millions of dollars, to produce the responsive documentation. I do not take this responsibility lightly.

**BACKGROUND**

I previously required Defendants to collect documents from 50 custodians chosen by Plaintiffs. *See* Dkt. 221 at 4–6. I further ordered the parties to "promptly confer on the appropriate search terms to be utilized for the 50 custodians selected by Plaintiffs," adding that "[i]n the event the parties cannot come to an agreement on a set of search terms, I am available to assist the parties in this effort." *Id.* at 5.

In November 2021, Plaintiffs identified the 50 custodians from whom they wanted to obtain documents. At the same time, Plaintiffs also proposed search terms to be utilized to assist in gathering responsive documents. For the past few months, the parties have worked tirelessly to come up with appropriate search terms, sharing various proposals with each other. The parties now find themselves at an impasse. Plaintiffs have put together a list of proposed search terms that will result in 773,508 search hits (with an additional 519,337 family-member documents [1]). That means that Plaintiffs' proposed search terms would result in Defendants having to review roughly 1.3 million documents (773,508 + 519,337) for privilege and relevance. Claiming that Plaintiffs' proposed list is too expansive and will result in exorbitant costs, Defendants counter with search terms that would require review of approximately 650,000 documents for privilege and relevance.

[1]    Family-member documents are groups of associated files (i.e., a document family). Take an example. Let's say an email comes backs with a search-term hit. A PowerPoint attached to the email might not contain a search term, but it would be considered a family-member document.

**ANALYSIS**

Federal Rule of Civil Procedure 26(b)(1) provides:

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 10 of 167
Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 1568279

Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

**\*2** FED. R. CIV. P. 26(b)(1).

In the simplest terms, Rule 26(b)(1) mandates that discoverable matter must be both relevant and proportional to the needs of the case. These "are related but distinct requirements." *Samsung Elecs. Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017).

On the relevance front, "[a] discovery request is relevant when the request seeks admissible evidence or is reasonably calculated to lead to the discovery of admissible evidence." *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) (quotation omitted). Importantly, information within the scope of discovery need not be admissible in evidence to be discoverable. *See* FED. R. CIV. P. 26(b)(1).

Turning to the proportionality prong, "[p]roportionality focuses on the marginal utility of the discovery sought." *Vaigasi v. Solow Mgmt. Corp.*, No. 11CIV5088RMBHBP, 2016 WL 616386, at \*14 (S.D.N.Y. Feb. 16, 2016). While the discovery rules are accorded broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials, discovery does have "ultimate and necessary boundaries." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). A district court assesses six factors when determining proportionality: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative

access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* FED. R. CIV. P. 26(b)(1); *Orchestratehr, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 504–05 (N.D. Tex. 2016). If a party resists discovery on the grounds of proportionality, it bears the burden of making a specific objection and showing that the discovery fails Rule 26(b)'s proportionality calculation. *See id.* at 505.

The present dispute focuses on the proportionality requirement. Simply put, are Plaintiffs' proposed search terms —which will require Defendants to review close to 1.3 million documents—proportional to the needs of the case? Or are Defendants' proposed search terms—which will result in the review of about half as many documents—more proportional to the needs of the case? There is no cut-and-dried application of the proportionality factors that leads to one inescapable conclusion. I can see respected jurists reaching different outcomes based on the same underlying facts. In reaching my decision, I bring to this discovery squabble my years on the bench and my experience in private practice as a lawyer representing both plaintiffs and defendants in securities litigation.

Let's focus on the six factors identified in Rule 26(b)(1) for assessing proportionality:

**(1)** *The Importance of the Issues at Stake*: Plaintiffs' claims are brought under §§ 10(b) and 14(a) of the Securities Exchange Act of 1934. Given that a central purpose of these securities laws is to protect investors and would-be investors in the securities market against misrepresentations, there can be little debate that the issues at stake in this case are meaningful. *See Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986).

**\*3** **(2)** *The Amount in Controversy*: The large amount Plaintiffs are seeking to recover (more than $1 billion in damages) weighs heavily in favor of allowing the sought-after discovery.

**(3)** *The Parties' Relative Access to Relevant Information*: The requested documents consist of emails and other electronic communications maintained by Defendants. Because Defendants have complete and exclusive control over McDermott's electronic platforms, Plaintiffs have no way of obtaining such information other than from Defendants through the discovery process. This factor also

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 11 of 167

**Edwards v. McDermott International, Inc., Not Reported in Fed. Supp. (2022)**

2022 WL 1568279

weighs in favor of the proportionality of the sought-after discovery.

**(4)** *The Parties' Resources***:** I really do not have much to go by here. I know that McDermott has been through a bankruptcy proceeding, and Plaintiffs' main source of recovery is expected to be through an insurance agreement. But I am unaware of the specific policy limits, and neither side has offered any argument or evidence on this factor. As a result, I view this factor as neutral.

**(5)** *The Importance of the Discovery in Resolving the Issues***:** Plaintiffs' search terms appear, for the most part, to be tailored to obtaining documents that are relevant to the claims and defenses in this case. As I have noted before: "I am well aware of the costs associated with email pulls. I am also mindful of how important email searches can be to unlocking the truth in securities fraud cases." Dkt. 221 at 4. Nobody, of course, knows what the email searches will reveal until the documents are reviewed and non-privileged, relevant documents are produced. But it is awful likely that the sought-after documentation is relevant and highly probative of Plaintiffs' claims and Defendants' defenses in the case.

**(6)** *Whether the Burden or Expense of the Proposed Discovery Outweighs its Likely Benefit***:** The truth of the matter is that I cannot say, with absolute certainty, that Plaintiffs' requested search terms will provide substantially more information than Defendants' proposed search terms. One would expect that the additional search hits will yield more information, but where do you draw the line? The whole purpose of the proportionality requirement is to set boundaries on the amount of documentation Plaintiffs can obtain through the discovery process. Discovery in securities fraud cases is costly. To protect defendants in securities fraud cases from the burden and expense of premature discovery, the Private Securities Litigation Reform Act of 1995 precludes discovery until the district court sustains the sufficiency of the complaint. *See* 15 U.S.C. § 78u-4(b)(3) (B). What ultimately sways me here is the fact that Judge George C. Hanks, Jr. has denied Defendants' motions to dismiss the claims brought under §§ 10(b) and 14(a). As a result, Defendants are fully entitled to employ the discovery devices provided by the Federal Rules of Civil Procedure. The discovery door has been flung wide open, and Plaintiffs should be allowed to probe inside. The purported damages in this case are huge, and that indicates to me that Plaintiffs' proposal is proportional to the needs of the case. It is a close call, but I ultimately conclude that the scales tip in favor of Plaintiffs on the proportionality analysis.

**\*4** For the reasons set forth above, I order Defendants to promptly apply Plaintiffs' proposed search terms, review responsive documents expeditiously for privilege and relevance, and produce relevant and non-privileged documents on a rolling basis.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1568279

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (14)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  The Section 14(a) Plaintiffs' Reply in Further Support of Renewed Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2023 WL 9954603 | — | S.D.Tex. | Nov. 17, 2023 | Motion |
| **2.  Defendants' Renewed Opposition to the Section 14(a) Lead Plaintiff's Renewed Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2023 WL 9954599 | — | S.D.Tex. | Nov. 07, 2023 | Motion |
| **3.  The Section 14(a) Lead Plaintiff's Renewed Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2023 WL 9954598 | — | S.D.Tex. | Nov. 06, 2023 | Motion |
| **4.  Unopposed Motion to Intervene as Additional Plaintiffs and Proposed Class Representatives by Local 813 Insurance and Pension Trust Funds and Local 1034 Pension Trust Fund** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2022 WL 22441349 | — | S.D.Tex. | June 10, 2022 | Motion |
| **5.  Defendants' Reply in Support of their Motion to Dismiss Plaintiff's S 10(b) Supplemental Class Action Complaint** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2022 WL 22441350 | — | S.D.Tex. | Jan. 18, 2022 | Motion |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **6.  Reply Memorandum of Law in Support of Motion by § 10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan to Consolidate Cases and to Vacate Additional Notice and Lead Plaintiff Deadline** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, Stuart Spence, Defendants. John Arden AHNEFELDT, Robert Brower, Jr. Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Danial Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, and Alexandre Tazi, on Behalf of Themselves and all Others Similarly Situated, Plaintiffs, v. David DICKSON, Stuart A. Spence, and Christopher A. Krummel, Defendants. <br> 2020 WL 6379383 | — | S.D.Tex. | Aug. 25, 2020 | Motion |
| **7.  Memorandum of Law of Ahnefeldt Plaintiffs in Opposition to Motion of Nova Scotia Health Employees' Pension Plan to Consolidate Cases and Vacate Notice and Lead Plaintiff Deadline** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. John Arden Ahnefeldt, Robert Brower, Jr., Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow and Alexandre Tazi, on Behalf of Themselves and all Others Similarly Situated, Plaintiffs, v. David DICKSON, Stuart A. Spence, and Christopher A. Krummel, Defendants. <br> 2020 WL 6379387 | — | S.D.Tex. | Aug. 18, 2020 | Motion |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **8.  Defendants' Response in Opposition to the Motion by § 10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan to Consolidate Cases and to Vacate Additional Notice and Lead Plaintiff Deadline** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Judge Hanks, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. John Arden AHNEFELDT, Robert Brower, Jr., Robert Brower, Sr., Khanh L. Bui, Jignesh Chandarana, Kruitika Chandarana, Amira Yousuf Chowdhury, Christopher Coligado, Daniel Gad, Edwin Howell, Sioe Lie Howell, Darren Hunting, Anne Ingledew, Shital Mehta, Thomas Carl Rabin, Adam Shultz, Amit Somani, Jayaprakash Srinivasan, Aarthi Srinivasan, Christopher Swedlow, and Alexandre Tazi, on Behalf of Themselves and all Others Similarly Situated,, Plaintiffs, v. David DICKSON, Stuart A. Spence, and Christopher A. Krummel, Defendants. <br> 2020 WL 6379389 | — | S.D.Tex. | Aug. 18, 2020 | Motion |
| **9.  Defendants' Reply in Support of their Motion to Dismiss Plaintiff's § 10(b) Corrected Class Action Complaint** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2020 WL 6379391 | — | S.D.Tex. | Aug. 05, 2020 | Motion |
| **10.  Opposition by 10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan to Defendants' Motion to Dismiss Plaintiff's § 10(b) Corrected Class Action Complaint** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, Stuart Spence, Defendants,. <br> 2020 WL 5101391 | — | S.D.Tex. | June 19, 2020 | Motion |
| **11.  the Section 14(a) Lead Plaintiff's Opposition to Defendants' Motion to Dismiss** <br> Miriam EDWARDS, Individually and on Behalf of all Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2020 WL 5101388 | — | S.D.Tex. | June 15, 2020 | Motion |
| **12.  Defendants' Motion to Dismiss Plaintiff's s 14(a) Class Action Complaint** <br> Miriam EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2020 WL 9209867 | — | S.D.Tex. | Jan. 30, 2020 | Motion |

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **13. Defendants' Motion to Dismiss Plaintiff's s 10(b) Corrected Class Action Complaint** <br> MIRIAM EDWARDS, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. MCDERMOTT INTERNATIONAL, INC., David Dickson, and Stuart Spence, Defendants. <br> 2020 WL 9209869 | — | S.D.Tex. | Jan. 30, 2020 | Motion |
| **14. Docket 4:18-CV-04330** <br> Edwards v. McDermott International, Inc. et al | — | S.D.Tex. | Nov. 15, 2018 | Docket |

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (19)**

**Direct History (1)**

1. Edwards v. McDermott International, Inc.
2022 WL 1568279 , S.D.Tex. , May 18, 2022

**Related References (18)**

2. Edwards v. McDermott International, Inc.
2021 WL 1415900 , S.D.Tex. , Apr. 12, 2021

3. Edwards v. McDermott International, Inc.
2021 WL 1421603 , S.D.Tex. , Apr. 13, 2021

4. Edwards v. McDermott International, Inc.
2021 WL 1421609 , S.D.Tex. , Apr. 13, 2021

5. Edwards v. McDermott International, Inc.
2021 WL 5121853 , S.D.Tex. , Nov. 04, 2021

6. Edwards v. McDermott International, Inc.
2021 WL 12296466 , S.D.Tex. , Dec. 22, 2021

7. Edwards v. McDermott International, Inc.
2022 WL 3927828 , S.D.Tex. , Aug. 30, 2022

*Report and Recommendation Adopted by*

8. Edwards v. McDermott International, Inc.
2022 WL 4454391 , S.D.Tex. , Sep. 23, 2022

9. Edwards v. McDermott International, Inc.
2022 WL 17908806 , S.D.Tex. , Dec. 16, 2022

10. Edwards v. McDermott International, Inc.
2023 WL 5916598 , S.D.Tex. , Sep. 11, 2023

*Report and Recommendation Rejected by*

11.　Edwards v. McDermott International, Inc.
2023 WL 6388552 , S.D.Tex. , Sep. 29, 2023

12.　Edwards v. Mcdermott International, Inc.
2023 WL 8461195 , S.D.Tex. , Nov. 20, 2023

🚩 13.　Edwards v. McDermott International, Inc.
2024 WL 873054 , S.D.Tex. , Feb. 29, 2024

*Report and Recommendation Adopted by*

🚩 14.　Edwards v. McDermott International, Inc.
2024 WL 1256293 , S.D.Tex. , Mar. 23, 2024 , withdrawn ( Apr 24, 2024 )

*AND Withdrawn and Superseded on Reconsideration by*

15.　Edwards v. McDermott International, Inc.
2024 WL 1769325 , S.D.Tex. , Apr. 24, 2024

*Report and Recommendation Adopted by*

🏳 16.　Edwards v. McDermott International, Inc
2024 WL 3085177 , S.D.Tex. , June 21, 2024

*Appeal Filed by*

17.　Nova Scotia Hlth v. McDermott Intl
, 5th Cir. , July 26, 2024

18.　Edwards v. McDermott International, Inc.
2024 WL 4969128 , S.D.Tex. , Nov. 13, 2024

*Objections Overruled by*

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

19.  Edwards v. McDermott International, Inc.
2024 WL 4969212 , S.D.Tex. , Dec. 04, 2024

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 3

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 21 of 167

In re Apache Corp. Securities Litigation, Not Reported in Fed. Supp. (2023)
2023 WL 5322444

2023 WL 5322444
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE APACHE CORP. SECURITIES LITIGATION

CIVIL ACTION NO. 4:21-cv-00575
|
Signed April 10, 2023

### ORDER

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

**\*1** Before me is a dispute relating to the process that will govern Defendants' production of documents in this securities fraud litigation. Plaintiffs have submitted a letter detailing a myriad of concerns they have with the upcoming search of documents by Defendants. *See* Dkt. 100. Defendants have filed a letter in response. *See* Dkt. 102. In a nutshell, Defendants argue that Plaintiffs "seek[ ] to (1) second-guess and overhaul Defendants' methodology for collecting and reviewing their own electronically stored information ("ESI"), and (2) wage hypothetical, preemptive battles over production disputes that do not—and will likely never—exist." *Id.* at 1.

To start, I will address Plaintiffs' request that I issue an ESI Order. I am willing to sign an ESI Order if it is jointly agreed to by the parties. I am not, however, going to unilaterally impose an "ESI Order dictating all manner of internal review protocols." *Id.* at 2. Before I took the bench five years ago, I spent more than two decades as a trial lawyer, often handling securities fraud cases on both sides of the docket. In all of those cases, I never once had an ESI Order forced upon me. It is my firm belief that the parties can move forward without an ESI Order in place. I have outstanding counsel in this case. I am confident that they fully understand their obligation to diligently search for and produce responsive documents.

Plaintiffs complain bitterly about the procedures Defendants intend to use to search for and produce those responsive documents. As I have explained in a previous securities fraud lawsuit, "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own [ESI]." *Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330, 2021 WL 5121853, at \*3 (S.D. Tex. Nov. 4, 2021) (quoting *The Sedona Principles, Third Ed.: Best Practices, Recommendations & Principles for Addressing Elec. Document Prod.*, 19 SEDONA CONF. J. 1, 118 (2018)). "I simply do not think that district court judges should micro-manage the parties' internal review procedures." *Id.* As Defendants correctly note, the proper path forward is to let Defendants proceed with the production of documents and "[i]f a dispute arises about materials Plaintiffs identify as missing from [the] productions, the parties should mediate it and, if they are not able to resolve it, file an appropriate motion." *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 3:18-MD-2843, 2021 WL 10282172, at \*20 (N.D. Cal. Oct. 11, 2021). I assure the parties that I will promptly resolve any discovery disputes.

It is my understanding that the parties are in the process of trying to agree to search terms. Defendants apparently sent revised search terms to Plaintiffs on March 31, 2023. Plaintiffs have yet to respond. I am hopeful that the parties will, in short order, agree to the search terms and begin the review and production of responsive documents. If not, I am here, ready to weigh in on a moment's notice.

**\*2** Last but not least, Plaintiffs ask me to modify the Docket Control Order to make the fact discovery deadline six months from the date Defendants substantially complete document production. Although I am certainly willing to entertain an extension of the discovery deadline as the case progresses, now is not the time. The parties should be laser focused on agreeing to search terms, gathering responsive documents, and producing such documents promptly. Let's see how that all shakes out before we talk about revising the case schedule.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5322444

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 4:21-CV-00575**<br>In re Apache Corp. Securities Litigation, No. 4:21-cv-00575 | — | S.D.Tex. | Feb. 23, 2021 | Docket |

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (6)**

**Direct History (1)**

1. In re Apache Corp. Securities Litigation
   2023 WL 5322444 , S.D.Tex. , Apr. 10, 2023

**Related References (5)**

🚩 2. Plymouth County Retirement System v. Apache Corporation
566 F.Supp.3d 712 , S.D.Tex. , Oct. 06, 2021

3. In re Apache Corp.
2022 WL 4277350 , S.D.Tex. , Sep. 15, 2022

*Report and Recommendation Adopted by*

4. Plymouth County Retirement Association v. Apache Corporation
2022 WL 17324439 , S.D.Tex. , Nov. 29, 2022

5. In re Apache Corp. Securities Litigation
2024 WL 532315 , S.D.Tex. , Feb. 09, 2024

6. In re Apache Corp. Securities Litigation
2024 WL 4881432 , S.D.Tex. , Nov. 25, 2024

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 4

2002 WL 1007614

KeyCite Yellow Flag

Distinguished by  Cornell Research Foundation, Inc. v. Hewlett Packard Co.,  N.D.N.Y.,  December 9, 2003

2002 WL 1007614
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David JONES, Issac Nelson, Kevin Martin, William Meachem, Clarence Suber, Tobias Walls, Henry Moreno, James White, Ramon Blas, Angelo Caravaggio, Roy Davis, Luciano Ortiz, Rory Dolan, Liberato Bermudez, Gregory Smith, Fruitquan Bailey, Todd Brockington, Renaldo Rivera, James Dixon, Juan Perdomo, Herbert Junior, Hector Lopez, Juan Rivera, Dwayne Faust, and all others similarly situated, Plaintiffs,
v.
Glenn S. GOORD, Acting Commissioner of the New York State Department of Correctional Services, Edmund Wutzer, Chairperson of the New York State Commission of Correction, Thomas J. Goldrick, Commissioner of the State Commission of Correction, Floyd Bennett, Superintendent of Elmira Correctional Facility, Hans Walker, Superintendent of Auburn Correctional Facility, Robert H. Kuhlmann, Superintendent of Sullivan Correctional Facility, David Miller, Superintendent of Eastern Correctional Facility and Christopher Artuz, Superintendent of Green Haven Correctional Facility, Defendants.

No. 95 CIV. 8026(GEL).
|
May 16, 2002.

OPINION AND ORDER

GERARD E. LYNCH, District Judge.

**\*1** Broad discovery is a cornerstone of the litigation process contemplated by the Federal Rules of Civil Procedure. Particularly in institutional reform litigation, the ability of citizen complainants to obtain access to governmental records, in order to present the courts with a full and accurate picture of the inner workings of public institutions, is a vital safeguard of fairness in litigation and of constitutional rights. The motion before the court, in which inmate plaintiffs seek access to various electronic databases maintained by state correctional authorities, tests the limits of this salutary practice. Because plaintiffs' demands exceed those limits, the motion will be denied.

I. *The Litigation*

This is a class action in which plaintiffs challenge New York State's administration of a program for double-celling in its maximum-security prisons. Double celling is a practice by which, due to overcrowding, two prisoners are housed in a cell originally designed for one person. It is clearly established that double-celling, even in maximum security prisons, does not in itself constitute cruel and unusual punishment in violation of the Eighth Amendment. *Rhodes v. Chapman,* 452 U.S. 337, 339, 349-50, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Plaintiffs nevertheless contend that in actual practice, the manner in which double-celling is carried out in New York violates the Constitution, because the increases in disease transmission and violence occasioned by the practice result in "depriv[ing] inmates of the minimal civilized measure of life's necessities," *id.* at 347, and demonstrate that the New York authorities have been deliberately indifferent to the health and safety of inmates in their charge. See *Wilson v. Seiter,*  501 U.S. 294, 303-05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

This litigation has a long history. The complaint was filed in 1995, making it one of the oldest active cases on this Court's docket, and the case has been assigned to several judges over the years. The case was effectively stayed for a considerable period pending litigation of a companion case challenging the same practice in medium-security prisons. After a full trial on the merits, Judge Stein denied the plaintiffs in that case any relief, in a lengthy and careful opinion. *Bolton v. Goord,* 992 F.Supp. 604 (S.D.N.Y.1998).

As the outcome of the *Bolton* case showed, plaintiffs here face a difficult burden. Under the Supreme Court's precedents, it is not enough for plaintiffs to prove that double-celling is overall less comfortable, or even less conducive to health and safety, than a policy of "one man, one cell." It would be surprising indeed if packing prisoners, particularly ones assigned to maximum-security institutions, in closer proximity, did not result in more incidents of inmate illness or injury than would otherwise occur. But, as *Chapman* shows, the former one-inmate-to-a-cell policy does not represent a constitutional baseline, any more than maintaining that policy would have placed conditions in New York's prisons beyond constitutional question. Without doubt, the more the state spends on security and health, the better off the inmates will

**Jones v. Goord, Not Reported in F.Supp.2d (2002)**

2002 WL 1007614

be, and it could always be argued that the failure to spend more results in harms to inmates that in principle could have been avoided by the allocation of additional resources. The problem for a court is not to enforce its idea of an ideal prison budget, but to decide when economies in prison spending create conditions that cannot be tolerated in a humane society. The plaintiffs' contention that New York's policy oversteps this line faces the further obstacle that double-celling is not a universal or even widespread condition in New York's prisons. It appears to be undisputed that the practice affects fewer than 5% of New York's maximum-security cells, and that inmates are housed in such cells for no more than 60 days at a time.

## II. *Discovery*

 **\*2**  Against this background, the parties have toiled in discovery for several years. Active discovery resumed after the *Bolton* trial in early 1998. Since then, pursuant to an agreement to concentrate discovery on a "sample" of only four of the State's thirteen maximum-security prisons, the State has provided to plaintiffs over 700,000 pages of documents, many of which have needed to be carefully reviewed and redacted prior to disclosure, at enormous expense. Among the categories of documents disclosed have been the forms prepared to determine which inmates are to be double-celled, inmate grievance reports, use of force reports, "unusual incident reports," and lists of inmates diagnosed with various diseases. There is no evidence that the State has resisted plaintiffs' demands for documents, or unreasonably refused to produce any records that have been sought.

Shortly after the case was reassigned to me in September 2000, the Court convened a conference to address the status of discovery in this then-already-aged case. It was represented to the Court at that conference, in early October 2000, that document discovery would be concluded by January 2001, and it was ordered that all fact discovery end by March 31, 2001. As often occurs, sometimes despite the best efforts of counsel, this deadline was not met, and in early March the parties contacted chambers to advise that depositions were behind schedule and that an extension of the deadline would be required. On March 23, 2001, the Court entered an order extending the discovery deadline to December 31, 2001, and providing that there would be no further extensions. As will shortly be seen, subsequent events led to further extensions, and the discovery deadline is now set for May 24, 2002.

## III. *The Electronic Database Request*

In August 2001, after nearly six years of litigation, plaintiffs for the first time specifically sought the production of electronic records and databases. Plaintiffs argue that the electronic data they seek was properly within the scope of discovery demands for inmate data served years before. Assuming for the sake of the argument that some or all of the requested databases came within the literal terms of broad document demands served by the plaintiffs, however, it ignores the practicalities of complex discovery, and the specific history of this case, to contend that the August 2001 request was merely a reminder that the State's production in response to earlier demands was still incomplete. Plaintiffs acknowledge that they have been aware of the existence of at least some of the databases in question here during testimony in the *Bolton* trial in 1997. By the time of plaintiffs' August 2001 letter, the parties had been engaged in active discovery for at least three years. Various discovery disputes had been presented to me and to previous judges assigned to the case. As noted above, in October 2000 the plaintiffs agreed in open court that they hoped to be through with document discovery in just a few months. On one of these occasions was there any indication that plaintiffs considered the State derelict in failing to produce electronic records. Indeed, plaintiffs point out no reference to discovery of electronic data in the court record or in correspondence between the parties prior to the August 2001 demand.

The State, in turn, was slow to respond, only objecting to the demand in November 2001. When the matter was called to the Court's attention, a pre-motion conference was promptly scheduled, and a briefing schedule set for a motion to compel production. (At the same time, the Court reluctantly granted yet another extension of the fact discovery cut-off, again threatening that further extensions would be denied.) Both sides eventually sought extensions on that briefing schedule. The Court, perhaps overly solicitous of counsel's needs, granted the extensions, and the matter was fully briefed on April 26, 2002. In the process, one very last extension of the fact discovery cut-off was granted, to May 24, 2002.

## IV. *The Parties' Positions*

### A. *Plaintiff's Motion*

 **\*3**  Plaintiffs request the production of six different electronic databases. Although both sides have filed their submissions under seal due to the sensitive nature of some of the materials involved, no security concerns prevent public disclosure of the nature of these databases. No one would be surprised to learn that the prison system

maintains computerized records that enable them (1) to track the location of prisoners in the system; (2) and (3) to record and recover unusual incident reports and disciplinary records; and (4), (5) and (6) to monitor prisoners' medical problems, including scheduling of medical appointments, tracking prisoners with certain specific medical problems, and recording the pharmaceuticals required by prisoners. Plaintiffs have demanded to be provided with copies of these databases.

Plaintiffs argue that this is a simple and straightforward discovery demand, of a sort routinely enforceable under the Federal Rules. Plaintiffs' complaint argues that double-celling produces intolerable health and safety risks to them. Information about which prisoners have been double-celled (and where and when), and the extent of disciplinary problems, violent incidents, and medical problems in the prisons is clearly relevant to testing that claim. Plaintiffs point out that at the *Bolton* trial, the State offered expert testimony about the correlation between double-celling and various problems that was derived, in part, from information contained in these databases. Plaintiffs claim that they should have the same opportunity to analyze the data for themselves, to see whether information in the State's records supports their claims.

In fact, plaintiffs go father than arguing relevance. They insist that the databases are "*essential* to the effective prosecution of Plaintiffs' claims." (Pl.Br. at 2, emphasis added.) "Without the Databases, Plaintiffs *cannot* effectively demonstrate the unconstitutional impact of double celling." (*Id.* at 9, emphasis added.) The argument is that without sophisticated statistical analysis of the incidence of disease and violence vis-à-vis double-celling, individual testimony will be dismissed as anecdotal, and plaintiffs will fail to establish that double-celling causes extensive and systematic harm. Plaintiffs propose to undertake "an iterative process in which a statistical expert must identify a set of independent variables related to characteristics of double celling," and then test the data for "relationships with any number of dependent variables, ... [including] incidents of violence, misbehavior, the severity of violence and misbehavior, incidence of infectious diseases among the inmate population, ... etc." (*Id.* at 9-10). The process of identifying correlations and performing regression analyses on these variables is not a simple matter of "running a test. Different combinations must be analyzed. After each analysis, the statisticians and counsel must review the results, and propose revised analyses to be run.... [T]he scope of the project is substantial: the number

of potential statistical relationships is in the millions." (*Id.* at 10-11.)

Plaintiffs go on to anticipate and rebut the State's objections to production. (1) To the extent that the State is concerned about security of information, plaintiffs contend that existing confidentiality orders can adequately protect the security of the information; further, they offer additional safeguards, such as limiting access to the copied data. Moreover, they point out that much of the data contained in the electronic databases (though not all) is already available to the plaintiffs in hard copy, so that the additional security risk is slight. (2) To the extent that the State argues that plaintiffs already have the necessary information, plaintiffs argue that the electronic data are both more extensive and more easily manipulable, permitting more efficient analysis of the evidence, and that requiring the plaintiffs to create their own electronic database will impose extraordinary burdens on plaintiffs' pro bono counsel. (3) To the extent that the State claims production of the databases will be unduly burdensome, plaintiffs point out that the data is already backed up on a routine basis, and that replication of an additional copy for plaintiffs on the occasion of such a data back-up should be relatively simple.

**\*4** Notably, however, plaintiffs' assertions about the kinds of analyses they wish to perform, the security issues involved, and the practicalities of reproducing the material and utilizing it for the desired purposes are supported only by affidavits from counsel. Plaintiffs provide no evidentiary support from any statistical expert concerning the kinds of hypotheses that could be tested by data of the nature contained in the databases, or what statistical methodology might produce reliable results. Nor do they offer an affidavit from any information technology expert who has considered the descriptions of the databases obtained in depositions, who can testify to the ease with which such data, once copied, can be integrated into a form that will permit whatever statistical manipulations are contemplated, or to how the data could be maintained in a secure manner. Indeed, it is apparent from an examination of plaintiffs' motion that plaintiffs have not retained any such experts yet, and are engaging for the most part in (somewhat informed) speculation about what might be done with the data they seek.

B. *Defendants' Response*

The State objects that the databases at issue should not be ordered produced. *First,* defendants denigrate the merits of plaintiffs' claims, arguing that plaintiffs are pursuing chimerical claims with little or no chance of success. *Second,*

Jones v. Goord, Not Reported in F.Supp.2d (2002)
2002 WL 1007614

they argue that the databases are not useful in the manner plaintiffs suggest, (1) because the data contained in them are already available to plaintiffs in hard copy form, previously produced to them at great public expense, and (2) because the databases involved, constructed for different purposes using different software and user interfaces for different users within the corrections bureaucracy, cannot simply be downloaded and massaged as easily as plaintiffs claim.

*Third,* defendants argue that reproduction of the databases, contrary to plaintiffs' submission, would in fact be a burdensome and technically complex task, since, in order to be usable, the data would not merely have to be copied, but also would have to be accompanied by extensive technical commentary and decoding to permit any unfamiliar user to understand the systems, integrate the different databases involved, and extract from them data in a form that could facilitate the comparisons and statistical tests contemplated by plaintiffs. *Fourth,* they argue that the data in question are subject at least to a qualified privilege, in that they contain confidential personal data about employees and prisoners (including many who are not members of the plaintiff class).

 **\*5** *Fifth* and finally, they argue that neither the existing protective order nor the additional measures proposed by plaintiffs nor any conceivable protective devices ordered by the Court could adequately deal with the security concerns presented by the databases. It is argued (1) that the very structure of the databases, and the necessary technical specifications that would have to accompany them in order to permit plaintiffs' experts to make any productive use of them, would disclose features of the correctional computer systems that (if disseminated) would render the State's systems more vulnerable to hacking; (2) that, although much of the information contained in the databases has already been made available in hard copy, information in electronic form is far easier to steal and transmit than the extensive paper records already in plaintiffs' hands; (3) that information (for example, matters relating to staff) not relevant to the case, redacted from prior document discovery, and contained in the databases, could not practically be redacted from the databases and would create risks to the physical security and privacy of guards and other staff.

In contrast to plaintiffs' motion papers, the State's submission includes detailed affidavits from officials familiar with and responsible for the construction and use of the databases. These affidavits contain significant technical details relating to at least some of the practical utilization and security issues relevant to disposition of the motion.

Incredibly, in the face of this voluminous and detailed response, plaintiffs' reply papers decline to join further issue with the State's factual contentions. While the Court appreciates any moving party's decision not to burden the Court with repetitive papers raking over the same ground as previous submissions, plaintiffs' cavalier dismissal of the State's well-supported factual presentation as a mere example of "protest[ing] too much" (Pl. Reply at 1) that raises no matters not already adequately disposed of in the moving papers, rings more of empty bravado than of calm confidence.

V. *The Legal Framework*
The discovery permitted by the Federal Rules is broad, but not without limits. As an initial matter, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." Fed.R.Civ.P. 26(b)(1). However, discovery is subject to limitation by the Court to the extent that

> the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

 **\*6** Fed.R.Civ.P. 26(b)(2). In addition, where necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," the Court may enter any protective order that is necessary, including "that the disclosure or discovery not be had." Fed.R.Civ.P. 26(c)(1). "Rule 26 vests the trial judge with broad discretion to tailor

Jones v. Goord, Not Reported in F.Supp.2d (2002)
2002 WL 1007614

discovery narrowly." *Crawford-El v. Britton,* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

Thus, the first step in the process is deciding whether requested material is discoverable, that is, whether it is relevant and not privileged. If it is, the Court still has considerable discretion to evaluate the practical realities of discovery, balancing the importance of the information against the burdens of production to decide whether fairness does or does not require production, and if so, on what terms.

This framework applies to requests for electronic or computer-based information just as it applies to more traditional materials. 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2218 at 451 (2d ed. 1994). As electronic mechanisms for storing and retrieving data have become more common, it has increasingly behooved courts and counsel to become familiar with such methods, and to develop expertise and procedures for incorporating "electronic discovery" into the familiar rituals of litigation. The rules cited above, albeit for the most part drafted in an earlier era, deal perfectly well with the problems occasioned by discovery of electronic "documents." At the same time, that the principles applied are the same does not mean that any information that would be discoverable in paper form must automatically be discoverable, on the same terms and conditions, and without consideration of additional issues, in electronic form-or, for that matter, that material that could not be discovered in hard copy would not be discoverable in the form of a database. Particularly when it comes to balancing the costs and benefits of providing discovery, the balance may well differ depending on the form of the information. In this case, for example, the plaintiffs claim that the same information produced in hard copy will be more valuable in the form of an electronic database, because the information will be more manipulable. The State, on the other hand, claims that the burdens and risks of producing electronic data will be much greater than those of producing the same information in the form of paper documents and reports. Such claims must be carefully evaluated on a case-by-case basis. Without at this point accepting either side's claims, it is evident that the form of the data requested creates special problems that must be given appropriate consideration.

VI. *The Framework Applied.*

A. Discoverability
**\*7** 1. *Relevance*

It is evident that the material requested is, at least for the most part, relevant to the plaintiffs' claims. Plaintiffs contend that the State's double-celling program, as it has actually been conducted, leads to unacceptable increases in the amount of disease and violence in the State's maximum-security prisons. To test this hypothesis (one might prefer to say, "to prove this case," but the plaintiffs' own submissions-that it will be impossible to prove their case without subjecting evidence that they have not yet obtained to statistical manipulations they cannot yet specify by experts they have not yet identified-strongly imply that they are engaged in speculation rather than proof), it would clearly be helpful to be able to identify which prisoners have been located in two-inmate cells during which periods, and to correlate that information with medical and incident reports. The databases in question, which relate to the location of prisoners, the incidence of medical problems and pharmaceutical use, and the extent of disciplinary incidents of various kinds, are generally relevant to that inquiry. The State, indeed, does not directly challenge the claim that the material sought is relevant, within the meaning of Rule 26(b)(1).

At the same time, it is far from clear from the evidence presented that all of the information in the databases sought goes to these issues. Plaintiffs have not established that the databases are limited to class members, or that they are or could be (without enormous effort and expense) redacted to relate only to maximum-security inmates. So far as the record before the Court indicates, in fact, the opposite is true. That is, the databases appear to be general DOCS managerial tools, covering all inmates in the State correctional system. Nothing in the record suggests that the databases are easily broken down in such a way that only the portion relating to the institutions involved in this lawsuit can be separately reproduced or disclosed.

Moreover, the databases by their nature disclose more than the data that is in them. By producing the electronic material in raw form, the State would disclose not only the underlying data sought by the plaintiffs, but also the organizational framework of the databases, which would effectively disclose a great deal about the way that DOCS maintains, stores, and classifies information. Worse, as will be discussed further below, the State asserts, and backs up its claim with expert testimony, that this disclosure would not be merely the passive result of providing the database. In order to enable any statistical use of the data, the State would have to affirmatively develop and provide to plaintiffs' experts the equivalent of a manual on how the data is encoded and

organized. The burden of doing so will be addressed below; for now it is sufficient to note that as a practical matter the plaintiffs' demands of necessity include the production of information that is not strictly speaking relevant to the case.

For purposes of this motion, however, it will be assumed that the databases, or at least a substantial part of the information contained in them, is relevant to the issues in this case.

**\*8**  2. *Privilege*

While the State does not contest the relevance of the material, it does argue that the databases are privileged. (Def.Br. at 13-19) The claim is that because production of the databases would raise issues of prison security, the material is subject to a qualified privilege. But defendants' claim that "courts have recognized at least qualified privileges in prison personnel and inmate files" (Def.Br. at 14) is somewhat overstated. Courts are generally and appropriately reluctant to create new privileges, since evidentiary privileges are exceptions to the general rules of disclosure and admissibility of evidence that favor seeking the truth and promoting uniformity and simplicity in the laws. *See Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (citing *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)); *Gonzales v. National Broadcasting Co.,* 155 F.3d 618, 623-24 (2d Cir.1998); 3 Jack B. Weinstein and Margaret Berger, *Weinstein's Federal Evidence,* § 501.02[2][c] at 501-15 (2d ed. 2002). Evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." "United States v. Nixon," 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). As such, they must be strictly construed and accepted "only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel,* 445 U.S. at 50 (citation omitted).

Accordingly, this Court has examined carefully the precedents relied on by the State, to see whether the privilege for which it contends has been recognized as within "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. This examination discloses that the State considerably overstates its authority, which do not support the conclusion that a broad privilege for prison personnel records has been established.

The State cites *Kerr v. United States District Court,* 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976), implying that in that case the Supreme Court recognized a privilege, "which 'rest[s] in large part on the notion that turning over the requested documents would result in substantial injury to the State's prison-parole system.' " (Def.Br. at 14, quoting *Kerr,* 426 U.S. at 405). But *Kerr* does not create such a privilege. The quoted text, in context, simply describes the basis for the California prison authorities' "*claims* of privilege." *Id.* The Court in *Kerr* refused to grant mandamus overturning a district court's disclosure order; while the Court noted with favor that the lower courts had not foreclosed an in camera review of the materials to determine whether privileged material was contained in the files, it certainly did not create, recognize or define any specific privilege in "prison personnel and inmate files," and instead appears to have left open whether there was any basis for invoking the "official or state secret privilege," which was apparently the only privilege asserted in the case. *Id.* at 399, citing *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

The other case relied on by defendants, *Association for Reduction of Violence v. Hall,* 734 F.2d 63, 66 (1st Cir.1984), is no more availing, and is also misleadingly cited by the State. The First Circuit in *Hall* did not recognize any general privilege in prison files, nor did it even pass on any claim of privilege at all. *Hall* holds that the district court erred in relying on documents it had reviewed in camera, but withheld from the plaintiff on grounds of privilege, in deciding a summary judgment motion. With respect to the merits of the privilege determination, the court merely "assumed, without deciding, that the district court did not abuse its discretion in ruling that the documents it viewed in camera were privileged" under one or more of the well-established privileges covering the identities of informants, law enforcement techniques, and intragovernmental policy-making memoranda. *Id.* Thus, even the district court's reasoning, which the Court of Appeals expressly did not adopt as its own, did not purport to create a general privilege for "prison personnel and inmate files," but simply found that particular documents were not discoverable because they contained specific information privileged under these other categories.

**\*9**  Thus, the authorities relied on by the defendants do not establish the sweeping general privilege for which they contend. Rather, they support the less dramatic and unsurprising proposition that prison records are sensitive

**Jones v. Goord, Not Reported in F.Supp.2d (2002)**

2002 WL 1007614

materials, which can be expected to contain a number of different types of information that potentially fall within several more traditional, carefully-defined privileges. Deciding whether the databases requested are privileged, or, more plausibly, contain some quantity of privileged information, would require more careful legal analysis than the parties have yet provided, including most likely some in camera inspection of the records, and a consideration of whether any privileges have been waived by the extensive disclosures already made by the defendants, which they themselves assert already contain substantial amounts of the data in the contested electronic databases.

Fortunately, it is not necessary in this case to decide whether the databases are, or contain material that is, within any of these privileges, or whether this Court should recognize the more general privilege claimed by the State as justified by "wisdom and experience." Defendants themselves claim no more than a qualified privilege, which may be overcome by a showing of need. But, as discussed below, even assuming for the sake of the argument that no privilege exists, and that the burden falls not on the plaintiffs to show special need, but on the defendants to establish that presumptively discoverable material nevertheless should be denied under the provisions of Fed.R.Civ.P. 26(b)(2) and 26(c), the balance of benefit and burden clearly supports denying the plaintiffs' motion to compel disclosure of the databases. Though this inquiry in many ways parallels the privilege analysis, it is preferable to address the question under the case-specific, balancing test of the discovery rule, without making unnecessary broad legal proclamations about privilege.

### B. *Balancing the Burdens and Benefits of Discovery*

**\*10** All three of the reasons set forth in Rule 26(b)(2) as rationales for limiting disclosure of otherwise-discoverable information apply in this case and require denying discovery of the databases.

The most important reason for this conclusion, foreshadowed by defendants' claim of privilege, is that set forth in Rule 26(b)(2)(iii): "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Indeed, as will be seen this standard largely subsumes the other considerations reflected in Rules 26(b)(2)(i) and (ii).

1. *Burden*

The State has demonstrated that the burden of the proposed discovery is extremely serious. In ordinary commercial litigation, the "burden" to be considered is primarily the economic cost of locating, reviewing, redacting, and reproducing requested files. Contrary to plaintiffs' claims, defendants have demonstrated that these burdens are not insignificant for the requested databases. Presumably, the actual data files could be reproduced quickly and without excessive labor on the part of DOCS's information technology specialists. But the expert affidavits supplied by defendants, and uncontradicted by any evidence offered by plaintiffs, persuasively establish that such a production of a few CD-ROMs would be of no utility to plaintiffs. Because the databases were designed for the operational purposes of prison administrators, the data desired by plaintiffs, while perhaps present in the databases, are not readily available for the statistical manipulations proposed by plaintiffs. (Martin Aff. ¶¶ 3A, 11.) Thus, the databases in question are not simply collections of lists or numbers that can be easily extracted and correlated with other numbers; rather, each of the requested databases has "been constructed to support the interactions of hundreds of concurrent users rather than to support the analytical activities of a few." (*Id.* ¶ 4.) Consequently, the databases are integrally connected to a data system that comprises "25 separate but interdependent subsystems that each are comprised of scores of programs, tens of databases and scores of screen and report formats. There are over 3,000 programs containing a total of 1,500,000 lines of program instructions." (*Id.*)

To take just one illustrative example, plaintiffs have requested the "database [ ] ... supporting ... the Unusual Incident System." (Pl. Br. at 1.) The Assistant Director of the Bureau of Management Information Systems in DOCS describes that system as follows:

> The Unusual Incident System was developed over fifteen years ago to replace and augment telephone and written notification to Central Office of any prison incident of an unusual nature. Data entry screens are used in the prison to record the description of the incident, the events causing the incident, the action taken, and a medical report. [This report is finalized and supplemented over time as additional information is received.] At each stage

of the process, the system provides a rudimentary word processing capability to prepare hard copy documents to certify and document the electronic record. This rudimentary word processing capability is vastly different than modern day word-processing functionality.... The content of an Unusual Incident "document" consists of many data fields and separate records for each line of narrative appearing on the report. When it is necessary to produce a hard copy document, a major program of the system reassembles all of the date, headings, captions and lines of narrative into a document such as those [already] provided to Plaintiff[s'] counsel.... The Unusual Incident system includes 36 programs, 21 screen formats and 48 reports available to the prisons or Central Office. The information in the Unusual Incident system is recorded in 8 database tables with a total of over 2,000,000 rows or records containing nearly 400,000,000 characters.

(Martin Aff. ¶ 6.) This description is typical of those provided for the various other databases at issue on this motion.[1]

[1]   The one exception to this generalization is the (inmate) Pharmacy System. Unlike the various other requested databases, which form part of a complex integrated system, it is not clear that there even exists any "pharmacy system database" as requested by plaintiffs. Apparently the "system" here consists of a program purchased from a vendor and in use on stand-alone PCs at those prisons (not all) that have pharmacies, in order to keep track of prescriptions issued to inmates. The system is incomplete, insofar as prisons without pharmacies supply prisoners' pharmaceutical needs via outside vendor pharmacies, which keep their own records in whatever form they choose, which records in turn are not available to DOCS. Moreover, the records in the pharmacy "system" are not centrally integrated, and are accessible only to

the pharmacists at each prison. The central office of DOCS "has never attempted to access data in the Pharmacy system," and its technical experts apparently have no idea how to do so. (Martin Aff. ¶ 9.)

**\*11**  Thus, providing plaintiffs with any meaningful access to aspects of this system is not a matter of duplicating discs and handing over copies. The data that would presumably be useful to plaintiffs in analyzing patterns of disease and violence or correlating such patterns with double-celled inmates are not simply numbers maintained in a simple set of files that can be downloaded into some (unspecified) statistical analytic program and then crunched in some (unspecified) way to produce meaningful results. DOCS personnel would need to prepare extensive documentation of the structure of the programs and databases to enable any experts retained by plaintiffs to understand the layout of the data, the meaning of codes, and the sources from which those codes can be derived. (Martin Aff. ¶¶ 12-17.)

Again to take just one concrete example, when double-celling was instituted, it took DOCS officials nearly six months, and several person-months of effort, to develop from the Locator database requested by the plaintiffs a method to produce a supposedly accurate list of inmates who have been double-celled; since the data were apparently not originally organized for purposes of tracking double-celling, which did not exist when the system began, it required the construction of additional programming tools to generate the list. DOCS experts estimate it would take eight weeks to prepare documentation of the Locator databases that would enable plaintiffs experts to recreate this effort to extract double-celling data in any form that would be usable for subsequent analysis. (This estimate does not, of course, account for whatever time it would take the experts to master that documentation.) (Martin Aff. ¶ 12.) Ironically, the plaintiffs have already been provided with the fruit of this effort, in the form of the most recent iteration of the list of inmates who have been double-celled. Contrary to plaintiffs' assertions, the electronic data are not a more easily-manipulated electronic version of the list, but an infinitely more complex and embedded set of files from which the list can only be extracted (conceivably, given enough additional time, burden and expense, in a more manipulable form than a hard-copy list) with great difficulty.

The defendants estimate that the cost of the efforts required by plaintiffs' requests would be in excess of $100,000, not including the burden of disrupting DOCS operations by

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 34 of 167
Jones v. Goord, Not Reported in F.Supp.2d (2002)
2002 WL 1007614

shifting expert computer personnel from operational duties. (Martin Aff. ¶ 3.) Even taking the specific dollar figure with a large grain of salt, it is apparent that the financial burden of the State of complying with plaintiffs' demand would be significant.

But unlike the typical commercial litigation, the burden on defendants here is not limited to financial cost or business disruption. Production of the requested databases would have other negative consequences for the State that are even more significant. The security risks of producing the databases are substantial, and cannot be met by the mild and insufficiently thought-out measures suggested by plaintiffs.

It should go without saying that the data in question are highly sensitive. Only a handful of DOCS's own employees, and no one else, have access to the programs used to compile and store the data sought here. (Martin Aff. ¶ 19) Access to the data themselves is more widely shared, but few DOCS officials have access to the totality of the databases sought, which are used for different purposes and are accessed piecemeal rather than in their totality by prison officials.[2] The requested databases contain confidential information about prison personnel; for example, unusual incident reports may contain identifying information (such as social security numbers) and medical information concerning prison staff. Pursuant to earlier court orders and confidentiality stipulations, such information has been painstakingly redacted, at considerable cost of time and effort, from hard-copy versions of these reports provided to plaintiffs. No program or other practicable automated method exists for redacting the computer records to remove the same information from any copy of the database provided to plaintiffs. (Martin Aff. ¶ 20.) Accordingly, the alternatives available to the Court are either to order production of the unredacted database, dramatically ratcheting up the security burden of disclosure, or to order the production of a redacted version of the database, which would require a digital duplication of the extraordinary effort already undertaken with respect to the paper discovery process: a manual effort to input changes and corrections into the copied database to eliminate sensitive material.[3]

[2] For example, inmate medical information contained in the medical databases requested by plaintiffs is not available to nonmedical personnel within DOCS. (Martin Aff. ¶ 23.)

[3] Personnel information is only one category of sensitive material contained in the database. The Locator database contains information, as the name suggests, detailing the cell location of every inmate in the system. That information, obviously confidential for security and other reasons, goes well beyond the listing of double-celled inmates already provided to plaintiffs. (Kirkpatrick Aff. ¶ 9.)

**\*12** The databases also contain sensitive information that *has* been provided to plaintiffs, but in a different form. Here the particular characteristics of electronic information come into play in assessing the security costs of providing information in digital form. The costs and difficulties of redaction, for example, have earlier led the Court to permit production of documents with otherwise-confidential inmate medical information unredacted. The cost/benefit analysis with respect to hard-copy information has led to the conclusion that reasonable restrictions on access to and reproduction of documents are sufficient to prevent wholesale exposure of this information to unauthorized persons, particularly as the authorized users were primarily members of the bar of this Court and their employees. While even the best security measures cannot prevent occasional regrettable leakage of particular documents, the difficulties attendant on the physical reproduction of hundreds of thousands of pages of material provide a de facto safeguard against massive theft or misuse of data.

But computer security is an entirely different matter. Plaintiffs' suggestions, including maintaining strict physical custody of discs or other storage media containing the requested data ignore the fact that the manipulation of the data projected by plaintiffs will require loading them into foreign computer systems, presumably belonging to as-yet-unselected experts who are neither subject to the licensing rules and ethical constraints imposed on members of the bar nor chosen for expertise in computer security. The ease with which entire databases can be reproduced or transmitted radically alters the security stakes and requires a rebalancing of the factors that permitted unredacted information to be disclosed in paper form. (Kirkpatrick Aff. ¶ 6; Clark Aff.) Plaintiffs have provided no reports or affidavits from anyone with expertise in computer security or database management that would provide any evidentiary basis for a conclusion that the data in question could be safeguarded by the means suggested by plaintiffs or by any other means.

2002 WL 1007614

Finally, production of the databases would present one other significant security concern not present in routine document discovery. Disclosure of the databases, and of the codes and documentation required to utilize them, would provide access not merely to the data themselves, but also to the techniques used by the prison authorities to record and store data. This is itself a highly confidential matter. In a business context, such disclosure would in some cases raise issues of the protection of trade secrets. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001-02, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (noting broad definition of trade secrets); *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (outlining defining factors of trade secrets); 3 *Weinstein's Federal Evidence,* §§ 508.02-508.07. In a prison context, the stakes are much higher. The security of the data in question against inmates or their associates who have an incentive to seek access to DOCS computers is obviously an important concern. Disclosure of the underlying code and programming information presents a significant danger not presented by disclosure of the data content in hard-copy format. As defendants eloquently make the point, "[Y]ou cannot hack into a computer printout, but a program can be a roadmap for hackers." (D.Br. at 16.)

**\*13** 2. *Benefit*

None of these concerns, significant as they are, necessarily preclude discovery. Security concerns can perhaps be met, with enough time, ingenuity, and expense; redaction can be accomplished, with the expenditure of sufficient resources. Parties to important public litigation or even private disputes sometimes have to bear significant costs in the discovery process, in order to assure fair and informed decision-making by courts. The "burden or expense of the proposed discovery," even when substantial, does not forbid disclosure. Rather, the rule asks whether that burden and expense "outweighs its likely benefits." Fed.R.Civ.P. 26(b)(2)(iii). Accordingly, it is necessary to turn to the projected benefits of discovery to plaintiffs and to the truth-seeking process before determining whether disclosure can be had.

The suggested benefits, however, prove elusive. Plaintiffs make the plausible claim that having data in electronic, manipulable form will facilitate expert analysis of the data, and avoid the need for plaintiffs to incur significant expense-which, as indigent inmates represented by pro bono counsel who have already expended significant resources on the case-they can ill afford. But if this claim is facially appealing in the abstract, it is much more difficult to document and quantify

any specific benefit sought by plaintiffs. As discussed above, the databases in question do not exist in a form that is susceptible to statistical analysis, and considerable time, effort and expense will be necessary to reduce them to a form that might be so usable, or to provide the background instructions and documentation that will permit them to be reduced to such form. Yet plaintiffs provide no meaningful account of what exactly they plan to do with the data. Other than very general statistical terms, such as "regression analysis," that offer little specific content, plaintiffs do not describe what they hope to find or how they hope to find it. Presumably, thinking through the actual uses of the databases is to be left to the as-yet-unselected experts who will one day be retained.

This puts the virtual cart before the digital horse. The Court cannot find that the major risks and burdens detailed above will be worth bearing on the basis of entirely speculative benefits. Of course, until an analysis is done, a court could never know whether that analysis will prove useful to plaintiffs, or produce proof of constitutional violations. But that is not the test; negative results could be as useful as positive ones to resolving this longstanding (long-*running* would be a misnomer) litigation. Though plaintiffs do not need to show that obtaining this data will in fact advance their cause, they do have to provide some basis to believe that specific tests can be run that, with a reasonable degree of scientific certainty, can be expected to yield results that would be relevant to the issues before the Court. *See, e.g., Waldron v. Cities Services Co.,* 361 F.2d 671, 673 (2d Cir.1966). The case might be different if the plaintiffs proffered an affidavit from a reputable statistician explaining exactly what hypotheses would be tested, on what theory and using which techniques, and precisely what data would be necessary to perform those tests. At a minimum, such an affidavit would enable defendants' computer experts to address whether and how the kind of data sought by the plaintiffs' statistics experts could be made available from DOCS's computers. On the present record, however, plaintiffs can only be characterized as demanding a huge volume of sensitive data, in a form that may or may not be usable for any productive purpose, on the vague hope that it will prove useful when subjected to future massage by unspecified experts. Plaintiffs, thus, have made little showing of "the importance of the proposed discovery in resolving the issues" before the Court. Fed.R.Civ.P. 26(b) (2)(iii).

**\*14** Finally, the benefits to be expected from the proposed discovery must be assessed in light of whether "(i) the

discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; [and] (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought." Fed.R.Civ.P. 26(b)(2)(i), (ii). Though the Rule identifies these as separate grounds on which discovery may be limited, they may productively be considered as part of the burden/benefit analysis. Even if the discovery sought is not *so* cumulative that it can be dismissed out of hand on that ground alone, the extent to which the discovery is duplicative will bear importantly on the benefits to be expected from the discovery; even if the party cannot be said to have simply forfeited any claim to discovery by prior inaction, the extent to which a party has unreasonably foregone efforts to seek the discovery sought will affect both the burden on the opposing party and the evaluation of whether the party seeking discovery itself believes that significant benefits will accrue. These factors both weigh against compelling discovery in this case.

First, much of the actual *data* in the databases (to the extent relevant) has already been provided to plaintiffs in documentary form. Plaintiffs cite no concrete facts available in the database, relevant to the litigation, and unprivileged, that are not available in the 700,000 pages of material already provided to them. As repeatedly acknowledged in this opinion, the Court accepts the fact that the form of the databases sought could in theory provide non-cumulative value added to plaintiffs. At the same time, as also discussed above, the defendants are correct that the security burdens on the State will be massively increased by production in this form, such that it can readily be concluded that the document discovery already provided is far "less burdensome [and] less expensive" than the electronic production now sought by plaintiffs.

 *15  Second, the expense of additional production has to be weighed in the context of the extraordinarily burdensome and expensive discovery process already undertaken in this case. Defendants have produced nearly three quarters of a million pages of records, and expended the months of personnel hours necessary to locate, prepare, redact, copy and ship those documents. This is no mere clerical task; the redaction process involves skilled work by attorneys and by paralegals and interns acting under their supervision. The Attorney General of New York has hired three full time clerks to work specifically on this case. (Moody Aff. ¶ 2.) While the costs of employees on the public payroll are harder to estimate than the bills paid by litigants represented by lawyers who bill by the hour, the (largely hidden) burden on the public of the discovery process already conducted in this case is disturbing. Plaintiffs' counsel, too, has expended a significant amount of out-of-pocket costs on the case, as well as investing an enormous amount of (putatively very costly) attorney time.

This is relevant in assessing the cost of the requested discovery; that cost should not be assessed in isolation, but in the context of the total cost of discovery to date. It is also relevant to assessing whether the plaintiffs have had "ample opportunity" to obtain the information in question. As noted above, plaintiffs argue that discovery demands served early in this litigation could be construed as covering the databases that are the subject of this motion. But that claim ignores the realities of big-case discovery, which, perhaps unfortunately, often proceeds by the exchange of overbroad discovery demands and blanket objections, followed by concrete negotiations over what records are really necessary and what production the opposing party is really prepared to make without compulsion. Discovery in many cases is already burdened by posturing correspondence and excessive resort to court conferences that vastly increase the friction and cost of the process. Parties should be encouraged to work out differences amicably; for a court to ignore or fail to give effect to the informal accommodations and understandings that develop over time would undermine the spirit of cooperation and informality that alone makes effective discovery and settlement possible in overburdened courts.

Viewed against that realistic background, the record in this case makes absolutely clear that this discovery request is belated. The parties have spent years, significant sums, and exhaustive efforts on discovering and analyzing a mountain of paper-a project that, plaintiffs now claim at the eleventh hour before expiration of the n-th discovery deadline, was largely useless, or at least superseded, because the production of electronic data instead would have accomplished the same thing and more. Plaintiffs may not have identified the specific databases by name until a deposition in December 2001 laid out the details of the DOCS computer system, but they have been aware throughout discovery that DOCS, like any modern enterprise, keeps its records in computerized form. It is undisputed that reports devised from these very databases were introduced into evidence at the *Bolton* trial in 1997, and many of the reports and records that defendants have disclosed in hard-copy form have self-evidently been produced as printouts from computer files.

**\*16** Nothing prevented plaintiffs from seeking, either informally through the extensive correspondence and telephonic communication between counsel, or formally by interrogatory, further information about the computer databases available from DOCS. Nothing prevented plaintiffs from discussing with their adversaries in a timely fashion, before the expenditure of hundreds of thousands of dollars on conventional document discovery, whether the mountain of paper was really necessary, or whether a cooperative effort to explore electronic discovery possibilities could have led to a mutually beneficial agreement. Nothing prevented plaintiffs from retaining experts to advise them as to what kinds of electronic data would likely be found in the DOCS computer system, what kinds of data would be necessary to evaluate plaintiffs' claims, and what kinds of security precautions could be presented to the State to satisfy its legitimate interests and induce agreement to cooperate in providing data. Nothing in the record suggests that any such efforts were made, or, indeed, that the plaintiffs took any step to seek discovery of any electronic data until after their adversaries had expended exorbitant sums of public money on conventional discovery, and until the ultimate deadline for completing fact discovery, after seven years of litigation, was at last at hand. Accordingly, the Court is constrained to find that the plaintiffs have had, and let pass, ample opportunity to obtain this information earlier in the discovery process, and that that conclusion strongly supports denying plaintiffs' motion.

VII. *Conclusion*

The factual findings set forth in this opinion are largely uncontested. The State has compiled an impressive record documenting the technical issues involved in assessing the burdens and risks, and the obstacles to securing the hoped-for benefits, of ordering the discovery sought. Plaintiffs, as noted above, have blithely declined to respond to that presentation, relying on the facially plausible generalities put forth in their initial motion papers. The Court has nevertheless carefully and skeptically reviewed the papers submitted by defendants, only to find them ultimately persuasive and accurate.

Assuming for the sake of argument that the databases sought by plaintiffs are relevant and not privileged, the Court finds that discovery should be denied because defendants have made a compelling showing that the burden of the proposed discovery far outweighs its likely benefit for resolving the issues before the Court, particularly in light of the failure of the plaintiffs to seek such discovery despite ample opportunity to do so in a more timely manner, and the vast amount of material, largely duplicating the contents of the databases now sought, which has already been provided by the defendants. The Court will not impose additional burden, expense and risk of harm on the parties, and especially on the defendants, at this belated hour, after the expenditure of so much effort and expense, and on the undocumented hope of obtaining such speculative benefits.

**\*17** The motion to compel production is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1007614

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:95cv08026**<br>JONES, ET AL v. BERTLEH, ET AL | — | S.D.N.Y. | Sep. 21, 1995 | Docket |

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

**Negative Citing References (1)**

*The KeyCited document has been negatively referenced by the following events or decisions in other litigation or proceedings:*

| Treatment | Title | Date | Type | Depth | Headnote(s) |
|---|---|---|---|---|---|
| Distinguished by | 🚩 1. Cornell Research Foundation, Inc. v. Hewlett Packard Co. 〞 MOST NEGATIVE<br><br>223 F.R.D. 55 , N.D.N.Y.<br>LITIGATION - Discovery. Plaintiff entitled to electronic discovery of technical files in patent infringement case. | Dec. 09, 2003 | Case | ▮▮▮▯ | — |

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (4)**

**Direct History (1)**

  ⚑ 1.  Jones v. Goord
2002 WL 1007614 , S.D.N.Y. , May 16, 2002

**Related References (3)**

⚑ 2.  Jones v. Goord
190 F.R.D. 103 , S.D.N.Y. , Sep. 27, 1999

3.  Jones v. Goord
2000 WL 290290 , S.D.N.Y. , Mar. 20, 2000

⚑ 4.  Jones v. Goord
435 F.Supp.2d 221 , S.D.N.Y. , May 26, 2006

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 5

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

2012 WL 201872
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

James P. KERR, et al., Plaintiffs,
v.
EXOBOX TECHNOLOGIES
CORPORATION, et al., Defendants.

Civil Action No. H–10–4221.
|
Jan. 23, 2012.

**Attorneys and Law Firms**

Eddie M. Krenek, Tricia Thompson, Krenek Law Offices, Katy, TX, for Plaintiffs.

David L. Tolin, The Tolin Law Firm, Beaumont, TX, Robert M. Corn, Attorney At Law, David Alan Walton, Beirne Maynard et al, John Thomas Black, Attorney At Law, Houston, TX, for Defendants.

Reginald Goodman, Pasadena, TX, pro se.

Michael Wittenburg, Stafford, TX, pro se.

Richard Evans, Houston, TX, pro se.

Jason Landess, Las Vegas, NV, pro se.

*MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court are the following motions:

(1) Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint for Failure to State a Claim upon which Relief Can Be Granted ("Sonfield's Motion to Dismiss") (Doc. No. 17);

(2) Defendant Jason Landess' Motion to Dismiss under Rule 12(b)(6) ("Landess' Motion to Dismiss") (Doc. No. 46);

(3) Defendant Exobox Technologies Corp.'s Motion to Dismiss Plaintiffs' First Amended Class Action

Complaint for Failure to State a Claim upon which Relief Can Be Granted ("Exobox's Motion to Dismiss") (Doc. No. 47);

(4) Defendant Exobox Technologies Corp.'s Motion for a More Definite Statement ("Exobox's Motion for a More Definite Statement") (Doc. No. 45); and

(5) Plaintiffs' Motion for Leave to Extend Time to File Response to Exobox's Motion to Dismiss ("Plaintiffs' Motion for Leave") (Doc. No. 53).

After considering the Motions, all responses thereto, and the applicable law, the Court finds that:

(1) Sonfield's Motion to Dismiss should be granted in part;

(2) Landess' Motion to Dismiss should be granted;

(3) Exobox's Motion to Dismiss should be granted in part;

(4) Exobox's Motion for a More Definite Statement should be denied; and

(5) Plaintiffs' Motion for Leave should be granted.

## I. BACKGROUND [1]

[1] The facts are taken from Plaintiffs' Amended Complaint (Doc. No. 16), and are accepted as true for purposes of the pending motions.

Plaintiffs, investors of Exobox Technologies Corporation ("Exobox"), bring claims against Exobox and the individual defendants for fraud and misrepresentation; violations of Texas and federal securities laws; and conspiracy and aiding and abetting fraud and violations of securities laws. Plaintiffs allege that Defendants engaged in a scheme involving the issuance and sale of securities in violation of state and federal securities laws. (*Id.* ¶ 1.) Since filing their Amended Complaint, Plaintiffs have voluntarily dismissed many of the individual defendants. [2] (Doc. No. 48.) Therefore, the defendants that remain in this case are Robert L. Sonfield, Donald C. Bradley, Jeffrey W. Bradley, Jason Landess, Marc Lane, Roger Brewer, Alexanderia K. Blankenship, and Exobox Technologies Corporation.

[2] Plaintiffs voluntarily dismissed Robert Dillon, Reginald Goodman, Michael Wittenburg, Marc Pernia, Michael Wirtz, Richard Evans, M.D., William Sklar, Leslie Danyel Owens–Swint,

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   1

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

Scott Copeland, Sydney Barrett, and James L. Jimmerman.

Defendants Donald and Jeffrey Bradley established Kilis in 1999, which was designed as a shell corporation and never conducted any business operations. (*Id.* ¶ 27.) In 2000, the Bradleys caused Kilis to issue 22 certificates representing 1,915,000 shares of Kilis common stock (the "founders' certificates"), which were not encumbered with restrictive legends warning against reselling the shares into the public market. (*Id.* ¶ 28.) Many of the founders' certificates were issued to nominees who paid no consideration, did not receive the certificates, and were not aware the certificates had been issued in their own name. (*Id.* ¶ 29 .) However, the Bradleys falsified Kilis' corporate records to indicate that the nominees had paid consideration and attended annual meetings, and further forged signatures on stock powers issued to them by various nominees to give them complete control over the Kilis stock. (*Id.* ¶ 30.) The Bradleys retained control over all of the founders' certificates until they were delivered to Defendant Sonfield in June 2005. (*Id.* ¶ 31.) Sonfield had knowledge of the Bradleys' complete control over the certificates and the methodology employed to obtain such control. (*Id.*)

**\*2** Sonfield began discussing with Defendants Lane and Brewer his intent to create, obtain control over, and sell stock in a company to make substantial sums of money. (*Id.* ¶ 32.) In June 2005, Sonfield proposed to Defendants Landess and the Bradleys that Kilis merge with JinPin, Inc., one of Sonfield's clients. (*Id.*) Landess and the Bradleys were to receive 10% of the stock in the resulting company. (*Id.*)

Sonfield took possession and control of Kilis shortly thereafter. (*Id.* ¶ 33.) In June and September 2005, additional Kilis shares of unrestricted stock, which were fraudulently backdated to March 1, 2003, were issued in a series of transactions designed by Sonfield to "distribute" shares and hide the fact that he retained sole control over all the stock. (*Id.* ¶ 34.) Sonfield issued 100,000 shares of Kilis stock in the name of Jason Landess' step-brother for no consideration, but retained control over these shares by receiving a blank stock power from Landess' step-brother. (*Id.*) He issued another 100,000 shares to his legal assistant, who also paid no consideration for the stock, and issued 300,000 shares to an individual claiming to have been appointed as JinPin's principal. (*Id.*)

Landess also filed documents with the Nevada Secretary of State reporting that Kilis had changed its name to JinPin and that the principal of JinPin had become Kilis' sole officer

and director. (*Id.* ¶ 35.) Plaintiffs allege that Sonfield had knowledge of these filings and representations because the JinPin merger never closed and Sonfield retained control of virtually all of the outstanding shares of Kilis stock. (*Id.*)

In August 2005, Sonfield, while still in control of the Kilis stock certificates, began representing Exobox and orchestrated transactions whereby Exobox would enter into a reverse merger with JinPin. (*Id.* ¶ 36.) Exobox ultimately agreed to enter the reverse merger with JinPin, based on Sonfield's advice. (*Id.* ¶ 37.) However, Sonfield failed to disclose: (1) his earlier transactions with Landess and the Bradleys; (2) that he would own and/or control virtually all of Exobox's outstanding common stock upon completion of the reverse merger; and (3) and that certain share certificates were fraudulently backdated to March 1, 2003 to allow the shares to be freely traded under certain safe harbor provisions. (*Id.*) The reverse merger was finalized on September 15, 2005, and Exobox emerged as the surviving entity. (*Id.* ¶ 38.) Sonfield controlled over 88% of Exobox's public float. (*Id.*)

Sonfield engaged an expert to value Exobox in order to place the shares of stock for sale on the market. (*Id.* ¶ 39.) When Sonfield and others, including Landess, failed to provide requested information and data to the expert to aid him in his valuation, the expert concluded that Exobox had no readily ascertainable value. (*Id.*) Sonfield, Landess, and others fraudulently tried to convince the expert to provide a significant value to Exobox and suggested certain numbers that they admitted did not represent Exobox's true value. (*Id.*)

**\*3** Despite their knowledge that Exobox had no value and that the shares of stock could not be sold to the general public, Sonfield and Landess undertook steps to facilitate the public trading of Exobox stock. (*Id.* ¶ 40.) Although he knew the stock certificates had been fraudulently backdated, Sonfield prepared and submitted a tradability opinion letter to the Pink Sheets, LLC on October 7, 2005, which stated that virtually all the shares of Exobox "may be sold immediately in the public market ... on the safe harbor of Rule 144(k) under the Securities Act." (*Id.*)

On or about October 14, 2005, Exobox stock began trading in the Over–the–Counter Bulletin Board. (*Id.* ¶ 41.) Defendants began manipulating the stock prices through the sales of Exobox stock; Exobox's share price reached a high of $22.00 and stabilized at approximately $15.00 on very limited volume. (*Id.*)

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

On or about October 15, 2005, Sonfield instructed his legal assistant to sell her shares, which had become 450,000 shares of stock in Exobox after the reverse merger. (*Id.* ¶¶ 42–43.) Until mid-January 2006, Sonfield directed or was aware of the sale of 12,200 Exobox shares from his legal assistant's account, for total gross proceeds of approximately $19,600. (*Id.* ¶ 43.) Sonfield told his legal assistant in January that he was "parking" the shares in her account and that they belonged to Defendants Lane and Brewer. (*Id.* ¶ 44.) On January 17, 2006, he directed her to transfer the remaining 437,800 shares of Exobox stock and $18,829 in Exobox proceeds to a brokerage account in Blankenship's name. (*Id.*) Sonfield had written, discretionary trading authority over this account, and sold 68,996 of these shares into the market for proceeds of approximately $628,486. (*Id.*) $25,000 of the proceeds was transferred by Sonfield and/or Blankenship to Landess, and wire transfers totaling $616,027 were made from the Blankenship brokerage account to a bank account in her name and then to an offshore entity controlled by Lane and Brewer. (*Id.* ¶ 45.) After the SEC began investigating Exobox, approximately $621,570 was returned to Blankenship's account. (*Id* .) No registration statement was filed and no other disclosure was made to the general public concerning these transactions. (*Id.* ¶ 46.)

On four occasions between October 2005 and July 2006, [3] Sonfield delivered 19 of the original Kilis' founders' certificates to Exobox's transfer agent for re-issuance as approximately 8.5 million post-split Exobox shares. (*Id.* ¶ 47.) Sonfield directed these certificates to be issued as unrestricted stock in the names of nine offshore entities controlled by Lane and Brewer. (*Id.*)

[3]     On October 12, 2005, 35.19% of Exobox stock was transferred to these offshore entities; 12.42% was transferred on February 17, 2006; 18.63% on July 10, 2006; and 12% on July 31, 2006. (*Id.* ¶ 47.)

Defendants Lane and Brewer directed the sale of approximately 8 million Exobox shares from these accounts, from which they obtained approximately $2.78 million that was transferred to their overseas bank accounts. (*Id.* ¶ 48.) Lane and Brewer used $500,000 of the above proceeds to pay to Sonfield for the benefit of Exobox for the preferred stock payment. (*Id.* ¶ 50.) No registration statement or notice of proposed sale was ever filed for any of these securities transactions. (*Id.* ¶¶ 49, 50.)

**\*4** Similarly, the Bradleys and Landess sold many shares of Exobox stock in 2006 and early 2007 for substantial sums of money. (*Id.* ¶¶ 51, 52.) No one filed a registration statement or publicly disclosed those transactions.

Additionally, Sonfield prepared and filed a Form 10–SB registration statement on behalf of Exobox on December 21, 2005, which he subsequently amended by filing Form 10–SB/A on February 3, 2006. (*Id.* ¶ 53.) These filings omitted facts necessary to make the statements contained in the filings not misleading, including:

- Sonfield's control of at least 9.6 million shares or 88% of the company's outstanding common stock, which was purportedly unrestricted float;

- Sonfield's transfer of approximately 35% of Exobox's common stock to Lane and Brewer's entities;

- Sonfield's agreement to provide 10% of Exobox's common stock to the Bradleys and to Landess; and

- The fact that Exobox had no product, no operations, and no value.

(*Id.*)

Sonfield additionally prepared and filed two post-effective amendments to the Form–SB on March 8 and 9, 2006. (*Id.* ¶ 54.) These filings:

- Failed to disclose Sonfield, Lane, and Brewer's control of the Kilis certificates;

- Failed to disclose Sonfield's disposition of virtually all of Exobox's common stock after the Exobox merger;

- Failed to correct Exobox's ownership although Sonfield had transferred 47.61% of Exobox's stock prior to the filing of this document; and

- Erroneously continued to report that the principal of JinPin owned 1,350,000 shares of Exobox common stock even though Sonfield had directed the sale of 300,000 of those shares to a Lane and Brewer offshore entity, and Sonfield received blank stock powers for the sale of the remaining shares; and

- Stated that "as of the closing date [of the Exobox merger], Exobox Nevada was a non-operating blank check or shell corporation controlled by Donald C. Bradley, his wife, Shirlene Bradley, and their son, Jeff Bradley."

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

However, Sonfield's tradability letter of October 7, 2005 stated that the Bradleys affiliation with the company ceased as of June 22, 2005.

(*Id.*)

Sonfield also prepared and filed Exobox's Form 10–KSB for the fiscal year ending on July 31, 2006. (*Id.* ¶ 55.) This filing:

- Failed to disclose that Lane and Brewer controlled the vast percentage of the company's common stock; and

- Failed to disclose that Sonfield, Lane, and Brewer controlled and had beneficial ownership of the reportable percentages of Exobox's common stock.

(*Id.*)

Each of these filings deprived investors of material information, including the fact that Sonfield, Lane, and Brewer controlled the company's purportedly unrestricted common stock float. (*Id.*)

In addition to the facts enumerated in their Amended Complaint, Plaintiffs "incorporate by reference, as if set forth verbatim herein, the factual allegations as set forth in Civil Action H–08–2351; Securities and Exchange Commission vs. Robert L. Sonfield, et al., filed In the United States District Court for the Southern District of Texas, Houston Division." (*Id.* ¶ 26.)

## II. LEGAL STANDARD FOR MOTION TO DISMISS

**\*5** A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief —including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir.2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at

556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal,* 129 S.Ct. at 1950 (citation omitted). The court should not " 'strain to find inferences favorable to the plaintiffs' " or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.' " *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir.2004)). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir.2000). Furthermore, a Court may refer to matters of public record when deciding a motion to dismiss. *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir.2011). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that a plaintiff adequately pleads a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004). "Motions to dismiss under Rule 12(b) (6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir.2009) (citation omitted); *Duke Energy Intern., L.L.C. v. Napoli,* 748 F.Supp.2d 656, 664–65 (S.D.Tex.2010). The Court should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir.2002).

## III. STATE LAW CLAIMS

**\*6** Plaintiffs assert claims of fraud and misrepresentation under the Texas common law. (Am.Compl.¶¶ 87–88.) Plaintiffs also include civil conspiracy claims in Count III.[4] (*Id.* ¶ 90.) Moreover, Plaintiffs assert that "[t]he claims at issue concern ... violation[s] of state ... securities

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

laws," and that "there are pendent claims for damages and injuries resulting from statutory and common law fraud, misrepresentation, gross negligence, and conspiracy to commit the violations of law." (*Id.* ¶ 1.)

4        The Court assumes that Plaintiffs' conspiracy claim is brought under state law, as Plaintiffs have not asserted any other basis for this claim.

### A. Legal Standard

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f)(2) and 15 U.S.C. § 77p(c), precludes maintenance of a securities class action in state or federal court if: (1) the action is a "covered class action;" (2) the claims are based on state law; (3) the action involves one or more "covered securities;" and (4) the claims allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of the security. *In re Enron Corp. Securities,* 535 F.3d 325, 338–39 (5th Cir.2008); 15 U.S.C. § 78bb(f). Congress enacted SLUSA "to ensure that all causes of action involving allegations of misrepresentation or omission in connection with covered securities would be subject to the requirements of the Private Securities Litigation Reform Act of 1995 ." *Miller v. Nationwide Life Ins. Co.,* 391 F.3d 698, 702 (5th Cir.2004).

### B. Analysis

Plaintiffs agree that "case law is clear that such claims are preempted at the federal level." (Resp. to Sonfield's Mot. to Dismiss ¶ 4.) Similarly, Plaintiffs do not respond to this allegation in Landess' Motion to Dismiss. As Plaintiffs fail to advance any arguments that their claims do not fit the test articulated above, these claims must be dismissed. [5]

5        Although Plaintiffs agree that their state law claims are precluded under SLUSA, Landess' Motion to Dismiss states that Plaintiffs have a remaining "federal common law claim for fraud under FRCP Rule 9(b)" and cites the elements of fraud under Texas law (Landess Mot. to Dismiss at ¶¶ 14–15.) The Court wishes to make clear that Plaintiffs claims of fraud are claims under state common law, and therefore are dismissed under the SLUSA preclusion argument articulated by Sonfield, Exobox, and Landess.

### IV. AIDING AND ABETTING CLAIMS

In Count III, Plaintiffs bring claims for aiding and abetting fraud and violations of securities laws.

### A. Legal Standard

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court determined that section 10(b) liability did not extend to aiders and abettors. Subsequently, Congress declined to extend the section 10(b) private right of action to claims against secondary actors, and instead, in the PSLRA, directed prosecution of aiders and abettors by the SEC. *Stoneridge Inv. Partners, LLC v. Scientific—Atlanta, Inc.,* 552 U.S. 148, 158, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Accordingly, a secondary actor is not liable for violations unless he satisfies all the requirements for liability under section 10(b).

### B. Analysis

In their responses, Plaintiffs do not argue that aiding and abetting liability is appropriate. Instead, they argue that Sonfield is a primary actor and therefore must be held responsible for the acts and statements identified in the Complaint. Similarly, Plaintiffs do not address aiding and abetting liability in response to Landess' or Exobox's Motions to Dismiss. Therefore, the Court finds that all aiding and abetting claims must be dismissed. [6]

6        Count III also includes claims of conspiracy. In Part III, *supra,* the Court found that these claims should be dismissed because they are state common law claims.

### V. FEDERAL SECURITIES LAW CLAIMS

**\*7** Plaintiffs also bring claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

### A. Legal Standard

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to this section, the SEC promulgated Rule 10b–5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To state a private 10(b) claim, a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge,* 552 U.S. at 157; *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *R2 Invs.,* 401 F.3d at 641.

A plaintiff pleading a false or misleading statement or omission as the basis of a 10(b) claim must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 533 (5th Cir.2008). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *ABC Arbitrage,* 291 F.3d at 350. The PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud actions under Rule 9(b). *Rosenzweig v. Azurix,* 332 F.3d 854, 866 (5th Cir.2003).

**\*8** To be actionable, a misrepresentation or omission of a fact must be material. The Supreme Court recently reaffirmed its long-standing holding that there is no "bright-line rule" for determining whether information withheld from a company's filings is material as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, —— – ——, 131 S.Ct. 1309, 1318–23, 179 L.Ed.2d 398 (2011). Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry ... that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. Under Fifth Circuit construction, the appropriate inquiry is whether, under all the circumstances, the statement or omitted fact is one that a reasonable investor would consider significant in making the decision to invest, "such that it alters the total mix of information available about the proposed investment ." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir.1993); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubenstein v. Collins,* 20 F.3d 160, 168 (5th Cir.1994).

In order to state a claim under section 10(b), a plaintiff also must have relied on the defendants' acts or statements. *Stoneridge,* 552 U.S. at 159. Requiring a plaintiff to plead reliance ensures "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* (citing *Basic,* 485 U.S. at 243). A rebuttable presumption of reliance exists in two circumstances: (1) when a plaintiff was

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

owed a duty to disclose, or (2) when the statements become public, as the public information is reflected in the market price of the security. *Id.* However, no reliance is presumed when a defendant's specific acts were not disclosed to the investing public, even when information about a defendant's deceptive transactions is later incorporated into a false public statement. *Id.* at 161.

Furthermore, section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement. *Shaw Group, Inc.,* 537 F.3d at 535. Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant. Rather, to establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Scienter, in the context of securities fraud, is defined as "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 207 (5th Cir.2009).

**\*9** A plaintiff may meet his scienter pleading obligation by pleading facts giving rise to a strong inference of reckless or conscious misconduct. *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 425 (5th Cir.2001). Under the PSLRA, the Court considers whether all the facts and circumstances, taken together, give rise to a strong inference of scienter. *Tellabs, Inc.,* 551 U.S. at 322–23; *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 431 (5th Cir.2002). To qualify as "strong" within the meaning of the statute, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent. *Tellabs, Inc.,* 551 U.S. at 309.

Moreover, the Fifth Circuit does not allow a "group pleading approach" to establishing scienter. *Southland,* 365 F.3d at 363–65. The court must look only to the state of mind of the individual who made or issued the statement or furnished information for use in the statement, and not to the collective knowledge of the corporation's officers and employees acquired in the course of their employment. *See Shaw Group,* 537 F.3d at 534. The complaint must specifically connect individual defendants to the statements or omissions, otherwise it will fail under the PSLRA's heightened pleading

standard. *Fin. Aquisition Partners LP v. Blackwell,* 440 F.3d 278, 287 (5th Cir.2006).

The Supreme Court's recent decision in *Janus Capital Group v. First Derivative Traders,* 564 U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), defined who can "make" a statement in the context of Rule 10b–5. The Court rejected the plaintiffs' argument that "make" should be defined as "create," and held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus,* 131 S.Ct. at 2302. The Court held that Janus Capital Management (JCM) could not be held liable for statements in prospectuses filed by Janus Investment Fund. JCM was the investment advisor and administrator of Janus Investment Fund and a wholly-owned subsidiary of Janus Management Group, which also created Janus Investment Fund as a separate legal entity owned by mutual fund investors. The Court observed that "it is undisputed that the corporate formalities were observed here," and JCM and Janus Investment Fund remained legally separate entities. *Id.* at 2304. Therefore, JCM's participation in the writing and dissemination of the prospectuses was not sufficient, as JCM did not retain "ultimate authority" over the statement. The Court compared this situation to the relationship between a speech and a speechwriter, noting that "[e]ven when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 2302. The Supreme Court further attempted to distinguish liability under Rule 10b–5 from liability under section 20(a), 15 U.S.C. § 78t(a). The Court found that the plaintiffs' theory of liability too closely resembled, and would expand, the liability Congress already created under section 20(a). *Id.* at 2304 ("Congress also has established liability in § 20(a) for '[e]very person who, directly or indirectly, controls any person liable' for violations of the securities laws." (citing 15 U.S.C. § 78t(a)).

**B. Analysis**

**1. Claims against Defendant Sonfield**

**\*10** In Plaintiffs' Response, Plaintiffs identify the statements and actions that form the basis of their claims against Sonfield, which the Court believes can be placed into three categories: (1) Sonfield's actions and misrepresentations to others, such as statements made in the process of orchestrating the reverse merger of Exobox and JinPin, engaging the expert to value Exobox, and issuing and ultimately transferring shares to his legal assistant, the Bradleys, Lane, and Brewer;

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

(2) Sonfield's tradability opinion letter to Pink Sheets; and (3) Exobox's public filings with the SEC, which were prepared by Sonfield.

### a. Statements to Others

Plaintiffs fail to plead sufficient reliance to state a claim based on the first category outlined above. Plaintiffs do not claim that they knew about these acts at the time they occurred or relied on them in any way. Sonfield's misrepresentations in this category were not made to the public, but rather only to the parties involved in these transactions. Therefore, Plaintiffs fail to state a claim for section 10(b) or Rule 10b–5 liability based on these statements and actions.

### b. Sonfield's Tradability Letter to Pink Sheets

Additionally, Plaintiffs assert that "Sonfield prepared and submitted a tradability opinion letter to the Pink Sheets, LLC claiming that virtually all shares of Exobox 'may be sold immediately in the public market by [sic] ... on the safe harbor of Rule 144(k) under the Securities Act.' " (Am.Compl.¶ 40.) Plaintiffs plead scienter adequately. Plaintiffs allege that Sonfield himself was involved in fraudulently backdating the shares, and therefore, that he knew the statements in the tradability letter were false. (Am.Compl.¶¶ 34, 40, 42.) Plaintiffs aver that this was just one part of his scheme to issue and sell securities to make substantial sums of money for himself and the other defendants.

Plaintiffs' Amended Complaint also provides enough information to conclude that this misstatement is material. The Court finds that a signed statement of a lawyer, representing that the shares were subject to the safe harbor of Rule 144(k) and could therefore be sold without registration, would be significant to a potential investor in deciding whether to buy Exobox shares, as "it alters the total mix of information available about the proposed investment ." *Krim,* 989 F.2d at 1445.

In the fact section of the complaint in *Securities and Exchange Commission v. Robert L. Sonfield, et al.,* 08–cv–2351 (S.D.Tex.) ("SEC Complaint"), the SEC notes that Sonfield's letter was "posted on the Pink Sheets website." (SEC Compl. ¶ 33.) Because Sonfield's statements about Exobox's tradability were public, Plaintiffs are entitled to a presumption of reliance. *See Basic,* 485 U.S. at 247. The factual allegations of the SEC Complaint were incorporated by reference into Plaintiffs' Complaint in the present action. (Am.Compl.¶ 26.) Federal Rule of Civil Procedure Rule 10(c) provides that

"[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Sonfield also acknowledges Plaintiffs' incorporation of the factual allegations from SEC Complaint in his motion. (Sonfield's Mot. to Dismiss ¶¶ 4, 22 n. 8.) While the Court notes that the Fifth Circuit has been reluctant to allow an incorporation by reference to another case, these cases involved plaintiffs who were trying to incorporate claims from complaints in other cases, rather than mere allegations. *See Texas Water Supply Corp. v. R.F. C.,* 204 F.2d 190, 197 (5th Cir.1953); *see also Muttathottil v. Gordon H. Mansfield,* 381 Fed. Appx. 454, 456–58 (5th Cir.2010). Defendants were on notice of the factual claims asserted in the SEC Complaint, as this case was filed in the same court against many of the same defendants sued in this action, including Sonfield. However, in light of the Fifth Circuit's hesitation to allow incorporation by reference to another case, even where defendants clearly had notice, *see Muttahottil,* 381 Fed. Appx. at 457, the Court finds it appropriate to allow Plaintiffs to replead this allegation in order to state a claim.

### c. Exobox's Public Filings

**\*11** Plaintiffs also allege that Sonfield violated Rule 10b–5 by making misstatements in Exobox's filings with the SEC. Sonfield argues that, under *Janus,* he did not make any statements for purposes of Rule 10b–5. Sonfield notes that, at a minimum, "attribution is necessary" to "find that a person or entity made a statement." *Janus,* 131 S.Ct. at 2305. The filings at issue were submitted by Exobox and signed by Robert Dillon, Exobox's President and Chief Executive Officer. Form 10–KSB was additionally signed by Michael G. Wirtz, Exobox's Chief Financial Officer. Sonfield did not sign the filings himself.

Plaintiffs assert that this case can be distinguished from *Janus* because Sonfield was in "control of" Exobox, as he owned 100% or 88% of Exobox at the relevant times, whereas Janus Investment Fund was a separate legal entity from JCM. (Resp. to Sonfield's Suppl. Reply ¶ 2.) Even assuming that Sonfield did control Exobox, as Plaintiffs assert,[7] Plaintiffs fail to show that Sonfield had "ultimate control" over the statements, as *Janus* requires. The Supreme Court held that "the maker of a statement is the person or entity with ultimate authority *over the statement";* just because a person or entity may "control" the company filing the document does not mean that the control person can be liable under 10b–5 for making the statements. *Janus,* 131 S.Ct. at 2302 (emphasis added). In their response to Sonfield's

**Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

supplemental reply, Plaintiffs appear to be quoting *Janus* in asserting that "[t]he Supreme Court looked to whether such a person/entity had 'control' over the entity making the statement such that the statement would become that 'controlling person's' statement." (Response to Supp. Reply ¶ 1.) However, the only time the Supreme Court used the phrase "controlling person" was to reference liability under section 20(a). *Janus,* 131 S.Ct. at 2301. The Court rejected the argument Plaintiffs assert here, distinguishing liability under 10b–5 from liability under section 20(a). *Id.* at 2304 (declining to "read into Rule 10b–5 a theory of liability similar to—but broader in application than—what Congress has already created expressly elsewhere." (internal citations omitted)). Plaintiffs' Amended Complaint does not contain a claim under section 20(a). Therefore, under the facts contained in the Amended Complaint, Sonfield may not be held liable for statements in Exobox's registration filings, even if he supplied Exobox with the false statements at issue.

7    Sonfield disputes that he owned all the common stock in question. However, even if this allegation were true, he claims this would be equivalent to a mere 3% voting interest. (Sonfield Second Supplemental Reply ¶ 5.) The officers and directors controlled 97% of the voting power. (*Id.*) The Court need not resolve this factual dispute at this stage of the litigation.

Sonfield notes that his name appears in certain transaction documents attached as exhibits to Exobox's filings. (Sonfield's Mot. to Dismiss ¶ 6 n. 5.) These pages note that Sonfield received copies of various notices and transmitted correspondence to the SEC identifying the revisions to the statements. (Doc. No. 18–3, Form 10–SB12G/A No. 1 at 56–58; Doc. No. 18–4, Form 10–SB12G/A No. 2 at 57.) Exobox's Form 10–SB12G form additionally contains an opinion letter signed by Sonfield, which notes the availability of an exemption from registration under the 1933 Act. (Doc. No. 18–1, Form 10–SB12G, at 201, 252–55.) However, Plaintiffs' Amended Complaint does not identify any misstatements or omissions from the pages signed by Sonfield. Sonfield was not a signatory to the public filings; they were signed by Exobox's President and CEO as well as Exobox's CFO in one instance. The attached statements signed by Sonfield appear to be separate from the substantive registration filings, merely notifying the SEC of the updates. Thus, the Court finds that Plaintiffs' Amended Complaint does not provide sufficient allegations about the letters and attachments to support a finding that Sonfield "made" any statements in Exobox's public filings.

\*12 The Court grants Plaintiffs leave to amend their Complaint on this narrow basis—to show which, if any, misstatements or omissions in the public filings forming the basis of Plaintiffs' 10b–5 claims were "made" by Sonfield, pursuant to *Janus* and this Order. The Court believes that leave to amend is appropriate because Plaintiffs' previous amendment to their complaint came before the Supreme Court's decision in *Janus* provided this narrow interpretation of the word "make."

### 2. Claims against Defendant Landess

Plaintiffs' claims against Defendant Landess under section 10(b) and Rule 10b–5 must be dismissed, as Plaintiffs do not plead these claims with the particularity required under the PSLRA.

Plaintiffs assert that Landess "filed certain documents with the Nevada Secretary of State reporting Kilis had changed its name to JinPin and the principal of JinPin had become Kilis' sole officer and director." (Am.Compl.¶ 35.) That paragraph asserts that *Sonfield* knew that these filings and representations were false, as the JinPin merger never closed, but the Complaint says nothing about Landess' scienter with respect to this filing. (*Id.*) Additionally, under *Janus,* the Court cannot conclude that Landess made the statement in this filing with the Nevada Secretary of State. Plaintiffs did not provide a copy of this document for the Court's review or assert why they believe Landess made this statement, which appears to be a corporate filing for Kilis or JinPin. Furthermore, Plaintiffs fail to assert why this name change is material and would affect Plaintiffs' investment decisions.

Plaintiffs also assert that Landess "undertook steps to facilitate the public trading of Exobox stock." (Am.Compl.¶ 40.) The Complaint does not specify what any of these "steps" are. That paragraph asserts that *Sonfield* issued a tradability letter, but does not provide any information suggesting that Landess also contributed to that statement. While the Complaint alleges that Landess tried to convince the valuation expert to provide a false value to Exobox, the expert elected to do nothing, stating that he could not make such a valuation. (*Id.* ¶ 39.) Plaintiffs have failed to plead any specific statements or actions of Landess that could form the basis of their federal securities law claims.

In Plaintiffs' Response, they also assert that Landess should be held liable for violations of section 10(b) and Rule 10b–5 based on "the actions undertaken by Sonfield with the

**Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

full knowledge of Landess so that Landess was/is a co-conspirator." (Response to Landess' Mot. to Dismiss ¶ 10.) However, as noted in Part III, *supra,* Plaintiffs' claim of conspiracy has been dismissed as a state law claim. Therefore, all claims against Defendant Landess must be dismissed.

### 3. Claims against Defendant Exobox

Exobox's Motion for a More Definite Statement alleges that Plaintiffs have not adequately established which actions can be attributed to Defendant Exobox. "The allegations in Part IV [containing the factual background] as to Exobox are either innocuous, mention Exobox only in passing, or make vague allegations without any supporting basis." (Exobox's Mot. for a More Definite Statement ¶ 4.) Additionally, Exobox's Motion to Dismiss alleges that Plaintiffs' federal securities law claims are not alleged with the specificity required by the PSLRA. Exobox incorporates Sonfield's Memorandum in support of his Motion to Dismiss. (Exobox's Mot. to Dismiss ¶ 8.)

 **\*13**  Similarly, Plaintiffs' late-filed response refers the Court to the arguments contained in their Response to Sonfield's Motion. (Resp. to Exobox's Mot. to Dismiss ¶ 2.) [8] Indeed, Plaintiffs' Response alleges Exobox's liability only with respect to actions taken by Sonfield, with one exception—Plaintiffs also assert that Exobox should be held liable for Landess' "false filings with the Nevada Secretary of State at a time when Sonfield retained control of virtually all of the outstanding Kilis shares of stock." (*Id.* ¶ 4 (citing Am. Compl. ¶ 34).) As noted above, Plaintiffs fail to provide any explanation as to why this name change is material and could affect investment decisions. Moreover, the basis for Exobox's liability for alleged misstatements involving Kilis and JinPin is unclear, especially because, in the same paragraph, Plaintiffs alleged that the "JinPin merger never closed." (Am.Compl. ¶ 35.)

[8]    The Court grants Plaintiffs' Motion for Leave to File (Doc. No. 53) and will allow the late-filed response, as it consists primarily of arguments made in its Response to Sonfield's Motion. The Court finds that Exobox's substantial rights are not affected by this late filing. *See Garza v. Laredo Independent School Dist.,* 309 Fed. Appx. 806, 811 (5th Cir.2009) (quoting Fed.R.Civ.P. 61).

### a. Statements to Others

As the Court stated in Part V.B. 1.a., *supra,* Plaintiffs fail to plead sufficient reliance to state a claim based on Sonfield's private statements to individuals such as his legal assistant, the expert, and others. Accordingly, these misrepresentations must be dismissed.

### b. xSonfield's Tradability Letter to Pink Sheets

Plaintiffs believe that Exobox should be liable for Sonfield's tradability opinion letter, because it "was done by Sonfield at a time when he still owned and controlled more than a mere majority of the Exobox stock." (Resp. to Exobox's Mot. to Dismiss ¶ 5.) However, Plaintiffs point to no theory of liability to support their argument that Exobox should be held liable for any misrepresentations made by Sonfield based solely on Sonfield's control of a majority of the Exobox stock. [9] Plaintiffs also argue that "Exobox adopted these statements, and is, thus, also responsible for such misrepresentation[s]." (*Id.*) On the basis of the facts contained in the Amended Complaint, however, Exobox cannot be said to have "made" the statements contained in the tradability letter under *Janus.* There is no indication that this letter was submitted or filed by Exobox; the fact that Plaintiffs called it an "opinion letter" implies that the letter expressed Sonfield's own opinion as an attorney. Even before the Supreme Court's decision in *Janus,* courts found that corporations generally were not liable for statements made by third parties on their behalf. *See Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) ("The securities laws require [a company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company].") Without allegations that Exobox had ultimate authority over the statement, the Court may not determine that Exobox made the statement and thus can be liable under section 10(b) and Rule 10b–5.

[9]    This argument is akin to control person liability under section 20(a). However, while Section 20(a) provides that a control person is liable for the violations of the entity it controls, the converse is not true—the controlled entity is *not* liable for every action taken by the control person. 15 U.S.C. § 78t(a). Moreover, as noted above, Plaintiffs' Amended Complaint does not contain a claim for control person liability under section 20(a).

### c. Exobox's Public Filings

Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)
2012 WL 201872, Fed. Sec. L. Rep. P 96,716

**\*14** Plaintiffs also assert that Sonfield, acting on behalf of Exobox, made material misrepresentations in its registration filings. The Court has already found that, under *Janus,* Sonfield did not make the representations at issue. *See* Part V.B.1.c., *supra.* In contrast, Exobox was the entity with ultimate authority over the statement, *Janus,* 131 S.Ct. at 2302, and Exobox is listed as the "filer" of the registration forms and amendments at issue. *Id.* at 2304–05. (Doc. No. 18–1, Form 10–SB12G, at 1.) Therefore, Exobox "made" the statements at issue.

The question thus becomes whether Exobox had scienter when it made the statements contained in its registration filings and amendments. In determining whether the Complaint adequately pleads scienter with respect to Exobox, the Court must look to see if any of the corporate officials who made or prepared the statement acted with scienter. The standard articulated by the Fifth Circuit in *Southland,* and repeated in many subsequent cases, provides that it is appropriate to look at the state of mind not only of the individual corporate official or officials who made the statement, but also those who "order or approve it or its making or issuance, or who furnish information or language for inclusion therein or the like." *Id; see also Shaw Group,* 537 F.3d at 533 (repeating this standard post-*Stoneridge*). The Court finds no reason to read *Janus* to limit the liability of the corporation on grounds of scienter. Exobox "made" the statements contained in the public filings under *Janus;* Plaintiffs need only assert that Sonfield furnished the information or language for inclusion in order to attribute his scienter to Exobox.

On the facts alleged, Sonfield was a corporate official. Plaintiffs assert that Sonfield was in "control of" Exobox, as he owned 100% or 88% of Exobox at the relevant times (Response to Sonfield's Suppl. Reply ¶ 2). He served as Exobox's lawyer and prepared the filing statements at issue. Thus, Sonfield certainly qualifies as an "official," as he was "authorized to act" for Exobox in drafting its filing statements. Black's Law Dictionary 1119 (9th ed.2009); *see also Teachers' Retirement System of LA v. Hunter,* 477 F.3d 162, 184 (4th Cir.2007) ("[T]he plaintiff must allege facts that support a strong inference of scienter with respect to at least one *authorized agent* of the corporation." (emphasis added) (citing *Southland,* 365 F.3d at 363–67)). Thus, Sonfield's scienter may be attributed to Exobox under *Southland.*

Plaintiffs allege adequately that Sonfield had the requisite state of mind when making false statements in the registration filings. The misrepresentations and information that Exobox failed to disclose largely involved Sonfield's ownership interests and transactions that Sonfield made with others. (Am.Compl.¶¶ 53–55 .) Additionally, Plaintiffs plead that Sonfield was aware, through his dealings with the expert that he hired, that Exobox had no product, no operations, and no value. (*Id.* ¶¶ 39, 53(d).) The filings also directly contradicted a statement that Sonfield made in his tradability letter. (*Id.* ¶ 54(a).) Each of these allegations fits within the scheme that Plaintiffs allege, and the Court finds sufficient facts to give rise to a strong inference that Sonfield committed this misconduct recklessly or consciously.

**\*15** Moreover, the misstatements contained in the filings satisfy the materiality requirement. Plaintiffs aver that the filings "deprived investors of material information, including the fact that [Sonfield], Lane[,] and Brewer controlled the company's purportedly unrestricted common stock float." (*Id.* ¶ 55.) Because the filings were public, Plaintiffs are also entitled to a presumption of reliance. *See Basic,* 485 U.S. at 247. Therefore, the Court finds that Plaintiffs' Amended Complaint states a claim against Exobox for violation of section 10(b) and rule 10b–5 with respect to the statements in Exobox's public filings.

Accordingly, the Court finds it appropriate to deny Exobox's Motion for a More Definite Statement. Plaintiffs' claims against Exobox are limited to the misstatements contained in Exobox's public filings, which the Amended Complaint clearly, and appropriately, attributes to Exobox. (*See* Am. Compl. ¶ 53 ("Sonfield prepared and filed a Form 10–SB registration statement *on behalf of Exobox.*").)

#### 4. Amendment

The Court previously allowed Plaintiffs the opportunity to amend their complaint. (*See* Minute Entry for proceedings held before Judge Keith P. Ellison, 12/14/2010.) Plaintiffs did not request leave to amend in connection with any of the pending motions to dismiss, and they failed to respond to Exobox's Motion for a More Definite Statement. Therefore, the Court will allow Plaintiffs leave to amend only on the narrow bases identified in this order: 1) to add factual allegations relating to the public disclosure of Sonfield's tradability letter; and 2) to plead any additional facts showing that, under *Janus,* Sonfield "made" any misstatements in Exobox's public filings.

### VI. CONCLUSION

**Kerr v. Exobox Technologies Corp., Not Reported in F.Supp.2d (2012)**

2012 WL 201872, Fed. Sec. L. Rep. P 96,716

For the reasons discussed in this order:

(1) Sonfield's Motion to Dismiss (Doc. No. 17) is **GRANTED IN PART;**

(2) Landess' Motion to Dismiss (Doc. No. 46) is **GRANTED;**

(3) Exobox's Motion to Dismiss (Doc. No. 47) is **GRANTED IN PART;**

(4) Exobox's Motion for a More Definite Statement (Doc. No. 45) is **DENIED;** and

(5) Plaintiffs' Motion for Leave (Doc. No. 53) is **GRANTED.**

Plaintiffs may file an amended complaint within 20 days in accordance with the Court's aforementioned instructions.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 201872, Fed. Sec. L. Rep. P 96,716

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (14)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Plaintiffs' Third Amended Class Action Complaint**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; Michael Paul Lebleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Roberet L. Sonfield, Jr.; Jeffrey Bradley; Donald Bradley; Marc Lane; Roger Brewer; and Alexanderia K. Blankenship, Defendants.<br>2012 WL 5272405 | PDF | S.D.Tex. | July 06, 2012 | Pleading |
| **2. Plaintiffs' Second Amended Class Action Complaint**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Roberet L. Sonfield, Jr.; Jeffrey Bradley; Donald Bradley; Marc Lane; Roger Brewer; and<br>2012 WL 1855267 | — | S.D.Tex. | Feb. 12, 2012 | Pleading |
| **3. Plaintiffs' First Amended Class Action Complaint**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; Lori Cukjati; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland;<br>2010 WL 5633699 | PDF | S.D.Tex. | Dec. 14, 2010 | Pleading |
| **4. Defendant Robert L. Sonfield, Jr.'s Reply to Plaintiffs' Response to Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Failure to State a Claim Upon Which Relief can be Granted**<br>James P. KERR ; et al.;, Plaintiffs;, v. EXOBOX TECHNOLOGIES CORPORATION; et al.;, Defendants.<br>2012 WL 4120990 | PDF | S.D.Tex. | July 27, 2012 | Motion |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **5. Plaintiffs' Response to Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss Plaintiff's Second Amended Class Action Complaint for Failure to State a Claim Upon Which Relief can be Granted**<br>James P. KERR ; Richard Hoover; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; L. West; and Michael Paul Lebleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland; Reginald Goodman; Michael Wittenburg; Marc Pernia; Michael Wirtz; Richard Evans, M.D.; Robert L. Sonfield, Jr.; Jason Landess; Sidney Barrett; Donald Bradley; Marc Lane; Roger Brewer; Alexanderia K. Blankenship; Illiam Sklar; James L. Jimmerson; and Leslie Danyel Owens-Swint, Defendants.<br>2012 WL 4120985 | PDF | S.D.Tex. | July 06, 2012 | Motion |
| **6. Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Failure to State a Claim Upon Which Relief can be Granted**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; Lori Cukjati; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; and Michael Paul Lebleu, Individually and as Representatives of a Class of Similarly-Situated Individuals;, Plaintiffs;, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland;<br>2012 WL 3621014 | PDF | S.D.Tex. | June 21, 2012 | Motion |
| **7. Memorandum of Authorities in Support of Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss Plaintiffs' First Amended Class Action Complaint for Failure to State a Claim Upon Which Relief Can Be Granted**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; Lori Cukjati; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; and Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland;<br>2010 WL 5633641 | PDF | S.D.Tex. | Dec. 22, 2010 | Motion |

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **8. Response to Robert L. Sonfield, Jr.'s and Richard Evans Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted**<br>James P. KERR; Richard Hoover; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; William McIlvride; Charles L. West; and Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland; Reginald Goodman; Michael Wittenburg; Marc Pernia; Michael Wirtz; Richard Evans, M.D.; Robert L.<br>2010 WL 5633640 | PDF | S.D.Tex. | Nov. 30, 2010 | Motion |
| **9. Memorandum of Authorities in Support of Defendant Robert L. Sonfield, Jr.'s Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; Lori Cukjati; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; and Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland;<br>2010 WL 5633642 | PDF | S.D.Tex. | Nov. 03, 2010 | Motion |
| **10. Defendant Robert L. Sonfield, Jr.'s Motion for Stay of Discovery and Other Proceedings**<br>James P. KERR; Richard Hoover; Stephen P. Adams; Mary Hoover; Dale E. Gale; Bruce W. Gale; Jacob P. Cukjati, IV; Natalie F. Cukjati; Lori Cukjati; Jimmy A. Schumacher; Carla Schumacher; Eric Randolph; William McIlvride; Carl L. Ulepich; Charles L. West; Don Schumacher; and Michael Paul LeBleu, Individually and as Representatives of a Class of Similarly-Situated Individuals, Plaintiffs, v. EXOBOX TECHNOLOGIES CORPORATION; Robert B. Dillon; Scott Copeland;<br>2010 WL 5633643 | PDF | S.D.Tex. | Nov. 03, 2010 | Motion |
| **11. (Report or Affidavit of Dr. Kenneth Eugene Lehrer)**<br>James P. KERR, et al., v. EXOBOX TECHNOLOGIES CORPORATION.<br>2012 WL 4043984 | PDF | S.D.Tex. | Apr. 23, 2012 | Expert Materials |
| **12. Docket 4:10-CV-04221**<br>Kerr et al v. Exobox Technologies Corp. et al | — | S.D.Tex. | Oct. 29, 2010 | Docket |
| **13. Expert Resume of Eddie M. Krenek**<br>Eddie M. Krenek<br>2012 WL 3134959 | — | S.D.Tex. | Apr. 23, 2012 | Expert Resume |
| **14. Expert Resume of Dr. Kenneth Eugene Lehrer**<br>Dr. Kenneth Eugene Lehrer<br>2011 WL 8491437 | PDF | S.D.Tex. | Nov 2011 | Expert Resume |

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (1)**

1. Kerr v. Exobox Technologies Corp.
2012 WL 201872 , S.D.Tex. , Jan. 23, 2012

**Related References (1)**

2. Kerr v. Exobox Technologies Corporation
2012 WL 13050577 , S.D.Tex. , Sep. 05, 2012

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 6

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 60 of 167
Killick v. Harbor Freight Tools USA Inc, Not Reported in Fed. Supp. (2022)
2022 WL 22586525

2022 WL 22586525
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Panama City Division.

Adam KILLICK, Plaintiff,
v.
HARBOR FREIGHT TOOLS USA INC, Defendant.

Case No. 5:21-cv-111-MW-MJF
|
Signed August 23, 2022

**Attorneys and Law Firms**

Adam Killick, Panama City Beach, FL, Pro Se.

Ashley Drumm, Ryan Stephen Cobbs, Garth Thomas Yearick, Carlton Fields PA, West Palm Beach, FL, for Defendant.

## ORDER

Michael J. Frank, United States Magistrate Judge

 **\*1**  Plaintiff included in his "motion to remand" various motions to compel discovery. Doc. 103. Because Plaintiff's motions to compel lack merit, they must be denied.

### I. DISCUSSION

#### A. Plaintiff's Motion to Compel Response to Interrogatories

Plaintiff first seeks an order compelling Defendant to respond to discovery requests that were filed by Plaintiff's former counsel. *Id.* at 7. Plaintiff raised this issue a second time in his "Motion to Comply with Order of this Court 12th July and to Compel Discovery." Doc. 105. The undersigned denied this request in an order dated July 29, 2022. Doc. 107. Thus, this request must be denied for the same reasons set forth in the undersigned's order dated July 29, 2022. *Id.*

#### B. Plaintiff's Motion to Compel the Deposition of Defendant's CEO

Plaintiff also seeks an order compelling the deposition of Defendant's CEO. Doc. 103 at 8. Before a party can move to compel a deposition, it first must show that it served a reasonable notice of the deposition on the opposing party and that the opposing party failed to attend the deposition. *Nuskey v. Lambright*, 251 F.R.D. 3, 12 (D.D.C. 2008). Plaintiff has not demonstrated that at the time he filed his motion Defendant's CEO had failed to appear for a properly-noticed deposition. This portion of Plaintiff's motion to compel, therefore, must be denied without prejudice.

#### C. Plaintiff's Motion to Compel Defendant to Reinspect Evidence

Plaintiff also requests an order compelling Defendant's expert witness to reinspect the "evidence" and provide a report of the reinspection to Plaintiff. Doc. 103 at 9. Plaintiff has not cited any authority which indicates that this court has the power to compel Defendant to reinspect evidence and/or create a report for his use. *See generally Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016) ("As a general matter, a party cannot invoke Rule 34(a) to require another party to create or prepare a new or previously non-existent document solely for its production."). Because the undersigned lacks the authority to require Defendant to order its expert witness to reinspect evidence and/or provide Plaintiff a report regarding the reinspection, this request also must be denied.

#### D. Plaintiff's Failure to Include a Certificate of Conferral

As the undersigned previously explained to Plaintiff, motions filed with this court must include a certificate, set apart by a separate heading, stating that the parties conferred and the result of the conference. Doc. 91; N.D. Fla. Loc. R. 7.1(C). Similarly, Rule 37 of the Federal Rules of Civil Procedure requires that a motion to compel include "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).

Plaintiff failed to include a certificate of conferral in this motion. Doc. 103. Conferral with opposing counsel on matters of discovery is particularly important because such conferral frequently can obviate the need for judicial intervention in such matters. Indeed, Local Rule 7.1(C) is designed to ensure that parties make a good-faith effort to resolve their differences and thereby obviate the need for judicial intervention and the expenditure of judicial resources. *See generally In re Stone*, 986 F.2d 898, 904 (5th Cir. 1993). Because Plaintiff failed to comply with the Local Rules, his

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 61 of 167

Killick v. Harbor Freight Tools USA Inc, Not Reported in Fed. Supp. (2022)
2022 WL 22586525

motions to compel must be denied for this reason as well. *See* N.D. Fla. Loc. R. 41.1.

### E. Plaintiff's Violations of Other Local Rules

**\*2**  In addition to violating Local Rule 7.1(C), Plaintiff's motions to compel violate several other Local Rules of the United States District Court for the Northern District of Florida. [1]

[1]    Because Plaintiff's motion requests relief that potentially is dispositive of this case (*i.e.*, Plaintiff's motion to remand) and relief that is not (*i.e.*, Plaintiff's motions to compel), the motion is defective only as to his motions to compel. *See* N.D. Fla. Loc. R. 7.1(D) (waiving the conference requirement for motions that would dispose of the case).
It is good practice not to combine motions that seek discrete forms of relief. That is, a motion to remand should not be asserted in the same document as a motion to compel. This ensures that the moving party can properly comply with the applicable Federal Rule of Civil Procedure and Local Rule for each type of motion. It also helps ensure that a responding party or the court does not overlook a motion buried within a motion.

The undersigned previously explained to Plaintiff that any "document filed by a *pro se* party must include a signature block with the party's handwritten signature, typed or printed name, street address, email address if the party has one, and telephone number if the party has one." N.D. Fla. Loc. R. 5.1(D). Plaintiff's signature block on his motion is insufficient insofar as it does not include his typed or printed name. It also does not include his street/mailing address.

Additionally, any document filed with the court that is typed must be (1) double spaced; (2) written in 14-point font; (3) include one-inch margins on the top, bottom, left, and right of each page; and (4) the pages must be numbered. N.D. Fla. Loc. R. 5.1(C). Plaintiff did not double space his motion and he failed to number his pages.

Finally, a movant must provide the court with a memorandum in support of their position. This memorandum must be filed either as the same document as the motion or as a separate document filed at the same time as the motion. The memorandum must not exceed 8,000 words and the movant must include a certificate stating the number of words in the memorandum. N.D. Loc. R. 7.1(F). Presumably, Plaintiff intended to combine his motion and memorandum in one document. Plaintiff failed to include, however, the certificate stating the number of words in this document. *See* Doc. 103. Plaintiff's motions to compel and the incorporated memorandum are deficient in this respect and should be denied without prejudice on this ground as well. *See* N.D. Fla. Loc. R. 41.1.

### II. CONCLUSION

For the reasons set forth above, Plaintiff's motions to compel —contained in his "Motion to Remand," Doc. 103—must be **DENIED** without prejudice.

**SO ORDERED** this 23rd day of August, 2022.

### All Citations

Not Reported in Fed. Supp., 2022 WL 22586525

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (10)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Notice of Removal**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA, INC., Defendant.<br>2021 WL 6200459 | — | N.D.Fla. | May 24, 2021 | Pleading |
| **2. Defendant's Response to Plaintiff's Motion for Summary Judgment**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238271 | — | N.D.Fla. | Nov. 03, 2022 | Motion |
| **3. Defendant's Motion in Limine to Limit Plaintiff's Testimony to Prevent Plaintiff from Offering "Expert" Opinions or Testimony**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238274 | — | N.D.Fla. | Sep. 02, 2022 | Motion |
| **4. Defendant's Motion to Dismiss Plaintiff's Complaint with Prejudice Due to Failure to Comply with Court Orders and Memorandum in Support**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238275 | — | N.D.Fla. | July 08, 2022 | Motion |
| **5. Defendant's Renewed Motion to Compel Plaintiff's Deposition and Extend Certain Remaining Case Deadlines and Motion to Compel Plaintiff's Verification of Interrogatory Responses**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238276 | — | N.D.Fla. | May 18, 2022 | Motion |
| **6. Harbor Freight Tools USA Inc.'s Renewed Motion to Compel AAA Ameribrit Auto Sales LLC's Compliance with Subpoena and Alternative Motion for Permission to Obtain Unsealed Copy of ECF No. 24**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238277 | — | N.D.Fla. | May 18, 2022 | Motion |
| **7. Defendant's Reply to Plaintiff's Objection to Motion for Summary Judgment and Request for Independent Investigation Into Fraud on this Court (ECF No. 80)**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA INC., Defendant.<br>2022 WL 20238270 | — | N.D.Fla. | May 13, 2022 | Motion |
| **8. Defendant's Motion for Summary Judgment and Memorandum of Law**<br>Adam KILLICK, Plaintiff, v. HARBOR FREIGHT TOOLS USA, INC., Defendant.<br>2022 WL 20238273 | — | N.D.Fla. | Apr. 28, 2022 | Motion |
| **9. Rule 26 Report of Lee A. Swanger Ph.D., P.E.**<br>Adam KILLICK, v. HARBOR FREIGHT TOOLS USA, INC.<br>2022 WL 3717971 | — | N.D.Fla. | June 03, 2022 | Expert Materials |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **10. Docket 5:21-CV-00111**<br>KILLICK v. HARBOR FREIGHT TOOLS USA INC | — | N.D.Fla. | May 24, 2021 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (17)**

**Direct History (1)**

1. Killick v. Harbor Freight Tools USA Inc
   2022 WL 22586525 , N.D.Fla. , Aug. 23, 2022

**Related References (16)**

2. Killick v. Harbor Freight Tools USA Inc
   2022 WL 2784435 , N.D.Fla. , June 17, 2022

*Reconsideration Denied by*

3. Killick v. Harbor Freight Tools USA Inc.
   2022 WL 22586526 , N.D.Fla. , July 12, 2022

4. Killick v. Harbor Freight Tools USA Inc.
   2022 WL 22586360 , N.D.Fla. , July 12, 2022

5. Killick v. Harbor Freight Tools USA Inc
   2022 WL 4388304 , N.D.Fla. , Aug. 23, 2022

*Report and Recommendation Adopted by*

6. Killick v. Harbor Freight Tools USA, Inc.
   2022 WL 4387870 , N.D.Fla. , Sep. 22, 2022

*Affirmed by*

7. Killick v. Harbor Freight Tools USA Inc.
   2024 WL 379215 , 11th Cir.(Fla.) , Feb. 01, 2024

8. Killick v. Harbor Freight Tools USA Inc.
   2023 WL 1822431 , N.D.Fla. , Jan. 09, 2023

*Report and Recommendation Adopted by*

9. Killick v. Harbor Freight Tools USA, Inc.
   2023 WL 1824914 , N.D.Fla. , Feb. 08, 2023

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Affirmed by*

10.  Killick v. Harbor Freight Tools USA Inc.
2024 WL 379215 , 11th Cir.(Fla.) , Feb. 01, 2024


11.  Killick v. Harbor Freight Tools USA Inc.
2022 WL 22586527 , N.D.Fla. , Aug. 24, 2022


12.  Killick v. Harbor Freight Tools USA Inc
2022 WL 22586528 , N.D.Fla. , Aug. 24, 2022


13.  Killick v. Harbor Freight Tools USA Inc.
2022 WL 22586365 , N.D.Fla. , Dec. 07, 2022


14.  Killick v. Harbor Freight Tools USA Inc.
2023 WL 1825094 , N.D.Fla. , Jan. 09, 2023


*Report and Recommendation Adopted by*

15.  Killick v. Harbor Freight Tools USA, Inc.
2023 WL 1819161 , N.D.Fla. , Feb. 08, 2023


16.  Killick v. Harbor Freight Tools USA Inc.
2023 WL 10407392 , N.D.Fla. , Jan. 09, 2023


17.  Killick v. Harbor Freight Tools USA, Inc.
2024 WL 1136342 , N.D.Fla. , Jan. 22, 2024

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 7

Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)

2022 WL 22879671

2022 WL 22879671
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Audrey K. MILLER Plaintiff,

v.

UNIVERSITY OF HOUSTON SYSTEM, and
University of Houston-Downtown. Defendants.

Civil Action No. 4:15-CV-002927
|
Signed October 20, 2022

**Attorneys and Law Firms**

Audrey K. Miller, Houston, TX, Pro Se.

Terrence B. Robinson, Mina Madani Banerjee, TB Robinson Law Group, PLLC, Houston, TX, for Plaintiff.

Matthew Allen Deal, Drew L. Harris, Office of the Attorney General, Austin, TX, Eric Mark Fineman, Littler Mendelson, Austin, TX, for Defendants.

## ORDER

Andrew S. Hanen, United States District Judge

**\*1** Pending before the Court is a Motion to Compel filed by Plaintiff Audrey K. Miller ("Dr. Miller" or "Plaintiff"). (Doc. No. 147). Defendants University of Houston-Downtown ("University of Houston" or "UHD") and University of Houston System ("UHS") (collectively "Defendants") filed a Response in opposition. (Doc. No. 148). Plaintiff did not file a Reply,

## I. Background

This is an alleged retaliation case brought against a prospective employer. Plaintiff received her Ph.D. in Psychology and completed a post-doctoral fellowship in Clinical-Forensic Psychology. After her fellowship, Dr. Miller became a tenure-track Assistant Professor in the Clinical Doctoral Program in the Psychology and Philosophy Department at Sam Houston State University ("SHSU" or "Sam Houston").

After a few years of teaching at Sam Houston, Plaintiff applied for a promotion but was denied the promotion as well as tenure. She alleges that Sam Houston denied her the promotion and tenure because of her gender and because she previously raised concerns about the mistreatment of women in her department. Following the denial of tenure, Miller filed an Equal Employment Opportunity Commission ("EEOC") Charge against Sam Houston, alleging sex discrimination and retaliation and eventually a lawsuit.

After Sam Houston denied Miller tenure, she "pursued other employment opportunities" at the University of Houston. (Doc. No. 1 at 4). Specifically, she "applied to UHD for three open psychology faculty positions advertised in the Department of Social Sciences." (Doc. No. 1 at 4). The University of Houston interviewed Plaintiff and included Miller in its list of its "top four candidates." Ultimately, the Defendants extended the offers to three individuals, but not the Plaintiff.

Subsequently, Plaintiff filed a Charge of Discrimination form with the EEOC, alleging that the Defendants here "retaliated against [her] because of [her] protected oppositions against SHSU," (Doc. No. 148-1). Then, Plaintiff filed this action under Title VII, claiming that Defendants subjected her to retaliation. Specifically, Plaintiff claims that Defendants failed to hire her for opposing unlawful conduct while at Sam Houston and for filing a charge of discrimination against Sam Houston.

## II. Legal Standard

This discovery dispute involves both interrogatories and requests for production. Federal Rule of Civil Procedure 26(b) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Discoverable information, however, is not limited to admissible evidence. *See id.* Rather, it includes anything "reasonably calculated to lead to the discovery of admissible evidence." *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991).

Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)
2022 WL 22879671

**\*2** A party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested. Fed. R. Civ. P. 37(a). The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir. 1990). At the discovery stage, courts traditionally construe "relevance" broadly, stating that information is relevant if it "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Id.*

While district courts are customarily accorded wide discretion in handling discovery matters, a ruling which "fail[s] to adhere to the liberal spirit of the Rules" or which "results in fundamental unfairness at trial" will not be upheld. *Coughlin,* 946 F.2d at 1159.

### III. Analysis

**A. Requests for Production**

Plaintiff argues that Defendants' Answers and Objections to Plaintiff's First Set of Request for Production are deficient. (Doc. No. 147 at 2). Specifically, Plaintiff takes issue with Defendants' production, responses, and objections to Request for Production Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10. The Court will address each in turn.

#### 1. *Request for Production No. 1*

Plaintiff first challenges Defendants response to Request for Production No. 1. In that Request, Plaintiff asks Defendants to provide complete applications, and records of all communications for each applicant who was offered employment for the following faculty searches: "(a) 2013-2014 Assistant Professor of Psychology, (2) 2014-2015 Assistant or Associate Professor of Clinical or Counseling Psychology, (c) 2014-2015 Assistant or Associate Professor of Cognitive Psychology; and (d) 2015-2016 Assistant Professor of Criminal Justice." (Doc. No. 147 at 3). Defendants responded to subsection (a), providing the complete applications and records of all related communications for each applicant who was offered employment during the 2013-2014 Assistant Professor of Psychology hiring cycle. Defendants, however, objected to subsections (b), (c), and (d), stating that the sole adverse

employment action at issue in the case is the failure to hire Plaintiff for the Assistant Professor of Psychology position in 2013 and 2014, and thus, all other hiring cycles are outside the scope of discovery. (*See* Doc. No, 148-2 at 3). Plaintiff takes issue with the fact that Defendants did not provide documents in compliance with subsections (b), (c), and (d). Further, Plaintiff argues that certain documents for candidates Turner, Rufino, and Coleman are missing. (Doc. No. 147 at 3).

As an initial matter, the Court must confront the issue of whether information concerning subsections (b), (c), and (d) is relevant and discoverable. Examining Plaintiffs Original Complaint, it states that she interviewed for three open psychology faculty positions and was notified that she was a candidate on April 4, 2014. (Doc. No. 1 at 4). The Original Complaint does not mention any facts or causes of action that concern any other dates or positions. (*See* Doc. No. 1). Additionally, Plaintiff's EEOC Charge Plaintiff's EEOC Charge form only lists "4/29/2014"[1] as the earliest and latest date of discrimination (Doc. No. 148-1). Thus, the question Court is whether requests for production concerning other hiring cycles, not addressed in either the Complaint or the EEOC Charge form, are "relevant to any party's claim or defense," as required under Federal Rule of Civil Procedure 26. Fed. R. Civ. P. 26.

[1] April *29*, 2014, is the date that Defendants notified Plaintiff that she did not receive any of the Assistant Professor of Psychology positions. (Doc. No. 43-13 at 1-2).

**\*3** As stated earlier, relevant information is information that is "reasonably calculated to lead to the discovery of admissible evidence." *Coughlin,* 946 F.2d at 1159. Information is relevant if it "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Id.* Considering both the Original Complaint and the EEOC Charge form, Plaintiff alleged one single retaliation claim against Defendants that occurred during the 2013-2014 hiring cycle. Any information related to other hiring cycles that occurred after the alleged conduct has no bearing on "any issue that is or may be in the case." For that reason, the Court finds that the only relevant and discoverable information is that which pertains to the one and only cause of action in this lawsuit—the 2013-2013 retaliation claim. Requests for Production that seek information about other hiring cycles is not relevant, and therefore, not discoverable. Following

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 70 of 167
Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)
2022 WL 22879671

that reasoning, the Court sustains Defendants objections to subsections (b), (c), and (d).

The Court must also address Plaintiff's contention that Defendants failed to provide complete application materials. In response to Plaintiffs claims, Defendants state that they "provided Plaintiff with the complete application material and all related communications for the three candidates that were hired" instead of Plaintiff. (Doc. No. 148 at 5). Further, Defendants claim that they "are not in possession any [sic] other responsive records." (Doc. No. 148 at 5).

Although the Court finds that information about the selected 2013-2014 Assistant Professor of Psychology candidates is relevant, the Court cannot compel Defendants to produce documents that they do not have. *See Alvarado v. Air Sys. Components LP*, No. 3:19-CV-2057-N, 2021 WL 2682870, at *3 (N.D. Tex. June 29, 2021) "(Defendants note in their response to the motion that they have subsequently produced all evidence they have that is responsive to this interrogatory. The Court cannot compel Defendants to produce additional information they do not have."). Accordingly, the Court hereby DENIES Plaintiff's Motion to Compel as to Request for Production No. 1.

#### 2. *Request for Production No. 2*

Moving on to Request for Production No. 2, Plaintiff requests production of "the job opening advertisement position details for each of the positions listed in Plaintiff's Request for Production No. 1." (Doc. No. 147 at 3). Defendants produced the job opening advertisement and position details for the 2013-2014 Assistant Professor faculty search (Subsection (a); however, Defendants re-assert their argument that subsections (b), (c), and (d) are outside the scope of discovery. (Doc. 148-2 at 11). Plaintiff presents a new argument, urging the Court to compel Defendants to respond to all subsections since she "subsequently applied for each position listed in Request for Production No. 1, and Defendants failed to interview or hire [her]". (Doc. No. 147 at 3).

As discussed. Plaintiff has not asserted any facts or claims in this lawsuit regarding hiring searches or positions outside the 2013-2014 Assistant Professor of Psychology position. Dr. Miller did not assert any such claims in her Original Complaint, (*See* Doc. No. 1), nor did Dr. Miller mention these claims in her EEOC Charge form. (*See* Doc. No. 148-1). For that reason, the outcome is the same. Only the 2013-2014

Assistant Professor of Psychology position is relevant to this lawsuit. [2] All requests that inquire as to other positions or time frames exceeds the scope of discovery.

[2]    In *Hinton v. Em ex Inc.*, a Title VII case, the plaintiff filed a motion to compel discovery of employment practices and policies of her employer at all facilities. *Hinton v. Entex Inc.*, 93 F.R.D. 336, 337 (E.D. Tex. 1981). The court denied the motion, reasoning that "plaintiff has not made any specific factual allegations of discrimination that pertain to any facility of Entex other than the one [she was located at]," *Id.* Similarly, Plaintiff does not allege any specific factual allegations that relate to any occasion outside of the 2013-2014 time frame.

**\*4** As to the 2013-2014 information, Defendants state that they "have provided all requested records" for the 2013-2014 position. (Doc. No. 148 at 5). Plaintiff does not challenge the information provided under subsection (a). Thus, the Court sustains Defendants' objection to subsection **(b),** (c), and (d), and DENIES the Plaintiff's Motion to Compel as to Request for Production No. 2.

#### 3. *Request for Production No. 3*

In Request for Production No. 3, Plaintiff states "for each of the faculty searches listed above in Plaintiff's Request for Production No. 1, provide records of all documents and communications... that directly or indirectly reference Plaintiff, her work, or her informal or formal complaints or grievances." (Doc. No. 147 at 3). Defendants produced "every single communication in their possession regarding the decision not to hire Plaintiff in 2014, including telephone records." (Doc. No. 148). That said, Defendants objected and refused to produce documents in connection with the three other positions listed in Request for Production No. 1. (Doc. No. 148-2 at 13). Plaintiff does not challenge Defendants' compliance with subsection (a). (*See* Doc. No. 147 at 3–4). Rather, she takes issue with Defendant's failure to produce documents that respond to subsections (a), (b), and (c). In support of her Motion, Plaintiff re-emphasizes the same argument made in connection with Request for Production No. 2. [3]

[3]    Plaintiff sets out her contentions in this Request as follows: "Plaintiff subsequently applied for each

**Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)**

2022 WL 22879671

position listed in RFP No. 1 and Defendants failed to interview or hire Plaintiff for each following job posting. As such, communications and documentation relating to all positions that Plaintiff applied for and was not considered for, following her first rejection, are highly relevant to Plaintiff's claims of discrimination and retaliation." (Doc No. 147 at 4). These claims, however, if ever made would be barred by the statute of limitations and the defense of failure to exhaust remedies.

As aforementioned, this lawsuit solely involves the 2013-2014 Assistant Professor of Psychology position. Any information as to the other three listed positions is irrelevant and not discoverable. As such, the Court sustains Defendant's objection to subsections (b), (c), and (d), and DENIES Plaintiff's Motion to Compel discovery as to Request for Production No. 3.

### 4. *Request for Production No. 4*

In Request for Production No. 4, Plaintiff requests that Defendants produce all communications regarding Plaintiffs application for employment. This information is encompassed by the broader Request for Production No. 3, which inquires about "records of *all* documents and communications ... that **directly or indirectly** reference **Plaintiff,** her work, *or* her informal or formal complaints and grievances." (Doc. No. 147 at 3) (emphasis added). Thus, the outcome is the same as the Court's ruling on Request for Production No.3. The Motion to Compel as to Request for Production No. 4 is DENIED.

### 5. *Request for Production No. 5*

Similarly, Plaintiff's Request for Production No. 5 [4] is duplicative of Request for Production No. 3, which directly asks for "records of all documents and communications... that directly or indirectly reference Plaintiff, her work, or *her informal or formal complaints."* (Doc. No. 147 at 3) (emphasis added). Additionally, as Defendants explain, after conducting a diligent search, they have no responsive documents or records to produce. [5] For those reasons, the Court DENIES the Motion as to this issue.

[4] "Please provide any and all communication or documentation regarding Plaintiff's disclosure of her legal claim against SHSU including but not limited to phone records, text messages, and emails (transmitted on institutional or personal devices), and any other documentation that directly references her claim." (Doc. No. 147 at 4).

[5] "Defendants have no responsive document or records to produce." (Doc No, 148 at 7; *see* Doc. No, 148-2 at 19).

### 6. *Request for Production No. 6*

**\*5** Plaintiff moves to compel production of documents in compliance with Request for Production No. 6. [6] Defendants produced responsive information for the 2013-2014 faculty search but objected to the remainder of Plaintiff's request in light of the temporal scope of the complaint. (Doc. No. 148-2 at 21). The Court agrees that documents relating to hiring cycles other than the 2013-2014 one are not relevant and outside the scope of discovery. Thus, the Court DENIES Plaintiff's Motion to compel information outside of the 2013-2014 faculty search.

[6] "For each of the faculty searches listed in Plaintiffs Request for Production No. 1, records of all documents and communications to or from UHD or UHS employees, electronic or otherwise, including but not limited to phone records, text messages, and emails (transmitted on institutional or personal devices), that directly or indirectly reference any applicant who was offered employment at UHD or their work." (Doc. No. 147 at 5).

### 7. *Request for Production No. 7*

Request for Production No. 7 requests that Defendants "[please produce any memorandums, notes, memos, budgets, justifications, that Defendants generated or received regarding the reasons why Defendants hired the individuals for the positions listed in Plaintiff's Request for Production No. 1." (Doc. No. 147 at 5), Plaintiff claims that Defendants have not produced two relevant, responsive documents: a notebook from former Provost Edward Hugetz and a performance metric chart from Dr, DeFreitas. (Doc. No. 147 at 5).

2022 WL 22879671

Discussing the notebook, it is clear that Provost maintained a notebook where he jotted down general notes. Unfortunately, it is also clear that the notebook is no longer in Defendants, nor Provost Hugetz's, possession. In his deposition, Provost was asked what he did with the notebook, and Provost replies, "[w]ell, the – the notebook I – I kept that – or, you know, while I was in office. I don't have those notebooks anymore." (Doc, No. 14804 at 35:18-36:25).

Plaintiff further argues that Dr. DeFreitas "kept her own performance metrics chart that directly relate to [her] impression of Plaintiff as an applicant." (Doc. No. 147 at 5). The deposition testimony, at best, confirms that Dr. DeFreitas took notes and maintained her own screening matrix. (Doc. No. 148-5). As Dr. DeFreitas explains, a matrix is used to score candidates based on various qualifications. (See Doc. No. 148-5 at 15:1-16:25). In her deposition, Dr. DeFreitas confirms that she kept her own individual matrix, but when asked whether she can say what she did with the matrix Dr. DeFreitas replies, "No. I don't remember." (Doc. No. 148-5 at 15:1-6).

Undouhtedly, documents that contain notes about Plaintiff or recount Plaintiff's scores based on her qualifications are relevant and discoverable, and the Defendants must produce those if they exist. Nevertheless, the Court cannot compel production of a document that does not exist. As Defendants explain, the Senior Assistant General Counsel for Defendants inquired with all potential custodians for the subject notes, and her inquiry confirmed that there are no additional existing notes to produce. (Doc. No. 148 at 7).

While the Court cannot order Defendants to produce documents that they do not have access to, if the above-discussed information becomes available, the Court orders Defendants to produce any and all documents on this subject.

### 8. *Request for Production No. 8*

Plaintiff also asks this Court to compel production of the "Faculty Employment Policies" with "effective dates relevant to the 2013-2014 assistant professor of psychology search." (Doc. No. 147 at 6). Defendants produced a document titled "Faculty Employment Policies." (Doc. No. 148-8). As Defendants explain, using deposition testimony from former Dean Doveanna Fulton as support, that policy had been in effect since 1989, and it continued to be in

effect during the 2013-2014 faculty search. (Doc. No. 148-7 at 15:21-18:04). That being the case, the Defendant has complied with this Request.

### 9. *Request for Production No. 9*

**\*6** Request for Production No. 9 presents a somewhat novel issue. This Request asks Defendants to "[p]llease produce all of your calendars, diaries, notes, memos, letters, job offers or other similar documents that would indicate any contact, correspondence or communications Defendants had with Plaintiff from the beginning of the 2013 to present." (Doc. No. 147 at 6). While Defendants produced several documents in compliance with this Request, Plaintiff claims that Defendants did not "package" certain responsive documents, including the application fdes for Dr. Turner, Dr. Rufino, and Dr. Coleman. Dr. Miller argues that these documents are in Defendants' possession per Texas Government Code Section 441.187 and that Defendants must "package" them in accordance UHS's Records Retention Schedule. (Doc. No. 147 at 6).

Plaintiff does not cite to or explain UHS's Records Retention Schedule, so the Court cannot ascertain what Plaintiff means when she requests that the job application be "packaged." The Court, however, will consider Federal Rule of Civil Procedure 34, which provides that, "[a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b). In response to Request for Production No. 9, Defendants produced a chart which lists the relevant documents and even includes a narrow range of bates numbers for each listed document. (*See, e.g.* Doc. No. 148-2 at 25). The Court believes that this organization system complies with Federal Rule of Evidence 34.

Further, the Court notes that the application files about which Plaintiff complains are not responsive to Request for Production No. 9. The Request specifically asks for "correspondence or communications ***Defendants had with Plaintiff*** from the beginning of the 2013 to present." (Doc. No. 147 at 7) (emphasis added). Applications from Dr. Turner, Dr. Rufino, and Dr. Coleman to Defendants do not qualify as correspondence or communications between Defendants and Plaintiff.

For that reason, the Court DENIES Plaintiff's requested relief.

Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)

2022 WL 22879671

### 10. *Request for Production No. 10*

Plaintiffs ask the Court to compel Defendants to produce documents under Request for Production No. 10. This Request asks Defendants to, "[p]lease produce all of your calendars, diaries, notes, memos, letters, job offers or other similar documents that would indicate any contact, correspondence or communications Defendants had with Plaintiff from the beginning of the 2013 to present." (Doc. No. 147 at 6). Among Defendants' objections includes a claim that the request is unreasonably cumulative or duplicative with Plaintiff's Request for Production No. 9. (Doc. No. 148-2 at 26). Plaintiff takes issue with that objection in her Motion. (Doc. No. 147 at 6).

To determine whether the two are duplicative the Court must consider both requests. Request 10 asks Defendants to produce "all documents ever received or sent between Defendants and Plaintiff regarding Plaintiff's application for employment at UHD." Whereas Request for Production No. 9 asks for "correspondence or communications Defendants had with Plaintiff from the beginning of the 2013 to present." (Doc. No. 147 at 6). Plaintiff correctly points out that Request 10 encompasses a larger time frame than Request 9, but this distinction does not work to Plaintiff's advantage.

The claim at issue in this case involves Defendants rejecting Plaintiff for an employment position she applied for during the 2013-2014 hiring cycle. In Request for Production No. 10, Plaintiff asks the Court to force Defendants to produce documents prior to 2013. As such information has no bearing on the case at hand, the Court holds that it is outside the scope of discovery. The Court, thus, sustains Defendants objections to Request for Production No. 10.

### B. Interrogatories

**\*7** Plaintiff's Motion to Compel also addresses interrogatories. Specifically, Plaintiff asks the Court to compel defendants to further respond to Interrogatory Numbers 1, 2, 3, 4, 5, 6, 7, and 8. Like the Request for Production, the Court will address each Interrogatory individually.

### 1. *Interrogatory No. 1*

In Interrogatory No. 1, Plaintiff seeks to obtain the evaluation criterion that UHD and UHS utilized when hiring applicants to fill the Assistant Professor of Psychology positions. Importantly, Plaintiff requests Defendants describe the criterion for both the 2013-2014 and 2014-2015 hiring cycles. Defendants asserted many objections, including vagueness of the word "criterion" and that the 2014-2015 hiring cycles were outside the scope of discovery. (Doc. No. 148-9 at 3). Nevertheless, Defendants responded, providing some information about what UHD looked for in candidates for the 2013-2014 hiring cycle. Plaintiff has two issues with Defendant's response (1) it does not address the 2014-2015 hiring cycle criterion and (2) the criterion it does address is not specific enough.

Taking Plaintiff's initial argument first, the 2014-2015 hiring cycle is not relevant to this lawsuit; it does not relate "to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). As such, the information is not discoverable. In contrast, the Court acknowledges that inquiries about the 2013-2014 hiring criteria are relevant, since that is the year Plaintiff claims that Defendants retaliated against her. Defendants did reply to the part of the Request inquiring about the 2013-2014 hiring criteria but objected to the meaning of "criterion" as vague. Plaintiff takes issue with the specificity of Defendant's response.

The first question for the Court is whether the term "criterion" is vague. The party objecting to discovery as vague has the burden to show vagueness. *Heller v. City of Dallas,* 303 F.R.D. 466, 491 (N.D. Tex. 2014). A party responding to a disco very request should "exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories." *Id.* at 492. The Court holds that the word "criterion" is not "so vague or ambiguous as to be incapable of reasonable interpretation." *See id.* at 492. Thus, the Court overrules Defendants' vagueness objection.

Since the Court determined that the word "criterion" is not vague, the Court must consider Plaintiff's argument that Defendant did not reply with enough specificity. Defendants responded to the Interrogatory, listing certain criterion they considered, and in their response to the motion, Defendants state that 'more specific criterion simply do not exist," (Doc. No. 148 at 10). If that is the case, Defendants need to supplement their Interrogatory answer and so state.

2022 WL 22879671

#### 2. *Interrogatory No. 2*

Plaintiff's Interrogatory No. 2 instructs Defendants to "[p]lease identify the names and gender of each applicant hired to fill the Assistant or Associate Professor of Psychology positions during the 2013-2014 and 2014-2015 hiring cycles." (Doc. No. 147 at 7). Defendants object to this interrogatory, arguing that Plaintiff only alleged a retaliation claim, not a gender or sex discrimination claim. (Doc. No. 148-2 at 5). In response, Plaintiff contends that she "specifically referred to retaliation for filing a *charge of discrimination under TITLE VII* and in her original complaint," and that her "original complaint refers to gender discrimination within the facts." (Doc. No. 147 at 7).

**\*8** Hypothetically, the Court must decide whether Plaintiff's current lawsuit includes a gender discrimination claim. In support of her argument, Plaintiff points the Court to two areas in the Original Complaint (Doc. No. 1) that allegedly refer to a gender discrimination claim. (Doc. No. 147 at 7). The first citation is to the cause of action section where Plaintiff specifically states that Defendants unlawfully retaliated against her "for filing a charge of discrimination under Title VII". (Doc. No. 1 at 5). Contrary to Plaintiff's contention this paragraph does not support a claim of gender discrimination against Defendants. Rather, it explains that Defendants allegedly retaliated against her for filing a claim against her previous employer.

Next, Plaintiff points to her Original Complaint, Paragraph 4.4. (Doc. No. 147 at 7). That paragraph states that "Dr. Miller applied for the Associate Professor with Tenure at SHSU... Dr. Miller believed she was denied promotion and tenure because or her gender." (Doc. No. 1 at 3). Once again, these facts do not support a claim of gender discrimination against Defendants in this case. Instead, they might support a gender discrimination claim against SHSU.

Ultimately, the Court is unconvinced that Plaintiff's claim against Defendants is a gender or sex discrimination claim. Plaintiff does not allege in her Original Complaint that Defendants discriminated against her based on sex or gender. (*See* Doc. No. I).[7] Neither does Plaintiff claim that Defendants discriminated against her on the basis of sex or gender in her EEOC Charge form. (*See* Doc. No. 148-1).[8] Considering the pleadings and the EEOC Charge form together, this Court finds that Plaintiff only asserted a retaliation claim against Defendants. Nevertheless, the

Court concludes that the applicant's specific genders could lead to admissible evidence in the current proceedings and are therefore discoverable, in addition to the names of the applicants hired to fill the position during the 2013-2014 position. Thus, the Court GRANTS Plaintiff's motion to compel as to Interrogatory No. 2.

[7] "Defendants subjected Dr. Miller to *retaliation*, in violation of Section 704(a) of Title VII." (Doc. No. 1 at 5) (emphasis added).

[8] "I was subjected to denial of hiring *because of* my legally protected oppositions to sex discrimination and retaliation against Sam Houston State University." (Doc. No. 148-1) (emphasis added), "I was not hired because UHD retaliated against me because of my protected oppositions against SHSU." *Id.*

#### 3. *Interrogatory No. 3*

In Interrogatory No. 3, Plaintiff asks Defendants to describe the evaluation criterion employed while filling the Assistant Professor of Criminal Justice position during the 2015-2016 hiring cycle.[9] As explained earlier, this type of information is not discoverable because it occurred after the alleged unlawful conduct involved in this lawsuit and does not relate "to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Therefore, the motion to compel is DENIED as to Interrogatory No. 3.

[9] "Describe the evaluation criterion that UHD and UHS employed to hire applicants to fill the Assistant Professor of Criminal Justice position during the 2015-2016 hiring cycle." (Doc. No. 147 at 7).

#### 4. *Interrogatory No, 4*

Plaintiff inquires about "the names and gender or each applicant hired to fill the Assistant or Associate Professor of Criminal Justice positions during the 2013-2014 and 2014-2015 hiring cycles," (Doc, No. 147 at 8). Defendants objected to this Interrogatory, stating that the sole position Plaintiff applied for was the Assistant Professor of Psychology position, not the Assistant Professor of Criminal Justice. (Doc. No. 148-9 at 7). Additionally, Defendants

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 75 of 167
Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)
2022 WL 22879671

objected because Plaintiff did not allege that Defendants' decision was motivated by gender or sex. (Doc. No. 148-9 at 7).

 **\*9** As discussed with Interrogatory No. 2, Plaintiffs did not assert a gender discrimination claim. For that reason, the genders of each applicant are not relevant and not discoverable. That said, there is a question whether the names of the 2013-2014 Associate Professor of Criminal Justice are discoverable.

The Court finds that there is some confusion on this point. Plaintiff's Original Complaint provides that, "[s]he applied to UHD for three open psychology faculty positions advertised in the Department of Social Sciences." (Doc, No. 1 at 4). While Plaintiffs application states that she is responding to a job posting for, "Assistant Professor, Psychology." (Doc. No. 54-3). Following the liberal spirit of the Rules, the Court finds that while this information may be irrelevant at trial, it is still discoverable. [10]

[10]   Wliile to the Court it seems unlikely, the parties do not make dear whether the Assistant Professor for Criminal Justice is a position within the Psychology department at University of Houston.

The Court sustains Defendants objection as to the genders of the individnals and the 2014-2015 applicants, but the Court overrules the objection to the 2013-2014 Associate Professor of Criminal Justice position. Plaintiff's Motion to Compel is GRANTED as to the names of the 2013-2014 Associate Professor of Criminal Justice applicants and DENIED as to the remainder of the Interrogatory.

### 5. *Interrogatory No. 5*

Interrogatory No. 5 instructs Defendants to "[d]escribe in detail the Defendants' official reason or reasons the Plaintiff was not hired for the Assistant or Associate Professor of Psychology positions during the 2013-2014 and 2014-2015 hiring cycles." (Doc. No. 147 at 8). Defendants lodged a few objections to this Interrogatory. First, Defendant re-urge the objection that Plaintiff did not assert claims relating to any other faculty search, other than the 2013-2014 one. Second, Defendants assert that the Interrogatory is argumentative.

Defendants did, however, provide a response to the 2013-2014 part of the Interrogatory. In their Response,

Defendants outlined the reasons why they selected the other three professors. Defendants clearly avoided answering the Interrogatory, which asked for the reason why they did not hire Dr. Miller. In their Response to Plaintiff's Motion Defendants state "that there are no 'official reasons' to provide or describe beyond what Defendants have already stated." (Doc. No. 148 at 10). The Court understands that the reasons why they hired the other candidates might be that they were the most desirable and the fact that they were better qualified, but if that is the case, Defendants must say so.

The Court GRANTS the motion to compel and instruct Defendants to state a reason why Plaintiff was not hired for the 2013-2014 Assistant or Associate Professor of Psychology position. As to the 2014-2015 position, the Court SUSTAINS Defendants objection that it is outside the scope of discovery and DENIES the Motion to Compel as to that point.

### 6. *Interrogatory No. 6*

Interrogatory No. 6 is similar to Interrogatory No. 3—the two both concern the 2015-2016 Assistant Professor of Criminal Justice position. As previously determined, this topic is not relevant, and thus, is outside the scope of discovery. Plaintiff's inquiry as to the reason Plaintiff was not hired for the Assistant Professor of Criminal Justice position during the 2015-2016 hiring cycle is not relevant to Plaintiff's allegations that Defendants retaliated against her during the 2013-2014 hiring cycle. Accordingly, the Motion to Compel is DENIED as to Interrogator No. **6**.

### 7. *Interrogatory No. 7*

 **\*10** Next, Plaintiffs challenge Defendants' response to Interrogatory No. 7. Interrogatory No, 7 states, "[i]dentify each and ever individual who participated in making hiring decisions for the Assistant or Associate Professor of Psychology positions during the 2013-2014 and 2014-2015 hiring cycles." (Doc. No. 147 at 9). Defendants partially objected to this Interrogatory, stating that "to the extent this interrogatory solicits information pertaining to the 2014-2015 hiring cycle, Defendants object to this interrogatory as outside the scope of discovery. (Doc. No. 148-9 at 11). As to the part of the interrogatory that concerns the 2013-2014 hiring cycle, Defendants provided a response. (See Doc. No. 148-9 at 11). Plaintiff urges the Court to Compel Defendants provide all the requested information.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 76 of 167

**Miller v. University of Houston System, Not Reported in Fed. Supp. (2022)**
2022 WL 22879671

The Court starts off again noting that any information related to the 2014-2015 hiring cycle is outside the scope of discovery, and thus, SUSTAINS Defendants' objection as to that part of the Interrogatory.

That said, the names of the individuals who participated in making hiring decisions for the 2013-2014 hiring cycle are relevant and discoverable. Defendants must answer this part of the Interrogatory, which they did. Plaintiff argues that "Defendants list a few individuals in their response but fail to completely disclose all persons who participated in making hiring decisions." (Doc. No. 147 at 9). In Response to that assertion, Defendants claim that they "have identified every requested individual" in their previous response to the interrogatories. (Doc. No. 148 at 10). Since Defendants have already answered Interrogatory No. 7, to the extent that they have the information, the Court DENIES the motion to compel as to this interrogatory. *Alvarado*, No. 3:19-CV-2057-N, 2021 WL 2682870, at *3 (the court denied a motion to compel where defendants previously answered the interrogatory and noted in their response to the motion that they have produced all evidence they have that is responsive to the interrogatory).

8. *Interrogatory No. 8*

Lastly, interrogatory No. 8 instructs Defendants to "[i]dentify each and every individual who participated in making hiring decisions for the Assistant Professor of Criminal Justice position during the 2015-2016 hiring cycle." (Doc. No. 147 at 9). Defendants object to this Interrogatory as outside the scope of discovery. (Doc. No. 148-2 at 12). The Court agrees, finding this information not relevant since it involves a time frame not at issue in this case. As a result, the Court DENIES Plaintiff's Motion to Compel as to Interrogatory No. 8.

### IV. Conclusion

The Court grants in part and denies in part Plaintiff's Motion to Compel. It has sustained and overruled certain of the Defendants' objection as set forth above. Defendant shall supplement their answers to the Interrogatories and their responses to the Requests for Production as described above by December 7, 2022.

Signed at Houston, Texas, this 20<u>th</u> day of October, 2022.

### All Citations

Not Reported in Fed. Supp., 2022 WL 22879671

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 4:15-CV-02927**<br>Miller v. University Of Houston System et al | — | S.D.Tex. | Oct. 06, 2015 | Docket |

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (10)**

**Direct History (1)**

1. Miller v. University of Houston System
2022 WL 22879671 , S.D.Tex. , Oct. 20, 2022

**Related References (9)**

🚩 2. Miller v. University of Houston System
2019 WL 4757752 , S.D.Tex. , Sep. 30, 2019

*Reversed and Remanded by*

🚩 3. Miller v. Sam Houston State University
986 F.3d 880 , 5th Cir.(Tex.) , Jan. 29, 2021

*On Remand to*

4. Miller v. University of Houston - Downtown
2023 WL 6465858 , S.D.Tex. , Oct. 04, 2023

*Motion to Amend Denied by*

5. Miller v. University of Houston - Downtown
2024 WL 1517212 , S.D.Tex. , Apr. 05, 2024

🚩 6. Miller v. Sam Houston State University
2019 WL 4758357 , S.D.Tex. , Sep. 30, 2019

*Reversed and Remanded by*

🚩 7. Miller v. Sam Houston State University
986 F.3d 880 , 5th Cir.(Tex.) , Jan. 29, 2021

*On Remand to*

8. Miller v. University of Houston - Downtown
2023 WL 6465858 , S.D.Tex. , Oct. 04, 2023

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Motion to Amend Denied by*

9.  Miller v. University of Houston - Downtown
2024 WL 1517212 , S.D.Tex. , Apr. 05, 2024


10.  Miller v. Sam Houston State University
2024 WL 1587470 , S.D.Tex. , Apr. 11, 2024

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 8

319 F.R.D. 220
United States District Court, N.D. Texas, Dallas Division.

Peter MIR, Plaintiff,

v.

L–3 COMMUNICATIONS INTEGRATED
SYSTEMS, L.P., Defendant.

No. 3:15–cv–2766–B
|
Signed 08/22/2016

**Synopsis**
**Background:** Job applicant brought action against federal contractor, alleging that contractor's failure to hire him violated the Rehabilitation Act and Americans with Disabilities Act (ADA). Contractor moved to compel applicant to sign authorizations for release of information relating to his application for and receipt of social security disability insurance benefits (DIB).

**Holdings:** The District Court, David L. Horan, United States Magistrate Judge, held that:

[1] documents sought were within applicant's possession, custody, and control, even though they were maintained by Social Security Administration, and

[2] contractor's discovery requests sought relevant information and were not overbroad.

Motion granted.

West Headnotes (17)

**[1]** **Federal Civil Procedure** 🔑 Grounds and Objections

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable.

15 Cases that cite this headnote

**[2]** **Federal Civil Procedure** 🔑 Grounds and Objections

A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.

**[3]** **Federal Civil Procedure** 🔑 Failure to respond; sanctions

A party who has objected to a discovery request must, in response to a motion to compel, urge and argue in support of its objection to a request, and, if it does not, it waives the objection. Fed. R. Civ. P. 37(a).

**[4]** **Federal Civil Procedure** 🔑 Scope

Under discovery rules, a court can, and must, limit proposed discovery that it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit, and the court must do so even in the absence of a motion. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C)(iii).

62 Cases that cite this headnote

**[5]** **Federal Civil Procedure** 🔑 Grounds and Objections

A party seeking to resist discovery on ground that proposed discovery is not proportional to needs of case bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by the rule by coming forward with specific information to address, insofar as that information is available to it, the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the

discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b).

63 Cases that cite this headnote

**[6]　Federal Civil Procedure**　Failure to respond; sanctions

The party seeking discovery, to prevail on a motion to compel, may well need to make its own showing of many or all of the proportionality factors under rule defining the scope and limits of discovery, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues, in opposition to the resisting party's showing. Fed. R. Civ. P. 26(b)(1), 37(a).

46 Cases that cite this headnote

**[7]　Federal Civil Procedure**　Existence, possession, custody, control and location

As a general matter, a party cannot invoke rule governing production of existing documents in the responding party's custody or control to require another party to create or prepare a new or previously non-existent document solely for its production. Fed. R. Civ. P. 34(a).

15 Cases that cite this headnote

**[8]　Witnesses**　Compliance with subpoena

Rule governing subpoenas does not contemplate that a non-party will be forced to create documents that do not exist. Fed. R. Civ. P. 45.

8 Cases that cite this headnote

**[9]　Federal Civil Procedure**　Construction and operation in general

When interpreting the Federal Rules of Civil Procedure, the court is to give the rules their plain meaning, and, as with a statute, the inquiry is complete if the court finds find the text of the rules to be clear and unambiguous. Fed. R. Civ. P. 1 et seq.

4 Cases that cite this headnote

**[10]　Federal Civil Procedure**　Construction and operation in general

The court may give weight to, and consider as persuasive authority, the construction of the Federal Rules of Civil Procedure offered by the Advisory Committee in its notes. Fed. R. Civ. P. 1 et seq.

5 Cases that cite this headnote

**[11]　Federal Civil Procedure**　Failure to Comply; Sanctions

Rule governing production of existing documents in the responding party's custody or control, along with rule governing motions to compel discovery responses, empowers courts to compel parties to sign written releases or authorization forms consenting to the production of various documents. Fed. R. Civ. P. 34(a), 37(a).

12 Cases that cite this headnote

**[12]　Federal Civil Procedure**　Existence, possession, custody, control and location

Rule governing production of existing documents in the responding party's custody or control is broadly construed, and documents within a party's control are subject to discovery even if owned by a nonparty. Fed. R. Civ. P. 34(a).

16 Cases that cite this headnote

**[13]　Federal Civil Procedure**　Existence, possession, custody, control and location

Definition of "possession, custody, or control" in rule governing production of existing documents in the responding party's custody or control includes more than actual possession or control of the materials; it also contemplates a party's legal right or practical ability to obtain the materials from a nonparty to the action. Fed. R. Civ. P. 34(a).

13 Cases that cite this headnote

**[14]** **Federal Civil Procedure** ⚷ Possession, custody and control

The burden is on the party seeking discovery, under rule governing production of existing documents in the responding party's custody or control, to make a showing that the other party has control over the documents sought. Fed. R. Civ. P. 34(a).

21 Cases that cite this headnote

**[15]** **Federal Civil Procedure** ⚷ Existence, possession, custody, control and location

Documents relating to job applicant's application for and receipt of social security disability insurance benefits (DIB) were within applicant's possession, custody, and control, and, thus, rule governing production of existing documents in responding party's custody or control, along with rule governing motions to compel discovery responses, was appropriate vehicle for federal contractor to seek to compel applicant to sign authorization for release of such information, in applicant's employment discrimination action against contractor, even though documents were maintained by Social Security Administration, where applicant could determine who could have access to documents sought by either granting or withholding his consent to their release. Fed. R. Civ. P. 34(a), 37(a).

4 Cases that cite this headnote
More cases on this issue

**[16]** **Federal Civil Procedure** ⚷ Particular Subject Matters

Discovery requests for documents relating to job applicant's application for and receipt of social security disability insurance benefits (DIB) sought relevant information and were not overbroad, as required for order compelling applicant to sign authorization for release of such information, in his employment discrimination action against federal contractor arising out of contractor's failure to hire him,

where possible estoppel effect of disability benefits determination by the Social Security Administration on applicant's ADA disability discrimination claim involved fact-specific inquiry, and discovery sought was proportional to needs of case. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

1 Case that cites this headnote
More cases on this issue

**[17]** **Social Security** ⚷ Determinations or awards by other entities, effect of

The possible estoppel effect of a disability benefits determination by the Social Security Administration on an ADA discrimination claim involves a fact-specific inquiry. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**Attorneys and Law Firms**

**\*222** Andrew S. Golub, Dow Golub Remels & Beverly LLP, Houston, TX, Brian P. Sanford, The Sanford Firm, Dallas, TX, for Plaintiff.

Robert E. Sheeder, Clayton McCarthy Davis, Bracewell & Giuliani LLP, Dallas, TX, **\*223** Leslie Selig Byrd, Bracewell & Giuliani LLP, San Antonio, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

DAVID L. HORAN, UNITED STATES MAGISTRATE JUDGE

**\*\*1** Defendant L–3 Communications Integrated Systems, L.P. ("L–3" or "Defendant") has filed a Motion to Compel Signed Releases from Plaintiff Peter Mir ("Mir" or "Plaintiff") [Dkt. No. 26] (the "MTC"), seeking an order under Federal Rule of Civil Procedure 37(a) to require Mir to complete, execute, and return Form SSA–3288 "Consent for the Release of Information" and an "Authorization for Release of Information" from Allsup Inc. as L–3 has requested pursuant to Federal Rule of Civil Procedure 34(a).

United States District Judge Jane J. Boyle referred Defendant's MTC to the undersigned United States magistrate judge for determination pursuant to 28 U.S.C. § 636(b). *See* Dkt. No. 27.

Mir filed a response, *see* Dkt. No. 30, and L–3 filed a reply, *see* Dkt. No. 31.

For the reasons explained below, the Court GRANTS L–3's Motion to Compel Signed Releases [Dkt. No. 26].

**Background**

Mir, an engineer, applied for a position with L–3. After an interview, L–3 did not award the job to Mir, and Mir filed an Administrative Complaint with the OFCCP, alleging violations of Section 503 of the Rehabilitation Act ("Section 503") and the Americans with Disabilities Act ("ADA") based on L–3's status as a federal contractor. The OFCCP has jurisdiction to investigate discrimination complaints leveled against federal contractors.

During the OFCCP's investigation of Mir's complaint, L–3 provided the OFCCP with a position statement as well as several follow up communications. L–3 contends that it provided these documents under the assurance that, in accordance with the OFCCP's regulations and longstanding practice, L–3's documents would remain confidential.

Following its investigation, the OFCCP issued a finding that there was insufficient evidence to conclude that L–3 violated its obligations under Section 503 and the ADA and issued a right-to-sue letter enabling Mir to bring a lawsuit against L–3 under the ADA within 90 days.

Mir then filed this action against L–3, alleging a violation of the ADA.

On April 25, 2016, L–3 deposed Mir. L–3 explains that Mir submitted his Application for Disability Insurance Benefits to the Social Security Administration on April 12, 2006 and has been receiving Social Security disability benefits from 2006 to the present. According to L–3, during his deposition, Mir admitted that he made misrepresentations to the Social Security Administration in connection with the Social Security benefits that he receives. Specifically, L–3 contends that, in his benefits application, Mir agreed to notify the Social Security Administration if his condition improved

and he became able to work; that Mir admitted that statements contained in his application are no longer true because his condition has in fact improved and he is able to work; and that Mir has not updated the Social Security Administration that his condition no longer prevents him from working.

According to L–3, Mir also filled out a questionnaire (the Adult Disability & Work History Report), which was submitted to the Social Security Administration, and Mir admitted that this report also contains information that is incorrect and out-of-date concerning his present condition and that portions of this report were not accurate regarding aspects of his job that he could not perform.

**\*\*2** In the MTC, L–3 explains that Mir also stated during his deposition that Allsup Inc. assisted him in making representations to the Social Security Administration, including by preparing the Adult Disability & Work History Report. According to L–3, Mir never informed Allsup Inc. or the Social Security Administration of the inaccuracies in the report, and Mir also testified that he cannot remember whether he talked to Allsup Inc. before submitting his Application for Disability Insurance Benefits to the Social Security Administration on April 12, 2006.

**\*224** L–3 contends that "Mir's Social Security Disability Insurance Benefits are relevant to claims and defenses in this lawsuit," where "Mir's acceptance of disability benefits, and the statements that Mir made to the Social Security Administration, have a direct bearing on whether he is judicially estopped from bringing his claim for disability discrimination under the ADA." Dkt. No. 26 at 2.

Following the deposition, L–3 served its Second Request for Production to Plaintiff Peter Mir, requesting in Request Nos. 1 and 2 that Mir complete, execute, and return Form SSA–3288 "Consent for the Release of Information" and an "Authorization for Release of Information" from Allsup Inc. (collectively, the "Releases"). According to Mir, the Form SSA–3288 release would authorize L–3 to access documents and information relating to (i) Mir's current monthly Social Security benefit amount; (ii) Mir's benefit or payment amounts from May 2005 to present; (iii) Mir's complete medical records from his claims folder(s); (iv) Mir's application(s) for disability benefits; and (v) decisions related to Mir's disability benefits, and the release to Allsup Inc. would give L–3 to access "all information pertaining to [Mir's] claim for Social Security benefits…including relevant

medical information." Dkt. No. 26–1 at Def. App. 00005–00006.

Mir objected to these requests and refused to sign and return the Releases. He asserts that the requests exceed the scope of Rule 34, which, according to Mir, only permits L–3 to seek the production of documents that are presently within Mir's possession, custody, or control and does not "require the creation of document that do not presently exist for the purpose of enabling another party to informally obtain the documents outside the boundaries of [Federal Rules of Civil Procedure] 34 and 45." *Id.* at Def. App. 00008–00009. Mir also objected that the requests seek information that is not relevant to the claims and defenses at issue in this lawsuit and that the Releases are overbroad. *See id.*

L–3 now moves to compel Mir to sign the Releases "[b]ased on the relevance of these Releases to claims and defenses in this lawsuit, as well as clear precedent allowing for L–3 to obtain signatures under Rule 34." Dkt. No. 26 at 2.

Mir responds that "L–3's argument is inconsistent with Rule 34's plain language, which only contemplates the production of existing documents in the responding party's custody or control, and is at odds with the majority of case law addressing the issue." Dkt. No. 30 at 1. Mir also contends that "L–3's proposed releases seek information regarding Mir's application for social security benefits in 2006 and his subsequent receipt of those benefits" and that the Releases therefore "are overbroad and seek information that is not relevant to Mir's claim that L–3 discriminated against him in 2011, or to L–3's claim that Mir is estopped from asserting his disability discrimination claim." *Id.*

Mir urges the Court to sustain his objections and deny L–3's MTC because Rule 34 does not provide a basis for compelling Mir to execute L–3's proposed Releases and because, even if it did, the Releases are overbroad and seek irrelevant information.

## Legal Standards

**3** Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* FED. R. CIV. P. 37(a)(3)(B)(iv).

**[1]  [2]** The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). In response to a Rule 34 request, "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." FED. R. CIV. P. 34(b)(2)(B). "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." FED. R. CIV. P. 34(b)(2)(C). A party resisting discovery must show how the requested **\*225** discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.").

**[3]** A party who has objected to a discovery request must, in response to a motion to compel, urge and argue in support of its objection to a request, and, if it does not, it waives the objection. *See Dolquist v. Heartland Presbytery*, 221 F.R.D. 564, 568 (D. Kan. 2004); *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 662 (D. Kan. 1999).

Federal Rules of Civil Procedure Rules 26(b) and 26(c) and 34 have been amended, effective December 1, 2015. Rule 26(b)(1) now provides that, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." FED. R. CIV. P. 26(b)(1).

The amendments to Rules 26 and 34 govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, in all proceedings then pending. The Court finds

Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)

2016 WL 4427488, 2016 A.D. Cases 272,022

that applying the standards of Rules 26 and 34, as amended, to Defendant's MTC is both just and practicable.

 **[4]**  Further, for the reasons the Court has previously explained, the Court concludes that the amendments to Rule 26 do not alter the burdens imposed on the party resisting discovery discussed above. *See Carr v. State Farm Mutual Automobile Insurance Company*, 312 F.R.D. 459, 463–69 (N.D. Tex. 2015). Rather, just as was the case before the December 1, 2015 amendments, under Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the  **\*226**  amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit—and the court must do so even in the absence of a motion. *See Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011). Thus, as amended, Rule 26(b)(2)(C) provides that, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." FED. R. CIV. P. 26(b)(2)(C).

 **\*\*4**  **[5]**  But a party seeking to resist discovery on these grounds still bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Rule 26(b) by coming forward with specific information to address—insofar as that information is available to it—the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

 **[6]**  The party seeking discovery, to prevail on a motion to compel, may well need to make its own showing of many or all of the proportionality factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties'

resources, and the importance of the discovery in resolving the issues, in opposition to the resisting party's showing.

And the party seeking discovery is required to comply with Rule 26(b)(1)'s proportionality limits on discovery requests; is subject to Rule 26(g)(1)'s requirement to certify "that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:...(B) with respect to a discovery request..., it is: (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action"; and faces Rule 26(g)(3) sanctions "[i]f a certification violates this rule without substantial justification." FED. R. CIV. P. 26(g)(1)(B), 26(g)(3); *see generally Heller v. City of Dallas*, 303 F.R.D. 466, 475–77, 493–95 (N.D. Tex. 2014).

But the amendments to Rule 26(b) do not alter the basic allocation of the burden on the party resisting discovery to—in order to successfully resist a motion to compel—specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable. *See McLeod*, 894 F.2d at 1485; *Heller*, 303 F.R.D. at 483–93.

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, or if the requested discovery is provided after the motion was filed, "the court must, after giving an opportunity to be heard, require the party...whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A).

Federal Rule of Civil Procedure 37(a)(5)(B)–(C) further provides in pertinent part that, "[i]f the motion is denied, the court may issue any protective order authorized under

Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party...who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees," "[b]ut the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust," and that, "[i]f the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." FED. R. CIV. P. 37(a)(5)(B)–(C).

### Analysis

I. Rule 34 is a proper vehicle for obtaining signed releases.

**\*\*5** L–3 contends that, "[w]hile there has been some disagreement among courts over whether Rule 34 can be used to require a party to sign a document, the overwhelming majority of courts in the Fifth Circuit have found Rule 34 is a proper mechanism for obtaining signatures" and that "this is particularly the case when the release relates to facts and claims the party has put at issue in a lawsuit." Dkt. No. 26 at 4. Mir responds that he "cannot be compelled under Rule 34 to sign the [Releases]" and that, "[i]f L–3 wants the documents at issue, it needs to subpoena them under Rule 45." Dkt. No. 30 at 8.

Rule 34(a) provides that "[a] party may serve on any other party a request within the scope of Rule 26(b): (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, **\*227** custody, or control: (A) any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or (B) any designated tangible things; or (2) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." FED. R. CIV. P. 34(a).

 **[7]**    **[8]**  As a general matter, a party cannot invoke Rule 34(a) to require another party to create or prepare a new or previously non-existent document solely for its production. *See, e.g., Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-cv-01644-REB-CBS, 2010 WL 502721, at \*14 (D. Colo. Feb. 8, 2010) (collecting cases); *accord Marchese v. Sec'y, Dep't of the Interior*, Civ. A. No. 03-3082, 2004 WL 2297465, at \*4 (E.D. La. Oct. 12, 2004) ("Rule 34 does not require a party responding to discovery to create responsive materials, only to produce those in its possession, custody or control." (emphasis removed)). Similarly, " Rule 45 'does not contemplate that a non-party will be forced to create documents that do not exist.' " *Georgacarakos v. Wiley*, No. 07-CV-01712-MSK-MEH, 2009 WL 924434, at \*2 (D. Colo. Apr. 3, 2009) (quoting *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 168 F.R.D. 630, 633 (N.D. Ill. 1996)).

L–3 does not ask Mir to create or prepare a new document but rather to sign two authorization forms for release of records. The United States Court of Appeals for the Fifth Circuit has specifically held that a party is not required by a Federal Rule of Civil Procedure 33 interrogatory to sign an authorization form appended to interrogatories. *See McKnight v. Blanchard*, 667 F.2d 477, 481–82 (5th Cir. 1982). But, where defendants sought to have a plaintiff sign "a form...that would authorize the release to the defendants of all of his medical records," the Fifth Circuit panel in *McKnight* also suggested that Federal Rule of Civil Procedure 34 may be an appropriate mechanism by which to require a party to sign an authorization release. *Id.* In that decision, the Court of Appeals noted that, "although the documents or authority to copy them could have been obtained by a request under Rule 34, and while quite possibly (since [the plaintiff's] physical condition was put at issue by his demands) the court upon proper motion could have ordered him to sign such an authorization, in default thereof staying further proceedings—, [the plaintiff] was not obliged by reason of the requests served upon him, which were based (solely) upon Rule 33 and [Federal Rule of Civil Procedure] 36, to sign the authorization incorrectly appended to the interrogatories as a 'request for admission.' " *Id.* at 482.

 **\*\*6**  But one court in this circuit recently explained that its "research has located no Fifth Circuit case that has *decided* whether a party can be compelled to sign a blank authorization form for medical or other records." *U.S. E.E.O.C. v. Res. for Human Dev., Inc.*, Civ. A. No. 10-3322, 2011 WL 3841066, at \*2 (E.D. La. Aug. 31, 2011) (emphasis in original). And, in the 34 years since the *McKnight* decision, district court decisions in this circuit and elsewhere have split as to the issue of whether Rule 34 is a proper vehicle by which a party may be required to sign an authorization for the release of medical,

employment, Social Security, or other records, even if those records are relevant to the claims or defenses at issue. *See, e.g., Robinson v. Jackson State Univ.*, No. 3:13-CV-7-HTW-LRA, 2014 WL 11514968, at *2 (S.D. Miss. July 31, 2014) (collecting cases); *Clewis v. Medco Health Sols., Inc.*, No. 3:12-cv-5208-L, 2013 WL 5354574, at *2 (N.D. Tex. Sept. 25, 2013) (collecting cases); *see also Cheshire v. Air Methods Corp*, No. 3:15CV933, 2015 WL 7736649, at *4 (W.D. La. Nov. 30, 2015) ("The Federal Rules of Civil Procedure do not prevent a party from willingly executing a release authorizing a nonparty custodian to produce confidential employment records directly to another party. Some courts allow a party to use a Rule 34 request to force the responding party to provide a release enabling the requesting party to get the records directly from the nonparty custodian. However, a majority of courts have held that **\*228** Rule 34 itself does not give courts the power to order a party to sign a release." (citations omitted)).

In one camp (on which Mir relies), courts have concluded that Rule 34(a) does not give courts the power to order a party to sign an authorization or release because (1) Rule 34(a) does not authorize requiring a party to create a document or sign a form attached to a request for production and (2) because, if the other party is not in possession or custody of the records at issue, the party should first serve a Rule 45 subpoena on the non-party custodian or "request the documents from the party, which then has a duty to collect them from the nonparty custodian to the extent the requested information is within the party's possession, custody, or control." *Cheshire*, 2015 WL 7736649, at *4.[1] These courts have held that "Rule 34 is [not] a vehicle by which a party may be compelled to sign an authorization for the release of records—even where such records have been determined to be relevant –" and that a "strained interpretation of Rule 34 [by which parties urge a contrary conclusion] is inconsistent with the plain language of the rule." *Klugel v. Clough*, 252 F.R.D. 53, 55 (D.D.C. 2008) ("hold[ing] that a request for production of documents pursuant to Rule 34 of the Federal Rules of Civil Procedure cannot be utilized as a vehicle by which to compel a party to sign an authorization for the release of medical records").

[1] *See also, e.g., E.E.O.C. v. Thorman & Wright Corp.*, 243 F.R.D. 426, 429 (D. Kan. 2007) ("Apparently, Defendant has not yet attempted to secure copies of the requested documents from the non-party custodian of the records via subpoena. The appropriate procedure to compel a non-party to produce documents is to serve them a subpoena

as set forth in Rule 45 of the Federal Rules of Civil Procedure. It is only after the individuals or entities object on grounds of privilege or otherwise fail to produce the documents pursuant to subpoena that the Court will consider a motion requesting (1) the Court compel the entity to produce the documents pursuant to Rule 45; or (2) compel the party to execute appropriate releases pursuant to the Court's general powers to enforce its own orders." (footnote omitted)); *Becker v. Securitas Sec. Servs. USA, Inc.*, No. 06-2226-KHV-DJW, 2007 WL 677711, at *3 (D. Kan. Mar. 2, 2007) ("Rule 34 contains no provision requiring a party to sign a release or authorization so that the requesting party may obtain a document directly from a non-party." (footnote omitted)).

Courts have also denied motions to compel requests under Rule 34(a) for signed releases or authorization forms based on a finding that the responding party was not in possession, custody, or control of the requested records. *See, e.g., Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470, 472 (D. Nev. 1998) ("acknowledg[ing] that some courts have ordered a party to sign a medical release, but [explaining that] these courts rely on the conclusion that a compelled medical release is the most expeditious, efficient, or least expensive means of procuring information from medical providers" but concluding, where "it is uncontroverted that medical records are documents or tangible items as defined under Rule 34(a) and that the Plaintiff does not have actual possession or custody of the medical records," and where "medical care providers maintain custody or control of medical records" and "[t]he relationship between the Plaintiff and her doctor is not sufficient to establish control," that "the Defendants can secure copies of the requested documents from the custodian of the records as readily as the Plaintiff," that "the Defendants have complete access to all necessary information through the appropriate discovery provisions of the Federal Rules of Civil Procedure," and that there is "no basis in Rule 34 for [compelling the signing of a release form to obtain the medical records] under these circumstances").

**\*\*7** In the other camp (to which L–3 looks for support), courts follow a line of cases that " 'hold, explicitly or implicitly, that Rule 34, along with Rule 37, empowers federal courts to compel parties to sign written authorizations consenting to the production of various documents.' " *Wymore v. Nail*, No. 5:14-CV-3493, 2016 WL 1452437, at *3 (W.D. La. Apr. 13, 2016) (quoting *Lischka v. Tidewater Servs, Inc.*, Civ. A. No. 96-296, 1997 WL 27066, at *2 (E.D. La.

Mir v. L–3 Communications Integrated Systems, L.P., 319 F.R.D. 220 (2016)
2016 WL 4427488, 2016 A.D. Cases 272,022

Jan. 22, 1997)). Courts have explained that Rule 34(a) "allows for production of documents which are in the possession, custody, or control of the party upon whom the request is served" and "that, for purposes of Rule 34, plaintiffs are in control of records that can be released via an authorization, because, by either granting or **\*229** withholding [their] consent, [they] may determine who shall have access to them." *Lischka*, 1997 WL 27066, at \*2 (internal quotation marks omitted). These courts have concluded that "written authorizations may be compelled under Rule 34 because they simply compel parties to disclose documents which are under their control." *Id.* at \*3; *see also Gondola v. USMD PPM, LLC*, No. 3:15-cv-411-M, 2016 WL 3031852, at \*6 (N.D. Tex. May 27, 2016) ("Plaintiffs report in their response to the MTC that they have already produced some documents but will also provide an authorization for unemployment records on or before Friday, April 20, 2016. At oral argument, Plaintiffs' counsel reported that Henshaw has since declined to sign the Unemployment Authorization. The Court determines that requiring this authorization is appropriate under Rule 34 and proportional to the needs of the case.").

As to Rule 34's not requiring a responding party to create new or nonexistent documents, courts have concluded that "[i]t simply does not follow that if Rule 34 permits courts to compel parties to sign written authorizations, it must also permit parties to compel their adversaries to create documents (or objects) of their choosing," where "[s]igning an authorization is an act that can be construed as production of a document under a party's control." *Lischka*, 1997 WL 27066, at \*2 (emphasis removed).

Another court in this camp rejected the argument "regarding the availability of the requested documents pursuant to FRCP Rule 45 subpoena" because "any attorney who has ever handled even one case implicating records and documents in the physical possession of non-parties and particularly government entities, including medical records, military records, social security disability records, tax records, and the like, will not be released without the written authorization of the individual to whom such records pertain." *Allen v. Indian Harbor Marine, Inc.*, Civ. A. 96-3135, 1997 WL 666210, at \*2 (E.D. La. Oct. 24, 1997).

[9]    [10]   When interpreting the Federal Rules of Civil Procedure, the Court is to give the rules their plain meaning, and, as with a statute, the inquiry is complete if the Court finds the text of the rules to be clear and unambiguous. *See Yesh Music v. Lakewood Church*, 727 F.3d 356, 359 (5th Cir. 2013).

The Court may also give weight to, and consider as persuasive authority, the construction of a rule offered by the Advisory Committee in its notes. *See, e.g., Schiavone v. Fortune*, 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). And, when interpreting a Federal Rule of Civil Procedure, the United States Supreme Court has also considered the rule's structure and context as well as its purpose and whether an interpretation is the rule's "most natural reading" as well as "an eminently sensible one." *Bus. Guides, Inc. v. Chromatic Comm'ns Enters., Inc.*, 498 U.S. 533, 540–46, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

[11]   Within this interpretive framework, the Court is persuaded to fall in with this second camp of courts that conclude that Rule 34, along with Rule 37, empowers courts to compel parties to sign written releases or authorization forms consenting to the production of various documents.

The Court agrees with other courts' observations that a party can seek documents such as Social Security or health records directly from a non-party custodian through a Rule 45(a) subpoena—in response to which the non-party may or may not refuse to release records without the written authorization of the individual to whom such records pertain —and that a party can, using Rule 34(a), request the records directly from the other party and thereby require that party to collect them from non-party custodians to the extent that the requested information is within the responding party's possession, custody, or control.

**\*\*8**   But those options' availability does not foreclose a party's using Rule 34(a) to seek a signed authorization or release from another party to facilitate disclosure by a non-party custodian of documents that are under the responding party's control but not within that party's possession or custody.

That is because requests for signing and executing written releases or authorizations may be properly made under Rule 34(a)—and then, if necessary, compelled under **\*230** Rule 37(a)—insofar as they require a responding party to permit the requesting party or its representative to inspect or copy designated documents or electronically stored information in the responding party's control. *See* FED. R. CIV. P. 34(a)(1). Reading Rule 34(a) to permissibly require parties to sign and execute written releases and authorization forms, so understood, does not amount to impermissibly requiring a responding party to create a new or non-existent document.

The Court concludes that this is the correct reading of Rule 34(a), consistent with the Fifth Circuit's observation in *McKnight* that "the documents or authority to copy them could have been obtained by a request under Rule 34, and while quite possibly (since [the plaintiff's] physical condition was put at issue by his demands) the court upon proper motion could have ordered him to sign such an authorization," 667 F.2d at 482, and with Federal Rule of Civil Procedure 1's directive that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding," FED. R. CIV. P. 1.

Of course, any discovery requests under Rule 34(a) are "still subject to the scope and limitations of Rule 26(b)." *Colsan v. Cincinnati Ins. Co.*, Civ. A. No. 13-495-BAJ-RLB, 2013 WL 6531917, at *3 (M.D. La. Dec. 12, 2013); *accord* FED. R. CIV. P. 26(b)(1) ("Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the [so-called proportionality factors]. Information within this scope of discovery need not be admissible in evidence to be discoverable."); FED. R. CIV. P. 34(a) (providing that "[a] party may serve on any other party a request within the scope of Rule 26(b)"); *Matherne v. Schramm*, Civ. A. No. 12-807-JJB-RLB, 2013 WL 5961096, at *3 (M.D. La. Nov. 7, 2013) ("This Court has previously declined to compel a party, over their objection, to sign an authorization to release confidential medical information when the material covered by such a waiver was irrelevant and privileged and thus outside of the scope of discovery.").

 **[12]**    **[13]**    And, on this reading of Rule 34(a), the responding party must actually have "control," for Rule 34(a)'s purposes, over the records sought through the releases or authorizations at issue. "Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty." *S. Filter Media, LLC v. Halter*, Civ. A. No. 13-116-JJB-RLB, 2014 WL 4278788, at *5 (M.D. La. Aug. 29, 2014) (internal quotation marks omitted). "Rule 34's definition of 'possession, custody, or control,' includes more than actual possession or control of the materials; it also contemplates a party's legal right or practical ability to obtain the materials from a nonparty to the action." *Edwards v. City of Bossier City*, No. CV 15-1822, 2016 WL 3951216, at *3 (W.D. La. July 20, 2016) (internal quotation marks omitted).[2]

2    *See also* *Benson v. Rosenthal*, No. CV 15-782, 2016 WL 1046126, at *4 (E.D. La. Mar. 16, 2016) ("The concept of 'control'...is often highly fact-specific, [but certainly includes when] the party to whom the request is made has the legal right to obtain the document, even though in fact it has no copy. Factors to consider in determining whether a party has 'control' of materials include whether the litigant...could secure materials from [a] nonparty corporation to meet its own business needs, and whether, by virtue of stock ownership or otherwise, one...effectively controls the other. [U]nder some circumstances courts interpret the control concept to go beyond whether the litigant has a legal right to obtain materials and focus on practical ability to obtain them....[I]f Benson has the legal right or practical ability to obtain 'League documents' responsive to these requests that are not in the actual possession or custody of Benson or the entities that he controls, they are within his control, and he must produce them." (internal quotation marks and citations omitted; emphasis removed)); *Savoy v. Davis*, No. CV 14-700-JJB-EWD, 2016 WL 589696, at *1 (M.D. La. Feb. 11, 2016) ("Although this production obligation may extend to materials that a party has a legal right to obtain, even though it has no copy, and to materials in the possession of employees or related entities, there is no obligation to manufacture documents or other materials in response to a Rule 34 request or to produce materials that are not in the responding party's possession, custody or control." (citation omitted; emphasis removed)); *Shell Glob. Sols. (US) Inc. v. RMS Eng'g, Inc.*, No. 4:09-CV-3778, 2011 WL 3418396, at *2 (S.D. Tex. Aug. 3, 2011) (" 'Control' does not require that a party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control for discovery purposes when that party has the right, authority, or practical ability to obtain the documents from a nonparty to the suit." (internal quotation marks omitted)); *In re Wells*, 426 B.R. 579, 610 (Bankr. N.D. Tex. 2006) ("In construing the phrase 'possession, custody or control' in [the context of] a request for documents under Federal Rule of Civil Procedure 34, federal courts have universally held that documents are deemed to be within the possession, custody or

2016 WL 4427488, 2016 A.D. Cases 272,022

control of a party for purposes of Rule 34 if the party has actual possession, custody or control of the materials or has the legal right to obtain the documents on demand." (internal quotation marks omitted)).

**9 *231 [14] "The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought." *S. Filter*, 2014 WL 4278788, at *5; *accord Shell Glob.*, 2011 WL 3418396, at *2 ("The party seeking production of documents bears the burden of establishing the opposing party's control over those documents."); *Goh v. Baldor Elec. Co.*, No. 3:98-mc-64-T, 1999 WL 20943, at *2 (N.D. Tex. Jan. 13, 1999) (same).

[15] Mir contends that "[t]he documents L–3 seeks from the Social Security Administration and Allsup are clearly not within Mir's possession or custody, nor are they within his control," and that "L–3 has neither argued nor shown that Mir has 'control' over documents belonging to the Social Security Administration or Allsup." Dkt. No. 30 at 5 n.2. Mir asserts that "L–3 must directly subpoena the documents it seeks from the Social Security Administration and Allsup" "before asking the Court to compel Mir to sign the releases." *Id.* at 6 & n.2.

The Court disagrees and finds that L–3 has shown that, under the circumstances here, the documents sought through the Releases are within Mir's control where, insofar as the records can be released—and perhaps can only be released—via an executed authorization or release, Mir, by either granting or withholding his consent, can determine who may have access to them. On the facts before the Court, the Court finds that Mir has either a legal right or at least a practical ability to obtain the records at issue, as L–3 asserts that he does.

The Court overrules Mir's objections that Rule 34(a) does not authorize L–3's requests that he complete, execute, and return the Releases and turns now to Mir's objections based on the scope of and limitations on discovery under Rule 26(b).

II. The Releases seek relevant information and are not overbroad.

[16] L–3 asserts that the documents that it seeks with the Releases are clearly relevant to this lawsuit where L–3 asserts an affirmative defense that Mir is estopped from bringing his claim in this case because of his Social Security disability benefits claims.

Mir responds that the Releases seek information regarding Mir's application for social security benefits in 2006 and his subsequent receipt of those benefits and that the Releases are overbroad and seek information that is not relevant to Mir's claim that L–3 discriminated against him in 2011 or to L–3's claim that Mir is estopped from asserting his disability discrimination claim. Mir contends that his application for Social Security benefits in 2006 and his communications with Allsup in connection with the preparation of his application are not relevant to Mir's claim that L–3 discriminated against him in 2011 or to L–3's affirmative defense of estoppel. Mir argues that nothing in his 2006 application even remotely precludes the possibility that he would be able to work in October 2011—more than five years later. Mir also explains that he has already produced a Social Security Administration Disability Update Report for the time frame of June 2011 to June 7, 2013 (which covers the time period when Mir interviewed with L–3 in October 2011), in which he discloses to the Social Security Administration that he has been looking for work for two–and-a-half years.

Mir contends that "the broad categories of information that L–3 seeks by virtue of its proposed releases—'all information pertaining to [Mir's] claim for Social Security benefits ...including relevant medical information' from Allsup as well as all documents and information from the Social Security Administration relating to (i) Mir's current monthly Social Security benefit amount; (ii) *232 Mir's benefit or payment amounts from May 2005 to present; (iii) Mir's complete medical records from his claims folder(s); (iv) Mir's application(s) for disability benefits; and (v) decisions related to Mir's disability benefits—are neither relevant nor proportional to the needs of the case, particularly when considering the minimal importance of the requested discovery in resolving the actual claims and defenses at issue in this case—i.e., whether L–3 discriminated against Mir, and whether Mir is estopped from asserting his discrimination claim." Dkt. No. 30 at 8–9.

**10 L–3 replies that Mir waived his relevance and overbreadth objections because he is, for the first time in his response, providing reasons why the disputed requests are irrelevant and overbroad and because his "form" or boilerplate objections failed to comply with the Federal Rules of Civil Procedure.

L–3 also explains that the report that Mir produced "was signed by Mir in August 2013, two years after his October 2011 interview with L–3," and that "[o]ne question on the

Report specifically asked Mir 'which best describes your health now as compared to June, 2011' and Mir checked the box indicating his condition was the 'same' as in June 2011." Dkt. No. 31 at 7. According to L–3, "[i]t would appear that Mir submitted a prior update report in June 2011 well before filling out this 2013 update report," and "L–3 simply seeks Releases to obtain this type of relevant information." *Id.* L–3 further asserts that "Mir's original 2006 Benefits Application requires him to update the Social Security Administration if his condition changes"; "[h]is 2013 Update Report references back to 2011"; and, "[c]onsequently, documents from 2006 to the present are relevant because Mir may have very well made representations at any point (before or after 2011) to the Social Security Administration about his condition at the time of his interview with L–3 in 2011." *Id.* L–3 argues that "[n]owhere in his Response does Plaintiff represent that he produced all relevant documents related to L–3's estoppel defense—clearly, Plaintiff has not." *Id.*

Finally, L–3 replies that, although Mir "appears to argue that L–3 must demonstrate that Mir's 'factual descriptions of his disability preclude the possibility of qualification as of a certain date' in order for the Releases to be relevant and not overbroad," "[t]his is not the standard for engaging in discovery." *Id.* L–3 contends that it "does not need to conclusively prove its estoppel defense in order to engage in discovery on that defense" and that "L–3 served the disputed Requests on Mir in order to determine if other documents exist demonstrating that Mir precluded himself from qualifying for the L–3 mechanical design engineer position at the time of the 2011 job interview." *Id.* According to L–3, it "seeks Releases specifically limited to documents related to Mir's Social Security Disability Benefits in order to investigate its estoppel defense." *Id.* at 10.

 **[17]** The possible estoppel effect of a disability benefits determination by the Social Security Administration on an ADA claim involves a fact-specific inquiry. *See Self v. BNSF Ry. Co.*, No. A-14-CA-618-SS, 2016 WL 543245, at *7–*8 (W.D. Tex. Feb. 9, 2016); *McDaniel v. IntegraCare Holdings, Inc.*, 901 F.Supp.2d 863, 869 (N.D. Tex. 2012). The Court determines that the information that L–3 seeks through the Releases is relevant to its judicial estoppel defense and Mir's disability discrimination claim. The scope of information

sought through the Releases is not overbroad in light of the claim and defense at issue. And, under Rule 26(b)(1), the Court determines that this discovery is proportional to the needs of the case, considering the importance of the issue of whether Mir is judicially estopped from bringing his ADA disability discrimination claim and the importance of this information sought through the Releases to resolving that fact-specific issue as well as the parties' relative access to relevant information (including the fact that this information may not be accessible from the non-party custodians without Mir's written authorization). Finally, Mir has not shown that any burden or expense of the proposed discovery—which here involves simply signing the Releases—outweighs its likely benefit.

 **\*\*11** The Court overrules Mir's objections that the requests seek information that is not relevant to the claims and defenses at issue **\*233** in this lawsuit and that the Releases are overbroad.

III. The Court will not award expenses under Rule 37(a)(5).

Under Federal Rule of Civil Procedure 37(a)(5), the Court determines that, under all of the circumstances presented here, Mir and L–3 should bear their own expenses, including attorneys' fees, in connection with L–3's MTC.

### Conclusion

For the reasons explained above, the Court GRANTS L–3's Motion to Compel Signed Releases [Dkt. No. 26]. Mir must, by **August 29, 2016**, serve on L–3's counsel the signed Form SSA–3288 "Consent for the Release of Information" and "Authorization for Release of Information" from Allsup Inc., as L–3 has requested in Request Nos. 1 and 2 of its Second Request for Production to Plaintiff Peter Mir.

SO ORDERED.

**All Citations**

319 F.R.D. 220, 2016 WL 4427488, 2016 A.D. Cases 272,022

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (10)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., Defendant. <br> 2017 WL 928863 | — | N.D.Tex. | Feb. 06, 2017 | Motion |
| **2. Brief in Support of Defendant's Motion for Summary Judgment** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant. <br> 2017 WL 928862 | — | N.D.Tex. | Jan. 09, 2017 | Motion |
| **3. Defendant's Reply to Plaintiff's Response to Motion to Compel Signed Releases and Brief in Support** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant. <br> 2016 WL 8459667 | — | N.D.Tex. | Aug. 18, 2016 | Motion |
| **4. Plaintiff Peter Mir's Response to Defendant's Motion to Compel Signed Releases and Brief in Support Thereof** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., Defendant. <br> 2016 WL 8459666 | — | N.D.Tex. | Aug. 10, 2016 | Motion |
| **5. Defendant's Motion to Compel Signed Releases and Brief in Support Thereof** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant. <br> 2016 WL 8459669 | — | N.D.Tex. | July 20, 2016 | Motion |
| **6. Plaintiff Peter Mir's Reply to Defendan't Response to His Motion to Compel** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., Defendant. <br> 2016 WL 8459665 | — | N.D.Tex. | July 18, 2016 | Motion |
| **7. Defendant's Response to Plaintiff's Motion to Compel Defendant's OFCCP Position Statement and Other Submissions and Brief in Support Thereof** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant. <br> 2016 WL 8459664 | — | N.D.Tex. | July 08, 2016 | Motion |
| **8. Plaintiff Peter Mir's Motion to Compel Defendant's OFCCP Position Statement and Other Submissions and Brief in Support** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., Defendant. <br> 2016 WL 8459659 | — | N.D.Tex. | June 17, 2016 | Motion |
| **9. Joint Status Report** <br> Peter MIR, Plaintiff, v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., Defendant. <br> 2015 WL 13119940 | — | N.D.Tex. | Dec. 03, 2015 | Filing |

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **10.  Docket 3:15cv02766**<br>MIR v. L-3 COMMUNICATIONS INTEGRATED SYSTEMS LP | — | N.D.Tex. | Aug. 24, 2015 | Docket |

**History (3)**

**Direct History (1)**

1. Mir v. L-3 Communications Integrated Systems, L.P.
319 F.R.D. 220 , N.D.Tex. , Aug. 22, 2016

**Related References (2)**

2. Mir v. L-3 Communications Integrated Systems, L.P.
315 F.R.D. 460 , N.D.Tex. , July 22, 2016

3. Mir v. L-3 Communications Integrated Systems, L.P.
2017 WL 5177118 , N.D.Tex. , Nov. 08, 2017

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 97 of 167

**Negative Treatment**

There are no Negative Treatment results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 9

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

KeyCite Yellow Flag

Distinguished by   Chen-Oster v. Goldman, Sachs & Co.,   S.D.N.Y., September 10, 2012

1995 WL 124186
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

NICHOLAS J. MURLAS
LIVING TRUST, et al. Plaintiffs,
v.
MOBIL OIL CORPORATION, et al. Defendants.

93 C 6956.
|
March 20, 1995.

MEMORANDUM OPINION AND ORDER

COAR, District Judge.

**\*1**  Plaintiffs the Nicholas J. Murlas Living Trust, the Mary Lou Murlas Living Trust, and the George J. Murlas Living Trust (collectively "Murlas" or "plaintiffs") have moved to compel discovery against Mobil Oil Corporation ("Mobil"). [Docket number 56]. This motion to compel is now fully briefed and ripe for decision. After having reviewed the pleadings, exhibits, and discovery submitted, this court decides as follows.

Background [1]

The complaint arises out of a lease agreement in which Mobil leased real property from plaintiffs and operated a gas station thereon. Plaintiffs subsequently discovered that the property was contaminated with hydrocarbons which had leaked from Mobil's underground storage tanks into the soil and groundwater. Plaintiffs allege violations of the Resource Conservation and Recovery Act ("RCRA"), breach of lease covenant, breach of certain indemnity agreements, breach of the Mobil–Groundwater Technology, Inc. ("GTI") contract as a third-party beneficiary, intentional misrepresentation, negligent misrepresentation, negligence, restitution, quasi-contract, and unjust enrichment.

Permissible Scope of Discovery

Discovery in federal civil cases is governed by Rule 26 of the Federal Rules of Civil Procedure. Rule 26 allows parties to have discovery regarding

any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, mature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Discovery may be limited by local rule. Fed.R.Civ.P. 26(b)(2). Discovery will also be limited by the court if it concludes that:

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 100 of 167

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

proposed discovery in resolving the issues....

Fed.R.Civ.P. 26(b)(2).

Discussion

Murlas moves to compel the answer or production to several different potentially discoverable items. The court will address each seriatim.

1. Production of Charles Sutter for Deposition

Plaintiffs allege that Mobil has failed to produce Charles Sutter, an in-house attorney with Mobil, for deposition in Chicago. Judge Plunkett ordered that Sutter and several other Mobil employees be produced for deposition. (*See* Response at p. 5). Plaintiffs state that they have already made one trip to Fairfax, Virginia to depose witnesses, and do not wish to travel to Virginia again to depose Mr. Sutter. Sutter was allegedly on the schedule to be deposed during plaintiffs' trip until two or three days before the trip, when plaintiffs were informed that he was going to Japan on business. Plaintiff requests that Sutter now be produced for deposition in Chicago.

 **\*2**  Mobil does not contest that Sutter may be deposed. However, Mobil requests that he be deposed in Fairfax instead of Chicago. Mobil points to Fed.R.Civ.P. 30, governing the taking of depositions, and notes that the rule allows a party to take the deposition of any person without leave of the court, and that the attendance of that witness may be compelled by subpoena pursuant to Rule 45. Rule 45(B)(iii) states that a court may quash or modify a subpoena that requires a person who is not a "party or an officer of a party" to incur substantial expense or travel more than 100 miles. However, that rule also states that if the party in whose behalf the subpoena is issued shows a "substantial need" for the testimony that cannot be otherwise met without substantial hardship, and that person assures the potential deponent that he will be reasonably compensated, the court may order appearance of that person. Fed.R.Civ.P. 45(B)(iii).

Neither Murlas nor Mobil has alleged that Sutter is an officer of Mobil. As a non-party deponent to this action, Sutter is not subject to the jurisdiction of this court. *In re Corrugated*

*Container Antitrust Litigation,* 655 F.2d 748, 750 n. 2, *rev'd other grounds,* 661 F.2d 1145 (7th Cir.1981). A deponent can be required to appear at a deposition only in the county in which he resides or is employed or transacts business in person. *See* Fed.R.Civ.P. 45(3)(A)(ii). Thus, this court cannot compel Sutter to appear at a deposition here in Chicago. Judge Plunkett has ordered Mobil, who is subject to the jurisdiction of this court, to produce Sutter. Mobil has affirmed this duty. The plaintiffs have alleged no undue hardship that could occur by conducting the deposition in Fairfax, except that plaintiffs' counsel is unwilling to make the trip. The court concludes that the plaintiffs should travel to Fairfax to complete Sutter's deposition, or conduct a telephonic deposition pursuant to Fed.R.Civ.P. 30(b)(7). Mobil is cautioned, however, that *Sutter is to be available on the date set for the deposition.*

2. Production of Documents Used to Refresh Recollection

Plaintiffs next argue that they are entitled to certain documents that were used by Tom Rush, Robert Johnson, and Craig LaBelle to refresh their recollection of events pertaining to this litigation prior to their depositions. Mobil asserts that those documents are protected by the attorney-client privilege and the work-product doctrines, but has agreed to tender the documents. Nonetheless, Mobil does not concede that plaintiffs have a right to reopen the depositions. Plaintiffs contend that they have a right to reopen the depositions and question the deponents on the documents.

Rule 612 of the Federal Rules of Evidence provides that if a writing used to refresh a witness' memory before a hearing, "an adverse party is entitled to have the writing produced *at the hearing,* to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. [Emphasis added]" Fed.R.Evid. 612. This entitlement is created so the adverse party may search out any discrepancies between the writing and the testimony. *Wheeling–Pittsburgh Steel Corp. v. Underwriters Laboratories, Inc. et al.,* 81 F.R.D. 8, 10 (N.D.Ill.1978). This rule furthers the purpose of the federal discovery rules to ascertain the truth. *See id.*

 **\*3**  The court concludes that the depositions of Rush, Johnson, and LaBelle should be reopened for the limited purpose of cross-examining them on the documents they used to refresh their recollection of this matter. Mobil should have produced those documents *at the time of the depositions,* and now gives no reason for not doing so. Further, plaintiffs are

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 101 of 167

Nicholas J. Murias Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)
1995 WL 124186

entitled to cross-examine the witnesses on the documents and so doing may aid in the ascertainment of the truth.

The case cited by Mobil, *U.S. v. Blas,* 947 F.2d 1320 (7th Cir.1991), does not counsel to the contrary. In *Blas,* the Court of Appeals reviewed a district court's decision to deny access to several documents used to refresh the recollection of a DEA agent. The trial court was concerned with its role as arbiter of what portions of the documents would have to be redacted in order to turn those documents over to the defense, and the resultant delay of the trial. *U.S. v. Blas,* 947 F.2d at 1326. The appeals court concluded that the denial was not a clear abuse of the trial court's discretion, and therefore declined to reverse the trial court's decision. *U.S. v. Blas,* 947 F.2d at 1326. *Blas* is distinguishable from the case at bar not only because the "clear abuse of discretion" standard does not apply but because here, Mobil has already agreed to turn over the documents intact. This court will not have to use judicial resources in wading through and redacting them.

However, this court will not require Mobil to pay the plaintiffs' expenses with regard to these additional depositions. Plaintiffs must travel to Fairfax in any event to depose Mr. Sutter. Imposition of costs is a drastic measure, and one that this court does not take lightly. Plaintiffs have not alleged, nor does this court surmise, that Mobil acted in bad faith or with wrongful intent in not producing the documents at the time of the depositions. Therefore, the costs of returning to Fairfax will not be imposed on Mobil. However, the court cautions Mobil that it should make every reasonable effort to schedule *all* the depositions so that plaintiffs will only have to make one return trip to Fairfax. Given the nature of these disputes and briefs, the court sees that discovery in this litigation has the flavor of two kindergartners arguing over a crayon. Such childish antics will not be tolerated and any future failure to follow the requirements of the discovery rules will result in escalating sanctions.

### 3. Mobil Documents Not Produced

#### a. Mobil Design Memo 31

Plaintiff requests production of a document discussed in the depositions of LaBelle and Johnson titled either "Mobil Design Memo 31" or "Mobil's Guidelines for Assessment and Remediation." Mobil responds that the document has been offered to plaintiffs by a "letter dated November 16." Plaintiffs report in their reply memorandum that documents

titled both "Mobil Design Memo 31" and "Mobil's Guidelines for Assessment and Remediation" have been produced. Thus, this issue is moot.

#### b. Made Environmental Report

**\*4** Plaintiffs seek discovery of an environmental consultant's report generated by "Maude Environmental" which one of Mobil's former project engineers Sharon Gallagher testified about in her deposition. Gallagher stated in her deposition that she relied on this report in deciding to apply "passive remediation" to the property at issue. (Plaintiff's exhibit M, Gallagher deposition at 123, 195, 215). Plaintiffs thus contend that the report is relevant and discoverable under Fed.R.Evid. 26.

Mobil disagrees with plaintiffs' characterization of both the deposition testimony and the relevance of the document. Mobil points to plaintiff's exhibit E, a letter from Mobil's counsel to plaintiffs' counsel in which Mobil's counsel states that the document at issue has been located and not only was it prepared after Gallagher left Mobil's employ, but it was prepared by "Hazardous Substance and Waste Management Research, Inc." (Plaintiffs' exhibit E p. 3). Further, Mobil's counsel states that the document is a "site specific risk assessment" prepared for a location in Wheaton, Illinois. (*Id.*).

Although Mobil correctly states that the statements of Gallagher do not necessarily bind Mobil, Gallagher at least implied that she relied on the "Maude Environmental" report in making decisions regarding the subject property. Thus, the document, whether prepared by Maude or by Waste Management Research, is relevant and discoverable under Rule 26. Of course, this does not mean that the report will ultimately be admitted into evidence. Rule 26 plainly states that documents need only be "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26. That document may lead to such discoverable evidence regarding the subject property. Perhaps, for example, the authors of the document will have relevant information regarding discussions with Mobil employees regarding the subject property.

Plaintiff reports in its reply memorandum that several documents, including documents relating to issues discussed by Gallagher, were produced on December 20, 1994. If those documents contain the documents discussed in Gallagher's deposition, this issue is moot. However, if Mobil holds

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 102 of 167

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)
1995 WL 124186

additional documents which could be the ones Gallagher discussed, Mobil should produce them.

#### c. Robert Johnson's Refusal to Answer

Plaintiffs request that Robert Johnson be required to divulge information regarding the settlement of other litigation having nothing to do with the subject property. Mobil replies that that settlement is irrelevant to this litigation and could not reasonably lead to the discovery of admissible information. The court agrees with Mobil. Settlement discussions in another, distinct matter are irrelevant to this litigation and need not be produced. Fed.R.Civ.P. 26.

#### d. Tank Removal Report

During the course of depositions, some deponents referred to "tank pull reports" and plaintiffs have requested that these reports be produced. Mobil responds that they have searched and re-searched for these documents, and they could not be found or no longer exist. The court will require that Mobil search one, final time for these documents before they are declared lost. If they are found they should be produced. Plaintiff should not make further requests for the "tank removal report."

#### e. Computer Database Model

**\*5** Plaintiffs request production of an entire computer database which inventories materials and equipment at all of Mobil's various leaking underground storage tank facilities throughout the country. Mobil responds that they have produced the portions of the database that are relevant to this litigation and that producing the entire database is "outrageous." The court agrees with Mobil. Producing an entire computer database would indeed be unduly burdensome on Mobil and the court cannot see how information regarding other contaminated sites would be relevant to this litigation. Plaintiffs argue that "the information from other sites may be relevant to show that Mobil failed to follow its own directives at the subject property and that plaintiffs were not the only parties to suffer the 'bait and switch' deception." (Plaintiffs' Sur–Reply at p. 14). This is a recurrent theme in this litigation. Murlas seeks to widen the scope of the action by asserting alternately that Mobil has conspired to dupe an entire universe of people

that it was engaged in clean-up activities when only "passive remediation" was contemplated, or that Mobil has violated its own guidelines used to determine when "passive" (as opposed to "active") remediation was to be used. Murlas has never articulated a coherent theory which would explain how or what Mobil did or did not do at another property has anything to do with the instant action. The fact that "Mobil's use of passive remediation of plaintiffs' property is similar to its use of passive remediation at property sites of other owners" is not an explanation of why this information is relevant. It is irrelevant to this litigation whether other parties "suffered from an [alleged] 'bait and switch' deception." *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991) (citing with approval *Reich v. Board of Fire and Police Comm'rs,* 13 Ill.App.3d 1031, 301 N.E.2d 501, 505 (1973), which allowed a party to subpoena documents relevant to a hearing, but declared that it was not error to deny subpoena to plaintiff who could not establish relevancy of requested document.). Mobil is hereby directed to re-search the database for all information relevant to the subject property, and if further information is discovered to produce it. However, Mobil is not required to produce the entire database.

#### 4. Plaintiffs' Second Request for Production

Plaintiffs have requested that all Mobil documents stating that the property was not contaminated by hydrocarbons be produced. Plaintiff contends that this request has not been fully completed. Mobil responds that it has produced the requisite documents to the extent that they exist. Again, the court cannot compel disclosure where nothing exists. Mobil has averred, under penalty of Fed.R.Civ.P. 11, that it has produced all the relevant documents. This court can do no more to satisfy the plaintiffs.

Plaintiffs have also requested production of "all documents relating to Mobil's policy, programs, and plans relating to Mobil's response to [hydrocarbon] leaks." Mobil objects to this request as being overbroad and vexatious. "Read literally," Mobil asserts, "compliance with this request would be a mammoth undertaking encompassing virtually every document worldwide that deals with underground storage tanks." (Response p. 11). Further, Mobil states that it has offered certain policy documents related to its "LUST" program in Illinois, and plaintiffs had not availed themselves of the opportunity to discover those documents. (*Id.*).

Case 4:21-cv-02473     Document 156-3     Filed 07/17/25 in TXSD     Page 103 of 167

Nicholas J. Murias Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

**\*6** Judge Plunkett has already once denied this motion without prejudice because the request was overbroad. (Plaintiffs' exhibit K, Transcript of hearing on June 15, 1994 p. 16). Judge Plunkett expressed his concern that the information regarding other sites would not be relevant to these proceedings because each contamination site is very different. Judge Plunkett specifically directed plaintiffs, if they wished to present this motion again, to submit evidence or testimony from their experts showing that the requested production would be relevant to this proceeding. To date, plaintiffs have not done so. This court concurs with the previous ruling and concludes that discovery encompassing all Mobil policy is overbroad and the expense of such production would outweigh the likely benefit of such production. Fed.R.Civ.P. 26(b)(2). Plaintiffs' motion to compel will be denied in this regard. *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991).

#### 5. Response to Plaintiffs' Interrogatories

Plaintiffs next ask that this court examine each and every interrogatory served on Mobil and the responses to each to ascertain their adequacy. To begin with, the parties should have been able to resolve this dispute between themselves. Reasonable and conscientious attorneys routinely deal with these disputes without involving the court; that is what the Federal Rules of Civil Procedure envision. In the future, this court orders both parties to attempt to settle these discovery tantrums without the involvement of this court. As to the instant motion, Mobil is directed to answer interrogatories 1–10 by April 10, 1995. Mobil is not required to answer interrogatories 11–19. The court has made plain in this memorandum opinion that discovery into sites other than the subject property will not be allowed. (See supra). Thus, to the extent that interrogatories 11–19 deal with production of information regarding other contamination sites, they are irrelevant and inappropriate. *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991).

#### 6. Plaintiffs' Motion for Rule 37 Sanctions

Plaintiffs contend that Mobil's "pattern of refusal to comply" merits the imposition of sanctions under Rule 37. Mobil contends that plaintiffs' motion is "impertinent, scandalous, and internally contradicted" and request that the motion be stricken with costs awarded to Mobil.

Neither party have acted with civility or maturity regarding these discovery disagreements. However, pettiness does not necessarily equal bad faith. Fed.R.Civ.P. 37 is flexible and this court has great discretion in deciding whether to impose sanctions. 8 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2284 (1970). The rule is designed to encourage discovery, and not to simply punish for general misbehavior. *Id.; Dorsey v. Academy Moving & Storage, Inc.,* 423 F.2d 858, 860–61 (5th Cir.1970). This court is not inclined, therefore, to impose sanctions on either party *at this time.* The parties should focus on completing discovery in as effective and efficient manner as possible.

#### Conclusion

**\*7** For reasons stated in this memorandum opinion, IT IS HEREBY ORDERED THAT plaintiffs' motion to compel discovery is denied in part and granted in part as follows:

1. Plaintiffs' motion to produce Charles Sutter for deposition is GRANTED, but it is further ordered that such deposition will take place in Fairfax, Virginia within thirty days.

2. Plaintiffs' motion to compel the production of documents used to refresh the recollection of Messrs. Rush, Johnson, and LaBelle is GRANTED. It if further ordered that the depositions of Messrs. Rush, Johnson, and LaBelle be reopened for the limited purpose of cross-examination on the documents used to refresh their individual recollections on the subject property. Plaintiffs' motion for fees and expenses in the taking of these reopened depositions is DENIED with prejudice.

3(a). Plaintiffs' motion to compel production of the "Mobil Design Memo 31" is moot.

3(b). Plaintiffs' motion to compel production of the "Maude Environmental Report" is GRANTED to the extent it has not been made moot by a subsequent production of the document.

3(c). Plaintiffs' motion to compel Robert Johnson to answer questions regarding a separate settlement of wholly different contamination site is DENIED with prejudice.

3(d). Plaintiffs' motion to compel production of a "Tank Removal Report" is GRANTED to the extent that Mobil should search one final time for the document, and if it is not located, the motion is DENIED with prejudice.

Case 4:21-cv-02473     v.   Document 156-3     Filed 07/17/25 in TXSD      Page 104 of 167

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

3(e). Plaintiffs' motion to compel production of Mobil's entire computer database model is DENIED with prejudice except that Mobil is hereby ordered to search the database one final time for any additional information regarding the subject property, and if any such information is found, to produce it to the plaintiffs.

4. Plaintiffs' motion to compel documents relating to its second request for production is DENIED with prejudice.

5. Plaintiffs' motion to compel more complete answers to its interrogatories is GRANTED in part and DENIED in part. Mobil shall provide complete answers to interrogatories 1–10 by April 3, 1995. Mobil is not required to answer interrogatories 11–19.

As a final note, this court cautions the parties that briefs are to be used with discretion. The parties seem to believe that every paper submitted to the court may argue any part of the case or any legal theory that the parties desire. Such is not the case. Parties should limit their arguments to the issue(s) before the court.

[1]     For a more thorough statement of the background facts of this litigation, see *Nicholas J. Murlas Living Trust, et al. v. Mobil Oil Corp. et al., 1994 WL 130778 (N.D.Ill. Apr. 13, 1994).*

**All Citations**

Not Reported in F.Supp., 1995 WL 124186

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:93CV06956**<br>NICHOLAS MURLAS TRST, ET AL v. MOBIL OIL CORP, ET AL | — | N.D.Ill. | Nov. 15, 1993 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

**Negative Citing References (1)**

*The KeyCited document has been negatively referenced by the following events or decisions in other litigation or proceedings:*

| Treatment | Title | Date | Type | Depth | Headnote(s) |
|---|---|---|---|---|---|
| Distinguished by | 1. Chen-Oster v. Goldman, Sachs & Co. **MOST NEGATIVE** <br><br> 285 F.R.D. 294 , S.D.N.Y. <br> CIVIL RIGHTS - Discovery. Former employees were entitled to pre-certification discovery of employer's computerized employment data. | Sep. 10, 2012 | Case | | — |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (2)**

⚐ 1.  Nicholas J. Murlas Living Trust v. Mobil Oil Corp.
1995 WL 124186 , N.D.Ill. , Mar. 20, 1995

*Reconsideration Denied by*

⚠ 2.  Nicholas J. Murlas Trust v. Mobil Oil Corp.
1995 WL 505468 , N.D.Ill. , Aug. 18, 1995

**Related References (1)**
3.  Nicholas J. Murlas Living Trust v. Mobil Oil Corp.
1994 WL 130778 , N.D.Ill. , Apr. 13, 1994

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 10

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 109 of 167

Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 2316228

2022 WL 2316228
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

TIREBOOTS BY UNIVERSAL
CANVAS, INC., Plaintiff,
v.
TIRESOCKS, INC., Tiresocks
International, Inc., Defendants.

No. 20 CV 7404
|
Signed 06/28/2022

**Attorneys and Law Firms**

Genna S. Hibbs, Hibbs Law, LLC, McHenry, IL, Emily Rebecca Shragal Mosnick, Gouthami Vanam Tufts, Hibbs Law, LLC, Woodstock, IL, for Plaintiff.

Thomas Lee Holt, Jeremy L. Buxbaum, Perkins Coie LLP, Chicago, IL, Thomas Alexander Gamache, Leahy, Eisenberg & Fraenkel, Ltd., Chicago, IL, Zachary Vernon Moen, ZVMLaw PLLC, Ann Arbor, MI, Daniel Alan Grossman, ZVMLaw, PLLC, Ann Arbor, IL, Sabrina J. Danielson, Pro Hac Vice, Perkins Coie LLP, Denver, CO, for Defendants.

## MEMORANDUM OPINION and ORDER

Young B. Kim, United States Magistrate Judge

 **\*1**  Before the court is Plaintiff's motion to compel a forensic examination of Defendants Tiresocks, Inc.'s and Tiresocks International Inc.'s electronically stored information ("ESI") under Federal Rule of Civil Procedure 34(a)(2). Plaintiff initially submitted a request to inspect all of Defendants' digital data and analytics tools related to their online business. Defendants objected to Plaintiff's request as overly broad and unduly burdensome. Plaintiff now moves to compel Defendants to permit Plaintiff's IT expert to perform a forensic inspection. For the following reasons, the motion is denied:

### Background

Plaintiff is a manufacturer and seller of equipment covers for various types of construction equipment, including aerial,

mechanical, electrical, and hydraulic lifts. (R. 32, Amend. Compl. ¶ 6.) Like Plaintiff, Defendants manufacture and sell commercial and construction equipment covers, and as such the parties are direct competitors. (Id. ¶¶ 9, 14.) In 2006, Plaintiff sought to create a website to market and sell its products under the domain "universalcanvas.com." (Id. ¶¶ 68-69.) But when Plaintiff attempted to register this domain name, Plaintiff discovered that another entity had already done so. (Id.) As a result, Plaintiff registered "universalcanvasinc.com" as its domain instead. (Id.) The parties agree that in 2011, Defendants began redirecting customers visiting "universalcanvas.com" to Defendants' other website, "tiresocks.com." (Id. ¶ 70; R. 86, Ans. ¶ 70.) However, Plaintiff says it did not learn of this redirection until five years later. (R. 32, Amend. Compl. ¶ 72.)

Plaintiff filed this suit in December 2020 alleging that Defendants committed: (1) trademark and trade dress infringement, unfair competition, false designation of origin, palming off, and false advertising under the Lanham Act; (2) cyberpiracy under the Anti-cybersquatting Consumer Protection Act ("ACPA"); and (3) unfair competition, deceptive trade practices, and tortious interference with prospective business relationships under Illinois law. (R. 1, Compl.; R. 32, Amend. Compl.) Plaintiff further alleges that Defendants misrepresented themselves to potential customers as Universal Canvas to capture Plaintiff's customers, thereby harming Plaintiff's sales. (R. 32, Amend. Compl. ¶¶ 70, 82.) Defendants assert six affirmative defenses in response, alleging that one or more of Plaintiff's claims are barred by the statute of limitations, laches, estoppel, acquiescence, waiver, and unclean hands. (R. 86, Ans. at 40-43.)

During discovery Plaintiff asked to perform a forensic inspection of "all digital data and analytical tools related to Defendants' business presence online (i.e., websites, social media, domain, etc.)." (Pl.'s Request for Inspection ("RFI") No. 1.) Defendants objected to this request as overly broad and unduly burdensome, as well as falling outside the permissible scope of discovery. (Defs.' Resp. to RFI No. 1.)

### Analysis

Federal Rule of Civil Procedure 37 allows a party to move to compel the production of requested discovery materials. This court has "broad discretion" in reviewing such a motion, *Mirbeau of Geneva Lake LLC v. City of Lake Geneva*, No. 08 CV 693, 2009 WL 3347101, at \*1 (E.D. Wis. Oct. 15, 2009),

and "should independently determine the proper course of discovery based on the arguments of the parties," *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996).

**\*2** Federal Rule of Civil Procedure 34 governs the production of ESI in discovery. But while Rule 34(a) allows a party to request the production of ESI, it "does not grant unrestricted, direct access to a respondent's database compilations." *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003); *see also* Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting that Rule 34(a) "is not meant to create a routine right of direct access to a party's electronic information system" and cautioning courts to "guard against undue intrusiveness resulting from inspecting or testing such systems"). Such direct access would "expand the expense and burden of [the] case" at bar, *Diepenhorst v. City of Battle Creek*, No. 1:05 CV 734, 2006 WL 1851243, at \*4 (W.D. Mich. June 30, 2006), and is typically only permitted where there has been a showing of noncompliance with discovery rules, *In re Ford Motor Co.*, 345 F.3d at 1317. As with all discovery materials, the discovery sought must also be both relevant *and* proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1) (emphasis added). To this end, any testing and sampling of ESI to determine relevance and proportionality under Rule 34 is "not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances." Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment.

Furthermore, forensic examinations are an "extraordinary remedy." *Belcastro v. United Airlines, Inc.*, No. 17 CV 1682, 2019 WL 7049914, at \*2 (N.D. Ill. Dec. 23, 2019); *Alight Sols. v. Thomson*, No. 20 CV 3043, 2021 WL 5119111 at \*6 (N.D. Ill. Nov. 3, 2021). Courts are especially reluctant to permit direct inspection of ESI when the request is not proportional to the needs of the case, *Motorola Sols., Inc. v. Hytera Commc'ns. Corp*, 365 F. Supp. 3d 916, 925 (N.D. Ill. 2019), is unduly burdensome, *id.* at 924, or the information sought does not go to the heart of the matter, *Hespe v. City of Chi.*, No. 13 CV 7998, 2016 WL 7240754, at \*5 (N.D. Ill. Dec. 15, 2016); *see Balboa Threadworks, Inc. v. Stucky*, No. 05 CV 1157, 2006 WL 763668, at \*3 (D. Kan. March 2, 2006) ("Courts have been cautious in requiring the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit is unduly vague."). Courts also "guard against undue intrusiveness" based on ESI requests. *Hansen v. Country Mut. Ins. Co.*, No. 18 CV 244, 2020 WL

5763588, at \*3 (N.D. Ill. Sept. 28, 2020). Parties can mitigate this concern by employing less intrusive discovery methods before resorting to more invasive measures. *John B. v. Goetz*, 531 F.3d 448, 461 (6th Cir. 2008). Finally, courts generally deny ESI requests when they would place an undue burden on the respondent. *Motorola Sols.*, 365 F. Supp. 3d at 924.

Accordingly, the court must conduct a fact-intensive inquiry, considering the specific allegations and circumstances of the case, *see Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002), and taking into account: (1) the relevance of the requested information as it pertains to the heart of the case; (2) the invasiveness of the RFI, and in particular whether Plaintiff has exhausted other less intrusive means of collecting the same information; and (3) the burden the RFI places on Defendants, *see Motorola Sols.*, 365 F. Supp. 3d at 924-25; *Hespe*, 2016 WL 7240754, at \*5; *Hansen*, 2020 WL 5763588, at \*3.

With respect to relevance, Plaintiff's RFI casts too wide a net. In determining whether ESI sought in discovery goes to the heart of the case, courts have considered whether "the connection between the computers and the claims in the lawsuit is unduly vague." *Balboa*, 2006 WL 763668, at \*3; *see also Hespe*, 2016 WL 7240754, at \*5. Plaintiff argues that a forensic examination would retrieve "highly relevant" evidence of Defendants' infringement, false advertising, false designation or origin, and cybersquatting, as well as information needed to prove damages. (R. 113, Pl.'s Mot. at 21-22.) But the connection between all of Defendants' electronic data and Plaintiff's claims is tenuous at best. Although the court recognizes the significance of the evidence Plaintiff hopes to retrieve, Defendants' ESI includes a substantial volume of information that does *not* go to the heart of this case.

**\*3** As for invasiveness, there is no dispute that Plaintiff has failed to exhaust other methods of collecting the information it seeks. Plaintiff nonetheless asserts that ordinary discovery methods are insufficient to secure the requested data. (Id. at 20.) For example, Plaintiff contends that a request for production would not "capture the relevant traffic and website data" needed to determine Plaintiff's lost revenue from Defendants' redirection, and that sifting through "personalized filters and settings" of a Google Analytics file or other individualized data platform would be "unduly burdensome and inefficient." (Id.) But without having attempted to obtain this information through less intrusive data platforms or discovery methods, Plaintiff's assertions

2022 WL 2316228

are unsubstantiated. Courts have advised movants in similar scenarios that "less intrusive means ... should be employed before resorting to inherently intrusive measures." *Goetz, 531 F.3d at 461*. This court agrees. Plaintiff must pursue the least intrusive means of obtaining the relevant data before requesting a forensic exam.

Plaintiff's request for a forensic examination would also impose too great a burden on Defendants. Defendants express concerns about giving Plaintiff unfettered access to their confidential business information, noting that Plaintiff previously mishandled Defendants' confidential material related to settlement discussions. (R. 118, Defs.' Resp. at 15; see also R. 113, Pl.'s Mot. at 23.) Plaintiff assures the court that "the risk of harm to Defendants in having their web-traffic and marketing platforms inspected is very low" because Plaintiff would only access unprivileged, business-related platforms that are unrelated to legal matters or personal information. (R. 113, Pl.'s Mot. at 22.) Plaintiff also notes that Defendants could designate certain ESI as "Confidential" or "Highly Confidential" pursuant to the Confidentiality Order in this case. (Id.; see R. 101, Confidentiality Order.) While these safeguards may protect Defendants' confidential information, they do not negate the fact that Plaintiff has framed its underlying discovery request too broadly. Plaintiff could have pursued other less burdensome discovery means that would have protected Defendants' confidentiality interests more effectively.

In sum, Plaintiff's request is not proportional to the needs of the case because a forensic examination would necessarily involve the examination and collection of more information than is required to support Plaintiff's claims. Simply put, "[t]he discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Motorola Sols., 365 F. Supp. 3d at 925*. And this court has previously ruled that discovery requests covering the entire scope of Defendants' business operations are unduly broad. (See R. 112 (denying Plaintiff's request for production of documents that would cover "the entire scope of Defendants' business operations").) Yet that is precisely what Plaintiff seeks to do here.

Nevertheless, Plaintiff asserts that a forensic examination is necessary because Defendants lack the expertise to search and retrieve the relevant data on their own. (R. 113, Pl.'s Mot. at 24.) Under the *Belcastro* standard,[1] there are two circumstances in which a forensic examination may be warranted: (1) when the responding party has intentionally

concealed the information; or (2) when the responding party lacks the expertise to search and retrieve the relevant data. *Belcastro*, 2019 WL 7049914, at *2. Plaintiff's motion focuses on the second factor. (R. 113, Pl.'s Mot. at 24.) First, Plaintiff alleges that Defendants' designated expert lacks expertise because he is not publicly listed in the online expert witness database. (Id.) Second, Plaintiff claims Defendants' expert produced flawed reports that used search filters to yield results in Defendants' favor. (Id.)

[1]    Plaintiff references this standard in its motion as the *Alight* standard. (R. 113, Pl.'s Mot. at 23.) But as *Alight* pulled this standard from *Belcastro*, the court refers to it as the *Belcastro* standard. *See Belcastro, 2019 WL 7049914, at *2*.

**\*4**  Neither argument is persuasive. Plaintiff's first point is weak because Defendants claim they have not even named the cited individual as an expert in this case. (R. 118, Defs.' Resp. at 15.) Even if they had, the absence of the potential expert's name from a database alone does not prove his inability to perform Defendants' inspection. And Plaintiff's second point is conclusory, lacking any details on the alleged flaw in Defendants' search protocol. Indeed, Plaintiff claims that Defendants' expert manipulated search results but provides no corroboration for this claim. (R. 113, Pl.'s Mot. at 24.) Additionally, and as discussed, there is no indication that Plaintiff tried to retrieve the requested information through less intrusive discovery means. Therefore, Plaintiff cannot claim that Defendants lack the expertise to produce responsive discovery materials when Plaintiff never even submitted a discovery request seeking such materials. Finally, Plaintiff's allegations rest on confidential materials Defendants disclosed during settlement discussions between the parties. (R. 118, Defs.' Resp. at 15.) This type of Rule 408 materials should only be used for purposes of discussing settlement. Because Plaintiff fails to show that Defendants lack the expertise to search and retrieve their own data, the court sees no reason to permit a forensic examination at this stage in the litigation.

### Conclusion

For the foregoing reasons, Plaintiff's motion to compel is denied.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2316228

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., Not Reported in Fed. Supp. (2022)**
2022 WL 2316228

---

**Filings (18)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Plaintiff's First Amended Complaint** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants. <br> 2021 WL 3417705 | — | N.D.Ill. | Mar. 15, 2021 | Pleading |
| **2.  Complaint for Trademark Infringement** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., Tiresocks International, Inc, and Jarrett Gordon, an individual, Defendants. <br> 2020 WL 9608066 | — | N.D.Ill. | Dec. 14, 2020 | Pleading |
| **3.  Plaintiff's Response to Defendant's Motion to Strike Expert Reports** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., and TireSocks International, Inc, Defendants. <br> 2022 WL 19299803 | — | N.D.Ill. | Dec. 13, 2022 | Motion |
| **4.  Defendants' Motion to Strike Plaintiff's Expert Reports on the Basis of Discovery Violations** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC. and TireSocks International, Inc., Defendants. <br> 2022 WL 19299799 | — | N.D.Ill. | Dec. 06, 2022 | Motion |
| **5.  Defendants' Motion to Strike Plaintiff's Expert Reports** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC. and TireSocks International, Inc., Defendants. <br> 2022 WL 19299800 | — | N.D.Ill. | Dec. 05, 2022 | Motion |
| **6.  Defendants' Motion to Stay the Remaining Expert Discovery Deadlines Pending a Decision on Defendants' Motion to Strike Plaintiff's Expert Reports** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC. and Tiresocks International, Inc., Defendants. <br> 2022 WL 19040136 | — | N.D.Ill. | Nov. 23, 2022 | Motion |
| **7.  Defendants' Response to Plaintiff's Motion to Compel Further and Complete 30(B)(6) Deposition Testimony from Defendant Tiresocks, Inc.** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC. and TireSocks International, Inc., Defendants. <br> 2022 WL 18357812 | — | N.D.Ill. | Sep. 29, 2022 | Motion |
| **8.  Defendants' Response to Plaintiff's Motion to Compel Defendants' Full and Complete Disclosure** <br> TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC. and Tiresocks International, Inc., Defendants. <br> 2022 WL 14733546 | — | N.D.Ill. | May 02, 2022 | Motion |

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **9.  Plaintiff's Motion to Compel Defendants' Full and Complete Disclosure**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., and Tiresocks International, Inc, Defendants.<br>2022 WL 4449425 | — | N.D.Ill. | Apr. 25, 2022 | Motion |
| **10.  Plaintiff's Motion to Compel Defendants' Full and Complete Disclosure**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., and Tiresocks International, Inc, Defendants.<br>2021 WL 8316709 | — | N.D.Ill. | Oct. 05, 2021 | Motion |
| **11.  Defendant's Reply in Support of Motion to Dismiss**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants.<br>2021 WL 8316707 | — | N.D.Ill. | Oct. 01, 2021 | Motion |
| **12.  Plaintiff's Response to Defendants' Memorandum of Law in Support of Rule 12(b)(6) Motion to Dismiss**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants.<br>2021 WL 7541802 | — | N.D.Ill. | Sep. 10, 2021 | Motion |
| **13.  Defendants' Memorandum of Law in Support of Rule 12(b)(6) Motion to Dismiss**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants.<br>2021 WL 7084973 | — | N.D.Ill. | Aug. 20, 2021 | Motion |
| **14.  Defendant Tiresocks, Inc.'s Response to Plaintiff/ Counter-Defendant's Motion to Dismiss Counterclaims and Motion to Strike Affirmative Defenses**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., Tiresocks International, Inc., and Jarrett Gordon, an individual, Defendants.<br>2021 WL 3417707 | — | N.D.Ill. | Mar. 31, 2021 | Motion |
| **15.  Plaintiff's Response to Tiresocks International, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants.<br>2021 WL 3417704 | — | N.D.Ill. | Mar. 23, 2021 | Motion |
| **16.  Plaintiff/Counter-Defendant's Memorandum of Law in Support of its Motion to Dismiss Counterclaims and Motion to Strike Affirmative Defenses**<br>TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., et al., Defendants.<br>2021 WL 3417702 | — | N.D.Ill. | Mar. 15, 2021 | Motion |

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **17. Defendant Tiresocks International, Inc.'s Memorandum of Law in Support of Motion to Dismiss** TIREBOOTS BY UNIVERSAL CANVAS, INC., Plaintiff, v. TIRESOCKS, INC., Tiresocks International, Inc., and Jarrett Gordon, an individual, Defendants. 2021 WL 2288502 | — | N.D.Ill. | Feb. 22, 2021 | Motion |
| **18. Docket 1:20-CV-07404** Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc. et al | — | N.D.Ill. | Dec. 14, 2020 | Docket |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (4)**

**Direct History (1)**

1.  Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.
    2022 WL 2316228 , N.D.Ill. , June 28, 2022

**Related References (3)**

2.  Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.
    2021 WL 5833985 , N.D.Ill. , Dec. 09, 2021

3.  Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.
    2021 WL 5833986 , N.D.Ill. , Dec. 09, 2021

4.  Tireboots By Universal Canvas, Inc. v. Tiresocks, Inc.
    2023 WL 8236895 , N.D.Ill. , Nov. 28, 2023

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 11

2024 WL 3802997
United States District Court, N.D. Texas, Dallas Division.

Mendi YOSHIKAWA, et al., Plaintiffs,
v.
EXXON MOBIL CORP., et al., Defendants.

Civil Action No. 3:21-CV-0194-N
|
Signed August 12, 2024

**Attorneys and Law Firms**

Willie Briscoe, The Briscoe Law Firm, Dallas, TX, for Plaintiff Mendi Yoshikawa.

Lewis T. LeClair, McKool Smith, Dallas, TX, Avi Josefson, Hannah Ross, John J. Esmay, Pro Hac Vice, John J. Rizio-Hamilton, Pro Hac Vice, Rebecca Ellen Boon, Pro Hac Vice, Stephen Boscolo, Pro Hac Vice, Thomas Z. Sperber, Pro Hac Vice, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Barbara J. Hart, Pro Hac Vice, Caitlin Marie Moyna, Pro Hac Vice, Daniel Lawrence Berger, Pro Hac Vice, Rachel A. Berger, Pro Hac Vice, Grant & Eisenhofer PA, New York, NY, for Plaintiff State of Rhode Island.

Lewis T. LeClair, McKool Smith, Dallas, TX, Barbara J. Hart, Pro Hac Vice, Caitlin Marie Moyna, Pro Hac Vice, Daniel Lawrence Berger, Pro Hac Vice, Lauren J. Salamon, Pro Hac Vice, Rachel A. Berger, Pro Hac Vice, Grant & Eisenhofer PA, New York, NY, John J. Rizio-Hamilton, Pro Hac Vice, Rebecca Ellen Boon, Pro Hac Vice, Richard Ryan Dykhouse, Pro Hac Vice, Bernstein Litowitz Berger & Grossman LLP, New York, NY, for Plaintiff Amalgamated Bank.

Noelle M. Reed, Abigail Elizabeth Davis, Pro Hac Vice, Michelle L. Davis, Wallis Mizell Hampton, Skadden Arps Slate Meagher & Flom, Houston, TX, Brent Michael Hanson, Steptoe LLP, Houston, TX, Michael William Restey, Jr., Pro Hac Vice, Skadden Arps Slate Meagher & Flom LLP, New York, NY, for Defendants Exxon Mobil Corporation, Melissa Bond.

Noelle M. Reed, Abigail Elizabeth Davis, Pro Hac Vice, Michelle L. Davis, Skadden Arps Slate Meagher & Flom, Houston, TX, Michael William Restey, Jr., Pro Hac Vice, Skadden Arps Slate Meagher & Flom LLP, New York, NY, for Defendant Darren W. Woods.

Noelle M. Reed, Abigail Elizabeth Davis, Pro Hac Vice, Kenneth P. Held, Pro Hac Vice, Michelle L. Davis, Wallis Mizell Hampton, Skadden Arps Slate Meagher & Flom, Houston, TX, Brent Michael Hanson, Steptoe LLP, Houston, TX, Michael William Restey, Jr., Pro Hac Vice, Skadden Arps Slate Meagher & Flom LLP, New York, NY, for Defendant Liam M. Mallon.

## MEMORANDUM OPINION AND ORDER

David C. Godbey, Chief United States District Judge

**\*1** This Order addresses Defendants Exxon Mobil Corporation ("ExxonMobil") and Melissa Bond's Motion for Judgment on the Pleadings [123]. Because Plaintiffs [1] adequately allege their remaining securities claims, the Court denies the motion.

[1]    "Plaintiffs" refers to co-lead plaintiffs, The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Amalgamated Bank.

### I. THE ORIGINS OF THE DISPUTE

As discussed in the Court's prior orders ruling on Defendants' first and second motions to dismiss [88] & [112], this is a federal securities putative class action on behalf of all persons and entities who purchased or otherwise acquired ExxonMobil common stock ("XOM") between March 7, 2018 and January 15, 2021 (the "Class Period"). Order 1, Sept. 29, 2022 ("First MTD Order") [88]; Order 1, Aug. 24, 2023 ("Second MTD Order") [112]. Plaintiffs allege that ExxonMobil portrayed its oil and gas assets in the Permian Basin [2] as more valuable than they were, and when ExxonMobil finally disclosed that its production goals could not be realized, the value XOM shares declined. Second MTD Order 1–2. Plaintiffs initially sued ExxonMobil and several of its personnel under Sections 10(b) and 20(a) of the Securities and Exchange Act (the "Exchange Act") and the related Rule 10b-5(b). *See* § 10, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b); 15 U.S.C. § 78t(a). Plaintiffs allege both affirmative misrepresentations of ExxonMobil's drilling potential in the Permian Basin and omissions of material information about the project's obstacles. *Id.* at 2. The

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Court initially dismissed Plaintiffs' claims for failure to plead adequately that any Defendant acted with the requisite state of mind but granted leave to amend. First MTD Order 20, 37–38.

2    The Permian Basin is an oil-and-gas rich area in west Texas and southeast New Mexico which also includes the Delaware Basin. SAC ¶ 41.

Plaintiffs filed a Second Amended Complaint ("SAC"), omitting several of the original defendants but maintaining the Section 10(b) misrepresentation and omission claims against ExxonMobil and its officers Woods and Mallon, as well as the Section 20(a) control person claim against Woods. *See* SAC ¶¶ 437–40, 448 [92]. In the SAC, Plaintiffs additionally asserted a scheme liability claim against Melissa Bond, the former Senior Manager of Delaware Basin Development, alongside Mallon and ExxonMobil, and named Mallon as a control person. *Id.* ¶¶ 441, 448. The SAC alleged that Bond and Mallon conspired to manipulate the valuation of ExxonMobil's Permian assets, of which Woods either would or should have learned from a meeting with Bond. *Id.* ¶¶ 123–32, 11–63. Specifically, the SAC alleged Bond manipulated learning curve assumptions included in ExxonMobil's 2019 development plan, which increased proved reserves by increasing the number of wells Exxon expected to drill. *Id.* ¶¶ 158, 274. Further, the SAC recounts that ExxonMobil was found liable for unlawfully terminating two whistleblowers who raised concerns about ExxonMobil's valuation of the Permian assets in response to negative press. *Id.* ¶¶ 132–34, 137, 141–43, 146, 151–53, 155–57.

**\*2** In ruling on the motion to dismiss the SAC, the Court dismissed all of Plaintiffs' claims under Section 10(b) of the Exchange Act, and the claims against Mallon under Rule 10b-5(a) and (c) with prejudice. Second MTD Order 22. The scheme liability claims under Rule 10b-5(a) and (c) against Bond and ExxonMobil remain. *Id.* At that stage, the Court determined that Plaintiffs adequately pled facts that created a strong "inference that Bond was at least severely reckless regarding the possibility that falsification of the 2019 Development Plan would mislead investors." *Id.* at 21. Likewise, because Defendants did not assert any deficiency in Plaintiffs' pleading regarding scheme liability against ExxonMobil based on Bond, the Rule 10b-5(a) and (c) claim against ExxonMobil survived the Rule 12(b)(6) challenge. *Id.* at 22. Finally, Plaintiffs' Section 20(a) claims survived the motion to dismiss because Defendants' sole argument for dismissing the control person liability claims was that Plaintiffs did not adequately plead a primary violation—but as of the Order on the second motion to dismiss, primary liability claims survived. *Id.* Now, Defendants move again to dismiss Plaintiffs' remaining claims, seeking a judgment on the pleadings.

## II. LEGAL STANDARDS

### *A. Motion for Judgment on the Pleadings*

Any party may move for judgment on the pleadings after the pleadings are closed, as long as the motion does not delay trial. FED. R. CIV. P. 12(c). A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam). When ruling on a Rule 12(c) motion for judgment on the pleadings, the Court applies the same standard as that used for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

When addressing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-plead facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a court does "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted). "When reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as ... documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (internal quotation marks omitted).

Section 10(b) claims are subject to Rule 9(b)'s heightened pleading standard, which requires that plaintiffs alleging fraud or mistake state their claims with particularity. *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015). Specifically, plaintiffs must set forth "the 'who, what, when, where, and how' of the events constituting fraud or mistake." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (internal quotations omitted)). Plaintiffs also must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). Allegations against defendants as a group, without more specific connections between an individual Defendant and an allegedly fraudulent act, should be disregarded. *Owens*, 789 F.3d at 537–38. Other inference-based allegations, such as pleading based on a defendant's position, corporate culture, or common knowledge alone, are similarly too vague. *See* First MTD Order 6–8 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002); *Callinan v. Lexicon Pharma.*, Inc., 479 F.3d 379, 432 (S.D. Tex. 2020) (quoting *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010)); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 537 (5th Cir. 2008)).

### *B. Pleading Section 10b-5(a) and (c) Claims*

**\*3**  Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), empowers the SEC to prescribe rules and regulations to protect the public from manipulative and deceptive securities practices. Rule 10b-5, implementing Section 10(b), makes it unlawful: "(a) [t]o employ any device, scheme, or artifice to defraud" and "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. There is "considerable overlap among the subsections of the Rule." *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019). Thus, pleading each type of claim varies only slightly. Rule 10b-5(a) and (c) claims "require allegations 'that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of [sic] sale, and (4) that the defendant's actions caused the plaintiff's

injuries.' " *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 720 (N.D. Tex. 2018) (quoting *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 678 n.45 (S.D. Tex. 2006)).

The Private Securities Litigation Reform Act ("PSLRA") further heightens the pleading requirements in two ways. Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, plaintiffs must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The latter "alters the usual contours of a Rule 12(b)(6) ruling" by requiring courts to "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Cotter v. Gwyn*, 2016 WL 4479510, at \*6 (E.D. La. 2016) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009)). When viewing the allegations holistically, the inference must be "cogent and compelling, not merely reasonable or permissible, in light of other explanations." *Cotter*, 2016 WL 4479510, at \*6 (internal quotations and citations omitted).

### *C. Pleading Section 20(a) Claims*

Section 20(a) of the Exchange Act "makes those who control others who violate section 10(b) jointly and severally liable 'unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.' " *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (quoting 15 U.S.C. § 78t(a)). Thus, adequately pleading a primary violation is a prerequisite to stating a controlling person claim. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023). Additionally, Plaintiffs must allege "that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 791. But unlike Rule 10b-5 claims, "[s]ection 20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b)." *Id.* Once plaintiffs have pled a primary violation with sufficient particularity, they "need only provide the defendant fair notice of the [controlling person] claim and the basis of the allegations."

*Id.* (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993)).

### III. THE COURT DENIES THE MOTION

#### A. Plaintiffs Pled Adequate Facts to Connect Bond's Allegedly Deceptive Conduct with the Purchase or Sale of a Security

The Court previously held that Plaintiffs' allegations created a strong inference of Bond's scienter of the alleged scheme. Second MTD Order 21. Still, Plaintiffs' scheme liability claim must allege sufficient facts that Bond's allegedly deceptive conduct was "in connection with the purchase or sale of any security" to survive. 17 C.F.R. § 240.10b-5. Plaintiffs make two connections between Bond's allegedly deceptive conduct and the purchase or sale of a security: (1) the scheme bolstered Defendants' public misstatements about false production goals and (2) the fabricated learning curve assumptions were incorporated in the company's reported proved reserves and resource base. *See generally* Pls.' Resp. 12–19 [125].

**\*4** As an initial matter, the Court held in its previous order that Plaintiffs failed to allege facts that support Mallon and Woods's scienter regarding awareness that their statements were misrepresentations. *See* Second MTD Order 12–18. Even so, Plaintiffs continue to argue that Bond's allegedly fraudulent development plan was the basis for public misstatements and omissions. *See* Pls.' Resp. 14. However, the Court severed the connection between Bond's alleged scheme and the public statements made by Woods or Mallon regarding ExxonMobil's prospects for oil production. *See* Second MTD Order 12–18 (Finding that "Plaintiffs still have not pleaded facts connecting Woods to Bond's conduct" or that Mallon's trades during the relevant time period did not establish his scienter of the scheme.). Likewise, Plaintiffs cannot rely on public statement made by Woods or Mallon to plead that Bond's alleged scheme impacted the purchase or sale of any security.

Here, the Court finds that Plaintiffs adequately alleged facts that Bond's deceptive acts were communicated to the public. ExxonMobil maintains that Bond's alleged scheme consisted of entirely internal company conduct. Defs.' Mot. J. Plead. at 6. Plaintiffs argue that Bond's fabricated learning curve assumptions were incorporated into the Company's reported proved reserves and resource basis. *See* Pls.' Resp. 16–19.

Plaintiffs' pleadings include the regulatory and accounting standards governing the calculation of proved preserves, SAC ¶¶ 315–38, "which include assumptions about how efficiently the Company will be able to drill and develop a given area." Pls.' Resp. 17 (citing SAC ¶ 318.). Plaintiffs explain "Exxon's 2019 development plan for the Permian Basin included Bond's manipulated learning curve assumptions, which dramatically increased the number of wells Exxon expected to drill, and thus increased proved reserves" and "Exxon's reported resource base was also inflated by Bond's scheme because proved reserves are a component of the resource base calculation." *Id.* (citing SAC ¶¶ 158, 274; ¶¶ 51, 66–67). Plaintiffs bolster this allegation by citing OSHA's findings of fact that Drs. Gulden and Burch informed ExxonMobil in April 2019 that its 8-K was misleading because the actual drilling-time data yielded lower resource base figures. SAC ¶ 158(c)-(d). Further, Plaintiffs allege that ExxonMobil explained in its 2018 10-K and 2019 10-K that "[p]roved undeveloped reserves are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years, unless specific circumstances support a longer period of time." SAC ¶ 317.

Despite Defendants' insistence that Bond's allegedly fabricated development plant was not incorporated into any public filing, any factual disputes regarding the calculation of reserves cannot be resolved at the pleading stage, and Plaintiffs allege sufficient facts that allow the court to infer that Bond's deceptive acts were communicated to the public through the development plan's incorporation into the public reports.

#### B. Plaintiffs Are Entitled to a Presumption of Reliance

Defendants argue that Plaintiffs could not have relied on Bond's allegedly deceptive conduct in their purchase or sale of a security; therefore, Plaintiffs' scheme liability claim against Bond fails as a matter of law. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (internal quotation marks omitted). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.' " *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). Plaintiffs pled that they are entitled to a presumption of reliance pursuant to the fraud-on-the-market doctrine as outlined in *Basic Inc. v. Levinson*

and are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). At the pleading stage, Plaintiffs allege sufficient facts to establish a presumption of reliance under both theories.

**\*5** ***1. Plaintiffs Are Entitled to*** **Basic's** ***Fraud-On-The-Market Presumption of Reliance.*** – In *Basic* the Supreme Court held that in an efficient market, courts may presume that the individual relied on public and material misrepresentations when trading securities. *See Basic,* 485 U.S. at 248 n.27; *see also Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 268 (2014) ("[A] plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed."). ExxonMobil can rebut this presumption with "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id. Basic* and *Halliburton* both emphasize the importance of the public disclosure component, but both cases focus on misrepresentation claims under Rule 10b–5(b). All that survives in this case are scheme lability claims under Rule 10b–5(a) and (c). The Supreme Court addressed the application of *Basic* to establish a presumption of reliance for scheme liability claims under Rule 10b–5(a) and (c) in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148 (2008). The parties in this case disagree on whether and how *Stoneridge* should apply.

First, contrary to Defendants' position, *Basic's* fraud-on-the-market presumption of reliance applies to scheme liability claims. *See Stoneridge,* 552 U.S. at 161 (applying *Basic* to a scheme liability claim, but concluding "respondents' deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance"); *see also CP Stone Fort Holdings, LLC v. Doe(s),* 2017 WL 1093166, at \*5 (N.D. Ill. 2017) ( "*Stoneridge* did not reject the use of a fraud-on-the-market presumption of reliance based on 'deceptive acts.' Rather, it rejected the use because the respondents' acts were not made public." (citation omitted)). Second, contrary to Plaintiffs' position, *Stoneridge* has no language limiting its holding to conduct by third parties. In finding that the essential element of reliance was absent, the Supreme Court in *Stoneridge* explained:

> [Defendants'] deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times. [Plaintiffs], as a result, cannot show reliance upon any of [defendants'] actions except in an indirect chain that we find too remote for liability.

*Stoneridge,* 552 U.S. at 159.

As stated in Section III.A, *supra,* Plaintiffs allege sufficient facts connecting Bond's deceptive conduct with the purchase and sale of a security. Accordingly, Plaintiffs allege facts sufficient to show that Bond's deceptive acts were communicated to the public to establish, at the pleading stage, a presumption of reliance under *Basic.* Defendants make no arguments regarding the application of *Basic's* other elements or attempts to rebut this presumption.

***2. Plaintiffs Are Entitled to the*** **Affiliated Ute** ***Presumption of Reliance.***— In the Fifth Circuit, to invoke the *Affiliated Ute* presumption of reliance on an omission, "a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure." *Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 384 (5th Cir. 2007). As the Fifth Circuit explained: "[w]here liability is premised on a failure to disclose rather than on a misrepresentation, 'positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.' " *Id.* at 383–84 (quoting *Affiliated Ute,* 406 U.S. at 153–54 (1972)). Like the presumption outlined in *Basic,* this presumption of reliance is a rebuttable one. *See Smith v. Ayres,* 845 F.2d 1360, 1363 (5th Cir. 1988).

**\*6** Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance for their Rule 10b-5(a) and (c) claims because the claims are primarily based on Bond's nondisclosure of her alleged scheme to fabricate the learning curve assumptions, which, at the pleading stage, Plaintiffs adequately allege were incorporated into ExxonMobil's reports. The Court finds that

a reasonable investor may have considered Bond's omissions important in making its decisions in purchasing a security. Defendants make no argument that Bond did not have a duty to disclose or attempt to rebut this presumption of reliance.

### C. Plaintiffs Adequately Pled that ExxonMobil Acted with Scienter

Plaintiffs rely on Bond's deceptive conduct to impute scienter onto to ExxonMobil. In this Circuit, to impute scienter onto a corporation, scienter "must be alleged with respect to 'the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) ....' " *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 367 (5th Cir. 2004)).

Here, Bond allegedly orchestrated and participated in the fraud of artificially inflating the learning curves, which furnished information to inflate publicly reported proved reserves and resource base; therefore, Bond's scienter can be imputed onto ExxonMobil. *See Lee v. Active Power, Inc., 29 F. Supp. 3d 876, 882–85 (W.D. Tex. 2014)* (imputing scienter on a company whose employee furnished false information, which resulted in the company issuing false public statements about the company's partnership with a corporation); *Kerr v. Exobox Tech's Corp.*, 2012 WL 201872, at *14 (S.D. Tex. 2012) (imputing scienter on a corporation because the corporation " 'made' the statements contained in the public filings" and "[p]laintiffs need only assert that [the employee] furnished the information or language for inclusion in order to attribute his scienter to"

the corporation); *In re Cognizant Tech. Sols Corp. Sec. Litig.*, 2020 WL 3026564, at *27 (D.N.J. 2020) (imputing scienter when individual defendant approved payments to conceal bribery scheme, furnishing misinformation for inclusion in the company's financial statements); *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498 (E.D. Va. 2018) (imputing scienter on a corporation which disclosed misrepresentative earnings and estimates because "a corporate defendant can be liable if an agent provides false information to the corporation and its officers intending that the corporation make a false or misleading statement"). Accordingly, Plaintiffs sufficiently pled ExxonMobil's scienter with respect to the alleged scheme.

### D. The Court Declines to Dismiss Plaintiffs' Control Person Claims Under Section 20(a)

As in Defendants' Second Motion to Dismiss, Defendants' sole argument against controlling person liability here is that Plaintiffs have not adequately pled a primary violation. The Court once again rejects this argument. Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' Section 20(a) claims.

### CONCLUSION

For the reasons set forth above, the Court denies Defendants' motion for judgment on the pleadings in its entirety.

**All Citations**

Slip Copy, 2024 WL 3802997, Fed. Sec. L. Rep. P 101,911

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (8)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Class Action Complaint**<br>Mendi YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Andrew P. Swiger, and David S. Rosenthal, Defendants.<br>2021 WL 298935 | — | N.D.Tex. | Jan. 28, 2021 | Pleading |
| **2. Defendants' Opposition to Lead Plaintiffs' Motion to Compel Responses to Lead Plaintiffs' Requests for Production 1-7**<br>Mendi YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Liam M. Mallon, and Melissa Bond, Defendants.<br>2024 WL 1827201 | — | N.D.Tex. | Feb. 23, 2024 | Motion |
| **3. Lead Plaintiffs' Motion to Compel Responses to Lead Plaintiffs' Requests for Production 1-7 and Memorandum of Law in Support of the Motion**<br>Mendi YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Liam M. Mallon, and Melissa Bond, Defendants.<br>2024 WL 1827196 | — | N.D.Tex. | Feb. 16, 2024 | Motion |
| **4. Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings**<br>Mendi YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Liam M. Mallon, and Melissa Bond, Defendants.<br>2024 WL 1827195 | — | N.D.Tex. | Jan. 29, 2024 | Motion |
| **5. Defendants' Motion for Judgment on the Pleadings and Memorandum of Law in Support**<br>Mendi YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Liam M. Mallon, and Melissa Bond, Defendants.<br>2024 WL 1827200 | — | N.D.Tex. | Jan. 08, 2024 | Motion |
| **6. Lead Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint**<br>Mendi YOSHIKAWA, Individually and on behalf of all others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Liam M. Mallon, and Melissa Bond, Defendants.<br>2022 WL 19297011 | — | N.D.Tex. | Dec. 05, 2022 | Motion |

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **7. Motion to Dismiss Second Amended Class Action Complaint and Brief in Support** <br> Mendi YOSHIKAWA, Individually and on behalf of all others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, Darren W. Woods, Neil A. Chapman, Jack Williams, Neil A. Hansen, David Rosenthal, Liam M. Mallon, Jeffrey J. Woodbury, and Sara N. Ortwein, Defendants. <br> 2022 WL 19297012 | — | N.D.Tex. | Nov. 14, 2022 | Motion |
| **8. Docket 3:21-CV-00194** <br> Yoshikawa v. Exxon Mobil Corporation et al | — | N.D.Tex. | Jan. 28, 2021 | Docket |

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (4)**

**Direct History (1)**

1. Yoshikawa v. Exxon Mobil Corp.
2024 WL 3802997 , N.D.Tex. , Aug. 12, 2024

**Related References (3)**

2. Yoshikawa v. Exxon Mobil Corporation
2022 WL 22894218 , N.D.Tex. , Feb. 15, 2022

3. Yoshikawa v. Exxon Mobil Corp.
2022 WL 4677621 , N.D.Tex. , Sep. 29, 2022

4. Yoshikawa v. Exxon Mobil Corp.
2023 WL 5489054 , N.D.Tex. , Aug. 24, 2023

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Negative Treatment**

There are no Negative Treatment results for this citation.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Case No. 12

**15 Sedona Conf. J. 171**

Sedona Conference Journal
Fall, 2014

Article
The Sedona Conference

Copyright © 2014 by The Sedona Conference; The Sedona Conference

# THE SEDONA CONFERENCE DATABASE PRINCIPLES ADDRESSING THE PRESERVATION AND PRODUCTION OF DATABASES AND DATABASE INFORMATION IN CIVIL LITIGATION
## A Project of the Sedona Conference Working Group on Electronic Document Retention & Production (WG1)

*Author:*
The Sedona Conference

| *2011 Editor-in-Chief:* | *2014 Editor-in-Chief:* |
| --- | --- |
| Conrad J. Jacoby | Sherry B. Harris |
| *2011 Editors:* | *2014 Editors:* |
| David J. Kessler | David J. Kessler |
| Catherine L. Muir | Catherine L. Muir |
| | Christopher Paskach |

Thanks go to all who participated in the dialogue that led to this Commentary. We thank all of our Working Group Series Sustaining and Annual Sponsors, whose support is essential to our ability to develop Working Group Series publications. For a listing of our sponsors just click on the "Sponsors" Navigation bar on the homepage of our website.

The opinions expressed in this publication, unless otherwise attributed, represent consensus views of the members of The Sedona Conference Working Group 1.

They do not necessarily represent the views of any of the individual participants or their employers, clients, or any other organizations to which any of the participants belong, nor do they necessarily represent official positions of The Sedona Conference.*

**\*172  PREFACE**

Welcome to the 2014 Edition of *The Sedona Conference Database Principles Addressing the Preservation and Production of Databases and Database Information in Civil Litigation,* another major publication of The Sedona Conference Working Group Series ("WGS"). This document contains numerous changes from the 2011 public comment version. The changes reflect the informal and formal suggestions and comments we received in the past few years. In addition, the changes take into consideration the continued evolution of law and best practices in the area over the past few years. The principles and accompanying text have been revised to harmonize the enhanced understanding of the technical, process, and legal issues that have emerged since publication for public comment.

The Sedona Conference Working Group on Electronic Document Retention and Production (WG1) recognizes that disputes over the discovery of electronically stored information in searchable data repositories are increasingly common in civil litigation. We hope this publication will provide practice guidance and recommendations to both requesting and producing parties and will simplify discovery in civil actions involving databases and information derived from databases.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 131 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

The Sedona Conference thanks the drafting team and all WG1 members whose comments contributed to this publication. Special acknowledgement goes to David J. Kessler, Catherine L. Muir and Chris H. Paskach who assumed leading roles in revising the public comment version and resulting in the 2014 Edition. WG1 Steering Committee Liaison Sherry B. Harris provided a fresh perspective and an independent review of the publication. WG1 member Tim Hart provided thoughtful, substantive comments and suggested revisions to the public comment version, many of which were extremely valuable during the editing process.

We hope our efforts will be of immediate and practical assistance to judges, parties in litigation and their lawyers and database management professionals. We continue to welcome comments for consideration in future updates. If you wish to submit feedback, please email us at *info@sedonaconference.org*.

Craig W. Weinlein

Executive Director

The Sedona Conference

September 2014

### TABLE OF CONTENTS

| | |
|---|---|
| Executive Overview | 175 |
| The Sedona Conference Database Principles | 176 |
| I. Introduction | 177 |
| A. How Do Databases Differ from Other ESI? | 177 |
| B. Components of a Typical Database System | 179 |
| C. Assessing Relevance for Databases and Database Records | 180 |
| D. Preservation of Databases | 180 |
| E. Collecting and Producing Database Information | 181 |
| F. Potential Use of Database Information by a Requesting Party | 182 |
| G. Locating Specific Database Information through Queries | 184 |
| H. Databases and Database Information in a Third Party's Custody or Control | 185 |
| II. Application of the Existing *Sedona Principles* to Databases and Database Information | 186 |
| A. Sedona Principle 3: The Early "Meet and Confer" | 186 |
| 1. Redactions, Omitted Data Fields, and the Inadvertent Production of Privileged and Other Protected Data | 186 |
| 2. Use and Role of Consultants and Technology Partners | 187 |
| 3. Impact of Remote Jurisdiction and Location | 188 |
| B. Sedona Principle 5: Duty of Preservation | 189 |
| 1. Burden of Preservation | 189 |
| 2. Inventory and Default Retention Periods | 190 |
| C. Sedona Principle 6: Responsibilities of Responding Parties | 191 |
| 1. Parties Must Understand Important Database Characteristics | 191 |
| 2. The Responding Party Ordinarily Should Determine the Best and Most Reasonable Way to Identify, Extract, and Produce Relevant Data from Databases | 192 |
| 3. Parties Must Consider the Database as It Is, Not as It Could be | 193 |
| 4. Direct Examination of Databases | 194 |
| 5. Documentation and Validation of Database Collections | 195 |
| 6. Features and Limitations of the Technology and Tools that can be Applied to Databases to Identify and Extract Relevant Information | 195 |
| D. Sedona Principle 12: Form of Production and Metadata | 196 |
| 1. Mismatch of "Native Format" to Most Database Productions | 196 |
| 2. Use of Standard Reports to Produce Database Information | 197 |
| 3. Use of Fielded Tables to Produce Database Information | 198 |
| III. The Sedona Conference Principles for the Preservation and Production of Databases and Database Information ("The Database Principles") | 199 |
| 1. Scope of Discovery | 199 |

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 132 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

2 Accessibility and Proportionality                                      205
3. Use of Test Queries and Pilot Projects                               209
4. Validation                                                           210
5. Data Authenticity and Admissibility                                  212
6. Form of Production                                                    214

## *175  EXECUTIVE OVERVIEW

The Sedona Conference Working Group on Electronic Document Retention and Production has developed Principles addressing the preservation and production of databases, *The Sedona Conference Database Principles*. In these *Database Principles*, we offer a number of practical suggestions that we believe clarify the obligations of both requesting and producing parties and simplify discovery in matters involving databases and information derived from databases. We recognize that the specific facts of a litigation matter, combined with the implementation of relevant databases likely will raise additional retention and production issues not explicitly covered by these Database Principles. Even so, we believe that the groundwork laid by the Database Principles will provide valuable guidance to litigants facing novel issues of database retention and production. It is important to set reasonable expectations for the production of database information, and thus, an overarching theme of these Principles is that communication - between database management professionals and the attorneys who are asking them to search and export litigation-specific information, as well as between requesting and producing attorneys - is critical when working with databases. Many common disputes about issues such as the production format of data can be reduced or even eliminated through better dialogue between litigants. [1] We also find that better communication naturally will reduce "blunderbuss" requests for databases that typically encompass irrelevant or inappropriate information, or the production of terabytes of useless, undifferentiated data.

Our Commentary is divided into three discrete sections. Following a brief Introduction in Section I to databases and database theory, Section II addresses how The Sedona Principles, which pertain to all forms of ESI, may be applied to discovery of databases. Section III proposes six Principles that pertain specifically to databases and provides commentary to support our recommendations.

As database technology continues to evolve, we acknowledge that The Sedona Conference Database Principles will need to be revisited regularly to ensure that their guidance remains topical. At the same time, we believe that the Database Principles lay a foundation that will be valid both today and in the future for developing effective and practical solutions in this sophisticated area of the law.

## *176  THE SEDONA CONFERENCE DATABASE PRINCIPLES

The Sedona Conference Working Group on Electronic Document Retention and Production (WG1) has been studying issues about the discovery of database information in civil litigation and has developed the following Principles addressing the preservation and production of databases, The Sedona Conference *Database Principles*.

### 1. Scope of Discovery

Absent a specific showing of need, a requesting party is entitled only to database fields that contain relevant information, and give context to such information, and not to the entire database in which the information resides or the underlying database application or database engine.

### 2. Accessibility and Proportionality

Due to differences in the way that information is stored or programmed into a database, not all information in a database may be equally accessible, and parties should therefore apply proportionality to each component of a database to determine the marginal value of the information to the litigation and the marginal cost of collecting and producing it.

### 3. Use of Test Queries and Pilots

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 133 of 167

Parties should use objective information, such as that generated from test queries, pilot projects, and interviews with persons with relevant knowledge to ascertain the burden and benefits to collect and produce information stored in databases and to reach consensus on the scope of discovery.

### 4. Validation

A responding party should use reasonable measures to validate that its collection from the database is both reasonably complete and did not inadvertently modify the ESI.

### 5. Data Authenticity and Admissibility

The proper validation of collection from a database does not automatically make the substantive information stored in the database authentic, admissible or true. These are separate issues that need to be analyzed by the appropriate decision makers.

### 6. Form of Production

The way in which a requesting party intends to use database information is an important factor in determining an appropriate format of production.

## *177  I. INTRODUCTION

Disputes over the discovery of information stored in databases are increasingly common in civil litigation. Part of the reason is that more and more enterprise-level information is being stored in searchable data repositories, rather than in discrete electronic files. Another factor is that the diverse and complicated ways in which database information can be stored has made it difficult to develop universal "best-practice" approaches to requesting and producing information stored in databases. The procedures that work well for simple systems may not make sense when applied to larger server-based systems. Similarly, data retention policies vary widely for different types of databases, from very short life-spans of data that can be measured in minutes or seconds to indefinite retention. (It is not uncommon for databases to have no purge or delete routines).

### A. How Do Databases Differ from Other ESI?

Successfully working in a discovery context with databases and the structured data found in them requires a basic understanding of this form of electronically stored information ("ESI") as it functions in the ordinary course of business.

Databases[2] generally contain "structured data,"[3] rather than "unstructured data." Structured data tends to have the following characteristics:

- Logical entities[4] are decomposed into their constituent data elements (known as *fields* or *records*) at a highly granular level;

- Individual data elements are stored in specific assigned logical and physical areas within a series of files (or a single fielded table or a text delimited file[5]);

- These data elements are linked to each other by internal mechanisms, interpretable by the database software;

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 134 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

• These links or relationships may involve metadata elements stored within the database, in addition to the data elements of the logical entity; and

• Once properly assembled and formatted (e.g., in the form of a report), structured data is often readily understandable.

For example, in the case of a simple invoice being stored in a relational database, the logical entity "invoice" might consist of customer name, customer address, item ordered, cost of item, etc. These data elements themselves consist of more granular data elements. For example, customer name could be further decomposed into customer first name, customer middle initial, and customer last name. Similarly, item ordered could be **\*178** decomposed into item description, SKU number, and price. These data elements are commonly placed in structures called "tables," which are used to organize the information, as defined further below.

By contrast, "unstructured" data[6] tends to have the following characteristics:

• "Stand-alone" ESI consisting of a self-contained file or document (examples include MS Word, MS Excel, Adobe PDF, etc.);

• Generally does not require any highly technical knowledge to understand or use an individual file or document containing unstructured data; and

• Both the creation or selection of information to be included in the file or document and the way that information is formatted for display are left to the discretion of the creator of the file or document containing unstructured data.

Structured data may be found in contexts that you might otherwise expect to contain unstructured data, such as email database systems[7] or websites (e.g., Lotus Notes, or WordPress). Conversely, unstructured data from time to time embedded in structured data (e.g., a customer invoice might be stored in a database column as a .pdf file). Both of these situations are outside the direct focus of this Commentary.

For structured data in a database, individual data elements or fields - each of which needs be accessed separately for relevance - must be assembled and viewed in context to be understood. Databases, however, impose strict rules that define how information can be entered, stored, and retrieved. For example, a particular database might store a customer's name, John Q. Smith, as three discrete elements - first name (John), middle initial (Q), and last name (Smith) - each in separate data fields. Unlike the unstructured file, these separate elements must reference each other to be recalled and displayed as a whole name. Each database may have its own unique rules for storing and recalling elements of information. Additionally, different applications (even those written on the same type of database system) may be designed differently and may store a whole name (for example John Q. Smith) in a single field without dividing it further.

End-users commonly think of database information in terms of records they query, retrieve, and view. Although a database record may be the closest intellectual analog to a "document" within a database, records consist of separate data elements that may be stored in a number of ways within a database, such as in multiple tables, or across multiple databases. Thus, a "record" may not exist until actions by a user instruct the database application to assemble specified fields for display. Accordingly, a database record is not always an appropriate granular level of information to respond to a discovery request. At various times,

key information may be found in a single data field, in a record made up of a set of selected fields, in a table containing a pool of records, or in a report that extracts discrete fields of information from multiple tables. Thus the extraction of responsive information from databases may often require specialized business or technical knowledge.

 **\*179**  For instance, using the simple example of the organized collection of customer invoices, the customer "record" might be defined as a set of "fields," composed of the following fields:

FIRST NAME:


MIDDLE INITIAL:


LAST NAME:


STREET ADDRESS:


SUITE NUMBER:


CITY:


STATE:


ZIP CODE:


TELEPHONE NUMBER:


FAX NUMBER:


EMAIL ADDRESS:


COMMENTS:


Hundreds or thousands of such customer records may be stored in the database, with the elements for each customer arranged in a data table or a set of data tables and sub-tables, depending on the complexity of the database. A record from this database, showing the information for a single customer, may appear to the user issuing a query to the database as a collection of selected

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 136 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

fields in a pre-determined format for that query, perhaps as a mailing label with only the name and address, or perhaps as a complete dossier with the contact information and a record of past transactions for that one customer derived from related databases. In addition to requesting a record from this database through a query, a user may ask for a report based on selected fields across many records, for instance the names of all marketing contacts within a particular state, ordered numerically by zip code and then alphabetically by last name. [8]

Databases systems tend to be highly unique and customized to support a specific task or system owner. Thus, in addition to the context typically required to understand the significance of a traditional document, the ability to fully understand the unstructured data within a database requires knowledge of data relationships, what the information represents, and how it was generated. Without this information, analyzing databases is akin to seeing a thousand-piece jigsaw puzzle without an illustration that shows the final completed puzzle. The jigsaw puzzle can be assembled, but only with great effort and with low efficiency.

## B. Components of a Typical Database System

Database systems typically consist of the following elements:

> **Database application** - a software program or programs, usually designed for a specific purpose, and usually providing a 'higher-level' view of the data (often through a graphical user interface) that conceals the complexity of data decomposition and data location.

> **\*180  Database engine** - the software program that stores and retrieves data at a basic level and interfaces between the applications and the database files. For example, a database engine may enforce rules pertaining to data such as only allowing storage of numbers in a telephone number field or ensuring that all invoices pertain to a customer.

> **Set of structured tables or files -** These contain the substantive data, often in a vendor-specific format.

Confusion can arise when parties use the same terminology to describe all three components of a database system.

The individual parts of a database system may themselves be composed of multiple parts. A *database engine* may be composed of multiple software programs that collectively provide core database functionality in a given hardware and operating system environment. The *database application* may be composed of tens - or hundreds - of individual programs. The *database storage file* that typically contains the information relevant to a specific legal dispute may be a single file, but more commonly, it is composed of multiple separate data storage files in multiple locations. Large storage systems may be composed of hundreds of separate data files.

## C. Assessing Relevance for Databases and Database Records

For the reasons given in section A. and B. above, the legal team often will require the assistance of individuals with technical and business expertise in order to assess what information within a database system is responsive to a particular matter. Although a database system may contain relevant, even critical, information, it also may contain information that is irrelevant or only tangentially related to the issues in a particular case. For example, the financial accounting system used by a large company may contain thousands of different data tables and tens of thousands of data fields. In most cases, however, only the substantive information contained in a small number of tables or fields will contain information of direct relevance to a legal dispute, unless the dispute relates specifically to the design or performance of the system. Thus, working successfully with a database system requires understanding how information is organized within a database and the relevance of the various fields to the issues.

To identify the data that might be relevant in a particular matter, the legal team must understand the core issues of the case, the facts that might prove or disprove liability, and the factors that might be useful in establishing or refuting damages. Different types of cases will require different types of information and will make use of database information in different ways.

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 137 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

## D. Preservation of Databases

A party is obligated to take reasonable steps to prevent the deletion or modification of information in its possession, custody or control that it knows or reasonably should know is relevant to pending or reasonably anticipated litigation. This obligation applies to databases, but differs from preservation of unstructured ESI in a number of important ways. Preservation of information contained in databases usually requires expertise of database system or application administrators. For certain information **\*181** in databases that is not overwritten (and is essentially aggregated) it is reasonable to preserve the data "in place," but for other dynamic data that is not stable it may not be technically possible to preserve the data "in place." For instance, if the data is volatile (subject to being programmatically changed or deleted) or if the database system or application has enforced retention periods that for technical reasons cannot be readily suspended or interrupted, then it may be advisable to copy the specific responsive information to a separate secure location in a manner that protects that responsive data. Because of the expense of production, restoring, and interpreting backups from tape or disk, preservation by means of backups should only be used in situations where there is no other reasonable means of preservation. One thing that is consistent across databases and unstructured data is that responding parties are only obligated to take steps to preserve the information that is actually relevant to the matter and not all data within the database or in the data source.

## E. Collecting and Producing Database Information

Differences in ways that database information and individual documents are organized also require different approaches and tools in the traditional discovery tasks of collection, review, and production. Unlike loose documents, database information does not fit neatly into standard document collection protocols. It is in the interests of both requesting and responding parties to avoid over-production of information. Other than situations where a large portion of a given database is responsive, it may be best practice to collect that responsive data by saving a copy of a subset of the database information to a separate location, such as a specifically-designed table, a separate database, or a text delimited file by means of a query or report. In some cases, a pre-existing ('canned') query or report may exist that can be used for this purpose. In other cases, a custom-created query or report will need to be used. [9]

Assuming that one can create a separate copy of a subset of relevant information from the database, the format by which this will be produced should be considered. Unlike text delimited files, a given database format will often not be readable by other software. Therefore, both parties should communicate early about the format for production so that the ESI is reasonably usable by the receiving party in accordance with Rule 34.

These uniqueness and customization issues preclude the use of generic ESI collection tools to capture relevant information within a database. Consequently, the process for understanding and retrieving the data from databases can require significant "hands-on" involvement by the database managers as well as database users to educate the legal team about the contents and structure of the database in question. This process is often matter-specific and potentially labor-intensive.

Certain specific types of contextual information are commonly requested and produced from databases. These include:

> • *Field names*, which may or may not help the requesting party understand the contents of each field. Note that field names and field contents may not necessarily be related, as in databases that have been in use for some time or whose primary design objectives have changed.

> **\*182** • *Field values and codes*, which define any abbreviations stored in data fields. Field codes, whether abbreviated or not, may require further context to convey their meaning to a requesting party. For example, the code "SG" that is stored in the Product Category field might require both translation to "Sporting Goods" and a further description of what this term encompasses within the organization. Field value translations and/or associated lookup tables may be critical to understanding accurately the content of the data file, and a responding party should provide this additional information if necessary.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 138 of 167

• *Input constraints,* that describe the allowable and/or expected values in a field. Common examples of field input constraints include numeric-only limits, state code abbreviations, and ZIP code validation. Understanding field constraints can explain why the data has been standardized in a specific way. Conversely, knowledge of these input constraints can make it easy to check a data production for errors; abnormal field values in the production may indicate that there were errors in process used to extract and prepare the data for production.

• *Auto-filled fields*, such as username or time stamps, are populated automatically by the system and without human intervention. These fields may be valuable validation tools in the ordinary course of business, as they are unlikely to contain human data entry errors, and they may have similar value in authenticating database information for possible evidentiary use. A requesting party may find it valuable to request the identification of these fields, along with the rules or programming logic used to populate them.

Information contained in databases may be the best source for establishing certain facts in a legal dispute. Information stored in this format also may be useful, if not essential, for analyses such as sorting, calculating, and linking to answer quantitative questions presented in a case. In contrast, documents such as individual email messages and free-form electronic word processing and presentation documents are not easily calculated or sorted based on their content, though they may better answer certain qualitative (as opposed to quantitative) questions than database information. Information extracted from databases is often used by accounting or economics experts on behalf of litigants, who use the quantitative conclusions of these analyses to support their legal positions.

## F. Potential Use of Database Information by a Requesting Party

An important consideration in how database information should be requested and produced in civil litigation or regulatory discovery is the manner in which the requesting party intends to use the information. Without such mutual understanding, databases and database information may be produced in ways - even electronic, machine-readable formats - that are not suitable for the requesting party's needs. A requesting party may use structured ESI in a variety of ways, including, but not limited to: (1) reviewing specific historical transactions and records; (2) developing an archive of information that can be queried as might have been done in the ordinary course of business; or (3) developing new analyses of the information that are based on a current, not historical, understanding of the data. The anticipated use of the data will drive the discussion regarding the most appropriate production format for structured ESI from a database system.

 **\*183**  Reviewing historical information typically requires the simplest production format of these three potential uses. If the parties are interested in discrete transactions or events, a simple query or review of the data to isolate relevant records may be sufficient. A simple example of this use would be querying a database for information regarding a specific invoice. Depending on the volume of information required for this use, database information can be produced in a number of different production formats, possibly even those that do not preserve the fielded nature of the information. Simple "canned" reports displaying the requested information may be adequate, and such reports sometimes can be exported into standard electronic formatted files, such as Microsoft Excel, or Comma Separated Value (.CSV).

However, developing an archive of relevant information that can be queried as might have been done in the ordinary course of business may require a more elaborate production format. For example, if the dispute involves all invoices and other interactions with a particular customer, relevant information may include a large volume of invoices and other accounting information, as well as standard reports that were generated or used by key players in the dispute as the basis for decisions involving that customer. Sometimes, the requesting party also may want to replicate standard reports that were used by the producing party, but with altered parameters, such as generating reports based on quarterly instead of annual data.

For purposes of deciding a production format, one key consideration is whether the requesting party will need to generate various alternative reports using a variety of search parameters. If so, then it is likely that the requesting party will need to receive not only the source data, but also a means to edit the "canned" reports, or create new reports. However, when the relevant

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 139 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

information is contained in only a few set reports, the producing party may be in the best position to generate and produce the specific reports, to the requesting party.

The need of a requesting party to develop new queries and reports to analyze the data from an existing, and particularly legacy, database system can raise the greatest challenges to identifying and implementing a useful production format for database information. For example, when a requesting party has a legitimate need to develop an independent analysis or show the significance of viewing the data in a certain way, responsive data must be provided in a format that supports the legitimate intended use. As such, the requesting party must make reasonable efforts to work with the responding party to ensure that structured ESI extracted from a database is produced in an appropriate reasonably usable format. This can be a complicated process for the producing party, particularly if the requesting party seeks the underlying data in a format in which it ordinarily has not been stored. When such situations arise, the parties should consider the scope of the request and the cost and effort required to collect and produce the information from the database in a reasonably usable format.[10]

The data analysis undertaken by a requesting party can range from simple data accumulations, such as total sales in a given time period, to complex time trending that reveals specific patterns in the data. Often, the requesting party will need to create custom reports or new tables to support these analyses. To ensure the accuracy of the underlying source data on which these analyses are based, at times it may be necessary to produce operational manuals, schematics, or other ancillary documentation that is required for the requesting party to correctly assemble the data.

 **\*184**  Creating new analyses of information contained in a database often expands a discovery request beyond the immediate fields that contain the substantive information at issue. For example, a call center application may have components that help manage the workflow between the agents. This may include external logs that track who participated in a particular call, how the call was processed, and its ultimate disposition. Even if the responding party does not routinely look at all of this stored information, if there is a question as to how the responding party managed its calls, then a requesting party may reasonably want to analyze this data, including the internal system fields that are not visible to the user that tie these disparate data elements together. Therefore, it is critical for the parties to confer as to the scope and format of the information to be produced.

A final consideration with respect to the requesting party's need to perform new analyses on the structured ESI is the extent to which the requested information can be introduced as substantive evidence in court. While the traditional approach for introducing this type of electronic evidence is through a testifying expert, some testifying experts may not be qualified to manipulate the underlying data to create the analysis that may form a partial basis for their conclusions. Certain experts may instead work with one or more technicians who serve as the interface between the data and the testifying expert. At this time, there are no standard practices with respect to these data technicians, and it is unclear to what extent their activities must be validated or whether they themselves must be available to testify as fact or expert witnesses to meet the evidentiary requirements. Further, such data processing has at times introduced questions regarding the accuracy and admissibility of analyses, even though they are based on the original data produced in discovery by an opponent.

### G. Locating Specific Database Information through Queries

Counsel should adequately communicate with the information technologists, database users, or other client representatives responsible for the database systems to determine the most efficient way to locate the responsive data. Those who are responsible for actually identifying relevant database information may need to rely on search tools, particularly for ESI within a larger database or database system. Three basic types of tools are available for this task: (1) built-in search functions relying upon an internal database index; (2) search functions that search database content in real-time (non-indexed) searches; and (3) third-party tools that develop their own indices or search existing data tables using alternate search algorithms. However, it should be noted that the Information Technology (IT) departments in many large organizations require that such third-party tools be comprehensively tested before installation or use to ensure that data integrity and operational functionality are not impaired. In such situations, the testing protocols can be quite rigorous and time consuming, thus potentially affecting the practicality of this third option.

Database indices[11] can be used to speed up queries against database data. Because database indices typically reference only a subset of the data fields that exist within a database, parties may need to assess the value of using additional technology to conduct broader searches that access more or additional information within a database. However, such "database-crawling" tools can significantly impact the speed at which a database processes transactions. In considering whether such supplemental

measures are required, the parties should weigh the likelihood that the search will provide useful additional **\*185** information against the burden that this approach would place on the responding party, both in terms of litigation costs and potential business disruption. This analysis can be very fact-specific, and requires that the parties engage in an open and well-informed dialogue. [12]

## H. Databases and Database Information in a Third Party's Custody or Control

It is common for companies to outsource some or even all of their IT functions to third parties - including the storage and management of database information. For example, many companies outsource their payroll function to another company that maintains some, if not all, of the detailed information regarding payroll on their databases and systems. In certain situations, information managed and maintained by these third parties could become relevant in a legal dispute and fall under a legal hold. In addition, while the substantive data sought by a requesting party may be deemed to be within the responding party's "possession, custody, and control," there may be ancillary data or metadata necessary for full understanding of the substantive data. Such information, like field structures or metadata, may be in the hands of a vendor or service provider, requiring a subpoena under Rule 45 to obtain. While the situation of potentially relevant data being stored at a third party location outside the possession, custody, or control of a litigant is not new or even limited to ESI, discovery of database information stored in a third-party repository can involve a complex mix of competing rights and obligations that may require court intervention to resolve.

When data is housed by third parties (e.g., "cloud computing"), it can complicate the legal and technical issues related to data preservation and production. These issues are beyond the scope of this Commentary, but some of the important issues to keep in mind are:

- Whether a party can legally obtain requested database information from the third party and the costs involved, which may be governed by the terms of a service contract.

- The extent to which the requested data may be co-located with data of other non-parties, and the difficulty of extracting only the requested data.

- The extent to which proprietary information, software, or equipment of the third party is required to understand or use the requested data.

- The extent to which the integrity or management of the data by the third party is itself a relevant issue in the litigation.

- Whether in any particular litigation, it is more appropriate or efficient to request an opposing party to produce the data under Rule 34, or request a third party to produce the data under Rule 45.

**\*186  II. APPLICATION OF THE EXISTING SEDONA PRINCIPLES TO DATABASES & DATABASE INFORMATION**

Since 2003, The Sedona Principles: *Best Practices Recommendations & Principles for Addressing Electronic Document Production* [13] has provided guidance to the legal community for the preservation and production of all forms of ESI, including databases. In Section III of this Commentary, we propose six new Database Principles that specifically address the issues associated with databases and database information. However, discussion of how the existing Sedona Principles (Second

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 141 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

Edition, June 2007), particularly Principles 3, 5, 6 and 12, apply to the discovery of databases and database information is instructive.

## A. Sedona Principle 3: The Early "Meet and Confer"

**Parties should confer early in discovery regarding the preservation and production of electronically stored information when these matters are at issue in the litigation and seek to agree on the scope of each party's rights and responsibilities.**

Sedona Principle 3 is especially applicable in the context of database discovery because of the complicated technical and logistical questions raised by the storage of information in database systems. Database discovery may entail some of the most expensive and complex discovery in a litigation matter, and meaningful conversations between the parties early in the litigation can substantially reduce confusion and waste of resources. It may be in the best interest of the parties to meet and confer regarding the specific fields that contain relevant information, and the specific exports and production format.

By addressing issues related to the preservation and production of information stored in databases as early as possible, parties can resolve easier questions and make progress on resolving more difficult ones. Sharing technical information also may benefit a responding party by educating the requesting party as to what information exists. Such early disclosure can help a responding party avoid wasting resources looking for data that does not exist or that the requesting party does not actually intend to use. Similarly, early discussion may identify specific cost or burden points that can be resolved relatively easily. For example, an ongoing preservation [14] would involve continually preserving every change to a dynamic data field, can be time consuming, expensive, and may not be practical in certain database systems. Advised of this, a requesting party may find that it needs only a single snapshot of that information, sparing the responding party unnecessary preservation costs.

## 1. Redactions, Omitted Data Fields, and the Inadvertent Production of Privileged and Other Protected Data

While a database that logs the use of electronic key cards for entrance into a building is unlikely to contain any attorney-client communications or work-product materials, some databases may contain granular information that requires special protection. For example, a database may contain personally identifying information, such as Social Security numbers, of the people using the key codes. Similarly, a database system that is used to manage a work flow for creating and publishing promotional material may store **\*187** comments from the in-house or retained legal counsel regarding the materials that fall under the attorney-client privilege. Such privileged notations may be placed in discrete "attorney notes" fields that could be isolated, or they could be mixed with non-privileged comments in free-text data fields. [15]

Early conversations between counsel regarding the existence of protected database information and how that database information should be treated can reduce costs and burden on both sides. For example, both sides may agree that the responding party need not disclose its employees' or third-parties' Social Security numbers, thus sparing the requesting party the need to set up complicated protective structures to comply with privacy laws or regulations. However, that may not always be possible. Using the earlier example of privileged communications that may be mixed with other free-form notes, the requesting party still may seek production of this field, with any privileged communications redacted and logged. Under such circumstances, the responding party may be required to budget for and execute a review of the database content, creation of a database-specific privilege log, and development of a protocol that clearly identifies the redaction of this content without otherwise disturbing the integrity of the rest of the data being produced.

It is good practice to discuss the topic of redaction early in discovery in general, and even more so with redaction of database information. Redaction of database information can take two basic forms: (1) not producing a field of information; and (2) overwriting some or all information in a data field so that the requesting party can see that information had been stored in the field. Early discussion can yield agreement on the type of redaction applied to protected information, such as replacing text with strings of uncommon characters (e.g., "&" or "@") to make it easy to find redacted information at any point. Deferring this conversation until later in the discovery process complicates and adds expense to the production of database information, as information may have to be treated more than once to meet the protocol that is ultimately negotiated.

Another database production issue that benefits from early conversation is the treatment of information that is inadvertently disclosed. Because database information is not well suited for inclusion into most, possibly not any, document review platforms, this information may not be scrutinized as closely as the discrete electronic files and email messages that make up the bulk of most ESI productions. As a result, the risk of inadvertently producing protected personally identifiable information may be higher in productions of database information than in production of other forms of ESI. Accordingly, parties are well advised to discuss protocols and consequences of producing or encountering inadvertently produced database information, including stipulation to an appropriate protective order. *See, The Sedona Conference Commentary on the Protection of Privileged ESI.* [16]

## 2. Use and Role of Consultants and Technology Partners

Discovery of database information differs in many respects from discovery of email and file-based ESI, and data collection and review of databases are the two phases of the **\*188** discovery lifecycle that vary most dramatically. The technical and logistical nuances in producing and receiving information extracted from databases create many opportunities for errors in the process. Thus, responding parties and their counsel may wish to use consultants and other technology partners to assist in preserving, extracting, analyzing, and producing data from databases. Likewise, requesting parties may want to employ subject matter experts to help analyze and understand the database information received in discovery. Involving these consultants early in the litigation, at the meet-and-confer stage if not before, can save all parties significant time and money, and help prevent miscommunication and duplication of effort.

It must be noted that not all e-discovery consultants have the requisite understanding of the technical aspects of database discovery, and parties should be careful to ensure any potential consultants have the actual expertise to address and resolve the database discovery issues present for the particular situation. For example, consultants and technology partners used by the responding party should understand that standard forensic collection practices may not be applicable to large enterprise databases and that separate verification and validation procedures may be required for extracted data. Consultants for receiving parties should be familiar with ways to review extracted database information. Analyzing email messages and discrete electronic files typically involves a team (sometimes a large team) of reviewers and takes place through a document review platform. Such review and analytical tools, however, are a poor fit for the matrices of information found in tables of extracted database information. Instead, review of this information may require technically sophisticated analysts to query the data and extract the meaning of its aggregated information.

Few, if any, industry standards exist to measure the competence of database discovery experts and consultants. As always, when considering a potential technology partner, parties should consider the qualifications of the partner, the cost, and the defensibility of the solutions and processes that these experts suggest for the legal dispute.

## 3. Impact of Remote Jurisdiction and Location

While beyond the scope of these Principles, it is important to understand that large enterprise-wide databases may pull data from multiple physical locations, including data stored outside the United States. Moreover, some U.S. companies make substantial use of databases that are stored entirely on computers outside the United States and are available only through remote access. Either of these situations may require parties to consider not only their respective needs in the immediate legal dispute, but also whether laws of foreign jurisdictions will complicate or even bar the use of database information outside the jurisdiction where the information is stored. Parties should discuss these issues early on to understand the impact of these logistical and legal limitations. Additional guidance may be found in *The Sedona Conference Framework for Analysis of Cross-Border Discovery Conflicts,* [17] published by The Sedona Conference Working Group 6 on International Electronic Information Management, Discovery and Disclosure (WG6).

**\*189  B. Sedona Principle 5: Duty of Preservation**

> **The obligation to preserve electronically stored information requires reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation. However, it is unreasonable to expect parties to take every conceivable step to preserve all potentially relevant electronically stored information.** [18]

Preservation of databases and database information can take place in a number of ways; the database structure and nature of the data it holds likely will suggest an appropriate procedure to ensure that potentially relevant data is not inadvertently altered or destroyed. The mere fact that a database contains some relevant information does not necessarily mean all information in the entire database must be placed under a legal hold. Database analysis typically starts with the most granular or atomic level possible - individual data fields - and uses relevance to guide the determination of whether information in that field should be preserved pursuant to a legal hold.

When preservation involves saving the results of a custom query or report outside the database, the specific query or report which was used to create the results also should be preserved. If preservation is done 'in place,' it is good practice to save both the query and report that was run, as well as a copy of the produced data.

### 1. Burden of Preservation

The burden of preserving a database may be relatively modest if the system maintains all information that has been entered into it - i.e., the repository serves as a permanent archive as well as a source of current information. In such cases, while the exact state of the database may change over time due to the addition of new records and information, there is less of a risk that information that existed at the time that a preservation obligation arose will be lost. Similarly, if a company's retention policy and practice is to permanently retain in the database the ESI that is relevant to the claims and defenses in the case, preservation in place may be an acceptable way to meet the preservation obligation.

On the other hand, preserving database information may be more complicated when it is stored in a system that purges database records and information on a routine basis. [19] Just as some email servers may retain messages for short periods of time before automatically deleting them, some transactional databases also remove records after their information has become dated or is no longer required for ongoing operations. One approach taken to preserve such transactional information is to retain archival or disaster recovery media for the systems that capture and process the transactions. Unfortunately, this broad preservation approach includes not only potentially relevant data, but also all of the data on the system. In addition, storing historical data in this format can strain IT resources **\*190** and disrupt business operations, as well as lead to substantial downstream costs when the database must be recreated as part of the process of restoring information from archival or disaster recovery media. [20]

In situations where a database lacks a permanent archival function or where there is no reasonable way to interrupt the usual purge or deletion cycles in order to support data preservation during the expected duration of the legal hold, preserving the relevant information stored within the database may require exporting a copy of some or all of the information to a more permanent storage medium. Tools that can accomplish this task include data export functions (either to static data tables or to an alternate database platform), special backups of the database (or of an appropriate portion of it), or by using built-in or third-party report writing functionality to identify, organize, and output the relevant information. [21]

### 2. Inventory and Default Retention Periods

Because of their complexity, databases often will require additional expertise beyond that of a legal team familiar with working with other sources of ESI, such as email messages and discrete files. In addition to understanding their databases and the information stored in them, parties should also be familiar with how databases may interact with one another and whether the information in the databases is permanent or transient - i.e., is deleted or purged from the database after a set period of time or when specific conditions are met.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 144 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

Many databases are subject to update and modification as part of the normal course of business. In addition, practical business considerations may prevent a party from locking down data contained in a critical database. In such cases, it is critical that the party develop an alternative way to preserve the relevant ESI. For example, if the prices or product offerings of an online retailer is relevant to the claims or defenses of a case, and preventing changes to the underlying pricing and product databases that control the products available to customers would impose an undue burden on the retailer, the party could preserve the relevant ESI outside the database in the manner described in B.1. above. [22] The retailer should, however, take proactive steps to preserve such data if it becomes reasonably apparent that time-sensitive information is likely to become relevant to a legal dispute. Failure to take appropriate proactive steps has led to sanctions or adverse inference instructions when potentially relevant data has been lost because a party's normal business practices for maintaining dynamic data sources led to the destruction of potentially relevant database information after a legal hold obligation accrued. [23] In such cases, responsive data can be preserved outside the database in the manner described in Section B.

### *191  C. Sedona Principle 6: Responsibilities of Responding Parties

**Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information.**

### 1. Parties Must Understand Important Database Characteristics

At a minimum, parties participating in the discovery of database information should familiarize themselves with a number of basic database attributes so that they have adequate knowledge and understanding to develop reasonable procedures for preserving and producing information from these repositories.

> • **Functional Purpose.** What is the purpose of the database system? A database may have field names that appear to indicate relevant information, but the actual information stored in the system may be completely different and irrelevant. Accounting systems, payroll, sales, and operations systems are database systems commonly found in many organizations. They may be critical to the ongoing company operations. However, some or even all of these systems may not contain relevant information. Understanding how data is used will help determine whether or not the database in which it resides should be subject to a litigation hold.

> • **System/Business Owners.** Who are the primary users of a database? Who are the administrators who maintain the "plumbing" of a database? These two groups, which may or may not overlap, together comprise the witness pool most knowledgeable about these systems. Database administrators/managers generally have the greatest knowledge of which users have access to the data and which users can add or modify information. Database users, on the other hand, can provide critical information about the nature and value of the information in the database that will identify whether the database is likely to be relevant. These users can provide invaluable substantive information, such as formatting inconsistencies, data anomalies (e.g., when a data field becomes used in a new way and old information is not the same as new information entered into the same field), and other functional limitations.

> • **Location.** Parties should know the physical location of its databases and understand how the data is managed. Because many databases are located in remote server farms (e.g., co-location facilities) or even in different countries, it is possible that the law of more than one jurisdiction may apply to any database discovery that must take place. Database systems also may be managed by third-party vendors whose proprietary database management procedures are not necessarily known to, much less legally under the custody and control of, a party.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 145 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

• **Reports.** Existing report templates or "canned reports" are a valuable and low burden method for identifying and potentially producing database information. Canned reports are particularly helpful when only a subset **\*192** of the information in a database is potentially relevant. Knowing what reports are available will help a party better understand the burden of complying with database discovery requests. For example, it may be possible to provide a requesting party with 80% of the database-stored information it seeks through a canned report, with extraction of the remaining information requiring a much greater effort. When presented with this information, the requesting party may defer the remainder of its request until it has a better sense of the actual relevance of this information to the legal dispute. Canned reports themselves can often be saved into database tables, providing a requesting party with validated, reliable information that can be used as produced or as raw data for further analysis. [24]

• **Archival, Retention and Disaster Recovery Policies.** Database systems frequently archive historical data that has exceeded its useful life and has no further business purpose. For example, online banking records often fall into this category; transaction records may be available for a discrete period of time before being archived and purged from the active database. Data that has been archived may still be accessible if required, although the burden of retrieving it is notably higher than when it was active data within the database. It is critical that parties to a potential suit know the extent to which database information is archived - and the schedules by which active and archived information is ultimately purged from a database system.

• **Legacy Systems.** In an infrastructure-upgrade project, it may be less expensive for an organization to start fresh with a new database system than to transfer all existing information from an old system. In such cases, the "old" legacy database may be maintained or archived in case its historical information is ever required. Legacy database systems are frequently associated with accounting or operations systems that were replaced, rather than upgraded. Orphaned legacy systems - databases or systems with no identifiable users, custodians, or technical support - also are common in merger or acquisition situations, when the corporate information of one entity is no longer in active use. A party should be able to identify what, if any, relevant legacy database systems exist within its organization, as well as whether any relevant information in these systems was ported to a newer, more readily available format.

## 2. The Responding Party Ordinarily Should Determine the Best and Most Reasonable Way to Identify, Extract, and Produce Relevant Data from Databases

A responding party, with the advice of its counsel, is responsible for determining a reasonable method for identifying, preserving, extracting, and producing relevant data from **\*193** databases. [25] However, just as a driver of a car may need a mechanic to help understand how the automobile's engine or on-board computer works, a party may require additional expertise to develop adequate procedures to identify and produce database information. Normally, such expertise, whether through consultants, IT professionals, or other specialists, serves as an adjunct to the responding party's legal team. In highly disputed situations, however, courts may choose a neutral third party, such as a special master, to assist with this process. [26]

## 3. Parties Must Consider the Database as It Is, Not as It Could Be

Databases may be in service for extended periods of time, evolving with the needs of the organizations that created them. However, older systems may be unwieldy or inefficient when compared to current or newer database applications and installations. This can lead to frustration (by all parties) with the functionality of a given database, and claims by a responding party that certain requests for information stored in a database are unduly burdensome. Requesting parties have challenged such claims of undue burden, arguing that a responding party may not rely upon idiosyncrasies and limitations in its systems to establish burden; parties may not "hide" behind a unique and burdensome data management system which they created. However, absent evidence that a party has purposefully designed its data systems to thwart discovery, such challenges are not

supported by Fed. R. Civ. P. 26(b)(2)(C)(iii) and its state analogs as those rules implicitly hold that the requesting party finds the producing party's database system as it is.

A number of courts have held that absent a statutory requirement to maintain data in a specific manner or in the absence of a specific preservation obligation, a company may maintain its corporate information in any manner it chooses, so long as its system is not intentionally designed to frustrate discovery.[27] As a consequence, a requesting party finds a producing party and its IT systems as they are and not as they wish them to be.[28]

This lack of explicit legal obligation does not mean that an organization should not consider litigation discovery issues and potential costs when choosing or implementing a new database. However, the organization is not required to design or implement its databases around the potential for litigation. Virtually all databases include some design compromises after balancing competing business and legal needs. Ensuring that the database can conduct core-business functions in the ordinary course of business typically is a higher priority than ensuring that the database has capabilities for the identification, collection, and production of data that is potentially relevant and responsive to litigation. Such design decisions are appropriate, as long as they are not made to frustrate legitimate discovery.

Not all courts have held that self-imposed idiosyncrasies of a litigant's information management systems that make it challenging or costly to extract information in response to **\*194** discovery requests are valid grounds for limiting discovery requests due to undue burden. In this line of cases, courts have applied the general principle that a litigant ordinarily bears the costs of collecting and producing relevant discoverable evidentiary materials, even if the litigant's discovery costs are unusually high due to the way that the responding party has chosen to organize its business records.[29] But high costs should factor into the courts' proportionality analysis, unless the party purposely designed its data systems to thwart discovery.

When analyzing production difficulties due to limitations in a database design, underlying database engine functionality, or data integrity, parties should consider a variety of data production options to see which best meets the needs of both requesting and producing parties. For example, it may be possible to extract and produce relevant data with relatively modest burden if it is bundled with some amount of non-responsive database information. In this circumstance, particularly if the responding party produces the data as it has been kept in the ordinary course of business, such a production may satisfy the responding party's obligations, so long as the burden of extracting responsive data is roughly equal for both parties.[30]

### 4. Direct Examination of Databases

Absent the parties' specific agreement, a requesting party is rarely granted permission to conduct a direct examination of a responding party's database to view or obtain information stored within it. As also noted in the commentary to Sedona Principle 6 above, most litigation discovery requests relate to a database's content, not how it operates. Allowing full access to a responding party's database makes it difficult, if not impossible, to prevent the requesting party from accessing irrelevant or privileged information; all data fields in all database records are theoretically accessible. Direct access to a proprietary database by a non-employee also may compromise the validation of the data in the database, reducing the database's reliability for both business and legal situations.

All this said, in certain civil litigation matters, responding parties have, in fact, invited requesting parties to access one or more of their database systems as an alternative to producing relevant information by exporting it or by cloning the database.[31] Typically, the databases in these cases contain no personally identifiable information; for example, a database of manufacturing information. Typically, too, the requesting party is often supervised, either by a responding party representative or by a neutral third party. In some cases, the requesting party has agreed not to directly access the system, instead directing an employee of the responding party to enter queries and otherwise manipulate the system. Finally, the requesting party usually must sign stringent confidentiality agreements to prevent the inadvertent disclosure of any proprietary information (relevant or irrelevant) that the requesting party may see when accessing the database.

**\*195** Direct access to a party's database systems is disfavored and has been granted over objection only in extraordinary circumstances. *In re Ford Motor Co.*[32] is a rare case that discusses this issue directly in the context of database discovery. The plaintiff had requested direct access to Ford's databases to conduct queries for claims related to defective seatbelts. However, the court held that "Rule 34(a) does not grant unrestricted, direct access to a respondent's database compilations. Instead, Rule

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 147 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

34(a) allows a requesting party to inspect and copy the product - whether it be a document, disk, or other device - resulting from the respondent's translation of the data into a reasonably usable form."[33] The court further explained that Rule 34(a) contemplates that the responding party will search its own records directly to produce the records, not that the requesting party directly searches the data itself.[34] The court held that while some kind of direct access might be permissible in certain cases, this case was not one of them, because the plaintiff 's request was too broad in scope and because the district court made no findings that Ford had failed to comply with discovery requests.[35]

### 5. Documentation and Validation of Database Collections

When extracting data from databases for production, it is important to document, test, and validate the procedures that are used. Well-documented data collection and production procedures enable a responding party to demonstrate its good faith efforts to accurately export and produce database information. The same documentation also makes it possible to respond to any allegations of over- or under-collection of database information.

### 6. Features and Limitations of the Technology and Tools that can be Applied to Databases to Identify and Extract Relevant Information

Databases differ in the types of functions that are incorporated into them. For example, some databases support open-ended free-form text fields; others impose much shorter character length limitations on their data fields. All databases offer search query functionality, but some database engines support deeper search functionality than others. Still other database engines may offer powerful search features, but may index only the first several hundred characters in a data field, making standard search queries unreliable when applied to long, free-form data fields.

Responding parties have an obligation to understand the features - and shortcomings - of the database engines that power their information repositories. Understanding this technology is separate from the data content or system usage knowledge required to explain the significance of database field names or how information was entered into the structure. Indeed, different individuals within an organization typically have one, but not both, of these distinct bodies of knowledge about its databases.

Understanding the limitations of a database also requires an understanding of which external utilities - if any - can be used to add functionality to a database. For **\*196** example, the software that powers many enterprise-class databases may be relatively limited in the ways that it can format information into reports. Instead, these database engines allow close integration with third-party report generation tools. Because of the variety of ways that a database can store its information, however, not all reporting or other enhanced functionality tools will work with all databases or database systems.

A responding party may not be able to meet its database discovery obligations without solid knowledge of these tools and their potential application to the party's relevant databases. Without this understanding, it is difficult for a responding party to fully understand, much less articulate, the burden that a given discovery request imposes on it. Moreover, a lack of this knowledge greatly limits a party's ability to have comprehensive, frank discussions about database discovery.

### D. Sedona Principle 12: Form of Production and Metadata

> **Absent party agreement or court order specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party where appropriate or necessary in light of the nature of the information and the needs of the case.**

### 1. Mismatch of "Native Format" to Most Database Productions

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 148 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

Rule 34(b)(ii) and its state equivalents mandate that a responding party must produce ESI in either the form or forms in which it is ordinarily maintained (sometimes called "native format") or in a reasonably useable form or forms. [36]  However, "native format" may not have as clear a meaning in a database context as it does for other forms of ESI. [37]  In fact, in many cases, a truly native format production of database information is less usable to a requesting party than an alternative production format.

Database engines typically compact the information they store and index to reduce storage requirements and speed information retrieval. Each database engine uses a different proprietary format for the data files that make up the components the database uses to properly function. For example, Microsoft Access often folds all database information into a single .MDB format file. A Microsoft SQL Server database, on the other hand, is composed of several types of files, including primary files (.MDF), secondary files (.NDF), and transaction logs (.LDF). Other database engines use different structures and file types, and few, if any, can read or process information stored in a different database engine's format.

 **\*197**  A true "native" production of database information provides a copy of a database that can be used only by someone possessing a licensed copy of the correct version of the database engine software. Depending on the nature and age of the original database, such a license may be difficult for a requesting party to obtain, if not practically impossible. An additional disadvantage of producing a database in its "native format" is that internal tracking may be difficult or impossible to turn off. Stated another way, this means that merely opening a database may alter some of its validation values such that the authenticity (and thus admissibility) of the database can no longer be established at the "native file" level.

While a true "native" production of database information may not be feasible or desirable, some metadata - in the generic sense of the term, "information about information" - is necessary for the production to make sense. This is a distinguishing feature of database information. As one court discussing Sedona Principle 12 put it, "while metadata may add little to one's comprehension of a word processing document, it is often critical to understanding a database application." [38]  And the same court, comparing different form-of-production options, noted "one marked disadvantage of [TIFF or PDF] is that the production involves significant costs; it also does not work well for spreadsheets and databases." [39]

If a requesting party receives a native-file database production, the native production should be accompanied by a production of database information in the form of generic "load files" such as text delimited files that can be read by many different types of databases or other software applications. Such load files should include the fielded data that has been exported, so the requesting party can use the load files to map each information field into a database structure of its own design.

## 2. Use of Standard Reports to Produce Database Information

As addressed in I.E., I.F., and II.B.1, *supra,* most databases include ways for business users to view or print out multiple data fields, organized in a useful manner. The simplest database reports might present columns of information in a simple table format; more complicated reports may combine content from multiple fields, perform mathematical calculations and present them, or include graphs derived from underlying database information. Database reports may be static - that is, an unchanging view of certain data that have been selected by query, or they may be more interactive, permitting users to change the scope, focus, and perspective of the database. Generally speaking, most existing reports that are used in day-to-day business are "pre-validated," meaning that accuracy of their data aggregation has been tested and demonstrated. Standard reports, also known as "canned" reports, should be contrasted with custom reports, where users (or database administrators) select report content based on individual or changing needs. Because these reports are created "on the fly" by database users, it is more possible for these information views to include errors, such as mismatches between field name and displayed field contents or mathematical errors.

Standard reports have both advantages and disadvantages as a production format for database information. Because these report templates already exist and have been pre-validated for accuracy, it is generally faster and cheaper to use these reports than to create custom views and information extracts. However, standardized reports may not collect all  **\*198**  potentially responsive or relevant data in the database, and they may not produce it in the specific format that has been requested. Thus, standardized reports may be a low-burden way to make a partial production of requested database information, but they may not provide the most complete solution. If a standardized report is missing crucial data or provides the information in a way that cannot be processed using reasonable efforts by the requesting party, a different production format may be more suitable. On the other hand, if the standardized report captures all of the significant data and omits only marginally relevant information, it may be more appropriate to produce database information in a standardized report than to invest time and money into creating a custom report that provides absolutely all of the database information that has been requested.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 149 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

### 3. Use of Fielded Tables to Produce Database Information

A common way to produce database information is through tables (i.e., rows and columns) of information, where each row represents a database record and each column represents a single data field. Most database engines, even those that do not have sophisticated reporting functionality, support exporting database information into either text delimited files or fielded tables. Similarly, many different database engines can import delimited files and separate out each field of information for subsequent analysis.

Text delimited files are closely related to, if not often virtually the same as, database "load files"; they are generically formatted sets of fielded information. Delimited files, however, may not be able to completely show the relationships found in multi-table relational databases. For example, in a banking database, a single customer may have both individual bank accounts and a shared bank account with one or more co-owners. Typically, these relationships are tracked in a multiple-table relational database, where each bank customer can be related to multiple bank accounts, and each bank account can be related to one or more customers. If this information must be consolidated in a single table, preserving these "one-to-many" relationships may require that information be repeated so that full information can be displayed in each view of the information. "De-normalizing" the data in this way (i.e., transforming it into a different format from the way in which it is stored in the ordinary course of business) is a relatively common and often acceptable data production practice, even though restoring this information into multiple relational tables to recreate the original types of relationships may not be a straightforward process, depending on the data relationships that are required.

For example, the parties could clarify whether the requesting party would prefer to see the results of a query or report that links the data elements together, or to have exports of the responsive data from separate tables and import the files into their own system in order to run their own queries.

### *199  III. THE SEDONA CONFERENCE PRINCIPLES FOR THE PRESERVATION & PRODUCTION OF DATABASES & DATABASE INFORMATION (THE "SEDONA DATABASE PRINCIPLES")

While *The Sedona Principles* cover the preservation and production of ESI in general, and includes useful guidance for the discovery of databases and database information in particular, the complex and evolving nature of database discovery calls for a more in-depth examination of the issues that are unique to databases and the information found in them.[40] Because of the structural complexity and volume of database information, database preservation, collection and production often involves relatively greater costs and burdens than those associated with the production of unstructured media. Defining a reasonable scope of database discovery requires all parties to understand the purpose for which the information is sought, the components and respective relevance of the data at issue, the workings of the technology that stores and manipulates the data, and the processes to ensure that the data produced is what it purports to be. To that end, the following six Sedona Database Principles are intended to inform and facilitate discussions regarding assessments of relevance, potential costs and burdens, and methods for validating results that necessarily must occur between parties that are involved in database production.

### 1. Scope of Discovery

> **Absent a specific showing of need, a requesting party is entitled only to database fields that contain relevant information, and give context to such information, and not to the entire database in which the information resides or the underlying database application or database engine.**

*Comment 1.A. Database Relevance Must Be Analyzed on a Granular Level*

Databases are often very large collections of disparate information. Although situations can exist when an entire database and its information are relevant to a legal dispute, often only a portion of a database is relevant.[41]

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 150 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

The process of determining which database information is relevant is performed at several levels. First, depending on the nature of the dispute, many database records will likely not contain relevant information. These normally would be excluded from production through use of search queries. Second, however, even within records that contain potentially relevant information, not all of the data fields that comprise the record may be relevant. [42] Identifying and extracting database information in response to discovery requests requires both levels of analysis.

The process may be complicated further by the differing views available to users based upon different levels of database-security access. A database record in a database **\*200** application that is viewed on the screen by a typical end-user generally is created from information stored on multiple data tables, and only database administrators may be able to see the raw data as it is stored in database tables and sub-tables. Unfortunately, many database discovery requests combine requests for both database records and database tables as if they were separate and mutually exclusive repositories of information. Depending on the technological sophistication of the party representatives managing this discovery, such terminology-mixing can further complicate the process of reaching consensus on the logistics of these discovery requests.

Other times, the way that database fields are organized into columns, rows, and tables may simplify conversations about the scope of production. Depending on the facts in a dispute, entire tables of database information may not be relevant and may not be required to be preserved or produced. Conversely, other data tables may contain fields of important information that require special treatment. To the extent that data is "rolled off" an active database, a database administrator may need to implement preservation measures for specific tables to reduce the risk of inadvertently destroying potentially relevant information.

> *Illustration i*. In litigation involving a car manufacturer and the various warranties provided to consumers, plaintiffs request documents to identify the customers of certain models of cars, the cars they purchased, and the warranties they purchased. The defendant's database that retains this relevant data also contains non-relevant information, including dealership, the salesperson, and the commission the salesperson received on selling the car. This non-relevant information is stored in the same rows and tables as the responsive, relevant information. The information in these data fields is not relevant to the dispute, and the data fields do not need to be produced. Furthermore, even though both the relevant and non-relevant information might appear in a standard view of the customer's database record, the responding party should not be obligated to produce the non-relevant information even if the requesting party asked for "all documents related to" customers of the certain car models.

> *Illustration ii*. In a breach of contract litigation between two companies where the amount paid by one to the other is in dispute, the defendant's accounts-payable database could contain potentially relevant information regarding payments by the defendant to the plaintiff. However, absent a persuasive argument to the contrary, the data records (i.e., rows) regarding payments to other companies for unrelated transactions is not relevant, and need not be produced. [43]

> *Illustration iii*. In the same breach of contract litigation, not every data field (i.e., column) displayed in a record that contains relevant information in the accounts payable database is necessarily relevant and within the scope of discovery. For example, the "payee," "amount," "date," "check number," "approver" and "comments" data fields (and their relationship to each other) may all be relevant, but other data fields in the record may not be relevant (e.g., "unique record ID," "tax ID," etc ....). *Id.*

**\*201  *Comment 1.B. Parties Must Determine the Relevance of Individual Data Fields Within a Database***

When reviewing the relevance of data fields, parties need to carefully examine the relationship between relevant data fields and other fields (or rows, or columns, or tables), because this relationship can make otherwise irrelevant data relevant because of its link or connection to relevant information. While it is possible that a single piece of relevant data within a record or table may transform otherwise irrelevant data within the same record or table into relevant data because of their relation to each other, such a logical connection is by no means automatic.

A responding party that finds relevant information in a portion of a database should reasonably consider the entire database to determine if other portions are relevant to the dispute. A party that unilaterally examines its own databases to determine what fields are relevant or irrelevant should, as a matter of best practice, act conservatively to avoid inadvertently excluding relevant data. Generally speaking, the cost of performing this analysis a second time, plus the downstream acts of extracting and processing this information a second time, is far more than the cost of identifying, extracting, processing, or producing slightly more data during a single pass.

Analysis regarding the relevance of information contained in individual cells is not unlike that pertaining to information contained in various types of metadata. In addressing the relevance of metadata associated with various forms of ESI in *Aguilar v. Immigration & Customs Enforcement Div.,*[44] the court drew from Principle 12 of *The Sedona Principles*[45] noting that "the two 'primary considerations' should be the need for and the probative value of the metadata, and the extent to which the metadata will 'enhance the functional utility of the electronic information.'" A parallel approach should be used to determine relevance of data fields (i.e., to what extent is the particular field data or its relationship to other fields essential to understanding the information sought; does such field-level data enhance the utility of the records). The *Aguilar* court noted that, "[a]s a general rule of thumb, the more interactive the application, the more important the metadata is to understanding the application's output."[46]

If the data fields themselves are not privileged or determined to be trade secret, metadata-type database field information can be analyzed in several ways for relevance. However, in *Aguilar*, because the data was sensitive, the court suggested a quick demonstration to the plaintiffs of database functionality using dummy data stored in an otherwise identical database structure.[47] This approach could be used as an exploratory tool with a requesting party or with fact experts to gain an understanding of the overall output from the database if the parties cannot agree on the fields or cells that may be relevant to make meaningful use of the data or if the producing party lacks this level of understanding of its database systems.

### Comment 1.C. Database Relevance Is Measured by its Data, not the Application

Under normal circumstances, a database is relevant to a legal dispute because of the database information stored within the tables or files, not the database application or **\*202** database engine.[48] Unless there is a unique relationship between the database information and the mechanism that manages or displays that data (which can happen in some older or proprietary database systems), the software components of the database application and engine are unlikely to have any relevance to the discovery request, and should be considered presumptively non-responsive.

Proactively focusing database discovery requests on the data component of the system greatly simplifies the process of responding to these requests while rarely sacrificing full disclosure. Moreover, because database systems are configured for specific hardware and software environments, the effort to recreate these environments is vastly more expensive and complex than providing the data files in a format that can be loaded into whatever database systems are available to the requesting party.

Fortunately, most database information can be produced easily in a generic format that does not require a specific database engine or application to be read or analyzed. Depending on the requesting party's needs, a data file in a common form such as Microsoft Access or Excel can be produced, and allow the database information to be reasonably usable by the receiving party. Additionally, limiting database discovery to the database information which can be produced in an alternative reasonably usable tabular form obviates the need to negotiate the terms of a protective order or other limited use agreement with the non-party proprietor of the database software, cloud computing service provider, or computing platform provider.

### Comment 1.D. Circumstances When a Database Application May Be Relevant

In certain circumstances the database application, structure, or even the database engine, may not only be relevant, but also essential to providing a complete response to a discovery request, for example, when the software itself either: (a) contains information relevant to the matter not otherwise stored in the database storage file; or (b) the software is the focus of one or more claims of the litigation.

> *Illustration i.* Acme Corp. has programmed its financial system to provide a limited number of choices when categorizing financial transactions. The universe of possible choices, rather than the history of actual choices, has

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 152 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

become an issue in litigation. Acme Corp. has been asked to produce the software application that contains the programming of these possible choices. It is clear that the database storage file will not contain this information. The parties should determine whether the production of the software is the best or only way to establish this information.

*Illustration ii.* It has been alleged that, for a two-year time period, Mortgage Broker Company's ("MBC") software incorrectly calculated monthly mortgage payments. MBC has been asked to produce the historical transactions, as well as the software code, that it used to calculate those transactions. It is clear that the database storage file does not contain those calculations. The parties should determine if the production of the software is the best or only way to provide information regarding the underlying algorithms used by MBC's software.

 **\*203**  In some cases, it may be more valuable to understand the database application than to receive the underlying transactional data. This situation occurs most often when one set of data ("dataset A") is acted upon by a software tool to then produce a second set of data ("dataset B"). For such discovery requests, it may be more effective to understand the software processes that transform dataset A into dataset B, rather than to simply receive dataset B, or dataset A.

*Illustration iii.* Franchise Food Co. tracks employee time and attendance via its point-of-sale system ("POS," i.e., the cash registers). The POS terminals record the time that cashiers signed into and out of the system. In wage and labor litigation, it has been asked to produce all POS time entries and to produce all payroll-system records. While the presumption is that both would be produced, it may be equally sufficient or even preferable to produce the POS time entries and the software that creates the payroll system records from the POS data, rather than the static payroll-system records.

### Comment 1.E. Value of Information About the Database System

In addition to disputes about the relevance of database information, or the database applications or engines themselves, requesting and responding parties often disagree about the relevance of the database system information, i.e., database's schematics or the underlying technical information that do not concern information that is directly at the heart of the dispute, but instead seek information that may help the requesting party better understand the information that it is receiving and any limits in its accuracy or functionality. Understanding the context, origin and normal business use of ESI in a production may be helpful for the requesting party to make effective use of the data received.

Accordingly, in appropriate circumstances, a responding party may produce the database system information that is reasonably needed by the requesting party to obtain a basic requisite understanding of the structure, content and format of the data being produced, including relevant field names and values, the relational connections between data fields and tables, and the extent to which data fields are automatically populated by the system. In some circumstances, the scope of this system information may be expanded to include not just information about the specific data being produced, but also information about where the produced data originated from within a larger environment that may include multiple database servers, internal or external databases, and other related ESI. The production of such database system information might also include dependencies of the produced data on other data sources, uses of the produced data within the system or overall environment, and relationships of the produced ESI to other data within the system or the overall environment.

*Illustration iv.* In *Illustration iii* above, where Franchise Food Co. could have produced the POS time entries and the software that creates the payroll system records from the POS data, in lieu of the static payroll system records, Franchise Food alternatively may have been able to produce the POS time entries and, if available and reasonably accessible, background system technical information about the software that creates the payroll system records from the POS data.

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 153 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

**\*204** Database system information may be presented in many different ways. Sometimes, tabular or graphical depictions of a complex data system, as can be found in "entity relationship" diagrams or data flow diagrams, may be both most helpful and least burdensome for a responding party to provide. Other times, it may be necessary to depose a witness with technical understanding of the system from which database information has been produced. Requesting parties should understand that there is rarely, if ever, a single, comprehensive source of the system information that they may request, and that a responding party has a burden of varying degree in collecting such information for production.

An additional consideration is that information produced from databases is rarely an exact copy of the data tables and database structure. Rather, the database information being produced is most often a subset of the sometimes substantial information that is stored in a larger database. In fact, this is often preferable. [49] Depending on the issues in the case, it may be appropriate for a requesting party to receive a description of the extraction and transformation process, including how the produced information was organized in the original database.

A final issue regarding the production of database system information is the extent to which database or system documentation is encompassed by a request for substantive information stored in a database. Organizations do not permanently retain all database system documentation they ever create, use, or reference. Absent explicit notice from opposing counsel or other extraordinary factors, a responding party should not be automatically obligated to preserve all supporting database system documentation, merely because the party has reason to believe that some ESI stored in the database may be potentially relevant to a party's claims or defenses in a current or reasonably foreseeable litigation. Commercial documentation, in particular, is usually available from a variety of sources, including third parties. More careful analysis may be required in situations involving custom-written documentation, such as internal guides or references. For such materials, responding parties should consider the nature of the documentation, as well as the degree of unique insight that this material provides into relevant database information.

### Comment 1.F. Appropriate Circumstances for Producing Additional Non-Relevant Database Information

While a responding party is not obligated to produce more data from or about a database than is relevant to the dispute, in some circumstances it may be easier, less expensive, and less burdensome to produce a larger slice of the database content or even the entire database. For example, business users of the database may have a "canned report" that compiles all requested information, plus some additional data fields. Producing this report is likely faster and much less expensive than designing a custom query and collecting the same database information through a custom data export utility. Thus, while a responding party is never obligated to produce additional irrelevant information (and may have reasons unrelated to litigation not to do so), a responding party *may* produce additional non-responsive information, so long as the responding party is not doing so for any improper purpose, such as attempting to make relevant information more difficult to extract or understand.

**\*205  2. Accessibility and Proportionality**

> **Due to differences in the way that information is stored or programmed into a database, not all information in a database may be equally accessible, and parties should therefore apply proportionality to each component of a database to determine the marginal value of the information to the litigation and the marginal cost of collecting and producing it.**

### Comment 2.A. Technical Challenges to Accessibility

Information from and about databases is subject to the same rules and limitations as all other information disclosures in civil litigation, and in ordinary circumstances, information that cannot reasonably be extracted using tools that are readily-available in the normal course of business of the responding party need not be produced absent good cause and potential cost shifting. [50] Whether specific requested information within a database is "reasonably accessible" within the context of a specific legal dispute is a deeply fact-specific inquiry that must be analyzed, like questions concerning other discoverable material, under the proportionality provisions of Rule 26 and its state analogs. [51]

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 154 of 167

It is important to recognize the technical limitations that affect levels of accessibility, and a requesting party should never assume that all information in a database - or even all information visible to "average" database users - is equally able to be produced. Instead, once a responding party has demonstrated why certain database information or elements are more difficult to produce than others, the parties should consider whether the value of the information is worth addition burden and cost. As with other discoverable information, the parties should consider the availability of the same information in a reasonably usable form from an alternate source (e.g., printed instruction manuals, printed database reports) and whether the importance of the requested information is proportional to the additional burden or cost that would be required to extract it from the database in which it resides. [52]

### Comment 2.B. Factors for Assessing the Burden or Cost of Preserving, Collecting or Producing Database Information

A number of factors may be considered in accordance with Rule 26(b)(2)(B) and Rule 26(b)(2)(C) to determine if database information may be considered "not reasonably accessible because of undue burden or cost" or is disproportionate for purposes of **\*206** preservation [53] or production. [54] Additionally, parties should understand that certain inherent limitations may exist impacting the production of database information.

- **The extent of the ability to search on database fields**. The ability to search fields depends on the way a particular database system has been designed and the sophistication of its search engines. For example, many databases contain one or more free-form text "comments" fields that may be visible when a database record is viewed on screen. However, to optimize performance, only the more critical, defined-format fields may be indexed and searchable, with the comments fields available only once the associated record has been located. Limiting the fields that are indexed allows databases to hold large volumes of information without compromising system performance. Third party query/report generation tools are commonly used to supplement such limitations; however, these tools are not perfect solutions. It should be noted that searching or creating indices on un-indexed fields can impose a significant burden on an operational system.

- **The extent to which information may be stored outside tables**. Not all information stored in a database is held in tables; it may be stored in a number of different places. For example, to facilitate speedy and consistent data entry, a database may include predefined values for certain fields, i.e., "drop down" or "lookup" tables, which may be hard-coded into the database application software itself and not stored in any searchable database fields or tables. Further, earlier entries in a lookup table may not have been retained when a table or the database itself was updated, making it functionally impossible to retrieve this system information without substantial effort and expense. Therefore, a request for production seeking all values from which an employee could have chosen while engaged in data entry might sound simple on its face, but responding to this request may be extremely difficult. Likewise, certain reports may be available within a system only as screen views and not easily converted to a printable or exportable format.

- **The capability for exporting data**. Because information may be visible to a user does not necessarily mean that it is practically capable of being produced. For instance, individual-rights restrictions on viewing and exporting certain fields or the character of the fields themselves (e.g., "validation fields," such as those that automatically capture the user ID of the person making changes) may impede or prohibit export through standard output channels. Moreover, since many databases are intended to be used as information repositories, the system may have been **\*207** designed solely with the ability for a user to add new data records or update existing records, with no functionality included for the export of records in bulk. Even extremely complex databases are often designed to be accessed by individual end users through a Graphical User Interface (GUI) through which users have the ability to view and edit a small number of records at any given time, but not the ability to export large numbers of records into a static format. To export the quantities of data often necessary to respond to civil litigation discovery requests and in a format reasonably usable to the requesting party, programmers may need to create custom tools or alternate interfaces to the database. In such conditions, the time, resources, and expense of such programming should be part of the burden analysis.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 155 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

• **The reporting functionality of the database**. Some databases allow users to employ built-in or third-party utilities to search the database and format the results into a report that can be printed or exported as fielded data. Typically, an organization will create a number of standardized report "templates" from which the user can choose, and sometimes a system will allow users to craft "custom" reports. However, most reporting functions, whether template or custom, are limited in some fashion, such as in the fields that can be queried against, the number and combinations of fields that can be searched together, the volume of records that can be included in the report, or the number of characters from a given data field that can be included in the report. Additionally, certain reports may be available within a system only as screen views and not easily converted to a printable or exportable format. If a party is required to overcome these limitations in meeting their production requirements, litigation-specific reports may need to be created by programmers, requiring additional time (to create the custom reports) and resources, potentially including hard costs. Even with custom programming, it is possible that some database fields, such as system and validation fields, may not be capable of being included in a report-writing function. [55]

• **The extent to which a database system is in the custody of a third-party**. In situations where a responding party has outsourced its databases systems containing responsive ESI to offsite storage solutions under the custody of a third-party referred to as "infrastructure as a service" ("IAAS"), or is using a third-party software hosting repository referred to as a "software as a service" ("SAAS") system (e.g., Salesforce.com), the responding party may not have the direct access to the "back end" of the database that is required to implement custom programming. The parties should consider the feasibility, burden and cost of timely exporting responsive database information, and whether there is a less burdensome alternative.

**\*208**  • **The active or legacy status of the database**. Unlike unstructured data, where the trend generally is to consider "active" information "reasonably accessible," [56] the fact that a database is in active use does not automatically mean that the data is easy and inexpensive to produce in litigation. Whether a database is active or in legacy status does not determine its accessibility. The same challenges in producing data from a database currently in use as in one that is no longer active (e.g., limited export functionality, poor data consistency, a limited-feature search engine), legacy databases can often pose additional challenges. For example, the software platform or operating system necessary to run a legacy database may no longer exist or can no longer be run on current hardware. Similarly, IT or business personnel who were familiar with the structure of the database may have left the organization, and it may be difficult, if not impossible, to find resources to export data or write any custom reports.

• **The availability of database system source material, if relevant**. Much of the information describing database structures and supporting hardware and software systems can be found in the end-user manuals, system documentation, written system backup procedures, training materials, and other documentation that accrues during the development or deployment of the system.

• **Legacy Systems**. Finding documentation for legacy systems may prove much more difficult, as supporting materials (and knowledgeable employees) for systems not in active use are often no longer available after a period of time. In situations where requested supporting information for legacy systems is not available, a responding party should not be required to either create new comprehensive documentation or deconstruct the database system for the purpose of assisting the requesting party's understanding of the system and the responsive database information.

• **Proprietary Systems**. It also may be difficult to find comprehensive documentation for highly integrated proprietary systems, such as financial systems from SAP or Oracle, and this information may not be readily available from either the responding party or the solutions provider. Additionally, the responding party may lack actual access to certain data tables that may be a trade secret of the solutions provider, and it thus may not

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 156 of 167

be possible for it to respond fully to a request for database table structure and overall organization. While the responding party should take reasonable steps to locate and produce any such relevant, but propriety, database system information, including obtaining information from alternate sources, the courts should consider the proportionality of the burden and costs associated with licensing or otherwise locating the requested information that is not within the party's custody and control.

**\*209  3. <u>Use of Test Queries and Pilot Projects</u>**

**Parties should use objective information, such as that generated from test queries, pilot projects, and interviews with persons with relevant knowledge to ascertain the burden and benefits to collect and produce information stored in databases and to reach consensus on the scope of discovery.**

*Comment 3.*

Many disputes about the discovery of potentially relevant information stored in databases are based on deduction and inference, rather than empirical data. A requesting party may insist that certain types of information must have been stored in an opponent's database "because that's what should be there." Conversely, a responding party may estimate the burden of responding to discovery requests without ever testing whether its assumptions are accurate. Neither of these approaches is acceptable.

A better approach for establishing the benefits and burdens of producing information stored in databases is to examine objective information about the systems. To this end, a responding party may examine user manuals or any database table schematics that exist, or more incisively, use one or more queries to test how long it takes the system to return results, the effect of those queries on the system's operation, the relevance of those results to the issues in the case, and the logistics required to export this information in a format that is reasonably useful to the requesting party. Each of these objectives - the speed of the system, impact on operations, the accuracy of the query, and the data extraction - can then be fine-tuned to improve efficiency and the overall results.

Regardless of whether the responding party concludes that the information requested is "accessible," it may wish to create a test query or pilot project and share the results with the requesting party to demonstrate the steps that are being taken to respond to a discovery request and allow both sides to assess the usefulness and relevance of the exported information before incurring the cost of a full production. The test queries may identify problems with the discovery request, such as over- or under-inclusion, or the pilot project may identify issues with preparing the data for production in precisely the format requested. Sharing this information provides a common factual basis upon which the parties can re-examine the discovery requests and modify them appropriately before incurring the cost of a full production.

> *Illustration v*. A requesting party seeks all records from a database of internal memoranda and reports that include certain key words and phrases, including the term "market." Test queries indicate that the request would flag more than two-thirds of the records as potentially relevant, even though the subject at issue is narrowly focused. A review of samples taken from the "market" query reveals that all of the sample records are, in fact, not relevant in any way to the dispute. Based on this and other information, the requesting party substantially revises its list of requested key words and phrases to eliminate certain terms that appear to generate "junk" results. Further sampling of the revised query results, which are much smaller than before, suggests that more than half of the records retrieved are likely relevant to the dispute.

**\*210**  In situations involving very large databases or multiple databases, test queries or pilot tests of the production process can be based on a subset of the data repository, consistent with the approach outlined in *Zubulake v. UBS Warburg LLC*[57]

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 157 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

and elsewhere. Although the *Zubulake* opinions do not concern database information, the court's approach of using small, manageable test queries to generate empirical results from which the burden and benefit of further discovery could be determined has been widely adopted in other ESI situations, including discovery of database information.

Sharing technical or logistical information and using sampling to more effectively negotiate the scope of discovery are also consistent with guidance contained in *The Sedona Conference Commentary on Achieving Quality in the E-Discovery Process* (2013) and *The Sedona Conference Cooperation Proclamation* (2008). [58]

### 4. Validation

**A responding party should use reasonable measures to validate that its collection from the database is both reasonably complete and did not inadvertently modify the ESI.**

*Comment 4.*

Due to the volume of information and the complexities of its organization inside databases, there are no established protocols or integrity checks (e.g., MD5 hash marking) to verify and validate the completeness and accuracy of database information collected from a larger database. However, verifying that information extracted from databases is an accurate copy of the same information as it is stored in the original database should not be seen as an insurmountable task; as a matter of due diligence, basic checks exist to ensure the completeness, accuracy, and integrity of the collected data.

Extracting data from a database in response to a discovery request typically involves: (1) executing a query to identify responsive records; and (2) structuring the responsive fields into an export format acceptable for production. Running queries and structuring output files frequently can result in unintended changes to data values, such as truncating text, substituting codes for values, or other data transformations. Other typical data extraction problems include unintentionally extracting records that are not responsive (over-inclusion) or missing records that should be included (under-inclusion) in the production set. These and other data integrity issues can render the resulting dataset incomplete or inaccurate, and thus unacceptable for production.

To reduce the risk that information extracted from databases contains transcription errors, a responding party that is extracting data from a database and formatting it into a report or file for the purpose of responding to a discovery request should test the proposed dataset to confirm that it includes all expected content and complies with the target format.

**\*211** Depending on the nature of the data and the methodology used to extract the data, a variety of validation procedures may be considered:

• **Validating numeric values**. When data consists of a numeric value, the following tests may be appropriate:

• Confirm that the number of extracted database records matches the number of records that were originally identified by one or more target queries.

• Compare the resulting number of records to the number that appears in reports that are regularly produced in the ordinary course of business.

• Compare the number of extracted records to control counts from the tables being queried.

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 158 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

• Compare the aggregate of certain fields, such as sales amounts, to known control totals from routine or regularly produced reports.

• Develop control totals by confirming that the sum total of the extracted records plus the total of the non-extracted records equals the total of the same field or record set as noted in the entire table or report.

*Illustration vi*. A party requests information about all buyers of a product, including the date of purchase, the price paid, and the state in which the purchase took place. All of this information is tracked in a sales database maintained by the responding party. The responding party runs a query to identify all the sales records for that specific product and exports the requested information into a .CSV file. Before producing this information, the responding party double-checks the number of data rows in the .CSV file by loading it into a spreadsheet program and comparing the number of lines to the number of records identified in the query. The responding party then checks to make sure that the date and price field rows contain only date and price information. Satisfied with the results of these checks, the responding party then provides this information to the requesting party.

• **Validating standard language values**. When the contents of an extracted field consist of standard language values rather than a numeric value, the responding party should confirm that the extracted text values conform to a list of expected values for those fields. For example, for fields that can contain only a limited number of valid values, such as the seven days of the week or the twelve months of the year, a responding party can run an automated comparison of the extracted information against all possible expected values for these fields to ensure that no unexpected values are included.

• **Validating non-standardized language values**. When text fields do not require standardized language, as in many narrative or comment fields, a sample of fields from the extracted text can be examined to confirm that **\*212** the information meets expectations of the information that should be stored there. Samples of extracted text fields can also be compared to the corresponding records in routine or regularly prepared reports to confirm that the extracted text field information is consistent with presentation of the same information in validated reports used in the ordinary course of business.

• **Validating from multiple fields**. In situations where values in the production dataset are calculated from several fields in the source database, responding parties can help make the extracted fields more easily validated by including not only the field containing a calculated result field value, but also the source field values from which the resultant values are calculated. Including this additional information would make it possible for both requesting and responding parties to check the internal consistency of the final result field.

• **Validating from multiple tables (relational databases)**. In relational databases, multiple tables of data are often linked by key values that are echoed on one or more tables. Extracted database information that has either been retrieved from or is being produced in multiple tables can be checked for accuracy and completeness by confirming that the linking key values from the various tables are consistent and sufficient to properly link the records from the various tables. Ambiguous key values - i.e., values that do not provide a unique relationship between correct data elements - can occur when information is extracted from multiple tables.

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 159 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

• **Validating from reports.** Finally, responding parties should not underestimate the ability of database reports in general to confirm the accuracy of a data extraction. Many standard reports that are used on a regular basis within an organization, including regulatory filings generated through queries or scripted tools, compile sophisticated information and metrics that can be used to double-check the accuracy and consistency of many types of data fields extracted from a database.

Authenticating exported database information builds on validation processes, and more than one procedure can be used to demonstrate sufficient consistency, completeness, and accuracy in the extracted data. However, situations can occur in which field values are different in the source database and in the extracted data. Typically, such differences are caused by mechanical issues, such as a report template that truncates the information in a field after the first N characters, thereby displaying only a partial entry that cannot be fully validated against the original database input. However, if these differences are not caught soon after the extracted data has been prepared and produced, the consequences of relying upon the extracted data can have far-reaching consequences. Both requesting and producing parties should consider adding quality assurance procedures to ensure that such errors are quickly identified.

## 5. Data Authenticity and Admissibility

**The proper validation of collection from a database does not automatically make the substantive information stored in the database authentic, admissible or true. These are separate issues that need to be analyzed by the appropriate decision makers.**

**\*213**  *Comment 5.A. Causes of Inaccuracy in Database Information*

Although businesses may rely on database data or reports in the ordinary course of business, the fact that data is derived from a database does not make it any more intrinsically reliable than other types of evidence produced in discovery. Databases, whether simple or complex, are not infallible. The "true" accuracy of the underlying data depends on many factors. Systems or components can malfunction, errors may occur in programs and formulas, manual data entry may introduce errors, and certain cells, fields or tables can be mislabeled or misinterpreted (e.g., a table of numbers reflecting a certain volume of widgets sold could pertain to either individual widgets or units of widgets, if values are not properly labeled or represented by a credible witness with knowledge). In addition, as mentioned previously, the way that certain fields within a database are used may change over time, meaning that old data records and new data records may use the same fields but record different information. Sometimes, current users of the database are not even aware of these changes.

While rare, it is also possible that a responding party or its counsel may have intentionally or unintentionally manipulated database output in a way that degrades the quality of the data being produced. Such degradation may take the form of data that lacks certain metadata fields that are integral to understanding the remainder of the information.[59]

*Comment 5.B. Standards for Admitting Database Information into Evidence*

Because the production of information extracted from databases may be composed of different elements - e.g., raw data, individual data cells, printed summary reports - the lack of consistency can make the process of authenticating the substantive content of this information a complex task. While there are currently no bright-line rules for authentication of database information, several opinions suggest that tests for admissibility of database information are becoming more stringent.[60] Discussion and application of the Federal Rules of Evidence are beyond the scope of this Commentary; however, *The Sedona Conference Commentary on ESI Evidence & Admissibility*[61] offers useful analyses of cases that reflect the various "evidentiary hurdles" that a proponent seeking to admit electronically stored information into evidence must clear.[62]

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 160 of 167

Across and even within jurisdictions, there is significant disparity between the most lenient and most demanding approaches for admitting database information as substantive evidence. While some of this disparity also may take into account proportionality considerations, parties seeking to make use of database information should be prepared to establish a rigorous foundation for this evidence. For the party that produced the database information, this may require calling one or more witnesses to trial **\*214** who can establish the foundation. For other parties, this may require deposing a representative of the producing party. While it may not require every single *Vinhnee* factor, [63] an evidentiary proffer of database information may require a witness who can explain the origins and lifecycle of the information in the ordinary course of business, as well as the procedures used to extract this data and prepare an exhibit of this information for trial. [64] Litigation-specific exhibits, as opposed to copies of reports or database views used in the ordinary course of business, are likely to draw special attention from both opponents and the presiding court, as validation procedures used to double-check business reports may not have been applied to litigation-driven work. Parties should consider reducing cost and saving trial time by stipulating to admissibility, where appropriate.

## 6. Form of Production

> **The way in which a requesting party intends to use database information is an important factor in determining an appropriate format of production.**

### Comment 6.A. *Discussing the Intended Reasonable and Legitimate Uses of Database Information Can Result in a More Useful Production Format*

While a requesting party is not required to divulge its counsel's work product or its litigation strategy, it may be impossible for a responding party to take appropriate steps to provide database information in a reasonably useful format if it has no idea of how the requesting party intends to use it. A requesting party's failure or refusal to identify the intended use of database information, especially upon request, may limit the responding party's ability to accommodate the format request, particularly where the responding party's preferred format is less expensive and appears *ex ante* reasonable. To maximize the value of the database information it will receive, a requesting party should provide detail sufficient to describe the tools or broad evidentiary use that it intends to make of this material. For example, a party's desire to review some database information in conjunction with witnesses' statements or testimony may make a database report the most useful way of receiving this information. Other times, a requesting party may wish to analyze or otherwise manipulate the database information to show relationships within the data. Disclosing the specific database or analytical engine that a requesting party intends to use - without revealing the precise type of analysis that will take place - enables the responding party to make reasonable efforts to accommodate the requestor's proportional, reasonable, and legitimate uses of the data, and thus better understand the technical specifications required for the production. To the extent that the parties cannot resolve questions of appropriate production format, this level of information also will facilitate a swift and appropriate decision by the court.

Like relevance, any assessment of a requesting party's stated "reasonable and legitimate use" of database information should provide sufficient latitude so that requesting parties can conduct their litigation as they generally see fit. However, the mere fact that databases contain large amounts of information does not permit a party to submit broad **\*215** discovery requests merely to satisfy idle curiosity or to use data beyond what is necessary to prosecute alleged claims and defenses.

### Comment 6.B. *Factors for Determining Reasonableness of Data Production Format*

Under Rule 34(b)(2)(E)(ii), if a requesting party does not specify the form of production, the data must be produced "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." And Rule 34(a) contemplates, "translation by the responding party into a reasonably usable form," "if necessary." The Committee Notes for the 2006 Amendments to Rule 34(b) explain that whether a responding party is required to convert information to a "more usable form, or should be required to produce it at all, should be addressed under Rule 26(b)(2)(B) [proportionality factors]." The Notes also make it clear that responding parties are not allowed to produce the information in a form "that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation."

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 161 of 167

Thus, Under Rule 34 and the accompanying 2006 Advisory Committee Note, the key factors for reasonableness of production format include whether there is any loss of information from the original format and whether the requesting party can make appropriate use of the database information. The Note also points to a third factor - proportionality (as measured under Rule 26 and its state analogs) - that also should be part of the analysis. A request for database information that requires a disproportionate amount of effort from the responding party should not be permitted, even if a lesser response does not provide the same degree of information access as would have the initial request. [65]

> *Illustration vii.* Requesting party seeks all of the invoice records of Company X's billing system from 2002-2006. The requesting party plans to use them as exhibits at trial, but it wants to easily search and find the specific invoices. Because the requesting party will not be using this database information to perform trend or other relational analysis, a searchable production of the invoices as fixed image files may be reasonably usable, provided sufficient searching information for the invoices is provided.

> *Illustration viii.* Requesting party seeks all of the invoice records of Company X's billing system from 2002-2006. The requesting party plans not only to use individual invoices as exhibits at trial, but it also wants to analyze aggregated invoice information by customer over time to see whether the Company has a pattern of double billing after the fourth invoice. Because the requesting party intends to use the data to undertake legitimate relational analysis, a fixed-imaged production may not be reasonably useable.

Producing database information in a reasonably usable form neither requires a responding party to produce it in a format that is the best or optimum format for the requesting party, nor ensures that such data requires little or no manipulation by a responding party. If the effort, ability, and cost to transform the data into a specific requested format are similar for both the requesting and responding parties, a strong argument can be made that the requesting party should bear the cost, so long as the initial production format was, in and of itself, reasonable.

> **\*216** *Illustration ix*. In a small-dollar contract dispute, the requesting party asks for invoice data stored in a database to be produced in table format with each row constituting a single invoice to a single customer. The responding party does not have direct access to the database and cannot easily run custom data extractions from the database. Instead, the responding party's built-in reporting script can create individualized invoices that contain identical data, but not in tabular form. The best technology available to the parties involves scanning invoices to manually create tables of information. The producing party argues that the requesting party should bear the cost of further manipulation of the data, as the production of searchable individualized invoices was reasonable, given the amount in controversy, the lack of information lost by the production format, and the equal burden for both requesting and responding parties.

## Footnotes

a1    Copyright 2014, The Sedona Conference. All Rights Reserved.

1     *See The Sedona Conference Cooperation Proclamation,* 10 SEDONA CONF. J. 331 (2009 Supp.), *available at* https:// thesedonaconference.org/download-pub/3802.

2     *The Sedona Conference Glossary: E-Discovery & Digital Information Management,* (4th ed.), 15 SEDONA CONF. J. 305 (2014) ("*The Sedona Glossary*"), defines a database as: "A set of data elements consisting of at least one file, or of a group of integrated files, usually stored in one location and made available to several users .... Computer databases typically contain aggregations of data records or files ...."

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 162 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

3    *The Sedona Glossary* defines structured data as: "Data stored in a structured format, such as databases or data sets according to specific form and content rules as defined by each field of the database."

4    *The Sedona Glossary* defines logical entity as: "An abstraction of a real-world object or concept that is both independent and unique. Conceptually, a logical entity is a noun, and its relationships to other entities are verbs. In a relational database, a logical entity is represented as a table. Attributes of the entity are in columns of the table and instances of the entity are in rows of the table. Examples of logical entities are employees of a company, products in a store's catalog, and patients' medical histories."

5    *The Sedona Glossary* defines text delimited file as: "A common format for structured data exchange whereby a text file contains fielded data where the fields are separated by a specific ASCII character and also usually contain a header line that defines the fields contained in the file."

6    *The Sedona Glossary* defines unstructured data as: "[F]ree form data which either does not have a data structure or have a data structure not easily readable by a computer without the use of a specific program designed to interpret the data; created without limitations on formatting or content by the program with which it is being created. Examples include word processing documents or slide presentations."

7    Although the email message content itself is unstructured, emails are accompanied by metadata in assigned fields, including, but not limited to, the sender, recipient, date, and time. The message content and metadata elements are stored together in an email database system, comprising an email record. The email database system stores individual email records, imposing the same storage format across all individual email records.

8    This description of a database with its structured data should be distinguished from the term "data compilation," introduced in the 1970 amendment to Rule 34 the Federal Rules of Civil Procedure, long before the advent of the desktop PC and off-the-shelf database software. That term was intended to encompass all of what we think of today as "electronically stored information," and was occasionally used by courts interchangeably with the term "database," even though the "records" in such "databases" may have included unstructured data. *See, e.g., Fauteck v. Montgomery Ward & Co.*, 91 F.R.D. 393 (N.D. Ill. 1980) (machine-readable employment records).

9    Note that if a text delimited file is produced and the format does not have column headings, then it is also generally necessary to produce metadata to explain the fields in the text file.

10   *See,* Database Principle 2, Accessibility and Proportionality.

11   *The Sedona Glossary* defines index as: "Database fields used to categorize and organize records. Often user-defined, these fields can be used for searching for and retrieving records."

12   *See, e.g., Soto v. Genentech, Inc.*, 2008 WL 4621832 (S.D. Fla. Oct. 17, 2008) (producing party failed to provide sufficiently detailed information to support its burdensomeness argument as to the time and effort required to compile certain relevant information stored in databases). *See also*, *FDIC v. Brudnicki*, No. 5:12-cv-00398-RS-GRJ, 2013 WL 2948098 (N.D. FL, Panama City Division, June 14, 2013) (rejecting the argument that proposed database search protocol requiring parties to collaborate in creating search terms was unduly burdensome and permitting modest cost-shifting consistent with traditional paper cost-shifting).

13   *The Sedona Principles Addressing Electronic Document Production*, (2d ed. 2007) https://thesedonaconference.org/download-pub/81.

Case 4:21-cv-02473 Document 156-3 Filed 07/17/25 in TXSD Page 163 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

14 Ongoing preservation is not only of historical information that pertains to certain conditions, but also of any new information coming into the system pertaining to those same conditions.

15 *See, e.g.*, *Chen-Oster v. Goldman Sachs & Co.*, No. 10 Civ. 6950(AT)(JCF 2013 WL 3009489 (June 18 2013) (finding information in data fields are communications subject to attorney-client privilege and denying motion to compel until plaintiff could offer evidence of a waiver).

16 *The Sedona Conference Commentary on the Protection of Privileged ESI,* 2014)

17 *See, The Sedona Conference Framework for Analysis of Cross-Border Discovery Conflicts,* (2008) https:// thesedonaconference.org/download-pub/67.

18 For additional guidance, *see also The Sedona Conference Commentary on Legal Holds: The Trigger & The Process,* 11 SEDONA CONF. J. 265 (2010); *The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 14 SEDONA CONF. J. 155 (2013).

19 JAY E. GRENIG & WILLIAM C. GLEISNER, EDISCOVERY & DIGITAL EVIDENCE § 7.18 (2008) (finding that the scope and format of preservation as it relates to structured data is not straightforward, as the data is generally composed not only of the individual pieces of data, but also a method of interconnecting such data); *Paul v. USIS Commercial Servs., Inc.*, 2007 WL 2727222, slip op. at *1 (D. Colo. Sept. 17, 2007) (court declines to shift $292,000 in preservation costs after the parties failed to agree to narrow the scope of database discovery); *see also* Thomas Y. Allman, *Managing Preservation Obligations After the 2006 Federal E-Discovery Amendments,* 13 RICH. J. L. & TECH. 9, at § 46 (Spring 2007) (When data is automatically and frequently overwritten, "preservation obligations can be difficult or impossible to execute.").

20 The Federal Rules Advisory Committee noted in 2005 that "many database programs automatically create, discard, or update information" ... and "that suspending or interrupting these features can be prohibitively expensive and burdensome." *Id.* (internal citations omitted).

21 13 RICH. J.L. & TECH. 9, *supra*, at § 48 (proposing to battle the problem of preserving continuously changing data in on a database by running and recording queries of the database at certain periods of time).

22 *See, e.g., Playboy v. Welles,* 60 F. Supp. 2d 1050 (S.D. Cal. 1999) (discussing factors to consider before ordering shutdown of producing party's online business to harvest potentially responsive ESI).

23 *See, e.g., Linnen v. A.H. Robins Co.,* 1999 WL 462015 (Mass. Super. 1999) (adverse inference jury instruction appropriate where responding party violated ex-parte order to preserve back-up tapes).

24 Producing reports from databases in lieu of production of the database itself is supported by Fed. R. Civ. P. 34(b)(2)(C)(iii): "A party need not produce the same electronically stored information in more than one form." But at least one court has held otherwise. *Margel v. E.G.L. Gem Lab Ltd.*, 2008 WL 2224288, at *5 (S.D.N.Y. May 29, 2008) ("[I]t appears that EGL-USA's only objection is that the database is redundant of the information that has already been produced. I do not find that objection to be persuasive in light of the fact that information maintained in an electronic database is necessarily in a form that is not identical to a report prepared on the basis of that data and should, therefore, ordinarily be produced."). The court in *Margel* did not cite Rule 34 for this proposition, and instead cited a case that ordered a party "to produce paper and electronic copies of same documents."

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 164 of 167

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

25    See *In re Ford Motor Co.*, 345 F.3d 1315 (11th Cir. 2003) (stating that the responding party's choice to review database and produce only those relevant portions was adequate discovery response absent specific evidence to the contrary).

26    *Maggette v. BL Dev. Corp.*, 2010 WL 3522798 (N.D. Miss. Sept. 2, 2010) (inability of a party to retrieve relevant information from one or more of its databases over the course of five years, required the appointment of a special master).

27    See *Arthur Andersen LLP v. U.S.,* 544 U.S. 696, 704 (2005) (endorsing business practice of routine records destruction).

28    *Jones v. Goord*, 2002 WL 1007614 (S.D.N.Y. May 16, 2002) *claim dismissed*, *Jones v. Goord*, 435 F. Supp. 2d 221, 266 (S.D.N.Y. 2006).The court described the interconnected and interrelatedness of the data as follows:

      [T]he databases in question are not simply collections of lists or numbers that can be easily extracted and correlated with other numbers; rather, each of the requested databases has been constructed to support the interactions of hundreds of concurrent users rather than to support the analytical activities of a few. Consequently, the databases are integrally connected to a data system that comprises 25 separate but interdependent subsystems that each are comprised of scores of programs, tens of databases and scores of screen and report formats. There are over 3,000 programs containing a total of 1,500,000 lines of program instructions.

      *Goord*, 2002 WL 1007614, at *10 (internal quotations and citations omitted).

29    See *Static Control Components, Inc. v. Lexmark Int'l*, 2006 WL 897218, at *4 (E.D. Ky. Apr. 5, 2006) ("The Federal Rules do not permit Lexmark to hide behind its peculiar computer system as an excuse for not producing this information to SCC."); *In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 360526, at *2 (N.D. Ill. June 15, 1995) (Producing party cannot shift discovery costs to class action plaintiffs where "the costliness of the discovery procedure involved is ... a product of the defendant's record-keeping scheme over which the [plaintiffs have] no control."); *see also* *Dunn v. Midwestern Indemnity*, 88 F.R.D. 191, 197-98 (S.D. Ohio 1980); *Kozlowski, PPA v. Sears, Roebuck and Co.*, 73 F.R.D. 73, 76 (D. Mass. 1976).

30    It should be noted that a responding party is never obligated to produce non-relevant information. *See,* Section III. A. Comment 1.F, *infra*.

31    *See, e.g.,* *OpenTV v. Liberate Tech.*, 219 F.R.D. 474, 475 (N.D. Cal. 2003) (in software patent infringement suit, responding party offers to grant requesting party access to its extensive source code database, but court orders parties to share cost of data extraction).

32    *In re Ford Motor Co.,* 345 F.3d 1315, *supra*.

33    *Id.* at 1316-1317.

34    *Id.* at 1317.

35    *Id. See also* *Cummings v. General Motors Co.,* 2002 WL 32713320 (W.D. Okla. June 18, 2002); *Butler v. Kmart Corp.*, 2007 WL 2406982, at *3 (N.D. Miss. Aug. 20, 2007); *but see* *Qualcomm, Inc. v. Broadcom Corp.*, 2007 WL 935617 (S.D. Cal. Mar. 13, 2007) (to resolve discovery dispute over search terms applied to a proprietary Oracle database, the Court ordered the responding party to provide the requesting party access to a full version of the database, including the same search capability and client tools used by producing party engineers, along with a one-hour live training tutorial and written instructions on how to use the search tools).

Case 4:21-cv-02473   Document 156-3   Filed 07/17/25 in TXSD   Page 165 of 167

36    In several instances, courts have held that databases should be produced in native format. *See, e.g., In re NVMS, LLC,* 2008 WL 4488963, at *1 (Bankr. M.D. Tenn. Mar. 21, 2008); *Covad Commc'ns Co. v. Revonet, Inc.,* 258 F.R.D. 5 (D.D.C. 2009). Compare with *Coquina Investments v. Rothstein,* N. 10-60787-civ, 2012 WL 3202273 (S.D. FL, Aug. 3, 2012) (finding that counsel should have produced a requested document in native format to preserve its original qualities but declining to award sanctions) and *In re Facebook PPC Advertising Litigation,* No. C09-03043 JF(HRL) 2011 WL 1324516, N.D. Cal, San Jose Division, Apr. 6, 2011) (ordering parties to meet and confer regarding an alternative to producing a proprietary database storage format when a PDF printout of the database did not show data fields, hence the database was not produced as it appears).

37    *See, e.g., Bob Barker Co. v. Ferguson Safety Prods.,* 2006 WL 648674, at *4 (N.D. Cal. Mar. 9, 2006) (declining to order production of financial services database responsive to discovery request because "it is unclear how a party could go about producing 'a database,' which ordinarily is a dynamic collection of data that changes over time").

38    *Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland Sec.,* 255 F.R.D. 350, 354 (S.D.N.Y. 2008).

39    *Id.* at 356.

40    The authors also wish to call the readers' attention to *The Sedona Conference Commentary on Proportionality in Electronic Discovery* for useful guidance applicable to database discovery. *See The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 14 SEDONA CONF. J. 155 (2013).

41    *See, In re Lowe's Companies, Inc.,* 134 S.W.3d 876 (Tex. App. 2004) (granting mandamus and vacating trial court's order for retail chain to produce database for query by requesting party without any limitations as to time, location, or subject matter); *Ex parte Wal-Mart, Inc.* 809 So.2d 818 (Ala. 2001) (mandamus granted in part to restrict requesting party's access to retail chain's incident reporting database to similar incidents only). *See also, Barnes v. District of Columbia,* 289 F.R.D. 1 (D.C., Sept. 28, 2012) (granting motion to compel search algorithm because a query used to search a database and generate reports is a "writing" subject to production, but denying request to access entire database as overbroad).

42    *See, e.g., Bob Barker Co. v. Ferguson Safety Prods.,* 2006 WL 648674, at *4 (N.D. Cal. Mar. 2006) (declining to order production of financial services database responsive to discovery request because "it is unclear how a party could go about producing 'a database,' which ordinarily is a dynamic collection of data that changes over time").

43    *See Ex parte Wal-Mart, Inc.,* 809 So.2d 818, *supra.*

44    *Aguilar, supra,* at 356.

45    *Supra* note 16.

46    *Aguilar, supra,* at 354-55, quoting *Williams v. Sprint/United Mgmt. Co.,* 230 F.R.D. 640, 647 (D. Kan. 2005).

47    *Aguilar, supra,* at 363.

48    *See,* Section I.B., *supra,* for definitions.

49    *See,* Section I.E. Instead of being exact duplicates of existing data tables, the information is typically compiled from multiple tables (a "denormalized view") and includes fewer than all fields or records stored in a given table (a "selective view") - thus providing a variant but useful view of the data stored in the system.

50    Rule 26(b)(2)(B) places specific limitation on the production of ESI. "A party need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost." *Id.* Additionally, a court on motion or on its own, must limit the scope of discovery if the discovery sought is unreasonably cumulative or duplicative, can be obtained from a more convenient source, could have been previously obtained by the party seeking the discovery or the burden or expense of the proposed discovery outweighs its likely benefit. Rule 26(b)(2). *See also The Sedona Conference Commentary on Preservation, Management and Identification of Sources of Information that are not Reasonably Accessible,* 10 SEDONA CONF. J. 281 (2009) and *The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 14 SEDONA CONF. J. 155 (2013).

51    *OpenTV v. Liberate Tech.*, 219 F.R.D. 474 (N.D. Cal. 2003) (court applies *Zubulake* factors to determine reasonable accessibility of source code database and allocation of data extraction costs); *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567 (D. Minn. 2007) (discovery of database denied when information sought was no longer in a searchable format, and database would have to be restored from original sources at a cost of at least $124,000 with a monthly storage cost of $27,823).

52    *See Superior Prod. P'ship d/b/a/ PBSI v. Gordon Auto Body Parts Co., Ltd.*, 2008 WL 5111184 (S.D. Ohio Dec. 2, 2008) (where plaintiff requested production of large volume of relevant documents and where deposition witness indicated that the information would not be easily retrieved from defendant's electronic database, court recognized potential burden to defendant and ordered production of sampling of documents to allow for determination of the need to produce the rest).

53    Before even turning to the question of the burden and expense of *producing* information from a database, the party in possession of the database must weigh the burden and cost of *preserving* the database information (both its structure and its contents, the preservation of which are not always accomplished through the same means), against the likely importance of the information in resolving the issues in the case. *See,* Rule 26(b)(2)(C)(iii). *See* the discussion of Sedona Principle 5 *supra* at II.B. For additional guidance, *see The Sedona Conference Commentary on Legal Holds: The Trigger & The Process,* 11 SEDONA CONF. J. 265 (2010), *supra*; *The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 14 SEDONA CONF. J. 155 (2013), *supra.*

54    *Jones v. Goord*, 2002 WL 1007614 (S.D.N.Y. May 16, 2002), *claim dismissed*, *Jones v. Goord*, 435 F. Supp. 2d 221, 266 (S.D.N.Y. 2006) (denying plaintiffs' motion to compel production of database maintained by the New York State Department of Correctional Services where the state made a compelling showing that the burden of production far outweighed its benefits).

55    The reverse problem occurs when data from a legacy system or from a time before the implementation of preservation efforts exist solely in "report" format and not in the original database structure format. It may be unduly burdensome for the producing party to restore that data to the original format. Indeed, if the data is maintained only in report format in the ordinary course of business, there may be no obligation at all to convert the data into an alternate format.

56    *See Zubulake v. UBS Warburg LLC* (*"Zubulake I"*) 217 F.R.D. 309, 321-22 (S.D.N.Y. 2003); *The Sedona Conference Commentary on Preservation, Management and Identification of Sources of Information that are not Reasonably Accessible* (2009), *supra.*

57    *Zubulake,* 217 F.R.D. 309, *supra.*

58    However, a responding party is not obligated to run test queries and provide sampling information to requesting parties to satisfy curiosity. For example, when a responding party reasonably believes that a database or other structured data

THE SEDONA CONFERENCE DATABASE PRINCIPLES..., 15 Sedona Conf. J. 171

Case 4:21-cv-02473    Document 156-3    Filed 07/17/25 in TXSD    Page 167 of 167

source contains no relevant information, it should not be obligated to sample the system absent particularized and credible evidence to the contrary. *See* Principle 6: Responsibilities of Responding Parties, *supra,* at II.C. *See The Sedona Conference Commentary on Achieving Quality in E-Discovery*, 15 Sedona Conf. J. 265 (2014) and *see The Sedona Conference Cooperation Proclamation,* 10 SEDONA CONF. J. 331 (2009 Supp.).

59    *See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 585-87 (M.D. Fla. 2009) (reviewing case law for proposition that production of static TIFF images of email from database, stripping all metadata fields, violated Rule 34, *vacated in part*, 2009 WL 5606058 (M.D. Fla. Nov. 16, 2009) (reversing Magistrate Judge's finding that attorneys had acted in bad faith).

60    *See, e.g.*, *In re Vee Vinhnee*, 2005 WL 3609376, 06 Cal. Daily Op. Serv. 146, 2006 Daily Journal D.A.R. 169 (B.A.P. 9th Cir. Dec 16, 2005) (detailing factors that impact admissibility of database information); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007).

61    *The Sedona Conference Commentary on ESI Evidence & Admissibility,* 9 Sedona Conf. J. 217 (2008).

62    One 9th Circuit opinion, *U-Haul Int'l, Inc. v. Lumbermens Mutual Casualty Co.,* 576 F.3d 1040 (9th Cir. Aug. 12, 2009), affirmed a more lenient standard in analyzing the district court's admissibility of computer-generated summaries of payments made on insurance claims. Finding that such summaries were properly admitted, the appellate court focused primarily on the four basic steps of the business records exception to hearsay under Fed. R. Evid. 803(6): (1) the underlying data was entered into the database at or near the time of each payment event; (2) the persons who entered the data had knowledge of the payment event; (3) the data was kept in the course of Republic Western's regularly conducted business activity; and (4) the claims manager was qualified and testified as to this information. 576 F.3d. at 1044-45.

63    *In re Vee Vinhnee*, *supra*.

64    *Santander Consumer USA, Inc. v. Superior Pontiac Buick GMC, Inc.* No. 10-13181, 2012 WL 5363553 (E. D. Mich, Oct. 30 2012) (rejecting argument that database records are inadmissible hearsay where a party does not own the database and finding that the plaintiff presented a witness who was familiar enough with the database system and record-keeping process to satisfy Rule 803(6)). Contrast with *Meyer Corporation U.S., v. Alfay Design*s, No. CV 20103647(CBA) (MDG), 2012 WL 3536987 (E.D. N.Y. Aug. 13, 2013) (imposing sanctions on a party who, despite knowing the depth of technical knowledge required for a deponent, produced an employee who could not even answer basic questions about the database system and retention policies).

65    *See The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 14 SEDONA CONF. J. 155 (2013).

15 SEDCJ 171

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.