**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE CONCHO RESOURCES INC., SECURITIES LITIGATION | Case No. 4:21-cv-02473 |

**REPLY OF CLASS REPRESENTATIVES IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DEFENDANT CONCHO RESOURCES, INC.'S ARIES DATABASE**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

ARGUMENT.....................................................................................................................2

I.     The Requested Databases Are Directly Relevant to the Case ..............................................2

II.    Producing the Databases Is Not Disproportionately Burdensome......................................6

III.   Defendants Have Not Produced Anything to Date That Can Substitute for the Requested Discovery ...................................................................................................13

CONCLUSION.................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................................................4

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
    2004 WL 5278716 (E.D. Tex. June 16, 2004) ....................................................4

*Lymphedema & Wound Care Consultants of Am., Inc. v. Health Care Serv. Corp.*,
    2022 WL 209562 (N.D. Tex. Jan. 24, 2022) .....................................................13

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*,
    322 F.R.D. 235 (N.D. Tex. 2016) ...............................................................13, 15

*ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*,
    2008 WL 11348342 (E.D. Tex. Oct. 3, 2008) ....................................................2

*In re SolarWinds Corp. Sec. Litig.*,
    595 F. Supp. 3d 573 (W.D. Tex. 2022) ..............................................................4

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..........................................................................4, 5

*Weinhoffer v. Davie Shoring, Inc.*,
    23 F.4th 579 (5th Cir. 2022) .............................................................................16

**Rules**

Fed. R. Civ. P. 26....................................................................................................2

Fed. R. Civ. P. 34...............................................................................................6, 13

Fed. R. Evid. 901 ..................................................................................................16

**Other Authorities**

Federal Communications Commission, www.fcc.gov/general/charts-measuring-broadband-america...............................................................................................12

Fifth Circuit Pattern Jury Instructions (Civil) § 7.1 (2020) ...................................2

Spectrum Business Bundles - Internet, Phone, TV and Mobile Promos,
    www.spectrum.com/business/internet .............................................................12

ii

## INTRODUCTION

Class Representatives hereby submit this reply in support of their Motion to Compel, filed in this action on June 26, 2025 as ECF No. 146 ("Motion").

Defendants' theatrical Opposition[1] creates the grossly inaccurate impression that Class Representatives are moving to compel unnecessarily voluminous or duplicative productions. But terms like "unrestricted access," "free rein," and "forensic examination" are mere hyperbole. Opp. at 2, 7, 9. Class Representatives' request is strictly limited to: (1) the database files that tie to the final reserve reports by third party auditors Netherland, Sewell & Associates ("NSAI") and Cawley, Gillespie and Associates, Inc. ("CGA") for 2017, 2018, and 2019 which were transmitted in the requested form between Concho and its auditors; and (2) Concho's corporate databases that tie to Concho's final budgets and plans in 2017, 2018, and 2019.[2] Appendix A, attached hereto, identifies the reports for which Class Representatives are requesting the corresponding database files.[3] This should eliminate any doubt or confusion as to which files which must be produced.[4]

---

[1] References to the "Opposition" or "Opp." are to Defendants' Response to Class Representatives' Motion to Compel Defendant Concho Resources Inc.'s ARIES Database (ECF No. 156).

[2] All of the requested documents are from within the August 1, 2017 to February 19, 2020 timeframe Defendants invoke. Opp. at 6 n. 5. To ensure a correct record, however, Class Representatives emphasize that this temporal limitation was part of an agreement reached specifically in connection with Class Representatives' First Set of Requests for Production, which were served in October 2023. Fact discovery properly extends beyond this period, and Class Representatives reserve the right to request supplementation where Defendants' discovery responses and document productions artificially exclude relevant discovery from outside this window.

[3] Class Representatives identified the documents listed herein as the likely final versions of the relevant plans and budgets. The Court should order the parties to confer and work together to ensure this list is complete and all of the documents listed are in fact final versions. Note that the three year-end reserve reports are not included in Appendix A, as Defendants appear to understand exactly what they are. Class Representatives reserve the right to add documents to this list to the extent Defendants' productions make clear that additional databases are needed.

[4] Each of the documents in Appendix A was reviewed by management. The figures in these documents were calculated based on Aries data. Given the importance of these documents to the Company, the databases associated with the data in these presentations should have been backed up, assuming Concho was acting in compliance with standard industry practice, as explained herein and in the accompanying Declaration of Stephen Hudson ("Hudson Decl.") at Item 6(b), attached hereto as Exhibit A. As such, identifying the correct databases should not require a blunt trial and error approach like downloading each and every iteration of the Aries database from the entire relevant period. Instead, Defendants should be able to search their backup folders by date and name to identify the correct databases. At the least, by applying date and name filters, Defendants should be able to cull the number of relevant databases to a substantially smaller set, which they can then test and verify.

At bottom, the Opposition is bluster, furtively seeking to conjure non-existent burden. The underpinning of Defendants' argument seems to be that Defendants need not comply with Class Representatives' proper discovery request for the simple reason that they have already produced a lot of documents. But this argument works ***against*** Defendants. The spirit of Rule 26 is betrayed when defense counsel delivers a disorganized document dump at the scale of Defendants' productions. *See ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*, 2008 WL 11348342, at *2 (E.D. Tex. Oct. 3, 2008) ("[A] party may not frustrate the spirit of the discovery rules—open, forthright, and efficient disclosure of information potentially relevant to the case— by burying relevant documents amid a sea of irrelevant ones."). Here, Defendants do not need to produce ***more*** materials; they need to produce and identify the ***right*** materials.

**ARGUMENT**

**I.      THE REQUESTED DATABASES ARE DIRECTLY RELEVANT TO THE CASE**

The Motion explained that the Aries files are relevant to two elements of a Section 10(b) claim: falsity and scienter. Defendants have not defeated either argument.

***Falsity***: Damningly, Defendants completely ignore the "falsity" aspect of the claims, pretending that falsity is somehow a sub-element of scienter. Opp. at 2. But Defendants know well that falsity and scienter are discrete elements that are assessed independently. *See* Defendants' Motion to Dismiss Amended Complaint, ECF No. 219 at 10 (outlining elements of a Section 10(b) claim) and generally (separately addressing falsity and scienter). Indeed, it is hornbook law that a jury (or a court considering a summary judgment motion) must consider each element of the claim independently. Here, any reasonable jury instructions would require the jury to first assess falsity.[5] Defendants ignore the falsity element for a reason: they cannot seriously deny the relevance of the

---

[5] *See* Fifth Circuit Pattern Jury Instructions (Civil) § 7.1 (2020).

2

requested Aries files, which contain Concho's type curve assumptions, to the falsity of statements such as "we have built our type curves and our internal modeling based upon the results we have seen here." ¶262. Defendants' relevance argument fails for this reason alone.

*Scienter*: With respect to scienter, Defendants baldly misconstrue Class Representatives' allegations and bedrock Fifth Circuit Law.

Defendants insist that the files cannot support scienter because the Individual Defendants purportedly did not access them. Opp. at 1; ECF No. 156-2, Declaration of Eric Angelos ("Angelos Decl.") at Item 6. Of course, were this true, the Individual Defendants could easily have produced their own declarations saying as much. Tellingly, Defendants rely instead on a low-level employee, Eric Angelos. Angelos never claims he had any interaction with the Individual Defendants and offers no basis for any knowledge of what they did or did not access during the Relevant Period.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Thus, Aries figures directly reflect Defendants' knowledge and influence, whatever Defendants might say to the contrary.

Moreover, Defendants brazenly dismiss the Court's prior holding on scienter. After carefully applying a thorough scienter analysis, this Court expressly found that the Complaint's allegations support the scienter of the Concho, Leach, Harper, and Giraud. ECF No. 43. Amongst the Complaint's allegations that the Court upheld is the allegation that the Individual Defendants had access to Aries and reviewed projections that they understood (and Defendants now admit, Opp. at 10) were based on data derived from Aries. Motion at 7; ECF No. 38 at 43 adopted at ECF

No. 43. Thus, to the extent Defendants had questions about type curves, projections, or performance they would or should have requested backup from Aries. These allegations are precisely borne out by discovery. Motion at 6-7. To be clear, the Complaint never alleged that the Individual Defendants regularly "huddle[ed] around a computer" to conduct their own Aries analyses, as Defendants now suggest would be necessary. Opp. at 10. Were this the requisite scienter standard, no Section 10(b) action would ever survive. *See In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) ("[T]here will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter ... suffice."). Thus, if the Aries files suggest the statements were inaccurate, as Class Representatives are confident they will, these files will be critical evidence of Defendants' scienter.[6]

Furthermore, Defendants wildly misconstrue the law on scienter in the Fifth Circuit with respect to the relevance of non-speaker executives' knowledge. Opp. at 11-12. At the summary judgment stage, Class Representatives will explain in full the inaccuracies in Defendants' arguments. Opp. at 11-12. Most problematically for Defendants, the one Fifth Circuit case they muster supports precisely Class Representatives' argument. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (holding that scienter can be imputed to a corporation from an individual defendant or individuals who "order or approve it or its making or

---

[6] Shockingly, the Opposition seems to admit that Defendants did not consult Aries before making the alleged misstatements, including the statements about Concho's type curves. Opp. at 10. That admission alone is sufficient to prove that Defendants acted with scienter, *i.e.*, severe recklessness, because Defendants made detailed statements about Concho's type curves, thereby holding themselves out as knowledgeable on the topic without having reviewed the data. *See e.g.*, *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 584 (W.D. Tex. 2022) (finding severe recklessness where defendant held himself out as a "responsive and knowledgeable authority" on a specific topic by addressing the topic publicly without detailed knowledge of the topic); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (finding severe recklessness if defendant touted safety improvements without paying special attention to safety efforts). To the extent Defendants intend to imply they relied on lower-level employees to keep them up to speed on the status of Concho's type curves in Aries, the databases containing the type curves, which those lower-level employees would have accessed, remain critically relevant.

issuance, or who furnish information or language for inclusion therein, or the like"). Defendants' selective omission of critical language from *Southland* is barely surprising but thoroughly dooming. Opp. at 9.

Last, Defendants' reliance on FE-1's testimony is misplaced. Opp. at 9. ████████

---

[7] Defendants cite testimony from other depositions in an effort to prove that other individuals also neglected to access the database. Opp. at 11 n. 8. These efforts are dubious. ████████

[8] Judge Sheldon also found that evidence that Concho knew Dominator would be too tight because the area had already been heavily drilled supported scienter. ECF No. 38 at 42-43. These allegations would likewise be substantiated by

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ Such allegations were sufficient to withstand a

motion to dismiss. To pinpoint the riskiness for a jury or a summary judgment motion, however,

and to assess the riskiness of certain less extreme but still highly experimental projects, Class

Representatives must review the actual risk percentages associated with the wells, not merely the

four broad categories. Thus, the spreadsheet excerpt reproduced in the Opposition is completely

insufficient at this stage for assessing the projects' true risk profiles. Opp. at 10.

## II.    PRODUCING THE DATABASES IS NOT DISPROPORTIONATELY BURDENSOME

At the threshold, Defendants' arguments on proportionality fail because they deliberately

misconstrue the scope of the requested discovery. Far from "an entire unstructured database,"

Class Representatives actually seek the discrete set of Access or .bak files corresponding to

specific, critical reports. This request is clearly proportionate to the needs of the case and does not

impose any undue burden. Nevertheless, Defendants resort to case law holding only that granting

access to *all* of a company's files is somehow improper. Opp. at 13. None of this law is relevant

because the discovery sought here is clearly limited to specific files.[9]  The Opposition's excerpt

---

the ARIES files, which tracked nearby wells and were used for simulations. Oddly, Defendants chose not to depose FE-2 or FE-8, who supported these allegations, or any other confidential witness excepting FE-1.

[9] Regardless, these cases would be inapposite. In *Nicholas J. Murlas Living Tr. v. Mobil Oil Corp.*, the allegations regarded just one site, and data from other locations was irrelevant. 1995 WL 124186, at *5 (N.D. Ill. Mar. 20, 1995). Here, the allegations regard spacing issues across Concho's asset base. In *Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.*, the scope of requested access covered "all digital data and analytical tools related to Defendants' business presence online," which is far in excess of even a request for Concho's full Aries database, and the connection between the requested discovery was "unduly vague." 2022 WL 2316228, at *2-3 (N.D. Ill. June 28, 2022). Here, there is no serious dispute that the Aries files contain data going to the core of Class Representatives' allegations, including type curves, spacing data, and production data. *In re Ford Motor Co.*, meanwhile, directly supports granting Class Representatives motion, holding that "Rule 34(a) allows a requesting party to inspect and to copy the product— whether it be a document, disk, or other device—resulting from the respondents' translation of the data into a reasonably usable form." 345 F.3d 1315, 1316-17 (11th Cir. 2003). Moreover, the data compilations at issue in these

6

from the Sedona Principles is even more off base. Opp. at 13-14. The Sedona Principles express concerns about granting access to privileged information and the potential for compromising the database's reliability. *Id.* Class Representatives are not requesting direct access to a live database that is currently in use, and Defendants nowhere claim that the Aries data is privileged (nor could they). Thus, these concerns are entirely moot.

Defendants argue that Class Representatives' request is disproportionate because "the Aries database contains confidential proprietary business information that remains highly sensitive to ConocoPhillips's operations in the Permian Basin today." Angelos Decl. at Item 5. This makes no sense where Defendants also argue that ConocoPhillips does not use Aries as its primary database and that few people at ConocoPhillips even know how to use the software. Angelos Decl. at Items 12-13. Clearly, the data contained in the Aries databases pre-dates the 2021 merger with ConocoPhillips and is undeniably stale. Furthermore, if the data truly were so important, surely ConocoPhillips employees would know how to access it. Damningly, Defendants are emphatic that they already produced multiple outputs that contain the requested data. Angelos Decl. at Item 8. Surely, if the data contained in the requested files was "highly sensitive" to ConocoPhillips's current operations, Defendants would not have produced any of these files—unless, that is, the Excel outputs are not actually equivalent to the Aries files as Defendants claim. Moreover, even if the files did have confidential information that was current, the Parties have a confidentiality order in place that will protect Defendants. Class Representatives will take care, as they have throughout the action, to protect Defendants' purportedly confidential information.

Separately, Defendants represent that the burden of identifying, verifying, and downloading the requested files outweighs their relevance. This burden is vastly exaggerated.

---

cases appear to be live databases that were still in use. Here, as explained further, all of the data that would be included in the requested files is long stale.

Defendants state that Aries was not a static database and "determining what the data in Aries was at any particular point in the past by running a query or report, for example, is not possible today." Angelos Decl. at Item 7. But Class Representatives are not requesting random versions of the database. They are requesting the specific versions that tie to critical reports. It is inconceivable that Defendants did not back these up or "put them into exportable form." Angelos Decl. at Item 14; Exhibit A, Hudson Decl. at Items 6(b-c). Similarly, Defendants argue that there are likely various iterations of the "plans" and "budgets." Angelos Decl. at Item 14. A red herring. Class Representatives are requesting the versions that tie to the final plans and budgets, archived or backed up versions of which should certainly exist.

In short, to comply with Class Representatives' request, Defendants will need to (a) identify the correct databases, (b) confirm the databases are the correct ones by assuring they can tie to the documents listed in Appendix A, (c) download the documents, and (d) produce the files. None of these steps is unduly burdensome.

***Identifying the documents***: The burden Defendants describe assumes Defendants would need to download and run each and every variation of the database that ever existed. That is wrong. The Aries files Class Representatives request correspond to year-end reserves and critical presentations made to management. There is no dispute that these reports were based upon Aries data. Class Representatives understand that the default settings for Aries outputs include a caption in the upper right corner of the outputs, which indicate the scenarios and settings used to generate them. *See* Ex. E (image with caption), Ex. A, Hudson Decl. at Item 6(e). Defendants should have access to these outputs and could use them to identify the most likely databases, which they could then test and run.

Furthermore, given the importance of the reports at issue, it is simply unbelievable that Concho would not have backed up the corresponding Aries files or saved the details necessary to access them.[10] ██████████████████

████████████████████████████████████

████████████████████████████████████

*See e.g.*, Ex. F, WARCOP02081365. Defendants can search their backup files by date to significantly limit the number of files to be searched. Unless Concho destroyed its backup files and any files pointing to the correct databases, Defendants can filter their backup files by data to significantly cull the number of files to be searched.[11]

Last, Defendants are certainly in the best position to know other details about how Concho utilized the database that would further limit the number of files to be searched. For example, Defendants are in the best position to know the names of the individuals who would have created and saved the relevant runs and the nomenclature Concho used for identifying the relevant scenarios and settings. Each of these factors could be used to further hone the search parameters and substantially decrease the number of outputs or iterations to be searched. By honing the search parameters by date, settings, creator, et cetera, Defendants can exponentially limit the number of potentially correct database scenarios.

---

[10] It is correct that individual engineers could run their own settings at any point to test specific things or yield specific outputs. However, the settings that would allow the databases to tie to the critically important year-end reserves and presentations that were made directly to Concho executives would certainly have been saved to the system so that they could be re-run multiple times and quality controlled. If these settings were not saved, that speaks volumes about Concho's severely reckless operations during the relevant period and the falsity of the alleged misstatements.

[11] These facts leave Defendants in a bind. On the one hand, if the backups did exist and were later deleted, Defendants have spoliated critical evidence and Class Representatives should seek adverse inferences in their favor or even sanctions. On the other hand, if the backups do exist, Defendants can easily use these backups to test that the requested files "tie" to Concho's reserves reports and management presentations and then turn over the files to Class Representatives. A burdenless process.

Indeed, if Defendants actually wanted to locate the correct files and made a good-faith effort to do so, the search process would not be anything close to as cumbersome or time-consuming as Defendants describe. By contrast, for Class Representatives to locate the relevant data on their own without Defendants' knowledge and access to outputs and backups would truly be prohibitively difficult, particularly since Defendants can provide no assurance that the relevant data is even present in the existing productions.

***Verifying the documents***: To verify that the files Defendants identify are indeed the correct ones, a Concho employee would merely need to select the most likely settings and "run" the program. Based on review of certain Access files produced by third parties, Class Representatives informedly estimate that each relevant file is approximately 1 gigabyte ("GB") or less. Running a 1 GB file takes approximately one hour. *See* Ex. A, Hudson Decl., Item 6(f). Given that Defendants should only be running a substantially limited number of scenarios, the total process should not take more than one week of largely hands-off work by one person (but likely significantly less time than that). *Id*. Defendants state that Concho has approximately four to six employees who are competent in Aries and could run these searches. Angelos Decl., at Item 13. This number is far more than sufficient.

Importantly, any engineer or engineering technician who worked with Aries or any of its software's competitors during or around the relevant period should be able to easily identify the likely settings necessary to tie the database to the documents listed in Appendix A because Concho's Aries databases contain drop-down menus with limited numbers of settings, as depicted in the screenshot attached as Exhibit G. *See* Ex. G (screenshot), Ex. A. After selecting the correct settings, the employee would simply compare the output figures with the totals in the reserves reports or budgets to ensure they are the same. See Ex. H (side-by-side comparison of Aries output

10

and plan data). Assuming the data matches, verification is complete. If the data does not match, the employee will simply rerun the program using alternate settings. If none of the settings saved to the database yield results that tie to the reports in Appendix A, it will be clear that the database is either not the correct one or has been tampered with. Defendants' argument that verification is unduly burdensome fails. Angelos Decl. at Item 15.

Defendants resist providing the tie-in settings, purportedly because it requires "the creation of new documents." Opp. at 15. Tie-in settings, particularly specific settings where verification cannot be made, could be as simple as providing what selection to make in the drop-down menus. It is providing information in a similar fashion as one would to an interrogatory. It does not technically require the creation of a new document. Nonetheless, this tie-in data is necessary primarily so that Class Representatives can be certain the correct documents are produced and avoid protracted disputes. However, to the extent Defendants are averse to providing the tie-ins in writing, the Court should order the parties to come together to discuss which Aries files tie to which reports and how.[12]

***Downloading the documents***: Once the files are identified and verified, Defendants would simply need to download and produce them. This is not a burdensome process. Indeed, Angelos admits that he personally downloaded and sent Aries data during his time at Concho and that doing so was a regular part of Concho's operations. Angelos Decl. at 6.

As noted, based on review of database files produced by third parties, Class Representatives can informedly estimate that each of the requested database files is approximately

---

[12] Angelos states that "it is unclear to [him] exactly what [] process or expectations" are contemplated by the request to "tie in" the databases to the specific plans and budgets. Angelos Decl. at Item 10. This is strange as the process for tying in the reserve reports is identical to the process for tying in the plans and budgets. Nevertheless, for the avoidance of confusion, Exhibit H hereto juxtaposes the figures in the Aries database with the figures in a year-end report. The figures in Exhibit H do tie. Defendants must simply ensure that the numbers "tie" for each of the plan and budget documents just as they would for the year-end reserves. Class Representatives are prepared to confer with Defendants as needed to provide any further clarity that Defendants deem necessary.

1 GB or less. Average download speeds in the United States hover around 100 megabytes per second ("MBps").[13] At that speed, each file would take approximately 2 hours, 17 minutes to download. Standard commercial internet plans support download speeds up to 1 gigabyte per second ("GBps").[14] At that speed, each file would take approximately 8.2 seconds to download. Class Representatives expect that complying with this request will necessitate production of approximately fifteen files. In total, downloading these files at 1 MBps would take approximately 34 hours. At 1 GBps, downloading these files should take just over two minutes. Indeed, Class Representatives' independent experts were able to download similar databases from third-party productions in under 12 hours. Surely ConocoPhillips has computers with at least equivalent download speeds.[15] Thus, Angelos's estimate of the time these downloads will take is pure exaggeration. Angelos Decl. at 16.

But even if ConocoPhillips forewent modern computing power, Defendants' representation that multiple people would be diverted from regular work for several weeks to complete the process would not be compelling. Downloading files is a hands-off process that does not require attentive supervision, and the ConocoPhillips employees managing the downloads (who, incidentally, need not be the engineers who will handle identifying and verifying the databases), would certainly be able to do other work at the same time as the files downloaded.

***Sharing the files***: Defendants admit that sharing the files is not unduly burdensome. Opp. at 14. Thus, Defendants' arguments as to burden all fail.

---

[13] *See* Charts - Measuring Broadband America | Federal Communications Commission, www.fcc.gov/general/charts-measuring-broadband-america.

[14] *See, e.g.*, Spectrum Business Bundles - Internet, Phone, TV and Mobile Promos, www.spectrum.com/business/internet.

[15] Even if downloading the documents did require more significant efforts by ConocoPhillips personnel than other discovery, Defendants cite no law supporting that this would preclude discovery. Indeed, *Jones v. Goord*, the only case they invoke contemplated a scenario where the financial burden for the state of New York would be excessive and, "more significant[ly]," complying with the request would create state security risks. 2002 WL 1007614, at *11 (S.D.N.Y. May 16, 2002). Neither of those factors are relevant here.

### III.     DEFENDANTS HAVE NOT PRODUCED ANYTHING TO DATE THAT CAN SUBSTITUTE FOR THE REQUESTED DISCOVERY

Defendants argue they need not produce the requested files because they have already produced multiple documents on "well or project economics." Opp. at 7. Of course, unnamed documents generically referencing "well or project economics" are no replacement for the specific databases requested. To the contrary, Defendants' "document dump" is a clear attempt to frustrate, manipulate, and delay the discovery process in violation of Rule 34 by burying potentially relevant documents in a morass of files and allowing Defendants to hide behind sheer volume of produced documents to cover up production deficiencies. *See Lymphedema & Wound Care Consultants of Am., Inc. v. Health Care Serv. Corp.*, 2022 WL 209562, at *6 (N.D. Tex. Jan. 24, 2022) (a party cannot "place the burden on [the opposing party] to, without any organization or direction from [the producing party], comb through all of those records to find the ones that might relate to the Claims."). Here, Defendants note three kinds of documents they purport obviate the need for the requested discovery. None do.

***First***, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ *See McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, 249 (N.D. Tex. 2016) (Fed. R. Civ. P. 34(b)(2)(i) "forbids 'dump truck' discovery tactics, where a party delivers voluminous and poorly organized documents to his adversary, who is forced to rummage through piles of paper in search of what is relevant.") (citation modified). Class Representatives can hardly determine which of these outputs correlate with the reserves, budgets, and plans the Individual Defendants reviewed, not the least because Defendants admit they have not produced an exhaustive set of Excel outputs and that they cannot

confirm that any of these documents do so correlate. *See* Opp. at 4 n. 6; Angelos Decl. at Item 14. Indeed, Defendants admit they have no idea which Excel outputs were produced, nor how many, and that "[c]oming up with an exact number of direct Aries outputs would require reviewing all 45,000-plus excel documents produced by Defendants to identify each one with hallmarks of an Aries data pull"—a task they are apparently unprepared to undertake despite clearly being the party far better positioned to do so. Opp. at 6 n. 5.

Assuming, *arguendo*, that Defendants' document dump were excusable, Defendants' Excel outputs do not contain the decline curves assumptions or type curves profiles underlying the projections. These assumptions are necessary to analyze the ways production and results from analog wells would have changed Concho's projections and assess the veracity of statements like "So I think everything we've seen has been consistent with what we were expecting and is baked into that outlook that were talking about for 2019 and 2020" and "[w]e definitely baked that [relationship between single-well pad development versus multi-well pad development in that parent-child relationship] into all of our plans and our forecast." ¶262. Similarly, the actual type curve profiles will prove the falsity of statements like "we have built our type curves and our internal modeling based upon the results we have seen here" (¶262), "[w]e are delivering exceptional performance across our portfolio" (¶289), and the myriad of misstatements that Q1 2019 production justified increasing guidance for full-year 2019 (¶¶288, 289, 291-92).

Moreover, while Microsoft Excel certainly "allow[s] for all sorts of categorization and sorting," there is a reason companies like Concho use Aries for their reserves and not Excel. Opp. at 15 n. 11. Aries has multiple relevant functionalities that are not possible in Excel, including the ability to run and calculate reserves. Courts recognize that "[p]reservation of format is important because conversion from native format may eliminate or degrade search and other information

14

processing features." *Metro. Life Ins. Co.*, 322 F.R.D. at 250. Thus, producing the Access or .bak

file forms is proper and appropriate. However, as noted, to the extent the files really cannot be

produced in those formats for a legitimate reason, the Court should order Defendants to produce

and identify the correct, corresponding Excel outputs.



Therefore, unlike Defendants' Exhibit 10, the Aries files will

allow Class Representatives to apply the type curves and assess anticipated returns for individual

projects. This is critical to determining how key projects were, in fact, performing compared to

expectations and to assessing the veracity of statements like "[s]o I think everything we've seen

has been consistent with what we were expecting." ¶270. Class Representatives understand from

their experts that these curves can only be replicated using the actual ARIES data.[16]

*Last*, Defendants argue that Class Representatives received the requested discovery from

Concho's third-party auditors. Wrong. Class Representatives have not received the final databases

with tie-ins for the Midland Basin. Regardless, as previously explained, the third-party documents

---

[16] To determine when and whether Concho actually incorporated such downward revisions in the Mabee Lower Spraberry and elsewhere, Class Representatives need to review Concho's actual type curves. *This is precisely the reason the Aries files are so critical.* Defendants' representations of Defendants' Exhibits 10 and 11 are characteristically misleading. To the extent, however, that there remains meaningful dispute about the proper interpretation of Defendants' Exhibits 10 and 11, that only underscores the importance of the Aries files which contain the actual curves.

and third-party authentication create verification and chain of custody issues that could undermine this discovery at trial, certainly with respect to the databases corresponding to internal plans and budgets, which the external auditors did not prepare. ECF No. 146 at 9, 11; *see* Fed. R. Evid. 901 (requiring authentication of evidence); *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 582 (5th Cir. 2022) (holding that authentication is unlikely to be sufficient where evidence was created and maintained by a different entity). Unless Defendants stipulate to waive all objections or cross-examination of an experts' reliance on the Aries databases produced by the third-party engineers, including receiving verbal confirmation and instruction on appropriate tie-in corrections from the third parties (because corrections were needed), then reliance on the third-party engineering firms' production could be subject to attack and foundation issues later in the matter.

In short, the volume of produced documents is a distraction, and none of the documents produced so far can substitute for the targeted discovery Class Representatives now request.

## CONCLUSION

For the foregoing reasons, the Court should grant Class Representatives' motion to compel production of Concho's ARIES databases in its entirety and for such other and further relief that this Court deems just and proper.

DATED: July 28, 2025

Respectfully submitted,

*Alfred L Fatale III*

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III (*pro hac vice*)
Joseph N. Cotilletta (*pro hac vice*)
Rachel A. Berger (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

16

Facsimile: (212) 818-0477
afatale@labaton.com
jcotilletta@labaton.com
rberger@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*


**FOGLER, O'NEIL & GRAY LLP**
Murray J. Fogler
Robin Finney O'Neil
909 Fannin St., Suite 1640
Houston, TX 77010
Telephone: 713-481-1010
Facsimile:713-574-3224
mfogler@foglerlaw.com
roneil@foglerlaw.com

*Liaison Counsel for Class Representatives and the Class*

17

## <u>CERTIFICATE OF CONFERENCE</u>

On July 28, 2025, the Court presided over a discovery hearing that included Class Representatives' request to compel Defendants' ARIES database. In that hearing, the Court ruled that Class Representatives have leave to file a formal motion to compel.

Joseph N. Cotilletta

## CERTIFICATE OF SERVICE

I certify that on July 28, 2025, I caused the foregoing to be electronically filed with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

email addresses denoted on the Notice of Electronic Filing.

Alfred L. Fatale III