**APPENDIX B**

**CLASS REPRESENTATIVES' UNPUBLISHED AUTHORITIES FOR REPLY OF CLASS REPRESENTATIVES IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DEFENDANT CONCHO RESOURCES, INC.'S ARIES DATABASE**

| Case No. | Case Name |
|---|---|
| 1 | *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716 (E.D. Tex. June 16, 2004) |
| 2 | *Jones v. Goord*, 2002 WL 1007614 (S.D.N.Y. May 16, 2002) |
| 3 | *Lymphedema & Wound Care Consultants of Am., Inc. v. Health Care Serv. Corp.*, 2022 WL 209562 (N.D. Tex. Jan. 24, 2022) |
| 4 | *Nicholas J. Murlas Living Tr. v. Mobil Oil Corp.*, 1995 WL 124186 (N.D. Ill. Mar. 20, 1995) |
| 5 | *ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*, 2008 WL 11348342 (E.D. Tex. Oct. 3, 2008) |
| 6 | *Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc.*, 2022 WL 2316228 (N.D. Ill. June 28, 2022) |

# CASE NO. 1

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 3 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

2004 WL 5278716
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Texarkana Division.

In re: FLEMING COMPANIES INC.
SECURITIES & DERIVATIVE LITIGATION

No. CIVA503MD1530TJW, MDL–1530.
|
June 16, 2004.

***MEMORANDUM OPINION AND ORDER***

WARD, J.

**\*1 THIS DOCUMENT RELATES TO ALL CASES**

**I. INTRODUCTION**

This private securities class action case relates to Fleming Companies, Inc. ("Fleming"). Fleming, at one time the second largest food distributor in the United States, first foreshadowed problems on July 30, 2002. The problems continued, culminating in a formal SEC investigation into Fleming's accounting practices. A series of class actions followed, which were consolidated. In April 2003, the company declared bankruptcy and announced its need to make a massive restatement of its earnings for 2001 and 2002. The company has yet to make any restatements of its earnings. An MDL proceeding ensued, and the cases were all transferred to this court for pre-trial handling. The court has appointed a lead plaintiff and set a briefing schedule. The plaintiffs filed their Third Amended Consolidated Class Action Complaint ("TAC"). The defendants have moved to dismiss the TAC on various grounds. The court held an oral hearing on the matter and, after considering the motions, responses, the arguments, and the applicable law, is of the opinion that the following order should issue.

**II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

The facts are stated in the light most favorable to the plaintiffs as alleged in the TAC. *Baker v. Putnal,* 75 F.3d 190, 196 (5 th Cir.1996). Fleming is a wholesale distributor of groceries. A wholesaler like Fleming purchases groceries from vendors and sells them to supermarkets and grocery stores. During the 1990s, Fleming struggled, due in part to its sharp business practices with its customers. Fleming's earnings steadily declined from 1995 through 1998, culminating in the termination of CEO Robert Smith in July, 1998.

In November 30, 1998, Fleming appointed Mark Hansen as CEO and Chairman of the Board. A week later, Fleming announced a "Strategic Plan to Improve Performance." One part of the plan was to improve the performance of Fleming's retail segment. Although Fleming had historically been a grocery wholesaler, the company identified a retail segment of price impact supermarkets as a potential growth opportunity. A price impact supermarket is a sort of "no frills" approach to selling groceries. Price impact supermarkets typically cost less to build and operate, lack amenities such as delis, and, ultimately, pass the savings along to customers in the form of lower prices. Hansen told shareholders at an annual meeting that Fleming would make a stronger and more focused push on retailing than ever before.

Throughout 1999, 2000, and 2001, Fleming made various statements concerning its strategic plan to analysts and investors. Fleming stated in a January 2000, press release that it attributed revenue growth to its emphasis on Food4Less price impact stores and expected future retail growth on a "same store" basis. To illustrate, Fleming expected that sales in retail stores 1, 2, and 3 would increase over the numbers realized by those stores in the preceding year. The court notes that same store sales comparison is important because it allows analysts and investors to evaluate the actual internal growth of the company, unclouded by acquisitions or divestitures.

**\*2** Throughout 2000, Fleming indicated that its focus would be on price impact stores, at the expense of conventional stores. Fleming began to divest its conventional stores and, by May, 2001, represented that it had sold all of its conventional stores. During that same time period, Fleming reported earnings growth, attributed in part to the success of its retail strategy. Also during this time period, Fleming and certain officers made public statements touting the success of its retail strategy. One Fleming press release stated, for instance, that Fleming's reported 36% net earning increase for the fourth quarter of 2001 "validate[d] our strategic initiatives" relating to price impact supermarkets. (TAC, ¶ 82). Fleming's 10K for 2000 also promoted this retail strategy.

Throughout the first half of 2001, analysts reacted favorably to Fleming's strategy. Bear, Stearns & Co., Deutsche Banc Alex. Brown, and UBS Warburg all issued reports

Case 4:21-cv-02473     Document 160-2     Filed 07/28/25 in TXSD     Page 4 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

commenting favorably on Fleming's retail operations focus. (TAC, ¶¶ 86–88). Additional analysts responded favorably throughout the balance of 2001 and into the first half of 2002. (TAC, ¶¶ 89–92).

All was not well inside Fleming, however. The plaintiffs allege that Fleming used accounting manipulations to inflate its earnings numbers for 2001 and 2002. The details of this scheme are discussed in more detail below; however, for present purposes, it is sufficient to note that the plaintiffs allege first that Fleming executives instituted a practice wherein Fleming's retail and wholesale divisions would arbitrarily and improperly deduct amounts payable from vendors' invoices, without cause and with no expectation that the vendors would approve the deduction. At the same time, although Fleming would reserve for a portion of those deductions, the reserves were often woefully inadequate to cover the amount of deductions. This practice had the effect of inflating the quarterly and yearly earnings reported by the company in press releases, SEC quarterly and annual reports, and Registration Statements filed in March and June 2002, for public offerings of securities.

The second significant area of numbers manipulations that the plaintiffs attack is the company's reporting of same store sales growth. The plaintiffs allege that certain Fleming executives instituted a practice whereby the reported same store sales figures were inflated. These inflated numbers led the investing public to assume that Fleming's retail strategic plan was growing. The plaintiffs allege that the true same store sales figures, had they been revealed, would have shown that Fleming's retail segment was suffering and that its price impact format was not successful.

In July 2002, despite the company's statements concerning the success of its business strategy, Fleming began to foreshadow problems in its retail segment. On July 30, 2002, Fleming issued a press release which indicated it was evaluating strategic alternatives to its retail segment, and in particular, its price impact retail stores. The company stated that comparable store sales declined 4.7 percent. At the same time, according to the plaintiffs, Fleming overstated its wholesale earnings and masked the extent of retail losses to cushion any decline in stock value. Although Fleming reiterated its prior earnings forecasts, analysts began to doubt the validity of those numbers. J.P. Morgan analyst Stephen Chick, for instance, cut Fleming from "market perform" to "market underperform." An article in Supermarket News observed that Fleming's announcement concerning alternatives to its

retail segment "appears to have caught most analysts by surprise." (TAC, ¶ 272).

 **\*3**  On September 4, 2002, the Dow Jones Newswire released an article on Fleming which disclosed customer dissatisfaction with certain of Fleming's price impact retail stores, inventory problems in those stores, and Fleming's practice of taking large vendor deductions to increase the company's cash flow. Although the article noted that the company was not alone in this practice, some of Fleming's unidentified customers said they had stopped shipping to Fleming because of the practice and one such customer, referring to Fleming, noted that "[w]hen it comes to deductions, they're off the scale compared to other customers." On September 5, 2002, the Wall Street Journal published the expose released by the Newswire the day before.

Fleming responded to the September 5, 2002 article by holding a conference call that day with analysts. The company's CFO, Neal Rider, stated on the conference call that Fleming's vendor deductions were "appropriately reserved for" and Fleming's CEO stated that "we have absolutely no issues with how we treated deductions, we reserve against deductions, and we certainly don't assume 100% collection." (TAC, ¶ 282). In the same conference call, the officers stated that Fleming's financial condition was solid and that the deductions were an ordinary part of the business, and were an industry-accepted practice. Indeed, according to Rider, "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that's risen to the level that we are at an impasse today." (TAC, ¶ 289). The plaintiffs contend that these statements were false.

The stock market reacted adversely to the September 4 and 5 articles. On September 3, 2002, Fleming stock was trading at $9.31 per share. By September 5, the stock closed at $6.92 per share, a decline of 26%. According to the plaintiffs, even though the stock price declined significantly, the statements by Fleming's executives cushioned the fall of the stock because those statements represented that the deductions that might reach "impasse" were minimal and that the deductions in any event were an industry standard practice and were properly accounted for. (TAC, ¶¶ 295–296).

On September 24, 2002, Fleming announced the divestiture of its price impact stores. Thereafter, on October 23, 2002, Fleming announced its third quarter earnings, confirmed its

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

decision to divest its price impact stores, and suggested that its relationship with its largest customer, Kmart, might be in jeopardy because of Kmart's bankruptcy proceedings and reorganization.

On November 13, 2002, Fleming announced that the SEC had commenced an informal investigation into Fleming's accounting practices. In particular, the SEC's investigation focused on Fleming's vendor trade practices and the company's calculation of comparable store sales in its discontinued retail operations. Following Fleming's January 23, 2003, announcement of a $190 million loss in retail operations for 2002, and its announcement of the loss of the Kmart contract in February 2003, Fleming's CFO insisted that the notion that Fleming would seek bankruptcy protection was "ludicrous." On February 25, 2003, the SEC reclassified its investigation as a formal one.

**\*4** In February and March, 2003, Fleming's credit ratings were downgraded. On March 3, 2003, Fleming announced the resignation of its CEO. Contrary to the previous representations of Fleming's CFO and unable to secure alternate sources of financing, Fleming announced on April 1, 2003, that it had filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

On April 17, 2003, Fleming announced that it would restate its 2001 annual and quarterly financial statements and 2002 quarterly financial statements previously filed with the Securities and Exchange Commission and that it would revise its previously announced 2002 fourth quarter and annual financial results. The Fleming press release stated in part that "the Company expects that the related restatements of the results for the full-year 2001 and the first three quarters of 2002 will reduce the pre-tax financial results from continuing operations for such periods by an aggregate amount of not more than $85 million." According to the press release, the restatements "mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts." (TAC, ¶ 322). Finally, the press release stated that Fleming's "fourth quarter 2002 pre-tax loss from continuing operations will be increased by expenses totaling not more than $80 million as a result of a number of factors, including increased vendor payback rates, the Kmart contract cancellation and corrections identified as a result of the Audit and Compliance Committee's independent investigation." (TAC, ¶ 322). Fleming subsequently announced it would restate its 2000

annual financial statements. To date, Fleming has not actually made its restatements.

These securities fraud cases raise the same issues involved in the SEC investigation and the announced restatements. The claims in this case may be divided into two categories: those brought under the 1934 Act and those brought under the 1933 Act. As will be seen, different standards apply to each.

In their 1934 Act claims, brought under section 10 and Rule 10b(5) promulgated thereunder, the plaintiffs complain of the conduct of five individual defendants. These defendants are referred to in this opinion either by individual name or collectively as the 1934 Act Individual Defendants. The 1934 Act Individual Defendants include the following past or present company officers: Mark Hansen, Fleming's Chief Executive Officer ("CEO"), Neal J. Rider, Fleming's Chief Financial Officer ("CFO"), Mark D. Shapiro, Fleming's Chief Accounting Officer ("CAO"), Thomas Dahlen, a Fleming Executive Vice–President and head of Fleming's Retail Division, and E. Stephen Davis, a Fleming Executive Vice–President and head of Fleming's Wholesale Division. The plaintiffs have also asserted securities fraud claims under the 1934 Act against Deloitte and Touche ("D & T"), Fleming's outside auditor. The basis for the plaintiffs' fraud claims against D & T is that D & T conducted its audits while ignoring several "red flags" that D & T should have investigated and, by failing to do so, acted with severe recklessness sufficient to warrant liability under section 10.

**\*5** In their 1933 Act claims, brought under sections 11 and 12(a)(2) of that act, the plaintiffs complain of the conduct of several additional individuals, namely the outside directors and any other executive who signed the Company's Registration Statements filed with the SEC in March 2002 and June 2002. These individuals are referred to in this opinion as the 1933 Act Individual Defendants. The 1993 Act Individual Defendants include the following chief officers, directors and general counsel: Mark Hansen, Neal J. Rider, Mark D. Shapiro, Herbert M. Baum, Kenneth M. Duberstein, Archie R. Dukes, Carol B. Hallett, Robert S. Hamada, Alice M. Peterson, Edward C. Joulian, III, Guy A. Osborn and Carlos M. Hernandez. Also, the plaintiffs join as defendants to their 1933 Act claims the various underwriters involved in the June 2002 offering. These defendants are referred to herein as the Underwriter Defendants. D & T is also joined as a defendant to the 1933 Act claims. The court will sometimes refer to the defendants to the 1933 Act claims collectively as the 1933 Act Defendants. The court now turns to a discussion

of the applicable legal standards, followed by a discussion of securities law, and, finally, to the analysis of the myriad issues raised by the motions to dismiss.

## III. STANDARDS FOR MOTIONS TO DISMISS IN SECURITIES LITIGATION

### A. Rule 12(b)(6)

The court begins with bedrock. Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A court may only dismiss a complaint under Rule 12(b)(6) when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Jones v. M.L. Greninger,* 188 F.3d 322, 324 (5th Cir.1999). The court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5th Cir.2002); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982). A plaintiff need only allege, not prove, sufficient facts to survive a motion to dismiss. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). Conclusory allegations, however, or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6). *S. Christian Leadership Conference v. Supreme Court of State of La.,* 252 F.3d 781, 786 (5th Cir.2001). The court may consider the totality of the allegations in the complaint in their entirety. *Haack v. Max Internet Communications, Inc.,* 2002 WL 511514, at *5 (N.D.Tex. April 2, 2002).

Courts apply Rule 12(b)(6) principles to motions to dismiss in securities class action cases, but it must be remembered that a securities cause of action deals primarily with very fact-specific inquiries. *Id.* at *3 (citing *Basic Incorporated v. Levinson,* 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Notwithstanding that the cases are fact-specific, a district court evaluating a motion under Rule 12(b)(6) must consider the strict pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") in a securities fraud case.

### B. Rule 9(b)

**\*6** Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Rule 9(b) applies to private securities fraud claims under the PSLRA. *Abrams,* 292 F.3d at 430. The Fifth Circuit has held that the particularity requirement of Rule 9(b) sets "the same standard" required by the PSLRA. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 349 (5th Cir.2002). It is settled in this circuit that Rule 9(b) requires the plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen,* 267 F.3d 400, 412 (5th Cir.2001).

### C. PSLRA

The express provisions of the PSLRA augment the Rule 9(b) requirements in several respects. The effect is to require plaintiffs to particularize the allegations of fraud so that individual defendants are given fair notice of the claims against them as well as their alleged roles in the fraudulent conduct. *ABC Arbitrage,* 291 F.3d at 349 n. 6. The PSLRA provides in relevant part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2).

The requirements of the statute are onerous. The statute was not, however, enacted to raise the pleading burdens under Rule 9(b) and § 78u–4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement,

must be routinely dismissed on Rule 9(b) and 12(b)(6) motions. *ABC Arbitrage,* 291 F.3d at 348. A securities fraud plaintiff need not allege all facts that may be related to his claims-such a requirement is impossible at the pleading stage because usually only the defendants know all the facts related to the alleged fraud. *Id.* Therefore, the particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession. *Id.* Finally, the totality of the complaint determines whether a claim has been pled with particularity. *Goldstein v. MCI Worldcom,* 340 F.3d 238, 246–47 (5th Cir.2003).

### D. Section 10(b) and Rule 10b–5

**\*7** In the TAC, plaintiffs seek class certification for a class on behalf of all persons who purchased or acquired the publicly traded equity and debt securities of Fleming between May 9, 2001, and February 25, 2003, inclusive, including those who purchased or acquired such Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement or the June 17, 2002 Registration Statement. The private rights of action involved with respect to the securities fraud claims alleged in the TAC flow from alleged violations of sections 10(b) and 20(a) of the 34 Act and Rule 10b–5 of the SEC, promulgated pursuant to the 1934 Act. The court now examines those provisions.

Section 10(b) provides that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 states that it is unlawful for any person, directly or indirectly, "[t]o employ any device, scheme, or artifice to defraud; [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The intersection of Rule 9(b), the PSLRA and the elements of a claim under section 10(b) and Rule 10b–5 yields a result which requires a plaintiff to allege, in connection with the purchase or sale of securities, the following:

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*ABC Arbitrage,* 291 F.3d at 350; *Nathenson,* 267 F.3d at 406–07. In addition, if an allegation is made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief. *ABC Arbitrage,* 291 F.3d at 350. This is the who, what, when, where, and how required under Rule 9(b) and the PSLRA. *Id.*

Section 10(b) and Rule 10b–5 require that the defendant make a material misstatement or omission. With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." A statement is forward looking if it is

**\*8** (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A). The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(I) and (ii). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, which "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to 'bespeak caution' to investors that actual results may differ, thereby shielding the statements from section 10(b) and Rule 10b–5 liability ." In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F.Supp.2d 549, 576 (S.D.Tex.2002)(quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 176 n. 7 (11th Cir.1999)). The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a per se bar to liability. Rubinstein v. Collins, 30 F.3d 160, 162 (5th Cir.1994). Under Fifth Circuit precedent, "cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, ... materiality is not judged in the abstract, but in light of the surrounding circumstances." Id. at 167–68 (citing Krim v. BancTexas Group, 989 F.2d 1435, 1448–49 (5th Cir.1993)). "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." ' Id. at 168 (citing Krim, 989 F.2d at 1445).

**\*9** In a similar vein, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. In re Enron, 235 F.Supp.2d at 576. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." In re Sec. Litig. BMC Software, Inc., 183 F.Supp.2d 860, 888 (S.D.Tex.2001)(citing Krim, 989 F.2d at 1446).

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity sufficient facts to support that belief. ABC Arbitrage, 291 F.3d at 353. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Id. If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named, provided they are described generally in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. Id. In that situation, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. Id. Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. Id .

In ABC Arbitrage, the Fifth Circuit found instances where the allegations as to confidential sources had been both adequately and inadequately pleaded. The court found that "allegations concerning a conversation between 'a high ranking [Company] official' who was 'a top executive of [the Company]" ' and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standard for pleadings based on information and belief" in that "[t]his executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." Id. at 357.

On the other hand, with regard to allegations that the company had understated its losses, the court held insufficient certain allegations that the source of the information was consultations and interviews with "Swiss, Thai, and Indonesian business journalists, employees of Deutsche Telecom and other Alcatel customers throughout the world, trade union officials, and Telecom analysts" in the course of counsel's investigation. *Id.* at 358. These allegations, according to the court, had not been pleaded with sufficient particularity to withstand the requirements of the PSLRA.

**\*10** Securities fraud claims are, of course, *fraud* claims. The requirement is that a company officer or agent acted with a culpable mental state. To that end, "scienter" is a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA did not alter the substantive scienter requirement for claims brought under section 10(b) and Rule 10b–5. *Nathenson,* 267 F.3d at 408. The court must consider cumulatively any evidence of scienter pleaded by the plaintiffs. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5th Cir.1994). Therefore, the court must consider whether all facts and circumstances "taken together" are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.

Under the PSLRA, it is "not enough to particularize false statements or fraudulent omissions made by a corporate defendant ... [p]laintiffs must also particularize intent allegations raising a 'strong inference of scienter.'" *Goldstein,* 340 F.3d at 238. "For securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts that, assumed to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted" with the required mental state. *In re Electronic Data Systems Corp. Sec. & ERISA Litig.,* 2004 WL 52088, at *8 (E.D.Tex. Jan.13, 2004)(quoting *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 422 (N.D.Tex.2000)).

A plaintiff can demonstrate scienter with allegations of conscious misconduct or severe recklessness. *Abrams,* 292 F.3d at 439. Severe recklessness includes "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which

is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams,* 292 F.3d at 430; *Tuchman,* 14 F.3d at 1067. Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. *In re Triton Energy Ltd. Sec. Litig.,* 2001 WL 872019, at *10 (E.D.Tex. Mar.30, 2001); *see also Abrams,* 292 F.3d at 436 (stating an allegation of actual knowledge is not required to withstand a motion to dismiss).

Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" or have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *Abrams,* 292 F.3d at 432–33; *ABC Arbitrage,* 291 F.3d at 351–54; *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000). Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts relating to the corporation. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2nd Cir.2001). In addition, courts have found sufficient allegations when plaintiffs have alleged "specific and detailed allegations about defendants' violation of GAAP, as well as other alleged misstatements regarding the company's earnings and technical problems [which] when viewed in their entirety —support[ed the claim]." *Haack,* 2002 WL 511514, at *7.

**\*11** Due to the fact that there will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter will suffice to withstand dismissal of the securities claims. *Goldstein,* 340 F.3d at 246; *Nathenson,* 267 F.3d at 424–25; *Novak,* 216 F.3d at 307. The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. *In re Triton,* 2001 WL 872019, at *11. But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. *Abrams,* 292 F.3d at 432. At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it. *Tuchman,* 14 F.3d at 1067. Thus, the requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud (2) engaged in deliberately illegal behavior (3) knew facts or had access to information suggesting that their public statements were not accurate, or

(4) failed to check information they had a duty to monitor. *Novaks,* 216 F.3d at 311.

A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10–K, regardless of whether he participated in the drafting of the document, "makes" a statement and may be liable as a primary violator under section 10(b) for making a false statement. *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 587 (S.D.Tex.2003). A misrepresentation alone is not enough, as the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. *Abrams,* 292 F.3d at 433. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. *Id.* When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter. *In re Triton,* 2001 WL 872019, at *11.

Rule 10b–5 does not impose on a corporation an affirmative duty to disclose all nonpublic material information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. *SEC v. Fox,* 855 F.2d 247, 252 (5th Cir.1988). The duty to disclose only arises if the person is in a position of trust. *Id.* One instance where a duty to disclose is imposed by law on corporations, is when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that there is a duty to make it complete and accurate. *Rubinstein,* 30 F.3d at 170. The Fifth Circuit has held that "under Rule 10b–5, 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything .'" ' *Id.* In addition, the defendants "have a duty under Rule 10b–5 to correct statements if those statements become materially misleading in light of subsequent events." *Id.* at 170 n. 41.

**\*12** While allegations of motive and opportunity alone are insufficient to satisfy the pleading requirements of the PSLRA, appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter. *Nathenson,* 267 F.3d at 412. Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations of motive and opportunity in and of themselves fail. *Abrams,* 292 F.3d at 434 (dismissing motive and opportunity allegations that defendants were motivated

to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices); *see also Tuchman,* 14 F.3d at 1068–69. Thus, some "motives," particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter.

Much of the parties' briefing is devoted to the issue of the group pleading or group publication doctrine. After the plaintiffs filed the TAC and after oral argument was held on the motions to dismiss, the Fifth Circuit held in *Southland Securities Corporation v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353 (5th Cir.2004), that the group pleading doctrine did not apply in cases under the PSLRA. The effect of that case is to clarify the pleadings requirements in securities fraud cases which, as this one does, rely on press releases and SEC documents that are not attributable to any one person, but instead are published by the company itself. [1] The court will thus examine the ramifications of the Fifth Circuit's recent holding by providing an overview of the group publishing doctrine, followed by a discussion of *Southland.* The court will then apply *Southland* and the additional requirements discussed above to the allegations of the TAC.

The group pleading or "group publishing" doctrine was a creation of the courts. The doctrine permitted "plaintiffs to 'rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company." ' *Southland,* 365 F.3d at 363 (quoting *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999)(quoting in turn *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998))). "Instead of being required to plead that a particular defendant actually made, authored, or approved an offending statement in a corporate communication, the 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland,* 365 F.3d at 363. Under the doctrine as it existed before the PSLRA, a plaintiff in a securities fraud case did not need to allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatements or omission where the defendants were "insiders or affiliates" of the company. *Id.*

**\*13** The TAC in this case relies heavily on press releases and filings with the SEC. The vast majority of

the plaintiffs' complaint is devoted to establishing (1) that *Fleming* understated its earnings in 2001 and 2002(2) that *Fleming* disclosed those statements of its earnings in the company's press releases, 10Q Forms, 10K Forms, and Registration Statements. Under *Southland,* these are the types of documents one ordinarily would expect to see associated with group pleading because the information contained in the forms is generally the result of a collaborative effort on the part of the officers and agents of the company.

The plaintiffs have represented repeatedly that they do not rely on the group pleadings doctrine. This is a smart move because *Southland* has now explicitly held that they may not. But saying one is not relying on the group pleading doctrine only advances the issue part of the way. This case is about the overstatement of a company's earnings, and the representations concerning those overstatements are found largely in corporate documents that are the product of collaborative preparation efforts. *Southland* is clear that under the PSLRA:

> corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement.

*Southland,* 365 F.3d at 365.

Under this language, to the extent the plaintiffs are relying on representations of Fleming's earnings in press releases or SEC filings, it is not enough to plead that *Fleming* said or did something because the plaintiffs here do not sue Fleming. They sue individual defendants. As a result, the court must examine the TAC and determine whether the plaintiffs have alleged (1) that any or all of the 1934 Act Individual Defendants signed a corporate document containing a misrepresentation or (2) particular factual allegations explaining an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement. *Id.*

### E. Section 20(a) controlling person liability

The previous discussion addressed liability for primary violations of the 1934 Act. Section 20(a) provides a basis for additional liability and states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Since section 20(a) is a secondary liability provision, it is necessary that a primary violation be established before liability under section 20(a) arises. *ABC Arbitrage,* 291 F.3d at 348 n. 57. Controlling person liability under section 20(a) is not subject to the heightened pleading requirements of Rule 9(b), but is instead governed by Rule 8. *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 2003 WL 230688, at *12–13 (S.D.Tex.2003). Rule 8 is a "simplified notice pleading standard" that "applies to all civil actions, with limited exceptions," and requires merely a statement that "gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N .A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

## IV. DISCUSSION

### A. Analysis of the 1934 Act Issues

 **\*14** The court now addresses the various arguments made by the 1934 Act Defendants in the light of the standards set forth above. The 1934 Act Defendants filed a joint motion to dismiss, and each filed his own separate motion to dismiss to address issues peculiar to that defendant. The court will first detail the alleged fraud itself; then the court will address the

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 12 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

1934 Act Defendants' arguments as presented in their joint brief and will address the individual arguments, to the extent necessary, after considering those positions common to the group.

In the TAC, Lead Plaintiff Jackson Capital Management alleges a scheme by the 1934 Act Individual Defendants to inflate the price of Fleming securities and defraud the investing public. The TAC alleges that Fleming's external auditors, D & T, had knowledge of the fraud and/or was severely reckless with regard to the fraud and made materially false and misleading statements to the public. The TAC alleges that these 1934 Act Individual Defendants personally perpetrated the fraud.

Many of the plaintiffs' allegations come from information provided by four inside sources ("Sources") who allegedly observed much of the alleged accounting manipulations and the involvement of each of the 1934 Act Individual Defendants and D & T. According to the TAC, Sources 1 and 4 were financial analyst managers in Fleming's retail segment. Sources 2 and 3 were chief accountants for two of Fleming's principal wholesale divisions. Source 1 was employed at Fleming from the fall of 2001 to the summer of 2002. Source 4 was employed at Fleming from the summer of 2001 to early 2003. Source 2 was employed at Fleming from the 1980s to 2002 and served as a chief accountant for a wholesale division in 2001 and 2002. Source 3 was employed at Fleming as a chief accountant for a wholesale division from 2001 through 2002.

Because the TAC relies heavily on the Sources, it is important to understand the information alleged to be possessed by them. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen, Rider, Shapiro, Dahlen, and Davis. (TAC, ¶ 95). The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." (TAC, ¶ 96).

The TAC alleges that starting in July of 2001 through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports

throughout the Company," and that "[h]ard copies of these reports were given directly to Defendants Hansen and Rider, and electronic copies were provided to Defendant Dahlen." (TAC, ¶ 122). The TAC alleges that from early 2001 through the class period, Sources 2 and 3 had access to company-wide financial information and frequently communicated with one another about accounting issues that affected the various divisions. (TAC, ¶ 144).

 **\*15** The court now turns to the specific allegations of fraud. It is helpful to recall, as the court noted in the factual background section of this opinion, that Fleming's press releases, and SEC filings made various statements concerning the company's earnings and the success of Fleming's retail operations strategies. As is true in any fraud claim, the plaintiffs' complaint is that the defendants made certain statements with knowledge of information to the contrary. Bearing this in mind, the court now examines the allegations contained in the TAC.

The TAC alleges that Source 1 prepared earnings analyses prior to the closing of the books for the various reporting periods and that the CFO for the retail segment "directed that a new revenue or margin number, which they supplied, be substituted for the original number in the analysis, while providing no basis or back-up documentation for the change." (TAC, ¶ 98). Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO][2] received." (TAC, ¶ 98).

The TAC further alleges that Source 1 was required by the retail CFO to reduce accounts payable by a specified amount in order to 'account' for 'deductions' that Fleming planned to claim from as-yet-unidentified vendors, for as-yet-unidentified products." (TAC, ¶ 99). The TAC alleges that the standard industry practice was to propose deductions to vendors for return of merchandise, adjustments for incorrect quantities invoiced, adjustments for incorrect pricing, and adjustments pursuant to written contractual arrangements, i.e., co-operative advertising agreements and volume discount agreements. (TAC, ¶ 99). The TAC alleges that according to Source 1, "Fleming did not follow standard industry practice" in that they "did not propose deductions." Fleming unilaterally took them without authorization from the vendors and that "there was no basis for concluding that the vendors would accept the improper and baseless deductions." (TAC, ¶ 100). The TAC alleges that the deductions "had already been accrued by Fleming's accounting department by the time

Source 1 was told to change [the earnings analyses], even though the vendor, the product, and the basis for the deduction had not yet been identified." (TAC, ¶ 101).

The plaintiffs also allege that accrual of these unauthorized, improper, and unsustainable deductions was directed by Dahlen and the retail CFO; and that the retail CFO often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions. (TAC, ¶ 101). According to the TAC, Source 1 stated that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." (TAC, ¶ 102). Each financial analyst manager had a deduction worksheet, which was reviewed by higher-level executives. The TAC alleges that "[b]y June 2002, Source 1 was emailing Source 1's deduction worksheets to Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "[e]ven after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction." (TAC, ¶ 103). The TAC alleges that "Hansen and Dahlen directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." (TAC, ¶ 104). Further, the TAC alleges that "Fleming didn't correct its financial statements to reflect any such repayments [of the deductions], nor did the Company stop taking the improper deductions." (TAC, ¶ 105).

 *16  The TAC alleges that the 1934 Act Individual Defendants and specifically Hansen attended Monday meetings where the handling of deductions and margins would be discussed. (TAC, ¶ 106). The executives allegedly reviewed documents showing that sales in Fleming's retail segment were flat or declining, and that there was a difference between publicly reported margins and internally calculated margins. (TAC, ¶ 106). Further Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by Dahlen. (TAC, ¶ 107). According to Sources 1 and 4 Hansen, Rider, Shapiro, and Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. (TAC, ¶ 108).

With regard to D & T, the TAC alleges that Source 1 provided back-up for these accrued deductions at D & T's request, but that D & T "never asked Source 1 any questions about the deductions that they were supposedly examining." (TAC, ¶ 109). The TAC alleges that the retail CFO hired D & T to validate deductions claimed by Fleming retail and that Source 1 provided information to D & T about the deductions. (TAC, ¶ 110). The TAC alleges that both Fleming wholesale and retail took deductions from vendors on the same product resulting in a double accrual of deductions on the books for a single product. (TAC, ¶ 112). In addition, the TAC alleges that when Fleming's wholesale group secured a contract with Kmart at thin margins, "the retail segment book[ed] more and more deductions in order to prop up company-wide margins" and "even accrued large disputed deductions on its purchases from Fleming's wholesale segment." (TAC, ¶ 114). The TAC alleges that there was a strong "push for unauthorized, improper, and unsustainable deductions in Fleming's retail segment reflect[ing] serious company-wide problems."

The TAC alleges that any reserves kept in the event that the deductions were reversed were inadequate and were eventually done away with in order to increase earnings. (TAC, ¶¶ 283–285). Specifically, according to Source 3 Fleming's policy was to reserve against only 50% of claimed deductions, but that the wholesale management frequently reversed the reserves to increase earnings. (TAC, ¶ 283). Further, according to Source 3, the accounting managers were told by the wholesale managers at the direction of Fleming's corporate management to stop taking reserves in the second quarter of 2002. (TAC, ¶¶ 284–285).

The plaintiffs also contend that the 1934 Act Individual Defendants misrepresented the company's same store sales data. According to Sources 1 and 4, the TAC alleges that "Fleming manipulated its 'same store' sales data to show increases in same-store sales." (TAC, ¶ 115). Specifically, "Fleming's financial analyst managers tracked the real same store sales data" that consistently showed "large declines in same-store sales." (TAC, ¶ 117). However, the TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide the adverse sales trend" by rejecting the data from the financial analysts and "chang[ing] the composition of the population of stores which constituted the Company's 'same stores.' " (TAC, ¶ 118).

 *17  Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores'

revenue and earnings with current-year 'same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a 'same store' comparison as is commonly understood in the retail industry." (TAC, ¶ 118). The TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores ... were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." (TAC, ¶ 128). The TAC alleges that "[a]ccording to Source 1, in November 2001, Fleming's retail financial analyst managers expressed concern to [the retail CFO] that Fleming's retail segment was over-reporting the strength of its sales, especially its 'comparable store' sales," but that the retail CFO told them "not to raise concerns, or they would lose their jobs." (TAC, ¶ 119).

Further, the TAC alleges that "[a]ccording to Sources 1 and 4, beginning in 2001 and continuing into 2002, Fleming also inflated its same store and/or comparable store sales figures by including certain sales, referred to as 'red tag' sales."[3] (TAC, ¶ 120). The TAC alleges that "[e]ven though red tag sales were not made through any Fleming retail store, Fleming would falsely attribute the revenue from these sales to the retail stores included in its same store and/or comparable store analyses, thereby inflating the total amount of same store and/or comparable store sales." (TAC, ¶ 120). The TAC alleges that when Source 4 was first given "red tag" sales numbers by the retail CFO and asked what they were, the retail CFO answered: "You don't want to know." (TAC, ¶ 125).

In addition, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming —at the direction of Dahlen and the retail CFO—reduced the previously reported same store sales for the year 2000 fiscal year by subtracting $1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $4.7 million in red tag sales. (TAC, ¶ 120). The plaintiffs allege that same store sales information was also misstated by a process called diverting.[4] (TAC, ¶ 123). According to Source 4, Fleming included this revenue in "same store" sales figures despite its not being attributable to any of the retail stores. (TAC, ¶ 123). The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. The TAC alleges

that the "total same store and/or comparable store figure for 2001 was falsely inflated, and the growth for the same store or comparable store figure was also falsely inflated [whereby] the market was misled about growth in same store sales." (TAC, ¶ 120).

**\*18** The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "[h]ard copies of these reports were given directly to defendants Hansen and Rider, and electronic copies were provided to defendant Dahlen." (TAC, ¶ 122). The TAC alleges that Hansen received special sales reports giving even more current information than Sources 1 and 4 received showing the declining sales trends. (TAC, ¶ 131). In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including defendants Hansen, Rider, and Dahlen— that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." (TAC, ¶ 124). Source 4's reports in 2002 also listed same store sales separately in each of Fleming retail's seven regions showing that overall same store sales were declining in almost all of the company's regions, some at up to 20% over the course of a year. (TAC, ¶ 127). In addition, Hansen and Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. (TAC, ¶¶ 459, 462). Also, Hansen, Shapiro, Rider, and Davis received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. (TAC, ¶ 459).

The TAC alleges that the actual sales trends clearly showed that the price-impact format was not working according to Source 4. (TAC, ¶ 132). Specifically, between July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. (TAC, ¶ 133). Using data that had been available to Hansen, Rider, and Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. (TAC, ¶ 133). The TAC alleges that it was apparent in 2001 and

2002 from reports provided to defendant Hansen that newly-purchased stores were performing poorly and routinely were not meeting the revenue and earnings projections prepared by Source 4 with information provided to him that were used to justify the purchases. (TAC, ¶ 134). The TAC alleges that "with the knowledge and direction of the 1934 Act Individual Defendants, Fleming continued to purchase retail stores based on unrealistic projections in order to create the fiction of a new source of revenue to hide the decline in the Company's sales." (TAC, ¶¶ 134, 135).

**\*19** The plaintiffs allege that defendants Hansen and Dahlen received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, ¶ 455). In addition, Hansen, Rider, Shapiro, Dahlen, and Davis received weekly, monthly and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, ¶ 456). Also, the TAC specifically alleges that Hansen, Rider, Shapiro, Dahlen, and Davis attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. (TAC, ¶ 457). According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. (TAC, ¶ 460)

In addition to the vendor deductions and the same store sales issues, the TAC alleges that according to Sources 1 and 4 "Fleming often reported normal [, recurring] operating expenses as 'strategic plan charges' or other one time charges even when the expenses were not related to Fleming's strategic plan" despite the "financial analyst managers stat[ing] in meetings with management that the charges in question were recurring" thereby "increas[ing] its reported margins and falsely suggest[ing] to analysts and investors that the expenses would not recur in future reporting periods." (TAC, ¶ 136).

The above discussion has related generally to the company's retail operations. The TAC also alleges that Fleming "engaged in a series of manipulations during the Class Period [in its wholesale segment] involving improper inflation of revenues and earnings; the accrual of unauthorized, improper, and unsustainable vendor deductions; a scheme to obtain unearned promotional funds through the use of nonexistent stores; the improper failure to recognize inventory losses; and the improper classification of prior-year expenses." (TAC, ¶ 137).

According to Source 4, Fleming "inflated its earnings by booking losses to 'discontinued operations' when the losses were in fact attributable to continuing operations" thereby "overstat[ing] the earnings of its continuing operations and bury[ing] the losses in the presumably less important 'discontinued operations' category." (TAC, ¶¶ 138, 139). Specifically, following a September 24, 2002 press release announcing the divestment of its price-impact Food4Less and Rainbow Foods Stores these stores were "treated as discontinuing operations, while the limited-assortment Yes!Less stores were [still treated as] continuing operations." (TAC, ¶¶ 138, 139). According to Source 4, "Yes!Less would sell its excess inventory to the price-impact stores at full price" and the "price-impact stores would then resell the excess inventory to ... another retailer[ ] at a fifty percent markdown." (TAC, ¶ 139). "In this way, the 'discontinued' price-impact stores assumed the excess-inventory losses of the 'continuing' Yes!Less stores" thereby overstating the earnings for continuing operations. (TAC, ¶ 139).

**\*20** According to the plaintiffs, beginning at least as early as 2000 and continuing through the Class Period, Fleming manipulated its wholesale earnings through a scheme whereby the company's internal controls were weakened and the company's upper management, including defendants Hansen and Davis, put pressure on the divisional staff to meet budgeted targets by any means necessary. (TAC, ¶ 140). In early 2001, the company centralized its accounting operations and terminated divisional accounting managers and clerks. Essentially, the plaintiffs contend that management put pressure on its staff to meet targets even though those goals were unrealistic. (TAC, ¶ 146, 148).

According to Source 3, the accountants routinely discussed among themselves the Company's financial condition in both the wholesale and retail divisions based on their access to actual results showing large losses and "that Fleming's publicly disseminated rosy consolidated financial statements were completely contrary to reality." (TAC, ¶ 151). These accountants even asked their directors where the publicly claimed profits were coming from, but received no valid or

plausible response. (TAC, ¶ 151). The TAC alleges that after December 2001 these accountants "routinely discussed the fact that Fleming was a sinking ship that eventually would have to declare bankruptcy." (TAC, ¶ 151).

The TAC alleges that "[o]ne of Fleming wholesale's most pervasive methods of inflating its earnings was to take unauthorized, improper, and unsustainable deductions from accounts payable to vendors." (TAC, ¶ 156). "According to Sources 2 and 3, Fleming's division officers directed accounting managers to recognize unauthorized, improper, and unsustainable deductions from vendors' invoices in order to enable the divisions to meet their targets" that eventually "increased in a snowball effect from period to period." (TAC, ¶ 157). The TAC further alleges that "[u]pon determining the amount of the division's shortfall to the forecast, the division staff would fax to the [accounting] managers sufficient unauthorized, improper, and unsustainable deductions, backdated to the financial period closing date, to make up the shortfall." (TAC, ¶ 158).

According to Sources 2 and 3, Fleming maintained a "Vendor Compliance Manual" that was "an 'open checkbook' that authorized division accountants to impose deductions for any reason that" was used by the divisions, "especially those that struggled to meet their targets." (TAC, ¶ 159). In one situation Fleming allegedly took an $800 deduction from a vendor because the truck was late making its delivery. The "deduction documents" sent to vendors "did not identify any specific vendor invoices that were the subject of the deduction" and one vendor said " 'it would take four months to figure out why Fleming took the deduction, and another four months to get it back.' " (TAC, ¶¶ 160, 161). The TAC alleges that once the "deduction documents" were prepared, the deduction would be accrued even though in most cases Fleming ended up reinstating all or almost all of the amount deducted from a vendor's invoice. (TAC, ¶¶ 161, 163).

**\*21** According to Source 3, at one point in July 2002, the disputed deductions totaled about $100 million at the corporate level in addition to $20 million at the divisional level in the wholesale segment. (TAC, ¶ 167). The TAC alleges that even though the deductions inevitably would have to be remitted to vendors and the accrual reversed, the deductions nevertheless were accrued because they created the illusion of present earnings. (TAC, ¶ 167). "According to Sources 2 and 3, in order to compensate for the adverse earnings consequences caused by writing checks to vendors to cover amounts improperly deducted, Fleming would initiate

another round of unauthorized, improper, and unsustainable deductions" leading to "a vicious cycle which continually served to falsely inflate current earnings ... eventually result [ing] in a huge charge to earnings." (TAC, ¶ 166).

The TAC includes excerpts from a September 5, 2002 *Wall Street Journal* article in its allegations detailing complaints from various vendors about the large deductions taken by Fleming being unjustified. (TAC, ¶¶ 171–174, 177–179). These articles include claims by former Fleming executives and employees that the disputed deductions amounted to $100 million during the middle of 2001, that the Fleming managers took the deductions at the direction of upper management, that Fleming took deductions for items it never actually put into distribution due to the cancellation of orders, and that executives resigned after disagreeing with Fleming about its practices. (TAC, ¶¶ 173, 177, 178).

The plaintiffs allege a variety of other accounting improprieties. According to Source 3, Fleming inflated earnings by booking sales and earnings to a fictitious store in order to earn promotional discounts from vendors and then failing to reverse the fictitious earnings. (TAC, ¶¶ 180–192). Also, Fleming, at the direction of defendant Shapiro, did not recognize a $1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. (TAC, ¶¶ 193–199). Fleming recognized an inventory surplus of $6 .2 million and booked it to income even though it was due to inventory that actually belonged to one of Fleming's customers and should have been offset by a liability. (TAC, ¶ 200).

Hansen, Shapiro, Rider, and Davis received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and were well aware of the magnitude and invalidity of massive deductions taken by Fleming. (TAC, ¶ 458). According to the plaintiffs, Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, defendants Hansen, Rider, Shapiro, and Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. (TAC, ¶ 461).

**\*22** As can be seen, the gist of the plaintiffs' complaint is that the 1934 Act Individual Defendants made false statements concerning Fleming's earnings with knowledge of contrary

information and/or reckless disregard for the truth of those earnings statements. The TAC alleges that the 1934 Act Individual Defendants had the motive to make materially false and misleading statements. (TAC, ¶ 468). Specifically, the TAC alleges that the defendants made the materially false and misleading statements in order to facilitate Fleming's offering which netted $170 million in exchange for stock, $200 million in exchange for senior notes, and a $975 million in new credit facilities. (TAC, ¶ 468). In addition, the plaintiffs allege that the defendants had the motive to manipulate earnings since their bonuses were tied directly to reporting certain targeted earnings which were met in 2001 as a result of the manipulations. (TAC, ¶ 469).

### 1. Group Pleading

The 1934 Act Individual Defendants contend that the TAC should be dismissed because the plaintiffs impermissibly rely on group pleading when they make allegations against the 1934 Act Individual Defendants as a whole and against Fleming. The plaintiffs respond that both parties have used the shorthand reference to the defendants in their pleadings and that allegations in the TAC against the 1934 Act Individual Defendants are as to each and everyone of them individually. The plaintiffs contend that the only paragraphs that arguably rely on group pleading concern the allegations that press releases were false and misleading and that the 1934 Act Individual Defendants knew of their falsity. The plaintiffs argue that there is a reasonable basis for believing that the individuals knew of their falsity based on the rest of the allegations in the TAC. Further, the plaintiffs contend that the viability of the group pleading doctrine after the enactment of the PSLRA is an open issue in this judicial district and the Fifth Circuit. Finally, the plaintiffs respond that the TAC makes adequate allegations against the individuals by name as well.

The Fifth Circuit's recent decision in *Southland,* discussed above, disposes of many of these issues. First, the court rejects the plaintiffs' argument to the extent it relies on the supposed potential "viability" of the doctrine in this circuit. The doctrine now has no viability at all. The court will not permit the use of such shorthand references to "defendants" to meet the particularity requirements of the PSLRA. This notwithstanding, the court observes that the plaintiffs do make substantial allegations that particular defendants were identified in press releases and conference calls with analysts. Likewise, the plaintiffs note, when appropriate, the signatories to the various SEC filings. No party has suggested that further repleading is necessary at this

stage; accordingly, the court will consider the TAC as it stands under the decision in *Southland.*

### 2. Failure to Adequately Identify the Source of their "Information and Belief"

**\*23** The 1934 Act Individual Defendants next contend that the TAC should be dismissed because the plaintiffs have not adequately identified the source of the allegations that are not based on the plaintiffs' personal knowledge. In addition, these defendants contend that no inference of fraud is raised without an adequate showing of the foundation of the Sources' information and its reliability. The defendants argue that the TAC fails to describe the details concerning how, when, and where any of the Sources acquired their information.

The plaintiffs respond by stating that even though they did not disclose the names, they provided information about the Sources' job positions to support the probability that those persons would possess the information pleaded to support the allegations, as well as used information that predated their employment to know that the misrepresentations had been ongoing. The plaintiffs respond further by stating that these Sources have personal knowledge of the events, meetings, and internal reports that evidence the misrepresentations and personal knowledge that the defendants attended the meetings and reviewed the documents and reports.

Applying the standards announced in *ABC Arbitrage,* the court finds that the plaintiffs have sufficiently identified the Sources who provided the information for their allegations. Although the TAC does not name the Sources, it discloses specific information about the positions held by the Sources, the time period in which they worked for the Company, and their job responsibilities. The TAC also discusses how the Sources received the information underlying the allegations and to whom the information was forwarded. Based on the particularity with which the allegations discuss the Sources themselves and the specifics regarding how the Sources acquired the information and knowledge underlying the allegations, the court holds that the allegations in the TAC are adequately pleaded to support the probability that the Sources would possess the information pleaded that support the allegations of false or misleading statements by the defendants.

### 3. Failure to Plead Fraud with Particularity

The 1934 Act Individual Defendants raise several issues with respect to whether the plaintiffs have sufficiently pleaded

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 18 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported In...

2004 WL 5278716

fraud with particularity. First, the defendants attack the pleading as it relates to financial reports, reports on retail stores, and Monday meetings. The defendants argue that the TAC does not allege specifically how the Sources know that the 1934 Act Individual Defendants knew about the improper earnings manipulations or knew what was being discussed at the Monday meetings. In addition, the defendants contend that there are no allegations that show that the 1934 Act Individual Defendants knew that the vendor deductions, same store sales analysis and improper classification of recurring expenses in the retail segment were improper.

The plaintiffs respond by arguing that the defendants are merely pointing to isolated paragraphs but that the totality of the complaint is what is determinative. With regard to the financial reports, reports on retail stores, and Monday meetings, the plaintiffs posit that the Sources prepared the financial reports with the manipulations as directed by defendants Dahlen and Hansen and known to the other 1934 Act Individual Defendants, prepared charts of retail store sales growth at the request of Hansen, and that the charts and manipulations were discussed at the Monday meetings.

 *24  Although documentary evidence, such as internal reports, may be the basis underlying the allegations in the TAC of false and misleading statements, an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Abrams, 292 F.3d at 432* (stating that plaintiffs did not point to any particular reports or information—available to the defendants before the announced financial restatements—that are contrary to the restatements and that it would be easier to infer that they had received such reports if information were given about who generated the reports, when they were reviewed, how defendants responded, etc.). Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients. *Id.* A plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. *ABC Arbitrage,* 291 F.3d at 356. However, the Fifth Circuit has expressly declined to adopt as a standard the threshold requirement in every case that the plaintiffs must provide report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information. *Id.* at 355.

A complaint can satisfy the PSLRA by providing documentary evidence and/*or* a sufficient general description of the personal sources of the plaintiffs' beliefs. *ABC Arbitrage,* 291 F.3d at 352. In this case, the plaintiffs have satisfied the pleading requirements by providing not only a sufficient factual basis for the internal reports, but also a sufficient factual basis for the information contained in the reports by virtue of the allegations concerning the Sources discussed above. The allegations contain numerous references to reports as outlined above, but in each instance the allegations contain sufficient factual information concerning the reports as required by *ABC Arbitrage* and/or are based upon information provided by the Sources. Therefore, the allegations in the complaint concerning internal reports are adequately pleaded.

Likewise, the allegations concerning the defendants and the Monday meetings are based on factual allegations provided by the Sources. The factual allegations in the TAC concerning the Sources support the belief that the Sources would possess the information about the Monday meetings. As discussed in *ABC Arbitrage,* as long as the factual basis concerning the Sources is adequate, the plaintiffs' allegations of false or misleading statements based on information provided by the Sources are adequate to satisfy the heightened pleading standards.

The court now considers whether the plaintiffs have sufficiently attributed any misrepresentation of fact to any particular 1934 Act Individual Defendant in light of the *Southland* decision. The court will address Fleming's statements concerning its earnings, followed by the same store sales reporting, and conclude with a discussion of the defendants' arguments concerning puffery, materiality and forward-looking statements. At the outset, the court agrees with the plaintiffs that Fleming's need to restate its earnings makes the plaintiffs' burden to demonstrate the falsity of particular earnings statements easier to discharge. The company made a public announcement that its earnings needed to be restated and that the restatement of its earnings for 2001 and 2002 would approximate $85 million, or 79% of Fleming's reported earnings for the time period at issue. At this point, the court is not addressing the scienter requirement; rather, the court is addressing whether the plaintiffs have sufficiently pleaded with particularity the falsity of the statements that any individual defendant made about Fleming's 2001 and 2002 earnings. The magnitude alone of the forecasted restatement is a testament to its materiality. And, although the court is not at this point

addressing scienter, the size of the restatement shall figure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter.

**\*25** The earnings statements made in the May 29, 2001, August 24, 2001, and November 15, 2001 Form 10Qs filed with the SEC are pleaded with sufficient particularity as against defendant Neal Rider, who signed the Form 10Qs for 2001 Q1 and Q2. They are also sufficient as against defendant Mark Shapiro, who signed the Form 10Q for Q3 of 2001. The plaintiffs have not alleged how any person other than Rider or Shapiro contributed to any specific portions of the Form 10Qs. Therefore, the claims based on the Form 10Qs are limited to defendant Rider and Shapiro, as they signed the forms.

As to the March 6, 2002 Form 10K filed with the SEC reporting year end financial information, the statements of earnings contained therein are pleaded with sufficient particularity as to defendants Hansen, Rider and Shapiro. (TAC, ¶¶ 204, 210, 217, 229). The company's earnings as reported in the Registration Statement filed in anticipation of the March 2002 Note Offering, which incorporated the Form 10K from 2001 is also pleaded with particularity as to defendants Hansen, Rider and Shapiro.

With respect to the 2001 earnings reports set forth above, the plaintiffs have adequately alleged why the statements are false. The plaintiffs have alleged that Fleming itself has announced that its 2001 earnings information is false, and materially so. In the court's opinion, the announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false. There is no reasonable argument that could be made that the proposed restatement, even though it has not yet occurred, is anything other than a material one. Consequently, as to the 2001 earnings information, the court is persuaded that the plaintiffs have sufficiently alleged the who, what, why, where, when, and how required by Rule 9(b) as against the defendants included above.

The court now turns to the 2002 earnings information. First, the plaintiff has pleaded with sufficient particularity the statements contained in Fleming's Form 10Q filed with the SEC on May 17, 2002 (TAC, ¶ 245) and signed by defendant Shapiro. Second, defendant Rider's statements made in the conference call following the release of the 1Q 2002 results that "our EBITDA, for continuing operations was $32.6 million for 4.87 percent of sales" is also sufficiently pleaded

with particularity. (TAC, ¶ 244). Third, the earnings reported in the June 2002 Registration Statement which, in turn, incorporated the company's financial results included in the 2001 10K filed with the SEC and signed by defendants Hanson, Rider and Shapiro is sufficiently pleaded with particularity. Fourth, the earnings reported in the August 27, 2002 Form 10Q filed with the SEC and signed by defendant Shapiro are pleaded with sufficient particularity. Fifth, with respect to reserves, defendant Rider's statements on the September 5, 2002 conference call with analysts that "[e]verything would be appropriately reserved for, correct" and that "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that risen to the level that we are at an impasse today" are sufficiently pleaded with particularity. Sixth, the court finds that the earnings reported in the company's amended 10Qs and 10K filed with the SEC on October 16, 2002 for Q1 and Q2 of 2002 of FY 2001 and signed and/or certified by Shapiro, Hansen and Rider are pleaded with particularity. Seventh, the court holds that the representations of earnings contained in Fleming's 10Q for the third quarter of 2002 have been pleaded with particularity. That form was signed by Shapiro and certified by Hansen and Rider. Finally, the court holds that the statements made by Shapiro in the January 23, 2003 conference call are pleaded with sufficient particularity. (TAC, ¶ 311).

**\*26** As to defendant Stephen Davis, the plaintiffs do not allege that Davis personally made any particular oral false statements or signed any of the press releases or SEC forms which contained the alleged misstated earnings.[5] Consequently, the court examines whether there are any "particular factual allegations explaining an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement." The closest that the plaintiffs come is "[d]uring that same period, Fleming's wholesale president—defendant Stephen Davis—with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants, also utilized a variety of techniques, including the accrual of unauthorized, improper and unsustainable deductions from accounts payable due to vendors, to inflate earnings in violation of accepted accounting practices." (TAC, ¶ 14). But the plaintiffs' allegation that Davis performed accounting "manipulations" or violated accounting standards or that he did so with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants falls far short of alleging specific facts that Davis prepared any portion of a

Fleming report or that, even if he did, that he did so with the knowledge or reckless disregard for the truth that the federal securities laws require to maintain a fraud claim. As such, the court dismisses the primary liability claims asserted against defendant Stephen Davis under section 10. The TAC is also silent as to specific allegations that Davis possessed the power or authority to control the operations of the company in general or had specific control over the activity upon which the primary violation is predicated. *McNamara v. Bre–X Minerals, Ltd.,* 46 F.Supp.2d 628, 638 (E.D.Tex.1999). The court therefore dismisses the controlling person claims against him as well.

The court now turns to a discussion of the statements claimed to be corporate puffing, nonmaterial, or forward-looking. The statements primarily under attack by the 1934 Act Defendants include: (1) statements regarding a "culture of thrift" or cost savings in light of the existence of the Fleming Air Force (2) statements regarding Fleming's overvalued retail stores (3) statements regarding Fleming not having a liquidity problem (4) Fleming's artificially inflated earnings in the October 23, 2002 press release and (5) Fleming's artificially inflated earnings in the January 23, 2003 press release. Because the motion to dismiss could be read, however, to challenge a broader range of statements (Joint Motion to Dismiss, p. 18 "[m]oreover, many of the alleged statements are either not material, or they are not false and misleading."), the court has endeavored to examine all of the alleged statements to assess their materiality and falsity.

The "culture of thrift" statement is not actionable. The plaintiffs argue that a statement that Fleming instituted "a culture of thrift" was misleading in light of their use of jets to fly home on the weekends and that one of the Sources knew that the executives had not instituted this culture. This statement is simply too general to constitute a material misstatement as required under Rule 10b–5. It is more in the nature of a corporate statement concerning a competitive strength of the company. As the defendants correctly observe, the courts have consistently held that analysts and investors rely on *facts* in making investment decisions, not vague expressions of corporate optimism or competitive strengths. *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869–70 (5th Cir.2003). "The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Id.* at 869. The TAC does not contain any allegations as to why the statement is rendered false by the

allegations concerning the Fleming Air Force. Therefore, the statement is not actionable.

**\*27** The next statement involves a January 14, 2003, press release where Fleming announced that it was marking down the "realizable value" of its retail stores by $116 million. The press release stated that "the company will record a non-cash charge of approximately $116 million to discontinued operations in the fourth quarter, to adjust the carrying value of the retail assets to their estimated net realizable value." The plaintiffs contend that this is a material misstatement in that this write-down did not result in the assets being adjusted "to their estimated net realizable value." The plaintiffs point to a subsequent press release from April 17, 2003, in which the Company announced "an additional impairment charge to discontinued operations of approximately $90 million related to retail store operations held for sale, due to a reduction in the net realizable value of such operations." Further, plaintiffs allege that the 1934 Act Individual Defendants, specifically Hansen, Rider, and Dahlen, received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores. In the second half of 2002, Source 4 prepared a report charting the trends in sales for newly-opened price-impact stores showing that the sales for a typical Fleming store declined consistently after opening, and never increased. The plaintiffs conclude that these allegations show that the net realizable value after the January 2003 write down was a material misrepresentation that the 1934 Act Defendants knew was false.

These allegations are not sufficient to make the statement actionable. The allegations do not provide enough information to show that the defendants knew even within a reasonable estimate the actual amount of the net realizable value. Measuring the net realizable value of a group of assets is not an exact science. The April, 2003, write-down easily could have been the result of the defendants being too optimistic in January of 2003 about how much a willing purchaser would pay for the assets or the result of subsequent events in the economy or operations. More to the point, the allegations revolve around the knowledge of the defendants in 2002, but does not address the knowledge of the defendants at the time of the first write-down. As such, the court holds that this statement is not actionable.

The third statement that the 1934 Act Defendants specifically contend is not adequately pleaded is a statement in a January 23, 2003 conference call in which an unidentified officer of the company stated in response to a question

suggesting that the Company was having liquidity problems that "no [we are not dipping lower and lower versus the loan covenants,] ... [t]hree of the four covenants, we are consistently-have ample room underneath those covenants. The one covenant that we keep bumping up against, at least over the past few quarters, is debt-to-EBITDA." The question posed specifically addressed the loan covenants and Fleming's ability to meet the loan covenants. The plaintiffs do not provide any specific allegations, other than the Company's eventual bankruptcy on April 1, 2003, to show that the defendant knew the statement was false when it was made and that the Company did not have ample room underneath the three covenants. Therefore, the plaintiffs' allegations are not sufficient to make the statement actionable. [6]

**\*28** The next two statements concern the allegations that the defendants overstated Fleming's wholesale earnings in an October 23, 2002 press release and January 23, 2003 press release. (TAC, ¶ 312–313). The defendants contend that the allegations are conclusory and refer to the entire press release quoted in its entirety in a previous paragraph. The defendants are correct, in that plaintiffs cannot simply recite portions of publicly disclosed documents and summarily allege that they are false and misleading. *BMC Software, 183 F.Supp.2d at 886*. With respect to the October 23, 2002 press release, the plaintiffs do not allege who the earnings information is attributed to; therefore, they have not satisfied *Southland.* As to the January 2003, press release, the allegations specifically attribute the statements only to defendant Shapiro; accordingly the court holds that the statements are only pleaded with sufficient particularity as to that defendant.

The plaintiffs' allegations, moreover, specifically state that "[i]n the October 23, 2002, press release and in the conference call, the 1934 Act defendants overstated Fleming's wholesale earnings" and "[i]n the ... January 23, 2003 press release[ ] ..., the 1934 Act Individual defendants again knowingly or recklessly overstated Fleming's earnings by failing to account for the manipulations described in this Complaint." The bullet items listed below the allegations are the links to the previous allegations supporting why the statements as to earnings were false. Looking at the totality of the TAC and its allegations concerning the ongoing use of various manipulations and overstatement of earnings throughout the Class Period up until the announced restatements in April of 2003, the court finds the allegations sufficient. Therefore, the court finds that the plaintiffs' allegations are sufficient to plead with particularity the material misstatements and why they are

false and misleading with respect to the January 2003 press release.

### 4. Failure to Adequately Plead Scienter

The 1934 Act Individual Defendants and D & T also contend that plaintiffs failed to adequately plead allegations giving rise to a strong inference of scienter as to each defendant. The plaintiffs respond by stating that they have adequately pleaded scienter against each of the 1934 Act Individual Defendants by alleging not only motive and opportunity, the close involvement of the individual defendants with the operations of Fleming, the violation of GAAP, and the magnitude of the fraud; but also the plaintiffs allege direct evidence of scienter by pointing to individual defendants and alleging that they directed manipulations resulting in misrepresentations on numerous occasions and knew about discrepancies in financial information and either made misstatements or omissions about the information or failed to correct previous misrepresentations or omissions.

The plaintiffs contend that they have adequately pleaded scienter against D & T by alleging red flags, numerous violations of the accounting and auditing standards, GAAP and GAAS, the simplicity of the accounting principles violated, the relative ease with which the fraud could have been detected, the magnitude of the restatement, and motive and opportunity. With the above standards as to pleading allegations of a strong inference of scienter in mind, the court now turns to the allegations as to each defendant.

**\*29** Mark Hansen was Chief Executive Officer of Fleming from November 1998 until March 3, 2003. Hansen contends that the allegations of scienter against him are insufficient. Hansen contends that Fleming's deduction practices have not been shown with particularity to be fraudulent and thus the allegations are not sufficient to show scienter. Also, Hansen contends that the TAC does not state with particularity that he had the information or knew of the information with regard to allegedly fraudulent deductions and accounting practices, only that he must have known about them. In addition, Hansen contends that the TAC does not specifically state what was in the reports and comparisons available to him. Finally, Hansen states that the TAC includes impermissible general allegations against the defendants as a whole that is foreclosed due to the fact that the group pleading doctrine is no longer followed after the enactment of the PSLRA.

The plaintiffs urge that Hansen himself publicly touted Fleming's strategic plan, portrayed himself as knowledgeable

concerning Fleming's earnings, sales, and operations, and represented to the market that earnings and sales were growing. The plaintiffs further contend that the deduction practices were fraudulent in that they went beyond industry practices, were done without vendor permission, and were improper and baseless. Specifically, the plaintiffs point to statements by Source 1 that deductions were taken and accrued to increase earnings before Fleming had even identified the vendor, the product, and the basis for the deduction. The plaintiffs argue that these allegations give rise to a strong inference that the deductions were not a legitimate cost reduction, but were instead accounting manipulations.

Additionally, plaintiffs point out that Source 1 personally participated in the delivery of reports showing revenue, cost, and margins in both the wholesale and retail segments to Hansen that showed the true financial picture for Fleming. The plaintiffs contend that the Sources give direct evidence that defendant Hansen was provided information showing that Fleming's internally-reported earnings were substantially different from Fleming's publicly-reported earnings. Also, the plaintiffs contend that Hansen's presence at Monday meetings where there were reports showing the discrepancies and discussions about the deduction practices supports a strong inference of scienter.

The plaintiffs thus attempt to allege a strong inference of scienter with regard to Hansen with numerous allegations that he knew of accounting manipulations, received reports showing the actual numbers, and made statements or signed filings containing representations that conflicted with the information that he knew about or recklessly disregarded. With regard to receiving reports of financial information and attending meetings where the manipulations and financial information were discussed the TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers' " along with other financial analysts and "compile [d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen. According to Source 1, Hansen received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. Also, the TAC alleges that the general ledger was published during the Class Period to Hansen.

 **\*30**  Source 4 also contributed to the allegations related to Hansen. Starting in July of 2001 and continuing through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "[h]ard copies of these reports were given directly to Hansen. At the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Hansen—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining.

According to Sources 1 and 4, Hansen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Further, Hansen received special daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he made public statements claiming that Fleming's retail segment was growing. In July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. Using data that had been available to Hansen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. In addition, Hansen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

With regard to Hansen's personal participation in the manipulations, the TAC alleges that "Hansen ... directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors" resulting in only $78,000 of the deductions being accepted. Thus, under the plaintiffs' theory and allegations, Hansen personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth.

Hansen cites two Fifth Circuit cases that he contends support his motion to dismiss: *Goldstein v. MCI Worldcom* and *Abrams v. Baker Hughes Inc.* In *Goldstein,* the court held

that the plaintiffs' circumstantial evidence relating to the timing of accounts receivable write-offs, the magnitude of the write-offs, the defendants' close involvement in the day-to-day operation and management of the company, and the defendants' positions in the company and alleged decision-making roles in writing off uncollectible accounts failed to sufficiently connect the defendants to support a strong inference of scienter. 340 F.3d at 248–54. In *Abrams,* the court held that the plaintiffs' circumstantial evidence relating to the defendants' receipt of financial reports that apprised them of the company's true financial status, the company's violations of GAAP, the defendants' desire to raise money and protect their incentive compensation, and the timing of the resignation of certain accounting department employees was insufficient to demonstrate a strong inference of scienter. 292 F.3d at 431–35.

 **\*31** These decisions notwithstanding, the allegations against Hansen taken as a whole sufficiently allege a strong inference of scienter. The allegations in the TAC include not only circumstantial evidence similar to that discussed in the cases above, but also direct evidence of Hansen's knowledge of and involvement in the scheme. In addition, the weakness of the allegations as to internal reports discussed by the Fifth Circuit in the two cases discussed above is not present in this case.

In *Abrams,* the Fifth Circuit held that "an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." 292 F.3d at 432 (quoted in *Goldstein,* 340 F.3d at 253–54). The court went on to state that "[s]uch allegations must have corroborating details regarding the contents of allegedly contrary reports of their authors and recipients." *Id.* Here, the allegations are supported by Sources who worked in the Company's accounting department and not only prepared some of the reports discussed at the request of the defendants, but also delivered them to the defendants. Other allegations state that the Sources saw reports that were prepared by other accounting managers, knew the contents of the reports, and knew that the reports were forwarded to the defendants.

In *ABC Arbitrage* the Fifth Circuit held that plaintiffs could satisfy the reports "standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them." 291 F.3d at 356 (quoting *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72, 73 (2d Cir.2001)). Further, the court held that the allegations as to Monthly Management Reports in the case met the

standard because they identified the reports as "being prepared monthly by each subsidiary's controller's office and transmitted to the defendants at the beginning of each month to convey information about the Telecom sector at each subsidiary by comparing actual results to budgeted numbers." *Id.* at 357. The allegations in this case are sufficiently similar and satisfy the standard as well.

In addition, these Sources had knowledge of the manipulations that resulted in the actual numbers in the reports being different from those reported to the public. The defendants contend that allegations where the Sources themselves were not actually involved in the events, but claim to have knowledge of the events are insufficient. The court in *ABC Arbitrage* noted that if the documentary evidence does not provide an adequate basis for believing that the defendants' statements or omissions are false, then the plaintiffs can satisfy their pleading burden with allegations from confidential sources as long as the sources described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. 291 F.3d at 353. Here, the allegations as to the documentary evidence and the Sources are sufficient to give rise to a strong inference of at least severe recklessness as to Hansen.

 **\*32** Neal Rider was the Chief Financial Officer of Fleming from January 2000 to February 2003. Rider contends that the allegations in the TAC against him are insufficient to give rise to a strong inference of scienter because they do not show what specific information was allegedly provided to him, why that information was false and misleading, or how he knew the information was false or that he acted with severe recklessness.

The plaintiffs respond by stating that Rider had access to all of the same information and reports alleged by the Sources. In addition, Source 4 specifically states that Rider personally approved the manipulation of same-store sales data, such that the data did not even compare sales for the same stores. The TAC also alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers' " along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Rider. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess

the retail segment's performance in comparison with the wholesale segment."

Rider also allegedly received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. The TAC alleges that starting in July of 2001 and continuing through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "[h]ard copies of these reports were given directly to ... Defendant Rider." In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Defendant Rider—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by defendant Dahlen whereby "new stores ... were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence."

Further, the TAC alleges that Rider received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores yet, he made public statements claiming that Fleming's retail segment was growing. According to Sources 1 and 4, Rider received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Using data that had been available to Rider prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format.

 **\*33**  Finally, the TAC specifically alleges that Rider attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC specifically alleges that Rider received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. The TAC

alleges that Rider participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Rider either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

Rider cites *In re Capstead Mortgage Corp. Sec. Litig.* to support his contention that the allegations are insufficient to support a strong inference of scienter. 258 F.Supp.2d 533 (N.D.Tex.2003). In that case the plaintiffs attempted to show knowing misconduct by alleging that senior officers and directors had access to and control over internal corporate data and other non-public information (specifically monthly reports on the company's intranet and monthly management reports) which contradicted their positive representations about the company's mortgage servicing operation. *Id.* at 564–65. The plaintiffs did not specifically identify any particular internal documents containing the alleged adverse information, the contents of such adverse or negative information, when the internal document containing the negative or adverse information was prepared, by whom it was prepared, or to whom it was directed. *Id.* at 565. The court stated that plaintiffs must allege facts which demonstrate that at the time defendants made representations regarding projected earnings and dividends, defendants knew or were severely reckless in not knowing information that adversely impacted the earnings. *Id.* The court specifically held that allegations the defendants were aware of the adverse information were insufficient due to the fact that the plaintiffs had not cited any documentary evidence or personal sources to establish the basis for this belief. *Id.* In this case, by contrast, the plaintiffs have not only cited documentary evidence and reports with particular facts as to their contents, who prepared them, and who received them, but the plaintiffs have also cited the Sources to support the allegations as to the reports and their contents and defendants and their knowledge. The court holds that the TAC pleads specific facts to support a strong inference of at least severe recklessness as against Rider.

Mark Shapiro was Senior Vice President of Finance and Control and Chief Accounting Officer from at least 2001 to February 2003, at which time he was appointed Chief Financial Officer and served until late April 2003. Shapiro contends that the allegations are insufficient to allege a strong inference of scienter. Shapiro contends that a majority of the allegations are not specific to him but to the management in general and that when Shapiro is specifically mentioned the TAC does not provide facts from which one could conclude

that Shapiro knew any particular statement to be inaccurate when made. Further, Shapiro contends that the allegations that he had reports that showed variances and discrepancies are not specific enough and that allegations concerning the Monday meetings do not state when he was there or what was discussed at them.

**\*34** The plaintiffs argue that Shapiro received the reports and information showing discrepancies between internal financial information and publicly-reported numbers and the deduction practices and participated in Monday meetings where flat or declining retail sales, variances between public and internal finances, and deduction practices were discussed. Further, the plaintiffs allege that Shapiro had a central role in the intentional weakening of Fleming's accounting practices, the linchpin of the manipulation scheme, when all divisional accounting operations were centralized in Oklahoma City and managed by unqualified division reports. This, the plaintiffs contend, allowed the company to put tight reigns on the manipulations and oversee them.

In addition, plaintiffs contend that Sources 2 and 3 have knowledge of Shapiro's knowledge of and participation in a scheme to defraud vendors to obtain unearned promotional funds to inflate its earnings. The plaintiffs allege that Shapiro directly participated in inventory manipulations to inflate earnings and shift losses from continuing operations to discontinued operations.

The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers' " along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Shapiro. According to Sources 1 and 4, Shapiro received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. The TAC also alleges that Shapiro participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Shapiro either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. The TAC specifically alleges that Shapiro attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

Under the allegations of the TAC, Shapiro received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. Also, the TAC alleges that Fleming, at the direction of Shapiro, did not recognize a $1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. The TAC further alleges that "Source 1 saw reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." The TAC alleges that Shapiro received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. On balance, and reading the complaint as a whole, the court is persuaded that the allegations raise a strong inference of at least severe recklessness against Shapiro.

**\*35** Thomas Dahlen was Executive Vice President and President, Retail and Marketing for Fleming in April 2001, and resigned effective December 31, 2002. Dahlen contends that the allegations are insufficient to support a strong inference of scienter. The court disagrees. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers' " along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Dahlen. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment."

In addition, Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] received." The TAC further alleges that "accrual of these unauthorized, improper, and unsustainable deductions was directed by Defendant Dahlen [and the retail CFO; and that the retail CFO] often accrued

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 26 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions." In the TAC Source 1 alleges that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." The TAC alleges that "[b]y June 2002, Source 1 was emailing Source 1's deduction worksheets to Defendant Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "[e]ven after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction."

The TAC alleges that "Defendant Dahlen directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." Further, Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by defendant Dahlen. According to Sources 1 and 4, Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002.

The TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide adverse sales trend" by rejecting the data from the financial analysts and 'chang[ing] the composition of the population of stores which constituted the Company's 'same stores.' ' Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year 'same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a 'same store' comparison as is commonly understood in the retail industry." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores ... were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." Further, the TAC alleges that according to Source 1, in at

least one instance in late 2001 or early 2002, Fleming—at the direction of Dahlen and [the retail CFO]—reduced the previously reported same store sales for the year 2000 fiscal year by subtracting $1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $4.7 million in red tag sales." The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Defendant Dahlen—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "electronic copies were provided to defendant Dahlen." Using data that had been available to Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. The TAC specifically alleges that Dahlen received weekly, monthly, and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, as well as, received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he either made or failed to correct misrepresentations claiming that Fleming's retail segment was growing.

**\*36** Also, the TAC specifically alleges that Dahlen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC alleges that defendants Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

The TAC includes allegations that Dahlen made false and misleading public statements about Fleming's financial

results, the health of the company, its prospects for growth, and the true nature and extent of the fraud, as well as, disclose false financial information and made public statements that were false, misleading, and in conflict with the information that the Sources had personally communicated to him. According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. The court finds that the allegations are sufficient to support a strong inference of scienter as to Dahlen. The allegations are specific as to the information that Dahlen possessed and his participation in the accounting manipulations.

D & T was the outside auditor for Fleming beginning in at least 1994 and throughout the Class Period. Defendant D & T contends that the plaintiffs failed to adequately allege scienter with respect to claims under section 10(b) of material misrepresentations involving D & T's issuance of its allegedly false and misleading 2001 audit opinion and quarterly Review Reports. D & T contends that the TAC is not sufficiently detailed and argues that the plaintiffs' alternative pleading that D & T either "knew" or "should have known" is not sufficient to show recklessness. Specifically, D & T states that the plaintiffs do not allege that the specific vendor deductions actually tested were fraudulent. Further, D & T points to the TAC's allegations that the fraud was concealed by Fleming and its employees from D & T and states that these allegations undercut the plaintiffs' scienter allegations as to D & T. Also, D & T contends that motive and opportunity alone do not suffice for an inference of scienter. Finally, D & T argues that it is not liable as an aider and abetter under *Central Bank*.

The plaintiffs respond by stating that the following facts establish a strong inference of scienter: (1) numerous red flags existed that should have alerted D & T of Fleming's fraud, (2) the magnitude of the restatement was significant, (3) violations of Generally Accepted Accounting Principles ("GAAP") were repetitive and over several fiscal years, (4) the accounting principles violated were relatively simple, (5) D & T failed to obtain sufficient evidentiary support for account balances in violation of Generally Accepted Auditing Standards ("GAAS"), (6) D & T failed to follow-up on known accounting errors in violation of GAAS, (7) the fraudulent vendor deduction scheme could have been identified with relative ease, and (8) D & T had a financial motive to engage in fraudulent or reckless conduct. The plaintiffs contend that

the totality of these allegations in the TAC in light of the restatement give rise to a strong inference of scienter.

**\*37** More specifically, the plaintiffs contend that the following sixteen red flags existed during the Class Period that should have alerted D & T that Fleming was artificially inflating its financial results: (1) a decline in net income for the years 1995–2000 that gave Fleming an incentive to manipulate its financial results, (2) self-imposed pressure by Fleming by setting aggressive earnings targets and unrealistic forecasts, (3) the gutting of Fleming's accounting staff and weakening of internal controls and centralization of accounting at the company's headquarters, (4) making non-accountant division presidents responsible for the financial reporting functions, (5) shortening of the monthly closing period and increased time pressure, (6) entering into large long-term contract with tight profit margins, (7) improper lengthening of the amortization period for long-term assets to reduce expense and increase income, (8) overstatement of inventory at one of the divisions by $1 million, (9) the remitting of payments by Fleming during the time of the 2001 audit field work to vendors who refused to accept deductions, (10) increase in the vendor deduction account to $120 million, (11) the elimination of the reserve against vendor deductions (12) the tying of executive bonuses to targeted earnings and the achievement of those earnings and payment of bonuses equaling 200% of the base salaries in 2001, (13) the findings of Ernst & Young of Fleming's excess price charges to its customers and demand by the auditor to be transferred away from Fleming when Fleming would not correct the overcharges, (14) the pending of lawsuits for overcharging customers, (15) Fleming's debit memos for vendor deductions did not identify the vendor invoices from which the deductions were taken, (16) the reporting by both the wholesale and retail segments of vendor deductions from the same product resulting in double accruals.

The plaintiffs state that with regard to testing, the allegations need only state that the auditor failed to test the items altogether, or inadequately tested items by selecting an insufficient sample size, or adequately tested items but turned a blind eye to errors that were discovered. The plaintiffs contend that "should have known" allegations are sufficient and that even though Fleming provided allegedly false information there was no basis or backup documentation supporting the information and that if D & T had sought backup in accordance with auditing procedures it would have learned of the falsity. The plaintiffs further contend that motive and opportunity can add weight to the scienter

calculus and that D & T's consulting work and corresponding fees amounting to two times the audit fees is sufficient motive. Finally, the plaintiffs state that D & T is not alleged to be an aider and abetter, but instead is liable as a primary violator upon the false statements contained in the audit opinion and review reports. [7]

With regard to sufficiently alleging scienter against auditors, courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an auditor performed a reckless or fraudulent audit: 1) red flags regarding accounting matters, 2) restated financial statements, 3) an auditor's failure to obtain sufficient support for account balances, and 4) an auditor's failure to follow-up on known accounting errors. *In re Enron,* 235 F.Supp.2d at 677–79, 706–07. The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct. *Id.* Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circumstances surrounding the restatement. *In re Triton,* 2001 WL 872019, at *11. A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the accounting principles that were violated. *Id.*

**\*38** Likewise, mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in a section 10(b) action against an accounting firm. *Abrams,* 292 F.3d at 430. *See also Melder v. Morris,* 27 F.3d 1097, 1103 (5 th Cir.1994)("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud"); *Umsted v. Andersen LLP,* 2003 WL 222621, at *3 (N.D.Tex. Jan.28, 2003)(noting that there is a judicial consensus that mere general allegations of violations of GAAP and/or GAAS are insufficient to state a claim for securities fraud). The plaintiffs must link such allegations of violations of GAAP and/or GAAS with fraudulent intent by showing that the firm deliberately misrepresented material fact or acted with reckless disregard about accuracy of its audits or reports. *Abrams,* 292 F.3d at 430; *Novak,* 216 F.3d at 308.

Recent cases provide insight about circumstances under which allegations of financial restatements and/or GAAP or GAAS violations, under the totality of circumstances, may constitute important factors in evaluating whether scienter has been adequately pleaded. Some of the factors recent courts have frequently addressed include: (a) the nature, size, and scope of GAAP violations; (b) the magnitude and frequency of restatements; and (c) whether the allegations of GAAP violations and/or restatements are accompanied by allegations of insider trading. Securities Litigation Update, SJ014 ALI–ABA 505, 516 (2003). In addition, in cases where the auditor is the defendant, courts look for "red flags" that should have put the auditor on notice of the company's financial improprieties. *Id.; see also, e.g., Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194 (11th Cir.2001).

When the defendant is an auditor, allegations that the audit was conducted negligently and allegations that the defendant lacked adequate internal controls are also routinely found insufficient. On the other hand, courts appear willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing. Securities Litigation Update, SJ014 ALI–ABA 505, 516 (2003).

For example, in *In re Ikon Office Solutions, Inc. Securities Litigation,* the court found the plaintiff properly pleaded scienter by alleging defendant (1) violated auditing principles and (2) had notes in its accounting file regarding an audit committee meeting which specifically referred to one employee "cooking the books." 66 F.Supp.2d 622, 629–34 (E.D.Pa.1999). In *In re Health Management, Inc. Sec. Litig.,* the court denied an auditor's motion to dismiss where plaintiff pleaded violations of GAAP/GAAS coupled with red flags of suspicious inventory shipments, and an analyst's letter alerting the auditor to inflated accounts receivables. 970 F.Supp. 192, 202–03 (E.D.N.Y.1997). In *Carley Capital Group v. Deloitte & Touche, L.L.P.,* the court denied an auditor's motion to dismiss, finding plaintiffs adequately pleaded scienter by alleging violations of GAAS coupled with the auditor's unrestricted access to financially records, heavy involvement in management and highly suspicious revenue manipulations that would have "put prudent auditors on notice." 27 F.Supp.2d 1324, 1339–40 (N.D.Ga.1998). The court concluded that alleged violations of accounting principles "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter ... [and] the totality and magnitude of the ...

accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Id.*

**\*39** Recently, in *In re Worldcom, Inc. Sec. Litig.* the court held the pleadings of scienter sufficient as to an outside auditing firm and denied its motion to dismiss. 2003 WL 21488087, at \*7 (S.D.N.Y. June 25, 2003). The court noted that the auditor had unlimited access to the company's books and records and an obligation to review and evaluate those records in order to form an opinion regarding the company's financial statements. The court discussed the obligations of an outside auditor as follows:

> Independent auditors [have unlimited access to the client's books and records and] are charged with obtaining and evaluating evidence concerning the assertions made in their client's financial statements. Auditors are not entitled to allow representations from a company's management to substitute for the auditing procedures that are necessary to provide a reasonable basis for forming an opinion regarding the financial statements that are the subject of the audit. In auditing the financial statements, an auditor may consider as evidence all books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations and reconciliations. The underlying accounting data should be considered when forming an opinion as to the financial statements. Professional auditors are required to act diligently and in good faith, and to apply a professional skepticism to their evaluation of evidence. An auditor should conduct the audit objectively, thoroughly and carefully. Before certifying

> financial statements, an auditor should have an understanding of the factors that may have a significant effect on the financial statements.

*Id.* at \*3–4. The court further noted that the defendant's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs. The court noted that had the auditor reviewed the company's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. Additionally, the court pointed to the fact that the complaint identified the steps the auditor should have taken and failed to take, and the fraud it would have discovered if it had taken those steps. In that case, the defendants pointed to the subsequent indictments and guilty pleas of former company executives showing that the company's senior management had lied to and concealed the falsification of the books from the auditors as evidence that the defendants lacked scienter. The court rejected the argument noting that the auditor would have uncovered the fraud perpetrated by the company if it had conducted the review it was required to do before issuing its audit opinions and that the auditor's audit opinions included in the company's year-end financial statements materially misrepresented the company's financial state.

**\*40** In this case, the court finds that the TAC in its totality sufficiently alleges scienter as to D & T. To begin with, the TAC includes allegations substantial allegations of motive and opportunity. Specifically, the TAC alleges that D & T served continuously as the company's auditor from at least 1994 through the class period. During that time D & T personnel were present at the company's headquarters frequently throughout the year and had continual access to and knowledge of Fleming's private and confidential corporate, financial, and business information giving D & T thorough knowledge of all aspects of Fleming's financial history, accounting practices, internal controls, and business operations.

Additionally, the TAC's allegations that D & T had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that of its auditing fees are sufficient to support an inference of scienter as well. *Nathenson,* 267 F.3d at 412 (holding that motive and opportunity to commit fraud may be facts that add to the scienter calculus); *see also In re Global Crossing, Ltd.*

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 30 of 80
In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...
2004 WL 5278716

*Sec. Litig.,* 2004 WL 763890, at *20–21 (S.D.N.Y. Mar.23, 2004)(finding motive allegations sufficient where the auditor generated consulting fees of six times its auditing fees and noting that an auditor may take on "a vested interested in the performance and profitability" of its client, and consequently "weaken[ ] its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud") (quoting *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 655 (E.D.Va.2000)). Courts have been especially ready to find motive pleading adequate to survive dismissal in cases where the auditing company plays a dual rule [8] with respect to the client. *Id.* at 20 (collecting cases).

The allegations surrounding D & T's failure to uncover the lack of internal controls and accounting manipulations are also pleaded sufficiently to give rise to a strong inference of scienter. Specifically, as to the lack of internal controls, the TAC alleges that during the latter part of 2001 the company terminated the controllers, the accounts receivable and accounts payable managers, and clerks from each division and centralized its accounting operations at the company's headquarters. Further, the TAC alleges that the company terminated its divisional internal audit staff and outsourced the function to Ernst & Young. Subsequently, the lone E & Y internal auditor allegedly demanded a transfer to another client after learning of the company's widespread improprieties. The TAC alleges that these conditions— inadequate staffing of accounting personnel, the absence of documentation supporting transactions, journal entries, and lack of any internal auditing of operations—required D & T to expand the extent of procedures applied as required by GAAS (AU § 312). [9]

With regard to the accounting manipulations, the TAC alleges that the Company accrued large amounts of unauthorized vendor deductions that D & T failed to discover during its audit and review procedures. The TAC alleges that the company violated GAAP by reducing both its accounts payable and cost of goods sold by the amount of the vendor deductions even before the vendor had received the debit memorandum and approved the deduction in contravention of FASB Statement No. 5. [10] The accrual of these vendor deductions resulted in earnings being overstated by up to $120 million at any one time during 2001 and 2002 amounting to more than 10% of the accounts payable during the class period and resulting in a material reduction of accounts payable that obligated D & T to audit their validity.

**\*41** The TAC alleges that, according to Source 3, D & T received copies of the debit memorandums in its audit packages, but never requested the invoices for which the debit memorandums were issued and never asked any questions, requested supporting documents, or sought verification of any documents or entry in contravention of GAAS (AU §§ 326 and 330). [11] The TAC alleges that if D & T during its interim reviews starting in mid–2001 had compared the magnitude of the dollar amount of vendor deductions issued during the fiscal quarter with the magnitude of the dollar amount of vendor deductions issued during the comparable prior period's quarter and during the immediate proceeding quarter in accordance with GAAS (AU § 722), [12] then D & T would have learned of the huge dollar amount of unauthorized, improper, and unsustainable deductions.

The TAC alleges that although the Company created debit memorandums supporting the deduction amounts, the debit memorandums did not include vendor invoice numbers that would allow the tracking of the deductions to the relevant invoice in an attempt to determine its validity. The TAC posits that had D & T adequately tested the debit memorandums in accordance with GAAS (AU § 150) [13] to determine their validity by inspecting vendor correspondence, examining signed vendor contracts, and inspecting the vendor statements, D & T would have learned that the claimed deductions were after-the-fact and after-delivery de facto unsubstantiated deductions disputed by the vendors. Additionally, the TAC alleges that letters from irate vendors disputing large deductions such as Agrilink Foods Inc., Kellogg Co., Unilever PLC, Oil–Dri, Solo Cup Co. were readily available for review by D & T in the vendor correspondence files. Further, the TAC alleges that the Company's reserve against doubtful deductions to accounts payable was at all times either insufficient to cover the extent of the disputed deductions or reversed to eliminate any reserve for the deductions.

With the amount of the deductions allegedly increasing to, at one point, upwards of $120 million, D & T's failure to test the legitimacy of the vendor deductions and the reserve account exceed an inference of negligence. Finally, the company's announcement in April of 2003 of a restatement of earnings of $85 million due to accounting irregularities accounting for 79% of the company's reported earnings for the time period at issue adds to and supports the allegations of a material misrepresentation in the company's financial statements and an inference of scienter. *In re MicroStrategy,* 115 F.Supp.2d at 652 (holding that the magnitude of the restatement and the

simplicity of the GAAP principles violated in the case and the ease with which the violations could be detected suggest a deliberate ignorance on the auditor's part and support an inference of scienter). Therefore, the court finds that the totality of the allegations of scienter in the TAC sufficiently support a strong inference of scienter as to D & T. As a result, D & T's motion to dismiss the 1934 Act claims is denied.

### 5. Failure to Adequately Plead Loss Causation

**\*42** The 1934 Act Defendants contend that the plaintiffs have failed to adequately plead loss causation. The defendants do not dispute that the plaintiffs have adequately pleaded transaction causation through the allegations of price inflation, but the defendants contend that the plaintiffs have failed to allege that the fraudulent conduct was in some reasonably direct way responsible for the loss caused by the decline in the price of their securities. The "loss causation" provision in the PSLRA provides that

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4). At trial, the plaintiffs will be required to show that the untruth was in some reasonably direct, or proximate, way responsible for their loss. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981). The necessary element of causation includes both "loss causation" and "transaction causation." *Coates,* 26 F.Supp.2d at 922. Transaction causation, similar to "but for" causation, is another way of describing reliance and is satisfied by allegations that the "misrepresentations or omissions induced [the plaintiff] to make the investment." *Id.* On the other hand, loss causation is satisfied by allegations that the plaintiff "would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss." *Id.*

At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation, not whether they can prove it. *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 626 (N.D.Tex.1998). The PSLRA does

not affect causation pleadings, thus the allegations must only meet the traditional "fair notice" standards. *Id.* To adequately plead loss causation and survive a motion to dismiss, "[p]laintiffs need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *Id.*

In this case, the plaintiffs' allegations outline the alleged misrepresentations and omissions leading up to the stock decline that caused the stock to be artificially inflated. Next, the allegations discuss in detail the sequence of events starting with Fleming's first press release on July 30, 2002, that caused the stock price to fall from $16.18 to 10.81, and the subsequent stair step decline in the price of the stock following the release of negative information from the company and articles in the financial news culminating with the SEC's upgrading of its investigation to formal on February 25, 2003, after which the price fell from $2.97 to $1.85, and the filing of bankruptcy in April of 2003. (TAC, ¶¶ 6–12). As in *Coates,* the plaintiffs allege tremendous drops in stock price in the days after the "truth" was revealed. 26 F.Supp.2d at 922. The court in *Coates* noted that even if the plaintiffs may not ultimately be able to prove that the decline resulted from the announcements, the foregoing allegations are adequate to demonstrate loss causation. *Id.*

### 6. Failure to State a Claim for Controlling Person Liability

**\*43** The defendants contend that the TAC does not state a claim for liability under section 20(a) of the 1934 Exchange Act. Specifically, defendants contend that plaintiffs have not alleged that any of the 1934 Act Individual Defendants, in their positions as officers of the Company, controlled any of the other 1934 Act Defendants such that liability under section 20(a) could exist for other individuals' primary violations. In addition, the defendants contend that plaintiffs have failed to adequately plead the necessary control to establish section 20(a) liability for the actions of Fleming. Finally, the defendants contend that the failure to allege the existence of underlying violations of section 10(b) and Rule 10b–5 by either Fleming or any of the 1934 Act Defendants negates any claim for controlling person liability.

Section 20(a) provides that:

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

Every person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. 78t(a). Since section 20(a) is a secondary liability provision, it is necessary that a primary violation be established before liability under section 20 arises. *ABC Arbitrage,* 291 F.3d at 348 n. 57. In considering whether the plaintiff has stated a claim under section 20, the court must determine whether the plaintiff has pled facts sufficient to establish that a defendant was in control of the primary violators. Control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12(b)–2(f); *see G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957 (5 [th] Cir.1981).

Under the control person doctrine, officers and directors may be found liable even if they did not make a representation themselves or play a significant role in the preparation of a misrepresentation. *In re Enron,* 235 F.Supp.2d at 594–96; *G.A. Thompson & Co.,* 636 F.2d at 958 (holding that a plaintiff need not demonstrate "actual participation" in the underlying fraudulent transaction). However, controlling person liability requires more than merely identifying a defendant's place in the hierarchy of the company or his job title and cannot hinge solely upon a defendant's position or title. *Id.* at 621; *Dennis v. General Imaging Inc.,* 918 F.2d 496, 509–510 (5 [th] Cir.1990). " '[A] person should be presumed to be a controlling person ... if they occupy a status or position that ordinarily bestows authority to control the primary violator generally, or specifically with respect to the matter or affairs that produced the Securities Act violation." ' *In re Enron,*

2003 WL 230688, at *18 (quoting Loftus C. Carson, II, *The Liability of Controlling Persons Under the Federal Securities Acts,* 72 Notre Dame L.Rev. 263, 281–83(1997)). In various cases the Fifth Circuit has provided the possible alternative or overlapping bases: day-to-day control of the corporation operations; knowledge of the underlying primary violation by the controlled person; or facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies. *Id.; see G.A. Thompson & Co.,* 636 F.2d at 958 (holding that in determining whether a plaintiff has made a *prima facie* showing of "control," a plaintiff must plead facts indicating that the defendant "had the requisite power to directly or indirectly control or influence corporate policy"); *McNamara,* 46 F.Supp.2d at 638 (stating that although it has not been explicitly addressed by the Fifth Circuit, it does not appear that a plaintiff must establish that the defendant "actually participated in the general, day-to-day control [of the general affairs of the company]").

**\*44** Federal Rule of Civil Procedure 9(b) and 15 U.S.C. § 78u–4(b)(2) do not apply to control person claims. *In re Enron,* 2003 WL 230688, at *42–45. The plaintiffs are not required to plead facts supporting every element of a prima facie case, but must only provide the defendants fair notice of the plaintiffs' claims and the grounds upon which they rest. *Id.* Controlling persons of a controlled entity are subject to liability as a controlling person even where the controlled entity is not joined as long as there are sufficient allegations of primary violations of the securities laws by the controlled person as an element of the action. *SEC v. Savoy,* 587 F.2d 1149, 1170 n. 47 (D.C.Cir.1978). At this stage, the court has concluded that the plaintiffs have pleaded sufficient facts under the PSLRA to survive the motions to dismiss as to certain primary violations alleged against the defendants Hansen, Rider, Shapiro and Dahlen. The court will, at this stage, deny the motions to dismiss on the grounds that the plaintiffs have sufficiently pleaded controlling person liability as against these named defendants. This concludes the court's discussion of the issues related to the 1934 Act claims.

### B. Analysis of the 1933 Act Issues

The court now turns to the 1933 Act claims. These claims arise from offerings of Fleming securities to the public by means of two allegedly material false and misleading Registration Statements in March and June of 2002. The first, a March 2002, exchange offering involved the issuance of $400 million of 10 5/8% Series D Senior Subordinated Notes in exchange for all outstanding Series B and Series C notes. The second, a June 2002, offering involved the

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 33 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

sale of 8 million shares of common stock at $19.40 per share and $200 million of 9 1/4% Senior Notes from a previous shelf offering that allowed for the delayed or continuous sale of up to $600 million of debt or common stock or some combination thereof over a two-year period. The plaintiffs allege that the FY01 financial statements used in both offerings were materially false and misleading and that Fleming acknowledged later the FY01 financial statements were false and need to be restated. In addition, the plaintiffs allege that the registration statements contained materially false and misleading statements regarding Flemings' current and historical business and operating conditions and that D & T falsely represented that its audit had been conducted in conformity with GAAS and that the statements fairly presented Fleming's financial condition. The plaintiffs [14] brought actions against the 1933 Act Individual Defendants, the Underwriters, and D & T.

The 1933 Act claims do not require a plaintiff to plead or prove fraudulent conduct and the plaintiffs expressly disavow all allegations of fraud or scheme. Therefore, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) do not apply. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363 (5th Cir.2001). Notice pleading under Rule 8 is all that is required to properly state 1933 Act claims. *In re Enron,* 235 F.Supp.2d at 596. That said, the court now turns to a discussion of liability under the 1933 Act. Specifically, these plaintiffs assert claims under sections 11 and 12(a)(2) of that act.

 **\*45** Section 11 imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading and grants standing to sue to any person acquiring such security. 15 U.S .C. § 77k(a). Section 11 imposes a stringent standard of liability on the parties who play a direct role in a registered offering. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). A plaintiff who purchased a security issued pursuant to a registration statements need only show a material misstatement or omission to establish his *prima facie* case. *Id.* at 382. The plaintiffs do not have to allege knowingly or intentionally false statements in registration statement because section 11 claims do not sound in fraud. *Schlotzsky's,* 238 F.3d at 369. Section 11 does not require a plaintiff to plead or prove scienter. *Id.* Congressional policy underlying section 11 was to create liability regardless of fault. *Id.* If there is a material misstatement or omission

in the registration statement, the buyer may sue the issuer, underwriter, or signor of the registration statement.

The Fifth Circuit interprets the operative language of section 11 to allow suits to be brought by direct buyers on the day an offering closes, as well as subsequent purchasers who can trace their securities to the challenged registration statement. *Rosenzweig,* 332 F.3d at 872–73. To establish standing, the plaintiffs must allege facts to show that all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement. *Krim v. pcOrder.com, Inc.,* 210 F.R.D. 581 (W.D.Tex.2002). Where there have been multiple offerings of the same type of securities, plaintiffs do not satisfy their tracing burden by showing they probably bought stock issued pursuant to the allegedly false registration statement. *Id.* at 586.

Under section 11 an expert has an affirmative defense if it shall sustain the burden of proof that after reasonable investigation it had reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statement therein not misleading. 15 U.S.C. § 77k(b). A defendant may be shielded from section 11 liability if the defendant reasonably, and without actual knowledge of any inaccuracies, relies on parts of a registration statement "purporting to be made on the authority of an expert." 15 U.S.C. § 77k(b)(3)(C). Expertised portions of a registration statement and prospectus include those, such as financial statements, that have been examined, reported upon and audited by independent auditors. *In re Enron,* 235 F.Supp.2d at 598. An underwriter may rely on expertised portions of a registration statement or prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. *Id.* at 613. The fact-specific determination of the reasonableness of a defendant's investigation or of his reliance on the opinion of an expert is not a question properly resolved on a motion to dismiss unless the affirmative defense clearly appears on the face of the complaint. *In re Enron,* 258 F.Supp.2d at 639.

 **\*46** Section 12(a)(2) imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact. *Lewis v. Fresne,* 252 F.3d 352, 357 (5th

Cir.2001). A seller is one who either passes title of the securities to the buyer or one who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). To count as solicitation, the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig,* 332 F.3d at 871. An issuer may be liable only if the plaintiff can allege and prove that an issuer's role was not the usual one, that it went farther and became the vendor's agent. *Id.* Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. *Lone Star Ladies,* 238 F.3d at 370. Section 12(a) does not require a plaintiff to prove scienter either and the pleadings need only satisfy the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *In re Enron,* 235 F.Supp.2d at 596.

As several of the 1933 Act Defendants raise limitations arguments, the court addresses in general the applicable limitations period. The 1933 Act requires plaintiffs to bring claims under section 11 or 12(a)(2) "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Sarbanes–Oxley Act does not extend the limitations period for the 1933 Act claims to two years. The plain language of the Sarbanes–Oxley Act states that the extended limitations period applies "to a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance ... as defined in section 3(a)(47) of the Securities Exchange Act of 1934." The courts have rejected the argument that the Sarbanes–Oxley limitations period applies to 1933 Act claims. *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 265 (S.D.N.Y.2003); *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 974–75 (W.D.Wis.2003). Instead, the applicable limitations period to these claims is one year after the plaintiffs were put on inquiry notice of their claims as required by Section 77m of the 1933 Act.

It is well-settled the inquiry notice may be determined as a matter of law. *Jensen v. Snellings,* 841 F.2d 600, 607 (5th Cir.1988)(affirming a dismissal where record revealed that the plaintiffs had notice of claims); *Rahr v. Grant Thornton LLP,* 142 F.Supp.2d 793, 796 (N.D.Tex.2000). In this regard, one court has observed that "[w]here ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint, resolution of the issue on a motion to dismiss

is appropriate...." *LC Capital Partners, LP v. Frontier Ins. Group,* 318 F.3d 148, 156 (2d Cir.2003).

**\*47** In this case, the plaintiffs plead that Fleming issued a press release on July 30, 2002, announcing that its retail segment was suffering from declining prices (TAC, ¶ 264). The plaintiffs also allege that on July 31, 2002, analysts downgraded Fleming's investment rating and questioned its reported per-share earnings (TAC, ¶ 270–71). Finally, most importantly, the plaintiffs allege that the Wall Street Journal published an article on September 5, 2002, that revealed Fleming's practice of taking unauthorized, improper, and unsustainable deductions from vendor's invoices. (TAC, ¶ 281). As a matter of law, the plaintiffs' own allegations reveal that, at the latest, the plaintiffs' were on inquiry notice of their claims by September 5, 2002, the date of the Wall Street Journal article exposing the practice of vendor deductions. Thus, limitations expired on the 1933 Act claims September 5, 2003, one year later. Against this backdrop, the court examines the various limitations arguments.

The 1933 Act Individual Defendants and D & T assert that the plaintiffs' claim against them relating to the March 2002 offering of 10.625% Notes is time-barred. In their response, the plaintiffs appear to concede that Terry Slater is the only plaintiff with standing to assert a section 11 claim relating to the March 2002 Registration Statement because he is the only named plaintiff to have obtained notes in an offer made pursuant to that statement. The plaintiffs argue that Terry Slater filed a lawsuit in Oklahoma state court on November 14, 2002, within the limitations period. But, what the plaintiffs fail to appreciate is that Slater did not sue the *1933 Act Individual Defendants or D & T* in that case. Slater's case joined only the Fleming Companies, Hansen, Rider, and Dahlen. Slater failed to join the 1933 Act Individual Defendants and D & T until September 12, 2003, more than one year after limitations commenced. Therefore, the claims against the 1933 Act Individual Defendants and D & T are time-barred unless saved by an exception, which, as the court will explain, they are not.

Rule 15(c)(3), governing the relation back of pleadings, does not apply. The explicit language of the rule states that an amendment adding a new defendant relates back only if, among other things, the new defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." The rule does not protect plaintiffs who "knew of the late-named party at all times but failed to include that

party in the original filing." *In re Xchange Inc. Sec. Litig., 2002 WL 1969661, at \*4 (D.Mass. Aug.26, 2002).* In this case, the identities of the 1933 Act Individual Defendants and D & T were readily ascertainable. All of the Individual Defendants (save and except Hernandez) actually signed the March 2002 Registration statement, and D & T's role as the auditor was plain from the face of the statement. (*See, e.g.,* March Registration Statement, p. 106, identifying independent auditor as D & T). And, even with respect to Hernandez, the plaintiffs here make no argument that they were mistaken as to his identity or that it was not readily ascertainable. The court grants the 1933 Act Individual Defendants' and D & T's motions to dismiss the plaintiffs' claims under the 1933 Act relating to the March 2002 offering because they are barred by the applicable one-year statute of limitations. Resolution of the limitations question makes it unnecessary to consider the 1933 Act Individual Defendants' and D & T's alternative argument that the March 2002 exchange offer is exempt from the provisions of section 11.

**\*48** The 1933 Act Individual Defendants, Defendant D & T, and the Underwriter Defendants (collectively, "1933 Act Defendants") also contend that the section 11 claim should be dismissed because the claims based on the June 2002 offering are time barred. The 1933 Act Defendants urge, with respect to the June 2002 offering, that the plaintiffs' claims relating to the purchase of 9.25% Notes are barred because one of the original plaintiffs, MSCPF, did not purchase notes in the offering and plaintiff Alaska Fund, which did purchase notes in that offering, was not joined as a party-plaintiff until September 12, 2003, after limitations had expired. The court disagrees.

The linchpin of the 1933 Act Defendants' argument is that MSCPF lacked standing to pursue claims on behalf of the note purchasers when it filed its February 20, 2003, complaint because it only purchased stock. It is not disputed that MSCPF filed suit within the limitations period and its pleading, on behalf of a class, alleging violations of federal law in connection with the sale of "Fleming Securities" issued in or traceable to the June 2002 Offering, placed the defendants named therein plainly on notice of these claims. There is authority that suggests that a *class representative* who purchased stocks can represent purchasers of debt instruments in the same lawsuit. *In re Enron Corp. Sec. Litig. ., 206 F.R.D. 427, 445 (S.D.Tex.2002)*(noting "there is no requirement that the claims of all plaintiffs and class members must be identical"); *Endo v. Albertine, 147 F.R.D. 164, 167 (N.D.Ill.1993)*("[A] class of plaintiffs who

purchased different types of securities may properly be certified with a representative party who only purchased one type of security."); *In re Saxon Sec. Litig., 1984 WL 2399, at \*7 (S.D.N.Y. Feb.23, 1984)*(holding that "[d]ebenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct").

The 1933 Act Defendants contend these cases are distinguishable, and these parties say that the cases concerned the propriety of class representation under Rule 23, not jurisdictional standing. The 1933 Act Defendants point to the holding in *In re Paracelsus Corp., 6 F.Supp.2d 626 (S.D.Tex.1998)*, where the court held that purchasers of stock issued pursuant to one registration statement did not have standing to sue on behalf of purchasers of notes issued out of a companion statement. It is true that *Paracelsus* addressed the concept of standing and dismissed, on standing grounds, the claims of plaintiffs who had not purchased bonds issued pursuant to the registration statement at issue. In that case, however, the two types of securities were issued pursuant to separate registration statements. The claims of the note purchasers had to be linked under section 11 to the registration statement pursuant to which the company issued the notes. Otherwise, the statutory requirements of section 11 failed.

**\*49** The point of Article III standing and the more specific statutory standing concept addressed in *Paracelsus* is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases "securities" as that term is defined by the Act issued pursuant to a particular registration statement. In this case, it is not disputed that the stocks and the notes were issued pursuant to a single registration statement, nor is it disputed that MSCPF bought securities issued pursuant to the registration statement. MSCPF had in February 2003, and continues to have a personal stake in the outcome of the case sufficient to warrant Article III standing on the section 11 claims.

Contrary to the 1933 Act Defendants' argument, the case law holds that purchasers of one type of security have *standing* to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement. The court in *In re Worldcom, Inc. Sec. Litig., 2004 WL 555697, at \*6–7 (S.D.N.Y. March 19, 2004)*, recently rejected a similar argument when it held that purchasers of one type of debt security (domestic) had standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant to the same registration statement). Similarly,

the court in *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 911 (D.N.J.1998) was faced with an argument that stock purchasers lacked standing to represent the interests of note purchasers and held that the plaintiffs had "sufficiently alleged individual cognizable injuries pursuant to section 11 and section 12(a)(2)" to confer standing. The court therefore rejects the argument that section 11 claims related to notes issued pursuant to the June 2002 Registration Statement are barred by the statute of limitations. Resolution of this question in this manner renders it unnecessary to consider the plaintiffs' alternative arguments that *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) applies to this case to toll limitations until the addition of Alaska Fund to this case in the September, 2003 or that Rule 15 permits the relation back of Alaska Fund's claims to the date of MSCPF's February 2003 complaint.

The 1933 Act Defendants also argue that aftermarket purchasers of Fleming's common stock cannot "trace" their purchases to the June 2002 Registration Statement, and therefore, section 11 claims asserted on their behalf should be dismissed. In the Fifth Circuit, aftermarket purchasers who can trace their purchase to the challenged registration statement have standing to bring a section 11 claim. *Rosenzweig,* 332 F.3d at 873. Bearing in mind that the case is still in the pleading stage, the court rejects the 1933 Act Defendants' argument. Here, the TAC specifically alleges that "Plaintiffs and the other members of the Subclasses purchased the Fleming Securities that were issued pursuant and traceable to the March and June 2002 Registration Statements." (TAC, ¶ 509). The plaintiffs have sufficiently pleaded section 11 standing with their allegation that the members of the class purchased the securities that were "issued pursuant and traceable to" the pertinent registration statements. Whether and to what extent the plaintiffs will be able to *prove* tracing is a different question and is one which, in any event, is not susceptible to decision in the current posture of this case.

**\*50** The 1933 Act Individual Defendants and D & T also contend that the plaintiffs' section 12(a)(2) claims should be dismissed because they are not "sellers" of securities. Section 12(a)(2) provides that a person who "offers or sells" a security by means of a prospectus or oral communication that contains a materially false statement or that omits to state certain material facts shall be liable to any person purchasing such security from him. 15 U.S.C. § 77l(a). A section 12(a)(2) "seller" is either (1) the person who actually passes title to the buyer, or (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own

financial interests or those of the securities owner." *Pinter,* 486 U.S. at 647.

The March and June 2002 offerings were firm commitment underwritings. As such, investors purchased securities not from Fleming, but from the underwriters or broker-dealers who purchased from the underwriters. Consequently, as a matter of law, the 1933 Act Individual Defendants and D & T cannot be sellers under the title-passing definition adopted by the Supreme Court.

As to the second definition, the plaintiffs allege in conclusory fashion that each defendant named in Count V "solicited and/ or was a substantial factor in the purchase by plaintiffs of securities in the offerings." (TAC, ¶ 517). What is required under *Pinter* is that the named defendant "successfully solicit" the purchase. To that end, the court agrees with the defendants that solicitation is a legal term of art and that conclusory allegations in a pleading or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993).

The Fifth Circuit has narrowly circumscribed the scope of section 12(a)(2) liability under the second *Pinter* definition. The court has held that to count as "solicitation," the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig,* 332 F.3d at 871. An issuer, like Fleming (and, by extension, its directors and its auditor), is liable under section 12(a)(2) only if the plaintiff can allege and prove "that an issuer's role was not the usual one; that it went farther and became a vendor's agent." *Id.* (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.,* 238 F.2d 363, 370 (5th Cir.2001)). This is because virtually all issuers promote their securities in some fashion, either by preparing prospectuses or conducting road shows. *Lone Star Ladies,* 238 F.3d at 370. The TAC is bereft of allegations that the 1933 Act Individual Defendants or D & T directly communicated with the purchasers of the securities or assumed the unusual role of the vendors' agents. The plaintiffs have failed to allege sufficient facts to prevent dismissal of the section 12(a)(2) claims against the 1933 Act Individual Defendants and D & T, and the court grants the motion to dismiss those claims.

**\*51** The Underwriter Defendants are named as defendants under sections 11 and 12(a)(2) of the 1933 Act with respect to their role in the June 2002 Offering. Most of their arguments have been addressed previously; however, they make a separate, distinct argument which they assert entitles them

to a dismissal of all of the 1933 Act claims against them. According to the Underwriter Defendants, they were entitled to rely on the accuracy of Fleming's financial statements because those statements were "expertised."

As noted above, section 11 of the 1933 Act contains a safe harbor from liability for underwriters who reasonably rely upon "expertised" portions of a registration statement. 15 U.S.C. § 77k(b)(3)(C). Likewise, underwriters are shielded from liability for a claim under section 12(a)(2) if they rely on the "expertised" portions of an offering prospectus. *In re Worlds of Wonder Sec. Litig.,* 814 F.Supp. 850, 867–68 (N.D.Cal.1993), *aff'd in relevant part,* 35 F.3d 1407 (9th Cir.1994). Unfortunately for the Underwriter Defendants, this question is generally not proper for resolution by a motion to dismiss, because the underwriter bears the burden of proof to show that it had no reason to believe and did not believe that the expertised portions of the registration statement were untrue. *In re Enron Corp. Sec. Derivative & ERISA Litig.,* 258 F.Supp.2d 576 (S.D.Tex.2003); *Griffin v. PaineWebber, Inc.,* 84 F.Supp.2d 508, 512–13 (S.D.N.Y.2000); *In re Chambers Development Sec. Litig.,* 848 F.Supp. 602, 624 (W.D.Pa.1994). The court rejects the Underwriter Defendants' argument that their entitlement to this affirmative defense is apparent from the face of the TAC and therefore denies the Underwriter Defendants' motion to dismiss the 1933 Act claims leveled against them.

Finally, the Underwriter Defendants assert that the plaintiffs have not sufficiently alleged standing to pursue their section 12(a)(2) claim against them. As noted, section 12(a)(2) liability is narrow. Standing exists under section 12(a)(2) and *Pinter* when a plaintiff can plead and prove that a seller actually passed title to a buyer. The Underwriter Defendants argue that the TAC fails to allege that the plaintiffs acquired title in their securities from the Underwriter Defendants, such that the first definition of "seller" under *Pinter* is satisfied.

The TAC alleges that "[t]he Underwriter Defendants offered for sale and sold the securities purchased by plaintiffs and the members of the Subclass...." (TAC, ¶ 516). This allegation is susceptible to two constructions: the first is that the Underwriter Defendants offered for sale and sold the securities *directly to* the plaintiffs; the second is that the Underwriter Defendants offered for sale and sold the securities *first to another* who *then* sold to the plaintiffs. As section 12(a)(2) only permits a purchaser to recover against his direct seller, the court agrees with the Underwriter Defendants that the plaintiffs have not sufficiently alleged

section 12(a)(2) standing with this allegation. Nor have the plaintiffs sufficiently articulated how or if they had direct communication with the Underwriter Defendants such that they satisfy the second *Pinter* definition. It may be, however, that the plaintiffs are able to satisfy these requirements. They are granted leave to do so within ten (10) days after the date of the entry of this opinion if they can. The court has canvassed the remaining arguments in support of the various motions to dismiss and, to the extent they have not been specifically addressed in this opinion, they are now rejected.

## V. CONCLUSION

**\*52** In accordance with the above opinion and for the reasons more fully expressed herein the court **ORDERS** that the following motions be disposed of as indicated below:

- Defendant Mark D. Shapiro's Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 15) **GRANTED IN PART AND DENIED IN PART**

- Defendant E. Stephen Davis' Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof (Docket # 16) **GRANTED**

- 1934 Act Defendants' Joint Motion to Dismiss Pursuant to Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 and Memorandum of Law in Support (Docket # 17) **GRANTED IN PART AND DENIED IN PART**

- Defendant Neal Rider's Supplemental Motion to Dismiss Pursuant to Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 and Memorandum of Law in Support (Docket # 18) **GRANTED IN PART AND DENIED IN PART**

- Defendant Thomas Dahlen's Individual Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 19) **GRANTED IN PART AND DENIED IN PART**

- Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof of Defendant Mark Hansen (Docket # 20) **GRANTED IN PART AND DENIED IN PART**

- Motion to Dismiss of Defendants Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities,

Inc., and Morgan Stanley & Co. Incorporated (Docket # 21) **GRANTED IN PART AND DENIED IN PART**

• Defendant Deloitte & Touche LLP's Motion to Dismiss and Supporting Brief (Docket # 22) **DENIED**

• 1933 Act Individual Defendants' Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action

Complaint and Supporting Brief (Docket # 25) **GRANTED IN PART AND DENIED IN PART**

So **ORDERED** and **SIGNED** this 10th day of June, 2004.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 5278716

---

## Footnotes

1    The Ninth and Tenth Circuits have continued to apply the group pleading doctrine following the passage of the PSLRA. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065–66 (9th Cir.2000); *Schwarz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 154 (10th Cir.1997). The First Circuit has yet to decide the issue. *In re Cabletron Systems, Inc.,* 311 F.3d 11, 40 (1st Cir.2002).

2    The position of retail CFO during the class period was filled initially by John Simrell and later Tim Otte. Since the two men are not being sued individually the use of their individual names is unnecessary.

3    "Red tag" sales are one-time transactions in which Fleming purchased and immediately sold large lots of a commodity which had been located for Fleming by a broker.

4    "Diverting" is a practice where the retail operations purchase product and resell it at a higher price to another company but where the retail operations do not take possession of the product or sell it through a particular store.

5    The TAC alleges that "... Hansen, Rider, Shapiro, Dahlen, and Davis made public statements claiming that Fleming's retail segment was growing." (TAC, ¶ 456). The plaintiffs, however, point to no particular statement made by Davis, making it impossible to gauge whether the remaining requirements of the PSLRA have been satisfied. This allegation is, therefore, equivalent to no allegation at all.

6    As noted above, the court has carefully examined the totality of the allegations in the TAC to assess whether the claimed statements are actionable misrepresentations. The court will detail some of these statements below, but the parties should assume that if the court has not specifically held a statement to be (a) a material misrepresentation that is (b) pleaded with sufficient particularity, then the court has concluded that the statement is not actionable under Rule 10b–5.

The following statements are either too vague to be actionable or are forward-looking statements protected by the safe-harbor provision of the PSLRA: the statement attributed to defendant Hansen in the October 24, 2001 press release that "[o]ur price impact formats, with their high volumes and low operating costs, are a great fit with our distribution strategy" (TAC, ¶ 215); the statements in the November 5, 2001 DSN Retailing Today article attributed to Hansen that the value retailing market represents an opportunity for expansion with "significant growth potential," and that the "formats have received overwhelming customer response" (TAC, ¶¶ 219–20); the statements in the Form 10K attributed to the signatories of the 10K that "[o]ur price impact supermarkets offer name-brand food and consumable goods at significantly lower prices than conventional format retail store operators because of the many low-cost features of our stores" and "we expect to be able to grow our price impact supermarket operations while incurring lower capital

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 39 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported In...

2004 WL 5278716

expenditures" (TAC, ¶ 229); the statements attributed to defendant Dahlen in the April 16, 2002 press release concerning Fleming's "excitement" about the acquisition of seven new retail stores in the Dallas market (TAC, ¶ 236–37); the statements in the May 7, 2002 press release attributed to defendant Hansen concerning Fleming's "outstanding start to 2002" and the company's "keenly focused" strategies (TAC ¶ 239); the statements attributed to Hansen in the conference call following the release of the first quarter 2002 results that "[w]e are very pleased about that and feel good about the customer acceptance" and that he was "almost giddy [about] the progress we are making in this area" (TAC, ¶ 244); the statements quoted from the June 2002 Registration Statement concerning the successful price impact retail format (TAC, ¶ 250); the company's ability to secure favorable terms and volume discounts on its purchases (TAC, ¶¶ 254–56); and the statement attributed to Rider in the second conference call concerning "closing of the gap" (TAC, ¶ 266). Although these statements may have evidentiary significance in the trial of this case, they are not actionable misrepresentations in the context of a Rule 10b–5 claim.

7 D & T also attacks the standing of one of the lead plaintiffs with respect to plaintiffs' section 10(b) claims. D & T contends that the Lead Plaintiff, Jackson Capital, does not have standing to assert section 10(b) claims on behalf of a putative class including purchasers of Fleming bonds because Jackson Capital pleads that it purchased only Fleming common stock. The plaintiffs respond by stating that a stockholder plaintiff may press bondholder claims so long as both arose out of the same scheme to defraud. The court finds D & T's argument unpersuasive and rejects it. At the pleading stage, Lead Plaintiff Jackson Capital has standing to assert a section 10(b) claim on behalf of purchasers of all securities against a defendant who makes "any untrue statement of material fact in connection with the purchase or sale of *any security"* because the various purchasers' claims arise out of the same material misstatements. 17 C.F.R. § 240.10b–5 (emphasis added). As discussed *infra* at pages 83–85, under section 11 of the 1933 Act, standing is limited to those purchasers who purchase securities pursuant to a specific registration statement containing a material misstatement because the claim arises out of that particular registration statement and the misrepresentations made within it. *See In re Paracelsus Corp.,* 6 F.Supp.2d 626 (S.D.Tex.1998).

8 In 2001 Fleming paid D & T $1,800,000 in consulting fees; $400,000 in attestation services and $1,000,000 in auditing fees.

9 In planning an audit, an auditor must assess the audit risk by looking at the various risks at issue in each audit, such as inherent risk and control risk, to assess the extent and scope of the audit.

10 In accounting for contingencies, contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.

11 Evidential matter from independent sources outside an entity provides greater assurance of reliability than that secured solely within the entity. The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly. In the examination of accounts payable, for example, alternative procedures [to sending written confirmation requests] may include examination of subsequent cash disbursements, correspondence from third parties, or other records to provide evidence for the completeness assertion.

12 During a review of interim financial information an auditor should compare interim financial information with comparable information for the immediately preceding interim period and for corresponding previous periods.

13 Standard of Field Work No. 3 requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations.

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 40 of 80

In re Fleming Companies Inc. Securities & Derivative Litigation, Not Reported in...

2004 WL 5278716

14    The "1933 Act Plaintiffs" include: Massachusetts State Carpenters Pension Fund ("MSCPF"), Massachusetts State Guaranteed Annuity Fund ("MSGAF"), Alaska Electrical Pension Fund ("Alaska Fund"), Anthony Colarich, David Dickey, Joel Feliciano, Raheela Zaman and Terry Slater.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CASE NO. 2

2002 WL 1007614

---

🚩 KeyCite Yellow Flag

Distinguished by Cornell Research Foundation, Inc. v. Hewlett Packard Co., N.D.N.Y., December 9, 2003

2002 WL 1007614
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David JONES, Issac Nelson, Kevin Martin, William Meachem, Clarence Suber, Tobias Walls, Henry Moreno, James White, Ramon Blas, Angelo Caravaggio, Roy Davis, Luciano Ortiz, Rory Dolan, Liberato Bermudez, Gregory Smith, Fruitquan Bailey, Todd Brockington, Renaldo Rivera, James Dixon, Juan Perdomo, Herbert Junior, Hector Lopez, Juan Rivera, Dwayne Faust, and all others similarly situated, Plaintiffs,
v.
Glenn S. GOORD, Acting Commissioner of the New York State Department of Correctional Services, Edmund Wutzer, Chairperson of the New York State Commission of Correction, Thomas J. Goldrick, Commissioner of the State Commission of Correction, Floyd Bennett, Superintendent of Elmira Correctional Facility, Hans Walker, Superintendent of Auburn Correctional Facility, Robert H. Kuhlmann, Superintendent of Sullivan Correctional Facility, David Miller, Superintendent of Eastern Correctional Facility and Christopher Artuz, Superintendent of Green Haven Correctional Facility, Defendants.

No. 95 CIV. 8026(GEL).
|
May 16, 2002.

OPINION AND ORDER

GERARD E. LYNCH, District Judge.

**\*1** Broad discovery is a cornerstone of the litigation process contemplated by the Federal Rules of Civil Procedure. Particularly in institutional reform litigation, the ability of citizen complainants to obtain access to governmental records, in order to present the courts with a full and accurate picture of the inner workings of public institutions, is a vital safeguard of fairness in litigation and of constitutional rights. The motion before the court, in which inmate plaintiffs

seek access to various electronic databases maintained by state correctional authorities, tests the limits of this salutary practice. Because plaintiffs' demands exceed those limits, the motion will be denied.

I. *The Litigation*

This is a class action in which plaintiffs challenge New York State's administration of a program for double-celling in its maximum-security prisons. Double celling is a practice by which, due to overcrowding, two prisoners are housed in a cell originally designed for one person. It is clearly established that double-celling, even in maximum security prisons, does not in itself constitute cruel and unusual punishment in violation of the Eighth Amendment. *Rhodes v. Chapman,* 452 U.S. 337, 339, 349-50, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Plaintiffs nevertheless contend that in actual practice, the manner in which double-celling is carried out in New York violates the Constitution, because the increases in disease transmission and violence occasioned by the practice result in "depriv[ing] inmates of the minimal civilized measure of life's necessities," *id.* at 347, and demonstrate that the New York authorities have been deliberately indifferent to the health and safety of inmates in their charge. *See Wilson v. Seiter,* 501 U.S. 294, 303-05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

This litigation has a long history. The complaint was filed in 1995, making it one of the oldest active cases on this Court's docket, and the case has been assigned to several judges over the years. The case was effectively stayed for a considerable period pending litigation of a companion case challenging the same practice in medium-security prisons. After a full trial on the merits, Judge Stein denied the plaintiffs in that case any relief, in a lengthy and careful opinion. *Bolton v. Goord,* 992 F.Supp. 604 (S.D.N.Y.1998).

As the outcome of the *Bolton* case showed, plaintiffs here face a difficult burden. Under the Supreme Court's precedents, it is not enough for plaintiffs to prove that double-celling is overall less comfortable, or even less conducive to health and safety, than a policy of "one man, one cell." It would be surprising indeed if packing prisoners, particularly ones assigned to maximum-security institutions, in closer proximity, did not result in more incidents of inmate illness or injury than would otherwise occur. But, as *Chapman* shows, the former one-inmate-to-a-cell policy does not represent a constitutional baseline, any more than maintaining that policy would have placed conditions in New York's prisons beyond constitutional question. Without doubt, the more the state spends on security and health, the better off the inmates will

---

be, and it could always be argued that the failure to spend more results in harms to inmates that in principle could have been avoided by the allocation of additional resources. The problem for a court is not to enforce its idea of an ideal prison budget, but to decide when economies in prison spending create conditions that cannot be tolerated in a humane society. The plaintiffs' contention that New York's policy oversteps this line faces the further obstacle that double-celling is not a universal or even widespread condition in New York's prisons. It appears to be undisputed that the practice affects fewer than 5% of New York's maximum-security cells, and that inmates are housed in such cells for no more than 60 days at a time.

## II. *Discovery*

 **\*2** Against this background, the parties have toiled in discovery for several years. Active discovery resumed after the *Bolton* trial in early 1998. Since then, pursuant to an agreement to concentrate discovery on a "sample" of only four of the State's thirteen maximum-security prisons, the State has provided to plaintiffs over 700,000 pages of documents, many of which have needed to be carefully reviewed and redacted prior to disclosure, at enormous expense. Among the categories of documents disclosed have been the forms prepared to determine which inmates are to be double-celled, inmate grievance reports, use of force reports, "unusual incident reports," and lists of inmates diagnosed with various diseases. There is no evidence that the State has resisted plaintiffs' demands for documents, or unreasonably refused to produce any records that have been sought.

Shortly after the case was reassigned to me in September 2000, the Court convened a conference to address the status of discovery in this then-already-aged case. It was represented to the Court at that conference, in early October 2000, that document discovery would be concluded by January 2001, and it was ordered that all fact discovery end by March 31, 2001. As often occurs, sometimes despite the best efforts of counsel, this deadline was not met, and in early March the parties contacted chambers to advise that depositions were behind schedule and that an extension of the deadline would be required. On March 23, 2001, the Court entered an order extending the discovery deadline to December 31, 2001, and providing that there would be no further extensions. As will shortly be seen, subsequent events led to further extensions, and the discovery deadline is now set for May 24, 2002.

## III. *The Electronic Database Request*

In August 2001, after nearly six years of litigation, plaintiffs for the first time specifically sought the production of electronic records and databases. Plaintiffs argue that the electronic data they seek was properly within the scope of discovery demands for inmate data served years before. Assuming for the sake of the argument that some or all of the requested databases came within the literal terms of broad document demands served by the plaintiffs, however, it ignores the practicalities of complex discovery, and the specific history of this case, to contend that the August 2001 request was merely a reminder that the State's production in response to earlier demands was still incomplete. Plaintiffs acknowledge that they have been aware of the existence of at least some of the databases in question here during testimony in the *Bolton* trial in 1997. By the time of plaintiffs' August 2001 letter, the parties had been engaged in active discovery for at least three years. Various discovery disputes had been presented to me and to previous judges assigned to the case. As noted above, in October 2000 the plaintiffs agreed in open court that they hoped to be through with document discovery in just a few months. On one of these occasions was there any indication that plaintiffs considered the State derelict in failing to produce electronic records. Indeed, plaintiffs point out no reference to discovery of electronic data in the court record or in correspondence between the parties prior to the August 2001 demand.

The State, in turn, was slow to respond, only objecting to the demand in November 2001. When the matter was called to the Court's attention, a pre-motion conference was promptly scheduled, and a briefing schedule set for a motion to compel production. (At the same time, the Court reluctantly granted yet another extension of the fact discovery cut-off, again threatening that further extensions would be denied.) Both sides eventually sought extensions on that briefing schedule. The Court, perhaps overly solicitous of counsel's needs, granted the extensions, and the matter was fully briefed on April 26, 2002. In the process, one very last extension of the fact discovery cut-off was granted, to May 24, 2002.

## IV. *The Parties' Positions*

### A. *Plaintiff's Motion*

 **\*3** Plaintiffs request the production of six different electronic databases. Although both sides have filed their submissions under seal due to the sensitive nature of some of the materials involved, no security concerns prevent public disclosure of the nature of these databases. No one would be surprised to learn that the prison system

Jones v. Goord, Not Reported in F.Supp.2d (2002)

2002 WL 1007614

maintains computerized records that enable them (1) to track the location of prisoners in the system; (2) and (3) to record and recover unusual incident reports and disciplinary records; and (4), (5) and (6) to monitor prisoners' medical problems, including scheduling of medical appointments, tracking prisoners with certain specific medical problems, and recording the pharmaceuticals required by prisoners. Plaintiffs have demanded to be provided with copies of these databases.

Plaintiffs argue that this is a simple and straightforward discovery demand, of a sort routinely enforceable under the Federal Rules. Plaintiffs' complaint argues that double-celling produces intolerable health and safety risks to them. Information about which prisoners have been double-celled (and where and when), and the extent of disciplinary problems, violent incidents, and medical problems in the prisons is clearly relevant to testing that claim. Plaintiffs point out that at the *Bolton* trial, the State offered expert testimony about the correlation between double-celling and various problems that was derived, in part, from information contained in these databases. Plaintiffs claim that they should have the same opportunity to analyze the data for themselves, to see whether information in the State's records supports their claims.

In fact, plaintiffs go father than arguing relevance. They insist that the databases are "*essential* to the effective prosecution of Plaintiffs' claims." (Pl.Br. at 2, emphasis added.) "Without the Databases, Plaintiffs *cannot* effectively demonstrate the unconstitutional impact of double celling." (*Id.* at 9, emphasis added.) The argument is that without sophisticated statistical analysis of the incidence of disease and violence vis-à-vis double-celling, individual testimony will be dismissed as anecdotal, and plaintiffs will fail to establish that double-celling causes extensive and systematic harm. Plaintiffs propose to undertake "an iterative process in which a statistical expert must identify a set of independent variables related to characteristics of double celling," and then test the data for "relationships with any number of dependent variables, ... [including] incidents of violence, misbehavior, the severity of violence and misbehavior, incidence of infectious diseases among the inmate population, ... etc." (*Id.* at 9-10). The process of identifying correlations and performing regression analyses on these variables is not a simple matter of "running a test. Different combinations must be analyzed. After each analysis, the statisticians and counsel must review the results, and propose revised analyses to be run.... [T]he scope of the project is substantial: the number

of potential statistical relationships is in the millions." (*Id.* at 10-11.)

Plaintiffs go on to anticipate and rebut the State's objections to production. (1) To the extent that the State is concerned about security of information, plaintiffs contend that existing confidentiality orders can adequately protect the security of the information; further, they offer additional safeguards, such as limiting access to the copied data. Moreover, they point out that much of the data contained in the electronic databases (though not all) is already available to the plaintiffs in hard copy, so that the additional security risk is slight. (2) To the extent that the State argues that plaintiffs already have the necessary information, plaintiffs argue that the electronic data are both more extensive and more easily manipulable, permitting more efficient analysis of the evidence, and that requiring the plaintiffs to create their own electronic database will impose extraordinary burdens on plaintiffs' pro bono counsel. (3) To the extent that the State claims production of the databases will be unduly burdensome, plaintiffs point out that the data is already backed up on a routine basis, and that replication of an additional copy for plaintiffs on the occasion of such a data back-up should be relatively simple.

**\*4** Notably, however, plaintiffs' assertions about the kinds of analyses they wish to perform, the security issues involved, and the practicalities of reproducing the material and utilizing it for the desired purposes are supported only by affidavits from counsel. Plaintiffs provide no evidentiary support from any statistical expert concerning the kinds of hypotheses that could be tested by data of the nature contained in the databases, or what statistical methodology might produce reliable results. Nor do they offer an affidavit from any information technology expert who has considered the descriptions of the databases obtained in depositions, who can testify to the ease with which such data, once copied, can be integrated into a form that will permit whatever statistical manipulations are contemplated, or to how the data could be maintained in a secure manner. Indeed, it is apparent from an examination of plaintiffs' motion that plaintiffs have not retained any such experts yet, and are engaging for the most part in (somewhat informed) speculation about what might be done with the data they seek.

B. *Defendants' Response*

The State objects that the databases at issue should not be ordered produced. *First,* defendants denigrate the merits of plaintiffs' claims, arguing that plaintiffs are pursuing chimerical claims with little or no chance of success. *Second,*

they argue that the databases are not useful in the manner plaintiffs suggest, (1) because the data contained in them are already available to plaintiffs in hard copy form, previously produced to them at great public expense, and (2) because the databases involved, constructed for different purposes using different software and user interfaces for different users within the corrections bureaucracy, cannot simply be downloaded and massaged as easily as plaintiffs claim.

*Third,* defendants argue that reproduction of the databases, contrary to plaintiffs' submission, would in fact be a burdensome and technically complex task, since, in order to be usable, the data would not merely have to be copied, but also would have to be accompanied by extensive technical commentary and decoding to permit any unfamiliar user to understand the systems, integrate the different databases involved, and extract from them data in a form that could facilitate the comparisons and statistical tests contemplated by plaintiffs. *Fourth,* they argue that the data in question are subject at least to a qualified privilege, in that they contain confidential personal data about employees and prisoners (including many who are not members of the plaintiff class).

 **\*5** *Fifth* and finally, they argue that neither the existing protective order nor the additional measures proposed by plaintiffs nor any conceivable protective devices ordered by the Court could adequately deal with the security concerns presented by the databases. It is argued (1) that the very structure of the databases, and the necessary technical specifications that would have to accompany them in order to permit plaintiffs' experts to make any productive use of them, would disclose features of the correctional computer systems that (if disseminated) would render the State's systems more vulnerable to hacking; (2) that, although much of the information contained in the databases has already been made available in hard copy, information in electronic form is far easier to steal and transmit than the extensive paper records already in plaintiffs' hands; (3) that information (for example, matters relating to staff) not relevant to the case, redacted from prior document discovery, and contained in the databases, could not practically be redacted from the databases and would create risks to the physical security and privacy of guards and other staff.

In contrast to plaintiffs' motion papers, the State's submission includes detailed affidavits from officials familiar with and responsible for the construction and use of the databases. These affidavits contain significant technical details relating to at least some of the practical utilization and security issues relevant to disposition of the motion.

Incredibly, in the face of this voluminous and detailed response, plaintiffs' reply papers decline to join further issue with the State's factual contentions. While the Court appreciates any moving party's decision not to burden the Court with repetitive papers raking over the same ground as previous submissions, plaintiffs' cavalier dismissal of the State's well-supported factual presentation as a mere example of "protest[ing] too much" (Pl. Reply at 1) that raises no matters not already adequately disposed of in the moving papers, rings more of empty bravado than of calm confidence.

V. *The Legal Framework*
The discovery permitted by the Federal Rules is broad, but not without limits. As an initial matter, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." Fed.R.Civ.P. 26(b)(1). However, discovery is subject to limitation by the Court to the extent that

> the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

 **\*6** Fed.R.Civ.P. 26(b)(2). In addition, where necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," the Court may enter any protective order that is necessary, including "that the disclosure or discovery not be had." Fed.R.Civ.P. 26(c)(1). "Rule 26 vests the trial judge with broad discretion to tailor

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 46 of 80
Jones v. Goord, Not Reported in F.Supp.2d (2002)
2002 WL 1007614

discovery narrowly." *Crawford-El v. Britton,* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

Thus, the first step in the process is deciding whether requested material is discoverable, that is, whether it is relevant and not privileged. If it is, the Court still has considerable discretion to evaluate the practical realities of discovery, balancing the importance of the information against the burdens of production to decide whether fairness does or does not require production, and if so, on what terms.

This framework applies to requests for electronic or computer-based information just as it applies to more traditional materials. 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2218 at 451 (2d ed. 1994). As electronic mechanisms for storing and retrieving data have become more common, it has increasingly behooved courts and counsel to become familiar with such methods, and to develop expertise and procedures for incorporating "electronic discovery" into the familiar rituals of litigation. The rules cited above, albeit for the most part drafted in an earlier era, deal perfectly well with the problems occasioned by discovery of electronic "documents." At the same time, that the principles applied are the same does not mean that any information that would be discoverable in paper form must automatically be discoverable, on the same terms and conditions, and without consideration of additional issues, in electronic form-or, for that matter, that material that could not be discovered in hard copy would not be discoverable in the form of a database. Particularly when it comes to balancing the costs and benefits of providing discovery, the balance may well differ depending on the form of the information. In this case, for example, the plaintiffs claim that the same information produced in hard copy will be more valuable in the form of an electronic database, because the information will be more manipulable. The State, on the other hand, claims that the burdens and risks of producing electronic data will be much greater than those of producing the same information in the form of paper documents and reports. Such claims must be carefully evaluated on a case-by-case basis. Without at this point accepting either side's claims, it is evident that the form of the data requested creates special problems that must be given appropriate consideration.

VI. *The Framework Applied.*

   A. Discoverability
 **\*7** 1. *Relevance*

It is evident that the material requested is, at least for the most part, relevant to the plaintiffs' claims. Plaintiffs contend that the State's double-celling program, as it has actually been conducted, leads to unacceptable increases in the amount of disease and violence in the State's maximum-security prisons. To test this hypothesis (one might prefer to say, "to prove this case," but the plaintiffs' own submissions-that it will be impossible to prove their case without subjecting evidence that they have not yet obtained to statistical manipulations they cannot yet specify by experts they have not yet identified-strongly imply that they are engaged in speculation rather than proof), it would clearly be helpful to be able to identify which prisoners have been located in two-inmate cells during which periods, and to correlate that information with medical and incident reports. The databases in question, which relate to the location of prisoners, the incidence of medical problems and pharmaceutical use, and the extent of disciplinary incidents of various kinds, are generally relevant to that inquiry. The State, indeed, does not directly challenge the claim that the material sought is relevant, within the meaning of Rule 26(b)(1).

At the same time, it is far from clear from the evidence presented that all of the information in the databases sought goes to these issues. Plaintiffs have not established that the databases are limited to class members, or that they are or could be (without enormous effort and expense) redacted to relate only to maximum-security inmates. So far as the record before the Court indicates, in fact, the opposite is true. That is, the databases appear to be general DOCS managerial tools, covering all inmates in the State correctional system. Nothing in the record suggests that the databases are easily broken down in such a way that only the portion relating to the institutions involved in this lawsuit can be separately reproduced or disclosed.

Moreover, the databases by their nature disclose more than the data that is in them. By producing the electronic material in raw form, the State would disclose not only the underlying data sought by the plaintiffs, but also the organizational framework of the databases, which would effectively disclose a great deal about the way that DOCS maintains, stores, and classifies information. Worse, as will be discussed further below, the State asserts, and backs up its claim with expert testimony, that this disclosure would not be merely the passive result of providing the database. In order to enable any statistical use of the data, the State would have to affirmatively develop and provide to plaintiffs' experts the equivalent of a manual on how the data is encoded and

organized. The burden of doing so will be addressed below; for now it is sufficient to note that as a practical matter the plaintiffs' demands of necessity include the production of information that is not strictly speaking relevant to the case.

For purposes of this motion, however, it will be assumed that the databases, or at least a substantial part of the information contained in them, is relevant to the issues in this case.

**\*8** 2. *Privilege*

While the State does not contest the relevance of the material, it does argue that the databases are privileged. (Def.Br. at 13-19) The claim is that because production of the databases would raise issues of prison security, the material is subject to a qualified privilege. But defendants' claim that "courts have recognized at least qualified privileges in prison personnel and inmate files" (Def.Br. at 14) is somewhat overstated. Courts are generally and appropriately reluctant to create new privileges, since evidentiary privileges are exceptions to the general rules of disclosure and admissibility of evidence that favor seeking the truth and promoting uniformity and simplicity in the laws. *See Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (citing *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)); *Gonzales v. National Broadcasting Co.,* 155 F.3d 618, 623-24 (2d Cir.1998); 3 Jack B. Weinstein and Margaret Berger, *Weinstein's Federal Evidence,* § 501.02[2][c] at 501-15 (2d ed. 2002). Evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." "United States v. Nixon," 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). As such, they must be strictly construed and accepted "only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel,* 445 U.S. at 50 (citation omitted).

Accordingly, this Court has examined carefully the precedents relied on by the State, to see whether the privilege for which it contends has been recognized as within "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. This examination discloses that the State considerably overstates its authority, which do not support the conclusion that a broad privilege for prison personnel records has been established.

The State cites *Kerr v. United States District Court,* 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976), implying that in that case the Supreme Court recognized a privilege, "which 'rest[s] in large part on the notion that turning over the requested documents would result in substantial injury to the State's prison-parole system.' " (Def.Br. at 14, quoting *Kerr,* 426 U.S. at 405). But *Kerr* does not create such a privilege. The quoted text, in context, simply describes the basis for the California prison authorities' "*claims* of privilege." *Id.* The Court in *Kerr* refused to grant mandamus overturning a district court's disclosure order; while the Court noted with favor that the lower courts had not foreclosed an in camera review of the materials to determine whether privileged material was contained in the files, it certainly did not create, recognize or define any specific privilege in "prison personnel and inmate files," and instead appears to have left open whether there was any basis for invoking the "official or state secret privilege," which was apparently the only privilege asserted in the case. *Id.* at 399, citing *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

The other case relied on by defendants, *Association for Reduction of Violence v. Hall,* 734 F.2d 63, 66 (1st Cir.1984), is no more availing, and is also misleadingly cited by the State. The First Circuit in *Hall* did not recognize any general privilege in prison files, nor did it even pass on any claim of privilege at all. *Hall* holds that the district court erred in relying on documents it had reviewed in camera, but withheld from the plaintiff on grounds of privilege, in deciding a summary judgment motion. With respect to the merits of the privilege determination, the court merely "assumed, without deciding, that the district court did not abuse its discretion in ruling that the documents it viewed in camera were privileged" under one or more of the well-established privileges covering the identities of informants, law enforcement techniques, and intragovernmental policy-making memoranda. *Id.* Thus, even the district court's reasoning, which the Court of Appeals expressly did not adopt as its own, did not purport to create a general privilege for "prison personnel and inmate files," but simply found that particular documents were not discoverable because they contained specific information privileged under these other categories.

**\*9** Thus, the authorities relied on by the defendants do not establish the sweeping general privilege for which they contend. Rather, they support the less dramatic and unsurprising proposition that prison records are sensitive

Jones v. Goord, Not Reported in F.Supp.2d (2002)
2002 WL 1007614

materials, which can be expected to contain a number of different types of information that potentially fall within several more traditional, carefully-defined privileges. Deciding whether the databases requested are privileged, or, more plausibly, contain some quantity of privileged information, would require more careful legal analysis than the parties have yet provided, including most likely some in camera inspection of the records, and a consideration of whether any privileges have been waived by the extensive disclosures already made by the defendants, which they themselves assert already contain substantial amounts of the data in the contested electronic databases.

Fortunately, it is not necessary in this case to decide whether the databases are, or contain material that is, within any of these privileges, or whether this Court should recognize the more general privilege claimed by the State as justified by "wisdom and experience." Defendants themselves claim no more than a qualified privilege, which may be overcome by a showing of need. But, as discussed below, even assuming for the sake of the argument that no privilege exists, and that the burden falls not on the plaintiffs to show special need, but on the defendants to establish that presumptively discoverable material nevertheless should be denied under the provisions of Fed.R.Civ.P. 26(b)(2) and 26(c), the balance of benefit and burden clearly supports denying the plaintiffs' motion to compel disclosure of the databases. Though this inquiry in many ways parallels the privilege analysis, it is preferable to address the question under the case-specific, balancing test of the discovery rule, without making unnecessary broad legal proclamations about privilege.

### B. Balancing the Burdens and Benefits of Discovery

**\*10** All three of the reasons set forth in Rule 26(b)(2) as rationales for limiting disclosure of otherwise-discoverable information apply in this case and require denying discovery of the databases.

The most important reason for this conclusion, foreshadowed by defendants' claim of privilege, is that set forth in Rule 26(b)(2)(iii): "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Indeed, as will be seen this standard largely subsumes the other considerations reflected in Rules 26(b)(2)(i) and (ii).

1. Burden

The State has demonstrated that the burden of the proposed discovery is extremely serious. In ordinary commercial litigation, the "burden" to be considered is primarily the economic cost of locating, reviewing, redacting, and reproducing requested files. Contrary to plaintiffs' claims, defendants have demonstrated that these burdens are not insignificant for the requested databases. Presumably, the actual data files could be reproduced quickly and without excessive labor on the part of DOCS's information technology specialists. But the expert affidavits supplied by defendants, and uncontradicted by any evidence offered by plaintiffs, persuasively establish that such a production of a few CD-ROMs would be of no utility to plaintiffs. Because the databases were designed for the operational purposes of prison administrators, the data desired by plaintiffs, while perhaps present in the databases, are not readily available for the statistical manipulations proposed by plaintiffs. (Martin Aff. ¶¶ 3A, 11.) Thus, the databases in question are not simply collections of lists or numbers that can be easily extracted and correlated with other numbers; rather, each of the requested databases has "been constructed to support the interactions of hundreds of concurrent users rather than to support the analytical activities of a few." (*Id.* ¶ 4.) Consequently, the databases are integrally connected to a data system that comprises "25 separate but interdependent subsystems that each are comprised of scores of programs, tens of databases and scores of screen and report formats. There are over 3,000 programs containing a total of 1,500,000 lines of program instructions." (*Id.*)

To take just one illustrative example, plaintiffs have requested the "database [ ] ... supporting ... the Unusual Incident System." (Pl. Br. at 1.) The Assistant Director of the Bureau of Management Information Systems in DOCS describes that system as follows:

> The Unusual Incident System was developed over fifteen years ago to replace and augment telephone and written notification to Central Office of any prison incident of an unusual nature. Data entry screens are used in the prison to record the description of the incident, the events causing the incident, the action taken, and a medical report. [This report is finalized and supplemented over time as additional information is received.] At each stage

Jones v. Goord, Not Reported in F.Supp.2d (2002)

2002 WL 1007614

of the process, the system provides a rudimentary word processing capability to prepare hard copy documents to certify and document the electronic record. This rudimentary word processing capability is vastly different than modern day word-processing functionality.... The content of an Unusual Incident "document" consists of many data fields and separate records for each line of narrative appearing on the report. When it is necessary to produce a hard copy document, a major program of the system reassembles all of the date, headings, captions and lines of narrative into a document such as those [already] provided to Plaintiff[s'] counsel.... The Unusual Incident system includes 36 programs, 21 screen formats and 48 reports available to the prisons or Central Office. The information in the Unusual Incident system is recorded in 8 database tables with a total of over 2,000,000 rows or records containing nearly 400,000,000 characters.

(Martin Aff. ¶ 6.) This description is typical of those provided for the various other databases at issue on this motion.[1]

 **\*11** Thus, providing plaintiffs with any meaningful access to aspects of this system is not a matter of duplicating discs and handing over copies. The data that would presumably be useful to plaintiffs in analyzing patterns of disease and violence or correlating such patterns with double-celled inmates are not simply numbers maintained in a simple set of files that can be downloaded into some (unspecified) statistical analytic program and then crunched in some (unspecified) way to produce meaningful results. DOCS personnel would need to prepare extensive documentation of the structure of the programs and databases to enable any experts retained by plaintiffs to understand the layout of the data, the meaning of codes, and the sources from which those codes can be derived. (Martin Aff. ¶¶ 12-17.)

Again to take just one concrete example, when double-celling was instituted, it took DOCS officials nearly six months, and several person-months of effort, to develop

from the Locator database requested by the plaintiffs a method to produce a supposedly accurate list of inmates who have been double-celled; since the data were apparently not originally organized for purposes of tracking double-celling, which did not exist when the system began, it required the construction of additional programming tools to generate the list. DOCS experts estimate it would take eight weeks to prepare documentation of the Locator databases that would enable plaintiffs experts to recreate this effort to extract double-celling data in any form that would be usable for subsequent analysis. (This estimate does not, of course, account for whatever time it would take the experts to master that documentation.) (Martin Aff. ¶ 12.) Ironically, the plaintiffs have already been provided with the fruit of this effort, in the form of the most recent iteration of the list of inmates who have been double-celled. Contrary to plaintiffs' assertions, the electronic data are not a more easily-manipulated electronic version of the list, but an infinitely more complex and embedded set of files from which the list can only be extracted (conceivably, given enough additional time, burden and expense, in a more manipulable form than a hard-copy list) with great difficulty.

The defendants estimate that the cost of the efforts required by plaintiffs' requests would be in excess of $100,000, not including the burden of disrupting DOCS operations by shifting expert computer personnel from operational duties. (Martin Aff. ¶ 3.) Even taking the specific dollar figure with a large grain of salt, it is apparent that the financial burden of the State of complying with plaintiffs' demand would be significant.

But unlike the typical commercial litigation, the burden on defendants here is not limited to financial cost or business disruption. Production of the requested databases would have other negative consequences for the State that are even more significant. The security risks of producing the databases are substantial, and cannot be met by the mild and insufficiently thought-out measures suggested by plaintiffs.

It should go without saying that the data in question are highly sensitive. Only a handful of DOCS's own employees, and no one else, have access to the programs used to compile and store the data sought here. (Martin Aff. ¶ 19) Access to the data themselves is more widely shared, but few DOCS officials have access to the totality of the databases sought, which are used for different purposes and are accessed piecemeal rather than in their totality by prison officials.[2]  The requested databases contain

2002 WL 1007614

confidential information about prison personnel; for example, unusual incident reports may contain identifying information (such as social security numbers) and medical information concerning prison staff. Pursuant to earlier court orders and confidentiality stipulations, such information has been painstakingly redacted, at considerable cost of time and effort, from hard-copy versions of these reports provided to plaintiffs. No program or other practicable automated method exists for redacting the computer records to remove the same information from any copy of the database provided to plaintiffs. (Martin Aff. ¶ 20.) Accordingly, the alternatives available to the Court are either to order production of the unredacted database, dramatically ratcheting up the security burden of disclosure, or to order the production of a redacted version of the database, which would require a digital duplication of the extraordinary effort already undertaken with respect to the paper discovery process: a manual effort to input changes and corrections into the copied database to eliminate sensitive material. [3]

**\*12** The databases also contain sensitive information that *has* been provided to plaintiffs, but in a different form. Here the particular characteristics of electronic information come into play in assessing the security costs of providing information in digital form. The costs and difficulties of redaction, for example, have earlier led the Court to permit production of documents with otherwise-confidential inmate medical information unredacted. The cost/benefit analysis with respect to hard-copy information has led to the conclusion that reasonable restrictions on access to and reproduction of documents are sufficient to prevent wholesale exposure of this information to unauthorized persons, particularly as the authorized users were primarily members of the bar of this Court and their employees. While even the best security measures cannot prevent occasional regrettable leakage of particular documents, the difficulties attendant on the physical reproduction of hundreds of thousands of pages of material provide a de facto safeguard against massive theft or misuse of data.

But computer security is an entirely different matter. Plaintiffs' suggestions, including maintaining strict physical custody of discs or other storage media containing the requested data ignore the fact that the manipulation of the data projected by plaintiffs will require loading them into foreign computer systems, presumably belonging to as-yet-unselected experts who are neither subject to the licensing rules and ethical constraints imposed on members of the bar nor chosen for expertise in computer security. The ease

with which entire databases can be reproduced or transmitted radically alters the security stakes and requires a rebalancing of the factors that permitted unredacted information to be disclosed in paper form. (Kirkpatrick Aff. ¶ 6; Clark Aff.) Plaintiffs have provided no reports or affidavits from anyone with expertise in computer security or database management that would provide any evidentiary basis for a conclusion that the data in question could be safeguarded by the means suggested by plaintiffs or by any other means.

Finally, production of the databases would present one other significant security concern not present in routine document discovery. Disclosure of the databases, and of the codes and documentation required to utilize them, would provide access not merely to the data themselves, but also to the techniques used by the prison authorities to record and store data. This is itself a highly confidential matter. In a business context, such disclosure would in some cases raise issues of the protection of trade secrets. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001-02, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (noting broad definition of trade secrets); *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (outlining defining factors of trade secrets); 3 *Weinstein's Federal Evidence,* §§ 508.02-508.07. In a prison context, the stakes are much higher. The security of the data in question against inmates or their associates who have an incentive to seek access to DOCS computers is obviously an important concern. Disclosure of the underlying code and programming information presents a significant danger not presented by disclosure of the data content in hard-copy format. As defendants eloquently make the point, "[Y]ou cannot hack into a computer printout, but a program can be a roadmap for hackers." (D.Br. at 16.)

**\*13** *2. Benefit*

None of these concerns, significant as they are, necessarily preclude discovery. Security concerns can perhaps be met, with enough time, ingenuity, and expense; redaction can be accomplished, with the expenditure of sufficient resources. Parties to important public litigation or even private disputes sometimes have to bear significant costs in the discovery process, in order to assure fair and informed decision-making by courts. The "burden or expense of the proposed discovery," even when substantial, does not forbid disclosure. Rather, the rule asks whether that burden and expense "outweighs its likely benefits." Fed.R.Civ.P. 26(b)(2)(iii). Accordingly, it is necessary to turn to the projected benefits of discovery to

2002 WL 1007614

plaintiffs and to the truth-seeking process before determining whether disclosure can be had.

The suggested benefits, however, prove elusive. Plaintiffs make the plausible claim that having data in electronic, manipulable form will facilitate expert analysis of the data, and avoid the need for plaintiffs to incur significant expense-which, as indigent inmates represented by pro bono counsel who have already expended significant resources on the case-they can ill afford. But if this claim is facially appealing in the abstract, it is much more difficult to document and quantify any specific benefit sought by plaintiffs. As discussed above, the databases in question do not exist in a form that is susceptible to statistical analysis, and considerable time, effort and expense will be necessary to reduce them to a form that might be so usable, or to provide the background instructions and documentation that will permit them to be reduced to such form. Yet plaintiffs provide no meaningful account of what exactly they plan to do with the data. Other than very general statistical terms, such as "regression analysis," that offer little specific content, plaintiffs do not describe what they hope to find or how they hope to find it. Presumably, thinking through the actual uses of the databases is to be left to the as-yet-unselected experts who will one day be retained.

This puts the virtual cart before the digital horse. The Court cannot find that the major risks and burdens detailed above will be worth bearing on the basis of entirely speculative benefits. Of course, until an analysis is done, a court could never know whether that analysis will prove useful to plaintiffs, or produce proof of constitutional violations. But that is not the test; negative results could be as useful as positive ones to resolving this longstanding (long-*running* would be a misnomer) litigation. Though plaintiffs do not need to show that obtaining this data will in fact advance their cause, they do have to provide some basis to believe that specific tests can be run that, with a reasonable degree of scientific certainty, can be expected to yield results that would be relevant to the issues before the Court. *See, e.g., Waldron v. Cities Services Co.,* 361 F.2d 671, 673 (2d Cir.1966). The case might be different if the plaintiffs proffered an affidavit from a reputable statistician explaining exactly what hypotheses would be tested, on what theory and using which techniques, and precisely what data would be necessary to perform those tests. At a minimum, such an affidavit would enable defendants' computer experts to address whether and how the kind of data sought by the plaintiffs' statistics experts could be made available from DOCS's computers. On the

present record, however, plaintiffs can only be characterized as demanding a huge volume of sensitive data, in a form that may or may not be usable for any productive purpose, on the vague hope that it will prove useful when subjected to future massage by unspecified experts. Plaintiffs, thus, have made little showing of "the importance of the proposed discovery in resolving the issues" before the Court. Fed.R.Civ.P. 26(b) (2)(iii).

**\*14** Finally, the benefits to be expected from the proposed discovery must be assessed in light of whether "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; [and] (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the records sought." Fed.R.Civ.P. 26(b)(2)(i), (ii). Though the Rule identifies these as separate grounds on which discovery may be limited, they may productively be considered as part of the burden/benefit analysis. Even if the discovery sought is not *so* cumulative that it can be dismissed out of hand on that ground alone, the extent to which the discovery is duplicative will bear importantly on the benefits to be expected from the discovery; even if the party cannot be said to have simply forfeited any claim to discovery by prior inaction, the extent to which a party has unreasonably foregone efforts to seek the discovery sought will affect both the burden on the opposing party and the evaluation of whether the party seeking discovery itself believes that significant benefits will accrue. These factors both weigh against compelling discovery in this case.

First, much of the actual *data* in the databases (to the extent relevant) has already been provided to plaintiffs in documentary form. Plaintiffs cite no concrete facts available in the database, relevant to the litigation, and unprivileged, that are not available in the 700,000 pages of material already provided to them. As repeatedly acknowledged in this opinion, the Court accepts the fact that the form of the databases sought could in theory provide non-cumulative value added to plaintiffs. At the same time, as also discussed above, the defendants are correct that the security burdens on the State will be massively increased by production in this form, such that it can readily be concluded that the document discovery already provided is far "less burdensome [and] less expensive" than the electronic production now sought by plaintiffs.

**\*15** Second, the expense of additional production has to be weighed in the context of the extraordinarily burdensome and

expensive discovery process already undertaken in this case. Defendants have produced nearly three quarters of a million pages of records, and expended the months of personnel hours necessary to locate, prepare, redact, copy and ship those documents. This is no mere clerical task; the redaction process involves skilled work by attorneys and by paralegals and interns acting under their supervision. The Attorney General of New York has hired three full time clerks to work specifically on this case. (Moody Aff. ¶ 2.) While the costs of employees on the public payroll are harder to estimate than the bills paid by litigants represented by lawyers who bill by the hour, the (largely hidden) burden on the public of the discovery process already conducted in this case is disturbing. Plaintiffs' counsel, too, has expended a significant amount of out-of-pocket costs on the case, as well as investing an enormous amount of (putatively very costly) attorney time.

This is relevant in assessing the cost of the requested discovery; that cost should not be assessed in isolation, but in the context of the total cost of discovery to date. It is also relevant to assessing whether the plaintiffs have had "ample opportunity" to obtain the information in question. As noted above, plaintiffs argue that discovery demands served early in this litigation could be construed as covering the databases that are the subject of this motion. But that claim ignores the realities of big-case discovery, which, perhaps unfortunately, often proceeds by the exchange of overbroad discovery demands and blanket objections, followed by concrete negotiations over what records are really necessary and what production the opposing party is really prepared to make without compulsion. Discovery in many cases is already burdened by posturing correspondence and excessive resort to court conferences that vastly increase the friction and cost of the process. Parties should be encouraged to work out differences amicably; for a court to ignore or fail to give effect to the informal accommodations and understandings that develop over time would undermine the spirit of cooperation and informality that alone makes effective discovery and settlement possible in overburdened courts.

Viewed against that realistic background, the record in this case makes absolutely clear that this discovery request is belated. The parties have spent years, significant sums, and exhaustive efforts on discovering and analyzing a mountain of paper-a project that, plaintiffs now claim at the eleventh hour before expiration of the n-th discovery deadline, was largely useless, or at least superseded, because the production of electronic data instead would have accomplished the same thing and more. Plaintiffs may not have identified the specific

databases by name until a deposition in December 2001 laid out the details of the DOCS computer system, but they have been aware throughout discovery that DOCS, like any modern enterprise, keeps its records in computerized form. It is undisputed that reports devised from these very databases were introduced into evidence at the *Bolton* trial in 1997, and many of the reports and records that defendants have disclosed in hard-copy form have self-evidently been produced as printouts from computer files.

**\*16** Nothing prevented plaintiffs from seeking, either informally through the extensive correspondence and telephonic communication between counsel, or formally by interrogatory, further information about the computer databases available from DOCS. Nothing prevented plaintiffs from discussing with their adversaries in a timely fashion, before the expenditure of hundreds of thousands of dollars on conventional document discovery, whether the mountain of paper was really necessary, or whether a cooperative effort to explore electronic discovery possibilities could have led to a mutually beneficial agreement. Nothing prevented plaintiffs from retaining experts to advise them as to what kinds of electronic data would likely be found in the DOCS computer system, what kinds of data would be necessary to evaluate plaintiffs' claims, and what kinds of security precautions could be presented to the State to satisfy its legitimate interests and induce agreement to cooperate in providing data. Nothing in the record suggests that any such efforts were made, or, indeed, that the plaintiffs took any step to seek discovery of any electronic data until after their adversaries had expended exorbitant sums of public money on conventional discovery, and until the ultimate deadline for completing fact discovery, after seven years of litigation, was at last at hand. Accordingly, the Court is constrained to find that the plaintiffs have had, and let pass, ample opportunity to obtain this information earlier in the discovery process, and that that conclusion strongly supports denying plaintiffs' motion.

VII. *Conclusion*

The factual findings set forth in this opinion are largely uncontested. The State has compiled an impressive record documenting the technical issues involved in assessing the burdens and risks, and the obstacles to securing the hoped-for benefits, of ordering the discovery sought. Plaintiffs, as noted above, have blithely declined to respond to that presentation, relying on the facially plausible generalities put forth in their initial motion papers. The Court has nevertheless carefully

2002 WL 1007614

and skeptically reviewed the papers submitted by defendants, only to find them ultimately persuasive and accurate.

Assuming for the sake of argument that the databases sought by plaintiffs are relevant and not privileged, the Court finds that discovery should be denied because defendants have made a compelling showing that the burden of the proposed discovery far outweighs its likely benefit for resolving the issues before the Court, particularly in light of the failure of the plaintiffs to seek such discovery despite ample opportunity to do so in a more timely manner, and the vast amount of material, largely duplicating the contents of the databases now sought, which has already been provided by the defendants. The Court will not impose additional burden, expense and risk of harm on the parties, and especially on the defendants, at this belated hour, after the expenditure of so much effort and expense, and on the undocumented hope of obtaining such speculative benefits.

**\*17**  The motion to compel production is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1007614

---

### Footnotes

1    The one exception to this generalization is the (inmate) Pharmacy System. Unlike the various other requested databases, which form part of a complex integrated system, it is not clear that there even exists any "pharmacy system database" as requested by plaintiffs. Apparently the "system" here consists of a program purchased from a vendor and in use on stand-alone PCs at those prisons (not all) that have pharmacies, in order to keep track of prescriptions issued to inmates. The system is incomplete, insofar as prisons without pharmacies supply prisoners' pharmaceutical needs via outside vendor pharmacies, which keep their own records in whatever form they choose, which records in turn are not available to DOCS. Moreover, the records in the pharmacy "system" are not centrally integrated, and are accessible only to the pharmacists at each prison. The central office of DOCS "has never attempted to access data in the Pharmacy system," and its technical experts apparently have no idea how to do so. (Martin Aff. ¶ 9.)

2    For example, inmate medical information contained in the medical databases requested by plaintiffs is not available to nonmedical personnel within DOCS. (Martin Aff. ¶ 23.)

3    Personnel information is only one category of sensitive material contained in the database. The Locator database contains information, as the name suggests, detailing the cell location of every inmate in the system. That information, obviously confidential for security and other reasons, goes well beyond the listing of double-celled inmates already provided to plaintiffs. (Kirkpatrick Aff. ¶ 9.)

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CASE NO. 3

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 55 of 80
Lymphedema & Wound Care Consultants of America, Inc...., Not Reported In Fed....

2022 WL 209562

2022 WL 209562
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

LYMPHEDEMA & WOUND CARE CONSULTANTS
OF AMERICA, INC. d/b/a Lymphedema
& Wound Care Institute and Lymphedema
& Wound Care Institute of Texas, Inc. d/b/a
Lymphedema and Wound Care Institute, Plaintiffs,
v.
HEALTH CARE SERVICE CORPORATION d/
b/a Blue Cross & Blue Shield of Texas, Defendant.

No. 3:19-cv-2164-X
|
Signed 01/24/2022

**Attorneys and Law Firms**

Charles Scott Nichols, Zachary Watson Thomas, Nichols Brar
Weitzner & Thomas LLP, Houston, TX, Laura Reilly O'Hara,
Clark Hill PLC, Dallas, TX, for Plaintiffs.

Martin James Bishop, Reed Smith LLP, Dallas, TX, Claudia
L. Cortes, Pro Hac Vice, Thomas C. Hardy, Reed Smith LLP,
Chicago, IL, Jarrad L. Wood, Pro Hac Vice, Reed Smith LLP,
Los Angeles, CA, Cheryl Lee Blount, Reed Smith, Houston,
TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

DAVID L. HORAN, UNITED STATES MAGISTRATE
JUDGE

 **\*1**  Defendant, Blue Cross and Blue Shield of Texas, a
division of Health Care Service Corporation, a Mutual Legal
Reserve Company ("BCBSTX"), has filed a Motion to
Dismiss with Prejudice the Claims of Lymphedema & Wound
Care Consultants Of America, Inc. d/b/a Lymphedema &
Wound Care Institute and for Sanctions for Failure to Comply
with the Court's March 5, 2021 Discovery Order Under Fed.
R. Civ. P. 37. See Dkt. No. 96 (the "Sanctions Motion").

United States District Judge Brantley Starr has referred the
Sanctions Motion to the undersigned United States magistrate
judge for a hearing, if necessary, and determination under 28
U.S.C. § 636(b). See Dkt. No. 99.

Lymphedema & Wound Care Consultants of America, Inc.,
d/b/a Lymphedema & Wound Care Institute ("LWCCA")
responded to the Sanctions Motion, see Dkt. No. 103, and
BBSTX filed a reply, see Dkt. No. 105.

**Background**

The parties are very familiar with the background of this case.
So the Court will not repeat it here and will instead focus on
the background of the Sanctions Motion.

In a March 5, 2021 Memorandum Opinion and Order, the
Court granted in part and denied in part BCBSTX's Motion
to Compel Plaintiffs to Produce Documents and Respond to
Interrogatories [Dkt. No. 40]. See Dkt. No. 68. In particular,
the Court ordered as follows:

VI. **RFP, Set One, No. 6 and Rog, Set One, No. 2(a) &
2(c) to LWCCA**

RFP, Set One, No. 6, requests:

A data export from your billing or other electronic
systems in Excel (and, if not capable of being
exported in Excel format, then in Access or comma-
delimited format) sufficient to show the following for
each of the Claims [defined as any medical claim
or invoice submitted by Plaintiffs to BCBSTX for
payment] identified in response to Interrogatory No.
1: Member's last name, Member's first name, date of
birth, member ID number, group ID number, Claim
Number, date of service, Claim's CPT Code(s), Claim's
HCPCS Code(s), billed charge(s), date the Claim was
submitted to BCBSTX, amount of payment received
from Member, date of receipt of payment from Member,
amount of payment received from BCBSTX, date of
receipt of payment from BCBSTX, amount(s) of any
subsequent payment(s) received from BCBSTX, and
date(s) of receipt of any such subsequent payment(s)
from BCBSTX.

ROG, Set One, No. 2 (a) and (c) asks, in pertinent part:

For each Claim in your answer to Interrogatory No. 1,
identify:

a. the amount you allege BCBSTX was required to pay
you, in addition to any amounts it has previously allowed
for each Claim; ...

Case 4:21-cv-02473  Document 160-2  Filed 07/28/25 in TXSD  Page 56 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

c. the factual and legal basis for your claim to be entitled to any amount identified in response to subsection a above[.]

BCBSTX explains:

The Excel exports (or spreadsheets) Plaintiffs have produced in response to this Request are deficient because they fail to identify the Claims at issue – specifically, the dates of service in dispute for each patient – as well as the nature of the dispute. Mainly, the Excel exports list thousands of dates of services with various codes beyond CPT Code 97140 and HCPCS Code S8950 that may or may not be at issue in this litigation. Hardy Decl., ¶¶ 7-8, 27-31. In informal discussions, LWCIT had represented to BCBSTX that the only Claims it is putting at issue in this lawsuit are those with CPT Code 97140 and HCPCS Code S8950. Id., ¶ 19. Yet, LWCIT has refused to explain why its spreadsheets include dates of services with various other codes. Id., ¶ 21. LWCCA likewise has yet to articulate what CPT and HCPCS Codes it is putting at issue. Id., ¶ 27. Further, both LWCIT and LWCCA have yet to produce all fields requested in RFP, Set One, No. 6, including, but not limited to, any payments received from BCBSTX subsequent to the original adjudication of a Claim.

    *2 ....

To date, Plaintiffs have only provided a vague and generic answer asserting that Plaintiffs are entitled to additional payments because, among other things, BCBSTX purportedly placed Plaintiffs in pre-payment review for certain unidentified Claims, wrongly recouped money for other unidentified Claims, and/or "bundled" some other unidentified Claims. This answer is nonresponsive, does not identify specific factual and legal theories of liability or recovery, and does not identify which individual Claims are impacted by each such theory of liability or recovery, and the additional amounts Plaintiffs contend BCBSTX is purportedly required to pay Plaintiffs for each Claim. Hardy Decl., Exs. C-1, C-2. However, pursuant to ROG, Set One, No. 2(a) and (c) – to which Plaintiffs did not object – Plaintiffs must provide a response for each Claim it contends to be at issue (i.e., identified in ROG, Set One, No. 1). Given Plaintiffs' complete failure to identify the Claims at issue in this litigation, the factual and legal bases that purportedly entitle LWCIT and

LWCCA to millions of dollars in additional payments, and the additional payment per Claim Plaintiffs contend they are entitled to receive, BCBSTX has no means to understand what Claims are at issue in this litigation and why Plaintiffs contend BCBSTX underpaid for specific dates of service for those Claims. Only Plaintiffs can provide this information to BCBSTX. Without this information, BCBSTX literally has to guess which of the thousands of dates of service for the multitude of patients Plaintiffs have included in their spreadsheets are at issue. Moreover, without knowing the factual and legal basis supporting each Claim, BCBSTX has no way of knowing what it purportedly did or failed to do in breach of its contracts with Plaintiffs with respect to any individual Claim.

Accordingly, the Court should order Plaintiffs to produce all requested information for each Claim, in response to RFP, Set One, No. 6, and ROG, Set One, No. 2.

LWCCA responds that

[t]his request is not proportional to the needs of this case because Defendant is already in possession of sufficient information to identify for itself the nature of each claim. Like LWCIT, LWCCA has already produced, through discovery in this suit and the pre-payment audit, the dates of service for each patient, as well as the following for each patient claim:

- • Patient name

- • Description of services provided

- • Related CPT code (universal codes known to Defendant)

- • Billed charges

- • Provider identification

Defendant complains that LWCCA has failed to identify the specific nature of each dispute. But in order to provide the factual and legal basis that gives rise to each Claim, LWCCA would need to review roughly a total of 69,845 line items, ERA's, denial notices, and other pertinent correspondence, all of which, again, Defendant was in possession of before this litigation began. See Exhibit 2, Declaration of Shanna McKinley. LWCCA does not have the resources or staff to timely complete such a task; While Defendant is a billion-dollar company with 16 million members, LWCCA has

only three administrative employees (non-clinical staff) with the skill set and access to review and compile the requested information. *Id.* Accordingly, it would take LWCCA up to a year to provide specific descriptions for each patient.

**\*3** Alternatively, LWCCA requests that the Court permit it to provide the information requested for a representative sample of claims.

BCBSTX replies that LWCCA waived any objections:

Plaintiffs agreed without objection to both identify the Claims at issue and the legal and factual basis for their allegation that they are owed damages as to each Claim in response to RFP Set One, No. 6, and ROG, Set One, No. 2. ECF No. 41, pp. 26-27, 32-33, 39, 47. Plaintiffs cannot object now, for the first time, in their Opposition that it is unduly burdensome and disproportionate to the needs of the case to provide this information. Failure to timely object to discovery results in waiver of the objection. .... Courts routinely find objections waived when not timely raised and, accordingly, order the production of documents and information. ....

Plaintiffs have no good cause for their failure to timely object. They now claim for the first time that it would take them months to identify the factual and legal bases for each of the Claims they have put at issue. [Plaintiffs' voluminous spreadsheets list many CPT codes that may or may not be at issue. As explained in the Memorandum and not disputed by Plaintiffs, in informal discussions, LWCIT represented to BCBSTX that the only Claims it is putting at issue are those with CPT Code 97140 and HCPCS Code S8950. ECF No. 40, p. 9. Yet, LWCIT has refused to explain why its spreadsheets include dates of service that do not even include those codes. Id. LWCCA likewise has yet to articulate which CPT/HCPCS codes on its Claims it is putting at issue or why. Id. In their Opposition, Plaintiffs did not dispute or respond to this and do not mention, even in passing, the CPT/HCPCS codes they contend were wrongfully denied or underpaid. See, ECF No. 44. As such, their spreadsheets are unhelpful and incomplete, as Plaintiffs admit. Id., p. 8 (admitting that LWCCA's spreadsheets include most, but not all of the information.). The critical information they omit is among the information BCBSTX seeks by its Motion.] But Plaintiffs presumably knew this when they served their responses to BCBSTX's discovery and said nothing. It also appears that Plaintiffs did nothing

after being served with BCBSTX's requests in August 2020 until now to attempt to collect and produce the requested information and documents. Indeed, Plaintiffs do not offer any reason why they waited until now – after discovery has closed, and only after BCBSTX was forced to file this Motion to Compel – to raise these issues for the first time. See ECF No. 44-1, 44-2.

Even if Plaintiffs had asserted timely objections, their objections cannot overcome BCBSTX's need for the information. Notably, and as an initial matter, Plaintiffs have refused to even confirm either in discovery or in their Opposition which of the thousands of claims they list in their spreadsheets constitute the Claims at issue.2 See ECF 44 (never identifying the CPT Codes at issue). Without this basic information, BCBSTX cannot even be sure what claims to defend.

Moreover, and importantly, Plaintiffs do not claim that there is a one-size-fits-all explanation for why Plaintiffs are entitled to more money that applies to all Claims, effectively conceding that they are alleging different theories of breach with respect to different Claims. As Plaintiffs themselves admit, they have submitted "thousands of claim lines .. for reimbursement over several years," and each patient "could have several dates of treatment weekly for weeks or months;" "each date of treatment may ... involve multiple services" and "each service is represented by a different CPT code." ECF No. 44, p. 6 (emphasis in original); p. 8-9 (also explaining that LWCCA submitted thousands of claims for reimbursement). It is precisely because Plaintiffs have submitted thousands of claims, each involving different services and CPT/HCPCS codes, that only Plaintiffs can identify both the Claims and the reasons they assert they are owed more money for each Claim – only they possess this information. If Plaintiffs cannot explain what it is about BCBSTX's processing of a Claim that they are disputing, BCBSTX is left to guess what is in dispute and why, to the detriment of its ability to defend itself.

**\*4** Plaintiffs cannot avoid their discovery obligations merely by asserting that BCBSTX purportedly placed them on prepayment review. Prepayment review means just that – that BCBSTX reviewed a claim and its associated medical records prior to processing it, resulting either in a denial or payment of the claim. Yet, Plaintiffs have not even identified which of the claims that went through this process and that are listed in their

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 58 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

voluminous spreadsheets, which were paid or denied, are Claims at issue here and why BCBSTX's resolution of those claims was somehow incorrect. The dodge in Plaintiffs' Opposition is thus apparent: pointing out that BCBSTX reviewed many claims before Plaintiffs filed suit does not at all explain why they contend additional benefits are payable on any of them – a point on which they of course bear the ultimate burden of production and persuasion in their case in the first place.

It is also no response to brush off discovery in the lawsuit by asserting that all of the information requested by RFP, Set One, No. 6 and ROG, Set Two, No. 2 (a) and (c), was provided prior to the litigation during the "pre-payment audit." ECF No. 44, p. 5, 8. Even assuming that were true, Plaintiffs submitted thousands of claims to BCBSTX over many years. BCBSTX should not be forced to blindly wade through all of those records when Plaintiffs refuse to tell BCBSTX which of the claims they submitted are at issue and why.

Plaintiffs' belated and hollow offer to produce documents and information relating to a "representative sample" of the Claims at issue is a non-starter, particularly at this stage of the litigation. Initially, sampling is a means to test and, in the appropriate case, extrapolate and present underlying facts; it is not a substitute for Plaintiffs articulating what they are challenging and why, let alone a fishing expedition in lieu of having any presently identifiable grounds after the close of discovery and almost two years into the case. Moreover, Plaintiffs do not offer a concrete proposal or any level of detail as to how a statistically sound sampling process would work, or even what it would sample the Claims for. Nor would such a conversation be possible without much of the discovery that has been requested, such as the types of disputes or issues that are being challenged. This eleventh hour, detail-free proposal is emblematic of Plaintiffs' overall approach to Discovery – hide the ball and then attempt to force BCBSTX to do the work of figuring out why Plaintiffs are suing.

Accordingly, the Court should compel Plaintiffs to confirm which of the thousands of claims they list in their spreadsheets are Claims at issue here and identify the factual and legal bases that purportedly entitle them to additional payments for the Claims they have at issue.

On this record, LWCCA waived the objections on which it now relies by failing to raise them.

Further, for the reasons that BCBSTX persuasively explains in its reply, this discovery – although extensive – is proportional to the needs of the case considering the parties' relative access to this information and its importance to LWCCA's claims and BCBSTX's ability to defend against the claims.

For the reasons that BCBSTX explains in its reply, the Court GRANTS the MTC as to RFP, Set One, No. 6 and Rog, Set One, No. 2(a) & 2(c) to LWCCA and ORDERS LWCCA to, by **April 5, 2021**, serve an amended response to, and, produce all previously unproduced, responsive documents in LWCIT's possession, custody, or control in response to, RFP, Set One, No. 6 in compliance with Federal Rule of Civil Procedure 34(b)'s requirements and serve amended answers to Rog, Set One, No. 2(a) & 2(c) that, in compliance with Federal Rule of Civil Procedure 33's requirements, provide the responsive, relevant facts reasonably available to it.

## VII. RFP, Set One, No. 1 to LWCCA

RFP, Set One, No. 1, requests:

All Documents and Communications related to the Claims identified in your answer to Interrogatory No. 1, including, but not limited to, patient intake records, patient insurance cards, assignments of benefits, medical records, benefit verification records, preauthorization/ precertification records, call notes or logs, call recordings, Claim forms, UB forms, remittance reports, remittance notices, transaction detail records, collection notes or collection records, and all payment and account records.

**\*5** BCBSTX explains:

To date, Plaintiffs' production in response to Request No. 1 is woefully incomplete. Plaintiff LWCIT has merely provided medical records relating to four patients, and even those productions have been partial and incomplete. Hardy Decl., ¶ 20. LWCCA has repeatedly promised that it would produce medical records, but it has not done so. Id., ¶¶ 12-13, 14-15, 29-30.

Because Plaintiffs' entire case rests on showing that it provided the services billed on the Claims and that the underlying medical records justify the CPT

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 59 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

and HCPCS Codes billed for those services, Request No. 1 necessarily includes medical records for all of the BCBSTX members to whom Plaintiffs allegedly provided the services for which they now seek additional payments. These medical records are critical to BCBSTX's defense, as they will permit BCBSTX to verify whether Plaintiffs actually provided the services that support their Claims and, if so, whether they correctly billed BCBSTX for such services. It would be patently unfair to allow Plaintiffs to pursue claims against BCBSTX for purported breach of contract for failure to pay for services, when Plaintiffs have failed and refused to produce the very records that could verify whether they actually provided those services and that arguably support the CPT and HCPCS Codes for which Plaintiffs claim BCBSTX should pay. This is especially true when BCBSTX has already discovered, in the limited productions Plaintiffs have made to date, medical records for dates of service purportedly approved by Dr. Share, when Dr. Share was no longer associated with LWCIT.

The Court therefore should compel Plaintiffs to produce medical records for every Claim for which they seek additional payment.

LWCCA responds that it "has produced spreadsheets identifying all claims which are the subject of this lawsuit" and that "[i]t would take a year or more for LWCCA to produce all of the information requested by Defendant," but, "[a]ternatively, LWCCA requests that the Court permit LWCCA to provide the information requested for a representative sample of claims."

BCBSTX replies that

LWCCA has also not been forthcoming with BCBSTX regarding the production of its medical records in response to RFP, Set One, No. 1. For one thing, LWCCA strung BCBSTX along for months with promises that it would produce its medical records – first, in paper, and then, electronically, ECF No. 41, pp. 56-60, 87, only to now claim for the first time that the records it had in hard copy were damaged by Hurricane Harvey in 2017. ECF No. 44-2, p. 3. LWCCA has no explanation for why it is just disclosing this information now, see ECF No. 44 and 44-2, after discovery closed more than a month ago and after BCBSTX was forced to file this Motion.

LWCCA has also waived its new, belatedly asserted objection that it would be unduly burdensome to produce the medical records it does have. ECF No. 44, p. 9; ECF No. 44-2, p. 3. LWCCA agreed to produce these records without objection in its discovery responses. ECF No. 41, p. 46. Its burden objection therefore is not timely. *Morris*, 2017 WL 10841356, at *2.

**\*6** Moreover, LWCCA cannot satisfy its discovery obligations by making the entirety of its records available to BCBSTX and placing the burden on BCBSTX to comb through all of those records to find the ones that might relate to the Claims. *See* ECF No. 44-2, p. 3 (proposing to have a BCBSTX's representative access LWCCA's medical record and billing systems to search for the records it has requested). Such tactics are prohibited by the Federal Rules of Civil Procedure. *McKinney/Pearl Rest. P'ners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235, 249 (N.D. Tex. 2016) (Federal Rule 34(b)(2)(i) "forbids 'dump truck' discovery tactics, where a party delivers voluminous and poorly organized documents to his adversary, who is forced to rummage through piles of paper in search of what is relevant.") (internal quotation marks and citation omitted); *ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*, No. 6:07 CV 251, 2008 WL 11348342, at *2 (E.D. Tex. Oct. 3, 2008) ("This Court does not endorse a method of document production that merely gives the requesting party access to a 'document dump' with an instruction to 'go fish.' ") (quoting *Residential Constr., LLC v. ACE Prop. & Cas. Ins. Co.*, No. 2:05-CV-1318, 2006 WL 1582122, at *2 (D. Nev. June 5, 2006)).

On this record, LWCCA waived the objections on which it now relies by failing to raise them.

Further, for the reasons that BCBSTX persuasively explains in its reply, this discovery – although extensive – is proportional to the needs of the case considering the parties' relative access to this information and its importance to LWCCA's claims and BCBSTX's ability to defend against the claims.

And the Court agrees with BCBSTX's assertion that LWCCA may not – consistent with Federal Rule of Civil Procedure 34(b)(2)(E)(i)'s requirements – only point BCBSTX to the entirety of its records and place the burden on BCBSTX to, without any organization or direction from LWCCA, comb through all of those records to find the ones that might relate to the Claims.

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 60 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

For the reasons that BCBSTX persuasively explains in its reply, the Court GRANTS the MTC as to RFP, Set One, No. 1 and ORDERS LWCCA to, by **April 5, 2021**, serve an amended response to, and, produce all previously unproduced, responsive documents in LWCCA's possession, custody, or control in response to, RFP, Set One, No. 1 in compliance with Federal Rule of Civil Procedure 34(b)'s requirements.

Dkt. No. 68 at 24-31.

BCBSTX now asserts that

[t]he Court should dismiss LWCCA's causes of action against BCBSTX with prejudice pursuant to Federal Rule of Civil Procedure 37 for its failure to comply with the discovery rules and this Court's Order. On March 5, 2021, the Court issued a detailed, 38-page order granting BCBSTX's Motion to Compel discovery responses in substantial part. The Order directed LWCCA to produce documents and information that the Court acknowledged are critical to BCBSTX's ability to defend itself in this matter, no later than April 5, 2021. LWCCA failed to do so. Instead, LWCCA produced admittedly incomplete documents and information by April 5, and then – after BCBSTX pointed out LWCCA's non-compliance with the Order – LWCCA attempted to supplement its production with untimely and still incomplete spreadsheets of claim information nearly a month later. And, critically, LWCCA has not produced medical records for most of the dates of service at issue. Despite its untimely efforts to shore up its production, LWCCA has not come close to producing the documents and information ordered by the Court. Given LWCCA's history of disregarding its discovery obligations and blatant disregard for the Order in particular, as well as the resulting prejudice to BCBSTX, dismissal is warranted.

Accordingly, BCBSTX respectfully requests that the Court dismiss LWCCA's complaint with prejudice. In the alternative, BCBSTX urges the Court to limit LWCCA's evidence to those claim lines (1) for which LWCCA included a factual basis for its payment demand; (2) for which it produced matching medical records; and (3) that it did not add for the first time to the spreadsheets it produced in response to the Court Order, after discovery had closed on January 6, 2021 – a total of 0 claim lines out of 66,781 total claim lines purportedly at issue. [As used herein, "claim" refers to any benefit claim submitted by LWCCA to BCBSTX for payment for a particular patient for a given date of service. A "claim line" refers to each separate service provided to a patient on a particular date of service, as represented on the claim. A claim may contain more than one claim line if, for example, multiple separate services were rendered to a patient on a particular date of service.] If the Court is disinclined to so exclude all claim lines, the Court should limit LWCCA's evidence, at most, to that relating to the 12 claim lines with a factual basis and matching medical record, for the only two patients for which LWCCA provided such information and did not add for the first time to the spreadsheets in response to the Court Order.

**\*7** Dkt. No. 96 at 1-2 (footnote omitted).

More specifically, BCBSTX requests that

the Court dismiss with prejudice LWCCA's claims against BCBSTX or, in the alternative that the Court issue an order limiting the evidence LWCCA may present at summary judgment or trial to that relating to:

- Those claims lines (1) for which LWCCA included a factual basis for its payment demand; (2) that LWCCA did not add for the first time after discovery closed; and (3) for which LWCCA produced matching medical records – a total of 0 claim lines.

- Or, in the alternative, to the 12 claims lines (1) for which LWCCA included a factual basis for its payment demand; (2) for which LWCCA produced matching medical records; and (3) which correspond to patients B.K. and B.W. – even though LWCCA only disclosed these claim lines for the first time in its New Spreadsheets, after discovery closed.

In addition, BCBSTX requests that the Court grant it its attorneys' fees in connection with this Motion.

Dkt. No. 96 at 21-22.

LWCCA responds that

BCBSTX now feigns ignorance about the claims at issue and the amounts that LWCCA claims it still owes, to try to have LWCCA's entire case dismissed with prejudice. Dismissal with prejudice of course would allow BCBSTX to dodge its contractual reimbursement obligations altogether.

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 61 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

BCBSTX would lead the Court to believe that LWCCA still has not disclosed basic information about its claims that the Court ordered it to produce by April 5, 2021 in response to BCBSTX's motion to compel. But LWCCA did produce the vast majority of the required information by the Court's deadline. The only information produced after the deadline (and, even then, just 25 days after the deadline) was an "allowed amount" column on LWCCA's claims spreadsheets showing the exact amount that LWCCA contends it is owed for the services it rendered to BCBSTX's members. The only information required by the Court that LWCCA was unable to produce was a few hundred paper patient medical files destroyed in Hurricane Harvey. Thus, BCBSTX has had everything required by the Court's order in LWCCA's possession, custody, or control since April 30, 2021 or earlier (almost four months ago).

BCBSTX cannot establish that it suffered any prejudice as a result of its receiving the "allowed amount" column on LWCCA's supplemental spreadsheets just 25 days after the Court's deadline – let alone any of the other factors required to justify sanctions under Rule 37. This is all the more true because the Court recently extended all deadlines in the case by 90 days on BCBSTX's motion, causing a continuance of the January 19, 2022 trial date to at least mid-April 2022 (some eight months from now). *See* Dkt. Nos. 74 (Fourth Amended Scheduling Order) and 94 (July 2, 2021 order). LWCCA's need for a mere 25 extra days to be able to produce an "allowed amount" for each of the claim lines at issue is no basis to issue the extreme sanctions that BCBSTX seeks against LWCCA.

BCBSTX is being a bully to LWCCA. The Court should deny BCBSTX's Motion to Dismiss with Prejudice.

 **\*8** Dkt. No. 103 at 4-5.

In reply, BCBSTX asserts that LWCCA's response

> confirms that the Court should dismiss LWCCA's claims against BCBSTX with prejudice. LWCCA's Opposition does not meaningfully dispute the deficiencies alleged in the Motion. For instance, LWCCA concedes that it provided a "reason for payment demand" for only 178 of 66,781 claim lines. And LWCCA concedes

> it added hundreds of new patients and claims in the spreadsheets it provided in April 2021, long after discovery had closed. LWCCA also concedes that it has not provided medical documents for hundreds of patients. LWCCA's brazen disregard for its discovery obligations and the Court's order – and the resulting prejudice to BCBSTX – make clear that the only appropriate sanction is dismissal with prejudice. LWCCA's defiant Opposition confirms it.

Dkt. No. 105 at 1-2 (footnote omitted).

BCBSTX's reply also requests that, in the alternative,

> the Court preclude LWCCA from introducing evidence it has refused to produce to BCBSTX in blatant disregard of the Court's Order. LWCCA's arguments to the contrary are unpersuasive.

> LWCCA arguments to the contrary largely mirror its arguments as to terminating sanctions. Opp. at 16-18. They lack merit for the same reasons discussed above. First, LWCCA again incorrectly states (without citation) that it provided all relevant information regarding LWCCA's claims. *Id.* at 17. That is simply not the case. *See supra* Sections I & II. LWCCA argues that BCBSTX "has patient files covering at least 24,790 of the claim lines in question." Opp. at 17. But this overlooks the whole picture. Providing pieces of information here and there does not cut it. At bottom, LWCCA failed to produce complete information for any single patient identified in the December Spreadsheet and produced complete information for 0 claim lines in the December Spreadsheet. Mot. at 10. In short, if the Court is not inclined to award terminating sanctions, BCBSTX respectfully requests that the Court should issue an order limiting the evidence LWCCA may present at summary judgment or trial.

> ....

> LWCCA argues that the Court should not award attorneys' fees in connection with the Motion because "LWCCA substantially complied with the Court's order on BCBSTX's motion to compel by the April 5th deadline, and it fully complied by April 30th...." Opp. at 18. As

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 62 of 80

Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....

2022 WL 209562

discussed above (see supra Sections I & II), LWCCA neither substantially complied nor fully complied with the Court's Order. Indeed, LWCCA's willful failure to provide the legal and factual bases of each claim – after representing to the Court that it fully understood that doing so would entail providing the specific basis for each claim and not a generic statement that purports to cover all claims – is sufficient on its own to demonstrate that LWCCA did not substantially (let alone fully) comply with the Court's Order. *See, e.g., supra* pp. 2-3.

Dkt. No. 105 at 9-10 (footnote omitted).

**Legal Standards**

Federal Rule of Civil Procedure 37(b)(2)(A) provides that, "[i]f a party ... fails to obey an order to provide or permit discovery, ... the court where the action is pending may issue further just orders. They may include the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; [or] (vi) rendering a default judgment against the disobedient party." FED. R. CIV. P. 37(b)(2)(A)(i)-(vi).

 **\*9** Rule 37(b)(2)(C) further requires that, "[i]nstead of or in addition to the orders [described under Rule 37(b)(2)(A)], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C). "A party's discovery conduct is found to be 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.' " *S.E.C. v. Kiselak Capital Grp., LLC*, No. 4:09-cv-256-A, 2012 WL 369450, at \*5 (N.D. Tex. Feb. 3, 2012) (quoting *Devaney v. Continental Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993) (in turn quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988))). "The burden rests on the party who failed to comply with the order to show that an award of attorney's

fees would be unjust or that the opposing party's position was substantially justified." *Id.* at \*3 (footnote omitted).

The undersigned has authority to enter a nondispositive order granting attorneys' fees or other nondispositive sanctions under Federal Rule of Civil Procedure 37(b) or denying a request for what might be considered a dispositive sanction. *See* 28 U.S.C. § 636(b); *Merritt v. Int'l Bhd. of Boilermakers*, 649 F.2d 1013, 1016-17 (5th Cir. Unit A 1981) (per curiam) (a magistrate judge has authority to enter a nondispositive order granting attorneys' fees as a sanction under Federal Rule of Civil Procedure 37); *Siegel v. Compass Bank*, No. 3:18-cv-1023-X, 2021 WL 4498914, at \*1 (N.D. Tex. Jan. 11, 2021) ("To determine whether a referred motion for sanctions is dispositive or non-dispositive, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether Rule 72(a) or 72(b) applies. To allow otherwise would permit the party seeking sanctions to engage in a game of labels that would improperly dictate the standard of review." (cleaned up)); *Brown v. Bridges*, No. 3:12-cv-4947-P, 2015 WL 410062, at \*1-\*4 (N.D. Tex. Jan. 30, 2015) (explaining that, when a district judge refers a motion for sanctions to a magistrate judge, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether Federal Rule of Civil Procedure 72(a) or 72(b) applies and that, when the magistrate judge finds that dismissal or another sanction disposing of a claim or defense is unwarranted, the motions should be characterized as non-dispositive and may be ruled on by the magistrate judge) (followed in *Green Hills Dev. Co., LLC v. Credit Union Liquidity Servs., LLC*, No. 3:11-cv-1885-L-BN, Dkt. No. 373 at 2 (N.D. Tex. Dec. 1, 2016)).

Rule 37(b)(2) "empowers the courts to impose sanctions for failures to obey discovery orders. In addition to a broad range of sanctions, including contempt, FED. R. CIV. P. 37(b)(2) authorizes the court to impose a concurrent sanction of reasonable expenses, including attorney's fees, caused by the failure to obey a discovery order." *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012) (internal quotation marks omitted); *see also Chilcutt v. United States*, 4 F.3d 1313, 1322 n.23 (5th Cir. 1993) ("Rule 37(b) clearly indicates that district courts have authority to grant a broad spectrum of sanctions.").

"The district court has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Smith*, 685 F.3d at 488 (internal quotation marks omitted). "This discretion,

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 63 of 80
Lymphedema & Wound Care Consultants of America, Inc...., Not Reported in Fed....
2022 WL 209562

however, is limited" based on the type of sanctions imposed. *Id.* The United States Court of Appeals for the Fifth Circuit has recently explained that

> **\*10** our caselaw imposes a heighted standard for litigation-ending sanctions (sometimes called "death penalty" sanctions). For a lesser sanction, we broadly require the district court to determine the sanctions are "just" and "related to the particular 'claim' which was at issue in the order to provide discovery."

*Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019) (cleaned up). The sanction imposed should be the least severe sanction adequate to achieve the proper functions of Rule 37(b)(2) under the particular circumstances. *See Smith*, 685 F.3d at 488-90. And the Fifth Circuit very recently repeated its guidance that,

> to levy a litigation-ending sanction for a discovery violation, the court must make four findings. First, the violation reflects bad faith or willfulness. Second, "the client," not counsel, "is responsible for the violation." Third, the violation "substantially prejudiced the opposing party." Fourth, "a lesser sanction would not substantially achieve the desired deterrent effect."

*Vikas WSP, Ltd. v. Econ. Mud Prod. Co.*, --- F.4th ——, No. 20-20309, 2022 WL 92861, at \*8 (5th Cir. Jan. 10, 2022) (cleaned up); *accord Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1304 (5th Cir. 1988) ("We have repeatedly emphasized that a dismissal with prejudice is a 'draconian' remedy, or a 'remedy of the last resort,' to be employed only when the failure to comply with the court's order results from wilfullness or bad faith rather than from an inability to comply. Nevertheless, deliberate, repeated refusals to obey discovery orders have been held to warrant the use of this ultimate sanction." (footnote omitted)); *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 514 (5th Cir. 1985) ("[D]ismissal is authorized only when the failure to comply with the court's order results from wilfulness or bad faith, and not from the inability to comply.").

But "[l]esser sanctions do not require a finding of willfulness." *Smith*, 685 F.3d at 488. "Of course, the flagrancy of a party's behavior must be directly proportionate to the severity of the sanction imposed," but "the lack of willful, contumacious, or prolonged misconduct [does not] prohibit[ ] all sanctions." *Chilcutt*, 4 F.3d at 1322 n.23. Even where a party was "unable to comply with the discovery requests, the district court still ha[s] broad discretion to mete out a

lesser sanction than dismissal." *Id.* (emphasis omitted). That is because "the type of conduct displayed by a party had no bearing on whether sanctions should be imposed, but only on the type of sanctions imposed," and "[t]he willfulness or good faith of [a party], can hardly affect the fact of noncompliance and [is] relevant only to the path which the District Court might follow in dealing with [the party's] failure to comply." *Id.* (internal quotation marks and emphasis omitted).

Rule 37(b) "is designed to empower the court to compel production of evidence by the imposition of reasonable sanctions." *Dorsey v. Acad. Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970). "Sanctions under Rule 37 serve the dual function of reimbursing the moving party and deterring the violator of the discovery orders (as well as other potential violators)." *Day v. Allstate Ins. Co.*, 788 F.2d 1110, 1114 (5th Cir. 1986). And courts have found sanctions excluding evidence or claims of damages appropriate where, for example, a party instructs its witness to violate a court order. *See Certain Underwriters at Lloyds London v. Corp. Pines Realty Corp.*, 355 F. App'x 778, 780 (5th Cir. 2009).

### Analysis

**\*11** Over LWCCA's opposition, including assertions that, "in order to provide the factual and legal basis that gives rise to each Claim, LWCCA would need to review roughly a total of 69,845 line items, ERA's, denial notices, and other pertinent correspondence," and that "[i]t would take a year or more for LWCCA to produce all of the information requested by Defendant," the Court ordered LWCCA to fully respond and answer to RFP, Set One, Nos. 1 and 6 and Rog, Set One, No. 2(a) and 2(c)

These RFPs and interrogatories required LWCCA to produce and serve (1) a data export from LWCCA's billing or other electronic systems in Excel showing, for each of the Claims [defined as any medical claim or invoice submitted by Plaintiffs to BCBSTX for payment] Member's last name, Member's first name, date of birth, member ID number, group ID number, Claim Number, date of service, Claim's CPT Code(s), Claim's HCPCS Code(s), billed charge(s), date the Claim was submitted to BCBSTX, amount of payment received from Member, date of receipt of payment from Member, amount of payment received from BCBSTX, date of receipt of payment from BCBSTX, amount(s) of any subsequent payment(s) received from BCBSTX, and date(s) of receipt of any such subsequent payment(s) from BCBSTX

as well as (2) interrogatory answers identifying for each Claim (a) the amount that LWCCA alleges that BCBSTX was required to pay LWCCA in addition to any amounts it has previously allowed for each Claim and (b) the factual and legal basis for LWCCA's claim to be entitled to any amount identified and (3) all documents and communications related to each Claim at issue, including, but not limited to, patient intake records, patient insurance cards, assignments of benefits, medical records, benefit verification records, preauthorization/precertification records, call notes or logs, call recordings, Claim forms, UB forms, remittance reports, remittance notices, transaction detail records, collection notes or collection records, and all payment and account records.

Based on LWCCA's supplemental answers and production and supporting declaration, the Court cannot agree with BCBSTX that LWCCA's response to the Court's March 5, 2021 order merits dismissal under the stringent governing standard. For the reasons that LWCCA explains, the fact that LWCCA has provided a "reason for payment demand" in its spreadsheet for only 178 of 66,781 claim lines does not demonstrate that LWCCA failed to adequately identify the factual and legal basis for LWCCA's claim to be entitled to any amounts identified. Neither does LWCCA's adding hundreds of new patients and claims in the spreadsheets that it served in April 2021 demonstrate any willful or bad faith violation of the Court's March 5, 2021 discovery order. And LWCCA had identified at the time of briefing on the motion to compel that the Court's March 5, 2021 order granted in part that medical records that LWCCA had in hard copy were damaged by Hurricane Harvey in 2017. *See* Dkt. No. 68 at 31.

BCBSTX's alternative requests also hinge on BCBSTX's insistence that LWCCA's providing a "reason for payment demand" in its spreadsheet for only 178 of 66,781 claim lines demonstrates that LWCCA failed to adequately identify the factual and legal basis for LWCCA's claim to be entitled to any amounts identified as to any other claim lines. *See* Dkt. No. 96 at 6, 9-10. BCBSTX's request for alternative relief – limiting LWCCA to claims as to which BCBSTX

contends that LWCCA has fully complied with its discovery obligations – is a request for dismissal by another name. BCBSTX is unhappy with the extent of what LWCCA has produced, but, on this record, it appears to the Court that LWCCA – after arguing unsuccessfully that it should not be required to do so – has now attempted to produce all the responsive information and records that it has available to support its claims.

**\*12** The Court, in short, finds that Rule 37(b)(2) sanctions are not warranted for LWCCA's alleged violations of the Court's March 5, 2021 discovery order. But, in addition to Rule 37(b)(2), Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." If LWCCA attempts at trial or summary judgment to use new or additional information that should have been produced in connection with the Court's March 5, 2021 discovery order, BCBSTX may make appropriate requests to the Court to exclude the use of that information or data.

### Conclusion

For the reasons explained above, the Court DENIES Defendant's Motion to Dismiss with Prejudice the Claims of Lymphedema & Wound Care Consultants Of America, Inc. d/b/a Lymphedema & Wound Care Institute and for Sanctions for Failure to Comply with the Court's March 5, 2021 Discovery Order Under Fed. R. Civ. P. 37 [Dkt. No. 96].

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 209562

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CASE NO. 4

Case 4:21-cv-02473    Document 160-2    Filed 07/28/25 in TXSD    Page 66 of 80

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)
1995 WL 124186

🚩 KeyCite Yellow Flag

Distinguished by Chen-Oster v. Goldman, Sachs & Co., S.D.N.Y., September 10, 2012

1995 WL 124186
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

NICHOLAS J. MURLAS
LIVING TRUST, et al. Plaintiffs,
v.
MOBIL OIL CORPORATION, et al. Defendants.

93 C 6956.
|
March 20, 1995.

MEMORANDUM OPINION AND ORDER

COAR, District Judge.

**\*1** Plaintiffs the Nicholas J. Murlas Living Trust, the Mary Lou Murlas Living Trust, and the George J. Murlas Living Trust (collectively "Murlas" or "plaintiffs") have moved to compel discovery against Mobil Oil Corporation ("Mobil"). [Docket number 56]. This motion to compel is now fully briefed and ripe for decision. After having reviewed the pleadings, exhibits, and discovery submitted, this court decides as follows.

Background [1]

The complaint arises out of a lease agreement in which Mobil leased real property from plaintiffs and operated a gas station thereon. Plaintiffs subsequently discovered that the property was contaminated with hydrocarbons which had leaked from Mobil's underground storage tanks into the soil and groundwater. Plaintiffs allege violations of the Resource Conservation and Recovery Act ("RCRA"), breach of lease covenant, breach of certain indemnity agreements, breach of the Mobil–Groundwater Technology, Inc. ("GTI") contract as a third-party beneficiary, intentional misrepresentation, negligent misrepresentation, negligence, restitution, quasi-contract, and unjust enrichment.

Permissible Scope of Discovery

Discovery in federal civil cases is governed by Rule 26 of the Federal Rules of Civil Procedure. Rule 26 allows parties to have discovery regarding

any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, mature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Discovery may be limited by local rule. Fed.R.Civ.P. 26(b)(2). Discovery will also be limited by the court if it concludes that:

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 67 of 80

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

proposed discovery in resolving the issues....

Fed.R.Civ.P. 26(b)(2).

Discussion

Murlas moves to compel the answer or production to several different potentially discoverable items. The court will address each seriatim.

1. Production of Charles Sutter for Deposition

Plaintiffs allege that Mobil has failed to produce Charles Sutter, an in-house attorney with Mobil, for deposition in Chicago. Judge Plunkett ordered that Sutter and several other Mobil employees be produced for deposition. (*See* Response at p. 5). Plaintiffs state that they have already made one trip to Fairfax, Virginia to depose witnesses, and do not wish to travel to Virginia again to depose Mr. Sutter. Sutter was allegedly on the schedule to be deposed during plaintiffs' trip until two or three days before the trip, when plaintiffs were informed that he was going to Japan on business. Plaintiff requests that Sutter now be produced for deposition in Chicago.

**\*2** Mobil does not contest that Sutter may be deposed. However, Mobil requests that he be deposed in Fairfax instead of Chicago. Mobil points to Fed.R.Civ.P. 30, governing the taking of depositions, and notes that the rule allows a party to take the deposition of any person without leave of the court, and that the attendance of that witness may be compelled by subpoena pursuant to Rule 45. Rule 45(B)(iii) states that a court may quash or modify a subpoena that requires a person who is not a "party or an officer of a party" to incur substantial expense or travel more than 100 miles. However, that rule also states that if the party in whose behalf the subpoena is issued shows a "substantial need" for the testimony that cannot be otherwise met without substantial hardship, and that person assures the potential deponent that he will be reasonably compensated, the court may order appearance of that person. Fed.R.Civ.P. 45(B)(iii).

Neither Murlas nor Mobil has alleged that Sutter is an officer of Mobil. As a non-party deponent to this action, Sutter is not subject to the jurisdiction of this court. *In re Corrugated*

*Container Antitrust Litigation,* 655 F.2d 748, 750 n. 2, *rev'd other grounds,* 661 F.2d 1145 (7th Cir.1981). A deponent can be required to appear at a deposition only in the county in which he resides or is employed or transacts business in person. *See* Fed.R.Civ.P. 45(3)(A)(ii). Thus, this court cannot compel Sutter to appear at a deposition here in Chicago. Judge Plunkett has ordered Mobil, who is subject to the jurisdiction of this court, to produce Sutter. Mobil has affirmed this duty. The plaintiffs have alleged no undue hardship that could occur by conducting the deposition in Fairfax, except that plaintiffs' counsel is unwilling to make the trip. The court concludes that the plaintiffs should travel to Fairfax to complete Sutter's deposition, or conduct a telephonic deposition pursuant to Fed.R.Civ.P. 30(b)(7). Mobil is cautioned, however, that *Sutter is to be available on the date set for the deposition.*

2. Production of Documents Used to Refresh Recollection

Plaintiffs next argue that they are entitled to certain documents that were used by Tom Rush, Robert Johnson, and Craig LaBelle to refresh their recollection of events pertaining to this litigation prior to their depositions. Mobil asserts that those documents are protected by the attorney-client privilege and the work-product doctrines, but has agreed to tender the documents. Nonetheless, Mobil does not concede that plaintiffs have a right to reopen the depositions. Plaintiffs contend that they have a right to reopen the depositions and question the deponents on the documents.

Rule 612 of the Federal Rules of Evidence provides that if a writing used to refresh a witness' memory before a hearing, "an adverse party is entitled to have the writing produced *at the hearing,* to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. [Emphasis added]" Fed.R.Evid. 612. This entitlement is created so the adverse party may search out any discrepancies between the writing and the testimony. *Wheeling–Pittsburgh Steel Corp. v. Underwriters Laboratories, Inc. et al.,* 81 F.R.D. 8, 10 (N.D.Ill.1978). This rule furthers the purpose of the federal discovery rules to ascertain the truth. *See id.*

**\*3** The court concludes that the depositions of Rush, Johnson, and LaBelle should be reopened for the limited purpose of cross-examining them on the documents they used to refresh their recollection of this matter. Mobil should have produced those documents *at the time of the depositions,* and now gives no reason for not doing so. Further, plaintiffs are

Case 4:21-cv-02473   Document 160-2   Filed 07/28/25 in TXSD   Page 68 of 80

Nicholas J. Murias Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

entitled to cross-examine the witnesses on the documents and so doing may aid in the ascertainment of the truth.

The case cited by Mobil, *U.S. v. Blas,* 947 F.2d 1320 (7th Cir.1991), does not counsel to the contrary. In *Blas,* the Court of Appeals reviewed a district court's decision to deny access to several documents used to refresh the recollection of a DEA agent. The trial court was concerned with its role as arbiter of what portions of the documents would have to be redacted in order to turn those documents over to the defense, and the resultant delay of the trial. *U.S. v. Blas,* 947 F.2d at 1326. The appeals court concluded that the denial was not a clear abuse of the trial court's discretion, and therefore declined to reverse the trial court's decision. *U.S. v. Blas,* 947 F.2d at 1326. *Blas* is distinguishable from the case at bar not only because the "clear abuse of discretion" standard does not apply but because here, Mobil has already agreed to turn over the documents intact. This court will not have to use judicial resources in wading through and redacting them.

However, this court will not require Mobil to pay the plaintiffs' expenses with regard to these additional depositions. Plaintiffs must travel to Fairfax in any event to depose Mr. Sutter. Imposition of costs is a drastic measure, and one that this court does not take lightly. Plaintiffs have not alleged, nor does this court surmise, that Mobil acted in bad faith or with wrongful intent in not producing the documents at the time of the depositions. Therefore, the costs of returning to Fairfax will not be imposed on Mobil. However, the court cautions Mobil that it should make every reasonable effort to schedule *all* the depositions so that plaintiffs will only have to make one return trip to Fairfax. Given the nature of these disputes and briefs, the court sees that discovery in this litigation has the flavor of two kindergartners arguing over a crayon. Such childish antics will not be tolerated and any future failure to follow the requirements of the discovery rules will result in escalating sanctions.

### 3. Mobil Documents Not Produced

#### a. Mobil Design Memo 31

Plaintiff requests production of a document discussed in the depositions of LaBelle and Johnson titled either "Mobil Design Memo 31" or "Mobil's Guidelines for Assessment and Remediation." Mobil responds that the document has been offered to plaintiffs by a "letter dated November 16." Plaintiffs report in their reply memorandum that documents

titled both "Mobil Design Memo 31" and "Mobil's Guidelines for Assessment and Remediation" have been produced. Thus, this issue is moot.

#### b. Made Environmental Report

**\*4** Plaintiffs seek discovery of an environmental consultant's report generated by "Maude Environmental" which one of Mobil's former project engineers Sharon Gallagher testified about in her deposition. Gallagher stated in her deposition that she relied on this report in deciding to apply "passive remediation" to the property at issue. (Plaintiff's exhibit M, Gallagher deposition at 123, 195, 215). Plaintiffs thus contend that the report is relevant and discoverable under Fed.R.Evid. 26.

Mobil disagrees with plaintiffs' characterization of both the deposition testimony and the relevance of the document. Mobil points to plaintiff's exhibit E, a letter from Mobil's counsel to plaintiffs' counsel in which Mobil's counsel states that the document at issue has been located and not only was it prepared after Gallagher left Mobil's employ, but it was prepared by "Hazardous Substance and Waste Management Research, Inc." (Plaintiffs' exhibit E p. 3). Further, Mobil's counsel states that the document is a "site specific risk assessment" prepared for a location in Wheaton, Illinois. (*Id.*).

Although Mobil correctly states that the statements of Gallagher do not necessarily bind Mobil, Gallagher at least implied that she relied on the "Maude Environmental" report in making decisions regarding the subject property. Thus, the document, whether prepared by Maude or by Waste Management Research, is relevant and discoverable under Rule 26. Of course, this does not mean that the report will ultimately be admitted into evidence. Rule 26 plainly states that documents need only be "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26. That document may lead to such discoverable evidence regarding the subject property. Perhaps, for example, the authors of the document will have relevant information regarding discussions with Mobil employees regarding the subject property.

Plaintiff reports in its reply memorandum that several documents, including documents relating to issues discussed by Gallagher, were produced on December 20, 1994. If those documents contain the documents discussed in Gallagher's deposition, this issue is moot. However, if Mobil holds

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)

1995 WL 124186

additional documents which could be the ones Gallagher discussed, Mobil should produce them.

#### c. Robert Johnson's Refusal to Answer

Plaintiffs request that Robert Johnson be required to divulge information regarding the settlement of other litigation having nothing to do with the subject property. Mobil replies that that settlement is irrelevant to this litigation and could not reasonably lead to the discovery of admissible information. The court agrees with Mobil. Settlement discussions in another, distinct matter are irrelevant to this litigation and need not be produced. Fed.R.Civ.P. 26.

#### d. Tank Removal Report

During the course of depositions, some deponents referred to "tank pull reports" and plaintiffs have requested that these reports be produced. Mobil responds that they have searched and re-searched for these documents, and they could not be found or no longer exist. The court will require that Mobil search one, final time for these documents before they are declared lost. If they are found they should be produced. Plaintiff should not make further requests for the "tank removal report."

#### e. Computer Database Model

 *5  Plaintiffs request production of an entire computer database which inventories materials and equipment at all of Mobil's various leaking underground storage tank facilities throughout the country. Mobil responds that they have produced the portions of the database that are relevant to this litigation and that producing the entire database is "outrageous." The court agrees with Mobil. Producing an entire computer database would indeed be unduly burdensome on Mobil and the court cannot see how information regarding other contaminated sites would be relevant to this litigation. Plaintiffs argue that "the information from other sites may be relevant to show that Mobil failed to follow its own directives at the subject property and that plaintiffs were not the only parties to suffer the 'bait and switch' deception." (Plaintiffs' Sur–Reply at p. 14). This is a recurrent theme in this litigation. Murlas seeks to widen the scope of the action by asserting alternately that Mobil has conspired to dupe an entire universe of people

that it was engaged in clean-up activities when only "passive remediation" was contemplated, or that Mobil has violated its own guidelines used to determine when "passive" (as opposed to "active") remediation was to be used. Murlas has never articulated a coherent theory which would explain how or what Mobil did or did not do at another property has anything to do with the instant action. The fact that "Mobil's use of passive remediation of plaintiffs' property is similar to its use of passive remediation at property sites of other owners" is not an explanation of why this information is relevant. It is irrelevant to this litigation whether other parties "suffered from an [alleged] 'bait and switch' deception." *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991) (citing with approval *Reich v. Board of Fire and Police Comm'rs,* 13 Ill.App.3d 1031, 301 N.E.2d 501, 505 (1973), which allowed a party to subpoena documents relevant to a hearing, but declared that it was not error to deny subpoena to plaintiff who could not establish relevancy of requested document.). Mobil is hereby directed to re-search the database for all information relevant to the subject property, and if further information is discovered to produce it. However, Mobil is not required to produce the entire database.

#### 4. Plaintiffs' Second Request for Production

Plaintiffs have requested that all Mobil documents stating that the property was not contaminated by hydrocarbons be produced. Plaintiff contends that this request has not been fully completed. Mobil responds that it has produced the requisite documents to the extent that they exist. Again, the court cannot compel disclosure where nothing exists. Mobil has averred, under penalty of Fed.R.Civ.P. 11, that it has produced all the relevant documents. This court can do no more to satisfy the plaintiffs.

Plaintiffs have also requested production of "all documents relating to Mobil's policy, programs, and plans relating to Mobil's response to [hydrocarbon] leaks." Mobil objects to this request as being overbroad and vexatious. "Read literally," Mobil asserts, "compliance with this request would be a mammoth undertaking encompassing virtually every document worldwide that deals with underground storage tanks." (Response p. 11). Further, Mobil states that it has offered certain policy documents related to its "LUST" program in Illinois, and plaintiffs had not availed themselves of the opportunity to discover those documents. (*Id.*).

Nicholas J. Murias Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)
1995 WL 124186

**\*6** Judge Plunkett has already once denied this motion without prejudice because the request was overbroad. (Plaintiffs' exhibit K, Transcript of hearing on June 15, 1994 p. 16). Judge Plunkett expressed his concern that the information regarding other sites would not be relevant to these proceedings because each contamination site is very different. Judge Plunkett specifically directed plaintiffs, if they wished to present this motion again, to submit evidence or testimony from their experts showing that the requested production would be relevant to this proceeding. To date, plaintiffs have not done so. This court concurs with the previous ruling and concludes that discovery encompassing all Mobil policy is overbroad and the expense of such production would outweigh the likely benefit of such production. Fed.R.Civ.P. 26(b)(2). Plaintiffs' motion to compel will be denied in this regard. *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991).

### 5. Response to Plaintiffs' Interrogatories

Plaintiffs next ask that this court examine each and every interrogatory served on Mobil and the responses to each to ascertain their adequacy. To begin with, the parties should have been able to resolve this dispute between themselves. Reasonable and conscientious attorneys routinely deal with these disputes without involving the court; that is what the Federal Rules of Civil Procedure envision. In the future, this court orders both parties to attempt to settle these discovery tantrums without the involvement of this court. As to the instant motion, Mobil is directed to answer interrogatories 1–10 by April 10, 1995. Mobil is not required to answer interrogatories 11–19. The court has made plain in this memorandum opinion that discovery into sites other than the subject property will not be allowed. (See supra). Thus, to the extent that interrogatories 11–19 deal with production of information regarding other contamination sites, they are irrelevant and inappropriate. *See Pirela v. Village of North Aurora,* 935 F.2d 909, 914 (7th Cir.1991).

### 6. Plaintiffs' Motion for Rule 37 Sanctions

Plaintiffs contend that Mobil's "pattern of refusal to comply" merits the imposition of sanctions under Rule 37. Mobil contends that plaintiffs' motion is "impertinent, scandalous, and internally contradicted" and request that the motion be stricken with costs awarded to Mobil.

Neither party have acted with civility or maturity regarding these discovery disagreements. However, pettiness does not necessarily equal bad faith. Fed.R.Civ.P. 37 is flexible and this court has great discretion in deciding whether to impose sanctions. 8 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2284 (1970). The rule is designed to encourage discovery, and not to simply punish for general misbehavior. *Id.; Dorsey v. Academy Moving & Storage, Inc.,* 423 F.2d 858, 860–61 (5th Cir.1970). This court is not inclined, therefore, to impose sanctions on either party *at this time.* The parties should focus on completing discovery in as effective and efficient manner as possible.

### Conclusion

**\*7** For reasons stated in this memorandum opinion, IT IS HEREBY ORDERED THAT plaintiffs' motion to compel discovery is denied in part and granted in part as follows:

1. Plaintiffs' motion to produce Charles Sutter for deposition is GRANTED, but it is further ordered that such deposition will take place in Fairfax, Virginia within thirty days.

2. Plaintiffs' motion to compel the production of documents used to refresh the recollection of Messrs. Rush, Johnson, and LaBelle is GRANTED. It if further ordered that the depositions of Messrs. Rush, Johnson, and LaBelle be reopened for the limited purpose of cross-examination on the documents used to refresh their individual recollections on the subject property. Plaintiffs' motion for fees and expenses in the taking of these reopened depositions is DENIED with prejudice.

3(a). Plaintiffs' motion to compel production of the "Mobil Design Memo 31" is moot.

3(b). Plaintiffs' motion to compel production of the "Maude Environmental Report" is GRANTED to the extent it has not been made moot by a subsequent production of the document.

3(c). Plaintiffs' motion to compel Robert Johnson to answer questions regarding a separate settlement of wholly different contamination site is DENIED with prejudice.

3(d). Plaintiffs' motion to compel production of a "Tank Removal Report" is GRANTED to the extent that Mobil should search one final time for the document, and if it is not located, the motion is DENIED with prejudice.

Case 4:21-cv-02473     Document 160-2     Filed 07/28/25 in TXSD     Page 71 of 80

Nicholas J. Murlas Living Trust v. Mobil Oil Corp., Not Reported in F.Supp. (1995)
1995 WL 124186

3(e). Plaintiffs' motion to compel production of Mobil's entire computer database model is DENIED with prejudice except that Mobil is hereby ordered to search the database one final time for any additional information regarding the subject property, and if any such information is found, to produce it to the plaintiffs.

4. Plaintiffs' motion to compel documents relating to its second request for production is DENIED with prejudice.

5. Plaintiffs' motion to compel more complete answers to its interrogatories is GRANTED in part and DENIED in part. Mobil shall provide complete answers to interrogatories 1–10 by April 3, 1995. Mobil is not required to answer interrogatories 11–19.

As a final note, this court cautions the parties that briefs are to be used with discretion. The parties seem to believe that every paper submitted to the court may argue any part of the case or any legal theory that the parties desire. Such is not the case. Parties should limit their arguments to the issue(s) before the court.

**All Citations**

Not Reported in F.Supp., 1995 WL 124186

---

**Footnotes**

1       For a more thorough statement of the background facts of this litigation, see *Nicholas J. Murlas Living Trust, et al. v. Mobil Oil Corp. et al.,* 1994 WL 130778 (N.D.Ill. Apr. 13, 1994).

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CASE NO. 5

2008 WL 11348342
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Tyler Division.

REEDHYCALOG UK, LTD., et al., Plaintiff
v.
UNITED DIAMOND DRILLING
SERVICES, INC., et al., Defendant

CASE NO. 6:07 CV 251
|
Signed 10/03/2008

**Attorneys and Law Firms**

Danny Lloyd Williams, Christopher Needham Cravey, Jackson Walker LLP, J. Mike Amerson, Jeffrey Allen Pfeifer, Amerson Law Firm, PLLC, James A. Jorgensen, Lee, Jorgensen, Pyle & Kewalramani, P.C., Matthew Richard Rodgers, Williams Morgan, PC, Stephen E. Edwards, Blank Rome LLP, Houston, TX, Elizabeth L. Derieux, Sidney Calvin Capshaw, III, Capshaw Derieux LLP, Gladewater, TX, Thomas John Ward, Jr., Claire Abernathy Henry, Ward, Smith & Hill, PLLC, Longview, TX, for Plaintiff.

Michael Patrick Cash, Liskow & Lewis, Ira Phillip Domnitz, Ewing & Jones, PLLC, Khannan Suntharam, Robert C. Shaddox, Winstead PC, Houston, TX, Andy Tindel, Attorney & Counsel at Law, P.C., Jennifer Parker Ainsworth, Wilson Robertson & Cornelius PC, Tyler, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

LEONARD DAVIS, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is ReedHycalog UK, Ltd.'s ("ReedHycalog") Motion to Compel (Docket No. 89). Having considered the parties' submissions and oral arguments, the Court **GRANTS** ReedHycalog's motion.

## BACKGROUND

ReedHycalog UK, Ltd. ("ReedHycalog") sued United Diamond Drilling Services, Inc. ("United Diamond") and Ulterra Drilling Technologies, L.P. ("Ulterra") and alleged United Diamond and Ulterra infringe various claims of twelve ReedHycalog patents. In the course of the litigation,

United Diamond and Ulterra delivered electronic discovery to ReedHycalog.

United Diamond and Ulterra imaged the hard drives of relevant custodians. United Diamond and Ulterra subsequently reviewed the production and removed privileged documents and designated documents under the Protective Order as "confidential" or "attorneys' eyes only." There was no effort to review or limit the production to information potentially relevant to the case, and ReedHycalog received 750 gigabytes of data that allegedly included baby pictures, audio folders, and pornography. ReedHycalog hosted the information at its own expense and has since taken the production offline.

ReedHycalog also served United Diamond and Ulterra with interrogatories. United Diamond and Ulterra relied on Rule 33(d) to respond to the interrogatories and answered the interrogatories with lists of search terms they ran over their respective productions. United Diamond and Ulterra listed as responsive documents those documents retrieved by searches that employed the listed search terms and appended the production numbers of those documents to their interrogatory responses. In one instance, the production numbers of over 75,000 documents was appended to an interrogatory response.

After a breakdown in the meet and confer process, ReedHycalog filed this motion, raising two issues: (1) whether United Diamond's and Ulterra's practice of electronically producing every document from relevant custodians conforms with the Federal Rules of Civil Procedure and the Local Rules; and (2) whether interrogatory responses that list search terms to run over electronically produced documents complies with Federal Rule of Civil Procedure 33(d).

After the hearing on this motion, the Court ordered the parties to meet and confer in an attempt to resolve this matter without further Court intervention. From that process, ReedHycalog has withdrawn the motion as to the interrogatory responses. Also from that process, the parties used search terms to narrow the scope of United Diamond's and Ulterra's document production. However, the parties now dispute whether all of the documents from the original production are still in play and whether United Diamond and Ulterra need to consecutively Bates number the subset of documents that resulted from using the search terms (the "simplified

production"). Additionally, United Diamond and Ulterra contend the search terms used were not agreed to.

## APPLICABLE LAW

There are two ways to lose a case in the Eastern District of Texas: on the merits or by discovery abuse. *See ClearValue, Inc. v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 375–385 (E.D. Tex. 2007) (Davis, J.). This Court adheres to a policy of liberal, open, and forthright discovery and will not tolerate gamesmanship. *Garmin Ltd. v. TomTom, Inc.*, No. 2:06-CV-338, 2007 WL 2903843, at *8 (E.D. Tex. Oct. 3, 2007) (Davis, J.); *STMicroelectronics v. Motorola, Inc.*, 308 F. Supp. 2d 754, 755 (E.D. Tex. 2004); *VirnetX, Inc. v. Microsoft Corp.*, No. 6:07-CV-80, Memorandum Opinion and Order (Docket No. 117), 11–12 (E.D. Tex. June 4, 2008) (Davis, J.).

**\*2** Parties may obtain discovery regarding any nonpriviledged matter that is relevant to any claim or defense. FED. R. CIV. P. 26(b). Relevant information need not be admissible at trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence. *Id.* The Local Rules provide guidance for counsel to determine whether a particular piece of information is relevant. L.R. 26(d); *see also* P.R. 3-4. The Agreed Discovery Order entered in this case also delineates what automatic disclosures are required. Docket No. 55.

While these provisions generally ensure that parties do not withhold relevant information, a party may not frustrate the spirit of the discovery rules—open, forthright, and efficient disclosure of information potentially relevant to the case—by burying relevant documents amid a sea of irrelevant ones. *See SEC v. Elfindepan, S.A.*, 206 F.R.D. 574, 576 (M.D.N.C. 2002) (holding "document dumps and vague references to documents" does not comply with rule 33(d)); *Residential Constructors, LLC v. ACE Prop. & Cas. Ins. Co.*, No. 2:05-CV-1318, 2006 WL 1582122, at *2 (D. Nev. June 5, 2006) ("This Court does not endorse a method of document production that merely gives the requesting party access to a 'document dump' with an instruction to 'go fish.' ") (internal citations omitted); FED. R. CIV. P. 1 ("[The Federal Rules of Civil Procedure] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding.").

## ANALYSIS

United Diamond's and Ulterra's production does not comply with the Federal or Local Rules. There appears to be no effort by either party to cull their productions to information that may be relevant to the case. Electronic discovery does not excuse Ulterra and United Diamond from their discovery obligations, specifically to parse out irrelevant information.

The reality of litigation is that initial production frames a party's case, and those initial documents indicate to the receiving party what other documents may be relevant and how to tailor subsequent discovery requests. The evidentiary value of a particular document is often not apparent until that document is linked with other evidence. *See* FED. R. EVID. 104(b). Thus, a producing party may not bury those relevant documents in the hope that opposing counsel will overlook the proverbial "smoking gun" as he wades through an ocean of production. United Diamond and Ulterra appear to be so motivated and have engaged in such gamesmanship, as they reviewed their respective productions to remove privileged documents and designate documents as "confidential" or "attorneys' eyes only" but made no effort to narrow their production to information that may be relevant in this case. United Diamond's and Ulterra's production practices amount to a data dump with an instruction to "go fish." *See Residential Constructors*, 2006 WL 1582122, at *2. That this fishing is done electronically is of no consequence.

Although the parties have now used search terms to narrow the documents, United Diamond's and Ulterra's insistence that all of the documents from the original production are still in play in this case renders that narrowing of documents meaningless. United Diamond and Ulterra also dispute that the narrowing search terms were agreed to. As United Diamond's and Ulterra's original production failed to comply with Local or Federal Rules, the original production documents are not in play in this case. Only the simplified production resulting from the search terms may be used in this case. As United Diamond and Ulterra contend they did not agree to the search terms that were used to narrow the original production to the simplified production, United Diamond and Ulterra may supplement the simplified production with additional documents resulting from the use of their own search terms. United Diamond's and Ulterra's deadline to supplement the production is fourteen days from the date of this Order. The Court strongly cautions United Diamond and Ulterra not to engage in another data dump. The parties

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 75 of 80
ReedHycalog UK, Ltd. v. United Diamond Drilling Services, Inc., Not Reported in Fed....
2008 WL 11348342

are hereafter on notice that if the discovery games continue, sanctions may be the appropriate remedy.

## CONCLUSION

**\*3** For the abovementioned reasons, the Court **GRANTS** ReedHycalog's Motion to Compel (Docket No. 89) and **ORDERS** that United Diamond and Ulterra are not permitted to use or otherwise rely on any documents or materials other than: (1) those already produced resulting from the running of the search terms (the simplified production), which must be renumbered with consecutive Bates numbers, (2) those documents United Diamond and Ulterra produce in the next two weeks resulting from their own use of narrow search terms, (3) documents or materials that may be specifically requested by ReedHycalog in the future, or (4) such other limited, relevant documents specifically identified and separately produced by United Diamond and Ulterra, in good faith, during the course of this litigation.

**So ORDERED and SIGNED this 3rd day of October, 2008.**

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11348342

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CASE NO. 6

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 77 of 80
Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 2316228

2022 WL 2316228
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

TIREBOOTS BY UNIVERSAL
CANVAS, INC., Plaintiff,
v.
TIRESOCKS, INC., Tiresocks
International, Inc., Defendants.

No. 20 CV 7404
|
Signed 06/28/2022

**Attorneys and Law Firms**

Genna S. Hibbs, Hibbs Law, LLC, McHenry, IL, Emily Rebecca Shragal Mosnick, Gouthami Vanam Tufts, Hibbs Law, LLC, Woodstock, IL, for Plaintiff.

Thomas Lee Holt, Jeremy L. Buxbaum, Perkins Coie LLP, Chicago, IL, Thomas Alexander Gamache, Leahy, Eisenberg & Fraenkel, Ltd., Chicago, IL, Zachary Vernon Moen, ZVMLaw PLLC, Ann Arbor, MI, Daniel Alan Grossman, ZVMLaw, PLLC, Ann Arbor, IL, Sabrina J. Danielson, Pro Hac Vice, Perkins Coie LLP, Denver, CO, for Defendants.

### MEMORANDUM OPINION and ORDER

Young B. Kim, United States Magistrate Judge

**\*1** Before the court is Plaintiff's motion to compel a forensic examination of Defendants Tiresocks, Inc.'s and Tiresocks International Inc.'s electronically stored information ("ESI") under Federal Rule of Civil Procedure 34(a)(2). Plaintiff initially submitted a request to inspect all of Defendants' digital data and analytics tools related to their online business. Defendants objected to Plaintiff's request as overly broad and unduly burdensome. Plaintiff now moves to compel Defendants to permit Plaintiff's IT expert to perform a forensic inspection. For the following reasons, the motion is denied:

### Background

Plaintiff is a manufacturer and seller of equipment covers for various types of construction equipment, including aerial,

mechanical, electrical, and hydraulic lifts. (R. 32, Amend. Compl. ¶ 6.) Like Plaintiff, Defendants manufacture and sell commercial and construction equipment covers, and as such the parties are direct competitors. (Id. ¶¶ 9, 14.) In 2006, Plaintiff sought to create a website to market and sell its products under the domain "universalcanvas.com." (Id. ¶¶ 68-69.) But when Plaintiff attempted to register this domain name, Plaintiff discovered that another entity had already done so. (Id.) As a result, Plaintiff registered "universalcanvasinc.com" as its domain instead. (Id.) The parties agree that in 2011, Defendants began redirecting customers visiting "universalcanvas.com" to Defendants' other website, "tiresocks.com." (Id. ¶ 70; R. 86, Ans. ¶ 70.) However, Plaintiff says it did not learn of this redirection until five years later. (R. 32, Amend. Compl. ¶ 72.)

Plaintiff filed this suit in December 2020 alleging that Defendants committed: (1) trademark and trade dress infringement, unfair competition, false designation of origin, palming off, and false advertising under the Lanham Act; (2) cyberpiracy under the Anti-cybersquatting Consumer Protection Act ("ACPA"); and (3) unfair competition, deceptive trade practices, and tortious interference with prospective business relationships under Illinois law. (R. 1, Compl.; R. 32, Amend. Compl.) Plaintiff further alleges that Defendants misrepresented themselves to potential customers as Universal Canvas to capture Plaintiff's customers, thereby harming Plaintiff's sales. (R. 32, Amend. Compl. ¶¶ 70, 82.) Defendants assert six affirmative defenses in response, alleging that one or more of Plaintiff's claims are barred by the statute of limitations, laches, estoppel, acquiescence, waiver, and unclean hands. (R. 86, Ans. at 40-43.)

During discovery Plaintiff asked to perform a forensic inspection of "all digital data and analytical tools related to Defendants' business presence online (i.e., websites, social media, domain, etc.)." (Pl.'s Request for Inspection ("RFI") No. 1.) Defendants objected to this request as overly broad and unduly burdensome, as well as falling outside the permissible scope of discovery. (Defs.' Resp. to RFI No. 1.)

### Analysis

Federal Rule of Civil Procedure 37 allows a party to move to compel the production of requested discovery materials. This court has "broad discretion" in reviewing such a motion, *Mirbeau of Geneva Lake LLC v. City of Lake Geneva*, No. 08 CV 693, 2009 WL 3347101, at \*1 (E.D. Wis. Oct. 15, 2009),

and "should independently determine the proper course of discovery based on the arguments of the parties," *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996).

**\*2** Federal Rule of Civil Procedure 34 governs the production of ESI in discovery. But while Rule 34(a) allows a party to request the production of ESI, it "does not grant unrestricted, direct access to a respondent's database compilations." *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003); *see also* Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting that Rule 34(a) "is not meant to create a routine right of direct access to a party's electronic information system" and cautioning courts to "guard against undue intrusiveness resulting from inspecting or testing such systems"). Such direct access would "expand the expense and burden of [the] case" at bar, *Diepenhorst v. City of Battle Creek*, No. 1:05 CV 734, 2006 WL 1851243, at \*4 (W.D. Mich. June 30, 2006), and is typically only permitted where there has been a showing of noncompliance with discovery rules, *In re Ford Motor Co.*, 345 F.3d at 1317. As with all discovery materials, the discovery sought must also be both relevant *and* proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1) (emphasis added). To this end, any testing and sampling of ESI to determine relevance and proportionality under Rule 34 is "not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances." Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment.

Furthermore, forensic examinations are an "extraordinary remedy." *Belcastro v. United Airlines, Inc.*, No. 17 CV 1682, 2019 WL 7049914, at \*2 (N.D. Ill. Dec. 23, 2019); *Alight Sols. v. Thomson*, No. 20 CV 3043, 2021 WL 5119111 at \*6 (N.D. Ill. Nov. 3, 2021). Courts are especially reluctant to permit direct inspection of ESI when the request is not proportional to the needs of the case, *Motorola Sols., Inc. v. Hytera Commc'ns. Corp*, 365 F. Supp. 3d 916, 925 (N.D. Ill. 2019), is unduly burdensome, *id.* at 924, or the information sought does not go to the heart of the matter, *Hespe v. City of Chi.*, No. 13 CV 7998, 2016 WL 7240754, at \*5 (N.D. Ill. Dec. 15, 2016); *see Balboa Threadworks, Inc. v. Stucky*, No. 05 CV 1157, 2006 WL 763668, at \*3 (D. Kan. March 2, 2006) ("Courts have been cautious in requiring the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit is unduly vague."). Courts also "guard against undue intrusiveness" based on ESI requests. *Hansen v. Country Mut. Ins. Co.*, No. 18 CV 244, 2020 WL

5763588, at \*3 (N.D. Ill. Sept. 28, 2020). Parties can mitigate this concern by employing less intrusive discovery methods before resorting to more invasive measures. *John B. v. Goetz*, 531 F.3d 448, 461 (6th Cir. 2008). Finally, courts generally deny ESI requests when they would place an undue burden on the respondent. *Motorola Sols.*, 365 F. Supp. 3d at 924.

Accordingly, the court must conduct a fact-intensive inquiry, considering the specific allegations and circumstances of the case, *see Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002), and taking into account: (1) the relevance of the requested information as it pertains to the heart of the case; (2) the invasiveness of the RFI, and in particular whether Plaintiff has exhausted other less intrusive means of collecting the same information; and (3) the burden the RFI places on Defendants, *see Motorola Sols.*, 365 F. Supp. 3d at 924-25; *Hespe*, 2016 WL 7240754, at \*5; *Hansen*, 2020 WL 5763588, at \*3.

With respect to relevance, Plaintiff's RFI casts too wide a net. In determining whether ESI sought in discovery goes to the heart of the case, courts have considered whether "the connection between the computers and the claims in the lawsuit is unduly vague." *Balboa*, 2006 WL 763668, at \*3; *see also Hespe*, 2016 WL 7240754, at \*5. Plaintiff argues that a forensic examination would retrieve "highly relevant" evidence of Defendants' infringement, false advertising, false designation or origin, and cybersquatting, as well as information needed to prove damages. (R. 113, Pl.'s Mot. at 21-22.) But the connection between all of Defendants' electronic data and Plaintiff's claims is tenuous at best. Although the court recognizes the significance of the evidence Plaintiff hopes to retrieve, Defendants' ESI includes a substantial volume of information that does *not* go to the heart of this case.

**\*3** As for invasiveness, there is no dispute that Plaintiff has failed to exhaust other methods of collecting the information it seeks. Plaintiff nonetheless asserts that ordinary discovery methods are insufficient to secure the requested data. (Id. at 20.) For example, Plaintiff contends that a request for production would not "capture the relevant traffic and website data" needed to determine Plaintiff's lost revenue from Defendants' redirection, and that sifting through "personalized filters and settings" of a Google Analytics file or other individualized data platform would be "unduly burdensome and inefficient." (Id.) But without having attempted to obtain this information through less intrusive data platforms or discovery methods, Plaintiff's assertions

Case 4:21-cv-02473 Document 160-2 Filed 07/28/25 in TXSD Page 79 of 80
Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 2316228

are unsubstantiated. Courts have advised movants in similar scenarios that "less intrusive means ... should be employed before resorting to inherently intrusive measures." *Goetz*, 531 F.3d at 461. This court agrees. Plaintiff must pursue the least intrusive means of obtaining the relevant data before requesting a forensic exam.

Plaintiff's request for a forensic examination would also impose too great a burden on Defendants. Defendants express concerns about giving Plaintiff unfettered access to their confidential business information, noting that Plaintiff previously mishandled Defendants' confidential material related to settlement discussions. (R. 118, Defs.' Resp. at 15; see also R. 113, Pl.'s Mot. at 23.) Plaintiff assures the court that "the risk of harm to Defendants in having their web-traffic and marketing platforms inspected is very low" because Plaintiff would only access unprivileged, business-related platforms that are unrelated to legal matters or personal information. (R. 113, Pl.'s Mot. at 22.) Plaintiff also notes that Defendants could designate certain ESI as "Confidential" or "Highly Confidential" pursuant to the Confidentiality Order in this case. (Id.; see R. 101, Confidentiality Order.) While these safeguards may protect Defendants' confidential information, they do not negate the fact that Plaintiff has framed its underlying discovery request too broadly. Plaintiff could have pursued other less burdensome discovery means that would have protected Defendants' confidentiality interests more effectively.

In sum, Plaintiff's request is not proportional to the needs of the case because a forensic examination would necessarily involve the examination and collection of more information than is required to support Plaintiff's claims. Simply put, "[t]he discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Motorola Sols.*, 365 F. Supp. 3d at 925. And this court has previously ruled that discovery requests covering the entire scope of Defendants' business operations are unduly broad. (See R. 112 (denying Plaintiff's request for production of documents that would cover "the entire scope of Defendants' business operations").) Yet that is precisely what Plaintiff seeks to do here.

Nevertheless, Plaintiff asserts that a forensic examination is necessary because Defendants lack the expertise to search and retrieve the relevant data on their own. (R. 113, Pl.'s Mot. at 24.) Under the *Belcastro* standard,[1] there are two circumstances in which a forensic examination may be warranted: (1) when the responding party has intentionally concealed the information; or (2) when the responding party lacks the expertise to search and retrieve the relevant data. *Belcastro*, 2019 WL 7049914, at *2. Plaintiff's motion focuses on the second factor. (R. 113, Pl.'s Mot. at 24.) First, Plaintiff alleges that Defendants' designated expert lacks expertise because he is not publicly listed in the online expert witness database. (Id.) Second, Plaintiff claims Defendants' expert produced flawed reports that used search filters to yield results in Defendants' favor. (Id.)

**\*4** Neither argument is persuasive. Plaintiff's first point is weak because Defendants claim they have not even named the cited individual as an expert in this case. (R. 118, Defs.' Resp. at 15.) Even if they had, the absence of the potential expert's name from a database alone does not prove his inability to perform Defendants' inspection. And Plaintiff's second point is conclusory, lacking any details on the alleged flaw in Defendants' search protocol. Indeed, Plaintiff claims that Defendants' expert manipulated search results but provides no corroboration for this claim. (R. 113, Pl.'s Mot. at 24.) Additionally, and as discussed, there is no indication that Plaintiff tried to retrieve the requested information through less intrusive discovery means. Therefore, Plaintiff cannot claim that Defendants lack the expertise to produce responsive discovery materials when Plaintiff never even submitted a discovery request seeking such materials. Finally, Plaintiff's allegations rest on confidential materials Defendants disclosed during settlement discussions between the parties. (R. 118, Defs.' Resp. at 15.) This type of Rule 408 materials should only be used for purposes of discussing settlement. Because Plaintiff fails to show that Defendants lack the expertise to search and retrieve their own data, the court sees no reason to permit a forensic examination at this stage in the litigation.

## Conclusion

For the foregoing reasons, Plaintiff's motion to compel is denied.

## All Citations

Not Reported in Fed. Supp., 2022 WL 2316228

**Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., Not Reported in Fed. Supp. (2022)**

2022 WL 2316228

---

## Footnotes

1    Plaintiff references this standard in its motion as the *Alight* standard. (R. 113, Pl.'s Mot. at 23.) But as *Alight* pulled this standard from *Belcastro*, the court refers to it as the *Belcastro* standard. *See Belcastro,* 2019 WL 7049914, at *2.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.