# EXHIBIT E

# The Rise of Shareholder Activism and Litigation Related to Environmental, Social, and Governance Investing

**Pete S Michaels** and **Alyssa C Scruggs**

Apr 01, 2021    🕐 10 min read

- While climate change has been a focal issue for ESG activists for a number of years, it is no longer the only issue in which activist shareholders are taking an interest.

- In particular, the events and social activism of 2020 generated a stronger societal focus on diversity and inclusion. It is therefore likely that shareholders will be more focused than ever on diversity and board composition.

- To mitigate the risk of facing related litigation, there are a few measures companies can proactively take (in addition to actually improving their ESG-related practices and impacts).



Sutthipong Kongtrakool via Getty Images

Environmental, social, and governance (ESG) investing is capturing the attention (and dollars) of more and more institutional investors each year. Issues related to ESG have, however, also captured the attention of activist shareholders and potential litigants seeking to effect change within companies or affect a company's reputation and business dealings. As the focus on ESG issues continues to intensify, it is likely that the securities world will continue to see an increasing number of these activist shareholder ESG litigations, which, using creative and novel legal theories, are starting to gain traction in the courts.

# Background on ESG Investing

ESG investors evaluate an investment using criteria focused on environmental, social, or governance factors, or some combination thereof. Every investor is different and so too are each investor's priorities for and methods of achieving the investor's ESG goals, but generally such investors are willing to look beyond the purely quantifiable value of a company and assess other factors such as a company's environmental impact, human rights record, or human capital management structures. There are broadly three types of ESG funds: (1) exclusionary funds, which select categories of companies to exclude; (2) single-theme funds, which select companies that fit or support a general theme; and (3) best-in-class funds, which include companies that are the best in their industries on particular ESG criteria.

# Tides Turning Toward ESG

As investors become more interested in ESG, ESG-related shareholder activism is on the rise. Activist shareholders are seeking board seats, launching social media campaigns, engaging the help of proxy advisors, and commencing litigation to bring attention and changes with respect to ESG issues. Many activists believe that ESG-related risks can materially affect a company's performance, as related to climate change in particular. And just as companies are under increasing pressure from their shareholders to perform better on ESG-related criteria, so too are institutional investors under increasing pressure to invest in sustainable and ESG-centric ways.

In a January 2020 annual letter to chief executive officers (CEOs), Larry Fink, CEO of BlackRock, Inc., pledged that BlackRock would dramatically increase its investments in funds focused on sustainability, divest from actively managed portfolio investments in thermal coal producers, and press companies to disclose their climate-related risks. BlackRock also indicated that it would "be increasingly disposed to vote against management and board directors when companies are not making sufficient progress on sustainability-related disclosures and the business practices and plans underlying them." Fink further told CEOs that BlackRock believes that investors, regulators, and the public need to be given clearer information about how companies are managing ESG-related issues, including climate issues, workforce diversity, supply chain sustainability, and customer data protection. State Street Global Advisors President and CEO Cyrus Taraporevala also indicated in January 2020 that State Street believes that addressing ESG issues is an essential business practice for successful long-term financial performance—specifically, "a matter of value, not values."

# An Eye on Greenwashing

Information related to an investment's ESG criteria may be disseminated in a variety of ways, including in a company's annual reports, formal Securities and Exchange Commission (SEC) filings, policies and procedures, webpages, marketing materials, submissions to scoring services, and communications with investors and shareholders. Shareholders are demanding more and more information, but, at present, there is no regulatory regime governing ESG labeling or disclosures, in particular no ESG-related disclosure requirements promulgated by the SEC. As a result, investors have no clear rubric by which to evaluate funds' or companies' ESG performance or level of commitment. While investors may be clear as to what they are looking for in funds, it is not always easy for investors to determine what they are getting.

Without any clear guidance or requirements, there is a risk of companies engaging in a practice known as "greenwashing." "Greenwashing" generally refers to any instance of a company placing more focus on *appearing* "green" than actually *being* "green." In the ESG arena, the term is used to describe the act of making statements or providing descriptions that make an investment seem more committed to or reflective of ESG criteria than it really is.

Because ESG investing is rapidly growing in popularity and because what makes an investment ESG varies widely, companies face a temptation to seem conscious of all or some combination of ESG issues even when their actions do not justify the ESG label. For example, it is not uncommon for a fund, even inadvertently, to be marketed as ESG when, in reality, only a small portion of the investments that make up the fund are actually ESG. This is another form of greenwashing, and it may create the mistaken impression that a fund is "greener" overall than it actually is or, worse still, may induce an investor to choose a fund that contains investments contrary to its investment policies. With a concern for "greenwashing" on the forefront of investors' minds, companies are beginning to face scrutiny from the Federal Trade Commission and other regulators for making potentially misleading ESG statements, as well as from activist shareholders who are drumming up creative new causes of action to target greenwashing and other ESG-related issues.

# Litigation Risks

As shareholders take up the charge with respect to ESG, lawsuits premised on a variety of causes of action are starting to arise all over the country. Among these are suits bringing claims based on a company's false or misleading ESG statements. As a result, over-reporting with respect to ESG carries just as much risk for a company as a failure to

communicate. If a company announces or publishes any measurable goals, it is likely that shareholders will seek to hold the company accountable, keeping track of the company's progress toward that goal.

While ESG activists seek to affect board composition to align with their values, others seek to change company policies and practices directly. Thus, ESG-related shareholder suits are challenging not only the accuracy of ESG disclosures and statements but also actual company activities, particularly with respect to climate change and human rights issues. Activist shareholders have increasingly sought to cause companies to focus on or address specific issues. For example, in 2017, the Commonwealth Bank of Australia was sued by shareholders claiming that its annual report did not adequately inform them of the material risk posed by climate change. Like the Commonwealth Bank case, most noteworthy ESG litigation has focused on climate change and significant environmental events, such as the BP oil spill. These high-profile litigations, regardless of how far they make it, have significant impacts on the companies facing them. They can inflict significant reputational and financial damage.

Even cases that do not progress past the motion to dismiss stage result in a company being subjected to massive legal fees and reputation-harming publicity. And in a social media world, "bad press" spreads quickly. Other risks include stock price hits, effects on relations with customers or suppliers (or both), loss of competitive edge, and discouragement of potential hires.

However, activist shareholders can also have a positive impact. For example, activist shareholders may alert management to issues on which customers, investors, and others in the market may be focused, allowing companies to identify and rectify issues and improve their ESG disclosures and reputation. That being said, any company is undoubtedly better off listening to its activist shareholders than being dragged into court by them.

## How the Courts View ESG Claims

To date, activist shareholders have had limited success in court on ESG-related causes of action, but the tides may be changing. Broadly, activists have attempted to bring claims that ESG information disseminated by a company is untrue, incomplete, or misleading. As such, affirmative statements made by companies are generally more dangerous than omissions, and as the specificity of the statement increases, so too does the risk. Aspirational goals are generally less likely to give rise to a viable cause of action. The risk of litigation is greater when companies set clear and measurable

targets, rather than "squishy" and general goals. In the past, courts have generally found that disclosures related to social policy and management of human capital are merely "puffery" insufficient to form the basis of a claim.

## The Viability of Claims Based on Aspirational, Rather than Concrete, Statements

Courts have generally found that statements regarding ESG criteria that are clearly aspirational cannot be relied on by reasonable investors. For example, in *In re Yum! Brands, Inc. Securities Litigation*, 73 F. Supp. 3d 846 (W.D. Ky. 2014), the Western District of Kentucky held that claims regarding the company's commitment to "strict" quality and "food safety" was "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." In *Yum!*, the claims were brought only after the company's stock price fell following the emergence of reports indicating that the company knew that some of its chicken suppliers had tested positive for antibiotic and drug residues. On the other hand, the Southern District of Texas found statements (sign-in required) made in BP's sustainability reports, annual reports, and analyst calls following the Deepwater Horizon oil spill concerning safety reforms in the wake of the incident to be actionable under section 10(b) because they were "statement[s] of existing fact" and "cover[ed] all aspects of [the company's] operations." The Southern District of West Virginia, in *In re Massey Energy Co. Securities Litigation*, 883 F. Supp. 2d 597 (S.D. W. Va. 2012), similarly found claims that a company was the "industry leader in safety" and that safety was the "first priority every day" actionable under section 10(b). And in *Water & Sanitation Health, Inc. v. Chiquita Brands International, Inc.*, No. C14-10 RAJ (W.D. Wash. May. 22, 2014), the Western District of Washington denied a motion to dismiss because Chiquita had made statements on its website concerning its environmentally sound business practices, including specific statements about how it protected water sources, but the plaintiff alleged that one of Chiquita's suppliers actually had contaminated local drinking water. The court found that the statements were specific enough for the plaintiff to have reasonably relied on them.

## Section 10(b) and Rule 10b-5 Claims Gaining Traction

While shareholders have been attempting for quite some time to bring claims under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 based on ESG disclosures, only recently are such claims beginning to see success in the courts. Brazilian mining company Vale, for example, has been fighting securities litigation for years concerning alleged misrepresentations it made in public filings and sustainability reports about its commitment to compliance with health, safety, and environmental standards. Following 2015 and 2019 Vale dam collapses, New York federal courts (sign-in

required) found that Vale's public statements represented "present or historical facts" related to affirmative steps taken by the company that could be the basis for claims under section 10(b) and Rule 10b-5.

Similarly, in *In re Banco Bradesco S.A. Securities Litigation*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017), the Southern District of New York denied a motion to dismiss claims brought under section 10(b) and Rule 10b-5 based on the aspirational statements made in the company's code of conduct, finding that these statements were material because "they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern." The court found that such statements were more than aspirational or mere puffery when considered in context.

## Expanding Liability

Courts may be paving a way for more of these cases to proceed in the future and against a broader range of defendants. In *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832 (N.D. Tex. 2018), the Northern District of Texas allowed a case to proceed against Exxon and its individual officers and directors arguing that a discrepancy between Exxon's public climate change report and its internal documents related to its carbon-accounting policies resulted in a material overvaluation of Exxon's assets. Worth noting is that the court did not dismiss the individual defendants, indicating that they "must have had knowledge based on their executive positions within Exxon Mobil." The following year, in *Lorenzo v. Securities and Exchange Commission*, 139 S. Ct. 1094 (2019), the Supreme Court held that an individual may be liable under SEC Rule 10b-5(a) and (c) for disseminating false information regardless of whether that person was the one to "make" the statement, provided that he or she have the requisite intent to defraud. (Previously, under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), only the one to "make" the statement faced liability.) Since *Lorenzo*, it is imperative that anyone responsible for disseminating ESG information to investors be very careful, as anyone sharing such information—even if not responsible for having prepared it—could be subject to a section 10(b) and Rule 10b-5 challenge, although liability will only attach if the intent to defraud can be shown.

# Looking Forward

By all accounts, ESG-related shareholder activism is here to stay and will likely only continue to grow in popularity. Cas Sydorowitz, global head of activism at Georgeson, LLC, a shareholder engagement and governance consulting firm,

predicts that shareholder activism related to ESG issues will remain on the rise, but, going forward, in addition to activist shareholders, there will also be third parties organizing investors to take action.

While climate change has been a focal issue for ESG activists for a number of years, it is no longer the only issue in which activist shareholders are taking an interest. In particular, the events and social activism of 2020 generated a stronger societal focus on diversity and inclusion. It is therefore likely that shareholders will be more focused than ever on diversity and board composition. In fact, in 2020, shareholders filed several lawsuits in California federal court against a handful of companies' current and former officers and directors, including officers and directors of Facebook, Inc., Qualcomm, Inc., and Oracle, Inc. In each complaint, the plaintiffs bring claims for breach of fiduciary duty, aiding and abetting thereof, unjust enrichment, abuse of control, and violations of Exchange Act section 14(a) and Rule 14a-9 based on allegations that, among other things, the companies' leadership and boards are not sufficiently diverse in the face of public statements by the companies regarding their commitments to diversity.

To mitigate the risk of facing such litigation, there are a few measures companies can proactively take (in addition to actually improving their ESG-related practices and impacts). Most importantly, a company can likely lower its risk by including caveats and cautionary language to indicate the factors that could influence whether a forward-looking ESG-related statement will come to fruition. While shareholders and potential investors will likely continue to demand the disclosure of ESG information, companies should be extremely careful about what information is disclosed and how. In particular, companies should be careful when drafting ESG disclaimers and be clear that ESG data are not governed by generally acceptable accounting principles. Any ESG-related disclosures should be carefully fact-checked and vetted. It will be a delicate balance between disclosing the appropriate amount of information to investors and safeguarding the company from litigation and regulatory risks, but an important one to strike.

**Authors**



**Pete S Michaels**

Mintz Levin Et Al

…



**Alyssa C Scruggs**

…

Published by the American Bar Association ©2025. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

ABA American Bar Association | https://www.americanbar.org/groups/litigation/resources/newsletters/securities/rise-of-shareholder-activism-environmental-social-investing/